**Exhibit C**





FOR CUSTOMERS    FOR INVESTORS    COMMUNITY RELATIONS    NOR?

About NorthWestern

CONTACT US                          Search

| Who We Are |
| News Center |

News Room
Media Contacts
Media Resources
Image Gallery
NorthWestern Energy's RSS Feed

| CareerLink |

# NorthWestern Corporation Reports 2002 Financial Results

### *Company Reports Loss of $892.9 Million for Full-Year 2002*

### *Update Provided on Turnaround Plan*

SIOUX FALLS, S.D. – April 16, 2003 – NorthWestern Corporation (NYSE:NOR), one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, today reported its financial results for the year ended Dec. 31, 2002, following the filing with the Securities and Exchange Commission of its Annual Report on Form 10-K and amended Quarterly Reports on Form 10-Q/A which restated prior unaudited results for the first three quarters of 2002. In addition, the Company updated the progress of its turnaround plan.

The Company reported a loss on common stock for the year ended Dec. 31, 2002, of $892.9 million, or $30.04 per diluted share, compared with earnings on common stock of $37.5 million or $1.53 per diluted share in 2001. Full-year 2002 results were negatively impacted by $878.5 million in charges.

Consolidated revenues for 2002 were $2.0 billion, a 15.5 percent increase from $1.7 billion in 2001. Revenue increased in 2002 due to the addition of the newly acquired Montana electric and natural gas utility operations as well as increased revenue at Blue Dot, the Company's heating, ventilation and air conditioning business, primarily as the result of several acquisitions. However, consolidated revenues were adversely impacted by a substantial decrease in revenue from Expanets, the Company's communications services business, due primarily to deteriorating telecommunications markets and problems caused by complications with its EXPERT billing and collection system.

**2002 Charges**
As previously announced, NorthWestern reported significant charges in 2002 totaling $878.5 million. The breakdown of the charges are as follows:

- Impairment of Blue Dot goodwill and other long-lived assets          $301.7 million
- Impairment of Expanets goodwill and other long-lived assets          $288.7 million
- Discontinued operations of CornerStone Propane, net of tax benefits          $101.7 million
- Valuation allowance for deferred tax asset                              $71.5 million
- Expanets billing adjustments and accounts receivable write-offs and reserves

$65.8 million
- Impairment of Montana First Megawatts
  project                                    $35.7 million
- Retirement of acquisition term loan, net of tax
  benefits                                   $13.4 million

**Restatement of Quarterly Results**
Immediately prior to filing NorthWestern's 2002 Annual Report on Form
10-K, NorthWestern filed amended Quarterly Reports on Form 10-Q/A
for the periods ended March 31, 2002, June 30, 2002, and Sept. 30,
2002. The quarterly reports were restated and include additional
disclosures in the appropriate periods related to:
- billing adjustments reducing revenues and increases in accounts
  receivable reserves and write-offs resulting from significant
  deficiencies in Expanets' EXPERT billing and collection system;
- the inadequacy of data to support recording certain revenues on a
  percentage of completion basis, thereby requiring utilization of
  completed contract revenue recognition methodology for such
  revenues and cost recognition;
- the impact resulting from the finalization of the purchase
  accounting for the acquisition of the Montana utility operations;
- the reversal of losses previously allocated to minority shareholders
  of Blue Dot as a result of the finalization of the purchase
  accounting for acquisitions made in 2002;
- the timing, amount and disclosure of adjustment to certain
  accruals;
- the quarterly impact of certain other adjustments.

**Results From Core Utility Operations For 2002**
NorthWestern's core electric and natural gas utility, NorthWestern
Energy, reported operating income of $145.0 million, compared with
operating income of $45.9 million in 2001.  Revenues for 2002
increased to $775.4 million, up substantially from revenues of $251.2
million in 2001.  Results for 2002 include 11 months of Montana
energy operations, which were acquired in February 2002.  In 2002,
Montana utility operations contributed $113.1 million in operating
income, with revenues of $562.6 million, excluding results from
January 2002.  South Dakota and Nebraska operations contributed
$31.9 million in operating income in 2002, with revenues of $212.7
million.

Total sales of electricity increased to approximately 9.4 million
megawatt hours in 2002, compared with 1.6 million megawatt hours in
2001.  Total sales of natural gas grew to approximately 36.7 million
MMBTU, compared with 18.3 million MMBTU in 2001.  Energy sales in
2002 reflect 11 months of results from Montana operations.

**Results From Nonutility Operations For 2002**
For 2002, Expanets reported an operating loss of $391.9 million,
compared with an operating loss of $102.6 million in 2001.  Full-year
2002 results were adversely impacted by goodwill and other long-lived
asset impairments in the fourth quarter of 2002 of $288.7 million and a
$65.8 million increase in reserves and write-offs for billing adjustments
and accounts receivable and ongoing complications with Expanets'
EXPERT enterprise billing and collection system.  Revenues

decreased in 2002 to $710.5 million, compared with $1.0 billion in 2001, due to deteriorating telecommunications markets and ongoing complications with the EXPERT system.

Blue Dot reported an operating loss in 2002 of $311.3 million, compared with an operating loss of $13.8 million in 2001. Blue Dot's results were adversely impacted by goodwill and other long-lived asset impairments of $301.7 million and challenging economic conditions. Revenues were $471.8 million in 2002, compared with revenues in 2001 of $423.8 million. The increase in revenues was primarily due to acquisitions made during 2001 and 2002.

**Turnaround Plan Update**
As previously announced, NorthWestern is implementing a turnaround plan involving the following actions:
- Focusing on the Company's core electric and natural gas utility business.
- Reducing debt by applying net proceeds from the sale of noncore assets and businesses, including Blue Dot, Expanets, the Montana First Megawatts generation project and the Colstrip (Montana) transmission line.
- Reducing costs and improving cash flow.
- Strengthening internal financial controls and procedures.

NorthWestern reported that progress has been made on several fronts regarding its turnaround plan, including:
- As part of a new agreement, Avaya, Inc. relinquished its equity interest in Expanets and canceled a noninterest bearing subordinated note with Expanets in the face amount of $35 million due in 2005, which had a carrying value of approximately $27 million. In addition, Expanets extended the payment schedule for approximately $27 million of debt owed to Avaya, originally due Dec. 31, 2002, and now due in three equal payments on Jan. 1, April 1 and July 1, 2004. NorthWestern has an obligation to purchase inventory and receivables in an amount equal to the outstanding balance in the event it is not repaid by Expanets.
- NorthWestern has engaged an investment advisor to pursue a possible sale or disposition of Blue Dot and Expanets. In addition, the Company does not intend to make additional significant investments in Blue Dot and Expanets and is working to improve their financial independence.
- Blue Dot has sold 15 of 16 noncore business locations that it had previously targeted for sale. Selling these underperforming locations, along with reductions in corporate overhead, will help Blue Dot to become more self sufficient.
- The Company has hired a chief restructuring officer, reporting directly to the Chief Executive Officer, and retained advisors to assist in developing strategic alternatives to reduce costs, improve cash flow and reduce debt.
- The Company has hired a vice president of audit and controls, reporting directly to the Chief Executive Officer, to assess, implement and monitor internal controls.

NorthWestern said that based on current plans and business conditions, the Company expects that its cash flows from

operations, cash and cash equivalents will be sufficient to meet its cash requirements for the next 12 months.  The Company believes that it may need additional funding sources or proceeds from the sale of noncore assets by the end of 2004 or early 2005.  In 2005, the Company faces substantial debt maturities.

Given the Company's significant debt, the board of directors intends to review the appropriateness of each periodic interest payment of its trust preferred securities in light of, among other things, the progress of its turnaround plan and the Company's liquidity needs.  The Company has the right to defer interest payments for up to 20 consecutive quarters.  If interest payments are deferred, cash distributions on the trust preferred securities will also be deferred.  In each case, interest would accrue on deferred payments.

Absent the receipt of significant proceeds from the sale of noncore assets, the raising of additional capital or a restructuring of existing debt, the Company will not be able to meet its substantial debt maturities.  The Company is currently working with outside advisors to identify alternatives to restructure its long-term debt.

"Recognizing our significant challenges, we are taking steps to try and stabilize NorthWestern's current financial position and ensure that we maintain sufficient funds to support our core utility business and meet our obligations," said Gary G. Drook, NorthWestern's Chief Executive Officer.  "In the near term, we are taking actions intended to assist us in reducing debt and returning our focus to our core utility business.  In the longer term, we are evaluating our options for restructuring our indebtedness."

**About NorthWestern**

NorthWestern Corporation is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 598,000 customers in Montana, South Dakota and Nebraska.  NorthWestern also has investments in Expanets, Inc., a leading nationwide provider of networked communications and data services to small and mid-sized businesses, and Blue Dot Services Inc., a provider of heating, ventilation and air conditioning services to residential and commercial customers.

**Forward-Looking Statements**

*STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: All statements contained herein, as well as statements made in press releases and oral statements that may be made by us or by officers, directors or employees acting on our behalf, that are not statements of historical fact constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such forward-looking statements involve known and unknown risks, uncertainties and other factors that could cause our actual results to be materially different from historical results or*

from any future results expressed or implied by such forward-looking statements. Among the factors that could cause our actual results or outcomes to differ materially are: the adverse impact of weather conditions and seasonal fluctuations; unscheduled generation outages, maintenance or repairs; unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments; developments in the federal and state regulatory environment and the terms associated with obtaining regulatory approvals and rate orders; costs associated with environmental liabilities and compliance with environmental laws; the rate of growth and economic conditions in our service territories and those of our subsidiaries; the speed and degree to which competition enters the industries and markets in which our businesses operate; the timing and extent of changes in interest rates and fluctuations in energy-related commodity prices; risks associated with acquisitions, transition and integration of acquired companies, including the transmission and distribution business of the former Montana Power Company and the Growing and Emerging Markets Division of Lucent Technologies, Inc., and the implementation of information systems and realization of efficiencies in excess of any related restructuring charges, pending litigation relating to our acquisition of the former Montana Power Company; a lack of minority interest basis, which requires us to recognize an increased share of operating losses at certain of our subsidiaries; our ability to recover transition costs; disallowance by the Montana Public Service Commission of the recovery of the costs incurred in entering into our default supply portfolio contracts while we are required to act as the "default supplier;" disruptions and adverse effects in the capital markets due to the changing economic environment; our ability to maintain effective systems of internal controls, including significant implementation difficulties with the Expert system at Expanets; the impact of war, hostilities or terrorist actions; our credit ratings with Moody's, Standard & Poor's and Fitch; potential delays in financings or Securities and Exchange Commission filings because we changed auditors; our substantial indebtedness, which could limit our operating flexibility and ability to borrow additional funds; our ability to obtain additional capital to refinance our indebtedness that is scheduled to mature and for working capital purposes; our ability to identify and successfully complete proposed asset divestitures and additional impairment charges that may result from sales below book value; the ability of our unregulated businesses to obtain independent financing without reliance on us; changes in customer usage patterns and preferences; possible future actions and developments of CornerStone Propane Partners L.P., Expanets, Inc. and Blue Dot Services Inc.; and other factors identified from time to time in our filings with the SEC. This news release should be read in conjunction with our Annual Report on Form 10-K for 2001, as amended, and any subsequent quarterly reports on Form 10-Q and current reports on Form 8-K, which can be located at www.sec.gov or requested from the Company.

Any forward-looking statement speaks only as of the date on which such statement is made, and, except as required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for management to predict all

Case 1:04-cv-01494-JJF     Document 67-3     Filed 02/13/2006     Page 7 of 25

*such factors.*

### 

**Investors/Media:**
Roger Schrum
605-978-2848
roger.schrum@northwestern.com

**Additional Information**
Download or view attachment

For Customers | For Investors | Community Relations | About NorthWestern
Privacy Policy | Legal Terms & Conditions | Site Map | Webmaster | RSS
Copyright © 2006 NorthWestern Energy Corporation. All rights reserved.

# Exhibit D

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

MAGTEN ASSET MANAGEMENT CORPORATION,

Plaintiff,

vs.

BANK OF NEW YORK, BANK OF NEW YORK
(DELAWARE) and JERROLD P. PEDERSON,

Defendants.

C.A. No. 1219-N

Vice Chancellor Strine

**OPENING BRIEF OF DEFENDANTS
THE BANK OF NEW YORK AND
THE BANK OF NEW YORK (DELAWARE)
IN SUPPORT OF THEIR MOTION TO DISMISS**

STEWART & ASSOCIATES
    Peter C. Campbell (I.D. No. 2570)
    Gordon W. Stewart (I.D. No. 2204)
Nemours Building
1007 Orange Street
Wilmington, Delaware 19801
(302) 652-5200

-and-

EMMET, MARVIN & MARTIN, LLP
    Kenneth M. Bialo (Pro Hac)
    Matthew K. McCoy (Pro Hac)
120 Broadway
New York, New York 10271
(212) 238-3000

Attorneys for Defendants
The Bank of New York and
The Bank of New York (Delaware)

May 27, 2005

App 1, ¶ 10), and under what terms that purchase was made, it has no standing to assert a Trust Indenture Act claim here. Moreover, the Bankruptcy Court found that Magten had purchased its interest just about the time Northwestern declared bankruptcy (313 B.R. at 599, Addendum A at 4), which, according to the complaint, was some seven months after BNY executed the last set of transaction documents alleged by Magten to have been improper (Complt, App 1, ¶¶ 26, 30). Since Magten has not alleged that it obtained the necessary assignment from the prior owners of its QUIPS, Magten lacks standing under *Bluebird* (85 F.3d at 974) to assert a claim under the Trust Indenture Act. For that reason alone the First Claim should be dismissed.

### B.  Plaintiff's First Claim Should Also Be Dismissed Because It Is Legally Insufficient.

Not only does Magten lack standing, but its Trust Indenture Act claim must fail on the documents. Plaintiff claims (Complt, App 1, ¶¶ 35-36) that BNY violated that provision in the Trust Indenture Act, 15 U.S.C. § 77ooo(a)(1), which states that prior to default, "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture . . . ."

In executing the First and Third Supplemental Indentures to the QUIPS-related Indenture BNY was indisputably performing its duties under the Agreements. As discussed above, the Indenture expressly provides for BNY to enter into supplemental indentures that reflect a merger or consolidation of MPC so long as there is an "assumption by any other successor of the covenants . . . all as provided in Article Eleven" (Indenture, App 2 § 1201(a); *see* §§ 1101-02).

While Magten alleges in conclusory fashion that those Supplemental Indentures were approved in "bad faith" (Complt, App 1, ¶ 36), the reality is that the documents

16

submitted to BNY satisfied the express purpose and requirements of the QUIPS-related Indenture. As is evident from an examination of App 7, BNY received a request from MPC to execute the First Supplemental Indenture providing for a successor to assume MPC's duties under the Indenture, dated February 13, 2002, and a certificate from MPC's Vice President, Chief Financial Officer and Treasurer, as well as an opinion of Milbank, Tweed, Hadley & McCloy LLP, both dated February 13, 2002, stating that both the transaction proposed and the Supplemental Indenture were authorized by the Indenture. The same is true for the Third Supplemental Indenture (App 8) -- the request and assumption of duties from MPC's successor was dated November 15, 2002, and it was accompanied by a certificate from the company's President and Chief Executive Officer, and an opinion of Paul Hastings, both dated November 15, 2002, stating that the transaction and Supplemental Indenture were authorized by the Indenture.

These documents on their face comply with 15 U.S.C. § 77nnn of the Act, as required by § 77ooo(a) and by § 102 of the Indenture. Indeed, the recitals of the opinions of counsel here, are quite similar to those approved in an earlier case involving BNY as Trustee. *Compare Cruden v. Bank of New York,* 957 F.2d 961, 970-71 (2d Cir. 1992) (the relevant covenants or conditions are identified, a brief statement of the nature and scope of the examination is provided, an opinion is given that such examination is sufficient to express an informed opinion, and an overall opinion as to compliance of the transaction is expressed).

As discussed above, BNY was entitled to rely conclusively on the truth of the statements in the officers' certificates and the correctness of counsel's opinion in each instance, and was obligated under the Indenture to execute the respective Supplemental

Indentures. An indenture trustee's role "as specified in the indenture, [is] limited and did not include going beyond the representations and warranties supplied." *Wells Fargo Minn., N.A. v. Nassau Broadcasting Partners, L.P.,* 2003 WL 22339299, *9 (S.D.N.Y.) (Addendum C hereto).

This point would end here, save that plaintiff includes in its First Claim a litany of references to the Twenty-First and Twenty-Third Supplemental Indentures to the First Mortgage executed by BNY in its capacity as Mortgage Trustee under the First Mortgage (Complt, App 1, ¶ 36). As described in Notes 6 and 7 above, these relate, respectively, to assumption of First Mortgage obligations by MPC's successor and to the Credit Suisse First Boston financing. For the convenience of the Court the documents related to these transactions are found at App 6 and App 9.

For starters, since Magten does not assert ownership of any First Mortgage bonds, it has no standing to complain about the propriety of these two transactions. To the extent, however, that Magten may be asserting that those Twenty-First and Twenty-Third Supplemental Indentures were contrary to the rights of QUIPS holders (*see* Complt, App 1, ¶¶ 36, 39-40, 45-46), that claim is directly refuted by the provisions of the QUIPS-related Indenture (App 2),where § 1509 says that "the holders of senior indebtedness" have the "absolute discretion" to "amend or supplement" the senior debt instrument "all without notice to or assent from the [QUIPS] holders or the [junior debt] Trustee." Thus Magten as a QUIPS holder had no rights and no claims at all in relation to the issuance of additional senior debt under the First Mortgage.

Moreover, it is manifestly neither a violation of the Trust Indenture Act, nor "bad faith" (whatever that is intended to mean), for BNY to act as Trustee for different classes

of securities of the same issuer.  For example, § 8.05 of the Trust Agreement (App 3) specifically allows any Trustee to own QUIPS in its own right, and to deal with the Trust as if it were not Trustee.  And § 1507 of the QUIPS-related Indenture (App 2) says that the Trustee is entitled to the same rights on any senior debt it may own as any other senior debt holder.

The Trust Indenture Act itself recognizes this real-world fact that financial institutions act as trustees for different classes of debt, and may hold for their own account as well.  15 U.S.C. § 77jjj(b) specifies that a conflict of interest is not deemed to exist unless there is a default, as defined in the indenture (except under certain conditions described in five pages of the Act but not relevant here).  If an Event of Default occurs the indenture trustee has 90 days to either eliminate the conflict or resign.  Section 908 of the QUIPS-related Indenture (App 2) and § 8.08 of the Trust Agreement (App 3) here echo the same requirement -- that is, if the Trustee "shall have *or* acquire any conflicting interest within the meaning of the Trust Indenture Act, it shall either eliminate the conflicting interest or resign . . . ."  That is exactly what BNY did by resigning on September 23, 2003 as Trustee under the Trust Agreement and the QUIPS-related Indenture just 10 days after Northwestern, MPC's ultimate successor, declared bankruptcy.  (*See* App 10.)

Magten is similarly in error to the extent that its claim of bad faith is somehow predicated on a conclusory allegation that BNY failed "to take steps to safeguard the Trust or the Trust beneficiaries interests in light of the obligor's anticipated and actual default."  (Complt, App 1, ¶ 36.)

## CONCLUSION

For the foregoing reasons, the complaint against the defendants The Bank of New York and The Bank of New York (Delaware) should be dismissed.

Dated: May 27, 2005

Respectfully submitted,

STEWART & ASSOCIATES


By: /s/ Peter C. Campbell
    Peter C. Campbell (I.D. No. 2570)
    Gordon W. Stewart (I.D. No. 2204)

Nemours Building
1007 Orange Street
Wilmington, Delaware  19801
(302) 652-5200

      -and-

EMMET, MARVIN & MARTIN, LLP
    Kenneth M. Bialo (Pro Hac)
    Matthew K. McCoy (Pro Hac)
120 Broadway
New York, New York 10271
(212) 238-3000

Attorneys for Defendants
The Bank of New York and
The Bank of New York (Delaware)

# Exhibit E

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action |
| | : | No. 1219-N |
| BAKN OF NEW YORK, BANK OF NEW YORK (DELAWARE) and JERROLD P. PEDERSON, | : | |
| | : | |
| | : | |
| Defendants. | : | |

- - -

Chancery Courtroom No. 12A
New Castle County Courthouse
Wilmington, Delaware
Tuesday, September 6, 2005
2:45 p.m.


- - -


BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor


- - -

MOTION TO DISMISS


- - -


CHANCERY COURT REPORTERS
500 North King Street, Suite 11400
Wilmington, Delaware  19801
(302) 255-0526

1  gripe?

2          THE COURT:  Were there equity holders?

3          MR. BIALO:  Of?

4          THE COURT:  Of the operating company.

5          MR. BIALO:  Yes.

6          THE COURT:  So the QUIP holders came in

7  front of them, right?

8          MR. BIALO:  Yes.

9          THE COURT:  You don't make dividend

10  payments unless the QUIP holders -- payments to the

11  QUIP holders had been made.

12          MR. BIALO:  I believe that is provided

13  for, but it is certainly my understanding that that's

14  true.  They are in front of the equity owners.

15          THE COURT:  Tell me your understanding of

16  the term of "event of default" and the

17  circumstances -- assume that the plaintiff -- had the

18  plaintiffs pled -- if the plaintiffs were able to

19  plead that there was an accounting analysis done by

20  Bank of New York in the actual possession of Bank of

21  New York that showed indisputably that one of these

22  transfers would result immediately in an inability of

23  the operating company to service its debt, if the

24  plaintiffs were able to plead that and say on June

14

1    whatever John Jones, the head whatever, wrote to the

2    head of Bank of New York and said "This company is on

3    the brink of disaster, this transfer will clearly

4    unbalance it and immediately the company will be in

5    default," if Bank of New York was in actual

6    possession of that and then received conforming

7    documents two hours later, would you agree that that

8    would be a difficult circumstance for me to get rid

9    of on a motion to dismiss when there's a good faith

10   standard?

11           MR. BIALO:  I think the answer to that

12   is -- I don't want to quibble here, but I think the

13   answer to that is I wouldn't agree because I think

14   event of default is the sine qua non for action by

15   the trustee, and it's very carefully defined.

16           THE COURT:  I thought that one of the

17   definitions of an event of default under one of the

18   things was that if the transaction -- if a merger

19   transaction was being proposed that would immediately

20   result in insolvency, that that would be an event of

21   default.

22           MR. BIALO:  Yes.  Well, I'm not sure that

23   that's an event of default.  It would mean that you

24   could not do the merger under Section 1101 of the

15

1   indenture.  I believe it's sub-division B or C.

2           THE COURT:  Right.

3           I guess what I mean by that is then you

4   could not -- what I'm trying to get at is if you had

5   evidence -- if there was a pleading that there was

6   actual evidence of possession of Bank of New York

7   that one of the necessary conditions for the

8   transaction -- that's what I meant, which is one of

9   the things that the indentured trustee was satisfied

10  itself that those conditions, that the documentation

11  addressed the necessary conditions for those kinds of

12  transactions, and one of them was that the merger not

13  immediately result essentially in insolvency.

14          So a couple hours before you get the

15  documentation, you've got a memo from your person

16  saying this transaction will, in fact, result in

17  insolvency, you then get conforming documentation

18  that says no, it will not.

19          Bank of New York says, well, it's all

20  right, we can rely just on the actual documents and

21  on their accuracy, we're going to go ahead and sign

22  off.  Could they do that?

23          MR. BIALO:  I think I have a complicated

24  answer.  I think the answer is, first of all, under

16

1   1101 and 1102, as it follows, of the indenture, that

2   that would not be an effective merger or sale of

3   assets because condition B of 1101 would not be met;

4   that is, that there shall be no immediately

5   thereafter event of default.

6          THE COURT:  What I'm talking about is the

7   hard case which is the extent that we can rely on

8   written words in this society.  One of my colleagues,

9   I won't name him, started talking about the

10  "wimpification" of American commercial law, but it's

11  the idea that you now decide things that are clear on

12  their face and they just say, oh, you know, I'm only

13  a head sponge, I can't understand words, and then

14  come into courts.

15          Here you have a -- somebody signs a

16  contract.  These QUIP holders signed the contract

17  basically saying if your guys get the documents in

18  the right forms and the forms touch on all the

19  things, if there's a debate about opinion, they don't

20  have to debate about it as long as it's in the form

21  they can do it, and that's their only duty, and this

22  releases the check that the form was in the form

23  presented and that someone else is making this

24  representation which can actually have some benefit

17

1    to the QUIP holders because, frankly, it can be

2    fraught on the trustee which I assume can be a claim

3    that the QUIP holders could make through the

4    indentured trustee if there's some sort of

5    representation like this that it's false.

6            But I guess the hard case is the bank is

7    put in that position which is its own internal

8    analysis suggests that the thing is not complying.

9    It then, from a reputable source, gets documentation

10   that says that the terms of 1101 are met.  It goes

11   ahead and says, well, you know, we don't have to

12   confirm the accuracy of this, we had our doubts, and

13   it approves it.

14           MR. BIALO:  Let me pick up on the last

15   bit.  It doesn't approve it.

16           THE COURT:  Well, essentially in its

17   capacity as the indentured trustee, it does the thing

18   it has to do.

19           MR. BIALO:  It's just a tad trickier than

20   that.

21           THE COURT:  I want all the tads because

22   this is a new answer.  I really look forward to

23   writing this.

24           MR. BIALO:  I think you have presented,

102

1    the people and where is the whole list of creditors

2    who had bonds from Montana Power since 1945 in

3    November of '01.

4            That is not -- it is not under the

5    agreement.  I submit, Your Honor, respectfully, it is

6    not under the agreement an event of default, and if

7    Your Honor considers what I'm saying, I think at

8    least what I'm thinking about this is it is

9    inconceivable that it's an event of default.

10   Otherwise the house would have come down.

11           There would have been no working out.

12   There would have been no re-structuring.  The company

13   would have stopped dead in its tracks.  Someone would

14   have ran to the court and said those guys are clearly

15   bankrupt.  They've admitted in writing they can't pay

16   their debts.  There's no prospect of it.  It's over.

17           So that just doesn't have an air of

18   reality to me, Your Honor.

19           THE COURT:  Thank you very much.  Thank

20   you everyone.

21           It's an interesting case.  I think from

22   the plaintiff's perspective, I would say this.  If

23   you're asking me to go forward on this, then make

24   your choice now.  If you want to dismiss without

1  prejudice and file again, I have resistance to that,

2  but don't come whining later on.  We have a rule now,

3  and make your choice.

4          I'm sufficiently concerned that the

5  Supreme Court might say I was wrong that if I didn't

6  give you that choice if I were to dismiss it given

7  what happened in Disney, an 88-page amended complaint

8  was dismissed and the plaintiffs were given another

9  shot.

10          I find this complaint exceedingly

11  unhelpful in many ways.  But I am just a practical

12  guy.  Frankly, I'm not doing the Bank of New York or

13  Mr. Pederson any favors by proceeding to dismiss the

14  complaint with prejudice if the plaintiffs want the

15  opportunity to amend.

16          I think the idea is, frankly, it's gone,

17  it's dismissed, it's out of here, never going to look

18  at it again.  You can file a new lawsuit if you wish

19  to do that.

20          And you will plead -- and it will be on

21  the condition that you plead the facts relating to

22  standing and that you plead this in a real way, and

23  frankly, Mr. Amini, you are a very articulate man,

24  but I would suggest you get Mr. Jenkins involved if

1    you really want and actually look at the way we plead

2    things down here and that it actually address the

3    agreements in some way, shape or form this time

4    around.

5            If you don't want that option, I'll go

6    ahead and rule and I'll write a decision, but if I

7    decide to dismiss any or all aspects of it, it will

8    be with prejudice.

9            MR. AMINI:  Your Honor, could we have

10   until Monday to give you our decision on that just so

11   I can consult with Mr. Jenkins?

12           THE COURT:  You can have until Friday,

13   but I take it -- understand what I said, which is

14   don't come back with a new complaint when you file

15   your new lawsuit, which it will be a new lawsuit.

16           I don't want this hanging around and have

17   five amended complaints.  Get it off the docket.  I

18   don't expect we'll have any statute of limitations

19   arguments if you bring it in in a reasonable period

20   of time, but don't come back not telling me when your

21   clients bought and not pleading real facts in a real

22   chronologically understandable way about what you

23   allege Bank of New York should have known or did

24   know, and don't play cutesy by failing to mention

105

1    obvious transactional documents, because I don't want
2    to play those games.
3                MR. AMINI:  We'll advise the Court by
4    Friday.
5                THE COURT:  Okay.  Thank you all.  Have a
6    good evening.
7
8                (The Court adjourned at 5:05 p.m.)
9
10
11
12                        -----
13
14
15
16
17
18
19
20
21
22
23
24