**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .      Chapter  11
                                    .
NorthWestern Corporation,           .      Bankruptcy #03-12872 (JLP)
                                    .
          Debtor(s).                .      Bankruptcy #04-11321 (JLP)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
January 11, 2006
10:30 a.m.


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor(s):          Jesse H. Austin, Esq.
                            Paul Hastings Janofsky
                            & Walker, LLP
                            600 Peachtree St.-24th Fl.
                            Atlanta, GA  30308

                            Karol K. Denniston, Esq.
                            Paul Hastings Janofsky
                            & Walker, LLP
                            600 Peachtree St.-24th Fl.
                            Atlanta, GA  30308

                            Victoria Counihan, Esq.
                            Greenberg, Traurig, LLP
                            The Brandywine Bldg.
                            1000 West St.-Ste. 1540
                            Wilmington, DE 19801

For Magten Asset Management: Gary Kaplan, Esq.
                            Fried Frank Harris Shriver
                            & Jacobson, LLP
                            One New York Plaza
                            New York, NY 10004

2

```
For Franklin Mutual:          Charlene Davis, Esq.
Advisers, LLC                 The Bayard Firm
                              222 Delaware Ave.-Ste. 900
                              Wilmington, DE 19899

For Law Debenture Trust:      John V. Snellings, Esq.
Company of New York           Nixon Peabody, LLP
                              100 Summer Street
                              Boston, MA 02110

                              Kathleen Miller, Esq.
                              Smith Katzenstein & Furlow, LLP
                              The Corporate Plaza
                              800 Delaware Ave
                              Wilmington, DE 19899

For Merle D. Lewis:           Neal J. Levitsky, Esq.
                              Fox Rothschild, LLP
                              Citizens Bank Center-Ste. 1300
                              919 N. Market Street
                              Wilmington, DE 19899


(Via telephone)

For Unofficial Committee:     Ephraim Diamond, Esq.
of Senior Noteholders         Paul Weiss Rifkind Wharton
                              & Garrison, LLP
                              1285 Avenue of the Americas
                              New York, NY 10019

                              Margaret Phillips, Esq.
                              Paul Weiss Rifkind Wharton
                              & Garrison, LLP
                              1285 Avenue of the Americas
                              New York, NY 10019

                              James Wheaton, Esq.
                              Paul Weiss Rifkind Wharton
                              & Garrison, LLP
                              1285 Avenue of the Americas
                              New York, NY 10019

For Ad Hoc Committee of:      Matthew J. Williams, Esq.
Class 7 Creditors             Kramer Levin Naftalis
                              & Frankel, LLP
                              919 Third Ave.
                              New York, NY 10022
```

3

```
For Richard Hylland:           Karl E. Robinson, Esq.
                               Winthrop & Weinstine, PA
                               225 South Sixth St.-ste. 3500
                               Minneapolis, MN 55402

                               Michael A. Rosow, Esq.
                               Winthrop & Weinstine, PA
                               225 South Sixth St.-ste. 3500
                               Minneapolis, MN 55402

For Matson Claimants:          Thomas R. Meites, Esq.
                               Meites Mulder Burger & Mollica
                               208 S. LaSalle Street-Ste. 1410
                               Chicago, IL 60604

Audio Operator:                Brandon J. McCarthy

Transcribing Firm:             Writer's Cramp, Inc.
                               6 Norton Rd.
                               Monmouth Jct., NJ 08852
                               732-329-0191
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

4

Index

Further
Direct Cross Redirect Recross Redirect


Witnesses For The:
 Debtor:

Mr. Harper                9



Witnesses For
 Mr. Blue:



MOTIONS:



| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| D-1 | Notice of Bankruptcy Filing | 10 | 16 |
| D-2 | Opinion and Order 5/12/03 | 11 | 16 |
| D-3 | Opinion and Order 7/22/03 | 12 | 16 |
| D-4 | Notice of Entry of Judgment | 13 | 16 |
| D-5 | Opinion and Order 9/19/05 | 14 | 16 |


SUMMATION BY:



THE COURT: Finding

5

(Proceeding in progress)

THE COURT:  -- NorthWestern Corporation, 03-12872.
Parties, give their appearances for the record, please.

MR. AUSTIN:  For the record, Your Honor, I'm Jesse
Austin of the firm of Paul Hastings Janofsky & Walker as for
NorthWestern Corporation.  Also with me this morning is Ms.
Karol Denniston.

THE COURT:  Thank you.

MR. KAPLAN:  Good morning, Your Honor, Gary Kaplan
from Fried Frank Harris Shriver & Jacobson on behalf of Magten
Asset Management.

THE COURT:  Thank you.

MS. PHILLIPS:  Good morning, Your Honor, Margaret
Phillips of Paul Weiss Rifkind Wharton & Garrison on behalf of
the Plan Committee, and joining me in the Courtroom today is my
colleague James Wheaton.

THE COURT:  Good morning.

MR. WHEATON:  Good morning.

THE COURT:  We have some individuals, I understand,
that are on the Court conference -- Court Call.  We have Mr.
Diamond from the Unofficial Committee of Service, listen only.

MR. DIAMOND:  Yes, Your Honor.

THE COURT:  Matthew Williams here.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  All right, thank you.  Karl Robinson?

MR. ROBINSON:  Yes.

THE COURT:  Roscow?  Rosow?  Thomas Meites?

MR. MEITES:  Present, Your Honor.

THE COURT:  Thank you.  Tom Knapp?

ALL:  (No verbal response).

MR. AUSTIN:  Mr. Knapp I do not believe will be joining us.

THE COURT:  All right.  John Singer?

MR. SINGER:  Yes, Your Honor.

THE COURT:  Any other counsel in Delaware who wants to make an appearance?

MS. COUNIHAN:  Yes, Your Honor, Victoria Counihan from Greenberg, Traurig on behalf of NorthWestern.

THE COURT:  Thank you.

MS. DAVIS:  Good morning, Your Honor, Charlene Davis of the Bayard Firm on behalf of Franklin Mutual Advisors, LLC.

MR. SNELLINGS:  Good morning, Your Honor, John Snellings from Nixon Peabody representing Law Debenture Trust Company, the Indentured Trustee to the Quipps.

THE COURT:  Anyone else?

ALL:  (No verbal response).

THE COURT:  All right, Mr. Austin, you may proceed with the calendar.

MR. AUSTIN:  Thank you, Your Honor.  As the Court noted, we're here today on NorthWestern's Chapter 11 case.  I'd

like to note to the Court that this may well be one of the last
regularly scheduled Omnibus Hearings that we may need in these
proceedings.  Ms. Denniston, as is usually the case, prepared
to go over the agenda, but I think once we go over the agenda
we believe there maybe only three matters to address, and only
one of those may be relatively some level of substance and none
of which should take too long.  I would request that at
conclusion of today's hearing that we take some time to go over
to advise the Court of the remaining unresolved matters in the
bankruptcy case.  To the process and the prescient context.  At
this time, NetExit's Chapter 11 case has been confirmed and
gone effective.  January the -- January 20 is the date set for
final hearings in the case on all administrative claims.
Following that hearing and the appeal periods, we anticipate
soon -- actually, it you've probably taken an order closing in
the NetExit case because distributions have made and claims
have been addressed.  At this point, Judge Baxter, to whom the
NetExit case was transferred, has already transferred those
proceedings to Judge Carey, who is now the -- sitting as a
Delaware Bankruptcy Court Judge.  And as a note, Judge, we can
then go over the matters at the conclusion which we still see
as still being open in the NorthWestern case, and I can advise
the Court there are very few that still have to -- have some
level of activity in them.  With that, I'd like to have Ms.
Denniston go over the agenda, if possible.

THE COURT:  Thank you.  We'll take up the matter of the objection to the Proof of Claim filed by Mr. Blue.  I want to say, Mr. Blue is not on the Court Call.  I will put into the record that our Deputy Clerk in Delaware has reported to me that he -- she spoke to Mr. Blue on January the 10th, 2006 and gave him Court Call's phone number and explained that if he wanted to participate by telephone, he needed to call them.  He did not contact Court Call, and therefore, he's not on the conference.  Mr. Blue requested that he would not -- told us that he was not going to be present in person, but that he wanted to participate by telephone, and he has had that opportunity.  You may proceed.

MS. DENNISTON:  Thank you, Your Honor, Karol Denniston on behalf of NorthWestern.  Mr. Blue filed a late claim in November of 2005.  After reviewing the claim with Mr. Harper, the litigator at NorthWestern that's been responsible for dealing with this file, we can advise the Court that not only is it a claim that was filed untimely, it's incomplete and possibly fraudulent.  It does not provide the complete and accurate information of the litigation story at the State Court level.  The claim is factually wrong.  I have Mr. Harper here in the Courtroom today, Your Honor, who can testify to the facts, or I can provide the Court with a proffer, however the Court would like to proceed.

THE COURT:  Go ahead.  Put it in the record so we get

an order out that we've got a complete record on it.

       MS. DENNISTON:  Okay, so at this point, I should call Mr. Harper to the stand?

       THE COURT:  Would you raise your right hand, please?

       WAYNE HARPER, DEBTOR'S WITNESS, SWORN

       DIRECT EXAMINATION

BY MS. DENNISTON:

Q.  Mr. Harper, can you state your name for the record?

A.  Wayne Harper.

Q.  And who is your employer, Mr. Harper?

A.  I work for NorthWestern Energy.

Q.  In what capacity?

A.  I am Senior Litigation Counsel.

Q.  And are you familiar with the litigation matter, <u>Chuck Blue vs. NorthWestern Energy</u>?

A.  Yes, I am.

Q.  Can you provide the Court with a brief background as to what this litigation matter is about?

A.  This matter comes from Mr. Blue's feeling that somehow we took out a power line to his irrigation field improperly and his filing of the complaint and the subsequent (indiscern.) at the Trial Court level.

Q.  And was the complaint initially filed in State Court?

A.  Yes, it was.

Q.  And are you also familiar with Mr. Blue's Proof of Claim

Harper - Direct                                        10

that was filed in November of 2005?

A.  Yes, I am.

Q.  And did you assist with the preparation of NorthWestern's
objection to that claim?

A.  Yes, I did.

Q.  Okay, I want to walk you through a couple of exhibits.
First of all, it is your understanding or do you have an
understanding as to whether Mr. Blue received notice of this
bankruptcy proceeding?

A.  Yes, I know for a fact he did.

        MS. DENNISTON:  Okay, Your Honor, if I could mark as
Exhibit #1, I'd like to mark the Notice of the Bankruptcy
Filing that was filed in the Montana Fourth Judicial District.

        THE COURT:  Very well.

        MS. DENNISTON:  Thank you, Your Honor.

    (Debtor's Exhibit-1 marked for identification)

BY MS. DENNISTON:

Q.  Mr. Harper, are you familiar with the Exhibit-1?

A.  Yes, I am.

Q.  Can you tell the Court what Exhibit-1 is?

A.  That is the Notice of Bankruptcy Filing I filed with the
Missoula Court Judicial District Court and on -- is signed by
me and on page two it shows the Certificate of Service to Mr.
Blue.

Harper - Direct                    11

Q.  And what date was this filed?

A.  This was filed the 23rd day of September, 2003.

Q.  Next, I'd like to hand you a -- what we have marked as
Exhibit-2.  This is an Opinion and Order dated May 12th, 2003.
Can you tell the Court what Exhibit-2 is?

        (Debtor's Exhibit-2 previously marked for identification)

A.  Exhibit-2, as you said, was -- is an Opinion and Order from
Judge John S. Hanson of the Fourth Judicial District Court in
Missoula and it set aside the default and judgment that Mr.
Blue filed in his Proof of Claim on this matter.

Q.  Can you tell the Court, if you know, how this order came to
be entered?

A.  Mr. Blue, as I believe he showed in his Proof of Claim by
only filing the judgment and the writ, has kind of a history of
trying to surreptitiously get his way.  He filed the complaint
against NorthWestern Energy, never served NorthWestern Energy,
told the Court he had, and then moved for a default judgment,
received it because on it he said he also served us with the
Motion for Default Judgment.  He did not.  And subsequently,
upon the facts being brought before the Court, vacated the
judgment.

Q.  Is it your understanding that the judgment that's the
subject of Mr. Blue's claim is in fact the same judgment that
was overturned by -- as a result of this default?

Harper - Direct                                    12

A.   The judgments he filed with his Proof of Claim were exactly
(inaudible) set aside.

Q.   So, just to clarify that, that judgment is not valid and
was overturned by this subsequent order?

A.   By this subsequent order and by further trial in this
matter, yes.

Q.   All right, let me ask you this, was there a further hearing
in this matter that involved a Summary Judgment Motion?

A.   Yes, we -- when we were served and he was allowed to go
forward with the complaint, we filed for summary judgment for
NorthWestern Energy.

Q.   And what was the result of the summary judgment?

A.   After a two day mini-trial -- it was supposed to be a --
about an hour on oral argument, turned into a trial, we were
granted summary judgment and a judgment was entered on our
behalf.

Q.   I'm gonna hand you what we're gonna mark as Exhibit-3.
This an Opinion and Order.  Also, (indiscern.) trial date of
June -- July 23rd, 2003.  Can you identify Exhibit-3 for the
Court?

        (Debtor's Exhibit-3 marked for identification)

A.   Exhibit-3 is the Opinion and Order of Judge John Hanson.
It was entered on the 22nd day of July, after the mini-trial
that I just referenced.

Harper - Direct                              13

Q.   There was a Notice of Entry of Judgment that was also
entered in connection with this Summary Judgment Motion,
correct?

A.   That's correct, we filed a motion.

Q.   Let me hand you Exhibit-4.  Would you identify this for the
Court?

     (Debtor's Exhibit-4 previously marked for identification)

A.   That is the Notice of Entry of Judgment that had I filed
with the Court on August 13th, 2003 after the appeal period
would have run.  And as shown on page two of that, I served it
on Mr. Blue.

Q.   And what is the status of the litigation in the State Court
at the present time?

A.   The litigation in the State Court, while Judge Hanson has
politely been and asking for status reports given the bank --
notice of bankruptcy filing, he -- Mr. Blue appealed the
Judge's order and the judgment to the Supreme Court of Montana.

Q.   And has the Judge -- has Judge Hanson entered any further
opinions or orders in this matter?

A.   He has actually entered opinions that told Mr. Blue that
his claim in District -- State District Court was somewhat moot
and/or over, but that if he wanted to try to get relief from
the automatic stay or something in Bankruptcy Court he had a
certain number of days to try to do that and show the Court

that he was doing something.

Q.  And in fact, Judge Hanson has made certain findings about
the notice Mr. Blue received in the State Court proceeding,
correct?

A.  In his order, he said that the Court record reflected and
Mr. Blue knew that there had been an automatic stay in a
Bankruptcy Court had been filed and he was aware of that.

Q.  Thank you.  Mr. Harper, I want to hand you the last
exhibit, which is the Opinion and Order that was filed
September 19th, 2005.  I've marked this as Exhibit-5.  Can you
tell the Court what Exhibit-5 is?

        (Debtor's Exhibit-5 previously marked for identification)

A.  That was the Opinion and Order the Judge Hanson recently
entered, recently being September 19th of this year.  And
that's the one that in it he notes that Mr. Blue asserts that
he didn't receive notice but that, in fact, he did receive
notice.

Q.  In fact, I would ask that if you wouldn't mind, if you
would read the fourth paragraph of the Opinion and Order into
the record.

A.  "Mr. Blue, having not contested NorthWestern's assertion
that a claim before the Bankruptcy Court is time barred makes
this matter subject to dismissal.  Mr. Blue can petition the
Bankruptcy Court for a relief from the automatic stay and for

recognition of this -- of his claim.  Because an avenue or

relief may be possibly -- may possibly be afforded him, the

Court determines the dismissal with prejudice is not

appropriate.  However, the Court will convert this matter to

dismissal with prejudice, absent proof by Mr. Blue, that Mr.

Blue has taken some action for his claim to be reinstated by

the Bankruptcy Court.  Mr. Blue has 60 days from the date of

this Opinion to provide the Court with sufficient proof of such

action."

Q.  To your knowledge, did Mr. Blue ever file anything with the

Bankruptcy Court, other than the late filed claim that was

filed in the November of 2005?

A.  To my knowledge, he's had no contact with the Bankruptcy

Court, other than relative to possibly being on a phone call

today.

Q.  And the claim that he filed based on the Exhibits 1 through

5 that we just presented does not present this Bankruptcy Court

with a true or accurate picture of his claim or the underlying

State Court litigation, does it?

A.  I would assert it doesn't at all.

            MS. DENNISTON:  Your Honor, I have no further

questions of this witness.

            THE COURT:  That's all.  Thank you very much.

        (Witness steps down)

Harper - Direct                                    16

THE COURT:  Any other matter?

MS. DENNISTON:  Your Honor, as to the claim objection
of Mr. Blue, we -- there's -- I would ask that the Court admit
Exhibits 1 through 5.  We had tendered the matter to the Court
with the request that the Court enter an order disallowing the
claim in it's entirety.  The claim does not accurately reflect
the status of the litigation.  It is clear that the claim is
untimely.  It is also clear that Mr. Blue had notice of this
bankruptcy proceeding.

(Debtor's Exhibit-1 admitted into evidence)

(Debtor's Exhibit-2 admitted into evidence)

(Debtor's Exhibit-3 admitted into evidence)

(Debtor's Exhibit-4 admitted into evidence)

(Debtor's Exhibit-5 admitted into evidence)

THE COURT:  All right, let the record show that on
October 10th, 2003, this Court entered an order establishing
deadlines for filing Proofs of Claim and approving form and a
manner of notice thereof.  The order specifically directed that
pursuant to Rule 2002(f), the Debtor shall publish notice of
the bar date substantially in the form attached to the
application, Exhibit-C, and in the USA Today, Wallstreet
Journal, New York Times, the (indiscern.) South Dakota, Journal
Rapid City, South Dakota, Billings Gazette, Billings, Montana,
Great Falls Tribune, Great Falls, Montana, and The Daily

<u>Missoulian</u>, Missoula, Montana, at least 25 days prior to the general bar date, which publication is hereby approved and shall be deemed good, adequate and sufficient publication notice of both the general bar date and the Government unit bar date.  The general bar date was set for January 15th, 2004.  No Proof of Claim was filed by Mr. Blue before the January 15th bar date.  In fact, it appears now from the record that Mr. Blue is not even a pre-petition Creditor and judgment had been entered against him prior to the filing of the bankruptcy petition.  So the objection to the Proof of Claim filed by Mr. Blue as a late-filed claim is granted and the objection is -- and the claim is ordered expunged from the record.

        MS. DENNISTON:  Your Honor, may I hand up an order?

        THE COURT:  You may.

        MS. DENNISTON:  Thank you, Your Honor.

        THE COURT:  Thank you.

  (Pause in proceedings)

        THE COURT:  Next matter?

        MS. DENNISTON:  Your Honor, should we return to the agenda?

        THE COURT:  Yes.

        MS. DENNISTON:  Matter #1 is the Debtor's protective objection to claim #707.  This matter is being continued as it is tied to the pending appeals.

18

THE COURT:  Very well.

MS. DENNISTON:  Matter #2 is the objection to claim #571 and 1083.  We've requested that this matter be continued because it is also subject to litigation between the parties.

THE COURT:  Very well.

MS. DENNISTON:  Matter #3 is the Reorganized Debtor's objection to the claim of Chuck Blue, which we have just addressed.  Matter #4 is the objection to claim 1087 of the Matson Plaintiffs.  Your Honor, this matter -- there was a settlement reached in the amount of $25,000 plus the assignment of whatever interest in certain insurance policy proceeds that may be available to provide coverage under this claim.  The parties filed a stipulation under Certification of Counsel on January the 5th, 2006, docket #3413, and at this time we would like to hand up an order approving the stipulation --

THE COURT:  Very well.

MS. DENNISTON:  -- and the settlement.  If I might approach?

THE COURT:  Yes.

MR. MEITES:  Your Honor, this is Thomas R. Meites representing the Matson claimants.

THE COURT:  Yes, go ahead, sir.

MR. MEITES:  I have a question for you, if I might, and perhaps counsel can assist me.  Have the insurance

companies received any notice of this proposed settlement?

MS. DENNISTON:  Your Honor, I would not be able to provide an answer to that question.  I would have to defer it to NorthWestern.

THE COURT:  Very well.

MS. DENNISTON:  Mr. Harper is in the Courtroom, Your Honor, and confirms that notice has been provided to the insurance company.

THE COURT:  Does that satisfy your inquiry, Counsel?

MR. MEITES:  Thank you very much.

THE COURT:  Thank you.  All right, I'll enter and we'll file this order today.

MS. DENNISTON:  Thank you, Your Honor.  Matter #5 is the Motion of the Plan Committee in aid of consummation and implementation of the Plan for Order Authorizing and Directing the NorthWestern Corporation to Distribute Surplus Distributions.  Would the Court like to proceed with the agenda or address this matter at this time?

THE COURT:  We'll address it now.

MS. DENNISTON:  All right, thank you, Your Honor. I'll tender the podium to the Plan Committee.

MS. PHILLIPS:  Good morning again, Your Honor, Margaret Phillips of Paul Weiss Rifkind Wharton & Garrison on behalf of the Plan Committee in support of its Motion in Aid of

Consummation and Implementation of the Plan for an Order
Authorizing NorthWestern to Distribute Surplus Distributions.
By this motion, the Plan Committee is simply asking the Court
to assist it in enforcing the Plan as written and confirmed.
Despite any arguments to the contrary, the relief requested is
not extraordinary, especially when the express language of
Section 7.7 of the Plan requires the Debtor to distribute
shares that constitute surplus distributions every 6 months
from the effective date.  The relief sought has been objected
to and the Plan Committee has filed an omnibus reply asking the
Court to overrule those objections.

     As background, NorthWestern has been very successful in
resolving the myriad of disputed claims pending as of the
effective date.  To that end, NorthWestern, as it represents in
its response, has resolved all disputed claims, except those of
Magten and Law Debenture in connection with the Quipps
litigation and the hypothetical SEC claim.  The SEC, at this
point, is clearly barred from filing a claim and any suggestion
that there should be a reserve for the SEC overlooks the plain
language of the Plan and the operation of the Bankruptcy Code
and the Bar Date Order.

     Thus, the only valid remaining disputed claims are those
of Magten and Law Debenture in connection with the Quipps
litigation.  As this Court is aware, disputed claims reserve

was originally funded with approximately 4.4 million shares of new common stock, and to date, as a result of the claims reconciliation process, the Debtor has distributed approximately 1.3 million shares, leaving more than 3 million shares in the disputed claims reserve. Of these remaining shares, 787,339 shares are segregated and are reserved for the Quipps litigation. Thus, the Plan Committee submits that there is more than enough in the disputed claims reserve to satisfy the requirements for surplus distributions to be made in accordance with Section 7.7 of the Plan and that the remaining shares, excluding those specifically reserved for the Quipps litigation, should be distributed at surplus distribution.

Lastly, it's the Plan Committee's position that to enforce the Plan as written, the Quipps litigation reserve should not be increased despite the language in certain stipulations or orders entered post-confirmation. However, to the extent the Court finds it necessary to increase the Quipps litigation reserve before surplus distributions may be made, it is the Plan Committee's position that the Quipps litigation reserve should not be increased to an amount greater than the full face value of the Quipps litigation as a Class 9 claim, which is approximately $48.8 million.

In sum, by this motion, the Plan Committee is only seeking the Court's assistance to enforce the Plan as written and

confirmed, and thus requests this Court overrule the objections and issue an order directing NorthWestern to distribute the shares that constitute surplus distributions in accordance with Section 7.7 of the Plan.

THE COURT:  Well, will the order provide, if I accept your position, how many shares will be distributed and to whom?

MS. PHILLIPS:  We believe that there should be -- what remains is 2 million, 309,079 shares and that in accordance with Section 7.7 of the Plan, it should be distributed pro rata to all holders of allowed claims.

THE COURT:  To all -- which class?  To which class claims?

MS. PHILLIPS:  To holders of allowed claims of, I believe, class 7 and 9.

MR. AUSTIN:  Your Honor, this is -- she's right, they're the class 7 and 9 pro rata.

MS. PHILLIPS:  Does the Court have any other questions?

THE COURT:  Thank you.

MS. PHILLIPS:  Thank you, Your Honor.

MR. KAPLAN:  Your Honor, I don't know if anybody else is gonna speak in favor of the motion before I start, but I don't know if anybody's on the --

MR. WILLIAMS:  Your Honor, this is Matthew Williams at

Kramer Levin Naftalis & Frankel for the Ad Hoc Creditor's Committee, class 7 Creditors.  We filed a brief joinder in support of the motion.  We agree with the Plan Committee's statements, and we think the Plan is clear in that the supplemental distribution should be made; in fact, should have been made back in November.

THE COURT:  All right, Counsel, thank you.  You may proceed.

MR. KAPLAN:  Thank you, Your Honor, for the record, Gary Kaplan from Fried Frank on behalf of Magten Asset Management.  Your Honor, this issue is actually fairly simple and it comes down to one question, is the Court gonna treat all Creditors equally and fairly and enforce a stipulation that was negotiated by the Debtors and Law Debenture and was approved by this Court 14 months ago after notice was provided to all parties in -- to Parties-In-Interest, including the Creditor's Committee, or is the Court going to give certain Creditors a windfall at the expense of Creditors whose claims are still disputed?  Boiled to it's essence, this is about fundamental fairness.  Under the Plan that was confirmed by this Court, holders in class 7 and class 9 claims, including holders with disputed claims such as Magten, were entitled to receive a recovery in common stock of the Reorganized Debtors in the amount of approximately 68 cents on the dollar.  As we sit here

today, Creditors with allowed claims who've already received
the distributions have received over 100 cents on the dollar.
So they've already received more than 30% higher than was their
expectation at the time.

THE COURT:  That wasn't because of the Plan, however,
that was because of the market conditions that took place after
the Plan was confirmed.

MR. KAPLAN:  Well, I -- the market conditions, despite
the Court's rule -- and it was a different Judge -- even though
there was a contested valuation fight, when the stock was
listed it immediately -- it was listed substantially higher
than the Court had determined just, you know, 2 weeks earlier -
-

THE COURT:  (Indiscern.).

MR. KAPLAN:  -- about the value.  But so -- but,
you're right, it is the market conditions, but when Creditors
are here saying, you know, it's not fair, you have to enforce,
you have to give out stock, we do need to look at the fact that
Creditor expectation at the time was 63 cents, they've gotten
100 cents, and for that -- and then we have other Creditors who
still holding zero -- who have gotten zero that they cannot sit
here and rely on, you know, it's unfair, it's -- you know, we
need to enforce the terms.

Your Honor, the -- until the Quipps claims are allowed,

either via settlement or another Court order, the Quipps are

entitled to have shares of stock reserved for them to ensure

that once the claims are ultimately allowed or if they're

ultimately allowed, that we receive exactly the same recovery

that they -- that the class 7 and class 9 Creditors received,

not one penny less.  And the reserve structure that was set up

in the Plan, it's not a novel concept, nor was it done because,

you know, people wanted to be nice to the holders of the Quipps

and set up a reserve.  It was done so that -- because it was

the only way for a Plan to satisfy the requirements of Section

1129, that it not unfairly discriminate against claimants with

disputed claims.  Absent the establishment of a reserve to

ensure that holder's disputed claims would receive the

identical recovery to holders with allowed claims on that day,

this Plan could never have been confirmed.

    And I think it's important to note also that, you know, as

Your Honor is aware when the Plan was confirmed, Magten sought

a stay pending appeal of the Confirmation Order, both at the

Bankruptcy Court level and at the District Court level.  And in

both places, the briefs and the oral argument, one of the main

arguments to the Court was you don't need a stay because there

is no harm to Magten because there's a disputed claims reserve.

    And if at the end of the day their claims is allowed, they're

entitled to pursue the litigation, and if they win their

litigation, then they are covered because there's a reserve.
And that was one of the things that was relied upon by Judge
Case in saying that there's no irreparable harm to Magten, and
Judge Jordan found the same thing; and that's in the briefs and
it's in the oral arguments.  And if Your Honor wants, I can
hand you copies of the briefs, but it was very clear that that
was the -- one of the main arguments on there being no
irreparable injury was -- and I'll read it into the record --
was that first Magten's remedies -- and this is from the
Debtor's brief to the District Court, and the language is
substantially similar in the one to the Bankruptcy Court.
"First, Magten's remedies of law, i.e., the right to pursue the
Quipps litigation with the recovery as a class 9 general
unsecured claim, are fully protected by the Plan.  Second, the
claims reserve provided by Section 7.5 of the Plan, whether
established by a Bankruptcy Court or through a stipulation,
will adequately protect Magten's recovery, should it be
successful on the merits.  Given the protections provided to
Magten under the explicit terms of the Plan, Magten cannot show
that it would irreparably harmed if this stay pending appeal is
not issued."  And again, that was in the briefs and in the oral
argument.

So to -- to ensure that the Creditors whose claims were
disputed on the effective date would receive the same recovery

as those who had allowed claims, the Plan did require that they -- that the Debtors establish a reserve either using the maximum claim amount, meaning somebody filed a claim for 100 million, would you say, fine, we're gonna assume when we make distributions your claim is 100 million, or that the Debtors could -- or the Court could enter an order fixing -- estimating the amount and saying, you know what, let's assume it's only $50 million.

What the Debtors did in the case of Magten and in the case of PPL was that in order to permit them to go effective without having to reserve the full amount of the claim, is that the Debtors entered into a stipulation. And what the stipulation did was it said we're gonna create a sub-reserve. Within the disputed claims reserve we're going to have a sub-reserve for 25 million. We can avoid an estimation hearing. They said, look at all these claims. There's loads of -- there's gonna be extra in the reserve if you look at all these others, but we'll guarantee you that no matter what happens, nobody can invade this reserve. And you're going to have the sub-reserve, but it is not a cap on your recovery, it doesn't limit your recovery, all it means is that there will be a bunch of shares that are yours, nobody else can touch it. But the other claims -- if we messed up on the reserve and everybody else's claims are significantly higher, they can't touch your reserve. And the

stipulation, as I mentioned earlier, was approved by the
Bankruptcy Court after notice to the Creditor's Committee and
it became a final order.  And that stipulation is binding on
the parties, and it's res judicata and cannot now be challenged
by the Plan Committee as they seek to do in their papers and
say, well, it modified the Plan, it can't be done, and
therefore it's inappropriate.  If they had that problem, they
had (indiscern.) time.  If they disagreed, they had to take an
appeal.  They can't stand here 14 months later and say, "You
know what, Your Honor, we think that stipulation and order was
wrong.  Disregard it's Plan's term -- this Plan terms."

         And in considering the motion, it's important that we
actually turn to the Plan terms of that stipulation.  Paragraph
one, as I said, provides for the creation of this sub-reserve
that I talked about.  Paragraph two of this stipulation -- and
it was attached to the motions.  And if Your Honor doesn't have
it, I can hand it up to you.  Paragraph -- would like a copy or
does Your Honor have a copy of the stipulations?

              THE COURT:  I have it.

              MR. KAPLAN:  Do you have it or you'd like --

              THE COURT:  I have it.

              MR. KAPLAN:  Okay, paragraph two makes it very clear
that the sub-reserve was not intended to limit the recovery of
the Quipps, and provided that to the extent that the Quipps

29

claim exceeds their sub-reserve, any deficiency is to be
satisfied out the general disputed claims reserve.  And
paragraph three makes it clear that if any other sub-reserves
are created, such as the one for PPL that we're dealing with
today, and those are released back into the disputed claims
reserve, the Quipps holders, and this is a quote, "shall be
entitled to draw" {close quote} from the -- from those
reserves.  So Your Honor, we have a binding final order of this
Court that conclusively resolves this issue.  It exactly dealt
with what happens if you have multiple sub-reserves within the
overall disputed claims reserve.  One of those, the shares are
released back into it, what happens?  The stipulation did not
say well, that's just surplus, it goes to everybody else, you
don't have a chance.  No, it specifically contemplated that the
Quipps, therefore, could go into that -- could access those
shares.

        And Your Honor, even though the issue is conclusively
resolved by the stipulation, the facts surrounding the disputed
claims reserve and the sufficiency thereof or insufficiency are
such that I think it's plainly -- it's just inappropriate to
determine today that, well, there's a surplus and so, we can
distribute it out.  You know, I just heard Ms. Phillips talk
about the amount of shares that are in there.  But if you go to
paragraph 21 of their reply, in their reply they admit that

30

they don't know how much is left.  And it's amazing to me that you have a fiduciary for all Creditors, including the Quipps, that says we don't know how much is in there, but you know what, let's distribute it out anyway because, you know, why not?  And this is a fiduciary for us.  This is a Court appointed fiduciary for us.

And Your Honor -- so, so that -- so then we have -- so we have a disputed claims reserve that already is in -- they -- no Plan Committee is gonna jump up and down and say they never said it, but it's perfectly clear that the Ad Hoc Committee was very plain in the settlement hearing -- I don't even know how long ago anymore it was -- that they said, and it could not be clearer on the record, that they reviewed it and there simply isn't enough stock.  We have an 1144 complaint out there saying the reserve is insufficient.  Now, I know that's been stayed and I understand that that's still going, but when we're -- when people are coming into this Court and saying, "Your Honor, there's a surplus, distribute it out," given the facts, given the prior representations to the Court, given the existence of a complaint under 1144 saying that there is insufficient stock, it's inappropriate without any evidentiary basis, when they filed a reply saying, "Well, we don't know how much is in the reserve."  Now, they stand up and somehow seem to know how much is there.  But frankly, it's inappropriate for them to come in

today and assert, "Well, there's a surplus."

And, you know, the last point I wanted to raise, and I think this is something that hasn't been happening in the Court, so it's something that, you know, that Your Honor may not be aware of, sort of what's going on in the background, that is -- I would submit, is probably leading to this motion here today. Your Honor, there's been a lot of public filings and letters that are all filed with the SEC by Harvard, which is member of the Plan Committee, a member of the Ad Hoc Committee, and right now the Debtor's largest shareholder based on the fact that they purchased some claims at the end of the Chapter 11 case and became the largest share holder. Your Honor, they have been publically sparring with the Debtor's Board of Directors. They have been trying to get the Debtor's Board to embark on the sales process that the Debtor's Board so far has been reluctant to do. And in it's latest letter, which is dated January 5th and filed with the SEC on January 6th, Harvard stated that it intended to propose a new slate of directors for the Board, that it wants to remove the current Board of Directors. It urges the company to hold an annual meeting as soon as possible so that there could be a vote on this action. And Your Honor, I don't think the timing is coincidental that at the same time Harvard is trying to vote in its capacity as a share holder to remove the Board, it's

running into Court and saying, "Hey, get all the shares out to us," so that their voting position is larger. And that is what this is about at the end of the day. They are sitting there saying, "We want to effectuate change. There's stock in that reserve. We want to make sure that we get that stock so that when we get into the room to vote, we have more shares than -- that we have larger shares than anybody else." And Your Honor, I think that it's inappropriate and this Court should not become part of ensuring that Harvard can use that capacity.

And Your Honor, I have no doubt that at the end of my remarks, the Plan Committee, the Ad Hoc Committee, they're all gonna jump up saying, "Of course, our motives are pure as driven snow. It's all about truth, justice, the American way, where -- you know, everything is perfect. It's just, you know, Magten and Law Debenture, they're trouble makers yet again." But you know what, I think we have to look at this. And I think as we think about this, there are some fundamental questions that we need to ask. We have to ask why would fiduciary be seeking to distribute the remainder of the disputed claims reserve prior to resolution of all disputed claims? Why would a fiduciary make such a motion without doing the most elementary diligence and acknowledging that they don't know the amount of the stock in the reserve? Why would a fiduciary seek to make distributions knowing that it violates

the terms of a stipulation and order approved by this Court of
which they had notice?  And why would a fiduciary do all of
this when there are Creditors who have already received 100
cents on the dollar, and there are Creditors who they've argued
-- always argued are pari passu with those Creditors have
received zero and have a claims reserve that would give them at
most 50% of the recovery of these other Creditors?  Why would
that fiduciary be standing here today before Your Honor saying,
"You know what, we don't care about them.  Lock them in at only
50% of what they are entitled to under the Plan, but get it out
there so that the rest of the -- that the rest of the Creditors
can get more of a recovery."  It just doesn't make sense.  And
Your Honor, I would submit that the reason is because of the
other reasons that I said.  They got a client saying, "You
know, we got this share holder vote coming.  We got all these
other things.  We gotta get this stock out of the reserve."

        And Your Honor, when I started out saying this was about
fundamental fairness, and at the end of the day, that's what
this is about.  Fundamental fairness requires that all
Creditors, whether they have disputed claims or allowed claims,
that are pari passu with one other as they have always
asserted, are entitled to receive the identical recovery, not
one penny less.  And the Plan Committee just stood up here and
said, "Well, if you argue and if the Court is somehow going to

say we'll increase the reserve for Magten, well, that's gotta
be locked in at the face amount of the bonds and that's it."
Well, you know what, Your Honor, there was pre-petition
interest that I think there is no argument that we're entitled
to.  There are fees and expenses of the Indentured Trustee that
were included in the Proof of Claim and that when the
Indentured Trustee stood before Your Honor -- again, my dates
are foggy because this case seems to have gone on forever.  But
when the Indentured Trustee stood before Your Honor and sought
reimbursement of their fees and expenses, the argument was
well, that's part of their Proof of Claim.  They get the
recovery as part of their Proof of Claim, and Your Honor ended
up agreeing with them (indiscern.) and said, "Well, that's part
of your claim."  And so, now they stand here today and say,
"Well, you know what, if you're gonna set a reserve for them,
cap it out at the face amount, forget about pre-petition
interest, forget that we told you before that the Proof of
Claim covers the Indentured Trustee's fees and expenses, which
are part of the Indenture and which are part of the Proof of
Claim, forget that, because you know what, forget about these
Creditors.  We're tired of them."  And you know what, if Your
Honor is considering establishing a reserve for the amount of
the Quipps, the amount has to include the pre-petition
interests, and it has to include all fees and expenses that are

under the Indenture because they were all done as part of --
they were included in the Proof of Claim that was filed by the
Indentured Trustee, and I have never heard anyone argue that
the Indentured Trustee is not --

THE COURT:  Well, I thought the Indentured Trustee has
already been paid.

MR. KAPLAN:  No, the Indentured Trustee -- Your Honor,
may recall the Indentured Trustee was paid a very small
component of it's fees.

THE COURT:  Well, my --

MR. KAPLAN:  The rest was to be --

THE COURT:  My reading of the record is that they
liquidated some six -- 53,000 shares.

MR. KAPLAN:  They have, Your Honor, but that --

THE COURT:  (Indiscern.) --

MR. KAPLAN:  But they haven't been paid --

THE COURT:  -- fees and expenses.

MR. KAPLAN:  Yes, but that payment has come out of the
Creditors.

THE COURT:  Well, what --

MR. KAPLAN:  And that's --

THE COURT:  It may be that's where it should come out.

MR. KAPLAN:  No, no, no, Your Honor, under the
Indenture -- the way the Indenture works is that -- and Mr.

Snellings is in Court in Delaware and I have no doubt he'll
correct if I misspeak. Under the -- the way the Indenture
works is that the Indentured Trustee has two parties to look
to. It has the Debtor and it has the Quipps Claimants. Even
if it gets paid by the Creditors by taking out of the Quipps
Creditor's distributions, that does not in any way, shape or
form -- and the Indenture is crystal clear -- limit the amount
of which the Debtors owe the Indentured Trustee and the Quipps
Claimant. We have a claim and that -- this has not been
contested by anyone on the face amount of the claim. The
Indentured Trustee and the Quipps holders have a claim for the
principle amount outstanding, for interest that's been accrued,
and for all fees, costs and expenses. If the Indentured
Trustee says, "You know what, I'm not waiting another 3 years
for the Debtor to pay me. I am going to take it out of the
amounts that have gone to the Quipps holders." They're free to
do so under their charging (indiscern.), but that does not mean
that it doesn't get repaid to the Quipps holders. What it
means is, they have said, "Okay, well, we're going to take it
from you first, but you then have to pay." It's an effect like
an indemnity, but the claim is still existing. They have filed
a Proof of Claim for it, which has not been objected to on that
grounds. And again, the parties all argued when the Indentured
Trustee sought it's fees and expenses in cash, they sit --

THE COURT:  Well, we'll save that for another day.

MR. KAPLAN:  Okay, well, then as long as that's not part of -- as long as we don't have an estimation that says recapped at the full amount, because if we do have that, then we'd have to deal with it today.  What I would submit --

THE COURT:  Well, what's the status of the Magten litigation or whatever's going on --

MR. KAPLAN:  It --

THE COURT:  It's all up in District Court.

MR. KAPLAN:  It's all up in the District Court.

THE COURT:  Why shouldn't the Distribution Order go up to District Court too?  Why don't we just ask the Court that they withdraw the reference from this Court, settle the distribution issue also?

MR. KAPLAN:  Your Honor, that would be fine with Magten.  If the other parties brought the motion that they want to -- we are more than fine with bringing it up to the District Court.  It does -- it's intimately entwined with the issues --

THE COURT:  Well, what is the status?

MR. KAPLAN:  The status is, Judge Farnan had a status conference in, I want to say November.  There was a status conference.  At the status conference the Debtors, supported by the Creditor's Committee said, "Hold on, Judge, don't say anything yet.  Don't decide all the appeals.  We want to give

mediation one more shot.  It failed before, but, you know,
mediation -- you know, things have changed.  You know, we're
hopeful this time it's gonna work, so hold on."  We said, "You
know what, this is gamesmanship.  We're not gonna do that."
Judge said, "Look, they're telling me today it's not -- he's
gonna give it a shot.  Give it a shot."  So we tried mediation
again.  Unfortunately, mediation, like the prior mediation, was
unsuccessful.  So Judge Farnan said he's going to rule on the
appeals by -- within the next week, although there's been a lot
going on in Delaware, so I don't know whether he's going to
actually do that.  But he said he'd be ruling on the appeals.
He did say he would start discovery immediately on the
fraudulent conveyance claim.  He asked the parties to agree on
the appointment of a special master.  And we have orders then,
there have been Scheduling Orders submitted to Judge Farnan as
recently as this past week with discovery schedules.  We're
waiting for the Judge to order an -- enter an order appointing
the special master.  The litigation is getting underway, there
have just been delays getting all the orders entered.  But, you
know, we've had our Rule 26 Conference with the other parties
on the litigation, and all of it is moving forward.  And again,
we have -- at least what Judge Farnan told us was if the
mediation failed, he would have rulings on the confirmation
appeal, as well as on the Motion to Approve the 9019 Settlement

39

in the middle of January.

    THE COURT:  Thank you.

    MR. KAPLAN:  Thank you, Your Honor.

    THE COURT:  Mr. Austin?

    MR. SNELLINGS:  Your Honor, John Snellings in
Delaware.  If I could just --

    THE COURT:  You may proceed, go ahead.

    MR. SNELLINGS:  Thank you, Your Honor.  I just -- very
quickly, I just want to join Mr. Kaplan and Magten on their
argument on behalf of Law Debenture.  And just to put a finer
point on this issue of the fees, just as we did when we settled
this case the first time, the -- Law Debenture, as Indentured
Trustee, worked to apportion its fees between the option one
and option two holders and -- in a fair and equitable way.  And
when we settle this case or get an order that settles it, we
will do the same thing so that our fees are apportioned between
the two, if we have to rely on the charging lien.  And that's
how that will work so that both groups of Quipps holders,
option one and option two, will share in that burden through a
settlement and negotiated settlement.  But we join Magten's
presentation here and request that the Plan Committee's motion
be denied.  Thank you.

    THE COURT:  Thank you.  Maybe we ought to recycle the
Settlement Agreement again in light of the settlement after --

40

which was made after the settlement of the PPL Agreement
because they were screaming -- as I remember, the opposition
was saying, "Well, there's enough shares. You're invading the
surplus," or something of that nature. And now that that
situation has changed, the settlement might look a lot more
attractive. You may proceed, Mr. Austin.

MR. AUSTIN: Thank you, Your Honor. We appreciate
your observation on that point. Before I go into any response
to both the Plan Committee and to the counsel for the various
Quipps holders, I would like to ask a question on the record so
we have a complete record. My question is, is there any
representative, any counsel for the Securities and Exchange
Commission on the telephone and appearing today?

UNIDENTIFIED SPEAKER: There is none.

THE COURT: They have made no appearance.

MR. AUSTIN: And we'd like the record to be clear,
Your Honor, that the SEC has made no appearance with respect to
today's hearing. We can state in our place that they were
given specific notice of today's hearing and they filed no
papers in response to the matters on for today's hearing, given
that opportunity to appear.

THE COURT: I'm prepared to sign an order stating that
they have no claim against the estate and they're barred.

MR. AUSTIN: And we will go into that in our comments,

Your Honor.  Your Honor, this Court asked Mr. Kaplan a very
quick question whether this Court can decide the distribution
issue or whether this needs to go to the District Court.  Our
perspective from NorthWestern is that this Court can decide
this issue today, and I will give an explanation as to why.
And we find ourselves, at least in today's hearing, in the
interesting position that we agree in part with the Plan
Committee and we agree in part with the Quipps holders.  But we
also disagree in part with both of them.

First and foremost, we would assert that there is no
failure of NorthWestern to abide by the Reorganization Plan.
To this part, we would agree with the Quipps holders that the
Plan Committee and the Ad Hoc Committee's interpretation of the
Reorganization Plan and the disregard of the stipulation
setting reserves relative to both PPL and with respect to --
with Law Debenture and the Quipps, is just flat wrong.  Section
7.5 of the Plan specifically provides that NorthWestern could
agree in writing to set reserves and the terms thereof.  This
is specifically what NorthWestern did with the reserves --
stipulations with Law Debenture for the non-accepting Quipps
and with respect to PPL.

To recap, Your Honor, what NorthWestern did prior to or in
contemplation of the effective date, it initially established
disputed claim reserve with claims totaling $140 million.  And

that $140 million of claims was always in the disputed claims reserve.  Thereafter, in negotiations with PPL on one hand and with Law Debenture on behalf on the non-accepting Quipps on the other hand, we negotiated a resolution of the disputed -- of their claims such that we did not have to put 100% of their face amount of the claim in disputed claims reserve, but we could do a segregated reserve for smaller amounts, which is exactly what we did.  Those stipulations were subject to, as Mr. Kaplan pointed out, that to the extent we didn't use those -- that segregated reserve to resolve the claim for which the reserve was established, then that unused portion would drop back to the general disputed claim reserve for everybody else's claims that -- who still had unresolved claims.

THE COURT:  Now, let me get something clear here so that I can pick it up.  Is that why NorthWestern transferred 136,000 shares to Law Debenture and the warrants at the time, which was less than the 550,000 shares set in the Plan for the option one?  Is that --

MR. AUSTIN:  Yes, Sir, the option one shares went to Law Debenture because option one accepted and that was their -- we didn't have to set a reserve for their claims, period, because we knew what their claims were.  What we really had left was -- I'm gonna give you some round numbers.  Roughly the pre-petition Quipps claims, including interest, was roughly $69

million.  Roughly $19.8 million of Quipps accepted the Plan.
So we made a distribution to Law Debenture on account of that
19.8, roughly, claims, and that's what got distributed to Law
Debenture.  The balance, which is roughly $48.8 million of the
face amount of claims, inclusive of interest we believe, is
really what Mr. Kaplan and Mr. Snellings effectively represents
today.  But those -- and that's the claims that went into the
disputed claims reserve.  That's the claims that we did the
segregated reserve of a $25 million claim and set aside stock
for that $25 million claim.

As was noted, each of the stipulations specifically
provided that if the reserve was not used to settle the claim,
that reserve fell back into the disputed claim reserve so all
undisputed claims could then still look to what then was in the
completed pool.  These stipulations were fully noticed with no
objection from anyone and specifically including the prior
Creditor's Committee, the forerunner of the current Plan
Committee.  Indeed, the PPL stipulation itself was incorporated
into the October 19th Confirmation Order at paragraph 27.  And
the Law Debenture stipulation was filed prior to the November 1
effective date of the Reorganization Plan with no objections
being filed.  And it is acknowledged by NorthWestern that the
segregated reserves for PPL was released to disputed claim
reserve upon the settlement with PPL where we had to -- we used

none of the reserve for the PPL claim.

But NorthWestern does dispute and disagrees with the Plan Committee and the Ad Hoc Committee's view that all of the PPL segregated reserve is now surplus available for distribution to class 7 and class 9 allowed claimants. But again, we also disagree with Magten and Law Debenture that 100% of that necessarily has to stay in the reserve and not be distributed at this time. Whether and to what extent there may be a surplus in the disputed claims reserve available for distribution is dependant on whether NorthWestern is required to retain stock in that reserve for the balance of the non-accepting Quipps asserted claims and any amount for a civil claim that could be asserted by the SEC. Following this Court's comments it is prepared to say the SEC is now time barred, then NorthWestern's prepared to continue no reserve for any SEC claim, as long as that's incorporated into an order. For the Court's perspective, we did include no reserve, no claim for the SEC in the disputed claim reserve based on the fact that the SEC had not even filed a place holder claim by the established bar date, and that secondly, the Plan effectively released any such claim as to the Debtor, a Plan which the SEC reviewed and actually commented on.

With respect to the claims of non-accepting Quipps, let's give a recap so this Court's clear and aware of where things

stand.  As we noted, Your Honor, the initial class 9 reserve
was set at $140 million.  That represented a Plan value 4
million, 409,100 shares.  At this point, Your Honor,
NorthWestern has settled all allowed claims, other than the
Magten/Law Debenture claims of roughly 41 million, 700,000 of
claims, which references and including the Matson claim, which
was resolved today, would have provided for a distribution of
roughly 1 million, 3 shares of the 4 million, 409 shares.  That
leaves at this point in the disputed claim reserves $98 million
325,692 of claims unresolved, and shares of 3 million, 96,628.

 Against those you do have a reserve of a $25 million claim
already established pursuant to stipulation for Magten and Law
Debenture, which equates to 787,339 shares set aside.  What you
then have is roughly a balance of 2.3, I believe, of shares
available for distribution.

    We would agree with Mr. Kaplan's comments with respect to
one portion of the Quipps claims, and we also would agree with
a portion of the Plan Committee's comments with respect to the
Quipps claims.  Where we agree with the Plan Committee is that
to the extent that you are looking at a face amount of
remaining claim, and we do believe this includes pre-petition
interest, then the face amount of the non-accepting Quipps
claim is roughly $48.8 million.  If you subtract the $25
million that's already set aside in claims, that leaves, at

46

least as to the face amount of the claim, roughly $23.8
million.  If you set aside shares for that, that would be
another 751,348 shares.  Where we agree with Mr. Kaplan and Mr.
Snellings is that the Indenture -- the Quipps Indenture does
provide that to the extent that the Indentured Trustee has to
litigate to recover on its claims and prevails, then that
Indentured Trustee is entitled to recover those fees and costs,
I believe it's reasonable fees and costs, from the Debtor, from
NorthWestern.  And to preserve that claim, Law Debenture did
timely file a Proof of Claim.

So Your Honor, to the extent NorthWestern -- and this
Court is looking to determine if there is indeed a surplus --
is required to retain something for the Law Debenture non-
accepting Quipps claims, we do believe it would be appropriate
that there be an additional hold-back, if you will, for some
amount of legal fees, which would be consistent with what
NorthWestern did when it negotiated a resolution with the
representatives and the Indentured Trustee for the Toppers.  To
recap that, and which is embedded in the reorganization claim,
Your Honor, NorthWestern agreed in the settlement with the
Toppers that it would pay $2 million 250,000, I believe, in
cash to Wilmington Trust on account of the fees and expenses it
incurred to litigate and to reach the settlement with
NorthWestern.  That did not pay 100%, however, and Wilmington

Trust did ultimately assert a claim for roughly $1.3 million on
account of a charging lien -- Trustee's charging lien against
the Topper's distributions back when we made distributions in
November of 2004.

So it would be appropriate, we believe, Your Honor, to
establish some additional reserve, if the Court is going to
allow some additional reserve, for some attorneys fees. Taking
just a ballpark number, we think that number may well be around
$5 million. We recognize that might be high, but we also have
reason to believe that a combination of Law Debenture's counsel
and Magten's counsel either has reached that number or has
exceeded it, so it's not an effort to put 100% in the reserve,
but is at least allowing something in the reserve in the event
they would prevail. If they don't prevail, then they're not
entitled to that, and any stock offering not used that's
retained would ultimately be distributed out to the class 7 and
class 9 allowed claims.

If NorthWestern is required to retain additional amounts
and that is all, there may well be -- and this is just for the
Quipps, for this additional amount in the face amount of the
claim and the additional amount for attorneys fees. And to put
that in raw numbers, Your Honor, if you did that, that would be
setting aside an additional 900 -- 8,000, roughly, shares for
the non-accepting Quipps. And if you add that to the current

reserve of roughly 787,000 shares, and then subtract those two
numbers or that summation from the undistributed shares of
roughly 3 million, 96,000, there may well be a surplus of
shares to distribute to this point of 1.4 million shares.  If
NorthWestern is to make any distribution, we believe it must be
based on an order which provides recognition that there is no
need to require any additional reserves for the non-accepting
Quipps, as well as no additional -- no reserve at all for the
SEC.

    Mr. Kaplan is correct that as a Debtor, NorthWestern does
owe a duty to all of it's Creditors to treat them fairly and
consistently.  To treat all Creditors fairly and consistently,
it may well be the appropriate action to allow for an
additional reserve for the non-accepting Quipps, but at the
same time, check their numbers and provide for some additional
distribution at this time.  We would note that this may well
provide resolution on this particular issue, and at this point,
there then would not need to any additional surplus
distribution process until -- unless and until the Magten --
the going-flat litigation and stuff is ultimately resolved,
which is, as Mr. Kaplan pointed out, before the District Court
for resolution.

    All that said, Your Honor, NorthWestern's prepared to do
what this Court may well think is appropriate, but we've tried

49

to give this Court the analysis of what may well be a decent
road map to resolve the issue before the Court today.  Thank
you.

THE COURT:  All right.  Mr. Kaplan, you can respond to
Mr. Austin.

MR. KAPLAN:  Thank you, Your Honor.  Your Honor, first
off, I don't have the benefit of the math, and I've heard it
today for the first time, but it's certainly not something that
I can verify.  With respect to the fee amount, the amount for
legal fees, I don't believe that it's appropriate without a
full Estimation Hearing, without -- you know, without any
evidence to just say, "Well, you know what, we'll cap it at" --
you know, he threw out $5 million.  We'll say that's the number
and we're done.  Litigation, as I mentioned, is in the early
stages.  Discovery is just starting.  We've seen how long this
case has gone on.  You know what, if there's another 2 years of
litigation, which, you know, for my own sake I hope doesn't
happen.  But if this goes on for a long time, those litigation
-- the fees could be more than that.  And I think the number
that was thrown out was the number of fees to date.  But the
Proof of Claim doesn't say, you know, fees and expenses until
January 10, '06.  It's fees and expenses until the claim is
allowed.  And if there is going to be some process or some
estimation, there needs to be a reasonable number to ensure

that at the end of the day the Proof of Claim that was filed by
Magten and by Law Debenture get not one penny less than they
are entitled to.  And the only way that it can be any less than
they are entitled to is with an Estimation Hearing or a number
that you say, well, you know what, let's be, you know, well
over and inclusive and come up with a number that's, you know,
well higher so we don't have to do that.  But I don't think
that we can pick a number say, well, that's what, you know,
maybe has been spent to date.  Let's assume that that's the end
of it and come up with a number.

THE COURT:  Well, maybe I missed something here, but
with regard to the last settlement that was proposed, as Mr.
Austin stated, Wilmington Trust is going to get paid $2.5
million in cash, not shares.

MR. KAPLAN:  No, that's a different --

THE COURT:  And --

MR. KAPLAN:  settlement.  That was a settlement with
the Toppers that -- what he was referring to was the settlement
--

THE COURT:  All right, now on that issue with regard
to Law Debenture then, they can't take cash, they have to take
the shares, is that what you're saying?

MR. KAPLAN:  Well, they had trouble -- well, they --
we had tried.  We had tried to get them cash and they had filed

a motion seeking to get their fees paid in cash and they -- you
know, it was found that they were only entitled to a limited
portion of their fees.  So they are entitled -- you know, we
believe and Law Debenture believes that under the Plan they are
entitled to get it in cash.  But, you know, the Debtor's
position -- I believe the Plan Committee's position is that
they have to shares.  If they want to say today Law Debenture's
fees get paid in cash, that may resolve that issue.  But so
long as they say well, they're stuck in the -- they're in the
reserve, you know, we can't have two -- multiple claimants with
disputed claims sharing against the shrinking pot.  And that's
what's gonna happen if you have claims that keep growing, but
the pot doesn't expand.  So again, if at the end of the day if
all the numbers are right and the math is right, you know, yes,
maybe there is some surplus.  But I don't think we can have a
surplus which says, you know, for every day that Magten -- that
Law Debenture continues litigating, the amount of it's -- the
amount that it can recover on its claim is going to shrink.

          THE COURT:  All right, thank you.  Plan Committee
counsel?

          MS. PHILLIPS:  Thank you, Your Honor.  I hope to make
this brief.  The first point I wanted to address was the
motivation of the Plan Committee.  We're simply trying to
enforce the Plan here.  We're not trying to change what Section

7.7 says.  We're not trying to, you know, do something that the
Plan doesn't explicitly provide for.  And, you know, as far as
Magten's counsel questioning the Plan Committee, I mean, they
have throughout this case tried to overturn the Plan, they've
tried to modify the Plan impermissibly.  So, I mean, we're the
fiduciary that's actually trying to enforce the Plan and -- as
written and confirmed.

        THE COURT:  Let me ask you this, Counsel.

        MS. PHILLIPS:  Sure.

        THE COURT:  Would you concede the under Section 7.7 of
the Plan, which has to do with the surplus distribution, that
it's contemplated that all of the disputed claims would be
resolved before there would be a distribution from the surplus?

        MS. PHILLIPS:  It doesn't say that, Your Honor.  If it
said that --

        THE COURT:  Well, what does it say?

        MS. PHILLIPS:  What it says is there's to be surplus -
- there -- it -- to the extent shares --

        THE COURT:  You mean it says to the extent that --

        MS. PHILLIPS:  To the extent shares --

        THE COURT:  -- a disputed a claim is not allowed or
becomes an allowed claim in an amount less --

        MS. PHILLIPS:  That extent --

        THE COURT:  -- any excess will be attributable to the

claim and distributed?  To me, that means that the disputed

claim has to be resolved, and you can't to the distribution of

surplus until there has been a resolution of all the disputed

claims.

MS. PHILLIPS:  But Section 7.7 also goes onto say that

there are going to be -- to the extent shares become surplus

distributions, there will be distributions -- surplus

distributions every 6 months.  The Plan could have said you're

gonna have the initial distribution and then you're gonna have

the final distribution.  And instead, what the Plan provides is

you're going to distribute surplus distributions, which is a

differed -- defined term within the Plan, every 6 months.  And

so that is what under cuts any type of reading that you're only

gonna have the initial and then the final once you resolve all

the disputed claims.

THE COURT:  Well, I guess I come down to the point

where I just think the argument at this time is premature in

view of the Magten outstanding litigation.  Exploding out there

somewhere between what they had said in their -- in the reserve

of 25 million shares, to in excess of 48 million.  And clearly,

it hasn't been resolved.  And for the rest of the Creditors now

to come in and say, "Well, we don't care that it's under

dispute, we'll take the $25 million figure, even though that

stipulation provides specifically different.  And we want the

54

rest of the shares." And then what happens if Magten recovers
their $48 million plus and there are shares in there to cover
that judgment? What happens then? Do we go back to your
clients and say, "Hey, pony back up the shares."?

MS. PHILLIPS: The answer to that is, Your Honor, it's
-- you know, the best they can do is they can -- I mean, one
proposal by NorthWestern's counsel is that we hold back a
reserve for Magten equivalent to their class 9 claim and --

THE COURT: Well, that's what Mr. Austin proposed --

MS. PHILLIPS: And --

THE COURT: -- and I want you to address that. He
says perhaps there's 1 million, 4.

MS. PHILLIPS: Well, we would say that at that -- the
-- at minimum, there's the 48.8 and then reasonable attorneys
fees. And we would say that, you know, reasonable is not 5
million, 10 million. I'm sure that --

THE COURT: I'm not going to settle that issue in this
-- on this motion. I can tell you that right now. That's an
open ball game, where ever it comes down. But they have made
an allocation of 908,000 shares for that potential liability,
and that still leaves the 1.4 million share surplus, according
to them.

MS. PHILLIPS: We would say that if there was -- if
the Court could set a reserve for Magten in the full value of

their class 9 claim, you know, including attorneys --
reasonable attorneys fees to the extent they're allowed, then,
you know, we believe that the Plan as written should be
enforced and allow for a surplus distribution.  It doesn't say
only a surplus distribution when everything's resolved.  It
specifically provides that there will be surplus distribution
every 6 months.  I don't see how you can ignore that language.

   THE COURT:  Well, because until today, I guess, we
really didn't know whether there was a surplus.  And I will say
this, that I interpret Section 7.7 as requiring a full
resolution of all disputed claims before there can be a
distribution.  That only makes sense to me because if you don't
get them all reserved, you don't know what is there
(indiscern.).  And Magten isn't resolved.  That's the only one.
 But to say now, "Well, we want everything in excess of $25
million which was set aside in the stipulation," the
stipulation doesn't say that.  The stipulation was covered both
sides of that recovery.  If it's less, you get more shares
yourselves.  If it's more, Magten has to -- there have to be
more shares given to Magten.  So between the stipulation and
7.7, there has to be a protection to the disputed claim of
Magten.

   MS. PHILLIPS:  Well, I think that --

   THE COURT:  And if we get that done, then if there's

some shares left at this time to comply with the 6 months rule,
perhaps you're entitled to a distribution of that surplus.

MS. PHILLIPS:  And I think to give affect to the
stipulations and also to protect Magten's class 9 claim, the
Plan Committee would be willing for there to be an increase of
their reserve and that the Court should distribute --

THE COURT:  And of course --

MS. PHILLIPS:  -- everything else.

THE COURT:  -- it would be in the interest of your
client to go back and try to recycle the agreement that would
have been made previously and you'll get more shares.

MS. PHILLIPS:  Your Honor, we were not part of that
Settlement Agreement.  I --

THE COURT:  Somebody was.

MS. PHILLIPS:  Well, we were not invited to that
party, Your Honor.

THE COURT:  Well, invite yourself in.  You've got an
interest in it.

MS. PHILLIPS:  I understand that, but I'm not --

THE COURT:  I'm not trying to pressure you, I'm just
trying to suggest that you maybe should do so.

MS. PHILLIPS:  Well, we thought we should have been at
the table the first time.

THE COURT:  All right.

MS. PHILLIPS:  As far as -- but as far as giving to effect the stipulations and the orders that were entered post-confirmation, as well as Section 7.7, the Plan Committee believes that you've -- there needs to be a surplus distribution per Section 7.7, and if that means there has to be an increase of Magten's reserve to the full amount of it's class 9 claim, we're willing for that to happen.  But, you know, 48.8 and -- Law Debenture filed it's fee application asking for approximately $1 million, 25,000 worth of fees. That's close to $50 million.  So we think that if there was a $50 million reserve in there of a class 9 claim, that everything else can go out and that should protect Magten.

THE COURT:  All right.

MS. PHILLIPS:  And that would give effect to the actual language in the Plan.

THE COURT:  All right, thank you.

MS. PHILLIPS:  Thank you.

THE COURT:  Anyone else back in Delaware wish to speak?

MR. WILLIAMS:  Your Honor, Matthew Williams for the Ad Hoc Committee, real quickly.  I'm just -- I don't necessarily see a difference or an inconsistency between the stipulations and the Plan.  I think what's being lost here a little bit is that Magten got a benefit in connection with the stipulation

that a lot of other Creditors didn't get.  Magten got a

segregated reserve, and in essence, was able to put off an

estimation hearing on its claim.  It said, "Okay, here Magten,

don't worry about the reserves, we're going to set aside 25

million for you -- or a $25 million claim amount.  And to the

extent that -- and you're protected.  And by the way, to the

extent, at the end of the day, if you have a larger claim, you

can come back and look to the disputed claims reserve."  But

nowhere in that stipulation does it guarantee Magten a certain

amount that it's going to be able to recover from that reserve,

nor does it guarantee --

                THE COURT:  I'm -- well, Counsel, I don't think it's a

guarantee, I just think it's setting aside a reserve that was

set aside for other Creditors, too.  Take an example, the PPL

claimants.  It set aside a reserve for $50 million and the

claim never came anywhere close to that so they got a release

of over 2.2 million shares.

                MR. WILLIAMS:  I understand --

                THE COURT:  What's the difference between --

                MR. WILLIAMS:  -- Your Honor, but Magten --

                THE COURT:  -- treating Magten the same way as we did

PPL?

                MR. WILLIAMS:  I completely agree with that, but all

I'm saying is for Magten to come in now and say, "I'm entitled

to everything in that reserve" -- not only that, I would
concede that if Magten's claim were settled today or tomorrow,
they would be able to look to that reserve because that's what
the stipulation says; the stipulation says I can look to the
disputed claims reserve, right. But it doesn't say and it
doesn't guarantee that what's going to be in that disputed
claims reserve. And when you look at the Plan, the Plan says
every 6 months we do a surplus distribution, and everything in
that disputed claims reserve that's not segregated for somebody
else is surplus and that should go out the door. So for Magten
to come in now and say, you know, "You've got to keep
everything in that disputed claims reserve" -- basically what
they're doing is they want to amend their stipulation. They
want to take their stipulation that says, "I'm entitled to hold
back -- you know, you have to hold back $25 million for me,"
and they want to bump that number up.

      THE COURT: And it works both way for you people. If
the litigation does not generate $25 million in a judgment by
Magten, you get the extra shares. If it exceeds $25 million,
then the holders of such claims, the Quipp claims, will have
the deficiency satisfied out of the disputed claims reserve.
It works both ways.

      MR. WILLIAMS: I agree, but --

      THE COURT: That stipulation I'm not going to back up

on.  You had notice of that stipulation.

         MR. WILLIAMS:  And I'm not asking you to back off --

         THE COURT:  And you signed off and that governs what
the Magten -- how they treated the Magten claim.

         MR. WILLIAMS:  Your Honor, all I'm saying, I think, is
that I would submit that I'm not asking you to back up on the
Magten stipulation, I'm saying enforce the Magten stipulation
pursuant to its terms.  And what I think the Magten stipulation
says is that you've got to hold $25 million segregated for me,
and to the extent there's something in the reserve at the end
of the day when my claim is settled I can look to that.  But
there's no guarantee as to what's going to be in that reserve.
And indeed, the Plan requires that amounts in that reserve be
distributed out.  And the reason for that, and the reason
Magten agreed to that is because they got a benefit in this
stipulation.  And the benefit they got that other unsecured --
disputed unsecured Creditors didn't get is that they were
assured that no matter what, at the end of the day, whether PPL
came in at a huge amount and there wasn't -- no matter what,
they were going to get at least a $25 million claim, if their
claim was allowed at that amount.  And that's a benefit that
other disputed Creditors didn't get here.  And as to the
nefarious motives that have been attributed to Harvard, the
Plan Committee spoke to them, and I don't think I have to speak

further on that.  We represent over 65% of the class 7
Creditors, and I will tell you that all of these Creditors are
focused on, you know, getting these shares because the Plan
requires that they get the shares in it's in their monetary to
do so.  And that's all I'll say on the motives point.  I don't
think there's such (indiscern.).

THE COURT:  (Indiscern.) draw your opposition to a
settlement that was proposed before?

MR. WILLIAMS:  Your Honor, I -- no, I'm not -- if a
settlement could be worked out, I don't think we would oppose
it, I just wanted to explain our position on the record.  I
think that a settlement probably would make sense, but I just
don't necessarily see that the stipulation and the Plan are
contrary to each other.  I can read them together.  But I don't
think the Ad Hoc Committee would stand in the way of a
settlement.

THE COURT:  All right, thank you, Counsel.

MR. KAPLAN:  Your Honor, just so the record is clear
on that point, one of the appeals that's before the District
Court is our appeal of the denial of the 9019 Motion, which the
Plan Committee and the Ad Hoc Committee, all of which are
opposing our appeal saying this element is ridiculous, we never
argued that there wasn't enough in the reserve and, you know,
that settlement's crazy.  But that's one of the decisions

that's before Judge Farnan is that in our view settlement, the
Debtors always said and continue to say, is in the best
interest of the estate.  Their issue before that said there's
not enough in the reserve presumably has gone away, and you
know what, I mean, we would still say and have said before, the
same settlement, increase the fees to cover the last year and a
half of litigation to make sure there's not some lost, and we
could all go home and the rest of the reserve could be
distributed.

     MR. WILLIAMS:  Your Honor, Matt Williams again.  One
other thing I just wanted to clarify.  What I was saying is I
wouldn't oppose a settlement in this motion along the lines of
what we were discussing earlier, i.e., you know, figuring out
what a proper reserve for Magten would be at this time and
moving forward to making a surplus distribution.  At this
point, we have no intention on settling that 9019 Motion.  I
just wanted to make that clear.  Because we think --

     MS. PHILLIPS:  Your Honor?

     MR. WILLIAMS:  -- no matter what --

     THE COURT:  Thank you very such.

     MR. WILLIAMS:  Okay.

     MS. PHILLIPS:  Your Honor, Margaret Phillips again of
Paul Weiss.  Just to clarify the record and respond to Mr.
Kaplan's response.  The basis for the Plan Committee's

objection to their joint 9019 Motion was and continues to be
that it violated the express terms of the Plan.  In addition,
we thought that the settlement was -- amount was too high,
however, with respect to the appeal, the focus is on the legal
issue of whether this Court was correct, and we believe it was,
in denying that motion based on the fact that it was concurrent
to the express terms of the Plan.  That's it, Your Honor.

    MR. SNELLINGS:  Your Honor, John Snellings in
Delaware.  Just to clarify a couple statements with respect to
the Plan Committee's statement about our fee application of 1.4
million, that was as of the effective date in November 2004.
We are all well aware that much more water has gone over this
dam since then, and that includes two failed mediations, both
of which the Plan Committee was at the table, and as well as
distribution issues, as well as the ongoing litigation in the
District Court.  And just to give a flavor of that with regard
to the two orders that are before Judge Farnan, Magten and Law
Debenture suggested that we could get discovery done in 4
months, but the Debtor and the rest of the parties want a year.
 So it's going to be very difficult for anyone to estimate what
the total fees of Law Debenture will be in that litigation.
And so I think this is a cautionary tale that we must proceed
with any type of continuing reserve with regard to the claims
of Law Debenture and Magten.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Snellings.  I think I am disposed to telling all the parties that if they want to get a surplus, get a resolution of the Magten case.  And until that case is resolved, there will be no Distribution Order.  It seems to me that you can't have it both ways.  You either sit down and get reasonable about it on both sides and try to get it resolved -- and it's obvious that there's -- if that is resolved there's a least going to be a distribution.  And that'll be a benefit to all the clients.  But if you're going to hold it up and let this thing go on for a year and 3 years, my difficulty with that is that the costs keep increasing, the surplus will get less, and you'll be hurting your clients.  So that's the way I'll leave it.

MR. AUSTIN:  Your Honor, we will present an order that -- based on your rulings.

THE COURT:  Yes.

MR. AUSTIN:  All right.  Would this be a good time to kind of re-cap where we are then?

THE COURT:  We're at the SEC claim.

MR. AUSTIN:  Excuse me.

MS. DENNISTON:  Excuse me, Your Honor, we have also one matter left on the agenda to dispose of, even though there has been an order --

THE COURT:  Let's take up the SEC claim, and then

we'll go on to the last matter.

MS. DENNISTON:  Thank you, Your Honor.

THE COURT:  When I gave a status report, because I've got to report into -- I've got a request for (indiscern.) about where we're at in this case, and there's three more Judges coming on in April or May -- or March and April, and I suspect that some of this is going to be turned over to them.

MR. AUSTIN:  With respect to the SEC claim, Your Honor, we think we can incorporate this Court's prior comments and ruling within the order on the Surplus Distribution Motion simply to say, you know, this Court has reviewed the record and they cannot assert a claim if they ultimately decide to assert a claim based on the --

THE COURT:  Just put in the language that this does not prejudice the SEC's claim against any non-Debtor.

MR. AUSTIN:  Correct.  That's in the Plan, Your Honor, we'll put that in the order.

THE COURT:  All right.

MS. DENNISTON:  Your Honor, the last remaining item on the agenda is item #6.  This was the Joint Motion of Franklin Mutual Advisors and the Plan Committee in Aid of Consummation and Implementation of the Plan Order Compelling Law Debenture to instruct DTC to distribute shares to holders.  This Court did continue this matter at the request of the parties, but

it's my understand that Mr. Snellings is in Delaware and has comments for the record about the status of that distribution. And I wanted to be sure before we close the agenda that to the extent that there were any comments --

THE COURT:  I vacated that hearing, didn't I?

MS. DENNISTON:  You continued it, yes you did, Your Honor.

THE COURT:  Yes.  Yes.

MS. PHILLIPS:  Your Honor, this is Marge Phillip again on behalf of the Plan Committee.  Part of us filing that Motion for the Order to Continue and Vacate that was an agreement with Mr. Snellings that he would make certain representations on the record that the documents were to be finalized and that the distribution would go forward.  So we would appreciate if he had an opportunity to make those statements on the record.

THE COURT:  He may.

MR. SNELLINGS:  Your Honor, I'll make this quick. With respect to the partial distribution, I can report to the Court and put on this record that Law Debenture has authorized its custodian, Commerce Bank, that was holding the warrants and shares, to initiate what is called a DWAK transfer to the transfer agent, LaSalle Bank; this is the transfer agent of NorthWestern, the Debtor.  And as of yesterday, the two institutions did speak and confirm that today, January 11th,

that they were prepared to transfer 254,241 warrants to
LaSalle, as well as 30,000 shares of stock.  Per LaSalle's
instructions, they were given notice of that yesterday, January
10th, that the transfer was going to occur January 11th.  Last
night at approximately 5:05 I received an email confirmation
from LaSalle that they had received such notice and were
prepared to receive such a transfer.  I could not confirm,
since Blackberries are taken from us as we enter the building,
that the transfer had actually occurred, but all buttons were
ready to be pushed.  I also understand from communications with
individuals at LaSalle that they have been in communication
with bond holders communication group, the agent of the Debtor
that is assisting LaSalle in the ultimate transfer to the
participants.  There is only one issue that is somewhat
connected, yet outside of the various papers that the parties
have drawn up in the last week, and that was the existence of a
cash dividend that had been paid over the last several months
to Law Debenture.  Law Debenture intends to distribute that
dividend.  We had thought that it would best, since these are
stock transfer agents, that we give a equivalent amount in
stock so that there would be a consistency and ease of
transfer.  We understand early this morning that the Debtor
might desire, as well as the Plan Committee, that a cash
dividend, the cash actually be distributed.  And to the extent

that whatever documents are necessary to finalize that type of distribution, Law Debenture promises to work with NorthWestern to finalize any requisite documents so that that distribution can continue as well.  But with respect to the 30,000 shares and the 250,000 warrants, that transfer has not been in any way delayed due to the fact that we have this issue regarding the cash dividend.  Thank you, Your Honor.

THE COURT:  Well, I don't understand how the cash dividend can be paid in stock.

MS. DENNISTON:  Your Honor, Karol Denniston on behalf of NorthWestern.  We have advised Law Debenture that it is the Debtor's position that would be a violation of the Plan which requires the dividends to be paid in cash because the dividends travel with the shares themselves --

THE COURT:  The post-confirmation -B

MS. DENNISTON:  -- and it would be not only inappropriate, but it would impair possibly other distributions to the holders if the stock is used for that purpose.  So we have advised the Debtor -- or advised Law Debenture that that would not be acceptable and that we will work with them to effectuate procedures to distribute the dividends, but they must be paid in cash.  They are being held in a restricted account for that purpose at NorthWestern, and we cannot permit a distribution of shares.

THE COURT:  All right.

MR. SNELLINGS:  That's fine with us, Your Honor.

THE COURT:  Thank you.

MS. DENNISTON:  Your Honor, that concludes the agenda.
I think Mr. Austin's going to handle the status report.  In
the event that there's housekeeping matters that are left, I'll
address those at the end.

THE COURT:  All right.

MR. AUSTIN:  Thank you, Your Honor.  With the rulings
on the matter before the Court today, and as we have done a
quick inventory of matters still pending or that impact the
NorthWestern Chapter 11 case, we've come up with a list of only
seven general areas.  I say areas because two of these are in
broad areas, but of these seven, there's really only four that
I would put in the category are actually before the Bankruptcy
Court itself.  The first is that we did file a motion this
week, last week, on negative notice to terminate the various
Delaware Business Trusts that form the Toppers.  And that was
just a mechanical thing to get completed under the
Reorganization Plan.  We do not anticipate any type of
objection, and once the notice period has run, we anticipate
just presenting an order allowing that termination of those
business trusts to occur.  The second matter that still has
some life technically are the claims that NorthWestern has to

70

address relative to Touch American, which filed claims in this estate, as well as claims Northwestern has filed against the TA case.  For the most part --

        THE COURT:  (Indiscern.).  Who was the last one?

        MR. AUSTIN:  NorthWestern's filed against the TA, Touch America, case.

        THE COURT:  Yes, okay.

        MR. AUSTIN:  For the most part, those claims are, as a matter of law under the Bankruptcy Court Code, subordinate because they're indemnification claims.  In fact, we have shared with the TA, the Touch America counsel, a proposed stipulation that indeed allows the Touch America claims in an amount to be determined if it's necessary in the future, but to specifically provide for provisions of the Bankruptcy Code that those claims are subordinate because they're indemnification claims.  We're also working with the Touch America counsel to resolve the claims in an adversary case that Touch America actually filed against NorthWestern to determine some of the issues raised in the McGreevy litigation in the Touch America bankruptcy case.  That case is before Judge Carey.  We think there'll be Cross Motions for Summary Judgment and there will be a resolution of that, but Judge Carey ultimately gets to decide that real issue.

        The third matter that still is somewhat alive is the

adversary case which we filed against the McGreevy Class.    This

Court had granted a prior injunction, as requested, to prevent

the McGreevy Class from pursuing State Court litigation post-

confirmation.    We have to come back and ultimately file a

summary judgment to resolve that completely, because I know it

was a preliminary injunction, but to complete that case.    In

the interim, the McGreevy Plaintiffs filed an appeal and filed

a Motion for Interlocutory Appeal.    That Motion for

Interlocutory Appeal has been completely briefed.    We are not

aware of any request by the McGreevy Class counsel for oral

argument, so technically that matter would be before this

Court, and this Court would actually issue a ruling either

granting or denying that appeal.    That's -- obviously

NorthWestern thinks the appeal should not be granted, but that

one has been completely briefed and (indiscern.) issued.

The last matter that is still within the province of the

Bankruptcy Court is to the extent that any issues arise

relative to allowance of claims and availability of insurance

to cover those claims under the D&O Trust, which was

established.    The mechanism under the D&O Trust is to the

extent there was a dispute relative to the allowance of either

the claim or the insurance coverage, that we would bring that

dispute back tot he Bankruptcy Court for an ultimate

adjudication.    No issues -- I can advise the Court no issues

have yet actually come to litigation, although I can advise the
Court that certain of the insurance carriers are taking the
position that some of the remaining policies may not be
available for the nature of the claims so that we may have an
issue on that in a couple of months.  But we don't have a live
issue on it yet.  I'm just letting the Court know as long as
the Bankruptcy case remains open, and it has to remain open,
that's one of the issues that could have to be addressed.

·The other three matters are fairly discreet, although two
of them involve multiple proceedings.  A discreet matter is the
litigation on allowance of the claim filed by the Carnival
Hamilton entities.  That matter has a Summary Judgment Motion
pending.  That litigation was transferred by this Court to
Judge Baxter, who recently transferred that litigation and
resolution of the summary judgment in the proceeding in the
adversary case to Judge Carey.  So that litigation is before
Judge Carey, it technically is not before Your Honor.

The other matters that are still out there are all of the
appeals associated with the Confirmation Order, the Settlement
Order, what-have-you.  And in connection with that technically,
the adversary proceeding initiated by Magten and Law Debenture,
generally referred to 1144 adversary case, of which has been
noted this morning has been stayed pending the outcome of the
appeals.  Because there are appeals, there obviously is nothing

for this Court to act upon because this Court's been removed of jurisdiction based on the appeals.

The last matter that involves the bankruptcy case, but again, not this Court, is all of the relative litigation referred to as the Magten/Law Debenture going-flat litigation. All of that is currently with Judge Farnan, having withdrawn the reference of the pending adversary cases. And as noted, it is proceeding forth with discovery because unfortunately efforts to again mediate a resolution were unsuccessful.

So that gives you a re-cap, Your Honor, of what we have left, what few matters we think we have left in this proceeding. If you have any questions, I'm glad to answer --

THE COURT: No, that'll be enough. I can get that off to Judge Walrath and then we'll decide how she wants to assign them.

MR. AUSTIN: Okay. Thank you very much, Your Honor.

THE COURT: Thank you.

(Court adjourned)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Signature of Transcriber                        Date