IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | Civil Action No. 04-1494-JJF |
| MAGTEN ASSET MANAGEMENT CORP.,<br><br>Plaintiff,<br><br>v.<br><br>MIKE J. HANSON and ERNIE J. KINDT,<br><br>Defendants. | Civil Action No. 05-499-JJF |

**SUPPLEMENTAL SUBMISSION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK IN FURTHER SUPPORT OF PLAINTIFFS MOTION TO <u>COMPEL PRODUCTION OF DOCUMENTS</u>**

As directed by the Special Master during the telephonic hearing on January 15, Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") hereby make this supplemental submission in further support of their Motion to Compel.

The primary issue Plaintiffs will address is the relevance to this litigation of documents related to the SEC's investigation of NorthWestern as well as documents submitted to regulators in connection with the transaction at issue. In order to explain the relevance of those documents more fully, we will first address the nature of the claims in the litigation, then the impact of

120087.01600/40166723v.1

Judge Case's decision on NorthWestern's 12(b)(6) motion, then NorthWestern's public admissions as to its prior financial statements and the scope of the SEC investigation.

### Plaintiffs' Fraudulent Conveyance Claims Against NorthWestern[1]

Plaintiffs ultimate liability case is simple and reflects the basic elements of any fraudulent conveyance claim. The QUIPs represent debt obligations of Clark Fork, whose predecessor was an independent public company when the QUIPs were issued, but which as of November 2002 had become a 100%-owned subsidiary of NorthWestern. As a result of NorthWestern's control and domination of it, Clark Fork transferred (the "Transfer") essentially all of its assets (the "Montana Power Assets") to NorthWestern without receiving adequate consideration in return.[2] As a result of the Transfer, Clark Fork was rendered insolvent. As a result of the ensuing insolvency, the holders of the QUIPs did not receive what they were owed, and are accordingly entitled to recover their losses from NorthWestern to the extent of the excess value NorthWestern received as transferee of the Montana Power Assets.

With respect to this basic case, Plaintiffs do not need to establish subjective fraudulent intent on the part of NorthWestern. Rather, the transfer for inadequate consideration of the assets of a debtor thereby rendered insolvent is deemed constructively fraudulent as a matter of law without regard to actual intent. Nor do Plaintiffs need to establish the falsity of NorthWestern's public financial statements prior to the transfer.

However, presumably because it had no other colorable defense on the merits, NorthWestern chose to attack Plaintiffs' standing to sue. This led to Judge Case's decision,

---

[1]  We will focus on the relevance of these documents to the claims against NorthWestern. However, the same documents also are relevant to what Messrs. Hanson and Kindt knew or should have known in the exercise of due care about NorthWestern's solvency and ability to meet the QUIPs-related obligations it was purportedly assuming as of the date of the Transfer, which is relevant to Magten's breach of fiduciary duty claims against them.

[2]  While the value of the Montana Power Assets was in excess of $1.4 billion, NorthWestern assumed barely $700 million in liabilities in the Transfer.

2

which transformed NorthWestern's prior public financial statements and other public representations as to NorthWestern's financial condition, as well as the extent of its contemporaneous knowledge of their falsity, into key issues in the case going forward.

<u>Judge Case's Decision on NorthWestern's Standing Defense</u>

NorthWestern's standing defense is, in essence, that the very transfer that stripped Clark Fork of its assets and ability to meet its obligations simultaneously stripped the QUIPs holders of their status and rights as creditors of Clark Fork, immediately rendering them out-of-the-money junior creditors of an insolvent NorthWestern. NorthWestern bases this argument on a purported release of Clark Fork from all QUIPs-related obligations derived from section 1102 of the governing indenture. (In essence, the argument is that the fraud was so pervasive that there is no one left to complain about it).

In his August 20, 2004 decision, Judge Case accepted NorthWestern's argument that section 1102, if effective, would strip Plaintiffs of their rights as creditors of Clark Fork and accordingly bar a fraudulent conveyance claim. However, Judge Case denied NorthWestern's motion to dismiss because the effectiveness of the section 1102 release was subject to dispute and could not be decided on the pleadings.[3]

In particular, Judge Case ruled that section 1102 could not protect NorthWestern if it had "engaged in a knowing and conscious fraudulent scheme" and "intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly" at the time of the Transfer. Decision at p. 9. The key "fact questions not appropriately resolved on a motion to dismiss" were identified as (1) "whether [NorthWestern] knew at the time that it could not do

---

[3] To the extent Judge Case rejected Plaintiffs' various other arguments against NorthWestern's motion, Plaintiffs respectfully disagree. Judge Case's decision was interlocutory and thus has not yet been subject to appellate review.

the transaction based on its restated accountings etc."; and (2) "whether the financial information [NorthWestern] provided the public was in fact false." Decision at p. 10.

Thus, NorthWestern's invocation of the section 1102 defense had the effect of making fact questions not otherwise necessary to plaintiffs' case central to the resolution of the threshold standing issue, thus inevitably shifting the focus of discovery. To the extent this has made discovery broader and more burdensome on NorthWestern then might otherwise have been the case, this is a self-inflicted wound resulting from NorthWestern's chosen defense strategy.

During the January 15 hearing, NorthWestern's counsel objected that Plaintiffs' complaint does not provide all of the details of the fraudulent scheme that, once proven, will invalidate the purported section 1102 release. This is neither here nor there. Judge Case's decision does not require Plaintiffs to replead the scheme in detail, and any legitimate concerns about the pleading could have and should have been raised with the Court long ago.[4]

Again, the fraudulent scheme in question is not an element of Plaintiffs' primary liability case which might be subject to the requirements of Rule 9(b). It is relevant only to negate NorthWestern's section 1102 defense. It might be thought of as akin to the use of evidence of fraudulent concealment to overcome a limitations defense in a case where the fraudulent concealment is not otherwise necessary to establish the defendant's liability.

With that said, it may be helpful to the Special Master if Plaintiffs briefly outline the fraudulent scheme NorthWestern was engaged in.

Both in 2002 and for several years prior thereto, NorthWestern was engaged not only in the regulated utilities business but in various other new and unregulated business ventures.

---

[4] Indeed, Judge Case's decision denied NorthWestern's 12(b)(6) motion and thus necessarily sustained the adequacy of the existing pleading. However, if NorthWestern wishes Plaintiffs to file a further amended complaint so that a more specific and detailed description of NorthWestern's fraudulent scheme is in the public record, we will be happy to consider such a course of action.

4

These ventures proved without exception to be money-losers and ultimately led to the chapter 11 filing. But NorthWestern filed false financial statements with the SEC and otherwise deceived the general public about the failure of these ventures and their catastrophic impact on NorthWestern's solvency for several years until the truth began leaking out at the end of 2002 – beginning only weeks after the Transfer had been consummated.

At least through 2001, NorthWestern's entire senior management team received special bonus compensation directly tied to the purported financial results of these non-utilities ventures. In April 2003, NorthWestern admitted that its publicly-released financial results for the first, second, and third quarters of 2002 were materially false and misleading and would be restated. At the same time, it announced that it would recognize, as of December 31, 2002, almost $1 billion in extraordinary losses associated with write-downs of its money-losing and unviable non-utilities businesses.

None of these problems were publicly acknowledged on or before November 15, 2002, the date of the Transfer, much less on the prior dates when necessary regulatory approvals had been obtained. Rather, the first partial disclosure that NorthWestern was in trouble was a press release floating the possibility of write-downs that was issued on December 13, 2002 – only 4 weeks after the Transfer. See Exhibit A (8K issued by NorthWestern on December 13, 2002).

Circumstances suggest that the timing of NorthWestern's admission of financial trouble just after the Transfer had just been completed is hardly likely to be mere coincidence. The first thing NorthWestern did with the Montana Assets was to use them as collateral for a new secured loan from CSFB – replacing a prior debt facility that was due to mature in the near term. The Montana Public Service Commission ("MPSC") expressed serious concern that as a result of the Transfer the Montana Assets had been commingled with NorthWestern's other money-losing

businesses (whose difficulties had not been disclosed when the regulators had approved the Transfer) and were being used to cover those businesses' losses, but were in effect presented with a fait accompli.[5] See Exhibit B (MPSC Final Order, dated January 24, 2003)

Thereafter, the MPSC commenced an investigation and in 2004 reached a settlement with NorthWestern requiring that in any future extraordinary transactions the Montana Assets be protected by "ring fencing" provisions that would prevent them from being dragged down by the problems of other, unregulated business ventures. See Exhibit C (Stipulation and Settlement Agreement, dated July 8, 2004)). By this point, of course, it was too late to prevent the damage already done to Clark Fork and its creditors by the Transfer. We believe that discovery will establish that but for NorthWestern's concealment and public misdescription of its true financial condition, the MPSC would have required such "ring fencing" provisions in 2002 as a condition to regulatory approval of NorthWestern's acquisition of Clark Fork, and the Transfer would never have been able to occur. The value of NorthWestern's equity interest in Clark Fork would have been available to satisfy NorthWestern's other creditors, but Clark Fork's own customers and creditors such as the QUIPs holders would have been protected from the consequences of the failure of NorthWestern's other business ventures.

Indeed, had NorthWestern's true financial condition been publicly disclosed prior to the Transfer, there are any number of independently sufficient paths by which the Transfer would not have occurred, since the prejudice threatened to Clark Fork and its creditors would have been known in advance. The MPSC and other regulators would have been motivated to block the Transfer, QUIPs holders themselves and/or Law Debenture's predecessor as Indenture Trustee would have been motivated to block the Transfer, and other potential Clark Fork creditors such

---

[5]   Notably, all the members of the Commission expressed concern with one member dissenting altogether at a time when the full extent of NorthWestern's fraudulent actions were not yet revealed.

6

as the plaintiffs in the <u>McGreevy</u> action (who were apparently dissuaded from seeking injunctive relief against the Transfer based on representations that NorthWestern would assume responsibility for any liability of Clark Fork) would have been motivated to block the Transfer.

<u>Relevance of Documents Related to the SEC's Investigation of NorthWestern</u>

Given the fraudulent scheme described above and the facts described by Judge Case as central to overcoming NorthWestern's section 1102 defense, we do not understand how NorthWestern can seriously contend that the SEC investigation is irrelevant. It deals precisely with the falsity of NorthWestern's public financial statements during the period prior to the Transfer and the contemporaneous knowledge of NorthWestern and its senior management of the company's true financial condition and prospects.[6] The limited charges already brought by the SEC involve knowing misstatements in NorthWestern's public financials for the first and second quarters of 2002 and the fourth quarter of 2001. <u>See</u> Steingart Declaration, Ex. N (submitted with Plaintiffs' motion to compel). Significantly, the SEC's investigation is ongoing and NorthWestern has not yet restated its 2001 financials. Moreover, NorthWestern's counsel did not deny that the SEC's investigation may result in further charges.

The claim by NorthWestern's counsel that the SEC investigation supposedly has nothing to do with the Transfer is neither reliable (especially since he admitted that his law firm does not represent NorthWestern in that investigation) nor relevant. It is not necessary to Plaintiffs' case that the QUIPs holders have been the primary or specifically intended victims of the fraudulent

---

[6] Indeed, as we stated during the January 15 hearing, we do not understand the basis for NorthWestern's apparent belief that the documents related to the SEC investigation would not all be responsive to request 18, seeking all documents related to the restatement, specifically including those provided to governmental agencies. However, the Second Request for Production of Documents was served precisely to preclude any attempt by NorthWestern to play interpretive games in this respect.

7

scheme.[7] Systematically issuing false financial statements was a fraud directed at the public at large. There were no doubt a wide range of potential and actual victims of the scheme, including stockholders, business counterparties, regulators, and anyone else who relied on the integrity of NorthWestern's publicly-announced financial statements and whose actions toward NorthWestern would have been different had they known of its true financial condition and increasing insolvency. As shown above, following the completion of discovery, Plaintiffs expect the evidence to prove that but for the fraudulent scheme, NorthWestern would have been unable to consummate the Transfer and obtain the purported section 1102 release.

During the January 15 hearing, NorthWestern's counsel suggested that since NorthWestern had already admitted that certain of its prior financial statements had been materially false and misleading the whole issue could be resolved by stipulation. To the extent that NorthWestern admits and is willing to stipulate that it engaged in a "knowing and conscious fraudulent scheme", we would be willing to consider such a proposal.

Beyond relevance, we would like to make two additional points about burden. Here, the documents related to the SEC have already been gathered. They will require neither review for responsiveness nor (if already produced to the SEC) review for privilege. NorthWestern's counsel indicated he thought they existed in electronic form, making copying for production to Plaintiffs even quicker and simpler than if they existed only on paper. There is thus extremely minimal burden involved in their production. However, NorthWestern's counsel also indicated that he thought the volume might be substantial – representing some multiple of what had already been produced and what was anticipated (other than the SEC documents) to be produced

---

[7] The notion that Plaintiffs needed to prove narrowly-targeted fraud specifically relied on by the prior Indenture Trustee in connection with the Transfer (with no other discovery into the broader fraudulent scheme allegedly being necessary) was directly rejected by the Court when it denied defendants' motion for protective order on September 29, 2006.

120087.01600/40166723v.1

in the future. Obviously, insight as to the volume of these materials is entirely within NorthWestern's knowledge at this point, but that volume necessarily has an impact on what will be a reasonable deadline for NorthWestern to complete production. The greater the volume, the more time needed for review by Plaintiffs before depositions can be intelligently taken. This further confirms Plaintiffs' original request for the SEC materials to be produced immediately, while any necessary review of other files for privilege is still being completed.

We appreciate the Special Master's consideration of this supplemental submission, and we look forward to addressing these issues further at the hearing scheduled for January 29.

Dated: Wilmington, Delaware
January 19, 2007

**BLANK ROME LLP**

_____
Dale R. Dubé (DE No. 2863)
Mark J. Packel (DE No. 4048)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile:  (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management Corporation

120087.01600/40166723v.1

| | |
|---|---|
| Dated: Wilmington, Delaware<br>January 19, 2007 | **SMITH KATZENSTEIN & FURLOW LLP**<br><br>/s/ Kathleen M. Miller<br><br>Kathleen M. Miller<br>800 Delaware Avenue<br>P.O. Box 410<br>Wilmington, DE 19899<br>Telephone:  (302) 652-8400<br>Facsimile:   (302) 652-8405<br>         - and -<br><br>**NIXON PEABODY LLP**<br>John V. Snellings<br>Amanda D. Darwin<br>100 Summer Street<br>Boston, MA 02110-2131<br>Telephone: (617) 345-1000<br>Facsimile:  (617) 345-1300<br><br>Counsel for Law Debenture Trust Company<br> of New York |

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of January, 2007, I served by hand delivery and electronic filing the SUPPLEMENTAL SUBMISSION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK IN FURTHER SUPPORT OF PLAINTIFFS MOTION TO COMPEL PRODUCTION OF DOCUMENTS using CM/ECF which will send notification of such filing(s) to the following:

Special Master John E. James
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951

Robert J. Dehney, Esquire
Curtis S. Miller, Esquire
MORRIS NICHOLS ARSHT
 & TUNNELL LLP
1201 Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
GREENBERG TRAURIG LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

David A. Jenkins, Esquire
SMITH KATZENSTEIN &
 FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899

Denise Seastone Kraft, Esquire
EDWARDS ANGELL PALMER &
 DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Kathleen M. Miller, Esquire
SMITH KATZENSTEIN &
 FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899

120087.01600/40166723v.1

I also certify that, on this 19th day of January, 2007, I served the aforementioned document, by e-mail and Federal Express, upon the following participants:

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061

John V. Snellings, Esquire
Amanda D. Darwin, Esquire
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-2131

Jesse H. Austin, Esq.
PAUL, HASTINGS, JANOFSKY &
 WALKER, LLP
600 Peachtree Street, N.E.
Atlanta, GA 30308

Bijan Amini, Esquire
Avery Samet, Esquire
Bradley F. Silverman, Esquire
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
BROWNING, KALECZYC, BERRY
 & HOVEN, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624

Dennis E. Glazer, Esquire
Paul Spagnoletti, Esquire
DAVIS POLK & WARDWELL
450 Lexington Avenue, Room 3004
New York, NY 10017

_____
Dale R. Dubé (I.D. No. 2863)