# Exhibit A

<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>nw8k.txt
<DESCRIPTION>PRESS RELEASE DATED DECEMBER 13, 2002
<TEXT>

================================================================================

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 13, 2002

NorthWestern Corporation
(Exact name of registrant as specified in its charter)

| Delaware | 0-692 | 46-0172280 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 125 South Dakota Avenue<br>Sioux Falls, South Dakota | 57104 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(605) 978-2908
(Registrant's telephone number, including area code)

================================================================================

<PAGE>

Item 5. Other Events

On December 13, 2002, NorthWestern Corporation (the "Company") issued a press release discussing lowered guidance for estimated 2002 results, a review of year-end charges and estimated 2002 results from utility operations. The press release is included as Exhibit 99.1 hereto and is incorporated herein by reference. The press release contains forward-looking statements regarding the Company and includes a cautionary statement identifying important factors that could cause actual results to differ materially from those anticipated.

Item 7. Financial Statements and Exhibits

| EXHIBIT NO. | DESCRIPTION OF DOCUMENT |
|---|---|
| 99.1* | Press Release of NorthWestern Corporation, dated December 13, 2002 |

* filed herewith

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NorthWestern Corporation

By: /s/ Kipp D. Orme
--------------------------------
Kipp D. Orme
Vice President and Chief Financial Officer

Date: December 13, 2002

3

<PAGE>

Index to Exhibits

| EXHIBIT NO. | DESCRIPTION OF DOCUMENT |
|---|---|
| 99.1* | Press Release of NorthWestern Corporation, dated December 13, 2002 |

* filed herewith

4

</TEXT>

8k - part 1.txt

</DOCUMENT>

Page 3

<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>ex99-1.txt
<DESCRIPTION>EX. 99.1 PRESS RELEASE DATED 12/13/02
<TEXT>

[LOGO OMITTED]

News Release
NYSE:NOR

Contacts:

Investors/Media:

Roger Schrum
605-978-2848
roger.schrum@northwestern.com

---

NORTHWESTERN LOWERS GUIDANCE FOR ESTIMATED 2002 RESULTS

---

YEAR-END CHARGES BEING REVIEWED

---

UTILITY RESULTS TO MEET PERFORMANCE EXPECTATIONS

---

SIOUX FALLS, S.D. - Dec. 13, 2002 - NorthWestern Corporation (NYSE:NOR) today announced that it will miss previously disclosed earnings estimates for full-year 2002 of between $1.50 to $1.60 per share from continuing operations. The expected lower 2002 results stem from NorthWestern's need to significantly increase reserves for accounts receivable and billing adjustments at its communications services business, Expanets, and lower than expected operating performance at Expanets and Blue Dot, the Company's heating, ventilation and air conditioning business.

In connection with its year-end audit, NorthWestern is also undertaking SFAS Nos. 142 and 144 reviews of the value of intangible assets of Expanets and Blue Dot. Due to the increase in reserves at Expanets and current operating performance of Expanets and Blue Dot, NorthWestern may recognize a substantial impairment of goodwill and other intangible assets for these businesses and take a noncash charge that would materially affect NorthWestern's 2002 operating results. Until the Company completes its year-end closing and audit process, NorthWestern will be unable to provide actual full-year 2002 results.

NorthWestern reaffirmed that it will meet its previously announced 2002 performance targets for its core regulated electric and natural gas utility business, which comprises the substantial majority of its annual consolidated operating income.

NorthWestern is currently evaluating the adequacy of reserves at Expanets for the collection of accounts receivable and billing adjustments related to previously disclosed billing lapses and data conversion issues in customer accounts stemming from the implementation of Expanets' enterprise software platform. In addition, Expanets expects to reflect a reduction in

- More -

<PAGE>

both maintenance and core services revenues in its fourth quarter 2002 results. NorthWestern has determined it will increase receivable and other reserves at Expanets by at least $50 million. The Company may determine after it has completed its evaluation as a part of its year-end closing and audit process that it is necessary to further increase reserves, as well as to determine the impacts, if any, to prior reported quarterly results for 2002. The anticipated increase in reserves, and any additional increases, will adversely affect NorthWestern's and Expanets' results.

As previously reported, Expanets is in negotiations with Avaya, Inc., which had previously been providing customer data and billing management services to Expanets under transition service agreements, regarding certain outstanding claims Expanets believes it has regarding, among other matters, acquired maintenance contracts and data conversion issues. Resolution of Expanets' claims may result in mitigation of portions of the damages reflected in the anticipated increase in reserves.

As a result of continued soft market conditions in the communications sector in the fourth quarter of 2002 and the anticipated increase in reserves, NorthWestern expects earnings before interest, taxes, depreciation and amortization (EBITDA) for Expanets for 2002 to fall substantially below the previously announced range of $73 million to $80 million.

The Company also expects EBITDA at Blue Dot to be slightly lower than previously anticipated for the fourth quarter of 2002 and, as a result, projects that EBITDA for full-year 2002 will fall below the previously announced range of $13 million to $16 million.

"We are disappointed with the ongoing implementation issues related to Expanets' system conversion as well as weaker than expected results from operations at Expanets and Blue Dot," said Merle D. Lewis, NorthWestern's chairman and chief executive officer. "We will continue to focus on operational excellence initiatives that we believe will lead to improved performance at these subsidiaries in future periods."

Additional Year-End Adjustments - SFAS Nos. 142 and 144 Reviews

NorthWestern is in the process of conducting its annual assessment of goodwill and other indefinite life intangible assets under Statement of Financial Accounting Standards No. 142 and other intangible assets under Statement of Financial Accounting Standards No. 144. The SFAS Nos. 142 and 144 analyses could result in a substantial impairment of goodwill and other intangible assets at Blue Dot and Expanets and the incurrence of a significant noncash charge relating to a write-down of goodwill and other intangible assets as a result of lower than

<PAGE>

NorthWestern Provides Fourth Quarter 2002 Update
Dec. 13, 2002

previously anticipated earnings and increased reserves. The assessment and determination under SFAS Nos. 142 and 144 will be made by the Company in consultation with its independent valuation specialists and with its auditors in connection with their audit of the Company's 2002 financial statements following year-end. A significant noncash charge would adversely affect NorthWestern's net income for 2002.

Utility Results to Meet Performance Expectations

According to Lewis, NorthWestern's strategy continues to focus on opportunities in its core regulated electric and natural gas utility business, which is performing well against its 2002 plan.

NorthWestern Energy, the Company's core utility business, remains on target to meet its EBITDA objective for the fourth quarter of 2002 as well as its previously announced EBITDA target for 2002 of between $225 million and $235 million, which excludes $22 million in EBITDA from January 2002 pre-acquisition results from Montana operations.

"NorthWestern has been focused on its core regulated utility business for nearly 80 years. With the acquisition of the Montana utility operations earlier this year, we have built one of the strongest electric and natural gas delivery businesses in the Upper Midwest," said Lewis. "This strategy has resulted in the development of a balanced energy business that possesses consistent, predictable earnings and cash flow. Under current market conditions, we believe this lower risk business profile provides our shareholders with the best opportunity for value creation going forward."

Webcast Delayed

NorthWestern's previously planned Dec. 19, 2002, investor conference call webcast will be delayed due to the pending year-end reviews. A future investor conference webcast to discuss the Company's strategy will be held in early 2003.

About NorthWestern

NorthWestern Corporation is a leading provider of services and solutions to more than 2 million customers across America in the energy and communications sectors. NorthWestern's partner businesses include NorthWestern Energy, a provider of electricity, natural gas and related services to customers in Montana, South Dakota and

<PAGE>

Nebraska; Expanets, the largest mid-market provider of networked communications solutions and services in the United States; and Blue Dot, a leading provider of air conditioning, heating, plumbing and related services.

Forward-Looking Statements

STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: All statements contained herein, as well as statements made in press releases and oral statements that may be made by us or by officers, directors or employees

acting on our behalf, that are not statements of historical fact constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that could cause our actual results to be materially different from historical results or from any future results expressed or implied by such forward-looking statements. Among the factors that could cause our actual results or outcomes to differ materially are: the adverse impact of weather conditions and seasonal fluctuations; unscheduled generation outages, maintenance or repairs; unanticipated changes to fossil fuel or gas supply costs or availability due to higher demand, shortages, transportation problems or other developments; developments in the federal and state regulatory environment and the terms associated with obtaining regulatory approval and rate orders; costs associated with environmental liabilities and compliance with environmental laws; the rate of growth and economic conditions in our service territories and those of our subsidiaries; the speed and degree to which competition enters the industries and markets in which our businesses operate; the timing and extent of changes in interest rates and fluctuations in energy-related commodity prices; risks associated with acquisitions, transition and integration of acquired companies, including NorthWestern Energy, L.L.C. and the Growing and Emerging Markets Division of Lucent Technologies, Inc., and the implementation of information systems and realization of efficiencies in excess of any related restructuring charges; a lack of minority interest basis, which requires us to recognize an increased share of operating losses at certain of our subsidiaries; our ability to recover transition costs; disallowance by the Montana Public Service Commission of the recovery of the costs incurred in entering into our default supply portfolio contracts while we are required to act as the "default supplier"; disruptions and adverse effects in the capital market due to the changing economic

<PAGE>

environment; our credit ratings with Moody's, Standard & Poor's and Fitch; potential delays in financings or Securities and Exchange Commission filings because we changed auditors; our substantial indebtedness, which could limit our operating flexibility and ability to borrow additional funds; our ability to obtain additional capital to refinance our indebtedness that is scheduled to mature and for working capital purposes; changes in customer usage patterns and preferences; possible future actions and developments of CornerStone Propane Partners L.P.; and changing conditions in the economy and capital markets and other factors identified from time to time in our filings with the SEC. This news release should be read in conjunction with our Annual Report on Form 10-K for 2001, as amended, and any subsequent quarterly reports on Form 10-Q and current reports on Form 8-K, which can be located at www.sec.gov or requested from the Company.

Any forward-looking statement speaks only as of the date on which such statement is made, and, except as required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for management to predict all such factors.

###

8k - Part 2.txt

Page 5

# Exhibit B

Service Date: January 27, 2003

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

* * * * *

| | | |
|---|---|---|
| IN THE MATTER of the Application of NORTHWESTERN CORPORATION for Authority to Consummate a Credit Agreement and Issue $390 MILLION in Principal Amount of Secured Long-Term Notes in the Form of First Mortgage Bonds | ) ) ) ) ) ) | UTILITY DIVISION<br>DOCKET NO. D2002.12.159<br>ORDER NO. 6474a |

**FINAL ORDER**

1. On December 23, 2002, NorthWestern Corporation ("NorthWestern" or "Applicant"), a Delaware corporation authorized to transact business within Montana, filed with the Montana Public Service Commission ("Commission") its application ("Application") pursuant to §§ 69-3-501-507, MCA (2001), seeking an order authorizing Applicant to perform its obligations under a certain Credit Agreement and the related transactions contemplated by the Credit Agreement whereby long-term notes in the form of first mortgage bonds (the "First Mortgage Bonds") are to be issued over a period beginning with the issuance of the applicable Commission Order and, unless extended, through and including December 31, 2004 (the "Transaction"), and which provides that the loan proceeds shall be placed in escrow and cannot be accessed by or disbursed by the Applicant without the Commission approval of the Transaction.

2. The Application is supported by exhibits and data in accordance with Commission practice and rules and regulations governing the issuance and sale of securities by public utilities operating within the State of Montana.

3. The Commission is required to consider applications for the issuance of securities within 30 days of the application being filed as set forth at § 69-3-503, MCA. There is a provision in that section that consideration of an application may be extended. In this Docket the Commission extended the time for consideration of this application by an additional 30 days. Proper notice of this filing was provided on the agenda for the

Commission's regularly scheduled business meeting held on January 6, 2003. No requests for intervention were received by the Commission in this Docket.

4. The Application states that Applicant is a public utility as defined at § 69-3-101, MCA, in that it furnishes electric and natural gas service in the State of Montana through NorthWestern Energy, a division of NorthWestern; that its principal executive office for its Montana operations is at 40 East Broadway, Butte, Montana; and that Applicant is duly qualified to do business in the State of Montana. For detailed information with respect to the general character of NorthWestern's business and the territory served by it, reference is made to the Application.

**FINDINGS**

1. Applicant is a corporation organized and existing under and by virtue of the laws of the State of Delaware and is qualified to transact business in the State of Montana.

2. Applicant is a public utility as defined at § 69-3-101, MCA, and is engaged in furnishing electric and natural gas service in the State of Montana through its division, NorthWestern Energy.

3. The Commission has jurisdiction over the subject matter of the Application pursuant to §§ 69-3-501-507, MCA. The Commission has jurisdiction over the entire $390 million of financing contained in the Application. The Commission historically addresses security issues in their entirety and again in this Docket will consider the entire amount of financing being contemplated by NorthWestern. Further, the Commission must evaluate all financing activity given the serious nature of the challenges now faced by NorthWestern.

4. The Application states that Applicant intends to issue and, potentially sell, First Mortgage Bonds. The First Mortgage Bonds will be issued under an indenture covering its Montana utility asset in the amount of $280 million (the "Montana Bonds") and under an indenture covering its South Dakota and Nebraska utility assets in the amount of $110 million (the "South Dakota Bonds"). As detailed in the Application, the Montana Bonds will be either (i) issued to a Collateral Agent to secure term loans under a new credit facility; and/or (ii) syndicated in a private placement to qualified institutional

buyers. The Montana Bonds (i) will be issued under and secured by the Mortgage and Deed of Trust dated October 1, 1945 from the Applicant to the trustees named therein, as supplemented from time to time, which indenture creates a general and first priority lien on substantially all of the Applicant's utility property in Montana, (ii) will be for terms of not less than nine months nor more than forty years, (iii) will have such redemption and/or repayment provisions as shall be determined at the time of sale, and (iv) will bear interest payable at such times and rates as shall be determined at the time of sale, all based on then-existing market conditions.

5.      The Application states that the Montana Bonds will secure term loans which will replace an existing $280 million credit facility as soon after the effective date of the Commission's Order as possible. It further states that the term loans secured by the Montana Bonds will be used for general corporate purposes allowed under § 69-3-501, MCA.

6.      Applicant has agreed to inform the Commission, after the issuance or sale, of the principal amount sold, the maturity, the interest rate, the redemption and/or repayment provisions and any other information with respect to the bonds that the Commission may request.

7.      Public notice of this Application was given by its inclusion on the Commission's Utility Division Agenda for January 6, 2002. Applicant has furnished complete financial data with its Application in accordance with the developed practice of the Commission. The Application sets forth a certified copy of the resolution of the Board of Directors of Applicant pertaining thereto, which was adopted on December 12, 2002.

8.      On December 20, 2002, Moody's Investors Service downgraded the debt ratings of NorthWestern senior secured to Baa3 from Baa1. Moody's indicated that it, "is continuing to review the long-term ratings for possible further downgrade, where they were placed August 1, 2002. This downgrade included ratings on obligations of the former NorthWestern Energy L.L.C., which became direct obligations of NorthWestern Corporation effective November 20, 2002 when the former subsidiary of NorthWestern was folded into NorthWestern's already existing utility division. The ratings downgrades reflect concerns about considerably less debt reduction to date than anticipated, as well

as weaker than anticipated cash flow relative to the consolidated debt load and fixed obligations." Moody's further stated, "The ratings downgrades also reflect North-Western's recently announced expectations for lower than expected earnings and cash flow for 2002 due to ongoing challenges and disappointing results at NorthWestern's nonutility operations. Those operations are Expanets, the telecommunications solutions business, and Blue Dot, the heating, ventilation and air conditioning service business." Moody's noted that "NorthWestern recently announced that it is anticipating a significant increase in reserves for accounts receivable and billing adjustments at Expanets, as well as substantial non-cash writedowns of goodwill and intangibles related to Expanets and Blue Dot. The full extent of the goodwill and intangible asset impairment will be determined in conjunction with the year-end audit which will be completed over the next several months." Moody's is continuing to review all of NorthWestern's long-term ratings for possible further downgrade due to uncertainties surrounding the amount of the expected asset impairment and the impact that action will have on NorthWestern's balance sheet. At the time of this writing the Commission is unable to evaluate the magnitude of the asset impairment because the year-end audit is not complete. Finally, Moody's noted that "absent access to the funds under the new CSFB facility—which would facilitate termination of the existing $280 million facility—the recent announcement related to expected non-cash charges could jeopardize NorthWestern's ability to remain in compliance with some of the financial covenants in that facility."

9.      On December 30, 2002 Standard and Poor's Ratings Services lowered its corporate credit rating on NorthWestern to BB+ from BBB+, and at the same time assigned its BBB- rating to NorthWestern's $390 million secured four-year bank loan and other senior secured debt. The ratings outlook remains negative. S&P stated that NorthWestern has about $1.7 billion in outstanding debt. S&P explained that "The downgrade is the result of the several problems facing NorthWestern Corporation, including a deteriorating balance sheet, continued poor performance in its Expanets and Blue Dot subsidiaries, and management's inability to adequately project the performance of the non-regulated businesses." S&P indicated that the financing plan for the Montana Power acquisition in early 2002 included $200 million of equity, to be issued in the first quarter of 2002. NorthWestern did issue about $83 million of equity in September 2002,

but given the company's current stock price ($5.51 on January 22, 2003) of half its book value, and general equity market conditions S&P does not believe that the company will issue additional equity in the foreseeable future. Instead, NorthWestern may potentially incur additional debt to substitute for equity issues. A new $390 million credit facility will be used to replace existing NorthWestern bank loans and fund capital expenditures at the utilities, will give the company additional liquidity, but will further weaken coverages for debtholders. S&P is also concerned about the performance of NorthWestern's non-utility businesses, specifically Expanets and Blue Dot.

10.    On January 16, 2002 Fitch rating service downgraded NorthWestern's senior unsecured notes and pollution control revenue bonds from BBB to BB+, the highest junk status Fitch has. Preferred stock and trust preferred securities for North-Western were also downgraded from BBB- to BB+. Secured debt with senior status was lowered from BBB+ to BBB- which is the lowest Fitch rating that still is investment grade. According to Fitch, NorthWestern's debt and preferred shares total $1.9 billion. The utility division's fixed assets carry a book value of $1.6 billion. That means NorthWestern's book value is less than the corporation's debt. Factors in the downgrades were NorthWestern's high debt, expected writeoffs against earnings this year and marginal performance at Expanets and Blue Dot. Fitch did indicate that "The utility is strong and has good cash flow, but despite that, there is a lot of debt at the parent company."

11.    On January 9, 2003, NorthWestern filed a letter which set forth the nature of the draws against the current credit facility. Non-utility activities accounted for $114 million of the $276 million expended through December 31, 2002. Montana First Megawatts (MFM), the proposed combined cycle gas plant in Great Falls drew $61 million, Expanets drew $37 million, Blue Dot contributed $10 million on a net basis, and CornerStone Propane drew $26. The new credit facility permits additional funds of $25 million to Blue Dot and $75 million to Expanets.

12.    The Commission views the financial condition of NorthWestern with great concern. The Commission approved NorthWestern as the purchaser of MPC's trans-mission and distribution systems. Since that approval the financial condition of North-Western has spiraled down due to non-utility activities at CornerStone Propane, Expanets

and Blue Dot. The Commission is dismayed at the erosion of NorthWestern's credit ratings to either the lowest investment grade or to junk status. The performance of the non-utility entities and the resulting threats to the provision of utility service is unacceptable to this Commission. The cost of borrowing money has been increased due to losses at the non-utility companies. In its January 9, 2003 letter, noted above, NorthWestern stated "It is the company's intent to move in the direction of a pure energy distribution business." The Commission finds that the company's intention to become a pure utility company is the proper course of action. The Commission directs NorthWestern to devote its management to making sure that the company focuses all of its resources on changing its strategic direction in a timely manner. As was noted in the comments of the rating agencies, it is imperative that NorthWestern take timely action to reduce the amount of debt in the company's capital structure.

13.    During its review of this filing the Commission became aware of an incentive program adopted by the company in September 1999. The program was one in which certain key executives of NorthWestern and key team members NorthWestern Growth Corporation, which initiates strategic investments for NorthWestern, were provided the opportunity to make personal investments. The investment entity was structured as a limited liability company, is controlled and substantially owned by NorthWestern, and enables the investors to participate in long-term capital appreciation resulting from increases in the value of NorthWestern's interests in Blue Dot, Expanets and CornerStone above benchmark rates of return to NorthWestern approved by the independent Compensation Committee of NorthWestern's Board of Directors. The limited liability company has no indebtedness and is consolidated in NorthWestern's financial statements. No losses of these subsidiaries have been allocated to the minority interest owned by the limited liability company. In the year ended December 31, 2001, the following executive officers of NorthWestern received distributions Merle Lewis $1.1 million; Richard Hyland $.8 million; Daniel Newell $.8 million; Eric Jacobsen $.4 million and Kipp Orme $.1 million. This recruitment and retention program is no longer being utilized to provide long-term equity incentives and is no longer open to new participants, although the pre-existing interests of the participants remain outstanding. The Commission finds that this Long-Term Equity Incentive Plan is completely

inappropriate and directs NorthWestern to refrain from making any further payments under the plan until NorthWestern's financial condition has dramatically improved. Any future incentive plans for key executives must be approved by the Commission before they are adopted.

14.     Questions about accounting practices at NorthWestern have appeared in a number of comments by analysts and others. NorthWestern has decided to discontinue recording income from minority interest. The Commission finds that NorthWestern should follow Generally Accepted Accounting Principles and take all necessary steps to ensure that its accounting records properly reflect the true results from each segment of the company in a manner that is transparent and easily understood.

## CONCLUSIONS OF LAW

1.     NorthWestern Energy is a public utility in Montana subject to the supervision and regulation of the Montana Public Service Commission. §§ 69-3-101-102, MCA.

2.     NorthWestern Energy is a division of NorthWestern Corporation. NorthWestern Corporation is subject to §§ 69-3-501-507, MCA, for purposes of the action it proposes in this Docket.

3.     The Transaction proposed by the Application, as hereinafter authorized, will be for a lawful purpose and is consistent with the public interest; is necessary or appropriate for and consistent with the proper performance by Applicant of service as a public utility; and the aggregate amount of the securities outstanding, and proposed to be outstanding, will not exceed the fair value of NorthWestern's utility properties and business of Applicant.

## ORDER

1.     The Application of NorthWestern for authority to consummate the Transaction and to issue secured long-term notes in the form of the First Mortgage Bonds is approved with the conditions noted below. This authorization is for a period beginning with the issuance of this Order and, unless extended, through and including December 31, 2004.

2.      In accordance with § 69-3-507, MCA, neither the issuance and sale of securities by NorthWestern pursuant to the provisions of this Order, nor any other act or deed done or performed in connection therewith, shall be construed to obligate the State of Montana to pay or guarantee, in any manner whatsoever, any security authorized, issued, assumed or guaranteed under the provisions of §§ 69-3-501-507, MCA.

3.      Issuance of this Order does not mean acceptance of NorthWestern's exhibits or other material accompanying the Application for any purpose other than the issuance of this Order.  Approval of this application is for financing purposes only.  This approval is without prejudice to the regulatory authority of this Commission with respect to ratemaking, rates, service, accounts, valuations, estimates or determinations of cost, or any other matter subject to its jurisdiction as provided by law.

4.      Because the Commission has continuing concerns about the performance and prospects of Applicant's non-utility businesses, and the implications of their financial performance for utility customers, the following conditions are expressly added to this Order.

5.      NorthWestern Corporation has indicated it is exploring its options with regard to any of its non-utility entities, specifically including Blue Dot and Expanets. When a sale in whole or in part of any non-utility entities is completed the proceeds shall be as expeditiously as possible applied to debt reduction.

6.      NorthWestern Corporation's loan agreement allows the company to make additional equity investments in its subsidiaries of no more than $10 million over the five-year term of the agreement.  Additionally, under the new loan agreement, secured loans of up to $25 million to Blue Dot and up to $75 million to Expanets are allowed by the lender.

7.      The Commission understands that NorthWestern may need to make limited capital available to the subsidiaries to ensure their viability while it completes its examination of alternatives for these entities.  However, the Commission does not favor additional financing of the subsidiaries since further investments in the subsidiaries may not be in the best interests of utility customers.

8.      The Commission recognizes that NorthWestern Corporation's board of directors and management are responsible to prepare and implement a strategic workout

plan to resolve the financial crisis precipitated by a series of corporate decisions, non-utility ventures, poor performance, and acquisitions. The crisis did not develop overnight, and it will not be resolved overnight. Nevertheless, the Commission's outlook is negative, mirroring that of rating agencies. Neither NorthWestern's actions nor information presented to date allay the concerns.

9.      The Commission is primarily responsible to ensure that regulated energy services provided to Montana consumers are safe, adequate and reliable at rates that are just and reasonable. NorthWestern's ability to fulfill these requirements is placed at risk by its current financial condition. Serious questions exist about the ability and commitment of NorthWestern to pursue adequate and necessary maintenance, repair and replacement of critical utility infrastructure when potential bankruptcy and survival occupy the attention of the board of directors and management. Approval of this security application requires ongoing commitment to fully fund comprehensive operation, maintenance, repair and replacement of its public utility infrastructure in Montana. NorthWestern must file a maintenance plan and budget within 45 days of the issuance of this Order.

10.      By approving this security application, subject to the conditions contained in this Order, the Commission is not satisfied that NorthWestern has pursued all available options for digging out of the financial crisis which threatens utility service quality and rates. The Commission expects the board of directors and management, to fully examine all options, including but not limited to: dividend policy and payouts; board of directors and senior management compensation levels and concessions; disposition of non-utility assets/operations; and sale of the Montana First Megawatts project, or a portion thereof.

11.      Without prior approval from the Commission, NorthWestern may, if it deems it necessary, provide up to an additional $10 million in capital to any non-utility entities. However, the Commission expects NorthWestern's management to exercise this authority with the utmost caution and to first ensure that all steps are being taken within these subsidiaries themselves to minimize the need for external resources. NorthWestern must report all advances to non-utility companies within 5 business days of the advances to this Commission.

12.    If existing credit agreements for Blue Dot or Expanets are terminated NorthWestern may file an application with the Commission seeking approval to provide secured loan agreements not to exceed $20 million for Blue Dot and $30 million for Expanets.

DONE IN OPEN SESSION at Helena, Montana, this 24th day of January, 2003, by a vote of 4 to 1.

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION

BOB ROWE, Chairman

TOM SCHNEIDER, Vice Chairman

GREG JERGESON, Commissioner

MATT BRAINARD, Commissioner
Voting to Dissent, Opinion Attached

JAY STOVALL, Commissioner

ATTEST:

Rhonda J. Simmons
Commission Secretary

(SEAL)

Note: Any interested party may request that the Commission reconsider this decision. A motion to reconsider must be filed within ten (10) days. See 38.2.4806, ARM.

## Dissenting Opinion of Commissioner Brainard

Docket No. D2002.12.159

As restrictive as the order may appear to some, it does little to retain the needed firewall between the utility and non-utility operations of the applicant. Certainly there is no reciprocity available to the utility and its customers to advantage themselves of the assets of the non-utility businesses, even if those businesses were financially robust and able. It is most certain that the Commission would not, could not, and should not ever order the use of non-utility assets to benefit the ratepayers.

The Commission has a duty to see that the utility owner lives up to legitimate obligations to manage the utility assets in a way that is not detrimental to the customers and the public interest. While it may be lawful for the company to have multiple business interests including utilities and non-utilities, a wall of separation should exist and business affairs should be conducted in a manner that insures that separation.

The applicant has presented the Commission with a "fait accompli" by using part of the credit facility used in the purchase of MPC to finance non-utility ventures. Now that it is time to restructure the credit facility the Commission is asked to sanction the use of utility assets to secure the debt of the non-utilities as well. This has been presented to the Commission as a unique event, the applicant is in desperate financial conditions and the utility itself is threatened by the conditions that face the applicant.

The Commission should not succumb to the exigency of imminent crisis and establish precedent that will undoubtedly be visited in the future. The non-utility businesses are beyond the regulatory scope of the Commission. Profits, losses or catastrophic failures of non-utility operations are beyond regulatory reach, hence regulated assets should not be tendered as security for those business ventures.

RESPECTFULLY SUBMITTED this 24th day of January, 2003.

__________________________

Matt Brainard, Commissioner
District #4

# **Exhibit C**

**STIPULATION AND SETTLEMENT AGREEMENT**

This Stipulation and Settlement Agreement (the "Agreement"), dated as of July 8, 2004, is by and among NorthWestern Corporation ("NorthWestern," the "Parent Company," or the "Debtor"), the Montana Department of Public Service Regulation, Montana Public Service Commission ("MPSC"), and the Montana Consumer Counsel ("MCC"). The Debtor, the MPSC and the MCC collectively are the "Parties" and, individually, a "Party."

**RECITALS**

A. On September 14, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Reform Act of 1978, codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware styled as Chapter 11 Case No. 03-12872 (CGC). The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B. The Debtor is a publicly-traded Delaware corporation incorporated in 1923. NorthWestern and its direct and indirect energy subsidiaries form one of the largest providers of electricity and natural gas in the upper Midwest and Northwest, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

C. The MPSC is the primary regulatory agency for the Debtor's retail utility business in gas and electricity transmission and distribution in Montana. The MPSC has the statutory obligation to regulate public utilities as set forth in Title 69, Mont. Code Ann.

D. The MCC is a constitutionally-established office in Montana, charged with representing consumer interests.

E. On August 13, 2003, the MCC petitioned the MPSC to initiate a financial investigation (the "Financial Investigation") into NorthWestern Energy, a division of the Debtor, to determine if the Debtor's historic financial difficulties would affect Montana ratepayers and to establish, if and where appropriate, protection for Montana retail consumers from further harm or risk. To that end, the MCC suggested through the Financial Investigation that the MPSC impose upon the Debtor, by MPSC order, a range of regulatory and structural provisions, including but not limited to: (1) establishing a utility-only subsidiary upon the Debtor's emergence from bankruptcy; (2) stricter regulation of the disposition of its Montana utility properties; (3) segregating utility finances from non-utility affiliate risks and operations; (4) a prohibition on inter-corporate relationships between the utility and non-utility entities; (5) restrictions on new

financing involving the Debtor's Montana utility properties; (6) further restriction of the cash management practices of the utility; (7) independent examination and verification of the Debtor's accounting systems; and, (8) the implementation of operation and maintenance service quality standards. In addition, the MCC has specifically requested that the MPSC order the Debtor to submit a retail rate case within a specified period following the Debtor's emergence from bankruptcy to provide Montana retail consumers with any rate reductions to which they may be entitled under Montana utility law as set forth in Title 69, Mont. Code Ann.

F. The Debtor, while cooperating in providing information and documentation to the MCC in the Financial Investigation, has asserted that following the initiation of the Chapter 11 Case the Financial Investigation was stayed by operation of the automatic stay under the Bankruptcy Code. Additionally, the Debtor opposed the requested relief sought by the MCC in the Financial Investigation and asserted that the MPSC did not have statutory or other authority to enter the relief requested by the MCC. Further, the Debtor has always asserted that it is neither over charging Montana retail customers nor over earning with respect to its Montana operations such that there should be any rate reduction with respect to its base rates charged to Montana consumers.

G. Both the MPSC and the MCC entered appearances in the Chapter 11 Case and have participated in it as parties-in-interest.

H. On March 11, 2004, pursuant to Section 1125 of the Bankruptcy Code, the Debtor filed its initial disclosure statement (the "Disclosure Statement") and proposed plan of reorganization ("Plan"), which Disclosure Statement and Plan were amended by that Disclosure Statement and Plan dated as of May 17, 2004.

I. On May 7, 2004, the Debtor filed in the Chapter 11 Case a Motion for an order enforcing the automatic stay (the "Stay Motion") asserting that the continuation of the Financial Investigation violated section 362 of the Bankruptcy Code, the automatic stay provision. The MPSC and MCC disagree that the Financial Investigation in any way violates the automatic stay and affirmatively allege, among other things, that the conduct of the Financial Investigation specifically and the MPSC's jurisdiction generally are consistent with the Bankruptcy Code.

J. On May 12, 2004, the MCC filed an Objection to Debtor's Motion for an Order Approving Debtor's Proposed Disclosure Statement (the "MCC Objection"), asserting a series of deficiencies in the Disclosure Statement and outlining objections to the Debtor's Plan based in part on regulatory concerns raised in the Financial Investigation.

K. On May 12, 2004, the MPSC filed an Objection to the Debtor's Disclosure Statement (the "MSPC Objection"), asserting a series of deficiencies in the Disclosure Statement and outlining objections to the Debtor's Plan based on jurisdictional and substantive concerns.

L. The Debtor, the MPSC, and the MCC have engaged in continuing negotiations in connection with the Chapter 11 Case, the Financial Investigation, the Stay Motion, the MPSC Objection, and the MCC Objection, and each Party has evaluated the merits of the claims being made by the other.

M. To avoid considerable expense, uncertainty and delay, the Debtor, on the one hand, and the MPSC and the MCC, on the other hand, desire to compromise and settle the disagreements between them, subject to: (1) Bankruptcy Court approval of the Agreement; (2) at least a majority vote of the MPSC approving this Agreement; and (3) the MPSC's entry of a Consent Order that is mutually agreed upon between the Debtor and the MCC which will, among other things, resolve the Financial Investigation (except with respect to implementing the recommendations from the Transmission and Distribution Infrastructure Audit described in paragraph 4(d), below).

N. Except as expressly provided in this Agreement, the Parties intend neither to expand nor to limit the jurisdiction of the MPSC under state law. The Parties do not intend this Agreement to establish a precedent that can be used by any Party to bind any other Party in any subsequent proceeding, except a proceeding arising out of or directly related to this Agreement or the Consent Order.

## AGREEMENTS

In consideration of the foregoing Recitals and the mutual covenants contained herein, which the parties acknowledge are good and sufficient consideration, the Parties agree as follows:

1. Recitals. The Recitals are an integral part of this Agreement and are incorporated by reference.

2. Definitions. In addition to terms otherwise defined in this Agreement, the following definitions shall apply:

   (a) "Agreement" means this Stipulation and Settlement Agreement binding the Debtor, the MPSC, and the MCC.

   (b) "Agreement in Principle" means the agreement dated May 14, 2004 by and among the Debtor, the MPSC, and the MCC initially

outlining the terms of this Agreement and approved by the MPSC at a public meeting on May 14, 2004.

(c) "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, in effect on the Petition Date, together with all subsequent amendments and modifications.

(d) "Bankruptcy Court" means The United States District Court for the District of Delaware having jurisdiction and, to the extent of any reference under 28 U.S.C. § 157, the bankruptcy unit of such District Court under 28 U.S.C. § 151 over the Chapter 11 Case.

(e) "Bankruptcy Estate" means the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

(f) "Business Day" means any day other than a Saturday, Sunday or a day that, in either Wilmington, Delaware or in Sioux Falls, South Dakota, is a legal holiday or any day designated in Bankruptcy Rule 9006(a) as a "legal holiday."

(g) "Chapter 11 Case" or "Bankruptcy Case" means the Debtor's case under Chapter 11 of the Bankruptcy Code administered in the Bankruptcy Court.

(h) "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

(i) "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

(j) "Confirmation Order" means the order of the Bankruptcy Court, to be entered after notice and a hearing, confirming the Plan pursuant to the provisions of the Bankruptcy Code.

(k) "Consent Order" means the mutually agreed (between the Debtor and the MCC) to Consent Order, the form of which is attached to this Agreement as Exhibit A, proposed and submitted by the MCC and the Debtor resolving the Financial Investigation (except with respect to implementing the recommendations from the Transmission and Distribution Infrastructure Audit described in paragraph 4(d), below) requested to be approved and entered by the MPSC after Notice and a Hearing pursuant to Title 69, Mont. Code Ann.

(l) "Disclosure Statement" means the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the First Amended Plan of Reorganization of the Debtor, as such Disclosure Statement was amended and approved in its final form by the Bankruptcy Court by Order dated May 26, 2004, and all related exhibits and schedules.

(m) "Effective Date" means that Business Day on or after the Confirmation Date specified by the Plan on which all conditions precedent to the occurrence of the Effective Date set forth in the Disclosure Statement or Section 11.2 of the Plan have been satisfied or waived pursuant to Section 11.3 of the Plan.

(n) "Environmental Liabilities Support Agreement" means that certain Environmental Liabilities Support Agreement dated as of November 12, 2002 by and between NorthWestern Corporation and NorthWestern Energy, L.L.C. (n/k/a Clark Fork and Blackfoot, LLC), as the same may be amended and modified from time to time.

(o) "Financial Investigation" means MPSC Docket No. D2003.8.109, the investigatory proceeding before the MPSC commenced by the MCC's petition on August 13, 2003, prior to the Petition Date, to examine the financial affairs of NorthWestern Energy, a division of the Debtor.

(p) "Independent Director" means a director deemed to be "independent" as determined by the published rules and regulations, as the same may be amended and modified from time to time, established by the New York Stock Exchange; provided, however, that an "Independent Director," at a minimum, shall be a director who has no material relationship with the Debtor (either directly or as a partner, shareholder or officer of an organization that has a relationship with the Debtor):

(i) A director who is an employee, or whose immediate family member is an executive officer, of the Debtor is not "independent" until three years after the end of such employment relationship.

(ii) A director who receives, or whose immediate family member receives, more than one hundred thousand dollars ($100,000) per year in direct compensation from the Debtor, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service), is not "independent" until three years after he or she

ceases to receive more than one hundred thousand dollars ($100,000) per year in such compensation.

(iii) A director who is affiliated with or employed by, or whose immediate family member is affiliated with or employed in a professional capacity by, a present or former internal or external auditor of the Debtor is not "independent" until three years  after the end of the affiliation or the employment or auditing relationship.

(iv) A director who is employed, or whose immediate family member is employed, as an executive officer of another company where any of the Debtor's present executives serve on that company's compensation committee is not "independent" until three years after the end of such service or the employment relationship.

(v) A director who is an executive officer or an employee, or whose immediate family member is an executive officer, of a company that makes payments to, or receives payments from, the Debtor for property or services in an amount which, in any single fiscal year, exceeds the greater of one million dollars ($1,000,000), or two percent (2%) of such other company's consolidated gross revenues, is not "independent" until three years after falling below such threshold.

(q) "Infrastructure Audit" shall have the meaning set forth in paragraph 4(d)(i) of this Agreement.

(r) "Limited Investment Basket Cap(s)" shall have the meaning set forth in paragraph 4(b)(v) of this Agreement.

(s) "New Common Stock" means the shares of authorized common stock of the Reorganized Debtor issued pursuant to the Plan and as may be approved by the MPSC pursuant to sections 69-3-501 through 507, M.C.A., and in accordance with the terms of this Agreement.

(t) "New Incentive Plan" means the incentive plan to be established prior to the Confirmation Hearing and the entry of the Consent Order.

(u) "Notice and a Hearing" means that notice and those public hearing requirements binding on the MPSC under Title 69, Mont. Code Ann. and the Montana Administrative Procedure Act.

(v) "Operating Support Agreement" means that certain Maintenance and Operating Costs Support Agreement dated as of November 15, 2002

by and between NorthWestern Corporation and NorthWestern Energy, L.L.C. (n/k/a Clark Fork and Blackfoot LLC), as the same may be amended and modified from time to time.

(w) "Plan" means the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated as of May 17, 2004, and all related exhibits and schedules, subject to notice, hearing and confirmation by the Bankruptcy Court.

(x) "Post-Downgrade Limited Investment Basket Cap" has the meaning set forth in paragraph 4(b)(vi) of this Agreement.

(y) "Pre-Downgrade Limited Investment Basket Cap" has the meaning set forth in paragraph 4(b)(vi) of this Agreement.

(z) "Public Utility" has the meaning provided in Mont. Code Ann. § 69-3-101(1).

(aa) "Reorganized Debtor" means the Debtor on and after the Effective Date.

(bb) "Reorganized Debtor Charter" means the certificate of incorporation and by-laws of the Reorganized Debtor.

3. Consent Order. The MCC and the Debtor shall stipulate to the entry of the Consent Order by the MPSC, the form of which is attached to this Agreement as Exhibit A, to be filed in the Financial Investigation and entered by the MPSC following notice and a public hearing pursuant to Title 69, Mont. Code Ann. The MPSC believes, in good faith, that at least a majority of the MPSC's five Commissioners will vote to approve this Agreement and the Consent Order.

4. NorthWestern Agreement. NorthWestern agrees, and consents to be bound by the Consent Order entered by the MPSC providing for, among other things, as follows:

Rate Review.

(a) No later than September 30, 2006, based on a 2005 test year, NorthWestern shall file complete documents complying with the minimum electric and gas rate case filing standards provided in ARM 38.5.106 through 38.5.195, including any additional documentation required for interim electric and gas rate adjustments as provided in ARM 38.5.501 through 38.5.507, whether or not an interim adjustment is or has been sought. Following such filing, NorthWestern shall respond to all reasonable discovery and data requests: (i) in accordance with the requirements of ARM 38.2.3301 through 38.2.3305 and the Montana Rules of Civil Procedure as

thereby made applicable; and (ii) in accordance with any procedural schedule established by the MPSC in connection with such filing.

(b)    Structural and Financial Separation of Public Utility Assets, Facilities, and Operations from Risks of Non-Utility Ventures.

NorthWestern will be subject to the following regulatory controls to separate and insulate the Public Utility's assets, facilities, and operations from risks that may be associated with non-utility ventures in which NorthWestern is or may become engaged from time to time. These controls are commonly known as, and are referenced in the Parties' Agreement in Principle as, "ring fencing" measures -- consisting of structural measures, financial measures, and affiliate and inter-corporate measures.

Structural Measures.

(i)    NorthWestern shall structure and maintain the ownership and control of its Public Utility assets, facilities, and operations in the ultimate parent corporation (the "parent") of whatever corporate structure NorthWestern may adopt, now or hereafter, without the intervention of any direct or indirect ownership or control of such Public Utility assets, facilities, or operations by any subsidiary or affiliate.

(ii)    NorthWestern shall provide written notice to the MPSC and the MCC at least forty-five (45) days in advance of the earlier of an irrevocable commitment or undertaking on the part of NorthWestern to transfer, merge, sell, lease, encumber, or otherwise enter into any disposition transaction involving its Montana Public Utility assets or facilities having either a net book value or transaction value (whichever is greater), as reflected in NorthWestern's records in accordance with the Uniform System of Accounts (18 C.F.R. Part 101), of five million dollars ($5,000,000) or more per transaction. The provision of such notice in accordance with this Agreement and the Consent Order shall not be deemed or construed to constitute an admission or acknowledgement by NorthWestern that the MPSC has jurisdiction over any such disposition under Montana law, and NorthWestern reserves the right to contend to the contrary in any forum or proceeding in which such issue may arise.

Financial Measures.

(iii) After the date of entry of the MPSC's Consent Order, NorthWestern shall be subject to the following restrictions and requirements:

(1) NorthWestern shall at all times hold all owned or operated Public Utility assets at the Parent Company, separate and segregated from the ownership, risks and operations of any subsidiaries and any affiliates that have or hold assets other than Public Utility assets. In addition, finances of any public utility owned or operated by NorthWestern shall at all times be held separate and segregated from the ownership, risks and operations of any subsidiaries and any affiliates that have or hold assets other than Public Utility assets.

(2) Debt at the Parent Company will consist only of public utility debt, whether secured or unsecured, and the proceeds of all such debt will be used solely to fund operations of the Parent Company's public utility business. This principle shall control in the event of any conflict between this paragraph and any other provision of this Agreement or the Consent Order.

(3) If Public Utility assets that are pledged or encumbered to secure debt are divested or "spun off," the debt must follow the assets and be divested or "spun off" to the same extent as the assets.

(4) If Public Utility assets financed by unsecured debt are divested or "spun off," then a proportionate share (to the same extent as the assets) of the debt also must be divested or "spun off."

(5) If any of the proceeds from unsecured debt are used for purposes other than Public Utility purposes, the debt likewise must follow the assets other than Public Utility assets and if such assets are divested or "spun off" then a proportionate share (to the same extent as the assets) of the debt must be divested or "spun off."

(6) Other than as allowed by the Limited Investment Basket Caps described below in subparagraph (v) the Parent Company will not extend credit to any of its subsidiaries or affiliates, will not pledge Public Utility assets as collateral for the use or benefit of any of its subsidiaries

or affiliates and will not guarantee any debt of any of its subsidiaries or affiliates.

(7) All debt associated with assets other than public utility assets or activities will be held at or by the subsidiaries or affiliates and will be non-recourse to the Parent Company.

(8) The Parent Company will take all measures necessary to ensure that it will have its own independent corporate credit rating.

Affiliate and Inter-Corporate Transactions.

(iv) NorthWestern shall not provide loans, guarantees, advances, equity investments, or working capital to its subsidiaries or affiliates, except in accordance with the Limited Investment Basket described in subparagraph (v) below. Provided that the ratio of NorthWestern's consolidated total book equity to its consolidated total capitalization is at no time less than forty percent (40%), NorthWestern will be permitted to provide loans, guarantees, advances, equity investments, and working capital to its subsidiaries and affiliates in an aggregate amount (the Limited Investment Basket Caps) defined below. For the purposes of this forty percent (40%) calculation, the Debtor's consolidated book equity and consolidated total capitalization shall be as reported by NorthWestern in its quarterly and year-end financial statements filed with the Securities and Exchange Commission in SEC Forms 10-Q and 10-K, respectively. Such ratio shall be measured on a quarterly basis beginning with the first fiscal quarter ending after the Effective Date. As used herein "total capitalization" shall include NorthWestern's secured and unsecured debt, plus capital leases, plus consolidated book equity as presented in NorthWestern's published financial statements. The equity ratio calculation described above shall not be a basis for determining the equity component of NorthWestern's capital structure for Montana utility rate making purposes.

(v) NorthWestern may, pursuant to the Consent Order, provide loans, guarantees, advances, equity investments, and working capital to its subsidiaries and affiliates only in amounts not to exceed the aggregate amounts set forth below, in accordance with the threshold credit ratings also set forth and in accordance with the Limited Investment Basket Caps. The Limited Investment Basket Cap amounts are inclusive of, and not in addition to, those amounts NorthWestern is committed to

provide as of the date of this Agreement: (1) in accordance with the Colstrip 4 leases and operating agreements; (2) as intercompany support for Clark Fork and Blackfoot, LLC, in connection with the Milltown Dam and the corresponding Environmental Liabilities Support Agreement and Operating Support Agreement ; (3) as reasonably required to preserve the present assets of Montana Megawatts I, LLC; and (4) for the unregulated South Dakota and Nebraska gas marketing operations of NorthWestern Services Corporation, provided, however, that if any of the aforementioned obligations (1) through (4) are eliminated or reduced, or if any of the aforementioned assets are sold or otherwise disposed of, the Limited Investment Basket Cap will be automatically reduced by an amount representing fifty percent (50%) of the average of the maximum balance outstanding during each of the preceding twelve (12) months, as the case may be, by NorthWestern with respect to the aforementioned obligations (1) through (4) which are eliminated or reduced, provided, however, that the Limited Investment Basket Caps shall not be reduced to less than forty-five million dollars ($45,000,000) at all times. The aggregate amounts of the Limited Investment Basket Caps are defined as the following limits and the related corporate credit rating levels:

| Criterion | Limited Investment Basket Cap |
|---|---|
| • Upon the Effective Date: | $60 million |
| • During any such time that NorthWestern has credit ratings of at least BBB- (Standard & Poor's) and at least Baa3 (Moody's Investors Service): | $75 million |
| • During any such time that NorthWestern has credit ratings of at least BBB (Standard & Poor's) and at least Baa2 (Moody's Investors Service): | $90 million |
| • Upon attainment of credit ratings of at least BBB+ (Standard & Poor's) and at least Baa1 (Moody's Investors Service), but in no event sooner than forty-two (42) months after the Effective Date: | No limit |

(vi) If NorthWestern's corporate credit rating is downgraded by either Standard and Poor's or Moody's Investors Service such that NorthWestern no longer meets the criterion for the Limited Investment Basket Cap that was in effect immediately prior to the downgrade, as set forth in subparagraph (v) above (the

"Pre-Downgrade Limited Investment Basket Cap"), then, notwithstanding anything to the contrary in the Consent Order, the Limited Investment Basket Cap on the date of such downgrade automatically shall decrease to the Limited Investment Basket Cap that applies to NorthWestern's credit ratings after such downgrade, as set forth in subparagraph (v) above (the "Post-Downgrade Limited Investment Basket Cap"), and NorthWestern shall proceed as expeditiously as possible to reduce the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital to its subsidiaries and affiliates to an amount no greater than the applicable Post-Downgrade Limited Investment Basket Cap. If the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital extended to its subsidiaries and affiliates exceeds the applicable Post-Downgrade Limited Investment Basket Cap on the date ninety (90) days subsequent to the effective date of the downgrade, NorthWestern shall implement whatever course(s) of action the MPSC deems necessary through, after Notice and a Hearing, an order, to decrease the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital to NorthWestern's subsidiaries and affiliates to an amount no greater than the Post-Downgrade Limited Investment Basket Cap. Any such order shall be effective twenty (20) days after filing pursuant to 69-3-401, M.C.A., subject to NorthWestern's right to petition the appropriate Montana state court pursuant to 69-3-403, M.C.A. for injunctive relief pending any judicial review.

(vii) In the event that the ratio of NorthWestern's consolidated book equity to its consolidated capitalization at any time falls below forty percent (40%), then, notwithstanding anything to the contrary in the Consent Order, the Limited Investment Basket Cap on that date automatically shall decrease to sixty million dollars ($60,000,000) (or such reduced amount as is appropriate based on the elimination, reduction, or disposition of assets described in paragraph 4(b)(v), above) and NorthWestern shall proceed as expeditiously as possible to reduce the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital to its subsidiaries and affiliates to an amount no greater than sixty million dollars ($60,000,000) (or such reduced amount as is appropriate based on the elimination, reduction, or disposition of assets described in paragraph 4(b)(v), above). If the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital extended to its subsidiaries and affiliates exceeds sixty million dollars

($60,000,000) (or such reduced amount as is appropriate based on the elimination, reduction, or disposition of assets described in paragraph 4(b)(v), above) on the date 90 days subsequent to the date on which the ratio of NorthWestern's consolidated book equity to its consolidated total capitalization falls below forty percent (40%), NorthWestern shall implement whatever course(s) of action the MPSC deems necessary and, after Notice and a Hearing, orders to decrease the aggregate amount of any and all loans, guarantees, advances, equity investments, and working capital to NorthWestern's subsidiaries and affiliates to an amount no greater than sixty million dollars ($60,000,000) (or such reduced amount as is appropriate based on the elimination, reduction, or disposition of assets described in paragraph 4(b)(v), above). Any such order shall be effective twenty (20) days after filing pursuant to 69-3-401, M.C.A., subject to NorthWestern's right to petition the appropriate Montana state court pursuant to 69-3-403, M.C.A. for injunctive relief pending any judicial review.

(viii) NorthWestern shall not enter into any contract with a subsidiary or an affiliate of NorthWestern where any part of the costs of such contract are, or are expected or requested by NorthWestern to be, recovered through utility rates paid by Montana ratepayers, unless:

(1) NorthWestern first shall have made application to the MPSC upon full disclosure of all material facts for authorization to enter into such contract; and

(2) The MPSC, after Notice and a Hearing, shall have authorized NorthWestern to enter into such contract.

(ix) NorthWestern shall maintain separate books and accounting records for each Public Utility operating within its corporate structure and for each direct or indirect subsidiary or affiliate of NorthWestern.

(x) NorthWestern shall permit the MPSC to audit the books and records of its Public Utility operations and, in addition, those of each direct or indirect subsidiary and affiliate, and NorthWestern shall provide the MPSC and its staff full access to all such books and records upon reasonable notice.

(xi) NorthWestern shall provide, subject to SEC disclosure limitations (which, if invoked as grounds for non-reporting, shall be documented by reference to the applicable SEC rule or regulation and the basis for its application in the

circumstances), quarterly reports of all transactions between the parent and any subsidiary or affiliate.

(xii) NorthWestern shall maintain Montana Universal Service Benefit funds collected by it in a separate and segregated interest-bearing bank account dedicated exclusively to the handling of such funds, and it shall account for such funds as trust funds as provided for under Montana law.

(c) Reporting and Disclosure Requirements.

(i) NorthWestern shall provide to the MPSC staff a complete and detailed explanation of all accounting systems and practices in use by NorthWestern and its direct and indirect subsidiaries and affiliates, and it shall provide the MPSC and MCC with current copies of all accounting manuals and practices in use by NorthWestern and its direct and indirect subsidiaries and affiliates. To the extent that the accounting manuals and practices contain proprietary and commercially sensitive information that would qualify as a trade secret under Montana law, NorthWestern may apply to the MPSC pursuant to Mont. Code Ann. § 69-3-105 for a protective order using the processes and criteria outlined in *Great Falls Tribune v. Montana Public Service Commission*, 319 Mont. 38, ¶¶ 55-57, 82 P.3d 876 (2003), or applicable MPSC administrative rules.

(ii) NorthWestern acknowledges and reaffirms its obligation to respond to reasonable requests by the MPSC, its staff, or the MCC, pursuant to Mont. Code Ann. §§ 69-3-102, 69-3-106, and 69-2-203, and shall respond to all such requests in a timely and complete manner.

(d) Transmission and Distribution Infrastructure Audit.

(i) NorthWestern has engaged voluntarily Liberty Consulting ("Auditor") to audit and make recommendations to NorthWestern concerning the state of NorthWestern's utility transmission and distribution infrastructure within Montana (the "Infrastructure Audit"). NorthWestern shall:

(1) Within three (3) business days of receipt, submit the Auditor's final report or reports containing the results and recommendations of the Infrastructure Audit to the MPSC;

(2) Cause the Auditor to present the findings and recommendations of the Infrastructure Audit to the MPSC at a public meeting within fifteen (15) days of receipt by NorthWestern of the final report with respect to the Infrastructure Audit; provided, however, that on or before August 1, 2004, the Debtor shall submit a report (whether final or not) containing the results and recommendations of the Infrastructure Audit to the MPSC; and

(3) Coordinate and cooperate with the MPSC and the MCC to implement appropriate recommendations of the Infrastructure Audit.

(ii) The Financial Investigation docket will remain open for the sole purpose of maintaining a procedural forum for the entry of any orders by the MPSC for the implementation of appropriate Infrastructure Audit recommendations agreed upon by the Parties.

(iii) Notwithstanding paragraph 4(d)(ii), above, if the Parties cannot agree on the implementation of Infrastructure Audit recommendations, then the MPSC, either on its own motion or upon the petition of the MCC, may commence a new proceeding to compel the implementation of any Infrastructure Audit recommendation not agreed upon by the Parties. If any such motion or petition is filed, NorthWestern reserves all rights to oppose the implementation of any recommendation of the Infrastructure Audit not agreed upon by the Parties.

(e)   Corporate Governance and Management. As part of its Plan, the Debtor shall establish a new Board of Directors with at least every director but one an Independent Director. The Debtor will use its reasonable best efforts to attract and retain directors with utility energy expertise. The Debtor will provide the MPSC and the MCC, no less than fifteen (15) days prior to the Confirmation Hearing, notice of the identity of the Reorganized Debtor's proposed board members and a summary of their experience. The Debtor will, at all times, ensure that at least one member of the Reorganized Debtor's Executive Management Committee and one member of its Energy Supply Board work in Montana and are legal residents of Montana.

(f)   Liquidity. The Debtor shall have, on or before the Effective Date, unrestricted cash on hand and/or immediately available credit

(without any closing conditions), in an aggregate amount not less than seventy-five million dollars ($75,000,000).

(g) Withdrawal of Stay Motion. Following execution of this Agreement, the Debtor will continue to refrain from prosecuting the Stay Motion in any way. Upon the latter of the MPSC's entry of the Consent Order or the Bankruptcy Court's entry of an Order approving this Agreement, the Debtor will withdraw the Stay Motion.

(h) Payment of Fees and Expenses. The Debtor agrees to pay to the appropriate entities the reasonable fees and out-of-pocket expenses of the professionals and experts retained by the MPSC, the MCC and the Montana Attorney General (including the fees of the state attorney retained by the Attorney General) incurred in connection with the Chapter 11 Case. In addition, the Debtor agrees to pay the reasonable out-of-pocket expenses incurred by the MPSC commissioners, MPSC staff, MCC and MCC staff in connection with the Chapter 11 Case. The fees and expenses of the various professionals which total approximately $2,297,768.86 as of May 31, 2004 are set forth on Exhibit B to this Agreement.

Payment by NorthWestern of the fees and expenses incurred through May 31, 2004 and any additional fees and expenses to be incurred through the Effective Date will be paid pursuant to Section 1129(a)(4) of the Bankruptcy Code and payments will be made no later than the Effective Date.

The Debtor's undertaking under this paragraph 4(h) is to pay the specific sums certain set forth on Exhibit B or as may be otherwise agreed to by the Parties, which sums shall not be modified except by the mutual written agreement of the Parties to this Agreement.

(i) Implementation. If the Debtor amends the Plan for any reason, any Plan amendment shall incorporate this Agreement and the Consent Order by reference unless the Parties agree that such action is not then necessary or required. No later than forty-five (45) days prior to the Effective Date of the Plan, NorthWestern will file with the MPSC a petition for authorization to issue stock, stock certificates, and securities payable at any time more than twelve (12) months after their issue date, as described, and only as described, in the Plan approved by the Bankruptcy Court. Any petition so filed: (1) shall not be opposed by the MCC, consistent with the terms of this Agreement; and (2) will be acted upon by the MPSC within thirty (30) days of the filing of a complete petition pursuant to 69-3-503, M.C.A. In the event that the MPSC either denies the petition for authorization to issue in connection with the Plan stock, stock

certificates and securities payable at any time more than twelve (12) months after their issue date, fails to act on the complete petition within thirty (30) days of filing, or attaches conditions to the approval of such petition, NorthWestern may exercise its asserted right to contest the jurisdiction of the MPSC with respect to securities to be issued in connection with the Plan.

(j) Order Validity. NorthWestern acknowledges that the terms of this Agreement and the Consent Order are lawful and consents to the MPSC's exercise of the authority, jurisdiction and power to enter into them. Except as specifically provided in paragraphs 4(d)(iii) and 4(i), above, NorthWestern specifically waives the right to challenge any order of the MPSC enforcing the terms of this Agreement or the Consent Order on the grounds that this Agreement or the Consent Order is or was not lawful or beyond the MPSC's jurisdiction.

(k) Preparation of Motion to Approve Agreement. The Debtor shall prepare and file all pleadings and other documents with the Bankruptcy Court, or any other court of appropriate jurisdiction, necessary to obtain approval of this Agreement and the settlement it describes, for the purposes of satisfying the condition precedent described in paragraph 8, below. The Debtor also shall take any and all other action reasonably necessary to obtain Bankruptcy Court approval of this Agreement. Upon the request of the Debtor, the MPSC and MCC shall provide such assistance as may reasonably be required to obtain Bankruptcy Court approval.

5. MCC Agreement. The MCC agrees as follows:

(a) It will not seek MPSC review of NorthWestern's transmission and distribution tariffed rates and charges at any time prior to September 30, 2006.

(b) Notwithstanding any practice or provision to the contrary in the MPSC's Rules, the burdens of proof and persuasion in the rate proceeding initiated by NorthWestern's filing set forth in paragraph 4(a) above shall be borne by any Party that is seeking to change rates from those approved by the then currently effective MPSC order.

(c) Provided all conditions in this Agreement are met, and provided that no material amendments are made to the Plan without the MCC's approval, MCC will not object to confirmation of the Plan. The MCC reserves its right, however, to object to any Plan amendments. Nothing in this Agreement, the Consent Order, or the Bankruptcy Court order approving this Agreement shall restrict

in any way the right of the MCC to endorse, oppose, or comment upon any other plan of reorganization or any offer to purchase the Debtor or its assets, in whole or in material part.

(d) The MCC will not oppose the Debtor's efforts to refinance all or some of its secured debt, including its debtor-in-possession financing, so long as the terms (taken as a whole) of such financing are at least comparable to the terms, including interest rates, amortization, fees, covenants, and term, of the indebtedness being refinanced, and provided that the Debtor complies with Mont. Code Ann. §§ 69-3-501 through 507.

6. MPSC Agreements. The MPSC agrees as follows:

(a) It will not issue an order authorizing changes in NorthWestern's transmission and distribution tariffed rates and charges at any time prior to September 30, 2006. Nothing in this provision shall prevent the MPSC from reviewing and ruling on commodity rates or responding to rate filings made by NorthWestern whenever made.

(b) Notwithstanding any practice or provision to the contrary in the MPSC's Rules, the burdens of proof and persuasion in the rate proceeding initiated by NorthWestern's filing set forth in paragraph 4(a) above shall be borne by any Party that is seeking to change rates from those approved by the then currently effective MPSC order.

(c) Provided all conditions in this Agreement are met, and provided that no material amendments are made to the Plan without the MPSC's approval, the MPSC will not object to confirmation of the Plan. The MPSC reserves its right, however, to object to any Plan amendments. Nothing in this Agreement, the Consent Order, or the Bankruptcy Court order approving this Agreement shall restrict in any way the right of the MPSC to endorse, oppose, or comment upon any other plan of reorganization or any offer to purchase the Debtor or its assets, in whole or in material part.

(d) The MPSC will not oppose the Debtor's efforts to refinance all or some of its secured debt, including its debtor-in-possession financing, so long as the terms of such financing (taken as a whole) are at least comparable to the terms, including interest rates, amortization, fees, covenants, and term of the indebtedness being refinanced, and provided that the Debtor complies with Mont. Code Ann. §§ 69-3-501 through 507.

7. No Effect on Rights of or Against Third parties. Nothing contained in this Agreement is intended to release, limit or otherwise affect any claims that: (a) third parties may have against the Debtor or any of its related entities; or (b) the Debtor may have against third parties other than the MCC or MPSC. Without limiting the generality of the foregoing statement, nothing in this Agreement shall affect the claims of the State of Montana or any of its agencies (except the MPSC and MCC) or subdivisions in the Chapter 11 Case or any other proceeding.

8. Conditions Precedent to Effectiveness of Agreement and Implementation of Its Terms. This Agreement, each term, condition and provision hereof, and the respective rights and obligations of the Parties hereunder are expressly conditioned on: (i) the entry of a final, non-appealable order by the Bankruptcy Court (or, if applicable, the United States District Court for the District of Delaware or the United States Court of Appeals for the Third Circuit) under Bankruptcy Rule 9019 or any other applicable section of the Bankruptcy Code or Bankruptcy Rules approving this Agreement without modification deemed unacceptable by any Party hereto, and authorizing the Debtor to implement each and every term of the settlement described in this Agreement; and (ii) entry of the Consent Order. Entry of the order described in clause (i) of this paragraph 8 is an express condition precedent to the effectiveness of this Agreement. In the event that a final non-appealable order approving the Agreement and the settlement it describes is not entered on or before July 30, 2004, then this Agreement, and each of its terms conditions, and provisions may be voidable at the option of any Party, and if voided no Party shall have any rights or obligations hereunder. The MPSC shall act upon the Debtor's and the MCC's motion for entry of the Consent Order within forty-five (45) days of the Consent Order's filing with the MPSC. The provisions of this Agreement and the undertakings of the Parties (except as otherwise provided) shall be implemented and become effective upon the Effective Date of the Plan.

9. Reservation of Rights. The MPSC and MCC reserve their rights, in the event that the Bankruptcy Court does not enter a final non-appealable order approving this Agreement, to re-assert arguments and positions asserted prior to this Agreement in the Chapter 11 Case, the Financial Investigation, or elsewhere, and NorthWestern shall not assert any procedural objections to the reassertion of those arguments or positions. Furthermore, if the Plan is not confirmed by the Bankruptcy Court for any reason on or before September 30, 2004, then this Agreement is voidable in its entirety at the option of the MPSC and/or the MCC. Nothing in this Agreement shall impair the Debtor's ability to, at any time, petition the MPSC for relief from the structural measures set forth in paragraph 4(b) of this Agreement.

10. Public Documents. Neither this Agreement, nor the Consent Order, nor the Bankruptcy Court's order approving this Agreement shall be subject to any confidentiality agreement or assertion of privilege. These documents shall constitute public records of the Bankruptcy Court and of the MPSC.

11. Binding on Successors and Assigns. This Agreement and each of its provisions, if approved by the Bankruptcy Court and the MPSC and upon its becoming effective pursuant to paragraph 8 of this Agreement, will be binding upon the reorganized Debtor, its affiliates, parents, subsidiaries, officers, directors, shareholders, agents, representatives, attorneys, successors and assigns, specifically including, without limitation, any purchaser or other transferee, directly or indirectly (whether by purchase, merger, consolidation or otherwise), of all or a material portion of the reorganized Debtor's Public Utility assets. This Agreement, if approved by the Bankruptcy Court and the MPSC and upon its becoming effective pursuant to paragraph 8 of this Agreement, will be binding upon the MPSC, the MCC, their successors, officers, directors, agents, representatives, and attorneys. This Agreement, and the attached Consent Order, address discrete components on which future revenue requirements may be based, but it does not, and does not purport to, set rates with respect to the Debtor's Montana Public Utility assets.

12. Representation By and Consultation With Counsel. The Parties each represent and warrant that: (i) each has read and understands the terms of this Agreement and is duly authorized to enter into this Agreement and bind the Party(ies) on whose behalf each is executing this agreement (subject, with respect to the MPSC, to a vote of the MPSC and approval by at least three members of the MPSC present and voting); (ii) each has been represented by counsel with respect to the negotiation and execution of this Agreement and all matters covered by and relating to it; and (iii) each has entered into this Agreement of its own free will and for reasons of its own.

13. Integration and Merger. This Agreement, along with the Consent Order and all other exhibits and attachments to this Agreement and any Order of the Bankruptcy Court approving this Agreement in its entirety, embodies the entire agreement among the Parties. There have been and are no agreements, representations, or warranties, whether express or implied, written or oral, other than those set forth or provided for herein or in the Consent Order. Other than as stated herein or in the Consent Order, each Party to this Agreement warrants that no representation, promise, or inducement has been offered or made to lead such Party to enter into this Agreement and that such Party is competent to execute this Agreement (subject, with respect to the MPSC, to a vote of the MPSC and approval by at least three members of the MPSC present and voting).

14.   Amendment of Agreement.  The terms of this Agreement may only be amended or modified by a writing that has been executed by each of the Parties.

15.   Construction.  This Agreement was drafted with the assistance of counsel for all Parties.  It shall not be construed in favor of or against any Party.

16.   Execution.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.  Executed signature pages may be removed from partially executed counterparts and attached to one or more other counterparts to produce fully executed counterparts.  This Agreement may be executed by facsimile copy, and each signature shall be and constitute an original signature, again as if all Parties had executed a single original document.  This Agreement shall be originally executed as many times as required to provide a fully executed duplicate original of such document to each Party requesting it.

17.   Continuing Jurisdiction.  The MPSC shall have exclusive jurisdiction, on its own or on the application of the MCC pursuant to Title 69, Mont. Code Ann., to enforce NorthWestern's compliance with the Consent Order.  Nothing in this Agreement shall be construed in any way to expand, diminish or limit the MPSC's jurisdiction under state law.  The Bankruptcy Court shall have jurisdiction to enforce the terms of this Agreement; provided, however, the MPSC and the MCC do not consent, by entering into this Agreement and/or the Consent Order, to the jurisdiction of the Bankruptcy Court except to the extent necessary to obtain Bankruptcy Court approval of the Agreement and, if necessary, enforcement of the Agreement's terms.

18.   No Precedential Effect.  Except as may be expressly provided in this Agreement, the Parties intend neither to expand nor to limit the jurisdiction of the MPSC under state law.  The Parties do not intend this Agreement to establish any precedent that can be used by any Party to bind any other Party in any subsequent proceeding, or otherwise, except a proceeding or action arising out of or directly related to this Agreement or the Consent Order.

19.   Choice of Law.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Montana, as enacted on the date hereof and without regard to principles of conflicts of laws.

20.   Headings.  The Parties agree that the captions and headings in this agreement are inserted for convenience of reference only and are not part of, and shall not affect the interpretation of, this Agreement.

Approved as to form:
Paul, Hastings, Janofsky
& Walker, LLP

By: ______________________________
Jesse H. Austin, III
Karol Denniston
Carolyn Chayavdhanangkur
Attorneys for NorthWestern

NorthWestern Corporation

By: ______________________________
Gary G. Drook
Chief Executive Officer

Approved as to form:
Duncan & Allen

By: ______________________________
John P. Coyle, Attorneys for the
Montana Consumer Counsel

The Montana Consumer Counsel

By: ______________________________
Robert A. Nelson
Montana Consumer Counsel

Approved as to form:
LaFollette Godfrey & Kahn

By: ______________________________
Brady C. Williamson
Katherine Stadler
Attorneys for the MPSC

The Montana Public Service Commission

By: ______________________________
Bob Rowe, Chairman

**EXHIBIT B**
**TO STIPULATION AND SETTLEMENT AGREEMENT**

Fees and Expenses of the MPSC, MCC, and Attorney General
to be paid by the Debtor pursuant to paragraph 4(h) of the Stipulation and Settlement Agreement

| Party/ Professional | Services through (date) | Fees | Expenses | Total |
|---|---|---|---|---|
| **Montana Public Service Commission** | | | | |
| Blank Rome LLP | 5/31/2004 | 8,474.96 | 436.14 | 8,911.10 |
| LaFollette Godfrey & Kahn | 10/9/2003 to12/1/2003 | 17,500.00 | -0- | 17,500.00 |
| | 12/1/2003 to 6/30/2004 | 353,176.21 | 30,000.00 (estimated) | 383,176.21 |
| | 7/1/2004 to 9/30/2004 | $60,000.00 (estimated) | $10,000.00 (estimated) | 70,000.00 (estimated) |
| Law Offices of Scott Hempling, P.C. | 5/31/2004 | 14,728.75 | 53.16 | 14,781.91 |
| Out-of-Pocket Expenses (Commissioners and staff) | 5/31/2004 | | 3,619.34 | 3,619.34 |
| **Montana Consumer Counsel** | | | | |
| Duncan & Allen | 5/31/2004 | 191,824.00 | 2,842.02 | 194,666.02 |
| McCarter & English, LLP | 5/31/2004 | 7,931.72 | (included in fees) | 7,931.72 |
| Out-of-Pocket Expenses (Consumer Counsel & staff) | 5/31/2004 | 0.00 | 0.00 | 0.00 |
| J.W. Wilson & Associates | 5/31/2004 | 113,328.00 | 605.65 | 113,933.65 |
| **Montana Attorney General** | | | | |
| Attorney James Screnar | 5/31/2004 | 27,808.59 | 326.12 | 28,134.71 |
| Out-of-Pocket Expenses (staff) | 4/30/2004 | | 870.03 | 870.03 |
| Monzack & Monaco | 5/31/2004 | 23,295.16 | included in fees | 23,295.16 |
| Morgan Joseph | 5/31/2004 | 200,000.00 | 4,324.77 | 204,324.77 |
| Miller Mathis | 5/31/2004 | 350,000.00 | 6,256.45 | 356,256.45 |
| | 6/1/2004 to 9/30/2004 | 400,000.00 | | 400,000.00 |
| | completion fee | 1,000,000.00 | -0- | 1,000,000.00 |
| **GRAND TOTALS:** | | 2,768,067.39 | 59,333.68 | 2,827,401.07 |