IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: Civil Action No. 04-1494-JJF<br>:<br>:<br>:<br>:<br>: |
| MAGTEN ASSET MANAGEMENT CORP.<br><br>Plaintiff,<br><br>v.<br><br>MIKE J. HANSON and ERNIE J. KINDT,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>: Civil Action No. 05-499-JJF<br>:<br>:<br>:<br>: |

**JOINT RESPONSE OF DEFENDANTS NORTHWESTERN CORPORATION, MICHAEL J. HANSON AND ERNIE J. KINDT TO THE SUPPLEMENTAL SUBMISSION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE COMPANY OF NEW YORK IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

In accordance with the directions of the Special Master during the telephonic hearing on January 15, 2007, Defendants NorthWestern Corporation ("NorthWestern"), Michael J. Hanson and Ernie J. Kindt, hereby reply to the Supplemental Submission of Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture" and collectively "Plaintiffs") made in support of Plaintiffs' Motion to Compel.

Plaintiffs claim the issue here is "the relevance to this litigation of documents related to the SEC's investigation of Northwestern as well as documents submitted to regulators in connection with the transaction at issue." Northwestern has already agreed to produce documents of

the latter category and even documents of the former category relating to the transaction at issue. But as Plaintiff's own papers show, their Document Requests go far beyond these areas of inquiry.

Indeed, Plaintiffs' supplemental submission is breathtaking in its audacity. It mischaracterizes the transaction of which they complain, glosses over the nature of the QUIPS, which are the most junior subordinated unsecured debt, misrepresents the holding of Judge Case on the motion to dismiss, ignores Plaintiffs' own pleadings and prior statements to the Court and, for the first time, attempts to articulate a completely new and never before presented theory of some pervasive fraudulent scheme. All of this is done to justify document requests which have no relevance to any claim asserted by Plaintiffs or defense asserted by the Defendants.

Any issue regarding the inaccuracy of the NorthWestern's financial statements can be resolved by stipulation. As will be demonstrated below, a stipulation eliminates the need for any additional discovery, other than the issue of whether those financials were at all relevant to, or had any impact on, the release of Clark Fork as obligor on the QUIPS. With the Parties focused on that issue, it should be little problem to complete fact discovery within the time limits contemplated by Judge Farnan's Rule 16 Scheduling Order.

Plaintiffs' Claims and the Prior Proceedings

Plaintiffs' claims are simple fraudulent conveyance claims, alleging that the transfer of the utility assets to NorthWestern by Clark Fork was a fraudulent conveyance because the value of the utility assets acquired by NorthWestern exceeded the value of the debt it assumed and that, as a result, Clark Fork was rendered insolvent. A copy of Plaintiffs' initial complaint is attached as Exhibit A. The problem with Plaintiffs' claims was that as of November 15, 2002, the QUIPS were no longer obligations of Clark Fork. They had been assumed by NorthWestern and Plaintiffs became

creditors of NorthWestern. Therefore whatever effect the transaction may have had on Clark Fork was irrelevant as it was no longer the obligor.[1]

Thus, the basis for NorthWestern's motion to dismiss the original complaint was not some technical standing argument. Rather, it went to an essential element of Plaintiffs' claim. Had the QUIPS *not* been assumed by NorthWestern when it transferred the utility assets from Clark Fork, and had the QUIPS holders been left as creditors of an asset stripped subsidiary, then a claim may lie. But NorthWestern was the obligor on the QUIPS, not some asset stripped shell.

Plaintiffs desperately tried to avoid the obvious defect in their claim by asserting – not in a pleading but in opposition to NorthWestern's motion to dismiss the original complaint– that the assumption of the QUIPS by NorthWestern and the release of Clark Fork as obligor was invalid because the release was procured by fraud.

In his decision, Judge Case reviewed the transaction. The so-called "Going Flat Transaction" at issue in this case was actually the last step in a transaction which began in 2000 whereby NorthWestern acquired the utility transmission and distribution assets (the "utility assets") of Montana Power Company. On September 29, 2000, Montana Power Company entered into a unit purchase agreement with NorthWestern pursuant to which NorthWestern agreed to purchase the utility assets. In order to facilitate the asset sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC ("MPLLC"). On February 13, 2002, Montana Power merged the utility assets into MPLLC as a result of which MPLLC held those assets. On February 15, 2002, NorthWestern closed on the acquisition of MPLLC for approximately $1.1 billion in cash

---

[1] The sole claim against Hanson and Kindt is that prior to the completion of the going flat transaction on November 15, 2002 they breached a fiduciary duty allegedly owed to Magten – which was not even a QUIPS holder and thus not a creditor of Clark Fork as of the date of the going flat transaction.

and the assumption of MPLLC liabilities including the QUIPS. Thereafter, NorthWestern Corporation changed the name of MPLLC to NorthWestern Energy, LLC ("NWE"). The transfer was approved by both the Federal Energy Regulatory Commission and the Montana Public Service Commission prior to the transfer of the utility assets to NorthWestern in February 15, 2002 transaction.[2] In connection with those approvals, NorthWestern had made clear that it would either continue to operate the utility assets through a wholly-owned subsidiary, NWE, or that it may choose to bring those assets into the parent company and operate the utility business as a division rather than through a subsidiary and the transaction was approved for either alternative. NorthWestern in fact continued to operate the utility assets through its subsidiary NWE until November 15, 2002, when the utility assets were moved into NorthWestern and NorthWestern assumed $700,000,000 of liabilities of NWE. NWE subsequently changed its name to Clark Fork & Blackfoot LLC.

Of the $700,000,000 of liabilities assumed by NorthWestern, $67,000,000 were attributable to the QUIPS.[3] *Id.* In connection with the assumption of the QUIPS obligations, NorthWestern executed a Third Supplemental Indenture in which it expressly assumed the payments on the outstanding securities and which released NWE (now Clark Fork) from any and all obligations on the QUIPS.

On the motion to dismiss, Judge Case made clear that Plaintiffs could not assert a fraudulent conveyance claim unless they were creditors of Clark Fork. He rejected each argument advanced by Plaintiffs on this issue except one. As stated by Judge Case:

---

[2] Thus, the regulatory approvals were obtained before the publication of the 2002 NorthWestern financial statements of which Plaintiffs complain.

[3] The QUIPS are essentially junior subordinated unsecured debt originally issued by Montana Power Company in 1996, with a maturity date in 2036. The obligations on the QUIPS were transferred from Montana Power Company to NorthWestern's subsidiary MPLLC as part of the consideration paid by NorthWestern for the February 2002 utility asset acquisition, and were assumed by NorthWestern itself in the November 2002 Going Flat Transaction. By their terms, the QUIPS may be subordinated not only to pre-existing debt of the obligor but to any subsequent debt incurred by the obligor. Interest payments on the QUIPS holders may be completely deferred for up to 60 months with no default. Furthermore, although the Plaintiffs have argued that the QUIPS have some interest in the utility assets, it is clear that they are completely unsecured and the bankruptcy court has already ruled in confirming NorthWestern's Plan of Reorganization that the QUIPS holders have no interest whatsoever in those assets.

> According to Plaintiffs, at the time of the transfer, [NorthWestern] intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. . . . <u>[I]f Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.</u> (emphasis added)

*See* Exhibit B, Under Advisement Decision Re: Motion to Dismiss dated August 20, 2004 ("Case Decision") at p. 9.

Having obtained a narrow reprieve from an overall dismissal of their claim, Plaintiffs filed an Amended Complaint. Plaintiffs pleaded no pervasive fraudulent scheme and simply added an allegation consistent with the only argument they made to Judge Case – that the release of Clark Fork was induced by fraud because the Indenture Trustee, The Bank of New York, executed the Third Supplemental Indenture in reliance on NorthWestern's false financials. The narrow allegation appears only at paragraph 68 of the Amended Complaint as follows:

> 68. The Third Supplemental Indenture, as executed by BNY in its capacity as Indenture Trustee did not include a release of Clark Fork's obligations under the Indenture and was executed by BNY in reliance Upon [NorthWestern's] fraudulent financial statements, while [NorthWestern] hid its true financial condition from BNY and from its investors.[4]

*See* Exhibit C, Amended Complaint

When NorthWestern received Plaintiffs First Request for Documents, it moved for a protective order seeking to limit discovery pursuant to Judge Case's ruling. In its Opposition Memorandum (appended hereto as Exhibit D), Plaintiffs again stated that the extent of their fraudulent scheme theory was that The Bank of New York was induced to execute the release of Clark Fork because it relied on NorthWestern's false financial statements. (Ex. D at 7) In fact, in opposing NorthWestern's motion for a protective order, Plaintiffs never asserted the fraudulent

---

[4] An alternative argument made by Plaintiffs, but never pled, is that as a result of the Going Flat Transaction, the QUIPS holders went from being creditors of a solvent enterprise, Clark Fork, to being deeply subordinated creditors of a financially shaky enterprise, NorthWestern. Undoubtedly, the reason Plaintiffs have never pled such a claim is that, given the nature of the QUIPS contract rights, the allegations simply fail to state a claim. Indeed Judge Case held that the QUIPS had no right or guarantee that an entity assuming the obligations on the QUIPS would even be solvent. (Ex. B at 5.)

-5-

scheme manufactured here to support their sweeping document requests. Instead they represented to Judge Farnan that they needed discovery in order to prove the following elements of their allegation of fraud in the inducement:

> In connection with the First Amended Complaint, Plaintiffs will establish that (i) NorthWestern made false and misleading statements with respect to its financial condition (or withheld information which, if know, would have made the statements NorthWestern made false under the circumstances), (ii) NorthWestern knew or should have known that its statements were false, and (iii) but for these false statements, NorthWestern would not have been able to consummate the Transfer and, in particular, would not have been able to obtain the release of Clark Fork executed by BNY, which is the cornerstone of its lack of standing defense. NorthWestern has not offered to stipulate that it made these false statements with the requisite knowledge and intent.

*See* Ex. D at 7.

Most significantly, Judge Farnan, in denying NorthWestern's motion for a protective order, adopted and relied upon these representations by Plaintiffs. Judge Farnan never endorsed discovery relating to the new fraudulent scheme theory Plaintiffs now allege. In ruling that discovery in the case should not be limited solely to the issue of whether The Bank of New York, as indenture trustee, relied upon or was concerned with NorthWestern's financial statements in executing the Third Supplemental Indenture releasing Clark Fork, Judge Farnan stated:

> Because the Court concludes that discovery should not be limited to The Bank of New York's beliefs when executing the Third Indenture, but necessarily must include Defendant's knowledge and conduct in initiating and completing the Third Indenture, Defendant's arguments for a protective order are unpersuasive.

*See* Ex. E, Memorandum Order at 5.

NorthWestern is prepared to offer a stipulation which will address two of the three issues Plaintiffs have told Judge Farnan are implicated by their claim of a "fraudulent scheme", i.e., (i) the falsity of NorthWestern's financials extant in November 2002 when the Third Supplemental Indenture was executed and (ii) the knowledge of NorthWestern executives in issuing those financial

statements. That leaves only one issue for Plaintiffs' claim of a fraud in the inducement: but for those financials The Bank of New York would not have executed the Third Supplemental Indenture.[5]

None of Plaintiffs' most recent document requests seeking all information provided to the SEC go to these issues and those requests should be denied.[6]

## ARGUMENT

### Plaintiffs' Document Requests Seeking Information About the SEC and other Government and Regulatory Investigations are not Relevant to any Claim or Defense

The touchstone of relevancy for any discovery request is Fed. R. Civ. P. 26(b)(1). The request must relate to a matter " that is relevant to the claim or defense of any party." Plaintiffs' claims against NorthWestern are simple: that the Going Flat Transaction was a fraudulent conveyance as to them because they remained creditors of Clark Fork after the utility assets were transferred to NorthWestern for inadequate consideration and the transaction rendered Clark Fork insolvent. Plaintiffs allege that they remain creditors of Clark Fork, an essential element of any fraudulent conveyance claim, because the release of Clark Fork was executed by The Bank of New York in reliance on NorthWestern's false financials and thus is vitiated by fraud. This is the only so-called "fraudulent scheme" ever pled, or asserted, by Plaintiffs in this action.

Until now. Now, for the very first time Plaintiffs assert in their Supplemental Submission a new expanded "fraudulent scheme" to justify their new requests. Now they allege that the Montana State regulators were defrauded into permitting the utility asset transfer without "ring fencing" requirements which Plaintiffs claim would have prevented the Going Flat Transaction.[7]

---

[5] It should be made clear that NorthWestern's position is that Plaintiffs claim must fail as a matter of law regardless of the answer to this last question. However, that is a substantive matter beyond the scope of any discovery motion.

[6] Significantly, Plaintiffs have not, nor have they offered to, narrow their Requests to documents which evidence some investigation or concern by the SEC, or any other regulatory body, with the Going Flat Transaction.

[7] Aside from the fact that "ring fencing" of utility assets was not required by Montana law, this assertion fails to take into account that the state and federal regulators had already given their consent to the transfer of the utility assets to NorthWestern in February 2002, before any of the financial statements for 2002 had been issued.

Now Plaintiffs allege that if NorthWestern's financial condition had been known, the Going Flat Transaction would have been blocked by "any number of sufficient paths." But Plaintiffs have never included these new and fanciful allegations of an overarching fraudulent scheme as part of their claims.

Nor do these allegations go to the one issue identified by Judges Case and Farnan as remaining in this case – whether Plaintiffs are creditors of Clark Fork. Indeed, this new fraudulent scheme concocted by Plaintiffs is the basis of a new theory of the case – that but for NorthWestern's financial statements the entire transaction would never have occurred and would have been derailed by regulators, or other class plaintiffs or some other *deus ex machina*.

Plaintiffs contend that they are under no obligation to plead the contours of this new fraudulent scheme because Rule 9(b) does not apply. They are wrong. The case law is clear that all allegations of the fraudulent scheme, including allegations that a release is vitiated by fraud in the inducement, must conform to the heightened pleading requirements of Rule 9(b). *See Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993); *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658-59 (3d Cir. 1998); *Ladenburg Thalmann & Co., Inc. v. Diagnostic Syst., Inc.*, 176 F.Supp. 2d 199 (S.D.N.Y. 2001). And the courts are equally clear in stating the reason why these heightened pleading requirements of Rule 9(b) apply. "The purpose of Rule 9(b) is to provide notice of the precise misconduct with which defendants are charged and to prevent false or unsubstantiated charges." *Rolo*, 155 F.3d at 658.

Plaintiffs argue that Rule 9(b) does not apply to their fraudulent scheme claims, in part because their claim "might be thought of as akin to the use of evidence of fraudulent concealment to overcome a limitation defense in a case where the fraudulent concealment is not otherwise necessary to establish the defendant's liability." Again, Plaintiffs are wrong. In *In re Fruehauf Trailer Corp.*, 250 B.R. 168 (Bankr. D. Del. 2000), plaintiffs alleged that defendants falsely publicized the financial status of the company, violated accounting practices, and concealed

their mismanagement from the public. *Id.* at 177-82. Plaintiffs brought several state law claims and argued that the statute of limitations should be tolled, because defendants fraudulently concealed their mismanagement. *Id.* at 186. The court held that while the heightened particularity requirement of 9(b) did not apply to the underlying state law claims, "Rule 9(b) does require particular pleading of fraudulent concealment as a tolling theory." *Id.* at 198.

NorthWestern is entitled to be apprised in a pleading of the precise misconduct with which it is charged. If Plaintiffs are content with their claim as pleaded, the additional document requests must be denied. If Plaintiffs believe they have additional claims, the Rule 16 Scheduling Order permits them to amend their complaint by February 2, 2007. What Plaintiffs cannot do is amend their pleadings in letters and then serve discovery requests to support their latest liability theory.

With respect to the two items sought in this application, NorthWestern has already agreed to produce all documents produced to the SEC that are relevant and not privileged which relate to the Going Flat Transaction, (*see* Steingart Decl. Ex.P., December 11, 2006 Letter to Bonnie Steingart from Joseph D. Pizzurro), as well as documents submitted to regulatory authorities in connection with that transaction. But as Plaintiffs are well aware, the SEC investigation did not focus on the utility assets of NorthWestern. The SEC investigation focused on NorthWestern's financial position for the first three quarters of 2002, specifically, the failure to disclose information about its non-utility businesses, Expanets, Inc. and Blue Dot Services, Inc., businesses which had nothing whatsoever to do with the Going Flat Transaction. The documents submitted to the SEC concerning the restatement and these companies total more than one million pages and their production in this case would implicate not only issues of relevance and privilege but work product, confidentiality and privacy. Plaintiffs' requests are plainly outside the scope of their claims as currently pleaded and can only be intended only to harass and delay.

In sum, the Plaintiffs only allegations of a fraudulent scheme are fraud in the inducement relating to the execution of the Third Supplemental Indenture releasing Clark Fork as obligor on the QUIPS. These allegations relate to an essential element of Plaintiffs' claim of a fraudulent conveyance and they are the only allegations contained in any pleading. These allegations are subject to Rule 9(b) which requires particularity in pleading fraud in order to put defendants, such as NorthWestern, on notice of the alleged fraudulent scheme. No new allegations of a different far broader fraudulent scheme, allegations which have nothing to do with whether Plaintiffs remained creditors of Clark Fork or became creditors of NorthWestern, can now be made on a discovery motion to support Plaintiffs document requests.

Dated: Wilmington, Delaware
January 23, 2007

**GREENBURG TRAURIG LLP**

_/s/_

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360

and

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Joseph D. Pizzurro
Nancy E. Delaney
101 Park Avenue
New York, NY 10178
Telephone: (212) 696-6000
Facsimile: (212) 697-1559

Counsel for NorthWestern Corporation

-11-

Dated: January 23, 2007

**EDWARDS ANGELL PALMER & DODGE LLP**
Denise Seastone Kraft (No. 2778)
919 North Market Street
15th Floor
Wilmington, DE 19801
Telephone: (302) 425-7106

and

/s/ Kimberly A. Beatty
Stanley T. Kaleczyc
Kimberly A. Beatty
**BROWNING, KALECZYC, BERRY & HOVEN, P.C.**
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624
Telephone: (406) 443-6820

Counsel to Michael J. Hanson And Ernie J. Kindt