Westlaw.

Not Reported in A.2d                                                                                                Page 1

Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
In re Circon Corp. Shareholders Litigation
Del.Ch.,1998.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re CIRCON CORP. SHAREHOLDERS LITIG.
United States Surgical Corp.
v.
Auhll
**No. C.A. 15165, Civ.A. 15223.**

July 6, 1998.

Thomas J. Allingham II, Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, Jesse A. Finkelstein, Raymond J. DiCamillo, Richards, Layton & Finger, Wilmington, DE, James C. Strum, Chimicles, Jacobsen & Tikellis, Wilmington, DE, Joseph A. Rosenthal, Rosenthal, Monhait, Gross & Goddess, Wilmington, DE.
CHANDLER, Chancellor.
*1 Dear Counsel:

This is the Court's decision on plaintiffs' motion to compel. United States Surgical Corporation and its wholly-owned subsidiary, USS Acquisition Corporation, (collectively "Surgical"), brought suit against the target of Surgical's outstanding tender offer, Circon Corporation and the original members of Circon's Board of Directors ("Circon" or "Circon and its Directors").[FN1] The suit alleges that Circon and its Directors have taken impermissible steps to prevent Circon's shareholders from accepting Surgical's current $16.50 per share, two-step tender offer for all outstanding shares, including (a) distribution of a preclusive shareholder rights plan, (b) approval of a management and employee incentive plan that would dilute the shares of a potential hostile acquiror, but fails to provide real incentives to Circon's workers, and (c) reappointment of Circon CEO, defendant Richard A. Auhll, to the Circon Board of Directors after he was voted out by the shareholders at the last annual meeting. Plaintiffs claim, under *Unocal* and *Blasius,* that these actions breached the Directors' fiduciary duties of loyalty and care.[FN2]

FN1. Richard A. Auhll ("CEO Auhll"), Bruce Thompson ("CFO Thompson"), Harold R. Frank, Rudolf R. Schulte, Paul W. Hartloff, Jr., John Blokker, and George A. Cloutier. Note that I use the term, "Circon," to refer to the company and its directors, and refer to the individual defendants as Directors where necessary.

FN2. Plaintiffs also allege that defendants breached their fiduciary duty to Circon's shareholders by not disclosing, *inter alia,* the true value of Circon's "strategic plan" alternative to the tender offer.

Before me now is Surgical's motion to compel Circon's production of documents that Circon claims are privileged, but that were inadvertently turned over to plaintiffs.[FN3] For the reasons set forth below, I conclude that plaintiffs may keep the documents and enter them into evidence at trial.

FN3. Although one might suspect that a party who accidentally turned over privileged documents to the other side would be the one who would need to file a motion to get them back, the opposite is true here because the parties expressly agreed that, if a party demands the return of an inadvertently turned over document, the other side possessing the document must file a motion to compel and prevail on that motion in order to keep it. Stipulation and Order Governing the Protection and Exchange of Confidential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 2
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Material. 14.

## BACKGROUND

On June 19, 1998, Circon's outside legal counsel, Wilson, Sonsini, Goodrich & Rosati ("Wilson Sonsini"), sent a letter to Surgical's law firm, Skadden, Arps, Slate, Meagher & Flom, asking Surgical to return Exhibits 93, 96, 97, 98, and 100 of the Thompson deposition because they were privileged.[FN4] Pursuant to their stipulated agreement, Surgical filed a motion to compel production of the same in order to keep them. Plaintiffs seek to keep the five documents prepared by Circon's CFO Thompson and CEO Auhll. A quick description of the documents follows:

> FN4. Susan Bower letter to Lauren Aguiar (June 19, 1998).

### A. Exhibit 93

Surgical conceded that this document appeared to ask for legal advice on construing 8 *Del.C.* § 211(c) and returned it to defendants. It is not part of this motion.

### B. Exhibit 96

This document is one page of hand-scribbled notes describing the classes of directors on Circon's board. It contains three scenarios. The board composition in August, 1997, just before the shareholders' annual meeting with seven Circon directors, bumping one director from class III to class II. The composition in October, 1997, supposing that CEO Auhll was voted out by the shareholders and reappointed as a class I director in an expanded ten-member board. Last, in July 1998, assuming three USSC board members were voted in by shareholders, in this scenario, the board nullifies the impact of that by expanding to twelve with two of the Circon directors who lost to the Surgical slate, Schulte and Cloutier, being reappointed.

### C. Exhibit 97

*2 Exhibit 97 basically restated the last two scenarios of Exhibit 93, again handwritten.

### D. Exhibit 98

1. A two-page outline from CEO Auhll describes Circon's business environment, corporate strategy, Cabot acquisition, a quick comment on Surgical's tender offer, and the board structure. The section on the business environment describes the consolidation of hospitals, Circon's customer base, and the switch from open surgery to endoscopy, which impacts customers' product needs. The corporate strategy section divides Circon's business plan into three phases: (i) acquisition; (ii) turnaround; and (iii) internal growth. The next part examines Circon's acquisition of Cabot in terms of product and technology synergies. Next, the outline discusses the complexities of integrating Cabot's operations and concludes that Surgical's tender offer distracted management just as they should have focused on integrating Cabot. The following section expands upon this theme, stating that the Cabot acquisition's benefits have been delayed by Surgical's tender offer. It then jumps to the subject of expanding the board to eight and concludes that Surgical could elect up to half of the board by 1998.

2. A chart supplements the outline, discussing possible election scenarios for the board in 1997 and 1998.

3. After that is a paper discussing possible shareholder voting patterns at an annual meeting. The breakdown shows Surgical winning 55.6% of the vote, but concludes that if Circon can solicit the vote of one large institutional shareholder, LGT, and 4.4% of the other institutional investors to support Circon, they can elect one director. (I would note that the last page on shareholder voting has a file name attached to it showing its origin to be the legal department and that it is in a different font than the rest of the exhibit's documents, suggesting that it was created separately.)

### E. Exhibit 100

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d												Page 3
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Exhibit 100 is in the same font and same letterhead as Exhibit 98's two-page memo, but comes from CFO Thompson. It's stated objective: "Develop a strategy to limit USSC's ability to gain control of Circon's Board of Directors plus prevent any USSC efforts to change Circon bylaws." It notes that Circon, through its officers and employee stock purchase plan, owns 15.38% of its own stock. It advocates finding "white squire" financial investors to purchase 1.5 to 1.9 mm shares of Circon common in order to control 26% to 30% of its own shares. The proposed means would be to issue new shares to sell directly to the white squires in conjunction with a stock repurchase program of publicly-held Circon common stock that otherwise would be tendered to Surgical.

*F. Exhibit 99*

A typed memo with the same letterhead and font as CFO Thompson's previous memo. The contents are the same as Exhibit 93. Basically, it is a typed version of the notes in Exhibit 93 with the exception that it is titled "Board Expansion Strategy" instead of just "Board Strategy." This Exhibit is not mentioned in the Wilson Sonsini June 19 letter, but was requested after Surgical filed its opening brief. FN5

> FN5. Susan Bower letter to Lauren Aguiar (June 24, 1998) (Defs.' An.Br., Ex. E). Where I discuss the June 19 Wilson Sonsini letter, the discussion applies to this June 24 letter as well.

*3 None of these documents is addressed to legal counsel. Nor are the contents focused on legal issues or questions. Some are more formal than others, but they generally contain strategic discussions on expanding the board, predicting shareholder votes, and dealing with Surgical's tender offer. Only the one page originating from Circon's Legal Department suggests on its face that it is a legal document to which one might expect attorney-client privilege to attach.

PARTIES' CONTENTIONS

Surgical seeks to hold onto the exhibits requested in the Wilson Sonsini letter for a number of reasons. First of all, Surgical points out that the "legal nature" is not readily apparent on the face of any of these documents. The documents describe management plans to negate Surgical's quest for control, and lack the hallmarks of legal memoranda or client requests for legal advice. They are not addressed to legal counsel (unlike the vast number of legal memos sent back and forth between Circon and Wilson Sonsini) and neither ask for, nor reflect, legal advice.

Moreover, Surgical urges the Court to find significance in the long delay from the time the documents were turned over to the time that Circon asked for their return. Circon gave these documents to Surgical seven months ago and waited this long to ask for them back. Furthermore, at his deposition on May 5-6, six weeks before the Wilson Sonsini letter, CFO Thompson saw and answered questions about the documents. Defendants' lawyer threatened to reclaim the letters then, but Circon waited more than a month to follow up on that threat with the June 19 Wilson Sonsini letter. Finally, Surgical argues that its trial preparation would be prejudiced by having to exorcise all mention of these documents from its legal memoranda at the close of discovery and four days before the filing of pretrial briefs. Besides, Surgical adds, these documents are highly probative of Surgical's claim that Circon is attempting in bad faith to thwart Surgical's quest for control.

Defendants present what they consider to be motion-dispositive reasons for denying Surgical access to the inadvertently turned over documents. Circon and its Directors argue that the documents were indisputably created for discussions with counsel and were never discussed by the board. CFO Thompson remembers that the documents were created for one meeting with the law firm and CEO Auhll recollects bringing such documents to Wilson Sonsini for discussions with them. Defendants add that the documents are "trial balloons," not facts. They admit that documents describing facts material to this action may be discoverable even if submitted to counsel because it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 4
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

is the legal advice that is protected, not the underlying facts. Here, Circon argues, the documents should not be discoverable as underlying facts because they describe possible business strategies for consultation with counsel, not historic facts in dispute in this action. Finally, defendants respond to Surgical's "tardiness" argument by stating that they were not late in requesting return of the documents, because the grounds for claiming privilege were not clear until after the testimony of CEO Auhll and, furthermore, the discovery agreement covers the return of inadvertent materials, so there is no need to evaluate the promptness of their request for the return of the five documents.

### LEGAL ANALYSIS

***4** Attorney-client privilege protects from discovery (1) a communication, (2) between a client and attorney, (3) that is confidential, and (4) is made to facilitate the attorney's legal services to the client.[FN6] The burden rests upon the party asserting this privilege to demonstrate that the document in question meets this criteria, and that burden is particularly difficult where none of the indicia of a legal communication appear on the document's face.[FN7] Furthermore, on a motion to compel production of documents inadvertently turned over, I may question defendants' claim of inadvertent production in light of the objective evidence available.[FN8]

> FN6. *Balin v. Amerimar Realty Co.,* Del.Ch., C.A. No. 12896, Jacobs, V.C. (April 10, 1995), mem. op. at 15.
>
> FN7. *Id.* (holding that privilege-seeking party's "burden to establish that the privilege attaches to those documents is in this case demanding, because on their face none of the documents appears to be a communication from a client to an attorney.")
>
> FN8. *Monsanto Co. v. Aetna Casualty & Surety Co.,* Del.Super., No. C.A.

88C-JA-118, Order at ___, 1991 WL 53822, *1, Poppiti, J. (Apr. 8, 1991) ("I am therefore convinced that a finder of fact cannot be required to evaluate a bald assertion of inadvertent disclosure; rather, the assertion must be tested against objective evidence.").

In regard to Surgical's claim that the June 19 Wilson Sonsini letter was tardy, I cannot agree with Circon that the discovery agreement's silence on this issue precludes me from considering the seven-month delay from the time of production and six-week delay from the time of the CFO Thompson deposition. I do not need, however, to create a hardfast rule for when the Wilson Sonsini letter should have been sent. I eschew creating a fixed time limit for requesting the return of inadvertently produced materials, because it is such a fact-intensive inquiry. Instead, I look to whether Circon had notice of its own inadvertent production of these documents and an opportunity to raise this motion before now. Needless to say, defendants had ample time to demand return in the seven months after production, and even if it required Surgical's disclosure of these documents at the CFO Thompson deposition to bring this problem to defendants' attention, they did not need to wait six weeks to send the Wilson Sonsini letter. Circon's claim that it needed to hear the CEO Auhll deposition to clarify the privileged nature of these documents is not, as Circon now argues, an answer to Surgical's "tardiness" attack, but only illustrates, in my mind, the difficulty in concluding that these non-legal documents were privileged client-attorney communications.[FN9] If Circon did not recognize the documents as privileged until seven months after their "inadvertent" production and their display at two depositions, how can Circon argue now that the documents are unambiguously and undisputably attorney-client communications?

> FN9. That impression is reinforced by the failure of the June 19 Wilson Sonsini letter to demand return of Exhibit 98. Because Exhibit 98 contains information identical to Exhibit 96 and similar to 97, I find Circon's failure to demand return of that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                      Page 5
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

    document until after Surgical filed its opening brief to be further evidence that these documents were not readily identifiable as attorney-client communications by the very party so claiming.

Circon has burdened both Surgical and this Court by raising this issue only three weeks before trial. Surgical would face a sizeable, unforeseen task in revamping its trial strategy in the absence of documents that it alleges demonstrates Circon's bad faith. Creating this burden at such a late stage in the proceedings when Circon had ample time to do so earlier is one factor mitigating in favor of not returning the documents.

As for the four elements defining a document susceptible to a claim of attorney-client privilege, as explained below, defendants have not shown that the communications were between Circon and its legal counsel, were to facilitate counsel's legal advice, or that the communications were confidential. Consequently, Circon cannot claim privilege for these documents.

### A. Between client and attorney and to facilitate legal services

*5 Nothing on the face of any document except the last page of Exhibit 98 gives any reason to suspect that the documents were drafted by a client to send to an attorney. The documents are not addressed to Wilson Sonsini or any other counsel. They do not ask legal questions or respond to legal advice. The content is by and large a strategic discussion of how to deal with issues stemming from Surgical's interest in acquiring Circon. The only document that even suggests a relationship to legal matters is the last page. It was created by the legal department of Circon, but nothing else about it suggests that it was created for use by an attorney in providing Circon legal services. Absent more, the mere origination of a document from within a corporation's legal department does not show it to be a communication between a client and attorney.[FN10]

FN10. In *Balin,* the Court reserved judgment on a particular document addressed to counsel merely because it had been addressed so. *Balin, supra,* n. 5, at 19-20. The origination of a document from within Circon's Legal Department does not merit the same presumption.

Although, on their face, the documents do not suggest that they were communications between attorney and client, I can look at extrinsic facts and so infer from the circumstances. But there is little extrinsic evidence supporting Circon's claim of privilege. Circon relies on CEO Auhll and CFO Thompson's hazy testimony that they prepared the documents for meetings with Wilson Sonsini. CEO Auhll stated, "I don't know this was actually given to the board or what. I don't-I don't know that it was. It may have been prepared for legal counsel. In fact, come to recollect, I think it kind of was." I will accord CEO Auhll's equivocations some weight, but hazy recollections after the fact by an interested party are not persuasive evidence that these documents were attorney-client communications.

CFO Thompson's testimony is similarly vague and somewhat inconsistent with the arguments asserted in Circon's brief.[FN11] He claims that Exhibit 99, dated July 29, 1997, was prepared for a single meeting with Wilson Sonsini. "I recall only one." [FN12] If so, it is hard to conceive how Exhibits 98 and 100 were prepared for the same meeting, as they were dated February 25, 1997. This factual difficulty concerning the document dates, and the fact that CFO Thompson recalls only one meeting, undercuts defendants' argument that "testimony about these documents is unambiguous and undisputed: each was created by either Mr. Thompson or Mr. Auhll, for a meeting with counsel." [FN13] CFO Thompson's and CEO Auhull's testimony is too vague to convince me that these documents were communications between a lawyer and a client. Defendants have failed to meet the second element of the definition for attorney-client privilege, a communication "between a client and attorney."

FN11. When asked if he attended a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 6
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

meeting at Wilson Sonsini, CFO Thompson responded yes, but when asked when the meeting took place: "I don't recall." When asked (1) when he was first approached about serving as a director, (2) who raised the issue, and (3) whether he was actively pursuing a slot on the board, CFO Thompson replied, "I don't remember " "I don't remember that, either," and "I don't remember." His inability to remember an issue focused on his own actions that is a major subject of the documents undercuts his assertion that, based on the documents' contents, he believes that they were prepared to show Wilson Sonsini. I find it curious that a director remembers almost no detail of discussions about his appointment as a director, yet he remembers the intended recipient of documents discussing his appointment. *See* Thompson Dep. at 148.

FN12. Thompson Dep. at 162.

FN13. Defs.' An.Br. at 1.

The documents similarly fail to contain anything that would suggest their purpose was to facilitate legal advice to Circon. The strategies described in them pertain to management's plans to frustrate Surgical, but nothing about them suggests a solicitation of, or reaction to, legal advice. Circon contends that the "trial balloons," because they are not "facts," are not discoverable, but that misapprehends the nature of attorney-client privilege. It covers only legal advice and, where appropriate, even facts delivered to an attorney for the purpose of forming a legal opinion can be discovered. The mere assertion that Circon's trial balloons are not facts does not make them legal advice, and they clearly are not. The documents describe business strategies that, like "facts," are subject to discovery. The vague testimony by CEO Auhll and CFO Thompson that they discussed these documents with Wilson Sonsini, even if undisputed, does not confer attorney-client privilege upon these documents, documents that lack legal content and can be produced without tipping Surgical as to what Wilson Sonsini may have told Circon.

*B. Confidentiality*

**\*6** Circon's claim for attorney-client privilege fails under this element as well. First, CEO Auhll admits that he showed his documents to CFO Thompson and possibly other parties.[FN14] If not the documents themselves, the subject matter of these documents, CEO Auhll admits, were discussed with third parties. [FN15] The fact that the business strategies contained in these documents were discussed with non-lawyers weakens both the assertion that the documents were provided "For Your Eyes Only" to Wilson Sonsini and precludes any argument that their disclosure will damage Circon's defense by introducing facts intended to be seen only by legal counsel, and not available elsewhere.

FN14. Auhll Dep. at 130 (asked whether he had distributed Exhibit 98 to anyone, CEO Auhll said, "I think probably Bruce Thompson, at least, probably our .... I'm sure I did.").

FN15. When asked if he discussed restricting Surgical's representation on the board with third parties, Auhll replied, " We were-yes." Auhll Dep. at 145.

CONCLUSIONS

These documents carry none of the indicia of privileged documents, and CEO Auhll and CFO Thompson's vague testimony to the contrary falls short of convincing me that documents not containing legal advice or requests for legal assistance should be privileged. Attorney-client privilege is a device designed to facilitate parties seeking legal counsel. Defendants cite a recent United States Supreme Court decision interpreting the scope of attorney-client privilege: "The loss of evidence admittedly caused by the privilege is justified in part by the fact that without the privilege, the client may not have made such communications in the first place." [FN16] This case, however, stands for the contrary proposition: A party who claims that a document is client communication to counsel, but who fails to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

memorialize on the face of the document its purpose or its intended recipient, cannot be heard to complain when its non-legal content is revealed to an opposing party because, insofar as this lack of discretion reveals a lack of interest in obtaining attorney-client privilege, one can assume that the communication would have taken place regardless of the possibility of protecting the document at a later date.

>  FN16. *Swidler & Berlin v. United States,* 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d379, 1998 WL 333019, *7 (June 25, 1998), slip op. at ___.

For all of these reasons, I grant Surgical's motion to compel production of the five documents.

IT IS SO ORDERED.

Del.Ch.,1998.
In re Circon Corp. Shareholders Litigation
Not Reported in A.2d, 1998 WL 409166 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.