**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWESTERN CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) C.A. No. 04-1494 (JJF) ) ) ) ) ) |
| MAGTEN ASSET MANAGEMENT CORP., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. HANSON and ERNIE J. KINDT, <br><br> Defendants. | ) ) ) ) ) ) C.A. No. 05-499 (JJF) ) ) ) ) ) |

**DEFENDANT NORTHWESTERN CORPORATION'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION SEEKING ORDERS
(A) SHORTENING THE BRIEFING SCHEDULE UNDER LOCAL RULE 7.1.2 AND
SETTING A HEARING DATE BEFORE THE SPECIAL MASTER;
(B) DETERMINING THE PRIVILEGE STATUS OF DOCUMENTS
NORTHWESTERN SEEKS TO RECALL UNDER A CLAIM OF INADVERTENT
PRODUCTION AND PRIVILEGE; (C) COMPELLING THE PRODUCTION OF NON-
PRIVILEGED DOCUMENTS; (D) COMPELLING THE PRODUCTION OF
DOCUMENTS PRODUCED IN ILLEGIBLE FORM; (E) EXTENDING THE PERIOD
FOR COMPLETING DEPOSITIONS; AND (F) ASSESSING FEES AND COSTS
AGAINST NORTHWESTERN**

GREENBERG TRAURIG LLP
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
 (302) 661-7000

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
101 Park Avenue
New York, NY 10178
(212) 696-6000

Dated: April 27, 2007

Attorneys for NorthWestern Corporation

## Table of Contents

Page #

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ............................................................................... 3

   Background ..................................................................................................... 3

   Plaintiffs' Claim ............................................................................................ 4

   The SEC Investigation .................................................................................. 5

ARGUMENT .................................................................................................... 6

   I. There Can Be No Waiver of Either the Attorney/Client Privilege or the Work Product Privilege Through the Inadvertent Production of Documents ........................... 6

   II. NorthWestern Has Waived Neither the Attorney/Client Privilege Nor Work Product Protection By Providing Documents to the SEC ................................. 7

     A. Delaware State Law Applies to the Questions of Privilege ......................... 8

     B. Delaware Recognizes a Selective Waiver of Privilege Where Disclosure Is Made Under a Confidentiality Agreement ........................................................ 10

     C. NorthWestern Took Additional Precautions, Under the Freedom of Information Act to Maintain the Confidentiality of Documents Produced to the SEC ...................... 13

     D. A Common Interest Exists Between NorthWestern and the SEC in Preserving the Work Product Protection ............................................................................ 15

     E. The SEC Itself Strongly Supports the Doctrine of Selective Waiver ......................... 16

     F. NorthWestern Was Not Required to Identify Which Documents On the Privilege Log Had Also Been Produced to the SEC ................................................... 17

   III. Plaintiffs Have Failed to Satisfy Their Burden of Showing That Documents Relating to Settlement Discussions With the SEC are Relevant ...................... 17

   IV. Plaintiffs Are Not Entitled to Production of Every Illegible Excel Spreadsheet .......... 19

   V. NorthWestern Did Not Waive Any Privileges By Supplementing Its 1600 Item Privilege Log Within 11 Days by the Addition of 120 Documents ......................... 24

   VI. Any Privilege Issues With Respect to the Remaining Documents Can Be Easily Resolved ............................................................................................... 27

   CONCLUSION ........................................................................................ 28

**Table of Authorities**

**Cases**

*Baker v. Gen. Motors Corp.,*
  209 F.3d 1051 (8th Cir. 2000) ................................................................. 11

*Bottaro v. Hatton Assocs., Inc.,*
  96 F.R.D. 158 (E.D.N.Y. 1982) ............................................................... 20

*Burlington N. & Santa Fe Ry. Co. v. United States District Court,*
  408 F.3d 1142 (9th Cir. 2005) ................................................................. 28

*Danklef v. Wilmington Med. Ctr.,*
  429 A.2d 509 (Del. Super. 1981) ............................................................. 10

*Diversified Indus., Inc. v. Meredith,*
  572 F.2d 596 (8th Cir. 1977) (en banc) ............................................. 11, 14

*Doe v. Methacton Sch. Dist.,*
  164 F.R.D. 175 (E.D. Pa. 1995) .............................................................. 21

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.,*
  232 F.R.D. 103 (S.D.N.Y. 2005) ............................................................ 32

*Fed. Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,*
  196 F.R.D. 375 (C.D. Cal. 2000) .............................................................. 9

*FG Hemisphere Assocs. v. Du Congo,*
  2005 U.S. Dist. LEXIS 3523 (S.D.N.Y. Mar. 7, 2005) ..................... 27, 29

*Fid. Fed. Sav. and Loan Assoc. v. Felicetti,*
  148 F.R.D. 532 (E.D. Pa. 1993) .............................................................. 20

*Get-a-Grip, II, Inc. v Hornell Brewing Co., Inc.,*
  C.A. No. 99-13322000, U.S. Dist. LEXIS 11961 (E.D. Pa. Aug. 8, 2000) .............. 29

*In re Best Lock Corp. S'holder Litig.,*
  No. Civ. A. 16281, 2000 WESTLAW 1876460 (Del. Ch. Dec. 18, 2000) ............ 10, 11

*In re Bieter Co.,*
  16 F.3d 929 (8th Cir. 1994) ..................................................................... 31

*In re Cardinal Health, Inc.,*
  No. C2-04-575 (ALM), 2007 WESTLAW 495150 (S.D.N.Y. Jan. 26, 2007) ........ 17

*In re Sealed Case,*
  676 F.2d 793 (D.C. Cir. 1982) ................................................................ 12

*In re Steinhardt Partners, L.P.,*
  9 F.3d 230 (2d Cir. 1993) ................................................................... 17

*In re Subpoenas Duces Tecum,*
  738 F.2d 1367 (D.C. Cir. 1984) ............................................................ 12

*Interfaith Hous. Dev. v. Town of Georgetown,*
  841 F. Supp. 1393 (D. Del. 1994) ......................................................... 13

*John Doe Co. v. U.S.,*
  79 Fed. Appx. 476 (2d Cir. 2003) ......................................................... 31

*Kaufman v. CA, Inc.,*
  905 A.2d 749 (Del. Ch. 2006) .............................................................. 13

*Lee v. Engle,*
  C.A. No. 13323, 1995 Del. Ch. LEXIS 149 (Del. Ch. Dec. 15, 1995) ................... 10

*Lesal Interiors, Inc. v. Resolution Trust Corp.,*
  153 F.R.D. 552 (D.N.J. 1994) .............................................................. 20

*Lopez v. City of New York,*
  2007 U.S. Dist. LEXIS 19694 (S.D.N.Y. Mar. 20, 2007) ............................... 28

*Niagra Mohawk Power Corp. v. Megan-Racine Assocs.*
  *(In re Megan-Racine Assoc., Inc.),*
  189 B.R. 562 (Bankr. N.D.N.Y. 1995) ...................................................... 9

*Rhone-Poulenc Rorer v. Home Indem. Co.,*
  32 F.3d 851 (3d Cir. 1994) ................................................................. 8

*Saito v. McKesson HBOC, Inc.,*
  Civ. A. No. 18553, 2002 WESTLAW 31657622 (Del. Ch. Oct. 25, 2002)
  *aff'd* 870 A.2d 1192 (Del. 2005) ................................................ 12, 13, 14, 16

*Samuelson v. Susen,*
  576 F.2d 546 (3d Cir. 1978) ................................................................. 9

*SEC v. R.J. Reynolds,*
  Misc. No. 03-1651 (JDB), 2004 U.S. Dist. LEXIS 24545 (D.D.C. June 29, 2004) ...... 16

*Travelers Indem. Co. v. Lake,*
  594 A.2d 38 (Del. 1991). ................................................................... 9

*U.S. v. Kovel,*
  296 F.2d 918 (2d Cir. 1961) ............................................................... 31

*Wachtel v. Health Net, Inc.,*
  239 F.R.D. 81 (D.N.J. 2006) ............................................................... 28

*Westinghouse Elec. Corp. v. Republic of Philippines,*
  951 F.2d 1414 (3d Cir. 1992) ............................................................... 8, 15

*Wolhar v. GMC,*
  712 A.2d 457 (Del. Super. Ct. 1997) ......................................................... 12

**Statutes**

17 C.F.R. § 200.83 (2000) ......................................................................... 15

Fed. R. Evid. 408 ............................................................................. 19, 20

Fed. R. Evid. 501 ............................................................................... 8, 9

**Other Authorities**

Brief of the Securities and Exchange Commission, Amicus Curiae, in Support of
  McKesson Corp. and Supporting Reversal, No. 03-10511 (Feb. 2004) *available at*
  http://www.sec.gov/litigation/amicusbriefs.shtml (last visited April 25, 2007) ....................... 18

Guidelines by the Ad Hoc Committee for Electronic Discovery of the United States
  District Court for the District of Delaware ........................................................ 23

John James, Privileged Communications and the Delaware Corporation
  § 7.03 at 136-37 (2000) .......................................................................... 10

Kenneth J. Withers, Electronically Stored Information, The December 2006
  Amendments to the Federal Rules of Civil Procedure, 4 Nw. J. Tech. & Intell. Prop.
  171, 188 (2006) ................................................................................. 22

Mia Mazza, In Pursuit of FRCP 1:  Creative Approaches to Cutting and Shifting
  the Costs of Discovery and Electronically Stored Information, 13 Rich. J.L. &
  Tech. 11, 164 (2007) ............................................................................ 23

Release No. 44969, Release No. 34-44969, Release No. AE - 1470, 76 S.E.C. Docket
  220, 2001 WESTLAW 1301408 (Oct. 23, 2001) ...................................................... 18

Report of the Advisory Committee on Evidence Rules, Proposed Rule 502 on Waiver of
  Attorney/Client Privilege and Work Product
  (proposed Aug. 10, 2006) *available at* http://www.uscourts.gov/rules/newrules6.htm
  (last visited April 16, 2007) .................................................................... 14

Defendant NorthWestern Corporation ("NorthWestern"), by and through its counsel, respectfully submits this memorandum of law in opposition to the Emergency Motion (the "Motion") by Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture" and collectively with Magten, "Plaintiffs") for the entry of orders (a) shortening the briefing schedule under Local Rule 7.1.2 and setting a hearing date before the Special Master; (b) determining the status of documents inadvertently produced by NorthWestern;[1] (c) compelling NorthWestern to produce documents Plaintiffs allege that are not privileged (including documents NorthWestern has produced to the SEC pursuant to a confidentiality agreement); (d) compelling NorthWestern to produce legible copies of certain Excel spreadsheets; (e) extending the discovery deadline; and (f) awarding Plaintiffs fees and costs.

## PRELIMINARY STATEMENT

Plaintiffs waited to submit its "emergency" motion until they had secured the documents they insisted be produced on an expedited basis and right before the two-week period set aside for depositions prior to the May 2, 2007 discovery cutoff date. The motivation is clear. Having obtained an expedited document production, Plaintiffs now prefer to review the documents at their leisure. What Plaintiffs now characterize as an "emergency" are a series of issues of which Plaintiffs have been aware for months. For example, Plaintiffs' "emergency" claim asserting that NorthWestern waived its privileges with respect to certain documents it produced to the Securities and Exchange Commission ("SEC") was first raised by Magten on December 11, 2006. Similarly, the dispute with respect to certain illegible Excel spreadsheets had also been

---

[1] On April 16, 2007, NorthWestern submitted an Emergency Cross Motion seeking an order that Plaintiffs and their counsel immediately comply with their obligations under the March 21, 2007 Stipulated Protective Order to promptly return or certify that it has destroyed inadvertently produced documents (the "Emergency Cross Motion"). Plaintiffs served a Memorandum of Law in Opposition on April 18, 2007 and NorthWestern submitted a Reply Memorandum on April 25, 2007.

under discussion for months and the parties had even arrived upon a negotiated solution – until Plaintiffs decided this "emergency" had to be presented to the Court on the eve of the depositions. The final "emergency" was created by Magten when it blatantly disregarded the Stipulated Protective Order entered by this Court and Federal Rule of Civil Procedure 26(b)(5)(B) and refused to destroy or return inadvertently produced privileged documents. In fact, despite their representations to the Court to the contrary, Plaintiffs are continuing to make use of the inadvertently produced documents.

These sharp litigation tactics should not be condoned.

Each one of these "emergencies" is easily disposed of. With respect to the inadvertently produced documents, for the reasons set forth in NorthWestern's Emergency Cross-Motion, there can be no waiver of any privilege based upon the facts or circumstances of the inadvertent production and those documents should be returned or Magten should certify that they have been destroyed. With respect to the documents produced to the SEC, the correct choice of law analysis mandates the finding that no waiver occurred. With respect to the Excel spreadsheets, on April 2 Magten was offered legible copies of the spreadsheets it reluctantly admitted were the ones it actually needed. Magten's decision to walk away from that agreement creates neither the right to demand a reformatted version of every Excel spreadsheet nor an "emergency."

When these issues are resolved, the few documents, if any, as to which there remain a disagreement can be easily resolved. No discovery extension is needed or warranted.

NorthWestern welcomes the prompt resolution of these matters on a truncated briefing schedule which is complete upon the submission of these opposing papers.

## STATEMENT OF FACTS

**Background**

NorthWestern is a Delaware corporation founded in 1923. It operated as a utility business for approximately 80 years with its principal place of business in Sioux Falls, South Dakota. After achieving success in the electric and gas utility business, NorthWestern decided to expand and seek growth opportunities in non-utility sectors. In 1994, NorthWestern formed NorthWestern Growth to pursue such additional growth opportunities.

Through NorthWestern Growth, three principal ventures were pursued. The first was CornerStone Propane Partners, L.P. CornerStone eventually became one of the nation's leading retail distributors of propane. The second venture NorthWestern Growth pursued was in the plumbing and heating, ventilation, and air conditioning services ("HVAC") industry through Blue Dot Services, Inc. ("Blue Dot"). Blue Dot acquired numerous small HVAC and plumbing companies across the country in an effort to become a leading national provider in plumbing and HVAC services. With the third venture, in 1997, NorthWestern Growth moved into the telecommunications industry with the formation of Expanets, Inc. ("Expanets"). Additional communications operations were acquired and moved under the Expanets' umbrella, including the Growing and Emerging Markets Division of Lucent Technologies/Avaya, Inc.

During the time that NorthWestern was pursuing its non-utility growth opportunities, it also continued to grow its energy business. The utility segment of NorthWestern engaged in various business deals during the 2001-2002 time period, principally the acquisition of the transmission and distribution business of The Montana Power Company in February 2002 which was renamed NorthWestern Energy LLC.

In late 2002 and continuing through early 2003, the NorthWestern Board of Directors began to learn of financial and internal control problems at Expanets and Blue Dot which

eventually resulted in the restatement of NorthWestern's financials on April 15, 2003 for the first three quarters of 2002. Following these announcements, a series of securities class action lawsuits, as well as derivative lawsuits, were filed against NorthWestern. Those actions have subsequently been resolved. During this time, the SEC also commenced its investigation into the circumstances surrounding NorthWestern's restatement.

On September 14, 2003, NorthWestern announced that it had filed a voluntary petition for bankruptcy.

**Plaintiffs' Claim**

Plaintiffs Magten and Law Debenture each filed a Proof of Claim against NorthWestern's bankruptcy estate in the United States Bankruptcy Court for the District of Delaware in or about January 2004 (the "QUIPS Claims"), asserting that a pre-petition transaction in which substantially all of the assets of NorthWestern's wholly-owned subsidiary, NorthWestern Energy LLC, later renamed Clark Fork and Blackfoot LLC ("Clark Fork"), were transferred to NorthWestern, in exchange for NorthWestern's assumption of its liabilities (the "Going Flat Transaction"), constituted a fraudulent conveyance. Plaintiffs then commenced an Adversary Proceeding against NorthWestern in the Bankruptcy Court in April 2004, asserting that the Going Flat Transaction was a fraudulent conveyance, and seeking to: (1) avoid the transfer of assets; (2) declare that those assets were not property of the estate; and (3) impose a constructive trust upon those assets on behalf of the QUIPS holders. In August 2004, the Bankruptcy Court held that as a result of the Going Flat Transaction, Clark Fork was released from all liability under the QUIPS, which had been assumed by NorthWestern, and therefore Plaintiffs lacked any standing to sue. However, the Bankruptcy Court allowed the Plaintiffs to pursue a theory that the release of Clark Fork had been induced by fraud based upon Plaintiffs' assertion that the

-4-

Indenture Trustee, Bank of New York, had relied on NorthWestern's allegedly misleading financial statements.

Despite Plaintiffs' objections to the Confirmation of NorthWestern's Chapter 11 Plan, the Bankruptcy Court confirmed the Plan, and NorthWestern emerged from bankruptcy as of November 1, 2004. Under the Plan, a reserve of shares of the Reorganized Debtor was set aside in the Disputed Claims Reserve to cover a potential recovery in the event the QUIPS claimants succeeded in obtaining final judgment in their favor in litigating their claims against the estate. This Court withdrew the reference from the Bankruptcy Court in the Magten/NorthWestern Action on September 22, 2005.

**The SEC Investigation**

The SEC commenced a formal investigation of NorthWestern relating to the restatement of its 10Qs for the first three quarters of 2002 in December 2003. NorthWestern entered into a confidentiality agreement with the SEC[2] and cooperated fully in the SEC investigation. On or about March 7, 2007, the SEC responded to NorthWestern's cooperation by issuing a Cease and Desist Order that contained no finding of fraud and instituted no monetary or other penalties against NorthWestern. The Cease and Desist Order specifically noted the "cooperation afforded the Commission Staff" by NorthWestern. (Brewer Decl., Ex. 1.)

---

[2] The actual confidentiality agreement with the SEC has been produced to Plaintiffs by NorthWestern. However, because that document has been designated "Attorneys' Eyes Only" under the terms of the Stipulated Protective Order, it has not been included in any of NorthWestern's submissions on this motion. If requested, NorthWestern is prepared to make a copy of the confidentiality agreement available to the Court or the Special Master for investigation in camera.

## ARGUMENT

### I.

### There Can Be No Waiver of Either the Attorney/Client Privilege or the Work Product Privilege Through the Inadvertent Production of Documents

Plaintiffs' assertion that the attorney/client and work product privileges have been waived as a result of the inadvertent production of privileged documents is dealt with at length in NorthWestern's Emergency Cross Motion. The points made in that Motion will not be repeated here and NorthWestern's arguments made therein are incorporated herein by reference. Suffice it to say that pursuant to the Stipulated Protective Order entered by this Court on March 21, 2007, Plaintiffs are precluded from asserting that NorthWestern waived any privilege to which the documents at issue are otherwise entitled as a result of either the fact of inadvertent production or circumstances of any such inadvertent production. Plaintiffs are bound by the terms of the Order which they negotiated, helped to draft, signed and which has been so ordered by this Court. Their attempts to avoid their obligations thereunder should be rejected.

Incredibly, despite their representations to this Court, Magten's counsel continue to use NorthWestern's privileged documents. On April 27, 2007, Magten's counsel sent a letter disputing whether certain inadvertently produced privileged documents were indeed privileged and demanding their production. (Bagnato Decl., Ex. 8.)[3] But what is more troubling is that this letter makes clear that counsel is using the documents recalled by NorthWestern as a discovery tool to ask for documents which are referenced in the recalled documents. In their April 27 letter, it is clear that Magten's counsel has parsed through privileged reports and their attachments and are demanding documents *referred to as exhibits to the reports or otherwise referenced therein.* (Bagnato Decl., Ex. 8 at 2.)

---

[3] References in the form of "Bagnato Decl. ___" are to the Declaration of Jennifer A. Bagnato dated April 27, 2007 and submitted concurrently with this memorandum of law.

Counsel's conduct is astonishing. First, it is not up to Magten's counsel to decide which parts of an inadvertently produced document are privileged. Pursuant to this Court's Stipulated Protective Order, as soon as NorthWestern identified those documents as inadvertently produced privileged documents, Plaintiffs were immediately required to put them down. It is clear they did not. Incredibly, Plaintiffs represented to this Court on April 18, 2007, in their Opposition to NorthWestern's Emergency Cross-Motion, that they were refraining from making any use of the inadvertently produced documents. That representation was apparently not true. NorthWestern renews its request for sanctions.

## II.

### NorthWestern Has Waived Neither the Attorney/Client Privilege Nor Work Product Protection By Providing Documents to the SEC

Plaintiffs have known NorthWestern's position with respect to requests for documents that had already been produced to the SEC since December 11, 2006. (Bagnato Decl., Ex. 1.) To the extent those documents were called for, and they are otherwise relevant and not privileged, NorthWestern agreed to produce them. On December 14 counsel for Magten expressed her disagreement with that position. (Bagnato Decl., Ex. 2.) This issue was also raised at the hearing before the Special Master on January 29, 2007 when counsel for NorthWestern explained NorthWestern's position that no waiver of privilege had occurred by virtue of the production of any documents to the SEC. (*See* Docket Entry No. 116, Special Master James's Report and Recommendation, Exhibit A at 19.) And counsel for Magten flagged this issue as a dispute between the parties in mid-March, specifically referencing the comments of NorthWestern's counsel at the January hearing. (Brewer Decl., Ex. 17.) Plaintiffs could have, and should have, made any motion they felt they had on this purely legal issue months ago. But Plaintiffs waited until April 13 – when the depositions were imminent – to submit this

-7-

"emergency" motion seeking an order that the production of documents to the SEC resulted in a waiver of the privilege.

More importantly, and setting aside these temporal realities, there has been no waiver.

Plaintiffs mistakenly rely on one case, *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414 (3d Cir. 1992), to support their position that disclosure to the SEC automatically waives any protection from discovery in other litigation. But *Westinghouse* is a decision by the Third Circuit based on an appeal from the District Court of New Jersey which involved a defendant that did not enter into a confidentiality agreement with the SEC in connection with the production of its documents. The case simply does not apply here.

Well-settled Third Circuit case-law requires that a federal court sitting in Delaware apply Delaware state choice-of-law rules to the question of privileges when the underlying claim is based on state law. Furthermore, the Delaware choice-of-law rule mandates that Delaware state law concerning privileges be applied to the present case. Under Delaware law, disclosures to the SEC under a confidentiality agreement do not operate as a waiver of privileges as to third parties. Therefore, NorthWestern's attorney/client privilege and work-product protection remain intact and prevent discovery of the documents designated in the privilege log.

A.    **Delaware State Law Applies to the Questions of Privilege**

Federal Rule of Evidence 501 provides that, with respect to state law claims in "civil actions and proceedings," any privilege "shall be determined in accordance with State law." *See Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851, 861-2 (3d Cir. 1994) (under Federal Rule of Evidence 501, "we should apply the state law in determining the extent and scope of the attorney/client privilege"). Where claims in an adversarial bankruptcy proceeding concern state law, Rule 501 requires that decisions regarding privilege be determined in accordance with state law. *Niagra Mohawk Power Corp. v. Megan-Racine Assocs. (In re Megan-Racine Assoc., Inc.)*,

189 B.R. 562, 569 (Bankr. N.D.N.Y. 1995); *Fed. Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland*, 196 F.R.D. 375, 379 (C.D. Cal. 2000) (applying California state law in bankruptcy proceeding, because "the second sentence [of Rule 501] requires district courts to apply state law in cases governed by state law"). Therefore, the choice-of-law rule regarding privilege is that "which would be applied by the courts of the state in which [the federal court] sits." *Samuelson v. Susen*, 576 F.2d 546, 549 (3d Cir. 1978).[4]

Delaware has adopted the "most significant relationship" test as its choice-of-law rule regarding privilege. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991). The four factors evaluated under this test are:

> (1) the number and nature of contacts that the state of the forum has with the parties and the transactions involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties.

*Lee v. Engle*, C.A. No. 13323, 1995 Del. Ch. LEXIS 149, at *18 (Del. Ch. Dec. 15, 1995); *see also Danklef v. Wilmington Med. Ctr.*, 429 A.2d 509, 512 (Del. Super. 1981) (applying test to physician-patient privilege). Cases in Delaware, and other jurisdictions applying the same test, give priority to the forum state's law of privileges, even where the privileged communications occurred in a different jurisdiction.

For example, the Delaware Chancery Court applied the "most significant relationship" test to find that Delaware, as the forum state, had a greater interest in applying its own law regarding the accountant-client privilege, despite the fact that the communications at issue had occurred in Indiana. *In re Best Lock Corp. S'holder Litig.*, No. Civ. A. 16281, 2000 WL 1876460 (Del. Ch. Dec. 18, 2000). The court took into account that defendant was a Delaware corporation with offices in Indiana; that the documents were material to Plaintiff's case; that the

---

[4] Plaintiffs' remaining claim for a fraudulent conveyance is clearly brought under state, not federal law.

privilege was unusual and not supported in Delaware; and that defendants chose Delaware as its place of incorporation. *Id.* at *6. Weighing these facts together, the court held that it was most fair to apply Delaware law to the privilege. *Id.*[5]

Like the holding in *Best*, the Eighth Circuit, which encompasses NorthWestern's principal place of business, also applies the same "most significant relations" test to find the forum state's attorney/client privilege applicable, even where nearly all of the contacts were with the non-forum state. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051 (8th Cir. 2000). In *Baker*, the court found that the actual communications with the attorney were made in Michigan and involved a Michigan corporation, whereas the litigation took place in Missouri. *Id.* at 1057. Despite these connections with Michigan, the court held that "the forum state has a greater interest in controlling the litigation tactics used in its court than does Michigan." *Id.* It therefore held that Missouri law applied to the issue of waiver of attorney/client privilege. *Id.*

Here, Magten's request for privileged documents in a Delaware proceeding are governed by the Delaware state rule concerning privileges. Both Magten and NorthWestern are incorporated in Delaware and the entire proceeding has taken place in Delaware. This court furthermore has "a greater interest in controlling the litigation tactics" used at trial than any other jurisdiction. *See id.* at 1057.

**B.    Delaware Recognizes a Selective Waiver of Privilege Where Disclosure Is Made Under a Confidentiality Agreement**

Delaware state courts have followed the Eighth Circuit in recognizing that a confidentiality agreement with the SEC operates to create a selective waiver of otherwise protected documents. *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (en

---

[5] In further support of this position, at least one commentator has argued that questions of privilege are procedural and therefore should always be governed by Delaware state law. John James, <u>Privileged Communications and the Delaware Corporation</u>, § 7.03 (2000).

banc). Delaware's policy of vigorously protecting the attorney/client and work product privileges, along with the unambiguous case-law creating a selective waiver rule in Delaware, strongly support the protection of NorthWestern's privileged documents.[6]

While work-product protection may be waived when the documents are disclosed to an adversary, "there is no waiver of privileged information to third parties if a disclosing party had a reasonable expectancy of privacy when it made an earlier disclosure." *Saito v. McKesson HBOC, Inc.*, Civ. A. No. 18553, 2002 WL 31657622, at *4 (Del. Ch. Oct. 25, 2002) *aff'd* 870 A.2d 1192 (Del. 2005); *see also In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1375 (D.C. Cir. 1984) (noting that a party can avoid waiver of work-product protection by "insist[ing] on a promise of confidentiality before disclosure to the SEC"); *In re Sealed Case*, 676 F.2d 793, 823-824 (D.C. Cir. 1982) (recognizing that a confidentiality agreement with the SEC or other government agency may prevent waiver of work-product protection). Disclosure of documents to the SEC under a confidentiality agreement creates just such a reasonable expectation of privacy and therefore preserves the protections against third parties. *Saito*, 2002 WL 31657622, at *6. Similarly, under Delaware law, the attorney/client privilege is waived when a party asserting the privilege "voluntarily discloses or consents to disclosure of any significant part of the privileged matter." *Interfaith Hous. Dev. v. Town of Georgetown*, 841 F. Supp. 1393, 1398 (D. Del. 1994). However, "the attorney/client privilege is not waived as to adverse third parties when documents are disclosed to the SEC (or to some other governmental authority) under color of a confidentiality agreement." *Kaufman v. CA, Inc.*, 905 A.2d 749, 753 n.14 (Del. Ch. 2006) (referring to the *Saito* decision).

---

[6] *See Wolhar v. GMC*, 712 A.2d 457, 463 (Del. Super. Ct. 1997) (finding of waiver of work-product "is discretionary with the court and rarely granted, as it is a harsh result").

In *Saito*, the Court of Chancery of Delaware held that work-product protection was not waived by disclosure to the SEC under a confidentiality agreement. The SEC investigated a corporation, during which time the corporation hired a law firm and an accounting firm to conduct an internal investigation. *Id.* at *1. The law firm disclosed its findings to the SEC and the United States Attorney's Office (USAO). *Id.* at *1. All of the documents were characterized as work product and/or attorney/client communications, and most were shared with the SEC after a confidentiality agreement was executed between the corporation and the SEC. *Id.* at *1.

The court analyzed the potential waiver of the work-product doctrine under Delaware Chancery Court Rule 26(b)(3), which is substantially the same as the same Federal Rule. *Id.* at *3. The court's central inquiry was whether the corporation had a "reasonable expectancy of privacy" when it made its disclosures. *Id.* at *4. Finding that the confidentiality agreement created such an expectation of privacy, the court adopted a selective waiver rule for the work-product documents disclosed after the confidentiality agreement was executed. *Id.* at *6. It stated, "public policy seems to mandate that courts continue to protect the confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies." *Id.* at *6. The court further stated, "a selective waiver rule is such a rule that benefits law enforcement agencies . . . [e]ncouraging corporations to disclose their internal investigations confidentially allows the SEC to resolve its investigations expeditiously and efficiently." *Id.* at *8. Under this rationale, the court held that the corporation did not waive its work-product privilege over the documents disclosed after the confidentiality agreement. *Id.* at *11.[7]

---

[7] The *Saito* decision is also consistent with recently proposed changes to Rule 502, drafted by the Federal Standing Committee on Rules of Practice and Procedure. *See* Report of the Advisory Committee on Evidence Rules, Proposed Rule 502 on Waiver of Attorney/Client Privilege and Work Product (proposed Aug. 10, 2006) *available at* http://www.uscourts.gov/rules/newrules6.htm (last visited April 16, 2007). Under this proposed rule, "disclosure of a communication or information covered by the attorney/client or work product protection – when made to a federal public office or agency in the exercise of its regulatory, investigative, or enforcement authority – does not operate as a waiver of privilege or protection." *Id.* at 5. In support of this selective waiver rule, the comments to Proposed Rule 502 point out that "[a] rule protecting selective waiver in these circumstances furthers the important policy of

Here, NorthWestern disclosed its attorney work-product explicitly under a confidentiality agreement with the SEC. This agreement states in no uncertain terms that NorthWestern "does not intend to waive the protection of the attorney work product doctrine, attorney/client privilege, or any other privilege applicable as to third parties" by its disclosures to the SEC. NorthWestern entered into such a confidentiality agreement with the full and reasonable expectation that it would operate to protect its privileged documents from discovery by outside parties, especially given that both the state law of Delaware, where NorthWestern is incorporated, and the law in the Eight Circuit, where NorthWestern conducts most of its business, support the use of selective waivers when disclosure is made to the SEC. *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (en banc) (articulating "selective waiver rule," under which attorney/client privilege is waived only with respect to the SEC after disclosure in an SEC investigation).

In the single case upon which Plaintiffs rely, the defendant failed to enter into a confidentiality agreement with the SEC prior to disclosing the confidential information, and instead relied upon the SEC regulations in effect at the time of the *Westinghouse* disclosure. The Court found that these regulations did not provide a justifiable expectation on *Westinghouse's* part that the attorney/client privilege would be preserved. *Westinghouse*, 951 F.2d at 1427. NorthWestern took no such chance.

## C.     NorthWestern Took Additional Precautions, Under the Freedom of Information Act to Maintain the Confidentiality of Documents Produced to the SEC

Each time NorthWestern submitted documents to the SEC pursuant to the confidentiality agreement, it took the further precaution of requesting that all information be maintained in confidence, not be made part of any public record and not be disclosed to any person in response

---

cooperation with government agencies, and maximizes the effectiveness and efficiency of government investigations." *Id.* at 12.

to a request under the Freedom of Information Act ("FOIA"). At the same time, NorthWestern

mailed a copy of the letter to the SEC to the Commissions Office of Freedom of Information and

Privacy Act Operations in an envelope marked "FOIA Confidential Treatment Requested."[8]

FOIA protections apply when third parties, such as Plaintiffs, make requests to the SEC

for information.[9] 17 C.F.R. § 200.83 (2000). When a company produces a document and

requests FOIA confidential treatment, the SEC will place that document in a nonpublic file for

10 years, unless prior to that time a third party submits to the SEC a request for access under

FOIA. *Id.* Once a third party request is made, the SEC will notify the producing party so that it

may provide written substantiation as to why its documents are confidential and should not be

disclosed to the requesting party. The SEC then makes a determination regarding whether or not

the producing party's information should remain confidential. If the producing party disagrees

with the SEC's determination, it can appeal to the General Counsel and, ultimately, commence

an action seeking judicial review. *See, e.g., SEC v. R.J. Reynolds*, Misc. No. 03-1651 (JDB),

2004 U.S. Dist. LEXIS 24545, at *36 (D.D.C. June 29, 2004).

In its request for confidential treatment under FOIA, counsel for NorthWestern went even

further and explained that the documents NorthWestern was producing to the SEC contain

---

[8] Like the confidentiality agreement, these communications with the SEC were produced to Plaintiffs by
NorthWestern and designated "Attorneys' Eyes Only" and so are not included with NorthWestern's motion papers.
They will be made available to the Court or Special Master in camera upon request.

[9] Despite the unequivocal ruling of the Special Master severely limiting Magten's requests for the production of all
information provided to or relating to the SEC investigation, as ordered by Judge Farnan on March 1, 2007 (the
"Discovery Order"), Magten went right ahead and served a subpoena upon the SEC seeking the same documents
they were prohibited from obtaining from the Defendants in this action. (*See* Bagnato Decl., Ex. 3.) For example,
subpoena request number 1 is identical to Magten Document Request number 32, pursuant to which NorthWestern
already agreed to produce non-privileged documents (*see* Docket Entry No. 116, Special Master James's Report and
Recommendation, Exhibit A at 72); subpoena request number 2 contains the same language as Document Request
number 33 which the Special Master struck as "entirely too broad" (*id.* at 78); subpoena request number 3 reflects
the language of Magten Document Request 34 which the Special Master restricted to reports and communications
with the SEC regarding the restatement of NorthWestern's financials (*id.* at 81-82); subpoena request number 4 is
the same language as Magten Document Request number 36 which the Special Master expressly said should not be
produced (*id.* at 84); and subpoena request number 5 reflects the language of Document Request number 37 which
the Special Master also struck (*id.* at 84).

confidential business information of NorthWestern, in addition to work product and attorney

client privileged materials for which NorthWestern has not waived the privilege. Thus it is clear

that NorthWestern took every precaution to maintain the confidentiality of the documents

disclosed to the SEC and has every reason to expect that the privilege would be preserved.

**D.    A Common Interest Exists Between NorthWestern and the
       SEC in Preserving the Work Product Protection**

A recent case in New York supports the approach in *Saito* and provides NorthWestern

with another important basis upon which to assert the attorney/client privilege and work-product

protection over the documents disclosed to the SEC. *See In re Cardinal Health, Inc.*, No. C2-04-

575 (ALM), 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007). In *Cardinal*, the audit committee of

defendant company, along with outside counsel, conducted an internal investigation concerning

certain accounting issues. *Id.* at *1. While counsel was conducting its investigation, the SEC

and U.S. Attorney's Office (USAO) initiated an investigation. Counsel for defendant company

produced documents to the SEC and USAO related to its own investigation, including documents

that contained work-product and attorney/client communications. *Id.* at *2. These disclosures

took place under a confidentiality agreement with the SEC and under the assurances from the

USAO that it would maintain the confidentiality of all materials produced to it. *Id.* at *2.

Relying on the Second Circuit's holding in *In re Steinhardt Partners, L.P.*, 9 F.3d 230

(2d Cir. 1993), the *Cardinal* court found that the confidentiality agreement supported a selective

waiver of the work-product doctrine. *Id.* at *8. Furthermore, the court noted that the audit

committee of defendant company and the SEC "shared a common interest in developing legal

theories and analyzing information concerning potential financial irregularities" at the company.

*Id.* at *9. Even "in the face of almost certain litigation between [defendant] and the SEC and

-15-

USAO," the court nonetheless held that this common interest preserved the work-product

protection and it therefore quashed the subpoena to compel the documents. *Id.* at *8-9.

NorthWestern disclosed the work-product to the SEC as part of its cooperation with the

investigation and in conjunction with its own internal inquiries. Despite Plaintiffs' hyperbole in

describing the Cease and Desist Order (Brewer Decl., Ex. 1), the finding that NorthWestern's

financial statements for the first three quarters of 2002 were materially false and misleading is

not breaking news. NorthWestern disclosed to the public at large that those first three quarters of

2002 were misstated when it restated its financials in April 2003. The real significance of the

Cease and Desist Order is that the SEC made no finding of fraud against NorthWestern and did

not impose any monetary penalty. In so doing, the SEC specifically noted the cooperation

NorthWestern had afforded the SEC staff. Thus, even if the SEC could be considered a potential

adversary, a common interest existed between NorthWestern and the SEC, thus preserving the

work-product protection.

E.     **The SEC Itself Strongly Supports the Doctrine of Selective Waiver**

The SEC has consistently taken the position that a party should not be held to have

waived any privilege with regard to documents produced during SEC investigations. *See*

Release No. 44969, Release No. 34-44969, Release No. AE-470, 76 S.E.C. Docket 220, 2001

WL 1301408, at *4, n.2 (Oct. 23, 2001) ("the provision of privileged information to the

Commission staff pursuant to a confidentiality agreement did not necessarily waive the privilege

as to third parties"); *see also* Brief of the Securities and Exchange Commission, Amicus Curiae,

in Support of McKesson Corp. and Supporting Reversal, No. 03-10511 (Feb. 2004) *available at*

http://www.sec.gov/litigation/amicusbriefs.shtml (last visited April 25, 2007) (arguing that

selective waiver promotes the public interest and cooperation with the SEC). NorthWestern, in

full cooperation with the SEC and under the auspices of a confidentiality agreement specifically

retaining privileges against third parties, falls exactly within the selective waiver rationale

supported by the SEC.

**F.    NorthWestern Was Not Required to Identify Which Documents On the Privilege Log Had Also Been Produced to the SEC**

Plaintiffs accuse NorthWestern of misconduct, again with no support, for failing to

immediately identify which documents on the privilege log were also produced to the SEC.  This

argument is ridiculous.  NorthWestern's position has been consistent and unequivocal – a

document which was otherwise privileged or protected by the work product doctrine did not lose

that protection because it was produced to the SEC.  The resolution of that issue is a question of

law – not fact – and requires neither a document identification nor a document review.  Thus,

Plaintiffs' overwrought argument that NorthWestern withheld this "legally dispositive fact" is

baseless.  Nevertheless, in an abundance of caution and a show of good faith, on April 9,

NorthWestern identified the documents on the privilege log that had been produced to the SEC.

(Brewer Decl., Ex. 16.)

**III.**

**Plaintiffs Have Failed to Satisfy Their Burden of Showing That
Documents Relating to Settlement Discussions With the SEC are Relevant**

NorthWestern's privilege log disclosed that certain documents on the privilege log (items

1512 through 1519) had been withheld on the basis of Fed. R. Evid. 408.  This is another item

that was raised before the Special Master in January 29, 2007,[10] placed on the privilege log

produced on March 23 and does not constitute an "emergency" calling for the extension of

discovery to allow Plaintiffs to have a more leisurely review of the documents.

Fed. R. Civ. P. 408 provides that offers, conduct, and statements made in compromise

negotiations are inadmissible.  While Rule 408 does not impose a direct limit on discovery under

Rule 26(b), "given the strong public policy of favoring settlements and the congressional intent

to further that policy by insulating the bargaining table from unnecessary intrusions," courts in

both the Second and Third Circuits have required "some particularized showing of a likelihood

that admissible evidence will be generated by the dissemination of the terms of a settlement

agreement." *Bottaro v. Hatton Assocs., Inc.*, 96 F.R.D. 158, 160 (E.D.N.Y. 1982); *see also Lesal*

*Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 562 (D.N.J. 1994) (holding that the

best balance between Rules 408 and 26(b) "is to require a greater, more 'particularized showing'

that the evidence sought is relevant and calculated to lead to the discovery of admissible

evidence"). The effect of this standard "is to switch the burden of proof from the party in

opposition to the discovery to the party seeking the information." *Lesal*, 153 F.R.D. at 562

(internal citations omitted); *see also Fid. Fed. Sav. and Loan Assoc. v. Felicetti*, 148 F.R.D. 532,

534 (E.D. Pa. 1993) ("In keeping with the strong Congressional policy behind Rule 408 as well

as the liberal discovery rules, we will . . . place the onus on the [party requesting production] to

show that the documents relating to the settlement negotiations are relevant and likely to lead to

the discovery of admissible evidence").

    In *Doe v. Methacton Sch. Dist.*, 164 F.R.D. 175 (E.D. Pa. 1995), for example, the court

applied the "particularized showing" standard to prevent discovery of a settlement agreement.

Plaintiffs reached a settlement with two defendants in the underlying suit, a settlement which the

remaining defendants argued was relevant evidence for the issue of damages. *Id.* at 176.

However, defendants' motion to compel only contended that the settlement evidence "most

assuredly could lead to the discovery of admissible evidence," and that it was clearly relevant to

the issue of damages. *Id.* at 176. The court denied discovery, holding that defendants'

---

[10] *See* Docket Entry No. 116, Special Master James's Report and Recommendation, Exhibit A at 80.

assertions, "without any detail or analysis whatsoever, are insufficient to prove the relevance of the [settlement]." *Id.* at 177.

As in *Methacton*, Plaintiffs have failed to provide any analysis as to why the settlement communications with the SEC could lead to admissible evidence.[11]  While the Court has given Plaintiffs great latitude in gathering evidence regarding their vague fraud theory, unless Plaintiffs satisfy their burden, they are not entitled to the documents.  Plaintiffs cannot merely make a blanket assertion that all communications related to the settlement with the SEC are relevant; rather, they must make a particularized showing as to how these negotiations, which took place outside of the current litigation, could lead to any relevant or admissible evidence in this matter concerning allegations of fraud in connection with the Going Flat Transaction.

## IV.

### Plaintiffs Are Not Entitled to Production of Every Illegible Excel Spreadsheet

Plaintiffs' request for an order compelling NorthWestern to reformat 3200 Excel spreadsheets should be denied.  This is another example of how Plaintiffs are using an issue which they have been aware of for months as an excuse to avoid the discovery schedule they insisted upon in order to get more time to review documents and prepare for depositions.

From the inception of document production, NorthWestern has produced its electronically stored documents as "tiffs."  Tiffs are images of a document as it would look when printed out page by page.  (Bagnato Decl. ¶ 5.)  The advantages of producing documents as tiffs – they can be easily numbered and there is no way to change or delete data in a tiff – has made tiffs the most common method of document production.  *Id.; see generally* Kenneth J. Withers, *Electronically Stored Information, The December 2006 Amendments to the Federal Rules of*

---

[11] Contrary to Plaintiffs' assertions, NorthWestern in fact did produce a copy of the final agreement with the SEC, at Bates number NOR 459283-459293.

*Civil Procedure*, 4 Nw. J. Tech. & Intell. Prop. 171, 188 (2006). However, a problem does arise when certain types of documents, known as Excel spreadsheets, are converted to tiffs. If the Excel document is not formatted correctly for printing before being converted to a tiff, the rows and columns expand and are scattered throughout several, and sometimes hundreds, of pages. (Bagnato Decl. ¶ 6.) Despite the fact that this is a common issue, Plaintiffs made no objection to NorthWestern's production of documents as tiffs. It was not until the end of January, after over 200,000 pages had been produced, that Plaintiffs raised the issue. (*See* Brewer Decl., Ex. 21.)

In their January 26 letter, Plaintiffs suggested that NorthWestern produce the Excel files in native format. Native format means that Plaintiffs would receive a copy of the actual Excel file – as opposed to a copy of the printout. (Bagnato Decl. ¶ 7.) Production of documents in native format is not common practice[12] and it presents several problems. *Id.* First, it is not possible to bates number native files. (Bagnato Decl. ¶ 7.) This is especially problematic because Plaintiffs have demanded over 3200 files scattered among almost a half million documents. If any of these files were to be used in depositions or referenced in briefs, it would be very difficult to identify the document in a clear manner. Similarly, native files cannot be redacted. Second, a party with access to the native file can make changes or deletions to the data or information contained therein. (Bagnato Decl. ¶ 7.) Even worse, any such changes would not be not readily apparent to anyone viewing the document. Instead, changes could only be determined through a line by line comparison between the changed version to the original file. *Id.; see generally* Mia Mazza, *In Pursuit of FRCP 1: Creative Approaches to Cutting and Shifting the Costs of Discovery and Electronically Stored Information*, 13 Rich. J.L. & Tech. 11,

---

[12] *See* Guidelines by the Ad Hoc Committee for Electronic Discovery of the United States District Court for the District of Delaware.

164 (2007). Plaintiffs, though surely aware, mention none of these problems, or any possible solutions, in their demand for native format.

For the reasons outlined above, as well as the time pressures of concurrently producing hundreds of thousands of electronic documents, NorthWestern elected to finish its electronic production and then turn to the costly and time-consuming task of reformatting the 27 Excel spreadsheets requested by Magten in the January 26 letter. In order to provide legible copies of Excel spreadsheets as tiffs, someone must open the Excel file in native format and adjust each column width and row height, set the proper print area and make other various adjustments to the format of the document so that it may be printed in a cohesive page by page format. (Bagnato Decl. ¶ 8.) In some cases, with large documents containing significant amounts of data, it can take several hours to reformat just one Excel spreadsheet. *Id.* After performing this process for each of the documents specifically identified by Plaintiffs, NorthWestern delivered 27 reformatted documents to Plaintiffs on March 13. (Bagnato Decl., Ex. 4.)

The following day, Plaintiffs identified two more allegedly unreadable spreadsheets – just two days before the March 16 document discovery deadline. (Brewer Decl., Ex. 22.) NorthWestern promptly reformatted the two identified documents and provided legible copies to Plaintiffs on March 16. (Bagnato Decl., Ex. 5.)

In addition, in their March 14 letter, Magten made the impossible demand that NorthWestern "produce all documents presenting this problem" in just two days, by the March 16 document production deadline. (Brewer Decl., Ex. 22.) NorthWestern responded to this unreasonable demand on March 16 by stating the obvious – that it is not NorthWestern's obligation to follow Magten's vague demand and search through its own document production to locate every Excel spreadsheet and determine which ones Plaintiffs had a need for, but could not read, and then undertake to reformat them. (Bagnato Decl., Ex. 6.) NorthWestern also pointed

out that it had already provided all 29 documents identified by Plaintiffs before the March 16

document production cut-off. NorthWestern further stated its belief that Plaintiffs had acted in

bad faith by demanding that NorthWestern produce all documents that Plaintiffs allegedly cannot

read within forty-eight hours, without identifying a single document by bates number. *Id.*

NorthWestern assumed that Plaintiffs' response to its March 16 letter would be some

reasonable attempt by them to compile a list of documents which they determined were

unreadable but necessary and relevant – similar to the January 26 and March 14 lists of requested

documents. Instead, Plaintiffs exhibited the same tactics employed in this motion. On March

28, Magten sent a list to NorthWestern of apparently every single Excel spreadsheet in the

production – *over 3200 documents* – and demanded that every one be reformatted. (Brewer

Decl., Ex. 24.) Magten stated that if NorthWestern could not reformat the entire list within five

days, an impossible task, they would prioritize the list. In a telephone discussion with Magten's

counsel on March 28, NorthWestern's counsel stated her view that it is unreasonable for

Plaintiffs to demand that NorthWestern reformat every single document on the list of over 3200

documents, many of them repeats, and accepted Plaintiffs offer to submit a list of documents that

Magten believed to be necessary. (Bagnato Decl. ¶ 12.)

On March 30, Magten provided a list of 63 documents to NorthWestern. (Brewer Decl.,

Ex. 25.) In an April 2 conversation, Magten's counsel stated that he did not know whether

Plaintiffs would need more than these 63 documents, along with the 29 spreadsheets already

produced, and stated that perhaps, if the case proceeded to the expert phase, additional

documents may be requested. (Bagnato Decl. ¶ 13.) Although the list appeared excessive, by

letter on April 3, NorthWestern agreed to provide reformatted copies of the 63 documents but

asked Plaintiffs to confirm that this list of 63, along with the 29 Excel sheets already reformatted

in March, were Plaintiffs' good faith attempt to identify all of the Excel spreadsheets that Plaintiffs deem relevant and needed to be reformatted at this time. (Bagnato Decl., Ex. 7.)

On April 11, without explanation, Magten abandoned its earlier prioritized list and went back to arguing that Plaintiffs are entitled to legible copies of every Excel spreadsheet. (Brewer Decl., Ex. 26.) The explanation for Magten's behavior came two days later, on April 13, when Plaintiffs filed this motion seeking additional time.

Plaintiffs have no basis to demand that NorthWestern reformat each and every Excel spreadsheet on Plaintiffs' massive list. First, to reformat every document on Plaintiffs' list of 3200 documents would be a senseless waste of time and expense. Plaintiffs' list is full of duplicates and they have made no attempt to remove them. For example, document numbers NOR 47588 and 47592, both on Plaintiffs' list, represent the same document that appears at two different bates numbers. In fact, in their April 11 letter, Plaintiffs admit that some of the documents on their list may be duplicates, but then they try to charge NorthWestern with the obligation to ferret out the duplicates on a list that Plaintiffs compiled.

Plaintiffs also have made no attempt to determine which documents are actually difficult to read. For example, the list includes extremely large documents as well as small documents, such as document number NOR 38737 which is four pages.[13] Although the columns are spread out over the four pages, the information is discernable with relative ease by turning the pages and matching up the rows. Yet, Plaintiffs still demand that NorthWestern provide reformatted copies of this and similar documents.

Most tellingly, Plaintiffs could not name one additional document that they needed outside of the 63 documents on their March 30 list and the 29 documents already produced. The

---

[13] NOR 38737 is also a repeat – the same document appears at NOR 38733.

request that some additional Excel spreadsheets may be requested in the future if Plaintiffs'
expert has a need for them was a reasonable resolution. Clearly, the March 28 letter retracting
that resolution and demanding the reformatting of 3200 Excel spreadsheets was drafted as an
exhibit to this baseless motion.

In sum, Plaintiffs have not demonstrated that they are entitled to all allegedly unreadable
documents and it would be a waste of time and expense for NorthWestern to do so. Plaintiffs'
demand must be denied in its entirety.

Nonetheless, NorthWestern is prepared to produce reformatted copies of each of the 63
documents identified when Plaintiffs come back to their senses.

V.

**NorthWestern Did Not Waive Any Privileges By Supplementing Its 1600
Item Privilege Log Within 11 Days by the Addition of 120 Documents**

On January 29, 2007, Special Master James directed NorthWestern to have "substantially
completed" its production of documents, except for good cause shown, by March 16 and to
provide a privilege log by March 23. (*See* Docket Entry No. 116, Special Master James's Report
and Recommendation, Exhibit A at 96-97.) NorthWestern produced a total of almost 500,000
documents by March 16 and a privilege log with approximately 1600 items by March 23. Thus,
NorthWestern did more than substantially comply. On April 5, NorthWestern supplemented its
privilege log with 120 items. Plaintiffs now ask the Court to find that NorthWestern waived its
privileges with respect to the items added to the privilege log after March 23. This last desperate
effort to get access to NorthWestern's privileged documents should be denied.

Courts have held that "the *unjustified* failure to list privileged documents on the required
log of withheld documents in a timely and proper manner operates as a waiver of any applicable
privilege." *FG Hemisphere Assocs. v. Du Congo*, 2005 U.S. Dist. LEXIS 3523, at *14

(S.D.N.Y. Mar. 7, 2005) (emphasis added). However, only in egregious circumstances have courts found that a party's tardy production of a privilege log constituted a waiver of the privileges claimed with respect to documents included therein.

The federal appellate courts have not established a hard and fast rule regarding the timeliness of a party's production of a privilege log. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. United States District Court*, 408 F.3d 1142, 1148-9 (9th Cir. 2005) (noting that no circuit has "explicitly weighed in on the precise content of Rule 26(b)(5)'s notice requirement" and "reject[ing] a *per se* waiver rule that deems a privilege waived if a privilege log is not produced within Rule 34's 30-day time limit").

In cases in which courts have held that an unjustified failure to timely produce an adequate privilege log constitutes waiver, the parties' delays in producing privilege logs have been substantial and their effects often aggravated by other factors. *See, e.g., Burlington*, 408 F.3d at 1149 (privilege log produced five months after production and no explanation provided for delay); *Lopez v. City of New York*, 2007 U.S. Dist. LEXIS 19694, at *11-12 (S.D.N.Y. Mar. 20, 2007) (plaintiff provided "what is purported to be a privilege log in which plaintiff simply notes the date of the interview and the name of the person interviewed, and fails to identify the 'investigator'" more than ten months after service of interrogatories and document requests, and only after defendant filed two motions to compel production of documents and privilege log); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 107 (D.N.J. 2006) (twelfth and thirteenth privilege logs delivered more than two years after scheduled close of large-scale discovery and following "continued pattern of concealed non-compliance with Court Orders"); *FG Hemisphere Assocs.*, 2005 U.S. Dist. LEXIS 3523 (party still had not produced privilege log (or completed production of requested documents) more than 2 years after initial document request despite agreement between parties that privilege log would be produced, admonition by district judge, multiple

-25-

conferences with magistrate judge regarding discovery issues, and order by magistrate judge that production be completed and log produced).

Plaintiffs rely on one case, *Get-a-Grip, II, Inc. v Hornell Brewing Co., Inc.*, C.A. No. 99-13322000, U.S. Dist. LEXIS 11961 (E.D. Pa. Aug. 8, 2000). While Plaintiffs have cleverly managed to dig out what is arguably the least egregious case in which a court has found wavier, the facts of that case are easily distinguishable from those presently before the Court.

In *Get-a-Grip*, the court attempted to resolve an ongoing discovery dispute between the parties – which had already resulted in motions for sanctions by both parties – by ordering, *inter alia*, that the plaintiff "shall produce all responsive documents to number twenty-four in defendant's first set of requests for production of documents within ten days from the date of the court's order or, to the extent necessary, submit a privilege log." *Id.* at *2-3. Nonetheless, the plaintiff did not produce a privilege log responsive to the document request at issue, leaving defendant to file a renewed motion for sanctions. Only after the renewed motion had been filed – and two months had passed since the court's order with respect to document request number twenty-four – did the plaintiff produce a privilege log in keeping with the court order. *Id.* at *5.

By contrast, NorthWestern – tasked with the review and production of a significant quantity of documents, nearly all electronic – has consistently produced documents responsive to Plaintiffs' requests according to the rolling production to which the parties had agreed. Furthermore, NorthWestern produced a detailed privilege log to the Plaintiffs on March 23, 2007, the deadline established by the parties and the Special Master. NorthWestern provided supplemental log to the Plaintiffs on April 5, 2007, less than two weeks after the close of a significant document production.[14]

---

[14] The portion of the privilege log accidentally omitted contained only 120 documents – less than 1% of the privileged documents included in NorthWestern's sizeable document review.

-26-

Given the brevity of NorthWestern's delay in supplementing its privilege log and the small number of documents included on the supplemental log, it is obvious that Plaintiffs have not suffered any prejudice as a result of the amendment of NorthWestern's privilege log and they do not argue that they have been prejudiced. Plaintiffs waiver argument should be rejected.

## VI.

## Any Privilege Issues With Respect to the Remaining Documents Can Be Easily Resolved

Once these issues are resolved, this entire "emergency" motion comes down to a dispute over the designation of a few hundred documents. Out of more than 1700 documents, Plaintiffs have identified only about 258 documents NorthWestern listed on its privilege log with which they take issue. This is a matter that could and should have been resolved by a meeting among counsel.

Magten's letters of April 5 and April 10 list primarily two types of documents: (i) documents where no lawyer is shown on the privilege log as associated with the documents; and (ii) documents that contain communications to or from third parties outside an attorney/client relationship. Plaintiffs specifically refer to communications with NorthWestern's accountants or individuals at companies hired to assist NorthWestern. Plaintiffs state that these documents are not privileged because the attorney/client privilege does not apply to communications disclosed to third parties. (Plaintiffs' Memorandum of Law at 19.)

Plaintiffs are misinformed. While generally, the attorney/client privilege applies only to communication between a client and its lawyer, not between the client or its lawyer and third parties, under certain limited circumstances, the privilege may extend to communications with a third party, such as an accountant or a private investigator hired to assist in the rendition of legal services. *John Doe Co. v. U.S.*, 79 Fed. Appx. 476, 466 (2d Cir. 2003). Like any communications protected by the attorney/client privilege, however, a communication with third

party agents is only protected if it is made in confidence for the purpose of obtaining legal advice from the lawyer. *Id.*; *see also U.S. v. Kovel*, 296 F.2d. 918, 922 (2d Cir. 1961) ("the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complemented tax story to the lawyer, ought not to destroy the privilege"). Thus, the presence of certain third parties may not result in a loss of an otherwise privileged communication.

In addition, NorthWestern employed consultants in the ordinary cause of business to assist in managing certain risks. When applying the attorney/client privilege to a corporation, some courts have found that it is inappropriate to distinguish between those on the client's payroll and those who are employed as independent contractors. *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994).

One court has laid out the following test:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (citations omitted).

NorthWestern is ready to review the few remaining disputed documents with Plaintiffs to resolve these matters in accordance with these well-settled legal principles.

## CONCLUSION

For the above reasons, Plaintiffs' Emergency Motion for the entry of orders (a) shortening the briefing schedule under Local Rule 7.1.2 and setting a hearing date before the Special Master; (b) determining the status of documents inadvertently produced by

-28-

NorthWestern; (c) compelling NorthWestern to produce documents Magten alleges that are not privileged (including documents NorthWestern has produced to the SEC pursuant to a confidentiality agreement); (d) compelling NorthWestern to produce legible copies of certain Excel spreadsheets; (e) extending the discovery deadline; and (f) awarding Plaintiffs fees and costs should be denied in its entirety.

Dated: April 27, 2007

**GREENBERG TRAURIG LLP**

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

and

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
101 Park Avenue
New York, NY 10178
(212) 696-6000
Facsimile: (212) 697-1559

Attorneys for NorthWestern Corporation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWESTERN CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 04-1494 (JJF) <br> ) <br> ) <br> ) <br> ) |
| MAGTEN ASSET MANAGEMENT CORP., <br><br> Plaintiff, <br><br> v. <br><br> MIKE J. HANSON and ERNIE J. KINDT, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 05-499 (JJF) <br> ) <br> ) <br> ) <br> ) |

## CERTIFICATE OF SERVICE

I, Dennis A. Meloro, being duly sworn according to law, deposes and says that I am employed by Greenberg Traurig, LLP, which is counsel for the NorthWestern Corporation, and that on the 27th of April 2007, I caused to be served copies of following upon the parties listed below via Electronic Mail, Hand Delivery upon Local Counsel and via First Class, United States Mail upon the remaining parties.

- Memorandum Of Law In Opposition To Plaintiffs' Emergency Motion Seeking Orders (A) Shortening The Briefing Schedule Under Local Rule 7.1.2 And Setting A Hearing Date Before The Special Master; (B) Determining The Privilege Status Of Documents Northwestern Seeks To Recall Under A Claim Of Inadvertent Production And Privilege; (C) Compelling The Production Of Non-Privileged Documents; (D) Compelling The Production Of Documents Produced In Illegible Form; (E) Extending The Period For Completing Depositions; And (F) Assessing Fees And Costs Against Northwestern

- Affidavit of Jennifer A. Bagnato, Esq.

| | |
|---|---|
| Dale Dube, Esq.<br>David Carickhoff, Esq.<br>Blank Rome LLP<br>1201 Market Street, Suite 800<br>Wilmington DE 19801<br>(Magten) | Bonnie Steingart, Esq.<br>Gary L. Kaplan, Esq.<br>Fried Frank Harris Shriver & Jacobson LLP<br>One New York Plaza<br>New York NY 10004<br>(Magten) |
| Kathleen M. Miller, Esquire<br>Smith Katzenstein & Furlow LLP<br>800 Delaware Avenue, 7th Floor<br>Wilmington, DE 19801<br>(Law Debenture) | John V. Snellings, Esq.<br>Amanda Darwin, Esq.<br>Nixon & Peabody LLP<br>100 Summer Street<br>Boston, Massachusetts 02100<br>(Law Debenture) |
| Neil Glassman, Esq.<br>Charlene Davis, Esq.<br>Eric Sutty, Esq.<br>The Bayard Firm<br>222 Delaware Avenue, Suite 900<br>Wilmington DE 19801<br>(NW Plan Committee) | Alan Kornberg, Esq.<br>Margaret Phillips, Esq.<br>Ephraim Diamond, Esq.<br>Paul Weiss Rifkind Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York NY 10019<br>(NW Plan Committee) |
| Stanley T. Kaleczyc<br>Kimberly A. Beatty<br>Browning, Kaleczyc, Berry & Hoven, P.C.<br>139 North Last Chance Gulch<br>P.O. Box 1697<br>Helena, Mt 59624<br>(M Hanson/E Kindt) | Denise Seastone Kraft<br>Edwards Angell Palmer & Dodge LLP<br>919 North Market Street, 15th Floor<br>Wilmington, DE 19801<br>(M Hanson/E Kindt) |

Date: April 27, 2007

GREENBERG TRAURIG, LLP

Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: 302-661-7000