**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 04-1494-(JJF) |
| | ) |
| NORTHWESTERN CORPORATION, | ) **PUBLIC VERSION** |
| | ) |
| Defendant. | ) |
| | ) |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. Action No. 05-499 (JJF) |
| | ) |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) **PUBLIC VERSION** |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION SEEKING ORDERS (a) SHORTENING THE BRIEFING
SCHEDULE UNDER LOCAL RULE 7.1.2 AND SETTING A HEARING DATE BEFORE
THE SPECIAL MASTER; (b) DETERMINING PRIVILEGE STATUS OF
DOCUMENTS NORTHWESTERN SEEKS TO RECALL UNDER CLAIM OF
INADVERTENT PRODUCTION AND PRIVILEGE; (c) COMPELLING THE
PRODUCTION OF NON-PRIVILEGED DOCUMENTS;
(d) COMPELLING THE PRODUCTION OF DOCUMENTS PRODUCED IN
ILLEGIBLE FORM; (e) EXTENDING THE PERIOD FOR COMPLETING
DEPOSITIONS; AND (f) ASSESSING FEES AND COSTS AGAINST
NORTHWESTERN**

Plaintiff, by and through their counsel, respectfully submit this reply memorandum of law

in further support of their emergency motion (the "Motion") pursuant to Rules 26(d), 34 and 37

of the Federal Rules of Civil Procedure for the entry of orders (a) shortening the briefing

schedule under Local Rule 7.1.2 and setting a hearing date before the Special Master; (b)

determining the status of documents previously produced by NorthWestern Corporation

("NorthWestern") that NorthWestern belatedly seeks to recall under unsubstantiated claims of

inadvertent production and privilege; (c) compelling defendant NorthWestern to produce

documents that are not privileged (including certain documents disclosed to the SEC); (d)

compelling the NorthWestern Defendants to produce legible versions of documents that were

produced in illegible form; (e) extending the deadline for completing depositions until a time

following the production of the subject documents, to permit Plaintiffs' counsel and the

deponents (many of whom are third parties scheduled to be deposed during the next few weeks at

various locations throughout the Midwest) to adequately prepare to address all relevant topics

and documents during the initial deposition of each witness; and (f) awarding Plaintiffs

reasonable fees, expenses and costs as sanction for NorthWestern's failure to comply with their

discovery obligations.[1]

## PRELIMINARY STATEMENT

Although Plaintiffs believe that most of the facts and law necessary for the disposition of

these issues were set forth in their opening papers and/or can be discussed at oral argument, they

are submitting this reply in advance of the deadline permitted by Delaware Local Rule 7.1.2 to,

among other things, alert the Court and Special Master to subsequent developments bearing on

these issues. First and foremost among these is the Securities and Exchange Commission's

("SEC") conclusion, announced on Wednesday, April 25, 2007, that NorthWestern's false and

misleading financial statements issued during 2002 (which were crucial to the fraudulent transfer

---

[1]     Item (a) is now moot since NorthWestern has responded in an opposition (the "Opposition Br.") to
Plaintiffs' Motion, but Plaintiffs still seek a hearing on the Emergency Motion (as well as NorthWestern's
cross-motion which involves a subset of the same subject matter) at the earliest possible date.

2

that is at the heart of this litigation), were the result of systematic and intentional fraud

committed by NorthWestern's top management team at the time – including its CEO, COO,

CFO, and Controller. Those individuals, rather than dispute the SEC's fraud charges against

them, agreed to pay hundreds of thousands of dollars in fines and accept five-year bars from

service as an officer or director of any public company. This development simply confirms the

outrageousness of NorthWestern's attempt to continue to withhold documents it provided to the

SEC in a successful attempt to obtain comparative leniency for itself while documenting the

fraud committed by its own former senior officers – fraud for which it cannot escape liability

with respect to its civil exposure to Plaintiffs.

NorthWestern has also belatedly supplemented its privilege log to, among other things,

permit the previously impermissible partial cross-referencing of the documents it has demanded

the return of (as noted in Plaintiffs' opening memorandum of law ("Pl. Mem.") at 8, 12) to the

documents it has admittedly disclosed to the SEC, thus waiving privilege under controlling Third

Circuit law. It is thus now clear that (at least with respect to the subset of the documents in

dispute where NorthWestern has now provided sufficient information to permit cross-

referencing) the majority of the documents NorthWestern demands the return of are not

privileged due to NorthWestern's own waiver of the privilege in a successful bid to obtain

leniency from the SEC.

As set forth in greater detail below, NorthWestern's other arguments

for withholding hundreds of nonprivileged documents and refusing to replace hundreds of thousands of pages of illegible documentations are also unjustified and should be rejected.

I.    THE SEC HAS NOW CONFIRMED MASSIVE INTENTIONAL FRAUD BY NORTHWESTERN'S SENIOR MANAGEMENT TEAM AT THE RELEVANT TIME

Just last week, on April 25, 2007 the SEC filed complaints in the U.S. District Court for the District of South Dakota (the "New SEC Complaints") against the majority of NorthWestern's senior management team as of November 2002 (the date of the fraudulent transfer giving rise to Plaintiffs' claims against NorthWestern): then-CEO Merle Lewis; then-COO Richard Hylland; then-CFO Kipp Orme; and then-Controller Kurt Whitesel. *See* Exhibits 27 through 30 attached to the Supplemental Declaration of John W. Brewer ("Supp. Brewer Decl.") submitted herewith.[2] The SEC's charges were not merely technical in nature, but included detailed descriptions of intentional fraudulent conduct on the part of each defendant in connection with NorthWestern's false and misleading public disclosures of its financial condition and prospects. Apparently realizing that they had no tenable defense to the charges, all four of the defendants settled the claims as soon as they were filed (effectively pleading "no contest"), agreed to pay fines totaling almost $400,000, and each agreed to the extraordinary relief of being barred for five years from eligibility from service as officer or director of any public company in the United States.[3] *See* Supp. Brewer Decl. Exhs. 31-34.

---

[2]    Mr. Orme invoked his Fifth Amendment right against self-incrimination rather than answer any substantive questions at his deposition in this case.

[3]    Pursuant to their settlements, each defendant agreed not to publicly dispute the truth of the SEC's conclusions subject to certain limited exceptions. *See, e.g.*, Supp. Brewer Decl. Exhs. 31-34 at ¶¶ 11. The five year officer and director bars are included in the final judgments against Lewis, Hylland, Orme and Whitesel. *See, e.g.*, Supp. Brewer Decl. Exhs. 35-38.

4

The underlying falsity in NorthWestern's financial statements (part of the fraudulent scheme used to accomplish the Transfer) set forth in the New SEC Complaints is substantially similar to that of the Cease-and-Desist Order previously entered against NorthWestern itself (previously submitted as Brewer Decl. Exh. 1), but the New SEC Complaints make it even clearer that the false statements and omissions were not the result of negligence or sloppy record-keeping but wide-ranging and intentional fraud aimed at deceiving the investing public. All four individuals were charged with violating fraud-based provisions of the law, such as section 10(b) of the Exchange Act (declining to contest the charges), and the factual detail confirms that fraud. For example:

- Lewis, Hylland, Whitesel and Orme "misled investors ... about the nature of NorthWestern's and Expanets' reported income." *See* Supp. Brewer Decl. Exhs. 27-30 at ¶¶ 3.

- Lewis, Hylland, Whitesel and Orme "misled investors ... about critical issues that impacted NorthWestern's liquidity." *See* Supp. Brewer Decl. Exhs. 27-30 at ¶¶ 4.

- Lewis, Hylland, Whitesel and Orme knew or were reckless in not knowing that the disclosure in NorthWestern's Form 10-Q for the third quarter of 2002 that Expanets' problems "*may* cause a need to increase the current reserve for bad debt, which *could* negatively impact financial performance in future quarters ... was false and misleading because by that time, Expanets' bad debt reserve was, in fact, already materially understated." *See* Supp. Brewer Decl. Exh. 27 at ¶ 50; Exh. 28 at ¶ 51; Exh. 29 at ¶ 51; Exh. 30 at ¶ 52.

5

- Lewis and Hylland were "reckless in not knowing that the final closure of the [Colstrip Utility Asset Sale] was at risk but that NorthWestern failed to properly disclose that risk and its impact to NorthWestern's liquidity." *See* Supp. Brewer Decl. Exh. 27 at ¶ 94; Exh. 28 at ¶ 95.

- During NorthWestern's analyst call in April 2002, Hylland "misstated the magnitude of NorthWestern's continuing financial support of Expanets over the first four months of 2002." *See* Supp. Brewer Decl. Exh. 28 at ¶ 89.

- During NorthWestern's analyst call on April 30, 2002, Orme's statement that Expanets' issues with its billing system have now been worked through was "misleading because he was informed, as of the time of his statement, that several issues affecting the operational status and full functionality of the EXPERT system remained unresolved." *See* Supp. Brewer Decl. Exh. 30 at ¶ 44. Furthermore, during that call, Orme misstated the magnitude of NorthWestern's continuing financial support of its subsidiaries over the first four months of 2002, and Orme "knew or was reckless in not knowing that his statements were false and misleading." *See* Supp. Brewer Decl. Exh. 30 at ¶ 89.

- During NorthWestern's analyst call in May 2002, Hylland "misstated that Expanets had made a payment on a credit facility, when, in fact, NorthWestern had provided funds for the payment." *See* Supp. Brewer Decl. Exh. 28 at ¶ 89.

- On August 14, 2002, Whitesel received from Expanets personnel a proposed disclosure regarding billing adjustments and their impact on Expanets' future financial results, and despite receipt of this information, NorthWestern failed to make any disclosure regarding Expanets' billing adjustments in its debt and equity offering filings with the Commission. *See* Supp. Brewer Decl. Exh. 29 at ¶ 58.

6

- During NorthWestern's analyst call on November 7, 2002, Orme indicated that

   "Expanets' cash flow during 2002 had funded the paydown of its credit facility with a

   third party and that NorthWestern had only 'supplemented' that paydown. Orme knew or

   was reckless in not knowing that this statement was misleading because … he knew …

   that NorthWestern had supplied a majority of the funds that Expanets had used to pay its

   credit facility during the year." *See* Supp. Brewer Decl. Exh. 30 at ¶ 94.

   Incredibly, NorthWestern goes on to claim its relationship with the SEC was not

adversarial and somehow gave rise to a "common interest," Opposition Br. at 15, despite the

SEC's institution of administrative proceedings against NorthWestern, its express findings that

NorthWestern violated the securities laws, and its issuance of orders compelling future

compliance. This is not credible. *See In re* Subpoenas *Duces Tecum* 738 F.2d 1367, 1372 (D.C.

Cir. 1984) ("There is no question that the SEC was an adversary to Tesoro…Tesoro

independently and voluntarily chose to participate in a thorough disclosure program, in return for

which it received the *quid pro quo* of lenient punishment for any wrongdoings exposed in the

process.").[4] What is clear is that NorthWestern sought and received comparative leniency for

itself from the SEC by trying to point to prior management as the persons responsible for its false

financial statements.[5] While the SEC may appropriately take such matters into account in

---

[4]    *See also Westinghouse. Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1992)
("Westinghouse was the target of investigations conducted by the agencies…we have no difficulty
concluding that the SEC and the DOJ were Westinghouse's adversaries."); *In re Steinhardt Partners*, 9
F.3d 230, 234 (2d. Cir. 1993) ("The determinative fact in analyzing the adversarial nature of the
relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the
memorandum was sought as part of this investigation.").

[5]

exercising its discretion as to the degree of appropriate prospective regulatory sanctions,
NorthWestern cannot evade its civil damages liability to Plaintiffs by blaming the fraud it
committed on its former CEO, CFO and other top managers. Their acts were NorthWestern's
acts, and their fraud was NorthWestern's fraud.

II.    NORTHWESTERN WAIVED PRIVILEGE WITH RESPECT TO ALL OF THE
       DOCUMENTS IT PROVIDED TO THE SEC IN A BID FOR LENIENT TREATMENT

       NorthWestern's attempts to evade the controlling force of *Westinghouse Elec. Corp. v.
Republic of Philippines*, 951 F.2d 1414 (3d Cir. 1992), and the strong national majority rule it
represents are totally unavailing. Under *Westinghouse* and the majority rule applicable here,
disclosure of privileged documents to a party outside the privileged relationship waives privilege
period, whether or not that third party is a government agency such as the SEC. Conspicuously,
NorthWestern fails to cite to a single lower federal court decision anywhere in the Third Circuit
finding *Westinghouse* inapplicable or distinguishable and holding that documents retain their
privileged status following intentional disclosure to the government. Our own research has
found no such case. NorthWestern's request for this Court to defy the Third Circuit is
groundless.

       First, NorthWestern tries to claim that *Westinghouse* only applies when a party produces
to the SEC without a confidentiality agreement. *Westinghouse* expressly rejects this argument.
While it was not convinced by the factual claim that a confidentiality undertaking had been
given, the Third Circuit expressly held that "Even if we had found that the agencies had made
such an [confidentiality] agreement ... it would not change our conclusion." 951 F.2d at 1430.

**REDACTED**

8

This is because "under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *Id.* at 1427. *See also In re Columbia/HCA Healthcare*, 293 F.3d 289, 306 (6th Cir. 2002) ("*Westinghouse* rejected the argument that…a confidentiality agreement could preserve the work product privilege"); *Cooper Hospital v. Sullivan*, 1998 U.S. Dist. LEXIS 22198 at *23 (D.N.J. May 7, 1998) (citing *Westinghouse* and holding that "any disclosure to a government agency not for the purposes of obtaining legal advice, even if subject to a confidentiality agreement, waives the attorney client privilege"). Again, no lower federal court decision in the Third Circuit has refused to follow *Westinghouse* on this basis. Moreover, here NorthWestern has not even put evidence of any confidentiality agreement before the Court.[6]

Second, NorthWestern claims the Third Circuit's controlling precedent is irrelevant because the issue is controlled by Delaware state law and subsequent Chancery Court decisions have de facto overruled the Third Circuit. Delaware state court decisions have absolutely no bearing on this case. This case has nothing to do with Delaware, and is venued in federal court here only because NorthWestern's chapter 11 filing occurred in this District. Fed. R. Evid. 501 does state that "with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law." But the "State law" that supplies the rule of decision here is *Montana* state law. NorthWestern's claim that "State law" necessarily means Delaware law the second time the words appear in the sentence despite the fact they mean something totally different the first time does violence to the rule.

---

[6]    NorthWestern claims that its confidentiality agreement with the SEC is so top-secret it will provide it to the Court only upon request and only *in camera*. Opposition Br. at 14 n.8. This is preposterous.

9

*Westinghouse* does not purport to be limited only to federal law claims, nor does it purport to be an application of the law of New Jersey (apparently the substantive law governing the claims in that case). No lower federal court in the Third Circuit has ever distinguished or refused to follow *Westinghouse* on the grounds that "State law" dictated a contrary result, or that Rule 501 permitted *Westinghouse* to be ignored outside the District of New Jersey, and NorthWestern has provided no basis for this Court to do so.

Even if it was appropriate to look at Delaware's *choice of law* rules to determine the applicable "State law," Delaware would not be the appropriate source of *substantive* privilege law. Far from being the state with the most significant contacts, Delaware has virtually no meaningful contacts but is simply the forum state through happenstance.[7] NorthWestern essentially admits that the allegedly privileged communications and documents had nothing to do with Delaware. Opposition Br. at 9. Defendant NorthWestern is headquartered in South Dakota; none of the lawyers involved appear to have been Delaware-based. Waiver then occurred as a result of a decision presumably made in South Dakota to disclose the documents to the SEC. Plaintiffs' substantive law claims are governed by Montana law and relate to the fraudulent transfer of assets located in Montana away from a Montana-domiciled entity.

---

7    In the context of privilege determinations, "Delaware follows the Restatement's [(Second) of Conflicts] choice of law principles and the Restatement's 'most significant relationship' test." *Lee v. Engle*, 1995 Del. Ch. LEXIS 149 at *19 (Del. Ch. Dec. 15, 1995). The Restatement notes that the state with the most significant relationship with a communication "will usually be the state where the communication took place … where the oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing." Restatement (Second) of Conflicts §139, cmt. e (1988 Revisions). *See also, e.g., Lego v. Stratos Lightwave, Inc.*, 224 F.R.D. 576, 578-79 (S.D.N.Y. 2004) (rejecting attempt to apply privilege law of forum under Rule 501 because "[i]n cases requiring a choice of privilege law, the interest analysis usually has led New York courts to apply the law of the jurisdiction in which the assertedly privileged communications were made, which in most of the cases was also the jurisdiction in which the party that made the communications resided").

10

Thus, the state with the most significant relationship to the communications and their waiver is either South Dakota or Montana, with Delaware not even in the running. NorthWestern cites no South Dakota or Montana state law authority embracing the minority selective waiver rule, and we are aware of none.[8] Accordingly, those states must be assumed to follow the national majority rule embodied by *Westinghouse*. *See, e.g.*, *Bowne of New York City, Inc. v. Ambase Corporation*, 150 F.R.D. 465, 478-81 (S.D.N.Y. 1993) (citing *Westinghouse* as evidence of majority rule when New York state courts had not directly addressed selective waiver issue); *GPA Incorporated v. Liggett Group, Inc.*, 1996 U.S. Dist. LEXIS 9644 at \*6-7 (S.D.N.Y. Jul. 10, 1996) (finding a waiver of privilege by following *Bowne* and case law from other jurisdictions including *Westinghouse*).[9]

Incredibly, NorthWestern seeks to rely on a possible *future* change in the law that, if but only if enacted, might legislatively overrule *Westinghouse* and permit selective waiver. *See* Opposition Br. at 12 n 7. But their hopes for the future are already out of date. The controversial selective waiver language contained in the earlier version of proposed Federal Rule of Evidence 502 relied on by NorthWestern was removed from the proposed rule at the Advisory

---

[8]     After first claiming that federal court decisions are irrelevant in an effort to avoid *Westinghouse*, NorthWestern cites Eighth Circuit cases on the grounds that it "resides" in that circuit. The Third Circuit expressly rejected the Eighth Circuit's *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) opinion in *Westinghouse*. 951 F.2d at 1424-25. If NorthWestern had wished to have the benefit of Eighth Circuit case law that conflicts with Third Circuit case law it should have filed its chapter 11 case in South Dakota rather than Delaware.

[9]     Not only is *Westinghouse* as the majority rule presumptively the rule that would be followed by South Dakota and Montana, other courts outside Delaware have refused to follow the minority viewpoint adopted by the Chancery Court when presented with arguments they should do so. *See United States v. Bergonzi*, 216 F.R.D. 487, 497 (N.D. Cal. 2003) (holding that "[w]ith all due respect to the *Saito* court ... the analysis set forth in the *Westinghouse* and *In Re Columbia/HCA Healthcare* decisions provide compelling policy and legal rationales to reject the selective waiver doctrine...[and the court finds] more persuasive the reasoning of the First, Third, and Sixth Circuit on this issue.").

11

Committee's April 13, 2007 meeting, as was publicly reported in the April 16 issue of the *National Law Journal. See* Supp. Brewer Decl. Exh. 40.[10]

For all of these reasons, NorthWestern took advantage of disclosure to the SEC to secure more lenient treatment for itself, but thereby waived privilege against third parties such as the present Plaintiffs.[11] Given *Westinghouse* and the majority rule it represents, NorthWestern knowingly assumed the risk of such waiver and nonetheless decided it to run it. Its attempt to have it both ways is not only substantively unfair but contrary to controlling law and should be rejected.

## III. NORTHWESTERN HAS NOT ESTABLISHED ITS ENTITLEMENT TO THE RETURN OF THE DISPUTED DOCUMENTS

The issue of the documents NorthWestern has belatedly demanded the return of as allegedly inadvertently produced has in general been fully briefed already. *See* D.I. Nos. 142 and 150. We make only a few additional points here. First, given NorthWestern's extremely belated further supplementation of their privilege log on April 24, it has been possible for the first time to begin to correlate the documents whose return they have demanded with the documents they admitted on April 9 had been disclosed to the SEC, thus waiving any privilege claim. We can now tell that a clear majority of documents subject to the return demands for which a correlation can be made (41 of 66) were disclosed to the SEC, and their production should accordingly be compelled whether or not they had previously been produced. Supp.

---

10    *See also* Supp. Brewer Decl. Exh. 41 (final version of proposed rule); Exh. 42 (separate text dealing with statutory waiver prepared by committee for potential Congressional consideration). The Committee's advisory notes to the latter use the Third Circuit's *Westinghouse* decision as their specific illustration of the approach "most courts" have taken in holding that production to the SEC waives privilege and work product protection without exception and regardless of any purported confidentiality agreement.

11    The SEC's own views as to the desirability of selective waiver as a policy matter are irrelevant and have thus far failed to persuade Congress, the Advisory Committee on Evidence Rules, or the vast majority of the courts.

Brewer Decl. Exh. 43.  We are still unable to determine whether 33 more of the documents in dispute were or were not disclosed to the SEC, since we either have been unable to correlate their Bates ranges to NorthWestern's log as most recently supplemented on April 22 or they had not been logged as of NorthWestern's belated April 9 admission as to which then-logged documents had been disclosed.[12]  *Id.*

---

[12]    NorthWestern's claim that the fact that its original log intentionally failed to disclose that the SEC had received these hundreds of documents is no problem is absurd.  What is the point of any privilege log if not to disclose the author and recipients of the allegedly protected communication?  If parties were free to refuse to disclose recipients who (in the party's judgment) did not negatively affect the privileged status of the document, no log would be necessary.

13



Indeed, they have again conspicuously failed to put any evidence in the record about what, if any steps they took which were reasonably calculated (even if not foolproof) to (i) identify privileged documents; and (ii) avoid production of the documents so identified. Such reasonable procedures are the sine qua non of any contention that production was "inadvertent" for the reasons we have previously briefed. *See* Pl. Mem. at 11.



14



Finally, NorthWestern claims Magten is making use of the documents in dispute. *See* Opposition Br. at 6. This is the exact opposite of the truth. Rather, Magten's counsel, who have had to prepare for depositions while this controversy has proceeded are attempting in good faith to avoid any use of the documents in dispute (pending its resolution) by, for example, endeavoring to replacing reference to disputed documents in work product such as deposition outlines created before the return demands with references to indisputably nonprivileged documents from elsewhere in NorthWestern's production. For example, there is less immediate need to show a witness a document whose return has been demanded to refresh his recollection of a factual event related in the disputed document, when the underlying nonprivileged email the disputed document cited for the point (which should otherwise have been produced) may be used for the same purpose. Of course, if NorthWestern has not produced another copy of that underlying nonprivileged email, problems arise. It was precisely that good faith process of trying to substitute documents not in dispute for those in dispute that led to the discovery of the apparently serious deficiencies in NorthWestern's document production that were set forth in the April 27 letter NorthWestern now complains about. Obviously, if NorthWestern has incorporated underlying nonprivileged documents in what it claims to be work product but then destroyed the underlying documents so that they cannot be produced, it cannot claim work product protection as to the factual matters set forth in the disputed documents, under Fed. R. Civ. P. 26(b)(3).

15

IV.    NORTHWESTERN SHOULD BE COMPELLED TO PRODUCE THE OTHER NON-
       PRIVILEGED DOCUMENTS IN DISPUTE

NorthWestern is withholding or seeking the return of over 150 items which it concededly

failed to put on its privilege log by the March 26 deadline imposed by the Special Master, many

but not all of which it separately waived privilege as to by disclosure to the SEC. See Supp.

Brewer Decl. Exh. 43.

The longstanding general rule is that barring an extension of time or good cause, an

objection based on privilege is waived unless made within the proper time limits. *See United

States v. 58.16 Acres*, 66 F.R.D. 570, 572 (E.D. Ill. 1975); *Davis v. Romney*, 53 F.R.D. 247, 248

(E.D. Pa. 1971) ("If discovery rules are to have 'any effect or meaning, the failure to serve such

objections within the time prescribed...should be considered a waiver of such objections.");

*American President Lines v. Hartford Fire Insurance Co.*, 55 F.R.D 61 (E.D. Pa. 1971).

Specifically, courts have found that the submission of untimely privilege logs constitutes a

waiver of privilege. *See Get-A-Grip, II, Inc. v. Hornell Brewing Co.*, 2000 U.S. Dist. LEXIS

11961 (E.D. Pa. Aug. 8, 2000) (finding waiver where privilege log was approximately two

months late); *Wachtel v. Health Net, Inc.* 239 F.R.D. 81, 106-07 (D.N.J. 2006); *FG Hemisphere

Associates v. Du Congo*, 2005 U.S. Dist. LEXIS 3523 at \*14 (S.D.N.Y. Mar. 8, 2005) ("As other

judges in this District and I have repeatedly held, the unjustified failure to list privileged

documents on the required log of withheld documents in a timely and proper manner operates as

a waiver of any applicable privilege.").

Not only is NorthWestern's explanation for its delay in claiming privilege on the items on

its first April 5 supplemental log inadequate, NorthWestern has not even tried to justify the

further delay as to the additional documents that were not included on the privilege log until

16

April 24 – a month after deadline and over a week after NorthWestern's belated return demands for those documents had been made.

Although NorthWestern now claims that the Court's intervention is not necessary with respect to the hundreds of items identified in Plaintiffs' letters of April 5 and 10 (Brewer Decl. Exhs. 19 and 20) as non-privileged on the fact of the log, it does not explain how the issue can be resolved. NorthWestern promised in its April 9 letter (Brewer Decl. Exh. 16) to respond to the issues in the April 5 letter by later that week, but never did so. In the interim, it took the position that it was refusing to respond to any outstanding discovery issues raised by Plaintiffs, D.I. 139 at Tab A, p. 2, thus necessitating our motion to compel. Weeks have now gone by without any response or explanation. If NorthWestern wishes to abandon its claim of privilege as to certain of the items in dispute and explain its position as to others, Plaintiffs would like to be reasonable, but it is unclear what NorthWestern suggests or how it could be accomplished quickly. NorthWestern does not defend the privileged status of any of the documents called into question, it simply says (without any explanation applied to any particular document) that the presence of certain third parties is not inevitably fatal to privilege.[13] This is too little, too late. These documents should be produced.

Moreover, as to a considerable number of these documents, they are separately subject to production because they were previously produced to the SEC, thereby waiving an alleged privilege. *See* Supp. Brewer Decl. Exh. 46.

---

[13]    For example, they note that under certain circumstances accountants may be retained to assist counsel in an investigation without destroying privilege, but do not acknowledge that the documents at issue here were shared with the company's regular outside auditors, whose need for formal independence for their audit work is obviously inconsistent with maintaining privilege.

17

V.     NORTHWESTERN SHOULD BE COMPELLED TO REPLACE THE HUNDREDS OF
       THOUSANDS OF PAGES OF ILLEGIBLE DOCUMENTS

       NorthWestern's Opposition to Plaintiffs' Motion is the first time that NorthWestern

raises the possible difficulties with producing the illegible documents in "native" form. Given

all the correspondence and discussion between counsel since January regarding the need to

replace the "illegible documents" in a readable format, it is disingenuous for NorthWestern to

only now raise alleged technical problems with respect to producing documents in their "native"

form. This has never been NorthWestern's position nor has it been the basis for their failure to

timely replace the problematic Excel spreadsheets.

       Plaintiffs have no doubt that had NorthWestern raised this difficulty back in February, the

parties could have reached agreement on this problem while minimizing any undue burden to

NorthWestern. Instead, three months have passed since Plaintiffs made the initial request for

replacement of the illegible Excel spreadsheets and NorthWestern has waited to raise this issue

until Plaintiffs had to move to compel production through a filing with the Court.

       Plaintiffs' letter to NorthWestern on January 26, 2007, in which Magten made

NorthWestern aware of the technical glitch affecting the Excel spreadsheets and the need to

replace any previously produced problem documents, was very clear that the problem needed to

be corrected in all future productions "so that neither of us needs to repeat this exercise." *See*

Brewer Decl. Exh. 21. Despite this very clear request, NorthWestern continued to produce

hundreds of illegible Excel documents after that date. Notably, NorthWestern is not even

disputing that it produced illegible documents and continued to do so in the nearly 300,000 pages

of documents it produced since January 26. Rather, it is simply taking the untenable position

that it is just too hard and too difficult to reformat the problem document and has chosen to wait

18

three months to complain about the alleged technical challenge in providing the Excel documents in a legible form.   While Plaintiffs were under the impression that they had a workable solution – compile a complete list of the bates-numbers of the illegible documents and provide that list to NorthWestern so that they may be replaced – NorthWestern has taken the position that the stress and expense of reviewing the 3200 problem documents should be Plaintiffs.

NorthWestern has created its own quandary – the need to replace the Excel Documents is the result of NorthWestern's choice to proceed in a fashion (using the problematic format) that NorthWestern knew was virtually guaranteed to render them illegible.  Accordingly, the alleged burden on NorthWestern to comply at this point in time is merely the result of its failure to deal with the issue at any time between late January and March 16.  For NorthWestern to now raise certain issues that could have been resolved months earlier is nothing short of a use of their tactics to delay any meaningful discovery.

## VI.    THE SCHEDULE FOR COMPLETION OF DEPOSITIONS SHOULD BE MODIFIED ACCORDINGLY

NorthWestern does not appear to oppose with any substantive argument the Emergency Motion's request for an extension of time to take depositions until after the document disputes are resolved.[14]  At this point, party depositions are on hold due to pending motions for protective orders involving other issues.  We are nonetheless attempting to proceed with non-party depositions (potentially subject to recalling certain witnesses once the pending document disputes are resolved) as rapidly as feasible given other scheduling difficulties, which will be addressed in a separate submission.

---

[14]    A throwaway sentence (Opposition Br. at 2) suggests no extension will be necessary because NorthWestern will supposedly win all the disputes over documents, but no further attention is given to the issue.

19

## CONCLUSION

For the foregoing reasons as well as those set forth in the original moving papers and the submissions on NorthWestern's cross-motion, the relief sought in the Emergency Motion should be granted in all respects.

Respectfully submitted,

Dated: Wilmington, Delaware
May 2, 2007

**BLANK ROME LLP**                           **SMITH, KATZENSTEIN & FURLOW, LLP**


 /s/ Dale R. Dubé                                 /s/ Kathleen M. Miller
Dale R. Dubé (DE No. 2863)                  Kathleen M. Miller (DE No. 2898)
David W. Carickhoff (DE No. 3715)          800 Delaware Avenue, 7th Floor
1201 Market Street, Suite 800               P.O. Box 410
Wilmington, DE 19801                        Wilmington, DE 19899
Telephone: (302) 425-6400                   Telephone: (302) 652-8400
Facsimile: (302) 425-6464                   Facsimile: (302) 652-8405

         - and -                                      -and-

**FRIED, FRANK, HARRIS, SHRIVER**           **NIXON PEABODY LLP**
    **& JACOBSON LLP**                      John V. Snellings
Bonnie Steingart                            Amanda Darwin
Gary L. Kaplan                              100 Summer Street
John W. Brewer                              Boston, MA 02110
One New York Plaza                          Telephone: (617) 345-1201
New York, NY 10004                          Facsimile: (866) 947-1732
Telephone: (212) 859-8000
Facsimile: (212) 859-4000                   Counsel for Law Debenture Trust
                                            Company of New York
Counsel for Magten Asset Management
Corporation

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of May, 2007, I served by hand delivery and

electronic filing the Public Version of the REPLY MEMORANDUM OF LAW IN FURTHER

SUPPORT OF PLAINTIFFS' EMERGENCY MOTION SEEKING ORDERS (a)

SHORTENING THE BRIEFING SCHEDULE UNDER LOCAL RULE 7.1.2 AND SETTING

A HEARING DATE BEFORE THE SPECIAL MASTER; (b) DETERMINING PRIVILEGE

STATUS OF DOCUMENTS NORTHWESTERN SEEKS TO RECALL UNDER CLAIM OF

INADVERTENT PRODUCTION AND PRIVILEGE; (c) COMPELLING THE PRODUCTION

OF NON-PRIVILEGED DOCUMENTS; (d) COMPELLING THE PRODUCTION OF

DOCUMENTS PRODUCED IN ILLEGIBLE FORM; (e) EXTENDING THE PERIOD FOR

COMPLETING DEPOSITIONS; AND (f) ASSESSING FEES AND COSTS AGAINST

NORTHWESTERN, using CM/ECF which will send notification of such filing(s) to the

following:

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

I also certify that, on this 9th day of May, 2007, I served the aforementioned document,

by e-mail and Federal Express, upon the following participants:

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
Browning, Kaleczyc, Berry & Hoven, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061

Dale R. Dubé  (No. 2863)