# *EXHIBIT A*

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re NORTHWESTERN CORPORATION, <br><br> Debtor. | ) ) ) ) ) | In Chapter 11 proceedings <br><br> Case No. 03-12872 (CGC) |
| MAGTEN ASSET MANAGEMENT CORPORATION & LAW DEBENTURE TRUST COMPANY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWESTERN CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | ADV. NO. 04-53324 (PBL) <br><br> UNDER ADVISEMENT DECISION RE: MOTION TO DISMISS |

## I.    Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,

delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II.    Factual Background

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

2

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder. Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy. Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors. While they (or their predecessors) were once essentially at the top of the heap of Clark Fork's creditors, upon the transfer to Debtor, they were subordinated to Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

## III.    Analysis

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action, Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

A.    **Did Debtor Comply with the Indenture?**

1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

5

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

### B.   Are the Plaintiffs Creditors Under The Guarantee?

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1]Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

Trust. Guarantee § 1.01 (definition of "Guarantee Payments"). In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork. For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2] Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets. In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3] Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets. In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations. Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures. The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2] Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3] Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4] If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

are harmonized to the extent possible. *Simon v. The Navellier Series Fund,* 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books,* 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.,* 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.,* 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS.* However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5] The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

8

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.    Was there a Fraudulent Scheme?

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

## III.    Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: _8/20/04_

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11

*EXHIBIT B*

MAGTEN ASSET MANAGEMENT CORP. VS. NORTHWESTERN CORP.

MARY LEWICKI - 5/2/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM



MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(1/1)

MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.



### Page 1

(1) UNITED STATES DISTRICT COURT
(1) FOR THE DISTRICT OF DELAWARE
(2) ------------------------------------X
(2) MAGTEN ASSET MANAGEMENT CORPORATION and
(3) LAW DEBENTURE TRUST COMPANY OF NEW YORK,
(4) Plaintiffs,
(5) - against -
(6) NORTHWESTERN CORPORATION,
(7) Defendant.
(8) CIVIL ACTION NO.: 04-1494(JJF)
       ------------------------------------X
(9) MAGTEN ASSET MANAGEMENT CORP.,
(10) Plaintiffs,
(11) - against -
(12) MICHAEL J. HANSON and ERNIE J. KINDT,
(13) Defendants.
(14) CIVIL ACTION NO.: 04-1494(JJF)
       ------------------------------------X
(15)
       One New York Plaza
(16)     New York, New York
(17)     May 2, 2007
           1:15 p.m.
(18)
(19)       Deposition of MARY LEWICKI, pursuant
(20) to Notice, before Melissa Gilmore, a Notary
(21) Public of the State of New York.
(22)
(23)     ELLEN GRAUER COURT REPORTING CO. LLC
(24)      126 East 56th Street, Fifth Floor
           New York, New York 10022
             212-750-6434
(25)         REF: 84143

### Page 2

(1) A P P E A R A N C E S:
(2)
(3) FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
(4) Attorneys for Plaintiff Magten Asset Management
(5)     One New York Plaza
(6)     New York, New York 10004-1980
(7) BY: GARY L. KAPLAN, ESQ.
(8)     JORDANNA L. NADRITCH, ESQ.
(9)     PHONE 212-859-8812
(10)    FAX 212-859-4000
(11)    E-MAIL gary.kaplan@friedfrank.com
(12)
(13)
(14) BARKET, MARVIN & MARTIN, LLP
(15) Attorneys for Bank of New York
(16)     130 Broadway
(17)     New York, New York 10271
(18) BY: KENNETH M. BIALO, ESQ.
(19)    MATTHEW M. MOODY, ESQ.
(20)    PHONE 212-238-3658
(21)    FAX 212-238-3100
(22)    E-MAIL kbialo@barketmarvin.com
(23)
(24)
(25)



### Page 3

(1) A P P E A R A N C E S:   (Cont'd)
(2)
(3) CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
(4) Attorneys for Defendant Northwestern Corporation
(5)     101 Park Avenue
(6)     New York, New York 10178-0061
(7) BY: NANCY E. DELANEY, ESQ.
(8)    PHONE 212-696-6935
(9)    FAX 212-697-1559
(10)    E-MAIL ndelaney@cm-p.com
(11)
(12)
(13) EDWARDS ANGELL PALMER & DODGE LLP
(14) Attorneys for Defendants Michael J. Hanson and
(15) Ernie J. Kindt
(16)    919 North Market Street, Suite 1500
(17)    Wilmington, Delaware 19801
(18) BY: DENISE SEASTONE KRAFT, ESQ.
(19)    PHONE 302-777-7770
(20)    FAX 302-777-7263
(21)    E-MAIL dkraft@eapdlaw.com
(22)
(23)
(24)
(25)

### Page 4

(1) A P P E A R A N C E S:   (Cont'd)
(2)
(3) NIXON PEABODY LLP
(4) Attorneys for Defendant Law Debenture Trust
(5) Company of New York
(6)     437 Madison Avenue
(7)     New York, New York 10022-7001
(8) BY: CHRISTOPHER M. DESIDERIO, ESQ.
(9)    PHONE 212-940-3077
(10)    FAX 866-741-3993
(11)    E-MAIL cdesiderio@nixonpeabody.com
(12)
(13)
(14) ALSO PRESENT:
(15)    ALEXANDER SHAPIRO, Bank of New York
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)






Page 73

document.

Q.   I understand, but you had sufficient knowledge to review the document and to at least form your own conclusion as to whether or not holder consent was required?

MS. KRAFT:  Objection.

MR. BIALO:  I will have to object to the form of that, also.

A.   Again, it's something that's discussed with counsel and confirmed with counsel before.

Q.   I understand it's confirmed with counsel, but you also come to your own independent view as to whether or not it needs holder consent?

A.   As I will state, it's confirmed with counsel. I am not an attorney that can say definitively whether a client consent is necessary or not. So it is reviewed with counsel to ensure that we capture all required actions.

Q.   Do you recall any discussions with the issuer or NorthWestern with respect to whether consent of the holders would be

Page 74

required to execute the Third Supplemental Indenture?

A.   Again, I -- I don't have any memory of this entire transaction other than what I've -- the documents I reviewed in the last couple of days.

Q.   Would that be something that you would ordinarily do -- let me rephrase that.

Ordinarily, if you are asked to execute a Supplemental Indenture, would you have discussions with the issuer with respect to whether consent of the holders is required?

A.   If, after we reviewed with counsel and a determination has been made that we -- we did have to, then we would go back and -- and notify. We would discuss it with the issuer that a transaction would require bond holders consent.

Q.   Would you seek an opinion from the issuer's counsel with respect to whether consent of the holders is required?

A.   Again, that's a legal requirement. I can't say specifically if that's a document I would need.

Page 75

Q.   When you were executing the Third Supplemental Indenture, and therefore, having NorthWestern be the sole obligor on the QUIPS, if you knew at the time you were executing the Third Supplemental Indenture, that NorthWestern's financial statements were fraudulent and grossly overstated its revenues, would you have signed this Supplemental Indenture?

MR. BIALO:  Okay. All right, hold it. Yeah.

MS. DELANEY:  Objection.

MR. BIALO:  Let them make their objection. I object to the form of the question. I think the witness has already said that she addressed in an earlier question that you asked, whether there was a release of any other obligors in the Third Supplemental Indenture. And I'm pretty clear that she said she didn't find any language doing that, that what she found was an assumption by the parent corporation, but not a release of the subsidiary corporation, and that was

Page 76

included as a premise in your question, which I don't think is fair to the witness.

Q.   Just for the record -- and other parties can correct me if I'm wrong -- in connection with this litigation, there is a motion to dismiss in which the bankruptcy judge found that there was a release of the subsidiary. Now, there may be ways to challenge that release, but the bankruptcy court did find there was a release, and that's the predicate.

MS. KRAFT:  I'm going to object to the characterization of what the court did or did not do.

BY MR. KAPLAN:

Q.   Assuming the Third Supplemental Indenture effectuated a release of the initial obligor such that the only obligor was going to be NorthWestern Corporation, if we use that as the base assumption, if you knew at the time that NorthWestern's publicly-issued financial statements were false and misleading, that NorthWestern had grossly overstated its



Page 77

revenues, would you nevertheless have executed
the Third Supplemental Indenture.

MS. KRAFT: Objection.

MS. DELANEY: Objection.

A. Again, we talked about this on the
financials, that the role of the trustee -- we
do not review financials. We just -- we just
confirm receipt of them.

I would not have any knowledge of --
of misstated financials, of a potential event
of default unless I had actually gotten
something from either the company or a
bondholder stating that fact to me.

Again, if I had something like that
in writing, addressed to me, it would have gone
up the chain-- up through the bank's process,
talking about it with my manager, with counsel,
and whatever action was determined, based on
those meetings and conversations, is the action
we would have chosen.

Q. Again, I am speaking hypothetically
here. Hypothetically, if you are asked to
execute a Supplemental Indenture such as --
similar to the Third Supplemental Indenture,

Page 78

and the party that's assuming the obligations
has just announced publicly that parties cannot
rely on its prior financial statements because
they overstated its revenues significantly,
would you take -- in that circumstance, would
you take the request for execution of the
Supplemental Indenture up to management and ask
them?

A. And again --

MS. KRAFT: Objection.

A. -- again hypothetically, I do not
have any knowledge, again until I get something
in writing from a bondholder or from the issuer
itself, and again, that's addressed to
management -- that is addressed with
management. That's addressed with counsel, and
I can't say one way or the other how we would
proceed, based on the outcome of those
conversations.

Q. Would one of the potential outcomes
be to seek to consent of the holders?

A. I -- I can't say that definitively.
Again, it's based on the discussions with
management and counsel and how -- how they --

Page 79

how we would want to proceed. I can't -- I'm
making a guess if I say "Yes" or "No" to that,
and that -- I can't do that.

MR. KAPLAN: Can we take five
minutes now?

(Discussion off the record.)

MR. KAPLAN: I'm going to mark as
Plaintiff's Exhibit 9, a lengthy document
that is Bates Stamped NOR009840 through
NOR009935. And it's a letter on Paul
Hasting's stationery dated September 26,
2002.

(Plaintiff's Exhibit 9, Letter from
Paul Hastings, dated September 26, 2002,
Bates Numbers NOR009840 to NOR009935,
marked for identification.)

A. (Perusing.) You want me to read
the --

Q. I just want you to look at the
letter. I'm not going to go through all the
exhibits.

MR. BIALO: Well, before we do that,
let me make sure I don't have an objection
for the record. Yeah, I do.

Page 80

May I state for the record, please,
that it's not clear that everything that
is under this gigantic staple, and is, as
you say, numbered NOR9840 to NOR9935 is,
in fact, one document.

It does seem to me that there are a
-- many documents -- many, many documents
that have been collected under this
staple, and are found within this document
range.

For the record, it appears like the
first couple of pages are a cover letter,
and attached to the cover letter may have
been -- I have no idea -- some things, but
it's clear that other things that are
within this exhibit as currently marked,
and I believe starting at NOR9865 to end
are, in fact, bunches of different
documents, some of which are signed, some
of which are not signed.

So I think the record needs to be
clear on what it is that you would like
the witness to address because it doesn't
seem to me like Exhibit 9 is, indeed, only



*EXHIBIT C*

1 of 1 DOCUMENT

[*1]  **Magten Asset Management Corporation, Plaintiff, against The Bank of New York, Defendant.**

**600410/06**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

**2007 NY Slip Op 50951U; 2007 N.Y. Misc. LEXIS 3320**

**May 8, 2007, Decided**

**NOTICE:** [**1] THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING THE RELEASE OF THE FINAL PUBLISHED VERSION.

THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**COUNSEL:** For Plaintiff: Storch Amini & Munves P.C., New York, New York, (Bijan Amini).

For Defendant: Emmet, Marvin & Martin, LLP, New York, New York, (Kenneth M. Bialo).

**JUDGES:** Bernard J. Fried, J.

**OPINION BY:** Bernard J. Fried

**OPINION:** Bernard J. Fried, J.

This case involves the duty that an indenture trustee bears toward the securities' holders. Some five months after plaintiff Magten Asset Management (Magten) purchased securities for $ 32 million, the issuer filed for bankruptcy and Magten lost most of the value of its investment. Allegedly, before the issuer filed for bankruptcy, it engaged in an event of default, as defined in the indenture. Magten claims that, upon the default, the indenture trustee, defendant Bank of New York (BNY) should have taken steps to protect the holders' interests. BNY did not do so. Magten alleges that BNY had a conflict of interest that caused it to neglect its duty to the securities' holders in favor of its own interests.

Magten seeks to recover the face [**2] amount of its securities. BNY moves to dismiss, pursuant to CPLR 3211 (a) (1) and (7), primarily on the ground that no event of default occurred. The background to this case involves non-parties, such as Montana Power Company (Montana), a provider of electricity and natural gas. In 1996, Montana issued Quarterly Income Preferred Securities (QUIPS), bearing 8.45% interest, and sold them in the public market. [*2] Montana used $ 65 million raised from selling the QUIPS to purchase bonds with a maturity date of 2036.

Pursuant to the Indenture between Montana and BNY (referred to hereinafter as the Indenture), BNY became Indenture trustee, charged with certain responsibilities toward the holders of the QUIPS. Montana deposited interest payments on the bonds into the trust, and the trustee distributed the payments to the QUIPS holders.

The Indenture provides that it is governed by the Trust Indenture Act, 15 USC 77aaa, et seq., and that the trustee is subject to all the duties and responsibilities in the Act (Ex. 2, Indenture, P P 107, 901). (Exhibits are attached to BNY's motion.) As described in the Indenture, the QUIPS were junior (Ex. 2, P P 101, 1501, [**3] 1502, 1512), unsecured (id., at title page, P 1502), subordinate to all senior debt (id., P P 301, 1501, 1504, 1506, 1509), and subject to the deferral of interest payments (id., P 312). The Indenture gave the QUIPS holders no voice in the event of a sale or merger by the issuer (id., P P 1101, 1201), and imposed no limit on the amount of senior debt that the issuer could take on (id., P P 101, 1501, 1509). The terms of the QUIPS were disclosed in the offering Prospectus, including the section entitled "Risk Factors" (Ex. 5, at ii, iii, 3-5, 17, 19, 21-23, 31).

  

2007 NY Slip Op 50951U, *2; 2007 N.Y. Misc. LEXIS 3320, **3

Non-party NorthWestern Corporation, another utility company, purchased almost all of Montana's electric, natural gas, and propane utility assets, structuring the sale in this manner. Montana transferred the utility assets to a newly created subsidiary. Montana executed a supplemental indenture with BNY, whereby Montana's subsidiary took on Montana's obligations under the original Indenture. Then NorthWestern purchased Montana's subsidiary in a transaction finalized on February 15, 2002.

Montana's subsidiary was renamed Northwestern Energy, LLC. All of the utility assets in NorthWestern Energy were transferred [**4] to NorthWestern. NorthWestern, Northwestern Energy, and BNY executed a second supplemental indenture, whereby NorthWestern assumed Northwestern Energy's QUIPS obligations under the original Indenture, and NorthWestern Energy was released from all obligations toward the QUIPS holders. NorthWestern assumed Northwestern Energy's liabilities, and did not pay any cash for the assets that it acquired from Northwestern Energy. Magten claims that the assets that NorthWestern acquired from Northwestern Energy were worth more than $ 1 billion, while the liabilities acquired were worth $ 700 million.

The Indenture lists several events of default that the securities obligor may commit, such as filing for bankruptcy or making an "admission . . . in writing of its inability to pay its debts generally as they become due" (Ex. 2, P 801 [e]). Once an event of default occurs, the trustee "may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities . . . by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights . . ." (id., P 803). Magten alleges that NorthWestern's 10-K and 8-K forms, [**5] dated April 16, 2003, contain an admission that NorthWestern was unable to pay its debts as they came due.

Magten asserts that once NorthWestern made the purported admission, BNY should have started judicial proceedings to put aside the transfer of the utility assets from NorthWestern Energy to NorthWestern or to impose a constructive trust on those assets. Either action would have preserved the assets for the QUIPS holders. [*3]

On May 1, 2003, after the alleged default, Magten purchased 1,078,431 QUIPS from another purchaser. On September 14, 2003, NorthWestern filed a petition for

relief under Chapter 11 of the Bankruptcy Code (11 USC § 101, et seq.) in the United States District Court for the District of Delaware. On September 23, 2003, BNY resigned as Indenture Trustee. Apparently, it was the successor trustee who filed the QUIPS holders' claims in the bankruptcy action. The final bankruptcy plan subordinated the QUIPS holders to NorthWestern's senior creditors, offering the QUIPS holders 14% of the face value of the securities in return for relinquishing all rights against NorthWestern and BNY.

Magten asserts that the transfer of NorthWestern [**6] Energy's assets and liabilities to NorthWestern was unfair to the QUIPS holders. NorthWestern Energy lost all of its utility assets, while NorthWestern acquired more in assets than in liabilities. Allegedly, NorthWestern never had the ability to meet the QUIPS obligations, even after it obtained the utility assets. But NorthWestern Energy could have met those obligations, if it had retained the utility assets. Even if NorthWestern Energy defaulted on its QUIPS obligations, the QUIPS holders could have looked to the assets for satisfaction, as long as the assets remained with NorthWestern Energy.

In NorthWestern's bankruptcy, Magten contended that the release of NorthWestern Energy (now named Clark Fork and Blackfoot, LLC) from the Indenture was fraudulently obtained. On the basis that Magten had sufficiently alleged a claim upon which relief could be granted, because a release obtained by fraud is unenforceable, the bankruptcy court denied NorthWestern's motion to dismiss Magten's complaint (In re NorthWestern Corp., 313 BR 595, 602-603 [Bankr D Del 2004]). It seems that this case is awaiting trial.

Regarding BNY's conflict of interest, Magten alleges that when [**7] Montana had the utility assets, BNY and others became Montana's secured creditors, with their interests secured by the assets. After NorthWestern acquired the assets, BNY was instrumental in causing NorthWestern to use the utility assets to secure the interests of yet other parties, for whom BNY was trustee. Allegedly, after the event of default, BNY did not act to preserve the assets for the QUIPS holders, because of BNY's own interest in those assets. Magten further alleges that the bankruptcy did not impair BNY's interests or the interests of the other secured parties for whom the utility assets were collateral. But the bankruptcy filing took the assets out of the QUIPS holders' reach, which would not have happened if BNY had secured the assets

  

2007 NY Slip Op 50951U, *3; 2007 N.Y. Misc. LEXIS 3320, **7

after the purported default.

The first cause of action asserts that BNY breached the Indenture, to which the QUIPS holders were third-party beneficiaries. The second asserts that BNY breached its fiduciary duty to the holders. The third asserts that BNY behaved negligently. The causes of action relate to BNY's failure to act after NorthWestern's alleged admission and event of default. No causes of action are founded on BNY's alleged [**8] conflict of interest by itself.

BNY puts forth three reasons to dismiss the complaint. One, no event of default took place, given that NorthWestern did not admit that it could not pay its debts. Two, the QUIPS holders, as unsecured creditors, had no claim on the assets of Montana, NorthWestern, or Northwestern Energy. Therefore, BNY, as the holders' trustee, had no standing to put aside the transfer of the assets or have them placed in a constructive trust. Three, the cause of action for negligence impermissibly duplicates the cause of action for breach of contract. [*4]

Magten claims that the financial forms clearly contain NorthWestern's admission in writing of its inability to pay its debts generally as they become due. Magten also claims that BNY should have investigated to see if NorthWestern made the admission, if it was able to pay its debts, or if it was actually paying its debts.

On a CPLR 3211 motion to dismiss a complaint, the court takes the allegations of the complaint as true and affords the plaintiff the benefit of every possible inference (*Goshen v Mutual Life Ins. Co. of NY*, 98 N.Y.2d 314, 326 [2002]; *Leon v Martinez*, 84 N.Y.2d 83, 87-88 [**9] [1994]). Under CPLR 3211 (a) (7), if the "four corners" of the complaint "manifest any cause of action cognizable at law a motion for dismissal will fail" (*Guggenheimer v Ginzburg*, 43 N.Y.2d 268, 275 [1977]). By contrast, under CPLR 3211 (a) (1), where documentary evidence is submitted that contradicts, negates, or disposes of the claims in the complaint, the truth of the complaint is not assumed and dismissal may eventuate (*Water St. Leasehold LLC v Deloitte & Touche LLP*, 19 A.D.3d 183, 185 [1st Dept 2005]; *Biondi v Beekman Hill House Apt. Corp.*, 257 A.D.2d 76, 81 [1st Dept 1999], *affd* 94 N.Y.2d 659 [2000]; *Kliebert v McKoan*, 228 A.D.2d 232, 232 [1st Dept 1996]).

The initial question is whether NorthWestern's 10-K and 8-K forms for the year 2002, which were filed with the Securities and Exchange Commission (SEC) and mailed to BNY, are an "admission . . . in writing of [NorthWestern's] inability to pay its debts generally as they become due," and thus an event of default (Ex. 2, Indenture, P 801 [e]). The financial forms, which are dated April 16, 2003, show that NorthWestern was [**10] having financial difficulties, and discuss plans for reinvigoration. According to Magten, the main part of the admission is as follows:

> based on current plans and business conditions, the Company expects that its cash flows from operations, cash and cash equivalents will be sufficient to meet its cash requirements for the next 12 months. The Company believes that it may need additional funding sources or proceeds from the sale of noncore assets by the end of 2004 or early 2005. In 2005, the Company faces substantial debt maturities

(Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6).

(Noncore assets are assets not associated with utilities.)

In consideration of NorthWestern's significant debt, the progress of its "turnaround plan," and its liquidity needs, the board will review the appropriateness of paying interest on the QUIPS (Ex. 6, 8-K, at 4). If NorthWestern decides to defer interest payments for up to 20 consecutive quarters, which it has the right to do under the Indenture, cash distributions on the QUIPS will also be deferred (Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6). The reports go on to state:

> Absent the receipt of significant proceeds from the sale of noncore assets, [**11] the raising of additional capital or a restructuring of existing debt, the Company will not be able to meet its substantial debt maturities. The Company is currently working with outside advisors to identify alternatives to restructure its long-term debt

(Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6, 40, 62). [*5]

NorthWestern states that "even if we are successful in selling some or all of our non-core assets, we will have

  

2007 NY Slip Op 50951U, *5; 2007 N.Y. Misc. LEXIS 3320, **11

Page 4

to restructure our debt or seek new capital" (Ex. 7, 10-K, at 6). The financial reports announced $ 875 million worth of impairments and charges based on NorthWestern's noncore assets, the assets that NorthWestern planned to sell to raise capital (Ex. 6, 8-K, at 1; Ex. 7, 10-K, at 5, 41). According to Magten, the impairment signified that NorthWestern would not be able to raise any money by selling the noncore assets and thus would not be able to implement its turnaround plan. The fact that the noncore assets were impaired to the tune of $ 875 million means that they had no value for any potential purchasers.

Magten alleges that NorthWestern's bankruptcy, following soon after the date of the financial reports, is evidence of its inability to pay its debts [**12] at the time that the reports issued. Magten emphasizes the statement that NorthWestern could meet its debts for the next 12 months, arguing that it is an admission that NorthWestern could not meet its debts after that period, and that the inability to meet debts must be decided on a prospective basis.

In *Sequa Corp. v Gelmin* (1996 WL 745448, *54, 1996 U.S. Dist LEXIS 19802, *149-150 [SD NY, December 31, 1996], *affd in part, vacated and revd in part* 156 F.3d 136 [2d Cir 1998]), a party put down in writing that "it has no prospect of being able to pay the Demand Indebtedness or pay or cure any defaults in respect of the Obligations resulting from such inability to pay in the foreseeable future . . . ." n1 No such definite admission of inability to pay debts is found in the writings here. Case law regarding what kind of language constitutes an admission of the kind described in the Indenture is scant. BNY cites cases, some of which are discussed below, in which the courts determined whether a party had made the admission. However, none of the cases involves an indenture trustee's obligations.

n1 Internal citations are omitted for all case citations.

[**13]

In *Reimann v Saturday Evening Post Co.* (464 F. Supp. 214 [SD NY 1979]), the seller of a business claimed that a note was in default because the buyer had made the relevant admission. The annual report said that the buyer was "technically insolvent" (*id.* at 221). At trial, the court held that this technical insolvency was insolvency in a mathematical or accounting sense, and that it could not be equated with an inability to pay debts as they became due. The court determined that the buyer was in fact paying its debts as they became due (*id.*). Regarding a statement that interest on the debenture "will not be paid," the court held that this concerned a decision not to pay interest regardless of ability to pay, which was not the same as being unable to pay (*id.*).

In *Atel Fin. Corp. v Quaker Coal Co.* (132 F. Supp. 2d 1233, 1238 [ND CA 2001], *affd* 321 F.3d 924 [9th Cir 2003]), the question of the admission arose in the parties' post-trial briefings. In a letter, the lessee described itself thusly: "experiencing poor liquidity"; "recent poor financial performance"; "the freezing of our revolving line of credit"; [**14] and "continued liquidity issues for the next 90-120 days" (*id.* at 1238). The lessee also admitted to recent losses of $ 4 million, and requested a moratorium on all payments to the lessor. The court disagreed with the lessor's contention that the lessee had made the admission. While the letter showed that the lessee was in a state of financial difficulty, if not distress, the statements of financial difficulty did not necessarily equate with an admission of inability to pay debts as they became due, although the lessee did experience a "subsequent and actual failure to pay" (*id.*). [*6]

*U.S. Bank Natl. Assn. v U.S. Timberlands Klamath Falls, L.L.C.* (2004 WL 1699057, *3 n 22, 2004 Del Ch LEXIS 106, *13 n 22 [Del Ch, July 29, 2004]), involved a motion to dismiss for lack of standing. A party's 10-Q stated that it had to "monetize sufficient assets to be in a position to make the interest payment" (*id.*). The court found that this was not an admission that the party could not pay its debts as they came due. The court also noted that the party did, in fact, make the required payments.

BNY claims that these cases show that courts [**15] do not readily construe a party's statements to constitute the admission, even when the statements concern financial difficulty, insolvency, and the probability of not paying debts. Magten claims that the cases demonstrate that the determination whether a party made the admission must be part and parcel of an overall assessment of the party's financial condition. Therefore, whether NorthWestern's financial reports contain the admission must be decided at trial. Magten also argues that the above cases establish that the determination may





2007 NY Slip Op 50951U, *6; 2007 N.Y. Misc. LEXIS 3320, **15

properly take into account whether a party was actually paying or able to pay its debts as they came due.

In interpreting a document, the court first decides whether it is clear or ambiguous (*see W.W.W. Assoc., Inc. v Giancontieri*, 77 N.Y.2d 157, 162 [1990]). If the document is determined to be clear and complete, the court will enforce it as written (*Vermont Teddy Bear Co., Inc. v 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 [2004]), according to its "plain meaning" (*150 Broadway NY Assoc., L.P. v Bodner*, 14 A.D.3d 1, 6 [1st Dept 2004]). The court will not look to "extrinsic evidence to create ambiguities [**16] not present on the face of the document" (*id.*). The Indenture and the financial forms in this case are clear enough. The Indenture requires an admission. It does not require that the trustee examine whether the obligor was actually paying its debts or able to do so. The plain meaning of the financial reports is that NorthWestern is undergoing serious financial difficulties and that it may not be able to pay its debts after 12 months. The plain meaning is not that NorthWestern cannot pay its debts as they come due.

In the cases cited above, deciding whether the party had made the admission was a side part of an extensive investigation into the party's financial health. The admission by itself was not the reason for the trial. Even if that were the case, however, that would not mean that such an inquiry was needed here. BNY was expected to perform significant acts in response to an event of default by NorthWestern. Language that is meant to stir action must be clear and unequivocal. NorthWestern's financial reports did not clearly inform BNY that it was time to take action.

Magten's contention that BNY was obligated to investigate NorthWestern's financial condition requires an [**17] inquiry into the duties of an indenture trustee. The Indenture provides that the trustee is not bound to investigate any facts or matters stated in any instrument, opinion, or report, but the trustee "in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit . . ." (Ex. 2, Indenture, P 903 [f]).

The role of an indenture trustee differs from that of an ordinary trustee in that an indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts (*LNC Investments, Inc. v First Fid. Bank, Natl.*

*Assn.*, 935 F. Supp. 1333, 1347 [SD NY 1996]). An ordinary trustee is subject to duties beyond those in the trust agreement, such as the duty of undivided loyalty (*Meckel v Continental Resources Co.*, 758 F.2d 811, 816 [2d Cir 1985]). But "an indenture trustee is more like a stakeholder whose duties and obligations are exclusively [*7] defined by the terms of the indenture agreement" (*id.*). Given the relationship that the indenture trustee has with both the securities issuers [**18] and holders, courts "have consistently rejected the imposition of additional duties on the trustee" (*Elliott Assoc. v J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 [2d Cir 1988]).

The law distinguishes between an indenture trustee's pre-default and post-default duties. Before default, the indenture trustee is liable only for the obligations set out in the indenture (15 USC 77ooo [a] [1]). The trustee is not obligated to affirmatively advance the debenture holders' interest in the period before default (*Elliott Assoc.*, 838 F.2d at 73). An indenture trustee's post-default duty toward the investors is significantly higher than its pre-default duty. In case of a default, the trustee "shall . . . use the same degree of care and skill . . . as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" (15 USC 77ooo [c]). After a default, the trustee is under an enforceable obligation to act prudently to preserve the trust assets for the benefit of the investors (*Beck v Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 12 [1st Dept 1995]; [**19] *see also LNC Investments, Inc.*, 935 F. Supp. at 1348).

Whether BNY had a duty to investigate NorthWestern's financial condition is governed by the standards applied to an indenture trustee's pre-default duty. Neither the law regarding an indenture trustee's duties, nor the Indenture, supports Magten's contention that BNY was duty bound to examine NorthWestern's financial condition in order to decide whether NorthWestern had made the admission or was actually able to pay its debts. The difficulty of such a determination is demonstrated by involuntary bankruptcy cases, where the courts must determine if a debtor "is generally not paying such debtor's debts as such debts become due" (11 USC 303 [h] [1]). Bankruptcy courts have found that there is no precise definition of the term "generally not paying" (*Matter of LeSher Intl., Ltd.*, 32 BR 1, 2 [Bankr SD NY 1982]; *see also In re Brooklyn Resource Recovery*, 216 BR 470, 481-482 [Bankr ED NY

 LexisNexis     LexisNexis     LexisNexis

Page 6

2007 NY Slip Op 50951U, *7; 2007 N.Y. Misc. LEXIS 3320, **19

1997]; *In re Einhorn Vacation Planning Ctr.*, 59 BR 179, 185 [Bankr ED NY 1986]). Furthermore, in order to determine whether the debtor is not paying its [**20] debts as they come due, the court examines the number and amount of claims against the debtor, the materiality of any nonpayments in the context of the debtor's overall financial picture, and its conduct of its financial affairs (*In re Brooklyn Resource Recovery*, 216 BR at 481; see also *In re B.D. Intl. Discount Corp.*, 701 F.2d 1071, 1075 [2d Cir 1983]; *In re Amanat*, 321 BR 30, 39 [Bankr SD NY 2005], citing *In re Paper I Partners, L.P.*, 283 BR 661, 677 [Bankr SD NY 2002]; *In re Century/ML Cable Venture*, 294 BR 9, 31 [Bankr SD NY 2003]). BNY's duty did not extend to undertaking a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default.

Lastly, a trustee's discharge of its duties is assessed according to the facts as they existed at the time, and not according to subsequent events (*LNC Investments Inc. v First Fid. Bank*, 1997 WL 528283, *17, 1997 U.S. Dist LEXIS 12858, *51-52 [SD NY 1997]). The fact that NorthWestern went bankrupt after the alleged admission does not mean that BNY should have predicted [**21] the bankruptcy.

As NorthWestern did not engage in the event of default, BNY did not err by failing to respond. The court does not need to inquire into the merits of BNY's other arguments. The motion to dismiss the complaint is granted.

To conclude, it is [*8]

ORDERED that defendant's motion to dismiss the complaint is granted and the complaint is dismissed; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

No costs.

  

*EXHIBIT D*

**Fried, Frank, Harris, Shriver & Jacobson LLP**

One New York Plaza
New York, New York 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com



Direct Line: 212.859.8004
Fax: 212.859.8583
steinbo@ffhsj.com

December 5, 2006

**VIA ELECTRONIC MAIL**

Joseph Pizzuro, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178

      Re:     ***Magten Asset Management Corp. and Law Debenture Trust
Co. v. Northwestern Corp.; C.A. No. 04-1494-JJF***

Dear Joe:

      I am writing to follow up on our discussions regarding deposition scheduling. In addition to the individual named defendants, we currently anticipate taking the depositions of the following persons formerly employed by NorthWestern:

Gary Drook
Richard Hylland
Eric Jacobsen
Merle Lewis
Daniel Newell
Kipp Orme

In addition, we may wish to depose some of the following:

William Austin
Patrick Corcoran
Jack Haffney
Kendell Kliewer
Michael Nieman
Ellen Senechal
Maurice Worsfold

New York • Washington DC • London • Paris • Frankfurt
Fried Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

December 5, 2006
Page 2

It is our understanding that most of these individuals are no longer employed by NorthWestern. Given what we consider to have been the unwarranted delays in arranging for document production, we intend to begin serving deposition subpoenas on these individuals in the near term. However, if your firm will be representing them and is authorized to receive service on their behalf, or you wish to refer us to separate counsel authorized to receive service on behalf of a particular individual, we will be happy to proceed on that basis. Please let us know promptly of any witnesses who wish to pursue this course, so that unnecessary inconvenience can be avoided. For those individuals listed above who are current employees or whom you will otherwise be representing, please let us know their availability for dates beginning in January. Please also let us know whether your firm or the Browning, Kaleczyc firm should be our primary contact for scheduling Mr. Hanson's deposition, which, as we have already told you, we would like to set for January.

Finally, as I mentioned in my letter of yesterday, please advise us of the identity of all those individuals who have received Wells notices, which will assist us in finalizing our list.

We look forward to hearing from you.

Sincerely,

Bonnie Steingart

cc:     Gary L. Kaplan, Esquire
        John W. Brewer, Esquire
        Dale R. Dubé, Esquire
        Bijan Amini, Esquire
        Steven J. Reisman, Esquire
        Jesse H. Austin, III, Esquire
        Victoria W. Counihan, Esquire
        Nancy E. Delaney, Esquire
        Karol K. Denniston, Esquire
        Dennis E. Glazer, Esquire
        Miriam K. Harwood, Esquire
        David A. Jenkins, Esquire
        Paul Spagnoletti, Esquire

Fried, Frank, Harris, Shriver & Jacobson LLP

December 5, 2006
Page 3

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
Denise Seastone Kraft, Esquire
Adam G. Landis, Esquire
Dennis A. Meloro, Esquire
Curtis S. Miller, Esquire
Kathleen M. Miller, Esquire
John V. Snellings, Esquire

*EXHIBIT E*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

ATTORNEYS AND COUNSELLORS AT LAW
101 PARK AVENUE
NEW YORK, NEW YORK 10178-0061

FRANKFURT    MUSCAT
HOUSTON    PARIS
LONDON    STAMFORD
MEXICO CITY    WASHINGTON, D.C.
MILAN

TELEPHONE 212-696-6000
FACSIMILE 212-697-1559
E-MAIL INFO@CM-P.COM
INTERNET WWW.CM-P.COM

WRITER'S DIRECT:
TEL.: 212-696-6196

December 13, 2006

Bonnie Steingart, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980

> Re: *Magten Asset Management Corp. and Law*
> *Debenture Trust Co. v. NorthWestern Corp.*;
> <u>C.A. No. 04-1494-JJF</u>

Dear Bonnie:

    Pursuant to your request, we have been advised that the following former employees of NorthWestern are represented as follows:

| 1. Gary Drook | 2. Gary Hylland | 3. Eric Jacobsen |
|---|---|---|
| Paul H. Dawes, Esq.<br>Latham & Watkins LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br>Phone: (650) 463-2626<br>Fax: (650) 463-2600<br>E-mail: paul.dawes@lw.com | David P. Pearson, Esq.<br>Winthrop & Weinstine, P.A.<br>225 South Sixth Street<br>Suite 3500<br>Minneapolis, Minnesota<br>55402<br>Phone: (612) 604-6692<br>Fax: (612) 604-6800<br>E-mail:<br>DPearson@winthrop.com | Joseph K. Brenner<br>Wilmer Cutler Pickering Hale<br>and Dorr LLP<br>1875 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>202.663.6120<br>202.663.6363 (fax)<br>joseph.brenner@wilmerhale.com |

3312160v1

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
ATTORNEYS AND COUNSELLORS AT LAW

Page 2

Bonnie Steingart, Esq.
December 14, 2006

4. Merle Lewis

Michael G. Taylor, Esq.
Leonard Street and Deinard
150 South Fifth Street
Suite 2300
Minneapolis, MN 55402
Phone: (612) 335-1589
Fax: (612) 335-1657
E-mail:
michael.taylor@leonard.com

5. Daniel Newell

Michael G. Taylor, Esq.
Leonard Street and Deinard
150 South Fifth Street
Suite 2300
Minneapolis, MN 55402
Phone: (612) 335-1589
Fax: (612) 335-1657
E-mail:
michael.taylor@leonard.com

6. Kipp Orme

Sheldon T. Zenner, Esq.
Katten Muchin Rosenman LLP
525 West Monroe Street
Suite 1600
Chicago, Illinois
60661-3693
Phone: (312) 902-5476
Fax: (312) 577-8995
E-mail:
sheldon.zenner@kattenlaw.com

We have not inquired as to whether the above counsel are authorized to accept service of process.

Yours truly,

Joseph D. Pizzurro

cc: Gary L. Kaplan, Esq.
    John W. Brewer, Esq.
    Bijan Amini, Esq.
    Jesse H. Austin, III, Esq.
    Victoria W. Counihan, Esq.
    Dennis E. Glazer, Esq.
    David A. Jenkins, Esq.
    Paul Spagnoletti, Esq.
    Denise Seastone Kraft, Esq.
    Adam G. Landis, Esq.
    Dennis A. Meloro, Esq.
    Curtis S. Miller, Esq.
    Kathleen M. Miller, Esq.
    John V. Snellings, Esq.
    Dale R. Dubé, Esq.
    Stanley T. Kaleczyc, Esq.
    Kimberly A. Beatty, Esq.

3312160v1

*EXHIBIT F*

AO 88 (Rev. 7/00) Subpoena in a Civil Case

### Issued by the

# United States District Court

DISTRICT OF    __MINNESOTA__

MAGTEN ASSET MANAGEMENT
CORPORATION,

           Plaintiff,

v.

PAUL HASTINGS JANOFSKY
& WALKER LLP

           Defendant.

**SUBPOENA IN A CIVIL CASE - *DUCES TECUM***

Case Number:   04-1256 (JJF)
(Case pending in the United States
District Court for the District of Delaware)

**TO:**    DELOITTE & TOUCHE LLP
       120 SOUTH 6TH STREET
       SUITE 400
       MINNEAPOLIS, MN 55402

☐ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.*

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Metro Legal Services, Inc.<br>330 2nd Avenue South, Suite 150<br>Minneapolis, MN 55401-2217 | FEBRUARY 13, 2006 AT 10:00 A.M.* |

■ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):**All documents identified on the attached Exhibit A**
***Attendance at the deposition will be waived if the deponent produces the requested documents before February 13, 2006.***

| PLACE | DATE AND TIME |
|---|---|
| Metro Legal Services, Inc.<br>330 2nd Avenue South, Suite 150<br>Minneapolis, MN 55401-2217 | FEBRUARY 13, 2006 AT 10:00 A.M.* |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| /s/ David A. Jenkins (ID No. 932)<br>Attorney for Defendant | January 27, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Smith, Katzenstein & Furlow LLP, 800 Delaware Avenue, P.O. Box 410, Wilmington, DE 19899
(302) 652-8400

cc: Magten Litigation Service List

(See Rule 45, Federal Rules of Civil Procedure, Parts C&D on next page)

## PROOF OF SERVICE

| SERVED | DATE | | PLACE |
|---|---|---|---|

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
　　　　　　　　DATE

_____
SIGNATURE OF SERVER

_____

_____
ADDRESS OF SERVER

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

**(c) Protection of Persons Subject to Subpoenas.**

(1)　　A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)　fails to allow reasonable time for compliance,

(ii)　requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place with the state in which the trial is held, or

(iii)　requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)　subjects a person to undue burden.

(B) If a subpoena

(i)　requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)　requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)　requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) Duties in Responding to Subpoena.**

(1)　A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)　When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

10010652.WPD

# EXHIBIT A

## DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below:

1.    "All" means "any and all," and "any" means "any and all."

2.    "Arthur Andersen" means Arthur Andersen LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

3.    "Board of Directors" shall mean all current and former members of the board of directors of NorthWestern Corporation, its affiliates, subsidiaries and predecessors or sucessors in interest.

4.    "Clark Fork" means Clark Fork and Blackfoot, LLC, formerly known as, among other things, NorthWestern Energy, LLC and Montana Power, LLC, and any of its affiliates, subsidiaries, predecessors and any person or entity acting or purporting to act on behalf of, at the direction of or in concert with it, including but not limited to Clark Fork's present and former officers, directors, employees, servants, agents, representatives and attorneys.

5.    "CSFB" shall mean Credit Suisse First Boston its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

6.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any medium -- oral, written or otherwise.

7.    "Concerning" includes referring to, relating to, embodying, in connection with, commenting on, responding to, showing, demonstrating, declaring, describing, analyzing, reflecting, containing or constituting.

8.    "Deloitte & Touche" means Deloitte and Touche LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

9.    "Document" is used herein in the broadest sense and includes, but is not limited to, all originals, whether printed or handwritten, non-identical copies, copies with marginal notations or interlineations of any writing, recording, photograph, computer data, film, e-mail, video or audio tape (including transcripts or memoranda reflecting or referring to the contents thereof), any written, typewritten or other tangible form of recording or preserving communication or thought (including computerized records of any kind), including any non-identical copy thereof, or any other items containing information of any kind or nature, however produced or reproduced, whatever its origin or location and regardless of the form in which such information exists or is maintained.

10.    "Expanets Investment" means all equity investments made in or loans extended to Expanets, Inc. by NorthWestern.

11.    "Guarantee Agreement" shall mean that certain Guarantee Agreement dated as of November 1, 1996, by and between The Montana Power Company as guarantor and The Bank of New York as guarantee trustee and any and all amendments, supplements, revisions and addendums thereto.

12.    "Junior Debentures" means the Junior Subordinated Interest Debentures which The Montana Power Company issued pursuant to its Indenture (For Unsecured Subordinated Debt Securities relating to Trust Securities) dated November 1, 1996.

13.    The "McGreevey Class Action" shall mean all litigation relating to the action styled <u>McGreevey, et al. v. The Montana Power Company, et al.</u> filed in the United States District Court for the District of Montana.

14.    "Montana Medium-Term Notes Indenture" shall mean that certain Indenture for Unsecured Debt Securities dated December 1, 1989 by and between The Montana Power Company and Citibank, N.A., as trustee and any and all amendments, supplements, revisions and addendums thereto.

15.    "Montana Trustee" shall mean Citibank, N.A. as trustee under the Montana Medium-Term Notes Indenture and any and all predecessors and/or successors in interest thereto.

16.    "NorthWestern" means NorthWestern Corporation, its affiliates and any parent, subsidiaries, predecessors and successors, and any person or entity acting or purporting to act on behalf of, at the direction of, or in concert with it, including but not limited to NorthWestern's present and former officers, directors, employees, servants, agents, representatives and attorneys; provided, however, that NorthWestern shall not be construed to include Clark Fork, which has been separately defined herein.

17.    "Northwestern's 2003 Credit Facility" means that senior secured credit facility by and between Northwestern and Credit Suisse First Boston, among others, dated February 10, 2003, including all drafts amendments, supplements, addendums and revisions thereto.

18.    "Paul Hastings" means Paul Hastings Janofsky & Walker LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

19.    "Person" includes any natural person, group, investigatory body, governmental unit, governmental agency or department, corporation, association, partnership, limited

partnership, joint venture, sole proprietorship, business, business entity, organization, or institution.

20.     "QUIPS" means the Series A 8.45% Quarterly Income Preferred Securities issued by Montana Capital Power Trust I pursuant to the Trust Agreement between The Montana Power Company, The Bank of New York, and various other persons dated on or about November 1, 1996.

21.     "QUIPS Indenture" shall mean that certain indenture for Unsecured Subordinated Debt Securities relating to Trust Securities dated November 1, 1996 by and between The Montana Power Company and The Bank of New York, as trustee, and all drafts, amendments, supplements, addendums and revisions thereto including, but not limited to the Second Supplemental Indenture and the Third Supplemental Indenture and the notes that were issued pursuant to such documents.

22.     "QUIPS Trustees" shall mean The Bank of New York as trustee under the QUIPS Indenture, The Bank of New York as property trustee under the Trust Agreement, The Bank of New York as guarantee trustee under the Guarantee Agreement and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell as administrative trustees under the Trust Agreement, together with any and all predecessors and/or successors in interest thereto.

23.     "Relating to" means, without limitation, consisting of, containing, constituting, concerning, discussing, describing, reflecting, transmitted in connection with, touching upon or summarizing, showing or relating or referring to in any way, directly or indirectly, and is meant to include, among other documents, documents underlying, supporting, now or previously attached or appended to, or used in the preparation of, any document called for by each request.

24. "Second Supplemental Indenture" shall mean that certain indenture dated August 13, 2002 by and between NorthWestern Energy, LLC as successor by merger to The Montana Power Company, NorthWestern, and The Bank of New York, as trustee and all drafts, amendments, supplements, addendums and revisions thereto.

25. "Third Supplemental Indenture" shall mean that certain indenture dated November 15, 2002 by and between NorthWestern and The Bank of New York as trustee and all drafts, amendments, supplements, addendums and revisions thereto.

26. "Transfer" means the transfer of the Transferred Assets from Clark Fork to NorthWestern that occurred on or about November 15, 2002. Transfer shall also include any and all strategies for the eventual acquisition and direct ownership of the Transferred Assets by NorthWestern.

27. "Transferred Assets" means those assets that were transferred from Clark Fork to NorthWestern on or about November 15, 2002.

28. "Trust Agreement" shall mean that certain Amended and Restated Trust Agreement dated as of November 1, 1996, among The Montana Power Company as depositors and The Bank of New York as property trustee, The Bank of New York (Delaware) as Delaware trustee and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell as administrative trustees and any and all amendments, supplements, revisions and addendums thereto.

## INSTRUCTIONS

1. Every request shall be answered separately and fully in writing. If any answer or part of any answer is based upon information and belief rather than personal knowledge, you shall state that it is made on that basis.

2.    If any part of a request is objected to, the reasons for the objection should be stated with particularity. If an objection is made to part of any item or category, the part should be specified.

3.    "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request all responses that might otherwise be construed to be outside of its scope.

4.    References to the singular shall include the plural, and references to the plural shall include the singular.

5.    The documents covered by this request include all documents in the possession, custody or control of NorthWestern, or any documents that were generated or received by NorthWestern or otherwise came into existence or were utilized by NorthWestern through the date of production. This request also calls for the production of documents kept or maintained by counsel for NorthWestern, and/or other professionals utilized by NorthWestern.

6.    A request for a document shall be deemed to include a request for any transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, and any file folder in which the document was maintained, in addition to the document itself.

7.    A request for a document shall be deemed to include a request for all drafts and successive iterations thereof and all modifications thereto, in addition to the document itself.

8.    If any document is withheld in whole or part on the ground that it is privileged or otherwise not discoverable, state:

(a) the date of the document;

(b) the name of each person to whom the document is addressed;

(c) the name of each person, other than the addressee(s), to whom the document has been sent or shown, or by whom it has been reviewed;

(d) the name of each person who signed or authored the document;

(e) the title and job description of each person identified in (b), (c), and (d) above;

(f) the subject of the document and the number of pages in the document;

(g) the specific privilege claimed and the grounds for any such claim; and

(h) the name and address of the person who has custody of the document.

9. If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

10. All documents requested are to be produced in a form which renders the documents susceptible to copying and examination for content in the language or numerical expression of the original.

11. Unless otherwise expressly stated, the documents covered by this request include any documents that were generated, crated, circulated, dated or otherwise came into existence during the period of January 1, 2001 to present.

12. Each request for production of documents herein shall be construed as continuing in nature, requiring supplemental responses as soon as further or different documents responsive to any request are discovered or obtained at any time prior to any judgment on the merits.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1**

All documents relating to or concerning the Transfer.

## REQUEST NO. 2

Documents sufficient to indicate the name, title, and/or acts undertaken with respect to the Transfer, of any employees, officers or directors of Clark Fork or NorthWestern that were involved in the Transfer.

## REQUEST NO. 3

All documents relating to or concerning the value of the Transferred Assets, any analysis performed to value such assets, and/or all communications concerning such valuation.

## REQUEST NO. 4

All documents relating to or concerning the value of any consideration paid or to be paid by NorthWestern to Clark Fork in connection with the Transfer, any analysis performed to value such consideration, and/or all communications concerning such consideration.

## REQUEST NO. 5

All documents relating to communications with members of the Board of Directors including, without limitation, presentations, proposals, minutes and resolutions of all board meetings and all written consents or actions taken by the Board of Directors, and any other materials (and all drafts thereof) provided to or by the members of the Board of Directors that concern or relate to the Transfer.

## REQUEST NO. 6

All legal opinions, fairness opinions, appraisals or other third party professional advice given in connection with the Transfer, the Transferred Assets, the QUIPS Indentures, Second Supplemental Indenture, Third Supplemental Indenture, and/or the Montana Medium-Term Notes Indenture.

## REQUEST NO. 7

All documents concerning the Trust Agreement and/or Guarantee Agreement.

## REQUEST NO. 8

All documents concerning the QUIPS and/or the QUIPS Indenture.

## REQUEST NO. 9

All documents concerning the Second Supplemental Indenture.

## REQUEST NO. 10

All documents concerning the Third Supplemental Indenture.

## REQUEST NO. 11

All documents constituting or concerning any communications involving any of the QUIPS Trustees, the Montana Trustee, NorthWestern and/or CSFB concerning the Transfer and/or the Transferred Assets, including, but not limited to, any request for the release of claims against Clark Fork and any purported release of such claims.

## REQUEST NO. 12

All documents reflecting communications between CSFB and NorthWestern concerning the Transfer or NorthWestern's 2003 Credit Facility.

## REQUEST NO. 13

All applications and/or other documents submitted to regulatory authorities in connection with the Transfer.

## REQUEST NO. 14

All documents relating to any and all analyses, reports, summaries, opinions, advice or similar evaluations concerning or relating to the financial condition of NorthWestern at any time between 2001 and the present.

## REQUEST NO. 15

All documents relating to or concerning the publicly issued financial statements for NorthWestern for the fiscal year ended 2001 through the present.

### REQUEST NO. 16

All documents relating to any and all analyses, reports, summaries, opinions, advice or similar evaluations concerning or relating to the financial condition of Clark Fork at any time between 2001 and the present.

### REQUEST NO. 17

All documents relating to or concerning the publicly issued financial statements for Clark Fork for the fiscal year ended 2001 through the present.

### REQUEST NO. 18

All documents concerning any possible or actual restatement of any publicly issued financial statements of Clark Fork and/or NorthWestern including, without limitation, any communications with any governmental agency.

### REQUEST NO. 19

All documents relating to Deloitte & Touche's review of financial information, operating, and other data related to Northwestern.

### REQUEST NO. 20

All documents relating to Deloitte & Touche's review of financial information, operating, and other data related to Clark Fork.

### REQUEST NO. 21

All documents relating to Arthur Andersen's review of NorthWestern's financial or accounting information between 2001 and 2003.

### REQUEST NO. 22

All documents concerning or relating to NorthWestern's accounting policies in effect at any time between 2001 and the present.

**REQUEST NO. 23**

All documents relating to communications with members of the Board of Directors including, without limitation, presentations, proposals, minutes and resolutions of all board meetings and all written consents or actions taken by the Board of Directors, and any other materials (and all drafts thereof) provided to or by the members of the Board of Directors that concern or relate to the Financial Statements including, without limitation, the restatement of the Financial Statements for the first three quarters of the fiscal year ended 2002.

**REQUEST NO. 24**

All documents relating to communications regarding the audit committee including, without limitation, presentations, proposals, minutes and resolutions of all board meetings, and any other materials (and all drafts thereof) provided to or by the members of the audit committee that concern or relate to the Financial Statements including, without limitation, the restatement of the Financial Statements for the first three quarters of the fiscal year ended 2002 and any investigation or inquiry concerning the Financial Statements.

**REQUEST NO. 25**

All documents concerning any analysis performed as of or prior to the date of the Transfer to determine whether following the Transfer NorthWestern would be able to pay its liabilities (including without limitation the liabilities it had assumed with respect to the Junior Debentures and the QUIPS) as they became due in the ordinary course of its business.

**REQUEST NO. 26**

All documents constituting or concerning any instructions given by NorthWestern to any officer, employee or agent of Clark Fork, including without limitation Hanson and Kindt, to execute documents or take other actions in connection with the Transfer.

## REQUEST NO. 27

All documents concerning any actual or potential write down by NorthWestern of the Expanets Investment.

## REQUEST NO. 28

All operating agreements for Clark Fork, or any other documents setting forth any rights, duties, and/or responsibilities of any officer, employee or agent of Clark Fork.

## REQUEST NO. 29

All documents reflecting any compensation paid to any law firm(s), investment bank(s), accountant(s), and/or other financial advisor(s) in connection with the Transfer.

*EXHIBIT G*

# Deloitte.

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

November 14, 2006

**By Facsimile (302) 652-8405 and Mail**

Kathleen M. Miller, Esq.
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, Delaware 19899

Re: Magten Asset Management Corp. v. Paul Hastings Janofsky & Walker LLP
Subpoena addressed to Deloitte & Touche LLP

Dear Ms. Miller:

Thank you for your letter addressed to Patrick Prunty, dated November 7, 2006, which I received today. I am happy to discuss the scope of the subpoena with you. As a starting point for discussions, I have enclosed a copy of my February 10, 2006 objection letter. It would be helpful if you provided a copy of the complaint as well as a copy of any confidentiality order or stipulation in place in the matter.

Very truly yours,

Annica H. Jin-Hendel
Counsel

Enclosure

cc: Paul Spagnoletti, Esq. (by facsimile: 650-752-3625)

Member of
Deloitte Touche Tohmatsu

# Deloitte.

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

February 10, 2006

**By Facsimile and Mail**

David Jenkins, Esq.
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
P.O. Box 410
Wilmington, Delaware 19899

Re:    Magten Asset Management Corp. v. Paul Hastings Janofsky & Walker LLP
       Subpoena addressed to Deloitte & Touche LLP

Dear Mr. Jenkins:

I write regarding the subpoena addressed to Deloitte & Touche LLP ("D&T") in the above referenced matter. While D&T is prepared to discuss the matter with you, D&T is objecting to the subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure in order to preserve its rights pending such discussions.

D&T's objections to the subpoena are as follows:

1.  D&T objects to the subpoena in its entirety as being overly broad on its face, unduly burdensome and oppressive, including, without limitation, to the extent that it seeks to compel the production of voluminous documents for an extended, undefined, and open-ended period of time.

2.  D&T objects to the subpoena to the extent that it calls for the production of documents that are not relevant to the subject matter involved in the pending litigation or reasonably calculated to lead to the discovery of admissible evidence.

3.  Upon information and belief, by virtue of its overbroad nature the subpoena calls for the production of documents that are not relevant to the claim or defense of any party in the pending action and D&T objects to the extent irrelevant documents are sought. For example, the subpoena attempts to request virtually every scrap of paper regarding NorthWestern Corporation, i.e., *"[a]ll documents relating to any and all analyses, reports, summaries, opinions, advice or similar evaluations concerning or relating to the financial condition of NorthWestern at any time between 2001 and the present"* (Request No. 14), and *"[a]ny documents relating to or concerning the publicly issued financial statements for NorthWestern for the fiscal year ended 2001 to the present"* (Request No. 15).

Member of
Deloitte Touche Tohmatsu

David Jenkins, Esq.
*Re: Magten Asset Management Corp. v. Paul Hastings Janofsky & Walker LLP*
Page 2

4. D&T objects to the subpoena to the extent that it purports to require the production of documents that are protected by the accountant-client privilege, the attorney-client privilege, the work product doctrine, or any other applicable privilege, rule or duty of confidentiality that precludes or limits production or disclosure of information therein.

5. Many of the documents and information requested are available from the parties, and D&T, a non-party, should not be put to the time and expense of producing such documents where the parties could get the information from one another or from their own files.

6. The subpoena is unduly vague, precluding D&T from determining with sufficient precision the identity of the documents for which production is sought.

7. D&T, a non-party to this action, objects to the subpoena to the extent that it calls for the production of documents that constitute proprietary information, trade secrets or other confidential, research, development or commercial information of D&T. Such documents have been developed at great expense to and effort by D&T. Further, such documents are neither relevant to the claims or defenses of any party in the pending action.

8. D&T objects to the subpoena to the extent that it calls for information that was not generated in the form of written or printed records on the grounds that it would be unduly burdensome and oppressive to require that D&T search through computer records or other means of electronic or magnetic data storage or compilation.

9. D&T objects the subpoena to the extent that it purports to impose any obligations upon D&T beyond those required by the Federal Rules of Civil Procedure.

10. The subpoena requests confidential information of D&T's client(s) and/or D&T. Therefore, D&T objects to the subpoena absent entry of a confidentiality order protecting the confidentiality of the documents. No documents will be produced absent such a confidentiality order.

11. D&T objects to producing the material sought by the subpoena in the absence of your clients' prior written commitment to pay for the significant expenses in search for documents requested by the subpoena, as well s the costs of production, including attorneys' fees and administrative costs. By Minnesota statute, a nonparty "who is required to give testimony or produce documents relating to a profession, business, or trade, or relating to knowledge, information or facts obtained as a result of activities in such profession, business or trade, is entitled to reasonable compensation for the time and expense involved in preparing for and giving such testimony or producing such documents" (Minnesota Rules of Court 45.05).

In making the above objections, D&T is not suggesting or implying in any way that it has documents responsive to a particular Request.

David Jenkins, Esq.
Re: *Magten Asset Management Corp. v. Paul Hastings Janofsky & Walker LLP*
Page 3

Given the above objections, no documents will be produced at this time. Please notify all counsel of record. However, D&T would like to resolve the objections amicably and without burdening the Court with motion practice. To that end, I will be happy to discuss this matter with you more fully. In the interim, it would be helpful if you would send me a copy of the complaint, a service list of counsel and a copy of any confidentiality stipulation or protective order in place in the case.

Thank you for your anticipated cooperation.

Very truly yours,

Annica H. Jin
Counsel

*EXHIBIT H*

A088 Subpoena in a Civil Case (12/06)

**Issued by the**

# United States District Court

SOUTHERN DISTRICT OF NEW YORK

Magten Asset Management Corporation
& Law Debenture Trust Company
of New York,

**SUBPOENA IN A CIVIL CASE**

        **Plaintiffs**

          v.

Civil Action No. 04-1494-JJF
Pending in the U.S. District Court for the District of
Delaware

    NorthWestern Corporation,

        **Defendant**

Magten Asset Management Corporation

        **Plaintiff**

          v.

Civil Action No. 05-499-JJF
Pending in the U.S. District Court for the District of
Delaware

Mike J. Hanson and Ernie J. Kindt,

        **Defendants**

To:    Deloitte & Touche
       1633 Broadway
       New York, NY 10019-6754
       Attn: Annica H. Jin-Hendel

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above proceedings.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above proceedings. The testimony will be recorded by stenographic and/or sound-and-visual means. See attached Schedule B

| PLACE | DATE AND TIME |
|---|---|
| Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, NY 10004-1980 | Wednesday, April 18, 2007, 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See attached Schedule A

| PLACE | DATE AND TIME |
|---|---|
| Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, NY 10004-1980 | Wednesday, April 4, 2007, 4:00p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PLACE | DATE AND TIME |
|-------|---------------|
|       |               |

Any subpoenaed organization not a party to this adversary proceeding shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| Attorney for Plaintiff Magten Asset Management Corp. | March 21, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
John W. Brewer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
(212) 859-8000

Ffny02/547162.1

## Schedule A

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York (together with Magten, the "Plaintiffs") request that Deloitte & Touche LLP ("Deloitte & Touche") produce for examination, inspection and copying at the offices of Fried, Frank, Harris, Shriver & Jacobson, LLP One New York Plaza, New York, New York at 4:00 p.m. on April 4, 2007 all of the documents described below which are in the possession, custody or control of Deloitte & Touche, or of any persons acting on its behalf.

## REQUESTS FOR PRODUCTION

### REQUEST NO. 1

All documents relating to or concerning the Transfer.

### REQUEST NO. 2

Documents sufficient to indicate the name, title, and/or acts undertaken with respect to the Transfer, of any employees, officers or directors of Clark Fork or NorthWestern that were involved in the Transfer.

### REQUEST NO. 3

All documents relating to or concerning the value of the Transferred Assets, any analysis performed to value such assets, and/or all communications concerning such valuation.

### REQUEST NO. 4

All documents relating to or concerning the value of any consideration paid or to be paid by NorthWestern to Clark Fork in connection with the Transfer, any analysis performed to value such consideration, and/or all communications concerning such consideration.

**REQUEST NO. 5**

All documents relating to communications with members of the Board of Directors including, without limitation, presentations, proposals, minutes and resolutions of all board meetings and all written consents or actions taken by the Board of Directors, and any other materials (and all drafts thereof) provided to or by the members of the Board of Directors that concern or relate to the Transfer.

**REQUEST NO. 6**

All legal opinions, fairness opinions, appraisals or other third party professional advice given in connection with the Transfer, the Transferred Assets, the QUIPS Indentures, Second Supplemental Indenture, Third Supplemental Indenture, and/or the Montana Medium-Term Notes Indenture.

**REQUEST NO. 7**

All documents concerning the Trust Agreement and/or Guarantee Agreement.

**REQUEST NO. 8**

All documents concerning the QUIPS and/or the QUIPS Indenture.

**REQUEST NO. 9**

All documents concerning the Second Supplemental Indenture.

**REQUEST NO. 10**

All documents concerning the Third Supplemental Indenture.

2

**REQUEST NO. 11**

All documents constituting or concerning any communications involving any of the QUIPS Trustees, the Montana Trustee, NorthWestern and/or CSFB concerning the Transfer and/or the Transferred Assets, including, but not limited to, any request for the release of claims against Clark Fork and any purported release of such claims.

**REQUEST NO. 12**

All documents reflecting communications between CSFB and NorthWestern concerning the Transfer or NorthWestern's 2003 Credit Facility.

**REQUEST NO. 13**

All applications and/or other documents submitted to regulatory authorities in connection with the Transfer.

**REQUEST NO. 14**

All documents relating to any and all analyses, reports, summaries, opinions, advice or similar evaluations concerning or relating to the financial condition of NorthWestern at any time between 2001 and the present.

**REQUEST NO. 15**

All documents relating to or concerning the publicly issued financial statements for NorthWestern for the fiscal year ended 2001 through the present.

**REQUEST NO. 16**

All documents relating to any and all analyses, reports, summaries, opinions, advice or similar evaluations concerning or relating to the financial condition of Clark Fork at any time between 2001 and the present.

3

**REQUEST NO. 17**

All documents relating to or concerning the publicly issued financial statements for Clark Fork for the fiscal year ended 2001 through the present.

**REQUEST NO. 18**

All documents concerning any possible or actual restatement of any publicly issued financial statements of Clark Fork and/or NorthWestern including, without limitation, any communications with any governmental agency.

**REQUEST NO. 19**

All documents relating to Deloitte & Touche's review of financial information, operating, and other data related to NorthWestern.

**REQUEST NO. 20**

All documents relating to Deloitte & Touche's review of financial information, operating, and other data related to Clark Fork.

**REQUEST NO. 21**

All documents relating to Arthur Andersen's review of NorthWestern's financial or accounting information between 2001 and 2003.

**REQUEST NO. 22**

All documents concerning or relating to NorthWestern's accounting policies in effect at any time between 2001 and the present.

4

**REQUEST NO. 23**

All documents relating to communications with members of the Board of Directors including, without limitation, presentations, proposals, minutes and resolutions of all board meetings and all written consents or actions taken by the Board of Directors, and any other materials (and all drafts thereof) provided to or by the members of the Board of Directors that concern or relate to the Financial Statements including, without limitation, the restatement of the Financial Statements for the first three quarters of the fiscal year ended 2002.

**REQUEST NO. 24**

All documents relating to communications regarding the audit committee including, without limitation, presentations, proposals, minutes and resolutions of all board meetings, and any other materials (and all drafts thereof) provided to or by the members of the audit committee that concern or relate to the Financial Statements including, without limitation, the restatement of the Financial Statements for the first three quarters of the fiscal year ended 2002 and any investigation or inquiry concerning the Financial Statements.

**REQUEST NO. 25**

All documents concerning any analysis performed as of or prior to the date of the Transfer to determine whether following the Transfer NorthWestern would be able to pay its liabilities (including without limitation the liabilities it had assumed with respect to the Junior Debentures and the QUIPS) as they became due in the ordinary course of its business.

**REQUEST NO. 26**

All documents constituting or concerning any instructions given by NorthWestern to any officer, employee or agent of Clark Fork, including without limitation Hanson and Kindt, to execute documents or take other actions in connection with the Transfer.

5

**REQUEST NO. 27**

All documents concerning any actual or potential write down by NorthWestern of the Expanets Investment.

**REQUEST NO. 28**

All operating agreements for Clark Fork, or any other document setting forth any rights, duties, and/or responsibilities of any officer, employee or agent of Clark Fork.

**REQUEST NO. 29**

All documents reflecting any compensation paid to any law firm(s), investment bank(s), accountant(s), and/or other financial advisor(s) in connection with the Transfer.

<strong><u>Schedule B</u></strong>

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiffs will take the deposition of one or more representatives of Deloitte & Touche on April 18, 2007 at 10:00 a.m. at the offices of Fried, Frank, Harris, Shriver & Jacobson, LLP One New York Plaza, New York, New York before an officer qualified to administer oaths. Plaintiffs intend to record the deposition by videotape and/or by stenographic means. The deposition shall continue from day to day until completed. You are invited to attend and cross-examine.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Deloitte & Touche is required to designate one or more officers, directors, managing agents or other persons to testify, who have knowledge about the following matters:

1.    Any and all work you performed for or in relation to NorthWestern or any subsidiary or affiliate thereof at any time between January 1, 2001 and December 31, 2003.

2.    Your production of documents called for in Schedule A to this subpoena.

## DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below:

1.      "All" means "any and all," and "any" means "any and all."

2.      "Arthur Andersen" means Arthur Andersen LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

3.      "Board of Directors" shall mean all current and former members of the board of directors of NorthWestern Corporation, its affiliates, subsidiaries and predecessors or sucessors in interest.

4.      "Clark Fork" means Clark Fork and Blackfoot, LLC, formerly known as, among other things, NorthWestern Energy, LLC and Montana Power, LLC, and any of its affiliates, subsidiaries, predecessors and any person or entity acting or purporting to act on behalf of, at the direction of or in concert with it, including but not limited to Clark Fork's present and former officers, directors, employees, servants, agents, representatives and attorneys.

5.      "CSFB" shall mean Credit Suisse First Boston its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

6.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any medium -- oral, written or otherwise.

7.      "Concerning" includes referring to, relating to, embodying, in connection with, commenting on, responding to, showing, demonstrating, declaring, describing, analyzing, reflecting, containing or constituting.

8.      "Deloitte & Touche" means Deloitte and Touche LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

7

9.    "Document" is used herein in the broadest sense and includes, but is not limited to, all originals, whether printed or handwritten, non-identical copies, copies with marginal notations or interlineations of any writing, recording, photograph, computer data, film, e-mail, video or audio tape (including transcripts or memoranda reflecting or referring to the contents thereof), any written, typewritten or other tangible form of recording or preserving communication or thought (including computerized records of any kind), including any non-identical copy thereof, or any other items containing information of any kind or nature, however produced or reproduced, whatever its origin or location and regardless of the form in which such information exists or is maintained.

10.    "Expanets Investment" means all equity investments made in or loans extended to Expanets, Inc. by NorthWestern.

11.    "Guarantee Agreement" shall mean that certain Guarantee Agreement dated as of November 1, 1996, by and between The Montana Power Company as guarantor and The Bank of New York as guarantee trustee and any and all amendments, supplements, revisions and addendums thereto.

12.    "Junior Debentures" means the Junior Subordinated Interest Debentures which The Montana Power Company issued pursuant to its Indenture (For Unsecured Subordinated Debt Securities relating to Trust Securities) dated November 1, 1996.

13.    "The McGreevey Class Action" shall mean all litigation relating to the action styled McGreevey, et al. v. The Montana Power Company, et al. filed in the United States District Court for the District of Montana.

14.    "Montana Medium-Term Notes Indenture" shall mean that certain Indenture for Unsecured Debt Securities dated December 1, 1989 by and between The Montana Power

8

Company and Citibank, N.A., as trustee and any and all amendments, supplements, revisions and addendums thereto.

15.    "Montana Trustee" shall mean Citibank, N.A. as trustee under the Montana Medium-Term Notes Indenture and any and all predecessors and/or successors in interest thereto.

16.    "NorthWestern" means NorthWestern Corporation, its affiliates and any parent, subsidiaries, predecessors and successors, and any person or entity acting or purporting to act on behalf of, at the direction of, or in concert with it, including but not limited to NorthWestern's present and former officers, directors, employees, servants, agents, representatives and attorneys; provided, however, that NorthWestern shall not be construed to include Clark Fork, which has been separately defined herein.

17.    "NorthWestern's 2003 Credit Facility" means that senior secured credit facility by and between NorthWestern and Credit Suisse First Boston, among others, dated February 10, 2003, including all drafts amendments, supplements, addendums and revisions thereto.

18.    "Paul Hastings" means Paul Hastings Janofsky & Walker LLP, its agents, attorneys, affiliates, representatives and all other persons acting in concert with it or on its behalf.

19.    "Person" includes any natural person, group, investigatory body, governmental unit, governmental agency or department, corporation, association, partnership, limited partnership, joint venture, sole proprietorship, business, business entity, organization, or institution.

20.    "QUIPS" means the Series A 8.45% Quarterly Income Preferred Securities issued by Montana Capital Power Trust I pursuant to the Trust Agreement between The Montana Power

9

Company, The Bank of New York, and various other persons dated on or about November 1, 1996.

21.    "QUIPS Indenture" shall mean that certain indenture for Unsecured Subordinated Debt Securities relating to Trust Securities dated November 1, 1996 by and between The Montana Power Company and The Bank of New York, as trustee, and all drafts, amendments, supplements, addendums and revisions thereto including, but not limited to the Second Supplemental Indenture and the Third Supplemental Indenture and the notes that were issued pursuant to such documents.

22.    "QUIPS Trustees" shall mean The Bank of New York as trustee under the QUIPS Indenture, The Bank of New York as property trustee under the Trust Agreement, The Bank of New York as guarantee trustee under the Guarantee Agreement and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell as administrative trustees under the Trust Agreement, together with any and all predecessors and/or successors in interest thereto.

23.    "Relating to" means, without limitation, consisting of, containing, constituting, concerning, discussing, describing, reflecting, transmitted in connection with, touching upon or summarizing, showing or relating or referring to in any way, directly or indirectly, and is meant to include, among other documents, documents underlying, supporting, now or previously attached or appended to, or used in the preparation of, any document called for by each request.

24.    "Second Supplemental Indenture" shall mean that certain indenture dated August 13, 2002 by and between NorthWestern Energy, LLC as successor by merger to The Montana Power Company, NorthWestern, and The Bank of New York, as trustee and all drafts, amendments, supplements, addendums and revisions thereto.

10

25.    "Third Supplemental Indenture" shall mean that certain indenture dated November 15, 2002 by and between NorthWestern and The Bank of New York as trustee and all drafts, amendments, supplements, addendums and revisions thereto.

26.    "Transfer" means the transfer of the Transferred Assets from Clark Fork to NorthWestern that occurred on or about November 15, 2002. Transfer shall also include any and all strategies for the eventual acquisition and direct ownership of the Transferred Assets by NorthWestern.

27.    "Transferred Assets" means those assets that were transferred from Clark Fork to NorthWestern on or about November 15, 2002.

28.    "Trust Agreement" shall mean that certain Amended and Restated Trust Agreement dated as of November 1, 1996, among The Montana Power Company as depositors and The Bank of New York as property trustee, The Bank of New York (Delaware) as Delaware trustee and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell as administrative trustees and any and all amendments, supplements, revisions and addendums thereto.

## INSTRUCTIONS

1.    Every request shall be answered separately and fully in writing. If any answer or part of any answer is based upon information and belief rather than personal knowledge, you shall state that it is made on that basis.

2.    If any part of a request is objected to, the reasons for the objection should be stated with particularity. If an objection is made to part of any item or category, the part should be specified.

11

3.    "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request all responses that might otherwise be construed to be outside of its scope.

4.    References to the singular shall include the plural, and references to the plural shall include the singular.

5.    The documents covered by this request include all documents in the possession, custody or control of Deloitte & Touche, or any documents that were generated or received by Deloitte & Touche or otherwise came into existence or were utilized by Deloitte & Touche through the date of production.  This request also calls for the production of documents kept or maintained by counsel for Deloitte & Touche, and/or other professionals utilized by Deloitte & Touche.

6.    A request for a document shall be deemed to include a request for any transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, and any file folder in which the document was maintained, in addition to the document itself.

7.    A request for a document shall be deemed to include a request for all drafts and successive iterations thereof and all modifications thereto, in addition to the document itself.

8.    If any document is withheld in whole or part on the ground that it is privileged or otherwise not discoverable, state:

    (a)    the date of the document;

    (b)    the name of each person to whom the document is addressed;

    (c)    the name of each person, other than the addressee(s), to whom the document has been sent or shown, or by whom it has been reviewed;

    (d)    the name of each person who signed or authored the document;

12

(e)    the title and job description of each person identified in (b), (c), and (d) above;

(f)    the subject of the document and the number of pages in the document;

(g)    the specific privilege claimed and the grounds for any such claim; and

(h)    the name and address of the person who has custody of the document.

9.    If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

10.    All documents requested are to be produced in a form which renders the documents susceptible to copying and examination for content in the language or numerical expression of the original.

11.    Unless otherwise expressly stated, the documents covered by this request include any documents that were generated, crated, circulated, dated or otherwise came into existence during the period of January 1, 2001 to present.

12.    Each request for production of documents herein shall be construed as continuing in nature, requiring supplemental as soon as further or different documents responsive to any request are discovered or obtained at any time prior to any judgment on the merits.