# TAB 10

LEXSEE



Positive
As of: May 25, 2007

### RAILROAD SALVAGE OF CONN., INC., Plaintiff, v. JAPAN FREIGHT CONSOLIDATORS (U.S.A.) INC., Venus Communications, LTD. and Y. Mori, Defendants

### No. 80 CIV 3089

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

### 97 F.R.D. 37; 1983 U.S. Dist. LEXIS 19048; 36 Fed. R. Serv. 2d (Callaghan) 716; 12 Fed. R. Evid. Serv. (Callaghan) 1999

### February 23, 1983

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff salvage company brought a diversity action against defendants, a freight consolidator, a communications company, and related individuals for conversion, negligence, and breach of contract. The salvage company and the freight consolidator filed discovery motions.

**OVERVIEW:** The salvage company sued defendants for conversion, negligence, and breach of contract. The salvage company filed a motion, pursuant to Fed. R. Civ. P. 34, to compel production of the freight consolidator's communications with its insurers. The freight consolidator filed a cross-motion for discovery. The court held that: (1) the documents requested by the salvage company from the freight consolidator were protected by the limited immunity from discovery that was afforded to trial preparation materials under Fed. R. Civ. P. 26(b)(3); (2) the affidavits submitted by the salvage company in support of its motion failed to demonstrate the substantial need that would justify production of the documents; thus, the salvage company's motion was denied; and (3) the court denied the freight consolidator's cross-motion to compel production of certain documents because the good faith inability of one party to produce requested documents was not to absolve the opposing party from its obligations under the discovery rules.

**OUTCOME:** The court denied the discovery motions.

**CORE TERMS:** work product, discovery, diversity, immunity, telephone, correspondence, state law, privileged matter, insurers, anticipation of litigation, production of documents, qualified immunity, absolute immunity, trial preparation, physician-patient, attorney-client, preparation, deposition, accountants, complied, evidentiary privilege, house counsel, seems clear, unavailability, disclosure, confirm, procure, exempts, sauce

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN1] Limited immunity from discovery which is afforded to trial preparation materials under Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN2] Documents which were afforded work product immunity in a prior suit retain that immunity in subsequent, even unrelated, litigation. A fortiori, documents prepared by a party's house counsel in anticipation of litigation should retain their status as work product when

97 F.R.D. 37, *; 1983 U.S. Dist. LEXIS 19048, **;
36 Fed. R. Serv. 2d (Callaghan) 716; 12 Fed. R. Evid. Serv. (Callaghan) 1999

delivered to and used by that party's trial counsel in the same suit.

*Evidence > Privileges > Doctor-Patient Privilege > Elements*

*Evidence > Privileges > Doctor-Patient Privilege > Scope*

*Healthcare Law > Business Administration & Organization > General Overview*

[HN3] In a diversity case, Fed. R. Evid. 501 requires the application of state law to questions of privilege. Case law requires the application of the New York rule on physician-patient privilege in a diversity action because the privilege is substantive rather than procedural. The rule of privilege is unlike the ordinary rules of practice which refer to the process of litigation, in that it affects private conduct before litigation arises.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

*Evidence > Privileges > General Overview*

[HN4] Fed. R. Evid. 501 provides that in a diversity case the privilege of a witness shall be determined in accordance with state law. Fed. R. Evid. 501.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

*Evidence > Privileges > Attorney-Client Privilege > Scope*

*Evidence > Privileges > Doctor-Patient Privilege > Scope*

[HN5] N.Y. C.P.L.R. 3101 provides for liberal disclosure. N.Y. C.P. L. R. 3101(b) exempts "privileged matter" from disclosure in all cases. N.Y. C.P.L.R. 3101(c) likewise exempts "the work product of an attorney" in all cases. Finally, N.Y. C.P.L. R. 3101(d) creates a conditional privilege for "material prepared for litigation." It is immediately evident that the Civil Practice Law and Rules itself distinguishes between a true evidentiary privilege (N.Y. C.P.L.R. 3101(b)) and attorney work product (N.Y. C.P.L.R. 3101(c)). If the latter were a privilege, there would obviously be no need for N.Y. C.P.L.R. 3101(c). Properly analyzed, it seems clear N.Y. C.P.L.R. 3101(b) refers to the traditional evidentiary privileges (attorney-client, doctor-patient, et cetera), while N.Y. C.P.L.R. 3101(c), (d) deal with matter as to which there is no evidentiary privilege, but which is nevertheless immune from pretrial discovery.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

*Evidence > Privileges > Doctor-Patient Privilege > Exceptions*

*Healthcare Law > Business Administration & Organization > General Overview*

[HN6] While Fed. R. Evid. 501 applies to the "privileged matter" referred to in N.Y. C.P.L.R. 3101(b), which are traditional evidentiary privileges such as the attorney-client and doctor-patient privileges, Fed. R. Evid. 501 does not apply to attorney work product under N.Y. C.P.L.R. 3101(d).

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*

[HN7] The good faith inability of one party to produce requested documents should not absolve the opposing party from its obligations under the discovery rules.

**COUNSEL:** [**1]

Bell, Kalnick, Beckman, Klee & Green, New York City (Allen Green, James Schwartz, New York City, of counsel), for Plaintiff.

Schoeman, Marsh, Updike & Welt, New York City (Charles B. Updike, Elizabeth Hellman Cooper, New York City, of counsel), for Defendant Japan Air Freight Consolidators (U.S.A.).

**JUDGES:**

McLaughlin, District Judge.

**OPINION BY:**

McLAUGHLIN

**OPINION:**

[*39] MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is a diversity action for conversion, negligence, and breach of contract. Several discovery motions are pending before the Court.

*Plaintiff's Motion To Compel Production Of Defendant's Communications With Its Insurers*

On December 31, 1980, plaintiff, Railroad Salvage of Conn., Inc. ("Railroad Salvage"), served defendant, Japan Freight Consolidators (U.S.A.) ("JFC"), with a request pursuant to Fed.R.Civ.P. 34 for production and inspection of documents. Paragraph 12 of that request

97 F.R.D. 37, *; 1983 U.S. Dist. LEXIS 19048, **;
36 Fed. R. Serv. 2d (Callaghan) 716; 12 Fed. R. Evid. Serv. (Callaghan) 1999

demands (a) production of "all insurance policies which may in any manner relate to coverage of Japan Freight for the transaction described in this action, or any part thereof, and (b) all documents relating to claims under said policies."

JFC has complied with paragraph 12(a) [**2] but refuses to produce the documents specified in paragraph 12(b). JFC argues that because the latter documents consist solely of correspondence between JFC's former counsel n1 in this matter and JFC's insurers, the documents are protected by the [HN1] limited immunity from discovery which is afforded to "trial preparation materials" under Fed.R.Civ.P. 26(b)(3). I have inspected the documents in question, and I agree with JFC. Accordingly, the motion to compel is denied.

> n1 Railroad Salvage argues that any correspondence involving JFC's house counsel, Mr. Rockove, should be made available for impeachment purposes in the event JFC's trial counsel calls Mr. Rockove as a witness.

It has been held that [HN2] documents which were afforded work product immunity in a prior suit retain that immunity in subsequent, even unrelated, litigation. See _Duplan Corp. v. Moulinage et Retorderie de Chavanoz,_ 487 F.2d 480 (4th Cir.1973). A fortiori, documents prepared by a party's house counsel in anticipation of litigation should retain their status as work product when delivered to and used by that party's trial counsel in the same suit. Indeed, Mr. Rockove's delegation of the responsibility for JFC's defense to trial counsel is irrelevant in determining whether the documents continue to enjoy immunity. All that need be shown is that the documents were prepared in anticipation of litigation and that at the time of their preparation Mr. Rockove was functioning as JFC's "representative." See Fed.R.Civ.P. 26(b)(3).

[**3]

## DISCUSSION

The threshold issue in evaluating JFC's claim of work product immunity is whether to apply Fed.R.Civ.P. 26 or N.Y. CPLR 3101. It is clear that [HN3] in a diversity case, Fed.R.Evid. 501 requires the application of state law to questions of privilege. _Dixon v. 80 Pine Street Corp.,_ 516 F.2d 1278, 1280 (2d Cir.1975) (governmental privilege); _Republic Gear Co. v. Borg-Warner Corp.,_ 381 F.2d 551, 555-56 n. 2 (2d Cir.1967) (attorney-client privilege); _Massachusetts Mutual Life Insurance Co. v. Brei,_ 311 F.2d 463, 466 (2d Cir.1962) (physician-patient privilege).

In _Brei,_ the court held that _Erie Railroad Co. v. Tompkins,_ 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), required the application of the New York rule on physician-patient privilege in a diversity action because the privilege is substantive rather than procedural. The court explained that "the rule of privilege is unlike the ordinary rules of practice which refer to the process of litigation, in that it affects private conduct before litigation arises." _Id._ 311 F.2d at 466. It is unclear, however, whether work product immunity is the type of "privilege" which mandates application of state law [**4] pursuant to Rule 501. See _Fine v. Bellefonte Underwriters Insurance Co.,_ 91 F.R.D. 420, 422 (S.D.N.Y.1981).

In _Merrin Jewelry Co. v. St. Paul Fire And Marine Insurance Co.,_ 49 F.R.D. 54 (S.D.N.Y.1970) defendant invoked CPLR 3101(d) ("material prepared for litigation") to oppose plaintiff's requests for production of documents prepared for defendant by its accountants. Quoting _Massachusetts Mutual_ [*40] _Life Insurance Co. v. Brei, supra,_ at 465-66, defendant argued "that state law 'governs the issue of privilege in diversity cases.'" _Merrin Jewelry, supra,_ at 56. Judge Frankel, however, rejected the argument stating:

> The defect in the argument is that we do not have here an "issue of privilege" in any pertinent sense. To begin with, CPLR § 3101, defining the scope of discovery in state courts, itself distinguishes the protection from discovery of "privileged matter," dealt with in subsection (b), from the separate category, subsection (d), of "material prepared for litigation." Thus, in the State's own terms, the matter is one governing procedure in the state courts, a direct counterpart of the federal rules governing us. And while that state classification [**5] may not be decisive in itself, it seems clear as a matter of federal law that New York's regulation of its own discovery practice in subsection (d) of CPLR § 3101 adds nothing to the scope of "privileged" matter protected against production under our Rule 34.

Id.

Thus, in a diversity case, Fed.R.Evid. 501 would not require the application of CPLR 3101(d). Instead, a court would analyze the claim of immunity under Fed.R.Civ.P. 26(b)(3).

Our case, however, presents a different issue. In _Merrin Jewelry, supra,_ the material sought had been prepared by defendant's accountants; here, the material was

97 F.R.D. 37, *; 1983 U.S. Dist. LEXIS 19048, **;
36 Fed. R. Serv. 2d (Callaghan) 716; 12 Fed. R. Evid. Serv. (Callaghan) 1999

prepared by defendant's attorney. The distinction is significant because CPLR 3101(c) accords "attorney work product" an absolute immunity from discovery unlike 3101(d)'s qualified immunity. Although Rule 501 does not require application of CPLR 3101(d)'s qualified immunity in diversity cases, *see Merrin Jewelry, supra,* the issue here is whether Rule 501 requires application of CPLR 3101(c)'s absolute immunity for attorney work product in diversity cases.

Rule 501 provides that [HN4] in a diversity case "the privilege of a witness . . . shall be determined in accordance with [**6] State law." Fed.R.Evid. 501. The question, therefore, is whether work product (CPLR 3101(c)) is a privilege within the meaning of Rule 501.

The structure of CPLR 3101 is enlightening. Subdivision (a) [HN5] provides for liberal disclosure. Subdivision (b) exempts "privileged matter" from disclosure in all cases. Subdivision (c) likewise exempts "the work product of an attorney" in all cases. Finally, subdivision (d) creates a conditional privilege for "material prepared for litigation." It is immediately evident that the CPLR itself distinguishes between a true evidentiary privilege (subdivision (b)) and attorney work product (subdivision (c)). If the latter were a privilege, there would obviously be no need for subdivision (c).

Properly analyzed, it seems clear CPLR 3101(b) refers to the traditional evidentiary privileges (attorney-client, doctor-patient, etc.), while subdivisions (c) and (d) deal with matter as to which there is no evidentiary privilege, but which is nevertheless immune from pretrial discovery. See Annot., 35 A.L.R.3d 412 (1971).

Recognizing that [HN6] while Rule 501 applies to the "privileged matter" referred to in CPLR 3101(b), *see Dixon; Republic Gear;* and *Brei,* [**7] *supra,* I hold that Rule 501 does not apply to attorney work product under CPLR 3101(d). Accordingly, JFC's work product claim is governed solely by Fed.R.Civ.P. 26(b)(3).

Rule 26 has been held to bar production of documents in circumstances very similar to those at hand. In *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 251 (D.D.C. 1970) the court stated:

> All records in this case between the hospital and its malpractice insurance carrier postdate the filing of this suit, and in fact were sent only as a consequence of this action. Reports from the insured to its insurance carrier subsequent to the institution of a suit are in furtherance of and for the purpose of aiding in the defense of its case and in [*41] the preparation of its attorney for trial. Such reports are part of attorney's 'work product' and are pre-

cluded from discovery. *Hickman v. Taylor,* 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).

*Id.*

In the instant case, all correspondence between JFC and its liability insurers post-date the filing of the complaint. Moreover, the Court's examination of these documents indicates that they were written as a consequence of pending [**8] litigation for the purpose of mounting a defense to the claim.

I adopt the reasoning of *Bredice, supra,* and hold that JFC's correspondence with its insurers constitutes "trial preparation materials" within the meaning of Fed.R.Civ.P. 26(b)(3). Further, I hold that the affidavits submitted by Railroad Salvage in support of its motion fail to demonstrate the "substantial need" which would justify production of these documents. See Fed.R.Civ.P. 26(b)(3).

Accordingly, the motion by Railroad Salvage to compel production pursuant to Fed.R.Civ.P. 37 is denied.

*Defendants' Cross-Motion To Compel Production Of Certain Documents and Executed Transcripts*

Material to the issue of JFC's potential liability for an alleged misdelivery of goods belonging to Railroad Salvage are the telephone records of the parties. Railroad Salvage insists that JFC notified it by telephone of the arrival of the goods at John F. Kennedy International Airport in New York, and that Railroad Salvage instructed JFC to hold the goods until further notice. JFC denies having spoken with Railroad Salvage before surrendering the goods to a third party, whom JFC believed to be authorized to accept the goods. [**9] Because any such telephone conversation would have been "long distance," the telephone records of the parties would be relevant in ascertaining whether the alleged conversation occurred. Accordingly, the parties, pursuant to Fed.R.Civ.P. 34, have requested production of one another's telephone records for the period from July 1, 1978 through September 1, 1979.

JFC has obtained copies of its records but refuses to produce them on the ground that Railroad Salvage has failed to produce its records. Railroad Salvage explains that, although it is willing to produce its records, it has been unable, thus far, to procure them. JFC seeks an order requiring both parties to produce the records for the period in question or, in the alternative, precluding either party from offering any records at trial. JFC bases its motion on the theory "that discovery is a two-way street and what is sauce for the goose should also be sauce for

97 F.R.D. 37, *; 1983 U.S. Dist. LEXIS 19048, **;
36 Fed. R. Serv. 2d (Callaghan) 716; 12 Fed. R. Evid. Serv. (Callaghan) 1999

the gander." (Affidavit In Support Of Defendant's Cross-Motion, Para. 11)

While JFC's argument has a certain visceral appeal, [HN7] the good faith inability of one party to produce requested documents should not absolve the opposing party from its obligations under the discovery [**10] rules. JFC is not without recourse, however, since Railroad Salvage's efforts and inability to procure the documents may certainly be explored at trial and may justify a jury instruction on failure to produce available evidence.

Accordingly, JFC's motion for an order of preclusion is denied. JFC is ordered to produce its telephone records for the period requested within 30 days. Railroad Salvage is likewise ordered to produce its records within 30 days or, in the alternative, to confirm their unavailability.

In addition to requesting telephone records, JFC, by its letter of June 21, 1982, requested production of cer-tain other documents. (Affidavit In Support Of Defendant's Cross-Motion, Exhibit B, Para. 2) I find that these documents, assuming they exist, lie well within the orbit of discoverability prescribed by Fed.R.Civ.P. 26(b)(1). Accordingly, Railroad Salvage is ordered to produce the requested documents within 30 days, or, in the alternative, to confirm their unavailability.

JFC has also requested that Railroad Salvage furnish executed copies of the deposition transcripts of Messrs. Roberge and Vine. Assuming it has not already complied [*42] with JFC's request, Railroad [**11] Salvage is ordered to produce the requested executed transcripts within 30 days. If the witnesses in question have refused to sign their depositions, the parties may proceed in accordance with Fed.R.Civ.P. 30(e).

All motions for costs are denied.

SO ORDERED.

# TAB  11

LEXSEE


Caution
As of: May 25, 2007

**REMINGTON ARMS COMPANY, a Corporation of the State of Delaware, Plaintiff, v. LIBERTY MUTUAL INSURANCE COMPANY, a Corporation of the Commonwealth of Massachusetts, Defendants.**

**Civil Action No. 89-420-JLL**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**142 F.R.D. 408; 1992 U.S. Dist. LEXIS 6691**

**April 24, 1992, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action by plaintiff insured to enforce defendant insurer's obligation to defend and indemnify underlying environmental damage claims, defendant sought to compel production of documents that plaintiff asserted were protected by the attorney-client privilege and the work product doctrine.

**OVERVIEW:** Defendant insurer denied coverage of environmental damage claims against plaintiff insured. During discovery in an action to enforce defendant's obligation to defend and indemnify, plaintiff withheld documents asserting attorney-client privilege and work product doctrine. The court denied defendant's motion to compel production finding that no principle categorically prevented the application of either doctrine. The court held that neither the insurance relationship nor the institution of a lawsuit constituted an implied waiver of the attorney-client privilege. The "cooperation clause" in the policy and the common interest exception did not warrant compelling discovery because defendant did not seek the documents to cooperate on underlying litigation, and did not share an interest in characterizing the nature of and response to the underlying damage. The court found that defendant's general need for relevant information did not meet the standard of Fed. R. Civ. P. 26(b)(3) to show necessity to overcome work product protection. The court admonished plaintiff that successful assertions of the privileges foreclosed it from introducing protected documents at trial against defendant.

**OUTCOME:** Defendant insurer's motion to compel production of allegedly privileged documents was denied because neither the insurance relationship nor the institution of a lawsuit by plaintiff insured constituted an implied waiver of the attorney-client privilege, and defendant's general need for relevant information did not overcome work product protection. Plaintiff was foreclosed from introducing privileged documents at trial.

**CORE TERMS:** attorney-client, work product doctrine, insured, work product, insurer, privileged information, disclosure, waived, implied waiver, cooperation, privileged, duty to cooperate, common interest, discovery, privileged communications, legal advice, confidentiality, waive, burden of proof, coverage, advice, stem, opposing party, expansive, intermediate, impressions, injecting, truthful, injects, vital

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Counsel > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
[HN1] Under Fed. R. Evid. 501, in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of a witness, person, government, state, or political subdivision thereof shall be determined in accordance with state law.

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 9 of 65

142 F.R.D. 408, *; 1992 U.S. Dist. LEXIS 6691, **

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

[HN2] Under general common law principles regarding the attorney-client privilege, (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*Evidence > Privileges > General Overview*

[HN3] Evidentiary privileges necessarily impinge on the production of relevant evidence and should therefore not be expansively construed. Nevertheless, they serve important values in the observance of law and the administration of justice and cannot be disregarded lightly.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

*Governments > Courts > Dicta*

*Governments > Courts > Judicial Precedents*

[HN4] In deciding Connecticut law, the federal district court must predict the manner in which the Connecticut Supreme Court would decide the issue. In this process the federal district court must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court would decide the issue. If the highest court of the state has not spoken on the issue, the decisions of lower courts of that state are entitled to special consideration. Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest court would rule otherwise.

*Evidence > Privileges > Attorney-Client Privilege > Scope*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Insurance Law > Claims & Contracts > Estoppel & Waiver > Policy Coverage*

[HN5] By taking an action that places privileged information "at issue" the party may forfeit the privilege.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Evidence > Privileges > Government Privileges > Waiver*

*Insurance Law > Claims & Contracts > Estoppel & Waiver > General Overview*

[HN6] Application of attorney-client privilege can not be categorically precluded. Because a plaintiff puts a question "at issue" which would normally be creating a divergence of claims between the parties who would normally be on the same side, does not in itself mean that the plaintiff has to give up, blanket-wise, all of the privileges that have been bestowed upon attorneys by Connecticut law.

*Civil Procedure > Discovery > Privileged Matters > General Overview*

*Evidence > Privileges > Government Privileges > Waiver*

[HN7] Placing-at-issue waiver is justified as an application of the "anticipatory waiver" principle: an allegation, like a pre-trial disclosure, merely anticipates a waiver that will occur at trial. When the party asserting the privilege bears the burden of proof on an issue and can meet that burden only by introducing evidence of a privileged nature, waiver is clearly warranted at the discovery stage.

*Evidence > Privileges > Government Privileges > Waiver*

[HN8] When a party seeks relief in a court of law, he must be held to have waived any privilege, which he otherwise might have had, to withhold testimony required by the rules of the pleading or evidence as a basis for such relief. Where a party injects part of a communication as evidence, fairness demands that the opposing party be allowed to examine the whole picture.

*Evidence > Privileges > Government Privileges > Waiver*

[HN9] A party is treated as having waived its privileges if (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Insurance Law > Claims & Contracts > Estoppel & Waiver > General Overview*

[HN10] Courts generally reject the idea that a party waives the attorney-client privilege by bringing a suit. Contending that parties seeking relief voluntarily relinquish their attorney-client privilege overstates the intention of the party's action. The party would be forced to forsake a claim or reveal its privileged information. This "choice" unfairly implies an intent to waive upon the insured. A better explanation is that an unlimited doctrine of waiver reflects a hostile attitude toward the existence of attorney-client privilege.

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Torts > Negligence > Defenses > Assumption of Risk > Procedure*

[HN11] If the information is actually required for a truthful resolution of the issue on which the party has raised by injecting the issue, the party must either waive the attorney-client privilege as to that information or it should be prevented from using the privileged information to establish the elements of the case. If the court cannot find information necessary for a truthful resolution at this point, it will not find the evidence convincing enough to meet the burden of persuasion. The party can still make its choice explicitly and assume the risk for failing to disclose materials claimed to be necessary to determine the truth where the party has the burden of proof. If the party fails to allow pretrial discovery of a confidential matter, the party will be precluded from introducing that evidence.

*Evidence > Privileges > Government Privileges > Waiver*

[HN12] The court cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant.

*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Evidence > Privileges > Government Privileges > Waiver*

[HN13] Connecticut courts deciding the issue of cooperation clauses explicitly reject constructions of cooperation clauses that would compel the production of privileged documents in insurance cases. Several other courts also reject the conclusion that the insured thereby forever contractually waives the attorney-client privilege.

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Evidence > Privileges > Attorney-Client Privilege > Exceptions*

*International Law > Immunity > General Overview*

[HN14] The attorney-client privilege does not apply under the common interest exception because of the absence of confidentiality, one of the elements necessary for forming attorney-client privilege. Most clearly, confidentiality is absent between two parties where they jointly and simultaneously consult with an attorney and statements are made directly in each other's hearing.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

[HN15] The common interest doctrine is one step beyond the joint consultation where communications by two clients are made directly in each other's hearing is the situation where two parties separately interested in some contract or undertaking, as in the case of borrower and lender or insurer and insured, engage the same attorney to represent their respective interests, and each communicates separately with the attorney about some phase of common transaction.

*Evidence > Privileges > Attorney-Client Privilege > Exceptions*

[HN16] The rationale which supports the "common interest" exception to the attorney-client privilege simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials. The doctrine should not apply where the documents at issue were prepared in an atmosphere of uncertainty as to the scope of any identity of interest shared.

*Civil Procedure > Discovery > Methods > General Overview*

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*

*Criminal Law & Procedure > Counsel > General Overview*

[HN17] The work product doctrine is governed by Fed. R. Civ. P. 26(b)(3). Rule 26(b)(3) allows the production of materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative only upon a showing that the party seek-

ing discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3). The rule gives special protection to what is commonly referred to as opinion work product. The mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation may not be overcome by a showing of substantial need. Fed. R. Civ. P. 26(b)(3). Federal law governs the rule's application.

*Civil Procedure > Counsel > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN18] Although the attorney-client privilege and work product doctrine spring from the same common law origin, the contemporary work product doctrine is distinct from and broader than the attorney-client privilege. As shown by Fed. R. Civ. P. 26(b)(3) and the previous discussion of the attorney-client privilege, the elements are different. Unlike attorney-client privilege, the right to assert the work product barrier to disclosure belongs in large part to the attorney. In addition to protecting confidentiality in the attorney-client relationship, the work product doctrine affords some additional protection to the attorney from unfair disclosure.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
*Civil Procedure > Discovery > Undue Burdens*
[HN19] One of the differences between attorney-client privilege and work product doctrine is that the latter can be discovered by a showing of necessity in certain cases. In order to gain factual work product, the opposing party must show a substantial need for the documents and that their equivalent cannot be acquired without undue hardship. Fed. R. Civ. P. 26(b)(3).

COUNSEL: [**1]  Richard D. Allen, Donald E. Reid, Luke W. Mette, and Karen A. Jacobs of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Joanne B. Grossman and William F. Greaney of Covington & Burling, Washington, D.C., of counsel, for plaintiff Remington Arms Company.

Lawrence S. Drexler of Elzufon, Austin & Drexler, Wilmington, Del., and John C. Sullivan, Richard S. Mannella and Stephen F. Brock of Manta and Welge, Philadelphia, Penna., of counsel, for defendant Liberty Mutual Insurance Company.

JUDGES: LATCHUM

OPINION BY: LATCHUM

OPINION:

[*410]  **MEMORANDUM OPINION**

Wilmington, Delaware
**April 24, 1992.**

**LATCHUM, Senior District Judge.**

## I. INTRODUCTION

Defendant Liberty Mutual insurance Company ("Liberty Mutual") has brought this motion to compel documents that the plaintiff, Remington Arms Company ("Remington"), claims are not subject to discovery because of the attorney-client privilege or the work product doctrine. The documents purportedly relate to underlying claims against Remington for environmental damage from three sites in Connecticut in September of 1988. Remington notified Liberty Mutual of its claim that the insurance company had a contractual obligation to defend and indemnify [**2]  Remington under various primary and excess liability insurance policies issued to Remington over the past 60 years. When Liberty Mutual failed to commit itself to coverage, Remington brought this action. Docket Item ("D.I.") 232 at 1; D.I. 259 at 1.

The discovery process has been an immense undertaking, resulting in the exchange of tens of thousands of documents. D.I. 259 at 5. During this process Remington has withheld numerous documents on the grounds they were protected by the attorney-client privilege or work product doctrine. *See, e.g.,* D.I. 264 at Exhibit ("Ex.") 21. At various times, Liberty Mutual protested these assertions. *See, e.g., id.* at Ex. 19 & Ex. 20. After revising its list of protected documents ("Revised Privilege Log"), Remington forwarded its Revised Privilege Log to Liberty Mutual on September 25, 1991. D.I. 259 at Ex. 5; *see also* D.I. 233 at Ex. 3. Liberty Mutual provided notice of a motion to compel the production of the documents on February 6, 1992. D.I. 231.

At issue before the Court is the question whether the documents designated as protected by the attorney-client privilege or the work product doctrine are discoverable [**3]  even assuming that they constitute privileged or protected material in the underlying actions. n1 Liberty Mutual contends that Remington cannot protect the documents in its Revised Privilege Log from disclosure because (1) Remington has placed the underlying claims

Case 1:04-cv-01494-JJF   Document 196-3   Filed 05/25/2007   Page 12 of 65

142 F.R.D. 408, *; 1992 U.S. Dist. LEXIS 6691, **

at issue by seeking coverage from Liberty Mutual; (2) Remington is contractually obligated to cooperate with Liberty Mutual with respect to the underlying claims; and (3) Remington and Liberty Mutual share a common interest in the defense of underlying claims. Remington disputes all of Liberty Mutual's contentions, and each party has cited some authority in support of its position. The Court will approach the issue mindful of the applicable law, the weight of applicable authority, and the policies that give form to the scope of the protections from disclosure.

> n1 Liberty Mutual has stated in its initial brief:
>
> Liberty Mutual contends that Remington continues to withhold documents to which the attorney-client privilege and work product doctrine do not apply, even with respect to any underlying claims, and Liberty Mutual does not waive its right to seek production of such documents. However, for purposes of this motion, Liberty Mutual does not contest Remington's assertion that the documents listed in its Revised Privileged Log are privileged or work product with respect to the underlying claimants.
>
> Docket Item ("D.I.") 232 at 11-12 n.11. This statement restricts the Court's analysis in ruling on this motion. Liberty Mutual has argued that, whether or not Remington can establish the elements in the underlying claims, the privileges do not apply in this action. The Court limits this decision to the question of whether the claims of the attorney-client privilege and work product doctrine categorically cannot apply in this action.

[**4]

## [*411] II. ATTORNEY-CLIENT PRIVILEGE

### A. Choice Of Law

The first question that the Court must address is the law that applies to Remington's assertion of attorney-client privilege. [HN1] Under Rule 501 of the Federal Rules of Evidence:

In civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

The parties have stipulated that the substantive law of Connecticut shall govern the action. D.I. 275. Pursuant to Rule 501 Connecticut law governs the question of attorney-client privilege.

The Connecticut Supreme Court has adopted general common law principles regarding the attorney-client privilege as stated by Wigmore. *McWilliams v. American Fidelity Co.,* 140 Conn. 572, 102 A.2d 345, 349 (Conn. 1954). [HN2] Under these principles

(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance [**5] permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

8 Wigmore, *Evidence* § 2292 at 554 (McNaughton rev. 1961). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). [HN3] Evidentiary privileges necessarily impinge on the production of relevant evidence and should therefore not be expansively construed. *United States v. Nixon,* 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974). Nevertheless, they serve important values in the observance of law and the administration of justice and cannot be disregarded lightly. *See Upjohn,* 449 U.S. at 389.

[HN4] In deciding Connecticut law, the Court must predict the manner in which the Connecticut Supreme Court would decide the issue. *Wilson v. Asten-Hill Mfg. Co.,* 791 F.2d 30, 32 (3d Cir. 1986). In this process the Court "must consider relevant state precedents, analogous decisions, considered [**6] dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court would decide the issue." *Zamboni v. Stamler,* 847 F.2d 73, 80 (3d Cir.), *cert. denied,* 488 U.S. 899, 102 L. Ed. 2d 233, 109 S. Ct. 245 (1988). If the highest court of the state has not spoken on the issue, the decisions of lower courts of that state are entitled to special consideration. "Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest court would rule otherwise." *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273-74 (3d Cir. 1985); *see also Rolick v. Collins Pine Co.,* 925 F.2d 661, 664 (3d Cir. 1991) ("An intermediate appellate court . . . is datum for ascertaining state law which is not to be disregarded unless it is convinced by other persuasive data that the highest court of

the state would rule otherwise."); *Aetna Casualty & Surety Co. v. Farrell,* 855 F.2d 146, 148 (3d Cir. 1988) ("In the absence [**7] of an authoritative pronouncement by a state's highest court, we may give serious consideration to the opinion of an intermediate appellate court."); *Hon v. Stroh Brewery Co.,* 835 F.2d 510, 512 (3d Cir. 1987) ("We accept decisions of Pennsylvania's intermediate courts as presumptive evidence of Pennsylvania law.").

### B. Implied Waiver Of Attorney-Client Privilege Under The "At Issue" Doctrine

Liberty Mutual argues that Remington has waived its attorney-client privilege in the underlying actions by putting its knowledge and conduct "at issue" by seeking insurance coverage in this action. The [*412] doctrine stems from traditional notions of waiver. [HN5] By taking an action that places privileged information "at issue" the party may forfeit the privilege. The general pronouncements of the Connecticut Supreme Court regarding the attorney-client privilege give little guidance to the scope of such a waiver doctrine and its application here.

Some indication of Connecticut law emerges from the lower courts on this particular issue. A lower court in Connecticut has addressed the waiver issue in an insurance case. The court in *Reichhold Chemicals v. Hartford* [**8] *Accident & Indemnity Co.* refused to follow the theory advanced by Liberty Mutual and rejected the cases on which it relies. CV-88-0351982 (Conn. Super. Ct. Feb. 1, 1991) (D.I. 233 at Ex. 15). The court ruled that [HN6] application of attorney-client privilege could not be categorically precluded, stating:

Because a plaintiff puts a question "at issue" which would normally be, as in this case, creating a divergence of claims between the parties who would normally be on the same side, does not in itself mean that the plaintiff has to give up, blanket-wise, all of the privileges that have been bestowed upon attorneys by our law. As far as I can see, there's nothing in Connecticut law that even has created any question as to our acceptance of these doctrines that have been enumerated by these other cases[.]

*Id.,* bench op. at 59-60. This case clearly states the court's understanding of Connecticut law, and Liberty Mutual's attempts to distinguish its application with minor factual distinctions are unavailing. The *Reichhold* court made a decision as to whether the "at issue" doctrine applied and reserved the right to determine whether or not the attorney-client privilege [**9] would apply to specific documents. In another Connecticut decision, a trial court stated in dicta that it was not inclined to adopt the "at issue" doctrine with respect to the attorney-client

privilege. n2 *Carrier Corp. v. Travelers Indemnity Co.,* CV88-352838, bench op. at 4 (Conn. Super. Ct. Sept. 11, 1991) (D.I. 260 at Ex. B).

> n2 The statements of the court constitute dicta because the court failed to "foreclose the issue" by making a definitive ruling. *Carrier Corp. v. Travelers Indemnity Co.,* CV88-352838, bench op. at 4 (Conn. Super. Ct. Sept. 11, 1991) (D.I. 260 at Ex. B).

Liberty Mutual argues that the Connecticut Supreme Court would not choose to follow lower court decisions and would follow precedent of other state courts because of their weight and persuasiveness. n3 The "at issue" doctrine stems from traditional notions of implied waiver. In order to determine the legitimate limits of implied waivers, it is necessary to examine the reason to have such a doctrine.

[HN7]

Placing-at-issue waiver [**10] can be justified as an application of the "anticipatory waiver" principle: an allegation, like a pre-trial disclosure, merely anticipates a waiver that will occur at trial. When the party asserting the privilege bears the burden of proof on an issue and can meet that burden only by introducing evidence of a privileged nature, waiver is clearly warranted at the discovery stage.

*Developments-Privileged Communications,* 98 Harv. L. Rev. 1450, 1639 (1985). [*413] This rationale is reflected by the traditional rule for implied waiver: "It seems that [HN8] when a party seeks relief in a court of law, he must be held to have waived any privilege, which he otherwise might have had, to withhold testimony required by the rules of the pleading or evidence as a basis for such relief." *Independent Productions Corp. v. Loew's, Inc.,* 22 F.R.D. 266, 277 (S.D.N.Y. 1958) (quoting *Fleming v. Bernardi,* 1 F.R.D. 624-625 (N.D. Ohio 1941)). The language that some jurisdictions employ in their test for implied waiver reflects the traditional test. *See, e.g., Home Ins. Co. v. Advance Machine Co.,* 443 So.2d 165, 168 (Fla. Dist. Ct. App. 1983) [**11] (relying on test stated in *Savino v. Luciano,* 92 So.2d 817, 819 (Fla. 1957) to reject the contention that injecting reasonableness of settlement waived privilege). A related rationale for finding a waiver in this area is that the selective use of privileged information by one side may "garble" the truth, as Learned Hand put it. *See United States v. St. Pierre,* 132 F.2d 837, 840 (2d Cir. 1942),*cert. dismissed as moot,* 319 U.S. 41, 87 L.Ed. 1199, 63 S.Ct. 910 (1943) (speaking in terms of the fifth amendment). Where a party injects part of a communication as evidence, fairness demands that the opposing

party be allowed to examine the whole picture. *See generally* Richard L. Marcus, *The Perils of the Privilege: Waiver and the Litigator*, 84 Mich. L. Rev. 1605 (1986); *Developments - Privileged Communications, supra,* at 1633-37.

> N3 Several recent decisions of other state courts seem to support that position. Lower courts in Delaware have found that a plaintiff seeking insurance coverage for underlying claims waives attorney-client privilege as to documents relevant to their conduct and the conduct of their counsel in those actions. *See E.I. duPont de Nemours & Co. v. Admiral Ins. Co.,* C.A. No. 89C-AU-99, Rubenstein, SDM (Del. Super. Ct. Feb. 18, 1991); *North Am. Philips Corp. v. Aetna Casualty & Surety Co.,* No. 88C-JA-155, Rubenstein, SDM (Del. Super. Ct. May 2, 1991) (D.I. 233 at Ex. 11); *Monsanto Co. v. Aetna Casualty & Surety Co.*, No. 88C-JA-118, Rubenstein, SDM (May 25, 1990), *aff'd,* 1990 WL 200482 (Del. Super. Ct. Nov. 20, 1990) (Poppiti, J.) (D.I. 233 at Ex. 12). *But see Playtex, Inc. v. Columbia Casualty Co.,* No. 88C-MR-233, Faw, SDM (Del. Super. Ct. Oct. 4, 1991) (D.I. 233 at Ex. 13). Similarly, a New Jersey trial court supports this line of analysis. *SCM Corp. v. Lumbermans' Mutual Casualty Co. (In re Environmental Ins. Declaratory Judgment Actions),* Docket Nos. L-8573-89, L-96187-87 (N.J. Super. Ct., Law Div. Sept. 20, 1990) (D.I. 233 at Ex. 14). A few federal district courts have also appeared to adopt similar reasoning. *See, e.g., Potomac Elec. Power Co. v. California Union Ins. Co.,* 136 F.R.D. 1, 4 (D.D.C. 1990).

[**12]

Courts' statements of what constituted issue injection began to become more liberal and often came to resemble a general balancing test with reliance on *Hearn v. Rhay,* 68 F.R.D. 574 (E.D. Wash. 1975). n4 Expansive applications of implied waivers, however, have led to substantial academic criticism, which courts upon mature reflection have begun to adopt. The core problem, according to this line of reasoning, is that expansive language for determining implied waiver leads to a type of ad hoc determination that ignores the system-wide role of the attorney-client privilege and undermines any confidence that parties can place in that privilege. *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 115 F.R.D. 308, 311-12 (N.D. Cal. 1987); Marcus, *supra,* at 1628-33, 1648-53; Davidson and Voth, *Waiver of the Attorney-Client Privilege,* 64 Oregon L. Rev. 637, 646-50 (1986); *Developments in the Law - Privileged Com-*

*munications, supra,* at 1637-43. These authorities contend that extremely liberal waiver rules increase litigation costs and judicial time spent on discovery disputes, favor the wealthiest litigants, [**13] undermine the values served by the privilege rules, and vary according to the identity of the litigants and their purported need for privileged information. *See Succession of Smith v. Kavanaugh, Pierson & Talley,* 513 So.2d 1138, 1145-46 (La. 1987); Marcus, *supra,* at 1628-33, Davidson and Voth, *supra,* at 640, 646-50 (1986); *Developments* [*414] *in the Law - Privileged Communications, supra,* at 1637-43.

> n4 Numerous courts have used language originating in *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D. Wash. 1975). *See, e.g., Conkling v. Turner,* 883 F.2d 431, 434 (5th Cir. 1989) (citing cases). [HN9] A party is treated as having waived its privileges if:
>
> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.
>
> *Hearn,* 68 F.R.D. at 581. Courts praised the *Hearn* court for adding a discretionary element. This element supposedly would be less harsh and rigid and more protective of attorney-client privilege than the traditional or automatic waiver rule. *Greater Newburyport Clamshell Alliance v. Public Serv. Co.,* 838 F.2d 13, 20 (1st Cir. 1988); *Zenith Radio Corp. v. United States,* 764 F.2d 1577, 1579-80 (Fed. Cir. 1985). In actuality, however, the *Hearn* language often provided much less protection for the privilege in application, because many understood the decision to mean that the important protected information is "at issue" and "vital" wherever it contains information relevant to the case. Some problems may stem from the loose manner in which the *Hearn* court originally stated its holding. Some of the decision's other language undermines an expansive reading of its holding. *See infra* note 6. In addition, with regards to the facts in the case, one court noted, "The actual holding in [*Hearn*] is not in point because the party there asserting the privilege had expressly relied upon the advice of counsel as a defense to the plaintiff's action." *Connell v. Bernstein-Macaulay, Inc.,* 407 F. Supp. 420, 422 (S.D.N.Y. 1976).

[**14]

In addition to the system-wide problems, the fairness to individual litigants and the intent demonstrated by a particular act is unclear in the broadest applications of implied waiver. n5 Davidson and Voth, *supra,* at 640. Fairness concerns should focus on how a party plans to prove the elements of its case, not whether the ability to claim the privilege seems fair to a court in a particular case. Marcus, *supra,* at 1630.    [HN10] Courts have generally rejected the idea that a party waives the attorney-client privilege by bringing a suit. *See, e.g., Zenith Radio Corp. v. United States,* 764 F.2d 1577, 1580 (Fed. Cir. 1985; *Barr Marine Products, Inc. v. Borg-Warner Corp.,* 84 F.R.D. 631, 635 (E.D. Pa. 1979); *In re Carter,* 62 Bankr. 1007, 1014 (Bankr. C.D. Cal. 1986). Contending that parties seeking relief voluntarily relinquish their attorney-client privilege overstates the intention of the party's action. The party would be forced to forsake a claim or reveal its privileged information. This "choice" unfairly implies an intent to waive upon the insured. A better explanation is that an unlimited doctrine [**15] of waiver reflects a hostile attitude toward the existence of attorney-client privilege. *See Connell v. Bernstein-Macaulay, Inc.,* 407 F. Supp. 420, 422 (S.D.N.Y. 1976) ("If the mere bringing of a lawsuit waived the privilege, it would have little meaningful existence."); *McCormack on Evidence §* 97 n.5 (Supp. 1987) ("Scattered case authority suggests that the privilege may be waived by institution of certain types of claims or assertion of certain defenses. Such decisions would appear to verge close to acceptance of the Benthamite view of the privilege [as an unnecessary obstacle], and at present may be classed as aberrational.").

n5 The Eighth Circuit has stated that in determining implied waiver a court should examine (1) implied intention and (2) fairness and consistency. *Sedco Int'l v. Cory,* 683 F.2d 1201, 1206 (8th Cir.), *cert. denied,* 459 U.S. 1017, 74 L.Ed.2d 512, 103 S.Ct. 379 (1982).

The logic of implying waivers has its limits. Remington proposes two [**16] situations where the "at issue" doctrine applies. The first application, where a party injects the contents of a privileged communication into the litigation, directly speaks to the central concern over "truth-garbling." For instance, where a party relies on legal advice to satisfy the elements of a claim or defense, this principle applies. Since the party is injecting part of the confidential communication into the litigation, the attorney-client privilege should not protect examination of the privileged communication. Some commentators suggest restricting the doctrine to this category. *See*

Davidson and Voth, *supra,* at 649; Marcus, *supra,* at 1633. By claiming that its attorney's fees or actions in the underlying litigation were reasonable, Remington does not forfeit its protection of the privileged documents, providing it does not rely on the exact nature of the legal advice made at that time or introduce its contents to prove these assertions as part of its legal case. Nor are the facts here so intertwined with the assertion of the attorney-client privilege that pleading of the facts necessarily reveals part of the privileged information.

The second [**17] application of waiver that Remington urges is where the information is required to permit truthful resolution of the issue. *See, e.g., Jules Jurgeson/Rhapsody, Inc. v. Rolex Watch, U.S.A., Inc.,* C.A. No. 85-5605, 1989 WL 6210 at *1 (E.D. Pa. 1989); *Hoechst Celanese Corp. v. National Union Fire Ins. Co.,* C.A. No. 89C-SE-35, slip op. at 17 (Del. Super. Ct. Feb. 21, 1992) (stating two categories). This application stems from the principle of anticipatory waiver and is actually consistent with *Hearn* as it was originally conceived. n6

n6 At its inception the rule in *Hearn* was generally consistent with the traditional notion of anticipatory waiver and the concern over duplicitous use of privileged communications. In proposing its test, the *Hearn* court developed "a new and narrowly limited exception." *Hearn,* 68 F.R.D. at 580. In attempting to state some "strict limitations" to this exception, the court emphasized the nature of the communications. *Id.* at 582. "The contents of the communications with their attorney is inextricably merged with the elements of plaintiff's case and defendants' affirmative defense . . .; they inhere in the controversy itself, and to deny access to them would preclude the court from a fair and just determination of the issues." *Id.* Thus, if the party wishes to establish the elements of the case or affirmative defense on which it has the burden of proof, it must divulge this information in order to prove its case or attempt to shield only part of the information. The court should not adopt the position of a party that has the burden of proof where it lacks the information to determine the issue justly and fairly.

It is worth noting that various courts have attempted to limit the expansive reading of *Hearn* in various ways. Some have restricted *Hearn* by noting that the party seeking to pierce the attorney-client privilege must overcome a high burden. *See, e.g., Chase Manhattan Bank v. Drysdale Secur. Corp.,* 587 F. Supp. 57, 58 (S.D.N.Y. 1984); *International Business Ma-*

*chines Corp. v. Comdisco, Inc.,* C.A. No. 91- C-07-199, 1992 WL 52413 at *3 (Del. Super. Ct. March 11, 1992). Others courts have attempted to place a limitation within the statement of the *Hearn* test by construing the definition of what is "at issue" or "vital" less expansively. For instance, the court in *Standard Chartered Bank v. Ayala Int'l Holdings* held that filing counter-claims failed to satisfy the second and third ele-ments of the *Hearn* test. 111 F.R.D. 76, 81 (S.D.N.Y. 1986). The actual legal advice ren-dered by its attorneys was not placed "in issue," even though it may have been relevant in the case. *Id.* at 80-85.

In this spirit some courts have listed the types of communications to which the doctrine could apply. *See, e.g., Sedco Int'l v. Cory,* 683 F.2d 1201, 1206 (8th Cir. 1982) ("Courts have found waiver by implication when a client testi-fies concerning portions of the attorney-client communication, when a client places the attor-ney-client relationship directly at issue, [i.e., a malpractice suit,] and when a client asserts reli-ance on an attorney's advice as an element of a claim or defense." (citations omitted)); *Jules Jurgeson/Rhapsody, Inc. v. Rolex Watch U.S.A., Inc.,* C.A. No. 85-5605, 1989 WL 6210 at *1 (E.D.Pa. 1989) (Implied waiver occurs generally "only where the party resisting discovery 'raises as a defense that which transpired between client and counsel, or reliance on advice of counsel, or questions counsel's authority.'" (citations omit-ted)); *Clark v. City of Munster,* 115 F.R.D. 609, 614 (N.D. Ind. 1987) ("The privileged communi-cations were not placed at issue [because the party] has not challenged the advice given to him by his attorney nor has he attempted to rely upon that advice as the basis of a claim or defense."). In accord with this approach, many statements of the doctrine also require the privileged informa-tion to be "directly at issue." *See, e.g., Hearn,* 68 F.R.D. at 583; 4 *Moore's Federal Practice* P 26.64[3-2] at 26-385 (1991); *see also In re Carter,* 62 Bankr. 1007, 1014 (Bankr. C.D. Cal. 1986) (Waiver occurs "if the exact nature of the former attorney's advice is put in-issue.").

[**18]

[*415] The way in which courts have dealt with this type of waiver has become inconsistent and unneces-sarily complicated. [HN11] If the information is actu-ally required for a truthful resolution of the issue on which the party has raised by injecting the issue, the party must either waive the attorney-client privilege as to

that information or it should be prevented from using the privileged information to establish the elements of the case. If the Court cannot find information necessary for a truthful resolution at this point, it will not find the evi-dence convincing enough to meet the burden of persua-sion. Often, although courts speak in terms of necessity, the party reveals that it is trying to rely on part of its privileged information, in which case the first principle compels disclosure. In the type of case here the party can still make its choice explicitly and assume the risk for failing to disclose materials claimed to be necessary to determine the truth where the party has the burden of proof. *See Independent Productions Corp. v. Loew's, Inc.,* 22 F.R.D. 266, 277 (S.D.N.Y. 1958); *cf.* Davidson and Voth, *supra,* at 649 ("The better rule might [**19] be one which restricts subject matter waiver to the case in which the client affirmatively uses an attorney-client communication as evidence."); Marcus, *supra,* at 1633 ("This waiver doctrine should be limited to cases in which the privilege-holder injects the privileged material itself into the case."). If the party fails to allow pretrial discovery of a confidential matter, the party will be pre-cluded from introducing that evidence. *International Telephone & Telegraph Corp. v. United Telephone Co.,* 60 F.R.D. 177, 186 (M.D. Fla. 1973).

[HN12] The Court cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant. Liberty Mutual argues it needs the documents in order to determine what Reming-ton knew about the discharges of pollutants it was sued for, the nature of those discharges, whether Remington adequately performed its responsibilities under the poli-cies, the reasonableness of its actions, how it has acted and what it knew in the past, and the amount [*416] of liability. D.I. 232 at 9-11. It is always possible that the client's motive or conduct [**20] was influenced by something his attorney told him, but compelling the pro-duction cannot be justified solely as a means to check the insured's statements. n7 The elements of the attorney-client privilege are not designed to preclude the disclo-sure of relevant factual information. *See Sedco Int'l v. Cory,* 683 F.2d 1201, 1205 (8th Cir. 1982). What Rem-ington's officials knew and did at the Connecticut sites, in response to legal action, and in their decision to seek coverage are subject to discovery, which Liberty Mutual has already taken the opportunity to pursue.

n7 It is not enough to contend that a general principle of fairness requires waiver in order to determine the truth of the insured's statements. First, this principle would apply to any litigant of-fering evidence on a relevant issue. Marcus, *su-pra,* at 1632 n.147. Second, it is worth noting

that a lawyer's ethical duty prevents the lawyer from assisting the client in committing perjury. *Id.* Finally, the liberal discovery rules gives the parties many tools to ferret out the truth in this type of case.

[**21]

Accordingly, based on Remington's assertion of attorney-client privilege and Liberty Mutual's assumption of correctness, no waiver can be implied merely because Remington instituted this action against Liberty Mutual. This conclusion is strengthened by the determination of the lower courts in Connecticut that insurance coverage actions did not foreclose the assertion of attorney-client privilege. As previously discussed, these decisions are entitled to significant weight in determining how the Supreme Court of Connecticut would rule on the waiver of attorney-client privilege. At the same time, Remington's successful assertion of the attorney-client privilege for a particular document will foreclose it from introducing the contents of the privileged document at trial and from relying on the content of legal advice contained in those documents in order to establish any of the elements of its case against Liberty Mutual.

## C. The Cooperation Clause

The claim that the "cooperation clause" in the insurance policy prevents the assertion of attorney-client privilege relies on a theory of contractual waiver. The pertinent clause reads:

> The insured shall cooperate with the [**22] company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy.

D.I. 232 at 25 n.18.

Liberty Mutual largely relies on *Waste Management, Ind. v. International Surplus Lines Ins. Co.,* which interprets another cooperation clause to "impose[] a broad duty of cooperation" that "is without limit or qualification." 144 Ill.2d 178, 579 N.E.2d 322, 328, 161 Ill. Dec. 774 (Ill. 1991). *See also SCM Corp. v. Lumbermans' Mutual Casualty Co. (In re Environmental Ins. Declaratory Judgment Actions),* Docket Nos. L-8573-89 and L-96187-87 (N.J. Super. Ct., Law Div. Sept. 20, 1991). Although some differences in construction may be due to the wording in respective clauses, n8 [HN13] Connecticut courts deciding the issue have explicitly rejected constructions of cooperation clauses that would compel the production of privileged documents in

insurance cases. *Reichhold, supra,* bench op. at 29-35; *Carrier Corp. v. Travelers Indemnity* [**23] *Co., supra,* bench op. at 4; *cf. Chenkus v. Dickson,* No. 28-20-07, 1990 WL 283216 at *2 (Conn. Super. Ct. Sept. 7, 1990) ("Simply because an insured has a duty to cooperate with assigned defense counsel, the insured should not lose his rights to a defense protected by the attorney-client privilege."). Several other courts have also "reject[ed] the conclusion . . . [*417] that the insured has thereby forever contractually waived the attorney-client privilege." *Bituminous Casualty Corp. v. Tonka Corp.,* 140 F.R.D. 381, 386 (D. Minn. 1992); *see, e.g., FMC Corp. v. Liberty Mutual Ins. Co.,* C.A. No. 643058, Order at 2 (Cal. Super. Ct. Sept. 13, 1991) (D.I. 260 at Ex. L); *Playtex, Inc. v. Columbia Casualty Co.,* No. 88C-MR-233, Faw, SDM, slip op. at 19 (Del. Super. Ct. May 1, 1990).

> n8 In *Waste Management,* the cooperation clause provided that the insureds had the duty to assist insurers in the conduct of suits and to "give all such information and assistance as the insurers may reasonably require." *Waste Management v. International Surplus Lines Ins. Co.,* 144 Ill. 2d 178, 579 N.E.2d 322, 327-28, 161 Ill. Dec. 774 (Ill. 1991).

[**24]

The Court concludes that the cooperation clause here does not imply a duty to produce documents protected by attorney-client privilege in a coverage dispute. Liberty Mutual does not seek these documents in order to cooperate on underlying litigation, but to succeed in Remington's coverage dispute against Liberty Mutual. Insurance law principles do not support imposing a duty to cooperate that applies regardless of coverage. A leading treatise states that "upon the insurer's anticipatory breach of its duty to indemnify the insured, the insured is freed from its obligations under the cooperation clause to the extent necessary to reasonably protect itself against the breach." 8 Appelman, *Insurance Law and Practice* § 4786 (Supp. 1991). Remington's position is consistent with its duties under the insurance policy, for either the policy provides coverage, in which case the denial of coverage breaches the insurance contract and relieves Remington of the duty to cooperate, or there is no duty to cooperate because the damage is not the type "to which insurance is afforded under this policy." D.I. 232 at 25 n.18. On the other hand, Liberty Mutual cannot simultaneously contend that [**25] it is entitled to performance of this duty and that its previous denial of coverage was justified.

## D. The Common Interest Exception

Liberty Mutual also urges the production of attorney-client privileged documents because the parties share a common interest in minimizing exposure in connection with the underlying allegations, even though the insurer had no attorney-client relations with those attorneys. In *Waste Management, Inc. v. International Surplus Ins. Co.,* the Illinois Supreme Court accepted this strange theory, reasoning that the commonality of interests creates an exception to the attorney-client privilege even though the parties become adverse. 144 Ill.2d 178, 579 N.E.2d 322, 328, 161 Ill. Dec. 774 (Ill. 1991). A few other courts appear to have accepted this broad interpretation. n9 *See, e.g., Occidental Chem. Corp. v. Hartford Accident and Indem. Corp.,* Index No. 410009180 (N.Y. Sup. Ct., Niagara Co., Nov. 2, 1990) D.I. 233 at Ex. 16).

> n9 Some of the decisions that Liberty Mutual cites as support are distinguishable because an attorney had been retained to represent both the insured and the insurer in a third-party action. That situation is not applicable here, for Liberty Mutual never had an attorney-client relation with any of Remington's attorneys in the underlying actions.

[**26] [HN14]

The attorney-client privilege does not apply under the common interest exception because of the absence of confidentiality, one of the elements necessary for forming attorney-client privilege. Most clearly, confidentiality is absent between two parties where they jointly and simultaneously consult with an attorney and statements are made directly in each other's hearing. A leading treatise explains:

[HN15]

The common interest doctrine is one step beyond the joint consultation where communications by two clients are made directly in each other's hearing is the situation where two parties separately interested in some contract or undertaking, as in the case of borrower and lender or insurer and insured, *engage the same attorney to represent their respective interests, and each communicates separately with the attorney about some phase of common transaction.* Here again it seems that the communicating client, knowing that the attorney represents the other party also, would not ordinarily intend that the facts communicated should be kept secret from him. Accordingly, the doctrine of limited confidentiality has been applied to communication by the insured under a liability insurance policy [**27] *to the attorney employed by the insurance company to* [*418] *represent both the company and the insured.*

*McCormick on Evidence* § 91 (1984) (emphasis added). According to Liberty Mutual, "the insurer and insured are deemed to have a common lawyer with respect to underlying claims." D.I. 232 at 24 n.17. The Court finds no principled reason to deem such a relation to exist or otherwise to engage in such a legal fiction.

The Court follows those courts that have concluded that [HN16] "the rationale which supports the 'common interest' exception to the attorney-client privilege simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials." *Bituminous Casualty Corp. v. Tonka Corp.,* 140 F.R.D. 381, 386 (D. Minn. 1992). *See also FMS Corp. v. Liberty Mutual Ins. Co.,* C.A. No. 643058, Order at 2-3 (Cal. Super. Ct. Sept. 13, 1991) (D.I. 260 at Ex. L); *Society Corp. v. American Casualty Co.,* C.A. No. 1:91CV0327, Order at 5 (N.D. Ohio July 24, 1991) D.I. 260 at Ex. M); *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litigation,* MDL No. 764, slip op. at 6-10 (E.D. Pa. June [**28] 27, 1990) D.I. 260 at Ex. N); *Hoechst Celanese Corp. v. National Union Fire Ins. Co.,* C.A. No. 89C-SE-35 (Del. Super. Ct. Feb. 21, 1992). The doctrine should not apply where "the documents at issue were prepared in an atmosphere of uncertainty as to the scope of any identity of interest shared by" Remington and Liberty Mutual. *Society Corp. v. American Casualty Co., supra,* Order at 5; *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litigation, supra,* slip op. at 10 n.7; *Carey-Canada, Inc. v. Aetna Casualty & Surety Co.,* 118 F.R.D. 250, 251 (D.D.C. 1987). This result is also in accord with the Connecticut court that has directly considered the issue. *Reichhold Chemicals v. Hartford Accident & Indemnity Co.,* CV-88-0351982, bench op. at 29-33 (Conn. Super. Ct. Feb. 1, 1991). The insurer asserts that the parties shared an interest in lowering the amount of damage in the underlying action. Even assuming this to be true, the parties did not then and do not now share an interest in characterizing how that damage occurred, what type of damage has occurred, or how Remington responded to the damage. These [**29] and other issues are interwoven into those issues in which the parties' interests may have overlapped. This litigation, as well as the common occurrence of insurance litigation in general, undermines the proposition that the Court should assume or imply that Remington did not intend to keep its communications confidential from its insurer without an attorney acting on the behalf of both parties.

## II. WORK PRODUCT DOCTRINE

Some of the documents noted on the Revised Privilege Log by Remington are claimed to be protected by the work product doctrine. [HN17] The work product doctrine is governed by Federal Rule of Civil Procedure

26(b)(3). Rule 26(b)(3) allows the production of materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Fed. R. Civ. P. 26(b)(3)*. The rule gives special protection to what is commonly referred to as opinion work product. [**30] "The mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation" may not be overcome by a showing of substantial need. *Id.* Federal law governs the rule's application. *See, e.g., Dunn v. Farm Fire & Casualty Co.,* 927 F.2d 869, 875 (5th Cir. 1991) (distinguishing state law applicable to attorney-client privilege and Federal Rule of Civil Procedure 26(b)(3) and its governing authority).

[HN18] Although "the attorney-client privilege and work product doctrine spring from the same common law origin," *In Grand Jury Proceedings,* 473 F.2d 840, 844 (8th Cir. 1973), the contemporary work product doctrine "is distinct from and broader than the attorney-client privilege." *United* [*419] *States v. Nobles,* 422 U.S. 225, 238, 45 L. Ed. 2d 141, 95 S. Ct. 2160 n.11 (1975). As shown by Rule 26(b)(3) and the previous discussion of the attorney-client privilege, the elements are different. Unlike attorney-client privilege, the right to assert the work product barrier to disclosure belongs in large part to the attorney. *In re Grand Jury Proceedings (FMC Corp.),* 604 F.2d 798, 801 n.4 (3d Cir. 1979). [**31] In addition to protecting confidentiality in the attorney-client relationship, the work product doctrine affords some additional protection to the attorney from unfair disclosure. The Supreme court stated that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor,* 329 U.S. 495, 510-11, 91 L. Ed. 451, 67 S. Ct. 385 (1947). Without this protection, "much of what is now put down in writing would remain unwritten." *Id.* at 511.

## A. The Showing Of Necessity To Overcome The Protection Of The Work Product Doctrine [HN19]

One of the differences between attorney-client privilege and work product doctrine is that the latter can be discovered by a showing of necessity in certain cases. For the purposes of the present motion, Liberty Mutual has accepted the designation of the documents in Remington's Revised Privilege Log as protected by the work product doctrine in the underlying actions. *See supra* note 1. In order to gain factual work product, Liberty Mutual must show a substantial need for the documents

and that their equivalent cannot be acquired [**32] without undue hardship. *See* Fed. R. Civ. P. 26(b)(3). The Third Circuit also allows the discovery of opinion work product on a showing of good cause in rare situations, although this standard is evidently more difficult to meet than that for factual work product. *See In re Grand Jury Investigation,* 599 F.2d 1224, 1230-31 (3d Cir. 1979). The Court cannot conclude that Liberty Mutual has made such a showing with regard to any documents listed in the Revised Privilege Log. The arguments presented in support of this motion point to a general need for relevant information but are insufficient to meet the appropriate standard for either factual or opinion work product.

## B. The Availability Of Work Product Protection

Liberty Mutual contends that the protection for opinion work product "would not screen information directly at issue." 4 *Moore's Federal Practice* P 26.64[4] at 26-385 (2d ed. 1991). *See, e.g., Donovan v. Fitzsimmons,* 90 F.R.D. 583 (N.D. Ill. 1981); *Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co.,* 66 F.R.D. 129 (E.D. Pa. 1975). The application of the "at issue" [**33] doctrine is properly analyzed as an implied waiver rather than a showing of necessity, whose requirements are laid out by Rule 26(b)(3) and the case law that has interpreted it. Mixing the doctrine with showings of general need leads to uncertain results and broad disclosure without distinctions between factual and opinion work product. Implying waiver too broadly and without certainty can undermine the role of work product doctrine by eroding the confidence that can be placed in it. *See generally* Marcus, *supra.* The application to work product brings special consideration with regard to the protection for opinion work product. As the Eighth Circuit has stated, "courts should proceed cautiously when requested to adopt a rule that would have an inhibitive effect on an attorney's freedom to express and record his mental impressions and opinions without fear of having these impressions and opinions used against the client." *In re Murphy,* 560 F.2d 326, 336 (8th Cir. 1977).

The Court finds the tentative guideline of the Supreme Court to be persuasive in determining when work product is put directly "at issue." Work product protections may be [**34] waived where "counsel attempts to make a testimonial use of these materials." *United States v. Nobles,* 422 U.S. 225, 239, 45 L. Ed. 2d 141, 95 S. Ct. 2160 n.14 (1975). Consistent with this principle, Remington may not introduce the contents of any material protected [*420] by the work product doctrine at trial nor rely on the content of those documents in order to establish any of the elements of its claims in this case against Liberty Mutual.

142 F.R.D. 408, *; 1992 U.S. Dist. LEXIS 6691, **

None of the other theories urged upon the Court applies here. Since the Court has already concluded that Remington has no duty to cooperate in this coverage dispute, it is not necessary to determine whether this duty to cooperate compels the production of material protected by the work product doctrine. Furthermore, the common interest exception does not apply to the work product doctrine. As previously explained, where the doctrine applies, it is because there is no confidentiality inherent in the party's communications. The work product doctrine serves a purpose in giving the attorney a zone of privacy. *Hickman v. Taylor,* 329 U.S. 495, 510-11, 91 L. Ed. 451, 67 S. Ct. 385 (1947). There is simply no reason to apply the exception to the work product of an attorney [**35] working on the behalf of one party.

## IV. CONCLUSION

Courts have apparently diverged in the areas we have addressed here. For the foregoing reasons, the Court has determined that no waiver or principle categorically prevents the application of either the attorney-client privilege or work product doctrine in this case. In turn, Remington is prevented from disclosing or relying on these documents not subject to discovery in proving the elements of its claims asserted in this action.

An order will be entered consistent with this Memorandum Opinion.

# TAB  12

LEXSEE

Caution
As of: May 25, 2007

IN THE MATTER OF THE RULES OF PROFESSIONAL CONDUCT AND
INSURER IMPOSED BILLING RULES AND PROCEDURES UGRIN,
ALEXANDER, ZADICK & HIGGINS, P.C., and JAMES, GRAY, BRONSON &
SWANBERG, P.C., Petitioners.

No. 98-612

SUPREME COURT OF MONTANA

2000 MT 110; 299 Mont. 321; 2 P.3d 806; 2000 Mont. LEXIS 104; 57 Mont. St. Rep.
433

September 28, 1999, Argued and Submitted
April 28, 2000, Decided

**SUBSEQUENT HISTORY:**    As Corrected May 5,
2000.

**PRIOR HISTORY:**    ORIGINAL PROCEEDING:
Declaratory Relief.

**DISPOSITION:**    Disclosure by defense counsel of
detailed descriptions of professional services to third-
party auditors without first obtaining the contemporane-
ous fully informed consent of insureds violates client
confidentiality under the Rules of Professional Conduct.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an original application
for declaratory judgment before state's highest court,
petitioner law firms claimed that certain insurer-imposed
billing rules and procedures violated Mont. R. Prof.
Conduct.

**OVERVIEW:** The petitioners claimed that insurers'
rules potentially limiting or directing the scope and ex-
tent of defense counsel's representation of insureds, and
requiring defense counsel to disclose detailed descrip-
tions of professional services to third-party auditors
without first obtaining consent of insureds, violated
Mont. R. Prof. Conduct ("Rules"). The court could prop-
erly invoke original jurisdiction pursuant to its state con-
stitutional mandate to fashion and interpret the Rules.
Under the Rules, the insured was the sole client of de-

fense counsel; the insurer was not a co-client. Third-
party auditors were not confidential agents of insureds
but agents of insurers, and disclosure of detailed billing
statements to third-party auditors constituted disclosure
to a potential adversary. While disclosure of billing in-
formation to insurers was impliedly authorized, disclo-
sure by defense counsel of detailed descriptions of pro-
fessional services to third-party auditors without first
obtaining contemporaneous fully-informed consent of
insureds violated client confidentiality requirements
mandated under the Rules.

**OUTCOME:** Disclosure by defense counsel of detailed
descriptions of professional services to third-party audi-
tors without first obtaining contemporaneous fully-
informed consent of insureds violated Mont. R. Prof.
Conduct client confidentiality mandate. Insured was sole
client; disclosure of billing statements to third-party
auditors, agents of insurers, constituted disclosure to
potential adversary.

**CORE TERMS:** insurer, insured, defense counsel's,
disclosure, auditor, billing, attorney-client, confidential,
audit, citations omitted, prior approval, privileged, inde-
pendent judgment, bad faith action, confidentiality, con-
sultation, co-client, loyalty, carrier, professional judg-
ment, appearance of impropriety, common interests, in-
terfere, Indian Law Resource Center, present case, insur-
ance contract, circle, minutes, practice law, professional
services

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

**LexisNexis(R) Headnotes**

*Constitutional Law > State Constitutional Operation*
*Governments > Courts > Authority to Adjudicate*
*Legal Ethics > Client Relations > General Overview*
[HN1]The Supreme Court of Montana has a constitutional mandate to fashion and interpret the Mont. R. Prof. Conduct. Mont. Const. art. VII, § 2(3).

*Constitutional Law > State Constitutional Operation*
*Governments > Courts > Authority to Adjudicate*
*Legal Ethics > Client Relations > General Overview*
[HN2]See Mont. Const. art. VII, § 2(3).

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Appearance of Impropriety*
*Legal Ethics > Client Relations > Billing & Collection*
[HN3]Whether insurers' billing and practice rules conflict with the Mont. R. Prof. Conduct is a question of law requiring no evidentiary hearing.

*Legal Ethics > Client Relations > Effective Representation*
[HN4]Competence. A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. Mont. R. Prof. Conduct 1.1.

*Legal Ethics > Client Relations > Conflicts of Interest*
[HN5]Conflict of Interest, Prohibited Transactions. (f) A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Mont. R. Prof. Conduct 1.6. Mont. R. Prof. Conduct 1.8.

*Legal Ethics > Client Relations > Effective Representation*
[HN6]Advisor. In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. Mont. R. Prof. Conduct 2.1.

*Legal Ethics > Client Relations > Conflicts of Interest*
[HN7]Professional Independence of a Lawyer. (c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services. Mont. R. Prof. Conduct 5.4.

*Insurance Law > Claims & Contracts > General Overview*
[HN8]An insurance contract may place absolute control of litigation in the hands of the insurer.

*Insurance Law > Claims & Contracts > General Overview*
[HN9]The provisions of an insurance contract which give the insurance company the right and impose a correlative duty to defend suits against the insured have the effect of placing absolute and exclusive control over the litigation in the insurance carrier.

*Insurance Law > Bad Faith & Extracontractual Liability > General Overview*
*Insurance Law > Claims & Contracts > Disclosure Obligations > Fraudulent Intent*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN10]Absent a conflict of interest, the attorney hired by the insurance company to defend its insured represents both the insurer and the insured, when considering client identity in determining whether insurer-defense counsel communications are privileged.

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs*
*Insurance Law > Claims & Contracts > Costs & Attorney Fees > Unreasonable & Vexatious Actions*
[HN11]If an insurer may be held liable for the actions of its attorney under a theory of agency, it is axiomatic that the insurer may be responsible for costs, expenses and attorney fees when the insurer multiplies the proceedings in any case unreasonably and vexatiously.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*

[HN12]The attorney-client privilege applies to communications between insurers and defense counsel in cases where by contract the insurer is deemed to have assumed absolute control of the litigation.

*Legal Ethics > Client Relations > General Overview*
[HN13]The Mont. R. Prof. Conduct have application in all cases involving attorneys and clients.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Conflicts of Interest*
[HN14]Under the Mont. R. Prof. Conduct, the insured is the sole client of defense counsel.

*Legal Ethics > Client Relations > General Overview*
[HN15]The Supreme Court of Montana is not bound by the Restatement of the Law Governing Lawyers in interpreting Montana's Rules of Professional Conduct.

*Legal Ethics > Client Relations > Appearance of Impropriety*
*Legal Ethics > Client Relations > Conflicts of Interest*
*Legal Ethics > Client Relations > Effective Representation*
[HN16]The requirement of an insurer's prior approval of the conduct of the defense of an action against an insured by an attorney fundamentally interferes with defense counsels' exercise of independent judgment, as required by Mont. R. Prof. Conduct 1.8(f). Further, prior approval creates a substantial appearance of impropriety in its suggestion that it is insurers rather than defense counsel who control the day to day details of a defense.

*Legal Ethics > Client Relations > Conflicts of Interest*
*Legal Ethics > Client Relations > Effective Representation*
[HN17]Defense counsel in Montana who submit to the requirement of prior approval by an insurer of the conduct of the defense of an action against an insured violate their duties under the Mont. R. Prof. Conduct to exercise independent judgment and to give undivided loyalty to insureds.

*Legal Ethics > Client Relations > Confidentiality of Information*
[HN18]Confidentiality of Information. (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except

for disclosures that are impliedly authorized in order to carry out the representation. Mont. R. Prof. Conduct 1.6(a).

*Business & Corporate Law > Agency Relationships > General Overview*
*Insurance Law > Claims & Contracts > Estoppel & Waiver > Agents & Brokers*
*Insurance Law > Industry Regulation > Insurance Company Operations > General Overview*
[HN19]Third-party auditors are not confidential agents of insureds but function rather as agents of insurers.

*Legal Ethics > Client Relations > General Overview*
[HN20]The Mont. R. Prof. Conduct do not vary according to commercial exigencies.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Billing & Collection*
*Legal Ethics > Client Relations > Conflicts of Interest*
[HN21]Disclosure of detailed billing statements to an insurer's third-party auditor is disclosure to a potential adversary. In third-party auditors' review of confidential information, there is always the possibility of disputes between auditors, defense counsel and their clients that could result in litigation.

*Legal Ethics > Client Relations > Confidentiality of Information*
*Legal Ethics > Client Relations > Conflicts of Interest*
[HN22]Disclosure to persons needed in the representation or appropriate to a consultation does not also justify disclosure to a potential adversary.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
*Legal Ethics > Client Relations > Conflicts of Interest*
[HN23]Insurers' third-party auditors are not agents of defense counsel, nor are disclosures to them communications passing from one party to the attorney for another party.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Billing & Collection*

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 25 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN24]Disclosures of billing information to insurers are impliedly authorized to carry out representation.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Conflicts of Interest*

[HN25]Insurers' third-party auditors stand in potential conflict with the interests of insureds in competent representation by defense counsel who exercise their independent professional judgment.

*Insurance Law > Claims & Contracts > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*

[HN26]Under Mont. R. Prof. Conduct 1.6, for an insured to make a fully informed consent to disclosure of detailed professional billing statements to an insurer's third party auditor, the consent must be contemporaneous with the facts and circumstances of which the insured should be aware.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
*Evidence > Privileges > Accountant-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*

[HN27]By its plain language, Mont. R. Prof. Conduct 1.6 extends to all communications between insureds and defense counsel. This rule is therefore broader in both scope and protection than the attorney-client privilege and the work product doctrine.

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN28]Disclosure by defense counsel of detailed descriptions of professional services to insurers' third-party auditors without first obtaining the contemporaneous fully-informed consent of insureds violates client confidentiality under the Mont. R. Prof. Conduct.

**COUNSEL:** For Petitioners: Neil E. Ugrin (argued) Gary M. Zadick (argued); Ugrin, Alexander, Zadick & Higgins, Great Falls, Montana, Robert James (argued), Bert Fairclough (argued); James, Gray, Bronson & Swanberg, Great Falls, Montana.

For Respondents: Ronald F. Waterman, Thomas E. Hattersley, III; Gough, Shanahan, Johnson & Waterman, Helena, Montana, Lloyd E. Williams, Jr. (argued), David E. Morgans; Williams & Montgomery, Chicago, Illinois (for National Farmers Union Property and Casualty Company, James C. Cumming, Attorney at Law, Helena, Montana (for National Farmers Union Property and Casualty Company), Lawrence R. Samuels, Jacquelyn F. Kidder, Robert L. Carter; Ross & Hardies, Chicago, Illinois (for St. Paul Fire and Marine Insurance Company, USF&G Company, TIG Insurance Company), Thomas M. Welsch; Poore, Roth & Robinson, Butte, Montana, William T. Barker, Jeffrey P. Lennard, Tracy T. Segal; Sonnenschein, Nath & Rosenthal, Chicago, Illinois (for Allstate Insurance Company, Zurich American Insurance Company, Universal Underwriters Insurance Company).

For Amicus Curiae Supporting Petitioners: Sam E. Haddon, Esq. (argued), Missoula, Montana; Rockwood Brown, Esq. (argued), Billings, Montana (for Montana Defense Trial Lawyers), Steven H. Gurnee, Esq., San Francisco, California (for Association of Defense Counsel of Northern California); Robert A. Davidson, Esq., Los Angeles, California (for Association of Southern California Defense Counsel), Mark L. Stermitz, Esq., Missoula, Montana (for Montana Appleseed Center for Law & Justice, Inc.), Brian M. Morris; Goetz, Gallik, Baldwin & Dolan, Bozeman, Montana; Elizabeth Brennan; Rossbach Brennan, Missoula, Montana; Patricia O'Brien Cotter (argued); Cotter & Cotter, Great Falls, Montana (for Montana Trial Lawyers Association).

For Amicus Curiae Supporting Respondents: Jacqueline T. Lenmark; Keller, Reynolds, Drake, Johnson & Gillespie, Helena, Montana (for American Insurance Association), Charles Silver, Esq., University of Texas School of Law, Austin, Texas (on his own behalf), Allen B. Chronister; Chronister, Moreen & Larson, Helena, Montana; John S. Piece, David J. McMahon, Gary A. Bresee; Barger & Wolen, San Francisco, California (for Legalguard, Inc.), Mark D. Parker; Parker Law Firm, Billings, Montana (for National Association of Independent Insurers).

**JUDGES:** Justice W. William Leaphart delivered the Opinion of the Court. We concur: J. A. TURNAGE, KARLA M. GRAY, JIM REGNIER, TERRY N. TRIEWEILER, WILLIAM E. HUNT, SR., JAMES C. NELSON.

**OPINION BY:** W. William Leaphart

**OPINION**

[**323]    [***807]    Justice W. William Leaphart delivered the Opinion of the Court.

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 26 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

[*P1]   In an original application for declaratory judgment, Petitioners assert that insurer-imposed billing rules and procedures violate the Rules of Professional Conduct.

[*P2]   We address the following issues:

[*P3]   1. May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured?

[***808]   [*P4]   2. May an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

Factual and Procedural Background

[*P5]   In June, 1985 we adopted the Rules of Professional Conduct "as rules governing the conduct of persons admitted to practice law before this Court and all state courts in the State of Montana." In November, 1998 Petitioners filed an application for original jurisdiction and declaratory relief. Petitioners requested a declaratory ruling on two issues: 1. May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured? 2. May [**324]   an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

[*P6]   We accepted original jurisdiction. We ordered that Petitioners identify insurers doing business in Montana whom they sought to have bound by this Court's determination of the issues, that the insurers (Respondents) file copies of the billing rules that they enforce in Montana, directly or through an auditing agency, and that the parties advise the Court whether they needed an evidentiary hearing.

[*P7]   Respondents moved this Court for an evidentiary hearing and Petitioners filed a brief in opposition. In March, 1999 we issued an order denying the request for an evidentiary hearing but allowing Respondents to jointly file an expert opinion. In September, 1999 this matter was argued before the Court.

Discussion

[*P8]   As a preliminary matter, we note that Respondents argue that this Court erred in accepting origi-

nal jurisdiction of this case and in denying their request for an evidentiary hearing. Respondents argue in part that there is no justiciable case, that the Petitioners lack standing, and that there is no issue of statewide importance.

[*P9]   Respondents' arguments are wholly without merit. [HN1]We have a constitutional mandate to fashion and interpret the Rules of Professional Conduct. [HN2]See Article VII, Section 2 of Montana's Constitution, providing that "[the supreme court] may make rules governing appellate procedure, practice and procedure for all other courts, admission to the bar and the conduct of its members." Art. VII, Sec. 2(3), Mont. Const. Compare §§ 37-61-101, MCA, et. seq (providing procedures for licensing and regulation of members of Montana's bar). Further, [HN3]whether insurers' billing and practice rules conflict with the Rules of Professional Conduct is a question of law that requires no evidentiary hearing. The tension between insurers' billing and practice rules and the Rules of Professional Conduct presents an appearance of impropriety that is a sufficient basis for this Court to exercise its inherent powers and its Constitutional mandate to address the issues presented here. Compare Bergeron v. Mackler (Conn. 1993), 225 Conn. 391, 623 A.2d 489, 494 (recognizing that "considering the appearance of impropriety may be part of the inherent power of the court to regulate the conduct of attorneys"); First American Carriers v. Kroger Co. (Ark. 1990), 302 Ark. 86, [**325]  787 S.W.2d 669, 671 (concluding "fact that Canon 9 [which provided that lawyers should avoid appearance of impropriety] is not in the Model Rules does not mean that lawyers no longer have to avoid the appearance of impropriety"); Matter of Weinroth (N.J. 1985), 100 N.J. 343, 495 A.2d 417, 421 (citations omitted) (concluding " 'even the appearance of impropriety' that casts doubt upon the integrity of the legal process must be avoided").

[*P10]   Moreover, Respondents' contentions that the issues presented in this case are not of statewide importance and that no urgency attends them are belied by the numerous amici briefs and expert opinions that [***809]  Respondents have submitted. Nor is Respondents' contention that Petitioners lack standing tenable. Petitioners clearly have a personal stake in the issue whether their compliance with insurers' billing and practice rules violates the Rules of Professional Conduct. Finally, Respondents' claim that they have not had notice and an opportunity to respond are flatly contradicted by the more than 1000 pages of affidavits, expert opinions, and billing and practice rules that they have filed with this Court, not to mention the numerous supporting amicus curiae briefs that also have been filed.

[*P11]   1. May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by

an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured?

[*P12]  In addressing this issue, there are several Rules of Professional Conduct that we keep in mind.

[*P13]  [HN4]Rule 1.1 provides: "**Competence**. A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.1, M.R.Prof.Conduct.

[*P14]  Rule 1.8 provides in pertinent part:

[HN5]**Conflict of Interest, Prohibited Transactions**

. . . .

(f) A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client consents after consultation;

(2) there is **no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship**; and

(3) information relating to representation of a client is protected as required by Rule 1.6.

[**326]  Rule 1.8, M.R.Prof.Conduct (emphasis added).

[*P15]  [HN6]Rule 2.1 provides in part: "**Advisor**. In representing a client, a lawyer shall exercise independent professional judgment and render candid advice." Rule 2.1, M.R.Prof.Conduct. Rule 5.4 provides in pertinent part: [HN7]"**Professional Independence of a Lawyer** . . . . (c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." Rule 5.4, M.R.Prof.Conduct.

[*P16]  In the present case, the parties do not dispute that insurers' billing and practice rules typically "impose conditions [upon an attorney appointed by an insurer to represent an insured] limiting or directing the scope and extent of the representation of his or her client." The Petitioners have focussed on the requirement of prior approval in insurers' billing and practice rules. We therefore address that condition of representation while recognizing that other conditions limiting or directing the scope and extent of representation of a client may also implicate the Rules of Professional Conduct.

[*P17]  As a representative set of litigation guidelines, we briefly consider the guidelines submitted by the St. Paul Companies (hereafter, St. Paul). The declared

policy of St. Paul's Litigation Management Plan (hereafter, the Plan) is to "provide a systematic and appropriate defense for St. Paul and its insureds, and to vigorously defend nonmeritorious claims and claims where the demands are excessive."

[*P18]  St. Paul promotes a "team" approach to litigation in which each member has distinct responsibilities. The claim professional is "responsible for disposition of claims, whether in suit or not. We expect the St. Paul claim professional to take the lead in initiating settlement negotiations . . . . We also expect the claim professional to have significant input into development of the litigation strategy (i.e., settle or try)." The Plan also "recognizes that defense counsel's primary responsibility and obligation are to protect and further the interests of the insured in the conduct of the litigation. Our goal is to cooperate with the insured and defense counsel to achieve the best result possible."

[***810]  [*P19]  However, the Plan states that "motion practice, discovery and research are items that have historically caused us some concern and which we plan to monitor closely. While we foresee very few differences of opinion, **we require that defense counsel secure the consent of the claim professional prior to scheduling depositions, undertaking [**327] research, employing experts or preparing motions**" (emphasis added).

[*P20]  Thus, the Plan expressly requires prior approval before a defense attorney may undertake to schedule depositions, conduct research, employ experts, or prepare motions. The Plan concludes that "we understand that any conflicts between the St. Paul Litigation Management Plan and the exercise of your independent judgment to protect the interests of the insured must be resolved in favor of the insured. We expect, however, to be given an opportunity to resolve any such conflicts with you before you take any action that is in substantial contravention of the Plan."

### A. Whether Montana has recognized the dual representation doctrine under the Montana Rules of Professional Conduct.

[*P21]  Petitioners assert that the insured is the sole client of a defense attorney appointed by an insurer to represent an insured pursuant to an insurance policy (hereafter, defense counsel) and that a requirement of prior approval in insurance billing and practice rules impermissibly interferes with a defense counsel's exercise of his independent judgment and his duty of undivided loyalty to his client. Petitioners argue that because the relationship of insurer and insured is permeated with potential conflicts, they cannot be co-clients of defense counsel.

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

[*P22]   Respondents argue that under Montana law, the rule is that in the absence of a real conflict, the insurer and insured are dual clients of defense counsel. From this fundamental premise, Respondents argue that as a co-client of defense counsel, the insurer may require pre-approval of attorney activities to assure adequate consultation. Respondents argue further that defense counsel must abide by a client's decisions about the objectives of representation and that defense counsel are obliged to consult with a client about the means for the objectives of representation. Respondents also argue that under Montana law, an insurer is vicariously liable for the conduct of defense counsel and that an insurer's control of litigation justifies holding an insurer vicariously liable for the conduct of defense counsel.

[*P23]   We conclude that Respondents have misconstrued our past decisions. This Court has not held that under the Rules of Professional Conduct, an insurer and an insured are co-clients of defense counsel. The Montana decisions chiefly relied upon by Respondents are inapposite because each one concerns situations where the insurer had "absolute" control of the litigation. None of the Montana decisions [**328] cited by Respondents addresses whether an insurer is a co-client under the Rules of Professional Conduct.

[*P24]   The central case underlying the Montana decisions cited by Respondents is Jessen v. O'Daniel (D.Mont. 1962), 210 F. Supp. 317. Jessen concerned a bad faith action brought by an insured against his insurer following underlying litigation in which the insurer had hired an attorney to represent its interests and those of its insured. Further, there was "the unique situation of the insured paying a fee to the attorney selected by the insurer, to do what in effect the attorney was already required to do under his contract of employment by the insurance company." Jessen, 210 F. Supp. at 331. In the course of negotiations between the parties in the underlying litigation, the insurer's attorney failed to communicate all of the offers that the parties made to each other. The court in Jessen found that "had [the attorney] communicated the respective offers to the other parties, the case would probably have been settled." Jessen, 210 F. Supp. at 324.

[*P25]   The insurer in Jessen argued that the attorney was "acting as a mutual attorney or agent for both [the insurer] and [the insured], and accordingly 'neither party can be held accountable for knowledge that the mutual attorney had, but did not transfer to the other parties or to either of them.' " Jessen, 210 F. Supp. at 330. The court in Jessen acknowledged a conflict in the authorities [***811] regarding whether "the insurance carrier becomes an agent of the insured with respect to settlement and trial, or is in the nature of an independent

contractor." Jessen, 210 F. Supp. at 331 (citations omitted). However, the court concluded that

The precise relationship is unimportant. The authorities agree that these provisions of the contract have the effect of placing absolute and exclusive control over the litigation in the insurance carrier, with "the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interests of the parties."

Jessen, 210 F. Supp. at 331 (citation omitted) (emphasis added). The Jessen court concluded that "there can be no question that in the absence of the special fee arrangement [1] with [the insured], [the attorney's] conduct and knowledge cannot be imputed to [the insurer]. Under [**329] the circumstances here, the special [fee] arrangement cannot relieve [the insurer] from its responsibility for [the attorney's] conduct in failing to disclose the various offers to the respective parties." Jessen, 210 F. Supp. at 332.

> 1     As previously noted, the insured also paid a
> fee to the attorney whom the insurer hired.

[*P26]   The court in Jessen emphasized the complete control over litigation that the insurer held under the insurance contract. Jessen did not address whether the attorney's compliance with that contract violated the Rules of Professional Conduct. Nor did Jessen determine whether the insured and the insurer were co-clients under the Rules of Professional Conduct.

[*P27]   As Respondents point out, subsequent Montana decisions have recognized Jessen's conclusion that [HN8]an insurance contract may place absolute control of litigation in the hands of the insurer. In Safeco Ins. Co. v. Ellinghouse (1986), 223 Mont. 239, 725 P.2d 217, the Court rejected an insurer's claim that because the attorney it hired was an independent contractor, the insurer was not responsible for the mistakes of the attorney. Relying on Jessen, the Court in Ellinghouse concluded that [HN9]"the provisions of an insurance contract which give the insurance company the right and impose a correlative duty to defend suits against the insured have the effect of placing absolute and exclusive control over the litigation in the insurance carrier." Ellinghouse, 223 Mont. at 252-53, 725 P.2d at 226 (citations omitted).

[*P28]   Similarly, in State v. Second Judicial Dist. Court (1989), 240 Mont. 5, 783 P.2d 911, the Court considered whether communication between an insurer and its attorneys, which occurred after litigation began, was privileged from disclosure in a bad faith action. Citing Jessen and Ellinghouse, the Court determined that [HN10]"absent a conflict of interest, the attorney hired by the insurance company to defend its insured, repre-

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 29 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

sents both." **Second Judicial Dist. Court**, 240 Mont. at 10, 783 P.2d at 914. We note, however, that the Court considered client identity only in determining whether insurer-defense counsel communications were privileged.

[*P29] In Tigart v. Thompson (1990), 244 Mont. 156, 796 P.2d 582, the district court granted plaintiff's motions for a new trial and attorney fees and costs under § 37-61-421, MCA. The insurer appealed the award of attorney fees and costs, arguing in part that it was not a "party" under § 37-61-421, MCA. The Court in **Tigart** noted the **Jessen** court's determination that insurance contracts place exclusive control of the litigation in the insurer and concluded that [HN11]"if an insurer may be held liable for the actions of its attorney, as was the case in [**330] **Ellinghouse**, under a theory of agency, it is axiomatic that the insurer may be responsible for costs, expenses and attorney fees when the insurer 'multiplies the proceedings in any case unreasonably and vexatiously.' " **Tigart**, 244 Mont. at 160, 796 P.2d at 585. Thus, relying on **Jessen**, the **Tigart** Court concluded that the insurer was liable for the conduct of its attorney because of the insurer's complete control over the litigation.

[*P30] In Palmer By Diacon v. Farmers Ins. (1993), 261 Mont. 91, 861 P.2d 895, the insured brought suit against the insurer, arguing that the insurer's denial of his claim for uninsured motorist benefits was made in bad faith. The insured claimed that an unidentified truck ran his motorcycle off a road. [***812] When the insurer denied his claim based on the statement of a witness that the truck was in its own lane, the insured filed suit. The district court ordered the insurer to produce all claim file materials dated before the time when the insured indicated that he would bring a bad faith action against the insured. Those materials "included confidential reports sent to [the insurer] by the attorneys who represented it in the uninsured motorist case." **Palmer**, 261 Mont. at 100, 861 P.2d at 900. Subsequently, the district court ruled for the insured. On appeal, the insurer raised the issue whether the attorney-client privilege applied in "first-party bad faith cases in which the insurer's attorney did not represent the insured's interests in the underlying case." **Palmer**, 261 Mont. at 107, 861 P.2d at 905.

[*P31] Defining first-party bad faith actions as cases where the plaintiff is the insured, the **Palmer** Court distinguished two kinds of first-party bad faith cases. The Court determined that one kind "involves dual representation by the attorney." **Palmer**, 261 Mont. at 108, 861 P.2d at 905. Such cases often arise when "a third-party claimant obtains a judgment in excess of policy limits and the insured later sues the insurance company for failure to settle within policy limits." **Palmer**, 261 Mont. at 108, 861 P.2d at 905. Quoting **Jessen**, the **Palmer** Court determined that in such first-party bad faith cases,

"under an insurance contract . . . the insurer initially employs the attorney to represent the interests of **both** the insured and the insurer." **Palmer**, 261 Mont. at 108, 861 P.2d at 905. The **Palmer** Court recognized that other courts have held that under that kind of first-party bad faith action, "the insured is entitled to the entire claim file prepared for the underlying lawsuit, because the insurer created the file primarily on behalf of the insured." **Palmer**, 261 Mont. at 108, 861 P.2d at 905 (citation omitted).

[**331] [*P32] However, under the facts in **Palmer**, the Court concluded that the action was a distinct kind of first-party bad faith action and that when the insurer denied the insured his uninsured motorist coverage, the insurer stepped into the shoes of the unidentified third-party motorist. **Palmer**, 261 Mont. at 108, 861 P.2d at 905-06. The **Palmer** Court further concluded that "the attorneys who represented [the insurer] in the uninsured motorist case have not represented [the insured], therefore the dual representation reasoning does not apply in this case." **Palmer**, 261 Mont. at 108, 861 P.2d at 906. Like the Court in **Second Judicial Dist. Court**, the **Palmer** Court recognized the dual representation doctrine only in determining whether the communications between an insurer and its attorneys are subject to the attorney-client privilege.

[*P33] As the foregoing decisions demonstrate, we have followed **Jessen** in holding insurers responsible for the conduct of defense counsel and we have applied [HN12]the attorney-client privilege to communications between insurers and defense counsel in cases where by contract the insurer was deemed to have assumed absolute control of the litigation. None of these decisions addressed whether insurers and insureds are co-clients under the Rules of Professional Conduct, and none of them addressed whether defense counsels' compliance with insurance contracts that repose "absolute" control of litigation in insurers violated the Rules of Professional Conduct.

[*P34] We note that Respondents argue that insurance contracts effectively place absolute control of litigation with insurers. However, Respondents' claim of absolute control of litigation cannot be reconciled with their insistence that whenever a conflict may arise between their litigation guidelines and an attorney's ethical obligations, the attorney is to follow the ethical course of action. Respondents' assertion that defense counsel are not only free to but must follow their independent judgment is inconsistent with their claim that insurers have absolute control of litigation.

**B. Whether insurers and insureds are co-clients under Montana's Rules of Professional Conduct.**

[\*P35] We turn to the question whether an insurer is a client of defense counsel under the Rules of Professional Conduct. We note that some other courts have concluded that the insurer is not a client of defense counsel. [\*\*\*813] In Atlanta Int. Ins. Co. v. Bell (Mich. 1991), 438 Mich. 512, 475 N.W.2d 294, the court addressed whether defense counsel retained by an insurer to defend its insured may be sued by the insurer for professional malpractice. [\*\*332] Recognizing the general rule that an attorney will only be held liable for negligence to his client, the court determined that "the relationship between the insurer and the retained defense counsel [is] less than a client-attorney relationship." Bell, 475 N.W.2d at 297. The court further determined, however, that although the insurer is not a client of defense counsel, the defense counsel nevertheless "occupies a fiduciary relationship to the insured, as well as to the insurance company." Bell, 475 N.W.2d at 297. Recognizing further that "the tripartite relationship between insured, insurer, and defense counsel contains rife possibility [sic] of conflict," Bell, 475 N.W.2d at 297, the court reasoned that "to hold that an attorney-client relationship exists between insurer and defense counsel could indeed work mischief, yet to hold that a mere commercial relationship exists would work obfuscation and injustice." Bell, 475 N.W.2d at 297.

[\*P36] Nor is Michigan unique in concluding that the insured is the sole client of defense counsel. See Jackson v. Trapier (Sup. Ct. 1964), 42 Misc. 2d 139, 247 N.Y.S.2d 315, 316 (concluding that once defense undertaken, "defendant is the client and not the insurance carrier even though the latter may have chosen the counsel and may be paying his fee"); Continental Cas. v. Pullman, Comley, et al. (2nd Cir. 1991), 929 F.2d 103, 108 (citation omitted) (concluding "it is clear beyond cavil that in the insurance context the attorney owes his allegiance, not to the insurance company that retained him but to the insured defendant"); Point Pleasant Canoe Rental v. Tinicum Tp. (E.D. Pa. 1986), 110 F.R.D. 166, 170 (concluding "when a liability insurer retains a lawyer to defend an insured, the insured is considered the lawyer's client"); First American Carriers v. Kroger Co. (Ark. 1990), 302 Ark. 86, 787 S.W.2d 669, 671 (citation omitted) (concluding that " 'when a liability insurer retains a lawyer to defend an insured, the insured is the lawyer's client' ").

[\*P37] Respondents argue vigorously that the interests of an insurer and an insured usually coincide and that most litigation is settled within an insured's coverage limits. These arguments gloss over the stark reality that the relationship between an insurer and insured is permeated with potential conflicts. Compare Thomas D. Morgan, What Insurance Scholars Should Know About Professional Responsibility, 4 Conn.Ins.L.J. 1, 7-8,

1997 (concluding that designating insurer "a second client . . . would routinely create the potential for conflicts of interest"); Kent D. Syverud, What Professional Responsibility Scholars Should Know About Insurance, 4 Conn.Ins.L.J. 17, 23-24, 1997 (recognizing "both insurance companies and insureds have important [\*\*333] and meaningful stakes in the outcome [of] a lawsuit against the insureds, stakes that include not just the money that the insurance company must pay in defense and settlement, but also the uninsured liabilities of the insured, which include not just any judgment in excess of liability limits, but also the insured's reputation and other non-economic stakes. The history of liability insurance suggests that unbridled control of the defense of litigation by either the insurance company or the insured creates incentives for the party exercising that control to take advantage of the other"). Compare also Restatement (Third) of the Law Governing Lawyers § 215, Comment f(5) (Proposed Final Draft No. 2, 1998) (emphasis added) (recognizing "material divergences of interest might exist between a liability insurer and an insured . . . . Such occasions for conflict may exist at the outset of the representation or may be created by events that occur thereafter"). In cases where an insured's exposure exceeds his insurance coverage, where the insurer provides a defense subject to a reservation of rights, and where an insurer's obligation to indemnify its insured may be excused because of a policy defense, there are potential conflicts of interest.

[\*P38] We reject Respondents' implicit premise that the Rules of Professional Conduct need not apply when the interests of insurers and insureds coincide. [HN13]The Rules of Professional Conduct have application in all cases involving attorneys and clients. Moreover, whether the interests of [\*\*\*814] insurers and insureds coincide can best be determined with the perfect clarity of hindsight. Before the final resolution of any claim against an insured, there clearly exists the potential for conflicts of interest to arise. Further, we reject the suggestion that the contractual relationship between insurer and insured supersedes or waives defense counsels' obligations under the Rules of Professional Conduct. We decline to recognize a vast exception to the Rules of Professional Conduct that would sanction relationships colored with the appearance of impropriety in order to accommodate the asserted economic exigencies of the insurance market. Compare Kroger, 787 S.W.2d at 671 (concluding "we have consistently taken strong positions in situations where the public's confidence in attorneys might be eroded by the appearance of a conflict of interest"). We hold that [HN14]under the Rules of Professional Conduct, the insured is the sole client of defense counsel.

[*P39] We caution, however, that this holding should not be construed to mean that defense counsel have a "blank check" to escalate litigation [**334] costs nor that defense counsel need not ever consult with insurers. Under Rule 1.5, M.R.Prof.Conduct, for example, an attorney must charge reasonable fees. See Rule 1.5, M.R.Prof.Conduct (providing in part that "[a] lawyer's fees shall be reasonable"). Nor, finally, should our holding be taken to signal that defense counsel cannot be held accountable for their work.

[*P40] Respondents argue further, however, that even if an insurer is not a co-client of defense counsel, an insurer's control of litigation is necessary and appropriate. Respondents argue that the insurer must control the litigation in order to meet its duties to the insured to indemnify and to provide a defense. Further, Respondents argue that the insured has a good faith duty to cooperate with the insurer in defense of a claim that warrants an insurer's control of litigation, and that in any event insureds agree to insurers' control of litigation. Respondents also argue that insureds typically contract for a limited defense that does not protect their reputational interests and that they are not entitled to unlimited expenditures on their behalf. Further, Respondents assert that insurers and insureds have "aligned" interests in minimizing litigation costs and settlements.

[*P41] None of these arguments is persuasive. Animating them is the deeply flawed premise that by contract insurers and insureds may dispense with the Rules of Professional Conduct.

[*P42] Respondents also argue that insurers' control of litigation is justified under the Restatement and that, for example, under the proposed draft for § 215 of the Restatement (Third) of the Law Governing Lawyers, an insurer's direction of a defense is justified regardless whether the insurer is a co-client "when the insurer 'will pay any judgment rendered against the [insured] client and [the insurer] makes a decision that defense costs beyond those designated by [the insurer] would not significantly change the likely outcome.' " We decline to join the parties' arguments over the Restatement. We note that in the draft cited by Respondents, the Restatement states that it "has not been considered by the members of the American Law Institute and does not represent the position of the Institute on any of the issues with which it deals. Restatement (Third) of the Law Governing Lawyers (Proposed Final Draft No. 2, 1998). More importantly, [HN15]we are in no way bound by the Restatement in interpreting Montana's Rules of Professional Conduct.

[*P43] Respondents also suggest that the billing and practice rules' requirement of prior approval is not as strict as it appears, that insurers [**335] employ it to

ensure that they are consulted, and that they "rarely" withhold approval. They contend that preapproval is permissible because the insurer "is entitled not to pay for services that are overpriced or unnecessary to the case."

[*P44] We conclude that whether the requirement of prior approval seldom results in denials of authorization for defense counsel to perform legal services begs the question whether the requirement of prior approval violates the Rules of Professional Conduct. Without reaching the issue here, moreover, we caution further that a mere **requirement** [***815] of consultation may be indistinguishable, in its interference with a defense counsel's exercise of independent judgment and ability to provide competent representation, from a requirement of prior approval. Further, the entitlement of insurers not to pay for overpriced or unnecessary services, which Petitioners do not dispute, also begs the question whether the requirement of prior approval violates the Rules of Professional Conduct.

[*P45] Finally, Respondents argue that their billing and practice rules do not interfere with defense counsels' freedom of action. As previously discussed, they suggest that when an insurer denies approval for particular actions that defense counsel propose, nothing prevents defense counsel from exercising their independent judgment and doing the very thing for which the insurer has denied approval. We reject Respondents' underlying dubious premise that the threat of withholding payment does not interfere with the independent judgment of defense counsel. The very action taken by Petitioners in seeking declaratory relief in the present case is a blunt repudiation of that speculative premise. Further, if the threat of withholding payment were quite as toothless as Respondents suggest, we doubt that they would make such a threat, let alone that they would expressly incorporate it in their billing and practice rules.

## C. Whether the requirement of prior approval violates the Rules of Professional Conduct.

[*P46] Having concluded that the insured is the sole client of defense counsel, we turn to the fundamental issue whether the requirement of prior approval in billing and practice rules conflicts with defense counsels' duties under the Rules of Professional Conduct. The parties appear to agree that defense counsel may not abide by agreements limiting the scope of representation that interfere with their duties under the Rules of Professional Conduct. Compare Annotated Model Rules of Professional Conduct (Fourth ed. Center for Professional Responsibility [**336] American Bar Association) Rule 1.2, p. 12, Comment [4] (concluding "the objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. . . .

[5] An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to agree to representation so limited in scope as to violate Rule 1.1").

[*P47] We conclude that [HN16]the requirement of prior approval fundamentally interferes with defense counsels' exercise of their **independent** judgment, as required by Rule 1.8(f), M.R.Prof.Conduct. Further, prior approval creates a substantial appearance of impropriety in its suggestion that it is insurers rather than defense counsel who control the day to day details of a defense.

[*P48] Montana is not alone in rejecting arrangements that fetter lawyers' undivided duty of loyalty to their clients and their independence of professional judgment in representing their clients. In Petition of Youngblood (Tenn. 1995), 895 S.W.2d 322, the court determined that for inhouse attorney employees of an insurance company to represent insureds was not a **per se** ethical violation. However, the **Youngblood** court emphasized the loyalty that an attorney owes an insured and concluded that

Some of the usual characteristics incident to [the employer-employee] relationship cannot exist between the insurer and the attorney representing an insured. The employer cannot control the details of the attorney's performance, dictate the strategy or tactics employed, or limit the attorney's professional discretion with regard to the representation. Any policy, arrangement or device which effectively limits, by design or operation, the attorney's professional judgment on behalf of or loyalty to the client is prohibited by the Code, and, undoubtedly, would not be consistent with public policy.

Youngblood, 895 S.W.2d at 328. The court went to conclude that "the same loyalty is owed the client whether the attorney is employed and paid by the client, is a salaried employee of the insurer, or is an independent contractor engaged by the insurer." **Youngblood**, 895 S.W.2d at 328.

[***816] [*P49] In addressing whether an insurer is vicariously liable for the malpractice of defense counsel, the Texas Supreme Court was similarly critical of insurer directions to defense counsel that interfere [**337] with their independent judgment and undivided loyalty to insureds. See State Farm Mut. Auto. Ins. Co. v. Traver (Tex. 1998), 980 S.W.2d 625. In **Traver**, the court held that an insurer is not vicariously liable for the malpractice of an independent attorney whom it chooses to defend an insured. The court in **Traver** reasoned that in evaluating whether a principal is vicariously responsible for the actions of its agent, "the key question is whether the principal has the right to control the agent with respect to the details of that conduct." **Traver**, 980

S.W.2d at 627 (citation omitted). The court determined that "even assuming that the insurer possesses a level of control comparable to that of a client, this does not meet the requisite for vicarious liability." **Traver**, 980 S.W.2d at 627. The **Traver** court went on to conclude:

A defense attorney, as an independent contractor, has discretion regarding the day-to-day details of conducting the defense, and is not subject to the client's control regarding those details. While the attorney may not act contrary to the client's wishes, the attorney "is in complete charge of the minutiae of court proceedings and can properly withdraw from the case, subject to the control of the court, if he is not permitted to act as he thinks best." Moreover, because the lawyer owes unqualified loyalty to the insured, **the lawyer must at all times protect the interests of the insured if those interests would be compromised by the insurer's instructions.**

Traver, 980 S.W.2d at 627-28 (citations omitted) (emphasis added). In a concurring and dissenting opinion, Justice Gonzalez criticized the court for a "perhaps naive view of the current status of insurance defense practice." **Traver**, 980 S.W.2d at 632 (J. Gonzalez, concurring and dissenting). Justice Gonzalez cautioned that measures designed to produce a no-frills defense can easily result in only a token defense. I am concerned that defense lawyers may be reluctant to resist cost-cutting measures that detrimentally affect the quality of the insured's defense. There is a real risk that these efforts at cost containment compromise a lawyer's autonomy and independent judgment on the best means for defending an insured. . . . The lawyers are under tremendous pressure trying to serve two masters.

Traver, 980 S.W.2d at 634 (J. Gonzalez, concurring and dissenting).

[*P50] Moreover, in American Ins. Ass'n v. Kentucky Bar Ass'n (Ky. 1996), 917 S.W.2d 568, the court affirmed an Advisory ethics opinion that proscribed insurers' use of inhouse attorneys to represent insureds. The court in Kentucky Bar Ass'n also affirmed an Advisory [**338] ethics opinion concluding that a lawyer may not "enter into a contract with a liability insurer in which the lawyer or his firm agrees to do all of the insurer's defense work for a set fee." **Kentucky Bar Ass'n**, 917 S.W.2d at 569. The court concluded that the pressures exerted by the insurer through the set fee interferes [sic] with the exercise of the attorney's independent professional judgment, in contravention of Rule 1.8(f)(2). The set fee arrangement also clashes with Rule 1.7(b) in that it creates a situation whereby the attorney has an interest in the outcome of the action which conflicts with the duties owed to the client: quite simply, in easy cases,

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 33 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

counsel will take a financial windfall; in difficult cases, counsel will take a financial loss.

**Kentucky Bar Ass'n, 917 S.W.2d at 572.** The **Kentucky Bar Ass'n** court stressed that "the **mere appearance of impropriety is just as egregious as any actual or real conflict**. Therefore, [the Advisory opinion] acts as a prophylactic device to eliminate the potential for a conflict of interest or the compromise of an attorney's ethical and professional duties." **Kentucky Bar Ass'n, 917 S.W.2d at 573** (emphasis added). Recognizing that set fee arrangements are "ripe with potential conflicts," the court concluded that the insurer and insured are "subject to complete divergence at any time. Inherent in all of these potential conflicts is the fear that the entity paying the attorney, the insurer, and not the one to whom the attorney is obligated to defend, the insured, **is controlling the legal** [***817] **representation.**" **Kentucky Bar Ass'n, 917 S.W.2d at 573** (emphasis added).

[*P51] We hold that [HN17]defense counsel in Montana who submit to the requirement of prior approval violate their duties under the Rules of Professional Conduct to exercise their independent judgment and to give their undivided loyalty to insureds. **Compare** Rule 1.7(b) (providing "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibility to another client or to a third person"); Annotated Model Rules of Professional Conduct, Comment [4] to Rule 1.7 (concluding "the critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client"); State v. Jones (1996), 278 Mont. 121, 125, 923 P.2d 560, 563 (concluding "the duty of loyalty is 'perhaps the most basic of counsel's duties' ") (citation omitted).

[**339] [*P52] 2. May an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

[*P53] Rule 1.6 provides in pertinent part:

### [HN18]Confidentiality of Information

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation.

Rule 1.6(a), M.R.Prof.Conduct.

[*P54] As a representative set of guidelines concerning the disclosure of detailed descriptions of professional services to third-party auditors, we consider the guidelines submitted by the Zurich-American Insurance Group (hereafter, Zurich). Zurich's litigation guidelines regarding audits provide in pertinent part:

### Audits

Zurich-American reserves the right to examine and audit books, records, other documents, and supporting material for the purpose of evaluating compliance with its litigation management guidelines, the billing requirements set forth therein, and the reasonableness of the firm's charges. The books, records, and documents we may examine include, without limitation: original time sheets from attorneys and staff; explanations of billing methods and practices; attorney work product and other contents of open and closed files involving the defense of Zurich-American customers; phone message records; and diaries, etc.

All requested books and records must be made available to us during business hours for examination, audit, or reproduction. We shall employ, at our discretion, internal auditors or independent outside auditors for purposes of accomplishing audits.

[*P55] Petitioners argue that Respondents' billing and practice rules require the disclosure of confidential detailed descriptions of professional services. These disclosures are not impliedly authorized and do not further representation. Nor does an insured's contractual consent to disclosure of confidential information cure such disclosures, as an insured cannot know in advance of litigation what will be disclosed. Petitioners argue further that third-party auditors are different from insurers and that they do not fall within a protective "magic circle." [**340] Petitioners argue that under the Rules of Professional Conduct, disclosures of detailed billing statements to third-party auditors are only permissible if the client gives his informed consent after consultation.

[*P56] Respondents respond that third-party auditors are agents of insurers. Because they share "common interests" with insureds in reducing costs of litigation, third-party auditors are part of a privileged community. Further, insureds' consent is implied for disclosures that are reasonably necessary for representation. Thus, disclosures to third-party auditors are like disclosures to secretaries and computer technicians. Moreover, insureds have consented to disclosure by contract. Respondents also argue that whether [***818] a disclosure to a third-party auditor breaches the attorney-client privilege is a question of fact. Further, Respondents argue that much of the information in billing statements is neither confidential nor privileged. Finally, Respondents contend that the obligation of defense attorneys to charge reasonable

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 34 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

fees is meaningless if insurers cannot monitor their services.

[*P57] Underlying the parties' positions is a fundamental disagreement regarding whether third-party auditors are part of a privileged community or magic circle within which confidential information may be shared without waiver of attorney-client or work product privilege. Respondents argue that in United States v. Mass. Inst. of Technology (1st Cir. 1997), 129 F.3d 681, the court recognized insurer and insured as a relationship within which parties share a common interest that protects privileged communications. Respondents argue further that in Indian Law Resources Ctr. v. Dept. of Interior (D. D.C. 1979), 477 F. Supp. 144, the court concluded that an auditor was a confidential agent of a privileged party and that disclosure of attorney fee information did not waive any privilege.

[*P58] **Mass. Inst. of Technology** does not support Respondents' claims. In **Mass. Inst. of Technology**, the IRS requested the billing statements of law firms that had represented MIT. MIT had apparently disclosed the very same billing statements to the Defense Contract Audit Agency (the audit agency), which "helped entities in the Department of Defense review contract performance to be sure that the government [was] not overcharged for services." **Mass. Inst. of Technology, 129 F.3d at 683**. MIT gave IRS the documents it requested but redacted information that it claimed was covered by the attorney-client privilege, the work product doctrine, or both. In turn, the audit agency [**341] refused to give the IRS those documents without the consent of MIT. The IRS also requested minutes of the MIT corporation and its executive and auditing committees. The district court ruled that MIT's disclosure of legal bills to the audit agency forfeited its attorney-client privilege. However, concluding that three of the minutes contained privileged material that MIT had not been shown to have disclosed to the audit agency, the district court declined to order their production.

[*P59] On appeal, MIT argued that its disclosure of the billing statements to the audit agency did not forfeit its attorney-client privilege. Further, while conceding that it could not prove that it had withheld the three minutes from the audit agency, MIT argued that the minutes were protected by the attorney-client privilege and the work product doctrine. On cross-appeal, the IRS argued that the district court erred in concluding that the three minutes contained privileged material.

[*P60] The court in **Mass. Inst. of Technology** concluded that "decisions do tend to mark out, although not with perfect consistency, a small circle of 'others' with whom information may be shared without loss of the privilege (e.g., secretaries, interpreters, counsel for a cooperating co-defendant, a parent present when a child consults a lawyer)." **Mass. Inst. of Technology, 129 F.3d at 684**. The court emphasized that "the underlying concern is functional: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation." **Mass. Inst. of Technology, 129 F.3d at 684** (citation omitted). The court acknowledged that "in a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills." **Mass. Inst. of Technology, 129 F.3d at 686**. However, the court determined that this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients-who are working together in prosecuting or defending a lawsuit or in certain other legal transactions-can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, [***819] would be to dissolve the boundary almost entirely.

**Mass. Inst. of Technology, 129 F.3d at 686**.

[**342] [*P61] Turning to MIT's disclosure of its minutes to the audit agency, the court concluded that its treatment of the billing statements disposed of MIT's claim that its attorney-client privilege survived disclosure of the minutes to the audit agency, and the court focused on MIT's work product claim. The court concluded that the prevailing rule is that "disclosure to an adversary, real or potential, forfeits work product protection." **Mass. Inst. of Technology, 129 F.3d at 687**. The court went on to conclude that

MIT's disclosure to the audit agency was a disclosure to a potential adversary. The disclosures did not take place in the context of a joint litigation where the parties shared a common legal interest. The audit agency was reviewing MIT's expense submissions. MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, **but the potential for dispute and even litigation was certainly there.**

**Mass. Inst. of Technology, 129 F.3d at 687** (emphasis added).

[*P62] In the present case we note Respondents' claim that the court in **Mass Inst. of Technology** recognized insurers and insureds as a relationship within which parties share a common interest that protects their privileged communications. Their claim is misguided. First, in **Mass Inst. of Technology**, MIT argued that its disclosure to the audit agency was like other cases where "disclosure has been allowed, without forfeiting the privilege, among separate parties similarly aligned in a

Case 1:04-cv-01494-JJF   Document 196-3   Filed 05/25/2007   Page 35 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

case or consultation (e.g., codefendants, insurer and insured, patentee and licensee)." **Mass. Inst. of Technology,** 129 F.3d at 685. In other words it was MIT, not the court, who made the analogy to the insurer-insured relationship. Second, in a footnote, the court in **Mass. Inst. of Technology** cited several decisions that have considered insurer-insured relationships.

[*P63]   In the first of these decisions, Roberts v. Carrier Corp. (N.D. Ind. 1985), 107 F.R.D. 678, the court addressed whether the company, Carrier, in passing on arguably privileged communications between itself and its attorney and between its attorney and its insurer to another company, Hamilton, waived any privilege that might otherwise have attached to those communications. The court recognized that under Indiana law, a statement by a "client to his attorney for communication to a third person is not considered confidential." **Carrier,** 107 F.R.D. at 686 (citations omitted). However, the court found that Carrier and Hamilton were sister subsidiaries of United Technologies and concluded that when "a corporation with a legal interest in an attorney-client [**343] communication relays it to another related corporation, the attorney-client privilege is not thereby waived." **Carrier,** 107 F.R.D. at 687 (citation omitted). Further, the court found that "Carrier and Hamilton do share an identical legal interest: defense of a claim based upon a malfunction of valve # 242." **Carrier,** 107 F.R.D. at 688. Under those particular facts, the court concluded that Indiana's rule concerning communications to third parties was not violated. **Carrier,** 107 F.R.D. at 688.

[*P64]   In the second of these decisions, Linde Thomson Langworthy Kohn & Van Dyke v. RTC (D.C. Cir. 1993), 303 U.S. App. D.C. 316, 5 F.3d 1508, the court noted that "federal courts have never recognized an insured-insurer privilege as such." **Linde Thomson,** 5 F.3d at 1514 (citations omitted). The court went on to firmly reject any sweeping notion that there is an attorney-client privilege in insured-insurer communications. . . Certainly, where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case, the law would exalt form over substance if it were to deny application of the attorney-client privilege. However, a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship. . . . **If what is sought is not legal advice, but insurance, no privilege can or should exist.**

**Linde Thomson,** 5 F.3d at 1515 (citations omitted) (emphasis added).

[***820]   [*P65]   **Carrier** and **Linde Thomson** clearly do not support Respondents in the present case.

Respondents have not suggested that third-party legal auditors "share an identical **legal** interest" with insureds. **Carrier,** 107 F.R.D. at 688 (emphasis added). Nor have Respondents suggested that "what is sought [from third-party auditors] is . . . legal advice." **Linde Thomson,** 5 F.3d at 1515. Moreover, **Carrier** and **Linde Thomson** do not address the disclosure of confidential information to third-party auditors under Montana's Rules of Professional Conduct.

[*P66]   Respondents rely on the court's decision in **Indian Law Resource Center** to argue that third-party auditors are confidential agents of insureds and that disclosure of billing statements to them therefore does not waive any privilege. We conclude that their reliance on **Indian Law Resource Center** is also misplaced. In **Indian Law Resource Center,** the plaintiff, a nonprofit corporation, brought an action under the Freedom of Information Act (FOIA), seeking disclosure [**344] of documentation regarding payments from funds under federal control to attorneys who served the Hopi tribe. The plaintiff requested documents that included "(1) Tribal resolutions reflecting the names of the lawyers chosen and the fee amounts endorsed; (2) periodic law firm statements to the Tribal Council, with attached vouchers describing in detail legal services provided and travel expenses incurred." **Indian Law Resource Center,** 477 F. Supp. at 146. Plaintiff's request was first sent to the Bureau of Indian Affairs (BIA); the Department of Interior (Interior) denied that request. The court in **Indian Law Resource Center** noted that "as part of its general trust responsibility to the Indians, Interior reviews and approves the choice of counsel and fixing of fees by Indian tribes." **Indian Law Resource Center,** 477 F. Supp. at 145.

[*P67]   The "only issue" in **Indian Law Resource Center** was whether, under an exemption in FOIA, the "withheld information is either confidential or privileged." **Indian Law Resource Center,** 477 F. Supp. at 146. Interior argued that the information withheld should be deemed confidential under FOIA because the information was received pursuant to "the agency's fulfillment of its trust responsibilities." **Indian Law Resource Center,** 477 F. Supp. at 146. Interior argued further that as a trustee it should "not be required to divulge whatever material The Hopi Tribe as beneficiary declares to be confidential, so long as the material otherwise qualifies under [FOIA] exemption four." **Indian Law Resource Center,** 477 F. Supp. at 147.

[*P68]   The court concluded that there was substantial evidence of future harm from disclosure of the detailed law firm statements and that the law firm statements were entitled to protection as attorney work product. Finding no evidence that the vouchers had been disclosed to any party other than Interior, "which is acting

Case 1:04-cv-01494-JJF    Document 196-3    Filed 05/25/2007    Page 36 of 65

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

as a confidential agent of the Tribe," **Indian Law Resource Center, 477 F. Supp. at 148,** the court concluded that the law firm statements are "exempt from disclosure under [FOIA] exemption four, on grounds of both privilege and confidentiality." **Indian Law Resource Center, 477 F. Supp. at 149.**

[*P69]  In the present case, Respondents compare Interior to third-party auditors and argue that because third-party auditors act as confidential agents, disclosure of billing information to them does not waive "the privilege." Respondents' reading of **Indian Law Resource Center** is incorrect. [HN19]Third-party auditors are not confidential agents of insureds but function rather as agents of insurers. Moreover, [**345] to compare third-party auditors to Interior, the confidential agent in **Indian Law Resource Center,** is to ignore the specific trust responsibilities that Interior has for the Hopi tribe, trust responsibilities that Respondents do not claim that third-party auditors similarly bear for insureds. Further, **Indian Law Resource Center** is readily distinguishable from the present case as the court there addressed a specific exemption under FOIA but did not address Rule 1.6 of the Rules of Professional Conduct.

[*P70]  We conclude that a third-party auditor is not within the "magic circle" or community of interest that the court in **Mass. Inst. of Technology** recognized. Respondents, again, claim that the purpose of third-[***821] party auditors complements the interests of insureds and that third-party auditors merely seek to control the costs of defense in order to keep insurance premiums down for insureds. This asserted common interest in keeping litigation costs and premiums down is not sufficient to bring third-party auditors within the magic circle. [HN20]The Rules of Professional Conduct do not vary according to commercial exigencies. Nor are third-party auditors "confidential agents" of insureds. **Indian Law Resource Center,** 477 F. Supp. at 148. We further conclude that [HN21]disclosure of detailed billing statements to a third-party auditor is "disclosure to a potential adversary." **Mass. Inst. of Technology, 129 F.3d at 687.** In third-party auditors' review of confidential information, there is always the possibility of disputes between auditors, defense counsel and their clients that could result in litigation.

[*P71]  Nor are third-party auditors "needed in the representation" or "appropriate, even if not vital, to a consultation," as secretaries and computer technicians may well be. **Mass. Inst. of Technology, 129 F.3d at 684.** [HN22]Disclosure to persons needed in the representation or appropriate to a consultation does not also justify disclosure "to a potential adversary." **Mass. Inst. of Technology, 129 F.3d at 687.**

[*P72]  We note Respondents argue that because the attorney-client privilege extends to the insurer and because an insurer can only act through its employees and agents, the attorney-client privilege applies to an insurer's agents as well, citing United States v. Schwimmer (2nd Cir. 1989), 892 F.2d 237. In **Schwimmer,** the court recognized that the attorney-client privilege "is held to cover communications made to certain agents of an attorney," **Schwimmer, 892 F.2d at 243,** and the court also recognized the "common interest" rule as protecting "the confidentiality of communications passing from one party to [**346] the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." **Schwimmer, 892 F.2d at 243** (citation omitted). **Schwimmer** does not support Respondents' argument. [HN23]Third-party auditors are not agents of defense counsel, nor are disclosures to them "communications passing from one party to the attorney for another party." **Schwimmer, 892 F.2d at 243.**

[*P73]  In determining that third-party auditors fall outside the "magic circle," however, we do not hold that the disclosure of detailed descriptions of professional services to a third-party auditor necessarily violates any privilege that may attach to them. Resolution of that issue would clearly entail findings of fact that we have not made in the present case.

[*P74]  Having determined that insurers are not clients of defense counsel and that third-party auditors are potential adversaries of defense counsel, we turn to the issue whether the disclosure of billing statements to third-party auditors is "impliedly authorized in order to carry out the representation." Rule 1.6., M.R.Prof.Conduct.

[*P75]  Petitioners do not dispute that [HN24]disclosures of billing information to **insurers** are impliedly authorized to carry out representation. It does not follow, however, that disclosing billing information to third-party auditors is also impliedly authorized. As previously discussed, third-party auditors lie outside the "magic circle" and do not share a community of interest with insureds. Their mission, as characterized in part by Respondents, is to find fault with legal charges, not to further the representation of insureds. Further, unlike secretaries and computer technicians who are engaged to assist defense counsel, third-party auditors are not employed by defense counsel and as noted they are potential adversaries of defense counsel. As such, [HN25]third-party auditors stand in potential conflict with the interests of insureds in competent representation by defense counsel who exercise their independent professional judgment.

2000 MT 110, *; 299 Mont. 321, **;
2 P.3d 806, ***; 2000 Mont. LEXIS 104

[*P76] Further, we reject Respondents' argument that insureds' consent by contract to disclosure of detailed professional billing statements comports with Rule 1.6, M.R.Prof.Conduct. An insured executing a liability policy with an insurer cannot know at the time he enters the contract what kind of claim will be brought against him, what the issues will be, or what kinds of services will be undertaken by his defense attorney. Nor can an insured know, at the time he [***822] contracts for insurance, the legal consequences that may result from the disclosure of [**347] billing information to a third-party auditor. Depending on the facts and circumstances, such disclosure may waive a specific privilege. Thus, [HN26]under Rule 1.6, M.R.Prof.Conduct, for an insured to make a fully informed consent to disclosure of detailed professional billing statements, the consent must be contemporaneous with the facts and circumstances of which the insured should be aware.

[*P77] We emphasize that [HN27]by its plain language, Rule 1.6, M.R.Prof.Conduct, extends to all communications between insureds and defense counsel and that this rule is therefore broader in both scope and protection than the attorney-client privilege and the work product doctrine. Compare In re Advisory Opinion No. 544 of N.J. (N.J. 1986), 103 N.J. 399, 511 A.2d 609, 612 (citation omitted) (emphasis added) (concluding "this Rule [of Confidentiality] expands the scope of protected information to include all information relating to the representation, regardless of the source or whether the client has requested it be kept confidential or whether the disclosure of the information would be embarrassing or detrimental to the client"); Damron v. Herzog (9th Cir. 1995), 67 F.3d 211, 215 (citation omitted) (concluding "an integral purpose of the rule of confidentiality is to encourage clients to fully and freely disclose to their attorneys all facts pertinent to their cause with absolute assurance that such information will not be used to their disadvantage").

[*P78] We hold that [HN28]disclosure by defense counsel of detailed descriptions of professional services to third-party auditors without first obtaining the contemporaneous fully informed consent of insureds violates client confidentiality under the Rules of Professional Conduct.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

# TAB 13

LEXSEE


Caution
As of: May 25, 2007

**NOEL SAITO, Plaintiff, v. McKESSON HBOC, INC., a Delaware corporation, Defendant.**

**Civil Action No. 18553**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**2002 Del. Ch. LEXIS 125**

**October 22, 2002, Submitted
October 25, 2002, Decided**

**SUBSEQUENT HISTORY:**    [*1]  As Revised November 13, 2002. Later proceeding: Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 139 (Del. Ch. Nov. 13, 2002).
Later proceeding at Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 139 (Del. Ch., Nov. 13, 2002)
Affirmed by McKesson Corp. v. Saito, 818 A.2d 970, 2003 Del. LEXIS 121 (Del., 2003)
Motion denied by Saito v. McCall, 2004 Del. Ch. LEXIS 204 (Del. Ch., Aug. 18, 2004)

**PRIOR HISTORY:** Saito v. McKesson HBOC, Inc., 806 A.2d 113, 2002 Del. LEXIS 379 (Del., 2002)

**DISPOSITION:**    Plaintiff's motion to compel granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholder filed an action against defendant corporation, pursuant to Del. Code. Ann. tit. 8, § 220, seeking court ordered access to the corporation's records to determine if the corporation's officers violated the law during a prior merger of two corporations. The corporation claimed that the information was protected by the attorney-client privilege and the work product doctrine.

**OVERVIEW:** The shareholder purchased stock in a corporation after it announced that it would merge with another corporation. After the merger, the corporation that was created discovered irregularities in the records of one of the merged corporations, and the U.S. Securi-

ties and Exchange Commission (SEC) instituted an investigation. The new corporation hired outside counsel who concluded a confidentiality agreement with the SEC and the United States Attorney's Office (USAO) and provided documents produced during an internal investigation to the SEC and USAO. In the shareholder's action seeking access to the corporation's records, the chancery court held that (1) the corporation did not waive the work product privilege when it gave documents to the SEC and the USAO under the confidentiality agreement and the court would not order the corporation to give those documents to the shareholder because he did not establish he could not obtain the information from other sources without undue hardship; and (2) the court would order the corporation to provide the shareholder with documents relating to pre-merger legal advice that was given to its directors but not post-merger legal advice.

**OUTCOME:** The court granted the shareholder's motion to compel release of documents relating to pre-merger legal advice which was given to the corporation's directors and documents which outside counsel provided to the SEC and the USAO before the confidentiality agreement was signed, but denied the shareholder's motion to compel release of documents that were provided to the SEC and the USAO under the confidentiality agreement.

**CORE TERMS:** work product privilege, disclosure, log, confidentiality agreement, work product doctrine, enforcement agencies, disclosing, attorney-client, legal advice, common interest, selective, work product, confidential, discovery, adversarial, undue hardship, waived, preparation, privileged, expectation of privacy, post-merger, merger, mental impressions, pre-merger, dis-

close, partial, audit, good cause', shareholder, cooperation

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN1]Documents do not lose their work product protection simply because a corporation's board of directors fails explicitly to state that an audit report may be used to assist in any anticipated litigation and that the materials prepared during an audit committee investigation are intended to be confidential.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN2]The traditional work product doctrine has been codified in Del. Ch. Ct. R. 26(b)(3) and generally bars the discovery of materials created in anticipation of litigation or for trial preparation. But this bar is not an impenetrable barrier. It is a qualified immunity. It allows a party to seek materials prepared in anticipation of litigation only when the party: (1) has a substantial need for the materials; and (2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions, and legal theories of a party's attorney. This is referred to as opinion work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless a requesting party can show that it is directed to the pivotal issue in the current litigation and the need for the information is compelling.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN3]See Del. Ch. Ct. R. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN4]While Del. Ch. Ct. R. 26(b)(3) states that the court of chancery of Delaware "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has interpreted Rule 26(b)(3) to hold that opinion work product is discoverable upon a strong

showing of substantial need and unavailability. This substantial need is met when a party shows that the mental impressions are: (1) directed to the pivotal issue in the current litigation; and (2) the need for the information is compelling.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN5]As with any privilege, the protection of work product may be waived when it no longer serves its useful purpose.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN6]The purpose behind the protection of work product is to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent. The adversary system is promoted because this protection allows clients to seek informed legal guidance and allows attorneys to prepare their cases without fear that these preparations will be used against their clients. Thus, the focus of the doctrine is upon preventing discovery of the work product from an opposing party in litigation, not necessarily from the rest of the world generally. Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN7]Waivers of the work product privilege are rarely granted in Delaware because of their harsh result. Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege. In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. A waiver does not always have to be express; it may also be implied from the circumstances.

*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Criminal Law & Procedure > Search & Seizure > Expectation of Privacy*
[HN8]Disclosure of work product does not negate its protection unless the disclosure is inconsistent with the

maintenance of secrecy from the disclosing party's adversary. A party may relinquish its right to protection of its work product if it knowingly and voluntarily discloses it with either the intention or practical result that the opposing party may see the documents. There is no waiver of privileged information to third parties if a disclosing party has a reasonable expectancy of privacy when it makes disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, a court generally asks two questions: (1) did the disclosing party believe its disclosure was confidential; and (2) will the law sanction that expectation? Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

*Business & Corporate Law > Joint Ventures > Management Duties & Liabilities*
*Contracts Law > Types of Contracts > Joint Contracts*
*Criminal Law & Procedure > Discovery & Inspection > Discovery Misconduct*
[HN9]Disclosures to a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers. The traditional example of this is the co-defendant situation. This common interest exception or joint prosecution privilege will attach when persons sharing the information have a common adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > Investigative Authority*
[HN10]The fact that a corporation cooperates voluntarily with the U.S. Securities and Exchange Commission (SEC) and a U.S. attorney's office (USAO) during an SEC investigation does not transform the relationship between the corporation and the SEC or the corporation and the USAO from adversarial to friendly. By yielding to these formidable opponents in order to minimize future damages, a disclosing party does not make those

opponents its friend. It merely concedes that it prefers not to anger such a foe.

*Business & Corporate Law > Joint Ventures > Management Duties & Liabilities*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN11]A corporation's decision to cooperate with the U.S. Securities and Exchange Commission (SEC) or a U.S. attorney's office during an SEC investigation to weed out wrongdoers in the company is not the type of common interest which the common interest exception to the rule on waiver of attorney work product by disclosure to a third party contemplates. Cooperation with a government investigation may be a laudable activity, but it does not align one's interests with that government entity. The interest between the disclosing party and the recipient must be so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN12]An instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. There are two distinct types of waivers: selective and partial. Selective waiver permits a client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. A partial waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information.

*Business & Corporate Law > Agency Relationships > Disclosure > General Overview*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Knowledge & Notice > Duty of Agent to Disclose*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN13]Fairness concerns generally govern partial waivers of the attorney work product privilege, but fairness

2002 Del. Ch. LEXIS 125, *

has little relevance in the context of selective waivers. This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work product was confidentially disclosed to a law enforcement agency in its investigation. Public policy seems to mandate that courts continue to protect confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies.

*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Criminal Law & Procedure > Search & Seizure > Expectation of Privacy*
[HN14]The work product doctrine exists to protect the fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the U.S. Securities and Exchange Commission (SEC), those attorneys can reasonably assume that the SEC will not reveal those confidential disclosures to other adversaries.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN15]Delaware courts vigorously protect work product and treat waiver as an extremely harsh result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by a privilege holder. An attorney who confidentially discloses work product on behalf of his or her client pursuant to a law enforcement agency investigation cannot be accused of egregious abuse of this privilege.

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN16]The U.S. Securities and Exchange Commission (SEC) is the agency principally responsible for the administration and enforcement of federal securities laws, which are designed to protect investors and the integrity of U.S. capital markets. When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. Thus, the SEC and private litigants alike benefit

from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN17]A disclosure to the U.S. Securities and Exchange Commission does not absolve a corporation of liability for illegal acts. The corporation may hope to obtain leniency by disclosing, but it comes with a cost: airing the corporation's dirty laundry.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN18]Private lawsuits against corporations are an important part of the enforcement scheme, but the U.S. Securities and Exchange Commission (SEC) is the governmental institution established as the first line of defense. There is no reason why courts should not tip the scales in the SEC's favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with the SEC, as private plaintiffs may still bring suit and have the same ability to acquire work product if their need is great enough.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN19]A fundamental advantage of the adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying information, their attorneys digest, analyze, and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions, and legal theories. Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information in discovery, not to their thought processes.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*

2002 Del. Ch. LEXIS 125, *

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN20]There is no reason why a court should not treat a law enforcement agency differently than a private plaintiff. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN21]A confidentiality agreement can prevent a law enforcement agency from passing along privileged information to other private adversaries.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN22]A rule which protects documents provided to law enforcement agencies by a corporation under a confidentiality agreement does not disadvantage private plaintiffs; they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN23]Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
*Civil Procedure > Settlements > General Overview*
[HN24]There are two types of work product: non-opinion (factual/historical) work product, and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party has a substantial need for the materials and the party cannot acquire a substantial equivalent of the materials by other

means without undue hardship. A party may receive opinion work product when it is directed to the pivotal issue in the current litigation and the need for the information is compelling. Delaware law protects opinion work product in all but the most compelling circumstances where those mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN25]Under Del. Ch. Ct. R. 26(b)(3), a party may discover non-opinion work product if it shows it has a substantial need for the materials and it cannot acquire a substantial equivalent without undue hardship.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN26]Opinion work product includes the mental impressions, conclusions, opinions, and legal theories of a party's attorney and is only discoverable when the requesting party shows it is directed to the pivotal issue in the current litigation and the need for the information is compelling.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN27]The attorney-client privilege is based upon Del R. Evid. 502(b). This privilege protects communications made for the purpose of facilitating the rendition of professional legal services. The privilege belongs to the client, and may be waived expressly or implicitly. Waiver of one privilege does not necessarily waive another privilege, however, because the purposes behind each privilege are different.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN28]If a corporation objects to discovery and successfully establishes that material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the

plaintiff seeking discovery shows good cause why the privilege should not attach. Delaware case law provides a non-exclusive list of factors for a court to consider in deciding if good cause exists in an action filed by a shareholder against a corporation: (i) the number of shares owned by the shareholder and the percentage of stock they represent; (ii) the assertion of a colorable claim; (iii) the necessity of the information and its unavailability from other sources; (iv) whether the stockholder has identified the information sought and is not merely fishing for information; and (v) whether the communication is advice concerning the litigation itself. Of these five factors, the least weight should be placed on (i). Only if no other factor supports good cause will the ownership factor come into play.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > General Overview*
*Evidence > Relevance > Relevant Evidence*
[HN29]Legal advice given to the board of directors of a corporation in conjunction with a merger is relevant and necessary in determining what information the board relied upon.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN30]Work product is information assembled by an attorney in anticipation of litigation. Work product provides a broader protection than attorney-client privilege since it includes more than just communications with the client. To obtain work product, a plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship.

COUNSEL: Pamela S. Tikellis and Robert J. Kriner, Jr., of CHIMICLES & TIKELLIS, LLP, Wilmington, Delaware; OF COUNSEL: Robert S. Green and Robert A. Jigarjian, of GREEN & JIGARJIAN, LLP, San Francisco, California, Attorneys for Plaintiff.

Anthony W. Clark, Paul J. Lockwood, Michael A. Barlow and Cynthia E. Carrasco, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Jonathan J. Lerner, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, and James E. Lyons and Timothy A. Miller, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, San Francisco, California, Attorneys for Defendant.

Richard M. Humes and Melinda Hardy, Office of the General Counsel, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., Attorneys for the SEC as Amicus Curaie.

JUDGES: CHANDLER, Chancellor.

OPINION BY: CHANDLER

OPINION

CHANDLER, Chancellor

Plaintiff Noel Saito instituted this action under 8 Del. C. § 220 to obtain access to certain books and records of defendant McKesson Corporation ("McKesson"). This is the Court's decision, after a trial and following briefing, with respect to certain records of McKesson as to which [*2] it has asserted attorney-client privilege and the work product doctrine. [1]

> 1   Following remand from the Supreme Court, this Court addressed the scope of plaintiff's demand in an Order dated September 20, 2002. I have stayed that Order until the filing of this opinion. Language in the Order addressing the attorney-client privilege and the work product doctrine refers specifically to the results of this decision.

Plaintiff's action seeks the books and records of McKesson Corporation (formerly McKesson HBOC, Inc.), a Delaware corporation. McKesson HBOC was formed through the merger of McKesson Corporation and HBOC & Co. ("HBOC") on January 12, 1999. Approximately 3 1/2 months after McKesson's acquisition of HBOC became effective, McKesson HBOC announced the first of what appears to be three downward revisions of revenues, earnings, net income, and other financial information, for financial years 1996-1998.

After these announcements, the Securities and Exchange Commission's (SEC) Office of Enforcement began [*3] an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. [2] The next day (April 29, 1999) the SEC notified McKesson that it had begun an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. McKesson HBOC's audit committee then retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") on May 3, 1999. Skadden, in conjunction with PricewaterhouseCoopers LLP ("PwC"), conducted an internal investigation of the alleged wrongdoing and prepared a written report for the audit committee, summarizing the relevant facts and legal principles involved in the various pending actions and investigations.

2  P1. App. of Docs. in Support of Mot. to Compel Ex. A, 14.

Skadden informed the SEC and the United States Attorney's Office for the Northern District of California ("USAO") of this investigation and offered to disclose the work product generated from this internal investigation upon the condition that the materials [*4] would be subject to a confidentiality agreement. Most of this work product was shared after a confidentiality agreement was executed among McKesson, the SEC, and the USAO on May 27 and 28, 1999. Five documents, however, were disclosed to the SEC prior to the execution of the confidentiality agreement. These documents are numbers 7 and 9-12 on the First Privilege Log.

Plaintiff, along with other shareholders, filed a derivative suit in this Court based on the earnings restatements and alleged wrongdoing. [3] Defendant moved to dismiss the derivative action, which I granted without prejudice. I also allowed plaintiff leave to amend the complaint after gathering the facts necessary to file a legally sufficient complaint. [4]

3  *Ash v. McCall*, 2000 Del. Ch. LEXIS 144 at *1 (Del. Ch. Sept. 15, 2000).

4  *Id.*

Plaintiff filed this § 220 action on December 14, 2000. At a pre-trial conference, the parties agreed to bifurcate the issues, addressing the scope of the inspection first, [*5] and later addressing the issues relating to attorney-client privilege and the work product doctrine. The issues concerning the scope of the inspection have been addressed in a separate opinion, and numerous documents and records have been ordered produced to plaintiff. [5] This opinion determines the applicability of the attorney-client privilege and work product doctrine to certain documents that continue to be in dispute.

5  *Saito v. McKesson HBOC, Inc.*, 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001); 806 A.2d 113 (Del. 2002); Order dated Sept. 20, 2002 (identifying records to be produced).

The disputed information plaintiff seeks is listed on four separate privilege logs. Defendant asserts that plaintiff is not entitled to these particular documents because of the attorney-client privilege, the work product doctrine, or both. [6] The documents are best identified by separating them into four different groups. Group A consists of documents McKesson HBOC produced to [*6] the SEC and the USAO. [7] Group B consists of pre-merger legal advice to defendant. [8] Group C consists of post-merger legal advice and board minutes. [9] Group D is

a catch-all of all documents prepared by in-house counsel but not produced to the SEC or the USAO. [10] For reasons set forth below, I grant the motion to compel in part, and deny it in part.

6  Each line of the privilege log states which defense is being made.

7  Items 7, 9-21, 23-114 on the First Privilege Log, letter dated 11/19/99 on Fourth Privilege Log. Item 22 on the First Privilege Log was listed as a Group A document by plaintiff, but, since it was not produced to the SEC or the USAG, I address this document under Group C.

8  All items on the Third Privilege Log.

9  Items 1 and 22 on the First Privilege Log; all items on the Second Privilege Log; agenda dated 1/27/99 on Fourth Privilege Log.

10  Items 2-6 and item 8 on the First Privilege Log; documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

[*7] I. ANALYSIS

*A. Documents Shared with the SEC and/or the USAO*

Group A documents are those disclosed by McKesson HBOC to the SEC. Most of these documents were not disclosed until a confidentiality agreement was signed with the SEC. Group A documents include Items 7, 9-21, 23-114 of the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. The documents shown to the SEC before the confidentiality agreement was in place are documents 7 and 9-12 of the First Privilege Log. Defendant asserts a work product privilege as to all of these documents and attorney-client privilege as to four of them. Plaintiff Saito contends that these documents are not shielded by the work product doctrine or attorney-client privilege.

1. Work Product Doctrine

Saito contends that the work product doctrine is inapplicable to the Group A documents because the documents were not confidential and because any privilege that would have attached was waived when the documents were disclosed to potential adversaries the SEC and/or USAO.

The documents in dispute were prepared in anticipation of litigation and were intended to be confidential. Thus, the documents clearly qualify as [*8] work product. Plaintiff argues that the McKesson HBOC board did not specifically empower the audit committee with de-

2002 Del. Ch. LEXIS 125, *

fending securities litigation, so the resulting investigative reports by the audit committee were not prepared in anticipation of litigation. The audit committee retained the law firm of Skadden and the accounting firm PwC, however, for that specific purpose. Skadden shared a dual role--the firm was assisting McKesson HBOC in its internal review, as well as defending various lawsuits linked to the subject of this very same investigation.

Plaintiff also argues that McKesson HBOC never intended the reports to be confidential McKesson HBOC, however, clearly negotiated a confidentiality agreement with the SEC before disclosing the documents at issue. Therefore, the [HN1]documents do not lose their work product protection simply because the board failed explicitly to state that the report may also be used to assist in any anticipated litigation and that the materials prepared during the audit committee investigation were intended to be confidential.

The pivotal question remaining is whether McKesson HBOC waived its work product privilege as to these documents by sharing them [*9] with the SEC in its investigation. [HN2]The traditional work product doctrine has been codified in Chancery Court Rule 26(b)(3), and generally bars the discovery of materials created in anticipation of litigation or for trial preparation. [11] But this bar is not an "impenetrable barrier." [12] It is a qualified immunity. [13] It allows a party to seek materials prepared in anticipation of litigation only when the party: 1) has a substantial need for the materials; and 2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. [14] Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions and legal theories of the party's attorney. [15] This is referred to as *opinion* work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless the requesting party can show that it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.* [16]

11    In pertinent part, Rule 26(b)(3) [HN3]provides that:

[A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials in the

preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

[*10]

12    *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254, 262 (Del. 1995).

13    *Id.*

14    DEL. CT. CH. R. 26(b)(3).

15    *Id.* [HN4]While the rule states that the Court "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has subsequently interpreted the rule to hold that opinion work product *is* discoverable upon an even stronger showing of substantial need and unavailability. *Tackett,* 653 A.2d at 262. This "more substantial need" is met when a party shows that the mental impressions are: 1) directed to the pivotal issue in the current litigation; and 2) the need for the information is compelling. *Id.*

16    *Tackett,* 653 A.2d at 262.

All of the Group A documents are designated as work product. The issue is whether McKesson HBOC waived its claim to work product privilege over Group A documents when it disclosed those documents to the SEC.

a. Waiver of the Work Product Privilege

[HN5]As with any privilege, the protection of work product may [*11] be waived when it no longer serves its useful purpose. [HN6]The purpose behind the protection of work product is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." [17] The adversary system is promoted because this protection allows clients to seek informed legal guidance and

allows attorneys to prepare their cases without fear that these preparations will be used against their clients. [18] Thus, the focus of the doctrine is upon preventing discovery of the work product from an *"opposing party in litigation,* not necessarily from the rest of the world generally." [19] Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute. [20]

17   *United States v. AT&T Co.,* 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

18   *Westinghouse Elec. Corp. v. Philippines,* 951 F.2d 1414, 1428 (3d Cir. 1992).

19   *United States v. AT&T Co.,* 642 F.2d at 1298-99 (emphasis added).

[*12]

20   *See, e.g., Hickman v. Taylor,* 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947); *In re Subpoenas Duces Tecum,* 238 U.S. App. D.C. 221, 738 F.2d 1367 (D.C. Cir. 1984).

[HN7]Such waivers are rarely granted in Delaware because of their harsh result. [21] Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege. [22] In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. [23] A waiver does not always have to be express, it may also be implied from the circumstances. [24]

21   *Wolhar v. GMC,* 712 A.2d 457, 463 (Del. Super. Ct. 1997) ("[A] finding of waiver is discretionary with the court and rarely granted, as it is a harsh result."); *see also Tackett,* 653 A.2d at 260 (describing the "exacting" standard required to overcome work product protection, a standard that is "more stringent" than that required to overcome attorney client privilege).

[*13]

22   *Wolhar,* 712 A.2d at 463.

23   *Metro. Bank & Trust Co. v. Dovenmuehle Mortg., Inc.,* 2001 Del. Ch. LEXIS 153, 2001 WL 1671445 at *5 (Del. Ch. Dec. 20, 2001).

24   *United States v. AT&T Co.,* 642 F.2d at 1298-99.

[HN8]Disclosure of work product does not negate its protection unless the disclosure is "inconsistent with the maintenance of secrecy from the disclosing party's adversary." [25] A party may relinquish its right to protec-

tion of its work product if it knowingly and voluntarily discloses it with "either the intention or practical result that the opposing party may see the documents." [26]

25   642 F.2d at 1299 (quoting *GAP Corp. v. Eastman-Kodak Co.,* 85 F.R.D. 46, 51-52 (S.D.N.Y. 1979).

26   *Wolhar,* 712 A.2d at 462-63.

There is no waiver of privileged information to third parties if a disclosing party had [*14] a reasonable expectancy of privacy when it made an earlier disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, the Court generally asks two questions: 1) did the disclosing party believe its disclosure was confidential; and 2) will the law sanction that expectation? [27] Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

27   *Jedwab v. MGM Grand Hotels, Inc.,* 1986 Del. Ch. LEXIS 383, 1986 WL 34210 at *2 (Del. Ch. March 20, 1986).

1 Common Interest Exception

[HN9]Disclosures to, a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are "so parallel and non-adverse that, at least with respect to the transaction involved, they may [*15] be regarded as acting as joint venturers." [28] The traditional example of this is the co-defendant situation. This "common interest exception" or "joint prosecution privilege" [29] will attach when the persons sharing the information have a common adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

28   *Id.*

2002 Del. Ch. LEXIS 125, *

29   _WT Equip. Partners, L.P. v. Parrish,_ 1999
Del. Ch. LEXIS 187, 1999 WL 743498 at *1
(Del. Ch. Sept. 1, 1999) (withholding oral disclo-
sures because they were made in accordance with
the joint prosecution privilege, provided little
relevance to solving the substantive issues and
outweighed the potential prejudice caused by
chilling future counsel preparations).

[*16]   McKesson-HBOC argues that it shared a
common interest with the SEC when it disclosed the
privileged documents at issue, and, therefore, the work
product protection was not waived. Saito disagrees, in-
sisting that McKesson HBOC was not aligned with the
SEC and was, in fact, a target of an SEC investigation
when the disclosure was made. Thus, Saito contends, the
two entities did not share a common interest and McKes-
son HBOC had no reasonable expectation of privacy in
the documents provided to the SEC.

The common interest question here boils down to
whether the SEC acts as a friend or foe when it begins
investigating a company for potential violations of the
Securities Act. I think the more reasonable conclusion is
that the SEC was a foe in this instance. [30]

30   The question in such cases is "who is the tar-
get" of the SEC's investigation. Is it the com-
pany? Senior officers? A rogue employee? In this
particular case, it is clear that the company, at the
very least, was a target, and that is sufficient for
purposes of my analysis.

[*17]   The adversarial relationship here is strikingly
similar to that in _In re Steinhardt Partners, L.P._ [31] The
_Steinhardt_ Court noted that

the SEC stood in an adversarial position
to Steinhardt when it requested assistance.
This was not a case in which a party com-
plied with a benign request to assist the
SEC in performing its routine regulatory
duties. The determinative fact in analyz-
ing the adversarial nature of the relation-
ship is that Steinhardt knew that it was the
subject of an SEC investigation, and that
the memorandum was sought as part of
this investigation. The fact that the request
came from the SEC'S Enforcement Divi-
sion further supports the conclusion that
this was an adversarial relationship. [32]

31   9 F.3d 230 (2d Cir. 1993).

32   _Id. at 234._

Similarly, McKesson was aware that the nature of
its relationship with the SEC was adversarial before dis-
closing its work product. McKesson knew it was a target,
knew the disclosure was being [*18] sought as part of
this investigation, and knew the investigation was being
conducted by the enforcement arms of two different
agencies immediately following a public admission of
wrongdoing. These enforcement agencies were _not_
"friendly" to McKesson. In fact, as Saito points out, and
defendant concedes, the SEC expressly disavowed shar-
ing a common interest with McKesson. [33]

33   One court has found that the SEC could po-
tentially share a common interest with a corpora-
tion in situations where the SEC is not adverse
because individual wrongdoers, as opposed to the
corporation itself, are the focus of investigation.
_McKesson HBOC, Inc. v. Adler,_ 254 Ga. App.
500, 562 S.E.2d 809 (Ga. Ct. App. 2002). The
Georgia Court of Appeals directed the trial court
to examine whether the fact that the SEC investi-
gation's focus was on former officers and em-
ployees, as opposed to current employees or the
corporation itself, indicated that the SEC shared a
common interest with the disclosing corporation.
This is not the situation here, however. McKes-
son was itself a target of the SEC investigation.
Thus, I need not discuss whether the SEC or an-
other law enforcement agency could possibly
share a common interest with a disclosing corpo-
ration. Instead, McKesson is much more similar
to _Cooper Hospital,_ where law enforcement
agencies were found to be adverse because the
agencies were targeting the corporation, not just a
few errant employees.   _Cooper Hospi-
tal/University Medical Center v. Sullivan,_ 183
F.R.D. 119 (D.N.J. 1998).

[*19]   [HN10]The fact that McKesson "cooperated
voluntarily does not transform the relationship from ad-
versarial to friendly." [34] McKesson had sufficient reason
to comply with the SEC and USAO even if its interests
were adverse. As other courts have noted, such enforce-
ment agencies are formidable adversaries. [35] Even though
they may be considered foes, a party under investigation
has significant incentives to cooperate with the authori-
ties. The disclosing party often decides that the benefits
of cooperation outweigh the possible damage that may
be caused by the information it discloses. Such benefits
often include more lenient treatment, avoidance of exten-
sive formal investigation and enforcement litigation, and
an opportunity to narrow the issues. [36] By yielding to
these formidable opponents in order to minimize future
damages, a disclosing party does not make those oppo-

nents its friend. It merely concedes that it prefers not to anger such a foe.

34  *Cooper, 183 F.R.D. at 119.*

35  *In re Steinhardt Partners, L.P.,* 9 F.3d at 236; *In re Subpoenas Duces Tecum,* 238 U.S. App. D.C. 221, 738 F.2d 1367, 1372 (D.C. Cir. 1984); *In re Sealed Case,* 219 U.S. App. D.C. 195, 676 F.2d 793, 822-23 (D.C. Cir. 1982).

[*20]

36  *In re Steinhardt Partners, L.P.,* 9 F.3d at 236.

McKesson HBOC argues that it had a common interest with the SEC and USAO in that it too wanted to weed out the wrongdoers in the company. But [HN11]this is not the type of common interest the exception contemplates. Cooperation with a government investigation may be a "laudable activity," [37] but it does not align one's interests with that government entity. [38] As noted above, the interest between the disclosing party and the recipient must be "so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers." [39] McKesson HBOC was not a joint venturer with the SEC or USAO because it was under investigation and its interests were adverse to these enforcement entities when the work product was disclosed. Thus, they did not share a common interest.

37  *Permian Corp. v. United States,* 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

38  *E.g., United States v. MIT,* 129 F.3d 681, 686 (1st Cir. 1997) ("In a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients - who are working together in prosecuting or defending a lawsuit or in certain other legal transactions - can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely.").

[*21]

39  *Id.*

2. Disclosure Pursuant to a Confidentiality Agreement

[HN12]Another instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. As noted in *Westinghouse Elec. Corp. v. Philippines,* [40] there are

> two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. [41]

40  951 F.2d 1414 (3d Cir. 1992).

41  *Id.* at 1423 n.7 (citations omitted).

The Delaware Supreme Court has already determined that [*22] it is sometimes unfair to allow for *partial* waivers of work product. [42] No Delaware court, however, has decided whether to allow *selective* waivers of work product. Selective waiver is the type of waiver at issue in this case, as McKesson HBOC has selectively disclosed its work product to the SEC and now asserts its work product privilege as to these same documents when requested by plaintiff Saito.

42  *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254 (Del. 1995). A *partial* waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information. *Id.* at 259-60 (finding that insurance company asserting its routine handling of plaintiffs claim implicitly disclosed its reliance upon its counsel's communications and was, therefore, required to produce the privileged materials supporting this assertion).

[*23]  [HN13]Fairness concerns generally govern *partial* waivers, [43] but fairness has little relevance in the context of *selective* waivers." [44] This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. I agree with Chief Judge Becker of the United States Third Circuit Court of Appeals in that I "do not see how disclosing protected materials to one adversary disadvantages another." [45] Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work product was confidentially disclosed to a law enforcement agency in its investigation. Plaintiff Saito has failed to provide such a justification in this instance. Instead, public policy seems to mandate that courts continue to protect the confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies.

> 43  Courts have noted that it may be unfair for a party to make an assertion revealing only portions of privileged information without allowing that party to examine the circumstances and evidence supporting that assertion. *See, e.g., Tackett v. State Farm Fire & Casualty Co.*, 653 A.2d 254 (Del. 1995) (stating that "implicit waiver also requires that the partial disclosure place the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information."); *Westinghouse Elec. Corp.*, 951 F.2d at 1426 n.13 (finding that partial waiver may disadvantage adversary by allowing the disclosing party to present a one-sided story to the court).

[*24]

> 44  *Westinghouse Elec. Corp.*, 951 F.2d at 1426 n.14 (rejecting fairness rationale as basis for refusing selective disclosure because "when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred.").

> 45  951 F.2d at 1430.

I must first determine whether McKesson HBOC had a reasonable expectation of privacy in its work product documents when it disclosed those documents to the SEC pursuant to a confidentiality agreement in the course of an investigation. If so, I must then determine whether to sanction that expectation. First, I find that McKesson HBOC did have a reasonable expectation of privacy in its disclosure to the SEC of documents secured by a confidentiality agreement. [46] As already noted, [HN14]the work product doctrine exists to protect the

fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the SEC, [*25] as McKesson HBOC's attorneys did, those attorneys can reasonably assume that the SEC would not reveal those confidential disclosures to other adversaries.

> 46  For those documents not secured by a confidentiality agreement before disclosure, it follows that McKesson HBOC did not have any reasonable expectation of privacy.

Although it can be argued that McKesson HBOC should not have had an expectation of privacy because some other courts have decided, that such disclosures waive work product privilege, the courts of Delaware have not considered the issue. In fact, plaintiff, defendant, and the SEC alike fight this battle in this Court using weaponry borrowed almost exclusively from foreign jurisdictional battlefields because Delaware's terrain is barren. The vigorousness of this clashing of swords suggests that the matter is far from settled even on foreign soil.

The resulting decisions cover the entire spectrum--from protection of work product in the absence of a confidentiality agreement to no protection [*26] of work product even when a disclosure was secured by a confidentiality agreement. The Eighth Circuit first established the selective waiver doctrine and protected work product disclosures made to the SEC during a private, nonpublic investigation, even without a confidentiality agreement in place. [47] The D.C. Circuit has since found that work product privilege could only be preserved if a confidentiality agreement is in place before the disclosure. [48] The Second, Third, Fourth, and Sixth Circuits have found that waiver of the privilege as to one opponent waives the privilege as to all when there is no confidentiality agreement in place. [49] Of these, some indicated that a confidentiality agreement may have changed the outcome of their decision. [50] Only two cases cited to this Court found that the privilege was waived even when the disclosure was subject to a confidentiality agreement. [51] Therefore, in light of conflicting but non-binding precedent, McKesson HBOC acted reasonably in expecting that its disclosures to the SEC under a confidentiality agreement would not reach the hands of its other adversaries.

> 47  *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978).

[*27]

> 48  *Permian Corp. v. United States*, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1218 (D.C. Cir. 1981) (upholding trial court's conclusion that a confidentiality agreement was in place before disclosures were made to the SEC and that this

2002 Del. Ch. LEXIS 125, *

agreement prevented waiver of the work product privilege as to these documents).

49   *See, e.g., In re Steinhardt Partners,* 9 F.3d 230, 236 (2d Cir. 1993); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir. 1992); *In re Martin Marietta Corp.,* 856 F.2d 619 (4th Cir. 1988) (as to non-opinion work product); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289 (6th Cir. 2002).

50   *See In re Subpoenas Duces Tecum,* 238 U.S. App. D.C. 221, 738 F.2d 1367, 1375 (D.C. Cir. 1984) (finding that to maintain confidentiality over work product, a corporation can simply refuse to disclose the work product or "the company can insist upon a promise of confidentiality before disclosure to the SEC."); *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 236 (2d Cir. 1993) (rejecting selective waiver in most situations but cautioning that "establishing a rigid rule would fail to anticipate situations ... in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials."); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir. 1992) (rejecting selective waiver doctrine as a general rule but finding that the result may differ when the SEC is not adversarial *and* disclosures were made pursuant to a confidentiality agreement).

[*28]

51   *Westinghouse Electric Corp.,* 951 F.2d at 1431; *In re Columbia/HCA Healthcare Corp.,* 192 F.R.D. 575 (D.Tenn. 2000).

Second, because McKesson HBOC reasonably believed that its disclosures would remain confidential, the remaining question is whether this Court should sanction an expectation of privacy when it arose from an attempt to cooperate with a law enforcement agency investigation. For the reasons discussed below, I believe the more prudent policy would be to recognize such expectations of privacy and hold that McKesson HBOC can therefore assert its work product privilege over Group A documents disclosed under a confidentiality agreement.

As noted earlier, [HN15]Delaware courts vigorously protect work product and treat waiver as an extremely harsh result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by the privilege holder. I fail [*29] to see how an

attorney who confidentially discloses work product on behalf of her client pursuant to a law enforcement agency investigation can be accused of egregious abuse of this privilege.

Of course, as other courts have noted, voluntary disclosure is often made to law enforcement agencies because there is already some benefit to be gained from such a disclosure. [52] For example, corporations may cooperate with SEC investigations to avoid extended formal investigation and enforcement litigation, to receive more lenient treatment, and to narrow the investigated issues. [53] Although there is something to be gained from cooperation, the fact remains that cooperation requires the company to often divulge highly sensitive and incriminating information. There is a balance in place already-whether the corporation should air its dirty laundry in exchange for mercy or whether to force the law enforcement agency to do its own legwork (and possibly overlook or fail to discover some of the incriminating evidence) at the cost of more stringent treatment.

52   *In re Steinhardt Partners, L.P.,* 9 F.3d at 235-36.

[*30]
53   *Id.*

When courts amplify the risk of disclosure to include future private plaintiffs, the scales begin to tip further in favor of corporate noncompliance with investigative agencies. A rigid rule leading to such an unwholesome trend seems unwise. Instead, a practical rule that would reduce the risk of secondary unintended disclosure to private plaintiffs from this initial balance would likely benefit both law enforcement agencies and the future private plaintiffs they were established to protect.

A selective waiver rule is such a rule that benefits law enforcement agencies, such as the SEC. Encouraging corporations to disclose their internal investigations confidentially allows the SEC to resolve its investigations expeditiously and efficiently. The SEC restricts its grants of confidentiality agreements to situations where it has reason to believe that obtaining work product is in the public interest and will result in greater efficiency in the investigation. [54] When the SEC benefits from a substantial savings in time and resources, it resolves a higher volume of investigations. [*31] [55]

54   Br. of the United States SEC as *Amicus Curiae* at 2

55   For example, the SEC in its *amicus* brief asserts that it saved several hundred hours, used half the number of staff to investigate, and completed the investigation of McKesson much earlier than it would have done without the confi-

dential disclosure in this case. The SEC has also benefited from confidentially disclosed reports from other targets that saved the SEC approximately 29,000 hours of work and another report saving approximately $ 9 million. Br. of the United States SEC as *Amicus Curiae* at 15-16.

These benefits have an interesting spillover benefit for private plaintiffs as well. Because of the SEC's savings and efficiency, greater protection is afforded to the beneficiaries that it was designed to protect--investing shareholders such as plaintiff Saito. [HN16]The SEC is the "agency principally responsible for the administration and enforcement of federal securities laws, which are designed to protect investors and [*32] the integrity of our capital markets." [56] When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. In fact, plaintiff Saito, the shareholder contesting the confidentiality of this disclosure, has already benefited by McKesson HBOC's disclosure. Thus, the SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

> 56  Br. of the United States SEC as *Amicus Curiae* at 1.

Undoubtedly it would provide private plaintiffs a strong tactical advantage to have open access to the trial preparations of their opponents. Plaintiff, however, has offered no justification for receiving such open access into the legal strategies and opinion work product of its opponent. Such an assertion is no different from the "have my cake and eat it too" mentality with which some jurisdictions charge disclosing parties. For example, in the context of selective waiver of the attorney-client privilege, [*33] the D.C. Circuit stated that

> the client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege was not designed for such tactical employment. [57]

•

> 57  *Permian Corp. v. United States,* 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

Although the attorney-client privilege is waived more easily than the work product privilege, a few juris-

dictions have extended this policy to further justify a full waiver of the work product privilege. [58] Some courts admonish disclosing parties for desiring to maintain secrecy over their work product because they already benefited from the disclosure by receiving potential lenient treatment from law enforcement agencies. Thus, the courts reason, the disclosing party should not later complain that this benefit [*34] resulted in the unpleasant consequence of stripping the privilege protection of those documents a's against any and all future adversaries. They reason that litigants cannot pick and choose adversaries because they cannot have their cake and eat it too.

> 58  *E.g.,*  *Bowne v. Ambase Corp.,* 150 F.R.D. 465, 480 (S.D.N.Y. 1993); *In re Subpoenas Duces Tecum,* 238 U.S. App. D.C. 221, 738 F.2d 1367 (D.C. Cir. 1984); *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir. 1993).

And yet, this reasoning fails to note two things: 1) disclosing parties actually are not having their cake and eating it too; and 2) the private litigating parties are just as guilty of wanting to have their cake and eat it too. First, disclosing parties can hardly be characterized as having their cake and eating it too. Disclosures made to the SEC when the corporation is under investigation are not really akin to enjoying a dessert. [HN17]A disclosure to the SEC does not absolve the corporation of liability for the acts [*35] disclosed. The corporation may hope to obtain leniency by disclosing, but it comes with a cost--airing the corporation's dirty laundry.

Second, litigating shareholders want to have their cake and eat it too: they want disclosing parties to continue disclosing to the SEC so they are better protected, while at the same time they want access to these disclosures for their own tactical advantage. Yet, these two desires are in tension with one another because to encourage the first, the second is necessarily discouraged. Imposing the harsh consequence of a waiver upon disclosing parties would discourage confidential disclosures. When the benefits of leniency from the SEC are uncertain, yet the burden of exposing a company's Achilles heel to a flood of adversaries is certain, corporations will be less likely to choose to disclose work product to the SEC. It seems inconsistent to deny a selective waiver rule and expect continued cooperation with law enforcement agencies when a confidential disclosure is such a double-edged sword for the corporation.

[HN18]Private lawsuits are an important part of the enforcement scheme, but the SEC is the governmental institution established as the first line [*36] of defense. I see no reason why we should not tip the scales in its favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with

the SEC, as private plaintiffs may still bring suit and have the same ability to acquire such work product if their need is great enough.

Plaintiff Saito has asserted no other policy reason why I should reject a selective waiver rule in favor of allowing it to access the trial preparations of its adversary. [HN19]A fundamental advantage of our adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying information, their attorneys digest, analyze and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions and legal theories.

Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information [*37] in discovery, not to their thought processes. As noted by Justice Jackson, "discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." [59] I know of no good reason why an opponent should borrow the wits of its adversary simply because that adversary was cooperating with a law enforcement agency. This outcome prevents both the SEC and the private plaintiffs from benefiting from confidential disclosures of work product rather than encouraging the benefits inherent in a selective waiver approach. It simply increases the cost of compliance with law enforcement agencies. [60] As noted by the Eighth Circuit it may also "have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." [61]

59 *Hickman v. Taylor*, 329 U.S. 495, 516, 91 L. Ed. 451, 67 S. Ct. 385 (1947) (Jackson, J., concurring).

60 *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 311 (6th Cir. 2002) (Boggs, J., dissenting op.) ("The court's rule does nothing more than increase the cost of cooperating with the government.").

[*38]

61 *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978).

This is a simple rule to navigate as well. There is no line-drawing problem because law enforcement agencies are readily distinguishable from private plaintiffs. Although there may be problems inherent in treating different *private* plaintiffs differently, [HN20]there is no rea-

son why a court should not treat a law enforcement agency differently than private plaintiffs. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

The only other substantial argument made in opposition to the selective waiver rule is that it does not further the purpose of the attorney work product privilege--to promote the adversary system. This purpose may not be furthered, but it is also not hindered. Because [HN21]a confidentiality agreement would prevent the law enforcement agency from passing along privileged information to other private adversaries, the adversarial system is still [*39] protected. Thus, this last justification for rejecting a selective waiver rule when a confidentiality agreement is in place seems inadequate to override the strong public interest such a rule would serve. As noted above, [HN22]such a rule does not disadvantage private plaintiffs--they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

Thus, because I find that it is in the best interests of the shareholders to encourage corporate compliance, and because the law enforcement agencies are designed by our legislature as the first line of defense for such shareholders, I adopt a selective waiver rule for disclosures made to law enforcement agencies pursuant to a confidentiality agreement. [HN23]Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

[*40]    Accordingly, I conclude that McKesson HBOC had a reasonable expectation of privacy in its disclosure of work product to the SEC under the protection of a confidentiality agreement. This expectation is one that this Court will sanction. Therefore, McKesson HBOC did not waive its ability to assert the work product privilege as to most of the documents within Group A. Five documents (7 and 9-12 on the First Privilege Log) were shown to the SEC before the confidentiality agreement and were not protected by it. Thus, defendants had no expectation of privacy as to these documents and have waived their work product privilege. These documents must be given to plaintiff Saito. The other documents within Group A will maintain their work product protection. The only remaining question, then, is whether plaintiff Saito has shown a substantial need for the remaining Group A documents.

2002 Del. Ch. LEXIS 125, *

b. Overcoming Work Product Privilege

As noted above, [HN24]there are two types of work product: non-opinion (factual/historical) work product and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party [*41] has a *substantial need* for the materials and the party cannot acquire a substantial equivalent of the materials by other means without *undue hardship.* [62] A party may receive opinion work product when it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.* [63]

> 62 DEL. CT. CH. R. 26(b)(3).

> 63 *Tackett,* 653 A.2d at 262. This Court has only found two instances where mental impressions have been granted to opposing parties. The limited situations include a claim of bad faith against an insurance company, *see id.,* and the circumstances surrounding the approval of a settlement agreement by the defendant when the result of the agreement would be the elimination of claims by the plaintiff. *See Fitzgerald v. Cantor,* 1999 Del. Ch. LEXIS 10 at *1-14 (Del. Ch. January 28, 1999). In light of this, it is obvious that Delaware law protects opinion work product in all but the most compelling circumstances where those mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

[*42]

1. Non-Opinion Work Product

[HN25]Under Chancery Court Rule 26(b)(3), a party may discover nonopinion work product if it shows it has a *substantial need* for the materials and it cannot acquire a substantial equivalent without *undue hardship.* The documents appearing to contain historical or fact information but no mental impressions, theories, or opinions are items 9-16, 23-25, 30-65, 67-73, 76-79, 81-101, 106-114 on the First Privilege Log and the letter dated 11/19/99 on Fourth Privilege Log.

Plaintiff has failed to meet the substantial need/undue hardship test in this instance. In his opening brief, plaintiff applies the *Garner* factors to the work product, even though this Court has held that there is no *Garner* exception to the work product privilege. [64] Of the

twenty pages in this brief, only one paragraph is even dedicated to establishing Saito's need/hardship. Plaintiff limits his "proof" that he has a substantial need for the challenged documents to a conclusory statement that they are "necessary to his determination of Defendant's actions regarding the acquisition of HBOC and what fiduciary duties were breached in that transaction." [65] Undue hardship [*43] is based upon plaintiff's assertion that the "documents are available from no source other than Defendant." [66]

> 64 *In re Fuqua Indus., S'holders Litig.,* 2002 Del. Ch. LEXIS 52 at *20 (Del. Ch. May 2, 2002).

> 65 Pl.'s Op. Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 15.

> 66 *Id.*

Further, in his reply brief, plaintiff is similarly inattentive to the substantial need/undue hardship test. For Group A documents, Saito relies solely on the argument that work product protection was waived. Even giving Saito the benefit of an inferential leap by treating the documents as Group C documents, [67] Saito still fails to establish his substantial need/undue hardship. In his twenty-five page reply brief, plaintiff limits his substantial need argument to a statement that the documents "involve discussion of the core matters Plaintiff is investigating." [68] Plaintiff provides no analysis of whether the challenged Group A documents fit the [*44] profile of such discussions, or even whether the documents in question were created before the challenged merger took place. Also, his undue hardship argument is limited to stating that "there is no other way for Plaintiff to obtain the information contained in those [documents]." [69] Because plaintiff has failed to adequately assert his substantial need for these documents, Saito's motion to compel production of these documents is denied.

> 67 Because the distinction of Group A documents (those disclosed to the SEC) disappears when the waiver argument fails, the documents should then be treated as no different from those in Group C (post-merger legal advice).

> 68 Pl.'s Reply Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 17.

> 69 *Id.*

2. Opinion Work Product

[HN26]Opinion work product includes the "mental impressions, conclusions, opinions and legal theories of a party's attorney" and is only discoverable when the requesting party shows it is directed [*45] to the pivotal issue in the current litigation and the need for the information is compelling. [70] The documents appearing to contain mental impressions and opinion work product are items 7, 17-21, 26-29, 66, 74-75, 80, 102-105 on the First Privilege Log.

> 70  *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254, 262 (Del. 1995).

Just as Saito has failed to establish his substantial need/undue hardship for non-opinion work product, he has similarly failed to meet the higher burden required to receive opinion work product. Thus, the motion to compel these documents is denied.

### c. Attorney-Client Privilege

[HN27]The attorney-client privilege is based upon Rule 502(b) of the Delaware Rules of Evidence. This privilege protects communications made for the purpose of facilitating the rendition of professional legal services. [71] The privilege, belongs to the client, and may be waived expressly or implicitly. [72] Waiver of one privilege does not necessarily waive another privilege, however, because [*46] the purposes behind each privilege are different. [73] I do not need to address attorney-client privilege in relation to most of the documents in Group A because they are protected by the work product doctrine and are subject to the analysis above, with the exception of document number seven on the First Privilege Log.

> 71  *Id.* at 259.

> 72  *Id.*

> 73  *Id.* at 260 (For example, "waiver of the attorney-client privilege does not automatically relinquish the protection provided by the work product doctrine."); *Merisel, Inc. v. Turnberry Capital Mgmt., L.P.,* 1999 Del. Ch. LEXIS 76, 1999 WL 252724 at *4 (Del. Ch. Apr. 20, 1999).

Because document number seven was disclosed to the SEC prior to the issuance of a confidentiality agreement, McKesson HBOC manifested its intent for the document not to remain confidential. Thus, it waived its attorney-client privilege as to this document.

### B. Pre-Merger Legal Advice

Seven documents are sought under Group B. Defendant asserts attorney-client [*47] privilege on behalf of all seven. The second document on the third privilege log also contains a defense of work product and non-responsiveness to the claim. The privilege log description states that the document contains legal advice concerning the Amerisource litigation. This is a rather cryptic description, and it is unclear why plaintiff desires this information. Before I rule on this document, I ask defendant to produce the document(s) to me for an *in camera* inspection. The other documents will be addressed now.

I grant the motion to compel production as to the documents relating to pre-merger legal advice as listed on the third privilege log, with the exception just stated concerning the Amerisource document. I base my decision on application of the well-known *Garner* [74] factors.

> 74  430 F.2d 1093 (5th Cir. 1970). I am, obviously, assuming (without deciding) that the pre-merger legal advice documents are protected by the attorney-client privilege. I hold only that Mr. Saito is entitled to access to the pre-merger documents because his status as a stockholder derivative plaintiff provides a mutual interest with McKesson. *See In re The Limited, Inc. S'holder Litig.,* 2002 Del. Ch. LEXIS 28, 2002 WL 991666 at *4 (Del. Ch.).

[*48]  In *Deutsch v. Cogan,* [75] this Court held that [HN28]"if the corporation objects to discovery and successfully establishes that the material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the plaintiff stockholder seeking discovery shows 'good cause' why the privilege should not attach." [76] *Garner v. Wolfinbarger* [77] provides "a non-exclusive list of factors for a Court to consider in deciding if 'good cause' exists." [78] The *Garner* factors relevant in a books and records action are:

> "(i) the number of shares owned by the shareholder and the percentage of stock they represent;
>
> (ii) the assertion of a colorable claim;
>
> (iii) the necessity of the information and its unavailability from other sources;
>
> (iv) whether the stockholder has identified the information sought and is not merely fishing for information;
>
> and (v) whether the communication is advice concerning the litigation itself." [79]

g

2002 Del. Ch. LEXIS 125, *

75  580 A.2d 100, 107 (Del. Ch. 1990).

76  *Id.*

77  430 F.2d 1093 (5th Cir. 1970).

[*49]

78  *Deutsch* 580 A.2d at 107.

79  *Grimes v. DSC Communications Corp.*, 724 A.2d 561, 568 (Del. Ch. 1998).

Of these five factors, I place the least weight on (i). Granted, plaintiff owns minimal stockholdings, but that factor is not dispositive in determining whether good cause has been shown. Only if no other factor supports good cause will the ownership factor come into play. Therefore, I turn to factors (ii)-(v).

Plaintiff clearly asserts a colorable claim. As stated in this Court's earlier opinion:

> The examination and inspection of the books and records demanded herein is requested for the purpose of enabling Mr. Saito, through his duly empowered attorneys: (1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co., Inc. to the acquisition of HBO & Co.  [*50]  , Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al.*, 2000 Del. Ch. LEXIS 144, C.A. No. 17132 in accordance with the September 15, 2000, Opinion of the Court of Chancery of Delaware. [80]

80  *Saito v. McKesson HBOC, Inc.*, 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001).

To summarize, plaintiff's purpose is to recoup any investment loss that may have been the result of breaches of fiduciary duty. Plaintiff seeks books and records to

determine if there was wrongdoing involved with the merger, which is a colorable claim.

The pre-merger legal advice is necessary to plaintiff's claim, and cannot be obtained elsewhere. Defendants assert that only financial advice is necessary for plaintiff to achieve his stated purpose. Plaintiff's purpose, however, is to determine what the board knew when approving the merger. The [HN29]legal advice given to the board in conjunction with the merger is [*51] relevant and necessary in determining what information the board relied upon. This information, considered by the board before the merger, is not obtainable elsewhere. Therefore, plaintiff satisfies the third factor.

The fourth factor is also met. Plaintiff seeks the legal advice given to the board prior to or in connection with the merger. This information is specific and relevant to plaintiff's stated purpose of determining whether wrongdoing occurred in connection with the merger.

The advice is also not addressed to the litigation itself, because the litigation had not commenced and the merger was not yet complete when the disputed advice was given. The purpose behind the advice was to aid the decision making of the board with respect to the merger. The fifth factor thus is met.

Plaintiff has shown a colorable claim, that the information is necessary and otherwise unobtainable, and that it specifically listed the desired information. The advice does not concern the pending litigation. Because plaintiff has shown good cause, I grant his motion to compel production of the pre-merger legal advice.

### C. Post-Merger Legal Advice

Twenty-three documents relating to post-merger [*52] legal advice are sought here in Group C. Defendant asserts attorney-client privilege and work product protection on all documents. For the reasons that follow, I deny the motion to compel with respect to these documents.

To rebut the privilege, plaintiff must show good cause, as delineated above. In this instance, plaintiff fails to satisfy factors (iii) and (v), and that is enough to deny a finding of good cause. Plaintiff has obtained the necessary underlying information through documents previously provided to him by defendant during discovery. Plaintiff does not have a right to defendant's legal analysis of that same information.

Defendant's legal analysis is also related to the litigation at hand. The improprieties at issue were discovered post-merger. At that point, defendant obtained legal advice to prepare for the ensuing litigation. To grant plaintiff access to this information, in my opinion, would be improper.

2002 Del. Ch. LEXIS 125, *

Plaintiff is also denied the post-merger legal advice under the work product' doctrine. [HN30]Work product is information assembled by an attorney in anticipation of litigation. [81] Work product provides a broader protection than attorney-client privilege since it includes [*53] more than just communications with the client. [82] To obtain work product, plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship. [83]

> 81  *Lee v. Engle*, 1995 Del. Ch. LEXIS 149 at *11 (Del. Ch. Dec. 15, 1995).

> 82  *Id.* 1995 Del. Ch. LEXIS 149 at *12.

> 83  *Grimes*, 724 A.2d at 570.

The documents in question are work product [84] because they were prepared by attorneys in anticipation of litigation. As discussed above, plaintiff already possesses the necessary information through other discovery provided by defendant. Because plaintiff has not shown a substantial need and undue hardship, I deny the motion to compel production of the twenty-three post-merger legal advice documents in Group C.

> 84  The Agenda dated 1/27/99 on the Fourth Privilege Log is not work product because it was created before the events leading to the litigation occurred. This document, however, is still protected under the attorney-client privilege.

[*54] *D. Post-Merger In-House Counsel Documents*

Plaintiff seeks six documents generated by in-house counsel. These six documents concern press relations, preservation of documents, and requests for information. Defendant asserts attorney-client privilege and work product protection. It also denies that the documents have any relevance to plaintiff's claims. Plaintiff makes the same arguments regarding these six documents as he does regarding the post-merger legal advice documents under Group C.

Plaintiff's arguments with respect to privilege and work product fail for the same reasons stated above. Even if plaintiff showed good cause, substantial need, and undue hardship, however, the documents do not appear related to plaintiff's claims or purposes. In-house counsel created these documents to handle the non-substantive yet important issues related to McKesson being in litigation: dealing with the press, requests for information, and preservation of documents. None of these documents relate to plaintiff's purpose in determining if board members violated their fiduciary duties when they recommended and approved the merger. Plaintiff's motion to compel production of the in-house [*55] counsel documents is denied.

II. CONCLUSION

For all the reasons stated above, I grant the motion to compel with respect to the documents disclosed to the SEC prior to the confidentiality agreement: documents 7 and 9-12 on the First Privilege Log. I also grant the motion to compel with respect to the pre-merger legal advice documents in Group B: documents 1, 3-7 on the Third Privilege Log. I request defendant to deliver document 2 on the Third Privilege Log to my chambers for an *in camera* inspection.

I deny the motion to compel as to the remaining Group A documents: documents 13-21, 23-114 on the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. I also deny the motion to compel as to the post-merger legal advice in Group C: documents 1 and 22 on the First Privilege Log, all documents on the Second Privilege Log, and the agenda dated 1/27/99 on the Fourth Privilege Log. Finally, the motion to compel is denied as to the post-merger in-house counsel documents in Group D: documents 2-6 and 8 on the First Privilege Log, documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

IT IS SO ORDERED.

# TAB 14

LEXSEE



Positive
As of: May 25, 2007

### STATE OF SOUTH DAKOTA, Plaintiff and Appellee, v. COLLINS CATCH THE BEAR, Defendant, IN THE MATTER OF CIVIL CONTEMPT PROCEEDINGS v. WITNESS BRUCE ELLISON, ATTORNEY AT LAW, Appellant

#### No. 14122

#### Supreme Court of South Dakota

#### 352 N.W.2d 640; 1984 S.D. LEXIS 326

#### September 14, 1983, Argued
#### June 13, 1984, Filed

**PRIOR HISTORY:**    [**1]    APPEAL FROM THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT, PENNINGTON COUNTY, SOUTH DAKOTA. HONORABLE ROLAND E. GROSSHANS, Judge.

**DISPOSITION:**    Affirmed in part, reversed in part and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant attorney challenged the civil contempt order entered against him by the Circuit Court of the Seventh Judicial Circuit (South Dakota) for refusing to submit to a court-ordered pretrial deposition.

**OVERVIEW:** In preparing to prosecute a case against a crime suspect, the state subpoenaed the attorney to submit to a pretrial deposition concerning his observations and discussions at an Indian encampment before law enforcement officials arrived. The attorney resisted the subpoena on the basis the trial court was without statutory authority to order the subpoena and that the lawyer-client privilege prohibited him from testifying. The court found that it must decide: 1) whether the trial court possessed authority to order the deposition; 2) whether principles of professional ethics prohibited a lawyer from disclosing client confidences even when required by court order; 3) whether a lawyer-client privilege existed between the attorney and suspect; and 4) whether a lawyer-client privilege existed between the attorney and the

other members of the camp. The court affirmed in part, and reversed in part. The trial court did not abuse its discretion in ordering the pretrial deposition. The court found, however, that the trial court did not make clear findings on the existence of the privilege with reference to the camp and its occupants. The court could not assume that no privilege existed.

**OUTCOME:** The court affirmed the lower court's action against the attorney in part, reversed it in part, and remanded the case. The lower court was to make findings on the existence of an attorney-client privilege with reference to the Indian encampment and its occupants.

**CORE TERMS:** deposition, lawyer-client, legal services, discovery, shooting, disclose, disclosure, rendition, pretrial, subpoena, Disciplinary Rule, authority to order, professional ethics, purpose of facilitating, confidential communications, disclosing, confidence, privileged, contempt, secret, ridge, Law of Evidence, Uniform Rules, contempt order, client confidences, exceptional circumstances, interest of justice, liberally construed, court-ordered, submitting

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Depositions*
*Evidence > Hearsay > Exceptions > Former Testimony of Unavailable Declarants*
[HN1]S.D. Codified Laws § 23A-12-6 states that at a trial or any hearing, a part or all of a deposition, so far as

otherwise admissible under the rules of evidence, may be used if it appears: 1) that a witness is dead; 2) that the witness is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; 3) that the witness is unable to attend or testify because of sickness or infirmity; or 4) that the witness is confined in jail or prison outside the state.

*Criminal Law & Procedure > Discovery & Inspection > Depositions*

[HN2]The circumstances which warrant taking a deposition are identified in S.D. Codified Laws § 23A-12-1. Depositions shall not be ordered for discovery or any other purpose except as specifically provided by statute or rule. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.

*Criminal Law & Procedure > Pretrial Motions > General Overview*

*Criminal Law & Procedure > Trials > Judicial Discretion*

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Discovery*

[HN3]S.D. Codified Laws § 23A-12-1 is adopted from Fed. R. Crim. P. 15(a). Federal courts universally hold that discovery matters under Fed. R. Crim. P. 15 are committed to the sound discretion of the trial courts and are reversible only upon a showing of abuse of discretion. Consistent with this construction, courts hold that the extent of discovery permitted by either side rests in the discretion of the court.

*Legal Ethics > Client Relations > Confidentiality of Information*

*Legal Ethics > Sanctions > General Overview*

[HN4]A lawyer may reveal confidences or secrets when permitted under disciplinary rules or required by law or court order. The permissive language of this rule becomes mandatory when set in juxtaposition with S.D. Code of Prof'l Responsibility DR 7-102(A)(3), which states that in his representation of a client, a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal. No ethical principle prohibits an attorney from submitting to a court-ordered deposition designed to discover client confidences.

*Civil Procedure > Parties > Self-Representation > General Overview*

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN5]S.D. Codified Laws § 19-13-3 states that a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: 1) between himself or his representative and his lawyer or his lawyer's representative, 2) between his lawyer and the lawyer's representative, 3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein, 4) between representatives of the client or between the client and a representative of the client, or 5) among lawyers and their representatives representing the same client. Minimum elements necessary to invoke that privilege include: 1) a client; 2) a confidential communication; 3) the communication was made for the purpose of facilitating the rendition of professional legal services to the client; and 4) the communication was made in one of the five relationships enumerated in § 19-13-3.

*Evidence > Privileges > Attorney-Client Privilege > Scope*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN6]It is the client, not the attorney, with whom the lawyer-client privilege reposes. The burden of showing entitlement to assert the privilege rests with its claimant.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN7]The facts concerning the existence of a lawyer-client relationship are not privileged evidence.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN8]The attorney-client privilege hinges not on the lawyer's perception of the relationship but on the client's belief that he is consulting a lawyer to obtain professional legal services. S.D. Codified Laws § 19-13-3. Consequently, while the lawyer at the time of the communication is presumed to have authority to claim the

privilege, S.D. Codified Laws § 19-13-4, his own perceptions are not controlling evidence.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
*Criminal Law & Procedure > Trials > Bench Trials*
*Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors > General Overview*

[HN9]S.D. Codified Laws § 23A-18-3 and Fed. R. Crim. P. 23(c) grant a criminal court authority to find facts specially in a case tried without a jury.

*Criminal Law & Procedure > Juries & Jurors > Waiver of Jury Trial > General Overview*
*Criminal Law & Procedure > Trials > Bench Trials*
*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*

[HN10]Findings made under Fed. R. Crim. P. 23(c) shall not be set aside unless clearly erroneous.

*Criminal Law & Procedure > Discovery & Inspection > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Governments > Legislation > General Overview*

[HN11]Generally, statutes concerning discovery should be liberally construed. The preamble to S.D. Codified Laws § 19-13 expressly limits the scope of the attorney-client privilege. Except as otherwise provided by the Constitution or statute or by S.D. Codified Laws §§ 19-9 to 19-18, inclusive, or by other rules promulgated by the Supreme Court of South Dakota, no person has a privilege to: 1) refuse to be a witness; 2) refuse to disclose any matter; 3) refuse to produce any object or writing; or 4) prevent another from being a witness or disclosing any matter or producing any object or writing. S.D. Codified Laws. § 19-13-1.

*Criminal Law & Procedure > Pretrial Motions > Suppression of Evidence*
*Evidence > Privileges > Attorney-Client Privilege*

[HN12]The application of S.D. Codified Laws. § 19-13-1 is in accord with modern authorities which hold that privileges created by statute are to be strictly construed to avoid suppressing otherwise competent evidence. The United States Supreme Court forcefully supports strict construction.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

[HN13]A person upon whom S.D. Codified Laws § 19-13-16 confers a privilege against disclosure waives that privilege if he, as the holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the privileged matter. Thus a lawyer-client privilege may be waived if the client voluntarily or through his attorney discloses the contents of the communication or advice to someone outside that relationship. After an effectual waiver the privilege disappears and the barrier is removed. The burden of establishing waiver of a privilege is on the party asserting the claim of waiver.

**COUNSEL:** Mikal Hanson, Assistant Attorney General, Pierre, South Dakota, on the brief: Mark V. Meierhenry, Attorney General, Pierre, South Dakota, Attorney for Plaintiff and Appellee.

Norton Tooby, Oakland, California and Nancy Manning, Rapid City, South Dakota, Attorneys for Appellant Bruce Ellison.

**JUDGES:** Fosheim, Chief Justice wrote the opinion. All the Justices concur.

**OPINION BY:** FOSHEIM

**OPINION**

[*642] Attorney Bruce Ellison appeals a civil contempt order entered against him for refusing to submit to a court-ordered pretrial deposition. We affirm in part, reverse in part and remand.

Clarence Tollefson was shot and killed on July 21, 1982, on a ridge near the Yellow Thunder Camp, an American Indian encampment on Victoria Lake in the Black Hills National Forest (camp). Several hours later Bruce Ellison visited the camp.

The next morning Ellison gave a statement to a deputy sheriff at the Pennington County Sheriff's Office. He told the officer that upon returning from the federal courthouse in [**2] Rapid City a man informed him a shooting had occurred at the camp. Ellison drove directly to the camp and climbed to the top of the ridge where the victim had been shot. He said he saw the [*643] body and a vehicle on the ridge and asked if anyone had contacted law enforcement officers. Upon learning that this had not been done, he promptly sent someone to do so. Mr. Ellison further described what he observed and what he learned from talking to people at the camp about the shooting. After making the statement at the sheriff's office, Ellison gave out several press releases and other news media disclosures concerning the incident.

In preparing to prosecute the case against the crime suspect, Collins Catch The Bear, the State subpoenaed Bruce Ellison to submit to a pretrial deposition concerning his observations and discussions at the camp before law enforcement officials arrived. Ellison resisted the subpoena on the grounds the trial court was without statutory authority to order the subpoena and that professional ethics and the lawyer-client privilege prohibited him from testifying. Ellison had been counsel in federal court for the defendants in a case entitled: "United States [**3] of America, Plaintiff, v. William Means, Mathew King, a/k/a Noble Redman, Charles Abourezk, Russell Means and All Other Persons Occupying the Location called 'Yellow Thunder Camp['] at Victoria Lake in the Black Hills National Forest, Defendants." That is a civil action brought by the United States for declaratory and injunctive relief and is not related to the Catch The Bear criminal action. The trial court ruled against Ellison on both issues and ordered him to testify.

Ellison persisted in his refusal and the trial court committed him to the Pennington County Jail "until such time as he submits to a deposition as ordered by this Court or until the end of the [Collins Catch The Bear] trial . . . whichever comes first. . . ." Execution of the order was stayed pending disposition of this appeal.

A mistrial was declared early in the Catch The Bear criminal trial, and the action was dismissed with prejudice. The State argues that the contempt order is consequently moot since the Catch The Bear dismissal automatically purged any contempt. This argument would have merit had the dismissal with prejudice prevailed. We have, however, reversed the prejudice part of that dismissal and [**4] remanded the case for a new trial. _State v. Catch The Bear, 352 N.W.2d 637 (S.D. 1984)._ The issues posed by the subpoena for a pretrial deposition therefore remain viable.

Specifically, we must decide (1) whether the court possesses authority to order the deposition; (2) whether principles of professional ethics prohibit a lawyer from disclosing client confidences even when required by court order; (3) whether a lawyer-client privilege exists between Bruce Ellison and Collins Catch The Bear; and (4) whether a lawyer-client privilege exists between Ellison and the other members of the camp.

I.

Ellison contends the trial court was without authority to order him to submit to a deposition because the State did not satisfy any of the requirements of SDCL 23A-12-6 for use of a deposition at trial, namely:

> [HN1]At a trial or any hearing, a part or all of a deposition, so far as otherwise

admissible under the rules of evidence, may be used if it appears:

> (1) That a witness is dead;
>
> (2) That the witness is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition;
>
> (3) That the witness is unable to attend or [**5] testify because of sickness or infirmity; or
>
> (4) That the witness is confined in jail or prison outside the state.

. . . .

Reliance on that statute is misplaced. It governs the use, not the taking, of a deposition.

[HN2]The circumstances which warrant taking a deposition are identified in SDCL 23A-12-1:

> Depositions shall not be ordered for discovery or any other purpose except as specifically provided by statute or rule.
>
> [*644] _Whenever due to exceptional circumstances of the case it is in the interest of justice_ that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition . . . [emphasis added]

[HN3]SDCL 23A-12-1 was adopted from Rule 15(a) of the Federal Rules of Criminal Procedure. Federal courts universally hold that discovery matters under Rule 15 are committed to the sound discretion of the trial courts and are reversible only upon a showing of abuse of discretion. _United States v. Mann, 590 F.2d 361 (1st Cir. 1978); United States v. Richardson, 588 F.2d 1235 (9th Cir. 1978), cert. [**6] denied, 440 U.S. 947, 99 S. Ct. 1426, 59 L. Ed. 2d 636 (1979); United States v._

*Rosenstein*, 474 F.2d 705 (2d Cir. 1973); *United States v. Puchi*, 441 F.2d 697 (9th Cir. 1971), *cert. denied*, 404 U.S. 853, 92 S. Ct. 92, 30 L. Ed. 2d 92 (1971); and *United States v. Linton*, 502 F. Supp. 871 (D.C. Nev. 1980). Consistent with this construction, we have held that the extent of discovery permitted by either side rests in the discretion of the court. *State v. Means*, 268 N.W.2d 802 (S.D. 1978); *State v. Wade*, 83 S.D. 337, 159 N.W.2d 396 (1968).

The State's Attorney conceded that the Ellison deposition would involve discovery. The trial court nevertheless found that "exceptional circumstances" existed which made it "in the interest of justice" to preserve Mr. Ellison's testimony for trial pursuant to SDCL 23A-12-1. Mr. Ellison's assertion of the lawyer-client privilege and the extensive time needed to resolve that complex issue convinced the court that it should best be heard and decided in advance of trial. The court reasoned it would not be conducive to an expeditious trial to have jurors impaneled, jeopardy attach, and everyone sit idle while court and counsel were [**7] engrossed in preliminary matters. Moreover, it would divert the attention of all involved in the trial from the central issue of guilt or innocence. We recognize the legitimacy of these concerns. Consequently, the trial court did not abuse its discretion in ordering the pretrial deposition.

II.

Ellison next argues that professional ethics prohibit him from submitting to the deposition. He quotes the attorney's oath: "I will maintain the confidence and preserve inviolate the secrets of my client . . ." SDCL 16-16-18. Additionally, SDCL 16-18-18 provides: "It is the duty of an attorney and counselor at law to maintain inviolate the confidence, and at any peril to himself to preserve the secret of his client." These maxims were adopted by supreme court rule in 1939.

Under these rules attorneys were conceivably willy nilly required to obey a subpoena to testify, thus exposing themselves to charges of unethical conduct, or to disobey the court at the risk of a contempt citation. *See Dike v. Dike*, 75 Wash.2d 1, 448 P.2d 490 (1968); American Bar Foundation, Annotated Code of Professional Responsibility 173 (1979). That unreasonable dilemma was resolved, however, by adoption of the [**8] Code of Professional Responsibility on July 21, 1970. SDCL ch. 16-18, Appx., specifically, DR 4-101(C)(2) in connection with DR 7-102(A)(3). SDCL 16-19-32 requires attorneys to follow its provisions.

Disciplinary Rule 4-101(C)(2) of the Code now provides: [HN4]"A lawyer may reveal . . . confidences or secrets when permitted under Disciplinary Rules or required by law or *court order*" (emphasis added). The

permissive language of this rule becomes mandatory when set in juxtaposition with Disciplinary Rule 7-102(A)(3): "In his representation of a client, a lawyer shall not . . . conceal or knowingly fail to disclose that which he is required by law to reveal." *In re Kerr*, 86 Wash.2d 655, 548 P.2d 297 (1976); *see also United States v. Mackey*, 405 F. Supp. 854 (E.D.N.Y. 1975); Annotated Code of Professional Responsibility, *supra*, at 174. It is clear that under the Code of Professional Responsibility, as adopted, no [*645] ethical principle prohibits an attorney from submitting to a court-ordered deposition designed to discover client confidences. The most recent supreme court rule on the subject, DR 4-101(C)(2), relieves the strict ethical prohibitions of the past.

III.

[**9] Even though an attorney may be ethically free to testify, his client nevertheless holds an independent confidentiality privilege. Pursuant to SDCL 19-2-4, it was the law of this state that every communication which a client made to his attorney in the course of professional employment was privileged. *Schutterle v. Schutterle*, 260 N.W.2d 341 (S.D. 1977); *see also State Highway Comm. v. Earl*, 82 S.D. 139, 143 N.W.2d 88 (1966); *Austin, Tomlinson & Webster Mfg. Co. v. Heiser*, 6 S.D. 429, 61 N.W. 445 (1894). Ellison relies heavily on SDCL 19-2-4 and that line of cases. In 1979, however, SDCL 19-2-4 was repealed and this privilege was made more restrictive by our adoption of Rule 502(b), Uniform Rules of Evidence, which is now [HN5]SDCL 19-13-3:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:
>
>> (1) between himself or his representative and his lawyer or his lawyer's representative,
>>
>> (2) between his lawyer and the lawyer's representative,
>>
>> (3) by him or his representative or his lawyer or a representative [**10] of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and

concerning a matter of common interest therein,

(4) between representatives of the client or between the client and a representative of the client, or

(5) among lawyers and their representatives representing the same client.

Minimum elements now necessary to invoke that privilege include: (1) a client; [1] (2) a confidential communication; [2] (3) the communication was made for the purpose of facilitating the rendition of professional legal services to the client; and (4) the communication was made in one of the five relationships enumerated in SDCL 19-13-3.

> 1   SDCL 19-13-2(1) defines a client as "a person, public officer, or corporation, association, or other organization or entity either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him."

> 2   A communication is confidential "if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." SDCL 19-13-2(5).

[**11] [HN6]It is the client, not the attorney, with whom the lawyer-client privilege reposes. *State v. Means*, 268 N.W.2d 802; *see also Conforti & Eisele, Inc. v. Division of Bldg., Etc.*, 170 N.J. Super. 64, 405 A.2d 487 (1979); *State v. Doster*, 276 S.C. 647, 284 S.E.2d 218 (1981), *cert. denied*, 454 U.S. 1030, 102 S. Ct. 566, 70 L. Ed. 2d 473 (1981); *State v. Pam*, 31 Wash. App. 692, 644 P.2d 722 (1982). The burden of showing entitlement to assert the privilege rests with its claimant. *F.T.C. v. Shaffner*, 626 F.2d 32 (7th Cir. 1980); *Matter of Walsh*, 623 F.2d 489 (7th Cir. 1980), *cert. denied*, 449 U.S. 994, 101 S. Ct. 531, 66 L. Ed. 2d 291 (1980); *In re Katz*, 623 F.2d 122 (2nd Cir. 1980); *United States v. Bump*, 605 F.2d 548 (10th Cir. 1979).

[HN7]The facts concerning the existence of a lawyer-client relationship are not privileged evidence. McCormick's Handbook of the Law of Evidence 185 (2d ed. 1972). The only evidence presented was an affidavit of Ellison setting forth his understanding of the relationship. [HN8]The privilege, however, hinges not on the lawyer's perception of the relationship but on the client's belief that he is consulting a lawyer to obtain professional [**12] legal services. SDCL 19-13-3. Consequently, while the [*646] lawyer at the time of the communication is presumed to have authority to claim the privilege, SDCL 19-13-4, his own perceptions are not controlling evidence. Catch The Bear, in whom the prerogative reposed, was silent.

Ellison's counsel conceded in argument before the trial court that he could not give a concrete answer whether Collins Catch The Bear was Ellison's client on the day Ellison investigated the shooting. He argued only that there was client status on that day because Ellison represented "All Other Persons Occupying the . . . Camp" (federal suit caption). The trial court specifically found that Catch The Bear was an occupant at the camp on the day of the shooting. That syllogism, however, does not substitute for hard facts showing Catch The Bear was provided professional legal services by Ellison or that he consulted Ellison with a view to obtaining professional legal services and that he had made confidential communications for the purpose of facilitating the rendition of such services. SDCL 19-13-2(1) and SDCL 19-13-3.

The trial court found that a lawyer-client privilege did not exist between Mr. Ellison [**13] and Mr. Catch The Bear. The finding was made pursuant to [HN9]SDCL 23A-18-3 (Rule 23(c), Federal Rules of Criminal Procedure), which grants a criminal court authority to find facts specially in a case tried without a jury. [HN10]Findings made under Rule 23(c) shall not be set aside unless clearly erroneous. *United States v. Longee*, 603 F.2d 1342 (9th Cir. 1979); *United States v. Hart*, 546 F.2d 798 (9th Cir. 1976)(en banc), *cert. denied*, 429 U.S. 1120, 97 S. Ct. 1155, 51 L. Ed. 2d 571 (1977). From the dearth of evidence in support of a lawyer-client relationship, we cannot conclude that finding was clearly erroneous.

IV.

The trial court focused only on the relationship between Ellison and Catch The Bear. It made no findings on the relationship between other members of the camp and Ellison concerning the communications made on the day of the shooting. Although other members of the camp were not named parties to the Catch The Bear litigation, SDCL 19-13-3 does not require that a client be party to a lawsuit to claim a lawyer-client privilege. Because the trial court did not make clear findings on the existence of the privilege with reference to the camp and its occupants we cannot [**14] assume that no privilege

existed. We must therefore reverse the judgment of contempt and remand for further findings in this regard.

To facilitate the remand in this vein, we deem it advisable to address two further areas of dispute.

[HN11]Generally, statutes concerning discovery should be liberally construed. *Bean v. Best*, 76 S.D. 462, 80 N.W.2d 565 (1957). In *Schutterle*, 260 N.W.2d 341, however, we held that communications between client and lawyer are to be liberally construed in favor of being within the scope of the lawyer-client privilege created under SDCL 19-2-4. As noted, that statute was repealed and replaced with SDCL 19-13-3. The preamble to SDCL ch. 19-13 now expressly limits the scope of the privilege:

> Except as otherwise provided by Constitution or statute or by chapters 19-9 to 19-18, inclusive, or by other rules promulgated by the Supreme Court of this state, no person has a privilege to:
>
>> (1) Refuse to be a witness;
>>
>> (2) Refuse to disclose any matter;
>>
>> (3) Refuse to produce any object or writing; or
>>
>> (4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

SDCL 19-13-1. We agree with [**15] the trial court that the apparent intent was that SDCL ch. 19-13 operate less liberally for the privilege claimant than did its predecessor SDCL 19-2-4 as construed in *Schutterle*.

[HN12]This application of SDCL 19-13-1 is in accord with modern authorities which hold that privileges created by statute are to be [*647] strictly construed to avoid suppressing otherwise competent evidence.

*American Nat. Watermattress Corp. v. Manville*, 642 P.2d 1330 (Alaska 1982); *United Services Auto. Ass'n. v. Werley*, 526 P.2d 28 (Alaska 1974); *Atlantic Coast Line Railroad Company v. Daugherty*, 111 Ga.App. 144, 141 S.E.2d 112 (1965); *Leer v. Chicago, M., St. P. & P. Ry. Co.*, 308 N.W.2d 305 (Minn. 1981), *cert. denied*, 455 U.S. 939, 102 S. Ct. 1430, 71 L. Ed. 2d 650 (1982); *Kahl v. Minnesota Wood Specialty, Inc.*, 277 N.W.2d 395 (Minn. 1979); *Metalsalts Corp. v. Weiss*, 76 N.J. Super. 291, 184 A.2d 435 (1962); *Koller v. W.E. Plechaty Co.*, 6 Ohio Misc. 57, 35 O.O.2d 113, 216 N.E.2d 399 (Ohio Mun.1965). The United States Supreme Court has forcefully supported strict construction: "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly [**16] created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 3108, 41 L. Ed. 2d 1039, 1065 (1974).

The issue of waiver was also raised in the trial court. [HN13]A person upon whom SDCL ch. 19-13 confers a privilege against disclosure waives that privilege if he, as the holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the privileged matter. SDCL 19-13-26 (Rule 510, Uniform Rules of Evidence); *United States v. Davis*, 636 F.2d 1028 (5th Cir. 1981), *cert. denied*, 454 U.S. 862, 102 S. Ct. 320, 70 L. Ed. 2d 162 (1981); *United States v. Flores*, 628 F.2d 521 (9th Cir. 1980); *United States v. Bump*, 605 F.2d 548; *United States v. Cote*, 456 F.2d 142 (8th Cir. 1972). Thus a lawyer-client privilege may be waived if the client voluntarily or through his attorney discloses the contents of the communication or advice to someone outside that relationship. *Bump*, 605 F.2d 548; *United States v. Grammer*, 513 F.2d 673 (9th Cir. 1975). After an effectual waiver the privilege disappears and the barrier is removed. *State v. Means*, 268 N.W.2d [**17] 802; *Olshen v. McMann*, 378 F.2d 993 (2nd Cir. 1967), *cert. denied* 389 U.S. 874, 88 S. Ct. 165, 19 L. Ed. 2d 157; McCormick's Handbook of the Law of Evidence, supra, at 192. The burden of establishing waiver of a privilege is on the party asserting the claim of waiver. *Hogue v. Massa*, 80 S.D. 319, 123 N.W.2d 131, 5 A.L.R.3d 1236 (1963).

Affirmed in part, reversed in part and remanded.

All the Justices concur.