# TAB 15

LEXSEE

THE STATE OF MONTANA, Plaintiff, v. CHERYL IRISH CLIFFORD and
LARRY JOSEPH CLIFFORD, Defendants.

Cause Nos. BDC 2003-248, BDC 2003-249

FIRST JUDICIAL DISTRICT COURT OF MONTANA, LEWIS AND CLARK
COUNTY

2004 ML 2446; 2004 Mont. Dist. LEXIS 3556

August 25, 2004, Decided

**CORE TERMS:** attorney-client, fax, web, disclosure, voluntary relinquishment, waived, known right, inadvertently, privileged, paralegal, sexual intercourse, transmitted, faxed, waive, suppress evidence, prosecutor, subpoena, sentencing hearing, privileged information, privileged communication, prima facie, failure to state a claim, supporting affidavit, high school, relinquishment, confidential, handwritten, inadvertent, deposition, fraudulent

**JUDGES:** [**1]   Jeffrey M. Sherlock, DISTRICT COURT JUDGE.

**OPINION BY:** Jeffrey M. Sherlock

**OPINION**

ORDER [*1]  Before the Court are Larry Clifford and Cheryl Clifford's Motions to Dismiss the Amended Information and to Dismiss Amended Information or to Suppress Evidence.

FACTUAL         AND         PROCEDURAL
BACKGROUND

[*2]  Defendants Larry and Cheryl Clifford were tried together in January 2003 on several criminal charges including Tampering With or Fabricating Physical Evidence and Threats and Other Improper Influence in Official and Political Matters. Larry was represented by Gregory A. Jackson and Cheryl was represented by Palmer A. Hoovestal. Cheryl was convicted, and Larry was acquitted. Throughout the trial, the Cliffords maintained that the actions they were being charged with had been committed by Cindy Hurst or one of her children, and that they were being framed.

[*3]  Prior to Cheryl's sentencing, on February 7, 2003, the Cliffords sent a facsimile transmission to each

of their respective attorneys. The fax was a one-page printed copy of a web page, which also had some handwriting on it. The web page purportedly included a posted message from Cindy Hurst (under an alias) intimating that she [**2]  had finally succeeded in framing Cheryl Clifford. On February 10, 2004[sic], the same document was faxed by Rachel Gratzer, the paralegal in Hoovestal's office, to the prosecutor Robert L. "Dusty" Deschamps. Gratzer completed a fax cover page, including a personal note to Deschamps.

[*4]  On April 11, 2004[sic], the Cliffords' home was searched pursuant to a warrant and several computers were seized. On May 30, 2004[sic], the Court issued an investigative subpoena for Gratzer. The Cliffords' attorneys moved to dismiss the investigative subpoena, claiming that the fax had been sent in error and that the attorney-client privilege barred Gratzer from discussing the matter. The Court denied the motion but then limited the subpoena to "asking Gratzer as to the circumstances and objectives that caused her to fax the web site to Deschamps." When Gratzer was interviewed, she said she had received a fax and without consulting anyone, forwarded it to Deschamps. She said she considered it to be discovery material.

[*5]  On August 28, 2003, the Cliffords were charged with felonies. Shortly afterward the Cliffords moved to dismiss the informations and to suppress evidence on the [**3]  ground that the evidence was protected by the attorney-client privilege. The motions were supported by affidavits from Hoovestal, Jackson and Gratzer. Gratzer's affidavit stated that she inadvertently sent the fax; that she had not been told to send it; and that Cheryl Clifford had not consented to her doing so and had not waived the attorney-client privilege.

[*6]  Gratzer later recanted much of what was in her affidavit, alleging that Hoovestal prepared and directed

—

2004 ML 2446, *; 2004 Mont. Dist. LEXIS 3556, **

her to sign the affidavit. In a deposition, she stated that Hoovestal directed her to fax the document to the prosecutor, and that she told Larry Clifford shortly afterward and that he made no objection. Gratzer further stated that Hoovestal knew that she believed he had directed her to fax the document to the prosecutor and that she signed the affidavit and gave false statements in her earlier interview with law enforcement because she feared her employment would be terminated if she revealed the truth.

ARGUMENT

Motion to Suppress Evidence

[*7]  The Cliffords request that the Court suppress the document faxed to the prosecution by Hoovestal's paralegal, arguing that the document originally transmitted [**4] to both Hoovestal's and Jackson's offices is a privileged communication and was obtained in violation of that privilege.

[*8]  The Cliffords also argue that use of the document would violate a number of their constitutional rights under the Fourth Amendment to the United States Constitution and Article II, sections 10 and 11, of the Montana Constitution. They argue that the State's continued use of privileged information violates their due process rights and that, because of the use of privileged information by the State, they have been denied effective assistance of counsel since they have been denied their counsel of choice. Each of these arguments aside, the threshold issues involve first, whether the document was privileged and second, whether that privilege was waived.

[*9]  The essential elements of attorney-client privilege are:

(1) Where legal advice of any kind is sought

(2) from a professional legal adviser in his capacity as such,

(3) the communications relating to that purpose,

(4) made in confidence

(5) by the client,

(6) are at this instance permanently protected

(7) from disclosure by himself or by the legal [**5] adviser,

(8) unless the protection be waived.

[*10]  State ex rel., United States Fid. & Guar. Co. v. Mont. 2nd Jud. Dist. Ct., 240 Mont. 5, 11; 783 P.2d 911, 914-15 (1989), citing Admiral Ins. Co. v. United States Dist. Ct., 881 F.2d 1486 (9th Cir. 1989). The attorney-client privilege is also defined in Section 26-1-803, MCA, "an attorney cannot, without the consent of his client, be examined as to any communication made by his client to him or his advice given thereon in the course of his professional employment."

[*11]  It is clear to this Court that the document in question here was covered by the attorney-client privilege. The document was faxed by one or both of the Cliffords to each of their attorneys' offices and contained handwritten comments, presumably from both Cliffords. Both Defendants had just finished a criminal trial; the document was purported to be related to at least one witness involved in the trial; and it was transmitted to the attorneys representing the Cliffords in that trial and who, presumably, would be preparing for the pending sentencing hearing and future appeals. It [**6]  is exactly this type of communication that the privilege is meant to protect. The attorney-client privilege recognizes the importance of free and open communication between the client and attorney, and encourages clients "to give information to their attorneys without fear that it will later be used against them." Palmer by Diacon v. Farmers Ins. Exch., 261 Mont. 91, 112, 861 P.2d 895, 908 (1993). That privilege also extends to the attorney's staff, including paralegals, secretaries and other individuals assisting attorneys in preparing or dispensing legal services. Wal-Mart Stores, Inc. v. Dickinson, 29 S.W.3d 796 (Ky. 2000). In addition, the privilege extends to joint defense agreements, which it appears that the Cliffords may have had. United States v. Almeida, 341 F.3d 1318 (11 th Cir. 2003).

[*12]  Even when a communication is privileged, the privilege can be waived by the client. Waiver is defined as the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right. Kuiper v. Dist. Ct., 193 Mont. 452, 460, 632 P.2d 694, 698 (1981). The burden of establishing waiver of [**7]  the privilege is on the party seeking to overcome the privilege. Miller v. Dist. Ct. of Denver, 737 P.2d 834, 838 (Colo. 1987). Two elements must be considered when a court reviews the waiver of an attorney-client privilege: (1) the element of a client's implied intention and (2) the element of fairness and consistency. See, 8 Wigmore, Evidence, § 2327 (1961); State v. Balkin, 48 Wn. App. 1, 5, 737 P.2d 1035, 1037 (1987). An implied waiver must be supported by evidence showing that a defendant, by words or by conduct, has impliedly forsaken his privilege of confidentiality with respect to the communication in question. Miller, at 838.

[*13] In Pacificorp v. Dep't of Revenue, 254 Mont. 387, 838 P.2d 914 (1992), the Montana Supreme Court addressed the issue of an inadvertent production of documents. According to the supreme court, the Statczar definition of waiver as "the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right" is consistent with the commission comments to Rule 503, M.R.Evid., which provide that subjective intent is not the only factor for determining waiver - conduct [**8] can also constitute waiver. The commission comments go on to state that knowledge is not a required element for waiver. Pacificorp at 396, 838 P.2d at 919. In Pacificorp, several documents were inadvertently produced to the other side along with a number of other documents. In evaluating whether Pacificorp's conduct constituted voluntary relinquishment of the privilege, the supreme court noted that Pacificorps' counsel was not aware of the disclosure until later. Pacificorp requested the return of the documents as soon as it became aware of the production and took prompt reasonable steps to protect its privilege, objected to any use being made of the documents and refused to permit questions to be asked about them as soon as the issue arose during depositions.

[*14] Whether the disclosure was done inadvertently has been a matter of lengthy discussion in this case. Initially, the Cliffords' counsel claimed that the fax was sent by accident, despite the presence of a fax cover sheet and note written by Hoovestal's paralegal. Later, Gratzer recanted her earlier claim and alleged that she had sent the fax on purpose and with Hoovestal's blessing. Although disclosure [**9] of this document was not inadvertent in the same manner as in Pacificorp, the Court finds the reasoning in Pacificorp to be relevant here. As in Pacificorp, initially, the Cliffords did not have knowledge of Gratzer's disclosure of the documents. However, according to Gratzer's statement, one of the Cliffords' attorneys, Hoovestal, was aware that the fax had been sent to the prosecution shortly after its receipt. Gratzer also noted that she notified Larry Clifford that the document had been forwarded to Deschamps and that Larry made no objection. The statement of some friends of the Cliffords indicates that Larry Clifford told them that the web page had been given by their attorneys to the State, indicating that the Cliffords were aware of its transmittal. Although it is clear that the Cliffords and their counsel knew that the prosecution was in possession of the document, no one objected or made any effort to retrieve the document. It was quite some time later - after a search warrant was executed and the state alleged that the web page had been created by the Cliffords - that the claim of privilege was asserted with respect to the document.

[*15] The attorney-client privilege [**10] belongs to the client and the attorney cannot waive it without consent of the client. Palmer by Diacon at 109, 861 P.2d at 906. However, neither the Cliffords nor their attorneys made any objection to the use of the document in question until well after they were made aware that the State was in possession of the document. In fact, it was months later before the Cliffords or their attorneys claimed that the fax was sent inadvertently and moved to have it suppressed. Although neither Hoovestal nor a member of his staff were able to waive the privilege, it appears that the Cliffords made no objection when they found out the State was in possession of the document.

[*16] In Kuiper, the Montana Supreme Court stated that if no legal action is taken to protect against wide dissemination of the materials, voluntary relinquishment of the right could be found. Kuiper at 460, 632 P.2d at 698. In this case, the Cliffords took no action to assert the privilege, indicating there was a voluntary relinquishment. The disclosure was not solicited or requested by the State, and the Cliffords made no effort to stop its use until they were charged with a crime.

[*17] [**11] The State also makes the argument that the privilege either never existed or was waived when the document was published on the world wide web. In addition, the state asserts, Larry Clifford told his friends, the Parmalees, about the general content of the web page; that the Cliffords had given it to their attorneys; and that it had also been given to the State. The attorney-client privilege protects communications made in the course of a professional relationship. Where a statement is to a number of people or within their hearing, communication is not confidential and not privileged. Jones v. Jones, 190 Mont. 221, 225, 620 P.2d 850, 852 (1980). In addition, according to the Montana Rules of Evidence, "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if the person or the person's predecessor while the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter." Rule 503, M.R.Evid.

[*18] The original document, absent the handwritten notes from the Cliffords, was published on the internet. The contents of that web page and the manner of its creation were not meant [**12] to be confidential and certainly did not fall within the protection of attorney-client privilege after the Cliffords voluntarily published it to an indeterminate number of internet users. According to the statements from the Parmalees, Larry Clifford told them about the web page and its transmittal to their attorneys. Specifically, he told them he had found a web page; that it was "from Cindy Hurst"; and that they had given the web page to their attorney who gave it to the State. His comments to his friends regarding the web

page and what he and his wife had done with it are not protected by any attorney client privilege.

[*19] Furthermore, there are certain limited exceptions to a privileged communication. Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome "where communication or work product is intended 'to further continuing or future criminal or fraudulent activity.'" In re Grand Jury Subpoena, 220 F.3d 406, 410 (5th Cir. 2000). Where the government makes a prima facie showing that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity, the privilege does not exist. [**13] United States v. Dyer, 722 F.2d 174, 177 (5th Cir. 1983). Here, the State has made that prima facie showing.

[*20] Defendants' motion to suppress is hereby DENIED.

Motion to Dismiss

[*21] The Montana Supreme Court has summarized the rules to be applied in deciding a motion to dismiss. Wheeler v. Moe, 163 Mont. 154, 161, 515 P.2d 679, 683 (1973). A trial court rarely grants a motion to dismiss for failure to state a claim upon which relief can be granted. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 161, 515 P.2d at 683 (citations omitted).

[*22] Motions to dismiss should only be granted if it appears clearly on the face of the complaint that there is an insuperable bar to relief. "In other words, dismissal is justified only when the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim." Id. See also Buttrell v. McBride Land & Livestock Co., 170 Mont. 296, 298, 553 P.2d 407, 408 (1976).

[*23] The Cliffords [**14] have filed a motion to dismiss the amended information, arguing that the State cannot prove by admissible evidence that the Cliffords acted with the requisite mental state. The Cliffords argue that the affidavit supporting the information must contain allegations which support the charges in the information. The Cliffords charge that State v. Thompson, 243 Mont. 28, 792 P.2d 1103 (1990), provides the authority and standard of review applicable in this case, and that under Thompson, the State cannot make out a prima facie case and the charges should be dismissed.

[*24] Thompson was a high school principal who was charged with two counts of sexual intercourse without consent after having threatened a student that she would not graduate from high school if she did not engage in oral sexual intercourse with him. The district court dismissed the two counts of sexual intercourse without consent on the ground that the probable cause affidavit was insufficient. The Montana Supreme Court affirmed the district court's decision. According to the supreme court, the facts in the information failed to state offenses. The phrase "without consent" was defined in Montana code as [**15] meaning "the victim is compelled to submit by force or by threat of imminent death, bodily injury, or kidnaping to be inflicted on anyone." See, Thompson at 31, 792 P.2d at 1105. The supreme court noted that no other circumstances eliminate consent under the statute, including the threat of non-graduation. Because the facts in the supporting affidavit failed to show the element of "without consent," the charges were dismissed.

[*25] Although the Cliffords argue that Thompson is controlling here, the Court does not see the connection. In Thompson, the allegations simply did not meet the definition of the offense defined in the statute. In the instant case, the Cliffords are charged with tampering with or fabricating physical evidence and several alternative charges. The Cliffords argue that the State cannot prove that they acted with purpose to mislead any person who is engaged in the official proceeding. The supporting affidavit alleges that the Cliffords created a web page and transmitted it to their attorneys. It is certainly within the realm of possibility that these actions were taken in the hope that it would be passed on to the court or some other person to [**16] influence the outcome of the pending sentencing hearing of Cheryl Clifford. Furthermore, the statute requires only that the Defendants acted with purpose to mislead any person involved in the proceeding, which could include their own attorneys. Whether the State can prove all the elements of the charges is something to be determined at trial, but the Court does not see any reason to dismiss the charges at this point.

[*26] Therefore, the Defendants' motion to dismiss is DENIED.

DATED this 25th day of August, 2004.

Jeffrey M. Sherlock

DISTRICT COURT JUDGE

# TAB 16

LEXSEE



Positive
As of: May 25, 2007

STATE OF SOUTH DAKOTA, Plaintiff and Appellee, v. WILLIAM BOYD
GUTHRIE, Defendant and Appellant.

# 21388

SUPREME COURT OF SOUTH DAKOTA

2001 SD 61; 627 N.W.2d 401; 2001 S.D. LEXIS 62

October 23, 2000, Argued
May 16, 2001, Filed

**SUBSEQUENT HISTORY:** [***1] As Amended
July 30, 2001.

**PRIOR HISTORY:** APPEAL FROM THE CIRCUIT
COURT OF THE THIRD JUDICIAL CIRCUIT.
BEADLE COUNTY, SOUTH DAKOTA. THE
HONORABLE EUGENE L. MARTIN, Judge.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant appealed a
judgment of the Circuit Court of the Third Judicial Cir-
cuit, Beadle County, South Dakota, convicting him of
first degree murder.

**OVERVIEW:** Defendant alleged that the trial court
erred in admitting expert testimony on the common fac-
tors for persons at risk for suicide, and, ultimately, an
opinion that defendant's wife had not committed suicide.
Defendant also alleged that his motion for judgment of
acquittal and his motion to suppress evidence obtained
from his home computer were erroneously denied. The
appellate court affirmed defendant's conviction. The trial
court properly applied the Daubert standard, leaving the
jury to decide whether the expert's testimony on the typi-
cal characteristics of suicidal persons deserved factual
acceptance. However, under the Daubert standard, given
the state of psychological knowledge, a suicide profile
alone could not have been used by the expert to declare
with scientific certainty that a person did or did not
commit suicide. Nonetheless, that error was harmless.

Considering the evidence as a whole, and that witness
credibility issues were to be determined by the jury, the
evidence was found to be sufficient to support defen-
dant's conviction. The challenged evidence was obtained
via lawful third party consent.

**OUTCOME:** Defendant's conviction was affirmed. The
trial court had properly applied the Daubert standard,
leaving the jury to decide whether an expert's testimony
on the typical characteristics of suicidal persons deserved
factual acceptance. Also, the evidence was sufficient to
support defendant's conviction.

**CORE TERMS:** suicide, lead opinion, citations omitted,
psychological, conversation, ultimate issue, autopsy,
daughter's, expert testimony, suicidal, reliable, reliability,
commit suicide, church, prints, profile, admissible, talk,
privileged, recording, prescription, credibility, scientific,
disclosure, seizure, defense counsel, murder, abused,
tape, abuse of discretion

**LexisNexis(R) Headnotes**

*Evidence > Relevance > Confusion, Prejudice & Waste
of Time*
[HN1]See S.D. Codified Laws § 19-12-3.

*Evidence > Procedural Considerations > Exclusion &
Preservation by Prosecutor*
[HN2]Surrebuttal is limited to proof rebutting rebuttal
evidence.

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

*Evidence > Testimony > Experts > General Overview*
[HN3]See S.D. Codified Laws § 19-15-2.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
[HN4]Trial courts retain broad discretion in ruling on the admissibility of expert opinion. Decisions to admit or deny opinion evidence will not be reversed absent a clear showing of abuse of discretion. A court's ruling on reliability receives the same deference as its decision on ultimate admissibility. When a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion.

*Evidence > Testimony > Lay Witnesses > Ultimate Issue*
[HN5]South Dakota abolishes the ultimate issue rule and replaces it with S.D. Codified Laws § 19-15-4: testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

*Evidence > Relevance > Relevant Evidence*
*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Helpfulness*
[HN6]Before admitting expert testimony, the court must address two preliminary points. First, expert opinion must be relevant to the matter in question. S.D. Codified Laws § 19-12-2. Relevance embraces evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. S.D. Codified Laws § 19-12-1. To be relevant, evidence need only be probative, not conclusive. Second, the opinion must assist the fact finder in understanding the evidence or deciding the issues. To be helpful, of course, expert opinion must offer more than something jurors can infer for themselves.

*Evidence > Testimony > Lay Witnesses > Ultimate Issue*
[HN7]Opinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule.

*Evidence > Scientific Evidence > General Overview*

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Daubert Standard*
[HN8]Under Daubert, the proponent offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge under S.D. Codified Laws § 19-15-2. This burden is met by establishing that there has been adequate empirical proof of the validity of the theory or method. In deciding whether to admit expert testimony, a court must ensure that the opinion abides on a reliable foundation. The standards set forth in Daubert are not limited to what has traditionally been perceived as scientific evidence. These standards must be satisfied whenever scientific, technical, or other specialized knowledge is offered.

*Evidence > Testimony > Experts > General Overview*
[HN9]The factual basis for an expert opinion is given wide latitude. Under S.D. Codified Laws § 19-15-3, experts may base their opinions on facts perceived by or made known to them at or before the hearing, if of a type reasonably relied on by experts in the field in forming opinions, and the facts or data need not be admissible in evidence.

*Evidence > Testimony > Experts > Daubert Standard*
[HN10]A trial court can consider the following nonexclusive guidelines for assessing an expert's methodology: (1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether standards exist to control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put. Daubert's list of factors may not each apply to all experts in every case.

*Evidence > Scientific Evidence > Autopsies*
*Evidence > Testimony > Experts > General Overview*
[HN11]The law does not require opinion testimony to be above all criticism before it is admissible.

*Governments > Legislation > Interpretation*
[HN12]The South Dakota Supreme Court interprets South Dakota's rules of evidence liberally with the general approach of relaxing the traditional barriers to "opinion" testimony.

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Testimony > Experts > Daubert Standard*
[HN13]The law endows the trial court with the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. As a result, Daubert and Kumho provide a fundamentally deferential analysis, leaving little reweighing in the appellate court. Generally, an expert's opinion is reliable if it is derived from the foundations of science rather than subjective belief.

*Evidence > Testimony > Experts > General Overview*
[HN14]The Daubert-Kumho factors are guides, not inflexible benchmarks. Nonetheless, as the U.S. Supreme Court recognized in Daubert and again in Kumho, the ability to validate a hypothesis lies at the core of a trial court's inquiry.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
[HN15]When opposing experts give contradictory opinions on the reliability or validity of a conclusion, the issue of reliability becomes a question for the jury.

*Criminal Law & Procedure > Trials > General Overview*
[HN16]Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Evidence > Testimony > Experts > Admissibility*
*Evidence > Testimony > Experts > Ultimate Issue*
[HN17]Pertaining to the question of the admissibility of expert testimony, in the present state of behavioral science research, a syndrome may be generally reliable to describe and explain functions and characteristics, but it is not dependable to prove that the syndrome itself establishes the ultimate issue.

*Evidence > Testimony > Experts > Daubert Standard*
*Healthcare Law > Treatment > Incompetent, Minor & Mentally Disabled Patients > Institutionalization*
[HN18]In allowing experts with specialized knowledge to testify, courts applying Daubert generally permit these experts to describe the symptoms or behaviors of known victims, report the symptoms or behaviors observed in the victim in the present case, and give an opinion that

the victim's symptoms or behaviors are "consistent with" those of known victims.

*Evidence > Scientific Evidence > Daubert Standard*
*Evidence > Scientific Evidence > Psychiatric & Psychological Evidence*
*Torts > Negligence > Proof > Custom > Expert Testimony*
[HN19]Pertaining to the question of the admissibility of expert testimony under the Daubert standards, in the present state of psychological knowledge, a suicide profile alone cannot be used to declare with scientific certainty that a person did or did not commit suicide.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > Harmless Error Rule*
*Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors > Evidence*
*Evidence > Testimony > Experts > Daubert Standard*
[HN20]Error is harmless when the jury verdict would not have been different if the challenged testimony were excluded. The State bears the burden of proving the error was not prejudicial.

*Criminal Law & Procedure > Trials > Motions for Acquittal*
*Criminal Law & Procedure > Appeals > Standards of Review > Harmless & Invited Errors > General Overview*
[HN21]Patterned after Fed. R. Crim. P. 29(a), the motion for judgment of acquittal replaces the former motion for directed verdict. S.D. Codified Laws § 23A-23-1; Fed. R. Crim. P. 29(a). A challenge to the sufficiency of the evidence being the only ground for the motion, the basis for a Rule 29(a) motion need not be stated with specificity. It is satisfactory to state, "the evidence is insufficient to sustain a conviction." If the defendant makes the motion without describing the grounds with specificity, both the court and the prosecutor can request further explanation.

*Criminal Law & Procedure > Trials > Motions for Acquittal*
*Criminal Law & Procedure > Appeals > Records on Appeal*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN22]In reviewing a circuit court's decision to deny a motion for judgment of acquittal, the appellate court inquires whether the State presented sufficient evidence on which the jury could reasonably find the defendant guilty of the crime charged. More specifically, the appellate

court asks if there was sufficient evidence in the record that, if believed, would be adequate to sustain a conviction beyond a reasonable doubt.

*Criminal Law & Procedure > Trials > Examination of Witnesses > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN23]In a sufficiency challenge, the appellate court will set aside a jury verdict only when the evidence and the reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt. The appellate court will not resolve conflicts in the testimony, pass on the credibility of witnesses, or weigh the evidence.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN24]All elements of a crime, including intent and premeditation, may be established circumstantially.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Use of Particular Evidence*
[HN25]When the State's case rests substantially or entirely on circumstantial evidence, the trial court must instruct the jury the defendant cannot be convicted unless (1) the proved circumstances are not only; consistent with the guilt of the accused, but cannot be reconciled with any other rational conclusion and (2) each fact which is essential to a complete set of circumstances necessary to establish the accused's guilt has been proven beyond a reasonable doubt.

*Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > General Overview*
[HN26]See S.D. Codified Laws § 22-16-4.

*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN27]To support a conviction on circumstantial evidence, the State is not required to exclude every hypothesis of innocence. Rather, the appellate court views the evidence cumulatively to see whether in its totality it is enough to rule out any reasonable hypothesis of innocence. In making this review, the appellate court must accept the evidence with its most reasonable inferences.

*Criminal Law & Procedure > Trials > Motions for Acquittal*
[HN28]Although in a circumstantial case it is a trial court's duty on a motion for judgment of acquittal to examine the facts for a reasonable hypothesis of innocence, when credibility gives meaning and color to so many facts, judges cannot scramble the complex circumstances to see if they might resituate to prove a more advantageous theory by dispensing with the credibility factor.

*Criminal Law & Procedure > Search & Seizure > Search Warrants > Execution of Warrant*
[HN29]See S.D. Codified Laws § 23A-35-4.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Warrants*
*Criminal Law & Procedure > Search & Seizure > General Overview*
*Criminal Law & Procedure > Pretrial Motions > Suppression of Evidence*
[HN30]U.S. Const. amend. IV and S.D. Const. art. VI, § 11 forbid unreasonable searches and seizures. For a search or seizure to be considered reasonable, a warrant is generally necessary. On the other hand, the requirement that a warrant be executed within 10 days is not a constitutional command. It is purely statutory. Evidence obtained in violation of a criminal statute is not automatically subject to suppression. Such evidence may be suppressed, however, where the violation is substantial.

*Criminal Law & Procedure > Search & Seizure > Search Warrants > Execution of Warrant*
*Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > General Overview*
[HN31]The 10 day rule ensures that a warrant does not become stale. In analyzing whether a warrant executed outside the statutory period was stale, timeliness of execution should not be determined by means of a mechanical test. Staleness should be measured in terms of whether probable cause still existed at the time the warrant was executed.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Criminal Law & Procedure > Search & Seizure > Search Warrants > General Overview*
*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Consent to Search > Sufficiency & Voluntariness*

[HN32]While a warrant is the preferred method for conducting a search or seizure, there are exceptions to the warrant requirement. One exception dispenses with the necessity of a warrant when voluntary consent is obtained from the owner or a third person who possesses common authority over the premises. This applies to third persons having common authority over effects sought to be inspected. The existence of valid consent to search is a question of fact, so the appellate court applies a clearly erroneous standard of review. On the other hand, whether police had a lawful basis to conduct a warrantless search is reviewed as a question of law. Consequently, in deciding whether a third party had the authority to give consent, the appellate court is presented with a mixed question of law and fact, reviewable de novo.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Consent to Search > Third Party Consent*

*Torts > Negligence > Defenses > Assumption of Risk > Elements & Nature > General Overview*

[HN33]Pertaining to the consent exception to the warrant requirement, in deciding if common control exists over a particular item, a proprietary interest alone is not dispositive. The existence of common authority rests on mutual use of the property by persons generally having joint access or control for most purposes. Common authority over personal property may exist when one allows another to use the property and leaves it at that person's home. By leaving possessions in someone else's custody, the entrusting party assumes the risk that the third party will consent to a search.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Consent to Search > Sufficiency & Voluntariness*

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*

[HN34]Pertaining to the consent exception to the warrant requirement, the State has the burden of proving consent by clear and convincing evidence.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Consent to Search*

*Torts > Negligence > Defenses > Assumption of Risk > Elements & Nature > General Overview*

[HN35]A defendant is not automatically entitled to expect that the contents of articles left behind at another premises will remain private and, should he leave such articles behind, he assumes the risk that the other person may consent to a search.

*Evidence > Privileges > Clergy Communications > General Overview*

[HN36]The clergy privilege is defined in S.D. Codified Laws §§ 19-13-16, 19-13-17.

*Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > General Overview*

[HN37]Because the application of a statute to particular facts involves a question of law, the appellate court reviews the circuit court's conclusions de novo.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*

*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*

*Evidence > Privileges > Clergy Communications > General Overview*

[HN38]Findings of fact made as part of a ruling on the clergy privilege are reviewed under a clearly erroneous standard.

*Evidence > Privileges > Clergy Communications > Scope*

[HN39]S.D. Codified Laws § 19-13-17 grants persons the privilege to prevent disclosure of (1) confidential communications, (2) made to clerics, (3) in their professional capacity as spiritual advisors. The person claiming the privilege carries the burden to prove his entitlement to assert the privilege.

*Criminal Law & Procedure > Pretrial Motions > Suppression of Evidence*

*Governments > Legislation > Interpretation*

[HN40]The court construes statutory privileges strictly to avoid suppressing otherwise competent evidence.

*Evidence > Privileges > Clergy Communications > General Overview*

[HN41]Not every communication to a cleric is protected by the clergy privilege.

*Evidence > Privileges > Clergy Communications*

[HN42]See S.D. Codified Laws § 19-13-16.

*Evidence > Privileges > Clergy Communications > General Overview*

[HN43]Pertaining to the question of whether a communication to a cleric is protected by the clergy privilege, by the language of S.D. Codified Laws § 19-13-16, the court's inquiry begins with a person's intent in communicating with a clergy member.

*Evidence > Privileges > Clergy Communications > Elements*

*Evidence > Privileges > Clergy Communications > Scope*

[HN44]Pertaining to the question of whether a communication to a cleric is protected by the clergy privilege, regarding the requirement in S.D. Codified Laws § 19-13-17 that the communication with the cleric be in the cleric's professional character as spiritual advisor, the communication need not be in the form of a confession.

*Evidence > Privileges > Clergy Communications > Elements*

*Evidence > Privileges > Clergy Communications > Scope*

[HN45]Pertaining to the question of whether a communication to a cleric is protected by the clergy privilege, regarding the requirements of S.D. Codified Laws § 19-13-17, in deciding if a communication was made to a cleric acting in a professional capacity as a spiritual advisor, the fact that the communication was initiated by the clergyman rather than the penitent may be viewed as significant. Similarly, the specific relationship between the communicants may be relevant. The court's inquiry must be founded on the particulars of each case.

*Evidence > Privileges > Government Privileges > Waiver*

[HN46]See S.D. Codified Laws § 19-13-26.

*Evidence > Privileges > Government Privileges > Waiver*

[HN47]Under S.D. Codified Laws § 19-13-26, voluntary disclosure of the contents of the communication to a third party constitutes a waiver of the privilege.

*Evidence > Privileges > Government Privileges > Waiver*

[HN48]In order for S.D. Codified Laws § 19-13-26 to apply, the disclosure of the privileged information must be more precise than simply conversations regarding the same subject matter.

*Evidence > Relevance > Relevant Evidence*

[HN49]South Dakota's rules favor the admission of evidence in the absence of strong considerations to the contrary.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

[HN50]Those objecting to admission have the burden of showing that the concerns addressed in S.D. R. Evid. 403 substantially outweigh probative value.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*

*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*

[HN51]Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

**COUNSEL:** MARK BARNETT, Attorney General, GRANT GORMLEY, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

PHILIP R. PARENT of Arneson, Issenhuth & Gienapp, Madison, South Dakota, Attorneys for defendant and appellant.

**JUDGES:** KONENKAMP, Justice. AMUNDSON, Justice, concurs on Issues 1, 2, 3, 4, and 5 and joins Justice Sabers' dissent on Issue 6. MILLER, Chief Justice, and GILBERTSON, Justice, concur in part and concur in result in part. SABERS, Justice, concurs in part and dissents in part.

**OPINION BY:** KONENKAMP

**OPINION**

[**406] KONENKAMP, Justice

[*P1] In this appeal, we affirm the defendant's conviction for murdering his wife.

**A.**

**The Drowning**

[*P2] At 7:00 a.m. on May 14, 1999, Dr. William B. Guthrie, a Presbyterian minister, called 911 for emergency assistance. Sharon, his wife of thirty-three years, lay naked and unconscious in the bathtub. The first persons to respond found her face down in the empty tub. Guthrie was "on his hands and knees sobbing and asking for help." Two EMTs pulled her out and [***2] moved

her to a nearby hallway to perform CPR. In their efforts, they became soaked with water. After the ambulance left, Bonnie Dosch, an R.N. who had assisted in attempts to resuscitate Sharon, offered to take Guthrie to the hospital. She helped him put on his shoes and socks.

[*P3] Sharon regained some heart activity in the emergency room, but never breathed on her own and never recovered any brain function. She expired on May 15, 1999, at age fifty-four. Dr. Brad Randall, a forensic pathologist, performed an autopsy the following day. Gastric and blood serum toxicology confirmed the presence of subtherapeutic amounts of two antianxiety agents, Diazepam and Lorazepam, and a sedative, Oxazepam. From the partially digested condition of the tablets, it appeared they could have been taken within four hours before her drowning. Also present was a toxic and debilitating level of Temazepam, but not a fatal overdose. The level of Temazepam in Sharon's system was enough to render her unconscious. Randall estimated that she ingested "about 20" Temazepam capsules, which could not have been taken accidentally. She drowned "because she was incapacitated from the Temazepam dose." In Randall's [***3] judgment, her death was not natural and not accidental, but from the autopsy alone he could not resolve whether it was suicide or homicide.

## B.

### The Investigation

[*P4] As the incepting cause of death was medically unattended, Beadle County Chief Deputy Sheriff Jim Sheridan examined and photographed the Guthrie home after Sharon was taken to the hospital. He then took Guthrie's statement. Guthrie said that in keeping with his morning routine, he left the house for about ten minutes of prayer and devotion at his church next door. When he returned he noticed that the hallway floor was wet; he opened the bathroom door and found his wife. He tried to remove her from the tub, but she was too heavy. He drained the water and called for help. Witnesses at the scene recalled that he was not wet or that his knee only was wet. Furthermore, he had no shoes or socks on when the emergency personnel arrived, peculiar in that he said he had just arrived home from devotions at his church.

[**407] [*P5] Deputy Sheridan learned that the autopsy revealed a large amount of prescription drugs in Sharon's system. He asked Jerry Lindberg of the Department of Criminal Investigation for assistance. [***4] They confirmed that Temazepam was present in the household. It had been prescribed for Guthrie as a sleeping aid. Additionally, they discovered that Guthrie had been involved with another woman. When the officers first confronted him about the affair, he denied it, but he

soon conceded it was true. Sheridan later obtained a search warrant for Guthrie's home and church office. The officers seized a computer in his office on July 27, 1999.

[*P6] The Guthries had three adult daughters: Suzanne, Jenalu, and Danielle. They knew their father was unhappy in the marriage. He had told Suzanne that he no longer loved Sharon and planned to obtain a divorce after Jenalu's wedding in June. For six or seven years he repeatedly told their youngest daughter, Danielle, not just that he wanted a divorce, but that he hated Sharon, that she was fat and ugly, that she so disgusted him he could not force himself to touch her.

[*P7] Guthrie's adulterous affair spanned from 1994 to 1999. It began while he was serving as a pastor in Orleans, Nebraska. Despite efforts to keep it secret, rumors of his illicit relationship with a married woman who served as an elder in the congregation ultimately prompted [***5] his superior to suggest that it would be best for him to find another position. Guthrie denied any impropriety to both his superior and his congregation. He persisted in saying that he could not consummate a sexual act because he was impotent. [1] Nonetheless, he relocated his family to Wolsey, South Dakota, in July 1996, where he began as the pastor for the Wolsey Presbyterian Church. There, an appreciative congregation heard "the best sermons that [they] ever had." But the affair continued.

> 1 His impotence originated, he claimed, from an incident when he was staying at a motel and "he was pushed into a room by a man and a woman truck driver [where he was] raped and sodomized and beaten."

[*P8] On the pretext of attending counseling or meetings, he and his paramour met in motels in Kansas and Nebraska. He had no sexual performance problems with her. Over the years, they talked "about him at some point being single," so they could be together. She eventually got a divorce. He was hesitant, though, because [***6] a divorce with revelations of an affair and his lies about it could affect his future in the ministry. Finally, she became "tired of sneaking around." In January 1999, she told him their relationship was over. It was time to start seeing other people, she said, but she left open the possibility that if he ever left Sharon, they "could date and see how it went." In the months before the drowning, Guthrie continued to talk with her on the telephone two or three times a week. They were intimate on one more occasion in late February. A week after the funeral, he tried to reconnect with her, but she declined. Rebuffed, he told her that it had not taken her long to betray him.

[*P9] Several curious mishaps occurred in the months before Sharon's death. In one case, a cord had

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

been stretched across the steps to the basement. In reporting the incident, Sharon told family members that Guthrie wanted her to come downstairs. When her foot touched the cord, she sat back on the steps. She recalled that Guthrie grabbed her shoulder to keep her from falling. Yet she told her daughter, Suzanne, "Somebody tried to kill me." Suzanne telephoned her dad. Angry that [**408] Suzanne had learned of the incident, [***7] Guthrie said he had told Sharon not to tell anybody about it because he was going to discuss it with the sheriff. The next day, however, he told Suzanne that Sharon "had stepped on her shoelace." Suzanne's husband examined the stairs a few days later. Two steps down he saw

> shavings like somebody had drilled a hole and there were fresh wood shavings on the carpet. On the other side of the wall it's like a concrete base, there was a round, I don't want to say hole, but there was a place where it looked like something had been glued and then pulled off, but there was actually something that appeared round there.

[*P10] On another occasion, a bathroom light was not working. Guthrie brought in a lamp so Sharon could wash her hair in the bathtub. The lamp fell over. As Sharon later recounted it, she believed the dog bumped the lamp. And Guthrie was there to catch it. Indeed, Guthrie thought he received an electrical shock in the incident and went to the emergency room for treatment. Dr. Richard Reed admitted him overnight for observation, but could find no physical manifestation of electrical shock. The doctor recalled, however, that Guthrie was "extremely anxious, breathing [***8] very rapidly, nervous," and complained about "a lot of pain in various parts of his body."

[*P11] Judd Robbins, a computer specialist with several degrees in Computer Science, examined the contents of the church computer's hard drive. He found that the computer had been used to conduct numerous Internet searches on subjects uncannily related to these disquieting incidents and to the drowning. Some of these searches were not connectable to any date; others could be pinpointed to specific days in the months before Sharon's death. Sharon had access to this computer, but she was not very familiar with the Internet. Her daughter had shown her twice how to use a web browser, but other than sending and receiving email, she seemed to have little interest in the Internet. In the two days before the falling lamp episode, the computer in Guthrie's church office had been used for two hours to conduct specific Internet searches using an online search engine -- the

repeated queries were for "household accidents" and "bathtub accidents."

[*P12] On April 15, 1999, Guthrie brought Sharon to the clinic with the complaint that she could not wake up. [2] She [**409] was "completely out of it." Twice [***9] he told clinic personnel, "I didn't do anything to her." The examining physician, Dr. Jeff Hanson, could find nothing wrong with Sharon. A urine toxicology screen revealed no drugs. The screen would not have revealed the presence of Benadryl, however. Guthrie told the doctor that while sleepwalking Sharon might have taken Benadryl and Codeine. Sharon could remember nothing of the incident the next day, but she believed it was her fault: she had overdosed on her allergy medication (Benadryl) and herbal diet pills. She wanted to lose weight before her daughter's wedding. Her excess weight and her husband's consequent disapproval also concerned her. She once remarked, "As soon as I lose weight, Bill is going to take me on a cruise."

> 2    On the church computer's hard drive was a draft email message from Guthrie to his daughter, Jenalu, dated April 16, 1999. The text of the message is repeated here with its spelling and typographical errors.

>> Hi well your mother continues to keep me on my toes even in the middle of the night. Wednesday night Tuesday evening she got up turned on all the lights walked into the kitchen was there about 15 min. and returned to bed, with a glass of chocolate milk. I asked her what she did she said nothing this was about 2:00 a.m. then about 3:00 she did the same thing. then about 4:30 she did it again this time after about ten min. I got up to check on her she passed me in the hall without acknowledging I was there. At 7:00 a.m. I woke her up for work and she wobbled into the bathroom and a few min. later she was asleep in the tub with water running all over the floor. I woke her up got her out of bed ant then started my investigation. She during the night at some point had ingested something like 15 to 20 Benadryl and God knows what else. She has been sleep walking now I figure for about 3 months and just now I'm realizing what she has been doing talk about feel-

ing stupid. Well I got her to the Dr. and he did some tests and he feels she has the same sleep disorder her brother has. Well I put up all the meds last night where she can't find them and we got some sleep last night. She got up twice in the night and I knew then what she is doing. Well so much for that now I will keep you posted on the continuing saga of How the Guthrie's churn. . .

I love you Dad. . .

Guthrie did not mention to the doctor anything about Sharon sleeping in the tub. When he spoke to investigators, he reported that Sharon had been sleepwalking since the mid-1970s. At trial, no family members could corroborate his claim that she sleepwalked. This email message was never sent.

[***10] [*P13] During the month of April, in addition to the searches on household accidents, the church computer was also used to explore details about prescription drugs. An online search engine was engaged to look for such medications as "Lorazepam," "Ativan," "Ambien," and "TCA." Various web pages were downloaded from drug manufacturers and other sites, all describing these drugs, their purposes, and their dangers. Although the date could not be isolated, one of the searches brought up a website promoting a book entitled "Worst Pills Best Pills -- A Consumer's Guide to Avoiding Drug-Induced Death or Illness." Ominously, listed among the 160 "do not use" prescriptions was a medication called Restoril (Temazepam). Pharmaceutical literature warns that this medication carries dangerous consequences if taken improperly. Overdosage symptoms include: somnolence; confusion with reduced or absent reflexes; respiratory depression; apnea; hypotension; impaired coordination; slurred speech; seizures; and ultimately coma and death. The last Internet drug search that month was on April 27.

[*P14] Two days later, on April 29, 1999, Guthrie went to the clinic complaining of insomnia. He saw [***11] Physician Assistant Jean Thompson. They discussed sleeping medications. She suggested Ambien. He declined, saying that both Ambien and Xanax had not been effective in the past. [3] (His medical records going back ten years mentioned nothing of past sleeping problems or of any prescriptions for sleeping medications.) They agreed on Temazepam (Restoril), although Thompson had reservations about prescribing it because of its side effects. One side effect is residual drowsiness the

day after the medication is taken. Guthrie received a prescription for fifteen capsules at thirty-milligram strength, with three refills. He was to take one capsule at bedtime.

3    After Sharon's death, Guthrie would obtain a prescription for Ambien on June 9, 1999.

[*P15] Later that day, Sharon reported to Thompson that her husband said "he had lost the prescription and asked if [she] would mind calling a second one in for him." Thompson phoned the prescription in at Statz Drug. Guthrie went to K-Mart that afternoon and had one prescription [***12] filled. Two hours later, he went to Statz Drug and had the other filled. On May 4, the church computer was again used to search the Internet, this time specifically for "Temazepam." On May 12, Sharon picked up a refill at Statz Drug. The next day, the day before Sharon drowned, [**410] Guthrie picked up yet another refill at K-Mart. Now, sixty capsules had been obtained in the period of two weeks.

[*P16] One of Sharon's favorite drinks was chocolate milk. She drank it every day and usually in the morning. Because Restoril comes in capsules, their contents can be removed by simply twisting them open. The powdery substance inside is tasteless and odorless. The other sleep remedies that the Physician Assistant had discussed with Guthrie, Ambien and Xanax, come in tablet form and thus cannot be as easily dissolved. When the pathologist examined the contents of Sharon's stomach, he thought it unusual that there were no Restoril capsule remnants to be found. He did find pieces of other medications in non-toxic amounts. Law enforcement officers theorized that the contents of approximately twenty Restoril capsules had been placed in Sharon's chocolate milk before she drank it that morning. She [***13] would not have been able to detect it. After Sharon's death, a friend who came to clean the home wiped up what she thought was flour on the kitchen counter. Sharon was allergic to flour, but flour was stored in the home. There were still chocolate milk cartons in the refrigerator.

[*P17] After Sharon's death, Guthrie gave conflicting accounts of the drowning. The version he reported to Deputy Sheridan is not the one Suzanne recalled her father giving. In her presence, he claimed to have gotten Sharon out of the tub himself and then called 911. Larry Provance, Sharon's brother, recalled that when he was in Guthrie's home after Sharon's death, he heard Guthrie explain the circumstances surrounding Sharon's death several times and each time the details changed. Executive Presbyter William Davis said that Guthrie told him that the night before Sharon's death, he had awakened around midnight because Sharon was sleepwalking. Guthrie went over to the church to work on his sermon. He returned an hour later to find water "running out of

the bathroom and down the stairs." He ran up to the bathroom and found Sharon. Guthrie told Davis that he tried to resuscitate her, but he told Deputy [***14] Sheridan that he did not know CPR. Davis thought it strange also that right after Sharon's death Guthrie told him, "We were getting along great." He had previously told Davis that he wanted a divorce.

## C.

### The State's Case

[*P18] Guthrie was indicted for first degree murder on August 27, 1999. Three days later, he appeared for arraignment and was ordered held without bond. He pleaded not guilty. The jury trial commenced on January 10, 2000. Whether Sharon's death was murder or suicide was the crucial issue. The State called various witnesses, including law enforcement officers, doctors, a computer specialist, the Executive Presbyter, and the three daughters. On the question of suicide, the State offered Dr. Alan Berman, a clinical psychologist, suicidologist, and the Executive Director of the American Association of Suicidology. A suicidologist, Berman explained, is an expert who through professional training and experience, studies suicidal death "primarily in terms of learning about the character of individuals who are suicidal and those that do [commit] suicide and the circumstances that surround suicidal death." Guthrie objected, arguing that Berman's theories [***15] were not scientifically validated.

[*P19] Berman detailed for the jury the psychological dynamics found in those who take their own lives. Sharon Guthrie exhibited a minimum of predisposing risk factors. Although she had ingested multiple [**411] drugs, a circumstance consistent with suicide, she had no history of mental illness, depression, significant physical illness, chemical dependency, or suicidal ideation. She had no personal or family background of suicidal behavior. Her husband had been having an affair, but she almost certainly had known of it for some time. [4] Guthrie later admitted on the stand that he had told her he wanted a divorce the previous January. With her knowledge of her husband's infidelity and plans for divorce, Dr. Berman believed that those circumstances could not likely be credited with triggering suicide. Berman found several contraindications for suicide risk. Sharon was excited about her daughter's upcoming wedding. With her personality and her self-consciousness about her weight, she would not have wanted to be found naked. He explained that less than 2% of women kill themselves by drowning in the bathtub, and those who do generally lie back in the water [***16] as if to sleep. Berman was permitted to go beyond reciting suicide risk factors and whether Sharon met a profile for suicidal

persons. Over objection, he testified that in his opinion "Sharon Guthrie did not die by suicide." Likewise, in his report admitted into evidence, Berman stated, "It is my considered opinion to a high degree of certainty that Sharon Guthrie did not die by suicide."

> 4    According to one of Guthrie's own exhibits, she knew of the affair while they were still living in Orleans, Nebraska.

## D.

### The "Suicide Note"

[*P20] After the State rested, defense counsel unveiled a "suicide note." Guthrie had given it to his attorney in mid-June, some seven months earlier. Despite a reciprocal discovery order, counsel did not disclose the note because, as he explained to the judge the next day, it had been given to him "in confidence and [he] was not authorized to release it until yesterday." At the time he received it, counsel believed the document "could be as inculpatory as it was [***17] exculpatory, absent some authentication to its source. And particularly the elimination of my client as the source of the document." It did not occur to counsel to have the note examined for fingerprints until he read a newspaper article in the Madison Daily Leader in late December 1999 about Cynthia Orton's locally operated fingerprint business. Over the State's objection, the note was admitted, subject to State experts having an opportunity to examine it and a hearing following the trial on possible sanctions against defense counsel.

[*P21] Guthrie took the stand for the limited purpose of explaining how he found the note. He said he discovered it in his church office on June 10, three weeks after Sharon drowned. It was "written by Sharon," he said, and placed in the liturgy book that "Sharon and I used for preparing bulletins." Guthrie told no one but his attorneys and a fellow minister in confidence. Five days after finding it, he gave it to defense counsel. He never mentioned it to his family or to law enforcement investigators. In fact, on July 26, 1999, Suzanne went to her father with a hidden tape recorder, seeking answers about her mother's death. She broached the subject [***18] of suicide, but Guthrie volunteered nothing. He appeared nervous and would not make eye contact with her. Two days later, however, he came to her workplace. He then revealed to her that "he had told my mom the evening before her death that he had told her about the affair and that [**412] he was going to divorce her." Sharon responded with an "anxiety attack," Guthrie said, and thus he "suspicioned" that her death the next morning was suicide. Yet Suzanne recalled telephoning her mother that same night after 10 p.m. to ask about a glue pot she

left at church. Sharon was in bed at the time. She agreed to bring the glue over the next morning. Suzanne detected no stress or emotional upset in her mother's voice.

[*P22]  The unsigned note was dated the day before Sharon's death. It was addressed to her daughter:

> May 13, 1999
>
> Dear Suzanne,
>
> I am sorry I ruined your wedding, Your dad told me about your concerns of my Interfering in Jenalu's and the possibility I might ruin hers. I won't be there so Put your mind at ease. You will understand after the wedding is done.
>
> I love you all Mom.

(The note, replicated here with its spacing and typographical errors, was apparently [***19] created on a computer.)

[*P23]  Five days before trial, defense counsel hired Cynthia Orton to examine the note for fingerprints. Orton, with years of training and experience gained in the military, obtained Sharon's latent prints from some of her personal possessions. Sharon had no record prints on file. Orton testified that out of several prints made visible on the "suicide note" with the aid of the chemical Ninhydrin, she chose four "strong" prints. She could not analyze all the prints due to "time constraints." The four prints could not be attributed to Guthrie or his attorney. Yet she could neither prove nor disprove that the prints belonged to Sharon, and thus she could not say if Sharon ever touched the note. Nonetheless, she testified that because the four prints appeared to have been left by someone "very sweaty," and sweating is commonplace for those contemplating suicide, she thought someone intending suicide handled the note. After the note was revealed to the State, an expert for the prosecution had an opportunity to analyze it. The State's expert used a different chemical "developer" to reveal prints in the oils left by persons touching the note. On the other hand, [***20] Ninhydrin, the developer Orton used, educes the alphamino acids left by perspiration. Orton testified that the physical developer used by the State examiner obliterated some of the coloration brought out by the Ninhydrin.

[*P24]  To prove the note was not written by Guthrie, the defense called a computer specialist who testified that in his examination of the contents of the church computer's hard drive, there were no traces of any such note ever having been created. However, prosecutors were reminded that there was a second computer. It had

been in the Guthrie home. When officers had earlier examined the home in July with a search warrant, they saw the computer, but it appeared not to have been used. They decided not to take it. Guthrie had access to it until he was arrested and jailed on August 27. Sometime after his arrest, he asked his daughter and son-in-law, Suzanne and Les Hewitt, to store some of his household belongings, including this computer and the printer connected to it. Now on the revelation of a suicide note, the State asked Les Hewitt to bring in the computer. He agreed. Guthrie moved to suppress the evidence gained from this computer, asserting that it was seized [***21] illegally. The court denied the motion.

[*P25]  From examining the home computer's hard drive, the State's expert found a document with conspicuous similarities to the note Guthrie gave to his attorney. This document had been created [**413] and modified on August 7, 1999. Like the document portrayed to the jury as Sharon's "suicide note," it was dated May 13. The font appeared similar, and the margin size and spacing between words appeared identical, even the lack of a space in the date between the comma and 1999. But there were also differences. The body of the note was missing; only the date and the words "I love you Mom" remained, but without the word "all" in that line. Nonetheless, based on his examination of the document's electronic background data and the similarities between the note Guthrie gave to his attorney and the document found on the home computer, the State's expert concluded that the August 7 document was the "predecessor" of the purported suicide note. According to the expert, additional lines could have been added, printed out, and the computer then turned off, and no record on the hard disk would remain of the added lines. When recalled to the stand to answer whether [***22] he created the August 7 document, Guthrie testified, "I probably did, but I don't -- I don't remember it." Even so, he insisted that he did not create the "suicide note" he found on June 10. To confirm that the note existed before August 7, attorney David Gienapp from defense counsel's law firm testified that he saw the note "quite a while before" July 26, 1999.

[*P26]  Still another note threatening suicide was found on the home computer's hard drive with Sharon again as the purported author. It listed various grievances Sharon addressed to Guthrie. One line stated, "I'm upset that you have had an affair and have not come clean with me, I have thought of ending my life and you would have to face up to it. Believe me I known how to do it." According to the State's expert this document was created on August 11. Guthrie admitted he wrote this one, but merely as his way of working through the emotional trauma of Sharon's death, "to try to bring some reason into what had happened."

[*P27] After the State's rebuttal case, Guthrie sought to recall Cynthia Orton. Although her examination was complete after she analyzed the "suicide note" for prints in early January, she thought [***23] that with added time, the prints might become more distinct, as Ninhydrin can improve the readability of prints over time. However, Orton believed the chemicals the State used obliterated or impaired any eventual improvement in readability. In an offer of proof, defense counsel represented to the court that if called on surrebuttal, Orton would testify that (1) she now had another set of latent prints fairly attributable to Sharon which could be neither matched nor excluded from the prints on the note, (2) that because of the method used by the State, the prints on the original note were stopped from developing further, and (3) the prints on the note were more distinct before the State processed it. In disallowing the offer, the circuit court ruled that this evidence would add nothing to her testimony, but would tend to disparage the State's own processing of the note, which it had a right to do.

### E. Verdict and Appeal

[*P28] After two weeks of trial and five hours of deliberation, the jury found Guthrie guilty of murder in the first degree. He was sentenced to mandatory life in prison. He appeals his conviction on the following issues: (1) whether expert testimony was [***24] properly allowed on the question of suicide; (2) whether the motion for judgment of acquittal was properly denied; (3) whether the circuit court properly denied a defense motion to suppress evidence obtained during trial; (4) whether [**414] he was entitled to offer surrebuttal testimony of his fingerprint expert; (5) whether certain communications by Guthrie to his superior fell under the "clergy privilege" in SDCL 19-13-17 and whether this privilege was waived under SDCL 19-13-26; and (6) whether the circuit court properly allowed the state to play the tape-recorded conversation, have the jury read a transcript of this recording, and permit live testimony regarding the same conversation. We conclude that Issue (4) lacks sufficient merit for full discussion. [5]

> 5  Issue 4 questions the trial court's order disallowing Guthrie's request to recall his fingerprint expert as a surrebuttal witness. The court ruled, after an offer of proof, that Orton had no new evidence to contribute beyond her original testimony. The judge found that her proposed testimony was not probative and may in fact mislead the jury. Evidence may be excluded if [HN1]"its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or . . . needless presentation of cumulative evidence." SDCL 19-12-3 (Rule 403). Guthrie also contends that Orton

would have testified that the four prints could not be placed on the note posthumously. This is irrelevant, as the prints could not be positively attributed to the deceased in any event. [HN2]Surrebuttal is limited to proof rebutting rebuttal evidence. See State v. Mitchell, 491 N.W.2d 438, 447 (SD 1992). We find no abuse of discretion.

[***25] **F.**

### Psychological Autopsy

[*P29] Dr. Berman's testimony included an account of the common factors for persons at risk for suicide, a comparison of those factors to this case, and finally an opinion that Sharon Guthrie did not commit suicide. Berman performed his psychological autopsy by reviewing various documents, including the death certificate, the coroner's report, medical records, police interviews, and grand jury testimony. [6] He also independently interviewed family members. Berman indicated that he had been previously qualified as an expert in equivocal death cases, that he was familiar with research on the common characteristics or factors in suicides, and that he had published numerous articles on the subject. After a *Daubert* hearing, the court ruled that Berman's testimony was admissible. [7] Guthrie did not counter with comparable expert testimony. Instead, defense counsel called Dr. Michael McGrath, a clinical psychologist, to attack Berman's methodology. McGrath offered no opinion on Sharon's state of mind before her death.

> 6  Dr. Berman described a psychological autopsy as "a manner of death investigation . . . akin to a physical autopsy, but clearly where the goal is to understand the probable manner of death from a perspective of method, site, and character of the decedent."

[***26]

> 7  The trial court entered findings of fact and conclusions of law, noting that Dr. Berman had expertise in the area of suicidology, that his research methodology was acceptable and relevant, and that his testimony rested on a reliable foundation.

[*P30] Admission of expert testimony is governed by SDCL 19-15-2 (Rule 702):

> [HN3]If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

fied as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[HN4]Trial courts retain broad discretion in ruling on the admissibility of expert opinion. State v. Edelman, 1999 SD 52, P4, 593 N.W.2d 419, 421 (citing State v. Bachman, 446 N.W.2d 271, 275 (SD 1989)); Zens v. Harrison, 538 N.W.2d 794, 795 (SD 1995)(citations omitted). Decisions to admit or deny opinion evidence will not be reversed [**415] absent a clear showing of abuse of discretion. State v. Logue, 372 N.W.2d 151, 156 (SD 1985) [***27] (citations omitted). A court's ruling on reliability receives the same deference as its decision on ultimate admissibility. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238, 252-53 (1999). When a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion. See Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L. Ed. 2d 392, 414 (1996).

[*P31] Guthrie contends that the circuit court erred in allowing Dr. Berman to give his theories on suicide and particularly his opinion that Sharon did not die by suicide, as it improperly went to the ultimate issue and thus invaded the province of the jury. [HN5]South Dakota abolished the ultimate issue rule and replaced it with SDCL 19-15-4: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

[*P32] [HN6]Before admitting expert testimony, the court must address two preliminary points. First, expert opinion must be relevant to the matter in question. [***28] See SDCL 19-12-2. Relevance embraces "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1. To be relevant, evidence need only be probative, not conclusive. Berman's knowledge of suicidal risk factors bore on the question of Sharon's mental state before her death. His testimony was certainly relevant. Second, the opinion must assist the fact finder in understanding the evidence or deciding the issues. See Robbins v. Buntrock, 1996 SD 84, P8, 550 N.W.2d 422, 425; see also Zens, 538 N.W.2d at 795 (citations omitted). To be helpful, of course, expert opinion must offer more than something jurors can infer for themselves. Berman's knowledge of suicidal risk factors met the helpfulness standard by assisting the jurors in evaluating the perplexing circumstances of Sharon's death.

[*P33] [HN7]Opinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule. Zens, 538 N.W.2d at 795 [***29] (citing McCormick on Evidence § 12 (4th ed 1992)). See also State v. Barber, 1996 SD 96, P38, 552 N.W.2d 817, 823 (citations omitted). Although Berman was not asked to address Guthrie's guilt or innocence, his opinion approached the impermissible when he told the jury that "Sharon Guthrie did not die by suicide." See Zens, 538 N.W.2d at 796. It left the inference that she was murdered, or perhaps died accidentally, a far less likely deduction in view of the pathologist's conclusions. It is one thing to state that few of the factors typically found in suicide can be seen in this case. It is another thing to declare as scientific fact that based on a psychological profile the death was not suicide. One assists the jury, but allows it to draw its own inferences from the psychological knowledge imparted. The other simply tells the jury what inference to draw. However, we need not decide if Dr. Berman's final opinion was impermissibly intrusive because it was inadmissible under the *Daubert* standard. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[*P34] [HN8]Under *Daubert*, the proponent [***30] offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge under SDCL 19-15-2 [**416] (Rule 702). This burden is met by establishing that there has been adequate empirical proof of the validity of the theory or method. Edward J. Imwinkelried, Evidentiary Foundations 287 (4th ed 1998). In deciding whether to admit expert testimony, a court must ensure that the opinion abides on a reliable foundation. *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2799, 125 L. Ed. 2d at 485. The standards set forth in *Daubert* are not limited to what has traditionally been perceived as scientific evidence. These standards must be satisfied whenever scientific, technical, or other specialized knowledge is offered. *Kumho*, 526 U.S. at 141, 119 S. Ct. at 1171, 143 L. Ed. 2d at 246. Guthrie does not challenge the relevance of this testimony; he contends only that Berman's opinion does not rest on a reliable foundation. *

> 8 Guthrie asserted that Berman's report was objectionable as it contained misstatements of fact and evidence not produced. Whatever inconsistencies there were went to the weight the jury may have given to the report, not to its admissibility. See Estate of Dokken, 2000 SD 9, P41, 604 N.W.2d 487, 499 (citations omitted). Guthrie points to an opinion in Berman's report stating that Sharon would not likely have committed suicide in a manner where she would be found naked. Berman attributes this information to an in-

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

terview he conducted. [HN9]The factual basis for an expert opinion is given wide latitude. Under SDCL 19-15-3, experts may base their opinions on facts perceived by or made known to them at or before the hearing, if of a type reasonably relied on by experts in the field in forming opinions, and the facts or data need not be admissible in evidence.

[***31] [HN10]

[*P35]    A trial court can consider the following nonexclusive guidelines for assessing an expert's methodology: (1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether standards exist to control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put. *See Daubert*, 509 U.S. at 593-95, 113 S. Ct. at 2796-98, 125 L. Ed. 2d 483-84. *Daubert's* list of factors may not each apply to all experts in every case. Rogen v. Monson, 2000 SD 51, P28, 609 N.W.2d 456, 462-63 (Konenkamp, J. concurring)(citing *Kumho*, 526 U.S. at 141, 119 S. Ct. at 1171, 143 L. Ed. 2d 238).

[*P36]    Guthrie's argument centers on contradictory testimony about whether psychological autopsies have been subject to validity studies. Of course, [HN11]the law does not require opinion testimony to be above all criticism before it is admissible. Guthrie's expert testified that there were no [***32] validity studies in the area. [HN12]We interpret our rules of evidence liberally with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588, 113 S. Ct. at 2794, 125 L. Ed. 2d at 480 (citations omitted). *See also* SDCL 19-9-2. The type of studies Berman used were on "reliability," which assesses whether a group will reach the same conclusion given the same criteria. On the other hand, a validity study determines whether the conclusion reached is correct. Thus, Guthrie insists that the methodology was not reliable. [HN13]The law endows the trial court with "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. at 142, 119 S. Ct. at 1171, 143 L. Ed. 2d at 246 (italics in original). As a result, *Daubert* and *Kumho* provide "a fundamentally deferential analysis, leaving little reweighing in the appellate court." 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-27 (3d ed 1999). Generally, an expert's opinion is [**417] reliable if it is derived from the foundations of science rather [***33] than subjective belief. *Daubert*, 509 U.S. at 589-90, 113 S. Ct. at 2795, 125 L. Ed. 2d at 480-81.

[*P37]    [HN14]The *Daubert-Kumho* factors are guides, not inflexible benchmarks. Rogen, 2000 SD 51, P28, 609 N.W.2d at 462-63 (Konenkamp, J. concurring)(citations omitted). Nonetheless, as the Supreme Court recognized in *Daubert* and again in *Kumho*, the ability to validate a hypothesis lies at the core of a trial court's inquiry. In *Kumho* the Court "openly extended *Daubert* to non-scientific areas such as engineering, and its reasoning would seem to apply to social sciences as well." Childress & Davis, *supra*, § 4.02, at 4-27. Considering Berman's credentials and methodology, allowing the jury the benefit of his psychological knowledge and experience on typical characteristics or profiles of suicidal persons is within the permissible bounds of expert testimony. These characteristics gave the jury valuable insights into the state of the mind of persons contemplating suicide. The circuit court could reasonably find that "relevant reliability concerns" focused on Berman's "personal knowledge [and] experience." *See Kumho*, 526 U.S. at 150, 119 S. Ct. at 1175, 143 L. Ed. 2d at 251. [***34]

[*P38]    [HN15]When opposing experts give contradictory opinions on the reliability or validity of a conclusion, the issue of reliability becomes a question for the jury. *See* State v. Hofer, 512 N.W.2d 482, 484 (SD 1994). The trial process is well equipped to deal with contradictory opinions.    [HN16]"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798, 125 L. Ed. 2d at 484 (citations omitted). Guthrie fiercely challenged the accuracy of Berman's methods with expert opinion from another psychologist. He chose to offer this type of testimony rather than expertise on suicide. Consequently, we conclude that the trial court ruled correctly on the reliability question, leaving for the jury to decide whether Berman's testimony on the typical characteristics of suicidal persons deserved factual acceptance. *See Hofer*, 512 N.W.2d at 484.

[*P39]    On the other hand, when Dr. Berman's testimony moved from imparting typical characteristics and whether Sharon met a suicidal [***35] profile to declaring that based on her profile she did not commit suicide, we face a more difficult question. What empirical proof is there that because certain deceased persons in equivocal death cases bore only a few characteristics of a suicidal profile, that therefore they can be declared to have not committed suicide? What studies exist on error rates and falsifiability for such opinions? Berman provided little data. [9] We think there [**418] is substantial reason to doubt the reliability of suicidal profiles if they are to be used to declare unequivocally that a subject's death was self-inflicted. This testimony has the same pitfalls as

syndrome evidence. We have been cautious in authorizing definitive opinions based on psychological syndromes.

> 9   Dr. Berman testified that he authored or co-authored eighty publications "most of which are research articles in peer review journals which are essentially studies of suicidal people relative to non-suicidal people." Nonetheless, only two of those articles dealt with psychological autopsies: one was published in 1986 and discussed the impact of such autopsies on medical examiners who determine the manner of death; the other one was published in 1989 and dealt with the operational criteria for the classification of suicide. In the *Daubert* hearing, he cited two other studies he did not author, but neither of these dealt with the predictive validity or reliability of psychological autopsies in suspected homicide cases. In truth, psychological autopsies are a "relatively new, un-refined, and un-researched clinical technique. . . ." "It is difficult to identify another area of law where psychological and psychiatric testimony with such little empirical foundation or support, and with such little acceptance by the field, is admitted as evidence." "Given the dearth of research investigating the validity and reliability of psychological autopsies, there is good reason to be cautious about introducing expert testimony about psychological autopsies in legal proceedings." James R. P. Ogloff and Randy K. Otto, *Psychological Autopsy: Clinical and Legal Perspectives*, 37 St.Louis ULJ 607, 620, 645-46 (1993). *See also* James T. Richardson, et al., *The Problems of Applying Daubert to Psychological Syndrome Evidence*, 79 Judicature 10-11 (July-August 1995).

[***36] [HN17]

[*P40]  In the present state of behavioral science research, a syndrome may be generally reliable to describe and explain functions and characteristics, but it is not dependable to prove that the syndrome itself establishes the ultimate issue. [10] *See generally Edelman*, 1999 SD 52, P17, 593 N.W.2d at 423 and the cases collected there. In State v. Burtzlaff, 493 N.W.2d 1, 4 (SD 1992), we upheld the trial court's order disallowing a retrospective assessment of the deceased victim's psychological profile and likewise affirmed the court's refusal to allow expert opinion that the defendant suffered from battered woman syndrome. However, we did cite cases in *Burtzlaff* approving psychological autopsies when "the victim's state of mind was relevant, such as suicide victims ( Jackson v. State, 553 So. 2d 719 (Fla 1989); Thompson v. Mayes, 707 S.W.2d 951 (Tex. Ct. App.-Eastland 1986)) and

where the murder defense was suicide ( Bartram v. State, 33 Md. App. 115, 364 A.2d 1119 (Md 1976))." *Burtzlaff,* 493 N.W.2d at 5. Nonetheless, *Daubert* was decided a year after *Burtzlaff*, and our standards have since been modified. Not only are these cases all pre-Daubert, [***37] but also they provide no assistance to our case in any event. In *Jackson*, for example, the question was not whether the victim committed suicide, but why she committed suicide. More helpful, though still pre-Daubert, is Beaver v. Hamby, 587 F. Supp. 88 (M.D. Tenn. 1983), a federal habeas corpus proceeding. Although it allowed psychiatric autopsy expert opinion, the testimony was confined to an examination of the victim's suicidal tendencies. [11] *Id.* at 91.

> 10   One exception is "battered child syndrome," which now has wide empirical support and receives routine acceptance in court. *See* State v. Wilcox, 441 N.W.2d 209 (SD 1989); State v. Svihl, 490 N.W.2d 269, 275 (SD 1992)(Henderson, J., dissenting).

> 11   No case applying the *Daubert-Kumho* standards allows giving an opinion like the one Dr. Berman gave here. The cases the concurrence in result cites provide no support: Three were decided before *Daubert*, and two others do not cite *Daubert*. Three cases are workers' compensation appeals, which does not make them unhelpful for that reason, but they involved known suicides and the question was whether the deaths were work related, not whether a psychological autopsy can reliably determine whether a death resulted from suicide. Another case was a will contest involving the question of undue influence, not whether a death was suicide or homicide. One case, Terrell State Hospital v. Ashworth, 794 S.W.2d 937 (1990), has nothing remotely to do with the question before us. It was a case dealing with whether a hospital waived its committee privilege with regard to a "psychological autopsy" performed after a patient committed suicide while staying in the state hospital.

[***38]  [*P41]  A few courts have allowed psychological autopsy evidence in cases where the question before the jury in a homicide prosecution was whether the deceased died from suicide. In those cases, however, the experts did not opine with scientific certitude that the deceased did or did not commit suicide. In United States v. St. Jean, 1995 CCA LEXIS 62, *13, 1995 WL 106960, *2, a case of a husband accused of murdering his wife, an expert testified that the circumstances of [**419] the wife's death bore none of the indicators associated with those who commit suicide. *St. Jean* applied *Daubert* and concluded that the psychologist's testimony

was reliable and thus admissible under the military rules of evidence equivalent to the federal rules. However, the psychologist's testimony was limited to "the profile of one who is, psychiatrically speaking, suicidal or a suicidal risk." _St. Jean, 1995 CCA LEXIS 62, *3, 1995 WL 106960, at *1._ In Horinek v. State, 977 S.W.2d 696, 701 (Tex. Ct. App. 1998), a case of a police officer charged with murdering his wife, a forensic pathologist-psychiatrist performed a "psychological autopsy" and then testified "that it appeared very unlikely that this individual would be the sort of person to kill [***39] herself." But the _Horinek_ court did not discuss the _Daubert_ reliability standards. _See generally_ Elizabeth Biffl, Psychological Autopsies: Do They Belong in the Courtroom? 24 AmJCrimL 123 (1996).

[*P42]  Unquestionably, Dr. Berman had special expertise on the mental states of those who commit suicide, but his knowledge was based primarily on observation and experience, not traditional empirical studies. _See_ SDCL 19-15-2 (Rule 702) (experts with "specialized knowledge" may testify in the form of an opinion). [HN18]In allowing experts with specialized knowledge to testify, courts applying _Daubert_ generally permit these experts to describe the symptoms or behaviors of known victims, report the symptoms or behaviors observed in the victim in the present case, and give an opinion that the victim's symptoms or behaviors are "consistent with" those of known victims. Isely v. Capuchin Province, 877 F. Supp. 1055, 1067 (E.D. Mich 1995) (PTSD symptoms); Gier v. Educational Serv. Unit No. 16, 845 F. Supp. 1342, 1353 (D. Neb 1994), _aff'd_, 66 F.3d 940 (8thCir 1995) (behaviors of abused child); State v. Alberico, 116 N.M. 156, 861 P.2d 192, 210 (NM 1993) [***40] (behaviors consistent with sexual abuse); State v. Kinney, 762 A.2d 833, 844 (Vt 2000) (characteristics and conduct of victims of rape trauma syndrome); Carnahan v. State, 681 N.E.2d 1164 (Ind 1997) (battered woman syndrome behaviors offered for limited purpose, not for proof that defendant battered victim). Berman's understanding of risk factors for suicide was relevant, helpful, and admissible, but [HN19]in the present state of psychological knowledge, a suicide profile alone cannot be used to declare with scientific certainty that a person did or did not commit suicide. Berman's opinion in that respect was inadmissible under the _Daubert_ standards. Thus, the trial court abused its discretion in allowing Berman's opinion that Sharon did not commit suicide. Our inquiry does not end here.

[*P43]  Because we find that Dr. Berman was allowed to go beyond permissible opinion testimony under _Daubert_, we must decide if admitting his opinion that the death was not suicide was harmless error. _See_ State v. Hart, 1996 SD 17, P17, 544 N.W.2d 206, 210. _See also_ SDCL 23A-44-14. [HN20]Error is harmless when "the

jury verdict [***41] would not have been different if the [challenged testimony] were excluded[.]" _See_ Hart, 1996 SD 17, P17, 544 N.W.2d at 210. The State bears the burden of proving the error was not prejudicial.  State v. Nelson, 1998 SD 124, P7, 587 N.W.2d 439, 443 (citations omitted). Although Berman's testimony was not properly limited to suicidal profiles or characteristics, the jury could have easily reasoned purely from his profiles and characteristics testimony that Sharon's death was not the result of a suicide based on the absence of sufficient suicidal indicators and the totality of the evidence offered at trial. Certainly, his opinion that Sharon did not die by suicide was not [**420] offered as a substitute for a thorough criminal investigation. The jury had the benefit of substantial and independent circumstantial evidence from which to conclude that Sharon's death was a homicide. As such, we cannot say that in the absence of Dr. Berman's opinion on suicide the jury verdict would have been different. _See_ Hart, 1996 SD 17, P17, 544 N.W.2d at 210. Allowing the opinion was therefore harmless error.

## G.

### Motion for Judgment of Acquittal

[*P44]   [***42]  Guthrie contends that the circuit court erred in not granting his motion for judgment of acquittal. Defense counsel first made this motion at the end of the State's case in chief, asserting that the State had failed to establish a prima facie case. He renewed the motion at the close of all the evidence. The State resisted without argument. In both instances, the circuit court denied the motion.

[*P45]  Guthrie believes that since the State relied solely on circumstantial evidence to prove its case, the evidence must be "entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of innocence and so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged." He contends that the State did not meet this burden; thus, the evidence was not sufficient to sustain a conviction for murder in the first degree. The State argues that Guthrie's motions were inadequate to preserve this issue for appeal.

[*P46]  The rules of criminal procedure aim to achieve just determinations in criminal cases. _See_ SDCL 23A-1-2. [HN21]Patterned after Federal Rule of Criminal Procedure 29(a), the motion for judgment [***43] of acquittal replaced the former motion for directed verdict. _See_ SDCL 23A-23-1; Fed.R. Crim. Pro. 29(a). A challenge to the sufficiency of the evidence being the only ground for the motion, the basis for a Rule 29(a) motion "need not be stated with specificity." 26 Moore's Federal Practice § 629.03[1] at 629-10 (3d ed and Supp

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

2000)(citations omitted); *see also* <u>United States v. Gju-rashaj, 706 F.2d 395, 399 (2d Cir. 1983)</u>(citations omitted); <u>United States v. Cox, 593 F.2d 46, 48 (6th Cir 1979)</u>(citations omitted). It is satisfactory to state, "the evidence is insufficient to sustain a conviction." 26 Moore's Federal Practice § 629.03[1] at 629-10. If the defendant makes the motion without describing the grounds with specificity, both the court and the prosecutor can request further explanation. *See* <u>United States v. Jones, 174 F.2d 746, 748 (7th Cir 1949)</u>. The defense motion clearly allowed the circuit court to address the matter, and thus we conclude the issue was sufficiently preserved for appeal. [12]

> 12    There are cases in South Dakota holding that a defendant's motion for directed verdict of acquittal are inadequately preserved when a defendant fails to "particularize the claimed deficiency or failure of proof." <u>State v. Jerke, 73 S.D. 64, 38 N.W.2d 874, 877 (SD 1949)</u>(citations omitted). These cases, however, were decided before South Dakota's adoption of the present <u>SDCL 23A-23-1</u> and <u>SDCL 23A-1-2</u>. *See* SL 1978, ch 178, § 297.

[***44] [HN22]

[*P47]  In reviewing a circuit court's decision to deny a motion for judgment of acquittal, we inquire whether the State presented sufficient evidence on which the jury could reasonably find the defendant guilty of the crime charged. <u>Edelman, 1999 SD 52, P4, 593 N.W.2d at 421</u>(citations omitted). More specifically, we ask if there was sufficient evidence in the record that, if believed, would be adequate to sustain a conviction beyond a reasonable doubt. *Id.* [HN23]In a sufficiency challenge, we will set aside a jury verdict [**421] only when "the evidence and the reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt." <u>State v. Hage, 532 N.W.2d 406, 410 (SD 1995)</u>(citations omitted); <u>State v. Lewandowski, 463 N.W.2d 341, 343-44 (SD 1990)</u>. We will not resolve conflicts in the testimony, pass on the credibility of witnesses, or weigh the evidence. *Hage,* 532 N.W.2d at 410-411 (citations omitted).

[*P48]  [HN24]All elements of a crime, including intent and premeditation, may be established circumstantially. [13] *See* <u>State v. Holzer, 2000 SD 75, P15, 611 N.W.2d 647, 651</u>. In some instances, convictions [***45] based on circumstantial evidence can be more reliable than those based on only direct evidence. *Hage,* 532 N.W.2d at 411 (citations omitted). Guthrie relies on language from <u>State v. Best, 89 S.D. 227, 232 N.W.2d 447, 457 (SD 1975)</u>. In later cases, however, this Court rephrased the rule on convictions based solely on circumstantial evidence. In <u>State v. Eagle Star, 1996 SD 143, P16, 558 N.W.2d 70, 73</u>, we explained:

[HN25]When the State's case rests substantially or entirely on circumstantial evidence, the trial court must instruct the jury the defendant cannot be convicted unless (1) the proved circumstances are not only consistent with the guilt of the accused, but cannot be reconciled with any other rational conclusion and (2) each fact which is essential to a complete set of circumstances necessary to establish the accused's guilt has been proven beyond a reasonable doubt.

<u>1996 SD 143, P11, 558 N.W.2d at 73</u> (citations omitted).

> 13    Murder    in    the    first    degree    is [HN26]"Homicide . . . perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being. . . ." <u>SDCL 22-16-4</u>.

[***46]  [*P49]  Guthrie centers his argument on evidence supporting his theory that Sharon took her own life. He points out that her own medications were found in her stomach. At trial, he offered proof that the presence of these prescriptions could only be explained by recent consumption. He argued that Sharon had told a friend that she had trouble sleeping. As further proof of her state of mind, he offered evidence that she had cashed out her retirement account at the clinic where she worked to buy her youngest daughter a car. Guthrie challenges the State's failure to explain how he "administered [the drugs] surreptitiously." [HN27]To support a conviction on circumstantial evidence, the State is not required "to exclude every hypothesis of innocence." <u>State v. Ashley, 459 N.W.2d 828, 832 (SD 1990)</u>(citations omitted). Rather, we view the evidence cumulatively to see whether in its totality it is enough to rule out any reasonable hypothesis of innocence. *Hage,* 532 N.W.2d at 411. In making this review, we must accept the evidence with its most reasonable inferences. *Hage,* 532 N.W.2d at 410.

[*P50]  Facts alone often have equivocal significance. Details take [***47] meaning in context with other details. Here, the import of so many details depends for significance on Guthrie's credibility. If the "suicide note" is authentic, for example, that may create reasonable doubt. But what is the magnitude of the evidence that he typed two such notes himself, naming his dead wife as the author? On another point, Guthrie told

the jury that he obtained the Restoril for Sharon, and he had no knowledge she later asked that a second prescription be called in. Yet, according to the Physician Assistant, Guthrie claimed he was having sleeping problems. Indeed, it was Guthrie who picked up three of the four prescriptions. [HN28]Although in a circumstantial case it is a trial court's [**422] duty on a motion for judgment of acquittal to examine the facts for a reasonable hypothesis of innocence, when credibility gives meaning and color to so many facts, judges cannot scramble the complex circumstances to see if they might resituate to prove a more advantageous theory by dispensing with the credibility factor. Leaving to the jury the pervasive issue of credibility and considering the evidence as a whole, we think the trial court properly denied the motion for acquittal.

**H.**

[***48] **Seizure of Home Computer**

[*P51]  The trial court admitted evidence obtained from the home computer, not taken in July 1999 when the original search warrant was executed, but obtained during the trial nearly six months later. The time for execution of the original warrant had expired under SDCL 23A-35-4. [14] Thus, Guthrie contends the seizure was without a search warrant and the resulting evidence was suppressible as a violation of his right against unreasonable search and seizure. The State asserts that the seizure was authorized under the original warrant or in the alternative that an exception to the warrant requirement applied.

> 14      This statute provides that a warrant [HN29]"shall command the officer to search, within a specified period of time not to exceed ten days, the person or place named for the property specified." SDCL 23A-35-4.

[*P52]    [HN30]The Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota [***49]  Constitution forbid unreasonable searches and seizures. For a search or seizure to be considered reasonable, a warrant is generally necessary. South Dakota v. Hanson, 1999 SD 9, P22, 588 N.W.2d 885, 891 (citations omitted). On the other hand, the requirement that a warrant be executed within ten days is not a constitutional command.    State v. Miller, 429 N.W.2d 26, 34 (SD 1988)(*writ of habeas corpus granted on other grounds, then reversed*). It is purely statutory. *Id.* (citing People v. Crispell, 110 A.D.2d 926, 487 N.Y.S.2d 174 (NY App. Div. 1985)). Evidence obtained in violation of a criminal statute is not automatically subject to suppression. *Miller,* 429 N.W.2d at 34 (citations omitted); *see also* Commonwealth v. Grimshaw, 413 Mass. 73, 595 N.E.2d 302, 305 (Mass 1992). Such evi-

dence may be suppressed, however, where the violation is substantial. *Grimshaw,* 595 N.E.2d at 305 (citations omitted).

[*P53]  The purpose of the ten day rule is "to ensure that probable cause still exists to believe that the items sought by the warrant are in the place to be searched." *Miller,* 429 N.W.2d at 34 (citing People v. Kibblewhite, 178 Cal. App. 3d 783, 224 Cal. Rptr. 48, 49 (CalCtApp 1986)). [***50]  [HN31]The rule ensures that a warrant does not become stale. In analyzing whether a warrant executed outside the statutory period was stale, "timeliness of execution should not be determined by means of a mechanical test. . . ." State v. Swift, 251 Neb. 204, 556 N.W.2d 243, 249 (Neb 1996); *compare* Spera v. State, 467 So. 2d 329, 330 (Fla. Dist. Ct. App. 1985)(applying a *per se* rule that warrants executed outside the ten-day rule are invalid). Staleness should be "measured in terms of whether probable cause still existed at the time the warrant was executed." *Swift,* 556 N.W.2d at 249.

[*P54]  In *Miller,* this Court addressed a search that took place after the expiration of the ten-day period, indicating that since probable cause was still present the evidence found was not subject to suppression. *See* 429 N.W.2d at 34-35. Our [**423] case is distinguishable from *Miller.* The seizure of the home computer took place nearly six months after the search warrant for the Guthrie household had been issued. Even applying a flexible standard, such a long gap in time requires a new showing of probable cause. If warrants can be executed at leisure, judicial control [***51]  over them would deteriorate. *Swift,* 556 N.W.2d at 249. The seizure in January cannot be upheld with use of the July search warrant.

[*P55]    [HN32]While a warrant is the preferred method for conducting a search or seizure, there are exceptions to the warrant requirement. State v. Fountain, 534 N.W.2d 859, 863 (SD 1995)(citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854, 858 (1973)). One exception dispenses with the necessity of a warrant when voluntary consent is obtained from the owner or a third person "who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d 148, 156 (1990)(citations omitted). This applies to third persons having common authority over "effects sought to be inspected." *Fountain,* 534 N.W.2d at 865 (citing State v. Tapio, 459 N.W.2d 406, 414 (SD 1990)). *See also* State v. Benallie, 1997 SD 118, P11, 570 N.W.2d 236, 238 (citations omitted).

[*P56]  The existence of valid consent to search is a question of fact, so we apply a clearly erroneous standard of review. *Benallie,* 1997 SD 118, P10, 570 N.W.2d at 238 [***52]  (citations omitted). On the other hand, "whether police had a lawful basis to conduct a war-

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

rantless search is reviewed as a question of law." State v. Hirning, 1999 SD 53, P8, 592 N.W.2d 600, 603 (citations omitted). Consequently, in deciding whether a third party had the authority to give consent, we are presented with a mixed question of law and fact, reviewable *de novo. See generally* State v. Gesinger, 1997 SD 6, P7, 559 N.W.2d 549, 550.

[*P57]  [HN33]In deciding if common control exists over a particular item, a proprietary interest alone is not dispositive. United States v. Matlock, 415 U.S. 164, 171, n7, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 250 (1974). The existence of common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes. . . ." *Id.* Common authority over personal property may exist when one allows another to use the property and leaves it at that person's home. *Matlock,* 415 U.S. at 170-71, 94 S. Ct. at 993, 39 L. Ed. 2d at 249 (discussing Frazier v. Cupp, 394 U.S. 731, 740, 89 S. Ct. 1420, 1425, 22 L. Ed. 2d 684 (1969)). By leaving possessions in someone else's custody, [***53] the entrusting party assumes the risk that the third party will consent to a search. *Matlock,* 415 U.S. at 171, 94 S. Ct. at 993, 39 L. Ed. 2d at 249.

[*P58]  [HN34]The State has the burden of proving consent by clear and convincing evidence. *Fountain,* 534 N.W.2d at 863 (citations omitted). There is no question that Les Hewitt, Guthrie's son-in-law, consented to the seizure of this computer. Hewitt voluntarily brought the computer to law enforcement officials. The question we must resolve is whether Hewitt, as a third party, had common authority over Guthrie's personal property, thus enabling him to give a valid third-party consent. We find that Hewitt possessed such common authority.

[*P59]  In *Fountain* this Court addressed a similar question. Fountain was arrested at the residence of a woman with whom he was staying. 534 N.W.2d at 861-62. After Fountain was taken to jail, the woman consented to a search of her home. *Fountain,* 534 N.W.2d at 862. During the search, law enforcement [**424] officers found a jacket belonging to Fountain. He claimed that because his jacket was searched after he had been taken to jail, the search was invalid. We held, [HN35] [***54] "[a] defendant is not automatically entitled to expect that the contents of articles left behind at another premises will remain private and, should he leave such articles behind, he assumes the risk that the other person may consent to a search." *Fountain,* 534 N.W.2d at 866 (string citation omitted). Guthrie attempts to distinguish *Fountain,* claiming he did not voluntarily leave the computer with the Hewitts as he was forced to move out of his home and was in custody. It is noteworthy, however, that some of Guthrie's other possessions were placed in a storage unit, but he chose to have the computer stored at the Hewitt home. Hewitt had unconditional access and

control over it, and as such, we conclude that he could validly consent to its search and seizure. *See Matlock,* 415 U.S. at 171 n.7, 94 S. Ct. at 993, 39 L. Ed. 2d at 250.

I.

### Clergy Privilege

[*P60]  The State offered videotaped testimony from William Davis, the Executive Presbyter for Central Nebraska. [15] He testified about the conversations he had with Guthrie both before and after Sharon's death. Guthrie invoked the clergy privilege in SDCL 19-13-17. Finding that [***55] the privilege indeed existed, the trial court nonetheless ruled that Guthrie waived the privilege in later communications with third parties.

> 15  An "Executive Presbyter" is the Presbyterian Church's designate minister who oversees churches within a specified geographical area. The Executive Presbyter acts as a support person for these churches and their ministers.

[*P61]  [HN36]The clergy privilege is defined in SDCL 19-13-16 and 17. [HN37]Because the application of a statute to particular facts involves a question of law, we review the circuit court's conclusions de novo. Lucero v. VanWie, 1999 SD 109, P6, 598 N.W.2d 893, 895 (citations omitted). [HN38]Findings of fact made as part of a ruling on the privilege are reviewed under a clearly erroneous standard. *See* State v. Sleep, 1999 SD 19, P6, 590 N.W.2d 235, 237. [HN39] SDCL 19-13-17 grants persons the privilege to prevent disclosure of (1) confidential communications, (2) made to clerics, (3) in their [***56] professional capacity as spiritual advisors. Guthrie carries the burden to prove his entitlement to assert the privilege. *See* State v. Catch the Bear, 352 N.W.2d 640, 645 (SD 1984)(citations omitted). [HN40]We construe statutory privileges strictly "to avoid suppressing otherwise competent evidence." *Catch the Bear,* 352 N.W.2d at 646-47 (citations omitted). [HN41]Not every communication to a cleric is protected by the clergy privilege. Scott N. Stone and Robert K. Taylor, 2 Testimonial Privileges, § 6.09 at 6-19 (2d ed 1995).

[*P62]  [HN42]"A communication is 'confidential' if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." SDCL 19-13-16. [HN43]By the language of the statute, our inquiry begins with a person's intent in communicating with a clergy member. *See Hofer,* 512 N.W.2d at 485. The circuit court heard testimony from Guthrie that he intended his conversations with William Davis to be in "confidence" as communications with his minister. Davis himself corroborated this in his testimony:

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

Q: Would it be fair to say that in your mind [Guthrie] was [***57] coming to you as his minister to talk to you about various matters?

A: I would say so.

[**425]

Q: Talking to you in confidence?

A: Yes.

We cannot say that the court was mistaken in its finding that Guthrie intended his conversations to remain in confidence. *See* State v. Almond, 511 N.W.2d 572, 573-74 (SD 1994). Davis was obviously a clergy person. "A clergyman is a minister, priest, rabbi, accredited Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him." SDCL 19-13-16.

[*P63] Guthrie explained in a motion hearing that William Davis was his Executive Presbyter when he was a pastor in Nebraska. An Executive Presbyter functions as a pastor to pastors. Guthrie indicated that his conversations with Davis concerning his relationship with Sharon were imparted to Davis in his capacity as a minister. The State disputes this, focusing on the fact that Davis was no longer Guthrie's superior after Guthrie moved to South Dakota. Simply because Davis was no longer Guthrie's superior, it does not logically follow that Guthrie [***58] did not "reasonably believe" that Davis could still serve as his minister.

[*P64] The most difficult inquiry under SDCL 19-13-17 is deciding whether, in each of these conversations, Guthrie's communications with Davis were in Davis's "professional character as spiritual advisor." *See* SDCL 19-13-17. Such a requirement is common among state privilege statutes. *See* Stone and Taylor, 2 Testimonial Privileges, § 6.12 at 6-26. In interpreting a similar statutory requirement, a Minnesota court explained that [HN44]the communication need not be in the form of a confession. [16] When a conversation takes place in a time of family crisis, the communication is likely for the purpose of seeking religious or spiritual advice. State v. Orfi, 511 N.W.2d 464, 470 (Minn.Ct.App. 1994).

16   The Minnesota statute required that the communication was for the purpose of seeking "religious or spiritual advice, aid, or comfort. . . ." State v. Orfi, 511 N.W.2d 464, 469

(Minn.Ct.App. 1994)(citing MinnStat § 595.02(1)(c)).

[***59] [HN45]

[*P65] In deciding if a communication was made to a cleric acting in a professional capacity as a spiritual advisor, other factors may be considered. For example, "the fact that the communication was initiated by the clergyman rather than the penitent [may be] viewed as significant." Stone and Taylor, *supra* § 6.12 at 6-27 (citations omitted). Similarly, the specific relationship between the communicants may be relevant. *See e.g.* Bonds v. State, 310 Ark. 541, 837 S.W.2d 881, 884 (Ark 1992)(minister acting as employer). Our inquiry must be founded on the particulars of each case. Magar v. State, 308 Ark. 380, 826 S.W.2d 221, 223 (Ark 1992)(citing United States v. Gordon, 493 F. Supp. 822 (NDNY 1980)(further citations omitted).

[*P66] The substance of Davis's testimony can be summarized as follows: (1) communications between Guthrie and Davis regarding an incident where Guthrie was allegedly sexually assaulted, (2) communications where Davis asked Guthrie whether he was having an affair, and (3) the conversation with Guthrie when Davis called him to offer his condolences after Sharon's death. In light of the foregoing considerations, only the conversation regarding [***60] the alleged sexual assault on Guthrie was privileged, as the circuit court found. Davis explained that before this conversation, Guthrie indicated he wanted to share something, but was not ready to discuss it. A few months later, Guthrie told Davis that he was sexually assaulted on a trip to Lincoln, Nebraska, and that it [**426] was "affecting all aspects of his life." Davis suggested that he seek counseling.

[*P67] On the other hand, the conversations about Guthrie's affair and about Sharon's death were not made to Davis as a spiritual advisor. We agree with the Minnesota court that to be classified as privileged such statements need not be a confession. Other factors, however, militate against interpreting these statements as privileged. Davis made clear that he initiated the communications about Guthrie's affair. *See* Bonds, 837 S.W.2d at 883-84 (conversation accusatory in nature). His inquiry was made in his capacity as a superior as indicated in the following exchange:

Q: After this conversation with him did that satisfy you and keep his position at the church?

A: Yes, I fully believed [Guthrie]. I had no reason to doubt his integrity, he had not shown [***61] previously that I should have reason to doubt his integrity.

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

Consequently, we conclude Davis's testimony about the affair was outside the clergy privilege.

[*P68] After the Guthries moved to South Dakota, Davis had much less contact with him. He spoke to Guthrie once during the first six months he was in Wolsey. Davis was informed of Sharon's death from another source and then called Guthrie to offer his condolences. During this conversation, Guthrie described the circumstances surrounding the death. Although Davis had counseled him in the past, they rarely spoke after Guthrie became established in South Dakota. *See Magar, 826 S.W.2d at 223* (notwithstanding past counseling the subject communication was not confidential when minister had not counseled defendant in several months). Furthermore, this conversation was initiated by Davis who called to offer his regrets as any other family friend might do. In light of these facts, Guthrie's description of the circumstances surrounding Sharon's death was not privileged.

[*P69] As Guthrie's statements to Davis about the alleged sexual assault were privileged under SDCL 19-13-17, [***62] we must decide whether Guthrie waived the privilege. Our statutory scheme grants particular privileges and provides for the voluntary waiver of those privileges:

> [HN46]A person upon whom this chapter confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This section does not apply if the disclosure itself is privileged.

SDCL 19-13-26. The circuit court found that Guthrie had waived his clergy privilege by voluntarily disclosing the privileged information to third persons, relying primarily on our decisions in *State v. Karlen* and *State v. Catch the Bear. Karlen, 1999 SD 12, 589 N.W.2d 594; Catch the Bear, 352 N.W.2d 640.*

[*P70] Guthrie argues that the circuit court erred in admitting his conversations with Davis under the *Karlen* standard. He summarizes his argument by explaining, "the person asserting the privilege [must tell] nonprivileged parties 'I had this confidential communication with a counselor and this is what I [said].'" Such an interpretation is at odds with [***63] SDCL 19-13-26 and precedent. [HN47]Under SDCL 19-13-26, voluntary disclosure of "*the contents* of the communication to a third party" constitutes a waiver of the privilege. *Karlen,*

1999 SD 12, P33, 589 N.W.2d at 601 (citations omitted)(emphasis added).

[*P71] In *Karlen,* two justices advanced the concern that "mere conversation regarding the same incident . . . [should] not constitute a privilege waiver." [**427] *Karlen, 1999 SD 12, P60, 589 N.W.2d at 607* (Miller, C. J., dissenting). This does not, however, implicitly suggest that waiver requires disclosure of the contents of a privileged communication plus disclosure that the holder previously had a privileged conversation. Instead, this language indicated that [HN48]the disclosure of the privileged information must be more precise than simply conversations regarding the same subject matter. *See Karlen, 1999 SD 12, P60, 589 N.W.2d at 607* (Miller C. J., dissenting)(for voluntary waiver to occur the holder must make "a specific disclosure of the information the privilege holder shared with the counselor."). *See also* John W. Larson, South [***64] Dakota Evidence § 510.1 at 277-78 (1991)(disclosure of *the content* of the communication waives the privilege)(emphasis added).

[*P72] The circuit court entered the following findings of fact on the testimony of William Davis:

> Guthrie had several conversations with William Davis regarding a sexual incident in Nebraska. . . .
>
> Guthrie was the holder of the privileged communications made to William Davis.
>
> Guthrie voluntarily disclosed *the contents* of these communications to third parties and that this disclosure included the same information as related to the communications with William Davis.

These findings were made after defense counsel offered to stipulate that Guthrie discussed with William Davis the same matters he disclosed to other people. Additionally, Guthrie brought to the court's attention that he had given an extensive statement to law enforcement, "including all the matters . . . at issue." With these admissions, we cannot say that the circuit court erred. *See Sleep, 1999 SD 19, P6, 590 N.W.2d at 237.* Consequently, we conclude that Guthrie voluntarily disclosed the contents of his confidential communications to others and waived [***65] the privilege under SDCL 19-13-26.

**J. Covert Tape Recording**

[*P73] Guthrie challenges the circuit court's decision to allow the jury to listen to a tape recording and follow along with a written transcript of the secretly recorded conversation between himself and his daughter.

He contends that the tape impermissibly gave the jury the impression that Suzanne believed he was guilty, that law enforcement agents provided her with the recording device knowing that he had retained counsel, that he mentions in the taped conversation that he wanted a lawyer, and that his taped conversation was more prejudicial than probative. The crux of his argument is that this evidence should have been excluded under SDCL 19-12-3 (Rule 403). [HN49]Our rules favor "the admission of evidence in the absence of strong considerations to the contrary." State v. Wright, 1999 SD 50, P15, 593 N.W.2d 792, 799 (citations omitted). [HN50]Those objecting to admission have the burden of showing that the concerns addressed in Rule 403 substantially outweigh probative value. Id. at P16, 593 N.W.2d at 799 (citations omitted). As Guthrie did not object to [***66] the substance of Suzanne's testimony, the jury could have drawn the same inferences from her testimony as from the recording.

[*P74] Guthrie claims that the recording and transcription were unfairly prejudicial because there were two instances where he remarked that he should speak with a lawyer. He alleges that officers provided Suzanne with a recording device knowing that he had retained counsel. The record does not bear this out. The circuit court entered findings of fact and conclusions of law on this issue, noting that Suzanne went to law enforcement officers [**428] volunteering to confront her father. At that time, the court found, Suzanne "had no knowledge whether defendant may have contacted an attorney." Likewise, the court concluded that law enforcement officers did not know whether an attorney represented Guthrie when they provided Suzanne with the recording device. After reviewing the record, we cannot state that these findings were clearly erroneous or that the court abused its discretion in admitting the evidence. See State v. Sleep, 1999 SD 19, P6, 590 N.W.2d at 237 (citations omitted).

[*P75] The trial court specifically found that Suzanne did not [***67] know whether her father had a lawyer before the taped conversation.

> On June 14, 1999, Suzanne Hewitt, along with her husband, went to the Beadle county deputy sheriff James Sheridan. . . . Jerry Lindberg, DCI investigator, was also at Sheridan's office. Suzanne visited with them and told them she wanted to get the truth . . . At this time *she had no knowledge* whether Defendant may have contacted an attorney.

Her testimony at the evidentiary hearing supports this finding:

> Q: And again just what's your best recollection, can you tell the Court what the Defendant told you about an attorney?
>
> A: That he was being investigated and that presbytery told him to hire an attorney.

Later in the hearing she reiterated her lack of knowledge about her father's legal representation:

> Q: And up -- between June 14th and when you went to visit with the Defendant with the tape recording, were you aware of any attorney that the defendant had hired?
>
> A: No.

[*P76] It is true that Agent Lindberg testified that Suzanne had told him "that her dad said not to talk to law enforcement unless his attorney was present. . . ." But Lindberg also commented that [***68] "she didn't know who the attorney was or *if there was one*. She just said that he said not to talk to us unless his attorney was present." At best, there were conflicting indications about law enforcement's knowledge, and the trial court made a credibility determination to resolve those conflicts. [HN51]"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985). This argument was given a mere one sentence mention in Guthrie's brief: "Defendant objected to the audiotape and the transcript on the grounds that it inferred [sic] that Suzanne Hewitt was cooperating with law enforcement and thus she believed that the Defendant was guilty, and on the further grounds that agents of the State knew prior to the interview of the Defendant by Hewitt that the Defendant had retained counsel." Guthrie offered no authority or elaboration on this point. And no prejudice was shown. He made no incriminating statements to his daughter during the taped conversation.

[*P77] Lastly, use of the transcript to aid the jury was in conformance [***69] with the guidelines set forth in State v. Faehnrich, 359 N.W.2d 895, 899 (SD 1984). The transcripts were checked for accuracy, were necessary because of audio difficulties (here the tape contained an echo), the circuit court instructed the jury on the proper use of the transcript and told the jury to rely on the tape itself if contradictions were present, and

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

the transcripts were promptly collected afterwards. *See Faehnrich*, 359 N.W.2d at 899. [**429]

**K. Summary**

[*P78] The circuit court abused its discretion in allowing the suicidologist to tell the jury that the deceased did not commit suicide, but the testimony was not prejudicial. The court did not err in finding that the suicidologist's methodology was sufficiently reliable. There was no error in denying Guthrie's motion for acquittal, as there was sufficient evidence to sustain a finding of guilt beyond a reasonable doubt. The court did not erroneously deny Guthrie's motion to suppress evidence obtained without a valid search warrant, as the evidence was obtained via lawful third party consent. The court did not abuse its discretion in denying Guthrie the opportunity to present surrebuttal evidence [***70] from his fingerprint expert. We find that only a portion of the testimony of William Davis was privileged and statements within the privilege were waived. Finally, the circuit court did not abuse its discretion in allowing the jury to listen to the audiotape and read a transcript of that tape.

[*P79] Affirmed.

[*P80] AMUNDSON, Justice, concurs on Issues 1, 2, 3, 4, and 5 and joins Justice Sabers' dissent on Issue 6.

[*P81] MILLER, Chief Justice, and GILBERTSON, Justice, concur in part and concur in result in part.

[*P82] SABERS, Justice, concurs in part and dissents in part.

**CONCUR BY:** GILBERTSON (In Part); SABERS (In Part)

**CONCUR**

GILBERTSON, Justice (concurring in part and concurring in result in part).

[*P83] I concur with the lead opinion on all issues except its conclusion that the trial court abused its discretion in allowing Dr. Berman to testify that in his opinion, Sharon Guthrie did not commit suicide. The trial court did not abuse its discretion in the admission of this testimony as (1) it is not ultimate issue testimony in this case, and (2) even if it were, under *Daubert* and our standard of review it is admissible.

[*P84] The standard [***71] under which we review this case plays a critical role in its final determination. A trial court is granted broad discretion when a decision to admit testimony is reviewed on appeal, and its decision will stand absent an abuse of that discretion. *State v. Edelman, 1999 SD 52, P4, 593 N.W.2d 419,*

421. We will not reverse a trial court's evidentiary ruling if "we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion." *Dakota Cheese, Inc. v. Taylor, 525 N.W.2d 713, 715 (SD 1995).* Under the abuse of discretion standard, "we must be careful not to substitute our reasoning for that of the trial court." *State v. Larson, 512 N.W.2d 732, 736 (SD 1994).* Only with these principles in mind can we properly resolve this issue.

[*P85] Expert testimony, when relevant, is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and if it "rests on a reliable foundation." *SDCL 19-15-2; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993).* The lead opinion correctly concludes [***72] that Dr. Berman's testimony as to Sharon's state of mind was relevant, helpful to the jury, and based on a reliable foundation. And yet, the lead opinion concludes the trial court abused its broad discretion bestowed upon it by allowing Dr. Berman to testify that in his opinion, Sharon Guthrie did not commit suicide. I respectfully disagree.

[*P86] The lead opinion states it does not reach the ultimate issue determination. Instead, it concludes that Dr. Berman's ultimate opinion is unreliable under *Daubert.* [17] [**430] Yet, Dr. Berman's prior testimony, where he explained common risk factors of suicide victims and compared those factors to the present case, was reliable under *Daubert.* While the lead opinion couches its decision in terms of reliability, it is quite clear that Dr. Berman's ultimate opinion is unreliable because it is perceived as an ultimate opinion. [18] Because remnants of the ultimate issue rule form the foundation for the lead opinion's conclusion, and are directly addressed by the dissent, it is necessary to address it here.

17   The lead opinion states that psychological autopsies are a "relatively new, unrefined, and unresearched clinical technique," and therefore are unreliable. It should be noted that the lead opinion's legal authorities for this proposition are law review articles published six and eight years ago respectively. Moreover, the author's concern is apparently not shared by appellate courts as not a single jurisdiction is cited as being in subsequent accord. [***73]

18   The lead opinion declares:

A few courts have allowed psychological autopsy evidence in cases where the question before the jury in a homicide prosecution was whether the deceased died

2001 SD 61, *; 627 N.W.2d 401, **;
2001 S.D. LEXIS 62, ***

from suicide. In those cases, how-
ever, the experts did not opine
with scientific certitude that the
deceased did or did not commit
suicide.

Conf. Op. P40.

[*P87] The ultimate issue of fact for the jury to de-
termine in this instance is whether William Guthrie mur-
dered his wife, Sharon. Guthrie stipulated to no elements
of the charge. Therefore, in this circumstantial evidence
case, the State shoulders the burden of proving each ele-
ment of the charge beyond a reasonable doubt. To prove
each element of murder, the State must disprove all other
manners of death, including suicide or accident. While a
jury determination of suicide would result in an acquittal,
a finding to the contrary does not automatically result in
a conviction. The testimony by Dr. Berman helped ex-
clude one manner of death. [19] The State was still required
to prove Sharon did not die accidentally, as well as the
identity of the [***74] perpetrator. As in State v. Barber,
1996 SD 96, P38, 552 N.W.2d 817, 823, here there is no
basis to conclude that the expert testimony "'devoured
the issue before the jury.'" Rather, as in Barber, here the
disputed testimony stops well short of expressing the
opinion "that [Guthrie] was guilty of the offense
charged." Id.

> 19  I question the lead opinion's conclusion that
> Dr. Berman's testimony "approached the imper-
> missible" and created an "inference" as to Guth-
> rie's guilt. Before the enactment of SDCL 19-15-
> 4, experts were not allowed to testify on ultimate
> issues. Are they now prohibited, despite the adop-
> tion of that statute, from testifying as to "infer-
> ences?" In certain instances it is difficult enough
> to determine what constitutes an ultimate issue let
> alone an "inference" of such. The use of this
> novel standard will only serve to further confuse
> this issue.

[*P88] In 1993, South Dakota repealed the ultimate
issue rule with the adoption of SDCL 19-15-4, [***75]
[20] which provides: "testimony in the form of an opinion
or inference otherwise admissible is not objectionable
because it embraces an ultimate issue to be decided by
the trier of fact." Prior to the adoption of that statute,
South Dakota was the only state in the nation which still
adhered to the prohibition against testimony by an expert
on an ultimate issue of fact. State v. Burtzlaff, 493
N.W.2d 1, 11 (SD 1992) (Wuest, J., concurring in part
and dissenting in part) (citing 2 Gregory P. Joseph &
Stephen A. Salzburg, Evidence in America: The Federal
Rules In The States, ch 53, 1 (1987)). Since the [**431]

adoption of 19-15-4, we have limited the rule such that,
in general, an expert cannot testify as to the credibility of
another witness. [21] State v. Raymond, 540 N.W.2d 407,
410 (SD 1995). We have also held that an expert cannot
testify as to legal conclusions. Robbins v. Buntrock,
1996 SD 84, P8, 550 N.W.2d 422, 425; Zens v. Harrison,
538 N.W.2d 794, 796 (SD 1995). In addition, we have
stated that an expert can testify as to ultimate issues, "as
long as the witness is not asked whether the defendant is
innocent or guilty." Barber, 1996 SD 96, P38, 552
N.W.2d at 823. [***76]

> 20  Thus, reliance upon cases such as State v.
> Hill, 463 N.W.2d 674 (SD 1990) by the dissent
> are not particularly helpful in an analysis of the
> issue now before us which is controlled by the
> 1993 enactment of SDCL 19-15-4.

> 21  The lead opinion states that experts are gen-
> erally permitted to testify that a victim's behavior
> is "consistent with" that of known victims. Conf.
> Op. P41. The cases cited for this proposition all
> limit the expert's testimony because any "ulti-
> mate" conclusion would tend to buttress the
> credibility of the victim or another witness. Un-
> der our case law, the admission of such testimony
> would clearly be an abuse of discretion. See
> Raymond, infra. However, Dr. Berman's opinion
> does not weigh on the credibility of any witness
> in this case. Therefore, the concerns expressed by
> those cases, while valid, are inapplicable to this
> case.

[*P89] In both Zens and Robbins the trial court's
evidentiary ruling was to preclude the evidence. Thus,
[***77] the posture of the issue on appeal before us was
whether the trial court abused its discretion in precluding
the evidence. Robbins, 1996 SD 84, P8, 550 N.W.2d at
425; Zens, 538 N.W.2d at 796. However, here the ques-
tion before us is whether the circuit court abused its dis-
cretion in admitting, rather than excluding, the evidence.
"The test is not whether we would make a similar ruling,
but rather whether a judicial mind, in view of the law and
the circumstances, could have reasonably reached the
same conclusion." Barber, 1996 SD 96, P14, 552
N.W.2d at 820. "[Abuse of discretion] is the most defer-
ential standard of review available with the exception of
no review at all." State v. Chamley, 1997 SD 107, P51,
568 N.W.2d 607, 620 (Gilbertson, J., dissenting) (citing
Martha S. Davis, Basic Guide to Standards of Judicial
Review, 33 SD Law Rev. 468, 480 (1988) (alterations in
original))). As such, it is not surprising that neither the
lead opinion nor dissent is able to cite to a single case in
which this Court reversed the admission of expert testi-
mony under the restrictive theories of admissibility they
now advocate.

Page 24

[***78] [*P90] In both *Robbins* and *Zens*, no abuse of discretion was found to exist as the precluded evidence sought to directly inform the jury as to which party was negligent. We found that testimony impermissibly entered the realm of ultimate legal conclusions. *Robbins*, 1996 SD 84, P8, 550 N.W.2d at 425; *Zens*, 538 N.W.2d at 796. While negligence is a legal conclusion, suicide is instead a factual determination. Suicide is statutorily defined as "the intentional taking of one's own life." SDCL 22-16-36. Clearly, no legal conclusion is required to find suicide, therefore neither *Zens* nor *Robbins* mandate a finding of abuse of discretion in this instance. The testimony at issue here is more similar to that expressed in *Barber*, where the defendant was charged with conspiracy to distribute a controlled substance. In that case, an expert concluded that the defendant was engaged in drug trafficking operations. *Barber*, 1996 SD 96, P38, 552 N.W.2d at 823. We held the trial court did not abuse its discretion by admitting that testimony. *Id.*

[*P91] Despite the mandate of SDCL 19-15-4, and the [***79] deference the trial court, the lead opinion finds the trial court abused its considerable discretion when it allowed Dr. Berman to state "in my opinion Sharon Guthrie did not die by suicide." Under the lead opinion's analysis, only the admission of that statement was an abuse [**432] of discretion, while all nonultimate issue testimony was properly admitted. I see no basis under SDCL 19-15-4 or *Daubert* to accord one standard for the admissibility of expert testimony, but employ another, more stringent standard before ultimate issue testimony will be admitted. In light of the explicit statutory abrogation of the ultimate issue rule, this result could lead to confusion, and at worst, eventually result in a judicial annulment of SDCL 19-15-4. If the nonultimate issue testimony is relevant, reliable and helpful enough to be admissible under *Daubert*, the ultimate issue testimony should also be found relevant, reliable and helpful enough to be admitted. *See* State v. Alberico, 116 N.M. 156, 861 P.2d 192, 210 (NM 1993) (noting that if post-traumatic stress disorder evidence is reliable and admissible for one purpose, it is reliable [***80] and admissible for all purposes). To hold otherwise will resurrect the "irreconcilable confusion" and "embarrassing inconsistencies" that resulted under the ultimate issue rule. *Burtzlaff*, 493 N.W.2d at 12 (Wuest, J., concurring in part and dissenting in part). The lead opinion's framework will once again require the bench and bar to wrestle with what the ultimate issue of fact is in a given scenario. *Burtzlaff*, 493 N.W.2d at 11 (Wuest, J., concurring in part and dissenting in part). In this case, is the ultimate issue Sharon's suicide? Or, is it William's guilt or innocence as to the crime charged? If an expert will testify as to an ultimate issue of fact, is another *Daubert* hearing required to judge the reliability, relevance, and helpfulness of the ultimate issue testimony? This resulting legal

quagmire is the precise situation SDCL 19-15-4 sought to remedy.

[*P92] The lead opinion determines Dr. Berman is qualified as an expert as to his non-ultimate issue testimony, yet he is unqualified to discuss this issue of "ultimate fact". This conclusion is prefaced by noting that Dr. Berman's ultimate fact opinion was based on "observation [***81] and experience, not traditional empirical studies." Conf. Op. P41. An expert may be qualified by his "knowledge, skill, experience, training, or education . . .." SDCL 19-15-2. Because the disjunctive *or* is used in the statute, an expert can be qualified under any one of the five categories listed. Nickles v. Schild, 2000 SD 131, P10, 617 N.W.2d 659, 661. Yet, under the lead opinion's analysis, Dr. Berman's experience and observation are not enough to allow him to testify that in his opinion, Sharon Guthrie did not commit suicide. Have we created two classes of experts, one qualified to testify on ultimate facts, the other not? Must there be a separate *Daubert* hearing on the qualifications of ultimate issue experts? The lead opinion also finds Dr. Berman's testimony relating common risk factors to Sharon's situation to be "relevant, helpful and admissible" and thus reliable, yet his ultimate conclusion is unreliable. Have we now also created two classes of reliability, one for ultimate issue testimony and one for non-ultimate issue testimony? Again, the bar and bench will be confronted with issues that should have been laid to rest with [***82] the adoption of SDCL 19-15-4. This result is clearly contrary to the "uniform procedure for addressing expert testimony" envisioned by *Daubert*. Rogen v. Monson, 2000 SD 51, P26, 609 N.W.2d 456, 462 (Konenkamp, J., concurring).

[*P93] Other jurisdictions have allowed psychological autopsy evidence to be admitted in cases, such as the case at bar, where the decedent's state of mind is at issue. Horinek v. State, 977 S.W.2d 696, 701 (TexApp 1998); U.S. v. St. Jean, 1995 CCA LEXIS 62, *2, 1995 WL 106960, *2 (AFCtCrimApp 1995); In re Estate of Hoover, 155 Ill. 2d 402, 615 N.E.2d 736, 744-45, 185 Ill. Dec. 866 (Ill 1993); Jackson v. State, 553 So. 2d 719, 720 (Fla. Dist. Ct. App. 1989); Harvey v. Raleigh Police [**433] Dep't, 85 N.C. App. 540, 355 S.E.2d 147, 152 (NCApp 1987); Campbell v. Young Motor Co., 211 Mont. 68, 684 P.2d 1101, 1104 (Mont 1984). *See also* Kostelac v. Feldman's, Inc., 497 N.W.2d 853 (Iowa 1993) *and* Terrell State Hosp. v. Ashworth, 794 S.W.2d 937 (TexApp 1990) (discussing psychological autopsies as used in the case, without discussing admissibility as an issue on appeal). [22] In addition, this Court has noted that "psychological [***83] autopsies have been admitted where the victim's state of mind was relevant." *Burtzlaff*, 493 N.W.2d at 5. More recently, this Court allowed a psychiatric expert to testify as to a decedent's

testamentary capacity. In re Dokken, 2000 SD 9, P44, 604 N.W.2d 487, 499. Under an abuse of discretion standard of review, how can we draw a distinction between an opinion that a decedent was legally capable of executing a will and an opinion that a decedent did not commit suicide?

> 22  The legal issue involved in these cases is entirely irrelevant under the *Daubert* reliability standard. If psychological profiles are reliable enough to be admitted in a worker's compensation proceeding or will contest, why are they not reliable enough to be admitted in criminal proceedings?

> The lead opinion claims that *Horinek* and *St. Jean* support its conclusion, and not one case cited above "allows giving an opinion like the one Dr. Berman gave here." In *St. Jean*, the court limited the expert testimony to "the profile of one who is, psychiatrically speaking, suicidal or a suicidal risk." 1995 CCA LEXIS 62, *3, 1995 WL 106960, *1. In *Horinek*, the expert testified "that it appeared very unlikely that this individual would be the sort of person to kill herself." 977 S.W.2d at 701. In both cases, the decision of the trial court was affirmed under an abuse of discretion standard. Two lessons can be drawn from those cases. First, the psychological autopsy evidence was admissible. Second, the trial court's decision was affirmed under the proper standard of review.

> As noted previously, other cases exclude conclusions that tend to weigh on a witness's credibility. That concern is not an issue in this case.

> Moreover, it should also be noted that no case cited by the lead opinion adopts or even supports the bifurcated reliability analysis which is now proposed.

[***84]  [*P94]  The lead opinion creates a two-tiered reliability analysis, which results in a bifurcation of the *Daubert* requirement of reliability. On one tier is expert testimony, which is examined under *Daubert* principles. On the second tier is ultimate issue expert testimony, or "inferences" thereto, which apparently is subject to a higher scrutiny. Such a result might be acceptable if there were any legal authority to support it. However, the only conceivable authority is the ultimate issue rule, which was repealed in 1993.

[*P95]  I agree with the lead opinion that the trial court did not abuse its discretion in allowing Dr. Berman to testify regarding common risk factors of suicide victims and relate those factors to Sharon Guthrie. As the

lead opinion concludes, that testimony is reliable under *Daubert*. However, I cannot conclude that Dr. Berman's opinion that Sharon Guthrie did not commit suicide was somehow unreliable, or inadmissible under SDCL 19-15-4. [23] The [**434] ultimate issue prohibition was put to rest in 1993, there is no need to exhume it now.

> 23  In addition to creating this two-tiered analysis, the lead opinion constructs an unacceptable rationale when it concludes this testimony was harmless error because the jury had already heard "the absence of [Dr. Berman's] suicidal indicators and the totality of the evidence offered at trial." Under the lead opinion's analysis, the ultimate conclusion was harmless because Dr. Berman testified as to how he reached his conclusion. Therefore, as long as an expert testifies as to the basis of his conclusion before stating that ultimate opinion, how can there ever exist reversible error? As long as an expert's testimony avoids the pitfalls of legal conclusions and comments on a witness' or victim's credibility, reversible error will only exist if the entirety of the expert's testimony is "In my opinion, X happened."

[***85]  [*P96]  For the above reasons I would outright affirm the trial court on this issue. As there is no majority opinion regarding the rationale for adjudication of this issue, resolution of the conflicting theories set forth in the various writings of this case await a future decision of this Court.

[*P97]  MILLER, Chief Justice, joins this special writing.

**DISSENT BY:** SABERS (In Part)

**DISSENT**

SABERS, Justice (concurring in part and dissenting in part).

[*P98]  The lead opinion purports to justify to the reader that no error occurred below or that the errors were harmless or nonprejudicial. I write specially to analyze these claims independently and conclude that substantial prejudicial error tainted Guthrie's trial. Therefore, I dissent. We should reverse and remand for a fair trial.

## [*P99]  1. IMPROPER EXPERT OPINION TESTIMONY THAT GUTHRIE MURDERED HIS WIFE BECAUSE IT WAS NOT SUICIDE.

[*P100]  Dr. Berman's testimony as a suicidologist was relevant and helpful to the jury. This testimony was crucial evidence concerning the ultimate issue of whether Sharon's death was caused by suicide, accident or murder. The necessity of such testimony was reinforced by

the [***86] State's theory of the case. The State contended from the outset that by eliminating the other potential causes of death, it would prove that Sharon was murdered by Guthrie. However, in so doing, the State was bound to use admissible expert testimony. *See* State v. Werner, 482 N.W.2d 286, 291 (SD 1992); United States v. St. Jean, 1995 CCA LEXIS 62, *5, 1995 WL 106960, *2.

[*P101] As the lead opinion recognizes, Dr. Berman's testimony "moved from imparting typical characteristics and whether Sharon met a suicidal profile, to *declaring that based on her profile she did not commit suicide*." (Emphasis added). I agree with the lead opinion's determination that such testimony was inadmissible expert testimony. Such psychological profile failed to meet the criteria under *Daubert* to declare with certainty that a person committed suicide. In fact, even with the proper scientific basis, such opinion testimony would necessarily have invaded the province of the jury.

[*P102] Such testimony is improper where an expert attempts to opine on the ultimate issue squarely before the jury. *See* Zens v. Harrison, 538 N.W.2d 794, 796 (expert cannot determine negligence [***87] as that role is exclusively for a jury); State v. Hill, 463 N.W.2d 674, 677 (SD 1990) (the "proper subject matter" of expert testimony does not include experts testifying as the credibility of witnesses as that role is exclusively for a jury). Though trials are sometimes a battle of experts, the experts should not decide them, juries should.

[*P103] I agree with the lead opinion that the trial court abused its discretion by allowing such testimony. However, I part company with the conclusion of the lead opinion that any error was harmless. The State's method of prosecuting this case, though in all fairness a proper method, clearly highlights the prejudicial effect of this improper testimony. From the outset, the State operated under the theory that Guthrie was guilty of murder because there was no other explanation for this tragic death. This expert's testimony was necessary for the State to dispense with Guthrie's theory that Sharon died as a result of suicide, thereby prejudicially damning Guthrie.

[*P104] The lead opinion incorrectly concludes, "we cannot say that in the absence [**435] of Dr. Berman's ultimate opinion the jury verdict would have been different." [***88] I am convinced that an expert's statement that the decedent did not commit suicide and therefore the only remaining option was murder contributed to the verdict. There is little that would have been more harmful in the context of this prosecution. As this testimony unduly influenced and infected the trial, I dissent from the lead opinion's determination that this error was harmless.

[*P105] Both the lead opinion and the special concurrence get it half right. I agree with the lead opinion's conclusion that this testimony was relevant to a certain point. However, once that threshold was crossed and the expert was allowed to state, with the pretense of scientific certainty, that the decedent did not commit suicide, it became clearly improper. It both invaded the province of the jury and was without proper scientific foundation. However, even the concurrence recognizes that if the lead opinion is accepted, its unwillingness to recognize this as harmful error is absurd. The concurrence rhetorically asks, "therefore, as long as an expert testifies to the basis of his conclusion before stating [the] ultimate opinion, how can there ever exist reversible error?" My addition to this [***89] exchange is simple, expert testimony embracing an issue to be resolved by the jury without the proper scientific foundation is reversible error. [24]

> 24 In all practicality, the lead opinion and the concurrence place our trial courts in tenuous positions. The lead opinion requires the trial court to limit the expert before the testimony becomes improper. The concurrence recognizes that trial court's will have difficulty determining when that threshold has been crossed. This is wrong because difficulty in the process doesn't justify the harm. Both result in a "just let it slide approach." I challenge this Court to do better.

## 2. TAPE RECORDED CONVERSATION BY GUTHRIE'S DAUGHTER.

[*P106] The lead opinion determines that the admission of the daughter's recording coupled with the written transcript was acceptable. In so doing, the lead opinion ignores an important mistake of law that occurred below based on admitted facts. Though defense counsel has not argued this point with proper emphasis, I dissent [***90] to the conclusion of the lead opinion.

[*P107] Suzanne Hewitt, Guthrie's oldest daughter, met with her father and recorded a conversation in which she confronted him about her mother's death. On a motion to exclude this testimony, Suzanne testified that she went to the police station to help and was not sure who suggested the tape recording device, that the recording device was supplied by the officers, and that "at the end of the [recorded] conversation he said he needed to talk to his attorney before he could talk to me anymore." Additionally, during examination of DCI Agent Lindberg the following exchange occurred:

Q: Do you remember during that conversation Suzanne mentioning something about an attorney that [Guthrie] had talked about?

A: Well, when she first came in to talk to us she said that her dad said not to talk to law enforcement unless his attorney was present and she stated I will talk to whoever I want to and she wasn't going to be bound by that.

Q: Did you try to get information from her on who this attorney was?

A: As I recall she didn't know who the attorney was or if there was one. She just [**436] said that he said not to talk to us unless his attorney was [***91] present.

THE COURT: Unless whose attorney was present?

Agent Lindberg: His. Mr. Guthrie's.

In further examination of DCI Agent Lindberg, defense counsel elicited:

Q: And so there is no doubt, . . . Mr. Lindberg, Suzanne Hewitt told you on June 14 of this year that her father told her not to talk to you until -- without Mr. Guthrie's attorney present?

A: That's correct.

The taping of the conversation between father and daughter occurred over a month later on July 26. Later that same day, the Division of Criminal Investigation contacted Guthrie for an interview. The agents were told "he retained an attorney and wasn't going to talk."

[*P108] Under these facts, the use of Guthrie's daughter as an agent of the State to produce evidence in the criminal investigation constituted a violation of Guthrie's Fifth Amendment right against self-incrimination.

[*P109] As Guthrie had not been formally indicted his Sixth Amendment right to have counsel present during any questioning by a State agent had not yet attached. *See* Massiah v. US, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); McNeil v. Wisconsin, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991). [***92] However, as he was a suspect and being questioned by his daughter on behalf of the State, his Fifth Amendment privilege against self-incrimination did exist. To protect Guthrie's right against self-incrimination he "has a right to the presence of an attorney, either retained or appointed. [Guthrie] may waive [] these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicated in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

[*P110] "Once an accused requests the assistance of counsel the current interrogation must cease and the suspect cannot be approached for further questioning until counsel is made available. Similarly, a defendant may not be subjected to the 'functional equivalent' of interrogation, namely words or actions on the part of the police that are likely to elicit an 'incriminating response.'" State v. Morato, 2000 SD 149, P23, 619 N.W.2d 655, 662. (Citations omitted). The protection of the defendant's right against self incrimination [***93] recognized by *Miranda* and its progeny should be "strictly enforced to prohibit any questioning of an accused once counsel has been requested." State v. Arpan, 277 N.W.2d 597, 599 (SD 1979).

[*P111] It is clear from the record that Guthrie was targeted by the Division of Criminal Investigation as a suspect in the tragic death of his wife. It is also apparent that the State must be allowed to question suspects in order to investigate crimes. However, our constitution provides all individuals with the right against self-incrimination. To protect this right, counsel is an invaluable tool and once the police are aware that a suspect has retained counsel or requests counsel questioning must cease. This includes all agents of the State. *See Massiah,* 377 U.S. at 206, 84 S. Ct. at 1199, 12 L. Ed. 2d 246, 250 (stating that if the protections afforded "have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse"). The State cannot take advantage of a daughter's breach of trust to her father even if it was her idea and she volunteers. Here, as in *Massiah,* Guthrie "was more seriously imposed upon . . . [***94] because he didn't even know that he was [**437] under interrogation by a government agent." *Id.*

[*P112] As early as June 14, law enforcement was aware that Guthrie had employed counsel or would not submit to further interrogation without counsel present. Despite this fact, on July 26, the State wired Guthrie's daughter and elicited statements from him through the use of this intimate relationship. Guthrie ended the conversation with his daughter by stating he "needed to talk to his attorney before he could talk to [her] anymore." This clearly establishes his expectation of privacy and confidentiality with his daughter. When we consider the State's role in this daughter's breach of trust to her father, it is obvious that displaying this testimony to the jury was so prejudicial it requires a new trial in its own right. As this improper recording was heard by the jury, then transcribed and distributed to the jury, I dissent.

[*P113] We should reverse and remand for a new trial on both issues.

[*P114] AMUNDSON, Justice, joins this special writing as to issue 6.

# TAB 17

LEXSEE



Positive
As of: May 25, 2007

**STATE OF SOUTH DAKOTA, Plaintiff and Appellee, v. TREY L. KARLEN, Defendant and Appellant.**

**# 20299**

**SUPREME COURT OF SOUTH DAKOTA**

**1999 SD 12; 589 N.W.2d 594; 1999 S.D. LEXIS 25**

**October 21, 1998, Argued**
**February 3, 1999, Filed**

**PRIOR HISTORY:**    [***1] APPEAL FROM THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT. BROOKINGS COUNTY, SOUTH DAKOTA. HONORABLE ROBERT L. TIMM Judge. REASSIGNED DECEMBER 16, 1998.

**DISPOSITION:**    Affirmed in part & Reversed & Remanded in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant appealed his conviction from the Circuit Court of the Third Judicial Circuit (South Dakota) of rape, unauthorized distribution of a substance with moderate potential for abuse, and sexual contact without consent.

**OVERVIEW:** Defendant was reindicted a week after charges against him were dismissed. Defendant was convicted under the new indictment of improper sexual contact, rape, and unauthorized distribution. Defendant claimed his rights to a speedy trial were violated. The court found no evidence to show the original indictment was improperly dismissed or that the state dismissed the charges in the original indictment to circumvent the 180-day rule. Thus, the 180-day period began when defendant first appeared on the reindictment and any delay thereafter was due to his counsel. Defendant was not entitled to a continuance as he failed to show that the unavailable witness testimony would be of any help. However, the court ruled that any conviction concerning one of the victims had to be reversed as the trial court had improperly quashed defendant's subpoena of this

victim's counseling records. The trial court should have conducted an in camera review for exculpatory material before it quashed the subpoena based on victim's privilege.

**OUTCOME:** The court affirmed all of the convictions except those involving one victim as it found that defendant's speedy trial rights were not violated and he was not entitled to a continuance. However, defendant's subpoena of victim's counseling records should not have been quashed without an in camera review for exculpatory material.

**CORE TERMS:** counselor, in camera, indictment, continuance, disclosure, privileged, presumptively prejudicial, cross-examination, cross-examine, inspection, sexual contact, unauthorized, moderate, waived, rape, speedy trial, consenting, counseling, reindictment, conversation, credibility, citation omitted, reasonable probability, confidential, pertinent part, judgment of acquittal, time period, privileged information, juvenile offenders, unambiguous

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN1]The court reviews a trial court's findings of fact under the clearly erroneous standard.

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN2]A trial court's evidentiary rulings are presumed correct and are reviewed under an abuse of discretion standard.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN3]The construction of a statute and its application to the facts present questions of law, which the court reviews de novo.

*Criminal Law & Procedure > Trials > Motions for Acquittal*
*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN4]In reviewing the denial of a motion for judgment of acquittal, the ultimate question is whether the evidence was sufficient to sustain the conviction.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN5]See S.D. Codified Laws § 23A-44-5.1.

*Criminal Law & Procedure > Accusatory Instruments > Dismissal*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN6]The court has adopted a two-part test for determining the date from which the 180-day period begins to run when an initial indictment has been dismissed and the defendant is reindicted. The 180-day period commences when the defendant has first appeared on the reindictment if (1) the earlier indictment was properly dismissed by a competent judicial officer and (2) the record does not reveal evidence of a prosecutorial attempt to circumvent the 180-day rule.

*Criminal Law & Procedure > Accusatory Instruments > Informations*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN7]The language of S.D. Codified Laws § 23A-44-5.1 is clear and unambiguous. The rule addresses five things: (1) the 180-day requirement; (2) the commencement of the time period following an indictment, information, or complaint; (3) the commencement of the time period

following an order for a new trial, a trial following a mistrial, and the filing of a mandate on remand; (4) the time periods excluded in computing the time for trial; and (5) the dismissal of the charges with prejudice if the defendant is not brought to trial within the 180-day time frame. Nothing in the language of the rule can be interpreted to prohibit a reindictment from starting a new 180-day period.

*Governments > Legislation > Interpretation*
[HN8]When the language of a statute is clear and unambiguous, the court's function is to declare its meaning as it is expressed.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Speedy Trial*
*Criminal Law & Procedure > Pretrial Motions > Speedy Trial > General Overview*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN9]The U. S. Const. amend. VI and S.D. Const. art. VI, § 7 guarantee a defendant the right to a speedy trial.

*Criminal Law & Procedure > Pretrial Motions > Speedy Trial > General Overview*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN10]When determining whether a defendant's right to a speedy trial has been denied, the court considers four factors. The court must consider: (1) The length of the delay; (2) the reason for the delay; (3) whether the accused asserted the right for a speedy trial; and (4) whether the accused was prejudiced by the delay.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN11]The first factor, length of the delay, is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*
[HN12]If a delay is determined to be "presumptively prejudicial," other factors must be considered.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial*

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

[HN13]Delays of more than one year to be presump-
tively prejudicial.

*Civil Procedure > Pretrial Matters > Continuances*
*Criminal Law & Procedure > Pretrial Motions > Con-
tinuances*
*Criminal Law & Procedure > Appeals > Standards of
Review > Abuse of Discretion > Continuances*
[HN14]A trial court's decision to grant or deny a con-
tinuance is reviewed under an abuse of discretion stan-
dard. Reversal of the trial court's ruling is proper only
upon a clear showing of abuse. Under the standard, the
test is not whether the court would have made the same
ruling, but whether the court believes a judicial mind, in
view of the law and the circumstances, could have rea-
sonably reached the same conclusion.

*Criminal Law & Procedure > Pretrial Motions > Con-
tinuances*
*Criminal Law & Procedure > Appeals > Standards of
Review > Abuse of Discretion > Continuances*
[HN15]When a witness is unavailable, three require-
ments must be met for the defendant to obtain a continu-
ance. First, the testimony of the absent witness must be
material. Next, due diligence must be used to secure the
witness' attendance or deposition. Finally, it must be rea-
sonably certain the presence of the witness or his testi-
mony will be procured by the time to which the trial
would be postponed. However, if the defendant has
failed to establish any of the three requirements, the
court has not abused its discretion in denying the con-
tinuance.

*Criminal Law & Procedure > Pretrial Motions > Con-
tinuances*
[HN16]Unsupported claims are not sufficient to establish
that testimony is material.

*Evidence > Privileges > Psychotherapist-Patient Privi-
lege*
[HN17]See S.D. Codified Laws § 19-13-26.

*Governments > Legislation > Interpretation*
[HN18]Related statutes must be construed together to
determine legislative intent.

*Governments > Legislation > Interpretation*
[HN19]Privileges are to be construed narrowly as they
constitute a barrier to the search for truth.

*Evidence > Privileges > Marital Privileges > Adverse
Spousal Testimony > Waiver*
[HN20]See S.D. Codified Laws § 19-13-26.

*Evidence > Privileges > Marital Privileges > Adverse
Spousal Testimony > Waiver*
[HN21]Since S.D. Codified Laws §19-13-21.2 is in the
same chapter as S.D. Codified Laws § 19-13-26, §19-13-
26 provides an additional method of waiver of privilege.

*Evidence > Privileges > Marital Privileges > Adverse
Spousal Testimony > Waiver*
[HN22]Disclosing information to a third party destroys
the privilege.

*Criminal Law & Procedure > Postconviction Proceed-
ings > Imprisonment*
*Evidence > Privileges > Marital Privileges > Adverse
Spousal Testimony > Scope*
*Evidence > Privileges > Marital Privileges > Adverse
Spousal Testimony > Waiver*
[HN23]The court interprets S.D. Codified Laws § 19-13-
26 to invoke waiver if the client voluntarily discloses the
contents of the communication to a third party.

*Criminal Law & Procedure > Trials > Defendant's
Rights > Right to Compulsory Process*
*Evidence > Privileges > Psychotherapist-Patient Privi-
lege*
[HN24]To ensure that justice is done, it is imperative to
the function of courts that compulsory process be avail-
able for the production of evidence needed either by the
prosecution or the defense. Whatever the privileges' ori-
gins, these exceptions to the demand for every man's
evidence are not lightly created nor expansively con-
strued, for they are in derogation of the search for truth.

*Civil Procedure > Appeals > Standards of Review >
Harmless & Invited Errors > Harmless Error Rule*
*Criminal Law & Procedure > Discovery & Inspection >
Discovery by Defendant > General Overview*
*Evidence > Procedural Considerations > Burdens of
Proof > Proof Beyond Reasonable Doubt*
[HN25]The burden of proving that the trial court's re-
fusal to allow inspection of records in some reasonable
manner is harmless error beyond a reasonable doubt rests
with the state.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Right to Confrontation*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN26]See U. S. Const. amend. VI.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN27]See S.D. Const. art VI, § 7.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
*Criminal Law & Procedure > Trials > Examination of Witnesses > Cross-Examination*
[HN28]The so-called Confrontation Clause provides two specific protections for criminal defendants. The first is being the right to face his accusers and the second is the right to cross-examine those who testify against him.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN29]The right to cross-examine is not absolute.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN30]The ability to cross-examine witnesses does not include the power to compel production of all information that may be useful to the defense.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN31]The Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
*Evidence > Privileges > General Overview*
[HN32]When it comes to the production of material covered under a statutory privilege, the defendant will often not be able to access the privileged information. Every privilege limits the evidence available in the judicial fact-finding process.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Compulsory Process*
*Evidence > Privileges > Psychotherapist-Patient Privilege*
[HN33]The public has an interest in protecting such information as it encourages patients to be open and candid with their counselors. However, it is a basic provision of American jurisprudence that a statutory provision never be allowed to trump a Constitutional right. The Constitution is the mother law. Statutes must conform to the Constitution, not vice versa.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Right to Confrontation*
*Criminal Law & Procedure > Discovery & Inspection > Discovery by Defendant > General Overview*
[HN34]The Confrontation Clause does not create a constitutionally compelled rule of pretrial discovery.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*
[HN35]The Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Evidence > Privileges*
[HN36]Due process principles require an in camera review of privileged material. This is especially true when the evidence was material.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Criminal Law & Procedure > Trials > Examination of Witnesses > Cross-Examination*
*Evidence > Testimony > General Overview*
[HN37]Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation*

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

*Evidence > Privileges > Psychotherapist-Patient Privilege > General Overview*
*Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview*
[HN38]There are methods used to strike a balance in the tension that exists between rights of the accused and the confidences of the patient. A just compromise is an in camera inspection of all relevant records, performed by the trial court.

*Criminal Law & Procedure > Trials > Motions for Acquittal*
*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN39]The standard of review for denial of a motion for judgment of acquittal is whether the evidence was sufficient to sustain the convictions.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN40]When reviewing sufficiency of the evidence, the court considers the evidence in a light most favorable to the verdict.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN41]A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN42]The court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence.

COUNSEL: MARK BARNETT, Attorney General, CLYDE R. CALHOON, Brookings County State's Attorney, Brookings, South Dakota and WILLIAM MARK KRATOCHVIL, Brookings County Deputy State's Attorney, Brookings, South Dakota, Attorneys for plaintiff and appellee.

DAVID R. GIENAPP of Arneson, Issenhuth & Gienapp, Madison, South Dakota, Attorneys for defendant and appellant.

JAMES F. SHEKLETON, General Counsel, South Dakota Board of Regents, Pierre, South Dakota, Attorney for Amicus Curiae South Dakota Board of Regents.

JUDGES: GILBERTSON, Justice (on reassignment). SABERS and AMUNDSON, Justices, concur. MILLER, Chief Justice, and KONENKAMP, Justice, concur in part and dissent in part.

OPINION BY: GILBERTSON

OPINION

[**596] GILBERTSON, Justice (on reassignment).

[*P1] Karlen appeals his conviction of two counts of second degree rape, three counts of unauthorized distribution of a substance with moderate potential for abuse and three counts of sexual contact without consent with person capable [***2] of consenting. We affirm as to issues one, two and four and reverse and remand with instructions as to issue three.

FACTS

[*P2] Trey Karlen was business manager and publicity director for the South Dakota State University (SDSU) Theater. On August 15, 1996, he was indicted in Brookings County on a thirteen-count indictment. The charged crimes, which occurred between October 31, 1994, and July 8, 1996, involved male victims associated with the SDSU theater community. The indictment included five counts of sexual contact without consent with person capable of consenting; three counts of second degree rape; and five counts of unauthorized distribution of a substance with moderate potential for abuse. Karlen pled not guilty to all charges. On December 19, 1996, following a hearing on the parties' motions, counts eleven (unauthorized distribution of a substance with moderate [**597] potential for abuse) and twelve (sexual contact without consent with person capable of consenting) of the indictment were dismissed. [*P3] On January 4, 1997, the state's attorney notified Karlen that the State intended to dismiss the charges in the indictment. The charges were formally dismissed [***3] on January 6, 1997. One week later, Karlen was indicted on fourteen counts. The crimes charged included three counts of second degree rape; [1] six counts of sexual contact without consent with person capable of consenting; [2] and five counts of unauthorized distribution of a substance with moderate potential for abuse. [3] Karlen pleaded not guilty to all counts.

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

1   Second degree rape is a violation of SDCL 22-22-1(4) which, in part, provides:

> Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:
>
> . . . .
>
> (4) If the victim is incapable of giving consent because of any intoxicating, narcotic or anesthetic agent or hypnosis[.]

2   These six counts are in violation of SDCL 22-7.4, which states:

> No person fifteen years of age or older may knowingly engage in sexual contact with another person other than his spouse who, although capable of consenting, has not consented to such contact.

3   Unauthorized distribution of a substance with moderate potential abuse is a violation of SDCL 22-42-3, which provides in pertinent part:

> No person may manufacture, distribute or dispense a substance listed in Schedule III; possess with intent to manufacture, distribute, or dispense a substance listed in Schedule III[.]

[***4]    [*P4]   The trial on these charges commenced on September 2, 1997. Karlen was found guilty on two counts of second degree rape, three counts of unauthorized distribution of a substance with moderate potential for abuse, [4] and three counts of sexual contact without person capable of consenting.

4   Acetaminophen/Codeine # 3 was the substance Karlen distributed.

[*P5]   In this appeal, Karlen raises the following issues:

> 1. Whether the trial court erred in denying Karlen's motion to dismiss.

2. Whether the trial court erred in not granting Karlen a continuance because of the unavailability of a witness.

3. Whether the trial court erred in granting a motion to quash a subpoena issued by the defense on Henry Fulda.

4. Whether the trial court erred in denying Karlen's motion for a judgment of acquittal as to Count IV.

## STANDARD OF REVIEW

[*P6]   [HN1]We review a trial court's findings of fact under the clearly erroneous standard.   State v. Westerfield, [***5] 1997 SD 100, P8, 567 N.W.2d 863, 866. [HN2]A trial court's evidentiary rulings "are presumed correct and are reviewed under an abuse of discretion standard." State v. Larson, 1998 SD 80, P10, 582 N.W.2d 15, 17 (citation omitted). "[HN3]The construction of [a] statute and its application to [the] facts present questions of law, which we review de novo." State v. Springer-Ertl, 1997 SD 128, P4, 570 N.W.2d 39, 40. "[HN4]In reviewing the denial of a motion for judgment of acquittal, the ultimate question is whether the evidence was sufficient to sustain the conviction." *Larson,* 1998 SD 80 at P9, 582 N.W.2d at 17.

## DECISION

[*P7]   **1. The trial court did not err in denying Karlen's motion to dismiss.** [*P8]   Karlen claims the trial court should have dismissed the charges because the 180-day rule was violated. He also claims the charges should have been dismissed, because he was denied his right to a speedy trial. We disagree with both claims. [*P9]   *a. 180-Day Rule.*

[*P10]   [HN5]SDCL 23A-44-5.1, which is the 180-day rule, provides, in pertinent part:

> (1) Every person indicted, informed or complained against for any offense shall be brought to trial within one hundred eighty days, [***6] and such time shall be computed as provided in this section.
>
> (2) Such one hundred eighty day period shall commence to run from the date the [**598] defendant has first appeared before a judicial officer on an indictment, information or complaint.

[\*P11] Karlen contends the State's dismissal of the August 15, 1996, indictment and its decision to reindict him on January 13, 1997, caused the 180-day rule violation. He claims that the trial would have been held within the 180-day time frame had the dismissal and reindictment not occurred. [5] We find these claims to be without merit. By using either date, Karlen cannot establish an 180-day rule violation. [6]

> 5  Karlen concedes that under SDCL 23A-44-2 the prosecution had the right to dismiss the indictment in the manner that it did, but he continues to argue that the dismissal interfered with his rights.

> 6  Karlen first appeared on the initial indictment on September 3, 1996, the date the 180-day period commenced running. However, on that same day, when determining an available date for trial, the court stated that it would like to have the time tolled until the first trial date available after January 1, 1997. The trial was set for January 6, 1997. The period, then, between September 3 and January 6, would be excluded from the computation of the 180 days. In addition, the time period between defense counsel's request for continuance on April 14, 1997, and the granting of the continuance on April 25, must also be excluded from the calculation, as must the period from the granting of the continuance until the September 2, 1997, trial date. Clearly, the 180-day rule was not violated, even if, as Karlen argues, the time should be computed from his initial appearance on the first indictment.

[\*\*\*7] [HN6]

[\*P12] This Court has adopted a two-part test for determining the date from which the 180-day period begins to run when an initial indictment has been dismissed and the defendant is reindicted. State v. Lowther, 434 N.W.2d 747, 751 (SD 1989); see also State v. Tiedeman, 433 N.W.2d 237, 239-40 (SD 1988) (applying the Pennsylvania court's two-pronged test to determine the date on which the 180-day period begins to run). The 180-day period commences when the defendant has first appeared on the reindictment if "(1) the earlier indictment was properly dismissed by a competent judicial officer and (2) the record does not reveal evidence of a prosecutorial attempt to circumvent the 180-day rule." Lowther, 434 N.W.2d at 751 (citing Tiedeman, 433 N.W.2d at 239) (other citations omitted).

[\*P13] After closely reviewing the record, we find no evidence to show the original indictment was improperly dismissed. Moreover, nothing in the record reveals that the State dismissed the charges in the original in-

dictment to circumvent the 180-day rule. The record shows that both prongs of Lowther have been satisfied. Therefore, we conclude the 180-day period commenced when Karlen first [\*\*\*8] appeared on the reindictment, which was February 5, 1997.

[\*P14] Moreover, a review of the record reveals that much of the delay was attributable to Karlen. At the February 5, 1997, arraignment, the State indicated it was ready to proceed with trial at any time the court and Karlen's counsel, David Gienapp, would be available. The trial was tentatively set to begin on May 13. The date was tentative, because Gienapp was involved in another trial that he felt might conflict with the May trial date. The conflict did, in fact, arise. On April 14, Gienapp, by letter, informed the court and the prosecutor that he would be unavailable for the May trial dates because of the conflict. On April 25, the court, Karlen, one of Gienapp's associates, and the prosecutor, held a telephonic conference to determine the manner in which the parties should proceed. The court informed the parties it was treating Gienapp's April 14 letter as a motion for a continuance and, thus, granted the continuance. The court then tolled the 180-day rule until the date of trial, which was set for September 2, 1997. Clearly, this demonstrates the delay was not the result of the State's actions and that the 180-day [\*\*\*9] rule was not violated.

[\*P15] Karlen further asserts SDCL 23A-44-5.1 prohibits a reindictment from starting a new 180-day period. This contention is erroneous. [HN7]The language of SDCL 23A-44-5.1 is clear and unambiguous. See Dahn v. Trownsell, 1998 SD 36, P14, 576 N.W.2d 535, 539 (citing Moss v. Guttormson, 1996 SD 76, P10, 551 N.W.2d 14, 17) (stating that [HN8]when the language of a statute is clear and unambiguous, our function is to declare its meaning as it is expressed). The rule [\*\*599] addresses five things: (1) the 180-day requirement; (2) the commencement of the time period following an indictment, information, or complaint; (3) the commencement of the time period following an order for a new trial, a trial following a mistrial, and the filing of a mandate on remand; (4) the time periods excluded in computing the time for trial; and (5) the dismissal of the charges with prejudice if the defendant is not brought to trial within the 180-day time frame. Nothing in the language of the rule can be interpreted to prohibit a reindictment from starting a new 180-day period.

[\*P16]  b. Right to a speedy trial.

[\*P17] [HN9]The Sixth Amendment of the United States Constitution and Article [\*\*\*10]  VI, § 7 of the South Dakota Constitution guarantee a defendant the right to a speedy trial. See State v. Jones, 521 N.W.2d 662, 666 (SD 1994). Karlen claims he was denied this right through the State's dismissal of the first indictment

and subsequent reindictment on January 13, 1997. He further contends he was prejudiced by the delay, because a "critical" defense witness, who would have been available for the January trial, was not available for the September trial.

[*P18] [HN10]When determining whether a defendant's right to a speedy trial has been denied, this Court considers four factors. _Jones_, 521 N.W.2d at 668. We must consider: "(1) The length of the delay; (2) the reason for the delay; (3) whether the accused asserted the right [for a speedy trial]; and (4) whether the accused was prejudiced by the delay." _Id._ (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2193, 33 L. Ed. 2d 101, 116-7 (1972)); _See_ State v. Goodroad, 521 N.W.2d 433, 437 (SD 1994).

[*P19] [HN11]The first factor, length of the delay, "is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors [***11] that go into the balance." State v. Holiday, 335 N.W.2d 332, 334-35 (SD 1983) (quoting _Barker_, 407 U.S. at 530, 92 S. Ct. at 2192, 33 L. Ed. 2d at 117). However, [HN12]if a delay is determined to be "presumptively prejudicial," the other factors must be considered. _See Goodroad_, 521 N.W.2d at 437 (citing Doggett v. United States, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). [*P20]

This Court has found [HN13]delays of more than one year to be presumptively prejudicial. _See Jones_, 521 N.W.2d at 668 (fourteen-month delay was presumptively prejudicial); _Goodroad_, 521 N.W.2d at 437-41 (twenty-seven-month delay was presumptively prejudicial, but dismissal was denied because the defendant was responsible for much of the delay); State v. Krana, 272 N.W.2d 75, 77-78 (SD 1978) (thirty-nine-month delay was presumptively prejudicial, but dismissal was denied because the defendant was responsible for much of the delay); State v. Black Feather, 249 N.W.2d 261, 264 (SD 1976) (thirty-three-month delay was presumptively prejudicial); State v. Starnes, 86 S.D. 636, 651, 200 N.W.2d 244, 253 (1972) (twenty-five-month delay resulted in dismissal of charges). We have also found no presumption of prejudice in delays [***12] of less than eight months. _See_ State v. Stock, 361 N.W.2d 280, 284 (SD 1985) (delay of seven months was not enough to constitute a constitutional violation); _Holiday_, 335 N.W.2d at 335 (five-month delay was not presumptively prejudicial); State v. Pickering, 87 S.D. 331, 338, 207 N.W.2d 511, 515 (1973) (four-month delay was not sufficient to require dismissal of charges).

[*P21] In this case, Karlen claims the length of delay is nine months. He concedes this delay may seem insignificant "in light of delays seen in other cases where

a speedy trial issue has been raised." We agree with his concession. Because a nine-month delay is not presumptively prejudicial, the other factors need not be considered. We, therefore, hold that Karlen's right to a speedy trial was not violated.

[*P22] **2. The trial court did not abuse its discretion by denying Karlen a continuance because of the unavailability of a witness.**

[*P23] [HN14]A trial court's decision to grant or deny a continuance is reviewed under an abuse of discretion standard. State v. Letcher, 1996 SD 88, P29, 552 N.W.2d 402, [**600] 407. Reversal of the trial court's ruling is proper only upon a clear showing of abuse. _Id._ [***13] Under the standard, "the test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." _Larson_, 1998 SD 80 at P10, 582 N.W.2d at 17 (quoting _Goodroad_, 1997 SD 46 at P9, 563 N.W.2d 126, 129) (citation omitted).

[*P24] [HN15]When a witness is unavailable, three requirements must be met for the defendant to obtain a continuance. _Letcher_, 1996 SD 88 at P30, 552 N.W.2d at 407. First, the testimony of the absent witness must be material. Next, due diligence must be used to secure the witness' attendance or deposition. Finally, it must be "reasonably certain the presence of the witness or his testimony will be procured by the time to which the trial would be postponed." _Id._ (citing State v. Davies, 33 S.D. 243, 247-8, 145 N.W. 719, 720 (1914) (citation omitted)). However, if the defendant has failed to establish any of the three requirements, the court has not abused its discretion in denying the continuance. _Davies_, 33 S.D. at 248-9, 145 N.W. at 720 (citation omitted).

[*P25] Here, Karlen has not established the first requirement. Although he claims that [***14] the absent witness, Mike Barnett, was a "critical" witness to the charges involving two of his accusers, he has provided no evidence that Barnett's testimony was material. He claims that he anticipated Barnett's testimony would contradict the two accusers' testimony, but nothing in the record supports this claim. Clearly, [HN16]unsupported claims are not sufficient to establish that testimony is material. Karlen makes no showing of the contents of Barnett's proposed testimony nor of his knowledge of the crimes charged. Further, he gives us no reason to believe Barnett's testimony would help the defense.

[*P26] We hold, therefore, that the trial court did not abuse its discretion in denying the continuance.

[*P27] **3. The trial court erred in granting a motion to quash a subpoena issued by the defense to Henry Fulda.**

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

[*P28] Karlen issued a subpoena duces tecum in an attempt to obtain Addison Johnston's (Johnston) records from Dr. Henry Fulda (Fulda), a counselor at SDSU Counseling Center. The jury determined that Johnston was one of Karlen's victims. Karlen claims, at the very least, the counseling records should have been reviewed in camera to determine whether exculpatory [***15] or contradictory information was present. Karlen contends since the record shows Johnston had given varying statements regarding the incidents with which Karlen was charged, the counseling records contain additional evidence that may go to Johnston's credibility or even exonerate Karlen.

[*P29] Karlen was convicted on eight of the fourteen counts in the indictment. Three of these counts involved Johnston: Count X, a conviction for Rape in the Second Degree; Count XII, a conviction for Unauthorized Distribution of a Substance with Moderate Potential for abuse and; Count XIV, a conviction for unauthorized Distribution of a Substance with Moderate Potential for abuse. [7] At trial, Johnston testified regarding these incidents. Johnston admitted he had given several previous statements contrary to his trial testimony. [8]

> 7  As such, we affirm on the remaining counts upon which Karlen was convicted as they do not involve Johnston.

> 8  It is important to note that at the time of each occurrence for which Karlen was charged, Johnston was using marijuana and other drugs to such an extent that he literally passed out. Johnston's testimony depicts his state of mind during the nights the incidents occurred.

> > Q: You would just take all of those drugs?
> >
> > A: Yes.
> >
> > Q: Along with smoking marijuana?
> >
> > A: Yes, sir.
> >
> > Q: How long did that continue . . .?
> >
> > A: Into the night. But I was playing cribbage . . . and I couldn't finish the game.
> >
> > ***
> >
> > Q: So, you couldn't complete a cribbage game?
> >
> > A: No, sir.

Q: Why not?

A: Because I wasn't concentrating very well. My -- I couldn't keep focused in on the game. I was kind of in a zone, I guess.

Q: What do you mean by kind of in a zone, Addison?

A: Being asleep when you're awake. Numbness, unconsciousness while being conscious.

Q: What caused that?

A: The drugs.

[***16]  [**601]  [*P30]  *a. Waiver of privilege under SDCL 19-13-26.*

[*P31]  The State argues the language of SDCL 19-13-21.2 creates a privilege in the student (Johnston) that can only be overcome by waiver. The statute provides, in pertinent part:

> [HN17]No counselor, regularly employed on a full-time basis as a counselor for a private or public college or university in the State of South Dakota, may divulge to any other person, or be examined concerning any information or communication given to the counselor in his official capacity by a client unless:
>
> (1) This privilege is waived in writing by the student; or
>
> (2) The information or communication was made to the counselor for the express purpose of being communicated or of being made public.

Relying solely on the waivers contained within SDCL 19-13-21.2, the State argues no waiver occurred in this case as Johnston did not give Fulda written permission to release the information nor did Johnston provide Fulda with the instructions to publicly communicate the information. However, [HN18]related statutes must be construed together to determine legislative intent. Maynard v. Heeren, 1997 SD 60 P13, 563 N.W.2d 830, 835. Further, [HN19]privileges [***17] are to be construed narrowly as they constitute a barrier to the search for truth. State v. Witchey, 388 N.W.2d 893, 895 (SD 1986) (citing United States v. Nixon, 418 U.S. 683, 710, 94 S. Ct. 3090, 3108, 41 L. Ed. 2d 1039, 1065 (1974)).

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

[*P32] [HN20]SDCL 19-13-26 states:

> A person upon whom *this chapter* con-
> fers a privilege against disclosure waives
> the privilege if he or his predecessor while
> holder of the privilege voluntarily dis-
> closes or consents to disclosure of *any*
> *significant part* of the privileged matter.
> This section does not apply if the disclo-
> sure itself is privileged. (Emphasis
> added).

[HN21]Since 19-13-21.2 is in the same chapter as 19-13-
26, SDCL 19-13-26 provides an additional method of
waiver that is applicable in this case. The record indi-
cates Johnston, prior to trial, discussed the Karlen inci-
dents with his girlfriend, M.J.E., his aunt on two occa-
sions, two members of the faculty, Dr. James Johnson,
and J. D. Ackman, and two other individuals, N.S. and
C.W. Johnston also admitted he discussed the Karlen
matters in some form with Fulda. [9] Therefore, under
SDCL 19-13-26 Johnston has waived his privilege con-
cerning the facts relevant to the charges against Karlen
[***18] as these conversations with third parties cannot
be claimed by themselves to also be privileged.

> 9    The following testimony was brought out by
> the state's attorney in his questioning of Johnston:
>
> Q: What did you tell [M.J.E.]?
>
> A: I had told her that Trey
> Karlen sexually harassed me and
> raped me.
>
> Q: And at that time, [M.J.E.] -
> - she was a student, right?
>
> A: Yes.
>
> Q: What did you -- or did you
> tell anyone in the college admis-
> sion faculty?
>
> A: I told Henry Fulda.

[*P33]  We have held that [HN22]disclosing infor-
mation to a third party destroys the privilege. In State v.
Catch the Bear, 352 N.W.2d 640, 647 (SD 1984)
[HN23]we interpreted SDCL 19-13-26 to invoke waiver
if the client voluntarily discloses the contents of the
communication to a third party. *See also* State v. McKer-
cher, 332 N.W.2d 286 (SD 1983) (statements made by
defendant in a telephone conversation with his wife
while he was detained in jail were not confidential, were

not protected by the spousal privilege and were admissi-
ble, since the statements [***19]  were not made pri-
vately or intended to go undisclosed to any other person).
Johnston's multiple disclosures prevent him from claim-
ing as privileged any conversation he had with Fulda
regarding Karlen.

[*P34]  This statutory policy is constitutionally ap-
propriate. The State is seeking to convict Karlen and thus
is using the privilege as a sword in that prosecution, not
as a shield to protect itself and its citizen from an action
by Karlen against them. *Cf. Maynard, 1997 SD 60 at
P16, 563 N.W.2d at 836.*

[**602]

> We have elected to employ an adversary
> system of criminal justice in which the
> parties contest all issues before a court of
> law. The need to develop all relevant facts
> in the adversary system is both fundamen-
> tal and comprehensive. The ends of
> criminal justice would be defeated if
> judgments were to be founded on a partial
> or speculative presentation of the facts.
> The very integrity of the judicial system
> and public confidence in the system de-
> pend on full disclosure of all the facts,
> within the framework of the rules of evi-
> dence. [HN24]To ensure that justice is
> done, it is imperative to the function of
> courts that compulsory process be avail-
> able for the production of evidence
> needed [***20]  either by the prosecution
> or the defense . . . . Whatever [the privi-
> leges'] origins, these exceptions to the
> demand for every man's evidence are not
> lightly created nor expansively construed,
> for they are in derogation of the search for
> truth.

*Nixon, 418 U.S. at 709-10, 94 S. Ct. at 3108, 41 L. Ed.
2d at 1064-5.* Before society can force a man to spend a
good portion of his adult life in prison, "it is not too
much to ask that he be allowed access to relevant infor-
mation with which to argue to society he is not guilty of
that charge." Black v. Class, 1997 SD 22, P24, 560
N.W.2d 544, 550.

[*P35]    Thus, the remaining consideration is
[HN25]whether the trial court's refusal to allow inspec-
tion of the Fulda records in some reasonable manner is
harmless error beyond a reasonable doubt. State v. Phil-

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

lips, 489 N.W.2d 613, 617 (SD 1992). The burden of proving harmless error rests with the State. State v. Nelson, 1998 SD 124 P7, 587 N.W.2d 439, 443. Rather than being harmless per se, depending on the contents of the Fulda file, it could be a violation of constitutional dimensions. [10]

> 10    The trial court, when it refused to require production of the documents, stated that SDCL 19-13-26 did not apply as "there was no disclosure of any part of the privileged matter." The record does not support this conclusion. As an example Johnston testified:
>
> > Q: And what did you tell [Ackman] had happened?
> >
> > A: I told him that Trey Karlen had raped me."
>
> Compare with Johnston's description to Fulda in footnote 9: "Trey Karlen sexually harassed and raped me."

[***21] [*P36] *b. Confrontation Clause.*

[*P37] [HN26]The Sixth Amendment of the United States Constitution provides, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const amend VI. The South Dakota Constitution provides similar protections: "[HN27]In all criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face . . . ." SD Const art VI, § 7. [HN28]The so-called Confrontation Clause provides two specific protections for criminal defendants. Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998, 94 L. Ed. 2d 40, 53 (1987). The first is being the right to face his accusers and the second is the right to cross-examine those who testify against him. *Id.*

[*P38]  It is well settled that [HN29]the right to cross-examine is not absolute. *Id.* at 53, 107 S. Ct. at 999, 94 L. Ed. 2d at 54-5. [HN30]The ability to cross-examine witnesses does not include the power to compel production of all information that *may* be useful to the defense. "[HN31]The Confrontation Clause only guarantees an opportunity for [***22] *effective* cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 53, 107 S. Ct. at 999, 94 L. Ed. 2d at 54 (emphasis added). Therefore, we must consider whether Karlen was denied an opportunity for effective cross-

examination because he could not use the privileged information to cross-examine Johnston.

[*P39]  [HN32]When it comes to the production of material covered under a statutory privilege, the defendant will often not be able to access the privileged information. "Every privilege limits the evidence available in the judicial fact-finding process." Maynard, 1997 SD 60 at P8, 563 N.W.2d at 833 (citation omitted). [HN33]The public has an interest in protecting such information as it encourages patients to be open and candid with their counselors. *Id.* However, it is a basic provision of American jurisprudence that a statutory [**603] provision never be allowed to trump a Constitutional right. "The Constitution is the mother law . . . . Statutes must conform to the Constitution, not vice versa." Beals v. Pickerel Lake Sanitary Dist., 1998 SD 42, P36, 578 N.W.2d 134, 142 (Sabers, J. dissenting and alternatively concurring [***23] in result) (citing Poppen v. Walker, 520 N.W.2d 238, 242 (SD 1994) (quoting Cummings v. Mickelson, 495 N.W.2d 493, 507 (SD 1993) (Henderson, J., concurring in part and dissenting in part)).

[*P40]  In *Ritchie* the Supreme Court considered the question of whether a state's interest in the confidentiality of its child abuse investigation files must yield to a defendant's Sixth and Fourteenth Amendment right to discover favorable evidence. In that case, the defendant was charged with the rape of his minor child. He had subpoenaed Child and Youth Services (CYS) to disclose a file related to the charge and certain other records. *Id.* at 43, 107 S. Ct. at 994, 94 L. Ed. 2d at 48. CYS refused, claiming that under a Pennsylvania statute the records were privileged. *Id.* The trial court refused to compel disclosure. *Id.* at 44, 107 S. Ct. at 994, 94 L. Ed. 2d at 49. This particular statute provided several exceptions to the privilege, one being the material would be disclosed to a court of competent jurisdiction pursuant to a court order. 480 U.S. at 43-44, 107 S. Ct. at 994, 94 L. Ed. 2d at 49. The judge denied the defendant's motion to compel production. *Id.* at 44, 107 S. Ct. at 994, 94 L. Ed. 2d at 49. [***24]

[*P41]  The Supreme Court considered Ritchie's claim that he was denied his right to cross-examine the witness. The Court noted that [HN34]the Confrontation Clause does not create a "constitutionally compelled rule of pretrial discovery." *Id.* 480 U.S. at 52, 107 S. Ct. at 999, 94 L. Ed. 2d at 54. "[HN35]The Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 53, 107 S. Ct. at 999, 94 L. Ed. 2d at 55. The Court found that [HN36]due process principles required an in camera review of privileged material. 480 U.S. at 56-7, 107 S. Ct. at 1001-2, 94 L. Ed. 2d at 57-8. This was especially true when the evidence was material.

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

_Id._ at 57, 107 S. Ct. at 1001, 94 L. Ed. 2d at 57. The
Court defined material evidence:

> Evidence is material only if there is a
> reasonable probability that, had the evi-
> dence been disclosed to the defense, the
> result of the proceeding would have been
> different. A 'reasonable probability' is a
> probability sufficient to undermine confi-
> dence in the outcome.

_Id._ [11]

11    Furthermore, many courts of competent ju-
risdiction have used the _Ritchie_ analysis to allow
a criminal defendant an in camera inspection of
privileged information. _See_ In re Robert H., 199
Conn. 693, 509 A.2d 475 (1986) (in camera in-
spection of records of sexual assault counselor
should be conducted to determine whether con-
sistent and relevant statements of the victim
should be disclosed to defendants); State v. Le-
duc, 40 Conn. App. 233, 670 A.2d 1309 (1996)
(remanded as defendant was entitled to an in
camera inspection of confidential records from
department of children and families); People v.
Stanaway, 446 Mich. 643, 521 N.W.2d 557
(1994) (where defendant can establish reasonable
probability that privileged records are likely to
contain material information necessary to de-
fense, in camera review of those records must be
conducted to ascertain whether they contain evi-
dence that is reasonably necessary to defense);
State v. Paradee, 403 N.W.2d 640 (Minn 1987)
(defendant, who was charged with criminal sex-
ual conduct, moved for discovery of human ser-
vices and welfare department records, the court
held that evidence requested by the defendant
should be viewed in camera by the court to de-
termine whether information contained therein is
relevant to defense prior to releasing privileged
information); State v. Shiffra, 175 Wis. 2d 600,
499 N.W.2d 719 (1993) (defendant had made a
preliminary showing of materiality so as to entitle
him to pretrial in camera inspection of victim's
mental health treatment records); _but see_ State v.
Ermatinger, 752 S.W.2d 344 (MoAppEd 1988)
(physician-patient privilege protected victim's
conversations with treating psychiatrist).

[***25]  [*P42]  A case that is also instructive is
Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed.
2d 347 (1974). In _Davis_ the defendant sought to intro-
duce information regarding the prosecution witness' pro-
bation status following an adjudication of juvenile delin-

quency. _Davis_, 415 U.S. at 310-1, 94 S. Ct. at 1108, 39
L. Ed. 2d at 350-1. The defendant sought to show that
the witness acted out of fear or concern of possible jeop-
ardy to his probation and might have made a faulty iden-
tification of the defendant to shift suspicion  [**604]
away from himself. _Id._ at 311, 94 S. Ct. at 1108, 39 L.
Ed. 2d at 351. The trial court refused the defendant's re-
quest based on state provisions protecting the anonymity
of juvenile offenders. [12] _Id._ at 311, 94 S. Ct. at 1108, 39
L. Ed. 2d at 351.

12    This statute provided:

> The commitment and placement of a child
> and evidence given in the court are not admissi-
> ble as evidence against the minor in a subsequent
> case or proceeding in any other court . . . .

Alaska Stat § 47.10.080(g) (repealed, § 55
ch 59 SLA 1996).

[***26]  [*P43]  The Supreme Court found that the
trial court's refusal to allow Davis to present evidence
regarding the witness' probation status and his possible
motivations for identifying the defendant denied him his
constitutional right to confront witnesses, notwithstand-
ing the state's policy protecting the anonymity of juvenile
offenders. The Court arrived at this conclusion by first
considering the purpose of the right of cross-examination
that stems from the Confrontation Clause.

> [HN37]Cross-examination is the princi-
> pal means by which the believability of a
> witness and the truth of his testimony are
> tested. Subject always to the broad discre-
> tion of a trial judge to preclude repetitive
> and unduly harassing interrogation, the
> cross-examiner is not only permitted to
> delve into the witness' story to test the
> witness' perceptions and memory, but the
> cross-examiner has traditionally been al-
> lowed to impeach, i.e., discredit, the wit-
> ness.

_Id._ at 316, 94 S. Ct. at 1110, 39 L. Ed. 2d at 353. The
Court weighed the state's interest in protecting a juvenile
offender and the defendant's right to cross-examine the
witness and found that "the State's policy interest in pro-
tecting the confidentiality [***27]  of a juvenile of-
fender's record cannot require yielding of so vital a con-
stitutional right as the effective cross-examination for
bias of an adverse witness." _Id._ at 320, 94 S. Ct. at 1112,
39 L. Ed. 2d at 356. [13]

13    Contrary to the argument advanced by the
South Dakota Board of Regents in its amicus

brief, Montana v. Egelhoff, 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) and United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998) do not modify Davis or Ritchie. Rather Engelhoff and Scheffer focus on whether the exclusion of evidence is unconstitutional as it has "infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at    , 118 S. Ct. at 1264, 140 L. Ed. 2d at 419. In Scheffer and Engelhoff the defendants were fully aware of the nature of the evidence they sought to place before the trier of fact. Karlen points out he has not even been allowed an in camera inspection by the trial court to determine if the file contained items that would be exculpatory, let alone full access by Karlen to the Fulda file on Johnston.

[***28]   [*P44]  Karlen claims that by quashing the subpoena duces tecum regarding Johnston's counseling records, the trial court has denied him access to information crucial to prepare his defense, and therefore, interfered with his right to *effectively* cross-examine Johnston. There is no dispute that Johnston has given several different renditions as to what occurred and that he was under the strong influence of alcohol and drugs at the time the incidents allegedly took place. If Karlen were allowed access to the counseling file, he may indeed discover that Johnston also gave a different version to Fulda. This is extremely important in this case, and in any sexual assault case, as this goes to Johnston's credibility. Credibility was the key issue at trial since the only evidence from which the jury made its determination to convict Karlen on the three counts was the credibility of Johnston's testimony verses Karlen's testimony. Based on the record before us, this is not a general attack on Johnston's credibility but "directed toward revealing possible biases, prejudices, or ulterior motives . . . as they may relate directly to issues or personalities in the case at hand." State v. [***29] Sprik, 520 N.W.2d 595, 600 (SD 1994) (citing State v. Rough Surface, 440 N.W.2d 746, 752 (SD 1989)). If there was yet another version of the facts in Johnston's counseling records or an indication that the trial testimony was an outright falsehood, there is a 'reasonable probability' that had the evidence been disclosed to the jury, the outcome as to the three counts would have been different.

[*P45]   Requiring full disclosure of Johnston's counseling records, however, would run the risk of creating a chilling effect on patient-counselor relationships. There may be substantial portions of the Fulda records [**605] which have nothing to do with Karlen and may concern individuals totally unconnected with this case. The purpose of the relationship between a student and a counselor would be hampered if all confidential material had to be turned over upon the defendant's demand.

[HN38]There are methods used to strike a balance in the tension that exists between rights of the accused and the confidences of the patient. A just compromise is an in camera inspection of all relevant records, performed by the trial court. Sprik, 520 N.W.2d at 600. Cf. Maynard, 1997 SD 60 at P15, 563 N.W.2d at 835-6. Other [***30] states have allowed in camera inspection of privilege material. Scurry v. State, 701 So. 2d 587 (FlaApp2Dist, 1997) (defendant was entitled to compel production of victim's Department of Health and Rehabilitative Services records for court to conduct an in camera review and determine whether information contained within was necessary to his defense, although it may be a fishing expedition the records may contain some relevant information). At oral argument Karlen stated he would be satisfied with an in camera inspection conducted by the trial court.

[*P46]   As Karlen may have been denied his right to effectively cross-examine the witness against him and Johnston has waived his privilege under SDCL 19-13-26, we remand to the trial court with instructions. Karlen has shown a reasonable probability that the records may contain material evidence based on Johnston's own testimony and pre-trial statements. Karlen is entitled to have Fulda's file reviewed by the trial court in camera. Sprik, 520 N.W.2d at 599-600. The trial court should make a determination of what the file contains concerning Johnston's discussions of Karlen. Copies of only those relevant portions of Fulda's notes should [***31] be furnished to Karlen and the State. After hearing each party's position, the trial court should determine whether the failure to give Karlen access to the relevant portion of the notes created a reasonable probability that the result of the trial would have been different if Karlen was able to use those notes. If it does, Karlen must be given a new trial only on those counts and be allowed access to *only* the parts of the file material to his defense at retrial.

[*P47]  **4. The trial court did not err in denying the motion for acquittal on Count IV.**

[*P48]   At the close of the State's case, Karlen moved for judgment of acquittal on count four of the indictment, a violation of SDCL 22-22-7.4, sexual contact without consent with person capable of consenting. The trial court denied the motion. Karlen argues the motion should have been granted, because the State failed to introduce sufficient evidence to establish the crime charged had been committed, or to establish he was the one who committed the crime. We disagree.

[*P49]  [HN39]The standard of review for denial of a motion for judgment of acquittal is whether the "evidence was sufficient to sustain the convictions." [***32] Larson, 1998 SD 80 at P9, 582 N.W.2d at 17. "[HN40]When reviewing sufficiency of the evidence,

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

this Court considers the evidence in a light most favorable to the verdict." *Jones*, 521 N.W.2d at 672-3 (citing State v. Blalack, 434 N.W.2d 55, 59 (SD 1988)). "[HN41]A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." *Jones*, 521 N.W.2d at 673 (quoting *Blalack*, 434 N.W.2d at 60). "[HN42]We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence." State v. White, 1996 SD 67, P24, 549 N.W.2d 676, 682 (citing State v. Andrews, 393 N.W.2d 76, 80 (SD 1986); State v. Blakey, 332 N.W.2d 729, 731 (SD 1983)).

[*P50]  Here, when viewing the evidence in the light most favorable to the jury's verdict, we find there was sufficient evidence to support it. The evidence established that on March 5 or 6, 1996, Karlen invited Grimsley to his home. Grimsley, who arrived there at about 11:00 p.m., had been drinking before he arrived and continued to drink throughout the evening. Chad Popham, Karlen's roommate, joined Karlen and Grimsley [***33] in the living room to watch movies. However, shortly after the first movie started, Popham went to bed, leaving Karlen and Grimsley alone in the room. Grimsley testified that he [**606] was seated in an armchair, which was in proximity to the couch on which Karlen was seated. Karlen later moved to the floor, near Grimsley's chair. Grimsley also testified that after watching one movie and about forty-five minutes of a second movie, he fell asleep or passed out. When he awakened, the lights were off, the television was turned off, and no one else was around. He found that his lap had been covered with a blanket, which he believed to have been behind or beside the couch earlier in the evening. He further testified that when he stood up, he realized his pants, including his underwear, had been pulled down and that he had ejaculated.

[*P51]  We find this evidence could support a rational theory of guilt. A jury could reasonably find Karlen knowingly engaged in sexual contact with Grimsley, who did not consent to the contact. As this Court has stated, if a "jury could reasonably find the defendant guilty, denial of a motion for acquittal will not be disturbed." *White*, 1996 SD 67 at P24, [***34] 549 N.W.2d at 682.

[*P52]  Affirmed in part and reversed and remanded in part with instructions.

[*P53]  SABERS and AMUNDSON, Justices, concur.

[*P54]  MILLER, Chief Justice, and KONENKAMP, Justice, concur in part and dissent in part.

**CONCUR BY:** MILLER

**DISSENT BY:** MILLER

**DISSENT**

MILLER, Chief Justice (concurring in part and dissenting in part).

[*P55]  I concur with the majority opinion on issues 1, 2, and 4, but respectively dissent as to the majority's opinion on issue 3. I disagree with the majority's holding that Johnston waived his privilege to any conversations he had with Fulda regarding Karlen, and that Karlen is entitled to an in camera review by the trial court of Fulda's records.

[*P56]  Generally, "unless there is a privilege, all relevant information is discoverable." Maynard v. Heeren, 1997 SD 60, P12, 563 N.W.2d 830, 835; *see generally* SDCL 15-6-26. South Dakota specifically recognizes the need for privileged communications between university and college students and their institution-provided counselors. SDCL 19-13-21.2 provides in pertinent part:

> No counselor, regularly employed on a full-time basis as a counselor for a private or public college or [***35] university in the State of South Dakota, may divulge to any other person, or be examined concerning any information or communication given to the counselor in his official capacity by a client unless:
>
>> (1) This privilege is waived in writing by the student; or
>>
>> (2) The information or communication was made to the counselor for the express purpose of being communicated or of being made public.

[*P57]  When interpreting this statute to determine the extent of the privilege, the "'words and phrases in [the] statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed.'" Dahn v. Trownsell, 1998 SD 36, P14, 576 N.W.2d 535, 539 (quoting Moss v. Gut-

1999 SD 12, *; 589 N.W.2d 594, **;
1999 S.D. LEXIS 25, ***

tormson, 1996 SD 76, P10, 551 N.W.2d 14, 17). "This court assumes that statutes mean what they say and that legislators have said what they meant." Mid-Century Ins. Co. v. Lyon, 1997 SD 50, P9, 562 N.W.2d 888, 891 (citing In re Famous Brands, Inc., 347 N.W.2d 882, 885 (SD 1984)). [*P58]

I find the language of SDCL 19-13-21.2 to be clear and unambiguous. [***36] The legislature certainly intended that the information revealed to a full-time counselor at a South Dakota university or college be privileged. In addition, it is clear the legislature intended to prohibit the counselor from being examined about the communication. Further, the student is the holder of the privilege and it can only be waived in one of two ways. The student can waive the privilege in writing or by disclosing the information to the counselor for the express purpose of allowing the counselor to communicate the information to others. These are the sole exceptions provided for in the statute.

[*P59] Neither of those exceptions was present in this case. Johnston elected to seek the services of Dr. Fulda, a full-time [**607] counselor at SDSU. He did not give Fulda written permission to disclose any information, nor did he provide him with information so that he could publicly communicate it. Therefore, Johnston did not waive the privilege provided for in SDCL 19-13-21.2.

[*P60] However, the majority argues that Johnston waived his privilege because he discussed the incidents with third parties as well as Fulda. While I agree that a privilege can be waived by disclosure [***37] to a third party, that waiver did not occur here. Mere conversation regarding the same incident does not constitute a privilege waiver. It requires much more than that. It requires a specific disclosure of the information the privilege holder shared with the counselor. See John W. Larson, South Dakota Evidence § 510.0 (1991) (citing FedREvid 511 (proposed) advisory committee's note) (stating that a privilege, such as the attorney-client privilege, covers the communication, not the subject matter, and that for waiver to occur, the client would have to make a disclosure of the communication itself).

[*P61] Also, the majority cites Pennsylvania v. Ritchie, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), as holding that "due process principles required an in camera review of privileged material." However, Ritchie can easily be distinguished from the instant case.

The record sought in Ritchie was not of a confidential communication between a university student and his counselor but, rather, was an investigative file compiled by a state agency investigating suspected child abuse. In addition, the relevant Pennsylvania statute allowed the file to be available "to a court [***38] of competent jurisdiction pursuant to a court order." See PaStatAnn, Tit 11, § 2215(a)(5) (Purdon Supp 1986). The privilege at issue in Ritchie was qualified, unlike the privilege here, which is absolute. Further, the Ritchie court expressly stated it would offer no opinion as to whether the result would have been different with a statute that forbid anyone from accessing the files, as SDCL 19-13-21.2 does here. 480 U.S. at 58 n14, 107 S. Ct. at 1001 n14, 94 L. Ed. 2d at 57 n14.

[*P62] In addition, no review of Fulda's records is required because Karlen has failed to establish that the records are relevant and contain material information. Karlen argued, without supporting his position, that the records contained statements that are "relevant, exculpatory and important to the defense," and are needed to establish Johnston gave contradictory statements. This general assertion of relevance is not enough to require an in camera review of confidential records. See People v. Dist. Court, City and County of Denver, 719 P.2d 722, 726 (Colo 1986) (stating "the vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim's [***39] anticipated trial testimony does not provide a sufficient basis to justify ignoring the victim's right to rely upon her statutory privilege"); People v. Stanaway, 446 Mich. 643, 521 N.W.2d 557, 576 (Mich 1994) (stating Stanaway's general assertion that the records were needed to attack an accuser's testimony "falls short of the specific justification necessary to overcome the privilege" and "without a more specific request, defendant is fishing").

[*P63] Moreover, SDCL 19-13-21.2 does not prevent all cross-examination of Johnston. In fact, Karlen had ample opportunity to fully cross-examine Johnston about his allegations and any inconsistent statements he may have made. Fulda's records were not needed to serve that purpose.

[*P64] For the above reasons, I respectfully dissent on issue 3.

[*P65] I am authorized to state that Justice Konenkamp joins in this special writing.

# TAB 18

LEXSEE



Positive
As of: May 25, 2007

STATE OF MONTANA, Plaintiff and Respondent, v. DALE STATCZAR, Defendant and Appellant

No. 85-550

Supreme Court of Montana

228 Mont. 446; 743 P.2d 606; 1987 Mont. LEXIS 1018

June 10, 1987, Submitted
October 6, 1987, Decided

**PRIOR HISTORY:**    [***1]  **Appeal from the District Court of Missoula County. Fourth Judicial District. Hon. Douglas Harkin, Judge Presiding.**

**DISPOSITION:**    Reversed and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant sought review of the decision of the District Court of Missoula County (Montana), which convicted defendant of sexual intercourse without consent following the rape of a woman in a car in the parking lot of a convenience store.

**OVERVIEW:** The victim was dragged to a car and raped. The victim recalled that the rapist had a plastic bag on his thigh. The victim identified defendant, who wore a urine collection bag for impotency, in a lineup. Defendant, who had a 75 I.Q., was declared unfit to proceed to trial. The decision was reversed and defendant was tried twice, resulting in his conviction for sexual intercourse without consent. On appeal, the court reversed. The court held that defendant's attorney-client privilege was violated when defendant's former attorney testified that defendant had given him conflicting alibis. The court ruled that only defendant was permitted to waive the privilege, and that defendant had not done so. The court further stated that defendant's psychiatrist-patient privilege was violated when the state's psychiatrist testified to defendant's knowledge of the incriminating evidence against him because the testimony did not go to defendant's competency. The court finally held that substantial evidence supported defendant's fitness to pro-

ceed to trial and that the prosecutor's statement of personal opinion did not unduly prejudice defendant.

**OUTCOME:** The court reversed defendant's conviction for sexual intercourse without consent.

**CORE TERMS:** competency hearing, attorney-client, proceed to trial, waive, fitness, closing argument, assailant, self-incrimination, bag, defense counsel's, inconsistent statements, mental condition, above-mentioned, confidential, privileged, jacket, hung, motorcycle accident, court-appointed, line-up, dark, evidence support, crime charged, consistency, admissible, phone call, prosecutorial, impression, telephone, cigarettes

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Defenses > Alibi*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN1]The attorney-client privilege is defined in Mont. Code Ann. § 26-1-803: An attorney cannot, without the consent of his client, be examined as to any communication made by his client to him or his advice given thereon in the course of his professional employment.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

Case 1:04-cv-01494-JJF   Document 196-4   Filed 05/25/2007   Page 53 of 58

228 Mont. 446, *; 743 P.2d 606, **;
1987 Mont. LEXIS 1018, ***

*Evidence > Privileges > Marital Privileges > Adverse Spousal Testimony > Waiver*

[HN2]Mont. Code Ann. § 26-1-803 provides that an attorney cannot be examined regarding confidential communications made in the course of employment without the consent of his client. Accordingly, only the client can waive the privilege.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel*

*Evidence > Privileges > Attorney-Client Privilege > Elements*

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

[HN3]A client may waive the attorney-client privilege: If the client elicits testimony from the lawyer-witness as to privileged communications this obviously would waive as to all consultations relating to the same subject, just as the client's own testimony would. Waiver is defined as the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right. The burden of establishing waiver of the privilege is on the party seeking to overcome the privilege. Two elements must be considered when a court reviews the waiver of an attorney-client privilege: (1) the element of a client's implied intention and (2) the element of fairness and consistency.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Evidence > Privileges > Marital Privileges > Adverse Spousal Testimony > Waiver*

[HN4]An implied waiver must be supported by evidence showing that defendant, by words or by conduct, has impliedly forsaken his privilege of confidentiality with respect to the communication in question.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Remain Silent > Self-Incrimination Privilege*

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

*Governments > Legislation > Statutory Remedies & Rights*

[HN5]A defendant's right against self-incrimination need not be surrendered in order to assert a statutory right. Mont. Code Ann. § 46-14-103.

*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Remain Silent > Self-Incrimination Privilege*

[HN6]Mont. Const. art. II, § 26 provides in part: No person shall be compelled to testify against himself in a criminal proceeding.

*Evidence > Privileges > Psychotherapist-Patient Privilege*

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*

*Evidence > Scientific Evidence > Psychiatric & Psychological Evidence*

[HN7]Mont. Code Ann. § 46-14-401 provides in part: A statement made for the purpose of psychiatric examination or treatment provided for in Mont. Code Ann. ch. 46 by a person subjected to such examination or treatment is not admissible in evidence against him in any criminal proceeding on any issue other than that of his mental condition. It is admissible on the issue of his mental condition, whether or not it would otherwise be considered a privileged communication, unless it constitutes an admission of guilt of the crime charged.

*Evidence > Privileges > Psychotherapist-Patient Privilege*

*Evidence > Scientific Evidence > Psychiatric & Psychological Evidence*

[HN8]A defendant's admissions and confessions, when made as a privileged communication to a psychiatrist, are protected and therefore inadmissible.

*Criminal Law & Procedure > Pretrial Motions > Competency to Stand Trial*

[HN9]Fitness to proceed is defined as: The test is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him.

*Criminal Law & Procedure > Pretrial Motions > Competency to Stand Trial*

*Criminal Law & Procedure > Defenses > Insanity > Insanity Defense*

*Criminal Law & Procedure > Sentencing > Mental Incapacity*

[HN10]Mont. Code Ann. § 46-14-103 provides: No person who, as a result of mental disease or defect, is unable to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures.

*Criminal Law & Procedure > Pretrial Motions > Competency to Stand Trial*

[HN11]Fitness to proceed to trial is a matter largely within the discretion of the district court. Mont. Code Ann. §§ 46-14-202 through 46-14-222.

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*

[HN12]An appellate court will not overturn a decision of the district court in the absence of a clear abuse of discretion. The evidence may conflict, but it is substantial if any reasonable trier of fact could rely upon the evidence in support of its conclusion.

**COUNSEL:** William Boggs argued, Ferguson & Mitchell, Paulette C. Ferguson, Missoula, for defendant and appellant.

Mike Greely, Atty. Gen., Kimberly Kradolfer argued, Asst. Atty. Gen., Helena, Roberts Deschamps, III, Co. Atty., Missoula, Karen Townsend argued, Deputy Co. Atty., for plaintiff and respondent.

**JUDGES:** Mr. Chief Justice Turnage delivered the Opinion of the Court. Mr. Justices Harrison, Sheehy, Weber, Hunt, Gulbrandson and McDonough concur.

**OPINION BY:** TURNAGE

**OPINION**

[*448] [**607] Defendant Dale Statczar appeals his conviction for sexual intercourse without consent. Defendant was charged by information on November 18, 1983. In January 1984, defendant was found unfit to proceed to trial in a competency hearing held pursuant to Section 46-14-221, MCA. Following a second competency hearing in September 1984, the court reversed its earlier decision and found defendant Statczar fit to proceed to trial. Defendant's first trial in April, 1985 resulted in a hung jury. Defendant was convicted following his second trial in [***2] May and June, 1985. He was sentenced to twenty years in the Montana State Prison with fifteen years suspended.

[**608] We reverse.

Ten issues are presented for our review. Because we are reversing defendant's conviction, we limit our review to the following issues:

(1) Did the District Court err when it permitted the defendant's former attorney, John Riddiough, to testify at trial?

(2) Did the District Court violate defendant's right against self-incrimination when it permitted the State to call Dr. William Stratford to testify against defendant?

(3) Does substantial evidence support the District Court's determination that defendant was fit to proceed to trial?

(4) Did the District Court err when it denied defendant's motion for a mistrial based on alleged improper prosecutorial comments during closing argument?

The victim, J. R., testified as follows. In the early morning hours of October 16, 1983, she was attacked by two men outside a Circle K store located on Russell and Longstaff Streets in Missoula. Moments prior to the attack, J.R. made a phone call to her boyfriend, Lane Cunningham. J.R. and Cunningham argued during the telephone conversation. Cunningham eventually [***3] hung up on J.R.. While J.R. was redialing Cunningham's phone number, the defendant approached her and asked if he could borrow some cigarettes. J.R. refused. After Cunningham hung up on J.R. a second time, she walked to her car for money for additional phone calls and more cigarettes. J.R.'s car was parked beside the Circle K store. As J.R. approached her car, two men grabbed her from behind and dragged her to another vehicle. She recognized one of her assailants as the man who had earlier asked for cigarettes.

After J.R. was dragged to the other vehicle, one of her assailants [*449] held her down, while the defendant moved on top of her. J.R. stated she was raped with an artificial device, "a penis that wasn't real." She also testified that the artificial penis was shoved into her mouth and she described biting it and causing no reaction in the defendant. J.R. was able to determine that defendant was wearing "some sort of bag" along his thigh. Finally, J.R. testified the defendant inserted several smooth stones in her vagina after defendant's accomplice asked if "he'd gotten his rocks off yet." J.R. was further assaulted and threatened by the two men before being pushed [***4] from the car. Testimony at trial established the above-mentioned attack took place between 2:30-3:00 a.m., with the most likely time of attack at 2:45 a.m.

At 3:14 a.m., 911 received a call from a woman who requested to remain anonymous, stating that she witnessed, approximately one-half hour previously, a rape or its aftermath at the Circle K store on Grant Avenue and South Avenue. The anonymous caller stated the victim had left the crime scene in a car. The caller further stated that she followed the victim to 14th Street, where the victim parked her car and disappeared on foot. The informant stated she stopped, looked in the car, and found a purse containing a slip of paper with two telephone numbers. She recited the numbers to the 911 op-

Case 1:04-cv-01494-JJF     Document 196-4     Filed 05/25/2007     Page 55 of 58

228 Mont. 446, *; 743 P.2d 606, **;
1987 Mont. LEXIS 1018, ***

erator. The telephone numbers belonged to Lane Cunningham and Delores Remo. In response to the call, a patrol car was dispatched to the Circle K at Grant Avenue and South Avenue. The officers found no evidence of a disturbance.

At 4:35 a.m., J.R. placed a call to 911. She reported that she was attacked after making a phone call at the Circle K store on Grant Avenue and South Avenue. Missoula City Police Officer Don Millhouse responded [***5] to J.R.'s call at 4:54 a.m. J.R. reported to Millhouse that she had "recovered" her car and purse. J.R. then changed her statement and told Officer Millhouse she was attacked near another Circle K store at Russell and Longstaff.

J.R. was taken to St. Patrick's Hospital. She was examined by emergency room personnel. J.R. had scratches around the chest, abdomen, and breasts and dirt around the perineal area, and "five roundish stones in the vagina, ranging in size from a quarter of one inch to two inches."

Later that afternoon J.R. told Detective Pete Lawrenson that her assailant was a white male, twenty-five to thirty years of age, 5'6" to 5'8" in height, with bushy [**609] sideburns and a mustache. She also stated that he had a plastic-like bag attached to his leg. She described the [*450] assailant's vehicle as a dark colored "car-like truck." The assailant was wearing a dark jacket with something silver, perhaps buttons, on the shoulder.

Detective Lawrenson contacted each Missoula urologist for information concerning a person matching this description. Dr. Bryan Olson responded that defendant Dale Statczar matched the above-mentioned description.

Detective Lawrenson [***6] presented J.R. with a six-person photo line-up including Statczar's photograph. J.R. identified defendant Statczar as her assailant.

Defendant was arrested eighteen days after the crime, on November 3, 1983. A dark blue Chevrolet "El Camino" belonging to defendant Statczar's brother was found outside defendant's home. Law enforcement personnel did not conduct a forensic test of the vehicle's interior. A search warrant for defendant's residence led to the State of seizure of a dark jacket with silver buttons and a plastic syringe which the defendant used for maintenance of his urine bag.

Defendant Statczar, at the time of his arrest, was twenty-three years old. When Statczar was nineteen years old, he was involved in a motorcycle accident leaving him impotent, without urinary function and with a stiff and disfigured left leg. Statczar spent approximately one and one-half years at St. Patrick's Hospital in Missoula recovering from his injuries. Testimony revealed

that prior to his motorcycle accident Statczar possessed severe learning disabilities.

Statczar was sent on November 3, 1983, to the Montana State Hospital at Warm Springs for evaluation of his fitness to proceed. [***7] On January 18, 1984, following examination by Dr. Harry Xanthopoulos, chief psychiatrist at the Montana State Hospital, and Dr. Roy Hamlin, psychologist, the court found defendant unfit to proceed to trial.

A second competency hearing was held on September 14, 1984. Dr. William Stratford testified for the State. Dr. Xanthopoulos and defendant's attorney John Riddiough testified for defendant. The court found defendant competent and fit to proceed.

A three-week trial, held in April, 1985, resulted in a hung jury. A second trial, held from May 21 to June 5, 1985, resulted in defendant's conviction.

*Issue 1*

Did the District Court err when it permitted defendant's attorney, John Riddiough, to testify at trial?

[*451] During the September 14, 1984, competency hearing, defendant's second court-appointed attorney, John Riddiough, called himself to the witness stand. Riddiough testified in narrative form that he had great difficulty communicating with defendant Statczar. Riddiough stated that defendant had told him three different alibis concerning his whereabouts during the night and early morning hours of October 15 and 16, 1983. Riddiough testified, "Statczar related [***8] to me that he had little or no recollections of giving the previous stories . . ." Riddiough also testified that Statczar did not appreciate the significance of the varying alibi stories:

"My impression was that he believed wholeheartedly in the story that he had given me. My impression was that he was not giving me a story to attempt to come up with a better alibi as it were. He gave me the impression that, frankly, he seemed surprised when I confronted him with the previous alibi stories."

During Riddiough's testimony, Statczar remained seated at defense counsel's table. Defendant was not called to testify and did not object to Riddiough's testimony.

During the second competency hearing on September 14, 1984, Dr. Xanthopoulos and Dr. Hamlin testified that Statczar was suffering from organic personality syndrome, that he had an IQ of 75, and that he was functioning at a "borderline level." When asked what a judge's role is at trial, Statczar responded, "The judge is to wear a black robe and sit in front of the courtroom."

[**610] Riddiough withdrew as defense counsel following the District Court's finding that defendant was competent to stand trial. Riddiough was subsequently [***9] called to testify for the State. At trial, Riddiough testified that defendant had given three different statements concerning his whereabouts on the night and early morning of October 15 and 16, 1983. Riddiough testified that defendant made the following inconsistent statements: (1) that defendant went to a movie with his brother and sister-in-law in Missoula and (2) that he went to a birthday party with relatives in Ronan, and (3) that he stayed home alone in Charlo. During closing arguments, the State referred to Riddiough's testimony and argued that defendant had "lied" to his own attorney.

At trial, Riddiough was limited by the court to testifying that he had been defendant's court-appointed counsel and that defendant had made the above-mentioned inconsistent statements. The court prohibited defense counsel from asking, and Riddiough from responding to, questions which defendant contends would explain his [*452] inconsistent statements. The court prohibited Riddiough from testifying that his interviews with defendant took place in Warm Springs State Hospital, that Riddiough felt defendant was mentally deficient and unable to comprehend the proceedings and that Riddiough [***10] did not believe defendant was lying.

Defendant contends that Riddiough's testimony at the second competency hearing constituted a breach of his attorney-client privilege. [HN1]The attorney-client privilege is defined in Section 26-1-803, MCA:

"An attorney cannot, without the consent of his client, be examined as to any communication made by his client to him or his advice given thereon in the course of his professional employment."

A careful review of the record reveals that defense counsel Riddiough violated his confidential relationship with his client, Dale Statczar, when he offered testimony of Statczar's conflicting alibi statements. At the September 14, 1984, competency hearing, Riddiough called himself to the witness stand and stated: "I'm making this statement -- because it is a breach of the attorney-client privilege -- because I feel it is necessary to make this statement." [HN2]Section 26-1-803, MCA, provides that an attorney cannot be examined regarding confidential communications made in the course of employment "without the consent of his client." Accordingly, only the client can waive the privilege. _State v. Iwakiri_ (1984), 106 Idaho 618, 621, 682 P.2d 571, 574. We find [***11] no evidence that defendant Statczar consented to Riddiough's voluntary disclosure of defendant's confidential statements.

The State contends that, by failing to object to Riddiough's testimony, defendant waived the attorney-client

privilege. [HN3]A client may waive the attorney-client privilege:

"If the client elicits testimony from the lawyer-witness as to privileged communications this obviously would waive as to all consultations relating to the same subject, just as the client's own testimony would."

McCormick, _Evidence_ Section 93 at 225.

Defendant claims that he did not waive his attorney-client privilege. Waiver is defined as the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right. _Kuiper v. District Court_ (1981), 632 P.2d 694, 698, 38 St.Rep. 1288. The burden of establishing waiver of the privilege is on the party seeking to overcome the privilege. _Miller v. Dis. Ct. City and Cty of Denver_ (Colo. 1987), 737 P.2d 834, 838. [*453] Two elements must be considered when a court reviews the waiver of an attorney-client privilege: (1) the element of a client's implied intention and (2) the element of [***12] fairness and consistency. See, 8 Wigmore, _Evidence_ Section 2327 at 636; _State v. Balkin_ (1987), 48 Wash.App. 1, 737 P.2d 1035, 1037.

[HN4]An implied waiver must be supported by evidence showing that defendant, by words or by conduct, has impliedly forsaken his privilege of confidentiality with respect to the communication in question. _Miller v. Dis. Ct., City and Cty of Denver_, 737 P.2d at 838. The State has not provided [**611] this Court with evidence that defendant intended to waive his attorney-client privilege. Defendant did not testify in either competency hearing or in either trial. Defendant was not asked whether he waived his attorney-client privilege for the competency hearing or for all further judicial proceedings.

The second part of Wigmore's waiver test concerns consistency and fairness. We note that defendant Statczar had no prior contact with the judicial system. Given defendant's mental capacity and unfamiliarity with courtroom procedure, we hold it is inherently unfair to require the defendant, under the specific facts before us, to object to his attorney's testimony at the competency hearing in order to prevent his confidential statements from [***13] being used against him at trial. We note that at trial, defendant's newly court-appointed counsel strenuously objected to Riddiough's testimony.

We hold the following factors prejudiced defendant's right to a fair trial: (1) Riddiough's testimony of defendant Statczar's inconsistent statements was extremely prejudicial with limited probative value.  Rule 403, M.R.Evid.  (2) The State presented no evidence that Statczar intended to waive his right not to divulge this privileged information.  (3) [HN5]Defendant's right against self-incrimination need not be surrendered in

Case 1:04-cv-01494-JJF    Document 196-4    Filed 05/25/2007    Page 57 of 58

228 Mont. 446, *; 743 P.2d 606, **;
1987 Mont. LEXIS 1018, ***

order to assert a statutory right. Section 46-14-103, MCA; *Simmons v. United States (1968), 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259*. We hold that fairness and consistency coupled with the lack of evidence that defendant intended to waive the privilege requires us to reverse defendant's conviction.

### Issue 2

Did the District Court violate defendant's right against self-incrimination when it permitted the State to call Dr. William Stratford to testify against defendant?

Defendant claims that his right against self-incrimination was violated [*454] when the court permitted the State [***14] to call Dr. William Stratford on rebuttal and allowed him to testify to statements made by defendant. The testimony in issue concerns defendant's recollection of events and defendant's factual understanding of the case. Stratford examined defendant on June 28, 1984, and on September 13, 1984. The State called Stratford to testify at defendant's second competency hearing on September 14, 1984, and at both of defendant's trials.

[HN6]Article II, Section 26, 1972 Mont. Const., provides in pertinent part: "No person shall be compelled to testify against himself in a criminal proceeding."

At defendant's second trial, Dr. Stratford testified:

"Q. (By Ms. Townsend) What was he able to tell you, Doctor, with reference to [defendant's] knowledge of some of the kinds of evidence that had been collected in this investigation?

"Mr. Boggs: Objection, Hearsay, irrelevant.

"The Court: Overruled.

"A. [Defendant's] understanding, that is, what he portrayed to me, I can tell you. Whether it was truthful or not, of course, is for the jury to decide.

". . .

"A. Okay. [Defendant] indicated there were particular kinds of automobiles, or a type of automobile involved. He indicated there was [***15] a particular kind of jacket that may be involved by the person who did this, that the individual involved had a colostomy bag, that there was a particular timing sequence, and that there will be a line-up, not a physical line-up, but as he referred to it, a photographic line-up. These were some of the factors that he indicated."

In its closing argument, the State referred to Stratford's testimony that defendant had knowledge of important and incriminating evidence.

[HN7]Section 46-14-401, MCA, provides in pertinent part:

"*A statement made for the purpose of psychiatric examination* or treatment provided for in this chapter by a person subjected to such examination or treatment *is not admissible in evidence against him in any criminal proceeding . . . on any issue other than that of* [**612] *his mental condition. It is admissible on the issue of his mental condition*, whether or not it would otherwise be considered a privileged communication, *unless it constitutes an admission of guilt of the crime charged.*" [Emphasis added.]

Earlier we held that [HN8]a defendant's admissions and confessions, [*455] when made as a privileged communication to a psychiatrist, are protected [***16] and therefore inadmissible. *State v. Clark (Mont. 1984), [209 Mont. 473,] 682 P.2d 1339, 1352, 41 St.Rep. 833, 848*. At trial, Dr. Stratford was permitted to testify that defendant's mental capacity enabled him to recall certain elements of the State's case against the defendant. Stratford's testimony is generally admissible because defendant has placed his mental condition at issue. However, Stratford's testimony of defendant's recall of the incriminating evidence (automobile, jacket, colostomy bag) comes dangerously close to violating defendant's right against self-incrimination. See, Section 46-14-401, MCA, and Article II, Section 26, 1972 Mont. Const.

Since we are reversing defendant's conviction due to a violation of defendant's attorney-client privilege, we are not required to decide this issue. However, we caution the District Court to refrain from admitting evidence of defendant's mental condition which implies or constitutes an admission of guilt of the crime charged. Section 46-14-401, MCA.

### Issue 3

Does substantial evidence support the District Court's determination that defendant was mentally competent to proceed to trial?

Defendant contends the District [***17] Court abused its discretion when it determined defendant was fit to proceed to trial. [HN9]Fitness to proceed is defined as:

"The test [is] whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him."

*State v. Austad (1981), 197 Mont. 70, 78, 641 P.2d 1373, 1378*, citing *Dusky v. United States (1960), 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825*.

Case 1:04-cv-01494-JJF   Document 196-4   Filed 05/25/2007   Page 58 of 58

228 Mont. 446, *; 743 P.2d 606, **;
1987 Mont. LEXIS 1018, ***

[HN10]Section 46-14-103, MCA, provides:

*No person who*, as a result of mental disease or defect, *is unable to understand the proceedings against him or to assist* in his *own defense* shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures." [Emphasis added.]

Defendant contends "eyewitness identification, alibi and statements attributed to the defendant comprised the core of the [State's] case." In *Austad*, 197 Mont. at 79, 641 P.2d at 1378, we held that if physical evidence comprises the core of the State's case, defendant's fitness to proceed might hamper "preparation and preservation [*456] [***18] of the defense." Therefore, defendant argues his defense was clearly hindered by his lack of fitness to assist and prepare his defense. Defendant cites testimony of John Riddiough, Dr. Henry Xanthopoulos, Dr. Roy Hamlin and Dr. William Stratford.

At the second competency hearing on September 14, 1984, Dr. Stratford testified in detail about his methods of evaluation and basis for his determination that defendant was fit to proceed to trial. Dr. Stratford reviewed the allegations made against the defendant, police reports concerning the nature of the crime charged, information he had received from the Montana State Hospital at Warm Springs and hospital record from St. Patrick's Hospital regarding defendant's motorcycle accident. Dr. Stratford concluded that defendant Statczar was capable of understanding the proceedings against him and of assisting in his own defense.

Dr. Xanthopoulos testified at the second competency hearing that defendant suffers from a "serious mental defect, Organic Personality Syndrome." He also testified that defendant may have suffered brain damage following his motorcycle accident in 1979 and stated that defendant performs at a "borderline level" of intelligence. [***19] Dr. Hamlin's testimony closely followed the testimony of Dr. Xanthopoulos.

[**613] As stated earlier, John Riddiough, defendant's court-appointed attorney offered testimony that defendant was unable to understand the judicial proceedings. As evidence of defendant's mental incompetency, Riddiough also testified that defendant had given three inconsistent alibi statements.

[HN11]Fitness to proceed to trial is a matter largely within the discretion of the District Court. Sections 46-14-202 through -222, MCA. Therefore, [HN12]we will not overturn a decision of the District Court in the absence of a clear abuse of discretion. The evidence may conflict, but it is substantial if any reasonable trier of fact could rely upon the evidence in support of its conclusion. *State v. Hall* (1983), 203 Mont. 529, 533, 662 P.2d 1306, 1308.

At the second competency hearing the State and defendant presented conflicting evidence of Statczar's fitness to proceed. The District Court heard the evidence and chose to adopt the State's position. The record reveals that substantial credible evidence supports the finding of the District Court. Accordingly, we hold the District Court properly determined [***20] that defendant was fit to proceed to trial. Section 46-14-103, MCA.

[*457] *Issue 4*

Did the District Court err when it denied defendant's motion for a mistrial based on improper prosecutorial comments during closing argument?

Following the State's closing arguments defendant moved for a mistrial alleging prosecutorial misconduct. The District Court denied defendant's motion. During closing argument the State argued that its office was too busy to prosecute innocent persons: "We don't have to do that, ladies and gentlemen. We do have 1,450 cases a year in the county attorney's office. We don't have time to spend chasing people that we believe are innocent or [have time] to frame people."

We disapproved an attorney's assertion of a personal opinion in *State v. Armstrong* (1980), 189 Mont. 407, 427, 616 P.2d 341, 352. Because defendant has not provided this Court with evidence of undue prejudice, we hold the District Court properly denied defendant's motion for a new trial. However, we caution the State to refrain from utilizing the above-mentioned trial tactic.

We reverse defendant's conviction and remand to the District Court for further proceedings.

MR. [***21] JUSTICES HARRISON, SHEEHY, WEBER, HUNT, GULBRANDSON and McDONOUGH concur.