Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

**H**

In re Best Lock Corp. Shareholder Litig.
Del.Ch.,2000.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re BEST LOCK CORP. SHAREHOLDER LITIG.
No. Civ.A. 16281.

Dec. 18, 2000.

Dear Counsel:

CHANDLER, J.

*1 This is my decision on plaintiffs' motion to compel production of documents in the consolidated action against defendants Best Lock Corporation ("Best") and related companies and individuals that arose out of the three interrelated freeze-out mergers consummated on March 23, 1998 (the "freeze-out mergers").[FN1] For simplicity's sake, I will respond to each of plaintiffs' fourteen demands (demands A-N) in the order in which plaintiffs present them.

> FN1. The actions consolidated herein are *Wood v. Frank E. Best, Inc.*, Del. Ch., C.A. No. 16281 (the fiduciary duty class action) and *Mitchell v. Russell C. Best*, Del. Ch., C.A. No. 18203 (the appraisal action).

Plaintiff's first demand, Demand A, asks this Court to compel defendants to confirm whether they ·have made complete production of the documents they purportedly have agreed to produce responsive to Request Nos. 1, 3, 4, 5, 15, 18, 21 and 45.[FN2] The documents which defendants have agreed to produce are those nonprivileged documents responsive to these requests. Plaintiffs emphasize that they would like defendants to produce notes taken at board meetings, if such notes exist, as well as documents relating to the Genesis Group ("Genesis"), called for in Request Nos. 4 and 56.

> FN2. Pls.' Br. on Mot. to Compel Produc. of Docs., at 4 [hereinafter Pls.' Br.]. For a list of Pls.' Reqs., see Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br., at Ex. A, at 5-10.

With regard to each of these requests, defendants

must make complete production and, if plaintiffs believe full production has not been made, confirm this fact to the plaintiffs by stating that all non-privileged documents that exist to the defendants' knowledge have been produced pursuant to these eight requests. These requests, which include board minutes and notes, documents from and to financial advisors, SEC filings, stock ledgers, directors' and financial advisors' communications, and the articles of the corporation, are well within the normal scope of discovery and should be produced or, if they do not exist, confirmed as to this fact. Thus, if notes were taken at the meetings, produce them if they are not privileged. If notes were not taken, confirm this fact.

As to documents relating to Genesis, defendants argue that such documents are not responsive to Request 4, which asks for "[a]ll documents supplied by the Best Companies and/or their officers or directors to any financial/investment bankers ...," [FN3] since Genesis did not provide investment banking advice but rather insurance-related services. Defendants also argue that they did not produce documents in response to Request No. 56, which specifically asks for documents relating to communication between Best and Genesis, because there has been no showing as to why these communications with Genesis are reasonably calculated to lead to the discovery of admissible evidence. Although defendants may be correct as to Request No. 4, I do not find defendant's argument with regard to Request No. 56 persuasive. Genesis signed a confidentiality agreement with Best in October of 1997. The agreement states that Genesis "may receive certain non-public information regarding the [Best] Companies" in connection with the possible engagement of their services.[FN4] It is possible that information relating to such communications between Genesis and Best may lead to the discovery of admissible evidence. Such evidence may not prove to be ultimately admissible. At this stage in the proceedings, however, it need only be reasonably calculated to lead to admissible evidence. Since this agreement was signed during the same period Best was considering a cash-out transaction, [FN5] production of this evidence does seem reasonably calculated to lead to admissible evidence.

> FN3. Pls.' First Req. for Produc. of Docs.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

excerpted in Pls.' Br., at Ex. A, at 6.

FN4. Pls.' Reply, at 3.

FN5. *See* Consol. Compl., at 37-38.

**\*2** Plaintiffs' second demand, Demand B, asks this Court to compel defendants to produce all documents relating to the freeze-out mergers that were submitted to any federal, state, or governmental agency in accordance with Request No. 6. Defendants have produced only those documents submitted to the SEC and the Delaware Secretary of State. While plaintiffs assert that defendants have not fully complied with their request, defendants state that while other government filings were made by Best, they have produced all of those made *"specific"* to the mergers. Request No. 6 asks for those documents *"concerning* the mergers submitted by the Best Companies to any federal, state, or local governmental agency." [FN6] If by "specific" the defendants mean "concerning," they have indeed complied with this request. If it is the case, however, that defendants withheld documents *concerning* but not *specific to* these mergers, defendants must now produce them.

FN6. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 6.

Demand C asks this Court to compel defendants to "explain their ambiguous limitation" in response to Request Nos. 7, 9, 10, and 42. Defendants agreed to produce documents for each of these responses, adding that documents will be produced only for "each of the Best companies as a whole." Plaintiffs demand that defendants explain exactly what the phrase "as a whole" means. Defendants answer that this phrase was "a more precise manner of stating that they were producing exactly what was requested - corporate-level documents as opposed to documents that pertained to some smaller business unit." [FN7] Plaintiffs' accept this definition, making the demand moot, but note that they should not have needed to bring a motion to compel in order to receive this definition from defendants.

FN7. Defs.' Answer, at 16.

Demand D asks this Court to compel defendants to produce all documents relating to actual or potential loans in excess of $1 million in accordance with Requests Nos. 12 and 13. Defendants have agreed to produce those documents submitted in connection with potential loans in excess of $5 million, as opposed to $1 million. Defendants argue that this $5 million limitation is "reasonable in light of the fact that $5,000,000 was significantly less than 5% of the Best Companies' revenues in the year before the mergers." [FN8] Defendants also state that reducing the limitation to $1 million would produce no additional documents and is, therefore, moot. As with the last demand, plaintiffs concede, but note that "it should not have been necessary for plaintiffs to file the Motion to obtain defendants' cooperation in the discovery process." [FN9]

FN8. Defs.' Answer, at 16.

FN9. Pls.' Reply, at 8.

Demand E asks this Court to compel defendants to identify what documents, if any, responsive to Request Nos. 14, 19 and 23, they have withheld from production. Request No. 14 asks for production of "[a]ll loan or lease agreements to which the Best Companies were parties...." [FN10] Defendants objected to this request on grounds of undue burden and relevance to the extent that "it seeks production of lease agreements with customers in lieu of sales or loans or lease agreements relating to miscellaneous vehicles, office equipment and small equipment." [FN11] Request No. 19 asks for "[a]ll documents constituting or memorializing any communications between the Best Companies, or any of their officers and directors, and any shareholder in any of the Best Companies." [FN12] Defendants object to this on grounds of overbreadth, relevance, and undue burden. Request No. 23 asks for "[a]ll documents concerning the market(s) for the products of the Best Companies." [FN13] Defendants object to this request on grounds of overbreadth, relevance, and undue burden. They also state that they "interpret this request to be limited to seeking production of general product market research and analysis." [FN14] Plaintiffs make the same response to each of defendants' objections. They state that "[a]ll [they] seek is the simple courtesy of a requested explanation." [FN15] Plaintiffs do not respond to defendants' specific objections or limitations.

FN10. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 7.

FN11. Defs.' Resps. and Objections to Pls.' First Req. for Produc. of Docs., excerpted in Motion to Compel at Ex. E, at 8.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN12. Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. A, at 7.

FN13. *Id.* at 8.

FN14. Defs.' Resps. and Objections to Pls.' First Req. for Produc. of Docs., excerpted in Pls.' Br. at Ex. E, at 11.

FN15. Pls.' Answer, at 9.

**\*3** With regard to Request No. 14, defendants have adequately responded. They placed a reasonable limitation on the request to exclude leases related to miscellaneous vehicles, office equipment and small equipment. Since plaintiffs did not specifically argue that this limitation is unacceptable and it appears to me to effectively narrow the request so as to prevent undue burden, I find that defendants have fully complied with this request. With regard to Request No. 19, defendants have given this Court no specific reason why the request for all communications between Best and its shareholders is overbroad, not likely to lead to admissible evidence, or unduly burdensome. In the absence of such an explanation, I will direct defendants to comply with this request, or indicate (if it is the case) that such communications do not exist. As to Request No. 23, I am not entirely certain what defendants mean by "general" product market research and analysis. This limitation seems to exclude "specific" product market research and analysis that may be properly discoverable. As to this request, I ask defendants either to define this limitation in greater detail or to produce all documents requested in the original request. If defendants choose the explanation alternative, plaintiffs must tell me if they find it unacceptable.

Part F asks this Court to compel defendants to produce all documents reflecting communications that occurred at meetings between representatives of Piper Jaffray and Russell and/or Mariea Best. In their response to the original Request No. 20, defendants placed a limitation that they would produce only such documents that were "prepared at or for" such meetings. Plaintiffs believed that this limitation excluded properly discoverable documents and asked for any such additional documents in this motion. Defendants answered that the issue is moot because they "have not located any additional documents that would be produced in response to the 'clarification' that have not already been produced." FN16 Once again, plaintiffs concede, but again note that "it should not have been necessary for plaintiffs to file

the Motion to obtain defendants' cooperation in the discovery process." FN17

FN16. Defs.' Answer, at 18.

FN17. Pls.' Reply, at 10.

Demand G asks this Court to compel defendants to produce documents reflecting all of the compensation received by Russell or Maria Best in accordance with Request No. 5. Defendant has thus far only agreed to produce SEC filings responsive to this request. Plaintiff ask that defendants produce all additional documents or, in the alternative, represent that neither Russell nor Mariea Best has received any compensation that is not disclosed in the SEC filings. Defendants respond that the SEC filings fully represent all compensation Russell or Mariea Best earned in their capacities as an executive or director. They further argue that plaintiffs have no right to learn about such additional compensation, noting that the claims set forth in the Consolidated Complaint do not include any premised upon excessive compensation. Plaintiffs point out in their answer that Russell or Mariea Best may have earned additional compensation other than in their capacities as an executive or director. They also disagree with defendants' legal argument that plaintiffs have no right to learn about such additional compensation. They believe this information is relevant in three contexts: (1) the payments may constitute a breach of fiduciary duty that may be valued in connection with the "fair price" prong of the "entire fairness" case, as well as in the appraisal action; (2) payments may bear on credibility; and (3) payments may be relevant in determining future cash flows.

**\*4** Although evidence of the alleged additional compensation may not ultimately be admissible for any of these purposes, its future admissibility is not the standard by which its discoverability is measured. It need only be reasonably calculated to lead to admissible evidence. As these documents appear relevant, or reasonably calculated to lead to admissible evidence, I direct the defendants to produce such documents, if they exist, evidencing additional payments to Russell or Mariea Best, whether or not it was in their capacities as executives or directors.

Demand H asks this Court to compel defendants to produce documents that would reflect third-party interest in one or more of the Best companies and/or their substantial assets in accordance with Request

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

No. 28. Defendants object to this request on two main theories. First, they argue that the price a third-party would be willing to pay to acquire Best is not relevant in a statutory appraisal action because the information is post-merger. I find this argument unpersuasive not only for the reason that the evidence need only be reasonably calculated to lead to admissible evidence (not *per se* admissible), but also because this is an action for breach of fiduciary duty in connection with a freeze-out merger. Whether the information, if it exists, is admissible in the pending appraisal action, is an issue for another day.

Defendants' second argument is that the request should be denied because it is not relevant to plaintiffs' *Revlon* claim, but, even if it was relevant, it still must be denied because plaintiffs do not have a valid *Revlon* claim (in effect, they ask the Court to rule on this claim before allowing discovery). Again, I am not persuaded by defendants' arguments. As an initial matter, it is not inappropriate for the plaintiffs to take discovery on this issue before the Court has decided the validity of the plaintiffs' *Revlon* claim. That is not an unusual occurrence in this Court. Moreover, information about third-party offers even as early as 1993 is still reasonably calculated to lead to admissible evidence since such offers might bear on the value of Best in 1995 and 1997, the period in which the Bests allegedly lost control of the companies. If this evidence proves to be irrelevant, it will be excluded at trial. At this point, however, it remains reasonably calculated to lead to admissible evidence and, therefore, defendants must produce it.

Demand I calls for the production of all documents respecting communications with investment advisors other than Piper Jaffray in accordance with Request No. 30. Defendants agreed to produce only such documents that concern the freeze-out mergers or their evaluation or review of a cash-out transaction. Plaintiffs find this limitation "unwarranted" since communications with investment advisors on other subjects might bear on the ultimate question of Best's fair value. Defendants object that the original request is too broad and "can only be described as an old-fashioned fishing expedition." [FN18] I disagree. These documents may indeed prove ultimately irrelevant and inadmissible but, at this point, they are reasonably calculated to lead to admissible evidence since there is a good possibility they may bear on the ultimate valuation issue. Moreover, as plaintiffs point out in their response, defendants do not argue it would be unduly burdensome for them to produce these records. Thus, I direct the defendants to produce these documents.

FN18. Defs.' Answer, at 20.

**\*5** Demands J and K ask this Court to compel defendants to produce *all* documents responsive to Request Nos. 31, 32, 33, 35, 37 and 38. These requests include production of documents concerning BLC's cost of raw materials, communications between BLC and its customers, contracts between BLC and its customers, and contemplated new products and/or renovations. These document requests are each preceded by the word "all." Defendants object to these requests on the grounds that they are overly broad, extremely burdensome and, ultimately, likely to be utterly irrelevant. For example, defendants note that BLC had well over 1000 customers during the period in question. Producing *every* contract and communication would amount to turning the company inside out and also compromising control and security procedures.

I agree with defendants that these requests are all too broad and would impose an undue burden on the defendants. Plaintiffs must narrow them where possible. For example, with regard to Requests 32 and 33, they might ask for contracts and communications of the twenty largest customers of Best as opposed to *all* customers. Similarly, they must define vague terms to both facilitate defendants' specific response to these requests and to limit the scope of the request. For example, Request Nos. 37 and 38 asks for documents relating to potential efficiencies. I am not sure what plaintiffs mean by "efficiencies" or what kind of documents, in particular, they seek. Finally, with regard to all of these documents, plaintiffs would be well advised to revise the requests with a limiting time frame. As they are currently drafted, each of these requests is far too broad and some of the ones mentioned above also suffer from fatal vagueness. I deny the motion to compel as to these requests. Plaintiffs must narrow and define the requests if they want defendants to respond.

Demand L asks this Court to compel defendants to produce documents dated beyond March 23, 1998 (the effective date of the freeze-out mergers). Defendants refuse to produce any documents after this date. Plaintiffs argue defendant's position is untenable for two reasons. First, plaintiffs argue that they are seeking rescissory damages, which necessitates post-merger discovery. Second, plaintiffs argue that "it is well-settled that post-merger discovery is proper even in a case in which the sole

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2d

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
(Cite as: Not Reported in A.2d)

issue is the value of a given corporation on the date of a merger." [FN19] Defendants answer that allowing post-merger discovery up to 2 and 1/2 years after the merger, as plaintiffs request, would be an extraordinary result. They argue that *Cede* requires a plaintiff to articulate a sound justification for post-merger discovery before it is allowed.[FN20] They also respond to plaintiffs' rescissory damages argument by stating that discovery concerning rescissory damages "should not occur, if at all until the Court first determines that rescissory damages are appropriate under the law and the facts and establishes appropriate parameters for such claims." [FN21]

> FN19. Pls.' Br., at 18 (citing *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 758 A.2d 485, 499 n. 91 (2000) and *Kaye v. Patone, Inc.,* Del. Ch., C.A. No. 5466, Hartnett, V.C. (Oct. 6, 1981)).

> FN20. *Cede,* 758 A.2d at 499.

> FN21. Defs.' Answer, at 6.

*6 I agree with the plaintiffs that *Cede,* in particular, as well as other cases, have relaxed significantly the limitations on discovery of post-merger evidence that *may* be admissible in certain circumstances even in appraisal cases that are statutorily limited to determining fair price at the time of the merger.[FN22] Moreover, the actions in these consolidated actions include a breach of fiduciary duty action (which may, ultimately, justify a rescissory damages remedy) as well as an appraisal case. Thus, these documents may be admissible for both of these reasons. As an aside, it is not necessary for the Court to determine whether rescissory damages are appropriate under the law and the facts before such discovery can proceed. Again, however, I emphasize that I am not deciding, at this stage, whether *any* of these documents will be admissible at a trial. I hold only that they appear reasonably calculated to lead to the discovery of admissible evidence. Thus, defendants must produce them.

> FN22. The Supreme Court notes in *Cede* that, "[i]n *Gonsalves I,* this Court held that post-merger evidence is admissible 'to show that plans in effect at the time of the merger have born fruition.' " *Cede,* 758 A.2d 499 (citing *Gonsolvas I,* Del.Supr., 701 A.2d 357, 362 (1997)).

Demand M asks this Court to compel defendants to produce documents in accordance with Request No. 9. Defendants withheld these documents pursuant to a claim of accountant-client privilege. Plaintiffs state that "[i]t is well settled that Delaware does not recognize an accountant-client privilege." [FN23] Defendants answer that despite this general rule in Delaware, "*Lee* [cited by plaintiffs] recognized that Delaware also follows the choice of law principles in the Restatement of Conflicts, and that the Court must determine which state has the most significant relationship under the Restatement ... A choice of law 'analysis' that can only have one answer (Delaware) is not an analysis at all." [FN24] They argue that since Best is an Indiana corporation, Indiana law, which grants accountant-client privilege, should apply. Plaintiffs reply that while the current Best Lock Corporation is an Indiana corporation, BLC, the company that was a party to these alleged privileged communications, was a Delaware corporation.

> FN23. Pls.' Br., at 22 (citing *Lee v. Engle,* Del. Ch, C.A. No. 13323, Steele, V.C. (Dec. 15, 1995) and D.R.E. 501).

> FN24. Defs.' Reply, at 11-12.

Article V of the Delaware Rules of Evidence does not recognize an accountant-client privilege; nor do the federal courts.[FN25] Nevertheless, defendants argue that Indiana law should apply. As then Vice-Chancellor (now Justice) Steele did in *Lee* (the case on which both parties affirmatively rely), I will weigh the four factors listed in the Restatement of Conflicts [FN26] to determine whether to apply law other than that of the forum state. These factors include: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties.[FN27] Applying these factors to the factual record, I conclude that Delaware law applies.

> FN25. *Lee,* C.A. No. 13323, at 6.

> FN26. The Court notes in *Lee* that "Delaware follows the Restatement's choice of law principles and the Restatement's 'most significant relationship' test. *Lee,* C.A. No. 13323, at 7 n. 3.

> FN27. Restatement (Second) of Conflicts, §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

139(2), Comment.

First, the former BLC was a Delaware corporation. Best Lock, however, did keep its offices in Indiana. Second, defendants do not refute that these documents may be material to the plaintiffs' case. Third, this privilege is unusual, not supported in Delaware or the federal courts. Fourth, and most importantly, it is most fair to apply the law of the forum sate-Delaware-in this case for the simple reason that BLC chose Delaware as its place of incorporation. Thus, defendants must produce the documents for which it has claimed an accountant-client privilege.

*7 Demand N asks this Court to order defendants to pay plaintiffs' the reasonable costs of bringing their motion to compel. They state that defendants' unjustifiably refused to respond to many of their requests and that their deficiencies are also unjustifiable. As this decision has made clear, defendants rightly objected on several points. They are being ordered to produce documents as a result of the motion on other points, but their conduct does not rise to the level that would prompt this Court to shift fees in a discovery dispute. Thus, I deny this aspect of the motion to compel. Although this motion, and the accompanying oral argument, have presented more jousting between counsel than is ordinarily the case in this Court, I find nothing untoward about the substantive positions of the parties, certainly nothing that would prompt me to shift fees.

Defendants will produce documents as described above and plaintiffs may resubmit certain discovery requests in accordance with this decision.

IT IS SO ORDERED.

Del.Ch.,2000.
In re Best Lock Corp. Shareholder Litig.
Not Reported in A.2d, 2000 WL 1876460 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 MONT DIST LEXIS 1158



Analysis
As of: May 25, 2007

**STEFANIE DOWNARD, Plaintiff, v. MONTANA RAIL LINK, INC., a Montana corporation, Defendant.**

**Cause No. ADV-2003-568**

**FIRST JUDICIAL DISTRICT COURT OF MONTANA, LEWIS AND CLARK COUNTY**

*2005 ML 2062; 2005 Mont. Dist. LEXIS 1158*

**August 22, 2005, Decided**

**SUBSEQUENT HISTORY:** Summary judgment denied by *Downard v. Mont. Rail Link, Inc., 2006 Mont. Dist. LEXIS 70 (2006)*

**PRIOR HISTORY:** *Downard v. Mont. Rail Link, 2005 Mont. Dist. LEXIS 1131, 2005 ML 2063 (2005)*

**JUDGES:** [**1] DOROTHY McCARTER, District Court Judge

**OPINION BY:** DOROTHY McCARTER

**OPINION**

DECISION AND ORDER

[*1] Plaintiff (Downard) has filed a motion to compel responses to Discovery Request No. 7 propounded to Defendant (MRL). This discovery request asks for certain information about the "Settlement Agreement and General Release of All Claims," which was being negotiated between the parties just prior to the termination of her employment.

[*2] MRL resists the motion, claiming (1) attorney-client privilege, (2) the information requested is not relevant to the lawsuit, and (3) the discovery request is too vague.

[*3] The Court first notes that counsel spent a lot of time and many pages arguing disputed facts relating to the allegations in the complaint. They also referred extensively to the facts, proceedings and rulings in the Winslow case, a case in which this judge had no involvement and is generally unfamiliar with.

[*4] It is well settled in Montana that discovery for purposes of a lawsuit is to be liberally applied. Its object is to obtain any information that might be relevant to the issues in the lawsuit. Privileged information is excluded from discovery. Rule 26B(1), M. [**2] R.Civ.P. The Montana Supreme Court stated:

> "The purpose of discovery is to promote the ascertainment of truth and the ultimate disposition of the lawsuit in accordance therewith. Discovery fulfills this purpose by assuring the mutual knowledge of all relevant facts gathered by both parties which are essential to proper litigation." *Massaro v. Dunham, 184 Mont. 400, 405, 603 P.2d 249, 252 (1979).*

[*5] The complaint alleges various claims for relief based on MRL's refusal to negotiate a termination settlement in good faith by including a three paragraph confidentiality provision in the agreement, which contained the following language: "Releasor understands and agrees . . . in furtherance of this confidentiality provision, that she cannot provide any assistance to other attorneys, representatives, or agents in litigation against MRL with regard to negligent mismanagement claims or claims arising under *MCA Section 39-2-703*." (Pl,'s Combined Mot. Compel Disc. & Supp. Br., Ex. 1, at 3.) This provision is the crux of the lawsuit, and its interpretation with respect to Downard's ability to testify in other court proceedings is in dispute.

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 8 of 45

Page 2

2005 ML 2062, *; 2005 Mont. Dist. LEXIS 1158, **

[**3]    [*6]  Discovery Request No. 7 asks for names, addresses and other information about persons who participated in the preparation of the settlement agreement, as well as related documentation. MRL claims that the information is protected by attorney-client privilege.

[*7]  As stated by the Montana Supreme Court in Palmer v. Farmers Ins. Exch.:

> The fundamental purpose of the attorney-client privilege is to enable the attorney to provide the best possible legal advice and encourage clients to act within the law. The privilege furthers this purpose by freeing clients from the consequences or the apprehension of disclosing confidential information, thus encouraging them to be open and forthright with their attorneys.
>
> Another important policy behind the attorney-client privilege is to foster the attorney-client relationship by ensuring that attorneys are free to give accurate and candid advice without fear that the advice will later be used against the client.

[*8]  *261 Mont. 91, 106-07, 861 P.2d 895, 904-05 (1993)* (citations omitted). Palmer, cited by counsel in their briefs, involved a bad faith claim against an insurer involving uninsured motorist coverage.  [**4]  In addressing the attorney-client privilege, the Montana Supreme Court noted that it had previously applied the privilege to third-party bad faith claims. Id. The court went on to discuss application of the privilege to first-party bad faith claims, observing that the nature of the relationship, not the nature of the cause of action, controls whether communications between attorney and client can be discovered. The court held that the privilege protects communications in first-party bad faith cases when the insurer's attorney did not represent the interests of the insured in the underlying case. *Id. at 108, 861 P.2d at 906.*

[*9]  In the present case, the attorney-client privilege is presumed to exist between MRL and its lawyers. The information asked for in the discovery request would be provided by Darla Keck, an attorney working for MRL. Downard insists that Keck was not working in a legal capacity in the case, but rather as an adjuster. Keck indicated that her role was primarily a legal one _ managing the litigation. She also prepared the settlement paperwork, a task ordinarily prepared by the company's adjuster who was unavailable. Whether the preparation

of the [**5]  settlement paperwork was ordinarily done by the company's adjuster or attorney is not decisive. Keck represented the company during the negotiation process and the settlement document prepared by her reflected at least in part her legal advice, opinions, and confidences between her and MRL. Her information is thus protected by the privilege.

[*10]  Notwithstanding the existence of the privilege, Downard asserts certain exceptions which have been recognized in Montana.

Waiver

[*11]  Downard first claims that MRL waived the privilege by placing the communications and documents related to the settlement agreement directly into issue, citing *Dion v. Nationwide Ins. Co., 185 F.R.D. 288 (D. Mont. 1998).* The United States District Court stated that the privilege can be waived if a party injects into litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct. *Id. at 294.* The court further explained that to waive a privilege, a party must do more than merely deny the opposing party's accusations, but must affirmatively raise the issue involving privileged communications. *Id. at 295.* [**6]

[*12]  A review of the pleadings and briefs indicates that Downard, not MRL, placed the communications and documents into issue. MRL did not waive the privilege by denying Downard's allegations that she was harmed by the release provision in the settlement agreement and by asserting an interpretation of the release provision that is different from MRL's interpretation.

[*13]  Downard next argues that MRL waived the privilege by relying on advice of its attorney. The supreme court has held that the privilege does not apply if the insurer directly relies on advice of counsel as a defense to a bad faith charge. Palmer, 261 Mont. at 110, 861 P.2d at 906. The information sought by Downard in the discovery request was prepared prior to the present litigation and thus not as a defense to Downard's subsequent bad faith charge.

[*14]  Downard next argues that the privilege was waived by MRL voluntarily testifying about the confidential communications. Generally, a person can waive the privilege if he or she voluntarily discloses or consents to the disclosure of any significant part of the privileged matter. Rule 503, M.R.Evid. However, mere reference to privileged [**7]  matter is not enough to waive the privilege. The waiver is narrow and strict _ the person must voluntarily divulge the specific confidential information. See Palmer at 112, 861 P.2d at 908. In her motion and supporting brief, Downard relied on the affidavit of MRL Superintendent Mike Lemm. Anything not specifically

2005 ML 2062, *; 2005 Mont. Dist. LEXIS 1158, **

revealed in that affidavit remains confidential under the attorney-client privilege.

[*15] Downard finally asserts the civil fraud exception to the privilege, citing *State ex rel. U.S.F. & G. v. Dist. Ct., 240 Mont. 5, 783 P.2d 911 (1990).* That case was a bad-faith insurance lawsuit, to which the supreme court refused to extend the civil fraud exception. The Court stated: "The civil fraud exception to the attorney-client privilege has traditionally been invoked where an attorney or client is involved in unlawful or criminal conduct, or future fraudulent activity." *Id. at 14, 783 P.2d at 916.*

[*16] The present action is not one to penalize MRL for engaging in criminal activity, nor is the action one to enjoin specific criminal activity. The civil fraud exception does not apply to this case.

Work Product

[*17] Downard [**8] argues that the information and communications at issue are discoverable because they are excludable from the attorney work-product

privilege under the compelling need exception. The Montana Supreme Court has held that attorney client privilege trumps otherwise discoverable attorney work product information because the privilege cannot be overcome by a showing of need. *Id. at 12, 783 P.2d at 915.*

[*18] Since the requested information is protected by the attorney client privilege, the asserted work product exception is of no effect.

[*19] In summary, the information requested in Request for Discovery No. 7 is protected by the attorney-client privilege.

[*20] IT IS THEREFORE ORDERED that Downard's motion to compel is DENIED in accordance with this decision.

DATED this 22nd day of August, 2005.

DOROTHY McCARTER

District Court Judge

LEXSEE 2001 MONT DIST LEXIS 2579

**PETER SHERNER and DEBORAH SHERNER, Plaintiffs, vs. CONOCO INC., Defendant.**

**Cause No. DV 97-626**

**THIRTEENTH JUDICIAL DISTRICT COURT OF MONTANA, YELLOWSTONE COUNTY**

*2001 ML 615; 2001 Mont. Dist. LEXIS 2579*

**January 22, 2001, Decided**

JUDGES: [**1] RUSSELL C. FAGG, District Court Judge.

OPINION BY: RUSSELL C. FAGG

**OPINION**

ORDER AND MEMORANDUM

ORDER

[*1] This matter comes before the Court on Defendant's Motion to Compel and Request for Sanctions, Defendant's Second Motion to Compel, and Defendant's Third Motion to Compel. The Motions are deemed submitted. For the reasons stated below,

[*2] **IT IS HEREBY ORDERED** that Defendant's Motion to Compel is **DENIED**.

[*3] **IT IS FURTHER ORDERED** that Defendant's Request for Sanctions is **DENIED**.

[*4] **IT IS FURTHER ORDERED** that the Court will hold an *in camera* inspection of the identity of the preparer of the schematic diagram at issue, as well as the factual basis justifying the application of the work product doctrine, before ruling on Defendant's Second Motion to Compel.

[*5] **IT IS FURTHER ORDERED** that Defendant's Third Motion to Compel is **GRANTED**.

MEMORANDUM

Background

[*6] On August 9, 1995, the Plaintiff, Peter Sherner, was involved in an accident at Defendant Conoco Refinery (Conoco) in Billings, Montana. During the accident, Sherner was exposed to Hydrogen Sulfide

(H 2 S) [**2] and suffered injuries. *See Sherner v. Conoco, 2000 MT 50, 995 P.2d 990, 992-93* (for detailed factual history). At the time of the accident, Mr. Wayne Lipp (Lipp), a Conoco employee, was the blind foreman who directed Sherner to install the blind which led to Sherner's injuries. *See id. at 993.*

[*7] The Sherners filed suit on July 17, 1997. On August 4, 1998, Conoco filed its first Motion to Compel and For Sanctions. Then, on August 20, 1998, Conoco filed its Second Motion to Compel.

[*8] The Court granted summary judgment for all defendants on September 9, 1998. As such, the Court rendered moot Defendant's Motion to Compel and for Sanctions. *See* Memorandum and Order (September 15, 1998). For similar reasons, the Court did not rule on Conoco's Second Motion to Compel.

[*9] The Sherners appealed this Court's Order granting summary judgment in Conoco's favor. On February 29, 2000, the Montana Supreme Court reversed and remanded the case for trial on the merits.

[*10] On September 22, 2000, the Court denied Conoco's Second Motion for Summary Judgment challenging the constitutionality of *§ 39-71-413, MCA*, and [**3] the trial is scheduled for April 2, 2001. Presently, Conoco requests a ruling on the previously filed Motion to Compel and For Sanctions and Second Motion to Compel. Additionally, the Court addresses Conoco's Third Motion to Compel.

Discussion

[*11] At this time, the Court must decide whether Plaintiffs must provide certain requested information to Conoco and whether they should be sanctioned. In so determining, the Court faces several issues: 1) whether the identification of all individuals the Sherners con-

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 11 of 45

Page 2

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

tacted with regard to their Complaint's allegations are entitled to work product protection; 2) whether information regarding the general substance of the conversations or statements made during these contacts is entitled to work product protection; 3) whether any written statements obtained by Plaintiffs during these contacts are entitled to work product protection; 4) if work product protection exists, whether Conoco has shown the requisite need for such materials; 5) whether the Sherners and/or their attorneys violated Rule 4.2 of the Montana Rules of Professional Conduct; 6) whether work product protection attaches to the identity of the preparer of a schematic [**4] diagram Plaintiffs had prepared and used during a deposition; and 7) whether Conoco poses over broad interrogatories or improperly requests information within its own knowledge. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Rule 26(b)(1), M.R.Civ.P. (2000). The purpose of discovery is to "promote the ascertainment of truth" and "assure the mutual knowledge of all relevant facts gathered by both parties which are essential to proper litigation." *Massaro v. Dunham, 184 Mont. 400, 405, 603 P.2d 249, 252 (1979)*(citing *Hickman v. Taylor, 329 U.S. 495, 507 (1947))*.

[*12]  With regard to discovery procedures, interrogatories must be answered separately and fully within the scope of Rule 26(b). Rule 33(a), M.R.Civ.P. (2000). Rule 33, M.R.Civ.P., is liberally construed to ensure all relevant facts are available to parties before trial and reduce the prospect of surprise and unfair advantage. *Eagle Ridge Ranch Limited, 283 Mont. 62, 66, 938 P.2d 1342, 1344 (1997)*(citing *Wolfe v. Northern Pacific Ry. Co., 147 Mont. 29, 40, 409 P.2d 528, 534 (1966))*. [**5] With respect to requests for production, any party may request copies of designated documents within the scope of Rule 26(b). Rule 34, M.R.Civ.P. (2000).

[*13]  The District Court has inherent discretionary authority to control trial administration, and it may supervise and control pretrial discovery matters. *State ex rel. Guarantee Insurance Company v. District Court of the Eighth Judicial District, 194 Mont. 64, 67-8, 634 P.2d 648, 650-51 (1981)*. When necessary, the Court may issue an order compelling a party to appropriately answer discovery requests. Rule 37(a), M.R.Civ.P. (2000).

I. Motion to Compel (August 4, 1998)

[*14]  Conoco challenges the sufficiency of Plaintiffs' responses to Interrogatory No. 11 and Request for Production No. 14 of Conoco's First Discovery Requests. Interrogatory No. 11 states:

Identify each and every individual, besides your attorneys, whom you or your representatives have contacted by either telephone or in person in regard to any of the allegations contained in the Complaint, and set forth in general the substance of the conversation or statements made by that individual and whether a written statement [**6] was obtained from the individual.

[*15]  *See* Defendant Conoco Inc.'s First Discovery Requests to Plaintiffs at 9 (Aug. 27, 1997). Request for Production No. 14 requests the production of any existing written statements identified in Interrogatory No. 11.

[*16]  In response, Plaintiffs object to Interrogatory No. 11 and Request for Production No. 14 on the grounds they are outside the scope of discovery, overly broad, and attorney work product. *See* Plaintiffs' Answers & Responses to Conoco's First Discovery Requests at 2, 13 (Oct. 6, 1997). However, in their brief, Plaintiffs rely solely upon the attorney work product objection. *See* Plaintiffs' Brief in Response to Defendant's Motion to Compel and For Sanctions (Aug. 14, 1998). In August of 1998, Plaintiffs submitted the materials at issue to the Court for an *in camera* inspection. The Court conducted an *in camera* inspection immediately prior to issuing this Order. The Court finds the issue of work product protection dispositive.

A. Identification of All Individuals Contacted

[*17]  Plaintiffs must disclose the ". . . identity and location of persons having knowledge of any discoverable [**7] matter." Rule 26(b)(1), M.R.Civ.P. (2000). When interrogatories are propounded in these words, such information is not attorney work product under Rule 26(b)(3), M.R.Civ.P., and an attorney may not avoid disclosing the names learned during the course of his or her investigation. *Commonwealth of Massachusetts v. First National Supermarkets, Inc., 112 F.R.D. 149, 152 (1986)*. (The Montana and federal rules are identical.) However, there is an important distinction between "asking the identity of persons with knowledge, which is clearly permissible, and asking the identity of persons contacted and/or interviewed during an investigation, which is not." *Id. at 152; See also Chiperas v. Rubin, 1998 WL 531845, at *1 (D.D.C. 1998); Laxalt v. C.K. McClatchy, 116 F.R.D. 438, 443 (D. Nev. 1987); Board of Education of Evanston Township High School v. Admiral Heating and Venting, 104 F.R.D. 23, 32 (N.D. Ill. 1984); Besly-Welles Corp. v. Balax, Inc., 43 F.R.D. 368, 370-71 (E.D. Wis. 1968)*.

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 12 of 45

Page 3

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

[*18] In *Commonwealth of Massachusetts*, the defendant's attorney interviewed its corporation's employees [**8] during an internal investigation of possible antitrust violations. *Commonwealth of Massachusetts, 112 F.R.D. at 151*. The only documents prepared during this investigation were handwritten and typewritten summaries of the interviews. *Id.* Rather than seeking disclosure of the notes and memos, the plaintiffs propounded interrogatories seeking the names of persons interviewed, dates of interviews, and descriptions of documents. *Id.*

[*19] The Federal District Court of Massachusetts first held the handwritten and typewritten notes and summaries of interviews were clearly privileged work product. *Id. at 151-52* (relying upon *Upjohn v. United States, 449 U.S. 383 (1981))*. Second, it discussed the discoverability of the identities of interviewed persons in light of the work product doctrine as set forth in *Hickman v. Taylor, 329 U.S. 495 (1947)*. The Court stated that such information goes beyond seeking identification of persons with knowledge and:

> to go beyond that - to tell plaintiffs whom defendants have interviewed, where and when such interviews took place and whether or not a record was made - is [**9] to give plaintiffs no more knowledge of substantive relevant facts, but rather to afford them the potential for significant insights into the defendant's lawyers' preparation of their case (and thus their mental processes).

[*20] *Commonwealth of Massachusetts, 112 F.R.D. at 153* (quoting *Board of Education of Evanston TP v. Admiral Heating, 104 F.R.D. 23, 32 (N.D. Ill. 1984))*.

[*21] Similar to *Commonwealth of Massachusetts*, an attorney, here the Plaintiff's former attorney, hired a private investigator to determine whether violations occurred at the Conoco plant with an eye towards anticipated litigation. The investigator, on behalf of the attorney, contacted and interviewed certain individuals and made handwritten notes as well as a typed memorandum and letter to the Sherners' former attorney summarizing the results of the interviews and setting forth theories and opinions formed from the information received. Now, Conoco seeks the identities of each and every person contacted by telephone or in person in regard to the Complaint's allegations and any written statements made.

[*22] The Court finds, based upon the rationale [**10] outlined by the Massachusetts Court, as well as

the other jurisdictions cited above, the identities of the individuals contacted are not discoverable. Conoco is entitled to discover the identity and location of persons having knowledge of any discoverable matter under Rule 26(b)(1), M.R.Civ.P.. However, it is not entitled to go further. In other words, it is not entitled to see which of these individuals the Sherners saw fit to single out and contact during the course of their investigation. The "detailed pattern of investigation and exploratory efforts of the plaintiffs' counsel in and of itself is not a proper subject of discovery." *Commonwealth of Massachusetts, 112 F.R.D. at 153*(citing *Besly-Welles Corp. v. Balax, Inc., 43 F.R.D. 368, 370-71 (1968))*. In sum, the Sherners chose from a host of possible individuals with potentially relevant material who they wanted to interview. "Clearly such decisions constitute 'strategy' and a lawyer's 'mental process' in preparing for litigation." *Chiperas, 1998 WL 531845 at *1*.

[*23] This remains the case even though a private investigator, as in this case, rather than the attorney himself, [**11] compiled the information. *See Allotmont v. United States, 177 F.2d 971, 976 (1950); Front Royal Ins. Co. v. Gold Players, Inc., 187 F.R.D. 252, (W.D. Va. 1999); United States v. Nobles, 422 U.S. 225, 238-39 (1975)*; and *People of the State of California v. United States, 27 F.R.D. 261, 262 (N.D. Cal. 1961)*(". . . where an investigative report contains material in the nature of opinion, theory, or recommendation, made by either witnesses or the investigator, such a document or report partakes of the nature of an attorney's notes in preparation of his case . . .". The Montana Supreme Court has stated as much in a criminal case involving discovery. *See State v. Miller, 231 Mont. 497, 513, 757 P.2d 1275, 1285 (1988)*("The reality of our legal system demands that the embraces of the [work product] protection also extend to agents of the attorney.").

[*24] Accordingly, the Court finds Conoco's Interrogatory No. 11, as phrased, includes information protected as opinion work product. However, the Court finds if the interrogatory is rephrased to ask Plaintiffs to list the names and addresses of any individuals [**12] who have knowledge of relevant facts about the case, Conoco could obtain the information it seeks, if those Plaintiffs contacted had relevant information, without requiring the Sherners to reveal their pattern of investigation. *See Commonwealth of Massachusetts, 112 F.R.D. at 153-54*.

B. General Substance of Conversations or Statements

[*25] As noted above, Plaintiffs must disclose the identity and location of persons having knowledge of discoverable matter and documents in its possession under Rule 26(b)(1), M.R.Civ.P.. However, similar to the identities of those interviewed, the Court finds Plaintiffs

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 13 of 45

Page 4

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

need not reveal the substance of the conversations and statements. Again, revealing the general substance of the interviews will impermissibly shed light on the focus of Plaintiffs investigation in violation of *Hickman* principles, which provide:

> proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . This work is reflected, of course, in interviews, statements, [**13] memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways . . . .

[*26]  *See Hickman,* 329 U.S. at 511-12. Simply stated, Plaintiffs should not have to reveal to Conoco the information they have assembled, sifted, and thus far analyzed. Additionally, as to oral statements made by witnesses to an attorney, the attorney should not be forced to repeat what the witnesses have told him and deliver the account to opposing counsel. *See id. at 512-13.* Accordingly, the Court finds the general substance and statements of conversations of all individuals contacted by the Sherners is opinion work product.

C. Written Statements

[*27]  In their brief, Plaintiffs have admitted that no written statement, in accordance with Rule 26(b)(3), M.R.Civ.P., was made during their conversation with Wayne Lipp. *See* Plaintiffs' Brief in Response to Defendant's Motion to Compel and For Sanctions at 9 (Aug. 12, 1998). The Court's *in camera* inspection revealed as much. In addition, the inspection revealed no Rule 26(b)(3) statements were made at all. As such, with regard to Conoco's [**14] Request for Production No. 14, Plaintiffs are unable to disclose any such statement. Furthermore, as previously discussed, any materials Plaintiffs possess with regard to these oral interviews are opinion work product and not discoverable. *Commonwealth of Massachusetts at 151-52* (relying upon *Upjohn v. United States,* 449 U.S. 383 (1981)).

D. Conoco's Need for Opinion Work Product

[*28]  Having determined Interrogatory No. 11 and Request for Production No. 14 involve attorney work product, the next question is whether Conoco has shown the requisite need to obtain disclosure. Conoco claims memories of the accident have faded over time with respect to details of the events which occurred in 1995. As

a result, Conoco argues Plaintiffs' interviews conducted within a few months of the accident are "unique and non-duplicable." *See* Defendant's Reply Brief in Support of Motion to Compel and For Sanctions at 6 (Aug. 24, 1998)(citing *Burlington Northern Railroad Co. v. District Court,* 239 Mont. 207, 779 P.2d 885, 891 (1989). Consequently, it concludes it has a substantial need for the information requested and cannot obtain it without [**15] undue hardship.

[*29]  Rule 26(b)(3) governs the discovery disclosure of trial preparation materials, or attorney work product. Upon a sufficient showing of substantial need and undue hardship, a party may obtain discovery of documents and tangible things, otherwise discoverable under Rule 26(b)(1), M.R.Civ.P., prepared in anticipation of litigation by or for another party's attorney. Rule 26(b)(3), M.R.Civ.P. (2000).

[*30]  However, if requested materials include the mental impressions, conclusions, opinions, or legal theories of an attorney or party's other representative, otherwise known as "opinion work product," the requesting party must show a compelling need before obtaining discovery. *Palmer v. Farmers Insurance Exchange,* 261 Mont. 91, 115-18, 861 P.2d 895, 910-12 (1993). In other words, opinion work product is only discoverable when the mental impressions sought are directly at issue in the case. *Id. at 117,* 861 P.2d at 911. Finally, oral statements made by witnesses in the form of mental impressions or memoranda may not be discovered except in rare situations. *Hickman,* 329 U.S. at 512-13; *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487, 492 (1970). [**16]

[*31]  Because, as discussed above, the information Conoco requests contains opinion work product, Conoco must show a compelling need for it. In fact, according to Montana law, Conoco must show the information, including mental impressions, it seeks are directly at issue in this case. This it has failed to do.

[*32]  This is especially true in light of the Montana Supreme Court's decision in *Burlington Northern.* In its decision, it instructed courts to strike a balance which allows for appropriate disclosure of facts, "without allowing a party to build its case on the other party's efforts." *Burlington Northern,* 239 Mont. at 216, 779 P.2d at 891. As recommended in *Burlington Northern,* this Court conducted an *in camera* inspection of the material at issue. It determined it reflects attorney thought processes, and, as such, it is "clearly not discoverable." *See id. at 217,* 779 P.2d at 891.

[*33]  Incidentally, the Court finds Conoco has not met even met the lesser "substantial need" standard set forth in Rule 26(b)(3). First, Conoco admits Wayne Lipp, its own employee, is a "key" witness in this case, and it has always known [**17] Lipp was present during the

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 14 of 45

Page 5

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

accident. *See* Defendant's Brief in Support of Motion to Compel and For Sanctions at 3, 6; Defendant's Reply Brief in Support at 4 ("In sum, there is not anyone in this case who is a more key figure in this case than Wayne Lipp."). When the identity of such a witness is known, the mere unavailability of one's own investigative notes does not warrant disclosure of one's opponent's investigative process." *National Labor Relations Board v. Building and Construction Trades Council*, 1989 WL 98643, at *1 (3 rd Cir.); *See also Heidebrink v. Moriwaki, 706 P.2d 212, 401-02 (1985)*("... in general there is no justification for discovery of the statement of a person contained in work product materials when the person is available for deposition."); *Gulford National Bank of Greensboro v. Southern Railway Co., 297 F.2d 921, 926 (4 th Cir. 1962)*(where opposing counsel had an opportunity to question known witnesses, passage of time did not warrant disclosure of protected statements); and *Long v. Milwaukee & Suburban Transport Corp., 227 N.W.2d 67, (1975)*(when a diligent investigation will reveal [**18] the identity of a witness, the passage of time does not warrant disclosure of protected materials).

[*34]  Second, Plaintiffs contacts with Lipp and other individuals did not take place until a few months after the accident. As such, they were not "contemporaneous" with the accident for purposes of showing a substantial need and undue hardship. *See, e.g., Burlington Northern, 239 Mont. at 216, 779 P.2d at 891*(statement taken within 24 hours); *People of the State of California, 27 F.R.D. at 262* (on the spot statement).

[*35]  Third, with regard to other individuals Plaintiffs may have contacted after the accident, Conoco had, and continues to have, the same opportunity to conduct such an investigation. Plaintiffs should not be penalized by the fact Conoco waited to do so. Furthermore, until Plaintiffs reveal those with relevant knowledge about the case, and Conoco subsequently conducts its own interviews or depositions, it is premature to conclude this individual will not remember the details of the traumatic accident. In sum, after considering the efforts made by Conoco to obtain the same or equivalent material and the work product nature [**19] of the material sought, the Court finds Conoco does not have a substantial need for the material, and it can otherwise obtain it without undue hardship. *See Burlington Northern, 239 Mont at 216, 779 P.2d at 891.*

II. Motion for Sanctions (Aug. 4, 1998)

[*36]  Conoco urges the Court to impose sanctions against the Sherners and/or their counsel for contacting Wayne Lipp, a Conoco employee, after the accident when they knew Conoco was represented by counsel. Conoco, thus, alleges the Sherners violated Rule 4.2 of the Rules of Professional Conduct. Rule 4.2 provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

[*37]  Rule 4.2, Montana Rules of Professional Conduct (2000).

[*38]  The Court declines to impose sanctions. First, while the buck may have stopped with Lipp as the blind foreman, Conoco fails to show Lipp had the "legal authority to 'bind' the corporation in a legal evidentiary sense," or had "speaking authority" [**20] for Conoco. *See Porter v. ARCO Metals Co., 642 F. Supp. 1116, 1118 (D. Mt. 1986)*(citing *Wright v. Group Health Hospital, 691 P.2d 564, 569 (Wa. 1984))*. As such, Lipp is not a "party" for the purposes of Rule 4.2.

[*39]  Additionally, contrary to Conoco's assertion, the pleadings in this case do not reveal Lipp committed any act or omission in connection with the accident which may be imputed to Conoco. In other words, Conoco has failed to show it will defend this lawsuit on the basis of anything Lipp did or failed to do. Indeed, Conoco has denied it caused any injury or harm to Pete Sherner. *See* Answer to Complaint and Jury Demand of Defendants at 3, P 16 (Sept. 2, 1997).

[*40]  Finally, Conoco's provides no basis for urging the Court to impose sanctions pursuant to Rule 37, M.R.Civ.P.. The Sherners have not failed to obey any court order or shown the "flagrant bad faith" or "repeated and inexcusable obstructions of discovery" prevalent in the cases Conoco cites.

[*41]  Accordingly, the Court finds Conoco has not established Plaintiffs violated Rule 4.2 of the Montana Rules of Professional Conduct or Rule 37, M.R.Civ.P., and it denies [**21] Conoco's Motion for Sanctions.

III. Conoco's Second Motion to Compel (August 28, 1998)

[*42]  On August 28, 1998, Conoco filed its Second Motion to Compel. This motion involves Conoco's Second Discovery Requests to Plaintiffs (July 27, 1998). These requests stem from the deposition of Wade Johnson (Johnson) taken on July 24, 1998. During his deposition, Plaintiffs' counsel produced a handwritten schematic diagram depicting a portion of the Conoco Billings Refinery. Conoco had not previously produced the diagram in discovery. Johnson was questioned with regard

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 15 of 45

Page 6

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

to the diagram, and it was attached to his deposition as Exhibit E.

[*43] Conoco objected to the diagram's use on the grounds Plaintiffs refused to identify who prepared it, it contained confidential refinery information, and it was incomplete. The deposition proceeded in the face of these objections. A few days after the deposition, Conoco propounded the discovery requests at issue in its second motion to compel. At this time, Conoco challenges the sufficiency of the Plaintiffs' answers to Interrogatories Nos. 23, 24, 25, and 26 as well as Request for Admissions Nos. 14, 15, and 16. The discovery requests [**22] are as follows:

Interrogatory No. 23: State the name, last known address, telephone number and employer of the individual or individuals who prepared Exhibit E to Wade Johnson's deposition.

Interrogatory No. 24: State the manner in which you came into possession of Exhibit E to Wade Johnson's deposition.

Request for Admission No. 14: Admit that the individual or individuals who prepared Exhibit E to Wade Johnson's deposition are employed by Conoco, Inc.

Request for Admission No. 15: Admit that you or your attorneys directly contacted the individual or individuals who prepared Exhibit E to Wade Johnson's deposition and that you or your attorneys requested the preparation of the exhibit.

Interrogatory No. 25: If the information in Exhibit E to Wade Johnson's deposition was not requested directly by you or your attorneys, state the name, last know address, telephone number and employer of the individual or individuals who requested the information from the individual or individuals who prepared Exhibit E to Wade Johnson's deposition.

Request for Admission No. 16: Admit that your or your attorneys obtained Exhibit E to Wade Johnson's deposition directly [**23] from the individual or individuals who prepared the exhibit.

Interrogatory No. 26: If neither you or your attorneys obtained Exhibit E to Wade Johnson's deposition directly from the individual or individuals who prepared the exhibit, state the name, last known address, telephone number and employer of the individual or individuals who directly obtained the exhibit from the individual or individuals who prepared it.

[*44] See Defendant's Second Discovery Requests to Plaintiffs (July 17, 1998)

[*45] Plaintiffs response to each request was:

Plaintiffs object to [the discovery request] in that it invades the work-product of plaintiffs' attorneys which his protected from disclosure to the adverse parties.

[*46] See Plaintiffs' Responses to Defendant's Second Discovery Requests to Plaintiffs (Aug. 13, 1998).

[*47] Conoco first contends the Plaintiffs' failed to provide enough information to enable the Court to determine whether the work product privilege applies. Second, it claims even if the work product privilege applies, the Plaintiffs waived it when voluntarily using the diagram at the deposition.

[*48] The Plaintiffs do not address [**24] Conoco's first argument. With regard to the work product protection issue, the Plaintiffs admit the protection was waived as to the diagram. However, they claim this waiver does not extend to the identity of Exhibit E's preparer under Rules 26(b)(3) and 26(b)(4)(B), M.R.Civ. P..

[*49] The Court finds the burden of proof issue dispositive at this time. Conoco cites several cases for the proposition the party asserting work product protection has the burden to provide enough information to show the protection applies. See Diamond State Ins. Co. v. Rebel Oil Co., 157 F.R.D. 691, 698-99 (D. Nev. 1994); Eureka Financial Corp. v. Hartford Accident and Indemnity Co., 136 F.R.D. 179, 182-83 (E.D. Cal. 1991); (Nutmeg Ins. Co. v. Atwell, Vogel & Sterling, 120 F.R.D. 504, 510 (W.D. La. 1988); and Peat v. West, 748 F.2d 540 (10 th Cir. 1984). However, each of these cases involves the disclosure of documents, not identities, as is the issue before this Court. As opposed to documents, the request for an identity presents a quandary. Plaintiffs cannot provide a detailed response to an interrogatory or an affidavit stating the [**25] identity requested, and the circumstances surrounding potential work product protection for it, without, necessarily, revealing exactly what they seek to protect. Yet, the Court agrees with Conoco it does not have enough information before it to determine whether the work product privilege applies to the identity of Exhibit E's preparer. In their brief, the Plaintiffs state:

Case 1:04-cv-01494-JJF   Document 198-2   Filed 05/25/2007   Page 16 of 45

Page 7

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

The schematic drawing at issue was prepared for, and at the direction of plaintiff's counsel. The schematic drawing, as well as the individual(s) who worked at the direction of the plaintiffs' counsel in preparing the schematic, constitute attorney work-product, protected from disclosure to the adverse party.

[*50]  *See* Plaintiffs' Response to Defendants' Second Motion to Compel at 4 (Sept. 2, 1998).

[*51]  The Court requires more than the Plaintiffs' unsupported assertions to determine the applicability of work product protection and the extent of any waiver. Furthermore, the Court needs more information to determine whether the individual or individuals at issue are "experts" or mere "actors" for the purposes of Rule 26(b)(4)(B) disclosure. *See Burlington Northern Railroad Co. v. District Court*, 239 Mont. 207, 212-15, 779 P.2d 885, 889-90 (1989) [**26] (identity of non-witness experts may not be discovered in the absence of exceptional circumstances.); *Atari Corp. v. Sega of America*, 161 F.R.D. 417, 420-22 (N.D. Cal. 1994)(a nontestifying expert may be deposed with regard to information acquired or opinions formed prior to his employment by a party.) Finally, the Court must know the identity of Exhibit E's preparer in order to assess the viability of Conoco's allegations regarding Plaintiffs' violation of Rule 4.2 of the Montana Rules of Professional Conduct.

[*52]  The Court is cognizant of the time line surrounding the filing of Conoco's Second Motion to Compel. All briefs were submitted after the Court issued summary judgment for all Defendants on September 9, 1998. As such, the motion became moot, and an *in camera* inspection was not needed or requested. The Court has every reason to believe if it had requested such an inspection, the Plaintiffs would have timely and completely responded, as they did with respect to Conoco's first motion to compel.

[*53]  Accordingly, the Court requires Plaintiffs now submit for its *in camera* inspection the identity of the preparer of Exhibit E, or the diagram [**27] utilized at Johnson's deposition, in addition to the factual basis justifying the application of work product protection. Plaintiffs must submit this information by January 12, 2001.

IV. Conoco's Third Motion to Compel (Dec. 1, 2000)

[*54]  Turning to Conoco's Third Motion to Compel discovery, Conoco challenges the sufficiency of Plaintiffs' responses to Interrogatory Nos. 1, 2, 10, 12, 13, and 16 as well as Request for Production Nos. 1 and 15.

[*55]  In Interrogatory No. 1, Conoco requests the names, addresses and telephone numbers of "all persons who have or claim to have knowledge of the transactions or occurrences upon which the Complaint is based, any of the events or conditions prior to or leading thereto, or related events or conditions existing at or after said transactions or occurrences." *See* Defendant Conoco Inc.'s First Discovery Requests to Plaintiffs at 3 (Aug. 27, 1997). In Interrogatory No. 2, Conoco seeks a summary and characterization of this information. Request for Production No. 1 involves the production of any written documents or tangible things related to Interrogatory No. 2. In Interrogatory No. 10, Conoco asks Plaintiffs to identify [**28] each person who has personal knowledge of the nature and extent of their damages as well as the information they possess. Plaintiffs object to these discovery requests on the grounds they are overly broad.

[*56]  In Interrogatory No. 12, Conoco requests information about Peter Sherner's educational background. Conoco seeks production of his high school and college transcripts in Request for Production No. 15. Conoco requests information about Peter Sherner's employment history in Interrogatory No. 13. Plaintiffs do not object to these requests. However, they do claim Conoco already possesses this information within Peter Sherner's personnel file, and request a copy of the file. Also, Sherner offers to sign an authorization allowing Conoco to gather any additional information needed.

[*57]  Finally, in Interrogatory No. 16, Conoco seeks the name and address of each health care provider who has examined Sherner for any physical condition in the past ten years. Sherner responds, except for his employment physicals, physicians at the Billings Clinic provided all health care. However, Conoco has discovered some treating physicians were not at the Billings Clinic.

Discussion

[**29]  A. Interrogatory Nos. 1, 2, and 10 and Request for Production No. 1

[*58]  Conoco may obtain discovery from Plaintiffs regarding any matter, not privileged, which is relevant to the pending action. *See* Rule 26(b)(1), M.R.Civ.P. (2000). As such, Plaintiffs must provide to Conoco a description of any relevant documents or tangible things as well as "the identity and location of persons having knowledge of any discoverable matter." *Id.*; *See also supra* this Order and Memorandum at 4, 7 (Dec. 29, 2000).

2001 ML 615, *; 2001 Mont. Dist. LEXIS 2579, **

[*59] Technically, Interrogatory Nos. 1, 2, and 10, as well as Request for Production No. 1, may exceed the limits of Rule 26(b)(1) by requesting information about "all persons with knowledge" of the accident and "each person with personal knowledge" about damages. Rather, these requests must be limited to all persons with knowledge of discoverable, or, in other words, relevant, matter. *See* Rule 26(b)(1), M.R.Civ.P. (2000). In seeking more than material or relevant information, discovery requests may be overly broad and unduly burdensome. *Hilt v. SFC INC., 170 F.R.D. 182, 186-87 (Kan. 1997).*

[*60] Nevertheless, Plaintiffs' [**30] responsibility to provide information within the bounds of Rule 26(b)(1) remains. Accordingly, the Court orders Plaintiffs to fully answer Interrogatory Nos. 1, 2, and 10, and Request for Production No.1, in conformity with Rule 26(b)(1) and Rule 33(a), M.R.Civ.P..

B. Interrogatory Nos. 12 and 13 and Request For Production No. 15

[*61] "It is no objection to interrogatories that the requested information is within the knowledge of the interrogating party." *Weiss v. Chrysler Motor Corp., 515 F.2d 449, 456 (2d Cir. 1975). See also Barks v. White, 365 N.W.2d 640, 643-44 (Iowa 1985); Stonybrook Tenants Assoc., 29 F.R.D. 165, 167-68 (D. Conn. 1961); and United States v. 58.16 Acres of Land, 66 F.R.D. 570, 573 (E.D. Ill. 1975); and Onofrio v. American Beauty Macaroni Co., 11 F.R.D. 181, 183-84 (W.D. Mo. 1951).*

[*62] In response to Conoco's requests for Peter Sherner's educational and employment history, Plaintiffs have referred Conoco to its own personnel file and offered to sign appropriate releases should Conoco need more information. Plaintiffs may not refuse to provide the [**31] requested information because they believe it is within the knowledge of Conoco. Nor may they require Conoco to point out inaccuracies in the personnel file before obtaining any of the requested information. Accordingly, the Court orders Plaintiffs to fully answer Interrogatory Nos. 12 and 13, and Request for Production No.15, as required by Rule 33(a), M.R.Civ.P.. Additionally, pursuant to Plaintiffs' discovery request, Conoco must provide a copy of Peter Sherner's personnel file to Plaintiffs. *See* Rule 34, M.R.Civ.P. (2000).

C. Interrogatory No. 16

[*63] Again, Conoco may obtain discovery regarding relevant matters. Rule 26(b)(1), M.R.Civ.P. (2000). In this case, Peter Sherner's medical condition is highly relevant, and Conoco may obtain information about it, including the identity and location of his treating physicians within the last 10 years. Plaintiffs may not shirk their responsibility to provide this information, and they may not force Conoco to identify mistakes made in their answer before supplementing it. As such, the Court orders Plaintiffs to fully answer Interrogatory No. 16 as required by Rule 33(a), M.R.Civ.P..

D. Employee Interviews

[**32] [*64] In their brief, Plaintiffs urge the Court to "find it is appropriate for Sherner, through his counsel, to talk to Conoco's employees without any further threat of motions for sanctions." *See* Plaintiffs Brief in Opposition to Conoco's Third Motion to Compel at 7-8 (Dec. 14, 2000). This issue is not before the Court in Conoco's Third Motion to Compel. Should Plaintiffs or Conoco find it necessary for the Court to address this issue, a motion may be filed.

DATED this 22nd day of January, 2001.

RUSSELL C. FAGG, District Court Judge

LEXSEE 1990 US DIST LEXIS 14106



Caution
As of: May 25, 2007

GENERAL ELECTRIC COMPANY, Plaintiff, HOECHST CELANESE COR-
PORATION and CELANESE ENGINEERING RESINS INC., Defendants

Civil Action No. 87-458-JRR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELA-
WARE

*1990 U.S. Dist. LEXIS 14106; 15 U.S.P.Q.2D (BNA) 1673*

May 8, 1990

CASE SUMMARY:

LexisNexis(R) Headnotes

PROCEDURAL POSTURE: Plaintiff filed an objec-
tion to the United States Magistrate's opinion granting
defendants' motions to compel discovery of certain
documents.

OVERVIEW: Plaintiff filed this action against defen-
dants alleging infringement of its patent for thermoplas-
tic, stable, blended compositions. Defendants each
counterclaimed for a declaration of noninfringement,
invalidity, and unenforceability of the patent. During
pretrial discovery, defendants requested a number of
documents from plaintiff. Plaintiff withheld certain
documents on the grounds of attorney-client privilege.
As a result, defendants filed motions to compel discov-
ery. The court held that the evidence supported a good
faith belief by a reasonable person that in camera inspec-
tion of plaintiff's allegedly privileged materials could
reveal evidence to establish that the crime-fraud excep-
tion applied. In addition, the court determined that plain-
tiff had effected a limited waiver of its attorney-client
privilege. Thus, the court affirmed the magistrate's deci-
sion to compel discovery.

OUTCOME: The court adopted in its entirety the U.S.
Magistrate's recommendation that plaintiff produce for in
camera inspection certain documents because defendants
made a sufficient showing to justify the in camera in-
spection.

*Civil Procedure > Judicial Officers > Magistrates >
Pretrial Orders*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
*Governments > Courts > Judges*
[HN1] *28 U.S.C.S. § 636*(b)(1)(B) permits district courts
to designate a magistrate to report and recommend on
case-dispositive motions. Matters referred to a Magis-
trate under section 636(b)(1)(B) are subject to de novo
review. *28 U.S.C.S. § 636*(b)(1)(C).

*Evidence > Privileges > Attorney-Client Privilege >
General Overview*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Remedies > Collateral Assessments >
Attorney Fees*
[HN2] Where the question is not whether a patent is en-
forceable, but whether the protective shield of the attor-
ney-client privilege may be pierced, the patentee's con-
duct must be measured against the traditional standard
for fraud. In a patent action, that equates to a prima facie
showing of (1) a knowing, wilful, and intentional act of
misrepresentation or omission before the patent office;
(2) that is material; and (3) that the patent office relied
upon in deciding to issue the patent.

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 19 of 45

Page 2

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

*Evidence > Privileges > Government Privileges > Waiver*
*Patent Law > Inequitable Conduct > Burdens of Proof*
[HN3] The showing necessary to trigger in camera review is considerably less demanding than that required to show prima facie common law fraud.

*Evidence > Privileges > Attorney-Client Privilege > Exceptions*
*Evidence > Privileges > Government Privileges > Waiver*
[HN4] A lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the attorney-client privilege. Before engaging in camera review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person, that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Evidence > Privileges > Government Privileges > Waiver*
[HN5] The attorney-client privilege is designed to secure the client's confidence in the secrecy of his communications. Yet the privilege is not absolute and can be waived. Two basic elements are given play in deciding whether the client has waived the privilege: the client's intent to waive the privilege, which may be implied from the circumstances, and considerations of fairness and consistency.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Evidence > Privileges > Government Privileges > Waiver*
[HN6] Fairness prevents a party from disclosing facts beneficial to its position while refusing to disclose, on the grounds of the attorney-client privilege, related facts adverse to its position.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Government Privileges > Waiver*
[HN7] A mere denial of intent, without more, is insufficient to constitute a waiver. On the other hand, when

state of mind is an issue in a case, a party should not be permitted to testify about its state of mind at the time allegedly privileged communications occurred, without pointing to nonprivileged evidence to substantiate its claim or allowing the opposition to discover the privileged communications themselves.

**COUNSEL:** [*1]

David A. Anderson, Esquire of Potter, Anderson & Corroon, Wilmington, Delaware, OF COUNSEL: William F. Kilgannon, Esquire, William J. Hone, Esquire and Stanley L. Amberg, Esquire of Davis, Hoxie, Faithfull & Hapgood, New York, New York, Attorneys for Plaintiff.

Howard M. Handelman, Esquire of Bayard, Handelman & Murdoch, Wilmington, Delaware, OF COUNSEL: John F. Lynch, Esquire and Michael Macklin, Esquire of Arnold, White & Durkee, Houston, Texas, Attorneys for Defendants.

**JUDGES:**

Jane R. Roth, United States District Judge.

**OPINION BY:**

ROTH

**OPINION:**

MEMORANDUM OPINION

General Electric Company ("GE") filed this action alleging infringement of U.S. Patent No. *3,953,394* ("the GE patent") against Hoechst Celanese Corporation ("HCC") and Celanese Engineering resins, Inc. ("CER"). HCC and CER have each counterclaimed for a declaration of noninfringement, invalidity and unenforceability of the GE patent.

I. FACTS

During pretrial discovery defendants requested a number of documents from GE that pertain to GE's prosecution of the GE patent in 1976, and [*2] to a re-examination of the GE patent in 1985-1986. GE withheld certain of these documents on the grounds of the attorney-client privilege. Defendants moved to compel, arguing 1) that GE's attorney-client privilege is vitiated under the "crime-fraud" exception to the attorney client privilege; and 2) that GE waived the attorney-client privilege by producing evidence that it did not have the requisite "state of mind" to commit fraud on the PTO. Defendants' motions to compel were referred to the United States Magistrate, who, in a Memorandum Opinion dated January 24, 1990, granted defendants' motions to compel in substantial part. Presently before the Court are GE's ob-

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

jections to the Magistrate's decision. For the reasons stated below, the Court treats the Magistrate's Memorandum Opinion as a Report and Recommendation, and adopts the Magistrate's recommendations as modified herein.

A. The GE Patent

In order to understand His discovery dispute it is necessary to know something of the chronology of events that surround GE's alleged fraud on the PTO, and something of the invention claimed by GE. The GE Patent was issued in 1976, and reexamined in 1986-1987. GE's original claim was for:

[*3]

thermoplastic, stable, blended compositions comprising in combination

a. from about 1 to about 99 parts by weight of a poly(ethylene terephthalate) resin [referred to as "PET"] and

b. from about 99 to about 1 part by weight of a poly(1,4-butylene terephthalate) resin [referred to as "PBT"] or a copolyester thereof with a minor amount of an aliphatic or aromatic dicarboxylic acid or an alphatic polyol.

(D.I. 109A, A54) PET and PBT are both polymers, known as polyesters. PET is more common and less expensive than PBT, but because PET crystallizes slowly from the melt, it is brittle when molded. PBT, on the other hand, has superior moldability because it crystallizes more rapidly from the melt than PET, but is more expensive to manufacture. The novelty and objective of the blended compositions claimed by the GE patent is explained in the patent as follows:

Because [PET] is known to crystallize only very slowly from the melt and [PBT] is known to crystallize very rapidly from the melt, in view of the above, it would be entirely unexpected to find that blends of these two resins prove to be highly compatible both on the macro and molecular scale. In other words, these two polyester [*4] resins, which should be incompatible on the basis of the wide difference in their rates of crystallization, have, in fact, been discovered to form a stable alloy . . .

It is an object of this invention to improve the moldability of [PET] while improving the properties of [PBT] and to provide compositions having many properties improved over those compositions containing either resin alone.

(D.I. 109A at A53) Thus an important object of GE's invention is to improve the moldability of PET/PBT mixtures. As GE put it: "the invention is predicated on the

finding of an unexpected property, namely that the solidified melt of [blended] PET and PBT will produce a homogeneous molded product." (D.I. 109A at A67)

B. The ABC Experiment -- 1987

The GE patent was reexamined in 1986-1987. The Patent Examiner ordered reexamination in light of British Patent No. 1,060,401 ("Kurashiki"), published in 1967, and Belgian Patent No. 747,243, ("Fiber") published in 1970, both of which disclose mixtures of PET and PBT. (D.I. 109A at A66-A67) On reexamination, GE argued to the Examiner that the GE patent was distinguishable from the prior art because those references claimed compounds that contained [*5] copolymers of PET and PBT, rather than a blend of substantially unreacted PET and PBT as called for in the GE Patent. (D.I. 109A at A69) The Examiner rejected GE's argument. He noted that the terminology of the GE patent was not limited to "blends" of PET and PBT alone, and that blends of PET and PBT made under the conditions of the GE's original patent inevitably contain small amounts of block copolymer. (D.I. 109A at A78) The Examiner concluded that:

The claim terminology, when reasonably interpreted, encompasses blended compositions which may comprise various components, including blocked [copolymer] material, as well as the two recited linear polymers. The other components may be in major amounts. The composition blended with all components is a blended composition. Hence, a blended composition as encompassed by the claims may include major proportions of block polymeric materials.

(D.I. 109A at A78) The GE Patent was rejected on November 13, 1987 as "being unpatentable over Kurashiki and Fiber . . ." (D.I. 109A at A77)

Shortly after the rejection of the GE Patent, representatives of GE met with the Examiner to discuss limiting the claims under the GE Patent to avoid [*6] prior art. GE proposed amending its claims from "comprising" PET and PBT, to "consisting essentially of" PET and PBT. (D.I. 109A at A81) This change in the claim terminology would eliminate copolymer from the claimed blend, thereby avoiding prior art. The Examiner responded that "objective evidence and discussion would be necessary to . . . show that what is being eliminated [block copolymer] would alter the basic nature of the compositions desired to be claimed." (Id.) (emphasis added)

In light of the object of GE's invention -- "to improve the moldability of [PET] while improving the properties of PBT," etc. -- the Court interprets the Examiner's request to call for evidence that blended compositions of PET and PBT behave differently than composi-

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 21 of 45

Page 4

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

tions of PET and PBT containing significant amounts of block copolymer. GE amended its claims to incorporate the "consisting essentially of" terminology, and conducted an experiment which compared the moldability of the PET/PBT mixture set out in kurashiki with that of GE's claimed "blend." In March of 1987 GE submitted the following scary of its best results in support of its amended claims:

Sample A-C bars were made by injection [*7] molding at a temperature of 170o F with a mold cycle of 30 seconds to produce a bar one quarter inch (1/4") thick.

In contrast to the uniformly milky, non-distorted bar of sample C, which bar was prepared from the claimed blend of PET and PBT, Samples A [Kurashiki] and B [Kurashiki/GE mix] were badly distorted and non uniform in that the edges of the bar are semi-transparent and milky only in the center.

. . .

It is urged that the experimental evidence submitted herewith overwhelmingly establishes that a copolymer of PET and PBT present in an amount such as in samples A and B produces a molded product that is unsatisfactory and thus constitutes an alteration of the basic nature of the claimed compositions.

(D.I. 109A at A89-A90) [hereinafter referred to as "the ABC experiment"] Dr. W.F.H. Borman, who supervised the ABC experiment, stated to the Examiner: "The results obtained clearly demonstrate that Samples A & B could not be injection molded to produce a useful product." (Affidavit of Willem F.H. Borman, D.I. 109A at A97) The conditions of the ABC experiment can be summarized as follows:

| | |
|---|---|
| Barrel Temperature: | 500o F |
| MoldTemperature: | 170o F |
| Cycle Time: | 30 sec. |

[*8]

| Sample | Description | PET Content (%) | Result |
|---|---|---|---|
| A | 100% prior art "Kurashiki" | 78 | Distorted, rubbery, struck in mold |
| B | 90% "Kurashiki" 10% of 50/50 PET/PBT Blend | 75 | Distorted, rubbery, |
| C | PET/PBT Blend | 38.5 | Uniformly milky, non-distorted |

(D.I. 109A at A96)

On March 18, 1987, the Examiner confirmed GE's amended claims:

The claims have been amended, narrowed, to exclude any materials which would alter the basic nature of the compositions claimed. It appears from the affidavit of

W. F. H. Borman, submitted in support of the amendments, that at least major amounts of block copolymeric material present would alter the basic nature of the blends claimed.

(D.I. 109A at A170)

C. The German Experiment -- 1986

In January, 1986, approximately one year before the reexamination, GE was prosecuting the German counter-

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 22 of 45

Page 5

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

part to the GE Patent. In connection with the prosecution of the GE patent Dr. Borman performed an experiment ("the German experiment") which compared the moldability [*9] of blends containing different ratios of PET and PBT in which there was no block copolymer. (D.I. 109A at A109) Dr. Borman related the results of the German experiment to GE counsel in a letter dated January 11, 1986:

The blends containing 25 and 35% PET yielded well crystallized parts that released easily from the mold without sticking or distortion. The composition containing 55% PET occasionally stuck in the mold and showed distortion as molded. The composition containing 75% PET stuck badly in the mold and was severely distorted due to the rubbery nature of the product as it exited the mold.

(D.I. 109A at A109) The conditions of the German experiment and the results are summarized in the following table:

| Barrel Temperature: | 500o F |
| Mold Temperature: | 187o F |
| Cycle Time: | 20 sec. |

| Sample | Description | PET Content (%) | Result |
| --- | --- | --- | --- |
| A | PET/PBT blend | 25 | OK |
| B | PET/PBT blend | 35 | OK |
| C | PET/PBT blend | 55 | Distorted, stuck in mold |
| D | PET/PBT blend | 75 | Distorted, rubbery stuck in mold |

[*10]
(D.I. 109A at A109) The German experiment shows that under certain conditions, high concentrations of PET in blended compositions produce an unsatisfactory mold product.

The German experiment was conducted in 1986 and the ABC experiment in 1987. Therefore, when Dr. Borman submitted his affidavit and the ABC experiment results to the Examiner in 1987, the German experiment had already taught him that under certain conditions high concentrations of PET in a blend similar to the high concentration of PET in the copolymer used in the ABC experiment, would produce an unsatisfactory mold. In other words, viewing the two experiments together, it is unclear whether moldability is affected by the presence of copolymer in a mixture or by the level of PET, or by both. Defendants assert that GE's failure to reveal the results of the German experiment to the Examiner in 1987 constitutes fraud on the PTO and vitiates the attorney-client privilege as to numerous documents. The Magistrate agreed with defendants.

II. DISCUSSION

A. Standard of Review

The parties dispute the standard of review to be applied to the Magistrate's decision. GE claims that the Court must conduct a [*11] de novo review of the Magistrate's findings, while defendants contend that the Magistrate's ruling must stand unless clearly erroneous or contrary to law. This conflict is engendered by an unfortunate ambiguity in the Court's orders referring these motions to the Magistrate.

The orders referred the case to the Magistrate to "hear, report and recommend." (D.I. 118, 133) This lan-

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

guage mirrors the language of *28 U.S.C. § 636*(b) (1) (B), which [HN1] permits district courts to designate a magistrate to report and recommend on case-dispositive motions. Matters referred to a Magistrate under section 636(b) (1) (B) are subject to de novo review. See *28 U.S.C. § 636*(b) (1) (C). The present motions, however, are non-dispositive matters, which ordinarily are referred to the Magistrate to "hear and determine" pursuant to *28 U.S.C. § 636*(b) (1) (A). Such non-dispositive matters may be reconsidered only where the Magistrate's order is "clearly erroneous or contrary to law." The Court, the Magistrate, and defendants all assumed that the instant discovery motions had been referred to the Magistrate to "hear and determine." However GE seizes on the "report and recommend" language in the orders [*12] of reference to argue that the Court must now apply the de novo standard of review.

The Court concludes that fairness requires it to conduct a de novo review of the issues presented by GE's objections. Having used the language of section 636(b) (1) (B) in the order of reference, the Court will adopt the standard of review mandated by that provision. Accordingly, the Court will read the Magistrate's Memorandum Opinion as though it were a "Report and Recommendation," and conduct "a de novo determination of those portions of the report . . . to which objection is made." *28 U.S.C. § 636*(b) (1).

B. Defendants' Motion to Compel Based on the "Crime-Fraud" Exception to the Attorney-Client Privilege

(1) Legal Standard

Defendants' first motion to compel urges that GE's attorney-client privilege is vitiated under the "crime-fraud" exception to the attorney-client privilege by the fraud GE allegedly perpetrated on the PTO. The legal standard for determining when the shield of the attorney-client privilege may be pierced has been stated as follows:

[HN2] Where, as here, the question is not whether a patent is enforceable, but whether the protective shield of the attorney-client privilege [*13] may be pierced, the patentee's conduct must be measured against the traditional standard for fraud. In a patent action, that equates to a prima facie showing of (1) a knowing, wilful, and intentional act of misrepresentation or omission before the patent office; (2) that is material; and (3) that the patent office relied upon in deciding to issue the patent.

*Union Carbide Corp. v. Dow Chemical Co., 619 F. Supp. 1036, 1052 (D Del. 1985).* The Magistrate applied this standard, found that defendants had demonstrated a prima facie case of fraud, and ordered GE to produce the documents for in camera review.

GE agrees with the legal standard applied by the Magistrate, but objects to the Magistrate's application of the standard to the facts of this case. (D.I. 176 at 2) Indeed, it is beyond doubt in this Court that Union Carbide provides the framework for evaluating allegations of crime or fraud in patent cases. However, there is no need to discuss the Magistrate's application of the Union Carbide factors here, because the Magistrate ordered in camera review of the allegedly privileged documents. n1 [HN3] The showing necessary to trigger in camera review is considerably [*14] less demanding than that required to show prima facie common law fraud.

> n1 A reasonable interpretation of the Magistrate's Order is that in camera review will screen out privileged communications that were not made in furtherance of a crime or fraud. GE agrees with this interpretation: "The ordered in camera inspection provides a necessary and desirable, antecedent, subject-matter screening by the Magistrate . . . ." Letter from David A. Anderson to Non. Jane R. Roth, dated Feb. 4, 1990.

In *United States v. Zolin, 109 S.Ct. 2619 (1989),* the Supreme Court considered the relationship between in camera review and the crime-fraud exception to the attorney-client privilege. The issue presented in Zolin was "whether the applicability of the crime-fraud exception must be established by 'independent evidence' . . . or, alternatively, whether the applicability of that exception can be resolved by an in camera inspection of the allegedly privileged material." *Zolin, 109 S.Ct. at 2623.* The Court [*15] set forth the conditions under which in camera review is appropriate as follows:

[A] [HN4] lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege. Before engaging in in camera review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' *Caldwell v. District Court, 644 P.2d 26, 33 (Colo. 1982),* that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

*109 S.Ct. at 2631.*

Therefore the relevant question before the Court on de novo review is whether the evidence supports a good faith belief by a reasonable person that in camera inspection of GE's allegedly privileged materials may reveal evidence to establish that the crime-fraud exception applies. In other words, could a reasonable person conclude

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 24 of 45

Page 7

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

that in camera review of GE's documents may lead to evidence of fraudulent intent, materiality, and reliance by the Examiner on that misrepresentation. n2 For the reasons outlined below, the Court finds that defendants [*16] have made this showing.

> n2 The Court does not wish to imply that the Magistrate incorrectly applied the Union Carbide factors. Nor does the Court hold that in camera review is always the appropriate response to a claim of common law fraud. Indeed, Zolin teaches otherwise. See *Zolin, 109 S.Ct at 2631.*

### (2) Materiality

GE argues that the omission of the German data was not material because the Examiner, both in the final rejection, and in his request for further evidence, did not request GE to show that blends and copolymers behave differently from one another. The Examiner's final rejection of the GE patent was based on the fact that GE's original claim encompassed blended compositions that included copolymers, and consequently was unpatentable over prior art. GE proposed to narrow its claims to eliminate copolymers. In response, the Examiner asked for evidence to show that the removal of copolymers would alter the basic nature of the compositions desired to be claimed. This was a fairly broad request. [*17] In essence, the Examiner asked GE to show that blends of unreacted polymers behave (mold) differently than blends containing copolymers. n3

> n3 GE takes issue with this interpretation of the Examiner's request but offers no plausible alternative. GE seems to be arguing that the Examiner requested evidence that blends are different from copolymers because they are different. Such an assertion cannot be taken seriously. GE realized as much when it submitted the ABC experiment, which focused on the moldability of the blends and copolymers.

Thus the Examiner requested evidence that the presence of copolymers altered the basic nature -- the behavior -- of the claimed compositions. GE responded with the ABC experiment, showing that samples A and B, which contained significant amounts of prior art copolymer, could not be molded to form a useful product. However, GE failed to disclose that the German experiment showed that blends containing PET in substantially the same proportion as in the copolymer in samples A and [*18] B could not be molded either. Thus, as the Magistrate noted, GE knew at the time of the reexamination that "the absence or elimination of copolymer does

not necessarily 'alter the basic nature of the compositions desired to be claimed.'" Memorandum Opinion at 16. GE counters that the German experiment is irrelevant to the ABC experiment and to the Examiner's request because the German experiment was conducted under different conditions than the ABC experiment. The German experiment had a different mold temperature and mold cycle than the ABC experiment (20 sec. vs. 30 sec.). GE argues that this difference in "cooking" time means that the German data does not necessarily contradict the ABC data. Moreover, argues GE, the Examiner's request did not require GE to show that all blends of PET and PBT will mold satisfactorily at all combinations of time and temperature within the specified ranges, nor did it require GE to show that the presence of a copolymer always causes a blend to behave differently than a copolymer. GE concludes that the German experiment was not material to the Examiner's request.

GE's materiality argument is strained. GE knew from the German experiment [*19] that blends with high proportions of PET did not necessarily mold well. In addition, GE knew that cooking time was a factor in moldability. Therefore, when GE submitted the ABC test to the Examiner with high concentrations of PET in the copolymer and low concentrations of PET in the blend, GE knew that the difference in moldability could have been due to the different proportions of PET, rather than to the crucial distinction between blends and copolymers. Having chosen to submit an experiment with differing ratios of PET, GE should have disclosed to the Examiner that the difference in moldability may have been due to the proportions of PET, rather that the difference between blends and copolymers. In substance then, either the German experiment was material to the Examiner's request, or, if it was not, plaintiff should have indicated to the Examiner that there was a significance in the ABC test, not only in the presence or absence of copolymer, but also in the percentage of PET present in each sample. The Court finds that GE's failure to reveal to the Examiner such information that was relevant to the basic nature of the compositions claimed is sufficient to support a good faith [*20] belief that in camera review of the communications relating to these experiments may reveal further evidence to establish that the crime-fraud exception applies.

### (3) Intent

The Court also rejects GE's contention that there is no evidence of fraudulent intent. Dr. Borman and Mr. Mufatti knew of the German experiment at the time it was conducted and one year later they knew of the ABC experiment. These experiments were conducted within a year of each other. In camera review of the allegedly privileged communications may uncover further evidence of GE's intent.

Case 1:04-cv-01494-JJF   Document 198-2   Filed 05/25/2007   Page 25 of 45

Page 8

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

(4) Reliance

Reliance is ascertained through application of a "but for" test: "But for the omission or misrepresentation, the claims would not have been allowed." *Union Carbide, 619 F. Supp. at 1052.* The Examiner relied on the ABC experiment to conclude that GE's claimed blends were distinguishable from the prior art. GE's omission of the German experiment was certainly a factor in the Examiner's decision. In camera review of GE's allegedly privileged communications may reveal further evidence of GE's understanding of the relationship between the German experiment and the ABC experiment. Such evidence will contribute [*21] to defendants' prima facie case of common law fraud.

C. Defendants' Waiver Motion

Defendants' waiver motion grows out of their "crime-fraud" motion. GE has steadfastly maintained its innocence in the face of defendants' allegations of fraud. To prove its innocence GE offers the testimony of Dr. Borman and Mr. Mufatti, who deny that they recollected the German experiment at the time of the ABC experiment. Borman and Mufatti also assert that, had they remembered it, they would have considered the German experiment irrelevant to the reexamination of the GE patent. Hence, argues GE, there could be no "intent" to defraud the Examiner. Defendants counter that by injecting Borman and Mufatti's state of mind as a defense to the allegations of fraudulent intent, GE has waived its attorney-client privilege with respect to communications which tend to show Borman and Mufatti's knowledge, at the time of the reexamination, of the moldability of high PET blends. The magistrate agreed with defendants, and concluded that GE had effected a limited waiver of the attorney-client privilege.

[HN5] The attorney-client privilege is "designed to secure the client's confidence in the secrecy of his communications." [*22] 8 Wigmore on Evidence § 2327 at 634 (McNaughten Rev. 1961). Yet the privilege is not absolute and can be waived. Two basic elements are given play in deciding whether the client has waived the privilege: the client's intent to waive the privilege, which may be implied from the circumstances, and considerations of fairness and consistency. See *International Paper Company v. Fibreboard Corporation, 63 F.R.D. 88, 92 (D. Del. 1974).* [HN6] Fairness prevents a party from disclosing facts beneficial to its position while refusing to disclose, on the grounds of privilege, related facts adverse to its position. *Hercules, Inc. v. Exxon Corp., 434 F. Supp. 136, 156 (D. Del. 1977).*

Here, defendants argue that GE injected Borman and Mufatti's state of mind into this controversy, thereby waiving the privilege for all communications that tend to show their knowledge, during the reexamination, con-

cerning the moldability of high PET blends. GE replies that it was defendants who injected the issue of intent into the controversy by asserting the "crime-fraud" exception to the attorney-client privilege.

This juxtaposition of viewpoints highlights the fact that defendants' waiver claim is a "claim [*23] within a claim." In other words, defendants would have no waiver claim unless they had first asserted their crime-fraud claim. GE says, "All we have done is deny intent and point out that there is a lack of intent . . . ." (D.I. 169 at 43) The question becomes what did GE say to "point out" its lack of intent.

[HN7] A mere denial of intent, without more, is insufficient to constitute a waiver. See *Lorenz v. Valley Forge Insurance Co., 815 F.2d 1095, 1098 (7th Cir. 1987).* On the other hand, when state of mind is an issue in a case, a party should not be permitted to testify about its state of mind at the time allegedly privileged communications occurred, without pointing to nonprivileged evidence to substantiate its claim or allowing the opposition to discover the privileged communications themselves. The evidence submitted by GE is as follows. First, Mr. Mufatti, GE's counsel, testified at deposition:

Q. Did you know at the time you were in the interview with the examiner about [the German experiment] as reflected in [Dr. Borman's Jan. 21, 1986 letter to Mr. Mufatti]?

A. I did not recall that work.

Q. You did not recall it?

A. No.

Q. If you had recalled it, what would you have [*24] told the examiner?

A. First of all, I became aware of this letter [five months ago] during Dr. Borman's deposition. I did not recall this letter at that time or during the interview with the examiner or during the prosecution of the reexamination.

Q. If you had recalled it, do you agree you should have told the examiner about this data?

A. I certainly consider this to be irrelevant to the question of the patentability of the claims.

. . .

Had I remembered this letter at the time or this work, I probably would not have called it to the attention of the Patent Office because I considered this to be irrelevant to the [GE] patent during reexamination.

Case 1:04-cv-01494-JJF    Document 198-2    Filed 05/25/2007    Page 26 of 45

Page 9

1990 U.S. Dist. LEXIS 14106, *; 15 U.S.P.Q.2D (BNA) 1673

(D.I. 132A at E66-E67) Dr. Borman testifying concerning the same letter:

Q. Dr. Borman, do you have any recollection of the events set forth in this letter?

A. No. I don't have any recollection.

Q. Do you have any recollection of having a meeting or discussion with Mr. Mufatti preparatory to undertaking the work that is reflected in this letter?

A. No, I don't.

. . .

Q. I was discussing with you the fact that one year prior to [the ABC experiment] you had for purposes of the German application supervised [the German experiment], [*25] correct?

A. According to the letter I was shown this morning, indeed I had done such work. However, that work was of a totally different nature. . . .

(D.I. 132A at A55-A57)

GE offers this testimony as proof that "Dr. Borman did not recall the 1986 German test at the time of his United States reexamination affidavit a year later. Further, Dr. Borman did not believe the German test was relevant to the [GE] patent," and that Mr. Mufatti considered the German experiment irrelevant to the Examiner's request. (D.I. 176 at 11, 14-15) Yet GE points to no evidence, other than the allegedly privileged communications themselves, which would substantiate these claims.

The only way for defendants to refute these assertions is to examine the privileged communications themselves. In light of GE's affirmative representations regarding Borman and Mufatti's state of mind, and in light of the record reflecting contemporaneous communications between Borman and Mufatti, fairness requires that defendants be allowed to uncover the foundations for GE's assertions. See *Friction Division Products, Inc. v.*

*E.I. DuPont de Nemours & Co.*, 117 F.R.D. 535, 538-39 (D. Del. 1987).

The court notes that there is very little likelihood of injury to the attorney-client relationship under the circumstances of this case. First, the Magistrate ordered in camera review of the documents allegedly subject to waiver. This gives added protection to GE's attorney-client relationship because defendants will not be given access to the communications unless the Magistrate's review indicates that the subject documents actually bear upon GE's state of mind. Second, GE was not compelled to rebut evidence of fraudulent intent unless defendants made a prima facie showing of all three elements of common law fraud. Defendants had to do more than merely accuse GE of fraud. Under these circumstances the benefit gained for the correct disposal of the litigation outweighs whatever slight injury might be done to GE's attorney-client relationship.

III. CONCLUSION

Having conducted a de novo review of the record and of GE's objections, the Court concludes that defendants have made a sufficient showing under United States v. Zolin to justify in camera inspection of those privileged documents (identified at D.I. 109A Exhibit B) generated between November, 13, 1986 and March 18, 1987. Accordingly, defendants' first motion to compel production of documents (D.I. 108) will be recommitted to the Magistrate to conduct an in camera review of the aforementioned documents, and to "hear and determine" the matter pursuant to *28 U.S.C. § 636*(b) (1) (A).

The Court also concludes that GE has effected a limited waiver of its attorney-client privilege. The Court adopts in its entirety the Magistrate's "recommendation" [*26] that Plaintiff produce for in camera inspection those documents: (a) as to subject matter, communications tending to show plaintiffs' knowledge regarding high-PET blends and their moldability under any conditions contemplated by the GE patent, and (b) as to time, from November 13, 1986, when the Examiner rejected plaintiff's claims, to March 18, 1987, when the Examiner allowed plaintiff's amended claims.

LEXSEE 2002 DEL CH LEXIS 125


Caution
As of: May 25, 2007

NOEL SAITO, Plaintiff, v. McKESSON HBOC, INC., a Delaware corporation, Defendant.

Civil Action No. 18553

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2002 Del. Ch. LEXIS 125*

October 22, 2002, Submitted
October 25, 2002, Decided

**SUBSEQUENT HISTORY:**    [*1]  As Revised November 13, 2002. Later proceeding: *Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 139 (Del. Ch. Nov. 13, 2002).*
Later proceeding at *Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 139 (Del. Ch., Nov. 13, 2002)*
*Affirmed by McKesson Corp. v. Saito, 818 A.2d 970, 2003 Del. LEXIS 121 (Del., 2003)*
Motion denied by *Saito v. McCall, 2004 Del. Ch. LEXIS 204 (Del. Ch., Aug. 18, 2004)*

**PRIOR HISTORY:** *Saito v. McKesson HBOC, Inc., 806 A.2d 113, 2002 Del. LEXIS 379 (Del., 2002)*

**DISPOSITION:**    Plaintiff's motion to compel granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholder filed an action against defendant corporation, pursuant to *Del. Code. Ann. tit. 8, § 220,* seeking court ordered access to the corporation's records to determine if the corporation's officers violated the law during a prior merger of two corporations. The corporation claimed that the information was protected by the attorney-client privilege and the work product doctrine.

**OVERVIEW:** The shareholder purchased stock in a corporation after it announced that it would merge with another corporation. After the merger, the corporation that was created discovered irregularities in the records of one of the merged corporations, and the U.S. Securi-

ties and Exchange Commission (SEC) instituted an investigation. The new corporation hired outside counsel who concluded a confidentiality agreement with the SEC and the United States Attorney's Office (USAO) and provided documents produced during an internal investigation to the SEC and USAO. In the shareholder's action seeking access to the corporation's records, the chancery court held that (1) the corporation did not waive the work product privilege when it gave documents to the SEC and the USAO under the confidentiality agreement and the court would not order the corporation to give those documents to the shareholder because he did not establish he could not obtain the information from other sources without undue hardship; and (2) the court would order the corporation to provide the shareholder with documents relating to pre-merger legal advice that was given to its directors but not post-merger legal advice.

**OUTCOME:** The court granted the shareholder's motion to compel release of documents relating to pre-merger legal advice which was given to the corporation's directors and documents which outside counsel provided to the SEC and the USAO before the confidentiality agreement was signed, but denied the shareholder's motion to compel release of documents that were provided to the SEC and the USAO under the confidentiality agreement.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*

2002 Del. Ch. LEXIS 125, *

[HN1] Documents do not lose their work product protection simply because a corporation's board of directors fails explicitly to state that an audit report may be used to assist in any anticipated litigation and that the materials prepared during an audit committee investigation are intended to be confidential.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN2] The traditional work product doctrine has been codified in Del. Ch. Ct. R. 26(b)(3) and generally bars the discovery of materials created in anticipation of litigation or for trial preparation. But this bar is not an impenetrable barrier. It is a qualified immunity. It allows a party to seek materials prepared in anticipation of litigation only when the party: (1) has a substantial need for the materials; and (2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions, and legal theories of a party's attorney. This is referred to as opinion work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless a requesting party can show that it is directed to the pivotal issue in the current litigation and the need for the information is compelling.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN3] See Del. Ch. Ct. R. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN4] While Del. Ch. Ct. R. 26(b)(3) states that the court of chancery of Delaware "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has interpreted Rule 26(b)(3) to hold that opinion work product is discoverable upon a strong showing of substantial need and unavailability. This substantial need is met when a party shows that the mental impressions are: (1) directed to the pivotal issue in the current litigation; and (2) the need for the information is compelling.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*

[HN5] As with any privilege, the protection of work product may be waived when it no longer serves its useful purpose.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN6] The purpose behind the protection of work product is to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent. The adversary system is promoted because this protection allows clients to seek informed legal guidance and allows attorneys to prepare their cases without fear that these preparations will be used against their clients. Thus, the focus of the doctrine is upon preventing discovery of the work product from an opposing party in litigation, not necessarily from the rest of the world generally. Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN7] Waivers of the work product privilege are rarely granted in Delaware because of their harsh result. Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege. In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. A waiver does not always have to be express; it may also be implied from the circumstances.

*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Criminal Law & Procedure > Search & Seizure > Expectation of Privacy*
[HN8] Disclosure of work product does not negate its protection unless the disclosure is inconsistent with the maintenance of secrecy from the disclosing party's adversary. A party may relinquish its right to protection of its work product if it knowingly and voluntarily discloses it with either the intention or practical result that the opposing party may see the documents. There is no waiver of privileged information to third parties if a disclosing party has a reasonable expectancy of privacy when it makes disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, a

court generally asks two questions: (1) did the disclosing party believe its disclosure was confidential; and (2) will the law sanction that expectation? Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

***Business & Corporate Law > Joint Ventures > Management Duties & Liabilities***
***Contracts Law > Types of Contracts > Joint Contracts***
***Criminal Law & Procedure > Discovery & Inspection > Discovery Misconduct***
[HN9] Disclosures to a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers. The traditional example of this is the co-defendant situation. This common interest exception or joint prosecution privilege will attach when persons sharing the information have a common adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

***Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > Investigative Authority***
[HN10] The fact that a corporation cooperates voluntarily with the U.S. Securities and Exchange Commission (SEC) and a U.S. attorney's office (USAO) during an SEC investigation does not transform the relationship between the corporation and the SEC or the corporation and the USAO from adversarial to friendly. By yielding to these formidable opponents in order to minimize future damages, a disclosing party does not make those opponents its friend. It merely concedes that it prefers not to anger such a foe.

***Business & Corporate Law > Joint Ventures > Management Duties & Liabilities***
***Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers***
***Contracts Law > Types of Contracts > Joint Contracts***
[HN11] A corporation's decision to cooperate with the U.S. Securities and Exchange Commission (SEC) or a U.S. attorney's office during an SEC investigation to weed out wrongdoers in the company is not the type of common interest which the common interest exception to the rule on waiver of attorney work product by disclosure to a third party contemplates. Cooperation with a government investigation may be a laudable activity, but it does not align one's interests with that government entity. The interest between the disclosing party and the recipient must be so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers.

***Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers***
[HN12] An instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. There are two distinct types of waivers: selective and partial. Selective waiver permits a client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. A partial waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information.

***Business & Corporate Law > Agency Relationships > Disclosure > General Overview***
***Business & Corporate Law > Agency Relationships > Duties & Liabilities > Knowledge & Notice > Duty of Agent to Disclose***
***Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers***
[HN13] Fairness concerns generally govern partial waivers of the attorney work product privilege, but fairness has little relevance in the context of selective waivers. This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work product was confidentially disclosed to a law enforcement agency in its investigation. Public policy seems to

mandate that courts continue to protect confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies.

*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Criminal Law & Procedure > Search & Seizure > Expectation of Privacy*
[HN14] The work product doctrine exists to protect the fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the U.S. Securities and Exchange Commission (SEC), those attorneys can reasonably assume that the SEC will not reveal those confidential disclosures to other adversaries.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN15] Delaware courts vigorously protect work product and treat waiver as an extremely harsh result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by a privilege holder. An attorney who confidentially discloses work product on behalf of his or her client pursuant to a law enforcement agency investigation cannot be accused of egregious abuse of this privilege.

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN16] The U.S. Securities and Exchange Commission (SEC) is the agency principally responsible for the administration and enforcement of federal securities laws, which are designed to protect investors and the integrity of U.S. capital markets. When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. Thus, the SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN17] A disclosure to the U.S. Securities and Exchange Commission does not absolve a corporation of liability for illegal acts. The corporation may hope to obtain leni-

ency by disclosing, but it comes with a cost: airing the corporation's dirty laundry.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN18] Private lawsuits against corporations are an important part of the enforcement scheme, but the U.S. Securities and Exchange Commission (SEC) is the governmental institution established as the first line of defense. There is no reason why courts should not tip the scales in the SEC's favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with the SEC, as private plaintiffs may still bring suit and have the same ability to acquire work product if their need is great enough.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN19] A fundamental advantage of the adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying information, their attorneys digest, analyze, and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions, and legal theories. Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information in discovery, not to their thought processes.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Securities Law > U.S. Securities & Exchange Commission > Administrative Proceedings > General Overview*
[HN20] There is no reason why a court should not treat a law enforcement agency differently than a private plaintiff. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

2002 Del. Ch. LEXIS 125, *

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN21] A confidentiality agreement can prevent a law enforcement agency from passing along privileged information to other private adversaries.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN22] A rule which protects documents provided to law enforcement agencies by a corporation under a confidentiality agreement does not disadvantage private plaintiffs; they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN23] Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
*Civil Procedure > Settlements > General Overview*
[HN24] There are two types of work product: non-opinion (factual/historical) work product, and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party has a substantial need for the materials and the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. A party may receive opinion work product when it is directed to the pivotal issue in the current litigation and the need for the information is compelling. Delaware law protects opinion work product in all but the most compelling circumstances where those mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN25] Under Del. Ch. Ct. R. 26(b)(3), a party may discover non-opinion work product if it shows it has a substantial need for the materials and it cannot acquire a substantial equivalent without undue hardship.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN26] Opinion work product includes the mental impressions, conclusions, opinions, and legal theories of a party's attorney and is only discoverable when the requesting party shows it is directed to the pivotal issue in the current litigation and the need for the information is compelling.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN27] The attorney-client privilege is based upon Del R. Evid. 502(b). This privilege protects communications made for the purpose of facilitating the rendition of professional legal services. The privilege belongs to the client, and may be waived expressly or implicitly. Waiver of one privilege does not necessarily waive another privilege, however, because the purposes behind each privilege are different.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN28] If a corporation objects to discovery and successfully establishes that material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the plaintiff seeking discovery shows good cause why the privilege should not attach. Delaware case law provides a non-exclusive list of factors for a court to consider in deciding if good cause exists in an action filed by a shareholder against a corporation: (i) the number of shares owned by the shareholder and the percentage of stock they represent; (ii) the assertion of a colorable claim; (iii) the necessity of the information and its unavailability from other sources; (iv) whether the stock-

holder has identified the information sought and is not merely fishing for information; and (v) whether the communication is advice concerning the litigation itself. Of these five factors, the least weight should be placed on (i). Only if no other factor supports good cause will the ownership factor come into play.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > General Overview*
*Evidence > Relevance > Relevant Evidence*
[HN29] Legal advice given to the board of directors of a corporation in conjunction with a merger is relevant and necessary in determining what information the board relied upon.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN30] Work product is information assembled by an attorney in anticipation of litigation. Work product provides a broader protection than attorney-client privilege since it includes more than just communications with the client. To obtain work product, a plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship.

**COUNSEL:** Pamela S. Tikellis and Robert J. Kriner, Jr., of CHIMICLES & TIKELLIS, LLP, Wilmington, Delaware; OF COUNSEL: Robert S. Green and Robert A. Jigarjian, of GREEN & JIGARJIAN, LLP, San Francisco, California, Attorneys for Plaintiff.

Anthony W. Clark, Paul J. Lockwood, Michael A. Barlow and Cynthia E. Carrasco, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Jonathan J. Lerner, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, and James E. Lyons and Timothy A. Miller, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, San Francisco, California, Attorneys for Defendant.

Richard M. Humes and Melinda Hardy, Office of the General Counsel, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., Attorneys for the SEC as Amicus Curaie.

**JUDGES:** CHANDLER, Chancellor.

**OPINION BY:** CHANDLER

**OPINION**

CHANDLER, Chancellor

Plaintiff Noel Saito instituted this action under *8 Del. C. § 220* to obtain access to certain books and records of defendant McKesson Corporation ("McKesson"). This is the Court's decision, after a trial and following briefing, with respect to certain records of McKesson as to which [*2] it has asserted attorney-client privilege and the work product doctrine. [1]

> 1   Following remand from the Supreme Court, this Court addressed the scope of plaintiff's demand in an Order dated September 20, 2002. I have stayed that Order until the filing of this opinion. Language in the Order addressing the attorney-client privilege and the work product doctrine refers specifically to the results of this decision.

Plaintiff's action seeks the books and records of McKesson Corporation (formerly McKesson HBOC, Inc.), a Delaware corporation. McKesson HBOC was formed through the merger of McKesson Corporation and HBOC & Co. ("HBOC") on January 12, 1999. Approximately 3 1/2 months after McKesson's acquisition of HBOC became effective, McKesson HBOC announced the first of what appears to be three downward revisions of revenues, earnings, net income, and other financial information, for financial years 1996-1998.

After these announcements, the Securities and Exchange Commission's (SEC) Office of Enforcement began [*3] an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. [2] The next day (April 29, 1999) the SEC notified McKesson that it had begun an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. McKesson HBOC's audit committee then retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") on May 3, 1999. Skadden, in conjunction with PricewaterhouseCoopers LLP ("PwC"), conducted an internal investigation of the alleged wrongdoing and prepared a written report for the audit committee, summarizing the relevant facts and legal principles involved in the various pending actions and investigations.

> 2   P1. App. of Docs. in Support of Mot. to Compel Ex. A, 14.

Skadden informed the SEC and the United States Attorney's Office for the Northern District of California ("USAO") of this investigation and offered to disclose the work product generated from this internal investigation upon the condition that the materials [*4] would be subject to a confidentiality agreement. Most of this work

product was shared after a confidentiality agreement was executed among McKesson, the SEC, and the USAO on May 27 and 28, 1999. Five documents, however, were disclosed to the SEC prior to the execution of the confidentiality agreement. These documents are numbers 7 and 9-12 on the First Privilege Log.

Plaintiff, along with other shareholders, filed a derivative suit in this Court based on the earnings restatements and alleged wrongdoing. [3] Defendant moved to dismiss the derivative action, which I granted without prejudice. I also allowed plaintiff leave to amend the complaint after gathering the facts necessary to file a legally sufficient complaint. [4]

> 3  *Ash v. McCall, 2000 Del. Ch. LEXIS 144* at *1 (Del. Ch. Sept. 15, 2000).

> 4  *Id.*

Plaintiff filed this *§ 220* action on December 14, 2000. At a pre-trial conference, the parties agreed to bifurcate the issues, addressing the scope of the inspection first, [*5] and later addressing the issues relating to attorney-client privilege and the work product doctrine. The issues concerning the scope of the inspection have been addressed in a separate opinion, and numerous documents and records have been ordered produced to plaintiff. [5] This opinion determines the applicability of the attorney-client privilege and work product doctrine to certain documents that continue to be in dispute.

> 5  *Saito v. McKesson HBOC, Inc., 2001 Del. Ch. LEXIS 96* at *4 (Del. Ch. July 10, 2001); *806 A.2d 113 (Del. 2002)*; Order dated Sept. 20, 2002 (identifying records to be produced).

The disputed information plaintiff seeks is listed on four separate privilege logs. Defendant asserts that plaintiff is not entitled to these particular documents because of the attorney-client privilege, the work product doctrine, or both. [6] The documents are best identified by separating them into four different groups. Group A consists of documents McKesson HBOC produced to [*6] the SEC and the USAO. [7] Group B consists of pre-merger legal advice to defendant. [8] Group C consists of post-merger legal advice and board minutes. [9] Group D is a catch-all of all documents prepared by in-house counsel but not produced to the SEC or the USAO. [10] For reasons set forth below, I grant the motion to compel in part, and deny it in part.

> 6  Each line of the privilege log states which defense is being made.

> 7  Items 7, 9-21, 23-114 on the First Privilege Log, letter dated 11/19/99 on Fourth Privilege

Log. Item 22 on the First Privilege Log was listed as a Group A document by plaintiff, but, since it was not produced to the SEC or the USAG, I address this document under Group C.

> 8  All items on the Third Privilege Log.

> 9  Items 1 and 22 on the First Privilege Log; all items on the Second Privilege Log; agenda dated 1/27/99 on Fourth Privilege Log.

> 10  Items 2-6 and item 8 on the First Privilege Log; documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

[*7] I. ANALYSIS

*A. Documents Shared with the SEC and/or the USAO*

Group A documents are those disclosed by McKesson HBOC to the SEC. Most of these documents were not disclosed until a confidentiality agreement was signed with the SEC. Group A documents include Items 7, 9-21, 23-114 of the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. The documents shown to the SEC before the confidentiality agreement was in place are documents 7 and 9-12 of the First Privilege Log. Defendant asserts a work product privilege as to all of these documents and attorney-client privilege as to four of them. Plaintiff Saito contends that these documents are not shielded by the work product doctrine or attorney-client privilege.

1. Work Product Doctrine

Saito contends that the work product doctrine is inapplicable to the Group A documents because the documents were not confidential and because any privilege that would have attached was waived when the documents were disclosed to potential adversaries the SEC and/or USAO.

The documents in dispute were prepared in anticipation of litigation and were intended to be confidential. Thus, the documents clearly qualify as [*8] work product. Plaintiff argues that the McKesson HBOC board did not specifically empower the audit committee with defending securities litigation, so the resulting investigative reports by the audit committee were not prepared in anticipation of litigation. The audit committee retained the law firm of Skadden and the accounting firm PwC, however, for that specific purpose. Skadden shared a dual role--the firm was assisting McKesson HBOC in its internal review, as well as defending various lawsuits linked to the subject of this very same investigation.

Plaintiff also argues that McKesson HBOC never intended the reports to be confidential McKesson HBOC, however, clearly negotiated a confidentiality agreement with the SEC before disclosing the documents at issue. Therefore, the [HN1] documents do not lose their work product protection simply because the board failed explicitly to state that the report may also be used to assist in any anticipated litigation and that the materials prepared during the audit committee investigation were intended to be confidential.

The pivotal question remaining is whether McKesson HBOC waived its work product privilege as to these documents by sharing them [*9] with the SEC in its investigation. [HN2] The traditional work product doctrine has been codified in Chancery Court Rule 26(b)(3), and generally bars the discovery of materials created in anticipation of litigation or for trial preparation. [11] But this bar is not an "impenetrable barrier." [12] It is a qualified immunity. [13] It allows a party to seek materials prepared in anticipation of litigation only when the party: 1) has a substantial need for the materials; and 2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. [14] Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions and legal theories of the party's attorney. [15] This is referred to as *opinion* work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless the requesting party can show that it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling*. [16]

11    In pertinent part, Rule 26(b)(3) [HN3] provides that:

[A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions,

conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

[*10]

12    *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254, 262 (Del. 1995).

13    *Id.*

14    DEL. CT. CH. R. 26(b)(3).

15    *Id.* [HN4] While the rule states that the Court "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has subsequently interpreted the rule to hold that opinion work product *is* discoverable upon an even stronger showing of substantial need and unavailability. *Tackett, 653 A.2d at 262.* This "more substantial need" is met when a party shows that the mental impressions are: 1) directed to the pivotal issue in the current litigation; and 2) the need for the information is compelling. *Id.*

16    *Tackett, 653 A.2d at 262.*

All of the Group A documents are designated as work product. The issue is whether McKesson HBOC waived its claim to work product privilege over Group A documents when it disclosed those documents to the SEC.

a. Waiver of the Work Product Privilege

[HN5] As with any privilege, the protection of work product may [*11] be waived when it no longer serves its useful purpose. [HN6] The purpose behind the protection of work product is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." [17] The adversary system is promoted because this protection allows clients to seek informed legal guidance and allows attorneys to prepare their cases without fear that these preparations will be used against their clients. [18] Thus, the focus of the doctrine is upon preventing discovery of the work product from an *"opposing party in litigation,* not necessarily from the rest of the world generally." [19] Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute. [20]

17   *United States v. AT&T Co., 206 U.S. App. D.C. 317, 642 F.2d 1285, 1299 (D.C. Cir. 1980).*

18   *Westinghouse Elec. Corp. v. Philippines, 951 F.2d 1414, 1428 (3d Cir. 1992).*

19   *United States v. AT&T Co., 642 F.2d at 1298-99 (emphasis added).*

[*12]

20   *See, e.g., Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947); In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367 (D.C. Cir. 1984).*

[HN7] Such waivers are rarely granted in Delaware because of their harsh result. [21] Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege. [22] In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. [23] A waiver does not always have to be express, it may also be implied from the circumstances. [24]

21   *Wolhar v. GMC, 712 A.2d 457, 463 (Del. Super. Ct. 1997)* ("[A] finding of waiver is discretionary with the court and rarely granted, as it is a harsh result."); *see also Tackett, 653 A.2d at 260* (describing the "exacting" standard required to overcome work product protection, a standard that is "more stringent" than that required to overcome attorney client privilege).

[*13]

22   *Wolhar, 712 A.2d at 463.*

23   *Metro. Bank & Trust Co. v. Dovenmuehle Mortg., Inc., 2001 Del. Ch. LEXIS 153, 2001 WL 1671445 at *5 (Del. Ch. Dec. 20, 2001).*

24   *United States v. AT&T Co., 642 F.2d at 1298-99.*

[HN8] Disclosure of work product does not negate its protection unless the disclosure is "inconsistent with the maintenance of secrecy from the disclosing party's adversary." [25] A party may relinquish its right to protection of its work product if it knowingly and voluntarily discloses it with "either the intention or practical result that the opposing party may see the documents." [26]

25   *642 F.2d at 1299* (quoting *GAP Corp. v. Eastman-Kodak Co., 85 F.R.D. 46, 51-52 (S.D.N.Y. 1979).*

26   *Wolhar, 712 A.2d at 462-63.*

There is no waiver of privileged information to third parties if a disclosing party had [*14] a reasonable expectancy of privacy when it made an earlier disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, the Court generally asks two questions: 1) did the disclosing party believe its disclosure was confidential; and 2) will the law sanction that expectation? [27] Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

27   *Jedwab v. MGM Grand Hotels, Inc., 1986 Del. Ch. LEXIS 383, 1986 WL 34210 at *2 (Del. Ch. March 20, 1986).*

1 Common Interest Exception

[HN9] Disclosures to, a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are "so parallel and non-adverse that, at least with respect to the transaction involved, they may [*15] be regarded as acting as joint venturers." [28] The traditional example of this is the co-defendant situation. This "common interest exception" or "joint prosecution privilege" [29] will attach when the persons sharing the information have a common adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

28   *Id.*

29   *WT Equip. Partners, L.P. v. Parrish, 1999 Del. Ch. LEXIS 187, 1999 WL 743498 at *1 (Del. Ch. Sept. 1, 1999)* (withholding oral disclosures because they were made in accordance with the joint prosecution privilege, provided little relevance to solving the substantive issues and outweighed the potential prejudice caused by chilling future counsel preparations).

[*16] McKesson-HBOC argues that it shared a common interest with the SEC when it disclosed the

privileged documents at issue, and, therefore, the work product protection was not waived. Saito disagrees, insisting that McKesson HBOC was not aligned with the SEC and was, in fact, a target of an SEC investigation when the disclosure was made. Thus, Saito contends, the two entities did not share a common interest and McKesson HBOC had no reasonable expectation of privacy in the documents provided to the SEC.

The common interest question here boils down to whether the SEC acts as a friend or foe when it begins investigating a company for potential violations of the Securities Act. I think the more reasonable conclusion is that the SEC was a foe in this instance. [30]

 30   The question in such cases is "who is the target" of the SEC's investigation. Is it the company? Senior officers? A rogue employee? In this particular case, it is clear that the company, at the very least, was a target, and that is sufficient for purposes of my analysis.

[*17] The adversarial relationship here is strikingly similar to that in *In re Steinhardt Partners, L.P.* [31] The *Steinhardt* Court noted that

 the SEC stood in an adversarial position to Steinhardt when it requested assistance. This was not a case in which a party complied with a benign request to assist the SEC in performing its routine regulatory duties. The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the memorandum was sought as part of this investigation. The fact that the request came from the SEC'S Enforcement Division further supports the conclusion that this was an adversarial relationship. [32]

 31   *9 F.3d 230 (2d Cir. 1993).*

 32   *Id. at 234.*

Similarly, McKesson was aware that the nature of its relationship with the SEC was adversarial before disclosing its work product. McKesson knew it was a target, knew the disclosure was being [*18] sought as part of this investigation, and knew the investigation was being conducted by the enforcement arms of two different agencies immediately following a public admission of wrongdoing. These enforcement agencies were *not* "friendly" to McKesson. In fact, as Saito points out, and

defendant concedes, the SEC expressly disavowed sharing a common interest with McKesson. [33]

 33   One court has found that the SEC could potentially share a common interest with a corporation in situations where the SEC is not adverse because individual wrongdoers, as opposed to the corporation itself, are the focus of investigation. *McKesson HBOC, Inc. v. Adler, 254 Ga. App. 500, 562 S.E.2d 809 (Ga. Ct. App. 2002).* The Georgia Court of Appeals directed the trial court to examine whether the fact that the SEC investigation's focus was on former officers and employees, as opposed to current employees or the corporation itself, indicated that the SEC shared a common interest with the disclosing corporation. This is not the situation here, however. McKesson was itself a target of the SEC investigation. Thus, I need not discuss whether the SEC or another law enforcement agency could possibly share a common interest with a disclosing corporation. Instead, McKesson is much more similar to *Cooper Hospital,* where law enforcement agencies were found to be adverse because the agencies were targeting the corporation, not just a few errant employees. *Cooper Hospital/University Medical Center v. Sullivan, 183 F.R.D. 119 (D.N.J. 1998).*

[*19]  [HN10] The fact that McKesson "cooperated voluntarily does not transform the relationship from adversarial to friendly." [34] McKesson had sufficient reason to comply with the SEC and USAO even if its interests were adverse. As other courts have noted, such enforcement agencies are formidable adversaries. [35] Even though they may be considered foes, a party under investigation has significant incentives to cooperate with the authorities. The disclosing party often decides that the benefits of cooperation outweigh the possible damage that may be caused by the information it discloses. Such benefits often include more lenient treatment, avoidance of extensive formal investigation and enforcement litigation, and an opportunity to narrow the issues. [36] By yielding to these formidable opponents in order to minimize future damages, a disclosing party does not make those opponents its friend. It merely concedes that it prefers not to anger such a foe.

 34   *Cooper, 183 F.R.D. at 119.*

 35   *In re Steinhardt Partners, L.P.,* 9 F.3d at 236; *In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367, 1372 (D.C. Cir. 1984); In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 822-23 (D.C. Cir. 1982).*

[*20]

36   *In re Steinhardt Partners, L.P.,* 9 F.3d at 236.

McKesson HBOC argues that it had a common interest with the SEC and USAO in that it too wanted to weed out the wrongdoers in the company. But [HN11] this is not the type of common interest the exception contemplates. Cooperation with a government investigation may be a "laudable activity," [37] but it does not align one's interests with that government entity. [38] As noted above, the interest between the disclosing party and the recipient must be "so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers." [39] McKesson HBOC was not a joint venturer with the SEC or USAO because it was under investigation and its interests were adverse to these enforcement entities when the work product was disclosed. Thus, they did not share a common interest.

37   *Permian Corp. v. United States,* 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

38   *E.g., United States v. MIT,* 129 F.3d 681, 686 (1st Cir. 1997) ("In a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients - who are working together in prosecuting or defending a lawsuit or in certain other legal transactions - can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely.").

[*21]

39   *Id.*

2. Disclosure Pursuant to a Confidentiality Agreement

[HN12] Another instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. As noted in *Westinghouse Elec. Corp. v. Philippines,* [40] there are

two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. [41]

40   *951 F.2d 1414 (3d Cir. 1992).*

41   *Id.* at 1423 n.7 (citations omitted).

The Delaware Supreme Court has already determined that [*22] it is sometimes unfair to allow for *partial* waivers of work product. [42] No Delaware court, however, has decided whether to allow *selective* waivers of work product. Selective waiver is the type of waiver at issue in this case, as McKesson HBOC has selectively disclosed its work product to the SEC and now asserts its work product privilege as to these same documents when requested by plaintiff Saito.

42   *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254 (Del. 1995). A *partial* waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information. *Id.* at 259-60 (finding that insurance company asserting its routine handling of plaintiffs claim implicitly disclosed its reliance upon its counsel's communications and was, therefore, required to produce the privileged materials supporting this assertion).

[*23] [HN13] Fairness concerns generally govern *partial* waivers, [43] but fairness has little relevance in the context of *selective* waivers." [44] This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. I agree with Chief Judge Becker of the United States Third Circuit Court of Appeals in that I "do not see how disclosing protected materials to one adversary disadvantages another." [45] Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work

product was confidentially disclosed to a law enforcement agency in its investigation. Plaintiff Saito has failed to provide such a justification in this instance. Instead, public policy seems to mandate that courts continue to protect the confidentially disclosed work product in order to encourage corporations to comply with law enforcement agencies.

43  Courts have noted that it may be unfair for a party to make an assertion revealing only portions of privileged information without allowing that party to examine the circumstances and evidence supporting that assertion. *See, e.g.,*  Tackett v. State Farm Fire & Casualty Co., 653 A.2d 254 (Del. 1995)* (stating that "implicit waiver also requires that the partial disclosure place the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information."); *Westinghouse Elec. Corp., 951 F.2d at 1426 n.13* (finding that partial waiver may disadvantage adversary by allowing the disclosing party to present a one-sided story to the court).

[*24]

44  *Westinghouse Elec. Corp., 951 F.2d at 1426 n.14* (rejecting fairness rationale as basis for refusing selective disclosure because "when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred.").

45  *951 F.2d at 1430.*

I must first determine whether McKesson HBOC had a reasonable expectation of privacy in its work product documents when it disclosed those documents to the SEC pursuant to a confidentiality agreement in the course of an investigation. If so, I must then determine whether to sanction that expectation. First, I find that McKesson HBOC did have a reasonable expectation of privacy in its disclosure to the SEC of documents secured by a confidentiality agreement. [46] As already noted, [HN14] the work product doctrine exists to protect the fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the SEC, [*25] as McKesson HBOC's attorneys did, those attorneys can reasonably assume that the SEC would not reveal those confidential disclosures to other adversaries.

46  For those documents not secured by a confidentiality agreement before disclosure, it follows that McKesson HBOC did not have any reasonable expectation of privacy.

Although it can be argued that McKesson HBOC should not have had an expectation of privacy because some other courts have decided, that such disclosures waive work product privilege, the courts of Delaware have not considered the issue. In fact, plaintiff, defendant, and the SEC alike fight this battle in this Court using weaponry borrowed almost exclusively from foreign jurisdictional battlefields because Delaware's terrain is barren. The vigorousness of this clashing of swords suggests that the matter is far from settled even on foreign soil.

The resulting decisions cover the entire spectrum-- from protection of work product in the absence of a confidentiality agreement to no protection [*26] of work product even when a disclosure was secured by a confidentiality agreement. The Eighth Circuit first established the selective waiver doctrine and protected work product disclosures made to the SEC during a private, nonpublic investigation, even without a confidentiality agreement in place. [47] The D.C. Circuit has since found that work product privilege could only be preserved if a confidentiality agreement is in place before the disclosure. [48] The Second, Third, Fourth, and Sixth Circuits have found that waiver of the privilege as to one opponent waives the privilege as to all when there is no confidentiality agreement in place. [49] Of these, some indicated that a confidentiality agreement may have changed the outcome of their decision. [50] Only two cases cited to this Court found that the privilege was waived even when the disclosure was subject to a confidentiality agreement. [51] Therefore, in light of conflicting but non-binding precedent, McKesson HBOC acted reasonably in expecting that its disclosures to the SEC under a confidentiality agreement would not reach the hands of its other adversaries.

47  *Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978).*

[*27]

48  *Permian Corp. v. United States, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1218 (D.C. Cir. 1981)* (upholding trial court's conclusion that a confidentiality agreement was in place before disclosures were made to the SEC and that this agreement prevented waiver of the work product privilege as to these documents).

49  *See, e.g., In re Steinhardt Partners, 9 F.3d 230, 236 (2d Cir. 1993); Westinghouse Electric Corp. v. Philippines, 951 F.2d 1414, 1431 (3d Cir. 1992); In re Martin Marietta Corp., 856 F.2d 619 (4th Cir. 1988)* (as to non-opinion work product); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289 (6th Cir. 2002).*

50   *See In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367, 1375 (D.C. Cir. 1984)* (finding that to maintain confidentiality over work product, a corporation can simply refuse to disclose the work product or "the company can insist upon a promise of confidentiality before disclosure to the SEC."); *In re Steinhardt Partners, L.P., 9 F.3d 230, 236 (2d Cir. 1993)* (rejecting selective waiver in most situations but cautioning that "establishing a rigid rule would fail to anticipate situations ... in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials."); *Westinghouse Electric Corp. v. Philippines, 951 F.2d 1414, 1431 (3d Cir. 1992)* (rejecting selective waiver doctrine as a general rule but finding that the result may differ when the SEC is not adversarial *and* disclosures were made pursuant to a confidentiality agreement).

[*28]
51   *Westinghouse Electric Corp., 951 F.2d at 1431; In re Columbia/HCA Healthcare Corp., 192 F.R.D. 575 (D.Tenn. 2000).*

Second, because McKesson HBOC reasonably believed that its disclosures would remain confidential, the remaining question is whether this Court should sanction an expectation of privacy when it arose from an attempt to cooperate with a law enforcement agency investigation. For the reasons discussed below, I believe the more prudent policy would be to recognize such expectations of privacy and hold that McKesson HBOC can therefore assert its work product privilege over Group A documents disclosed under a confidentiality agreement.

As noted earlier, [HN15] Delaware courts vigorously protect work product and treat waiver as an extremely harsh result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by the privilege holder. I fail [*29] to see how an attorney who confidentially discloses work product on behalf of her client pursuant to a law enforcement agency investigation can be accused of egregious abuse of this privilege.

Of course, as other courts have noted, voluntary disclosure is often made to law enforcement agencies because there is already some benefit to be gained from such a disclosure. [52] For example, corporations may cooperate with SEC investigations to avoid extended formal investigation and enforcement litigation, to receive more lenient treatment, and to narrow the investigated issues. [53] Although there is something to be gained from

cooperation, the fact remains that cooperation requires the company to often divulge highly sensitive and incriminating information. There is a balance in place already-whether the corporation should air its dirty laundry in exchange for mercy or whether to force the law enforcement agency to do its own legwork (and possibly overlook or fail to discover some of the incriminating evidence) at the cost of more stringent treatment.

52   *In re Steinhardt Partners, L.P., 9 F.3d at 235-36.*
[*30]
53   *Id.*

When courts amplify the risk of disclosure to include future private plaintiffs, the scales begin to tip further in favor of corporate noncompliance with investigative agencies. A rigid rule leading to such an unwholesome trend seems unwise. Instead, a practical rule that would reduce the risk of secondary unintended disclosure to private plaintiffs from this initial balance would likely benefit both law enforcement agencies and the future private plaintiffs they were established to protect.

A selective waiver rule is such a rule that benefits law enforcement agencies, such as the SEC. Encouraging corporations to disclose their internal investigations confidentially allows the SEC to resolve its investigations expeditiously and efficiently. The SEC restricts its grants of confidentiality agreements to situations where it has reason to believe that obtaining work product is in the public interest and will result in greater efficiency in the investigation. [54] When the SEC benefits from a substantial savings in time and resources, it resolves a higher volume of investigations. [*31] [55]

54   Br. of the United States SEC as *Amicus Curiae* at 2

55   For example, the SEC in its *amicus* brief asserts that it saved several hundred hours, used half the number of staff to investigate, and completed the investigation of McKesson much earlier than it would have done without the confidential disclosure in this case. The SEC has also benefited from confidentially disclosed reports from other targets that saved the SEC approximately 29,000 hours of work and another report saving approximately $ 9 million. Br. of the United States SEC as *Amicus Curiae* at 15-16.

These benefits have an interesting spillover benefit for private plaintiffs as well. Because of the SEC's savings and efficiency, greater protection is afforded to the beneficiaries that it was designed to protect--investing shareholders such as plaintiff Saito. [HN16] The SEC is the "agency principally responsible for the administration

and enforcement of federal securities laws, which are designed to protect investors and [*32] the integrity of our capital markets." [56] When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. In fact, plaintiff Saito, the shareholder contesting the confidentiality of this disclosure, has already benefited by McKesson HBOC's disclosure. Thus, the SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

[56]   Br. of the United States SEC as *Amicus Curiae* at 1.

Undoubtedly it would provide private plaintiffs a strong tactical advantage to have open access to the trial preparations of their opponents. Plaintiff, however, has offered no justification for receiving such open access into the legal strategies and opinion work product of its opponent. Such an assertion is no different from the "have my cake and eat it too" mentality with which some jurisdictions charge disclosing parties. For example, in the context of selective waiver of the attorney-client privilege, [*33] the D.C. Circuit stated that

> the client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege was not designed for such tactical employment. [57]

[57]   *Permian Corp. v. United States*, 214 U.S. App. D.C. 396, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

Although the attorney-client privilege is waived more easily than the work product privilege, a few jurisdictions have extended this policy to further justify a full waiver of the work product privilege. [58] Some courts admonish disclosing parties for desiring to maintain secrecy over their work product because they already benefited from the disclosure by receiving potential lenient treatment from law enforcement agencies. Thus, the courts reason, the disclosing party should not later complain that this benefit [*34] resulted in the unpleasant consequence of stripping the privilege protection of those documents a's against any and all future adversaries. They reason that litigants cannot pick and choose adversaries because they cannot have their cake and eat it too.

[58]   *E.g., Bowne v. Ambase Corp.,* 150 F.R.D. 465, 480 (S.D.N.Y. 1993); In re Subpoenas Duces Tecum, 238 U.S. App. D.C. 221, 738 F.2d 1367 (D.C. Cir. 1984); In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir. 1993).

And yet, this reasoning fails to note two things: 1) disclosing parties actually are not having their cake and eating it too; and 2) the private litigating parties are just as guilty of wanting to have their cake and eat it too. First, disclosing parties can hardly be characterized as having their cake and eating it too. Disclosures made to the SEC when the corporation is under investigation are not really akin to enjoying a dessert. [HN17] A disclosure to the SEC does not absolve the corporation of liability for the acts [*35] disclosed. The corporation may hope to obtain leniency by disclosing, but it comes with a cost—airing the corporation's dirty laundry.

Second, litigating shareholders want to have their cake and eat it too: they want disclosing parties to continue disclosing to the SEC so they are better protected, while at the same time they want access to these disclosures for their own tactical advantage. Yet, these two desires are in tension with one another because to encourage the first, the second is necessarily discouraged. Imposing the harsh consequence of a waiver upon disclosing parties would discourage confidential disclosures. When the benefits of leniency from the SEC are uncertain, yet the burden of exposing a company's Achilles heel to a flood of adversaries is certain, corporations will be less likely to choose to disclose work product to the SEC. It seems inconsistent to deny a selective waiver rule and expect continued cooperation with law enforcement agencies when a confidential disclosure is such a double-edged sword for the corporation.

[HN18] Private lawsuits are an important part of the enforcement scheme, but the SEC is the governmental institution established as the first line [*36] of defense. I see no reason why we should not tip the scales in its favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with the SEC, as private plaintiffs may still bring suit and have the same ability to acquire such work product if their need is great enough.

Plaintiff Saito has asserted no other policy reason why I should reject a selective waiver rule in favor of allowing it to access the trial preparations of its adversary. [HN19] A fundamental advantage of our adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying

information, their attorneys digest, analyze and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions and legal theories.

Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information [*37] in discovery, not to their thought processes. As noted by Justice Jackson, "discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." [59] I know of no good reason why an opponent should borrow the wits of its adversary simply because that adversary was cooperating with a law enforcement agency. This outcome prevents both the SEC and the private plaintiffs from benefiting from confidential disclosures of work product rather than encouraging the benefits inherent in a selective waiver approach. It simply increases the cost of compliance with law enforcement agencies. [60] As noted by the Eighth Circuit it may also "have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." [61]

>    [59] *Hickman v. Taylor, 329 U.S. 495, 516, 91 L. Ed. 451, 67 S. Ct. 385 (1947)* (Jackson, J., concurring).

>    [60] *In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 311 (6th Cir. 2002)* (Boggs, J., dissenting op.) ("The court's rule does nothing more than increase the cost of cooperating with the government.").

[*38]

>    [61] *Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978).*

This is a simple rule to navigate as well. There is no line-drawing problem because law enforcement agencies are readily distinguishable from private plaintiffs. Although there may be problems inherent in treating different *private* plaintiffs differently, [HN20] there is no reason why a court should not treat a law enforcement agency differently than private plaintiffs. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

The only other substantial argument made in opposition to the selective waiver rule is that it does not further the purpose of the attorney work product privilege--to promote the adversary system. This purpose may not be furthered, but it is also not hindered. Because [HN21] a

confidentiality agreement would prevent the law enforcement agency from passing along privileged information to other private adversaries, the adversarial system is still [*39] protected. Thus, this last justification for rejecting a selective waiver rule when a confidentiality agreement is in place seems inadequate to override the strong public interest such a rule would serve. As noted above, [HN22] such a rule does not disadvantage private plaintiffs--they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

Thus, because I find that it is in the best interests of the shareholders to encourage corporate compliance, and because the law enforcement agencies are designed by our legislature as the first line of defense for such shareholders, I adopt a selective waiver rule for disclosures made to law enforcement agencies pursuant to a confidentiality agreement. [HN23] Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

[*40]    Accordingly, I conclude that McKesson HBOC had a reasonable expectation of privacy in its disclosure of work product to the SEC under the protection of a confidentiality agreement. This expectation is one that this Court will sanction. Therefore, McKesson HBOC did not waive its ability to assert the work product privilege as to most of the documents within Group A. Five documents (7 and 9-12 on the First Privilege Log) were shown to the SEC before the confidentiality agreement and were not protected by it. Thus, defendants had no expectation of privacy as to these documents and have waived their work product privilege. These documents must be given to plaintiff Saito. The other documents within Group A will maintain their work product protection. The only remaining question, then, is whether plaintiff Saito has shown a substantial need for the remaining Group A documents.

b. Overcoming Work Product Privilege

As noted above, [HN24] there are two types of work product: non-opinion (factual/historical) work product and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party [*41] has a *substantial need* for the materials and the party cannot acquire a substantial equivalent of the

materials by other means without *undue hardship.* [62] A party may receive opinion work product when it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.* [63]

62  DEL. CT. CH. R. 26(b)(3).

63  *Tackett, 653 A.2d at 262.* This Court has only found two instances where mental impressions have been granted to opposing parties. The limited situations include a claim of bad faith against an insurance company, *see id.,* and the circumstances surrounding the approval of a settlement agreement by the defendant when the result of the agreement would be the elimination of claims by the plaintiff. *See Fitzergald v. Cantor, 1999 Del. Ch. LEXIS 10* at *1-14 (Del. Ch. January 28, 1999). In light of this, it is obvious that Delaware law protects opinion work product in all but the most compelling circumstances where those mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

[*42]

1. Non-Opinion Work Product

[HN25] Under Chancery Court Rule 26(b)(3), a party may discover nonopinion work product if it shows it has a *substantial need* for the materials and it cannot acquire a substantial equivalent without *undue hardship.* The documents appearing to contain historical or fact information but no mental impressions, theories, or opinions are items 9-16, 23-25, 30-65, 67-73, 76-79, 81-101, 106-114 on the First Privilege Log and the letter dated 11/19/99 on Fourth Privilege Log.

Plaintiff has failed to meet the substantial need/undue hardship test in this instance. In his opening brief, plaintiff applies the *Garner* factors to the work product, even though this Court has held that there is no *Garner* exception to the work product privilege. [64] Of the twenty pages in this brief, only one paragraph is even dedicated to establishing Saito's need/hardship. Plaintiff limits his "proof" that he has a substantial need for the challenged documents to a conclusory statement that they are "necessary to his determination of Defendant's actions regarding the acquisition of HBOC and what fiduciary duties were breached in that transaction." [65] Undue hardship [*43] is based upon plaintiff's assertion that the "documents are available from no source other than Defendant." [66]

64  *In re Fuqua Indus., S'holders Litig., 2002 Del. Ch. LEXIS 52* at *20 (Del. Ch. May 2, 2002).

65  Pl.'s Op. Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 15.

66  *Id.*

Further, in his reply brief, plaintiff is similarly inattentive to the substantial need/undue hardship test. For Group A documents, Saito relies solely on the argument that work product protection was waived. Even giving Saito the benefit of an inferential leap by treating the documents as Group C documents, [67] Saito still fails to establish his substantial need/undue hardship. In his twenty-five page reply brief, plaintiff limits his substantial need argument to a statement that the documents "involve discussion of the core matters Plaintiff is investigating." [68] Plaintiff provides no analysis of whether the challenged Group A documents fit the [*44] profile of such discussions, or even whether the documents in question were created before the challenged merger took place. Also, his undue hardship argument is limited to stating that "there is no other way for Plaintiff to obtain the information contained in those [documents]." [69] Because plaintiff has failed to adequately assert his substantial need for these documents, Saito's motion to compel production of these documents is denied.

67  Because the distinction of Group A documents (those disclosed to the SEC) disappears when the waiver argument fails, the documents should then be treated as no different from those in Group C (post-merger legal advice).

68  Pl.'s Reply Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 17.

69  *Id.*

2. Opinion Work Product

[HN26] Opinion work product includes the "mental impressions, conclusions, opinions and legal theories of a party's attorney" and is only discoverable when the requesting party shows it is directed [*45] to the pivotal issue in the current litigation and the need for the information is compelling. [70] The documents appearing to contain mental impressions and opinion work product are items 7, 17-21, 26-29, 66, 74-75, 80, 102-105 on the First Privilege Log.

70    *Tackett v. State Farm Fire & Casualty Co.,*
*653 A.2d 254, 262 (Del. 1995).*

Just as Saito has failed to establish his substantial need/undue hardship for non-opinion work product, he has similarly failed to meet the higher burden required to receive opinion work product. Thus, the motion to compel these documents is denied.

c. Attorney-Client Privilege

[HN27] The attorney-client privilege is based upon Rule 502(b) of the Delaware Rules of Evidence. This privilege protects communications made for the purpose of facilitating the rendition of professional legal services. [71] The privilege, belongs to the client, and may be waived expressly or implicitly. [72] Waiver of one privilege does not necessarily waive another privilege, however, because [*46] the purposes behind each privilege are different. [73] I do not need to address attorney-client privilege in relation to most of the documents in Group A because they are protected by the work product doctrine and are subject to the analysis above, with the exception of document number seven on the First Privilege Log.

71    *Id. at 259.*

72    *Id.*

73    *Id. at 260* (For example, "waiver of the attorney-client privilege does not automatically relinquish the protection provided by the work product doctrine."); *Merisel, Inc. v. Turnberry Capital Mgmt., L.P., 1999 Del. Ch. LEXIS 76, 1999 WL 252724* at *4 (Del. Ch. Apr. 20, 1999).

Because document number seven was disclosed to the SEC prior to the issuance of a confidentiality agreement, McKesson HBOC manifested its intent for the document not to remain confidential. Thus, it waived its attorney-client privilege as to this document.

*B. Pre-Merger Legal Advice*

Seven documents are sought under Group B. Defendant asserts attorney-client [*47] privilege on behalf of all seven. The second document on the third privilege log also contains a defense of work product and non-responsiveness to the claim. The privilege log description states that the document contains legal advice concerning the Amerisource litigation. This is a rather cryptic description, and it is unclear why plaintiff desires this information. Before I rule on this document, I ask defendant to produce the document(s) to me for an *in camera* inspection. The other documents will be addressed now.

I grant the motion to compel production as to the documents relating to pre-merger legal advice as listed on the third privilege log, with the exception just stated concerning the Amerisource document. I base my decision on application of the well-known *Garner* [74] factors.

74    *430 F.2d 1093 (5th Cir. 1970).* I am, obviously, assuming (without deciding) that the pre-merger legal advice documents are protected by the attorney-client privilege. I hold only that Mr. Saito is entitled to access to the pre-merger documents because his status as a stockholder derivative plaintiff provides a mutual interest with McKesson. *See In re The Limited, Inc. S'holder Litig., 2002 Del. Ch. LEXIS 28, 2002 WL 991666* at *4 (Del. Ch.).

[*48]    In *Deutsch v. Cogan,* [75] this Court held that [HN28] "if the corporation objects to discovery and successfully establishes that the material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the plaintiff stockholder seeking discovery shows 'good cause' why the privilege should not attach." [76] *Garner v. Wolfinbarger* [77] provides "a non-exclusive list of factors for a Court to consider in deciding if 'good cause' exists." [78] The *Garner* factors relevant in a books and records action are:

"(i) the number of shares owned by the shareholder and the percentage of stock they represent;

(ii) the assertion of a colorable claim;

(iii) the necessity of the information and its unavailability from other sources;

(iv) whether the stockholder has identified the information sought and is not merely fishing for information;

and (v) whether the communication is advice concerning the litigation itself." [79]

75    *580 A.2d 100, 107 (Del. Ch. 1990).*

76    *Id.*

77    *430 F.2d 1093 (5th Cir. 1970).*

[*49]

2002 Del. Ch. LEXIS 125, *

78   *Deutsch* 580 A.2d at 107.

79   *Grimes v. DSC Communications Corp., 724 A.2d 561, 568 (Del. Ch. 1998).*

Of these five factors, I place the least weight on (i). Granted, plaintiff owns minimal stockholdings, but that factor is not dispositive in determining whether good cause has been shown. Only if no other factor supports good cause will the ownership factor come into play. Therefore, I turn to factors (ii)-(v).

Plaintiff clearly asserts a colorable claim. As stated in this Court's earlier opinion:

> The examination and inspection of the books and records demanded herein is requested for the purpose of enabling Mr. Saito, through his duly empowered attorneys: (1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co., Inc. to the acquisition of HBO & Co. [*50] , Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al., 2000 Del. Ch. LEXIS 144,* C.A. No. 17132 in accordance with the September 15, 2000, Opinion of the Court of Chancery of Delaware. [80]

80   *Saito v. McKesson HBOC, Inc., 2001 Del. Ch. LEXIS 96* at *4 (Del. Ch. July 10, 2001).

To summarize, plaintiff's purpose is to recoup any investment loss that may have been the result of breaches of fiduciary duty. Plaintiff seeks books and records to determine if there was wrongdoing involved with the merger, which is a colorable claim.

The pre-merger legal advice is necessary to plaintiff's claim, and cannot be obtained elsewhere. Defendants assert that only financial advice is necessary for plaintiff to achieve his stated purpose. Plaintiff's purpose, however, is to determine what the board knew when approving the merger. The [HN29] legal advice given to the board in conjunction with the merger is [*51] relevant and necessary in determining what information the

board relied upon. This information, considered by the board before the merger, is not obtainable elsewhere. Therefore, plaintiff satisfies the third factor.

The fourth factor is also met. Plaintiff seeks the legal advice given to the board prior to or in connection with the merger. This information is specific and relevant to plaintiff's stated purpose of determining whether wrongdoing occurred in connection with the merger.

The advice is also not addressed to the litigation itself, because the litigation had not commenced and the merger was not yet complete when the disputed advice was given. The purpose behind the advice was to aid the decision making of the board with respect to the merger. The fifth factor thus is met.

Plaintiff has shown a colorable claim, that the information is necessary and otherwise unobtainable, and that it specifically listed the desired information. The advice does not concern the pending litigation. Because plaintiff has shown good cause, I grant his motion to compel production of the pre-merger legal advice.

*C. Post-Merger Legal Advice*

Twenty-three documents relating to post-merger [*52] legal advice are sought here in Group C. Defendant asserts attorney-client privilege and work product protection on all documents. For the reasons that follow, I deny the motion to compel with respect to these documents.

To rebut the privilege, plaintiff must show good cause, as delineated above. In this instance, plaintiff fails to satisfy factors (iii) and (v), and that is enough to deny a finding of good cause. Plaintiff has obtained the necessary underlying information through documents previously provided to him by defendant during discovery. Plaintiff does not have a right to defendant's legal analysis of that same information.

Defendant's legal analysis is also related to the litigation at hand. The improprieties at issue were discovered post-merger. At that point, defendant obtained legal advice to prepare for the ensuing litigation. To grant plaintiff access to this information, in my opinion, would be improper.

Plaintiff is also denied the post-merger legal advice under the work product' doctrine. [HN30] Work product is information assembled by an attorney in anticipation of litigation. [81] Work product provides a broader protection than attorney-client privilege since it includes [*53] more than just communications with the client. [82] To obtain work product, plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship. [83]

2002 Del. Ch. LEXIS 125, *

81   *Lee v. Engle, 1995 Del. Ch. LEXIS 149* at
*11 (Del. Ch. Dec. 15, 1995).

82   *Id. 1995 Del. Ch. LEXIS 149* at *12.

83   *Grimes, 724 A.2d at 570.*

The documents in question are work product [84] be-
cause they were prepared by attorneys in anticipation of
litigation. As discussed above, plaintiff already possesses
the necessary information through other discovery pro-
vided by defendant. Because plaintiff has not shown a
substantial need and undue hardship, I deny the motion
to compel production of the twenty-three post-merger
legal advice documents in Group C.

84   The Agenda dated 1/27/99 on the Fourth
Privilege Log is not work product because it was
created before the events leading to the litigation
occurred. This document, however, is still pro-
tected under the attorney-client privilege.

[*54] *D. Post-Merger In-House Counsel Documents*

Plaintiff seeks six documents generated by in-house
counsel. These six documents concern press relations,
preservation of documents, and requests for information.
Defendant asserts attorney-client privilege and work
product protection. It also denies that the documents
have any relevance to plaintiff's claims. Plaintiff makes
the same arguments regarding these six documents as he
does regarding the post-merger legal advice documents
under Group C.

Plaintiff's arguments with respect to privilege and
work product fail for the same reasons stated above.
Even if plaintiff showed good cause, substantial need,
and undue hardship, however, the documents do not ap-
pear related to plaintiff's claims or purposes. In-house
counsel created these documents to handle the non-
substantive yet important issues related to McKesson
being in litigation: dealing with the press, requests for
information, and preservation of documents. None of
these documents relate to plaintiff's purpose in determin-
ing if board members violated their fiduciary duties
when they recommended and approved the merger.
Plaintiff's motion to compel production of the in-house
[*55] counsel documents is denied.

II. CONCLUSION

For all the reasons stated above, I grant the motion
to compel with respect to the documents disclosed to the
SEC prior to the confidentiality agreement: documents 7
and 9-12 on the First Privilege Log. I also grant the mo-
tion to compel with respect to the pre-merger legal ad-
vice documents in Group B: documents 1, 3-7 on the
Third Privilege Log. I request defendant to deliver
document 2 on the Third Privilege Log to my chambers
for an *in camera* inspection.

I deny the motion to compel as to the remaining
Group A documents: documents 13-21, 23-114 on the
First Privilege Log and the letter dated 11/19/99 on the
Fourth Privilege Log. I also deny the motion to compel
as to the post-merger legal advice in Group C: docu-
ments 1 and 22 on the First Privilege Log, all documents
on the Second Privilege Log, and the agenda dated
1/27/99 on the Fourth Privilege Log. Finally, the motion
to compel is denied as to the post-merger in-house coun-
sel documents in Group D: documents 2-6 and 8 on the
First Privilege Log, documents dated 5/14/99 and
5/20/99 on the Fourth Privilege Log.

IT IS SO ORDERED.