Page 178

1  depositions that we noticed was of American Appraisal.
2  American Appraisal we sought documents from and they
3  said no problem; we'll comply and we will produce the
4  documents. They then realized when they went to find
5  the documents that they had turned their documents
6  over to the SEC and they had not retained a copy of
7  their documents.
8      So they then had to go to the SEC and get
9  them back, which they did. When American Appraisal
10 said they have the documents, we're going to produce
11 them, NorthWestern apparently had a contractual right
12 to review those documents before they were produced.
13 So we were in a situation where by the time American
14 Appraisal was able to deliver documents to us, the
15 original notice date for the deposition was impossible
16 because we simply did not have enough time to do an
17 adequate review of the documents and then to take the
18 deposition.
19     SPECIAL DISCOVERY MASTER JAMES: Do you
20 have those documents now?
21     MR. KAPLAN: We now have the documents and
22 we're prepared, we have been talking with them
23 scheduling, but there's been a lot of -- it's not easy
24 to schedule all the depositions, but we do have the

Page 179

1  documents now.
2      MS. STEINGART: But we also have a
3  tentative date of the 25th for a deposition of them
4  that we will confirm on Monday and then send around
5  notice to all parties that they say that they can make
6  their witness available.
7      MR. KAPLAN: Another deposition was of
8  Deloitte & Touche. Deloitte & Touche we had
9  originally noticed up for a deposition on April 18th
10 and we were supposed to have documents by April 4th.
11 We ended up not getting the documents until April
12 13th, which made having a deposition -- that was I
13 think a Friday at the end of the day, which made
14 having a deposition on the 18th impossible.
15     So given what we were on getting
16 the deposition -- given where we were in terms of
17 receiving the documents, the notice date, which we
18 spent a lot of time working with Deloitte & Touche to
19 make sure it worked, we're now in a situation where we
20 had to figure out, go back to Deloitte & Touche and
21 try to work on a new date. So that also we're working
22 on, and I don't know yet whether we have a holding
23 date for Deloitte & Touche, but that's another one
24 that, again, document issues delayed the deposition.

Page 180

1  Otherwise, that deposition would have been done.
2      The last one is Jacobson. It was also
3  discussed in our papers. That one when we received
4  the debtors' responses to our interrogatories, we
5  learned for the first time that he had received a
6  Wells notice, which obviously made him an essential
7  person for us to talk with. We also had a situation
8  where we took the deposition, and it was referred to
9  by Ms. Steingart, with one of the witnesses invoking
10 his Fifth Amendment rights, which meant that when we
11 originally were looking at the list of depositions and
12 the parties that we needed there were facts that we
13 had thought we would be able to develop, an
14 evidentiary record that we would be able to build
15 which we now were unable to build because the witness
16 refused to answer any questions.
17     So originally we had said it would be
18 somebody we may want to depose. We then were looking
19 at it saying okay, we can probably get this
20 information from somebody else. When we deposed that
21 other person, while we got helpful inferences to use
22 against NorthWestern, we were not able to actually add
23 to the evidentiary record. So he's a non-party whose
24 deposition is important to us and it's a deposition

Page 181

1  that we should be able to complete fairly soon.
2      SPECIAL DISCOVERY MASTER JAMES: Well,
3  with respect to the gentleman who has the Wells
4  notice, isn't he going to invoke the Fifth too?
5      MR. KAPLAN: We don't know. We have taken
6  depositions. Mr. Hylland, for example, who settled
7  with the SEC, nevertheless didn't take the Fifth and
8  answered questions. And there have been a number of
9  others, Fresia also had a Wells notice and he answered
10 questions. So we don't know whether these people will
11 or will not answer the questions.
12     And then the last thing just in terms of
13 the total number of depositions, NorthWestern and
14 Hanson and Kindt have told us that there's just one
15 deposition that they're seeking to take, which means
16 even if we take all of these depositions, some of
17 which may be obviated by the documents, some of which
18 may not be, we will have a total in this case of
19 fifteen depositions.
20     Considering the number of plaintiffs, the
21 number of defendants, the total of fifteen depositions
22 is hardly a lot of depositions. Judge Farnan's order
23 contemplated, in essence, ten on each side, so he was
24 contemplating twenty total depositions. So the max

Page 182

1  that we're going to have here are fifteen depositions.
2  And of those we have told NorthWestern that well,
3  we're seeking to depose Mr. Thielbar to the extent
4  that the Rule 30(b)(6) witness --
5     MR. BREWER: Kliewer.
6     MR. KAPLAN: Kliewer. I'm sorry. Kliewer
7  that to the extent that the 30(b)(6) witness is
8  adequately prepared and can answer the question, that
9  will obviate the need to take Mr. Kliewer. So we may
10 only end up taking thirteen depositions and, again,
11 some of these document issues and now that they have
12 withdrawn privilege on those documents and when we get
13 to the issue of documents that are illegible may
14 obviate the need for one or two of these depositions,
15 but we won't know until we're actually able to look at
16 the documents that we have and that we will be
17 getting.
18     SPECIAL DISCOVERY MASTER JAMES: Okay.
19 Thank you.
20    Mr. Pizzurro.
21    MR. PIZZURRO: Well, very briefly. First
22 of all, yes, there was discussion that the plaintiffs
23 may want more than ten, but there was never agreement
24 that we acquiesced in that, so having discussions and

Page 183

1  e-mails, we never agreed. In fact, I think I made it
2  clear on a couple of occasions that we can have this
3  discussion, but we're not agreeing to anything right
4  now about the number of depositions. So we just
5  didn't pick a fight at that time.
6     SPECIAL DISCOVERY MASTER JAMES: The ten
7  that's in the case order was selected by the Court?
8     MR. PIZZURRO: Correct. Also, with the
9  logic of the last argument, I guess they should get
10 nineteen depositions since Judge Farnan apparently
11 thought twenty is the right number. Judge Farnan made
12 it very clear, ten for each side. I think that's
13 almost verbatim what he said.
14    So there's no --
15    SPECIAL DISCOVERY MASTER JAMES: Was there
16 a hearing on the case schedule?
17    MR. PIZZURRO: No.
18    SPECIAL DISCOVERY MASTER JAMES: So you're
19 saying verbatim in the order?
20    MR. PIZZURRO: Verbatim in the order. It
21 doesn't contemplate that there will be twenty
22 depositions; divvy them up, folks. It's we get ten
23 and they get ten. So there's no logic to arguing that
24 if we don't take all of ours, they get to pick up the

Page 184

1  slack.
2     In terms of addressing -- we're not
3  arguing about party witnesses, we're not arguing about
4  the timing on that. We understand motions were made
5  for protective order. Those things were in abeyance.
6  That's not an argument that we're making.
7     With respect to these additional
8  non-parties, let's just take them. Let's take
9  Mr. Jacobson, for example. Counsel asked me in a
10 letter back in December, he sent a letter to me, and
11 it's appended I believe to papers that we filed yet,
12 saying here are the people that we think we're
13 definitely going to take; here's an additional list of
14 people that we may want to take; can you tell us, do
15 you represent them? Who does if you don't?
16 Mr. Jacobson was on the definite we want Mr. Jacobson
17 and that was the list.
18    So that's back in December. Mr. Jacobson
19 was not noticed. Indeed, no witness -- I can't recall
20 the first notice of deposition or subpoena for a
21 witness that was served by the plaintiffs, but it was
22 pretty late. Mr. Jacobson I think was on May 1 or May
23 2, the discovery cutoff date.
24    Now, to say well, we need Mr. Jacobson

Page 185

1  because we found out that Mr. Orme was taking the
2  Fifth, Mr. Orme took the Fifth on April 12th. So
3  there was no revelation that Mr. Jacobson was going to
4  be needed if it was Mr. Orme taking the Fifth.
5     If we look at Deloitte, the story with
6  Deloitte, I understand from Deloitte's counsel they're
7  not going to raise an issue about this, but there's
8  not even a valid subpoena out to Deloitte. They
9  initially subpoenaed Deloitte back in '06. They
10 reissued the subpoena. They issued those subpoenas
11 out of the Southern District of New York.
12    The Deloitte folks --
13    MS. DELANEY: The new subpoena.
14    MR. PIZZURRO: The new subpoena. And the
15 Deloitte folks are -- and it's a 30(b)(6). And the
16 people who did the audit are in Minnesota and they
17 were told you're going to have to come to Minnesota
18 and you can't subpoena us in New York.
19    Now, Deloitte could have been resubpoenaed
20 in -- they should have known there were documents that
21 had to be produced way back when. They did not notice
22 a deposition for Deloitte in September of '06 or in
23 October, December or February. It wasn't until March.
24    If there's an issue with Deloitte having

47 (Pages 182 to 185)

Page 186

1  produced the documents or the timing of that
2  production, that's easy to have obviated. You simply
3  subpoena the documents a little earlier. It has
4  nothing to do with any of the document disputes that
5  exist between the parties because the Deloitte
6  documents have nothing to do with us or any disputes
7  that we have with the plaintiffs.
8       So I don't understand the argument as to
9  why there should be extra time or an extra number of
10 witnesses to take Jacobson or Deloitte.
11      Mr. Lewis, Mr. Lewis was subpoenaed for
12 April I think it was 17th. My understanding is that
13 Mr. Lewis's counsel told Magten, plaintiff's counsel,
14 you want him, you got him on the 17th; if you can't
15 make it on the 17th, that's too bad. And rather than
16 try to resubpoena him or otherwise deal with it, they
17 withdrew the subpoena and then they reissued the
18 subpoena close to the discovery cutoff date.
19      Finally, American Appraisers, it's the
20 first I've heard that we're going to have a deposition
21 on May 25. I'm not -- it is what it is and I have got
22 nothing really to say about that other than to note
23 that American Appraisers again, yes, there were issues
24 with the production by American Appraisers because

Page 187

1  they had given their documents to the SEC. But the
2  timing of that is only a result of when the subpoena
3  was issued because once the subpoena was issued,
4  American Appraisers contacted the SEC and the SEC got
5  them back the documents. American Appraisers gave us
6  the documents and plaintiffs' counsel knew about this.
7  We got the documents first in order to review them to
8  see if there were any privilege issues. We reviewed
9  them in three days back in April and they have had the
10 documents.
11      So, again, these depositions should have
12 been taken and they could have been taken, these
13 non-party ones, and I don't understand the need now to
14 have additional. They have, in effect, become the
15 additional depositions, the ones that are over the
16 ten.
17      And Mr. Orme taking the Fifth? I didn't
18 tell them to take Mr. Orme. I don't represent
19 Mr. Orme. You know, what can you do? It is what it
20 is.
21      SPECIAL DISCOVERY MASTER JAMES: Okay.
22      MR. KAPLAN: The only thing that I would
23 like to say in response is we have to look at the
24 deposition period from the end of document discovery

Page 188

1  until the Court-ordered cutoff and we had an
2  incredibly short period of time. NorthWestern didn't
3  finish producing their documents until March 16th for
4  a May 2nd discovery cutoff.
5       So when we had to determine which
6  depositions we were going to notice and we were
7  issuing subpoenas, some parties, for example, American
8  Appraisal, we didn't know who American Appraisal was
9  until we were going through the document production in
10 March. We knew there were appraisals done, but we
11 didn't know who they were done by and it wasn't until
12 reviewing the documents and there was some
13 communications back and forth between us and counsel
14 for NorthWestern that they were able to identify who
15 had done the appraisals until we first started issuing
16 subpoenas.
17      So this isn't a situation where we have
18 had the documents for two years and then we waited
19 until right on the eve of the discovery cutoff to
20 start issuing subpoenas. We had an incredibly short
21 time frame, about 45 days from the end of document
22 discovery to get all of the depositions done. And in
23 this compressed time frame we have been dealing on the
24 fly with issues such as a witness taking the Fifth,

Page 189

1  the SEC issuing complaints and a cease and desist
2  order in the middle of this. And so, yes, some of it
3  has been done on the fly, but that's a fact that we
4  have been facing because of the fact that we didn't
5  get the documents until mid-March.
6       So this is not a problem that we have
7  created. This is just the circumstances that we find
8  ourselves in.
9       SPECIAL DISCOVERY MASTER JAMES: To what
10 extent will my rulings on any of the outstanding
11 privilege issues raise the possibility of other
12 deponents whom you have not thought of yet or
13 identified?
14      MR. KAPLAN: That's a very hard question
15 to answer.
16      MS. STEINGART: I don't think that the
17 documents will lead to new deponents. My view is that
18 as I understand the documents and the description of
19 them, they relate to people that we have already asked
20 for.
21      And I would just like to add one other
22 fillup to this, and that is we haven't finished -- we
23 have received a lot of documents from Deloitte and
24 we're not looking at them alone. Our experts are

Page 190

1  looking at them as well and we didn't receive them
2  until the middle of April and it takes time to look at
3  financial documents like this.
4      The same thing is true with American
5  Appraisal. We had no objection to their review of the
6  documents. We didn't rush them. We got them. We
7  were happy to then schedule afterwards. But these are
8  documents also our experts have to look at as well as
9  us. That's why we have experts. And that adds to the
10 time.
11     We may decide that we don't want these
12 depositions and so I don't want to -- we're trying to
13 make a cut. We're trying to get final dates from
14 people and then decide in some compressed time frame
15 hopefully before the end of next week, if we actually
16 want American Appraisal and Deloitte. I'm not sure we
17 want them, but we would like to have them, to have the
18 ability to do them if we decide they're necessary and
19 to put them on whatever schedule the Court permits us
20 to have. And we don't want to take any unnecessary
21 deposition. It's not something that we have been
22 trying to do.
23     And when Mr. Pizzurro said that we have
24 always talked about it, they have never agreed,

Page 191

1  absolutely. We all talked about it. We were all
2  trying to reach a consensus on a number of issues.
3  Each of the issues involve give-and-take. Mr. Kaplan
4  said we were hopeful that we would have an agreement.
5  We didn't have an agreement and Mr. Kaplan recognized
6  that. And I'm really hoping that the place we're at
7  is eleven and we'll do all we can for it to be at
8  eleven. We would prefer it was at eight, but we think
9  that we have tried to exercise a great deal of
10 judgment and deliberation before we do the
11 depositions, especially when it's non-parties who are
12 otherwise pressured in other areas.
13     So we didn't want to have to take everyone
14 who had the Wells if we could take one person because
15 we know what kind of problems that create for the
16 witnesses. So that's why, that's another reason why
17 we are where we are. We have tried to be diligent.
18 We have tried not to be obstructionists.
19     SPECIAL DISCOVERY MASTER JAMES: Okay.
20 Thank you.
21     This is a complex case. The ten
22 deposition rule limit is a standard default number
23 that every judge in this particular district court
24 uses. They freely depart from those limitations when

Page 192

1  good cause is shown. I think the circumstances that
2  have been discussed in the papers and dealt with here
3  today show that good cause exists to increase the
4  number of depositions that either side wants to take.
5      Mr. Kaplan, the number that we're looking
6  at from your perspective now is you have taken five
7  and you want to take how many more?
8      MR. KAPLAN: We want to take up to a total
9  of fourteen.
10     SPECIAL DISCOVERY MASTER JAMES: All
11 right. So to be safe, I will give you fifteen
12 depositions and as I will give the defendants fifteen
13 depositions if they want to waste their time.
14     In terms of timing, I don't think I'm
15 going to set a specific cutoff, although I may think
16 about that. Let me take that under advisement because
17 I know from practical experience how difficult it is
18 to schedule depositions, especially with third parties
19 who don't want to see your face and you have to drag
20 them in kicking and screaming to depositions.
21     But in order to keep this case moving, I
22 may and in light of what I have heard from
23 NorthWestern's counsel concerning perhaps not being as
24 diligent as possible, I'll take that for what it's

Page 193

1  worth, I have heard the contrary from Magten and as
2  far as I'm concerned it's a wash, so I'll consider
3  whether I want to impose a deadline. I would
4  encourage the parties to cooperate as much as possible
5  on these issues, which will lead us to the next issue.
6      MR. PIZZURRO: May I raise one point
7  before we leave this one in light of what you just
8  said?
9      SPECIAL DISCOVERY MASTER JAMES: Yes.
10     MR. PIZZURRO: Two points. One, I just
11 want to note this for the record. I'm going to
12 assume, given that ruling, which is fine, we served
13 interrogatories and document requests which
14 technically were due on the 11th --
15     MS. STEINGART: And we will respond.
16     MR. PIZZURRO: And you will respond, fine.
17     MS. STEINGART: Right.
18     MR. PIZZURRO: The other thing that I want
19 to raise is, and this is not adversarial at all, we're
20 not looking simply at a discovery cutoff. We're
21 looking at other scheduling dates, milestones,
22 different dates that the Court has in the order and we
23 have got a date for expert discovery, we have a date
24 for dispositive motions and then we have a trial date

Page 194

1 and I have a concern that letting this date slip --
2 and it's fine. I want to be clear. Originally we
3 were the ones who were arguing that this case could
4 not possibly fit in the kind of schedule that was
5 being demanded and that this was, in fact, a
6 compromise by Judge Farnan, so I'm not making that
7 point.
8      Simply I don't want to have us or anybody
9 jammed up on experts or jammed up on dispositive
10 motions and then jammed up on a trial date because the
11 depositions aren't finished until September. We have
12 got the summer holidays and whatever.
13      SPECIAL DISCOVERY MASTER JAMES: Yes. I
14 wasn't even contemplating that happening. I mean,
15 maybe it is better if I set a cutoff date.
16      MR. KALECZYC: Excuse me, Your Honor, if I
17 could be heard on that?
18      SPECIAL DISCOVERY MASTER JAMES: Yes, sir.
19      MR. KALECZYC: Just so that the Court is
20 aware, we had anticipated that the discovery would be
21 completed in this case by May 2 and on that basis
22 Ms. Beatty and I have two other matters that are
23 scheduled to go to hearing or trial in Montana at the
24 end of July, beginning of August and depositions have

Page 195

1 yet to be taken in those cases and Mr. Kaplan talks
2 about wanting to take nine or ten additional
3 depositions. We still want to depose Mr. Embry.
4 Obviously, we will work with all of the parties in
5 order to accommodate all of these schedules, plus meet
6 our requirements to our other clients.
7      But if the Court is inclined to set a
8 deadline, we would ask that you take into
9 consideration that we have other obligations during
10 this time and not make that too short. I would
11 suggest depositions being done by mid to late July
12 with respect to this case. Again, we're work with
13 counsel. We have already told Ms. Steingart some of
14 the dates that we have available and dates that we
15 don't have available for deposition, but we have a
16 very horrific calendar during the month of June and
17 July.
18      And, again, that was set in anticipation
19 of discovery being completed on May 2nd in this case.
20      SPECIAL DISCOVERY MASTER JAMES:
21 Mr. Pizzurro, how does that relate? How do you feel
22 about mid-July?
23      MR. PIZZURRO: It's an awfully long time
24 from now. Look, I don't want to have anybody jammed

Page 196

1 up. My concern is not that we get the depositions
2 done in the next two weeks. My concern is that the
3 depositions don't get done at a point where these
4 other dates become impossible to meet.
5      So what I would suggest is it might make
6 sense not just to set a date for the completion of the
7 depositions but then to examine whether the other
8 dates in that order -- frankly, since one of the dates
9 is a trial date and the judge's trial calendar is his
10 calendar, I don't know how much we can deal with that.
11      SPECIAL DISCOVERY MASTER JAMES: I'm not
12 touching that. We can't touch that.
13      MS. STEINGART: Right.
14      SPECIAL DISCOVERY MASTER JAMES: To be
15 frank, but for the concern I just heard expressed on
16 behalf of counsel for Messrs. Hanson and Kindt, I was
17 thinking of June 30 as a cutoff.
18      You have to defend Mr. Hanson and
19 Mr. Kindt, correct?
20      MR. KALECZYC: That's correct.
21      SPECIAL DISCOVERY MASTER JAMES: And
22 Mr. Embry is the only deposition that as far as I know
23 up until now that this side contemplates taking. Is
24 that correct?

Page 197

1      MR. PIZZURRO: Correct.
2      SPECIAL DISCOVERY MASTER JAMES: Now, I
3 suppose one of you has to be there; certainly both of
4 you don't have to be there?
5      MR. KALECZYC: At least one of us would
6 have to be there for the 30(b)(6), Mr. Kliewer, if
7 he's separate, Mr. Thielbar, if he's separate, as well
8 as the non-NorthWestern witnesses. Maybe not for
9 American Appraisal. Local counsel could probably
10 cover that for us, but the Deloitte & Touche we may
11 need to be there for and also certainly for
12 Mr. Jacobson if his deposition is going to be taken.
13      MS. STEINGART: Just as to the third
14 parties, what we have been doing thus far is letting
15 the third parties tell us what dates they're available
16 and then we notify counsel. We haven't been --
17      SPECIAL DISCOVERY MASTER JAMES: You don't
18 have much control over third parties.
19      MS. STEINGART: Right. But to the extent
20 that we have a cutoff, we will get the third parties
21 scheduled before the cutoff. We provided dates that
22 Mr. Embry is available. We have gotten some dates
23 that Mr. Hanson and Mr. Kindt may be available.
24      I think that the other thing to keep in

Page 198

1  mind is that with respect to expert discovery, the
2  materials that the experts need to do their reports
3  hopefully now everyone has so the expert discovery
4  does not have to add, does not have to -- the
5  completion of the fact discovery can overlap the
6  period of the expert discovery because the materials
7  for the experts -- you know, I don't think anybody
8  needs Mr. Embry's deposition to prepare whatever
9  expert you have. You know, that's not what the
10 experts are opining on.
11      So I think that the materials that the
12 experts are working on is already out there. So I
13 think that there can be an overlap of those two
14 things. I think that the end of June is certainly
15 doable for completing discovery.
16      SPECIAL DISCOVERY MASTER JAMES: All
17 right. Here's what I'm going to order.
18      I'm mindful of the concern expressed by
19 counsel for Messrs. Hanson and Kindt. However, I'm
20 going to order that all fact discovery, all fact
21 depositions be completed by June 30. To the extent
22 that a hardship arises with respect to Messrs. Hanson
23 and Kindt's counsel, I'll entertain some motion for
24 relief and rescheduling of a deposition if you can't

Page 199

1  fit it in. I'm very concerned. We have the experts
2  reports are due on August the 3rd. Things slow down
3  in the summer. People go on vacation. It's hard to
4  get a hold of people and this case has been delayed
5  long enough and I think we have a December trial date,
6  et cetera, et cetera.
7      So that's my order on that.
8      Now let's turn, since we're talking about
9  discovery and since our friends from Montana have been
10 patiently waiting, let's turn to the motion for
11 protective order with respect to NorthWestern and
12 Messrs. Hanson and Kindt. Although before we get to
13 that --
14      MR. PIZZURRO: Could I ask for a five-
15 minute break?
16      MS. STEINGART: We have the electronic
17 document issue. We'll do that later?
18      SPECIAL DISCOVERY MASTER JAMES: We can do
19 that later.
20      MS. STEINGART: Okay.
21      SPECIAL DISCOVERY MASTER JAMES: We'll
22 take a break and after the break, actually before we
23 get to Hanson and Kindt, I want to know what the
24 status is on Embry.

Page 200

1      MS. STEINGART: We provided dates that
2  Mr. Embry could be available and we're waiting to hear
3  back which dates are selected, which date is selected.
4      SPECIAL DISCOVERY MASTER JAMES: So that
5  has been resolved?
6      MS. STEINGART: I hope so. I hope so. We
7  provided dates and you were copied on the letter.
8      MS. BEATTY: Yes. I think, Bonnie, the
9  issue is that we were waiting to schedule Embry's
10 deposition until a time that we resolved these issues
11 on additional production of documents, on your answers
12 to discovery. Some of those issues have been taken
13 care of today. The underlying issue with Mr. Embry's
14 deposition, as this Court is aware, you had offered
15 him up on May 4th. We ultimately took you up on that.
16 You filed your motion for protective order in any
17 event, didn't withdraw it, so we were willing to take
18 him on the 4th.
19      That didn't occur so we just need at this
20 point to set a new trial date -- or a new deposition
21 date. It only makes sense to set his deposition date
22 for after we get together and these issues resolved
23 and get your answers, so we have received your dates
24 that he's available. We'll be looking at it in the

Page 201

1  context of everything else and trying to set a date,
2  so I think we can work through that one.
3      SPECIAL DISCOVERY MASTER JAMES: Fine.
4  Good.
5      Let's take a five-minute break.
6      (A brief recess was taken.)
7      SPECIAL DISCOVERY MASTER JAMES: The next
8  item for argument is item number 7 in my May 17
9  letter, the joint motion for protective order filed by
10 NorthWestern and Messrs. Hanson and Kindt as to
11 certain depositions noticed by plaintiffs.
12      And I'll leave it up to counsel for the
13 respective parties as to who wants to go first.
14      MR. KALECZYC: There are really two issues
15 here, Your Honor. One is at this point the location
16 of the depositions and then also the possibility
17 still, though that may be diminished as a result of
18 some of the orders earlier today, of depositions of at
19 least Hanson and Kindt being continued or taken a
20 second time.
21      In addition to Hanson and Kindt, the
22 location issue also involves the location for the
23 depositions of Mr. Kliewer, Mr. Thielbar and a
24 30(b)(6) witness for NorthWestern if, in fact, it's

Page 202

1  different than one of the other witnesses.
2        SPECIAL DISCOVERY MASTER JAMES: Remind me
3  who Thielbar and Kliewer are and was that addressed in
4  the motion papers I have?
5        MR. KALECZYC: Yes, it was addressed in
6  the motion papers. Mr. Kliewer as I recall is the CFO
7  of the company. Mr. Thielbar is now a manager of the
8  company and he was an officer at an earlier point
9  of -- was it Expanet? I can't remember which.
10       You may remember which company
11 Mr. Thielbar was associated with.
12       MR. PIZZURRO: NCS, I believe.
13       MR. KALECZYC: So we have really these
14 five individuals. They're all NorthWestern employees.
15 Mr. Kindt is no longer an employee. He was employed
16 originally by the Montana Power Company and when
17 NorthWestern acquired the Montana utility business,
18 then Mr. Kindt became an employee of what at that
19 point was known as NorthWestern Energy, LLC.
20 Subsequently, the name changed to Clark Fork and
21 Blackfoot. Mr. Kindt has always worked in Butte,
22 Montana. He's no longer an employee of the company.
23 He is serving as an independent contractor doing work
24 related largely to regulatory filings in Montana for

Page 203

1  the company.
2        Mr. Hanson obviously today is the chief
3  executive officer of the company and he's located in
4  Sioux Falls. Mr. Kliewer is also in Sioux Falls. I
5  believe Mr. Thielbar, while he lives in a different
6  location, commutes and works in the Sioux Falls
7  office.
8        So all of these individuals are, with the
9  exception of Mr. Kindt, whom we have offered to make
10 available in Sioux Falls, and even under our motion
11 that's the most convenient location for them and
12 certainly the case law is that the preferred location
13 to take the depositions of corporate officers and key
14 corporate employees would be at the corporate offices
15 and there's no dispute that the corporate offices are
16 in Sioux Falls.
17       So, first, we would like the depositions
18 ideally to be taken in Sioux Falls. Now, we had
19 during the negotiations that have been referred to
20 earlier offered to make these individuals available in
21 Minnesota when there were other depositions being
22 scheduled of non-party witnesses at the same time in
23 Minnesota.
24       So there was the opportunity to have those

Page 204

1  depositions taken at that location. Given the Court's
2  order that all depositions are to be completed by the
3  end of June, it seems that we're going to need to
4  cluster these depositions and have them all occur in
5  one location. Sioux Falls certainly becomes an
6  acceptable location for all of those depositions of
7  the corporate employees and, quite frankly, they would
8  probably be required to be taken the week of June 25.
9  We have indicated to Ms. Steingart that that's one of
10 the times when Mr. Hanson and Mr. Kindt would be
11 available to be deposed.
12       One of the questions or issues that has
13 been raised in the briefs that were filed by Magten is
14 the argument that the Hanson and Kindt litigation was
15 originally initiated in Montana and by order of the
16 federal court, Judge Cebull in Montana, the action was
17 transferred to the Delaware District Court. Judge
18 Cebull did that at a time when there were nine other
19 separate proceedings brought by Magten that involved
20 in one fashion or another the acquisition of the
21 Montana Power Company utility business and then
22 subsequent as part of that acquisition the decision to
23 move the assets out from Clark Fork and Blackfoot or
24 NorthWestern Energy, LLC to a division of the parent.

Page 205

1        Judge Cebull looking at all of those
2  issues and the fact, in particular, that this lawsuit
3  against NorthWestern and also at that time another
4  lawsuit brought against Paul, Hastings' law firm who
5  were counsel to NorthWestern at the time were both
6  pending in Delaware, he believed that judicial economy
7  favored moving this lawsuit against Hanson and Kindt
8  to Delaware.
9        SPECIAL DISCOVERY MASTER JAMES: In fact,
10 Mr. Hanson and Kindt believed that too, correct?
11       MR. KALECZYC: And Mr. Hanson and Kindt
12 believed that too, anticipating that if there were
13 going to be a trial in this action that they would be
14 coming to Delaware for trial.
15       Judge Cebull in his order transferred the
16 case for purposes of the trial. Nothing in Judge
17 Cebull's order transferring the case addresses the
18 appropriate location for any depositions of witnesses
19 to be taken, contrary to what is suggested in the
20 Magten opposition brief. So it's our position that
21 while the Hanson and Kindt trial obviously will go
22 forward in Delaware that in no way impacts or relates
23 to where their deposition should be taken and the
24 general rule should apply and, in particular, given

Page 206

1  the time crunch that we're under and the desirability
2  of clustering depositions, not to mention the
3  difficulties of Mr. Hanson and Mr. Kindt making it to
4  the east coast and at this point Mr. Hanson, in
5  particular, as his affidavit indicates, is in the
6  middle of an acquisition of NorthWestern and a lot of
7  his time is being consumed by that activity, as well
8  as his other normal activities as chief executive
9  officer. All of that suggests that those depositions
10 should be taken in Sioux Falls.
11     SPECIAL DISCOVERY MASTER JAMES: Let me
12 ask you about the acquisition issue without getting
13 into any detail that would be confidential as to that.
14     What is the time line on that? Is that
15 something where it's imminent and he needs to be there
16 every day for the foreseeable future?
17     MR. KALECZYC: Well, I don't know, Your
18 Honor, that he has to be there every day specifically
19 for this acquisition. The acquisition is moving
20 forward.
21     SPECIAL DISCOVERY MASTER JAMES: This is
22 an acquisition of NorthWestern by some third party?
23     MR. KALECZYC: By an Australian
24 corporation.

Page 207

1     As I understand it, and we are not counsel
2  involved in the acquisition, but our understanding is
3  that they're waiting for approval from the Montana
4  Public Service Commission as the last regulatory
5  approval that needs to be obtained in order for the
6  acquisition to go forward. I believe the Montana
7  Public Service Commission's decision could be
8  imminent.
9      MS. BEATTY: The Montana Public Service
10 Commission committed, I believe, to get their decision
11 out within 30 days of post-hearing briefs and I
12 believe the post-hearing briefs were filed a week to
13 ten days ago.
14     MR. KALECZYC: So within the next --
15     MR. SNELLINGS: I think it was just last
16 week.
17     MS. BEATTY: Yes, a week ago.
18     MR. KALECZYC: So within the next couple
19 of weeks we anticipate a decision from the Montana
20 Public Service Commission and then after that I would
21 assume that the next steps in the acquisition are
22 going to begin to cascade, so his time commitments are
23 additionally limited by that unique set of
24 circumstances but, again, he is the CEO of the company

Page 208

1  and he has other normal duties in that regard.
2      Finally, the Deloitte & Touche and Merle
3  Lewis and Jacobson depositions, if in fact they're all
4  going to go forward on the part of Magten, would be
5  located in Minnesota. As I mentioned earlier, we had
6  offered to make the deponents available in Minnesota.
7  Right now it seems, given the number and the limited
8  time, Sioux Falls would be the preferred location for
9  those depositions.
10     SPECIAL DISCOVERY MASTER JAMES: Is there
11 a direct flight access from Minneapolis to Sioux
12 Falls? I assume there is.
13     MR. KALECZYC: There is. There's regular
14 air service between Minnesota, between Minneapolis and
15 Sioux Falls.
16     SPECIAL DISCOVERY MASTER JAMES: What's
17 the flight time between them?
18     MR. KALECZYC: I think about an hour?
19     MS. BEATTY: Yeah, about an hour.
20     MR. KALECZYC: Roughly an hour, an hour
21 flying time.
22     And, finally, Your Honor getting back to
23 the question of multiple depositions, unless we hear a
24 representation from Magten to the contrary, we

Page 209

1  continue to have the concern that they may try to
2  continue the depositions of Mr. Hanson and Mr. Kindt.
3  Maybe that problem is now resolved or going to be
4  resolved, depending upon how quickly the remaining
5  document-related discovery issues get finally resolved
6  and documents reviewed by Magten's counsel. But,
7  again, we don't want to be in a position, especially
8  under the time crunch that we're now under, of having
9  Hanson and Kindt be scheduled for, in effect, two
10 depositions.
11     SPECIAL DISCOVERY MASTER JAMES: Thank
12 you.
13     MR. KALECZYC: Mr. Pizzurro may have some
14 additional comments.
15     SPECIAL DISCOVERY MASTER JAMES: Yes.
16 NorthWestern.
17     MR. PIZZURRO: I have little to add. In
18 terms of the legal arguments that were made in the
19 brief, I want to point out that the overriding factor
20 that the courts apply in determining where depositions
21 are to be held, particularly the depositions of
22 corporate officials, you start, you start with the
23 rule that the preferred venue is the corporate
24 headquarters and that is applied even in cases, not

53 (Pages 206 to 209)

Page 210

1  all, but often in cases where the corporation is a
2  plaintiff and the forum and the corporate headquarters
3  are in different locations.
4      The overriding factors that the courts
5  apply are determining what are the convenience --
6  minimizing the expense and inconvenience to the
7  parties. And whether you look at it from the point of
8  view of who is the plaintiff or who is the defendant,
9  I know the argument is out there that although Magten
10 and Law Debenture are the plaintiffs, this venue was
11 chosen by NorthWestern because it's where it filed for
12 bankruptcy and then there's apparently a case in the
13 past 25 years that so held and no other.
14     Nevertheless, in all of the cases what the
15 courts apply are the factors to determine minimum
16 inconvenience and expense. This is a situation where
17 it really, it really doesn't make any sense to have
18 these witnesses deposed in Delaware and particularly,
19 as counsel just pointed out, where they're going to
20 have to be in Minnesota for at least three of these
21 non-parties if they go forward, Deloitte, Jacobson and
22 Lewis, which is a short hop to Sioux Falls as opposed
23 to an all-day trip to Wilmington.
24     SPECIAL DISCOVERY MASTER JAMES: Thank

Page 211

1  you.
2      Ms. Steingart.
3      MS. STEINGART: Thank you. I think what
4  we have here is a situation where both NorthWestern
5  and individuals are in denial about the situation that
6  they have created for themselves. And first we'll
7  begin with NorthWestern.
8      The arguments that have just been recited
9  by Mr. Pizzurro may be all well and good in other
10 circumstances, but they don't wash in bankruptcy. In
11 bankruptcy the rule is as stated in Norton's and we
12 provided it to the Court, that when a corporation
13 picks a forum for its bankruptcy proceeding,
14 plaintiffs have no choice. They have to litigate in
15 that forum. They have to hire lawyers in that forum.
16 They have to make themselves available in that forum
17 and the corporation and its officers and its employees
18 must do likewise.
19     And there are not cases that have been
20 cited in any of the materials that we have received
21 from defendants that indicate that NorthWestern has
22 the option of insisting that its personnel be deposed
23 elsewhere when itself chose and wanted this forum and
24 caused all who wanted to participate in this

Page 212

1  bankruptcy proceedings to come here and to hire
2  counsel who would be able to conveniently appear here
3  to participate in those proceedings.
4      SPECIAL DISCOVERY MASTER JAMES: Would you
5  rather they brought the action in South Dakota?
6      MS. STEINGART: I wouldn't have minded it
7  if they brought the action in South Dakota because
8  then probably I wouldn't be involved, which at this
9  point probably all of us on this side of the table
10 would be very happy about that.
11     SPECIAL DISCOVERY MASTER JAMES: I doubt
12 that.
13     MS. STEINGART: But the truth of the
14 matter is that would I have preferred it? They didn't
15 ask me. We might have talked about it. Certainly
16 they didn't and that is really the operative fact.
17 The operative fact is they controlled the forum. And
18 in terms of how the cases in bankruptcy are decided to
19 a one they are uniform that once the corporation has
20 chosen the forum, whether it's in the context of the
21 bankruptcy proceeding or any adversary that's
22 commenced in connection with the bankruptcy
23 proceeding, the requirement is that the corporation
24 bring its personnel to that forum.

Page 213

1      I don't think that Mr. Hanson -- because
2  Mr. Hanson is a witness that would have to be
3  produced, whether he was a defendant in a separate
4  action or because of the position he has now at
5  NorthWestern, he had all during the course of the
6  bankruptcy at NorthWestern and prior to that time,
7  there's double reason for requiring Mr. Hanson to
8  appear here.
9      And we'll get to the second half of why
10 both Mr. Hanson and Mr. Kindt should be required in
11 connection with the separate action against them to
12 appear here and that is we hear a lot of talk about
13 Judge Cebull and Judge Cebull transferring this case
14 because of nine other cases.
15     Plaintiffs moved this case because they
16 were receiving treatment from Judge Cebull that made
17 them unhappy. They made two motions for summary
18 judgment, two motions to dismiss, one motion for
19 summary judgment, all of which were denied.
20 Thereafter, they made a motion to transfer under
21 404(a). Judge Cebull didn't say there are other
22 litigations going on here; I want to transfer it. The
23 case was transferred at the request of these parties
24 and after representations were made to the Court by

54 (Pages 210 to 213)

Page 214

1  these parties.
2  Judicial estoppel does not operate only
3  when the judge mentions the affidavits and other
4  representations that were made in court filings.
5  Judicial estoppel operates because such
6  representations were made. And I don't think that
7  either Mr. Hanson or Mr. Kindt can avoid that in this
8  context because it serves them now to deny the import
9  of what they did or the statements they made about the
10 convenience for them to proceed in Delaware just as if
11 they were in Montana.
12 So I think that it was a tactical move,
13 certainly a tactical move. Judge Cebull was I'm sure
14 relieved not to have us there. I'm not sure that
15 there was any joy in Mudville in the district court
16 here when this action also landed on its doorstep.
17 SPECIAL DISCOVERY MASTER JAMES: No. We
18 want cases here.
19 MS. COUNIHAN: Thank you.
20 SPECIAL DISCOVERY MASTER JAMES: Please
21 bring your cases here.
22 MS. STEINGART: So I don't think that the
23 efforts to avoid deposition where Mr. Kindt and
24 Mr. Hanson have chosen to be are well-taken at this

Page 215

1  point. Certainly there are occasions in the near
2  future when Mr. Hanson will be in this jurisdiction
3  and he'll be here because we all have a Court-ordered
4  mediation in connection with a Third Circuit case and
5  there may be other events that bring him here.
6  In terms of the timing of the merger,
7  there was an 8-K filed by NorthWestern where the time
8  of the merger was extended for four months, for a
9  period of four months from the date they were
10 originally going to close the merger and I don't
11 remember what the exact time frame was, but that 8-K
12 was filed about two weeks ago.
13 SPECIAL DISCOVERY MASTER JAMES: This is
14 the merger with the new company?
15 MS. STEINGART: Exactly. So that has been
16 put on a much longer time frame, though there's
17 nothing that says it's not going to occur, but the
18 public announcement was made that it was being put
19 off; that the closing was supposed to have occurred
20 during the summer and instead it will occur sometime
21 during the fall or that's the outside date that now
22 the parties have agreed to.
23 SPECIAL DISCOVERY MASTER JAMES: Let me
24 stop you there.

Page 216

1  Mr. Kaleczyc, what's your reaction to that
2  issue?
3  MR. KALECZYC: With respect to the --
4  SPECIAL DISCOVERY MASTER JAMES: The fact
5  that the merger is not going to take place until the
6  fall.
7  MR. KALECZYC: Well, Your Honor, the
8  merger will occur no later than the fall, first of
9  all. It could occur sooner. That was the outer date,
10 as Ms. Steingart just explained.
11 SPECIAL DISCOVERY MASTER JAMES: Oh, okay.
12 MR. KALECZYC: And the fact is that
13 Mr. Hanson is not necessarily going to be sitting on
14 his thumbs waiting until whatever that magic date is
15 of the closing. There will be things that he will be
16 involved in throughout that time period.
17 SPECIAL DISCOVERY MASTER JAMES: Okay.
18 Thank you.
19 MS. STEINGART: Right. I did not mean to
20 assert that he was sitting on his thumbs.
21 SPECIAL DISCOVERY MASTER JAMES: No. Go
22 ahead.
23 MS. STEINGART: So from our point of view
24 I think that the assumption should be that unless they

Page 217

1  can conveniently be done at the time that other
2  witnesses are done in Minneapolis or Chicago,
3  someplace closer to their home, that it should be in
4  Delaware or New York at their option.
5  I don't think that the same standard
6  should necessarily apply to Mr. Hanson and Mr. Kindt.
7  I think that with Mr. Hanson, there's a much more
8  compelling case because no matter which party you look
9  at, it's Mr. Hanson's obligation -- I'm sorry. No
10 matter which matter you look at, it's Mr. Hanson's
11 obligation to place himself here, whereas Mr. Kindt no
12 longer being an employee would not come under the
13 rubric of the usual bankruptcy practice.
14 As to the other witnesses who have been
15 mentioned, those who are current employees of
16 NorthWestern I think have the same requirement as
17 Mr. Hanson would under the practice in bankruptcy
18 proceedings. As to those who are no longer working
19 there or those who are contractors, we will make
20 whatever arrangements are acceptable.
21 So I think as a threshold, they should be
22 required to come here, unless they are available, they
23 and their counsel are available at times that we are
24 otherwise going there.

55 (Pages 214 to 217)

Page 218

1  SPECIAL DISCOVERY MASTER JAMES: Going
2  where?
3  MS. STEINGART: And I place it, I put it
4  in that rubric.
5  SPECIAL DISCOVERY MASTER JAMES: You mean
6  going to Minnesota?
7  MS. STEINGART: Because, because -- it
8  depends on which tail is wagging the dog here. It's
9  hard enough to schedule the third-party depositions
10  knowing that when there's limited availability for
11  both Hanson and Kindt's lawyers and Hanson and Kindt
12  themselves and then I have the third parties whose
13  lawyers are not inclined to be overly cooperative and
14  the third parties themselves.
15  So to the extent that I schedule third
16  parties and both Hanson and Kindt and their lawyers
17  make themselves available in a way that is convenient
18  for me, I'll do it. But, if not, I think it's only
19  fair that the onus be on them to appear in the
20  jurisdiction that they have chosen.
21  So there are three levels here. One is as
22  a practical matter because of the choice of this forum
23  by Hanson and Kindt and by NorthWestern and
24  plaintiffs' lack of choice of forum in both instances,

Page 219

1  these witnesses should make themselves, should be
2  required to make themselves available here, unless
3  other circumstances exist that make it convenient for
4  everyone to have their testimony taken elsewhere. And
5  we can assure you that we will try in good faith to
6  make that happen, but if that doesn't happen I think
7  it's only fair that we have the right to take them
8  here.
9  SPECIAL DISCOVERY MASTER JAMES: With
10  respect to Mr. Kindt, apart from your argument with
11  respect to the fact that he chose this jurisdiction,
12  he's a non-employee.
13  MS. STEINGART: Right.
14  SPECIAL DISCOVERY MASTER JAMES: As a
15  matter purely of procedure and the technical
16  requirements, he cannot be compelled to come here.
17  Isn't that correct?
18  MS. STEINGART: No. He can be compelled
19  to come here. Mr. Kindt? Because he initiated an
20  action here, he absolutely can be compelled to come
21  here. He sought, he sought out this jurisdiction. He
22  moved that matter to this court. He can be compelled
23  to come here. He placed himself under the
24  jurisdiction of the Court.

Page 220

1  SPECIAL DISCOVERY MASTER JAMES: When he
2  did that wasn't he an employee then of NorthWestern?
3  MS. STEINGART: It doesn't matter,
4  respectfully, because --
5  SPECIAL DISCOVERY MASTER JAMES: Can you
6  answer my question?
7  MS. STEINGART: I don't think he was, but
8  I don't know.
9  SPECIAL DISCOVERY MASTER JAMES: Okay.
10  MS. STEINGART: But I think that it
11  doesn't matter because when we brought suit against
12  him in Montana, we had personal jurisdiction over him
13  and then he was properly before the Court. He asked
14  for the transfer. The Court granted it and the case
15  was transferred at his request. So this makes this
16  forum his forum and he has submitted himself to the
17  jurisdiction of the Court, so he can be compelled to
18  come here.
19  SPECIAL DISCOVERY MASTER JAMES: What
20  effect does the fact, which neither party seems to
21  have addressed, that the reference has been withdrawn
22  from the bankruptcy court? Both of these actions are
23  pending in district court now.
24  MS. STEINGART: That doesn't change, that

Page 221

1  doesn't change the normal rule in bankruptcy
2  proceedings that it is the corporation who is the
3  plaintiff and chose the forum.
4  SPECIAL DISCOVERY MASTER JAMES: It's not
5  a bankruptcy proceeding anymore.
6  MS. STEINGART: Yes, it is. Adversary
7  proceedings that are commenced under the rubric of it
8  being a core proceeding that can only occur in the
9  bankruptcy court, it doesn't lose its characteristic
10  as a core proceeding when the reference is withdrawn.
11  If that were the case, Your Honor, what
12  would happen is when the reference were withdrawn, the
13  cases would go out far and wide. It would be like an
14  MDL as opposed to like a bankruptcy case. In an MDL
15  everything is put together and when the MDL is over,
16  things are farmed out.
17  In a bankruptcy court or in a bankruptcy
18  case, the issue of the nature of the matter does not
19  change when it's the district court or bankruptcy
20  court. The bankruptcy courts operate as arms of the
21  district court so they really operate as the way a
22  magistrate would operate, so it's really always a
23  district court case. The bankruptcy rules provide
24  that the bankruptcy procedure applies even when the

### Page 222

1 case is referred from the bankruptcy court, when the
2 reference is withdrawn from a bankruptcy court to a
3 district court, so it doesn't lose the fact that it's
4 a bankruptcy proceeding regardless of whether it's
5 being tried by the bankruptcy judge or the district
6 court that supervises the bankruptcy court the way it
7 supervises a magistrate in that district.
8     SPECIAL DISCOVERY MASTER JAMES: Based on
9 your pleadings with respect to this action -- correct
10 me if I'm wrong -- there are no bankruptcy issues
11 remaining, are there, based on the decision by Judge
12 Case as applied by Judge Farnan?
13     MS. STEINGART: Yes. But in an adversary
14 proceeding that's usually the case.
15     SPECIAL DISCOVERY MASTER JAMES: That's
16 right.
17     MS. STEINGART: I mean, but it's still a
18 bankruptcy. It's still under -- it's still brought
19 here and it still remains here.
20     SPECIAL DISCOVERY MASTER JAMES: Will a
21 bankruptcy judge ever see this case again?
22     MS. STEINGART: The bankruptcy judge is
23 just the assistant of the district court judge.
24 Bankruptcy cases are referred from district court

### Page 223

1 judges to bankruptcy judges.
2     SPECIAL DISCOVERY MASTER JAMES: This case
3 is going to go to trial before Judge Farnan.
4     MS. STEINGART: Right.
5     SPECIAL DISCOVERY MASTER JAMES: If you
6 lose or if they lose, they're going to appeal to the
7 Third Circuit.
8     MS. STEINGART: Right.
9     SPECIAL DISCOVERY MASTER JAMES: And from
10 there who knows? The case will be over.
11     MR. PIZZURRO: God help us.
12     MS. STEINGART: But our rights, our rights
13 and obligations in connection with this matter are
14 governed by the bankruptcy code and by the plan of
15 reorganization. If we settle this case, if we should
16 be so lucky as to settle this case, the approval of
17 the settlement will not be before Judge Farnan. It
18 will be before the bankruptcy judge.
19     So even though it may look and walk like a
20 diversity case that somehow found its way to Delaware,
21 it's not. It's here because it's a bankruptcy
22 proceeding and the caption is still a bankruptcy
23 caption even though it's in the district court. It
24 doesn't lose the fact that it's being supervised and

### Page 224

1 effectuated and -- I mean if there's a judgment here,
2 it will be effectuated by a bankruptcy court.
3     MS. KRAFT: Your Honor, if I may speak for
4 a moment?
5     SPECIAL DISCOVERY MASTER JAMES: I just
6 have a few more questions for her.
7     MS. STEINGART: Yes. It's still a
8 bankruptcy case.
9     SPECIAL DISCOVERY MASTER JAMES: What
10 about the fact that NorthWestern has now come out of
11 bankruptcy, what effect does that have on your
12 argument?
13     MS. STEINGART: But it has not come out of
14 bankruptcy. Its bankruptcy case is still open. So
15 it's not -- its plan has been confirmed, but it's not
16 out of bankruptcy yet. And it has a disputed claims
17 reserve with stock and that's where we get our
18 recovery. We don't get our recovery from
19 NorthWestern. We get our recovery from the disputed
20 claim reserve that's set up and is managed by the
21 bankruptcy court.
22     So they're not out of bankruptcy.
23     SPECIAL DISCOVERY MASTER JAMES: Okay.
24     MS. KRAFT: I just wanted to make a brief

### Page 225

1 point. I'm not sure which rules Ms. Steingart is
2 referring to in terms of the bankruptcy court still
3 having jurisdiction over this proceeding which is
4 before you today and upon which the reference was
5 actually withdrawn and moved to the district court. I
6 would be interested in seeing those rules.
7     My understanding of the way the court
8 works is that all cases are automatically referred to
9 the bankruptcy court, as I guess a first article or
10 third article or -- we have had a debate in our office
11 about that recently regarding the Constitution.
12     But it's referred to the bankruptcy court
13 but when reference is withdrawn, it goes back to
14 basically where it was. And the rules and procedures
15 of the court where it's at should govern. And I would
16 love to see the rules otherwise. I understand the
17 concept of an approval being made through a 9019
18 motion back in bankruptcy court, but that's simply
19 another procedure, one approval that's made based upon
20 an entire set of different circumstances involving the
21 help of the estate and what can be distributed.
22     That's a distribution question rather than a
23 procedural question involving substantive issues
24 before the district court.

Page 226

1   So I just step in to say I'm not aware of
2   that, but I'm always willing to be educated on whether
3   or not the district court somehow is flipped and now
4   is governed by the bankruptcy court rather than the
5   reverse.
6   SPECIAL DISCOVERY MASTER JAMES: Yes. I
7   would like to hear from Ms. Dube on this. The local
8   counsel should be the most knowledgeable about
9   Delaware practice.
10   I will say that obviously we have a
11   bankruptcy practice here and I've consulted with my
12   folks here about the practice in handling depositions
13   in adversary actions and it's not uncommon at all for
14   depositions in adversary actions of defendants who may
15   have, as here, agreed to come to Delaware, the debtor,
16   for example, to be taken under the general rule, which
17   is that the defendant will be deposed at its principal
18   place of business.
19   So that's my knowledge of practice of
20   which I can take judicial notice. But I would like to
21   hear from Ms. Dube if she has a different perspective.
22   MS. DUBE: I don't have the cite in front
23   of me, Your Honor, but any cases arising from a
24   bankruptcy, any matters related to a bankruptcy case,

Page 227

1   the bankruptcy rules of procedure continue to apply to
2   that case irrespective of whether or not they're
3   transferred to the district court and with respect to
4   appellate procedure they follow special bankruptcy
5   rules of appellate procedure. And I'm sure that
6   Ms. Counihan can confirm that.
7   That's true as to any matter arising from
8   or related to a bankruptcy case. And days are counted
9   differently, for example.
10   SPECIAL DISCOVERY MASTER JAMES:
11   Mr. Pizzurro?
12   MR. PIZZURRO: It's a very interesting
13   discussion. I'm not a bankruptcy lawyer and all the
14   bankruptcy lawyers will jump up if I'm wrong when I
15   say there is no bankruptcy rule which requires that
16   the depositions be taken here. There is nothing in
17   the Bankruptcy Code that has anything to do with this.
18   There is a case which is from 1981 out of
19   the District of Massachusetts and there's a line in a
20   commentary and what it says is the normal rule is the
21   plaintiff, right, if the plaintiff sues a corporate
22   defendant, the corporate defendant, not having had the
23   choice of forum, has a right to have its officers and
24   directors and employees deposed at the corporate

Page 228

1   headquarters, but that where you were in a bankruptcy
2   one could say that because the debtor chose the forum
3   because the debtor filed that that presumption flips.
4   That is something that came out of a case. It is
5   something which a commentator has said. There is no
6   bankruptcy rule. There is no practice.
7   The fact that the reference was withdrawn
8   or this was an adversary, it's all completely
9   irrelevant. Whether the bankruptcy rules apply, you
10   know, 7026 applies here as opposed to Rule 26, it's
11   all completely irrelevant. There is no rule. There
12   is a case and there's only one that we're aware of
13   that's ever decided this this way. So as we have
14   argued, the considerations that you should be looking
15   at are the considerations all of the courts look at,
16   and that is given the set of circumstances, what is
17   the appropriate place to have the depositions to
18   minimize the cost and expense to the parties and to
19   counsel and get away from the idea that there's some
20   magic in who is the plaintiff and who is the
21   defendant.
22   So I just -- now, we can talk about
23   article 3 and bankruptcy and all that, but it's got
24   nothing to do with anything here. There's no

Page 229

1   bankruptcy rule that applies.
2   SPECIAL DISCOVERY MASTER JAMES: Even
3   if --
4   MR. PIZZURRO: And I didn't hear any
5   bankruptcy lawyer telling me I'm wrong.
6   SPECIAL DISCOVERY MASTER JAMES: Following
7   up on your point about the bankruptcy rules continuing
8   to apply in district court, which is I guess news to
9   me because nobody has been citing them in any of the
10   briefing that we have had, there's nothing different,
11   is there, between 7030 and Rule 30 of the Federal
12   Rules?
13   MS. DUBE: I believe that's correct, Your
14   Honor. There are differences between the set of
15   rules, but it usually comes in calculating deadlines.
16   SPECIAL DISCOVERY MASTER JAMES: What
17   about 7026 and 26?
18   MR. KAPLAN: That's the same. It's the
19   same. A lot of the bankruptcy rules just say Rule 26,
20   for example, 7026 or Rule 26 applies in bankruptcy
21   cases.
22   MS. STEINGART: Right. But if we could
23   get a copy of the bankruptcy rules, you'll see that we
24   can point out to you the specific rule that says even

Page 230

1  when cases are tried in the district court they're
2  still, even when adversaries, the referral is made,
3  once it's a bankruptcy case, the bankruptcy rules
4  continue to apply.
5      SPECIAL DISCOVERY MASTER JAMES: Okay.
6  Well, I've just asked her if there's any difference
7  between the bankruptcy rules as to depositions and
8  they're identical.
9      MS. STEINGART: The bankruptcy rules are
10 identical, but as a matter of practice and as a matter
11 of court procedure in this district and in others,
12 it's more than one case. There's Adams, a case which
13 was decided by Judge Robinson in the District of
14 Delaware which applies this rule to an adversary
15 proceeding. She was sitting on the adversary
16 proceeding. The company said the plan has been
17 confirmed; we don't want to be here anymore; we want
18 to be somewhere else. And she said you don't have
19 that option; you started the bankruptcy here. The
20 practice is when a company chooses a forum for its
21 bankruptcy proceeding and the adversaries from there
22 have to flow up and remain in that jurisdiction that
23 the corporation that has chosen that forum has the
24 obligation to make itself and its officers available

Page 231

1  there. And this is a 2005 Delaware District Court
2  decision. It's cited in our papers.
3      SPECIAL DISCOVERY MASTER JAMES: That was
4  a discussion where the deposition should take place?
5      MS. STEINGART: Yes, it was.
6      SPECIAL DISCOVERY MASTER JAMES: May I see
7  that?
8      MS. STEINGART: Yes.
9      MS. COUNIHAN: Apparently the --
10     SPECIAL DISCOVERY MASTER JAMES: I'm
11 reading.
12     MS. COUNIHAN: I'm sorry.
13     SPECIAL DISCOVERY MASTER JAMES: This
14 decision has nothing whatsoever to do with location of
15 scheduling of depositions.
16     MS. STEINGART: I think that it --
17     SPECIAL DISCOVERY MASTER JAMES: I've
18 heard enough on that. I just read the case.
19     Okay. Is there anything else on this?
20 Ms. Counihan?
21     MS. COUNIHAN: I just wanted to point out,
22 Your Honor, that the federal bankruptcy rules are
23 actually in the back of the Delaware rules, so to the
24 extent anyone wants to see them, but it does say that

Page 232

1  7026 just applies in adversary proceedings and the
2  other one, 7030, applies directly to adversary
3  proceedings. So I thought I would point that out.
4  It's on page 915 in the back of the book.
5      SPECIAL DISCOVERY MASTER JAMES: Thank
6  you. That's what I thought.
7      MR. KALECZYC: Just one last point, Your
8  Honor, and that is that the Hanson and Kindt lawsuit
9  was never an adversary proceeding. It was never
10 brought in bankruptcy. It was initiated in the United
11 States District Court and is indisputably governed by
12 the federal rules.
13     SPECIAL DISCOVERY MASTER JAMES: All
14 right. I'm prepared to render a decision on this.
15     This is one of those things that I think a
16 lot of it has to do with the dynamics of the
17 disagreements over document production and the fact
18 that the depositions had to be adjusted because of
19 those issues and I think it's taken on a life of its
20 own, which it never should have, and that the parties
21 should have been, should have been able to work this
22 out.
23     This is a discretionary matter. There's
24 no question that I can certainly force, I have the

Page 233

1  power to force any of the defendants to be deposed
2  here in Delaware. I certainly have that authority.
3      The general rule, however, as recognized
4  by any number of authorities, is that a defendant and
5  its officers and directors and employees will be
6  deposed at their principal place of business. In this
7  particular case, while I understand Magten's argument
8  about NorthWestern choosing this forum to have its
9  bankruptcy adjudicated, I don't think that carries
10 much weight, frankly, with respect to the adversary
11 actions where it is a true defendant.
12     I'm especially mindful of the exigent
13 circumstances relating to Messrs. Hanson and Kindt. I
14 don't believe that, giving the greatest weight to
15 Magten's argument, that it has the authority to
16 require Mr. Kindt to come to Delaware because he no
17 longer is an employee of NorthWestern and that I could
18 require the deposition be taken in Montana. However,
19 Mr. Kindt has indicated he will make himself available
20 in Sioux Falls.
21     Having read all the correspondence that's
22 gone back and forth here, it's clear that if schedules
23 could have been worked out everyone could have been
24 deposed in Minnesota and that probably would have made

59 (Pages 230 to 233)

Page 234

1  the best sense for everyone because that's a more
2  accessible location perhaps than Sioux Falls.
3       But on the record before me and based on
4  the overwhelming law here in Delaware and other
5  jurisdictions, I hereby order that the motion for
6  protective order I guess it is of NorthWestern and
7  Mr. Hanson and Mr. Kindt is granted; that the
8  depositions of the employees of NorthWestern will take
9  place in Sioux Falls; the deposition of Mr. Hanson and
10 Mr. Kindt will take place in Sioux Falls.
11      Having issued that decision, I strongly
12 encourage Magten and counsel for the defendants to
13 work together to cluster these depositions because of
14 the conflicting schedules of parties. Counsel for
15 Mr. Hanson, and I guess this might apply to Mr. Kindt
16 as well, has indicated dates in late June that work
17 for them. I would request that Magten make every
18 effort to accommodate that request because of the
19 special problems that Mr. Hanson has to deal with as
20 the CEO of the new company, trying to sell the company
21 and restore the fortunes of the company, which in the
22 end I think would benefit everyone who was perhaps
23 involved in the bankruptcy. Perhaps I'm wrong about
24 that.

Page 235

1       In any event, that's my ruling on that
2  issue. Any questions?
3       Okay. And I won't impose any sanctions on
4  anyone with respect to that motion.
5       So I guess the last thing we have to deal
6  with is there are two other issues. One is the form
7  of documents, the so-called illegible document issue,
8  and whether I guess sanctions should be applied to
9  either party with respect to that motion.
10      Specifically, it's paragraph 6 in my May
11 17 letter that says with respect to the plaintiffs'
12 motion referenced in paragraph 1 above whether
13 NorthWestern should be required to produce certain
14 documents in another electronic format.
15      So, Ms. Steingart, that's you.
16      MS. STEINGART: Okay. This is another
17 issue in which there is a long history of going back
18 and forth. Shortly after we received the CD's
19 containing the material we realized that the
20 formatting prevented anyone from being able to read
21 the material on a screen, when it was printed out, in
22 any form at all. And there began to be an exchange of
23 e-mails about the fact that we could not read the
24 data.

Page 236

1       Initially we attempted to prioritize the
2  documents that we needed to have reformatted and it
3  got to a point where the last we heard from NorthWest
4  was that they would agree to reformat a group of
5  documents and had requested if that was all we were
6  going to ask. And what we were trying to do was to
7  prioritize so that we could have the ones that our
8  experts had identified as things they needed earlier
9  at an earlier point in time and give NorthWestern the
10 option of reformatting the other documents at a later
11 point in time.
12      We did not provide initial lists of
13 material so that we could be required to make some
14 determination about which ones we didn't want to ever
15 have in a legible format but, rather, permit
16 NorthWestern to do it in groupings if doing it all at
17 once was going to be a problem or if the documents
18 were kept in their native format in such a way that
19 they didn't want to give it to us in that form was a
20 problem. The option was always theirs, but it was not
21 an option from our point of view for NorthWestern to
22 take the position that we could have some subset of
23 the production which was illegible and the illegible
24 pages are about 300,000 pages and --

Page 237

1       SPECIAL DISCOVERY MASTER JAMES: There are
2  300,000 pages that have not been reformatted that in
3  your view are illegible?
4       MS. STEINGART: Right, that are illegible.
5  And we have a hard copy to show you so you can have a
6  sense of what the hard copy looks like and Mr. Kaplan
7  can show you on the computer screen what it looks like
8  when you try to access it electronically, but unless
9  it's reformatted there's really no way that it's
10 usable.
11      So we're happy to agree that there will be
12 a process where that is done over time. To the extent
13 that they would like us to tell them which ones we
14 want first, that's great. But we can't agree that we
15 can have a group reformatted only if we agree that the
16 rest of them can remain illegible. And that's what we
17 had understood the last communication on this topic to
18 be, that we could have these fixed so we could read
19 them only if we said these were the only ones we
20 wanted to have in readable form.
21      So if you would like to see what the
22 documents look like.
23      SPECIAL DISCOVERY MASTER JAMES: I would.
24 I would like to ask you a question first. I gather --

Page 238

1  and I guess this would have been manifest from the
2  briefing on this -- that there was no protocol
3  established among the parties as to how to deal with
4  electronic documents going into this case?
5      MS. STEINGART: None other than what
6  exists in the protective order that was signed.
7      MR. PIZZURRO: That's correct.
8      SPECIAL DISCOVERY MASTER JAMES: Is there
9  a provision in there that deals with that?
10     MS. STEINGART: Not that I'm aware of.
11     MR. PIZZURRO: No. No.
12     SPECIAL DISCOVERY MASTER JAMES: And
13 nothing in the case order, the case schedule doesn't
14 deal with that?
15     MS. STEINGART: No.
16     SPECIAL DISCOVERY MASTER JAMES: Okay.
17 Let me look at the hard copy first.
18     MR. KAPLAN: Here's one. This is one
19 example.
20     SPECIAL DISCOVERY MASTER JAMES: Thank
21 you.
22     And this is what was originally an Excel
23 spreadsheet?
24     MS. STEINGART: Yes.

Page 239

1      SPECIAL DISCOVERY MASTER JAMES: Or is an
2  Excel spreadsheet.
3      MR. KAPLAN: And I also have other ones
4  which came in bad format that they did reformat to
5  sort of show -- that's one that they have yet to fix.
6  But I do have ones that I can show you that --
7      SPECIAL DISCOVERY MASTER JAMES: Can I see
8  one of those, please?
9      MR. KAPLAN: Sure.
10 Here's a before and after.
11     SPECIAL DISCOVERY MASTER JAMES: Thanks.
12 If there's anyone that needs to take a
13 break while I'm looking at this, feel free, although I
14 don't expect to spend too much time, but five minutes
15 or so, please take a break.
16     (A brief recess was taken.)
17     SPECIAL DISCOVERY MASTER JAMES: Anything
18 else from your side?
19     MS. STEINGART: I don't think so. Thank
20 you.
21     SPECIAL DISCOVERY MASTER JAMES:
22 Mr. Pizzurro.
23     MR. PIZZURRO: All right. This is one of
24 those issues which, frankly, I cannot believe has not

Page 240

1  been worked out and cannot be worked out. Start from
2  the premise that everyone knows that when you are
3  producing Excel spreadsheets this is the way that they
4  come out. Everybody knows that. It's not a surprise
5  to anyone.
6      When this was first brought to our
7  attention that they believed that there were certain
8  of these Excel spreadsheets that they needed, as we
9  set forth in our papers there were 27 of them. We did
10 what needed to be done and we produced them.
11     Now, at that time the communication
12 was "and any others that we might need." What has to
13 be understood here -- and, again, I'm now getting a
14 little out of my ken because I'm not a technologist.
15 My understanding is, and the events bear it out, that
16 the people who are reviewing the documents have an
17 understanding as to which spreadsheets they need. So
18 they're not getting a bunch of stuff and, you know,
19 how am I supposed to know if I need this or don't?
20 They know what they need. They knew enough to ask for
21 the 27 and they knew enough to ask for the additional
22 two, which we provided, and the turnaround was like a
23 day.
24     And when this was then being negotiated,

Page 241

1  they knew enough to ask for I believe 63 or maybe 63
2  of the total on top of what had already been provided
3  and the representation that was made at the time was
4  all right; this is what we need; we're not saying it's
5  all that we need; our experts might need some more,
6  but for the time being this will do it.
7      Now, so the plaintiffs know or the people
8  who are reviewing this they know when a spreadsheet is
9  crucial and has to be in a format that they can read
10 and they know when they don't need any part of it.
11     SPECIAL DISCOVERY MASTER JAMES: How many
12 spreadsheets are there that you have produced?
13     MR. PIZZURRO: I believe there's 3200,
14 3200 spreadsheets.
15     I also would point out, and again I'm
16 informed of this, that in the entire investigation by
17 the SEC when documents were produced the SEC asked for
18 40 spreadsheets, 40 out of all of the documents. So
19 there were more documents that were produced because
20 the universe was a greater number of documents and
21 there were fewer already than they have asked for.
22     So this issue should not be is there an
23 obligation to go to the very considerable time and
24 expense, and it's very considerable in terms of both

Page 242

1  of those aspects, to reformat 3200 Excel spreadsheets?
2  The question is what do they need and what is
3  reasonable and when can it be provided?
4      Now, we're already -- we can provide them
5  and we have told them. The Excel spreadsheets that
6  they have told us that today they need subject to
7  their experts saying they need more, we can give them
8  to them. They can have them next week. That's not a
9  problem. And if there are a few more that come up
10 from time to time, we can work that out. But for them
11 to sit there and say we want 3200 spreadsheets is
12 patently unreasonable and there is no obligation under
13 Rule 26 or Rule 34 to engage in that kind of an
14 exercise.
15     So the parties had been working. We had
16 gotten to what I thought was a resolution of this and
17 all of a sudden it turned into 3200 and that's the
18 deal, which is completely unreasonable, particularly
19 in light of the fact that that's on a magnitude of
20 almost ten times as many as the SEC itself asked for.
21     SPECIAL DISCOVERY MASTER JAMES: Is there
22 an understanding --
23     MR. PIZZURRO: A hundred times.
24     SPECIAL DISCOVERY MASTER JAMES: Is there

Page 243

1  a written understanding in this case -- I almost never
2  have a case where there is not something in writing in
3  a case management order or whatever in which the
4  parties agree as to who is going to be responsible for
5  costs associated with document production.
6      In this case is there any such agreement?
7      MR. PIZZURRO: No.
8      SPECIAL DISCOVERY MASTER JAMES: From my
9  experience, and you can tell me if your experience is
10 different, the cost usually falls on the party
11 requesting the documents, does it not?
12     MR. PIZZURRO: Often.
13     SPECIAL DISCOVERY MASTER JAMES: But in
14 this case you have not charged Magten anything for
15 the --
16     MR. PIZZURRO: We have not yet sent them a
17 bill, no. We have done this all on NorthWestern's
18 time.
19     SPECIAL DISCOVERY MASTER JAMES: And the
20 same for you?
21     MS. STEINGART: Yes.
22     SPECIAL DISCOVERY MASTER JAMES: Okay. I
23 interrupted you. Or had you finished?
24     MR. PIZZURRO: No. I was finished.

Page 244

1      MS. STEINGART: May I? I'm sorry.
2      SPECIAL DISCOVERY MASTER JAMES: I'm going
3  to come back to you.
4      You're not looking for production of these
5  documents in native format?
6      MS. STEINGART: We would take them in
7  native form, but the assertion is that because if
8  they're produced in native form there may be some
9  ability to alter them or to toy with them, that can't
10 be done.
11     SPECIAL DISCOVERY MASTER JAMES: Yes. I
12 mean, that's not a surprising response because --
13     MS. STEINGART: If that's true, I would
14 understand that concern. I have no argument with the
15 concern.
16     But if I can just read you the letter of
17 what was said that led to this motion: "In sum, we
18 have been responsive and diligent throughout the
19 production phase," even though it was a period of six
20 weeks between the first request and the first
21 reformatting, "and have responded promptly to your
22 requests to document production issues. You are not
23 entitled to a reformatted version of every document
24 listed in your March 28th letter. If you continue to

Page 245

1  insist that we reformat every Excel document we will
2  seek appropriate protection with the Court. If,
3  however, you can give us your assurance that the 29
4  Excel sheets already produced and the 63 Excel sheets
5  identified on your first priority list are your good
6  faith attempt to identify all the sheets that you deem
7  relevant and that need to be reformatted, we will
8  undertake to reformat the 63."
9      Now, the only reason we said all of them
10 was because there was a request that we sign off on
11 this at this point and we couldn't because we weren't
12 in a position to do that. May we not need all of
13 them? Obviously. Mr. Pizzurro says well, but the SEC
14 only asked for a portion of these. The SEC had all of
15 NorthWestern's internal reports and internal work
16 product and part of the quid pro quo for the lenient
17 treatment was that NorthWestern would do the legwork
18 in looking at this kind of data and provide the
19 summaries or provide the information or provide the
20 results to the SEC.
21     You can't compare it if these are things
22 that they resist in giving us. If they gave us
23 everything that they gave to the SEC so the SEC didn't
24 need this kind of material, we could consider asking

Page 246

1  for fewer spreadsheets.
2       So it's not, it's not comparing apples and
3  apples.
4       SPECIAL DISCOVERY MASTER JAMES: Do I hear
5  you saying that, notwithstanding what may have been
6  said in the briefing, you may not need anywhere near
7  the 3200?
8       MS. STEINGART: We may not need them. But
9  I need to be able to call up and say the experts need
10 another ten. I don't think that they want to look at
11 3200 either. But I don't think I can say at this
12 point because they're not finished that there may not
13 be some amount in addition to this that they want, nor
14 has there been any discussion of how, you know, there
15 might be some easier way either to reformat or to have
16 our experts look at it in some other form or in a
17 supervised setting or in any of those things which we
18 can talk about. But just to have such -- it's really
19 the major part of the production. You know, it's
20 almost two-thirds of the production, these illegible
21 documents.
22      So it's not as if it's an irrelevant
23 aspect of what's going on, but certainly we have tried
24 to be modest. We have tried to do the priority list,

Page 247

1  but it's only when, you know, there was the ultimatum
2  that it's only -- you know, stop now because we'll
3  seek a protective order.
4       And we thought well, let's get the issue
5  resolved. If there can be a reasonable give-and-take
6  about this, as there was before, we're fine with it,
7  but we can't sign off today that these are the last
8  ones we'll need.
9       SPECIAL DISCOVERY MASTER JAMES: I gather
10 that -- are these given on a disk to the other side, I
11 assume, right, in TIFF, right?
12      MR. PIZZURRO: Right.
13      MS. DELANEY: They're TIFF'd, right,
14 they're reformatted.
15      SPECIAL DISCOVERY MASTER JAMES: Like you,
16 I'm not a techno-nerd, and I shouldn't say that. But
17 am I correct that the disk you get in TIFF you
18 yourself cannot do whatever you have to do to compress
19 them into usable Excel spreadsheets?
20      MS. STEINGART: Correct.
21      SPECIAL DISCOVERY MASTER JAMES: It has to
22 be done on their end?
23      MS. STEINGART: Yes.
24      SPECIAL DISCOVERY MASTER JAMES: Neither

Page 248

1  side really addressed I guess the law on this, which
2  the district court here has a default standard. The
3  default standard is, and I think this was actually
4  referenced in one of NorthWestern's briefs, but the
5  default standard on format of electronic documents is,
6  and this is a standing order of the United States
7  District Court that's on the Web site, "If during the
8  course of the Rule 26(f) conference," which I assume
9  you folks had at some point, "the parties cannot agree
10 to the format for document production, the electronic
11 documents shall be produced to the requesting party as
12 image files, for example, PDF or TIFF. When the image
13 file is produced, the producing party must preserve
14 the integrity of the electronic documents' contents,
15 i.e. the original formatting of the documents,"
16 et cetera, et cetera. It means you can't destroy the
17 meta data behind the documents in their native form.
18      So as a technical matter, I could rule
19 here today that what NorthWestern has done conforms to
20 the rules here because that's the default rule in the
21 event that the parties don't agree. And I guess this
22 is the lesson, A, to know your local rules and, B, to
23 deal with these issues up front because electronic
24 discovery is such a headache these days.

Page 249

1       But I do see the problem that you're
2  facing here and I am sympathetic to it because the
3  only way that these can actually be usable are for
4  NorthWestern to take the native format documents, the
5  documents in their native format and to do whatever
6  magic they do and put them in a TIFF file where they
7  look like a normal spreadsheet in Excel. And that can
8  be expensive and that goes back again to the issue
9  that there should have been some agreement on here as
10 to who was going to pay for what.
11      So my decision on this is that I will
12 permit Magten to request that NorthWestern produce
13 additional Excel spreadsheets in the TIFF form that
14 they did for the sixty-odd documents that they have
15 done and I will not order them to produce all 3200,
16 unless Magten agrees to pay for the cost.
17      I hesitate to put a number on how many
18 more you can ask for because I don't have enough sense
19 of the merits of the case and I don't want to restrict
20 your ability to develop your case in the time left
21 fairly. So the order I'm rendering today is that
22 Magten is free to request that NorthWestern produce
23 documents in the readable format that has been done to
24 date and that to the extent the requests become

63 (Pages 246 to 249)

Page 250

1  burdensome, excessive, then the parties should come
2  back to me to deal with that issue.
3       All right?
4       MR. PIZZURRO: Understood.
5       SPECIAL DISCOVERY MASTER JAMES: Okay.
6  And I'm not going to assess any sanctions with respect
7  to that.
8       So reviewing what we have done today,
9  because I think that covers the agenda, on item number
10 1 of my letter I've issued a decision today. I will
11 not submit my report and recommendation to the Court
12 until I have dealt with the issues that are under
13 advisement and as part of that, I will attach this
14 transcript which deals with the issues that I've
15 addressed today.
16      Number 1 was dealt with today. Number 2
17 is taken under advisement. Number 3 is taken under
18 advisement. Number 4 is taken under advisement.
19 Number 5 is taken under advisement, subject to the
20 supplementation that was discussed and which local
21 counsel in terms of the timing will collaborate on
22 confirming in writing what those dates are.
23      Paragraph 6 I have ruled upon today.
24 Paragraph 7 I have ruled upon today. Paragraph 8 I

Page 251

1  did not have to rule upon today. Paragraph 9 I ruled
2  upon today. And paragraph 10 is still open with
3  respect to the issues that are under advisement.
4       Is there anything else that I need to
5  address before we adjourn?
6       MS. COUNIHAN: I just have one
7  housekeeping matter that I wanted to address while we
8  were here. And I was wondering, I thought it might be
9  helpful for you to let the parties know what your
10 policy is with respect to which party should be paying
11 for the court reporter?
12      I think for today's purposes there were
13 motions on both sides that were being addressed. I
14 know at the last hearing that we had in front of Your
15 Honor it was Magten's motion, so I think if you can
16 give us some guidance as to what your position on that
17 matter is, it would be helpful.
18      SPECIAL DISCOVERY MASTER JAMES: Well,
19 again, that's another issue that parties customarily
20 work out among themselves and I would ask that the
21 parties consult about that and come to an agreement.
22      Off the record.
23      (Discussion off the record.)
24      SPECIAL DISCOVERY MASTER JAMES: Thank you

Page 252

1  very much. Sorry it took so long but that's the way
2  these things are.
3       (Proceedings concluded at 4:45 p.m.)

Page 253

1  State of Delaware. )
                      )
2  New Castle County )

            CERTIFICATE OF REPORTER

7       I, Kurt A. Fetzer, Registered Diplomate
8  Reporter and Notary Public, do hereby certify that the
9  foregoing record, pages 1 to 252 inclusive, is a true
10 and accurate transcript of my stenographic notes taken
11 on May 18, 2007, in the above-captioned matter.

13      IN WITNESS WHEREOF, I have hereunto set my hand
14 and seal this 21st day of May, 2007, at Wilmington.

18      Kurt A. Fetzer, RDR, CRR
19      Certification No. 100-RPR
20      (Expires January 31, 2008)