IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 04-1494-JJF |
| NORTHWESTERN CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) ) | |
| Plaintiff, | ) | Civil Action No. 05-499-JJF |
| v. | ) ) | |
| MIKE J. HANSON and ERNIE J. KINDT, | ) ) ) | |
| Defendants. | ) ) | |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER
WITH RESPECT TO
CERTAIN DISCOVERY MOTIONS FILED BY PLAINTIFFS**

1.    On February 8, 2006, the Honorable Joseph J. Farnan, Jr. appointed me to

serve as Special Master in the above-referenced actions.

**The Pending Motion**

2.    The motion that is the subject of this ruling is:

Plaintiffs' Emergency Motion Seeking Orders (a) Shortening the
Briefing Schedule under Local Rule 7.1.2 and Setting a Hearing
Date Before the Special Master; (b) Determining Privilege Status
of Documents Northwestern Seeks to Recall Under Claim of
Inadvertent    Production    and    Privilege;    (c)    Compelling
Northwestern to Produce Non-Privileged Documents; (d)
Compelling Northwestern to Produce Legible Versions of

Documents Produced in Illegible Form; (e) Extending the Period for Completing Depositions; and (f) Assessing Fees and Costs Against Northwestern ("Plaintiffs' Emergency Motion Seeking Orders, etc.").

### Introduction

3.    On May 2, 2007, Judge Farnan advised me that he was referring the above-referenced motion to me for decision. Consistent with the Court's direction to me, I heard oral argument on the pending motion on May 18, 2007, beginning at 10:00 A.M. and concluding at 5:00 P.M. A copy of the hearing transcript is attached as Exhibit B to my Report and Recommendation dated June 1, 2007.

4.    As a prelude to the oral argument that was to be presented by the parties on May 18, 2007, I wrote to the parties on May 17, 2007 and identified ten issues that were raised by the parties' respective motions, including Plaintiffs' Emergency Motion Seeking Orders, etc., and the order in which they would be addressed during the oral argument on May 18. The May 17, 2000 letter (the "May 17 agenda letter") to counsel for the parties is attached hereto as Exhibit A.

5.    During the May 18 hearing, I issued bench rulings with respect to six of the ten issues identified in the May 17 agenda letter (as well as rejecting applications for sanctions as to those issues). Those bench rulings were incorporated in a formal Report and Recommendation that was submitted to the Court and to the parties on June 1, 2007.

6.    The issues that are the subject of this Report and Recommendation, as reflected in the May 17 agenda letter are reflected below in subparagraphs A through B as taken verbatim from the May 17 agenda letter:

A.    3.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern's identification of certain documents as privileged

after the fact discovery cutoff, constitutes a waiver
of privilege as to those documents;

B.    4.    With respect to the Plaintiffs' motion referenced in
paragraph 1 above, whether the disclosure by
Northwestern to the SEC of allegedly privileged
documents waived the privilege as to those
documents;

## PLAINTIFFS' MOTION SEEKING TO COMPEL PRODUCTION OF DOCUMENTS PROVIDED BY NORTHWESTERN TO THE SEC[1]

7.    In my Report and Recommendation to the Court dated February 1, 2007, I
ordered Northwestern to produce documents, in response to Plaintiffs' discovery
requests, that were provided by Northwestern to the Securities and Exchange
Commission (the "SEC") as part of the SEC's investigation of Northwestern.
Northwestern complied with that Order and provided Plaintiffs with non-privileged
documents given to the SEC.   However, Northwestern has declined to produce to
Plaintiffs documents provided to the SEC that Northwestern contends are protected by
the attorney-client or work product privileges and argues that the disclosure of these
allegedly privileged documents to the SEC has not waived those privileges.

8.    In support of this argument, Northwestern asserts that because it was
cooperating with the SEC in the investigation by the SEC of certain accounting and other
irregularities related to Northwestern's financial condition, the SEC should not be
considered an adversary and in fact that Northwestern and the SEC, at least vis-à-vis
other parties such as Plaintiffs here, shared a "common interest," at least with respect to
the privileged documents at issue. Furthermore, Northwestern contends that Fed.R.Evid.
501's requirement that in a federal action where the law to be applied is the law of a

---

[1] This issue appears as paragraph 4 in the May 17 agenda letter (Exhibit A hereto).

State, that the applicable state law (*i.e.* Delaware) protects Northwestern's so-called "selective waiver" of privileged documents to the SEC. In this regard, Northwestern asserts that Delaware has the most significant relationship to the privilege issue that is the subject of Plaintiffs' motion and, based on that contention, suggests that Chancellor Chandler's decision in *Saito v. McKesson HBOC, Inc.*, C.A. No. 18553, 2002 WL 31657622 (Del. Ch. Nov. 13, 2002), should control. It is Northwestern's position that the *Saito* decision supports the selective waiver doctrine that shields its privileged communications turned over to the SEC because Northwestern was cooperating with the SEC in its investigation. It is also important to Northwestern's argument that it produced the privileged documents to the SEC pursuant to an agreement that would maintain the confidentiality of the documents, including protection of the disclosure of the documents from any Freedom of Information Act request by third-parties such as Plaintiffs.

9.      Plaintiffs argue that Northwestern's disclosure of privileged documents to the SEC, whether pursuant to a confidentiality agreement and other protective measures or not, does not prevent me or the Court in this case from requiring Northwestern to produce those documents based on the fact that the privilege has been waived by the production of allegedly privileged documents to an adverse party. Plaintiffs assert that it is inconceivable that a non-adversarial relationship existed between Northwestern and the SEC with respect to the investigation that the SEC conducted, notwithstanding Northwestern's cooperation.

10.      With respect to the appropriate state law to be applied to this privilege issue under Fed.R.Evid. 501, Plaintiffs' position is that the law of Montana should govern the question of whether the documents are privileged and whether privilege has been

waived by the production of the documents to the SEC. In support of this position, Plaintiffs argue that Rule 501's directive requires the application of the law of the state having the most significant relationship to the merits of the case, both as to substantial law aspects of the case, but also as to privilege, which depending on the state, may be considered substantive or procedural.

11.    There is no real disagreement among the parties that with respect to the merits of Plaintiffs' remaining claims in this action, the substantive law of Montana governs. Montana law was relied upon by both Plaintiffs and Northwestern in previous motion practice.[2] Because Montana, unlike Delaware, has no law that deals directly with the issue of the selective waiver of privilege by the disclosure of documents to the SEC, Plaintiffs argue that the Court should look to other decisions on point, which are federal decisions that have dealt with the specific issue of the waiver of privilege by the disclosure of privileged documents to the SEC or other governmental agency as part of a government initiated investigation. The primary decision on which Plaintiffs base their argument that the privilege as to the Northwestern documents has been waived is the decision by the Third Circuit Court of Appeals in *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir. 1991), in which the *Westinghouse* court rejected the "selective waiver" concept.

---

[2]  During the hearing, I asked the parties to explain why Montana law was considered to be the governing law, as opposed to the law of South Dakota, where Northwestern's headquarters is and has been located during the period in which the alleged wrongful conduct forming the basis for Plaintiffs' claims occurred. The parties appear to agree that actions relating to Plaintiffs' claims also occurred in Montana, notwithstanding the corporate headquarters nexus to South Dakota and that, as indicated above, both parties had previously briefed substantive issues relying upon Montana substantive law.

12.     As part of the motion practice before me, the parties provided no authority

from Montana (or South Dakota) with respect to basic principles of privilege law that

might apply to the instant motion. I expressed a concern to the parties that I was reluctant

to rely on federal decisions by default, to the extent that there might be principles of

Montana law that could be viewed as consistent with decisions like *Saito*, on the one

hand, or *Westinghouse* on the other. Accordingly, I ordered supplemental briefing by the

parties as to Montana (and South Dakota) law, the general principles of which might aid

my decision on this motion to the extent that Montana (or South Dakota) law was applied

under relevant choice of law principles. That supplemental briefing was completed on

May 25, 2007.

### Choice of Law

13.     The starting point for any choice of law analysis in the present context

where federal law does not apply to the merits is Fed.R.Evid. 501 which states:

> [I]n civil actions and proceedings, with respect to an element of a
> claim or defense as to which State law supplies the rule of
> decision, the privilege of a witness, person, government, State, or
> political subdivision thereof shall be determined in accordance
> with State law.

14.     The difficult portion of deciding what law to apply here is determining

whether the above-quoted language from Fed.R.Evid. 501 requires: (a) the application of

the privilege law of the state the substantive law of which applies to the merits of the case

(Montana), or (b) the privilege law of the forum state (Delaware), because Delaware

considers privilege questions to be issues of procedure rather than substance.

15.     The wording of the rule quoted above is not helpful with respect to the

issue raised by the pending motion. However, some guidance, albeit not necessarily

determinative, is provided by the Committee Notes to Rule 501. Specifically, the Committee Notes state that "federal law should not supersede that of the State's in **_substantive areas such as privilege_** absent a compelling reason." The Committee Notes go on to point out that one of the benefits of considering privilege law as substantive, rather than procedural, is that it would avoid forum shopping when, in the unlikely event, the law of privilege could be such a determinative factor as to lead to the choice of one court over another. _Id._

16.     Reading the Committee Notes referenced above that identify privilege law as substantive law might lead one to the conclusion argued by Plaintiffs that the substantive law providing the rule of decision in the present actions, _i.e._ Montana, would also supply the rule of decision with respect to the current privilege dispute. However, the leading authorities on federal civil practice, and the courts, have not found the answer to this question to be so easily resolved.

17.     For example, the leading treatise on federal practice and procedure has stated that there are four possible interpretations of Rule 501's requirement that state law be applied to privilege disputes. These four options are: (a) that the privilege law of the state providing the rule of decision on the merits should apply (the position that the Committee Notes seem to suggest); (b) that the state privilege law of the forum should apply because issues of privilege and evidence are procedural issues; (c) that the courts should apply the forum state's conflict of laws doctrine as to the privilege issue, as opposed to the substantive law issue – in other words, a separate choice of law analysis should be performed with respect to privilege as opposed to the substantive law governing the merits of the litigation in the unlikely event that the factors affecting choice

of law would be different for privilege than merits; and (d) the ambiguity in Rule 501 should simply lead the federal courts to rely on federal common law as to privilege issues. *See* C. Wright & K. Graham, *Federal Practice and Procedure*, § 5435 (2007 ed.).

18.    The resolution of this conundrum would be aided to the extent the Third Circuit or this District Court has spoken on the issue. Fortunately, there is authority from the Third Circuit and the Delaware District Court.

19.    The Third Circuit in *Samuelson v. Susen*, 576 F.2d 546, 549 (3d Cir. 1978), appears to be the only Third Circuit decision that has squarely addresses this issue. The privilege at issue in *Samuelson* concerned the privilege protecting disclosures by physicians in administrative medical review proceedings. The plaintiff, Samuelson, asserted that other doctors had defamed him in such proceedings and he sought discovery with respect to the medical review proceedings. *Id.* at 548-49.

20.    The Pennsylvania District Court applied Ohio law to the privilege issue because the *Restatement (Second) Conflict of Laws* held that the law of the state where the defamation occurred should govern. Chief Judge Seitz rejected this ruling, stating that the section of the *Restatement* relied upon by the District Court "does not pertain *to evidentiary matters* and hence has no applicability to the resolution of the issues before us." (emphasis added) The Court also held that § 139 of the *Restatement* was the applicable section because it dealt specifically with privileged communications.

21.    The *Samuelson* court then set forth its analysis in support of the conclusion that the Pennsylvania District Court should apply the choice of law rules that were applicable to the privilege issue of the forum state, Pennsylvania:

A federal court's application of the law of privilege which the forum states' courts would apply in cases like the instant one, seems to us to be consistent with Congress' goal of effectuating state substantive rights, laws and policies in controversies where there is no substantial federal interest. Such an approach furthers Congress' goal of preserving the domain of state privilege law in diversity cases by achieving outcome identity between state and federal courts of the forum state on choice of law, thus discouraging forum shopping. Such an approach also takes cognizance of the fact that a forum state's choice-of-law rules may reflect important policy underpinnings of its own law and are an integral part of it.

*        *        *

We are mindful of the fact that in *Klaxon* the Supreme Court was in effect interpreting the reference in the Rules of Decision Act to "the laws of the several states . . . in cases where they 'apply' to include a forum state's choice-of-law rules. As one commentator has pointed out," the reference in that Act to the laws of the several states . . . in cases where they apply is no less ambiguous in terms of horizontal choice of law than the references to 'State law' in the Federal Rules of Evidence." Wellborn, *The Federal Rules of Evidence and the Application of State Law in Federal Courts*, 55 Texas L.Rev. 371, 446 (1977).

*        *        *

We thus look to Pennsylvania's conflict-of-laws rules to determine whether Ohio's or Pennsylvania's privilege law applies. We do so even though, it might be argued that the law of the two jurisdictions, controlling the resolution of the privilege question is essentially the same. 576 F.2d at 550-51.

22.        Not surprisingly, the *Samuelson* court found no Pennsylvania law on point. Thus, it applied the Pennsylvania "interests analysis" to the conflict-of-law question and reached the same conclusion of the Pennsylvania District Court, that Ohio law should govern the privilege issue because the communications took place in Ohio and the proceedings of which the communications were a part related to a Ohio

physician's use of Ohio medical facilities. In short, Ohio had the "more 'significant relationship'" to the privilege dispute. 576 F.2d at 551.[3]

23.    While *Samuelson* should control the outcome here, it is worthwhile reviewing the three decisions from the District Court that have addressed the choice of law question under Rule 501, albeit in rather summary fashion.

24.    The most recent case is a decision by Judge Latchum in *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408 (D. Del. 1992). In that diversity action, the court was presented with a privilege dispute and recognized that Rule 501 required the application of state law. However, the parties stipulated that the controlling substantive law on the merits was Connecticut law. The court, without further explanation, simply stated that in accordance with Rule 501, Connecticut law would also govern the attorney-client privilege dispute. At most, one can infer from these limited set of circumstances that the *Remington* court believed that the state's law that would apply to substantive issues in the case would also apply to privilege issues, because the court made no effort to undertake the choice of law analysis adopted in *Samuelson*.

25.    A similar decision from this District Court where one must read between the lines in order to understand the rule of law applied as to choice of law, is *Finley Associates, Inc. v. Sea & Pines Consolidated Corp.*, 714 F.Supp. 110, 116 (D. Del. 1989). This was an action based on diversity jurisdiction, but the facts indicate that clearly all of the contacts were in Delaware in connection with a real estate dispute. *Id.* at 111-112. No choice of law analysis was performed by the court. It simply stated that Rule 501 applied and that meant the court was required to apply Delaware Uniform Rule of

---

[3]    The court also observed that its decision was consistent with § 139(2) of the *Restatement. Id.*

Evidence 502. There are two inferences that can be drawn from the *Finley* decision. One is that the ruling, like *Remington,* applied the privilege law of the state the substantive law of which was to be applied. On the other hand, it could be read as standing for the proposition that is mentioned above in Wright & Miller that a federal court will simply apply the law of the forum with respect to privilege issues because determinations as to privilege are procedural in nature.

26.    The final Delaware decision that addresses choice of law with respect to the privilege issue is *Brennan v. Walt Disney Productions, Inc.*, C.A. No. 86-521-CMW, 1987 U.S. Dist. LEXIS 7420 (D. Del. Aug. 18, 1987). This was a personal injury action in which the plaintiff brought suit for injuries allegedly sustained at Disney World in Florida. As to the choice of law rule to be applied to the privilege dispute, Disney had relied upon Florida cases relating to that issue. The reasoning of the court for rejecting the application of Florida law was that "[a]lthough the court applies state substantive law in a diversity case, the Court still uses federal procedural law [for privilege issues]." *Id.* at *3-4 (*citing Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

27.    The Third Circuit's decision in *Samuelson* obviously must control on choice of law in the present circumstances and it is difficult to understand why the three Delaware District Court decisions did not rely upon *Samuelson.* The *Brennan* decision that employed the federal common law with respect to the privilege issue in that case is clearly an aberration and completely inconsistent with *Samuelson. Remington* and *Finley* can be harmonized with the Third Circuit's ruling in *Samuelson* only to the extent that one concludes (liberally reading between the lines) that in both cases (and it is slightly more explicit in *Remington* than *Finley*) that the court believed that applying Delaware's

choice of law rules to the privilege issue would have required in both instances the courts to choose the law of the state the substantive law of which also applied to the merits of the action because the same significant contacts that supported the choice of Connecticut and Delaware for substantive reasons also supported the choice of those states' privilege laws.

28.    Fraud cases, such as the one here, under Delaware choice of law principles are governed by the law of either the jurisdiction that has the most significant relationship to the claim (*see, e.g., Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.,* 576 F.Supp. 107, 127 (D. Del. 1983), *aff'd,* 740 F.2d 956 (3d Cir. 1984), *cert. denied,* 469 U.S. 1159 (1985); *Hurst v. General Dynamics Corp.,* 583 A.2d 1334, 1338 (Del. Ch. 1990)), or the jurisdiction where the fraud occurred (*see, e.g., Johnston Assoc., Inc. v. Rohm & Haas Co.,* 560 F.Supp. 916, 918 (D. Del. 1983)).  The parties agree that the merits of Plaintiffs' fraud claims should be decided under Montana law because that state has the most significant relationship to the claims at issue.

29.    Applying *Samuelson,* I must determine whether the Delaware state courts applying Delaware's choice of law principles as to privilege issues, would follow the privilege law of Montana or Delaware.

30.    There has been no occasion for the Delaware state courts to make any choice of law decision with respect to the applicable state's law governing disputes as to privileged documents with respect to actions initiated originally in the Delaware state courts because issues of privilege are considered to be procedural and evidentiary in nature and therefore governed by Delaware law.  *See, e.g., Monsanto Co. v. Aetna Casualty & Sur. Co.,* C.A. No. 88C-JA-118, 1993 Del. Super. LEXIS 442, at *14 (Del.

Super. Dec. 9, 1993); J. James, *Privileged Communications and the Delaware Corporation*, § 7.03, p. 136 (2000 ed.). That, of course, is not the case we have here, because the present action is pending in federal court, as opposed to state court, and the appropriate choice of law for deciding the privilege matters at issue is subject to the direction of federal law, in this case the *Samuelson* decision.

31.     While there have been no decisions by the Delaware courts concerning the application of choice of law to a privilege dispute, there are three Delaware decisions that have addressed choice of law in the context of an alleged accountant-client privilege and physician privacy privilege. The Court of Chancery in *In re Best Lock Corp. Shareholder Litig.*, Consol. C.A. No. 16281, 2000 Del. Ch. LEXIS 175 (Del. Ch. Dec. 18, 2000) and *Lee v. Engle*, C.A. No. 13323, 1995 Del. Ch. LEXIS 149 (Del. Ch. Dec. 15, 1995) applied privilege choice of law principles, with respect to an accountant-client privilege which is not recognized in Delaware as a privilege. The parties seeking to assert the privilege argued that under relevant choice of law principles, the Court of Chancery should follow the law of a different state that did recognize such a privilege and not require the production of such accountant-client "privilege" documents. *See Best Lock*, 2000 Del. Ch. LEXIS 175, at *19-21; *Lee*, 1995 Del. Ch. LEXIS 149, at *18-21.

32.     Both Courts relied upon the *Restatement (Second) of Conflicts*, § 139, and the Comment thereto. In *Lee*, the Court stated that it "should weigh four factors when determining whether it should apply law other than that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties in the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties." *Lee*, at *19.

In both *Best Lock* and *Lee*, the courts found that the contacts analysis set forth in the *Restatement* required the application of Delaware law, rather than the law of Indiana or Illinois. Accordingly, in both cases, the courts rejected the application of the accountant-client privilege and ordered the production of documents. *See Best Lock* at *22-23 and *Lee* at *20-21.

33.     The third case, *Danklef v. Wilmington Medical Center*, 429 A.2d 509 (Del. Super. Ct. 1981), was a decision issued in response to a subpoena filed in connection with an action pending in Colorado. The subpoena was filed initially in a Colorado state court on behalf of a patient who had sued his physician for an operation performed in Delaware. Among other documents sought by the subpoena were documents that were part of an investigation conducted by the Wilmington Medical Center's Credentials Committee. *Id.* at 509-510. The Medical Center opposed the disclosure of the proceedings of the Credentials Committee on the ground that it was protected by statute under Delaware law. *Id.* at 510. On the other hand, Colorado did not have such an applicable privilege or source of protection for those documents. *Id.* at 512. Applying the same four-factor test articulated in the Comment to § 139 of the *Restatement*, the Superior Court concluded that the relevant contacts dictated the application of Delaware law, and that, accordingly, the medical records sought from the Credentials Committee did not have to be produced. *Id.* at 512.

34.     Applying the four factors articulated in the Comment to § 139 of the *Restatement*, and followed by the Delaware courts, it would appear that Montana has the most significant relationship to the waiver of privilege as to the documents produced by Northwestern to the SEC:

(1)    First, and most importantly, on the record before me, the same contacts that led the parties to apply Montana law in prior motion practice on substantive issues also direct me to that state for purposes of determining the locus to which the privileged communications have the most common connection.    Also, although I have not reviewed the communications given to the SEC, I have reviewed other privileged documents *in camera.*    These communications among the parties to this litigation involved a number of jurisdictions, including, obviously, Montana and South Dakota but New York and other states as well.    However, prior to the filing of the Northwestern bankruptcy, the communications involving Delaware appear to have been non-existent or *de minimis.*

(2)    By my earlier rulings in the case, I have already decided that the SEC material is reasonably calculated to lead to the production of admissible evidence and should be produced in this case to the extent that it is not privileged.

(3)    The privileges at issue are, of course, the attorney-client and work product privileges, both of which are accorded substantial weight, and protection is afforded when a privilege is applicable and not waived.

(4)    The factor of fairness to the parties does not weigh more heavily on one side than the other.    On the one hand, Plaintiffs are entitled to obtain relevant documents to support their claims.    On the other hand, Northwestern can protect privileged documents from disclosure.

35.    In summary, Montana law is the applicable law to be applied here in determining whether Northwestern has waived privilege with respect to the documents it has disclosed to the SEC.

### Montana Law and the Issue of Waiver

36.    The law of Montana on privilege provides straightforward guidance with respect to the issue of waiver.    Like Delaware, Montana's privilege rules are codified in its Rules of Evidence.    Montana Rule of Evidence 503 states:  "A person upon whom these rules confer a privilege against disclosure waives the privilege if the person or the

person's predecessor while the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged material."[4]  This principle has been applied by the Montana courts.  For example, in *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 294-96 (D. Mont. 1998), the court, applying Montana law, held that the defendant insurer in a bad faith case had waived privileged communications relating to the handling of the plaintiff's claim because it had affirmatively placed privileged communications at issue by designating, as an expert witness, one of its attorneys who had handled the plaintiff's claims during the course of the litigation.

37.      Similarly, in *Barnes v. Montana Milk Express, Inc.*, C.A. No. DV-01-305, 2003 Mont. Dist. LEXIS 2625 (Dist. Ct. Gallatin Co. Apr. 29, 2003), the defendant voluntarily produced in discovery a privileged communication from its counsel to demonstrate that the defendant company had relied upon advice of counsel in deciding to fire the plaintiff.  *Id.* at *2-5.  The issue raised by the plaintiff's motion to compel was whether all privileged communications from that attorney to the company lost their privileged status and were waived by the selective and partial disclosure of the one letter in question.  The court held that the plaintiff had met his burden by demonstrating implied waiver as to all communications between counsel and the company relating to the subject matter of the letter that had been intentionally disclosed and that the company intended to use at trial.[5]

---

[4]  Similarly, South Dakota Rule of Evidence 510 is substantively identical to Montana Rule of Evidence 503.

[5]  *Cf. Statler v. Buffalo-Bodega Complex, Inc.*, C.A. No. 06-5003, slip. op. (D.S.D. Nov. 6, 2006) (the court, applying South Dakota law, held that the intentional disclosure by defendant of its counsel's work product as reflected in two letters to the South Dakota Division of Human Rights was a waiver of work product privilege, but only with respect to those two particular letters).

38.     Northwestern has cited two Montana cases in support of its position that it has not intentionally waived the privilege with respect to the documents produced to the SEC because it obtained the agreement from the SEC to treat the documents as confidential and not otherwise available to third parties.  In support of this position, Northwestern has cited the Montana Supreme Court decision of *PacifiCorp. v. Dept. of Revenue*, 838 P.2d 914 (Mont. 1992).  Northwestern describes this case as "particularly instructive" with respect to documents produced to a state agency.

39.     However, the *PacifiCorp.* case is entirely distinguishable from the facts in the case at bar relating to the production to the SEC.  In *PacifiCorp.*, a taxpayer had inadvertently disclosed several privileged documents in discovery to the Montana Department of Revenue.  The Montana Supreme Court held that this inadvertent production did not constitute waiver of any privilege.  *Id.* at 919.  By no stretch of the imagination can the ruling in *PacifiCorp.* be analogized to the situation involving Northwestern and the SEC.  Northwestern's production of privileged communications to the SEC was advertent.  Northwestern intended to disclose those documents at the risk of waiving the attorney-client privilege because of the potential benefits it might receive by cooperating with the SEC in its investigation.  Northwestern apparently made a conscious decision to accept the benefits of cooperating with the SEC at the cost of potentially losing the protection afforded to the privileged communications that were disclosed to an adverse third party.

40.     Accordingly, there is no precedent within Montana (or South Dakota) that either the parties or this Court has found that would support the proposition advanced by Northwestern that its disclosure to the SEC was an intentional disclosure that would

otherwise be protected from waiver by the mere fact that it was produced confidentially to the government agency.

41.    Also, neither party, nor I, have found any authority in Montana (or South Dakota) that would support Northwestern's claim of common interest with the SEC by disclosing the privileged communications as a part of its effort to cooperate with the SEC investigation. While the SEC investigation did not result in the imposition of the kind of punitive sanctions that were either imposed upon or accepted by former officers of Northwestern, the process of that investigation and the outcome cannot be viewed as anything other than adversarial. Northwestern admits that the result of the SEC investigation as to it was a Cease and Desist Order with a finding that Northwestern's financial statements for the first three quarters of 2002 were materially false and misleading. The fact that the SEC did not also find that Northwestern had acted fraudulently and did not impose any monetary penalty does not detract from the adverse findings that resulted from the SEC investigation. *See* Exhibit 1 to the Declaration of John W. Brewer, dated April 13, 2007, filed in support of Plaintiffs' Emergency Motion Seeking Orders, etc.

42.    Significantly, Northwestern has not cited any law from its chosen forum, Delaware, in support of its contention that the disclosures to the SEC are protected by the common interest doctrine, which is part of the attorney-client privilege in Delaware under Delaware Uniform Rule of Evidence 502. This is not surprising because the Delaware case law is clear that to the extent there is the slightest degree of adversity between two parties in a situation where privileged communications are being shared, the common interest doctrine simply does not apply. The Delaware courts have analyzed on a number

of occasions efforts to shield from third parties communications that allegedly are privileged based on common interest.

43.        For example, in *Jedwab v. MGM Grand Hotels*, C.A. No. 8077, 1986 Del. Ch. LEXIS 383 (Del. Ch. Mar. 20, 1986), a class action was brought on behalf of a group of MGM stockholders who endeavored to enjoin a proposed merger between MGM and Bally.  In responding to discovery requests directed to privileged communications, Bally argued that the common interest doctrine protected communications between attorneys for Bally and a separate group of attorneys representing MGM during the course of the negotiation of the merger agreement between those two companies.   The Court of Chancery stated that the common interest doctrine as reflected in Delaware Uniform Rule of Evidence 502 was predicated upon:

> [a] recognition that a disclosure may be regarded as confidential even when made between lawyers representing different clients if in the circumstances, those clients have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers.  The classic case of this kind would be communications relating to the defense of a lawsuit among lawyers for co-defendants.

*Id.* at *5.

44.        However, the *Jedwab* court held that the logic of that policy could not be applied to the situation affecting Bally and MGM because at the time of the communications at issue – the negotiations of the merger – Bally and MGM had adverse interests in negotiating the terms of that merger transaction.   The fact that the two corporations later became co-defendants with mutual interests vis-à-vis the plaintiff shareholders with respect to the terms of that merger did not satisfy the rule.  *Id.* at *4-5.

*See also Zirn v. VLI Corp.*, C.A. No. 9488, 1990 Del. Ch. LEXIS 135 (Del. Ch. Aug. 13, 1990), *reversed on other grounds*, 621 A.2d 773 (Del. 1993).

45.    It follows, almost *a fortiori*, in view of the parameters of the common interest doctrine under Delaware law, that the common interest doctrine certainly would not protect the disclosures by Northwestern to the SEC in connection with the SEC's investigation, notwithstanding confidentiality restrictions and other efforts by Northwestern and the SEC to prevent the disclosure of those documents from third parties.

### Controlling Authority on Dissemination of Privileged Communications to the SEC

46.    Based upon the applicable principles of Montana privilege law, we come back to the essential proposition of whether to apply the *Saito* or *Westinghouse* decision to the case at bar. Because of my determination that Delaware privilege law does not govern the issue of Northwestern's disclosure of privileged communications to the SEC, we are left with the controlling authority from the Third Circuit, which is, of course, the *Westinghouse* case.

47.    In *Westinghouse*, the plaintiff, the Republic of the Philippines, brought suit against Westinghouse, alleging that Westinghouse had obtained power plant contracts by bribing former government officials of then President Marcos. 951 F.2d at 1417. Long before the litigation was brought by the Republic, the SEC had begun investigating the situation to see if any securities laws had been violated by the making of illegal payments with respect to the Westinghouse contracts. Westinghouse retained Kirkland & Ellis to conduct an internal investigation, and Kirkland & Ellis produced two letters reporting its findings. Westinghouse disclosed one of these letters to the SEC

investigators and described the findings of the other letter to the SEC without producing the letter. Additionally, neither of the letters was given to the SEC nor were any of the other privileged materials created in connection with the writing of those letters produced to the SEC. *Id.* at 1418.

48.      At about the same time, the Department of Justice also investigated Westinghouse in connection with the alleged kickback scheme. As part of the DOJ proceedings, a subpoena was issued for the production of the Kirkland & Ellis letters. Westinghouse entered into a Confidentiality Agreement with the DOJ and produced the subpoenaed documents to the grand jury that was a part of the DOJ's investigation into the alleged illegal payments. Pursuant to that Confidentiality Agreement, the DOJ reviewed the privileged communications, both attorney-client and work product, in the Kirkland & Ellis offices, with the agreement that the information would not be disclosed to anyone outside of the DOJ and that the review would not constitute a waiver of Westinghouse's attorney-client and work product privileges. *Id.* at 1419.

49.      The Third Circuit analyzed in some detail (that it is not necessary to repeat here for purposes of this decision) the concept of selective waiver of the attorney-client and work product privileges. Westinghouse relied upon a decision from the Eighth Circuit, *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), to support its argument that a party could waive the attorney-client privilege with respect to certain selected entities or persons, as long as confidentiality was maintained with those persons so that there would not be a waiver as to other third parties. Suffice it to say that the *Westinghouse* court found the selective waiver theory to be in conflict with the fundamental purposes that accorded protection to the attorney-client and work product

privileges. It specifically rejected the idea that a special exception should apply in situations where a party was cooperating with a government agency such as the SEC. *Id.* at 1423, *et seq.* Based on the principles of Montana law discussed above, I find that Montana would follow *Westinghouse* rather than *Saito.*

50.    Interestingly, the *Westinghouse* court noted that in 1984 Congress rejected an amendment proposed by the SEC to the Securities and Exchange Act of 1934 that would have established a selective waiver rule regarding documents disclosed to the agency. *Id.* at 1425. Agencies of government, including the SEC and the Department of Justice, and certain members of Congress have recently sought again to incorporate the selective waiver doctrine into the SEC regulations. However, at this time, neither the Committee of Rules of Practice and Procedure of the Judicial Conference of the United States, nor, more importantly, Congress, have adopted the selective waiver doctrine with respect to disclosures made to the SEC or DOJ. Thus, while selective waiver may eventually be incorporated into either the Federal Rules of Evidence or into statutes or regulations promulgated by Congress or the SEC, the law applying to the privilege dispute here is governed by *Westinghouse.*

51.    That brings us back to § 139 of the *Restatement.* Section 139(1) of the *Restatement* states:

> (1)    Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admissions of such evidence would be contrary to the strong public policy of the forum.

52.    Northwestern argues, by implication, that Delaware, based on the reasoning in *Saito,* sets forth a strong Delaware public policy in favor of adoption of a

selective waiver doctrine under circumstances like those here. An extended exegesis of the holdings of Chancellor Chandler in *Saito* is not required here to resolve the present dispute, however, because the *Saito* decision addressed a Delaware corporate governance dispute and an important section (8 *Del. C.* § 220) of the Delaware General Corporation Law. Plaintiffs' action against Northwestern is a common law fraud action, and the discovery of the SEC documents does not have any collateral impact on important Delaware corporate governance issues or other Delaware public policy concerns.

53.    Accordingly, I find that Northwestern has waived any privilege attaching to the documents that it has produced to the SEC. Northwestern, therefore, is ordered to produce forthwith to Plaintiffs all documents that it has provided to the SEC but has withheld from production in this case based on the attorney-client or work product privileges. Plaintiffs' Emergency Motion Seeking Orders, etc., with respect to this issue is hereby GRANTED. No sanctions will be awarded.

### WHETHER NORTHWESTERN HAS WAIVED PRIVILEGE WITH RESPECT TO CERTAIN DOCUMENTS IDENTIFIED ON PRIVILEGE LOGS PRODUCED AFTER THE DUE DATE FOR SUBMISSION OF PRIVILEGE LOGS[6]

54.    Pursuant to my bench rulings on January 29, 2007, that were incorporated in a Report and Recommendation to the Court of February 1, 2007, I ordered the parties to complete written discovery by March 16, 2007 and that all privilege logs be produced by March 23, 2007. The record reflects that Northwestern filed a supplemental privilege log on April 5 and another supplemental log on April 23 or April 24, 2007. In neither case did Northwestern make an application to the Court or to me for the right to submit

---

[6] This issue appears as paragraph 4 in the May 17 agenda letter (Exhibit A hereto).

these privilege logs, in one case 13 days after they were due and in the other case approximately three weeks after the due date.

55.     One factor of note in connection with the filing of the supplemental privilege logs by Northwestern is that in the supplementation that was made on April 5, 2007, the supplementation included a combination of documents, some of which were part of the inadvertent production that was the subject of my Report and Recommendation dated June 1, 2007, and another portion that consisted of privileged documents that, for whatever reason (for example, human error), had not been logged by March 23, 2007. The supplemental log that was produced on April 23 or April 24, 2007, consisted entirely of documents that were allegedly inadvertently produced and subject to the pull-back order set forth in paragraph 8 of the Stipulated Protective Order.

56.     Plaintiffs have not provided any authority to support the proposition that a Special Master or the Court is required to sanction a party for untimely compliance with a discovery order by, in this case, compelling the disclosure of documents that Northwestern alleges are privileged. However, the failure of Northwestern to meet the March 23 deadline for submission of its privilege log and its failure to seek leave from the Court or me to supplement the log in the two to three weeks after the March 23, 2007 date for submission of the privilege log, is not an action that should be viewed lightly.

57.     As a practical matter, one must analyze this dispute in the context of the complex litigation that is involved here and the number of documents that the Court and I have ordered Northwestern to produce. The privileged documents that were added to the Northwestern privilege log after March 23 are approximately 150 in number. Comparing that number with the total number of documents that Northwestern has identified as

privileged – 1,773 – it would appear that, as a result of human error, approximately eight percent (8%) were identified two to three weeks late. Indeed, of those 150 documents, Plaintiffs were in the possession of 60 of the documents which Northwestern had inadvertently produced but had not yet added to its privilege log.

58.    With respect to the 60 documents that were added to the privilege log after March 23 and were part of the inadvertent production, Northwestern argues that the protections afforded in paragraph 8 of the Stipulated Protective Order would be vitiated if it were not permitted to add those documents to its privilege log at the same time that it sought the return of those documents in accordance with the provisions of paragraph 8. That argument is sensible and consistent with the purpose of a pull-back or claw-back provision and my Report and Recommendation of June 1, 2007. Accordingly, as to the approximately 60 documents added to the privilege log after March 23 that were added after the discovery that they were inadvertently produced, I do not find that there has been any waiver of any privilege as to those documents by the supplementation of Northwestern's privilege log after March 23.

59.    Analytically, there is little difference between the 60 inadvertently produced privileged documents referenced above and the additional 90 privileged documents that were found to be responsive to Plaintiffs' discovery requests after the close of written discovery and after the privilege logs were due on March 23. In both cases, the discoveries flowed from the mistakes of attorneys or legal assistants charged with the task of sifting through hundreds of thousands of pages of documents and identifying and sequestering privileged documents. It is not unusual for a party in a case of this size to discover that it has failed to identify documents as privileged after they

have been produced or to discover that documents that were not produced should have been produced but for the fact that they are privileged.

60.    In the normal course of litigation, it is likely that both sides would have been forgiving with respect to these relatively minor failures of compliance with the discovery dates that I had established in my February 1 Report and Recommendation to the Court. However, by the time the second supplementation of the privilege log was made by Northwestern, the litigation dynamics had reached a critical threshold that has led to the spate of motions that are presently before me. Since the inception of the motion practice that is before me, Northwestern has not tried to hide the fact that it was late in supplementing its privilege log or in admitting that it was late because of the mistakes made by the persons charged with reviewing the documents to identify privileged communications and to add them to the privilege log.

61.    The record is devoid of any support for an argument by Plaintiffs that Northwestern deliberately or intentionally ignored the deadline for the submission of privilege logs that were due on March 23, 2007. Additionally, there is no record evidence to support a conclusion that upon discovering the additional documents that needed to be added to its privilege log that Northwestern and its counsel did not diligently and promptly supplement the otherwise deficient logs.

62.    The imposition of sanctions in this context is discretionary. I find that the circumstances do not warrant the imposition of any sanctions, most significantly the sanction of finding that the privileged documents on the supplemental logs should lose their privileged status by being added to the logs in an untimely manner.

63.     The case law cited by the parties supports this decision.   In the one decision relied upon by Plaintiffs, *Get-a-Grip, II, Inc. v. Hornell Brewing Co., Inc.*, C.A. No. 99-1332 2000, U.S. Dist. LEXIS 11961 (E.D. Pa. Aug. 8, 2000), the District Court had ordered that the plaintiff produce responsive documents to a Request for Production within ten days of the date of the court's order, or submit an appropriate privilege log. *Id.* at *2-3.   The plaintiff ignored this court order and only two months after the court's original order and a renewed motion by the defendant did the plaintiff comply with the court's original order, which led to the imposition of the type of sanctions sought here by Plaintiffs. The *Get-a-Grip* facts are different than the facts of record here.

64.     Other decisions in which the courts have imposed the waiver of privilege as a sanction because of the untimely production of adequate privilege logs include circumstances that bear not the slightest affinity to the matters of record in this case.   *See, e.g., Burlington Northern & Santa Fe Ry. Co. v. United States District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005) (privilege log produced five months after production and no explanation provided for delay); *Wachtell v. Health Net, Inc.*, 239 F.R.D. 81, 107 (D.N.J. 2006) (supplemental privilege logs were not provided until more than two years after scheduled close of discovery and the facts reflected a pattern of non-compliance with court orders).

65.     Thus, for the reasons stated above, Plaintiffs' Emergency Motion Seeking Orders, etc., as to this issue is DENIED.   No sanctions will be awarded.

66.     This Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed.R.Civ.P. 53(g).

IT IS SO ORDERED this 8th day of June, 2007.

John E. James
Special Master

cc:    The Honorable Joseph J. Farnan, Jr.
       Dale R. Dube, Esquire
       Victoria Watson Counihan, Esquire
       Denise Seastone Kraft, Esquire
       Kathleen M. Miller, Esquire

799355/30048-001

# EXHIBIT A



Potter
Anderson
& Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

John E. James
Partner
Attorney at Law
302 984-6018  Direct Phone
302 658-1192  Fax
jjames@potteranderson.com

May 17, 2007

**By Hand and By E-Mail**

Dale R. Dube, Esquire
Blank Rome LLP
Chase Manhattan Center – Suite 800
1201 North Market Street
Wilmington, DE  19801

Victoria Watson Counihan, Esquire
Greenberg Traurig LLP
Nemours Building – Suite 1200
1007 North Orange Street
Wilmington, DE  19801

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street – Suite 1500
Wilmington, DE  19801

RE:  ***Magten Asset Management Corp. and Law Debenture Trust Company of New York, Plaintiffs, v. Northwestern Corporation, Defendant,*** D. Del., C.A. No. 04-1494-JJF
-and-
***Magten Asset Management Corp., Plaintiff, v. Mike J. Hanson and Ernie J. Kindt, Defendant,*** D. Del., C.A. No. 05-499-JJF

Dear Counsel:

I have received correspondence from counsel for Magten and Northwestern in response to my letter to the parties dated May 14, 2007 in which I outlined the agenda for the hearing on Friday.  Based on the letters from Ms. Dube and Mr. Pizzurro, I have slightly revised the schedule of the issues to be presented on Friday.  I have identified below the order in which argument will now be presented to me at the hearing:

1.   With respect to Plaintiffs' Emergency Motion Seeking Orders, etc., and the Emergency Cross-Motion of Defendant Northwestern, etc.,

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 2
May 17, 2007

whether Northwestern has waived privilege with respect to the documents that Northwestern produced to Plaintiffs or whether the production was inadvertent or privilege was otherwise not waived;

2.    With respect to the parties' motions referenced in paragraph 1 above, whether Plaintiffs are immediately required to return the documents or destroy the documents that are alleged to have been produced inadvertently or whether Plaintiffs can retain them until their privileged status is resolved;

3.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern's identification of certain documents as privileged after the fact discovery cutoff, constitutes a waiver of privilege as to those documents;

4.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether the disclosure by Northwestern to the SEC of allegedly privileged documents waived the privilege as to those documents;

5.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether certain other documents that are subject to Plaintiffs' discovery requests are privileged or whether the privilege has been waived;

6.    With respect to the Plaintiffs' motion referenced in paragraph 1 above, whether Northwestern should be required to produce certain documents in another electronic format;

7.    The Joint Motion for Protective Order filed by Northwestern and Messrs. Hanson and Kindt as to certain depositions noticed by Plaintiffs;

8.    Magten's Motion for Protective Order with respect to the deposition of Talton R. Embry; and

9.    Plaintiffs' motion to exceed the ten deposition limit and to extend the discovery schedule for the taking of depositions in this action; and

10.    Whether sanctions should be imposed with respect to any of the motions addressed in paragraphs 1 through 8 above.

Dale R. Dube, Esquire
Victoria Watson Counihan, Esquire
Denise Seastone Kraft, Esquire
Page 3
May 17, 2007

    If I have failed to include any application that is pending before me, please notify me at your earliest convenience.  Also, please forward this letter to all interested counsel.

Sincerely,

John E. James
Special Master

JEJ/cml
795277/30048-001 and 002