# Exhibit 34

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE

 2

    Civil Action No. C.A. No. 04-1494 (JJF)

 3

    MAGTEN ASSET MANAGEMENT CORPORATION and

 4  LAW DEBENTURE TRUST COMPANY OF NEW YORK,

 5  Plaintiffs,

 6  v.

 7  NORTHWESTERN CORPORATION,

 8  Defendant.

 9  -----------------------------------------------

10  Civil Action No. C.A. No. 05-499 (JJF)

11  MAGTEN ASSET MANAGEMENT CORP.,

12  Plaintiff,

13  v.

14  MICHAEL J. HANSON and ERNIE J. KINDT,

15  Defendants.

16  -----------------------------------------------

17               DEPOSITION OF

18             MICHAEL J. HANSON

19  -----------------------------------------------

20

21

22

23

24

25  TAKEN ON:  6/27/2007           BY:  DANA ANDERSON
```



Page 14

1    Q.    At the time you signed those
2    officer's certificates, did you review the
3    indenture?
4    A.    I reviewed portions of the
5    indenture, not necessarily the whole
6    document.
7    Q.    So you may have seen portions
8    of a -- excerpted portions of an indenture
9    that was identified to you as relating to
10   the QUIPS?
11   A.    Just to be clear, I don't have
12   a recollection of specifically signing
13   officer's certificates related to the QUIPS.
14   But I do and have at times signed officer's
15   certificates, and when I did, I would review
16   those portions of the indenture documents to
17   make sure that I understood what I was
18   certifying to.
19   Q.    Okay.  We'll get to that then.
20         Let's talk about the business
21   structure of NorthWestern and the manner in
22   which the QUIPS were held just so that as
23   the deposition's going on, you and I can
24   talk about the same thing.
25         Now, at the time that

Page 15

1    NorthWestern was in the process of
2    acquiring the Montana Power Company assets
3    it submitted an application to the Montana
4    Public Service Commission, correct?
5    MS. DELANEY:  Just so the record
6    is clear, Bonnie, I believe the witness has
7    already testified what was acquired was the
8    Montana Power, LLC which had within it assets
9    and liabilities associated with the Montana
10   utility business.
11   THE WITNESS:  If we might describe
12   the acquisition itself, it may clarify so we
13   can move forward.
14   BY MS. STEINGART:
15   Q.    I'm just asking you a specific
16   question about an application to the
17   regulators.  So at the time that
18   the -- that NorthWestern acquired the
19   Montana Power Company, LLC, NorthWestern
20   made an application for permission to do
21   that with the Montana Public Service
22   Commission, correct?
23   A.    Just to be clear, what we
24   acquired was the unit interest or equity
25   ownership of the Montana Power, LLC, the

Page 16

1    assets and liabilities were those of the
2    LLC, we didn't acquire the assets directly,
3    we acquired the unit interest.  And at that
4    time we made an application for approval
5    with the Montana Public Service Commission
6    to acquire the LLC and hold it either as a
7    subsidiary of NorthWestern or a division of
8    NorthWestern.
9         (Deposition Exhibit Number 2
10   marked for identification.)
11   BY MS. STEINGART:
12   Q.    I'd like to show you what we've
13   marked as Hanson 2 and ask you whether you
14   recognize that as a copy of the application
15   with one of the exhibits to that
16   application excerpted on the back.
17   MR. KALECZYC:  Are you
18   representing, Bonnie, that this is not the
19   complete application with all exhibits?
20   MS. STEINGART:  All these exhibits
21   are not exact, only one of the
22   exhibits -- it's a copy of the body of the
23   application with a single exhibit in the
24   interest of not deforesting America because
25   that was the one exhibit we were interested

Page 17

1    in.
2         THE WITNESS:  It does appear to be
3    a copy of the application, there are some
4    number of attachments here, couple of
5    verification statements and then two
6    organizational charts.
7    BY MS. STEINGART:
8    Q.    These were -- so this was a
9    joint application by both NorthWestern and
10   the Montana Power Company, correct?
11   A.    Yes, it was.
12   Q.    And the charts that we have
13   attached were identified in the application
14   as Exhibit Number 7, correct?
15   A.    I don't recall that
16   specifically, it's labeled Exhibit 7 here.
17   Q.    Right.  So what I was -- wanted
18   to do was to walk through what the
19   structure was before and after.  Now, is
20   the document that's the first page of
21   Exhibit 7, and that's NOR 44694, a
22   depiction of the corporate structure before
23   that acquisition occurred?
24   A.    I don't believe so.  And the
25   reason it has a box on the right that shows

5 (Pages 14 to 17)



Page 22

1  (indicating), off of what you have here.
2  So that to the extent that NorthWestern had
3  options about how to hold the company after
4  this acquisition, you could tell me which
5  option or which structure the company
6  determined to have.
7       MR. KALECZYC:  You are not asking
8  the witness to testify about the accuracy of
9  the rest of the chart as it's depicted?
10      MS. STEINGART:  Well, the rest of
11 the chart is a copy of the chart that's here.
12 BY MS. STEINGART:
13      Q.    I'm not asking you to compare
14 it box for box.  It's a copy of the chart
15 that is listed in the Hanson Exhibit 2
16 except for the Montana Power, LLC.
17      A.    To get to your question, the
18 chart and the one you copied it from, each
19 of the boxes are not separate corporations.
20 There is a mixture here of corporations and
21 divisions.  But with that said, your
22 question is:  How was NorthWestern Energy,
23 LLC formerly Montana Power held?  It was a
24 direct subsidiary of NorthWestern
25 Corporation upon closing.

Page 24

1       Q.    Right.
2       A.    I do something like that.  I've
3  just drawn a line directly from that box to
4  the line below NorthWestern Corporation.
5       Q.    We'll mark something without
6  the line as 3 and we'll mark this as 3-A,
7  okay?  So I'm marking this as 3-A.
8            (Deposition Exhibit Number 3-A
9  marked for identification.)
10 BY MS. STEINGART:
11      Q.    So we'll have both as
12 deposition exhibits.
13            Now, during the period from
14 February 15th and before November 2002 when
15 the going-flat transaction occurred, did
16 that structure by which NorthWestern held
17 the Montana Power, LLC change, the
18 structure you've depicted here
19 (indicating)?
20      A.    Between the time of closing and
21 the transaction in November, to my
22 recollection today, the legal structure did
23 not change.  The management structure did,
24 but the legal structure did not, other than
25 changing the name to NorthWestern Energy,

Page 23

1       Q.    So on February 15th Montana
2  Power, LLC with that name was a direct sub
3  of NorthWestern Corporation?
4       A.    That's correct.
5       Q.    So there would just be a
6  straight line.  Could you depict that in
7  whatever place you think it belongs?  Do
8  you have a pen?  I can give you a pen.
9       A.    You can draw the line any
10 direction you like as long as it connects
11 directly to this line below NorthWestern
12 Corporation.
13      Q.    Could you draw a line that you
14 think is correct?
15      A.    I can draw a line.  Where
16 you've positioned it on the page it doesn't
17 make it easy to --
18      Q.    You can cross the line.
19      A.    Okay.
20      Q.    It's in here, it's not like the
21 Ghostbuster's thing where you can't cross
22 the streams.
23      A.    (Complies.)  Okay.  It's
24 understood that crossing the line has no
25 meaning.

Page 25

1  LLC that I recall.
2       Q.    One of the things that changed
3  is between February 15, 2002 and November
4  of 2002, the name was changed from Montana
5  Power, LLC to NorthWestern Energy, LLC?
6       A.    That's right.
7       Q.    When you say that the structure
8  didn't change but management changed, can
9  you describe that to me?
10      A.    Yes.  The chart that you have,
11 again, is depicting a legal ownership
12 structure of sorts, although I'd point out
13 that NorthWestern Public Service at no time
14 was a separate subsidiary of NorthWestern
15 Corporation, it was always a division of and
16 part of the same corporation.
17      Q.    Right.  I would just note that
18 the box here says "division."
19      A.    That's correct.  The management
20 structure, looking at that chart, as myself
21 as the president and CEO of NorthWestern
22 Public Service Division, the box next to it,
23 NorthWestern Services Group, and then CEO
24 initially but not president of then the
25 Montana Power, LLC.  Over time the

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 26

```
 1  then-president Jack Haffey retired as did a
 2  number of other executives of the Montana
 3  Power, LLC and we integrated the management
 4  between the Montana utility and the South
 5  Dakota/Nebraska utility.
 6      Q.    So from a management point of
 7  view, would we know, looking at the chart
 8  that's, let's say 3, the chart without the
 9  line, from a management point of view,
10  would there be a line from Montana Energy,
11  LLC to NorthWestern Public Service?
12      MR. KALECZYC:  Objection to vague.
13      THE WITNESS:  Not in a sense of
14  one reporting to.  The easiest way that I know
15  of to describe that is that everything to the
16  right, NorthWestern Services Group,
17  NorthWestern Public Service and the -- excuse
18  me, NorthWestern Energy, LLC over time as
19  retirements went the senior executives in
20  charge of that group managed all of those
21  utility properties.
22  BY MS. STEINGART:
23      Q.    So they managed those utility
24  properties as if they were all in one box,
25  more or less, there wasn't a hierarchy?
```

Page 27

```
 1      MS. DELANEY:  Objection.
 2      THE WITNESS:  I'm not sure what
 3  you mean by "hierarchy."  What I was trying to
 4  say is upon closing we had a complete
 5  complement of senior management at the Montana
 6  utility, Jack Haffey and several others, I was
 7  named CEO, we had a president, quite a number
 8  of them chose to retire at different stages
 9  along the way.  So between the closing and
10  November of 2002 as they retired, we would
11  combine the management responsibilities with
12  their counterparts in South Dakota or in
13  reverse where we named someone in charge of a
14  function in Montana would then assume that
15  responsibility across the other two states as
16  well, we integrated the management.  I don't
17  know any other more accurate way to describe
18  that.
19  BY MS. STEINGART:
20      Q.    So at no point between
21  February of 2002 and November of -- when
22  the going-flat transaction occurred, was
23  there any intermediate holding company
24  structure between NorthWestern Corp and
25  NorthWestern Energy, LLC?
```

Page 28

```
 1      A.    That's right.
 2      Q.    Though in terms of management
 3  and reporting, NorthWestern Energy, LLC was
 4  managed and reported through NorthWestern
 5  Services Group?
 6      MS. DELANEY:  Objection.
 7      THE WITNESS:  No.  NorthWestern
 8  Services Group is the consolidation of what at
 9  one time were separate non-utility
10  subsidiaries in the Midwest area,
11  communications, natural gas, marketing
12  function and appliance repair and the like.
13  They were at one time separate subsidiaries of
14  NorthWestern, they were combined of what was
15  called NorthWestern Services Group.  I had the
16  executive management responsibility of that,
17  all though each one of those segments had its
18  own CEO if you will.  Of the utility
19  NorthWestern Public Service upon closing we
20  had separate management other than myself, and
21  over the course of time as each change was
22  made, we had integrated management sometime
23  over the year follow closing.
24  BY MS. STEINGART:
25      Q.    So if I understand it,
```

Page 29

```
 1  NorthWestern Energy, LLC was managed and
 2  reported through NorthWestern Public
 3  Service Company to --
 4      A.    They were managed by the same
 5  people reporting to NorthWestern
 6  Corporation, the owner.
 7      Q.    All right.
 8      (Deposition Exhibit Number 4
 9  marked for identification.)
10  BY MS. STEINGART:
11      Q.    I'd like to show you what we've
12  marked as Hanson 4.
13      A.    (Reviews document.)
14      Q.    Sir, do you recognize Hanson 4
15  to be the minutes of the initial meeting of
16  the board of directors of NorthWest Energy
17  held April 2, 2002?
18      A.    Yes.
19      Q.    And you were present at that
20  meeting?
21      A.    Yes.
22      Q.    And you presented a proposed
23  slate of officers for NorthWest Energy,
24  correct?
25      A.    Yes.
```

8 (Pages 26 to 29)

Page 30

1    Q.   Then there was a discussion, if
2  you look at page 2 with me, it indicates
3  that you provided an executive summary, a
4  NorthWestern strategy update reviewing
5  specifically the 2002 strategic imperatives
6  and an overview of the integration of the
7  NorthWestern, LLC operations.
8        Do you see that?
9    A.   Yes.
10   Q.   So did NorthWestern Public
11 Services Group from a management
12 perspective oversee and review the
13 operations of NorthWestern Energy, LLC?
14       MR. KALECZYC:  Objection.
15       THE WITNESS:  I'm sorry, I don't
16 follow your reference to NorthWestern Public
17 Services Group.
18 BY MS. STEINGART:
19   Q.   I'm sorry.  Strike that.
20       Did NorthWestern Energy oversee
21 from a management perspective oversee and
22 manage the operations of NorthWestern
23 Energy, LLC?
24   A.   I'm not sure I follow the
25 question.  If the question was there some

Page 31

1  kind of a subordination role between
2  NorthWestern Energy, LLC which was the
3  former Montana Power, LLC and the utility
4  formerly called NorthWestern Public Service
5  Division of NorthWestern, the answer is no.
6        All this is describing is, as I
7  said, we had lost through retirements a
8  series of the senior executives and in April
9  of 2002, we had decided to manage both
10 utilities if you will, Montana and the
11 former South Dakota, Nebraska with a single
12 slate of officers and an internal board,
13 they didn't have separate corporations and
14 therefore separate board of directors but an
15 internal management board as a tool and
16 technique to oversee those operations.  It
17 does not describe the legal ownership
18 structure.
19   Q.   Now, in addition to having a
20 position or a status in NorthWest Energy
21 that we've just reviewed in these minutes,
22 did you have a position or designation in
23 NorthWestern Energy, LLC?
24       MR. KALECZYC:  Objection,
25 timeframe.

Page 32

1        THE WITNESS:  Upon closing of the
2  purchase of the Montana Power, LLC, I was CEO
3  of both.
4  BY MS. STEINGART:
5    Q.   Now, in addition to the
6  positions that you've had in NorthWest
7  Energy, you also had a title and a position
8  with respect to the NorthWestern Services
9  Group, correct?
10       MR. KALECZYC:  Objection.
11       THE WITNESS:  For a period of time
12 I did until that was eventually restructured
13 as well.
14 BY MS. STEINGART:
15   Q.   And with respect to
16 NorthWestern Corporation there are
17 documents that refer to you as a partner
18 entity CEO.  Are you familiar with that
19 term?
20   A.   Yes.
21   Q.   And what does that mean?
22   A.   It is a reference that
23 NorthWestern used to its business lines,
24 some of those were subsidiaries, some
25 were -- in the case of utility, a division

Page 33

1  of.  But the major business lines were
2  considered to be the utility operations what
3  eventually was called Expanets, Blue Dot and
4  CornerStone and the CEOs of each those
5  business lines were referred to as partner
6  entity CEOs.
7    Q.   And the employment agreement
8  that you had with -- was with NorthWestern
9  Corporation, correct?
10   A.   Yes.
11   Q.   It's that employment agreement
12 that -- through which you received your
13 designations and titles and compensation,
14 correct?
15   A.   I believe that's right.  The
16 titles would be presented and approved by
17 the board and I don't know that at all times
18 the agreement was updated to conform to the
19 title given to me by the board, but
20 generally speaking, that's correct.
21   Q.   So as time went on, you may
22 have gotten some more titles or
23 designations that weren't reflected
24 actually in the employment agreement?
25   A.   There may have been times where

9 (Pages 30 to 33)

Page 38

1    2002, were those requests made of
2    Mr. Hylland and Mr. Lewis?
3        A.    I don't want to get tripped up
4    on terminology. I can recall jointly with
5    Mr. Jacobsen asking them to consider a -- an
6    alternative compensation approach or
7    program, if you will. But I don't recall
8    any time what I would consider just
9    discretionary compensation where based upon
10   their position or authority they could just
11   award a sum to someone, that just was not a
12   practice that we had at NorthWestern.
13       Q.    Would it surprise you to learn
14   that it was Mr. Drook's understanding as
15   far as your compensation was concerned the
16   comp committee of the board looked to
17   Mr. Lewis and Mr. Hylland with respect to
18   their views?
19           MS. DELANEY: Objection.
20           THE WITNESS: I can't speak
21   to -- first of all, I don't know if Mr. Drook
22   was on what they call comp committee. I
23   remember him at one time being the chairman of
24   the governance committee, but -- assuming that
25   he was. I can't speak to who or what they

Page 39

1    relied on in their judgment, I wouldn't know.
2    BY MS. STEINGART:
3        Q.    Getting back to the activities
4    that you engaged in with respect to
5    NorthWestern Corporation, during the year
6    you attended meetings with Mr. Lewis and
7    Mr. Hylland?
8        A.    Yes.
9           MS. DELANEY: Do we have a
10   timeframe?
11           MS. STEINGART: During 2001 and
12   2002.
13   BY MS. STEINGART:
14       Q.    In addition to having meetings
15   with Mr. Lewis and Mr. Hylland, from time
16   to time you attended board meetings of the
17   NorthWestern board?
18       A.    Generally speaking, from time
19   to time I would attend parts of board
20   meetings.
21       Q.    In addition to that there were
22   meetings -- there were operations meetings
23   that occurred on a periodic basis with
24   respect to the NorthWestern Energy
25   businesses?

Page 40

1        A.    Yes.
2        Q.    Who attended the monthly
3    operation meetings of the NorthWestern
4    Energy businesses?
5        A.    If I'm following the label that
6    you are giving to those, it would be this
7    (indicating) internal management board
8    referenced in Exhibit Hanson 4 and most of
9    the officers of NorthWestern Energy,
10   although they may not have attended each one
11   if they didn't have some item on the agenda
12   related to their scope of authority.
13       Q.    So those persons that you
14   referenced would be Merle Lewis?
15       A.    Again, generally I don't know
16   that Merle attended every one, but
17   Merle Lewis, Dick Hylland, myself,
18   Dan Newell, Eric Jacobsen, Kipp Orme as the
19   internal board, and then the officers listed
20   here or some combination of them.
21       Q.    And "listed here" refers to
22   Exhibit 4.
23           And in addition to you received
24   periodic reports called management
25   financial information reports, correct,

Page 41

1    during 2002?
2        A.    Yes.
3        Q.    Also the end of 2001, correct?
4        A.    I don't know when those reports
5    began, but subject to verifying that it was
6    in 2001, most likely, yes.
7           MS. STEINGART: For the
8    convenience of counsel we've created another
9    binder. Do they have their binders?
10           MR. KIMBALL: Yes.
11           MS. STEINGART: I'm going to show
12   you another binder called the management
13   financial information report binder so this
14   way you have -- and we've put in there -- and
15   just -- there is one for the witness here
16   so -- just for reference during the
17   deposition, we've put in the MFIRs that are
18   dated December 2001 through November 2002.
19   BY MS. STEINGART:
20       Q.    So would you agree with me,
21   sir, looking at the binder that we've
22   placed before you that at least for the
23   period December 2001 though November 2002
24   there was periodic management financial
25   information reports that were distributed

11 (Pages 38 to 41)

Page 42

1   to the partner entity CEOs among others?
2        MR. KALECZYC: Could you read back
3   the question for me, please?
4        (Whereupon, the court reporter
5   read back the previous question.)
6        THE WITNESS: I'm not sure I know
7   the full distribution list. But if your
8   question is did I receive these reports at
9   least for this period of time, the answer is
10  yes, I did.
11  BY MS. STEINGART:
12       Q.   Thank you. In addition to
13  those reports, there were monthly meetings
14  of a group called the executive/staff of
15  NorthWestern, correct?
16       A.   Yes.
17       (Deposition Exhibit Number 5
18  marked for identification.)
19  BY MS. STEINGART:
20       Q.   Sir, I've placed before you
21  what we've marked as Hanson Exhibit 5. Do
22  you recognize that to be a calendar for
23  2002 with respect to management financial
24  and information report meeting?
25       A.   (Reviews document.) That's

Page 43

1   what it purports to be. I don't recall
2   seeing such a calendar, but that's what it
3   purports to be.
4        Q.   Do you see the first bullet
5   point where it says "11th floor NOR
6   boardroom immediately following the NOR
7   staff/executive meeting"?
8        A.   Yes.
9        Q.   So did -- when these meetings
10  occurred, were there staff/executive
11  meetings then followed by meetings where
12  the, if you'll excuse my reference to
13  MFIRs, were discussed?
14       MS. DELANEY: Objection.
15       THE WITNESS: As best I recall
16  there was a staff meeting or executive meeting
17  that I would attend that was Merle Lewis,
18  Dick Hylland, the corporate officers and we
19  would have periodic staff meetings. Following
20  that, the financial reporting personnel would
21  attend a meeting to discuss the preparation of
22  these financial information reports that you
23  are calling MFIRs.
24       For the most part, subject to
25  going back and looking at that, I don't

Page 44

1   believe I attended those, Kipp Orme would host
2   them, Dick Hylland I think attended many, if
3   not most, but Dave Monaghan who was the
4   controller of the utility. And the purpose of
5   that was to work on the financial information
6   that was eventually included in these reports
7   which were circulated to the partner entity
8   CEOs.
9        Again, as I said, I don't know the
10  full distribution list.
11  BY MS. STEINGART:
12       Q.   And the financial information
13  and other business issues that were current
14  at the businesses were discussed at the NOR
15  staff executive meeting?
16       A.   I think you may be -- there is
17  a third set of meetings -- whether you are
18  confusing or just confusing me with the
19  references that -- the NOR staff meeting,
20  Merle's staff focused on NorthWestern
21  business.
22       And again, for the most part,
23  there was not a lot of discussion about
24  the --in fact, I don't think the other
25  partner entity CEOs routinely attended

Page 45

1   those.
2        So there wasn't a lot of
3   discussion about business issues or
4   developments or whatever that was going on
5   in their businesses. They, like
6   NorthWestern Energy, had their own version
7   of an operations meeting where we would go
8   through those details with our internal
9   board, but I was not on those and didn't
10  attend them. We had a -- some frequency,
11  I'm not certain exactly how much, but I
12  believe quarterly there was what was called
13  a partner entity CEO meeting where Merle,
14  Dick, myself and the other partner entity
15  CEOs, couple of the other corporate officers
16  would get together and just discuss
17  generally the businesses.
18       Q.   The quarterly meetings that you
19  referenced, were there minutes kept at
20  those meetings?
21       A.   I don't recall if there was.
22       (Deposition Exhibit Number 6
23  marked for identification.)
24  BY MS. STEINGART:
25       Q.   I'd like to show you what we've

12 (Pages 42 to 45)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 62

1 business that was being acquired by
2 NorthWestern would be exposed to risks
3 presented by the non-utility businesses
4 being run by NorthWestern?
5     MS. DELANEY:  At what time?
6     MS. STEINGART:  Would you read the
7 question back.
8     (Whereupon, the previous question
9 was read back by the court reporter.)
10     MR. KALECZYC:  Objection,
11 timeframe.
12     THE WITNESS:  My understanding is
13 that their standard for review is to determine
14 whether or not the utility in Montana would
15 remain a fit and able provider of utility
16 service after the transaction was completed.
17 There were lots of questions asked by
18 intervening parties and commissioners at the
19 hearing, I don't recall without looking at the
20 transcript to what extent they inquired about
21 non-utility businesses.
22 BY MS. STEINGART:
23     Q.   Now, was the Montana Public
24 Service Commission concerned that there
25 would be increased capital costs for the

Page 63

1 utilities because of the risks that the
2 non-regulated businesses posed to the
3 financial condition of NorthWest?
4     MS. DELANEY:  Objection.
5     MR. KALECZYC:  Objection.
6     THE WITNESS:  I apologize, but I
7 do not recall that question.  The transcripts
8 will tell you the questions and responses.
9     But again, they were trying to
10 establish to their satisfaction whether they
11 believed that the utility would remain a fit
12 and able provider after closing and ask a lot
13 of questions about the management, about all
14 sorts of things.  I do not recall that
15 particular question.
16 BY MS. STEINGART:
17     Q.   Wasn't the Montana Public
18 Service Commission concerned that the
19 stability of the utility businesses should
20 not be adversely affected by the risks
21 presented by NorthWestern's non-regulated
22 businesses?
23     MS. DELANEY:  Objection.
24     MR. KALECZYC:  Objection.
25     THE WITNESS:  I can't speak to

Page 64

1 their concerns, only my recollection of what
2 their scope of inquiry is and, again, they
3 asked lots of questions.  Now, you infer from
4 that a concern, I don't know that.
5 BY MS. STEINGART:
6     Q.   Was it important to the Montana
7 Public Service Commission that the
8 utilities' cost of capital not be increased
9 by the risks that the non-regulated
10 businesses posed to NorthWestern's
11 financial condition?
12     MS. DELANEY:  Objection.
13     MR. KALECZYC:  Objection.
14     THE WITNESS:  I have no way of
15 knowing if that issue was of importance to
16 them or not.
17     What I know is that -- what their
18 stated inquiry was because that was clear.  On
19 the onset of the application of the hearing,
20 they asked through discovery, on the stand
21 many, many questions and approved the
22 application.
23     What importance they gave to one
24 issue or the other, I can't speak to that.  I
25 don't know.

Page 65

1 BY MS. STEINGART:
2     Q.   So when you told the
3 commissioners that NorthWestern had the
4 managerial and financial capability to
5 acquire MPC, you did not believe that you
6 were telling them that the stability of the
7 utilities would not be threatened by
8 NorthWestern's non-regulated businesses?
9     MR. KALECZYC:  Objection.
10     MS. DELANEY:  Objection.
11     MR. KALECZYC:  The pre-file
12 testimony speaks for itself.
13     MS. STEINGART:  I'm asking him
14 what he believed he was telling them.
15     THE WITNESS:  I absolutely
16 believed at the time we had both the
17 managerial capability and the financial
18 capability to complete the transaction and
19 operate the utility as a fit and able provider
20 after closing.
21 BY MS. STEINGART:
22     Q.   So you --
23     A.   In connection with that, I
24 didn't have any knowledge or belief that
25 there were the threats that you are

17 (Pages 62 to 65)



Page 110

1  question the transaction was accretive to
2  earnings and cash flow and therefore
3  strengthened the financial profile of the
4  company.
5  BY MS. STEINGART:
6      Q.   Do you understand now as you
7  look at this that that transaction, that
8  the common thread that you referred to in
9  those offerings were giving pro forma
10 effect to the acquisition of Montana Power?
11         MR. KALECZYC: Objection.
12         MS. DELANEY: Objection.
13         THE WITNESS: I think that's a
14 truism.
15 BY MS. STEINGART:
16     Q.   The paragraph goes on to say
17 that NOR's retention of an investment grade
18 rating during this period, dash, absolutely
19 crucial to future liquidity, dash, was
20 entirely dependent on the pro forma utility
21 operations.
22         Do you see that?
23     A.   I see the reference.
24     Q.   Did you tell the Montana Public
25 Service Commission that the credit ratings

Page 111

1  that NorthWestern had at the time it made
2  its application and that you gave its
3  testimony -- strike that.
4          Did you tell the Montana Public
5  Service Commission that NorthWestern's
6  credit ratings that existed at the time you
7  gave your testimony in January was
8  dependent on the pro forma utility
9  operations?
10         MR. KALECZYC: Objection.
11         THE WITNESS: Candidly, this
12 statement is -- this is overstating it. Do
13 the credit ratings depend on the financial
14 strength cash flow interest rate coverage
15 ratios? Of course. Is it important to
16 strengthen the company to have an accretive
17 transaction, earnings and cash flow? Of
18 course. Are they entirely dependent on that?
19 No, I don't believe that to be the case and
20 obviously there is some advocacy going on.
21 The point we are trying to convey was this was
22 very important, took a lot of hard work from
23 people and deserves recognition, very
24 beneficial to our company.
25 BY MS. STEINGART:

Page 112

1      Q.   It goes on to say that without
2  the Montana Power Company transaction, it
3  is doubtful that these capital transactions
4  could have been completed.
5          Do you see that?
6      A.   I see it.
7      Q.   Now, that's what you were
8  telling your superiors in or about March of
9  2002, correct?
10     A.   It's part of what we were
11 telling them in this memo.
12     Q.   Okay. If we could go back to
13 the January 28th executive committee
14 minutes. Sir, could you look at Exhibit 6
15 again?
16         Now, even in January you were
17 aware of the problems that Expanets was
18 having, correct.
19     A.   I was aware that they were
20 having problems, have any knowledge of the
21 details, but they reported a number of times
22 including this that they were having
23 problems and they were working to fix them.
24     Q.   At the meeting that you
25 attended on the 28th, there was an update

Page 113

1  given with respect to the Expert system at
2  Expanets, correct?
3      A.   This would indicate that, yes.
4      Q.   And you gave a presentation at
5  that meeting concerning the
6  Montana Power Company acquisition, correct?
7      A.   I did, yes.
8      Q.   And Mr. Orme gave a
9  presentation with a financial update,
10 right?
11     A.   Yes, it appears that.
12     Q.   Now, if we look at -- and these
13 are the kinds of updates that occurred
14 throughout the year at these meetings,
15 right?
16     A.   There were updates like that,
17 you know, each of the minutes, you know, I
18 describe the specific ones.
19     Q.   In addition to a finance update
20 by Mr. Orme, right?
21     A.   I'm sorry?
22     Q.   In addition to this finance
23 update -- I'm sorry, I'm looking at the
24 page after your presentation.
25     A.   Mr. Orme gave a finance update,

29 (Pages 110 to 113)

Page 114

1    yes.
2       Q.   If we could look at that
3    together. Here Mr. Orme talks about the
4    money that was raised in the offerings,
5    doesn't he?
6              MR. KALECZYC:  Objection.
7              THE WITNESS:
8    Indicates that -- he's talking about an
9    offering.
10   BY MS. STEINGART:
11      Q.   He's talking about a 100
12   million retail trust preferred that
13   occurred in January?
14      A.   Yes, that's what it says.
15      Q.   That was just two days after
16   your testimony to the Montana Power
17   Commission, correct?
18      A.   I don't remember the dates, but
19   I think it was January, yes.
20      Q.   And it goes on to say "He noted
21   that these preferred offerings are helpful,
22   however, there are still significant cash
23   flow issues affecting NOR."
24              Do you see that?
25      A.   Yes.

Page 116

1    doesn't talk about immediacy of the issue or
2    what to do. And you haven't gotten into the
3    rest of 2002, but we, you know, spent a lot
4    of time working to improve the cost
5    structure and therefore cash flow.
6       Q.   He indicates that there are
7    significant cash flow issues affecting NOR.
8              Do you see that?
9       A.   I see the reference, yes.
10      Q.   At or about that time, what did
11   you understand those cash flow issues to
12   be?
13      A.   I understood that these
14   businesses were not meeting their
15   projections. They were using more cash than
16   anticipated. They were providing less than
17   anticipated missing earnings targets and
18   that the management of those businesses said
19   they had the issues in hand, they were
20   working to improve them and this is nothing
21   more than the CFO saying we all need to
22   continue our efforts to improve the cash
23   flow of the company going forward. That was
24   my understanding.
25      Q.   And you understood that they

Page 115

1       Q.   At the end, if you look at the
2    last sentence with me, he reminded everyone
3    that NOR has gone through $175 million of
4    cash during the last quarter.
5              Do you see that?
6       A.   Yes.
7       Q.   55 to Blue Dot, right?
8       A.   That's what it says, yes.
9       Q.   70 to Expanets?
10      A.   Yes.
11      Q.   13 to CornerStone?
12      A.   Yes.
13      Q.   20 to NOR, right?
14      A.   Yes.
15      Q.   And then he says "In essence we
16   are no better off regarding working capital
17   than we were before the $200 million
18   offering."
19              Do you see that?
20      A.   I see it, that's what it says.
21   It doesn't -- look, talking about an
22   offering that was made, monies received, it
23   talks about how they were used in working
24   capital. And, you know, clearly they are
25   looking at having to approve it. But it

Page 117

1    were not only missing their projections but
2    they were not generating enough cash to
3    cover their operating cash flow, correct?
4              MS. DELANEY:  Objection.
5              THE WITNESS:  I don't recall ever
6    having that understanding. But what you are
7    talking about is, again, a time-specific, not
8    all businesses are positive cash flow every
9    day or every month. The utility is negative
10   cash flow today. Usually two out of four
11   quarters of the year, seasonal businesses. So
12   did I have the understanding? I do not recall
13   that understanding. Would that necessarily
14   alarm me?  No.
15   BY MS. STEINGART:
16      Q.   In fact, that Expanets had
17   negative cash flow for an entire year did
18   not alarm you?
19              MS. DELANEY:  Objection.
20              THE WITNESS:  In and of itself
21   that does not describe what Expanets was
22   saying it's doing about the problem or how
23   it's going to improve the operations.
24   BY MS. STEINGART:
25      Q.   When Expanets continued to have

30 (Pages 114 to 117)

Page 118

```
 1   negative cash flow in the first quarter of
 2   2002, did that concern you?
 3           MR. KALECZYC:  Objection.
 4           THE WITNESS:  I don't have any
 5   recollection of being concerned.  I hear what
 6   they reported, their explanations seemed
 7   logical, taking action to improve it, the
 8   reports will speak for themselves.
 9   BY MS. STEINGART:
10       Q.    So in January you knew that
11   these issues existed and you also knew them
12   in March, right?
13           MR. KALECZYC:  Objection.
14   BY MS. STEINGART:
15       Q.    You knew the issues with
16   respect to Expanets and the issues with
17   respect to cash flow existed in March too,
18   didn't you?
19       A.    Are you referring to the memo
20   we just looked at?
21       Q.    Indeed I am.
22       A.    I believe the memo references
23   2001 performance.  And 2001 was completed as
24   of the end of the year.
25       Q.    Let's look again.  We are
```

Page 120

```
 1           MR. KALECZYC:  Objection.
 2           THE WITNESS:  As I just said,
 3   Counselor, what I knew or what information I
 4   had to me was entirely what was given in the
 5   various reports.
 6   BY MS. STEINGART:
 7       Q.    Okay.
 8       A.    And my recollection of those,
 9   they will speak for themselves.  Every time
10   they discussed a problem there was also a
11   discussion of actions they were going to do
12   about it and the constant theme was it's
13   going to improve, going to improve.
14       Q.    So they fooled you?
15           MS. DELANEY:  Objection.
16           MR. KALECZYC:  Objection.
17   BY MS. STEINGART:
18       Q.    Did they fool you?
19           MR. KALECZYC:  Objection.
20   BY MS. STEINGART:
21       Q.    Do you think that they fooled
22   you?  As you sit here today, knowing what
23   you know today, did they fool you?
24           MS. DELANEY:  Objection.
25           THE WITNESS:  I don't accept that
```

Page 119

```
 1   reading on page 3, I think.  "The
 2   difficulties...", and I'm looking at that
 3   paragraph after it talks about the
 4   disappointing 2001.  The paragraph goes on
 5   to say "The difficulties encountered in
 6   obtaining a third-party credit facility and
 7   in implementing the Expert software system
 8   required NOR to substantially increase its
 9   cash commitment to Expanets."
10           Do you see that?
11       A.    I see it and it doesn't have a
12   time reference.
13       Q.    So is it your testimony, as you
14   sit here today, that you understood that as
15   being only in 2001?
16       A.    I didn't say that, but on its
17   face, it is historic and the reference at
18   the top of the paragraph says the last half
19   of 2001.
20       Q.    But you knew that these issues
21   that are referred to in the sentence the
22   difficulty in the third-party credit
23   facility in implementing Expert software
24   had continued into the beginning of 2002,
25   right?
```

Page 121

```
 1   characterization.  I don't think that question
 2   is --
 3   BY MS. STEINGART:
 4       Q.    Okay.  Let's look at some other
 5   things then.  Let's look at the MFIRs.  You
 6   have a binder of those documents, why don't
 7   we look at them.  Let's look at May 2002.
 8   If we could look at page 458111.  Do you
 9   see that on the bottom of that page there
10   is a chart that shows incremental
11   borrowings by Expanets?
12       A.    I see that.
13       Q.    Did you understand that during
14   March and April that the incremental
15   borrowings of Expanets were increasing?
16       A.    I'm sorry, are you looking at
17   the graph?
18       Q.    Yeah, I'm looking at the chart
19   on the bottom of page 458111.
20       A.    And how is it that you are --
21       Q.    Do you see the chart shows
22   NorthWestern incremental borrowings?
23       A.    Yes.
24       Q.    Do you understand that this
25   chart depicts the borrowings of Expanets
```

31 (Pages 118 to 121)

Page 122

1　from NorthWestern?
2　　A.　I'm not sure that's what it's
3　showing, incremental borrowings from
4　NorthWestern by Expanets.
5　　Q.　Right. It says the chart
6　showing the current -- this is the Expanets
7　section, right? It says "Expanets" at the
8　top of the page, do you see that?
9　　A.　Yes.
10　　Q.　And there is a sentence here
11　that says "A chart showing..." and I'm
12　reading from the middle of the paragraph
13　right above that chart, "A chart showing
14　the current forecasted borrowings and
15　repayment schedule to NorthWest has been
16　added below."
17　　　Do you see that? And one line
18　shows --
19　　A.　I must need reading glasses, I
20　apologize.
21　　Q.　I can wait until you are with
22　me.
23　　A.　Can you help me with the line?
24　　Q.　Sure. If you look --
25　　A.　Thank you. Okay. Yes, that's

Page 123

1　what it says.
2　　Q.　Okay.
3　　A.　Yes.
4　　Q.　All right.
5　　A.　And to my earlier point, it
6　shows falling off as the year goes on.
7　　Q.　Indeed it does. But you
8　learned later that those borrowings weren't
9　going to be repaid, didn't you?
10　　MR. KALECZYC: Objection.
11　　THE WITNESS: I don't know what
12　you are referencing. But back to the
13　foundation of your question, what relevance
14　after acquired information, hindsight, in
15　other words, has to my understanding at the
16　time -- I'm missing the point of your
17　question.
18　BY MS. STEINGART:
19　　Q.　Well, this is something -- the
20　incremental borrowings is something that
21　you understood were occurring in May of
22　2002, correct? Or --
23　　A.　I have no understanding other
24　than the information given to me.
25　　Q.　Well, this was information

Page 124

1　given to you, you received the MFIR?
2　　A.　That's right. I cannot explain
3　to you the details behind it. I did not
4　manage those businesses. I do not know
5　those details. I did not know those
6　details. All I had was the information
7　given to me. And as I said, you asked me a
8　recollection question, and the recollection
9　is consistent that they were saying we are
10　having problems but we are going to fix it
11　and things will improve. And I think this
12　chart says that.
13　　Q.　So this says by May they were
14　borrowing over $140 million from NorthWest,
15　correct?
16　　A.　It would indicate that.
17　　Q.　Did some of that $140 million
18　come from the utility operations?
19　　　MR. KALECZYC: Objection.
20　BY MS. STEINGART:
21　　Q.　Do you know?
22　　A.　I don't know how you can make
23　that statement, it come from the general
24　funds of the corporation. Each business
25　uses an amount of cash for investment and

Page 125

1　expense and they generate cash. The utility
2　was positive cash flow.
3　　Q.　You also knew at this time
4　because of what's contained in this
5　document that they were still doing system
6　fixes to Expanets, correct?
7　　A.　That is what they are
8　indicating, yes.
9　　Q.　And at this point they are
10　anticipating system fixes being implemented
11　by July, right? "System fixes scheduled to
12　be implemented on July 4 are expected to
13　fix many of the billing problems that have
14　been occurring with customer bills."
15　　　Do you see that?
16　　A.　I'm not finding a line
17　reference.
18　　Q.　It's a couple of lines above
19　the line about the chart.
20　　A.　Okay, I see that now, yes.
21　　Q.　Okay. Now, at that point, did
22　anyone tell you when they expected to fix
23　all of the billing problems? This talks
24　about many of the billing problems, was
25　there any conversation in or about May

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 138

1  reports were including cash of partner
2  entities and no longer due, I don't know
3  that.
4      Q.   Well, let's talk about the
5  partner entities for a minute.  Expanets
6  didn't have any cash, did it?
7          MR. KALECZYC:  Objection.
8          MS. DELANEY:  Objection.
9          THE WITNESS:  I don't know.
10  BY MS. STEINGART:
11      Q.   Certainly if Expanets had cash,
12  it could have been used to repay some of
13  those borrowings, right?
14          MR. KALECZYC:  Objection.
15          MS. DELANEY:  Objection.
16          THE WITNESS:  Are you asking me
17  the hypothetical if they had cash could they
18  use it for things they use cash for?
19  BY MS. STEINGART:
20      Q.   As far as you know, did
21  Expanets have any cash?
22          MR. KALECZYC:  Objection.
23          THE WITNESS:  I do not know.
24  BY MS. STEINGART:
25      Q.   Blue Dot?

Page 139

1          MR. KALECZYC:  Objection.
2          THE WITNESS:  I don't know.
3  BY MS. STEINGART:
4      Q.   CornerStone?
5      A.   I don't know.
6      Q.   Indeed at this point, as you
7  sit here today, the only partner entity
8  that you are aware of that could have had
9  cash was the regulated companies, correct?
10          MR. KALECZYC:  Objection.
11          MS. DELANEY:  Objection.
12          THE WITNESS:  I do not agree.
13  Could have had cash?  Any of them could have
14  had cash.  I think I just testified I don't
15  know what they had -- I do know the utility
16  was generating positive cash flow on an
17  annualized basis, but you are also coming into
18  the fall of the year where the demands for
19  energy purchases -- we had an all-time peak
20  use of cash at the utility at that time.  And
21  then it turns as you get into the winter
22  months.
23  BY MS. STEINGART:
24      Q.   So over the course of the year,
25  you were informed Expanets had borrowings,

Page 140

1  correct?
2      A.   I got the reports, yes.
3      Q.   And over the course of the
4  year, you were informed that the repayments
5  of those incremental borrowings would be
6  less than they were anticipated to be at
7  the beginning of the year, correct?
8      A.   I got the updates provided
9  here, yes.
10      Q.   And at some point you received
11  a further update that said that Expanets
12  wouldn't be paying anything back by the end
13  of the year, right?
14      A.   I'm sorry, what?
15      Q.   You knew that, didn't you, by
16  the fall of 2002, you knew Expanets was not
17  going to pay any of that anticipated
18  190 million of borrowings during 2002,
19  right?
20          MR. KALECZYC:  Objection.
21          THE WITNESS:  I don't believe so.
22  I don't know where you get that reference.
23  And incidentally just watching the cash
24  balance here, collective -- accepting there
25  may be cash at partner entities, that pattern

Page 141

1  doesn't surprise me at all just given the
2  seasonality of the utility business.  It
3  doesn't mean that it's not going to improve.
4  And that is my recollection, that these
5  reports will speak for themselves.  But every
6  time they come with a -- or missing a
7  projection there is also an indication that
8  it's going to improve.  Those charts say that.
9  BY MS. STEINGART:
10      Q.   And during the fall there was a
11  lot of activity going on at NorthWest to
12  raise funds to meet pressing liquidity
13  needs during that period, right?
14          MR. KALECZYC:  Objection.
15          MS. DELANEY:  Objection.
16          THE WITNESS:  I don't accept your
17  characterization of "pressing liquidity
18  needs."  Were there activities to raise cash?
19  Yes, they are in the reports.
20  BY MS. STEINGART:
21      Q.   And without that cash wouldn't
22  there have been serious implications for
23  NorthWest's credit ratings without raising
24  that cash?
25          MR. KALECZYC:  Objection.

36 (Pages 138 to 141)

Page 222

```
1        THE WITNESS:  We'd have to check
2   the minutes to see what they say.  I do recall
3   a discussion of that with the board where
4   counsel updated the board.  But whether that
5   was an executive session that didn't get
6   detail in the minutes, again, I don't know
7   without going through all of these.
8        MS. STEINGART:  To the extent such
9   a document exists, such a reference in the
10  board minutes exists, I would ask that it be
11  produced.
12  BY MS. STEINGART:
13       Q.    Let's talk about what you did
14  in furtherance of this directive.  I'd like
15  to show you what we've marked as 22 and 23.
16       A.    (Reviews document.)
17       MS. STEINGART:  Actually, as part
18  of 23 there are two copies of the officer's
19  certificate.  You can take off that last one.
20  It's not signed.
21       MS. DELANEY:  Do you want it
22  removed from the exhibit?
23       MS. STEINGART:  Yeah, could you
24  remove it.
25       MS. DELANEY:  Blue page and all?
```

Page 223

```
1        MS. STEINGART:  Yes.  Thank you.
2        THE WITNESS:  (Reviews document.)
3   BY MS. STEINGART:
4        Q.    My only question with respect
5   to 22 is whether you recognize it to be the
6   second supplemental indenture that you
7   executed on behalf of NorthWest Energy on
8   or about August 13, 2002?
9        A.    I believe that it is.
10       Q.    And with respect to 23 --
11       A.    Was I supposed to remove
12  something?
13       Q.    Yeah, just the blue page and
14  beyond.
15       A.    (Complies.)
16       Q.    And with respect to 23, that is
17  the officer's certificate that you executed
18  in August 2002 in connection with that
19  second supplemental indenture.
20       A.    (Reviews document.)  Well, it's
21  an officer's certificate and that is my
22  signature.  I'm not sure why it says "The
23  undersigned, David A. Monaghan, in his
24  capacity as CEO does hereby certify on
25  behalf of NorthWestern Energy that..."
```

Page 224

```
1   but --
2        Q.    Well, evidently you stood in
3   for Mr. Monaghan.
4        A.    Maybe.  But yes, officer's
5   certificate signed by me.  That is my
6   signature.
7        Q.    Do you understand what an
8   officer's certificate is?
9        A.    Yes.
10       Q.    If you look at paragraph 3 with
11  me.
12       A.    Uh-huh.
13       Q.    And in paragraph 3 you certify
14  that all conditions precedent, provided for
15  in the indenture relating to the execution
16  and delivery of the second supplemental
17  indenture dated as of the date hereof among
18  NorthWestern Energy, LLC and the trustee
19  including any covenants compliance which
20  constitute a condition precedent have been
21  complied with."
22       Do you see that?
23       A.    Yes, I do.
24       Q.    What did you do to satisfy
25  yourself that that was correct?
```

Page 225

```
1        A.    I reviewed the documents that
2   are referenced in that case, it's the second
3   supplement and the fourth, it's the
4   indenture, and required of other management,
5   particularly Mr. Monaghan, and of counsel,
6   basically whether the conditions stated were
7   in compliance.
8        Q.    Well, doesn't paragraph 6 say
9   that counsel was relying on you?
10       A.    It indicates that Paul Hastings
11  will rely on the accuracy and truth of the
12  foregoing for purposes of rendering its
13  opinion to the trustee.  But the
14  conversations I had were with --
15  Euclid Irving was one of the attorneys
16  advising on the -- advising me and
17  NorthWestern Energy, LLC on the transaction.
18       Q.    So you certified paragraph 3
19  based on what Mr. Monaghan told you?
20       MS. DELANEY:  Objection.
21       THE WITNESS:  I don't think I said
22  that.  Based, number 3, on personal inquiry
23  and information provided to me by management
24  including Mr. Monaghan and advice of counsel.
25  BY MS. STEINGART:
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 226

1     Q.    And describe the substance of
2  the personal inquiry.
3     A.    Reading the documents to figure
4  out what conditions precedent existed.  And
5  then inquiring whether or not we were in
6  compliance with those conditions.
7     Q.    As you sit here today, do you
8  recall what conditions precedent that you
9  inquired into?
10     A.    I don't recall.  But I think
11  they are in the document.
12     Q.    And in preparation for this
13  deposition, did you look at any of those
14  things?
15     A.    I did not, no.
16     Q.    Paragraph 4 says that you've
17  read the applicable provisions of the
18  indenture.
19        Do you see that?
20     A.    Yes.
21     Q.    What provisions did you read?
22     A.    I don't recall specifically.  I
23  had available the entire indenture document,
24  it was a -- I don't remember the date of it,
25  it's an older document, and went though its

Page 227

1  provisions.
2     Q.    It's a document that we marked
3  just by happenstance as the first exhibit
4  to this deposition.  Is this the document
5  (indicating)?
6     A.    (Reviews document.)  Yes.
7     Q.    It says you've also examined
8  originals or copies certified to his
9  satisfaction of the various certificates
10  and instruments prepared in connection with
11  the execution and delivery of the second
12  supplemental indenture.
13        What certificates and
14  instruments did you review?
15     A.    I don't remember other than
16  the -- the supplement indenture itself.  I
17  don't remember if there are certificates and
18  instruments in connection with it.  If there
19  are, I think I was provided with a complete
20  packet.
21     Q.    Do you have a recollection of
22  that?
23     A.    I don't know if there are
24  such -- I don't recall if there are other
25  certificates and instruments related to that

Page 228

1  or not.
2     Q.    And it indicates here "As well
3  as the indenture and such corporate records
4  and other instruments and documents."
5        What corporate records did you
6  look at?
7     A.    I don't remember looking at
8  other corporate records.  I recall making
9  inquiries of some number of people including
10  Mr. Monaghan and counsel, Euclid Irving.
11     Q.    As you sit here today, do you
12  recall either what Mr. Monaghan or what
13  counsel told you in that regard?
14     A.    Generally.  Not the specific
15  words.
16     Q.    What did they tell you?
17     A.    That, in general, the substance
18  was that we are -- we meet the requirements
19  of the covenants and the conditions.
20     Q.    And did you ask them what they
21  were they basing -- what information they
22  based those conclusions on?
23     A.    I don't recall asking him that.
24     Q.    Did they prepare memos or
25  summaries for you concerning what they

Page 229

1  looked at and what they found in the things
2  they looked at?
3     A.    I don't recall if there was
4  memos or other written material provided.
5     Q.    Then it goes on to say "And
6  made such examination and investigation as,
7  in his opinion, is necessary to unable him
8  to express an informed opinion as to
9  whether or not such covenants and
10  conditions have been complied with."
11     A.    Yes.
12     Q.    What examination and
13  investigation did you make?
14     A.    Just what I told you.
15     Q.    So that just refers to what you
16  received from Mr. Monaghan and counsel?
17     A.    As I said, there may have been
18  some number other than just Mr. Monaghan.
19  But my specific recollection today is that I
20  discussed with Mr. Monaghan and with
21  Mr. Irving.
22     Q.    Did you take any steps to
23  assure yourself that there was the capacity
24  to pay principal and interest on the part
25  of NorthWestern Corporation when you

58 (Pages 226 to 229)

Page 230

1    executed this indenture?
2        MS. DELANEY:  Objection.
3        (Whereupon, the court reporter
4    read back the previous question.)
5        THE WITNESS:  I don't recall
6    taking any specific steps relative to that
7    question.  But based on my view at the time, I
8    certainly -- I believe that there was such
9    capacity.  In fact, I think such payments were
10   made.
11   BY MS. STEINGART:
12       Q.    And was your view at the time
13   based on the company's SEC filings and
14   other public financial statements?
15       A.    In part as well as the other
16   management reports, financial reports we
17   talked about.
18       (Deposition Exhibit Number 26
19   marked for identification.)
20   BY MS. STEINGART:
21       Q.    I'd like to show you what we've
22   marked as Hanson 26.  It's a memo dated
23   October 16th to the board from Mr. Lewis
24   and Mr. Hylland.
25       A.    (Reviews document.)

Page 231

1        (Deposition Exhibit Number 27
2    marked for identification.)
3    BY MS. STEINGART:
4        Q.    And also Hanson 27, which is a
5    part of one of the attachments referenced
6    in that October 16th memo.
7        A.    (Reviews document.)
8        Q.    My only question now is whether
9    you recall seeing this cover, this e-mail
10   dated October 16th and the operating plan
11   and board summary that was -- that's noted
12   in the first bullet?
13       MR. KALECZYC:  Object to form.
14       THE WITNESS:  I don't
15   recall -- you say "this e-mail," are you
16   referring to this memo.
17   BY MS. STEINGART:
18       Q.    Yes.
19       A.    I don't recall seeing that and
20   don't know whether or not this was
21   circulated to people other than to board
22   members.  The reference plan summaries, I
23   don't recall seeing them in advance but did
24   attend that portion of the board meeting
25   where myself and each of the other partner

Page 232

1    entity CEOs went through our portion of a
2    presentation as well as the overall
3    discussion by Mr. Hylland.
4        Q.    And do you have an
5    understanding that a packet concerning NOR
6    liquidity and financing opportunities and
7    strategic plan sensitivities was also
8    provided to the board in preparation for
9    the November meeting?
10       A.    I see the reference and their
11   typically were board packets, but I don't
12   know that I knew at that time the contents
13   of the board packet.
14       Q.    We'll get to the meeting and
15   talk about 27 in connection with the
16   meeting.
17       (Deposition Exhibit Number 28
18   marked for identification.)
19   BY MS. STEINGART:
20       Q.    What we've marked as Hanson 28
21   which is a memo dated October 30th from
22   Mr. Orme to the board of directors.
23       A.    (Reviews document.)
24       Q.    And the only thing I'm going to
25   ask you about is the first paragraph under

Page 233

1    2002 Forecast.
2        A.    (Reviews document.)  Okay.
3        Q.    Do you recall having seen the
4    October 30th memo?
5        A.    I don't, no.
6        Q.    Did you learn in or around that
7    time, and that is at some point between
8    October 30th and November 5th or 6th board
9    meeting, that the current EPS forecast is
10   now 1.99 as compared with 2.30 reflected in
11   the prior submission?
12       A.    I recall at the meeting that
13   we've not yet discussed that a plan, both
14   operating and financial plan was presented
15   and that segment of sessions, which we
16   talked about, then myself and other partner
17   member CEOs were asked to leave.  But
18   following that, Mr. Lewis and Mr. Hylland
19   reported back that the board did not accept
20   and approve a plan and directed the company
21   management to go back and revise the plan
22   because they felt there was too much risk
23   contained in it.  And we had a revised plan.
24   I wouldn't recall specifically what that
25   said, but this memo would indicate that the

59 (Pages 230 to 233)

Page 270

1  directives tell you that nothing was
2  sacred?
3      A.   I don't remember them saying
4  that, but they may have.
5      Q.   Was that the understanding you
6  had in connection with the directives that
7  money was to be raised and nothing was
8  sacred?
9          MR. KALECZYC:  Objection.
10         THE WITNESS:  My understanding was
11  there were efforts under way to raise cash.
12     (Deposition Exhibit Number 30
13  marked for identification.)
14  BY MS. STEINGART:
15     Q.   I'd like to show you what we've
16  marked as Hanson 30 and ask you if you
17  could describe what that is for the record?
18     A.   (Reviews document.)  The
19  document, albeit unsigned, is an asset and
20  stock transfer agreement dated November 15th
21  by and between NorthWestern Energy, LLC and
22  NorthWestern Corporation.  This is the
23  agreement by which the utility assets and
24  liabilities were transferred from
25  NorthWestern Energy, LLC to NorthWestern

Page 271

1  Corp and other certain assets and
2  liabilities retained at NorthWestern Energy,
3  LLC, later named Clark Fork and Blackfoot,
4  LLC.
5      Q.   So this is the agreement by
6  which the going-flat transaction was
7  effectuated?
8      A.   I believe so.  As I said, it's
9  an unsigned version, but that's what it
10  looks like.
11     Q.   But there is one that's signed
12  and the transaction, in fact, occurred?
13     A.   Yes.
14         MS. STEINGART:  Just for the
15  record, if I can find a signed one, I will
16  make it an Exhibit 30-A.
17         (Deposition Exhibit Numbers 31 and
18  32 marked for identification.)
19  BY MS. STEINGART:
20     Q.   I'd like to show you what we've
21  marked as Exhibit 31 and Exhibit 32.
22     A.   (Reviews document.)
23     Q.   Sir, do you recognize Hanson 31
24  to be the third supplemental indenture that
25  was executed in connection with the

Page 272

1  going-flat transaction?
2      A.   Well, it is the third
3  supplemental indenture executed now by
4  NorthWestern Corporation and the Bank of
5  New York.
6      Q.   And it was executed in or
7  around November 15th in connection with the
8  going-flat?
9      A.   I believe it was, yes.
10     Q.   And exhibit 32, do you
11  recognize that to be the officer's
12  certificate that was executed by you in
13  connection with the going-flat transaction?
14     A.   (Reviews document.)  It is an
15  officer's certificate executed by me in
16  connection with that transaction.
17     Q.   Now, what did you do to satisfy
18  yourself with respect to paragraph 1 of the
19  officer's certificate that the transaction
20  complies with article 11 of the indenture
21  and all conditions precedent in the
22  indenture including any covenant compliance
23  which constitutes a condition precedent as
24  they relate to the transaction?
25     A.   Well, same answer as the prior

Page 273

1  one, I reviewed the documents referenced,
2  made inquiry of other management, to the
3  best of my recollection, Mr. Monaghan, and
4  conversations with counsel.
5      Q.   And did they prepare any memos
6  for you that summarized or described the
7  assurances that they were providing you
8  with?
9      A.   I don't recall if -- well, to
10  the best of my recollection, I don't think
11  they were internal management ones.  I don't
12  recall if there were memos or a memo from
13  counsel or not.
14     Q.   Looking at the earlier
15  paragraph, the sentence that begins "He has
16  read and is familiar with covenants and
17  conditions in the provisions in articles
18  11 and 12 of the indenture."
19         Did you rely on Mr. Monaghan
20  for that?
21     A.   I read those articles at the
22  time, had some discussions with
23  Mr. Monaghan, perhaps others, but I remember
24  Mr. Monaghan and counsel.
25     Q.   Then it says further down "And

69 (Pages 270 to 273)

Page 274

```
 1   has examined the various certificate and
 2   instruments prepared in compliance with the
 3   covenants and conditions."
 4             What certificates and
 5   instruments did you review?
 6        A.   I don't recall if there are any
 7   or what they are.
 8        Q.   What did you do to assure
 9   yourself that NorthWestern was capable of
10   paying principal and interest in connection
11   with the QUIPS?
12        MS. DELANEY:  Objection.
13        THE WITNESS:  I didn't make a
14   specific analysis of that.  And as I said,
15   based upon my involvement in the company and
16   general understanding, I believe we had the --
17   the corporation had the ability to make such
18   payments and did, in fact, do so over at least
19   some period of time.
20   BY MS. STEINGART:
21        Q.   What documents or materials did
22   you base that belief on?
23        A.   I can't point to a specific
24   list of documents.  But we've discussed the
25   types of management reports and information
```

Page 275

```
 1   that have been provided to me during that
 2   time period.
 3        Q.   So you referred to the
 4   management financial information reports in
 5   reaching that conclusion?
 6        A.   Not solely, but in part.
 7   Management information reports, 10-Ks and
 8   10-Qs, presentations made to the board.
 9        Q.   Did anyone prepare a fairness
10   opinion on behalf of Montana Power, LLC
11   that the going-flat transaction was fair
12   from a financial point of view to creditors
13   of Montana Power, LLC?
14        A.   To the best of my knowledge,
15   one was not required.
16        Q.   Did anyone prepare an
17   assessment for you of the value of the
18   assets being transferred and the
19   liabilities being assumed in connection
20   with the going-flat transaction?
21        A.   I don't recall any such
22   assessment nor do I think one was necessary.
23        Q.   Did anyone provide an
24   assessment for you about whether the
25   disparity in the value of the assets being
```

Page 276

```
 1   transferred and the liabilities assumed in
 2   connection with the going-flat transaction
 3   made the going-flat transaction a
 4   fraudulent transfer?
 5        MR. KALECZYC:  Objection.
 6        MS. DELANEY:  Objection.
 7        THE WITNESS:  I'm assuming that
 8   you are not asking for the legal conclusion.
 9   To go back, the assets and the liabilities are
10   on the books of the subsidiary, in this case,
11   NorthWestern Energy, LLC.  The owner of the
12   assets and the liabilities, the difference
13   being equity, is NorthWestern Corporation.  We
14   just looked at a directive from the board of
15   directors of NorthWestern Corporation saying
16   move those up with the exception of Milltown
17   Dam and some incidentals.  They owned them
18   both.  There was no change.  They owned the
19   equity of it before the transaction.  They
20   owned it after the transaction.  So I just
21   dispute the premise that that type of fairness
22   opinion or assessment of those things was
23   necessary under the circumstances.
24   BY MS. STEINGART:
25        Q.   When you signed the officer's
```

Page 277

```
 1   certificate that's Exhibit 32, were you
 2   aware of the disparity in the value of the
 3   assets transferred and liabilities assumed
 4   in connection with the going-flat
 5   transaction?
 6        A.   I don't believe there is any
 7   such disparity.
 8        MS. DELANEY:  Objection.
 9   BY MS. STEINGART:
10        Q.   What do you understand the
11   value of the assets transferred in the
12   going-flat transaction to be?
13        A.   It doesn't matter.  The assets
14   were worth what they were, the liability was
15   worth what they were and the net result of
16   those was the responsibility of and the
17   property of NorthWestern before and after
18   the transaction.
19        Q.   Sir, at the time you executed
20   the officer's certificate, did you have an
21   understanding of the value of the assets
22   transferred and the liabilities assumed in
23   connection with the going-flat transaction?
24        A.   I would have had, in the normal
25   course of things, the balance sheet that you
```

70 (Pages 274 to 277)

Page 278

1    are referring to of NorthWestern Energy,
2    LLC, had a general understanding. I did not
3    inquire at that time about what those
4    specific balances were.
5        Q.    Now, at the time of the
6    going-flat transaction, did counsel for
7    Montana Power, LLC indicate to you that you
8    should be aware of the value of the assets
9    being transferred as well as the
10    liabilities assumed in connection with the
11    going-flat transaction?
12        MS. DELANEY:  Objection.
13        MR. KALECZYC:  Objection.
14        MS. DELANEY:  To the extent this
15    calls for any privileged conversation with
16    counsel, I direct the witness not to answer.
17    BY MS. STEINGART:
18        Q.    Who represented Montana Power,
19    LLC in connection with the going-flat
20    transaction?
21        A.    I relied on advice from
22    Euclid Irving and Paul Hastings.
23        Q.    Who represented NorthWestern in
24    connection with the going-flat transaction?
25        A.    I don't know the answer to that

Page 280

1    certificate -- or the materials that you
2    were relying on included the MFIRs and the
3    10-Ks and 10-Qs, was there anything else?
4        A.    Yes.
5        Q.    What else?
6        A.    I cannot tell you. I used
7    those as examples. I had all the variety of
8    information provided to me in the normal
9    course of things available.
10        Q.    And to the extent that those
11    documents that you've been able to identify
12    for me were false and misleading, then you
13    relied on false information in executing
14    the officer's certificate, correct?
15        MS. DELANEY:  Objection.
16        MR. KALECZYC:  Objection.
17        THE WITNESS:  I have no basis for
18    believing that those documents were false or
19    misleading.
20    BY MS. STEINGART:
21        Q.    Are you familiar with the
22    restatements that NorthWestern made of its
23    first three quarter 10-Qs for 2002 in 2003?
24        A.    Generally, yes.
25        Q.    Are you familiar with the cease

Page 279

1    question.
2        Q.    It's true -- well, you knew
3    that Paul Hastings was also representing
4    NorthWestern, correct?
5        A.    I knew and recall that
6    Paul Hastings represented NorthWestern in a
7    variety of matters.
8        Q.    Did you consider, as the
9    individual who executed the officer's
10    certificate, that it was not in the best
11    interest of the creditors of Montana Power,
12    LLC for Montana Power, LLC to have the same
13    counsel as NorthWestern in connection with
14    the going-flat?
15        MR. KALECZYC:  Objection.
16        MS. DELANEY:  Objection.
17        THE WITNESS:  I did not.
18    BY MS. STEINGART:
19        Q.    Did anyone talk to you about
20    that?
21        A.    Not that I recall.
22        MR. KALECZYC:  Objection.
23    BY MS. STEINGART:
24        Q.    So you said that you had in
25    mind when you executed the officer's

Page 281

1    and desist order that was entered against
2    NorthWestern by the SEC?
3        A.    Generally.
4        Q.    Are you familiar with the
5    complaints that have been filed against
6    Merle Lewis, Kipp Orme, Mr. Whitesel and
7    Mr. Hylland?
8        MR. KALECZYC:  Object to the form.
9    BY MS. STEINGART:
10        Q.    Are you familiar with the SEC
11    complaint that was filed against Mr. Lewis?
12        A.    I'm aware that one was filed
13    from the news accounts and reports.
14        Q.    And are you aware that he
15    entered into a consent decree?
16        A.    I'm aware that there was a
17    fairly recent -- a news account indicating
18    that.
19        Q.    And the same is true -- is the
20    same true with respect to your awareness of
21    Mr. Hylland having a complaint filed and
22    entering into a consent decree?  Are you
23    aware of those two things?
24        A.    I'm aware from the news
25    accounts. What I am saying is I have not

71 (Pages 278 to 281)

Page 282

1  read those complaints or familiar with or
2  knowledge of what resolution was reached
3  other than as relates to those individuals
4  other than what has been reported in the
5  news accounts of the case.
6      Q.    Are you aware that Mr. Orme
7  took the 5th Amendment in response to
8  questions concerning the falsity of the
9  first, second and third quarter 10-Qs for
10  2002?
11         MS. DELANEY:  Objection.
12         THE WITNESS:  Well, I don't know
13  in what context that may have happened.  But
14  no, I'm not aware of that.
15  BY MS. STEINGART:
16      Q.    It happened in the context of
17  this case, sir.  Did no one inform you of
18  that?
19      A.    To the best of my recollection,
20  I was informed that in response to a
21  question or line of questioning, that he had
22  taken the 5th Amendment.  But the scope of
23  that, I don't know.  And your question talks
24  about in relation to certain -- I wouldn't
25  know that, that context.

Page 283

1      Q.    So based on all of the items
2  we've just discussed, is it still your
3  sworn testimony that you have no reason to
4  believe that the first, second and third
5  quarter 10-Qs when they were filed in 2002
6  were not false and misleading?
7         MR. KALECZYC:  Objection.
8         MS. DELANEY:  Now, or in 2002?
9  I object.
10         THE WITNESS:  My testimony is that
11  upon signing these documents, I did not know
12  that nor did I have any basis to know or
13  believe that to be the case.
14  BY MS. STEINGART:
15      Q.    To the extent that -- I'm
16  asking you now, to the extent that those
17  documents were false at the time you signed
18  this officer's certificate, to the extent
19  those documents were false and misleading,
20  in signing this officer's certificate you
21  relied on false and misleading material,
22  correct?
23         MS. DELANEY:  Objection.
24         MR. KALECZYC:  Objection.
25         THE WITNESS:  In part.  I had all

Page 284

1  the many reports, all the information, the
2  public disclosures are just one of many.  So I
3  cannot say that I relied specifically on those
4  and but for that would not have signed.  I'm
5  just saying that was one of a body of
6  information that I had.  And the collective
7  body of information, it did not -- I had no
8  reason at that time to believe there was any
9  problem with it or that the company was not
10  able to manage this transaction.
11  BY MS. STEINGART:
12      Q.    But if it was false, if those
13  materials were false, then you relied on
14  false financials in signing the officer's
15  certificate, right?
16      A.    I am aware that allegations
17  have been made, that aspects of those were
18  false, I have no independent understanding
19  or opinion of whether or not that is the
20  case.
21      Q.    If they were false, then you
22  relied on false documents, correct?
23         MS. DELANEY:  Objection.
24         MR. KALECZYC:  Objection.
25         THE WITNESS:  Accepting that your

Page 285

1  question is a hypothetical, "if they were."
2  Well, as I said before, in part, but I relied
3  on the body of information that I had
4  available to me.
5  BY MS. STEINGART:
6      Q.    And in the body of information
7  that you had available to you, did you have
8  any information that evidenced to you in
9  2002 that those SEC files, 10-Ks and 10-Qs,
10  were false?
11         (Whereupon, the court reporter
12  read back the previous question.)
13         THE WITNESS:  And you are asking
14  the question as of November 15, 2002 and the
15  answer is no.
16         MR. KALECZYC:  Could we take a
17  break at this point?
18         MS. STEINGART:  Yes.
19         (Recess.)
20         (Deposition Exhibit Number 33
21  marked for identification.)
22  BY MS. STEINGART:
23      Q.    Sir, I'm handing you what we've
24  had marked as Hanson 33.  And it's a memo
25  dated December 7th from Dick Hylland and

72 (Pages 282 to 285)