# Exhibit 35



1
2
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

3
Civil Action No. C.A. No. 04-1494 (JJF)

4
MAGTEN ASSET MANAGEMENT CORPORATION and
LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5
Plaintiffs,

6
v.

7
NORTHWESTERN CORPORATION,

8
Defendant.

9
------------------------------------------------------

10
Civil Action No. C.A. No. 05-499 (JJF)

11
MAGTEN ASSET MANAGEMENT CORP.,

12
Plaintiff,

13
v.

14
MICHAEL J. HANSON and ERNIE J. KINDT,

15
Defendants.

16
------------------------------------------------------

17
             DEPOSITION OF

18
             ERNIE KINDT

19
------------------------------------------------------

20
21
22
23
24
25
TAKEN ON: 6/28/2007

          BY: DANA ANDERSON

ELISA DREIER
REPORTING CORP.

780 Third Avenue
New York, New York 10017

Telephone: 212-557-5558
Fax: 212-557-0050
Email:production@courtreportingedrc.com

1   A.   I don't think that this resolution names me as
2        an executive officer.
3   Q.   If you see in the paragraph that says "Be it
4        resolved..."  I'm skipping some lines, but it
5        says "The following named persons are hereby
6        elected as the executive officers of NWE for
7        the positions indicated."
8   A.   Okay.  I don't believe that this changed
9        anything as far as my management
10       responsibilities.
11  Q.   Did your management responsibilities as vice
12       president of accounting ever change from the
13       time that NorthWestern acquired Montana Power
14       until the time you left the company?
15  A.   I had changes of duties as certain people
16       elected to take the change of control.  But
17       other than that, no.
18  Q.   Would that have been an increase in duties?
19  A.   Yes.
20  Q.   And what additional duties did you take on?
21  A.   Ellen Senechal, who was the treasurer at
22       Montana Power LLC became -- came across with
23       the Montana Power officers.  When she left, I
24       was made the contact, and I was responsible for
25       making sure that the requirements of filings

1      with the certain debt holders were completed on
2      time.
3   Q. When you say the certain debt holders, does
4      that include the QUIPS?
5   A. Yes, I believe it does.
6   Q. And when did you become responsible for contact
7      and filings relating to the QUIPS?
8   A. When Ellen left, and I think that that was in
9      August or September of 2002.
10  Q. And what specifically were your
11     responsibilities in connection with the QUIPS?
12  A. There were certain items that had to be filed
13     annually, I think an officer's certificate.
14     There was a book that had listed the items that
15     had to be filed.  I don't remember them off the
16     top of my head.
17  Q. Did you sign the officer's certificates?
18  A. Yes, I believe I did.
19  Q. When you signed the officer's certificate, what
20     did you --
21  A. Wait a minute, maybe I -- I honestly don't
22     remember if I did or didn't.
23  Q. But you would have been -- whether you signed
24     them or not, you would have been the one that
25     put the package together and delivered the --

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1   A.   Yes.

2   Q.   What, if anything, did you do to ensure that

3        the information in the book was accurate?

4   A.   The information in the book?

5   Q.   I thought you said that you would put together

6        a book that you would --

7   A.   It wasn't that big.  It was one or two pages.

8        And I think it listed the officers.  It wasn't

9        anything that complicated.

10  Q.   Did you do anything to ensure that the

11       officer's certificate was correct?

12  A.   That it listed the correct officers.

13  Q.   Is that the only thing that the officer's

14       certificate did?

15  A.   I think so.

16  Q.   Now, in November of 2002 the assets of

17       NorthWestern Energy LLC were transferred to

18       NorthWestern, correct?

19            MR. KALECZYC:  Objection.

20            THE WITNESS:  The assets and

21       liabilities of NorthWestern Energy LLC with

22       the exception of certain assets that were

23       not utility in nature were merged into

24       NorthWestern.

25  BY MR. KAPLAN:

18

1    Q.   Let's take this a part a little bit.  What was

2         your involvement in that transaction?

3    A.   From an accounting standpoint there, wasn't a

4         whole lot of activity that was required on the

5         books.  Basically we kept -- Montana operations

6         were already separate from everything else.

7         And so if you remember, I talked about the fact

8         that we were operated as an electric and gas

9         utility, but we kept everything for Nebraska

10        and South Dakota and Montana in separate

11        company codes on the accounting records.

12             And so since the Montana stuff was in

13        a separate company code and we're still going

14        to report them, for Montana purposes, on a

15        standalone basis, it was determined that the

16        easiest way to account for the going-flat

17        structure was to move the assets that were

18        staying in the Montana LLC.  And I think it was

19        subsequently renamed to the Clark Fork LLC and

20        set up a separate company code for those

21        transactions.

22             Other than that, you still had equity

23        and earnings and that.  So there was some title

24        changes on accounts, but it wasn't any massive

25        endeavor.

1    Q.   How about with respect to the NorthWestern

2         Energy LLC debt, what was your -- what, if any,

3         responsibilities did you have in connection

4         with the going-flat transaction?

5    A.   As far as --

6              MR. KALECZYC:  Objection.

7              THE WITNESS:  As far as the debt, I

8         think I may have transmitted some

9         paperwork, but that would be the full

10        extent of...

11             (Deposition Exhibit Number 2 marked

12        for identification.)

13   BY MR. KAPLAN:

14   Q.   We'll mark as Kindt Exhibit 2 a document Bates

15        stamped NOR 000909 through NOR 000911.

16   A.   (Reviews document.)

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   Can you identify what it is?

20   A.   This is a transmittal letter that transmitted

21        certain data that was -- certain documents that

22        were needed to complete the transaction.

23   Q.   You see on the second page of the document

24        there is a list of four items?

25   A.   Right.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1    Q.   Six items, I'm sorry.

2    A.   Uh-huh.

3    Q.   Prior to submitting or transmitting this letter

4       did you review those six items?

5    A.   I don't remember if I reviewed them or not.

6    Q.   You don't recall whether you -- strike that.

7           Would you typically have reviewed

8       items such as this when sending them on to the

9       trustee?

10    A.   These were documents that were drafted by

11      basically the lawyers that were responsible for

12      completing the transaction. They are legal

13      documents. My responsibility was more

14      administerial to assure that they were

15      transmitted.

16    Q.   Presumably the lawyers could have transmitted

17      it by themselves?

18    A.   I believe I was the contact with the bank.

19    Q.   The officer's certificate wasn't a legal

20      document, was it?

21          MR. KALECZYC: Objection.

22          THE WITNESS: That I don't know.

23 BY MR. KAPLAN:

24    Q.   Pardon?

25    A.   I don't know if that's considered a legal

1          discussed it with, Mike Manning.

2     Q.   Do you have any recollection of actually

3          discussing them?

4     A.   No.

5     Q.   Do you recall having any discussions with

6          anyone at NorthWestern, the parent corporation,

7          with respect to any of these six documents?

8     A.   No, I don't.

9     Q.   Do you remember ever taking any efforts to

10         ensure that any of these documents were true

11         and correct?

12    A.   Like I indicated, these are documents that were

13         not financial in nature.  And so there really

14         wasn't anything for me to review on these.

15    Q.   In the course of your responsibilities, have

16         you ever reviewed indentures?

17    A.   No.

18    Q.   Even when you took over for Ms. Senechal you

19         didn't look at the indentures?

20    A.   No.

21    Q.   Do you recall ever having conversations with

22         anyone from The Bank of New York with respect

23         to any of these six documents?

24    A.   No, I don't.

25    Q.   Do you recall ever having any discussions with

23

1          The Bank of New York in connection with your

2          responsibilities for the QUIPS?

3    A.    The only contact that I can remember having

4          with The Bank of New York would be related to

5          interest payments and to the annual filing.  I

6          think there may have been a call to make sure

7          that everything was filed on time.

8    Q.    Were you involved in the decision to transfer

9          the assets from NorthWestern Energy LLC to

10         NorthWestern?

11   A.    No.

12   Q.    Do you recall the first discussions that you

13         had with anyone at NorthWestern Energy LLC or

14         NorthWestern with respect to the transfer of

15         the assets?

16   A.    I don't know if I can remember the specific

17         date that we discussed it.  But Dave Monaghan

18         had kept people that reported to him aware that

19         they had requested an exemption from the Public

20         Utility Holding Company Act.  When that

21         exemption was not received or was denied, we

22         were informed that the going-flat structure

23         would have to be undertaken.  And so then there

24         was discussion as to what was the simplest way

25         accounting-wise to accomplish that.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1    Q.   In connection with the going-flat transaction,

2         did you review NorthWestern's -- when I say

3         NorthWestern, I mean the parent company's

4         financials?

5    A.   As part of the going-flat structure, no, I did

6         not.

7    Q.   Did you do any diligence to see whether

8         NorthWestern Corporation would be able to

9         satisfy obligations to the QUIPS holders?

10   A.   NorthWestern owned the assets subject to the

11        liabilities that were outstanding.  They were

12        assuming those liabilities.  To the best of my

13        knowledge, they had the financial wherewithal

14        to continue to service the debt.

15   Q.   What was that knowledge based on?

16   A.   The cash flow was there.  They were managing

17        the cash flow on a corporate basis at the time.

18        Whenever the utility needed cash, it was

19        available.

20   Q.   Did you review projections to see whether the

21        cash flow would still be there?

22   A.   No, I did not.

23             MS. DELANEY:  Objection to form.

24   BY MR. KAPLAN:

25   Q.   Did you -- did you review the financial

32

1          statements of the other NorthWestern divisions

2          or entities to see how they were performing?

3    A.    No, I did not.

4    Q.    Did you discuss with anyone at NorthWestern

5          whether they would have the financial

6          wherewithal to honor their obligations under

7          the QUIPS?

8    A.    No, I did not.

9    Q.    Did you review NorthWestern's public financial

10         statements, its SEC filings in connection with

11         the going-flat transaction?

12   A.    Not specifically in conjunction with the

13         going-flat.

14   Q.    Did you have any discussions with Mr. Hanson

15         with respect to whether NorthWestern would be

16         able to satisfy its obligations under the

17         QUIPS?

18   A.    No, I did not.

19   Q.    Did you have any concerns with respect to

20         whether NorthWestern would be able to satisfy

21         its obligations under the QUIPS?

22   A.    No, I did not.

23   Q.    Did you have any views as to the value of the

24         assets that were being transferred to

25         NorthWestern?

```
 1              MR. KALECZYC:  Objection.
 2              MS. DELANEY:  Objection, foundation.
 3              THE WITNESS:  Like I previously
 4         indicated, my understanding was that
 5         NorthWestern owned the LLC and effectively
 6         owned the net assets and that all they were
 7         doing was converting their ownership
 8         interest into ownership of the actual
 9         assets and that there was no actual sale.
10    BY MR. KAPLAN:
11    Q.  You were an executive officer of NorthWestern
12         Energy LLC prior to November 15, 2002, correct?
13    A.  Correct.
14    Q.  You weren't an officer of
15         NorthWestern Corporation prior to that point,
16         were you?
17    A.  That's correct.
18    Q.  And as -- and you took direction from Mike
19         Hanson, correct?
20              MR. KALECZYC:  Objection, vague.
21    BY MR. KAPLAN:
22    Q.  You reported --
23    A.  I took direction through Dave Monaghan who
24         reported to Mike Hanson.
25    Q.  And Mike Hanson was the CEO of NorthWestern
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1  Q.  Was -- following the going-flat transaction,

2      NorthWestern Energy LLC's name changed,

3      correct?

4  A.  Yes.

5  Q.  And it became known as Clark Fork and

6      Blackfoot?

7  A.  Yes.

8  Q.  Based on your understanding, following the

9      going-flat transaction, did Clark Fork have

10     sufficient cash flow to keep paying its

11     obligations?

12 A.  The guarantee from NorthWestern provided the

13     cash flow for Clark Fork to pay its

14     obligations.

15 Q.  Absent the guarantee, would it have had

16     sufficient cash flow to satisfy its

17     obligations?

18 A.  Absent the guarantee, no.

19 Q.  Did that concern you at the time that you

20     were -- at the time that the transfer was

21     occurring did that concern you?

22 A.  The guarantee was there.  And so there was no

23     need for concern.

24 Q.  Did you do any analysis as to how much the

25     environmental liability could ultimately be?

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1   Q.  If you knew that NorthWestern wouldn't be able

2        to satisfy its obligations, would you have

3        objected to the transfer?

4              MR. KALECZYC:  Objection.

5              MS. DELANEY:  Objection, calls for

6        speculation.

7              THE WITNESS:  If I believed that

8        NorthWestern wouldn't be able to meet its

9        obligations, I honestly don't know what my

10       response would have been.

11  BY MR. KAPLAN:

12   Q.  Did you ever discuss with anybody at

13        NorthWestern Energy LLC or

14        NorthWestern Corporation retaining a

15        third-party to evaluate the fairness of the

16        going-flat transaction?

17  A.  As I previously stated, my belief was that

18        NorthWestern was the owner of the assets and

19        that all they were doing was changing the form

20        of that ownership from ownership of the LLC to

21        direct ownership of the net assets.

22   Q.  But going specifically to my question, did you

23        ever discuss with anyone at NorthWestern Energy

24        LLC or NorthWestern Corporation having a third

25        party evaluate the fairness of the transaction?

50

1   A.   The Montana utility operations were typically

2        cash-flow negative starting in May and running

3        through November.

4   Q.   I think there is a binder, it's the MFIR

5        binder, and I would like you to turn to the tab

6        that says May 2002.

7   A.   (Complies.)

8   Q.   And it's a document that's Bates stamped NOR

9        458099 through NOR 458119.

10            Are you familiar with this document?

11            MR. KALECZYC:  Take your time to

12        review it before you answer.

13            THE WITNESS:  (Reviews document.)  No.

14        This is not a document that I am familiar

15        with.

16  BY MR. KAPLAN:

17  Q.   Did you ever see these management financial and

18       information reports for any month?

19  A.   No.

20  Q.   If you turn to page 2 of 15.

21            MS. DELANEY:  What page?

22            MR. KAPLAN:  Says 2 of 15, which is

23        NOR 458102.

24  BY MR. KAPLAN:

25  Q.   You see on the top there is a chart of an

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

63

1        discussions.

2    Q.   And what was the nature of the discussion?

3    A.   There were discussions that -- and disclosures

4         in the annual report that indicated that there

5         was a liquidity challenge, that certain events

6         needed to go the company's way to resolve some

7         short-term cash-flow issues.

8    Q.   When was the first time that you remember

9         hearing that there were liquidity or cash-flow

10        issues at NorthWestern?

11   A.   Would have been in the spring, late winter,

12        early spring of 2003.

13   Q.   Did you ever hear that in 2002?

14   A.   Not that I recall.

15   Q.   Based on your job responsibilities, to the

16        extent that NorthWestern was considering

17        sale-leaseback transactions for the utility

18        assets, would you have been involved?

19             MR. KALECZYC:  Objection.

20             MS. DELANEY:  What was the timeframe,

21        Gary?

22             MR. KAPLAN:  At any time after

23        NorthWestern acquired Montana Power.

24             THE WITNESS:  I do not recall any

25        discussions of sale-leaseback transactions

1    Q.  I can clarify the question for you.

2            Solely with respect to funded debt, by

3    that, I mean bonds, QUIPS or bank loans, you

4    testified earlier that when Ms. Senechal left,

5    you took over her responsibility to administer

6    that, or if there is a better word, but to --

7    A.  To provide the annual filings.

8    Q.  To provide the annual filings for that debt.

9            Was there any NorthWestern Energy

10   funded debt for which you weren't responsible

11   for providing the filings?

12   A.  Not that I can recall.

13   Q.  Were you the regular -- were you the person at

14   NorthWestern Energy who would be -- who would

15   generally interface with the trustee or the

16   agent for the various issuances of debt?

17   A.  I would not have been the person who negotiated

18   the issuance of new debt or the retirement of

19   old debt.  That would have been someone else.

20   Q.  But debt that was existing and just in the

21   ordinary course filing and submissions, would

22   you have been the person who would have been

23   most likely to interface with the agent or the

24   trustee?

25            MS. DELANEY:  At what time?

Elisa Dreier Reporting Corp.  (212) 557-5558
         780 Third Avenue, New York, NY 10017

1              MR. KAPLAN:  After Ms. Senechal left

2         until -- while it was NorthWestern LLC.

3              THE WITNESS:  I can be -- I can

4         honestly state that I had very little

5         contact with Ms. Lewicki.  And I can't

6         recall more than one or two phone calls.

7    BY MR. KAPLAN:

8    Q.  Are you aware of whether anybody else at

9         NorthWestern Energy was having the same or more

10        communication with Ms. Lewicki?

11             MR. KALECZYC:  Objection.

12             THE WITNESS:  I have no way of knowing

13        if anyone else had contact with

14        Ms. Lewicki.

15   BY MR. KAPLAN:

16   Q.  Did Ms. Lewicki or anyone else from Bank of New

17        York ever ask you about the value of the

18        Milltown Dam or whether there were other

19        alternatives to dispose of the Milltown Dam?

20             THE WITNESS:  No.

21   BY MR. KAPLAN:

22   Q.  Did Mike Hanson ever talk to you about the

23        value of the Milltown Dam or other alternatives

24        to dispose of the Dam?

25   A.  No.

72

1   Q.  In your role as VP for accounting, did you ever
2       review any of the financials for Expanets?

3   A.  No.

4   Q.  In the time frame -- during 2002, what do you
5       recall being told about Expanets' performance?

6   A.  There was one management meeting shortly after
7       NorthWestern bought Montana Power's assets that
8       all of the vice presidents from Montana went
9       to.  There was a presentation at that
10      conference where the presidents of the various
11      divisions of the company spent ten or
12      15 minutes updating people on their progress.
13      Expanets at that point in time was confident
14      that they would meet their annual budgeted
15      target which they indicated was an aggressive
16      target.

17   Q.  Was that the only thing you heard about
18      Expanets during 2002?

19   A.  Other than that, on a monthly basis we would
20      see the -- on the utility financials, there
21      would be a one-line comparison of their net
22      income compared to budget for that month and
23      year-to-date.

24   Q.  Why would that show on the utility financial
25      statement?

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

83

1          to clear up some things.

2

3                      EXAMINATION

4

5   BY MR. KALECZYC:

6   Q.   Do you remember telling Mr. Kaplan, Ernie, that

7        you were the normal contact for The Bank of New

8        York trustee with respect to QUIPS?

9   A.   That's correct.

10  Q.   During the period of time between the

11       acquisition of Montana Power LLC and the

12       going-flat transaction, were you ever contacted

13       by The Bank of New York and told that QUIPS

14       payments had not -- had failed to be made when

15       due?

16  A.   No.

17  Q.   During that same time period between the

18       acquisition and the going-flat transaction,

19       were you ever contacted by the trustee and told

20       there was an event of default?

21  A.   No.

22  Q.   Now, between the time that the going-flat

23       transaction was completed in November 2002 and

24       June of 2003 when you testified you left the

25       company, were you ever told by The Bank of New

        Elisa Dreier Reporting Corp.   (212) 557-5558
           780 Third Avenue, New York, NY 10017

1    Q.   Do you remember you testified no?

2    A.   That's correct.

3    Q.   Why didn't you in November, approximately

4         November 2002 before the going-flat transaction

5         was completed, request a fairness opinion?

6              MR. KAPLAN:  Objection, asked and

7         answered.

8              THE WITNESS:  My understanding was

9         that NorthWestern owned the assets or owned

10        the LLC which owned the assets and that the

11        transaction was really just a change in the

12        form of that ownership of the assets.  They

13        still were responsible for the liabilities

14        that attached to the assets.  But it was

15        strictly a change in the form of ownership.

16   BY MR. KALECZYC:

17   Q.   Did you have any concern in your own mind in

18        November 2002 that after the going-flat

19        transaction was completed, that NorthWestern

20        would not be able to continue to make QUIPS

21        payments?

22   A.   No.

23   Q.   Why not?

24   A.   The balance sheet of NorthWestern was strong.

25        They were a very large company.  The company

1     had just recently issued some debt and did not

2     have a difficult time issuing that debt.

3  Q.  And when you say "balance sheet," do you mean

4     the consolidated balance sheet of

5     NorthWestern Corporation?

6  A.  The consolidated balance sheet.

7        MR. KALECZYC:  I have no other

8     questions.  I don't know if you have any,

9     Nancy.

10       MS. DELANEY:  I have no questions.

11      MR. KAPLAN:  I have a couple of

12    follow-up on those questions.

13

14          FURTHER EXAMINATION

15

16 BY MR. KAPLAN:

17  Q.  You just testified that when NorthWestern

18    issued debt it had no difficulty issuing the

19    debt.  Do you recall saying that?

20  A.  Yes.

21  Q.  What to you make that statement based on?

22  A.  I worked on the preparation of the financials

23    that were used to support -- to get the debt.

24    And from everything that I had seen in my

25    personal involvement, there wasn't a difficulty