# Exhibit 37

# EXPERT REPORT OF

## ROBERT W. BERLINER, CPA, CFE

### SEPTEMBER 19, 2007

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK<br>Plaintiffs,<br>v.<br>NORTHWESTERN CORPORATION,<br>Defendant. | ) ) ) ) ) ) ) | C.A. No. 04-1494-(JJF)<br>RE: D.I. 94 |
| MAGTEN ASSET MANAGEMENT CORP.,<br>Plaintiffs,<br>v.<br><br>MICHAEL J. HANSON and ERNIE J. KINDT<br>Defendants. | ) ) ) ) ) ) ) ) ) | C.A. Action No. 05-499 (JJF)<br>RE: D.I. 121 |

## A. INTRODUCTION

I am a certified public accountant. I have been retained by counsel for Magten Asset Management Corporation in the above referenced matters as an expert witness on behalf of both plaintiffs. Specifically, I have been requested by counsel to address the following issues:

- NorthWestern Corporation's ("NW's") violations of generally accepted accounting principles ("GAAP") attributable to its non-utility subsidiaries;

- NW's false and misleading disclosures in its publicly-issued financial reports during 2002; and

- The effect on Clark Fork and Blackfoot, LLC's[1] ("Clark Fork's") assets and liabilities following the November 15, 2002 going-flat transaction, assuming that it remained directly obligated for the mandatorily redeemable quarterly income preferred stock (the QUIPS")[2] .

---

[1] Formerly, Northwestern Energy, LLC ("NELLC"), formerly Montana Power, LLC ("MPLLC").
[2] The QUIPS were originally issued by the Montana Power Company and assumed by MPLLC (see background section below).

1

## 1. GAAP violations that were restated by NW

In its 2002 Form 10-K and its Form 10-Q/A Amendment No.2 for the quarters ended March 31, June 30, and September 30, 2002, all of which were filed on April 15, 2003, NW disclosed that it "restated these unaudited quarterly financial statements principally to reflect the quarterly impact of certain adjustments and to include additional disclosures in the appropriate period…" **[Form 10-Q/A Amendment No. 2 for the quarters ended March 31, June 30, and September 30, 2002.]** The following subsections of this Basis for Opinion address the more significant GAAP violations that were restated by NW in 2003.

### a. NW failed to provide an adequate allowance for bad debts at Expanets and to timely record billing adjustments attributable to Expanets' EXPERT system.

#### Background

In 2000, Expanets initiated a project to design and implement a customized information technology system (known as the EXPERT system) to "operate and manage all aspects of its business, including order entry, scheduling, forecasting, customer billing, trend analysis, compensation and margin calculation, product and sales support, and financial reporting." **[2001 Form 10-K/A]** The "cut over" (implementation) of the EXPERT system occurred in November 2001. Because of its planned scope and impact across operations, the functionality of the EXPERT system was critical to Expanets.

#### Management's knowledge of problems with EXPERT

Almost from the start, Expanets' management realized that EXPERT was not functioning as designed. For example, John Charters, who became Expanets CEO around the first quarter of 2002, stated that "even as early as June 2002 (shortly after he joined Expanets) he began to understand the immense issues that the Expert billing system was causing Expanets, in that (1) the Expert billing system issues were taking longer to discover and fix than planned, and (2) we had received bad information from Avaya, and many receivables were as much as 500 days old, which would make it difficult to collect payment. I notified Mr. Hylland of these issues." **[NOR519910]**

Furthermore, *The Report of the Special Committee of the Board of Directors of NorthWestern Corporation* (the "Special Committee Report") dated April 25, 2003 described the background of the implementation of the EXPERT system based on its interviews with management. The Special Committee Report stated the following:

> On approximately November 26, 2001, Expanets launched its cut-over to the Expert System. From inception, however, there were significant issues with the functionality of the Expert System, and it is still not fully operational. From late November 2001 until December 24, 2001, Expanets had a billing hiatus where no bills were issued to customers. From December 24, 2001 until January 21, 2002, bills were slowly processed and not all bills were issued to customers. The first bills that were produced

If, based on current information and events, it is probable that the enterprise will be unable to collect all amounts due according to the contractual terms of the receivable, the condition in paragraph 8(a) is met. As used here, *all amounts due according to the contractual terms* means that both the contractual interest payments and the contractual principal payments will be collected as scheduled according to the receivable's contractual terms. However, a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments as meeting the condition in paragraph 8(a). Whether the amount of loss can be reasonably estimated (the condition in paragraph 8(b)) will normally depend on, among other things, the experience of the enterprise, information about the ability of individual debtors to pay, and *appraisal of the receivables in light of the current economic environment.* [Emphasis added.] In the case of an enterprise that has no experience of its own, reference to the experience of other enterprises in the same business may be appropriate. Inability to make a reasonable estimate of the amount of loss from uncollectible receivables (i.e., failure to satisfy the condition in paragraph 8(b)) precludes accrual and may, if there is significant uncertainty as to collection, suggest that…*some other method of revenue recognition be used* [Emphasis added.]

With respect to the amount of loss to be accrued, Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss an interpretation of FASB Statement No. 5*, ("FIN 14") states that if "information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated… When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." In addition, paragraph 9 of SFAS 5 states that disclosure of the nature of an accrual and, in some circumstances, the amount accrued, may be necessary for the financial statements not to be misleading and paragraph 10 requires disclosure of the nature of the contingency and the additional exposure to loss if there is at least a reasonable possibility of loss in excess of the amount accrued.

With respect to disclosure of contingencies in interim financial statements Accounting Principles Board Opinion No. 28, *Interim Financial Reporting* ("APB 28"), states:

Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial.

<u>NW's violation of GAAP</u>

The documents and deposition testimony are replete with clear and convincing evidence that EXPERT was not performing as designed and, in particular, was improperly billing customers. The Special Committee Report cites a number of *Expert Status Reports* detailing the various deficiencies of the EXPERT system. **[NOR519789 and NOR519789-90]** For example, the March 8, 2002 *Expert Status Report*… indicated that

"no billing occurred from November 22, 2001 through December 24, 2001, and "very slow" billing occurred from December 24, 2001 through January 21, 2002, primarily due to data migration and billing format issues." **[NOR519789]**

Thus, it is clear from the documents and deposition testimony that the problems with EXPERT were on-going and, despite a significant expenditure of personnel and financial resources, the problems continued to plague Expanets' operations well into 2002. However, despite the mounting evidence that a substantial portion of billings were improper and/or inaccurate, NW violated GAAP by failing to properly record billing adjustments attributable to deficiencies in its EXPERT system for the first three quarters of 2002.

As equally problematic as the aforementioned billing problems was the fact that EXPERT was incapable of applying cash collections to the proper customer accounts throughout much of 2002. For example, the SEC noted, among other things, that until September 2002, the EXPERT system could not properly apply cash collected to customer accounts. **[SEC March 7, 2007 Cease & Desist Order]**

Further examples of management's knowledge of EXPERT's billing problems and its impact on Expanets' billing adjustments and allowance for bad debts are provided below:

- Mr. Fresia's August 6, 2002 email to Messrs. Charters and Younger re: *billing adjustments cleanup* states that "I'm still very concerned about where the billing adjustment situation may end up." Mr. Fresia indicates that he thinks the impact may approach $30 million and he wants to raise the issue again with Orme. **[NOR306795]**

- Mr. Fresia's August 6, 2002 email to Mr. Snella [Expanets Chief Technology Officer] "re: gap in reported revenue for July" gives Mr. Fresia's estimate of an approximate $30 million shortfall in revenues in July. He indicates that he has told NOR of this issue and surmises that "…but I'm not sure they are listening." **[NOR306793]** This is further proof that NW management was not interested in hearing the truth, but rather just wanted to make the numbers promised to the public.

- Mr. Fresia testified that, in July 2002 at a management committee meeting attended by Messrs. Lewis, Hylland and Orme, he brought up the need for a $30 million addition to the bad debt reserve. Mr. Charters intervened and Mr. Fresia says he got no reaction to his suggestion that an additional reserve be considered. This reaction shows that management was not interested in hearing bad news and they ignored Mr. Fresia's suggestion. **[Fresia 31:6-25 – 32:1-15]**

- Ms. Clark's October 21, 2002 memorandum to Mr. Donovan points out the need for additional allowances for doubtful accounts of about $16.15 million. These allowances are for accounts over 90 days old ($3.4 million) and for accounts over 300 days old ($12.75 million). **[NOR306817]**

- Mr. Drook testified that NW needed a larger bad debt reserve for Expanets and that "In retrospect, they should have reserved more earlier." **[Drook 161:12-19]**

- Mr. Snella later declared that "in my opinion, by August 2002, it was clear that Expanets had a significant amount of aged accounts receivable (those outstanding more than 90 days) that would affect the operating performance of Expanets." **[NOR520032]**

Yet, despite the overwhelming evidence regarding the uncertainties surrounding the collectibility of its receivables, NW management ignored the warnings of Expanets' own senior executives and, therefore, violated GAAP by failing to provide an adequate allowance for possible credit losses during the first three quarters of 2002.

In its restatement of its quarterly financial statements for the first three quarters of 2002, NW acknowledged its violation of GAAP regarding its failure to (a) properly recognize billing adjustments resulting in an overstatement of revenue and (b) provide an adequate allowance for bad debts resulting in an understatement of SG&A expenses. As a result, NW restated revenue, expenses and net accounts receivable. These restatement adjustments were necessary to prevent NW's consolidated financial statements from being false and misleading. The effect of these adjustments on NW's operating income, EBITDA and net income is as follows:

|  | Billing Adjustments | Operating Income Amt. | % | EBITDA Amt. | % | Net Income Amt. | % [a] |
|---|---|---|---|---|---|---|---|
| Q1' 02 | $ 18,300 | $ 34,648 | 52.8% | $ 62,272 | 29.4% | $ (29,488) | 37.2% |
| Q2' 02 | $ 10,100 | $ 48,816 | 20.7% | $ 81,081 | 12.5% | $ 15,804 | 38.3% |
| Q3' 02 | $ 5,400 | $ 45,549 | 11.9% | $ 77,654 | 7.0% | $ (41,317) | 7.8% |

($ in thousands)

[a] - Calculated using 40% effective tax rate.

1 - 6

**b. NW improperly allocated losses to minority interests in Blue Dot.**

### Background

In its 2002 Form 10-K, NW disclosed that "substantially all of [its] acquisitions at Expanets and Blue Dot have involved the issuance of common and preferred stock in those subsidiaries to the sellers of acquired businesses… The common stock issued to third parties in connection with acquisitions creates minority interests… Operating losses at Expanets and Blue Dot have been allocated first to the common shareholders of each subsidiary in proportion to common equity ownership to the extent the allocation does not exceed the minority interest of such common shareholders in the equity capital of the subsidiary…". **[2002 Form 10-K p.46]** During 2002, Blue Dot made several acquisitions for which NW assigned a value of $0.40 to each share of Blue Dot's common stock consistent with the value assigned in prior periods. **[DT 011047]**

### Relevant GAAP

SFAS 141, *Business Combinations*, states that cost of the acquired entity should be generally measured based on the fair value of the consideration given. **(¶¶ 5, 20)** Therefore, common stock issued to consummate a business combination should be measured based on its fair value.

ARB 51, *Consolidated Financial Statements*, states that if losses applicable to minority interests in a subsidiary, based on the shares of common stock held[1], are in excess of the minority interests in the equity capital of the subsidiary, then such excess losses should be allocated to the majority interest. **(¶ 15)**

### NW's accounting for allocation of losses to minority interest

As noted above, NW's policy was to allocate losses attributable to minority common shareholders to minority interest to the extent that such losses did not exceed the minority interest basis. During the second quarter of 2002, Blue Dot issued common stock in connection with a number of acquisitions and assigned to it a total value of $8.1 million based on NW's previously-determined value of Blue Dot's common stock of $0.40 per share. **[DT 011047, 1Q'02 Form 10-Q/A Amendment No. 2, p. 5]** This had the effect of increasing the minority interest basis in Blue Dot. Based on the aforementioned valuation of Blue Dot's common stock, NW allocated $8.1 million of Blue Dot's second quarter losses to such minority interests. **[2Q'02 Form 10-Q/A Amendment No. 2, p. 5]** Accordingly, the second quarter allocation of Blue Dot's losses to minority interests again reduced the basis to zero, which would have precluded further allocation of Blue Dot's losses to minority interests.

---

[1] SFAS 128, *Earnings per Share* (which amended APB 18, *The Equity Method of Accounting for Investments in Common Stock*), specifies that "an investor's share of the earnings or losses of an investee shall be based on the shares of common stock held by an investor." **(¶162)**

<u>NW's violation of GAAP</u>

NW's Form 10-Q/A Amendment No. 2 for the quarter ended March 31, 2002 disclosed that "As of March 31, 2002,… no remaining minority interest basis existed upon which to allocate losses…Based on the capital structures of Expanets and Blue Dot at March 31, 2002, all losses at Expanets and Blue Dot will be allocated to [NW], unless additional minority interest is issued as a result of new acquisitions." **[1Q'02 Form 10-Q/A Amendment No. 2, p.7]** Thus, at the beginning of the second quarter of 2002, the basis in minority interests was zero. Accordingly, no losses of Blue Dot could be allocated to minority interests absent the recognition of additional basis through further issuances of Blue Dot common stock.

As demonstrated in the Attachment to this Basis for Opinion, I determined that the value attributable to Blue Dot's common stock is less than zero as of the January 1, 2002 valuation date, using AAA's valuation of $351 million as of January 1, 2002 (which, as discussed in Basis for Opinion 2.a., I concluded was overstated). Based on information provided to D&T by NW's management, D&T likewise concluded in its August 19, 2002 memorandum, *SFAS 142 – NorthWestern Corp. Market Capitalization Reconciliation*, that Blue Dot's common stock had no value as January 1, 2002. **[DT 007020-21]** This memo preceded NW's filing of its Form 10-Q/A Amendment No.1 for the second quarter of 2002 on September 20, 2002. My conclusion is further supported by D&T's working paper *Blue Dot Common Stock Valuation* dated February 21, 2003, which states that: "…the proper valuation of the Blue Dot Class C common stock issued in the second and third quarters of 2002 were zero." **[DT 011049]** Nonetheless, NW improperly assigned a value of $0.40 per share to Blue Dot's common stock issued in connection with its 2002 second quarter acquisitions.

NW ultimately recognized that the value attributable to minority common shareholders was, indeed, less than zero. Based on AAA's valuation of Blue Dot of $143 million as of October 1, 2002, NW determined that no value should have been allocated to Blue Dot's common stock issued in the second quarter and, therefore, no loss should have been allocated to minority interests due to the absence of available basis. **[DT 011048 - 9]**

NW acknowledged its improper accounting for minority interest by restating its consolidated financial statements for the second quarter of 2002. As disclosed in its Form 10-Q/A Amendment No.2 for the quarter ended June 30, 2002, NW restated its financial statements to account for Blue Dot acquisitions as if no value had been assigned to common stock issued in those acquisitions, and to reduce losses allocated to minority interests in the second quarter by $8.1 million. **[2Q'02 Form 10-Q/A Amendment No.2, p. 5]**

<u>Conclusion</u>

Based on the documents and deposition testimony that I have reviewed, I concluded that NW violated GAAP by improperly allocating $8.1 million of Blue Dot's net loss to Blue Dot's minority interests. As a result, NW overstated its operating income from

1 -9

...the percentage-of-completion method is preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made and in which all the following conditions exist:

• Contracts executed by the parties normally include provisions that clearly specify the enforceable rights regarding goods or services to be provided and received by the parties, the consideration to be exchanged, and the manner and terms of settlement.

• The buyer can be expected to satisfy his obligations under the contract.

• The contractor can be expected to perform his contractual obligations.

* * *

An entity using the percentage-of-completion method as its basic accounting policy should use the completed-contract method for a single contract or a group of contracts for which reasonably dependable estimates cannot be made or for which inherent hazards make estimates doubtful. Such a departure from the basic policy should be disclosed. [¶ .22 - .25]

Furthermore, "the use of the percentage-of-completion method of accounting [is discouraged] in circumstances in which inherent hazards make estimates doubtful. 'Inherent hazards' relate to contract conditions or external factors that raise questions about contract estimates and about the ability of either the contractor or the customer to perform his obligations under the contract." [SOP 81-1 ¶ .28]

<u>NW's GAAP Violation</u>

As discussed in Bases for Opinions 1.a. and 3.a., Expanets encountered numerous difficulties with the implementation of its EXPERT system. As disclosed in NW's Forms 10-Q/A Amendment No.2 for each of the first three quarters of 2002, the "completed contract method of accounting... was used prior to 2002 for projects accounted for in the EXPERT system, rather than the percentage of completion method that was initially used in 2002.1 Expanets determined during [its] year end closing process that [it] was unable to provide adequate information to support recording project revenues on a percentage-of-completion basis." [3Q'02 Form 10Q/A Amendment No.2]

Given the operating deficiencies of the EXPERT system from its initial implementation and the fact that Expanets had previously accounted for the aforementioned contracts on a completed contract basis, it was, in my view, improper for Expanets and, therefore, NW to begin using the percentage-of-completion method in 2002 for contracts that had previously been accounted for under the completed contract method. In its restatement of its financial statements for the first three quarters of 2002, NW acknowledged its GAAP

---

[1] Although no reason is given for NW's using the completed contract method, presumably those contracts did not meet the criteria for recognition under the percentage-of-completion method. Neither is any reason given for NW's changing to the percentage-of-completion method in 2002.

violation regarding its failure to properly account for long-term contracts. As a result, NW restated revenue and cost of sales as set forth below. Those restatement adjustments were necessary to prevent NW's consolidated financial statements from being false and misleading.

($ in thousands)

| | Contract Accounting | Operating Income | | EBITDA | | Net Income | |
|---|---|---|---|---|---|---|---|
| | | Amt. | % | Amt. | % | Amt. | % [a] |
| Revenues | 4,300 | | | | | | |
| Cost of Sales | 1,800 | | | | | | |
| Q1' 02 | $    2,500 | $  34,648 | 7.2% | $  62,272 | 4.0% | $ (29,488) | 5.1% |
| Revenues | 8,800 | | | | | | |
| Cost of Sales | 4,800 | | | | | | |
| Q2' 02 | $    4,000 | $  48,816 | 8.2% | $  81,081 | 4.9% | $  15,804 | 15.2% |
| Revenues | 1,600 | | | | | | |
| Cost of Sales | 500 | | | | | | |
| Q3' 02 | $    1,100 | $  45,549 | 2.4% | $  77,654 | 1.4% | $ (41,317) | 1.6% |

[a] Calculated using 40% effective tax rate.

NW's Accounting

In his June 24, 2002 memo, D&T's Kerri Kotsmith noted that as a result of "the decrease in operating performance at NorthWestern's Cornerstone, Blue Dot and Expanets subsidiaries…the company performed a review [in conformity with SFAS 121] for each of these entities at December 31, 2001 to support recorded goodwill values." **[DT 000748]** Mr. Kotsmith further noted that in "order to prepare for NorthWestern's adoption of SFAS No. 142 … management… prepared a discounted cash flow analysis as required under SFAS No. 142." **[DT 000765-72, DT 000776-83]** This analysis (the valuation model) "was reviewed by the prior auditor experts [Arthur Andersen] to assist in improving the model for SFAS No.142 adoption purposes." **[DT 000748]**

Although management's projections of discounted cash flows were optimistic in light of past operating performance of both Expanets and Blue Dot and the discount rates appeared unusually low in light of the associated risks,[3] Mr. Kotsmith nonetheless concurred with NW's conclusion that "the assets held by NorthWestern for Blue Dot [and] Expanets … were not impaired at 12/31/2001." **[DT 000749]** Mr. Kotsmith further noted that NW "hired American Appraisal to perform a fair value analysis of both Expanets and Blue Dot in connection with its implementation of SFAS 142. … As a result of the analysis, no impairment charge was deemed necessary." **[DT 000749]**

Although AAA's valuation report as of January 1, 2002 was dated September 3, 2002, drafts of the reports were reviewed by D&T as of August 2, 2002.[4] Thus, it is clear that the valuations had been, for all intents and purposes, completed by the filing of NW's Form 10-Q on August 14, 2002. AAA determined that the business enterprise value as of January 1, 2002 for Expanets and Blue Dot was $790 million and $351 million, respectively. **[NOR305042, NOR365610]** As a result, NW concluded that no impairment loss needed to be recognized as of either the January 1, 2002 adoption date or as of the quarter ended June 30, 2002. The carrying values of Expanets and Blue Dot were $556 and $320 million, respectively, as of January 1, 2002 and $628 and $340 million, respectively, as of June 30, 2002. (See Attachment A-2 to this Basis for Opinion.)

AAA was also engaged to perform the required annual valuations of Expanets and Blue Dot as of October 1, 2002 in order to have the valuations completed by the time of filing of NW's 2002 Form 10-K. AAA's business enterprise values for Expanets and Blue Dot as of October 1, 2002 declined dramatically to $305 million (from $790 million) and $143 million (from $351 million), respectively. **[NOR364581, NOR364690]**

---

[3] For example, the discount rate used by management to determine the present value of Expanets' projected cash flows was 10.7%. **[DT 000765]** However, KPMG, who was engaged to perform a valuation to determine the fair market value of Northwestern Growth Corporation's ("NGC") ownership interests in Expanets as of 1/1/00, used a discount rate of 14%. **[NOR195038-58]** AAA also used a discount rate of 14% in its valuation as of January 1, 2002. **[NOR305018-78]** The risks associated with substantially higher cash flow projections would indicate a higher discount rate, not the substantially lower discount rate used by NW's management in its analysis. Also, in a 7/25/02 meeting among representatives of D&T, NW and AAA, D&T raised concerns about the  WACC  (weighted average cost of capital) used by AAA as the discount rate. **[AAA03784]**
[4] AAA responded to D&T's comments via Fax on August 7, 2002. **[NOR369206-9]**

Using AAA's valuations as of October 1, 2002, Kendall Kliewer, NW Chief Accountant, prepared "an impairment analysis of all identifiable intangible assets, goodwill, and the Expert system [as required by SFAS 142 and 144] as of October 1, 2002." **[DT 003506-13]** Based on his analysis, the "total impairment charge recorded [by NW] on [Expanets'] assets was $250.2 million[5] [as of December 31, 2002]." **[DT 003509]** In a separate analysis, NW determined that an impairment charge aggregating $270 million was also necessary for Blue Dot. (See Attachment A-1)

<u>NW violated GAAP by failing to recognize a goodwill impairment loss attributable to Expanets prior to December 31, 2002</u>

<u>The precipitous decline in the business enterprise value of Expanets</u>

As discussed above, only eight months after reporting a business enterprise value of $790 million for Expanets as of January 1, 2002,[6] **[NOR305042, Attachments A-9 and A-10]** AAA's May 1, 2003 valuation report reflected a decline in Expanets' business enterprise value of more than 60% to $305 million as of October 1, 2002. **[NOR364581, Attachment A-11 and 12]** AAA's May 1, 2003 valuation report as of October 1, 2002 did not refer to its previously-issued valuation as of January 1, 2002 nor did it explain the reasons for the precipitous decline in Expanets' fair value. However, it noted, among other things, that:

- During 2002, Expanets was negatively impacted by an overall market softness in the technology and communications segment of the industry;

- Expanets' revenue declined from $1.1 billion in 2000 to $0.8 billion in the latest 12 months ended October 1, 2002, due to depressed capital spending;

- Delays in implementation of the Expert System and less than full functionality…following its initial use in November 2001 caused further negative effects on Expanets' 2001 and 2002 performance; and

- Expanets was negatively impacted by the revisions made in May 2001 to the original agreements executed in association with its March 2000 acquisition of Lucent's Growing and Emerging Markets ("GEM") business, which eliminated minimum sales referral obligations of Avaya. **[NOR364568-69]**

NW's management attributed the decline in earnings (and EBITDA)[7] to the "increase in reserves for accounts receivable and billing adjustments at…Expanets and lower than

---

[5] This was apparently a preliminary estimate. As disclosed in NW's 2002 Form 10-K, an impairment loss of $289 million was recognized. **[2002 Form 10-K, p.6]**

[6] In its valuation, AAA used a 50-50 weighting of the market approach and income approach. **[NOR305042]**

[7] A significant change in earnings will have a dramatic effect on the business enterprise value under the Income Approach.

expected operating performance at Expanets and Blue Dot." **[Form 8-K dated December 13, 2002]** Furthermore, NW's management asserted that the impacts of the EXPERT system problems and the failure of Expanets and Blue Dot to meet operating performance targets was not known until the fourth quarter of 2002 when the October 1, 2002 impairment analysis was being performed. For example, an undated memorandum from "Expanets management" to AAA states that, as of October 1, 2002, "Expanets current five-year forecast has decreased very significantly as compared to the five-year forecast provided on January 1, 2002." **[NOR238766]** Among the reasons given in the memo for the decline are the following:

- There has been a significant market downturn in Expanets industry….Various industry reports…project little to no growth in the market segments for traditional enterprise voice communications products.

- While Expanets began using the Expert system in 2001, there have been considerable problems with the implementation and functionality of this system. … [Furthermore,] Expanets does not have access to many of the customer contracts purchased from Avaya, [which] has not delivered these contracts….In addition to adversely impacting cash flows, this has created strained customer relations and loss of customers. [Although the] billing issues peaked in October 2002…it became apparent there were substantial receivable balances that will not be collectible and, in December 2002, Expanets increased its bad debt reserve and billing adjustment reserve by more than $50 million.

- [The failure to resolve disputes with Avaya] would likely have a material adverse effect on Expanets financial results. [In addition, the] strained relationship with Avaya also impacts management's forecast of Maintenance-Left-Behind (MLB) income. Avaya [had been paying] Expanets approximately $2.2 million per month not to solicit certain Avaya customers under the MLB non-compete agreement. **[NOR238766-68]**

The memo concludes that the "factors noted above create considerable uncertainty around Expanets ability to increase market share and generate significant revenue growth. … Given the above factors, Expanets believes the decline in the current five-year forecast, as compared to the January 1, 2002 forecast, is conservative and appropriate." **[NOR238768-9]** Based on the documents and testimony I have read, I concur that the aforementioned events adversely impacted Expanets' earnings. Contrary to NW's and AAA's assertions, however, I believe that such adverse information was known prior to the issuance of AAA's valuation as of January 1, 2002.

Management's knowledge of Expanets' deteriorating operating performance

Despite NW's management's assertions concerning Expanets' supposed improving operating performance, the documents and deposition transcripts that I have read provide compelling evidence that NW management was fully aware of the continuing financial difficulties of Expanets well before it publicly announced lower earnings expectations in

late 2002. Indeed, management knew that Expanets would be unable to meet its 2002 financial performance forecasts before the issuance of AAA's January 1, 2002 valuation report.

First of all, NW management was certainly aware of Expanets' deteriorating operating performance since its acquisition of GEM from Avaya in 2000 as indicated in the table below:

| | ($ in thousands) | | | |
|---|---|---|---|---|
| | 2002[8] | 6 Months - 2002[9] | 2001[8] | 2000[8] |
| Revenues | 710 | 412 | 1032 | 1104 |
| Operating Income | (103) [10] | 5 | (103) | (25) |
| EBITDA | (48) [10] | 30 | (53) | 13 |
| Net Loss | (157) [10] | (7) | (87) | (20) |

Although NW management reported that Expanets had operating income of $5 million for the six months ended June 30, 2002, the numbers were achieved only through management's misstatement of Expanets' (and, correspondingly, NW's) financial statements resulting from the myriad of GAAP violations discussed elsewhere in this report. However, Expanets actually incurred an operating *loss* of $47 million[11] for the six months ended June 30, 2002 when adjusted to reflect the correction of the GAAP violations discussed in this report.

Furthermore, the Monthly Financial Information Reports ("MFIRs") clearly showed that Expanets was barely meeting its forecasted monthly earnings despite the inclusion of the aforementioned GAAP violations. (See Attachment A-6 to this Basis for Opinion.) Even more importantly, and contrary to what management was disclosing publicly, the MFIRs indicated steadily declining forecasted earnings for the full year 2002. For example, the January 2002 MFIR forecasted revenue and EBITDA of $920 million and $87 million, respectively, which was communicated to the investing public as NW's "2002 guidance" for Expanets. However, the July 2002 MFIR (which preceded the issuance of AAA's September 3, 2002 valuation report) presented forecasted revenue and EBITDA of $816 million and $80 million – a decline of 20% and 9%, respectively, in six months.

In addition, the following sample of documents provide further compelling evidence of NW management's skepticism and concerns regarding Expanets' operating performance

---

[8] See Attachment A-4 to this Basis for Opinion.
[9] See Attachment A-5 to this Basis for Opinion.
[10] Excluding impairment losses.
[11] Reported operating income of $8 million less restatement and other adjustments aggregating $55 million. (See Attachment A-3 to this Basis for Opinion.)

and its knowledge of Expanets deteriorating financial condition beginning as early as the first quarter of 2002:

- In his 4/7/02 email to Mr. Hylland relating to the "Draft 1stQ Forecast Release," Kipp Orme (NW CFO) states that "I am skeptical of anything Expanets represents and I therefore wanted to provide some flexibility on our side to cover their likely misrepresentations..." **[NOR405696 – Kliewer Ex. 9]** While this statement reflects an unequivocal repudiation of Expanets financial forecasts, it also reflects NW management's willingness to utilize Expanets inflated forecasts in reporting projected consolidated earnings.

- In his 4/9/02 email to Messrs. Lewis (NW CEO), Hylland (NW COO) and Charters (Expanets' new CEO), James Walker (Expanets' former CEO)[12] refers to "negative views expressed about Expanets prospects for 2002 and beyond, (views shared by Gary Drook [who succeeded Lewis as NW's CEO] which he summarized from board and management interviews)." Mr. Walker's email also refers to Mr. Drook's comment that "Expanets is a time bomb getting ready to explode" and that "no one has ever made any money in this market." **[NOR406200 – Kliewer Ex. 10]** Thus, even senior members of NW doubted Expanets' ability to achieve its financial objectives.

- Kipp Orme's 5/28/02 memorandum, *Financing Plans & Considerations*, cites, among other things, the public's and the rating agencies' concerns regarding the "Massive turnarounds required at Expanets and Blue Dot (with related questions regarding potential goodwill impairment)." Thus, it is clear that management was aware of the market's skepticism, if not ambivalence, about the prospects for Expanets and Blue Dot future operating performance. As a further indication of Expanets deteriorating financial condition, Mr. Orme's memo noted that "Expanets... was a much larger cash use in [2001]." **[NOR056238-45, Hylland Ex. 14]** Thus, management was aware that Expanets was consuming larger amounts of cash than anticipated.

- Mr. Charters' 5/30/02 email to Messrs. Fresia (Expanets' CFO), Younger and Walker reflects Expanets' internal concerns about its ability to achieve its EBITDA forecasts: "If Revenues aren't ramping to the $919M [million] level by the end of the year, why are you so certain that the EBITDA target is going to be reached?" **[NOR405401]**

- In his 5/31/02 email response to Mr. Charters aforementioned memo, Mr. Fresia states that "We knew (and communicated) going in, that May would be a tough month using not so pretty tactics." **[NOR405404]** Thus, Mr. Fresia provides insight as to how Expanets was achieving its operating target, that is, through the use of GAAP violations.

---

[12] Mr. Walker remained on with Expanets for a short period after Mr. Charters joined NW.

- In his 6/8/02 email to Mr. Charters, Mr. Hylland expresses the following concerns about Expanets results:

  > ...the numbers continue to lag substantially from plan. This has now got the urgency of DEFCON 1 in this area. We simply need to get a full audit/assessment of the magnitude of issues here given the potential effect on revenues, A/R collectibility...our posture as "NO SURPRISES" given the current market dictates overkill in this area. The SHORTS, as well as our analysts, will be all over your Expanets receivable number at June 30 and September 30 (like stink on...) not to mention the cash picture requirements." **[NOR405409]**

- In his 6/10/02 email to NW's Board of Directors, Mr. Lewis indicates that investors had expressed "...a great deal of skepticism [last year regarding] the telecom sector and this year to the energy sector, energy being accentuated by sector concerns...accounting complexities (which are now assumed to be synonymous with wrong)...we had a lousy year for operating results from 3 of our entities in 2001 [Expanets, Blue Dot and Cornerstone]...." **[NOR405410]**

- In its 4/5/06 letter to the SEC NW's outside counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), noted that "...the non-utility growth strategy [orchestrated by NW management] eventually turned out to be an unsuccessful plan. The stock market collapsed in mid-2000, with telecom stocks especially hard hit..." **[NOR519602 – Hanson Ex. 35]** Thus, management knew that telecom was "in the tank" long before the end of 2002 as asserted by NW management.

- In his 8/18/06 letter to SEC, Paul Hastings disclosed that "Expanets and Blue Dot had significant financial issues known only to a few people [NW senior executives Messrs. Hylland and Orme] in early to mid-2002." **[NOR519590 -- Hanson Ex. 35]** Thus, even NW's outside legal counsel acknowledged NW management's knowledge of the problems with Expanets early in 2002 rather than the end of the year as asserted by NW in its restatement of its 2002 quarterly operating results.

Despite its knowledge of Expanets' deteriorating financial condition, NW's management was nonetheless fixated on the "necessity" for Expanets to achieve its forecasted EBITDA. The following is a sample of documents evidencing management's emphasis on Expanets' operating performance and its potential impact on NW's consolidated earnings:

- Mr. Orme's 3/14/02 email to Messrs. Chris Younger (Expanets' COO) and Greg Sargen (Expanets' CFO) regarding Expanets forecast emphasizes that "...it is imperative that we demonstrate a strong quarter at Expanets and that it is consistent and supportive of the full year 02' Expanets plan that we have previously shared with the street. As you know, the most significant push back we currently receive from the street surrounds Expanets..." **[NOR405678]**

- In his 3/14/02 email response to Mr. Orme, Mr. Younger suggests that NW is more concerned about achieving financial targets than compliance with GAAP when he "tongue-in-check" refers to "GAOP (Generally Accepted Orme Principles)..." **[NOR405680]**

- In his 3/19/02 email to Michael Hanson (then CEO of NWE), Mr. Newell (Blue Dot's CEO) and Mr. Walker of Expanets re: "Partner Entity Q1 Forecasts," Mr. Hylland re-emphasizes NW's desire to meet "street guidance" when he requests "an 'almost ironclad' projection of Q1 financial performance ASAP...." **[NOR405682]**

Thus, the foregoing examples provide compelling evidence that management was aware of the continuing deterioration in Expanets' operating performance.

Management's concerns regarding the potential impact of Expanets' declining financial results on its business enterprise value

Despite public assertions to the contrary, NW management internally expressed concerns regarding both the operating performance of Expanets and the potential impact on its SFAS 142 impairment assessment to AAA prior to AAA's valuations of Expanets as of January 1, 2002. In an email exchange between October 24 and 26, 2001, Mark Atkinson (AAA's Vice President and Principal) and Carlo Carpino (an AAA analyst) acknowledged that NW "was asking [AAA to perform] Step 1 and Step 2 [SFAS 142 assessment] because they [NW management] believe impairment exists in all three segments [Cornerstone and Blue Dot as well as Expanets]" Furthermore, AAA noted that NW had "done preliminary work which points to impairment at all three units...." **[From documents produced by AAA that were not Bates stamped.]**

Thus, NW management had openly expressed its concerns that a potential impairment loss existed at Expanets even prior to AAA's valuation of Expanets upon adoption of SFAS 142 as of January 1, 2002.

D&T's concerns with AAA's valuation of Expanets upon implementation of SFAS 142

In his August 2, 2002 *SAS 73*[13]*Appraisal Review* Memorandum regarding his review of AAA's preliminary draft of its valuation report, D&T Partner Daniel Lynn (Chicago Valuation Services) expresses the following concerns regarding the financial information provided to AAA by NW's management:

1. The indication of value derived from the Income Approach may be optimistic in light of the following factors:

   a. Indications of value derived from this approach are dependent on judgmental assumptions regarding future Expanets performance that anticipate significant revenue growth and substantial improvements in profitability.

---

[13] Statement on Auditing Standards No. 73, *Using the Work of a Specialist.*

b. The discount rate selected by AAA may not adequately consider company-specific risks associated with achieving projected improvements in profitability. The discount rate is dependent on subjective adjustments for company-specific risk factors made by AAA.

2. The indications of value derived from the Market Approach are dependent upon judgmental comparisons to the guideline companies. Interpretations of the data which ascribe relatively more weight to recent Expanets financial performance could result in significantly lower indications of value.
**[NOR369204]**

AAA subsequently provided innocuous responses to D&T's concerns. **[NOR369209]** However, no changes were made to management's projections or AAA's valuation as a result of D&T's comments.

<u>The inconsistency of Expanets' cash flow projections provided to AAA with internal information known to NW's management</u>

To say that NW management's projections for Expanets were "optimistic" is indeed an understatement. Despite reflecting a slight decline in total revenue from 2001 actual of $1.032 million to a forecast of $960 million for 2002, NW projected EBITDA to be $87 million in 2002 versus an actual **negative** EBITDA of $56 million in 2001 - a projected $143 million turnaround in one year despite the lower forecasted revenue. **[NOR305071]** Furthermore, 2003 EBITDA was projected to increase nearly 50% to $128 million. In my view, these projections are incomprehensible given Expanets' past operating performance and the state of the telecommunications industry and despite management's optimistic projections of the impact of its arrangement with Avaya.

NW management asserted that the decline in revenues would be more than offset by increasing profit margins and significant cost reductions despite Expanets historical operating performance. **[2Q'02 Form 10-Q, p. 17; NOR379779-80]** However, as indicated in the actual results for the six months ended June 30, 2002 (as well as the full year 2002), it is clear that these "cost offsets" not only did not materialize, but costs actually increased as a result of the problems with the EXPERT system discussed elsewhere in this report.

Furthermore, the projected 2002 and 2003 EBITDA figures, on which subsequent years' projections were based, significantly exceeded the EBITDA projections prepared by NW management in connection with its SFAS 121 impairment analysis as of December 31, 2001. A *Discounted Cash Flow* schedule prepared by NW reflects forecasted Expanets EBITDA of $30.8 million for 2002 (versus projected EBITDA of $87 million used in AAA's valuation report as of January 1, 2002) and $58.9 million for 2003 (versus the projected EBITDA of $128 million used in AAA's 1/1/02 valuation report). **[DT000765, NOR305071]**

Management's forecasts of Expanets revenues are even more implausible in light of the actual results for the first six months of 2002. Expanets revenue for the six months ended

2 - 11

June 30, 2002 was $412 - 7% short of plan. Although "actual" EBITDA was above plan, the actual results included various GAAP violations, including material understatements of expenses, discussed in this report.[14] These actual results confirm D&T's concerns regarding the overly optimistic projections and reflect the downturn in the telecommunications industry as acknowledged by Mr. Lewis in his aforementioned 6/10/02 memo to NW's Board.

Based on the documents and deposition transcripts that I have read, I have concluded that NW management knowingly provided to AAA Expanets cash flow projections that were inconsistent with (a) the plethora of "bad news" described in the documents and deposition testimony cited throughout this report and (b) the "actual" operating results for the first half of 2002 which, as noted above, were artificially inflated by the GAAP violations documented in this report.

<u>My independent calculation of Expanets' goodwill impairment loss as of June 30, 2002 to correct for NW's aggressive projections provided to AAA</u>

As noted previously, NW's aggressive projections for Expanets (which AAA acknowledges that it "accepted without further verification") directly resulted in a business enterprise value that was substantially overstated. **[NOR305025]** Therefore, I recalculated Expanets' business enterprise value based on more realistic assumptions of its projected operating performance and cash flows. Employing these more realistic assumptions, my estimate of Expanets business enterprise value as of January 1, 2002 is $165 million. (See Attachments A-7 and 8 to this Basis for Opinion.)

Because my computation of Expanets' business enterprise value was lower than its carrying value as of June 30, 2002, I have concluded that a potential impairment loss in conformity with step 1 of SFAS 142 existed as of that date. I have further concluded that AAA's valuation would also have caused NW to identify a potential impairment loss had NW provided more realistic cash flow projections to AAA. Therefore, it would have been necessary for NW to perform the step 2 analysis required by SFAS 142[15] to measure the amount of goodwill impairment loss to be recorded. Based on AAA's valuation, however, NW concluded that no impairment loss existed because AAA's business enterprise value of Expanets ($790 million) exceeded its carrying value ($556 million). Therefore, it did not perform the step 2 analysis. **[NOR305071]**

Yet, only several months later, NW management determined that the carrying value of Expanets assets exceeded its business enterprise value by more than the carrying value of its goodwill, based on AAA's valuation as of 10/1/02 ($305 million). **[NOR364581]** Consequently, NW concluded that no implied goodwill existed as of December 31, 2002

---

[14] See Attachment A-3 to this Basis for Opinion detailing adjustments to Expanets reported operating income which has the same effect on EBITDA.

[15] As stated above, SFAS 142 requires the valuation of the reporting unit's assets and liabilities similar to the allocation performed in a business combination. The net value of the reporting unit's assets and liabilities is compared to its business enterprise value to determine the implied value of goodwill. If the carrying value of such goodwill exceeds the implied value, an impairment loss is recognized in the amount of such excess.

and, accordingly, recognized a goodwill impairment loss equal to the full $120 million carrying value of Expanets' goodwill as of December 31, 2002.[16] **[DT 003502]**

As presented in Attachment A-2 to this Basis for Opinion, I calculated Expanets carrying value as of June 30, 2002 to be $628 million. This amount exceeded my aforementioned calculation of its business enterprise value ($163 million) by $465 million. Because my calculated carrying value of Expanets exceeded my calculation of its business enterprise value by more than the carrying value of Expanets' goodwill as of that date, I concluded –as did NW as of December 31, 2002 - that there was likewise no implied goodwill at Expanets as of June 30, 2002. Consequently, applying the very same methodology that NW applied at December 31, 2002, I concluded that a $120 million goodwill impairment loss should have been recognized as of June 30, 2002 to write-off the full carrying value of Expanets' goodwill as of that date.

<u>NW violated GAAP by failing to record an impairment loss attributable to Blue Dot prior to December 31, 2002</u>

<u>The precipitous decline in the business enterprise value of Blue Dot</u>

AAA's September 3, 2002 valuation report reflected a business enterprise value of $351 million for Blue Dot as of January 1, 2002. **[NOR365587, Attachments A-18 and 19 to this Basis for Opinion]** Yet, only eight months later, AAA's May 1, 2003 valuation report reflected that Blue Dot's business enterprise value had declined by more than 59% to $143 million as of October 1, 2002. **[NOR364666, Attachments A-20 and 21 to this Basis for Opinion]** Although AAA did not refer to its previously-issued valuation as of January 1, 2002 nor explain the reasons for the precipitous decline in value, its October 1, 2002 report did note, among other things, that:

- Blue Dot performed below year expectations during the latest 12 months [9/01 to 9/02] and for fiscal 2001 posting operating EBIT of negative $9.6 million and negative $11.6 million, respectively.

- Blue Dot's decline in operating income within three underperforming locations, margin shortfalls, and an overall increase in operating expenses resulted in an operating loss of $11.6 million, before a $7.2 million restructuring charge.

- Blue Dot experienced substantial growth by making 90 acquisitions from 1998 to 2001. As of the 10/01/02 valuation date, management indicated that Blue Dot will not be acquisitive going forward. Blue Dot, as well as the HVAC industry as a whole, was negatively impacted by a heavy dependence on housing starts and new construction, low demand in mild weather, labor shortages, new industry entrants (such as utilities, home improvement stores and large retailers) and competition from small owner-operated companies. **[NOR364671-76]**

---

[16] NW also recognized impairment losses on other intangible assets as of 12/31/2002.

Based on the documents and testimony I have read, I concur that the aforementioned matters adversely impacted Blue Dot's earnings. Contrary to NW's and AAA's assertions, however, I believe that such adverse information was known prior to the issuance of AAA's valuation as of January 1, 2002 as discussed below.

<u>Management's knowledge of Blue Dot's deteriorating operating performance</u>

As with Expanets, the documents and deposition transcripts that I have read provide compelling evidence that NW's management was fully aware of the continuing financial difficulties of Blue Dot well before it publicly announced lower earnings expectations in late 2002. Indeed, management knew that Blue Dot would be unable to meet its 2002 financial performance forecasts before the issuance of AAA's January 1, 2002 valuation report.

For example, NW's internal MFIRs indicated that Blue Dot's quarterly revenues were below plan by $12 million and $15 million in the first and second quarters of 2002, respectively, representing a negative variance of 11% for each quarter. EBITDA was also below plan by $5 million and $7 million in the first and second quarters of 2002, respectively. (See Attachment A-13 to this Basis for Opinion.) Indeed, the MFIRs indicated a steady month-to-month downward revision of Blue Dot's full year forecasted earnings. For example, the January MFIR forecasted revenue and EBITDA of $508 million and $32 million, respectively (which was communicated to the investing public as NW's "2002 guidance" for Blue Dot). **[NOR362060]** However, the June 2002 MFIR, which preceded the issuance of AAA's valuation report, forecasted revenue and EBITDA of $476 million and $19 million – a decline of 6% and 41%, respectively.

Management's earnings forecasts were even more implausible in light of the Blue Dot's actual operating results for the first six months of 2002. Blue Dot's revenue and EBITDA for the six months ended June 30, 2002 were $212 million and $0, respectively. (See Attachment A-14 to this Basis for Opinion.) These actual results represent a variance from forecast of $27 million and $12 million or 11% and 100%, respectively, and are reflected in Mr. Lewis' concerns expressed to NW's Board of Directors in June 2002 that Blue Dot continue[d] to struggle to hit its numbers." **[NOR405410]** This further confirms D&T's concerns regarding the overly optimistic projections provided by NW's management to AAA for purposes of computing its business enterprise value.

Thus, based on the documents and deposition testimony that I have read, NW's management knowingly overstated its cash flow projections despite Blue Dot's declining operating performance as evidenced in its variance from forecast for the first half of 2002.

<u>Management's concerns regarding the potential impact of Blue Dot's declining financial results on its business enterprise value</u>

Despite public assertions to the contrary, NW management internally expressed concerns regarding the operating performance of Blue Dot and the potential impact on its SFAS 142 impairment assessment to AAA prior to AAA's valuation as of January 1, 2002.  In an email exchange between October 24 and 26, 2001, AAA's Messrs. Atkinson and Carpino acknowledged that NW was asking AAA to perform "Step 1 and Step 2 [of SFAS 142 assessment] because they [NW management] believe impairment exists in all three segments [Cornerstone, Expanets and Blue Dot]." Furthermore, AAA noted that NW had "done preliminary work which points to impairment at all three units...." **[From documents produced by AAA that were not Bates stamped.]** Thus, NW's management had openly expressed its concerns that a potential impairment loss existed at Blue Dots even prior to AAA's valuation of Blue Dot upon adoption of SFAS 142 as of January 1, 2002.

<u>D&T's concerns with AAA's valuation of Blue Dot upon implementation of SFAS 142</u>

As noted previously, NW's artificial inflation of Blue Dot's projections (which AAA "accepted without further verification") directly resulted in a business enterprise value that was substantially overstated.  **[NOR365586]** Indeed, D&T had numerous concerns regarding AAA's valuation of Blue Dot.  Among the more serious concerns raised by D&T are the following:

1.  It is difficult to reconcile the conclusion of value derived from Income Approach to the indication developed using the Market Approach.  If the Market Approach were weighted in the overall conclusion, the indicated value of Blue Dot would be significantly lower.

2.  Assigning no weight to the Market Approach in developing an overall conclusion of value appears to be inconsistent with giving considerable weight to guideline company data in supporting important assumptions in the Income Approach including both key discount rate calculations (e.g., debt mix, beta, etc.) and working capital assumptions.

3.  The indication of value derived from the Income Approach appears to be optimistic in light of the following factors:

    a.  Indications of value derived from this approach are dependent on judgmental assumptions regarding future Blue Dot performance that assume significant revenue growth and substantial improvements in profitability.

    b.  The discount rate selected by AAA may not adequately consider company-specific risks associated with achieving projected improvements in profitability.  The discount rate is dependent on subjective adjustments for company-specific risk factors made by AAA.

   c. The implied value of $315.4 million implies a multiple of 2001 revenue of 0.74. This exceeds the median revenue multiple for the 5 guideline companies used in the Market Approach (0.4 times) by 85 percent. This appears unreasonable since Blue Dot is significantly less profitable than all of the guideline companies considered.

4. The indication of value derived from the Market Approach, although not used, may be optimistic in that it does not directly account for differences in profitability between Blue Dot and the guideline companies since no weight is given to indications of value derived from earnings multiples.
**[NOR369199]**

Furthermore, a meeting among Dale Norton and Kurt Whitesel (NW Corporate Controller), AAA's Carlino, and D&T's Polacek and Lynn was held on 7/25/02 to discuss AAA's preliminary valuations of Expanets and Blue Dot. Mr. Carlino's handwritten notes from the meeting regarding AAA's Blue Dot valuation indicated that (a) no weighting of the market approach in the valuation was a "big issue" and (b) D&T "was uncomfortable [with] the valuation." **[AAA03785]**

Finally, hand written notes from a call[17] among Dan Newell ( Blue Dot's CEO), Rob Kennedy (Blue Dot's CFO), and NW's Whitesel to discuss Blue Dot's "business Strategy and what has changed" indicated, among other things, the following:

- They've had six months of learning since last report [however, this "learning" was not adequately incorporated into the valuation projections]

- Learned from "horrific misses" from prior budgets and revised budgets [although actual 2002 results vis-à-vis plan would indicate otherwise]

- Conclusion: this business isn't capable of performing at the level they thought it was

- Didn't make [the] progress they thought they'd need
**[AAA15769]**

This document is undated but it appears that this call occurred some time after December 2002. However, it is clear from the above and the other documents and deposition testimony I have read that NW management was well aware of D&T's concerns regarding the potential impact of Blue Dot's declining financial results on its business enterprise value before AAA's valuation report as of January 1, 2002.

---

[17] (No date or author was indicated). Although other participants in this call are not identified, presumably AAA was involved as this document was contained in the AAA's documents.

<u>The inconsistency of Blue Dot's cash flow projections provided to AAA with internal information known to NW's management</u>

Management's forecasts of Blue Dot's revenues and EBITDA were, in my view, very optimistic in light of the actual results for the first six months of 2002. Blue Dot's actual revenue and EBITDA for the six months ended June 30, 2002 were $212 and $0 million, respectively. (See Attachment A-14 to this Basis for Opinion.) These actual results represent a negative variance from forecast of $27 million and $12 million or 11% and 100%, respectively. These results confirm the appropriateness of D&T's concerns regarding the overly optimistic projections and further reflect, as indicated by AAA, the risks and uncertainties associated with the highly fragmented, people intensive HVAC Industry. **[NOR364677]**

As a result of (a) D&T's substantive concerns, (b) Blue Dot's poor historical operating performance, (c) actual results failing to meet forecasts for the six months ended June 30, 2002, and (d) management's internal assessment that Blue Dot would likely not achieve the 2002 "guidance" it had communicated to the public, I have concluded that NW management knowingly provided cash flow projections for Blue Dot to AAA that were inconsistent with (a) the plethora of "bad news" described in the documents and deposition testimony cited throughout this report and (b) Blue Dot's actual operating results for the first half of 2002.

<u>My independent calculation of Blue Dot's goodwill impairment loss as of June 30, 2002 to correct for NW's aggressive projections provided to AAA</u>

As noted previously, NW's aggressive projections for Blue Dot (which AAA acknowledges that it "accepted without further verification") directly resulted in a business enterprise value that was substantially overstated. **[NOR365617]** Therefore, I recalculated Blue Dot's business enterprise value based on more realistic assumptions of its projected operating performance and cash flows. Employing those more realistic assumptions, my estimate of Blue Dot's business enterprise value as of June 30, 2002 is $37 million. (See Attachments A-16 and 17 to this Basis for Opinion.)

Because my computation of Blue Dot's business enterprise value was lower than its carrying value as of June 30, 2002, I concluded that a potential impairment loss in conformity with step 1 of SFAS 142 existed as of that date. I have further concluded that AAA's valuation would also have caused NW to identify a potential impairment loss had NW provided more realistic cash flow projections to AAA. Therefore, it would have been necessary to perform the step 2 analysis required by SFAS 142[18] to measure the amount of goodwill impairment loss to be recorded. Based on AAA's valuation, however, NW concluded that no impairment loss existed as of June 30, 2002 because AAA's business enterprise value of Blue Dot ($351 million) exceeded its carrying value

---

[18] As stated above, SFAS 142 requires the valuation of the reporting unit's assets and liabilities similar to the allocation performed in a business combination. The net value of the reporting unit's assets and liabilities is compared to its business enterprise value to determine the implied value of goodwill. If the carrying value of such goodwill exceeds the implied value, an impairment loss is recognized in the amount of such excess.

of $311 million.  Therefore, it did not perform the step 2 analysis.  **[NOR365616, Attachment A-16 to this Basis for Opinion]**

Yet, only several months later, NW identified a potential impairment loss based on AAA's valuation as of 10/1/02 ($143 million) and Blue Dot's carrying value of $342 million as of that date.  **[NOR364666, NOR376038, Attachments A-20 and 21 to this Basis for Opinion]**  As a result, a "step 2 analysis was performed under SFAS 142 to provide an allocation based on the fair value of Blue Dot's assets.  During step 2, [AAA] provided [an] allocation of the concluded value of Blue Dot."[19]  Based on AAA's valuation, NW determined that the implied value of goodwill of Blue Dot was de minimus.  **[NOR376038]**  As a result, NW recognized an impairment loss for the full $270 million carrying value of Blue Dot's goodwill as of December 31, 2002.

As presented in Attachment A-2 to this Basis for Opinion, I calculated Blue Dot's carrying value to be $340 million as of June 30, 2002.  This amount exceeded my aforementioned calculation of its business enterprise value ($37million) by approximately $303 million.  Thus, I identified a potential impairment loss under step 1 of SFAS 142.

The documents and deposition testimony I have read clearly indicate that Blue Dot's performance had not only been declining throughout 2002  but that minimal changes had occurred in either Blue Dot's internal operating performance or its external operating environment from June 30 to December 31, 2002.  Therefore, it is reasonable to conclude that the implied value of Blue Dot's goodwill as of June 30, 2002 approximated that as of December 31, 2002.  Consequently, applying the very same methodology that NW applied at year-end, and recognizing that the carrying value of goodwill did not change from June 30, 2002 to December 31, 2002,[20] I concluded that the entire $270 million goodwill impairment loss that NW recognized as of year-end (to write-off the full carrying value of Blue Dot's goodwill) should have been recognized as of June 30, 2002.

---

[19] I was unable to locate any documents supporting such valuation.
[20] Goodwill is recorded at the time of consummation of a business combination, cannot be written up thereafter, and can be written down only to recognize impairment in its value.

**b. NW improperly accounted for liability reserves and other accruals of Expanets.**

Background

As discussed previously in this report, NW restated its consolidated financial statements for the first three quarters of 2002. Its restated financial statements included in its Forms 10-Q/A Amendment No. 2 filed on April 15, 2003 reflected a decrease in selling, general and administrative (SG&A) expenses for the first quarter of 2002 of $5.4 million **[Q1'02 Form 10-Q/A, p. 4]** and an increase in SG&A expenses for the second and third quarters of $1.5 million and $3.8 million, respectively **[2Q'02 Form 10-Q/A Amendment No.2, p. 4; 3Q'02 Form 10-Q/A Amendment No.2, p. 4]**. The restatements were made "to reflect the reversal of adjustments to accruals related to vendor settlements, bonus accruals and other items that were made in the third quarter. These adjustments should have been reported in the first and second quarters of 2002." **[3Q'02 Form 10-Q/A Amendment No.2, p. 4]**

The SEC's Cease-and-Desist Order stated that, during the first three quarters of 2002, Expanets reduced amounts it had recorded in at least fourteen of the reserve accounts it maintained on its balance sheet, including its billing adjustments reserve account, and that these reductions had materially increased Expanets' and NW's income. It further stated that $2.6 million, $8.8 million and $27 million of income of Expanets in the first, second and third quarters of 2002, respectively, was derived from such reductions of Expanets' reserve accounts **[SEC Cease-and-Desist Order, par. 27-31]**. However, the restatement adjustments made by NW, as discussed in the preceding paragraph, constituted only a portion of the reserve reductions noted in the SEC's Cease-and-Desist Order.

Relevant GAAP

The relevant GAAP with respect to accounting for liability accruals and other "reserves" is contained principally in SFAS 5, *Accounting for Contingencies* ("SFAS 5") and Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss an interpretation of FASB Statement No. 5*, ("FIN 14"). See BFO 1.a. for a summary of the applicable guidance in these pronouncements.

NW's Accounting

Expanets maintained a reserve for billing adjustments[1] and numerous other reserve accounts and provided accruals for other expenses unpaid as of the end of the reporting period. Such expenses included marketing, travel and training expenses, bonuses, vendor settlements and vendor rebates. As discussed above, NW reduced some of these reserves and accruals in the first, second and third quarters of 2002 in order to increase Expanets' net income.

---

[1] In 2002, Expanets "experienced numerous complications with its new EXPERT system, particularly with billings and collections." **[3Q'02 Form 10Q/A, p. 2]** The resulting billing errors led to misstatements in revenue and accounts receivable. To account for these errors, Expanets established a reserve account for an estimated amount of billing adjustments that would be necessary to accurately state revenue and accounts receivable. (See BFO 1.a.)

2 - 19

<u>NW Violated GAAP by Overstating and then Improperly Reducing Liability Reserves and
Other Accruals at Expanets</u>

Certain documents that I reviewed indicate that, as of the end of various periods, some
reserve accounts at Expanets were in excess of management's best estimate of its probable
loss exposure. In other words, NW's management knowingly accrued amounts greater
than the estimated future cash outflows that it believed would be necessary to settle its
liabilities. For example:

- Rick Fresia (CFO of Expanets) wrote in his July 16, 2002 email to Kipp Orme
  regarding Expanets' 2002 EBITDA forecast:

    ...If I'm right, in conjunction with doable countermeasures, we'll deliver $86M
    of organic EBITDA...I have at least $8M+ (per Lonnie, who is conservative)
    available from the B.S. [balance sheet]. In other words, we'll squeak by...
    **[NOR521024]**

    In other words, Rick Fresia communicated that he had $8M accrued in Expanets'
    reserve accounts that were "available" to be reduced in future months (presumably
    because they were in excess of management's estimate of probable loss).

- NW prepared a document showing reserve balances as of March 31, 2002.
  **[NOR306836]** This document was requested in early May by Mr. Fresia to show
  "an inventory of the accruals on the balance sheet with the assessment of their
  viability." **[NOR306834]** Actual reserve balances, totaling $40.8M are shown in
  the far left column, while the next column, entitled "(Risks)/Opportunities" shows
  *potential* changes in the reserve accounts, for a total reduction of $29.2M. This
  suggests that NW's best estimate of its loss exposure was lower than its actual
  accrued liabilities on the balance sheet, with the difference being viewed as an
  "opportunity" to reverse these amounts in current or future periods. Presumably,
  Mr. Fresia requested this document because he was questioning "viability," or
  appropriateness, of Expanets' reserve balances.

FAS 5 requires a loss contingency to be accrued if the loss is probable and its amount can
be reasonably estimated. FIN 14 further requires the amount of the reserve to represent
management's best estimate of the amount of the loss. If the estimate is a range of equally
likely amounts, then the lowest amount in the range should be recognized. Therefore, by
knowingly creating excessive reserves and accrued liabilities, NW violated GAAP.

Other documents that I reviewed indicate that NW then reduced the amounts in some of
Expanets' reserve and accrued liability accounts in order to help Expanets meet its earnings
projections. That is, NW knowingly overestimated some of its reserves and accrued
liabilities in some periods (as discussed above), and then reduced them in future periods
when additional income was needed to improve earnings. The following are but a few
examples of documents evidencing that NW's management was reducing Expanets'
reserve and accrued liability accounts to improve Expanets' earnings:

- In October 2002, NW's management instructed Mr. Fresia to reverse $4.2 million of reserves in the third quarter of 2002 in order to "make the quarter," i.e. to enable Expanets to meet its EBITDA projections. Mr. Fresia was "uncomfortable" with the reversal and objected, but was "overruled." **[NOR306834]** This was confirmed by Kendall Kliewer (NW's Chief Accountant) at his deposition. **[Kliewer 132:2-4 – 133:1-23 – 135:2-19 – 138: 17-24 – 139:1-5]**. The reversal was also strongly opposed by Mr. Fresia's finance team, including Reggie Vegliante (Expanets' Treasurer) who said that the reversal was "a mistake" and by Lonnie Clark (Expanets' VP Controller) who suggested getting the decision "in writing from whomever made the call." **[NOR306842]**

- In a document chronicling NW's accounting decisions pertaining to reserves, Mr. Fresia wrote that billing adjustment reserves were reversed off the balance sheet via "a process [that] contains more subjectivity than [he] feels comfortable with." He further states that "balance sheet helps" became part of NW's "vernacular." **[NOR306834]**

  Therefore, not only did Expanets accrue insufficient amounts to account for EXPERT billing errors during the first three quarters of 2002 (See Basis for Opinion 1.a.), but as this document indicates, it also reduced the accruals it did have when "balance sheet help" was needed to increase its EBITDA.

- The April 25, 2003 *Report of the Special Committee of the Board of Directors of the NorthWestern Corporation* describes the results of the Special Committee's investigation into NW's accounting practices. It states:

  > ...[M]any Interviewees stated that the timing of reversals related partly to assisting Expanets in achieving its projections that NW has publicized to the financial markets... The reversals of accruals at Expanets (which were being tracked in an effort to understand their impact on the 2002 operations plan) began in March 2002. As of September 2002, these reversals accounted for approximately $38.5 million of Expanets' EBITDA for the first nine months of 2002. **[NOR519812]**

Pursuant to SFAS 5 and FIN 14, reserves and accrued liabilities should be reversed only if there is a change in management's best estimate of the amount and the likelihood of loss. By improperly reducing its reserves and accrued liabilities merely to enable it to meet "earnings targets," NW violated GAAP.

As discussed in the Background section above, in its Form 10-Q/A Amendment No.2 for the first, second and third quarters of 2002, NW restated only a portion of the reserve reversals identified in the SEC's Cease-and-Desist Order. For each of the three quarters, NW's Form 10-Q/A Amendment No. 2 does not provide sufficient disclosure to enable a reader to understand the amount of Expanets' income derived from the reserve reductions, or how the reserve reductions complied with FAS 5 and FIN 14. Therefore, I was unable to quantify the exact amount of Expanets' reserve reversals that were not in compliance with GAAP. For this reason, I included the entire amounts identified in the SEC's Cease-and-

Desist Order less the portions thereof restated by NW as adjustments to the revised financial statements presented in Attachments A-1 through A-10.

The effect of these adjustments on NW's earnings reported in its original Forms 10-Q is as follows:

($ in thousands)

| | Adjustments to SG&A as Reported in Original 10-Qs | | | Total Adjustment to SG&A as Percentage of Earnings | | | | | | |
| | NW Restatements [1] | GAAP Violations Not Restated by NW [2] | (A) Total Adjustment | (B) Operating Income | (A)/(B) % | (C) EBITDA | (A)/(C) % | (D) Net Income | (A)/(D) % [3] |
|---|---|---|---|---|---|---|---|---|---|
| Q1' 02 | $ (5,300) | $ 2,600 | $ (2,700) | $ 34,648 | -7.8% | $ 62,272 | -4.3% | $ (29,488) | 5.5% |
| Q2' 02 | $ 1,500 | $ 7,300 | $ 8,800 | $ 48,816 | 18.0% | $ 81,081 | 10.9% | $ 15,804 | 33.4% |
| Q3' 02 | $ 3,800 | $ 23,200 | $ 27,000 | $ 45,549 | 59.3% | $ 77,654 | 34.8% | $ (41,317) | -39.2% |

(1) 1Q'02 Form 10-Q/A Amendment No.2, p. 4; 2Q'02 Form 10-Q/A, Amendment No.2, p. 4; 3Q'02 Form 10-Q/A, Amendment No.2, p. 4.

(2) GAAP violations not restated were determined as follows:

- In the first quarter of 2002, NW recognized $2.6 million in reserve reductions based on the SEC cease-and-desist order. None of these reserve reductions were adjusted in NW's restated financial statements. Although NW's restated financial statements reflected a decrease of SG&A expenses of $5.3 million, this amount represents movement of reserve reductions recorded in the second and third quarters of 2002 to the first quarter of 2002. Therefore, NW did not adjust for $2.6 million of reserve reductions taken in the first quarter of 2002, and I included this amount as an additional adjustment to NW's restated SG&A expenses.

- In the second quarter of 2002, NW recognized $8.8 million in reserve reductions based on the SEC cease-and-desist order. In its restated financial statements, NW adjusted for $1.5 million of these reserve reductions by moving them to the first quarter of 2002. Therefore, I included the remaining $7.3 million as an additional adjustment to NW's restated SG&A expenses.

- In the third quarter of 2002, NW recognized $27 million in reserve reductions based on the SEC cease-and-desist order. In its restated financial statements, NW adjusted for $3.8 million of these reserve reductions by moving them to the first quarter of 2002. Therefore, I included the remaining $23.2 million as an additional adjustment to NW's restated SG&A expenses.

(3) Calculated using a 40% effective tax rate.

2 - 22

whichever period is shortest, discuss the impact of inflation and changing prices on the registrant's net sales and revenues and on income from continuing operations.

<u>NW's violations of GAAP and SEC disclosure requirements</u>

The documents and deposition testimony that I have read provide compelling evidence that NW management violated the disclosure requirements of GAAP and SEC Regulations with respect to the adequacy, timing and veracity of its disclosures regarding the matters discussed in the following sections.

**a.  The true extent of problems associated with Expanets' EXPERT system that resulted in improper or inaccurate billings.**

As noted previously in this report, NW management, and in particular Mr. Hylland, was touting the operating and financial benefits of Expanets' EXPERT system.  For example, Mr. Hylland commented on the progress of the EXPERT System during the April 30th analysts call stating that "....Expanets completed the cutover of [its EXPERT] system, as [it] made that system fully operational." **[NOR379799]**

However, Mr. Hylland's assertions are contradictory to internal information NW management was receiving concerning the operating performance of EXPERT.  The documents and deposition testimony are replete with examples of the problems with the EXPERT system.  The following is but a sample of documented evidence of such problems:

- Kliewer testified that Hylland was "aware of...substantial problems with EXPERT."  Kliewer further acknowledged that Hylland had this knowledge sometime between March 15, 2002 and April 15, 2002. **[Kliewer 186:5-25 – 187:1]**

- Fresia testified that when he started at Expanets in April 2002, Lewis and Hylland told him that the EXPERT billing function was not working and that bills had not been sent out for some time. **[Fresia 7:13-25]**

- When asked about Snella's declaration to Paul Hastings concerning Expanets, Mr. Kliewer testified that he did not disagree with Mr. Snella's statement that, among other things, the problems with the EXPERT system were so obvious that everyone involved in monitoring the status knew of the severity of the problems.

- The Special Committee Report stated that, Timothy Atkinson (Expanets General Counsel) informed Mr. Hylland on May 19, 2002 that "...there would be a sizeable impact on current revenue, cash collections, and future operations for Expanets, due to the numerous billing errors that occurred [resulting from EXPERT deficiencies].... Therefore, many clients would not pay their

outstanding bills or return to Expanets for future services." **[NOR519792 – Special Committee Report, p.23]**

- Mr. Jacobsen testified that the July MFIR indicated that 100% of the customers would not receive accurate bills until October. **[Jacobsen 83 : 19-23]**

- Furthermore, Mr. Drook agreed that "Northwestern's 10-Q for the first and second quarters of 2002 and its press releases attached to form 8-K mischaracterized Expanets' billing activities as fully operational or operational." **[Drook 160:14-24]**

Yet, despite the overwhelming evidence to the contrary, NW knowingly misled analysts and the public by asserting that EXPERT was "fully operational." In fact, in its MD&A, NW painted a misleadingly rosy picture of EXPERT stating that "…the system has eliminated redundant costs incurred under the former transition service agreements executed with Avaya as part of the original Lucent GEM acquisition. The system is now operational and savings are expected to continue throughout 2002 from both efficiencies and the elimination of non-capitalizable integration costs from the project. **[NW 2Q' 02 Form 10-Q, p.25]** However, the true nature and extent of the problems with EXPERT were not publicly disclosed until NW restated its consolidated financial statements in April 2003 for the first three quarters. NW attributed its restatement adjustments with respect to the allowance for bad debts and billing adjustments to the deficiencies associated with EXPERT.

**b.  The deteriorating financial condition of Expanets and Blue Dot and resulting impact on consolidated operating performance and cash flows**

As discussed in Basis for Opinion 2. a., the financial condition of both Expanets and Blue Dot continued to deteriorate during 2002. The documents and deposition testimony that I have read provide convincing evidence of management's knowledge of the deteriorating financial condition of both Expanets and Blue Dot. The following is but a sample of such documented evidence:

- Kliewer testified that Hylland was "aware of substantial risks associated with Expanets' and Blue Dot's ability to meet the representative 2002 EBITDA targets and that there were substantial problems associated with the risks…." Kliewer further acknowledged that Hylland had this knowledge sometime between March 15, 2002 and April 15, 2002. **[Kliewer 186:5-25 – 187:1]**

- According to the minutes of The January 28, 2002 Executive Committee Meeting, Mr. Orme Stated that NW had gone through $175 million in cash during the last quarter, of which $70 million was to Expanets. He also stated that "In essence, we're no better off regarding working capital when we were before the $200 million offering". **[NOR 365803]**

3 - 4

- NW's Special Committee concluded that *as early as the first quarter of 2002*, Mr. Hylland "knew or should have known that the statements made in NorthWestern's publicly filed documents and press releases were inconsistent with his knowledge of Blue Dot's and Expanets' actual performance." (Emphasis added.) **[NOR519814 – Special Committee Report, p.45]**

- In his April 7, 2002 email to Mr. Hylland concerning the "Draft 1stQ Forecast Release," Mr. Orme states that "I am skeptical of anything Expanets represents and I therefore wanted to provide some flexibility on our side to cover their likely misrepresentations…" **[NOR405696 – Kliewer Ex. 9]** This statement reflects an unequivocal repudiation of Expanets financial forecasts. However, it also reflects NW management's willingness to utilize Expanets inflated forecasts in reporting projected consolidated earnings.

- Kipp Orme's (NW CFO) May 28, 2002 memorandum *Financing Plans & Considerations* cited, among other things, the public's and the rating agencies' concerns regarding the "Massive turnarounds required at Expanets and Blue Dot (with related questions regarding potential goodwill impairment)." **[NOR056238, Hylland Ex. 14]**

- Mr. Charters' May 30, 2002 email to Messrs. Fresia (Expanets CFO), Younger and Walker reflected Expanets' internal concerns about its ability to achieve its EBITDA forecasts: "If revenues aren't ramping to the \$919M [million] level by the end of the year, why are you so certain that the EBITDA target is going to be reached?" **[NOR405401]**

At the same time that it was internally expressing serious concerns and skepticism concerning the operating performance of Expanets and Blue Dot, NW management knowingly disseminated contradictory information in its public disclosures. For example, in its April 30, 2002 analysts call regarding First Quarter 2002 Earnings, NW management affirmed its 2002 Expanets forecast for Expanets by stating that "…we have gone ahead and sized our revenue base at \$920 million conservatively. We positioned [Expanets'] business to be successful with our EBITDA targets of \$80 million to \$87 million this year, assuming no economic recovery." **[NOR379770]** However, as discussed in Basis for Opinion 2.a., NW was exceeding its targeted EBITDA of \$21 million for six months ended June 30, 2002 through the use of \$55 million of earnings "enhancements" in the form of GAAP violations.

In its April 30, 2002 press release, NW knowingly misstated that there was "….substantial improvement as we expected from our communications business, Expanets" during the first quarter of 2002. Also, in its press release dated May 17, 2002, NW stated that "Expanets expects to achieve its previously announced \$135 million EBITDA increase in 2002 – reaching \$80 to \$87 million in EBITDA…." However, management was fully aware that Expanets "substantial improvement" was the direct result of GAAP violations that artificially inflated operating income and EBITDA. Thus, NW management was artificially inflating Expanets operating results to enable it to continue to "confirm its full year guidance" of \$87 million.

Throughout 2002, NW continued to provide materially misleading information to the public concerning Expanets. For example, in its August 8, 2002 Second Quarter Earnings Release conference call, NW confirmed that "We continue to stand behind our forecasts as being on track at an EBITDA level of $80 to $87 million." **[NOR063184]** NW's management expressed its optimism about Expanets in such superlatives as "tremendous accomplishment." **[NOR063183]** NW further stated that "…if we look at the first six months it's been an even more dramatic improvement where you've seen the six months ended last year was a negative $63 million, and on an overall basis the six months operating income was $8.3 million for Expanets." **[NOR063182]** However, management was fully aware that Expanets "dramatic transformation" was the direct result of the GAAP violations discussed in this report that artificially inflated operating income and EBITDA.

As further indication of management's knowledge of the accounting problems at NW's subsidiaries, a February 18, 2002 memorandum documents a discussion among Messrs. Drook, Hanson Knapp and VanCamp regarding, among other things, the internal auditors' allegations of possible fraud at NCS (an Expanets subsidiary). Among other things Messrs. Knapp and VanCamp noted the following:

- Messrs. Janecke and Ming (the internal auditors) believe that the financial irregularities uncovered by Marty Barrack during his due diligence of Norcom…were serious and required corrective measures through the adoptions of formal policies.

- In our investigation, we did hear repeatedly from individuals within Norcom and from members of management that the accounting environment… was "aggressive," particularly with respect to the recognition of revenues, so that Norcom could "make the numbers."

- Management's response to the findings of the internal audit report was slow, at times not effective and also missed one of the most damning remarks of the report.

- Though there is some question about factual basis for the internal auditors statement that management directed Norcom employees to "meet projected numbers by whatever means necessary", the failure by management to initially respond directly to the statement is disquieting.

- There is an indication that management understood the revenue recognition problems and other accounting difficulties well in advance of the internal audit, and clearly thereafter, and was slow to take corrective measures resulting in adjustments extending beyond monthly and quarterly reporting periods.

- Messrs. Janecke and Mings's performance appraisal was by manager (Kindt) who had never supervised their work because their purported supervisor (Monaghan)

was involved in approving some of the accounting treatments that the auditors
questioned... Kindt reports directly to Monaghan. **[NOR521843-47]**

Thus, NW violated SEC disclosure requirements by failing to disclose the impact of the
deteriorating financial performance of Expanets and Blue Dot on NW's trend in earnings
and its liquidity.

### c. The nature and extent of intercompany advances to Expanets and Blue Dot

NW disclosed in its 2001 Form 10-K that "Expanets will need to complete the
implementation and full functionality of the 'Expert System' in [2002] in order to realize
the contemplated cost savings and productivity enhancements. Further delays in this
process could have a negative effect on its operations and cash flow." However, as
discussed in Basis for Opinion 2.a. and in 3.a. above, Expanets encountered numerous
difficulties with the implementation of EXPERT throughout 2002 resulting in a
significant expenditure of resources at Expanets.

As a result of the deteriorating financial condition of Expanets during 2002, partially
attributable to the costs of the EXPERT system, NW was forced to advance significant
amounts of funds to Expanets. As of December 31, 2001, NW had provided a loan of
$51.4 million, which NW disclosed in its 2001 Form 10-K and its Forms 10-Q for the
first three quarters of 2002. During 2002, NW made substantial additional working
capital advances to Expanets aggregating $139.8 million. Consequently, advances to
Expanets as of September 30, 2002 aggregated $191.2 million. **[3Q'02 Form 10-Q/A
Amendment No. 2, p.44]**

As discussed in Basis for Opinion 1.a., NW management was fully aware of Expanets
deteriorating financial condition. It was further aware of the impact that Expanets
EXPERT system and Expanets continuing inability to meet its financial targets was
having on NW's consolidated earnings forecast and liquidity. For example, in his May
28, 2002 memorandum *Financing Plans & Considerations*, Kipp Orme (NW CFO) noted
the rating agencies' concerns regarding the "Massive turnarounds required at Expanets
and Blue Dot (with related questions regarding potential goodwill impairment)." Mr.
Orme further noted that, as a result of the EXPERT problems and Expanets' failure to
achieve its financial targets, "Expanets... was a much larger cash use in [2001]."
**[NOR056238-45, Hylland Ex. 14]**

Thus, management was aware that Expanets was consuming larger amounts of NW's
cash than anticipated and, consequently, placing a significant strain on NW's
consolidated liquidity. Yet, NW failed to disclose the nature and amount of its
substantial advances to Expanets and their potential impact on NW's liquidity in the
MD&A of its Forms 10-Q for the first two quarters of 2002. Indeed, it was not until NW
filed its Form 10-Q for the third quarter of 2002 that it disclosed that the aggregate
amount due from Expanets was $191.2 million as of September 30, 2002. In addition,
NW failed to disclose the nature and amounts of advances to Blue Dot for the quarter
ended June 30, 2002 until it filed its Form 10-Q/A Amendment No. 1 on September 20,

2002.  Therefore, I have concluded that NW failed to comply with applicable SEC Regulations.

### d.  The impact of "non-recurring revenues" on consolidated operating earnings.

As disclosed in NW's Forms 10-K for the years ended December 31, 2000 and 2001, NW acquired the Growing and Emerging Markets ("GEM") division of Lucent Technologies ("Lucent") in March 2000.  As a result of various differences between the parties since the consummation of the transaction in 2000, "Expanets and Avaya (formerly Lucent) completed [in May 2001] a substantial restructuring of the GEM transaction [including] a reconciliation of various financial and performance aspects of the transaction...."
**[NW's 2001 Form 10-K]**

Under the terms of a maintenance fee agreement,[1] "Expanets received payments that were calculated based on Avaya's maintenance contract customer base and were known as "management-left-behind" ("MLB") payments.  These payments, which were similar in effect to "non-compete" payments, were credited by Expanets to SG&A expenses.  These payments were (a) based on an unusual and non-recurring transaction (b) had a limited life (the contract was scheduled to expire in March 2005), and (c) were material to both Expanets operating income and net income.  Therefore, disclosure of the impact of such payments was required under SEC Regulation S-K Item 303 (3).  However, NW failed to provide such disclosures.

NW subsequently acknowledged its violation of SEC Regulations by including such disclosures in its Forms 10-Q/A for the first three quarters of 2002.  The following table summarizes the effects of non-recurring revenue, including MLB, on NW's operating income, EBITDA, and net income for the first three quarters of 2002.

($ in thousands)

|        | Non Recurring Revenue | Operating Income | | EBITDA | | Net Income | |
|--------|-----------------------|------------------|-----|--------|-----|------------|----------|
|        |                       | Amt.             | %   | Amt.   | %   | Amt.       | % [a]    |
| Q1' 02 | $      9,300          | $ 34,648         | 26.8% | $ 62,272 | 14.9% | $ (29,488) | 18.9% |
| Q2' 02 | $     10,100          | $ 48,816         | 20.7% | $ 81,081 | 12.5% | $ 15,804   | 38.3% |
| Q3' 02 | $     15,300          | $ 45,549         | 33.6% | $ 77,654 | 19.7% | $ (41,317) | 22.2% |

[a] - Calculated using a 40% effective tax rate.

---
[1] Set to expire in March 2005.

3 - 8

**e.  The dispute regarding the sale of the "Colstrip assets" and resulting impact on consolidated cash flows.**

When NW purchased MPC in February 2002, it became a successor-in-interest to a contract for the sale of the Colstrip transmission assets ("Colstrip Assets") to PPL Montana LLC ("PPL").  The contract called for payment of approximately $97 million to NW upon satisfaction of certain conditions.[2]

In its April 30, 2002 analysts' conference call, NW announced that it expected to collect the proceeds from the sale of the Colstrip Assets by June or July 2002.  **[NOR379805]** Again, in its analysts call on May 17, 2002, NW reiterated its prior public statement that it would be receiving $97 million from the "Coal Strip divestiture out of the Montana Power transaction... ." **[NOR074571]**

In light of the additional cash requirements to fund Expanets' operating cash flow deficits, resulting in part from the implementation problems with EXPERT throughout 2002, the cash flows from the sale of the Colstrip assets were significant to NW's liquidity.  As a result, analysts and rating agencies tracked the status of the sale. **[NOR379805]**

In his deposition, Mr. Jacobsen testified that during the May and June 2002 timeframe, PPL repeatedly informed NW that it would not close on the Colstrip sale until other claims were resolved.  He further testified that in July 2002 the dispute relating to the possible sale of Colstrip to PPL had led to NW filing a lawsuit in an attempt to force PPL to abide by its contracted obligation to purchase Colstrip.  Jacobsen further testified that PPL focused on certain unrelated issues and was not moving forward to close on the transaction. **[Jacobsen 74:5-25 – 75:1-7]**  Yet, despite the clear intention of PPL to delay closing on the Colstrip assets, NW failed to disclose its dispute with PPL and the potential implications for NW's cash flows until it filed its Form 10-Q for the third quarter of 2002. **[3Q'02 Form 10-Q, p. 51]**

Therefore, NW led analysts and the public to believe that receipt of the $97 million proceeds from the Colstrip sale was imminent when, in fact, the consummation of the transaction was, at best, uncertain.

As noted above, SEC Regulation S-K Item 303 (1) requires disclosure of any known trends or any known demands, commitments, events or *uncertainties* that will result in or that *are reasonably likely to result in* the [company's] liquidity *increasing or decreasing* in any material way.  However NW failed to provide sufficient disclosure of the uncertainties associated with the Colstrip sale and resulting cash flows and, instead, asserted to the contrary that such cash flows were imminent.

---

[2] Article 4.15 of the Unit Purchase Agreement dated September 29, 2000 between NW, Touch America Holdings, Inc. and The Montana Power Company with respect to all outstanding membership interests in MPLLC.

**f.  Billing adjustments, allowance for bad debts and reserve reversal.**

NW also violated the GAAP requirements of SOP 94-6 by failing to disclose that it was at least reasonably possible that its estimates of both the allowance for bad debts and billing adjustments would change in the near term and that the effect of such change would be material to NW's consolidated financial statements.

Furthermore, as discussed in Basis for Opinion 2.b., I have concluded that a substantial portion of Expanets' income in the first three quarters of 2002 was derived from improperly reducing various reserves and accrued liability accounts that were knowingly overstated in various periods.  NW violated the disclosure requirements of SEC Regulation S-K Item 303 (3) by failing to disclose amounts of Expanets' income derived from these reserve reductions.  I have also concluded that NW violated GAAP (specifically, SFAS 5 and SOP 94-6) by failing to (a) provide adequate disclosure about the nature and amount of Expanets' reserve balances and (b) disclose that it was at least reasonably possible that the estimates of its accrued liabilities would change in the near term and that the effect of such change would be material to NW's consolidated financial statements.

**5.  Based on the defendants' responses to interrogatories and other documents
regarding Clark Fork's assets and liabilities as of December 31, 2002 and the
further assumption that Clark Fork remained directly obligated under the QUIPS
following the "going-flat" transaction, total liabilities materially exceeded total
assets.**

In its Responses and Objections to Interrogatories dated March 30, 2007, the Defendants
asserted that "...the balance sheet of Clark Fork reflected total assets of $11,005,407 and
total liabilities of $11,005,407 as of December 31, 2002."[1] However, the Defendants do
not specify the nature or composition of the assets and liabilities.

Although I have been unable to find anything denoting the composition of the $11
million of assets and liabilities, the January 28, 2002 memorandum from Messrs.
Jacobsen (NW's General Counsel) and Hanson to the NW Board of Directors indicated
that NW intended to "isolate Milltown Dam in a subsidiary...." **[NOR142392, Hanson
Ex. 10]** In addition, numerous documents provide further evidence that substantially all
of Clark Fork's assets and liabilities - except the assets and liabilities associated with the
Milltown Dam Site - were transferred to NW in the going-flat transaction.

For example, the following is a sample of such evidence:

- On November 15, 2002, NW and NELLC (subsequently renamed Clark Fork)
  entered into the Asset and Stock Transfer Agreement (the Agreement) pursuant to
  which all assets and liabilities of NELLC were transferred to NW, subject to the
  exclusions discussed below.

- Section 2.2 and Schedule 2.2 of the Agreement specified that the transferred
  assets did not include the assets related to the Milltown Dam nor certain other de
  minimus assets.

- Section 2.4 and Schedule 2.4 of the Agreement specified that the transferred
  liabilities did not include any liabilities related to the aforementioned excluded
  assets.

- NW's December 27, 2001 memorandum to the SEC relating to its acquisition of
  MPC requests, among other things, permission to "...to move all of the utility
  related assets and operations into the parent company, with the exception of those
  assets related to a single small hydroelectric project, which is currently a
  Superfund Site [Milltown Dam]..." **[NOR003287, NOR003300]**

- In NW's February 14, 2002 application to the SEC, NW indicates that
  "... Northwestern currently intends to undertake the second step of the
  Transaction [Purchase of MPC]... while it explores various options for addressing

---

[1] Responses and Objections of Northwestern Corporation to Plaintiffs' Magten Asset Management
Corporation and Law Debenture Trust Company of New York's First Set of Interrogatories for Defendant
Northwestern Corporation, p.9.