# Exhibit 40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 04-1494-JJF |
| NORTHWESTERN CORPORATION, | : : | |
| Defendant. | : : | |
| MAGTEN ASSET MANAGEMENT CORP., | : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No. 05-499-JJF |
| MIKE J. HANSON and ERNIE J. KINDT, | : : | |
| Defendants. | : : | |

### EXPERT REPORT OF CHRISTOPHER J. KEARNS

[This Report has been designated as Confidential pursuant to orders entered by the Court.]

October 17, 2007

My billing rate for this assignment is $595 per hour. I was assisted by others at Capstone, who worked at my direction and under my supervision. I have relied on the findings presented in the expert report of Bruce Bingham ("Bingham" or the "Bingham Report") for certain limited purposes. In addition, I have considered and relied upon various documents in the preparation of this report. A list of those documents is attached hereto as Appendix B.

## II.    **Summary of Opinions**

In my opinion:

1.    Marcus assumes that, had NorthWestern disclosed the negative financial information concerning its non-regulated businesses earlier in 2002, NorthWestern would not have acted any differently than it did act. This conclusion is wrong. In my opinion, had NorthWestern known and disclosed negative financial information regarding its nonregulated businesses earlier in 2002, it would have accelerated the efforts to improve its financial situation (which it actually did undertake in early 2003) including suspension of the dividend, limiting any funding of Expanets and Blue Dot, and focusing on its "core" utility businesses (the "Turnaround Plan").

2.    Marcus's opinion that NorthWestern would not have had the ability to draw on the revolving credit facility (due to defaults of certain financial covenants, based on Berliner's conclusion thereon - see my opinion 4) and would not have had access to the capital markets during the period he analyzed is wrong. NorthWestern would have had access to adequate liquidity through 2002 and into

3

2003 (even without net proceeds related to the October 2002 equity offering), as demonstrated by the Company's $390 million secured credit facility. This likely would have been the case even accepting Marcus's premise that the negative information concerning NorthWestern's nonregulated businesses was, in his scenario, disclosed at an earlier date. In addition, NorthWestern would have been able to accomplish a financing like the secured credit facility, even before going flat ("Going Flat"),[1] by closing that financing at the NorthWestern Energy LLC level.

3.  Marcus's conclusion that "security holders" and speculation that "regulators" would have "impeded" the Company from Going Flat is flawed since:

    a)  Corporate stakeholders (discussed in Section VC1) would have favorably viewed a simplified capital structure. Indeed, a "flat" capital structure could be viewed as beneficial to the Company's shareholders;

    b)  Security holders in other business units (discussed in Section VC2) had no incentive to prevent the Company from Going Flat;

    c)  Secured creditors of Northwestern Energy LLC (discussed in Section VC3) had no incentive to prevent the Company from Going Flat as they remained structurally senior to other creditors after the Company completed the Going Flat part of the asset acquisition. This is clearly demonstrated by (i) the $390 million senior secured credit facility, which was secured by collateral at the regulated division including the assets acquired from The Montana Power Company (excluding the Milltown

---

[1] See Section III for a description/definition of the Going Flat step of NorthWestern's acquisition of the Montana Power Assets.