# Exhibit 42

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK,

Plaintiffs,

-vs-

NORTHWESTERN CORPORATION,

Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

Plaintiff,

-vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

------------------------------------- X

DATE: November 13, 2007

TIME: 9:00 a.m.

Deposition of PAUL A. MARCUS, held at the offices of Curtis, Mallet-Prevost, Colt & Mosle, 101 Park Avenue, New York, New York,

- PAUL A. MARCUS -

**Q. Mr. Marcus, I think you said you were asked to assess certain misrepresentations and omissions in Northwestern's financial statements for the year 2002; is that correct?**

MR. KAPLAN: Objection.

A. I don't believe I set a date. I believe my characterization was that I was asked to assess those misrepresentations and omissions and determine the impact that those would have had on the company's invested capital and its availability of financing.

**Q. Who told you there were any omissions or misrepresentations in any of Northwestern's financial statements?**

A. Through reviewing documents, there were restated financial statements which would have omissions. There was a Securities and Exchange Dissent Decree Order that I reviewed.

There were documents pertaining to an internal investigation that I reviewed, things of that nature.

**Q. Do I take it, then, that you are offering no independent opinion of your own in this action as to whether or not there were any**

**- PAUL A. MARCUS -**

**misstatements or omissions in any of Northwestern's financial statements?**

MR. KAPLAN: Objection to form.

A. I can tell you what my opinions are in the matter, which are that, you know, as it's clearly articulated in my report, that the October 8th equity financing would not have happened, that the transfer of assets -- that would have been impeded by the involved security holders and regulatory commission, that the transfer put the holders of the QUIPS, who were part of the Montana Power Company, at greater risk as being part of the Northwestern company, those would have been two of my opinions. The third being that Clark Fork did not have the wherewithal to pay the QUIPS back. Those are my three opinions.

**Q. Let me direct your attention, please, to the penultimate paragraph on the first page of Exhibit 1.**

**Could you read that, please, into the record?**

A. Which paragraph are you referring to?

**Q. The second to the last paragraph, the last full paragraph, if you will, on Page 1.**

**- PAUL A. MARCUS -**

A. The one beginning, "We will not be auditing"?

**Q. Yes.**

A. "We will not be auditing any financial statements or performing test procedures with respect to information in conjunction with this engagement. Our services are not designed nor should they be relied upon to disclose weaknesses in internal controls, financial statement errors, irregularities, illegal acts, or disclosure deficiencies."

**Q. Mr. Marcus, let me ask you then, again: Do I take it you are not offering any independent opinion of your own in this action consistent with the representation in the engagement letter as to whether there were any omissions or misstatements in any financial statements of Northwestern?**

MR. KAPLAN: Objection.

A. Consistent with this paragraph, I have not performed any attestation procedures that would specifically relate to auditing financial statements, if that answers your question.

**Q. Would you agree that nothing in your opinion should be relied upon to disclose any**

**- PAUL A. MARCUS -**

**disclosure deficiencies in any of Northwestern's financial statements?**

MR. KAPLAN: Objection.

A. I disagree with that.

**Q. You disagree.**

**In what way does your opinion disclose such disclosure deficiencies?**

A. As I mentioned earlier, my opinion is based on review of significant information which talks about the deficiencies within the financial statements, within the public disclosures that were made. And I gave you a list of sources that I -- I used in my -- developing my understanding of those deficiencies, so --

MR. PIZZURRO: Mark this as 2.

(Whereupon, Marcus Exhibit 2 was marked at this time.)

**Q. Mr. Marcus, you've just been handed a document marked as Exhibit 2.**

**Do you recognize this as the second amend -- strike that.**

**-- First Amended Complaint in this action?**

A. It looks familiar.

- PAUL A. MARCUS -

**Q. Did you review this document in connection with the opinion you gave in this matter?**

A. My recollection is, is that I read the document early in the process.

**Q. I'd like you to turn to Page 10 of the document. Look at Paragraph 51 if you would, sir.**

**Paragraph 51 reads, "The Debtor was insolvent both immediately before and immediately after the acquisition of MPLLC and the assumption of related liabilities. The Debtor was engaged in a business with unreasonably small capitalization and incurred debts beyond its ability to pay both immediately before and immediately after the acquisition of MPLLC and the assumption of liabilities."**

**Sir, do you understand that the Debtor in this paragraph is Northwestern Corporation?**

MR. KAPLAN: I think if we look -- if you look on the first page of the Complaint -- actually, I'm sorry, Paragraph 1 on Page 2, there it's defined.

A. Yes, I do.

**Q. Did you ever discuss the allegations**

**- PAUL A. MARCUS -**

**contained in this paragraph with anyone from Fried, Frank?**

A. Not to my recollection, no.

**Q. Did you ever discuss the allegations in this paragraph with anybody else at Huron?**

A. Not to my recollection, no.

**Q. Were you ever asked or did you ever understand that you were being asked to offer any opinions with respect to the allegations contained in Paragraph 51?**

MR. KAPLAN: Objection to the form.

A. I was never asked to perform any form of insolvency analysis.

MR. PIZZURRO: Mark this as Exhibit 3.

(Whereupon, Marcus Exhibit 3 was marked at this time.)

**Q. Mr. Marcus, you've just been handed a document which is marked as Exhibit 3.**

**Do you recognize this as your report submitted in connection with this matter?**

A. Generally I recognize it. And I'll assume all of the pages were appropriately copied, and it is my report, yes.

**Q. In connection with issuing this report,**

**- PAUL A. MARCUS -**

**did you ever speak to Mr. Robert Berliner?**

A. I did not, no.

**Q. Did you ever review any opinions prepared by Mr. Berliner?**

A. I did.

MR. PIZZURRO: Mark this as Exhibit 4.

(Whereupon, Marcus Exhibit 4 was marked at this time.)

MR. KAPLAN: Just so the record is clear, there was an errata sheet which was also circulated with respect to the report.

MR. PIZZURRO: It should be attached as the last page; if you'd like us to do that.

MR. KAPLAN: No, that's all right. I wanted to make sure the record is clear.

**Q. Mr. Marcus, do you recognize Exhibit 4? I'm sorry. Let me strike that.**

**You have been handed a document which is marked as Exhibit 4.**

**Does that document contain the opinions of Mr. Berliner to which you referred earlier?**

A. I believe it does.

**Q. Is there any other document prepared by or on behalf of Mr. Berliner that you reviewed in**

**- PAUL A. MARCUS -**

**connection with your opinion?**

A. Are you asking me if I recognize this document? I've seen one document from Mr. Berliner, I believe I submitted to you in the documents that I produced.

It was the only one I produced. I don't know anything more than that.

**Q. Did you speak to any colleagues of Mr. Berliner before you prepared your report or finalized your report?**

A. I did not, no.

**Q. Do you know if any colleagues of yours at Huron spoke to Mr. Berliner prior to the preparation of your report?**

A. I believe they did.

**Q. Who was that?**

A. I believe it would have been Dana Hayes.

**Q. Does Ms. Hayes report to you on her conversations with Mr. Berliner?**

A. She would have given me a quick summary of her conversations.

**Q. What do you recall her telling you of her conversation with Mr. Berliner?**

A. Not a lot. I think she probably would

- PAUL A. MARCUS -

issue that became obvious, that, I guess, in conversations with counsel there was a discussion about it and I was asked the question, and I included it as part of my opinions.

**Q. Give us the best recollection you have of your discussions with counsel about this opinion.**

A. My best recollections are that I was asked whether or not they were better off or not, depending where the assets were. And I said I would analyze that and that's part of my opinion. I guess I don't recall exactly how it became part of the opinion.

**Q. Do you recall in any of your discussions with counsel obtaining an understanding as to why it is relevant in this lawsuit as to whether the QUIPS holders were better off as creditors of Northwestern Energy LLC or Northwestern?**

MR. KAPLAN: Objection to the form.

A. I don't recall a specific understanding of that, no.

**Q. Do you recall whether in any of those discussions it was stated that the injury to the QUIPS holders resulted from the conclusions that**



- PAUL A. MARCUS -

**you've drawn in II?**

MR. KAPLAN: Objection to the form.

A. I don't recall having a discussion like that.

**Q. Do you have an opinion as to whether or not the injury to QUIPS holders is the result of the circumstances you're opining on in this Paragraph II?**

MR. KAPLAN: Objection to form.

A. Again, the Paragraph II is exactly what it says. It's my opinion that the QUIPS holders as a junior security were better off before the asset transfer than after, essentially.

**Q. Do you have an opinion as to how the QUIPS holders were injured in this case?**

**Strike that.**

**Do you have an opinion as to how the QUIPS holders were damaged in this case? I'm not asking you to quantify anything, just how they were damaged.**

A. I've only analyzed this case and come up with the opinions that I have in my report. I haven't come up with a separate set of conclusions; the one you asked being something I haven't come up



- PAUL A. MARCUS -

with.

**Q. It's not something that you considered?**

A. When you say "considered," it's nothing that affects my report in any way.

**Q. That's not what I'm asking. I think if you remember some of the questions and answers this morning, I was asking you if the only opinions you had formed were in your report.**

**One of your answers was, "Well, I don't know. You might ask me a question. I might have an opinion."**

**So I'm asking you now.**

MR. KAPLAN: Objection.

A. As I sit here, I don't have an opinion to that.

MS. BEATTY: Mr. Marcus, could you speak up?

THE WITNESS: I'm trying. My throat is very sore.

MS. BEATTY: We can't hear you at all down here. I'm lip reading and getting every other word.

THE WITNESS: I'll keep drinking water.

MS. BEATTY: Thank you.



- PAUL A. MARCUS -

**Q. Directing your attention, again, to Page 7 III on that page, above the "Background," your third opinion, where it says, "Assuming Clark Fork remained liable for the QUIPS obligations, Clark Fork would not have had the financial ability to meet those obligations."**

**Do you see that?**

A. I do.

**Q. Sir, that is assuming, in addition, that the assets had been transferred out of Clark Fork as well as -- and that Clark Fork remained liable, correct?**

A. That's correct.

MR. PIZZURRO: Let's mark this Exhibit 6.

(Whereupon, Marcus Exhibit 6 was marked at this time.)

**Q. Mr. Marcus, I show you what's been marked as Exhibit 6, which bears the caption in these consolidated cases and is entitled "Expert Report of Christopher J. Kearns."**

**Have you seen this document before?**

A. I was sent a copy of his report. I assume this is the same one.

- PAUL A. MARCUS -

**Q. Did you review it?**

A. Briefly skimmed through it.

**Q. When did you briefly skim through it?**

A. Very shortly after I received it, which would have been very shortly after it was submitted, but I don't remember the exact date.

**Q. Did you review it in preparation for your deposition today?**

A. I did not, no.

**Q. Let me direct your attention to Page 3 of the exhibit. Summary of Opinions. Let me ask you to read to yourself the Opinion Number 1 on Page 3.**

A. I've read it.

**Q. Is there anything in that paragraph with which you disagree?**

A. First, I reserve the right to think about it in the whole context of everything I've written, but, I mean, they knew about the information so this seems to suggest that they didn't know about it.

If they had known about it, they would have executed the plan. Well, they actually knew about it. The SEC said they knew about it, and

- PAUL A. MARCUS -

they're -- the internal investigation said they knew about it and they didn't do it.

So I'm not sure I agree with the characterization they would have done it, because they didn't do it and they knew.

Now, I do agree with if they did do it, they would have cut the dividend earlier. So there are parts of it, I guess, I agree with.

**Q. Let me ask you to read Paragraph Number 2 on that page. It goes over the page.**

A. I've read it.

**Q. Is there anything in that paragraph with which you disagree?**

A. Same comment. I would reserve the right to review it in the context of all the information in his report, in my report. Looking briefly at it, as I've done just now, I'm not sure I understand what his point is about actually having adequate liquidity for 2002-2003.

We knew that they had that even with all the misinformation in the marketplace. That didn't affect how they ultimately progressed through 2003, so that's not all that important.

His point that the secured credit

- PAUL A. MARCUS -

facility would have gotten done at the Northwestern Energy LLC level, I'm not sure I agree with wholeheartedly in that as long as we're in a time before the asset transfer as we discussed earlier, there are things that could have happened either from the stakeholders, security holders or the Commission that might have prevented that as well. Again, there might be some other things in here if I had some time to think about it.

**Q. Let me ask you to take a look at Paragraph 3 on Page 4. I'm going to try to break this down because there's the a, b, c et cetera.**

**I would ask you, sir, if you would just first read (a) up to the end of (a).**

A. Okay. I've read (a).

**Q. My question with respect to each of these subparagraphs includes, of course, the prefatory language before (a), including that language, is there anything in (a) with which you disagree?**

MR. KAPLAN: Just so we're clear, to make sure, you're asking him to both give you the -- for each question to give you his views on the prefatory language and then the subparagraph.

- PAUL A. MARCUS -

**Q. Yes. I just don't want there to be any confusion that I might be asking about something that might not make sense because it can only be read in context.**

A. Sure. So I don't have to repeat it, my sort of general comment about really needing to take a look at information, let stand for all them.

**Q. It will stand for all, anything more I ask you about this report today.**

A. Fair enough.

"(A) doesn't really define corporate stakeholders and there are certain corporate stakeholders that would have benefitted by the transfer; for instance, the equity holders of Northwestern would have benefitted by the transfer. The unsecured creditors, just off the top -- at the Northwestern Corporation level would have benefitted because there would have been more asset coverage for their unsecured position.

I have to think of others, but those are a couple that would cause me to disagree with this.

**Q. I'm going to ask the reporter to read this back because I'm having a little difficulty.**

MR. PIZZURRO: Can you read back the

- PAUL A. MARCUS -

working on the case with me. We were analyzing it. She was in charge of executing my requests for information, and she was involved in crunching some of the numbers, so to speak, and that as we found out there was an accounting expert that was doing that, I diverted our attention to doing the other analyses that we did. And we didn't continue to push for information since it was already being done.

**Q. Did you consider that the analysis was crucial to the opinion that you were rendering?**

A. As we talked at great lengths this morning, it's not crucial to the opinion that I'm rendering.

It all relates to whether or not the 280 got funded or not, and it's a component of the analysis where I used Mr. Berliner's numbers that supported a position I already had; so it wasn't critical. I don't agree with your characterization; "crucial," I think you said.

**Q. Do you know how much the plaintiffs have paid to have Mr. Berliner's analysis done?**

MR. KAPLAN: Objection.

A. No idea.

- PAUL A. MARCUS -

**Q. No idea?**

A. None.

MR. PIZZURRO: Let's take a five-minute break. I might be done.

(Whereupon, there was a brief recess in the proceedings.)

MR. PIZZURRO: I have no further questions.

EXAMINATION BY MR. KALECZYC:

**Q. Mr. Marcus, my name is Stan Kaleczyc, and I'm one of the attorneys who represents Michael Hanson and Ernie Kindt in the lawsuit Northwestern versus Hanson and Kindt.**

**At the time prior to the filing of your expert report, were you told that the expert report was also to be used in connection with the case Northwestern versus Hanson and Kindt?**

A. I was not, no.

**Q. Did you have a general understanding that it would be used in that lawsuit?**

A. I did not, no.

**Q. As we sit here today, do you anticipate being called as an expert witness in connection**

**- PAUL A. MARCUS -**

**with the Northwestern versus Hanson lawsuit?**

MR. KAPLAN: Objection.

A. I don't know what I'm going to be called for past this meeting, so no.

**Q. Before you filed the ex -- your expert report in this case, had you reviewed the Complaint in the lawsuit Northwestern versus Hanson and Kindt?**

A. I had not.

**Q. Do you have any general understanding of the allegations in the lawsuit against Messrs. Hanson and Kindt?**

A. I do not.

**Q. At any time prior to the completion of your expert report, did you ever discuss the Hanson and Kindt litigation with Miss Steingart or any of the other lawyers from Fried, Frank?**

A. I don't recall doing so, no.

**Q. Did you ever discuss -- did you ever discuss the Hanson and Kindt matter in any way with any of your associates at Huron?**

A. Not that I recall, no.

**Q. In preparation of your expert report, did you review the deposition of Ernie Kindt?**

**- PAUL A. MARCUS -**

**And if it would help you to refer to the exhibit in your expert report, please feel free to do so.**

A. It is not on the list, and it's not one that I would have remembered; so I don't believe so, no.

**Q. What about the deposition of Mr. Hanson?**

A. I believe that is on the list. I will confirm that for you.

No. The deposition of Ernie Kindt is on the list, and -- but I don't recall specifically reviewing that one. I do recall reviewing the Hanson deposition.

**Q. Would anyone else from Huron have reviewed the Kindt deposition?**

A. Possibly, yes.

**Q. Do you recall anyone from Huron giving you any type of summary of anything that was discussed or testified to in the Kindt deposition?**

A. Not that I recall, no.

**Q. Did you receive any type of summary of that, verbal or otherwise, from any of the attorneys at Fried, Frank with respect to the Kindt deposition?**

Page 162

- PAUL A. MARCUS -

position.

**Q. Do you know if he held any other positions?**

A. I'm sure I knew what his positions were prior to writing the report. I just don't recall specifically as I'm sitting here what they were.

**Q. To the best of your recollection sitting here today, your recollection is that he was the CEO of Expanets?**

A. I think that was his title, though, again, it was confusing because there were overlapping people and overlapping time periods and overlapping titles. So I knew all of those prior to the deposition. I didn't refresh my memory on everyone's exact title prior to today.

**Q. Do you recall whether Mr. Hanson had any involvement with the management of subsidiary Blue Dot?**

A. I don't recall.

**Q. Do you know whether Mr. Hanson had any responsibilities with respect to the utility business of Northwestern Corporation?**

A. I don't recall that either.

**Q. Do you have any opinion as to whether**

Page 163

**- PAUL A. MARCUS -**

**Mr. Kindt had any responsibility for the failure to disclose information during the year 2002 that you discussed in your expert report?**

MR. KAPLAN: Objection.

A. The opinions that I stated are set forth in my report. I would have incorporated a whole host of information in that to the extent he's specifically identified in the report; that would be evidence of a specific connection, but that's not to say that there wouldn't be some others. But I haven't put forth a separate opinion on Mr. Kindt.

**Q. Were you asked to render any opinion with respect to Mr. Kindt and whether he had any responsibility for the disclosures or failure to disclose information in 2002?**

A. No, I was not.

**Q. Just so that the record is clear, Mr. Marcus, to the extent that you do have an opinion concerning Mr. Kindt's responsibility, it would be contained in the expert report?**

A. I would have identified -- if there's a specific identification of him in the report, then that would signify that there was some particular

Page 164

- PAUL A. MARCUS -

piece of evidence that I was tying to the report in supporting one of the positions in the report. There might be some other things that didn't make it to the report that might or might not support that position. I don't recall them all.

**Q. Well, is it your testimony, Mr. Marcus, that just because an individual's name appears in the report, that that person had responsibility for the failure to disclose information that you believe should have been disclosed in 2002?**

MR. KAPLAN: Objection to the form.

A. I don't think that that was what I was trying to say. What I suggested was that if the person was identified in the report, that it was my belief that that information was supporting the positions and the opinions that I was making in my report. That's all I said.

**Q. I think you've told me just a moment ago that there was other information that may not have been -- may not have made its way into the report; is that correct?**

A. I believe I said that in an earlier part of the deposition, as well. There are lots and lots of pieces of information that I reviewed.

Page 165

- PAUL A. MARCUS -

**Q. Can you, sitting here today, think of any examples of any information related to Mr. Kindt that did not make its way into the report?**

A. None that I can recall, no.

**Q. You never specifically analyzed whether Mr. Kindt was responsible in any way for the failure to make disclosures that you criticize in your report?**

A. That's correct.

**Q. Let's talk for a few minutes, then, about Mr. Hanson.**

**Were you ever requested to render an opinion as to whether Mr. Hanson specifically was responsible for the failure to make any disclosures?**

A. I was not, no.

Can we go off the record?

**Q. Absolutely.**

**(Whereupon, a brief discussion was held off record.)**

**Q. In your expert report -- in the preparation of your expert report, did you consider whether Mr. Hanson had any responsibility for**

Page 166

- PAUL A. MARCUS -

**failure to make the disclosures that you criticize in the report?**

A. Again, only to the extent that he would have been identified as participating in something where -- which I felt was indicative of there being misleading information in the marketplace, and that would have been identified in the report.

**Q. Could you point out for me any places in your expert report where you identified Mr. Hanson as participating in something which you felt were indicative of there being misleading information?**

A. I don't believe there's any specific reference to Mr. Hanson in the report.

**Q. Although there is no specific references in the report, Mr. Marcus, did you specifically analyze whether Mr. Hanson was in any way responsible for the failure to disclose certain information during 2002?**

A. I did not, no.

**Q. You reviewed Mr. Berliner's report prior to the finalization of your expert report, correct?**

A. "Review" would be a strong word. I skimmed through it.

**Q. In skimming through Mr. Berliner's**

Page 167

- PAUL A. MARCUS -

**report, do you recall anything in Mr. Berliner's report that indicated that Mr. Hanson was in any way responsible for the failure to make disclosures in 2002?**

A. Again, based on my very preliminary review of it, I don't recall any, no.

**Q. And the same question with respect to Mr. Kindt in your review of the Berliner report?**

A. And my answer would be the same.

**Q. If you would turn to Pages 5 and 6 of your report, please, Mr. Marcus.**

A. Okay.

**Q. With respect to your first opinion -- and actually, it's on Page 6 in the paragraph that begins, "In each case above." It's after the bullet points.**

A. I see that, yes.

**Q. In the first sentence reads, "In each case above, material information, much of which was the focal point of analyses being performed by security analysts, rating agencies and investors, was known and withheld from the marketplace by the management of Northwestern."**

**When you say "management of**

Page 168

- PAUL A. MARCUS -

**Northwestern," specifically to which individuals are you referring?**

A. In this case, it's a general characterization. I did not analyze each individual manager's contribution to the information that was not in the marketplace.

**Q. Did you analyze the contribution of any of the individual managers of Northwestern?**

A. Analyzing individual contributions would be too strong of a statement. I did review declarations made by different managers. I reviewed the Cease and Desist Order from the SEC and their accusations regarding management.

So I generally reviewed those things and there were different pieces of information I relied on. But I did not undertake a separate analysis of each individual manager's contribution to those misrepresentations.

**Q. Well, would it be fair to say, then, that you have no opinion as to any specific manager at Northwestern as to whether that person has any responsibility for the failure to make disclosures?**

A. It's fair to say that I haven't analyzed that.

Page 169

- PAUL A. MARCUS -

**Q. Well, do you have an opinion as to whether Mr. Hylland, for example, bears any responsibility for the failure to make disclosures?**

A. Again, my assignment was to assess -- analyze the impact of the disclosures not being made, not necessarily who was responsible for the disclosures not being made, if that's answering your question.

**Q. So you have no opinion as to any individual's responsibility for failure to make disclosures?**

MR. KAPLAN: Objection. Asked and answered.

A. I guess what I'm saying is that I have not analyzed any specific individual's contribution to those misrepresentations or omissions.

**Q. So I think you already testified that you have no opinion as to Mr. Hylland.**

**How about with respect to Mr. Lewis?**

MR. KAPLAN: Objection. Asked and answered.

A. It's the same answer. I don't have -- I have not specifically analyzed any individual person's contribution to the misrepresentations or

43 (Pages 166 to 169)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, New York 10017

- PAUL A. MARCUS -

which would have had an effect on how the company would have been able to issue debt and how the company Northwestern was viewed by the debt holders. So I used that information in coming up with my opinions to help assess those particular characteristics within the debt markets.

**Q. The rating agencies would have relied upon publicly available information that -- at the particular time they made their comments?**

MR. KAPLAN: Objection to the form.

A. I don't know that to be a fact or not. They could be given information that I don't know about that isn't public, so --

**Q. Have you ever been employed by a rating agency?**

A. I have not, no.

**Q. In your career, you've worked with rating agencies in various capacities and in your work representing lenders, for example?**

A. I've had to analyze the reports of credit rating agencies numerous times, yes.

**Q. In that context, have you ever known rating agencies to be relying upon information that was not part of the public domain?**

**- PAUL A. MARCUS -**

A. It's a bit of a chicken and the egg. Once they put out a report, then the information is in the public domain. I don't know if they had inside conversations with management prior to issuing their report that might have been private; I just can't answer that.

**Q. Earlier, Mr. Marcus, I had asked you about the definition of who was management, specifically with respect to your opinion on Page 6 of your report. There are other places in the report where you also refer to company management.**

**Would your answer be the same in each of those cases, that it's a general statement rather than a specific reference to individuals?**

A. That's correct; it would.

**Q. In the preparation of your expert report, did you ever review the public disclosure documents issued by the Montana Power Company at the time that it sold the QUIPS to the public in 1996?**

A. I did not, no.

**Q. I believe you did testify earlier that you did review the indenture and amendments to the indenture associated with the QUIPS?**

**- PAUL A. MARCUS -**

A. I believe I testified that I read it quickly. I reviewed would probably be stronger than I actually -- than I did.

**Q. If you would turn to Page 7 of your report, Mr. Marcus, in your opinion that's II.**

**You state, "Had the assets of Northwestern Energy LLC not been transferred to Northwestern, the QUIPS' investors would have been covered by the former's assets and not junior to the debt and other liabilities of Northwestern Corp."**

**What do you mean by "covered by the former's assets"?**

A. I refer you to later in my report where I describe it, but generally it's the structural subordination that we were talking about. So if Northwestern LLC is a separate entity, and looking at the assets and the liabilities of that entity there was positive net worth, as I described later in the report, whereas when they went to -- when those assets were transferred to Northwestern that flipped and by the end of 2002 there was no coverage for the securities that were at the bottom of the pile which, in this case, were the QUIPS.

- PAUL A. MARCUS -

**Q. So might it be fair to say when you used the phrase "covered by the former's assets," you mean that sometime in 2002 prior to November 15th, 2002, the assets of Northwestern Energy were greater than the liabilities of Northwestern Energy LLC? Excuse me.**

A. I believe the calculation that I employed in my report was to look at the tangible assets of Northwestern LLC at the last point in time where separate financial statements were prepared and subtract from that the total liabilities of the company, making the assumption that all the other liabilities in the company were senior to the QUIPS.

And I know that might or might not be correct but I took the most conservative position I could and said that even with that, there was an excess of asset coverage of, I believe it was $250 million, if that answers your question.

**Q. I think there was nothing in your answer to suggest that the QUIPS in any way were secured by the assets of Northwestern Energy LLC, correct?**

A. If you -- are you using "secured" in a legal --

**- PAUL A. MARCUS -**

A. Again, to the extent that I reviewed other documents relating to the Commission's attitude and feelings towards this company, they would have been included in my thinking when I came up with my opinions. I don't think they're referenced in the report, but they would have been -- they would have been something that would have given me a certain impression of what the company relationship with the Commission was and how the Commission might respond in a situation where all of a sudden the financial prospects of the company change dramatically.

**Q. Why would you not have referenced those in your report?**

A. I'm not saying it's not referenced in the document list. What I'm suggesting is there was one particular quote which I used in my report which you're calling a reference. I'm telling you the collective report describes what my belief is from my review of all this information.

**Q. So that it's clear to me, Mr. Marcus, are all the documents you reviewed listed in Exhibit 1 to your report?**

MR. KAPLAN: Objection to the form.

- PAUL A. MARCUS -

A. It's always my sincere hope that all of them do make it to this list. There could be an exception, and I just don't know.

**Q. So other than as a result of perhaps inadvertence, everything you looked at is referenced in Exhibit 1?**

A. That's my sincere desire to make that happen.

**Q. Just so that the record is clear, you have no understanding as to what the allegations against Messrs. Hanson and Kindt are that are made in the Complaint by Magten against them?**

MR. KAPLAN: Objection. Asked and answered.

A. That's correct.

MR. KALECZYC: Let's take a few minute break.

(Whereupon, there was a brief recess in the proceedings.)

**Q. Mr. Marcus, would you turn to Page 7 of your report, again, please.**

A. Okay.

**Q. In III, the third opinion, the assumption is that Clark Fork remained liable for**

**- PAUL A. MARCUS -**

**the QUIPS obligations.**

**Is that your assumption, or did someone direct you to make that assumption?**

MR. KAPLAN: Objection to the form.

A. That was an assumption I was asked to make.

**Q. Who asked you to make that assumption?**

A. That assumption would have been asked by counsel. I was asked to make that assumption by counsel.

**Q. Independent of the assumption that counsel asked you to make, do you have any opinion as to whether Clark Fork remained liable for the QUIPS obligations?**

MR. KAPLAN: Objection.

A. As a matter of a legal conclusion, I don't.

**Q. Any opinion?**

MR. KAPLAN: Objection. Calls for a legal conclusion. Goes to the underlying issue in the litigation.

A. I guess I can only tell you what I have, and I've made this assumption based on what I was asked to do by counsel.

- PAUL A. MARCUS -

**Q. You have no opinion independent of that assumption?**

MR. KAPLAN: Objection. Asked and answered. Calls for a legal conclusion.

A. I think I said the last time before the objection, that would be a legal conclusion and I did not make that opinion.

**Q. In your expert opinion in this case, you on several occasions give -- speculate as to what the Montana Public Service Commission may have done had certain information in your view been known to it.**

**Have you ever been called upon in an expert report in another matter to speculate on what a public utility commission or public service commission from a state might do?**

MR. KAPLAN: Objection to the opening speech, as well as to the characterization of the testimony.

A. I disagree with your calling my testimony speculative. And the speculation that I used, number one.

Number two, I have been involved in analyzing the Commission's responses to all kinds