448 F.3d 573, *578; 2006 U.S. App. LEXIS 12346, **11

District Court determined that "it [was] not clear whether all payments were made through Empire [as payment agent] or whether some were made directly." Thus, the District Court decided that summary judgment was unwarranted in favor [*579] of Horizon or any of the excepted three hospitals with respect to the Foreign Blue Cross Exception.

Because the District Court found that the NYPHRM completely abrogated the contracts upon its enactment, it determined that all parties had been "performing pursuant to implied contracts." The District Court also found that, during the course of this implied-in-fact contractual relationship, "all parties were performing pursuant to the [payment] terms of the abrogated contracts" without objection and applying by analogy "the law governing the performance of illegal contracts," concluded that it would [**12] "leave the parties as [it found] them."

The District Court further concluded that the Hospitals were not third-party beneficiaries of insurance policies between Horizon and its subscribers because the contracts between Horizon and its subscribers did not "provide any specifics as to how much the hospitals will be paid" and because there was no evidence suggesting that Horizon had ever promised its subscribers "that it would pay more than it actually paid" to the Hospitals. The District Court also dismissed the Hospitals' claims for unjust enrichment. The District Court determined that it was "not against 'equity and good conscience'" for Horizon to pay the Hospitals "at the New York Blue Cross Rates when [the Hospitals] accepted those rates without protest for several years." *See Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)* ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." (internal quotation marks omitted)). Indeed, the District Court determined that "the unjust result would [**13] be to allow [the Hospitals] to recover after silently accepting payment for eight years." Finally, the District Court determined that the Hospitals could not show that Horizon's conduct was deceptive and dismissed their claim for deceptive practices.

Judgment was entered on October 20, 2004. The Hospitals timely filed an amended notice of appeal on November 8, 2004. This Court has jurisdiction pursuant to *28 U.S.C. § 1291.*

**ANALYSIS**

I. *Standard of Review*

The standard of review of a district court's grant of summary judgment is a familiar one. A district court's grant of summary judgment is reviewed de novo. *Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir. 1999).* This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).* A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute [**14] about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997).* In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987).* This Court reviews a district court's interpretation of a contract [*580] de novo. *Lee v. BSB Greenwich Mortgage L.P., 267 F.3d 172, 178 (2d Cir. 2001).* Questions of law or mixed questions of fact and law are reviewed de novo. *Hirschfeld v. Spanakos, 104 F.3d 16, 19 (2d Cir. 1997).* This Court may "affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Leecan v. Lopes, 893 F.2d 1434, 1439 [**15] (2d Cir.), cert. denied, 496 U.S. 929, 110 S. Ct. 2627, 110 L. Ed. 2d 647 (1990).*

II. *Contract Claims*

A. CHA Claims

The parties disagree as to whether the NYPHRM applies to the relationships between Horizon and those hospitals subject to CHAs, given the CHAs' choice of law provision for the application of New Jersey law. Horizon argues that New Jersey law governs the application of the CHAs, that nothing in New Jersey law would abrogate any part of the CHAs, and, therefore, that the CHAs should be enforced as written. Horizon specifically

448 F.3d 573, *580; 2006 U.S. App. LEXIS 12346, **15

argues that the reimbursement rates provided by the CHAs, with which it complied, have not been abrogated and therefore that it did not breach its contracts. The Hospitals argue, conversely, that New York law governs the application of the CHAs and that the NYPHRM abrogated the CHAs completely. Specifically, the Hospitals argue that the CHAs' rate of reimbursement, choice of law, and limitation of actions provisions have been abrogated and are not enforceable. The District Court determined that the NYPHRM applied to the CHAs and abrogated them completely, thereby determining that the choice of law provision was "irrelevant" [**16] and, by implication, that the limitation of actions provision also was irrelevant. We need not address the question of whether New York or New Jersey law applies to the CHAs, for, whichever law applies, the CHAs' limitation of actions provisions are enforceable and all claims arising under the CHAs must be dismissed.

New Jersey law provides that "courts should enforce contracts as made by the parties." *Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 N.J. 86, 101, 415 A.2d 1156, 1164 (N.J. 1980). Although New Jersey law provides that a contract is "unenforceable where it is held to be contrary to public policy," *Manning Engineering, Inc. v. Hudson County Park Comm'n*, 74 N.J. 113, 138, 376 A.2d 1194, 1207 (N.J. 1977), Horizon asserts that nothing in the CHAs is contrary to New Jersey public policy and that this Court must enforce the CHAs as written. The Hospitals have not argued to the contrary and this Court is unaware of any public policy of New Jersey that would preclude enforcement of the CHAs. Accordingly, under New Jersey law, this Court would enforce the one-year limitation for bringing claims arising under the CHAs.

Under New York [**17] law the analysis is slightly different, but the result is the same. New York law provides that this Court must enforce contract provisions clearly expressing the intent of the parties. *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (citations omitted)). Contracts for an illegal purpose or contrary to public policy are not enforceable. *See 64th Associates, L.L.C. v. Manhattan Eye, Ear & Throat Hosp.*, 2 N.Y.3d 585, 589-90, 813 N.E.2d 887, 780 N.Y.S.2d 746 (N.Y. 2004). ("Ordinarily, courts are not involved in the oversight or approval of contracts and

will enforce them unless illegal, against public policy or deficient in some other respect."). [*581] Where part of a contract is contrary to public policy, and therefore unenforceable, a court may nevertheless enforce the remainder of the contract. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (N.Y. 1999) (enforcing portions of a restrictive covenant where another portion of the covenant was overbroad and unenforceable as contrary to public policy); *Triggs v. Triggs*, 46 N.Y.2d 305, 385 N.E.2d 1254, 413 N.Y.S.2d 325 (N.Y. 1978) [**18] (enforcing legal provisions of a corporate shareholder agreement containing illegal provisions); *Ferro v. Bologna*, 31 N.Y.2d 30, 286 N.E.2d 244, 334 N.Y.S.2d 856 (N.Y. 1972) (holding that a provision of a separation agreement that was of questionable legality did not vitiate the entire agreement and the other provisions of the agreement may be valid and enforceable); *see also Restatement (Second) of Contracts § 184(1)* (1981) ("If less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreements is unenforceable is not an essential part of the agreed exchange.").

The NYPHRM provided that "special payment rate methodology agreements other than those permitted in accordance with the provisions of paragraphs (a) and (b) of this subdivision shall not be authorized." N.Y. PUB. HEALTH LAW § 2807-c(2)(c). This is a clear statement of New York public policy. The at-issue CHAs present valid provisions governing the relationship between Horizon [**19] and the party-hospitals, covering such topics as types of services to be rendered by the hospitals, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical and financial records, confidentiality, and choice of governing law. Contrary to the District Court's view, the NYPHRM does not abrogate the CHAs *in toto* but only the part that contravenes New York public policy. Nothing in the NYPHRM purports to interfere with the parts of the CHAs that are not "special payment rate methodology agreements," and the balance of the CHAs remain valid and enforceable.

This action seeks to recover on claims that accrued between January 1, 1991 and the expiration of the

448 F.3d 573, *581; 2006 U.S. App. LEXIS 12346, **19

pertinent NYPHRM rate structure on December 31, 1996. Nothing in NYPHRM abrogates the CHAs' limitation of actions provision that "no action at law or in equity shall be maintainable for any claim arising out of this Agreement unless brought within one year from the date when the cause of action accrued," and that provision must be enforced according to its clear and unambiguous [**20] language. The original Complaint was filed on July 7, 1998, well after the one-year limitation period provided in the CHAs would have run for any accrued claim. Accordingly, all claims arising from the CHAs must be dismissed as untimely brought.

B. The Implied-in-Fact Contract Claims

With regard to the claims of the hospitals without CHAs -- Montefiore, the Hospital for Special Surgery, and Lennox Hill after June 8, 1995 -- a different analysis applies. Both Horizon and these three hospitals seem to agree that their relationships were based on implied-in-fact contracts. However, the District Court considered the CHAs abrogated in their entirety and treated Horizon and *all* the Hospitals as if they were subject to implied-in-fact-contracts. We proceed to analyze the implied-in-fact contract claims [*582] insofar as they relate to the hospitals without CHAs.

Under New York law, the conduct of the parties may lead to the inference of a binding agreement:

A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated [**21] by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.

*Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 330 N.E.2d 414, 369 N.Y.S.2d 400 (N.Y. 1975)* (internal citations omitted). New Jersey law provides the same: "Contracts implied in fact are no different than express contracts, although they exhibit a different way or form of

expressing assent than through statements or writings. Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances." *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574, 677 A.2d 747, 752 (N.J. 1996)* (citing *Restatement (Second) of Contracts §§ 4 cmt. a, 5 cmt. a (1979)*). The terms of an implied-in-fact contract turn on the conduct of the parties. *See Watts v. Columbia Artists Mgmt. Inc., 188 A.D.2d 799, 801, 591 N.Y.S.2d 234 (N.Y. App. Div. 3d Dep't 1992)* (citing *Jemzura, 36 N.Y.2d at 503-04*). The conduct of the parties in this case demonstrates [**22] that the implied-in-fact contract terms called for reimbursement at the equivalent of the Standard Rate, inasmuch as payments were made and accepted without objection at that rate. [4] This Court also must look to the conduct of the parties to determine whether the implied-in-fact contract terms include either a limitation of action provision or a choice of law provision, as did the CHAs. On the Record before us, we cannot say that the parties' course of conduct provides any evidence of the adoption of such specific terms. This Court must therefore determine whether New York or New Jersey law applies to these claims and the effect of that law.

4    The Hospitals have produced declarations claiming that "underpayments" under the NYPHRM "are solely the responsibility of Horizon" because "bills issued during NYPHRM listed the standard charges for hospital services, and all third-party payors were required to know at what level they should reimburse the hospital pursuant to NYPHRM." **[A 238; *see also* A 250]** Nevertheless, it is undisputed that, during the period that the NYPHRM was in effect, the Hospitals never objected to the rate of reimbursement they were receiving. **[*See* Blue 39]**

[**23] i. The Choice of Law

A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*; *Gilbert v. Seton Hall Univ., 332 F.3d 105, 109 (2d Cir. 2003)*. Here, the forum state is New York, as the action was properly venued in the United States District Court for the Eastern District of New York. We therefore apply New York choice of law analysis.

The New York Court of Appeals has held that "the

448 F.3d 573, *582; 2006 U.S. App. LEXIS 12346, **23

first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 613 N.E.2d 936, 597 N.Y.S.2d 904 (N.Y. 1993); see also Zurich Ins. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 642* [*583] *N.E.2d 1065, 618 N.Y.S.2d 609 (N.Y. 1994).* In this case the answer to that inquiry clearly is yes. Under New York's NYPHRM, these hospitals were entitled to a greater rate of reimbursement from Horizon than under New Jersey law, which permitted Horizon to enter contracts to pay these hospitals at reduced rates.

The New York Court [**24] of Appeals has held, in contract cases, that the "center of gravity" or "grouping of contacts" analysis is to be applied in choice of law situations. *Stolarz, 81 N.Y.2d at 226 (1993).* The "center of gravity" or "grouping of contacts" choice of law theory allows a court to consider a "spectrum of significant contacts." *Stolarz, 81 N.Y.2d at 225-26.* In *Solarz,* the New York Court of Appeals listed several factors which should be considered in a conflict of law analysis in a contract case. These factors include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Id. at 227* (citing *Restatement (Second) of Conflict of Laws, § 188(2)* (1971)). Given these factors, we determine that New York law should apply to these implied in-fact-contracts. The most significant contacts here were the rendering of hospital services in New York, the billing by the Hospitals in New York, and the New York domicile of all the Hospitals. We note moreover that New York has an important interest [**25] in maintaining the viability of hospitals in the state through the setting of appropriate rates. *See Zurich Ins. Co., 84 N.Y.2d at 317* ("The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" (quoting *Restatement (Second) of Conflict of Laws § 188(1)* (1971))).

ii. The NYPHRM Applied

Horizon argues that, in the event this Court determines that New York law governs these contracts, the NYPHRM did not "affect any right which had accrued prior to its enactment" and, therefore, that Horizon's pre-NYPHRM contracts (whether express or implied-in-fact) were unaffected by the NYPHRM. The basis of this argument can be found in the session law

enacting the NYPHRM. Section twenty-four of that session law (chapter two), dealing with effective dates and retroactivity of the NYPHRM, provides: "This act shall not be construed to alter, change, affect, impair or defeat any rights, obligations, duties or interests accrued, incurred or conferred prior to the enactment of this act." 1988 N.Y. Sess. Laws 44 (McKinney).

The District Court [**26] rejected this argument, determining that the statutory language of the NYPHRM demonstrated that

> the legislature clearly intended to set the rates of payment from [the point of NYPHRM's enactment] forward and did not intend to exclude pre-existing contracts with foreign insurers from the statute. Rather, the legislature was simply trying to ensure that any costs that accrued prior to January 1, 1988 [the effective date of the rate provisions, *see* 1988 N.Y. Sess. Laws 44 (McKinney) )] were not subject to the terms of the statute. Thus, [Horizon] is not exempt from the terms of the NYPHRM because of the Alteration Clause.

We agree with the rationale and conclusion of the District Court. Neither section twenty-four, nor any other provision of the NYPHRM, insulates these implied-in-fact contracts from the effects of the NYPHRM.

[*584] iii. The Doctrine of Illegality Misapplied

The District Court determined that the NYPHRM rate structure was not part of any implied-in-fact contract. First, the District Court noted that it had not been provided "any authority . . . for the proposition that [a court] should read the rates of the statute into an implied[-in-fact] [**27] contract where both parties were clearly not performing according to the statute." Second, the District Court found that the NYPHRM "clearly gave [the Hospitals] the right to demand higher rates of reimbursement, but it did not create a new implied[-in-fact] contract because the parties did not agree to the terms." The District Court therefore determined that the implied-in-fact contracts contained payment terms "rendered illegal by the passage of [the] NYPHRM" and analogized them to illegal contracts that

448 F.3d 573, *584; 2006 U.S. App. LEXIS 12346, **27

could not be enforced by any party.

But this analogy is misplaced. The contracts at issue were not illegal in their subject matter or in their purpose. *Cf. Stone v. Freeman, 298 N.Y. 268, 271, 82 N.E.2d 571 (N.Y. 1948)* ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." (citations omitted)). Instead, as with the CHAs, these are otherwise legitimate contracts that have been abrogated in part by a statute. [**28] In such cases, New York courts enforce those portions of the contracts that are not abrogated and apply the relevant statute to those abrogated portions. In *Metropolitan Life Ins. Co. v. Conway, 252 N.Y. 449, 169 N.E. 642 (1930)*, for example, Chief Justice Cardozo, writing for the Court of Appeals, held that where an insurance policy rider was not approved by the New York Superintendent of Insurance, as required by New York Insurance Law, "the rider is not invalid ipso facto unless in conflict with the provisions exacted by the statute. It is invalid even then to the extent of the conflict, and no farther. *The statute reads itself into the contract, and displaces inconsistent terms." Id. at 451-52* (emphasis added). Accordingly, the NYPHRM provides the relevant rates of reimbursement for these implied-in-fact contracts.

iv. The Foreign Blue Cross Exception

The District Court determined, as to the three hospitals not subject to a CHA, that summary judgment was unwarranted in regard to the claims that invoked the Foreign Blue Cross Exception. The District Court properly found contested issues of material fact regarding the extent to which [**29] Horizon used Empire as a payment agent, an element essential to a resolution of the Foreign Blue Cross Exception claims. *See Fed. R. Civ. P. 56(c)*. We therefore must remand for further proceedings in relation to the implied-in-fact contract claims. We express here no opinion as to the District Court's conclusions as to the other two necessary elements of Horizon's eligibility for the Foreign Blue Cross Exception.

v. Waiver

Horizon argues that, assuming it breached its contracts by not paying at the Self-Pay Rate, any breach

has been waived by the Hospitals because they accepted the payments that it made "without objecting or reserving any rights." [5] A [*585] breach of contract may be waived by the non-breaching party. *See New York Tel. Co. v. Jamestown Tel. Corp., 282 N.Y. 365, 372, 26 N.E.2d 295 (N.Y. 1940). See generally §§ 22A N.Y. Jur. 2d Contracts 369, 430 (1996)*. The New York Court of Appeals has held that waiver of a contract right "is the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." *Jefpaul Garage Corp. v. Presbyterian Hosp., 61 N.Y.2d 442, 446, 462 N.E.2d 1176, 474 N.Y.S.2d 458 (N.Y. 1984)* [**30] (citations omitted); *Nassau Trust Co. v. Montrose Concrete Products Corp., 56 N.Y.2d 175, 184, 436 N.E.2d 1265, 451 N.Y.S.2d 663 (N.Y. 1982)* ("Waiver requires . . . the voluntary and intentional abandonment of a known [contract] right which, but for the waiver, would have been enforceable." (citation omitted)); *see also Champion Spark Plug Co. v. Automobile Sundries Co., 273 F. 74, 79-80 (2d Cir. 1921)* ("Waiver [of a contract right] depends upon the intention of the party who is charged with the waiver. It is an intentional abandonment or relinquishment of a known right or advantage.").

> 5   The Hospitals assert that they "were not given an opportunity to make an evidentiary showing on this issue . . . because the lower court ruled on this issue without input or briefing by the parties." The District Court did not explicitly address the issue of waiver, though portions of its decision addressing the Hospitals' having "accepted each of [Horizon's] payments without questioning whether or not they complied with the [NYPHRM]" over the course of eight years could be read that way.

[**31] Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a "clear manifestation of an intent by plaintiff to relinquish her known right" and "mere silence, oversight or thoughtlessness in failing to object" to a breach of the contract will not support a finding of waiver. *Courtney-Clarke v. Rizzoli Intern. Publications, Inc., 251 A.D.2d 13, 13, 676 N.Y.S.2d 529 (N.Y. App. Div. 1st Dep't 1998); see also Champion Spark Plug Co., 273 F. at 79* ("Oversight, carelessness, or thoughtlessness will not create a waiver. There must appear to be an intention to relinquish the right or advantage, and it must be proved."). "The intent to waive is usually a question of

448 F.3d 573, *585; 2006 U.S. App. LEXIS 12346, **31

fact . . . ." *Jefpaul Garage Corp., 61 N.Y.2d at 448; see also Champion Spark Plug Co., 273 F. at 80* ("So much depends upon the intention of the parties that, where such intent is disputed, it necessarily becomes a question for the determination of a jury.").

The Hospitals first argue that, no matter their intent, the doctrine of waiver is inapplicable here because "the statutorily mandated rate under NYPHRM was not subject [**32] to waiver by the Hospitals." The Hospitals recognize, as they must, that any statutory or constitutional right ordinarily may be waived. However, the Hospitals point to the "broad spectrum of public policies" underlying NYPHRM's enactment and argue that "it was not in the power of the Hospitals to frustrate the will of the Legislature either expressly or impliedly or through an alleged waiver or acquiescence." *See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707, 65 S. Ct. 895, 89 L. Ed. 1296 (1945)* ("Neither petitioner nor respondent suggests that the right to the basic statutory minimum wage could be waived by any employee subject to the [Fair Labor Standards] Act. No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act."); *see also Garofalo v. Empire Blue Cross and Blue Shield, 67 F. Supp. 2d 343, 347-48 (S.D.N.Y. 1999)* (finding that the NYPHRM "gives the insurer no discretion to vary this methodology, nor to contract around it").

The hospitals next argue that, in any event, no waiver can be found under the facts of this case. On the Record [*586] before us, there has been no express waiver of the [**33] hospitals' rights to greater recompense. There has, of course, been evidence that the hospitals never previously objected to the rate of reimbursement they were receiving, *see supra* note 4, but we cannot determine that this failure to object, as a matter of law, effects a waiver. *See Jefpaul Garage Corp., 61 N.Y.2d at 448* ("The intent to waive is usually a question of fact . . . ."); *Courtney-Clarke, 251 A.D.2d at 13* ("The requisite clear manifestation of an intent by plaintiff to relinquish her known right to the royalty rate in the publishing agreement is not inferable, under the circumstances, from her mere silence, oversight or thoughtlessness in failing to object to the lower royalty rate she had been receiving, and thus the defense of waiver was properly dismissed." (citation omitted)); *see also Champion Spark Plug Co., 273 F. at 79-80* (holding that waiver of a contract right is generally a question for the jury). Accordingly, and in view of the posture in which this issue comes to us, we

must remand to the District Court to resolve issues related to the defense of waiver in the first instance.

vi. Statute [**34] of Limitations

New York law provides a six-year statute of limitations period for implied-in-fact contract claims. *N.Y. C.P.L.R. § 213(2)*. As previously noted, this action sought recovery for claims accrued between January 1, 1991, and December 31, 1996. The initial Complaint was not filed until July 7, 1998, so at least some of these claims are barred by the statute of limitations. Moreover, the Hospital for Special Surgery was not added as a plaintiff until a later date still. Accordingly, on remand, the District Court will have to determine, in the first instance, which claims are timely and which are not.

III. *Unjust Enrichment*

The Record makes clear the Hospitals' claims of unjust enrichment have been made "in the alternative" to their contract claims. In support of their cross-motion for summary judgment and in opposition to Horizon's motion for summary judgment the Hospitals argued to the District Court that

> if this court determines that no contractual relationships exist between the Hospitals and Horizon -- which it should not -- the Hospitals are still entitled to summary judgment because Horizon's payment to [**35] the Hospitals at rates far lower than those permitted by New York law constitutes unjust enrichment as a matter of law.

Thus, Horizon recognized that the court should treat the claims for unjust enrichment only if it first determines that no contractual relationships exist between Horizon and the hospitals. Because we have determined, as the Hospitals insisted that we should, that contractual relationships did exist between Horizon and the Hospitals, the unjust enrichment claims must be dismissed.

Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."

448 F.3d 573, *586; 2006 U.S. App. LEXIS 12346, **35

*E.g., Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)* (internal quotation marks omitted). It is important to note, however, the nature of an unjust enrichment claim in New York: "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." [**36] *Goldman* [*587] *v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572, 841 N.E.2d 742, 807 N.Y.S.2d 583 (N.Y. 2005)* (citations omitted; emphasis added). As the New York Court of Appeals has explained:

> The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. . . . Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved. . . .*

> Of course, a party may perform a contract under protest, and then sue for damages resulting from the second party's breach. Alternatively, where rescission of a contract is warranted, a party may timely rescind and seek recovery on the theory of quasi contract. It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid [**37] written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388-89, 516 N.E.2d 190, 521 N.Y.S.2d 653 (N.Y. 1987)* (internal citations omitted; emphasis in original).

Thus, under New York law, those hospitals subject to CHAs clearly may not recover under a theory of unjust enrichment, inasmuch as the valid and enforceable written CHAs governed the particular subject matter of this case.

Claims of unjust enrichment by the three hospitals that were not subject to CHAs must also be dismissed. Because, as noted above, "in the law there is no distinction between agreements made by words and those made by conduct," and implied-in-fact contracts are "just as binding as [] express contract[s] arising from declared intention," *Jemzura, 36 N.Y.2d at 504, Clark-Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact. *See Jim Longo, Inc. v. Rutigliano, 294 A.D.2d 541, 742 N.Y.S.2d 877 (N.Y. App. Div. 2d Dep't 2002)* (reversing [**38] a jury verdict in favor of the plaintiff on "a theory of quasi-contract" because a performed oral contract precluded any such claim (citing, inter alia, *Clark-Fitzpatrick*)); *Bello v. Cablevision Systems Corp., 185 A.D.2d 262, 587 N.Y.S. 2d 1 (N.Y. App. Div. 2d Dep't 1992)* (holding that an implied-in-fact contract precluded a claim for "quasi-contract" (citing, inter alia, *Clark-Fitzpatrick*)). As we have determined that valid, enforceable implied-in-fact contracts existed between Horizon and each of the three at-issue hospitals and that these contracts governed the particular subject matter of this case, the unjust enrichment claims of the at-issue hospitals are precluded. *Cf. Nakamura v. Fujii, 253 A.D.2d 387, 677 N.Y.S.2d 113 (N.Y. App. Div. 1st Dep't 1998)* (in case involving purported oral contract, recognizing that existence of oral contract would "preclude[] quasi-contractual recovery," but holding that where "a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories" (citing, inter alia, *Clark-Fitzpatrick*)).

In accordance with the foregoing, all claims for unjust [**39] enrichment are dismissed as precluded under New York law and inconsistent with the Hospitals' own pleadings [*588] because we have found valid, enforceable contracts between Horizon and the Hospitals.

*IV. Other Claims*

We have considered the Hospitals' third-party beneficiary and deceptive practices claims and find them meritless for the same reasons as did the District Court.

**CONCLUSION**

For the foregoing reasons we affirm in part and

448 F.3d 573, *588; 2006 U.S. App. LEXIS 12346, **39

vacate in part the judgment of the District Court and remand for further proceedings consistent with the foregoing. Specifically, the District Court is directed to determine: whether any timely claims were made for breach of implied-in-fact contract by Montefiore, the Hospital for Special Surgery, and Lennox Hill (after June 8, 1995 ); whether, if so, any of the three hospitals waived any benefit to which they were otherwise entitled; and, if no waiver is found, whether Horizon was entitled to the benefit of the Foreign Blue Cross Exception as to claims made by any of the three hospitals. The District Court is further directed to fix the amount of any claim deemed meritorious in accordance with these directions.

**DISSENT BY:** KEARSE

**DISSENT**

KEARSE, *Circuit Judge*, dissenting in part:

[**40] I respectfully dissent from the majority opinion in several respects. First, I disagree that a hospital that had a written Contracting Hospital Agreement ("CHA") with defendant or its predecessors (collectively "Horizon" or the "Plan") is barred from recovery by the contractual one-year limitations period specified in the CHA. Second, I disagree (a) that a plaintiff hospital that had no written contract with Horizon had an implied-in-fact contract calling for payments at the rate mandated by the 1988-1996 legislation known as the New York Prospective Hospital Reimbursement Methodology ("NYPHRM"),and (b) that such rights as those hospitals had to receive payment at the NYPHRM-mandated rate could be waived. In my view, NYPHRM abrogated the CHAs, and there were no implied-in-fact contracts calling for payments at the NYPHRM-mandated rate; however, I believe that plaintiffs' claims in quantum meruit should not have been summarily dismissed to the extent that they accrued within six years of the commencement of the present action.

A.   *The   Upholding   of   the   Contractual Limitations-Period Provision*

I agree with [**41] the majority that NYPHRM abrogated the payment provisions of the CHAs. NYPHRM provided, with exceptions not pertinent here, that "special payment rate methodology agreements . . . shall not be authorized, and no other arrangements with a general hospital for inpatient rates of payment other than

those established in accordance with this section shall be negotiated." *N.Y. Pub. Health Law § 2807-c(2)(c).* As the majority notes, this section constituted "a clear statement of New York public policy." Majority Opinion *ante* at 12. Because the CHAs allowed Horizon to pay New York hospitals at a lower rate than that permitted by NYPHRM § 2807-c(1)(c), the CHAs were contrary to public policy. I disagree with the majority's view, however, that the CHA was a severable contract from which the provision for payment could be excised leaving the limitations-period provision enforceable.

As the majority opinion recognizes, *see ante* at 12, it is established that "if less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not [*589] engage in [**42] serious misconduct *if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.*" *Restatement (Second) of Contracts § 184(1)* (1981) (emphasis mine). However, the latter condition is not satisfied in the present case, for Horizon's payment to the hospital was an essential part of the agreed exchange. Indeed, it was the entire essence of the CHA: The only substantive promise Horizon made to the hospitals was to pay them.

The majority opinion instead views the CHA--a 3-page, 12-paragraph form document created by Horizon--as dealing with "many . . . topics":

> The CHAs governed the relationship between Horizon and the hospitals as to many specific topics: types of services to be rendered by the hospitals, rate of payment, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical     and     financial     records, confidentiality, and choice of governing law.

Majority Opinion *ante* at 3. But every one of the substantive [**43] topics covered in the CHA concerned payment.

For example, the CHA did not govern the types of services "to be rendered" by the hospitals or a patient's

448 F.3d 573, *589; 2006 U.S. App. LEXIS 12346, **43

eligibility for services; rather, it governed only the types of services for which-- for Horizon subscribers--Horizon agreed to pay. Thus, the CHA defined "eligible persons" to "mean[] such persons as are entitled to eligible hospital services" as Plan subscribers, and it defined "eligible hospital services" to "mean[] *such hospital services as Plan has contracted to provide payment* for eligible persons." (CHA P1.B. (emphasis added).)

Similarly, notice of an admission to the Hospital was required only with respect to services "purporting to be eligible for payment by the Plan under this Agreement." (*Id.* P4.) The CHA's termination paragraph made provision for payment for past "eligible hospital services" and the continuation of current "eligible hospital services." (*Id.* P7.) And medical records were required to be made available only as they "pertained to claim determination." (*Id.* P8.)

Aside from imposing a duty to keep patient information confidential, the remainder of the CHA consists of provisions [**44] that are merely procedural. (*See id.* P3 (one-year limitation period for lawsuits); *id.* P10 (choice of law); *id.* P11 (where to send notices of termination); and *id.* P12 (CHA paragraph headings not to be deemed controlling as to contract meaning).) In my view, the contractual limitations-period provision cannot survive the invalidation of the payment provision, for if there had been no provision for Horizon to make payments to the hospitals, there would have been no contract at all.

Given that the agreement for payment is invalid, I would conclude that the district court ruled correctly that the CHAs were abrogated *in toto.*

I note in passing my disagreement with Horizon's contention that the CHA provision for payments at a below-NYPHRM-mandated rate should be upheld on the theory that New Jersey law does not require payment at the NYPHRM rate and the CHAs provided that New Jersey law should apply. The plaintiff hospitals were domiciled in New York; they treated patients in New York; and NYPHRM sought to protect the New York hospitals' viability. The New York hospitals and those who dealt with them could not defeat New York's interest in the public [**45] welfare or override the statute implementing it, by the simple expedient of agreeing among [*590] themselves that they would be governed by New Jersey law.

I agree with the district court's rejection of plaintiffs' contention that once the CHAs were overridden by the statute, the parties were performing pursuant to implied contracts. The district court correctly ruled that a contract may be implied in fact from the presumed intention of the parties as indicated by their conduct, *see, e.g., Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 376 n.5 (2d Cir. 2000),* but that there is no indication here that the parties intended that Horizon would pay the hospitals at the rate mandated by NYPHRM.

However, given the invalidation of the express contracts and the absence of any implied-in-fact contracts, I see no doctrinal impediment to plaintiffs' pursuit of claims in quasi contract, or quantum meruit. *See generally Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656 (1987)* (a claim in quasi-contract or quantum meruit is normally not available where a valid and enforceable agreement exists between [**46] the parties). The district court dismissed the quantum meruit claims here on the ground that there was no injustice because plaintiffs accepted the below-NYPHRM-mandated rate without protest for eight years. This seems to me an unduly narrow view of what is just, especially given that NYPHRM sought to further "New York['s] . . . important interest in maintaining the viability of hospitals in the state through the setting of appropriate rates," Majority Opinion *ante* at 16 n.5, and that the hospitals' viability is, in turn, critical to the availability of adequate medical treatment for the people of and in New York. I do not believe the quantum meruit claim was susceptible to summary judgment in favor of Horizon simply on the basis of the hospitals' failure to commence this action sooner.

### B. *Implied-in-Fact Contracts and Waiver*

I also disagree with the majority's view that the hospitals that did not have written contracts with Horizon may be found to have waived their right to payment at the rate mandated by NYPHRM. The majority's premise is that "valid, enforceable implied-in-fact contracts existed" between Horizon and the plaintiff hospitals that [**47] did not have written contracts, *see* Majority Opinion *ante* at 23; and it notes that contract rights may be waived, *see, e.g., id.* at 19 ("*waiver of a contract right* is the voluntary abandonment or relinquishment of" such a right (internal quotation marks omitted) (emphasis added)); *id.* ("*waiver of a contract right* must be proved to be intentional"

448 F.3d 573, *590; 2006 U.S. App. LEXIS 12346, **47

(emphasis added)).

I disagree with the majority's premise. I do not see in the parties' words or conduct a basis for imputing to Horizon and any of the hospitals that accepted Horizon's rate an intention that Horizon would pay the NYPHRM-mandated rate.

Thus, it seems to me that the hospitals' right to payment at the rate mandated by NYPHRM was not a contract right; it was a right conferred by statute. As discussed above, that statute sought to further New York's interest in maintaining the fiscal viability of its hospitals in order to ensure the availability of adequate medical treatment for persons in New York. My view is that the right to be paid at a rate that was statutorily mandated in the interest of public welfare,*i.e.*, for purposes beyond that of merely filling hospital coffers, [**48] could not be waived. Indeed, the view that the hospitals that had no written contracts with Horizon may permissibly be found to have waived their rights to the

NYPHRM-mandated payment rate if their actions [*591] were knowing, voluntary, and intentional would seem to be inconsistent with this panel's unanimous view that the lower-than-NYPHRM-mandated rate actually agreed to in writing by the hospitals that entered into CHAs cannot be enforced.

In sum, my view is that all of the plaintiffs' claims based on contracts, express or implied, were properly dismissed. But given the statutory landscape, the court should not have granted summary judgment dismissing their claims for quantum meruit.

Claims in quantum meruit in New York are subject to a six-year statute of limitations. *See N.Y. C.P.L.R. § 213(1)*. Accordingly, I would vacate the judgment to the extent that it dismissed plaintiffs' quantum meruit claims and would remand for the adjudication of those claims to the extent that they accrued within the six-year period prior to the commencement of the present action.

*** Slip Sheet ***

Document

LEXSEE 2001 U.S. DIST. LEXIS 16345

**NORMAN H. BROOKS, JR., Plaintiff, v. ROBERT G. FIORE and the NATIONWIDE MUTUAL INSURANCE CO., Defendants.**

**C.A.No. 00-803 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 16345*

**October 11, 2001, Decided**

**DISPOSITION:** [*1] Defendants' motion for summary judgment was granted. Judgment was entered in favor of the defendants on all claims. Defendants' motion to dismiss was declared moot.

**COUNSEL:** For NORMAN H. BROOKS, JR., plaintiff: Norman H. Brooks, Jr., Norman H. Brooks, Jr., Esq., Middletown, DE.

For ROBERT G. FIORE, NATIONWIDE MUTUAL INSURANCE COMPANY, defendants: Kathleen Furey McDonough, Wendy K. Voss, Erica L. Niezgoda, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

Plaintiff, Norman H. Brooks, Jr. ("Brooks"), filed suit against his former employer, Nationwide Mutual Insurance Co. ("Nationwide") and his supervisor Robert G. Fiore ("Fiore") (collectively "the defendants")for violating various state and federal laws. In total, Brooks has alleged eleven claims relating to his employment contract, his duties as a Staff Judge Advocate in the United States Air Force, and his subsequent termination from Nationwide.

On July 20, 2000, Brooks [*2] filed his original complaint in the Superior Court of Delaware, alleging violation of his rights under OSHA and retaliation by the defendants in response to his filing a complaint with the regional OSHA administrator. The action was removed to this court on August 30, 2000 on the basis of diversity jurisdiction. Brooks amended his original Complaint on January 8, 2001 to add various state law and statutory claims. Based on the amended complaint, the defendants filed a pre-answer motion to dismiss, or in the alternative for summary judgment, on January 22, 2001. They subsequently filed this motion for summary judgment on June 13, 2001.

Presently before the court is the defendants' motion for summary judgment on all eleven claims [1]. The court will grant the motion in its entirety because there are no genuine issues of material fact to be resolved by a factfinder.

> 1    January 22, 2001, the defendants filed a motion to dismiss for failure to state a claim under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Because the court will now rule on the defendants' subsequent motion for summary judgment on the same issues, the January 22, 2001 motion to dismiss is rendered moot and will not be ruled upon.

[*3] **II. STANDARD OF REVIEW**

Thecourt may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

2001 U.S. Dist. LEXIS 16345, *3

matter of law." *Fed. R.Civ. P. 56(c); see also Boyle v. County of Allegheny, Pennsylvania,139 F.3d 386, 392 (3d Cir. 1998).* Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,139 F.3d at 392.* A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).* An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* Indeciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assafv. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999).* [*4]

With these standards in mind, the court will briefly describe the facts and procedural history that led to the motion presently before the court.

## III. BACKGROUND

Brookswas employed by Nationwide as an attorney in its Delaware Trial Division office from February 1993 until November 9, 2000. While employed at Nationwide, Brookswas also a reserve Staff Judge Advocate in the United States Air Force.

During Brooks' interviews with Nationwide in 1993, he learned that it was Nationwide'spractice to conduct a performance evaluation after one year of employment and then annually thereafter. These performance evaluations were used in determining whether the employee received a pay raise. Nationwide did not, however, guarantee its employees would receive a post-evaluation raise, regardless of the outcome of an evaluation. Nationwide also assured Brooks, prior to his accepting employment with them, that his job responsibilities would not interfere with his reserve military commitments. These policies were also contained in an employee handbook, which Brooks has acknowledged he received and read. The handbook further clarifies that Nationwide's relationship with its employees is [*5] an at-will relationship.

During the first three years of Brooks' employment with Nationwide, Ransford Palmer was his supervisor. Palmer completed annual performance reviews for Brooks. These reviews always resulted in an increase in compensation. In 1997, Fiore was appointed the

managing attorney of the Delaware Trial Division office and, therefore, became Brooks' direct supervisor. In May 1997, the first time that Fiore served as Brooks' rater, Brooks again received a raise. The following April, Brooks and Fiore discussed his performance, which resulted in a raise and a promotion. On this occasion, Fiore did not do a written performance evaluation. After complaining to John Flynn, Fiore's supervisor, Fiore completed a written performance evaluation, giving Brooks marks indicating that he "consistently achieved performance standards." Brooks then sent a memorandum entitled "Employee Response to Performance Evaluation" to John Jones, the Division Vice President. In that memorandum, Brooks asserted that his performance evaluation was "nothing more than an act of reprisal" due to Brooks'original complaint to Flynn about the late written evaluation.

Beginning in September 1998, the [*6] Delaware Trial Divisionattorneys were required to input their time records using a new computer system. Brooks refused to comply with that requirement. Moreover, Brooks asserts that when he typed on his office computer, he experienced pain in his wrists. Brooks believed that this problem was caused by an ergonomically incorrect work station. On November 9, 1998, Brooks filed a complaint with the regional OSHA office regarding his work station configuration. In response, Nationwide flew an occupational health nurse from Ohio to Delaware. The nurse recommended, and Flynn approved, the purchase of a new chair and computer stand for Brooks. Brooks withdrew his OSHA complaint.

In 1998, Nationwide also experienced problems with Brooks' lack of documentation with regard to his time away from the office for military service, which Nationwide paid for. Under Nationwide'spolicies, a member of the military could receive up to two weeks salary "differential" in a given year for time spent performing required duty. To qualify for the salary differential, however, the employee had to provide notice and documentation in regard to such benefits and/or the allocation of leave. Brooks failed to provide [*7] such documentation and, indeed, threatened to sue the office manager when she asked for the records.

Brooks' performance as an attorney for Nationwide was also suffering during this time. Flynn reviewed Brooks' files and noted severe deficiencies in his cases. Therefore, Flynn assigned Tom Bouchelle to monitor

2001 U.S. Dist. LEXIS 16345, *7

Brooks' work on an ongoing basis. Fiore also advised Brooks that failure to heed future directives would result in immediate termination for insubordination.

In Spring 1999, Fiore informed Brooks that due to his performance deficiencies and interpersonal problems during the prior year, Brooks would not be receiving a salary increase. Fiore also asserted that he would not prepare a written performance evaluation for Brooks because it would be quite negative. Fiore finally put Brooks on a minimum of one year "probation" before any salary increase would even be considered. On October 21, 1999, however, Brooks again asked for a written performance review and salary increase for 1999. Fiore denied this request.

Brooks was called to military duty in April 2000. At that time, he again expressed concern that he had not received a written performance review in two years. When Brooks [*8] brought this concern to the Human Resources representative, Julie Blankenship, she informed him that records indicated that his most recent performance review had been conducted in April 1999. Brooks informed Flynn via e-mail that he had not received a review then. He concluded the e-mail by mentioning that Fiore must have retaliated against him for filing the OSHA complaint in November 1998. Flynn then confirmed with Fiore that, in fact, Brooks' last formal evaluation had been in September 1998.

Additionally, Fiore initially imposed certain conditions in connection with Brooks' April 2000 military leave. Amongthem was the requirement that Brooks use his vacation time for military service, before he would allow Brooks to leave. However, within one day, and prior to Brooks' leaving for duty, Fiore's instructions to Brooks were countermanded. Thereafter, all that remained for Brooks to do was to comply with Nationwide's normal documentation procedures regarding absences for which the employee is seeking paid leave.

Brooks filed another complaint with OSHA in April 2000. In this second complaint, Brooks alleged that both Fiore and Nationwide had retaliated against him for filing his [*9] November 1998 OSHA complaint by withholding subsequent performance reviews and salary adjustments. Brooks further asserted that Fiore'sinitial response to his impending military leave was in retaliation for the original OSHA complaint. Brooks twice offered to hold the retaliation complaint in

abeyance if Flynn would intercede on his behalf with regard to his compensation and performance reviews. Flynn declined on both occasions to do so. Brookslater withdrew the April 2000 OSHA suit.

Brooks returned from his military leave in mid-May 2000. At that time, the office manager once again attempted to obtain the required documentation from him. Brooks refused and accused her of harassment. Brooks finally submitted the paperwork three months later.

On July 20, 2000, Brooks filed his initial lawsuit against Nationwide in the Superior Court of Delaware. Nationwide terminated Brooks' employment on November 9, 2000. Flynn decided to do so after Nationwide's General Counsel recommended that Brooks be terminated for filing a frivolous lawsuit against the company. The General Counsel stated that such a lawsuit constituted disruptive behavior and unprofessional conduct.

With this background [*10] in mind, the court will discuss each of Brooks'eleven claims in turn.

## IV. DISCUSSION

### A. Retaliation

Brooks has indicated that he is no longer pursuing Count One of his amended complaint. Accordingly, the court need not address Count One.

### B. Breach of Contract

Count Two of Brooks' amended complaint alleges that the defendants breached an employment contract between the defendants and Brooks. Brooks conceded during his deposition on May 29, 2001 that he never had a contract for employment with the defendant Fiore. Therefore, the court will grant summary judgment on Count Two as to the defendant Fiore.

With regard to the defendant Nationwide, Brooks has also failed to prove the existence of an employment contract between himself and the defendant Nationwide. Absent a contract of employment, an employee under Delaware law is considered to be an at-will employee. See Heideck v. Kent Gen. Hosp., Inc.,446 A.2d 1095, 1096 (Del. 1982). As such, he or she may be terminated with or without cause at any time. Seeid. Delaware law is clear that "written or oral statements to a prospective employee concerning the conditions of [the prospective

employee's] [*11] employment are not enforceable against the employer without some basic contract consideration, i.e. detrimental reliance by the employee upon the representations made by the employer." *Asher v. A.I. duPont Inst. of the Nemours Found., 1987 Del. Super. LEXIS 1206, 1987 WL 14876*, at *3 (Del.Super. June 19, 1997) (citing 9 WILLISTON ON CONTRACTS § 1017 (3d ed.).

Brooks' breach of contract claim rests first upon the theory that the pre-hire oral statements made to him formed a valid oral employment contract. As previously noted, these alleged statements include statements that Brooks would receive annual performance reviews and would be permitted to continue serving in the U.S. Air Force reserve without detriment to his position with Nationwide. Such statements, which merely reiterated Nationwide policy, are not sufficient to create enforceable contractual obligations under Delaware law. *See Avallone v. Wilmington Med. Ctr., Inc., 553 F. Supp. 931, 936 (D. Del. 1982); Asher 1987WL 14876*, at *3. Brooks has presented no evidence that at the time of hire, there was any negotiation, much less consideration, for Nationwide's alleged oral promises. Indeed, Brooks testified [*12] during his deposition that he did not condition his acceptance of Nationwide's employment offer in any way. As such, the court finds no valid oral contract.

Alternatively, Brooks argues that a written contract embodying the terms of his employment was created by a series of documents, including Nationwide's Employee Handbook, a document entitled "Total Compensation Statement," several annual performance evaluations, pay stubs and a statement that Brooks signed, in which he agreed to limit his private practice of law during the time of his employment with Nationwide. This argument too must fail.

Brooks acknowledged that he received an employee handbook in 1993. At his deposition, upon being shown a copy of an employee handbook dated April 1993, Brooks agreed that the book was the one given to him when he began his employment at Nationwide. That handbook clearly states as follows:

> The philosophies, policies, procedures and benefits contained in this handbook are not conditions of employment, *nor do they imply, create or constitute an*

*employment contract. Nationwide has an employment at will relationship with its employees.*This means both Nationwide and each employee have [*13] the right to terminate employment at any time, with or without reason. (emphasis added)

This language leaves no doubt as to the nature of the employment relationship Nationwide and its employees shared. Further, Delawarelaw is well-settled that an employee handbook containing a unilateral expression of company policies, does not create an employment contract. *See Heideckv. Kent Gen. Hosp., Inc., 446 A.2d 1095, 1096 (Del. 1982); Asher*, 1987WL 14876, at *2-3. Furthermore, none of the other documents which Brooks cites, taken alone, or in conjunction with others, in any way changed his status as an employee at will.

Prior to beginning his employment with Nationwide, Brooks filled out and signed a formal employment application, which stated as follows:

> If I am granted employment, I agree to conform to the rules and regulations of Nationwide, and my employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either Nationwide or me. I understand no supervisor or representative of Nationwide, other than the General Chairmanof Nationwide, has the authority to make any representation [*14] for employment for any specified period of time, or to make any representations contrary to the foregoing. The policies, procedures and statements contained on this application do not imply, create, or constitute, an employment contract.

It is undisputed that Brooks never had any conversations with the General Counsel of Nationwide regarding his employment, nor did they exchange any correspondence. Similarly, the Total Compensation Statement upon which Brooks relies also contains explicit language warning that the document does not "imply, create or constitute an employment contract." As for the document Brooks signed limiting his practice of law during his employment with Nationwide, that document contains no language

indicating that Brooks' employment was anything but at-will. Additionally, it does not contain any language related to performance evaluations, military service, or any of the other alleged "terms" of Brooks' employment "contract."

Therefore, and in light of the fact that Brooksfailed to address this claim in his answering brief dated July 23, 2001, the court finds that there is no disputed issue as to Nationwide's assertion that there was no contract as a [*15] matter of law. Accordingly, summary judgment in favor of the defendants is granted on Count Two.

## C. Promissory Estoppel

In order to succeed on a claim for promissory estoppel, a plaintiff must prove (i)the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reasonable reliance; and (iv) injury. *See Scott-Douglas Corp. v. Greyhound Corp., 304 A.2d 309, 319 (Del. Super. 1973).* Mere expressions of opinion, expectation, or assumption are insufficient. *See Borish v. Graham, 655 A.2d 831, 835 (Del. Super. 1994).* Finally, a "unilateral expression" by an employer of its employment policy does not modify an employee's at-will status. Such expression is insufficient to give rise to a cause of action for at-will employees. *See Rizzo v. E.I. duPont de Nemours& Co., 1989 Del. Super. LEXIS 450, 1989 WL 135651, at *2 (Del. Super.Oct. 31, 1989).*

With regard to the defendant Fiore, Brooks points to no evidence of any promises made by Fiore. The court thus grants summary judgment on this count in favor of Fiore.

With regard to Nationwide, Brooks first alleges that Palmer made promises to him during the interview process. [*16] Contrary to Brooks' allegations, however, the record shows that the statements made by Palmer during the interview process merely reiterated standard Nationwide policies. Brooks further acknowledges that he cannot remember the exact language used by Palmer during that time. Rather, Brooks seeks to rely only on the conclusory allegations in his affidavit that Palmer used "promise-like language." As such, he cannot as a matter of law meet his burden of proving that any such statements made to him during the interview process were in promissory form. *See Quirogav. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)* (noting that summary judgment shall be granted if, in opposition, the

non-moving party rests solely "upon mere allegations, general denials, or . . . vague statements."); *see also Reeder v. Sanford School, Inc., 397 A.2d 139, 141 (Del. 1979)* (requiring promissory form unless there is evidence of fraud of falsity).

Moreover, Brooks has also failed to point to any evidence of reasonable and detrimental reliance on the alleged promises. As proof of reliance, Brooks argues that he detrimentally relied on Nationwide's promises by leaving his prior [*17] employment, with which he was "content. "However, during Brooks' deposition, he freely admitted he was actively seeking other employment of exactly the type offered by Nationwide. The defendants also argue in response that, if accepting new employment alone could support a claim for promissory estoppel, the at-will doctrine would be effectively abolished. The court finds the defendants' argument to be persuasive.

Brooks further argues that Nationwide breached its "promise" to him that he could remain employed as a Staff Judge Advocate in the United States AirForce. [2] However,the alleged "promise" was nothing more than a restatement of Nationwide'sduty under federal law to permit the military service of its employees. Promissory estoppel cannot be predicated upon a promise to do that which the promisoris already obliged to do. *Danby v. Osteopathic Assn. of Delaware,34 Del. Ch. 427, 104 A.2d 903, 907 (Del. Super. 1954).* Moreover, on the present facts, Brooks does not deny that Nationwide in fact permitted him to fulfill his military obligation, thus making this argument moot.

> 2  Brooks argues for the first time in his Answer Brief that his real grievance with regard to statements made concerning his military service is, in fact, Nationwide'salleged promise of differential pay during military service. However, Brooksdid not raise this issue in any way in his amended complaint. As such, the court will disregard this argument.

[*18]  Next, Brooks argues that he was "hired" on January 15, 1993, and that Nationwide's disclaimers regarding, among other things, the at-will employment, were not provided until after he resigned from his previous employer. This argument is also unpersuasive because it is undisputed that Brooks was provided with Nationwide's handbook at or immediately after his interview, and that he signed an application for employment containing explicit disclaimers prior to

2001 U.S. Dist. LEXIS 16345, *18

leaving his former employer.

Finally, Brooks contends that, because he did not receive any formal performance reviews in 1999 and 2000, he suffered an actionable injustice. This argument too must fail. While Brooks was clearly unhappy with the turn of events, his grievances with Nationwide did not amount to the sort of "injustice" that permits the invocation of the doctrine of promissory estoppel. There is ample evidence to show that Brooks was aware that he was not guaranteed a salary increase each year, as well appraised of his supervisor's opinion of his performance during the relevant time period, and was aware that any formal performance evaluations prepared during the relevant time period would not have led to a salary increase.

[*19] The court finds that Brooks failed to adduce sufficient evidence of reliance and injury to sustain Count Three and will, therefore, grant summary judgment for the defendants.

**D. Fraud**

The elements of fraud under Delaware law are well established. A party claiming fraud must demonstrate (1) a false representation, usually one of fact, made by the defendant;(2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5)damage to the plaintiff as a result of such reliance. *See Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).*

In the present case, Brooks alleges that the defendants committed fraud against him by falsifying company records to show that his most recent performance evaluation had been conducted in April 1999, when, in fact, he had not received a written performance evaluation since 1998. The court rejects this contention.

The evidence of record establishes unequivocally that the defendants did [*20] not possess the intent to deceive Brooks. To the contrary, Brooks himself admitted that Fiore informed him, prior to the time that the incorrect record was created, that he would receive no written performance evaluation in 1999. Brooks also acknowledged that Fiore advised him that he would not

receive a raise then, nor in the foreseeable future. Further, as soon as Nationwide's human resources representative learned that the company records erroneously showed that a performance evaluation had been performed in April 1999, Fiore had the record corrected. Fiore also directly informed Flynn that no evaluation had occurred in April 1999.

Additionally, Brooks never relied on the accuracy of the company record. The record evidence amply demonstrates that as soon as Brooks became aware of the inaccurate company record, he promptly sent Flynn an e-mail stating that the record was wrong and no such evaluation existed. Brooks, therefore, cannot now claim that he was misled by the incorrect record.

Finally, no harm resulted to Brooksas a result of the alleged fraud. Brooks argues that he waited until July 2000 to file his OSHA suit because in April 2000, the company records reflected that [*21] a performance evaluation had been completed in April 1999. However, even if Brooks were made to wait as a result of the erroneous entry, he alleges no cognizable harm resulting from that three month stay.

Brooks cannot establish the elements for a valid cause of action for fraud. As such, summary judgment is granted in favor of the defendants on Count Four.

**E. Breach of Implied Covenant of Good Faith and Fair Dealing**

In this portion of Brooks' claims, he argues that the defendants breached their duty to him to act in good faith and deal fairly by committing acts of fraud, deceit, or misrepresentation.

With respect to Fiore, Brooks admits he never had a contractual relationship with him. To the extent Brooks contends that Fiore acted as an agent of Nationwide,this claim must also fail. Under Delaware law, where a principle is disclosed in a breach of contract action, only the principle is liable for the breach and not the agent. *See Harris v. Dependable Used Cars, Inc.,1997 Del. Super. LEXIS 142, 1997 WL 358302,* at *1 (Del. Super. March 20, 1997).Therefore, Fiore cannot be held liable either in his personal capacity or as the agent of Nationwide.

With respect to Nationwide, the court [*22] again finds that Brooks' argument is meritless. The Delaware Supreme Court has strictly limited the application of the

2001 U.S. Dist. LEXIS 16345, *22

implied covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000).* The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied thereon to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996).*

As the defendant stresses, however, irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc., 1992 Del. Super. LEXIS 454, 1992 WL 354087,* [*23] *at *5 (Del. Nov. 13, 1992), aff'd, 1993 Del. LEXIS 142 (Del. 1993).* Thus, the traditional elements of fraud must be present in a claim for breach of an implied covenant of good faith. *See Hudson v. Wesley College, Inc., 1998 Del. Ch. LEXIS 235, 1998 WL 939712, at *13 (Del. Ch. Dec. 23, 1998) aff'd 734 A.2d 641 (Del. 1999).*

In Count Five of his complaint, Brooks argues that the defendants breached the implied covenant of good faith and fair dealing by falsifying Nationwide computer records to show that he received an evaluation in September 1999. Brooks has, however, failed to bring forth any evidence that the incorrect record was in any way related to Nationwide'sdecision to terminate his employment. In fact, there is no dispute that Brooks'termination occurred as a direct result of his filing a meritless lawsuit against Nationwide. Thus, because no fraud or misrepresentation occurred here, summary judgment in favor of the defendants will be granted as to Count Five.

In Count Seven, Brooks bases his retaliation claim on a violation of public policy. Such a public policy, however, must be recognized by some legislative, administrative, or judicial authority. [*24] *See Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 587-589 (Del. Ch. 1994).* The employee asserting the claim must also be able to show that she was responsible in her capacity as

an employee for implementing the recognized public interest. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 441-442 (Del.1996).*

Brooks argues that the defendants breached the duty of good faith and fair dealing when Fiore allegedly retaliated against him for reporting to senior management Fiore's purported inappropriate imposition of conditions on Brooks' military service. For Brooks to be protected by this implied covenant, however, he must, in his capacity as an employee of the defendant, occupy a position with responsibility for reporting misconduct. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000).* Brooks contends he occupied such a position because he is a Staff Judge Advocatein the Air National Guard. However, as the defendants correctly point out, the relevant inquiry is the nature of Brooks' duties *with the defendant employer.* There is no evidence that Nationwide charged Brooks with the responsibility of reporting his supervisor's [*25] allegedly improper actions with regard to his military leave. Furthermore, Brooks offers no legal support for his contention that his position as a Staff Judge Advocate conferred upon him a position of responsibility for reporting any purported misconduct of Nationwide.

For the above reasons, the court will grant summary judgment in favor of the defendants as to both Counts Five and Seven.

**F. Employment Rights of Members of the Uniformed Services**

Brooks alleges that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), were violated from 1998-2000 by the defendants. [3] *See 38 U.S.C. § 4301 et seq. (2001).* Specifically, Brooks argues that the defendants refused to permit him to serve his military duty and required him to seek pre-approval of any military service. Further, Brooks alleges that he did not receive a performance evaluation or pay increase as retaliation for exercising his rights under USERRA. It is clear from the record before the court that he was not prevented from serving military duty and was not subjected to conditions violating USERRA.

3 As a preliminary matter, it is clear from settled law that Fiore is not covered by USERRA. *See 38 U.S.C. § 4303(4)(A) (2001).* Thus, he can not be held individually liable. Courts have recognized

that USERRA applies only to employers, or those individuals who have the power to hire or fire the employee. *See Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 438 (E.D. Pa. 1998).* Here, it is undisputed that, while Fiore carried out orders to fire Brooks, he did not initiate that decision, nor did he have the power to do so.

[*26] Brooks first alleges that his USERRA rights were violated because the defendants prevented him from serving military duty from 1998-2000. *See 38 U.S.C. § 4301 et seq. (2001).* The record clearly indicates, however, that the defendants not only permitted Brooks to fulfill his military commitments, they permitted him to receive CLE time and full pay for extended periods of military service for which Brookswas also receiving military pay. Brooks himself testified at his deposition that, in 1998, he and Fiore resolved their issues related to his military service and he did in fact serve.

Brooks argues next that the violation of his USERRA rights relate to Connie Peterson's attempts to have him properly document his military service time. He does not dispute, however, that this was done in order to account for any pay differential for which he might be eligible under Nationwide's *voluntary* policy of paying its employees the difference between any military pay received and their usual pay during periods of military service. However, there is no requirement under USERRA that Nationwide provide such differential pay to its employees. Further, USERRA does not [*27] prohibit employers from requiring certain notification procedures or documentation of military leave. In fact, USERRA specifically states that an individual wishing to perform military service is protected by the statute only if "the person...has given advance written or verbal notice of such service to such person's employer." *38 U.S.C. § 4312(a) (2001).* Thus, it is clear that the problems Brooks contends are related to the notification and pay procedures are not actionable under USERRA.

Brooks next alleges that he was penalized from 1998-2000 because the defendants held him to the same billable hour requirements as other attorneys and forced him to use vacation time for his military leave. There is, however, no record evidence that demonstrates any action was taken against Brooks as a result of his billable hours deficiency. To the contrary, in 2000, Brooks' billable hour goal was explicitly reduced to account for time spent on military leave. Even prior to 2000, there is no

evidence in the record that action was ever taken against Brooks for having a deficiency in his hours. Further, Brooks' contention that he was required to use vacation time for military [*28] duty is unsupported in the record. In fact, while Fiore was initially confused in April 2000 about the requirements of the law when he required Brooks to use his vacation time, that misunderstanding was promptly resolved. Thereafter, Brooks completed his military leave as scheduled.

Finally, Brooks argues that Fiore retaliated against him for reporting Fiore's mistaken April 2000 directive to Nationwidemanagement by refusing to perform an annual review or salary increase. In the defendants' briefs, they point out that Brooks has twice changed this allegation. First Brooks alleged that the lack of a performance evaluation and salary increase was caused by Fiore's retaliation since Brooks went over Fiore's head to force him into action. Secondly, he attributed the lack of a performance evaluation and salary increase to retaliation for filing his OSHA complaint. He now claims it was retaliation for exercising his rights under USERRA. The court thus agrees with defendants that this claim is clearly a post-hac claim, and there is no evidence to support it.

## G.Unreimbursed Client Expenses

Brooks alleges that defendants failed to reimburse him for expenditures related to his employment [*29] at Nationwide. Specially, Brooks testified at his deposition that he is seeking reimbursement for expenditures that occurred from January 2000 through August 3, 2000.

Brooks has identified no basis for holding Fiore personally liable for these expenses. Thus, summary judgment will be granted as to Fiore.

With regard to Nationwide, the record clearly indicates that Brooks never submitted any receipts or requests for reimbursement for these alleged expenses during his employment. Nor has Brooks identified any specific expenses during the course of this litigation and, indeed, has failed to disclose an actual amount of money due him. As such, the court will grant summary judgment on Count Eight in favor of the defendants.

## H. Prima Facie Tort

Under Delaware law, claims for prima facie tort are not permitted in the employment context. *See Lord v. Souder, 748 A.2d 393, 403 (Del. 2000).* In *Lord*, the

2001 U.S. Dist. LEXIS 16345, *29

Delaware Supreme Court considered a claim alleging prima facie tort (in addition to claims for breach of contract, promissory estoppel, violation of public policy, and fraud) based upon an at-will employee's termination. The Court concluded that the tort claim must [*30] be dismissed as inconsistent with the employment-at-will doctrine. The Court there viewed the tort claim as an effort to maintain an action for wrongful discharge in contravention of the exclusive categories established by *E.I. duPont de Nemours& Co. v. Pressman* (See discussion section B, *supra*). Contrary to Brooks' position, it is clear that *Lord* governs situations both arising during employment and at termination. *748 A.2d at 400*. As such, *Lord* controls Count Nine of Brooks' amended complaint. The court will follow this precedent and grant summary judgment in favor of the defendants on Count Nine.

## I. Wrongful Discharge

Brookstestified at his deposition that he believed there was no basis for his termination on November 9, 2000, other than Fiore's "knee-jerk reaction and wrongful perception" that Brooks' lawsuit was without merit. As previously noted, however, Fiore was not responsible for the decision to terminate Brooks' employment. That decision was in fact made by Flynn, upon the advice of Nationwide's General Counsel. Brooks further concedes that, even if Fiore had been the decision-maker, Brooks did not have an employment contract with [*31] Fiore. Thus, Fiore can not be held liable for wrongful termination. *See Harris v. Dependable Used Cars, Inc., 1997 Del. Super. LEXIS 142, 1997 WL 358302,* at *1 (Del. Super. 1997) (citing Delaware Rule that "where the principal is disclosed, only the principle is liable...not the agent.").

With respect to Nationwide's liability on this claim, Delaware courts have noted that nothing is "to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *See Layfield v. Beebe Med. Ctr, Inc., 1997 Del. Super. LEXIS 472,* *11, 1997 WL 716900,* at *5 (Del.Super. July 18, 1997) (citing *E.I. duPont de Nemours & Co. v Pressman, 679 A.2d 436, 441 (Del. Super.1996)).* Indeed, these courts have further recognized that, due to the personal nature of an employment relationship, causes of action should not be based solely on personal motivations such as dislike, hatred, or ill-will alone. *See id.* at *11. Thus,

the employer's conduct must rise to the level of fraud, deceit, or misrepresentation. *See id.* Courts in other jurisdictions have followed this rationale, and held that an action for wrongful termination [*32] does not lie where the at-will employee was terminated for suing the employer. *See e.g., Tynes v. Shoney's, Inc.,867 F. Supp. 330, 334 (D. Md. 1994); Deiters v. Home Depot U.S.A., Inc.,842 F. Supp. 1023, 1028 (M.D. Tenn. 1993).*

Asin Counts Five and Seven of Brooks' complaint, the court here finds no evidence of fraud, deceit, or misrepresentation on Nationwide's part sufficient to sustain a charge of wrongful discharge. Nationwide has made no attempt to hide the reason it fired Brooks, namely that its General Counselhad found the lawsuit to be frivolous and disruptive to the office, while also calling into question Brooks' professional integrity and judgment. On these facts, the court will not find Nationwide acted beyond its legal rights when dealing with such an at-will employee.

For the above reasons, the court will grant summary judgment with regard to Count Ten.

## J. Consolidated Omnibus Budget Reconciliation Act

Thecourt will grant summary judgment on Count Eleven, although it was not briefed by the defendants until they filed their reply brief on July 23, 2001, because Brooks has voluntarily withdrawn this claim in his answer to [*33] interrogatory question number 14. As there is no longer a dispute as to this issue, summary judgment will be granted.

## V.CONCLUSION

For these reasons, IT IS HEREBY ORDERED that:

1.The Pre-Answer Motion to Dismiss (D.I. 21) filed by Nationwide Mutual InsuranceCompany and Robert G. Fiore is declared moot;

2. The Motionfor Summary Judgment (D.I. 59) filed by Nationwide Mutual Insurance Companyand Robert G. Fiore is GRANTED.

3. Judgment BE AND IS HEREBYENTERED in favor of the defendants on all claims against them.

Page 10

2001 U.S. Dist. LEXIS 16345, *33

UNITEDSTATES DISTRICT JUDGE

Date: October 11, 2001

Gregory M. Sleet

Document

LEXSEE 477 U.S. 317

## CELOTEX CORP. v. CATRETT, ADMINISTRATRIX OF THE ESTATE OF CATRETT

### No. 85-198

### SUPREME COURT OF THE UNITED STATES

*477 U.S. 317; 106 S. Ct. 2548; 91 L. Ed. 2d 265; 1986 U.S. LEXIS 118; 54 U.S.L.W. 4775; 4 Fed. R. Serv. 3d (Callaghan) 1024*

**April 1, 1986, Argued**
**June 25, 1986, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.

**DISPOSITION:** *244 U. S. App. D. C. 160, 756 F.2d 181,* reversed and remanded.

**DECISION:**

Party moving for summary judgment held not required by *Rule 56 of Federal Rules of Civil Procedure* to support motion with affidavits or other similar materials negating opponent's claim.

**SUMMARY:**

A widow sued in the United States District Court for the District of Columbia, alleging that her husband's death resulted from his exposure to asbestos manufactured or distributed by 15 named corporations. One corporation moved for summary judgment, claiming that the plaintiff had failed to produce evidence that her husband had been exposed to its asbestos products. The plaintiff produced documents tending to show such exposure, but the moving party argued that they were inadmissible hearsay and could not be considered in opposition to the motion for summary judgment. The District Court granted the motion, holding that there had been no showing that the decedent had been exposed to the moving party's products in the District of Columbia or elsewhere. The United States Court of Appeals for the District of Columbia Circuit reversed, holding that the moving party had not adduced evidence, in the form of affidavits or otherwise, to support its motion, and that

*Rule 56(e) of the Federal Rules of Civil Procedure* and the decision of the *United States Supreme Court in Adickes v S. H. Kress & Co. 398 US 144, 26 L Ed 2d 142, 90 S Ct 1598*, required that the party opposing a motion for summary judgment bore the burden of responding only after the moving party had met its burden of coming forward with proof of the absence of any genuine issue of material fact (*244 App DC 160, 756 F2d 181*).

On certiorari, the United States Supreme Court reversed and remanded the case for further proceedings. In an opinion by Rehnquist, J., joined by White, Marshall, Powell, and O'Connor, JJ., it was held that the position taken by the majority of the Court of Appeals was inconsistent with the standard for summary judgment set forth in *Rule 56(c) of the Federal Rules of Civil Procedure*, because *Rule 56* did not require the moving party to support its motion with affidavits or other similar materials negating the opponent's claim, *Rule 56(c)* suggesting the absence of such requirement when it referred to "the affidavits, if any," and because the decision in Adickes v S. H. Kress & Co. should not be construed to mean that the burden is on the moving party to produce evidence showing the absence of a genuine issue of material fact.

White, J., concurred in the court's opinion and judgment, expressing the view that while the Court of Appeals was wrong in holding that the moving party must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact, the moving party must discharge the burden that the rules placed upon him and it was not enough to move for summary judgment without supporting the motion in any way or with a conclusory

477 U.S. 317, *; 106 S. Ct. 2548, **;
91 L. Ed. 2d 265, ***; 1986 U.S. LEXIS 118

assertion that the plaintiff had no evidence to prove his case.

Brennan, J., joined by Burger, Ch. J., and Blackmun, J., dissented, expressing the view that while the Court of Appeals erroneously read the decision in Adickes v S. H. Kress & Co. when it required the moving party to submit evidence establishing that the widow's decedent had not been exposed to the moving party's asbestos, and while the moving party could seek summary judgment on the ground that the widow could not prove exposure to the moving party's asbestos at trial, the moving party was nevertheless still required to satisfy its initial burden of production under *Rule 56*, and it had failed to do so, thereby rendering summary judgment improper.

Stevens, J., dissented, expressing the view that, in the context of the motion for summary judgment based on the decedent's lack of exposure to the moving party's asbestos in the District of Columbia, the District Court's decision to grant the motion was erroneous and the reversal of summary judgment should have been affirmed on the narrow ground that the widow had made an adequate showing that the decedent had been exposed to the moving party's asbestos in Illinois.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §3

summary judgment -- evidence negating nonmoving party's claim --

Headnote:[1A][1B][1C][1D][1E]

In a wrongful death action in Federal District Court arising from the death of the plaintiff's husband allegedly due to exposure to asbestos manufactured or distributed by named corporations, where one corporation moved for summary judgment on the ground that the plaintiff failed to produce evidence showing the decedent's exposure to the moving party's asbestos, the decision of the Federal Court of Appeals reversing the grant of summary judgment on the ground that the moving party failed to produce proof of the absence of any genuine issues of material fact is inconsistent with the standard for summary judgment set forth in *Rule 56(c) of the Federal Rules of Civil Procedure*, because (1) *Rule 56* does not

require that the moving party support its motion with affidavits or other similar materials negating the opponent's claim, *Rule 56(c)* suggesting the absence of such requirement when it refers to "the affidavits, if any"; (2) *Rule 56(e)*, in requiring the nonmoving party to come forward with rebuttal affidavits or other specified kinds of materials only in response to a motion for summary judgment "made and supported as provided in this rule," does not require that the motion be supported by affidavits, since, in a case such as the instant one where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party may rely solely on the pleadings, depositions, answers to interrogatories, and admissions on file, and such a motion will be "made and supported as provided in this rule"; and (3) the statement in *Adickes v S. H. Kress & Co., 398 US 144, 26 L Ed 2d 142, 90 S Ct 1598*, that the moving party must show initially the absence of a genuine issue concerning any material fact, should not be construed to mean that the moving party must produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof, but should instead be understood as requiring the moving party to discharge his burden by showing--that is, pointing out to the District Court--that there is an absence of evidence to support the nonmoving party's case. (Stevens, J., dissented from this holding.)

[***LEdHN2]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §5

summary judgment -- nonmoving party's burden --

Headnote:[2]

The plain language of *Rule 56(c) of the Federal Rules of Civil Procedure* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial; in such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial; the moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the

burden of proof.

[***LEdHN3]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §3

summary judgment -- moving party's duty --

Headnote:[3]

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes will demonstrate the absence of any genuine issue of material fact.

[***LEdHN4]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §1

summary judgment -- purpose --

Headnote:[4]

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.

[***LEdHN5]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §4

summary judgment -- nonmoving party's proof --

Headnote:[5]

The nonmoving party is not required to produce evidence in a form that would be admissible at trial in order to avoid summary judgment; *Rule 56 of the Federal Rules of Civil Procedure* does not require the nonmoving party to depose his own witnesses; *Rule 56(e)* permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in *Rule 56(c)*, except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to show that there is a genuine issue for trial.

[***LEdHN6]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §3

summary judgment -- premature motion --

Headnote:[6]

The plaintiff in an action in Federal District Court cannot claim to have been "railroaded" by a premature motion for summary judgment, where the motion is filed 12 months after the commencement of the action; any potential problem with a premature motion can be adequately dealt with under *Rule 56(f) of the Federal Rules of Civil Procedure*, which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

[***LEdHN7]

APPEAL §1692.2

summary judgment -- issues not determined -- remand --

Headnote:[7]

In a wrongful death action in Federal District Court arising from the death of the plaintiff's husband allegedly due to exposure to asbestos manufactured or distributed by named corporations, where one corporation moved for summary judgment on the ground that the plaintiff failed to produce evidence showing the decedent's exposure to the moving party's asbestos, and the plaintiff produced documents tending to show such exposure, but the moving party argued that they were inadmissible hearsay and could not be considered in opposition to the motion for summary judgment, and where the United States Supreme Court reverses and remands for further proceedings the decision of the Federal Court of Appeals which reversed summary judgment for the moving party's failure to produce evidence negating the nonmoving party's claim, the Supreme Court will leave to the Court of Appeals the determination of the adequacy of the showing made by the plaintiff in opposition to the motion for summary judgment and whether such a showing, if reduced to admissible evidence, would be sufficient to carry the plaintiff's burden of proof at trial, because that court with its superior knowledge of local law is better suited than the Supreme Court to make these

477 U.S. 317, *; 106 S. Ct. 2548, **;
91 L. Ed. 2d 265, ***LEdHN7; 1986 U.S. LEXIS 118

determinations in the first instance.

[***LEdHN8]

SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS §3

summary judgment -- construction of Rule 56 --

Headnote:[8]

*Rule 56 of the Federal Rules of Civil Procedure* must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

## SYLLABUS

In September 1980, respondent administratrix filed this wrongful-death action in Federal District Court, alleging that her husband's death in 1979 resulted from his exposure to asbestos products manufactured or distributed by the defendants, who included petitioner corporation. In September 1981, petitioner filed a motion for summary judgment, asserting that during discovery respondent failed to produce any evidence to support her allegation that the decedent had been exposed to petitioner's products. In response, respondent produced documents tending to show such exposure, but petitioner argued that the documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion. In July 1982, the court granted the motion because there was no showing of exposure to petitioner's products, but the Court of Appeals reversed, holding that summary judgment in petitioner's favor was precluded because of petitioner's failure to support its motion with evidence tending to *negate* such exposure, as required by *Federal Rule of Civil Procedure 56(e)* and the decision in *Adickes v. S.H. Kress & Co., 398 U.S. 144.*

*Held*:

1. The Court of Appeals' position is inconsistent with the standard for summary judgment set forth in *Rule 56(c)*, which provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pp. 322-326.

(a) The plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Pp. 322-323.

(b) There is no express or implied requirement in *Rule 56* that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, *Rule 56(c)*, which refers to the affidavits, "if any," suggests the absence of such a requirement, and *Rules 56(a)* and *(b)* provide that claimants and defending parties may move for summary judgment "with or without supporting affidavits." *Rule 56(e)*, which relates to the form and use of affidavits and other materials, does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Adickes v. S.H. Kress & Co., supra,* explained. Pp. 323-326.

(c) No serious claim can be made that respondent was "railroaded" by a premature motion for summary judgment, since the motion was not filed until one year after the action was commenced and since the parties had conducted discovery. Moreover, any potential problem with such premature motions can be adequately dealt with under *Rule 56(f)*. P. 326.

2. The questions whether an adequate showing of exposure to petitioner's products was in fact made by respondent in opposition to the motion, and whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial, should be determined by the Court of Appeals in the first instance. Pp. 326-327.

477 U.S. 317, *; 106 S. Ct. 2548, **;
91 L. Ed. 2d 265, ***; 1986 U.S. LEXIS 118

**COUNSEL:** Leland S. Van Koten argued the cause for petitioner. With him on the briefs were H. Emslie Parks and Drake C. Zaharris.

Paul March Smith argued the cause for respondent. With him on the brief were Joseph N. Onek, Joel I. Klein, James F. Green, and Peter T. Enslein. *

> * Stephen M. Shapiro, Robert L. Stern, William H. Crabtree, Edward P. Good, and Paul M. Bator filed a brief for the Motor Vehicle Manufacturers Association et al. as amici curiae urging reversal.

**JUDGES:** REHNQUIST, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, post, p. 328. BRENNAN, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, post, p. 329. STEVENS, J., filed a dissenting opinion, post, p. 337.

**OPINION BY:** REHNQUIST

**OPINION**

[*319]  [***271]  [**2550]  JUSTICE REHNQUIST delivered the opinion of the Court.

[***LEdHR1A]  [1A]The United States District Court for the District of Columbia granted the motion of petitioner Celotex Corporation for summary judgment against respondent Catrett because the latter was unable to produce evidence in support of her allegation in her wrongful-death complaint that the decedent had been exposed to petitioner's asbestos products. A divided panel of the Court of Appeals for the District of Columbia Circuit reversed, however, holding that petitioner's failure to support its motion with evidence tending to *negate* such exposure precluded the entry of summary judgment in its favor. *Catrett v. Johns-Manville Sales Corp., 244 U. S. App. D. C. 160, 756 F.2d 181 (1985).* This view conflicted with that of the Third Circuit in *In re Japanese* [**2551] *Electronic Products, 723 F.2d 238 (1983),* rev'd on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).* [1] We granted certiorari to resolve the conflict, *474 U.S. 944 (1985),* and now reverse the decision of the District of Columbia Circuit.

1    Since our grant of certiorari in this case, the

Fifth Circuit has rendered a decision squarely rejecting the position adopted here by the District of Columbia Circuit. See *Fontenot v. Upjohn Co., 780 F.2d 1190 (1986).*

Respondent commenced this lawsuit in September 1980, alleging that the death in 1979 of her husband, Louis H. Catrett, resulted from his exposure to products containing asbestos manufactured or distributed by 15 named corporations. Respondent's complaint sounded in negligence, breach of warranty, and strict liability. Two of the defendants filed motions challenging the District Court's *in personam* jurisdiction, and the remaining 13, including petitioner, filed motions for summary judgment. Petitioner's motion, which was first filed in September 1981, argued that summary judgment was proper because respondent had [***272] "failed to produce evidence that any [Celotex] product . . . was the proximate cause of the injuries alleged within the jurisdictional [*320] limits of [the District] Court." In particular, petitioner noted that respondent had failed to identify, in answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products. In response to petitioner's summary judgment motion, respondent then produced three documents which she claimed "demonstrate that there is a genuine material factual dispute" as to whether the decedent had ever been exposed to petitioner's asbestos products. The three documents included a transcript of a deposition of the decedent, a letter from an official of one of the decedent's former employers whom petitioner planned to call as a trial witness, and a letter from an insurance company to respondent's attorney, all tending to establish that the decedent had been exposed to petitioner's asbestos products in Chicago during 1970-1971. Petitioner, in turn, argued that the three documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion.

In July 1982, almost two years after the commencement of the lawsuit, the District Court granted all of the motions filed by the various defendants. The court explained that it was granting petitioner's summary judgment motion because "there [was] no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia or elsewhere within the statutory period." App. 217. [2] Respondent [*321] appealed only the grant of summary judgment in favor of

477 U.S. 317, *321; 106 S. Ct. 2548, **2551;
91 L. Ed. 2d 265, ***272; 1986 U.S. LEXIS 118

petitioner, and a divided panel of the District of Columbia Circuit reversed. The majority of the Court of Appeals held that petitioner's [**2552] summary judgment motion was rendered "fatally defective" by the fact that petitioner "made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion." *244 U. S. App. D. C., at 163, 756 F.2d, at 184* (emphasis in original). According to the majority, *Rule 56(e) of the Federal Rules of Civil Procedure*, [3] and this Court's decision in [***273] *Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970)*, establish that "the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." *244 U. S. App. D. C., at 163, 756 F.2d, at 184* [*322] (emphasis in original; footnote omitted). The majority therefore declined to consider petitioner's argument that none of the evidence produced by respondent in opposition to the motion for summary judgment would have been admissible at trial. *Ibid.* The dissenting judge argued that "[the] majority errs in supposing that a party seeking summary judgment must always make an affirmative evidentiary showing, even in cases where there is not a triable, factual dispute." *Id., at 167, 756 F.2d, at 188* (Bork, J., dissenting). According to the dissenting judge, the majority's decision "undermines the traditional authority of trial judges to grant summary judgment in meritless cases." *Id., at 166, 756 F.2d, at 187.*

2    JUSTICE STEVENS, in dissent, argues that the District Court granted summary judgment only because respondent presented no evidence that the decedent was exposed to Celotex asbestos products *in the District of Columbia.* See *post*, at 338-339. According to JUSTICE STEVENS, we should affirm the decision of the Court of Appeals, reversing the District Court, on the "narrower ground" that respondent "made an adequate showing" that the decedent was exposed to Celotex asbestos products in Chicago during 1970-1971. See *ibid.*

JUSTICE STEVENS' position is factually incorrect. The District Court expressly stated that respondent had made no showing of exposure to Celotex asbestos products "in the District of Columbia *or elsewhere*." App. 217 (emphasis added). Unlike JUSTICE STEVENS, we assume that the District Court meant what it said. The

majority of the Court of Appeals addressed the very issue raised by JUSTICE STEVENS, and decided that "[the] District Court's grant of summary judgment must therefore have been based on its conclusion that there was 'no showing that the plaintiff was exposed to defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period.'" *Catrett v. Johns-Manville Sales Corp., 244 U. S. App. D. C. 160, 162, n. 3, 756 F.2d 181, 183, n. 3 (1985)* (emphasis in original). In other words, no judge involved in this case to date shares JUSTICE STEVENS' view of the District Court's decision.

3    *Rule 56(e)* provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[***LEdHR1B] [1B] [***LEdHR2] [2]We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in *Rule 56(c) of the Federal Rules of Civil Procedure.* [4] Under *Rule 56(c)*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

477 U.S. 317, *322; 106 S. Ct. 2548, **2552;
91 L. Ed. 2d 265, ***LEdHR2; 1986 U.S. LEXIS 118

bear the burden of proof at trial. In such a situation, [*323] there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[The] standard [for granting summary judgment] mirrors the standard [***274] for a directed verdict under *Federal Rule of Civil Procedure 50(a)* . . . ." *Anderson* v. *Liberty Lobby, Inc., ante,* at 250.

    4  *Rule 56(c)* provides:

        "The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

    [**2553] [***LEdHR1C] [1C] [***LEdHR3] [3] [***LEdHR4] [4]Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in *Rule 56* that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, *Rule 56(c),* which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of *Rule 56(c)* in this regard, such doubt is clearly removed by *Rules 56(a)* and *(b),* which provide that claimants and defendants, respectively, may move for summary judgment *"with or without supporting*

*affidavits"* (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in *Rule 56(c),* is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported [*324] claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose. 5

    5  See Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L. J. 745, 752 (1974); Currie, Thoughts on Directed Verdicts and Summary Judgments, 45 U. Chi. L. Rev. 72, 79 (1977).

    [***LEdHR1D] [1D]Respondent argues, however, that *Rule 56(e),* by its terms, places on the nonmoving party the burden of coming forward with rebuttal affidavits, or other specified kinds of materials, only in response to a motion for summary judgment "made and supported as provided in this rule." According to respondent's argument, since petitioner did not "support" its motion with affidavits, summary judgment was improper in this case. But as we have already explained, a motion for summary judgment may be made pursuant to *Rule 56* "with or without supporting affidavits." In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and *Rule 56(e)* therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

    [***LEdHR5] [5]We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, *Rule 56* does [***275] not require the nonmoving party to depose her own witnesses. *Rule 56(e)* permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in *Rule 56(c),* except the mere pleadings

477 U.S. 317, *324; 106 S. Ct. 2548, **2553;
91 L. Ed. 2d 265, ***275; 1986 U.S. LEXIS 118

themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

[*325] [***LEdHR1E] [1E]The Court of Appeals in this case felt itself constrained, however, by language in our decision in *Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)*. There we held that summary judgment had been improperly entered in favor of the defendant restaurant in an action brought under *42 U. S. C. § 1983*. In the course of its opinion, the *Adickes* Court said that "both the commentary on and the background of the 1963 amendment conclusively [**2554] show that it was not intended to modify the burden of the moving party . . . to show initially the absence of a genuine issue concerning any material fact." *Id., at 159*. We think that this statement is accurate in a literal sense, since we fully agree with the *Adickes* Court that the 1963 amendment to *Rule 56(e)* was not designed to modify the burden of making the showing generally required by *Rule 56(c)*. It also appears to us that, on the basis of the showing before the Court in *Adickes*, the motion for summary judgment in that case should have been denied. But we do not think the *Adickes* language quoted above should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case.

The last two sentences of *Rule 56(e)* were added, as this Court indicated in *Adickes*, to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings. While the *Adickes* Court was undoubtedly correct in concluding that these two sentences were not intended to *reduce* the burden of the moving party, it is also obvious that they were not adopted to *add to* that burden. Yet that is exactly the result which the reasoning of the Court of Appeals would produce; in effect, an amendment to *Rule 56(e)* designed to [*326] *facilitate* the granting of motions for summary judgment would be interpreted to make it *more difficult* to grant such motions. Nothing in the two sentences themselves requires this result, for the reasons we have previously

indicated, and we now put to rest any inference that they do so.

Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence. See *244 U. S. App. D. C., at 167-168, 756 F.2d, at 189* (Bork, J., dissenting); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2720, pp. 28-29 (1983). It would surely defy common sense to hold that the District [***276] Court could have entered summary judgment *sua sponte* in favor of petitioner in the instant case, but that petitioner's filing of a motion requesting such a disposition precluded the District Court from ordering it.

[***LEdHR6] [6]Respondent commenced this action in September 1980, and petitioner's motion was filed in September 1981. The parties had conducted discovery, and no serious claim can be made that respondent was in any sense "railroaded" by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under *Rule 56(f)*, [6] which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

> 6 *Rule 56(f)* provides:
>
> "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

[***LEdHR7] [7]In this Court, respondent's brief and oral argument have been devoted as much to the proposition that an adequate showing of exposure to petitioner's asbestos products was [*327] made as to the proposition that no such showing should have been required. But the Court of Appeals declined to address either the adequacy of the showing made by respondent in opposition to petitioner's motion for summary judgment, or the question whether such a showing, if [**2555] reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial.

477 U.S. 317, *327; 106 S. Ct. 2548, **2555;
91 L. Ed. 2d 265, ***LEdHR7; 1986 U.S. LEXIS 118

We think the Court of Appeals with its superior knowledge of local law is better suited than we are to make these determinations in the first instance.

[***LEdHR8] [8]The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Fed. Rule Civ. Proc. 1*; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. *Rule 56* must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

[*328] [***277] The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**CONCUR BY:** WHITE

**CONCUR**

JUSTICE WHITE, concurring.

I agree that the Court of Appeals was wrong in holding that the moving defendant must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact. I also agree that the movant may rely on depositions, answers to interrogatories, and the like, to demonstrate that the

plaintiff has no evidence to prove his case and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules or by court order. Of course, he must respond if required to do so; but he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

Petitioner Celotex does not dispute that if respondent has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact. Tr. of Oral Arg. 43, 45. It asserts, however, that respondent has failed on request to produce any basis for her case. Respondent, on the other hand, does not contend that she was not obligated to reveal her witnesses and evidence but insists that she has revealed enough to defeat the motion for summary judgment. Because the Court of Appeals found it unnecessary to address this aspect [*329] of the case, I agree that the case should be remanded for further proceedings.

**DISSENT BY:** BRENNAN; STEVENS

**DISSENT**

JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and JUSTICE BLACKMUN join, dissenting.

This case requires the Court to determine whether Celotex satisfied its initial [**2556] burden of production in moving for summary judgment on the ground that the plaintiff lacked evidence to establish an essential element of her case at trial. I do not disagree with the Court's legal analysis. The Court clearly rejects the ruling of the Court of Appeals that the defendant must provide affirmative evidence disproving the plaintiff's case. Beyond this, however, the Court has not clearly explained what is required of a moving party seeking summary judgment on the ground that the nonmoving

477 U.S. 317, *329; 106 S. Ct. 2548, **2556;
91 L. Ed. 2d 265, ***277; 1986 U.S. LEXIS 118

party cannot prove its case. [1] This lack of [***278] clarity is unfortunate: district courts must routinely decide summary judgment motions, and the Court's opinion will very likely create confusion. For this reason, even if I agreed with the Court's result, I would have written separately to explain more clearly the law in this area. However, because I believe that Celotex did not meet its burden of production under *Federal Rule of Civil Procedure 56*, I respectfully dissent from the Court's judgment.

> 1  It is also unclear what the Court of Appeals is supposed to do in this case on remand. JUSTICE WHITE -- who has provided the Court's fifth vote -- plainly believes that the Court of Appeals should reevaluate whether the defendant met its initial burden of production. However, the decision to reverse rather than to vacate the judgment below implies that the Court of Appeals should assume that Celotex has met its initial burden of production and ask only whether the plaintiff responded adequately, and, if so, whether the defendant has met its ultimate burden of persuasion that no genuine issue exists for trial. Absent some clearer expression from the Court to the contrary, JUSTICE WHITE's understanding would seem to be controlling. Cf. *Marks v. United States, 430 U.S. 188, 193 (1977).*

[*330]  I

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. Rule Civ. Proc. 56(c)*. The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727, p. 121 (2d ed. 1983) (hereinafter Wright) (citing cases); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice para. 56.15[3] (2d ed. 1985) (hereinafter Moore) (citing cases). See also, *ante*, at 323; *ante*, at 328 (WHITE, J., concurring). This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party. See 10A Wright § 2727. The court need not decide whether the moving party has satisfied its ultimate burden of persuasion [2] unless and until the court finds that the

moving party has discharged its initial [*331] burden of production. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-161 (1970);* 1963 Advisory Committee's Notes on *Fed. Rule Civ. Proc. 56(e)*, 28 U. S. C. App., p. 626.

> 2  The burden of persuasion imposed on a moving party by *Rule 56* is a stringent one. 6 Moore para. 56.15[3], p. 56-466; 10A Wright § 2727, p. 124. Summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc., ante*, at 255, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-159 (1970).* In determining whether a moving party has met its burden of persuasion, the court is obliged to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion. 10A Wright § 2721, p. 44; see, *e. g., Stepanischen v. Merchants Despatch Transportation Corp., 722 F.2d 922, 930 (CA1 1983); Higgenbotham v. Ochsner Foundation Hospital, 607 F.2d 653, 656 (CA5 1979).* As explained by the Court of Appeals for the Third Circuit in *In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238 (1983)*, rev'd on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)*, "[if] . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment . . . ." *723 F.2d, at 258.*

[**2557] The burden of production imposed by *Rule 56* requires the moving [***279] party to make a prima facie showing that it is entitled to summary judgment. 10A Wright § 2727. The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in *Rule 56(c)* -- that would entitle it to a directed verdict if not controverted at trial. *Ibid.* Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit

477 U.S. 317, *331; 106 S. Ct. 2548, **2557;
91 L. Ed. 2d 265, ***279; 1986 U.S. LEXIS 118

requesting additional time for discovery. *Ibid.*; *Fed. Rules Civ. Proc. 56(e)*, *(f)*.

If the burden of persuasion at trial would be on the *nonmoving* party, the party moving for summary judgment may satisfy *Rule 56*'s burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. See 10A Wright § 2727, pp. 130-131; Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L. J. 745, 750 (1974) (hereinafter Louis). If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. *Anderson* v. *Liberty Lobby, Inc., ante,* at 249.

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party -- who will bear the burden of persuasion at trial -- has [*332] no evidence, the mechanics of discharging *Rule 56*'s burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. See *ante*, at 328 (WHITE, J., concurring). Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. See Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. *Ante,* at 323. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may

defeat a motion for summary judgment that asserts that the nonmoving party [***280] has no evidence by calling the court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies *Rule 56*'s burden of production. [3] Thus, if the record disclosed that the [**2558] moving [*333] party had overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under *Rule 56*.

3 Once the moving party has attacked whatever record evidence -- if any -- the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in *Rule 56(e)*, or *(3)* submit an affidavit explaining why further discovery is necessary as provided in *Rule 56(f)*. See 10A Wright § 2727, pp. 138-143. Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial. See, e. g., *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968).*

The result in *Adickes v. S.H. Kress & Co., supra,* is fully consistent with these principles. In that case, petitioner was refused service in respondent's lunchroom and then was arrested for vagrancy by a local policeman as she left. Petitioner brought an action under *42 U. S. C. § 1983* claiming that the refusal of service and subsequent arrest were the product of a conspiracy between respondent and the police; as proof of this conspiracy, petitioner's complaint alleged that the

477 U.S. 317, *333; 106 S. Ct. 2548, **2558;
91 L. Ed. 2d 265, ***280; 1986 U.S. LEXIS 118

arresting officer was in respondent's store at the time service was refused. Respondent subsequently moved for summary judgment on the ground that there was no actual evidence in the record from which a jury could draw an inference of conspiracy. In response, petitioner pointed to a statement from her own deposition and an unsworn statement by a Kress employee, both already in the record and both ignored by respondent, that the policeman who arrested petitioner was in the store at the time she was refused service. We agreed that "[if] a policeman were present, . . . it would be open to a jury, in light of the sequence that followed, [*334] to infer from the circumstances that the policeman and Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." *398 U.S., at 158.* Consequently, we held that it was error to grant summary judgment "on the basis of this record" because respondent had "failed to fulfill its initial burden" of demonstrating that there was no evidence that there was a policeman in the store. *Id., at 157-158.*

The opinion in *Adickes* has sometimes been read to hold that summary [***281] judgment was inappropriate because the respondent had not submitted affirmative evidence to negate the possibility that there was a policeman in the store. See Brief for Respondent 20, n. 30 (citing cases). The Court of Appeals apparently read *Adickes* this way and therefore required Celotex to submit evidence establishing that plaintiff's decedent had not been exposed to Celotex asbestos. I agree with the Court that this reading of *Adickes* was erroneous and that Celotex could seek summary judgment on the ground that plaintiff could not prove exposure to Celotex asbestos at trial. However, Celotex was still required to satisfy its initial burden of production.

                    II

I do not read the Court's opinion to say anything inconsistent with or different than the preceding discussion. My disagreement with the Court concerns the application of these principles to the facts of this case.

Defendant Celotex sought summary judgment on the ground that plaintiff had "failed to produce" any evidence that her [**2559] decedent had ever been exposed to Celotex asbestos. [4] App. 170. Celotex supported this motion with a [*335] two-page "Statement of Material Facts as to Which There is No Genuine Issue" and a three-page "Memorandum of Points and Authorities" which asserted that the plaintiff had failed to identify any

evidence in responding to two sets of interrogatories propounded by Celotex and that therefore the record was "totally devoid" of evidence to support plaintiff's claim. See *id., at 171-176.*

    4   JUSTICE STEVENS asserts that the District Court granted summary judgment on the ground that the plaintiff had failed to show exposure in the District of Columbia. He contends that the judgment of the Court of Appeals reversing the District Court's judgment should be affirmed on the "narrow ground" that it was "palpably erroneous" to grant summary judgment on this basis. *Post,* at 339 (dissenting). The Court replies that what the District Court said was that plaintiff had failed to show exposure in the District of Columbia "or elsewhere." *Ante,* at 320, n. 2. In my view, it does not really matter which reading is correct in this case. For, contrary to JUSTICE STEVENS' claim, deciding this case on the ground that Celotex failed to meet its burden of production under *Rule 56* does not involve an "abstract exercise in Rule construction." *Post,* at 339 (STEVENS, J., dissenting). To the contrary, the principles governing a movant's burden of proof are straightforward and well established, and deciding the case on this basis does not require a new construction of *Rule 56* at all; it simply entails applying established law to the particular facts of this case. The choice to reverse because of "palpable [error]" with respect to the burden of a moving party under *Rule 56* is thus no more "abstract" than the choice to reverse because of such error with respect to the elements of a tort claim. Indeed, given that the issue of the moving party's burden under *Rule 56* was the basis of the Court of Appeals' decision, the question upon which certiorari was granted, and the issue briefed by the parties and argued to the Court, it would seem to be the preferable ground for deciding the case.

Approximately three months earlier, Celotex had filed an essentially identical motion. Plaintiff responded to this earlier motion by producing three pieces of evidence which she claimed "[at] the very least . . . demonstrate that there is a genuine factual dispute for trial," *id., at 143*: (1) a letter from an insurance representative of another defendant describing asbestos products to which plaintiff's decedent had been exposed,

477 U.S. 317, *335; 106 S. Ct. 2548, **2559;
91 L. Ed. 2d 265, ***281; 1986 U.S. LEXIS 118

*id., at 160*; [***282] (2) a letter from T. R. Hoff, a former supervisor of decedent, describing asbestos products to which decedent had been exposed, *id., at 162*; and (3) a copy of decedent's deposition from earlier workmen's compensation proceedings, *id., at 164*. Plaintiff also apparently indicated [*336] at that time that she intended to call Mr. Hoff as a witness at trial. Tr. of Oral Arg. 6-7, 27-29.

Celotex subsequently withdrew its first motion for summary judgment. See App. 167. [5] However, as a result of this motion, when Celotex filed its second summary judgment motion, the record *did* contain evidence -- including at least one witness -- supporting plaintiff's claim. Indeed, counsel for Celotex admitted to this Court at oral argument that Celotex was aware of this evidence and of plaintiff's intention to call Mr. Hoff as a witness at trial when the second summary judgment motion was filed. Tr. of Oral Arg. 5-7. Moreover, plaintiff's response to Celotex' second motion pointed to this evidence -- noting that it had already been provided to counsel for Celotex in connection with the first motion -- and argued that Celotex had failed to "meet its burden of proving that there is no genuine factual dispute for trial." App. 188.

> 5     Celotex apparently withdrew this motion because, contrary to the assertion made in the first summary judgment motion, its second set of interrogatories had not been served on the plaintiff.

On these facts, there is simply no question that Celotex failed to discharge its initial burden of production. Having chosen to base its motion on the argument that there was no evidence in the record to support plaintiff's claim, Celotex was not free to ignore supporting evidence that the record clearly contained. Rather, Celotex was required, as an initial matter, to attack the adequacy of this evidence. Celotex' failure to fulfill this simple requirement constituted a failure to discharge its initial [**2560] burden of production under *Rule 56*, and thereby rendered summary judgment improper. [6]

> 6     If the plaintiff had answered Celotex' second set of interrogatories with the evidence in her response to the first summary judgment motion, and Celotex had ignored those interrogatories and based its second summary judgment motion on the first set of interrogatories only, Celotex

obviously could not claim to have discharged its *Rule 56* burden of production. This result should not be different simply because the evidence plaintiff relied upon to support her claim was acquired by Celotex other than in plaintiff's answers to interrogatories.

[*337] This case is indistinguishable from *Adickes*. Here, as there, the defendant moved for summary judgment on the ground that the record contained no evidence to support an essential element of the plaintiff's claim. Here, as there, the plaintiff responded by drawing the court's attention to evidence that was already in the record and that had been ignored by the moving party. Consequently, here, as there, summary judgment should be denied on the ground that the moving party failed to satisfy its initial burden of production. [7]

> 7     Although JUSTICE WHITE agrees that "if [plaintiff] has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact," he would remand "[because] the Court of Appeals found it unnecessary to address this aspect of the case." *Ante*, at 328-329 (concurring). However, Celotex has admitted that plaintiff had disclosed her intent to call Mr. Hoff as a witness at trial before Celotex filed its second motion for summary judgment. Tr. of Oral Arg. 6-7. Under the circumstances, then, remanding is a waste of time.

[***283] JUSTICE STEVENS, dissenting.

As the Court points out, *ante*, at 319-320, petitioner's motion for summary judgment was based on the proposition that respondent could not prevail unless she proved that her deceased husband had been exposed to petitioner's products "within the jurisdictional limits" of the District of Columbia. [1] [*338] Respondent made an adequate showing -- albeit possibly not in admissible form [2] -- that her husband had been exposed to petitioner's product in Illinois. [3] Although the basis of the motion and the argument had been the lack of exposure *in the District of Columbia*, the District Court stated at the end of the argument: "The Court will grant the defendant Celotex's motion for summary judgment there being no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period." App. 217

477 U.S. 317, *338; 106 S. Ct. 2548, **2560;
91 L. Ed. 2d 265, ***283; 1986 U.S. LEXIS 118

(emphasis added). The District Court offered no additional explanation and no written [**2561] opinion. The Court of Appeals reversed on the basis that Celotex had not met its burden; the court noted the incongruity of the District Court's opinion in the context of the motion and argument, but did not rest on that basis because of the "or elsewhere" language. [4]

1  See Motion of Defendant Celotex Corporation for Summary Judgment, App. 170 ("Defendant Celotex Corporation, pursuant to *Rule 56(b) of the Federal Rules of Civil Procedure* moves this Court for an Order granting Summary Judgment on the ground that plaintiff has failed to produce evidence that any product designed, manufactured or distributed by Celotex Corporation was the proximate cause of the injuries alleged *within the jurisdictional limits of this Court*") (emphasis added); Memorandum of Points and Authorities in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.*, at 175 (Plaintiff "must demonstrate some link between a Celotex Corporation product claimed to be the cause of the decedent's illness and the decedent himself. The record is totally devoid of any such evidence *within the jurisdictional confines of this Court*") (emphasis added); Transcript of Argument in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.*, at 211 ("Our position is . . . there has been no product identification of any Celotex products . . . that have been used *in the District of Columbia* to which the decedent was exposed") (emphasis added).
2  But cf. *ante,* at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment").
3  See App. 160 (letter from Aetna Life Insurance Co.) (referring to the "asbestos that Mr. Catrett came into contact with while working for Anning-Johnson Company" and noting that the "manufacturer of this product" was purchased by Celotex); *id.*, at 162 (letter from Anning-Johnson Co.) (confirming that Catrett worked for the company and supervised the installation of asbestos produced by the company that Celotex ultimately purchased); *id., at 164, 164*c (deposition of Catrett) (description of his work with asbestos "in Chicago").

4  See *Catrett v. Johns-Manville Sales Corp., 756 F.2d 181, 185, n. 14 (1985)* ("[The] discussion at the time the motion was granted actually spoke to venue. It was only the phrase 'or elsewhere,' appearing with no prior discussion, in the judge's oral ruling at the close of argument that made the grant of summary judgment even conceivably proper").

Taken in the context of the motion for summary judgment on the basis of no exposure in the District of Columbia, the [*339] District Court's decision to grant summary judgment [***284] was palpably erroneous. The court's bench reference to "or elsewhere" neither validated that decision nor raised the complex question addressed by this Court today. In light of the District Court's plain error, therefore, it is perfectly clear that, even after this Court's abstract exercise in Rule construction, we should nonetheless affirm the reversal of summary judgment on that narrow ground. [5]

5  Cf. n. 2, *supra.* The Court's statement that the case should be remanded because the Court of Appeals has a "superior knowledge of local law," *ante*, at 327, is bewildering because there is no question of local law to be decided. Cf. *Bishop v. Wood, 426 U.S. 341, 345-347 (1976).*

The Court's decision to remand when a sufficient ground for affirmance is available does reveal, however, the Court's increasing tendency to adopt a presumption of reversal. See, *e. g., New York v. P.J. Video, Inc., 475 U.S. 868, 884 (1986)* (MARSHALL, J., dissenting); *Icicle Seafoods, Inc.* v. *Worthington, 475 U.S. 709, 715 (1986)* (STEVENS, J., dissenting); *City of Los Angeles v. Heller, 475 U.S. 796, 800 (1986)* (STEVENS, J., dissenting); *Pennsylvania v. Goldhammer, 474 U.S. 28, 31 (1985)* (STEVENS, J., dissenting). As a matter of efficient judicial administration and of respect for the state and federal courts, I believe the presumption should be precisely the opposite.

I respectfully dissent.

**REFERENCES**

*73 Am Jur 2d, Summary Judgment 15, 16- 19*

28 Federal Procedure, L Ed, Pleadings and Motions 62:535-62:541, 62:589-62:612

Page 15

477 U.S. 317, *339; 106 S. Ct. 2548, **2561;
91 L. Ed. 2d 265, ***284; 1986 U.S. LEXIS 118

1 Federal Procedural Forms, L Ed, Actions in District Courts 1:1731-1:1758

USCS, *Federal Rules of Civil Procedure, Rule 56*

US L Ed Digest, Appeal 1692.2; Summary Judgment and Judgment on the Pleadings 1, 3-5

Index to Annotations, Summary Judgment

     Annotation References:

Reviewability of federal court's denial of motion for summary judgment. *17 L Ed 2d 886.*

Propriety, under *Rule 56(c) of the Federal Rules of Civil Procedure*, of granting oral motion for summary judgment. 52 ALR Fed 567.

Sufficiency of showing, under *Rule 56(f) of Federal Rules of Civil Procedure*, of inability to present by affidavit facts justifying opposition to motion for summary judgment. 47 ALR Fed 206.

*** Slip Sheet ***

Document