LEXSEE 424 F. SUPP. 2D 1229

**CFM COMMUNICATIONS, LLC, Plaintiff, vs. MITTS TELECASTING COMPANY, Defendant.**

**No. CV-F-04-6111 REC DLB**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*424 F. Supp. 2d 1229; 2005 U.S. Dist. LEXIS 42409*

**October 11, 2005, Decided**
**October 11, 2005, Filed**

**PRIOR HISTORY:** *CFM Communs., LLC v. Mitts Telecasting Co., 2005 U.S. Dist. LEXIS 36494 (E.D. Cal., Aug. 29, 2005)*

**COUNSEL:** [**1] For CFM Communications, LLC, Plaintiff: Marshall Craig Whitney, Timothy John Buchanan, McCormick Barstow Sheppard Wayte and Carruth, Fresno, CA.

For Mitts Telecasting Co, Defendant: Bruce Alan Owdom, Leslie H. Wiesenfelder, Dietrich Glasrud Mallek and Aune, Fresno, CA.

**JUDGES:** Robert E. Coyle, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Robert E. Coyle

**OPINION**

[*1231] ORDER DENYING PLAINTIFF'S MOTION TO STRIKE DESIGNATION OF DEFENDANT'S EXPERT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT AT TRIAL. (Doc. 67)

On October 3, 2005, the Court heard oral argument regarding Plaintiff's Motion to Strike Designation of Defendant's Expert and to Exclude Testimony of Defendant's Expert at Trial. Upon due consideration of the written and oral arguments of the parties and the record herein, the Court GRANTS IN PART and

DENIES IN PART the motion as set forth below.

**I. Factual Background**

Pappas Telecasting of the Midlands ("Pappas" or "PTM") held the FCC license for television station KXVO(TV) Channel 15 in Omaha, Nebraska. Because current FCC regulations prohibit one owner from holding more than one license in any given area Pappas has had to employ [**2] middlemen to "own" the station. Gary Cocola held the station for Pappas from 1994 to 1999, during which time Pappas held a promissory note in its favor (the "Cocola Note"). The Cocola Note provided that the note holder could require Mr. Cocola to form a limited partnership with the note holder and that the note holder, who would be the general partner, could require Mr. Cocola to convey his interest in the station at any time with proper notice.

In 1999, Pappas assigned its interest in the Cocola Note to Defendant MTC via a "Note Power and Assignment." The Note Power and Assignment gave MTC the right to force Mr. Cocola to form a limited partnership and then sell to MTC his share of the limited partnership, which would effectively result in MTC purchasing the Station. MTC paid $ 972,500 for the assignment.

At the same time, Pappas also executed an "Option Agreement" with MTC. The Option Agreement is the focus of this litigation. It provided for three scenarios by which Pappas could exercise a purchase option. MTC had a put option that contained the same language, which is as follows:

424 F. Supp. 2d 1229, *1231; 2005 U.S. Dist. LEXIS 42409, **2

(a) MTC [Defendant] hereby grants to Pappas or its assignee an exclusive and irrevocable [**3] option (the "Purchase Option") as follows:

(i) If, at the time the Purchase Option is exercised, MTC has not acquired any interest in the Partnership or the assets used in connection with the Station pursuant to the 97% Option or the 3% Option, then Pappas shall have the option to acquire from MTC the Note, including all of MTC's rights under the 97% Option and the 3% Option, for a price equal to $ 425,000, plus or minus the CPI Adjustment as defined below (the "Note Exercise Price"); or

(ii) If, at the time the Purchase Option is exercised, MTC has acquired, pursuant to the 97% Option, the 97% general partner interest in the Partnership, but has not acquired the 3% limited partner interest in the Partnership, then Pappas shall have the option to acquire from MTC all of MTC's interest in the Partnership, plus MTC's rights under the 3% Option, for a price equal to $ 425,000, plus or minus the CPI Adjustment as [*1232] defined below (the "Partnership Interest Exercise Price"); or

(iii) If, at the time the Purchase Option is exercised, MTC has acquired, pursuant to the 97% Option and the 3% Option, all of the FCC authorizations and other assets used by Cocola in the operation of [**4] the Station, then Pappas shall have the option to acquire from MTC all of such authorizations and other assets for a price equal to $ 425,000, plus the amount for which MTC acquired the 3% interest in the Partnership from Cocola, plus or minus the CPI Adjustment (the "Station Assets Exercise Price").

The Option Agreement provides that the purchase option is exercisable for seven years after the effective date, on or about November 5, 1999.

After the assignment was completed, MTC notified Mr. Cocola of its intent to exercise its rights under the Cocola Note such that the limited partnership would be formed and then MTC would exercise its right to compel Mr. Cocola to sell his interest, approximately 3% to MTC. The partnership was never formed and Mr. Cocola separately conveyed his interest in the station to MTC. One of the conditions of the single step transaction was the approval of Pappas, which was given. The transaction was finalized on August 4, 2000.

In August of 2003, Pappas sent a letter to MTC purporting to exercise the purchase option. In February of 2004, Pappas assigned its rights under the Option Agreement to Plaintiff CFM. Sometime after MTC was notified of Pappas' [**5] assignment, MTC informed CFM that the Option Agreement was unenforceable. The station has an appraised value of approximately $ 18 million.

The case is set for trial on November 8, 2005. Joint Pretrial Statement at 1. CFM and MTC have withdrawn their demands for a jury trial. Joint Pretrial Statement at 2.

## II. The Current Motion

CFM moves to strike the designation of Dennis P. Corbett as an expert, to strike his expert report, and to exclude his testimony at trial. CFM argues that 1) Mr. Corbett's expert report (the "Report") features improper legal conclusions, 2) the Report is irrelevant because the issue of FCC approval is not before the Court, and 3) the FCC, not the district court, has exclusive authority to decide an applicant's qualifications.

MTC argues in response that 1) Mr. Corbett's testimony is relevant, 2) Mr. Corbett will not offer improper legal conclusions, and 3) Mr. Corbett will not invade the Court's role as sole arbiter of the law.

## III. Legal standard

*Federal Rule of Evidence 702* governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist [**6] the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

424 F. Supp. 2d 1229, *1232; 2005 U.S. Dist. LEXIS 42409, **6

experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court acts as a "gatekeeper" and preliminarily determines whether the expert testimony is reliable and whether the methodology can be applied to the facts of the case and is relevant to the task at hand. *Daubert v. Merrell Dow* [*1233] *Pharms., 509 U.S. 579, 582, 592-93, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* Pursuant to *Federal Rule of Evidence 104(a)*, the proponent of expert testimony bears the burden to establish admissibility by a preponderance of proof. *Daubert, 509 U.S. at 592 n. 10* (citing *Bourjaily v. U.S., 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)).*

To the extent CFM seeks a final determination of the admissibility [**7] of all or part of Mr. Corbett's testimony, what it offers is a definitive motion *in limine*. See 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037.10 (2d ed. 2005). *Federal Rule of Evidence 103* empowers a court to make "a definitive ruling on the record admitting or excluding evidence, either at or before trial." A pretrial motion *in limine* forces a court to decide the merits of introducing a piece of evidence without the benefit of the context of trial. Id.; see *United States v. Marino, 200 F.3d 6, 11 (1st Cir. 1999)* (recognizing that proffered evidence can be more accurately assessed in the context of other evidence). Regardless of a court's initial decision on a motion *in limine* it may revisit the issue at trial. See *Fed. R. Evid. 103* advisory committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); *Luce v. United States, 469 U.S. 38, 41-42, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984)* [**8] ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.") "The Supreme Court has recognized that a ruling on a motion *in limine* is essentially a preliminary opinion that falls entirely within the discretion of the district court." *United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999)* (citing

*Luce, 469 U.S. at 41-42*). *Rule 103* does not require a court to rule on a motion *in limine*. Wright & Graham, supra, § 5037.18.

## IV. Discussion

### A. Mr. Corbett's Qualifications

CFM conceded at oral argument that it does not challenge Mr. Corbett's qualifications as an expert in the field of communications regulatory law or FCC matters. The Court will presume for purposes of this motion that Mr. Corbett's specialized knowledge qualifies him to give expert opinions concerning the FCC.

### B. Legal Opinion

Though expert testimony is appropriate where "scientific, technical, or other specialized knowledge will assist the trier of fact," expert testimony consisting of legal conclusions is generally inappropriate. *Aguilar v. Int'l Longshoremen's Union Local # 10, 966 F.2d 443, 447 (9th Cir. 1992)* [**9] (upholding district court's exclusion of expert legal opinion as "utterly unhelpful"). While expert testimony may be permissible to describe a complicated agency process, such testimony should not prescribe legal standards to apply to the facts of the case. *Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 508-09 (2d Cir. 1977)* (permitting expert testimony regarding SEC registration practices but excluding testimony interpreting legal effect of contract terms).

The concerns about admitting expert legal opinion may be lessened where, as here, a court sits as trier of fact. *Martin v. Ind. Mich. Power Co., 292 F. Supp. 2d 947, 959 (W.D. Mich. 2002)* (concluding that dangers that legal expert testimony presents are "minimal if not nonexistent" where a court is the trier of fact); see also *Volk v. United States, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999)* ("[T]he Daubert gatekeeping [*1234] obligation is less pressing in connection with a bench trial."); *Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000)* ("Most of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits [**10] as the trier of fact in place of a jury."). Nevertheless, the trial judge acting as trier of fact has "broad discretion to admit or exclude" expert testimony that is not helpful to its decision. *Beech Aircraft Corp. v. United States, 51 F.3d 834, 842 (9th Cir. 1995)* (holding that the court properly excluded from a bench trial expert opinion concerning what could be heard in a tape recorded

424 F. Supp. 2d 1229, *1234; 2005 U.S. Dist. LEXIS 42409, **10

conversation because the trial judge was in a better position to make that determination).

The meaning of federal regulations is a question of law, not a question of fact. *Bammerlin v. Navistar Int'l Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994)* (excluding expert testimony regarding compliance with Federal Motor Vehicle Safety Standards); *United States v. S. Ind. Gas & Elec. Co., 55 Env't Rep. Cas. (BNA) 1597, 2002 U.S. Dist. LEXIS 20936, at *23-24 (S.D. Ind. Oct. 24, 2002)* (excluding expert testimony interpreting the Clean Air Act and its accompanying regulations). One district court has excluded expert testimony reviewing "FCC rulings and regulations" on the ground that it "usurps the role of the trial judge in determining the relevant law. [**11] " *TC Systems Inc. v. Town of Colonie, 213 F. Supp. 2d 171, 182 (N.D.N.Y. 2002)*. Noting that a portion of the expert's report "reads more like a legal brief than an expert opinion," the court refused to consider it in deciding a motion for summary judgment. Id. Though the FCC leaves determination of state-law contractual rights to the courts, it has exclusive authority over licensing matters. *Dale J. Parsons, Jr., 10 FCC Rcd 2718, 2720 (1995); Arecibo Radio Corp., 101 F.C.C.2d 545, 548 (1985)*.

Plaintiff contends that a number of the Report's contentions are impermissible legal conclusions:

"Under *47 C.F.R. § 73.3555*, Larry Miller's Lincoln application is therefore still 'pending' at the FCC within the meaning of *47 C.F.R. § 1.65(a)*. Larry Miller may not lawfully own attributable ownership interests in television stations on both Channel 51 and Channel 45 in Lincoln, Nebraska. Given this prohibition, and given Larry Miller's pending application for Channel 45 in Lincoln, Larry Miller could not, consistent with *47 C.F.R. § 73.3518*, also propose to [**12] acquire and hold a second attributable ownership interest in the permittee of Channel 51 in Lincoln." (Report, at 3-4.)

"FCC analysis of the issue . . . typically focuses on three aspects of broadcast station operation: finances, personnel, and programming. Stated most simply, the individual(s) demonstrated to

be in control of these three aspects of operation are deemed to be in control of a licensed station. . . . In my review of the Lincoln 51 Application and the Transcript, I evaluated evidence that bears on the issue of Carol Miller's deposition that bears on CFM's control of CFM and the Lincoln 51 Application." (Report, at 4.)

"Given the representations and certifications made under Carol Miller's signature to the FCC in the Lincoln 51 Application, I reviewed the Transcript for evidence that the person represented to be the sole member of the limited liability company, who had been solely responsible for all certifications in CFM's Lincoln 51 Application, was familiar with basic details [*1235] concerning the applicant and its application." (Report, 6-7)

"In light of Carol Miller's answers as reflected in the Transcript, the multiple representations and certifications in [**13] the Lincoln 51 Application under Carol Miller's signature as CFM's sole member constitute disqualifying misrepresentations under relevant FCC case law, of a magnitude sufficient to render CFM unfit to hold any FCC license under FCC precedent." (Report, at 10)

"In addition to this fundamental overall misrepresentation, Carol Miller's testimony indicates that the Lincoln 51 Application contains multiple individual false certifications." (Report, at 11)

"The applicant, CFM, ultimately must suffer the consequences of these stark, intentional misrepresentations, exacerbated by CFM's attempt to forestall a [FCC] inquiry by aggressively claiming, in the face of Gray's challenge at the FCC, that Carol Miller was in total control of CFM and the Lincoln 51 Application. [FCC] case law is replete with examples of applicants for FCC authorizations who were disqualified on the basis of evidence presented at a hearing similar to or even less compelling than that presented here."

424 F. Supp. 2d 1229, *1235; 2005 U.S. Dist. LEXIS 42409, **13

(Report at 12-13)

"Under this test, CFM's false certifications and misrepresentations in the Lincoln 51 Application are so egregious as to disqualify CFM from becoming the license[e] of Omaha Channel [**14] 15." (Report, at 14)

"The 'total delegation' of authority over CFM's affairs to her husband evident from her deposition testimony in fact constitutes an impermissible abrogation of the complete authority she is held out to the FCC as possessing over CFM." (Report, at 14)

"The FCC's recent grant of the Lincoln 51 Application calls attention to another issue relating to CFM's basic qualifications to hold an FCC authorization. . . . 47 C.F.R. § 1.65(a) obligated CFM to amend the Lincoln 51 Application as promptly as possible . . . CFM's failure to do so significantly compounded its original infraction by depriving the [FCC] of a full record concerning the Lincoln 51 Application before the FCC acted on May 24, 2005. The withholding of this material, which has a substantial bearing on the application's bona fides, constitutes a lack of candor and is itself a separate, disqualifying offense under [FCC] precedent." (Report, at 15-16)

The Report does read "like a legal brief" arguing that CFM is not qualified to operate KXVO (TV) under FCC regulations and case law. Whitney Decl. Ex. A. The Report features numerous citations to federal court opinions, [**15] FCC case law, and the Code of Federal Regulations. The Report applies a variety of regulatory law to facts concerning CFM's application (the "Lincoln Application") for FCC consent to transfer Lincoln Broadcasting, LLC, ("Lincoln") and a transcript of the deposition of Carol Miller on April 13, 2005.

In conjunction with its opposition, MTC submitted a Supplement to the Report of Dennis P. Corbett (the "Supplement"). Owdom Decl. Ex. A. The Supplement, dated September 7, 2005, is based on developments since Mr. Corbett composed the Report. The Supplement focuses on three letter rulings the FCC has issued regarding a different case concerning CFM. The first letter ruling of May 24, 2005, ("Letter Ruling I") granted the Lincoln Application to transfer control of Lincoln from World [*1236] Investments, Inc. ("World") to CFM. Owdom Decl. Ex. A at 4. The second letter ruling of June 20, 2005, ("Letter Ruling II") rescinded the consent to transfer that Letter Ruling I had granted. Owdom Decl. Ex. A at 11. On August 25, 2005, the FCC issued a third letter ruling ("Letter Ruling III") that required CFM to relinquish control of Lincoln and required World to resume control. [**16] Owdom Decl. Ex. A at 13.

Mr. Corbett opines in the Supplement that the FCC's recision of its grant of consent in Letter Ruling II was "an extraordinary event." Owdom Decl. Ex. A at 1. According to the Supplement, "the FCC's actions in Letter Rulings II and II are extremely reliable indicators that the FCC would not approve CFM's acquisition of any broadcast station license, including KXVO (TV), Omaha, Nebraska, without the FCC's first resolving in a manner favorable to CFM, all qualifications issues raised by the transcript." Owdom Decl. Ex. A at 2. Mr. Corbett further alleges in the Supplement that Letter Rulings II and III are "extremely reliable indicators of the seriousness with which the FCC regards this matter." Owdom Decl. Ex. A at 3. The Supplement concludes that the FCC "is virtually certain to refrain from granting any application that may be filed by CFM to acquire Station KXVO (TV) unless and until the qualifications issues raised by the Transcript are resolved favorably to CFM." Owdom Decl. Ex. A at 3 (emphasis in original; footnote omitted).

In the Supplement, Mr. Corbett does not invoke FCC case law as he did in the Report. Instead, he substitutes vague assertions [**17] of the FCC's "typical" course. Without citing any authority, the Supplement states that the "far more typical course" is for the FCC to leave initial rulings in place while it considers reconsideration requests and applications for review. Owdom Decl. Ex. A at 2. Mr. Corbett writes that based on his "opinion and experience" the letter rulings are "reliable indicators" and that the FCC's rescission has been "highly unusual and abrupt." Owdom Decl. Ex. A at 2. He bases his certainty of the outcome on the "extraordinary and dramatic action" that the FCC has taken. Owdom Decl. Ex. A at 2.

424 F. Supp. 2d 1229, *1236; 2005 U.S. Dist. LEXIS 42409, **17

To the extent that the Supplement substitutes a vague invocation of "opinion and experience" for legal sources, its admission for the purpose of guessing what the FCC will do next does not become any more appropriate. Where Mr. Corbett abandons the legal sources that supported the initial Report, his opinion as to the likely outcome becomes mere unsupported speculation. See *GE v. Joiner, 522 U.S. 136, 143-47, 118 S. Ct. 512, 139 L. Ed. 2d 508 (U.S. 1997)*. A district court may exclude as speculative expert opinion testimony that lacks a reliable basis. *Id. at 146-47.* "Otherwise admissible expert testimony [**18] may be excluded under *Fed. R. Evid. 403* if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or undue delay." *United States v. Hoac, 990 F.2d 1099, 1103 (9th Cir. 1993)*. Expert testimony may be excluded where it "would inject collateral matters with weak probative value." Id.

Mr. Corbett's opinions in the Report and Supplement about how the FCC will likely apply statutory and case law precedent to CFM's application, whether based on his interpretations of the law or his experience, are in any circumstances "utterly unhelpful" to the Court. See *Aguilar, 966 F.2d at 447*. The Court is perfectly able to review FCC decisions and regulations to decide how the law applies to the present facts. See *TC Systems Inc., 213 F. Supp. 2d at 182.* MTC remains free to use briefing to persuade the Court that [*1237] MTC's interpretation of the law is superior. To the extent Mr. Corbett's opinions about the FCC's likely actions rest merely on vague claims regarding his experience of practicing before the FCC, they amount to mere speculation. The ultimate disposition [**19] of any legal proceeding is by nature unpredictable. The FCC has already once reversed itself in the case on which Mr. Corbett has based his opinions. See Owdom Decl. Ex. A at 11. Mr. Corbett's stated basis for his opinion is simply that the FCC's actions have been "highly unusual and abrupt" and "extraordinary and dramatic." Owdom Decl. Ex. A at 3. These cursory descriptions do not meet MTC's burden to show that Mr. Corbett's opinion about the outcome of FCC proceedings is reliable. See *Daubert, 509 U.S. at 592 n. 10.*

Mr. Corbett's opinions will not help the trier of fact decide how the FCC would likely decide the propriety of CFM acquiring KXVO. Mr. Corbett is therefore prohibited from testifying about how FCC law applies to the facts of this case. He is also barred from testifying to any conclusions the basis of which, in whole or in part, is

his opinion about the likely outcome of any future decision of the FCC. The Court hereby excludes opinion testimony concerning, or opinion testimony that has as a premise opinions concerning:

. whether any entity may now or in the future lawfully have an ownership interest in any broadcast station.

. what factors [**20] the FCC considers in deciding control of a broadcast station and how such factors apply to this case.

. whether and how any past, present, or future conduct, including but not limited to Carol Miller's deposition and the Lincoln Application, will affect any future FCC decision.

. whether and how any FCC action, including but not limited to letter rulings, indicates its likely decision on any legal issue.

. how the FCC will decide any legal issue.

. any other application of law to the facts of the case.

Therefore, with respect to this testimony CFM's motion is GRANTED.

**C. Relevance**

A district court's gatekeeping function requires that it "ensure that the proposed expert testimony is 'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., 43 F.3d 1311, 1315 (9th Cir. 1995)* (quoting *Daubert, 509 U.S. at 597*) (internal citation omitted). The party advancing the expert testimony therefore bears the burden of showing that it is relevant to advancing a claim or defense. *Daubert, 509 U.S. at 592 n. 10*; see *Fed. R. Evid. 402* [**21] ; see also *Bourjaily, 483 U.S. at 175-76.* "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401.*

In determining whether Mr. Corbett can provide relevant opinion testimony, the Court looks to his Report and Supplement. An expert report should contain "a complete statement of all opinions to be expressed and the basis and reasons therefor." *Fed. R. Civ. P.*

424 F. Supp. 2d 1229, *1237; 2005 U.S. Dist. LEXIS 42409, **21

*26(a)(2)(B)*. The report should "set forth the substance of the direct examination." *Fed. R. Civ. P. 26(a)(2)* advisory committee's note to 1993 Amendment. *Federal Rule of Civil Procedure 37(c)(1)* automatically excludes from trial any opinions that should have been disclosed in the report but were not, unless the failure to disclose was substantially [*1238] justified or harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001)*.

### 1. Unclean [**22]  Hands Doctrine

One ground that MTC asserts for relevance of Mr. Corbett's testimony is in support of its unclean hands defense to CFM's claim for specific performance. Def.'s Opp'n at 5. In support, MTC cites only one case, *In re Marriage of Fogarty and Rasbeary, 78 Cal. App. 4th 1353, 1366, 93 Cal. Rptr. 2d 653 (2000)*, for the general rule that "a party requesting equitable relief must come into court with clean hands." In that case, the ex-husband invoked the defense of laches against a claim brought by his ex-wife for past-due child support payments. Id. The ex-husband's failure to pay child support did not bar under the unclean hands doctrine his use of the equitable defense of laches. Id. Marriage of Fogarty provides no support to MTC's assertion that Mr. Corbett's expert testimony is relevant to its unclean hands defense.

MTC faces two problems in establishing the relevance of Mr. Corbett's testimony to an unclean hands defense. First, the unclean hands defense only applies to misconduct in the particular transaction or concerning the subject matter of the litigation. *Wilson v. S.L. Rey, Inc., 17 Cal. App. 4th 234, 244, 21 Cal. Rptr. 2d 552 (1993)* (holding that doctrine of [**23] unclean hands barred recovery where evidence showed plaintiff committed waste on land that was the subject of the suit). Courts should look to how intimately the alleged misconduct relates to the present action: "What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." *Republic Molding Corp. v. B.W. Photo Utilities, 319 F.2d 347, 350 (9th Cir. 1963)*; see *Newman v. Checkrite Cal., 912 F. Supp. 1354, 1376 (E.D. Cal. 1995)* (holding that doctrine of unclean hands did not prevent plaintiffs, who had written bad checks for retail purchases, from obtaining equitable relief against defendant collection agencies for improper collection practices).

MTC alleges that misconduct in connection with the transfer of a different television station, Channel 51 in Lincoln, Nebraska, bars CFM's claim for specific performance. Whitney Decl. Ex. A. at 4; Owdom Decl. Ex. A at 1. MTC does not assert that CFM's purchase of a different television station is part of the same transaction or the same litigation [**24] as that involved in this case. The Supplement does explain how CFM's conduct in other proceedings could affect its future acquisition of KXVO(TV). Owdom Decl. Ex. A at 3. Even if the two transactions may affect one another, CFM did not dirty its hands "in acquiring the right [it] now asserts." See *Republic Molding Corp., 319 F.2d at 350*. CFM's attempt to acquire Channel 51 appears to be completely unrelated to the contractual rights at issue here regarding KXVO(TV). Nor has MTC explained how in any other way "the manner of dirtying renders inequitable the assertion of" CFM's contractual rights. See id.

The second hurdle that MTC faces is that an unclean hands defense is appropriate only where the alleged misconduct, if unchecked, would have prejudiced the other party. *Soon v. Beckman, 234 Cal. App. 2d 33, 36, 44 Cal. Rptr. 190 (1965)*. For the doctrine to apply, the "'conduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief. It must have been conduct which, if permitted, inequitably [*1239] affects the relationship between the plaintiff and the defendant, . . .'" [**25] *Estate of Blanco, 86 Cal. App. 3d 826, 833, 150 Cal. Rptr. 645 (1978)* (quoting *Bradley Co. v. Bradley, 165 Cal. 237, 242, 131 P. 750 (1913))*. In *Pleasant Valley Canal Co. v. Borror, 61 Cal. App. 4th 742, 72 Cal. Rptr. 2d 1 (1998)*, the court addressed the effect of a plaintiff's past submission of untruthful information to a government agency. *Id. at 785 n. 31*. The case concerned the parties' respective riparian rights and depended in part upon plaintiff's allegedly inflated reports to the state regarding its water use. Id. Acknowledging defendant's assertions that plaintiff was "fully clothed in bad faith and inequitable conduct," the court nevertheless refused to apply the unclean hands doctrine where defendant had not been prejudiced by any alleged improper reporting practices. Id. (citing *Soon, 234 Cal. App. 2d at 36*).

MTC asserts that if the Court orders specific performance, it will be "required to join with CFM in an application that would be filed with the FCC in which MTC would be requesting the consent of the FCC to

424 F. Supp. 2d 1229, *1239; 2005 U.S. Dist. LEXIS 42409, **25

transfer the license for Station KXVO in Omaha, Nebraska, from MTC to CFM." Def.'s Opp'n at 2-3. For the first time at [**26] oral argument, MTC argued that it would be prejudiced by a decree of specific performance because any application would be held "in limbo." MTC also claimed that a decree of specific performance, combined with FCC's denial of CFM's licence, would be prejudicial because it would require more litigation in this Court.

In any event, it appears that courts are free to resolve issues of state law prior to an FCC licensing inquiry. *Radio Station WOW, Inc. v. Johnson, 326 U.S. 120, 131-32, 65 S. Ct. 1475, 89 L. Ed. 2092 (1945)* (recognizing the power of the states to resolve issues of fraud concerning FCC-licensed facilities); see also *Minn.-Iowa Television Co. v. Watonwan T.V. Improvement Ass'n, 294 N.W.2d 297, 305 (Minn. 1980)* (holding that FCC's opposition to a contract provision did not bar the enforcement of the contract under state law). A district court deciding a case similar to this one awarded specific performance under an option contract despite uncertainty about the likelihood of FCC approval. *Media Gen. Broad. of S.C. Holdings, Inc. v. Pappas Telecasting of the Carolinas, 152 F. Supp. 2d 865, 868 (W.D.N.C. 2001)*. The court entered judgment requiring defendant [**27] to file FCC documents for transfer pursuant to the option. Id. Acknowledging defendants' assertion that the FCC would not approve the sale, the court granted specific performance and noted that it would "revisit the question of remedies if the FCC blocks said sale." Id.

Accordingly, the Court is unable to discern how Mr. Corbett's testimony could be relevant to an unclean hands defense. Divining the outcome of FCC proceedings or interpreting the law that applies to such actions cannot establish that specific performance is barred by the doctrine of unclean hands. The Court can grant specific performance regardless of the FCC's predisposition toward CFM's alleged misconduct or any other licensing issues. Nevertheless, because the merits of the unclean hands defense were not fully briefed in the context of this motion, the Court declines at this time to exclude on this ground any of Mr. Corbett's testimony.

## 2. Superiority of Specific Performance

A second ground of relevance MTC asserts is that Mr. Corbett's testimony is relevant to the Court's determination of whether specific performance is the superior remedy. Specific performance is a [*1240] discretionary remedy. *Petersen v. Hartell, 40 Cal. 3d 102, 110, 219 Cal. Rptr. 170, 707 P.2d 232 (1985)*. [**28] Specific performance may be refused where granting it would cause "unreasonable hardship or loss to the party in breach or to third persons." *Restatement (Second) of Contracts § 364* (1981); see *Cal. Civ. Code § 3391* ("Specific performance cannot be enforced against a party to a contract . . . [i]f it is not, as to him, just and reasonable . . ."); *United States v. Georgia-Pacific Co., 421 F.2d 92, 104 (9th Cir. 1970)* ("Courts of equity have long refused to decree specific performance where the result would be unconscionable, unjust, inequitable, oppressive or unduly harsh."); *Blackburn v. Charnley, 117 Cal. App. 4th 758, 765, 11 Cal. Rptr. 3d 885 (2004)* (upholding trial court grant of specific performance based on balancing the hardships of enforcement).

It is not, at this point, clear what factors will be relevant to determine whether to grant specific performance. MTC's claims that it will be prejudiced by being held "in limbo" pending a licensing decision or by being compelled to engage in further litigation following the denial of a license may impact a remedial decision of the Court.

The Court's [**29] decision does not preclude Mr. Corbett from giving nonopinion testimony or from giving relevant nonlegal opinion testimony disclosed in the Report and Supplement. Where complex administrative processes are at issue, expert testimony can be helpful to explain them to the trier of fact. See *Marx, 550 F.2d at 508-09 (2d Cir. 1977)*. In Marx, the court excluded expert testimony about whether a party's conduct violated a term of a contract regarding the registration of stock. *Id. at 509*. The court decided, however, that the expert in securities regulation "was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC." *Id. at 508-09*; see also *TC Systems Inc., 213 F. Supp. 2d at 182* (excluding portions of expert report regarding the FCC that read "like a legal brief" but declining to exclude the expert's testimony at trial if the party could establish "a nexus between the FCC criteria and the facts here").

Testimony about the process of obtaining FCC approval may prove relevant to a decision about whether to award specific [**30] performance. Though the Court is capable of applying FCC law to any relevant facts, Mr.

424 F. Supp. 2d 1229, *1240; 2005 U.S. Dist. LEXIS 42409, **30

Corbett may give relevant expert testimony regarding the nature of FCC procedures and practices apart from the law that underlies them. Such testimony could be factual or could be in the form of any nonlegal opinion that he has already disclosed in the Report and Supplement. The Court is not in a position to determine at this stage whether MTC can establish a relevant "nexus" between Mr. Corbett's testimony and this case. Excluding all of Mr. Corbett's testimony on a relevance ground is therefore premature.

**ACCORDINGLY:**

1. Plaintiff's motion to exclude Mr. Corbett's opinion testimony concerning the following subjects is GRANTED:

    a. whether any entity may now or in the future lawfully have an ownership interest in any broadcast station.

    b. what factors the FCC considers in deciding control of a broadcast station and how such factors apply to this case.

    c. whether and how any past, present, or future conduct, including but not limited to Carol Miller's deposition and

the Lincoln Application, will affect any future FCC decision.

    d. whether and how any FCC action, [**31] including but not limited to letter [*1241] rulings, indicates its likely decision on any legal issue.

    e. how the FCC will decide any legal issue.

    f. any other application of law to the facts of the case.

2. Plaintiff's motion to exclude the remainder of Mr. Corbett's testimony is DENIED.

3. Plaintiff's motion to strike Mr. Corbett's designation as an expert and to strike his expert report is DENIED.

IT IS SO ORDERED.

**Dated: October 11, 2005**

**/s/ Robert E. Coyle**

UNITED STATES DISTRICT JUDGE

*** Slip Sheet ***

Document

LEXSEE 470 F. SUPP. 2D 457

**CREEDON CONTROLS, INC., a Delaware corporation, Plaintiff, v. BANC ONE BUILDING CORPORATION, an Illinois corporation, and FOREST ELECTRIC CORPORATION, a New York corporation, Defendants.**

**Civil Action No. 05-300-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*470 F. Supp. 2d 457; 2007 U.S. Dist. LEXIS 4432*

**January 22, 2007, Decided**

**COUNSEL:** [**1] For Creedon Controls Inc., a Delaware Corporation, Plaintiff: Robert K. Beste, Jr., LEAD ATTORNEY, Cohen Seglias Pallas Greenhill & Furman PC, Wilmington, DE.

For Banc One Building Corporation, an Illinois Corporation, Defendant: Lawrence C. Ashby, LEAD ATTORNEY, Philip Trainer, Jr., Ricardo Palacio, Ashby & Geddes, Wilmington, DE; Jennifer Michele Zelvin, McCarter & English, LLP, Wilmington, DE.

For Forest Electric Corp, a New York Corporation, Defendant: Paul A. Bradley, LEAD ATTORNEY, Maron Marvel Bradley & Anderson, P.A., Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION**

[*458] *MEMORANDUM OPINION*

January 22, 2007

Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court are Defendant Banc One Building Corporation's ("Banc One") Motion For Summary Judgment (D.I. 115) and Defendant Forest Electric's [*459] ("Forest") Motion For Partial Summary Judgment. (D.I. 120). For the reasons discussed, Banc One's Motion will be granted and Forest's Motion will be denied.

**I. BACKGROUND**

Banc One was tasked to construct two data centers, Core Data Center 1 and Core Data Center 2 ("CDC 1" and "CDC 2"). Banc [**2] One selected Tishman Construction of Maryland ("Tishman") to act as the "Construction Manager," and Banc One's agent, for the CDC 1 and 2 project. Banc One also contracted with co-defendant Forest to serve as the "Trade Manager for Electrical Work" for the project. Tishman and Forest entered into a Trade Manager Agreement which set forth the parties' understandings with regard to their roles and responsibilities. Forest was tasked with coordinating all electrical power and data connections work, and had the responsibility of competitively bidding and awarding this work to subcontractors.

After submitting a successful bid, Plaintiff Creedon Controls, Inc. ("Creedon") was selected by Forest to perform part of the electrical work. Creedon contracted directly with Forest, as an electrical subcontractor. Forest supervised and coordinated Creedon's performance throughout the project, and served as an intermediary between Creedon, Tishman, and Banc One for any changes to the scope of the project. Forest was also responsible for scheduling the work of all of its electrical subcontractors, including Creedon.

Upset with the significant delays and cost increases it was facing because of Defendants' [**3] alleged inefficiency and improper behavior, Creedon initially filed its complaint against Defendants Banc One and

470 F. Supp. 2d 457, *459; 2007 U.S. Dist. LEXIS 4432, **3

Forest in Delaware Superior Court. The case was removed to this Court on May 17, 2005. Banc One and Forest filed the current Motions on July 14, 2006.

## II. PARTIES' CONTENTIONS

### A. Banc One's Motion For Summary Judgment

By its Motion, Banc One contends that the Court should grant summary judgment in its favor because no contract was ever formed between itself and Creedon. Defendant further contends that Creedon and Forest have failed to establish an agency relationship between Banc One and Forest. Therefore, Banc One contends, summary judgment must be granted because there is no relationship between Creedon and Banc One that could expose Banc One to liability.

In response, both Creedon and Forest contend that summary judgment is inappropriate because there are genuine issues of material fact in dispute as to the existence of an agency relationship between Banc One and Forest.

### B. Forest's Motion For Partial Summary Judgment

By its Motion, Forest contends that summary judgment is warranted because there is a contract between Forest and Creedon which [**4] expressly precludes any damages for delay. Forest also contends that it was merely an agent of Banc One, and therefore should not be held liable for any damages Creedon may be awarded.

In response, Creedon contends that there are genuine issues of material fact as to what contract language binds the parties and as to which party Creedon may recover from. Creedon also contends that the No-Damages-For-Delay clause is unenforceable due to Forest's bad faith. In its response, Banc One agrees with Forest that contract language expressly precludes damages arising from Forests delays. [*460] However, Banc One contends that there are no facts to support Forest's contention that it was an agent of Banc One.

## III. LEGAL STANDARD

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure,* a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are

no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In determining [**5] whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).*

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citations omitted). However, the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

## III. DISCUSSION

[**6] A. *Banc One's Motion For Summary Judgment*

Because the parties do not dispute that Banc One and Creedon never contracted directly with each other, the Court must consider whether there is sufficient evidence to enable a jury to find that Forest was acting as Banc One's agent. If there is not, the Court must grant Defendant's Motion, because Creedon will have failed to show any basis under which Banc One might be liable to Creedon.

A principal is liable for the actions of its agent that are within the scope of the agent's actual or apparent authority. *Restatement (Second) of Agency § 140.* Actual authority is created by words or conduct of the principal, which reasonably cause the agent to determine that the principal wishes the agent to act on the principal's behalf. *Edwards v. Born, Inc., 792 F.2d 387, 389-90 (3d Cir. 1986).* Apparent authority, on the other hand, can be created by words or conduct of the principal, which reasonably cause a third party to believe that the agent is

470 F. Supp. 2d 457, *460; 2007 U.S. Dist. LEXIS 4432, **6

acting on the principal's behalf. *Id. at 390.*

The Court concludes that no jury could reasonably find that Forest had actual [**7] authority to act on Banc One's behalf. Banc One has pointed to contract documents between Banc One and Forest, and Forest and Creedon, which show Forest is not Banc One's agent. Banc One also points to Forest's solicitations for bids, which do not mention Banc One; the award letter sent from Forest to Creedon stating that Creedon was to be a sub-contractor to Forest; the subcontract agreement between Forest and Creedon; and the fact that Creedon never signed the one contract document referenced by [*461] Creedon and Forest where Forest unilaterally described itself as Banc One's agent.

The non-moving parties can point only to parole evidence, an unsigned contract document sent to Creedon a year after work began on the project where Forest unilaterally identified itself as Banc One's agent, and Banc One's initial Answer (D.I. 5), which Creedon and Forest contend is an "admission" which establishes Forest's actual authority. As to the "admission" in its first Answer, Banc One contends that it submitted its Amended Answer (D.I. 92) to overcome deception perpetrated by Forest's counsel throughout the original Answer, which contained misrepresentations of the contract documents. (D.I. 138).

[**8] Generally, "an admission contained in an amended or superceded pleading, while it may not have the full binding force of a judicial admission, is evidence against the pleader of the facts admitted." *Barringer v. Prudential Ins. Co. of America*, 62 F. Supp. 286, 287 (E.D. Pa. 1945); *See Bruce E.M. v. Dorothea A.M.*, 455 A.2d 866, 869 (D. Del 1983)(finding the same). However, some exceptions have been allowed when counsel, not the party himself, verified or signed a pleading, where "it was filed under a clear misapprehension of the facts," or "where the matter constituting an admission . . . is contained in inconsistent pleas or defenses." 52 A.L.R. 2d 516. In this case, whether there is a basis for deviating from this general rule to disallow Banc One's admission in its original Answer, or not is a factual question. Therefore, for purposes of resolving this Motion, the Court must decide it in a light most favorable to the non-moving parties. Even assuming that Banc One's original Answer can be used as evidence against Banc One, the Court concludes that Creedon and Forest have failed to establish actual authority sufficient to survive a motion [**9] for summary judgment.

The Court also concludes that no jury could reasonably find that Forest had apparent authority to act on Banc One's behalf. Creedon and Forest contend that apparent authority was created through (1) the beliefs of several parties to the CDC 1 and 2 project, (2) silence from Banc One's agent, which was interpreted as assent, and (3) Forest's previous transactions with one member of Banc One.

Creedon and Forest point to the words and actions of their own executives, but not to anyone from Banc One, in an attempt to demonstrate an agency relationship. For example, Creedon has asserted views of Forest's management, who contend they were not taking the CDC 1 and 2 job at risk, despite the language of the contract. Creedon has also put forth deposition testimony from its president, who said she relied on Forest's representations that it was Banc One's agent. Finally, Creedon and Forest argue that Forest became an agent of Banc One because Tishman Construction of Maryland, the CDC 1 and 2 Construction Manager and Banc One's agent, did not object to the few occasions when Forest identified itself as such. However, "apparent authority can never be derived from the acts [**10] of the agent alone." *Finnegan Const. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super 1976). Furthermore, in order to establish an agency relationship, the non-moving parties must point to words or actions *of the principal,* which Creedon and Forest have not done.

Finally, Creedon and Forest contend that there is apparent authority based upon a prior working relationship between Forest and Banc One. However, the pleadings acknowledge that the prior work Forest did for Banc One was entirely unrelated to the CDC 1 and 2 project. Accordingly, the Court finds that Forest did [*462] not have apparent authority to act as Banc One's agent.

### B. *Forest's Motion For Partial Summary Judgment*

Forest contends that a contract was formed between itself and Creedon based upon Creedon's conditional agreement and acceptance of Forest's October 2, 2003 offer letter and attached subcontractor agreement. The subcontractor agreement contained a No-Damages-For-Delay clause barring Creedon from recovering monetary damages for any delays caused by Forest or Tishman. Both Creedon and Forest contend

470 F. Supp. 2d 457, *462; 2007 U.S. Dist. LEXIS 4432, **10

that, if a contract exists, this clause would generally be enforceable, unless the delay [**11] was unanticipated (e.g. act of deity) or resulting from bad faith. Creedon's complaint alleges such bad faith.

Construing the evidence in the light most favorable to Creedon, the Court concludes that there are genuine issues of material fact as to how the delays arose that Creedon experienced, as well as to the enforceability of the No-Damages-For-Delay clause. Therefore, summary judgment is inappropriate. Accordingly, the Court will deny Defendants' Motion For Partial Summary Judgment. (D.I. 120).

## IV. CONCLUSION

For the reasons discussed, the Court concludes that Creedon and Forest have failed to establish that Forest was an agent of Banc One, and therefore, there is no privity of contract or other relationship between Creedon and Banc One that would expose Banc One to liability on the claims asserted in this litigation. Accordingly, Defendant Banc One Building Corporation's Motion For Summary Judgment (D.I. 115) will be granted.

Further, the Court concludes that there are genuine issues of material fact regarding the reasons for Creedon's

delays and also the enforceability of the No-Damages-For-Delay clause in the subcontractor agreement between Forest and Creedon. [**12] Therefore, Defendant Forest Electric Corporation's Motion For Partial Summary Judgment (D.I. 120) will be denied.

An appropriate Order will be entered.

## ORDER

At Wilmington, the 22 day of January 2007, for the reasons stated in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant Banc One Building Corporation's Motion For Summary Judgment is **GRANTED.** (D.I. 115).

2. Defendant Forest Electric Corporation's Motion For Partial Summary Judgment is **DENIED.** (D.I. 120).

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT COURT

107Z1G

********** Print Completed **********

Time of Request: Friday, November 30, 2007   09:19:46 EST

Print Number:    1822:62626654
Number of Lines: 175
Number of Pages: 4

Send To:   SWAMINATHAN, PRIYA
           CURTIS MALLET-PREVOST COLT & MOSLE
           101 PARK AVE
           NEW YORK, NY 10178-0002

*** Slip Sheet ***

Document

LEXSEE 290 F.3D 567

**DELAWARE RIVER PORT AUTHORITY; PORT AUTHORITY TRANSIT CORPORATION, a subsidiary of the Delaware River Port Authority v. FRATERNAL ORDER OF POLICE, PENN-JERSEY LODGE 30, an unincorporated labor organization; JAMES R. STEWART, in his capacity as President of FOP Lodge 30; NEW JERSEY POLICEMEN'S BENEVOLENT ASSOCIATION INTERCOUNTIES LOCAL # 30, an unincorporated labor organization; ANTHONY CAPPELLO, JR., in his capacity as President of New Jersey Policeman's Benevolent Association Intercounties Local # 30; Fraternal Order of Police, Penn-Jersey Lodge # 30; James R. Stewart, Appellants**

No. 01-1866

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*290 F.3d 567; 2002 U.S. App. LEXIS 9430; 170 L.R.R.M. 2019*

**January 17, 2002, Argued**
**May 14, 2002, Filed**

**PRIOR HISTORY:**    [**1] On Appeal from the United States District Court for the Eastern District of Pennsylvania. D.C. Civil Action No. 99-cv-05367. (Honorable Eduardo C. Robreno).
*Del. River Port Auth. v. FOP, 135 F. Supp. 2d 596, 2001 U.S. Dist. LEXIS 3052 (E.D. Pa. 2001).*

**DISPOSITION:**    Reversed and remanded.

**COUNSEL:** CHARLES T. JOYCE, ESQUIRE (ARGUED), BENJAMIN EISNER, ESQUIRE, Spear, Wilderman, Borish, Endy, Spear & Runckel, Philadelphia, Pennsylvania. GARY M. LIGHTMAN, ESQUIRE, Lightman & Welby, Harrisburg, Pennsylvania, Attorneys for Appellants, Fraternal Order of Police, Penn-Jersey Lodge 30 and James R. Stewart.

PATRICK MATUSKY, ESQUIRE (ARGUED), JEROME J. SHESTACK, ESQUIRE, LAURA E. KRABILL, ESQUIRE, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pennsylvania. WILLIAM H. ROBERTS. ESQUIRE, PETER A. GOLD, ESQUIRE, SCOTT A. MAYER, ESQUIRE, Blank, Rome, Comisky & McCauley, Philadelphia, Pennsylvania, Attorneys for Appellees, Delaware River Port Authority and Port Authority Transit Corporation.

DONALD F. BURKE, ESQUIRE, Port Authority of New York and New Jersey, Newark, New Jersey, Attorney for Amici Curiae-Appellee, The Port Authority of New York and New Jersey.

DAVID B. GREENFIELD, ESQUIRE, Waterfront Commission of New York Harbor, New York, New York, Attorney for Amici Curiae-Appellee, The Waterfront Commission of New [**2] York Harbor.

MICHAEL HOUGHTON, ESQUIRE, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. RICHARD S. MROZ, ESQUIRE, Stradley, Ronon, Stevens & Young, Cherry Hill, New Jersey, Attorneys for Amici Curiae-Appellee, The Delaware River and Bay Authority.

**JUDGES:** Before: SCIRICA and ROSENN, Circuit Judges, and KANE, District Judge. *

    * Honorable Yvette Kane, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

**OPINION BY:** SCIRICA

**OPINION**

    [*569] OPINION OF THE COURT

    SCIRICA, Circuit Judge:

290 F.3d 567, *569; 2002 U.S. App. LEXIS 9430, **2;
170 L.R.R.M. 2019

At issue is whether we should give preclusive effect to a state court judgment on a collective bargaining matter. In a declaratory judgment action, the District Court held that despite a prior New Jersey judgment, the Delaware River Port Authority had no duty under its congressionally approved bi-state compact to recognize certain collective bargaining rights of supervisory employees. We will reverse.

I.

In 1999 the Fraternal Order of Police, Penn-Jersey Lodge 30 ("Lodge 30") and the Policemen's Benevolent Association Intercounties Local 30 ("Local 30") sought recognition and the right to collectively bargain for supervisory law enforcement personnel from [**3] the Delaware River Port Authority (DRPA) and the Port Authority Transit Corporation (PATCO), a subsidiary of the DRPA. A majority of "superior officers" -- corporals and sergeants with supervisory capacity -- employed by the DRPA and the PATCO had authorized the unions to represent them as their exclusive bargaining agents. [1]

> [1]    Because the PATCO's interests in this litigation coincide with the DRPA's interests, we will collectively refer to the two as "the DRPA."

> The DRPA has two separate police forces. Lodge 30 seeks to represent the sergeants and corporals employed by the DRPA itself. Local 30 seeks to represent the sergeants, corporals, and detectives employed by the PATCO's Police Department. The reasons why the different unions seek to represent the different officers are irrelevant to this appeal, so we will not distinguish Lodge 30's arguments from Local 30's arguments.

The DRPA sought a declaratory judgment in the United States District Court for the Eastern District of Pennsylvania that (1) the [**4] authority to fix and determine terms and conditions of employment, including compensation of the superior officers, rests solely with the DRPA; and (2) the DRPA was not required to recognize [*570] or bargain collectively with the unions. The unions contended a prior New Jersey judgment merited preclusive effect. *Fraternal Order of Police, Penn-Jersey Lodge 30 v. DRPA, 733 A.2d 545, 547, 323 N.J. Super. 444* (N.J. App. Div.), cert. denied, 162, N.J. 663, *745 A.2d 1213 (N.J. 1999)*, cert. denied, *530 U.S. 1275, 147 L. Ed. 2d 1007, 120 S. Ct. 2743 (2000)* ("Lodge 30").

There is a prior history of labor-management relations between the parties. In 1975, the DRPA voluntarily recognized Lodge 30 as the collective bargaining agent for DRPA patrol officers and until 1996, negotiated a series of collective bargaining agreements. [2] In 1996, labor negotiations stalled between the DRPA and Lodge 30. After the DRPA altered the employment terms and conditions for patrol officers, Lodge 30 brought suit in New Jersey state court to "require the continuation of good faith bargaining" under the prior arrangement. Id. The New Jersey Superior Court agreed, finding New Jersey and Pennsylvania had "parallel or complementary legislation of a different [**5] nature . . . which . . . clearly gives public employees a right to freely organize and designate representatives and also to negotiate in good faith." Id. (quotation and citation omitted). Holding the New Jersey and Pennsylvania statutes demonstrated a shared public policy favoring labor arbitration, the Superior Court granted Lodge 30's motion for summary judgment. *Id. at 547-48*.

> [2]    These officers were considered "rank and file" members of the departments. The officers seeking recognition and bargaining rights in the present suit are their "superiors."

The New Jersey Superior Court, Appellate Division, affirmed, holding:

> Pennsylvania Collective Bargaining by Policemen or Firemen Act

> Although neither of the creator states of a bi-state agency may unilaterally impose its legislative will on the bi-state agency . . . the agency may be subject to complementary or parallel state legislation. . . . This parallel or complementary legislation need not be nearly identical and specifically apply to the agency. Rather, the public policy of both states, articulated [**6] in parallel statutes that are substantially similar but do not specifically include defendant, is applicable to a bi-state agency, although the statutory scheme of each state is not.

*Id. at 551* (quotations and citations omitted). The New Jersey Supreme Court denied a petition for certification. *745 A.2d 1213 (1999)*. The United States

290 F.3d 567, *570; 2002 U.S. App. LEXIS 9430, **6;
170 L.R.R.M. 2019

Supreme Court denied certiorari. *530 U.S. 1275 (2000).*

The unions cite the preclusive effect of Lodge 30. Additionally, they claim the New Jersey and Pennsylvania statutes providing collective bargaining rights to patrol officers also apply to the DRPA. See *N.J. STAT. ANN. § 34:13A-1 et seq.* (West 1990 & Supp. 1993), *PA. STAT. ANN. tit. 43, § 217.1 et seq.* (1961 & Supp. 1993). These "complementary" statutory schemes, the unions contend, demonstrate each legislature has "concurred in" the legislation of the other, effectively modifying the DRPA Compact.

The District Court granted the DRPA's motion for summary judgment, concluding that under federal constitutional and statutory law, the DRPA Compact can only be amended by legislation of both New Jersey and Pennsylvania that (1) "expressly applies" to the DRPA; [**7] and (2) is "substantially similar" in substance, imposing specific additional duties on the *DRPA. DRPA v. Fraternal Order of Police, 135 F. Supp. 2d 596, 606-09 (E.D. Pa. 2001).* Because neither legislature expressly applied their state's labor laws to the DRPA, the District Court ruled the DRPA was not [*571] obligated to comply with state laws regarding union recognition and collective bargaining for law enforcement officers. Id. The District Court also rejected the unions' issue preclusion arguments, holding Lodge 30 only addressed the DRPA's obligation to bargain with a voluntarily recognized union. *Id. at 609-11.* [3] This appeal followed. [4]

> [3]  The District Court cited cases interpreting New Jersey-New York interstate agencies: the Waterfront Commission, e.g., *Malverty v. Waterfront Comm'n, 71 N.Y.2d 977, 524 N.E.2d 421, 529 N.Y.S.2d 67 (N.Y. 1988),* and the Port Authority of New York and New Jersey, e.g., *Bailey v. Port Auth., 216 A.D.2d 42, 627 N.Y.S.2d 921 (App. Div. 1995).* Those cases adopted an "express intent" standard, requiring that both legislatures expressly state an intention to alter a bi-state compact. *DRPA, 135 F. Supp. 2d at 604-06.*

[**8]

> [4]  The District Court had jurisdiction under *28 U.S.C. § 1331.* We have jurisdiction under *28 U.S.C. § 1291.*

II.

In 1931, the State of New Jersey and the Commonwealth of Pennsylvania legislatively created the Delaware River Port Authority to develop the ports of Philadelphia and Camden and to operate bridges and provide mass transportation across the Delaware River. *N.J. STAT. ANN. § 32:3-2 et seq.; PA. STAT. ANN. tit. 36, § 3503 et seq.* Under the Compact Clause of the United States Constitution, "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State." *U.S. CONST. art. 1, § 10, cl. 3.* The United States Congress formally approved the DRPA Compact in 1932.

The DRPA is a "public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey." *N.J. STAT. ANN. § 32:3-2, PA. STAT. ANN. tit. 36, § 3503.* But it is not an "arm" of either state. Nor is it vested with attributes of state sovereignty. *Peters v. DRPA, 16 F.3d 1346, 1351-52 (3d Cir. 1994).* The [**9] DRPA's powers and duties are framed entirely by the Compact. It is governed by a sixteen-member Board of Commissioners. [5] A majority of each state's delegates to the Board must approve any DRPA action. Id. The Compact allows either state's legislature to grant the DRPA additional powers or impose on it additional duties by passing legislation that is "concurred in by the legislation of the other state." *N.J. STAT. ANN. § 32:3-5, PA. STAT. ANN. tit. 36, § 3503.*

> [5]  Eight of the Commissioners are appointed by the Governor of New Jersey for periods of five years. The Governor of Pennsylvania appoints six Commissioners for five-year terms, with the elected Auditor General and the elected State Treasurer of Pennsylvania filling the remaining two positions for their four-year terms. All Commissioners, other than the Pennsylvania Auditor General and State Treasurer, continue to hold office after the expiration of their terms and until their successors are appointed and qualified.

Article IV(e) of the Compact provides [**10] the DRPA Commissioners the right to "appoint, hire or employ . . . agents and employes, as it may require for the performance of its duties, by contract or otherwise, and fix and determine their qualifications, duties and compensation." *N.J. STAT. ANN. § 32:3-5, PA. STAT. ANN. tit. 36, § 3503.* Under Article IV(e), the DRPA maintains a Bureau of Police to protect the public and DRPA property. The Bureau consists of patrol officers,

sergeants, and corporals, who are accorded "all of the powers . . . and all of the immunities conferred by law on police officers or municipal police officers in . . . the State of New Jersey and the Commonwealth of Pennsylvania." *N.J. STAT. ANN. § 32:4-6, PA. STAT. ANN. tit. 36, § 3504.1.* [*572] The DRPA Compact itself does not expressly grant DRPA employees collective bargaining rights. Nor does the Compact impose a duty on the DRPA's management to bargain collectively with unions.

III.

First, we consider whether the District Court wrongfully declined to give issue preclusive effect to Lodge 30, which held that legislation need not "specifically" apply to the DRPA Compact to modify the DRPA's obligations to collectively bargain with its police officers. [**11] We exercise plenary review over this question of law. [6]

6    The DRPA urges us to review for abuse of discretion. New Jersey courts have sometimes applied the issue preclusion doctrine in a discretionary way. See, e.g., *New Jersey v. Gonzalez, 75 N.J. 181, 380 A.2d 1128, 1132 (N.J. 1977)* ("a variety of factors may make[the use of issue preclusion] in a particular case either unjust or counterproductive"). Our circuit has not always been consistent. See, e.g., *Witkowski v. Welch, 173 F.3d 192, 198 n.7 (3d Cir. 1999)* (collecting cases employing different standards). But in *Dici v. Pennsylvania, 91 F.3d 542 (3d Cir. 1996),* we said, "On appeal, our review of the district court's grant of summary judgment in favor of the Appellees on the ground of issue preclusion is plenary." *Id. at 547.* A majority of our sister circuits have also endorsed a de novo analysis. E.g., *Chartier v. Marlin Mgmt., 202 F.3d 89, 93 (2d Cir. 2000); Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir. 1997); United States v. Shenberg, 89 F.3d 1461, 1478 (11th Cir. 1996); Sandberg v. Va. Bankshares, Inc., 979 F.2d 332, 334 (4th Cir. 1992),* vacated and remanded for dismissal, *1993 U.S. App. LEXIS 33286, 1993 WL 524680 (4th Cir. 1993); United States v. Sandoz Pharm. Corp., 894 F.2d 825, 826 (6th Cir. 1990).* The Courts of Appeals for the Fifth and Eighth Circuits have endorsed an abuse of discretion standard, but they

have done so only when reviewing the refusal to apply "offensive collateral estoppel," a "less favored" type of issue preclusion than the "defensive collateral estoppel" involved here. Accord *Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326-30, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979).*

We exercise plenary review over the grant of summary judgment and the legal interpretation of the *Compact. Witkowski, 173 F.3d at 198.* Because this appeal does not address the potential overturning of a state court judgment, no "Rooker-Feldman issues" arise. Cf. *Homola v. McNamara, 59 F.3d 647, 650 (7th Cir. 1995).*

[**12] Under the doctrine of issue preclusion, a determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity. E.g., *Kremer v. Chem. Constr. Corp., 456 U.S. 461, 485, 72 L. Ed. 2d 262, 102 S. Ct. 1883 (1982)* ("The usual rule is that merits of a legal claim once decided in a court of competent jurisdiction are not subject to redetermination in another forum."); *Allen v. McCurry, 449 U.S. 90, 96, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980)* ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."); *Montana v. United States, 440 U.S. 147, 153, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979)* ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."). Stated broadly, issue preclusion prevents relitigation of the same [**13] issues in a later case. [7]

7    We have observed that issue preclusion can avoid the costly litigation of issues already determined. *O'Shea v. Amoco Oil Co., 886 F.2d 584, 593 (3d Cir. 1989).*

More than two hundred years ago, the first Congress enacted the predecessor to *28 U.S.C. § 1738,* the Full Faith and Credit Act, which now provides:

[*573] The . . . judicial proceedings of any court of any . . . State, Territory, or Possession [of the United States] . . . shall

290 F.3d 567, *573; 2002 U.S. App. LEXIS 9430, **13;
170 L.R.R.M. 2019

have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

*Section 1738* therefore requires state court decisions be given the same preclusive effect in federal court they would be given in the courts of the rendering state. The phrase "every court within the United States" encompasses all courts, regardless of jurisdiction. The statute directs federal [**14] courts considering the preclusive effect of another jurisdiction's prior judgment to look not to federal preclusion law or practice but to what the other jurisdiction would decide regarding its preclusive effect. [8]

8  In *Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 88 L. Ed. 2d 877, 106 S. Ct. 768 (1986)*, the Supreme Court considered a state court's refusal to give preclusive effect to a prior federal judgment, where the state court reached a judgment contrary to that of the federal court. Even in this circumstance, where the state court -- arguably wrongly -- did not find any preclusive effect, the Supreme Court unanimously refused to allow the prior federal winner to seek a federal court injunction against further proceedings. *Id. at 525*. That the first federal judgment came in a federal question case was of no consequence. The Court stated the remedy for a possible state court error lay "by way of appeal through the state-court system and certiorari from this Court." Id.

[**15] The threshold issue on appeal is whether the District Court should have given preclusive effect to the narrow issue of the DRPA's collective bargaining obligations, previously litigated in Lodge 30. [9] A federal court looks to the law of the adjudicating state to determine its preclusive effect. *Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999)*. In New Jersey, when a judgment of a court of competent jurisdiction determines a question in issue, the judgment estops the parties and privies from relitigating the same issue in a subsequent proceeding. *City of Plainfield v. Pub. Serv. Elec. & Gas Co., 82 N.J. 245, 412 A.2d 759, 765 (N.J. 1980)*. Such a determination is conclusive on either the

same or a different claim. *412 A.2d at 766*.

9  Accord *Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 384, 84 L. Ed. 2d 274, 105 S. Ct. 1327 (1985); N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. N.J. Bd. of Higher Educ., 654 F.2d 868, 876 (3d Cir. 1981)*.

[**16] New Jersey courts apply a five-pronged test to determine whether collateral estoppel should bar relitigation of an issue: (1) the issue must be identical; (2) the issue must have actually been litigated in a prior proceeding; (3) the prior court must have issued a final judgment on the merits; (4) the determination of the issue must have been essential to the prior judgment; and (5) the party against whom collateral estoppel is asserted must have been a party or in privity with a party to the earlier proceeding. *In re Estate of Dawson, 136 N.J. 1, 641 A.2d 1026, 1034-35 (N.J. 1994)*. [10] As noted, the District Court rejected any preclusive effect of Lodge 30:

[*574] The issue in this case, but not present in Lodge 30, is whether, in the absence of voluntary recognition, DRPA is obligated under the terms of the Compact to recognize and bargain collectively with the Unions. . . . Therefore, because the duty of the DRPA under the Compact to recognize and bargain collectively with police officers was not relevant to the cause of action or the issues involved in Lodge 30 and was not considered by the Appellate Division, Lodge 30 is not a bar to the instant action.

*135 F. Supp. 2d at 611.* [**17] [11]

10  Under federal common law the standards are almost identical. In *Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc. v. Centra, 983 F.2d 495 (3d Cir. 1992)*, we held preclusion was appropriate when an issue was distinctly put in issue, directly determined adversely to the party against whom estoppel is asserted, and where: "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the

party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Id. at 504*.
11 In a footnote, the District Court added, "The DRPA is of course free to voluntarily recognize and bargain collectively with its superior officers. The issue presented by this case is not whether the DRPA has the power to recognize and bargain collectively, but whether it is under any legal duty to do so." *135 F. Supp. 2d at 611 n.18*.

[**18] We disagree. Lodge 30 satisfies the requirements outlined in Dawson and has preclusive effect here. In Lodge 30, the "identical issue" -- whether an "express statement" is necessary to modify the DRPA's obligations to bargain with its patrol officers -- was "litigated in the prior proceeding." See *733 A.2d at 550* (referencing the DRPA's contention that only "the adoption by both Compact States of nearly identical State legislation expressly intended to apply" to the DRPA may alter the Compact); *id. at 551*:

> The DRPA contends . . . that these voluntary acts[of union recognition] do not provide any basis to impose on it the impasse-resolution procedures applicable to public employers in New Jersey to resolve the current impasse between it and its police officers. . . . The agency may be subject to complementary or parallel state legislation. This parallel or complementary legislation need not be nearly identical and specifically apply to the agency. Rather, the public policy of both states, articulated in parallel statutes that are substantially similar but do not specifically include defendant, is applicable to a bi-state agency . . . .

(quotations [**19] and citations of New Jersey cases omitted). There was a "final judgment on the merits." The "determination" that an express statement is unnecessary to modify the DRPA Compact was "essential to the prior judgment." And the party against whom issue preclusion is asserted was "a party or in privity with a party to the prior adjudication." As noted, the DRPA litigated both lawsuits. Cf. *United States v. Silliman, 167 F.2d 607, 616-18 (3d Cir. 1948)*.

Additional factors support our conclusion. The DRPA could have removed Lodge 30, which presented federal constitutional questions, but chose instead to litigate in state court. Also, Lodge 30 was decided less than three years ago and New Jersey courts have not called it into question in the interim. Furthermore, the Lodge 30 decision has not proven "inequitable." Nor do we review the soundness of the Lodge 30 decision. The issues in that case are not before us and have been rejected in the state appellate proceedings where the parties elected to litigate. Whether we would have reached the same result as the New Jersey court is not at issue.

The effort to distinguish the facts and issues between this litigation and Lodge 30 is [**20] unavailing. For the purposes of issue preclusion, any distinction between this litigation and Lodge 30 is legally insignificant. 12 The plaintiffs in Lodge 30 sought [*575] to represent patrol officers, whose union the DRPA had recognized for more than twenty years, while the plaintiffs here seek to represent their "superior officers." It is true that there was no voluntary recognition of a bargaining unit for the superior officers. But the Lodge 30 judgment was not based on prior voluntary recognition. *733 A.2d at 551*. 13 The Lodge 30 court held the unions' right to negotiate was statutory, not contractual, so the "voluntary" recognition issue was irrelevant to its judgment.

> 12 The DRPA claims that even where a prior and a subsequent proceeding turn on a common underlying issue, if the factual circumstances of the cases differ, the issue may not be "identical" for estoppel purposes. *Dawson, 641 A.2d at 1035*. But the "differences" in Dawson were significant. There, the case hinged on whether particular stock distributions were better labeled as dividends or splits. Id. Because the corporation in the case with the alleged estoppel effect was different from the one in Dawson, the court found no issue preclusion: "Inasmuch as the corporations and their corresponding stock transactions are different, the issues to be litigated in the accountings are different as well." Id. Additionally, no "sufficient identity of parties" existed in Dawson to bind the court to a prior result. Id.

[**21]

> 13 The DRPA disputes that New Jersey courts always disavowed the "express intent"

requirement. In *DRBA v. Int'l Org. of Masters, Mates & Pilots, 211 A.2d 789, 45 N.J. 138 (N.J. 1965)*, the court held a union representing Delaware River and Bay Authority (DRBA) employees was prevented from striking by a New Jersey law, but refused to reach the opposite conclusion that the DRBA was bound by New Jersey labor laws. *Id. at 794*; see also *Bell v. Bell, 83 N.J. 417, 416 A.2d 829, 833 (N.J. 1980)* (agreements governing bi-state agencies must be agreed upon by both states involved). The DRPA argues the "abrupt departure" in jurisprudence occurred in recent New Jersey state court decisions allowing statutes not expressly applying to bi-state agencies to bind the entity to a certain public policy. But it is not our task to correct "departures" in New Jersey jurisprudence.

Under this set of facts, we must give effect to the Lodge 30 court's determination that in the context of collective bargaining for law enforcement officers, amending the DRPA Compact does not require "express" [**22] statutory amendment by its creator states. *733 A.2d at 551* (finding the DRPA "may be subject to complementary or parallel state legislation . . . . [that] need not be nearly identical and specifically apply to the agency," provided the "public policy of both states, [as] articulated in parallel statutes that are substantially similar" is complementary). [14] If a New Jersey state court had heard this case in the first instance, we believe it would find Lodge 30 controlling. [15] Issue preclusion is proper when factual differences "are of no legal significance whatever in resolving the issue presented in both cases." *United States v. Stauffer Chem. Co., 464 U.S. 165, 174, 78 L. Ed. 2d 388, 104 S. Ct. 575 (1984)*.

14    The *Constitution's Full Faith and Credit Clause* does not apply in this context. The Clause only indicates that full faith and credit shall be given in each state to the judicial proceedings of every other state. *U.S. CONST. art. IV, § 1.*

15    In *Switlik v. Hardwicke Co., Inc., 651 F.2d 852 (3d Cir. 1981)*, the plaintiff filed a *42 U.S.C. § 1983* action claiming the Supreme Court's denial of certiorari of a state court conviction constituted state action violating his constitutional rights. We found the "very issues presented by this civil rights action were raised and litigated in at least the appellate courts of New Jersey and were presented to the United States Supreme

Court in the petition seeking a writ of certiorari." *Id. at 857.* After "freely and forcefully" pressing their claims in the state system, we noted, the plaintiffs "now seek to have the same issues heard again in the federal system. . . . This is the precise situation in which the doctrines of res judicata and collateral estoppel operate as a bar." *Id. at 859.* Although the issue before the federal and state courts in Switlik were identical, its holding demonstrates the res judicata effect of certain final judgments.

[**23] That the litigation concerns federal law does not alter the analysis in [*576] this case. [16] Compacts, though approved by Congress, are contracts between states. These contracts rarely contain uniform terms. As Justice Frankfurter observed:

Since a Compact comes into being through an Act of Congress, its construction gives rise to a federal question. But a federal question does not require a federal answer by way of a blanket, nationwide substantive doctrine where essentially local interests are at stake. A Compact, is after all, a contract. Ordinarily, in the interpretation of a contract, the meaning the parties attribute to the words governs the obligations assumed in the agreement. Similarly, since these States had the freedom to waive or to refuse to waive immunity granted by the *Eleventh Amendment*, the language they employed in the Compact, not modified by Congress, should be limited to the legal significance that these States have placed upon such language, not to avoid the obligations they undertook, but to enforce the meaning of conventional language used in their law.

*Petty v. Tenn.-Mo. Bridge Comm'n, 359 U.S. 275, 285, 3 L. Ed. 2d 804, 79 S. Ct. 785 (1959)* (Frankfurter, J., dissenting) [**24] (citations omitted); see also Hess, 513 U.S. at 43-44, 130 L. Ed. 2d 245, 115 S. Ct. 394.

16    Accord *Hickerson v. City of New York, 146 F.3d 99, 103-13 (2d Cir. 1998)* (finding state court's rejection of plaintiffs' state constitutional

claims foreclosed plaintiffs from relitigating, in the form of a *First Amendment* claim in federal court, the same issues resolved against them in state court; see also *Marrese, 470 U.S. at 385-86* (finding a state court decision can even preclude federal litigation over certain claims over which Congress vests federal courts with exclusive jurisdiction). As the District Court correctly observed, issues relating to the interpretation of a bi-state contract present federal questions. *Cuyler v. Adams, 449 U.S. 433, 440, 66 L. Ed. 2d 641, 101 S. Ct. 703 (1981).*

State courts may answer federal questions. [17] The unions and the DRPA agreed to litigate this issue of federal law in New Jersey courts. If those courts answered federal questions erroneously, it remained for [**25] state appellate courts, and ultimately for the United States Supreme Court, to correct any mistakes. Error in a prior judgment is not a sufficient ground for refusing to give it preclusive effect. Cf. *Salazar v. United States Air Force, 849 F.2d 1542, 1548 (5th Cir. 1988)* (finding a prior state court decision "wrong and unacceptable," but holding that under *28 U.S.C. § 1738,* a later federal court was bound to enforce it "no matter how intrinsically erroneous the state district court's unappeased judgment"). New Jersey courts have found that New Jersey and Pennsylvania, the parties to the Compact, have not required an "express statement" to modify the DRPA's obligations to collectively bargain with its patrol officers. [18] Under this set of [*577] facts, that determination must be granted preclusive effect. [19]

[17]  Discussing one New Jersey Supreme Court case, the District Court held, "Because the . . . Court was professedly interpreting federal law, their pronouncements are only persuasive authority with respect to this court. Of course, if New Jersey state law applied and the New Jersey Supreme Court was construing New Jersey law, its holdings would be binding on this court." *135 F. Supp. 2d at 606 n.9.* We believe this statement erroneously stated the doctrine of issue preclusion, which can prohibit relitigation in federal court of issues decided in state court.

[**26]

[18]  The District Court's public policy analysis of whether the "concurred in" requirement was satisfied absent "express" statutory statements was unnecessary. Cf. *Montana, 440 U.S. 147,*

*153, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979).* The District Court held the DRPA represented a "surrender" of sovereignty from New Jersey and Pennsylvania that must be "strictly construed." *135 F. Supp. 2d at 603.* Because neither New Jersey nor Pennsylvania expressly required the DRPA to bargain with its superior officers, the Court held nothing demonstrated collective bargaining rights applied to the superior officers. Id. Given Lodge 30, we need not reach this issue. But we do not believe cases interpreting compacts between New Jersey and New York, on which the District Court relied, are apposite. E.g., *Dezaio v. Port Auth., 205 F.3d 62, 65* (2d Cir.), cert. denied, *531 U.S. 818, 148 L. Ed. 2d 24, 121 S. Ct. 56 (2000)* (refusing to apply New York's or New Jersey's antidiscrimination laws to the Port Authority); *Settecase v. Port Auth., 13 F. Supp. 2d 530 (S.D.N.Y. 1998); Baron v. Port Auth., 968 F. Supp. 924 (S.D.N.Y. 1997); King v. Port Auth., 909 F. Supp. 938 (D.N.J. 1995); C. T. Hellmuth & Assocs., Inc. v. Wash. Metro. Area Transit Auth., 414 F. Supp. 408 (D. Md. 1976); Malverty, 524 N.E.2d at 421.*

[**27]

[19]  The District Court held *International Union of Operating Engineers, Local 68 v. Delaware River & Bay Authority, 147 N.J. 433, 688 A.2d 569 (N.J. 1997)* ("Local 68"), and *Bunk v. Port Authority, 144 N.J. 176, 676 A.2d 118 (N.J. 1996),* were "wrongly decided" and deserved no preclusive effect. The District Court characterized Bunk's treatment of the "law dealing with bistate agencies" as "incomplete and thus inaccurate." *135 F. Supp. 2d at 607.* Regarding Local 68, the District Court found the New Jersey Supreme Court had again "incorrectly conflated the two prongs of the Eastern Paralyzed-Nardi-Malverty rule." *Id. at 608.* The District Court also found the "authority of Local 68 . . . further undermined by a lengthy dissent," which argued the majority opinion was "flawed as a matter of statutory construction, use of precedent, and public policy." Id.

The United States Supreme Court has cautioned that a "question or right distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached [**28] upon an erroneous view or by an erroneous application of the

290 F.3d 567, *577; 2002 U.S. App. LEXIS 9430, **28;
170 L.R.R.M. 2019

law," where "a party . . . freely and without reservation submits his federal claims for decision by the state courts . . . and has them decided there." *Montana, 440 U.S. at 163* (quotation and citation omitted); see also *Fed. Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 398, 69 L. Ed. 2d 103, 101 S. Ct. 2424 (1981)* ("A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack."). Were we sitting on the New Jersey courts, we might have interpreted the respective statutes and the DRPA's obligations to its patrol officers differently. But we may not reconsider the New Jersey judgment.

IV.

We turn now to a matter not considered by the District Court. [20] Because the District Court found no "express statement" authorizing collective bargaining, it did not consider whether New Jersey and Pennsylvania law enforcement labor laws, providing police officers the right to organize and collectively bargain, were "complementary and parallel." As noted, the District Court refused to grant preclusive effect to Lodge 30's determination that an "express statement" [**29] was not necessary to modify the DRPA's collective bargaining obligations for law enforcement officers. For the same reasons, the District Court should have given preclusive effect to Lodge 30's holding New Jersey and Pennsylvania law enforcement labor laws apply to the DRPA.

20  Perhaps for this reason, the parties have not extensively briefed the issue.

Lodge 30 held that New Jersey and Pennsylvania have enacted parallel legislation that gave law enforcement employees the right to freely organize and designate representatives for good-faith negotiations. *733 A.2d at 548-49.* The court elaborated:

Our review of each state's enactments governing police and fire labor relations, the New Jersey Police and Fire Public Interest Arbitration Reform Act and the Pennsylvania Collective Bargaining by [*578] Policemen or Firemen Act, reveals that each state has made a policy decision in favor of public interest arbitration for police officers. Certainly, there are some differences in each scheme. . . . Although [**30] we discern some differences in

each state's legislation governing public employer-employee labor disputes, we conclude that those differences do not negate the basic public policy of each state that their public employees are entitled to engage in collective negotiations with their employer. The discrepancies are not so significant to render the two statutory schemes substantially dissimilar. Thus, the New Jersey statutes and the Pennsylvania statutes are complementary and parallel.

*Id. at 552-54* (citations omitted).

The DRPA suggests the differences between the statutory schemes are too numerous to label them "complementary." There are some "differences" -- including the different bargaining rights of first-level supervisors in New Jersey and Pennsylvania. [21] But for our purposes, the New Jersey courts have declared the similarities between the schemes significant enough to label them "complementary."

21  And under *43 Pa. Cons. Stat. § 1101.1301*, Pennsylvania's PLRB has exclusive jurisdiction over all labor matters. Under *N.J. Stat. Ann. § 34:13A-5.2*, New Jersey's PERC is vested with such jurisdiction.

[**31] Therefore, we will give preclusive effect to the determination that DRPA and PATCO supervisory law enforcement officers have the right to bargain collectively with management. [22] But we express no opinion on other issues relating to bi-state compacts that fall outside the specific context of labor negotiations with DRPA and PATCO law enforcement employees.

22  The DRPA contends New Jersey courts can allow relitigation of a purely legal issue, even where the usual prerequisites for issue preclusion are satisfied. E.g., *Dawson, 641 A.2d at 1034-35; City of Plainfield, 412 A.2d at 766;* see also *RESTATEMENT (SECOND) OF JUDGMENTS § 28(2)* (observing an exception to the doctrine where the issue "is one of law"). The DRPA suggests this issue, which concerns an abstruse issue of federal constitutional law, merits litigation. But the doctrine of issue preclusion applies equally to issues of law. *RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c* ("An

290 F.3d 567, *578; 2002 U.S. App. LEXIS 9430, **31;
170 L.R.R.M. 2019

issue on which litigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law . . . if the issue [is] one of law, new arguments may not be presented to obtain a different determination of that issue.").

[**32] V.

For the foregoing reasons we will reverse and remand for proceedings consistent with this opinion. [23]

23   We need not reach the constitutional inquiry of whether congressional consent is necessary to impose additional duties, as opposed to additional powers, under DRPA.

*** Slip Sheet ***

Document

LEXSEE 2005 U.S. APP. LEXIS 17111

**DIMENSIONAL COMMUNICATIONS, INC. v. OZ OPTICS, LTD., Appellant**

**No. 04-1817**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*148 Fed. Appx. 82; 2005 U.S. App. LEXIS 17111*

**May 10, 2005, Submitted Under Third Circuit LAR 34.1(a)**
**August 12, 2005, Opinion Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by *Oz Optics v. Dimensional Communications, 2006 U.S. LEXIS 1698 (U.S., Feb. 21, 2006)*

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 01-cv-4893). District Judge: Honorable William G. Bassler.
*Dimensional Communs., Inc. v. OZ Optics Ltd., 218 F. Supp. 2d 653, 2002 U.S. Dist. LEXIS 20702 (D.N.J., 2002)*

**COUNSEL:** For DIMENSIONAL COMM INC, Appellee: Timothy J. O'Neill, Windels, Marx, Lane & Mittendorf, Princeton, NJ.

For OZ OPTICS LTD, Appellant: Peter A. Ouda, Somerville, NJ.

**JUDGES:** Before: SLOVITER and FISHER, Circuit Judges and POLLAK, * District Judge.

    * Honorable Louis H. Pollak, Senior District Judge for the United States District Court of the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** Louis H. Pollak

**OPINION**

[*83] OPINION OF THE COURT

POLLAK, District Judge.

    This diversity case arises out of a contract dispute between Dimensional Communications, Inc., ("DCI"), and Oz Optics, Ltd. ("Oz"). [1] Oz, a manufacturer of optical [*84] fiber communications equipment, had a jury verdict entered against it on a breach of contract claim brought by DCI, a corporation that designs, manufactures, and installs trade-show booths. Oz appeals from the District [**2] Court's orders (1) denying Oz's motion for leave to file a counterclaim, and (2) denying Oz's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial. The District Court exercised jurisdiction over this suit under *28 U.S.C. § 1332(a)(2)*, [2] and this court has appellate jurisdiction under *28 U.S.C. § 1291*. For the reasons which follow, we will affirm.

    1  Oz has been alternately referred to as "Oz" or "OZ" in the parties' submissions and in the District Court docket. For the sake of uniformity, we will use only "Oz" here.
    2  Oz is a Canadian corporation with its principal place of business in Ontario; DCI is a New Jersey corporation with its principal place of business in Northvale, New Jersey.

I.

    Inasmuch as we write chiefly for the parties it is not necessary to recite the facts of this case in detail. Oz and DCI had entered into a contract according to which DCI was to design and construct a trade-show booth for Oz.

148 Fed. Appx. 82, *84; 2005 U.S. App. LEXIS 17111, **3

[**3] After the booth was completed, DCI coordinated the transportation of the booth to four trade-shows, and performed maintenance and set-up activities at each show. DCI billed Oz separately for the maintenance and set-up costs, and Oz refused to pay for any of these ancillary charges on the ground that it had not endorsed them. While Oz had most of the electronic equipment used in its booth shipped back to its New Jersey facility, DCI retained the booth itself and some of the electronic equipment pending Oz's payment of the outstanding invoices. On October 22, 2001, DCI filed its complaint in the United States District Court for the District of New Jersey, asserting claims for breach of contract, book account, and quantum meruit. Oz's answer asserted the affirmative defense of setoff/recoupment, but it contained no counterclaims.

On November 12, 2002, Magistrate Judge Madeline Cox Arleo entered a Pretrial Scheduling Order that, *inter alia*, set December 31, 2002, as the deadline for filing motions to amend the pleadings. On May 16, 2003, Oz filed a motion to amend its answer to assert a counterclaim for conversion for the seizure of the trade-show booth and other property. After [**4] briefing and argument, Magistrate Judge Arleo denied Oz's motion, finding, pursuant to *Fed. R. Civ. Proc. 16(b)*, that Oz had not shown good cause for its failure to comply with the Pretrial Scheduling Order. Magistrate Judge Arleo further found that Oz's actions constituted undue delay and evidenced dilatory motive, such that Oz could not meet the liberal amendment provisions of *Fed. R. Civ. Proc. 15(a)*. Oz appealed Magistrate Judge Arleo's denial of its motion to amend, and the District Court affirmed the denial. This affirmance is the first subject of this appeal.

The case was tried before a jury in December, 2003. The jury rendered a verdict in favor of DCI in the amount of $ 492,766.01. The jury also found that Oz was not entitled to any recoupment or setoff. On January 13, 2004, Oz filed a motion for judgment as a matter of law or, in the alternative, a new trial. The District Court denied that motion, finding that Oz was entitled neither to judgment as a matter of law nor to a new trial. The District Court's denial of this post-trial motion gives rise to Oz's second and third grounds of appeal.

II.

[**5] We review a district court's denial of leave to amend a pleading for abuse of [*85] discretion. *See*

*Arab African Int'l Bank v. Epstein, 10 F.3d 168, 174 (3d Cir. 1993)*. "An abuse of discretion occurs when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Montgomery County v. Microvote Corp., 320 F.3d 440, 445 (3d Cir. 2003)* (citation and quotation marks omitted).

We exercise plenary review over a district court's denial of a *Rule 50(b)* motion for judgment as a matter of law. *See, e.g., Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 (3d Cir. 1996)*.

We review a district court's denial of a new trial motion for abuse of discretion. *Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3d Cir. 1988)*.

III.

A. Motion to Amend

Where, as here, a party seeks to amend a pleading after a responsive pleading has been served, it may do so "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Fed. R. Civ. Proc. 15(a)* [**6] . "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)*. In addition, a court's "schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." *Fed. R. Civ. Proc. 16(b)*.

Magistrate Judge Arleo found that Oz could not satisfy *Rule 16(b)*'s good cause requirement because Oz was in possession of the facts underlying its proposed counterclaim well before the amendment deadline. The Magistrate Judge found further that *Rule 15(a)*'s liberal amendment provision did not extend to Oz because Oz's delay was undue and prejudicial, and because it evidenced a dilatory motive. The District Court agreed with the Magistrate Judge's findings, and concluded that the Magistrate Judge's denial of Oz's motion to amend did not constitute clear error.

Oz now argues that the Third Circuit has not adopted a "good cause" requirement in determining the propriety of a motion to amend a pleading after [**7] the deadline

148 Fed. Appx. 82, *85; 2005 U.S. App. LEXIS 17111, **7

has elapsed, and that the District Court thus abused its discretion in denying the motion to amend. We disagree. In *Eastern Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000)* -- a case with a similar procedural history -- this court approved the district court's determination that a failure to satisfy *Rule 16(b)*'s "good cause" requirement was sufficient to deny a motion to amend filed six months after the deadline for amendments to pleadings. Further, we find no error in the Magistrate Judge's finding, which the District Court approved, that Oz could not satisfy even the liberal amendment provisions of *Rule 15(a)* because Oz's delay was undue and its requested amendment would be prejudicial to DCI. In short, there is no ground for disturbing the District Court's order.

B. Motion for Judgment As a Matter of Law

A denial of a post-trial motion for judgment as a matter of law shall be affirmed where "there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner." *Blum v. Witco Chemical Corp., 829 F.2d 367, 372 (3d Cir. 1987).*

Oz contests two elements of the verdict [**8] on the ground that there was, Oz [*86] contends, no rational basis for them. First, Oz asserts that the jury erred in finding that Oz had authorized ancillary charges, which included markups for subcontractor work, and freight, handling, refurbishing and storage charges. [3] Yet the jury could reasonably have inferred that Oz had authorized the ancillary charges. For example, the jury heard testimony that a sub-contractor of DCI had overheard Oz's president approve the markups; that a DCI employee had explained to Oz's president that there would be handling charges; and that Oz's president had been quoted a per-show estimate of refurbishment costs. Further, as the District Court found, there was evidence of an oral agreement for storage charges. This testimony formed a legitimate basis for the jury's finding that Oz had authorized the charges. Thus, Oz's first claim of error is baseless.

3   As a subsidiary element of its claim that the jury erred in finding that Oz had approved the ancillary charges, Oz argues that the jury erred further in adopting DCI's calculation of the handling charges inasmuch as DCI, so Oz contends, relied upon a "mysterious," "undisclosed mathematical equation" to arrive at this calculation. As the District Court found, however, DCI presented testimony describing

how it arrived at the handling charges. The jury thus had a reasonable basis upon which to conclude that Oz did in fact owe DCI money in the asserted amount.

[**9] Second, Oz contends that the jury erred in failing to reduce its verdict by the monies that Oz lost as a result of DCI's seizure of Oz's booth and some of the electronic equipment used in that booth. Yet having found that Oz had authorized the ancillary charges and hence was unjustified in refusing to pay for them, and having heard testimony from DCI stating that it would have returned the retained property upon receipt of payment from Oz, the jury could have reasonably concluded that Oz was not entitled to a set-off. Accordingly, Oz's claim that the jury erred in rejecting its recoupment/set-off defense is also baseless.

In sum, because sufficient evidence supported the jury's verdict, the District Court did not err in denying Oz's motion for judgment as a matter of law.

C. Motion for a New Trial

Oz argues that three grounds supported its motion for a new trial. First, Oz contends that, even though neither party requested a jury instruction on whether DCI was entitled to use self-help, the District Court should have issued *sua sponte* an instruction disapproving the use of self-help. Second, the District Court should have provided a jury verdict sheet that itemized the [**10] charges Oz would be found to have owed DCI since, without such itemization and in light of the jury's verdict that Oz owed less than DCI claimed it did, the parties cannot determine which charges the jury in fact found that Oz was obligated to pay. Finally, Oz charges that the District Court should have found, as a matter of law, that DCI breached the contract with Oz, and instructed the jury accordingly.

Oz's charge that the District Court erred in failing to instruct on the permissibility of the use of self-help is unavailing. "An appellate court will not consider trial errors [involving alleged deficiencies in jury instructions] to which no objection was made." *Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 138 (3d Cir. 1973).* Before the District Court, Oz neither requested a jury instruction on the permissibility of self-help nor objected to the omission of such an instruction. We will not entertain Oz's objection to the jury instructions now.

148 Fed. Appx. 82, *86; 2005 U.S. App. LEXIS 17111, **10

[*87] Oz's claim that the judge ought to have furnished the jury with an itemized jury verdict form is no more meritorious. "It is well established that the trial court may exercise broad discretion in determining whether to [**11] use a general verdict or the procedures described in *Rule 49 of the Federal Rules of Civil Procedure.*" *Kazan v. Wolinski, 721 F.2d 911, 915 (3d Cir. 1983).* Further, there is no evidence in the record that Oz objected below to the jury verdict form, and its failure to do so before the District Court bars it from raising that objection before this court. Accordingly, we decline to find that the District Court erred in constructing the jury verdict form as it did.

For similar reasons, we find no merit in Oz's claim that the District Court should have found, as a matter of law, that DCI breached the contract with Oz, and instructed the jury accordingly. The District Court judge properly determined that the parties had adduced evidence sufficient to create an issue of fact on this matter. Further, Oz did not at trial raise any objections to the judge's asserted failure to instruct the jury on the alleged breach of contract, and so we will not consider these objections now.

In sum, we find that the District Court did not abuse its discretion in denying Oz's motion for a new trial.

IV.

For the foregoing reasons, we do not find [**12] merit in any of Oz's claims of error. Accordingly, the challenged orders of the District Court will be affirmed.

*** Slip Sheet ***

Document

LEXSEE 225 F.3D 330

**EASTERN MINERALS & CHEMICALS CO.; CARY W. AHL, SR., Appellants v. GARY H. MAHAN**

**No. 99-3320**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*225 F.3d 330; 2000 U.S. App. LEXIS 21232; 44 Collier Bankr. Cas. 2d (MB) 1303*

**February 3, 2000, Argued**
**August 23, 2000, Filed**

**PRIOR HISTORY:** [**1] On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civil No. 97-cv-01941). District Judge: Hon. William W. Caldwell.

**DISPOSITION:** REVERSED the District Court's entry of summary judgment. AFFIRMED the District Court's denial of Eastern's untimely motion to amend its complaint.

**COUNSEL:** Dale E. Lapp, Esq. [ARGUED], Lancaster, PA, Counsel for Appellants.

James J. Kutz, Esq. [ARGUED], Kathleen Misturak-Gingrich, Esq., Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, Counsel for Appellees.

**JUDGES:** Before: MANSMANN, NYGAARD and RENDELL, Circuit Judges.

**OPINION BY:** RENDELL

**OPINION**

[*331] OPINION OF THE COURT

RENDELL, Circuit Judge.

Eastern Minerals & Chemicals Co., a creditor of Delta Carbonate Inc., appeals an order of the District Court precluding it from seeking recovery from Delta's sole shareholder, Gary Mahan, on an alter ego theory because Eastern should have pursued this claim in the context of Delta's bankruptcy case. We conclude that the District Court misapplied claim preclusion in this bankruptcy setting. Therefore, we will reverse the District Court's order granting Mahan's motion for summary judgment.

Eastern also appeals the District Court's denial [**2] of its motion to amend its complaint to add a RICO count against Mahan and to join other defendants believed to be jointly and severally liable. The District Court did not abuse its discretion in denying Eastern's motion, and therefore we will affirm as to that order.

We have jurisdiction to hear this appeal under *28 U.S.C. § 1291.* We exercise plenary review over a district court's order granting summary judgment. See *New Jersey Turnpike Authority v. PPG Indus., Inc., 197 F.3d 96, 104 (3d Cir. 1999).*

Facts and Procedural History

Eastern was party to a sales agency contract with Bestone, Inc., a business in York, Pennsylvania that mined a quarry and produced calcium carbonate. In 1989, Delta acquired Bestone's assets and assumed Bestone's contracts, including the Eastern contract. Delta, which is solely owned by Mahan, was one of a group of companies owned or partially owed by Mahan, including Millington Quarry, Inc. and PenRoc, Inc. In January 1994, Delta and PenRoc both filed petitions for relief under chapter 11 of the Bankruptcy Code, [1] and Delta liquidated its assets in the context of its chapter 11 case.

1    The cases were administratively, but not substantively, consolidated.

[**3] [*332] Eastern actively participated in Delta's bankruptcy case by challenging various actions

Page 2

225 F.3d 330, *332; 2000 U.S. App. LEXIS 21232, **3;
44 Collier Bankr. Cas. 2d (MB) 1303

and decisions of Delta, consulting with other creditors, and exploring alternatives for maximizing its return. Eastern opposed Delta's proposed rejection of its sales agency contract with Eastern pursuant to *11 U.S.C. § 365* and sought reconsideration of the Bankruptcy Court's approval of the rejection, which also included a request for acknowledgment of an equitable lien on certain contracts. App. 437a-439a. Based on the rejection of its contract, Eastern filed a proof of claim for over $ 2.2 million in Delta's bankruptcy case, to which Delta objected. As discussed below, Eastern ultimately agreed by consent order to reduce its claim to $ 900,000. App. 674a.

Eastern was quite aggressive in challenging Delta and its dealings with affiliated entities at every turn of the bankruptcy case and repeatedly asserted that Delta had been used for the benefit of the affiliated companies, primarily Millington, to the detriment of Delta's creditors. Eastern circulated a draft application to disqualify Delta's counsel, asserting that he could not properly represent Delta in light of [**4] his representation of PenRoc, had not disclosed facts relevant to his representation as debtor's counsel, actively concealed facts, and arranged for employment of special counsel that was not disinterested by virtue of its prepetition claim against Delta. App. 405a. It also attempted to disqualify Delta's special counsel, asserting that counsel was a prepetition creditor of Delta and thus was not disinterested, and that counsel had an actual conflict of interest based on its representation of Millington. App. 452a-454a. Not only did Eastern object to Delta's request for appointment of appraisers and consultants in connection with the valuation and sale of Delta's assets, alleging that they were not disinterested because they previously had performed services for Millington, App. 27a, but it also objected to a proposed sale of Delta's assets, alleging that the sale was not proposed in good faith and that such a sale should go forward only in the context of a confirmed plan of reorganization. App. 254a-255a.

Eastern attached to its objection to the sale of Delta's assets a draft complaint seeking equitable subordination of certain claims of Millington and its primary lender Chemical [**5] Bank to the claims of Eastern and other unsecured creditors under *section 510 of the Bankruptcy Code.* App. 272a. [2] The committee of unsecured creditors ("Committee") also sought leave of court to file a complaint on behalf of the estate requesting, inter alia, equitable subordination of the claims of Millington and

Chemical Bank. [3] Both complaints allege that Millington and Chemical Bank obtained liens on Delta's assets without any lawful basis and improperly received $ 4.3 million in postpetition payments from Delta. App. 380a. [4] Eastern did not seek to [*333] subordinate any claim held by Mahan himself, [5] although the complaint included a description of how Mahan allegedly engaged in conduct causing Delta to prefer Millington over Delta's other creditors. App. 289a. These complaints were never filed, and there was never a final judgment on the merits of the putative equitable subordination dispute.

2    A court may subordinate an allowed claim for purposes of distribution under principles of equitable subordination. *11 U.S.C. § 510(c)*. Most courts have required a showing that the claimant engaged in inequitable conduct resulting in injury to creditors or unfair advantage to the claimant, and that equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. See *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-987 (3d Cir. 1998)* (citing *United States v. Noland, 517 U.S. 535, 134 L. Ed. 2d 748, 116 S. Ct. 1524 (1996))*.

[**6]

3    The Committee's request was based on the improbability that Delta, as debtor-in-possession, would file such a complaint itself; an affidavit of the chairperson of the creditors' committee asserted that "in light of the fact that one of the proposed defendants, Gary Mahan, is the 100 shareholder of the Debtor and at least a 51 shareholder of another proposed defendant, Millington, it is unrealistic to expect the Debtor to be able to bring the actions set forth in the complaint." App. 369a. The Committee's draft complaint named Mahan as an additional defendant, but not with respect to the equitable subordination count.

4    The Committee's draft complaint further alleges that Millington and Chemical Bank "demonstrated a callous disregard for the rights of the Debtor and its unsecured creditors and have proceeded to improve their position without regard to the such parties, the facts, or the law." App. 380a.

5    Mahan had a claim against Delta, which ultimately was extinguished pursuant to Delta's

225 F.3d 330, *333; 2000 U.S. App. LEXIS 21232, **6;
44 Collier Bankr. Cas. 2d (MB) 1303

chapter 11 plan. App. 232a.

Eastern ultimately agreed to reduce its $ 2.2 million claim [**7] to $ 900,000 and withdrew its opposition to the sale of Delta's assets, and consented to the amendment of Delta's liquidating chapter 11 plan to provide a fund to pay unsecured creditors a portion of their claims. Eastern's pro rata distribution was slightly more than $ 380,000, approximately 42% of its $ 900,000 claim.

In October 1997, after Delta's bankruptcy case was closed, Eastern filed a complaint in the York County Court of Common Pleas naming Mahan as defendant. Eastern sought to recover $ 580,783.13, the remaining 58% of the $ 900,000 claim that Eastern did not receive from Delta by piercing the corporate veil on an alter ego theory. App. 649a. [6] Eastern alleged that Mahan caused Delta to be undercapitalized, "pilfered" corporate opportunity, and acted to further his own personal ends, thereby abusing corporate privilege and breaching his fiduciary duty and his duty of loyalty. [7] App. 650a, 668a. The complaint provides the following summary of the factual basis for Eastern's action:

By way of conclusory overview . . . Eastern contends that Mahan invested [*334] heavily in Delta in the late '80s, realized his investment was in trouble by the end of 1991, and spent the next [**8] several years designing and implementing a course of conduct calculated to shift the risk of loss from himself and other affiliated alter egos of Delta, to Eastern and other trade creditors. Mahan's manipulation began with garden variety pilfering of corporate opportunity and breach of fiduciary obligation, continued with highly inappropriate conversion of his equity investment to secured indebtedness at a time when the company was both undercapitalized and insolvent, and culminated in his use and abuse of the federal bankruptcy system to assure for himself and other alter egos, the benefit of the unconscionable advantage he had taken. Along the way he routinely ignored verbal commitments and acted in knowing and intentional violation of written agreements. Self dealing,

misrepresentation, and deceit were the order of the day. Mahan continuously and unabashedly used Delta and other affiliated entities as the means for the achievement of personal ends. Especially as pertains to Eastern, an involuntary creditor of Delta, giving regard and effect to the corporate form of organization would result in perpetration of fraud, illegality, or injustice, would defeat public policy, and would [**9] render the entire theory of corporate existence useless.

App. 650a-651a. Specifically, Eastern's complaint contends that Delta was severely undercapitalized and that Mahan engaged in a pattern of improper conduct:

Among other things, prior to the filing of the Bankruptcy Case, Mahan (i) set up a competing company, violating the corporate opportunity doctrine, (ii) caused Delta to prefer Millington over other creditors, in violation of fiduciary responsibility, when he granted a blanket security interest in unencumbered assets in 1992, (iii) caused Delta to pay Millington, Rockcrest and other Affiliated Entities management, development, and administrative fees that were not bona fide fees; (iv) caused Delta to violate along with Penroc [sic.], the restrictive covenant assumed by Delta in connection with the Bestone transaction, and (v) caused Delta to mislead creditors with conflicting UCC filings and descriptions subject to Millington's security interest. During the pendency of the Bankruptcy Case, through his company's attorney, Mahan (i) treated the Affiliated Entities as though they were alter egos of each other and himself, (ii) misled gullible Committee counsel [**10] and the Bankruptcy Court to believe that Millington held a secured position justifying a post-petition payment (before plan confirmation) in the amount of $ 4.7 million, when in fact it did not, and (iii) made every decision entrusted to Delta as debtor-in-possession with a view toward promoting his own self interest, not the interest of the estate generally.

225 F.3d 330, *334; 2000 U.S. App. LEXIS 21232, **10;
44 Collier Bankr. Cas. 2d (MB) 1303

App. 669a-670a. In December 1997, the action was removed to the United States District Court for the Middle District of Pennsylvania.

6   The "'classical' piercing of the corporate veil is an equitable remedy whereby a court disregards 'the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.' " *In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999)* (quoting *In re Schuster, 132 B.R. 604, 607 (Bankr. D. Minn. 1991)* (citations omitted)). We have commented that "Pennsylvania, like New Jersey, does not allow recovery unless the party seeking to pierce the corporate veil on an alter ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham. . . . In other words, both Pennsylvania and New Jersey require a threshold showing that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 14-15 (3d Cir. 1990)* (per curiam). See generally *Lumax Indus., Inc. v. Aultman, 543 Pa. 38, 669 A.2d 893, 895 (Pa. 1995)* (listing factors for disregarding the corporate form as "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud"); *Ashley v. Ashley, 482 Pa. 228, 393 A.2d 637, 641 (Pa. 1978)* ("we have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate entity may properly be disregarded").

[**11]
7   The alter ego theory comes into play in piercing the corporate veil when one seeks to hold liable an individual owner who controls the corporation. See *S.T. Hudson Engineers v. Camden Hotel Dev. Assoc., 2000 PA Super 49, 747 A.2d 931, 936 (Pa. Super. 2000)*; *Miners, Inc. v. Alpine Equip. Corp., 722 A.2d 691, 695 (Pa. Super. 1998)* (citing *Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994)*, aff'd, *514 U.S. 938, 131 L. Ed. 2d 985, 115 S. Ct.*

*1920 (1995))*. Factors considered under Pennsylvania law, for example, with respect to the alter ego theory include, but are not limited to, the following: "The failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization." *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1059 (W.D. Pa. 1990)* (citing *Galgay v. Gangloff, 677 F. Supp. 295, 300 (M.D. Pa. 1987))*. See also *United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)*.

[**12]   Mahan filed a motion to dismiss Eastern's complaint on several grounds, including the affirmative defense of claim preclusion. App. 12a. The District Court found that the first element of claim preclusion -- that the first suit was a final judgment on the merits -- was satisfied by the entry of the plan confirmation order in Delta's bankruptcy case. The second element of claim preclusion -- that the first suit was between the same parties or their privies -- similarly was held to be satisfied. The District Court concluded that it could not determine from the complaint whether the third element was satisfied, namely, whether Eastern's action against Mahan was based on the same cause of action as Delta's confirmation order, and therefore denied the motion to dismiss, but considered the issue on summary judgment shortly thereafter.

[*335]   In the context of the summary judgment motion, Mahan argued that the record -- including Eastern's draft complaint seeking equitable subordination in Delta's bankruptcy case, which the District Court noted "parallels the material averments of the complaint in the instant case" -- demonstrated that Eastern knew all of the facts supporting its instant cause [**13] of action against Mahan while Delta's bankruptcy case was unfolding. Slip Op. at 4. Mahan also argued that there was ample precedent for the Bankruptcy Court to exercise jurisdiction over alter ego claims. Eastern contended that the chapter 11 plan had not specifically provided for the extinguishment of Eastern's claim against Mahan, that there would have been no subject matter jurisdiction, and that barring his claim would burden bankruptcy courts

225 F.3d 330, *335; 2000 U.S. App. LEXIS 21232, **13;
44 Collier Bankr. Cas. 2d (MB) 1303

with every claim creditors may have against third parties.

Although the District Court correctly set forth the third element of claim preclusion at the outset, e.g., that the later claim is based on the same cause of action as the prior claim, the Court ultimately re-stated the test incorrectly when it concluded that "it appears that claim preclusion should bar the instant action because it is based on a cause of action that could have been raised in the bankruptcy proceedings, but for whatever reason, was not." Slip Op. at 5. In other words, the District Court's claim preclusion ruling is not predicated on a finding that Eastern's instant claim against Mahan is based on the same cause of action as a claim raised by Eastern in Delta's bankruptcy. [**14] Interestingly, the District Court later expressed second thoughts regarding this ruling, but that is not before us. [8] The District Court also rejected Eastern's concerns regarding the lack of subject matter jurisdiction over Eastern's claim.

8  In a separate RICO lawsuit brought by Eastern against Mahan, the District Court denied summary judgment on the basis of claim preclusion on October 21, 1999. The Judge stated he believed he had erred in granting Mahan's motion for summary judgment on Eastern's complaint at issue here:

We have concluded that we erred in the No. 97-1941 memorandum. . . . Our ruling in No. 97-1941 was based on an unstated, but erroneous, premise -- that an alter ego of the debtor was the debtor for all intents and purposes. . . .Neither Mahan nor Millington, even as an alter ego of Delta, can be considered the debtor and entitled to force their creditors to pursue their claims against them in the Delta bankruptcy. To the contrary, *section 524(e)* would prohibit them from invoking Delta's discharge in bankruptcy. . . . No. 97-1941 was an alter ego action against Mahan alone for Delta's breach of the sales agency agreement. That case was erroneously dismissed on the basis of claim preclusion.

Slip Op. 99-0366 at 23-28 (emphasis added) (appended to Reply Brief for Appellants).

[**15] Urging us to affirm the District Court's ruling that Eastern's complaint against Mahan is barred, Mahan emphasizes that Eastern knew all the facts necessary to assert its present claim during Delta's bankruptcy, and that Eastern's present claim against Mahan arises out of the same cause of action that Eastern raised in Delta's bankruptcy case. [9] Eastern argues that the District Court erred by applying the claim preclusion test to bar the second action even if the prior proceeding did not involve the same cause of action, that it is not pursuing the same cause of action that was at issue in Delta's bankruptcy case, and that the District Court's ruling, if affirmed, would mean that the entry of a confirmation order in a chapter 11 bankruptcy case bars every claim that might have been asserted in the bankruptcy. [10] [*336] Under the doctrine of claim preclusion, a final judgment on the merits of an action involving the same parties (or their privies) bars a subsequent suit based on the same cause of action. See *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 208 (3d Cir. 2000); *Arab African Int'l Bank v. Epstein*, 10 F.3d 168, 171 (3d Cir. 1993). [**16] Eastern's focus, and accordingly ours as well, is the third element. [11]

9  Mahan also asks that we reject Eastern's arguments relating to the Bankruptcy Court's putative jurisdiction over Eastern's instant claim against Mahan and to whether applying claim preclusion to bar Eastern's claim would amount to an impermissible discharge of a nondebtor in violation of *11 U.S.C. § 524(e)*. Based on our conclusion that Eastern's current complaint against Mahan does not arise out of the same cause of action as its claims raised in Delta's bankruptcy and thus is not barred, we need not reach these issues.

10  In light of the fact that some of Eastern's allegations stem from events occurring during the course of Delta's bankruptcy, Eastern also asserts that its claim against Mahan cannot be barred because it had not yet accrued at the time of the first action. Although we do not read the assertions in Eastern's complaint to arise only out of post-confirmation conduct or events, we need not reach this issue.

225 F.3d 330, *336; 2000 U.S. App. LEXIS 21232, **16;
44 Collier Bankr. Cas. 2d (MB) 1303

11    Eastern does not challenge the District Court's findings with respect to the first two elements, namely, that the Delta confirmation order, inclusive of the settlement, was a final judgment and that it involved both Eastern and Mahan. Although Eastern's failure to challenge the applicability of the first two elements of claim preclusion does not affect the outcome of this appeal due to our conclusion that the third element of claim preclusion is not satisfied, we question whether the District Court too readily assumed and concluded that the first "dispute" in Delta's bankruptcy case involved the same parties or their privies as Eastern's current suit against Mahan. The District Court reasoned that "Plaintiff 's claims against Defendant are premised on Plaintiff 's theory that Delta was Defendant's alter ego. If Plaintiff can establish that this was so, then Defendant was a party to Delta's bankruptcy proceedings for preclusion purposes." App. 94a (citation omitted). Although we have held, in a unique factual context, that a creditor's objection to a chapter 11 plan could be considered a claim against another creditor for claim preclusion purposes, see *CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 199-200 (3d Cir. 1999)*, the circumstances that gave rise to our narrow holding in that case are not present here. Nor do we believe it appropriate to assume solely on the basis of Eastern's current veil piercing lawsuit that Mahan was Delta's privy, as the District Court did in its decision denying Mahan's motion to dismiss. As to the first element, we recognize that an order confirming a chapter 11 plan is a final order "on the merits," but we do not decide whether those merits can be equated to the merits of the instant dispute. Cf. *Huls, 176 F.3d at 206* (holding that merits of dispute regarding competing interest in $ 600,000 were specifically resolved in confirmation order); *First Union Comm. Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1316 (4th Cir. 1996)* (barring lender from raising postconfirmation objection to secured claim of law firm when its claim was specifically addressed and resolved in context of plan confirmation).

[**17]   Before embarking on our analysis, it is important to identify what is not at issue. No one disputes

that Eastern was an active participant in Delta's bankruptcy case, and filed a number of motions and objections claiming inequitable conduct on the part of various entities controlled by Mahan. Equally clear is that Eastern did not raise the precise claim that is the subject of this complaint, namely, that Mahan's conduct warrants piercing Delta's corporate veil and holding Mahan liable on an alter ego theory. The parties also acknowledge that claim preclusion does not bar all unasserted claims that theoretically could have been raised, but only those based on the same cause of action that was actually asserted previously. See Brief for Appellee at 33 ("Mahan has never argued that all possible causes of action must be raised in a bankruptcy such as Delta's. What he argued, and proved, is that claims which are known and asserted in a bankruptcy proceeding cannot later be asserted elsewhere."); Brief for Appellant at 18 ("in the absence of actual assertion of a cause of action in the bankruptcy proceeding, claim preclusion does not follow"). See generally *Huls, 176 F.3d at 191* [**18] ("Claim preclusion bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action.") (emphasis added).

The issue facing us, therefore, is whether the claim currently being asserted by Eastern against Mahan is based on the same cause of action as the claims actually asserted by Eastern in Delta's bankruptcy such that its instant claim should have been asserted in that forum. Mahan says it is; Eastern says it is not.

[*337]   Our case law often suggests that we consider whether there is an "essential similarity of the underlying events" to determine whether the prior and current claim arise from the same cause of action and cite to *United States v. Athlone Industries, Inc., 746 F.2d 977, 984 (3d Cir. 1984)*. Although we stated this test in *Athlone*, we did not actually apply it, ultimately holding instead that the district court erred in dismissing the action because "the suits involved different statutes, different acts, different wrongs, and necessitated different evidence to support the different material facts alleged." *Id. at 986.* See also *Lewison Bros. v. Washington Savings Bank (In re Lewison Bros.), 162 B.R. 974, 981 (Bankr. D.N.J. 1993)* [**19] (explaining that *Athlone* instructed that courts determine whether suits involve the same causes of action by comparing the acts and demand for relief, theory of recovery, necessary evidence, and alleged material facts). Furthermore, the "essential similarity"

225 F.3d 330, *337; 2000 U.S. App. LEXIS 21232, **19;
44 Collier Bankr. Cas. 2d (MB) 1303

test, when literally construed, is ideally suited for litigation that has been generated by discrete events, such as a car accident or commercial transaction gone awry; indeed, claim preclusion is typically invoked when issues surrounding a discrete incident or transaction have been litigated previously in a civil action. However, the claim at risk of being precluded in this case is based on conduct that allegedly took place over the course of several years. Although some of the underlying events and relationships are described in terms that are similar (and indeed sometimes nearly identical) in both Eastern's complaint against Mahan and various documents Eastern circulated in Delta's bankruptcy case (e.g., the draft equitable subordination complaint), the similarity of certain events in and of itself does not trigger a bar of Eastern's subsequent complaint against Mahan. Surely the mere existence of overlapping facts and events [**20] in this setting is not sufficient to foreclose Eastern's current claim. To properly apply the affirmative defense of claim preclusion, we must take a closer look.

Claim preclusion is complicated in this case not only because the instant claim involves a multifaceted factual scenario and extensive course of events, but also because the prior litigation involved an expansive and complex chapter 11 bankruptcy case. A bankruptcy case is not a discrete lawsuit. It is commenced by the filing of a petition for relief, which then provides a forum in which any number of adversary proceedings, contested matters, and claims will be litigated. Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction. [12]

12   Claim preclusion would have a broad scope indeed if it barred every claim over which a bankruptcy court might have had jurisdiction. See *Huls, 176 F.3d at 209* (Stapleton, J., dissenting) (noting that a broad view of claim preclusion in the bankruptcy context would likely produce "multitudinous protective filings of claims against nondebtors and the needless complication of bankruptcy confirmation proceedings").

[**21] Claim preclusion doctrine must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case. [13] Difficult as it may be to define the contours of a cause of action in a bankruptcy setting, we

conclude that a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be [*338] unreasonable not to have brought them both at the same time in the bankruptcy forum. [14] Here, that is not the case.

13   Indeed, the factual setting here -- involving a closely-held debtor corporation that is part of a group of such companies controlled by one shareholder -- raises special problems, yet is all too common. Surely it cannot be the case that the corporation's bankruptcy becomes the exclusive forum to address any claims a creditor might have against the nondebtor controlling shareholder based on that shareholder's own conduct.

14   This is, after all, essentially the test that we actually applied in Athlone, and it is consistent with the reasoning in Huls, in which we recognized that courts normally must scrutinize the "totality of the circumstances" to determine whether two claims are based on the same cause of action, although we found that the claims' "essential similarity" was facially apparent in that particular instance. See *Huls, 176 F.3d at 206.* This test, of course, assumes subject matter jurisdiction over the later claim.

[**22] Eastern's participation in Delta's bankruptcy case, as previously described, was undoubtedly active and aggressive. Yet, Eastern never litigated any cause of action against Mahan that sought what its current claim would accomplish. The claim most closely resembling the current action was Eastern's draft equitable subordination complaint, which was never actually filed and which sought to subordinate the claims of Millington and Chemical Bank, not Mahan. Characterizing Millington's claim as equity or capital rather than "debt," Eastern's draft complaint essentially took the position that Millington should not have creditor status in Delta's bankruptcy, but instead should stand in line behind Delta's other creditors. Unlike that draft equitable subordination complaint, Eastern's instant complaint seeks recovery from Mahan and focuses not on whether Millington should have equivalent creditor status or whether Delta's assets were properly used to collateralize obligations of Millington to Chemical Bank, but rather on whether Mahan should be personally liable for the debt due to Eastern based on his conduct in using Delta as his

225 F.3d 330, *338; 2000 U.S. App. LEXIS 21232, **22;
44 Collier Bankr. Cas. 2d (MB) 1303

"mere instrumentality" and "alter ego" for his individual [**23] benefit. [15] Although some of the descriptions of certain events and particular relationships are common to both claims, the theory of the case and relief sought in Eastern's instant complaint are markedly different from those underlying the draft complaint to subordinate the claims of Millington and Chemical Bank that Eastern considered filing in bankruptcy court.

> 15   We recognize that other courts of appeals have considered whether the claim holder has used the debtor as an alter ego when deciding whether a claimant has engaged in inequitable conduct such that its claim should be equitably subordinated. See, e.g., *In re Lifschultz Fast Freight, 132 F.3d 339, 345 (7th Cir. 1997)*. However, even if we employed that analysis in this circuit, it would not affect the outcome here, particularly because Eastern sought to subordinate the claim of Millington, not Mahan.

Both Eastern and Mahan take the position that our decision in Huls dictates that they prevail on their respective positions as to whether [**24] Eastern's suit against Mahan is barred. Huls involved a lawsuit between two lenders, CoreStates and Huls, based on a subordination agreement between them. After the conclusion of the bankruptcy case of their mutual borrower, United Chemical Technologies ("UCT"), CoreStates sued Huls to recover $ 600,000 that Huls had received in the case. Huls filed a motion for judgment on the pleadings based on the claim preclusive effect of UCT's bankruptcy confirmation order. In UCT's bankruptcy case, CoreStates had specifically challenged the $ 600,000 payment to Huls by way of formal objection as well as informal colloquy with the parties and the court. CoreStates also had appealed the court's entry of the confirmation order, which, although overturned on different grounds, was ultimately followed by the successful confirmation of a second amended plan.

We affirmed the District Court's decision that claim preclusion barred CoreStates' later suit. The underlying question in Huls was whether "CoreStates had a right to receive the funds, when both CoreStates's and Huls's rights in the bankruptcy estate, and CoreStates's objection based on the payment in particular, were settled in the confirmation [**25] proceeding." *Huls, 176 F.3d at 190-191.* We concluded that "CoreStates functionally raised the Subordination Agreement in its objection

[*339] to the Reorganization Plan," *id. at 203,* and that CoreStates's objection in UCT's confirmation proceedings was, in fact, a claim against Huls:

> The objection put Huls's rights in the bankruptcy estate into question. The $ 600,000 payment was all Huls was entitled to receive under the Reorganization Plan. A challenge to that payment amounted to a challenge to Huls's position in the scheme of distribution the Plan envisioned. In addition, Huls clearly felt that it had an interest in the issue worth preserving, since it opposed the objection extensively throughout the bankruptcy proceedings. Furthermore, Huls filed a brief in opposition to CoreStates's appeal in the District Court, and CoreStates filed a reply brief dealing almost solely with Huls's arguments. Accordingly, the Bankruptcy Judge's dismissal of CoreStates's objection and the subsequent confirmation of the Plan constitute a final judgment on CoreStates's claim against Huls.

*Id. at 206.* Noting that our holding was largely fact-bound and [**26] was the result of "the coincidence of several unusual circumstances," we emphasized the significance of the fact that CoreStates specifically challenged the fairness of providing the $ 600,000 to Huls in the plan of reorganization: "in the absence of extensive litigation of this claim in the confirmation proceeding, CoreStates would not now be prevented from bringing its suit." *Id. at 206.* In other words, CoreStates actually litigated the same cause of action -- Huls' entitlement to the $ 600,000 as opposed to CoreStates' -- in the plan confirmation process that it sought to litigate thereafter.

Huls illustrates, in what we recognized to be a somewhat unique factual and procedural setting, that one does not get a second bite at the proverbial apple simply because the first bite was taken in a bankruptcy case. See *Huls, 176 F.3d at 202* (citations omitted). Similarly, we note that care must be taken in determining whether the first bite was actually taken such that it would preclude the second. Huls does not stand for the proposition that nondebtors must assert all potential claims in a bankruptcy case or be forever barred, nor does Mahan ask us to reach such [**27] a conclusion. Rather, Huls helps

225 F.3d 330, *339; 2000 U.S. App. LEXIS 21232, **27;
44 Collier Bankr. Cas. 2d (MB) 1303

us frame the key question that the parties agree we should ask whenever the affirmative defense of claim preclusion is raised on the basis of a prior bankruptcy confirmation order, namely, whether the later claim arises from the same cause of action as a claim that was actually asserted or interposed in the earlier bankruptcy case and resolved in the confirmation order. Here, we have concluded that it does not. [16]

> 16    Recent decisions of other courts bolster our interpretation as to how claim preclusion is reasonably applied in the context of bankruptcy. For example, the Court of Appeals for the Fifth Circuit recently concluded that a hearing determining the fees earned by an accounting firm for services rendered to the bankruptcy estate barred the bankruptcy trustee from later suing the accounting firm for negligence and professional malpractice because both disputes squarely presented the identical question of the quality and value of the firm's services to the bankruptcy estate. See *Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.), 200 F.3d 382, 387 (5th Cir. 2000).*

[**28] For the foregoing reasons, we conclude that Eastern's suit against Mahan is not barred and we will, therefore, reverse the District Court's grant of summary judgment and remand for further proceedings.

Denial of Eastern's Motion to Amend

Eastern also appeals the District Court's denial of Eastern's motion requesting leave to amend its complaint a second time to add RICO claims against Mahan and to join two additional defendants. [17] Eastern contends that the District Court erroneously relied on *Rule 16(b) of the Federal Rules of Civil Procedure* without sufficient consideration of *Rules 15(a)* and *42*. We review the District [*340] Court's determination for abuse of discretion. See *Epstein, 10 F.3d at 174.*

> 17    The District Court denied this motion on March 1, 1999, prior to granting summary judgment.

The District Court's case management conference order set the amendment and joinder deadlines for June 30, 1998. App. 121a-122a. On January 6, 1999, more than six months after the deadline, Eastern filed [**29] its motion for leave to amend. App. 124a. As justification

for seeking leave to amend, Eastern stated that it had become aware of the viability of new claims and that filing an amended complaint would conserve judicial resources and would obviate the need for a separate action. App. 125a. Opposing Eastern's motion, Mahan argued that Eastern had to comply with *Rule 16(b) of the Federal Rules of Civil Procedure* before seeking amendment under *Rule 15(a)*; [18] because Eastern had not been diligent, Mahan contended, the amendment should not be allowed under *Rule 16(b)*. Slip Op. at 5.

> 18    *Rule 15(a)*, "Amended and Supplemental Pleadings," provides that under most circumstances, a party seeking to amend more than once may do so only by leave of court or with the adverse party's written consent, although "leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). *Rule 16(b)* instructs courts to set time limits in connection with pretrial conferences, and a "schedule shall not be modified except upon a showing of good cause and by leave of the district judge." FED. R. CIV. P. 16(b).

[**30] Agreeing with Mahan's reasoning, the District Court concluded that good cause had not been shown under *Rule 16(b)* to modify the case management order. According to the District Court, Eastern had not specified what led it to decide that RICO claims could be pled or why information from independent sources could not have been obtained earlier. Slip Op at 6. The District Court concluded that it need not examine Eastern's *Rule 15(a)* argument, but nonetheless noted that there was sufficient reason to deny Eastern's motion under *Rule 15(a)* due to Eastern's unexplained delay in moving to amend.

We conclude that the District Court acted well within its discretion when it denied Eastern's motion to amend the complaint six months after the amendment and joinder deadlines had expired, and we will not disturb the Court's ruling in this regard. [19]

> 19    Eastern has withdrawn the third issue it originally listed for appeal, namely the District Court's denial of Eastern's request to file an outsized brief. See Reply Brief of Appellants, at 8.

[**31] For the foregoing reasons, we will REVERSE the District Court's entry of summary

225 F.3d 330, *340; 2000 U.S. App. LEXIS 21232, **31;
44 Collier Bankr. Cas. 2d (MB) 1303

judgment. We will AFFIRM the District Court's denial of
Eastern's untimely motion to amend its complaint.

*** Slip Sheet ***

Document

LEXSEE 233 F.3D 734

**CARMELITA ELCOCK v. KMART CORPORATION, Appellant**

**NO. 98-7472**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*233 F.3d 734; 2000 U.S. App. LEXIS 34822*

**December 7, 1999, Argued**
**October 10, 2000, Filed**

**SUBSEQUENT HISTORY:**    [**1] As Amended November 20, 2000.

**PRIOR HISTORY:**    On Appeal From the District Court of the Virgin Islands. (D.C. Civ. No. 1996/28 F). District Judge: Honorable Raymond L. Finch, Chief Judge.

Previously Reported at: *228 F.3d 448* and Withdrawn from the Bound Volume.

**DISPOSITION:**    Judgment of the District Court affirmed in part and reversed in part, and case remanded for a new trial on the issue of damages.

**COUNSEL:** ANDREW C. SIMPSON, ESQUIRE (ARGUED), Bryant, Barnes & Simpson, P.C., Christiansted, St. Croix USVI, Counsel for Appellant.

LEE J. ROHN, ESQUIRE, MAURICE CUSICK, ESQUIRE, K. GLENDA CAMERON, ESQUIRE (ARGUED), Law Office of Lee J. Rohn, Christiansted, St. Croix USVI, Counsel for Appellee.

**JUDGES:** Before: BECKER, Chief Judge, SCIRICA and GARTH, Circuit Judges.

**OPINION BY:** BECKER

**OPINION**

[*738] OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by defendant Kmart from a judgment entered on a $ 650,000 jury verdict in favor of plaintiff Carmelita Elcock ("Elcock") for personal injuries and economic loss that she suffered as the result of a slip and fall at a Kmart store in Frederiksted, U.S. Virgin Islands. Kmart concedes its liability and acknowledges that [**2] Elcock's fall caused her some quantum of harm. However, Kmart challenges several evidentiary rulings that relate to the proof of Elcock's damages, and contends that the $ 650,000 award, which consisted of $ 300,000 for pain and suffering and $ 350,000 for loss of future earnings and earning capacity, was excessive.

The most important questions on appeal relate to the testimony of Dr. Chester Copemann, who was proffered by Elcock, inter alia, as an expert in vocational rehabilitation, and whose vocational rehabilitation presentation substantially informed the large award for loss of future earnings and earning capacity. We conclude that there should have been a Daubert hearing prior to the receipt of Copemann's testimony, and that because there was no such hearing, his testimony cannot stand. In the course of reaching this conclusion, we decide that the District Court did not abuse its discretion either in qualifying Copemann as an expert or in limiting the scope of cross-examination concerning Copemann's prior acts of criminal misconduct. With respect to the testimony of Dr. Bernard Pettingill, an economist put on by Elcock to assess her lost future earnings, we conclude that his [**3] opinion should have been excluded because his economic model relied on assumptions wholly without foundation in the record. In the absence of the testimony of these two critical witnesses, and given the inability of Elcock's other witnesses to act as surrogates therefor, the economic loss portion of the jury verdict, which rests on this inadmissible evidence, must

233 F.3d 734, *738; 2000 U.S. App. LEXIS 34822, **3

be set aside, and a new trial granted.

Kmart also submits that both the economic and non-economic portions of the jury award were excessive and thus should be remitted. We do not reach Kmart's remittitur arguments. Because we find that the jury's tainted economic damage award was not clearly distinct and separate from the non-economic portion of its damage verdict, a new trial must be had on all aspects of the damage award. We do, however, for the guidance of the District Court on remand, reject Kmart's contention that Elcock failed to present sufficient evidence to show that her damages, particularly her permanent injuries, were caused by her slip and fall, as we are satisfied that there is sufficient evidence in the record to support such a finding. We thus affirm in part, vacate in part, and remand for a new trial on [**4] the issue of damages.

I. Facts and Procedural History

On August 12, 1995, Elcock and her husband went to the Frederiksted Kmart to purchase mints. While shopping, Elcock [*739] slipped and fell on a waxy substance that had built up on the floor. Elcock reported her fall to customer service, and a Kmart employee placed her in a wheelchair. Elcock told Kmart representatives that she had injured her back and right leg and was in excruciating pain. Kmart offered her the opportunity to visit a physician of her choice at its expense, but informed her that it would pay for only one visit.

Elcock declined the offer and visited her own doctor, Dr. Arakere B. Prasad. Prasad diagnosed her as suffering from a lumbar sprain. Because Elcock complained of low back pain and cramps in her right leg, Prasad prescribed painkillers for her. Elcock, however, never used the prescription. Prasad stated that Elcock's back and leg injuries would interfere with her flexibility and cause her pain, and that her injury was "an ongoing thing. It may be forever."

Elcock sought a second opinion from an orthopedist, Dr. Claudius Henry. During her initial visit, four days after the slip and fall, Henry also diagnosed [**5] Elcock with a low back sprain. He found limitation in Elcock's range of motion, as well as tenderness and irritation in her right leg and back "in the right LV-3 which is lumbar third to LV-1 which is the paraspinal along the spine on the right side." He considered both symptoms to be indicative of nerve root irritation arising out of an injury

to muscles, ligaments, and the outer portion of the disc area in Elcock's back. Henry prescribed physical therapy, x-rays, and an anti-inflammatory drug, and recommended that Elcock limit her physical activity. The x-rays revealed that she had "minimal spurring [i.e., the accretion of calcium deposits in] the anterior portion of the vertebral bodies of the lower back." In Henry's opinion, this preexisting condition made her more susceptible to suffering a low-back sprain when she slipped and fell.

During a second visit, Henry diagnosed Elcock with resolving post-traumatic radiculopathy. Radiculopathy is often caused by a herniated intervertebral disc. Henry noted that Elcock suffered pain and nerve irritation, and complained of a limited range of motion in her back and right leg. He described these injuries as "chronic," meaning that they [**6] could "exist off and on for an indefinite period," possibly for the rest of Elcock's life. The two visits with Henry took place over a span of seven months. During this time and in the months thereafter, Elcock also saw a Dr. Ali once a month; Ali had been treating her for an unrelated diabetes condition. As evidenced by Ali's notes, Elcock never made any mention of her back and leg pain to him.

Elcock claimed that the injuries she received as a result of the fall profoundly impacted her life. At the time of the accident, Elcock was fifty-one years old and self-employed as a salesperson for Mary Kay Cosmetics. Elcock contended that she suffered extreme and uninterrupted physical pain, as well as depression that often caused her to cry until her eyes became swollen. She reasoned that this depression arose in large part from the fact that her debilitating injuries affected other aspects of her life. Elcock testified that she had lost most of her Mary Kay business, and that, as a result, her income fell from the $ 5,744 she earned in 1995 to $ 1,070 in 1996. Mary Kay sells its products through a force of salespeople organized in a pyramid structure. The salespeople earn commissions and [**7] prizes on their sales and the sales of those they recruit into their personal pyramids. Elcock was thus not only responsible for selling Mary Kay's products, but for recruiting and maintaining a subordinate sales force. She stated that her injuries interfered with her ability to perform all of these functions.

Seventeen months after the slip and fall, Elcock visited Dr. Sylvia Payne, a San Juan-based specialist in

233 F.3d 734, *739; 2000 U.S. App. LEXIS 34822, **7

physical medicine and rehabilitation, so that Payne might give an opinion as to Elcock's medical condition [*740] in relation to the fall for purposes of this litigation. Payne found that Elcock suffered from lumbar myositis (inflammation of the lower back muscles, characterized by pain, tenderness, and sometimes spasms in the affected area) and from two "trigger points" in the gluteus maximus muscle. Trigger points, according to Payne, are "very tiny points in the muscle believed to be part of a muscle spindle that is firing constantly and causing pain at the sight [sic] and causing pain in another area not anatomically related." Payne testified that the trigger points were responsible for the pain Elcock felt radiating down her right leg to her knee. Payne also concluded that [**8] Elcock's "pain was severe and it interfered with several of her activities," that Elcock would be in pain for the rest of her life because of her fall, and that the injuries resulting from the fall were permanently disabling.

Elcock was also referred to Copemann, a psychologist and purported expert in vocational rehabilitation. A vocational rehabilitationist assesses the extent of an individual's disability, evaluates how the disability affects the individual's employment opportunities, and assists the individual's re-entry into the labor market. Copemann examined Elcock for the purposes of this litigation, but also treated her for her chronic pain. As part of his examination, he diagnosed Elcock's psychological condition and evaluated her lost earning capacity in light of her physical and psychological disabilities. Copemann concluded that Elcock suffered from depression, pain disorder, and adjustment disorder with anxiety, and opined that these symptoms were caused by her slip and fall and the physical injuries that arose therefrom. Copemann also concluded that Elcock's psychological condition was improving and was not permanent. Based on his assessment of Elcock's psychological [**9] condition, the extent of her physical injuries, relevant employment factors, and the results of diagnostic tests he had performed, Copemann opined that Elcock was between 50 and 60 percent vocationally disabled and that this disability was permanent.

Except for Ali, all of the doctors mentioned above testified at Elcock's four-day jury trial, as did Elcock and her husband. Elcock also offered the testimony of Pettingill, who gave an expert opinion as to Elcock's lost earning capacity. The jury found for Elcock on all elements of her tort claim and awarded her $ 650,000 in

damages: $ 350,000 for her economic injuries, and $ 300,000 for her pain and suffering. Kmart moved for judgment as a matter of law, for a new trial, or alternatively, for a remittitur. The District Court denied the motion for judgment as a matter of law and for a new trial, but did remit the pain and suffering award to $ 115,000. Upon Elcock's motion for reconsideration, however, the Court vacated the remittitur and reinstated the jury's damage award. The District Court had jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

[**10] II. The Evidentiary Issues Relating to Copemann's Qualifications

Before trial and again during trial, Kmart sought to exclude Copemann's vocational rehabilitation testimony on the grounds that he was not qualified as an expert in the field. The District Court conducted a voir dire on Copemann's qualifications, during which Copemann testified regarding his credentials, and Kmart's vocational rehabilitation expert gave testimony that called those credentials into question. The District Court considered the qualifications issue raised by Kmart a "close call," but ultimately found that Copemann was qualified to testify about vocational rehabilitation. [1] Kmart challenges this decision. We review the District [*741] Court's decision to qualify Copemann for abuse of discretion. See Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998).

> [1] Copemann also testified about the physical and psychological harm that Elcock suffered as a result of her slip and fall. In light of the fact that Copemann is a formally trained and experienced psychologist, Kmart does not challenge his qualifications to render this opinion.

[**11] A.

Federal Rule of Evidence 702, rescribed in the margin, governs the use of expert testimony in the federal courts. [2] As explained in In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) (hereinafter "Paoli II"), Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit. See id. at 741-43. Before an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of specialized expertise. See id. at 741. In Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998), we articulated the standard for qualifying an expert:

233 F.3d 734, *741; 2000 U.S. App. LEXIS 34822, **11

*Rule 702* requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." We have interpreted the [**12] specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman. . . ."

d. at 625 (citations omitted).

2   The Rule provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. *Fed. R. Evid. 702.*

Even under the liberal standard described in Waldorf, Copemann's qualifications as a vocational rehabilitationist are thin. In contending that Copemann possessed skill or knowledge "greater than the average layman," Elcock [**13] focuses primarily on Copemann's experience. Specifically, Elcock points to (1) Copemann's general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments; (5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place no restrictions on membership; and (7) the fact that when Copemann was in

school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless. This last fact, Elcock argues, explains why Copemann did not possess the degrees or formal training one would ordinarily associate with an expert.

In response, Kmart [**14] emphasizes several factors that significantly undermine Copemann's purported qualifications. First, during Kmart's voir dire, Copemann admitted that he had neither the academic training nor the standard credentials that would ordinarily qualify one as an expert in vocational rehabilitation. Moreover, Kmart argues that nothing prevented Copemann from either receiving formal training in vocational rehabilitation after he left school or from earning a related degree or certificate while he was in school. Second, Copemann conceded that his experience dealing with the workers' compensation board consisted primarily of diagnosing whether patients were so disabled that they could not return to a particular job; [*742] this experience did not include assessing what range of jobs those injured individuals were capable of performing. Third, Kmart adduced evidence suggesting that not only was Copemann's experience as a counselor for drug addicts dated, but that it did not include performing assessments of which jobs the recovered addicts would be able to perform. Fourth, although Copemann maintained that there was no difference between a psychologist and a vocational rehabilitationist, Kmart's vocational [**15] rehabilitation therapist testified that despite a common psychological diagnostic component in both jobs, the vocational rehabilitationist's expertise entails a distinct speciality: the capacity to "translate" psychological and physical impairments into the "ability to work, earn income, [and] get a job . . . ." [3]

3   In support of this latter point Kmart cites *Terry v. Mathews, 427 F. Supp. 464 (E.D. Pa. 1976)*, in which the district court remanded an administrative law judge's ("ALJ") decision to deny a social security claimant benefits because the ALJ gave great weight to the vocational rehabilitation opinion of a trained psychologist with "some limited experience in occupational therapy and counseling." *Id. at 466.* The district court reasoned that "the issue here is not a psychological one. Rather it is a question of expertise in the vocational field. . . . In light of [the expert's] qualifications as a psychologist, as opposed to any qualifications as a vocational

233 F.3d 734, *742; 2000 U.S. App. LEXIS 34822, **15

expert, [the heavy weight given the expert's testimony] is impermissible." Id.

[**16] Kmart's forceful argument all but persuaded the District Court. Given Copemann's lack of credentials and limited experience, the District Court twice expressed its reluctance to qualify Copemann as an expert in vocational rehabilitation. However, after two attempts by Elcock's counsel to qualify him, the Court eventually admitted Copemann's testimony. The Court relied heavily on the fact that a formal degree in vocational rehabilitation therapy was not available when Copemann attended school, and the fact that the training of psychologists was functionally similar to that of vocational rehabilitationists at the time. The Court also relied on Copemann's practical experience evaluating the ability of injured employees to return to work.

B.

This court has had, for some time, a generally liberal standard of qualifying experts. See, e.g., *Paoli II, 35 F.3d at 741; Hammond v. International Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982); Knight v. Otis Elevator Co., 596 F.2d 84, 87-88 (3d Cir. 1979)*. However, we have also set a floor with respect to an expert witness's qualifications. For example, in *Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110 (3d Cir. 1987)*, [**17] we held that a district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. See *id. at 114.* In making this determination we stated:

Drewnoski [the expert witness] was not an engineer. He had no experience in designing construction machinery. He had no knowledge or experience in determining the cause of equipment fire. He had no training as a mechanic. He had never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.

Id. (citations omitted); see also *Waldorf, 142 F.3d at 625* ("Even though we apply *Rule 702* liberally, we have not pursued a policy of qualifying any proffered witness as an expert.").

Our decision in Waldorf provides guidance for our assessment of Copemann's qualifications. In Waldorf, the district court qualified an expert with credentials similar

to Copemann's, and we affirmed that decision on appeal:

The district court qualified Rizzo [the putative expert] to testify as a vocational [**18] expert in spite of his lack of any formal training in that field, and notwithstanding that his educational training culminated in a master's degree in sociology [*743] and social organization from Rutgers University in 1973. . . .

. . . In 1991, he became involved in the Council's administration of a million dollar loan pool to assist disabled New Jersey residents in starting their own businesses. In that capacity, Rizzo evaluated the capacity of disabled individuals to accomplish specific employment opportunities. Rizzo also testified that, through the course of his employment, he became familiar with studies on the work that quadriplegics can perform. Furthermore in his job experience, Rizzo utilized the New Jersey Department of Labor Statistics and the New Jersey Job Listing Book, which indicate employment opportunities available in various job categories in New Jersey. Thus, based on his experience and his familiarity with the literature in the field, the district court held that Rizzo was qualified properly as a vocational expert. The court said that "while his formal credentials may be a little thin, he certainly had sufficient substantive qualifications to be considered an expert [**19] under the liberal standard of *Rule 702.*

*Id. at 626* (citations omitted).

What drove the Waldorf panel's decision to affirm on this issue was not the impressiveness of Rizzo's credentials or experience, but the standard of review governing our review of *Rule 702* qualification rulings:

Waldorf has a heavy burden in challenging this decision because, absent an abuse of discretion, we will not substitute our own judgment for that of the

233 F.3d 734, *743; 2000 U.S. App. LEXIS 34822, **19

trial court regarding the admission or exclusion of expert testimony. Of course, an abuse of discretion means much more than that the appellate court disagrees with the trial court. Rather, a trial court's determination whether to admit or exclude expert testimony will be upheld "unless manifestly erroneous."

. . . Even though Rizzo did not possess formal academic training in the area of vocational rehabilitation, he did have experience in the field through his employment at the Developmental Disabilities Council in attempting to provide jobs for disabled individuals. During this time, Rizzo also became familiar with the relevant literature [**20] in the field. Even if his qualifications are, as the district court described, "a little thin," he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals. In the circumstances, we cannot say that the district court abused its discretion in determining that Rizzo possessed the minimum qualifications necessary to testify as an expert.

*Id. at 626-27* (citations omitted).

Copemann, like Rizzo, has no formal training in vocational rehabilitation and Elcock must therefore rely on Copemann's practical experience to demonstrate that he "possessed the minimum qualifications necessary to testify as an expert." *Id. at 627.* In support of Copemann's qualifications, Elcock points to Copemann's experience in helping drug addicts return to employment and to his work with the Virgin Islands Division of Workers' Compensation. Based on this background, one can presume that Copemann has learned about the difficulties disabled individuals face in employment, and has accumulated some experience in evaluating whether they can return to a particular job. Nonetheless, the most fundamental problem with Copemann's [**21] experience in this area is that he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level

regarding the number of jobs in the national or local economy that the disabled individual is able to perform.

On the other hand, Copemann claims to have kept abreast of the relevant literature in his field, and to have consulted the Dictionary of Occupational Titles, a standard tool of the vocational rehabilitationist. [*744] [4] In addition, Copemann possesses a degree in a field tangentially related to the one about which he testified, and he has also attended conferences regarding vocational rehabilitation. Finally, in the process of testifying as an expert in similar matters, Copemann has no doubt performed his brand of vocational rehabilitation assessments. [5] Though his efforts in this regard are not grounded in formal training, when taken together with his review of the literature in the field and his attendance at conferences, we must acknowledge that he has "substantially more knowledge than an average lay person regarding employment opportunities for [**22] disabled individuals." *Id. at 627.*

4    The DOT describes "the majority of occupations" in the economy, 1 U.S. Dep't of Labor, Dictionary of Occupational Titles iii (4th ed. 1991) (Message from the Secretary of Labor), as well as the hazards accompanying those jobs, see, e.g., *Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994)*, and is often used by vocational rehabilitationists to assess what jobs are available to disabled employees.

5    We note that the mere fact that Copemann was previously admitted as an expert witness qualified to give testimony on vocational rehabilitation is irrelevant to the determination whether he is qualified to give such testimony in this case. See *Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989)* ("It would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."). Moreover, while any expertise he may have gained in performing vocational rehabilitation assessments in these cases would be relevant, the crucible of litigation makes for a poor classroom.

[**23] We consider Waldorf to be at the outer limit of this court's generally liberal approach to reviewing the qualifications of experts. We also suspect that, had the district court in Waldorf ruled the witness unqualified, the panel would have affirmed. While Copemann seems but marginally qualified to perform a vocational

233 F.3d 734, *744; 2000 U.S. App. LEXIS 34822, **23

rehabilitation assessment, and a district judge would be free to decline to qualify him, we recognize that Copemann's qualifications fall within Waldorf's outer bounds. Despite misgivings, because we are not prepared to say that the District Court, acting "on the spot" and exercising considerable care in its approach to this question, abused its discretion, we will affirm the Court's decision to qualify Copemann as an expert. We note, however, that the marginal nature of Copemann's qualifications does enter into the Daubert calculus, to which we now turn.

III. The Daubert Reliability of Copemann's Testimony

During trial and again on appeal, Kmart sought to exclude Copemann's testimony on the ground that his methodology for rendering vocational disability assessments was unreliable. Kmart repeatedly requested that the District Court conduct a Daubert hearing regarding [**24] Copemann's methods as a vocational rehabilitationist. The District Court denied this request, stating that it "didn't look at" Copemann's vocational rehabilitation opinion "as a Daubert issue." Although we hold that the District Court erred in not granting a Daubert hearing, we acknowledge that the Court's refusal to do so is understandable, as the Court's decision was rendered before the Supreme Court's opinion in *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, extended the rigorous gatekeeping function assigned to trial judges by *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, to cases involving non-scientific testimony. See *Kumho, 526 U.S. at 141*.

A.

In Daubert, the Supreme Court directed district court judges to perform a screening function, to insure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. See *Daubert, 509 U.S. at 597*. Our precedent [*745] initially limited Daubert's command to cases involving scientific testimony. For instance, in *In re Unisys Savings Plan Litigation, 173 F.3d 145, 157 (3d Cir. 1999)*, [**25] cert. denied sub nom., *Meinhardt v. Unisys Corp., 528 U.S. 950, 145 L. Ed. 2d 290, 120 S. Ct. 372 (1999)*, we stated that non-scientific testimony (such as Copemann's) "does not fall within the scope of scientific testimony, and accordingly, it should not be tested by the particular standards required for testimony based on a particular scientific ethic." *173 F.3d at 157*. It

was not until Kumho Tire that the Supreme Court made clear that Daubert's gatekeeping obligation covered not only scientific, but also non-scientific, testimony. See *Kumho Tire, 526 U.S. at 151* (rejecting the "Eleventh Circuit's holding that a trial judge may ask questions of the sort Daubert mentioned only where an expert 'relies on the application of scientific principles,' but not where an expert relies 'on skill- or experience-based observation' ") (citation omitted).

Although we would ordinarily review a district court's application of *Rule 702*, as well as the decision whether to grant a Daubert hearing, for abuse of discretion, see *Kumho Tire, 526 U.S. at 142, 152*, our standard [**26] of review is somewhat different in this case. Because we are evaluating the District Court's legal interpretation of a federal rule, our review is plenary. See *In re Paoli R.R. Yard PCB Litigation, 221 F.3d 449, 2000 WL 1137475*, at *6 (3d Cir. 2000). As will appear, a review of Copemann's vocational rehabilitation testimony demonstrates the significant reliability questions raised by his methodology and compels the conclusion that a Daubert hearing would have permitted a fuller assessment of Copemann's analytical processes and thus was a necessary predicate for a proper determination as to the reliability of Copemann's methods. See *Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417-18 (3d Cir. 1999)* (holding that the district court abused its discretion in excluding an expert's opinion without conducting an in limine hearing focused on the Daubert reliability of his testimony). "When a [district] court . . . misapprehends [the] bounds" of a federal rule, "it abuses its [**27] discretion." Id. (citing *Koon v. United States, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996))*; cf. *Kumho Tire, 526 U.S. at 159* (Scalia, J., concurring) ("Though, as the Court makes clear today, the Daubert factors are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion."). In fairness, we note that, because he was without the benefit of Kumho Tire, the District Judge understandably misapprehended the bounds of *Rule 702's* gatekeeping requirement. Kumho Tire, however, must be applied.

B.

An expert's opinion is reliable if it is " 'based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II*,

233 F.3d 734, *745; 2000 U.S. App. LEXIS 34822, **27

*35 F.3d at 742* (quoting *Daubert, 509 U.S. at 589*). In cases involving scientific testimony, "[the] inquiry into the reliability of scientific evidence . . . requires a determination as to its scientific validity." Id. (citation omitted). [**28]

"Daubert suggests several factors that a district court should take into account in evaluating whether a particular scientific methodology is reliable . . . ." Id. The factors that Daubert and this Court have already declared important include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on [*746] the methodology; and (8) the non-judicial uses to which the method has been put.

*35 F.3d at 742 n.8* (citing *Daubert and United States v. Downing, 753 F.2d 1224, 1238-41 (3d Cir. 1985),* as the source of those non-exclusive factors). We will henceforth refer to these factors as the Daubert factors.

*Kumho Tire* makes clear that [**29] this list is non-exclusive and that each factor need not be applied in every case. As noted above, it also resolves the question whether these same factors should be applied when testing the reliability of a non-scientific method:

> Daubert's gatekeeping requirement. . . . makes certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. . . . The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider

the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.

*Kumho Tire, 526 U.S. at 152;* see also *id. at 158-59* (Scalia, J., concurring) ("I join the opinion of the Court, which makes clear that the discretion it endorses--trial-court discretion in choosing the manner of testing expert reliability--is not discretion to abandon the [**30] gatekeeping function.").

Kmart accepts that vocational rehabilitation expertise flows from a valid non-scientific method; it disputes, however, the reliability of Copemann's particular methodology. Kmart points to a number of instances in which application of the Daubert factors would weigh against the reliability of Copemann's methods.

   1.

Kmart first contends that Copemann's method can be described, in essence, as an idiosyncratic or subjective judgment in which the result can neither be duplicated nor tested for validity (implicating by rough analogy, and for reasons explained below in this Section, the first and fourth Daubert factors, see *Paoli II, 35 F.3d at 742 n.8*). Given the lack of a Daubert hearing, we must turn to Copemann's trial testimony in order to identify and evaluate the processes Copemann employed in making the disability determination in Elcock's case. On direct examination, Copemann described his method for arriving at the 50 to 60 percent disability opinion he rendered:

> My vocational assessment consisted of testing Mrs. Elcock for intelligence level achievement, that is school level, getting a work history on her and then doing an analysis [**31] of the Dictionary of Occupational Titles aptitude testing on her, and then doing a search of the Dictionary of Occupational Titles.

> . . .

> [In addition to a clinical interview,] I performed the [Wechsler] Adult Intelligence Scale revised and she had an IQ of 98 which is in the normal or average range.

233 F.3d 734, *746; 2000 U.S. App. LEXIS 34822, **31

And I also performed the wide range achievement test revised which indicated that she had a reading level of above 12th grade level, spelling level of beginning 10th grade, and an arithmetic level of ending 6th grade.

. . .

Then I performed the aptitude testing on her, and I think we need to, I need to explain the aptitude test. Each job in the United States is categorized in this Dictionary of Occupational Titles put out by the U.S. Department of Labor and the characteristics of those jobs. Those jobs are listed, characterized and listed for each job, and every job has a set of aptitudes that tells you what is needed or what are needed in order to be able [*747] to do those jobs. And there are tests that you can give to determine what a person's aptitude are for doing a particular job.

Copemann further testified that he also assessed which jobs were available in the [**32] local job market by reviewing the job listings his office receives weekly from the Virgin Islands labor department, and by searching a database his office creates of jobs listed in the local newspapers within the prior two months. He then stated that he "took into consideration [Elcock's] physical injuries and. . . her psychological impairments," and, in sum, concluded that he "rated [Elcock's] capacity after [he] had done all the analysis as somewhere between 50 and 60 percent."

When asked by Elcock's counsel to describe his methodology, Copemann testified as follows:

You take into comparison her education, her intelligence, her aptitude, her previous work experience and her medical injuries, what she says, she would like to do, what her desires are as a person, her temperaments, whether she likes working by herself or she likes working with groups of people, whether she likes working on detailed stuff or she doesn't like working on detailed things because those are important, and her limitations as

she states them, not only the medical findings but her limitations as she states them. So when you take all of those things together the closest I could come to it as a 50 to [**33] 60 percent disability.

. . .

[What that disability means] is that she is at a disadvantage when she goes out into the labor market because she's going to be competing with healthier individuals and she's going to be competing with [non-]impaired individuals.

On cross-examination, Kmart made several attempts to have Copemann explain how he arrived at the 50 to 60 percent figure other than his ipse dixit statement that the consideration of these factors produced these numbers.

Kmart pointed out that, before trial, Copemann had diagnosed Elcock's disability at 50 to 75 percent, and asked him to explain the discrepancy. Other than to state that his initial "estimate was too broad," Copemann did not explain why the range changed by 15 percent. Though Kmart might have conducted a more thorough cross-examination of Copemann on this point, a Daubert hearing would have afforded a far greater opportunity to probe the particulars of how Copemann arrived at specific disability figures, without running the risk of boring or "turning off " the jury. Moreover, because Copemann never explained his method in rigorous detail, it would have been nearly impossible for Kmart's experts [**34] to repeat Copemann's apparently subjective methods, or, in the nomenclature of Paoli II, to find that his "method consists of a testable hypothesis" for which there are "standards controlling the technique's operation." 35 F.3d at 742 n.8.

As suggested above, we can only roughly analogize to these two Daubert factors when reviewing the non-scientific evidence presented by Copemann. Vocational rehabilitation is a social science that does not exactly mirror the fundamental precepts of the so-called harder sciences. However, the gist of the above Daubert factors are nonetheless implicated in this case. Just as a scientist would want to duplicate the outcome when evaluating a colleague's claim that he had developed a technique for cold fusion, a vocational rehabilitationist assessing Copemann's disability determination would want to test the underlying hypotheses and review the

standards controlling the technique's operation in an attempt to reproduce the results originally generated.

If such testing did not generate consistent results, Copemann's method would be exposed as unreliable because it is subjective and unreproducible. Moreover, without an inkling as to the standards [**35] controlling Copemann's method--i.e., how [*748] he excludes for other variables, such as Elcock's pre-existing injuries or job limitations--an expert trying to reproduce Copemann's methods would be lost. Because Elcock had neither the need nor the opportunity to test Copemann's methods in this manner, on the present record we conclude that the first and fourth Daubert factors suggest that Copemann's method was unreliable and therefore his opinion would not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." *Fed R. Evid. 702.*

2.

Kmart's second argument is based on the fact that Copemann admits that he employed an untested, novel method for performing vocational rehabilitation assessments that was based on an arbitrary admixture of two widely used methods. This contention implicates the fifth and sixth Daubert factors: "(5) whether the method is generally accepted; [and] (6) the relationship of the technique to methods which have been established to be reliable . . . ." *Paoli II, 35 F.3d at 742 n.8.*

Given the absence of a full Daubert hearing, our exposure to the mechanics of Copemann's admittedly unique methodological approach to [**36] vocational disability assessment is limited to the brief description Copemann offered at trial. On cross examination, Kmart asked Copemann to explain the basis of his method and how he arrived at a disability rating of 50 to 60 percent. Copemann testified as follows:

I use a combination of the procedure recommended by Fields which is to look at level of preinjury access to the labor market and post injury access and the percentage and the difference between those percentages Fields says is the loss of jobs or the lost percentage.

I also looked at which is what I normally do at the procedure recommended by Anthony Gamboa and he

suggests that you look at all the factors involved in the client's analysis, injury, test results, psychological results, the client's statements, and so on, and then you as the clinician must make a, you as a vocational expert must make an estimate. And so what I do is I use Fields analysis as a starting point and then I revert to Gamboa to depart from Fields to come up with an estimate.

Kmart does not dispute that the Fields and Gamboa approaches are accepted methodologies in the vocational rehabilitation field; what it does challenge is Copemann's [**37] combination method. Each approach, taken in isolation, may very well contain sufficient analytical rigor to be deemed reliable. However, we are inclined to view Copemann's admittedly novel synthesis of the two methodologies as nothing more than a hodgepodge of the Fields and Gamboa approaches, permitting Copemann to offer a subjective judgment about the extent of Elcock's vocational disability in the guise of a reliable expert opinion. [6]

[6]   An argument could perhaps be made that Copemann's method represents a cross-checking approach that applies the learning of two accepted methods. In different circumstances, we have opined that there is nothing wrong with cross-checking the results of two accepted methods to insure that the outcomes at which one is arriving are reliable. See *Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1, 2000 WL 1038142,* at *4 n.1 (3d Cir. 2000) (recommending that in awarding attorneys' fees "courts cross-check the percentage award at which they arrive against the 'lodestar' award method"). We are doubtful that such a generous characterization is appropriate for Copemann's combination method, but the parties can seek to have that issue resolved at the Daubert hearing on remand.

[**38] Moreover, like the plaintiff in Kumho Tire, Elcock not only failed to introduce evidence that the particular admixture of these two methods by Copemann was "generally accepted," as required by Daubert's fifth factor, but she also did not demonstrate that this hybrid approach bore a logical relationship to the Fields and Gamboa techniques, methods that had been "established to be reliable," as required [*749] by Daubert's sixth

factor. *Paoli II, 35 F.3d at 742 n.8.* What is at issue here bears a remarkable similarity to the situation in Kumho Tire, in which the Court wrote that

> nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire. As we said before, the question before the trial court was specific, not general. . . .
>
> The particular issue in this case concerned the use of Carlson's [the plaintiff's expert] two-factor test and his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire [**39] experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach. . . . . Of course, Carlson himself claimed that his method was accurate, but, as we [have] pointed out . . . , "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."

*526 U.S. at 156-57* (citations omitted). Elcock did not introduce evidence that Copemann's combination method was either used by other experts or even referenced in the vocational rehabilitation literature. Moreover, aside from the brief statement that he used the Gamboa approach to depart from the Fields approach, Copemann offered no explanation as to how his hybrid methodology could be rationally derived from the application of the two accepted techniques. [**40] Thus, we conclude that the fifth and sixth Daubert factors militate in favor of excluding Copemann's testimony.

3.

Third, Kmart points to Copemann's thin qualifications to cast doubt on the reliability of his vocational rehabilitationist opinion. As we made clear in Paoli II, an expert's "level of expertise may affect the reliability of the expert's opinion." *35 F.3d at 741*; see also *id. at 742 n.8* (listing this element as the seventh Daubert factor). In light of our substantial discussion in Section II explaining how Copemann's qualifications are marginal at best, and mindful of the District Court's statement that the question of Copemann's qualifications was a "close call," we believe that this factor also weighs in favor of excluding Copemann's testimony.

4.

Finally, we note that Copemann's application of the hybrid method he describes appears unreliable on its face. On direct examination, Copemann testified that "with or without her disabilities," given the jobs available in the Virgin Islands, "the only job that [Elcock] could really possibly go back to [**41] do . . . if she gets motivated enough" would be with Mary Kay. "Given . . . her present condition," however, Copemann testified that Elcock is "not now [capable]" of meeting the requirements for work as a Mary Kay representative. If Copemann had actually employed the Fields method as he described it, Copemann would have had to conclude that Elcock was 100 percent disabled. According to Copemann, a vocational rehabilitationist employing the Fields methodology arrives at a job loss percentage by comparing the difference between "preinjury access to the labor market" and "post injury access." Taking Copemann's testimony at face value, Elcock was qualified for only one job in the Virgin Islands before her injury, and no jobs afterwards. As a matter of "percentage" her "loss of jobs" was 100 percent.

Copemann also said nothing to clarify why an application of the Gamboa method would have halved this disability estimate, [*750] as it must have if Copemann ultimately concluded that Elcock was between 50 and 60 percent disabled. Nor, looking at Copemann's description of his methodology, does it seem that a reasonable explanation could be provided. Given the disconnect between the stated nature [**42] of these methods and the results they produced when the facts of the instant case were plugged into their machinery, we hesitate to say that Copemann's method is a reliable one. Though this inconsistency would normally go to the weight a jury would give Copemann's testimony, in this

case the discord is so stark that we factor it into our Daubert calculus. Perhaps this inconsistency could be sufficiently clarified, but at this juncture, a Daubert hearing is the proper forum for such an elucidation. Cf. *Padillas, 186 F.3d at 418* (stating that a district court may abuse its discretion in failing to conduct a Daubert hearing "when the ruling on admissibility turns on factual issues").

Thus, on balance, given the serious doubts raised by Kmart regarding Copemann's methods, and in light of Elcock's failure to adduce much evidence validating his methods, we feel compelled both to vacate the District Court's decision to admit Copemann's testimony and to remand for a Daubert hearing on this issue. We express no opinion as to the outcome of this hearing. On remand, Elcock will have [**43] an opportunity to substantiate the bases underlying Copemann's opinion, and Kmart will have an opportunity to impeach or undermine them. [7]

> [7] We note that, on remand, the District Court need not conduct a Daubert hearing regarding Copemann's ability to testify regarding Elcock's psychological harms. The parties do not contest his qualifications to render, or his methods for rendering, such an opinion.

C.

Lastly, we offer some guidance for remand concerning the appropriate role that the challenge to Copemann's credibility is to play in the Daubert calculus. We note that in reaching our conclusion about the reliability of Copemann's methods, we do not consider evidence regarding Copemann's credibility, or his alleged character for untruthfulness.

During trial, in an effort to impeach Copemann's character for truthfulness and to blunt the force of his testimony, Kmart sought to question Copemann about the fact that he had engaged in acts of criminal misconduct involving dishonesty or false statements. Kmart [**44] offered to prove that Copemann and the corporation for which he served as chief executive officer, Caribbean Behavioral Institute, Inc. (CBI), had pled guilty to violating *18 U.S.C. § 641*, which prohibits "embezzling . . . or knowingly converting to [one's] use . . . any property made or being made under contract for the United States . . . ." Kmart sought to question Copemann about the fact that he and CBI had misappropriated $ 331,000 from the

federal government.

The fact that Copemann and CBI pled guilty to embezzlement and knowing conversion of federal property arguably casts doubt on his credibility as a witness, and could--under an overly expansive reading of our jurisprudence--be an appropriate Daubert factor to weigh when adjudging reliability. In *In re Unisys Savings Plan Litigation, 173 F.3d 145 (3d Cir. 1999)*, cert. denied sub nom., *Meinhardt v. Unisys Corp., 528 U.S. 950, 145 L. Ed. 2d 290, 120 S. Ct. 372 (1999)*, over a strong dissent by the author of this opinion, a panel of this court affirmed a district court's decision not to admit the testimony of an expert witness, based in part on the fact that the district court found the expert [**45] to be not credible. See *id. at 158*. In support of its conclusion, the majority contended that the district court could properly take into account the expert witness's credibility--and was not limited to assessing the reliability of the expert's methodology under the *Rule 702* Daubert framework--because the expert's "testimony [did] not fall within the scope of scientific testimony, and accordingly, it should not be tested by the particular standards required for testimony based on a particular [*751] scientific ethic." *Id. at 157* (second emphasis added).

Insofar as In re Unisys relied on the now-rejected distinction between scientific and non-scientific testimony, this part of the majority's opinion was cast into doubt by Kumho Tire. Moreover, In re Unisys explicitly limited its holding to bench trials, in which "the role of the gatekeeper to admit or exclude evidence . . . and the role of the fact finder to assess and weigh the evidence that was admitted . . . are one and the same . . . ." *173 F.3d at 158*. The case at bar was not a bench trial and thus, even assuming that In re Unisys's holding is still good law, Copemann's credibility is and was [**46] an issue solely within the province of the jury that could neither be considered by the District Court when performing its *Rule 702* analysis, nor by this Court in reviewing that analysis. We thus decline to apply In re Unisys here. On remand, therefore, the District Court should not consider Copemann's likely credibility as a witness when assessing the reliability of his methods. [8]

> [8] We do not hold, however, that a district court can *never* consider an expert witness's credibility in assessing the reliability of that expert's methodology under *Rule 702*. Such a general prohibition would be foreclosed by the language

233 F.3d 734, *751; 2000 U.S. App. LEXIS 34822, **46

of *Rule 104(a)*, which delineates the district court's fact-finding responsibilities in the context of an *in limine* hearing on the *Daubert* reliability issue. Indeed, consider a case in which an expert witness, during a *Daubert* hearing, claims to have looked at the key data that informed his proffered methodology, while the opponent offers testimony suggesting that the expert had not in fact conducted such an examination. Under such a scenario, a district court would necessarily have to address and resolve the credibility issue raised by the conflicting testimony in order to arrive at a conclusion regarding the reliability of the methodology at issue. We therefore recognize that, under certain circumstances, a district court, in order to discharge its fact-finding responsibility under *Rule 104(a)*, may need to evaluate an expert's general credibility as part of the *Rule 702* reliability inquiry.

On the other hand, we believe that a district court's fact-finding role under *Rule 104(a)* is circumscribed in the *Daubert* reliability context. Although *Daubert* assigns to the district court a preliminary gatekeeping function -- requiring the court to act as a specialized fact-finder in determining whether the methodology relied upon by an expert witness is reliable -- it does not rein to employ its assessment of an expert witness's general credibility in making the *Rule 702* reliability determination. *See In re Unisys, 173 F.3d at 165-66* (Becker, C.J., dissenting) (noting that, for the most part, the *Daubert* reliability factors are "relatively objective" and do not require "consideration of the proffered expert's credibility in general"). To conclude otherwise would be to permit the district court, acting in its capacity as a *Daubert* gatekeeper, to improperly impinge on the province of the ultimate fact-finder, to whom issues concerning the general credibility of witnesses are ordinarily reserved.

The relationship between evidence bearing on an expert witness's credibility and a court's analysis of the reliability of that expert's methodology pursuant to its *Rule 104(a)* fact-finding function is subtle and nuanced, and does not readily admit to the drawing of bright lines. Rather, the appropriate role of credibility

evidence in the *Rule 702* reliability inquiry must be assessed on an individualized basis. One can, however, begin to draw a distinction based on the degree to which the credibility evidence at issue relates to the methodology before the court, and to the *Daubert* factors used to evaluate the reliability of that methodology.

For instance, in situations involving an attempt to attack an expert witness's credibility on the basis of prior bad acts or convictions, at least one prominent evidence commentator has noted that an expert's prior dishonesty or misconduct should not qualify as an appropriate factor in assessing methodological reliability when the acts are wholly unrelated to the expert's use of a particular methodology, but that a court should take such dishonesty or misconduct into account when the nexus between the acts and the expert's methodology is more direct -- e.g., when the prior dishonest acts involve fraud committed in connection with the earlier phases of a research project that serves as the foundation for the expert's proffered opinion. *See* Edward J. Imwinkelreid, Trial Judges -- Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert testimony Without Invading the Jury's Province to Evaluate the Credibility and Weight of the Testimony, *84 Marq. L. Rev. 1, 39 (2000)*. Under this approach, for instance, the fact that an expert witness falsely reported his salary on a income tax return has little if any bearing on the reliability of a diagnostic test he frequently employs, but that fact that the expert lied about whether his methodology had been subjected to peer review, or intentionally understated the test's known rates of error, is a different matter entirely.

We add two caveats. First, the foregoing discussion, which was animated by the request of Kmart's counsel on a petition for panel rehearing that we afford guidance to the trial court and the bar on the issue, is not intended to apply to anything other than *Daubert* proceedings. Thus, our discussion of the court's appropriate gatekeeping role under *Rule 702* and *104(a)* does not apply to cross-examination of the expert at trial insofar as the expert's credibility is challenged with respect to testimony other than

that directly related to the methodology employed by that expert to arrive at his proffered opinion. Second, we recognize that a district court may elect to conduct the *Daubert* reliability inquiry during the trial itself, and in the presence of the jury. In such a circumstance, the district court, acting in its capacity as a *Daubert* gatekeeper, will have to discount evidence implicating the expert's credibility to the extent that such evidence does not bear directly on the methodology at issue.

[**47] IV. The Scope of Kmart's Cross-Examination Regarding Copemann's Character for Untruthfulness

The fact that Copemann and CBI pled guilty to violating *18 U.S.C. § 641* became [*752] an issue in the litigation between Elcock and Kmart in another respect. During trial, Kmart sought to introduce evidence (i) of the fact that Copemann and CBI had pled guilty to violating *18 U.S.C. § 641*, and *(ii) that would provide* further details about Copemann's and CBI's misconduct, including the fact that their crime consisted of misappropriating $ 331,000 from the federal government. Kmart also wanted to cross-examine Copemann based on the extensive findings of fact made by the District Court in describing Copemann's and CBI's misdeeds when sentencing the two in the *§ 641* prosecution. See United States v. Caribbean Behavioral Inst., Crim. No. 99-0012, at 1-14 (D.V.I. Aug. 15, 1997). However, in ruling on an in limine motion filed by Elcock, the District Judge, who also presided over the criminal case against Copemann, forbade questions regarding the amount that Copemann and CBI had embezzled, as well as about the facts and circumstances underlying these crimes, [**48] holding that such questions would be cumulative and would add nothing to Kmart's attempt to impeach Copemann's veracity. See Elcock v. Kmart Corp., Civ. No. 1996-0028F, at 5 (D.V.I. Sept. 23, 1997).

Neither party contests the District Court's admission of the pleas. *Rule 609(a)(2)* provides that "evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment." *Fed. R. Evid. 609(a)(2)* (emphasis added). A violation of *18 U.S.C. § 641* is a crime of dishonesty because it involves the embezzlement of money. See *Fed. R. Evid. 609* advisory committee notes (1990 Amendment) (noting that the House and Senate Conference Committee debating *Rule*

*609* stated that " 'by the phrase "dishonesty and false statement," the Conference means crimes such as . . . embezzlement' "), reprinted in Federal Civil Judicial Procedure and Rules 389 (West 2000). The District Court thus followed *Rule 609(a)(2)*'s mandate [**49] when it admitted evidence of Copemann's and CBI's guilty pleas for crimes involving dishonesty.

The District Court's discretion to exclude the challenged questions regarding the specific acts of misconduct underlying these pleas reposes in *Rule 608(b)*. Pursuant to that Rule, which is rescribed in the margin, the specific acts of misconduct about which Kmart attempted to cross-examine Copemann are permissible lines of inquiry to impeach a witness's character for truthfulness, but only at the discretion of the district court. [9] The advisory committee [*753] notes to *Rule 608(b)* recognize that, in addition to the terms of *Rule 608(b)*, *Rules 403* and *611* govern this discretionary authority. See *Fed. R. Evid. 608(b)* advisory committee notes (1972 Proposed Rules; Note to Subdivision (b)), reprinted in Federal Civil Judicial Procedure and Rules 383 (West 2000).

> 9  The Rule, in pertinent part, provides:
>
> (b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in *rule 609*, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
>
> . . .
>
> *Fed. R. Evid. 608(b)* (emphasis added).

[**50] Elcock does not contend that *Rule 608(b)*,

233 F.3d 734, *753; 2000 U.S. App. LEXIS 34822, **50

by its terms, mandates the exclusion of this evidence. Instead, she rests her argument on the discretion of the District Court to forbid lines of inquiry permissible under *Rule 608(b)*. Accordingly, as did the District Court, we turn to *Rules 403* and *611*. *Rule 403* provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Rule 611* instructs district courts to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time." As noted above, the District Court excluded the proffered specific-acts line of inquiry beyond questions relating to the Copemann's and CBI's guilty pleas and the elements of those offenses, because inquiries into the facts [**51] underlying those crimes would have been cumulative and would have "provided little further assistance to the jury in evaluating Dr. Copemann's credibility." Elcock v. Kmart Corp., Civ. No. 1996-0028F, at 5 (D.V.I. Sept. 23, 1997). We review this decision for abuse of discretion. See *Becker v. ARCO Chem. Co., 207 F.3d 176, 180-81 (3d Cir. 2000)*.

The amount of money that Copemann and CBI misappropriated and the exact way in which they did so is certainly relevant to prove the extent of Copemann's dishonesty. A juror could rationally conclude that one who embezzles a million dollars from the Government over a long period of time has a worse character for veracity than a person who steals five dollars once. Cf. *United States v. Geevers, 226 F.3d 186, 2000 U.S. App. LEXIS 20981, *21, 2000 WL 1171976, at *7 (3d Cir. 2000)* ("We think that a defendant who falsifies checks for large sums of money is more culpable than one who does so for lesser sums."). To the extent that they paint Copemann's crimes in a more accurate and complete manner (as the District [**52] Judge did in his sentencing opinion), questions relating to the facts underlying the pleas are also more probative of untruthfulness than a bland reference to a United States Code section or a recitation of the crime's elements. [10]

    [10]  The criminal statute under which Copemann and CBI were convicted, *18 U.S.C. § 641*, states:

        Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or

without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . .

        . . .

    shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $ 1,000, he shall be fined under this title or imprisoned not more than one year, or both.

In reviewing the trial court record, it is apparent [**53] that the extent and nature of Copemann's criminal misdeeds were somewhat blunted by the fact that Kmart could not ask Copemann about the amount of money stolen or the lengths to which Copemann went to misappropriate these funds. Thus, were we acting as the trial court in the case at bar, we likely would have admitted some of this additional evidence. However, it was well within the District Court's discretion to reach the conclusion it did, as that decision was certainly [*754] rational and consistent with the terms of *Rules 403* and *611*. The chief probative force of the guilty pleas was the fact that Copemann and CBI committed crimes of dishonesty, and this evidence came out during trial. Filling in the details surrounding these crimes would doubtless have taken a fair bit of trial time, and would have been cumulative insofar as doing so would only result in proving the same points--i.e., that Copemann has a character for being untruthful and his expert opinions should not be believed. The District Judge, having presided over the criminal case, was familiar with the complexity of the facts vel non surrounding these crimes, and likely had a better sense than we do of what this line of inquiry [**54] would have entailed.

We give "substantial deference" to evidentiary rulings under *Rule 403* and other similarly discretionary evidentiary rules. *Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110 (3d Cir. 1999)*, cert. denied, *528 U.S. 1074, 145 L. Ed. 2d 663, 120 S. Ct. 786 (2000)*. Abiding by this standard, we hold that the District Court did not

abuse its discretion under *Rules 403* and *611* in permitting Kmart to question Copemann only about the United States Code section of the crime to which he and CBI entered guilty pleas, as well as the elements of that offense. [11] We note that during the retrial of the damages issue on remand, Kmart is free to try to pursue its more expanded line of inquiry, and the District Court is concomitantly free to forbid such questions for the same reasons it did so before.

> 11 Judge Garth does not agree with the majority of the panel that the District Court properly exercised its discretion in limiting Kmart's cross-examination of Copemann. Copemann had pled guilty to violating *18 U.S.C. § 641* (rescribed in the margin at footnote 10). The extent of Copemann's crime was found to be $ 331,513. Kmart was prevented from bringing this fact to the attention of the jury when it cross-examined Copemann. Nor could Kmart examine Copemann about the conveyance and the disposal of those moneys, all of which was accomplished without authority.
>
> As the majority acknowledges, the facts underlying a plea are more probative of untruthfulness than merely a recitation of a violation of a United States Code section or a recitation of the particular crime's elements. While Judge Garth agrees that the District Court is entitled to deference when it exercises its discretion, he is of the view that, in this instance, the District Court abused its discretion by restricting the cross-examination of Copemann to the extent that it did. He would so hold.

[**55] V. The Evidentiary Issues Relating to Pettingill's Testimony

Pettingill, an economist, testified on Elcock's behalf regarding her economic losses. He prepared an economic damages model that relied on several empirical assumptions about the extent of Elcock's injuries, her earning capacity before and after the accident, and her life expectancy. Kmart challenged each of these assumptions before the District Court, and raises those objections again on appeal. Kmart, in essence, argues that Pettingill inflated each of these figures in rendering his expert opinion, and in doing so, rested his damages opinion on assumptions wholly lacking foundation in the record. We review the District Court's decision to admit

Pettingill's testimony for abuse of discretion.

A.

We have held that "although mathematical exactness is not required, [expert] testimony of post-injury earning capacity must be based upon the proper factual foundation." *Benjamin v. Peter's Farm Condominium Owners Ass'n., 820 F.2d 640, 643 (3d Cir. 1987).* Put another way, an "expert's testimony [regarding future earnings [**56] loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983).* In both Benjamin and Gumbs, we held that an expert's lost future [*755] earnings opinion was too speculative to be presented to the jury. In Benjamin, the expert relied solely on the plaintiff's personal assessment of his ability to re-enter the work force in assuming that the injured plaintiff would make only $ 10,000 a year as a result of the injuries he sustained. *820 F.2d at 642-43.* We held that this assumption, absent "sufficient factual predicates," *id. at 642,* was a "castle made of sand," *id. at 643* (internal quotation marks omitted). In so doing, we set aside a jury verdict for the plaintiff, because the district court failed to exclude the expert opinion that relied on this flawed assumption. See id.

In Gumbs, we held similarly. The expert in Gumbs "calculated the plaintiff's future earnings loss based on plaintiff's remaining life expectancy of eighteen years rather than plaintiff's remaining work-life expectancy of seven and one-half years." *718 F.2d at 98.* [**57] The expert also assumed that, but for his accident, the plaintiff would in the future earn twice his average annual income for the four years preceding the accident, as well as receive "$ 1700 in annual fringe benefits even though there was no evidence that the plaintiff had ever received fringe benefits in the past." Id. Reversing on other grounds, we stated that, on remand, the expert could not include these assumptions in his testimony before the jury, unless the assumptions were "accompanied by a sufficient factual foundation. . . ." Id. [12]

> 12 Other Courts of Appeals have similarly excluded expert opinions not grounded in the facts of a case. See, e.g., *Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992)* ("Because [the expert's] analysis was predicated on an assumption not supported by the record--the assumption that [the plaintiff] suffered

from a permanent, total disability--the district court did not err in excluding the proffer."); *In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir. 1986)* ("We find the economist's 'opinion' that the collective loss of inheritance for the three children was $ 1,778,873 to be completely airborne, premised as it was on assumptions without basis in the real world of [the decedents].").

[**58] B.

Turning to the facts of this case, we must examine the disputed assumptions that Pettingill used in arriving at his lost economic opportunities opinion. Pettingill testified that, in preparing his economic damages model on Elcock's behalf, he had received a copy of Copemann's report, which presumably described Elcock as either 50 to 60 or 50 to 75 percent disabled. Nonetheless, Pettingill assumed that Elcock was 100 percent disabled when arriving at his opinion. Pettingill also testified that he was familiar with Elcock's past earnings, which were relatively meager. Elcock's husband had testified that she worked fourteen hours a day as a Mary Kay representative, and the record shows that she earned $ 5,774 in 1995 (before the injury) and $ 1,070 in 1996 (after the injury). Pettingill nevertheless assumed, in rendering his opinion, that Elcock would have made $ 6 an hour, working 40 hours a week. Those figures indicate that Pettingill presumed that Elcock would have made a $ 12,480 a year but for her 100 percent disability, more than twice her pre-injury earnings. Pettingill also did not discount for the $ 1,070 that Elcock was still able to earn even with her injury. Moreover, [**59] although Pettingill at one point did suggest that the jury could discount from his 100 percent disability figure so as to take account of the possibility that Elcock was not completely disabled, Pettingill persisted in employing the 100 percent figure.

As did the experts' assumptions in Benjamin and Gumbs, Pettingill's assumptions in the instant case lack foundation in the record. Though in supplemental post-appellate oral argument briefing Elcock has pointed out the fact that in the past she had worked, inter alia, as a pastry chef and a baker making more than $ 9 an hour, the underlying data supporting these assertions was not part of the trial record. [*756] Rather, Elcock failed to adduce evidence at trial (or at any time before the District Court) laying a foundation for the fact that she could have

obtained employment at those wages in the Virgin Islands before her injuries. Thus, the assumption that Elcock could have earned over $ 12,000 a year when she had only made $ 5,774 in the year of her injury should have been excluded for lack of foundation.

The same can be said of Pettingill's failure to take into account the fact that Elcock continued to earn money as a Mary Kay salesperson [**60] after her injury. According to Elcock's tax records, she earned $ 1,070 in 1996, the year after her slip and fall. Pettingill ignored these more concrete numbers rooted in the record, which suggest that Elcock was not completely disabled, in favor of his arbitrary 100 percent disability figure. He made similarly questionable assumptions about Elcock's life expectancy. In constructing his damages model, Pettingill assumed that Elcock would live and work to the average retirement age expected of African American females. He did not adjust this estimate to reflect the fact that Elcock's own expert, Payne, testified that Elcock's poorly controlled diabetes could cut her life span--and perhaps her working life--short. Ignoring "the real world of " Carmelita Elcock renders Pettingill's opinion inadmissible.

In sum, we believe that Pettingill's economic damages model relied on several empirical assumptions that were not supported by the record. Although Pettingill suggested to the jury that it might discount the 100 percent disability figure that he plugged into his economic model, this suggestion is not sufficient to change the result. In the absence of clearer instructions or emphasis [**61] by the witness or the court, a jury is likely to adopt the gross figure advanced by a witness who has been presented as an expert. Accordingly, the District Court abused its discretion in admitting Pettingill's model as evidence. Cf. *Benjamin, 820 F.2d at 643; Gumbs, 718 F.2d at 98.* [13]

    13    Interestingly, though the foundation requirement for expert testimony is well developed in the case law and in the experience of trial lawyers and judges, neither our opinions in Gumbs and Benjamin nor the evidence treatises themselves expressly ground this requirement in one of the Federal Rules of Evidence or in the legislative history or advisory committee notes accompanying the Rules. Like the case law and trial practice governing cross-examination for bias, see *United States v. Abel, 469 U.S. 45, 49,*

233 F.3d 734, *756; 2000 U.S. App. LEXIS 34822, **61

*83 L. Ed. 2d 450, 105 S. Ct. 465 (1984)*, the foundation requirement is a rule of evidence that can only be found in the interstitial gaps among the federal rules.

In these terms, Article VII would likely be the best source for the rule, as it governs and is titled "Opinions and Expert Testimony." *Rules 702* and *703* bear on foundation analysis, but neither Rule addresses it in explicit terms; nor do the advisory committee notes accompanying the Rules. Nonetheless, a lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to "assist the trier of fact," as *Rule 702* requires. This type of an opinion misleads the fact-finder and arguably does not comply with the "fit" requirement of that Rule. See supra Section II.A (discussing this requirement); see also 2 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 1272-75 (7th ed. 1998) (detailing *Rule 702* and collecting cases in which courts have excluded expert testimony from economists because their damages models did not fit with the facts in evidence).

*Rule 703* embodies a similar requirement, which does not clearly set forth the foundation rule used in Gumbs and Benjamin, but which does bear on the analysis inhering in those cases. *Rule 703*, titled "Bases of Opinion Testimony by Experts," provides that

> the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

While these limitations and the notes accompanying them do not specifically address the exclusion of expert testimony based on assumptions lacking a foundation in the record, it is not a stretch from the requirement that other "experts in the particular field" would "reasonably rely" on such data in "forming opinions . . . on the subject," id., to suggest that an expert should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a particular plaintiff's case. Cf. Saltzburg, supra, at 1397-99 (discussing *Rule 703* and collecting cases in which courts have excluded expert testimony because the experts unreasonably relied on underlying data that was too speculative or not introduced into evidence). Indeed, the very title of *Rule 703* supports its applicability to foundation generally.

Undergirding for Gumbs's and Benjamin's foundation rule can also be found in Article IV of the Rules of Evidence. Rule 402 sets forth a liberal admissibility standard for "all relevant evidence," defined in Rule 401 as "evidence having any tendency" to make "more probable or less probable" the existence "of any fact that is of consequence to the determination of the action." Under this framework, an economist's testimony concerning a reliable method for assessing future economic losses can be deemed relevant only insofar as a jury can usefully apply that methodology to the specific facts of a particular plaintiff's case. Moreover, *Rule 403* grants to the district court the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Given the realities of litigation, the opinion of a witness impressed by the court with the label of "expert" may carry a great deal of weight with a lay jury, particularly in matters as complex as lost future earnings assessments. Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which *Rule 403* defends.

[**62]

## [*757] VI. The Jury's Award

Kmart challenges the jury's $ 650,000 damage award on two grounds. First, Kmart contends that Elcock failed to adduce evidence sufficient to support a jury's finding

that her slip and fall caused her permanent injuries. Second, Kmart argues that both the economic and non-economic awards were excessive and should be remitted.

A.

In asserting that Elcock failed to establish causation with respect to her permanent injuries, Kmart points primarily to inconsistencies in the testimony of Payne, who was Elcock's principal witness on permanence, concerning the location of trigger points. On direct examination, Payne testified that, as a result of her fall, Elcock suffered permanent injuries to her back and legs, including trigger points in the gluteus maximus that caused pain to radiate to her right knee. On cross examination, Kmart impeached Payne's testimony by forcing her to admit that, according to the leading treatise on the subject, pain caused by trigger points in the gluteus maximus would not travel below the thigh. Payne acknowledged that her original diagnosis was mistaken, but responded by clarifying that Elcock's trigger points were in fact situated on [**63] the dividing line between the gluteus maximus and gluteus medius muscles. Parsing this testimony, Kmart contends that Payne has not offered an opinion as to causation based on the revised trigger point placement, and, therefore, that Elcock has failed to produce sufficient evidence to support a conclusion that her slip and fall caused her permanent injuries.

However, Kmart has ignored the fact that Payne testified on redirect examination that her misplacement of trigger points did not affect either her opinion regarding the permanence of Elcock's injuries or her conclusion that Elcock's slip and fall at Kmart caused those harms. Thus, while Kmart's cross examination may have poked some holes in Payne's trigger point diagnosis, Payne did reaffirm her opinion as to the permanence and cause of Elcock's injuries. In making its determination as to causation, the jury apparently credited Payne's testimony, as it was entitled to do. We will not disturb that conclusion.

B.

Kmart also argues that both the economic element of the jury's damage award, which includes a recovery for lost [*758] earnings and lost earning capacity, and the non-economic component, which includes a recovery for pain and [**64] suffering, were excessive and should

have been remitted. We need not reach Kmart's remittitur argument, however, as we remand for a new trial on the issue of damages. Our discussion of the defects in Copemann's and Pettingill's testimony sufficiently demonstrates the need for a retrial of economic damages. Whether the new trial on remand must also extend to the non-economic portion of the jury's damage verdict presents a closer question.

A partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 760 (3d Cir. 1977) (quoting *Gasoline Prods. Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 75 L. Ed. 1188, 51 S. Ct. 513 (1931)). The grant of a partial new trial is appropriate "only in those cases where it is plain that the error which has crept into one element of the verdict did [**65] not in any way affect the determination of any other issue." *Romer v. Baldwin*, 317 F.2d 919, 922-23 (3d Cir. 1963) (citation and quotation marks omitted). Having looked at the manner in which evidence of Elcock's damages was presented at trial, we must acknowledge the possibility that the jury did not keep the award of non-economic damages distinct and separate from the award of economic damages.

For instance, at trial, Copemann offered not only an opinion as to Elcock's vocational disability, the basis of her recovery for lost earnings and lost earning capacity, but also testified about the extent of Elcock's psychological and physical injuries, a principal factor in her pain and suffering award. In light of Copemann's testimony, the jury may have considered it appropriate to base its pain and suffering award in part on evidence of Elcock's lost earning capacity. There are other possible areas of overlap. Both Copemann and Pettingill opined that Elcock was substantially, if not completely, impaired in her ability to work. Pettingill's lost earnings model assumed that Elcock was 100 percent disabled, and Copemann specifically noted that, following her injury, Elcock was [**66] no longer fit for the one job for which she was qualified. From these opinions of complete disability, the jury may have inferred that Elcock suffered a significant loss in her enjoyment of life, and increased her non-economic damage award accordingly.

Because we cannot confidently conclude that the flaws in Elcock's evidence of economic damages did not

233 F.3d 734, *758; 2000 U.S. App. LEXIS 34822, **66

affect the jury's determination of her non-economic damages, the general presumption against partial new trials recognized in Vizzini and Romer guides our decision. We therefore hold that a new trial must be had on the entire damage issue. [14]

> 14 Given the fact that Kmart has conceded its liability, the new trial on remand need not include

the liability issue.

VII. Conclusion

For the foregoing reasons, the judgment of the District Court will be affirmed in part and reversed in part, and the case remanded for a new trial on the issue of damages. Parties to bear their own costs.

*** Slip Sheet ***

Document