LEXSEE 40 A. 948

**FREEMAN & WISE vs. JACOB H. TOPKIS & WILLIAM SIMMONS, Sheriff.**

**[NO NUMBER IN ORIGINAL]**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE COUNTY**

*15 Del. 174; 40 A. 948; 1893 Del. LEXIS 21; 1 Marvel 174*

**November, 1893**

**PRIOR HISTORY:**    [***1] New Castle County, November Term, 1893.

This was an action of replevin for goods which had been sold by the plaintiff to the defendant, Topkis, who, shortly after receiving the goods and before payment therefore, became insolvent, and the plaintiff claimed the right to rescind the contract and retake the goods, upon the ground that the sale was procured, as they alleged, by false and fraudulent representations which gave them the right to rescind the same.

Evidence was offered on the part of the plaintiff of transactions with other parties about the time of the alleged sale for the purpose of showing purchases from several persons while the defendant was, in fact, insolvent, the purpose being to show by a general course of dealing at the time a fraudulent intention. This evidence was objected to by Davis, for defendant, who cited *Myers vs. Waples, 3 Houst. 619.*

**HEADNOTES**

**Sale. Rescision.** -- A sale once made in good faith, and the goods delivered thereunder, vests in the vendee an indefeasible title, and the vendor cannot retake the goods in specie, but must sue for the contract price thereof should they not be paid for.

**Sale. Rescision. Fraud.** -- Where a contract for the sale of goods is induced by false and fraudulent conduct or representations, the vendor may rescind the contract of sale and reclaim the goods.

**Fraud.** -- In the case of a sale alleged to have been induced by fraudulent conduct or representations, what constitutes fraud is a question of law for the Court.

Whether the fraud was actually committed is a question of fact for the jury.

**Sale. Rescision. Fraud. Insolvency.** -- Mere insolvency of the buyer, though well known to himself and by him concealed from the seller, does not in itself furnish sufficient ground for rescinding a contract of sale.

**Evidence. Fraud.** -- The great latitude permitted in the introduction of evidence to prove fraud imposes upon the jury a correlative duty of close scrutiny and careful sifting of the proof.

**Evidence. Fraud.** -- Fraud is never presumed but must be clearly established by evidence and the burden of proof is upon the party charging it.

**COUNSEL:** Cooper, for the plaintiff, contended that it was admissible to prove general fraudulent conduct about that time; Morris, Replevin 190; 3 Wait, Act. & Def. 447; Rowley vs. Bigelow, 12 Pick. 307; *Hoxie vs. Home Ins. Co., 32 Conn. 21; Eastman vs. Premo, 49 Vt. 354.*

The evidence was admitted.

Sanborn, for [***2] the plaintiff. The transaction should be scrutinized in the light of all the facts proved with respect to the dealings of the defendant at the time of the sale and afterwards. And if they are found to have been inconsistent with fair dealing there was a right to rescind the contract; Carr, Fraud, 384; *Saunders vs. Clark, 6 Houst. 463.*

A fraudulent purpose may be inferred by the jury from (1) false representations as to solvency; Benj. Sales, 2nd Ed. 359; (2) fraudulent concealment of his insolvency; *Donaldson vs. Farwell, 93 U.S. 631;* (3) his intention not

to pay for the goods as gathered from all the facts and circumstances proved with respect to the time of the sale; Rowley vs. Bigelow, 12 Pick. 311; *Jeffrey vs. Brown, 29 Fed. Rep. 476.*

Lyman and Davis, for defendant. Fraud is never presumed, and in order to establish it there must be satisfactory proof of false statements, known to be such at the time they were made, which operated upon the mind of the other party and caused him to part with his goods; Clayton vs. Cavender, Post.

In the absence of substantial proof of fraud the vendor cannot rescind the sale; Cross vs. Peters, 1 Greenl. 378; *Mears & Son vs. Waples,* [***3] *3 Houst. 621.*

Mere insolvency of the buyer, though known to himself and concealed from the seller, is not of itself sufficient; *Bell vs. Ellis, 33 Cal. 620; Smith vs. Murphy & Co., 21 Pa. 367.* The fraud must have existed in the mind of the purchaser at the time of the sale; *Fulton vs. Loftis, 63 N. C. 393.*

A mere intention on the part of the buyer not to pay will not avoid the sale after the delivery of the property sold; there must be artifice intended and fitted to deceive; *Rodman vs. Thalheimer, 75 Pa. 232.* The fraud of the buyer practiced upon the seller which will avoid the sale must be acted, not thought; *Bell vs. Ellis, supra.* Nor will insolvency avoid the sale after delivery; *Lupins vs. Marie, 6 Wend. 77, 81; Musser vs. Oliver, 21 Pa. 367.* The fraud must have been relied on and the sale induced by the fraud; *Gregory vs. Schoenell, 55 Ind. 101.*

**JUDGES:** LORE, C. J.

**OPINION BY:** LORE

**OPINION**

   [*176]  [**948] LORE, C. J. (charging the jury).

On the 15th or 16th day of September, 1891, Freeman & Wise, the plaintiffs, who were then merchants of the city of Philadelphia, State of Pennsylvania, sold and delivered to Jacob H. Topkis, one of the defendants, who was then a merchant,  [***4]  [*177] doing business at New Castle, in this State, a bill of goods amounting to $ 240. Early in December of the same year the plaintiff sued out a writ of replevin, and thereunder took from said defendant, Topkis, $ 165 worth of the goods so sold (being all that they could identify then in the store of the defendant), claiming that they had the right to do so, because the sale was effected through the fraud and fraudulent representations of Topkis, who being then, as they claim, insolvent and not intending [**949] to pay for the goods, falsely represented to them that he was in debt only in a small amount and had a good business and stock, and was about to move into a larger store. Being so deceived and defrauded by him, they rescinded the contract of sale and took back so much of the goods as they could find.

Under that writ they recovered the goods named therein, and now ask your verdict for the nominal damages of six cents, which will carry costs.

Jacob H. Topkis, the defendant, on the other hand, denies every allegation of fraud, and claims that the sale was made in the ordinary course of trade, like other transactions theretofore had with the said plaintiffs; with whom [***5] he had theretofore dealt some seven or eight years; that there was no fraud or misrepresentation whatever on his part. He therefore claims at your hands a verdict of $ 165, being the value of the goods which he alleges the plaintiff wrongfully took from him under this writ of replevin.

The question for you therefore is, Who had the right of property in the goods replevied? This depends entirely upon whether there was fraud as alleged at the sale in December.

Unquestionably the goods were sold and delivered to Topkis by Freeman & Wise in September, and they could not lawfully retake them from Topkis in replevin after the delivery to him, unless the sale was so tainted by the fraudulent conduct of Topkis as to give them the right to rescind the contract of sale and reclaim the goods. A sale once made in good faith and the goods delivered thereunder vests in the vendee an indefeasible title, and the vendor [*178] cannot retake the goods in specie, but must sue for the contract price thereof should they not be paid for.

Was there such fraud then on the part of Topkis at the sale in September as to make voidable at the option of Freeman & Wise the said sale? This is the single issue [***6] to be by you determined.

What constitutes fraud is a question of law for the Court. Whether the fraud was actually committed is a

question of fact for you.

If you are satisfied from the evidence in this case that at the time of the sale in Septemberr, 1891, Topkis made false representations to Freeman & Wise in respect to his solvency and his business, knowing them to be false, for the purpose of effecting such sale, and Freeman & Wise were thereby induced to part with their property, this would constitute such fraud as to avoid the sale at the option of the vendors.

In like manner the sale would be voidable if you believe at that time Topkis fraudulently obtained the goods with an intention never to pay for them.

Mere insolvency of the buyer, however, though well known to himself and by him concealed from the seller does not in itself furnish sufficient ground for rescinding a contract of sale; *Mears & Son vs. Waples, 8 Del. 581, 3 Houst. 581.*

A purchaser may know that he is insolvent, and may not disclose the insolvency to the vendor, hoping and believing in good faith that he will be able to pay the bill thus contracted, and the law presumes that he purchased in good faith [***7] unless proved otherwise.

In ascertaining whether such fraud entered into the contract of sale in September, 1891, you are to take into consideration all the facts and circumstances surrounding this case and which have been admitted in evidence.

Evidence of fraud is generally circumstantial, not positive and direct. Men rarely proclaim their purpose to commit fraud. In the language of the late Chief Justice Comegys in *Sanders vs. [*179] Clark, 6 Houst. 462,* "One rarely enters upon a career of fraud with respect to creditors, without endeavoring to forecast and provide against circumstances and occasions likely to expose his artifice; it is generally extremely difficult to obtain the necessary proof to sustain a proceeding to defeat it, and when obtained it is found in a vast majority of cases to consist of a multitude and variety of isolated facts."

Chief Justice Gilpin, in *Mears & Son vs. Waples,* before cited, tersely says: "The law abhors fraud of every nature and description, and will unkennel and expose it whenever it can be found, no matter how many or what may be the character of the disguises which surround it."

Because fraud must generally be proved by [***8]

circumstantial evidence, courts of law have given the widest latitude in the admission of evidence, which tends to throw light on alleged fraudulent transactions. For this reason in this case we have admitted the dealings of Topkis, of a like character, with other men than the plaintiff, which seemed to be connected with or to throw light upon this transaction. This very latitude of evidence, however, imposes upon you the duty of closest scrutiny. Where fraud is charged the law throws the door of evidence wide open that fraud may be unearthed; but it demands that the latitude thus given shall be met with convincing proof of the charge. The law will permit no one to be convicted of fraud until he is proved guilty.

The burden of proof is upon the party charging fraud. "Fraud is never presumed to exist; on the contrary it must be clearly established by the evidence. For where the circumstances attending the transaction are of a doubtful character merely, or raise but a bare suspicion of fraud in regard to the party charged therewith, they will not be sufficient evidence of the fact. The circumstances relied on must be of such a nature as to raise more than a suspicion of fraud; they [***9] must be of such significance and force as clearly to establish the fact in the judgment of the jury. It is not necessary, however, that the proof should be direct and positive, it will be sufficient if the circumstances disclosed by the [*180] evidence manifestly [**950] show that fraud has been practiced by the party;" *Mears & Son vs. Waples, 8 Del. 581, 3 Houst. 581.*

Apply the law as the Court have laid it down to you to the evidence in this case.

If you are satisfied from the evidence that at the time of the sale and delivery of the goods Topkis wilfully misstated his condition to Freeman & Wise, with intent to deceive them and to effect the sale, and that they were induced to part with their goods by such false statements, or even if no such false representations were made, still if you are satisfied that Topkis did then fraudulently procure the goods with the then intent not to pay for them, in either case you should find for the plaintiffs and assess their damages at six cents; inasmuch as they have retaken their goods and will thus have their right thereto confirmed.

If, however, you believe that there were no such false representations made, or if made that they [***10] did not induce the plaintiffs to sell, or if you believe Topkis did not fraudulently buy the goods with intent never to

15 Del. 174, *180; 40 A. 948, **950;
1893 Del. LEXIS 21, ***10; 1 Marvel 174

pay for them, but bought the same in the ordinary course of trade, as he had theretofore dealt with the plaintiffs, then your verdict should be for the defendant, and you should assess his damages at $ 165, being the value of his goods, which, in that view of the case, the plaintiffs wrongfully took from him by the writ of replevin in this case.

*** Slip Sheet ***

Document

LEXSEE 5 N.Y.3D 561

**Neil A. Goldman, on Behalf of Himself and All Others Similarly Situated, Appellant, v. Metropolitan Life Insurance Company, Respondent. Allen S. Franco et al., Appellants, v. The Guardian Life Insurance Company of America, Respondent. Michael Katz, Appellant v. American Mayflower Life Insurance Company of New York, Respondent.**

**No. 149, No. 150, No. 151**

**COURT OF APPEALS OF NEW YORK**

*5 N.Y.3d 561; 841 N.E.2d 742; 807 N.Y.S.2d 583; 2005 N.Y. LEXIS 3222*

**October 17, 2005, Argued**
**November 21, 2005, Decided**

**PRIOR HISTORY:** Appeal, in the first above-entitled action, by permission of the Appellate Division of the Supreme Court in the First Judicial Department, from an order of that Court, entered December 28, 2004. The Appellate Division (1) reversed, on the law, an order of the Supreme Court, New York County (Ira Gammerman, J.), which had denied defendant's motion to dismiss the complaint, (2) granted the motion, and (3) directed the Clerk to enter judgment in favor of defendant Metropolitan Life Insurance Company dismissing the complaint. The following question was certified by the Appellate Division: "Was the order of this Court, which reversed the order of Supreme Court, properly made?"

Appeals, in the second and third above-entitled actions, by permission of the Appellate Division of the Supreme Court in the First Judicial Department, from orders of that Court entered December 28, 2004. The Appellate Division affirmed orders of the Supreme Court, New York County (Herman Cahn, J.; op *2003 N.Y. Misc. LEXIS 51, 2003 NY Slip Op 50024(U))*, which had granted defendants' motion to dismiss the complaints. The following question was certified by the Appellate Division in each action: "Was the order of this Court, which affirmed the order of the Supreme Court, properly made?"
*Goldman v. Metro. Life Ins. Co., 13 A.D.3d 289, 788 N.Y.S.2d 25, 2004 N.Y. App. Div. LEXIS 15625 (1st Dept 2004)*, affirmed.
*Franco v. Guardian Life Ins. Co. of Am., 13 A.D.3d 292, 786 N.Y.S.2d 307, 2004 N.Y. App. Div. LEXIS 15651 (1st Dept 2004)*, affirmed.

*Katz v. American Mayflower Life Ins. Co. of N.Y., 14 A.D.3d 195, 788 N.Y.S.2d 15, 2004 N.Y. App. Div. LEXIS 15674 (1st Dept 2004)*, affirmed.

**DISPOSITION:** In each case: Order affirmed, with costs. Certified question not answered upon the ground that it is unnecessary.

**HEADNOTES**

**Insurance -- Life Insurance -- Policy Date Set Prior to Effective Date -- Payment for Days Not Covered**

No breach of a life insurance contract occurred where a policy date was set prior to an effective date and the insured, in the first year of the policy, paid for days that were not covered. An insurance contract using the word "annual" to describe premium payments is not ambiguous as to coverage because the insured, in the first year, receives less than 365 days of coverage. There was no evidence that the insurer was not bargaining in good faith and fair dealing with the insured. The application clearly stated the terms and conditions of the insurance policy, and the policy also stated when coverage would begin. Further, there was no unjust enrichment inasmuch as the matter was controlled by contract. Finally, there was no breach of *General Business Law § 349*, as plaintiffs failed to properly allege any deceptive practices.

**COUNSEL:** *Goodkind Labaton Rudoff & Sucharow LLP*

, New York City (*Ira A. Schochet, Joel H. Bernstein* and *Stacey Fishbein* of counsel), *Goldman Scarlato & Karon, P.C.*, Conshohocken, Pennsylvania (*Mark S. Goldman* and *Brent T. Jordan* of counsel), and *Weinstein Kitchenoff & Asher, LLC*, Philadelphia, Pennsylvania (*David H. Weinstein* of counsel), for appellant in the first above-entitled action. I. The policy documents are ambiguous and misleading. (*Hartol Prods. Corp. v Prudential Ins. Co., 290 N.Y. 44, 47 N.E.2d 687; Bronx Sav. Bank v Weigandt, 1 N.Y.2d 545, 136 N.E.2d 848, 154 N.Y.S.2d 878; United States Fid. & Guar. Co. v Annunziata, 67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790; Sloman v First Fortis Life Ins. Co., 266 A.D.2d 370, 698 N.Y.S.2d 295; Matter of Ideal Mut. Ins. Co. [Superintendent of Ins. of State of N.Y.--Harbour Assur. Co. of Bermuda], 231 A.D.2d 59, 659 N.Y.S.2d 273; Holmes Protection of N.Y. v National Union Fire Ins. Co. of Pittsburgh, 152 A.D.2d 496, 543 N.Y.S.2d 459; Matter of Mostow v State Farm Ins. Cos., 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421; Janneck v Met. Life Ins. Co., 162 N.Y. 574, 57 N.E. 182; Greenfield v Philles Records, 98 N.Y.2d 562, 780 N.E.2d 166, 750 N.Y.S.2d 565; Computer Assoc. Intl., Inc. v U.S. Balloon Mfg. Co., Inc., 10 A.D.3d 699, 782 N.Y.S.2d 117.*) II. Other courts in New York and elsewhere have upheld claims against insurers in risk-free period cases. (*MDW Enters. v CNA Ins. Co., 4 A.D.3d 338, 772 N.Y.S.2d 79; Randazzo v Gerber Life Ins. Co., 3 A.D.3d 485, 769 N.Y.S.2d 753; 2 N.Y.3d 704, 811 N.E.2d 36, 778 N.Y.S.2d 774; Dougherty v William Penn Life Ins. Co. of N.Y., 3 A.D.3d 469, 769 N.Y.S.2d 905; 2 N.Y.3d 704, 811 N.E.2d 36, 778 N.Y.S.2d 774; Topel v Reliastar Life Ins. Co. of N.Y., 6 A.D.3d 608, 774 N.Y.S.2d 790.*) III. Dismissal of appellant's cause of action for breach of contract was improper. (*Lachs v Fidelity & Cas. Co. of N.Y., 306 N.Y. 357, 118 N.E.2d 555; Matter of Mostow v State Farm Ins. Cos., 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421.*) IV. Dismissal of appellant's cause of action for unjust enrichment was improper. (*Wolf v National Council of Young Israel, 264 A.D.2d 416, 694 N.Y.S.2d 424; Plant City Steel Corp. v National Mach. Exch., 23 N.Y.2d 472, 245 N.E.2d 213, 297 N.Y.S.2d 559; Merrill Lynch, Pierce, Fenner & Smith v Chipetine, 221 A.D.2d 284, 634 N.Y.S.2d 469; Springer v Allstate Life Ins. Co. of N.Y., 94 N.Y.2d 645, 731 N.E.2d 1106, 710 N.Y.S.2d 298; Great N. Ins. Co. v Mount Vernon Fire Ins. Co., 92 N.Y.2d 682, 708 N.E.2d 167, 685 N.Y.S.2d 411; North Star Reins. Corp. v Continental Ins. Co., 82 N.Y.2d 281, 624 N.E.2d 647, 604 N.Y.S.2d 510; Caldwell v ABKCO Music & Records, 269 A.D.2d 206, 703 N.Y.S.2d 97; Natimir Rest.*

*Supply v London 62 Co., 140 A.D.2d 261, 528 N.Y.S.2d 564.*) V. Dismissal of appellant's cause of action for breach of the implied covenant of good faith and fair dealing was improper. (*Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 188 N.E. 163; Dalton v Educational Testing Serv., 87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977; White Angel Realty v Asian Bros. Corp., 183 Misc. 2d 674, 706 N.Y.S.2d 583; Just-Irv Sales v Air-Tite Bus. Ctr., 237 A.D.2d 793, 655 N.Y.S.2d 131; Broder v MBNA Corp., 281 A.D.2d 369, 722 N.Y.S.2d 524; Zurakov v Register.Com, Inc., 304 A.D.2d 176, 760 N.Y.S.2d 13; Jaffe v Paramount Communications, 222 A.D.2d 17, 644 N.Y.S.2d 43; Sims v First Consumers Natl. Bank, 303 A.D.2d 288, 758 N.Y.S.2d 284; Frydman & Co. v Credit Suisse First Boston Corp., 272 A.D.2d 236, 708 N.Y.S.2d 77.*)

*Baker & McKenzie*, San Francisco, California, New York City (*Christopher Van Gundy* and *Mark R. Winston* of counsel), for respondent in the first above-entitled action. I. Plaintiff's breach of contract claim fails as a matter of law because the policy admittedly disclosed when coverage began, and when the second premium was due. (*Kraft v Sheridan, 134 A.D.2d 217, 521 N.Y.S.2d 238; Atkinson v Mobil Oil Corp., 205 A.D.2d 719, 614 N.Y.S.2d 36; Klein v Empire Blue Cross & Blue Shield, 173 A.D.2d 1006, 569 N.Y.S.2d 838; MG Ref. & Mktg., Inc. v Knight Enters., Inc., 25 F. Supp. 2d 175; Nowak v Ironworkers Local 6 Pension Fund, 81 F.3d 1182; Matter of Mostow v State Farm Ins. Cos., 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421; Greenfield v Philles Records, 98 N.Y.2d 562, 780 N.E.2d 166, 750 N.Y.S.2d 565; Doyne v Kerner, 96 A.D.2d 523, 464 N.Y.S.2d 830; Breed v Insurance Co. of N. Am., 46 N.Y.2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352; Hunt Ltd. v Lifschultz Fast Frgt., Inc., 889 F.2d 1274.*) II. Plaintiff's breach of the implied covenant of good faith and fair dealing claim fails as a matter of law. (*New York Univ. v Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283; Bank of N.Y. v Sasson, 786 F Supp 349; Holmes Protection of N.Y. v Provident Loan Socy. of N.Y., 179 A.D.2d 400, 577 N.Y.S.2d 850; Teller v Bill Hayes, Ltd., 213 A.D.2d 141, 630 N.Y.S.2d 769; Skillgames, LLC v Brody, 1 A.D.3d 247, 767 N.Y.S.2d 418.*) III. Plaintiff's unjust enrichment claim fails as a matter of law. (*State of New York v Barclays Bank of N.Y., 76 N.Y.2d 533, 563 N.E.2d 11, 561 N.Y.S.2d 697; Evans v City of Johnstown, 96 Misc. 2d 755, 410 N.Y.S.2d 199; Miller v Schloss, 218 N.Y. 400, 113 N.E. 337; Hornett v Leather, 145 A.D.2d 814, 535 N.Y.S.2d 799; 74 N.Y.2d 603, 541 N.E.2d 425,*

5 N.Y.3d 561, *; 841 N.E.2d 742, **;
807 N.Y.S.2d 583, ***; 2005 N.Y. LEXIS 3222

543 N.Y.S.2d 396; *Joseph Sternberg, Inc. v Walber 36th St. Assoc., 187 A.D.2d 225, 594 N.Y.S.2d 144; Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653; Caldwell v ABKCO Music & Records, 269 A.D.2d 206, 703 N.Y.S.2d 97; Greenfield v Philles Records, 98 N.Y.2d 562, 780 N.E.2d 166, 750 N.Y.S.2d 565.)*

*Goodkind Labaton Rudoff & Sucharow LLP*, New York City (*Ira A. Schochet, Joel H. Bernstein, Louis Gottlieb* and *Stacey Fishbein* of counsel), and *Lowey Dannenberg Bemporad & Selinger P.C.*, White Plains (*Richard Bemporad* and *Vincent Briganti* of counsel), for appellants in the second above-entitled action. I. The only reasonable expectation of an average insured is that an annual premium payment purchases one full year of insurance coverage. (*Hartol Prods. Corp. v Prudential Ins. Co., 290 N.Y. 44, 47 N.E.2d 687; Bronx Sav. Bank v Weigandt, 1 N.Y.2d 545, 136 N.E.2d 848, 154 N.Y.S.2d 878; Kosierowski v Madison Life Ins. Co., 31 A.D.2d 930, 298 N.Y.S.2d 810; Eagle Star Ins. Co. v International Proteins Corp., 45 A.D.2d 637, 360 N.Y.S.2d 648; 38 N.Y.2d 861, 346 N.E.2d 249, 382 N.Y.S.2d 481; United States Fid. & Guar. Co. v Annunziata, 67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790; Sloman v First Fortis Life Ins. Co., 266 A.D.2d 370, 698 N.Y.S.2d 295; Matter of Ideal Mut. Ins. Co. [Superintendent of Ins. of State of N.Y.--Harbour Assur. Co. of Bermuda], 231 A.D.2d 59, 659 N.Y.S.2d 273; Holmes Protection of N.Y. v National Union Fire Ins. Co. of Pittsburgh, 152 A.D.2d 496, 543 N.Y.S.2d 459; Matter of Mostow v State Farm Ins. Cos., 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421.)* II. Guardian Life Insurance Company of America's policy documents are ambiguous. (*Hartol Prods. Corp. v Prudential Ins. Co., 290 N.Y. 44, 47 N.E.2d 687; Janneck v Met. Life Ins. Co., 162 N.Y. 574, 57 N.E. 182; Matter of United Community Ins. Co. v Mucatel, 69 N.Y.2d 777, 505 N.E.2d 624, 513 N.Y.S.2d 114; Pichel v Hanover Ins. Cos., 155 Misc. 2d 746, 589 N.Y.S.2d 979; 192 A.D.2d 1132, 598 N.Y.S.2d 749; Greenfield v Philles Records, 98 N.Y.2d 562, 780 N.E.2d 166, 750 N.Y.S.2d 565; Computer Assoc. Intl., Inc. v U.S. Balloon Mfg. Co., Inc., 10 A.D.3d 699, 782 N.Y.S.2d 117; Guardian Life Ins. Co. v Schaefer, 70 N.Y.2d 888, 519 N.E.2d 288, 524 N.Y.S.2d 377; Lavanant v General Acc. Ins. Co. of Am., 79 N.Y.2d 623, 595 N.E.2d 819, 584 N.Y.S.2d 744; Liverpool & London & Globe Ins. Co. v Kearney, 180 U.S. 132, 21 S. Ct. 326, 45 L. Ed. 460.)* III. Other courts in New York and elsewhere have upheld claims against insurers in risk-free period cases. (*MDW Enters. v CNA Ins. Co., 4*

*A.D.3d 338, 772 N.Y.S.2d 79; Randazzo v Gerber Life Ins. Co., 3 A.D.3d 485, 769 N.Y.S.2d 753; 2 N.Y.3d 704, 811 N.E.2d 36, 778 N.Y.S.2d 774; Dougherty v William Penn Life Ins. Co. of N.Y., 3 A.D.3d 469, 769 N.Y.S.2d 905; 2 N.Y.3d 704, 811 N.E.2d 36, 778 N.Y.S.2d 774; Topel v Reliastar Life Ins. Co. of N.Y., 6 A.D.3d 608, 774 N.Y.S.2d 790.)* IV. Dismissal of appellants' cause of action for violation of *General Business Law § 349* was improper. (*State of New York v Princess Prestige Co., 42 N.Y.2d 104, 366 N.E.2d 61, 397 N.Y.S.2d 360; People v Apple Health & Sports Clubs, 206 A.D.2d 266, 613 N.Y.S.2d 868; Matter of State of New York v Maiorano, 189 A.D.2d 766, 592 N.Y.S.2d 409; Karlin v IVF Am., 93 N.Y.2d 282, 712 N.E.2d 662, 690 N.Y.S.2d 495; Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 N.Y.2d 20, 647 N.E.2d 741, 623 N.Y.S.2d 529; Gaidon v Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 725 N.E.2d 598, 704 N.Y.S.2d 177; Unibell Anesthesia v Guardian Life Ins. Co. of Am., 239 A.D.2d 248, 658 N.Y.S.2d 14; Taylor v American Bankers Ins. Group, 267 A.D.2d 178, 700 N.Y.S.2d 458; Negrin v Norwest Mtge., 263 A.D.2d 39, 700 N.Y.S.2d 184; Teller v Bill Hayes, Ltd., 213 A.D.2d 141, 630 N.Y.S.2d 769.)* V. Dismissal of appellants' cause of action for breach of contract was improper. (*Lachs v Fidelity & Cas. Co. of N.Y., 306 N.Y. 357, 118 N.E.2d 555; Matter of Mostow v State Farm Ins. Cos., 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421.)* VI. Dismissal of appellants' cause of action for unjust enrichment was improper. (*Wolf v National Council of Young Israel, 264 A.D.2d 416, 694 N.Y.S.2d 424; Plant City Steel Corp. v National Mach. Exch., 23 N.Y.2d 472, 245 N.E.2d 213, 297 N.Y.S.2d 559; Merrill Lynch, Pierce, Fenner & Smith v Chipetine, 221 A.D.2d 284, 634 N.Y.S.2d 469; Springer v Allstate Life Ins. Co. of N.Y., 94 N.Y.2d 645, 731 N.E.2d 1106, 710 N.Y.S.2d 298; Great N. Ins. Co. v Mount Vernon Fire Ins. Co., 92 N.Y.2d 682, 708 N.E.2d 167, 685 N.Y.S.2d 411; North Star Reins. Corp. v Continental Ins. Co., 82 N.Y.2d 281, 624 N.E.2d 647, 604 N.Y.S.2d 510; Caldwell v ABKCO Music & Records, 269 A.D.2d 206, 703 N.Y.S.2d 97; Natimir Rest. Supply v London 62 Co., 140 A.D.2d 261, 528 N.Y.S.2d 564.)*

*Skadden Arps Slate Meagher & Flom LLP*, New York City (*Thomas J. Dougherty* of counsel), for respondent in the second above-entitled action. I. The six Appellate Division decisions on virtually identical claims have all been decided against appellants. (*Dougherty v William Penn Life Ins. Co. of N.Y., 3 A.D.3d 469, 769 N.Y.S.2d 905; Randazzo v Gerber Life Ins. Co., 3 A.D.3d 485, 769*

5 N.Y.3d 561, *; 841 N.E.2d 742, **;
807 N.Y.S.2d 583, ***; 2005 N.Y. LEXIS 3222

N.Y.S.2d 753; *Topel v Reliastar Life Ins. Co. of N.Y.*, 6 A.D.3d 608, 774 N.Y.S.2d 790.) II. The courts have long approved Guardian Life Insurance Company of America's practice of providing different dates for the date of coverage and the date premiums are due. (*Travelers Ins. Co. v Castro*, 341 F.2d 882.) III. Dismissal of the breach of contract claim was proper because the terms of the policy are unambiguous. (*Randazzo v Gerber Life Ins. Co.*, 3 A.D.3d 485, 769 N.Y.S.2d 753; *Topel v Reliastar Life Ins. Co. of N.Y.*, 6 A.D.3d 608, 774 N.Y.S.2d 790; *Belt Painting Corp. v TIG Ins. Co.*, 100 N.Y.2d 377, 795 N.E.2d 15, 763 N.Y.S.2d 790; *Lavanant v General Acc. Ins. Co. of Am.*, 79 N.Y.2d 623, 595 N.E.2d 819, 584 N.Y.S.2d 744; *Ace Wire & Cable Co. v Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 457 N.E.2d 761, 469 N.Y.S.2d 655; *Guardian Life Ins. Co. of Am. v Schaefer*, 70 N.Y.2d 888, 519 N.E.2d 288, 524 N.Y.S.2d 377; *Pichel v Hanover Ins. Cos.*, 155 Misc. 2d 746, 589 N.Y.S.2d 979; *Matter of United Community Ins. Co. v Mucatel*, 69 N.Y.2d 777, 505 N.E.2d 624, 513 N.Y.S.2d 114; *Matter of Ideal Mut. Ins. Co. [Superintendent of Ins. of State of N.Y.--Harbour Assur. Co. of Bermuda]*, 231 A.D.2d 59, 659 N.Y.S.2d 273; *Holmes Protection of N.Y. v National Union Fire Ins. Co. of Pittsburgh*, 152 A.D.2d 496, 543 N.Y.S.2d 459.) IV. Appellants' authority is unpersuasive and does not support their reading of the policy. (*Metropolitan Life Ins. Co. v RJR Nabisco, Inc.*, 906 F.2d 884; *Abner, Herrman & Brock, Inc. v Great N. Ins. Co.*, 308 F. Supp. 2d 331; *Ark Bryant Park Corp. v Bryant Park Restoration Corp.*, 285 A.D.2d 143, 730 N.Y.S.2d 48.) V. The unjust enrichment claim was also properly dismissed. (*Apfel v Prudential-Bache Sec.*, 81 N.Y.2d 470, 616 N.E.2d 1095, 600 N.Y.S.2d 433; *Sunrise Plaza Assoc. v International Summit Equities Corp.*, 288 A.D.2d 300, 733 N.Y.S.2d 443; *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653; *Moore v Microsoft Corp.*, 293 A.D.2d 587, 741 N.Y.S.2d 91; *Plant City Steel Corp. v National Mach. Exch.*, 23 N.Y.2d 472, 245 N.E.2d 213, 297 N.Y.S.2d 559; *Merrill Lynch, Pierce, Fenner & Smith v Chipetine*, 221 A.D.2d 284, 634 N.Y.S.2d 469; *Caldwell v ABKCO Music & Records*, 269 A.D.2d 206, 703 N.Y.S.2d 97; *Natimir Rest. Supply v London 62 Co.*, 140 A.D.2d 261, 528 N.Y.S.2d 564.) VI. The *General Business Law § 349* claim also was properly dismissed. (*Ludl Elecs. Prods. v Wells Fargo Fin. Leasing*, 6 A.D.3d 397, 775 N.Y.S.2d 59; *Citipostal, Inc. v Unistar Leasing*, 283 A.D.2d 916, 724 N.Y.S.2d 555; *Stutman v Chemical Bank*, 95 N.Y.2d 24, 731 N.E.2d 608, 709 N.Y.S.2d 892; *Gaidon v Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 725 N.E.2d 598, 704 N.Y.S.2d 177; *Negrin v Norwest Mtge.*, 263 A.D.2d 39, 700 N.Y.S.2d 184; *Unibell Anesthesia v Guardian Life Ins. Co. of Am.*, 239 A.D.2d 248, 658 N.Y.S.2d 14; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20, 647 N.E.2d 741, 623 N.Y.S.2d 529; *Taylor v American Bankers Ins. Group*, 267 A.D.2d 178, 700 N.Y.S.2d 458.)

*Wechsler Harwood LLP*, New York City (*William R. Weinstein* and *Robert I. Harwood* of counsel), for appellant in the third above-entitled action. I. The lower court decisions dismissing plaintiff's claim for breach of contract are erroneous and should be reversed by this Court. (*Hartol Prods. Corp. v Prudential Ins. Co.*, 290 N.Y. 44, 47 N.E.2d 687; *United States Fid & Guar. Co. v Annunziata*, 67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790; *Sloman v First Fortis Life Ins. Co.*, 266 A.D.2d 370, 698 N.Y.S.2d 295; *Bronx Sav. Bank v Weigandt*, 1 N.Y.2d 545, 136 N.E.2d 848, 154 N.Y.S.2d 878; *Matter of Mostow v State Farm Ins. Cos.*, 88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421; *Tri Town Antlers Found. v Fireman's Fund Ins. Co.*, 158 A.D.2d 908, 550 N.Y.S.2d 953; 76 N.Y.2d 841, 559 N.E.2d 1283, 560 N.Y.S.2d 124; *Lachs v Fidelity & Cas. Co. of N.Y.*, 306 N.Y. 357, 118 N.E.2d 555; *Garry v Worldwide Underwriters Ins. Co.*, 120 Misc. 2d 91, 465 N.Y.S.2d 483; 101 A.D.2d 717; *Guardian Life Ins. Co. of Am. v Schaefer*, 70 N.Y.2d 888, 519 N.E.2d 288, 524 N.Y.S.2d 377; *Matter of United Community Ins. Co. v Mucatel*, 127 Misc. 2d 1045, 487 N.Y.S.2d 959; 119 A.D.2d 1017, 501 N.Y.S.2d 761; 69 N.Y.2d 777, 505 N.E.2d 624, 513 N.Y.S.2d 114; *Miller v Continental Ins. Co.*, 40 N.Y.2d 675, 358 N.E.2d 258, 389 N.Y.S.2d 565.) II. The lower courts erred in dismissing plaintiff's alternative claim for unjust enrichment. (*Wolf v National Council of Young Israel*, 264 A.D.2d 416, 694 N.Y.S.2d 424; *Paramount Film Distrib. Corp. v State of New York*, 30 N.Y.2d 415, 285 N.E.2d 695, 334 N.Y.S.2d 388; *Plant City Steel Corp. v National Mach. Exch.*, 23 N.Y.2d 472, 245 N.E.2d 213, 297 N.Y.S.2d 559; *Limited v McCrory Corp.*, 169 A.D.2d 605, 564 N.Y.S.2d 751; *Caldwell v ABKCO Music & Records*, 269 A.D.2d 206, 703 N.Y.S.2d 97; *Natimir Rest. Supply v London 62 Co.*, 140 A.D.2d 261, 528 N.Y.S.2d 564; *Greenfield v Philles Records*, 288 A.D.2d 59, 732 N.Y.S.2d 856; *Louros v Cyr*, 175 F. Supp. 2d 497.)

*Sonnenschein Nath & Rosenthal LLP*, New York City (*Reid L. Ashinoff*, *Sandra D. Hauser* and *Michael S. Gugig* of counsel), for respondent in the third

5 N.Y.3d 561, *; 841 N.E.2d 742, **;
807 N.Y.S.2d 583, ***; 2005 N.Y. LEXIS 3222

above-entitled action. I. The breach of contract claim was properly dismissed. (*Leon v Martinez*, 84 N.Y.2d 83, 638 N.E.2d 511, 614 N.Y.S.2d 972; *WorldCom, Inc. v Sandoval*, 182 Misc. 2d 1021, 701 N.Y.S.2d 834; *Breed v Insurance Co. of N. Am.*, 46 N.Y.2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352; *Teichman v Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 663 N.E.2d 628, 640 N.Y.S.2d 472; *Chimart Assoc. v Paul*, 66 N.Y.2d 570, 489 N.E.2d 231, 498 N.Y.S.2d 344; *Teitelbaum Holdings v Gold*, 48 N.Y.2d 51, 396 N.E.2d 1029, 421 N.Y.S.2d 556; *Bethlehem Steel Co. v Turner Constr. Co.*, 2 N.Y.2d 456, 141 N.E.2d 590, 161 N.Y.S.2d 90; *Ruttenberg v Davidge Data Sys. Corp.*, 215 A.D.2d 191, 626 N.Y.S.2d 174; *R & D Maidman Family L.P. v Scottsdale Ins. Co.*, 4 Misc. 3d 728, 783 N.Y.S.2d 205; *A. Meyers & Sons Corp. v Zurich Am. Ins. Group*, 74 N.Y.2d 298, 545 N.E.2d 1206, 546 N.Y.S.2d 818.) II. There can be no claim for unjust enrichment where an enforceable contract exists. (*Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653; *Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 192 A.D.2d 83, 600 N.Y.S.2d 212; *Feigen v Advance Capital Mgt. Corp.*, 150 A.D.2d 281, 541 N.Y.S.2d 797; *Alamo Contract Bldrs. v CTF Hotel Co.*, 242 A.D.2d 643, 663 N.Y.S.2d 42; *Tierney v Capricorn Invs.*, 189 A.D.2d 629, 592 N.Y.S.2d 700; *Strategic Risk Mgt. v Federal Express Corp.*, 174 Misc. 2d 383, 665 N.Y.S.2d 799; 253 A.D.2d 167, 686 N.Y.S.2d 35; *Greenfield v Philles Records*, 288 A.D.2d 59, 732 N.Y.S.2d 856; *Caldwell v ABKCO Music & Records*, 269 A.D.2d 206, 703 N.Y.S.2d 97; *Limited v McCrory Corp.*, 169 A.D.2d 605, 564 N.Y.S.2d 751; *Natimir Rest. Supply v London* 62 Co., 140 A.D.2d 261, 528 N.Y.S.2d 564.)

**JUDGES:** Opinion by Judge G.B. Smith. Chief Judge Kaye and Judges Ciparick, Rosenblatt, Graffeo and R.S. Smith concur. Judge Read took no part.

**OPINION BY:** G.B. SMITH

**OPINION**

[*567]  [***584]  [**743] G.B. Smith, J.

The primary issue in each of these cases is whether there is a breach of an insurance contract when a policy date is set prior to an effective date and the insured, in the first year of the policy, must pay for days that are not covered. We hold that the insurers' *CPLR 3211 (a) (1)* and *(7)* motions to dismiss the complaints were properly

granted, and we affirm the orders of the Appellate Division.

Facts

*Goldman v Metropolitan Life Ins. Co.*

On January 30, 2002, plaintiff "submitted an application to MetLife for a yearly renewable term life insurance policy in the amount of $ 250,000." On May 30, 2002, the policy was delivered and plaintiff paid his annual premium. The insurer set the policy date as May 6, 2002. The total annual premium amount was $ 217.50.

Goldman brought a putative class action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and violations under *General Business Law § 349*. [*568] In the complaint and on this motion to dismiss, plaintiff argues that since he was not covered for the 24 days between May 6 and May 30, 2002, yet was required to pay for that period of time, there was a breach of contract. He argues that the term "annual premium" is ambiguous because it leads the average insured to believe that he or she will receive 365 days of coverage. In fact, based upon the delay from the policy date until the date of payment and delivery of the policy, there are fewer than 365 days of coverage in the first year of the policy.

Defendant counters that there is no breach, the policy is not ambiguous and that the dates of coverage are in accordance with the payment of the premiums. Defendant points to the language of the application, which is incorporated into the policy and states "no insurance will take effect until a policy is delivered to the owner and the full first premium due is paid." Further, plaintiff had the option of [***585]  [**744] not accepting the policy and receiving a refund of any premiums already paid. According to defendant, the term "annual premium" never referred to the days of coverage but rather to the "frequency of payment."

Supreme Court denied MetLife's motion to dismiss based on ambiguity in the contract specifically related to payment for days of coverage without actually receiving coverage. The Appellate Division reversed, granted the insurer's motion and dismissed the complaint, finding "that the terms of the subject insurance policy, including the initial application, which was incorporated therein, were not ambiguous and clearly set forth when coverage was to begin and when the first and subsequent annual

premiums were to be paid by the C.O.D. policyholders." (*13 A.D.3d 289, 290, 788 N.Y.S.2d 25 [2004].*) The Appellate Division granted plaintiff's motion for leave to appeal and certified the following question to this Court: "Was the order of this Court, which reversed the order of Supreme Court, properly made?"

*Franco v Guardian Life Ins. Co. of Am.*

On June 13, 2000, the Francos signed an application for a "modified premium whole life insurance policy in the amount of $ 2 million." On July 28, 2000, Guardian Life sent a policy to the Francos. On the same day, the Francos completed a second application in order to change the beneficiary from the wife to a trust. The total initial annual premium of $ 2,790 was paid on August 2, 2000. On August 28, 2000, Guardian Life reissued the policy to plaintiffs with the same policy date of July 20, 2000. [*569] The policy became effective only after the policy was delivered and accepted by the insured. Even though it was permitted by the application, the Francos chose not to purchase interim coverage and receive a conditional receipt for temporary insurance to cover the dates between the date of application and delivery of the policy.

The Franco plaintiffs brought a putative class action for breach of contract, unjust enrichment and violations of *General Business Law § 349*. They argue that they were required to pay for a period of time in which the insurance company assumed no financial risk and, thus, unjustly collected monies without providing coverage. In addition to the breach of contract and unjust enrichment claims, the Francos argue that Guardian engaged in deceptive business practices in violation of *General Business Law § 349*. The Francos argue that the term "annual" is ambiguous because it does not mean a calendar year which is what the average insured would interpret the word to mean.

Defendant counters that the life insurance policy is clear on its face, that the payment of the premiums is stated on the policy and that the policy is not ambiguous. Also, defendant argues that the date of delivery was July 28, 2000, not October 10, 2000, and that the premiums are due from the policy date, not the date of delivery of the policy. Further, the Francos had an option either to pay at the time of signing the application and have coverage from the policy date or to pay at the time of delivery which would give them the same policy date but no coverage from the policy date until the date of payment.

*Katz v American Mayflower Life Ins. Co. of N.Y.*

On July 11, 1997, plaintiff signed an insurance application with American Mayflower Life Insurance Company of New York for a term life policy of one million dollars. The policy was issued on September 2, 1997 and delivered on September 24, 1997. On the date of delivery, plaintiff sent in his initial premium for $ 447.20. His annual premium, as stated on the contract, was $ 1,720, to be paid in quarterly [***586] [**745] installments. The policy also stated when each subsequent premium was due until the full premium was paid.

Plaintiff brought a putative class action alleging breach of contract and unjust enrichment. Like the *Goldman* and *Franco* plaintiffs, Katz argues that the insurance contract was breached and that the defendant was unjustly enriched.

[*570] Defendant denies that the policy is ambiguous and instead points to the policy language as clearly stating the dates of coverage and when the premiums are due. Defendant argues that all premiums, after the initial premium, were due based on the policy date, not the delivery date, and that plaintiff continued to pay premiums under this policy for four years prior to filing a complaint. In fact, the premium schedule which governed defendant's policy stated that the premiums would be due on the 2nd of March, June, September and December.

While the Goldman and Franco policies provide for a 10-day "free look" period, the Katz policy allows for a 20-day "free look" period in which the insured can reject the policy and be refunded any previously paid premiums. The policy states that the premiums must be paid in advance of coverage and that the total initial premium must be paid as "shown in the Schedule on or before policy delivery."

Supreme Court granted the motion to dismiss brought by Guardian Life against the Francos. On the same date, the Supreme Court granted American Mayflower's motion to dismiss the Katz complaint for the reasons stated in its *Franco* decision. The Appellate Division affirmed Supreme Court in *Katz*, and, based upon its *Katz* decision, affirmed Supreme Court's determination in *Franco v Guardian Life*. In *Katz*, the

5 N.Y.3d 561, *570; 841 N.E.2d 742, **745;
807 N.Y.S.2d 583, ***586; 2005 N.Y. LEXIS 3222

Appellate Division wrote:

> "due to plaintiff's selection of the C.O.D. payment option, American Mayflower set different dates for the commencement of coverage and the premium due dates [which] does not constitute a breach of contract since they are, as plaintiff concedes, part of the contract. Thus, any claim that plaintiff paid a premium for a period of time before coverage commenced is contradicted by the express terms of the contract." (*14 A.D.3d 195, 198, 788 N.Y.S.2d 15 [2004]*.)

In *Franco* and *Katz*, the Appellate Division granted plaintiffs' motion for leave to appeal to this Court and certified the following question: "Was the order of this Court, which affirmed the order of the Supreme Court, properly made?"

Discussion

When determining a motion to dismiss, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within [*571] any cognizable legal theory" (*see Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner, 96 N.Y.2d 300, 303, 751 N.E.2d 936, 727 N.Y.S.2d 688 [2001]; Leon v Martinez, 84 N.Y.2d 83, 87-88, 638 N.E.2d 511, 614 N.Y.S.2d 972 [1994]*). A *CPLR 3211* dismissal "may be granted where documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law" (*Held v Kaufman, 91 N.Y.2d 425, 430-431, 694 N.E.2d 430, 671 N.Y.S.2d 429 [1998]* [citation and internal quotation marks omitted]).

Breach of Contract

There were two options for payment in each of the insurance agreements. Plaintiffs could pay at the time the application was submitted and receive temporary coverage until the delivery of the policy, or pay at the time of delivery of the policy [***587] [**746] and have coverage become effective upon receipt of the first initial premium and delivery of the policy. The second option was the cash on delivery (C.O.D.) option. In all three cases, plaintiffs chose the second option.

Goldman, Katz and Franco all argue that their insurance contracts were breached. The basic issue is whether an insurance contract using the word "annual" to describe premium payments is ambiguous as to coverage because the insured, in the first year, receives less than 365 days of coverage. The insureds argue that the policy is ambiguous because it is the average insured's understanding that an annual premium purchases a full year of coverage. However, "[m]ere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact" (*see Bethlehem Steel Co. v Turner Const. Co., 2 N.Y.2d 456, 460, 141 N.E.2d 590, 161 N.Y.S.2d 90 [1957]*).

In each case, the Appellate Division properly held that the contracts could be interpreted only in one manner and granted the *CPLR 3211* motions to dismiss.

There is no evidence that MetLife was not bargaining in good faith and fair dealing with the insured (*see Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 85, 188 N.E. 163 [1933]*). The application clearly states the terms and conditions of the insurance policy. Further, the policy also states when coverage will begin. Plaintiff argues that the period in the contract which allows the insured to return the policy and receive a refund of any paid premiums is misleading. Plaintiff cites several lower court cases from foreign jurisdictions that have rejected [*572] premiums based on a policy date versus a coverage date (*see Semler v Guardian Life Ins. Co. of Am.*, case No. 990637 [Cal Super Ct 2002]; *Semler v First Colony Life Ins. Co.*, case No. 984902 [Cal Super Ct 1999]; *Burstein v First Penn-Pac. Life Ins. Co., 209 F.R.D. 674 [SD FL 2002]*). Those cases were based on the law of their respective states (*see Semler v Guardian Life Ins. Co., supra*). In other states, courts have permitted premiums that are based upon a policy date rather than a coverage date (*Life Ins. Co. of the Southwest v Overstreet, 580 S.W.2d 929 [Tex Ct Civ App 1979]; Travelers Ins. Co. v Castro, 341 F.2d 882 [1st Cir 1965]*).

Plaintiffs have cited no case law in New York State holding that the "Risk Free" period is misleading. The fact that the insured can return the contract does not mean that the contract period would otherwise be covered even without a payment. There is nothing in the "Risk Free" period suggesting that the coverage will start from the

5 N.Y.3d 561, *572; 841 N.E.2d 742, **746;
807 N.Y.S.2d 583, ***587; 2005 N.Y. LEXIS 3222

policy date without the payment of a premium.

### Unjust Enrichment

Plaintiffs in each case make a claim for unjust enrichment. The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement (*see State of New York v Barclays Bank of N.Y., 76 N.Y.2d 533, 540, 563 N.E.2d 11, 561 N.Y.S.2d 697 [1990]*). Here, in each case, there was no unjust enrichment because the matter is controlled by contract (*see Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 [1987]* ["(t)he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter"]). Given that the disputed terms and conditions fall entirely [***588] [**747] within the insurance contract, there is no valid claim for unjust enrichment.

General Business Law § 349

The Francos' claim that *General Business Law § 349* was breached should also be rejected. * That section makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." (*§ 349 [a]*.) Plaintiffs have not properly alleged any deceptive practices.

    * Goldman does not pursue his *General Business Law § 349* claim in this Court.

[*573] Accordingly, in each case, the order of the Appellate Division should be affirmed, with costs, and the certified question not answered as unnecessary.

Chief Judge Kaye and Judges Ciparick, Rosenblatt, Graffeo and R.S. Smith concur; Judge Read taking no part.

In each case: Order affirmed, etc.

*** Slip Sheet ***

Document

LEXSEE 59 MISC. 2D 712

**Robert C. Halligan, Plaintiff, v. Elizabeth M. Glazebrook, Defendant**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of New York, Special Term, Suffolk County**

*59 Misc. 2d 712*; *299 N.Y.S.2d 951*; *1969 N.Y. Misc. LEXIS 1614*

**April 18, 1969**

## HEADNOTES

[***1] **Discovery and inspection -- notice to admit -- motion for order requiring adversary to pay expenses incurred in proving fact which adversary refused to admit before trial must be made "at or immediately following the trial" (** *CPLR 3123, subd. [c]***) -- motion made four days after trial of issue of damages, or month after trial and verdict of liability, was too late and hence was denied.**

One of the issues in this negligence action was whether defendant was driving while in an intoxicated condition. Plaintiff demanded before trial that defendant admit such intoxication, and defendant refused to admit it, and so, at the trial, plaintiff had to prove the fact of intoxication. A verdict of defendant's liability resulted, and three weeks later, a three-day trial before the court of the issue of damages resulted in a money judgment for plaintiff. Four calendar days, or two working days, after the jury trial of the issue of damages, or one month after the proof of intoxication and the verdict of liability, plaintiff moved for an order requiring the defendant to pay plaintiff's expenses for proving the intoxication ( *CPLR 3123*). However, the motion was not made "at or immediately [***2] following the trial" ( *CPLR 3123, subd. [c]*), hence it is denied.

**COUNSEL:** *William A. Scorzari* for plaintiff.

*Francis J. Heneghan* for defendant.

**JUDGES:** Arthur M. Cromarty, J.

**OPINION BY:** CROMARTY

## OPINION

[*713] [**952] Motion for reconsideration is granted and on such reconsideration the court adheres to the previous decision.

At issue is the meaning of the expression "immediately following" as it is used in *CPLR 3123* (subd. [c]). That section establishes a procedure by which a party may demand from his adversary an admission of the truth of facts. If the adversary does not admit the facts and they are thereafter established as true, the requesting party may recover the expenses incurred for being put to his proof. A reasonable attorney's fee is also recoverable. The procedure for recovery of these expenses is to "move at or immediately following the trial."

Herein, the trial was conducted in two phases. The issue of liability was tried before Mr. Justice Hill on November 12, 13 and 14 of 1968. The jury having rendered its verdict in favor of plaintiff, the damages issue was tried before this court on December 4, 5 and 6 of 1968. Plaintiff did not move "at" either [***3] trial, but waited until December 10, 1968, four calendar -- two working -- days after the trial on damages. The question then is whether plaintiff moved "immediately following the trial."

In the third revision of Bouvier's Law Dictionary it is said: "The words 'forthwith' and 'immediately' have the same meaning. They are stronger than the expression 'within a reasonable time,' and imply prompt, vigorous action, without any delay, and whether there has been such action is a question of fact, having regard to the circumstsances of the particular case." In Black's Law Dictionary (4th ed.) the word "immediately" is defined

59 Misc. 2d 712, *713; 299 N.Y.S.2d 951, **952;
1969 N.Y. Misc. LEXIS 1614, ***3

thus: "Without interval of time, without delay, straightway, or without any delay or lapse of time."

While in the area of statutory construction dictionary definitions are not controlling they do provide a useful guide when read in the context of the act of which the word is a part. By *CPLR 3123* (subd. [c]) the party offended by a refusal to admit a fact has two choices. He may move "at or immediately following the trial". These words do not permit the passage of an unstated period of time. They require action at the very latest when the trial ends. If the [***4] Legislature had intended to grant some time after the close of trial appropriate language could have been inserted. To sanction any extension [*714] of time in view of the express [**953] language of the statute would constitute judicial legislation, a result to be avoided.

Even if we accept Bouvier's statement that whether the party has acted promptly and vigorously and without delay is a factual question to be determined by the circumstances of the case, plaintiff cannot benefit. The fact in issue was whether defendant was driving while in an intoxicated condition. Proof of that fact, necessitated by defendant's failure to admit, was given at the trial of the liability issue. On the damages phase of the case there was no need to prove defendant's intoxication. If plaintiff intended to pursue the remedy afforded by *CPLR 3123* (subd. [c]) he had ample opportunity to do so at or at the end of the liability trial, in the intervening period between the trials of the separate issues or at the end of the damages trial. If there is any justification for broadening the meaning of the word "immediately" beyond its dictionary connotation no such justification is shown herein. [***5] Plaintiff had ample opportunity to seek redress. An attempt to gain further time by a strained construction of the statute is simply not warranted.

*** Slip Sheet ***

Document

LEXSEE 897 F.2D 21

**Jeffrey HECHT, Appellant v. COMMERCE CLEARING HOUSE, INC., William Miller, Louis Ceccoli, and Stanley Stephens, Appellees**

**No. 89-7515**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*897 F.2d 21; 1990 U.S. App. LEXIS 1245; 100 A.L.R. Fed. 655; 5 I.E.R. Cas. (BNA) 78*

**November 20, 1989, Argued**
**January 25, 1990, Decided**

**SUBSEQUENT HISTORY:**    [**1]   As Amended February 21, 1990.

**PRIOR HISTORY:**    Appeal from dismissal of civil action under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961-68 (1988)*, for lack of standing and failure to plead with sufficient particularity.

**DISPOSITION:**    Judgment affirmed.

**COUNSEL:** Michael Flomenhaft, New York, New York, for Appellant.

David F. Graham, Sidley & Austin, New York, New York, for Appellees Commerce Clearing House, Inc., William Miller, and Louis Ceccoli.

**JUDGES:** Oakes, Chief Judge, Cardamone, Circuit Judge, and Pollack, District Judge. *

> *    Of the United States District Court for the Southern District of New York, sitting by designation.

**OPINION BY:** OAKES

**OPINION**

[*22]  OAKES, Chief Judge:

Jeffrey Hecht appeals an April 28, 1989, judgment of the United States District Court for the Southern District of New York, Shirley Wohl Kram, Judge, dismissing his complaint seeking civil remedies under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961-68 (1988)*, for failure to state a claim upon which relief can be granted and failure to plead with sufficient particularity. [**2]  Assuming, as we must, that the allegations of the complaint are true, we nevertheless affirm the order of the district court.

In this case, we primarily consider whether an employee has civil RICO standing for injuries from loss of employment and business commissions resulting from his failure to aid or abet alleged RICO violations by his employer and co-employees targeted at the employer's customers.

Hecht began working in January 1985 at Commerce Clearing House ("CCH"), a publisher of various law and business publications, as a Candidate Sales Representative. Assuming the position previously held by defendant Stanley Stephens, and working under the supervision of defendants Louis Ceccoli and William Miller, Hecht was responsible for servicing existing subscriptions and promoting new business in an assigned geographical area.

After beginning work at CCH, Hecht allegedly learned of various fraudulent acts committed by defendants and their agents, including forging customer signatures on orders, billing customers for fabricated or improperly confirmed orders, and disregarding subscription cancellation requests. Some customers advised Hecht that they would make no further purchases [**3]  from CCH until the allegedly irregular practices were rectified. Hecht demanded that these practices be corrected, but was told by Ceccoli and Miller that he must either cooperate with the concealment of these frauds or lose his job. Upon refusing to cooperate, Hecht

was terminated for insubordination.

Hecht filed a complaint on December 24, 1986, and an amended complaint on August 3, 1987, seeking recovery against CCH and the individual defendants under RICO's civil liability treble damages provision, *18 U.S.C. § 1964(c) (1988),* as well as under common law theories of prima facie tort [*23] and fraud. He based his RICO claim on allegations that the defendants violated *18 U.S.C. § 1962 (1988)* [1] through participation as an enterprise in fraudulent acts constituting mail fraud under *18 U.S.C. § 1341 (1988)* and wire fraud under *18 U.S.C. § 1343 (1988)* and qualifying as RICO predicate acts of "racketeering activity" under *18 U.S.C. § 1961(1)(1988).*

   1  *Section 1962,* RICO's substantive provision, outlaws in separate subsections four types of racketeering-related activities. *Section 1962(a)* prohibits using income received from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce. *Section 1962(b)* proscribes the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity. *Section 1962(c)* prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity. *Section 1962(d)* proscribes conspiring to violate subsection (a), (b), or (c). *Section 1962(c)* and *(d)* are the principal provisions at issue in this case.

[**4]  The district court, in *Hecht v. Commerce Clearing House, Inc., 713 F. Supp. 72 (S.D.N.Y. 1989),* found that whether or not Hecht's injuries resulted from his "blowing the whistle" and insisting on correction of defrauded customer accounts or from his simple refusal not to participate in the frauds, his injuries were not proximately caused by either defendants' racketeering conduct in violation of *18 U.S.C. § 1962(a)-(c)* or defendants' racketeering conspiracy in violation of *18 U.S.C. § 1962(d).* On this basis, the district court concluded Hecht had no standing to assert civil claims. In the alternative, the district court found that Hecht failed to plead a RICO conspiracy adequately. Finally, the district court dismissed the pendent common law claims as lacking sufficient federal jurisdictional basis.

On appeal, Hecht advances two theories of standing. First, he argues that defendants' racketeering conduct violating *section 1962(c)* proximately caused him to lose

not only his job but also business commissions, thus distinguishing his case from the line of cases relied on by the district court. Second, he argues that [**5] an overt act in furtherance of defendants' conspiracy to racketeer was his discharge from employment and that such an act suffices to create civil liability under *section 1962(d).* Hecht also argues that he properly pleaded a RICO conspiracy, and that, even if he did not, he should be permitted to amend his complaint.

DISCUSSION

The RICO civil liability provision confers standing on "any person injured in his business or property by reason of a violation of *section 1962.*" *18 U.S.C. § 1964(c).* Thus, in order to have standing, a plaintiff must show: (1) a violation of *section 1962;* (2) injury to business or property; and (3) causation of the injury by the violation. *See O'Malley v. O'Neill, 887 F.2d 1557, 1561 (11th Cir. 1989).*

This appeal principally concerns the last element: causation. Because a plaintiff must show injury "by the conduct constituting the violation" of RICO, *see Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985),* the injury must be caused by a pattern of racketeering activity violating *section 1962* or by individual RICO predicate acts. *See Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1100 (2d Cir. 1988),* [**6] *cert. denied, 490 U.S. 1007, 109 S. Ct. 1642, 104 L. Ed. 2d 158, 1989 U.S. LEXIS 1796 (1989).* Moreover, the RICO pattern or acts must *proximately* cause plaintiff's injury. *See Sperber v. Boesky, 849 F.2d 60, 64 (2d Cir. 1988); O'Malley, 887 F.2d at 1561.* By itself, factual causation (e.g., "cause-in-fact" or "but for" causation) is not sufficient. *See Sperber, 849 F.2d at 63.* We recognize that determining what is the proximate cause of an injury is not free from normative legal policy considerations. *See id.* (citing to W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* 264 (5th ed. 1984); *Restatement (Second) of Torts § 431 comment a* (1965); Howarth, *"On Madness of Discourse, That Cause Sets Up with and Against Itself!"* (Book Review), *96 Yale L.J. 1389, 1394-95 (1987).* For our purposes, the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence [*24] of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence. *See Bonsignore v. City of New York, 683 F.2d 635, 637 (2d Cir. 1982);* [**7] *Restatement*

897 F.2d 21, *24; 1990 U.S. App. LEXIS 1245, **7;
100 A.L.R. Fed. 655; 5 I.E.R. Cas. (BNA) 78

*(Second) of Torts §§ 431, 435 comment b* (1965).

1. *Standing for Defendants' Section 1962(c) Violation*

Hecht's first ground of appeal is that racketeering conduct violating *section 1962(c)* caused him injury in the form of lost business commissions. This injury is too speculative to confer standing, because Hecht only alleges that he would have lost commissions in the future, and not that he has lost any yet. Even assuming that Hecht actually lost commissions, we hold that his injury was not proximately caused by violations of *section 1962(c)*.

We previously have held that loss of employment (as distinct from loss of commissions) for reporting or refusing to participate in an enterprise engaging in a pattern of racketeering activity is not injury sufficient for standing. *See Burdick v. American Express Co., 865 F.2d 527, 529 (2d Cir. 1989)* (per curiam) (no standing for a stockbroker who alleged being fired and losing his client base for complaining about his employer's questionable practices); *see also O'Malley, 887 F.2d at 1563* (no standing for vice president and dean of private university fired for refusing to participate [**8] in mail fraud scheme); *Cullom v. Hibernia Nat'l Bank, 859 F.2d 1211, 1216 (5th Cir. 1988)* (no standing for employee constructively discharged for refusing to participate in fraudulent loan transactions); *Pujol v. Shearson/American Express, Inc., 829 F.2d 1201, 1204-05 (1st Cir. 1987)* (no standing for whistle-blowing employee constructively discharged for reporting fraudulent securities transactions); *Nodine v. Textron, Inc., 819 F.2d 347, 348-49 (1st Cir. 1987)* (no standing for employee fired for registering objections to employer's customs law violations); *Morast v. Lance, 807 F.2d 926, 932-33 (11th Cir. 1987)* (no standing for bank vice president fired after reporting irregular transactions to authorities); *cf. Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 635-37 (2d Cir. 1989)* (no standing for employee suffering intimidation and harassment for whistle-blowing activities). *But see Callan v. State Chem. Mfg. Co., 584 F. Supp. 619, 622-23 (E.D.Pa. 1984)* (pre-Sedima finding of standing for employee fired for refusing to participate in bribery). These cases underscore that [**9] the purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies. "A defendant is not liable for treble damages to

everyone he might have injured by conduct other than that prohibited by RICO." *Norman, 873 F.2d at 636.* Although Hecht's loss of employment may have been factually caused by defendants' RICO violations, it was not a foreseeable natural consequence sufficient for proximate causation.

For similar reasons, Hecht's injury from loss of commissions does not confer standing. *See Burdick, 865 F.2d at 529* (no standing for stockbroker whose ability to service his customers, keep them happy and earn a living for himself'"). Hecht's loss of commissions may have been factually caused by RICO violations, but was not proximately caused by the violations. Because Hecht was "neither the target of the racketeering enterprise nor the competitor[] nor the customer[] of the racketeers," *see Sperber, 849 F.2d at 65*, the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon [**10] discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations. [2]

2    Seeking to distinguish the line of cases that decline to find standing for discharged employees, Hecht claims that loss of commissions involves a deprivation of a "business or property" interest under *section 1964(c)*, but that loss of employment does not. None of the discharged-employee cases, however, turn on insufficiency of the injury. Rather, they focus on the cause of the injury. Moreover, loss of employment, even in the absence of a contract, may be a deprivation of a property interest. *Cf. Perry v. Sindermann, 408 U.S. 593, 601-02, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972)* (employment rights are property interest for purposes of due process). Even were no property rights at play, we could not agree that loss of employment does not injure one's "business".

[*25] 2. *Standing for Defendants' Section 1962(d) Violation*

Hecht's second ground of appeal is that his discharge [**11] was an overt act in furtherance of the alleged RICO conspiracy, and thus that his injury directly resulted from defendants' violation of *section 1962(d)*.

*Section 1964(c)* extends civil liability to any violation of *section 1962*. Therefore, it allows that injury may result from a *section 1962(d)* conspiracy. Because a

conspiracy -- an agreement to commit predicate acts -- cannot by itself cause any injury, we think that Congress presupposed injury-causing overt acts as the basis of civil standing to recover for RICO conspiracy violations. *See Medallion TV Enters. v. SelecTV of California, Inc., 627 F. Supp. 1290, 1297-98 (C.D.Cal. 1986), aff'd, 833 F.2d 1360 (9th Cir. 1987), cert. denied, 492 U.S. 917, 109 S. Ct. 3241, 106 L. Ed. 2d 588, 1989 US LEXIS 3388.* (1989). [3] Therefore, although an overt act by itself (whether or not injury ensues) is not a requisite element of a *section 1962(d)* criminal conspiracy violation, *see United States v. Teitler, 802 F.2d 606, 613 (2d Cir. 1986),* we hold that injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation.

> [3] At common law, a civil conspiracy claim may be founded on an injury from an unlawful overt act done in furtherance of the conspiracy. *See Halberstam v. Welch, 227 U.S. App. D.C. 167, 705 F.2d 472, 477 (D.C.Cir. 1983); Rutkin v. Reinfeld, 229 F.2d 248, 252 (2d Cir.), cert. denied, 352 U.S. 844, 77 S. Ct. 50, 1 L. Ed. 2d 60 (1956).*

[**12] We cannot agree, however, with cases relied on by Hecht that find standing on the basis of *any* overt act in furtherance of the conspiracy, even if it is not a predicate racketeering act. *See Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1169 (3d Cir. 1989)* ("Nothing in *Sedima* forecloses the possibility that harm arising from an act predicate to conspiracy, yet distinct from the racketeering acts listed in *section 1961(1)*, might yet confer standing so long as the plaintiff has alleged a violation of *section 1962(d)*."); *Williams v. Hall, 683 F. Supp. 639, 643 (E.D.Ky. 1988)* (any injury-causing overt act may confer standing).

Congress did not deploy RICO as an instrument against all unlawful acts. It targeted only predicate acts catalogued under *section 1961(1)*. Admittedly, RICO is to be read broadly to effect its purpose. *See Sedima, 473 U.S. at 497.* Its purpose, however, is to target RICO activities, and not other conduct.

Therefore, we hold that standing may be founded only upon injury from overt acts that are also *section 1961 predicate acts,* and not upon any and all overt acts furthering a RICO conspiracy. [**13] *See In re Crazy Eddie Sec. Litig., 714 F. Supp. 1285, 1291-92 (E.D.N.Y. 1989)* (finding civil standing for RICO conspiracy on the basis of injury "resulting from the defendant's commission in furtherance of the agreement of a predicate act."). Because the overt act of Hecht's discharge was not a *section 1961(1)* predicate act, his loss of employment does not confer civil standing.

### 3. Sufficiency of Conspiracy Pleading

Finally, we agree with the district court that Hecht did not plead a RICO conspiracy with sufficient particularity. Paragraph 105 of the complaint alleges that defendants were "conspiring with agents, servants, and employees and others to conduct their affairs through a pattern of racketeering activity; . . . . [and were] conspiring to violate provisions of *[section] 1962(a),*[](b) and (c)." It does not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts. Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement. *See Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)* [**14] (must plead agreement to commit predicate acts and knowledge that those acts were part of a pattern of racketeering activity in violation of *section 1962(a)-(c)); Morin v. Trupin, 711 F. Supp. 97, 111 (S.D.* [*26] *N.Y. 1989)* (must plead agreement and that defendants understood scope of enterprise and knowingly agreed to further its affairs through commission of offenses); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 660 F. Supp. 1362, 1372 (D. Conn. 1987)* (must plead knowing agreement to commit predicate acts). [4]

> [4] Defendants moved to dismiss the complaint for lack of particularity under Rule 9(b), but the title district court did not state whether its decision was based on Rule 9(b). On its face, Rule 9(b) applies only to fraud or mistake, not to conspiracy. Hecht's pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a). *See Rose, 871 F.2d at 366; Andreo, 660 F. Supp. at 1372.* Even so, the complaint must allege some factual basis for a finding of a conscious agreement among the defendants.

[**15] Because it would make no difference in outcome if he had pleaded conspiracy properly, we decline to remand to the district court to give Hecht an opportunity to move to amend his complaint. [5]

897 F.2d 21, *26; 1990 U.S. App. LEXIS 1245, **15;
100 A.L.R. Fed. 655; 5 I.E.R. Cas. (BNA) 78

5　We find it unnecessary to reach the questions, not decided by the district court, whether a corporation is capable of conspiring with its own officers and whether Hecht adequately pleaded the "enterprise" requirement.

The judgment of the district court is affirmed. [6]

6　Although the district court's judgment of April 28, 1989, dismissed the complaint with respect to all the defendants, defendant Stephens has not entered an appearance in this case, nor did he join in the motion to dismiss. *Sua sponte* dismissal of the complaint with respect to Stephens is appropriate here, because the issues concerning Stephens are substantially the same as those concerning the other defendants, and Hecht, the party against whom the judgment of dismissal was entered, had notice and a full opportunity to make out his claim against Stephens. *See Perez v. Ortiz, 849 F.2d 793, 797 (2d Cir. 1988)* (discussing general appropriateness of *sua sponte* dismissals); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1357, at 593 (1969).

[**16]

*** Slip Sheet ***

Document

LEXSEE 769 A.2D 88

**HILLS STORES COMPANY, et al., Plaintiffs, v. MICHAEL BOZIC, et al., Defendants, GAYLE DOLOWICH, et al., v. CHAIM Y. EDELSTEIN, et al., Defendants. PETER M. FUSCO, et al., Plaintiffs, v. CHAIM Y. EDELSTEIN, et al., Defendants.**

**Civil Action No. 14527, Civil Action No. 14460, Civil Action No. 14787**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*769 A.2d 88; 2000 Del. Ch. LEXIS 28*

**February 9, 2000, Submitted
February 22, 2000, Decided**

**SUBSEQUENT HISTORY:** [**1] Released for Publication by the Court February 29, 2000. Revised August 29, 2000. As Corrected October 6, 2000.

**DISPOSITION:** Defendants' motion for summary judgment as to the plaintiffs' claims for breach of fiduciary duty and waste granted; defendants' motion for summary judgment as to the plaintiffs' claim for breach of contract and unjust enrichment against defendants Bozic, Reen and Matthews denied; the plaintiffs' motion for partial summary judgment on their breach of contract and unjust enrichment claims against defendants Bozic, Reen, and Matthews granted.

**COUNSEL:** David C. McBride, Esquire and Martin S. Lessner, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware; OF COUNSEL: Alan R. Friedman, Esquire, Jonathon M. Wagner, Esquire, and Elizabeth Wolstein, Esquire, of KRAMER LEVIN NAFTALIS & FRANKEL, New York, New York, Attorneys for Plaintiffs in C.A. No. 14527.

Joseph A. Rosenthal, Esquire of ROSENTHAL, MONHAIT, GROSS & GODDESS, Wilmington, Delaware, Attorney for Plaintiffs in C.A. Nos. 14460 and 14787.

Kevin G. Abrams, Esquire, Raymond J. DiCamillo, Esquire, Thad J. Bracegirdle, Esquire, of RICHARDS, LAYTON & FINER, Wilmington, Delaware; OF COUNSEL: John D. Donovan, Jr., Esquire, Robert G. Jones, Esquire Alexandra D. [**2] Furth, Esquire, of ROPES & GRAY, Boston, Massachusetts, Attorneys for Defendants.

**JUDGES:** STRINE, Vice Chancellor.

**OPINION BY:** STRINE

**OPINION**

[*89] In this case, the winning slate in a June 1995 proxy contest has caused the plaintiffs, the Hills Stores Company ("Hills") and its subsidiary Hills Department Stores Company ("HDS"), to sue the former members of the Hills board. The winning slate was proposed by Dickstein Partners, an investment fund that promised either to buy all of the shares of Hills for $ 22 in cash and $ 5 in junk bonds per share or to sell Hills to a higher bidder in the auction its slate pledged to conduct. Dickstein assured the Hills stockholders that it had the wherewithal to finance the acquisition and to cover the costs that would accompany a change in control of the Hills board.

Those costs included the payment of severance to certain top executives of Hills pursuant to employment agreements entered into the year before in response to a previous Dickstein-initiated control contest. Those agreements provided that the executives covered by the contracts would have the right to resign and receive full severance in the event of any change in control, other than one approved by the [**3] Hills board. In a judicial settlement, Hills and Dickstein both agreed not to challenge the validity of the employment agreements.

After Dickstein made its acquisition offer in the

spring of 1995, the Hills board determined that the offer was inadequate [*90] and shakily financed and that Dickstein's proposed strategy for the company was harmful. Rather than erecting substantial defensive measures, however, the Hills board decided to let the stockholders decide whether to accept the Dickstein offer for themselves in a board election contest at the Hills annual meeting.

The day before that meeting the Hills board met in response to Dickstein's demand that the board vote on whether to approve the Dickstein change in control solely for purposes of the employment agreements. After receiving advice from legal counsel, the members of the Hills board without an interest in that decision unanimously decided not to approve the Dickstein change in control. They, the undisputed evidence shows, believed that change in control to be a serious threat to Hills and that the company had promised the covered executives severance in such a situation.

After the Dickstein slate took office, the covered executives [**4] resigned and received their severance. The company's creditors terminated their debt agreements with Hills. Dickstein, however, apparently lacked the financing to deal with these known and foreseeable risks. Thus it never consummated its acquisition offer nor did it conduct an auction. Instead, its slate caused Hills to bring this suit against the former Hills board in September 1995 alleging that the payment of severance resulted from breaches of fiduciary duty and contract by the former Hills directors. [1] Nearly four years after Dickstein prevailed in its effort to secure control of the Hills board, the sale of Hills for $ 1.50 a share was consummated.

> 1    In this opinion, I refer to the former members of the Hills board who are defendants as defendants or defendant-directors.

In this opinion, I find that the defendant-directors are entitled to summary judgment on the plaintiffs' breach of fiduciary duty claims. Because of the defensive origins and purpose of the employment agreements, I apply the [**5] *Unocal* [2] standard of review and conclude that the defendant-directors have submitted evidence sufficient to entitle them to summary judgment under that standard. The plaintiffs have produced no evidence to rebut the evidence that the defendant-directors' decision to oppose the Dickstein change in control was made on a well-informed and good faith basis. Nor have they submitted a convincing argument as to why the

defendant-directors were unreasonable in concluding that the company had contractual duties to the covered executives that required the payment of severance if the board could not, in good faith, approve a change in control as benign to the company and its stockholders.

> 2    *Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946 (1985).*

But because the plaintiffs have produced unrebutted evidence that some of the covered executives received severance in excess of that required by their employment agreements, I also grant the plaintiffs' motion for partial summary judgment [**6] to recover those amounts. [3]

> 3    Two of the three civil actions affected by this opinion were initiated on behalf of a purported class of Hills stockholders. The class plaintiffs have joined in the papers filed by the Hills company plaintiffs and are not differently situated from them in any material respect. As such, this opinion will dispose of the class plaintiffs' claims as well.

I. Factual Background

A. The Genesis Of The Employment Agreements

At all relevant times; Hills was a Delaware corporation engaged in the retail discount [*91] department store business. Its shares were traded on the New York Stock Exchange. Hills managed its 152 stores through its wholly-owned operating subsidiary, HDS.

In the fall of 1993, Hills emerged from bankruptcy under the managerial leadership of its Chief Executive Officer Michael Bozic, who is a defendant in this litigation, and a new board of directors. Aside from Bozic, that board consisted of defendants Thomas H. Lee, James L. Moody, Jr., Richard B. Loynd, [**7] Susan B. Engel, John G. Reen, and Norman S. Matthews, as well as Michael S. Gross. [4] Only three of the Hills board members were "inside" directors: Bozic was CEO, Reen was Chief Financial Officer, and Matthews was a full-time consultant and the company's chief merchant.

> 4    Gross left the board in January 1995.

The relative placidity of the Hills board's post-bankruptcy life was soon disturbed, however, by the unwanted attentions of Mark Dickstein and Dickstein Partners Inc. (collectively "Dickstein"). Dickstein had

acquired 12% or so of Hills's stock in exchange for claims in bankruptcy it purchased during Hills's reorganization.

In August 1994 -- less than a year after Hills emerged from bankruptcy -- Dickstein wanted Hills to repurchase six million of its shares for $ 150 million by using leveraged financing. To increase the persuasive impact of its suggestion, Dickstein initiated a consent solicitation to remove four members of the Hills board and replace them with its own nominees who were pledged [**8] to support the stock buy-back.

After retaining outside advice from the law firm of Cravath, Swaine & Moore and the investment bank of SmithBarney, the Hills board decided to oppose the Dickstein initiative as adverse to the company's best interests. In particular, the board believed that it was unwise to take on such substantial debt so soon after emerging from bankruptcy and that it was preferable to stick with management's existing game plan. As the Chairman of the Board, defendant Lee, put it, "[Dickstein] was perceived as a raider .... We, who had just emerged from bankruptcy, didn't want anything to do with weakening our balance sheet. We saw Dickstein as wanting to weaken our balance sheet by paying out a lot of cash to shareholders and possibly taking on a lot of debt." [5]

5  Lee Dep. I at 23.

As part of its response to the Dickstein initiative, the Hills board decided to enter into new employment agreements with seven of Hills's top executives (the "Covered Executives") as well as a new consulting [**9] agreement with Matthews. The employment agreements were intended to provide the Covered Executives with enough security to allow them to focus on doing their jobs without distraction by Dickstein's overtures. [6]

6  The plaintiffs have not contested the evidence that Bozic and his management team had other employment options. See Loynd Dep. at 20; Bozic Dep. at 53, 79.

The task of crafting the employment agreements fell in the first instance to the board's Compensation Committee, which was comprised of four outside directors. That Committee was aided in this endeavor by Barry White and David Feinberg from the law firm of Foley, Hoag & Eliot as well as Allen Finkelson from Cravath.

On August 19, 1994, the Hills board met to consider the Compensation Committee's recommendations. Critically for present purposes, the proposed employment agreements contained a provision entitling the [*92] Covered Executives to severance payments ("Severance") in certain circumstances. As the agreements were presented to the [**10] board by the Compensation Committee, the Covered Executives' right to Severance would have been triggered automatically in the event of a "Change in Control." A "Change in Control" was defined as occurring when any person became the beneficial owner of more than fifty percent of Hills's voting stock or elected more than thirty percent of the members of the Hills board as the result of an actual or threatened election contest.

After discussion, the board decided to adopted a different approach. That approach triggered the Covered Executive's right to Severance, in among other circumstances, when (i) the Covered Executive was demoted or fired within one year of any Change in Control or (ii) any Change in Control other than an "Approved Change in Control" occurred. An Approved Change in Control was defined as follows:

> The term "Approved Change in Control" shall mean a Change of Control that has occurred with *the prior approval of a majority of the Continuing Directors* and the term "Continuing Director" shall mean any member of the Board of Directors of the Company who is not an Acquiring Person or a nominee or representative of an Acquiring Person or of any affiliate or associate [**11] of an Acquiring Person and any successor to a Continuing Director who was recommended for election or elected to succeed a Continuing Director by a majority of the Continuing Directors then on the Board of Directors of the Company. [7]

7  PX 6 § 10(c).

Two reasons motivated the board's decision to move away from an automatic vesting of Severance rights upon any Change in Control (a "single trigger" approach) to

769 A.2d 88, *92; 2000 Del. Ch. LEXIS 28, **11

the more nuanced, or "double trigger" approach.

The primary reason was that the double trigger approach gave the Hills board the ability to "deliver management" to a friendly acquiror in a negotiated transaction. [8] The flip side of this ability was that the board could refuse to approve the Change in Control "if the prospective acquiror didn't seem to be offering sufficiently for the company ...." [9] That is, the Hills board could use the double trigger as negotiating leverage. If an acquiror agreed to the board's terms, the board could approve the Change in Control and allow the acquiror [**12] the opportunity to keep the Covered Executives or, at the very least, avoid the Severance. If an acquiror did not agree to the board's terms, the board could protect the expectations of the Covered Executives and deter the unwanted overture by failing to approve the Change in Control. This guaranteed the Covered Executives their Severance while increasing the potential acquiror's cost of acquisition.

    8  Moody Dep. at 29-30; see also Loynd Dep. at 32.
    9  Moody Dep. at 30.

The secondary reason the board opted for the double trigger approach was more narrowly confined to the dynamic it then confronted. At that time, Dickstein was seeking to replace half the board. The board feared that a single trigger might unsettle the company's creditors, who would be troubled by an automatic or, put more precisely, fully incentivized management exodus if Dickstein succeeded. The double trigger gave the creditors some reassurance that the Continuing Directors [*93] would have the discretion to conclude that a [**13] Change in Control was acceptable and thereby avoid any automatic vesting of the Covered Executives' right to Severance.

Following the board's discussion of the Change in Control provisions, the three directors with an interest in the agreements (Bozic, Reen, and Matthews) stepped out of the meeting. The five remaining directors then unanimously voted to approve the employment contracts with the double trigger (the "Employment Agreements").

B. The Basic Components Of Severance Under The Employment

    Agreements

Severance payable under the Agreements was an

"amount equal to three (3X) times [the Covered] Executive's Annual Compensation...." [10] The "Executive's Annual Compensation" was defined as the "sum of (A) the executive's base salary for 1994 plus (B) any bonus compensation to which [the Covered] Executive would have been entitled if [the Covered] Executive continued to be employed under [the] Agreement to the end of 1994.... " [11] In addition, the Covered Executive was entitled to a gross-up payment for taxes owed pursuant to § 4999 of Title 26 of the United States Code. That statutory provision imposes an excise tax on severance payments that exceed a [**14] certain threshold.

    10  PX 6 § 10(c).
    11  Id. (emphasis added). The Employment Agreements contained a somewhat different definition as of this time, but that difference is immaterial.

C. The Hills Board Is Sued By Class Plaintiffs And Quickly Reaches A Settlement With Them And Dickstein

Five days later, on August 24, 1994, a derivative and class action suit was filed in this court, captioned Weiss v. Lee, et al., C.A. No. 13707 (the "Weiss" Action"). The Weiss Action plaintiffs alleged, among other things, that the Hills board had breached its fiduciary duties by entering into the Employment Agreements.

By the next month, the Weiss plaintiffs, Dickstein, and Hills had reached a settlement involving the following basic provisions:

    .  Hills agreed to repurchase up to three million of its shares for $ 25 apiece.

    .  Hills agreed to revise the Employment Agreements, inter alia, to reduce their terms from three years to a somewhat shorter period and to agree that [**15] a Change in Control would not occur unless forty percent (rather than thirty percent) of the board was elected by an acquiror, if the board's size was increased from eight to nine or more.

    .  Dickstein agreed to drop its consent solicitation and support the removal from Hills' charter of the right of stockholders to act by consent.

. Dickstein agreed not to "institute, prosecute or pursue [any claim] against (or in the right of) [Hills]... with respect to [the Employment Agreements]". [12]

. The *Weiss* Action class of plaintiffs -- which consisted of all Hills stockholders on or after August 16, 1994, including Dickstein -- agreed to compromise, release, and settle "all claims ... that arise now or hereafter out of ... the Employment Agreements...." These included all claims that had been or could have been brought by "Hills, the shareholders of Hills, or any member of the Class...." [13]

12    DX 6 § 2.2(a).
13    DX 4 P3.

[*94] With the agreement to settle, peace seemed on [**16] the horizon for Hills. The company was doing relatively well, with increased sales, earnings, and net income. As a result of this turnaround, a retailing industry publication named Hills's CEO Bozic as its "1994 Retailer of the Year." [14]

14    DX 8.

In January 1995, Hills completed the share buy-back it had agreed to accomplish. That same month, Hills adopted a Supplemental Executive Retirement Plan ("SERP") covering twenty top executives at Hills. Unlike the Employment Agreements, the SERP benefits vested automatically upon a Change in Control. A Change in Control was defined for purposes of the SERP in the same manner as in the Employment Agreements (as modified by the *Weiss* settlement).

D. The *Weiss* Action Settlement Is Approved

On March 20, 1995, Chancellor Allen signed a final order resolving the *Weiss* Action on the basis of the September 1994 settlement terms. As contemplated, the final order released all claims that could have been brought in the Action arising out of the Employment [**17] Agreement -- including by Hills itself -- which was a party to the *Weiss* Action and bound by the judgment. [15]

15    DX 5 P7.

B. Oops! The Employment Agreements Are With The Wrong Company!

The Employment Agreements had one major technical flaw caught by none of the parties to the settlement or this court: the Agreements ran between the Covered Executives and HDS, Hills's subsidiary, and not between the Covered Executives and Hills. In one sense, this was understandable because HDS was the operating company and the Covered Executives did work for it.

But in the context of the Change in Control provision, the use of HDS made absolutely no sense. HDS was a wholly-owned subsidiary of Hills. Thus a Change in Control at HDS was not the threat the Change in Control provision was attempting to guard against. Rather, that provision was designed to protect the Covered Executives if a Change in Control at Hills occurred.

This was so obviously the intent of the Employment Agreements that the settlement agreement [**18] and final order in the *Weiss* Action each define those Agreements as being between Hills and the Covered Executives. [16] It appears undisputed that Hills, Dickstein, the *Weiss* plaintiffs, and this court believed that Hills was a party to the Employment Agreements and that the Change in Control provision applied at the Hills, not HDS, level.

16    DX 4P D; DX 5P7(b).

F. Dickstein Puts Hills In Play Again

Having settled one dispute with the Hills board, Dickstein promptly started another. On May 3, 1995, Dickstein sent Bozic a letter stating in part as follows:

We have been keenly observing your efforts to convince the investment community that by spending more than $ 70 million annually on capital expenditures, Hills will achieve increases in earnings per share that justify valuing Hills as a growth stock. Obviously, either the message has not been communicated or it has not been believed.

We seriously question the wisdom, in the existing retail environment, of spending the capital [**19] necessary to

open twenty new stores a year, particularly when [*95] weighed against the alternative of repurchasing Hills' own stock in the marketplace at approximately three times EBITDA and when you have not yet gone up against Target Stores, who is likely to be Hills' toughest competition. Notwithstanding the above, we do believe that Hills' existing franchise is a strong one and as a result we are proposing to acquire, pursuant to a merger, all of Hills outstanding shares for $ 25 per share in cash.

* * *

Dickstein Partners is willing to provide up to one half of the $ 75 million of equity capital we believe will be required to finance this transaction. We intend to expeditiously initiate discussions with third parties in order to raise the balance of the equity capital. Depending on the level of interest, we may be able to increase our proposal to materially higher than $ 25 per share.

* * *

If we are successful in acquiring Hills, our preference would be to continue to employ existing management. However, we have prepared for the possibility of existing management leaving by retaining Chaim Edelstein, who we would intend to install as Hills' interim Chief Executive Officer [**20] while we search for a permanent management team. Mr. Edelstein was formerly chairman of Abraham & Strauss/Jordan Marsh, a division of Federated Department Stores.

In case the Hills Board chooses to reject our acquisition proposal we are taking the precaution of nominating a slate of directors for election at Hills' upcoming annual meeting.... If elected, our nominees would, as soon as practicable, seek to have Jack Reen and yourself added to the Board. Our nominees would seek to have Hills sold to the highest bidder. Subject to

obtaining financing and other standard conditions we would be prepared to offer at least $ 25 per share in cash for Hills in such an auction.

NatWest Bank N.A. has also advised us that, subject to certain conditions, it is "highly confident" that it can arrange up to $ 335 million of new senior secured bank financing which may be required, together with Hills' available cash, to refinance those portions of Hills' existing debt (i.e., the working capital facility and the $ 160 million of public debt) which could accelerate upon the change of control that will occur if our nominees are elected to the Hills Board. [17]

17  DX 11, at 1-2.

[**21] G. The Hills Board Rejects The Dickstein Proposal But Agrees To Let Its Stockholders Decide To Accept That Proposal At The Ballot Box

The Hills board retained outside advisors to help them decide how to respond to the latest Dickstein overture (the "Dickstein Proposal" or "Dickstein Change in Control"). Cravath was again brought in to provide legal advice in addition to Foley, Hoag, as was the Delaware firm of Morris, Nichols, Arsht & Tunnell. The board retained SmithBarney to provide financial advice and D.F. King to act its proxy solicitor.

On May 15, 1995, the board met to consider the Dickstein Proposal. Cravath provided the board with an overview of its legal and contractual duties, including the Employment Agreements and other contracts -- in particular the company's debt facilities -- that had Change in Control triggers. SmithBarney presented its financial analysis of the Dickstein Proposal, [18] which [*96] concluded that "the Dickstein Proposal was inadequate from a financial point of view." [19]

18  DX 12.
19  DX 14, at 3.

[**22] Management, through Bozic, presented its view of the Dickstein Proposal and its belief that the company's current strategy would deliver more value.

Bozic also expressed management's view that it would prefer not to work at Hills under Dickstein's plan, because that plan would leave the company in a highly leveraged condition. Bozic did not, however, recommend aggressive defensive measures. Instead, he advised that the board "allow the stockholders to decide at the annual meeting whether to support the current Board and its policies for continued expansion or the Dickstein Proposal." [20]

20   *Id.,* at 2.

Bozic, Reen, and Matthews were then excused from the meeting because of their interests in the Employment Agreements. At this point, the meeting minutes reflect that the following occurred:

> Mr. Finkelson explained to the outside directors that under various employment and consulting contracts, each senior executive under contract would be paid three (3) times his 1994 salary and full bonus [**23] if Dickstein Partners was successful in replacing the current Board and the person resigned, but, if the Company was sold with Board approval, such payments would not be made.

> The outside directors then reviewed the strategic alternatives that had been presented by Smith Barney, as well as management's recommendations, and expressed the view that the Dickstein Proposal was not in the best interest of shareholders. [21]

21   *Id.,* at 3.

After the outside directors had reached their own determination that the Dickstein Proposal should be rejected, the insiders returned to the meeting. The full board then voted unanimously to reject that Proposal. Several reasons existed for their decision:

> . several low-end retailers were having a bad time of it and this was hurting the market valuation of all low-end retailers, making it an inopportune time to sell the company;

> . the directors believed that the company's existing strategic plan -- which involved expanding Hills and opening new stores [**24] -- would deliver more value than $ 25 a share;

> . at $ 25 a share, the total cost of Dickstein's offer was $ 642 million, yet only $ 75 million of that was to come from equity, the rest from debt;

> . of the $ 75 million in equity, Dickstein could only commit to put up half and did not have a firm commitment for the other half and

> . Dickstein's debt financing was also questionable, and consisted of a conditioned "highly confident" letter from NatWest Bank, N.A. ("NatWest").

The same day, Bozic wrote Dickstein and told it that the board had rejected its proposal. [22]

22   DX 15.

On May 24, 1995, Dickstein revised its Proposal. The new Proposal offered Hills stockholders $ 22 per share in cash and $ 5 principal amount per share of new 14% payable-in-kind holding company debentures (a.k.a. "PIK" or "junk bonds"). Dickstein backed up this offer with a conditional "highly confident" letter from NatWest to finance the debt portion of the offer, but Dickstein still had found no one to supply [**25] the other half of the equity financing [*97] required. Dickstein's letter stated that NatWest was "highly confident" that it could refinance Hills's existing debt, most of which would accelerate upon the election of the Dickstein slate. [23]

23   DX 17

The Hills board met again on May 30, 1995 to consider the revised Dickstein Proposal. SmithBarney concluded that the revised Proposal had an implied valuation of $ 24.50 to $ 25.51 and was thus only questionably and marginally an increase over Dickstein's original Proposal. SmithBarney also told the board that the Nat West letter was subject to more than the typical conditions, that NatWest had never served as lead manager in a deal like the one Dickstein was proposing, and that Dickstein still had no commitment to the

769 A.2d 88, *97; 2000 Del. Ch. LEXIS 28, **25

necessary level of equity financing.

The board decided to reject the revised Dickstein Proposal and to continue its efforts to secure reelection. Again, the board did not consider placing any defensive barriers in the path of Dickstein's proxy efforts.

[**26] On June 1, 1995, the Hills board mailed its proxy materials in connection with the company's June 23, 1995 annual meeting to its stockholders. Those materials explained the board's reasons for rejecting the Dickstein Proposal and for recommending against the election of the Dickstein slate. In particular, the board argued that the company's current strategy was sound, that it was a bad time to sell a low-end retailing company because such companies were trading at or near their twelve-month lows, that the Dickstein leverage strategy was of the kind that had caused other retailers to descend into bankruptcy, and that Dickstein had not secured firm financing for its Proposal.

The board also disclosed the impact a Change in Control could have under the company's agreements with its creditors and under the Employment Agreements:

> Election of the Dickstein nominees would trigger a "change in control" under the Indenture covering Hills' 10.25% Senior Notes, the Credit Agreement governing the Company's $ 225 million working capital facility, the employment agreements of Hills' key senior executives and other significant arrangements to which Hills is a party. Hills could be required [**27] immediately to repay - at a premium - approximately $ 160 million in principal of existing senior debt as well as any accrued but unpaid interest. The loss of the credit facility could adversely affect the terms under which Hills purchases inventory from vendors. The Dickstein Proposal also calls for replacing Hills' unsecured working capital facility with a secured facility - a change that management believes will harm relationships with vendors and reduce the amount of trade credit available to the Company, adversely affecting the Company's cash flow.

Election of the Dickstein nominees

also would be extremely expensive for the Company. Such a change in control could require Hills to refinance its 10.25% Senior Notes and working capital credit facility. In addition, substantial payments could be required under certain sale-leaseback arrangements to which the Company is a party, under employment agreements with certain of the Company's senior executives, and under the Company's supplemental executive retirement plan. If the parties to the various arrangements described above exercise their rights upon a change in control, management estimates that a change in control could cost [**28] [*98] Hills approximately $ 60 to $ 70 million. This estimate does not even consider many of the transaction costs involved in these refinancings and similar activities. Hills would incur these change in control costs even if the Dickstein nominees do not succeed in selling the Company. Merely electing Dickstein's nominees triggers a change in control.

Perhaps even more important than the financial burdens, if the Dickstein nominees are elected, the key senior executives who have been responsible for Hills' success will be able to terminate their employment and obtain substantial severance benefits. See "Employment Contracts" below. There is no assurance that Hills' senior management would remain with the Company upon such a change in control. The departure of those executives would be detrimental to the value of the Hills franchise....

* * *

In the event an executive terminates his employment agreement within one year after a Change in Control (other than an Approved Change in Control) such executive will receive a lump sum payment equal to (i) all earned but unpaid salary and pro rated bonus to the time of termination and (ii) three times such

executive's 1994 base salary and [**29] bonus, subject to adjustment under certain circumstances; and such executive will continue to be entitled to benefits and perquisites during the stated term of the agreement. [24]

24 DX 1 at 3, 17 (emphasis in original); *see also* PX 18 at 6-7 (disclosing same risks).

Dickstein's own proxy materials acknowledged the same potential effects and specifically noted that under the Employment Agreements the Covered Executives could "terminate their employment agreements [and receive their Severance] within one year following the occurrence of a Dickstein Change in Control without the approval of the existing Directors of Hills." [25] The approximate amount of the Covered Executives' Severance was easily calculable from the information on page twelve of the Dickstein materials. [26]

25 DX 13, at 12.
26 *Id.*

[**30] On June 5, 1995, Dickstein wrote a letter to Bozic, which it copied to all Hills stockholders, stating:

As you are probably aware, *in the event of a change of control that the existing Hills Board does not approve, then in fact there will be approximately $ 20 million of payments that must be made to members of management and one board member even if the beneficiaries continue to be employed by Hills.* However, if the existing Board approves of the change in control, then the severance payments are only made if the respective individual is no longer employed by Hills in a similar capacity. Obviously, in such a circumstance a prospective buyer for Hills can, all other things being equal, afford to pay a higher price for Hills. And, due to the fact that our stated preference is to continue to employ all of Hills' existing management, *if the existing Hills Board does not automatically trigger the $ 20 million golden parachute upon a change in control then we believe it probable that*

*we can raise our existing offer.*

I also think that if the Hills Board does not approve of this change in control it would be ignoring its fiduciary obligations to shareholders by effectively [**31] transferring $ 20 million from shareholders [*99] to management just when a sale of the company is about to occur. [27]

27 DX 20, at 1 (emphasis added).

H. The Hills Board Takes Action To Ensure That The Employment Agreements Are Honored

In the days leading up the June 23, 1995 annual meeting, the Hills board met on four occasions. During these meetings, the board took action to ensure that the Covered Executives would receive their Severance in the event of a Dickstein Change in Control.

Thus the board authorized the creation of so-called "Rabbi Trusts," into which funds sufficient to pay the Severance and other benefits due under the Employment Agreements, the SERP, and other relevant plans were deposited. The funds would then be payable by the trustee automatically upon the occurrence of events giving the Covered Executives the contractual right to payments. The board set these up in reliance upon the advice of Cravath, using funds from the company's revolving credit facility with Chemical Bank. [**32] [28]

28 The plaintiff alleges that the board somehow breached its fiduciary duties by failing to discuss with Chemical Bank the use of the facility for this purpose. Yet the plaintiff has failed to point to any contractual duty on the part of Hills to do so, nor has it dealt with the fact that the use of the facility to pay Severance and other employment benefits was discussed by Hills management with outside counsel, who agreed that such use was appropriate. In addition, it is difficult to imagine that Chemical Bank did not follow the proxy fight and realize that the Covered Executives' right to severance was likely to be triggered given the board's opposition to the Dickstein Proposal. For these and other reasons, I conclude that this allegation is too insubstantial to sustain any relief

769 A.2d 88, *99; 2000 Del. Ch. LEXIS 28, **32

and give it no further consideration.

The board also corrected the error in the original Employment Agreements which triggered a right to Severance in the event of an unapproved Change in Control at HDS, rather than [**33] at Hills. The board reasoned that the Employment Agreements obviously contemplated that a Change in Control at Hills - not Hills's wholly-owned subsidiary which was not subject to a takeover except after a spin-off by its parent - would be the trigger for certain rights. [29]

  29   Again, the plaintiffs challenge this action. This challenge is rather incredible given that Dickstein's own understanding and that of this Court was that the Employment Agreements ran between Hills and the Covered Executives. If ever there was a clear case of scrivener's error justifying reformation, this was it. I reject this challenge without further discussion.

I. Dickstein Urges The Board To Approve The Change in Control For Purposes Of The Employment Agreements Only

On June 21, 1995, Dickstein's lawyer, David P. Levin of the firm of Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, wrote to Hills's counsel at Cravath, Allen Finkelson. The letter speaks for itself:

  We begin with the incontrovertible proposition that [**34] whatever the existing Board does with respect to those golden parachute provisions must be in the best interests of Hills and its shareholders. It is equally incontrovertible that, under the present circumstances, it is not in the best interests of Hills or its shareholders for management to be entitled (upon termination) to parachute payments triggered merely by the shareholders electing directors other than the incumbent board. Thus, it is necessary for the incumbent board to take whatever action may avoid that possible liability, including approving the change of control that would result from the election of the Dickstein slate....

  [*100] If the incumbent Board were to fail to approve the change of control

(for whatever reason), that decision would be a self-interested one under Delaware law since it imposes upon the shareholders a penalty for *not* re-electing the incumbent Board. That decision would require the incumbent directors to prove that their inaction was "entirely fair" to Hills and its shareholders. Quite simply, it cannot be fair for the incumbent directors to cause a penalty to be imposed on the Hills' shareholders when there is action those directors could take under [**35] the golden parachute contracts to avoid that possible liability. [30]

  30   DX 22, at 1 (emphasis in original).

The clear import of Levin's letter was that the Hills board was supposed to consider whether to approve the Change in Control for purposes of the Employment Agreements without consideration of the facts that: 1) the Covered Executives had stayed with the company throughout the turbulence of 1994 and 1995 in reliance upon their contractual protections; and 2) the board had already voted that the Change in Control was, in its view, harmful to the company and its stockholders. The simple analysis Levin believed was in order was whether, in the event that Dickstein won, it would be good or bad for the stockholders of Hills if the company were to trigger an immediate right on the part of the Covered Executives to resign and receive their Severance.

J. The Board Meets To Consider Levin's Letter And To Vote On Whether To Approve The Dickstein Change in Control For Purposes Of The Employment Agreements

[**36] Finkelson brought Levin's letter to the attention of the board the next day and according to his unrebutted affidavit gave the board the following advice:

  I advised the board that, in my opinion, concurred in by Johnston, [31] Levin's analysis was wrong. I advised the board that the obligation of the directors was to determine whether a Dickstein-led change in control of Hills was in the best interests of Hills stockholders. If they determined that it was not, the directors were under no obligation to "approve" such change in

control for purposes of the employment agreements. I advised that, particularly in light of the history of the "approval" provision - an exception designed to allow Hills to retain management in the case of a transaction believed by the directors to be in the best interests of the stockholders of Hills - and in light of the directors' belief that a Dickstein-led change in control was not in the best interests of the stockholders of Hills, a board decision not approving a potential Dickstein takeover for purposes of the employment agreements was justifiable. [32]

31    This refers to Andrew M. Johnston of the Morris, Nichols firm.
[**37]
32    Finkelson Aff. P19.

The board then discussed whether to approve the Change in Control for purposes of the Employment Agreement. By this time, the board knew that it was probable that Dickstein would win the election, but several members still harbored hope that a couple of the company's largest stockholders would decide to stick with the current board and thus tilt the outcome toward the incumbents.

In considering whether to approve the Change in Control for purposes of the Employment Agreement, it is evident that the board's view was that it was not appropriate to consider that question [*101] through the narrow prism recommended by Levin. Rather, the board followed the advice given it by Finkelson.

In doing so, the board was not unaware of the financial and operational consequences to the company of triggering the Covered Executives' right to resign and receive Severance, but the board did not give those factors much weight. Instead, the board believed that the company had made contracts with the Covered Executives, and that these contracts should be honored. As director Loynd put it, Hills [**38] faced "exactly the circumstances that had been anticipated going to contract, if you will more than a year earlier.... [33] Loynd continued, "I have always.., honored the commitments that I have made. And I expect my company to do the same." [34] The outside directors felt that the company had

a contractual obligation to the Covered Executives to trigger their right to Severance, unless the board believed in good faith that the Change in Control was not harmful to the company.

33    Loynd Dep. at 94.
34    Loynd Dep. at 99.

In that regard, the board continued to adhere to its strongly held view that, for the reasons previously identified, the Dickstein Change in Control would be seriously adverse to the interests of the company and its stockholders. Therefore, the outside directors voted as a group to disapprove the Change in Control for purposes of the Employment Agreements. Then the full board voted the same way.

K.    Dickstein Wins The Election But Doesn't Buy The Company Or Run An Auction

On June 23, 1995, the Hills annual meeting took place. The Dickstein slate won election by a decisive margin. On July 5, 1995, the election results were certified. As both the board and Dickstein knew, this Change in Control had important [**39] consequences under the Employment Agreements, the SERP, the indenture agreement governing Hills's senior notes, and Hills's major credit agreement.

The same day the election results were certified, the Covered Executives all resigned. Upon resignation, they received the Severance, SERP, and other benefits due them under their various contracts and benefit plans.

Soon thereafter, Hills's primary creditor, Chemical Bank, exercised its default fights, forcing Dickstein to refinance the company's debt. [35] Despite the fact that Dickstein had assured Hills's stockholders it had the wherewithal to refinance the company's debt and bear the other costs associated with a Change in Control (including the Severance and SERP obligations) and to acquire all the shares of the company for $ 22 in cash plus $ 5 in PIK, Dickstein never did so. Nor did it run the promised auction. Instead, the Dickstein slate simply managed the company.

35    Mark Dickstein and one of his slate attribute this to Chemical's outrage over the triggering of the Severance and the resignation of outgoing management. But no Chemical witness has said that is so, and Chemical had a contractual right to

769 A.2d 88, *101; 2000 Del. Ch. LEXIS 28, **39

pull its financing upon a Change in Control, which Dickstein well knew.

[**40] In April 1999, Hills was acquired from its stockholders by Ames Department Stores in exchange for $ 1.50 a share and a share in the upside of this lawsuit.

## II. The Claims Of The Parties

This matter is before me now on motions for summary judgment. The director-defendants have moved for summary [*102] judgment on the following claims made by the plaintiffs:

   . that the defendant-directors breached their fiduciary duties by refusing to approve the Dickstein Change in Control for purposes of the Employment Agreements;

   . that the defendant-directors committed waste by refusing to approve the Dickstein Change in Control for purposes of the Employment Agreements;

   . that defendant-directors Bozic, Reen, and Matthews were unjustly enriched by the Severance they received under the Employment Agreements; and

   . that defendant-directors Bozic, Reen, and Matthews received Severance and other payments in excess of what was due them under the Employment Agreement, SERP, and other relevant plans.

For their part, the plaintiffs have moved for partial summary judgment on their claim that the Covered Executives who are defendants - Bozic, Reen, and Matthews - received payments [**41] of Severance that exceeded the proper amount due them under the Employment Agreements.

In addressing these claims, I apply the familiar standard under Court of Chancery Court Rule 56. Under that standard, summary judgment should be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. [36] When a moving party has properly supported its motion, the non-moving party must submit admissible evidence

sufficient to generate a factual issue for trial or suffer an adverse judgment. [37]

   36 *See e.g., Williams v. Geier, Del. Supr., 671 A.2d 1368, 1375 (1996).*
   37 *See, e.g., In re Liquidation of National Heritage Life Insur. Co.,728 A.2d 52, 56, aff'd, Del. Supr., 1998 Del. LEXIS 403 (1998).*

## III. Is There A Triable Issue Regarding Whether The Defendant-Directors Breached Their Fiduciary Duties By Failing To Approve The Dickstein Change in Control For Purposes Of The Employment Agreements?

[**42] Resolving whether summary judgment should be granted on the plaintiffs' fiduciary duty claims is made a bit more difficult by two factors. First, the plaintiffs and the defendant-directors have offered up virtually every possible standard of review as the appropriate prism through which to evaluate this question. For their part, the plaintiffs say that either the *Blasius Industries, Inc. v. Atlas Corp.,* [38] the *Unocal,* [39] or the entire fairness standard of review applies. The defendant-directors, meanwhile, contend that their decisions are to be reviewed under the deferential business judgment rule standard.

   38 *Del. Ch., 564 A.2d 651 (1988).*
   39 *493 A.2d 946.*

The second complicating factor is that the plaintiffs have no right to challenge the initial decision of the Hills board to enter into the Employment Agreements in 1994. Thus they have no right to challenge and therefore must concede that those Agreements were entered into for a proper purpose and that [**43] Hills received adequate consideration from the Covered Executives in exchange for their rights under those Agreements. As will be noted, the plaintiffs' current arguments often appear to be an attempt to second-guess Dickstein's own decision to accept the *Weiss* Action settlement and thereby waive any right on its own or Hills's part to challenge the decision of the Hills board to execute the Employment Agreements. I will not permit [*103] them to do so, but will only allow them to challenge whether the director-defendants made appropriate decisions in 1995 regarding whether to oppose the Dickstein Change in Control and to trigger the Covered Executives' Right to Severance.

## A. What Is The Appropriate Standard Of Review?

The plaintiffs' attack on the board's decision to trigger the Severance does not fall neatly within any of the traditional standards of review. But, for reasons I now explain by process of elimination, I believe it is most appropriate to apply the *Unocal* standard of review.

In reaching this conclusion, I start with a rejection of plaintiffs' argument that the *Blasius* compelling justification standard of review should apply. The plaintiffs are estopped from [**44] arguing and have produced no evidence that the Employment Agreements were entered into for the "primary purpose of thwarting the exercise of a stockholder vote." [40] Rather, they essentially admit that the Employment Agreements were executed as an incentive for current management to remain at Hills in the face of a takeover threat from Dickstein and that the double trigger was put in place to give the Hills board negotiating leverage with potential acquirors and to assuage the company's creditors. The record is simply devoid of any hint that the Hills board decided to adopt the Employment Agreements as a method of placing pressure on the Hills electorate to vote against a Change in Control. [41]

40 *Blasius,* 564 A.2d at 660.
41    This distinguishes this case from *Sutton Holding Corp. v. Desoto, Inc.,* Del. Ch., C.A. No. 12051, mem. op., *1991 Del. Ch. LEXIS 85,* Allen, C. (May 14, 1991).

    In *Sutton,* a company's pension plans provided that the plans could not be terminated nor benefits be reduced under the plans for five years following an unapproved change in control. In dicta, Chancellor Allen said that this provision of the plan appeared to implicate *Blasius,* because it was designed to deter a change in control (by denying an acquiror the opportunity to use excess pension funding to finance the acquisition) and not to create useful rights in pension plan beneficiaries. *Id., 1991 Del. Ch. LEXIS 85,* at *3-6. In this case, unlike *Sutton,* there is no evidence that the Hills's board's "dominant motivation" was to "seek to coerce shareholders in the exercise of the vote," *1991 Del. Ch. LEXIS 85,* *3, and ample evidence that the Employment Agreements were intended to "create.. . valuable economic right[s]" in the Covered Executives. *1991 Del. Ch. LEXIS 85,* *4.

[**45] Nor are the Employment Agreements the

sort of corporate action that directly affects the electoral rules or process; rather, the plaintiffs contend that the Employment Agreements have the incidental effect of coercing or placing an undue toll on the free exercise of the shareholder vote. That is, the plaintiffs allege that the Severance under the Agreement exacts a financial penalty on the company and therefore the stockholders if they vote for an unapproved Change in Control. This, the plaintiffs contend, is sufficient to trigger *Blasius* review. Put simply, this is an argument that the *Blasius* standard is triggered because the Employment Agreements fail the proportionality prong of *Unocal,* which already proscribes coercive defensive measures. I admit that our case law often determines whether *Blasius* applies by examining whether the challenged corporate action is coercive or preclusive of electoral action, an exercise that is duplicative of *Unocal.* [42]

    42    *See generally Chesapeake Corporation v. Shore, Del. Ch., 2000 Del. Ch. LEXIS 20,* *73-78, C.A. No. 17626, Strine, V.C. (Feb. 7, 2000, rev. Feb. 11, 2000).

[**46] Rather than extend this unwieldy and redundant practice to corporate action that [*104] is not directed specifically at the electoral process, I believe that it is more rational and efficient to apply the more flexible, but still exacting, *Unocal* standard in situations like this, but with a sharp eye out for electoral coercion. [43] In so concluding, I am conscious that a different approach could subject a variety of measures commonly reviewed under *Unocal* to *Blasius* scrutiny. For example, a termination fee payable in the event of a negative stockholder vote on a merger places the same sort of economic toll on the franchise as the Employment Agreements. Our law has traditionally reviewed the propriety of these fees under the *Unocal* or *Revlon* [44] standards depending on the circumstances, [45] or under the comparable liquidated damages standard used in the *Brazen* case. [46] Because these standards can already be applied to strike down termination fees or severance payments that coerce stockholders, there is no need to layer *Blasius* on top of them.

    43    *2000 Del. Ch. LEXIS 20,* *73.
    44    *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del. Supr., 506 A.2d 173 (1986).*
[**47]
    45    *See QVC Network v. Paramount Communications, Inc., Del. Ch., 635 A.2d 1245,*

769 A.2d 88, *104; 2000 Del. Ch. LEXIS 28, **47

*1271 (1993), aff'd, Paramount Communications v. QVC Network Inc., Del. Supr., 637 A.2d 34 (1994).*
46  *Brazen v. Bell Atlantic Corp., Del. Supr., 695 A.2d 43, 47-50 (1997).*

Similarly, I reject the plaintiffs' argument that *Blasius* applies because the defendant-directors informed the Hills stockholders of the financial and personnel effects under the Employment Agreements that could result from an unapproved Change in Control. "The mere fact that the stockholders knew" that voting to approve the Dickstein Change in Control may trigger the Covered Executives' right to Severance "does not by itself constitute stockholder coercion." [47] The Hills board was duty-bound to inform its stockholders of the possible financial and operational implications of a Change in Control. [48] The board did so, and Dickstein informed the stockholders of the same risks. There is no evidence in the record to support a claim that the Hills board purposely used the Severance [**48] lever so as to place unwarranted pressure on the Hills stockholders. Indeed, it would have been absurd for the board to use such a harmless weapon against Dickstein. *After all, Dickstein had assured the electorate that it could cover the Severance, refinance the company's debt facilities and senior notes, and offer a minimum of $ 22 plus $ 5 in PIK a share.* Given that this was Dickstein's electoral platform, there is no basis to conclude that the possibility of post-election Severance payments would coerce an electorate that Dickstein had already promised to largely cash out - regardless of whether that Severance was paid. At worst, stockholders knew that if the Severance was triggered they might lose out on Dickstein's promise that it would probably "raise [its] existing offer" if the Severance was not paid. [49]

47  *Brazen, 695 A.2d at 50.*
48  *In re General Motors Class H Shareholders Litig, Del. Ch., 734 A.2d 611, 620-21 (1999)* (where board fulfilled its duty to inform stockholders of the implications of rejecting a board-proposed transaction in a non-threatening manner, no coercion was found).
[**49]
49  DX 20.

The plaintiffs are also estopped from making the argument that the Severance is so large as to constitute a coercive influence on a Hills stockholder vote. When it was agreed and ordered that Hills could not bring suit challenging the Employment [*105] Agreements, that agreement and order meant many things. One of them was that Hills was not entitled to claim that the level of the Severance in the Agreements was so excessive as to be coercive. Dickstein (who caused the Hills companies to bring this suit) cannot credibly claim that it was unaware of the magnitude of the Severance payments at the time it released its claims. Nor can Hills and the Hills stockholders who are bound by a similar release.

For different reasons, I reject plaintiffs' invitation to apply the entire fairness standard of review. In the purest sense, only three of the seven Hills directors had a self-dealing "interest" in the Employment Agreements. [50] Thus to the extent that plaintiffs wish me to concentrate solely on the June 22, 1995 vote of the Hills board to disapprove the Dickstein Change in Control for [**50] purposes of the Employment Agreements, the plaintiffs face the insuperable dilemma that a majority of disinterested directors made that decision. The plaintiffs, however, contend that all of the directors were interested because they desired reelection and that defendant Lee was interested because his firm received $ 250,000 annually to act as a financial advisor to Hills and because entities affiliated with Lee allegedly would have lost certain rights to purchase Hills shares at a favorable price if a merger with Dickstein occurred.

50  See 8u. $ 144.

As to the latter point, the plaintiffs must present admissible evidence creating a genuine issue of material fact whether Lee is interested" under the materiality standard applicable to non-§ 144 interests under *Cede & Co. v. Technicolor, Inc.* [51] and *Cinerama. Inc. v. Technicolor, Inc.* [52] This they have not done. At oral argument, the defendant-directors assured me that Lee was far too wealthy to be influenced by the interests cited by plaintiffs. They backed this assertion up with an affidavit indicating that Lee's adjusted gross income for 1994 and 1995 combined was in excess of $ 200 million. [53] Moreover, I note that Lee (or his affiliated [**51] businesses) owned nearly 800,000 Hills shares during the spring and summer of 1995 and thus stood to receive over $ 20 million in proceeds if Dickstein's promised strategy panned out. [54]

51  *Del. Supr., 634 A.2d 345, 364 (1993)* (subsequent history omitted).
52  *Del. Supr., 663 A.2d 1156, 1169-71(1995)*

(subsequent history omitted).
53    Given that the plaintiffs had ample opportunity to take discovery on this issue and have been permitted to advance new arguments in response to the affidavit, I will accept the affidavit as being non-prejudicial. The affidavit should have been presented sooner, however.
54    DX 1, at 15.

Although it is true that the test to be applied is a subjective one, [55] that subjectivity does not permit a plaintiff to wait until trial to present *plausible* evidence of a material self-interest on the part of a director. The $ 250,000 that went to Lee's firm represents an infinitesimal proportion of his annual income. Moreover, [**52] the plaintiffs have failed to produce evidence that the rights Lee's affiliates possessed would in fact have been extinguished by a merger or other Change in Control, or that these rights overrode Lee's interest in maximizing his return from the 800,000 Hills shares he already controlled. Given these facts and the plaintiffs' failure (through depositions and other discovery) to demonstrate that Lee was abnormally obsessed (apologies to Benjamin Franidin) with (what to Lee are) pennies rather than [*106] dollars, I conclude that there is no triable issue regarding Lee's disinterested status.

55    *Cede II,* 634 A.2d at 364.

Even if Lee was interested under the *Cinerama* and *Cede II* standards, it would not change my decision. To date, Delaware law has not taken the position that a board of directors' decision to oppose a takeover is subject to the entire fairness standard simply because a majority of the board has an "interest" in continuing to remain in control. Rather, the potential conflict [**53] always inherent in a challenge to a board's control is the very foundation for the *Unocal* standard of review itself. In the application of that standard, the court is to consider whether a majority of the directors have a financial or personal "interest" in securing the continuation of the incumbent board's control of the corporation, [56] but the presence of a majority of directors "interested" in this sense does not trigger the entire fairness standard of review unless the defensive measure under challenge is subject to fairness review by virtue of the application of 8 Del. C. § 144. [57] A credible argument can be made, of course, that a board's decision to take steps to maintain itself in office is an inherently self-interested decision that invariably ought to be evaluated under the exacting

entire fairness standard. [58] But the extremity of this approach might well inhibit defensive action that is in fact stockholder-protective and act as a disincentive for qualified businesspeople to serve on boards. The current Delaware approach avoids these costs while providing stockholders with sufficient protection from improper entrenching tactics - so long as our courts apply [**54] *Unocal* with the appropriate rigor and sanction only well-justified and proportionate defensive measures. [59] Thus as an initial matter, it is inappropriate to apply the entire fairness standard of review.

56    *Unocal,* 493 A.2d at 955.
57    *Chesapeake Corp. v. Shore,* 2000 Del. Ch. LEXIS 20, *62, n. 32.
58    *See* Joel Seligman, *The New Corporate Law,* 59 BROOKLYN L. REV. 1, 11(1993).
59    In this regard, one should not forget the proven willingness of Delaware courts to strike down purposely entrenching board action and even well-intentioned board action that has the primary purpose of thwarting a stockholder vote. *Schnell v. Chris-Craft Industries, Inc.,* Del. Supr., 285 A.2d 437 (1971); *Blasius,* 564 A.2d 651.

Hence, the choice of the initial standard of review comes down to *Unocal* and the business judgment rule. Although the Employment Agreements are not so self-evidently defensive as a poison pill, their origin [**55] and purpose convince me that they have objectively defensive characteristics justifying heightened scrutiny.

The Employment Agreements were concededly adopted as a "reaction to a perceived 'threat to corporate policy and effectiveness which touches upon issues of control.'" [60] The Hills board feared that it would lose management in the face of Dickstein's 1994 overtures. Not only that, the Hills board decided to adopt a double trigger approach so as to provide the board with negotiating leverage in the context of a change of control battle. This approach gave the board the flexibility to use the contractual Change in Control approval process as an incentive to a friendly transaction, as a tool to extract a higher bid from a potential acquiror, or as a financial barrier to an acquisition bid the board believed was inadvisable. [61]

60    *Stroud v. Grace,* Del. Supr., 606 A.2d 75, 82 (1992) (quoting *Gilbert v. El Paso Co.,* Del. Supr., 575 A.2d 1131, 1144 (1990)).

61  *See MAI Basic Four, Inc. v. Prime Computer, Inc., 1988 Del. Ch. LEXIS 161*, Del. Ch., C.A. No. 10428, mem. op., 1988 WL 140221, mem. op., Hartnett, V.C. (Dec. 20, 1988) (considering under *Unocal* standard whether a target board responded reasonably to a tender offer by, among other things, refusing to rescind severance rights payable to executives after a change in control).

[**56]  Delaware case law has assured stockholders that the fact that the court has [*107] approved a board's decision to put defenses in place on a clear day does not mean that the board will escape its burden to justify its use of those defenses in the heat of battle under the *Unocal* standard. 62 The "omnipresent specter that a board may be acting primarily in its own interests," 63 is, if anything, more ominously haunting when a board is faced with an actual contest for control, such as was the case here, and must decide how to deploy its defensive arsenal.

62  *See, e.g., Moran v. Household International, Inc., Del. Supr., 500 A.2d 1346, 1354 (1985).*
63  *Unocal, 493 A.2d at 954.*

By contrast, the defendant-directors would have me apply the business judgment rule because, according to them, there is no evidence that the Hills board decided to trigger the Severance in order to deter the Dickstein Change in Control. In support of this proposition, they cite to the board's [**57] decision to let the stockholders decide who should run the company in a fair election. I am reluctant, however, to adopt this approach, given the concededly defensive capabilities the double trigger gave the Hills board. Dickstein all but invited the board to sit down with it and negotiate an increase in its bid in exchange for a board decision not to trigger the Severance. Thus the board had the chance to exercise the sort of negotiating leverage the double trigger was intended to give it. Its decision how to exercise that leverage in an actual conflict is entitled to no more deference than its original decision to give itself that leverage. As a result, I conclude that the *Unocal* standard of review is appropriate in the first instance.

B.  Has The Hills Board Demonstrated Its Entitlement To Summary Judgment Under The *Unocal* Standard?

This case requires me to draw on the Supreme Court's assurance that *Unocal* is not intended to lead to a

structured, mechanistic, mathematical exercise. 64 As is well known, the *Unocal* test has two prongs. The first requires the board to demonstrate that, after a reasonable investigation, it determined in good faith that the corporation [**58] faced a threat warranting a defensive response. 65 The second requires the board to demonstrate the proportionality of its defensive measures to the threats it identified. 66 "The presence of a majority of outside independent directors" materially enhances a board's ability to meet these burdens. 67

64  *Unitrin, Inc. v. American Gen'l Corp.; Del. Supr., 651 A.2d 1361, 1373 (1995).*
65  *Unocal, 493 A.2d at 955.*
66  *Id. at 955-957.*
67  *Unitrin, 651 A.2d at 1375; Unocal, 493 A.2d at 955; Chesapeake Corp. v. Shore, 2000 Del. Ch. LEXIS 20, *101, n. 86.*

In this case, the first prong is of preeminent importance. The plaintiffs waived their right to challenge the validity of the Employment Agreements. That waiver is consequential. The plaintiffs cannot in good faith claim that the Severance is a disproportionate response in a situation when the Hills board, on a good faith and informed basis, concluded that [**59] a Change in Control was adverse to the interests of Hills and its stockholders. To find otherwise would be to say that the plaintiffs waived nothing when they agreed not to challenge the adoption of the Employment Agreements.

[*108]  This is not to say that the board could ignore the circumstances facing the company in 1995 when it triggered the Severance, but it is to emphasize that the board's prior decision to promise the Covered Executives Severance in the context of a non-Approved Change in Control and the plaintiffs' waiver of the right to challenge that basic promise are critically important foundational facts. These facts greatly restrict the court's ability to second-guess the board's decision to trigger the Severance if the court concludes that the board has met its burden to demonstrate that it made a good faith and informed judgment that the Dickstein Change in Control was a threat to Hills and its stockholders.

Turning to that question, my job becomes surprisingly simple. The plaintiffs have failed to challenge the board's conclusion that the Dickstein Change in Control constituted a threat to Hills and its stockholders. In the face of abundant evidence supporting the board's [**60] determination, the plaintiffs have

769 A.2d 88, *108; 2000 Del. Ch. LEXIS 28, **60

remained steadfastly mute. Thus they have conceded away most of their case.

I reach this conclusion because I reject the narrow prism through which the plaintiffs would have me view the board's actions. According to plaintiffs, the Hills board was duty-bound on June 22, 1995 to consider the narrow question of whether, if the Dickstein slate prevailed, as the board thought was likely, it was in the best interests of Hills to trigger the Severance rights of the Covered Executives.

In answering this narrow question, the plaintiffs suggest, the board was to ignore the fact that the Covered Executives had remained loyal employees during a period of corporate turbulence and had resisted the opportunity to go to work for other employers. The board was to ignore the fact that the Covered Executives had signed contracts that gave them the right to Severance unless the board *affirmatively approved* a Change in Control, [68] contracts that were subject to an implied covenant of good faith and fair dealing. [69] Finally, the board was to ignore the fact it had in good faith and with the advice of outside financial and legal advisors reached the judgment that [**61] the Dickstein Change in Control was adverse to the interests of the company and its stockholders.

> 68    That is, the Employment Agreements clearly contemplate a right to Severance in the absence of a board vote on whether to approve a Change in Control. This weakens plaintiffs' argument that the board's supposed duty was to consider the Change in Control's advisability from the singular perspective of whether it was wise to trigger the Severance, assuming the Change in Control was in fact going to occur.
>
> 69    *Anthony's Pier Four, Inc., v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806, 820-21 (Mass. 1991).*

Confessedly, the logic of this approach escapes my comprehension. Unless the Employment Agreements are read as containing a wholly illusory promise of Severance when the board does not approve a Change in Control, the plaintiffs' approach is baffling. Because I do not believe that a responsible board could read the Employment Agreements as providing the Covered Executives with an [**62] essentially phony promise, I do not accept the plaintiffs' approach.

Rather, the board's decision, per Finkelson's advice,

[70] to take a consistent approach to the issue of whether to approve the Dickstein Change in Control was a reasonable response in the circumstances presented. Because the board had determined, [*109] for many sufficient reasons, that the Dickstein Change in Control was harmful to the company, it would have exercised bad faith under the Employment Agreements if it had voted to approve the Change in Control simply so as to avoid triggering the Covered Executives' right to Severance. After one party to a contract has given its consideration for a promised payment, it is often in the other party's narrow, selfish interest to accept that consideration and avoid the promised payment. Acting on that interest is commonly referred to as a breach of contract.

> 70    See *8 Del.C.§ 141(e).*

A majority of the Hills board had no self-interest in the Employment Agreement. Their decision to trigger the Severance [**63] because they believed that the Dickstein Change in Control was a harmful threat and because they believed that the company should live up to its contractual commitments was a reasonable decision in the circumstances. Having produced no evidence rebutting the board's showing that the Dickstein Change in Control was reasonably considered by it to be dangerous, the plaintiffs have failed to generate a triable question about whether the board has failed to meet its burden under *Unocal.* Notable in this regard is the fact that if Dickstein had been capable of doing what it assured the Hills stockholders it could do - consummating an acquisition of Hills that required the payment of the Severance and the refinancing of the company's debt and senior notes - this case would not be here.

## C. The Plaintiffs Have Not Otherwise Produced Evidence Of A Breach Of Fiduciary Duty Sufficient To Generate A Material Issue Of Fact For Trial

Under *Unocal,* it putatively remains open to the plaintiffs to show that board action that has been found to be proper under heightened scrutiny is, nonetheless, invalid because it resulted from breaches of the duty of care or loyalty by the board. [71] The [**64] plaintiffs have not come close to generating a triable issue regarding whether the defendant-directors breached their fiduciary duties by failing to approve the Dickstein Change in Control for purposes of the Employment Agreements.

769 A.2d 88, *109; 2000 Del. Ch. LEXIS 28, **64

71  *E.g., Unitrin,* 651 A.2d at 1373, 1390. *See In re Gaylord Container Shareholders Litig., Del. Ch., 753 A.2d 462, 2000 Del. Ch. LEXIS 16,* *67, Strine, V.C. (2000) (questioning the logic of this approach).

As to loyalty, a majority of the board had no interest in the Employment Agreements. On at least two occasions, this majority voted separately to consider whether to approve the Dickstein Change in Control and unanimously decided not to do so. Furthermore, there is no evidence that would support the proposition that the three interested directors either possessed the capability to or in fact did exercise undue influence on the disinterested majority. And the board's unrebutted showing that it legitimately opposed that Change in Control for good faith reasons [**65] makes any inference of a loyalty breach impossible.

Notably, this is not a situation where the plaintiffs have produced evidence that the board, realizing it was going to be thrown out of office, triggered the Severance out of spite or hard feelings. Evidence that would support a finding that board members were sore losers and took action out of a bad faith desire to exact revenge on the stockholders for voting the wrong way would justify a trial to determine whether the board had violated its duty of loyalty. But the plaintiffs have produced no evidence of this nature.

Finally, the plaintiffs have failed to submit evidence that would support a conclusion [*110] that the board breached its duty of care. Although the plaintiffs contend that the board ignored or gave inadequate weight to certain factors, their due care argument really rehashes their view that on June 22, 1995 the board was supposed to blind itself to its contractual obligations and its previous good-faith determination that the Dickstein Change in Control was inadvisable.

But the evidence is clear that the board believed that the departure of the Covered Executives would hurt the company; knew that at least some, if not [**66] all, of the Covered Executives were likely to depart if granted Severance; and understood the size of the payments to be made to the Covered Executives. Indeed, the board informed the Hills stockholders of all these issues. A proper application of the gross negligence standard therefore precludes judicial second-guessing of their presumptively good-faith decision to honor the agreements and oppose the Dickstein Change in Control.

72  The record evidence simply will not support a finding of gross negligence in the face of the substantial evidence of the board's careful consideration of the merits of the Dickstein Change in Control, the board's decision to allow the stockholders to choose that Change in Control in a fair election, and the board's reliance upon advice from respected outside advisors. [73]

72  A good example of the plaintiffs' unique approach to this case is their argument that the board should have considered amending the SERP to deprive the Covered Executives of their rights under that plan. That is, after the Covered Executives had stuck with the company the board was to amend the SERP at the last minute to deprive them of their promised benefits. This argument cannot bolster a due care claim.

[**67]

73  I also note that the four defendant-directors who were not Covered Executives cannot be held responsible for monetary damages for a breach of their duty of care. The Hills charter has an exculpatory charter provision adopted under the authority of *8 Del. C. § 102(b)(7).*

For all these reasons, I grant summary judgment for the defendant-directors on the plaintiffs' claim that the board breached its fiduciary duties by failing to approve the Dickstein Change in Control for purposes of the Employment Agreements. [74]

74  I also grant summary judgment to the defendant-directors on the plaintiffs' waste claim. The plaintiffs concede, as they must, that there was adequate consideration given by the Covered Executives for the Employment Agreements. But they contend that Hills derived no benefit from triggering the Severance on June 22, 1995 and thus the board's decision to fire that gun was a gift to the Covered Executives. The plaintiffs can only do so by disregarding the fact that the Covered Executives performed their obligations under the Agreement and remained with Hills during the Change in Control fight - that is, the Covered Executives had already given value under the contract. This argument does not come close to meeting the onerous test for waste. *See, e.g., Glazer v. Zapata, Corp.. Del. Ch., 658 A.2d 176, 183 (1993)* (waste claim must be supported by evidence that "an exchange... is so one sided that

no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration"); *see also Brehm v. Eisner, Del. Supr., 746 A.2d 244, 2000 Del. LEXIS 51, *54 (2000)* (to effectively challenge a board's decision about executive compensation as waste, the plaintiff must demonstrate that the board acted "unconscionably" by "irrationally squandering or giving away corporate assets").

But I deny the motion for summary judgment by defendants Bozic, Reen, and Matthews against plaintiffs' breach of contract claim based on their receipt of excess Severance payments. As fiduciaries of Hills, they are in no position to claim from Hills more than that to which they were contractually due. The funding of the Rabbi Trusts occurred while they were still on the Hills board, the Hills board had ultimate responsibility to ensure compliance with the Agreements, and Reen (Bozic's subordinate) was the manager whose department calculated the Severance. *Section 102(b)(7)(iv)* of Title 8 precludes Bozic, Reen, and Matthews from claiming that they are insulated from any responsibility to repay overpayments made to them - overpayments they were in a position to have avoided in the first instance.

For a related reason I also deny the defendants' motion for summary judgment on the plaintiffs' unjust enrichment claim. Under either Massachusetts or Delaware law, the plaintiffs are only entitled to relief in this dispute *involving rights under written Employment Agreements* if they show that the Covered Executives received Severance improperly as a result of breaches of fiduciary duty by the defendant-directors or breaches of the Employment Agreements themselves. If the plaintiffs make either of the required showings of a fiduciary or contractual breach, relief necessary to ensure that the defendant-directors are not "unjustly enriched" will be awarded, *see Sanders v. Wang, Del. Ch., 1999 Del. Ch. LEXIS 203, C.A. No. 16640, mem. op. 1999 WL 1044880, at *10, Steele, V.C. (Nov. 8, 1999 rev. Nov. 10, 1999),* but not because plaintiffs have proven a free-standing "unjust" enrichment claim. Nonetheless, I leave the unjust enrichment claim in the case for a narrow reason.

Even if Bozic, Matthews, and Reen can convince me that they had no role in causing any excessive payments to themselves, they still would be unjustly enriched if they received them. Just as someone can't keep a mistakenly excessive tax refund or automatic teller pay out, these defendants cannot hold on to overpayments from the company to which they owed fiduciary duties.

[**68]

[*111] IV. Are The Plaintiffs Entitled To Summary Judgment On Their Claim That Defendants Bozic, Reen, and Matthews Received Severance In Excess Of That Called For By The Employment Agreements?

The plaintiffs contend that defendants Bozic, Reen, and Matthews were paid Severance in an amount substantially greater than the Employment Agreements authorized. [75] Specifically, the plaintiffs allege that these defendants received a windfall because Hills included in the calculation of their Severance a totally discretionary, non-mandatory bonus (the "Special Bonus") that was paid to each of these Executives by the Hills board in early 1995 because of the company's strong 1994 performance. These Special Bonuses, which amounted to $ 100,000 for Bozic and $ 70,000 each for Reen and Matthews, were included in the Severance formula. As a result, the Special Bonuses were multiplied by three and the company was forced to pay gross-up taxes on these amounts - for a total payment of nearly $ 1.2 million.

75    The plaintiffs sought summary judgment on two other contractual claims. The defendants do not oppose the plaintiffs' motion as to those claims, and the parties have agreed to work together to formulate an agreed-upon order embodying the appropriate relief.

[**69] For the following reasons, I find that there is no genuine issue of material fact regarding plaintiffs' entitlement to judgment on this claim, which is supported by the plain language of the Employment Agreements. Because the contractual language is dispositive to this issue I cite it now.

Under the Employment Agreements, a Covered Executive was to receive Severance in an amount equal

769 A.2d 88, *111; 2000 Del. Ch. LEXIS 28, **69

to "three (3x) times [the Covered] Executive's Annual Compensation.....," [76] "Annual Compensation," in turn, was defined as "the sum of (A) the [Covered] Executive's base salary for 1994 and (B) any bonus compensation to which [the Covered] Executive *would have been entitled* if [the Covered] Executive continued to be employed under [the] Agreement to the end of 1994 (assuming that all Company and individual performance goals and objectives had been achieved pursuant to Section 5(b)) [of this Agreement].... " [77] Under Section 5(b) of [*112] all of the Agreements, a "[Covered] Executive shall receive the bonuses specified in Schedule A upon the terms and conditions specified in Schedule A. Such bonuses shall be paid to [the Covered] Executive within sixty (60) days after the end of each [**70] of the Company's fiscal years during the term of this Agreement." [78] Schedule A, in turn, provides that the Covered Executive shall receive 50% of his base salary if he meets the annual goals established for him by the Hills board. [79]

76  DX 7 § 10(c).

77  *Id.* There is one exception to this definition that the parties agree has no relevance to the current dispute regarding the Severance awarded defendants Bozic, Reen, and Matthews.

78  *Id.* § 5(b).

79  *Id.*, Sched. A.

The Employment Agreements each contain a Massachusetts choice of law provision that is entitled to respect, given that Hills was headquartered in that state and that the Covered Executives performed the bulk of their services there. [80] Like Delaware courts, Massachusetts courts interpret contracts in accordance with their plain terms. [81] Unless the terms of the contract are inconsistent or can reasonably be read in two different ways, the contract is considered unambiguous and extrinsic [**71] evidence may not be used to vary or contradict its terms. [82]

80  *Wilmington Trust Co. v. Wilmington Trust Co.,* Del. Ch., 26 Del. Ch. 397, 24 A.2d 309, 313 (1942).

81  *Suffolk Const. Co. v. Lanco Scaffolding Co.,* 47 Mass. App. Ct. 726, 716 N.E.2d 130, 133 (Mass. Ct. App. 1999); *Boston Edison Co. v. Federal Energy Regulatory Commission,* 856 F.2d 361, 365-67 (1st Cir. 1988).

82  *Davis v. Dawson, Inc.,* 15 F. Supp. 2d 64,

*107-08 (D.Mass. 1998).*

In determining whether the discretionary bonuses were properly included in the Severance paid to Bozic, Reen, and Matthews, the most important words of the Employment Agreements contract are "would have been entitled...." Under the Employment Agreements, Bozic, Reen and Matthews were "entitled" only to the bonus compensation identified in Section 5(b) and further detailed in Schedule A of the Agreements.

The Special Bonuses awarded to them by the Hills board were not bonuses to which the Covered [**72] Executives "were entitled." Thus the Special Bonuses did not form a part of the Covered Executives' Annual Compensation and should not have been included in their Severance calculation. In fact, the defendants have failed to advance any argument that Bozic, Reen, and Matthews were entitled to the Special Bonuses they received on account of their 1994 performance. This failure is fatal to them. [83]

83  The defendants' extrinsic evidence cannot be used to vary the clear terms of the Agreements. *Merrimack Valley Nat'l Bank v. Baird,* 372 Mass. 721, 363 N.E.2d 688, 690 (Mass. 1977); *Boston Edison Co.,* 856 F.2d at 366-67. Even if it were to be considered, it would not preclude summary judgment. All the defendants have presented is evidence that certain Foley, Hoag attorneys had differences of opinion regarding whether the Special Bonuses were to be included in the Severance calculation because they were paid in 1995, rather than 1994. These post-hoc debates hardly bear on the original meaning of § 10(c); moreover, the Foley, Hoag attorneys appear to have concluded that the Special Bonuses were not includable, although what they told their client is unclear. In any event, this evidence does not in any way support a finding that the Covered Executives were "entitled to" the Special Bonuses they received as a matter of grace on top of the § 5(b) bonuses they were contractually due.

[**73]  V. Conclusion

For the foregoing reasons, I grant the defendants' [*113] motion for summary judgment as to the plaintiffs' claims for breach of fiduciary duty and waste; deny the defendants' motion for summary judgment as to the plaintiffs' claim for breach of contract and unjust

769 A.2d 88, *113; 2000 Del. Ch. LEXIS 28, **73

enrichment against defendants Bozic, Reen and Matthews; and grant the plaintiffs' motion for partial summary judgment on their breach of contract and unjust enrichment claims against defendants Bozic, Reen, and Matthews. [84] The parties are directed to confer about the appropriate form of order and to present such an order to me, along with an identification of the remaining issues in the case, no later than seven days from the date of this opinion. [85]

85    Among the issues the parties must discuss is the appropriate treatment of the gross-up tax payments on the Special Bonuses. The parties should reflect upon whether these payments can be recouped from the federal government through a refund process and how that affects the relief to be awarded on this claim.

84    Under one, if not both of these theories, the plaintiffs are entitled to have these defendants return to Hills the contractually excessive payments made to them.

[**74]

*** Slip Sheet ***

Document

LEXSEE 112 S. CT. 1311

## ROBERT G. HOLMES, JR., PETITIONER v. SECURITIES INVESTOR PROTECTION CORPORATION, ET AL.

### No. 90-727

### SUPREME COURT OF THE UNITED STATES

*503 U.S. 258; 112 S. Ct. 1311; 117 L. Ed. 2d 532; 1992 U.S. LEXIS 1947; 60 U.S.L.W. 4225; Fed. Sec. L. Rep. (CCH) P96,555; 92 Cal. Daily Op. Service 2460; 92 Daily Journal DAR 4030; 6 Fla. L. Weekly Fed. S 89*

**November 13, 1991, Argued**
**March 24, 1992, Decided**

**PRIOR HISTORY:**    ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**DISPOSITION:**    *908 F.2d 1461*, reversed and remanded.

**DECISION:**

Securities Investor Protection Corp. held unable to maintain RICO suit under *18 USCS 1964(c)* against party to scheme that allegedly disabled broker-dealers from meeting obligations to customers.

**SUMMARY:**

The Securities Investor Protection Corporation (SIPC) brought suit in the United States District Court for the Central District of California against a person who was alleged to be one of several conspirators in a stock manipulation scheme that disabled two broker-dealers from meeting obligations to customers. It was alleged that the scheme had triggered SIPC's authority, pursuant to a provision of the Securities Investor Protection Act (SIPA) (*15 USCS 78fff-3(b)(2)*), to advance funds to the broker-dealers' trustees in order to reimburse the customers. SIPC claimed that the alleged conspirators had violated 10(b) of the Securities Exchange Act of 1934 (*15 USCS 78j(b)*), the Securities and Exchange Commission's *Rule 10b-5* (*17 CFR 240.10b-5*), and various provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USCS 1961-1968), and that SIPC was thus entitled to recover

treble damages under a provision of RICO (*18 USCS 1964(c)*). The District Court, entering summary judgment for the defendant on the RICO claims, held that (1) SIPC did not meet the purchaser-seller requirements for standing to assert RICO claims that were predicated on 10(b) and *Rule 10b-5*, given that SIPC was not a purchaser or seller of securities, and (2) SIPC had not shown that the defendant's alleged acts were the proximate cause of SIPC's losses. On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded on the grounds that (1) the RICO cause of action under 1964(c) does not impose a purchaser-seller requirement for standing, and (2) the District Court had erred in finding no proximate cause (*908 F2d 1461*).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Souter, J., joined by Rehnquist, Ch. J., and Blackmun, Kennedy, and Thomas, JJ., and joined in part (except for holding 3 below) by White, Stevens, and O'Connor, JJ., it was held that (1) SIPC could not recover damages under *18 USCS 1964(c)* on the theory that SIPC was subrogated to the rights of those customers who did not purchase manipulated securities, given that the alleged conspirators' conduct did not proximately cause the nonpurchasing customers' injury; (2) a provision of SIPA (*15 USCS 78eee(d)*), under which SIPC is deemed to be a party in interest as to all matters arising in a liquidation proceeding and is deemed to have intervened with respect to all such matters, did not--either alone or with *18 USCS 1964(c)*--give SIPC a right to sue to recover the funds advanced to the trustees pursuant to *15 USCS 78fff-3(b)(2)*, given that 78eee(d) says nothing about the

503 U.S. 258, *; 112 S. Ct. 1311, **;
117 L. Ed. 2d 532, ***; 1992 U.S. LEXIS 1947

conditions necessary for SIPC's recovery as a plaintiff; and (3) under the circumstances, it was inopportune to resolve the issue whether every RICO plaintiff who sues under 1964(c) and claims securities fraud as a predicate offense must have purchased or sold a security.

O'Connor, J., joined by White and Stevens, JJ., concurring in part and concurring in the judgment, expressed the view that (1) the civil RICO provisions have a proximate cause element; but (2) the court should have considered the standing question before deciding whether SIPC was proximately injured by the defendant; and (3) a plaintiff need not be a purchaser or a seller to assert RICO claims predicated on securities fraud, given that the relevant predicate offense is 32 of the 1934 Act (*15 USCS 78ff(a)*), a criminal provision as to which the purchaser-seller standing requirement is of no import.

Scalia, J., concurring in the judgment, expressed the view that (1) the purchaser-seller limitation applicable to private actions under *Rule 10b-5* does not apply in civil RICO cases alleging *Rule 10b-5* violations as predicate acts, given that the action under *18 USCS 1964* is congressionally created, unlike the action under *Rule 10b-5*, which action was created by the court itself; and (2) a proximate cause requirement applied to SIPC's action, and this requirement was not met.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

PARTIES §3

PROXIMATE CAUSE §11

SECURITIES REGULATION §15

STATUTES §195

SIPC -- stock manipulation -- RICO suit to recover customers' damages -- remedial purposes of law --

Headnote:[1A][1B][1C][1D][1E]

In connection with a stock manipulation scheme that allegedly disabled two broker-dealers from meeting obligations to customers and triggered the authority of the Securities Investor Protection Corporation (SIPC) to advance funds to reimburse the customers, SIPC cannot recover damages under a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18*

*USCS 1964(c)*)--which provides that any person injured in his business or property by reason of a violation of RICO may sue therefor in any appropriate United States District Court--from one of several alleged conspirators in the scheme on the theory that SIPC is subrogated to the rights of those customers who did not purchase manipulated securities; even assuming that SIPC may properly stand in the shoes of nonpurchasing customers, SIPC's claim fails because the alleged conspirators' conduct did not proximately cause the nonpurchasing customers' injury, in that such injury arose only insofar as the stock manipulation first injured the broker-dealers and left them unable to pay customers' claims; such an analysis is not deflected by a congressional admonition that RICO be liberally construed to effectuate its remedial purposes; under such circumstances, SIPC must wait on the outcome of a suit by the broker-dealers' trustees against the defendant in order to share in their recovery, if any, according to the priority given to SIPC's claim under a provision of the Securities Investor Protection Act (*15 USCS 78fff-2(c)*).

[***LEdHN2]

PARTIES §3

SECURITIES REGULATION §15

SIPC -- stock manipulation -- suit to recover liquidation funds --

Headnote:[2A][2B][2C]

A provision of the Securities Investor Protection Act (*15 USCS 78eee(d)*), under which the Securities Investor Protection Corporation (SIPC) is deemed to be a party in interest as to all matters arising in a liquidation proceeding and is deemed to have intervened with respect to all such matters, does not--either alone or with a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USCS 1964(c)*), which provides that any person injured in his business or property by reason of a violation of RICO may sue therefor in any appropriate United States District Court--give SIPC a right to sue an alleged conspirator in a stock manipulation scheme to recover funds advanced by SIPC, pursuant to *15 USCS 78fff-3(b)(2)*, to trustees for administering liquidation proceedings with respect to broker-dealers that were allegedly disabled by the scheme from meeting obligations to customers, given that 78eee(d) says nothing about the conditions necessary for

503 U.S. 258, *; 112 S. Ct. 1311, **;
117 L. Ed. 2d 532, ***LEdHN2; 1992 U.S. LEXIS 1947

SIPC's recovery as a plaintiff.

[***LEdHN3]

PARTIES §3

right to sue under RICO --

Headnote:[3A][3B]

A plaintiff's right to maintain a suit under a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USCS 1964(c)*), which provides that any person injured in his business or property by reason of a violation of RICO may sue therefor in any appropriate United States District Court, requires a showing that the defendant's violation was the proximate cause--not merely the "but for" cause--of the plaintiff's injury, given that (1) Congress modeled 1964(c) on 4 of the Clayton Act (*15 USCS 15*), which provision that previously had been interpreted by federal courts as requiring a showing of proximate cause; (2) the Congress that enacted RICO may fairly be credited with knowing this interpretation; and (3) the United States Supreme Court will assume that Congress intended the words of 1964(c) to have the same meaning that courts had already given them.

[***LEdHN4]

#)§Appeal_#1087.5(2)#

Headnote:[4A][4B]

With respect to a claim by the Securities Investor Protection Corporation (SIPC) under a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USCS 1964(c)*) against an alleged participant in a stock manipulation scheme, the issue whether the claim must satisfy the standard of proximate causation is fairly included--for purposes of Rule 14.1(a) of the Rules of the United States Supreme Court--within the question on which the Supreme Court granted certiorari, where (1) the question, as phrased by the alleged participant in his petition for certiorari, was, "Whether a party which was neither a purchaser nor a seller of securities, and for that reason lacked standing to sue under Section 10(b) of the Securities Exchange Act of 1934 and *Rule 10b-5* thereunder, is free of that limitation on standing when presenting essentially the same claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO')," and (2) the restatement of the question in SIPC's respondent brief reads, "Was the Ninth Circuit

correct when it held that SIPC need not be a 'purchaser or seller' of securities to sue under *Section 1964(c)*, which provides that 'any person' may sue for 'injury to his business or property' 'by reason of' 'any offense ... involving fraud in the sale of securities ... punishable under any law of the United States,' wire fraud, or mail fraud in violation of *Section 1962*?"; by thus restating the question presented, SIPC--which also briefed the proximate cause issue and announced at oral argument that SIPC recognized that the Supreme Court might reach that issue--properly set the inquiry in the key of the language of 1964(c), which carries a proximate cause requirement within it.

[***LEdHN5]

APPEAL §1088

briefs --

Headnote:[5A][5B]

Under Rule 24.2 of the Rules of the United States Supreme Court--which provides that the brief filed by a respondent need not include the questions presented for review unless the respondent is dissatisfied with their presentation by the other side--a respondent has the right to restate the question presented.

[***LEdHN6]

STATUTES §144.3

legislative history --

Headnote:[6A][6B]

A statement in the legislative history of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USCS 1961-1968), to the effect that it would be inappropriate to have a private litigant contend with a body of precedent--appropriate in a purely antitrust context--setting strict requirements on questions such as standing to sue and proximate cause, is rightly understood to refer only to the applicability of the concept of "antitrust injury" to RICO.

[***LEdHN7]

PARTIES §3

SECURITIES REGULATION §15

503 U.S. 258, *; 112 S. Ct. 1311, **;
117 L. Ed. 2d 532, ***LEdHN7; 1992 U.S. LEXIS 1947

SIPC -- stock manipulation -- suit to recover customers' damages --

Headnote:[7A][7B]

In connection with a stock manipulation scheme that allegedly disabled two broker-dealers from meeting obligations to customers and triggered the authority of the Securities Investor Protection Corporation (SIPC) to advance funds to reimburse the customers, SIPC cannot recover damages under a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USCS 1964(c)*)--which provides that any person injured in his business or property by reason of a violation of RICO may sue therefor in any appropriate United States District Court--from one of several alleged conspirators in the scheme on the theory that those customers that owned manipulated securities were themselves victims of the alleged fraud, where SIPC does not claim subrogation to the rights of such customers; given that SIPC does not claim such subrogation, SIPC is bound by the rule that creditors generally may not sue for injury affecting their debtors' solvency.

[***LEdHN8]

BANKRUPTCY §168

trustee's duties --

Headnote:[8A][8B]

A creditor can compel a trustee in bankruptcy to institute suit against a third party, where the creditor petitions the Bankruptcy Court for an order to that effect.

[***LEdHN9]

APPEAL §1662

effect of decision on other grounds --

Headnote:[9]

On certiorari to review the decision of a United States Court of Appeals which held that the Securities Investor Protection Corporation (SIPC) could maintain a suit under a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USCS 1964(c)*) against an alleged participant in a stock manipulation scheme even though SIPC was not a purchaser or seller of securities, the United States Supreme Court will

decline to decide whether every RICO plaintiff who sues under 1964(c) and claims securities fraud as a predicate offense must have purchased or sold a security, where the Supreme Court decides that SIPC cannot maintain the RICO suit for failure to show that the alleged conspiracy to manipulate was the proximate cause of the injury claimed; under such circumstances, it is inopportune to resolve the purchaser-seller issue, given that (1) discussion of this issue would be unnecessary to the resolution of the case at hand, and (2) although the United States Courts of Appeals appear divided on this issue, a review of the conflicting cases shows that all could have been resolved on proximate-causation grounds. (O'Connor, White, Stevens, and Scalia, JJ., dissented in part from this holding.)

## SYLLABUS

Pursuant to its authority under the Securities Investor Protection Act (SIPA), respondent Securities Investor Protection Corporation (SIPC) sought, and received, judicial decrees to protect the customers of two of its member broker-dealers. After trustees were appointed to liquidate the broker-dealers' businesses, SIPC and the trustees filed this suit, alleging, among other things, that petitioner Holmes and others had conspired in a fraudulent stock-manipulation scheme that disabled the broker-dealers from meeting obligations to customers; that this conduct triggered SIPC's statutory duty to advance funds to reimburse the customers; that the conspirators had violated the Securities Exchange Act of 1934 and regulations promulgated thereunder; and that their acts amounted to a "pattern of racketeering activity" within the meaning of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U. S. C. §§ 1962, 1961(1),* and *(5),* so as to entitle the plaintiffs to recover treble damages, *§ 1964(c).* The District Court entered summary judgment for Holmes on the RICO claims, ruling, *inter alia,* that SIPC did not meet the "purchaser-seller" requirement for standing under RICO. The Court of Appeals held the finding of no standing to be error and, for this and other reasons, reversed and remanded.

*Held:* SIPC has demonstrated no right to sue Holmes under *§ 1964(c).* Pp. 265-276.

(a) A plaintiff's right to sue under *§ 1964(c)* -- which specifies that "any person injured . . . by reason of a violation of *[§ 1962]* may sue therefor . . . and . . .

503 U.S. 258, *; 112 S. Ct. 1311, **;
117 L. Ed. 2d 532, ***LEdHN9; 1992 U.S. LEXIS 1947

recover threefold the damages he sustains . . ." -- requires a showing that the defendant's violation was the proximate cause of the plaintiff's injury. *Section 1964(c)* was modeled on § 4 of the Clayton Act, which was itself based on § 7 of the Sherman Act, see *Associated General Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 530, 74 L. Ed. 2d 723, 103 S. Ct. 897,* and both antitrust sections had been interpreted to incorporate common-law principles of proximate causation, see, *e. g., id., at 533-534,* and n. 29, 536, n. 33. It must be assumed that the Congress which enacted *§ 1964(c)* intended its words to have the same meaning that courts had already given them. Cf. *id., at 534.* Although *§ 1964(c)*'s language can be read to require only factual, "but for," causation, this construction is hardly compelled, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades this Court that RICO should not get such an expansive reading. Pp. 265-268.

(b) As used herein, "proximate cause" requires some direct relation between the injury asserted and the injurious conduct alleged. For a variety of reasons, see *id., at 540-544,* such directness of relationship is one of the essential elements of Clayton Act causation. Pp. 268-270.

(c) SIPC's claim that it is entitled to recover on the ground that it is subrogated to the rights of the broker-dealers' customers who did not purchase manipulated securities fails because the conspirators' conduct did not proximately cause those customers' injury. Even assuming, *arguendo,* that SIPC may stand in the shoes of such customers, the link is too remote between the stock manipulation alleged, which directly injured the broker-dealers by rendering them insolvent, and the nonpurchasing customers' losses, which are purely contingent on the broker-dealers' inability to pay customers' claims. The facts of this case demonstrate that the reasons supporting adoption of the Clayton Act direct-injury limitation, see *ibid.,* apply with equal force to *§ 1964(c)* suits. First, if the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy, as opposed to, *e. g.,* the broker-dealers' poor business practices or their failures to anticipate financial market developments. Second, assuming that an appropriate assessment of factual causation could be made out, the court would then have to find some way to

apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages. Finally, the law would be shouldering these difficulties despite the fact that the directly injured broker-dealers could be counted on to bring suit for the law's vindication, as they have in fact done in the persons of their SIPA trustees. Indeed, the insolvency of the victim directly injured adds a further concern to those already expressed in *Associated General Contractors,* since a suit by an indirectly injured victim would be an attempt to circumvent the relative priority its claim would have in the directly injured victim's liquidation proceedings. This analysis is not deflected by the congressional admonition that RICO be liberally construed to effectuate its remedial purposes, since allowing suits by those injured only indirectly would open the door to massive and complex damages litigation, which would not only burden the courts, but also undermine the effectiveness of treble-damages suits. *Id., at 545.* Thus, SIPC must await the outcome of the trustees' suit and may share according to the priority SIPA gives its claim if the trustees recover from Holmes. Pp. 270-275.

(d) SIPC's claim that it is entitled to recover under a SIPA provision, *15 U. S. C. § 78eee(d),* fails because, on its face, that section simply qualifies SIPC as a proper party in interest in any "matter arising in a liquidation proceeding" as to which it "shall be deemed to have intervened," and gives SIPC no independent right to sue Holmes for money damages. Pp. 275-276.

(e) This Court declines to decide whether every RICO plaintiff who sues under *§ 1964(c)* and claims securities fraud as a predicate offense must have purchased or sold a security. In light of the foregoing, discussion of that issue is unnecessary to resolve this case. Nor will leaving the question unanswered deprive the lower courts of much-needed guidance. A review of those courts' conflicting cases shows that all could have been resolved on proximate-causation grounds, and that none involved litigants like those in *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917,* who decided to forgo securities transactions in reliance on misrepresentations. P. 276.

**COUNSEL:** Jack I. Samet argued the cause for petitioner. With him on the briefs were Jovina R. Hargis and Stephen K. Lubega.

G. Robert Blakey argued the cause for respondents. With him on the brief for respondent Securities Investor Protection Corporation were Stephen C. Taylor, Mark Riera, Theodore H. Focht, and Kevin H. Bell. *

    \* Briefs of amici curiae urging reversal were filed for the American Institute of Certified Public Accountants by Louis A. Craco and John J. Halloran, Jr.; and for Arthur Andersen & Co. et al. by Kathryn A. Oberly, Carl D. Liggio, Jon N. Ekdahl, Harris J. Amhowitz, Howard J. Krongard, Leonard P. Novello, and Eldon Olson.

    Kevin P. Roddy and William S. Lerach filed a brief for the National Association of Securities and Commercial Law Attorneys (NASCAT) as amicus curiae urging affirmance.

**JUDGES:** SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, KENNEDY, and THOMAS, JJ., joined, and in all but Part IV of which WHITE, STEVENS, and O'CONNOR, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which WHITE and STEVENS, JJ., joined, post, p. 276. SCALIA, J., filed an opinion concurring in the judgment, post, p. 286.

**OPINION BY:** SOUTER

**OPINION**

    [*261] [***539] [**1314] JUSTICE SOUTER delivered the opinion of the Court.

    [***LEdHR1A] [1A] [***LEdHR2A] [2A]Respondent Securities Investor Protection Corporation (SIPC) alleges that petitioner Robert G. Holmes, Jr., conspired in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations [***540] to customers, thus triggering SIPC's statutory duty to advance funds to reimburse the customers. The issue is whether SIPC can recover from Holmes under the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U. S. C. §§ 1961-1968 (1988 ed. and Supp. II)*. We hold that it cannot.

I

A

The Securities Investor Protection Act of 1970

(SIPA), 84 Stat. 1636, as amended, *15 U. S. C. §§ 78aaa-78lll*, authorized the formation of SIPC, a private nonprofit corporation, § 78ccc(a)(1), of which most broker-dealers registered under *§ 15(b)* of the Securities Exchange Act of 1934, § 78o(b), are required to be "members," § 78ccc(a)(2)(A). Whenever SIPC determines that a member "has failed or is in danger of failing to meet its obligations to customers, " and finds certain other statutory conditions satisfied, it may ask for a "protective decree" in federal district court. *§ 78eee(a)(3)*. Once a court finds grounds for granting such a petition, *§ 78eee(b)(1)*, it must appoint a trustee charged with liquidating the member's business, *§ 78eee(b)(3)*.

    After returning all securities registered in specific customers' names, *§§ 78fff-2(c)(2)*; 78fff(a)(1)(A); 78lll(3), the trustee must pool securities not so registered together with cash found in customers' accounts and divide this pool ratably to satisfy customers' claims, *§§ 78fff-2(b)*; 78fff(a)(1)(B). [1] To [*262] the extent the pool of customer property is inadequate, SIPC must advance up to $ 500,000 per customer [2] to the trustee for use in satisfying those claims. *§ 78fff-3(a).* [3]

    1 Such "customer property," see 15 U. S. C. § 78lll(4), does not become part of the debtor's general estate until all customers' and SIPC's claims have been paid. See *§ 78fff-2(c)(1)*. That is to say, the claim of a general creditor of the broker-dealer (say, its landlord) is subordinated to claims of customers and SIPC.
    2 With respect to a customer's cash on deposit with the broker-dealer, SIPC is not obligated to advance more than $ 100,000 per customer. *§ 78fff-3(a)(1).*
    3 To cover these advances, SIPA provides for the establishment of a SIPC Fund. § 78ddd(a)(1). SIPC may replenish the fund from time to time by levying assessments, § 78ddd(c)(2), which members are legally obligated to pay, § 78jjj(a).

B

    On July 24, 1981, SIPC sought a decree from the United States District Court for the Southern District of Florida to protect the customers of First State Securities Corporation (FSSC), a broker-dealer and SIPC member. Three days later, it petitioned the United States District Court for the Central District of California, seeking to protect the customers of Joseph Sebag, Inc. (Sebag), also a broker-dealer and SIPC member. Each court issued the

requested decree and appointed a trustee, who proceeded to liquidate the broker-dealer.

[**1315] Two years later, SIPC and the two trustees brought this suit in the United States District Court for the Central District of California, accusing some 75 defendants of conspiracy in a fraudulent scheme leading to the demise of FSSC and Sebag. Insofar as they are relevant here, the allegations were that, from 1964 [***541] through July 1981, the defendants manipulated stock of six companies by making unduly optimistic statements about their prospects and by continually selling small numbers of shares to create the appearance of a liquid market; that the broker-dealers bought substantial amounts of the stock with their own funds; that the market's perception of the fraud in July 1981 sent the stocks plummeting; [*263] and that this decline caused the broker-dealers' financial difficulties resulting in their eventual liquidation and SIPC's advance of nearly $ 13 million to cover their customers' claims. The complaint described Holmes' participation in the scheme by alleging that he made false statements about the prospects of one of the six companies, Aero Systems, Inc., of which he was an officer, director, and major shareholder; and that over an extended period he sold small amounts of stock in one of the other six companies, the Bunnington Corporation, to simulate a liquid market. The conspirators were said to have violated § 10(b) of the Securities Exchange Act of 1934, *15 U. S. C. § 78j(b)*, Securities and Exchange Commission (SEC) Rule 10b-5, *17 CFR § 240.10b-5 (1991)*, and the mail and wire fraud statutes, *18 U. S. C. §§ 1341, 1343 (1988 ed., Supp. II)*. Finally, the complaint concluded that their acts amounted to a "pattern of racketeering activity" within the meaning of the RICO statute, *18 U. S. C. §§ 1962, 1961(1), and (5) (1988 ed. and Supp. II)*, so as to entitle the plaintiffs to recover treble damages, *§ 1964(c)*.

After some five years of litigation over other issues, 4 the District Court entered summary judgment for Holmes on the RICO claims, ruling that SIPC "does not meet the 'purchaser-seller' requirements for standing to assert RICO claims which are predicated upon violation of Section 10(b) and *Rule 10b-5*," App. to Pet. for Cert. 45a, 5 and that neither [*264] SIPC nor the trustees had satisfied the "proximate cause requirement under RICO," *id.*, at 39a; see *id.*, at 37a. Although SIPC's claims against many other defendants remained pending, the District Court under *Federal Rule of Civil Procedure 54(b)* entered a partial judgment for Holmes, immediately

appealable. SIPC and the trustees appealed.

4  See generally *Securities Investor Protection Corporation v. Vigman, 803 F.2d 1513 (CA9 1986) (Vigman II); Securities Investor Protection Corporation v. Vigman, 764 F.2d 1309 (CA9 1985) (Vigman I).*

5  Two years earlier, the District Court had dismissed SIPC's non-RICO securities action on the ground that SIPC's claim to have been subrogated to the rights only of those customers who did not purchase any of the manipulated securities rendered the action a failure under the so-called *Birnbaum* test, which requires a plaintiff to be a purchaser or seller of a security. See *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (CA2)*, cert. denied, *343 U.S. 956, 96 L. Ed. 1356, 72 S. Ct. 1051 (1952)*. The Court of Appeals for the Ninth Circuit reversed that ruling, *Vigman II, supra*, holding that the District Court should have permitted SIPC to proceed under the *Birnbaum* rule to the extent that FSSC and Sebag had made unauthorized use of those customers' assets to buy manipulated securities, as SIPC had alleged they had. *Id., at 1519-1520*. On remand, after discovery, the District Court ruled that no genuine issue of material fact existed on the question of unauthorized use and that Holmes was entitled to summary judgment. App. to Pet. for Cert. 27a. SIPC has not appealed that ruling.

The United States Court of Appeals for the Ninth Circuit reversed and remanded after rejecting both of the District Court's grounds. *Securities [***542] Investor Protection Corporation v. Vigman, 908 F.2d 1461 (1990)*. The Court of Appeals held first that, whereas a purchase or sale of a security is necessary for entitlement to sue on the implied right of action recognized under § 10(b) and *Rule 10b-5*, see *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*, the cause of action expressly provided by *§ 1964(c)* of RICO imposes no such requirement limiting SIPC's standing, *908 F.2d at 1465-1467*. Second, [**1316] the appeals court held the finding of no proximate cause to be error, the result of a mistaken focus on the causal relation between SIPC's injury and the acts of Holmes alone; since Holmes could be held responsible for the acts of all his co-conspirators, the Court of

Appeals explained, the District Court should have looked to the causal relation between SIPC's injury and the acts of all conspirators. *Id., at 1467-1469.* [6]

> 6  For purposes of this decision, we will assume without deciding that the Court of Appeals correctly held that Holmes can be held responsible for the acts of his co-conspirators.

Holmes' ensuing petition to this Court for certiorari presented two issues, whether SIPC had a right to sue under [*265] RICO, [7] and whether Holmes could be held responsible for the actions of his co-conspirators. We granted the petition on the former issue alone, *499 U.S. 974 (1991),* and now reverse. [8]

> 7  The petition phrased the question as follows: "Whether a party which was neither a purchaser nor a seller of securities, and for that reason lacked standing to sue under Section 10(b) of the Securities Exchange Act of 1934 and *Rule 10b-5* thereunder, is free of that limitation on standing when presenting essentially the same claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO')." Pet. for Cert. i.
>
> 8  Holmes does not contest the trustees' right to sue under *§ 1964(c)*, and they took no part in the proceedings before this Court after we granted certiorari on the first question alone.

II

A

RICO's provision for civil actions reads that

> "any person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *18 U. S. C. § 1964(c).*

[***LEdHR3A]    [3A]    [***LEdHR4A]    [4A] [***LEdHR5A]    [5A]This language can, of course, be read to mean that a plaintiff is injured "by reason of" a RICO violation, and therefore may recover, simply on showing that the defendant violated *§ 1962*, [9] the plaintiff [***543] was injured, and the defendant's violation

[*266] was a "but for" cause of plaintiff's injury. Cf. *Associated General Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 529, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983).* This construction is hardly compelled, however, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover [10] persuades us that RICO should not get such an expansive [**1317] reading. [11] Not even SIPC seriously argues otherwise. [12]

> 9  *Section 1962* lists "Prohibited activities." Before this Court, SIPC invokes only subsections (c) and (d). See Brief for Respondent 15, and n. 58. Subsection (c) makes it "unlawful for any person . . . associated with any enterprise . . . to . . . participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Insofar as it is relevant here, subsection (d) makes it unlawful to conspire to violate subsection (c). The RICO statute defines "pattern of racketeering activity" as "requiring at least two acts of racketeering activity[,] . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *§ 1961(5).* The predicate offenses here at issue are listed in *18 U. S. C. §§ 1961(1)(B) and (D) (1988 ed., Supp. II),* which define "racketeering activity" to include "any act which is indictable under . . . *section 1341* (relating to mail fraud), [or] *section 1343* (relating to wire fraud), . . . or . . . any offense involving . . . fraud in the sale of securities . . . ."
>
> 10  "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.'" W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984) (quoting *North v. Johnson, 58 Minn. 242, 245, 59 N.W. 1012 (1894)).* As we put it in the antitrust context, "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 [of the Clayton Act, *15 U. S. C. § 15,*] there is a point beyond which the wrongdoer should not be held liable." *Blue Shield of Virginia v. McCready, 457*

*U.S. 465, 476-477, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982)* (internal quotation marks and citation omitted).

11   The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required. See, *e. g., Pelletier v. Zweifel, 921 F.2d 1465, 1499-1500 (CA11),* cert. denied, *502 U.S. 855, 116 L. Ed. 2d 131, 112 S. Ct. 167 (1991); Ocean Energy II, Inc. v. Alexander & Alexander, Inc., 868 F.2d 740, 744 (CA5 1989); Brandenburg v. Seidel, 859 F.2d 1179, 1189 (CA4 1988); Sperber v. Boesky, 849 F.2d 60 (CA2 1988); Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (CA7 1984),* aff'd, *473 U.S. 606, 87 L. Ed. 2d 437, 105 S. Ct. 3291 (1985) (per curiam).* Indeed, the court below recognized a proximate-cause requirement. See *Securities Investor Protection Corporation v. Vigman, 908 F.2d 1461, 1468 (CA9 1990).*

[***LEdHR4B] [4B] [***LEdHR5B] [5B]

12   SIPC does say that the question whether its claim must, and as alleged may, satisfy the standard of proximate causation is not within the question on which we granted certiorari. See Brief for Respondent 3, 33, 34, 38-39. However, the proximate-cause issue is "fairly included" within that question. See this Court's Rule 14.1(a). SIPC's own restatement of the question presented reads: "Was the Ninth Circuit correct when it held that SIPC need not be a 'purchaser or seller' of securities to sue under *Section 1964(c),* which provides that 'any person' may sue for 'injury to his business or property' 'by reason of 'any offense . . . involving fraud in the sale of securities . . . punishable under any law of the United States,' wire fraud, or mail fraud in violation of *Section 1962?*" Brief for Respondent i (ellipses in original). By thus restating the question presented (as was its right to do, see this Court's Rule 24.2), SIPC properly set the enquiry in the key of the language of *§ 1964(c),* which we hold today carries a proximate-cause requirement within it. What is more, SIPC briefed the proximate-cause issue, see Brief for Respondent 34-36, 38-39, and announced at oral argument that it recognized the Court might reach it, see Tr. of Oral Arg. 31.

[*267] [***LEdHR3B] [3B]The key to the better interpretation lies in some statutory history. We have repeatedly observed, see *Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 150-151, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987);Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 241, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987);Sedima, S. P. R. L. v. Imrex Co., 473 U.S. 479, 489, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985),* that Congress modeled *§ 1964(c)* on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act, which reads in relevant part that

"any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . [***544] and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." *15 U. S. C. § 15.*

In *Associated General Contractors, supra,* we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. [13] Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation, *459 U.S. at 533-534,* and n. 29 (citing *Loeb v. Eastman Kodak Co., 183 F. 704 (CA3 1910); Ames v. American Telephone & Telegraph Co., 166 F. 820 (CC Mass. 1909)),* and we reasoned, as many lower federal courts had done before us, see *Associated General* [*268] *Contractors, supra, at 536, n. 33* (citing cases), [14] that congressional use of the § 7 language in § 4 presumably carried the intention to adopt "the judicial gloss that avoided a simple literal interpretation," *459 U.S. at 534.* Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well.

13   When Congress enacted § 4 of the Clayton Act, § 7 of the Sherman Act read in relevant part:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue . . . ."

26 Stat. 210.
14    These lower courts had so held well before
1970, when Congress passed RICO.

The reasoning applies just as readily to *§ 1964(c)*.
We may fairly credit the 91st Congress, which enacted
RICO, with knowing the interpretation federal courts had
given the words earlier Congresses had used [**1318]
first in § 7 of the Sherman Act, and later in the Clayton
Act's § 4. See *Cannon v. University of Chicago, 441 U.S.
677, 696-698, 60 L. Ed. 2d 560, 99 S. Ct. 1946 (1979)*. It
used the same words, and we can only assume it intended
them to have the same meaning that courts had already
given them. See, *e. g., Oscar Mayer & Co. v. Evans, 441
U.S. 750, 756, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979);
Northcross v. Memphis Bd. of Ed., 412 U.S. 427, 428, 37
L. Ed. 2d 48, 93 S. Ct. 2201 (1973)*. Proximate cause is
thus required.

B

Here we use "proximate cause" to label generically
the judicial tools used to limit a person's responsibility for
the consequences of that person's own acts. At bottom,
the notion of proximate cause reflects "ideas of what
justice demands, or of what is administratively possible
and convenient." W. Keeton, D. Dobbs, R. Keeton, & D.
Owen, Prosser and Keeton on Law of Torts § 41, p. 264
(5th ed. 1984). Accordingly, among the many shapes this
concept took at common law, see [**1319] *Associated
General Contractors, supra, at 532-533*, was a demand
for some direct relation between the injury asserted and
the injurious conduct alleged. Thus, a plaintiff who
complained of harm flowing merely from the misfortunes
visited upon a third person by the defendant's acts was
generally said to stand at too remote a distance to [*269]
recover. See, *e. g.,* 1 J. Sutherland, Law of Damages
55-56 (1882).

[***LEdHR6A]  [6A]Although such directness of
[***545] relationship is not the sole requirement of
Clayton Act causation, [15] it has been one of its central
elements, *Associated General Contractors, 459 U.S. at
540*, for a variety of reasons. First, the less direct an
injury is, the more difficult it becomes to ascertain the
amount of a plaintiff's damages attributable to the
violation, as distinct from other, independent, factors.
*Id., at 542-543*. Second, quite apart from problems of
proving factual causation, recognizing claims of the
indirectly injured would force courts to adopt

complicated rules apportioning damages among plaintiffs
removed at different levels of injury from the violative
acts, to obviate the risk of multiple recoveries. *Id., at
543-544; Blue Shield of Virginia v. McCready, 457 U.S.
465, 473-475, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982);
Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 264, 31
L. Ed. 2d 184, 92 S. Ct. 885 (1972)*. And, finally, the
need to grapple with these problems is simply unjustified
by the general interest in deterring injurious conduct,
since directly injured victims can generally be counted on
to vindicate the law as [*270] private attorneys general,
without any of the problems attendant upon suits by
plaintiffs injured more remotely. *Associated General
Contractors, supra, at 541-542*.

[***LEdHR6B]  [6B]

15    We have sometimes discussed the
requirement that a § 4 plaintiff have suffered
"antitrust injury" as a component of the
proximate-cause enquiry. See *Associated General
Contractors of Cal., Inc. v. Carpenters, 459 U.S.
519, 538, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983);
Blue Shield of Virginia v. McCready, 457 U.S. at
481-484*. We need not discuss it here, however,
since "antitrust injury" has no analogue in the
RICO setting. See *Sedima, S. P. R. L. v. Imrex
Co., 473 U.S. 479, 495-497, 87 L. Ed. 2d 346, 105
S. Ct. 3275 (1985)*.

For the same reason, there is no merit in
SIPC's reliance on legislative history to the effect
that it would be inappropriate to have a "private
litigant . . . contend with a body of precedent --
appropriate in a purely antitrust context -- setting
strict requirements on questions such as 'standing
to sue' and 'proximate cause.'" 115 Cong. Rec.
6995    (1969)    (American    Bar    Association
comments on S. 2048). That statement is rightly
understood to refer only to the applicability of the
concept of "antitrust injury" to RICO, which we
rejected in *Sedima, supra, at 495-497*. See
*Brandenburg v. Seidel, 859 F.2d at 1189, n. 11*.
Besides, even if we were to read this statement to
say what SIPC says it means, it would not amount
to more than background noise drowned out by
the statutory language.

We will point out in Part III-A below that the facts
of the instant case show how these reasons apply with

equal force to suits under *§ 1964(c).*

### III

[***LEdHR1B] [1B] [***LEdHR2B] [2B]As we understand SIPC's argument, it claims entitlement to recover, first, because it is subrogated to the rights of those customers of the broker-dealers who did not purchase manipulated securities, and, second, because a SIPA provision gives it an independent right to sue. The first claim fails because the conspirators' conduct did not proximately cause the nonpurchasing customers' injury, the second because the provision relied on gives SIPC no right to sue for damages.

### A

[***LEdHR1C] [1C]As a threshold matter, SIPC's theory of subrogation is fraught with unanswered questions. In suing Holmes, SIPC does not rest its claimed subrogation to the rights of the broker-dealers' customers on any [***546] provision of SIPA. See Brief for Respondent 38, and n. 181. SIPC assumes that SIPA provides for subrogation to the customers' claims against the failed broker-dealers, see *15 U. S. C. §§ 78fff-3(a), 78fff-4(c);* see also *§ 78fff-2(c)(1)(C);* see generally *Mishkin v. Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 556-557 (SDNY 1990),* but not against third parties like Holmes. As against him, SIPC relies rather on "common law rights of subrogation" for what it describes as "its money paid to customers for customer claims against third parties." Brief for Respondent 38 (footnote omitted). At oral argument in this Court, SIPC narrowed its subrogation argument to cover only the rights of customers who never purchased manipulated [*271] securities. Tr. of Oral Arg. 29. [16] But SIPC stops there, leaving us to guess at the nature of the "common law rights of subrogation" that it claims, and failing to tell us whether they derive from federal or state common law, or, if the latter, from common law of which State. [17] Nor does SIPC explain why it declines to assert the rights of customers who bought manipulated securities. [18]

16   And, SIPC made no allegation that any of these customers failed to do so in reliance on acts or omissions of the conspirators.
17   There is support for the proposition that SIPC can assert state-law subrogation rights against third parties. See *Redington v. Touche Ross & Co., 592 F.2d 617, 624 (CA2 1978),* rev'd on other grounds, *442 U.S. 560, 61 L. Ed. 2d 82, 99*

*S. Ct. 2479 (1979).* We express no opinion on this issue.
18   The record reveals that those customers have brought their own suit against the conspirators.

It is not these questions, however, that stymie SIPC's subrogation claim, for even assuming, *arguendo,* that it may stand in the shoes of nonpurchasing customers, the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims. Although the customers' claims are senior (in recourse to "customer property") to those of the broker-dealers' general creditors, see *§ 78fff-2(c)(1),* the causes of their respective injuries are the same: The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors.

[***LEdHR7A] [7A] [***LEdHR8A] [8A]As we said, however, in *Associated General Contractors,* quoting Justice Holmes, "'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *459 U.S. at 534* (quoting *Southern Pacific Co. v.* [*272] *Darnell-Taenzer Lumber Co., 245 U.S. 531, 533, 62 L. Ed. 451, 38 S. Ct. 186* [**1320] *(1918)),* [19] and the reasons that supported [***547] conforming Clayton Act causation to the general tendency apply just as readily to the present facts, underscoring the obvious congressional adoption of the Clayton Act direct-injury limitation among the requirements of *§ 1964(c).* [20] If the nonpurchasing customers were [*273] allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets. Assuming that an appropriate assessment of factual causation could be made out, the district court would then have to find some way to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages. Finally, the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the

503 U.S. 258, *273; 112 S. Ct. 1311, **1320;
117 L. Ed. 2d 532, ***547; 1992 U.S. LEXIS 1947

law's vindication. As noted above, the broker-dealers have in fact sued in this case, in the persons of their SIPA trustees appointed on account of their insolvency. [21] [*274] Indeed, [***548] the insolvency of the victim directly injured adds a further concern to those already expressed, [**1321] since a suit by an indirectly injured victim could be an attempt to circumvent the relative priority its claim would have in the directly injured victim's liquidation proceedings. See *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago, 877 F.2d 1333, 1336 (CA7 1989).*

[***LEdHR7B] [7B]

19    SIPC tries to avoid foundering on the rule that creditors generally may not sue for injury affecting their debtors' solvency by arguing that those customers that owned manipulated securities themselves were victims of Holmes' fraud. See Brief for Respondent 39, n. 185 (citing *Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1280 (CA7 1989); Ocean Energy, 868 F.2d at 744-747; Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1100-1101 (CA2 1988),* cert. denied, *490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989)).* While that may well be true, since SIPC does not claim subrogation to the rights of the customers that purchased manipulated securities, see *supra, at 270-271,* it gains nothing by the point.

We further note that SIPC alleged in the courts below that, in late May 1981, Joseph Lugo, an officer of FSSC and one of the alleged conspirators, parked manipulated stock in the accounts of customers, among them Holmes, who actively participated in the parking transaction involving his account. See Statement of Background and Facts, 1 App. 223-225. Lugo "sold" securities owned by FSSC to customers at market price and "bought" back the same securities some days later at the same price plus interest. Under applicable regulations, a broker-dealer must discount the stock it holds in its own account, see *17 CFR § 240.15c3-1(c)(2)(iv)(F)(1)(vi) (1991),* and the sham transactions allowed FSSC to avoid the discount. But for the parking transactions, FSSC would allegedly have failed capital requirements sooner; would have been shut down by regulators; and would not have dragged Sebag with it in its

demise. 1 App. 231. Thus, their customers would have been injured to a lesser extent. *Id., at 229, 231.* We do not rule out that, if, by engaging in the parking transactions, the conspirators committed mail fraud, wire fraud, or "fraud in the sale of securities," see *18 U. S. C. §§ 1961(1)(B) and (D) (1988 ed., Supp. I),* the broker-dealers' customers might be proximately injured by these offenses. See, *e. g., Taffet v. Southern Co., 930 F.2d 847, 856-857 (CA11 1991); County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311-1312 (CA2 1990).* However this may be, SIPC in its brief on the merits places exclusive reliance on a manipulation theory and is completely silent about the alleged parking scheme.

20    As we said in *Associated General Contractors,* "the infinite variety of claims that may arise make it virtually impossible to announce a blackletter rule that will dictate the result in every case." *459 U.S. at 536* (footnote omitted). Thus, our use of the term "direct" should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached. See, *e. g., Sedima, 473 U.S. at 497, n. 15; id., at 522* (Marshall, J., dissenting); *Pelletier, 921 F.2d at 1499-1500; Ocean Energy, supra.*

[***LEdHR8B] [8B]

21    If the trustees had not brought suit, SIPC likely could have forced their hands. To the extent consistent with SIPA, bankruptcy principles apply to liquidations under that statute. See § 78fff(b); see also § 78fff-1(b) (to extent consistent with SIPA, SIPA trustee has same duties as trustee under Chapter 7 of Bankruptcy Code); *§ 78eee(b)(2)(A)(iii)* (to extent consistent with SIPA, court supervising SIPA liquidation has same powers and duties as bankruptcy court). And, it is generally held that a creditor can, by petitioning the bankruptcy court for an order to that effect, compel the trustee to institute suit against a third party. See *In re Automated Business Systems, Inc., 642 F.2d 200, 201 (CA6 1981).* As a practical matter, it is very unlikely that SIPC will have to petition a court for such an

order, given its influence over SIPA trustees. See
§ 78eee(b)(3) (court must appoint as trustee "such
person as SIPC, in its sole discretion, specifies,"
which in certain circumstances may be SIPC
itself); § 78eee(b)(5)(C) (SIPC's recommendation
to court on trustee's compensation is entitled to
"considerable reliance" and is, under certain
circumstances, binding).

[***LEdHR1D] [1D]As against the force of these
considerations of history and policy, SIPC's reliance on
the congressional admonition that RICO be "liberally
construed to effectuate its remedial purposes," § 904(a),
84 Stat. 947, does not deflect our analysis. There is, for
that matter, nothing illiberal in our construction: We hold
not that RICO cannot serve to right the conspirators'
wrongs, but merely that the nonpurchasing customers, or
SIPC in their stead, are not proper plaintiffs. Indeed, we
fear that RICO's remedial purposes would more probably
be hobbled than helped by SIPC's version of liberal
construction: Allowing suits by those injured only
indirectly would open the door to "massive and complex
damages litigation[, which would] not only burden the
courts, but [would] also undermine the effectiveness of
treble-damages suits." *Associated General Contractors,
459 U.S. at 545.*

In sum, subrogation to the rights of the manipulation
conspiracy's secondary victims does, and should, run
afoul of proximate-causation standards, and SIPC must
wait on the outcome of the trustees' suit. If they recover
from Holmes, SIPC may share according to the priority
SIPA gives its claim. See *15 U. S. C. § 78fff-2(c).*

B

[***LEdHR2C] [2C]SIPC also claims a statutory
entitlement to pursue Holmes for funds advanced to the
trustees for administering the liquidation proceedings.
See Tr. of Oral Arg. 30. Its theory here apparently is not
one of subrogation, to which the statute makes no
reference in connection with SIPC's obligation [*275] to
make such advances. See *15 U. S. C. § 78fff-3(b)(2).* 22
SIPC relies instead, see Brief for Respondent 37, and n.
180, on this SIPA provision:

"SIPC participation -- SIPC shall be
deemed to be a party in interest as to all
matters arising in a liquidation proceeding,

with the right to be heard on all such
matters, and shall be deemed to have
intervened with respect to all such matters
with the same force and effect as if a
petition for such purpose had been allowed
by the court." *15 U. S. C. § 78eee(d).*

22  To the extent that SIPC's unexplained remark
at oral argument, see Tr. of Oral Arg. 29-30,
could be understood to rest its claim for recovery
of these advances on a theory of subrogation, it
came too late. One looks in vain for any such
argument in its brief.

The language is inapposite to the issue here,
however. On its face, it simply qualifies SIPC as a proper
[***549] party in interest in any "matter arising in a
liquidation proceeding" as to which it "shall be deemed to
have intervened." By extending a right to be heard in a
"matter" pending between other parties, however, the
statute says nothing about the conditions necessary for
SIPC's recovery as a plaintiff. How the provision could
be read, either alone or with *§ 1964(c),* to give SIPC a
right to sue Holmes for money damages eludes us.

IV

[***LEdHR9] [9]Petitioner urges us to go further and
decide whether every RICO plaintiff who sues under *§
1964(c)* and claims securities fraud as a predicate offense
must have purchased or sold a security, an issue on which
the [**1322] Circuits appear divided. 23 We decline to
do so. Given what we have said in Parts II [*276] and
III, our discussion of the issue would be unnecessary to
the resolution of this case. Nor do we think that leaving
this question unanswered will deprive the lower courts of
much-needed guidance. A review of the conflicting cases
shows that all could have been resolved on
proximate-causation grounds, and that none involved
litigants like those in *Blue Chip Stamps v. Manor Drug
Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917
(1975),* persons who had decided to forgo securities
transactions in reliance on misrepresentations. Thus, we
think it inopportune to resolve the issue today.

23  Compare *908 F.2d at 1465-1467* (no
purchaser-seller rule under RICO); *Warner v.
Alexander Grant & Co., 828 F.2d 1528, 1530
(CA11 1987)* (same), with *International Data*

*Bank, Ltd. v. Zepkin, 812 F.2d 149, 151-154 (CA4 1987)* (RICO plaintiff relying on securities fraud as predicate offense must have been purchaser or seller); *Brannan v. Eisenstein, 804 F.2d 1041, 1046 (CA8 1986)* (same).

## V

[***LEdHR1E] [1E]We hold that, because the alleged conspiracy to manipulate did not proximately cause the injury claimed, SIPC's allegations and the record before us fail to make out a right to sue petitioner under *§ 1964(c)*. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

**CONCUR BY:** O'CONNOR (In Part); SCALIA

## CONCUR

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE STEVENS join, concurring in part and concurring in the judgment.

I agree with the Court that the civil action provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 84 Stat. 941, as amended, *18 U. S. C. §§ 1961-1968 (1988 ed. and Supp. II)*, have a proximate cause element, and I can even be persuaded that the proximate cause issue is "fairly included" in the question on which we granted certiorari. *Ante*, at 266, n. 12. In my view, however, before deciding whether the Securities Investor Protection Corporation (SIPC) was proximately injured by petitioner's alleged activities, we should first consider the standing question that was decided below, and briefed and argued here, and which was the only clearly articulated question on which we granted certiorari. In resolving [***550] that question, I would hold [*277] that a plaintiff need not be a purchaser or a seller to assert RICO claims predicated on violations of fraud in the sale of securities.

Section 10(b) of the Securities Exchange Act of 1934 (1934 Act) makes it unlawful for any person to use, "in connection with the purchase or sale of any security," any "manipulative or deceptive device or contrivance" in contravention of rules or regulations that the Securities and Exchange Commission (SEC) may prescribe. *15 U. S. C. § 78j(b)*. Pursuant to its authority under § 10(b), the

SEC has adopted *Rule 10b-5*, which prohibits manipulative or deceptive acts "in connection with the purchase or sale of any security." *17 CFR § 240.10b-5 (1991)*. In 1971, we ratified without discussion the "established" view that § 10(b) and *Rule 10b-5* created an implied right of action. *Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 13, n. 9, 30 L. Ed. 2d 128, 92 S. Ct. 165*. Four years later, in *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*, we confirmed the federal courts' "longstanding acceptance" [1] of the rule that a plaintiff must have actually purchased or sold the securities at issue in order [**1323] to bring a *Rule 10b-5* private damages action. *Id., at 733.*

> 1 That acceptance was not universal. *E. g., Eason v. General Motors Acceptance Corp., 490 F.2d 654, 659 (CA7 1973)* (holding that "the protection of [*Rule 10b-5*] extends to persons who, in their capacity as investors, suffer significant injury as a direct consequence of fraud in connection with a securities transaction, even though their participation in the transaction did not involve either the purchase or the sale of a security") (Stevens, J.).

In this case, the District Court held that SIPC, which was neither a purchaser nor a seller of the allegedly manipulated securities, lacked standing to assert RICO claims predicated on alleged violations of § 10(b) and *Rule 10b-5*. App. to Pet. for Cert. 45a. The Court of Appeals reversed and held that *Blue Chip Stamps'* purchaser/seller limitation does not apply to suits brought under RICO. *Securities Investment Protection Corp. v. Vigman, 908 F.2d 1461 (CA9 1990)*. An examination [*278] of the text of RICO, and a comparison with the situation the Court confronted in *Blue Chip Stamps*, persuades me that the Court of Appeals' determination was correct. Because the Court's decision today leaves intact a division among the Circuits on whether *Blue Chip Stamps'* standing requirement applies in RICO suits, 2 I would affirm this portion of the decision below, even though we go on to hold that the alleged RICO violation did not proximately cause SIPC's injuries.

> 2 Compare *Securities Investment Protection Corp. v. Vigman, 908 F.2d 1461, 1465-1467 (CA9 1990)* (purchaser/seller standing limitation does not apply to RICO claims predicated on acts of fraud in the sale of securities); *Warner v.*

503 U.S. 258, *278; 112 S. Ct. 1311, **1323;
117 L. Ed. 2d 532, ***550; 1992 U.S. LEXIS 1947

*Alexander Grant & Co., 828 F.2d 1528, 1530 (CA11 1987)* (same), with *International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 151-154 (CA4 1987)* (standing to bring RICO action predicated on fraud in the sale of securities is limited to purchaser or seller of securities); *Brannan v. Eisenstein, 804 F.2d 1041, 1046 (CA8 1986)* (same).

Our obvious starting point is the text of the statute under which SIPC sued. RICO makes it unlawful for any person who has engaged in a "pattern of racketeering activity" to invest, maintain an interest, or participate in an enterprise that is engaged in interstate or foreign commerce. *18 U. S. C. [***551] § 1962*. "Racketeering activity" is defined to include a number of state and federal offenses, including any act indictable under *18 U. S. C. § 1341 (1988 ed., Supp. II)* (mail fraud) or *§ 1343* (wire fraud), and "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States." *§ 1961(1)*. RICO authorizes "any person injured in his business or property by reason of a violation of *section 1962*" to sue for treble damages in federal court. *§ 1964(c)*.

RICO's civil suit provision, considered on its face, has no purchaser/seller standing requirement. The statute sweeps [*279] broadly, authorizing "*any* person" who is injured by reason of a RICO violation to sue. "Person" is defined to include "*any* individual or entity capable of holding a legal or beneficial interest in property." *§ 1961(3)* (emphasis added). "Insofar as 'any' encompasses 'all'," *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. 211, 223, 112 L. Ed. 2d 636, 111 S. Ct. 615 (1991)*, the words "any person" cannot reasonably be read to mean only purchasers and sellers of securities. As we have explained in rejecting previous efforts to narrow the scope of civil RICO: "If the defendant engages in a pattern of racketeering activity in a manner forbidden by *[§ 1962's]* provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under *§ 1964(c)*. There is no room in the statutory language for an additional . . . requirement." *Sedima, S. P. R. L. v. Imrex Co., 473 U.S. 479, 495, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)*.

Of course, a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation." *Id., at 496*. We have already remarked that the requirement of injury in one's "business or property" limits the availability of RICO's civil remedies to those who have suffered injury in fact. *Id., at 497* (citing *Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (CA7 1984)*). Today, the Court sensibly holds that the statutory words "by reason of" operate, as they do in the antitrust laws, to [**1324] confine RICO's civil remedies to those whom the defendant has truly injured in some meaningful sense. Requiring a proximate relationship between the defendant's actions and the plaintiff's harm, however, cannot itself preclude a nonpurchaser or nonseller of securities, alleging predicate acts of fraud in the sale of securities, from bringing suit under *§ 1964(c)*. Although the words "injury in [one's] business or property" and "by reason of" are words of limitation, they do not categorically exclude nonpurchasers [*280] and nonsellers of securities from the universe of RICO plaintiffs.

Petitioner argues that the civil suit provisions of *§ 1964(c)* are not as sweeping as they appear because *§ 1964(c)* incorporates the standing requirements of the predicate acts alleged. But *§ 1964(c)* focuses on the "injury" of any "person," not the legal right to sue of any proper plaintiff for a predicate act. If standing were to be determined by reference to the predicate offenses, a private RICO plaintiff could not allege [***552] as predicates many of the acts that constitute the definition of racketeering activity. The great majority of acts listed in *§ 1961(1)* are criminal offenses for which only a State or the Federal Government is the proper party to bring suit. In light of *§ 1964(c)'s* provision that "any person" injured by reason of a RICO violation may sue, I would not accept that this same section envisions an overlay of standing requirements from the predicate acts, with the result that many RICO suits could be brought only by government entities.

Nor can I accept the contention that, even if *§ 1964(c)* does not normally incorporate the standing requirements of the predicate acts, an exception should be made for "fraud in the sale of securities" simply because it is well established that a plaintiff in a civil action under § 10(b) and *Rule 10b-5* must be either a purchaser or seller of securities. A careful reading of *§ 1961(1)* reveals the flaw in this argument. The relevant predicate offense is "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United

503 U.S. 258, *280; 112 S. Ct. 1311, **1324;
117 L. Ed. 2d 532, ***552; 1992 U.S. LEXIS 1947

States." The embracing words "offense . . . punishable under any law of the United States" plainly signify the elements necessary to bring a criminal prosecution. See *Trane Co. v. O'Connor Securities, 718 F.2d 26, 29 (CA2 1983); Dan River, Inc. v. Icahn, 701 F.2d 278, 291 (CA4 1983)*. To the extent that RICO's reference to an "offense involving fraud in the sale of securities" encompasses conduct that violates § 10(b), see *infra*, at 282-283, the relevant predicate is [*281] defined not by § 10(b) itself, but rather by § 32(a) of the 1934 Act, *15 U. S. C. § 78ff(a)*, which authorizes criminal sanctions against any person who willfully violates the Act or rules promulgated thereunder. As we have previously made clear, the purchaser/seller standing requirement for private civil actions under § 10(b) and *Rule 10b-5* is of no import in criminal prosecutions for willful violations of those provisions. *United States v. Naftalin, 441 U.S. 768, 774, n. 6, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979); SEC v. National Securities, Inc., 393 U.S. 453, 467, n. 9, 21 L. Ed. 2d 668, 89 S. Ct. 564 (1969)*. Thus, even if Congress intended RICO's civil suit provision to subsume established civil standing requirements for predicate offenses, that situation is not presented here.

Although the civil suit provisions of *§ 1964(c)* lack a purchaser/seller requirement, it is still possible that one lurks in *§ 1961(1)'s* catalog of predicate acts; *i. e.*, it is possible that *§ 1961(1)* of its own force limits RICO standing to the actual parties to a sale. As noted above, the statute defines "racketeering activity" to include "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States." Unfortunately, the term "fraud in the sale of securities" is not further defined. "Any offense . . . punishable under any law of the United States" presumably means that Congress intended to refer to the federal securities laws and not common-law tort actions for fraud. Unlike most of the predicate [**1325] offenses listed in *§ 1961(1)*, however, there is no cross-reference to any specific sections of the United States Code. Nor is resort to the legislative history helpful in clarifying what kinds of securities violations Congress contemplated would be covered. See generally Bridges, Private RICO Litigation [***553] Based Upon "Fraud in the Sale of Securities," *18 Ga. L. Rev. 43, 58-59 (1983)* (discussing paucity of legislative history); Note, RICO and Securities Fraud: A Workable Limitation, *83 Colum. L. Rev. 1513, 1536-1539 (1983)* (reviewing testimony before Senate Judiciary Committee).

[*282] Which violations of the federal securities laws, if any, constitute a "fraud in the sale of securities" within the meaning of *§ 1961(1)* is a question that has generated much ink and little agreement among courts [3] or commentators, [4] and one [*283] which we need not definitively resolve here. The statute unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, and that there be a sale of securities. At the same time, however, I am persuaded that Congress' use of the word "sale" in defining the predicate offense does not *necessarily* dictate that a RICO plaintiff have been a party to an executed sale.

[3]    Compare *First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 546 (CA9 1988)* (violations of §§ 13(d) and 14(e) of the 1934 Act cannot be RICO predicate offenses because neither provision embraces fraud "in the sale" of a security); *In re Par Pharmaceutical, Inc. Securities Litigation, 733 F. Supp. 668 (SDNY 1990)* (violation of § 10(b) and *Rule 10b-5* involving fraud in connection with the purchase of securities cannot be a predicate offense), with *In re Catanella and E. F. Hutton & Co. Securities Litigation, 583 F. Supp. 1388, 1425, n. 56 (ED Pa. 1984)* (reach of RICO claims predicated on violations of § 10b and *Rule 10b-5* encompasses "both purchases and sales"); *Lou v. Belzberg, 728 F. Supp. 1010, 1026 (SDNY 1990)* (violation of Hart-Scott-Rodino reporting requirement relates to "fraud in the sale of securities" and may constitute a RICO predicate act); *Spencer Cos. v. Agency Rent-A-Car, Inc.*, 1981-1982 CCH Fed. Sec. L. Rep. P98,361, p. 92,215 (Mass. 1981) (violation of § 13(d) reporting requirements is RICO predicate act because "the remedial purpose of the statute would appear to encompass fraud committed by the purchaser of securities, as well as by the seller").

[4]    See, *e. g.*, Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," *18 Ga. L. Rev. 43, 81 (1983)* ("fraud in the sale of securities" encompasses any violation of a specific antifraud or antimanipulation provision of the securities laws and regulations or use of stolen or counterfeit securities, as long as violation is by means of an actual sale of securities); Johnson, Predators Rights: Multiple Remedies for Wall Street Sharks Under the Securities Laws and RICO, 10 J. Corp. L. 3, 39-40 (1984) (allegations

of violations of antifraud provisions of the federal securities laws should satisfy "fraud in the sale of securities" definition); Long, Treble Damages for Violations of the Federal Securities Laws: A Suggested Analysis and Application of the RICO Civil Cause of Action, 85 Dick. L. Rev. 201, 225-226 (1981) (any violation of federal securities laws other than reporting or "housekeeping" measures suffices to assert predicate act of "fraud in the sale of securities"); MacIntosh, Racketeer Influenced and Corrupt Organizations Act: Powerful New Tool of the Defrauded Securities Plaintiff, 31 Kan. L. Rev. 7, 30-37 (1982) ("fraud in the sale of securities" is both broader and narrower than antifraud provisions of securities laws); Mathews, Shifting the Burden of Losses in the Securities Markets: The Role of Civil RICO in Securities Litigation, 65 Notre Dame L. Rev. 896, 944-947 (1990) (securities fraud is a predicate offense only if fraud occurs in actual sale of a security); Tyson & August, The Williams Act After RICO: Has the Balance Tipped in Favor of Incumbent Management?, 35 Hastings L. J. 53, 79-80 (1983) (criminal violations of antifraud provisions of the securities laws should constitute racketeering activity, provided that the conduct is in connection with purchase or sale of securities); Note, Application of the Racketeer Influenced and Corrupt Organizations Act (RICO) to Securities Violations, 8 J. Corp. L. 411, 430-431 (1983) ("fraud in the sale of securities" applies to fraudulent purchase as well as fraudulent sale of securities).

Section 1961(1)'s list of racketeering offenses provides the RICO predicates for both criminal prosecutions and civil actions. Obviously there is no requirement that the Government be party to a sale before it can [***554] bring a RICO prosecution predicated on "fraud in the sale of securities." Accordingly, any argument that the offense itself embodies a standing requirement must apply only to private actions. That distinction is not tenable, however. By including a private [**1326] right of action in RICO, Congress intended to bring "the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources [were] deemed inadequate." Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 151, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987). Although not everyone can qualify as an appropriate "private

attorney general," the prerequisites to the role are articulated, not in the definition of the predicate act, but in the civil action provisions of § 1964(c) -- a plaintiff must allege "injury in his business or property by reason of" a RICO violation.

Construing RICO's reference to "fraud in the sale of securities" to limit standing to purchasers and sellers would be [*284] in tension with our reasoning in Blue Chip Stamps. In that case, the Court admitted that it was not "able to divine from the language of § 10(b) the express 'intent of Congress' as to the contours of a private cause of action under Rule 10b-5." 421 U.S. at 737. The purchaser/seller standing limitation in Rule 10b-5 damages actions thus does not stem from a construction of the phrase "in connection with the purchase or sale of any security." Rather, it rests on the relationship between § 10(b) and other provisions of the securities laws, id., at 733-736, and the practical difficulties in granting standing in the absence of an executed transaction, id., at 737-749, neither of which are relevant in the RICO context.

Arguably, even if § 10(b)'s reference to fraud "in connection with" the sale of a security is insufficient to limit the plaintiff class to purchasers and sellers, § 1961(1)'s reference to fraud "in" the sale of a security performs just such a narrowing function. But we have previously had occasion to express reservations on the validity of that distinction. In United States v. Naftalin, 441 U.S. 768, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979), we reinstated the conviction of a professional investor who engaged in fraudulent "short selling" by placing orders with brokers to sell shares of stock which he falsely represented that he owned. This Court agreed with the District Court that Naftalin was guilty of fraud "in the "offer" or "sale" of securities in violation of § 17(a)(1) of the Securities Act of 1933, 15 U. S. C. § 77q(a)(1), even though the fraud was perpetrated on the brokers, not their purchasing clients. The Court noted:

"[Naftalin] contends that the requirement that the fraud be 'in' the offer or sale connotes a narrower range of activities than does the phrase 'in connection with,' which is found in § 10(b) . . . . First, we are not necessarily persuaded that 'in' is narrower than 'in connection with.' Both Congress, see H. R. Rep. No. 85, 73d Cong., 1st Sess., 6 (1933), and this Court,

see *Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 10, 30 L. Ed. 2d 128, 92 S. Ct. 165 [*285] (1971),* have on occasion used the terms interchangeably. But even if 'in' were meant to connote a narrower group of transactions [***555] than 'in connection with,' there is nothing to indicate that 'in' is narrower in the sense insisted upon by Naftalin." *441 U.S. at 773, n. 4.*

So also in today's case. To the extent that there is a meaningful difference between Congress' choice of "in" as opposed to "in connection with," I do not view it as limiting the class of RICO plaintiffs to those who were parties to a sale. Rather, consistent with today's decision, I view it as confining the class of defendants to those proximately responsible for the plaintiff's injury and excluding those only tangentially "connected with" it.

In *Blue Chip Stamps,* we adopted the purchaser/seller standing limitation in § 10(b) cases as a prudential means of avoiding the problems of proof when no security was traded and the nuisance potential of vexatious litigation. *421 U.S. at 738-739.* In that case, however, we were confronted with limiting access to a private cause of action that was judicially implied. [**1327] We expressly acknowledged that "if Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability." *Id., at 748.* To be sure, the problems of expansive standing identified in *Blue Chip Stamps* are exacerbated in RICO. In addition to the threat of treble damages, a defendant faces the stigma of being labeled a "racketeer." Nonetheless, Congress *has* legislated the elements of a private cause of action under RICO. Specifically, Congress has authorized "*any* person injured in his business or property by reason of" a RICO violation to bring suit under *§ 1964(c).* Despite the very real specter of vexatious litigation based on speculative damages, it is within Congress' power to create a private right of action [*286] for plaintiffs who have neither bought nor sold securities. For the reasons stated above, I think Congress has done so. "That being the case, the courts are without authority to restrict the application of the statute." *United*

*States v. Turkette, 452 U.S. 576, 587, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).*

In sum, we granted certiorari to resolve a split among the Circuits as to whether a nonpurchaser or nonseller of securities could assert RICO claims predicated on violations of § 10(b) and *Rule 10b-5.* See cases cited n. 1, *supra.* I recognize that, like the case below, some of those decisions might have been more appropriately cast in terms of proximate causation. That we have now more clearly articulated the causation element of a civil RICO action does not change the fact that the governing precedent in several Circuits is in disagreement as to *Blue Chip Stamps'* applicability in the RICO context. Because that issue was decided below and fully addressed here, we should resolve it today. I would sustain the Court of Appeals' determination that RICO plaintiffs alleging predicate acts of fraud in the sale of securities need not be actual purchasers or sellers of the securities at issue. Accordingly, I join all of the Court's opinion except Part IV.

[***556] JUSTICE SCALIA, concurring in the judgment.

I agree with JUSTICE O'CONNOR that in deciding this case we ought to reach, rather than avoid, the question on which we granted certiorari. I also agree with her on the answer to that question: that the purchaser-seller rule does not apply in civil RICO cases alleging as predicate acts violations of Securities and Exchange Commission *Rule 10b-5, 17 CFR § 240.10b-5 (1991).* My reasons for that conclusion, however, are somewhat different from hers.

The ultimate question here is statutory standing: whether the so-called *nexus* (mandatory legalese for "connection") between the harm of which this plaintiff complains and the defendant's so-called predicate acts is of the sort that will support [*287] an action under civil RICO. See *Sedima, S. P. R. L. v. Imrex Co., 473 U.S. 479, 497, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985).* One of the usual elements of statutory standing is proximate causality. It is required in RICO not so much because RICO has language similar to that of the Clayton Act, which in turn has language similar to that of the Sherman Act, which, by the time the Clayton Act had been passed, had been interpreted to include a proximate-cause requirement; but rather, I think, because it has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a

503 U.S. 258, *287; 112 S. Ct. 1311, **1327;
117 L. Ed. 2d 532, ***556; 1992 U.S. LEXIS 1947

condition of recovery, unless the legislature specifically prescribes otherwise, that the injury have been proximately caused by the offending conduct. Life is too short to pursue every human act to its most remote consequences; "for want of a nail, a kingdom was lost" is a commentary on fate, not the statement of a major cause of action against a blacksmith. See *Associated General Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 536, 74 L. Ed. 2d 723, 103 S. Ct. 897* [**1328] *(1983)*.

Yet another element of statutory standing is compliance with what I shall call the "zone-of-interests" test, which seeks to determine whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefited by the provision at issue. * Judicial inference of a zone-of-interests requirement, like judicial inference of a proximate-cause requirement, is a background practice against which Congress legislates. See *Block v. Community Nutrition Institute, 467 U.S. 340, 345-348, 81 L. Ed. 2d 270, 104 S. Ct. 2450 (1984)*. Sometimes considerable limitations upon the zone of interests are set forth explicitly in the statute itself -- but rarely, if ever, are those limitations so complete that they are [*288] deemed to preclude the judicial inference of others. If, for example, a securities fraud statute specifically conferred a cause of action upon "all purchasers, sellers, or owners of stock injured by securities fraud," I doubt whether a stockholder who suffered a heart attack upon reading a false earnings report could recover his medical expenses. [***557] So also here. The phrase "any person injured in his business or property by reason of" the unlawful activities makes clear that the zone of interests does not extend *beyond* those injured in that respect -- but does not necessarily mean that it includes *all* those injured in that respect. Just as the phrase does not exclude normal judicial inference of proximate cause, so also it does not exclude normal judicial inference of zone of interests.

* My terminology may not be entirely orthodox. It may be that proximate causality is *itself* an element of the zone-of-interests test as that phrase has ordinarily been used, see, *e. g., Wyoming v. Oklahoma, 502 U.S. 437, 473, 117 L. Ed. 2d 1, 112 S. Ct. 789 (1992)* (SCALIA, J., dissenting), but that usage would leave us bereft of terminology to connote those aspects of the "violation-injury connection" aspect of standing that are distinct from proximate causality.

It seems to me obvious that the proximate-cause test and the zone-of-interests test that will be applied to the various causes of action created by *18 U. S. C. § 1964* are not uniform, but vary according to the nature of the criminal offenses upon which those causes of action are based. The degree of proximate causality required to recover damages caused by predicate acts of sports bribery, for example, see *18 U. S. C. § 224*, will be quite different from the degree required for damages caused by predicate acts of transporting stolen property, see *18 U. S. C. §§ 2314-2315*. And so also with the applicable zone-of-interests test: It will vary with the underlying violation. (Where the predicate acts consist of different criminal offenses, presumably the plaintiff would have to be within the degree of proximate causality and within the zone of interests as to all of them.)

It also seems to me obvious that unless some reason for making a distinction exists, the background zone-of-interests test applied to one cause of action for harm caused by violation of a particular criminal provision should be the same as the test applied to another cause of action for harm caused by violation of the same provision. It is principally in this respect that I differ from JUSTICE O'CONNOR's analysis, [*289] *ante*, at 280 (opinion concurring in part and concurring in judgment). If, for example, one statute gives persons injured by a particular criminal violation a cause of action for damages, and another statute gives them a cause of action for equitable relief, the persons coming within the zone of interests of those two statutes would be identical. Hence the relevance to this case of our decision in *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*. The predicate acts of securities fraud alleged here are violations of *Rule 10b-5*; and we held in *Blue Chip Stamps* that the zone of interests for civil damages attributable to violation of that provision does not include persons who are not purchasers or sellers. As I have described above, just as RICO's statutory phrase "injured in his business or property by reason of" does not extend the rule of [**1329] proximate causation otherwise applied to congressionally created causes of action, so also it should not extend the otherwise applicable rule of zone of interests.

What prevents that proposition from being determinative here, however, is the fact that *Blue Chip Stamps* did not involve application of the background zone-of-interests rule to a congressionally created *Rule*

503 U.S. 258, \*289; 112 S. Ct. 1311, \*\*1329;
117 L. Ed. 2d 532, \*\*\*557; 1992 U.S. LEXIS 1947

10b-5 action, but rather specification of the contours of a *Rule 10b-5* action "implied" (*i. e.*, created) by the Court itself -- a practice we have since happily abandoned, see, *e. g., Touche Ross & Co. v. Redington, 442 U.S. 560, 568-571, 575-576, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979)*. The policies that we identified in *Blue Chip* [\*\*\*558] *Stamps, supra*, as supporting the purchaser-seller limitation (namely, the difficulty of assessing the truth of others' claims, see *id., at 743-747*, and the high threat of "strike" or nuisance suits in securities litigation, see *id., at 740-741*) are perhaps among the factors properly taken into account in determining the zone of interests covered by a statute, but they are surely not alone enough to restrict standing to purchasers or sellers under a text that contains no hint of such a limitation. I think, in other words, that the limitation we approved in *Blue Chip Stamps* was essentially a legislative judgment rather than an [\*290] interpretive one. Cf. *Franklin v. Gwinnett County Public Schools, ante,* at 77 (SCALIA, J., concurring in judgment). It goes beyond the customary leeway that the zone-of-interests test leaves to courts in the construction of statutory texts.

In my view, therefore, the Court of Appeals correctly rejected the assertion that SIPC had no standing because it was not a purchaser or seller of the securities in question. A proximate-cause requirement also applied, however, and I agree with the Court that that was not met. For these reasons, I concur in the judgment.

## REFERENCES

*31 Am Jur 2d, Extortion, Blackmail, and Threats 208-212, 222; 69 Am Jur 2d, Securities Regulation--Federal 444- 459, 484- 490*

30 Federal Procedure, L Ed, Securities Regulation 70:315-70:335, 70:388, 70:561, 70:562

14 Federal Procedural Forms, L Ed, Securities Regulation 59:67.5

*15 USCS 78eee(d), 78fff-3(b); 18 USCS 1964(c)*

L Ed Digest, Parties 3; Proximate Cause 11; Securities Regulation 15

L Ed Index, Proximate Cause; Racketeering; Securities Regulation; Subrogation

Index to Annotations, Proximate Cause; Racketeer Influenced and Corrupt Organizations Act; Securities Regulation; Subrogation

Annotation References:

Supreme Court's construction and application of antifraud provisions of 10(b) of Securities Exchange Act of 1934 (*15 USCS 78j(b)*) and SEC *Rule 10b-5* ( *17 CFR 240.10b-5*). *99 L Ed 2d 950*.

Civil action for damages under *18 USCS 1964(c)* of Racketeer Influenced and Corrupt Organizations Act (RICO, *18 USCS 1961 et seq.*) for injuries sustained by reason of racketeering activity. 70 ALR Fed 538.

Validity, construction, and application of Securities Investor Protection Act of 1970 (*15 USCS 78aaa et seq.*). 23 ALR Fed 157.

What is a "purchase or sale" of securities within the antifraud provisions of 10(b) of the Securities Exchange Act of 1934 (*15 USCS 78j(b)*) and of SEC *Rule 10b-5* promulgated thereunder. 4 ALR Fed 1048.

*** Slip Sheet ***

Document