88 N.Y.2d 413, *423; 668 N.E.2d 1370, **1375;
646 N.Y.S.2d 76, ***81; 1996 N.Y. LEXIS 1187

Primerica was Smith Barney's merger partner and could or would have withdrawn from the merger if less than 95% of Smith Barney's shareholders approved of the merger, that Lama faced substantial tax consequences if it participated in the merger, and that Smith Barney did not use its best efforts to permit Lama to sell its shares to a purchaser of Lama's choice as required by the shareholder agreement.

Plaintiffs contend that their breach of fiduciary duty claim is governed by Delaware law which authorized the claim made here. Under Delaware law, corporate officers, directors and controlling shareholders "owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness" (*Singer v The Magnavox Co., 380 A.2d 969, 976, overruled on other grounds in Weinberger v UOP, Inc., 457 A2d 701*). Delaware law imposes a duty upon corporations to disclose "all available material information when obtaining shareholder approval" (*Cede & Co. v Technicolor, Inc., 634 A.2d 345, 372*). Only damages caused by the breach of fiduciary duty are compensable (*Thorpe v Cerbco, Inc., 676 A.2d 436*). Plaintiffs argue that at the May 19, 1987 meeting, defendants' misrepresentation of material facts concerning Smith Barney's merger partner and the concomitant tax consequences to Lama of voting in favor of the merger, breached defendants' fiduciary duty of disclosure.

[*424] **[5]** Plaintiffs do not allege how receipt by Lama of the undisclosed information prior to the May 19, 1987 meeting would have affected Lama's tax consequences under the merger. At any rate, the undisclosed information was provided to all of Smith Barney's shareholders, including plaintiffs, in the proxy material. Plaintiffs had all of the previously undisclosed material prior to casting their vote in favor of the merger. Therefore, Lama's decision to vote in favor of the merger and take its approximately $ 90 million profit was an informed one and no breach of fiduciary duty was sufficiently pleaded here.

**[6]** Further, Rana and Rasha are not owed a fiduciary duty, as they are shareholders of Lama, which is itself a shareholder of Smith Barney (*see, U-Haul Acquisition Co. v Barbo,* 1994 WL 34688 [Del Ch Ct] [decided Jan. 31, 1994] ["It is axiomatic that in order to maintain a claim for breach of fiduciary duty, a plaintiff must show that it was owed a fiduciary duty"]). Rana and Rasha

also lack standing because they were neither purchasers nor sellers of Smith Barney stock. Since Rana and Rasha are shareholders of the Smith Barney shareholder, any injury to them is derivative. Moreover, as shareholders of Lama, Rana and Rasha cannot sue directly for injury to Lama (*see, Abrams v Donati, 66 N.Y.2d 951, 498 N.Y.S.2d 782, 489 N.E.2d 751* [shareholder has no standing to sue for wrong committed against corporation]; *Glenn v Hoteltron Sys., 74 N.Y.2d 386, 547 N.Y.S.2d 816, 547 N.E.2d 71*). At any rate, Smith Barney owed no independent and separate duty to Rana and Rasha.

Tortious     Interference     with     Contract     and
Advantageous Business Relations

Plaintiffs maintain in count four of the complaint that defendants have tortiously [***82] interfered with the performance of Lama's contract and Lama's advantageous business relationship with Bankers Trust. Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom (*Israel v Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97; see also, NBT Bancorp v Fleet/Norstar Fin. Group, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492* [discussing the elements of tortious interference with contract and tortious interference with prospective business relations]).

**[7]** Plaintiffs charge that defendants' actions and omissions during the May 19, 1987 [**1376] meeting "wrongfully interfered with and frustrated the performance of plaintiffs' agreement" with [*425] Bankers Trust. There is, however, no allegation that Smith Barney intentionally procured Bankers Trust's breach of its contract with Lama, nor that Bankers Trust in fact breached its contract to provide financial advice and represent Lama in the disposition of Lama's Smith Barney stock.

Breach of Contract

**[8]** In count five of the complaint, plaintiffs allege that Smith Barney, by its omissions and misrepresentations at the May 19, 1987 meeting, breached the parties' June 1982 agreement. Specifically, plaintiffs argue that defendants breached the June 1982

88 N.Y.2d 413, *425; 668 N.E.2d 1370, **1376;
646 N.Y.S.2d 76, ***82; 1996 N.Y. LEXIS 1187

agreement by obstructing or preventing Lama from selling its stock. The complaint, however, fails to allege any breach of the June 1982 agreement. Plaintiffs do not allege facts sufficient to support their claim that Smith Barney interfered with their efforts to obtain a bona fide offer for Lama stock. Furthermore, applying the law of New York (as provided in the agreement), plaintiffs' damages claim must fail since it is not susceptible to proof with certainty but is instead entirely speculative (*see, Kenford Co. v County of Erie, 67 N.Y.2d 257, 261,* *502 N.Y.S.2d 131, 493 N.E.2d 234*).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge Kaye and Judges Simons, Titone, Levine and Ciparick concur; Judge Bellacosa taking no part.

Order affirmed, with costs.

*** Slip Sheet ***

Document

LEXSEE 396 F.3D 161

**John Kilgour Lentell, Brett Raynes and Juliet Raynes, Plaintiffs-Appellants, v. Merrill Lynch & Co. Inc. and Henry M. Blodget, Defendants-Appellees, Thomas P. Willcutts, on behalf of himself and all others similarly situated, Yolanda Rice, individually and on behalf of all others similarly situated, Neil Trama, on behalf of himself and all others similarly situated, Brent Wickam, individually and on behalf of all others similarly situated, Marie Forte, on behalf of herself and all others similarly situated, C. Anthony Martignetti Trust, and on behalf of those similarly situated, Bob Raiano, individually and on behalf of those similarly situated, Christophe De Reynal, individually and on behalf of all others similarly situated, Diane Pilgrim, individually and on behalf of all others similarly situated, Turgut Ergun, on behalf of himself and all others similarly situated, Doug Seidenburg, individually and on behalf of all others similarly situated, Robert Rueben, on behalf of himself and all others similarly situated and Fulgham, individually and on behalf of all others similarly situated, Consolidated-Plaintiffs, Abraham Twersky Family Trust, on behalf of itself and all others similarly situated and John Deleo, on behalf of himself and all others similarly situated, Plaintiffs.**

Docket No. 03-7948

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*396 F.3d 161; 2005 U.S. App. LEXIS 1016; Fed. Sec. L. Rep. (CCH) P93,077*

**August 12, 2004, Argued
January 20, 2005, Decided**

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by *Lentell v. Merrill Lynch & Co., 126 S. Ct. 421, 163 L. Ed. 2d 321, 2005 U.S. LEXIS 7318 (U.S., Oct. 11, 2005)*

**PRIOR HISTORY:** [**1] John Kilgour Lentell and Brett and Juliet Raynes, as lead plaintiffs for a putative class of purchasers of the publicly traded stock of two internet companies, appeal from the dismissal by the United States District Court for the Southern District of New York (Pollack, J.) of their securities-fraud actions against Merrill Lynch & Co. and Henry M. Blodget. Plaintiffs' core allegation is that Merrill Lynch, through Blodget and other research analysts, recommended that investors purchase certain publicly traded stocks even though they did not then believe that the issuing companies were a good investment. Among other grounds cited for dismissal, the district court ruled that the complaints were time-barred and (even if not time-barred) that they fail to plead loss causation as required by the decisions of this Court. We conclude that the underlying complaints were timely filed, but we affirm the dismissal because the complaints fail to plead that the alleged misrepresentations and omissions caused the losses claimed.

*In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 2003 U.S. Dist. LEXIS 11005 (S.D.N.Y., 2003)*

**DISPOSITION:** Judgment affirmed in part and reversed in part.

**COUNSEL:** HERBERT E. MILSTEIN, Cohen, Milstein, Hausfeld, & Toll, P.L.L.C., Washington, DC (Stephen J. Toll, Joshua S. Devore, Adam T. Savett, Cohen, Milstein, Hausfeld, & Toll, [**2] P.L.L.C., Washington, DC; Douglas G. Thompson, Donald J. Enright, Finkelstein Thompson & Loughran, Washington, DC; Frederic S. Fox, Laurence D. King, Donald R. Hall, Kaplan Fox & Kilsheimer, LLP, New York, NY; Edward F. Haber, Michelle Blauner, Theodore M. Hess-Mahan, Shaprio Haber & Urmy LLP, Boston, MA; Jacqueline Sailer,

396 F.3d 161, *; 2005 U.S. App. LEXIS 1016, **2;
Fed. Sec. L. Rep. (CCH) P93,077

Gregory Linkh, Murray, Frank & Sailer, LLP, New York, NY, on the brief) for Plaintiffs-Appellants.

JAY B. KASNER, EDWARD J. YODOWITZ (Scott D. Musoff, Joanne Gaboriault, on the brief) Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY for Appellee Merrill Lynch & Co., Inc.

MARC B. DORFMAN (Samuel J. Winer, Brian S. Chilton, Adam J. Eisner, on the brief), Foley & Lardner LLP, Washington, DC for Appellee Henry M. Blodget.

JEAN LIN, Assistant Solicitor General, New York, NY (Eliot Spitzer, Attorney General of the State of New York, Daniel Smirlock, Deputy Solicitor General, Roger Waldman, Assistant Attorney General, on the brief) for Amicus State of New York.

DAVID C. FREDERICK, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC (Neil M. Gorsuch, Paul B. Matey, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC; Robin [**3] S. Conrad, Stephanie A. Martz, National Chamber Litigation Center, Washington, DC, on the brief) for Amici United States Chamber of Commerce and Business Roundtable.

**JUDGES:** Before: Jacobs, Sotomayor and B.D. Parker, Circuit Judges.

**OPINION BY:** Dennis G. Jacobs

**OPINION**

[*164] DENNIS JACOBS, *Circuit Judge*:

John Kilgour Lentell and Brett and Juliet Raynes, as lead plaintiffs for purchasers of the publicly traded stock of two internet companies, appeal from the dismissal by the United States District Court for the Southern District of New York (Pollack, *J.*) of their securities-fraud actions against Merrill Lynch & Co. and its former star analyst, Henry M. Blodget (collectively, "Merrill Lynch," "Merrill," or "the Firm"). In a nutshell, plaintiffs allege that Merrill, through Blodget and other research analysts, issued false and misleading reports recommending that investors purchase shares of 24/7 Real Media, Inc. ("24/7 Media") and Interliant, Inc. ("Interliant"), even though the analysts did not then believe that those companies were a good investment. It is alleged that analysts were touted to investors as independent assessors of business prospects, but that they issued the falsely optimistic [**4]

recommendations to cultivate the Firm's investment-banking clients.

In a thorough opinion, Judge Pollack concluded: [i] that the suits were time-barred and (in any event) that they fail [ii] to plead loss causation, [iii] to plead fraud with the particularity required by *Federal Rule of Civil Procedure 9(b)* and the *Private Securities Litigation Reform Act of 1995* ("PSLRA"), and [iv] to overcome the "bespeaks caution" doctrine. We conclude that the underlying complaints were timely filed, but we affirm the dismissal on the ground that the complaints fail to plead that the alleged misrepresentations and omissions caused the claimed losses.

**BACKGROUND**

These securities-fraud suits arise from an investigation by the New York Attorney General ("NYAG") into investment recommendations and research issued by prominent financial institutions, including Merrill Lynch. The NYAG sought a state court order in April 2002 compelling the production of documents, testimony, and other evidence by Merrill Lynch and several of its current and former employees. The supporting affidavit outlined a scheme by Merrill Lynch's research arm to publish [**5] bogus analysis in an effort to generate investment banking business. The NYAG's papers cited dozens of internal communications that expressed bluntly negative views on internet stocks that the Firm's analysts were then recommending to the investing public.

Within weeks, some 140 class-action complaints were filed, relying on the NYAG's application to allege securities [*165] fraud in connection with Merrill Lynch's analyses and investment recommendations concerning 27 publicly traded internet companies -- including 24/7 Media and Interliant. *See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 357-59 (S.D.N.Y. 2003)*. The Judicial Panel on Multi-District Litigation ("MDL") transferred these cases to Judge Pollack, *see id.*, who consolidated the cases, appointed lead plaintiffs (by issuer), and ruled that the 24/7 Media and Interliant actions would proceed first and together. *Id. at 359 n. 14.* Amended, consolidated class-action complaints were filed in February 2003; the dispositive issue on appeal is the sufficiency of those complaints.

I

396 F.3d 161, *165; 2005 U.S. App. LEXIS 1016, **5;
Fed. Sec. L. Rep. (CCH) P93,077

Because we assume plaintiff's factual allegations to be true on review [**6] of a motion to dismiss pursuant to *Rule 12(b)(6)*, *DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003)*, the facts of Merrill Lynch's fraud are taken from the amended complaints and any documents upon which they rely. *See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)*.

Merrill Lynch employs analysts to study and publish research and investment recommendations on a wide range of publicly traded companies. The Firm's Internet Group covers so-called new economy companies that emerged in the 1990s as investment was ignited by electronic commerce and other internet-based business models. Merrill Lynch is also an investment bank; among the services it provides in that capacity, Merrill assists companies seeking access to the capital markets by underwriting public offerings of securities. In theory, a "Chinese Wall" isolated Merrill's Internet Group analysts from the investment bankers soliciting business from companies in the new economy. Plaintiffs claim that the Chinese Wall was breached.

A. The Alleged Fraud

Identical frauds are alleged as to 24/7 Media and Interliant: the publication by Merrill Lynch's Internet Group of false and misleading [**7] research and investment recommendations "aimed at fraudulently driving up the market prices of [those] companies . . . and motivated by the desire to obtain and maintain investment banking business for Merrill Lynch." "The result of the scheme was to manipulate, inflate and maintain the market prices of the securities of the Internet companies at artificially high levels . . . [and w]hen the market prices of the Internet companies fell, public investors lost hundreds of millions of dollars." The complaints challenge approximately 80 reports issued during a combined class period of May 12, 1999 through February 20, 2001. *Merrill Lynch, 273 F. Supp. 2d at 360*. Henry Blodget -- then a star analyst -- headed the Internet Group throughout the putative class periods, and he figures prominently in plaintiffs' allegations.

The scheme had five elements common to research published on 24/7 Media and Interliant:

(i) "the public issuance and maintenance of knowingly or recklessly false, bullish research reports";

(ii) the publication of false "BUY or ACCUMULATE recommendations" on 24/7 Media and Interliant;

(iii) the setting of "profoundly unrealistic [**8] price targets for [those] stocks";

(iv) the existence of undisclosed agreements between Merrill Lynch and 24/7 Media and Interliant to "'trade' favorable, bullish Analyst Reports for investment banking business directed to Merrill Lynch"; and

[*166] (v) the undisclosed "sharing of investment banking fees among Merrill Lynch and its internet analysts."

The false "buy" and "accumulate" recommendations appear in each of the challenged reports. Analyses issued on 24/7 Media and Interliant during the combined class periods were of three types: "Comments"; briefer, but largely similar "Bulletins"; and the terse "Morning Call Notes" (for 24/7 Media) and "Intra-Day Special Notes" (for Interliant). Page one of every challenged Comment and Bulletin includes a four-barreled "Investment Opinion" expressed in the form "X-a-b-c" where (according to the margin notes) "X" is an "Investment Risk Rating" that ranged from "A" to "D"; "a" is a number keyed to intermediate "Appreciation Potential Rating," *i.e.*, a prediction of the investment's growth potential over the ensuing twelve months; "b" is a number keyed to long-term "Appreciation Potential Rating," *i.e.*, a prediction of [**9] growth potential on a time-line greater than one year; and "c" is a number keyed to "Income Rating," *i.e.*, a prediction of likely dividend payout.

Only the Appreciation Potential Ratings are alleged to have been false and misleading. Those ratings appeared in the full "Investment Opinion" offered in every challenged report, as well as in prominent, free-standing recommendations heading each Comment and Bulletin issued during the combined class period. [1] According to the reports, appreciation potential was rated on a six-point scale: 1 -- Buy; 2 -- Accumulate; 3 -- Neutral; 4 -- Reduce; 5 -- Sell; 6 -- No Rating. During the combined class period, the long-term and intermediate appreciation potentials for 24/7 Media and Interliant were

396 F.3d 161, *166; 2005 U.S. App. LEXIS 1016, **9;
Fed. Sec. L. Rep. (CCH) P93,077

never rated below "neutral," and only rarely below "buy" or "accumulate." Plaintiffs allege that this was *de facto* a 3-point ratings system, and that the ever-optimistic recommendations were bait and reward for investment-banking business.

> 1  For example, Merrill published a 24/7 Media "Bulletin" on September 15, 1999, offering the Investment Opinion "D-1-1-9," *i.e.,* "High" investment risk, "Buy" for medium-term appreciation potential, "Buy" for long-term appreciation potential, and "No Cash Dividend" likely. The Appreciation Potential Ratings also appear as recommendations at the top right-hand corner on the front page, *i.e.,* **BUY** and, immediately below, in smaller typeface, **Long Term BUY**.

[**10] B. The 24/7 Media and Interliant Allegations

24/7 Media "provides marketing solutions to the digital advertising industry." Merrill Lynch acted as lead underwriter for two public offerings made by 24/7 Media in August 1998 and April 1999. Plaintiffs challenge as materially false and misleading each of the approximately 45 reports issued by Merrill's Internet Group from May 12, 1999 through November 9, 2000. The stock-appreciation potential of 24/7 Media was rated at "accumulate" or "buy" throughout that period, until it was downgraded to "neutral" on November 9, 2000. The stock price gyrated from $ 45.125 on May 12, 1999, to a high of $ 64.625, and to a low of $ 2.9375 at the close of the putative class period.

According to plaintiffs, the 24/7 Media research reports -- "particularly [the] 'ACCUMULATE' and 'BUY' recommendations" -- were false and misleading, and failed to disclose that Merrill Lynch and Blodget "had a policy and practice throughout the Class Period of never issuing . . . [a] rating or recommendation . . . other than 'BUY' or 'ACCUMULATE'" because to do so "would jeopardize Merrill Lynch's . . . ability to obtain underwriting or investment advisory engagements. [**11] " It is further alleged that the reports were [*167] issued primarily as a means to artificially inflate the price of 24/7 Media stock, and that the appreciation ratings were "nothing more than undisclosed 'momentum' plays -- i.e. the stock should be bought because its price will rise, even though there are no rational economic reasons why the stock should trade at its current price . . . [or] why the stock price should continue to rise."

Similar allegations are made with respect to the Internet Group's coverage of Interliant, a provider of "enhanced Internet services that enable[d its] customers to deploy and manage their Web sites and network-based applications." Merrill Lynch acted as co-lead underwriter of Interliant's initial public offering in July 1999. Plaintiffs challenge as false and misleading each of the approximately 35 reports issued by the Internet Group between August 4, 1999 (when coverage initiated with intermediate and long-term appreciation ratings of "Accumulate" and "Buy") and February 20, 2001 (after which the stock was downgraded from "Buy/Buy" to "Accumulate/Accumulate"). Interliant was trading at $ 16.375 when Merrill initiated coverage, rose to a high of $ [**12] 55.50, and had plummeted to $ 4.00 as of February 21, 2001, the day after the putative class period closed. Throughout this period, Merrill's investment-banking arm assisted Interliant in its acquisition of 27 companies, and underwrote a $ 150 million convertible-bond offering in February 2000.

Plaintiffs challenge the veracity and completeness of the Interliant research reports in allegations virtually identical to those made regarding the 24/7 Media reports: the intermediate and long-term appreciation ratings were false and misleading; they were intended to artificially inflate Interliant's share price and to encourage Interliant and other internet-sector companies to use Merrill Lynch for investment-banking services; and the ratings had no rational economic basis.

Plaintiffs filed amended, consolidated class-action complaints in February 2003 and Merrill promptly moved to dismiss for failure to state a claim. Judge Pollack granted defendants' motion, citing numerous pleading deficiencies. This appeal followed.

### DISCUSSION

We review *de novo* a district court's dismissal of a complaint for failure to state a claim. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 194 (2d Cir. 2003).* [**13] The district court catalogued numerous deficiencies in the consolidated complaints, *Merrill Lynch, 273 F. Supp. 2d at 361-82*; because we affirm their dismissal on the ground that plaintiffs failed to plead loss causation, we address only that issue and, antecedently, the statute of limitations.

**I**

396 F.3d 161, *167; 2005 U.S. App. LEXIS 1016, **13;
Fed. Sec. L. Rep. (CCH) P93,077

"*Section 10(b) of the Securities Exchange Act of 1934* provides that 'no action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation.'" *LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003)* (quoting *15 U.S.C. § 78i(e) (2000)*). The limitations period begins to run "after the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *Id.* (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)*) (emphasis omitted).

[*168] Inquiry notice -- often called "storm warnings" [**14] in the securities context -- gives rise to a duty of inquiry "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)* (quoting *Dodds v. Cigna Sec., 12 F.3d 346, 350 (2d Cir. 1993)*); see also *Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003)* ("The existence of fraud must be a probability, not a possibility."). In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) "if the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute knowledge of what an investor in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." *LC Capital 318 F.3d at 154* (citation and internal quotation marks omitted).

Where inquiry notice is clearly established, see *Newman, 335 F.3d at 193*, dismissal [**15] of a securities-fraud complaint as untimely may be readily affirmed; but "'the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims,'" *Rothman, 220 F.3d at 97* (quoting *Sterlin v. Biomune Sys., 154 F.3d 1191, 1202 (10th Cir. 1998)*). "Whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'" *LC Capital, 318 F.3d at 156* (quoting *Marks v. CDW Computer Ctrs., 122 F.3d 363, 367 (7th Cir. 1997)*). In contrast, where "the facts needed

for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint," we can readily resolve the issue on a motion to dismiss, and have done so in "'a vast number of cases.'" *LC Capital, 318 F.3d at 156* (quoting *Dodds, 12 F.3d at 352 n. 3*). The district court concluded [**16] that plaintiffs were on inquiry notice of Merrill's alleged fraud "years prior to the filing of these cases," *Merrill Lynch, 273 F. Supp. 2d at 382*, and dismissed the complaints as untimely filed. We disagree.

Any fraud must be pled with particularity, *Fed. R. Civ. P. 9(b)*; but the rule is applied assiduously to securities fraud. This Circuit's strict pleading requirements in securities-fraud cases, see *Novak v. Kasaks, 216 F.3d 300, 307-10 (2d Cir. 2000)*, were (essentially) codified in the Private Securities Litigation Reform Act of 1995, *id. at 309-11*. So no claim should be filed unless and until it can be supported by specific factual allegations. See, e.g., *Levitt, 340 F.3d at 104* ("Complaints in federal securities fraud cases [must] allege 'those events which they assert give rise to a strong inference that [the] defendants had knowledge of the facts . . . or recklessly disregarded their existence,' including 'when the[] particular events occurred.'") (quoting *Ross v. A.H. Robins Co., 607 F.2d 545, 558 (2d Cir. 1979)*). A ripe claim will keep [**17] only for one year, but "the triggering . . . data must be such that it relates *directly* to the misrepresentations and omissions the Plaintiffs allege in their action against the defendants." *Newman, 335 F.3d at 193* (emphasis added) (citation and quotation marks omitted).

We have had frequent occasion to apply these rules. See, e.g., *Levitt v. Bear Stearns, Co., 340 F.3d 94 (2d Cir. 2003)*; *Newman v. Warnaco Group, Inc., 335 F.3d 187 (2d Cir. 2003)*; *LC Capital Partners,* [*169] *LP v. Frontier Ins. Group, Inc., 318 F.3d 148 (2d Cir. 2003)*. Our recent decisions reinforce the fact-specific nature of the limitations defense, particularly where the claim is foreclosed by inquiry notice. Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate. For example, in *LC Capital* we concluded that three substantial charges taken against reserves by an issuer between 1994 and 1998 put plaintiffs on notice of probable wrongdoing more than a year before their untimely complaint was filed. *LC Capital, 318 F.3d at 154-57*. Pleading with sufficient

396 F.3d 161, *169; 2005 U.S. App. LEXIS 1016, **17;
Fed. Sec. L. Rep. (CCH) P93,077

particularity [**18] may be especially difficult with claims against a "secondary" or "tertiary" wrongdoer (as opposed to an issuer or its officers or directors). *See, e.g., Levitt, 340 F.3d at 102-04* (vacating the dismissal of a complaint against an issuer's clearing agent where the district court failed to ascertain whether plaintiffs had access to facts sufficient to make out a claim of primary liability under *§ 10(b)*). We have been decidedly reluctant to foreclose such claims as untimely absent a manifest indication that plaintiffs "could have learned" the facts underpinning their allegations more than a year prior to filing. *See id.*

No such clear indication appears in this record. The fraud is alleged against a third party rather than against 24/7 Media or Interliant. True, the Internet Group's misleading statements and omissions were allegedly motivated by Merrill's desire to win banking business from (*inter alia*) 24/7 Media and Interliant, but plaintiffs do not challenge any specific securities offering (or other investment-banking transactions) undertaken on behalf of either company. This is not a fraud that can be apprehended "simply by examining . . . financial [**19] statements and media coverage" of the issuers. *See Levitt, 340 F.3d at 103-04*; cf. *LC Capital, 318 F.3d at 155* (probability of fraud could be gleaned from substantial reserves charges disclosed in issuer's financial and other public statements).

The 140 securities-fraud complaints consolidated before Judge Pollack were filed shortly after the NYAG sought to compel the production of documents and other evidence in its investigation of Merrill's research practices. That investigation was undertaken pursuant to the Martin Act, *N.Y. Gen Bus. L. § 352 et seq.*, which "proscribes a wide array of business practices in connection with the sale of securities," such as publication of fraudulent issuer-related research. The NYAG's supporting affidavit catalogued many specific examples of such research issued by Merrill Lynch, not to prove a violation of federal securities law, but simply to compel additional discovery. Thus it was arguably sufficient for the NYAG to allege specific facts concerning Merrill's coverage of one issuer to make a case for discovery pertaining to a wholly different issuer or issuers. But such pleading [**20] does not suffice to plead federal securities fraud. The district court correctly consolidated the complaints issuer-by-issuer and required plaintiffs to allege facts "*specific to the* security in question," including "who said what to whom concerning

that *particular security.*" *In re Merrill Lynch & Co., 2003 U.S. Dist. LEXIS 26555, No. 02 MDL 1484, Case Management Order No. 3 (S.D.N.Y. Feb. 5, 2003)* (emphasis added).

By the same token, however, the one-year limitation period of *§ 10(b)* is triggered only by data that "relates *directly* to the misrepresentations and omissions" that plaintiffs allege against Merrill Lynch. *Newman, 335 F.3d at 193* (emphasis added) (citation and quotation marks omitted). The dispositive question is whether the [*170] data held sufficient by the district court meets this standard.

Plaintiffs filed amended, consolidated class-action complaints in February 2003, which were dismissed as untimely four months later. *Merrill Lynch, 273 F. Supp. 2d at 382*. According to the district court, a duty to investigate the conflicts of interest among Merrill's research analysts and investment bankers arose "years prior to the filing of these cases" [**21] when numerous generic articles on the subject of structural conflicts appeared in the financial press. *Id.* The eleven articles cited by the court, published between May 2, 1996 and June 12, 2000, were insufficient as a matter of law to put plaintiffs on inquiry notice of the frauds alleged with respect to the Internet Group's coverage of 24/7 Media and Interliant. *See id. at 382-89*. Many of the articles cited by the district court were published before 24/7 Media or Interliant went public. [2] Pre-IPO articles could not prompt an investigation of the Internet Group's coverage of 24/7 Media and Interliant because when the pieces appeared, plaintiffs could not have been holding the securities of either company, nor could Merrill Lynch have recommended them.

> 2 Four articles appeared before 24/7 Media went public on August 13, 1998; seven went to press before Interliant's public float on July 7, 1999.

The post-IPO articles are a closer question, as each describes (in a style echoed in the [**22] complaints) the conflicts of interest faced by a research analyst employed at a Wall Street investment bank. For example, in October 1998 (two months after 24/7 Media's IPO), Business Week reported that "the 'Chinese Wall' that on paper still separates a firm's analysts from its investment bankers continues to crumble as analysts are encouraged to scout deals," *Merrill Lynch, 273 F. Supp. 2d at 385* (quoting Jeffrey M. Ladderman, *Who Can You Trust? Wall Street's Spin Game*, Bus. Week, Oct. 5, 1998, at

148); that an observed consequence of this breakdown was the virtual elimination of "sell" ratings from the Wall Street analyst's lexicon, see *id. at 386-88*; and that many banks (including Merrill) tied analysts' compensation to the firm's investment-banking income, *id.* In the district court's view, this "plethora of public information would have required even a *blind, deaf, or indifferent* investor to take notice of the purported alleged 'fraud,'" so that "every investor of reasonable intelligence would have been absolutely on inquiry notice." *Id. at 389* (emphasis in original).

Conflicts of interest present [**23] opportunities for fraud, but they do not, standing alone, evidence fraud -- let alone furnish a basis sufficiently particular to support a fraud complaint. Nor does the existence of temptation trigger a duty of inquiry -- at least, not by a reasonable investor. Something more than conflicted interest is required, no matter how well publicized the conflict may be. Plaintiffs do allege something more: that Merrill's analysts were actually corrupted as evidenced by investment opinions that were not just "systematically overly optimistic," *Merrill Lynch, 273 F. Supp. 2d at 383* (quoting Steve Bailey & Steven Syre, *Taking Analysts' Tempting Forecasts with a Grain of Salt*, Boston Globe, Oct. 23, 1996, at C1), but demonstrably false. In support, plaintiffs point to emails collected during the NYAG's 2002 Martin Act investigation; the district court, however, found sufficient evidence of corruption in the public domain well before that investigation picked up steam. The articles relied upon to support that finding fall well short of the specificity required to prompt further inquiry by a reasonable investor.

[*171] The articles cited by the district court strongly suggest [**24] grounds to believe that certain investment recommendations were less than candid. Well before the underlying complaints were filed, it was reported that "analysts routinely play up good news and sugarcoat the bad," *id. at 385* (citation omitted); that "the analyst today is an investment banker in sheep's clothing," *id. at 386* (citation omitted); that "in public, Wall Street brokers say that their research is objective," but "privately, they concede that 'sell' ratings are bad for investment-banking business," *id.* (citation omitted); and that "too many analysts [are] keen to report that 'what looks like a frog is really a prince,'" *id. at 386-87* (citation omitted). One anecdote does go beyond innuendo and metaphor: following Blodget's decision to upgrade the investment recommendation on a particular stock,

Blodget commented cheerily that "'it's dead money for a while, but I want to differentiate it from all the pieces of [expletive] we have buys on.'" *Id. at 388* (quoting David Streitfeld, *Analyst with a Knack for Shaking up Net Stocks; Henry Blodget is Wall Street's Link Between Online Firms, Investors* [**25] , Wash. Post, Apr. 2, 2000, at H1). However, that comment says nothing about 24/7 Media or Interliant; neither company is mentioned in *any* article relied upon by the district court.

If Blodget's lone remark is sufficient to put a reasonable investor on inquiry notice of the frauds alleged in the 24/7 Media and Interliant complaints, then plaintiffs had a viable fraud claim with respect to every issuer covered by Merrill's Internet Group no later than April 2, 2000. [3] And if the conflicts of interest catalogued by the financial press were sufficient to trigger *§ 10(b)*'s one-year limitation period, then the publication of a single investment recommendation by an underwriting bank would sustain a claim for securities fraud. Such a result is incompatible with the congressional intent of the PSLRA "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)* (citation and quotation marks omitted). We do not mean to suggest that inquiry notice could never be established on the basis of non-specific public-pronouncements, [**26] but the level of particularity in pleading required by the PSLRA is such that inquiry notice can be established only where the triggering data "relates *directly* to the misrepresentations and omissions" alleged. *Newman, 335 F.3d at 193* (emphasis added) (citation and quotation marks omitted); *see also La Grasta v. First Union Sec., Inc., 358 F.3d 840, 846 (11th Cir. 2004)* (finding earliest inquiry notice of stock analyst's conflict of interest to be a published interview in which she referenced the conflict with respect to the specific security). The articles cited by the district court describe the conflicted situation of Wall Street's research analysts; but evidence of the outright falsity of Merrill Lynch's investment recommendations is stray and indiscriminate at best, and is insufficient to put plaintiffs on inquiry notice of the specific frauds alleged. Furthermore, where (as here) plaintiffs allegations rely on internal communications that (arguably) could not be discovered absent a government-initiated investigation, we will not "punish [a] pleader for waiting until the appropriate factual information [has been] gathered by [**27] dismissing the complaint as time-barred." *Levitt, 340*

396 F.3d 161, *171; 2005 U.S. App. LEXIS 1016, **27;
Fed. Sec. L. Rep. (CCH) P93,077

*F.3d at 104.*

    3   Defense counsel expressed skepticism at a similar line of argument; indeed, counsel was unwilling to concede any scenario in which complaints based on allegations of a type made by plaintiffs would be timely. We make no such categorical determination here.

[*172] For these reasons we reverse the district court's ruling on the statute of limitations. We turn now to the sufficiency of plaintiffs' timely allegations.

## II

It is alleged (i) that Merrill's analysts did not actually believe 24/7 Media or Interliant securities were a good investment when they encouraged the public to buy them; (ii) that the analysts' reports failed to disclose that the Firm's true motivation for publishing the fraudulent recommendations was to attract investment banking business; and (iii) that as a result of Merrill's misstatements and omissions, plaintiffs bought the stocks and, when their value plummeted, lost millions of dollars.

To state [**28] a claim for relief under *§ 10(b)* and *Rule 10b-5*, plaintiffs must allege that Merrill Lynch "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Securities Litigation, 163 F.3d 102, 106 (2d Cir. 1998).* The district court found the complaints deficient in numerous respects, including that plaintiffs failed to satisfy the particularity requirements of *Rule 9(b)* and the PSLRA, or to overcome the "bespeaks caution" doctrine. *Merrill Lynch, 273 F. Supp. 2d at 368-78.* We do not address these alternative bases for dismissal because, assuming away any other pleading defects, the district court correctly found that plaintiffs failed to plead that Merrill Lynch's misstatements and omissions caused their investment losses. *Id. at 362-68.*

It is long settled that a securities-fraud plaintiff "must prove both transaction and loss causation." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)* (citing [**29] *Citibank N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)*); *see also Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp., 801 F.2d 13, 20-21 (2d Cir. 1986); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380 (2d Cir. 1974).*

Transaction causation is akin to reliance, and requires only an allegation that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).* Plaintiffs do not claim to have read Merrill's reports, or to have bought 24/7 Media or Interliant securities through the Firm; instead, they rely on the fraud-on-the-market presumption blessed in *Basic v. Levinson, 485 U.S. 224, 247, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).* We assume for present purposes that the allegations could amount to a fraud on the market. Moreover, Merrill Lynch does not contest transaction causation at this stage, so the appellate issue is whether the complaints adequately plead loss causation.

Loss causation "is the causal link between the alleged [**30] misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital, 343 F.3d at 197.* The PSLRA codified this judge-made requirement: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." *15 U.S.C. § 78u-4(b)(4).* We have described loss causation in terms of the tort-law concept of proximate cause, *i.e.,* "that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission," *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189 at 197 (2003)* (quoting *Castellano* [*173] *v. Young & Rubicam, 257 F.3d 171, 186 (2d Cir. 2001)*); but the tort analogy is imperfect. A foreseeable injury at common law is one proximately caused by the defendant's fault, but it cannot ordinarily be said that a drop in the value of a security is "caused" by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated. Put another way, a misstatement or omission is the "proximate cause" of an investment loss if [**31] the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor. *See AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 238 (2d Cir. 2000)* (Winter, *J.,* dissenting).

Thus to establish loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," *Suez*

396 F.3d 161, *173; 2005 U.S. App. LEXIS 1016, **31;
Fed. Sec. L. Rep. (CCH) P93,077

*Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added), *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable.

We acknowledge that the pleading principles set out in the foregoing passage require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk; and we further acknowledge that our opinion in *Suez Equity* can be (mis-)read to say that this Circuit has rejected the "materialization of risk" approach. *Suez Equity* does not purport to express this Circuit's authoritative [**32] position, because that wording: (i) is *dicta* consigned to a footnote; (ii) is framed in terms that are tentative and speculative, *see id.* at 98 n. 1 ("The standard that we have employed in this opinion *attempts* to reconcile *what we view* as our *somewhat* inconsistent precedents on loss causation.") (emphasis added); and (iii) is expressly limited to what was (in 2001) "our precedents *to date,*" *id.* (emphasis added).

This Court's cases -- post-*Suez* and pre-*Suez* -- require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk. *See Emergent Capital,* 343 F.3d at 197 ("Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in . . . value . . . ."); *id.* at 198 (loss causation satisfied where the plaintiffs "specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the venture"); *Castellano,* 257 F.3d at 190 ("[a] jury could find that [**33] by failing to disclose material information . . . [defendant] disguised the very risk to which [plaintiff] fell victim"); *id.* at 188 ("a jury could find that foreseeability links the omitted information and the ultimate injury in this case"); *First Nationwide Bank,* 27 F.3d at 769 (loss causation requires a showing "that the misstatements were the reason the transaction turned out to be a losing one"); *Citibank,* 968 F.2d at 1495 ("To establish loss causation a plaintiff must show, that the economic harm that it suffered *occurred as a result of* the alleged misrepresentations.") (emphasis in original).

As this Court stated in *Castellano*:

If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

[*174] 257 F.3d at 188 (quoting *AUSA Life Ins.,* 206 F.3d at 235 (Winter, J. [**34] , dissenting)); *see also Suez Equity,* 250 F.3d at 97 ("it would have been foreseeable to defendants that facts concealed . . . would have indicated [the executive's] inability to run the Group, and would have forecast its (eventually fatal) liquidity problems"); *id.* at 98 ("Since defendants reasonably could have foreseen that [the executive's] concealed lack of skill would cause the company's eventual liquidity problems, defendants' misrepresentations may be the causal precursor to the Group's final failure."). *But see, e.g., Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708-10 (2d Cir. 1980) (allegation that fraud induced investor to make an investment and to persevere with that investment sufficient to establish loss causation). We follow the holdings of *Emergent Capital, Castellano,* and *Suez Equity.*

Members of this Court have disagreed as to whether certain losses were attributable to a concealed risk, *see AUSA Life Ins.,* 206 F.3d at 224-28 (Jacobs, J., concurring in the mandate); but our precedents make clear that loss causation has to do with the relationship between [**35] the plaintiff's investment loss and the information misstated or concealed by the defendant. *See Emergent Capital,* 343 F.3d at 198-99; *Castellano,* 257 F.3d at 186-90; *Suez Equity,* 250 F.3d at 96-98. If that relationship is sufficiently direct, loss causation is established, *see, e.g., Suez Equity,* 250 F.3d at 98 (finding that a CEO's "concealed lack of managerial ability" induced the company's failure); but if the connection is attenuated, or if the plaintiff fails to "demonstrate a causal connection between the content of the alleged misstatements or omissions and 'the harm actually suffered,'" *Emergent Capital,* 343 F.3d at 199 (quoting

*Suez Equity, 250 F.3d at 96*), a fraud claim will not lie. *See, e.g., Citibank, 968 F.2d at 1494-96* (finding defendant's nondisclosure of a seven-week bridge loan insufficiently connected to plaintiff's loss to establish causation). That is because the loss-causation requirement -- as with the foreseeability limitation in tort -- "is intended 'to fix a legal limit on a person's responsibility, even for wrongful [**36] acts.'" *Castellano, 257 F.3d at 186* (quoting *First Nationwide Bank, 27 F.3d at 769-70*).

Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by circumstances, but our precedents establish certain parameters. It is not enough to allege that a defendant's misrepresentations and omissions induced a "purchase-time value disparity" between the price paid for a security and its "true 'investment quality.'" *Emergent Capital, 343 F.3d at 198* (clarifying *Suez Equity, 250 F.3d at 97-99*). Such an allegation -- which is "nothing more than a paraphrased allegation of transaction causation" -- explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment. *Emergent Capital, 343 F.3d at 198; see also Robbins v. Koger Props. Inc., 116 F.3d 1441 (11th Cir. 1997)*. "If the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a *Rule 12(b)(6)* motion to [**37] dismiss." *Emergent Capital, 343 F.3d at 197*. However, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *First Nationwide Bank, 27 F.3d at 772*. Though all reasonable [*175] inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, "conclusions of law or unwarranted deductions of fact are not admitted." *Id. at 771* (citation omitted).

Plaintiffs allege that when they invested, they were relying on the integrity of the market (including the fraudulent recommendations and omissions made by Merrill Lynch during the putative class periods), that the shares plummeted, and that their investments became virtually worthless. To plead loss causation, the complaints must allege facts that support an inference

that Merrill's misstatements and omissions concealed the circumstances that bear upon the loss [**38] suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud. As the district court found, no such allegations are made. *Merrill Lynch, 273 F. Supp. 2d at 367-68*. There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's "buy" and "accumulate" recommendations [4] and no allegation that Merrill misstated or omitted risks that did lead to the loss. This is fatal under Second Circuit precedent.

    4    Plaintiffs contend that they *have* alleged a corrective disclosure to the market, in alleging that Merrill's eventual downgrades of 24/7 Media and Interliant stock (from "accumulate" to "neutral" and from "buy" to "accumulate," respectively) negatively impacted the price of those securities. These allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations. To the contrary, plaintiffs have argued (affirmatively) on this appeal that the falsity of Merrill's recommendations was made public no earlier than April 2002, when the NYAG's affidavit "described the inner workings of Merrill's Internet Group," and that until then plaintiffs (and presumably the market at large) therefore lacked knowledge of the fraud. The complaints withstand the statute of limitations on the strength of that argument. By the same token, however, Merrill's concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public.

[**39] As noted, to establish loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity, 250 F.3d at 95* (emphasis added). It is alleged that Merrill's "buy" and "accumulate" recommendations were false and misleading with respect to 24/7 Media and Interliant, and that those recommendations artificially inflated the value of 24/7 Media and Interliant stock. However, plaintiffs do not allege that the subject of those false recommendations (that investors should buy or accumulate 24/7 Media and Interliant stock), or any corrective disclosure regarding the falsity of those recommendations, is the cause of the *decline* in stock value that plaintiffs claim as their loss.

396 F.3d 161, *175; 2005 U.S. App. LEXIS 1016, **39;
Fed. Sec. L. Rep. (CCH) P93,077

Nor do plaintiffs allege that Merrill Lynch concealed or misstated any risks associated with an investment in 24/7 Media or Interliant, some of which presumably caused plaintiffs' loss. Plaintiffs therefore failed to allege loss causation, as that requirement is set out in *Emergent Capital, Castellano,* and *Suez Equity.*

Plaintiffs do allege that Merrill's "material misrepresentations and omissions [**40] induced a disparity between the transaction price and the true 'investment quality'" of 24/7 Media and Interliant securities; "that the market price of [the] securities was artificially inflated"; and that the securities were acquired "at artificially inflated prices and [the plaintiffs] were damaged thereby." Assuming (as we must) the truth of these allegations, they may establish transaction causation; but they do not provide the necessary causal link between Merrill's fraud and plaintiffs' losses. *Emergent Capital, 343 F.3d at 198.*

[*176] It is further alleged that plaintiffs were injured "because the risks that materialized were risks of which they were unaware as a result of Defendants' scheme to defraud," and that they would not have been injured absent the scheme. But that is a legal conclusion; missing are the necessary allegations of fact to support the conclusion. The only misrepresentation that can inhere to the "buy" and "accumulate" recommendations is that they were not Merrill's true and sincere opinion. Yet plaintiffs allege no loss resulting from the market's realization that the opinions were false, or that Merrill concealed any risk that could plausibly [**41] (let alone foreseeably) have caused plaintiffs' loss. In fact, as the district court recognized, plaintiffs fail to grapple in any meaningful way with the complexity of the reports that form the basis of their claims or, for that matter, to account for the price-volatility risk inherent in the stocks they chose to buy. *See, e.g., Merrill Lynch, 273 F. Supp. 2d at 367-68.*

The essence of plaintiffs' claim is that the Internet Group's ratings for medium- and long-term-Appreciation Potential (*i.e.,* the "buy" and "accumulate" recommendations) issued during the putative class periods were false and misleading. Issue is taken with certain other aspects of the reports, [5] but plaintiffs do not challenge the detailed financial information and investment analysis published alongside Merrill's fraudulent recommendations. It is thus incontestible that the risk of price volatility -- and hence, the risk of

implosion -- is apparent on the face of every report challenged in the underlying complaints. Merrill's fraudulent "buy" and "accumulate" ratings appear as part of an "Investment Opinion" that includes an "Investment Risk Rating." As described earlier, Merrill rates [**42] investment risk on a four-point scale, from "A" ("Low"), to "D" [6] ("High"). 24/7 Media and Interliant were rated as D-grade investments throughout the putative class periods. *Merrill Lynch, 273 F. Supp. 2d at 361.* Since the Investment Opinions are decoded in the margin of every "Bulletin" and "Comment" cited in the underlying complaints, the high-risk nature of the investment in 24/7 Media and Interliant was available to the marketplace just as readily as Merrill's Appreciation Potential Ratings, along with all the other information contained in the challenged reports. *See Basic, 485 U.S. at 247* (noting that "most publicly available information is reflected in market price").

5   Plaintiffs challenge the reports' "bullish" price targets and the "Reason for Report" indicated on each, but do not challenge the substantive analysis offered with respect to 24/7 Media and Interliant.
6   According to the Policy and Procedures Manual of Merrill Lynch's Global Securities Research and Economics Group, a "D" Risk Rating indicates that a stock has "high potential for price volatility," and that the issuer "may be unseasoned, [that it may] have a small [public] float, [that] management may be untested, [that] the industry may be new, [that] the company may depend heavily on one product or service, and/or [that the company] may not have a proven track record of earnings."

[**43] In addition to this systematic and consistent risk indicator, the research reports are full of (unchallenged) analysis, *see Merrill Lynch, 273 F. Supp. 2d at 367-68,* suggesting that 24/7 Media and Interliant were volatile investments, and therefore subject to sudden and substantial devaluation risk. [7] To plead successfully that Merrill's [*177] fraud caused their losses, plaintiffs were required to allege facts to establish that the Firm's misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of 24/7 Media and Interliant.

7   Report-specific indications of devaluation risk are abundant; for example, in the 24/7 Media

396 F.3d 161, *177; 2005 U.S. App. LEXIS 1016, **43;
Fed. Sec. L. Rep. (CCH) P93,077

"Comment" and "Bulletin" issued August 12, 1999 (when the Intermediate Appreciation Potential Rating was raised from "Accumulate" to "Buy"), the final "Investment Highlight[]" featured on the opening page states "As always with this sector, the stock is likely to be extremely volatile." The 24/7 Media reports consistently couch share-price targets in terms of the stock's valuation relative to competitors (a method plaintiffs do not challenge); and anticipated weaknesses (through, *e.g.*, acquisitions) are reported throughout the putative class period. The Interliant reports are peppered with similar analysis. Plaintiffs do not challenge or attempt to explain how this (and much additional) information bears upon their alleged losses.

[**44] We are told that Merrill's "buy" and "accumulate" recommendations were false and misleading, and that the Firm failed to disclose conflicts of interest, salary arrangements, and collusive agreements among analysts, bankers, and 24/7 Media and Interliant. But plaintiffs nowhere explain how or to what extent those misrepresentations and omissions *concealed* the risk of a significant devaluation of 24/7 Media and Interliant securities. The reports indicate that 24/7 Media and Interliant were high-risk investments, a designation that specifies, *inter alia*, a "high potential for price volatility," and "no proven track record of earnings." And the unchallenged financial analyses presented (*e.g.*, negative EPS ratios and consistent quarterly losses) certainly indicate weakness.

Plaintiffs do not allege that Merrill "doctored" or hid, or omitted this information, all of which suggests that 24/7 Media and Interliant were volatile, devaluation-prone investments and that Merrill revealed as much in its reports. This case is therefore sharply distinguishable from cases in which some or all of the risk that materialized was clearly concealed by a defendant's misstatements or omissions. [**45] *See, e.g.,*

*Suez Equity,* 250 F.3d at 97-98; *Emergent Capital,* 343 F.3d at 196-98.

We do not suggest that plaintiffs were required to allege the precise loss attributable to Merrill's fraud, or that "systematically overly optimistic" ratings of the type published by the Internet Group are categorically beyond the reach of the securities laws. But where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud -- rather than other salient factors -- that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment. Plaintiffs have done neither, and thus offer no factual basis to support the allegation that Merrill's misrepresentations and omissions caused the losses flowing from the well-disclosed volatility of securities issued by 24/7 Media and Interliant.

Finally, plaintiffs cast their claims in terms of market manipulation, pursuant [**46] to *Rule 10b-5(a)* and *(c)*. We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under *Rule 10b-5(a)* and *(c)*, and remain subject to the heightened pleading requirements of the PSLRA. See *Schnell v. Conseco, Inc.,* 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (B.D. Parker, *J.*) (refusing to characterize allegations as market manipulation claims where alleged "schemes to defraud" consisted largely of an aggregation of material misrepresentations to inflate stock, such as research [*178] reports containing misrepresentations of the underlying facts and use of false names to solicit investors).

**CONCLUSION**

For the foregoing reasons, the judgment is affirmed.

*** Slip Sheet ***

Document

LEXSEE 831 N.Y.S.2D 354

**[\*1]  Robert Mark Levin and KARL KORTE derivatively, on behalf of Tyco International Ltd., , Plaintiffs, against L. Dennis Kozlowski, LORD MICHAEL ASHCROFT, JOSHUA M. BERMAN, RICHARD S. BODMAN, JOHN F. FORT, III, STEPHEN W. FOSS, WENDY E. LANE, JAMES S. PASMAN, JR., W. PETER SLUSSER, MARK H. SWARTZ, JOSEPH F. WELCH, FRANK E. WALSH, JR. and MARK BELNICK, Defendants.**

**602113/02**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

***2006 NY Slip Op 52142U; 13 Misc. 3d 1236A; 831 N.Y.S.2d 354; 2006 N.Y. Misc. LEXIS 3305***

**November 14, 2006, Decided**

**NOTICE:**     THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**SUBSEQUENT HISTORY:** Affirmed by *Levin v. Kozlowski, 2007 N.Y. App. Div. LEXIS 11767 (N.Y. App. Div. 1st Dep't, Nov. 15, 2007)*

**PRIOR HISTORY:** *In re Tyco Int'l, Ltd., 340 F. Supp. 2d 94, 2004 U.S. Dist. LEXIS 20731 (D.N.H., 2004)*

**DISPOSITION:**     The court granted the motion to dismiss. It dismissed the complaint with prejudice.

**HEADNOTES**

[\*\*1236A] [\*\*\*354] Corporations--Shareholders' Derivative Action. Judgments--Collateral Estoppel.

**COUNSEL:** For Plaintiffs: Wolf Haldenstein Adler, Freeman & Herz, LLP, New York, NY, (Gregory Mark Nespole).

For Defendants: Cravath, Swaine & Moore, LLP, Attorney for defendant, Tyco Iternational Ltd., New York, NY, (Francis P. Barron; Stephen S. Madsen), Weil, Gotshal & Manges, LLP; Attorney for defendants, Richard S. Bodman and Wendey E. Lane, New York, NY, (Ashley R. Altschuler), Cadwalader Wickersham & Taft, LLP; Attorney for defendants, Michael A. Ashcroft,

John F. Fort, III, James S. Pasman and Joseph F. Welch, New York, NY; (Gregory A. Markel; Douglas I. Koff), Latham & Watkins, LLP; Attorney for defendant, Stephen W. Foss, Reston, VA; (Laurie B. Smilan), Kramer Levin Naftalis & Frankel, LLP; Attorney for defendant, Joshua M. Berman, New York, NY; (Alan R. Friedman; Steven S. Sparling), O'Melveny & Myers, LLP; Attorney for defendant W. Peter Slusser, New York, NY, (Martin Glenn) Debevoise & Plimpton, LLP; Attorney for defendant, L. Dennis Kozlowski, New York, NY, (Robert N. Shwartz), Stillman & Friedman, PC; Attorney for defendant, Mark H. Swartz, Stillman & Friedman PC, New York, NY, (Michael Grudberg), Steptoe & Johnson, LLP; Attorney for defendant, Mark Belnick, New York, NY, (Amy Lester), Stroock & Stroock & Lavan, LLP; Attorney for defendant, Frank E. Walsh, Jr., New York, NY, (Laurence Greenwald; Michele Pahmer).

**JUDGES:** Bernard J. Fried, J.

**OPINION BY:** Bernard J. Fried

**OPINION**

Bernard J. Fried, J.

This is a shareholder derivative action brought by two shareholders, Robert Mark Levin and Karle Korte, on behalf of defendant Tyco International Ltd. (Tyco). This action is one of many shareholder class and derivative

2006 NY Slip Op 52142U, *1; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

actions filed against Tyco and its former officers and directors after Tyco publicly announced in 2002 that its former Chief Executive Officer/Chairman of the Board (L. Dennis Kozlowski), Chief Financial Officer/Director (Mark H. Swartz) and former Lead Director (Frank E. Walsh, Jr.), as well as former Chief Corporate Counsel Mark A. Belnick, had misappropriated Tyco's funds, and had engaged in an elaborate scheme to hide their wrongdoing from Tyco's former Board of Directors.

Motion Sequence Nos. 001, 002, 003, 004, 005 and 006 are consolidated for disposition. In Motion Sequence No. 001, Tyco moves, pursuant to *CPLR 3211 (a) (5)* and *(a) (7)*, for an order dismissing the complaint with prejudice on the grounds that the claims asserted in the complaint are barred by the doctrine of collateral estoppel, and because plaintiffs lack standing, under Bermudian law, to assert derivative claims on behalf of a Bermuda corporation.

In Motion Sequence No. 002, defendants Richard S. Bodman and Wendy E. Lane move, pursuant to *CPLR 3211 (a) (3), (5), (7)* and *(8)*, for an order dismissing the complaint with prejudice on the grounds of improper service, collateral estoppel, standing, and because the claims are barred as a matter of law by Tyco's Bye-Laws.

In Motion Sequence No. 003, defendant Walsh moves, pursuant to *CPLR 3211 (a) (3), (5), (7)* and *(8)*, for an order dismissing the complaint on the grounds of collateral estoppel, lack of standing, failure to state a claim, and/or improper service.

In Motion Sequence No. 004, defendant Belnick moves, pursuant to *CPLR 3211 (a) (3), (5)* and *(8)*, for an order dismissing the complaint with prejudice, on the grounds of improper service, collateral estoppel, and standing.

In Motion Sequence No. 005, defendants Kozlowski and Swartz move, pursuant to *CPLR 3211 (a) (3)* and *(5)*, for an order dismissing the complaint on the grounds of lack of standing and collateral estoppel.

In Motion Sequence No. 006, defendants Michael A. Ashcroft, Joshua M. Berman, John F. Fort, III, Stephen F. Foss, James S. Pasman, Jr., W. Peter Slusser, and Joseph F. Welch move, pursuant to *CPLR 3211 (a) (3), (5), (7)* and *(8)*, for an order dismissing the complaint with prejudice [*2] on the grounds of improper service, collateral estoppel, and standing, and because plaintiffs'

claims are barred by Tyco's Bye-Laws.

For the reasons set forth below, the complaint is dismissed with prejudice on the ground of collateral estoppel.

Tyco, a Bermuda corporation with its principal executive offices located in Bermuda, is a diversified manufacturing and service conglomerate. Defendants Ashcroft, Berman, Bodman, Fort, Foss, Lane, Pasman, Slusser, and Welch (collectively, the Former Outside Directors) were non-management members of Tyco's Board of Directors (the Board) during the events underlying the allegations in plaintiffs' complaint. The other defendants are former Chief Executive Officer Kozlowski, former Chief Financial Officer Swartz, former Chief Corporate Counsel Belnick, and former Lead Director Walsh (collectively, the Individual Defendants).

In January 2002, the Board learned that Kozlowski had secretly caused Tyco to pay Walsh a $ 20 million fee in connection with Tyco's 2001 acquisition of CIT Group, Inc. (Complaint, P47). [1] In June 2002, the Board learned that Kozlowski was the target of a criminal investigation by the District Attorney of New York County and an investigation by the SEC (*see* Form 9/17/02 8-K Current Report of Tyco, at 2 [Aff. of Brad E. Konstadt, Exh A]). On June 3, 2002, Kozlowski resigned as chief executive officer and chairman of the Board (*id.*). The next day, he was indicted for violations of state sales tax laws, and was later charged with obstruction of justice (*id.*). On June 10, 2002, Belnick's employment was terminated (*id.* at 13). Kozlowski, Walsh, Belnick and Swartz were later indicted by the State of New York for criminal violations that victimized Tyco, and the SEC filed complaints against each of them. On December 17, 2002, Walsh pleaded guilty to a felony and settled the SEC civil action, agreeing to pay $ 20 million in restitution to Tyco. On June 17, 2005, Kozlowski and Swartz were both convicted of grand larceny, and were each sentenced to substantial prison terms.

    1   This statement of facts is taken from the complaint, from other court filings (including Declarations submitted in the Federal Action), and from publicly available Securities and Exchange Commission filings (SEC), which the court may consider under *CPLR 3211* (*see Gibraltar Steel v Gibraltar Metal Processing, 19 A.D.3d 1141, 796 N.Y.S.2d 814 [4th Dept 2005]*).

2006 NY Slip Op 52142U, *2; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

On June 27, 2002, Tyco filed complaints against Walsh and Belnick, seeking recovery for losses suffered by Tyco as a result of their wrongful conduct. On September 12, 2002, Tyco filed a complaint against Kozlowski. On October 7, 2002, Tyco filed an arbitration claim against Swartz. When Swartz refused to proceed with arbitration, Tyco filed a complaint against him on April 1, 2003. On December 6, 2002, Tyco filed a complaint against Kozlowski and Swartz, alleging that they violated *Section 16 (b)* of the Securities Exchange Act of 1934, and seeking disgorgement of short-swing trading profits from prohibited transactions in Tyco stock.

On July 25, 2002, Tyco appointed Edward O. Breen as Chief Executive Officer and Chairman of the Board. On August 6, 2002, Eric M. Pillmore was appointed to the new position of Senior Vice President of Corporate Governance. On September 10, 2002, David J. Fitzpatrick was appointed Executive Vice President and Chief Financial Officer, replacing Swartz. On September 12, 2002, William B. Lytton was appointed Executive Vice President and General Counsel.

On September 12, 2002, the Board, as then constituted, voted not to nominate for reelection any of the then-current members of the Board who had been members prior to July 25, 2002, the date [*3] on which the new Chairman was appointed. Between August 2002 and January 2003, five members of the Board resigned, and were replaced by new members. At the annual meeting on March 6, 2003, shareholders elected the nominated slate of new candidates to the Board. By this date, all of the Former Outside Directors had stepped down from the Board, and were replaced by an entirely new group of directors. The new directors were re-elected at the annual meetings held in 2004, 2005, and 2006.

On March 7, 2003, the Board appointed a Special Litigation Committee to investigate and evaluate whether it would be in Tyco's interest to take additional action beyond the lawsuits already filed against Kozlowski, Swartz, Belnick, and Walsh. The Committee retained the firm of Covington and Burling to assist and advise it. On May 12, 2004, on the basis of the Committee's recommendations, the Board decided that Tyco would not pursue additional legal action against the Former Outside Directors, and would seek dismissal of the several derivative suits that had been filed.

On June 28, 2002, plaintiffs filed this action. In January 2003, plaintiffs' counsel, the law firm of Wolf,

Haldenstein Adler Freeman & Herz LLP (Wolf Haldenstein) agreed to suspend this action indefinitely to await the outcome of a concurrent consolidated derivative action with a different named plaintiff, which was being prosecuted in federal district court in New Hampshire before Judge Paul J. Barbadoro (the Federal Action). [2] Although there was no formal order staying the instant action, the parties agreed to suspend all deadlines, and filed no Request for Judicial Intervention. During the subsequent years, Wolf Haldenstein was actively involved in the Federal Action, appearing with the title "Of Counsel" or "Counsel for Derivative Plaintiffs" on at least 20 different pleadings.

> 2  At a November 15, 2002 pretrial conference, a Wolf Haldenstein attorney represented to Judge Barbadoro that "We have agreed to stay our action in New York State Court and to refer to this leadership structure [for plaintiffs' counsel in the Federal Action] and work in this case as we're given assignments, and accordingly, we withdraw our earlier filed objection to these proceedings going on here" (Tr, at 15 [Konstadt Aff., Exh J]).

The Federal Action was part of a wave of lawsuits that began in February 2002, shortly after the $ 20 million payment to Walsh became public. Ultimately, there were 42 class actions alleging violations of the securities laws, eight class actions alleging violations of the Employee Retirement Security Act of 1974 (ERISA), and three derivative actions. The Judicial Panel on Multidistrict Litigation ordered all actions centralized in the District of New Hampshire. Judge Barbadoro divided the litigation into three consolidated categories: securities, ERISA and derivative. The consolidated securities and ERISA class actions have survived motions to dismiss as to Tyco and certain individual defendants.

On January 29, 2003, Shelly Evans, the plaintiff in the Federal Action, filed the first Consolidated and Amended Derivative Complaint (the First Amended Federal Complaint), listing Wolf Haldenstein as "Counsel for Derivative Plaintiffs," and naming Kozlowski, Swartz, Belnick, Walsh, and nine other former or then-current directors of Tyco as defendants. Tyco was named as a nominal defendant. In the First Amended Federal Complaint, the plaintiff alleged that the then-[*4] current and former directors breached their fiduciary duty to exercise due care, loyalty and diligence in the management and administration of Tyco, and wasted

2006 NY Slip Op 52142U, *4; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

corporate assets.

On March 17, 2003, Tyco and the Former Outside Directors moved to dismiss the First Amended Federal Complaint on the grounds, inter alia, that: (1) Bermuda law governed, as Tyco is a Bermuda corporation; and (2) plaintiffs had not met the requirements under Bermudian law for pursuing the asserted derivative claims. The applicable Bermudian/English law requires that, to pursue a derivative action, a plaintiff must show that the alleged wrongdoers have committed a "fraud on the minority" that is, have committed an equitable fraud upon the company, and are preventing the company from taking action because they are in control, or are about to commit an ultra vires act. However, none of the individual defendants remained an officer or director, and four of them had been sued by Tyco. Thus, the defendants argued, it could not possibly be said that they controlled Tyco, or that they were about to engage in an ultra vires act.

The plaintiff never responded to the motion the dismiss. [3] Instead, the plaintiff sought leave to filed a Second Amended Derivative Complaint (the Second Amended Federal Complaint) in order to cure the pleading defects by adding the new directors of Tyco as defendants. Wolf Haldenstein was, once again, listed on the Second Amended Federal Complaint as "Counsel for Derivative Plaintiff."

> [3]    Indeed, Judge Barbadoro observed at oral argument that the "control" element would have required dismissal of the prior complaint as to the Former Outside Directors (see June 22, 2004 Tr, at 206 [Aff. of Ashley R. Altschuler, Exh D]).

In the Second Amended Federal Complaint, the claims against the former officers and directors were essentially the same as those asserted in the First Amended Federal Complaint. With respect to the new directors, the Second Amended Federal Complaint blamed them for conduct that took place during the "Kozlowski era," which was uncovered and disclosed after the new management and Board took over. The plaintiff alleged that the new Board members "assumed their duties" knowing that there were problems at Tyco (Second Amended Federal Complaint, P5); that "[t]he current Board, having stepped into the quagmire of Tyco's ongoing problems, has placed itself in an irreconcilable conflict" (id., P22); and that the new directors "have not rescued Tyco from the pernicious

wrongdoing inflicted on it and, indeed have perpetuated the wrongdoing" (id., P3).

On February 26, 2004, the defendants in the Federal Action moved to dismiss the Second Amended Federal Complaint on the grounds that: (1) the element of wrongdoer control could not possibly be established against the former officers and directors; (2) the plaintiff had not pleaded (and could not show) that the new directors controlled a majority of the voting shares (the test under English law) and, in any case, had not pleaded (and could not show) that the new directors had committed equitable fraud by misappropriation of company property for their own benefit; and (3) the plaintiff had not pleaded (and could not show) that the former or new directors were threatening to commit a future ultra vires act.

By Opinion and Order dated October 14, 2004, Judge Barbadoro dismissed the Second Amended Federal Complaint in its entirety (In re Tyco Intl., Ltd., 340 F. Supp. 2d 94, 2004 DNH 155 [D NH 2004]). As a threshold matter, the court found that, because Tyco is a Bermuda corporation, Bermudian law would determine a shareholder's right to bring an action in the company's name, and that thus, it would "evaluate [plaintiff's] right to sue on Tyco's behalf under English law as it would be applied [*5] by a Bermudian court" (id. at 96). The court then determined that, "[u]nder English law, whether Evans is a proper plaintiff to sue on Tyco's behalf is viewed as a question of standing," and that "American courts, in turn, generally view standing as a component of subject matter jurisdiction" (id. at 96-97). The court held that the plaintiff's pleading, even if taken as true, did not demonstrate her standing to assert derivative claims on behalf of Tyco. The court did so "without engaging in jurisdictional fact finding because I conclude that I lack subject matter jurisdiction even if all of Evans' well-pleaded jurisdictional averments are true" (id. at 97).

In reaching this determination, the court found that "[a] shareholder's standing to sue on behalf of a corporation under English law is governed by the rule in Foss v Harbottle,'" (id. at 98 [citations omitted], which is derived from an "1843 [English] court case of the same name" (id., citing Foss v Harbottle [2 Hare 461 (Eng 843)]). [4] The court stated the rule as follows: "a shareholder may ordinarily bring a derivative claim on behalf of a corporation only if a simple majority of the shareholders could not ratify the conduct on which the

2006 NY Slip Op 52142U, *5; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

suit is based" (*id. at 98*). The plaintiff primarily relied on two exceptions to the rule in *Foss v Harbottle*, which permit a shareholder to bring suit when the conduct at issue is ultra vires, or qualifies as a "fraud on the minority."

> 4    The validity of *Foss v Harbottle* in the derivative context was recently reaffirmed by the Supreme Court of Bermuda in *Clark v Energia Global Intl. Ltd.*, [2001] No. 173, at 10 [Bermuda, September 18, 2002] [Konstadt Aff, Exh H]).

The court found that the action did not fall within the fraud-on-the minority exception, which "has two elements that work together to limit the circumstances in which a minority shareholder may seize control of the company's right to sue" (*id.*). The first element "is that the alleged wrongdoers must have control' over a majority of the stock with voting rights and the second is that the wrongdoers must have committed fraud,'" meaning "in a broader equitable sense," that "the alleged wrongdoer has benefitted at the company's expense as a result of his misconduct" (*id. at 98, 99*).

The court concluded that because "it is the current board's litigation judgment that [plaintiff seeks] to displace," the plaintiff's standing to pursue derivative claims hinged on the sufficiency of her allegations that the current directors (who the court assumed, for purposes of its decision, had sufficient "control" to satisfy *Foss v Harbottle*) engaged in fraud on the minority (*id. at 100*). As to the element of "fraud," the court held that the plaintiff did "not allege the kind of self-dealing by the current directors that is necessary to satisfy the fraud requirement" (*id. at 100*). The court found that the plaintiff did not allege that the directors had enjoyed any benefit beyond those normally enjoyed by directors, and that the directors' alleged desire to avoid personal liability and damage to their reputations are motivations shared by all corporate directors. The court concluded that "[i]f allegations of this sort could satisfy the self-dealing component of a fraud on the minority claim, the requirement would be meaningless because it would be satisfied in every derivative action in which a breach of fiduciary duty claim is asserted against a sitting board of directors" (*id.*).

With respect to the plaintiffs' contention that her case qualified under the "ultra vires" exception to the *Foss v Harbottle* rule, the court concluded that the exception applies only to prospective ultra vires acts. Where a

shareholder seeks to bring a derivative action to recover damages for past ultra vires acts, she must demonstrate that the case qualifies under the "fraud on the minority" exception. Thus, the court found that the plaintiff's attempt to rely on the ultra vires [*6] exception also failed.

The plaintiff also contended that her case qualified under an "interests of justice" exception. The court cited authority casting doubt on the existence of such an exception, but found that, in any event, there would be no basis for the application of such an exception in the case before it.

Accordingly, the District Court concluded that the plaintiff in the Federal Action "lack[ed] standing to bring a derivative claim on Tyco's behalf," and dismissed all of the claims that had been asserted, including those against the Former Outside Directors and the Individual Defendants.

The plaintiff subsequently appealed. Wolf Haldenstein appeared as "Of Counsel" in the Notice of Appeal. On May 19, 2005, plaintiff voluntarily dismissed her appeal after defendants filed their responsive briefs.

Plaintiffs in the present derivative action filed their complaint on June 28, 2002, making substantially the same allegations as were included against the same defendants in the First Amended Federal Complaint and Count I of the Second Amended Federal Complaint. Wolf Haldenstein's name appears in both pleadings as "Counsel for Derivative Plaintiffs" on the Second Amended Federal Complaint, and as the submitting firm on the complaint now before this court. Plaintiffs here first claim that defendants' alleged conduct was "due to their intentional breaches or reckless disregard of their fiduciary duties to the company" (Complaint, P108). Second, plaintiffs claim that defendants grossly mismanaged Tyco because they "knew or recklessly disregarded the unreasonable risks associated" with their alleged misconduct (*id.*, P117). Third, plaintiffs allege that defendants caused Tyco to waste corporate assets (*id.*, P121). Fourth, plaintiffs include an additional claim of conversion against defendants Kozlowski, Swartz, Berman, Fort, Ashcroft, Foss and Belnick (*id.*, P125). Plaintiffs' claims of breach of fiduciary duty and gross mismanagement in the present case (Complaint, Counts I and II, PP106-112; 113-118) mirror Count I of the Second Amended Federal Complaint (Second Amended Federal Complaint, PP438-447); plaintiff's claim of

2006 NY Slip Op 52142U, *6; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

corporate waste (Complaint, Count III, PP119-122) was also pleaded in the Second Amended Federal Complaint under Count II (Second Amended Federal Complaint, PP448-445); and plaintiff's conversion claim was effectively subsumed in the claim of waste of corporate assets in the Federal Action, where the plaintiff alleged that defendants' misconduct caused Tyco to "incur[] significant expenses, liabilities, and obligations for the benefit of the individual defendants" (*id.*, P450).

In a June 14, 2005 letter to Tyco's counsel, Wolf Haldenstein announced that it was reviving the instant action, stating that although it had "voluntarily agreed to stay proceedings in New York and cooperate with the prosecution of the federal derivative action in the district court in New Hampshire . . . we intend to proceed with the New York action" in light of the New York plaintiff's dismissal of her appeal (Altschuler Aff., Exh F).

Defendants now move to dismiss the complaint with prejudice, primarily on the ground that plaintiffs' claims are barred by collateral estoppel. As set forth below, plaintiffs are precluded from relitigating the issue of standing, and the complaint is dismissed. Based upon this conclusion, it is unnecessary to reach the merits of defendants' remaining contentions.

Collateral estoppel is based upon the general notion that a party, or one in privity with a party, should not be permitted to relitigate an issue that has already been decided against it (*see Pinnacle Consultants, Ltd. v Leucadia Natl. Corp.*, 94 N.Y.2d 426, 431-432, 727 N.E.2d 543, 706 N.Y.S.2d 46 [2000] [internal quotation marks and citation omitted] ["Collateral estoppel, or issue preclusion, prevents a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or [*7] proceeding and decided against that party"]). There are two requirements governing the application of collateral estoppel: (1) the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action; and (2) the party to be precluded from re-litigating an issue must have had a full and fair opportunity to contest the prior determination (*Kaufman v Eli Lilly & Co.*, 65 N.Y.2d 449, 482 N.E.2d 63, 492 N.Y.S.2d 584 [1985]; *accord D'Arata v New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 564 N.E.2d 634, 563 N.Y.S.2d 24 [1990]; *Kleiger-Brown v Brown*, 306 A.D.2d 482, 761 N.Y.S.2d 516 [2d Dept 2003]).

The first question that arises in every derivative suit

is whether the elected board of directors of the nominal defendant company is disqualified from exercising its "inherent powers . . . to manage the affairs of the corporation, which includes making decisions about whether or not to pursue . . . litigation" (*Wilson v Tully*, 243 A.D.2d 229, 232, 676 N.Y.S.2d 531 [1st Dept 1998]). That question which has nothing to do with the particular individual shareholder who brings suit is the fundamental question when considering shareholder standing to bring a derivative action (*see Henik v LaBranche*, 433 F. Supp. 2d 372, 381 [SD NY 2006] ["the demonstration of standing to sue derivatively does not require any showing of the characteristics specific to the individual shareholder who seeks standing, aside from the obvious demonstration that the plaintiff was a shareholder during the relevant period"]).

Plaintiffs' claims in the current case are substantially identical to the claims in the Federal Action. Therefore, the identical, controlling legal issue whether plaintiffs have standing to sue was already decided by Judge Barbadoro. Additionally, plaintiffs and their counsel have already had a full and fair opportunity to contest Judge Barbadoro's determination that they lack standing to bring the present shareholder derivative action. Thus, plaintiffs' claims are barred by collateral estoppel, and the complaint must be dismissed pursuant to *CPLR 3211 (a) (5)* (*see Pinnacle Consultants, Ltd. v Leucadia Natl. Corp.*, 94 N.Y.2d 426, 727 N.E.2d 543, 706 N.Y.S.2d 46, *supra* [dismissing shareholder derivative action on collateral estoppel grounds where issues had been raised and decided against plaintiff in a prior federal court action]).

More specifically, with respect to the first prong of the collateral estoppel test, all of the allegations of the complaint in the present case were also made in the Federal Action, and thus, the issue of whether plaintiffs have standing to sue derivatively on Tyco's behalf is identical to that previously and necessarily adjudicated in the Federal Action (*see Parker v Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 712 N.E.2d 647, 690 N.Y.S.2d 478 [1999] [citation omitted] [collateral estoppel " precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same'"]).

The complaint here alleges that: (1) Tyco's former directors knowingly or recklessly breached their fiduciary

2006 NY Slip Op 52142U, *7; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

duty to Tyco by allowing Tyco's senior management to loot the company and create a false impression about the company's financial condition (Complaint, PP106-112); (2) Tyco's former directors were guilty of gross mismanagement (*id.* , PP113-118); (3) Tyco's former directors caused Tyco to waste corporate assets (*id.*, PP119-122); and (4) Kozlowski, Swartz, Berman, Fort, Ashcroft, Foss, and Belnick converted corporate assets for personal use (*id.*, PP123-126).

In the prior Federal Action, plaintiffs claimed that: (1) Tyco's former directors had breached their fiduciary duty to the Company and committed equitable fraud and mismanagement (Second Amended Federal Complaint, PP438-447); and (2) Tyco's former directors had engaged in a "continuing pattern and practice of wasting corporate assets" tantamount to conversion, because of [*8] which "Tyco has incurred significant expenses, liabilities, and obligations for the benefit of the individual defendants and has been injured thereby (*id.*, PP448-450).

Judge Barbadoro evaluated these substantially identical claims when granting defendants' motion to dismiss the Federal Action, and determined that, under Bermudian law, plaintiff's complaint, even if taken as true, did not demonstrate standing to assert derivative claims on behalf of Tyco. Specifically, Judge Barbadoro determined that plaintiff failed to make a prima facie showing that the company: (1) has a claim that defendants have engaged in "fraud," i.e., misappropriated something belonging to the company; or (2) is prevented from taking action because the alleged wrongdoers are in control (*see In re Tyco Intl., Ltd., 340 F. Supp. 2d at 100*). Accordingly, Judge Barbadoro dismissed the claims against both the current and former directors on the ground that plaintiff could not usurp control of Tyco's claims from Tyco's independent, shareholder-elected, decision-making body. [5]

5   Although Judge Barbadoro's decision focused on plaintiff's lack of standing to bring a derivative suit against the then-current directors, given the plaintiff's concession that the Former Outside Directors were not in control of Tyco, his conclusions extend, a fortiori, to the former directors named as defendants in that action, as well as the current action (*In re Tyco Intl., Ltd., 340 F. Supp. 2d at 100* ["Although [the plaintiff] has sued several of Tyco's former directors and officers as well as the company's current

directors, her standing to maintain each of her claims depend[s] upon the sufficiency of her allegations that the current directors have engaged in fraud on the minority. This is necessarily so because it is the current board's litigation judgment that she seeks to displace"]).

In light of this prior adjudication of the issue of standing, plaintiffs are precluded from arguing the point again in the present case (*see* 4A NY Practice, Commercial Litigation in New York State Courts § 74:34 [2d ed 2005] [" even if there are variations in the facts alleged, or different relief is sought, the separately stated "causes of action" may nevertheless be grounded on the same gravamen of the wrong upon which the action is brought,' thereby collaterally estopping the plaintiff from raising the prior cause of action in the guise of a new legal theory or claim"], quoting *Smith v Russell Sage Coll., 54 N.Y.2d 185, 192, 429 N.E.2d 746, 445 N.Y.S.2d 68 [1981]*).

Indeed, standing "is one of the those questions of jurisdiction and justiciability which may preclude or collaterally estop relitigation of the precise issues of jurisdiction adjudicated" (*Treeby v Aymond, 2000 U.S. Dist. LEXIS 9471, 2000 WL 869502, * 4 [ED La 2000], affd 251 F.3d 156 [5th Cir 2001]; see also Perry v Sheahan, 222 F.3d 309, 318 [7th Cir 2000]* ["A dismissal for lack of jurisdiction precludes relitigation of the issue actually decided, namely the jurisdictional issue"]).

For example, in *Treeby*, the district court enjoined a state court from allowing relitigation of a shareholder derivative action that had been dismissed in that district court for lack of standing. The district court noted that the "same impediments to the justiciability of [the] derivative claims, which [were] substantially the same as the Federal Derivative Action, remain[ed] extant as of the filing of the State Derivative Action" (*Treeby v. Aymond, 2000 U.S. Dist. LEXIS 9471 at *15, 2000 WL 869502, at * 4*).

Similarly, in *Meng v Schwartz (305 F. Supp. 2d 49 [D DC 2004])*, the plaintiff sought to press a shareholder derivative action in federal court, despite a prior decision by the First Department holding that she lacked standing to bring that claim. The federal court dismissed the plaintiff's claim, holding that the plaintiff was collaterally estopped from raising the same issue in federal court that [*9] already had been decided against her in a New York state court (*id.; see also Welt v Abrams, 832 F. Supp. 88,*

2006 NY Slip Op 52142U, *9; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

92 [SD NY 1993] [a decision that plaintiff "does not have standing" in a prior action is "final in its determination," and therefore, "relitigation of the issue [in a subsequent action] is precluded" by res judicata or collateral estoppel]; *Janitschek v Trustees of Friends World Coll., 249 A.D.2d 368, 671 N.Y.S.2d 490 [2d Dept 1998]* [plaintiff's complaint seeking to rescind sale of a college was barred by collateral estoppel because plaintiffs had brought identical claims in a prior proceeding and had been found to lack standing]).

The District Court in New Hampshire has already decided that the current Board of Directors is not disqualified and that thus, individual shareholders do not have standing to prosecute derivative claims on the Company's behalf. Under the doctrine of collateral estoppel, plaintiffs are precluded from relitigating that issue in this Court.

With respect to the second prong of the test, plaintiffs and their counsel have already had a full and fair opportunity to contest Judge Barbadoro's determination that they lack standing. Where, as here, the party seeking the benefit of collateral estoppel establishes that an issue was necessarily decided in the prior action, the burden shifts to the party attempting to defeat the application of collateral estoppel to establish the absence of a full and fair opportunity to litigate (*see Parker v Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 712 N.E.2d 647, 690 N.Y.S.2d 478, supra*). Plaintiffs here cannot show that they did not have a full and fair opportunity to litigate the matters at issue.

Although the particular Tyco shareholders named as plaintiffs in this suit are different from those in the Federal Action, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation" (*D'Arata v New York Cent. Mut. Fire Ins. Co., 76 N.Y.2d at 664*]). Indeed, in derivative suits, shareholder plaintiffs are treated like equal and effectively interchangeable members of a class action because their claims belong to and are brought on behalf of the corporation, rather than on behalf of themselves (*Auerbach v Bennett, 47 N.Y.2d 619, 631, 393 N.E.2d 994, 419 N.Y.S.2d 920 [1979]* ["Derivative claims against corporate directors belong to the corporation itself"]). As

a result, prior legal determinations in derivative suits can bind all other similarly situated plaintiffs who might bring subsequent derivative claims, thus avoiding wasteful and duplicative litigation:

Because the claim asserted in a stockholder's derivative action is a claim belonging to and on behalf of the corporation, a judgment rendered in such an action brought on behalf of the corporation by one shareholder will generally be effective to preclude other actions predicated on the same wrong brought by other shareholders.

*Parkoff v General Tel. & Elecs. Corp., 53 N.Y.2d 412, 420, 425 N.E.2d 820, 442 N.Y.S.2d 432 (1981).* Accordingly, collateral estoppel applies to (1) the shareholder plaintiff in the first derivative action; and (2) all parties who are in privity with that first shareholder plaintiff (*see Auerbach v Bennett, 47 N.Y.2d at 627-628* ["a dismissal on the merits of one derivative action is generally a bar to suits by other stockholders of the same corporation on the same cause of action"]; *Janitschek v Trustees of Friends World Coll., 249 A.D.2d at 369* [plaintiff was "collaterally estopped from commencing the instant action because he was in privity with (the previous plaintiffs)"]; *see also In re Sonus Networks, Inc. Shareholders Deriv. Litig., 422 F. Supp. 2d 281, 291 [D Mass 2006]* [citation omitted] [" nonparty shareholders are [*10] usually bound by a judgment in a derivative suit on the theory that the named plaintiff represented their interests in the case"]).

Therefore, as Tyco shareholders in privity with the shareholder plaintiff in the Federal Action, plaintiffs have already had a full and fair opportunity to litigate the issue of standing in the Federal Action.

Moreover, in addition to the fact that both the claims in the Federal Action and in the current case are shareholders' derivative actions made on Tyco's behalf, plaintiffs' counsel in the current litigation were actively involved in the prior Federal Action. Wolf Haldenstein was listed with the title "Of Counsel" or "Counsel for Derivative Plaintiffs" on at least 20 different pleadings in the previous Federal Action, including both versions of the complaint, the Derivative Plaintiff's Memorandum in Opposition to Nominal Defendant Tyco International Ltd.'s Motion to Dismiss Second Amended Derivative Complaint and the Notice of Appeal (*see Konstandt Aff., Exh I*). As in a securities fraud class action, the plaintiff's

2006 NY Slip Op 52142U, *10; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

lawyer in a derivative suit (who has the most to gain financially) is typically the "real mover and shaker" of the lawsuit, rather than the plaintiff (*see Robinson v Sheriff of Cook County, 167 F.3d 1155, 1157 [7th Cir], cert denied 528 U.S. 824, 120 S. Ct. 71, 145 L. Ed. 2d 60 [1999]*). Thus, Wolf Haldenstein has already had the opportunity in the Federal Action to put forth its best arguments for why the identically situated plaintiff making substantively identical claims had standing to sue in that case.

Although plaintiffs concede that "[t]he claims in the Prior Action were substantially similar to those plaintiffs are making in the present case" (Pl Br, at 14), they nevertheless argue, in response to the dismissal motion, that: (1) the earlier decision was not on the merits; (2) this action raises a separate issue; and (3) they have not had a full and fair opportunity to litigate all issues. None of these arguments, however, has any merit. The issues that are dispositive of plaintiffs' claims have already been resolved on the merits by Judge Barbadoro, in a proceeding that is binding on them.

Plaintiffs first argue that they are not forbidden to relitigate the issues decided by Judge Barbadoro because his decision was not on the merits, but rather, dealt only with plaintiffs' standing. Contrary to plaintiffs' arguments, however, the doctrine of collateral estoppel does apply to the question of shareholder standing in derivative actions. In two cases decided subsequent to Judge Barbadoro's decision, both courts dismissed shareholder derivative suits as barred by prior decisions "on the merits," i.e., prior decisions dismissing derivative suits brought by fellow shareholders (and challenging the same alleged wrongdoing), where the prior dismissals were based on plaintiffs' failure to establish that a board of directors was disabled from acting (*see Henik v LaBranche, 433 F. Supp. 2d at 379* (dismissing derivative action, and holding that a ruling on shareholder standing "does constitute a decision on the merits' for the purposes of preclusion"); *In re Sonus Networks, Inc. Shareholders Deriv. Litig., 422 F. Supp. 2d at 290* [dismissing derivative action and holding that the shareholder was precluded from relitigating the issue of demand futility decided in a previously dismissed derivative action, as prior dismissal was "on the merits"]).

Indeed, courts have repeatedly made clear that the requirement that the Board, rather than self-appointed shareholders, must decide whether to bring an action on behalf of the corporation is "a matter of substance' not procedure'" (*Kamen v Kemper Fin. Servs., Inc., 500 U.S. 90, 96-97, 111 S. Ct. 1711, 114 L. Ed. 2d 152 [1991]* [citation omitted]), and "implements the basic principle of corporate governance that the decisions of a corporation including the decision to initiate litigation should be made by the board of directors or the majority of shareholders" (*id. at 101* [citation omitted]; *accord Henik v* [*11] *LaBranche, 433 F. Supp. 2d at 379* ["the issue of whether or not [a] board of directors did not lack the disinterestedness and independence needed to consider a demand albeit technically a procedural issue of standing to proceed derivatively does constitute a decision on the merits' for the purposes of preclusion"]; *Locals 302 and 612 of Intl. Union of Operating Engineers - Empl. Constr. Indus. Retirement Trust v Blanchard, 2005 U.S. Dist. LEXIS at * 23, 2005 WL 2063852, * 6 [SD NY 2005]* ["both the Supreme Court and Court of Appeals have found that demand rules in derivative actions are substantive in nature" because " the issue is not just "who" may maintain an action or "how" it will be brought, but "if" it will be brought.' No determination could be more substantive"]; *Burns v Egan, 117 A.D.2d 38, 42, 501 N.Y.S.2d 742 [3d Dept 1986]* [Court held that relitigation of the standing issue was barred by res judicata, and specifically found that "the previous determination that plaintiffs lacked standing was on the merits'"]).

Moreover, a decision on derivative standing is clearly on the merits because it turns on the facts with respect to the board and its ability to exercise its powers. As the court in *Henik* explained, cases discussing the res judicata effect of a standing determination in other contexts are simply irrelevant in the derivative context, as shareholder derivative standing is different from other types of jurisdictional standing. In non-derivative cases, each plaintiff is situated differently, and the standing analysis is analyzed individually for each. In contrast, in all shareholder derivative suits brought on behalf of a given company, the real plaintiff the corporation is the same, and the central "standing" inquiry is whether its board is disqualified, such that it cannot perform its normal function of controlling the company's litigation decision-making:

[I]n the context of standing based upon demand futility, the facts submitted by an individual shareholder to demonstrate that she has standing to sue on behalf of the corporation are facts about the corporation and about

2006 NY Slip Op 52142U, *11; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

members of the corporation's board of directors. Indeed, the demonstration of standing to sue derivatively does not require any showing of the characteristics specific to the individual shareholder who seeks standing, aside from the obvious demonstration that the plaintiff was a shareholder during the relevant period. Given this unique nature of the derivative standing inquiry, assuming the claims are the same, which they are here, the standing analysis for one shareholder will not differ from the standing analysis for another shareholder.

*Henik v LaBranche, 433 F. Supp. 2d at 381.*

The cases plaintiffs cite for the proposition that an adjudication of standing is not a determination on the merits are completely inapposite, as none of them involved the preclusive effect, in a second derivative suit, of a decision as to the board's authority in a prior derivative suit. For example, in *Stevens v Kirk (171 A.D.2d 587, 567 N.Y.S.2d 453 [1st Dept 1991])*, the First Department held that the trial court had improperly dismissed state common law-claims as collaterally estopped where a federal court had dismissed those claims for lack of pendent jurisdiction. The federal court held that the plaintiff who was not a shareholder lacked standing under federal securities laws, and dismissed the state law claims for lack of federal subject matter jurisdiction, without ever reaching the question of whether plaintiffs would have otherwise had standing to purse those common-law claims in state court. *Stevens* has nothing to do with a situation where, as here, a federal court previously determined that a shareholder lacked standing to sue derivatively because the board was not disabled from making litigation decisions for the company. Likewise, in *Tong v Hang Seng Bank, Ltd. (210 A.D.2d 99, 620 N.Y.S.2d 42 [1st Dept 1994])*, the Court considered the preclusive effect of a *non-* [*12] derivative suit on a derivative suit. The earlier determination, however, did not address the question of demand futility that was resolved favorably for the plaintiff in the second suit. The cases of *Pullman Group, LLC v Prudential Ins. Co. of America (297 A.D.2d 578, 747 N.Y.S.2d 170 [1st Dept 2002], lv dismissed 99 N.Y.2d 610, 787 N.E.2d 1166, 757 N.Y.S.2d 820 [2003]), St. Pierre v Dyer (208 F.3d 394 [2d Cir 2000])*, and *Citibank (South Dakota), N.A. v Martin (11 Misc. 3d 219, 807 N.Y.S.2d 284 [Civ Ct, NY County 2005])*, also relied on by plaintiffs, are not derivative cases at all.

Plaintiffs next argue that the issue in the Federal

Action is not identical to the issue in this action because they chose to bring this suit in New York, which they contend has different choice of law principles than New Hampshire. I reject this argument. As in the Federal Action, the threshold issue in this derivative suit is whether, under Bermuda law, Tyco's Board is disabled from acting, so that plaintiffs have derivative standing to sue on behalf of Tyco. The seminal question of shareholder standing, including the question of applicable law, has already been decided, and cannot be relitigated. For example, in *Weston Funding Corp. v Lafayette Towers, Inc. (550 F.2d 710 [2d Cir 1977])*, the Court refused not only to reach the underlying merits of a claim, but also to reassess the choice of law applicable to it. The Court held that "even if Weston were not barred from maintaining a new action in the New York federal court, it would be estopped from challenging Judge Coolahan's choice of New Jersey law. . . . The choice of New Jersey law issue is res judicata between the parties since it actually was litigated and decided" (*id.* at 715). Likewise, in *NatTel, LLC v SAC Capital Advisors (2006 U.S. Dist. LEXIS 20179, 2005 WL 2253756 [D Conn 2005], affd 2006 U.S. App. LEXIS 9460, 2006 WL 957342 [2d Cir 2006])*, the court held that an arbitration panel's decision barred plaintiffs' claims, despite their argument that the court should reach a different choice-of-law decision than had the arbitrators. As the court explained:

[Plaintiff] argues that the arbitration did not resolve the same issues as presented in this case because the arbitrators applied Bahamian law [the law of the place of incorporation], whereas a Connecticut court would apply Connecticut law. . . . [C]ontrary to [plaintiff's] argument, the choice-of-law question was fully explored in arbitration. The [arbitration] panel, after a complete statement of its reasons, held that Bahamian law applied because [plaintiff's] claims involved matters of internal corporate governance. . . . Thus [plaintiff] is collaterally estopped from relitigating the choice of law question, which already was decided against it in arbitration.

*Id.* at * 8.

Plaintiffs also argue that "there was never an opportunity to litigate in the Prior Action the issues raised in this action," because the "New Hampshire conflict of law statute precluded the parties or the court from considering any of these issues" (Pl Br, at 24). As plaintiffs concede, however, in the prior Federal Action,

2006 NY Slip Op 52142U, *12; 13 Misc. 3d 1236A, **1236A;
831 N.Y.S.2d 354, ***354; 2006 N.Y. Misc. LEXIS 3305

"the parties agreed that [the shareholders'] standing was a matter of Bermuda law" (*id.* at 15). That agreement precludes relitigation of the choice of law issue. To have preclusive effect, an issue must be "raised, necessarily decided and material in the first action" (*Pinnacle Consultants, Ltd., 94 N.Y.2d at 432* [citation omitted]). The issue, however, need not be resolved by the court in order to have preclusive effect. Rather, it may be resolved, like here, by the parties' agreement (*see e.g. U.S. v Hansel, 999 F. Supp. 694 [ND NY 1998]).

Finally, plaintiffs contend that they have not yet had a full and fair opportunity to litigate because they have not had the opportunity to argue their case under New York's choice of law principles. This argument basically amounts to a theory that shareholders suing on behalf of the [*13] same corporation are entitled to litigate in every state, so that they might avail themselves of each state's choice of law principles. However, this is not the law in New York. In *Hart v General Motors Corp. (129 A.D.2d 179, 517 N.Y.S.2d 490 [1st Dept], appeal denied 70 N.Y.2d 608, 515 N.E.2d 910, 521 N.Y.S.2d 225 [1987]), the First Department reversed the denial of a forum non conveniens motion to dismiss, and applied Delaware law to dismiss a derivative suit involving a Delaware corporation doing business in New York. The Court held that the trial court had "erred in concluding that the . . . transaction falls within that category of corporate acts where the liability of a director can be decided by different local law rules in different states'" (*id.* at 182 [citation omitted]). The Court reasoned that " [u]niform treatment of directors, officers and shareholders . . . is an important objective which can only

be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law'" that of the place of incorporation (*id.* at 84 [citation omitted]).

Indeed, courts "have long recognized the preclusive effect of judgments in derivative actions upon subsequent actions brought by stockholders who were not plaintiffs in the original action" because "if this were not the rule, shareholder plaintiffs could indefinitely relitigate the demand futility question in an unlimited number of state and federal courts, a result the preclusion doctrine specifically is aimed at avoiding" (*Henik v LaBranche, 433 F. Supp. 2d at 380*).

Accordingly, plaintiffs' derivative claims are barred, and the complaint is dismissed with prejudice.

Accordingly, it is

ORDERED that the motion to dismiss is granted, and the complaint is dismissed with prejudice, with costs and disbursements to defendants as taxed by the Clerk of the Court; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

Dated: November 14, 2006

ENTER:

J.S.C.

*** Slip Sheet ***

Document

LEXSEE 15 MISC. 3D 1132A

[*1]  **Magten Asset Management Corporation, Plaintiff, against The Bank of New York, Defendant.**

**600410/06**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*2007 NY Slip Op 50951U; 15 Misc. 3d 1132A; 841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320*

**May 8, 2007, Decided**

**NOTICE:**    [**1]   THIS  OPINION  IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**PRIOR HISTORY:** *Magten Asset Mgmt. Corp. v. Northwestern Corp. (In re Northwestern Corp.), 313 B.R. 595, 2004 Bankr. LEXIS 1261 (Bankr. D. Del., 2004)*

**HEADNOTES**

Trusts--Indenture Trustee.

**COUNSEL:** For Plaintiff: Storch Amini & Munves P.C., New York, New York, (Bijan Amini).

For Defendant: Emmet, Marvin & Martin, LLP, New York, New York, (Kenneth M. Bialo).

**JUDGES:** Bernard J. Fried, J.

**OPINION BY:** Bernard J. Fried

**OPINION**

Bernard J. Fried, J.

This case involves the duty that an indenture trustee bears toward the securities' holders. Some five months after plaintiff Magten Asset Management (Magten) purchased securities for $ 32 million, the issuer filed for bankruptcy and Magten lost most of the value of its investment. Allegedly, before the issuer filed for bankruptcy, it engaged in an event of default, as defined in the indenture. Magten claims that, upon the default, the indenture trustee, defendant Bank of New York (BNY)

should have taken steps to protect the holders' interests. BNY did not do so. Magten alleges that BNY had a conflict of interest that caused it to neglect its duty to the securities' holders in favor of its own interests.

Magten seeks to recover the face [**2] amount of its securities. BNY moves to dismiss, pursuant to *CPLR 3211 (a) (1)* and *(7)*, primarily on the ground that no event of default occurred. The background to this case involves non-parties, such as Montana Power Company (Montana), a provider of electricity and natural gas. In 1996, Montana issued Quarterly Income Preferred Securities (QUIPS), bearing 8.45% interest, and sold them in the public market. [*2] Montana used $ 65 million raised from selling the QUIPS to purchase bonds with a maturity date of 2036.

Pursuant to the Indenture between Montana and BNY (referred to hereinafter as the Indenture), BNY became Indenture trustee, charged with certain responsibilities toward the holders of the QUIPS. Montana deposited interest payments on the bonds into the trust, and the trustee distributed the payments to the QUIPS holders.

The Indenture provides that it is governed by the Trust Indenture Act, *15 USC 77aaa, et seq.*, and that the trustee is subject to all the duties and responsibilities in the Act (Ex. 2, Indenture, P P 107, 901). (Exhibits are attached to BNY's motion.) As described in the Indenture, the QUIPS were junior (Ex. 2, P P 101, 1501, [**3] 1502, 1512), unsecured (*id.*, at title page, P 1502), subordinate to all senior debt (*id.*, P P 301, 1501, 1504, 1506, 1509), and subject to the deferral of interest payments (*id.*, P 312). The Indenture gave the QUIPS

2007 NY Slip Op 50951U, *2; 15 Misc. 3d 1132A;
841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320, **3

holders no voice in the event of a sale or merger by the issuer (*id.*, P P 1101, 1201), and imposed no limit on the amount of senior debt that the issuer could take on (*id.*, P P 101, 1501, 1509). The terms of the QUIPS were disclosed in the offering Prospectus, including the section entitled "Risk Factors" (Ex. 5, at ii, iii, 3-5, 17, 19, 21-23, 31).

Non-party NorthWestern Corporation, another utility company, purchased almost all of Montana's electric, natural gas, and propane utility assets, structuring the sale in this manner. Montana transferred the utility assets to a newly created subsidiary. Montana executed a supplemental indenture with BNY, whereby Montana's subsidiary took on Montana's obligations under the original Indenture. Then NorthWestern purchased Montana's subsidiary in a transaction finalized on February 15, 2002.

Montana's subsidiary was renamed Northwestern Energy, LLC. All of the utility assets in NorthWestern Energy were transferred [**4] to NorthWestern. NorthWestern, Northwestern Energy, and BNY executed a second supplemental indenture, whereby NorthWestern assumed Northwestern Energy's QUIPS obligations under the original Indenture, and NorthWestern Energy was released from all obligations toward the QUIPS holders. NorthWestern assumed NorthWestern Energy's liabilities, and did not pay any cash for the assets that it acquired from Northwestern Energy. Magten claims that the assets that NorthWestern acquired from Northwestern Energy were worth more than $ 1 billion, while the liabilities acquired were worth $ 700 million.

The Indenture lists several events of default that the securities obligor may commit, such as filing for bankruptcy or making an "admission . . . in writing of its inability to pay its debts generally as they become due" (Ex. 2, P 801 [e]). Once an event of default occurs, the trustee "may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities . . . by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights . . ." (*id.*, P 803). Magten alleges that NorthWestern's 10-K and 8-K forms, [**5] dated April 16, 2003, contain an admission that NorthWestern was unable to pay its debts as they came due.

Magten asserts that once NorthWestern made the purported admission, BNY should have started judicial proceedings to put aside the transfer of the utility assets

from NorthWestern Energy to NorthWestern or to impose a constructive trust on those assets. Either action would have preserved the assets for the QUIPS holders.

[*3] On May 1, 2003, after the alleged default, Magten purchased 1,078,431 QUIPS from another purchaser. On September 14, 2003, NorthWestern filed a petition for relief under Chapter 11 of the Bankruptcy Code (*11 USC § 101, et seq.*) in the United States District Court for the District of Delaware. On September 23, 2003, BNY resigned as Indenture Trustee. Apparently, it was the successor trustee who filed the QUIPS holders' claims in the bankruptcy action. The final bankruptcy plan subordinated the QUIPS holders to NorthWestern's senior creditors, offering the QUIPS holders 14% of the face value of the securities in return for relinquishing all rights against NorthWestern and BNY.

Magten asserts that the transfer of NorthWestern [**6] Energy's assets and liabilities to NorthWestern was unfair to the QUIPS holders. NorthWestern Energy lost all of its utility assets, while NorthWestern acquired more in assets than in liabilities. Allegedly, NorthWestern never had the ability to meet the QUIPS obligations, even after it obtained the utility assets. But NorthWestern Energy could have met those obligations, if it had retained the utility assets. Even if NorthWestern Energy defaulted on its QUIPS obligations, the QUIPS holders could have looked to the assets for satisfaction, as long as the assets remained with NorthWestern Energy.

In NorthWestern's bankruptcy, Magten contended that the release of NorthWestern Energy (now named Clark Fork and Blackfoot, LLC) from the Indenture was fraudulently obtained. On the basis that Magten had sufficiently alleged a claim upon which relief could be granted, because a release obtained by fraud is unenforceable, the bankruptcy court denied NorthWestern's motion to dismiss Magten's complaint (*In re NorthWestern Corp.*, 313 BR 595, 602-603 [Bankr D Del 2004]). It seems that this case is awaiting trial.

Regarding BNY's conflict of interest, Magten alleges that when [**7] Montana had the utility assets, BNY and others became Montana's secured creditors, with their interests secured by the assets. After NorthWestern acquired the assets, BNY was instrumental in causing NorthWestern to use the utility assets to secure the interests of yet other parties, for whom BNY was trustee. Allegedly, after the event of default, BNY did not act to preserve the assets for the QUIPS holders, because of

2007 NY Slip Op 50951U, *3; 15 Misc. 3d 1132A;
841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320, **7

BNY's own interest in those assets. Magten further alleges that the bankruptcy did not impair BNY's interests or the interests of the other secured parties for whom the utility assets were collateral. But the bankruptcy filing took the assets out of the QUIPS holders' reach, which would not have happened if BNY had secured the assets after the purported default.

The first cause of action asserts that BNY breached the Indenture, to which the QUIPS holders were third-party beneficiaries. The second asserts that BNY breached its fiduciary duty to the holders. The third asserts that BNY behaved negligently. The causes of action relate to BNY's failure to act after NorthWestern's alleged admission and event of default. No causes of action are founded on BNY's alleged [**8] conflict of interest by itself.

BNY puts forth three reasons to dismiss the complaint. One, no event of default took place, given that NorthWestern did not admit that it could not pay its debts. Two, the QUIPS holders, as unsecured creditors, had no claim on the assets of Montana, NorthWestern, or Northwestern Energy. Therefore, BNY, as the holders' trustee, had no standing to put aside the transfer of the assets or have them placed in a constructive trust. Three, the cause of action for negligence impermissibly duplicates the cause of action for breach of contract.

[*4] Magten claims that the financial forms clearly contain NorthWestern's admission in writing of its inability to pay its debts generally as they become due. Magten also claims that BNY should have investigated to see if NorthWestern made the admission, if it was able to pay its debts, or if it was actually paying its debts.

On a *CPLR 3211* motion to dismiss a complaint, the court takes the allegations of the complaint as true and affords the plaintiff the benefit of every possible inference (*Goshen v Mutual Life Ins. Co. of NY, 98 N.Y.2d 314, 326, 774 N.E.2d 1190, 746 N.Y.S.2d 858 [2002]; Leon v Martinez, 84 N.Y.2d 83, 87-88, 638 N.E.2d 511, 614 N.Y.S.2d 972 [1994]).* [**9] Under *CPLR 3211 (a) (7),* if the "four corners" of the complaint "manifest any cause of action cognizable at law a motion for dismissal will fail" (*Guggenheimer v Ginzburg, 43 N.Y.2d 268, 275, 372 N.E.2d 17, 401 N.Y.S.2d 182 [1977]).* By contrast, under *CPLR 3211 (a) (1),* where documentary evidence is submitted that contradicts, negates, or disposes of the claims in the complaint, the truth of the complaint is not assumed and dismissal may

eventuate (*Water St. Leasehold LLC v Deloitte & Touche LLP, 19 A.D.3d 183, 185, 796 N.Y.S.2d 598 [1st Dept 2005]; Biondi v Beekman Hill House Apt. Corp., 257 A.D.2d 76, 81, 692 N.Y.S.2d 304 [1st Dept 1999], affd 94 N.Y.2d 659, 731 N.E.2d 577, 709 N.Y.S.2d 861 [2000]; Kliebert v McKoan, 228 A.D.2d 232, 232, 643 N.Y.S.2d 114 [1st Dept 1996]).*

The initial question is whether NorthWestern's 10-K and 8-K forms for the year 2002, which were filed with the Securities and Exchange Commission (SEC) and mailed to BNY, are an "admission . . . in writing of [NorthWestern's] inability to pay its debts generally as they become due," and thus an event of default (Ex. 2, Indenture, P 801 [e]). The financial forms, which are dated April 16, 2003, show that NorthWestern was [**10] having financial difficulties, and discuss plans for reinvigoration. According to Magten, the main part of the admission is as follows:

> based on current plans and business conditions, the Company expects that its cash flows from operations, cash and cash equivalents will be sufficient to meet its cash requirements for the next 12 months. The Company believes that it may need additional funding sources or proceeds from the sale of noncore assets by the end of 2004 or early 2005. In 2005, the Company faces substantial debt maturities

(Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6).

(Noncore assets are assets not associated with utilities.)

In consideration of NorthWestern's significant debt, the progress of its "turnaround plan," and its liquidity needs, the board will review the appropriateness of paying interest on the QUIPS (Ex. 6, 8-K, at 4). If NorthWestern decides to defer interest payments for up to 20 consecutive quarters, which it has the right to do under the Indenture, cash distributions on the QUIPS will also be deferred (Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6). The reports go on to state:

> Absent the receipt of significant proceeds from the sale of noncore assets, [**11] the raising of additional capital or a restructuring of existing debt, the

2007 NY Slip Op 50951U, *4; 15 Misc. 3d 1132A;
841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320, **11

Company will not be able to meet its substantial debt maturities. The Company is currently working with outside advisors to identify alternatives to restructure its long-term debt

(Ex. 6, 8-K, at 4; Ex. 7, 10-K, at 6, 40, 62).

[*5] NorthWestern states that "even if we are successful in selling some or all of our non-core assets, we will have to restructure our debt or seek new capital" (Ex. 7, 10-K, at 6). The financial reports announced $ 875 million worth of impairments and charges based on NorthWestern's noncore assets, the assets that NorthWestern planned to sell to raise capital (Ex. 6, 8-K, at 1; Ex. 7, 10-K, at 5, 41). According to Magten, the impairment signified that NorthWestern would not be able to raise any money by selling the noncore assets and thus would not be able to implement its turnaround plan. The fact that the noncore assets were impaired to the tune of $ 875 million means that they had no value for any potential purchasers.

Magten alleges that NorthWestern's bankruptcy, following soon after the date of the financial reports, is evidence of its inability to pay its debts [**12] at the time that the reports issued. Magten emphasizes the statement that NorthWestern could meet its debts for the next 12 months, arguing that it is an admission that NorthWestern could not meet its debts after that period, and that the inability to meet debts must be decided on a prospective basis.

In *Sequa Corp. v Gelmin (1996 WL 745448, *54, 1996 U.S. Dist LEXIS 19802, *149-150 [SD NY, December 31, 1996], affd in part, vacated and revd in part 156 F.3d 136 [2d Cir 1998])*, a party put down in writing that "it has no prospect of being able to pay the Demand Indebtedness or pay or cure any defaults in respect of the Obligations resulting from such inability to pay in the foreseeable future . . . ." [1] No such definite admission of inability to pay debts is found in the writings here. Case law regarding what kind of language constitutes an admission of the kind described in the Indenture is scant. BNY cites cases, some of which are discussed below, in which the courts determined whether a party had made the admission. However, none of the cases involves an indenture trustee's obligations.

1   Internal citations are omitted for all case citations.

[**13] In *Reimann v Saturday Evening Post Co. (464 F. Supp. 214 [SD NY 1979])*, the seller of a business claimed that a note was in default because the buyer had made the relevant admission. The annual report said that the buyer was "technically insolvent" (*id. at 221*). At trial, the court held that this technical insolvency was insolvency in a mathematical or accounting sense, and that it could not be equated with an inability to pay debts as they became due. The court determined that the buyer was in fact paying its debts as they became due (*id.*). Regarding a statement that interest on the debenture "will not be paid," the court held that this concerned a decision not to pay interest regardless of ability to pay, which was not the same as being unable to pay (*id.*).

In *Atel Fin. Corp. v Quaker Coal Co. (132 F. Supp. 2d 1233, 1238 [ND CA 2001], affd 321 F.3d 924 [9th Cir 2003])*, the question of the admission arose in the parties' post-trial briefings. In a letter, the lessee described itself thusly: "experiencing poor liquidity"; "recent poor financial performance"; "the freezing of our revolving line of credit"; [**14] and "continued liquidity issues for the next 90-120 days" (*id. at 1238*). The lessee also admitted to recent losses of $ 4 million, and requested a moratorium on all payments to the lessor. The court disagreed with the lessor's contention that the lessee had made the admission. While the letter showed that the lessee was in a state of financial difficulty, if not distress, the statements of financial difficulty did not necessarily equate with an admission of inability to pay debts as they became due, although the lessee did experience a "subsequent and actual failure to pay" (*id.*).

[*6] *U.S. Bank Natl. Assn. v U.S. Timberlands Klamath Falls, L.L.C. (2004 WL 1699057, *3 n 22, 2004 Del Ch LEXIS 106, *13 n 22 [Del Ch, July 29, 2004])*, involved a motion to dismiss for lack of standing. A party's 10-Q stated that it had to "monetize sufficient assets to be in a position to make the interest payment" (*id.*). The court found that this was not an admission that the party could not pay its debts as they came due. The court also noted that the party did, in fact, make the required payments.

BNY claims that these cases show that courts [**15] do not readily construe a party's statements to constitute the admission, even when the statements concern financial difficulty, insolvency, and the probability of not paying debts. Magten claims that the cases demonstrate that the determination whether a party made the

2007 NY Slip Op 50951U, *6; 15 Misc. 3d 1132A;
841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320, **15

admission must be part and parcel of an overall assessment of the party's financial condition. Therefore, whether NorthWestern's financial reports contain the admission must be decided at trial. Magten also argues that the above cases establish that the determination may properly take into account whether a party was actually paying or able to pay its debts as they came due.

In interpreting a document, the court first decides whether it is clear or ambiguous (*see W.W.W. Assoc., Inc. v Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 [1990]*). If the document is determined to be clear and complete, the court will enforce it as written (*Vermont Teddy Bear Co., Inc. v 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 775 N.Y.S.2d 765 [2004]*), according to its "plain meaning" (*150 Broadway NY Assoc., L.P. v Bodner, 14 A.D.3d 1, 6, 784 N.Y.S.2d 63 [1st Dept 2004]*). The court will not look to "extrinsic evidence to create ambiguities [**16] not present on the face of the document" (*id.*). The Indenture and the financial forms in this case are clear enough. The Indenture requires an admission. It does not require that the trustee examine whether the obligor was actually paying its debts or able to do so. The plain meaning of the financial reports is that NorthWestern is undergoing serious financial difficulties and that it may not be able to pay its debts after 12 months. The plain meaning is not that NorthWestern cannot pay its debts as they come due.

In the cases cited above, deciding whether the party had made the admission was a side part of an extensive investigation into the party's financial health. The admission by itself was not the reason for the trial. Even if that were the case, however, that would not mean that such an inquiry was needed here. BNY was expected to perform significant acts in response to an event of default by NorthWestern. Language that is meant to stir action must be clear and unequivocal. NorthWestern's financial reports did not clearly inform BNY that it was time to take action.

Magten's contention that BNY was obligated to investigate NorthWestern's financial condition requires an [**17] inquiry into the duties of an indenture trustee. The Indenture provides that the trustee is not bound to investigate any facts or matters stated in any instrument, opinion, or report, but the trustee "in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit . . ." (Ex. 2, Indenture, P 903 [f]).

The role of an indenture trustee differs from that of an ordinary trustee in that an indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts (*LNC Investments, Inc. v First Fid. Bank, Natl. Assn., 935 F. Supp. 1333, 1347 [SD NY 1996]*). An ordinary trustee is subject to duties beyond those in the trust agreement, such as the duty of undivided loyalty (*Meckel v Continental Resources Co., 758 F.2d 811, 816 [2d Cir 1985]*). But "an indenture trustee is more like a stakeholder whose duties and obligations are exclusively [*7] defined by the terms of the indenture agreement" (*id.*). Given the relationship that the indenture trustee has with both the securities issuers [**18] and holders, courts "have consistently rejected the imposition of additional duties on the trustee" (*Elliott Assoc. v J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 [2d Cir 1988]*).

The law distinguishes between an indenture trustee's pre-default and post-default duties. Before default, the indenture trustee is liable only for the obligations set out in the indenture (*15 USC 77ooo [a] [1]*). The trustee is not obligated to affirmatively advance the debenture holders' interest in the period before default (*Elliott Assoc., 838 F.2d at 73*). An indenture trustee's post-default duty toward the investors is significantly higher than its pre-default duty. In case of a default, the trustee "shall . . . use the same degree of care and skill . . . as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" (*15 USC 77ooo [c]*). After a default, the trustee is under an enforceable obligation to act prudently to preserve the trust assets for the benefit of the investors (*Beck v Manufacturers Hanover Trust Co., 218 A.D.2d 1, 12, 632 N.Y.S.2d 520 [1st Dept 1995]*; [**19] *see also LNC Investments, Inc., 935 F. Supp. at 1348*).

Whether BNY had a duty to investigate NorthWestern's financial condition is governed by the standards applied to an indenture trustee's pre-default duty. Neither the law regarding an indenture trustee's duties, nor the Indenture, supports Magten's contention that BNY was duty bound to examine NorthWestern's financial condition in order to decide whether NorthWestern had made the admission or was actually able to pay its debts. The difficulty of such a determination is demonstrated by involuntary bankruptcy cases, where the courts must determine if a debtor "is

2007 NY Slip Op 50951U, *7; 15 Misc. 3d 1132A;
841 N.Y.S.2d 219; 2007 N.Y. Misc. LEXIS 3320, **19

generally not paying such debtor's debts as such debts become due" (*11 USC 303 [h] [1]*). Bankruptcy courts have found that there is no precise definition of the term "generally not paying" (*Matter of Le Sher Intl., Ltd., 32 BR 1, 2 [Bankr SD NY 1982]; see also In re Brooklyn Resource Recovery, 216 BR 470, 481-482 [Bankr ED NY 1997]; In re Einhorn Vacation Planning Ctr., 59 BR 179, 185 [Bankr ED NY 1986]*). Furthermore, in order to determine whether the debtor is not paying its [**20] debts as they come due, the court examines the number and amount of claims against the debtor, the materiality of any nonpayments in the context of the debtor's overall financial picture, and its conduct of its financial affairs (*In re Brooklyn Resource Recovery, 216 BR at 481; see also In re B.D. Intl. Discount Corp., 701 F.2d 1071, 1075 [2d Cir 1983]; In re Amanat, 321 BR 30, 39 [Bankr SD NY 2005], citing In re Paper I Partners, L.P., 283 BR 661, 677 [Bankr SD NY 2002]; In re Century/ML Cable Venture, 294 BR 9, 31 [Bankr SD NY 2003]*). BNY's duty did not extend to undertaking a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default.

Lastly, a trustee's discharge of its duties is assessed according to the facts as they existed at the time, and not according to subsequent events (*LNC Investments Inc. v First Fid. Bank, 1997 WL 528283, *17, 1997 U.S. Dist LEXIS 12858, *51-52 [SD NY 1997]*). The fact that NorthWestern went bankrupt after the alleged admission does not mean that BNY should have predicted [**21] the bankruptcy.

As NorthWestern did not engage in the event of default, BNY did not err by failing to respond. The court does not need to inquire into the merits of BNY's other arguments. The motion to dismiss the complaint is granted.

To conclude, it is

[*8] ORDERED that defendant's motion to dismiss the complaint is granted and the complaint is dismissed; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

No costs.

*** Slip Sheet ***

Document

LEXSEE 72 A.D.2D 624

**Marine Midland Bank, Appellant, v. Meehan's Express, Inc., et al., Respondents**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of New York, Appellate Division, Third Department**

*72 A.D.2d 624; 420 N.Y.S.2d 788; 1979 N.Y. App. Div. LEXIS 13757*

**October 11, 1979**

**JUDGES:** [***1] Mahoney, P. J., Sweeney, Staley, Jr., Main and Herlihy, JJ., concur.

**OPINION**

[*624] [**789] Appeal from an order of the Supreme Court at Special Term, entered December 29, 1978 in Albany County, which granted a motion by defendants David P. Mody and Richard Mody for summary judgment dismissing the second and third causes of action in the complaint. The complaint contained three causes of action. In the first cause of action, plaintiff sought a judgment against the defendant Meehan's Express, Inc., to recoup overdrafts which resulted from payment by plaintiff of certain checks drawn by the corporation upon its account with plaintiff. An order granting summary judgment to plaintiff upon this cause of action has been granted and is not subject to this appeal. The second cause of action sought to impose personal liability upon defendant David P. Mody for said overdrafts because he signed the corporate checks without indicating that he was signing as an officer or agent of the corporation. Plaintiff is not pursuing its appeal as to this cause of action. The third cause of action, which is the subject of this appeal, sought recovery of the amount of the overdrafts from defendants [***2] David P. Mody and Richard Mody as shareholders, directors and officers of the corporation upon allegations that they caused the checks to be drawn by the corporation knowing that there would be insufficient funds in the account for payment thereof, and that plaintiff honored the checks in reliance upon their assurances, both express and implied. On August 23, 1978, plaintiff moved for summary judgment on the first cause of action, which was subsequently granted. On September 11, 1978, defendants David P. Mody and Richard Mody cross-moved for summary judgment in their favor as to the second and third causes of action. The moving affidavits on this cross motion indicate that David P. Mody was an employee of Meehan's Express, Inc., from October, 1977, becoming the sole stockholder, director and officer of the corporation on December 28, 1977, and that at no time did he execute any written guarantee or assurance that he would personally reimburse plaintiff for any overdrafts of the corporation. As to Richard Mody, he was never an employee, shareholder, officer or director of the corporation, and he also did not execute any written guarantee or assurance to plaintiff. It is also stated [***3] that he made no oral assurances to plaintiff. Reference is made to plaintiff's bill of particulars wherein the alleged assurances are stated to be as follows: "The assurances referred to in paragraph 14 of the complaint were made by defendant David Mody in conversations with William Sajler an officer in January and February, 1978. Defendant David Mody repeatedly assured Sajler that he or defendant Richard Mody would soon deposit in the checking account funds sufficient to reimburse plaintiff for all overdrafts and pay all future checks drawn on the account. Moreover, from defendants' issuance of checks which they knew or should have known would result in overdrafts, defendants impliedly assured plaintiff that it would be reimbursed for all overdrafts." The answering affidavit of plaintiff's attorney asserts that the third cause of action is for fraud and deceit allegedly practiced by defendants David P. Mody and Richard Mody upon plaintiff. As to David P. Mody, it is asserted that monthly statements of the corporate checking account were forwarded to the corporation, that the statement dated December 22, 1977 showed a balance of $ 333.78 and that David P. Mody signed checks totaling [***4] $

22,828.38 during January and February, 1978, although deposits totaled only $ 5,810.49. It is further stated that David P. Mody not only knew that there were insufficient funds in the account, but [*625] also must have known that the corporation's liabilities exceeded its current assets by $ 46,425 as of December 31, 1977, as shown on a copy of the corporation's balance sheet filed with the New York State Department of Transportation, and that his assurances were given to plaintiff with knowledge that the corporation was insolvent. [**790] The answering affidavit also asserts that facts tend to indicate that Richard Mody owned stock of the corporation in early 1978, and that he held a position of managerial authority, had control of the corporate bank accounts and had knowledge of the overdrafts and dire financial condition of the corporation. It is alleged that (1) on October 10, 1977, Richard Mody entered into an agreement with Samuel Braunstein to purchase all the capital stock of the corporation; (2) on March 28, 1978, Richard Mody signed two checks drawn on an account with the Oneida National Bank; and (3) A. C. U. Transport, Inc., of which Richard Mody is president, [***5] has a pending application before the New York State Department of Transportation for approval of a proposed tranfer of the interstate operating rights of Meehan's Express, Inc., to A. C. U. Transport, Inc. It is further asserted that the above facts raise issues of fact as to the nature of his relationship to the corporate defendant, and an additional issue of fact as to whether Richard Mody conspired with or aided and abetted David P. Mody in the accomplishment of a scheme to defraud plaintiff and other creditors of Meehan's Express, Inc., through the transfer of the corporation's principal asset to A. C. U. Transport, Inc. An affidavit by William Sajler states: "On several occasions during January and February, 1978, defendant, David P. Mody and I had discussions concerning the steadily increasing overdraft balance on the Meehan's Express, Inc. checking account. Mody repeatedly assured me that plaintiff would be reimbursed for all overdrafts. * * * In reliance upon these assurances, I authorized the continued payment of checks drawn on the Meehan's Express, Inc. account." *CPLR 3016* (subd [b]) provides: "Where a cause of action or defense is based upon misrepresentation, fraud, [***6] mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail." Further, to "plead a prima facie case of fraud the plaintiff must allege representation of a material existing fact, falsity, scienter, deception and injury" ( *Lanzi v Brooks, 54 AD2d 1057, 1058*, affd *43 NY2d 778*). On its face, the complaint herein totally fails to comply with these essential requirements. Considering the complaint and answering affidavits, there are no facts and circumstances disclosed upon which a finding of fraud could be properly founded. The assurances allegedly made by David P. Mody are mere expressions of a future intention to repay. Nothing is alleged indicative of an intent not to honor or act on such assurances. "Any inference drawn from the fact that the expectation did not occur is not sufficient to sustain the plaintiff's burden of showing that the defendant falsely stated his intentions" ( *Lanzi v Brooks, supra*). Further, the evidence in the record of the deposits into the account on January 19, 27 and 30, 1978 are indicative of an intent to honor the assurances. Insofar as plaintiff attempts to impute fraud to the [***7] defendants because of their knowledge of the insolvency of the corporation, the law in this State is that an intent to defraud cannot be imputed merely from the fact of insolvency and the omission to disclose such fact ( *Morris v Talcott, 96 NY 100*). Here, there was no request by plaintiff for a corporate financial statement, and none was furnished. There was, therefore, no express misrepresentation of the corporation's financial condition. All that was sought and obtained by plaintiff were assurances of repayment of the overdrafts, which assurances were merely promissory in nature and are not actionable ( *First Nat. Bank of* [*626] *Hamden v Kaufman, 58 AD2d 668*). Plaintiff's contention that the pending application for approval of a proposed transfer to A. C. U. Transport, Inc., of the interstate operating rights of Meehan's Express, Inc., shows a conspiracy to defraud plaintiff and other creditors of the defendant corporation through the transfer of the corporation's principal asset is without merit. [**791] The allegation of a proposed transfer without more does not establish a scheme to defraud creditors. Further, if such a transfer actually took place and the [***8] facts of the transfer established that it was in fraud of creditors, plaintiff would not be without a remedy. The order appealed from should be affirmed. Order affirmed, without costs.

*** Slip Sheet ***

Document