*Supp. 1177, 1181 (S.D.N.Y. 1983)* (failure to initiate certain investigative checks does not bar action for fraud) (citing *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir. 1980) (Friendly, J.), *cert. denied*, 449 U.S. 1123, 67 L. Ed. 2d 109, 101 S. Ct. 938 (1981); *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.) (Wisdom, J.), *cert. denied*, 434 U.S. 911, 98 S. Ct. 312, 54 L. Ed. 2d 197 (1977)).

We note the applicable legal standard regarding plaintiff's conduct. [HN6] Plaintiff's burden of persuasion "is simply to negate recklessness when defendant puts that in issue, not to establish due care." *Mallis*, 615 F.2d at 79 (footnote omitted). Thus, although *Edwards & Hanly* had expressly "approach[ed] the issue of [plaintiff's] conduct from the standpoint of . . . due diligence," 602 F.2d at 485, the applicable standard is recklessness. We note, however, that Judge Friendly asserted in dicta that "the facts in *Edwards & [**28] Hanly* would have led to dismissal under the *Dupuy* [recklessness] standard." *Mallis*, 615 F.2d at 79 n.9. [7]

> 7  *Dupuy* replaced the traditional due diligence-negligence test of plaintiff conduct in a civil action under section 10(b) with the less stringent recklessness standard, thereby harmonizing the plaintiff conduct doctrine with the Supreme Court's imposition of proof of *scienter* in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). *See Dupuy*, 551 F.2d at 1013-24. Thus, notwithstanding language in *Edwards & Hanly* regarding "due care," the *Dupuy* recklessness standard, as adopted by this Circuit in *Mallis*, 615 F.2d at 78-79 & n.9, remains the standard under which we are to evaluate Andersen's arguments regarding MHT's conduct.

In our view, the evidence adduced at trial demonstrates that Andersen's reliance on *Edwards & Hanly* is misplaced, and its arguments of recklessness on MHT's [**29] part unpersuasive. We note that plaintiff Edwards & Hanly, a brokerage house, was denied recovery because, in that case, "the primary cause of E & H's loss was its failure to comply with Regulation T, . . . [promulgated] pursuant to § 7 of the Exchange Act, 15 U.S.C. § 78g." 602 F.2d at 486. [HN7] Regulation T expressly requires broker-dealers, such as E & H, to ensure that [*23] a security purchased in a cash account is "held in the account" or that "the creditor accepts in good faith the customer's statement that the security is owned by the customer or the customer's principal, and that it will be promptly deposited in the account." *See* 12 C.F.R. § 220.8(a)(2). In the present case, however, Andersen has not alleged any particular regulatory violation by MHT, which, in any event, was acting not as a broker purchasing or selling securities for its customer, but as fiscal agent for an undisclosed principal, providing for its customers short-term repo and reverse repo positions in government securities, and assuming responsibility to its customers [**30] for DGSI's obligations. Of course, MHT may be denied recovery on the basis of adequate proof of common law recklessness as assessed in light of industry practice. We do not wish to suggest that a defendant must show a violation of some statutory or regulatory proscription to show recklessness. But the lack herein of an established statutory or regulatory cognate to Regulation T, violation of which was central to our holding in *Edwards & Hanly*, forces us to inquire as to what, if anything, in this case stands as similarly compelling proof of recklessness.

Andersen's arguments on this critical issue rest principally on its comparisons of various aspects of MHT's DGSI transactions with those of other financial institutions that managed to escape the DGSI collapse either unscathed or considerably less harmed than was MHT. We find these arguments ultimately unpersuasive. For example, Andersen argues that MHT recklessly failed adequately to control its own volume and other risks. Volume risks relate to the amount of money that MHT invested in repo and reverse repo positions with DGSI at any one time. Although some financial institutions, such as Merrill Lynch, Dean Witter Reynolds, [**31] Salomon Brothers, First Boston, Citibank and Prudential-Bache, determined that they would transact from zero to $50 million worth of repo business with DGSI, based principally on its cash reserves, there was also evidence that other reputable firms, notably U.S. Trust Company and Chase Manhattan Bank, transacted some $2 to $2.5 billion in repo business with DGSI, as did MHT. Thus, industry practice as to volume risk was not nearly as uniform as Andersen would suggest. Further, volume risk is but one element in total risk exposure, and its significance in the calculus of total risk exposure may be diluted to the extent that the primary government securities dealer, here, DGSI, maintains matched books of repos and reverse repos, a practice that DGSI fraudulently purported to maintain. There was evidence regarding the government securities business of other primary dealers, W.E. Pollack, Prudential-Bache, and Dean Witter, suggesting that the volume of business transacted by DGSI generally and with a particular customer, such as MHT, might have comported with the practices of those firms had matched books in fact been sustained.

As to non-volume risk controls, Andersen introduced evidence [**32] that MHT failed adequately to monitor the following: the "market risk" that the cash and bonds which it received from DGSI might be worth less than the cash and bonds delivered to DGSI; the "coupon interest risk" that DGSI might fail to pay accrued coupon interest when due or to return borrowed bonds; and the "repo interest risk" that DGSI might fail

to pay repo interest owed. But there was also evidence -- certainly enough to allow a jury to find the claim of recklessness negated -- that MHT monitored these risks reasonably when measured by prevailing industry practice. As to "market risk," there was evidence that MHT followed the common industry practice of "marking to market" at 100% of the stated par value of the securities. U.S. Trust, the only other intermediary bank that testified as to risk controls, apparently marked to market in the same way as MHT: the intermediary bank would not initiate marks, but would process the marks requested by the principals to the transactions. There was also evidence that MHT periodically checked to ensure that the DGSI transactions were being marked to market. In our view, the [*24] evidence of these internal controls by MHT was sufficient [**33] to justify a jury's negating the charge of recklessness as to market risk, whether or not MHT could have or should have actually initiated, as opposed to merely processed and periodically monitored, markings to market. Cf. Faller Group, Inc., 564 F. Supp. at 1181 (failure to initiate further investigative checks did not bar action for fraud) (citing Mallis, supra; Dupuy, supra).

As to "coupon interest risk," there was evidence that MHT's handwritten records were transcribed from computerized risk assessments that were substantially similar to Andersen's own computer assessments of accrued coupon risk, except that MHT's program entailed a one-day lag in calculation and did not account for DGSI "fails" in tendering cash or securities due by the time the Fed wire closes at the end of a business day under reverse repos until MHT employee D'Amore corrected by hand the computer assessment each day to account for such fails. There was also evidence that MHT controlled coupon risk by demanding that DGSI process more repos than reverse repos through MHT, thereby reducing risk since, with repos, the borrower was obligated to remit coupon interest to DGSI, while with [**34] reverse repos, DGSI was obligated to remit coupon interest to the lender. Further, there was evidence that in monitoring coupon risk, MHT set up a collateral account into which DGSI was to deposit cash and securities to cover MHT's coupon interest exposure. Andersen's own expert on repo procedures, Robert Bird, conceded that prior to DGSI's collapse, it was not the industry practice to collateralize accrued coupon interest, and that MHT's coupon risk controls, including its collateral account, constituted "a fair effort to attempt to control the coupon exposure." Certainly these internal controls render MHT considerably more conscientious than E & H, which often failed even to mark the defendant's sales "long" -- a failure "which alone might not even be a breach of duty." Edwards & Hanly, 602 F.2d at 486 (citing Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, 469 F.2d 1166, 1175 (8th Cir. 1972)). Also, even assuming, ar-

guendo, that Andersen is correct that MHT often failed to enforce this collateral control procedure when DGSI ignored requests for additional collateral, the mere institution and partial enforcement of the collateral control [**35] procedure appears to have rendered MHT ahead of, not behind, then-prevailing industry practice in monitoring coupon interest risk.

As to "repo interest risk," there was evidence only that at least two other firms had developed computer programs to monitor this risk, the importance of which must not be overstated in the total calculus of risk, and that MHT was beginning to develop its own program when the collapse occurred.

In short, applying the overall standards of industry practice, the jury reasonably could conclude that MHT endeavored to control risk sufficiently to negate Andersen's claim of MHT's recklessness.

Andersen also argues that MHT recklessly failed to heed warning signs of DGSI's impending collapse. In our view, Andersen relies improperly on Edwards & Hanly and thereby mischaracterizes MHT's immediate response to warning signals as a longer-term organizational policy of conscious avoidance. During the approximately one month preceding DGSI's collapse, DGSI often failed to return securities due. As Andersen points out, in April 1982 "fails" lasting three or more days occurred on 58 percent of DGSI's scheduled returns. But the countervailing evidence was sufficient [**36] to allow a finding that the charge of recklessness had been negated: MHT officers Martello, D'Amore and Zinns apparently worked with DGSI in April and May in an effort to reduce exposure risks; and, in May 1982, MHT was in daily communication with DGSI regarding the former's exposure. Further, there was evidence that in MHT's experience, DGSI consistently cured fails, and that, in any event, only fails that occurred in the week prior to the collapse of DGSI were still open on May 17, 1982. This contrasts with Edwards & Hanly, where, in response to fails [*25] of up to several months for securities due within several days, repeatedly over a period of approximately one year, plaintiff E & H made only "sporadic inquiries" and even then apparently contented itself with evasive answers. Edwards & Hanly, 602 F.2d at 486-87. Finally, we must recognize the sheer speed of events herein in contrast to Edwards & Hanly. While E & H had approximately one year during which it could have protected itself form ongoing fails, here MHT had at most one-quarter to one-third that duration from the time of the circulation of the Andersen statement in February 1982 until the [**37] ultimate collapse of DGSI in May 1982. Indeed, the duration must be considered shorter still when measured from the time when fails became a legitimate source of concern. In sum, as to the brief period of MHT's interaction with DGSI, the evidence sup-

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

ports the conclusion that MHT endeavored to protect its investments, and negated the charge of recklessness.

III. *Section 17(a) of the 1933 Act.*

Since we affirm the judgment of the district court on the basis of section 10(b) of the 1934 Act, we need not reach the issues raised herein as to whether there is an implied private right of action under section 17(a) of the 1933 Act, and, if so, whether liability thereunder may be predicated on the basis of mere negligence. *See Zerman v. Ball, 735 F.2d 15, 23 (2d Cir. 1984)* (declining to decide whether a private right of action exists under section 17(a) of the 1933 Act since plaintiff might instead prevail on the basis of *Rule 10b-5*). However, nothing in our opinion today should be construed as commenting in any way on Judge Friendly's recent admonition that our conclusion in *Kirshner v. United States, 603 F.2d 234, 241 (2d Cir. 1978)*, cert. [**38] *denied, 442 U.S. 909, 99 S. Ct. 2821, 61 L. Ed. 2d 274 (1979)*, that such a private right of action exists, "may be open to reexamination." *See Yoder, 751 F.2d at 559 n.3.*

IV. *The Verdict.*

Much is made by both sides on this appeal of the import of the procedures surrounding the return of the jury verdict. In our view, the procedures employed by the district judge do not warrant reversal, as Andersen now urges, or a review of five allegedly valid verdicts, as MHT now urges. Rather, we think it appropriate to review, as we have done, only the substantive federal securities cause of action, namely, the claim, made under section 10(b), as to which we can say with certainty that a clear and explicit verdict has been rendered. *Cf. Morris v. Pennsylvania R. Co., 187 F.2d 837, 841 (2d Cir. 1951)* (errors in verdict procedure should be "localized so that the sound portions of the verdict may be saved") (Clark, J.).

On the morning of the jury charge, the district judge informed counsel that he "did not find satisfactory any form of [special] verdict sheet." The judge charged the jury on the three federal substantive securities [**39] claims, the federal "subsidiary theories" of conspiracy and aiding and abetting and the two state common law theories of fraud and negligence. He instructed the jury to find "either in favor of the plaintiff or the defendant, and if your verdict is in favor of the plaintiff you are to state the amount of damage that you find." Later, he sent into the jury room copies of the conspiracy and aiding and abetting charge. At 5:48 p.m., the jury announced its verdict, as follows:

THE FOREMAN: We find for Manufacturers Hanover.

THE CLERK: In what amount?

THE FOREMAN: 17 million.

Judge Owen then asked the jury "to advise the court on the record of which cause of action or causes of action you base this award on." Counsel for neither side objected. The jury returned to the jury room. A few minutes later, the jury asked by note whether it was to identify by number the statutes that had been violated or to explain its reasoning. The court responded, "Just state by number." Although it is only of contextual interest, at this time the jury apparently had in the jury room that [*26] portion of the charge reciting the language of *Rule 10b-5* and §§ 10(b), 12(2) and 17(a) [**40] and the charge on aiding and abetting and conspiracy, but not on fraud and negligence. At approximately 6:17 p.m., the jury returned, and the following colloquy ensued:

THE COURT: Mr. Foreman, you are prepared to state which of the statutes were violated?

THE FOREMAN: Yes, your Honor. We feel that 10B5 [sic], Section 12(2), 17 A [sic] and the two state statutes.

THE COURT: Were all violated?

THE FOREMAN: Were all violated.

Without further questions, polling, or objection, the judge then excused the jury.

Andersen contends that the judge's request for the bases of the jury's verdict was improper and thus failed to convert to a special verdict the jury's initial general verdict, as to which a reversal on any one claim would necessitate a new trial. We note that Andersen failed to object to the request, and thus has not preserved this issue for appeal. *See, e.g., Turchio v. D/S A/S Den Norske Africa, 509 F.2d 101, 105 (2d Cir. 1974)*. Andersen's response to this point -- that the request was a nullity, and hence required no objection -- begs the very question that Andersen itself raises as to whether the request was legally a nullity. [**41] Whether a request regarding a verdict is timely is a proper legal question. *Cf. Baker v. Sherwood Construction Co., 409 F.2d 194, 195 (10th Cir. 1969)* (per curiam) (too late to poll the jurors individually after clerk read verdict and jury was polled collectively and excused). [HN8] In general, counsel must object to any procedure that it wishes to raise on appeal. *See Fed. R. Civ. P. 46; Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981)*. Further, the failure to object precludes Andersen from contesting the oral, as opposed to written, form of the inquiry. *Turchio, 509 F.2d at 105.*

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

[HN9] As to the propriety of the judge's request, our standard of review is the abuse of discretion standard. *See Cann v. Ford Motor Co., 658 F.2d 54, 58 (2d Cir. 1981), cert. denied, 456 U.S. 960, 72 L. Ed. 2d 484, 102 S. Ct. 2036 (1982).* We note first that the request was not "tantamount, in its effect, to a direction to the [**42] jury" to alter or otherwise compromise the decisiveness of its ultimate verdict. *Compare McCollum v. Stahl, 579 F.2d 869, 871 (4th Cir. 1978)* (resubmission of interrogatories as to damages and defendant's conduct after jury found no wrongful conduct by defendant held improper), *cert. denied, 440 U.S. 912, 59 L. Ed. 2d 460, 99 S. Ct. 1225 (1979).* Further, the request for the legal basis for the verdict did not result in the rendering of a special verdict under *Fed. R. Civ. P. 49(a).* The term "special verdict" is a term of art, and properly speaking, refers only to special findings regarding *factual* issues that the court may ask the jury to resolve, *see Griffin v. Matherne, 471 F.2d 911, 917 n.6 (5th Cir. 1973); Skidmore v. Baltimore & Ohio R. Co., 167 F.2d 54, 65-70 (2d Cir.), cert. denied, 335 U.S. 816, 69 S. Ct. 34, 93 L. Ed. 371 (1948);* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2506 at 498-502 (1971), or perhaps mixed questions of law and fact, assuming applicable legal standards are charged. *See Wright & Miller, supra at 502.* By contrast, Judge Owen simply asked [**43] the jury to specify the cause or causes of action upon which it based its verdict; in short, he inquired as to the legal basis or bases of its verdict. Again, we note counsel's failure to object to the oral form of the inquiry or the answers.

In any event, we find no basis for concluding that this sequence resulted in *post hoc* rationalization by the jury. *See Litton Systems, Inc. v. American Tel. & Tel. Co., 700 F.2d 785, 802-04 (2d Cir. 1983)* (upholding post-verdict resubmission of unresolved mixed questions), *cert. denied, 464 U.S. 1073, 79 L. Ed. 2d 220, 104 S. Ct. 984 (1984).* In our view, the potential for inaccuracy or mere rationalization might be significant with factual interrogatories, since in reaching its verdict, the jury may not collectively have resolved the particular factual questions posed. By contrast, with a post-verdict inquiry into the *legal basis* for a verdict, [*27] as in the present case, it is virtually inconceivable that the jury, having deliberated and returned a verdict, had not already considered the question posed and thus would provide a mere rationalization in its response to the post-verdict inquiry.

[**44] In his initial charge, Judge Owen effectively had instructed the jury to consider the very issue presented in the post-verdict inquiry -- the seven possible bases for any finding of liability -- and had instructed the jury on the elements of each of the seven causes of action. [HN10] Juries are presumed to follow instructions.

*United States v. Siegel, 717 F.2d 9, 19 (2d Cir. 1983)* (citing *Watkins v. Sowders, 449 U.S. 341, 347, 66 L. Ed. 2d 549, 101 S. Ct. 654 (1981)).* Andersen offers no reason to believe that the jury did not consider the seven causes of action charged in reaching its verdict. Further, Andersen certainly has shown no reason to suspect that, once Judge Owen submitted the post-verdict request to the jury, the jury did not earnestly consider, resolve, and report the results of its deliberations. *See Litton Systems, 700 F.2d at 803-04* (no basis to conclude that jury did not deliberate conscientiously over post-verdict resubmission of unresolved law/fact interrogatories). Thus, the post-verdict question does not undermine the [**45] fairness or decisiveness of the verdict. [8]

8    Further, responses to factual interrogatories, because they will later be subject to the clearly erroneous rule on appeal, portend a graver risk of manifest injustice if hastily made than does a jury's statement of the legal basis for its verdict, which may be reviewed by an appellate court under the mere error standard.

The legal inquiry herein is also justifiable on grounds similar to those advanced in support of a separate post-verdict interrogatory on damages, see 5A J. Moore, Moore's Federal Practice para. 49.06, at 2236 (1971), or a jury's *sua sponte* itemization of damages returned with its general verdict, *see Dagnello v. Long Island Railroad Co., 193 F. Supp. 552, 554 (S.D.N.Y. 1960)* (Weinfeld, J.), *aff'd, 289 F.2d 797 (2d Cir. 1961).* In *Dagnello,* Judge Weinfeld justified the *sua sponte* itemization thusly:

Since the jury's method of computing the damages is before the Court, it is desirable that [**46] it remain as of record so that if the defendant is advised to prosecute an appeal, the reviewing court will have knowledge of the basis upon which the jury reached its judgment.

*Id.* It was because the jury's additional finding went to the legal "basis" of the verdict that the finding was legitimate in *Dagnello* as in the instant case.

Finally, in the present case, which entailed six weeks of trial time to resolve complex securities issues pleaded on seven distinct theories, the jury's post-verdict specifications play an important role in rationally maximizing the use of scarce judicial resources. *See Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263, 279 (2d Cir. 1979)* (urging use of special verdicts and interrogatories

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

in "large and complex cases" to resolve issues, reduce probability of "laborious and expensive retrial," and facilitate appellate review), *cert. denied, 444 U.S. 1093, 62 L. Ed. 2d 783, 100 S. Ct. 1061 (1980)*. We wish to emphasize that the preferred procedure, in the interest of avoiding confusion or unnecessary use of trial time, would have been for the district judge to request a statement of the bases [**47] for the verdict in his initial instructions and to provide the jury with a written interrogatory form. However, it is clear that in some instances additional instructions may be given even after a jury begins deliberations or returns a verdict. *See, e.g., Litton Systems, 700 F.2d at 802-04*. The particular inquiry herein did not portend manifest injustice but rather promoted a more complete record; hence, we do not hold the procedure invoked invalid. On the contrary, the procedure was preferable to allowing a lengthy and complex trial to conclude with one general verdict without any indication as to the legal basis or bases for that verdict. Such an unexplained verdict would risk wasting precious judicial resources since, as Andersen argues, it might be overturned for, *inter alia*, any serious error in the charge relating to a single [*28] claim since the reviewing court would be unable to determine the legal basis of the verdict. *See, e.g., Greenbelt Cooperative Publishing Assoc. v. Bresler, 398 U.S. 6, 11, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970)*.

The judgment herein must be sustained if any one of the indicated bases for the verdict is sustained. [**48] *See, e.g., Turner v. United States, 396 U.S. 398, 420-21, 24 L. Ed. 2d 610, 90 S. Ct. 642 (1970)*. Since, as discussed, we affirm on the basis of the claim under section 10(b), one of the bases on which the jury clearly returned its verdict, the verdict procedure poses no bar to our affirming the judgment of the district court.

As to the jury's reference to "state statutes" in its answer to Judge Owen's request, we are unable to say whether this inaccuracy reflects a misstatement in the word "state" or the word "statute." We find unpersuasive MHT's contention that the jury must have meant not the state common law theories but the federal conspiracy and aiding and abetting claims because the jury had the charge on those claims in the jury room and the court had charged that conspiracy and aiding and abetting are "subsidiary theories" to the substantive federal claims. That argument strikes us as little more than an educated guess. The integrity of the jury system and the concern for fairness to litigants simply cannot accommodate such guesswork in sustaining a verdict. In any event, since we affirm on the basis of section 10(b), we need not consider whether Andersen [**49] may be liable as an aider and abettor as a matter of law, notwithstanding the verdict procedure, or whether any of the other theories of liability support the jury's verdict.

V.

The parties raise several additional issues, which we can dispose of briefly. First, Andersen argues that the empanelment of the jury was fundamentally unfair because the district judge expressly excused nine persons who could not sit for a trial likely to last several weeks. [HN11] A jury selection procedure is unconstitutional if it "systematically and intentionally" discriminates or otherwise deprives a litigant of a chance to have his case heard by a cross-section of the community. *See Thiel v. Southern Pacific Co., 328 U.S. 217, 224, 90 L. Ed. 1181, 66 S. Ct. 984 (1946)* (automatic exclusion of wage-earners who earn less than four dollars per day held unconstitutional). In the present case, since there was no *per se* exclusion of any group, and no systematic and intentional discrimination against any person or persons, the district judge's empanelment procedure was not unconstitutional.

[**50] Andersen also contests the award of pre-judgment interest. The district judge granted MHT's motion to amend the judgment to provide for costs and post-judgment interest, which Andersen did not contest, and for pre-judgment interest. As to pre-judgment interest, in a memorandum and order dated September 12, 1985, the court specifically based its award on the theory that, under *N.Y. Civ. Prac. L. § 5001*, "the state fraud and negligence findings mandate an award of pre-judgment interest." In our view, the post-verdict inquiry did not result in a legally ascertainable finding of liability under the state common law causes of action, and we instead affirm solely on the basis of section 10(b). Therefore, we cannot say whether the district court order of pre-judgment interest was intended to apply herein. [HN12] Pre-judgment interest on federal securities claims, unlike on New York state law claims, is not mandatory. *See, e.g., Blau v. Lehman, 368 U.S. 403, 414, 7 L. Ed. 2d 403, 82 S. Ct. 451 (1962)*.

We therefore remand to the district court the issue of whether and to what extent [**51] pre-judgment interest is appropriate in this case. The purpose of pre-judgment interest is to compensate a plaintiff for loss of the use of funds ultimately awarded. *See, e.g., Freschi v. Grand Cole Venture, 767 F.2d 1041, 1051 & n.12 (2d Cir. 1985)*. [*29] Thus, should the district court determine that pre-judgment interest is appropriate, it may further consider the extent, if any, to which MHT had pre-trial use of "deferred credit" funds or of funds received upon release to MHT on May 17, 1982 of certain collateral securities, and the extent, if any, to which MHT's pre-award tax savings on losses due to the DGSI collapse exceed post-award tax liability on the judgment award. Thus, we remand to the district court for resolution of these issues.

801 F.2d 13, *; 1986 U.S. App. LEXIS 30205, **;
Fed. Sec. L. Rep. (CCH) P92,902

Finally, we deny MHT's cross-appeal for a mini-trial on punitive damages. First, the district judge was within his discretion in denying MHT's motion for an amended complaint seeking punitive damages as both untimely and unwarranted. *See Fed. R. Civ. P. 16; see also* 3 J. Moore, Moore's Federal Practice para. 16.19, at 16-74 (1985). Second, in any event, [**52] [HN13] it is well settled in this Circuit that proof of fraud or misrepresentation in a private civil action, even if such proof would constitute grounds for punitive damages under common law, generally warrants no such damages under the federal securities laws. *See, e.g., Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L. Ed. 2d 766 (1969); Globus v. Law Research Service, Inc., 418 F.2d 1276, 1283 (2d Cir. 1969);*

*see also* 3A H. Bloomenthal, Securities and Federal Corporate Law § 8.28[5] (1985) (citing cases).

We have considered the remaining arguments raised herein, and we find them to be without merit.

In light of the foregoing, we affirm the judgment of the district court -- excluding its award of pre-judgment interest -- on the basis of section 10(b) and *Rule 10b-5* thereunder. The cause is remanded to the district court solely for resolution of Andersen's claims as to pre-judgment interest in a manner not inconsistent with this opinion.

Judgment affirmed in part. Award of pre-judgment interest vacated and remanded.

*** Slip Sheet ***

Document

LEXSEE 94 NY2D 426

**Pinnacle Consultants, Ltd., Doing Business as Testa Pinnacle Consultants, on Its Own Behalf and on Behalf of Shareholders of Leucadia National Corporation, Appellant, v. Leucadia National Corporation et al., Respondents.**

No. 1

**COURT OF APPEALS OF NEW YORK**

*94 N.Y.2d 426; 727 N.E.2d 543; 706 N.Y.S.2d 46; 2000 N.Y. LEXIS 74*

**January 4, 2000, Argued**
**February 17, 2000, Decided**

**SUBSEQUENT HISTORY:**    The Docket Number of this Case has been Corrected February 18, 2000.

**PRIOR HISTORY:**    Appeal, by permission of the Court of Appeals, from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered May 11, 1999, which modified, on the law, and, as modified, affirmed an order of the Supreme Court (Herman Cahn, J.), entered in New York County, granting a motion by defendants to dismiss the complaint to the extent of dismissing the first and third causes of action, and denying the motion as to the second and fourth causes of action.  The modification consisted of granting defendants' motion to the further extent of dismissing plaintiff's remaining claims.

*Pinnacle Consultants v Leucadia Natl. Corp., 261 AD2d 164*, affirmed.

**DISPOSITION:**    Order affirmed, with costs.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff challenged the Appellate Division's (New York) order dismissing plaintiff's entire complaint, holding that plaintiff lacked standing and was estopped from challenging transactions because, as a shareholder, it had not voted against them, and finding that defendant partnership was not prohibited from voting its shares in favor of the merger.

**OVERVIEW:** Plaintiff's claims that defendants breached their fiduciary duty and committed corporate waste by issuing the warrants to defendant chairman and defendant president were raised and necessarily decided in the prior federal court action. As predicate acts for

plaintiff's Racketeer Influenced and Corrupt Organizations claim, plaintiff alleged that defendant corporation's board of directors illegally authorized the warrants and that they were not supported by valid consideration. The federal court rejected plaintiff's argument and therefore, concluded that the warrants were properly issued and that their issuance was economically justified as compensation. Therefore, the issuance of the warrants was not corporate waste and not a breach of fiduciary duty, and the State law claims were barred by collateral estoppel. *N.Y. Bus. Corp. Law § 612(b)* did not apply, because it explicitly applied only to corporations, and defendant partnership was not a corporation; therefore, it could vote its shares in favor of the merger.

**OUTCOME:** The order was affirmed. Plaintiff's claims for breach of fiduciary duty and corporate waste were rejected in the prior federal Racketeer Influenced and Corrupt Organizations claim; therefore, plaintiff's claims were barred by collateral estoppel. Defendant partnership was not a corporation and therefore, it could vote its shares in favor of the merger.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN1] Collateral estoppel, or issue preclusion, prevents a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party. The doctrine applies if the issue in the second action was raised, necessarily decided and material in the first action, and if the party had a full

94 N.Y.2d 426, *; 727 N.E.2d 543, **;
706 N.Y.S.2d 46, ***; 2000 N.Y. LEXIS 74

and fair opportunity to litigate the issue in the earlier action.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN2] See *N.Y. Bus. Corp. Law § 505(h)*.

*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > General Overview*
[HN3] See *N.Y Bus. Corp. Law § 612(b)*.

*Business & Corporate Law > Corporations > Finance > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Meetings & Voting > Voting Shares > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > General Overview*
[HN4] *N.Y. Bus. Corp. Law § 612* states that a subsidiary, that is, a corporation a majority of whose voting shares are owned by the parent corporation, may not vote shares held in the parent corporation.

*Business & Corporate Law > Foreign Businesses > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > General Overview*
[HN5] *N.Y. Bus. Corp. Law § 612* explicitly applies only to corporations. *Section 612(b)* is very particular: it applies only to shares held by a domestic or foreign corporation of any type or kind.

*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > General Overview*
[HN6] *N.Y. Bus. Corp. Law § 612(b)* uses the term "corporation" no less than three times to define its scope.

## HEADNOTES

Judgments - Collateral Estoppel - Corporate Derivative Action - Prior Federal Court Action

1. In a corporate derivative action arising out of the issuance of stock warrants to two members of the corporation's board of directors and a merger of two corporations, plaintiff's claims that the individual defendants breached their fiduciary duty and committed corporate waste by issuing the warrants are barred by collateral estoppel, because they were raised and necessarily decided against plaintiff in its prior Federal District Court action against defendants under the Racketeer Influenced

and Corrupt Organizations Act (RICO). The premise of plaintiff's corporate waste and breach of fiduciary duty claims is that, in authorizing the warrants, the directors improvidently exercised their business judgment. That, however, was the very issue decided against it in Federal court. Further, it is of no moment that, after dismissing plaintiff's RICO claim, the Federal court dismissed its State law waste and fiduciary duty claims for lack of Federal jurisdiction rather than on the merits, since the Federal court's dismissal of the RICO claim necessarily determined the same issues raised by the corporate waste and breach of fiduciary duty claims. Moreover, *Business Corporation Law § 505 (h)* states that "[i]n the absence of fraud in the transaction, the judgment of the board shall be conclusive as to the adequacy of the consideration ... for the issue of rights or options for the purchase from the corporation of its shares," and inasmuch as the Federal court found no fraud in the issuance of the warrants, plaintiff's challenge cannot stand.

Parties - Standing - Corporate Derivative Action - Failure to Vote against Challenged Actions

2. In a corporate derivative action arising out of the issuance of stock warrants to two members of the corporation's board of directors and a merger of two corporations, plaintiff is not estopped from challenging the merger on the ground that it did not vote its shares against the merger. While it might be reasonable to expect a shareholder in a close corporation to object affirmatively to an action before bringing suit, the dynamics are quite different in a publicly traded corporation. Although a shareholder in a publicly held corporation who votes in favor of a merger, thereby participating in the challenged activity, might be deemed to have acquiesced in it, that does not also mean that the shareholder who abstains from voting must be estopped from later bringing suit. This is especially true where, as here, a predetermined number of affirmative votes are required to approve the merger, thus making abstention the equivalent of a negative vote.

Corporations - Merger - Shares of Subsidiary Not Entitled to Vote - Shares of Partnership Not Disqualified

3. A partnership controlled by a corporation is not barred by *Business Corporation Law § 612 (b)* from voting its shares in favor of a proposed merger of that corporation with another, since the statute restricts a corporate subsidiary only from voting the shares it holds in the parent corporation. Regardless of whether the partnership was effectively controlled by the corporation, the statutory restriction does not apply here, because it explicitly applies only to corporations, not partnerships.

**COUNSEL:** *Tanner Propp, L. L. P.,* New York City (*Lester J. Tanner* of counsel), for appellant. I. Plaintiff

94 N.Y.2d 426, *; 727 N.E.2d 543, **;
706 N.Y.S.2d 46, ***; 2000 N.Y. LEXIS 74

has not conceded on appeal that there was no corporate waste or breach of fiduciary duty with respect to the warrants because it had been determined that *Business Corporation Law § 505* had not been violated. II. *Business Corporation Law § 612 (b)* applies to shares held by Leucadia whether held in its own name or held in the name of a controlled partnership for which Leucadia has the voting rights. (*Norlin Corp. v Rooney, Pace*, 744 F2d 255; *Patrolmen's Benevolent Assn. v City of New York*, 41 NY2d 205.) III. The most relevant fact regarding the merger was not disclosed in the proxy statement. IV. Plaintiff's failure to send in its proxy cannot be counted as a vote in favor of the merger so as to estop plaintiff from maintaining this suit. (*Diamond v Diamond*, 307 NY 263; *Winter v Bernstein*, 149 Misc 2d 1017, 177 AD2d 452.)

*Weil Gotshal & Manges, L. L. P.*, New York City (*Joseph S. Allerhand, Stephen A. Radin, Miranda S. Schiller* and *Anthony J. Albanese* of counsel), and *Pavelic & Leviter, P. C. (Raymond Levites* of counsel), for respondents. I. Plaintiff is collaterally estopped from challenging the issuance of the warrants in this action, because of the prior Second Circuit holding. (*Browning Ave. Realty Corp. v Rubin*, 207 AD2d 263, 85 NY2d 804; *Niagara Mohawk Power Corp. v Tonawanda Band of Seneca Indians*, 94 F3d 747; *Steiker Co. v Eccelston Props.*, 156 Misc 2d 308; *Central Hudson Gas & Elec. Corp. v Empresa Naviera Santa*, 56 F3d 359; *Remington Rand Corp. v Amsterdam-Rotterdam Bank*, 68 F3d 1478; *Stone v Williams*, 970 F2d 1043, 508 US 906; *Society For Good Will to Retarded Children v Cuomo*, 652 F Supp 515; *Mattes v Rubinberg*, 220 AD2d 391.) II. The trial court, the court below and the Federal District Court correctly construed *Business Corporation Law § 612 (b)*. (*Patrolmen's Benevolent Assn. v City of New York*, 41 NY2d 205; *Connecticut Natl. Bank v Germain*, 503 US 249; *Norlin Corp. v Rooney, Pace*, 744 F2d 255.) III. The court below correctly concluded that plaintiff acquiesced in the challenged transactions and therefore is estopped from maintaining this action. (*Winter v Bernstein*, 149 Misc 2d 1017, 177 AD2d 452; *Jacobson v VanRhyn*, 127 AD2d 743; *Kranich v Bach*, 209 App Div 52.) IV. The entire complaint should be dismissed, because plaintiff has failed to plead particularized facts that, if true, would demonstrate compliance with the prelitigation demand requirement. (*Marx v Akers*, 88 NY2d 189; *Auerbach v Bennett*, 47 NY2d 619; *Isaac v Marcus*, 258 NY 257; *Barr v Wackman*, 36 NY2d 371; *Gordon v Elliman*, 306 NY 456; *Wilson v Tully*, 243 AD2d 229; *Teachers' Retirement Sys. v Welch*, 244 AD2d 231; *Kamen v Kemper Fin. Servs.*, 500 US 90; *Stoner v Walsh*, 772 F Supp 790; *Kaster v Modification Sys.*, 731 F2d 1014.)

**JUDGES:** Judges Bellacosa, Smith, Levine, Ciparick, Wesley and Rosenblatt concur.

**OPINION BY:** KAYE

**OPINION**

[*428] [**544] [***47] Chief Judge Kaye.

At the heart of this factually complex commercial case are [*429] two legal issues: first, whether a claim has been stated for breach of fiduciary duty and waste, and second, whether *Business Corporation Law § 612* was violated in connection with a merger effectuated by the corporate defendant. Concluding that there was neither, we affirm the Appellate Division order dismissing the complaint.

Plaintiff Pinnacle Consultants, Ltd., a Delaware corporation, has since 1987 owned stock in defendant Leucadia National Corporation, a publicly owned financial services corporation organized in New York. The other defendants are Leucadia's board of directors individually. Defendant Ian Cumming has served as Leucadia's chairman since 1978, and defendant Joseph Steinberg as president since 1979. Allegations of wrongdoing center on four transactions: three involve the issuance of warrants; the fourth concerns the merger.

In 1985, 1991 and 1992, the board of directors approved the issuance of warrants that gave Cumming and Steinberg, separately, options to purchase several hundred thousand shares of Leucadia stock. [*] The terms of those warrants were described in proxy statements to Leucadia's shareholders, and the shareholders voted to approve each transaction. In 1989, Leucadia repurchased the majority of the 1985 warrants. In 1990, the Leucadia board of directors proposed a merger with Marks Investing Corporation (MIC). Leucadia owned 56% of MIC's stock, and MIC owned a 54% interest in TLC Associates, a partnership. TLC, in turn, owned [***48] [**545] an approximately 58% interest in Leucadia. Cumming and Steinberg, in addition to their positions with Leucadia, were directors of both MIC and TLC. The proffered reason for the merger, as set forth in the proxy statement sent to Leucadia's shareholders, was to simplify the circular ownership structure among Leucadia, MIC and TLC.

[*]    At the time, there were more than 15 million shares outstanding.

The proxy statement also revealed that the merger would give Cumming, Steinberg and another director--defendant John W. Jordan II--a controlling interest in Leucadia. Prior to the merger, Cumming and Steinberg each owned 4.39% of MIC's stock, and Jordan owned 15.2%. In addition, Cumming and Steinberg each owned

94 N.Y.2d 426, *; 727 N.E.2d 543, **;
706 N.Y.S.2d 46, ***; 2000 N.Y. LEXIS 74

23% of TLC. Following the merger, TLC would be dissolved, and its assets--over 8.6 million shares of Leucadia stock--would be distributed to its owners in proportion to their interest. The result would leave Cumming and [*430] Steinberg each with slightly over 22.1% of Leucadia's stock, and Jordan with 5.87%. Together, Cumming, Steinberg and Jordan would own just over 50% of Leucadia. The proxy statement also revealed that TLC intended to vote its Leucadia shares--58.7% of the outstanding shares--in favor of the merger. Therefore, excluding the directed voting shares, the merger would be approved if 8% of the remaining outstanding shares voted in favor. On May, 11, 1990, Leucadia's shareholders approved the merger. Pinnacle did not vote its shares for or against the merger, nor did it return the proxy.

In 1994, Pinnacle--a corporation that buys and sells stock for the benefit of its sole shareholder, who is also its president--brought a derivative action in the United States District Court for the Southern District of New York against Leucadia and its officers and directors, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 USC § 1962 [b]-[d]*), as well as various other claims. As predicate acts for its RICO claim, Pinnacle alleged wrongdoing in the issuance of the 1985, 1991 and 1992 warrants, and failure of the proxy statement to state that *Business Corporation Law § 612* prohibited TLC from voting its shares in favor of the merger. The District Court dismissed the suit in part, holding that Pinnacle's claims concerning the 1985 warrants were time-barred; that the proxy statements relating to the 1991 and 1992 warrants were not false or misleading; that the warrants were properly issued under *Business Corporation Law § 505*; and that *Business Corporation Law § 612* did not prohibit TLC--a partnership--from voting its shares in favor of the merger. The court held, however, that Pinnacle did state claims for breach of fiduciary duty and corporate waste under New York law, but dismissed those claims for lack of Federal jurisdiction.

The United States Court of Appeals for the Second Circuit affirmed, holding that the authorizations of the warrants were proper and did not constitute predicate fraudulent acts under RICO. Specifically, the court held that Leucadia complied with *Business Corporation Law § 505*; that it issued the warrants to Cumming and Steinberg because of the "dramatic turnaround that Leucadia experienced;" and that the corporation "could reasonably determine that the issuance of the warrants was deserved on the basis of past service" (*Pinnacle Consultants v Leucadia Natl. Corp., 101 F3d 900, 905*). In addition, the court held that there was "no fraud shown in the issuance of the warrants," and that "the Directors' business judgment is conclusive that valid consideration was received for the [*431] warrants" (*id.*). Further, be-

cause at least two predicate acts were necessary under RICO, the single alleged *Business Corporation Law § 612* violation could not alone support a RICO claim, and the court held that it was unnecessary to reach the question whether *section 612* had been violated (*id., at 906*). Finally, the court held that there was no diversity of citizenship to support Federal [***49] [**546] jurisdiction for any State law claims (*id., at 906-907*).

Pinnacle then brought the instant derivative action in State court against Leucadia and its officers and directors, alleging that defendants had violated *Business Corporation Law § 612* by permitting TLC to vote its shares in favor of the merger with MIC. Pinnacle also claimed that, by issuing the warrants, defendants violated *Business Corporation Law § 505* and committed fraud, corporate waste, conversion and breach of fiduciary duty. Supreme Court dismissed, as barred by collateral estoppel, the claim that the warrants had been improperly issued. In addition, the court held that *section 612* had not been violated because it applies only to corporations--not partnerships. The court, however, held that Pinnacle had stated a claim for breach of fiduciary duty and corporate waste.

The Appellate Division modified Supreme Court's judgment and dismissed the entire complaint, holding that Pinnacle lacked standing and was estopped from challenging any of the transactions because, as a shareholder, it had not voted against them. Further, the Appellate Division held that *Business Corporation Law § 612* did not prohibit TLC from voting its shares in favor of the merger because that section does not apply to partnerships; that the proxy statement for the merger disclosed all relevant facts; and that defendants' compliance with *Business Corporation Law § 505* precluded Pinnacle's claims that defendants had committed conversion and corporate waste in issuing the warrants. We granted leave and now affirm.

Analysis

On appeal to this Court, Pinnacle urges first, that, as officers and directors of Leucadia, the individually named defendants breached their fiduciary duty and committed corporate waste by issuing the warrants to Cumming and Steinberg, and second, that under *Business Corporation Law § 612* TLC should have been precluded from voting its shares in favor of the merger.

Pinnacle's claims concerning the warrants are barred by collateral estoppel. [HN1] Collateral estoppel, or issue preclusion, [*432] prevents a party from " 're-litigating an issue clearly raised in a prior action or proceeding and decided against that party' " (*Parker v Blauvelt Volunteer Fire Co., 93 NY2d 343, 349*). The doctrine applies if the issue in the second action was "raised, necessarily decided and

material in the first action," and if the party "had a full and fair opportunity to litigate the issue in the earlier action" (id.; see also, Gramatan Home Investors Corp. v Lopez, 46 NY2d 481, 485).

Here, Pinnacle's claims that defendants breached their fiduciary duty and committed corporate waste by issuing the warrants to Cumming and Steinberg were raised and necessarily decided in the Federal court action. As predicate acts for its RICO claim, Pinnacle alleged that Leucadia's board of directors illegally authorized the warrants and that they were not supported by valid consideration (see, Business Corporation Law § 505 [a] [1]). The Second Circuit rejected Pinnacle's argument, holding that the warrants had been validly issued in order to reward Cumming and Steinberg for Leucadia's "dramatic turnaround;" that there was "no fraud shown in the issuance of the warrants;" and that "the Directors' business judgment is conclusive that valid consideration was received for the warrants" (101 F3d, at 905). Thus, the court concluded that the warrants were properly issued and that their issuance was economically justified as compensation for Cumming and Steinberg's service to Leucadia.

From this decision, it follows necessarily that issuance of the warrants was not corporate waste and not a breach of fiduciary duty. Indeed, the premise of Pinnacle's [***50] [**547] corporate waste and breach of fiduciary duty claims is that, in authorizing the warrants, the directors improvidently exercised their business judgment. That, however, was the very issue decided by the Second Circuit against Pinnacle (see, Browning Ave. Realty Corp. v Rubin, 207 AD2d 263, 266-267 [where Federal court dismissed RICO claim, subsequent State law claims raising same issue barred by collateral estoppel], lv denied 85 NY2d 804).

Further, it is of no moment that, after dismissing Pinnacle's RICO claim, the Second Circuit dismissed its State law waste and fiduciary duty claims for lack of Federal jurisdiction rather than on the merits. Indeed, in view of the RICO dismissal, the Federal court lacked subject matter jurisdiction to determine the merits of the pendant State law claims. Nevertheless, since, as noted, the Federal court's dismissal of the RICO claim necessarily [*433] determined the same issues raised by the corporate waste and breach of fiduciary duty claims, the State law claims are barred by collateral estoppel (see, id. [applying collateral estoppel even though, in dismissing RICO claim, Federal court never assumed jurisdiction over State law claims]).

Moreover, [HN2] Business Corporation Law § 505 (h) states that "[i]n the absence of fraud in the transaction, the judgment of the board shall be conclusive as to the adequacy of the consideration ... for the issue of

rights or options for the purchase from the corporation of its shares." As the Appellate Division recognized, since the Second Circuit found "no fraud shown in the issuance of the warrants" (101 F3d, at 905), plaintiff's challenge cannot stand.

We next turn to Pinnacle's argument that Business Corporation Law § 612 (b) barred TLC from voting its shares in favor of the merger. At the outset, defendants contend--as the Appellate Division held--that Pinnacle lacks standing, and is estopped from bringing this claim, because it failed to vote its shares against the merger. In support of this argument, defendants rely on the general principle that a shareholder who participated in an activity may not subsequently challenge its legality in a derivative suit (see, Diamond v Diamond, 307 NY 263, 266 [plaintiff who had participated in corporate action estopped from bringing suit challenging that action]). In addition, defendants cite cases finding estoppel where shareholders in closely held corporations did not oppose the challenged actions (see, e.g., Kranich v Bach, 209 App Div 52, 54 [1924]; Winter v Bernstein, 149 Misc 2d 1017, 1020, affd as mod 177 AD2d 452).

While it might be reasonable to expect a shareholder in a close corporation to object affirmatively to an action before bringing suit, the dynamics are quite different in a publicly traded corporation. To be sure, a shareholder in a publicly held corporation who votes in favor of a merger--and thus participates in the challenged activity--might be deemed to have acquiesced to it (see, Vierling v West Chem. Prods., 143 AD2d 829, 830 [plaintiff who voted his shares in favor of merger estopped from bringing suit]; Kahn v Household Acquisition Corp., 591 A2d 166, 176-177 [Del Sup Ct] [same]). But that does not mean that the shareholder who abstains from voting must be estopped from later bringing suit. This is especially true where, as here, a predetermined number of affirmative votes are required to approve the merger, thus making abstention the equivalent of a negative vote (see, Pavlidis v [*434] New England Patriots Football Club, 675 F Supp 696, 698-700 [D Mass] [shareholders who abstained not deemed to have acquiesced to merger where "merger approval required the affirmative vote of a majority of each class entitled to vote"]).

TLC was not, in any event, barred by Business Corporation Law § 612 from [***51] [**548] voting its shares in favor of the merger. [HN3] Section 612 (b) states:

"Treasury shares and shares held by another domestic or foreign corporation of any type or kind, if a majority of the shares entitled to vote in the election of directors of such other corporation is held by the corporation, shall not be shares entitled to vote or to be counted in

94 N.Y.2d 426, *; 727 N.E.2d 543, **;
706 N.Y.S.2d 46, ***; 2000 N.Y. LEXIS 74

determining the total number of outstanding shares."[HN4]

This section states that a subsidiary--that is, a corporation a majority of whose voting shares are owned by the parent corporation--may not vote shares held in the parent corporation (*see, CIBC Bank & Trust Co. v Banco Cent. do Brasil, 886 F Supp 1105, 1114* [SD NY]). The reason for this rule is that, "[i]f cross-ownership and cross-voting of stock between parents and subsidiaries were unregulated, officers and directors could easily entrench themselves by exchanging a sufficient number of shares to block any challenge to their autonomy" (*Norlin Corp. v Rooney, Pace, 744 F2d 255, 262* [2d Cir]).

Pinnacle argues that TLC was, in effect, a subsidiary of Leucadia, because Leucadia owned a controlling interest (56%) in MIC, and MIC, in turn, owned a controlling interest (54%) in TLC. Indeed, as noted, Cumming and Steinberg served as directors of all three companies, which supports Pinnacle's argument that TLC was in fact under Leucadia's control. Thus, Pinnacle contends that *section 612 (b)* barred TLC from voting its shares in favor of the merger.

Regardless, however, of whether TLC was effectively controlled by Leucadia, *section 612 (b)* does not apply in this case, because that [HN5] section explicitly applies only to *corporations,* and TLC was a partnership. *Section 612 (b)* is very particular: it applies only to shares held by a "domestic or foreign *corporation* of any type or kind" (emphasis added). In fact, [HN6] *section 612 (b)* uses the term "corporation" no less than three times to define its scope. As the Appellate Division, trial court and the United States District Court concluded, this statute applies only to corporations--not to partnerships.

We must respect the legislative judgment that the prohibition on cross-voting between parents and subsidiaries applies only to corporations.

[*435] We note that the same policy behind *section 612 (b)* might support a statute barring any entity from voting shares controlled by the parent corporation. For instance, Model Business Corporation Act § 7.21 (b), and Delaware General Corporation Law § 160 (c), prohibit cross-voting where a subsidiary "directly or indirectly" owns shares in the parent corporation (*see also,* 5 Fletcher, Cyclopedia of Private Corporations § 2040 [Perm ed]). A Delaware court explained that "indirectly" includes stock held by a "third party" or an "individual" that "would vote it as ordered by the [parent] corporation's directors" (*Italo Petroleum Corp. v Producers' Oil Corp., 20 Del Ch 283, 289, 174 A 276, 278*). Thus, had Delaware law, or the Model Act, been applicable, TLC might have been precluded from voting its shares in favor of the merger. *Section 612 (b),* however, specifically limits its restrictions on cross-voting to subsidiary *corporations.* This statute is unambiguous, and we must apply it as written.

In light of our holding, we need not reach defendants' argument regarding prelitigation demand on the corporation (*see, Business Corporation Law § 626 [c]*).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Judges Bellacosa, Smith, Levine, Ciparick, Wesley and Rosenblatt concur.

Order affirmed, with costs.

*** Slip Sheet ***

Document

LEXSEE 116 F2D 584

ROCHFORD v. NEW YORK FRUIT AUCTION CORPORATION.

No. 121

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*116 F.2d 584; 1940 U.S. App. LEXIS 2723*

December 23, 1940

**PRIOR HISTORY:**     [**1] Appeal from the District Court of the United States for the Southern District of New York.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant creditor challenged the decision of the District Court of the United States for the Southern District of New York, which held that appellee bankrupt did not have a fraudulent intent to leave unpaid for goods bought on credit from appellant, which were latter repossessed when insolvency became clear.

**OVERVIEW:** The court affirmed the decision of the trial court, which held that appellee bankrupt did not have a fraudulent intent to leave unpaid for goods bought on credit from appellant, which were latter repossessed when insolvency became clear. Appellant contended that an inference of fraudulent intent was shown from the fact that the bankrupt's last balance sheet showed liabilities slightly over $ 12,000, against assets of more than $ 25,000, as well as a net profit from operations of $ 3,595.73. The court disagreed, holding that a purchase of goods on credit by one hopelessly insolvent, knowing that payment could never be made, may have been held fraudulent without proof of specific presentations. Merely continuing business in the natural hope that better times would come was not enough. There must have been evidence from which the trier could have reasonably inferred in the buyer both a knowledge of insolvency and a present intent not to pay for the goods.

**OUTCOME:** The court affirmed appellee bankrupt's non-fraudulent intent to leave unpaid for goods bought on credit from appellant creditor. Merely continuing business in the natural hope that better times would come

was not enough to show fraudulent intent. There must have been evidence from which the trier could have reasonably inferred in the buyer both a knowledge of insolvency and a present intent not to pay for the goods.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Fraudulent Transfers > General Overview*
*Contracts Law > Sales of Goods > Damages & Remedies > Seller's Damages & Remedies > Remedies on Discovery of Buyer's Insolvency*
*Contracts Law > Sales of Goods > Performance > General Overview*
[HN1] A purchase of goods on credit by one hopelessly insolvent, and so knowing that payment can never be made, may be held fraudulent without proof of specific presentations. Fraud must be thoroughly proven. Merely continuing business in the natural hope that better times would come, that tomorrow should be as this day and much more abundant, is not enough. There must be evidence from which the trier can reasonably infer in the buyer both a knowledge of insolvency and a present intent not to pay for the goods.

**COUNSEL:** I. Saul Fleischman, of New York City (Irving Coopersmith and Michael Berman, both of New York City, on the brief), for plaintiff-appellee.

Harry Weinberger, of New York City (Chester A. Pearlman and W. E. Aronberg, both of New York City, on the brief), for defendant-appellant.

**OPINION BY:** CLARK

116 F.2d 584, *; 1940 U.S. App. LEXIS 2723, **

## OPINION

Before L. HAND, SWAN, and CLARK, Circuit Judges.

[*584] CLARK, Circuit Judge.

We are asked to hold "clearly erroneous" [Rules of Civil Procedure, Rule [*585] 52(a), 28 U.S.C.A. *following section 723c*] the district court's findings that the bankrupt here did not have a fraudulent intent to leave unpaid for goods bought on credit from defendant and by the latter repossessed when insolvency became clear. But the evidence of record does not justify such a step. The law is, of course, well settled. [HN1] A purchase of goods on credit by one hopelessly insolvent - and so knowing that payment dan never be made - may be held fraudulent without proof of specific epresentations. In re Meiselman, 2 cir., *105 F.2d 995, 998*, and cases cited. But [**2] the charge of fraud, being in effect one of a crime, must be thoroughly proven, *Morris v. Talcott, 96 N.Y. 100, 107*; merely continuing business in the not unnatural hope "that better times would come - that tomorrow should be as this day and much more abundant," *Nichols v. Pinner, 18 N.Y. 295, 299*, is not enough. There must be evidence from which the trier can reasonably infer in the buyer both a knowledge of insolvency and a present intent not to pay for the goods. *Dwellee-Kaiser Co. v. Aetna Casualty & Surety Co., 241 N.Y. 464, 469, 150 N.E. 517; In re B. & R. Glove Corporation, 2 Cir., 279 F. 372, 381*.

Here, however, facts justifying, not to speak of compelling, such a conclusion are lacking. Ardeeco Produce, Inc., a small corporation engaged in the business of selling fruit and produce, had made purchases of supplies from defendant, so that the balance due on January 1, 1938, was approximately $1,895.61. On January 3, Ardeecon made a payment of $266 on account and, on that day and the next, bought of defendant additional merchandise on credit to the extent of $700.75. The court found that defendant in making the sale [**3] had relied upon a financial statement which Ardeeco had furnished it about two months earlier and had made no inquiry with respect to Ardeeco's subsequent financial condition.

On the morning of January 5, Ardeco was served with a summons in a creditors' action, and its officers then realized that it could not continue in business unless some arrangement could be effected with its creditors. So they notified the creditors that a creditors' meeting would be held four days later. Defendant received the notice that same day and immediately repossessed itself of some of the merchandise, to the amount of $430.50, which it had just sold Ardeeco. Defendant concedes its then knowledge of Ardeeco's insolvency; the court found that insolvency existed on January 2, 3, and 4. An involuntary petition in bankruptcy was filed on january 12 and adjudicagion followed thereafter. The estate noew in the hands of the trustee amounts to $4,027.05; claims filed total slightly more than $14,000.

Defendant claims that an inference of fraudulent intent must be drawn from the foregoing facts. But other evidence rebuts any such inference. The bankruptzhs last balance sheet, that for October 1, 1938, showed [**4] liabilities slightly over $12,000, against assets of more than $25,000, as well as a net profit from operations for the first nine months of 1938 of $3,595.73. Undoubtedly the assets, particularly the accounts receivable, would show substantial depreciation in the event of finaancial stringency; but this affords little basis for supporting an absence of hopr on the part of the debtor.

The balance sheet was made up by a certified public accountant who was Ardeeco's auditor and credit man and who was examined at great length by defendant. He conceded knowledge of losses on goods in October of $4,200 and that business got worse in November and December, so that the officers faced financial difficulties, as they realized, about the middle of December, because their cash position was getting smaller and weaker. That is in substance all the proof, except for denials of knowledge of insolvency and fraudulent intent upon the part of the bankrupt's officers; we agree with the trial court that it "falls far short of establishing any fraud." Therefore, when, after notice of the creditors' meeting, defendant retook the merchandise it had sold, it had a voidable preference under Bankruptcy [**5] Act, § 60, sub. b, and N.Y. Stock corporation Law, § 15, for the value of which the trustee was properly given judgment below. The motion for a new trial for "fraud, perjury and concealment of evidence" is only an attempt once again to examine the auditor; if his work sheets were destroyed, not delivered to the attorney as he claimed, and if that point deserved more exploration than it had already received, that voyage of discovery should have been had at the original trial.

Affirmed.

*** Slip Sheet ***

Document

LEXSEE 479 FSUPP2D 419

**ROYAL INDEMNITY COMPANY, Plaintiff, v. PEPPER HAMILTON LLP, W. RODERICK GAGNE, FREED MAXICK & BATTAGLIA CPA'S PC, MCGLADREY & PULLEN LLP, MICHAEL AQUINO, and FREED MAXICK SACHS & MURPHY, P.C., Defendants.**

Civil Action No: 05-165-JJF

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*479 F. Supp. 2d 419; 2007 U.S. Dist. LEXIS 20797*

**March 22, 2007, Decided
March 22, 2007, Filed**

**PRIOR HISTORY:** *Royal Indem. Co. v. Pepper Hamilton LLP, 2006 U.S. Dist. LEXIS 93309 (D. Del., Dec. 26, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurer sued defendants, a law firm, a lawyer, accounting firms, and a director, for fraud, conspiracy, breach of fiduciary duty, and negligence, inter alia, in connection with a student loan financing operation. The insurer also asserted Racketeer Influenced and Corrupt Organizations Act (RICO) claims against the attorney and the director. The insurer moved to compel and for sanctions, and defendants moved to dismiss.

**OVERVIEW:** The insurer first claimed that certain defendants did not comply with the court's order to commence written discovery. The court concluded that written discovery, including the production of relevant documents, was to occur pursuant to the instructions in its previous order. The court did, however, accept defendants' assertion that no party had produced a single document as of the date of filing its answer brief in response to the insurer's motion to compel. Because the insurer had not demonstrated that defendants acted in bad faith, sanctions were not warranted. The insurer's amended complaint alleged that the enterprise was the association in fact and by agreement between the student loan financing operation and its related entities, the law firm and accounting firms. The insurer alleged that the operation conducted the business of borrowing money, making loans, and obtaining insurance while the firms

provided the necessary legal and financial guidance. Because the insurer identified an enterprise that existed apart from the underlying alleged racketeering activity, and met the other requirements of a RICO claim, the insurer's allegations were sufficient to survive dismissal.

**OUTCOME:** The insurer's motion to compel was granted, but sanction were denied. The court denied defendants' motions to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] Pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court may dismiss a complaint for failure to state a claim upon which relief may be granted. *Fed. R. Civ. P. 12(b)(6)*. The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. However, the court is not required to accept legal conclusions either alleged or inferred from the pleaded facts. Dismissal is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*

Case 1:04-cv-01494-JJF    Document 246-15    Filed 11/30/2007    Page 19 of 32

Page 2

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

*Securities Law > Liability > Private Securities Litigation > Federal Preemption*
*Securities Law > Liability > RICO Actions > Elements of Proof > Pattern > Fraud as Predicate Act*
[HN2] The Private Securities Litigation Reform Act precludes from the type of conduct that could qualify as a predicate act to establish a violation of the Racketeer Influenced and Corrupt Organizations Act any conduct that would have been actionable as fraud in the purchase or sale of securities. *18 U.S.C.S. § 1964(c).* The proper focus of the analysis is on whether the conduct pled as predicate offenses is "actionable" as securities fraud - not on whether the conduct is intrinsically connected to, and dependent upon conduct actionable as securities fraud.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN3] In order to establish a claim under *18 U.S.C.S. § 1962(c),* a plaintiff must show: 1) the existence of an enterprise affecting interstate commerce; 2) that the defendant is employed by or associated with the enterprise; 3) that the defendant participates, either directly or indirectly, in the conduct or the affairs of the enterprise; and 4) that the defendant participates through a pattern of racketeering activity that includes at least two racketeering acts.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN4] An enterprise is defined as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity. *18 U.S.C.S. § 1961(4).* The identification of an enterprise separate from the underlying pattern of racketeering activity is sufficient to withstand a motion to dismiss.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN5] Liability under *18 U.S.C.S. § 1962(c)* is limited to those who participate in the operation or management of the enterprise.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*

[HN6] A "pattern of racketeering activity" requires the commission of at least two predicate offenses, including mail and wire fraud. *18 U.S.C.S. § 1961(1)(B), (5).* To establish a pattern, two critical factors must be present: 1) a relationship between the acts of racketeering charged; and 2) a threat of continuing activity, or continuity. To establish the continuity requirement, a Racketeer Influenced and Corrupt Organizations plaintiff must show that the predicate acts of racketeering either constitute or threaten long-term criminal activity. Continuity may be either "close-ended" or "open-ended". Open-ended continuity may be established by evidence that the predicate acts themselves involve a distinct threat of long-term racketeering activity or that the acts are part of an ongoing entity's regular way of doing business.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN7] A party can demonstrate close-ended continuity for Racketeer Influenced and Corrupt Organizations Act purposes by proving a series of related predicate acts extending over a substantial period of time. A court may focus on the duration of the underlying scheme rather than on the occurrences of the predicate acts themselves.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud > Elements*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud > Elements*
[HN8] A plaintiff raising a claim of mail or wire fraud must establish two essential elements: 1) a scheme to defraud; and 2) the use of the mails or wires for the purpose of executing the scheme. A scheme "need not be fraudulent on its face"; rather, it must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. The second requirement, use of the mail or wires to execute the scheme, requires that the mail or wire communications be incident to an essential part of the scheme, or a step in the plot, although they need not contain misrepresentations.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN9] Under either Delaware or Pennsylvania law, the statute of limitations is tolled where the defendants fraudulently conceal their wrongdoing.

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements*

[HN10] Under Delaware or North Carolina law, a claim for civil conspiracy requires: 1) a combination of two or more persons; 2) an unlawful act done in furtherance of the conspiracy; and 3) actual damage. Under Pennsylvania law, malice is an essential element to a civil conspiracy claim. Malice exists where the defendant intends to injure the plaintiff without legal justification.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*

[HN11] Under Delaware law, the elements of common law fraud are: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation is false, or is made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as the result of such reliance.

**COUNSEL:** [**1] For Royal Indemnity Company, Plaintiff: Philip Trainer, Jr., LEAD ATTORNEY, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

For Pepper Hamilton LLP, W. Roderick Gagne', Defendants: William H. Sudell, Jr., LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Bruce P. Merenstein, Pro Hac Vice; Daniel Bryan Butz, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Elizabeth K. Ainslie, Pro Hac Vice; Nicholas J. LePore, Pro Hac Vice; Stephen J. Shapiro, Pro Hac Vice.

For Freed Maxick & Battaglia CPA's PC, Defendant: James L. Holzman, LEAD ATTORNEY, J. Clayton Athey, Prickett, Jones & Elliott, P.A., Wilmington, DE; John H. Eickemeyer, Pro Hac Vice; Marie A. Tieri, Pro Hac Vice.

For McGladrey & Pullen LLP, Defendant: Christopher M. Winter, LEAD ATTORNEY, Duane Morris LLP, Wilmington, DE; Amber M. Mettler, Pro Hac Vice; Jason M. Butler, Pro Hac Vice; Richard P. Swanson, Pro Hac Vice; Steven M. Farina, Pro Hac Vice; Thomas H.L. Selby, Pro Hac Vice; Veronica E. Rendon, Pro Hac Vice.

For Michael Aquino, Defendant: Christopher M. Winter, LEAD ATTORNEY, Duane Morris LLP, Wilmington, DE.

For Freed Maxick Sachs & Murphy, P.C., Defendant: J. Clayton Athey, [**2] Prickett, Jones & Elliott, P.A., Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., District Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION**
[*423]

*MEMORANDUM OPINION*

March 22, 2007

Wilmington, Delaware

**Farnan, District Judge**

On March 31, 2006, the Court entered an Order (D.I. 122) granting in part Plaintiff's Motion To Compel And For Sanctions (D.I. 84) and denying the following motions to dismiss filed by the Defendants: 1) Motion To Dismiss for Failure To State A Claim filed by Freed Maxick & Battaglia CPA's PC (D.I. 29); 2) Motion To Dismiss Based Upon Motion Of W. Roderick Gagne For The Dismissal Of Plaintiff's First Amended Complaint filed by W. Roderick Gagne (D.I. 32); 3) Motion To Dismiss Based Upon Motion Of Pepper Hamilton LLP For The Dismissal Of Plaintiff's First Amended Complaint filed by Pepper Hamilton LLP (D.I. 35); and 4) Motion To Dismiss For Failure To State A Claim filed by McGladrey & Pullen LLP and Michael Aquino (D.I. 58). The Court's reasons are discussed herein.

[*424] **I. BACKGROUND**

The following facts are alleged in Plaintiff's Amended Complaint (D.I. 14). Plaintiff is a Delaware Capital Stock Insurance Company with its principal place of business [**3] in North Carolina. Defendant Pepper Hamilton, LLP ("Pepper") is a Pennsylvania limited liability general partnership which provides legal services. Defendant W. Roderick Gagne ("Gagne") was, at the time of the filing of this action, a partner in the Philadelphia office of Pepper Hamilton, LLP. Defendants Freed Maxick & Battaglia CPAs, PC ("Freed") and McGladrey & Pullen, LLP ("McGladrey") are accounting firms. Freed is headquartered in Buffalo, New York. McGladrey is headquartered in Bloomington, Minnesota. Defendant Michael Aquino ("Aquino"), was, at the time of filing of this action, a Managing Director and Partner with McGladrey.

The instant action relates to the operations of Student Finance Corporation ("SFC"), which was in the business of originating, purchasing, and selling tuition loans primarily to students of truck driving schools. [1] Defendants Pepper and Aquino became involved with SFC around 1998 by providing legal and accounting services, respectively. In the summer of 1998, an insurance

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

broker contacted Plaintiff on behalf of SFC regarding the opportunity to provide credit risk insurance to SFC. Thereafter, SFC communicated to Plaintiff information about its loan programs. [**4] Plaintiff alleges that these communications contained numerous material misrepresentations.

> 1  On June 5, 2002, SFC was the subject of an involuntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

On January 22, 1999, Plaintiff issued to SFC a credit risk insurance policy with a liability limit of $ 75 million. The policy was intended to provide coverage for loan defaults by students. Plaintiff alleges that SFC made payments on behalf of its borrowers to conceal defaults, referring to them as "forbearance payments" or "ghost payments". These payments were allegedly reported to Plaintiff as if they were made by the student borrowers, thus, distorting the actual rate of default. Plaintiff alleges the accountant Defendants (Freed, McGladrey, and Aquino) knowingly aided and abetted SFC in disguising that the payments were made by SFC itself. Plaintiff further alleges that Defendant Pepper knew the payments made by SFC manipulated the true performance [**5] of the loan activity.

Plaintiff alleges that, based on misrepresentations made by Defendants, it issued numerous additional credit risk insurance policies to cover SFC loans between 1999 and November 2001. Plaintiff alleges it relied on numerous documents drafted by the Defendants regarding SFC's financial situation and its loan performance; specifically: 1) monthly "servicer reports" issued by SFC to Plaintiff regarding the performance of SFC loans; 2) an Independent Accountant's Report issued in 2001 by McGladrey and Aquino which did not disclose that SFC was making "ghost payments"; 3) Private Placement Memoranda drafted by SFC and Pepper which failed to disclose the "ghost payments"; 4) an Independent Auditor's Report issued in 2000 by Freed which certified SFC's financial statements for 1998 and 1999; 5) an Independent Auditor's Report issued in 2001 by McGladrey under Aquino's supervision which certified SFC's financial statements for 2000; and 6) notes with SFC's 2000 financial statements for which McGladrey assisted with the drafting. Plaintiff also alleges that, after expressing concern for a high number of delinquent loans, it relied [*425] on false statements knowingly made by [**6] Andrew N. Yao, owner of SFC, that the delinquencies were caused by students making advance payments. The statements were made in the presence of Gagne, who allegedly knew the statements were false.

On or around March 20, 2002, Mr. Yao admitted to Plaintiff that SFC had been making "forbearance pay-

ments" to reduce the number or appearance of defaulted student loans. On or around April 10, 2002, an SFC officer disclosed in an email to Plaintiff that SFC had made more than $ 50 million in "ghost payments" between January 2001 and March 2002 on policies which Plaintiff insured.

On March 18, 2005, Plaintiff filed its original Complaint. On April 12, 2005, Plaintiff filed its Amended Complaint (D.I. 14) asserting claims for fraud, conspiracy to commit fraud, aiding and abetting fraud and breach of fiduciary duty, negligence and negligent misrepresentation in connection with the student loan financing operations of Student Finance Corporation. Plaintiff also asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Defendants Gagne and Aquino.

## II. LEGAL STANDARD

[HN1] Pursuant to *Federal Rule of Civil Procedure 12(b)(6)* [**7] , the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. *Fed. R. Civ. P. 12(b)(6)*. The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)*. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *Neitzke v. Williams, 490 U.S. 319, 326-27, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir. 1994)*. However, the Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost, 1 F.3d at 183*. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*.

## III. DISCUSSION

### A. *Motion To Compel And For Sanctions (D.I. 84)*

By its Motion, Plaintiff contends that the Defendants McGladrey, [**8] Freed, and Aquino have not complied with the Court's Order (D.I. 38) to commence written discovery on September 7, 2005. Plaintiff further contends that sanctions are warranted because the Defendants McGladrey, Freed, and Aquino have acted in bad faith in refusing to comply with the Court's Order regarding the scheduling of discovery. In response, the Defendants contend they were waiting for the Court to resolve the pending motions to dismiss before commencing discovery in full compliance with the Court's Order (D.I. 38).

Case 1:04-cv-01494-JJF   Document 246-15   Filed 11/30/2007   Page 22 of 32

Page 5

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

The Court concludes that a proper reading of its Order is that written discovery was to commence on September 7, 2005, regardless of the status of the motions to dismiss. The Court accepts the Defendants' assertion that the Court had indicated that addressing the motions to dismiss would be a priority. The Court, however, disagrees with the Defendants' conclusion that written discovery was not to commence before the motions to dismiss were resolved. Thus, the Court concludes that written discovery, including the production of relevant documents, shall occur pursuant [*426] to the instructions in the Court's Order entered June 13, 2005 (D.I. 38).

Further, the Court accepts [**9] the Defendants' assertion that no party has produced a single document as of the date of filing its answer brief in response to Plaintiff's Motion To Compel. Because Plaintiff has not demonstrated that Defendants have acted in bad faith, the Court concludes that sanctions are not warranted at this time. Accordingly, the Court will grant in part Plaintiff's Motion To Compel (D.I. 84) and deny the Motion in part to the extent Plaintiff requests an award of sanctions.

B. *Motions To Dismiss For Failure To State A Claim (D.I. 29, 32, 35, 58)*

By its motions to dismiss, Defendants raise the same or similar arguments. Therefore, the Court will address the issues raised by the motions collectively.

1. *Whether Plaintiff's RICO Claims Are Precluded By The Private Securities Litigation Reform Act*

Defendant Gagne contends that because the predicate acts on which Plaintiff bases its claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") allege fraud in the purchase or sale of securities, the claims are barred by the Private Securities Litigation Reform Act ("PSLRA") pursuant to *18 U.S.C. § 1964(c)*. In response, Plaintiff contends that [**10] the PSLRA does not apply to preclude its claims because the predicate acts alleged are not actionable as securities fraud.

[HN2] The PSLRA precluded from the type of conduct that could qualify as a predicate act to establish a violation of RICO "any conduct that would have been actionable as fraud in the purchase or sale of securities." *18 U.S.C. § 1964(c)*; see PSLRA Pub.L. No. 104-67, 109 Stat. 737 (1995). "[T]he proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud -- not on whether the conduct is 'intrinsically connected to, and dependent upon' conduct actionable as securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 330 (3d. Cir. 1999).*

In its Amended Complaint, Plaintiff alleges that mail and wire fraud are the predicate acts of the RICO-violating conduct. More specifically, Plaintiff alleges that the Defendants made fraudulent misrepresentations to Plaintiff which induced it to issue insurance policies. Construing the Amended Complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged predicate acts that [**11] do not constitute conduct "actionable as fraud in the purchase or sale of securities." Thus, Plaintiff's claims are not barred by the PSLRA pursuant to *18 U.S.C. § 1964(c)*.

2. *Whether Plaintiff Has Stated A RICO Claim For Which Relief May Be Granted*

Defendants Aquino and Gagne contend that Plaintiff fails to state a claim under RICO, *18 U.S.C. § 1962(c)*, or a claim for conspiracy to violate RICO under *§ 1962(d)*. [2] Defendants contend that Plaintiff's RICO claims (Count I and II) fail because: 1) Plaintiff fails to allege the existence of an enterprise; 2) Plaintiff's allegations are insufficient to establish that [*427] Aquino or Gagne was involved in the operation or management of the enterprise necessary to establish "control" of the enterprise; 3) the alleged predicate acts do not constitute a pattern of racketeering activity; and 4) the predicate acts to not rise to the level of mail or wire fraud. Accepting all allegations in Plaintiff's Amended Complaint as true and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has adequately stated its RICO claims against Defendants [**12] Aquino and Gagne.

> 2   Defendant Freed also contends in its Motion To Dismiss that Plaintiff fails to state a RICO claim against it. However, by its Amended Complaint, Plaintiff does not include Defendant Freed in Counts I or II. Thus, the Court need not address Defendant Freed's arguments with respect to the RICO claims.

[HN3] In order to establish a claim under *section 1962(c)*, a plaintiff must show: "1) the existence of an enterprise affecting interstate commerce; 2) that the defendant was employed by or associated with the enterprise; 3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and 4) that the defendant participated through a pattern of racketeering activity that included at least two racketeering acts." *Annulli v. Panikkar, 200 F.3d 189, 198 (3d. Cir. 1999).*

With respect to the Defendants' argument that Plaintiff fails to allege an enterprise, the Court concludes that, construing the Amended Complaint in the light most favorable [**13] to Plaintiff, Plaintiff alleges the existence of an enterprise.[HN4]   An enterprise is defined as

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

"any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." *18 U.S.C. § 1961(4)*. The identification of an enterprise separate from the underlying pattern of racketeering activity is sufficient to withstand a motion to dismiss. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 790 (3d. Cir. 1984)*. Here, Plaintiff's Amended Complaint alleges that the "enterprise" was the association in fact and by agreement between SFC and its related entities, Pepper, McGladrey, and Freed. (D.I. 14, P 141). Plaintiff alleges that SFC conducted the business of borrowing money, making loans, and obtaining insurance while Defendants Pepper, through Gagne, and McGladrey, through Aquino, provided the necessary legal and financial advice, guidance and information. Because Plaintiff identifies an enterprise that existed apart from the underlying alleged racketeering activity, the Court concludes that Plaintiff's allegations are sufficient to plead [**14] the existence of an enterprise.

With respect to the Defendants' argument that Plaintiff fails to plead that Aquino or Gagne had "control" of the enterprise, the Court concludes that Plaintiff's allegations are sufficient to withstand dismissal. [HN5] Liability under *§ 1962(c)* is limited to those who participate in the operation or management of the enterprise. *Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. Plaintiff alleges that, "Aquino guided the enterprise on the effective representation of Student Finance Corporation's financial status . . ." (D.I. 14, P 151). Plaintiff alleges that, "Gagne advised and guided the enterprise on legal issues . . ." (D.I. 14, P 151). Plaintiff also alleges that Aquino and Gagne "participated in, conducted the affairs of, directed the activities of, used and . . . knowingly facilitated, the RICO Enterprise . . . ." (D.I. 14, P150). Reading the allegations of the Amended Complaint in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has alleged facts sufficient to plead "control" of the enterprise by Defendants Aquino and Gagne.

With respect to the Defendants' argument that the predicate acts do not constitute [**15] a pattern of racketeering activity, [*428] the Court concludes that Plaintiff has sufficiently pled continuity so as to avoid dismissal.[HN6] A "pattern of racketeering activity" requires the commission of at least two predicate offenses, including mail and wire fraud. *18 U.S.C. §§ 1961(1)(B), 1961(5)*. To establish a pattern, two critical factors must be present: 1) a relationship between the acts of racketeering charged; and 2) a threat of continuing activity, or continuity. *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*. To establish the continuity requirement, a RICO plaintiff must show that the predicate acts of racketeering either

constitute or threaten long-term criminal activity. [3] *Id.* Continuity may be either "close-ended" or "open-ended". Open-ended continuity may be established by evidence that the predicate acts themselves involve a distinct threat of long-term racketeering activity or that the acts are part of an ongoing entity's regular way of doing business. *Id. at 242-43*. In its Amended Complaint, Plaintiff alleges that "[t]here is a threat of continued racketeering activity [**16] in the future because all of the RICO Persons continue in the same or similar lines of business today. . ." (D.I. 14, P 152). Reading the Amended Complaint in the light most favorable to the Plaintiff, the Court concludes that Plaintiff satisfies the requirement of open-ended continuity because Plaintiff has alleged a threat of continued criminal activity.

    3   Defendants do not challenge the relatedness requirement. Accordingly, the Court will discuss only the continuity element.

[HN7] A party can demonstrate close-ended continuity by proving a series of related predicate acts "extending over a substantial period of time." *Id. at 242*. A court may focus on the duration of the underlying scheme rather than on the occurrences of the predicate acts themselves. *Tabas v. Tabas, 47 F.3d 1280, 1294 (3d. Cir. 1995); Nielsen Electronics Institute v. Student Finance Corporation, No. 99-285, 2001 U.S. Dist. LEXIS 25556 at *25 (D. Del. Jan. 16, 2001)*. Reading the Amended Complaint [**17] in the light most favorable to Plaintiff, the Court concludes that Plaintiff has sufficiently pled close-ended continuity because it has alleged a scheme extending from 1998 through the spring of 2002.

With respect to the Defendants' argument that the predicate acts do not rise to the level of mail or wire fraud, the Court concludes that Plaintiff has alleged sufficient facts to plead the predicate acts of mail or wire fraud. [HN8] A plaintiff raising a claim of mail or wire fraud must establish two essential elements: "1) a scheme to defraud; and 2) the use of the mails or wires for the purpose of executing the scheme." *Schuylkill Skyport Inn, Inc. v. Rich, No. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *47 (E.D. Pa. Aug. 21, 1996)*. A scheme "need not be fraudulent on its face"; rather, it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d. Cir. 1991)*(citation and internal quotation marks omitted), cert. denied, *501 U.S. 1222, 111 S. Ct. 2839, 115 L. Ed. 2d 1007 (1991)*. The second requirement, use of the mail or wires [**18] to execute the scheme, requires that the mail or wire communications be "incident to an essential part of the scheme," or "a step in [the] plot," although

they need not contain misrepresentations. *Schmuck v. United States*, 489 U.S. 705, 710-11, 109 S. Ct. 1443, [*429] *103 L. Ed. 2d 734 (1989); Kehr Packages, Inc., 926 F.2d at 1413.* Reading the Amended Complaint liberally, the Court concludes that Plaintiff has alleged that the Defendants knew of and facilitated communication via the mail and wires to further the scheme.

In sum, the Court concludes that the facts alleged in Plaintiff's Amended Complaint are sufficient to state a RICO claim. Accordingly, the Court will deny the Defendants' motions to dismiss Counts I and II of Plaintiff's Amended Complaint; for violation of RICO and conspiracy to commit a violation of RICO.

### 3. *Whether Plaintiff's Common Law Claims Are Barred As Untimely*

By its Motion, the Defendants contend that Pennsylvania law applies to Plaintiff's claims and thus, its claims are barred by the two year statute of limitations. In response, Plaintiff contends that its claims are timely whether Delaware or Pennsylvania law applies because it could not have learned of [**19] the Defendants' participation in the fraudulent scheme until 2004.

The Court concludes that, accepting all allegations in Plaintiff's Amended Complaint as true, Plaintiff has alleged that it did not learn and could not have learned of the Defendants' knowing participation in the fraudulent scheme until the fall of 2004.[HN9] Under either Delaware or Pennsylvania law, the statute of limitations is tolled where the defendants fraudulently conceal their wrongdoing. *Bohus v. Beloff, 950 F.2d 919, 926 (3d Cir. 1991); Albert v. Alex. Brown Mgmt. Servs., No. 762-N, 2005 Del. Ch. LEXIS 100, 2005 WL 1594085 at *19 (Del. Ch. June 29, 2005).* Plaintiff has alleged that the Defendants knowingly and fraudulently concealed the scheme of making "forbearance payments" on the student loans. Thus, the Court concludes Plaintiff has alleged sufficient facts to adequately plead that its claims are timely.

### 4. *Whether Plaintiff Has Stated Common Law Claims For Which Relief May Be Granted*

Defendants contend that Pennsylvania law applies to Plaintiff's common law claims. Defendants further contend that Plaintiff's common law claims are deficient as a matter of law. In response, Plaintiff contends [**20] that Delaware or North Carolina law applies to its common law claims and that it properly pled causes of action.

#### a. *Whether Plaintiff has stated a claim for civil conspiracy to commit fraud.*

Defendants contend that Plaintiff has failed to allege malice, an essential element to a civil conspiracy claim

under Pennsylvania law. In response, Plaintiff contends that Delaware or North Carolina law applies, and, under both, its allegations are sufficient. Plaintiff further contends that, even if Pennsylvania law applies, it properly pleads malice.

[HN10] Under Delaware or North Carolina law, a claim for civil conspiracy requires: 1) a combination of two or more persons; 2) an unlawful act done in furtherance of the conspiracy; and 3) actual damage. *See AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc., 871 A.2d 428, 437 n.8 (Del. 2005); DiFrega v. Pugliese, 164 N.C. App. 499, 596 S.E.2d 456, 461-62 (N.C. Ct. App. 2004).* Under Pennsylvania law, malice is an essential element to a civil conspiracy claim. *See Jeter v. Brown & Williamson Tobacco Co., 294 F.Supp.2d 681, 688 (W.D. Pa. 2003).* Malice exists where the defendant intends to injure the plaintiff without [**21] legal justification. *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (Pa. 1979).* Construing the allegations [*430] in the Amended Complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged sufficient facts to plead all the elements of a civil conspiracy claim under either Delaware, North Carolina, or Pennsylvania law.

#### b. *Whether Plaintiff has stated a claim for fraud, fraudulent inducement, fraudulent concealment, and aiding and abetting fraud.*

Defendants contend that Plaintiff has failed to state a claim for fraud for the following reasons: 1) the facts alleged by Plaintiff are inconsistent with the elements of fraud; 2) Plaintiff fails to plead fraud with particularity pursuant to *Federal Rule of Civil Procedure 9(b)*; and 3) Plaintiff fails to allege facts showing justifiable reliance on the Defendants' alleged misrepresentations.

[HN11] Under Delaware law, the elements of common law fraud are:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to [**22] the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

Page 8

479 F. Supp. 2d 419, *; 2007 U.S. Dist. LEXIS 20797, **

5) damage to the plaintiff as the result of such reliance.

*Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992). Accepting all allegations in Plaintiff's Amended Complaint as true and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has stated a claim for fraud sufficient to survive a motion to dismiss.

With respect to the pleading requirements of *Rule 9(b)*, the Court finds that Plaintiff's Amended Complaint contains specific allegations of factual misrepresentations made by the Defendants. For example, Plaintiff has alleged that the Defendants knew of the falsity of the financial reports and intended that Plaintiff rely on them. Plaintiff has also alleged that its reliance on the Defendants' misrepresentations was justifiable and that it was harmed as a result. Accordingly, the Court concludes that Plaintiff has sufficiently pled fraud to withstand dismissal.

c. *Whether Plaintiff has stated a claim for negligence* [**23] *and negligent misrepresentation.*

Defendants contend that, under Pennsylvania law, Plaintiff's claim for negligence fails because there is no strict privity between the Defendants and Plaintiff. Defendants contend that Plaintiff's claim for negligent misrepresentation should be dismissed because Plaintiff fails to allege justifiable reliance. In response, Plaintiff contends that Pennsylvania law does not apply and contractual privity is not a requirement under Delaware or North Carolina law. Plaintiff further contends that, even under Pennsylvania law, it has sufficiently pled the elements necessary for its negligence claims.

After reviewing the allegations in Plaintiff's Amended Complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged the elements of its negligence claims. Considering the requirements of negligence and negligent misrepresentation under the law of Delaware, North Carolina, and Pennsylvania, and the similarity with the elements of fraud discussed above, the Court concludes that Plaintiff's allegations are sufficient to withstand a motion to dismiss.

[*431] d. *Whether Plaintiff has stated a claim for aiding and abetting breach* [**24] *of fiduciary duty.*

Defendants contend that Pennsylvania law applies and a claim for aiding and abetting a breach of fiduciary duty is not recognized under Pennsylvania law. Defendants further contend that even if such a claim were recognized, Plaintiff fails to allege the existence of a fiduciary duty.

At the motion to dismiss stage, the Court need not accept legal conclusions alleged or inferred in the pleaded facts. Thus, the Court does not predict whether Pennsylvania law would recognize a claim for aiding and abetting a breach of fiduciary duty. However, considering the elements necessary for such a claim under Delaware and North Carolina law, the Court concludes that, construing the Amended Complaint in the light most favorable to Plaintiff, Plaintiff has alleged sufficient facts to withstand dismissal. Plaintiff has alleged that SFC was insolvent and that such insolvency led to a fiduciary duty. Plaintiff has also alleged that Defendants knowingly participated in the fraudulent scheme and gave SFC substantial assistance through its accounting and legal services.

e. *Whether Plaintiff has stated a claim for deepening insolvency.*

Defendants contend that Plaintiff's claim [**25] for "deepening insolvency" should be dismissed because it is not an independent cause of action. Defendant Pepper further contends that, even if it was a cause of action, Plaintiff has no standing to bring the claim. In response, Plaintiff contends that federal courts have found that Delaware, North Carolina, and Pennsylvania have recognized claims for deepening insolvency and it has adequately pled the elements of such a claim.

In support of its contentions, the Defendants and Plaintiff rely on differing interpretations of a Third Circuit case, *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 350 (3d. Cir. 2001). Considering the uncertainty of the law in this area and drawing all reasonable factual inferences in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has pled sufficient facts to state a claim for deepening insolvency.

In sum, the Court concludes that Plaintiff's allegations are sufficient to state common law claims for fraud, conspiracy to commit fraud, aiding and abetting breach of fiduciary duty, negligence and negligent misrepresentation against all of the Defendants. In addition, the Court [**26] concludes that Plaintiff's allegations are sufficient to establish that its common law claims are not barred as untimely. Accordingly, the Court will deny Defendants' motions to dismiss with respect to Plaintiff's common law claims.

## IV. CONCLUSION

For the reasons discussed, the Court granted in part and denied in part Plaintiff's Motion To Compel (D.I. 84). Additionally, the Court denied Defendants' Motions To Dismiss (D.I. 29, 32, 35, 58). *See* D.I 122.

*** Slip Sheet ***

Document

LEXSEE 1994 DEL. CH. LEXIS 214

**ANTHONY D. WOLF and GERALDINE S. WOLF, Plaintiffs, v. MAGNESS CONSTRUCTION COMPANY, a Delaware corporation, NEW CASTLE COUNTY, a municipal corporation of the State of Delaware and THE DELAWARE DEPARTMENT OF TRANSPORTATION, an agency of the State of Delaware, Defendants.**

Civil Action No. 13004

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1994 Del. Ch. LEXIS 214*

November 28, 1994, Date Submitted
December 20, 1994, Date Decided

**NOTICE:**    [*1]  THIS OPINION HAS NOT BEEN RELEASED   FOR   PUBLICATION.   UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff buyers sued defendants, the seller, the county and the state transportation department, seeking damages from the seller for breach of warranty, negligence, fraud and misrepresentation, and requesting the court to order the county and the transportation department to alleviate drainage problems on their property. The buyers moved to compel discovery against the county and the buyers and the seller cross moved for summary judgment.

**OVERVIEW:** The court held that the buyers' motion to compel discovery was moot because the county had responded to the buyers' interrogatories. The court granted the seller's motion for summary judgment on the breach of warranty claim. The arbitration clause of the homebuyer's warranty required the buyers to submit their breach of warranty claims to arbitration. The court denied summary judgment on the negligence claim because there was an issue of fact as to whether there were alternate methods of designing the drainage easement that could alleviate the drainage problems. The court granted the seller's motion for summary judgment on the fraud claim because the buyers had not shown evidence to establish the scienter element of that claim. While the seller's sales agent misrepresented the warranty provision of the seller's standard form contract, the undisputed

facts showed that the misrepresentation was not intentional or reckless. The agent intended to provide the buyers with accurate information, but misunderstood the contract. The court deferred consideration of the buyers' claim for negligent misrepresentation until the parties had had the opportunity to adequately brief the issue.

**OUTCOME:** The court denied the buyers' motion for an order compelling a response to their discovery requests. It granted the seller's motion for summary judgment on the breach of warranty and fraud claims. It denied summary judgment on the negligence claim. It deferred consideration of the buyers' claim for negligent misrepresentation until the parties had had the opportunity to adequately brief the issue.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Del. Ch. Ct. R. 56(c).

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN2] Delaware respects agreements to arbitrate. *Del. Code Ann. tit. 10, § 5701.*

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN3] The elements of a fraud claim are well settled. The plaintiffs must show: 1. A false representation, usually one of fact, made by the defendant. 2. Defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3. An intent to induce the plaintiff to act or refrain from acting; 4. Plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5. Damage to the plaintiff as a result of that reliance.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN4] Whether a court of equity can provide relief for an unintentional fraud depends on the relief sought.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN5] Delaware recognizes claims for negligent misrepresentation based on a theory of negligence, which is distinct from a claim of fraud.

**COUNSEL:** John H. Newcomer, Jr., Esquire, of BAYARD, HANDELMAN & MURDOCH, P.A., Wilmington, Delaware, Attorney for Plaintiffs.

Jeffrey M. Weiner, Esquire, of LAW OFFICES OF JEFFREY M. WEINER, Wilmington, Delaware, Attorney for Defendant Magness Construction Company.

Lydia C. F. Anderson, Esquire, of NEW CASTLE COUNTY LAW DEPARTMENT, Wilmington, Delaware, Attorney for New Castle County.

**JUDGES:** CHANDLER, Vice Chancellor

**OPINION BY:** CHANDLER

**OPINION**

*MEMORANDUM OPINION*

CHANDLER, Vice Chancellor

Plaintiffs, Anthony D. and Geraldine S. Wolf, ("the Wolfs") are dissatisfied with the new house they purchased from defendant, Magness Construction Co. ("Magness"). Through this lawsuit, the Wolfs hope to compel Magness to provide them with the dream home they expected. The Wolfs also ask the Court to order New Castle County (the County) and the Delaware Department of Transportation (DelDOT) to alleviate drainage problems on the Wolfs' property.

New Castle County and Magness moved for summary judgment on each count of the Wolfs' complaint on October 4, 1994. The Wolfs answered Magness' motion for summary judgment, [*2] and filed a cross motion for summary judgment as to Count IV of their complaint which states claims for fraud and misrepresentation. The Wolfs did not immediately answer the County's motion for summary judgment because the County had not responded to their discovery requests. Instead, they moved to compel the County to respond to their discovery requests. Plaintiffs also request that the Court dismiss the County's summary judgment motion because of the County's dilatory actions. The County responded to plaintiffs' interrogatories on November 2, 1994, while the motion to compel discovery was still pending, but plaintiffs have not withdrawn their motion to compel or their request to dismiss the County's motion for summary judgment.

This Opinion considers two distinct issues: 1) plaintiffs' motion to compel discovery against the County, and 2) the cross motions for summary judgment by plaintiffs and Magness. Plaintiffs' motion to compel discovery can be disposed of easily, so I will consider it first.

I. MOTION TO COMPEL DISCOVERY

The Wolfs contend that they were unable to answer the County's motion for summary judgment without the County's responses to the Wolfs' interrogatories. They [*3] ask the Court to order the County to respond to their discovery requests and to dismiss the County's motion for summary judgment. In its initial response to Wolf's motion to compel, the County represented that the motion was unnecessary because the County would respond by November 4. The County has acted in accordance with that representation, and I conclude that Wolf's motion for an order compelling a response to its discovery requests is moot. Plaintiffs request an unusually harsh sanction for the County's failure to respond to their discovery request. The County has responded to the interrogatories and has not violated or even required an order from this Court, so I decline to dismiss the County's motion for summary judgment. Plaintiffs shall respond to the County's motion for summary judgment within 20 days.

## II. CROSS MOTIONS FOR SUMMARY JUDGMENT

The remaining motions for summary judgment are ready for decision. Defendant Magness has moved for summary judgment on each count of the Wolfs' complaint made against it. The Wolfs have moved for summary judgment on their fraud and misrepresentation claims. [HN1] Summary judgment is appropriate "if there is no genuine issue as to any material [*4] fact and the moving party is entitled to judgment as a matter of law." Court of Chancery Rule 56(c).

Magness argues that it is entitled to judgment as a matter of law because, taking the facts straight from the complaint, the Wolfs have not adequately stated any claim for relief. The Wolfs respond that Magness does not rely on the facts asserted by Wolf, but actually disputes material facts concerning the Wolfs' claims for breach of warranty and negligence. As to their fraud and misrepresentation claims, the Wolfs argue that the undisputed facts entitle them to judgment as a matter of law.

### A. Breach of Warranty

Magness seeks summary judgment on the breach of an express or implied warranty claims. The Wolfs claim that their Home Buyer's Warranty guarantees them a home that is substantially similar to the Model Home. They complain that the stairwell in their house and the drainage in their yard do not comply with that standard. Magness installed a jacuzzi in the house, and the Wolfs argue that Magness breached an express or implied warranty by not providing a hot water heater that can meet the demands of the jacuzzi.

Magness insists that this Court cannot consider plaintiffs breach [*5] of warranty claims. The sales contract contains a merger clause that limits all warranties to those expressly contained in the warranty documents. Because the Wolfs must rely on the express warranty, Magness argues, the arbitration clause of the Home Buyer's Warranty applies to all of plaintiffs' breach of warranty claims. In their summary judgment briefs, the Wolfs have not pressed their breach of implied warranty claims, but they continue to claim that Magness breached the express warranty. According to plaintiffs, the Court can consider their breach of warranty claims because the arbitration clause does not apply to disputes over the terms of the warranty.

As a preliminary matter, I must determine whether the arbitration clause applies to the plaintiffs' claims. *Pettinaro Constr. Co. v. Harry C. Partridge, Jr., & Sons, Del. Ch., 408 A.2d 957, 962 (1979)*. I cannot consider any issue that the parties agreed to arbitrate because [HN2] Delaware respects agreements to arbitrate. *10 Del. C. § 5701*. If the meaning of the arbitration clause is clear from its plain language, then I can decide this issue

as a matter of law without looking at any other evidence [*6] of the parties' intent. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., Del. Supr., 616 A.2d 1192, 1195 (1992)*. The arbitration clause in the Home Buyers Warranty reads:

> If the Homebuyer(s) and Builder disagree on any defective items or resulting repairs in accordance with the warranty documents and Construction Quality Standards herein, the builders or Homebuyer(s) may request an impartial third party arbitration with a Home Buyers Warranty approved arbitration service which will be conducted according to their rules and regulations . . . . In states where this arbitration can be legally binding on all parties to the arbitration, then this arbitration is binding.

The plain meaning of this clause requires the Wolfs to submit their complaints to arbitration. Clearly, an arbitrator must review the purported defectiveness of the stairwell and the water heater. The Wolfs argue that the arbitration clause may apply to disputes over the quality of items or workmanship, but it cannot apply to disputes over the terms of the warranty. Under the plaintiffs' interpretation of the arbitration clause, a court can decide whether the warranty [*7] guarantees a drainage easement substantially similar to the drainage easement behind the model house. Plaintiffs rely on the negative implication of the language in the agreement that only explicitly requires disputes over defective items or repairs to be submitted to an arbitrator. They distort the meaning of the arbitration clause by looking at only a fraction of a sentence. The Home Buyers Warranty gives an arbitrator the authority to decide disputes over defective items or repairs "in accordance with the warranty documents and the Construction Quality Standards." In order to make a decision according to the standards set by the warranty documents, the arbitrator must construe the terms of the documents. An arbitrator must decide whether the warranty guarantees a drainage ditch substantially similar to the one behind the model home and then decide whether the present condition of the Wolfs' yard comports with that standard. Magness' request for summary judgment on Count I of the complaint--breach of warranty--is granted.

### B. Negligence

Magness also moves for summary judgment on the Wolfs' claim that Magness negligently designed the drainage easement. Plaintiffs' negligence claim [*8]

cannot survive Magness' motion for summary judgment unless plaintiffs can offer evidence to support each of the essential elements of their claim. *Glosser v. Cellcor, Inc.,* Del. Ch., C.A. No. 12725, Allen, C. (Sept. 2, 1994), Mem. Op. at 48 (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).* Magness argues that the Wolfs have provided no evidence that Magness negligently designed the drainage ditch. Magness submits a letter from Larry R. Walker, the Wolfs' anticipated trial expert, to show that Mr. Walker believes that the drainage is properly designed to handle the anticipated water flow. The Wolfs respond that Magness' design adequately handles the water that flows across their property, but does not account for the leaves and debris that clog the drainage. Mr. Wolf and Mr. Pierre Leroy, the President of Magness, testified at their depositions that the current condition of the drainage is a serious hazard. In Mr. Walker's letter, submitted by Magness, he describes alternate methods of designing the drainage that can alleviate that hazard. Magness argues that those measures are not feasible and will not solve the problem. Obviously, I cannot [*9] hold for either party without resolving this factual dispute. Magness' motion for summary judgment on the negligence claim is denied.

Magness did not move for summary judgment based on the "economic loss doctrine", which prevents recovery in tort for injuries that should be covered by warranties in contract law. *E.g., Danforth v. Acorn Structures, Inc., Del. Supr., 608 A.2d 1194, 1198 (1992).* I decline to consider the applicability of the economic loss doctrine because Magness did not request summary judgment on this basis. However, I note that the inapplicability of the economic loss doctrine was assumed by me for purposes of this motion.

### C. *Fraud and Misrepresentation*

Plaintiffs and Magness request summary judgment on Count IV of the complaint, the fraud and misrepresentation claims. The undisputed facts are that Mr. Wolf was concerned about the drainage easement and asked the real estate agent what the drainage would look like. Gilbert Brockson, the sales agent for Magness who sold the house to the Wolfs, candidly admits that he told Mr. Wolf that the drainage will be a "gentle swale" substantially similar to the drainage behind the model home. [*10] Mr. Brockson developed this understanding of the warranty from reading the sales contract and the other related documents. Magness relied on its agent's ability to comprehend the documents and did not teach them the meaning of the terms of the contract. Mr. Leroy testified that: "it was all printed in black and white and basically trusted upon him to--not to extrapolate anything other than that was given to him." (Leroy Dep. at 6.)

Plaintiffs characterize the sales agent's statement as a misrepresentation of the condition of the drainage easement, but the drainage did not exist at the time the sales agent made the statement. The agent actually misrepresented the warranty provision of Magness' standard form contract. The agent's statement lead Mr. Wolf to believe that the contract guaranteed a drainage that was substantially similar to the drainage behind the model house, and on that basis Mr. Wolf signed the contract. The Wolfs have not received a "gentle swale", and they demand that Magness provide them with one. In response, Magness asserts that the contract gives the builder complete discretion over the size and character of the drainage. Magness does not deny that the written [*11] language it relies on directly conflicts with its sales agent's statement to Mr. Wolf. The sales agent testified at his deposition that he would not have told Mr. Wolf that the drainage will be a gentle swale had he known that it could end up as the deep ditch currently on the Wolf's property.

Plaintiffs request summary judgment on their fraud and misrepresentation claim based on these undisputed facts. Magness also requests summary judgment, asserting that these facts do not establish a claim of fraud. [HN3] The elements of a fraud claim are well settled. The Wolfs must show:

> 1. A false representation, usually one of fact, made by the defendant.

> 2. Defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

> 3. An intent to induce the plaintiff to act or refrain from acting;

> 4. Plaintiff's action or inaction taken in justifiable reliance upon the representation; and

> 5. Damage to the plaintiff as a result of that reliance.

*Stephenson v. Capano Development, Inc., Del. Super., 462 A.2d 1069, 1074 (1983).* The Wolfs contend that a lesser scienter requirement applies to fraud in the Court [*12] of Chancery. It appears, however, that plaintiffs have misstated the difference between equitable fraud and common law fraud. [HN4] Whether a court of equity can provide relief for an unintentional fraud depends on the relief sought. *Clark v. Teeven Holding Co., Inc., Del. Ch., 625 A.2d 869, 877 (1992).* The Wolfs could have elected to reject the contract and request a return to the

1994 Del. Ch. LEXIS 214, *

status quo ante. *Id.* If they had chosen this option, they could have brought an equitable action for rescission, which contains a lesser scienter requirement than a common law fraud action. *See Eastern States Petroleum Co. v. Universal Oil Products Co., Del. Ch., 24 Del. Ch. 11, 3 A.2d 768, 775 (1939).* The Wolfs have chosen to accept the contract and assert an *ex contractu* claim for the tort of fraud. *See Clark, 625 A.2d at 877.* The Wolfs do not seek to return to the status quo ante, but request an injunction that will force Magness to make good on its agent's misrepresentation. Because the Wolfs have affirmed the contract and sought a further remedy in tort, their claim is one for common law fraud, [*13] not equitable fraud. *See Clark, 625 A.2d at 877.* To state a claim for common law fraud, plaintiffs must show that defendant acted with knowledge that the representation was false, or with reckless indifference to its falsity. *Stephenson, 462 A.2d at 1074.*

The undisputed facts do not support a finding that Magness recklessly misrepresented the warranty provision to Mr. Wolf. Recklessness requires "a conscious indifference to the decision's foreseeable results." *Jardel Co., Inc. v. Hughes, Del. Supr., 523 A.2d 518, 529 (1987).* Magness' agent intended to provide Mr. Wolf with accurate information, but misunderstood the contract. Magness may not have adequately trained its agents to understand the basic provisions of the warranty, but nothing in the record indicates that Magness consciously disregarded the risk that its agents might misrepresent the warranty provisions. I grant Magness' motion for summary judgment as to the fraud claim because plaintiffs have not shown evidence to establish the sci-

enter element of that claim. *See Glosser, supra,* Mem. Op. at 48 (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).* [*14]

Plaintiffs have failed to establish a claim for common law fraud; however, Count IV of their complaint requests relief for fraud and misrepresentation. Neither party distinguishes between a claim for fraud and a claim for negligent misrepresentation in their briefs, but Delaware law makes such a distinction. [HN5] Delaware recognizes claims for negligent misrepresentation based on a theory of negligence, which is distinct from a claim of fraud. *E.g., Guardian Construction Co. v. Tetra Tech Richardson, Inc., Del. Super., 583 A.2d 1378 (1990)* (adopting *Restatement (Second) of Torts § 552 (1977));* *Glosser, supra,* Mem. Op. at 42. Both parties have addressed Count IV of the complaint as an equitable fraud claim, but Count IV of the plaintiffs' complaint may state a claim for negligent misrepresentation as well. In their arguments, the parties have discussed Count IV as a fraud claim with a negligence scienter requirement, which is almost identical to a claim for negligent misrepresentation. *See Glosser, supra,* Mem. Op. at 41 n.46. Nevertheless, I defer consideration of plaintiffs claim for negligent misrepresentation until the parties have had the opportunity [*15] to adequately brief this issue. *See El Paso Natural Gas Co. v. Amoco Production Co.,* Del. Ch., C.A. No. 12083, Allen, C. (March 29, 1994), Mem. Op. at 41-42 (requesting supplemental briefs by parties instead of setting damages). The parties should confer and draft an order that implements this decision and establishes a briefing schedule on the remaining cross motions for summary judgment.