# EXHIBIT
# 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
--------------------------------------X
MAGTEN ASSET MANAGEMENT CORPORATION and
LAW DEBENTURE TRUST COMPANY OF NEW YORK,

              Plaintiffs,

       - against -

NORTHWESTERN CORPORATION,

              Defendant.

CIVIL ACTION NO.: 04-1494(JJF)
--------------------------------------X
MAGTEN ASSET MANAGEMENT CORP.,

              Plaintiffs,

       - against -

MICHAEL J. HANSON and ERNIE J. KINDT,

              Defendants.

CIVIL ACTION NO.: 04-1494(JJF)
--------------------------------------X

                One New York Plaza
                New York, New York

                May 2, 2007
                1:15 p.m.


      Deposition of MARY LEWICKI, pursuant

to Notice, before Melissa Gilmore, a Notary

Public of the State of New York.


    ELLEN GRAUER COURT REPORTING CO. LLC
     126 East 56th Street, Fifth Floor
       New York, New York 10022
           212-750-6434
           REF: 84143

1    A P P E A R A N C E S:

2

3    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

4    Attorneys for Plaintiff Magten Asset Management

5        One New York Plaza

6        New York, New York 10004-1980

7    BY:   GARY L. KAPLAN, ESQ.

8        JORDANNA L. NADRITCH, ESQ.

9        PHONE 212-859-8812

10       FAX 212-859-4000

11       E-MAIL gary.kaplan@friedfrank.com

12

13

14   EMMET, MARVIN & MARTIN, LLP

15   Attorneys for Bank of New York

16       120 Broadway

17       New York, New York 10271

18   BY:   KENNETH M. BIALO, ESQ.

19       MATTHEW K. McCOY, ESQ.

20       PHONE 212-238-3058

21       FAX 212-238-3100

22       E-MAIL kbialo@emmetmarvin.com

23

24

25

1    A P P E A R A N C E S:   (Cont'd)

2

3    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

4    Attorneys for Defendant Northwestern Corporation

5         101 Park Avenue

6         New York, New York 10178-0061

7    BY:   NANCY E. DELANEY, ESQ.

8         PHONE 212-696-6939

9         FAX 212-697-1559

10        E-MAIL ndelaney@cm-p.com

11

12

13   EDWARDS ANGELL PALMER & DODGE LLP

14   Attorneys for Defendants Michael J. Hanson and

15   Ernie J. Kindt

16        919 North Market Street, Suite 1500

17        Wilmington, Delaware 19801

18   BY:   DENISE SEASTONE KRAFT, ESQ.

19        PHONE 302-777-7770

20        FAX 302-777-7263

21        E-MAIL dkraft@eapdlaw.com

22

23

24

25

Page 4

1    A P P E A R A N C E S:   (Cont'd)

2

3    NIXON PEABODY LLP

4    Attorneys for Defendant Law Debenture Trust

5    Company of New York

6         437 Madison Avenue

7         New York, New York 10022-7001

8    BY:  CHRISTOPHER M. DESIDERIO, ESQ.

9         PHONE 212-940-3077

10        FAX 866-741-3993

11        E-MAIL cdesiderio@nixonpeabody.com

12

13

14   ALSO PRESENT:

15        ALEXANDER SHAPIRO, Bank of New York

16

17

18

19

20

21

22

23

24

25

1          LEWICKI

2      our objection letter, our Rule 45

3      objection letter dated April 6th?

4              MR. KAPLAN:  We have -- I have.

5              MR. BIALO:  Okay.  And you noticed

6      that in that letter, we have made the

7      objection that discovery has been stayed

8      by Judge Fried in the separate action

9      brought by Magten against Bank of New

10     York, in the New York County Supreme

11     Court, and we are giving this deposition

12     on the subjects that were defined by the

13     April 25th production letter in the --

14     which follows on the agreement after

15     discussion between Ms. Nadritch and

16     Mr. McCoy.

17             MR. KAPLAN:  That is correct.

18     BY MR. KAPLAN:

19         Q.    Ms. Lewicki, what is your current

20     title at the Bank of New York?

21         A.    I'm the conversion manager for the

22     corporate finance and specialty products groups

23     within corporate trust.

24         Q.    And what do you do as the conversion

25     manager?

LEWICKI

A.    I have been responsible for the movement of the issues, the assets, and the cash from the swap between Bank of New York and JPM related to the corporate trust business and the retail business, specifically the corporate trust business.

Q.    And how long have you been in that role?

A.    That's one year.

Q.    And what was your role before that?

A.    I was a control officer for the structured finance group within corporate trust.

Q.    And how long were you in that role?

A.    Approximately two years.

Q.    So from -- just to put context, from 2004 to '06 or --

A.    Probably mid 2004 through March 2006.

Q.    And prior to that?

A.    I was a -- I was a training officer for the corporate trust group.

Q.    And when was that?

A.    That started October, November 2003

LEWICKI

until I transferred over to the control officer
position.

Q.    And prior to October 2003?

A.    I was a team leader in the corporate
finance group and team leader relationship
manager.

Q.    And when?  When were you the team
leader?

A.    I can't tell you exact dates when it
began.  It was two or three years.

Q.    Two or three -- 2001 approximately?

A.    Yes, yes.

Q.    So for the period of 2001 and 2002,
you were the team leader?

A.    Yes.

Q.    And what were your -- what was your
responsibilities as the team leader?

A.    As a team leader, I managed a group
of approximately 12 people that were other
relationship managers and trust associates, and
just the general day-to-day administration of
their accounts and projects processes within
the bank.

Q.    So did you -- so you oversaw the --

1                          LEWICKI
2    well, just if you could --
3         A.    Well, like a -- well, like a team
4    leader is an interim step between -- you have a
5    business manager, and you have a team leader.
6    So you are not officially the manager, but you
7    are taking on a lot of the management
8    functionalities.
9         Q.    Are there several different team
10   leaders?
11        A.    At the time I was in corporate
12   finance, there were three.
13        Q.    Were you the team leader responsible
14   for the QUIPS, Quarterly Income Preferred
15   Securities, that were issued by Montana Power?
16        A.    I was the team leader and
17   relationship manager.
18        Q.    Okay.  And what was your role as
19   relationship manager?
20        A.    I -- I was a -- as trustee, our role
21   was to support the requirements under the
22   governing documents, receipt of cash for debt
23   service, or any other instances where it might
24   be payment to bondholders.  Confirmation that
25   compliance documentation required under the

1                           LEWICKI
2    agreement is received by us.  Communications
3    with bondholder of requests, some general --
4    typically, general requests from bondholders.
5    Preparation of any notices, if that was a
6    requirement.
7          Q.    And were there multiple relationship
8    managers for each issuance, or was there just
9    one?
10         A.    For the QUIPS issuance?
11         Q.    For the QUIPS issuance.
12         A.    There was only one issuance of debt
13   for that.
14         Q.    And why was there only one
15   relationship -- were you the sole relationship
16   manager for that issuance?
17         A.    In 2003 or 2002, yes.
18         Q.    Okay.  Who did you report to?
19         A.    My business group manager.  At that
20   time, it was Doug Macinnes, M-A-C-I-N-N-E-S.
21         Q.    Were there others that reported to
22   you in connection -- solely in connection --
23   I'm just focusing now on the QUIPS.  Were there
24   others who reported to you or were you solely
25   responsible?

Page 14

LEWICKI

A.    On the QUIPS, I had -- I had a trust
associate that supported me.

Q.    And who was that?

A.    Jeremy Finkelstein.
F-I-N-K-E-L-S-T-E-I-N, I think.

Q.    Just some general questions about
role of a trustee.  When you are the trustee
for a bond issuance, do you generally review
the financial statements issued by the issuer?

A.    No, we do not.

Q.    Were there ever circumstances in
which you review the financial statements of
the issuer?

A.    No, we do not.  It's not a
requirement under the governing documents.

Q.    If -- do you receive -- are there
occasions when you are the trustee, that you
would receive financial statements from the
company?

A.    Typically, under a QUIPS Indenture,
it's one of the requirements that they provide
us with their financial statements.

Q.    And what do you do when you receive
those financial statements?

Page 19

1                    LEWICKI

2          just wanted to make sure that we were

3          clear on what the numbers were.

4                 MR. KAPLAN:  So we're only going to

5          mark this.  We are not going to mark that

6          piece.

7                 MR. BIALO:  So we are going to

8          remove BNY132 from Plaintiff's Exhibit 1?

9                 MR. KAPLAN:  That is correct.

10                MR. BIALO:  Okay.

11   BY MR. KAPLAN:

12         Q.    Is this the entire extract of the

13   from the tickler system relating to the QUIPS?

14         A.    Let me just take a quick look to

15   make sure.

16                (Perusing.)  Yes, it appears to be.

17         Q.    Turning to the first page, which is

18   BNY0105?

19         A.    Um-hum.

20         Q.    If you could just explain to me how

21   to read this page?  You see it says "Due Date,

22   Lead Date, Completion Date and Close Date"?

23                Could you just explain to me what

24   those columns mean?

25         A.    Okay.  Do you want me to go across

1                    LEWICKI

2    the top, too, or you don't care about that?

3         Q.    Sure.  If I need that to understand

4    the page, sure.

5         A.    Okay.  If you start off with the

6    issue document number with an R, within the

7    banks tickler system, each issuer -- each

8    Indenture is given a docket number.  That's

9    just for tracking purposes.  The office

10   represents the location where it was

11   administered, the unit, the corporate unit, the

12   RM, and the trust associate.

13           I don't know when this was run as

14   of, but this must have been after I left the

15   office.  It reflects Jeremy and another trust

16   associate.  Status would be "Terminated," and

17   the "Date open" reflects, I believe the actual

18   date of the governing documents.

19           And if you go down a little further,

20   you have a -- far left column, you have number

21   1.  That's the tickler number.  The tickler

22   description, you will see "Debt service

23   payment."  Again, that's a reminder of an

24   upcoming payment due to bondholders.

25           The "Lead Time" is "1," which

LEWICKI

represents one month.  So the tickler would
appear on the report one month prior to the due
date.

The "Start Date" is the date that
the first tickler was generated.  The "End
Date" is the end date that has been entered by
the administrator.

"Frequency" let's you know that this
is a quarterly tickler that has an action due
on the due date.  And "Administrative Open,"
I'm not really sure what that means.

The "Due Date" is the actual date of
an event that's going to occur.  In this case,
if you look at 3/31/99, that's when a debt
service payment was due.

The "Lead Date" is the date that
that tickler will print on a pending payment or
a pending tickler report.  So on 2/28/99 would
be the first date that that tickler would
appear.

The "Completion Status" in this
case, it's marked "Closed," meaning that the
payment was made, and then the date -- the
close date, itself, is the date that the

1                          LEWICKI

2    administrator actually marked it closed on the

3    system.

4         Q.    So just to clarify, so when it says

5    "Closed," it means that the interest payment

6    was actually -- was actually made on those

7    days?

8         A.    It was actually made, or if there

9    was another event related to it where payment

10   wasn't made, but another event replaced that,

11   it indicates that.

12        Q.    Okay.  If you turn to the page

13   marked BNY0111?

14        A.    Yes.

15        Q.    If you see towards the bottom of the

16   paged in the middle of the page, there is a

17   section that says "10/15/02, spoke to Gary

18   Staudinger at company, who requested a copy

19   of" --

20        A.    Um-hum.

21        Q.    Do you recall why you requested a

22   copy of the compliance certificate?

23        A.    I, personally, don't recall, but if

24   you read what's on this report, we called

25   because we hadn't gotten the certificate as of

1                        LEWICKI

2        A.      Okay.  (Perusing.)

3                Okay.

4        Q.      Do you recall signing this

5    Supplemental Indenture?

6        A.      I don't have a personal memory of

7    it.

8        Q.      Do you recall the transaction

9    generally?

10       A.      Not -- no.

11       Q.      Do you recall the reason that you --

12   that you were asked to execute the Supplemental

13   Indenture?

14       A.      I mean if you read from -- from the

15   Supplemental Indenture, it's basically

16   NorthWestern Corporation is jointly and

17   severally, assuming the obligations of the

18   company on the outstanding QUIPS deals.  That's

19   in the third WHEREAS clause.

20       Q.      Do you recall any conversations with

21   the issuer with respect to the execution of

22   this Second Supplemental Indenture?

23       A.      Not specifically, no.

24       Q.      What is Bank of New York's practice

25   or process regarding the approval and signing

1               LEWICKI

2    of supplementals to an Indenture?

3         A.    First of all, the Bank of New York

4    does not approve supplemental indentures.

5              MS. DELANEY:  Excuse me, I'm -- I'm,

6         just having trouble hearing you.  If you

7         could speak up, please?

8         A.    To start over, the Bank of New York

9    doesn't approve supplemental indentures or

10   transactions contemplated by them.  What we do

11   is typically get a request from an issuer for a

12   supplemental Indenture.

13             Pursuant to that request, we are

14   required to receive an Officer's Certificate

15   and an opinion of counsel.  It's reviewed by

16   the relationship manager.  It's also sent to

17   our external counsel for review and comment.

18   Typically, our external counsel will work with

19   issuer's counsel regarding any negotiation

20   matters.

21             Once it's confirmed that the

22   agreement conforms to what the Indenture

23   requirements are, and the opinion and Officer's

24   Certificate are in the correct format, then the

25   document can be executed by the Bank of New

1                      LEWICKI

2     York.

3          Q.     Why does Bank of New York insist on

4     receiving an Officer's Certificate?

5          A.     It's a requirement under the

6     governing document -- it's a right under the

7     governing document to receive an Officer's

8     Certificate.  If you go to the Indenture, it's

9     one of the stipulations when you are signing a

10    supplemental Indenture, that we can ask for an

11    opinion and an Officer's Certificate.

12         Q.     But I understand it's the right that

13    you have under the documents.  Do you know why

14    Bank of New York would insist on receiving an

15    Officer's Certificate?

16         A.     It's because the Officer's

17    Certificate has to make certain statements by

18    the client that we rely on, which we are

19    entitled to rely on under the terms of the

20    Indenture.

21         Q.     Would you execute a Supplemental

22    Indenture without receiving an Officer's

23    Certificate?

24         A.     Typically, it would depend on what

25    your governing documents said.  But if my

1                          LEWICKI

2   governing documents says I am entitled to

3   receive one, I would definitely require one.

4        Q.    If you received an Officer's

5   Certificate that created questions in your mind

6   with respect to the validity of the statements

7   contained in the certificate, what would you

8   do?

9        A.    What do you mean "validity" of the

10  statements?  I mean it's the Officer's

11  Certificate pretty much has to make statements

12  that are identified in the agreement.

13       Q.    If you have questions with respect

14  to the veracity of the statements in the

15  Officer's Certificate, what would you do?

16       A.    I mean typically, we are relying on

17  the form of the statements unless -- we are

18  relying on the form of the statements.  It's

19  reviewed by our counsel, it's reviewed with our

20  senior management if we do have a question,

21  but...

22       Q.    I just want to show you some

23  language, and it's still in the same Indenture.

24       A.    Okay.

25       Q.    If you look on page 3, which is

1          LEWICKI
2    NOR010001, in Section 302, there is a proviso
3    there that I would like you to focus on?
4          A.    (Perusing.)  Yes.
5          Q.    Specifically, the Supplemental
6    Indenture provides -- it says, "provided,
7    however, that the trustee shall not be
8    responsible in any manner whatsoever for, or in
9    respect of the validity or sufficiency of this
10   Second Supplemental Indenture,..." and then it
11   continues.
12          That language that I just read, is
13   that language that the Bank of New York always
14   insists upon in executing a supplemental
15   Indenture?
16          A.    I can't speak for everyone at the
17   Bank of New York.  That, I can say that is
18   typical language in a Supplemental Indenture.
19          Q.    When you were the relationship
20   manager, did you always insist on that language
21   in a Supplemental Indenture?
22          A.    I can't remember every situation
23   that I was in, but again, this is generally
24   language that is very typical of a Supplemental
25   Indenture.

1                          LEWICKI

2        Q.     And do you know why such language

3    would be included?

4        A.     It's for the protections of the

5    trustee.

6        Q.     Would you sign a Supplemental

7    Indenture if you had doubts about its validity?

8               MR. BIALO:  I'm going to object to

9           the form.  You can answer.  If you can

10          figure it out, you can answer it.

11              THE WITNESS:  Okay.

12       A.     Again, when I am signing a

13   Supplemental Indenture, it is based on

14   requirements by the governing documents.  If

15   the documents I'm getting, such as the opinion

16   and the Officer's Certificate, the supplemental

17   are in the form required by the governing

18   document, and this has been reviewed by myself

19   and counsel, I would sign the document as long

20   as it met the terms and requirements.

21       Q.     I understand that.  The question I'm

22   asking, though, is if you had a question about

23   whether the Indenture or the Supplemental

24   Indenture is valid under the terms of the

25   Indenture, would you sign the Supplemental

1          LEWICKI

2   Indenture?

3       A.    I think I'm confused with your

4   question.  I'm sorry.

5       Q.    Well, okay, and let me -- let me try

6   to be clearer.  This language -- as I interpret

7   this language, it says that the trustee is not

8   responsible in respect of the validity of the

9   Second Supplemental Indenture.

10          So what I'm asking is that if you

11   had a question -- while I understand it says

12   you are not responsible for its validity, if,

13   when you are signing it, however, you had a

14   question about whether it would be valid, would

15   you still sign it?

16       A.    This -- I mean it would not be my

17   decision alone to sign it.  Anything that we

18   sign, again, is through discussions with our

19   external counsel and with my manager.  But

20   again, in this type of situation, if I'm

21   provided with the documentation and the backup

22   documentation, I have no reason to believe it's

23   not a valid transaction or a valid agreement.

24       Q.    Do you have any recollection of

25   being told by the issuer why NorthWestern was

Page 59

1                        LEWICKI

2       A.    I don't have memory of the time that

3  this Officer's Certificate came in.  I don't

4  remember the situation around the entire

5  transaction.

6       Q.    Does Bank of New York ever conduct

7  its own examination or investigation of the

8  facts that are expressed in the Officer's

9  Certificate?

10       A.    Again, we rely on the terms of the

11  Officer's Certificate pursuant to the

12  indenture, which allows us to rely on an

13  Officer's Certificate and/or an opinion of

14  counsel.

15       Q.    Do you recall why the Third

16  Supplemental Indenture was executed?

17       A.    I mean I recall, if I can go back to

18  the form of the Third Supplemental Indenture,

19  it was for the NorthWestern Corporation to

20  assume the duties and rights under the

21  indenture from NorthWestern Energy LLC, which

22  is one of their subsidiaries.

23       Q.    Do you recall whether -- under the

24  indenture if NorthWestern assumed the

25  obligations, whether Clark Fork would therefore

Page 60

1                          LEWICKI

2   be released from its obligations?

3            MR. BIALO:  Objection to the form.

4        A.    I would have to go back and look at

5   the actual governing document, the base

6   indenture, to see what the terms and what the

7   parties were to that indenture.

8            But to my knowledge, Clark Fork was

9   not -- was not a party to the QUIPS Indenture.

10       Q.    And when I say Clark Fork, it was

11  formerly known as NorthWestern Energy LLC.  It

12  changed its name to Clark Fork at some point.

13       A.    Okay.

14       Q.    I apologize if I confused you with

15  Clark Fork.

16           MR. BIALO:  Maybe you want to state

17       the question in a clearer way so that the

18       witness can give you a clearer answer.

19           MR. KAPLAN:  Could you remind me of

20       my question?

21           (Record read.)

22       Q.    Do you recall whether the Indenture

23  provides that upon NorthWestern assuming the

24  obligations for the QUIPS, that NorthWestern

25  Energy LLC would be released from its

Page 68

1                           LEWICKI

2              MS. KRAFT:   I join in the objection.

3         Q.    If NorthWestern had submitted an

4    Officer's Certificate that did not comply with

5    the requirements of section 1101(c), would you

6    have executed the Third Supplemental Indenture?

7         A.    Again, we reviewed the supplemental

8    with counsel.  Based on counsel's review and

9    legal review, we do not sign -- we would not

10   sign off until all conditions under the

11   agreement are met.

12        Q.    Asked another way, if you or your

13   counsel concluded that it did not comply with

14   the terms of the Indenture, would you still

15   sign the Supplemental Indenture?

16        A.    It would be, again, brought up with

17   management.  Based on the discussion with them

18   and counsel, we make the determination whether

19   or not we would sign the Supplemental

20   Indenture.

21        Q.    Do you recall any discussions at all

22   in connection with the Third Supplemental

23   Indenture regarding the Officer's Certificate?

24        A.    No.

25        Q.    When executing the Third

1          LEWICKI

2    Supplemental Indenture, you didn't seek the

3    consent of the holders of the QUIPS did you?

4          MS. KRAFT:  Objection.

5    A.    I need to go -- can I look at the

6    agreement?

7    Q.    Absolutely.

8    A.    I'm going to read you from Section

9    1201, remember the Third Supplemental Indenture

10   is the assumption of the corporation of all of

11   the responsibilities under the QUIPS Indenture

12   from the LLC.  Section 1201 says, "Supplemental

13   indentures without consent of holder.  Without

14   the consent of any holders, the company and the

15   trustee, at any time and from time to time, may

16   enter into one or more indentures supplemental

17   thereto in a form satisfactory to the trustee

18   for any of the following purposes..." and I'm

19   going to read the first purpose in paragraph A,

20   "To evidence the succession of another person

21   to the company and the assumption by such

22   successor of the covenants of the company

23   herein and in the securities as provided in

24   Article 11."

25   Q.    Did you seek the consent of the

Page 70

1                          LEWICKI

2      holders to execute the Third Supplemental

3      Indenture?

4           A.     Pursuant to this base Indenture,

5      consent was not required from the holders.

6           Q.     I'm not asking whether it was

7      required.  I'm asking whether you sought the

8      consent?

9           A.     It was not a requirement, no.

10          Q.     So no, you didn't seek the consent?

11     No, you did not seek the consent?

12          A.     No, I did not.

13          Q.     Okay.

14          A.     Again, it was -- to preface, it was

15     not a requirement under the governing document.

16          Q.     If the modification to the Indenture

17     had changed or modified the rights of the

18     holders of the securities, would you have

19     sought consent from the holders of the QUIPS?

20          A.     You would have to define what the

21     changes to the holders are.  We would have to

22     go back to the base Indenture to determine

23     whether or not a consent of holders is

24     required.

25          Q.     If you look at 1202 of the

1              LEWICKI

2       included as a premise in your question,

3       which I don't think is fair to the

4       witness.

5       Q.    Just for the record -- and other

6    parties can correct me if I'm wrong -- in

7    connection with this litigation, there is a

8    motion to dismiss in which the bankruptcy judge

9    found that there was a release of the

10    subsidiary.  Now, there may be ways to

11    challenge that release, but the bankruptcy

12    court did find there was a release, and that's

13    the predicate.

14            MS. KRAFT:  I'm going to object to

15        the characterization of what the court did

16        or did not do.

17    BY MR. KAPLAN:

18       Q.    Assuming the Third Supplemental

19    Indenture effectuated a release of the initial

20    obligor such that the only obligor was going to

21    be NorthWestern Corporation, if we use that as

22    the base assumption, if you knew at the time

23    that NorthWestern's publicly-issued financial

24    statements were false and misleading, that

25    NorthWestern had grossly overstated its

Page 77

1                        LEWICKI

2     revenues, would you nevertheless have executed

3     the Third Supplemental Indenture.

4              MS. KRAFT:  Objection.

5              MS. DELANEY:  Objection.

6        A.    Again, we talked about this on the

7     financials, that the role of the trustee -- we

8     do not review financials.  We just -- we just

9     confirm receipt of them.

10             I would not have any knowledge of --

11    of misstated financials, of a potential event

12    of default unless I had actually gotten

13    something from either the company or a

14    bondholder stating that fact to me.

15             Again, if I had something like that

16    in writing, addressed to me, it would have gone

17    up the chain-- up through the bank's process,

18    talking about it with my manager, with counsel,

19    and whatever action was determined, based on

20    those meetings and conversations, is the action

21    we would have chosen.

22       Q.    Again, I am speaking hypothetically

23    here.  Hypothetically, if you are asked to

24    execute a Supplemental Indenture such as --

25    similar to the Third Supplemental Indenture,

1          LEWICKI
2          MR. BIALO:  Fair enough.  Sorry.
3     BY MR. KAPLAN:
4          Q.    No problem.  What I was actually
5     asking -- this question was actually going to
6     the section on the assets and liabilities not
7     transferred.
8              And do you recall any discussion or
9     any analysis as to whether the non transfer of
10    these assets meant that NorthWestern Energy was
11    transferring less than substantially all of its
12    assets to NorthWestern?
13         A.    Again, I do not remember any
14    conversations to that issue.  And to go back to
15    what our process is for executing a
16    Supplemental Indenture, we are relying on an
17    Officer's Certificate and an opinion of counsel
18    that are stating that the terms and conditions
19    under the Indenture have all been met.
20             MR. KAPLAN:  We are going to mark
21         two documents.  We are going to mark them
22         as 10.  We are going to mark as -- it is a
23         Complaint.  It's not Bates numbered, but
24         it is a Complaint and Demand for Jury
25         Trial in the Montana Second Judicial