# EXHIBIT 10

10-K 1 a2107598z10-k.htm FORM 10-K

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark One)

☒  **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2002

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____ .

Commission File Number: 0-692

# NORTHWESTERN CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-0172280** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **125 S. Dakota Avenue, Sioux Falls, South Dakota** | **57104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **605-978-2908**

Securities registered pursuant to Section 12(b) of the Act:

| (Title of each class) | (Name of each exchange on which registered) |
|---|---|
| Common Stock, $1.75 par value, and related Common Stock Purchase Rights | |
| Company Obligated Mandatorily Redeemable | All listed on New York Stock Exchange |

Part I

## ITEM 1. BUSINESSES

### OVERVIEW

NorthWestern Corporation is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 598,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy, formerly NorthWestern Public Service. In February 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company for $478 million in cash and the assumption of $511 million in existing debt and mandatorily redeemable preferred securities of subsidiary trusts of The Montana Power Company, net of cash received. As a result of the acquisition, from February 15, 2002, the closing date of the acquisition, through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy LLC. Effective November 15, 2002, we transferred all of the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation and since that date, we have operated that business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories.

We operate our business in five reporting segments:

- electric utility operations;
- natural gas utility operations;
- communications;
- heating, ventilation and air conditioning, or HVAC, and plumbing related services; and
- all other, which primarily consists of our other miscellaneous service and non-energy related operations and activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts.

For additional information related to our industry segments, see Note 23 of "Notes to Consolidated Financial Statements," included in Item 8 herein.

We also have made significant investments in three non-energy businesses:

- Expanets, Inc., or Expanets, a provider of networked communications and data services and solutions to medium sized businesses nationwide;
- Blue Dot Services Inc., or Blue Dot, a nationwide provider of air conditioning, heating, plumbing and related services; and
- CornerStone Propane Partners, L.P., or CornerStone, a publicly traded limited partnership (OTC: CNPP.PK) that is a retail propane and wholesale energy related commodities distributor.

Our experience with our non-energy businesses has been very disappointing. They have adversely impacted our overall results of operations, financial condition and liquidity for the past three years. See Note 23 of "Notes to Consolidated Financial Statements," included in Item 8 herein. We have written off our investment in CornerStone and have written off substantially all of our investments in Expanets and Blue Dot. In particular, Expanets has suffered from the continued deterioration of business in the telecommunications markets and billings and collections problems caused by the problems encountered

5

during the conversion to its EXPERT enterprise system. During 2002, we recorded the following charges aggregating approximately $878.5 million:

- Impairment of Blue Dot goodwill and other long-lived assets — $ 301.7 million
- Impairment of Expanets goodwill and other long-lived assets — $ 288.7 million
- Discontinued operations of CornerStone Propane, net of tax benefits — $ 101.7 million
- Valuation allowance for deferred tax assets — $ 71.5 million
- Expanets billing adjustments and accounts receivable write-offs and reserves — $ 65.8 million
- Impairment of Montana First Megawatts project — $ 35.7 million
- Retirement of acquisition term loan, net of tax benefits — $ 13.4 million

We have incurred a significant amount of debt as a result of the investments we made in Expanets, Blue Dot, and CornerStone and our purchase of the electric and natural gas transmission and distribution business formerly owned by The Montana Power Company. At December 31, 2002, we had a common stockholders' deficit of $456.1 million and currently have $2.2 billion in debt and trust preferred instruments outstanding. The performance of Expanets, Blue Dot, and CornerStone has not met our expectations. It has become increasingly apparent that we will never recover our investments in these entities and that these entities will not generate cash flows in sufficient amounts to provide meaningful contributions to our debt service.

In February 2003, we closed and received funds from a $390.0 million senior secured term loan. The net proceeds of $366.0 million, after payment of financing fees and costs, were used to repay approximately $260 million of outstanding debt and accrued interest and retire approximately $20 million of outstanding letter-of-credit commitments under our existing $280 million bank credit facility. The remaining proceeds will be used to provide working capital and for general corporate purposes.

Also in February 2003, we outlined the elements of a turnaround plan that we are implementing. We will return our focus to our core utility business. We propose to sell or dispose of our non-core assets, including Expanets, Blue Dot, the Montana First Megawatts generation project, and several other smaller investments we have made and to enforce our sale of our Colstrip Transmission Line. We no longer hold a direct or indirect economic equity interest in CornerStone; accordingly, the results of CornerStone's operations are no longer reflected in our financial statements. We have told Expanets and Blue Dot that they must become financially independent from us. We are unwilling to provide additional financial support to Blue Dot or Expanets and the Montana Public Service Commission will not let us make advances of more than $10 million in the aggregate to our non-regulated businesses without their prior approval. To the extent possible under our senior secured term loan, we intend to use any proceeds from sales of non-core assets to reduce our debt.

Our senior secured term loan contains certain restrictions on the sale or disposition of assets, including non-core assets, and on the prepayment of the senior secured term loan and our other indebtedness. However, in the event of the sale of non-core or other assets having a fair market value of less than 10% of the value of the consolidated tangible assets of our utility business as of December 17, 2002, the reference date for the senior secured term loan, we must first offer the net proceeds of such sale to our lenders and, if such offer is rejected, we may use such proceeds to prepay other indebtedness. If we are unable to prepay debt as a result of these or other restrictions, we intend to retain the proceeds of any sale of non-core assets, or surplus cash, until the maturity date of such debt, at which time those funds would be applied to such debt.

For our utility only operations, which excludes Blue Dot, Expanets, and all other unregulated entities, and absent proceeds from the sale of non-core assets, we estimate the following for the years 2003 and 2004 ($ are approximate and in millions):

|  | 2003 | 2004 |
|---|---|---|
| Cash flows from operating activities(1) | $ 30 | $ 80 |
| Cash flows used in investing activities(2) | (60) | (60) |

not be permitted to own transmission assets pursuant to its charter, so the transmission operating agreement would not convey ownership of the assets to RTO West but would grant RTO West the right to operate the assets consistent with the obligation to provide services pursuant to applicable tariffs. NorthWestern Energy and other participating transmission owners would likely retain the right and obligation to maintain the facilities that RTO West has authority to operate pursuant to the transmission operating agreements. Participation in RTO West would create a new commercial arrangement for the transmission of the energy we distribute in Montana, but NorthWestern Energy does not anticipate any material change in the size or timing of the transmission related revenue stream as a result of participation in RTO West.

With respect to our South Dakota transmission operations, we filed in October 2000 our Order No. 2000 Compliance Filing with the FERC detailing options we are pursuing in order to participate in an RTO, including participation in the investigation of the formation of a regional transmission entity as well as the pursuit of various options associated with joining the Midwest Independent System Operator.

On July 31, 2002, the FERC issued its Notice of Proposed Rulemaking in Docket No. RM01-12-000, Remedying Undue Discrimination through Open Access Transmission Service and Standard Electricity Market Design, or the SMD NOPR. The proposed rules set forth in the SMD NOPR would require, among other things, that:

- all transmission owning utilities transfer control of their transmission facilities to an independent third party;

- transmission service to bundled retail customers be provided under the FERC-regulated transmission tariff rather than state-mandated terms and conditions; and

- new terms and conditions for transmission service be adopted nationwide, including new provisions for pricing transmission in the event of transmission congestion.

If adopted as proposed, the rules set forth in the SMD NOPR would materially alter the manner in which transmission and generation services are provided and paid for. On January 15, 2003, the FERC announced the issuance of a white paper on SMD NOPR to be released in April 2003. The FERC also has indicated that it expects to issue the final rules during the summer of 2003.

Furthermore, the SMD NOPR presents several uncertainties, including what percentage of our investments in RTO West would be recovered, how the elimination of transmission charges, as proposed in the SMD NOPR, would impact us, and what amount of capital expenditures would be necessary to create a new wholesale market. We cannot predict when the FERC will issue final rules on SMD NOPR, or in what form, or the effect that they may have on the current RTO West proceedings. Although we cannot predict with certainty the impact the future proceedings will have on the Company's earnings, revenues or prices, management believes that in the aggregate, our earnings and revenues would not be materially affected.

The Montana Power Company provided wholesale power to two electric cooperatives, but the two cooperatives have chosen to obtain their power supply from another source, and NorthWestern Energy provides only transmission services to the Montana cooperatives. In order to recover the transition costs associated with power that would have been supplied to these two cooperatives, The Montana Power Company made a filing with the FERC in April 2000, seeking recovery of approximately $23.8 million in transition costs associated with serving both of the wholesale electric cooperatives. On November 1, 2002, the FERC granted the electric cooperatives' motion for summary judgment and determined that The Montana Power Company had failed to meet its burden of showing that it was entitled to recover the transition costs at issue. NorthWestern Energy, as successor to The Montana Power Company, is currently appealing the decision by the administrative law judge through the appropriate FERC rules of practice and procedure.

The limited liability company that formerly held our Montana transmission and distribution assets has been renamed "Clark Fork and Blackfoot, L.L.C." This entity operates the Milltown Dam, a two megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license granted by the FERC. The current license for operation of the dam would have expired but for extensions received from the FERC. The Montana Power Company received an extension of its FERC license to operate the dam until 2007, and we are currently seeking to extend that license until 2008. Generally, under FERC rules, notice of intent to renew a license must be filed five years prior to its expiration. Accordingly,

Clark Fork and Blackfoot, L.L.C. gave the FERC its notice to seek renewal of the license in 2003. In the event the FERC license were terminated, the FERC may require that the dam be removed. If Clark Fork and Blackfoot, L.L.C. does not receive the license extension, it might be required to relinquish the license, cease operating the dam and remove the structures as early as 2007. Based on estimates received from our environmental consultants, management believes that the cost of such removal would be approximately $10 million.

### Montana

NorthWestern Energy's Montana operations are subject to the jurisdiction of the MPSC with respect to electric service territorial issues, rates, terms and conditions of service, accounting records and other aspects of its operations.

In August 2000, The Montana Power Company filed a combined request for increased natural gas and electric rates with the MPSC. The Montana Power Company requested increased annual electric revenues of approximately $38.5 million, with a proposed interim annual increase of approximately $24.9 million. On November 28, 2000, the MPSC granted the former owner an interim electric rate increase of $14.5 million. On May 8, 2001, The Montana Power Company received a final order from the MPSC resulting in an annual electric service revenue increase of $16.0 million.

Montana law required that the MPSC determine the value of net unmitigable transition costs associated with the transformation of the utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that The Montana Power Company was required to enter into with certain "qualifying facilities" as established under the Public Utility Regulatory Policies Act of 1978. The Montana Power Company estimated the pre-tax net present value of its transition costs to be approximately $304.7 million in a filing with the MPSC on October 29, 2001.

On January 31, 2002, the MPSC approved a stipulation among The Montana Power Company, us and a number of other parties, which, among other things, conclusively established the pre-tax net present value of the retail transition costs relating to out-of-market power purchase contracts recoverable in retail rates to be approximately $244.7 million, approximately $60 million less than The Montana Power Company's filing with the MPSC. In addition, the stipulation set a fixed annual recovery for the retail transition costs beginning at $14.9 million in the first year after implementation and increasing up to $25.6 million through 2029. Because the recovery stream as finalized by the stipulation is less than the total payments due under the out-of-market power purchase contracts, the difference must be mitigated or covered from other revenue sources. Qualifying Facilities Contracts, or QFs, require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.9 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.5 billion through 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value of the difference between our obligations under the QFs and the related amount recoverable. Although we believe that we have opportunities to mitigate the impact of these differences through improved management of our obligations under these contracts and by negotiating buyouts of certain of these contracts, we cannot assure you that our actions will be successful.

The stipulation also required The Montana Power Company and us to contribute $30 million to an account, which will fund credits to Montana electric distribution customers. The account is being applied on a per kilowatt hour basis which began on July 1, 2002 with a term of one year, and had a balance of $16.3 million at December 31, 2002. See "Risk Factors—We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition" and "Risk Factors—If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," we may be required to seek alternative sources of supply and may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition" included in Item 7 hereof.

*Relationship with Avaya and Problems with the EXPERT System*

Expanets was formed in 1997 and through December 31, 1999 had established operations in many major United States markets through the acquisition of 26 telecom and/or data services companies. In March 2000, Expanets purchased the Growing and Emerging Markets division, or GEM division, of Lucent Technologies' Enterprise Network Group, Lucent's primary distribution function for voice systems for U.S. small and mid-sized businesses. In September 2000, Lucent contributed its enterprise network business to Avaya, Inc., including the various agreements and instruments relating to Expanets. Through the GEM transaction, Expanets became, and continues to be, Avaya's largest dealer. Avaya became Expanets' primary vendor for products, maintenance and technical support services sold to Expanets' customers. The terms of the sale provided that under Transition Service Agreements, or TSAs, Avaya would provide Expanets with critical supporting systems such as accounting, billing, collection and maintenance services for substantial fees during a transitional period.

During 2000 and 2001, Expanets worked with consultants to develop the EXPERT system, an enterprise information technology and management system that was intended to enable Expanets to terminate certain TSAs with Avaya and manage the substantial transaction volume assumed with the purchase of the GEM assets. Expanets implemented the EXPERT system for transactions related to the GEM purchase (more than 70% of Expanets' business), in late November 2001. The EXPERT system was not sufficiently tested prior to cut-over and Expanets began to experience significant problems upon implementation, including order entry and customer fulfillment, billing and collection functions, an inability to provide timely and complete billing detail with beginning and ending balances for a majority of Expanets' customers until May 2002, and numerous reporting deficiencies which prevented management from receiving critical accounts receivable and cash application data. Expanets was forced to resort to manual journal entries in many instances. As work on the EXPERT system progressed, Expanets determined that problems relating to data migration from Avaya's system, underlying problems with the accuracy of the Avaya database, as well as data migration scripting performed by Expanets, were contributing to the functional deficiencies Expanets was experiencing with the EXPERT system. As Expanets expanded its efforts to correct deficiencies in the EXPERT system, it encountered and continues to encounter additional substantial functional deficiencies. The combination of these issues resulted in substantial weaknesses in Expanets' internal controls and procedures during 2002.

In March 2001, Expanets and Avaya completed a substantial restructuring of the GEM transaction to address concerns that had arisen in connection with certain customer referral and service obligations under the original transaction. Significant aspects of the restructuring included a more precise definition of the customer base to be serviced by each party, modifications to the Master Dealer Agreement, or MDA, under which Expanets purchases products from Avaya, and modification of a $35 million note held by Avaya to extend the payment deadline to March 31, 2005, and eliminate the payment of interest. As part of the restructuring, Avaya agreed to provide a secured $125 million short-term line of credit, due March 2002, to finance equipment purchases by Expanets.

Because Expanets was unable to obtain an independent credit facility by March 2002, Avaya agreed to extend the credit line to December 31, 2002 with scheduled debt paydowns and NorthWestern agreed to purchase up to $50 million in inventory and accounts receivable from Avaya in the event of a default by Expanets. In addition, Avaya entered into an agreement with Expanets to supply technical customer support and maintenance services with defined service levels for the "Expanets Technical Assistance Center," or the ETAC Agreement, and terminated an earlier TSA for similar services that was substantially more expensive.

During the fourth quarter of 2002, Expanets and Avaya engaged in discussions concerning various issues that had arisen between the parties regarding certain operating issues and disputes with respect to customer data migration, accuracy of customer data, and billing and collection management services stemming from the GEM transaction. While those discussions were pending, Avaya and Expanets

26

extended the repayment deadline of the credit agreement on several occasions, to a final due date of March 13, 2003. On March 13, 2003, Expanets and Avaya restructured their relationship and, in exchange for mutual releases, resolved all outstanding issues between the parties. The principal terms of the new arrangement are:

- The outstanding principal balance on the credit agreement of approximately $27 million has been further