# EXHIBIT 12

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
1299 Pennsylvania Avenue, NW, 10th Floor, Washington, DC 20004-2400
telephone 202-508-9500 / facsimile 202-508-9700 / internet www.paulhastings.com

FILED
OFFICE OF THE SECRETARY

02 OCT 30  PM 4: 41

FEDERAL ENERGY
REGULATORY COMMISSION

ORIGINAL

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Stamford
Tokyo
Washington, D.C.

(202) 508-9518
jenniferhong@paulhastings.com

October 30, 2002

31259.00039

VIA MESSENGER

The Honorable Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:    *NorthWestern Corporation*, Docket No. ES03-8-000

Dear Secretary Salas:

Enclosed for filing are an original and 14 copies of Exhibit B and Exhibit E to
NorthWestern Corporation's "Application For Authorization Of The Assumption Of
Liabilities And Authorization For Exemption From Competitive Bidding And Negotiated
Offer Requirements And Expedited Treatment" filed in the above-captioned docket on
October 25, 2002. NorthWestern submits these replacement exhibits after discovering
that incorrect exhibits were submitted with its Application. These exhibits should replace
Exhibits B and E that were originally submitted with NorthWestern Corporation's
Application.

We apologize for any inconvenience that this might have caused. Also enclosed is an
extra copy of the filing to be date-stamped and returned with our messenger. Please
contact me if you have any questions about this filing.

Respectfully submitted,

*Jennifer L. Hong*

Jennifer L. Hong
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosures

cc:    Jean M. Miller, Federal Energy Regulatory Commission
       Official Service List

**<u>Exhibit B</u>**

**Board of Directors Resolution**

**NORTHWESTERN CORPORATION**
**BOARD OF DIRECTORS MEETING**
**AUGUST 7, 2002**
**RESOLUTION**

WHEREAS, NorthWestern Corporation (the "Corporation") believes it is advisable for rating agency purposes to move the assets of its wholly-owned subsidiary, NorthWestern Energy, L.L.C. (referred to herein as "NWE", formerly known as The Montana Power, L.L.C. ("MPLLC") into which The Montana Power Company was merged on February 13, 2002, with MPLLC being the surviving entity), to the Corporation to more directly support the obligations of the Corporation;

WHEREAS, the Corporation desires that NWE transfer substantially all of NWE's assets to it, except for those assets (and liabilities) associated with the Milltown hydroelectric dam on the Clark Fork River (the "Milltown Dam") (collectively, excluding the Milltown Dam assets and liabilities, the "NWE Assets and Liabilities");

WHEREAS, the Board of Directors desires to effect the transfer of the NWE Assets and Liabilities to it by NWE (the "NWE Asset Transfer") such that upon the consummation of the NWE Asset Transfer all assets and liabilities associated with the Milltown Dam remain with NWE and from and after the consummation of the NWE Asset Transfer, to operate the business comprising the NWE Assets and Liabilities as a division of the Corporation to be known as the "NorthWestern Energy Division".

NOW, THEREFORE, BE IT RESOLVED that the Board of Directors hereby authorizes, empowers and directs the officers of the Corporation, or any of them, to execute and deliver an asset and stock transfer agreement to be entered into between the Corporation and NWE (the "Transfer Agreement") to effect the NWE Asset Transfer, as well as any agreements, instruments, or documents contemplated thereby or in connection therewith ("Ancillary Agreements"), as the proper officers of the Corporation may deem necessary or desirable, with such modifications or amendments thereto as such officers shall approve and the execution of such Transfer Agreement and Ancillary Agreements shall be deemed conclusive evidence of such approval;

FURTHER RESOLVED, that the Board of Directors hereby authorizes, empowers and directs the proper officers of the Corporation, or any of them, to execute and deliver a power purchase agreement with NWE for the purchase of power from the Milltown Dam at a price equal to the price authorized in NWE's Tier II proceeding (the "PPA") and a support agreement to be entered into between the Corporation and NWE pursuant to which the Corporation will ensure that NWE will have necessary funds to pay (i) the maintenance and operating costs of the

Milltown Dam not paid pursuant to the PPA and (ii) subject to a cap on the maximum amount payable by this Corporation, as determined by the officers executing the support agreement after consultation with the Corporation's environmental consultants and counsel, NWE's allocable share of environmental liabilities relating to the Milltown Dam and certain former manufactured gas plant sites as finally determined by appropriate regulatory proceeding not subject to further appeal, on mutually agreeable terms, with such modifications or amendments thereto as such officers shall approve and the execution of such PPA and support agreement shall be deemed conclusive evidence of such approval;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation to take all other actions to effect the NWE Asset Transfer, such as, among other things, obtaining any necessary or desirable consents, or providing necessary or desirable notices, certificates, ratings confirmation letters or taking other actions, including, without limitation, under, or in connection with, the Credit Agreement among the Corporation, Credit Suisse First Boston ("CSFB"), CIBC Inc. ABN AMRO Bank, N.V., and Barclays Capital, as co-arrangers, and CSFB, as administrative agent, lead arranger and sole book runner, dated as of January 14, 2002, and as such officer shall deem necessary or desirable;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation and in its name to prepare, execute and file with the Securities and Exchange Commission any and all documents, reports, statements, filings, requests and information supplements as may be necessary or desirable for the purpose of completing the transactions contemplated by, or in connection with, the NWE Asset Transfer;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed on behalf of the Corporation to take all action, and act in the name of, or represent, the Corporation where necessary or desirable to comply with any and all applicable federal, state and local laws, rules and regulations applicable to the Corporation or the NWE Asset Transfer, including, without limitation, in connection with the Federal Energy Regulatory Commission and state and other federal regulatory agencies;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them is, authorized, empowered and instructed, for and on behalf of the Corporation, to retain such consultants, advisors, attorneys, independent contractors, investor and public relations firms as they deem necessary or desirable and on such terms and conditions as they deem appropriate to effect the NWE Asset Transfer and further the purposes and intent of these resolutions;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and instructed, for and on behalf of the Corporation, to take all such further actions and to negotiate, execute and deliver any and all documents, filings, reports, statements, instruments and certificates, and to do or cause to be done any and all acts as such officers may deem necessary or appropriate in order to carry out the purposes and intentions of these resolutions, including, but not limited to, the transactions in anticipation of, contemplated by, or in connection with the NWE Asset Transfer;

FURTHER RESOLVED, that Eric R. Jacobsen and Michael J. Hanson, or either of them, shall have a proxy to adopt the necessary or appropriate resolutions of the Corporation as manager of NWE to approve as manager of NWE the NWE Asset Transfer and related actions; and

FURTHER RESOLVED, that any and all actions taken by any director, officer, employee or agent of the Corporation in furtherance of the foregoing resolutions and within the authority conferred by the foregoing resolutions are hereby ratified and approved in all respects.

**Exhibit E**

**Statement of Cash Flows and Computation of Interest**

Exhibit E

## NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION
## CASH FLOWS
## 12 MONTHS ENDED JUNE 30, 2002
### (Dollars in thousands)

| | NPS/NOR Historical | Pro Forma Adjustments | | Pro Forma |
|---|---|---|---|---|
| Net Cash Flow from Operating Activities: | | | | |
| Net Income | ($31,129) | $10,194 | | ($20,935) |
| Noncash Charges (Credits) to Income: | | | | |
| Depreciation and Depletion | 15,403 | 56,024 | | 71,427 |
| Amortization of Limited Term Investments | 1,537 | 0 | | 1,537 |
| Deferred Income Taxes (Net) | (61) | (28,260) | | (28,321) |
| Investment Tax Credit Adjustment (Net) | (490) | (443) | | (933) |
| Net (Increase) Decrease in Receivables | (850,309) | 698,610 | | (151,699) |
| Net (Increase) Decrease in Inventory | 761 | 377 | | 1,138 |
| Net Increase (Decrease) in Payables and Accrued Expenses | 670,350 | (959,062) | | (288,712) |
| (Less) Undistributed Earnings from Subsidiary Companies | 17,699 | (67,020) | | (49,321) |
| Other Current Assets | 12,876 | 8,991 | | 21,867 |
| Other Current Liabilities | 1,584 | 18,065 | | 19,649 |
| Other | (37,877) | 90,410 | | 52,533 |
| Net Cash Provided by (Used in) Operating Activities | (199,656) | (172,114) | | (371,770) |
| | | | | |
| Cash Flows from Investment Activities: | | | | |
| Construction and Acquisition of Plant (including land): | | | | |
| Gross Additions to Utility Plant (less nuclear fuel) | (7,054) | (28,368) | | (35,422) |
| Gross Additions to Common Utility Plant | 0 | (1,234) | | (1,234) |
| Gross Additions to Non-Utility Plant | (1,105) | 751 | | (354) |
| (Less) Allowance for Other Funds Used During Construction | 0 | 0 | | - |
| Cash Outflows for Plant | (8,159) | (28,851) | | (37,010) |
| Net (Increase) Decrease in Investments in Associated Companies | (594,224) | 381,187 | | (213,037) |
| Net (Increase) in Investments in Subsidiary Companies | (5,476) | 67,189 | | 61,713 |
| Advances from Associated Companies | 121,392 | 0 | | 121,392 |
| Net (Increase) in Investments and Special Funds | (779) | (8,973) | | (9,752) |
| Net Cash Provided by (Used in) Investing Activities | (487,246) | 410,552 | | (76,694) |
| | | | | |
| Cash Flows from Financing Activities: | 4,912 | | | |
| Increase in Long-Term Debt | 650,328 | 133,159 | | 783,487 |
| Dividends on Preferred Stock | 0 | 0 | | - |
| Increase in Common Stock | 2,508 | 0 | | 2,508 |
| Increase in Premium on Common Stock | 69,127 | | | 69,127 |
| Decrease in Additional Paid in Capital | | (554,243) | | (554,243) |
| Decrease in Reacquired Capital Stock | | 205,656 | | 205,656 |
| Dividends on Common Stock | (33,151) | 0 | | (33,151) |
| Net Cash Provided by (Used in) Financing Activities | 688,812 | (215,428) | | 473,384 |
| | | | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | 1,910 | 23,010 | | 24,920 |
| | | | | |
| Cash and Cash Equivalents at Beginning of Period | 7,165 | 10,726 | | 17,891 |
| | | | | |
| Cash and Cash Equivalents at End of Period | $9,075 | $33,736 | | $42,811 |

(1) Pro forma adjustments include June 30, 2002 amounts for the Montana
operations of NorthWestern Energy and consolidating eliminations.

**NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION**
**FEDERAL ENERGY REGULATORY COMMISSION**
**WORKSHEET FOR COMPUTATION OF INTEREST COVERAGE**
**(Dollars in thousands)**

**OMB CONTROL NO.1902-004 INTEREST COVERAGE:**

|  | Actual for 12 Months Ended 6/30/2002 | | OMB control No. 1902-0043 Pro Forma for 12 Months Ended 6/30/2002 | | Pro Forma for 12 Months Ended 6/30/2002 |
|---|---|---|---|---|---|
| Net income | $27,404 | (2) | $24,590 | (3) | $51,994 |
| Add:  Interest on long-term debt | 60,393 | | 28,304 | | 88,697 |
| Other interest | (38,201) | | 14,870 | | (23,331) |
| Total Interest | 22,192 | | 43,174 | | 65,366 |
| Federal and state income taxes | (4,123) | | (13,660) | | (17,783) |
| Income Before Interest and Income Taxes | $   45,473 | | $   54,104 | | $   99,577 |

Computation of Interest Coverage:

| | | | |
|---|---|---|---|
| Income Before Interest and Income Taxes | 45,473 | 54,104 | 99,577 |
| Divided by Total Interest | 22,192 | 43,174 | 65,366 |
| Interest Coverage | 2.05 | 1.25 | 1.52 |

(1) Pro forma adjustments include amounts for 12 months ended June 30, 2002 for the Montana operations of NorthWestern Energy.

(2) Net income excludes discontinued operations of ($45,086) and a one time extraordinary item of ($13,447).  This presentation differs from the FERC statements which present net income after discontinued operations and extraordinary items.

(3) Excludes a one-time charge of ($23,751) pre tax and ($14,396) after tax related to seller of the Montana operations sale of the oil and gas properties prior to the acquisition of the Montana operations by NorthWestern which was the responsibility of the seller.

NOTE:  The pro forma interest coverage ratio at June 30, 2002, is below 2.0 as this calculation does not yet reflect NorthWestern's planned equity offerings of approximately $200 million and receipt of $97 million in proceeds from the sale of Colstrip transmission properties. These items are part of NorthWestern's plan to reduce its current debt levels, increase common equity and reduce interest expense resulting from the acquisition of the Montana operations.  Approximately $88 million of the equity offerings are now completed and the company continues to work on finalizing the remaining items in the plan it has set forth.

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
1299 Pennsylvania Avenue, NW, 10th Floor, Washington, DC 20004-2400
telephone 202-508-9500 / facsimile 202-508-9700 / internet www.paulhastings.c

ORIGINAL



Atlanta
Beijing
Hong Kong
London
Los Angeles
New York        (202) 508-9518
Orange County   jenniferhong@paulhastings.com
San Francisco
Stamford
Tokyo
Washington, D.C.  October 25, 2002                                             31259.00039

**VIA MESSENGER**

The Honorable Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:    *NorthWestern Corporation*, Docket No. ES03- 8 - 000

Dear Secretary Salas:

Enclosed for filing are an original and 14 copies of NorthWestern Corporation's "Application For
Authorization Of The Assumption Of Liabilities And Authorization For Exemption From
Competitive Bidding And Negotiated Offer Requirements And Expedited Treatment". As
explained in the filing, NorthWestern Corporation requests that the Commission act on this filing
on an expedited basis and approve it so it is effective by November 15, 2002 in order to complete
an internal corporate restructuring.

A draft notice for this filing in hard copy and on diskette is enclosed. Also enclosed is an extra
copy of the filing to be date-stamped and returned with our messenger. Please contact me if you
have any questions about this filing.

Respectfully submitted,

*Jennifer L. Hong*

Jennifer L. Hong
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosures

cc:    Jean M. Miller, Federal Energy Regulatory Commission

Disk / 6MTR

ORIGINAL

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

NorthWestern Corporation                    )          Docket No. ES03-8-680

## APPLICATION FOR AUTHORIZATION
## OF THE ASSUMPTION OF LIABILITIES
## AND AUTHORIZATION FOR EXEMPTION FROM
## COMPETITIVE BIDDING AND NEGOTIATED OFFER REQUIREMENTS
## AND EXPEDITED TREATMENT

NorthWestern Corporation ("NorthWestern"), pursuant to Section 204 of the

Federal Power Act ("FPA") and Part 34 of the Federal Energy Regulatory Commission's

("Commission") regulations under the FPA,[1] requests an order from the Commission

authorizing NorthWestern to assume those outstanding liabilities of NorthWestern

Energy, L.L.C. ("NWE"), formerly known as The Montana Power Company ("Montana

Power") detailed herein; and granting an exemption from the Commission's competitive

bidding requirements of Section 34.2,[2] all as more fully described below.  NorthWestern

also requests this authorization on an expedited basis, by November 15, 2002, in order to

facilitate an internal corporate restructuring which is the final phase of the acquisition of

the utility business of NWE previously approved by the Commission.[3]

---

[1]     18 C.F.R. Part 34.

[2]     18 C.F.R. § 34.2.

[3]     The Montana Power Co., et al., 94 FERC ¶ 62,161 (2001).

## II.    SUMMARY AND REQUEST FOR EXEMPTION

NorthWestern requests authority to assume those outstanding liabilities of NWE described below.  The Commission previously approved NorthWestern's purchase of the utility business of Montana Power.[5]  As part of corporate reorganization prior to the closing, the utility business of Montana Power was placed in a separate entity, Montana Power, LLC, and after closing was renamed NorthWestern Energy, LLC.  NWE, at closing of the acquisition, had approximately $430,000,000 of debt, which remains the debt of NWE.  Currently, NorthWestern is undertaking an internal corporate restructuring to complete the final step in its acquisition of the utility business of Montana Power.[6]  The NWE debt that is being assumed by NorthWestern was previously approved by the Montana Public Service Commission ("MPSC").[7]

---

[5]      See The Montana Power Co., et al., 94 FERC ¶ 62,161 (2001).

[6]      This internal corporate restructuring was contemplated and discussed in the Joint Application of NorthWestern and Montana Power in Docket No. EC01-47.

[7]      In the Matter of the Application of the Montana Power Company for Authority to Incur up to $210,000,000 Principal Amount of First Mortgage Bonds, Default Order No. 5585, 1991 Mont. PUC LEXIS 136 (Nov. 4, 1991); In the Matter of the Application of the Montana Power Company for Authority to Incur Not to Exceed $150,000,000 Principal Amount of Long-Term Debt in the Form of Medium Term Notes, Default Order No. 5669, 1992 Mont. PUC LEXIS 146 (Nov. 30, 1992); In the Matter of the Application of the Montana Power Company for Authority to Borrow the Proceeds from the Sale of Not to Exceed $90,205,000 Principal Amount of Pollution Control Revenue Refunding Bonds to be Sold by the City of Forsyth, Montana and, to Provide for the Payment Thereof, to Issue a like Principal Amount of the Applicant's First Mortgage Bonds, Default Order No. 5707, 1993 Mont. PUC LEXIS 54 (May 11, 1993); In the Matter of the Application of the Montana Power Company for Authority, Among Other Things, to Borrow the Proceeds From the Sale of Not to Exceed $ 80,000,000 Principal Amount of Pollution Control Revenue Refunding Bonds to be Sold by the City of Forsyth, Montana and, to Provide for the Payment Thereof, to Issue Not to Exceed $ 90,000,000 Principal Amount of the Applicant's First Mortgage Bonds, Default Order No. 5760, 1993 Mont. PUC LEXIS 84 (Nov. 8, 1993); In the Matter of the Application of The Montana Power Company for Authority to Incur Not to Exceed $ 150,000,000 Principal Amount of Secured Long-Term Debt in the Form of First Mortgage Bonds, Default Order No. 6380,

(continued...)

NorthWestern requests that a single order be issued to authorize the relief requested by this Application, that the authorization be effective as of the date of the Commission's letter order. NorthWestern seeks exemption from the competitive bidding and negotiated offer requirements of the Commission's rules. In support of NorthWestern's request for exemption, NorthWestern affirmatively states that it has no affiliation or relationship with any financial institutions with regard to the liabilities and securities that are described in this Application. NorthWestern further states that it will take appropriate steps to ensure that the assumption of such securities will be accomplished so as to provide NorthWestern with the lowest cost of money and greatest net proceeds that can be provided for such securities in order to safeguard the interests of its shareholders and customers, but that assumption of the securities that are contemplated are not adaptable to the competitive bidding and negotiated offer requirements of the regulations. Also, the NWE debt that is being assumed by NorthWestern was previously approved by the MPSC.[8] NorthWestern will take steps to ensure that it assumes obligations consistent with the public interest, and therefore, NorthWestern requests that it be granted an exemption from these regulation requirements.

## III.    INFORMATION REQUIRED UNDER SECTION 34.3 OF THE REGULATIONS

In support of this Application, NorthWestern submits the following information pursuant to Section 34.3 of the Regulations:

---

(...continued)

2001 Mont. PUC LEXIS 16 (Oct. 23, 2001); In the Matter of the Application of the Montana Power Company for Authority to Incur Not to Exceed $ 150,000,000 Principal Amount of Unsecured Long-Term Debt in the Form of Medium-Term Notes, Default Order No. 5957, 1996 Mont. PUC LEXIS 105 (Dec. 2, 1996).

[8]    Id.

(a)   <u>Name and Address of Applicant</u>. The Applicant is NORTHWESTERN CORPORATION and the address of its principal business office is 125 S. Dakota Avenue, Sioux Falls, South Dakota 57104.

(b)   <u>State of Incorporation; States Where Applicant Operates</u>. NorthWestern is a corporation duly incorporated under the laws of the State of Delaware on November 27, 1923, and operates its utility business in the States of South Dakota, Montana and Nebraska.

(c)   <u>Names, Addresses, and Telephone Numbers for Service Purposes</u>. The names, addresses, and telephone numbers of persons authorized to receive notices and communications with respect to this Application are set forth in Section I of this Application.

(d)   <u>Date by Which Action is Requested</u>. The authorization is sought by November 15, 2002. Authorization by that time will allow the internal corporate restructuring to be completed.

(e)   <u>Description of obligations assumed</u>.

NorthWestern proposes to assume the outstanding liabilities of NWE as detailed below:

**FIRST MORTGAGE BONDS**

NWE has outstanding, as of the date hereof, $355,402,000 of First Mortgage Bonds which were issued under the Mortgage and Deed of Trust dated October 1, 1945 (the "Mortgage"). The Mortgage imposes a first mortgage lien on all physical properties owned by NWE, exclusive of subsidiary company assets and certain property and assets specifically excluded by the Mortgage. The obligation collateralized under the Mortgage are the First Mortgage Bonds, including those First Mortgage Bonds designated as Secured Medium-Term Notes and Pollution Control Revenue Bonds.

Since 1945, NWE has issued altogether twenty two (22) series of First Mortgage
Bonds, fifteen of which have already been retired. As of the date hereof the following
seven (7) series of First Mortgage Bonds are outstanding:

| Series # and Interest Rate | Date of Issuance | Maturity Date | Moody's[9] Rating as of 10/8/02 | Outstanding Principal Amount |
|---|---|---|---|---|
| 8.25% Series | 12/5/1991 | 2/1/2007 | Baa1 | $365,000 |
| 8.95% Series | 12/5/1991 | 2/1/2022 | Baa1 | $1,446,000 |
| 7.25% Series (designated as Secured Medium-Term Notes) | 2/26/1993 | 3/3/2008 | Baa1 | $13,000,000 |
| 7.23% Series (designated as Secured Medium-Term Notes) | 1/26/1993 | 1/27/2003[10] | Baa1 | $7,000,000 |
| 7.23% Series (designated as Secured Medium-Term Notes) | 1/28/1993 | 1/28/2003[11] | Baa1 | $8,000,000 |
| 7% Series | 3/1/1993 | 3/1/2005 | Baa1 | $5,386,000 |
| 6.125% Series (designated as Pollution Control | 6/30/1993 | 5/1/2023 | Not rated[12] | $90,205,000 |

---

[9]    Moody's Investors Services, Inc.

[10]    This Series matures within one year of the expected date of assumption of such liability by NorthWestern and would normally not be subject to the Commission's review pursuant to 18 C.F.R. § 34.1(c)(2); however, NorthWestern provides this information for the sake of completeness.

[11]    This Series matures within one year of the expected date of assumption of such liability by NorthWestern and would normally not be subject to the Commission's review pursuant to 18 C.F.R. § 34.1(c)(2); however, NorthWestern provides this information for the sake of completeness.

| | | | | |
|---|---|---|---|---|
| Revenue Bonds) | | | | |
| 5.90% Series (designated as Pollution Control Revenue Bonds) | 12/30/1993 | 12/1/2023 | Not rated[13] | $80,000,000 |
| 7.30% Series Twenty-second | 11/27/2001 | 12/1/2006 | Baa1 | $150,000,000 |

None of the outstanding series of First Mortgage Bonds described above is listed on a stock exchange.

### JUNIOR SUBORDINATED DEBENTURES

NWE has outstanding, as of the date hereof, $67,010,325 of 8.45% Junior Subordinated Debentures ("Debentures"). All of the Debentures are held by Montana Power Capital I, a Delaware statutory business trust subsidiary of NWE (the "Trust"). The Trust was originally established by NWE as a special purpose entity to issue common undivided beneficial interests in the assets of the trust ("Common Securities") to NWE and the $65,000,000 aggregate liquidation amount 8.45% Cumulative Quarterly Preferred Securities (Series A) ("QUIPS") to the public.

The Debentures are unsecured, subordinated obligations of NWE which rank junior to all of NWE senior indebtedness, which senior indebtedness include all obligations (other than non-recourse obligations and the indebtedness represented by the Debentures) of, or guaranteed or assumed by, NWE for borrowed money or for the

---

(...continued)

[12]     The 6.125% Series and the 5.90% Series are not rated by any rating institution since the underlying bonds were issued to the First National Bank of Chicago, as trustee under Indentures of Trust between such trustee and the City of Forsyth, Rosebud County, Montana relating to certain Pollution Control Revenue Refunding Bonds Series 1993A and 1993B, both, under the condition that such bonds will not be transferable (except to a successor trustee).

[13]     See n.12.

payment of money relating to any lease which is capitalized on the consolidated balance sheet of NWE and its subsidiaries in accordance with generally accepted accounting principles as in effect from time to time.

The Debentures bear interest at an annual rate of 8.45% , such interest being payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year.  The Trust's obligation to make distributions on the QUIPS substantially corresponds, in time and amount, to the interest and principal payments payable by NWE on its Debentures.

The Debentures were issued on November 6, 1996 and will mature on December 31, 2036.

The Debentures are not rated by any rating institution as they were issued only to the Trust and were intended to support the Trust's obligations under the QUIPS.  The Debentures are not listed on any stock exchange.

In addition to its obligations under the Debentures, NWE is obligated to provide the Trust with certain back-up undertakings.  Such undertakings include the guarantee (on a subordinated basis) by NWE of payments of distributions and other amounts due on the QUIPS, to the extent the Trust has no funds to pay such distributions or amounts.  They also include an obligation by NWE to pay all of the expenses of the Trust.  Considered together, the Debentures and the back-up undertakings described above, constitute in effect a full and unconditional guarantee by NWE of the Trust's obligation under the QUIPS.

The guarantee of the QUIPS by NWE (the "Guarantee") is pursuant to the Guarantee Agreement, dated as of November 1, 1996, as amended, between Montana Power and The Bank of New York, as trustee (the "Trustee"), as supplemented by the Side Letter, dated as of February 13, 2002, from NWE to the Trustee, and as amended by the Amendment to Guarantee Agreement, dated as of August 13, 2002, among NWE,

NorthWestern and the Trustee (as amended and supplemented, the "Guarantee Agreement"), for the benefit of the holders from time to time of the QUIPS. There are currently approximately 90 holders of the QUIPS. The QUIPS, together with the Guarantee, are listed on the New York Stock Exchange under the ticker symbol "MTPPrA." NorthWestern will also assume the Guarantee.

Pursuant to the Guarantee, NWE irrevocably and unconditionally agreed, to the extent set forth in the Guarantee Agreement, to pay the Guarantee Payments (as defined below) in full to the holders of the QUIPS (except to the extent paid by or on behalf of the Trust), as and when due, regardless of any defense, right of set-off or counterclaim that the Trust may have or assert. The following payments with respect to the QUIPS, to the extent not paid by or on behalf of the Trust, are subject to the Guarantee (without duplication) (the "Guarantee Payments"): (i) any accrued and unpaid distributions required to be paid on the Preferred Securities, but only if and to the extent that the Trustee has available funds sufficient to make such payment, (ii) the redemption price with respect to any QUIPS called for redemption by the Trust, but only if and to the extent that the Trustee has available funds sufficient to make such payment, and (iii) upon a voluntary or involuntary dissolution, winding-up or termination of the Trust (unless the Debentures are distributed to the holders), the lesser of (a) the aggregate of the liquidation preference and all accrued and unpaid distributions on the QUIPS to the date of payment and (b) the amount of assets of the Trust remaining available for distribution to holders of the QUIPS. NWE's obligation to make a Guarantee Payment may be satisfied by direct payment of the required amounts by NWE to the holders of the QUIPS or by causing the Trust to pay such amounts to such holders. The Guarantee constitutes a guarantee of payment and not of collection (i.e., the guaranteed party may institute a legal proceeding directly against NWE to enforce its rights under the Guarantee without first instituting a legal proceeding against any other person or entity).

## UNSECURED MEDIUM-TERM NOTES

NWE has outstanding, as of the date hereof $40,000,000 of Unsecured Medium-Term Notes (the "MTNs"), representing unsecured obligations of NWE.

Since 1989, NWE has issued four (4) series of MTNs out of which one series was already retired by NWE in 2001. As of the date hereof the following series of MTNs are outstanding:

| Interest Rate | Date of Issuance | Maturity Date | Moody's Rating as of 10/8/02 | Outstanding Principal Amount |
|---|---|---|---|---|
| 7.875% Series | 12/23/1996 | 12/23/2026 | Baa2 | $20,000,000 |
| 7.96% Series | 12/20/1996 | 12/21/2026 | Baa2 | $5,000,000 |
| 7.07% Series | 12/20/1996 | 12/20/2006 | Baa2 | $15,000,000 |

None of the outstanding series of Unsecured Medium Term Notes described above are listed on a stock exchange.

## TRANSITION BONDS[14]

Montana Code Annotated (MCA), Sections 69-3-1401, et seq., and Sections 69-8-103 and 69-8-503 permit, Montana natural gas utilities, including NWE to finance the recovery or their respective "Transition Costs" through the issuance of transition bonds. In Financing Order No. 6035a of the Montana Public Service Commission ("MPSC"), dated April, 27, 1998, with a service date of May 1, 1998, the MPSC has approved the

---

[14]    The Transition Bonds were issued by NGFT and are without recourse to NWE's general credit, because NGFT is a wholly-owned subsidiary of NWE. Therefore, such bonds are not considered as a liability of NWE which is to be assumed by NorthWestern pursuant to this Application. Thus, NorthWestern does not believe that such Transition Bonds would be subject to the Commission's jurisdiction; however, NorthWestern discusses them in this Application for informational purposes, the fact that such bonds are included on NWE's combined balance sheet, and out of an abundance of caution.

issuance of up to $65,000,000 of transition bonds ("Transition Bonds"), intended to recover Transition Costs related to NWE's natural gas operation.

On December 22, 1998, NWE issued, through the Montana Power Natural Gas Funding Trust, a wholly-owned Delaware statutory business trust of NWE ("NGFT") originally established by NWE for purpose of issuing the Transition Bonds, $62,700,000 of 6.20% Transition Bonds. Prior to such issuance, NWE had sold to NGFT its right to recover the Transition Costs (such right a "Transition Property") and, in order to insure the collection of the Transition Costs by NGFT, undertook to act as a servicer in the collection of such costs.

The Transition Bonds bear interest at an annual rate of 6.20%, such interest being payable semi-annually in arrears on March 15 and September 15 of each year. The Transition Bonds mature on March 15, 2013.

As of October 8, 2002, the Transition Bonds were rated Aaa by Moody's. The Transition Bonds are not listed on any stock exchange.

(f)    Purpose of Issue.  The purposes for which the securities covered by this Application are to be assumed are as follows:

NorthWestern, as permitted by law and pursuant to the corporate purposes stated in its Certificate of Incorporation, and with the approval and authorization of its Board of Directors, seeks to assume the outstanding liabilities of NWE, as described above, in connection with its acquisition of the utility business of NWE/Montana Power. This assumption is the final step in NorthWestern's acquisition of the utility business of NWE/Montana Power. The liabilities being assumed were incurred by NWE/Montana Power in connection with the operation of its utility business and approved by the MPSC.

NorthWestern's assumption for which authorization is sought herein is for a lawful object, within NorthWestern's corporate purposes and compatible with the public interest, and its assumption of these obligations as requested herein is consistent with the

proper performance by NorthWestern of service as a public utility and will not impair NorthWestern's ability to perform that service, and is reasonably necessary or appropriate for such purposes.

(g)    Other Regulatory Approvals.  No application (other than this Application), registration statement or similar document with respect to the assumption of liabilities covered by this Application is required to be filed by NorthWestern with any Federal or state regulatory body other than filing of one or more Registration Statements with the Securities and Exchange Commission.  If, by nature of a future transaction, any additional regulatory approvals are necessary, NorthWestern will take steps to receive such approvals.

(h)    Propriety of Issue.  NorthWestern believes that the facts set forth herein show (i) that the assumption of liabilities covered by this Application will be for a lawful object within NorthWestern's corporate purposes, (ii) that said object is necessary or appropriate for, or consistent with, the proper performance by NorthWestern of service as a public utility and will not impair its ability to perform that service and will not impair its ability to perform that service, and (iii) that such issuance is reasonably necessary or appropriate for such purposes.

(i)    Limitations on Interest and Dividend Coverage.  None.

(j)    Rate Changes.

During the twelve-month period ended June 30, 2002, as presented in the financial statements incorporated as Exhibit E in this Application, NorthWestern has not increased retail electric or natural gas rates through general corporate cost of service rate procedures in the State of South Dakota, and it increased retail natural gas rates through a rate of return realignment proceeding in the State of Nebraska, effective August 1, 2001, in the total sum of $401,378 on an annual basis.  NorthWestern's retail electric and natural gas tariffs provide for rate adjustments to reflect changes in fuel and purchased power costs

affecting electric rates and Commission approved changes in wholesale purchased gas costs affecting natural gas rates, with such adjustments made on a quarterly basis for electric tariffs and monthly for natural gas tariffs.

NorthWestern notes that NWE has its own rates on file with the MPSC. Certain retail rate increases were granted to Montana Power prior to the closing by NorthWestern of its acquisition of the utility business of Montana Power. NWE succeeded to those retail rate increases.[15]

(k)     Form of Notice of Publication in the Federal Register. A form of notice suitable for publication in the Federal Register is included at Attachment 2, both in written format and on the diskette enclosed with this filing.

(l)     Exhibits. As required by Section 34.4 of the Commission Regulations, the following exhibits are made a part of this Application. Each of such Exhibits is filed herewith unless otherwise indicated. Exhibits incorporated by reference are so identified with appropriate references. Each of the Exhibits filed herewith is hereby certified to be a true and correct copy.

EXHIBIT A. Statement of corporate purposes from NorthWestern's Restated Certificate of Incorporation.

EXHIBIT B. Copy of resolution of the Board of Directors of NorthWestern authorizing this Application.

EXHIBIT C. Balance Sheet of NorthWestern, for the twelve months ended _June 30, 2002, with supporting schedules, in conformity with the form prescribed for

---

[15]     In the Matter of the Application of Montana Power Company for Approval of its Electric Utility Restructuring Transition Plan Filed Pursuant to Senate Bill 390; In the Matter of the Joint Application for Approval of the Sale of Montana Power Company To NorthWestern Corporation, Order Nos. 5986w and 6353c, 2002 Mont. PUC LEXIS 1 (Jan. 29, 2001).

Comparative Balance Sheet of the FERC Annual Report on Form No. 1, dated December 31, 2001.

EXHIBIT D. Income Statement of NorthWestern, for the twelve months ended June 30, 2002, with supporting notes in conformity with the form prescribed for the Statement of Income for the Year of the FERC Annual Report on Form No. 1.

EXHIBIT E. Statement of Cash Flows and Computation of Interest Coverage, for the twelve months ended June 30, 2002, in conformity with the form prescribed for Statement of Cash Flows of the FERC Annual Report on Form No. 1.

EXHIBIT F. NorthWestern has not included an Exhibit F at this time; however, any Registration Statement(s) to be filed with the Securities and Exchange Commission related to possible issuance of securities will be filed by amendment to this Application.

## IV.    **VERIFICATION**

Verification by NorthWestern's Vice President for Legal Administration & Corporate Secretary of the matters contained in this Application, as required by Section 34.8 of the Commission's Regulations[16] is appended to this Application as Attachment 1.

---

[16]    18 C.F.R. § 34.8.

## V.    <u>CONCLUSION</u>

Based on the foregoing and the appended Attachments and Exhibits,

NorthWestern hereby requests that the Commission approve, under Section 204 of the

FPA and Part 34 of its Regulations, the authorization requested by NorthWestern in this

Application on an expedited basis by November 15, 2002.

Respectfully submitted,

*Jennifer L. Hong*

Charles A. Patrizia
Jennifer L. Hong
Paul, Hastings, Janofsky & Walker LLP
1299 Pennsylvania Avenue, N.W.
Tenth Floor
Washington, D.C. 20004-2400
Office: (202) 508-9500
Fax:    (202) 508-9700

October 25, 2002                    Attorneys for NorthWestern Corporation

**<u>Attachment 1</u>**

**Verification**

# VERIFICATION

State of South Dakota        )
                             ) ss
County of Minnehaha          )

     Alan D. Dietrich, being first duly sworn on oath, deposes and says that he is Vice President – Legal Administration and Corporate Secretary of Northwestern Corporation, that he has read the foregoing Application and knows the contents thereof, and that the same are true and correct to the best of his knowledge, information and belief.

                               Alan D. Dietrich
                               Vice President – Legal Administration
                               & Corporate Secretary

Subscribed and sworn to before me this **25th** day of October, 2002.

                               Notary Public, South Dakota
                               My Commission Expires: _ncs_ 9-13-06

**Attachment 2**

**Notice of Filing**

## UNITED STATES OF AMERICA
### BEFORE THE
### FEDERAL ENERGY REGULATORY COMMISSION

NorthWestern Corporation           )          Docket No. ES02-_____

### NOTICE OF APPLICATION

(_____, 2002)

Take notice that on October 25, 2002, NorthWestern Corporation ("NorthWestern") submitted an application under Section 204 of the Federal Power Act for authorization to assume certain liabilities of NorthWestern Energy, L.L.C., formerly known as Montana Power Company. NorthWestern also requested exemption from the competitive bidding and negotiated offer requirements. NorthWestern has also requested expedited treatment of its Application.

Any person desiring to be hear or to protest said filing should file a motion to intervene or protest with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 CFR 385.211 and 18 CFR 385.214). All such motions or protests should be filed on or before _____, 2002. Protests will be considered by the Commission to determine the appropriate action to be taken, but will not serve to make protestants parties to the proceedings. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection. This filing may also be viewed on the Internet at http://www.ferc.fed.us/online/rims.htm (call 202-208-2222 for assistance).

Magalie R. Salas
Secretary

## Exhibit A

**Statement of Corporate Purpose**

EXHIBIT A

# NORTHWESTERN CORPORATION
## STATEMENT OF CORPORATE PURPOSES
## FROM
## RESTATED CERTIFICATE OF INCORPORATION
## ARTICLE THIRD

The nature of the business of, and the objects and purposes proposed to be transacted, promoted and carried on by the corporation, are to do any or all of the things herein mentioned and set forth, as fully and to the same extent, to all intents and purposes, as natural persons might or could do, and in any part of the world, namely;

To generate, produce, buy or in any manner acquire, and to sell, transmit, distribute or otherwise dispose of, and to use in any manner, electricity for light, heat, power, radio broadcasting, and any and all other purposes; and to manufacture, buy or otherwise acquire, own, hold, sell, lease and deal in, or otherwise dispose of fixtures, chandeliers, electroliers, brackets, lamps, globes, motors, generators, meters, dynamoes, batteries and all other appliances, appurtenances and devices, capable of being used or employed in connection with generation, production, purchase, acquisition, sale, transmission, distribution, disposition or use in any manner, including radio broadcasting, of electricity.

To bore for, or in any manner develop, or in any manner acquire, natural gas, to produce, or in any manner acquire artificial gas, or chemicals of any kind, and to use, own, hold, store, sell, transport, transmit, distribute or otherwise dispose of either natural or artificial gas, or both, and the by-products and residual products of them or either of them, or chemicals of any kind.

To bore for, develop, produce or in any manner acquire, to own, hold, sell, distribute, transport or otherwise dispose of, to use in any manner oils and its by-products and residual products.

To sell, furnish, or in any manner to use, distribute or supply light, heat and power by gas, oil, electricity, steam, water or other means.

To construct, acquire, build, equip, own, hold, maintain and operate, and to sell, exchange, lease, or in any manner dispose of, street railways, interurban railways, and bus lines for the transportation of passengers, merchandise, mail, express and other freight, and to acquire, own, hold, maintain, operate, equip, sell, exchange, lease or in any manner dispose of parks and other public places of amusement and attraction calculated to promote the use of any such street or interurban railway.

To construct and in any manner to acquire, to equip, own, hold, maintain, operate, manage and to sell, exchange, lease or in any manner dispose of a telephone and/or telegraph line or lines and all incidental or appurtenant apparatus and generally to engage in the business of owning, operating, maintaining and supplying telephone and or telegraph service in all its branches.

To carry on the business of mining, milling, concentrating, converting, smelting, treating, preparing for market, manufacturing, buying, selling, exchanging and otherwise producing and dealing in gold, silver, copper, lead, zinc, brass, iron, steel and all kinds of ores, metals and minerals and the products and by-products thereof of every kind and description and by whatsoever process the same can be or may hereafter be produced and generally and without limit as to amount, to buy, sell, exchange, lease, acquire, and deal in lands, mines, and mineral rights and claims, and to conduct all business appertaining thereto.

To search for, prospect and explore for ores and minerals and to locate mining claims, grounds or lodes in the United States of America or the territories thereof or in foreign countries, and record the same pursuant to the mining laws of the said United States or other countries; to bore, drill, prospect and mine for gold, silver, copper, lead, zinc, iron, atimony, tin, asbestos and all kinds of ores, metals, minerals and precious stones, oils, gas and coal and to mill, convert, prepare for market and otherwise produce and deal in the same and in the products and by-products thereof; to carry on the business of searching for, prospecting, preparing, procuring, refining, piping, storing, transporting, supplying, buying, selling, manufacturing and distributing petroleum and other oils and their products or by-products; to acquire by grant, purchase or otherwise any property or privileges from any government or from any authority, individual, municipal or otherwise, and to perform and fulfill the conditions thereof.

To manufacture, or in any manner to produce, own, hold, buy, sell, or otherwise acquire or dispose of, ice, whether natural or artificial, to conduct and carry on the business of storage, cold storage, refrigeration, freezing and ice-making and of the trading and dealing in all kinds of refrigerating plants, ice machines, ice making machines, apparatus and refrigerating processes.

To acquire water by purchase, development or otherwise to construct reservoirs and water towers, erect pumping machines, to construct and maintain water mains, pipes, flumes, sluices, gates, valves and hydrants, to furnish, sell and distribute water to manufactories, corporations, individuals and others for fire protection, manufacturing and domestic use or otherwise, and collect payment or rentals for the same.

To manufacture, or in any manner to produce, hold, buy, sell, or otherwise acquire or dispose of, hot water or steam, for heat, power and any and all other purposes, and to manufacture, buy or otherwise acquire, own, hold, sell, lease and deal in or otherwise dispose of, fixtures and all other appliances, appurtenances and devices capable of being used or employed in connection with the manufacture, production, purchase, sale, acquisition, distribution or use in any manner of hot water or steam.

To guarantee, purchase, subscribe for, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of, the shares of capital stock of or other interest in, or any bonds, securities or evidences of indebtedness created by any other corporation, joint stock company or association, of the State of Delaware, or any other state, country, nation or government, and while the owner thereof to exercise all the rights, powers and privileges of ownership, including the right to vote thereon, and to do anything needful or convenient for the protection, improvement, betterment or enhancement in value of such shares of stock, or interest, or any bonds, securities, or evidences of indebtedness owned by the corporation, and in any manner to aid any such corporation, joint stock company or association, the stock or other interest in, or the bonds, securities or other evidences of indebtedness of, which are held or guaranteed by the corporation.

To purchase, hold, sell and transfer shares of the capital stock of the corporation, provided, however, that the corporation shall not use its funds or property for the purchase of such shares of its capital stock when such use would cause any impairment of the capital of the corporation and provided, further, that any such shares of its own capital stock belonging to the corporation shall not be voted upon directly or indirectly.

To acquire the good will, rights and property and to take over or manage the whole or any part of the assets or liabilities of any person, firm, association or corporation; to pay for the same in cash, the stock or bonds of this corporation, or otherwise; to hold, or in any manner dispose of the whole or any part of the property so purchased; to conduct in any lawful manner the whole or any part of the business so acquired and to exercise all the powers necessary or convenient in and about the conduct and management of such business; to establish or promote, or concur in establishing or promoting, any company or corporation and to guarantee or underwrite subscriptions for any stock, shares or securities of any company or corporation and to subscribe for the same or any part thereof.

To apply for, obtain, register, lease or otherwise dispose of any trademarks, trade-names, copyrights, patents, inventions, improvements, and processes used in connection with or secured under letters patent of the United States or of any other countries or otherwise.

To enter into, make and perform contracts of any and every kind, with any person, firm, association, corporation, municipality or body politic.

To build, construct, erect, buy, take on lease, or in any manner acquire, own, hold, develop, maintain, operate, conduct, equip, sell, convey, assign, transfer, exchange, lease, or otherwise dispose of or turn to account any and all buildings, plants, stores, storehouses, warehouses, works, workshops, factories, refineries, laboratories, piers, wharves, docks, railways, railroads, tramways, poles, transmission lines, pipe-lines, mains, conduits, subways, tunnels, bridges, motors, generators, meters, dynamos, locomotives, cars, boats, vessels, tools, machinery, apparatus, appliances, facilities, rights, privileges, licenses, franchises, ordinances, concessions, easements, lands, timber rights, oil rights, ice rights, mining rights, patents or patent rights, trademarks, trade-

names, copyrights, good will, inventions, improvements, processes, and generally any property (real, personal or mixed) of any kind and any license right or privilege in any property which may, at any time, be necessary or convenient for use in its business or any part or branch thereof, or for any object or purpose herein expressed.

To borrow money, to draw, make, accept, endorse, discount, execute, and issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures, obligations and evidences of indebtedness of all kinds, whether secured by mortgage, pledge or otherwise, so far as may be permitted by the laws of the State of Delaware.

To mortgage, pledge or otherwise encumber for its proper corporate purposes, or any thereof, all or any portion of its property, rights and assets, of any kind, which at any time may be owned or held by the corporation.

To have one or more offices out of the State of Delaware and, except as herein or by the laws of the State of Delaware otherwise expressly provided, to carry on its business and promote its objects and purposes within or without the State of Delaware, without restriction as to place or amount and generally to do and perform any or all of the acts and things herein expressly set forth or provided for, to the same extent as natural persons might or could do in any part of the world, as principal, agent, contractor, trustee or otherwise, either alone or in conjunction with others; and in general to carry on any business in connection therewith, and with all the powers conferred by the laws of the State of Delaware upon corporations organized under the act hereinafter referred to, provided however, that it shall not construct, maintain or operate within the State of Delaware any railroad or railway.

**Exhibit B**

**Board of Directors Resolution**

**NORTHWESTERN CORPORATION**
**BOARD OF DIRECTORS MEETING**
**NOVEMBER 6-7, 2001**
**RESOLUTION**

WHEREAS, the Board of Directors ("Board") of NORTHWESTERN CORPORATION (the "Corporation") has, by resolution adopted at this meeting, approved the 2002 capital and operating budget for the Corporation, including specific operational plans for the Corporation and its partner entities; and

WHEREAS, the Board wishes to authorize the Corporation to take the appropriate steps to provide for the equity and debt financing necessary to enable such budget and operational plans;

NOW, THEREFORE, the Board hereby adopts the following recitals and resolutions:

## A.    NORTHWESTERN CORPORATION

1.    Financing for The Montana Power Company Acquisition

WHEREAS, in connection with the authorization by resolution of this Board provided on September 19, 2000, the Corporation entered into a Unit Purchase Agreement relating to the acquisition of the utility business (the "Utility Business") of The Montana Power Company ("MPC") at a purchase price of approximately $1.1 billion and is proceeding with the completion of the acquisition of the Utility Business;

NOW, THEREFORE, BE IT HEREBY RESOLVED, that the Board has determined that it is in the best interests of the Corporation, to complete the acquisition of the Utility Business, and that each and any of the Chairman and Chief Executive Officer, the President and Chief Operating Officer, the Vice President-Finance and Chief Financial Officer, the General Counsel and Chief Legal Officer, the Treasurer and Controller of the Corporation, and any other officer of the Corporation designated by any of the foregoing named officers (each such named officer and other officers being hereinafter referred to as an "Authorized Officer"), be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to take such actions and execute and deliver such agreements, documents, instruments and certificates related thereto, with such changes as any such officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by these resolutions; and all actions of the Authorized Officers heretofore taken in connection with the foregoing are hereby ratified in all respects.

(a)    Montana Power Facility

FURTHER RESOLVED, that the Board has determined that it is in the best interests of the Corporation, in order to complete the acquisition of the Utility Business and to provide for the working capital needs of the Corporation, to establish and maintain one or more credit facilities with one or more financial institutions (including the Credit Agreement described in the following resolution and any amendment, renewal, replacement or extension thereof), pursuant to which the

1

Corporation may, among other things, borrow funds (on a term loan or revolving credit basis, any combination of the two or otherwise) up to $1.2 billion (any such credit facility being herein referred to as the "Montana Power Facility"), any such facility to have an initial term of between twelve and twenty-four months (or such other period of time as determined by the Offering Committee (established pursuant to one of the resolutions below)) following the completion of the acquisition;

FURTHER RESOLVED, that the Board authorizes and approves the Corporation to establish a Montana Power Facility pursuant to and in the form of the proposed credit agreement (the "Credit Agreement") among the Corporation, one or more financial institutions as the lenders party thereto (the "Lenders"), and Credit Suisse First Boston, as administrative agent, lead arranger and book runner (the "Agent"), and the form, terms and conditions of such Credit Agreement be and hereby are approved in all respects, together with such changes (or on such different terms and conditions and in such different form from the proposed term sheet) as any Authorized Officer (established pursuant to one of the resolutions below) may approve, such approval being conclusively evidenced by any such Authorized Officer's execution of the Credit Agreement;

FURTHER RESOLVED, that any Montana Power Facility may initially be comprised of up to $700 million constituting an acquisition facility (the "Acquisition Facility") and up to $500 million constituting a working capital facility (the "Working Capital Facility"); provided, however, that the Offering Committee may modify the amount of such allocations in any manner it determines to be advisable;

FURTHER RESOLVED, that each Authorized Officer is authorized, empowered and directed, in the name and on behalf of the Corporation, to enter into the Montana Power Facility and to execute and deliver the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form) and any other agreements, documents, instruments and certificates related thereto, and all amendments, renewals, replacements and extensions thereof, with such changes as any such Authorized Officer may approve, the execution and delivery of any such facility and any other agreements, documents, instruments and certificates to be conclusive evidence that the same has been authorized and approved by this resolution, and which upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms;

(b)    Additional Financings

FURTHER RESOLVED, that there be established an Offering Committee of the Board (the "Offering Committee"), made up of Directors Merle D. Lewis and Richard R. Hylland, acting in consultation with the other Authorized Officers, and the Corporation's counsel and financial advisors, which Offering Committee is hereby authorized, consistent with the 2002 operating and capital plan presented to the Board, and in addition to the Montana Power Facility, to exercise the powers and authority of this Board to facilitate one or more of the following financings: (i) one or more credit facilities of up to $500 million, in the aggregate, as an amendment, replacement or refinancing of the Working Capital Facility, (ii) the issuance and sale of up to [12 million] shares of Common Stock, par value $1.75 per share, or other securities convertible into or exchangeable for such shares of Common Stock, not to exceed $200 million of gross proceeds, (iii) the issuance and sale of up to $750

million of commercial paper to fund all or a portion of the acquisition price for the Utility Business, which commercial paper program would be supported by undrawn capacity under an authorized credit facility, and (iv) the issuance and sale of up to $750 million of one or more of the following securities (collectively, the "Securities") to refinance or replace all or a portion of the Montana Credit Facility: Preferred Stock, Preference Stock, New Mortgage Bonds, short term securities, notes (short-, medium-, or long-term), debentures, subordinated debentures, guarantees or other evidences of indebtedness (including so-called monthly income preferred securities, quarterly income preferred securities, trust originated preferred securities, trust preferred securities or variations thereof) (this resolution shall be referred to herein as the "Base Resolution");

FURTHER RESOLVED, that to the extent the Offering Committee determines to issue either Preferred Stock or Preference Stock pursuant to the Base Resolution, the Board hereby authorizes the creation of one or more series of Preferred Stock and Preference Stock, not to exceed $300 million of gross proceeds in the aggregate, in each case, such stock to be issued in such number and with such par value per share as may be determined from time to time by the Offering Committee, consistent with the Corporation's charter and bylaws; aggregate;

FURTHER RESOLVED, that in connection with any issuance and sale by the Corporation of Securities pursuant to the Base Resolution, the Offering Committee, acting in consultation with the other Authorized Officers and the Corporation's counsel and financial advisors, is hereby authorized to exercise all of the powers and authority of this Board as such Offering Committee determines to be advisable to determine the terms of such Securities and the terms and conditions of the offering or offerings thereof, including, but not limited to, the following:

    (a)    with respect to Securities that constitute indebtedness:

        (i)    the aggregate principal amount and denominations;

        (ii)    the applicable currency of any series and denominations of such series;

        (iii)    the maturity or maturities;

        (iv)    the price to be received by the Corporation from the sale of the Securities, the offering price and the discount received by, or commission paid to, the underwriters, dealers, agents, initial purchasers, or financial advisors, as the case may be;

        (v)    the interest rate, if fixed, or the manner of determining the interest rate, if not fixed, to be borne by the Securities, the interest payment dates of the Securities, and any mechanisms for the deferral of interest;

        (vi)    the form of subordination, if any;

        (vii)    any optional or mandatory redemption rights and repayment provisions, if any, of the Corporation and of the holders of the Securities, and related redemption and repayment prices and any limitations on such redemption and repayment;

3

(viii)    sinking fund provisions, if any, and related redemption prices;

(ix)    any affirmative and negative covenants to be imposed on the Corporation;

(x)    any events of default;

(xi)    any rights of defeasance; and

(xii)    such other terms, conditions and provisions as the Offering Committee shall deem appropriate; and

(b)    with respect to Securities that are Preferred Stock or Preference Stock:

(i)    the designation of any series, the number of shares to constitute such series and the stated value thereof if different from the par value thereof;

(ii)    whether the Securities shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(iii)    the dividends, if any, payable on such Securities, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of stock of any other class or any other series;

(iv)    whether the Securities shall be subject to redemption by the Corporation, and, if so, the times, prices and other conditions of such redemption;

(v)    the amount or amounts payable for Securities upon, and the rights of the holders of such Securities in, the voluntary or involuntary liquidation, dissolution or winding up, or upon any distribution of the assets, of the Corporation;

(vi)    whether the Securities shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the Securities for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

(vii)    whether the Securities shall be convertible into, or exchangeable for, shares of stock of any other class or any other series or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

(viii)    the limitations and restrictions, if any, to be effective while any Securities are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the

Corporation of, the Common Stock or shares of stock of any other class or any other series;

          (ix)    the conditions or restrictions, if any, upon the creation of indebtedness of the Corporation or upon the issue of any additional stock, including additional shares of any other series or of any other class; and

          (x)    any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof; and

      (c)    the form of the offering or offerings of Securities, whether through public or private sale, and whether the sale thereof shall be to or through one or more underwriters or directly to dealers or other purchasers or otherwise, together with the terms and conditions of sale thereof, including the offering price thereof (which, in the case of Securities that constitute indebtedness, may be at a deep discount from their principal amount at maturity);

      (d)    the type of security or securities, and the title or titles thereof; and whether the securities shall be convertible into, or exchangeable for, shares of stock of any other class or any other series or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

      (e)    the selection of any one or more underwriters, dealers, agents, initial purchasers or financial advisors in connection with the sale thereof and the approval of any related underwriting, purchase, sales agency or other agreements; and

      (f)    the selection of any trustees, authenticating agents, paying agents, transfer agents and registrars in connection therewith (collectively, the "Fiduciaries"), and the approval of any related indentures or other agreements;

      FURTHER RESOLVED, that the Offering Committee is hereby authorized, empowered and directed, in the name and on behalf of the Corporation, to take any and all such actions as may be delegated to the Offering Committee by this Board under the General Corporation Law of the State of Delaware, as the Offering Committee may deem necessary or appropriate, to determine the terms of the Securities and the terms and conditions of the offerings thereof;

      FURTHER RESOLVED, that, upon the Corporation's receipt of payment for any such Securities that constitute equity securities, such Securities will be duly authorized, validly issued, fully-paid and non-assessable with no personal liability attaching to the ownership thereof;

      FURTHER RESOLVED, that in the event the Offering Committee determines to issue any Securities that are convertible into or exchangeable for the Corporation's Common Stock (i) such additional shares of the Corporation's authorized and unissued Common Stock as are required pursuant to the terms of such Securities are hereby reserved for issuance upon conversion or exchange of such Securities, and (ii) such shares of Common Stock when issued will be duly authorized, validly issued, fully-paid and non-assessable with no personal liability attaching to the ownership thereof.

2.    Notes

RESOLVED, that in the event the Offering Committee determines to issue Securities that constitute indebtedness (including, without limitation, short-, medium-, or long-term notes, debentures, subordinated debentures or guarantees) pursuant to the Base Resolution, the Board hereby authorizes the creation of one or more issues of up to $750 million aggregate principal amount of such Securities of the Corporation (the "Notes");

FURTHER RESOLVED, that in the event the Offering Committee determines to issue Notes pursuant to the Base Resolution, the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to (i) execute and deliver (A) (1) if the issuance of Notes is pursuant to an SEC Rule 144A offering or a private placement, a Purchase Agreement (or other agreement as any Authorized Officer may approve) (the "Purchase Agreement") to be entered into between the Corporation and one or more initial purchasers as any Authorized Officer may approve (the "Initial Purchasers"), providing, among other things, for the sale of the Notes to the Initial Purchasers, with such terms and conditions therein as any Authorized Officer may approve, and (2) if the issuance of Notes is pursuant to a registered offering, an Underwriting Agreement (or other agreement as any Authorized Officer may approve) (the "Underwriting Agreement"; each of the Underwriting Agreement and the Purchase Agreement are referred to herein as an "Offering Agreement") to be entered into between the Corporation and one or more underwriters as any Authorized Officer may approve (the "Underwriters"), providing, among other things, for the sale of the Notes to or by the Underwriters, with such terms and conditions therein as any Authorized Officer may approve, (B) a Fiscal and Paying Agency Agreement (or other agreement as any Authorized Officer may approve) relating to the Notes (the "Fiscal and Paying Agency Agreement") to be entered into between the Corporation and one or more financial institutions as any Authorized Officer may approve, as fiscal and paying agent (the "Fiscal Agent"), providing, among other things, for the provision of fiscal and paying agent services with respect to the Notes, with such terms and conditions therein as any Authorized Officer may approve, (C) a Calculation Agency Agreement (or other agreement as any Authorized Officer may approve) relating to the Notes (the "Calculation Agency Agreement") to be entered into between the Corporation and one or more financial institutions as any Authorized Officer may approve, as calculation agent (the "Calculation Agent"), providing, among other things, for the provision of calculation agent services with respect to the Notes, with such terms and conditions therein as any Authorized Officer may approve, (D) a Financial Advisor Agreement (or other agreement as any Authorized Officer may approve) (the "Financial Advisor Agreement") to be entered into between the Corporation and one or more financial advisors as any Authorized Officer may approve, with such terms and conditions therein as any Authorized Officer may approve, and (E) any other agreements, documents, instruments and certificates related to any of the foregoing; each of the above referenced agreements, documents, instruments and certificates with such changes as any Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by this resolution; and the same, upon such execution, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms; (ii) delegate to any other officers or employees of the Corporation authority to give instructions to the agents or representatives under any of the foregoing

agreements; and (iii) do such acts as may be necessary and proper to effect the transactions contemplated hereby, including, without limitation, (X) amending agreements, documents, instruments and certificates referred to herein, and (Y) appointing additional underwriters, fiscal agents, calculation agents, financial advisors or other agents and successors to any of the parties named;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to (i) authorize the issuance and sale by the Corporation of any series of Notes; (ii) execute Notes (including all supplements and amendments thereto and Notes issued to replace lost, stolen, mutilated or destroyed Notes) up to an aggregate principal amount of $750 million as may be required in accordance with the terms of the Fiscal and Paying Agency Agreement, all in such form and with such terms and conditions therein as are approved by an Authorized Officer, such approval to be conclusively evidenced by the execution thereof, and to acknowledge execution of such Notes and to deliver the same to the Underwriters, Initial Purchasers or other appropriate parties upon payment therefor; and (iii) execute and deliver any other agreements, documents, instruments and certificates related to the Notes; all with such changes as any Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by this resolution; and which Notes, when issued, executed and delivered (against receipt of payment therefor in accordance with the Offering Agreement) in accordance with this resolution, and authenticated, as applicable, shall be duly executed, authenticated, issued and delivered and shall constitute the legal, valid and binding obligations of the Corporation, enforceable in accordance with their terms; and which other agreements, documents, instruments and certificates, upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms;

FURTHER RESOLVED, that, to the extent consistent with the Fiscal and Paying Agency Agreement, any Authorized Officer may (i) deliver to the Fiscal Agent up to the aggregate principal amount of Notes authorized herein, and (ii) execute and deliver to the Fiscal Agent the written order or orders of the Corporation requesting the Fiscal Agent to authenticate any Notes that may be issued pursuant to these resolutions and to deliver the same to the Corporation, the Initial Purchasers, Underwriters or other appropriate parties; and the Fiscal Agent is hereby authorized to authenticate and deliver such Notes pursuant to said order or orders, and thereafter to authenticate and deliver all such other Notes as may be necessary in accordance with the terms of the Fiscal and Paying Agency Agreement, each such authentication to be effected by the manual signature of an authorized officer of the Fiscal Agent;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to prepare or cause to be prepared an offering circular (the "Offering Circular") relating to the sale of the Notes (the "Offering"); and to prepare and deliver, or cause to be prepared and delivered, to the Initial Purchasers and their designees or other purchasers or prospective purchasers of Notes, the Offering Circular and such supplements, amendments and modifications thereto as any such Authorized Officer may deem necessary, appropriate or advisable and any other documents required by law or regulations in connection with the Offering, and

that their acts in preparing or causing the preparation of the Offering Circular and such documents are in all respects approved, adopted, ratified and confirmed;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to pay any such taxes, fees or expenses as may be required to register, qualify or exempt the Notes for the purposes of the Offering; and

FURTHER RESOLVED, that the Offering Committee is hereby authorized, in the name and on behalf of the Corporation, to take any and all such actions and to do, or authorize to be done, all such things as the Offering Committee may deem necessary or appropriate to effectuate the purposes and intent of these resolutions, the taking of such action conclusively establishing the validity thereof.

3.     CIBC Credit Facility

RESOLVED, that the form, terms and conditions of the proposed amendment to the credit agreement (the "Amendment") among the Corporation, one or more financial institutions, as lenders, and Canadian Imperial Bank of Commerce, as agent for such lenders, to increase up to $350 million such existing $250 million credit facility be and hereby are ratified and approved in all respects, together with such changes (or on such different terms and conditions and in such different form from the proposed term sheet) as any of the Authorized Officers may approve, such facility to be replaced by the Working Capital Facility upon the closing of the MPC acquisition; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to enter into the Amendment and to execute and deliver the Amendment and any other agreements, documents, instruments and certificates related thereto, with such changes as any such Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by these resolutions, and which Amendment, other agreements, documents, instruments and certificates, upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms; and all actions of the Authorized Officers heretofore taken in connection with the foregoing are hereby ratified in all respects.

4.     Commercial Paper Program

RESOLVED, that in the event the Offering Committee determines to issue commercial paper notes (the "CP Notes") pursuant to the Base Resolution, the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to: (i) borrow for the use and benefit of the Corporation from time to time up an aggregate of $750 million at any one time outstanding through the issuance of CP Notes; (ii) execute and deliver, (A) a Commercial Paper Dealer Agreement (or other agreement as any Authorized Officer may approve) (the "Dealer Agreement") between the Corporation and Credit Suisse First Boston Corporation (or one or more other financial institutions as any Authorized Officer may approve), as dealer

(the "Dealer"), providing, among other things, for the sale of CP Notes on behalf of the Corporation and the indemnification of the Dealer in connection therewith, (B) an Issuing and Paying Agency Agreement (or other agreement as any Authorized Officer may approve) (the "Issuing and Paying Agency Agreement") between the Corporation and one or more financial institutions as any Authorized Officer may approve, as issuing and paying agent, (C) a Financial Advisor Agreement, to be entered into between the Corporation and one or more financial advisors as any Authorized Officer may approve, with such terms and conditions therein as any Authorized Officer may approve, and (D) any other agreements, documents, instruments and certificates related to or necessary in connection with any of the foregoing; each of the above referenced agreements, documents, instruments and certificates with such changes as any Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by this resolution; and the same, upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms; (ii) delegate to any other officers or employees of the Corporation authority to give instructions to any agent, dealer or representative pursuant to any of the foregoing; and (iii) do such acts as may be necessary and proper to effect the transactions contemplated hereby, including, without limitation, (X) amending agreements, documents, instruments and certificates referred to herein, and (Y) appointing additional dealers, issuing and paying agents and financial advisors and successors to any of the parties named.

5.      Bank Resolutions

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute and deliver (i) certain revolving credit notes (the "Revolving Credit Notes") evidencing revolving loans to be made pursuant to the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form); (ii) certain term notes (the "Term Notes") evidencing term loans to be made pursuant to the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form); (iii) a certain pledge agreement (the "Pledge Agreement") pursuant to which the Corporation would pledge to the Agent (or other agent), for the benefit of the Lenders (or other lenders), among other things, all the outstanding membership interests owned by it in any of its subsidiaries holding assets acquired by the Corporation from MPC; and (iv) all other instruments, documents, certificates, agreements, guaranties, deeds of trust, real property, mortgages, pledges, powers of attorney, stock powers, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other written matter heretofore, now or from time to time hereafter required or advisable to be executed by or on behalf of the Corporation and delivered to or for the benefit of the Agent (or other agent) and the Lenders (or other lenders), or any of them, by or on behalf of the Corporation or any of its subsidiaries in connection with the credit being extended to the Corporation pursuant to the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form) and other related transactions; in any case the execution and delivery of the Revolving Credit Notes, the Term Notes, the Pledge Agreement and any such other items listed herein to be conclusive evidence that the same has been authorized and approved by this resolution, and the same, upon execution by an

Authorized Officer, shall be the legal, valid and binding obligation of the Corporation, enforceable in accordance with their respective terms; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute and deliver any agreement, document, instrument, certificate or other written matter as may be necessary or advisable in connection with the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form) or any amendment, restatement, renewal, extension or other modification thereof, and to do all things necessary or appropriate for the payment and performance of any obligations under the Credit Agreement (or, if in a different form or with different lenders, the Montana Power Facility in such other form), the execution and delivery thereof and the taking of any such action to be conclusive evidence that the same has been authorized and approved by this resolution, and the same, upon execution by an Authorized Officer, shall be the legal, valid and binding obligation of the Corporation, enforceable in accordance with their respective terms.

6.     New Equity Issuance

RESOLVED, that, in the event the Offering Committee determines to issue shares of Common Stock pursuant to the Base Resolution, the Offering Committee, acting in consultation with the other Authorized Officers and the Corporation's counsel and financial advisors, is hereby authorized to exercise all of the powers and authority of this Board as such Offering Committee determines to be advisable, consistent with the Corporation's overall financial and operating plan, with regard to the issuance of shares of Common Stock, par value $1.75 per share, or securities exchangeable or convertible for such shares, not to exceed $250 million of gross proceeds;

FURTHER RESOLVED, that, upon the Corporation's receipt of payment for any such shares of Common Stock, such shares of Common Stock will be duly authorized, validly issued, fully-paid and non-assessable with no personal liability attaching to the ownership thereof.

## B.     NORTHWESTERN GROWTH CORPORATION

1.     Montana First Megawatts Project

RESOLVED, that the Corporation's wholly owned subsidiary NorthWestern Growth Corporation ("NGC"), which has heretofore been authorized by the Corporation to make an investment, through subsidiary special purpose limited liability companies (each such special purpose entity being a "SPE"), in electric generation turbines for installation at a facility in the State of Montana known as the Montana First Megawatts ("MFM") project, such turbine financing ("Turbine Financing") arranged and lead by ABN AMRO Bank ("ABN"), is hereby further authorized, acting through NGC's Executive Committee ("Executive Committee"), and any officer designated by the act of such committee ("Authorized Officers"), to acquire the real property selected for the project, enter into contracts for services necessary to complete the MFM project, and negotiate construction and permanent financing of such MFM project in an aggregate amount not to exceed $200 million, secured by the assets of MFM, including real estate, the generation facility and all

contractual and other rights relating thereto, including, without limitation, MFM's power purchase agreement with The Montana Power Company; such financing to be in such form as approved by the Executive Committee, including leveraged lease, bank facility, sale-leaseback, industrial revenue bond, mortgage note, or other type, all on terms and conditions as approved by the Executive Committee (collectively, the "MFM Financing"); provided, that the MFM Financing shall be on a non-recourse basis to the Corporation (other than with respect to any equity investment in any such SPE or the project and credit support in a principal amount not to exceed $30 million); and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, NGC and/or any such SPE, to execute and deliver (i) credit or financing agreements; (ii) notes, bonds, leases, instruments and other evidences of indebtedness; (iii) pledge, mortgage and other security agreements; (iv) offering statements and circulars; (v) financial advisory agreements with ABN (or such other financial institution as selected by the Authorized Officers); (vi) interest rate hedge agreements of any form; and (vii) all other instruments, documents, certificates, agreements, guaranties, deeds of trust, real property, mortgages, pledges, powers of attorney, stock powers, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other written matter heretofore, now or from time to time hereafter required or advisable to be executed by or on behalf of the Corporation, NGC and/or any such SPE in connection with, and subject to the non-recourse and other conditions set forth in, the proceeding resolution; the execution and delivery of any of the foregoing to be conclusive evidence that the same has been authorized and approved by this resolution, and the same, upon execution by an Authorized Officer, shall be the legal, valid and binding obligation of the Corporation, NGC and/or such SPE, as the case may be, enforceable in accordance with their respective terms; and all actions of the Authorized Officers heretofore taken in connection with the foregoing are hereby ratified in all respects.

FURTHER RESOLVED, that the Corporation and NGC are authorized to create, through a subsidiary SPE, NorthWestern Energy Marketing, LLC (or such other name as may be selected), of which NGC will be the managing member, for the purpose of marketing energy from the MFM project and otherwise, including electric energy, natural gas, and such other services as the Executive Committee deems advisable, including providing services to the Corporation and its affiliates; and to file such applications and obtain such authorizations, licenses and permits under federal (including, without limitation, the Federal Energy Regulatory Commission ("FERC")), state and local law or regulation as are necessary or advisable; and all actions of the Authorized Officers heretofore taken in connection with the foregoing are hereby ratified in all respects.

2.    New Investment Authorization

RESOLVED, that the Corporation, acting through NGC, is authorized and empowered to make new investments, to be approved and administered by the Executive Committee, of up to $50 million, constituting strategic investments that further the Corporation's strategic plans and initiatives.

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, NGC and/or any such SPE, to execute and deliver credit or financing agreements; notes, bonds, leases, instruments and other evidences of indebtedness; pledge, mortgage and other security agreements; financial advisory agreements; interest rate hedge agreements of any form; all other instruments, documents, certificates, agreements, guaranties, deeds of trust, real property, mortgages, pledges, powers of attorney, stock powers, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other written matter heretofore, now or from time to time hereafter required or advisable to be executed by or on behalf of the Corporation, NGC and/or any such SPE in connection with the proceeding resolution; the execution and delivery of any of the foregoing to be conclusive evidence that the same has been authorized and approved by this resolution, and the same, upon execution by an Authorized Officer, shall be the legal, valid and binding obligation of the Corporation, NGC and/or such SPE, as the case may be, enforceable in accordance with their respective terms; and all actions of the Authorized Officers heretofore taken in connection with the foregoing are hereby ratified in all respects.

## C.    CORNERSTONE PROPANE PARTNERS, L.P.

1.    Extended Credit Support

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to provide further credit support for Cornerstone Propane Partners, L.P. ("Cornerstone"), in the form of guaranties, advances, keepwell agreements or other types of financial support, of up to $85,000,000 in principal amount, on such terms as may be negotiated by the Authorized Officers providing similar economic returns to the Corporation as previously provided, or as the Authorized Officers deem advisable in the circumstances, and to negotiate with one or more banking or financial firms as they deem necessary or advisable in relation to providing this further credit support; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to enter into, execute and deliver any agreements, documents, instruments and certificates (including, without limitation, evidences of indebtedness) related to providing credit support to Cornerstone, with such changes as any such Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by these resolutions, and which agreements, documents, instruments and certificates (including, without limitation, evidences of indebtedness), upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms.

2.    Authorization to Retain Financial Advisors

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation and as the parent of NGC and the managing general partner of Cornerstone, to retain such financial advisors as they deem necessary or

12

appropriate to advise the Corporation, NGC and Cornerstone Propane GP, Inc. (a wholly owned subsidiary of NGC and the managing general partner of Cornerstone) to provide financial advisory and other financial services relating to a recapitalization or restructuring of Cornerstone, and to authorize the payment to such financial advisors of all fees and costs deemed appropriate by the Authorized Officers.

## D.    BLUE DOT SERVICES INC.

1.    Credit Support

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to provide credit support for Blue Dot Services Inc. ("Blue Dot"), an indirect subsidiary of NGC, in the form of guarantees, advances, keepwell agreements, purchases of equity of Blue Dot, including, without limitation, additional shares of preferred stock and dividends on preferred stock, or other types of financial support, consistent with the 2002 operating and capital plan presented to the Board, and as necessary or advisable in connection with the extension or replacement of the credit facility currently provided by the Bank of America, N.A., such credit support or investment not to exceed $100 million in principal amount, on such terms as may be negotiated by the Authorized Officers providing economic returns to the Corporation in the form of cash, stock, or a combination thereof as the Authorized Officers deem appropriate, or such other consideration as the Authorized Officers deem advisable in the circumstances, and to negotiate with one or more banking or financial firms as they deem necessary or advisable in relation to providing this further credit support; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to enter into, execute and deliver any agreements, documents, instruments, contracts and certificates (including, without limitation, evidences of indebtedness) related to providing credit support to Blue Dot, with such changes as any such Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by these resolutions, and which agreements, documents, instruments and certificates (including, without limitation, evidences of indebtedness), upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms.

2.    Exchange Authorization

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to make additional capital contributions to or on behalf of NGC of cash and/or shares of the Corporation's Common Stock, par value $1.75 per share, or shares of preferred stock, or securities exchangeable or convertible for such shares (any such securities being "Exchange Shares"), as shall be required to discharge certain capital stock repurchase obligations of Blue Dot, the dollar amount or value of any such capital contribution to be part of the Credit Support authorization and limitation set forth in the proceeding resolution; and any such Exchange Shares, upon being so contributed to or on behalf of NGC, will be duly authorized, validly

issued, fully-paid and non-assessable with no personal liability attaching to the ownership thereof.

## E.    EXPANETS, INC.

1.    Credit Support

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to provide credit support for Expanets, Inc. ("Expanets"), an indirect subsidiary of NGC, in the form of guarantees, advances, keepwell agreements, purchases of equity of Expanets, including, without limitation, additional shares of preferred stock and dividends on preferred stock, or other types of financial support, consistent with the 2002 operating and capital plan presented to the Board, such credit support or investment not to exceed $100 million in principal amount; and a contingent additional authorization of credit support of up to $150 million in principal amount as necessary or advisable in connection with the extension or replacement of the credit facility currently provided by Avaya, Inc.; in each case on such terms as may be negotiated by the Authorized Officers providing economic returns to the Corporation in the form of cash, stock, or a combination thereof as the Authorized Officers deem appropriate, or such other consideration as the Authorized Officers deem advisable in the circumstances, and to negotiate with one or more banking or financial firms as they deem necessary or advisable in relation to providing this further credit support; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to enter into, execute and deliver any agreements, documents, instruments, contracts and certificates (including, without limitation, evidences of indebtedness) related to providing credit support to Expanets, with such changes as any such Authorized Officer may approve, the execution and delivery thereof to be conclusive evidence that the same has been authorized and approved by these resolutions, and which agreements, documents, instruments and certificates (including, without limitation, evidences of indebtedness), upon execution by an Authorized Officer, shall be the legal, valid and binding obligations of the Corporation, enforceable in accordance with their respective terms.

2.    Exchange Authorization

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to make additional capital contributions to or on behalf of NGC of cash and/or shares of the Corporation's Common Stock, par value $1.75 per share, or shares of preferred stock, or securities exchangeable or convertible for such shares (any such securities being "Exchange Shares"), as shall be required to discharge certain capital stock repurchase obligations of Expanets, the dollar amount or value of any such capital contribution to be part of the Credit Support authorization and limitation set forth in the proceeding resolution; and any such Exchange Shares, upon being so contributed to or on behalf of NGC, will be duly authorized, validly issued, fully-paid and non-assessable with no personal liability attaching to the ownership thereof.

**F.    FERC CAPACITY AND FILINGS**

RESOLVED, that the Corporation wishes to maintain for future needs additional and unused FERC authorization generally consistent with the Corporation's current authorizations, and, as securities are issued from time to time, or as FERC authorizations are to expire, to replace such current authorizations used or expiring with new authorizations in similar amounts;

RESOLVED, FURTHER, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation to make and file such application or applications as they deem advisable with the FERC for the authorization, in addition to any current or other FERC authorization, for the issuance and sale of (1) not more than $500 million of mortgage bonds, notes, debentures, subordinated debentures, guarantees or other evidence of indebtedness (including so-called monthly income preferred securities, quarterly income preferred securities, trust originated preferred securities, trust preferred securities or variations thereof), (2) not more than $500 million of short-term debt in the form of promissory notes, commercial paper or other instruments; (3) not more than 15,000,000 shares of the Company's Common Stock, par value $1.75 per share; (4) not more than 500,000 shares of the Company's Cumulative Preferred Stock, par value $100 per share; and (5) not more than 500,000 shares of the Company's Preference Stock, par value $50 per share;

RESOLVED, FURTHER, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to file such applications and other documents with the FERC, or such other agency having jurisdiction as they deem necessary or advisable to obtain the required authorization of that Commission for the financing instruments and securities referenced above and authorized herein, and to do any and all acts and things which they deem necessary or advisable to carry out the intent and purposes of this resolution.

**G.    PROVISIONS APPLICABLE TO ALL OF THE ABOVE AUTHORIZATIONS**

RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation: (i) to do and perform or cause to be done and performed all such acts and things as any Authorized Officer shall deem necessary, advisable or appropriate to consummate or facilitate the transactions contemplated by these resolutions; (ii) to execute and deliver and to otherwise make and give all such agreements, amendments, certificates, notes, interest rate hedging arrangements, directions, representations, warranties, transfers, assurances and other instruments and documents of every character and to do and perform or cause to be done and performed such other and further acts and things as any Authorized Officer shall deem necessary, advisable or appropriate to consummate or facilitate the transactions contemplated by these resolutions or to otherwise give effect to and carry out the intent and purposes of these resolutions, the execution thereof and the taking of such action conclusively establishing the validity thereof, and (iii) to engage such financial advisors as any Authorized Officer deems appropriate to assist the Authorized Officers in carrying out the intent of the resolutions herein, including executing such engagement letters and agreeing to pay such fees and costs as they deem appropriate with such financial advisors;

FURTHER RESOLVED, that the officers of the Corporation be, and each of them acting alone hereby is authorized, empowered and directed, in the name and on behalf of the Corporation, to make and file with the FERC, and such other federal, state or local governmental bodies such applications (and supplements, amendments or other modifications to any pre-existing application, applications, order or orders), and all certificates, letters, instruments, documents, reports, statements, filings, requests and information supplements as may be necessary or desirable for the purpose of completing the transactions contemplated by, or in connection with, the resolutions herein;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to take any and all actions necessary to cause the issuance and sale of any securities that may be issued pursuant to these resolutions, as applicable, to qualify for an exemption from registration under Section 4(2) of the Securities Act of 1933, as amended, and to cause such securities to not be required to comply with any provision of the Trust Indenture Act of 1939, as amended.

FURTHER RESOLVED, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to prepare, execute and file, or cause to be prepared, executed and filed, with the Securities and Exchange Commission (the "SEC") (i) a registration statement or statements under the Securities Act of 1933, as amended (the "Securities Act"), for the registration of some or all securities described in these resolutions, and (ii) to prepare, execute and cause to be filed any amendments to such registration statement or statements (whether pre-effective or post-effective amendments) or supplements thereto, together with all documents required as exhibits to such registration statement or statements, or any amendment or supplement thereto, and all certificates, letters, instruments, applications, and any other documents which may be required to be filed with the SEC with respect to the registration and offering of such securities, and to take any and all action with respect to any of the foregoing that any such officer shall deem necessary or advisable, the taking of such action conclusively establishing the validity thereof;

FURTHER RESOLVED, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to negotiate agreements for underwritten public offering sales or private placement sales of Securities, or combinations of the two methods of sale, as the Offering Committee deems advisable to facilitate the financings authorized in these resolutions;

FURTHER RESOLVED, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to sponsor partnerships or business trusts as may need to be organized to enable the use of so-called monthly income preferred securities, quarterly income preferred securities, trust originated preferred securities, trust preferred securities or variations thereof, in connection with some or all of the financing sought by the Corporation;

FURTHER RESOLVED, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the

name and on behalf of this Corporation, to execute and deliver with such underwriting firm or firms (including, if applicable, any such firm or firms acting as initial purchaser or purchasers) as the Offering Committee approves, an underwriting agreement or underwriting agreements or purchase agreement or purchase agreements in form and substance as the Offering Committee may approve, such approval to be evidenced by such execution and delivery thereof (each such underwriting agreement or purchase agreement being hereinafter referred to as an "Offering Document"), and such officers of this Corporation be, and each of them acting alone hereby is, further authorized, empowered and directed to do any and all acts which they, in their discretion, may deem necessary or advisable to make any Offering Document the valid and effective act and agreement of this Corporation;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute and deliver a letter of representation with Depository Trust Corporation ("DTC") (and any other appropriate party as determined by an Authorized Officer, including, without limitation, the Fiscal Agent) and any other documents required by DTC, with such terms, conditions, modifications, changes, or amendments thereto as any Authorized Officer shall in his discretion approve for purposes of facilitating the clearance and settlement of transactions regarding any securities that may be issued pursuant to these resolutions, as applicable, among DTC's participants (including, without limitation, any initial purchasers and underwriters) through the use of an electronic book-entry system, pursuant to which (i) DTC, or one or more of its nominees, will acquire possession of and control over such securities, and (ii) such securities will be registered in the name of DTC, or one or more of its nominees, and the execution and delivery thereof by any such Authorized Officer shall constitute conclusive evidence: (i) of such approval; and (ii) that such letter of representation and such other documents have been authorized approved and adopted hereby;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed in the name and on behalf of the Corporation, to appoint one or more financial institutions, as any Authorized Officer may approve, as Transfer Agent and Registrar with respect to any securities that may be issued pursuant to these resolutions, to, among other things, issue, countersign, record and register certificates for such securities either upon the original issue of such securities or by reason of transfers of such securities;

FURTHER RESOLVED, that any such appointment of a Transfer Agent and Registrar shall apply to making transfers from time to time upon the books of the Corporation of such certificates for such securities as may be surrendered for transfer properly endorsed and to the countersigning of new certificates issued in lieu thereof and to the registration of such certificates, signed by or bearing the facsimile signatures of the proper officers of the Corporation, and to the issuance of certificates for such securities as an original issue when the Transfer Agent and Registrar has been furnished with such documents as it deems necessary to authorize the issue thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on

behalf of the Corporation, to appoint the Transfer Agent and Registrar as Dividend Disbursing or Distribution Agent of the Corporation with respect to any securities that may be issued pursuant to these resolutions that constitute equity securities, for the purpose of disbursing dividends declared by the Board or the Corporation on such securities;

FURTHER RESOLVED, that the Transfer Agent and Registrar in either capacity may rely on certifications of the Chairman or Chief Financial Officer of the Corporation as to proceedings or facts in connection with the action of the security holders and directors of the Corporation and may apply to counsel of the Corporation or to its own counsel for advice and instructions when it deems it expedient at the expense of the Corporation and that specimen signatures of the officers of the Corporation and specimen stock certificates be lodged with it; and that the Transfer Agent and Registrar shall be protected and held harmless in recognizing and acting upon any signature or certificate believed in good faith to be genuine. The Transfer Agent and Registrar is so authorized and directed, until otherwise instructed in writing by the Corporation whether such persons remain incumbent or not;

FURTHER RESOLVED that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation, to, from time to time, give the Transfer Agent and Registrar instructions as to the transfer or non-transfer of particular shares or certificates of stock or as to the affixing or refraining from affixing legends upon particular certificates or as to refusing to permit any security holder to inspect the list of security holders of the Corporation; it being understood that the Transfer Agent and Registrar will be indemnified for all liability, damage and expense incurred in following such instructions, and upon request, will be furnished with a surety bond to secure such liability, damage or expense;

FURTHER RESOLVED, that to the extent that the Offering Committee determines to cause the Corporation to issue any securities that may be issued pursuant to these resolutions under an indenture, the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to execute and deliver such an indenture or indentures, and indentures supplemental thereto, in each case in form and substance as the Offering Committee may approve, such approval to be evidenced by such execution and delivery thereof (each such indenture, as may be amended by indentures supplemental thereto, being hereinafter referred to as an "Indenture"), and to do any and all acts which they, in their discretion, may deem necessary or appropriate to make such indenture the valid and effective act and agreement of this Corporation;

FURTHER RESOLVED, that the Authorized Officers be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to execute and deliver such other agreements, documents, certificates and instruments as may be required by any Fiduciary in connection with any Indenture, or as may be necessary or appropriate in connection with the issuance and sale of any securities that may be issued pursuant to these resolutions;

FURTHER RESOLVED, that each Fiduciary or other agent or representative engaged in connection with the implementation of the actions contemplated by these resolutions be, and each hereby is, authorized to rely and act upon, and shall be fully protected in so relying and acting upon, any instructions received by it and signed by any officer of this Corporation or by counsel for this Corporation and to rely and act upon, and shall be fully protected in so relying and acting upon, any security, assignment, power of attorney, certificate, order, instruction, notice or other instrument or paper believed by it to be genuine and duly authorized and properly executed, that this Corporation may reimburse each such Fiduciary or other agent or representative for all expenses incurred by it in the performance of its duties, and this Corporation may indemnify and hold harmless each Fiduciary or other agent or representative from and against any and all claims, suits, damages, losses, expenses (including counsel fees) and liabilities which may be incurred by it to which it may be subjected by reason of, or in connection with, its appointment and duties, and that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to execute and deliver a written order to the appropriate Fiduciary or other agent or representative directing such person, when securities that may be issued pursuant to these resolutions have been properly executed by this Corporation, to authenticate them in such amount as shall have been determined pursuant to these resolutions, to deliver such securities pursuant to these resolutions and thereafter to authenticate and deliver such other securities as may be necessary upon registration or transfer of, in exchange for, or in lieu of, any outstanding securities, all in accordance with the terms of any Indenture;

FURTHER RESOLVED, that the Authorized Officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to enter into any arrangement and execute and delivery any agreement, document, certificate or instrument with any third party with respect to the indemnification of such third party by the Corporation in connection with any of the transactions pursuant to these resolutions as the Authorized Officers may deem necessary, appropriate or advisable to carry out the intent and purposes of the resolutions herein, and this Corporation may so indemnify any such third party, such determinations to be conclusively evidenced by the entering into of any such indemnity arrangement and the execution and delivery of such documents by any such officer;

FURTHER RESOLVED, that it is desirable and in the best interest of this Corporation that any securities that may be issued pursuant to these resolutions be qualified or registered for sale in various states, districts, territories or commonwealths of the United States; that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized to determine the jurisdictions in which appropriate action shall be taken to qualify or register all or such part of the securities as such officers may deem necessary or appropriate; that such officers be, and each of them acting alone hereby is, authorized to perform on behalf of this Corporation any and all such acts as they may deem necessary or advisable in order to comply with the applicable laws of any such jurisdictions, and in connection therewith to execute and file all requisite papers and documents, including, but not limited to, applications, reports, surety bonds, irrevocable consents and appointments of attorneys for service of process; and that the execution by such officers, or any of them, of any such paper or document or the doing by them of any act in connection with the foregoing matters shall conclusively establish their

authority therefor from this Corporation and the approval and ratification by this Corporation of the papers and documents so executed and the action so taken, and any resolution of this Board which is required or appropriate in connection therewith shall be deemed to have been adopted by this resolution and may be so certified by the Secretary or any Assistant Secretary of this Corporation;

FURTHER RESOLVED, that this Board hereby adopts in haec verba the form of any resolution required by any state securities law to be adopted in connection with an application for qualification or registration of securities, or any consent to service of process or other requisite paper or document required to be filed in connection therewith if (i) in the opinion of any of the proper officers of the Corporation, the adoption of such resolution is necessary or advisable, and (ii) the Secretary of the Corporation evidences such adoption by inserting in the minutes a copy of such resolution which will thereupon be deemed to be adopted by this Board with the same force and effect as if specifically adopted at this meeting;

RESOLVED FURTHER, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to execute and file such application or applications, and amendments and supplements thereto, deliver all necessary documents and agreements and take such other action as may be necessary to register and/or list any issue of shares of Common Stock, Exchange Shares or other securities that may be issued pursuant to these resolutions on the New York Stock Exchange and/or any other stock exchanges deemed appropriate by such officers, or any of them, and that the proper officers be, and each of them acting alone hereby is, authorized to appear before any such stock exchanges, and to execute such papers and agreements (including, without limitation, indemnity agreements for the benefit of any such exchange and others against loss resulting from reliance or facsimile signatures of officers of this Corporation), as may be necessary to conform with the requirements of any such stock exchanges and to do any and all things which may be necessary or advisable to effectuate any such listing, specifically including registration of Securities under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act");

FURTHER RESOLVED, that the proper officers of this Corporation be, and each of them acting alone hereby is, authorized, empowered and directed, in the name and on behalf of this Corporation, to take any and all action (including, without limitation, the payment of fees and expenses), and to execute (by manual or facsimile signature) and deliver any and all instruments, letters, documents, certificates, or other writings (and any amendments or supplements thereto), under this Corporation's seal or otherwise, that such officer or officers may deem necessary or advisable in order to enable this Corporation to exercise its rights and to perform its obligations arising in connection with the issuance, sale and registration of any securities that may be issued pursuant to these resolutions under the Securities Act and under the securities or Blue Sky laws of various jurisdictions, the listing of such securities on any exchange, the registration of such securities under the Exchange Act, and otherwise in connection with these resolutions;

FURTHER RESOLVED, that the execution and delivery for and on behalf of the Corporation of any documents and instruments in furtherance of the foregoing resolutions by any of the Authorized Officers shall be conclusive evidence of the approval of the terms and conditions thereof by the Board;

FURTHER RESOLVED, that if any Authorized Officer, who shall manually or in facsimile sign, seal or attest any of the agreements, documents, instruments and certificates authorized by these resolutions, ceases to be such officer of the Corporation before the agreements, documents, instruments and certificates which are sealed, signed and attested have actually been authenticated and delivered, such agreements, documents, instruments and certificates nevertheless may be authenticated, issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Corporation, and such agreements, documents, instruments and certificates may be signed, sealed and attested on behalf of the Corporation by such person who on the actual date of the execution thereof is a proper officer of the Corporation, although on the nominal date thereof such person is not an officer of the Corporation; and

FURTHER RESOLVED, that the authority and power granted hereunder shall be deemed retroactive and any and all acts authorized hereunder performed prior to the adoption of these resolutions by the Authorized Officers or any proper officer in furtherance of the intent and purposes hereof be, and each of them hereby is, ratified, affirmed and approved.

**<u>Exhibit C</u>**

**Balance Sheet**

Exhibit C 1 of 2

## NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION
## BALANCE SHEET
## JUNE 30, 2002
### (Dollars in thousands)

| ASSETS AND OTHER DEBITS | NOR/NPS Historical | Pro Forma Adjustments | (1) | Pro Forma |
|---|---|---|---|---|
| **UTILITY PLANT** | | | | |
| Utility Plant (101-106, 114) | $469,372 | $1,622,803 | | $2,092,175 |
| Construction Work in Progress (107) | 18,217 | 25,711 | | 43,928 |
| TOTAL Utility Plant | 487,589 | 1,648,514 | | 2,136,103 |
| (Less) Accum. Prov. for Depr. Amort. Depl. (108, 111, 115) | (209,670) | (618,114) | | (827,784) |
| Net Utility Plant | 277,919 | 1,030,400 | | 1,308,319 |
| Gas Stored Underground - Noncurrent (117) | 659 | 35,634 | | 36,293 |
| **OTHER PROPERTY AND INVESTMENTS** | | | | |
| Nonutility Property (121) | 4,768 | 2,008 | | 6,776 |
| (Less) Accum. Prov. For Depr. Amort. Depl. (122) | (702) | (101) | | (803) |
| Investment in Associated Companies (123) | 594,224 | (396,771) | | 197,453 |
| Investment in Subsidiary Companies (123.1) | 142,587 | 13,988 | | 156,575 |
| Other Investments (124) | 9,368 | 29,768 | | 39,136 |
| Special Funds (125-128) | 0 | 1,440 | | 1,440 |
| TOTAL Other Property and Investments | 750,245 | (349,668) | | 400,577 |
| **CURRENT AND ACCRUED ASSETS** | | | | |
| Cash (131) | 9,080 | 33,684 | | 42,764 |
| Working Funds (135) | (5) | 52 | | 47 |
| Temporary Cash Investments (136) | 0 | 0 | | 0 |
| Notes Receivable (141) | 0 | 23 | | 23 |
| Customer Accounts Receivable (142) | 9,696 | 26,880 | | 36,576 |
| Other Accounts Receivable (143) | 63,313 | 8,240 | | 71,553 |
| (Less) Accum. Prov. for Uncollectible Acct.-Credit (144) | (178) | (1,254) | | (1,432) |
| Accounts Receivable from Assoc. Companies (146) | 1,415,793 | (526,759) | | 889,034 |
| Fuel Stock (151) | 2,466 | 639 | | 3,105 |
| Plant Material and Operating Supplies (154) | 4,729 | 10,784 | | 15,513 |
| Merchandise (155) | 0 | 0 | | 0 |
| Other Materials and Supplies (156) | 0 | 0 | | 0 |
| Stores Expenses Undistributed (163) | 540 | 0 | | 540 |
| Gas Stored Underground - Current (164.1) | 0 | 0 | | 0 |
| Prepayments (165) | (430) | 13,511 | | 13,081 |
| Interest and Dividends Receivable (171) | 7,494 | 0 | | 7,494 |
| Rents Receivable (172) | 13 | 260 | | 273 |
| Accrued Utility Revenues (173) | 0 | 13,855 | | 13,855 |
| Miscellaneous Current and Accrued Assets (174) | 0 | 310 | | 310 |
| TOTAL Current and Accrued Assets | 1,512,511 | (419,775) | | 1,092,736 |
| **DEFERRED DEBITS** | | | | |
| Unamortized Debt Expenses (181) | 30,446 | 3,624 | | 34,070 |
| Other Regulatory Assets (182.3-182.9) | 7,771 | 57,585 | | 65,356 |
| Prelim. Survey and Investigation Charges (Electric) (183) | 502 | 0 | | 502 |
| Clearing Accounts (184) | 946 | 0 | | 946 |
| Temporary Facilties (185) | 0 | 0 | | 0 |

| | | | |
|---|---|---|---|
| Miscellaneous Deferred Debits (186) | 48,098 | 32,418 | 80,516 |
| Unamortized Loss on Reacquired Debt (189) | 1,416 | 3,454 | 4,870 |
| Accumulated Deferred Income Taxes (190) | 0 | 155,515 | 155,515 |
| Unrecovered Purchased Gas Costs (191) | 4,830 | (8,333) | (3,503) |
| TOTAL Deferred Debits | 94,009 | 244,263 | 338,272 |
| TOTAL Assets and other Debits | $2,635,343 | $540,854 | $3,176,197 |

(1) Pro forma adjustments include June 30, 2002 amounts for the Montana operations of NorthWestern Energy and consolidating eliminations.

Exhibit C 2 of 2

**NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION**
**BALANCE SHEET**
**JUNE 30, 2002**
**(Dollars in thousands)**

| LIABILITIES AND OTHER CREDITS | NOR/NPS Historical | Pro Forma Adjustments | (1) | Pro Forma |
|---|---|---|---|---|
| **PROPRIETARY CAPITAL** | | | | |
| Common Stock Issued (201) | $43,951 | $0 | | $43,951 |
| Preferred Stock Issued (204) | 3,750 | 0 | | 3,750 |
| Premium on Capital Stock (207) | 241,379 | 0 | | 241,379 |
| Other Paid-in Capital (208 - 211) | 0 | 0 | | 0 |
| (Less) Discount on Capital Stock (213) | 0 | 0 | | 0 |
| (Less) Capital Stock Expense (214) | 4,912 | 0 | | 4,912 |
| Retained Earnings (215, 215.1, 216) | 67,532 | 56 | | 67,588 |
| Unappropriated Undistributed Subsidiary Earnings (216.1 to 216.4) | 0 | - | | 0 |
| (Less) Reacquired Capital Stock (217) | 0 | - | | 0 |
| TOTAL Proprietary Capital | 361,524 | 56 | | 361,580 |
| **LONG-TERM DEBT** | | | | |
| Bonds (221) | 1,320,737 | 392,402 | | 1,713,139 |
| Advances from Associated Companies (223) | 121,392 | 0 | | 121,392 |
| Other Long-Term Debt (224) | 0 | 68,000 | | 68,000 |
| (Less) Unamortized Discount on Long-Term Debt-Debit (226) | (853) | (3,032) | | (3,885) |
| TOTAL Long-Term Debt | 1,441,276 | 457,370 | | 1,898,646 |
| **OTHER NONCURRENT LIABILITIES** | | | | |
| Accumulated Provision for Property Insurance (228.1) | 0 | 329 | | 329 |
| Accumulated Provision for Injuries and Damages (228.2) | 0 | (71) | | (71) |
| Accumulated Provision for Pensions and Benefits (228.3) | 3,848 | 11,252 | | 15,100 |
| Accumulated Miscellaneous Operating Provisions (228.4) | 0 | 138,980 | | 138,980 |
| TOTAL Other Noncurrent Liabilities | 3,848 | 150,490 | | 154,338 |
| **CURRENT AND ACCRUED LIABILITIES** | | | | |
| Notes Payable (231) | 0 | 0 | | 0 |
| Accounts Payable (232) | 5,336 | 26,193 | | 31,529 |
| Notes Payable to Associated Companies (233) | 0 | 0 | | 0 |
| Accounts Payable to Associated Companies (234) | 695,476 | (639,516) | | 55,960 |
| Customer Deposits (235) | 428 | 1,529 | | 1,957 |
| Taxes Accrued (236) | 24,786 | 28,551 | | 53,337 |
| Interest Accrued (237) | 30,829 | 5,814 | | 36,643 |
| Dividends Declared (238) | 0 | 0 | | 0 |
| Tax Collections Payable (241) | (520) | (438) | | (958) |
| Miscellaneous Current and Accrued Liabilities (242) | 7,267 | 54,561 | | 61,828 |
| Obligations Under Capital Leases (243) | 0 | 7 | | 7 |
| TOTAL Current and Accrued Liabilities | 763,602 | (523,299) | | 240,303 |
| **DEFERRED CREDITS** | | | | |
| Customer Advances for Construction (252) | 0 | 20,804 | | 20,804 |
| Other Deferred Credits (253) | 28,526 | 112,989 | | 141,515 |
| Other Regulatory Liabilities (254) | 0 | 88,908 | | 88,908 |
| Accumulated Deferred Investment Tax Credits (255) | 6,481 | 12,498 | | 18,979 |
| Unamortized Gain on Reacquired Debt (257) | 0 | 8 | | 8 |
| Accumulated Deferred Income Taxes (281-283) | 30,086 | 221,030 | | 251,116 |
| TOTAL Deferred Credits | 65,093 | 456,237 | | 521,330 |
| TOTAL Liabilities and Other Credits | $2,635,343 | $540,854 | | $3,176,197 |

(1) Pro forma adjustments include June 30, 2002 amounts for the Montana operations of NorthWestern Energy and consolidating eliminations.

**Exhibit D**

**Income Statements**

Exhibit D

**NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION**
**INCOME STATEMENT**
**12 MONTHS ENDED JUNE 30, 2002**
**(Dollars in thousands)**

| | NOR/NPS Historical | Pro Forma Adjustments (1) | Pro Forma |
|---|---|---|---|
| **UTILITY OPERATING INCOME** | | | |
| Operating Revenues (400) | $169,491 | $570,909 | $740,400 |
| Operating Expenses | | | |
| Operation Expenses (401) | 102,957 | 372,985 | 475,942 |
| Maintenance Expenses (402) | 6,713 | 25,589 | 32,302 |
| Depreciation Expense (403) | 15,403 | 52,722 | 68,125 |
| Amort. & Depl. of Utility Plant (404-405) | 1,537 | 3,207 | 4,744 |
| Amort of Utility Plant Aqu. Adj. (406.1) | | 95 | 95 |
| Regulatory Debits (407.3) | | 117,805 | 117,805 |
| (Less) Regulatory Credits (407.4) | | (16,857) | (16,857) |
| Taxes Other Than Income Taxes (408.1) | 5,495 | 53,384 | 58,879 |
| Income Taxes - Federal (409.1) | (428) | (35,803) | (36,231) |
| - Other (409.1) | | 0 | 0 |
| Provision for Deferred Income Taxes (410.1) | (1,522) | 6,358 | 4,836 |
| (Less) Provision for Deferred Income Taxes - Cr.(411.1) | (1,508) | (35,824) | (37,132) |
| Investment Tax Credit Adj. - Net (411.4) | (267) | (443) | (710) |
| (Less) Gains from Disposition of Allowances | | (8) | (8) |
| TOTAL Utility Operating Expenses | 128,380 | 543,410 | 671,790 |
| Net Utility Operating Income | 41,111 | 27,499 | 68,610 |
| **OTHER INCOME AND DEDUCTIONS** | | | |
| Other Income | | | |
| Nonutility Operating Income | | | |
| Revenues From Merchandising, Jobbing and Contract Work (415) | 0 | 2,091 | 2,091 |
| (Less) Costs and Exp. of Merchandising, Job & Contract Work (416) | 0 | 0 | 0 |
| Revenues From Nonutility Operations (417) | (3) | (1,063) | (1,066) |
| (Less) Expenses of Nonutility Operations (417.1) | (8,122) | (602) | (8,724) |
| Nonoperating Rental Income (418) | | 1 | 1 |
| Equity in Earnings of Subsidiary Companies (418.1) | (17,699) | 67,020 | 49,321 |
| Interest and Dividend Income (419) | 6,036 | 232 | 6,268 |
| Allowance for Other Funds Used During Construction (419.1) | 10 | 239 | 249 |
| Miscellaneous Nonoperating Income (421) | (63) | 11,743 | 11,680 |
| Gain on Disposition of Property (421.1) | 0 | 0 | 0 |
| TOTAL Other Income | (19,841) | 79,661 | 59,820 |
| Other Income Deductions | | | |
| Loss on Disposition of Property (421.2) | | 445 | 445 |
| Miscellaneous Amortization (425) | 14 | 622 | 636 |
| Miscellaneous Income Deductions (426.1-426.5) | 25,688 | 517 | 26,205 |
| TOTAL Other Income Deductions | 25,702 | 1,584 | 27,286 |
| Taxes Applic. to Other Income and Deductions | | | |
| Taxes Other Than Income Taxes (408.2) | 1,220 | 9 | 1,229 |
| Income Taxes - Federal (409.2) | (3,144) | 50,846 | 47,702 |
| Income Taxes - Federal ((5)(2)409.210, .230) | | | 0 |
| Income Taxes - Other ((5409.220 & 5409.120) | | | 0 |
| Provision for Deferred Inc. Taxes (410.2) | 2,969 | 5,030 | 7,999 |
| Provision for Deferred Inc. Taxes (411.2) | | (4,024) | (4,024) |
| Investment Tax Credit Adj | (223) | | (223) |
| TOTAL Taxes on Other Income and Deductions | 822 | 51,861 | 52,683 |
| Net Other Income and Deductions | (46,365) | 26,216 | (20,149) |
| **INTEREST CHARGES** | | | |
| Interest on Long-Term Debt (427) | 60,393 | 28,304 | 88,697 |
| Amortization of Debt Disc. and Expense (428) | 3,692 | 509 | 4,201 |
| Amortization of Loss on Reacquired Debt | | 307 | 307 |
| (Less) Amortization of Gain on Reacquired Debt - Credit (429) | | (9) | (9) |
| Other Interest Expense (431) | (38,201) | 14,870 | (23,331) |
| (Less) Allow. for Borrowed Funds Used During Construction-Cr. (432) | (9) | (460) | (469) |
| Net Interest Charges | 25,875 | 43,521 | 69,396 |
| Net Income | ($31,129) | $10,194 | ($20,935) |

(1) Pro forma adjustments include amounts for the 12 months ended June 30, 2002 for the Montana operations of NorthWestern Energy.

**<u>Exhibit E</u>**

**Statement of Cash Flows and Computation of Interest**

Exhibit E

## NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION
## CASH FLOWS
### 12 MONTHS ENDED JUNE 30, 2002
#### (Dollars in thousands)

| | NOR/NPS Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| **Net Cash Flow from Operating Activities:** | | | |
| Net Income | ($31,129) | $10,194 | ($20,935) |
| Noncash Charges (Credits) to Income: | | | |
| Depreciation and Depletion | 15,403 | 56,024 | 71,427 |
| Amortization of Limited Term Investments | 1,537 | 0 | 1,537 |
| Deferred Income Taxes (Net) | (61) | (28,260) | (28,321) |
| Investment Tax Credit Adjustment (Net) | (490) | (443) | (933) |
| Net (Increase) Decrease in Receivables | (850,309) | 698,610 | (151,699) |
| Net (Increase) Decrease in Inventory | 761 | 377 | 1,138 |
| Net Increase (Decrease) in Payables and Accrued Expenses | 670,350 | (959,062) | (288,712) |
| (Less) Undistributed Earnings from Subsidiary Companies | 17,699 | (67,020) | (49,321) |
| Other Current Assets | 12,876 | 8,991 | 21,867 |
| Other Current Liabilities | 1,584 | 18,065 | 19,649 |
| Other | (37,877) | 90,410 | 52,533 |
| Net Cash Provided by (Used in) Operating Activities | (199,656) | (172,114) | (371,770) |
| | | | |
| **Cash Flows from Investment Activities:** | | | |
| Construction and Acquisition of Plant (including land): | | | |
| Gross Additions to Utility Plant (less nuclear fuel) | (7,054) | (28,368) | (35,422) |
| Gross Additions to Common Utility Plant | 0 | (1,234) | (1,234) |
| Gross Additions to Non-Utility Plant | (1,105) | 751 | (354) |
| (Less) Allowance for Other Funds Used During Construction | 0 | 0 | - |
| Cash Outflows for Plant | (8,159) | (28,851) | (37,010) |
| Net (Increase) Decrease in Investments in Associated Companies | (578,640) | 381,187 | (197,453) |
| Net (Increase) in Investments in Subsidiary Companies | (11,673) | 67,189 | 55,516 |
| Advances from Associated Companies | | 0 | 121,392 |
| Net (Increase) in Investments and Special Funds | | | (9,752) |
| Net Cash Provided by (Used in) Investing Activities | (477,859) | 410,552 | (67,307) |
| | | | |
| **Cash Flows from Financing Activities:** | 4,912 | | |
| Increase in Long-Term Debt | | | 783,487 |
| Dividends on Preferred Stock | 0 | 0 | - |
| Increase in Common Stock | | 0 | 243,887 |
| Increase in Premium on Common Stock | | | (158,954) |
| Decrease in Additional Paid in Capital | | (554,243) | (554,243) |
| Decrease in Reacquired Capital Stock | | 205,656 | 205,656 |
| Dividends on Common Stock | (33,151) | 0 | (33,151) |
| Net Cash Provided by (Used in) Financing Activities | 702,110 | (215,428) | 486,682 |
| | | | |
| Net Increase (Decrease) in Cash and Cash Equivalents | 24,595 | 23,010 | 47,605 |
| | | | |
| Cash and Cash Equivalents at Beginning of Period | 7,165 | 10,726 | 17,891 |
| | | | |
| Cash and Cash Equivalents at End of Period | $31,760 | $33,736 | $85,496 |

**NORTHWESTERN PUBLIC SERVICE A DIVISION OF NORTHWESTERN CORPORATION**
**FEDERAL ENERGY REGULATORY COMMISSION**
**WORKSHEET FOR COMPUTATION OF INTEREST COVERAGE**
**(Dollars in thousands)**

**OMB CONTROL NO.1902-004 INTEREST COVERAGE:**

|  | Actual for 12 Months Ended 6/30/2002 | OMB control No. 1902-0043 Pro Forma for 12 Months Ended 6/30/2002 (1) | Pro Forma for 12 Months Ended 6/30/2002 |
|---|---|---|---|
| Net income | ($31,129) | $10,194 | ($20,935) |
| Add: Interest on long-term debt | 60,393 | 28,304 | 88,697 |
| Other interest | (38,201) | 14,870 | (23,331) |
| Total Interest | 22,192 | 43,174 | 65,366 |
| Federal and state income taxes | (4,123) | (13,660) | (17,783) |
| Income Before Interest and Income Taxes | $ (13,060) | $ 39,708 | $26,648 |

**Computation of Interest Coverage:**

|  |  |  |  |
|---|---|---|---|
| Income Before Interest and Income Taxes | (13,060) | 39,708 | 26,648 |
| Divided by Total Interest | 22,192 | 43,174 | 65,366 |
| Interest Coverage | (0.59) | 0.92 | 0.41 |

(1) Pro forma adjustments include amounts for 12 months ended June 30, 2002 for the Montana operations of NorthWestern Energy.