# EXHIBIT
# 19

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORPORATION and

LAW DEBENTURE TRUST COMPANY OF NEW YORK,

                        Plaintiffs,

     -vs-

NORTHWESTERN CORPORATION,

                       Defendant.

Civil Action No. C.A. No. 04-1494 (JJF)

-------------------------------------- X

MAGTEN ASSET MANAGEMENT CORP.,

                       Plaintiff,

     -vs-

MICHAEL J. HANSON and ERNIE J. KINDT,

                       Defendants.

Civil Action No. C.S. No. 05-499 (JJF)

-------------------------------------- X

DATE:     November 13, 2007

TIME:     9:00 a.m.


        Deposition of PAUL A. MARCUS, held at

the offices of Curtis, Mallet-Prevost, Colt &

Mosle, 101 Park Avenue, New York, New York,

1                - PAUL A. MARCUS -

2     contained in this paragraph with anyone from Fried,

3     Frank?

4          A.     Not to my recollection, no.

5          Q.     Did you ever discuss the allegations in

6     this paragraph with anybody else at Huron?

7          A.     Not to my recollection, no.

8          Q.     Were you ever asked or did you ever

9     understand that you were being asked to offer any

10    opinions with respect to the allegations contained

11    in Paragraph 51?

12               MR. KAPLAN:  Objection to the form.

13         A.     I was never asked to perform any form of

14    insolvency analysis.

15               MR. PIZZURRO:  Mark this as Exhibit 3.

16               (Whereupon, Marcus Exhibit 3 was marked

17    at this time.)

18         Q.     Mr. Marcus, you've just been handed a

19    document which is marked as Exhibit 3.

20               Do you recognize this as your report

21    submitted in connection with this matter?

22         A.     Generally I recognize it.  And I'll

23    assume all of the pages were appropriately copied,

24    and it is my report, yes.

25         Q.     In connection with issuing this report,

1                    - PAUL A. MARCUS -

2          A.    I guess I can't answer that because if

3     somebody were to ask me a question and phrase it a

4     certain way and ask me for my opinion, I might

5     offer that opinion.  But I have written a report

6     that summarizes the things that I've analyzed to

7     date and opinions that I'm setting -- proactively

8     setting forth.  But were you to ask me my opinion

9     today on something, if I could give it, I would

10    give it.

11         Q.    Have you changed any of the opinions as

12    they're set forth in Marcus Exhibit 3 as of today?

13         A.    I'm a bit confused by your question.

14         Q.    I want to know if your opinion as

15    expressed in the report or any one of them has

16    changed in any way since September 19th, the date

17    of the report, until you're sitting here today?

18         A.    I understand now.  No, they have not.

19         Q.    Mr. Marcus, you're a CPA, are you not?

20         A.    I'm not, no.

21         Q.    You are not a CPA?

22         A.    I'm not a CPA.

23         Q.    Do you consider yourself an expert on

24    the Montana Public Service Commission?

25         A.    Can you be more specific what you mean

1           - PAUL A. MARCUS -

2    by an expert on the Commission?

3         Q.    No.   That's as specific as my question

4    is.   It's pretty specific.

5         A.    Let me try to answer it then.   I can

6    tell you that I have extensive experience working

7    in financing utility companies and reviewing

8    opinions of commissions throughout the country in

9    many jurisdictions.   I have experience in reviewing

10   other people's interpretation and understanding of

11   how those commissions function.   And I would

12   consider myself an expert in interpreting and

13   understanding how commissions work, what positions

14   they put forth, their interests, and the

15   constituencies that they represent.

16        Q.    Do you have any experience in dealing

17   with the Montana Public Service Commission?

18        A.    I don't recall.

19        Q.    Have you ever offered opinion testimony

20   as an expert about any aspect of the Montana Public

21   Service Commission?

22             MR. KAPLAN:   Objection to the form.

23        A.    I have not.

24        Q.    Have you ever testified as an expert

25   before the Montana Public Service Commission?

Page 37

1                    - PAUL A. MARCUS -

2        A.    No, I have not.

3        Q.    Have you ever testified as an expert

4    about any commission regulating utilities at a

5    state level?

6        A.    I have not.

7        Q.    Have you ever testified as an expert

8    about any utility regulatory commissions at a

9    federal level?

10       A.    I have not.

11       Q.    Sir, are you familiar with the statutory

12   authority or the statutory structure pursuant to

13   which the Montana Power -- strike that.

14             -- Montana Public Service Commission

15   derives its authority?

16       A.    Not that I recall, no.

17       Q.    Are you familiar with any regulations

18   governing the authority or procedures of the

19   Montana Public Service Commission?

20       A.    Can you repeat that again, please?

21       MR. PIZZURRO:  Can you read the

22   question, please?

23             (The question requested was read back by

24   the reporter.)

25       A.    Yes.

1              - PAUL A. MARCUS -

2        Q.    And what are those regulations?

3        A.    I can't specifically articulate which

4    regulations I've read.  I have read through their

5    procedural announcements, their rulings on certain

6    cases; so from that perspective, I've actually seen

7    some of their rulings.

8              MS. BEATTY:  Excuse me.  Mr. Marcus, can

9    you speak up a little bit?  You're hard to hear.

10             THE WITNESS:  Sorry.

11       Q.    Have you ever spoken to counsel about

12   the regulations governing the authority of the

13   Montana Public Service Commission?

14             MR. KAPLAN:  Objection to the form.

15       A.    I don't recall that specific discussion.

16       Q.    Other than in this case, what rulings of

17   the Montana Public Service Commission have you

18   reviewed?  And by "this case," what I mean are any

19   rulings that the Montana Public Service Commission

20   made in connection with either the acquisition of

21   the Montana Power assets by Northwestern or any

22   subsequent approvals of financings that

23   Northwestern did which might have been required by

24   the Montana Public Service Commission.

25       A.    I'm sorry?

1              - PAUL A. MARCUS -

2        Q.      Better question.

3               Other than the proceedings and decisions

4    of the Montana Public Service Commission, which are

5    referenced in your report which is Exhibit 3, what

6    other rulings and cases of the Montana Public

7    Service Commission have you reviewed?

8        A.      None that I recall.

9        Q.      So is it safe to say --

10               MR. KAPLAN:  Just for the record, I'm

11   not sure you cited the right exhibit.  I'm not sure

12   it's Exhibit 3.

13               MR. PIZZURRO:  I believe it is.

14       Q.      Could you tell us -- when I say

15   Exhibit 3, I'm talking about Exhibit 3 in this

16   deposition, the deposition of today.

17               MR. KAPLAN:  Okay.  The deposition.

18               MR. PIZZURRO:  I didn't mean any exhibit

19   to the report.

20       Q.      What is the scope of the authority of

21   the Montana Public Service Commission?

22               MR. KAPLAN:  Objection to the form.  Are

23   you asking for a legal interpretation of their

24   scope of authority?  What are you asking this

25   witness to testify about?

1                    - PAUL A. MARCUS -

2              MR. PIZZURRO:  I'm asking the witness

3      to -- the witness testified he's reviewed, I guess

4      now, only what happened with respect to a couple of

5      instances involving Northwestern but he's offered

6      testimony concerning Montana Public Service

7      Commission.  I want to know what the scope of the

8      authority of the Commission is.

9              MR. KAPLAN:  I'm going to object.  That

10     calls for a legal conclusion.

11             MR. PIZZURRO:  I wouldn't disagree with

12     you but I would like an answer from this witness

13     anyway.

14         A.    Well, first, you just made a statement

15     on the record which is talking about Montana --

16     what I've said to you in my prior answer is that I

17     have a lot of experience working with commissions.

18             I've financed over a billion dollars

19     worth of utility financing.

20             I've had to assess many different

21     commissions' authorities and their ability to work

22     with the utilities in those states and fully

23     recognize that regardless of whatever the legal

24     scope is, is that the commissions have an

25     obligation to protect the rate payers and the

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, New York 10017

1          - PAUL A. MARCUS -

2    constituents within their states.  And I know that

3    from having worked with regulators in many

4    different states and having seen their opinions and

5    having seen how they interact with many different

6    utilities.

7          Q.    Mr. Marcus, my question was:  What is

8    the scope of the authority of the Montana Public

9    Service Commission?

10              If you want to say, "I don't know,"

11   that's fine.  I would like an answer to that

12   question.

13              MR. KAPLAN:  I still have an objection

14   to that question.

15          A.    I can't give you a legal interpretation,

16   but I can give you an interpretation I have as a

17   layperson, which is that all commissions,

18   regardless of what state they're in, have an

19   obligation to protect the constituents within those

20   states -- protect the rate payers and consumers in

21   those states.

22          Q.    I didn't ask you what their obligations

23   were.  I asked what the scope of authority of the

24   Montana Public Service Commission was, what

25   authority does it have?

1                   - PAUL A. MARCUS -

2     is the contract that the QUIPS had with

3     Northwestern, that they had a right to any

4     treatment better than they received in the asset

5     transfer and liability assumption?

6                   MR. KAPLAN:  Objection to the form.

7          A.    I'm not sure I understand the question.

8          Q.    Your testimony as to how the QUIPS

9     holders' interests were adversely affected was that

10    ultimately they received little to nothing.

11                I assume you're speaking about what

12    happened after Northwestern filed for Chapter 11

13    and the Plan was approved, correct?

14         A.    That's my recollection, yes.

15         Q.    Okay.  The reason for that was because

16    the QUIPS holders became creditors of Northwestern

17    and were not only unsecured but ended up being the

18    most junior creditors, all other debt, even

19    subsequent debt, being senior to the QUIPS holders.

20                Isn't that why they ended up in the

21    position they did in the bankruptcy?

22                MR. KAPLAN:  Objection to the form.

23         A.    I'm not sure I can give you an answer to

24    that.

25         Q.    Well, do you know whether or not the

Page 59

- PAUL A. MARCUS -

1
2  right to contact a Trustee of the bonds, to see if
3  anything could be done as a group.  I know that
4  everyone has the right to go talk to the
5  commissions to try to persuade them that the asset
6  transfer would be problematic.
7            You've asked me for things they could
8  do.  Those are definitely things that they could
9  do.
10     Q.    Did you review the opinion of Judge
11  Case, which was issued in or about August of 2004,
12  on motion to dismiss that was made in this action
13  by Northwestern?  Do you recall, sir?
14     A.    I don't recall seeing that.
15     Q.    Back in that same sentence when you say,
16  "impeded by the attempts of security holders and
17  regulators."
18            Other than the Montana Public Service
19  Commission, were there any other regulators that
20  you were referring to?
21     A.    At one point I was thinking about some
22  of the possible regulators within the state in
23  terms of Attorney Generals, things of that nature,
24  but the majority of my focus was on the Montana
25  Public Utility Commission.

Page 60

- PAUL A. MARCUS -

Q.    Was that because you had reviewed some of the statements that had been made by the Commissioners in connection with the approval of the $390 million secured financing that was accomplished in January and February of 2003?

MR. KAPLAN:  Objection to the form.

A.    I'm not sure what you're asking me.

Q.    You say the majority of your focus was on the Montana Public Utility Commission.  I think it's Public Service Commission, not the Public Utility Commission.

At any rate, I'm asking if your focus was because you actually reviewed some statements made in proceedings involving the MPSC in connection with Northwestern?

A.    No.  My focus was on the Commission because I have experience with utility companies and commissions and know what an integral role they play in all of these things.  I did ask to look at any rulings they might have made, and I did look at that one as part of my analysis.

Q.    Okay.  You know that the MPSC had already approved the acquisition of the Montana Power assets by Northwestern in early 2002,

Page 61

- PAUL A. MARCUS -

1
2    correct?

3        A.    I'd have to go back to the specific

4    order, but my general recollection is that they

5    approved it, yes.

6        Q.    You also knew that that approval covered

7    whether or not Northwestern kept the assets in a

8    wholly owned subsidiary or moved them to the parent

9    company to operate as a division along with

10   Northwestern's other utility assets; is that

11   correct?

12       A.    My recollection is that the approval was

13   for either a separate subsidiary or as a division.

14       Q.    Do you have any basis for understanding

15   whether having given that approval, the MPSC had

16   the authority or the ability to step in and impede,

17   as you've put it, the asset transfer?

18            MR. KAPLAN:  Objection to the form.

19       A.    All I can tell you is that the

20   commissions -- from my understanding of commissions

21   in general, is that they have broad authority over

22   the utilities in their states.  And that to the

23   extent that this information, which is material in

24   which they commented on extensively after the fact,

25   if that information had been in the public domain,

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, New York 10017

1         - PAUL A. MARCUS -

2    that they would have done whatever they could have

3    to protect their constituents.  And to the extent

4    that that meant taking action, I believe that they

5    would have done that.

6         Q.    My question wasn't whether they wanted

7    to do or not wanted to do.

8              My question is:  Do you know what they

9    had the authority to do, yes or no?

10        A.    I haven't made a legal determination of

11   what their authority is.

12        Q.    You don't know, do you?

13             MR. KAPLAN:  Objection.  Asked and

14   answered.

15        Q.    Withdrawn.

16             Do you know whether the Montana Public

17   Service Commission in its history has ever

18   rescinded approval of a transaction once that

19   approval had already been given?  Ever?

20        A.    That's a bit of a loaded question in

21   that if you're asking me for a good transaction,

22   did they rescind it?  I don't know.

23             I don't know if there have been any

24   transactions where material information was omitted

25   or misrepresented and they were then put in a

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, New York 10017

1             - PAUL A. MARCUS -

2        Q.    Well, why didn't the MPSC just say,

3    "Give the assets back to your subsidiary

4    Northwestern Energy LLC"?

5             MR. KAPLAN:  Objection.

6        A.    At that point, I don't know if they had

7    the legal ability to do that.  I just don't know

8    the answer to your question.

9        Q.    You also don't know whether they had the

10   legal ability to impede the going flat transaction

11   having given their approval to the transaction in

12   January of '02, correct?

13            MR. KAPLAN:  Objection.

14       Q.    I'm just trying to probe the limits of

15   what your knowledge is concerning the scope of

16   authority and ability of the MPSC to act.  You

17   offer an opinion they would have impeded.

18       A.    That's correct.

19       Q.    You don't know whether they could have

20   ordered the assets given back.

21            That's your testimony, correct?

22       A.    My testimony is I don't know the legal

23   steps that they can take.  I can tell you that my

24   experience has seen a variety of different measures

25   that utility commissions have taken to protect the

Page 99

- PAUL A. MARCUS -

1

2    Northwestern made?

3           MR. KAPLAN:  Objection to the form.  Are

4    you asking any specific filings?

5       Q.    Any.  Did you review the Petition?

6       A.    I don't specifically recall.

7       Q.    Did you review the Disclosure Statement?

8       A.    I don't recall that.

9       Q.    Did you review the Plan?

10      A.    I don't recall.

11      Q.    What caused the company to go bankrupt?

12             MR. KAPLAN:  Objection to the form.

13      A.    As I said, I haven't seen -- I don't

14   recall seeing the documents, so I might have known

15   that at one point.  I just don't know it now.

16      Q.    You don't know?

17      A.    I don't know right now.

18      Q.    Sir, let me direct your attention to

19   Page 43 of the report.

20             Starting with Paragraph 108 and going on

21   to Paragraph 117, do you see that, sir, under the

22   heading -- under "$390 Million CSFB Financing"?

23      A.    I do.

24             MR. KAPLAN:  If you need to read the

25   paragraph, you should.

1          - PAUL A. MARCUS -

2          Q.    When you say "known to the public," that

3    would include information known to the rating

4    agencies as of mid-April 2003?

5               MR. KAPLAN:  Objection.

6          A.    I'm not sure what your question is.

7          Q.    When you say "to the public," do you

8    include the rating agencies as part of the public?

9          A.    When I say "public," I mean the public

10   domain, so anyone who wanted to find that out

11   could.  It would include security agencies, rating

12   agencies, security analyst, you and I, people.

13         Q.    Lenders, investors, would that be part

14   of the public domain?

15         A.    It might or might not be.

16         Q.    Why might it not be?

17         A.    I take that back.  To the extent the

18   information is in the public domain, then anybody

19   who wants to see it can see it.  I misunderstood

20   your question.  I'm sorry.  It's been a long day.

21         Q.    When the disclosures were made in April

22   of 2003, do you have an opinion as to whether

23   after -- after those disclosures were made, that

24   the bankruptcy of Northwestern was an

25   inevitability?

Page 172

1                      - PAUL A. MARCUS -

2              MR. KAPLAN:  Objection to the form.

3        A.    I have not analyzed that, no.

4        Q.    Earlier in your deposition I believe you

5   testified -- and if I got it wrong, please correct

6   me, Mr. Marcus.

7              I believe you testified that

8   Northwestern ceased paying a dividend.

9        A.    I don't believe I testified to it.  I

10  believe in February of 2003 they stopped paying

11  their dividend.

12       Q.    And if I understood your testimony

13  earlier today, you said that when a public utility

14  stops paying a dividend, that inevitably they go

15  into bankruptcy.

16       A.    I believe my testimony was that the

17  company's financial advisor, Bear, Stearns in a

18  presentation to them, made the comment that it

19  would be a bad signal because the utilities that

20  they were aware of that took their dividend to zero

21  went bankrupt.

22       Q.    Would you -- do you agree with that

23  observation by Bear Sterns that you just recited?

24       A.    I have no reason to disagree with it.

25       Q.    Throughout your expert report,

Page 183

1                      - PAUL A. MARCUS -

2     today.

3          Q.     Either in preparation of your expert

4     report or in preparation for your deposition today,

5     did you ever review the joint applications

6     submitted by the sellers and Northwestern

7     Corporation for the acquisition of Montana Power

8     LLC?  That's the joint application to the Montana

9     Public Service Commission.

10          A.     I don't recall that.

11          Q.     I didn't see it listed in the exhibit to

12     your expert report.

13          A.     Then I don't believe I would have.

14          Q.     Did you review the transcript of the

15     proceedings related to the joint application for

16     the acquisition of Montana Power LLC by

17     Northwestern?

18          A.     I don't believe I did.

19          Q.     This afternoon in response to a question

20     from Mr. Pizzurro you stated that the Montana

21     Public Service Commission could have ring fenced

22     the Montana utility assets; is that correct?

23          A.     I think I used the term that someone

24     else had used in the sense that he asked what they

25     could have done, and it was a description of their

Page 186

- PAUL A. MARCUS -

1

2    Q.    I think I know that you don't know.

3          MR. KAPLAN:  Objection to the extra

4    commentary.

5    Q.    Withdrawn.

6          Mr. Marcus, have you ever advised a

7    client on financing matters involving a company

8    regulated by the Montana Public Service Commission?

9    A.    I might have.  I just don't recall.

10   Q.    In what capacity might you have done

11   that?

12   A.    Most specifically, it would have been at

13   the time when I was a lender at Bank of America.

14   We lent money to companies in the utility industry.

15         I was doing that out of their Chicago

16   office so I was covering utilities all throughout

17   the midwest.  Montana was not specifically a state

18   that was covered in our geographical area, although

19   I'm just not sure I remember whether or not some of

20   the utilities that I was working with would have

21   had some holding in Montana that would have caused

22   Montana to regulate them.

23   Q.    But nothing that stands out in your mind

24   sitting here today?

25   A.    That's correct.

Page 187

1                    - PAUL A. MARCUS -

2        Q.    Do you know what utilities operate in

3    Montana, regulated utilities?

4        A.    Sitting here today, no.

5        Q.    This morning I think you had testified,

6    if I took my note correctly, that you had reviewed

7    certain procedural pronouncements of the Montana

8    Public Service Commission.

9              Do you recall that testimony?

10       A.    If by the "procedural pronouncements"

11   you're talking about the final order to the

12   dissenting order on the $390 million bond offering,

13   I did review that.

14       Q.    That would have been the order that came

15   out in the early part of 2003?

16       A.    I believe that was the time frame.

17       Q.    And that's the same order in which you

18   quote from the dissenting opinion of Commissioner

19   Brainard, B-R-A-I-N-A-R-D; is that correct?

20       A.    That would be correct.

21       Q.    Other than that one particular order,

22   did you review any other orders of the Montana

23   Public Service Commission?

24       A.    I believe there were other things.  I

25   just don't recall what they were specifically.

1                    - PAUL A. MARCUS -

2      certain situations and my recollection is that I

3      saw some other things from earlier in the time

4      period from the Commission.  I just can't identify

5      them sitting here.

6            Q.    Would they have been other things

7      related to the docket whose subject was the

8      acquisition of Montana Power LLC by Northwestern?

9            A.    That would be my general understanding,

10     yes.

11           Q.    Do you have any recollection of looking

12     at any orders of the Montana Public Service

13     Commission dealing with dockets involving regulated

14     utilities other than Northwestern Corporation?

15           A.    I did not, no.

16           Q.    How did you locate those other orders?

17     Did you find them or your staff find them or were

18     they given to you?

19           A.    My staff provided them to me.  I don't

20     know if they independently found those or they

21     requested them from counsel.  I just don't know the

22     answer to that.

23           Q.    Are there any opinions or orders of the

24     Public Service Commission on which you relied that

25     are not referenced somewhere in your expert report?