# EXHIBIT
# 22

*EXECUTION VERSION*

---

### CREDIT AGREEMENT

among

**NORTHWESTERN CORPORATION,**
as Borrower,

The Several Lenders from Time to Time Parties Hereto,

**CREDIT SUISSE FIRST BOSTON,
CIBC INC.,
ABN AMRO BANK N.V.
and
BARCLAYS CAPITAL,**
as Co-Arrangers

and

**CREDIT SUISSE FIRST BOSTON,**
as Administrative Agent,
Lead Arranger and Sole Book Runner

Dated as of January 14, 2002

---

CSFB001264

# TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ........................................................................................ 1
  1.1    Defined Terms ............................................................................................ 1
  1.2    Other Definitional Provisions ................................................................. 24

ARTICLE 2. AMOUNT AND TERMS OF COMMITMENTS .............................. 25
  2.1    Commitments ............................................................................................ 25
  2.2    Notes ........................................................................................................... 27
  2.3    Procedure for Borrowings ....................................................................... 27
  2.4    Fees ............................................................................................................. 29
  2.5    Optional and Mandatory Termination or Reduction .......................... 30
  2.6    Optional and Mandatory Prepayments ................................................. 31
  2.7    Interest Rate Conversion and Continuation Options .......................... 32
  2.8    Maximum Amounts of Eurodollar Tranches ....................................... 33
  2.9    Interest Rates; Default Rate Payment Dates ........................................ 33
  2.10  Computation of Interest ........................................................................... 33
  2.11  Inability to Determine Interest Rate ...................................................... 34
  2.12  Pro Rata Treatment and Payments; Funding Reliance ....................... 34
  2.13  Illegality .................................................................................................... 35
  2.14  Requirements of Law .............................................................................. 36
  2.15  Taxes ......................................................................................................... 37
  2.16  Indemnity .................................................................................................. 39
  2.17  Discretion of Lender as to Manner of Funding .................................... 40
  2.18  Change of Lending Office; Replacement Lender ................................. 40
  2.19  [Intentionally Omitted] ............................................................................ 41
  2.20  Additional Provisions relating to Letters of Credit ............................. 41
  2.21  Additional Provisions Relating to Swingline Loans ........................... 45
  2.22  Participations in Letters of Credit and Swingline Loans .................... 46
  2.23  NW Restructuring .................................................................................... 46

ARTICLE 3. REPRESENTATIONS AND WARRANTIES .................................. 47
  3.1    Financial Condition .................................................................................. 47
  3.2    No Change ................................................................................................. 47
  3.3    Corporate Existence; Compliance with Law ........................................ 47
  3.4    Corporate Power; Authorization; Enforceable Obligations ................ 48
  3.5    No Legal Bar ............................................................................................. 48
  3.6    No Material Litigation ............................................................................. 49
  3.7    No Default ................................................................................................. 49
  3.8    Ownership of Property; Liens ................................................................. 49
  3.9    [Intentionally Omitted] ............................................................................ 49
  3.10  Intellectual Property ................................................................................ 49
  3.11  No Burdensome Restrictions .................................................................. 50
  3.12  Taxes ......................................................................................................... 50

NY—591039.20

CSFB001265

| | | |
|---|---|---|
| 3.13 | Margin Stock | 50 |
| 3.14 | ERISA | 50 |
| 3.15 | Holding Company; Investment Company Act; Other Regulations | 51 |
| 3.16 | Purpose of Loans | 51 |
| 3.17 | Environmental Matters | 51 |
| 3.18 | Insurance | 52 |
| 3.19 | Accuracy and Completeness of Information | 52 |
| 3.20 | Leaseholds, Permits, etc | 52 |
| 3.21 | No Restrictive Covenants | 53 |
| 3.22 | Solvency | 53 |
| 3.23 | Index Debt Rating | 53 |
| 3.24 | Acquisition Agreement; Merger | 53 |
| 3.25 | Subsidiaries | 54 |

ARTICLE 4. CONDITIONS PRECEDENT .......................................... 54

| | | |
|---|---|---|
| 4.1 | Conditions to Initial Loans | 54 |
| 4.2 | Conditions to Each Extension of Credit | 57 |

ARTICLE 5. AFFIRMATIVE COVENANTS .......................................... 58

| | | |
|---|---|---|
| 5.1 | Financial Statements | 58 |
| 5.2 | Certificates; Other Information | 59 |
| 5.3 | Payment and Performance of Obligations | 60 |
| 5.4 | Maintenance of Existence | 60 |
| 5.5 | Maintenance of Property; Insurance | 60 |
| 5.6 | Inspection of Property; Books and Records; Discussions | 60 |
| 5.7 | Notices | 61 |
| 5.8 | Environmental Laws | 61 |
| 5.9 | ERISA | 62 |
| 5.10 | Use of Proceeds | 62 |
| 5.11 | Margin Stock | 62 |
| 5.12 | Maintain Ownership of the Company and the Utility Business | 62 |
| 5.13 | Amendment of Loan Documents | 63 |
| 5.14 | Ratings | 63 |

ARTICLE 6. NEGATIVE COVENANTS .......................................... 63

| | | |
|---|---|---|
| 6.1 | Financial Covenants | 63 |
| 6.2 | Limitation on Fundamental Changes | 63 |
| 6.3 | Limitation on Transactions with Affiliates | 64 |
| 6.4 | Limitation on Liens | 64 |
| 6.5 | Amendments of Acquisition Agreement and Organizational Documents | 64 |
| 6.6 | Limitation on Guarantee Obligations | 64 |
| 6.7 | Limitation on Sale of Assets | 65 |
| 6.8 | Limitation on Investments, Loans and Advances | 65 |
| 6.9 | Limitation on Dividends and Stock Repurchases | 66 |
| 6.10 | Limitation on Indebtedness or Mandatory Redeemable Stock | 67 |
| 6.11 | Limitation on Sales and Leasebacks | 68 |

NY—591039.20

CSFB001266

6.12 Limitation on Negative Pledge Clauses; Payment Restrictions......................68
6.13 Limitation on Businesses................................................................69
6.14 Limitation on Certain Prepayments and Amendments.................................69
6.15 Limitations on Subsidiaries' Equity Interests ......................................69

ARTICLE 7. EVENTS OF DEFAULT...........................................................70

7.1 Events of Default......................................................................70

ARTICLE 8. THE AGENTS .......................................................................72

8.1 Appointment ..............................................................................72
8.2 Delegation of Duties....................................................................73
8.3 Exculpatory Provisions..................................................................73
8.4 Reliance by Agents......................................................................73
8.5 Notice of Default........................................................................73
8.6 Non-Reliance on Agents and Other Lenders .........................................74
8.7 Indemnification ..........................................................................74
8.8 Agent in Its Individual Capacity .......................................................75
8.9 Successor Administrative Agent .......................................................75

ARTICLE 9. MISCELLANEOUS ...............................................................75

9.1 Amendments and Waivers ............................................................75
9.2 Notice ....................................................................................76
9.3 No Waiver; Cumulative Remedies.....................................................77
9.4 Survival of Representations and Warranties..........................................77
9.5 Payment of Expenses and Taxes; Indemnification ..................................77
9.6 Successors and Assigns; Participations and Assignments............................78
9.7 Adjustments; Setoff.....................................................................81
9.8 Confidentiality ..........................................................................82
9.9 Effectiveness ............................................................................82
9.10 Counterparts .............................................................................82
9.11 Severability ..............................................................................82
9.12 Integration ...............................................................................82
9.13 GOVERNING LAW ....................................................................83
9.14 Submission To Jurisdiction; Waivers.................................................83
9.15 Acknowledgments.......................................................................83
9.16 Waivers of Jury Trial...................................................................84

NY—591039.20

CSFB001267

EXHIBITS AND SCHEDULES

| Annex A | Pricing Grid |
| Exhibit A-1 | Form of Revolving Credit Note |
| Exhibit A-2 | Form of Term Note |
| Exhibit B-1 | Form of Notice of Borrowing |
| Exhibit B-2 | Form of Notice of Request for Letter of Credit |
| Exhibit B-3 | Form of Notice of Borrowing of Swingline Loans |
| Exhibit B-4 | Form of Notice of Interest Rate Conversion |
| Exhibit C | Form of Closing Certificate |
| Exhibit D | Form of Assignment and Assumption Agreement |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of Pledge Agreement |
| | |
| Schedule 1 | Lending Offices of Lenders |
| Schedule 3.4 | Required Consents of Governmental Authorities |
| Schedule 3.6 | Litigation |
| Schedule 3.8 | Exceptions to Title to Borrower's Properties |
| Schedule 3.12 | Taxes |
| Schedule 3.14 | ERISA |
| Schedule 3.15 | Regulations Limiting Indebtedness |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.25 | Subsidiaries |
| Schedule 6.3 | Transactions with Affiliates |
| Schedule 6.6 | Guarantee Obligations |
| Schedule 6.8 | Investments |
| Schedule 6.10 | Indebtedness, Mandatory Redeemable Stock and Preferred Stock |

NY—591039.20

CSFB001268

CREDIT AGREEMENT, dated as of January 14, 2002, between NORTHWESTERN CORPORATION, a Delaware corporation (the "Borrower"), the several banks and other financial institutions from time to time party hereto (the "Lenders"), CREDIT SUISSE FIRST BOSTON, ABN AMRO BANK N.V., CIBC INC. and BARCLAYS CAPITAL, as Co-Arrangers (each a "Co-Arranger" and, collectively, the "Co-Arrangers"), and CREDIT SUISSE FIRST BOSTON, acting through its New York Branch, as Administrative Agent (in such capacity the "Administrative Agent "), Lead Arranger and Sole Book Runner.

## PRELIMINARY STATEMENTS

1.    The Borrower intends to acquire (the "Acquisition") all of the membership interests of The Montana Power, L.L.C., a Montana limited liability company (the "Company"), which holds the assets and securities owned by The Montana Power Company ("MPC") as of September 29, 2000 (other than Entech, Inc. and its subsidiaries), pursuant to the terms of the Unit Purchase Agreement, dated as of September 29, 2000 (as amended from time to time, the "Acquisition Agreement"), among the Borrower, MPC, the Company and Touch America Holding, Inc. (the "Seller").

2.    The Borrower desires that, subject to the satisfaction of the conditions set forth herein, (a) during the Availability Period (as hereinafter defined), Lenders having Revolving Credit Commitments (as hereinafter defined) make revolving credit loans in an aggregate principal amount not to exceed $280,000,000 at any one time outstanding, and (b) on the Closing Date (as hereinafter defined), Lenders having Term Loan Commitments (as hereinafter defined) make term loans in an aggregate principal amount not to exceed $720,000,000. The Lenders are willing to provide such loans, subject to the terms and conditions set forth herein.

3.    In consideration of the foregoing premises and the mutual covenants herein contained and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1. DEFINITIONS

1.1 Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"Acquisition" shall have the meaning ascribed thereto in the Preliminary Statements hereof.

"Acquisition Agreement" shall have the meaning ascribed thereto in the Preliminary Statements hereof.

"Administrative Agent " shall have the meaning ascribed thereto in the heading hereto and shall include such other Lender or financial institution as shall

have subsequently been appointed as the successor Administrative Agent pursuant to Section 8.9.

"Affected Lender" shall have the meaning ascribed thereto in Section 2.18.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of (including all directors and officers of such Person), is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting securities, by contract or otherwise.

"Agents" shall have the meaning ascribed thereto in Section 8.1.

"Agreement" shall mean this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, on any particular date, a rate of interest per annum equal to the higher of

(a)     the rate of interest most recently announced by CSFB as its prime rate in effect at its principal office in New York City (which rate is not necessarily intended to be the lowest rate of interest charged by CSFB in connection with extensions of credit); and

(b)     the Federal Funds Rate for such date plus 0.50%.

"Alternate Base Rate Loans" shall mean Loans the rate of interest applicable to which is based upon the Alternate Base Rate.

"Applicable Margin" shall mean, for any day, with respect to any Alternate Base Rate Loan or Eurodollar Loan, or with respect to the Commitment Fees payable hereunder, as the case may be, the applicable rate *per annum* determined pursuant to the Pricing Grid.

"Approved Fund" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in commercial loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Arranger" shall mean CSFB and its successors.

"Asset Sale" shall mean any sale, lease or other disposition (including (x) any such transaction effected by way of merger or consolidation and (y) any sale-leaseback transaction, whether or not involving a Financing Lease) (any such transaction, a "disposition"), by the Borrower or any of its Subsidiaries, of any asset, but excluding (a) any disposition of inventory, cash, Cash Equivalents or other cash management investments or obsolete and unused or unnecessary

2

CSFB001270

equipment, in each case in the ordinary course of business, (b) any disposition to the Borrower or any of its Subsidiaries, (c) any disposition the proceeds of which will be used to purchase assets similar to the assets disposed of (a contract for which purchase is entered into within 180 days (and such assets are acquired within 270 days) after the date of such disposition) but only to the extent such proceeds are actually so used, (d) any sale-leaseback transaction entered into in respect of property acquired by the Borrower or any of its Subsidiaries, if such sale-leaseback transaction is entered into within 180 days after the date of such acquisition, (e) any sale of receivables (including in connection with securitizations thereof) effected to finance working capital requirements of the Borrower and its Subsidiaries, (f) any disposition of the assets of a Special Purpose Subsidiary, to the extent that the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary to finance (i) the development or operation of the assets it was formed to develop or (ii) activities incidental thereto, and (g) any other disposition of assets by the Borrower or any of its Subsidiaries the aggregate Net Cash Proceeds (including for purposes hereof any deferred payments) of which, for all such dispositions during any fiscal year, do not exceed $50,000,000 during any fiscal year.

"Assignee" shall have the meaning ascribed thereto in Section 9.6(c).

"Assignment and Assumption Agreement" shall have the meaning ascribed thereto in Section 9.6(c).

"Availability Period" shall mean the period from and including the Closing Date to, but not including, the Termination Date, or such earlier date on which the Revolving Credit Commitments shall terminate as provided herein.

"Benefited Lender" shall have the meaning ascribed thereto in Section 9.7(a).

"Borrower" shall have the meaning ascribed thereto in the heading hereto.

"Borrowing Date" shall mean any Business Day specified in a notice pursuant to Section 2.3 as a date on which the Borrower requests that the Lenders make Loans hereunder.

"Business" shall have the meaning ascribed thereto in Section 3.17(a).

"Business Day" shall mean (a) a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, and (b) with respect to the date of

     (i)     making or continuing any Loans as, or converting any Loans from or into, Eurodollar Loans,

NY—591039.20

CSFB001271

(ii)    making any payment or prepayment or principal of or payment of interest on any portion of the principal amount of any Loans being maintained as Eurodollar Loans, or

(iii)    the Borrower giving any notice (or the number of Business Days to elapse prior to the effectiveness thereof) in connection with any matter referred to in the immediately preceding clause (b)(i) or (b)(ii),

any such day on which dealings in Dollars are also carried on in the interbank market in London, England.

"Capital Expenditures" of any Person shall mean, for any period, without duplication, all expenditures (whether paid in cash or other consideration) during such period that, in accordance with GAAP, are or should be included in additions to property, plant and equipment or similar items reflected in the statement of cash flows for such period for such Person.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

"Cash Equivalents" shall mean (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition and overnight bank deposits of any Lender and certificates of deposit with maturities of one year or less from the date of acquisition and overnight bank deposits of any other commercial bank having capital and surplus in excess of $500,000,000, (c) commercial paper of any issuer rated at least A-2 by Standard & Poor's or P-2 by Moody's, (d) additional money market investments with maturities of one year or less from the date of acquisition rated at least A1 or AA by Standard & Poor's or P-1 or Aa by Moody's and (e) tax-exempt debt obligations of any State of the United States or of any county or other municipal government subdivision of any State of the United States with maturities of one year or less from the date of acquisition rated at the highest investment grade rating by Standard & Poor's or by Moody's, or publicly traded or open-end bond funds that invest exclusively in such tax-exempt debt obligations.

"Change of Control" shall mean the occurrence of any of the following:

(a)    any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934) (i) shall have acquired beneficial ownership of 40% or more of the aggregate outstanding classes of Capital Stock having voting power in the election of directors of the Borrower or (ii) shall obtain the power (whether or not exercised) to elect a majority of the Borrower's directors;

4

NY—591039.20

CSFB001272

(b)    a majority of the persons who comprised the Board of Directors of the Borrower on the date hereof shall be replaced, unless such replacement shall have been approved by at least two-thirds of the Board of Directors of the Borrower then still in office who either were members of such Board of Directors on the date hereof or whose election as a member of such Board of Directors was previously so approved;

(c)    the Borrower shall cease to own, beneficially or of record, all of the outstanding Capital Stock of the Company other than as a result of a merger of the Company with and into the Borrower; or

(d)    the Borrower shall be liquidated or dissolved.

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 4.1 shall be satisfied or waived.

"Co-Arrangers" shall have the meaning ascribed thereto in the heading hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning ascribed thereto in the Pledge Agreement.

"Collateral Agent" shall have the meaning ascribed thereto in the Pledge Agreement.

"Collateral Documents" shall mean a collective reference to the Pledge Agreement and such other documents executed and delivered in connection with the attachment and perfection of the Collateral Agent's security interest and liens arising thereunder, including, without limitation UCC financing statements filed in connection therewith.

"Commitment" shall mean, as applicable, a Term Loan Commitment, a Revolving Credit Commitment or a Swingline Commitment.

"Commitment Fee" shall have the meaning ascribed thereto in Section 2.4.

"Commitment Percentage" shall mean, as to any Lender, at any time, the percentage which such Lender's Revolving Credit Commitment (or after the Termination Date, such Lender's Revolving Credit Loans) plus such Lender's Term Loan Commitment (or after the Closing Date, such Lender's Term Loans) then constituting the aggregate Revolving Credit Commitments (or after the Termination Date, all Revolving Credit Loans) plus the aggregate Term Loan Commitments (or after the Closing Date, all Term Loans), in each case outstanding at such time.

5

CSFB001273

"Commonly Controlled Entity" shall mean an entity, whether or not incorporated, which is under common control with the Borrower and/or any Subsidiary within the meaning of Section 4001(a)(14) of ERISA or is part of a group which includes the Borrower and which is treated as a single employer under Section 414 of the Code.

"Company" shall have the meaning ascribed thereto in the Preliminary Statement hereof.

"Compliance Certificate" shall have the meaning ascribed thereto in Section 5.2(b).

"Consolidated Group" shall mean the Borrower and its Consolidated Subsidiaries after giving effect to the Acquisition.

"Consolidated Recourse Interest Expense" shall mean, for any period, the aggregate amount of interest expense of the Consolidated Group *minus*, to the extent included therein, the aggregate amount of interest accrued on Non-Recourse Debt, determined on a consolidated basis in accordance with GAAP.

"Consolidated Subsidiary" shall mean, at any time, any Subsidiary or other Person the accounts of which are consolidated with the Borrower in its consolidated financial statements as of such time.

"Contractual Obligation" shall mean as to the Borrower or any Subsidiary, any provision of any security issued by the Borrower or any Subsidiary or of any agreement, instrument or other undertaking to which the Borrower or any Subsidiary is a party or by which it or any of its property is bound.

"Credit Event" shall have the meaning ascribed thereto in Section 4.2.

"CSFB" shall mean Credit Suisse First Boston.

"Debt for Borrowed Money" shall mean, as to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all Financing Lease obligations of such Person, and (d) all obligations of such Person under synthetic leases, tax retention operating leases, off-balance sheet loans or other off-balance sheet financing products that, for tax purposes, are considered indebtedness for borrowed money of the lessee but are classified as operating leases under GAAP.

"Debt Incurrence" shall mean the incurrence by the Borrower or any of its Subsidiaries of Debt for Borrowed Money, other than Excluded Debt.

"Default" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

6

NY—591039.20

CSFB001274

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Lending Office" shall mean, initially, the office of each Lender designated as such in Schedule I (or the office of an Assignee designated pursuant to an Assignment and Assumption Agreement), and thereafter, such other office of such Lender, if any, which shall be making or maintaining Alternate Base Rate Loans as may be designated from time to time by notice from such Lender to the Borrower and the Administrative Agent.

"Environmental Laws" shall mean any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, judgments, permits, licenses, registrations or authorizations or requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning the health and safety of humans and other living organisms as it relates to exposures to Materials of Environmental Concern, protection of natural resources or the environment, including the manufacture, distribution in commerce, and use of, or Release to the environment of, Materials of Environmental Concern, as now or may at any time hereafter be in effect.

"Equity Issuance" shall mean (a) the issuance of any Capital Stock by the Borrower or any of its Subsidiaries, other than (i) Capital Stock issued by a Special Purpose Subsidiary, to the extent that the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary to finance (x) the development or operation of the assets it was formed to develop or (y) activities incidental thereto), (ii) Capital Stock issued to the Borrower or any of its Wholly-Owned Subsidiaries, (iii) directors' qualifying shares, (iv) Capital Stock issued in the ordinary course of business in connection with director or employee stock purchase plans and arrangements and other director or employee compensation arrangements, and (v) Capital Stock issued in the ordinary course of business under any dividend reinvestment and stock purchase plan maintained by the Borrower; or (b) to the extent not excluded in clause (a) above, any contribution to the capital of the Borrower or any of its Subsidiaries, other than a contribution by any Person to the capital of a Special Purpose Subsidiary provided the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary to finance (x) the development or operation of the assets it was formed to develop or (y) activities incidental thereto or a contribution by the Borrower or any of its Subsidiaries to one of its Subsidiaries.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurodollar Base Rate" shall mean, with respect to any Eurodollar Loan for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date which is two Business Days prior to the beginning of such Interest Period by reference to the

NY—591039.20

CSFB001275

British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date which is two Business Days prior to the beginning of such Interest Period. Each determination by the Administrative Agent pursuant to this definition shall be conclusive absent manifest error.

"Eurodollar Loans" shall mean Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Office" shall mean, initially, the office of each Lender designated as such in Schedule I (or the office of an Assignee designated pursuant to an Assignment and Assumption Agreement), and thereafter, such other office of such Lender, if any, which shall be making or maintaining Eurodollar Loans as may be designated from time to time by notice from such Lender to the Borrower and the Administrative Agent.

"Eurodollar Rate" shall mean with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Requirements}}$$

"Eurodollar Reserve Requirements" shall mean, for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the rates (expressed as a decimal) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto) dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such System.

"Eurodollar Tranche" shall mean either (a) all Term Loans which consist of Eurodollar Loans incurred on the Closing Date (or which result from continuations or conversions on a given date after the Closing Date) and have the same Interest Period, or (b) all Revolving Credit Loans which consist of Eurodollar Loans incurred on a given date (or which result from continuations or conversions on a given date) and having the same Interest Period.

8

NY—591039.20

CSFB001276

"Event of Default" shall mean any of the events specified in Section 7.1; provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excluded Debt" shall mean (a) Debt for Borrowed Money incurred hereunder; (b) Debt for Borrowed Money incurred by a Special Purpose Subsidiary, to the extent that the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary that incurs such Debt for Borrowed Money to finance (i) the development or operation of the assets it was formed to develop or (ii) activities incidental thereto; (c) Debt for Borrowed Money of any Person at the time such Person becomes a Subsidiary of the Borrower, provided that such Debt for Borrowed Money was not incurred in contemplation of such occurrence; (d) Debt for Borrowed Money incurred by the Borrower or any Subsidiary (other than a Special Purpose Subsidiary) incurred (i) to finance working capital needs of any such entity in the ordinary course of business (in any event excluding Restricted Payments) or (ii) to the extent permitted hereunder, to finance Capital Expenditures (including fees and expenses incidental to the acquisition of the assets so acquired); (e) Indebtedness of Montana First Megawatts LLC (or its affiliates) in an aggregate amount not to exceed $200,000,000, which proceeds of such Indebtedness are used to finance construction and related costs of the Montana First Megawatts project; (f) Non-Recourse Debt of any Subsidiary; (g) Indebtedness incurred pursuant to a credit facility under which Blue Dot Services, Inc. is the borrower in an aggregate amount not to exceed $45,000,000 and Indebtedness incurred pursuant to a credit facility under which Expanets, Inc. is the borrower in an aggregate amount not to exceed $150,000,000; and (h) refinancings, replacements and extensions by the obligor thereof of any of the foregoing (other than clause (a) above) to the extent that the principal of the Debt for Borrowed Money so refinanced, replaced or extended is not increased as a result thereof and the scheduled maturity date thereof is not earlier as a result thereof (and in the case of any refinancing or replacement of Non-Recourse Debt, after giving effect thereto, such Indebtedness constitutes Non-Recourse Debt).

"FDIC" shall mean the Federal Deposit Insurance Corporation or any successor thereto.

"Federal Funds Rate" shall mean for any particular date, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent (in its individual capacity) on such day on such transactions as determined by the Administrative Agent.

9

CSFB001277

"Fee Letter" shall mean the Amended and Restated Senior Credit Facilities Fee Letter from CSFB to the Borrower dated September 20, 2001.

"FERC" shall mean the Federal Energy Regulatory Commission.

"Financing Lease" shall mean any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.

"Funded Debt" shall mean, as of any date of determination, the sum of all Indebtedness of the Borrower and each of its Consolidated Subsidiaries (without duplication) other than (i) Indebtedness of the type described in clause (e) of the definition thereof and (ii) Non-Recourse Debt.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time consistent with those utilized in preparing the audited financial statements referred to in Section 3.1; provided that in the event that any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) results in a change in the calculation of any of the financial covenants hereunder, the Required Lenders and the Borrower will in good faith enter into negotiations in order to reevaluate such financial covenants in light of such change; and provided, further, that this provision shall not operate as a waiver of any right, remedy, power or privilege available to any Lender under any provision of any Loan Document or pursuant to any applicable law.

"Government Acts" shall have the meaning ascribed thereto in Section 2.20(h).

"Governmental Authority" shall mean any national government (United States or foreign), any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any agency, authority, instrumentality, or regulatory body of any thereof.

"Granting Lender" shall have the meaning ascribed thereto in Section 9.6(f).

"Guarantee Obligation" shall mean as to any Person (the "guaranteeing person"), any obligation of the guaranteeing person (including, without limitation, any reimbursement, counter-indemnity or similar obligation), guaranteeing or in effect guaranteeing any Indebtedness, lease, dividend or other similar obligation (the "primary obligation") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security

10

NY—591039.20

CSFB001278

therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth, liquidity or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person as of any date of determination shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hedging Agreements" shall mean (a) any interest rate protection agreement, interest rate future, interest rate option, interest rate swap, interest rate cap or other interest rate hedge or arrangement under which the Borrower is a party or a beneficiary and (b) any other agreement or arrangement designed to limit or eliminate the risk or exposure of the Borrower to fluctuations in currency exchange rates.

"Indebtedness" of any Person at any date shall mean, without duplication, (a) Debt for Borrowed Money of such Person, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (c) all outstanding reimbursement obligations of such Person in respect of outstanding letters of credit, acceptances and similar obligations issued or created for the account of such Person, (d) all liabilities secured by any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, (e) liabilities arising under Hedging Agreements (other than interest rate caps) of such Person and (f) all Guarantee Obligations of such Person.

"Indenture" shall mean the General Mortgage Indenture and Deed of Trust dated as of August 1, 1993 between the Borrower and The Chase Manhattan Bank, as trustee.

"Index Debt" shall mean the senior, unsecured, long-term Debt for Borrowed Money of the Borrower that is not guaranteed by any other Person or subject to any other credit enhancement.

NY—591039.20

CSFB001279

"Insolvency" shall mean with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"insolvent" shall mean pertaining to a condition of Insolvency.

"Intellectual Property" shall have the meaning set ascribed thereto in Section 3.10.

"Interest Payment Date" shall mean (a) as to any Alternate Base Rate Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, and (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day which is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period.

"Interest Period" with respect to any Eurodollar Loan shall mean:

(a)    initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Interest Rate Conversion, as the case may be, given with respect thereto; and

(b)    thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto;

provided that, the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period pertaining to a Eurodollar Loan would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day (and, with respect to payments of principal and interest thereon, shall be payable at the then applicable rate during such extension) unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    no Interest Period with respect to a Revolving Credit Loan shall be selected which would extend beyond the Termination Date;

(iii)    no Interest Period with respect to a Term Loan shall be selected which would extend beyond the Termination Date;

NY—591039.20

CSFB001280

(iv)    any Interest Period pertaining to a Eurodollar Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(v)    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"ISO" shall mean any "Independent System Operator" or similar entity approved by FERC to manage the transmission system owned by the Borrower.

"Issuing Lender" shall mean CSFB.

"Lender" shall have the meaning ascribed thereto in the heading hereto.

"Letter of Credit" shall mean any standby letter of credit issued by the Issuing Lender for the account of the Borrower in accordance with the terms of Section 2.3(c) hereof.

"Letter of Credit Fee" shall have the meaning assigned to such term in Section 2.4(b).

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Financing Lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, other than any such filing in connection with any true lease or operating lease).

"Loan Documents" shall mean collectively, this Agreement, the Collateral Documents, the LOC Documents, the Notes, the Fee Letter, the Syndication Fee Letter and each other agreement, instrument or certificate issued, executed and delivered to the Administrative Agent, the Collateral Agent, the Lenders or the Issuing Lender hereunder or thereunder or pursuant hereto or thereto (in each case as the same may be amended, restated, supplemented, extended, renewed or replaced from time to time), and "Loan Document" means any one of them.

"Loans" shall mean the loans made by the Lenders, including Swingline Loans made by the Swingline Lender, to the Borrower pursuant to this Agreement.

"LOC Committed Amount" shall have the meaning assigned to such term in Section 2.1(c).

13

CSFB001281

"LOC Documents" shall mean, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (i) the rights and obligations of the parties concerned or at risk or (ii) any collateral security for such obligation.

"LOC Obligations" shall mean, at any time, the sum of (i) the maximum amount which is, or at any time thereafter may become, available to be drawn under the Letters of Credit then outstanding, assuming compliance with all requirements for drawings referred to in such Letters of Credit plus (ii) the aggregate amount of all drawings under the Letters of Credit honored by the Issuing Lender but not theretofore reimbursed.

"Material Adverse Effect" shall mean (a) a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Consolidated Subsidiaries (taken as a whole), (b) any material adverse effect on the validity or enforceability of this Agreement, any of the Notes or any of the other Loan Documents, or the rights or remedies of the Administrative Agent, the Collateral Agent, the Issuing Lender, the Swingline Lender or the Lenders hereunder or thereunder or (c) with respect to any determination of Material Adverse Effect on or prior to the Closing Date, any material adverse effect on the ability of the Borrower, MPC, the Company or the Seller to consummate the Transactions.

"Mandatory Redeemable Stock" shall mean, with respect to any Person, any share of such Person's Capital Stock, to the extent that it is (a) redeemable, payable or required to be purchased or otherwise retired or extinguished, or convertible into any Indebtedness or other liability, obligation, covenant or duty of or binding upon, or any term or condition to be observed by or binding upon such Person or any of its assets, (i) at a fixed or determinable date, whether by operation of a sinking fund or otherwise, (ii) at the option of any other Person or (iii) upon the occurrence of a condition not solely within the control of such Person such as a redemption required to be made utilizing future earnings, or (b) convertible into Capital Stock which has the features set forth in clause (a).

"Material Subsidiary" shall mean, as at any time of determination, (a) each present or future Subsidiary of the Borrower other than any Subsidiary which as at the end of the fiscal quarter immediately preceding such time of determination, shall have a net worth (calculated as the stockholder's equity of such Subsidiary disregarding any liabilities of such Subsidiary to an Affiliate) equal to or less than 10% of the Net Worth of the Borrower and its Consolidated Subsidiaries as at the end of such fiscal quarter, or net income equal to or less than 10% of the Net Income of the Borrower and its Consolidated Subsidiaries for the four fiscal quarter period ending at the end of such fiscal quarter and (b) in any event, the Company.

14

CSFB001282

"<u>Materials of Environmental Concern</u>" shall mean any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any other pollutant, contaminant, hazardous substance, hazardous waste, special waste, toxic substance, radioactive material, or other compound, element, material or substance in any form whatsoever (including products) regulated, restricted or addressed by or under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>MPC</u>" shall have the meaning ascribed thereto in the Preliminary Statement hereof.

"<u>MPC Restructuring</u>" shall mean the Restructuring as such term is defined in the Acquisition Agreement.

"<u>Multiemployer Plan</u>" shall mean a plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>" shall mean, with respect to any Reduction Event, an amount equal to the cash proceeds received by the Borrower or any of its Subsidiaries from or in respect of such Reduction Event (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received), less (a) any investment banking and underwriting fees and any other fees and expenses reasonably incurred by such Person in respect of such Reduction Event, and (b) if such Reduction Event is a disposition of assets, (i) the amount of any Debt for Borrowed Money secured by a Lien on any asset disposed of in such Reduction Event and discharged from the proceeds thereof and (ii) any taxes actually paid or to be payable by such Person (as estimated by a senior financial or accounting officer of the Borrower, giving effect to the overall tax position of the Borrower) in respect of such Reduction Event; <u>provided</u> that if the cash proceeds of such Reduction Event are received by a Subsidiary that is not a Wholly-Owned Subsidiary, Net Cash Proceeds shall include only the portion thereof proportionately equivalent to the Borrower's direct and indirect interest in such Subsidiary. The Net Cash Proceeds of Debt Incurrences in respect of a revolving credit facility shall be deemed to be the aggregate amount of the commitments thereunder, used or unused (but shall not include any commercial paper issued in connection with, or any letters of credit issued under, such facility).

"<u>Net Income</u>" for any period shall mean, net income (or deficit) of the Borrower and its Consolidated Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

"<u>Net Worth</u>" shall mean for any date the sum of shareholders' equity and preferred stock, preference stock and preferred securities of the Borrower and its

NY—591039.20

CSFB001283

Consolidated Subsidiaries on such date, in each case as described in the consolidated financial statements of the Borrower.

"Non-Excluded Taxes" shall have the meaning ascribed thereto in Section 2.15.

"Non-Recourse Debt" shall mean any Indebtedness as to which neither the Borrower nor the Company has any direct or indirect liability whether as primary obligor, guarantor, surety, provider of collateral security or through any other right or arrangement of any nature (including any election by the holder of such indebtedness) providing direct or indirect assurance of payment or performance of any such obligations in whole or in part (other than direct or indirect liability which by its terms may be payable solely in Capital Stock (other than Mandatory Redeemable Stock) of the Borrower).

"NorthWestern Public Service" shall mean the regulated transmission and distribution businesses conducted by the Borrower, historically reported under the headings titled "Electric" and "Natural Gas" on the SEC Reports of the Borrower filed annually with the SEC.

"Note" shall mean, as applicable, a Revolving Credit Note, a Term Note or a QFL Note.

"Notice of Borrowing" shall mean a notice given by the Borrower pursuant to Section 2.3(a), (b) or (d).

"Notice of Interest Rate Conversion" shall have the meaning ascribed thereto in Section 2.7.

"NW Restructuring" shall mean the reorganization, if any, of the corporate structure of the Borrower and its Subsidiaries (including, without limitation, the re-incorporation of the Borrower into a new jurisdiction and the creation of a limited purpose holding company parent of the Borrower) in connection with (or as a result of) the Acquisition.

"Obligations" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any Subsidiary, as applicable, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding and whether the Administrative Agent, for the benefit of the Lenders, is oversecured or undersecured with respect to such Loans) the Notes and all other obligations and liabilities of the Borrower to the Administrative Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Notes, the other Loan Documents or any other document made, delivered or given in connection therewith or herewith, whether on account of

NY—591039.20

CSFB001284

principal, interest, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or the Lenders that are required to be paid by the Borrower pursuant to the terms of this Agreement or any other Loan Document) or otherwise.

"Participant" shall have the meaning ascribed thereto in Section 9.6(b).

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor thereto.

"Pension Plan" shall mean any single-employer plan, as defined in Section 4001(a)(15) of ERISA, which the Borrower, any Subsidiary or any Commonly Controlled Entity maintains, administers, contributes to or is required to contribute to, or under which the Borrower, any Subsidiary or any Commonly Controlled Entity has any liability.

"Permitted Liens" shall mean

(a)     Liens for taxes, assessments or governmental charges or levies or Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Consolidated Subsidiaries, as the case may be, in conformity with GAAP;

(b)     statutory Liens of carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits securing liability to insurance carriers under insurance or self- insurance arrangements, and deposits to secure true leases in the ordinary course;

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and landlords' Liens which, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower;

(f)     any attachment or judgment Lien not constituting an Event of Default under Section 7.1(h);

17

NY—591039.20

CSFB001285

(g) Liens solely on assets of a Subsidiary (other than the Company) incurring Indebtedness, which Liens secure such Indebtedness;

(h) Liens under the Indenture, as such Indenture may be amended or supplemented from time to time in accordance with the terms hereof;

(i) Liens created in connection with the acquisition by the Borrower or any Consolidated Subsidiary of assets and the continuation of such Liens in connection with any refinancing of the Indebtedness secured by such Liens; provided that such Liens are limited to the assets so acquired;

(j) Liens on the assets or other rights to receive income of any Person that exist at the time such Person becomes a Consolidated Subsidiary (or with respect to assets of the Company, upon the transfer of such assets to the Borrower, any Liens of the Borrower, as successor to the Company, on such assets) and the continuation of such Liens in connection with any refinancing or restructuring of the obligations secured by such Liens;

(k) any Lien vested in any licensor or permitter for obligations or acts to be performed, the performance of which obligations or acts is required under licenses or permits, so long as the performance of such obligations or acts is not delinquent or is being contested in good faith and by appropriate proceedings;

(l) any controls, restrictions, obligations, duties or other burdens imposed by any federal, state, municipal or other law, or by any rule, regulation or order of any Governmental Authority, upon any property of the Borrower or the operation or use thereof or upon the Borrower with respect to any of its property or the operation or use thereof or with respect to any franchise, grant, license, permit or public purpose requirement, or any rights reserved to or otherwise vested in any Governmental Authority to impose any such controls, restrictions, obligations, duties or other burdens;

(m) Liens granted on air or water pollution control, sewage or solid waste disposal, or other similar facilities of the Borrower in connection with the issuance of pollution control revenue bonds, in connection with financing the cost of, or the construction or acquisition of, such facilities;

(n) any right which any Governmental Authority may have by virtue of any franchise, license, contract or statute to purchase, or designate a purchaser of or order the sale of, any property of the Borrower upon payment of cash or reasonable compensation

18

CSFB001286

therefor or to terminate any franchise, license or other rights or to regulate the property and business of the Borrower;

(o) party-wall agreements and agreements, in each case existing on the date hereof, for and obligations relating to the joint or common use of property owned solely by the Borrower or owned by the Borrower in common or jointly with one or more parties;

(p) liens existing on the date hereof securing indebtedness incurred by a Person, other than the Borrower which indebtedness has been neither assumed nor guaranteed by the Borrower nor on which it customarily pays interest, existing on property which the Borrower owns jointly or in common with such Person or such Person and others, if there is a bar against partition of such property which would preclude the sale of such property by such other Person or the holder of such lien without the consent of the Borrower;

(q) liens on property of the Borrower and/or the Company securing Indebtedness or other obligations of the Borrower or the Company, provided that the aggregate principal amount of such Indebtedness of the Borrower and the Company taken as a whole shall not exceed $5,000,000 at any one time outstanding; and

(r) Liens existing on the date hereof.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority, ISO or other entity of whatever nature.

"Plan" shall mean at a particular time, any employee benefit plan which is defined in Section 3(2 of ERISA and in respect of which the Borrower or any Subsidiary is, an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" shall mean the pledge agreement substantially in the form of Exhibit F attached hereto between the Borrower and the Collateral Agent for the benefit of the Secured Parties (as therein defined).

"Pricing Grid" shall mean the pricing grid attached hereto as Annex A.

"Properties" shall have the meaning ascribed thereto in Section 3.17(a).

"QFL Note" shall have the meaning ascribed thereto in Section 2.15.

"Qualified Foreign Lender" shall have the meaning ascribed thereto in Section 2.15.

19

CSFB001287

"Reduction Event" shall mean any (a) Asset Sale, (b) Debt Incurrence or (c) Equity Issuance.

"Refinancing" shall mean the refinancing of existing Indebtedness of the Borrower and its Subsidiaries, if any, required to be repaid by the terms thereof as a result of the Acquisition.

"Register" shall have the meaning ascribed thereto in Section 9.6(d).

"Regulation D, T, U or X" shall mean Regulation D, T, U or X, respectively, of the Board of Governors of the Federal Reserve System as in effect from time to time, or any successor regulation.

"Release" shall mean any release, pumping, pouring, emptying, injecting, escaping, leaching, migrating, dumping, seepage, spill, leak, flow, discharge, disposal or emission.

"Reorganization" shall mean with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Replaced Note" shall have the meaning ascribed thereto in Section 2.15.

"Replacement Lender" shall have the meaning ascribed thereto in Section 2.18.

"Reportable Event" shall mean any of the events set forth in Section 4043(c) of ERISA other than those events for which the notice requirement has been waived under applicable regulations.

"Required Lenders" shall mean, at any time, Lenders having Term Loan Commitments (or after the Closing Date, Term Loans) and Revolving Credit Commitments (or after the Termination Date, Revolving Credit Loans and Revolving Credit Commitment Percentages of Swingline Loans and LOC Obligations) representing 51% or more of the aggregate of all Term Commitments (or after the Closing Date, Term Loans) and Revolving Credit Commitments (or after the Termination Date, Revolving Credit Loans, Swingline Loans and LOC Obligations) in each case outstanding at such time.

"Requirement of Law" as to any Person shall mean the articles of organization and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority (including, without limitation, the Public Utility Holding Company Act of 1935, as amended, any of the foregoing relating to employee health and safety or public utilities and any Environmental Law), in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

NY—591039.20

CSFB001288

"Responsible Officer" shall mean, with respect to a Person, the chairman of the board of directors, the chief executive officer or the president of such Person or, with respect to financial matters, the chief financial officer of such Person, or any other officer of such Person designated as a Responsible Officer by any of the foregoing.

"Restricted Payment" shall have the meaning ascribed thereto in Section 6.9.

"Revolving Credit Commitment" shall mean, (a) in the case of each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on Schedule I as such Lender's "Revolving Credit Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Revolving Credit Commitment" in the Assignment and Assumption Agreement pursuant to which such Lender assumed a portion of the Total Revolving Credit Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. A Lender's Revolving Credit Commitment shall also include the commitment of such Lender to participate in Letters of Credit and Swingline Loans hereunder as set forth in Sections 2.20 and 2.21 hereof. The initial aggregate amount of the Revolving Credit Commitments is $280,000,000.

"Revolving Credit Commitment Percentage" shall mean, for each Lender having a Revolving Credit Commitment, a fraction (expressed as a percentage) the numerator of which is the Revolving Credit Commitment of such Lender at such time and the denominator of which is the Total Revolving Credit Commitment at such time. The initial Revolving Credit Commitment Percentage for each Lender is set forth on Schedule I.

"Revolving Credit Loans" shall have the meaning ascribed thereto in Section 2.1(b).

"Revolving Credit Note" shall have the meaning ascribed thereto in Section 2.2(a).

"Revolving Credit Obligations" shall mean, collectively, the Revolving Credit Loans, the Swingline Loans and the LOC Obligations.

"SEC" shall mean the Securities and Exchange Commission.

"SEC Reports" shall mean the reports filed by the Borrower with the SEC on Form 10-K, Form 10-Q or Form 8-K or any successor Form.

"Secured Parties" shall have the meaning ascribed thereto in the Pledge Agreement.

"Seller" shall have the meaning ascribed thereto in the Preliminary Statements hereof.

21

CSFB001289

"SPC" shall have the meaning ascribed thereto in Section 9.6(f).

"Special Purpose Subsidiary" shall mean a direct or indirect Subsidiary of the Borrower, formed solely for the purpose of acquiring and owning certain assets and issuing Indebtedness which is secured solely by such assets (or the assets of one or more other Special Purpose Subsidiaries) and as to which the Borrower and each other Subsidiary (other than any Special Purpose Subsidiary) has no Guarantee Obligation or other liability or obligation to contribute additional equity or for which the Borrower or any other Subsidiary (other than a Special Purpose Subsidiary) has general partner liability or other derivative liability by operation of law or contract. The term "Special Purpose Subsidiary" shall also include any Subsidiary whose assets consist solely of equity interests in another Special Purpose Subsidiary and, other than having general partner liability, otherwise meets the requirements of the preceding sentence.

"Standard & Poor's" shall mean Standard & Poor's Rating Group, a division of The McGraw-Hill Companies, Inc.

"Subsidiary" shall mean a corporation, company, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such corporation, company, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise expressly stated herein all references to any Subsidiary are to direct or indirect subsidiaries of the Borrower. Any corporation, company, partnership or other entity which becomes a Subsidiary of the Borrower upon consummation of the Acquisition shall, for all purposes hereof, be deemed to be a Subsidiary of the Borrower from and after the Closing Date.

"Swingline Commitment" shall mean the commitment of the Swingline Lender to make Swingline Loans in an aggregate principal amount at any time outstanding up to the Swingline Committed Amount, as such amount may be reduced from time to time in accordance with the provisions hereof.

"Swingline Committed Amount" shall mean the amount of the Swingline Lender's Commitment as specified in Section 2.1(d).

"Swingline Lender" shall mean CSFB.

"Swingline Loan" means a swingline revolving credit loan made by the Swingline Lender pursuant to the provisions of Section 2.1(d).

"Syndication Fee Letter" shall mean the Syndication Fee Letter from CSFB to the Borrower dated the date hereof.

NY—591039.20

CSFB001290

"Tangible Net Worth" shall mean the excess of (a) the assets of the Borrower and its Consolidated Subsidiaries (excluding intercompany items) which, in accordance with GAAP, are tangible assets, after deducting adequate reserves in each case where, in accordance with GAAP, a reserve is proper, over (b) all liabilities of the Borrower and its Consolidated Subsidiaries (excluding intercompany items as determined in accordance with GAAP), provided that in no event shall there be included as tangible assets patents, trademarks, trade names, copyrights, licenses, goodwill, deferred charges (other than assets classified as deferred charges under FAS 71) or treasury stock or any securities issued by or any liabilities of the Borrower or any Subsidiary.

"Term Loans" shall have the meaning ascribed thereto in Section 2.1(a).

"Term Loan Commitment" shall mean, (a) in the case of each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on Schedule I as such Lender's "Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Term Loan Commitment" in the Assignment and Assumption Agreement pursuant to which such Lender assumed a portion of the Total Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. The initial aggregate amount of the Term Loan Commitments is $720,000,000.

"Term Loan Commitment Percentage" shall mean, for each Lender having a Term Loan Commitment, a fraction (expressed as a percentage) the numerator of which is the Term Loan Commitment of such Lender at such time and the denominator of which is the Total Term Loan Commitment at such time. The initial Term Loan Commitment Percentage for each Lender is set forth on Schedule I.

"Term Note" shall have the meaning ascribed thereto in Section 2.2(b).

"Termination Date" shall mean a date that is 364 days after the Closing Date, or, if such date is not a Business Day, the immediately preceding Business Day.

"Total Capital" shall mean on any date (a) Funded Debt on such date plus (b) the sum of (i) stockholders' equity and (ii) preferred stock, preference stock and preferred securities of the Borrower and its Consolidated Subsidiaries on such date, in each case as described in the consolidated financial statements of the Borrower.

"Total Revolving Credit Commitment" shall mean the sum of the Revolving Credit Commitments of all Lenders.

"Total Term Loan Commitment" shall mean the sum of the Term Loan Commitments of all Lenders.

NY—591039.20

CSFB001291

"Transactions" shall mean, collectively, (a) the Acquisition (and the other transactions contemplated by the Acquisition Agreement), (b) the MPC Restructuring, (c) the NW Restructuring, if any, (d) any refinancing or replacement of Indebtedness by the Borrower or its Subsidiaries in connection with the foregoing, (e) borrowings hereunder and (f) any other transactions related or entered into in connection with any of the foregoing.

"Transferee" shall have the meaning ascribed thereto in Section 9.6(f).

"Type" shall mean as to any Loan, its nature as a Revolving Credit Loan, Swingline Loan or a Term Loan, or as an Alternate Base Rate Loan or a Eurodollar Loan, or both, as the context may require.

"UCP" shall have the meaning ascribed thereto in Section 2.20(g).

"Utility Business" shall mean the combined business and operations of NorthWestern Public Service and the Company, whether conducted as a Wholly-Owned Subsidiary or as a division of the Borrower.

"Utility Business EBITDA" shall mean, for any period for the Utility Business, the sum of (i) the operating income of the Utility Business for such period _plus_, without duplication and to the extent reflected as a charge in the statement of operating income of the Utility Business for such period, (ii) depreciation and amortization, in each case on a consolidated basis determined in accordance with GAAP, provided, however, with respect to the first Fiscal Quarter ended immediately after the Closing Date, the Utility Business EBITDA shall be subject to adjustment on a pro forma basis.

"Wholly-Owned Subsidiary" of any Person shall mean any Subsidiary 100% of whose Capital Stock is at the time owned by such Person directly or indirectly through other Wholly Owned Subsidiaries (other than qualifying directors' shares).

1.2 Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or any certificate or other document made or delivered pursuant hereto.

(b)    As used herein, in the Notes and in any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Borrower or any Subsidiary not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

NY—591039.20

CSFB001292

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "or" shall not be exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall".

(f)    Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, and (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE 2. AMOUNT AND TERMS OF COMMITMENTS

2.1 Commitments. (a) Term Loans. On the Closing Date, subject to the terms and conditions hereof, each Lender having a Term Loan Commitment severally agrees to make term loans ("Term Loans") to the Borrower in an aggregate principal amount not to exceed such Lender's respective Term Loan Commitment, which (i) may, at the option of the Borrower be incurred and maintained as, or converted into Alternate Base Rate Loans or Eurodollar Loans; provided that all Term Loans made by each Lender pursuant to the same Type of Loan shall, at any one time, unless otherwise specifically provided herein, consist entirely of Term Loans of the same Type, and (ii) may be repaid in accordance with the provisions hereof, but once repaid, may not be reborrowed. No Lender shall be permitted or required to make any Term Loan if after giving effect thereto:

(x)    the aggregate outstanding principal amount of Term Loans made by such Lender would exceed such Lender's Term Loan Commitment; or

(y)    the aggregate outstanding principal amount of the Term Loans made by all the Lenders would exceed the Total Term Loan Commitment.

(b) Revolving Credit Loans. Subject to the terms and conditions hereof, each Lender having a Revolving Credit Commitment severally agrees to make revolving credit loans ("Revolving Credit Loans") to the Borrower from time to time during the Availability Period in an aggregate principal amount at any one time outstanding not to exceed such Lender's Revolving Credit Commitment, which (i) may, at the option of the Borrower be incurred and maintained as, or converted into Alternate Base Rate Loans or Eurodollar Loans; provided that all Revolving Credit Loans made by each Lender pursuant to the same Type of Loan shall, at any one time, unless otherwise specifically provided herein, consist entirely of Revolving Credit Loans of the same Type, and (ii)

25

CSFB001293

may be repaid and reborrowed in accordance with the provisions hereof. No Lender shall be permitted or required to make any Revolving Credit Loan if after giving effect thereto:

> (x)   the aggregate outstanding principal amount of Revolving Credit Loans made by such Lender would exceed such Lender's Revolving Credit Commitment; or

> (y)   the sum of the aggregate outstanding principal amount of the Revolving Credit Loans made by all the Lenders plus the aggregate outstanding LOC Obligations plus the aggregate outstanding principal amount of Swingline Loans would exceed the Total Revolving Credit Commitment.

No Revolving Credit Loan shall be made as or converted into a Eurodollar Loan after the day that is one month prior to the Termination Date.

> (c) Letters of Credit.  Subject to the terms and conditions hereof and of the LOC Documents, if any, and such other terms and conditions which the Issuing Lender may reasonably require, the Issuing Lender shall issue, and the Lenders having Revolving Credit Commitments shall participate severally in, such Letters of Credit as the Borrower may request from time to time during the Availability Period, in form reasonably acceptable to the Issuing Lender, for the purpose hereinafter set forth; provided, that (i) the aggregate amount of LOC Obligations shall not exceed FIFTY MILLION DOLLARS ($50,000,000) at any time, (the "LOC Committed Amount"), (ii) with regard to the Lenders having Revolving Credit Commitments collectively, the aggregate principal amount of Revolving Credit Obligations at any time shall not exceed the Total Revolving Credit Commitment and (iii) with regard to each Lender having a Revolving Credit Commitment individually, such Lenders' Revolving Commitment Percentage of Revolving Credit Obligations at any time shall not exceed such Lenders' Revolving Credit Commitment.  Letters of Credit issued hereunder shall have an expiry date not more than 360 days from the date of issuance or extension, and may not extend beyond the date five (5) Business Days prior to the Termination Date.

> (d) Swingline Loans.  Subject to the terms and conditions hereof, the Swingline Lender agrees to make swingline loans (the "Swingline Loans") to the Borrower from time to time during the Availability Period; provided that (i) the aggregate principal amount of Swingline Loans shall not exceed TWENTY-FIVE MILLION DOLLARS ($25,000,000) (the "Swingline Committed Amount"), (ii) with regard to the Lenders collectively, the aggregate principal amount of Revolving Credit Obligations at any time shall not exceed the Total Revolving Credit Commitment and (iii) with regard to each Lender individually, such Lender's Revolving Commitment Percentage of Revolving Credit Obligations at any time shall not exceed such Lender's Revolving Credit Commitment.  Swingline Loans shall consist of Alternate Base Rate Loans and may be repaid and reborrowed in accordance with the provisions hereof.  Each Swingline Loan advance shall be in a minimum principal amount of $1,000,000 and integral multiples of $100,000 in excess thereof.

NY—591039.20

CSFB001294

2.2 Notes. (a) Any Lender may request that Loans made by such Lender shall be evidenced by one or more promissory notes of the Borrower. In such event, the Borrower shall prepare, execute and deliver such promissory notes as set forth in clauses (b) and (c) below.

(b) To the extent requested by any Lender in accordance with clause (a) above, Revolving Credit Loans made by such Lender shall be evidenced by one or more promissory notes of the Borrower, each substantially in the form attached hereto Exhibit A-1, with appropriate insertions as to payee, date and principal amount (a "Revolving Credit Note"), payable to the order of such Lender and in a principal amount equal to the initial Revolving Credit Commitment of such Lender. Each Lender is hereby authorized to record the date, Type and amount of each Loan made by it, each continuation thereof, each conversion of all or a portion thereof to another Type, the date and amount of each payment or prepayment of principal thereof and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto, on the schedule annexed to and constituting a part of its Revolving Credit Note, and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded absent manifest error. Each Revolving Note shall (i) be dated the Closing Date, (ii) be stated to mature on the Termination Date and (iii) provide for the payment of interest in accordance with Section 2.9.

(c) To the extent requested by any Lender in accordance with clause (a) above, Term Loans made by such Lender shall be evidenced by one or more promissory notes of the Borrower, each substantially in the form attached hereto Exhibit A-2, with appropriate insertions as to payee, date and principal amount (a "Term Note"), payable to the order of such Lender and in an aggregate principal amount equal to the aggregate principal amount of Term Loans of such Lender then outstanding. Each Lender is hereby authorized to record the date, Type and amount of each Loan made by it, each continuation thereof, each conversion of all or a portion thereof to another Type, the date and amount of each payment or prepayment of principal thereof and, in the case of Eurodollar Loans, the length of each Interest Period with respect thereto, on the schedule annexed to and constituting a part of its Term Note, and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded absent manifest error. Each Note shall (i) be dated the Closing Date, (ii) be stated to mature on the Termination Date and (iii) provide for the payment of interest in accordance with Section 2.9.

2.3 Procedure for Borrowings. (a) The Borrower may borrow Term Loans on the Closing Date; provided that the Borrower shall give the Administrative Agent an irrevocable notice substantially in the form of Exhibit B-1 (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, (i) three Business Days prior to the requested Borrowing Date, if all or any part of the requested Term Loans are to be Eurodollar Loans, or (ii) one Business Days prior to the requested Borrowing Date, if none of the requested Loans are to be Eurodollar Loans), specifying (1) that a Term Loan is requested, (2) the aggregate amount to be borrowed, (3) the requested Borrowing Date, (4) whether the borrowing is to be of Eurodollar Loans, Alternate Base Rate Loans or a combination thereof, (5) if the borrowing is to be

27

CSFB001295

entirely or partly of Eurodollar Loans, the amounts of such Eurodollar Loans and the lengths of the initial Interest Periods therefor and (6) the number and the location of the account to which the proceeds are to be disbursed. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the office of the Administrative Agent specified in Section 9.2 prior to 11:00 a.m., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in the manner specified by the Borrower in such Notice of Borrowing in the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent. If the Borrower fails to indicate the initial Interest Periods in such notice, the Interest Period shall be one month.

(b) The Borrower may borrow Revolving Credit Loans during the Availability Period on any Business Day; provided that the Borrower shall give the Administrative Agent an irrevocable notice substantially in the form of Exhibit B-1 (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, (i) three Business Days prior to the requested Borrowing Date, if all or any part of the requested Revolving Credit Loans are to be Eurodollar Loans, or (ii) one (1) Business Days prior to the requested Borrowing Date, if none of the requested Loans are to be Eurodollar Loans), specifying (1) that a Revolving Credit Loan is requested, (2) the amount to be borrowed, (3) the requested Borrowing Date, (4) whether the borrowing is to be of Eurodollar Loans, Alternate Base Rate Loans or a combination thereof, (5) if the borrowing is to be entirely or partly of Eurodollar Loans, the amounts of such Eurodollar Loans and the lengths of the initial Interest Periods therefor and (6) the number and the location of the account to which the proceeds are to be disbursed. Each such borrowing shall be in an amount equal to (x) in the case of Alternate Base Rate Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof (or, if the unused portion of the Commitments is less than $5,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the office of the Administrative Agent specified in Section 9.2 prior to 11:00 a.m., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in the manner specified by the Borrower in such Notice of Borrowing in the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent. If the Borrower fails to indicate the initial Interest Periods in such notice, the Interest Period shall be one month.

(c) The Borrower may request the issuance or extension of Letters of Credit during the Availability Period on any Business Day; provided that the Borrower shall give the Issuing Lender, with a copy to the Administrative Agent, an irrevocable

NY—591039.20

CSFB001296

notice substantially in the form of Exhibit B-2 (a "Notice for Request") for a Letter of Credit (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, three Business Days prior to the date of the requested issuance or extension or such shorter period as may be agreed to by the Issuing Lender). Each such Notice for Request shall specify, among other things, (i) that a Letter of Credit is requested, (ii) the date of the requested issuance or extension, (iii) the type, amount, expiry date and terms on which the Letter of Credit is to be issued or extended, and (iv) the beneficiary.

(d) The Borrower may borrow Swingline Loans during the Availability Period on any Business Day; provided that the Borrower shall give the Swingline Lender, with a copy to the Administrative Agent, an irrevocable notice substantially in the form of Exhibit B-3 (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, on the requested Borrowing Date), specifying (i) that a Swingline Loan is requested, (ii) the amount to be borrowed and (iii) the requested Borrowing Date. The Swingline Lender will make the amount of such Swingline Loan available to the Borrower prior to 2:00 p.m., New York City time, on the Borrowing Date requested by the Borrower in immediately available funds.

2.4 Fees. (a) Commitment Fee. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee (each a "Commitment Fee"), which shall accrue at the Applicable Margin with respect to the Commitment Fee on the daily amount, if any, of the Revolving Credit Commitment of such Lender in excess of the sum of the aggregate principal amount of such Lender's Revolving Credit Loans (and Swingline Loans) then outstanding plus such Lender's Revolving Credit Commitment Percentage of the actual daily maximum amount available to be drawn under each Letter of Credit then outstanding during the period from and including the Closing Date to but excluding the date on which such Commitment terminates. Accrued Commitment Fees shall be payable in arrears on the last Business Day of March, June, September and December of each year and on the date on which the Revolving Credit Commitment terminates, commencing on the first such date to occur after the Closing Date. All Commitment Fees shall be computed on the basis of a 360-day year and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of computation of the Commitment Fee, Swingline Loans shall not be counted toward or considered usage under the Revolving Credit Commitment of any Revolving Lender other than the Swingline Lender.

(b) Deferred Closing Fee. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a deferred closing fee (each a "Deferred Closing Fee"), which shall accrue at twenty-five one hundredths of one percent (0.25%) per annum on the daily amount of the sum of the Term Loan Commitment and the Revolving Credit Commitment of such Lender then outstanding during the period from and including the date hereof to but excluding the earlier of the Closing Date and the date on which such Commitments terminate. Accrued Deferred Closing Fees shall be payable in arrears on the Closing Date (or, if earlier, on the date on which the Commitments terminate). All Deferred Closing Fees shall be computed on the basis of a

29

CSFB001297

TABLE OF CONTENTS

Page

ARTICLE 1.  DEFINITIONS ..................................................................... 1
   1.1    Defined Terms................................................................... 1
   1.2    Other Definitional Provisions ..........................................24

ARTICLE 2.  AMOUNT AND TERMS OF COMMITMENTS ...........................25
   2.1    Commitments....................................................................25
   2.2    Notes.................................................................................27
   2.3    Procedure for Borrowings................................................27
   2.4    Fees...................................................................................29
   2.5    Optional and Mandatory Termination or Reduction .......30
   2.6    Optional and Mandatory Prepayments .............................31
   2.7    Interest Rate Conversion and Continuation Options ........32
   2.8    Maximum Amounts of Eurodollar Tranches ...................33
   2.9    Interest Rates; Default Rate Payment Dates ....................33
   2.10   Computation of Interest ...................................................33
   2.11   Inability to Determine Interest Rate ................................34
   2.12   Pro Rata Treatment and Payments; Funding Reliance .....34
   2.13   Illegality..........................................................................35
   2.14   Requirements of Law ......................................................36
   2.15   Taxes................................................................................37
   2.16   Indemnity .........................................................................39
   2.17   Discretion of Lender as to Manner of Funding................40
   2.18   Change of Lending Office; Replacement Lender .............40
   2.19   [Intentionally Omitted]....................................................41
   2.20   Additional Provisions relating to Letters of Credit. .........41
   2.21   Additional Provisions Relating to Swingline Loans. ........45
   2.22   Participations in Letters of Credit and Swingline Loans...46
   2.23   NW Restructuring. ...........................................................46

ARTICLE 3.  REPRESENTATIONS AND WARRANTIES ...........................47
   3.1    Financial Condition .........................................................47
   3.2    No Change .......................................................................47
   3.3    Corporate Existence; Compliance with Law ...................47
   3.4    Corporate Power; Authorization; Enforceable Obligations...........48
   3.5    No Legal Bar ....................................................................48
   3.6    No Material Litigation .....................................................49
   3.7    No Default .......................................................................49
   3.8    Ownership of Property; Liens ..........................................49
   3.9    [Intentionally Omitted].....................................................49
   3.10   Intellectual Property ........................................................49
   3.11   No Burdensome Restrictions ...........................................50
   3.12   Taxes................................................................................50

i

CSFB001265

3.13    Margin Stock...................................................................................50
3.14    ERISA.............................................................................................50
3.15    Holding Company; Investment Company Act; Other Regulations.................51
3.16    Purpose of Loans............................................................................51
3.17    Environmental Matters....................................................................51
3.18    Insurance........................................................................................52
3.19    Accuracy and Completeness of Information ......................................52
3.20    Leaseholds, Permits, etc .................................................................52
3.21    No Restrictive Covenants ...............................................................53
3.22    Solvency..........................................................................................53
3.23    Index Debt Rating............................................................................53
3.24    Acquisition Agreement; Merger......................................................53
3.25    Subsidiaries.....................................................................................54

ARTICLE 4.  CONDITIONS PRECEDENT ...................................................54

4.1     Conditions to Initial Loans .............................................................54
4.2     Conditions to Each Extension of Credit ..........................................57

ARTICLE 5.  AFFIRMATIVE COVENANTS...................................................58

5.1     Financial Statements.......................................................................58
5.2     Certificates; Other Information........................................................59
5.3     Payment and Performance of Obligations ........................................60
5.4     Maintenance of Existence ...............................................................60
5.5     Maintenance of Property; Insurance ................................................60
5.6     Inspection of Property; Books and Records; Discussions..................60
5.7     Notices.............................................................................................61
5.8     Environmental Laws.........................................................................61
5.9     ERISA...............................................................................................62
5.10    Use of Proceeds...............................................................................62
5.11    Margin Stock....................................................................................62
5.12    Maintain Ownership of the Company and the Utility Business ..........62
5.13    Amendment of Loan Documents ......................................................63
5.14    Ratings.............................................................................................63

ARTICLE 6.  NEGATIVE COVENANTS ........................................................63

6.1     Financial Covenants ........................................................................63
6.2     Limitation on Fundamental Changes ...............................................63
6.3     Limitation on Transactions with Affiliates.......................................64
6.4     Limitation on Liens ........................................................................64
6.5     Amendments of Acquisition Agreement and Organizational
        Documents.......................................................................................64
6.6     Limitation on Guarantee Obligations ..............................................64
6.7     Limitation on Sale of Assets............................................................65
6.8     Limitation on Investments, Loans and Advances ............................65
6.9     Limitation on Dividends and Stock Repurchases .............................66
6.10    Limitation on Indebtedness or Mandatory Redeemable Stock...........67
6.11    Limitation on Sales and Leasebacks ...............................................68

ii

CSFB001266

6.12   Limitation on Negative Pledge Clauses; Payment Restrictions.................68
6.13   Limitation on Businesses.................................................................................69
6.14   Limitation on Certain Prepayments and Amendments...............................69
6.15   Limitations on Subsidiaries' Equity Interests ............................................69

ARTICLE 7.  EVENTS OF DEFAULT .................................................................................70
7.1    Events of Default.........................................................................................70

ARTICLE 8.  THE AGENTS ...............................................................................................72
8.1    Appointment .................................................................................................72
8.2    Delegation of Duties....................................................................................73
8.3    Exculpatory Provisions................................................................................73
8.4    Reliance by Agents.......................................................................................73
8.5    Notice of Default..........................................................................................73
8.6    Non-Reliance on Agents and Other Lenders ..............................................74
8.7    Indemnification ............................................................................................74
8.8    Agent in Its Individual Capacity .................................................................75
8.9    Successor Administrative Agent ..................................................................75

ARTICLE 9.  MISCELLANEOUS .......................................................................................75
9.1    Amendments and Waivers............................................................................75
9.2    Notice ...........................................................................................................76
9.3    No Waiver; Cumulative Remedies...............................................................77
9.4    Survival of Representations and Warranties................................................77
9.5    Payment of Expenses and Taxes; Indemnification .....................................77
9.6    Successors and Assigns; Participations and Assignments...........................78
9.7    Adjustments; Setoff......................................................................................81
9.8    Confidentiality .............................................................................................82
9.9    Effectiveness ................................................................................................82
9.10   Counterparts.................................................................................................82
9.11   Severability ..................................................................................................82
9.12   Integration ....................................................................................................82
9.13   GOVERNING LAW .....................................................................................83
9.14   Submission To Jurisdiction; Waivers..........................................................83
9.15   Acknowledgments.........................................................................................83
9.16   Waivers of Jury Trial ...................................................................................84

iii

NY—591039.20

CSFB001267

EXHIBITS AND SCHEDULES

| Annex A | Pricing Grid |
| Exhibit A-1 | Form of Revolving Credit Note |
| Exhibit A-2 | Form of Term Note |
| Exhibit B-1 | Form of Notice of Borrowing |
| Exhibit B-2 | Form of Notice of Request for Letter of Credit |
| Exhibit B-3 | Form of Notice of Borrowing of Swingline Loans |
| Exhibit B-4 | Form of Notice of Interest Rate Conversion |
| Exhibit C | Form of Closing Certificate |
| Exhibit D | Form of Assignment and Assumption Agreement |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of Pledge Agreement |
| | |
| Schedule 1 | Lending Offices of Lenders |
| Schedule 3.4 | Required Consents of Governmental Authorities |
| Schedule 3.6 | Litigation |
| Schedule 3.8 | Exceptions to Title to Borrower's Properties |
| Schedule 3.12 | Taxes |
| Schedule 3.14 | ERISA |
| Schedule 3.15 | Regulations Limiting Indebtedness |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.25 | Subsidiaries |
| Schedule 6.3 | Transactions with Affiliates |
| Schedule 6.6 | Guarantee Obligations |
| Schedule 6.8 | Investments |
| Schedule 6.10 | Indebtedness, Mandatory Redeemable Stock and Preferred Stock |

NY—591039.20

CSFB001268

CREDIT AGREEMENT, dated as of January 14, 2002, between NORTHWESTERN CORPORATION, a Delaware corporation (the "Borrower"), the several banks and other financial institutions from time to time party hereto (the "Lenders"), CREDIT SUISSE FIRST BOSTON, ABN AMRO BANK N.V., CIBC INC. and BARCLAYS CAPITAL, as Co-Arrangers (each a "Co-Arranger" and, collectively, the "Co-Arrangers"), and CREDIT SUISSE FIRST BOSTON, acting through its New York Branch, as Administrative Agent (in such capacity the "Administrative Agent "), Lead Arranger and Sole Book Runner.

## PRELIMINARY STATEMENTS

1.    The Borrower intends to acquire (the "Acquisition") all of the membership interests of The Montana Power, L.L.C., a Montana limited liability company (the "Company"), which holds the assets and securities owned by The Montana Power Company ("MPC") as of September 29, 2000 (other than Entech, Inc. and its subsidiaries), pursuant to the terms of the Unit Purchase Agreement, dated as of September 29, 2000 (as amended from time to time, the "Acquisition Agreement"), among the Borrower, MPC, the Company and Touch America Holding, Inc. (the "Seller").

2.    The Borrower desires that, subject to the satisfaction of the conditions set forth herein, (a) during the Availability Period (as hereinafter defined), Lenders having Revolving Credit Commitments (as hereinafter defined) make revolving credit loans in an aggregate principal amount not to exceed $280,000,000 at any one time outstanding, and (b) on the Closing Date (as hereinafter defined), Lenders having Term Loan Commitments (as hereinafter defined) make term loans in an aggregate principal amount not to exceed $720,000,000. The Lenders are willing to provide such loans, subject to the terms and conditions set forth herein.

3.    In consideration of the foregoing premises and the mutual covenants herein contained and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1. DEFINITIONS

1.1 Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Acquisition" shall have the meaning ascribed thereto in the Preliminary Statements hereof.

"Acquisition Agreement" shall have the meaning ascribed thereto in the Preliminary Statements hereof.

"Administrative Agent " shall have the meaning ascribed thereto in the heading hereto and shall include such other Lender or financial institution as shall

have subsequently been appointed as the successor Administrative Agent pursuant to Section 8.9.

"Affected Lender" shall have the meaning ascribed thereto in Section 2.18.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of (including all directors and officers of such Person), is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting securities, by contract or otherwise.

"Agents" shall have the meaning ascribed thereto in Section 8.1.

"Agreement" shall mean this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, on any particular date, a rate of interest per annum equal to the higher of

(a)    the rate of interest most recently announced by CSFB as its prime rate in effect at its principal office in New York City (which rate is not necessarily intended to be the lowest rate of interest charged by CSFB in connection with extensions of credit); and

(b)    the Federal Funds Rate for such date plus 0.50%.

"Alternate Base Rate Loans" shall mean Loans the rate of interest applicable to which is based upon the Alternate Base Rate.

"Applicable Margin" shall mean, for any day, with respect to any Alternate Base Rate Loan or Eurodollar Loan, or with respect to the Commitment Fees payable hereunder, as the case may be, the applicable rate *per annum* determined pursuant to the Pricing Grid.

"Approved Fund" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in commercial loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Arranger" shall mean CSFB and its successors.

"Asset Sale" shall mean any sale, lease or other disposition (including (x) any such transaction effected by way of merger or consolidation and (y) any sale-leaseback transaction, whether or not involving a Financing Lease) (any such transaction, a "disposition"), by the Borrower or any of its Subsidiaries, of any asset, but excluding (a) any disposition of inventory, cash, Cash Equivalents or other cash management investments or obsolete and unused or unnecessary

2

CSFB001270

equipment, in each case in the ordinary course of business, (b) any disposition to the Borrower or any of its Subsidiaries, (c) any disposition the proceeds of which will be used to purchase assets similar to the assets disposed of (a contract for which purchase is entered into within 180 days (and such assets are acquired within 270 days) after the date of such disposition) but only to the extent such proceeds are actually so used, (d) any sale-leaseback transaction entered into in respect of property acquired by the Borrower or any of its Subsidiaries, if such sale-leaseback transaction is entered into within 180 days after the date of such acquisition, (e) any sale of receivables (including in connection with securitizations thereof) effected to finance working capital requirements of the Borrower and its Subsidiaries, (f) any disposition of the assets of a Special Purpose Subsidiary, to the extent that the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary to finance (i) the development or operation of the assets it was formed to develop or (ii) activities incidental thereto, and (g) any other disposition of assets by the Borrower or any of its Subsidiaries the aggregate Net Cash Proceeds (including for purposes hereof any deferred payments) of which, for all such dispositions during any fiscal year, do not exceed $50,000,000 during any fiscal year.

"Assignee" shall have the meaning ascribed thereto in Section 9.6(c).

"Assignment and Assumption Agreement" shall have the meaning ascribed thereto in Section 9.6(c).

"Availability Period" shall mean the period from and including the Closing Date to, but not including, the Termination Date, or such earlier date on which the Revolving Credit Commitments shall terminate as provided herein.

"Benefited Lender" shall have the meaning ascribed thereto in Section 9.7(a).

"Borrower" shall have the meaning ascribed thereto in the heading hereto.

"Borrowing Date" shall mean any Business Day specified in a notice pursuant to Section 2.3 as a date on which the Borrower requests that the Lenders make Loans hereunder.

"Business" shall have the meaning ascribed thereto in Section 3.17(a).

"Business Day" shall mean (a) a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, and (b) with respect to the date of

    (i)    making or continuing any Loans as, or converting any
Loans from or into, Eurodollar Loans,

3

NY—591039.20

CSFB001271

(ii)     making any payment or prepayment or principal of or payment of interest on any portion of the principal amount of any Loans being maintained as Eurodollar Loans, or

(iii)     the Borrower giving any notice (or the number of Business Days to elapse prior to the effectiveness thereof) in connection with any matter referred to in the immediately preceding clause (b)(i) or (b)(ii),

any such day on which dealings in Dollars are also carried on in the interbank market in London, England.

"Capital Expenditures" of any Person shall mean, for any period, without duplication, all expenditures (whether paid in cash or other consideration) during such period that, in accordance with GAAP, are or should be included in additions to property, plant and equipment or similar items reflected in the statement of cash flows for such period for such Person.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

"Cash Equivalents" shall mean (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition and overnight bank deposits of any Lender and certificates of deposit with maturities of one year or less from the date of acquisition and overnight bank deposits of any other commercial bank having capital and surplus in excess of $500,000,000, (c) commercial paper of any issuer rated at least A-2 by Standard & Poor's or P-2 by Moody's, (d) additional money market investments with maturities of one year or less from the date of acquisition rated at least A1 or AA by Standard & Poor's or P-1 or Aa by Moody's and (e) tax-exempt debt obligations of any State of the United States or of any county or other municipal government subdivision of any State of the United States with maturities of one year or less from the date of acquisition rated at the highest investment grade rating by Standard & Poor's or by Moody's, or publicly traded or open-end bond funds that invest exclusively in such tax-exempt debt obligations.

"Change of Control" shall mean the occurrence of any of the following:

(a)     any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934) (i) shall have acquired beneficial ownership of 40% or more of the aggregate outstanding classes of Capital Stock having voting power in the election of directors of the Borrower or (ii) shall obtain the power (whether or not exercised) to elect a majority of the Borrower's directors;

NY—591039.20

CSFB001272

(b)    a majority of the persons who comprised the Board of Directors of the Borrower on the date hereof shall be replaced, unless such replacement shall have been approved by at least two-thirds of the Board of Directors of the Borrower then still in office who either were members of such Board of Directors on the date hereof or whose election as a member of such Board of Directors was previously so approved;

(c)    the Borrower shall cease to own, beneficially or of record, all of the outstanding Capital Stock of the Company other than as a result of a merger of the Company with and into the Borrower; or

(d)    the Borrower shall be liquidated or dissolved.

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 4.1 shall be satisfied or waived.

"Co-Arrangers" shall have the meaning ascribed thereto in the heading hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning ascribed thereto in the Pledge Agreement.

"Collateral Agent" shall have the meaning ascribed thereto in the Pledge Agreement.

"Collateral Documents" shall mean a collective reference to the Pledge Agreement and such other documents executed and delivered in connection with the attachment and perfection of the Collateral Agent's security interest and liens arising thereunder, including, without limitation UCC financing statements filed in connection therewith.

"Commitment" shall mean, as applicable, a Term Loan Commitment, a Revolving Credit Commitment or a Swingline Commitment.

"Commitment Fee" shall have the meaning ascribed thereto in Section 2.4.

"Commitment Percentage" shall mean, as to any Lender, at any time, the percentage which such Lender's Revolving Credit Commitment (or after the Termination Date, such Lender's Revolving Credit Loans) plus such Lender's Term Loan Commitment (or after the Closing Date, such Lender's Term Loans) then constituting the aggregate Revolving Credit Commitments (or after the Termination Date, all Revolving Credit Loans) plus the aggregate Term Loan Commitments (or after the Closing Date, all Term Loans), in each case outstanding at such time.

5

NY---591039.20

CSFB001273

year of 365 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c) <u>Letter of Credit Issuance Fees</u>.  In consideration of the issuance of Letters of Credit hereunder, the Borrower promises to pay to the Administrative Agent for the account of each Lender having a Revolving Credit Commitment a fee (the "<u>Letter of Credit Fee</u>") on such Lender's Revolving Credit Commitment Percentage of the actual daily maximum amount available to be drawn under each outstanding Letter of Credit computed at a per annum rate for each day from the date of issuance to the date of expiration (including the first day but excluding the last day) equal to the Applicable Margin for Revolving Credit Loans which are Eurodollar Loans.  The Letter of Credit Fee shall be payable in arrears on the last Business Day of March, June, September and December of each year (or portion thereof) beginning with the first such date to occur after the Closing Date and on the Termination Date.

(d) <u>Issuing Lender's Fees</u>.  The Borrower agrees to pay to the Issuing Lender, for its own account as Issuing Lender, such fees and expenses when due as are separately agreed to between the Issuing Lender and the Borrower.

(e) <u>Fee Letters</u>.  The Borrower agrees to pay to the Administrative Agent, (i) for the account of CSFB or the Administrative Agent, as applicable as set forth therein, concurrent with signing of this Agreement (or as otherwise specified therein), the fees set forth in the Fee Letter and (ii) for the account of each Co-Arranger or the Lenders, as applicable as set forth therein, concurrent with signing of this Agreement (or as otherwise specified therein), the fees set forth (or referred to) in the Syndication Fee Letter.

(f) <u>Payment of Fees</u>.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the benefit of the parties entitled thereto.  Fees paid shall not be refundable under any circumstances.

2.5 <u>Optional and Mandatory Termination or Reduction</u>.  (a)  The Term Loan Commitments shall terminate on the Closing Date (immediately after funding of the Term Loans).  Unless previously terminated, the aggregate amount of the Revolving Credit Commitments shall terminate on the Termination Date.  Anything herein to the contrary notwithstanding, the Term Loan Commitments and the Revolving Credit Loan Commitments shall terminate on March 31, 2002 in the event that the Closing Date has not occurred (and each of the conditions precedent set forth in Section 4.1 has not been satisfied) on or prior to such date.

(b) The Borrower shall have the right, upon not less than three Business Days' notice (if any Eurodollar Loans are outstanding at such time) or two Business Days' notice (otherwise) to the Administrative Agent, to terminate the Term Loan Commitments or, from time to time, to reduce the aggregate amount of the Term Loan Commitments.  Any such reduction shall be in an amount equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and shall reduce permanently the Term Loan Commitments then in effect.  The Administrative Agent agrees promptly to notify the

NY—591039.20

CSFB001298

Lenders of any notice of reduction or termination received by the Administrative Agent. Each reduction of the Term Loan Commitments shall be made ratably among the Lenders in accordance with their respective Term Loan Commitments.

(c) The Borrower shall have the right, upon not less than three Business Days' notice (if any Eurodollar Loans are outstanding at such time) or two Business Days' notice (otherwise) to the Administrative Agent, (i) to terminate the Revolving Credit Commitments if no Revolving Credit Obligations are then outstanding or (ii) from time to time, to reduce the aggregate amount of the Revolving Credit Commitments in excess of the sum of the aggregate principal amount of the Revolving Credit Obligations then outstanding. Any such reduction shall be in an amount equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and shall reduce permanently the Revolving Credit Commitments then in effect. The Administrative Agent agrees promptly to notify the Lenders of any notice of reduction or termination received by the Administrative Agent. Each reduction of the Revolving Credit Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Credit Commitments.

(d) The principal amount of all Term Loans, Revolving Credit Loans and Swingline Loans shall be due and payable on the Termination Date.

2.6 Optional and Mandatory Prepayments. (a) Subject to Section 2.16, the Borrower may, at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon at least three Business Days' irrevocable written notice (in the case of Eurodollar Loans), or one Business Day's irrevocable written notice (in the case of Alternate Base Rate Loans), to the Administrative Agent, specifying the date and amount of prepayment and whether the prepayment is of Revolving Credit Loans or Term Loans or a combination thereof, with respect to each such type of Loan, whether such prepayment is of Eurodollar Loans, Alternate Base Rate Loans or a combination thereof, and, in each case if of a combination thereof, the amount allocable to each. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (x) any amounts payable pursuant to Section 2.16, (y) with respect to Eurodollar Loans, accrued interest to such date on the amount prepaid and (z) any outstanding fees and expenses then due and owing with respect to the amount prepaid. Partial prepayments and optional prepayments of the Revolving Credit Loans shall be applied to such Revolving Credit Loans but shall not reduce the Revolving Credit Commitments unless the Borrower so specifies in its written notice to the Administrative Agent. Partial prepayments shall be in an aggregate principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.

(b) If the Borrower or any of its Subsidiaries shall at any time, or from time to time, after the date hereof receive any Net Cash Proceeds in respect of any Reduction Event, then, on the first Business Day immediately succeeding the date of such receipt, such Net Cash Proceeds shall be applied to the prepayment of any Term Loans then outstanding (or if the Closing Date shall not have occurred on or prior to such Business Day, then the Term Loan Commitments then outstanding shall be permanently reduced by an amount equal to such Net Cash Proceeds).

NY—591039.20

CSFB001299

(c) Each prepayment of Eurodollar Loans pursuant to this Section 2.6 shall be accompanied by payment in full of all accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing pursuant to Section 2.16 and any outstanding fees and expenses due and owing with respect to the amount prepaid.

(d) If at any time the aggregate principal amount of Swingline Loans shall exceed the Swingline Commitment, the Borrower shall immediately make payment on the Swingline Loans in an amount sufficient to eliminate the excess.

2.7 Interest Rate Conversion and Continuation Options. (a) The Borrower may elect from time to time to convert Eurodollar Loans of one Type of Loan to Alternate Base Rate Loans of the same Type of Loan by giving the Administrative Agent prior irrevocable notice of such election substantially in the form of Exhibit B-4 (a "Notice of Interest Rate Conversion") (which notice must be received by the Administrative Agent by at least 10:00 a.m., New York City time, two Business Days prior to such election); provided that any such conversion of Eurodollar Loans may be made only on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert Alternate Base Rate Loans of one Type of Loan (other than a Swingline Loan) to Eurodollar Loans of the same Type of Loan by giving the Administrative Agent prior irrevocable notice of such election (which notice must be received by the Administrative Agent by at least 10:00 a.m., New York City time, three Business Days prior to such election). Any such Notice of Interest Rate Conversion to Eurodollar Loans shall specify the length of the initial Interest Period or Interest Periods therefor. Upon receipt of any such notice, the Administrative Agent shall promptly notify each Lender thereof. All or any part of the outstanding Eurodollar Loans and Alternate Base Rate Loans may be converted as provided herein; provided that (i) no Loan may be converted into a Eurodollar Loan when any Default has occurred and is continuing, (ii) no Revolving Credit Loan may be converted into a Eurodollar Loan after the date that is one month prior to the Termination Date, (iii) no Term Loan may be converted into a Eurodollar Loan after the date that is one month prior to the Termination Date, (iv) no Swingline Loan may be converted into a Eurodollar Loan and (v) such conversion shall be in an aggregate principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.

(b) Any Eurodollar Loans may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 of the length of the next Interest Period to be applicable to such Loans; provided that (i) no Eurodollar Loan may be continued as such when any Default has occurred and is continuing, (ii) no Eurodollar Loan which is a Revolving Credit Loan may be continued as a Eurodollar Loan after the date that is one month prior to the Termination Date, and (iii) no Eurodollar Loan which is a Term Loan may be continued as a Eurodollar Loan after the date that is one month prior to the Termination Date; provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph, or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be automatically converted to

32

CSFB001300

Alternate Base Rate Loans on the last day of such then expiring Interest Period.  The Administrative Agent agrees to notify the Lenders of any notice of continuation referred to herein received by the Administrative Agent.

2.8 <u>Maximum Amounts of Eurodollar Tranches</u>.    All borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and shall be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof.  There shall not be more than ten Eurodollar Tranches at any one time outstanding.

2.9 <u>Interest Rates; Default Rate Payment Dates</u>.  (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for the first day of such Interest Period (subject to daily adjustments, if any, required by changes in the Eurodollar Reserve Requirements) <u>plus</u> the Applicable Margin then in effect for such Type of Loans.

(b) Each Alternate Base Rate Loan shall bear interest at a rate per annum equal to the Alternate Base Rate <u>plus</u> the Applicable Margin then in effect for such Type of Loans.

(c) If an Event of Default has occurred and is continuing, the Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section <u>plus</u> 2% from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment).  In addition, should any interest on such Loans or any Commitment Fees or other amount (other than principal) payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate per annum as determined pursuant to the preceding sentence, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d) Interest shall be payable in arrears on each Interest Payment Date; <u>provided</u> that interest accruing pursuant to <u>Section 2.9(c)</u> shall be payable from time to time on demand.

2.10    <u>Computation of Interest</u>.  (a)  The Alternate Base Rate interest (when calculated based upon the prime rate) shall be calculated on the basis of a 365/366 day year and all other interest shall be calculated on the basis of a 360-day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the Alternate Base Rate, the Eurodollar Reserve Requirements or the Applicable Margin shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative

33

CSFB001301

Agent shall, as soon as practicable, notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

(b) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent, at the request of the Borrower, shall deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.10(a).

2.11  Inability to Determine Interest Rate.  If prior to the first day of any Interest Period:

(a) the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining its affected Loans during such Interest Period, the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the Lenders as soon as practicable thereafter.  If such notice is given, (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as Alternate Base Rate Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Alternate Base Rate Loans and (z) any outstanding Eurodollar Loans shall be converted, on the first day of such Interest Period, to Alternate Base Rate Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Alternate Base Rate Loans to Eurodollar Loans.

2.12  Pro Rata Treatment and Payments; Funding Reliance.  (a) Each borrowing by the Borrower of Revolving Credit Loans from the Lenders hereunder, each payment by the Borrower on account of any Commitment Fee hereunder and any reduction of the Revolving Credit Commitments of the Lenders shall be made pro rata according to the respective Revolving Credit Commitment Percentages of the Lenders. Each borrowing by the Borrower of Term Loans from the Lenders hereunder and any reduction of the Term Loan Commitments of the Lenders shall be made pro rata according to the respective Term Loan Commitment Percentages of the Lenders.  Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans of any one Type shall (except as may be required as a result of Section 2.16) be made pro rata according to the respective outstanding principal amounts of the Loans of such Type then held by the Lenders.   All payments (including prepayments) to be made by the Borrower hereunder and under the Notes, whether on account of principal, interest, fees or otherwise, shall be made without setoff or

34

CSFB001302

counterclaim and shall be made prior to 12:00 noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Administrative Agent's office specified in <u>Section 9.2</u>, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal and interest thereon, shall be payable at the then applicable rate during such extension.

(b) Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make available to the Administrative Agent the amount that would constitute its applicable Commitment Percentage of such borrowing, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If the Administrative Agent makes such amount available to the Borrower and if such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such borrowing. If such Lender's applicable Commitment Percentage of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to the applicable Loan, on demand, from the Borrower. The obligations of the Lenders hereunder are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereunder.

2.13   <u>Illegality</u>.   Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law after the date hereof or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Alternate Base Rate Loans to Eurodollar Loans shall forthwith be suspended until such condition shall cease to exist and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Alternate Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to <u>Section 2.16</u>.

NY—591039.20

CSFB001303

2.14  <u>Requirements of Law</u>.  (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

> (i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, its Notes, any Eurodollar Loan, any Letter of Credit or any Lender's participation therein, any LOC Documents, or its obligation to make Eurodollar Loans, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by <u>Section 2.15</u> and changes in the rate of tax on the overall net income of such Lender);

> (ii)   shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the Eurodollar Rate hereunder; or

> (iii)  shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans or any Letter of Credit or LOC Document, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower through the Administrative Agent, of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this Section submitted by such Lender through the Administrative Agent to the Borrower shall be in writing and accompanied by calculations in reasonable detail demonstrating the basis for such Lender's claim and shall be considered conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

> (b) If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof has or shall have the effect of reducing the rate of return on such Lender's or the corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then

36

CSFB001304

from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent ) of a written request therefor accompanied by calculations in reasonable detail demonstrating the basis for such Lender's claims, the Borrower shall pay to such Lender the additional amount or amounts as will compensate such Lender for such reduction. This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

    2.15   Taxes. (a) Any and all payments made by the Borrower to or for the account of the Administrative Agent or any Lender under this Agreement, the Notes or the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, and all liabilities with respect thereto, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent or any Lender by a jurisdiction under the Laws of which such Lender or its applicable lending office, or the Administrative Agent, as the case may be, is organized or maintained. If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions, withholdings or liabilities ("Non-Excluded Taxes") are required to be deducted or withheld from or in respect of any amounts payable to the Administrative Agent or any Lender hereunder or under the Notes, (i) the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary, so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.15), the Administrative Agent or such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower shall make such deductions or withholdings, and (iii) the Borrower shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law; provided that the Borrower shall not be required to increase any such amounts payable to any Lender if such Lender fails to comply with the applicable requirements of paragraph (b) of this Section. Whenever any Non-Excluded Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof. The Borrower agrees to indemnify and hold harmless each Lender and the Administrative Agent from the full amount of Non-Excluded Taxes (including, without limitation, any such taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.15) paid or incurred by such Lender or the Administrative Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. The covenants in this Section shall survive the termination of this Agreement and the payment of the Notes and payment of the Obligations hereunder.

    (b) Each Lender shall:

        (i)    deliver to the Borrower and the Administrative Agent (A) in the case of a Lender that is not incorporated under the laws of the United States or any state thereof, either (x) two duly completed copies of

37

NY—591039.20

CSFB001305

United States Internal Revenue Service Form W-8BEN or W-8ECI, as applicable, or successor applicable forms, as the case may be, or, (y) if such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and intends to claim exemption from U.S. Federal withholding tax under Section 871(h) or Section 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8BEN, or any subsequent versions thereof or successors thereto together with a certificate executed by such Lender representing that (1) such Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code), and claiming complete exemption from U.S. Federal withholding tax on payments of interest by the Borrower under this Agreement, the Notes and the other Loan Documents and (2) the Lender has received in replacement of any Note held by or assigned to it, a QFL Note in accordance with <u>Section 2.15(c)</u>, and (B) in the case of any other Lender, an Internal Revenue Service Form W-9, as applicable, or successor applicable form, as the case may be;

(ii)    deliver to the Borrower and the Administrative Agent two further copies of any such form or certification on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower; and

(iii)    obtain such extensions of time for filing and complete such forms or certifications as may reasonably be requested by the Borrower or the Administrative Agent;

unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders such form inapplicable or which would prevent such Lender from duly completing and delivering any such form with respect to it and such Lender so advises the Borrower and the Administrative Agent. Such Lender shall certify (i) in the case of a Form W-8BEN or W-8ECI, as applicable, that it is entitled to receive payments under this Agreement at a reduced rate of withholding, or without deduction or withholding, as the case may be, of any United States federal income taxes and (ii) in the case of a Form W-9, that it is entitled to an exemption from United States backup withholding tax. Each Person that shall become a Lender or a Participant pursuant to <u>Section 9.6</u> shall, upon the effectiveness of the related transfer, be required to provide all the applicable forms and statements required pursuant to this Section; <u>provided</u> that, in the case of a Participant, such Participant shall furnish all such required forms and statements to the Lenders from which the related participation shall have been purchased.

(c) Any Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and satisfies the requirements of <u>Section 2.15(b)(i)(A)(y)</u> (a "<u>Qualified Foreign Lender</u>") shall, upon receipt of the written request of the

NY—591039.20

CSFB001306

Administrative Agent or the Borrower and may, upon its own written request to the Administrative Agent, exchange any Note held by or assigned to it for a qualified foreign lender note ( a "QFL Note"). A QFL Note shall be in the form of the applicable Note being exchanged, but shall contain the following legend, "This Note is a QFL Note, and as such, ownership of the obligation represented by such QFL Note may be transferred only in accordance with Section 2.15 of the Credit Agreement." Any QFL Note issued in replacement of any existing Note pursuant to this Section 2.15(c) shall be (i) dated the Closing Date, (ii) issued in the name of the entity in whose name such existing Note was issued and (iii) issued in the same principal amount as such existing Note. Any Note replaced pursuant to this Section is sometimes referred to herein as a "Replaced Note".

(d) The Borrower agrees that, upon the request of, or delivery of a request to, a Qualified Foreign Lender pursuant to paragraph (c) of this Section, it shall execute and deliver a QFL Note to the Administrative Agent in replacement of the Replaced Note surrendered in connection with such request conforming to the requirements of this paragraph. Each Qualified Foreign Lender shall surrender its Note in connection with any replacement pursuant to this Section 2.15. Upon receipt by the Administrative Agent, in connection with any replacement, of a QFL Note and the existing Note to be replaced by such QFL Note in accordance with this paragraph, the Administrative Agent shall forward the QFL Note to the Lender which has surrendered its Note for replacement by such QFL Note and shall forward the surrendered Note to the Borrower marked "canceled". Once issued, QFL Notes (i) shall be deemed to and shall be "Notes" for all purposes under the Loan Documents, (ii) may not be exchanged for Notes which are not QFL Notes, notwithstanding anything to the contrary in the Loan Documents and (iii) shall at all times thereafter be QFL Notes, including, without limitation, following any transfer or assignment thereof.

(e) Notwithstanding anything to the contrary in the Loan Documents, the QFL Notes are registered obligations as to both principal and interest with the Borrower and transfer of the obligations underlying such QFL Note may be effected only by surrender of the QFL Note to the Borrower and either reissuance by the Borrower of such QFL Note to the transferee or issuance by the Borrower of a new QFL Note to the transferee. A QFL Note shall only evidence the Lender's or an assignee's right, title and interest in and to the related obligation, and in no event is a QFL Note to be considered a bearer instrument or obligation. This Section 2.15 shall be construed so that the obligations underlying the QFL Notes are at all times maintained in "registered form" within the meaning of Sections 871(h)(2) and 881(c)(2) of the Code.

2.16    Indemnity. The Borrower agrees to indemnify each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of (a) default by the Borrower in payment when due of the principal amount of or interest on any Eurodollar Loan, (b) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same, (c) default by the Borrower in making any prepayment after the Borrower has given a notice thereof or (d) the making of a prepayment or conversion of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto including, without limitation, in each case, any such

NY—591039.20

CSFB001307

loss or expense arising from the redeployment of funds obtained by it or from fees payable to terminate the deposits from which such funds were obtained. This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

      2.17    <u>Discretion of Lender as to Manner of Funding</u>.  Notwithstanding any other provisions of this Agreement (but subject to <u>Section 2.18</u>), each Lender shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit, it being understood that for the purposes of this Agreement all determinations hereunder shall be made assuming each Lender had actually funded and maintained each Eurodollar Loan through the purchase of deposits of Dollars in the London interbank market having a maturity corresponding to each Loan's Interest Period and bearing an interest rate equal to the Eurodollar Rate for such Interest Period.

      2.18    <u>Change of Lending Office; Replacement Lender</u>.  (a) Each Lender agrees that if it makes any demand for payment under <u>Section 2.14</u> or <u>Section 2.15</u> or if any adoption or change of the type described in <u>Section 2.13</u> shall occur with respect to it, such Lender will use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it as determined in its sole discretion) to designate a different lending office if the making of such a designation would reduce or obviate the need for the Borrower to make payments under <u>Section 2.14</u> or <u>Section 2.15</u>, or would eliminate or reduce the effect of any adoption or change described in <u>Section 2.13</u>.

      (b) In determining the amount of any claim for reimbursement or compensation hereunder, each Lender will use reasonable methods of calculation consistent with such methods customarily employed by such Lender in similar situations.

      (c) Each Lender will notify the Borrower and the Administrative Agent of any event giving rise to a claim under Sections 2.13, 2.14, 2.15 or 2.16 promptly after the occurrence thereof, which notice shall be accompanied by a certificate of such Lender setting forth in reasonable detail the circumstances of such claim.

      (d) If any Lender, other than (in its capacity as a Lender) the Administrative Agent (an "<u>Affected Lender</u>"), seeks payment or indemnification from the Borrower pursuant to <u>Section 2.14</u> or <u>Section 2.15(a)</u> (without prejudice to any amounts then due to such Lender under such Sections) that are not applicable to all Lenders, then the Borrower may designate another Lender or another bank or financial institution acceptable to the Administrative Agent to assume, in accordance with <u>Section 9.6</u>, all (but not less than all) the Commitments, Loans and other rights and obligations of such Affected Lender hereunder (a "<u>Replacement Lender</u>"), in each case, on a date mutually acceptable to the Replacement Lender, the Affected Lender, the Borrower and the Administrative Agent, without recourse upon, warranty by, or expense to, such Affected Lender or the Administrative Agent, for a purchase price equal to the outstanding principal amount of the Loans of such Affected Lender <u>plus</u> all interest accrued thereon and all other amounts owing to such Affected Lender hereunder, or such other purchase price as may be mutually agreed upon between the Affected Lender and the Replacement

NY—591039.20

CSFB001308

Lender, upon such assumption and purchase by the Replacement Lender, such Replacement Lender shall be deemed a "Lender" for purposes of this Agreement and the other Loan Documents and such Affected Lender shall cease to be a "Lender" for such purposes and shall no longer have any obligations hereunder.

2.19    [Intentionally Omitted]

2.20    Additional Provisions relating to Letters of Credit.

(a) Reports. The Issuing Lender will provide to the Administrative Agent bi-monthly, and more frequently upon request, a detailed summary report on its Letters of Credit and the activity thereon, in form and substance acceptable to the Administrative Agent. In addition, the Issuing Lender will provide to the Administrative Agent for dissemination to the Lenders at least quarterly (no later than three Business Days before the end of each quarter), and more frequently upon request, a detailed summary report on its Letters of Credit and the activity thereon, including, among other things, the beneficiary, the face amount, and the expiry date. The Issuing Lender will provide copies of the Letters of Credit to the Administrative Agent and the Lenders promptly upon request.

(b) Participation. Each Lender, with respect to Letters of Credit issued on or after the Closing Date, upon issuance of a Letter of Credit, shall be deemed to have purchased without recourse a risk participation from the Issuing Lender in such Letter of Credit and the obligations arising thereunder, in each case in an amount equal to its pro rata share of the obligations under such Letter of Credit (based on the respective Revolving Credit Commitment Percentages of the Lenders) and shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and be obligated to pay to the Issuing Lender therefor and discharge when due, its pro rata share of the obligations arising under such Letter of Credit. Without limiting the scope and nature of each Lender's participation in any Letter of Credit, to the extent that the Issuing Lender has not been reimbursed as required hereunder or under any such Letter of Credit, each Lender shall pay to the Issuing Lender its pro rata share of such unreimbursed drawing in same day funds on the day of notification by the Issuing Lender of an unreimbursed drawing pursuant to the provisions of subsection (d) hereof. The obligation of each Lender to so reimburse the Issuing Lender shall be absolute and unconditional and shall not be affected by the occurrence of a Default, an Event of Default or any other occurrence or event. Any such reimbursement shall not relieve or otherwise impair the obligation of the Borrower to reimburse the Issuing Lender under any Letter of Credit, together with interest as hereinafter provided.

(c) Reimbursement. In the event of any drawing under any Letter of Credit, the Issuing Lender will promptly notify the Borrower. Unless the Borrower shall immediately notify the Issuing Lender that the Borrower intends to otherwise reimburse the Issuing Lender for such drawing, the Borrower shall be deemed to have requested that the Lenders make a Revolving Credit Loan in the amount of the drawing as provided in subsection (d) hereof on the related Letter of Credit, the proceeds of which will be used to satisfy the related reimbursement obligations. The Borrower promises to reimburse

41

CSFB001309

the Issuing Lender on the day of drawing under any Letter of Credit (either with the proceeds of a Revolving Credit Loan obtained hereunder or otherwise) in same day funds. If the Borrower shall fail to reimburse the Issuing Lender as provided herein above, the unreimbursed amount of such drawing shall bear interest at a per annum rate equal to the Alternate Base Rate plus the sum of (i) the Applicable Margin for Revolving Credit Loans comprising Alternate Base Rate Loans plus (ii) two percent (2%). The Borrower's reimbursement obligations hereunder shall be absolute and unconditional under all circumstances irrespective of any rights of setoff, counterclaim or defense to payment the Borrower may claim or have against the Issuing Lender, the Administrative Agent, the Lenders, the beneficiary of the Letter of Credit drawn upon or any other Person, including without limitation any defense based on any failure of the Borrower to receive consideration or the legality, validity, regularity or unenforceability of the Letter of Credit. The Issuing Lender will promptly notify the Administrative Agent which shall promptly thereafter notify the other Lenders of the amount of any unreimbursed drawing and each Lender shall promptly pay to the Administrative Agent for the account of the Issuing Lender in Dollars and in immediately available funds, the amount of such Lender's Revolving Credit Commitment Percentage of such unreimbursed drawing. Such payment shall be made on the day such notice is received by such Lender from the Issuing Lender if such notice is received at or before 10:00 A.M. (New York, New York time) otherwise such payment shall be made at or before 10:00 A.M. (New York, New York time) on the Business Day next succeeding the day such notice is received. If such Lender does not pay such amount to the Issuing Lender in full upon such request, such Lender shall, on demand, pay to the Administrative Agent for the account of the Issuing Lender interest on the unpaid amount during the period from the date of such drawing until such Lender pays such amount to the Issuing Lender in full at a rate per annum equal to, if paid within two (2) Business Days of the date that such Lender is required to make payments of such amount pursuant to the preceding sentence, the Federal Funds Rate and thereafter at a rate equal to the Alternate Base Rate. Each Lender's obligation to make such payment to the Issuing Lender, and the right of the Issuing Lender to receive the same, shall be absolute and unconditional, shall not be affected by any circumstance whatsoever and without regard to the termination of this Agreement or the Commitments hereunder, the existence of a Default or Event of Default or the acceleration of the obligations of the Borrower hereunder and shall be made without any offset, abatement, withholding or reduction whatsoever. Simultaneously with the making of each such payment by a Lender to the Issuing Lender, such Lender shall, automatically and without any further action on the part of the Issuing Lender or such Lender, acquire a participation in an amount equal to such payment (excluding the portion of such payment constituting interest owing to the Issuing Lender) in the related unreimbursed drawing portion of the LOC Obligation and in the interest thereon and in the related LOC Documents, and shall have a claim against the Borrower with respect thereto.

    (d) <u>Repayment with Revolving Credit Loans</u>. On any day on which the Borrower shall have requested, or been deemed to have requested, a Revolving Credit Loan advance to reimburse a drawing under a Letter of Credit, the Administrative Agent shall give notice to the Lenders that a Revolving Credit Loan has been requested or deemed requested by the Borrower to be made in connection with a drawing under a Letter of Credit, in which case a Revolving Credit Loan advance comprised of Alternate

42

CSFB001310

Base Rate Loans (or Eurodollar Loans to the extent the Borrower has complied with the procedures of Section 2.3(b) with respect thereto) shall be immediately made to the Borrower by all Lenders (notwithstanding any termination of the Commitments pursuant to Article 7) pro rata based on the respective Revolving Credit Commitment Percentages of the Lenders (determined before giving effect to any termination of the Commitments pursuant to Article 7) and the proceeds thereof shall be paid directly to the Issuing Lender for application to the respective LOC Obligations. Each such Lender hereby irrevocably agrees to make its pro rata share of each such Revolving Credit Loan immediately upon any such request or deemed request in the amount, in the manner and on the date specified in the preceding sentence notwithstanding (i) the amount of such borrowing may not comply with the minimum amount for advances of Revolving Credit Loans otherwise required hereunder, (ii) whether any conditions specified in Section 4.2 are then satisfied, (iii) whether a Default or an Event of Default then exists, (iv) failure for any such request or deemed request for Revolving Credit Loan to be made by the time otherwise required hereunder, (v) whether the date of such borrowing is a date on which Revolving Credit Loans are otherwise permitted to be made hereunder or (vi) any termination of the Commitments relating thereto immediately prior to or contemporaneously with such borrowing. In the event that any Revolving Credit Loan cannot for any reason be made on the date otherwise required above (including, without limitation, as a result of the commencement of a proceeding under the Bankruptcy Code with respect to the Borrower or any Subsidiary), then each such Lender hereby agrees that it shall forthwith purchase (as of the date such borrowing would otherwise have occurred, but adjusted for any payments received from the Borrower on or after such date and prior to such purchase) from the Issuing Lender such participation in the outstanding LOC Obligations as shall be necessary to cause each such Lender to share in such LOC Obligations ratably (based upon the respective Revolving Credit Commitment Percentages of the Lenders (determined before giving effect to any termination of the Commitments pursuant to Article 7)), provided that in the event such payment is not made on the day of drawing, such Lender shall pay in addition to the Issuing Lender interest on the amount of its unfunded participation at a rate equal to, if paid within two (2) Business Days of the date of drawing, the Federal Funds Rate, and thereafter at the Alternate Base Rate.

(e) Designation of Other Credit Parties as Account Parties. Notwithstanding anything to the contrary set forth in this Agreement, including without limitation Section 2.3(b) hereof, a Letter of Credit issued hereunder may contain a statement to the effect that such Letter of Credit is issued for the account of a Subsidiary, provided that notwithstanding such statement, the Borrower shall be the actual account party for all purposes of this Agreement for such Letter of Credit and such statement shall not affect the Borrower's reimbursement obligations hereunder with respect to such Letter of Credit.

(f) Renewal, Extension. The renewal or extension of any Letter of Credit shall, for purposes hereof, be treated in all respects the same as the issuance of a new Letter of Credit hereunder.

NY—591039 20

CSFB001311

(g) Uniform Customs and Practices. The Issuing Lender may have the Letters of Credit be subject to The Uniform Customs and Practice for Documentary Credits, as published as of the date of issue by the International Chamber of Commerce (the "UCP") or the International Standby Practices (the "ISP"), as applicable, in which case the UCP or ISP, as applicable, may be incorporated therein and deemed in all respects to be a part thereof.

(h) Indemnification; Nature of Issuing Lender's Duties.

(i)  In addition to its other obligations under this Section 2.20, the Borrower hereby agrees to protect, indemnify, pay and save the Issuing Lender harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees) that the Issuing Lender may incur or be subject to as a consequence, direct or indirect, of (A) the issuance of any Letter of Credit or (B) the failure of the Issuing Lender to honor a drawing under a Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority (all such acts or omissions, herein called "Government Acts").

(ii)  As between the Borrower and the Issuing Lender, the Borrower shall assume all risks of the acts, omissions or misuse of any Letter of Credit by the beneficiary thereof. The Issuing Lender shall not be responsible:  (A) for the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason; (C) for errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (D) for any loss or delay in the transmission or otherwise of any document required in order to make a drawing under a Letter of Credit or of the proceeds thereof; and (E) for any consequences arising from causes beyond the control of the Issuing Lender, including, without limitation, any Government Acts unless, in any case, any of the foregoing is caused by the gross negligence or willful misconduct of the Issuing Lender, as determined by a court of competent jurisdiction. None of the above shall affect, impair, or prevent the vesting of the Issuing Lender's rights or powers hereunder.

(iii)  In furtherance and extension and not in limitation of the specific provisions hereinabove set forth, any action taken or omitted by the Issuing Lender, under or in connection with any Letter of Credit or the related certificates, if taken or omitted in good faith, shall not put such Issuing Lender under any resulting liability to the Borrower. It is the intention of the parties that this Agreement shall be construed and applied to protect and indemnify the Issuing Lender against any and all risks involved in the issuance of the Letters of Credit, all of which risks are hereby assumed by the Borrower, including, without limitation, any and all Government Acts. The Issuing

44

NY—591039.20

CSFB001312

Lender shall not, in any way, be liable for any failure by the Issuing Lender or anyone else to pay any drawing under any Letter of Credit as a result of any Government Acts or any other cause beyond the control of the Issuing Lender.

(iv)     Nothing in this subsection (h) is intended to limit the reimbursement obligations of the Borrower contained in subsection (d) above.  The obligations of the Borrower under this subsection (h) shall survive the termination of this Agreement.  No act or omissions of any current or prior beneficiary of a Letter of Credit shall in any way affect or impair the rights of the Issuing Lender to enforce any right, power or benefit under this Agreement.

(v)     Notwithstanding anything to the contrary contained in this subsection (h), the Borrower shall have no obligation to indemnify the Issuing Lender, and waivers of liability shall be ineffective in respect of any liability incurred by the Issuing Lender arising solely out of the gross negligence or willful misconduct of the Issuing Lender, as determined by a court of competent jurisdiction.

(i)     Responsibility of Issuing Lender.  It is expressly understood and agreed that the obligations of the Issuing Lender hereunder to the Lenders are only those expressly set forth in this Agreement and that the Issuing Lender shall be entitled to assume that the conditions precedent set forth in Section 4.2 have been satisfied unless it shall have acquired actual knowledge that any such condition precedent has not been satisfied; provided, however, that nothing set forth in this Section 2.20 shall be deemed to prejudice the right of any Lender to recover from the Issuing Lender any amounts made available by such Lender to the Issuing Lender pursuant to this Section 2.20 in the event that it is determined by a court of competent jurisdiction that the payment with respect to a Letter of Credit constituted gross negligence or willful misconduct on the part of the Issuing Lender.

(j)     Conflict with LOC Documents.  Solely as among the parties hereto, in the event of any conflict between this Agreement and any LOC Document (including any letter of credit application), this Agreement shall control.

2.21     Additional Provisions Relating to Swingline Loans.     The Swingline Lender may, at any time, in its sole discretion, by written notice to the Borrower and the Lenders, demand repayment of its Swingline Loans by way of a Revolving Credit Loan advance, in which case the Borrower shall be deemed to have requested a Revolving Credit Loan advance comprised solely of Alternate Base Rate Loans in the amount of such Swingline Loans; provided, however, that any such demand shall be deemed to have been given one (1) Business Day prior to the Termination Date and on the date of the occurrence of any Event of Default described in Article 7 and upon acceleration of the indebtedness hereunder and the exercise of remedies in accordance with the provisions of Article 7.  Each Lender hereby irrevocably agrees to make its Revolving Credit Commitment Percentage of each such Revolving Credit Loan in the amount, in the manner and on the date specified in the preceding sentence notwithstanding (i) the amount of such borrowing may not comply with the minimum amount for advances of Revolving Credit Loans otherwise required hereunder,

45

NY--591039.20

CSFB001313

(ii) whether any conditions specified in <u>Section 2.3</u> are then satisfied, (iii) whether a Default or an Event of Default then exists, (iv) failure of any such request or deemed request for Revolving Credit Loan to be made by the time otherwise required hereunder, (v) whether the date of such borrowing is a date on which Revolving Credit Loans are otherwise permitted to be made hereunder or (vi) any termination of the Commitments relating thereto prior to or contemporaneously with such borrowing. In the event that any Revolving Credit Loan cannot for any reason be made on the date otherwise required above (including, without limitation, as a result of the commencement of a proceeding under the Bankruptcy Code with respect to the Borrower), then each Lender hereby agrees that it shall forthwith purchase (as of the date such borrowing would otherwise have occurred, but adjusted for any payments received from the Borrower on or after such date and prior to such purchase) from the Swingline Lender such participations in the outstanding Swingline Loans as shall be necessary to cause each such Lender to share in such Swingline Loans ratably based upon its Revolving Credit Commitment Percentage (determined before giving effect to any termination of the Commitments, <u>provided</u> that (A) all interest payable on the Swingline Loans shall be for the account of the Swingline Lender until the date as of which the respective participation is funded and (B) at the time any purchase of participation pursuant to this sentence is actually made, the purchasing Lender shall be required to pay to the Swingline Lender, to the extent not paid to the Swingline Lender by the Borrower in accordance with the terms of <u>Section 2.5</u>, interest on the principal amount of participations purchased for each day from and including the day upon which such borrowing would otherwise have occurred to but excluding the date of payment for such participations, at the rate equal to the Federal Funds Rate.

      2.22   <u>Participations in Letters of Credit and Swingline Loans</u>.  Each Lender's obligation to make Revolving Credit Loans, and its obligation to participate in Letters of Credit or Swingline Loans, pursuant to Section 2.20(d) and 2.21 shall be absolute and unconditional and shall not be affected by any circumstance, including without limitation, (i) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against the Issuing Lender, the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (ii) any adverse change in condition (financial or otherwise) of the Borrower or any of its Subsidiaries, (iii) any breach of this Agreement by the Borrower or any other Lender or (iv) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

      2.23   <u>NW Restructuring</u>.  In the event that the Borrower wishes to consummate a proposed NW Restructuring after date hereof, the Borrower shall give the Administrative Agent and the Lenders written notice (in form and substance satisfactory to the Administrative Agent) setting forth, in reasonable detail, the timing, structure and terms of such NW Restructuring. If the proposed NW Restructuring would require any amendment or waiver to this Agreement, the Borrower shall not be permitted to consummate such proposed NW Restructuring unless and until the Borrower, the Administrative Agent and the Required Lenders enter into an amendment and/or waiver agreement in form and substance satisfactory to the Borrower, the Administrative Agent and the Required Lenders (and any conditions precedent set forth in such amendment or

NY—591039.20

CSFB001314

waiver shall have been satisfied); provided that neither the Administrative Agent nor any Lender shall have any obligation to enter into any such amendment or waiver agreement.

## ARTICLE 3. REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make or participate in extensions of credit hereunder, the Borrower hereby represents and warrants to the Administrative Agent and each Lender:

3.1 <u>Financial Condition</u>.    (a) The consolidated balance sheets of the Borrower as of December 31, 1998, December 31, 1999 and December 31, 2000 and the related consolidated statements of income, retained earnings and cash flows for the fiscal year ended on such date, and the unaudited consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of September 30, 2001; and the related consolidated statements of income, retained earnings and cash flows for the period ending as of such date, reported on, in the case of the annual audited financial statements, by Arthur Andersen LLP, copies of which have heretofore been furnished to the Lenders, present fairly the consolidated financial condition of the Borrower and its Consolidated Subsidiaries as at such date, and the results of their operations and their retained earnings and cash flows for each of the fiscal periods then ended.  All such financial statements, including the related schedules and notes thereto relating to the audited financials, have been prepared in accordance with GAAP applied consistently throughout the periods involved.

(b) All balance sheets, all statements of income and shareholders equity and of cash flows and all other financial information which shall hereafter be furnished by or on behalf of or the Borrower to the Administrative Agent for the purposes of, or in connection with, this Agreement or any transaction contemplated hereby have been or will be prepared in accordance with GAAP consistently applied throughout the periods involved (except as disclosed therein) and do or will present fairly (subject to normal year-end adjustment and the absence of footnotes in the case of financial statements for any fiscal quarter) the financial condition of the Borrower and its Consolidated Subsidiaries, as the case may be, as at the dates thereof and the results of their operations and their shareholders equity and cash flows for the periods then ended.

3.2 <u>No Change</u>.  Since December 31, 2000, there has been no development or event which has had a Material Adverse Effect.

3.3 <u>Corporate Existence; Compliance with Law</u>.  Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the corporate or limited liability company power and authority, and the legal right to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or limited liability company and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to

NY—591039.20

CSFB001315

have a Material Adverse Effect and (d) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

    3.4 <u>Corporate Power; Authorization; Enforceable Obligations</u>.  The Borrower has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and the Acquisition Agreement and to authorize the execution, delivery and performance of the Loan Documents and the Acquisition Agreement, and to borrow hereunder.  The Borrower has taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Notes and to consummate the Acquisition on the terms and conditions set forth in the Acquisition Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder, with the consummation of the Acquisition or ownership, lease or operation of the assets and securities of MPC that the Borrower intends to acquire pursuant to the terms of the Acquisition Agreement, or with the execution, delivery, performance, validity or enforceability of the Loan Documents to which the Borrower is a party or the Acquisition Agreement other than (x) as set forth on <u>Schedule 3.4</u>, or (y) any consents, authorizations and filings in connection with the foregoing that, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  On the Closing Date, the Administrative Agent and each Lender shall have received complete and current copies of all consents, authorizations and filings listed on <u>Schedule 3.4</u>.  No such consent, authorization or filing is conditioned upon or otherwise imposes any materially burdensome or adverse condition.  On the Closing Date, all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon any of the Transactions.  This Agreement and the Acquisition Agreement have been, and each other Loan Document will be, duly executed and delivered on behalf of the Borrower.  This Agreement and the Acquisition Agreement constitute, and each other Loan Document when executed and delivered will constitute, a legal, valid and binding obligation of the Borrower enforceable against the Borrower, in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

    3.5 <u>No Legal Bar</u>.  The execution, delivery and performance of the Loan Documents and the Acquisition Agreement, the borrowings hereunder and the use of the proceeds thereof, and the consummation of the Acquisition will not violate any Requirement of Law or Contractual Obligation of the Borrower or any Subsidiary which violation could reasonably be expected to have a Material Adverse Effect, will not accelerate or result in the acceleration of any payment obligations of the Borrower or such Subsidiary and will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of the Borrower or any such Subsidiary pursuant to any such Requirement of Law or Contractual Obligation.

NY—591039.20

CSFB001316

3.6 <u>No Material Litigation</u>. (a) Except as set forth in <u>Schedule 3.6</u>, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower or any Subsidiary or against any of the respective properties or revenues of the Borrower or any Subsidiary which could reasonably be expected to have a Material Adverse Effect.

(b)    No litigation, investigation or proceeding of or before any Governmental Authority is pending or, to the knowledge of the Borrower, is threatened (i) challenging the consummation of the Transactions or which would restrain, prevent or impose burdensome conditions on the Transactions, individually or in the aggregate, or any other transaction contemplated hereby, (ii) seeking to prohibit the ownership or operation by the Borrower or any of its subsidiaries or, to the knowledge of the Borrower, MPC or any of its subsidiaries of all or a material portion of any of their business or assets, or (iii) seeking to obtain, or having resulted in the entry of, any judgment, order or injunction that (A) would restrain, prohibit or impose adverse conditions on the ability of the Lenders to make the Loans under this Agreement, (B) could reasonably be expected to affect the legality, validity or enforceability of any Loan Document or the ability of any party thereto to perform its obligations thereunder, (C) would be materially inconsistent with the stated assumptions underlying the projections provided to the Administrative Agent or the Lenders, or (D) is seeking any material damages as a result thereof; which, solely in the case of any private civil action or proceeding, (1) has a reasonable basis for success and (2) singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.

3.7 <u>No Default</u>. No Default or Event of Default has occurred and is continuing.

3.8 <u>Ownership of Property; Liens</u>. Except as set forth in <u>Schedule 3.8</u>, each of the Borrower and its Material Subsidiaries has good record and marketable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material property. None of such property is subject to any Lien other than Permitted Liens.

3.9 [Intentionally Omitted].

3.10    Intellectual Property. Each of the Borrower and its Subsidiaries owns, or is licensed to use, all patents, trademarks, trade names, copyrights, technology, know-how, processes, logos and insignia necessary for the conduct of its business as currently conducted except for those which the failure to own or license could not reasonably be expected to have a Material Adverse Effect (the "<u>Intellectual Property</u>"). No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property which could reasonably be expected to have a Material Adverse Effect, nor does the Borrower or any Consolidated Subsidiary know of any valid basis for any such claim. The use of such Intellectual Property by the Borrower or any Subsidiary does not infringe on the rights of any Person, except for such claims and infringements

49

CSFB001317

that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.11    No Burdensome Restrictions.    No Requirement of Law or Contractual Obligation of the Borrower or any Subsidiary could reasonably be expected to have a Material Adverse Effect.

3.12    Taxes.    Except as set forth in Schedule 3.12, each of the Borrower and the Subsidiaries has filed or caused to be filed all federal, state and other material tax returns which are required to be filed and has paid all taxes (including interest and penalties) shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or such Subsidiary, as the case may be); and no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

3.13    Margin Stock.    (a) The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U), and no proceeds of any extension of credit hereunder will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock, except in compliance with applicable law and regulations.

(b) Following application of the proceeds of each extension of credit hereunder, not more than 25% of the value of the consolidated assets of the Borrower and its Consolidated Subsidiaries that are subject to the provisions of Section 6.3 will be comprised of margin stock.

3.14    ERISA.    Neither the Borrower nor any Subsidiary maintains, contributes to or has material obligations with respect to, any welfare plan (as defined in Section(3)(1) of ERISA) which provides benefits to employees after termination of employment other than as required by Part 6 of Title I of ERISA or similar state laws regarding continuation of benefits. Each Plan has complied and is in compliance with all respects with the applicable provisions of ERISA and the Code except where failure to do so could not reasonably be expected to have a Material Adverse Effect. The Borrower and each Subsidiary have not breached any of the responsibilities, obligations or duties imposed on it by ERISA, the Code, or regulations promulgated thereunder with respect to any Plan, which breach could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any Subsidiary nor any fiduciary of any Plan who is an officer or an employee of the Borrower or any Subsidiary has engaged in a nonexempt prohibited transaction described in Section 406 of ERISA or 4975 of the Code with respect to a Plan which could reasonably be expected to have a Material Adverse Effect. With respect to any employee benefit plan (as defined in Section 3(3) of ERISA) currently or formerly maintained or contributed to by any Commonly Controlled Entity,

50

NY—591039.20

CSFB001318

no liability exists and no event has occurred which could subject the Borrower or any Subsidiary to any liability which could reasonably be expected to have a Material Adverse Effect. Except as disclosed in Schedule 3.14, none of the Borrower or any Subsidiary has any liability, direct or indirect, contingent (including, without limitation, any such liability in connection with a Multiemployer Plan) or otherwise, under Title IV of ERISA or under Section 412 of the Code which could reasonably be expected to have a Material Adverse Effect.

     3.15   Holding Company; Investment Company Act; Other Regulations. The Borrower is not (a) prior to the Closing Date, a "holding company", a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company", as such terms are defined in the Public Utility Holding Company Act of 1935, as amended, (b) an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended, or (c) except as described on Schedule 3.15, subject to regulation under any Federal or state statute, regulation, decree or order which limits its ability to incur Indebtedness or conditions such ability upon any act, approval or consent of any Governmental Authority or an ISO. On and after the Closing Date, the Borrower is either (i) not a "holding company", a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company", or (ii) an "exempt holding company," as each such terms are defined in the Public Utility Holding Company Act of 1935, as amended. As of the Closing Date, the Borrower has duly filed in good faith, an application on Form U-1 seeking an exemption under Section 3(a)(3) of the Public Utility Holding Company Act of 1935, as amended.

     3.16   Purpose of Loans. The proceeds of Revolving Credit Loans will be used solely for general corporate purposes of the Borrower and its Subsidiaries (in compliance with all applicable legal and regulatory requirements) including up to but not exceeding $25,000,000 to finance the Acquisition, the Refinancing and the payment of related fees and expenses. The proceeds of Term Loans will be used for general corporate purposes of the Borrower and its Subsidiaries (in compliance with all applicable legal and regulatory requirements) including, without limitation, (i) to finance the Acquisition, the Refinancing and the payment of related fees and expenses and (ii) to repay other Indebtedness outstanding on the date hereof.

     3.17   Environmental Matters. Except as set forth on Schedule 3.17,

     (a)   The facilities and properties owned, leased or operated by the Borrower and its Subsidiaries and the facilities and properties owned, leased or operated by MPC that the Borrower intends to acquire pursuant to the terms of the Acquisition Agreement (the "Properties") and all operations at the Properties are in, and have been in, compliance in all material respects with all applicable Environmental Laws, and there is no contamination in, at, under, from or about the Properties or violation of any Environmental Law or other circumstance or condition, with respect to the Properties or the business operated by the Borrower and its Subsidiaries or MPC, or any predecessor of any of them (the "Business") which in either case could reasonably be expected to result in any claims, liability, investigation or cost pursuant to any Environmental Law and to have a Material Adverse Effect.

NY—591039.20

CSFB001319

(b) None of the Borrower, any Subsidiary or MPC, or any predecessor of any of them, has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the Business, nor do the Borrower or any Subsidiary have knowledge or reason to believe that any such notice will be received or is being threatened, in each case which could reasonably be expected to have a Material Adverse Effect.

(c) There has been no Release or threat of Release of Materials of Environmental Concern at or from any of the Properties, or arising from or related to the operations of the Borrower or any Subsidiary, or any predecessor of any of them, in connection with any of the Properties or otherwise in connection with the Business that could reasonably be expected to have a Material Adverse Effect.

3.18    Insurance.    All policies of insurance of any kind or nature maintained by or issued to the Borrower or any Subsidiary, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, worker's compensation, employee health and welfare, title, property and liability insurance, are in full force and effect in all material respects and are of a nature and provide such coverage as is sufficient and as is customarily carried by companies of similar size and character.

3.19    Accuracy and Completeness of Information.    All information, reports and other papers and data (other than projections) with respect to the Borrower or any Consolidated Subsidiary, or, to the knowledge of the Borrower, any Subsidiary furnished to the Lenders by the Borrower, or on behalf of the Borrower, and all SEC Reports were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lenders a true and accurate knowledge of the subject matter in all material respects. All projections with respect to the Borrower or any Consolidated Subsidiary, or, to the knowledge of the Borrower, any Subsidiary, furnished by the Borrower, were prepared and presented in good faith by the Borrower based upon facts and assumptions that the Borrower believed to be reasonable in light of current and foreseeable conditions, it being understood that projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and that no assurance can be given that the financial results set forth in such projections will actually be realized and the Borrower shall be under no obligation to update such projections. No document furnished or statement made in writing to the Lenders by or on behalf of the Borrower in connection with the negotiation, preparation or execution of this Agreement and no SEC Report contains any untrue statement of a material fact, or omits to state any such material fact necessary in order to make the statements contained therein not misleading, in either case which has not been corrected, supplemented or remedied by subsequent documents furnished or statements made in writing to the Lenders.

3.20    Leaseholds, Permits, etc.    The Borrower possesses or has the right to use, all leaseholds, easements, franchises and permits and all authorizations and other

52

NY—591039.20

CSFB001320

rights which are material to and necessary for the conduct of the Business and its business. All the foregoing are in full force and effect, and each of the Borrower and the Subsidiaries is in substantial compliance with the foregoing without any known conflict with the valid rights of others, except for such noncompliance with the foregoing which could not reasonably be expected to have a Material Adverse Effect. No event has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any such leasehold, easement, franchise, license or other right, which termination or revocation, considered as a whole, could reasonably be expected to have a Material Adverse Effect.

3.21   No Restrictive Covenants. No Subsidiary, including the Company, of the Borrower is party to, or otherwise bound by, any agreement or other arrangement that prohibits such Subsidiary from making any payments, directly or indirectly, to the Borrower, by way of dividends, advances, repayment of loans or advances, reimbursements of management or other intercompany charges, expenses and accruals or other returns on investment, or any other agreement or arrangement that restricts the ability of such Subsidiary to make any payment, directly or indirectly, to the Borrower, other than prohibitions and restrictions permitted to exist under Section 6.12.

3.22   Solvency. The Borrower is solvent, is able to pay its debts as they mature, owns property with fair saleable value greater than the amount required to pay its debts and has capital sufficient to carry on its business as then constituted.

3.23   Index Debt Rating. On the Closing Date, the Borrower has (a) a rating for Index Debt established by Moody's of not less than Baa2 and by Standard & Poor's of not less than BBB and (b) a rating for senior unsecured short-term debt (without third party credit enhancement) established by Moody's of not less than P-2 and by Standard & Poor's of not less than A-2 (and no such rating is on credit watch with negative implications).

3.24   Acquisition Agreement; Merger. (a) On and as of the Closing Date, (i) each of the representations and warranties of the Borrower made in the Acquisition Agreement are true and correct in all material respects, (ii) the Borrower and, to the knowledge of the Borrower, the Seller and MPC, have performed and complied with, in all material respects, the agreements, covenants and obligations required by the Acquisition Agreement to be so performed or complied with by each of them at or before the Closing (as defined in the Acquisition Agreement), (iii) no Order or Law (as such terms are defined in the Acquisition Agreement) is in effect restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Acquisition Agreement, (iv) all consents (or, solely in the case of consents referred to below in Sections 6.06 or 7.06 of the Disclosure Schedule, in lieu thereof waivers), approvals, actions, filings and notices set forth in Schedules 3.03 and 3.04 of the Acquisition Agreement and Sections 2.06, 2.07, 6.06 and 7.06 of the Disclosure Schedule to the Acquisition Agreement have been duly obtained, made or given, and are in full force and effect, (v) all rights and obligations under the Contracts (as defined in the Acquisition Agreement) listed on Schedule 6.08 to the Acquisition Agreement have been duly and validly assigned to the Company or the subsidiaries of

NY—591039.20

CSFB001321

MPC and any required third party consents have been obtained, (vi) all Benefit Plans (as defined in the Acquisition Agreement) listed on Schedule 6.09 of the Disclosure Schedule to the Acquisition Agreement have been terminated or assigned to the Seller in a manner satisfactory to the Borrower, (vii) no other consent, approval, waiver, filing, termination, assignment or other action (whether by MPC, the Seller, the Borrower, any of their respective Subsidiaries, any Governmental Authority or any other Person) is required in order to consummate the Acquisition in accordance with the terms of the Acquisition Agreement and the Requirements of Law which has not been obtained, filed or taken or which is no longer in full force and effect and (viii) the Acquisition has been consummated (and the Closing has occurred) in accordance with the terms of the Acquisition Agreement and the Borrower has acquired all of the right, title and interest in and to the Units free of any Lien or adverse claim.

(b)     To the knowledge of the Borrower, on and as of the Closing Date (except to extent made therein only as of an earlier specified date, in which case, on and as of such earlier date), each of the representations and warranties of the Seller and MPC made in the Acquisition Agreement are true and correct in all respects except for such failures of representations and warranties to be true and correct (without regard to any materiality qualifier therein) that, individually or in the aggregate, could not result in a material adverse effect to the Business or Condition (as such terms are defined in the Acquisition Agreement) of MPC and the Company.

3.25    Subsidiaries.  Set forth on Schedule 3.25(a) are all of the Material Subsidiaries of the Borrower, which schedule correctly sets forth, as of the date hereof, the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other equity interests of each of its Material Subsidiaries and also identifies the direct owner thereof. Set forth on Schedule 3.25(b) are all of the Material Subsidiaries of the Borrower after giving effect to the Acquisition, which schedule correctly sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other equity interests of each of its Material Subsidiaries and also identifies the direct owner thereof. All outstanding shares of capital stock of each Subsidiary of the Borrower has been duly and validly issued, are fully paid and non-assessable and have been issued free of any preemptive rights. No Material Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its Capital Stock or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase or, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Capital Stock or any stock appreciation or similar rights.

## ARTICLE 4.  CONDITIONS PRECEDENT

4.1 Conditions to Initial Loans.  The agreement of each Lender to make or participate in any extension of credit hereunder requested to be made by it on the Closing Date is subject to the satisfaction, immediately prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

NY—591039.20

CSFB001322

(a) <u>Documents</u>. The Administrative Agent shall have received each of the following documents, each of which shall be satisfactory to the Administrative Agent (and to the extent specified below, to each Lender) in form and substance:

(i)    <u>Executed Counterparts</u>. From each party hereto and thereto either (i) multiple counterparts of this Agreement and each other Loan Document (other than the Notes of which there shall only be one original), signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page to this Agreement and each other Loan Document) that such party has signed a counterpart of this Agreement and such other Loan Document, and all documentation necessary and appropriate to convey a valid and perfected first-priority security interest in the Collateral, as more specifically enumerated in the Pledge Agreement, each executed by a duly authorized officer of the Borrower;

(ii)    <u>Corporate Documents</u>. Such documents and certificates as the Administrative Agent or its counsel may reasonably request, certified as of the Closing Date as complete and correct copies thereof by the Secretary or an Assistant Secretary of the Borrower, relating to (i) the organization, existence and good standing of the Borrower, (ii) the authorization of the execution, delivery and performance by the Borrower of this Agreement, and of the borrowings hereunder by the Borrower, and (iii) certificates as to the incumbency and signature of each individual signing this Agreement and any other agreement or document contemplated hereby on behalf of the Borrower;

(iii)    <u>Financial Statements</u>.    Copies of (i) the audited consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of December 31, 2000, and the related audited statement of earnings and cash flows for the period ending as of such date, and (ii) the unaudited consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of September 30, 2001, and the related unaudited statement of earnings and cash flows for the period ending as of such date, and the related unaudited statement of earnings and cash flows for the period ending as of such date, respectively;

(iv)    <u>Acquisition Agreement</u>.    A certified copy of the Acquisition Agreement (and any amendments to the originally filed statements or executed agreement, as applicable, shall be in form and substance satisfactory to the Administrative Agent and the Lenders);

(v)    <u>Application for Exemption under Section 3(a)(3)</u>.    The application on Form U-1 seeking an exemption under Section 3(a)(3) of the Public Utility Holding Company Act of 1935 referred to in Section 3.15, shall be in form and substance satisfactory to the Administrative Agent and the Lenders; and

NY—591039.20

CSFB001323

(vi)    Other Documents.    Such other documents as the Administrative Agent or any Lender or special New York counsel to CSFB may reasonably request.

(b) Consents, Licenses and Approvals.  The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of a Responsible Officer of the Borrower (i) attaching copies of all consents, authorizations and filings referred to in Schedule 3.4, including without limitation, the order of the FERC referred to in item 1 thereof, and (ii) stating that, except as shown in Schedule 3.4, such consents, licenses and filings are in full force and effect; and each such consent, authorization and filing shall be in form and substance satisfactory to the Administrative Agent.  Without limiting the foregoing, any consents, filings, approvals or notices set forth on Schedule 3.15 (or which are necessary or advisable as a result of the facts or circumstances set forth on such schedule) shall have been obtained or made, as applicable, shall be in full force and effect and shall be in form and substance satisfactory to the Administrative Agent.

(c) Closing Fees and Expenses.  The Administrative Agent previously shall have received the fees to be received on the Closing Date referred to in the Fee Letter and shall have received reimbursement of all costs and expenses (including the fees and expenses of counsel to the Administrative Agent).

(d) Legal Opinions.  The Administrative Agent shall have received, with a counterpart for each Lender, the executed legal opinions of counsel to the Borrower, which opinions shall be satisfactory in form and substance to the Administrative Agent.

(e) Closing Certificate.  The Administrative Agent shall have received, with a counterpart for each Lender, a closing certificate of the Borrower substantially in the form of Exhibit C, dated as of the Closing Date and satisfactory in form and substance to the Administrative Agent.

(f) Insurance.  The Administrative Agent shall have received evidence satisfactory to it of the existence of the insurance required hereunder.

(g) Compliance Certificate.    The Administrative Agent shall have received, with a counterpart for each Lender, a Compliance Certificate substantially in the form of Exhibit E executed by a Chief Financial Officer or Treasurer of the Borrower, dated as of the Closing Date and satisfactory in form and substance to the Administrative Agent.

(h) No Material Adverse Effect.  Since December 31, 2000, there shall have been no development or event which, singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(i) Index Debt Rating.  The Administrative Agent shall have received written confirmation (i) from Standard & Poor's that, immediately after consummation of the Acquisition, Index Debt will be rated at least BBB by Standard & Poor's and senior unsecured short-term debt of the Borrower (without third party credit enhancement) will be rated at least A-2 by Standard & Poor's, and (ii) from Moody's that, immediately after

56

CSFB001324

consummation of the Acquisition, Index Debt will be rated at least Baa2 by Moody's and senior unsecured short-term debt of the Borrower (without third party credit enhancement) will be rated at least P-2 by Moody's.

(j) Pro Forma Financials. The Administrative Agent shall have received, with a copy for each Lender, pro forma balance sheets as of the end of the fiscal quarter immediately preceding the Closing Date and pro forma statements of operations and cash flows for the immediately preceding fiscal year of the Borrower and its Consolidated Subsidiaries and for the period from the end of such fiscal year to the end of the fiscal quarter immediately preceding the Closing Date, (i) giving effect to the Transactions and (ii) demonstrating that, had consummation of the Acquisition occurred on the first day of the immediately preceding fiscal year of the Borrower, each of the financial covenants set forth in Section 6.1 would have been satisfied as at the end of such fiscal year and at the end of each succeeding fiscal quarter ending on or before the Closing Date, certified by the chief financial officer or treasurer of the Borrower.

(k) Termination of Prior 364-Day Credit Agreement. The Administrative Agent shall have received evidence, satisfactory to it, that the Credit Agreement dated as of June 10, 1999 among the Borrower, the lenders party thereto and Canadian Imperial Bank of Commerce as agent shall have been terminated and all indebtedness, liabilities, and obligations thereunder shall have been paid in full.

(l) Acquisition. The Administrative Agent shall have received evidence, satisfactory to each of the Co-Arrangers, that substantially concurrent with the making of the Initial Loans, (i) the Restructuring (as defined in the Acquisition Agreement) shall have been consummated in all material respects in accordance with the terms of the Acquisition Agreement, (ii) all conditions precedent to the Closing (as defined in the Acquisition Agreement) set forth in the Acquisition Agreement shall have been satisfied and (iii) the Borrower shall have received beneficial and legal title to the Units (as defined in the Acquisition Agreement).

(m) Outside Closing Date. The Closing Date shall have occurred and each of conditions precedent set forth above and in Section 4.2 shall have been satisfied on or prior to March 31, 2002.

4.2 Conditions to Each Extension of Credit. The agreement of each Lender to make any Loan other than Loans constituting an interest rate conversion, continuation or rollover of a pre-existing Loan requested to be made by it on any date and the agreement of the Issuing Lender to issue, amend, renew or extend (and each Lender to participate in) any Letter of Credit (the making of any such Loan or the issuance, amendment, renewal or extension of (and the participation in) any such Letter of Credit, a "Credit Event") is subject to the satisfaction of the following conditions precedent:

(a) Representations and Warranties. Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents (except to the extent applicable to an earlier date) shall be true and correct in all material respects on

NY—591039.20

CSFB001325