and as of such date as if made on and as of such date (both before and after giving effect to such Credit Event).

(b) No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to such Credit Event requested to be made on such date.

(c) Additional Matters. All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions and the other transactions contemplated by this Agreement, the other Loan Documents and the Acquisition Agreement shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received such other documents, instruments and legal opinions in respect of any aspect or consequence of the Transactions and the other transactions contemplated hereby or thereby as it shall reasonably request.

Each Credit Event shall constitute a representation and warranty by the Borrower as of the date of such Credit Event that the statements in any document delivered by the Borrower in connection with such borrowing are true and correct and that the conditions contained in this Section 4.2 have been satisfied.

(d) Additional Conditions to Letters of Credit. If the issuance of a Letter of Credit is requested pursuant to Sections 2.1 and 2.3, all conditions set forth therein with respect to the issuance of a Letter of Credit shall have been satisfied

(e) Additional Conditions to Swingline Loans. If a Swingline Loan is requested pursuant to Sections 2.1 and 2.3, all conditions set forth therein with respect to Swingline Loans shall have been satisfied.

## ARTICLE 5. AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, from and after the Closing Date and thereafter for so long as any of the Commitments remains in effect, any Note remains outstanding and unpaid or any Obligation is owing to any Lender, the Issuing Lender, the Collateral Agent or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall and shall cause each of its Subsidiaries to:

5.1 Financial Statements. Furnish to each Lender:

(a) as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the consolidated balance sheet of the Borrower and the Consolidated Subsidiaries as at the end of such year and the related consolidated and consolidating statements of income, retained earnings and cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Arthur Andersen LLP or other independent certified public accountants of nationally recognized standing;

NY—591039.20

CSFB001326

provided that the submission of the Borrower's report on Form 10-K shall satisfy the foregoing requirements; and

(b) as soon as available, but in any event not later than 45 days after the end of each quarterly period for each of the fiscal quarters of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and the Consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income, retained earnings and cash flows of the Borrower and the Subsidiaries for such quarter and the portion of the fiscal year through the end of such quarter and setting forth the actual figures for the corresponding date or period in the previous year, certified by the chief financial officer or treasurer of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments); provided that the submission of the Borrower's report on Form 10-Q shall satisfy the foregoing requirements;

all such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

5.2 <u>Certificates; Other Information</u>.  Furnish to each Lender:

(a) concurrently with the delivery of the financial statements referred to in <u>Section 5.1(a)</u>, a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b) concurrently with the delivery of the financial statements referred to in <u>Section 5.1(a) or (b)</u>, a compliance certificate substantially in the form of <u>Exhibit E</u> of the chief financial officer or treasurer of the Borrower (the "<u>Compliance Certificate</u>"), in form and substance satisfactory to the Administrative Agent, (i) showing compliance by the Borrower and the Subsidiaries with the covenants contained in <u>Section 6.1</u> and (ii) setting forth the description of any Reduction Event occurring during such period and the aggregate amount of Net Cash Proceeds received during such period with respect to any Reduction Event;

(c) within 5 Business Days after the filing thereof, copies of all reports which the Borrower sends to any of its stockholders, and copies of all registration statements, reports on Form 10-K, Form 10-Q or Form 8-K (or, in each case, any successor form) and other material reports which the Borrower or any Subsidiary files with the SEC or any successor or analogous Governmental Authority (other than public offerings of securities under employee benefit plans or dividend reinvestment plans);

(d) within five days after either of Moody's or Standard & Poor's has raised or lowered its credit rating of any of the Borrower's long-term unsecured Debt for

NY—591039.20

CSFB001327

Borrowed Money (including any Index Debt) a notice to the Administrative Agent as to such effect; and

(e) promptly, such additional financial and other information as the Administrative Agent or any Lender may from time to time reasonably request.

5.3 <u>Payment and Performance of Obligations</u>.  Perform in all material respects all of its obligations under the terms of all material agreements, indentures, mortgages, security agreements and other debt instruments to which it is party or bound, including, without limitation, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes, fees or other charges imposed on it or on any of its properties by any Governmental Authority and all its other material obligations of whatever nature, except, in each case, where the amount or validity thereof is currently being diligently contested in good faith and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or any of its Subsidiaries, as the case may be.

5.4 <u>Maintenance of Existence</u>.  Renew and keep in full force and effect its corporate existence, take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business except to the extent such failure to maintain could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

5.5 <u>Maintenance of Property; Insurance</u>.  Keep all property useful and necessary in its business in good working order and condition (ordinary wear and tear, and casualties, excepted), maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and furnish to each Lender, upon request, full information as to the insurance carried including certified copies of policies and certificates of insurance from a recognized insurance broker reasonably acceptable to the Required Lenders.

5.6 <u>Inspection of Property; Books and Records; Discussions</u>.  Keep proper books of records and account, in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit after reasonable notice representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired, and to discuss the business, operations, properties and financial and other condition of the Borrower and each Subsidiary with officers and employees of the Borrower and such Subsidiary and with their independent certified public accountants.

NY—591039.20

CSFB001328

5.7 <u>Notices</u>. Within 5 days after the Borrower knows with respect to any notice under clause (i) or within 10 days with respect to any other notice under this Section 5.7(a), give notice to the Administrative Agent and each Lender of:

       (i)    the occurrence of any Default or Event of Default;

       (ii)   any (i) default or event of default under any Contractual Obligation of the Borrower or any Subsidiary, or (ii) litigation, investigation or proceeding which may exist at any time between the Borrower or any such Subsidiary and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

       (iii)  any material labor dispute to which the Borrower or any Subsidiary may become a party and which involves any group of employees, any strikes or walkouts relating to any of its plants or facilities and the expiration or termination of any labor contract to which the Borrower or such Subsidiary is a party or by which the Borrower or such Subsidiary is bound and which dispute could reasonably be expected to have a Material Adverse Effect on the operations of the Borrower or such Subsidiary.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto. For the purposes of this Section 5.7(a), the Borrower shall be deemed to have knowledge when any officer of the Borrower charged with responsibility for any matter that is the subject of such notice requirement knows or should have known that such notice was required.

(b) At least three (3) Business Days prior to such event, give notice to the Administrative Agent and each Lender of the occurrence of any Reduction Event (i) the Net Cash Proceeds of which are (or are scheduled to be) in excess of $5,000,000 or (ii) together with any other concurrent or prior Reduction Event for which notice has not been given hereunder the aggregate Net Cash Proceeds of which are (or are scheduled to be) in excess of $10,000,000.

5.8 <u>Environmental Laws</u>. (a) Comply and cause its Subsidiaries to comply in all material respects with all applicable Environmental Laws and obtain and comply and cause its Subsidiaries to obtain and comply in all material respects with and maintain and cause its Subsidiaries to maintain any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b) Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws except to the extent that the

NY—591039.20

CSFB001329

same are being contested in good faith by appropriate proceedings and the pendency of such proceedings could not be reasonably expected to have a Material Adverse Effect.

(c) Defend, indemnify and hold harmless the Administrative Agent, the Collateral Agent, the Swingline Lender, the Issuing Lender and the Lenders, and their respective parents, subsidiaries, affiliates, employees, agents, officers and directors, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature (whether arising under theories of negligence, strict or absolute liability, or otherwise) known or unknown, contingent or otherwise, arising out of, or in any way relating to the violation of, noncompliance with or liability under any Environmental Laws in each instance occurring at, or involving the operation of any facility by the Borrower or its Material Subsidiaries, or arising out of, or relating to the operations of the Borrower or any Material Subsidiary, or the Business or the Properties, applicable to the operations of the Borrower or any Subsidiary or the Business or the Properties, or any orders, requirements or demands of Governmental Authorities related thereto, including, without limitation, reasonable attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, except to the extent that any of the foregoing arise out of the gross negligence or willful misconduct of the party seeking indemnification therefor.  This indemnity shall continue in full force and effect regardless of the termination of this Agreement.

5.9 ERISA.  Establish, maintain and operate and cause each of its Subsidiaries to establish, maintain and operate all Plans to comply in all material respects with the applicable provisions of ERISA, the Code, and all other applicable laws, and the regulations and interpretations thereunder and the respective requirements of the governing documents for such Plans except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.10    Use of Proceeds.  Use the proceeds of each extension of credit hereunder solely for the purposes set forth in Section 3.16.

5.11    Margin Stock.  Not permit the aggregate value of margin stock (as defined in Regulation U) at any time owned or held by the Borrower or any of its Subsidiaries to exceed an amount equal to 25% of the value of all consolidated assets subject at such time to any "arrangement" (as such term is used in the definition of "indirectly secured" in Section 221.2 of Regulation U).

5.12    Maintain Ownership of the Company and the Utility Business. Maintain direct ownership of all of the issued and outstanding Capital Stock of the Company (except (i) as a result of a merger of the Company with and into the Borrower, or (ii) the Utility Business EBITDA of the assets remaining in the Company at the time of transfer did not exceed $5 million for the four (4) consecutive fiscal quarters immediately preceding the date of such transfer) and, other than as permitted pursuant clauses (a), (b) or (d) of Section 6.7, maintain ownership, directly or through the Company, of all or substantially all of the assets of the Utility Business.

NY—591039.20

CSFB001330

5.13    Amendment of Loan Documents.  Amend this Agreement and the other Loan Documents, and execute such additional documents, as may be reasonably requested by the Arranger, after consultation with the Borrower and prior to completion of the successful syndication (as determined by the Arranger) of the credit facilities provided hereby, to change the pricing, terms and structure of such credit facilities if the Arranger determines that such changes are advisable to ensure the successful syndication thereof.

5.14    Ratings.  At all times maintain ratings by both Moody's and Standard & Poor's with respect to the Index Debt.

## ARTICLE 6. NEGATIVE COVENANTS

The Borrower hereby agrees that, from and after the Closing Date and thereafter for so long as the Commitments remain in effect, any Note remains outstanding and unpaid or any Obligation is owing to any Lender, the Issuing Lender, the Collateral Agent or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall not:

6.1 Financial Covenants.  (a) Minimum Net Worth.  Permit Net Worth on the last day of any fiscal quarter of the Borrower to be less than $350,000,000; or

(b) Total Capitalization.  Permit the ratio (expressed as a percentage) of Funded Debt to Total Capital on the last day of any fiscal quarter of the Borrower specified below to exceed the percentage set forth below for such quarter:

| Fiscal Quarter Ended Immediately After the Closing Date: | Percentage |
|---|---|
| First (1st) | 78% |
| Second (2nd) | 76% |
| Third (3rd) | 72% |
| Fourth (4th) | 70% |
| Fifth (5th) | 68% |

(c) Utility Business' Financial Covenant.  Permit the ratio of (i) Utility Business EBITDA to (ii) Consolidated Recourse Interest Expense, in each case on the last day of any fiscal quarter of the Borrower to be less than 2.00 to 1.00.

6.2 Limitation on Fundamental Changes.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all its property, business or assets, or permit the Company to do any of the foregoing, except any Person (including the Company) may be merged or consolidated with or into the Borrower or convey, sell, assign, or otherwise transfer all or substantially all its property, business or assets to the Borrower; provided that (a) the Borrower shall be the continuing or surviving corporation and (b) as of the

63

NY—591039.20

CSFB001331

consummation of, and after giving effect to, such transaction, (i) the Tangible Net Worth of the Borrower shall be equal to or greater than the Tangible Net Worth of the Borrower immediately prior to such transaction; and (ii) Standard & Poor's and Moody's, or any successor agency providing ratings on the long-term unsecured debt obligations of the Borrower, shall either (x) have affirmed their respective ratings on such Indebtedness or (y) not have placed the Borrower on "credit watch" as a result of or with respect to such merger or consolidation.

6.3 <u>Limitation on Transactions with Affiliates</u>.  Except as described on <u>Schedule 6.3</u> and except for transactions providing services (including, without limitation, group purchases of equipment or energy) at cost to any Subsidiary, enter into, and shall not permit the Company to enter into, any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is upon fair and reasonable terms no less favorable to the Borrower or, if the Borrower is not party to such transaction, the Company, than it would have obtain in a comparable arm's length transaction with a Person which is not an Affiliate.

6.4 <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, assume or suffer to exist, any Lien upon any of its properties, assets or revenues, whether now owned or hereafter acquired, except for Permitted Liens.  In the event that any assets of the Borrower that are subject to any "arrangement" (as such term is used in the definition of "indirectly secured" in Section 221.2 of Regulation U) hereunder constitute "margin stock" ( as defined in Regulation U), such arrangement shall not apply to such margin stock to the extent that the value of such margin stock exceeds 25% of the value of all assets subject to such arrangement.

6.5 <u>Amendments of Acquisition Agreement and Organizational Documents</u>.  (a) Amend, waive or terminate, or permit any amendment, waiver or termination of, the Acquisition Agreement or any document entered into in connection therewith that materially adversely affects (i) the Borrower and its Subsidiaries taken as a whole, (ii) the ability of the Borrower or any of its Subsidiaries to perform their respective obligations under the Acquisition Agreement or (iii) the rights and remedies of the Lenders; or (b) amend, modify or change its articles of incorporation or bylaws that could reasonably be expected to result in a Material Adverse Effect.

6.6 <u>Limitation on Guarantee Obligations</u>.  Create, incur, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, assume or suffer to exist, any Guarantee Obligation except:

(a)    guarantees of obligations to third parties made in the ordinary course of business in connection with relocation of employees of the Borrower or any of its Subsidiaries;

(b)    guarantees not otherwise permitted by this <u>Section 6.6</u> by the Borrower and its Subsidiaries incurred in the ordinary course of business for an aggregate amount not to exceed $200,000,000 at any one time;

NY—591039.20

CSFB001332

(c)     Guarantee Obligations existing on the date hereof and described in Schedule 6.6;

(d)     Guarantee Obligations which by their terms (either mandatorily or at the unfettered option of the Borrower) are payable solely in Capital Stock (other than Mandatory Redeemable Stock) of the Borrower provided that the Borrower agrees to cause any payment under any such outstanding obligation to be made only in such Capital Stock; and

(e)     (x) guarantees by the Borrower or the Company of the Company's or the Borrower's Indebtedness and other obligations, as applicable, (y) guarantees by the Borrower or the Company of obligations (other than Indebtedness) of any other Subsidiaries, and (z) guarantees by Subsidiaries (other than the Company) of Indebtedness and other obligations of other Subsidiaries and the Borrower, in each case as permitted under this Agreement.

6.7 Limitation on Sale of Assets.  Convey, sell, lease, assign, transfer or otherwise dispose of, and shall not permit any Subsidiary (other than any Special Purpose Subsidiary) to convey, sell, lease, assign, transfer or otherwise dispose of any of, its property, business or assets (including, without limitation, tax benefits, receivables and leasehold interests but excluding the Capital Stock of any Special Purpose Subsidiary), whether now owned or hereafter acquired except (a) for the sale or other disposition of any property that, in the reasonable judgment of the Borrower, has become uneconomic, obsolete or worn out, and which is disposed of in the ordinary course of business; (b) for sales of inventory and receivables made in the ordinary course of business; (c) that any Subsidiary of the Borrower may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or, subject to Section 5.12, a Wholly-Owned Subsidiary of the Borrower and any Subsidiary of the Borrower may sell or otherwise dispose of, or part with control of any or all of, the stock of any Subsidiary to a Wholly-Owned Subsidiary of the Borrower or a Subsidiary of the Borrower may merge with the Borrower (so long as the Borrower is the surviving corporation) or, subject to Section 5.12, another Subsidiary; and (d) for the sale or other disposition by the Borrower or any of its Subsidiaries of other assets consummated after the date hereof, provided that (i) such sale or other disposition shall be made for fair value on an arm's-length basis, (ii) the aggregate fair market value of all such assets sold or disposed of under this clause (d) (and the proceeds of which are not reinvested within one year in similar assets) shall not exceed 10% of the consolidated total assets of the Borrower and its Subsidiaries as of the Closing Date and (iii) the Borrower shall comply with Section 2.6.

6.8 Limitation on Investments, Loans and Advances.  Make, and shall not permit any Subsidiary to make, any advance, loan, extension of credit (excluding Guarantee Obligations but including any payment by a guarantor thereunder) or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of, or make any other investment in, any Person except:

(a)     extensions of trade credit in the ordinary course of business;

NY—591039.20

CSFB001333

(b)    investments of the Borrower or any Subsidiary existing on the date hereof in any Subsidiary;

(c)    investments of the Borrower or any Subsidiary after the date hereof that are:

(i)    investments by the Borrower in any Subsidiary or

(ii)    acquisitions of the capital stock of, or assets constituting a business unit of, another Person, provided that, after giving effect to any such acquisition, the Borrower shall be in pro forma compliance with Section 6.1 and no Default or Event or Default shall have occurred and be continuing or shall result therefrom,

provided, that the aggregate amount of investments made pursuant to clause (i) plus the aggregate consideration for all acquisitions (including assumed debt but excluding any Capital Stock (other than Mandatory Redeemable Stock) of the Borrower or any Subsidiary issued as consideration for such acquisition) made pursuant to clause (ii) shall at no time exceed during any fiscal year $125,000,000 per annum (excluding any dividends paid in kind on any preferred Capital Stock, other than Mandatory Redeemable Stock);

(d)    the Borrower and its Subsidiaries may invest in, acquire and hold Cash Equivalents;

(e)    the Borrower or any of its Subsidiaries may make travel and entertainment advances, relocation loans and payroll advances in the ordinary course of business to officers and employees of the Borrower or any such Subsidiary;

(f)    investments of the Borrower or any Subsidiary existing on the date hereof and described in Schedule 6.8;

(g)    investments in obligations arising out of bankruptcy of customers and suppliers; and

(h)    investments arising out of non-cash consideration received in connection with sales of assets as permitted by Section 6.7.

6.9 Limitation on Dividends and Stock Repurchases. Declare, and shall not permit any Subsidiary to declare, any dividends on any shares of any class of Capital Stock, or make, and shall not permit any Subsidiary to make, any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any shares of any class of Capital Stock (including the outstanding Capital Stock of the Borrower), whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Subsidiaries (all of the foregoing being referred to herein as "Restricted Payments"); except that:

66

CSFB001334

(a)    Subsidiaries may pay dividends directly or indirectly to the Borrower or the other Subsidiaries which are directly or indirectly Wholly-Owned by the Borrower;

(b)    any Subsidiary may redeem or repurchase shares of its Capital Stock to the extent required to do so pursuant to, and upon the terms provided in, any put agreement existing on the date hereof between such Subsidiary and any holder of such Capital Stock; provided that if permitted pursuant to the terms of such agreement, the sole consideration for such Capital Stock shall be Capital Stock (other than Mandatory Redeemable Stock) of the Borrower; and

(c) the Borrower or any Subsidiary may make Restricted Payments (other than redemption or repurchase of Capital Stock with respect to such agreements existing as of the date hereof as set forth in clause (b) above) on or with respect to its Capital Stock so long as, after giving effect to such Restricted Payments, (i) no Default or Event of Default shall have occurred and be continuing or shall result therefrom and (ii) Index Debt shall be rated at least BBB by Standard & Poor's and at least Baa2 by Moody's.

6.10    Limitation on Indebtedness or Mandatory Redeemable Stock. Create, incur, issue, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, issue, assume or suffer to exist, any Indebtedness or Mandatory Redeemable Stock (including any Indebtedness or Mandatory Redeemable Stock of any of its Subsidiaries), except:

(a) Indebtedness of the Borrower under this Agreement;

(b) [Intentionally omitted];

(c) Indebtedness consisting of reimbursement obligations under surety, indemnity, performance, release and appeal bonds and guarantees thereof and letters of credit required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower or its Subsidiaries;

(d) Debt for Borrowed Money of the Borrower or any Subsidiary constituting a Debt Incurrence (and the Net Cash Proceeds thereof are applied as set forth in Section 2.6(b));

(e) Debt for Borrowed Money incurred by a Special Purpose Subsidiary, to the extent that the Net Cash Proceeds thereof are retained by a Special Purpose Subsidiary to finance (i) the development or operation of the assets it was formed to develop or (ii) activities incidental thereto;

(f) Debt for Borrowed Money incurred by any Subsidiary (other than the Company or a Special Purpose Subsidiary) incurred (i) to finance working capital needs of any such entity in the ordinary course of business (in any event excluding Restricted Payments) or (ii) to the extent permitted hereunder, to finance Capital Expenditures (including fees and expenses incidental to the acquisition of the assets so acquired);

67

NY—591039.20

CSFB001335

(g) Indebtedness of Montana First Megawatts LLC (or any related Special Purpose Subsidiary) in an aggregate amount not to exceed $200,000,000, which proceeds of such Indebtedness are used to finance construction and related costs of the Montana First Megawatts project;

(h) Non-Recourse Debt of any Subsidiary (other than the Company);

(i) Financing Lease obligations, mortgage financings, purchase money Indebtedness and industrial revenue bond issues in respect of real property or equipment incurred by the Borrower or any Subsidiary prior to or within 180 days after a capital expenditure in order to finance the purchase or improvement of properties;

(j) Indebtedness and Mandatory Redeemable Stock outstanding on the date hereof as set forth on Schedule 6.10 hereto;

(k) refinancings, replacements and extensions by the obligor thereof of any Debt for Borrowed Money under clause (d) through (j) above to the extent that the principal of the Debt for Borrowed Money so refinanced, replaced or extended is not increased as a result thereof and the scheduled maturity date thereof is not earlier as a result thereof (and in the case of any refinancing or replacement of Non-Recourse Debt, after giving effect thereto, such Indebtedness constitutes Non-Recourse Debt) and

(l) Indebtedness not otherwise permitted by the preceding clauses of this Section 6.10 not exceeding $25,000,000 in aggregate principal amount at any one time outstanding.

6.11    Limitation on Sales and Leasebacks.  Enter into, and shall not permit the Company to enter into, any arrangement with any Person providing for the leasing by the Borrower or the Company of real or personal property, in an aggregate amount for all such property exceeding 10% of Tangible Assets, as defined by GAAP, of the Borrower and the Company, which has been or is to be sold or transferred by the Borrower or the Company to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or the Company.

6.12    Limitation on Negative Pledge Clauses; Payment Restrictions. Enter into or suffer to exist, and shall not permit any Subsidiary to enter into or suffer to exist, any agreement or other consensual encumbrance or restriction which prohibits or limits the ability of the Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or prohibits or limits the ability of the Borrower or any of its Subsidiaries to make loans, payments or dividends to or investments in, or to transfer assets to, the Borrower or any of its Subsidiaries, other than (a) any such agreement, encumbrance or restriction contained in this Agreement or the Pledge Agreement, (b) any such agreement, encumbrance or restriction (including any negative pledge) contained in any industrial revenue bonds, purchase money mortgages, development financing, operating leases entered into in the ordinary course of business, acquisition agreements or

68

NY—591039.20

CSFB001336

Financing Leases, in each case permitted by this Agreement (in which cases, any prohibition or limitation shall only be effective against the assets financed, acquired or leased thereby), (c) any such agreement, encumbrance or restriction contained in any loan agreement or other financing document entered into with respect to Debt for Borrowed Money of Subsidiaries (other than the Company) (other than industrial revenue bonds, purchase money mortgages, development financing or Financing Leases) permitted to be incurred pursuant to Section 6.10, (d) customary provisions in any contract entered into in the ordinary course of business (including any licensing agreement, management agreement or franchise agreement) restricting assignments of such contract, or (e) any agreement, encumbrance or restriction contained in any indenture or financing document entered into with respect to the issuance of up to an aggregate principal amount of $720 million in senior unsecured bonds of the Borrower, the Net Cash Proceeds of which shall be applied in accordance with Section 2.6(b) hereof.

     6.13   Limitation on Businesses.  Enter into or engage in any business, either directly or through any Subsidiary, except for businesses of the same general type as those in which the Borrower and its Subsidiaries are engaged on the date hereof or other business activities reasonably incidental or related to any of the foregoing.

     6.14   Limitation on Certain Prepayments and Amendments.  (a) Make, and shall not permit the Company to make, any optional payment or prepayment on or redemption, defeasance or purchase of such Person's Debt for Borrowed Money (other than with respect to (i) Indebtedness hereunder and (ii) any Indebtedness to the extent such Indebtedness by the terms thereof would otherwise have become due and payable within three months of such payment, redemption, defeasance or purchase), or (b) amend, modify or change, or consent to any amendment, modification or change to any of the terms relating to the payment or prepayment or principal of or interest on, any such Indebtedness, other than any amendment, modification or change which would extend the maturity or reduce the amount of any payment or prepayment of principal thereof or which would reduce the rate or extend the date for payment of interest thereon or which would not be adverse to the Lenders.

     6.15   Limitations on Subsidiaries' Equity Interests.  Permit any Subsidiary to issue any preferred Capital Stock or any redeemable common stock unless, in either case, the issuance thereof is, and all terms thereof are, satisfactory to the Required Lenders in their sole discretion, other than (a) issuances of preferred Capital Stock in payment of regularly accruing dividends on theretofore outstanding shares of such preferred Capital Stock, (b) issuances of preferred Capital Stock issued to and, so long as thereafter outstanding, held by the Borrower and (c) issuances in consideration of acquisitions permitted under Section 6.8 of preferred Capital Stock which ranks junior, as to the payment of dividends and as to the distribution of assets upon any liquidation, dissolution or winding up of such Subsidiary, to all preferred Capital Stock held by the Borrower in such Subsidiary.

NY—591039.20

CSFB001337

ARTICLE 7. EVENTS OF DEFAULT

7.1 Events of Default. If any of the following events shall occur and be continuing:

(a) The Borrower shall fail to pay any principal of any Loan or the reimbursement obligation with respect to any LOC Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any fee or any other amount payable hereunder or any other Loan Document, within three (3) days after any such interest, fee or other amount becomes due in accordance with the terms thereof or hereof; or

(b) Any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c) The Borrower shall default in the observance or performance of any agreement contained in Article 6 (other than Section 6.12 and Section 6.14(b)) or Section 5.7; or

(d) The Borrower shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of 30 days; or

(e) The Borrower or any Material Subsidiary shall (i) default in any payment (regardless of amount) of principal of or interest on any Indebtedness having an aggregate principal amount in excess of $30,000,000 (other than the Notes) beyond the period of grace (not to exceed 30 days), if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or Administrative Agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice, if required, such Indebtedness to become due prior to its stated maturity; provided that any such default by the Borrower or any Material Subsidiary under Non-Recourse Debt will not constitute an Event of Default unless such default also constitutes a default under other recourse Indebtedness of the Borrower or such Subsidiary in an aggregate outstanding principal amount of $30,000,000 or more; or

(f) (i) The Borrower or any Material Subsidiary shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to

NY—591039.20

CSFB001338

adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any such Subsidiary shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any such Subsidiary any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or un-bonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any such Subsidiary any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any such Subsidiary shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any such Subsidiary shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g) (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Pension Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower, any Subsidiary or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such plan for purposes of Title IV of ERISA, (iv) any Pension Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower, any Subsidiary or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Pension Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(h) One or more judgments or decrees shall be entered against the Borrower or any Subsidiary involving in the aggregate a liability (to the extent not covered by third-party insurance as to which the insurer has acknowledged coverage) of $30,000,000 or more and sufficient judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof to reduce such amount to less than $30,000,000; or

(i) (x) The Pledge Agreement shall cease, for any reason, to be in full force and effect, other than pursuant to the terms thereof and hereof, or (y) the Lien

NY—591039.20

CSFB001339

created thereby shall cease to be enforceable and of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the Collateral; or

(j) A Change of Control shall occur;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitment shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement (including all amounts due in respect of Letters of Credit, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) and the Notes shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, by notice to the Borrower, declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement (including all amounts due in respect of Letters of Credit, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) and the Notes to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

## ARTICLE 8. THE AGENTS

8.1 <u>Appointment</u>. Each Lender hereby irrevocably designates and appoints CSFB as Administrative Agent and as Collateral Agent (for purposes of this Article 8, collectively, the "<u>Agents</u>"), and to act as its agent under this Agreement and the other Loan Documents. Each such Lender irrevocably authorizes each Agent, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to each Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Each Lender further authorizes and directs each Agent to execute and deliver releases (or similar agreements) to give effect to the provisions of this Agreement and the other Loan Documents, including specifically, without limitation, the provisions of <u>Section 6.7</u> hereof. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in therein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against either Agent. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the

NY—591039.20

CSFB001340

rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Pledge Agreement.

8.2 <u>Delegation of Duties</u>. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

8.3 <u>Exculpatory Provisions</u>. No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for its own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties, made by the Borrower or any officer or any of them contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by either Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or the Notes or any other Loan Document or for any failure of the Borrower to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of the Borrower or any Subsidiary.

8.4 <u>Reliance by Agents</u>. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any Note, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants and other experts selected by such Agent. Each Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the Notes and the other Loan Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Notes.

8.5 <u>Notice of Default</u>. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has

NY—591039.20

CSFB001341

received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. Each Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

8.6 Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that no Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by either Agent hereafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by either Agent to any Lender. Each Lender represents to each Agent that it has, independently and without reliance upon either Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon either Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder or furnished to the Administrative Agent for the account of, or with a counterpart or copy for, each Lender, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower which may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

8.7 Indemnification. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) and their respective directors, officers, employees and agents, ratably according to their respective Commitment Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their Commitment Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Notes) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of this Agreement, any of the other Loan

74

CSFB001342

Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from such Agent's gross negligence or willful misconduct. Each Lender having a Revolving Credit Commitment agrees to reimburse each of the Issuing Lender and its directors, officers, employees and agents, in each case to the same extent and subject to the same limitations as provided above for the Agents. The agreements in this Section shall survive the payment of the Obligations hereunder.

8.8 <u>Agent in Its Individual Capacity</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any Subsidiary as though such Agent were not an Agent hereunder and under the other Loan Documents. With respect to Loans made or renewed by it and any Note issued to it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

8.9 <u>Successor Administrative Agent</u>.  The Administrative Agent may resign as Administrative Agent upon ten days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall, with the consent of the Borrower (which consent shall not be unreasonably withheld and shall not be required if an Event of Default shall have occurred that is continuing) appoint a successor administrative agent, whereupon such successor Administrative Agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor Administrative Agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Notes. After any retiring or terminated Administrative Agent's resignation or termination, as the case may be, as Administrative Agent, the provisions of this Section shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

ARTICLE 9. MISCELLANEOUS

9.1 <u>Amendments and Waivers</u>.  Neither this Agreement, any Note or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section. The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of the Lenders or of the Borrower hereunder, (b) enter into with the Borrower written amendments, supplements or

75

NY—591039.20

CSFB001343

modifications to the Note and the other Loan Documents for the purpose of adding provisions to the Notes or such other Loan Documents or changing in any manner the rights of the Lenders or the Borrower thereunder or (c) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement, the Notes or the other Loan Documents or any Default or Event of Default and its consequences; provided that no such waiver and no such amendment, supplement or modification (i) shall reduce the amount or extend the scheduled date of maturity of the Note of any Lender or of any installment thereof, or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Commitments, in each case, without the consent of such Lender, (ii) shall amend, modify or waive any provision of this Section, or vary any provision of this Agreement or any other Loan Document which specifically by its terms requires the approval or consent of all the Lenders or reduce the percentage specified in the definition of Required Lenders, or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, the Notes and the other Loan Documents, in each case, without the written consent of all the Lenders, (iii) shall amend, modify or waive any provision of Section 2.1(c), 2.4(c), 2.4(d), 2.20 or 8.7 (to the extent relating to the Issuing Lender) or any LOC Document without the written consent of the Issuing Lender, (iv) shall amend, modify or waive any provision hereof relating to Swingline Loans without the written consent of the Swingline Lender, (v) shall amend, modify or waive any provision of Article 8 or any other provision in any Loan Document governing the rights or obligations of the Administrative Agent or the Collateral Agent without the written consent of the then Administrative Agent and the Collateral Agent or (vi) shall amend, modify or waive the provisions of Section 6.6(b) or 6.8 without the consent of Lenders having Term Commitments (or after the Closing Date, Term Loans) and Revolving Credit Commitments (or after the Termination Date, Revolving Credit Loans and Revolving Credit Commitment Percentages of Swingline Loans and LOC Obligations) representing 75% or more of the aggregate of all Term Commitments (or after the Closing Date, Term Loans) and Revolving Credit Commitments (or after the Termination Date, Revolving Credit Loans, Swingline Loans and LOC Obligations) in each case outstanding at such time. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Notes. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Notes and any other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

9.2 Notice . All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of notice by mail, when received, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower or the Administrative Agent, and as set forth in Schedule I in the case of any Lender, or to such

76

CSFB001344

other address as may be hereafter notified by the respective parties hereto and any future holders of the Notes:

| | |
|---|---|
| Borrower: | Northwestern Corporation<br>125 S. Dakota Avenue, Suite 1100<br>Sioux Falls, South Dakota 57104<br>Attention:  Chief Financial Officer |
| with a copy to: | Northwestern Corporation<br>125 S. Dakota Avenue, Suite 1100<br>Sioux Falls, South Dakota 57104<br>Attention:  Eric R. Jacobsen, Vice President and<br>General Counsel |
| Administrative Agent: | Credit Suisse First Boston<br>Eleven Madison Avenue<br>New York, New York 10010-3629<br>Attention:  Agency Department Manager |

provided that any notice, request or demand to or upon the Administrative Agent made under this Agreement may be made by telephone, with prompt written confirmation thereafter of such telephonic notice, and the Administrative Agent shall be entitled to rely on such telephonic notice; provided, further, that any notice, request or demand to or upon the Administrative Agent and the Lenders pursuant to Section 2.3, Section 2.5, Section 2.8, Section 2.9, Section 2.10, or Section 2.15 shall not be effective until received.

9.3 No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

9.4 Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans hereunder.

9.5 Payment of Expenses and Taxes; Indemnification.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Collateral Agent for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or

NY—591039.20

CSFB001345

modification to, this Agreement, the Notes and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of counsel to the Administrative Agent and the Collateral Agent, (b) to pay or reimburse the Administrative Agent, the Collateral Agent and each Lender for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the Notes, the other Loan Documents and any such other documents, including, without limitation, the fees and disbursements of counsel (including allocated costs of internal counsel) to the Administrative Agent, the Collateral Agent and each Lender, (c) to pay, and indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender from, any and all present or future stamp, documentary or excise taxes or similar charges, any and all recording and filing fees, and any and all liabilities with respect thereto, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or payment under, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, the other Loan Documents and any such other documents, and (d) to pay, and indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender (including each of their respective parents, subsidiaries, officers, directors, employees, agents and affiliates) from and against, any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, judgments, suits (regardless of whether such Person is a party thereto), costs, settlements, expenses or disbursements of whatever kind or nature arising from, in connection with or with respect to (i) the execution, delivery, enforcement, performance and administration of this Agreement, the Notes, the other Loan Documents, or any other documents, (ii) the proposed or actual use of the proceeds of the Loans or (iii) the Acquisition, any other Transaction or any transaction or document related thereto or in connection therewith (all the foregoing in this clause (d), collectively, the "indemnified liabilities"); provided that the Borrower shall not have any obligation hereunder to any Lender with respect to indemnified liabilities arising from the gross negligence or willful misconduct of the Administrative Agent, the Collateral Agent or such Lender. The agreements in this Section 9.5 shall survive repayment of the Obligations hereunder.

9.6 Successors and Assigns; Participations and Assignments. (a) This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lenders, the Administrative Agent, all future holders of the Notes and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

(b) Any Lender may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Lender, any Note held by such Lender, any Commitment of such Lender or any other interest hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the

NY—591039.20

CSFB001346

holder of any such Note for all purposes under this Agreement and the other Loan Documents, the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and other obligations owing to such Lender and to approve any amendment, modification, or waiver of any provision of this Agreement (other than amendments, modifications, or waivers (i) decreasing the amount of principal of or the rate at which interest is payable on such Loans or Notes, (ii) extending any scheduled principal payment date or date fixed for the payment of interest on such Loans or Notes, (iii) extending its Commitment or (iv) permitting any assignment or transfer of any of the Borrower's rights or obligations under this Agreement). The Borrower agrees that if amounts outstanding under this Agreement and the Notes are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or any Note; provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if it were a Lender hereunder. The Borrower also agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15 and Section 2.16 with respect to its participation in the Commitments and the Loans outstanding from time to time as if it were a Lender; provided that, in the case of Section 2.15, such Participant shall have complied with the requirements of said Section and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c) Any Lender, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time and from time to time may assign to any Lender or any affiliate or Approved Fund thereof with the consent of the Administrative Agent, or, with the consent of the Borrower (so long as no Event of Default shall have occurred which is continuing) and the Administrative Agent (which consent, in the case of either the Borrower or the Administrative Agent, shall not be unreasonably withheld), to an additional bank or financial institution (an "Assignee") all or any part of its rights and obligations under this Agreement and the Notes pursuant to a "Assignment and Assumption Agreement", substantially in the form of Exhibit D, executed by such Assignee, such assigning Lender and, in the case of an Assignee that is not then a Lender or an affiliate or Approved Fund thereof, by the Borrower and the Administrative Agent and delivered to the Administrative Agent for its acceptance and recording in the Register; provided that (i) any such assignment must be in a minimum amount equal to the lesser of (x) $1,000,000 and (y) the aggregate Commitments and outstanding Loans of such Lender then in effect, and (ii) after giving effect to any such assignment, such Lender shall have either (x) sold all its rights and obligations hereunder and under the Notes or (y) retained at least $1,000,000 of the aggregate Commitments. Upon such execution, delivery, acceptance and recording, from and after the effective

NY—591039.20

CSFB001347

date determined pursuant to such Assignment and Assumption Agreement, (1) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder with a Commitment or Commitments as set forth therein and (2) the assigning Lender thereunder, to the extent provided in such Assignment and Assumption Agreement, shall be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto; provided that the provisions of Section 2.14, Section 2.15, Section 2.16 and Section 9.5 shall continue to benefit such assigning Lender to the extent required by such Sections).

(d) The Administrative Agent shall maintain, at its address referred to in Section 9.2, a copy of each Assignment and Assumption Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of any Assignees and the Commitment of, and principal amount of the Loans owing to, any Assignees from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower and the Administrative Agent may treat each Person whose name is recorded in the Register as the owner of the Loan recorded therein for all purposes of this Agreement. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

(e) Upon its receipt of an Assignment and Assumption Agreement executed by the assigning Lender, an Assignee (and, in the case of an Assignee that is not then a Lender or an affiliate thereof, by the Borrower and the Administrative Agent ) and the Borrower together with payment by the assigning Lender or by the Assignee to the Administrative Agent of a registration and processing fee of $3,500, the Administrative Agent shall promptly accept such Assignment and Assumption Agreement and, on the effective date determined pursuant thereto, shall record the information contained therein in the Register and give notice of such acceptance and recordation to the Borrower.

(f) Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any advance hereunder, (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the applicable Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper

NY—591039.20

CSFB001348

or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.6(f), any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC. This section may not be amended without the written consent of the SPC.

(g) The Borrower authorizes the Lenders to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee, any and all financial information in the Lenders' possession concerning the Borrower and its respective Affiliates which has been delivered to the Administrative Agent or the Lenders by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to the Administrative Agent or the Lenders by or on behalf of the Borrower in connection with the Lender's credit evaluation of the Borrower and its respective Affiliates prior to becoming a party to this Agreement; provided that each such Transferee and prospective Transferee agrees in writing to be bound by the provisions of Section 9.8.

(h) Nothing herein shall prohibit any Lender from pledging or assigning any Note to any Federal Reserve Bank in accordance with applicable law.

9.7 Adjustments; Setoff. (a) If any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 7.1(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b) Upon the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, (without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law), upon any amount becoming due and payable by the Borrower hereunder or under the Notes

NY—591039.20

CSFB001349

(whether at the stated maturity, by acceleration or otherwise), to setoff and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.

9.8 Confidentiality. Each Lender agrees to exercise all reasonable efforts (consistent with its customary methods for keeping information confidential) to keep any information delivered or made available by the Borrower confidential from anyone other than persons employed or retained by such Lender who are or are expected to become engaged in evaluating, approving, structuring or administering the Loans; provided that nothing herein shall prevent any Lender from disclosing such information (a) to any Affiliate of such Lender or to any other Lender, (b) upon the order of any court or administrative agency, (c) upon the request or demand of any regulatory agency or authority having jurisdiction over such Lender, (d) that has been publicly disclosed, (e) in connection with any litigation relating to the Loans, this Agreement or any transaction contemplated hereby to which any Lender or the Administrative Agent may be a party, (f) to the extent reasonably required in connection with the exercise of any remedy hereunder, (g) to such Lender's legal counsel and independent auditors, and (h) to any actual or proposed participant or assignee of all or any part of its Loans hereunder, if such other Person, prior to such disclosure, agrees, in writing, for the benefit of the Borrower to comply with the provisions of this Section 9.8.

9.9 Effectiveness. This Agreement shall become effective on the date when counterparts hereof executed on behalf of the Borrower, the Administrative Agent and each Lender shall have been received by the Administrative Agent and notice thereof shall have been given by the Administrative Agent to the Borrower.

9.10 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with each of the Borrower and the Administrative Agent.

9.11 Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.12 Integration. This Agreement and the other Loan Documents represent the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings,

NY—591039.20

CSFB001350

representations or warranties by the Administrative Agent or any Lender relative to subject matter hereof or thereof not expressly set forth or referred to herein or in the other Loan Documents.

9.13    GOVERNING LAW. **THIS AGREEMENT AND THE NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.**

9.14    Submission To Jurisdiction; Waivers.    The Borrower hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be, at its address set forth in Section 8.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d) agrees that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

9.15    Acknowledgments.  The Borrower hereby acknowledges that:

(a) Neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and the Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of creditor and debtor; and

NY—591039.20

CSFB001351

(b) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between the Administrative Agent, the Lenders and the Borrower.

9.16  <u>Waivers of Jury Trial</u>.    THE  BORROWER,  THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

NY—591039.20

CSFB001352

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BORROWER:

NORTHWESTERN CORPORATION

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


ADMINISTRATIVE AGENT:

CREDIT SUISSE FIRST BOSTON

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

CSFB001353

LENDERS:

CREDIT SUISSE FIRST BOSTON,
  CAYMAN ISLANDS BRANCH

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

*Signature Page to the*
*Northwestern Credit Agreement*

CSFB001354

CIBC INC.

By: _____
     Name:
     Title:

CSFB001355

ABN AMRO BANK N.V.

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

*Signature Page to the*
*Northwestern Credit Agreement*

BARCLAYS BANK PLC

By: _____
    Name:
    Title:

CSFB001357

**Annex A**

PRICING GRID

The "Applicable Margin" and "Commitment Fee Rate" for any day are the respective percentages set forth below in the applicable row under the column corresponding to the Status that exists on such day:

| Status | Level I | Level II | Level III | Level IV | Level V | Level VI |
|---|---|---|---|---|---|---|
| Applicable Margin - Eurodollar Loans (basis points) | 112.5 | 125 | 150 | 175 | 225 | 275 |
| Applicable Margin - Alternate Base Rate Loans (basis points) | 0 | 0 | 0 | 0 | 0 | 150 |
| Commitment Fee Rate (basis points) | 20 | 22.5 | 25 | 30 | 50 | 50 |

For purposes of this Schedule, the following terms have the following meanings (as modified by the provisos below):

"Level I Status" exists at any date if, at such date, the Borrower's senior unsecured long-term debt is rated either A- or higher by S&P or A3 or higher by Moody's.

"Level II Status" exists at any date if, at such date, the Borrower's senior unsecured long-term debt is rated either BBB+ or higher by S&P or Baa1 or higher by Moody's.

"Level III Status" exists at any date if, at such date, the Borrower's senior unsecured long-term debt is rated either BBB or higher by S&P or Baa2 or higher by Moody's.

"Level IV Status" exists at any date if, at such date, the Borrower's senior unsecured long-term debt is rated either BBB- or higher by S&P or Baa3 or higher by Moody's.

"Level V Status" exists at any date if, at such date, the Borrower's senior unsecured long-term debt is rated either BB+ or higher by S&P or Ba1 or higher by Moody's.

"Level VI Status" exists at any date if, at such date, no other Status exists.

"Status" refers to the determination which of Level I Status, Level II Status, Level III Status, Level IV Status, Level V Status or Level VI Status exists at any date.

The credit ratings to be utilized for purposes of this Schedule are those assigned to the senior unsecured long-term debt securities of the Borrower without third-party credit enhancement and any rating assigned to any other debt security of the Borrower shall be disregarded. The rating in effect at any date is that in effect at the close of business on such date.

Provided, if the Borrower is split-rated and the ratings differential is one level, the higher rating will apply. If the Borrower is split-rated and the differential is two levels or more, the rating at

the midpoint will apply. If there is no midpoint rating, the higher of the two intermediate ratings will apply.

Provided, further, Level I Status will apply in the event that the Borrower is rated at or above either of the Moody's or Standard & Poor's ratings set out in Level I Status above. Level VI Status will apply in the event that the Borrower is rated below both the Moody's and Standard & Poor's ratings set out in Level V Status above.

      Notwithstanding the foregoing, the respective percentages set forth in each Level for the Applicable Margins (Eurodollar Loans and Alternate Base Rate Loans) for Term Loans shall be increased by (i) 25 basis points on and after the 210th day after the Closing Date, (ii) 50 basis points on and after the 240th day after the Closing Date, (iii) 75 basis points on and after the 270th day after the Closing Date, (iv) 100 basis points on and after the 300th day after the Closing Date and (v) 125 basis points on and after the 330th day after the Closing Date.

CSFB001359

EXHIBIT A-1<br>
TO CREDIT AGREEMENT

## FORM OF REVOLVING CREDIT NOTE

$_____                                    New York, New York

[_____], 200_


        FOR VALUE RECEIVED, the undersigned, NORTHWESTERN
CORPORATION, a Delaware corporation, with its principal place of business at 125 South
Dakota Avenue, Suite 1100, Sioux Falls, South Dakota 57104-6403 (the "Borrower"), hereby
unconditionally promises to pay to the order of _____, with a place of business
at _____ (the "Lender"), by wire transfer to the account of Credit
Suisse First Boston, as Administrative Agent (as defined in the Credit Agreement referred to
below), with [ACCOUNT BANK], ABA NO. [•], Account No. [•], Attn: Agency, Reference:
[•], or at such other place or places and to such account or accounts as the Administrative Agent,
may direct from time to time by notice to the Borrower in accordance with the Credit Agreement
(as hereinafter defined), in lawful money of the United States of America and in immediately
available funds, the principal amount of the lesser of (a) _____ DOLLARS
($ _____ ) and (b) the aggregate unpaid principal amount of all Revolving Credit Loans
(as defined in the Credit Agreement) made by the Lender to the undersigned pursuant to the
Credit Agreement, payable, subject to the fourth paragraph hereof, on or before the Termination
Date (as defined in the Credit Agreement).

        The Borrower hereby unconditionally further agrees to pay interest in like money
on the unpaid principal amount hereof from time to time outstanding from the date hereof, and to
the extent permitted by applicable law, on any unpaid interest payable hereon, from the date such
interest is due hereunder, at the applicable rates per annum and on the dates specified in Section
2.9 of the Credit Agreement until such principal amount or interest, as applicable, is paid in full
(both before and after judgment). The Borrower agrees to pay costs and expenses, including
reasonable attorneys' fees, incurred in connection with the interpretation or enforcement of this
Revolving Credit Note in accordance with the Credit Agreement.

        The holder of this Revolving Credit Note is authorized to record the date, Type
and amount of each Revolving Credit Loan made by the Lender pursuant to Section 2.1(b) of the
Credit Agreement, each continuation thereof, each conversion of all or a portion thereof to
another Type, the date and amount of each payment or prepayment of principal thereof and, in
the case of Eurodollar Loans, the length of each Interest Period with respect thereto, on the
schedules annexed hereto and made a part hereof, and any such recordation shall constitute
prima facie evidence of the accuracy of the information so recorded absent manifest error,
provided that the failure of the Lender to make such recordation (or any error in such
recordation) shall not affect the obligations of the Borrower hereunder or under the Credit
Agreement.

3

CSFB001360

This Revolving Credit Note is one of the Revolving Credit Notes referred to in the Credit Agreement, dated as of January 14, 2002 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms defined therein being used herein as defined therein), among the Borrower, the several banks and other financial institutions parties thereto (including the Lender), and the Administrative Agent, and is entitled to the benefits thereof and of the other Loan Documents referred to therein, and is subject to optional and mandatory prepayment in whole or in part as provided therein. This Revolving Credit Note is secured as provided in the Loan Documents. Reference is hereby made to the Loan Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security, the terms and conditions upon which the security interests were granted and the rights of the holder of this Revolving Credit Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts remaining unpaid on this Revolving Credit Note shall become, or may be declared to be, immediately due and payable all as provided therein.

The Lender may proceed against the Borrower in such manner as it deems desirable in accordance with the Credit Agreement. None of the rights or remedies of the Lender hereunder are to be deemed waived or affected by failure or delay on the part of the Lender to exercise the same. All remedies conferred upon the Lender by this Revolving Credit Note or any other instrument or agreement or by applicable law, shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

All parties now and hereafter liable with respect to this Revolving Credit Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand of payment, notice of protest, notice of dishonor and all other notices of any kind.

**THIS REVOLVING CREDIT NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

NORTHWESTERN CORPORATION

By:_____
    Name:
    Title:

4

CSFB001361

Schedule A
to Revolving Credit Note

## REVOLVING CREDIT LOANS, CONVERSIONS AND
## PAYMENTS OF EURODOLLAR LOANS

| Date | Amount of Eurodollar Loans Made | Amount of Alternate Base Rate Loans Converted into Eurodollar Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Eurodollar Loans Converted into Alternate Base Rate Loans | Amount of Principal Repaid or Prepaid | Notation Made by |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

5

CSFB001362

## REVOLVING CREDIT LOANS, CONVERSIONS AND
## PAYMENTS OF ALTERNATE BASE RATE LOANS

| Date | Amount of Eurodollar Loans Made | Amount of Eurodollar Loans Converted into Alternate Base Rate Loans | Interest Period and Eurodollar Rate with Respect Thereto | Amount of Alternate Base Rate Loans Converted into Eurodollar Loans | Amount of Principal Repaid or Prepaid | Notation Made by |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

A-1-6

EXHIBIT A-2
TO CREDIT AGREEMENT

FORM OF TERM NOTE

$_____                                                    New York, New York
                                                           [_____], 200_

FOR VALUE RECEIVED, the undersigned, NORTHWESTERN CORPORATION, a Delaware corporation, with its principal place of business at 125 South Dakota Avenue, Suite 1100, Sioux Falls, South Dakota 57104-6403 (the "Borrower"), hereby unconditionally promises to pay to the order of _____, with a place of business at _____ (the "Lender"), by wire transfer to the account of Credit Suisse First Boston, as Administrative Agent (as defined in the Credit Agreement referred to below), with [ACCOUNT BANK], ABA NO. [•], Account No. [•], Attn: Agency, Reference: [•], or at such other place or places and to such account or accounts as the Administrative Agent, may direct from time to time by notice to the Borrower in accordance with the Credit Agreement (as hereinafter defined), in lawful money of the United States of America and in immediately available funds, the principal amount of the lesser of (a) _____ DOLLARS ($_____) and (b) the aggregate unpaid principal amount of all Term Loans (as defined in the Credit Agreement) made by the Lender to the undersigned pursuant to the Credit Agreement, payable, subject to the fourth paragraph hereof, on or before the Termination Date (as defined in the Credit Agreement).

The Borrower hereby unconditionally further agrees to pay interest in like money on the unpaid principal amount hereof from time to time outstanding from the date hereof, and, to the extent permitted by applicable law, on any unpaid interest payable hereon, from the date such interest is due hereunder, at the applicable rates per annum and on the dates specified in Section 2.9 of the Credit Agreement until such principal amount and interest, as applicable, is paid in full (both before and after judgment). The Borrower agrees to pay costs and expenses, including reasonable attorneys' fees, incurred in connection with the interpretation or enforcement of this Term Note in accordance with the Credit Agreement.

This Term Note is one of the Term Notes referred to in the Credit Agreement, dated as of January 14, 2002 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms defined therein being used herein as defined therein), among the Borrower, the several banks and other financial institutions parties thereto (including the Lender), and the Administrative Agent, and is entitled to the benefits thereof and of the other Loan Documents referred to therein, and is subject to optional and mandatory prepayment in whole or in part as provided therein. This Term Note is secured as provided in the Loan Documents. Reference is hereby made to the Loan Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security, the terms and conditions upon which the security interests were granted and the rights of the holder of this Term Note in respect thereof.

A-2-1

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable all as provided therein.

The Lender may proceed against the Borrower in such manner as it deems desirable in accordance with the Credit Agreement. None of the rights or remedies of the Lender hereunder are to be deemed waived or affected by failure or delay on the part of the Lender to exercise the same. All remedies conferred upon the Lender by this Term Note or any other instrument or agreement or by applicable law, shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

All parties now and hereafter liable with respect to this Term Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand of payment, notice of protest, notice of dishonor and all other notices of any kind.

**THIS TERM NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

NORTHWESTERN CORPORATION

By:_____
    Name:
    Title:

A-2-2

CSFB001365

EXHIBIT B-1
TO CREDIT AGREEMENT

FORM OF NOTICE OF BORROWING

Date:

Credit Suisse First Boston,
   as Administrative Agent
Eleven Madison Street
New York, New York 10010-3629
Attention: Agency Department Manager

Re:   Credit Agreement dated as of January 14, 2002 among
Northwestern Corporation, a Delaware corporation (the
"Borrower"), the Lenders from time to time party thereto, and the
Administrative Agent (as amended, restated, supplemented or
otherwise modified from time to time, the "Credit Agreement").

Pursuant to Section 2.3 of the Credit Agreement, this Notice of Borrowing
("Notice") represents the request of the Borrower to borrow on [_____, _____] (the
"Borrowing Date")[1] from the Lenders the principal amount of _____
DOLLARS ($ _____) in [Revolving Credit] [Term] Loans as [Alternate Base
Rate Loans] [Eurodollar Loans].

    1.    [$_____ of such Loans will be Eurodollar Loans.] [The initial
Interest Period for such Eurodollar Loans is requested to be a [one] [two] [three] or [six] month
period.]

    2.    Proceeds of such Loans are to be wire-transferred in accordance with the
following wire instructions:

_____
_____
_____

The undersigned hereby certifies that, as of the Borrowing Date, all the applicable
conditions contained in [Sections 4.1 and 4.2][2] [Section 4.2][3] of the Credit Agreement have been
satisfied (or waived pursuant to Section 9.1 of the Credit Agreement).

---

[1] A Notice of Borrowing must be received by the Administrative Agent prior to 10:00 a.m. (New
York time), (a) three (3) Business Days prior to the requested Borrowing Date, if all or any part of the requested
Loans are to be Eurodollar Loans initially, or (b) one (1) Business Day prior to the requested Borrowing Date
otherwise.

[2] To be used for Term Loans and Revolving Credit Loans made on the Closing Date.

CSFB001366

Unless otherwise defined herein, terms defined in the Credit Agreement shall have the same meanings in this Notice.

IN WITNESS WHEREOF, the Borrower has caused this Notice to be executed and delivered by an authorized officer this _____ day of _____, _____.

NORTHWESTERN CORPORATION

By:_____
    Name:
    Title:

---

[3] To be used for Revolving Credit Loans made after the Closing Date.

B-1-2

CSFB001367

EXHIBIT B-2
TO CREDIT AGREEMENT

FORM OF NOTICE OF REQUEST FOR LETTER OF CREDIT

Date:

Credit Suisse First Boston,
    as Administrative Agent
Eleven Madison Street
New York, New York 10010-3629
Attention: Agency Department Manager

> Re:    Credit Agreement dated as of January 14, 2002 among
> Northwestern Corporation, a Delaware corporation (the
> "Borrower"), the Lenders from time to time party thereto, and the
> Administrative Agent (as amended, restated, supplemented or
> otherwise modified from time to time, the "Credit Agreement").

Ladies and Gentlemen:

The undersigned hereby irrevocably requests, pursuant to Section 2.3(c) of the Credit
Agreement, that [a] standby Letter(s) of Credit be issued as follows[1]:

(1)    For use by:

(2)    Beneficiary:

(3)    Stated Amount of Letter of Credit:    [_____        DOLLARS]
(US$_____)

(4)    Date of Issuance:

(5)    Expiration Date:

Delivery of the Letter(s) of Credit should be made as follows: [INSTRUCTIONS]

The undersigned hereby certifies that, as of the Borrowing Date, all the applicable
conditions contained in [Sections 4.1 and 4.2][2] [Section 4.2][3] of the Credit Agreement have been
satisfied (or waived pursuant to Section 9.1 of the Credit Agreement).

---

[1] A Notice for Request of Letter of Credit must be received by the Administrative Agent prior to
10:00 a.m. (New York time), three Business Days prior to the date of the requested issuance or extension (or such
shorter period as agreed to by the Issuing Lender).
[2] To be used for Letters of Credit requested and issued on the Closing Date.

CSFB001368

Unless otherwise defined herein, terms defined in the Credit Agreement shall have the same meanings in this Notice of Request for Letter of Credit.

This Notice of Request for Letter of Credit is in compliance with the requirements for issuance of the Letters of Credit set forth in the Credit Agreement.

IN WITNESS WHEREOF, the Borrower has caused this Notice of Request for Letter of Credit to be executed and delivered by an authorized officer this _____ day of _____, _____.

NORTHWESTERN CORPORATION

By:_____
   Name:
   Title:

---

[3] To be used for Letters of Credit requested and issued after the Closing Date.

B-2-2

CSFB001369

EXHIBIT B-3
TO CREDIT AGREEMENT

FORM OF NOTICE OF BORROWING FOR SWINGLINE LOANS

Date:

Credit Suisse First Boston,
   as Administrative Agent
Eleven Madison Street
New York, New York 10010-3629
Attention: Agency Department Manager

Re:   Credit Agreement dated as of January 14, 2002 among Northwestern Corporation, a Delaware corporation (the "Borrower"), the Lenders from time to time party thereto, and the Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

Ladies and Gentlemen:

Pursuant to Section 2.3(d) of the Credit Agreement, this Notice of Borrowing for Swingline Loans ("Notice") represents the request of the Borrower to borrow on [_____, _____ _____] (the "Borrowing Date")[1] from the Swingline Lender Swingline Loans in the principal amount of _____DOLLARS ($ _____).

The Swingline Loan shall mature on [_____, _____].

The undersigned hereby certifies that, as of the Borrowing Date, all the applicable conditions contained in [Sections 4.1 and 4.2][2] [Section 4.2][3] of the Credit Agreement have been satisfied (or waived pursuant to Section 9.1 of the Credit Agreement).

Unless otherwise defined herein, terms defined in the Credit Agreement shall have the same meanings in this Notice.

---

[1] A Notice of Borrowing must be received by the Administrative Agent prior to 10:00 a.m. (New York time) on the requested Borrowing Date.

[2] To be used for Swingline Loans made on the Closing Date.
[3] To be used for Swingline Loans made after the Closing Date.

CSFB001370

IN WITNESS WHEREOF, the Borrower has caused this Notice to be executed and delivered by an authorized officer this _____ day of _____, _____.

NORTHWESTERN CORPORATION

By:_____
    Name:
    Title:

B-4-2

CSFB001371

EXHIBIT B-4
TO CREDIT AGREEMENT

FORM OF NOTICE OF INTEREST RATE CONVERSION

Date:

Credit Suisse First Boston,
    as Administrative Agent
Eleven Madison Street
New York, New York 10010-3629
Attention: Agency Department Manager

Re:    Credit Agreement dated as of January 14, 2002 among
Northwestern Corporation, a Delaware corporation (the
"Borrower"), the Lenders from time to time party thereto, and the
Administrative Agent (as amended, restated, supplemented or
otherwise modified from time to time, the "Credit Agreement").

Ladies and Gentlemen:

The Borrower hereby gives notice pursuant to Section 2.7 of the Credit
Agreement that it requests a continuation or conversion of a [Revolving Loan][1] [Term Loan][2]
outstanding under the Credit Agreement, and in connection therewith sets forth below the terms
on which such continuation or conversion is requested to be made; capitalized terms used and
not defined herein shall have the meanings provided in the Credit Agreement:

The Borrower hereby requests that on _____, _____[3]

(1)    $ _____ of the currently outstanding principal amount of the
[Revolving Credit] [Term] Loans originally made on _____, _____ and currently
being maintained as [Alternate Base Rate Loans] [[one] [two] [three] [six] month
Eurodollar Loans][4],

(2)    be [converted into] [continued as],

---

[1] No Revolving Credit Loans may be converted into Eurodollar Loans after the date that is one
month prior to the Termination Date.
[2] No Term Loans may be converted into Eurodollar Loans after the date that is one month prior to
the Termination Date.
[3] Conversion of Eurodollar Loans may be made only on the last day of the applicable Interest
Period. A Notice of Conversion must be received by the Administrative Agent prior to 10:00 a.m. (New York time)
at least three Business Days prior to the date of Borrower's election.
[4] Select appropriate option.

CSFB001372

(3)    [Eurodollar Loans having an Interest Period of [one] [two] [three] [six] months, which Interest Period will expire on _____, ____][5] [Alternate Base Rate Loans].

[In the event that such Loans are to be converted into, or continued as, Eurodollar Loans, the Borrower hereby certifies in accordance with Section 2.7 of the Credit Agreement that no Default or Event of Default has occurred and is continuing as of the date of this Notice of Interest Rate Conversion.]

IN WITNESS WHEREOF, the Borrower has caused this Notice of Interest Rate Conversion to be executed and delivered, and the certification contained herein to be made, by an authorized officer this _____ day of _____, _____.

NORTHWESTERN CORPORATION

By: _____
    Name:
    Title

---

[5] Insert appropriate interest rate option and, if applicable, number of months (for Eurodollar Loans).

B-4-2

CSFB001373

EXHIBIT C
TO CREDIT AGREEMENT

## FORM OF CLOSING CERTIFICATE

## NORTHWESTERN CORPORATION

Pursuant to Section 4.1(e) of the Credit Agreement dated as of January 14, 2002 among Northwestern Corporation, a Delaware corporation (the "Borrower"), the several banks and other financial institutions from time to time parties thereto (the "Lenders"), and Credit Suisse First Boston, as administrative agent for the Lenders (the "Credit Agreement"; terms defined therein shall have their defined meanings when used herein), the undersigned hereby certifies that he is the _____ of the Borrower and in such capacity further certifies as follows:

1.      The representations and warranties of the Borrower set forth in the Credit Agreement and each of the other Loan Documents to which the Borrower is a party, are true and correct in all material respects on and as of the date hereof.

2.      The Borrower has received all documents and instruments, including all consents, authorizations and filings, required or advisable under any Requirement of Law or Contractual Obligation of the Borrower in connection with the execution, delivery, performance, validity and enforceability of the Credit Agreement, Notes and Loan Documents except as expressly set forth in each document. I have examined Schedule 3.4 to the Credit Agreement and attached hereto are copies of all consents, authorizations and filings referred to in Schedule 3.4 of the Credit Agreement, which consents, authorizations and filings are in full force and effect as of the date hereof.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the making of the Loans on the date hereof.

4.      There are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Borrower, nor has any other event occurred affecting or threatening the existence of the Borrower.

5.      Attached hereto as Annex I is a true and complete copy of the Acquisition Agreement, together with any existing amendments thereto, which is in full force and effect as of the date hereof.

CSFB001374

IN WITNESS WHEREOF, the undersigned has hereunto set his name.

_____

Name:
Title:

Date:  [•], 200_

C-2

CSFB001375

EXHIBIT D
TO CREDIT AGREEMENT

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1.   Assignor:                          _____

2.   Assignee:                          _____ [and is an
                                        Affiliate/Approved Fund[1]]

3.   Borrower:                          Northwestern Corporation, a Delaware corporation.

4.   Administrative Agent:              Credit Suisse First Boston, as the administrative agent
                                        under the Credit Agreement

5.   Credit Agreement:                  Credit Agreement, dated as of January 14, 2002 (as
                                        amended, restated, supplemented or otherwise modified
                                        from time to time, the "Credit Agreement"; terms defined
                                        therein being used herein as defined therein), among the
                                        Borrower, the several banks and other financial institutions
                                        parties thereto (including the Lender), and the
                                        Administrative Agent

---
[1] Select as applicable.

CSFB001376

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[2] |
|---|---|---|---|
| Revolving Credit Commitment | $_____ | $_____ | _____% |
| Term Loan Commitment | $_____ | $_____ | _____% |

[Name of Assignor]

| | |
|---|---|
| Revised Revolving Credit Commitment Amount: | $_____ |
| Revised Revolving Commitment Percentage: | _____% |
| [Revised Term Loan Commitment Amount: | $_____] |
| [Revised Term Loan Commitment Percentage: | _____%] |
| Revised Term Loan Amount: | $_____ |
| Fees Assigned (if any): | $_____ |

[Name of Assignee]

| | |
|---|---|
| New Revolving Credit Commitment Amount: | $_____ |
| New Revolving Credit Commitment Percentage: | _____% |
| [New Term Loan Commitment Amount: | $_____] |
| [New Term Loan Commitment Percentage: | _____%] |
| Revised Term Loan Amount: | $_____ |

Address for Notices for Assignee:

[Address]
Attention: _____
Telephone: _____
Telecopy: _____
Telephone
Confirmation:_____

---

[1]  Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

Eurodollar Lending Office:

_____
_____
_____

Domestic Lending Office:

_____
_____
_____

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:_____
   Name:
   Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By:_____
   Name:
   Title:

Consented to and Accepted:

CREDIT SUISSE FIRST BOSTON, as
  Administrative Agent


By_____
   Name:
   Title:


By_____
   Name:
   Title:


[Consented to:]³

NORTHWESTERN CORPORATION


By_____
   Name:
   Title:

---

³ To be added only if there is no Event of Default occurring and in the case where the Assignee is
not a Lender or an Affiliate or Approved Fund thereof.

CSFB001379

ANNEX 1

## NORTHWESTERN CORPORATION CREDIT AGREEMENT
## DATED AS OF JANUARY 14, 2002

### STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
### AND ASSUMPTION AGREEMENT

1. Representations and Warranties.

    1.1. Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

    1.2. Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 3.1 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Foreign Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

    2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

D-5

CSFB001380

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

       3.  <u>General Provisions</u>. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the law of the State of New York.

CSFB001381