**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1494-(JJF) |
| NORTHWESTERN CORPORATION, | ) ) | PUBLIC VERSION |
| Defendant. | ) ) | |
| MAGTEN ASSET MANAGEMENT CORP., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-499 (JJF) |
| MICHAEL J. HANSON and ERNIE J. KINDT, | ) ) ) | PUBLIC VERSION |
| Defendants. | ) | |

**BRIEF OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW**
**DEBENTURE TRUST COMPANY OF NEW YORK IN OPPOSITION TO**
**NORTHWESTERN CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT....................................................................................................................4

I.   NORTHWESTERN DOES NOT DENY THAT THERE IS OVERWHELMING
     EVIDENCE OF ALL ELEMENTS OF ITS LIABILITY UNDER THE
     MONTANA UNIFORM FRAUDULENT TRANSFER ACT ABSENT THE
     PURPORTED SECTION 1102 RELEASE....................................................................5

     A.   Evidence on Lack of Reasonably Equivalent Value for the Transfer. ........................6

     B.   Evidence of Undercapitalization and Insolvency Resulting from the Transfer............7

     C.   Evidence of the "Badges of Fraud" from Which Intent May Be Inferred....................8

II.  NORTHWESTERN DOES NOT DENY THAT THERE IS OVERWHELMING
     EVIDENCE OF MASSIVE FRAUD AND CONCEALMENT OF ITS DIRE
     FINANCIAL CONDITION AS OF THE DATE OF THE TRANSFER AND
     PURPORTED RELEASE...............................................................................................8

     A.   The Nature and Scope of the Fraud. ...........................................................................8

     B.   Benefits Obtained by NorthWestern as a Result of the Fraud Prior to the
          Consummation of the Transfer. ................................................................................15

     C.   NorthWestern's Concealed Liquidity Crisis...............................................................16

     D.   NorthWestern Cannot Preclude Trial on the Issue of Its Concealed Financial
          Condition as of the November 2002 Date of the Transfer Simply Because It
          Managed to Stave Off Bankruptcy Until the Following Year......................................19

III. THERE IS MORE THAN SUFFICIENT EVIDENCE TO CREATE A
     GENUINE ISSUE FOR TRIAL ON WHETHER THE PURPORTED SECTION
     1102 RELEASE IS INVALID AS A RESULT OF NORTHWESTERN'S
     FRAUDULENT SCHEME.............................................................................................22

     A.   The Fraud Enabled NorthWestern to Carry Out the Transfer. ....................................25

     B.   The Transfer Was an Integral Part of the Fraudulent Scheme. ...................................32

     C.   NorthWestern's Asserted Concern About Its PUHCA Exemption Does Not
          Overcome or Negate the Effects of Its Fraud. ...........................................................36

IV.    NORTHWESTERN'S ATTACK ON THE UNJUST ENRICHMENT CLAIM
       FAILS FOR THE SAME REASONS ..........................................................................38

CONCLUSION...........................................................................................................................39

## TABLE OF AUTHORITIES

PAGE

**Cases**

Aasheim v. Humberger,
    695 P.2d 824 (Mont. 1985) ................................................................29

A.M. v. Luzerne County Juvenile Det. Ctr.,
    372 F.3d 572 (3d Cir. 2004) .................................................................4

Affiliated Ute Citizens v. United States,
    406 U.S. 128 (1972) ...........................................................................30

In re Americana Servs., Inc.,
    175 B.R. 1018 (W.D. Mo. 1994) .......................................................31

Anderson v. Liberty Lobby,
    477 U.S. 242 (1986) .............................................................................4

Ass'n of Unit Owners of the Deer Lodge Condo. v. Big Sky of Montana, Inc.,
    798 P.2d 1018 (Mont.1990) ...............................................................24

Berckeley Inv. Group, Ltd. V. Colkitt,
    455 F.3d 195 (3d Cir. 2006) ...............................................................35

Brink's Inc. v. City of New York,
    717 F.2d 700 (2d Cir. 1983) .................................................................9

Brooks v. Kyler,
    204 F.3d 102 (3d Cir. 2000) .................................................................4

Cantor Fitzgerald, L.P. v. Cantor,
    No. C.A. 16297, 1998 WL 326686 (Del. Ch. June 16, 1998) ...........38

Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,
    No. 99 Civ. 1725, 2003 U.S. Dist. LEXIS 6150 (S.D.N.Y. April 11, 2003).....................35

CFM Commc'ns, LLC v. Mitts Telecasting Co.,
    424 F. Supp.2d 1229 (E.D. Cal. 2005).............................................35

Citizens Nat'l Bank v. Cook,
    857 S.W.2d 502 (Mo. Ct. App. 1993)...............................................31

Flight Sys., Inc. v. Elec. Data Sys. Corp.,
    112 F.3d 124 (3d Cir. 1997)...............................................................23

Georgia Cas. & Sur. Co. v. Atmos Energy Corp.,
    No. 4:05-CV-87 (CDL), 2007 WL 4287720 (M.D. Ga. Dec. 4, 2007) ...........................35

In re Hechinger Inv. Co. of Delaware, Inc.,
    298 B.R. 240 (Bankr. D. Del. 2003) ...........................................................................21

Hodgson v. Kottke Asssocs., LLC,
    No. 06-5040, 2007 U.S. Dist. LEXIS 56205 (E.D. Pa. July 31, 2007)...........................24

Huff v. Nationwide Insurance Co.,
    167 B.R. 53 (W.D. Pa. 1992), aff'd, 989 F.2d 487 (3d Cir. 1993)...................................23

Interdonato v. Interdonato,
    521 A.2d 1124 (D.C. 1987) .......................................................................................24

Jones v. Bock,
    127 S. Ct. 910 (2007)..................................................................................................23

Kilduff v. Adams, Inc.,
    593 A.2d 478 (Conn. 1991) .......................................................................................29

Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc.,
    176 F. Supp.2d 199 (S.D.N.Y.2001)...........................................................................24

Libhart v. Copeland,
    949 S.W.2d 783 (Tex. App. 1997)..............................................................................25

Magten Asset Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.),
    313 B.R. 595 (Bankr. D. Del. 2004) ..........................................................6, 22, 23, 24, 38

Nat'l Westminster Bank NJ v. Anders Eng'g, Inc.,
    674 A.2d 638 (N.J. Super. Ct. App. Div. 1996)..............................................................6

NLRB v. Local 542, 542-A, and 542-B, Int'l Union of Operating Eng'rs,
    485 F.2d 387 (3d Cir. 1973).......................................................................................32

New York v. N. Storonske Cooperage Co.,
    174 B.R. 366 (Bankr. N.D.N.Y. 1994) ..........................................................................5

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,
    267 F.3d 340 (3d Cir. 2001).......................................................................................15

In re Paragon Sec. Co.,
    589 F.2d 1240 (3d Cir. 1978)......................................................................................23

Rad Servs., Inc. v. Aetna Cas. and Sur. Co.,
    808 F.2d 271 (3d Cir. 1986).........................................................................................9

iv

Riggs et al. v. Gillespie,
  241 F. 311 (4th Cir. 1917) ................................................................................24

Ritchie v. Glidden Co.,
  242 F.3d 713 (7th Cir. 2001) ..............................................................................5

Roberts v. Fleet Bank,
  342 F.3d 260 (3d Cir. 2003)................................................................................4

Rochford v. New York Fruit Auction Corp.,
  116 F.2d 584 (2d Cir. 1940)..............................................................................23

Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC),
  331 B.R. 47 (Bankr. E.D.N.Y. 2005)..................................................................5

Sharp v. Coopers & Lybrand,
  649 F.2d 175 (3rd Cir. 1981) ............................................................................30

Stanley v. Allan G. Holms, AGH, Inc.,
  975 P.2d 1242 (Mont. 1999) .............................................................................25

In re Tate-Jones & Co.,
  85 F. Supp. 971 (W.D. Pa. 1949) ......................................................................23

Todaro v. Bowman,
  872 F.2d 43 (3d Cir. 1989)..................................................................................4

Todaro v. Orbit International Travel, Ltd.,
  755 F. Supp. 1229 (S.D.N.Y. 1991)..................................................................23

Towe Antique Ford Found. v. IRS,
  791 F. Supp. 1450 (D. Mont. 1992) ....................................................................8

United States v. Hemmons,
  774 F. Supp. 346 (E.D. Pa. 1991) .....................................................................21

In re Unisys Savings Plan Litigation,
  74 F.3d 420 (3d Cir. 1996)..................................................................................4

In re Virginia Hall,
  109 B.R. 149 (W.D. Pa. 1990)...........................................................................32

WTM, Inc. v. Henneck,
  125 F. Supp. 2d 864 (N.D. Ill. 2000) ................................................................25

In re Winstar Commc'ns, Inc.,
  348 B.R. 234 (D. Del. 2005)...........................................................................9-10

## Statutes

Fed. R. Civ. P. 7(a) ................................................................................................23

Fed. R. Civ. P. 8(c) ................................................................................................22

Fed. R. Civ. P. 56(c) ................................................................................................4

Mont. Code § 31-2-301 et seq. ...............................................................................5

Mont. Code § 31-2-333(1)(a) ..............................................................................5, 8

Mont. Code § 31-2-333(b) ...................................................................................5, 6

Mont. Code § 31-2-333(2) ...................................................................................5, 8

Mont. Code § 31-2-334 .........................................................................................5-6

Mont. Code § 31-2-340(2) .......................................................................................6

Mont. Code § 31-3-330(1) .......................................................................................7

Mont. Code § 69-3-102 ..........................................................................................29

Mont. Code § 69-3-106 ..........................................................................................29

Mont. Code § 69-3-504(3) ......................................................................................29

## Other Authorities

RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:4 (4th ed. 2003) .........................................24

ROBERT I. LANDAU & JOHN E. KRUEGER,
CORPORATE TRUST ADMINISTRATION AND MANAGEMENT, 174-179 (5th ed. 1998)................29

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York, as Indenture Trustee[1] ("Law Debenture") respectfully submit this brief in opposition to the motion for summary judgment filed by defendant NorthWestern Corporation ("NorthWestern").[2]

## PRELIMINARY STATEMENT

Through discovery, it has been confirmed that NorthWestern was engaged in a massive fraudulent scheme throughout 2002, misrepresenting its financial condition to the markets and the public while it spiraled toward bankruptcy with hundreds of millions of dollars of concealed losses. As early as 2001, it was clear to NorthWestern's senior management that the company's liquidity was extremely tight, and that NorthWestern's non-utility subsidiaries were draining money from the company. Accordingly, NorthWestern began 2002 facing a multitude of challenges, with the knowledge that it would soon be facing a liquidity crisis, and thus it needed to raise capital to sustain itself. NorthWestern's dire financial situation made it imperative that it stave off a ratings downgrade, and it was essential that NorthWestern complete the fraudulent transfer at issue in this case (the "Transfer"), as such a ratings downgrade would have prevented NorthWestern from any further capital markets transactions, including raising equity and issuing debt.

---

[1]    Law Debenture is a trust company organized under the laws of New York and is the successor trustee to The Bank of New York ("BONY") under the various agreements governing the QUIPS (as described below).

[2]    Because this opposition is being filed simultaneously with Magten's opposition to the summary judgment motion brought by defendants Hanson and Kindt in 05-499, which is consolidated with this case, and there is substantial overlap in the relevant evidence plaintiffs are filing a single declaration of John W. Brewer ("Brewer Decl.") to place before the court all discovery material and similar documents referred to in either opposition. Plaintiffs are also submitting herewith (as well as in support of Magten's opposition in the Hanson and Kindt case), the declarations of their experts Robert Berliner and Paul Marcus, which place before the Court their respective expert reports (the "Berliner Report" and "Marcus Report").

Defendant's moving brief is referred to as "NOR Br.," its purported statement of undisputed facts is referred to as "NOR SUF," and its supporting affidavits and declarations are referred to as, e.g., "Delaney Aff." and "Patrizia Decl."

The evidence shows that NorthWestern's fraudulent scheme both motivated and enabled NorthWestern to carry out the Transfer – i.e., the November 15, 2002 transfer of substantially all of the assets of its subsidiary Clark Fork and Blackfoot LLC ("Clark Fork") to itself without paying reasonably equivalent value for those assets. The Transfer injured Clark Fork's creditors, especially the plaintiffs who are, respectively, the largest current holder of the Clark Fork securities known as QUIPS and the indenture trustee representing the interests of all holders of QUIPS.[3]   Although NorthWestern purportedly agreed to assume the obligations with respect to the QUIPS, that agreement was worthless in light of NorthWestern's financial condition at the time and then its subsequent chapter 11 filing. Clark Fork lacked the wherewithal to fulfill its original obligations to the QUIPS holders, having been stripped by NorthWestern of all of its assets except for a single property saddled with severe environmental liabilities and incapable of generating positive cash flow.

From the beginning of this litigation until now, NorthWestern has defended itself not by denying the fraud or the injustice done to the QUIPS holders, but by hiding behind technical provisions of the indenture governing the underlying Junior Debentures (the "Indenture"). Section 1102 of that Indenture, which contemplated a legitimate arms-length transaction not tainted by fraud and self-dealing, purportedly gave rise to a release of Clark Fork from all potential liability relating to the QUIPS, thus depriving plaintiffs of standing to bring a fraudulent transfer claim for NorthWestern's actions in looting Clark Fork and rendering it insolvent. Judge Case rejected this

---

[3]   Clark Fork is the current name of an entity formerly known by various names, including Montana Power LLC and NorthWestern Energy LLC, and is the successor to the Montana Power Company. To minimize confusion, Clark Fork will be used to refer to this entity consistently throughout this brief, although some of the historical documents referred to use the name the entity had at previous points in time. Technically speaking, the QUIPS were not issued directly by Clark Fork's predecessor. Rather, the Clark Fork predecessor issued debt securities ("Junior Debentures") to a related trust entity which in turn issued QUIPS to the investing public. NOR SUF #26, 27, 28. For ease of exposition, we will follow the same practice as the defendants have in their papers and discuss the QUIPS as if directly issued by Clark Fork except where the two-step structure just described is specifically relevant to the point at hand.

defense at the outset of the case, because under well-established legal principles the release was

invalid to the extent NorthWestern had engaged in a fraudulent scheme, which was a factual

question. NorthWestern's contention that the undisputed facts eliminate the possibility that the

finder of fact could find the release to be tainted by fraud do not stand up to even cursory scrutiny.[4]

The fraud is connected to, and thus vitiates, the release through a number of separate and

independently sufficient causal paths, as discussed below.   For example:

- NorthWestern's current CEO and the former CEO of Clark Fork testified that he relied on the integrity of the financial statements now undisputed to be fraudulent in determining whether to execute a key document necessary to the Transfer;

- NorthWestern's fraudulent concealment of its dire financial circumstances blinded QUIPS holders to the true consequences of the Transfer, thus assuring that BONY (the indenture trustee at the time) received no objections to the Transfer and would not investigate the Transfer further;

- NorthWestern's fraudulent concealment likewise enabled it to remove or avoid other legal and regulatory obstacles to the consummation of the Transfer;

- NorthWestern's fraud enabled it to obtain hundreds of millions of dollars in desperately needed additional cash from hoodwinked banks and equity investors in the months just prior to the Transfer, absent which it would have simply run out of cash, defaulted on maturing debt, and been unable to go forward with the Transfer.

As further set forth below, it is clear that once this technical defense is overcome, NorthWestern

will have no substantive defense to plaintiffs' claims.  The case should proceed to trial.

---

[4]     Consistent with the Court's individual practice and prior discussion with Chambers, plaintiffs are submitting a full opposition brief on the merits in lieu of a point by point response to NorthWestern's purported Statement of Undisputed Facts. Given the voluminous papers relating to this motion and the parallel motion in 05-499, we do not think a formal separate counterstatement would be a productive use of additional pages. However, we note for the record that at a minimum the evidence set forth herein is sufficient to create a genuine issue of disputed fact as to numerous items, including without limitation 11, 22, 25, 34, 40, 41, 46, 50, 51, 52, 65, 66 on NorthWestern's list. Many other items on NorthWestern's list, including 10, 13, 15, 16, 30-35, 39, 44, 45, 53, 54, 55, 56, 68, 69, are also not "undisputed facts" because they are disguised contentions of law and/or address irrelevant matters.

## ARGUMENT

On a motion for summary judgment, defendants must show that, on the record before the court, "there is no genuine issue as to any material fact and [they] [are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must determine, viewing the evidence in the light most favorable to the nonmoving party, in this case Plaintiffs, and without weighing the evidence or determining the truth of the matter, whether there are any genuine issues of material fact and whether judgment is appropriate as a matter of law. Roberts v. Fleet Bank, 342 F.3d 260, 264-65 (3d Cir. 2003); Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000). See also In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 n. 10 (3d Cir. 1996) ("The party opposing the motion is entitled to have his allegations taken as true, to receive the benefit of the doubt when his assertions conflict with those of the movant and to have inferences from the underlying facts drawn in his favor.").

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). This is true even where the case will ultimately be heard without a jury. Unisys, 74 F.3d at 433 n.10. An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. See Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989). Furthermore, to raise a genuine issue of material fact, "the opponent need not match, item for item, each piece of evidence proffered by the movant," and if the non-moving party has "exceeded the mere scintilla threshold and offered a genuine issue of material fact," then summary judgment is inappropriate. Unisys, 74 F.3d at 433 n.10.

Where, as here, the movants argue that their conduct was not the proximate cause of the nonmovant's injury, summary judgment is particularly inappropriate. See A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 581 (3d Cir. 2004) (reversing grant of summary judgment for defendants because "[o]nce evidentiary proof is adduced, the issue of proximate cause is best left to

4

the determination of a trier of fact"); Ritchie v. Glidden Co., 242 F.3d 713 (7th Cir. 2001)

(reversing grant of summary judgment for defendants, noting that "[p]roximate cause … is an issue

for the factfinder … unless only one conclusion can be drawn from the facts") (citations omitted).[5]

I.     NORTHWESTERN DOES NOT DENY THAT THERE IS OVERWHELMING
       EVIDENCE OF ALL ELEMENTS OF ITS LIABILITY UNDER THE MONTANA
       UNIFORM FRAUDULENT TRANSFER ACT ABSENT THE PURPORTED SECTION
       1102 RELEASE

NorthWestern's motion focuses almost exclusively on the validity of the release purportedly

created by section 1102 of the Indenture.  In order to understand the context of this defense,

however, it may be useful to review briefly the key elements of liability under the Montana Uniform

Fraudulent Transfer Act ("MUFTA"), Mont. Code § 31-2-301 et seq., and the overwhelming

evidence that supports those elements.

The Montana statute (simply a version of a uniform law widely adopted across the country)

is not unusual in this regard:  a transfer will be held fraudulent as to a creditor under any of three

different scenarios (all of which may, of course, be present in the same case):  (a) the transfer is

made with "intent to hinder, delay, or defraud any creditor of the debtor" (Mont. Code § 31-2-

333(1)(a)), with such intent determined by reference to the various "badges of fraud" listed in Mont.

Code § 31-2-333(2); (b) the transfer is made "without receiving a reasonably equivalent value in

exchange for the transfer" when the debtor's remaining assets left it undercapitalized (Mont. Code

§ 31-2-333(b)); (c) the transfer is made "without receiving a reasonably equivalent value in

exchange for the transfer" when the "debtor became insolvent as a result of the transfer" (id. § 31-2-

---

5     To the extent NorthWestern is seeking summary judgment by claiming it did not have fraudulent intent with
      respect to the Transfer, that is likewise a question for the trier of fact.  See Sec. Investor Prot. Corp. v. Rossi
      (In re Cambridge Capital, LLC), 331 B.R. 47, 57-58 (Bankr. E.D.N.Y.2005) ("Summary judgment on
      questions of fraudulent intent can pose significant obstacles for a moving party because of the difficulty in
      establishing a defendant's state of mind."); New York v. N. Storonske Cooperage Co., 174 B.R. 366, 390
      (Bankr. N.D.N.Y. 1994) ("Summary judgment on a fraud claim of any kind is exceedingly rare due to the
      intent element, which, is almost always an issue of fact.").

334).[6] It is important to note that Mont. Code § 31-2-333(b) and § 31-2-334 establish constructive fraud regardless of intent.

NorthWestern's primary attack has been on plaintiffs' status as creditors of Clark Fork (the "debtor" for MUFTA purposes), arguing that the purported section 1102 release meant that plaintiffs ceased being Clark Fork creditors the instant the Transfer was accomplished and thus lacked any remedy under MUFTA. Judge Case correctly held that this defense stands or falls with the validity of the release. Magten Asset Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.), 313 B.R. 595, 603 (Bankr. D. Del. 2004).

A.     Evidence on Lack of Reasonably Equivalent Value for the Transfer.

NorthWestern does not challenge the evidence that Clark Fork did not receive reasonably equivalent value for the Transfer, nor could it. NorthWestern has admitted that the value of the assets transferred was at least $1.15 billion, Brewer Decl. Exh. 1 at 3, and discovery has revealed an internal valuation done shortly after the Transfer valuing those assets at $1.5 billion. Brewer Decl. Exhs. 2 at 3; and 3 at 33:14 – 36:25.

By comparison, the only "value" NorthWestern can claim to have provided Clark Fork in exchange for the assets was the assumption of debt worth no more than approximately $710 million, Brewer Decl. Exh. 1 at 4, leaving a gap of approximately $400 million to $800 million.[7] No factfinder could consider this reasonably equivalent.

---

6     These different bases for holding the Transfer fraudulent correspond to the second, fourth, and third causes of action, respectively, set forth in the First Amended Complaint. If the transfer is fraudulent for any or all of these reasons, a creditor "may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim" from the transferee of the assets (in this case NorthWestern). Mont. Code § 31-2-340(2).

7     Defendant notes that it paid Clark Fork's former parent company $478 million in cash nine months before the Transfer. NOR Br. at 9. This is irrelevant, however, because the statute considers only consideration "received by" Clark Fork. See Nat'l Westminster Bank NJ v. Anders Eng'g, Inc., 674 A.2d 638, 639 (N.J. Super. Ct. App. Div. 1996) (applying the New Jersey version of the Uniform Fraudulent Transfer Act).

B.    Evidence of Undercapitalization and Insolvency Resulting from the Transfer.

Plaintiffs' experts have opined that, assuming the section 1102 release was ineffective in relieving Clark Fork of its QUIPS-related liabilities, the Transfer rendered it both undercapitalized and insolvent. Marcus Report at 51; Berliner Report at 5-2. NorthWestern can quarrel with the assumption but not (if the assumption is otherwise borne out) the conclusion. The QUIPS liabilities on Clark Fork's balance sheet just prior to the Transfer totaled some $65 million. Brewer Decl. Exh. 4 at 10. The only asset Clark Fork retained was the Milltown Dam. Michael Hanson represented to BONY that this dam was economically worthless and incapable of generating positive cash flow (Brewer Decl. Exh. 5), and it appears to have been assigned a balance sheet value (dubious in light of Mr. Hanson's representations) of no more than approximately $11 million, balanced by $11 million in other liabilities. Brewer Decl. Exh. 6 at 9. There can be no doubt that, if the section 1102 release was invalid and Clark Fork remained obligated for the $65 million in QUIPS, it was rendered both undercapitalized and insolvent the instant the Transfer closed, with no possible means of meeting its QUIPS-related obligations.[8] See also Delaney Aff. Exh. 26 at 1-2 (contract giving Clark Fork right to seek payment from NorthWestern to extent necessary for Clark Fork to maintain positive net worth of $1,000, but subject to $10 million cap on total payments under agreement).

---

Nor can NorthWestern point to the contractual support agreements it entered into with Clark Fork as sufficient to justify a finding of reasonably equivalent value. First of all, the statute expressly provides that "value does not include an unperformed promise made other than in the ordinary course of the promisor's business to furnish support to the debtor." Mont. Code § 31-3-330(1). These extraordinary support agreements were not in the ordinary course of NorthWestern's business. Just as importantly, NorthWestern has made no attempt to quantify the present value to Clark Fork of those support agreements as of the date of the transfer, but it is obvious that any such value could not materially close the $400 million to $800 million gap.

[8]    The fact that Clark Fork had a contractual right to defer interest payments provides no defense here; deferring the payment obligation does not excuse it, and Clark Fork was left with no conceivable means of ever generating the cash flow sufficient to meet its QUIPS-related obligations.

C.    Evidence of the "Badges of Fraud" from Which Intent May Be Inferred.

While two bases for holding that the Transfer was fraudulent require no showing at all of subjective intent, Mont. Code § 31-2-333(1)(a) does require intent, but intent may be inferred from circumstantial evidence such as the "badges of fraud" enumerated in Mont. Code § 31-2-333(2)[9] Here, no fewer than four of the "badges" are undeniably present: the transfer was to an insider (factor (a)); the transfer was of substantially all of Clark Fork's assets (factor (e)); there was an utter lack of reasonably equivalent value (factor (h)); and Clark Fork became insolvent at or about the time of the Transfer (factor (i)).[10]  With all this established, the reason NorthWestern's single-minded focus on the validity of the section 1102 release is clear.  It will have no other defense at trial.

II.    NORTHWESTERN DOES NOT DENY THAT THERE IS OVERWHELMING EVIDENCE OF MASSIVE FRAUD AND CONCEALMENT OF ITS DIRE FINANCIAL CONDITION AS OF THE DATE OF THE TRANSFER AND PURPORTED RELEASE

A.    The Nature and Scope of the Fraud.

NorthWestern cannot deny that there is ample, indeed overwhelming evidence that its publicly announced financial statements for the first, second, and third quarters of 2002 were fraudulent.  Documents and testimony make clear the rationale for this fraud:  it was essential that

---

[9]    Not all badges of fraud need to be established in any given case. "Often a single one of [the badges of fraud] may establish and stamp a transaction as fraudulent.  When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent." Towe Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1458 (D. Mont. 1992) (applying similar predecessor statute) (citations omitted).

[10]    Moreover, the intent need not specifically have been to defraud Clark Fork's creditors: an intent to "hinder" or "delay" them is sufficient for liability under Mont. Code § 31-2-333(1)(a).  Here, NorthWestern's express intent as set forth in its board resolution authorizing the Transfer was to shift the assets to itself "to more directly support the obligations of the Corporation."  Delaney Aff. Exh. 23 at NOR009571.  In other words, NorthWestern fully understood that, without the Transfer, Clark Fork's creditors, including the QUIPS holders, were structurally senior to creditors of the parent company with respect to the positive cash flow generated by the Montana utility assets held by Clark Fork.  Accomplishing the transfer would foreseeably and necessarily destroy that priority and put other creditors ahead of the QUIPS holders, thus "delaying," "hindering," and ultimately totally destroying their ability to get paid, as the subsequent course of NorthWestern's chapter 11 case amply demonstrated.

NorthWestern conceal its problems so as to prevent a ratings downgrade by the ratings agencies. The Transfer was a key component of this fraudulent scheme, as NorthWestern went ahead with the Transfer in order to placate the ratings agencies and bolster its failing non-utility businesses. A ratings downgrade would have prevented NorthWestern from pursuing any further capital markets transactions, including raising equity and issuing new debt, at a time when it desperately needed access to capital. Accordingly, NorthWestern's need for capital, its need to prevent a ratings agency downgrade, and its need for the Transfer are inextricably linked.

Indeed, NorthWestern's "house of cards" soon came tumbling down. It is undisputed that NorthWestern ultimately restated those financials during 2003 (NOR SUF #61), filed for bankruptcy protection under chapter 11 (NOR SUF #67), and that the SEC entered a cease and desist order against NorthWestern describing in detail the falsity of certain statements and materiality of certain omissions in the original financial statements (NOR SUF # 63). NorthWestern itself has put the SEC's order, which generally focuses on the same items in the original financials that NorthWestern corrected in its restatement, before this Court (Delaney Aff. Exh. 17) and treated it as reliable evidence. The testimony of both NorthWestern's CEO and General Counsel at the time of the restatement (as well as that of Expanets' CFO during the time of the fraud) have confirmed its accuracy. Brewer Decl. Exhs. 7 at 146; 8 at 181-89; and 9 at 77-95.

Moreover, Kipp Orme, who was NorthWestern's CFO at the time of the fraud (and a signer of all of the fraudulent 10-Q's) invoked his Fifth Amendment privilege against self-incrimination when questioned at deposition about the accuracy of the original financial statements, thus giving rise to an inference that they were intentionally falsified. Brewer Decl. Exh. 10 at 25 – 28; Rad Servs., Inc. v. Aetna Cas. and Sur. Co., 808 F.2d 271 (3d Cir. 1986) (adverse inference may be drawn against party employer when non-party former employee invoked Fifth Amendment privilege); Brink's Inc. v. City of New York, 717 F.2d 700 (2d Cir. 1983) (same); In re Winstar

Comme'ns, Inc., 348 B.R. 234, 280 (D. Del. 2005) (drawing an adverse inference against defendant where defendant's former employees invoked Fifth Amendment privilege).

The restated items were individually and collectively highly material, for example:

| Original First Quarter 10Q | Restated First Quarter 10Q |
|---|---|
| Net Income: $29.5 million<br>EBITDA: $62.3 million | Net Income: $10.7 million<br>EBITDA: $38.2 million |
| Original Second Quarter 10Q | Restated Second Quarter 10Q |
| Net Income: $15.8 million<br>EBITDA: $81.1 million | Net income: $(13.9) million<br>EBITDA: $49.7 million |
| Original Third Quarter 10Q | Restated Third Quarter 10Q |
| Net Income: $(41.3) million<br>EBITDA: $77.1 million | Net income: $(55.3) million<br>EBITDA: $55.6 million |

Berliner Report Appendix A-5 to A-7. The SEC calculated that NorthWestern overstated the key metric of operating income from continuing operations by 176%, 618%, and 109% for the first, second, and third quarters respectively. Delaney Aff. Exh. 17 at 2 (Summary).

The plaintiffs' accounting expert, Robert Berliner, has not merely relied on the restatement and the SEC's findings but has conducted an exhaustive analysis looking at the underlying evidence uncovered in discovery in light of applicable accounting and SEC disclosure rules, and confirmed essentially all of the points in the SEC's order, additionally focusing on the substantial evidence that the misstatements and omissions were intentional.[11] The common thread of most elements of the fraud was to conceal the failure of NorthWestern's unregulated non-utilities business ventures, Expanets and Blue Dot. Expanets was experiencing a crisis throughout the year because of the catastrophically botched implementation of a new billing and accounting system, ironically called

---

[11]    Because NorthWestern has not contended that the finder of fact could not accept all of the conclusions in the Berliner Report, we have generally not submitted the extremely voluminous underlying documentary material referred to in the report in an effort to limit the already considerable volume of paper before the Court on these motions.

EXPERT, which rendered it impossible for Expanets to issue accurate bills or collect any meaningful amount of revenue for almost the entirety of 2002, causing horrendous cash flow problems that were covered by undisclosed cash advances from NorthWestern itself – advances that would mostly never be repaid,. Both Expanets and Blue Dot were also experiencing losses due to the poor performance of their core businesses. Berliner Report at 1-8 to 1-13; Delaney Aff. Exh. 17 at 2 (Summary). This led to, among other things:

- Overstated income because of inadequate bad debt allowances, failure to record appropriate billing adjustments, and improper revenue recognition by abuse of percentage-of-completion accounting. Berliner Report at 1-1, 1-11; Delaney Aff. Exh. 17 at ¶¶ 14-20.

- The generation of phantom net income by reversing amounts booked for prior "cookie-jar" reserves – without any corresponding new revenue – and failure to disclose that other revenue was based on unusual, one-shot arrangements unlikely to recur. Berliner Report at 2-19; Delaney Aff. Exh. 17 at ¶¶ 27-31.

- Overstatement of income by improperly allocating a portion of the losses generated by Blue Dot to minority shareholders rather than recognizing the losses on the income statement of NorthWestern. Berliner Report at 1-8; Delaney Aff. Exh. 17 at ¶¶ 43-46.

- Failure to disclose the problems associated with EXPERT (combined with affirmative false statements that EXPERT was fully operational). Berliner Report at 3-3; Delaney Aff. Exh. 17 at ¶¶ 11-13.

- Failure to disclose the substantial and increasing intercompany loans made by NorthWestern to both Blue Dot and Expanets and the increasingly dubious prospects that those loans could or would ever be repaid. Berliner Report at 3-7; Delaney Aff. Exh. 17 at ¶¶ 37-42.

- Failure to disclose that a supposed asset sale (of the so-called "Colstrip" assets) that was supposed to generate approximately $97 million in desperately-needed new cash had fallen

apart, with the supposed buyer refusing to proceed and NorthWestern resorting to litigation.

Berliner Report at 3-9; Delaney Aff. Exh. 17 at. ¶¶ 47-50.

**REDACTED**

The evidence uncovered in discovery, when analyzed by Mr. Berliner, also revealed one

highly significant issue not addressed by the restatements and the SEC. On the same date in April

2003 as NorthWestern restated its quarterly results from 2002, it announced extraordinary write-offs

of approximately $600 million in charges related to Expanets and Blue Dot, including $390 million

of goodwill impairments – essentially conceding that its equity investment in those businesses had

been rendered worthless. NOR SUF #61; Berliner Report at 2-1. Based on his analysis, Mr.

Berliner has concluded that the relevant accounting rules required NorthWestern to recognize those goodwill impairment charges no later than June 30, 2002 (i.e., in the 10-Q issued in August 2002).

Discovery revealed two sets of appraisals of both Expanets and Blue Dot done approximately eight months apart by the same appraiser. Berliner Report at 2-4. The latter appraisals showed business values almost $700 million lower than the earlier appraisals – low enough to wipe out all of the goodwill that had been carried as an asset on NorthWestern's balance sheet – and were used as the basis for the writedowns taken as of December 31, 2002. Id. at 2-5. But the evidence reviewed by Mr. Berliner revealed that the difference was not due to any change in the fundamentals of the businesses in the intervening eight months, but because the earlier appraisals were based on unrealistic and inflated projections of future revenues provided by management to the appraisers precisely to avoid the need to recognize an impairment loss. Id. at 2-6. Having knowingly given false information to the appraisers which predictably distorted their results, id. at 2-12, management was then able to use the "independent" appraisal to justify postponing the inevitable recognition of massive impairment losses.[12]

Use of the bogus appraisals to justify postponing a writedown of NorthWestern's worthless investments in Expanets and Blue Dot not only misled the public in general, it had one very concrete benefit for NorthWestern. On August 14, 2002, essentially simultaneously with the release of its fraudulent 10-Q for the quarter ended June 30, NorthWestern represented to CSFB that it was in full compliance with all required covenants under its revolving credit facility. Brewer Decl. Exh. 12. Had the writedowns required by GAAP been properly taken in that 10-Q, NorthWestern would

---

[12]    NorthWestern's experts challenge Mr. Berliner's view of the time at which the impairment losses should have been recognized (while appearing to accept his analysis of the other intentional misrepresentations and omissions he found in NorthWestern's financials), but NorthWestern does not claim in the context of the present motion that the finder of fact could not determine that Mr. Berliner has the better view of the issue.

have been unable to give that representation because it would have had to confess it was in violation of the covenants. Berliner Report at 4-1; Marcus Report at 36.

It is worth noting that NorthWestern's internal documents reveal a de facto writeoff long before the belated announcement in December that NorthWestern's investments in Expanets and Blue Dot might be impaired.

# REDACTED

As if trying to turn lemons into lemonade, NorthWestern blithely points out that the SEC ultimately did not bring a charge of intentional fraud against the NorthWestern itself in the settlement the company negotiated, and did not impose a fine. NOR Br. at 16. This is wholly disingenuous. NorthWestern made certain that it would be able to resolve matters with the SEC without paying a fine by obtaining an order of the Bankruptcy Court barring the SEC from seeking any monetary relief. D.I. 3438, Case No. 03-12872 (this aspect of the Bankruptcy Court decision was not appealed and not reversed). That the company was not charged directly with fraud speaks only to the nature of plea-bargaining.

The SEC, of course, did charge NorthWestern's entire prior management team, including the CEO (Lewis), COO (Hylland), and CFO (Orme) with intentional fraud in connection with the same

scheme, and those officers not only paid fines but agreed to the extraordinary relief of being barred from serving as officers or directors of any public company rather than fight the SEC's charges. Brewer Decl. Exhs. 15, 16, and 17.[13]  For purposes of NorthWestern's civil liability in private litigation, it cannot avoid responsibility for the fraudulent intent and conduct of Lewis, Hylland, and Orme.  Their acts were the company's acts, and their intent was the company's intent.  See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 358-360 (3d Cir. 2001) (discussing the imputation of management's fraudulent conduct to the corporation).

      B.      Benefits Obtained by NorthWestern as a Result of the Fraud Prior to the Consummation of the Transfer.

The expert report of Paul Marcus makes clear the consequences that would have befallen NorthWestern had it not been for its fraudulent misstatements and omissions.  Had the markets known the truth during the period from May through November of 2002, Mr. Marcus explains that, among other things (Marcus Report at 30, 38):

- The company's precipitous stock price drop would have accelerated;

- The ratings agencies would have downgraded NorthWestern's credit to below investment grade (i.e. to "junk");

- The company would have been in default on the covenants on its $280 million revolving credit facility with CSFB, such that CSFB would have been entitled to refuse, and likely would have refused to provide, to provide any further funding under that facility; and

- The company would have been unable to carry out the October 2002 equity offering from which it obtained $81 million in new net proceeds.

The fraud enabled NorthWestern to reap all of these benefits:  postponing and alleviating pressure on its stock price and credit ratings, maintaining access to the CSFB revolver (from which the company drew almost $200 million in net new cash between August 7 and the end of September,

---

13    Expanets' CEO John Charters was likewise charged and agreed to similarly onerous sanctions rather than contest the SEC's charges.  Brewer Decl. Exh. 18.

Marcus Report at 36-37), and gaining over $80 million in new cash from the equity offering. These benefits were largely interrelated. For example, avoiding a ratings downgrade and its indirect consequences such as a contractual obligation to suspend payment of stock dividends was a necessary step in order to carry out the equity offering. Marcus Report at 37-42.

The fraud thus provided the company with a solution to a number of the key short-term concerns Orme had identified for management in May (Brewer Decl. Exh. 19):

- ratings agency and stockholder concerns about the performance of Expanets and Blue Dot. Id. at NOR056239-056240, 056242.

- paying off over $175 million in debt coming due in August and September -- which was ultimately accomplished by using the CSFB revolver. Id. at NOR056239.

- raising significant additional cash through an equity offering, since failure to do so would "likely cause some potentially serious ramifications with certain constituents . . . (particularly the Rating Agencies and Bond Holders)." Id. at NOR056243.

Another key concern Orme identified in this memo was the need to carry out the Transfer, which, as shown below at section III(B), was accomplished through the same fraudulent scheme. Id. at NOR056240.

C.    NorthWestern's Concealed Liquidity Crisis.

Even with the benefits it reaped from the fraud (not least the $175 million in additional cash from the CSFB revolver and $81 million from the equity offering), NorthWestern faced a massive and potentially catastrophic liquidity crisis as it entered the fall of 2002.

# REDACTED

**REDACTED**

This did not happen, and the company's cash position steadily worsened over the summer.[14]

**REDACTED**

---

[14]    Brewer Decl. Exhs. 22 at NOR361932, 23 at NOR361987, 24 at NOR362030, 25 at NOR458118, 26 at
NOR362063, 13 at NOR362079, 14 at NOR362099, 27 at NOR362119, 28 at NOR362139, 29 at NOR362155.

17

In early October, the company (as a result of its systematic fraud) managed to close an equity offering but raised only $82.5 million net, less than half of what it had earlier projected and led the market to expect.

REDACTED

Only three weeks later, even this bleak prognosis was overtaken by events. On October 30, Orme sent a memo to the board acknowledging that it was now clear that the operating targets would not be met, due to increasing problems with both Expanets and Blue Dots. Brewer Decl. Exh. 35 at NOR006177.

REDACTED

18

By early November, NorthWestern was thus in a full-blown crisis and in the process of melting down from sheer lack of cash. But the crisis was still concealed from the public, including the QUIPS holders.[15] See Marcus Report at 47 (had truth been disclosed, it would have been obvious to QUIPS holders prior to the Transfer that the Transfer would injure their interests because of the bleak prospects of repayment by NorthWestern as compared to the prospects of payment by Clark Fork if Clark Fork retained the assets). On November 14, the company issued another fraudulent 10-Q, and the following day carried out the Transfer.

D.    NorthWestern Cannot Preclude Trial on the Issue of Its Concealed Financial Condition as of the November 2002 Date of the Transfer Simply Because It Managed to Stave Off Bankruptcy Until the Following Year

NorthWestern essentially seeks to draw an inference from the passage of time between the Transfer and the bankruptcy filing that its financial condition must have been perfectly fine as of the date of the Transfer. It has not shown and could not show that any such inference would be mandatory for the finder of fact to accept. First, it points out that two quarterly payments were made on the QUIPS following the transfer before payment was suspended. But those payments was simply part of the ongoing cover-up of the fraud. What was finally revealed in April 2003 – almost a billion dollars in losses and write-offs – was an order of magnitude worse than the hints of missed earnings and possible "significant" charges disclosed in December. See Marcus Report Exh. 4 (showing further downgrades by all three ratings agencies shortly following April issuance of 10-K and restated 10-Q's). The interim payments were part of the façade aimed at creating the appearance of business as usual.

---

[15]    NorthWestern claims that it was not actually technically insolvent on November 15. But this is a red herring. Nothing in Judge Case's decision turns on whether its assets exceeded its liabilities as of the instant the transfer was accomplished. Rather, the question is whether it had a reasonable basis to believe that it would be able to meet its obligations as they fell due going forward. The record is sufficient to permit the finder of fact to conclude that it did not. That various desperate contingency plans were being pursued in an effort to stave off bankruptcy does not mean it was reasonable to presume they were guaranteed to work.

REDACTED

Management refused, presumably knowing that doing so would be viewed by the market as a signal that the situation was much worse than the company had acknowledged. Marcus Report at 33. Even at the early November board meeting where the liquidity crisis came to a head, the board approved another dividend payment in order to continue the public concealment of the crisis. Brewer Decl. Exh. 38 at NOR009599 - 009600. See also Marcus Report at 10 & Exh. 3 (showing significant decline in stock price coinciding with February 2003 announcement of suspension of dividends).

Once the truth was more fully disclosed in April, the path to bankruptcy was inevitable, and the pretense of normality no longer could be sustained. No more dividends were paid and QUIPS payments were suspended.[16] The finder of fact can reasonably infer that the same would have happened five or six months earlier had the truth been revealed then, as it should have been. Marcus Report at 30.

NorthWestern also attempts to contend that its financial condition as of the date of the Transfer was perfectly fine by invoking a file memo (Delaney Aff. Exh. 35) from its auditors Deloitte & Touche ("D&T"), documenting the basis for D&T's decision to issue its opinion on NorthWestern's financials as of December 31, 2002 without an express going-concern qualification. This stratagem fails both procedurally and substantively.

---

[16] Indeed, the restated 10-Q for the third quarter of 2002 that NorthWestern released on April 15, 2003 (Brewer Decl. Exh. 39 at 67) admitted: "We will need significant additional capital to refinance our indebtedness as it matures. If we cannot sell sufficient assets or borrow new indebtedness sufficient to repay our indebtedness as it matures in future periods, our ability to fund our operations and service our substantial indebtedness will be adversely affected, and we will default on such maturing indebtedness as well as all other indebtedness that is cross-defaulted to such indebtedness thereby materially and adversely affecting our financial condition and results of operations."

First, the memo is inadmissible hearsay. NorthWestern has conspicuously failed to obtain an affidavit from either of its authors saying that he stands by its conclusions and would so testify at trial. See United States v. Hemmons, 774 F. Supp. 346, 350 n.4 (E.D. Pa. 1991) (inadmissible material "will not be considered on a motion for summary judgment") (citations omitted); In re Hechinger Inv. Co. of Del., Inc., 298 B.R. 240, 242 (Bankr. D. Del. 2003) (movants' exhibits were not considered on motion for summary judgment because they were inadmissible hearsay submitted without supporting affidavits that might have laid foundation for admissibility). Just as seriously, NorthWestern is clearly attempting to use this hearsay memo as a form of expert testimony on its financial condition without having identified anyone from D&T as an expert witness or produced an export report from them by the deadlines imposed by this Court's scheduling order.

Moreover, the unreliability of the D&T memo is manifest on its face. Most basically, its optimism about NorthWestern's capacity to make it through the end of 2003 was rapidly proved to be misplaced by the chapter 11 filing. Furthermore, like almost any work product by auditors, it expressly states that it was based on representations from management, so its credibility rises or falls on the credibility of those representations. Here, management's purported plan to survive the year as documented in the memo included assumptions that over $200 million in cash would be rapidly obtained from disposing of Colstrip and Expanets. Like every prediction and promise management had made on those subjects over the preceding year, these assumptions were false. Nor can they be presumed to be good-faith mistakes, given that concealment of the troubles of both Expanets and the disposition of Colstrip had been principal elements of the fraud in the 2002 financial statements.[17] Whether or not D&T behaved in conformity with its own professional

---

[17] As to Colstrip, the memo assumed the receipt of $65 million in "a relatively short timeframe (i.e. 3-6 months)." What happened? NorthWestern received only $9 million, and received it in May 2005, over two years later. Delaney Aff. Exh. 17 at ¶ 50. As to Expanets, the memo assumed the receipt of $175 million in the near term. What happened? NorthWestern received essentially zero, as it pulled the plug on Expanets' continuing

obligations in accepting these representations, its decision to do so provides no proof, much less dispositive proof, of NorthWestern's true financial condition and its knowledge of it.

III.    THERE IS MORE THAN SUFFICIENT EVIDENCE TO CREATE A GENUINE ISSUE FOR TRIAL ON WHETHER THE PURPORTED SECTION 1102 RELEASE IS INVALID AS A RESULT OF NORTHWESTERN'S FRAUDULENT SCHEME

NorthWestern's no-causation argument hinges almost entirely on the fact that although it deliberately sent copies of its fraudulent financial statements to BONY, as the Indenture required it to do, Delaney Aff. Exh 27 at § 1002, BONY's personnel apparently never actually read them. But NorthWestern ignores both Judge Case's decision and this Court's own prior interpretation of that decision, which expressly held that it "does not condition [plaintiffs'] standing to sue NorthWestern on whether [BONY] relied on NorthWestern's financial statements." [D.I. 86, Case No. 04-1494 ( Sept. 29, 2006 Memorandum Order) at 4.] Rather, Judge Case held more generally that the release would be invalidated if it was obtained "as part of a fraudulent scheme," with the dispositive "fact questions" being "whether [NorthWestern] knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information [NorthWestern] provided the public was in fact false." Magten, 313 B.R. at 603. See also id. at 602 (evidence that NorthWestern "intentionally and fraudulently concealed the fact that its financial condition was much worse then reported publicly" would establish fraudulent scheme sufficient to render release ineffective.).[18]

---

business operations before the end of the second quarter of 2003 (i.e., less than three months after the date of the D&T memo), with Expanets ultimately filing its own chapter 11 bankruptcy. Delaney Aff. Exh. 17 at ¶ 2.

[18]    NorthWestern's attempt to argue that plaintiffs were required to plead in detail the causal connection between NorthWestern's fraud and the release is meritless. Judge Case sustained the original complaint because of the viability of the "fraudulent scheme" argument; he did not dismiss and order the details of the scheme pled in an amended complaint. Notice pleading did not require the details or even the existence of the scheme be affirmatively alleged. The reason for this is clear: the fraudulent scheme is not an element of NorthWestern's prima facie MUFTA case. Rather, the purported validity of the release is a defense NorthWestern is raising to the MUFTA claims in order to defeat plaintiffs' standing. See Fed. R. Civ. P. 8(c) (specifying "release" as an affirmative defense); Amended Answer, D.I. 70 at 15, Case No. 04-53324 (raising alleged lack of standing and alleged lack of status as creditors of Clark Fork as affirmative defenses, in both cases apparently based on the purported release of Clark Fork in connection with the Transfer). The law simply does not require a plaintiff

In yet another attempt to deflect attention from the real issues in this case, Northwestern also argues that it cannot be liable for fraud under the standard set forth in Rochford v. New York Fruit Auction Corp., 116 F.2d 584 (2d Cir. 1940), which deals with implicit representations of solvency and the intent to pay creditors. The Third Circuit has expressly held, however, that this rule only applies when the plaintiff "has not alleged that [the defendant] materially misrepresented its financial position." In re Paragon Sec. Co., 589 F.2d 1240, 1244 (3d Cir. 1978). See also In re Tate-Jones & Co., 85 F. Supp. 971, 982 (W.D. Pa. 1949) (Rochford-like approach only applicable "[w]here no affirmative representations were made to induce a sale"). Here, plaintiffs alleged that NorthWestern materially misrepresented its financial position and, as a direct result of those material misrepresentations, the Transfer (and resulting release) was achieved through fraud. The technical insolvency of NorthWestern is not essential to this inquiry, and the Rochford line of cases is thus inapplicable.[19]

---

to anticipate and negate affirmative defenses in its pleadings. Flight Sys., Inc. v. Elec. Data Sys. Corp., 112 F.3d 124, 127-29 (3d Cir. 1997) (plaintiff not required to plead facts in complaint sufficient to overcome anticipated statute of frauds defense given various potential grounds for avoiding defense that might be developed during discovery); Fed. R. Civ. P. 7(a) (no reply to be filed to defendant's answer unless ordered by court). See also Jones v. Bock, 127 S. Ct. 910 (2007) (rejecting judicially-created heightened pleading requirement that would have essentially required plaintiffs to negate potential affirmative defense).

The first amended complaint was filed not because the original complaint was infirm – it had already survived NorthWestern's 12(b)(6) motion. Rather, it was filed to add a claim for NorthWestern's violation of the Public Utilities Holding Company Act ("PUHCA") that was ultimately overtaken by the subsequent Congressional repeal of that statute, with the brief mention of fraud directed to BONY as an illustrative rather than exhaustive indication of why the release might be invalid. Plaintiffs answered the amended complaint rather than challenging its legal adequacy, and in particular did not raise any claim under Rule 9(b) that fraud was pled in insufficient detail. Any potential 9(b) objection was therefore waived. Huff v. Nationwide Ins. Co., 167 B.R. 53, 58 n.4 (W.D. Pa. 1992), aff'd, 989 F.2d 487 (3d Cir. 1993) (table case); Todaro v. Orbit Int'l Travel, Ltd., 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991).

Beyond the technical pleading issue, NorthWestern has been fully on notice that plaintiffs' arguments on the invalidity of the release were not solely limited to BONY directly reading and relying on the false financials at least since early 2006. See D.I. 66 and 114, Case No. 04-1494.

[19]   Indeed, Judge Case ruled that, under the terms of the Indenture, NorthWestern had not given an implicit representation of its technical solvency as of the date of the Transfer. Magten, 313 B.R. at 600. As Judge Case went on to hold, the real issue in this case is whether there was a fraudulent scheme at NorthWestern that invalidated the Transfer as a whole: "Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack." Id. at 602.

As Judge Case held, if the release was procured by fraud, then it is invalid. Magten, 313 B.R. at 602-03. Here, the purported release was not a separate element of the Transfer for which separate consideration was given. Indeed, there was no document executed at the time of the Transfer by BONY or by anyone else which contained a release. Instead, this purported release automatically became effective by operation of the Indenture upon the date of the Transfer. Its validity, therefore, must be evaluated by analyzing the causal links that led up to the Transfer as a whole.[20] In this context, the central question is not simply whether obtaining the release, in isolation, was the central focus of NorthWestern's fraudulent scheme. Rather, it is whether NorthWestern engaged in a fraudulent scheme that enabled it to carry out the Transfer. In other words, did fraud so infect NorthWestern's operations by November 2002 that the Transfer itself was a product (and even an element) of the overarching fraudulent scheme? If so, the entire transaction (including the release) would be void. As Judge Case noted, "If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect."[21] Id. at 603 (citing RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:4 (4th ed. 2003)).[22] It is simply too narrow to focus (as NorthWestern wishes to do) on what

---

[20]    Recognizing that the inquiry is too narrow if it focuses merely on the technicalities of Transfer, Judge Case noted, "Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms." Magten, 313 B.R. at 603 (emphasis added).

[21]    Judge Case's decision also cited the following authority addressing the invalidity of release when obtained by fraud: Stanley v. Holms, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions); Riggs et al. v. Gillespie, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc., 176 F. Supp. 2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release); Ass'n of Unit Owners of the Deer Lodge Condo. v. Big Sky of Montana, Inc., 798 P.2d 1018 (Mont. 1990); Interdonato v. Interdonato, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

[22]    See also Hodgson v. Kottke Assocs., LLC, No. 06-5040, 2007 U.S. Dist. LEXIS 56205 (E.D. Pa. July 31, 2007) (denying defendant's motion for judgment on the pleadings where a receiver, on behalf of the creditors of a company, claimed that a Settlement Agreement, which included a release, was procured through the

BONY's personnel knew or did not know upon signing the Supplemental Indenture or whether NorthWestern was technically insolvent at the time of the Transfer.

As already shown, there is overwhelming evidence of the intentional falsity of NorthWestern's publicly-disclosed financial information. There is likewise overwhelming evidence of NorthWestern's knowledge prior to the Transfer that it was experiencing a massive liquidity and cash flow crisis, which necessarily cast doubt on its ability to meet its obligations going forward.[23] This is all Judge Case's opinion requires plaintiffs to show. Nonetheless, there is abundant evidence in the record sufficient to establish multiple causal links between the fraudulent scheme and the Transfer, as well as the Transfer's role in the overall scheme.

A.    The Fraud Enabled NorthWestern to Carry Out the Transfer.

Stepping back, NorthWestern's contention that there was no causal linkage whatsoever between the fraud and the transfer is almost laughable. The last affirmative false statement that was part of the fraud was the 10-Q issued November 14, 2002 – the very day before the Transfer. See Brewer Decl. Exh. 4.

REDACTED

Against this backdrop, the notion that a massive asset transfer aimed at holding the

---

fraudulent conduct of an officer of the company); WTM, Inc. v. Henneck, 125 F. Supp. 2d 864, 869 (N.D. Ill. 2000) (on a motion to dismiss, plaintiffs were not necessarily bound by the exclusive remedy of the indemnification clause in the contract where plaintiffs sufficiently allege that "fraud vitiates the making of the contract"); Libhart v. Copeland, 949 S.W.2d 783, 794 (Tex. App. 1997) ("fraud vitiates all transactions").

[23] As discussed at note 15 and its accompanying text, supra, the question of whether NorthWestern was technically insolvent on the date of the Transfer is not essential in determining whether the Transfer (and its purported release) was achieved by NorthWestern's fraudulent scheme.

ratings agencies at bay was some sort of bona fide, ordinary business event whose timing was purely coincidental would require a belief in coincidence that, to put it mildly, the finder of fact would not be obligated to adopt.

Even as to the narrowest possible form of causal linkage, however, NorthWestern's attempt to capitalize on BONY's failure to specifically review the financials it received has been fatally undercut by its own CEO Michael Hanson. NorthWestern does not dispute that BONY read and relied on the officer's certificate executed by Mr. Hanson in connection with the Transfer. See NOR Br. at 22-23. But Mr. Hanson has testified that he reviewed and relied on NorthWestern's financial statements in determining whether to sign the officer's certificate, and that, to the extent they were false, he relied on false information in giving that certificate. Brewer Decl. Exh. 40 at 279, 283 – 285. This testimony by itself is sufficient to permit a finding that the fraud in the financials fatally tainted the officer's certificate on which BONY relied. NorthWestern cannot avoid this conclusion, unless it wishes to contend that no reasonable fact-finder could give credence to its CEO's sworn testimony. Indeed, Hanson executed numerous other documents essential to the consummation of the Transfer, including the basic Asset and Stock Transfer Agreement. Beatty Aff. Exh. 15. See also id. Exhs. 16, 17, 18, 20, 21 (further transactional documents executed by Hanson on behalf of Clark Fork). If the finder of fact were to credit his claim (obviously calculated to limit his own personal liability for breaching his fiduciary duties to Clark Fork) that he only permitted the Transfer to go forward because he had no reason to believe that NorthWestern's fraudulent financials were not accurate, causation would be established beyond any doubt. Brewer Decl. Exh. 40 at 283 - 284.

Moreover, Kipp Orme (NorthWestern's CEO throughout 2002) was directly asked whether the Transfer would have been able to go forward had NorthWestern's true financial condition been disclosed, and refused to answer in order to avoid incriminating himself. Brewer Decl. Exh. 10 at

31.[24] The inference plaintiffs are entitled to as a result of Orme's invocation of the Fifth

Amendment (see cases cited supra at 9-10) is likewise sufficient by itself to establish the causal link

between the fraud and the Transfer if accepted by the finder of fact, and therefore sufficient to avoid

summary judgment.

There is much more evidence establishing the linkage, however. NorthWestern was also

assisted by its fraudulent financials in removing at least two other obstacles to the consummation of

the Transfer. First, on October 23, 2002, a state court in Montana enjoined Clark Fork from

carrying out the Transfer, because it correctly recognized that the Transfer would make any

judgment against Clark Fork in the litigation pending in that court essentially worthless. Brewer

Decl. Exh. 41. Initial attempts to vacate this injunction were apparently unsuccessful, as it was

reaffirmed at a November 4, 2002 hearing, and the Montana court was ultimately induced (on

November 15, the very day of the Transfer) to allow the Transfer to proceed only after

NorthWestern itself agreed to be joined as an additional defendant and be responsible for payment

of any judgment entered against Clark Fork. Brewer Decl. Exh. 42. Plaintiffs did not object to this

resolution. It is obvious that had either plaintiffs or the Court been aware of NorthWestern's true

financial condition, they would not have agreed so quickly to accept this result as offering security

equivalent to litigation against a solvent Clark Fork.

Second, NorthWestern sought and received permission from FERC for the Transfer.

Delaney Aff. Exhs. 12, 13. The application included representations about the financial condition

of NorthWestern's utility business as of June 30, 2002 (its exhibits C, D, and E) which, while

prepared in a distinctive format required for FERC Filings (and different from the format used for

---

[24]    Orme likewise refused to answer questions about whether NorthWestern knew it lacked the ability to pay the
obligations it was assuming and whether the purpose of the fraud had been to effectuate the Transfer, id.,
entitling plaintiffs to the same inference on those factual issues.

NorthWestern's SEC reporting of the same date), were necessarily infected by the fraud in the company's 10-Q for period ended June 30, 2002.

Moreover, the fraud prevented any contemporaneous objections to the Transfer by QUIPS holders or other interested parties. As Mr. Marcus has shown (Marcus Report at 30), had the truth been disclosed it would have been obvious to the QUIPS holders that the Transfer placed the value of their investment in great jeopardy, motivating them to take any and all available steps to block the transaction, including raising concerns with the trustee charged with safeguarding their interests. No doubt, had the holders taken such steps to notify the trustee of their concerns, the trustee would have delayed signing the document and would have taken additional steps to investigate the matter further. Such steps may have included one or more of the following: (i) notifying Clark Fork and NorthWestern of the holders' concerns and asking for further information on the particular issues raised by the holders, (ii) seeking further information from NorthWestern's counsel about the issues raised, (iii) referring the matter to superiors within the bank, (iv) seeking the advice of outside counsel to the trustee (iv) sending a notice to the remaining holders alerting them to the issues raised, and (v) seeking direction from the objecting holders, with appropriate indemnity, that the document presented by NorthWestern not be signed. BONY, on the other hand, having received no such objection and having no actual knowledge of the fraud being perpetrated by NorthWestern passively enabled the Transfer precisely because of the lack of objection by signing upon receipt of the documents enumerated in the Indenture.[25]  Brewer Decl. Exh. 43 at 63 -- 67 (noting no objections received) and at 91:25 – 93:14 (witness would not have known how to proceed if QUIPS

---

[25]  NorthWestern's invocation of a trial court decision (currently being appealed) in separate state court litigation between Magten and BONY is yet another red herring. Whether or not BONY had a mandatory obligation to take certain steps in April 2003 (the question involved in that case), after the Transfer was already a fait accompli, has nothing to do with whether it would have acquiesced in the Transfer in the first place had the truth been disclosed and brought to its attention. Moreover, any purported collateral estoppel effect of that decision (which, as noted above, is currently being appealed) would have no application to Law Debenture, which was not a party to that separate litigation.

holders had raised objections and would have sought advice of senior management and counsel).[26]

See generally ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION AND

MANAGEMENT 174-179 (5th ed. 1998).

Regulatory intervention to impede the Transfer would also have been a strong possibility.

Marcus Report at 30.[27] The MPSC had been originally induced to approve NorthWestern's

acquisition of the equity interest in Clark Fork (with the possibility of a subsequent transaction

similar to the Transfer) by Michael Hanson's promise on behalf of NorthWestern that:

> "[C]apital will be no more expensive with NorthWestern as owner of
> [Clark Fork] than is the case today... While our corporate structure
> may seem complex on first examination, it assures separation of the
> utility related financing from other activities, and it should not create
> any new or additional concerns for this Commission . . . ." Brewer
> Decl. Exh. 44 at NOR044711.

The Transfer broke this promise to the MPSC, and the MPSC recognized that almost immediately.

Shortly after the Transfer had been consummated and the truth about NorthWestern's previously-

concealed financial crisis and the failure of its non-utilities businesses had begun to leak out, the

MPSC bluntly stated that "The performance of the non-utility entities and the resulting threats to the

---

26    Since it was NorthWestern's fraud that prevented the QUIPS holders and others from raising concerns with
      BONY or from otherwise seeking to challenge the Transfer, NorthWestern cannot hide behind the inherent
      lack of absolute certainty as to whether such a challenge was guaranteed to succeed (and in so doing, hold the
      Plaintiffs to an unrealistic standard of causation that no one could prove). The Montana Supreme Court has
      expressly recognized that a compensable injury may be caused by a "loss of chance" to take corrective action
      even when the evidence is insufficient to establish that the lost chance had at least a fifty percent likelihood of
      success. Aasheim v. Humberger, 695 P.2d 824, 826-28 (Mont. 1985). See also Kilduff v. Adams, Inc., 593
      A.2d 478, 482 (Conn. 1991) ("the dispositive issue ... is whether the plaintiffs lost a viable opportunity ... that
      they otherwise would have pursued had the misrepresentations not been made").

27    The MPSC has broad powers of "supervision, regulation and control" over Clark Fork and NorthWestern.
      Mont. Code § 69-3-102. Those supervisory powers include the authority to seek whatever information it may
      require, including by inspection of books and records, examination of officers or agents under oath, or issuance
      of subpoenas. § 69-3-106. Had the true condition of NorthWestern not been fraudulently concealed, the
      MPSC might well have determined prior to the Transfer that, if completed, the Transfer would lead to
      NorthWestern being in violation of § 69-3-504(3) (providing that the aggregate amount of securities
      outstanding and proposed to be outstanding by a public utility not exceed the fair value of its properties and
      business).

29

provision of utility service is unacceptable to this Commission. The cost of borrowing money has been increased due to losses at the non-utility companies." Brewer Decl. Exh. 45 at NOR001611. But by then it was too late for the MPSC to act to block the Transfer, because it was already a fait accompli.[28]

Finally, and just as importantly, it was only the fruits of the ongoing fraudulent scheme that had enabled NorthWestern to still be standing as of November 15 and thus close the Transfer. As detailed above, without the fraud, it would have been in default on the CSFB revolving credit facility no later than mid-August 2002. Without the ability to draw on that facility, it would have been unable to pay off the $175 million in debt that matured during September. Marcus Report 36-37. Likewise, without the fraud, it would have been unable to carry out the equity offering in October by which it obtained another $80+ million. Id. at 37-38. NorthWestern needed both of these cash infusions to avoid a total meltdown; the unavailability of either would have pushed it over the edge.

# REDACTED

---

[28]    That the MPSC would have been highly motivated to block the Transfer had it known the truth and thus concluded that the promise which had induced it to grant advance approval to the transaction was about to be breached is obvious to anyone with both common sense and a modicum of understanding of how regulatory agencies typically function. It requires no arcane expertise. See also infra at n.36.

Moreover, when NorthWestern itself forestalled both investors and regulators from taking action by fraudulently concealing the true facts that would have made the need for action apparent, it cannot then insist on proof of reliance and causation that could never be satisfied under real-world conditions. Indeed, it is precisely because it is always impossible to prove without some degree of conjecture that a plaintiff affirmatively relied on an omission (in other words how would the plaintiff have acted if in possession of knowledge that was not, in fact, available) that direct and conscious reliance is not necessary in omission-based fraud cases. Rather, all that need be shown is that the omission was sufficiently material that a hypothetical investor would have considered it significant. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972); Sharp v. Coopers & Lybrand, 649 F.2d 175, 187 (3rd Cir. 1981).

REDACTED

Absent some extraordinary and counterfactual rescue operation, the availability and success of
which the finder of fact would be perfectly free to doubt, an accelerated chapter 11 filing before
NorthWestern had the opportunity to consummate the Transfer would have been almost inevitable.
Even NorthWestern cannot claim that it would have been able to induce BONY to approve the
Transfer in the face of a bankruptcy filing.[31]

Far from being excessively "attenuated," any or all of these different causal routes, each
independently linking the Transfer to NorthWestern's fraudulent scheme, were eminently
foreseeable. NorthWestern's apparent contention that it certainly intended to commit financial
fraud on some other victims, but the resulting ability to consummate the Transfer was an
unpredicted and unintended side effect need not be credited.[32] NorthWestern's publicly reported

---

[29]

REDACTED

[30]

REDACTED

[31]    Among other things, such an event would have caused an immediate default under the indenture. Delaney Aff.
        Exh. 27 at § 801(e). Indeed, because NorthWestern had already become a co-obligor as of August, Delaney
        Aff. Exh. 31, a default would have been caused even without the Transfer.

[32]    See In re Americana Servs., Inc., 175 B.R. 1018, 1022 (W.D. Mo. 1994) (in holding that defendants
        fraudulently transferred assets from the debtor's estate, the court held that "a party must be presumed to have
        foreseen and intended the necessary consequences of his own act [and] the transaction itself is conclusive
        evidence of a fraudulent intent.") (citing Citizens Nat'l Bank v. Cook, 857 S.W.2d 502 (Mo. Ct. App. 1993));
        In re Virginia Hall, 109 B.R. 149, 155 (W.D. Pa. 1990) (holding that defendant debtor's intent to deceive
        plaintiff creditor was presumed by publication of its materially false financial statements and "it may be
        assumed that a debtor intends the natural, foreseeable consequence of his/her actions" of publishing false

financial disclosures (including the fraudulent 10-Q's for the second and third quarters of 2002) were specifically intended for the use of, among others, the holders of the QUIPS. Indeed, in August 2002 NorthWestern's board took steps to eliminate Clark Fork's separate SEC reporting obligations, giving the QUIPS holders only NorthWestern's filings to rely on. Delaney Aff. Exh. 23 at NOR009573-77. See also Brewer Decl. Exhs. 5 at 11; and 46 at 9 (portions of 10-Q's giving breakout of numbers between Clark Fork and parent for benefit of QUIPS holders).[33]

B.    The Transfer Was an Integral Part of the Fraudulent Scheme.

Indeed, NorthWestern's desire to accomplish the Transfer arose from the same motive as its overall motive for the whole fraud and its need to accomplish the Transfer grew greater as it became more enmeshed in the fraud. It needed to keep the ratings agencies at bay and maintain access to fresh capital while keeping its troubles concealed – in the ultimately vain hope that it would find a way to solve them. .

# REDACTED

---

financials). See also NLRB v. Local 542, 542-A, and 542-B, Int'l Union of Operating Eng'rs, 485 F.2d 387, 392 (3d Cir. 1973) ("a party is presumed to intend the natural, foreseeable consequences of its acts").

[33]    Likewise, NorthWestern does not deny that it sent the fraudulent financial statements directly to BONY, as it was obligated to do. It cannot now claim to be surprised that there might be some causal relationship, whether direct or indirect, between those false documents and the ultimate consummation of the Transfer. Moreover, given NorthWestern's knowledge of its liquidity crisis in the period running up to the Transfer, it was also eminently foreseeable that NorthWestern's impending financial collapse would expose its most junior creditors to a disproportionate risk of injury, and that the Transfer would move the QUIPS holders into that position from their prior status as structurally senior to all parent-level creditors.

Consistent with Orme's understanding, the ratings agencies publicly expected the Transfer throughout 2002 (Marcus Report at 23), and their ratings were contingent on that expectation. The fraudulent concealment of the failure of Expanets and Blue Dot also headed off downgrade, as Orme and other senior management must have known, hoped, and expected. The failure of the October equity offering (already delayed from its initial schedule) to raise anywhere near the $200 million originally anticipated was a disappointment to the agencies, and led to some downgrades. Marcus Report at 23.

The markets were becoming skeptical and it became increasingly clear to management by October that the concealment of the catastrophic failure of Expanets and Blue Dot could not be continued indefinitely, as was subsequently demonstrated by the belated December 13 announcement of potential writedowns, followed in short order by downgrades. Delaney Aff. Exh. 16; Marcus Report at Exh. 4 (indicating Moody's and S&P downgrades on December 20 and 30, respectively). Thus, the only way to stave off doom was to consummate the Transfer and get the benefit of the direct control of the valuable Montana assets before the roof caved in. This explains the urgency in the affidavit NorthWestern caused to be submitted to a Montana state court seeking to vacate the injunction that had been entered against the Transfer. Brewer Decl. Exh. 47. Any delay in the Transfer, the affidavit admitted, would likely lead to a ratings downgrade which could impair the company's access to new capital – new capital it knew internally it needed for its immediate survival.

Indeed, NorthWestern's last doomed attempt to postpone its inevitable demise could not have been attempted unless the Transfer had first been completed. Since no one was willing to advance any more funds to NorthWestern on an unsecured basis, the assets NorthWestern received via the Transfer were used as the principal collateral for the new $390 million secured loan from a syndicate headed by CSFB (with which it paid off the maturing CSFB revolver while also receiving

incremental new cash). Marcus Report at 31 (noting that $280 million of the collateral derived from the Montana assets). Recognizing that those assets were the best collateral the company had available to it, Gary Drook's urgent directive to Lewis and Hylland (dated November 15 – the same day the Transfer occurred) specified replacing the existing CSFB facility and using the Montana assets as collateral to support a replacement facility as priorities number one and two. Brewer Decl. Exh. 36 at NOR024847 (noting that "time is of the essence").

Using the Montana assets as collateral required the approval of the MPSC, which ultimately gave it with great reluctance by a 4-1 vote. It is clear from the face of the opinion (Brewer Decl. Exh. 45 at 10) that it understood that the Montana assets were being used to raise cash necessary to cover the previously-concealed losses and was extremely unhappy about the situation:

> "The Commission views the financial condition of NorthWestern with great concern. . . . The Commission is dismayed at the erosion of NorthWestern's credit ratings to either the lowest investment grade or to junk status. The performance of the non-utility entities and the resulting threats to the provision of utility service is unacceptable to this Commission. The cost of borrowing money has been increased due to losses at the non-utility companies." Id. at 5-6.[34]

The MPSC also noted its disapproval of NorthWestern's lucrative compensation arrangements with its senior executives which had previously been concealed from it, and directed their immediate cessation. Id. at 6-7. Nonetheless, approval was forthcoming because the MPSC was faced with a fait accompli. As a result of the Transfer, the former Clark Fork assets had been inextricably commingled with the liabilities associated with NorthWestern's failed unregulated businesses – the very failure which had been concealed by the fraudulent scheme still in effect at the time of the Transfer. Because those liabilities were now in a position to drag down the utilities business, the

---

[34]    Hanson, of course, had previously promised the MPSC that the nonutility businesses would have no negative impact on the utility's access to capital. Brewer Decl. Exh. 44 at NOR044711.

MPSC could not refuse to allow the assets to be used as collateral without jeopardizing the Montana customers it was charged with protecting.[35]

NorthWestern appears to be attempting to create a distraction on this issue by claiming that Mr. Marcus is not qualified to opine on how the MPSC would have ruled under different circumstances (apparently because no one, certainly including NorthWestern's own experts, could do so). NOR Br. at 29-33. This misses the point.[36] The MPSC approval of the new secured CSFB

---

[35]    The dissenting commissioner, however, felt so strongly that he was unwilling to acquiesce in trying to ameliorate the situation NorthWestern itself had created by the combination of its fraud and the Transfer, saying:

"The Commission has a duty to see that the utility owner lives up to legitimate obligations to manage the utility assets in a way that is not detrimental to the customers and the public interest....The applicant has presented the Commission with a "fait accompli" by using part of the credit facility used in the purchase of MPC to finance non-utility ventures.... [T]he applicant is in desperate financial conditions and the utility itself is threatened by the conditions that face the applicant....Profits, losses or catastrophic failures of non-utility operations are beyond regulatory reach, hence regulated assets should not be tendered as security for those business ventures." Brewer Decl. Exh. 45 at 12.

[36]    Mr. Marcus has a vast knowledge of the utility business, a highly regulated field, and in his work, he has had substantial experience in financing utility companies and dealing with utility regulators of several states. Marcus Report at 36, 40-41.

Contrary to NorthWestern's interpretation, CFM Commc'ns, LLC v. Mitts Telecasting Co., 424 F. Supp. 2d 1229 (E.D. Cal. 2005), does not create a strict rule of law prohibiting experts from opining on how regulatory bodies work. Instead, the expert in that case had submitted a report that "read[] like a legal brief." Id. at 1235. He also submitted a supplement in which he opined that the FCC was "virtually certain" to act in a specific way regarding the plaintiff based on his interpretation of three recent FCC rulings. Id. at 1236. To the extent that the expert's report made legal conclusions, the court's decision to strike that portion of his testimony was not extraordinary. It is well established that expert testimony should not embody legal conclusions. See Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) ("an expert witness is prohibited from rendering a legal opinion"); Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc., No. 99 Civ. 1725, 2003 U.S. Dist. LEXIS 6150, at *13 (S.D.N.Y. April 11, 2003).

Unlike the expert in CFM, Mr. Marcus does not profess to opine on the MPSC's likely actions under different circumstances with virtual certainty. Instead, his expertise allows the trier of fact to understand, as a practical matter, how the utility business operates, including the importance of addressing and anticipating regulatory concerns. As a subset of that, his extensive knowledge of the utility business can aid the trier of fact in understanding how the regulatory process works and what utility regulators consider important. It is well established that experts are permitted to testify to such matters. See Georgia Cas. & Sur. Co. v. Atmos Energy Corp., No. 4:05-CV-87 (CDL), 2007 WL 4287720, at *2-3 (M.D. Ga. Dec. 4, 2007) (permitting plaintiffs' expert to testify to the content and importance of federal regulations regarding pipeline safety where plaintiff had considerable experience in the gas industry); Cary Oil Co., Inc., 2003 Dist. LEXIS 6150, at *10-11 (permitting plaintiffs' expert to testify to the "general overview" of the Commodity Futures Trading Commission and it regulations of futures trading as it would aid the jury in understanding "background issues involved in [the] dispute centered in an intricate regulatory scheme").

facility followed the Transfer. The injury to plaintiffs was already complete and was not affected by that approval (non-approval would presumably simply have led to an earlier bankruptcy filing and commencement of the same litigation the parties now find themselves in). NorthWestern cannot claim with any certainty or even plausibility that it would have been able to secure MPSC approval under different circumstances: where it had not yet been able to carry out the Transfer but needed and desired to raise immediate cash for itself by using Clark Fork's assets as collateral (because, for example, the equity offering had failed or CSFB had barred further draws on the existing revolver because of covenant violations).

If Mr. Marcus cannot be absolutely certain how the MPSC would have ruled under those significantly different circumstances, neither can anyone else. But anyone with common sense (with or without the benefit of expert testimony) can see that obtaining MPSC approval for the use of these assets as collateral would have been much more challenging if the Transfer had not already occurred, and the assets were thus still held by Clark Fork rather than already having been commingled with NorthWestern's assets (and, more importantly, its liabilities). This is simply a specific example of the benefit NorthWestern explicitly expected from the Transfer in the August 7 board resolution: that the assets once moved upstream could "more directly support the obligations of the Corporation." Delaney Aff. Exh. 23 at NOR009571. That the Transfer worked as intended is simply further confirmation of its linkage with the fraudulent scheme, rather than some benign independent transaction that occurred simultaneously with the fraud by mere happenstance.

C.    NorthWestern's Asserted Concern About Its PUHCA Exemption Does Not Overcome or Negate the Effects of Its Fraud.

Finally, it may be necessary to dispel the confusion NorthWestern has sought to sow by its invocation of a purported non-fraudulent motivation for the Transfer. NorthWestern claims that the Transfer was necessary to avoid the need to comply with PUHCA's registration requirements. But NorthWestern also claims (NOR Br. at 9; Patrizia Decl. ¶¶ 10-11, 14) that it received an exemption

36

from those PUHCA requirements in February 2002 that was good for 18 months (thus, until August 2003).[37] There was thus no urgency in completing the Transfer at any particular point in time; the potential PUHCA issue arising from the Milltown Dam was apparently solved by mid-2003.  Even the former lawyer enlisted as a purported fact witness concedes, as he must, that NorthWestern's motives were at a minimum mixed:  it also desired to carry out the Transfer in order to satisfy "the ratings agencies and capital markets."  Patrizia Decl. ¶¶ 4, 8.[38]

The evidence is more than sufficient for the finder of fact to determine that NorthWestern's urgency in ramming through the Transfer in November 2002 was not motivated by the expiration of the PUHCA exemption that was still nine months in the future, but by the very real fear that the company's fraudulent concealment of its financial distress could not endure much longer.[39]  More fundamentally, however, NorthWestern points to no authority for the improbable claim that a desire to comply with PUHCA can somehow validate an otherwise fraudulent transfer.  PUHCA did not

---

[37]    Interestingly, while NorthWestern now claims that it definitively decided to pursue the going-flat strategy in late 2001 (prior to the MPSC's approval of its purchase of Clark Fork), it points to no evidence that it ever told the MPSC about this decision before receiving its approval for the purchase on January 31, 2002. NorthWestern's application to that agency (Delaney Aff. Exh. 7 at 14) indicated that it well might operate in a holding company structure indefinitely and wanted to keep its options open.  The first public document it points to in which it committed to the going-flat strategy is its February 14, 2002 Form U-1 filed with the SEC (Delaney Aff. Exh. 4), only after the MPSC final approval had already been obtained.

[38]

REDACTED

[39]    The finder of fact will also be entitled to be skeptical of the sincerity of NorthWestern's purported concern with its PUHCA obligations given that it was systematically violating its other obligations under the securities laws at the exact same time.  Moreover, there are substantial grounds to believe that NorthWestern acted in bad faith when it obtained the limited PUHCA exemption it now seeks to rely on.  The First Amended Complaint herein set forth an additional liability theory based on NorthWestern's PUHCA violations.  Only the subsequent Congressional repeal of PUHCA has prevented those issues from being directly litigated in this case.

mandate the Transfer, nor did it authorize fraudulent means of carrying it out. Assuming the

original exemption was lawfully obtained, PUHCA mandated only that, by August 2003,

NorthWestern either comply with PUHCA's registration requirements or seek an extension of the

existing exemption.

## IV.    NORTHWESTERN'S ATTACK ON THE UNJUST ENRICHMENT CLAIM FAILS FOR THE SAME REASONS

The sole basis NorthWestern raises to ask for judgment in its favor on plaintiffs' fifth cause

of action for unjust enrichment (NOR Br. at 38) is the seemingly uncontroversial proposition that

unjust enrichment will not lie when the benefit received by defendant was received pursuant to a

valid contract. But this is simply another variation on the theme Judge Case rejected at the outset of

the case: the contention that the Indenture authorized the Transfer and therefore no possible

liability can arise.[40] Judge Case held that purported technical contractual authorization did not

shield NorthWestern's actions if the Transfer and its enabling documents were tainted by the

fraudulent scheme. Magten, 313 B.R. at 602. Moreover, Judge Case's decision refused to dismiss

plaintiffs' unjust enrichment claim, which was present in the original complaint (Id. at 597), or even

expressly condition the viability of that claim on proof of the fraudulent scheme, and NorthWestern

cannot relitigate that decision now.[41]

---

[40]    In any event, the existence of the Indenture does not necessarily preclude an action by Magten on a theory of unjust enrichment. See Cantor Fitzgerald, L.P. v. Cantor, No. C.A. 16297, 1998 WL 326686, at *6 (Del. Ch. June 16, 1998) (claim for unjust enrichment will survive notwithstanding the existence of an express contract between the parties where the conduct that is the subject of the claim is not governed exclusively by the contract).

[41]    NorthWestern cites no factual evidence developed in discovery relevant to the unjust enrichment claim: its motion is based on the same purely legal arguments of technical compliance with the Indenture that were presented without success to Judge Case. Indeed, NorthWestern conceded in its opening brief before Judge Carey, D.I. 5 at 21, Case No. 04-53324, that the unjust enrichment claim stood or fell with the fraudulent conveyance claims and was not subject to any additional defenses.

## CONCLUSION

For the foregoing reasons, NorthWestern's motion should be denied in all respects and

plaintiffs' claims adjudicated on their merits at trial.


Dated:   Wilmington, Delaware
         December 21, 2007


**BLANK ROME LLP**                              **SMITH, KATZENSTEIN & FURLOW, LLP**


*Dale R. Dubé*                                  /s/ Kathleen M. Miller
Dale R. Dubé (DE No. 2863)                      Kathleen M. Miller (DE No. 2898)
David W. Carickhoff (DE No. 3715)               800 Delaware Avenue, 7th Floor
1201 Market Street, Suite 800                   P.O. Box 410
Wilmington, DE 19801                            Wilmington, DE 19899
Telephone: (302) 425-6400                       Telephone: (302) 652-8400
Facsimile: (302) 425-6464                       Facsimile: (302) 652-8405

Bonnie Steingart                                John V. Snellings
Gary L. Kaplan                                  Amanda Darwin
John W. Brewer                                  **NIXON PEABODY LLP**
**FRIED, FRANK, HARRIS, SHRIVER**               100 Summer Street
   **& JACOBSON LLP**                           Boston, MA 02110
One New York Plaza                              Telephone: (617) 345-1201
New York, NY 10004                              Facsimile: (866) 947-1732
Telephone: (212) 859-8000
Facsimile: (212) 859-4000                       *Counsel for Law Debenture Trust*
                                                *Company of New York*
*Counsel for Magten Asset Management*
*Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2008, I served by hand delivery and electronic filing the Public Version of the BRIEF OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK IN OPPOSITION TO NORTHWESTERN CORPORATION'S MOTION FOR SUMMARY JUDGMENT using CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

I also certify that, on this 4th day of January, 2008, I served the aforementioned document, by e-mail and Federal Express, upon the following participants:

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
Browning, Kaleczyc, Berry & Hoven, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Myles Bartley, Esquire
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061

_Dale R. Dubé_
Dale R. Dubé  (No. 2863)