# UNREPORTED CASES

Westlaw.

Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
**(Cite as: Not Reported in A.2d)**

**H**

Fitzgerald v. Cantor
Del.Ch.,1998.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Cantor FITZGERALD, L.P., Plaintiff,
v.
Iris CANTOR, Individually, and as De Facto Trust-
ee of the Cantor Family Trust, and Iris Cantor as
Trustee of the Michelle Labozzetta Trust, Iris Can-
tor as Trustee of the Suzanne Fisher Trust, Iris Can-
tor as Trustee of the Howard Lutnick Trust, Iris
Cantor as Trustee of the Stuart Fraser Trust, Iris
Cantor as Trustee of the Monica Muhart Trust, and
Iris Cantor as Trustee of the Randi Ross Trust, Can-
tor Fitzgerald Incorporated, Rodney Fisher, Market
Data Corporation and Chicago Board Brokerage,
L.L.C., Defendants.
**No. C.A. 16297.**

Submitted June 3, 1998.
Decided June 16, 1998.

Rodman Ward, Karen L. Valihura, Joseph M. Asher
and George F. Fraley, III of Skadden, Arps, Slate,
Meagher & Flom, Wilmington, Delaware, of coun-
sel Thomas J. Schwarz and Jeremy A. Berman of
Skadden, Arps, Slate, Meagher & Flom, New York
City, for plaintiff.
Lawrence C. Ashby, Stephen E. Jenkins, Richard
D. Heins and Richard I.G. Jones, Jr. of Ashby &
Geddes, Wilmington, Delaware, of counsel, Jack C.
Auspitz and Howard E. Heiss of Morrison & Foer-
ster, New York City, Steven M. Weinberg of Wein-
berg Sullivan, Phoenix, Arizona; Barry I. Slotnick,
J. Lawrence Crocker and Joshua T. Rabinowitz of
Slotnick Shapiro & Crocker, New York City, David
F. Dobbins and Saul B. Shapiro of Patterson,
Belknap, Webb & Tyler, New York City, for de-
fendants Iris Cantor, Cantor Fitzgerald Incorpor-
ated, Rodney Fisher and Market Data Corporation.
Martin P. Tully and William Lafferty of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,

of counel Josef J. Riemer, Ellen M. Moskowitz and
Mark A. Racanelli of Kirkland & Ellis, New York
City, for defendant Chicago Board Brokerage,
L.L.C.

**MEMORANDUM OPINION**

STEELE, Vice Chancellor.
**\*1** Cantor Fitzgerald, L.P. ("CFLP" or "Plaintiff"),
a Delaware limited partnership, alleges that three of
its limited partners, working through a Delaware
corporation under their control and in conjunction
with an unassociated Delaware limited liability cor-
poration, have developed a product that will com-
pete directly with CFLP's core business. Plaintiff
CFLP seeks a preliminary injunction against all five
defendants to prevent the new product's launch on
July 13, 1998. Plaintiff may obtain a preliminary
injunction if it establishes the following three ele-
ments: (1) a reasonable likelihood of success on the
merits, (2) imminent, irreparable harm will result if
an injunction is not granted and (3) the damage to
Plaintiff if the injunction does not issue will exceed
the damage to the defendants if the injunction does
issue.[FN1]Decision on the application for a Prelim-
inary Injunction is reserved until the record may be
supplemented on the issues of the existence of imm-
inent, irreparable harm and whether the balance
of the equities favors the issuance of the injunction.

> FN1.*Mills Acquisition Co. v. Macmillan,
> Inc.,* Del.Supr., 559 A.2d 1261, 1279
> (1988).

In the underlying Complaint, Plaintiff alleges
breach of fiduciary duty, breach of contract and un-
just enrichment claims against the three limited
partners. It alleges aiding and abetting, tortious in-
terference and unjust enrichment claims against the
Delaware corporation and limited liability com-
pany.[FN2]Defendants have moved to dismiss all
claims pursuant to Rule 12(b)(6) or for Judgment
on the Pleadings pursuant to Rule 12(c). As to the
fiduciary duty and contract claims, defendants' Mo-
tions to Dismiss and joint Motion for Judgment on
the Pleadings are denied. As to the unjust enrich-

ment claims, the Motions to Dismiss/joint Motion for Judgment on the Pleadings are granted with respect to the three limited partners and denied with respect to the Delaware corporation and limited liability company.

> FN2. At the parties' request, this Opinion does not address four additional counts of the Complaint.

## BACKGROUND

Plaintiff CFLP is a leading inter-dealer and institutional broker of United States Treasury securities and other government securities. Three of the defendants in this action, Iris Cantor ("Cantor"), Rodney Fisher ("Fisher"), and Cantor Fitzgerald Incorporated ("CFI") (collectively "Limited Partner Defendants"), are Limited Partners in CFLP. Cantor, in addition to being a Limited Partner of CFLP, is also the Vice Chairman of CFLP and the owner FN3 and CEO of CFI.

> FN3. Cantor owns CFI through the Iris Cantor Trust, of which Cantor is grantor, trustee and sole beneficiary.

Market Data Corporation ("MDC"), a fourth defendant in this action, is a Delaware corporation in the business of distributing financial data and of licensing software and technology for electronic trading systems. CFLP spun off MDC in 1987 in order to enhance the focus of MDC's business as a separate profit center. Cantor is majority shareholder of MDC FN4, and Fisher is MDC's Chairman and CEO.

> FN4. Cantor is the majority shareholder of MDC through the Iris Cantor Trust.

The fifth defendant is Chicago Board Brokerage, L.L.C. ("CBB"), a Delaware limited liability company. CBB is a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane, a broker/competitor of CFI. "CBB was formed to develop a new and more efficient way of brokering and trading Treasuries-through an interactive elec-

tronic trading system...." FN5

> FN5. CBB's Memorandum of Law is Support of Its Motion to Dismiss the Complaint at 2-3 (hereafter "CBB's Open. Dismiss Br.").

**\*2** CFLP filed this action after CBB announced that, on July 13, 1998, it will launch a new electronic trading system called "MarketPower." CFLP contends the new system is intended to compete directly against CFLP in its "historic core business"-the brokerage of U.S. Treasuries. CBB concedes that, through MarketPower, it "intends to bring full and fair competition to the Treasuries market," which is currently "dominated by plaintiff CFLP." FN6 CBB developed the specifications for MarketPower and searched for approximately four years for a vendor to build the system. Ultimately, CBB chose MDC as its vendor because "it committed to develop the software on a timetable acceptable to CBB and because [it] could produce the software on acceptable financial terms." FN7

> FN6. CBB's Open. Dismiss Br. at 3.

> FN7. CBB's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 4 (hereafter "CBB's Opposing P.I. Br.").

Although CBB did not sign a formal contract with MDC until February 9, 1998, and did not announce the impending launch of MarketPower until March 19, 1998, CFLP learned from one of its employees that MDC was close to signing a contract with CBB to develop an electronic trading system at least as early as September of 1997. On October 6, 1997, CFLP sent a letter to Cantor, Fisher and MDC objecting to MDC's role as CBB's software vendor. CFLP claimed that the activity constituted a breach of the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. ("1996 Limited Partnership Agreement" or "1996 Agreement"). CFLP knew that its warnings were going unheeded, however, in November of 1997, when a CFLP employee attended a high-profile, industry-wide, public demonstration of the MarketPower software that MDC

Not Reported in A.2d    Page 3
Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
(Cite as: Not Reported in A.2d)

built for CBB. Plaintiff did not initiate this action until April 6, 1998.

Plaintiff never expressed any concern directly to CBB about the propriety of using MDC as CBB's software vendor. Nevertheless, CBB learned of the allegations in CFLP's October 6, 1997, letter through MDC. Fisher assured CBB, however, as he had from the start of the companies' negotiations in June of 1997, that CFLP and MDC were separate companies and that CFLP's allegations were baseless. In fact, the Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation (the "CBB/MDC Software Licensing Agreement") provides that if CFLP ever materially interferes with MDC's participation in the CBB/MDC deal, MDC will be in material breach of the CBB/MDC Software Licensing Agreement, and CBB may terminate the agreement and look to its rights as stated in paragraphs 8.3 and 11.3. Thus, between October of 1997, and April of 1998, in reliance on MDC's assurances, CBB "made substantial commitments ... to prepare for the launch of MarketPower, including hiring more staff and undertaking the significant task of building a network to support the system."[FN8] Despite seeing caution flags waved, CBB intends to launch as scheduled, on July 13, 1998.

FN8. CBB's Opposing P.I. Br. at 8.

### CONTENTIONS OF THE PARTIES

Count I of the Complaint alleges that the Limited Partner Defendants, by allowing or causing MDC to collaborate with CBB to develop and sell a product intended to compete directly against CFLP in its "historic core business," breached a fiduciary duty of loyalty owed to CFLP and breached section 3.03(b) of the 1996 Limited Partnership Agreement. Count III of the Complaint alleges that Cantor and CFI breached section 3.03(a) of the 1996 Agreement. Counts II and IV of the Complaint, respectively, allege that MDC and CBB, by collaborating on the development and sale of MarketPower, aided and abetted the Limited Partner Defendants' breach of their duty of loyalty and tortiously interfered

with the 1996 Limited Partnership Agreement. Count V alleges a claim of unjust enrichment against all five defendants.

*3 Shortly after filing the Complaint, CFLP filed a Motion for Preliminary Injunction to prevent the July 13, 1998, launch of MarketPower. CFLP contends that it has at least a reasonable likelihood of success on the merits, based on its interpretation of the 1996 Limited Partnership Agreement and based on Delaware's case law concerning the fiduciary duty of loyalty and accomplice liability. CFLP also contends that, if MarketPower is allowed to be released in July, CFLP will suffer irreparable harm in the form of, *inter alia,* loss of customers and of market share. Finally, CFLP argues that the harm it will suffer if the Court refuses to issue an injunction substantially outweighs the harm that defendants will suffer if the Court grants the injunction. All five defendants contest Plaintiff's arguments and oppose the Motion for Preliminary Injunction.

Fisher, MDC and CBB have filed Motions to Dismiss the Complaint for failure to state a claim. Because Cantor and CFI had already filed their Answer, they were prohibited from filing a Motion to Dismiss and instead filed a joint Motion for Judgment on the Pleadings ("J.O.P."). Rather than respond to the defendants' Motions to Dismiss/Motion for J.O.P. directly, CFLP filed a Motion for Leave to File Amended Complaint. CFLP contends that the proposed Amended Complaint has fixed any problems that may have existed in the original Complaint. As to the defendants who have not yet filed a responsive pleading, CFLP may amend the Complaint as of right.[FN9] However, with respect to Cantor and CFI, CFLP must obtain this Court's permission to file an Amended Complaint.[FN10]

FN9. Ct.Ch.R. 15(a).

FN10. Ct.Ch.R. 15(a). A party may also amend its complaint by written consent of the adverse party, but there has been no written consent in this case.

This Court liberally grants motions to amend "unless there is a showing of substantial prejudice

or legal insufficiency."[FN11]Cantor and CFI oppose CFLP's Motion to Amend on the basis of legal insufficiency. The standard for assessing the legal sufficiency of a proposed Amended Complaint is the same standard applicable to a Motion to Dismiss.[FN12]Therefore the Court's decision on defendants' Motions to Dismiss, which follows, implicitly decides Plaintiff's motion to amend the Complaint as well.

> FN11.*Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1996 WL 189435 at *3, Allen, C. (Apr. 16, 1996).

> FN12.*Moore Business Forms, Inc. v. Cordant Holdings Corp.,* Del.Ch., C.A. No. 13911, 1995 WL 707877 at *2, Jacobs, V.C. (Nov. 30, 1995).

### THE 1996 LIMITED PARTNERSHIP AGREEMENT

Section 3.03(b) of the 1996 Limited Partnership Agreement states:
"Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity."

The Limited Partner Defendants are "Partners," [FN13] and Plaintiff contends they are, as a result, bound by the terms of section 3.03(b). CFLP contends that the Limited Partner Defendants, by allowing MDC to contract with CBB to develop a product that will compete with CFLP in its core business, breached their fiduciary duty of loyalty to CFLP and took an action that would reasonably be expected to harm CFLP.

> FN13. The 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P., § 1.01 (hereafter "1996 Limited Partnership Agreement"), defines "Partner," in part, as "the General Partners and the Limited Partners."

Section 3.03(a) states, in pertinent part:

"Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided,* that such activities do not constitute Competitive Activities."[FN14]

> FN14. 1996 Limited Partnership Agreement § 3.03(a) (italics in original). Cantor and MDC appear to be Affiliates of CFI.1996 Limited Partnership Agreement § 1.01. (defining "Affiliate" as any person or entity "that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified [person or entity]").

**\*4** The 1996 Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:
"[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner ...
(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity ...
(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or
(v) assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv)."[FN15]

> FN15. A Competing Business: "(i) involves the conduct of the wholesale or in-

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
**(Cite as: Not Reported in A.2d)**

stitutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged [in] by the Partnership or an Affiliated Entity...." 1996 Limited Partnership Agreement § 11.04(c).

CFLP contends that the Limited Partner Defendants, by allowing or causing MDC to help CBB develop and sell MarketPower, have: (1) "solicit[ed] the customers of CFLP to reduce their volume of business with CFLP" in violation of section 11.04(c)(ii), (2) "directly engag[ed] in a Competing Business" in violation of section 11.04(c)(iv) and (3) "assist[ed] others in engaging in [a] Competing Business" in violation of section 11.04(c)(v).[FN16]

> [FN16.] Plaintiff's Opening Brief in Support of Its Motion for Preliminary Injunction at 15. The quotation includes Rodney Fisher, but CFLP has apparently since conceded that § 3.03(a) of the 1996 Agreement does not apply to Fisher.

This is the Court's decision on defendants' Motions to Dismiss and joint Motion for J.O.P.

## DISCUSSION

A cause of action may be dismissed pursuant to Rule 12(b)(6) for failure to state a claim when, assuming the truth of all well-pleaded facts in the Complaint and construing all inferences to be drawn from those facts in the light most favorable to the non-moving party, the Court is convinced that there is no set of facts under which the plaintiff would be entitled to relief.[FN17] The Court may consider facts contained in documents incorporated into the complaint by reference when deciding a motion to dismiss.[FN18] The 1996 Limited Partnership Agreement and the CBB/MDC Software Licensing Agreement are incorporated by reference into CFLP's Amended Complaint.

> [FN17.] *Union Texas Petroleum Holdings, Inc. v. Travelers Indem. Co.,* Del.Ch., C.A. No. 15548, 1998 WL 83068 at *3, Chandler, C. (Feb. 19, 1998).

> [FN18.] *See e.g., In re Santa Fe Pacific Corp. Shareholder Litigation,* Del.Supr., 669 A.2d 59, 69-70 (1995) (considering joint and supplemental proxy statements on motion to dismiss disclosure action and suggesting appropriateness of considering underlying contract in action for its breach).

The legal standard applicable to a Motion for J.O.P. differs from the standard applicable to a Motion to Dismiss. Although the Court is still required to assume the truth of all well-pleaded facts in the Complaint and to construe all inferences to be drawn from those facts in the light most favorable to the non-moving party, just as on a motion to dismiss, "[a] motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[FN19]

> [FN19.] *Desert Equities v. Morgan Stanley,* Del.Supr., 624 A.2d 1199, 1205 (1993).

Counts I and III of the Amended Complaint allege that the Limited Partner Defendants breached their duty of loyalty to CFLP and the 1996 Limited Partnership Agreement. The 1996 Agreement clearly states that all Limited Partners owe CFLP a duty of loyalty and agree to take no action that would reasonably be expected to harm CFLP. The Agreement also states that CFI and its Affiliates may not engage in Competitive Activities or Competing Businesses. The Amended Complaint alleges that the Limited Partner Defendants, while Limited Partners of CFLP, allowed MDC to contract with CBB to develop and sell a product that will compete directly against CFLP in its core business of brokering U.S. Treasuries. The underlying facts, stated in the Amended Complaint, if true, would seem to support an inference of (a) a breach of the Limited Partners' duty of loyalty, (b) harm to CFLP, (c) a Competit-

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
**(Cite as: Not Reported in A.2d)**

ive Activity and (d) a Competing Business.

**\*5** The Limited Partner Defendants contend, among other arguments, that regardless of the 1996 Limited Partnership Agreement's terms [FN20], they have earned the right to allow or cause MDC to compete with CFLP through a prior course of dealing. They contend that since 1993, the year CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Agreement, MDC has completed, or has proposed and negotiated, many transactions with CFLP's competitors that would arguably constitute Competitive Activities or Competing Businesses, or that might arguably be considered a violation of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that Plaintiff never objected to, or sought to enjoin, these dealings, notwithstanding that some allegedly involved the development of electronic trading systems for companies that compete directly with CFLP in the fields of mortgage-backed securities and emerging markets, as well as in CFLP's core business of U.S. Treasuries.

> [FN20.] The Limited Partner Defendants also contend that the 1996 Agreement, when considered in the context of its drafting history, permits them to take precisely the actions CFLP complains of in this action. This argument is more appropriately considered next month, when the record concerning all three elements of the Preliminary Injunction standard is complete.

The Limited Partner Defendants may prevail on their theory after a full trial on the merits. On the very limited record before me, however, and construing all reasonable inferences in the light most favorable to CFLP, I cannot say with certainty that there is no set of facts under which CFLP would be entitled to relief. Thus, Fisher's Motion to Dismiss Counts I and III is denied. Similarly, whether Cantor and CFI may allow or cause MDC to compete with CFLP, despite the terms of the 1996 Agreement, because of the parties' prior course of dealing is a disputed material fact that precludes this Court

from entering judgment on the pleadings. Cantor's and CFI's joint Motion for J.O.P. on counts I and III is denied.

Counts II and IV raise accomplice liability theories against MDC and CBB. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant.[FN21]The elements of tortious interference are: (1) a contract, (2) defendant's knowledge of the contract, (3) an intentional act that is a significant factor in causing the breach of the contract, (4) lack of justification and (5) injury.[FN22]

> [FN21.]*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1995 WL 694397 at \*15, Allen, C. (1995).

> [FN22.]*See CPM Indus. v. Fayda Chems. & Minerals, Inc.,* Del.Ch., C.A., No. 15996, 1997 WL 770683 at \*7, Jacobs, V.C. (Nov. 26, 1997).

A common basis for dismissing accomplice liability theories under Rule 12(b)(6) is that Plaintiff has stated no underlying claim for principal liability. As I have explained, however, the Amended Complaint does state a claim for breach of the duty of loyalty expressly inserted in the 1996 Limited Partnership Agreement. Defendants contend, nevertheless, that Counts II and IV must be dismissed because Plaintiff has stated no facts to support the elements of knowing participation or of intentional action without justification. I disagree. Plaintiff has pleaded sufficient facts to support these elements of its respective claims.

**\*6** Plaintiff alleges that MDC and CBB agreed to work together to develop and sell a product that would compete directly with Plaintiff's core business. It alleges that the product is operable and is

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
(Cite as: Not Reported in A.2d)

set to launch on July 13, 1998. Certain Defendants admit in their pleadings that customers are currently being solicited to use the product. MDC received a letter explaining that such a relationship/product would constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement. Plaintiff has alleged that MDC shared this information with CBB and that, in response, CBB required MDC to agree to indemnify CBB in the event that Plaintiff should obtain "against MDC any final and unappealable permanent injunction, court order or settlement of any litigation...."FN23

> FN23. Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation §§ 2.9, 8.3, 11.3.

Under these circumstances, the Court may infer that MDC and CBB had reason to believe that developing and marketing MarketPower may constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement. The Court may further infer that MDC's and CBB's continued development and marketing of MarketPower in the face of their knowledge lacked justification. Accordingly, defendants' Motions to Dismiss Counts II and IV are denied.

Finally, all five defendants have moved to dismiss Count V, which alleges a cause of action for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."FN24 The elements of unjust enrichment have also been stated in this way: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.FN25

> FN24.*Fleer Corp. v. Topps Chewing Gum, Inc.*, Del.Supr., 539 A.2d 1060, 1062 (1988).

> FN25.*Khoury Factory Outlets, Inc. v. Snyder,* Del.Ch., C.A. No. 11,568, 1996

WL 74725 at *11, Kiger, M. (Jan. 8, 1996).

The Limited Partner Defendants argue that a cause of action for unjust enrichment does not lie when a contract determines the obligations between the parties.FN26 However, the Amended Complaint specifically states: "In the alternative, and/or with respect to conduct *not governed by the existence of an express contract,* CFLP seeks the equitable remedy of unjust enrichment."FN27 Thus, unless and until this Court determines that the defendants' obligations are governed exclusively by contract, Plaintiff has properly stated a claim for unjust enrichment.

> FN26. See *ID Biomedical Corp. v. TM Techs., Inc.,* Del.Ch., C .A. No. 13269, 1995 WL 130743 at *15, Steele, V.C. (Mar. 16, 1995), for a discussion of this principle.

> FN27. Proposed Amended Complaint ¶ 113 (emphasis added).

I do, however, find that the claims against the Limited Partner Defendants are governed exclusively by contract and that, as to them, the Motions to Dismiss/joint Motion for J.O.P. must be granted with respect to Count V. Whether or not there is an implied duty of loyalty which applies to limited partners generally and prohibits the conduct complained of here is not an issue. Here, by contract, within the 1996 Limited Partnership Agreement, the parties accepted the invitation of 6 Del.C. § 17-1101(d) to address fiduciary duties. The 1996 Agreement is certainly not silent on the subject. Therefore, it may be fairly assumed that the parties intended the nature and scope of the fiduciary duties owed, by whom to whom, to be addressed within the language adopted by them in their own freely-fashioned agreement. This Court repeatedly has emphasized that Delaware law favors allowing parties to an agreement to pursue their own aims so long as no underlying fraud or innocent misrepresentation taints the crafting of the language actually adopted.FN28 This is consistent with the policy of

Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
**(Cite as: Not Reported in A.2d)**

the General Assembly expressed in *6 Del.C. §* *17-1101(c)*.

> FN28.*See, e.g.,* **In re Cencom Cable In-** **come Partners, L.P. Litig.,** Del.Ch., C.A. No. 14634, 1997 WL 666970 at *4, Steele, V .C. (Oct. 15, 1997); **In re Cencom Cable** **Income Partners, L.P. Litig.,** Del.Ch., C.A. No. 14634, 1996 WL 74726 at *4-5, Steele, V.C. (Feb. 15, 1996).

**\*7** Cantor's and CFI's joint Motion for J.O.P. with respect to Count V is granted. Fisher's Motion to Dismiss Count V is granted.

The claims against CBB and MDC are not governed by any contract with CFLP. The Amended Complaint states a claim that survives CBB's and MDC's Motions to Dismiss. Plaintiff repeatedly alleges that, if MarketPower is a success, defendants will be enriched, and Plaintiff will be impoverished. Plaintiff also alleges that neither defendant can retain any benefit resulting from the success of MarketPower "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience," because they knew that Cantor, Fisher, and CFI were prohibited from producing a product that would compete with Plaintiff's core business. Assuming the truth of these facts, as I must at this stage, I find that Plaintiff has stated a claim that survives CBB's and MDC's Motions to Dismiss. CBB's and MDC's Motion to Dismiss Count V is denied.

## CONCLUSION

Plaintiff's Motion for Leave to File Amended Complaint is ***granted.***Defendants' Motions to Dismiss the Amended Complaint/joint Motion for J.O.P. are ***granted, in part, and denied, in part.***Decision on Plaintiff's Motion for a Preliminary Injunction is ***reserved*** until the record is supplemented, on July 6 - 8, 1998, on the issues of the existence of imminent, irreparable harm and whether the balance of the equities favors the issuance of the injunction.

**IT IS SO ORDERED.**

Del.Ch.,1998.
Fitzgerald v. Cantor
Not Reported in A.2d, 1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189

END OF DOCUMENT

LEXSEE 2003 US DIST LEXIS 6150

**CARY OIL CO., INC., et al., Plaintiffs, - against - MG REFINING & MARKETING, INC., et al., Defendants.**

**99 Civ. 1725 (VM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 6150*

**April 11, 2003, Decided
April 11, 2003, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at *Cary Oil Co. v. Mg Ref. & Mktg., Inc., 2003 U.S. Dist. LEXIS 6267 (S.D.N.Y., Apr. 15, 2003)*

**PRIOR HISTORY:** *Cary Oil Co. v. MG Ref. & Mktg., 2003 U.S. Dist. LEXIS 2479 (S.D.N.Y., Feb. 19, 2003)*

**DISPOSITION:** **[*1]** Plaintiffs' motion in limine to strike certain opinions in defendants' expert report denied. Defendants' motion to strike the plaintiff's expert reports denied.

**COUNSEL:** For Cary Oil Co, Inc, Corbon Fuel Co, Higginson Oil Co, Merritt Oil Co, Raymer Oil Co, RK Distributing, Inc, Wise Oil & Fuel, Inc, Ports Petroleum Co, Guttman Oil Co, Ferrell Fuel Co, Fauser Oil Co, Inc, Dalton Petroleum, Inc, Premier Petroleum, Inc, MM Satterfield Oil Company, Inc, Erickson Oil Products, Inc, Fox Fuel Oil Co, Inc, Abbott Oil Company, Inc, PLAINTIFFS: Richard G Tashjian, Tashjian & Padian, Jerome K Walsh, Lane & Mittendorf LLP, New York, NY USA.

For MG Refining & Marketing, Inc, Metallgesellschaft Corp, Metallgesellschaft AG, DEFENDANTS: Robert B Bernstein, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY USA.

For Deutsche Bank AG, Deutsche Bank North America, Deutsche Bank New York, DEFENDANTS: Jeffrey Barist, Milbank, Tweed, Hadley & McCloy LLP, New York, NY USA.

**JUDGES:** VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** VICTOR MARRERO

**OPINION**

*DECISION AND ORDER*

**VICTOR MARRERO, United States District Judge.**

**[*2]** Before the Court are five motions in limine (the "Motions") submitted by Plaintiffs and Defendants in connection with the trial of this matter, scheduled to begin on May 5, 2003.

As discussed in the Statement of the Court Regarding Certain Motions in Limine of Plaintiffs and Defendants, dated April 11, 2003, which is attached hereto and incorporated by reference herein, the Court denies the Motions. Accordingly, it is hereby

**ORDERED** that the Plaintiffs' Motion in Limine to Strike Certain Opinions in Defendants' Expert Report of Dr. Phillip Verleger is denied; and it is further

**ORDERED** that the Defendants' Motion to Strike the Expert Reports of Gerald Gay, Marcel Kahan, Michael Canes, and Jeffrey Bernard is denied.

*STATEMENT OF THE COURT REGARDING CERTAIN MOTIONS IN LIMINE OF PLAINTIFFS AND DEFENDANTS*

**VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.**

The Court has considered certain motions in limine submitted by Plaintiffs and Defendants in connection with the trial of this matter, which is scheduled to begin on May 5, 2003. The Court will briefly state the findings and reasoning supporting its decision regarding each separate motion in limine.

**[*3]** I. *PLAINTIFFS' MOTION TO STRIKE CERTAIN OPINIONS IN DEFENDANTS' EXPERT REPORT OF DR. PHILIP VERLEGER*

Plaintiffs move to strike certain opinions issued by Defendants' economic expert, Dr. Philip K. Verleger, Jr. ("Verleger") on the grounds that Verleger is not qualified to render such opinions and these opinions do not fit the facts of the case. The Court finds that Verleger's expert testimony satisfies the standards for such testimony as enunciated by the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, and thus should be admitted.

*Rule 702 of the Federal Rules of Evidence* allows a "witness qualified as an expert by knowledge, skill, experience, training or education" to testify if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Fed. R. Evid. 702*. Courts within the Second Circuit "have liberally construed expert qualification requirements" when determining if a witness can be considered an expert. *TC Sys. Inc. v. Town of Colonie, New York, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)*; *see also McCulloch v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995)* **[*4]** ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); *United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985)* (qualification requirements of *Rule 702* "must be read in light of the liberalizing purpose of the rule"); *Sullivan v. Ford Motor Co., 2000 U.S. Dist. LEXIS 4114, No. 97 Civ. 0593, 2000 WL 343777, at *4 (S.D.N.Y. 2000)* ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion."); *Canino v. HRP, Inc., 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000)* ("liberality and flexibility in evaluating qualifications should be the rule").

The Second Circuit has instructed that a trial court,

in determining whether a witness is qualified to render an expert opinion, "must first ascertain whether the proffered expert has the educational background or training in a relevant field." *TC Sys., 213 F. Supp. 2d at 174.* Then the court "'should further compare the expert's area of expertise with the particular opinion the expert seeks to offer and permit the expert ... to testify only **[*5]** if the expert's particular expertise ... enables the expert to give an opinion that is capable of assisting the trier of fact.'" *Zwillinger v. Garfield Slope Housing Corp., 1998 U.S. Dist. LEXIS 21107, No. 94 Civ. 4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998)* (quoting Federal Judiciary Center, Reference Manual on Scientific Evidence 55-56 (1994) (alterations in original)).

Under such permissive standards, the Court is persuaded that Verleger is qualified to render expert opinions in the area of petroleum sales and marketing that this matter encompasses. Based on a review of Verleger's curriculum vitae and his expert report discussing the Plaintiffs and the contracts here in question (the "Contracts"), the Court is persuaded that Verleger possesses extensive knowledge about the petroleum marketing business. Indeed, Verleger's experience is extensive, starting with his doctorate in economics from the Massachusetts Institute of Technology and continuing with his focused work over a period of more than twenty five years in the petroleum industry, including his substantial writings on the subject, his position as a member of the Board of Directors of an independent refining company and his **[*6]** consultant work for several petroleum suppliers and marketers.

Plaintiffs argue that because Verleger has not actually run the day-to-day operations of a small fuel distributor, he is therefore incapable of opining in the case at bar. However, "lack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying." *Valentin v. New York City, 1997 U.S. Dist. LEXIS 24059, No. 94 CV 3911, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997)*. A formal education in a particular field is sufficient to qualify a witness as an expert. See *id.* (collecting cases). Verleger is clearly not new to the world of petroleum distribution, and his area of expertise certainly enables him to provide an opinion that would assist a jury in understanding the issues relevant in the instant case.

A trial court must also decide if a qualified expert's testimony rests on a reliable foundation, or is simply

based on "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 590, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* Inherent in this analysis is the question of whether the testimony is relevant in that it "fits" **[\*7]** the facts of the case. *Id. at 591-92.* Moreover, such testimony must "assist the trier of fact to understand the evidence or determine a fact in issue." *Id. at 591* (quoting *Fed. R. Evid. 702*).

The Court is satisfied that Verleger's expert opinions regarding the financial and logistical ability of Plaintiffs to absorb certain volumes of petroleum under the Contracts is admissible pursuant to the*Daubert* and*Kumho* standards. A review of Verleger's report demonstrates that his opinion fits the facts of the case and is not premised on a false predicate fact, as Plaintiffs contend. Verleger's opinions, rather than being based solely on the purportedly inaccurate presumption that Plaintiffs would have waited until the end of the Contracts to take delivery of the full contract volumes, also consider the possibility of pro rata delivery over the course of the Contract and delivery limited to twenty percent of annual sales of each Plaintiff. Thus, Verleger's analysis incorporated several different hypotheses in examining the ability of Plaintiffs to utilize the Contracts.

In addition, Verleger's opinions involve relatively straightforward analysis **[\*8]** using data obtained from the Plaintiffs themselves to conclude that the Contracts, were certain options within them exercised, would have required Plaintiffs to purchase far more petroleum than they had sold on a historical basis, could store given their acknowledged storage capacities, or could afford given their financial statements, and these massive purchases would have likely driven the price of the petroleum down. Verleger, as an economist with significant expertise in the petroleum industry developed from his educational training and work experience, is qualified to explain to the fact finder how his numerical analysis, which employed data submitted by the opposing party, led him to a specific conclusion, and how that conclusion supports the Defendants' theory. That is not to say that Verleger would have license to speculate on what alternatives Plaintiffs did or did not contemplate or what they should or should not have done to satisfy the requirements and contingencies of the Contracts.

Finally, Plaintiffs' argument goes more to the weight that should be afforded Verleger's testimony. "The fact that a witness's qualifications are not unassailable does

not mean the witness **[\*9]** is incompetent to testify; rather it is ... for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinions." *Valentin,* 1997 U.S. Dist. LEXIS 24059, 1997 WL 33323099, at \*15 (internal quotations omitted). Thus, Plaintiffs' contention that Verleger "lacks practical experience relating to the issues in this case is better left for cross-examination." *TC Sys. Inc., 213 F. Supp. 2d at 175.*

## II. *DEFENDANTS' ORDER TO STRIKE THE EXPERT REPORTS OF GERALD GAY, MARCEL KAHAN, MICHAEL CANES AND JEFFREY BERNARD*

Defendants move to strike the opinion testimony of four expert witnesses proffered by Plaintiffs to explain various corporate and contractual issues involving Defendants and the Contracts. The Court addresses each individual challenge separately.

### A. *THE EXPERT TESTIMONY OF GERALD GAY*

Defendants challenge the testimony of Gerald Gay ("Gay"), the chairman of the Department of Finance at Georgia State University and a former chief economist at the Commodity Futures Trading Commission ("CFTC"), arguing that his opinions do not fit the facts of the case as required by *Daubert* and will not assist the jury in understanding **[\*10]** the evidence. The Court disagrees.

Gay's testimony as a whole serves the reasonable purpose of offering a general overview of derivative instruments, the CFTC, its regulation of futures trading and other such general economic background to a laymen jury which will have to confront complex questions involving the motivation of petroleum marketing companies in entering into the Contracts. While Defendants contend that such an overview is unnecessary because the jury must simply determine each Plaintiff's underlying purpose in entering into its Contract with Defendant, the Court is not persuaded that the jury will understand the nature of the Contracts or the complex issues inherent in the formation of such a Contract without understanding the regulatory scheme that structures those Contracts or common economic terms such as "hedge" or "derivative." Thus, the Court agrees that having an expert witness such as Gay -- who teaches graduate level courses in derivatives, has authored articles discussing derivatives hedging and valuation, and was Chief Economist and Director of the Division of

Economic Analysis for the CFTC, where he led a team that examined contracts similar to one at issue [*11] here -- is important if Plaintiffs are to explain to the jury the background issues involved in this complex contractual dispute centered in an intricate regulatory scheme.

The Court is also not persuaded by Defendants' assertion that much of Gay's testimony must be excluded because it was not contained in his initial report and therefore violated *Fed. R. Civ. P. 26(a)(2)(B)*. As the Advisory Committee Notes to the Federal Rules explain, *Rule 26(a)(2)* requires parties to disclose "expert testimony sufficiently in advance of trial [so] that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Fed. R. Civ. P. 26(a)(2)(B)*, Advisory Committee Notes (1993 Amendments) at 152 (West 2003). Such a rule intends to prevent surprise testimony from one party that, by virtue of its unexpectedness, would create the perception that the opposing party has no viable response, and thus imbue the surprise testimony with greater significance than it deserves. The modification of this rule by *Rule 37(c)(1)*, which precludes the introduction of new opinions not previously disclosed unless the failure to [*12] disclose them is "harmless," demonstrates that these rules are not designed to prohibit a witness from testifying about anything not explicitly mentioned in his *Rule 26* disclosure, but rather to protect one party from being blindsided by another party with new opinions never before discussed.

In the case at bar, the opinions that Plaintiffs hope to introduce through the testimony of Gay do not fall into the category of prohibited testimony as described above. Instead, they are general facts and discussions related directly to the expert report Gay submitted to Defendants and the Court. Even if one were to assume that such opinions were sufficiently different or new, Defendants are now on notice about these opinions more than a month before trial and thus have ample time to prepare effective cross examination and consider possible witnesses to counter such discussions, which renders the failure to disclose such opinions harmless.

B. *THE EXPERT TESTIMONY OF MARCEL KAHAN*

Defendants also challenge the testimony of Marcel Kahan ("Kahan"), a professor of law at New York University School of Law who specializes in corporate

governance. Defendants argue that Kahan's testimony, as [*13] foreshadowed by his expert report, will impermissibly state the legal standards for control of a company and consequently interfere with the Court in instructing the jury on the law. The Court disagrees.

Trial courts must be careful to prevent experts from offering opinions that embody legal conclusions. *See United States v. Scop, 846 F.2d 135, 139 (2d Cir. 1988)*. To allow such opinions would "trespass[] on the province of the jury and the trial court" by imposing the expert's view of what the law is. *Fiataruolo v. United States, 8 F.3d 930, 941 (2d Cir. 1993)*. However, the Federal Rules of Evidence were amended over twenty years ago to allow expert witnesses to render opinions even if they "embrace[] an ultimate issue to be decided by the trier of fact." *Fed. R. Evid. 704*. This amendment provided trial courts with more latitude to allow experts to testify about issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that the opinions may encroach on matters of law. Thus, the Second Circuit has held that "experts may testify on ... mixed questions of fact and law." *Fiataruolo, 8 F.3d at 941*. [*14]

In the instant case, Plaintiffs want to offer Kahan's testimony to explain general corporate governance principles and the concept of veil-piercing to the jury. As explained above in relation to Gay's testimony, the Court considers such background information crucial if the laymen jury is to understand fully the complex issues in this matter. Kahan's analysis of the evidence in this case -- and his identification of how such evidence may indicate that the relation between the Defendants exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing -- does not cross the boundaries into an opinion that would tell the jury what decision to reach, but rather mirrors an example offered by the Advisory Committee to the Federal Rules (the "Committee") when distinguishing permissible opinions on ultimate facts from inadmissible legal conlcusions:

The question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be

Case 1:04-cv-01494-JJF    Document 260-2    Filed 01/04/2008    Page 14 of 28

Page 5
2003 U.S. Dist. LEXIS 6150, *14

allowed.

(*Fed. R. Evid. 704*, Advisory Committee Notes (1972 Proposed Rules) (West 2001).)

[*15] Through this example, the Committee intended to demonstrate that an opinion which told the jury whether or not a party had the capacity to make a will would be inadmissible because the answer was a conclusion of law that is reserved for the jury to decide, but an opinion which discussed whether the evidence showed the party had met the three requirements necessary to adjudge that party capable of making a will was admissible because it involved questions of fact that could be established based on the expert's opinion. In the instant case, Kahan is being asked to opine on questions of fact concerning the relationship between two of the Defendants. As indicated by his expert report, Kahan intends to conduct this analysis by referring to the evidence submitted for trial that he has reviewed, including objective facts such as the composition of the Board of Directors for and shareholdings of the Defendants. As long as this discussion does not become a statement to the jury "on how its verdict should read," and Kahan "couches his opinion specifically 'on the evidence that [he] looked at and the work that [he] did, [*16] '" *Fiataruolo, 8 F.3d at 942*, the Court is satisfied that his opinions will fall within the accepted guidelines for admissible testimony.

Defendants also contend that Kahan is not qualified to render opinions on matters of corporate governance and, more specifically, veil-piercing. On the contrary, the Court is persuaded that Kahan is more than qualified to testify on such issues. Kahan, a professor of law at one of the nation's most esteemed law schools who teaches exclusively on matters involving corporations and who has lectured and published extensively on matters of corporate governance, can certainly offer a laymen jury the necessary information needed to understand basic issues of corporate governance.

Defendants argue that Kahan's experience does not rise to the level of an expert witness in another case brought before this Court, where the judge there allowed the expert to testify on "good corporate practice" because of his "thirty years' of experience in the corporate governance field." *Pereira v. Cogan, 281 B.R. 194 (S.D.N.Y. 2002)*. However, neither this case nor any other provided by Defendants offers as a decisive threshold a

minimum [*17] amount of experience that a potential expert witness in corporate governance or any other field must reach in order to demonstrate sufficient ability to testify. Thus, the Court is not inclined to dismiss Professor Kahan's many years of teaching and writing experience in this field as insufficient in determining his qualifications.

C. *THE EXPERT TESTIMONY OF MICHAEL CANES*

Defendants next challenge the testimony of Dr. Michael Canes ("Canes"), a retired Vice President and Chief Economist of the American Petroleum Institute. Similar to their objections to the testimony of Gay, Defendants contend that Canes's opinions do not fit the facts of the case as required by *Daubert* and will not assist the jury in understanding the evidence. The Court disagrees.

Much like the testimony of Gay, Canes's testimony will help the laymen jury understand certain complex business issues that are at the crux of this dispute, such as what a flexie contract is and how it can be utilized by petroleum marketers. Such concepts are likely to be foreign to even the more well-educated members of the jury. Indeed, to ask the jury to render a verdict in this matter without allowing the Plaintiffs to [*18] explain what a flexie contract is and why companies like their own would ever enter into one would result in an uninformed and perhaps confused jury lacking sufficient background information to understand accurately the complex issues involved in this matter. Thus, the Court is persuaded that Canes's testimony fits the facts of the case, and will offer the jury invaluable assistance in understanding the difficult concepts at the core of this litigation. However, the Court notes that allowing Canes to testify does not grant him license to speculate on what motivations Plaintiffs had in entering into the Contracts or whether they intended to take delivery of the oil and gas in the Contracts.

D. *THE EXPERT TESTIMONY OF JEFFREY BERNHARD*

Finally, Defendants challenge the testimony of Jeffrey Bernard ("Bernard"), an apparently retired fuel marketer and sales and distribution specialist for Mobil Oil Corporation ("Mobil"). [1] Defendants contend that Bernard is not qualified to render opinions on possible delivery alternatives for fuel marketers. Moreover, Defendants argue that, based on Bernard's expert report,

his testimony will offer merely unsupported speculation on whether or **[*19]** not Plaintiffs could have secured financing to purchase the full volumes of fuel available under the Contracts. While the Court is persuaded that Bernard is qualified to discuss matters regarding fuel delivery, it is not satisfied that Bernard can testify to the ability of the Plaintiffs to secure financing for fuel purchases under the Contracts.

> 1    The Court notes that Bernard's curriculum vitae, which lists over thirty years of job experience, does not discuss any job positions he has held since 2000, and Plaintiffs do not indicate in their memorandum of law what Bernard's current job is.

As the Court has discussed in regard to Gay and Canes, the jury considering this dispute will need assistance in understanding the complex issues inherent in the petroleum marketing business. One of the disputed issues in this matter concerns the question of whether the Plaintiffs had the storage capacity to take delivery of the massive quantities of fuel under the Contracts. While the Plaintiffs' ability to do so appears **[*20]** impossible based solely on the amount of storage they owned on-site, Plaintiffs hope to inform the jury of alternatives utilized by the industry that would have allowed Plaintiffs to take delivery of the fuel despite their lack of storage. The Court is satisfied that Bernard, who worked for over three decades in various aspects of the petroleum marketing and supply and distribution business for one of the world's largest oil companies, can provide "specialized knowledge" to the jury about industry customs with regard to fuel storage alternatives and thus assist them in determining whether these alternatives were realistically available to Plaintiffs. *See Employers Reinsurance Corp. v. Mid-Continent Casualty Co., 202 F. Supp. 2d 1212, 1216 (D. Kan. 2002)* (finding that forty years of insurance industry background and work experience of expert witness qualified him to testify about industry custom). Thus, the Court does not believe Bernard's testimony would sink to the level of "subjective belief or unsupported speculation." *Daubert, 509 U.S. at 590*. If anything, Defendants' argument goes more to the weight that should be afforded Bernard's testimony, and as explained **[*21]** above with regard to Verleger's testimony, it is "for the jury, with the assistance of vigorous cross-examination, to measure the worth of [an expert's] opinions." *Valentin,* 1997 U.S. Dist. LEXIS 24059, 1997 WL 33323099, at *15 (internal quotations

omitted).

However, the Court is not persuaded that Bernard's testimony regarding the abilities of the Plaintiffs to secure financing for their product purchases meets the standards for expert testimony that the Court has articulated above. Bernard opines in his expert report that the Plaintiffs could have readily obtained financing to purchase their full contract volumes under the Contracts because Plaintiffs had previous credit lines established with Defendants and, regardless of the size or availability of this credit, "there is no indication that [Defendants] would restrict purchases under the [Contracts] on the basis of credit unworthiness." (Jeffrey D. Bernard Expert Report ("Bernard Report"), attached to Appendix I to the MG Defendants' Memorandum of Law In Support of Their Motion to Strike the Proposed Testimony of Plaintiffs' Experts, dated December 6, 2002 ("Deft's Memo"), at 12.) This conclusion is unsupported by any factual basis,  **[*22]**  and thus qualifies as mere conjecture by Bernard as to what Defendants might have done. Moreover, Bernard's hypothesis that Defendants would have delivered millions of dollars worth of petroleum products despite a lack of assurances that Plaintiffs could afford payment strike the Court as counterintuitive, and therefore particularly unreliable.

Similarly unsupported is Bernard's assertion that even if Defendants were not to extend credit for full contract volumes, "any number of financial institutions would extend credit." (Deft's Memo, Bernard Report, at 13.) Bernard neither identifies these possible institutions, nor explains how Plaintiffs would be considered creditworthy. The Court is also not satisfied that Bernard's experience qualifies him to opine on the extension of credit to petroleum marketers by financial institutions. In Bernard's last assignment with Mobil, he was charged with overseeing the extension of credit to customers, but this brief three-year stint only provides him insight into Mobil's policies on extension of credit, and not with those of Defendants. Thus, Bernard could testify as to general industry custom for extension of credit in similar situations *to*  **[*23]**  *the extent such custom exists,* but by allowing him to testify as to whether or not Defendants and financial institutions would have actually extended such credit would allow Bernard to speculate to an extent forbidden by the Supreme Court.

Plaintiffs argue that finding Bernard's testimony on

2003 U.S. Dist. LEXIS 6150, *23

credit issues inadmissible while allowing Verleger to testify about whether Plaintiffs could have financed their purchases is inconsistent, but the Court disagrees. Verleger undertook an objective numerical analysis to demonstrate the abilities of Plaintiffs to purchase products under the Contracts, using data supplied by Plaintiffs themselves. Bernard desires to opine on whether or not business institutions would have extended credit to Plaintiffs, a fact-intensive, subjective inquiry

that Bernard is not in a position to make.

**SO ORDERED.**

Dated: 11 April 2003

Victor Marrero

U.S.D.J.

LEXSEE 2007 US DIST LEXIS 56205

**C. CLARK HODGSON, JR., RECEIVER, et al. v. KOTTKE ASSOCIATES, LLC**

**CIVIL ACTION NO. 06-5040**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 56205*

**July 31, 2007, Decided**
**August 1, 2007, Filed**

**COUNSEL:** **[*1]** For C. CLARK HODGSON, JR., RECEIVER FOR PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC, AND ITS PARTNERS, AFFILIATES, SUBSIDIARIES AND RELATED ENTITIES, Plaintiff: DANIEL T. FITCH, LEAD ATTORNEY, STRADLEY RONON STEVENS & YOUNG LLP, PHILADELPHIA, PA; NICHOLAS M. ORLOFF, STRADLEY, RONON, STEVENS & YOUNG, PHILADELPHIA, PA.

For KOTTKE ASSOCIATES, LLC, Defendant: RICHARD G. PLACEY, LEAD ATTORNEY, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, PHILADELPHIA, PA.

For KOTTKE ASSOCIATES, LLC, Counter Claimant: RICHARD G. PLACEY, LEAD ATTORNEY, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, PHILADELPHIA, PA.

For C. CLARK HODGSON, JR., RECEIVER FOR PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC, AND ITS PARTNERS, AFFILIATES, SUBSIDIARIES AND RELATED ENTITIES, Counter Defendant: NICHOLAS M. ORLOFF, STRADLEY, RONON, STEVENS & YOUNG, PHILADELPHIA, PA.

**JUDGES:** Michael M. Baylson, U.S.D.J.

**OPINION BY:** Michael M. Baylson

**OPINION**

**MEMORANDUM**

**Baylson, J.**

**I.** *Introduction*

On November 14, 2006, C. Clark Hodgson, the Receiver for Option Capital Fund, LP ("Option Capital") and the Philadelphia Alternative Asset Fund, LP (the "LP Fund") filed a Complaint in this Court against Kottke Associates, LLC ("Kottke"), asserting claims for fraudulent **[*2]** transfer, unjust enrichment/constructive trust, and conversion/wrongful detention. The Receiver seeks to recover approximately $ 662,000 he claims Paul Eustace ("Eustace"), the general partner, trading advisor and commodity pool operator for Option Capital, improperly transferred from the accounts of Option Capital to Kottke.

There are currently three outstanding motions in this case: (1) Kottke's Motion to Transfer Venue Pursuant to *28 U.S.C. Section 1404(a)* (Doc. No. 5); (2) Kottke's Motion for Judgment on the Pleadings (Doc. No. 7); and (3) the Receiver's Motion to Dismiss the Counterclaim of Defendant Kottke or, In the Alternative, to Dismiss Defendant's Request for Attorneys' Fees (Doc. No. 10). For the following reasons, all three motions will be denied.

**II.** *Factual and Procedural Background*

According to the Receiver's Complaint, Eustace formed Option Capital in May 2000. He operated Option Capital as "commodity pool" in which he solicited investors to purchase limited partnership interests and

invested the resulting funds in the commodities market. The investors in Option Capital, including the LP Fund, directly deposited the funds they wished to invest in Option Capital's trust [*3] account in Toronto, Canada. In October 2000, Eustace, acting as general partner for Option Capital, opened an account with FC Stone LLC ("FC Stone"), a future commodities merchant, for the purpose of trading commodity futures through FC Stone on behalf of Option Capital. Over the course of the next year, Eustace made a number of transfers from the Option Capital trust account to the FC Stone trading account

In May 2001, Eustace also entered into a Trading Advisory Agreement with Kottke unrelated to his activities with Option Capital. According to the terms of that agreement, Eustace agreed to develop and implement trading strategies for Kottke, and to personally indemnify Kottke for any losses it sustained while he carried out trades on its behalf. Within weeks of entering into this agreement, Kottke sustained approximately $ 630,000 in trading losses, and Eustace executed a promissory note for the full amount he owed Kottke. He defaulted on the promissary note, and Kottke confessed judgment against Eustace in an action in the United States District Court for the Northern District of Illinois, *Kottke v. Eustace*, No. 01-5522 ("Illinois Action") in July 2001. While attempting to execute [*4] this judgment, Kottke discovered the trading account Option Capital maintained with FC Stone and requested the court to order FC Stone to liquidate that account and turn the proceeds over to Kottke in satisfaction of Eustace's debt. Option Capital intervened in the action and denied that Eustace had any personal interest in the funds maintained in the FC Stone account. In January 2002, Option Capital and Kottke entered into a Settlement and Release Agreement ("Settlement Agreement"), whereby Kottke released all claims to the funds frozen in the FC Stone account and, in turn, received $ 159,000 in partial satisfaction of Eustace's debt. District Judge Charles Kocoras, the judge presiding over the Illinois Action, signed an order approving the Settlement Agreement.

The Receiver claims that, when Kottke entered into the Settlement Agreement, Kottke knew or reasonably should have known that Eustace would make the payment of $ 159,000 from the funds maintained in Option Capital's trading account with FC Stone, even though those funds belonged to Option Capital and its investors and not Eustace. The Receiver further alleges that Kottke received and retained ten additional payments totaling

[*5] $ 503,00 from Eustace using Option Capital's funds. The Receiver further states that he did not learn that Eustace has paid off his personal debt to Kottke using Option Capital's funds until January 2006 when he received a set of documents from the Commodity Futures Trading Commission ("CFTC") relating to the Option Capital trust account and the FC Stone account. He filed this action on November 14, 2006 to recover the approximately $ 662,00 in funds he claims were improperly transferred from Option Capital's accounts to pay off Eustace's personal debt to Kottke.

On January 16, 2007, Kottke filed a Motion for Transfer of Venue pursuant to *28 U.S.C. § 1404(a)* arguing that the present action is a continuation of the prior lawsuit before Judge Kocoras. On the same date, Kottke filed its Answer, Affirmative Defenses and Counterclaims to the Receiver's Complaint. In its Counterclaim, Kottke asserts that the Receiver is in breach of a Settlement Agreement reached in 2002 between Kottke and Option Capital in the Illinois Action. According to Kottke, the $ 159,000 transfer made pursuant to the Settlement Agreement was offered as consideration for that agreement, and the Settlement Agreement [*6] consequently precludes the recovery of transferred funds by the Receiver.

The Receiver filed a Motion to Dismiss Kottke's Counterclaim pursuant to *Federal Rule of Civil Procedure 12(b)(6)* on February 8, 2007, asserting that he is not bound by the release Eustace granted to Kottke on the behalf of Option Capital because the release was made with intent to defraud Option Capital and its creditors.

On February 1, 2007, Kottke filed a Motion for Judgment on the Pleadings pursuant to *Rule 12(c)* requesting this Court to enter judgment against the Receiver on all counts of the Complaint to the extent they seek to recover the $ 159,000 paid in consideration of the Settlement Agreement between Kottke and Option Capital. Kottke asserts that the Receiver's action is a collateral attack on the judgment in the Illinois Action and this matter should therefore be referred back to that court for resolution.

### III. *Legal Standard*

When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox,*

2007 U.S. Dist. LEXIS 56205, *6

*Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).* The Court must accept as true all well-pleaded allegations [*7] in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).* A *Rule 12(b)(6)* motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).*

A motion for judgment on the pleadings pursuant to *Rule 12(c)* is governed by the same standard as a *Rule 12(b)(6)* motion to dismiss for a failure to state a claim upon which relief can be granted. [1] *Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991).*

> 1   The Receiver argues in his Memorandum in Opposition to Kottke's Motion for Judgment on the Pleadings that Kottke's Motion is premature because the pleadings in this action are not yet closed. Motions to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)* must be brought before filing an answer. A *Rule 12(c)* motion, by contrast, may be made after the pleadings are closed. The Receiver is technically correct that the pleadings are not yet closed in this action because he has not replied to Kottke's counterclaim. Because no prejudice will result to the Receiver, [*8] the Court will nonetheless decide Kottke's motion. As Kottke notes in its Reply in Support of its Motion for Judgment on the Pleadings, Kottke's Motion for Judgment on the Pleadings is addressed solely at the allegations made in the Complaint, which has been answered, and does not rely on the Counterclaim for its contentions.

This Court has jurisdiction over this action pursuant to *28 U.S.C. § 1332* as an action between citizens of different states involving an amount in controversy greater than $ 75,000. The Court also has jurisdiction pursuant to *28 U.S.C. §§ 754* and *1692*.

**IV.** *Discussion*

**1.** *Motion to Transfer Venue*

In its Motion to Transfer Venue pursuant to *28 U.S.C. § 1404(a)*, Kottke requests the Court to transfer the present action to the United States District Court for the Northern District of Illinois, contending that this action is simply a continuation of Kottke's prior suit against Eustace before Judge Kocoras. Kottke further argues that such a venue transfer is proper because, among other things, the matters raised in this action involve substantial issues of Illinois law and many of the material witnesses involved in this action reside in Illinois. The Receiver responds that [*9] the present action is in fact a continuation of the receivership proceedings currently taking place before this Court. He contends that the interests of both efficiency and cost effectiveness, as well as the Court's familiarity with the facts surrounding the receivership, should lead the Court to deny Kottke's motion.

*Section 1404(a)* of Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. The decision whether to transfer an action pursuant to *§ 1404(a)* lies soundly within this Court's discretion. *See Lony v. E.I. DuPont de Nemours & Co., 886 F.2d 628, 631-32 (3d Cir. 1989).* And, as the moving party, the burden rests on Kottke to establish that the proposed venue transfer is proper. *See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).*

The Court is not limited to the factors enumerated in *§ 1404(a)* in determining whether to grant a motion to transfer venue. *See Jumara, 55 F.3d at 879.* The Third Circuit has recognized a number of additional private and public factors [*10] a court may consider in evaluating such a motion. The private interests include: (1) the plaintiff's choice of venue; (2) the defendants' preference; (3) where the claim arose; (4) the relative physical and financial condition of the parties; (5) the extent to which witnesses may be unavailable for trial in one of the forums; and (6) the extent to which books and records would not be produced in one of the forums. *See Miller v. Atkins Nutritionals, Inc., No. 04-5775, 2005 U.S. Dist. LEXIS 3250, 2005 WL 503261, at *3 (E.D. Pa. Mar. 3, 2005)* (citing *Jumara, 55 F.3d at 879*). Public factors include: (1) enforceability of a judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty resulting from court congestion; (4) the local interest in deciding the controversy; (5) the public policies of the forums; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

This is not the first venue transfer motion this Court has encountered during the course of these receivership proceedings. In this Court's September 18, 2007 opinion in *Hodgson v. Gilmartin, No. 06-1944, 2006 U.S. Dist. LEXIS 73063, 2006 WL 2707397 (E.D. Pa. Sept. 18, 2006),* [*11] this Court denied the defendant Man Financial Inc.'s motion to transfer venue to the United States District Court for the Northern District of Illinois. The same considerations that led this Court to deny that motion also apply here.

With respect to the private factors, the Receiver's clear preference is for this action to remain in this District and this factor should be accorded due weight. This preference squares with the larger goal of the receivership, to conserve the funds of the aggrieved investors, because the Receiver, acting in his court appointed role on behalf of these investors, is compensated out of the receivership estate. [2] Kottke, of course, asserts that this action should be transferred to the United States District Court for the Northern District of Illinois. To the extent that Kottke's preference is founded on its claim that the present action is a mere continuation of a prior action in the Northern District of Illinois, the Court will not give it great weight. The issue raised by the Receiver's Complaint is whether Eustace, acting on behalf of Option Capital, fraudulently transferred investor funds to Kottke. Furthermore, although Kottke's office is located Illinois, [*12] it is not clear that any of the alleged fraudulent transfers that are the subject of the Receiver's action originated or ended in Illinois. To the contrary, the Receiver asserts that the transfers took place between accounts located in Canada. It may be less convenient for Kottke to litigate this action in this District than in the Northern District of Illinois. However, Kottke is a future commissions merchant with a substantial amount of assets, and the Court concludes that the relative costs of litigating this case in Illinois will fall more heavily on the Receiver than they would on Kottke if the Court were to grant this transfer motion. The Receiver has expended substantial time and assets in fulfilling his court-appointed role and requiring him to hire local Illinois counsel and take on the duty of educating a new court about the intricacies of these proceedings would incur substantial costs. While many of Kottke's witnesses appear to be located in the Northern District of Illinois, at least one of the key witnesses in this action, Paul Eustace, lives in Canada and is subject to this Court's jurisdiction under the Consent Order recently entered in *CFTC v. Eustace,* 05-2973. Finally, [*13] as

the Court noted in its prior opinion, in light of modern document imaging technology, the location of books and records relevant to this matter is of limited significance.

> 2   The Receiver was appointed by this Court on the motion of the CFTC in the action brought by the CFTC against Eustace and the Philadelphia Alternative Asset Management Co. LLC, *CFTC v. Eustace,* No. 05-2973. The Court recently approved the entry of a Consent Order of Permanent Injunction and Other Relief Against Eustace in that action (Doc. No. 426).

Concerning the public factors, the Court finds that these factors also weigh against a transfer. A judgment in this case would be equally enforceable in either jurisdiction. Moreover, the litigation arising from Eustace's alleged fraudulent conduct has been ongoing in this Court for over two years, and the Receiver, who is based in Philadelphia and represented by a Philadelphia law firm, has been involved in recovering assets for investors injured by that conduct for over a year and a half. This Court has given these receivership proceedings a high priority and is very familiar with the factual background of the receivership and Eustace's alleged fraudulent schemes. [*14] The Court has issued numerous opinions in the two other actions currently pending before this Court related to these receivership proceedings, *Harmelin v. Man,* No. 06-1944 and *CFTC v. Eustace,* No. 05-2973. To the extent that Court will be called upon to apply Illinois state law in this action, the advent of internet-based legal research significantly lessens the burden on this Court in learning the law of another jurisdiction.

In sum, for all of the reasons discussed above, the Court concludes that keeping this action in this District is the most efficient way for the parties to reach a just and fair resolution of this action. Accordingly, Kottke's Motion to Transfer Venue is denied.

### 2. *Motion for Judgment on the Pleadings*

Kottke makes two arguments in its Motion for Judgment on Pleadings. First, Kottke argues that the Receiver, standing in the shoes of Option Capital, has no rights greater than those of Option Capital and may only assert a cause of action that would be available to Option Capital. Because Option Capital settled and dismissed its claim to the $ 159,000 when it entered into a Settlement Agreement with Kottke, the Receiver cannot now assert a

cause of action to recover **[\*15]** these funds. Second, Kottke contends the claims arising from the settlement in the Illinois Action are barred by res judicata. According to Kottke, the present action is barred because the January 24, 2002 order of Judge Kocoras approving the Settlement Agreement between Kottke and Option Capital was a final judgment on the merits involving the same parties and the same causes of action as this suit.

The Receiver rejects these contentions. The Receiver first notes that the Complaint in this action is brought not only on behalf of Option Capital but also on behalf of the LP Fund, a creditor of Option Capital. Because the LP Fund was not a party to the Settlement Agreement or the proceedings before Judge Kocoras, the parties are not the same in both actions. Further, the Receiver asserts that the causes of action raised in the Complaint, including fraudulent transfer under the Uniform Fraudulent Transfer Act of 1984, were not resolved or even raised in the Illinois Action. Finally, the Receiver argues that the claim for $ 159,000 on behalf of Option Capital is not barred because the Settlement Agreement was procured as a result of the fraudulent conduct of Paul Eustace.

As an initial matter, **[\*16]** the Court finds that, based on the facts alleged by the Receiver, res judicata is not a bar to the Receiver's action against Kottke. The Third Circuit has laid out three requirements to determine whether res judicata applies to a subsequent action: (1) there was a final judgment on the merits in the prior suit; (2) the prior suit involved the same parties or their privies; and (3) the subsequent suit is based on the same causes of action. *See CoreStates Bank, N.A. v. Huls Am., Inc., 176 F.3d 187, 194 (3rd Cir. 1999).* The second and third requirements are not met in this action.

Option Capital was a party to the Settlement Agreement. However, the Receiver represents the interests of all of Option Capital's creditors, including the LP Fund, which was not a party in the Illinois Action. *See In re Cowden, 337 B.R. 512, 529-35 (W.D. Pa. 2006)* (finding bankruptcy trustee was neither a party, nor in privity with a party for res judicata purposes when trustee represented not only creditors who were parties in the prior suit but also the interests of the remaining creditor body); *see also In re Hill, 342 B.R. 183, 196 (D.N.J. 2006)* (observing that the doctrines of collateral estoppel and res **[\*17]** judicata did not apply because the creditors in that case were not parties to the prior proceeding).

Moreover, although both actions concern the $

159,000 paid to Kottke pursuant to the Settlement Agreement, the Court must at this stage in the proceedings credit the Receiver's assertion that, at the time of the transfer, none of the creditors of Option Capital, including the LP Fund, knew of the Settlement Agreement or had an opportunity to challenge it, and Judge Kocoras never had an opportunity to hear from those creditors before entering an order approving the Settlement Agreement. If the Receiver is able to prove that Eustace acted on behalf of Option Capital without the knowledge or participation of its creditors, then Kottke's contention that the fraudulent transfer claim brought by the Receiver in this case could have been brought in the Illinois Action fails. Judge Kocoras's order approving the Settlement Agreement cannot bar the creditors of Option Capital from bringing this action because they failed to raise a claim in an action that was deliberately concealed from them. *See In re Cowden, 337 B.R. at 532* (holding court order approving settlement agreement does not bar fraudulent **[\*18]** conveyance action that was neither brought nor could have been brought at the time of the prior litigation).

Even if the Court were to find that Judge Kocoras's order would normally bar such an action, if the Settlement Agreement was procured through fraud as is alleged in this case, it cannot be enforceable against the Receiver acting on behalf of Option Capital. Contrary to Kottke's assertion, the Receiver is not seeking to void an agreement validly entered into by Option Capital and approved by a federal court. Instead, the Receiver is arguing that the agreement itself was not valid because it was made with an intent to defraud. The Receiver urges this Court to follow the approach taken in the bankruptcy context where, depending on the circumstances, a trustee may avoid a transfer made pursuant to a settlement agreement, even if that agreement was approved by court order, when that transfer was made with the intent to defraud creditors of the debtor. *See, e.g., In re Hill, 342 B.R. at 196* (permitting trustee to avoid transfer made pursuant to divorce settlement proceeding where trustee was able to prove actual fraudulent intent on part of debtor); *In re Cowden, 337 B.R. at 531* (holding **[\*19]** res judicata did not bar trustee's fraudulent conveyance action where settlement agreement approved by court order did not establish the propriety or timing of the challenged transfer); *see also Bullard v. Aluminum Co. of Am., 468 F.2d 11, 13-14 (7th Cir. 1972)* (affirming district court's decision allowing trustee to avoid transfer made pursuant to a settlement agreement where

undisputed facts showed that transfer was fraudulent within the meaning of the Bankruptcy Act).

Particularly because this issue is before the Court on a Motion for Judgment on the Pleadings, where all factual inferences should be made in favor of the Receiver, this Court agrees that the existence of the Settlement Agreement does not preclude the Receiver from bringing this action, if that agreement was procured through fraud. Kottke's "reasonable interpretation of events" that the payment in the Illinois Action was the "court-supervised resolution of an ongoing dispute" does not square with the standard applied to a motion brought pursuant to *Federal Rule of Civil Procedure 12(c)*. (Def.'s Reply Br. 8.) The Court must credit the Receiver's allegation that the Settlement Agreement and release are not valid because **[*20]** they were executed and procured as a result of Eustace's fraudulent conduct without the knowledge or consent of all necessary parties. A release will not be found valid if "executed and procured by fraud, duress, accident or mutual mistake." *See Adena, Inc. v. Cohn, 162 F. Supp. 2d 351, 357 (E.D. Pa. 2001)* (quoting *Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 892 (3d Cir. 1975))* (finding plaintiffs' allegations regarding misrepresentations and omissions contained in settlement agreement were outside the scope of protection provided by release).

Furthermore, simply because the Receiver is acting on behalf of Option Capital to recover the investors' funds, the Receiver is not bound by an agreement Eustace, acting with the intent to defraud, signed on behalf of Option Capital at a point in time when Option Capital was entirely dominated by Eustace. It would create a perverse incentive indeed for a court to rule that a party who fraudulently enters into an agreement subsequently bars a trustee or receiver from bringing an action to recover the funds fraudulently transferred pursuant to that agreement.

The Seventh Circuit case of *Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995)*, **[*21]** is particularly persuasive on this point. In that case, the principal wrongdoer created three corporations as part of a "Ponzi" scheme and then caused those corporations to create limited partnerships in which the corporations would be general partners and investors would be limited partners. The corporations represented to prospective investors that the funds invested in the limited partnerships would be used to trade commodities. Instead, the principal wrongdoer

fraudulently transferred at least some of the invested funds to himself, his wife, several charities and one investor. When the scheme was exposed, the bankruptcy court appointed a receiver to act on behalf of those corporations in recovering the funds the investors had lost in the scheme. The Seventh Circuit rejected the defendants' argument that the acts of the principal wrongdoer were attributable to the corporations after they went into receivership, and that the receiver therefore lacked standing to recover funds on behalf of those corporations: "Now that the corporations created and initially controlled by [the principal wrongdoer] are controlled by a receiver whose only object is to maximize the value of the corporations **[*22]** for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [the principal wrongdoer]." *Id. at 755.* As the Seventh Circuit summed up, "the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated." *Id.* The Third Circuit has taken a similar approach in the bankruptcy context, finding that, once the principal wrongdoer had been removed from controlling a corporation, equitable considerations dictate that a trustee may seek to recover funds on behalf of the corporation in the interests of innocent investors. *See In re Personal & Business Ins. Agency, 334 F.3d 239, 246 (3d Cir. 2003)*.

In sum, because the Receiver alleges that the Settlement Agreement and the subsequent court order approving that agreement were procured through Eustace's fraudulent conduct, the Court rejects Kottke's contention that the Receiver's action is barred and denies Kottke's Motion for Judgment on the Pleadings.

### 3. *Motion to Dismiss Counterclaim*

Kottke asserts in its Counterclaim that the Receiver, acting on behalf of Option Capital, has breached the Settlement Agreement **[*23]** and violated the court order approving that agreement by bringing this action against Kottke. In addition to seeking a judgment for any amount that Kottke may be required to pay the Receiver, Kottke also seeks the attorney's fees it has accumulated in defending this action. The Receiver responds that he is not bound by the fraudulent acts of Eustace who dominated Option Capital before the receivership was instituted and may disavow any agreements Eustace made on behalf of Option Capital with intent to defraud or in violation of the law.

2007 U.S. Dist. LEXIS 56205, *23

While the Court agrees with the Receiver's general propositions of law, the Court must make all factual inferences in favor of Kottke when confronted with a Motion to Dismiss. If Kottke is able to show, inter alia, that Eustace's acts in entering into the Settlement Agreement on behalf of Option Capital were not fraudulent, Kottke may be able to prevail in a breach of contract action against Option Capital for violating the terms of the Settlement Agreement. [3] The Receiver's Motion to Dismiss Kottke's Counterclaim is denied.

> 3    The **[*24]** Receiver's alternative Motion to Dismiss Kottke's Request for Attorneys' Fees need not be resolved at this stage of the proceedings.

### V. *Conclusion*

For the reasons outlined in the forgoing Memorandum, Kottke's Motion to Transfer Venue, Kottke's Motion for Judgment on the Pleadings and the Receiver's Motion to Dismiss are denied.

An appropriate Order follows.

### ORDER

AND NOW, this 31st day of July, 2007, it is hereby ORDERED that the Defendant's Motion to Transfer Venue Pursuant to *28 U.S.C. Section 1404(a)* (Doc. No. 5), Defendant's Motion for Judgment on the Pleadings (Doc. No. 7) and Plaintiff's Motion to Dismiss the Counterclaim (Doc. No. 10) are DENIED.

BY THE COURT:

/s/ Michael M. Baylson, U.S.D.J.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 4287720 (M.D.Ga.)
**(Cite as: Slip Copy)**

Georgia Cas. & Sur. Co. v. **AtmosEnergy** Corp.
M.D.Ga.,2007.
Only the Westlaw citation is currently available.
        United States District Court,M.D. Geor-
                gia,Columbus Division.
GEORGIA CASUALTY & SURETY COMPANY,
    as subrogee of Art Angell, Bryant Sneed, Frank
    McDonald, William Champion, Walt Craner, Barry
    Grant, Robert Kelly, Deborah Green, and Liz Borg,
                        Plaintiffs,
                            v.
**ATMOSENERGY** CORPORATION, Defendant.
andGeorgia Casualty & Surety Company, as subro-
gee of Woodcraft by MacDonald, Inc., Coachcraft
    by MacDonald, Harold Case, Philip Lambertus,
    Ken Kahler, Robin Corbet, Brad MacDonald, Jim
    Rhodes, and Larry Motos, Plaintiffs,
                            v.
    **AtmosEnergy** Corporation, Defendant.
Woodcraft by McDonald, Inc., d/b/a Coachcraft by
        McDonald, Plaintiff-Intervenor.
        Brad MacDonald, Plaintiff-Intervenor.
Progressive Insurance Company, as subrogee of
    Brad MacDonald and Robin MacDonald, Plaintiff-
                        Intervenor.
            **No. 4:05-CV-87 (CDL).**

                    Dec. 4, 2007.

Richard C. Foster, Marietta, GA, for Georgia Casu-
alty & Surety Company, Progressive Insurance
Company, Brad MacDonald.
Ben B. Philips, Columbus, GA, for Woodcraft by
McDonald, Inc.
C. Morris Mullin, Columbus, GA, for Woodcraft by
McDonald, Inc., Brad MacDonald.
Clayton M. Adams, Jeffrey A. Brown, Columbus,
GA, David Frank Root, Shannon Mckenzie
Sprinkle, Atlanta, GA, Godfrey Bruce Parkerson,
New Orleans, LA, for Atmos Energy Corporation.

                        *ORDER*
CLAY D. LAND, District Judge.
**\*1** Presently pending before the Court is Defend-

ant's Motion to Exclude Plaintiffs' Expert Douglas
C. Buchan (Doc. 86). For the reasons set forth be-
low, Defendant's Motion to Exclude is denied, but
Buchan's testimony will be appropriately limited.

                    DISCUSSION

The basis for the pending litigation is Plaintiffs'
claim that Defendant negligently failed to prevent
and/or properly respond to a gas leak, resulting in
an explosion and the destruction of property be-
longing to Plaintiffs and Plaintiffs' insured. In sup-
port of their claims, Plaintiffs proffer the expert
testimony of Douglas C. Buchan, a professional
witness with over forty years of experience in the
gas industry. Buchan owned and operated a propane
delivery company for many years and later served
as a political appointee, liaison, and energy consult-
ant with the United States government. Currently,
Buchan owns a consulting business that primarily
provides expert testimony related to gas incident in-
vestigation. Buchan is prepared to opine that De-
fendant did not comply with applicable federal
pipeline safety regulations or accepted industry
practices in its prevention of or response to the gas
leak.

Defendant attacks both Buchan's qualifications and
the reliability of his conclusions, arguing that
Buchan's experience is inapplicable to the natural
gas industry and that his opinions are based solely
on his unsupported personal beliefs. For the reasons
set forth below, the Court denies Defendant's Mo-
tion to Exclude, but limits Buchan's testimony to
the content and importance of the federal statutes
and regulations governing pipeline safety.

        **I. General Principles of Admissibility**

Federal Rules of Evidence Rule 702 governs the ad-
missibility of expert testimony. It provides that "a
witness qualified as an expert by knowledge, skill,
experience, training, or education" may testify in
the form of an opinion "if (1) the testimony is based
upon sufficient facts or data, (2) the testimony is
the product of reliable principles and methods, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 4287720 (M.D.Ga.)

**(Cite as: Slip Copy)**

(3) the witness has applied the principles and methods reliably to the facts of the case."Fed.R.Evid. 702. In applying this rule, the trial court serves as a gatekeeper and may admit expert testimony only where it is both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993)."District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.' " *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir.2005) (quoting *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002)). The proponent of the expert bears the burden of showing by a preponderance of the evidence that the proffered expert testimony is admissible. *See Hall v. United Ins. Co. of Am.,* 367 F.3d 1255, 1261 (11th Cir.2004); *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").

**\*2** The language of Rule 702 imposes three specific restrictions on the admissibility of expert testimony: qualification, reliability, and assistance. First, to qualify to testify as an expert, a witness must possess specialized expertise based on knowledge, skill, experience, training, or education. *See*Fed.R.Evid. 702. Although an expert is not required to have personal knowledge of the facts at issue in the case, *see*Fed.R.Evid. 703, he must be qualified "regarding the matters he intends to address."*Allison,* 184 F.3d at 1309. Second, "the methodology by which the expert reaches his proffered testimony must be "supported by appropriate validation-*i.e.,* 'good grounds,' based on what is known."*United States v. Frazier,* 387 F.3d 1244, 1261 (11th Cir .2004) (quoting *Daubert,* 509 U.S. at 590). The Supreme Court has provided a nonexclusive list of factors to assist in determining whether an expert's opinion is reliable: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the

technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community."*Allison,* 184 F.3d at 1312 (citing *Daubert,* 509 U.S. at 593-94). Finally, the expert testimony must "fit" the case, meaning the testimony must be relevant to the issues at hand and assist the trier of fact in resolving those issues. *See Frazier,* 387 F.3d at 1262-63. If the testimony addresses issues within the understanding and experience of an average citizen, it is not considered helpful to the jury and is properly excluded under Rule 702.*Id.* Put differently, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."*Id.*

### *II. Analysis of Proposed Expert Testimony*

#### *A. Qualification*

Defendant first contends that Buchan is not qualified to testify as an expert in the field of natural gas primarily because Buchan's experience "relates exclusively to the propane industry."(Def.'s Br. in Supp. of Its Mot. to Exclude Pls.' Expert Douglas C. Buchan 9 .) While it is certainly true that the two fuel systems differ in some respects, Buchan has significant experience specifically related to the natural gas industry and its governing regulations. FN1

> FN1. Although Buchan admitted that he had not considered Georgia's specific regulations in analyzing the Coachcraft fire, Georgia has adopted the federal standards in their entirety:
>
> [A]ll Rules and Regulations prescribed by the United States Department of Transportation applicable to the "Transportation of Natural and Other Gas by Pipeline: Minimum Safety Standards" (C.F.R. 49, Parts 191 and 192) are by this Rule made the Rules and Regulations of the Georgia Public Service Commission for the safe installation and operation of all natural gas transmission and distribution facilities by com-

Slip Copy, 2007 WL 4287720 (M.D.Ga.)
**(Cite as: Slip Copy)**

panies subject to the jurisdiction of the Commission within this State. Ga. Comp. R. & Regs. 515-9-1-.01 (2007). Moreover, it is clear that GPSC "has not varied from these Federal standards."*Id.* Accordingly, any experience that Buchan has with the federal standards is necessarily relevant to his experience with the Georgia standards.

Although Buchan spent the majority of his professional career as a propane distributor, he also has extensive experience working directly with the natural gas industry. Buchan served as the Deputy Assistant Secretary of Energy with the United States Department of Energy from 1989 to 1993, a time when the Department was responsible for regulating interstate pipeline distribution of natural gas. Buchan served as a liaison between the government and the natural gas industry, requiring him to work closely with the industry to ensure the integrity of the distribution system in preparation for potential deregulation. After his formal government service, Buchan served as an energy consultant to the United States government until 1999.

**\*3** Buchan also has significant experience with regard to the level of emergency response required by the federal regulations. The record indicates that Buchan: (1) developed and coordinated national energy emergency conferences covering topics such as coordination of emergency response between local natural gas distributors and local government officials, including fire departments; (2) participated with response teams to Grade 1 leaks involving both propane and natural gas; (3) participated in gas emergency responses on a routine basis as a member of the Pinellas County, Florida gas board; and (4) trained fire department personnel in appropriate responses to gas emergencies.

Finally, Buchan has significant experience with regard to the training requirements of the federal regulations. In addition to his coordination of training conferences and receipt of comprehensive operator qualification training, Buchan is a member of the Energy Training Network, a group formed to provide operator qualification training consistent with the requirements of the federal regulations. In addition, Buchan has been qualified by the Energy Training Network to assess whether the network's evaluators are properly administering operator qualification training to natural gas operators.

While it may be true that Buchan has not had significant experience actually operating natural gas pipelines for a local distribution company or enforcing pipeline regulations, his anticipated testimony does not encompass those subjects. Buchan certainly has extensive experience with the natural gas industry and its regulations. Accordingly, the Court finds Buchan is qualified as an expert in the field of pipeline safety regulation.

*B. Reliability*

Defendant next argues that Buchan's conclusions are not generally accepted in the industry and that Plaintiffs cannot establish the reliability of Buchan's conclusions by reference to any of the *Daubert* factors. Specifically, Defendant contends that: (1) Buchan's conclusions fail to utilize a published methodology accepted in Georgia; (2) Buchan's opinions and conclusions have not been submitted for peer review; (3) Buchan has never performed any empirical or scientific studies to test his conclusions; (4) Buchan has never studied operating practices or training materials of natural gas distribution companies in order to develop his concept of industry standards; and (5) Buchan has failed to demonstrate how he reached his conclusion that had the leak been discovered sooner, the gas would not have ignited.[FN2]

> [FN2.] Plaintiffs apparently do not intend to use Buchan to establish causation in this case. To the extent that they do, the Court finds that Buchan's testimony with respect to causation is inadmissible. Plaintiffs have made no showing that any of Buchan's opinions regarding causation are reliable. Even when construing the evidence in the light most favorable to Plaintiffs, the only possible evidence weighing in favor of re-

Slip Copy, 2007 WL 4287720 (M.D.Ga.)

**(Cite as: Slip Copy)**

liability is Buchan's experience responding to gas leaks and observing gas companies' responses to emergencies. In this case, that type of anecdotal evidence alone is not enough to establish the element of reliability. *See Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1199 (11th Cir.2002)* (recognizing that while a court may rely on anecdotal evidence in its reliability analysis, anecdotal evidence alone likely will not supply reliable proof of causation).

Plaintiffs point out that Buchan's "opinions are based on (1) his experience and training in the industry, (2) his thorough knowledge of the federal safety regulations, and (3) his knowledge of accepted industry practices as relates to emergency responses and operator qualification."(Pl.'s [Ga. Casualty Ins.] Resp. to Def.'s Mot. to Exclude Pl.'s Expert Douglas C. Buchan 12.) In addition, Buchan deposed that he based his opinions, in part, upon studying the operations manuals and operating practices of gas distribution companies that he maintains as reference material.

**\*4** The Court finds that Buchan's extensive experience with the energy industry renders his observations regarding the natural gas industry reliable. However, insofar as Buchan *concludes* that Defendant was negligent or violated regulations, Plaintiffs have not sufficiently demonstrated that Buchan's conclusions are supported by the type of testing, publication, peer review, or acceptance within the natural gas industry contemplated by *Daubert* and *Kumho.*Accordingly, the Court finds that Buchan's testimony on the content and purpose of the federal pipeline safety regulations is reliable. However, to the extent that Plaintiffs purport to use Buchan's ultimate conclusions to establish Defendant's negligence, the Court finds that Buchan's testimony is unreliable and thus inadmissible.

C. *Assistance*

Finally, Defendant argues that Buchan's specialized knowledge will not assist the trier of fact in this case. Defendant contends that Buchan's testimony

is merely his own common-sense opinion about how Defendant should have reacted to the emergent situation, and as such, it is inadmissible. Accordingly, Defendant maintains that Buchan's testimony "[a]t minimum," should be restricted to "[a]llowing him to testify to the content of the rules and the reason for the rules."(Def.'s Mem. in Reply to Pls.' Resp. to Mot. to Exclude Pl.'s Expert, Douglas Buchan 10-11.) In contrast, Plaintiffs contend that Buchan's testimony is necessary to help define the regulations by reference to generally accepted industry practices.

The Court finds that Buchan's testimony will assist the jury in understanding the regulations themselves and the reasons for their existence. However, the Court also finds that once the jury understands the purpose and meaning of the regulations, the question of whether a violation occurred is well within "the understanding of the average lay person."*Frazier, 387 F.3d at 1262;see also Tyson v. Shoemaker, 208 Ga. 28, 32, 65 S.E.2d 163, 165-66 (1951)* ("What constitutes negligence on the part of a defendant, what constitutes the proximate cause of an injury, and what amounts to a failure to exercise ordinary care on the part of a plaintiff, are generally questions for the jury.") (internal quotation marks and citations omitted). Buchan's opinion as to whether Defendant violated the applicable regulations and his opinion as to Defendant's negligence will not assist the jury in this case. Therefore, Buchan's ultimate conclusions are inadmissible.

Ultimately, then, the Court finds that Buchan meets all three prongs of the Rule 702 analysis and may testify as an expert only as to the content and importance of the federal statutes and regulations governing pipeline safety. Buchan may not, however, opine as to whether Defendant was negligent, whether any regulatory violations actually occurred, or whether those violations or negligent acts were a proximate cause of Plaintiffs' loss. Plaintiffs have failed to show by a preponderance of the evidence that Buchan's testimony on those subjects is reliable or would assist the jury in this case.

CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4287720 (M.D.Ga.)
**(Cite as: Slip Copy)**

**\*5** For the foregoing reasons, the Court denies Defendant's Motion to Exclude Plaintiffs' Expert Douglas C. Buchan (Doc. 86), but limits Buchan's testimony to the content and importance of the federal statutes and regulations governing pipeline safety.

IT IS SO ORDERED.

M.D.Ga.,2007.
Georgia Cas. & Sur. Co. v. Atmos Energy Corp.
Slip Copy, 2007 WL 4287720 (M.D.Ga.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.