# UNREPORTED CASES



Slip Copy                                                                 Page 1
Slip Copy, 2006 WL 1308232 (E.D.Pa.)
**(Cite as: Slip Copy)**

C Baumgardner v. Wyeth Pharmaceuticals
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Renee Noll BAUMGARDNER, et al.
v.
WYETH PHARMACEUTICALS.
**Civil Action No. 05-05720-JF.**

May 11, 2006.

Arnold Anderson Vickery, Fred H. Shepherd, III,
Paul F. Waldner, Vickery & Waldner LLP, Houston,
TX, Rosemary Pinto, Feldman & Pinto PC,
Philadelphia, PA, for Renee Noll Baumgardner.
David B. Alden, Mark Herrmann, Jones, Day, Reavis
and Pogue, Cleveland, OH, Reetu Dandora, Reed
Smith LLP, Philadelphia, PA, for Wyeth
Pharmaceuticals.

*MEMORANDUM AND ORDER*
FULLAM, Sr. J.
**\*1** This case presents several procedural anomalies
and incongruities. There are 10 sets of plaintiffs,
none of whom reside in Pennsylvania. The only thing
they have in common (other than being represented
by the same law firm) is that they or the decedents
whom they represent allegedly suffered severe
adverse consequences from ingestion of a
prescription drug "Effexor" or "Effexor XR"
manufactured by the defendant, Wyeth
Pharmaceuticals, which is located in this district. The
claims of all of the plaintiffs are set forth in a single
complaint, which contains 66 paragraphs, set forth on
26 pages. In utter disregard of the requirements of
Fed.R.Civ.P. 8(a)(2) ("a short and plain statement of
the claim"), this complaint is principally devoted to a
recitation of evidence seemingly derived from expert
opinions and/or technical publications, and would
pass muster as an appellate brief.

On a more mundane level, the only named defendant,
Wyeth Pharmaceuticals, is not a suable entity; rather,
as the complaint alleges, it is alleged to be "an
unincorporated division of the corporation known
simply as 'Wyeth.' " (*See* Complaint at ¶ 13).

Counsel for the defendant has filed a motion to
dismiss the complaint under Fed.R.Civ.P. 12(b)(6).
Alternatively, the defendant contends that the claims
of the 10 sets of plaintiffs should be severed, and
transferred to the various districts where the plaintiffs
reside. Defense counsel has not addressed the non-
compliance with Rule 8 or the non-suability of the
named defendant, but contends merely that the
complaint embodies 10 separate claims which are
improperly joined, and therefore should either be
dismissed, or severed and tried separately elsewhere.

At oral argument on the pending motion, plaintiffs'
counsel virtually conceded that the 10 cases could not
be tried to conclusion in this district: each case
would, to a considerable extent, involve distinct facts,
and the application of the different laws of the
various states. Rather, plaintiffs' counsel insists (1)
that the cases should remain in this district for
consolidated pretrial discovery; and (2) that there is
one common issue (whether the defendant's drug can
cause the adverse consequences experienced by the
plaintiffs) which should be tried here. This is an issue
which would require expert testimony on both sides,
the expense of which, plaintiffs contend, should only
be incurred once. Defense counsel is willing to have
the cases remain in this district for consolidated
pretrial discovery, but remains convinced that the
cases must be tried separately.

I have reached the following tentative conclusions:

1. There really are 10 separate cases. If plaintiffs
wish to proceed in this court, each set of plaintiffs
must pay the appropriate filing fee. The cases will
therefore be severed from each other, to the extent set
forth below.

2. The defendant shall hereafter be referred to as
"Wyeth, d/b/a Wyeth Pharmaceuticals."

**\*2** 3. The cases shall be deemed to have been
consolidated for purposes of pretrial discovery which
is either common to all these cases or, if applicable
only to individual cases, may conveniently be
conducted in this district.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 2
Slip Copy, 2006 WL 1308232 (E.D.Pa.)
(Cite as: Slip Copy)

4. Since eventual transfers to other districts are likely, the claims of each set of plaintiffs should be set forth in a separate document, and receive a separate sub-file number (e.g., 5720(1), (2), etc.).

5. Decision as to whether any alleged common issue can properly be tried in this district will be deferred until completion of discovery in this district.

An Order follows.

ORDER

AND NOW, this 11th day of May 2006, upon consideration of defendant's motion to dismiss, IT IS ORDERED:

1. The defendant shall hereafter be referred to in these actions as "Wyeth, d/b/a Wyeth Pharmaceuticals," or "Wyeth."

2. Each set of plaintiffs shall file an amended complaint which (a) complies with Fed.R.Civ.P. 8, and (b) bears a separate sub-file number. All of these complaints will be deemed consolidated within C.A. 05-05720.

3. Each set of plaintiffs shall pay the required filing fee.

4. All of these cases are consolidated for purposes of pretrial discovery.

5. Decision as to whether one or more issues can properly be resolved in a single trial, whether one or more trials should take place in this district, etc., will await further development of the record.

E.D.Pa.,2006.
Baumgardner v. Wyeth Pharmaceuticals
Slip Copy, 2006 WL 1308232 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



129 Fed.Appx. 1                                                    Page 1
129 Fed.Appx. 1, 2005 WL 428779 (C.A.4 (Va.)), RICO Bus.Disp.Guide 10,835
**(Cite as: 129 Fed.Appx. 1)**

**H**D'Addario v. Geller
C.A.4 (Va.),2005.
This case was not selected for publication in the Federal Reporter.UNPUBLISHEDPlease use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)
United States Court of Appeals,Fourth Circuit.
Lawrence D'ADDARIO, suing individually and on behalf of all others similarly situated, and derivatively on behalf of RMS Titanic, Inc., Plaintiff-Appellant,
v.
Arnie GELLER; Joe Marsh; Gerald Couture; RMS Titanic, Incorporated, Defendants-Appellees,
andG. Michael Harris; Nick N. Cretan; Doug Banker, Defendants,
v.
Allan H. Carlin, Party in Interest.
**No. 04-1687.**

Argued: Dec. 1, 2004.
Decided: Feb. 24, 2005.

**Background:** Shareholder brought action alleging that corporation's officers, directors, and controlling shareholder breached their fiduciary duties and violated Racketeer Influenced and Corrupt Organizations Act (RICO) by engaging in fraud, self-dealing, mismanagement, diversion, and waste of corporate assets. The United States District Court for the Eastern District of Virginia, Rebecca Beach Smith, J., dismissed shareholder rights claim, denied class certification, and entered summary judgment in favor of defendants. Shareholder appealed.

**Holdings:** The Court of Appeals held that:

(1) fact issues remained as to whether officers and directors breached their fiduciary duties to corporation;

(2) denial of shareholder's discovery requests was not abuse of discretion; and

(3) shareholder did not have standing to bring claim that officers and directors improperly barred exercise of voting and dissenters' rights.

Affirmed in part, vacated in part, reversed in part, and remanded.
West Headnotes

**[1] Federal Civil Procedure 170A** 2513

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
       170Ak2513 k. Stock, Stockholders, and Corporations, Cases Involving. Most Cited Cases
Genuine issue of material fact as to whether corporation's officers and directors engaged in kickback scheme at corporation's expense, whether corporation did business with company in which officer was fifty percent owner, whether officers and directors approved exorbitant salaries and bonuses for themselves, and whether those actions caused monetary losses to corporation precluded summary judgment in shareholder's derivative action alleging that officers and directors breached their fiduciary duties to corporation. West's F.S.A. § 607.0830.

**[2] Corporations 101** 320(11)

101 Corporations
   101X Officers and Agents
     101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k320 Actions Between Shareholders and Officers or Agents
       101k320(11) k. Evidence. Most Cited Cases
Under Florida law, expert testimony was not necessary to establish that officers and directors breached their fiduciary duties to corporation, where action did not involve complicated factual disputes or complex legal issues.

**[3]    Federal    Civil    Procedure    170A** 1272.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1272.1 k. In General. Most Cited Cases

Denial of shareholder's discovery requests in action against corporation's officers and directors alleging violation of Racketeer Influenced and Corrupt Organizations Act (RICO) was not abuse of discretion, where RICO claim was dismissed for failure to allege requisite specificity for underlying claims of mail fraud and obstruction of justice, and requested information had minimal relevance to those claims. 18 U.S.C.A. § 1962.

[4] Securities Regulation 349B  86

349B Securities Regulation
    349BI Federal Regulation
        349BI(D) Securities and Exchange Commission and Proceedings
            349Bk86 k. Compelling Testimony or Production of Evidence. Most Cited Cases

Documents involuntarily submitted by corporation to Securities and Exchange Commission (SEC) in response to investigative subpoena were not subject to privilege from disclosure in shareholder's action against corporation's officers and shareholders for breach of fiduciary duties, where documents were not subject to attorney-client or work product privilege. 17 C.F.R. § 203.2.

[5] Partnership 289 375

289 Partnership
    289VIII Limited Partnership
        289k375 k. Actions by or Against Firms or Partners. Most Cited Cases

Limited partner of partnership that owned corporation's stock did not have standing to bring claim that corporation's officers and directors violated shareholders' rights by failing to permit exercise of voting and dissenters' rights during hostile takeover, even if partner was beneficial owner of corporation's shares, where partnership agreement did not grant limited partner voting or dissenters' rights. West's F.S.A. § 607.0902.

*2 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca Beach Smith, District Judge. (CA-02-250).

Steven Gary Storch, Storch, Amini & Munves, P.C., New York, New York, for Appellant.
Robert William McFarland, McGuirewoods, L.L.P., Norfolk, Virginia, for Appellees.
John D. Padgett, McGuirewoods, L.L.P., Norfolk, Virginia; William H. Baxter, II, McGuirewoods, L.L.P., Richmond, Virginia, for Appellees.
Arnie Geller and Gerald Couture. Megan E. Burns, Williams Mullen, P.C., Virginia Beach, Virginia, for Appellee Joe Marsh.

Before NIEMEYER and MICHAEL, Circuit Judges, and NORMAN K. MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed in part, vacated in part, reversed in part, and remanded by unpublished per curiam opinion.
Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).PER CURIAM:
**1 Lawrence D'Addario sued the officers, directors, and controlling shareholder of RMS Titanic, Inc. (RMST), a Florida corporation, alleging that the defendants engaged in fraud, self-dealing, mismanagement, diversion, and waste of corporate assets. D'Addario sought class certification for one of his claims (the shareholder rights claim), which the district court denied. The court then dismissed the shareholder rights claim on the ground that D'Addario lacked standing to bring it. After extensive discovery the court awarded summary judgment to the defendants on the remaining claims. D'Addario appeals the district court's order dismissing the shareholder rights claim and denying class certification. He also appeals various discovery rulings and the award of summary judgment to the defendants. We affirm the district court's orders and discovery rulings with two exceptions. We (1) vacate the district court's order granting summary judgment to defendants Arnie Geller and Gerald Couture on D'Addario's fiduciary duty claims and (2) reverse the district court's discovery ruling denying D'Addario access to documents and materials submitted by RMST to the Securities and Exchange Commission (SEC).

*3 I.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In August 1987 D'Addario invested $500,000 and became a limited partner in Titanic Ventures Limited Partnership (TVLP), a commercial enterprise formed to explore the sunken vessel, The Titanic. In 1993 TVLP and RMST entered into a reverse merger. Pursuant to this merger RMST acquired all of the assets of TVLP, and TVLP became a shareholder of RMST, holding several million shares of the company.

In November 1999 Arnie Geller and G. Michael Harris (two directors of RMST) and Joe Marsh (the single largest shareholder of RMST) obtained control of RMST through a hostile takeover. After the takeover Geller was named President, CEO, and Treasurer; he remained a director. Harris was named Executive Vice President, COO, and Secretary; he also remained a director. Gerald Couture, who apparently had no role in the takeover, was named Vice-President, CFO, and a director of RMST. Sometime after the takeover TVLP was dissolved and its RMST shares were distributed to the partners of TVLP, including D'Addario. It is unclear on what date TVLP was officially dissolved, but it was apparently on or after March 13, 2000, as this was the date that D'Addario signed off on the dissolution. On August 14, 2000, D'Addario received from TVLP a distribution of 784,088 RMST shares.

On April 15, 2002, D'Addario filed suit against Marsh, Geller, Couture, Harris, and two other members of RMST's board of directors. Though D'Addario originally brought a number of claims against a number of different defendants, it appears that D'Addario is now pursuing only three types of claims against three defendants, Geller, Couture, and Marsh. First, D'Addario asserts claims alleging that Geller and Couture breached their fiduciary duties as directors and officers (the fiduciary duty claims). Second, he alleges that Geller and Marsh violated the Racketeer Influenced and Corrupt Organizations Act (the RICO claim). D'Addario brings the fiduciary duty claims and the RICO claim as derivative ones on behalf of RMST. Third, he alleges that Geller and Marsh violated RMST shareholders' rights when they gained control of RMST pursuant to the hostile takeover (the shareholder rights claim). D'Addario brings this last claim individually and purportedly on behalf of a class.

**2 In December 2003 the three defendants (Geller, Couture, and Marsh) moved for summary judgment

on the fiduciary duty claims and the RICO claim. On December 19, 2003, while the motions for summary judgment were pending, the district court denied class certification on the shareholder rights claim and dismissed the claim on the basis that D'Addario lacked standing to bring it. On April 23, 2004, the district court awarded summary judgment to the defendants on the fiduciary duty claims and the RICO claim. D'Addario appeals the award of summary judgment to the defendants, the denial of class certification on the shareholder rights claim as well as its dismissal, and various discovery rulings.

II.

We turn first to the district court's award of summary judgment to the defendants on the fiduciary duty and RICO claims. We review a district court's award of summary judgment de novo, and in doing so we "view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994)* (citation omitted). Summary judgment may only be awarded when the evidence proffered "show[s] that there is no genuine *4 issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A.

According to D'Addario, he has proffered evidence that Geller and Couture breached their fiduciary duties to RMST in several ways, by, for example, managing RMST in an incompetent fashion, engaging in sham transactions with third parties at the expense of RMST, and engaging in transactions that involved conflicts of interest. D'Addario therefore argues that the district court erred in granting summary judgment on the fiduciary duty claims. Under Florida law (which applies here) a plaintiff must prove three elements to make out a claim for breach of fiduciary duty: (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) a causal connection between the breach and the plaintiff's injuries. *SeeGracey v. Eaker, 837 So.2d 348, 353 (Fla.2002)*. To satisfy his or her fiduciary duty to a corporation, "[a] director shall discharge his or her duties ... [i]n good faith ... with the care an ordinarily prudent person in a like position would exercise under similar circumstances and ... in a manner he or she reasonably believes to be in the best interests of the corporation." Fla. Stat. Ann. § 607.0830(1). Further, a director is personally liable

for monetary damages to the corporation when his breach of fiduciary duty involves willful misconduct, a conscious disregard of the corporation's best interests, or the receipt of an improper benefit. *See id.* § 607.0831(1)(b)(2), (b)(4).

[1] The district court determined that Geller and Couture, as officers and directors of RMST, owed fiduciary duties to the company. However, the court concluded that D'Addario failed to proffer any evidence to support a finding that Geller and Couture breached their fiduciary duties to RMST or that, if they did breach their duties, the breaches proximately caused damages to D'Addario. The district court erred because D'Addario did submit evidence that Geller and Couture breached their duties. For example, D'Addario pointed to testimony of Harris (another director at RMST) that Geller engaged in a kickback scheme at the expense of RMST with a man named Graham Jessop and his solely owned company, Argosy International, Ltd. (Argosy). *See* J.A. 3210. Argosy received from RMST 600,000 shares of RMST stock (valued at $900,000) in exchange for several treasure maps. RMST purchased the maps at Geller's request, and Geller did not have the maps appraised prior to the purchase. *See* J.A. 4300-04. The maps were later discovered to be worthless, and Harris testified that the whole transaction was a scam. According to Harris, Geller offered to divide up the 600,000 shares three ways between Geller, Harris, and Jessop, using "dummy" corporations. *See* J.A. 3210. Harris refused to engage in the scheme and eventually left RMST.

**3 D'Addario also proffered evidence of a questionable transaction in which the board of directors of RMST, at Geller's request, unwound the treasure map transaction with Argosy and entered into a substitute transaction with Argosy. Some time after the worthless treasure map deal, Argosy and RMST returned the 600,000 RMST shares for the treasure maps. The purported reason for the unwinding was that RMST lacked the financial wherewithal to pursue the opportunities presented in the maps. *See* J.A. 4109-11. Rather than just rescinding the transaction, however, RMST and Argosy entered into a new transaction in which RMST purchased from Argosy the rights to the Carpathia, another sunken vessel, by issuing 1,704,545 common shares of RMST *5 (valued at $750,000). *See* J.A. 3230. Geller told RMST's board (which included Couture at the time) that, based on an independent appraisal, the value of the Carpathia

rights was $4.5 million. *See* J.A. 3230. However, an examination of the appraisal reveals that it relied heavily (if not completely) on the value of the contents of the Carpathia. *See* J.A. 3233-34. There is an issue as to whether the rights Argosy sold to RMST included the rights to the contents of the Carpathia because it did not even include the rights to any cargo. *See* J.A. 2660, 3227. Indeed, Argosy had purchased the rights a year earlier from only five hundred pounds from the Secretary of State for the Environment in England. D'Addario also proffered evidence of other transactions by Geller and Couture that could constitute breaches of fiduciary duties, such as having RMST do business with a corporation in which Geller was a fifty percent owner, *see* J.A. 4007-13, approving seemingly exorbitant salaries and bonuses for themselves (for example, Couture approved, with little or no investigation, a $400,000 payment to Geller as back pay), *see* J.A. 2692-94, 4032-37, and engaging in another imprudent (and financially detrimental) transaction with Argosy, specifically, by having RMST sell one of its vessels to Argosy in exchange for a promissory note and a relatively small down payment, *see* J.A. 3551-52. This evidence is sufficient to create a genuine issue of material fact as to whether Geller and Couture breached their fiduciary duties to RMST.

The district court also concluded that D'Addario could not establish that he was damaged by the alleged breaches because he failed to introduce any evidence that the decrease in value of his RMST stock was due to Geller's and Couture's breaches of their fiduciary duties. The court erred because D'Addario brought the fiduciary duty claims as derivative claims on behalf of RMST, and he specifically sought damages for injuries sustained by the company. The issue is not whether Geller's and Couture's breaches caused damages to D'Addario but rather whether their breaches caused damage to RMST. *See Citizens Nat'l Bank of St. Petersburg v. Peters, 175 So.2d 54, 56 (Fla.Dist.Ct.App.1965)* (noting that in a derivative action "the injury is primarily against the corporation, or the shareholders generally [and that] the cause of action is in the corporation and the individual's right to bring it is derived from the corporation."). D'Addario has proffered evidence that the breaches by Geller and Couture caused monetary losses to RMST. For example, if the Carpathia deal constitutes a breach of fiduciary duty, then the breach surely damaged the company: Geller and Couture arranged for RMST to exchange $750,000 worth of shares for what appear,

129 Fed.Appx. 1
129 Fed.Appx. 1, 2005 WL 428779 (C.A.4 (Va.)), RICO Bus.Disp.Guide 10,835
(Cite as: 129 Fed.Appx. 1)

at the summary judgment stage, to be worthless rights. In sum, it was error for the district court to award summary judgment to Geller and Couture on the breach of fiduciary duty claims on the ground that D'Addario had not proffered evidence that these two defendants breached their duties or that the breaches caused damage.

**\*\*4**[2] Geller and Couture argue that they are entitled to summary judgment because D'Addario presented no expert testimony establishing that their conduct amounted to breaches of their fiduciary duties or that their conduct caused damages to D'Addario. They rely heavily on Florida law for the proposition that "questions of proximate cause and damages present complex questions of law and fact that cannot be resolved strictly through lay witnesses." Br. for Appellees at 38. A review of the authority cited by Geller and Couture, however, reveals no such requirement under Florida law. Although experts may be needed in complicated cases, in the present **\*6** case it should not be unduly difficult to determine whether or not the defendants' actions constitute breaches of their fiduciary duties or whether any breaches caused damage to RMST. For example, expert testimony is not essential to establish that a kickback scheme engaged in by a director at the expense of the corporation constitutes a breach of the director's fiduciary duties. Nor is expert testimony needed to determine the amount of damages suffered if $750,000 worth of stock is wrongfully exchanged for essentially worthless rights.

D'Addario also argues that the district court abused its discretion in refusing to allow further time for the gathering of additional evidence pursuant to Fed.R.Civ.P. 56(f) and in refusing to allow him to submit belated expert reports. According to D'Addario, this evidence would have further buttressed his fiduciary duty claims and provided further grounds for reversing the district court's award of summary judgment on the fiduciary duty claims. We need not address these arguments because we vacate on other grounds the district court's award of summary judgment against D'Addario on his fiduciary duty claims.

**B.**

D'Addario next argues that the district court erred in awarding summary judgment to Geller and Marsh on his RICO claim (this claim was not brought against Couture). D'Addario alleges that Geller and Marsh

engaged in a pattern of racketeering in violation of the RICO Act, 18 U.S.C. § 1962. As predicate acts for his RICO claim, he alleges that Geller and Marsh engaged in mail fraud and that Geller engaged in obstruction of justice. The district court dismissed the RICO claim because (1) D'Addario failed to allege the requisite specificity for a claim of mail fraud under 18 U.S.C. § 1341, and (2) assuming D'Addario could establish that Geller engaged in obstruction of justice, D'Addario offered no evidence that the predicate acts caused harm to RMST.

[3] On appeal D'Addario does not dispute the district court's reasoning but rather argues that the entry of judgment against him was error due to the district court's denial of two discovery requests. D'Addario claims the discovery he sought would have provided him with evidence to support his RICO claim. D'Addario first claims that the district court abused its discretion in refusing to allow him access to RMST's artifacts. Access to the artifacts was necessary to establish the RICO claim, D'Addario asserts, because there is an issue as to whether the defendants' illegal conduct is exposing RMST to financial risk, which in turn could affect the company's ability to care for the artifacts. Because of the minimal relevance, if any, of the condition of the artifacts to the claims of mail fraud and obstruction of justice, the district court's denial of this discovery request was not an abuse of discretion.

**\*\*5** D'Addario also claims that the district court abused its discretion in refusing to compel the defendants to produce corporate telephone records that would have supposedly aided him in establishing wire fraud, an alternative predicate act for his RICO claim. D'Addario sought telephone records of "any and all phone numbers which RMST entirely or partially maintains, pays for, reimburses, or which are otherwise used by any RMST officer, director, employee, and/or consultant from September 1999 through the present." J.A. 231. The district court denied D'Addario's request because it was too broad and because the fact that telephone calls were made is insufficient by itself to establish wire fraud. We have considered the **\*7** district court's reasoning, and we conclude that the denial of this request was not an abuse of discretion.

**III.**

D'Addario next argues that the district court erred by refusing to compel Geller and Couture to produce (on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 1                                                                                                                 Page 6
129 Fed.Appx. 1, 2005 WL 428779 (C.A.4 (Va.)), RICO Bus.Disp.Guide 10,835
(Cite as: 129 Fed.Appx. 1)

behalf of RMST) documents and materials that RMST had submitted to the SEC in a separate investigation. The district court found, and Geller and Couture now argue, that there exists a privilege (an SEC privilege) as to documents that are involuntarily submitted to the SEC in response to an investigative subpoena.

[4] The district court erred because there is no such thing as an SEC privilege. Geller and Couture cite to _In re Steinhardt Partners, L.P., 9 F.3d 230 (2nd Cir.1993), In re Subpoenas Duces Tecum, 738 F.2d 1367 (D.C.Cir.1984), and 17 C.F.R. § 203.2 (2004)_ to support their argument for this privilege. These sources do not establish or support an independent SEC privilege. The two cited cases deal with the attorney-client and work product privileges and examine only whether a party's disclosure of privileged documents in connection with an SEC investigation waives any privilege in later civil proceedings initiated by private litigants. _SeeIn re Steinhardt, 9 F.3d at 233;In re Subpoenas, 738 F.2d at 1369._ Geller and Couture do not argue that the documents RMST submitted to the SEC are subject to the attorney-client or work product privilege, and there is no evidence that they established the necessary elements to claim either privilege. Further, the regulation cited by Geller and Couture, _17 C.F.R. § 203.2,_ provides only that information and documents obtained by the SEC in the course of an investigation are deemed non-public. The regulation does not provide that documents and materials submitted to the SEC are not discoverable in a later civil proceeding. Because there is no SEC privilege, the district court erred in refusing to compel discovery of the documents and materials submitted by RMST to the SEC.

IV.

D'Addario finally argues that the district court erred in refusing to grant class certification for his shareholder rights claim and that the district court erred in ultimately dismissing the claim because D'Addario lacked standing. D'Addario alleges that Geller and Marsh violated the rights of RMST shareholders by failing to comply with Fla. Stat. Ann. § 607.0902 during their hostile takeover of RMST in November 1999. D'Addario alleges Couture is liable for this violation because he "ratified this wrong." J.A. 55. Section 607.0902 requires a majority of disinterested shareholders having voting rights to grant approval of a hostile takeover in which a

shareholder acquires a controlling interest in the corporation. _SeeFla. Stat. Ann. § 607.0902(9)._ As written at the time, _§ 607.0902_ granted dissenters' rights to all shareholders; these rights permitted shareholders, at their option, to sell their shares back to the corporation at a fair value. _See id. § 607.0902(11)_ (repealed 2003). D'Addario asserts that the defendants "prevented [D'Addario] and the class members from voting [RMST] shares at the time of the takeover ... and from obtaining dissenters' rights at a time when RMST was profitable." J.A. 56. D'Addario requested class certification for this claim, purporting to represent "all persons who were shareholders in November, 1999 just prior to the acquisition of majority shareholder control by the takeover defendants and their group and entitled to voting and dissenters' rights under Florida Statute 607.0902." J.A. 56.

*8**6[5] We agree with the district court that D'Addario does not have standing to bring the shareholder rights claim and that he is not a member of the class he purports to represent. As to the standing issue, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." _Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)_ (citations omitted). Phrased differently, the plaintiff "must have a personal stake in the outcome of the lawsuit." _Id. at 478, 110 S.Ct. 1249_ (internal quotation marks and citations omitted). In the present case the injury D'Addario claims is a deprivation of voting and dissenters' rights associated with RMST stock. The problem is that D'Addario was not deprived of voting or dissenters' rights by the defendants' action because D'Addario did not have these rights at the time of the hostile takeover. D'Addario did not even own RMST stock during the relevant time, as the takeover took place in November 1999, and he did not become a shareholder of RMST until August 2000. TVLP, a limited partnership in which D'Addario was a limited partner, was the record owner of the RMST shares at the time of the takeover, and it was TVLP that would have been deprived of voting and dissenters' rights. Because D'Addario himself was not deprived of any rights, he did not suffer "an actual injury traceable to the defendant[s]" and has no standing to bring the shareholder rights claim. _Id. at 477, 110 S.Ct. 1249._

D'Addario argues that he was in fact a shareholder

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entitled to voting and dissenters' rights because he was the beneficial owner of the shares held by TVLP prior to the transfer. Under Florida law a shareholder is one who is either "a holder of record" or "the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." Fla. Stat. Ann. § 607.01401(24). D'Addario argues that he was the beneficial owner of the RMST shares and that the TVLP limited partnership agreement, which was on file with RMST, should be considered a nominee certificate on file with the corporation. On this reasoning D'Addario asserts that he was a shareholder under § 607.01401(24) and that he was entitled to voting and dissenters' rights on the date of the takeover under § 607.0902.

The flaw in D'Addario's argument is that even if he is considered a beneficial owner of the RMST shares owned by TVLP on the takeover date, he is only considered a shareholder "to the extent of the rights granted by [the] nominee certificate on file" with RMST. Id. § 607.01401(24). Section 607.01401(24) provides that a beneficial owner's rights as a shareholder are limited to only those that are listed in the nominee certificate on file with the corporation. TVLP's limited partnership agreement, which D'Addario asserts was in fact a nominee certificate, provided that the general partners of the partnership had the power "[t]o purchase, lease, develop, improve, maintain, exchange, trade, or sell all or part of the Partnership assets at such price, rental or amount for cash, security or other property, and upon such terms as the General Partners in their sole, absolute and uncontrolled discretion shall deem to be in the best interest of the Partnership." J.A. 667-68. Notably absent from the agreement is any clause granting limited partners of TVLP, such as D'Addario, *any* rights as to the RMST shares held by TVLP, let alone the more specific voting and dissenters' rights. The right to exercise dissenters' rights and thereby liquidate TVLP's shares of RMST stock was clearly vested in TVLP as the record owner*9 and, through the limited partnership agreement, in the general partners of TVLP. Even if D'Addario was a beneficial owner of the RMST shares he was not entitled to voting or dissenters' rights because the TVLP partnership agreement did not grant him such rights. And because he was not entitled to voting and dissenters' rights, D'Addario is not a member of the class he purports to represent, namely shareholders of RMST who were "entitled to voting and dissenters' right under Florida Statute

607.0902." J.A. 56.

V.

**7 With the exception of one claim, we affirm the district court's order awarding summary judgment to Geller, Couture, and Marsh. We vacate the summary judgment to the extent that it disposed of D'Addario's breach of fiduciary duty claims against Geller and Couture. We also affirm the district court's discovery rulings except for the ruling that D'Addario is not entitled to documents and materials submitted by RMST to the SEC. The documents and materials were not privileged, and we therefore reverse the district court's ruling that denied discovery of these items. Finally, we affirm the district court's order denying class certification on D'Addario's shareholder rights claim and dismissing the claim. The case is remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED*

C.A.4 (Va.),2005.
D'Addario v. Geller
129 Fed.Appx. 1, 2005 WL 428779 (C.A.4 (Va.)), RICO Bus.Disp.Guide 10,835

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3025397 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**Nickel v. Gillette
W.D.Wis.,2006.
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
Dorothy H. NICKEL, Plaintiff,
v.
Nevin J. GILLETTE and Diversified Financial Of
Illinois, Inc., Defendants.
**No. 06-C-24-S.**

Sept. 13, 2006.

Nevin J. Gillette, Rock Falls, IL, pro se.

MEMORANDUM AND ORDER
JOHN C. SHABAZ, District Judge.
*1 Plaintiff Dorothy Nickel commenced this action for fraud, breach of fiduciary duty and negligence against her investment advisors and brokers, defendants Nevin Gillette and Diversified Financial of Illinois, Inc. The matter is presently before the Court on defendants' motion for summary judgment. The following is a summary of facts viewed most favorably to plaintiff.

FACTS

Plaintiff is a Wisconsin resident and an unsophisticated investor. Defendant Gillette is an Illinois investment advisor and broker and an agent of defendant Diversified. In 1985 defendants made representations to plaintiff and her husband and solicited them to open an account with defendants for the purpose of purchasing securities and life insurance. Plaintiff and her husband opened an account and invested funds, relying on defendants to make investment decisions on their behalf. Defendants made the following representations to plaintiff and her husband: that defendants would invest to preserve principal, maximize return and maintain liquidity; that defendants were experienced, knowledgeable investment advisors; that plaintiff and her husband would profit from the investments; that plaintiff's risk exposure would be limited. Thereafter defendants received funds from and rendered reports to plaintiff setting forth investments allegedly made on plaintiff's behalf and the value of plaintiff's

account. After plaintiff's husband's death in October 2005 plaintiff sought documentation of her investments from defendants. When defendants provided only limited and inaccurate documentation plaintiff commenced this action on January 11, 2006.

Notwithstanding numerous discovery conferences and motions to compel discovery, defendants have been unable to present the type of third party documentation which would normally be expected had investments been made as defendants represented in their statements. Defendants have provided incomplete and inadequate documentation and explanations of investments. During her relationship with defendants plaintiff and her husband had sent $254,000 to defendants and had withdrawn $69,380.57. On May 2, 2006 defendants paid plaintiff $354,717.91, an amount which defendant represented to be the total of plaintiff's contributions and earnings held by defendants. Plaintiff's expert has opined that the lack of adequate documentation makes it impossible to determine whether the amount paid represents the actual balance of funds and earnings.

MEMORANDUM

Defendants move for summary judgment on the basis that plaintiff lacks essential expert testimony to prove damages at trial. Plaintiff contends that damages may established based on documents and testimony at trial which could establish that a greater return was realized on certain investments. Defendants also advanced several arguments relating to elements of plaintiff's liability case, which they abandoned in their reply brief.

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3025397 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

factfinder, applying the appropriate evidentiary standard of proof, could return a verdict for the nonmoving party. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 254 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

**\*2** Concerning the liability aspect of the motion, the facts viewed most favorably to plaintiff, particularly the virtual lack of documentation provided by defendants, could sustain the inference that defendants falsely reported the investments they were making on plaintiff's behalf, converting the funds to a different purpose. Such conduct clearly could sustain claims of negligence, misrepresentation and breach of fiduciary duty even in the absence of expert testimony that it is improper.

Defendants correctly note that proof of actual damages is an essential element of each of defendant's tort claims, _Widemshek v. Fale,_ 17 Wis.2d 337, 340, 117 N.W.2d 275 (1962), and that punitive damages are not recoverable in the absence of compensatory discrepancies. _Tucker v. Marcus,_ 142 Wis.2d 425, 418 N.W.2d 818 (1988). However, record keeping discrepancies and testimony could establish some amount of actual damages for which expert testimony would not be required.

More importantly, defendants' motion entirely overlooks plaintiff's alternative claim for the equitable remedy of an accounting. In general, an accounting is available as an equitable remedy when the legal remedy appears inadequate because underlying facts have been undiscoverable, the accounts are complicated and a fiduciary relationship exists. _Anitgo Superior Nursing Home, Inc. v. First Fed. S & L Ass'n,_ 51 Wis.2d 196, 201, 186 N.W.2d 265; _Walter Diehnelt, Inc. v. Root,_ 183 Wis. 535, 198 N.W. 388 (1924). _See also_ 1 Am.Jur.2d Accounts and Accounting § 59 (2005) ("equity jurisdiction may be exercised and an accounting decreed, in actions arising out of a tort where there is an allegation of fraud, especially where there is an additional ground for jurisdiction, such as the existence of a fiduciary relationship, or where the accounts and transactions alleged to have been tainted with fraud were complicated").

Accordingly, the evidence necessary to establish liability and damages (or the inability to prove damages so that a remedy at law is inadequate) is largely the same as that necessary to obtain an accounting. Defendants' disregard for the possibility of an accounting remedy at the conclusion of trial is particularly striking in light of their vigorous opposition to plaintiff's recent motion to compel on the basis that the accounting remedy remained available pursuant to count V of the complaint. _See_ Defendants' response to plaintiff's motions at ¶ 2.

The evidence of record and inferences from it could sustain a finding that defendants breached their duty to plaintiff and defrauded her, and that she sustained damages as a result. In the absence of sufficient proof of damages at trial plaintiff may be entitled to an accounting as an equitable alternative based on the fact that defendants' conduct itself precluded her from establishing a legal remedy.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is DENIED.

W.D.Wis.,2006.
Nickel v. Gillette
Not Reported in F.Supp.2d, 2006 WL 3025397 (W.D.Wis.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2003 BANKR LEXIS 1635



Analysis
As of: Dec 20, 2007

**In re: RSL COM PRIMECALL, INC. and RSL COM U.S.A., INC., Debtors. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF RSL COM PRIMECALL, INC. and RSL COM U.S.A., INC., -against- RSL COM U.S.A., INC., RSL COM PRIMECALL, INC., and LDM SYSTEMS, INC., Plaintiffs, -against- JOEL BECKOFF, NESIM BILDIRICI, GUSTAVO CISNEROS, PAUL DOMORSKI, AVERY FISCHER, ITZHAK FISHER, FRED LANGHAMMER, LEONARD A. LAUDER, RONALD S. LAUDER, ROLLAND MALLCOTT, MICHAEL MARINO, STEVEN SCHIFFMAN, EUGENE SEKULOW, DONALD SHASSIAN, JACOB SCHUSTER, NIR TARLOVSKY, NICHOLAS TROLLOPE, and RICHARD E. WILLIAMS, Defendants.**

**Chapter 11, Case Nos. 01-11457 and 01-11469 (ALG) (Jointly Administered), Adv. Proc. No. 03-2176 (ALG)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 Bankr. LEXIS 1635*

**December 11, 2003, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at *RSL Communs. PLC v. Bildirici, 2006 U.S. Dist. LEXIS 67548 (S.D.N.Y., Sept. 14, 2006)*

**DISPOSITION:** [*1] Allegations of complaint with respect to claims for wrongful concealment and constructive fraud and for aiding and abetting constructive fraud dismissed. Allegations of complaint with respect to breach of fiduciary duty sustained only as to claims relating to guarantees by RSL USA and only as against Defendants Fisher, Shassian, Beckoff and Marino in their capacities as directors of RSL USA. Claims for aiding and abetting breach of fiduciary duty dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, debtors, together with the debtors' official committee of unsecured creditors, filed an adversary proceeding against defendants, officers or directors of he debtors and affiliated companies. The complaint alleged: (1) constructive fraud and aiding and abetting constructive fraud; (2) breach of fiduciary duty; (3) aiding, and abetting in a breach of

fiduciary duty; and (4) piercing the corporate veil. Defendants moved to dismiss.

**OVERVIEW:** The allegations with respect to the claims for wrongful concealment and constructive fraud, and for aiding and abetting constructive fraud, were dismissed. The debtors included in this claim creditors who allegedly relied on defendants' concealment of the debtors' insolvency. The debtors had no standing to sue on behalf of these creditors. Even if the debtors had standing, they failed to plead this claim with particularity as required by *Fed. R. Civ. P. 9*. The breach of fiduciary duty claim alleged that the directors had a duty to liquidate upon insolvency. However, the decision by the directors to postpone a bankruptcy filing and attempt to "work out" the debtors' financial problems was subject to the business judgment rule. However, the debtors did state a claim for breach of fiduciary duty regarding certain directors authorizing guarantees for affiliate entities of the debtors that allegedly did not benefit the debtors and without reviewing the propriety of such guarantees. Finally, the debtors' claims of lack of adequate capitalization and overlapping of officers and directors among the

2003 Bankr. LEXIS 1635, *

various affiliate entities failed to state a claim for piercing the corporate veil.

**OUTCOME:** The bankruptcy court denied the motion to dismiss with respect to the allegations of the complaint regarding breach of fiduciary duty relating to the authorization of the guarantees, and only as against certain directors. The bankruptcy court granted the motion to dismiss as to all of the remaining claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] A complaint may not be dismissed under *Fed. R. Civ. P. 12(b)(6)*, incorporated into adversary proceedings in bankruptcy by *Fed. R. Bankr. P. 7012(b)(6)*, unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] In a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, upon consideration of the allegations contained in a complaint, including any exhibits attached thereto, a court is obligated to accept all of the allegations in the complaint as true and must draw all reasonable inferences in favor of a plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3] In a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the scope of a court's review is limited as the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. In order to survive a motion to dismiss, the plaintiff only has to allege sufficient facts, not prove them.

*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN4] Constructive fraud has been defined as a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN5] In order to establish a claim for constructive fraud, a plaintiff must establish the same elements as a claim for fraud, except that the element of scienter is not essential in view of the existence of a fiduciary or confidential relationship between the parties.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Elements*
[HN6] The elements of a cause of action for constructive fraud under New York law are the following: (1) a representation was made; (2) the representation was of a material fact; (3) the representation was false; (4) the representation was made with intent that the other party would rely upon it; (5) the other party did, in fact, rely on the representation without knowledge of its falsity; (6) injury resulted; and (7) the parties were in a fiduciary or confidential relationship.

*Bankruptcy Law > Estate Property > Content*
*Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview*
[HN7] It is black letter law that a trustee in bankruptcy (including a debtor in possession) may only pursue claims that belong to the estate. A claim may belong to a bankrupt company only where the complaint can identify a direct injury to the debtor, or in limited circumstances where the claim is so generally for the benefit of all creditors as an undifferentiated group that the trustee can be considered to be acting for "creditors generally."

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN8] Because standing is a jurisdictional matter, the burden is on a plaintiff clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.

*Bankruptcy Law > Estate Property > Content*
[HN9] Whether a claim is property of a bankruptcy estate or of individual creditors depends on whether the claim is general or particular. If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of a debtor, a

2003 Bankr. LEXIS 1635, *

trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.

**Bankruptcy Law > Estate Property > Content**
**Civil Procedure > Federal & State Interrelationships > Erie Doctrine**
[HN10] In bankruptcy, the question whether a claim is general, so that it should be brought by a bankruptcy trustee, or particular, so that it belongs to individual creditors, is a question of state law.

**Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview**
**Governments > Fiduciary Responsibilities**
**Torts > Business Torts > Fraud & Misrepresentation > General Overview**
[HN11] Under New York law, a cause of action for fraudulent concealment requires, in addition to a misrepresentation and a fiduciary or confidential relationship, reliance and subsequent injury. In an adversarial proceeding in bankruptcy, by charging a state law wrong, plaintiffs are not relieved of their burden of alleging and proving individual reliance and damages. Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information at different times, and in some cases may not have relied on any information.

**Civil Procedure > Justiciability > Standing > General Overview**
**Governments > Fiduciary Responsibilities**
**Torts > Business Torts > Fraud & Misrepresentation > General Overview**
[HN12] The intentional distortion of a corporation's financial picture and its solvency, for the purpose of misleading creditors to extend goods and services, is undoubtedly wrongful. But absent an allegation of direct injury to a corporation, or a diversion of goods or services from the company, it cannot be presumed that the alleged wrongful concealment of the corporation's insolvency from creditors harmed or injured the corporation.

**Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims**
**Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview**
[HN13] Fed. R. Civ. P. 9(b) provides that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity.

Irrespective of whether a claim is for actual fraud or constructive fraud, Fed. R. Civ. P. 9(b) applies.

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Fraudulent Transfers > General Overview**
**Torts > Business Torts > Fraud & Misrepresentation > General Overview**
[HN14] A constructive fraudulent transfer claim has nothing to do with fraud, and instead is based on a transferor's financial condition and the sufficiency of the consideration provided by the transferee.

**Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims**
**Criminal Law & Procedure > Accusatory Instruments > Complaints**
[HN15] To pass muster under Fed. R. Civ. P. 9(b), a complaint must allege with some specificity the acts constituting fraud; conclusory allegations that a defendant's conduct was fraudulent or deceptive are not enough. This is particularly true where fraud is alleged against multiple defendants. Where a case involves multiple defendants, Fed. R. Civ. P. 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act.

**Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview**
**Civil Procedure > Federal & State Interrelationships > Erie Doctrine**
[HN16] The law of the state of incorporation applies, the charges relate to the duties of a corporation's directors.

**Business & Corporate Law > Corporations > Directors & Officers > General Overview**
**Contracts Law > Contract Interpretation > Fiduciary Responsibilities**
**Governments > Fiduciary Responsibilities**
[HN17] Traditionally, under Delaware law, directors owe fiduciary duties to stockholders, and perhaps to the corporation, and the relationship between directors and creditors is not fiduciary but contractual in nature. Insolvency, however, changes the scope of a director's duties, and upon insolvency directors owe fiduciary duties to creditors or, stated differently, to the corporation and to all of its interested constituencies, including creditors and shareholders. The rationale behind the "insolvency exception" is that the fiduciary duties held ordinarily for

the benefit of shareholders should shift to creditors who now occupy the position of residual owners.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty to Third Parties*
*Governments > Fiduciary Responsibilities*
[HN18] When a corporation is "in the vicinity of insolvency," the directors owe fiduciary duties to the entire "community of interests" of those involved with the corporation, including creditors. When managing a corporation "in the vicinity of insolvency," directors must consider the best interests of the corporation, and not just the interests of either creditors or shareholders alone. While this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth-creating capacity.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN19] It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can "work out" its problems or should file a bankruptcy petition. Surely, a doctrine like that would stand in the way of the development of any new enterprise. There is no duty to liquidate and pay creditors when a corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule*
*Civil Procedure > Judgments > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
[HN20] The business judgment rule in Delaware law creates a presumption that in making a business decision the disinterested directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. The presumptive validity of an exercise of business judgment is rebutted in cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN21] A plaintiff bears the burden of alleging well-pleaded facts to overcome the presumption that in making a business decision the disinterested directors of a corporation act on an informed basis and survive a motion to dismiss.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Self-Dealing*
[HN22] Courts that have actually addressed the issue of the duty of directors of insolvent corporations to file a bankruptcy petition have uniformly found officers and directors not liable in the absence of self-dealing.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN23] Domination and control of a corporate director is not established by arguing that a director is not independent because of selection by and ties to an interested director. This is a common and accepted way of becoming a corporate director.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN24] Conclusory allegations, unaccompanied by specific factual allegations that directors of a corporation were somehow controlled or dominated are insufficient to establish a lack of independence.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN25] The type of conduct which courts have held is proscribed for a corporation operating in the vicinity of insolvency include transactions, usually without fair consideration to the company, for the benefit of the parent corporation or related entities. Further, plaintiffs are not required allege that each defendant director was the re-

cipient of a direct pecuniary benefit from a challenged transaction, but that the transaction allegedly benefited only a corporate affiliate and was patently inequitable to a subsidiary.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > Business Judgment Rule***
***Governments > Fiduciary Responsibilities***
***Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities***
[HN26] The business judgment rule does not protect conduct of directors where material decisions are made in the absence of any information and any deliberation. Allegations that corporate directors abdicated all responsibility to consider action that was arguably of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests.

***Bankruptcy Law > Conversion & Dismissal > Lack of Good Faith***
***Contracts Law > Contract Conditions & Provisions > Exculpatory Clauses***
***Torts > Procedure > Settlements > Releases > General Overview***
[HN27] Where plaintiffs challenge the good faith of a corporation's directors, this is enough, at the motion to dismiss stage, to overcome an exculpation clause in the corporation's articles of incorporation.

***Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > General Overview***
***Contracts Law > Contract Conditions & Provisions > Exculpatory Clauses***
***Torts > Negligence > Defenses > Exculpatory Clauses > General Overview***
[HN28] An exculpation clause in a corporation's article of incorporation allocates the risk of loss only between the parties to the articles of incorporation, i.e., the shareholders and the directors, but not as among directors and third parties such as creditors, and it therefore does not affect suits by creditors.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview***
***Governments > Fiduciary Responsibilities***

[HN29] Delaware courts have recognized that directors who hold dual directorships in a parent-subsidiary context may owe fiduciary duties to each corporation.

***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
***Governments > Fiduciary Responsibilities***
[HN30] Under Delaware law, officers as well as directors may owe fiduciary duties.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > General Overview***
***Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview***
[HN31] Aiding and abetting a breach of duty is usually used to impose liability on third parties and raises the question as to whether the wrongdoing of the corporation itself is not a bar to the action. Aiding and abetting requires knowing participation in the wrongdoing.

***Business & Corporate Law > Corporations > Formation > Place of Incorporation > General Overview***
***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
***Civil Procedure > Federal & State Interrelationships > Erie Doctrine***
[HN32] In determining whether the corporate form will be disregarded and a corporate veil pierced, the law of the state of incorporation is applied.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Fraud***
***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Sham Corporations***
***Torts > Vicarious Liability > Corporations > Subsidiary Corporations***
[HN33] Under Delaware law, in order to pierce the corporate veil and establish alter ego liability, a party must show: (1) that the parent and the subsidiary operated as a single economic entity; and (2) that an overall element of injustice or unfairness was present. Allegations of mere domination or control by one entity over another are insufficient; in the context of veil piercing, it is not sufficient at the pleading stage to make conclusory allegations of control. Rather, the extent of the domination and

control must preclude the controlled entity from having legal or independent significance of its own. There must be an abuse of the corporate form to effect a fraud or an injustice--some sort of elaborate shell game.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Sham Corporations*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Torts > Transportation Torts > General Overview*
[HN34] To survive a motion to dismiss on a claim of corporate veil-piercing, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability. Further, the plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud. The fraud or similar injustice that must be demonstrated in order to pierce the corporate veil under Delaware law must, in particular, be found in the defendant's use of the corporate form.

*Business & Corporate Law > Corporations > Governing Documents & Procedures > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Corporate Formalities*
*Business & Corporate Law > Corporations > Shareholders > Shareholder Duties & Liabilities > Controlling Shareholders > General Overview*
[HN35] In determining whether the corporate form has been misused under Delaware law, courts have considered the following factors: (1) whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholders siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for a dominant shareholder.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN36] If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN37] It is commonplace for subsidiaries governed by the laws of different legal systems to be separately incorporated, so that their corporate structure can address the potential differences between applicable corporate laws.

COUNSEL: For Plaintiffs: William F. Gray, Jr., Esq., William F. Kuntz, II, Esq., Steven R. Schoenfeld, Esq., TORYS, LLP, New York, New York.

For Joel Beckoff, Nesim Bildirici, Paul Domorski, Avery Fischer, Itzhak Fisher, Ronald S. Lauder, Rolland Mallcott, Steven Schiffman, Jacob Schuster, Eugene Sekulow, Defendants: John S. Kiernan, Esq., Sean Mack, Esq., Emily O. Slater, Esq., DEBEVOISE & PLIMPTON, New York, New York.

For Donald Shassian, Defendant: P. Gregory Schwed, Esq., John Lang, Esq., Eric S. Manne, Esq., LOEB & LOEB LLP, New York, New York.

For Gustavo Cisneros, Fred Langhammer, Leonard A. Lauder, Nicholas Trollope, Defendants: Gary P. Naftalis, Esq., Alan R. Friedman, Esq., Steven S. Sparling, Esq., KRAMER LEVIN [*2] NAFTALIS & FRANKEL LLP, New York, New York.

For Michael Marino, Defendant: Robert Fryd, Esq., Donald M. Levinsohn, Esq., WARSHAW BURSTEIN COHEN SCHLESINGER & KUH, LLP, New York, New York.

JUDGES: Allan L. Gropper, UNITED STATES BANKRUPTCY JUDGE.

OPINION BY: Allan L. Gropper

OPINION

MEMORANDUM OF DECISION

ALLAN L. GROPPER

UNITED STATES BANKRUPTCY JUDGE

On March 15, 2003, RSL COM U.S.A., Inc. ("RSL USA"), RSL COM PRIMECALL, Inc., its subsidiary, and LDM Systems, Inc., a third-tier subsidiary (collectively the "Debtors"), together with the Debtors' Official Committee of Unsecured Creditors, filed an adversary proceeding against eighteen individuals, some of whom were RSL USA's officers or directors and some of whom were officers or directors of affiliated companies. [1] The complaint is in four counts and sets forth the following claims for relief: (1) breach of fiduciary duty, (2) aiding,

2003 Bankr. LEXIS 1635, *

abetting, inducing or participating in a breach of fiduciary duty, (3) constructive fraud and aiding and abetting constructive fraud, and (4) alter/ego, piercing the corporate veil. Defendants have moved to dismiss the complaint in its entirety.

> 1    The defendants ("Defendants") are: Joel Beckoff, Nesim Bildirici, Gustavo Cisneros, Paul Domorski, Avery Fischer, Itzhak Fisher, Fred Langhammer, Leonard A. Lauder, Ronald S. Lauder, Rolland Mallcott, Michael Marino, Steven Schiffman, Eugene Sekulow, Jacob Schuster, Donald Shassian, Nir Tarlovsky, Nicholas Trollope and Richard E. Williams. According to the complaint, the following were affiliated with LTD: Messrs. Cisneros, Langhammer, L. Lauder, Schuster, Sekulow, Shassian and Trollope were directors of LTD (Shassian denies this); Messrs. Beckoff, Bildirici, Domorski, Fisher, R. Lauder, Schiffman, Shassian and Tarlovsky were officers of LTD. The following were affiliated with PLC: Messrs. Bildirici, Fisher, Schuster, Sekulow, Tarlovsky and Williams were directors of PLC; R. Lauder was Chairman. The following were affiliated with RSL USA: Messrs. Beckoff, Domorski, Fisher, Mallcott, Marino, Schiffman, Shassian and Tarlovsky were directors of RSL USA at one time or another; Beckoff, A. Fischer, Fisher, Mallcott, Marino and Tarlovsky were officers of RSL USA. Two of the Defendants, Williams and Tarlovsky, did not appear in this proceeding; Plaintiffs were authorized to move to enter default judgments against them but have not done so.

[*3] **FACTS**

**The Facts as Alleged in the Complaint**

The following facts alleged in the complaint, presented in the light most favorable to Plaintiffs on this motion to dismiss, are assumed to be true for purposes of this motion.

The Debtors were part of a telecommunications conglomerate that provided services to businesses and residential customers in the United States and abroad. At the top of the corporate structure was a holding company, RSL Communications, Ltd. ("LTD"), incorporated in Bermuda, where it is currently in liquidation proceedings. [2] According to the complaint, Ronald S. Lauder owned 28.4% of its stock and controlled 57.2% of the voting power. LTD in turn owned all the stock of RSL Communications PLC ("PLC"), an operating United Kingdom company that is currently in liquidation proceedings in the United Kingdom. PLC in turn owned RSL Com North America ("RSL North America"), an

intermediate holding company whose only function was to hold 100% of the stock of RSL USA.

> 2    LTD also brought a proceeding in this Court under *§ 304 of the Bankruptcy Code* to stay its creditors from taking action against its assets in this country in derogation of the Bermuda proceeding. (Case No. 01-11506.) The *§ 304* proceeding was largely unopposed and a permanent injunction was entered.

[*4]   The complaint categorizes Defendants primarily in two groups. Fourteen of the Defendants, a group Plaintiffs refer to as the "Lauder Control Group," are alleged to have controlled RSL USA for their own personal interests and to the detriment of the Debtors and their creditors. [3] The remaining four Defendants were directors of RSL USA, and are alleged to have supported and permitted the exercise of control by the Lauder Control Group. [4] The complaint alleges that the Lauder Control Group was able to exercise its control over RSL USA through Ronald S. Lauder and Itzhak Fisher, who were Chairman of the Board and President of LTD, respectively, and were allegedly able to pick and choose the directors of LTD at will. These two individuals indirectly controlled the election of the directors of RSL USA.

> 3    The Debtors allege the "Lauder Control Group" consisted of the following defendants: Messrs. Bildirici, Cisneros, A. Fischer, Fisher, Langhammer, L. Lauder, R. Lauder, Mallcott, Schuster, Sekulow, Shassian, Tarlovsky, Trollope and Williams.

> 4    This group includes Messrs. Beckoff (Director and Treasurer/Secretary of RSL USA and Corporate Controller of LTD), Domorksi (Director of RSL USA and President/CEO of LTD), Marino (Director and President of RSL USA) and Schiffman (Director of RSL USA and CFO of LTD).

[*5]   Against the backdrop of alleged control of RSL USA by the Lauder Control Group and acquiescence by the four other Defendants, the complaint charges wrongdoing that can generally be categorized in the following manner. First, the complaint charges that RSL USA was insolvent and undercapitalized from inception, and/or that it was from the start unable to pay its debts as they became due. (Complaint, PP 43-44.) By concealing RSL USA's insolvency from creditors, it is alleged, Defendants breached a fiduciary duty to RSL USA and to its creditors, who were unaware of the insolvency, relied on false information and continued to provide goods, services and credit to RSL USA. Thus, the

complaint alleges that the fraud damaged the Debtors and all creditors alike. (Complaint, PP 72-75.)

Second, the complaint asserts that Defendants breached their fiduciary duties to creditors by wrongfully prolonging the corporate existence of RSL USA and operating it well past the point of insolvency. It is argued that Defendants, in deciding to keep RSL USA in business, were not independent and continued to incur massive amounts of debt when the company should have been liquidated. (Complaint, PP 46-47.) [*6] As the principal example of Defendants' wrongdoing, the complaint claims that Defendants caused RSL USA to guarantee a total of $ 1.6 billion of the debt of PLC in February, 2000, 13 months prior to RSL USA's chapter 11 filing. This guarantee was of debt issued under seven indentures between PLC as issuer, LTD as guarantor and J.P. Morgan Chase Bank as indenture trustee, pursuant to which PLC issued approximately $ 1.6 billion in public debt securities from October 1996 through May 1999. RSL USA was not a party to and did not originally guarantee the debt. In February 2000, the complaint alleges, the Lauder Control Group caused PLC and LTD to enter into two additional indentures to raise more capital for the companies (and, it is further charged, to increase the value of Defendants' ownership interest). But unlike practice in connection with the previous seven indentures, the Lauder Control Group allegedly caused RSL USA to guarantee all of the debt, both old and new. On February 14, 2000, Defendants Fisher, Shassian, Beckoff and Marino signed a "Unanimous Written Consent" of the Board of Directors of RSL USA authorizing the officers of RSL USA to execute documentation guaranteeing [*7] the full $ 1.6 billion of old PLC debt, assertedly against RSL USA's interests and without any independent analysis or evaluation. No other subsidiary of LTD had guaranteed the debt of PLC, making RSL USA the only operating subsidiary responsible for the PLC debt. (Complaint, P 56.)

Plaintiffs charge that this guarantee was wrongful and occurred at a time when the RSL enterprise as a whole was suffering net losses in excess of $ 600 million, with further losses expected through 2001 and beyond. (Complaint, P 53.) Furthermore, it is asserted that with declining revenue in all markets, PLC and/or LTD were unlikely to repay their obligations to the holders of the public debt securities. The complaint charges that Defendants who did not sign the "Unanimous Written Consent" and were not members of the Lauder Control Group also breached their fiduciary duty to the Debtors and their creditors by supporting the guarantees and by failing in their capacity as officers, directors and managers of the business of RSL USA.

Subsequent to the RSL USA guarantee of the $ 1.6 billion of PLC debt, the complaint further charges, the Lauder Control Group caused PLC, as borrower, and LTD and RSL USA as [*8] "guarantors," to enter into a Senior Standby Loan and Warrant Agreement ("the Lauder Loan Agreement"), dated July 6, 2000, with Ronald S. Lauder as lender. This agreement permitted PLC to borrow up to $ 100 million from Lauder and provided him with warrants to purchase up to 1.5 million shares of LTD stock. It is alleged that Defendant Itzhak Fisher signed the agreements on behalf of LTD and RSL USA, and that he authorized the guarantee by RSL USA without giving due regard to the interests of RSL USA and without the authorization of its Board of Directors. Plaintiffs charge that the Lauder Loan Agreement was exclusively for the benefit of the Lauder Control Group and to the detriment of the Debtors and their "non-insider creditors." It is also alleged that the other Defendants either supported or assisted in the making of the guarantee of the Lauder Loan Agreement and thereby failed to carry out their duties to manage the business and affairs of the Debtors in a proper manner. [5]

> 5    This includes Messrs. Joel Beckoff (Director and Treasurer/Secretary of RSL USA and Corporate Controller of LTD), Paul Domorksi (Director of RSL USA and President/CEO of LTD), Michael Marino (Director and President of RSL USA) and Steven Schiffman (CFO of LTD).

[*9] The alleged wrongful acts by Defendants can thus generally be summarized as follows: (i) wrongful concealment of the fact that RSL USA was insolvent from its inception to the detriment of RSL USA and its creditors; (ii) wrongful prolongation of the corporate existence of RSL USA to the detriment of RSL USA and its creditors; (iii) wrongful imposition on RSL USA of guarantees totaling $ 1.7 billion of debt of its parent, PLC; and (iv) misuse of RSL USA's corporate form in a manner that would permit piercing the corporate veil from the American subsidiaries through PLC to LTD. Defendants have sought dismissal as to all counts for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction as to the constructive fraud claims. Alternatively, they seek dismissal on the ground that the complaint does not allege fraud, breach of duty and grounds for piercing the corporate veil with the specificity required by *Rule 9(b) of the Federal Rules of Civil Procedure* and applicable Delaware law.

## DISCUSSION

### The *Rule 12(b)(6)* Standard

[HN1] A complaint may not be dismissed under *Federal Rule of Civil Procedure 12(b)(6)* [*10] , incorporated herein by Bankruptcy *Rule 7012(b)(6)* unless it "appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* [HN2] Upon consideration of the allegations contained in the complaint, including any exhibits attached thereto, the Court is obligated to accept all of the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Stuto v. Fleishman, 164 F.3d 820, 824 (2d Cir. 1999).* [HN3] The scope of the court's review is limited as the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002); Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).* In order to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).*

It is with these legal standards in mind that this Court will consider the [*11] allegations of the complaint.

**Wrongful Concealment or Constructive Fraud**

The complaint charges that Defendants wrongfully concealed certain facts from RSL USA and its creditors and that Plaintiffs suffered harm as a consequence. Defendants have moved to dismiss the constructive fraud claims on the grounds that: (i) Plaintiffs have no standing to bring the claims, and (ii) even if Plaintiffs have standing, the complaint does not plead the claims with the requisite particularity required by Bankruptcy *Rule 7009(b)*, incorporating *Federal Rule of Civil Procedure 9(b)*.

[HN4] Constructive fraud has been defined as "a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention." *Grand Union Mount Kisco Employees Fed. Credit Union v. Kanaryk, 848 F.Supp 446, 455 (S.D.N.Y. 1994),* citing *Brown v. Lockwood, 76 A.D.2d 721, 730-31, 432 N.Y.S.2d 186, 193 (2d Dept. 1980). See also, Klembczyk v. Di Nardo, 265 A.D.2d 934, 935, 705 N.Y.S.2d 743, 744 (4th Dept. 1999);* [*12] *Callahan v. Callahan, 127 A.D.2d 298, 301, 514 N.Y.S.2d 819, 821 (3d. Dept. 1987).* [HN5] In order to establish a claim for constructive fraud, a plaintiff must establish the same elements as a claim for fraud, except that the element of *scienter* is not essential in view of the existence of a fiduciary or confidential relationship between the parties. *Burrell v. State Farm and Cas. Co., 226 F.Supp.2d 427, 438 (S.D.N.Y. 2002).* [HN6] The elements of a cause of action for constructive fraud under New York law, which all parties agree is applicable on the constructive fraud

claims, are the following: (1) a representation was made, (2) the representation was of a material fact, (3) the representation was false, (4) the representation was made with intent that the other party would rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties were in a fiduciary or confidential relationship. *See Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts, 717 F.Supp. 148, 155 (S.D.N.Y. 1989); Brown v. Lockwood, 76 A.D.2d at 730.*

[*13] *Standing*

Defendants first argue that Plaintiffs lack standing to pursue the constructive fraud claims. They contend that the constructive fraud charges (i) cannot be brought on behalf of all creditors generally because such claims, if they exist, belong to individual creditors, and (ii) cannot be brought on behalf of RSL USA because it was not harmed or injured by the alleged wrongdoing.

[HN7] It is black letter law that a trustee in bankruptcy (including a debtor in possession) may only pursue claims that belong to the estate. *Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 429, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972).* A claim may belong to a bankrupt company, such as RSL USA, only where the complaint can identify a direct injury to the debtor, or in limited circumstances where the claim is so generally for the benefit of all creditors as an undifferentiated group that the trustee can be considered to be acting for "creditors generally." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 696-700 (2d Cir. 1989); Murray v. Miner, 876 F.Supp. 512, 516-17 (S.D.N.Y. 1995), aff'd, 74 F.3d 402 (2d Cir. 1996).* [HN8] Because [*14] standing is a jurisdictional matter, the burden is on the plaintiff "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994).*

[HN9] Whether a claim is property of the estate or of individual creditors depends on whether the claim is general or particular. "If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993),* quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d at 701.* [HN10] The question whether a claim is general, so that it should be brought by a trustee, or particular, so that it belongs to individual creditors, is a question of state law, which in this case is New York law. *Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 825 (2d Cir. 1997).*

In the instant complaint Plaintiffs charge Defendants with failure to disclose [*15] certain facts, particularly that RSL USA was "insolvent from inception." Since RSL USA was in existence for approximately six years, Plaintiffs lump together creditors who allegedly relied on information made available by Defendants over a six-year period. In addition to a failure to plead fraud over such a long period with particularity (see below), there is no basis on which Plaintiffs' basic premise--that all creditors were damaged identically by a six-year course of non-disclosure--can be accepted, even on this motion to dismiss. Plaintiffs cannot be deemed to act as surrogates for all creditors who extended credit to the Debtors throughout this entire period and necessarily relied (or did not rely) on different information at different times. It is no answer that the failure to disclose insolvency was common throughout the period. [HN11] A cause of action for fraudulent concealment requires, in addition to a misrepresentation and a fiduciary or confidential relationship, reliance and subsequent injury. *See Banque Arabe Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995); Congress Fin. Corp v. John Morrell & Co., 790 F.Supp. 459, 472 (S.D.N.Y. 1992).* [*16] In this case, charging a State law wrong, Plaintiffs are not relieved of their burden of alleging and proving individual reliance and damages. *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd., 675 F.Supp. 122, 129 (S.D.N.Y. 1987).* Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information about RSL USA at different times, and in some cases may not have relied on any information. *In re Granite Partners, 194 B.R. 318, 320 (Bankr. S.D.N.Y. 1996).*

Defendants also challenge the standing of Plaintiffs on the ground that RSL USA was conferred a benefit and not harmed by the alleged wrongful concealment. [HN12] The intentional distortion of a corporation's financial picture and its solvency, for the purpose of misleading creditors to extend goods and services, is undoubtedly wrongful. But absent an allegation of direct injury to the corporation, or a diversion of goods or services from the company, it cannot be presumed that the alleged wrongful concealment of RSL USA's insolvency from creditors harmed or injured RSL USA. *See Colotone Liquidating Trust v. Bankers Trust New York Corp., 243 B.R. 620 (S.D.N.Y. 2000),* [*17] where the court had before it claims for fraud and breach of fiduciary duty and held that there was no injury to the debtor Colotone where its controlling affiliate allegedly knowingly disseminated false financial information about it. "On the contrary, there is every reason to suppose that Colotone was the beneficiary of any such deceit because it would have resulted in its receiving goods and services, the obligation to pay for which was discharged in bankruptcy." *Id. at 622.*

Plaintiffs cite several cases for the proposition that RSL USA was harmed by the non-disclosure. In these cases, the real harm suffered by the company was the self-dealing or looting engaged in by insiders during the period of non-disclosure. *See e.g., Schacht v. Brown, 711 F.2d 1343 (7th Cir. 1983),* an action to recover for RICO violations against officers, directors and the parent corporation who allegedly kept an insurer in business past the point of insolvency; the court found that the corporation was harmed because the defendants looted the insurer of valuable business, not because of the non-disclosure; *Investors Funding Corp. of New York Sec. Litig. v. Dansker (In re Investors Funding Corp. Sec. Litig.), 523 F.Supp. 533 (S.D.N.Y. 1980),* [*18] where principal officers and directors created the false appearance of fiscal strength to raise capital for plundering.

Plaintiffs, in their papers responding to the instant motion, argue for the first time that all three alleged wrongful acts--the concealment of insolvency, the prolongation of the life of RSL USA and the guarantees of $1.7 billion of parent debt--are inextricably linked together and give the complaint any necessary allegations of looting. They argue that Defendants continued to sink RSL USA into deepening insolvency and hid RSL USA's insolvency from creditors so that they could wrongfully guarantee the $1.7 billion of parent company debt. Passing the fact that this new theory does not appear in the complaint, *Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998),* it does not bolster the Plaintiffs' standing to bring constructive fraud or wrongful concealment claims. First, there is no allegation that the fact of the guarantees was concealed. Second, the complaint is still insufficient for the Court to find that the constructive fraud claims can be brought on behalf of "creditors generally." Plaintiffs cannot bring the same constructive [*19] fraud claims on behalf of those creditors who may have extended credit after disclosure of the guarantees as they could on behalf of others who extended credit unknowingly.

Accordingly, Plaintiffs do not have standing to bring the constructive fraud claims on behalf of "creditors generally" of RSL USA, and Defendants' motion to dismiss these claims is granted. *A fortiori*, Plaintiffs do not have standing to pursue claims for aiding and abetting any such constructive fraud.

### Constructive Fraud Not Pleaded With 9(b) Particularity

In any event, the constructive fraud claims would have to be dismissed because they have not been pleaded with the particularity required by *Rule 9(b) of the Federal Rules of Civil Procedure. Rule*[HN13] *9(b)* provides that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be

stated with particularity." Irrespective of whether a claim is for actual fraud or constructive fraud, *Rule 9(b)* applies. *See Burrell v. State Farm & Casualty Co., 226 F.Supp.2d at 438; Victor v. Riklis, 1992 U.S. Dist. LEXIS 7025, 1992 WL 122911, at *5 n.6 (S.D.N.Y. 1992)* ("*Rule 9(b)'s* [*20] particularity requirements are not 'relaxed' for constructive fraud claim."); *Frota v. Prudential Bache Sec., Inc., 639 F.Supp. 1186, 1193 (S.D.N.Y. 1986)* ("*Rule 9(b)* extends to all averments of fraud or mistake, whatever may be the theory of legal duty--statutory, common law, tort, contractual or fiduciary.").

Plaintiffs argue that cases assessing the pleading requirements for constructive fraudulent *transfer* claims have held that the heightened pleading requirements of *Rule 9(b)* do not apply. *See Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999); see also In re White Metal Rolling and Stamping Corp., 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998); In re Allegheny Health, Educ. & Research Found., 253 B.R. 157, 162 n.2 (Bankr. W.D. Pa. 2000).* This argument is misplaced. The instant claims are for constructive fraud or wrongful concealment, not for a constructive fraudulent *transfer*, which is a separate and distinct cause of action with different elements. [6] Moreover, in the cases cited by Plaintiffs, *Rule 9(b)* has been "relaxed" where a trustee who had no direct [*21] knowledge of the case has been appointed and could not frame a detailed complaint without discovery and access to information. Such is not the case here. Plaintiffs have already had discovery and access to information, including the books and records of RSL USA and deposition of both Ronald S. Lauder and Itzhak Fisher, the primary members of the alleged Lauder Control Group. [7]

> 6    [HN14] A constructive fraudulent transfer claim has nothing to do with fraud, and instead is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee. *See In re White Metal Rolling and Stamping Corp., 222 B.R. at 428-29* (noting also a split of authority as to whether *Rule 9(b)* applies to constructive fraudulent transfer claims).

> 7    This also answers Plaintiffs' contention that if *Rule 9(b)* does apply, they should be entitled to leniency in the pleading requirement on the ground that courts sometimes grant such leniency to a trustee who has never had an opportunity to conduct discovery.

[*22] Thus, the complaint's allegations of fraudulent concealment must comply with *Rule 9(b)*. [HN15] "To pass muster [under *Rule 9(b)*] in this Circuit, a complaint 'must allege with some specificity the acts constituting fraud' ... conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd., 85 F.Supp.2d 282, 293 (S.D.N.Y. 2000),* quoting *Lobatto v. Berney, 1999 U.S. Dist. LEXIS 13224, 1999 WL 672994, at *9 (S.D.N.Y. 1999).* This is particularly true where fraud is alleged against multiple defendants. *Ellison v. Am. Image Motor Co., Inc. 36 F.Supp.2d 628, 640-41 (S.D.N.Y. 1999)* ("where a case involves multiple defendants *F.R.C.P 9(b)* requires that the complaint allege facts specifying each defendant's contribution to the fraud, identifying which defendant is responsible for which act.").

Here, even if Plaintiffs could overcome the standing requirements, they have not adequately pleaded the constructive fraud claims pursuant to *Rule 9(b).* It is not enough, as Plaintiffs argue, merely to state the elements of a constructive fraud claim and [*23] assert generally that a fiduciary relationship was established with creditors and subsequently breached. The complaint lacks any specific misrepresentation that was made to creditors or any specific detrimental reliance and subsequent injury thereto. Simply stating that RSL USA was "insolvent from inception" and that Defendants--all eighteen of them--are somehow culpable does not comport with the requirements of *Rule 9(b).*

## Wrongful Prolongation of RSL USA's Corporate Life

The second principal charge against Defendants is that they (i) breached their fiduciary duties to creditors by wrongfully prolonging the corporate existence of RSL USA when they should have liquidated it for the benefit of creditors, and (ii) cannot rely on the business judgment rule because they were not independent. Defendants argue that these claims should be dismissed because (i) they did not breach any fiduciary duty to creditors, as there is no "duty to liquidate," and (ii) a decision by directors to keep an insolvent corporation operating is subject to the business judgment rule, and the complaint does not set forth sufficient allegations to overcome the presumption of validity that the business [*24] judgment rule confers. The parties agree that [HN16] Delaware law applies, as RSL USA is a Delaware corporation and the charges relate to the duties of its directors. *See Walton v. Morgan Stanley Co., 623 F.2d 796, 798 (2d Cir. 1980); H.S.W. Enters., Inc. v. Woo Lae Oak, Inc., 171 F.Supp.2d 135, 142 (S.D.N.Y. 2001).*

### The Alleged Duty to Liquidate

The fiduciary duty of a director of a financially troubled corporation has been the subject of much analysis by both courts and commentators. [HN17] Traditionally, under Delaware law, directors owe fiduciary duties to stockholders, and perhaps to the corporation, and the relationship between directors and creditors is not fiduci-

ary but contractual in nature. *See Katz v. Oak Indus., Inc., 508 A.2d 873 (Del. Ch. 1986); Mia Shoes v. Republic Factors Corp., 1997 U.S. Dist. LEXIS 12571, 1997 WL 525401 (S.D.N.Y. 1997); Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.), 274 B.R. 71, 88 (D. Del. 2002). See also,* 3A W. Fletcher, *Private Corporations* § 1035.60 (2003). Insolvency, however, changes the scope of a director's duties, and upon insolvency directors owe fiduciary duties to creditors [*25] or, stated differently, to the corporation and to all of its interested constituencies, including creditors and shareholders. *See Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784 (Del. Ch. 1992); In re Subpoena Issued to Friedman, 286 B.R. 505, 508 (S.D.N.Y. 2002); In re Kingston Square Assocs., 214 B.R. 713, 736 n.24 (Bankr. S.D.N.Y. 1997).* The rationale behind the "insolvency exception" is that the fiduciary duties held ordinarily for the benefit of shareholders should shift to creditors who "now occupy the position of residual owners." *Geyer v. Ingersoll Publ'ns Co., 621 A.2d at 787.*

In *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 Del. Ch. LEXIS 215, Civ. 12150, 1991 WL 277613, at *34 n.55 (Del. Ch. 1991),* the Delaware Chancellor held that [HN18] when a corporation is "in the vicinity of insolvency," the directors owe fiduciary duties to the entire "community of interests" of those involved with the corporation, including creditors. Subsequent decisions have emphasized that when managing a corporation "in the vicinity of insolvency," directors must consider the best interests of the corporation, and not [*26] just the interests of either creditors or shareholders alone. "While this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity." *In re Hechinger Inv. Co. of Delaware, 274 B.R. at 89; In re Ben Franklin Retail Stores, Inc., 225 B.R. 646, 654 (Bankr. N.D. Ill. 1998), aff'd in part by, 1999 U.S. Dist. LEXIS 16645, 1999 WL 982963 (N.D. Ill. 1999), rev'd in part on other grounds, 2000 U.S. Dist. LEXIS 276, 2000 WL 28266 (N.D. Ill 2000). See also,* Jonathan L. Lipson, *Directors' Duties to Creditors: Power Imbalance and the Financially Distressed Corporation, 50 U.C.L.A. L.REV. 1189 (2003);* Steven L. Schwarz, *Rethinking a Corporation's Obligation to Creditors, 17 CARDOZO L. REV. 647 (1996);* Ann E. Conway Stilson, *Reexamining the Fiduciary Paradigm at Corporate Insolvency and Dissolution: Defining Directors' Duties to Creditors, 20 DEL. J. CORP. L. 1 (1995).*

In the case at bar, the dispute between the parties as to the wrongful prolongation claims does not center around the abstract question whether directors [*27] of an insolvent corporation have fiduciary duties to credi-

tors, but rather the scope of those duties. Most of the Defendants do not seriously contend that directors of an insolvent corporation are free of any fiduciary duties to creditors. Defendants argue principally that there is no absolute duty for directors of an insolvent corporation to liquidate for the immediate benefit of creditors. [8] Instead, in pursuance of their duties to the entire corporate enterprise, directors facing the decision whether to continue a corporation in business or to file an insolvency petition must still seek to "maximize the corporation's long-term wealth creating capacity." Such a decision, Defendants argue, is entitled to the protection of the business judgment rule absent self-dealing, which they assert has not been effectively alleged in this case.

> 8  Several of the Defendants contend that even when the corporation is insolvent, the directors of a subsidiary corporation owe duties only to the parent company. This argument is dealt with below.

[*28] There is no authority that supports Plaintiffs' position that there is a blanket duty to liquidate upon insolvency, untempered by the business judgment rule. Plaintiffs have not cited any case in the United States that supports this bald proposition. It would require directors to determine what standard of insolvency might apply--two possibilities are inability to pay debts as they come due (as used in *§ 303(b)(1) of the Bankruptcy Code*) and balance sheet insolvency (as defined in *§ 101(32)*). *See Geyer v. Ingersoll Publ'ns Co., 621 A.2d. at 789,* which refers to them both. It would then require them to make a determination as to the exact status of the corporation's financial affairs, on pain of liability to creditors. In the absence of the protection of the business judgment rule, a director would ordinarily have to opt for an insolvency filing, as the director could have little confidence that the corporation would not, in the bright light of hindsight, be deemed to have been insolvent under one definition or the other. [HN19] It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can "work [*29] out" its problems or should file a bankruptcy petition. *See Sanford Fork & Tool Co. v. Howe, Brown & Co., 157 U.S. 312, 319, 39 L. Ed. 713, 15 S. Ct. 621 (1895),* where the Court said, in a different context, "Surely, a doctrine like that would stand in the way of the development of any new enterprise." *See also, In re Ben Franklin Retail Stores, Inc., 225 B.R. at 655,* where the court rejected the notion of "a duty to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative." [9]

> 9  United States law differs markedly in this respect from the laws of many other countries,

where by statute directors can be liable for corporate debts if they continue to trade after liquidation appears unavoidable. *See In re Ionica, PLC, 241 B.R. 829, 839 (Bankr. S.D.N.Y. 1999)*, citing § 214(2) of the English Insolvency Act that makes a director liable for the debts of a corporation if he "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation." *See also,* Carl Felsenfeld, *et al., International Insolvency* (2000), at vol. II, pp. U.K. 24-25 and U.S. 22-25 for a comparison of English and American law on this point.

[*30] Plaintiffs cite four cases for the proposition that the business judgment rule is inapplicable to insolvent corporations. None is persuasive. In *Askanase v. Fatjo, 1993 U.S. Dist. LEXIS 7910, 1993 WL 208440 (S.D. Tex. 1993)*, the court considered a claim to recover a preferential transfer by the Chapter 7 trustee, and discussed both Texas and Delaware law before ultimately concluding that it could not determine which state's law applied. In *dicta,* the court stated that the business judgment rule has no effect in the context of insolvency. [10] In *Shultz v. Miramar Res., Inc., 208 B.R. 723 (M.D. Fla. 1997)*, the court does not even discuss the business judgment rule. In *In re General Homes Corp., 199 B.R. 148 (Bankr. S.D. Tex. 1996)*, the court--applying Texas law--held that the business judgment rule has "no consequence in the context of a conservatorship." In *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.), 239 B.R. 93 (N.D. Tex. 1999)*, another case applying Texas law, the court cited *In re General Homes Corp.* for the proposition that the business judgment rule *may* be wholly inapplicable where the corporation is insolvent.

> 10   The court held there were outstanding questions as to whether or not Delaware law applied to the case, but that if Delaware law were applicable, it would apply the Delaware Trust Fund Doctrine. This doctrine provides that under certain circumstances, a corporation's assets are deemed a *res,* held in trust by corporate fiduciaries for the benefit of creditors. *See American Nat'l Bank of Austin v. Mortgage Am., (In re Mortgage Am.), 714 F.2d 1266, 1268-69 (5th Cir. 1983)*. The complaint contains no reference to the doctrine, and one commentator states it has been repudiated. 15A W. Fletcher, *Private Corporations* § 7373 (2003).

[*31] In sum, Plaintiffs have no substantial support for the proposition that a director's decision to postpone a bankruptcy filing and attempt to "work out" a financial problem is not subject to the business judgment rule, a rule that protects directors' decision-making in other situations.

### The Business Judgment Rule

[HN20] The business judgment rule in Delaware law creates a presumption that in making a business decision the disinterested directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. *See Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999); Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985).* The presumptive validity of an exercise of business judgment is rebutted in cases where the decision under attack is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Ryan v. Aetna Life Ins. Co., 765 F.Supp. 133, 138 (S.D.N.Y. 1991)*. [HN21] A plaintiff bears the burden of [*32] alleging well-pleaded facts to overcome the presumption and survive a motion to dismiss. *Id.; Aronson v. Lewis, 473 A.2d at 812*.

In the instant case, Defendants argue that Plaintiffs have failed to plead any specific facts that would demonstrate that their decision not to file an insolvency petition for RSL USA earlier than in 2001 was not taken on an "informed basis, in good faith and in an honest belief that the action was in the best interest of RSL USA." They argue further that [HN22] courts that have actually addressed the issue of the duty of directors of insolvent corporations have uniformly found officers and directors not liable in the absence of self-dealing. *See In re Ben Franklin Retail Stores, Inc., 225 B.R. at 655-56,* where the court--relying on Delaware law--dismissed a claim for wrongful prolongation of corporate life where the directors of an insolvent corporation were alleged to have manipulated accounts so that third parties would continue to lend money and supply inventory. The court found that the complaint was subject to dismissal because it did not allege specific facts demonstrating that the directors failed to use the corporate assets [*33] in "an informed, good faith effort to maximize the corporation's long-term wealth creating capacity", citing *Credit Lyonnais, 1991 Del. Ch. LEXIS 215, 1991 WL 277613, at *34*. The court further noted, in dismissing the claim, that "All of the decisions in which courts have allowed creditors to recover for breach of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets for the benefit of insiders or preferred creditors." *Id. at 655*, citing Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty of Creditors, 46 VAND. L.REV. 1485, 1512 (1993)*. [11] *See also, Bank of America v. Musselman, 222 F.Supp.2d 792, 799-800 (E.D. Va. 2002)*, where the court also cites and relies on the Lin article.

11   In that article, on which the Defendants rely and which will be further discussed below, the author concludes that courts have permitted creditors to recover for breach of fiduciary duty in different contexts where self-dealing is alleged. The article includes, as one type of self-dealing, the situation where directors allegedly have "permitted the company to engage in transactions, usually without fair consideration to the company, for the benefit of its parent corporation or related entities". Lin, *46 VAND. L. REV. at 1514.*

[*34]  Except for the transaction discussed below (the corporate guarantees), Plaintiffs have failed to allege any specific fact that would amount to self-dealing on the part of Defendants. One specific charge made by the complaint with respect to an "insider transaction" is that Ronald S. Lauder made a $ 100 million loan and received "valuable" warrants at a time when PLC, LTD and RSL USA were all insolvent. It appears that, as it turned out, the warrants were worthless, and Lauder received only a claim in two insolvency cases. [12] In any event, whether or not Lauder lost most of his investment, for present purposes it cannot be ignored that at a time when LTD, PLC an RSL USA were arguably insolvent and nearing collapse, Lauder put money into PLC on an unsecured basis, instead of taking it out. [13]

12   The Court can take judicial notice of the fact that Lauder filed a claim for $ 100 million in the RSL USA Chapter 11 cases; according to the Disclosure Statement for the Debtors' First Amended Plan of Reorganization, he will receive at best a very small recovery.

13   We discuss separately below the charge that RSL USA's guarantee of the Lauder Loan involved a breach of fiduciary duty.

[*35]  As another example of alleged bad faith, Plaintiffs allege that Defendants should have sought equity infusions to fund RSL USA, rather than continuing to accumulate debt. It is, at best, an open question whether RSL USA could have attracted equity investors, given that Plaintiffs allege it was "insolvent from inception." In any case, absent well-pleaded allegations of specific acts of self-dealing or even bad faith, Plaintiffs cannot overcome the presumption afforded by the business judgment rule that the directors acted reasonably and in good faith in the manner in which they obtained funding for the business.

Nor have Plaintiffs shown that there was such a lack of independence on the part of the directors as to make the business judgment rule generally inapplicable. Plain-

tiffs have alleged that most if not all Defendants were not independent because they were close associates, "beholden" to Ronald S. Lauder and Itzhak Fisher, and that the other Defendants feared that the exercise of good faith judgment could compromise their employment or other relationships. But [HN23] domination and control is not established by arguing that a director is not independent because of selection by and [*36] ties to an interested director. This is a common and accepted way of becoming a corporate director. *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 355 (Del. Ch. 1998), aff'd in relevant part, 746 A.2d 244 (Del. 2000); Aronson v. Lewis, 473 A.2d at 816.* Plaintiffs also assert that each defendant had a personal stake in LTD in that he possessed a stock ownership interest in it. This, too, is not enough; [HN24] conclusory allegations, unaccompanied by specific factual allegations that directors were somehow controlled or dominated are insufficient to establish a lack of independence. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A., 80 F. Supp. 2d 129, 1999 WL 754015, at *5 (S.D.N.Y. 1999); Polar Int'l Brokerage Corp. v. Reeve, 108 F.Supp.2d 225, 247 (S.D.N.Y. 2000).*

Except in one respect, which will be discussed next, Plaintiffs have not in the instant complaint shown enough to rebut the presumptive validity of the business judgment of Defendants in continuing RSL USA's corporate existence.

### Wrongful Guarantee of Affiliate Debt

The one exception referred to above, and the principal specific [*37] act of wrongdoing alleged in the complaint, is RSL USA's guarantee of $ 1.6 billion of the outstanding debt of PLC at a time when both entities were insolvent. It is alleged, and presumed as true, that the Defendants who were directors of RSL USA at the time--Messrs. Fisher, Shassian, Beckoff and Marino--signed a Unanimous Written Consent of Directors approving the guarantees. They thereby authorized the assumption of $ 1.6 billion of the debt of the parent, allegedly amidst the backdrop of net losses of the corporate group in excess of $ 600 million. It is alleged that the guarantee was approved just days after the directors took office without any independent analysis or evaluation whatsoever. It is also alleged that, thereafter, RSL USA guaranteed the $ 100 million Lauder Loan, bringing the total amount of PLC debt guaranteed by RSL USA to $ 1.7 billion, and that defendant Fisher signed that guarantee on behalf of RSL USA without even obtaining the authorization of the RSL USA Board. Plaintiffs argue that the directors of RSL USA breached their direct fiduciary duty to RSL USA and that the other Defendants were *de facto* directors of RSL USA and directed and/or aided and abetted [*38] the breach of fiduciary duty of the RSL USA Board members. In short, Plaintiffs allege,

all Defendants, in one way or another, breached a fiduciary duty to RSL USA in connection with the guarantees.

Defendants contend that these claims should be dismissed because (i) the guarantees embody decisions made by RSL USA officers and directors that are entitled to the protection of the business judgment rule, (ii) the complaint does not identify how any director benefited and that the guarantees accordingly did not reflect self-dealing, and (iii) Defendants who were not RSL USA board members had no fiduciary duties to RSL USA and certainly cannot be charged with the wrongdoing in connection with the guarantees.

As discussed above, decisions made by directors are protected by a presumption of validity under the business judgment rule. The allegations as to the guarantees, however, charge the directors with authorizing precisely that [HN25] type of conduct which the courts have held is proscribed for a corporation operating in the vicinity of insolvency: "transactions, usually without fair consideration to the company, for the benefit of the parent corporation or related entities." *See* Lin, [\*39] *46 VAND. L. REV. at 1514*, citing *Federal Deposit Ins. Co. v. Sea Pines Co., 692 F.2d 973 (4th Cir. 1982), cert. denied, 461 U.S. 928, 77 L. Ed. 2d 299, 103 S. Ct. 2089 (1983); Clarkson v. Shaheen Co. Ltd., 660 F.2d 506 (2d Cir. 1981), cert. denied, 455 U.S. 990, 71 L. Ed. 2d 850, 102 S. Ct. 1614 (1982); Automatic Canteen Co. of Am. v. Wharton, 358 F.2d 587 (2d Cir. 1966); and South Falls Corp. v. Rochelle, 329 F.2d 611 (5th Cir. 1964).* These cases do not require that the plaintiffs allege that each defendant director was the recipient of a direct pecuniary benefit from a challenged transaction, but in each the transaction allegedly benefited only the affiliate and was patently inequitable to the subsidiary. Here, especially in view of the enormous size of the guarantees and the lack of any record of any review of their propriety, the Plaintiffs' have adequately alleged self-dealing. *In re Healthco Int'l Inc., 208 B.R. 288, 305 (Bankr. D.Mass. 1997); see also, Arwood v. Dunn (In re Caribbean K Line, Ltd.), 288 B.R. 908, 919 (Bankr. S.D.Fla. 2002); In re STN Enters., 779 F.2d 901, 902 (2d Cir. 1985).* [\*40]

Moreover, [HN26] the business judgment rule does not protect conduct of directors where material decisions are made in the absence of any information and any deliberation. Allegations that the RSL USA directors abdicated all responsibility to consider action that was arguably of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests. *See In re Walt Disney Co. Derivative Litig., 825 A.2d 275 (Del. Ch. 2003); see also Pereira v. Cogan, 2001 U.S. Dist. LEXIS 2461, 2001 WL 243537, at \*13 (S.D.N.Y. 2001).* Based on the allegations in the complaint, a breach of fiduciary duty claim has

been adequately pleaded against those RSL USA directors who signed the "Unanimous Written Consent" for the $ 1.6 billion guarantee, as well as against the director who purported to authorize the guarantee of the Lauder Loan without even obtaining Board approval.

These defendants argue that they are relieved from all potential liability on the facts alleged in the complaint by virtue of an exculpation clause in RSL USA's certificate of incorporation. RSL USA's exculpation clause eliminates [\*41] directors' liability for all claims of breach of duty founded upon negligence, including gross negligence, but does not eliminate claims based on breach of loyalty and does not bar "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law...." With respect to the guarantees, [HN27] Plaintiffs have challenged the Defendants' good faith and this is enough, at this stage, to overcome the exculpation clause. *See In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003),* where there was a similar clause at issue. It has also been held that [HN28] an exculpation clause allocates the risk of loss only between the parties to the articles of incorporation, *i.e.,* the shareholders and the directors, but not as among directors and third parties such as creditors, and that it therefore does not affect suits by creditors. *See Pereira v. Cogan, 2001 U.S. Dist. LEXIS 2461, 2001 WL 243537, at \*10, In re Ben Franklin Retail Stores, Inc., 2000 U.S. Dist. LEXIS 276, 2000 WL 28266, at \*7-8.*

The Defendants further contend that the facts alleged in the complaint, together with facts of record in the RSL USA Chapter 11 case, demonstrate that there could [\*42] be no damages because RSL USA attempted to set aside the guarantees. But the Chapter 11 record shows that the Debtors were only partially successful in this effort. Moreover, it is premature to reach issues of damages on this motion. There may be defenses to the charges in the complaint, but at this stage a claim has been properly pleaded against four of the Defendants.

Finally, certain of these Defendants argue that they owed no duty to RSL USA because RSL USA was part of a larger corporate group and a subsidiary of another corporation. They advance this proposition by quoting out of context statements in several decisions where the actions of a parent corporation were challenged by the new shareholders of the subsidiary after the subsidiary had been spun off. *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del. 1998),* where the court stated, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders"; *see also Aviall v. Ryder System, 913 F.Supp. 826, 832 (S.D.N.Y. 1996), aff'd [\*43] on other grounds, 110 F.3d 892 (2d Cir. 1997).* In those cases, however, the

holding merely reflected the principle that directors of a solvent corporation are obligated to manage it in the interest of the shareholders--in those cases, the parent corporation. None of the cases involved the duty that directors owe to the corporation and its entire community of interests when the corporation is in the vicinity of insolvency.

It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors. The [HN29] Delaware courts have recognized that directors who hold dual directorships in the parent-subsidiary context may owe fiduciary duties to each corporation. *Weinberger v. UOP, 457 A.2d 701, 710 (Del. 1983)*; *In re Digex Inc. Shareholders Litig., 789 A.2d 1176, 1205-06 (Del. Ch. 2000)*, citing *Warshaw v. Calhoun, 43 Del. Ch. 148, 221 A.2d 487, 492 (1966)*; [*44] *see Shaev v. Wyly,* 1998 Del. Ch. LEXIS 2, 1998 WL 13858 (Del. Ch. 1998), *aff'd, 719 A.2d 490 (Del. 1998)*. There is no basis for the principle propounded by a few of the Defendants that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation.

*The Other Defendants*

Plaintiffs seek to impose liability not only on the directors of RSL USA who participated in the approval of the guarantees but also on additional defendants. These include the following:

1. The "Non-Participating" Directors of RSL USA and Its Officers

Plaintiffs have named as defendants four individuals who were directors of RSL USA at times that are not clearly stated in the complaint. This includes Domorski, a director starting "some time in 2000"; Mallcott, an officer starting February 3, 2000 and a director "in 2000"; Schiffman, a director from "on or about February 3, 2000"; and Tarlovsky, a director "at various times." Plaintiffs also name one individual, Avery Fischer, who was RSL USA's Assistant Secretary and General Counsel. These Defendants also seek dismissal of the complaint as against them, and they are [*45] entitled to it. In brief, the complaint is simply too vague to retain these individuals as defendants in a $ 1.8 billion lawsuit, when Plaintiffs do not even clarify when they became directors so that it is clear what they did wrong. *See Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1201-02 (Del. Ch. 1988)*; *Jefferson Chemical Co. v. Mobay Chemical Co., 253 A.2d 512 (Del. Ch. 1969)*. *See also, Stevelman v. Alias Research Inc., et al., 174 F.3d 79, 84 (2d Cir.*

*1999)*. The same is true for defendant Fischer, who was not a director. [HN30] Under Delaware law, officers as well as directors may owe fiduciary duties. *Harris v. Carter, 582 A.2d 222, 234 (Del. Ch. 1990)*. In order to sustain a claim against Fischer, however, Plaintiffs would have to allege more than that he held the office of Assistant Secretary and Legal Counsel. *See Lippe v. Bairnco Corp., 230 B.R. 906, 917 (S.D.N.Y. 1999)*.

These Defendants are entitled to an order dismissing the complaint as against them.

2. The Non-RSL Officers and Directors

That brings us to the Defendants who were only officers and directors of PLC and LTD. [14] [*46] Plaintiffs seek to impose liability on these Defendants on two principal theories: (i) that they had *de facto* or effective control over the affairs of RSL USA and its directors; and (ii) that they aided and abetted the breach of fiduciary duty committed by the directors of RSL USA.

> 14    This includes Messrs. Bildirici, Cisneros, Langhammer, L. Lauder, R. Lauder, Schiffman, Schuster, Sekulow, Trollope, and Williams.

As to the concept of *de facto* control, Plaintiffs' allegations are too vague as to any wrongdoing on the part of these Defendants. As discussed above, there is much in the complaint regarding the "Lauder Control Group," but insufficient specificity as to facts that the Lauder Control Group (or Lauder personally) so dominated the RSL USA Board that they became *de facto* directors. *See Odyssey Partners, L.P. v. Fleming Cos., Inc., 735 A.2d 386 (Del. Ch. 1999)*; *Aronson v. Lewis, 473 A.2d at 815-16*. Indeed, the parent corporation appointed at least several [*47] directors for RSL USA who were not directors of either PLC or LTD, and it was the responsibility of these and the other members of the Board of RSL USA to manage the corporation. [15]

> 15    According to the complaint, two of the defendants who were RSL USA directors, Messrs. Mallcott and Marino, were not either officers or directors of LTD or PLC.

The Defendants who were not directors of RSL USA also rely on the authority cited above that indicates that a subsidiary corporation should be operated in the interests of its shareholder parent and that neither the directors of the parent nor the directors of the subsidiary can be faulted for such action. *See, e.g., Anadarko Petroleum Corp. 545, A.2d at 1174*. As discussed earlier, this line of authority cannot be applied blindly to immunize an insolvent subsidiary's Board from liability for action in disregard of its own interests and those of its creditors. By the same token, the directors of the parent cannot be compelled at such time to attend only to the interests

[\*48] of the subsidiary, especially where (as here) *both* were insolvent. To the extent American corporate law would have been applicable, PLC and LTD were entitled to have directors who had due regard for their respective interests and the interests of their creditors, just as was RSL USA. *Lippe v. Bairnco Corp., 230 B.R. at 916; Aviall, Inc. v. Ryder Sys. Inc., 913 F.Supp. 826, 832 (S.D.N.Y. 1996), aff'd, 110 F.3d 892 (2d Cir. 1997).*

Plaintiffs' alternative theory is that the other Defendants aided and abetted the breach of duty of the RSL USA directors. [HN31] Aiding and abetting a breach of duty is usually used to impose liability on third parties and raises the question as to whether the wrongdoing of the corporation itself is not a bar to the action. *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991); Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997).* Plaintiffs offer no authority that the doctrine has been used to impose wholesale liability on directors of an affiliate. Even if it could, aiding and abetting requires knowing participation in the wrongdoing, and Plaintiffs do not [\*49] adequately plead specific facts demonstrating knowing participation by these other Defendants in the allegedly wrongful guarantees. *See In re Santa Fe Pacific Corp. Shareholder Litig., 669 A.2d 59, 72 (Del. 1995); Kolbeck v. LIT America, 939 F.Supp. 240, 246 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998).*

These Defendants are also entitled to an order dismissing the complaint as against them.

**Alter Ego/Piercing the Corporate Veil**

The complaint finally seeks to pierce the corporate veil of RSL USA and to hold PLC and LTD (and presumably their officers and directors) liable for all of the Debtors' debts. According to the complaint, Defendants exercised a degree of control over RSL USA that caused the Debtors to be mere instrumentalities or alter egos of the other corporations, and Defendants used their control to commit wrongs that resulted in loss and injury to Plaintiffs. Defendants have moved to dismiss this count, arguing that Plaintiffs fail to plead facts, which, if established, would show that piercing the corporate veils is warranted and that even if the veils were pierced, the affiliates' officers and directors [\*50] would not become automatically liable for all of the debts of all of the companies.

[HN32] In determining whether the corporate form will be disregarded and a corporate veil pierced, the law of the state of incorporation is applied. *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995); Sunbeam Corp. v. Morgan Stanley & Co., (In re Sunbeam Corp.), 284 B.R. 355 (Bankr. S.D.N.Y. 2002).* Since RSL USA is a Delaware corporation, Delaware law applies. [HN33] Under Delaware law, in order to pierce the corporate veil

and establish alter ego liability, a party must show: (1) that the parent and the subsidiary operated as a single economic entity; and (2) that an overall element of injustice or unfairness was present. *Fletcher v. Atex, Inc., 68 F.3d at 1457.* Allegations of mere domination or control by one entity over another are insufficient; in the context of veil piercing, "it is not sufficient at the pleading stage to make conclusory allegations of control." *In re Sunbeam Corp., 284 B.R. at 366.* Rather, "the extent of the domination and control must preclude the controlled entity from having legal or independent significance of its [\*51] own. There must be an abuse of the corporate form to effect a fraud or an injustice--some sort of elaborate shell game." *Id.*

[HN34] To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an "incorporated pocketbook" and used the corporate form to shield themselves from liability. *United States v. Golden Acres, Inc., 702 F.Supp. 1097, 1105-07 (D. Del. 1988); In re Sunbeam Corp., 284 B.R. at 368.* Further, the plaintiff must plead facts showing that the "corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999); see also Foxmeyer Drug Co. v. General Elec. Corp., 290 B.R. 229, 236 (Bankr. D. Del. 2003)* ("the fraud or similar injustice that must be demonstrated in order to pierce the corporate veil under Delaware law must, in particular, be found in the defendant's use of the corporate form.") (internal citations omitted). [HN35] In determining whether the corporate form has been misused under Delaware law, courts have considered the following factors:

(1) whether the corporation was [\*52] adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholders siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher v. Atex, Inc., 68 F.3d at 1458; In re Sunbeam Corp., 284 B.R. at 365.*

In support of its argument that the corporate veil of RSL USA should be disregarded, the Debtor and Committee rely on six principal factors: (i) RSL USA was

2003 Bankr. LEXIS 1635, *

undercapitalized and insolvent since its inception; (ii) there was significant overlap in the directors and executive officers of RSL USA, PLC and LTD; (iii) certain directors of PLC and LTD had ownership interests in RSL USA; (iv) RSL USA was never able to sustain a financially viable business and thus was dependent on its parents for financing; (v) PLC and LTD provided managerial and other services to RSL USA, and PLC and LTD officers often became involved in and directed the day-to-day business of RSL [*53] USA; and (vi) RSL USA merely served as a tool to further the interests of Defendants.

These are insufficient allegations to state a claim that RSL USA and LTD operated as a single entity and that there was an overall element of injustice or unfairness present arising from abuse of the corporate form. [HN36] If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced. *United States v. Golden Acres, Inc., 702 F.Supp. at 1104*. Plaintiffs have alleged (i) extensive overlapping officers and directors; (ii) managerial and other services that LTD provided to RSL USA; and (iii) unspecified involvement in the day-to-day business affairs of RSL USA by several officers and directors of LTD. These do not show that RSL USA was a mere sham. Rather than supporting a finding of domination, the allegations of the complaint describe a "typical" relationship between parent and subsidiary. *See Fletcher v. Atex, Inc., 68 F.3d at 1459-60*. Plaintiffs further argue that RSL USA merely served as a tool to further Defendants' interests, and that this indicates an [*54] overall element of injustice. This claim alone cannot support a finding that RSL USA was used improperly for the benefit of its parents or affiliates, nor does it show overall fraud or injustice from the use of the corporate form. There are insufficient allegations to show an "overall element of injustice or unfairness" which would have arisen from the sham nature of RSL USA's corporate identity. *Fletcher v. Atex, Inc., 68 F.3d at 1461; see also LaSalle Nat'l Bank v. Perelman, 82 F.Supp.2d. 279, 295 (D. Del. 2000)*.

Moreover, the complaint recognizes that RSL USA operated three business units (some or all acquired as operating concerns) and had its own employees responsible for its day-to-day operations. (Complaint, PP 36, 38-39.) These allegations are inconsistent with the contention that RSL USA was a mere shell, and the existence of separate operating companies usually negates a piercing of the veils. *See Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.456 F.Supp. 831, 845-46 (D. Del. 1978)*. Further, RSL USA, PLC and LTD were incorporated and doing business in three different nations. [HN37] It is commonplace for subsidiaries [*55] gov-

erned by the laws of different legal systems to be separately incorporated, so that their corporate structure can address the potential differences between applicable corporate laws. *See* Lynn M. LoPucki, *Cooperation in International Bankruptcy: A Post-Universalist Approach, 84 CORNELL L.REV. 696, 724-25, 750-51 (1999); see also, supra*, n.9. Plaintiffs have not cited to any authority in which courts have pierced the veils of affiliates doing business and incorporated in different countries.

As discussed above, the Debtors have adequately pleaded a claim against certain Defendants related to the guarantees given by RSL USA with respect to the $ 1.7 billion debt of PLC already guaranteed by LTD. But this well pleaded claim is not enough to justify a general piercing of the corporate veil and, in fact, appears to cut just the other way. Prior to the guarantees, RSL USA was not liable for its affiliates' substantial debts, even though there are allegations that PLC and LTD financed their subsidiary. If the guarantee was a wrong, it was because the companies were separate; if the veil between PLC and RSL USA were pierced, it would be pierced for all purposes, [*56] making RSL USA and its parent one company, and in substance validating the guarantees. *Cf. Geyer v. Ingersoll Publ'ns Co., 621 A.2d at 790; Eagle Transp. Ltd. v. O'Connor, 449 F.Supp. 58, 59-60 (S.D.N.Y. 1978)*. Thus, the one adequately pleaded claim cuts against the concept of piercing the corporate veils.

Plaintiffs' fourth count is dismissed on the ground that the allegations of the complaint are insufficient to support a claim for piercing the corporate veils between RSL USA, PLC and LTD. There is no need to consider the further issue as to the liability of the directors of PLC and LTD if the veils were pierced.

## CONCLUSION

The allegations of the complaint with respect to the claims for wrongful concealment and constructive fraud, and for aiding and abetting constructive fraud, are dismissed. The allegations of the complaint with respect to breach of fiduciary duty are sustained only as to the claims relating to the guarantees by RSL USA and only as against Defendants Fisher, Shassian, Beckoff and Marino in their capacities as directors of RSL USA. The claims for aiding and abetting a breach of fiduciary duty are dismissed, as are the [*57] claims relating to piercing the corporate veil. Defendants shall settle an order consistent with this decision on five days' notice.

Dated:

December 11, 2003

*Allan L. Gropper*

UNITED STATES BANKRUPTCY JUDGE

LEXSEE 2006 US APP LEXIS 2370



Cited
As of: Dec 20, 2007

**STATE FARM FIRE AND CASUALTY COMPANY, as subrogee of ROCKY
MOUNTAIN and SUZANNE MOUNTAIN, Appellant v. HOLMES PRODUCTS;
J.C. PENNEY COMPANY, INC.**

**No. 04-4532**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*165 Fed. Appx. 182; 2006 U.S. App. LEXIS 2370*

**January 17, 2006, Argued
January 31, 2006, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:**    Appeal from the United States
District Court for the District of New Jersey. (D.C. No.
02-cv-04790). Magistrate Judge: Honorable Ann M.
Donio.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurer, as the
subrogee of its insureds, sought review from the disquali-
fication of its primary expert witness following a pre-
trial Daubert hearing, and a subsequent entry of summary
judgment in favor of defendants, the distributor and
seller of a halogen floor lamp that the insurer alleged to
be the cause of a fire that destroyed the insureds' home.

**OVERVIEW:** The insurer contended that a window
curtain on the wall of the living room of the insureds'
residence caught fire by coming into contact with a halo-
gen lamp's bulb and sought to admit expert testimony
supporting this theory. However, the district court ex-
cluded the testimony because it did not satisfy the re-
quirements of Daubert and *Fed. R. Evid. 702.* On review,
the court affirmed because it found that the testimony
was speculative insofar as it involved a theory that the
insureds' dog somehow brought the draperies in contact
with the lamp. This theory was not supported by any

scientific analysis or methodology. Also, in the absence
of any evidence that could lead a jury to reasonably con-
clude that the draperies' contact with the halogen lamp
was the probable cause of the fire, the district court did
not exceed the permissible bounds of its discretion by
precluding the remainder of the expert's testimony on
causation because it was not helpful to the trier of fact.
Finally, the district court properly granted summary
judgment in favor of the distributor and seller because
the insurer did not show evidence sufficient to create a
material issue of fact regarding causation.

**OUTCOME:** The court affirmed the district court's
judgment excluding expert testimony and its order grant-
ing summary judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Re-
view > Standards of Review*
*Evidence > Procedural Considerations > Rulings on
Evidence*
[HN1] The United States Court of Appeals for the Third
Circuit reviews an order granting summary judgment de
novo, and evaluates the evidence in the light most favor-
able to the nonmoving party. It reviews a district court's
ruling as to the admissibility of evidence under an abuse
of discretion standard where the question presented in-
volves the application of the Federal Rules of Evidence.

Evidence > Testimony > Experts > Admissibility
Evidence > Testimony > Experts > Daubert Standard
[HN2] The language of *Fed. R. Evid. 702* requiring an expert to testify to scientific knowledge means that the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.

Torts > Products Liability > Strict Liability
[HN3] Under Pennsylvania law, causation is an essential element of a strict products liability claim and the plaintiff has the burden of proving this essential element.

**COUNSEL:** Norman W. Briggs, Esq. (Argued), Michelle L. Weckerly, Esq., Frey, Petrakis, Deeb, Blum, Briggs & Mitts, Philadelphia, PA, Attorneys for Appellant.

Judson B. Barrett, Esq. (Argued), Barrett & Pavluk LLC, Ocean, NJ, Attorney for Appellees.

**JUDGES:** Before: BARRY, AMBRO and ALDISERT, Circuit Judges.

**OPINION BY:** ALDISERT

**OPINION**

[*183] OPINION OF THE COURT

ALDISERT, Circuit Judge.

Plaintiff State Farm Fire & Casualty Co., as subrogee of Rocky and Suzanne Mountain, appeals from the disqualification of its primary expert witness following a pre-trial hearing held pursuant to the teachings of *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, and a subsequent entry of summary judgment in favor of Defendants Holmes Products and J.C. Penney Co., Inc. Defendants are the distributor and seller, respectively, of a free-standing torchiere-style [**2] halogen floor lamp that State Farm alleges to be the cause of a fire that destroyed the Mountains' home. State Farm contends that a window curtain on the west wall of the living room of the Mountain residence caught fire by coming into contact with the halogen lamp's bulb. We must decide two things: (1) whether the District Court properly excluded the testimony of State Farm's expert on the issue of causation; and (2) if so, whether the absence of this expert testimony regarding causation warranted summary judgment in favor of Defendants. We have jurisdiction to review this appeal pursuant to *28 U.S.C. § 1291*. Because we answer both questions in the affirmative, we will affirm the decision of the District Court.

I.

The parties are familiar with the facts and the proceedings in the District Court, so we will only briefly revisit them here. On April 5, 1999, the home of Rocky and Suzanne Mountain was destroyed in a fire. At the time of the fire, the home was insured by State Farm. The Mountains thereafter filed a claim pursuant to that policy, for which they received $ 197,654.92, and State Farm was subrogated to the rights of the Mountains. After investigating [**3]    [*184] the claim, State Farm came to the conclusion that the fire was caused by a torchiere-style halogen lamp sold by J.C. Penney and distributed by Holmes Products.

This halogen lamp had been subject to a Consumer Product Safety Commission ("CPSC") recall in August 1997 because it lacked a wire or glass guard. According to the CPSC, the halogen lamp bulb could reach extremely high temperatures capable of igniting curtains, clothing or other flammable materials. As a result of the recall, J.C. Penney issued a safety notice, to be sent to customers, that free safety guards were available for halogen lamps sold prior to August 1997. It also notified all its stores of the recall. The Mountains purchased their halogen lamp from J.C. Penney in February 1998. It is undisputed that the lamp did not have a wire or glass guard and that the Mountains were never provided with the safety notice.

On April 5, 1999, the day of the fire, the Mountains had left their home at approximately 6:45 a.m. with the halogen lamp still on. Around 9:20 a.m., the Bradford Township Volunteer Fire Department was called to combat a fire at the Mountains' residence. After the fire company extinguished the fire, the fire [**4] chief inspected the scene and determined that the fire originated in the area of the living room where the halogen lamp was located. He theorized that it was caused by either a short in the lamp's electrical cord or the draperies coming into contact with the lamp.

State Farm's expert, Brian Gray, a fire investigator, subsequently conducted an investigation of the fire. He found the following: (1) the fire originated in the western part of the living room based on fire pattern analysis; (2) this was the area where the lamp was located; (3) there was no defined ring on the carpet where the lamp would have stood throughout the fire, indicating that it had fallen over; (4) there were no signs of electrical arcing on the halogen lamp and the insulation on the lamp's external power cords remained intact, indicating that the fire was not electrical in nature; (5) the damage to the lamp's wiring was restricted to that section inside the poles, with the heaviest amount of damage sustained at the top of the lamp and around the halogen bulb, indicating that it was subject to higher heat; (6) the halogen bulb could reach

165 Fed. Appx. 182, *; 2006 U.S. App. LEXIS 2370, **

temperatures high enough to ignite flammable material located within one [**5] or two inches of the lamp's bulb; and (7) the room's heavy cotton draperies were located one and a half to two feet away from the lamp. The evidence also showed that the lamp was approximately six feet tall, that the draperies hung from a height of approximately nine feet, and that on the morning of the fire no windows or doors were open in the home.

Based on the above information, Gray eliminated all other potential causes of the fire and concluded that it was caused by the draperies coming into contact with the defective lamp:

> Well, we know that the lamp was close to the vicinity of the draperies. We know that the lamp was always on, and by doing a process of elimination in this area of fire origin and, for example, eliminating all other igniting sources, the only item relative to causation of the fire was the halogen lamp; the only ignitable materials that were in that area were the draperies.

(App. at 78.)

As to how the lamp came in contact with the draperies, Gray then hypothesized that the Mountains' large boxer dog, who perished in the fire, might have accidentally pulled the window draperies over the lamp or knocked or tilted the lamp into the [*185] draperies [**6] in an effort to investigate the tree trimming that was occurring in the home's vicinity that day. Gray did concede, however, that the lamp may have remained standing until the firefighters arrived and began their fire suppression efforts. In addition, another of State Farm's experts, Matthew Balmer, testified that, in his opinion, the lamp stayed standing throughout the fire.

On July 29, 2004, a Daubert hearing was held to determine the admissibility of Gray's testimony. After considering written submissions, the District Court, Magistrate Judge Donio presiding, granted Defendants' motion to exclude Gray's expert testimony. The Court found it significant that neither Gray nor Balmer could definitively state that the lamp was knocked over before the fire began and that there was no factual support for Gray's hypothesis that the Mountains' dog caused the fire. It therefore concluded that Gray's testimony did not satisfy Daubert's "fit" requirement because his conclusion on causation was based on assumptions and was not supported by any methodology. See Daubert, 509 U.S. at 591. The Court then excluded Gray's testimony on the issue of causation.

On November 3, 2004, the [**7] District Court granted summary judgment in favor of Defendants, concluding that State Farm had not presented any evidence on the issue of causation sufficient to show that the halogen lamp was the proximate cause of the fire. The Court stated that "absent Gray's causation testimony, Plaintiff does not have sufficient evidence to create an issue of fact for trial." More specifically, the Court found that State Farm failed to present sufficient facts indicating how the defective halogen lamp, which could only ignite materials located within one or two inches of the lamp's bulb, could have ignited the living room draperies that were one and one half to two feet from the lamp. Because of the lack of evidence "bridging the gap" from the draperies to the defective halogen lamp, the Court concluded that "a jury could only speculate as to whether the fire was caused by the lamp." The Court found this speculation to be impermissible and accordingly granted Defendants' motion for summary judgment.

II.

[HN1] We review an order granting summary judgment de novo, and we evaluate the evidence in the light most favorable to the nonmoving party. *Antol v. Perry, 82 F.3d 1291, 1294-1295 (3d Cir. 1996).* [**8] We review a district court's ruling as to the admissibility of evidence under an abuse of discretion standard where the question presented involves the application of the Federal Rules of Evidence. *Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 525 (3d Cir. 1995).* Pennsylvania's substantive law on strict products liability applies to this appeal. See *Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964); Austin v. Dionne, 909 F. Supp. 271, 274 (E.D. Pa. 1995).* [1]

> 1 Although this appeal arose from the District of New Jersey, we apply Pennsylvania law to this dispute because the action was initially filed in the Western District of Pennsylvania, but was later transferred to New Jersey for the convenience of the parties pursuant to *28 U.S.C. § 1404.* Because of this transfer, the transferee court must apply the choice of law rules of the transferor court, here Pennsylvania. See *Van Dusen, 376 U.S. at 639.* Under Pennsylvania law, because there is no conflict between the laws of other states that may have an interest in the current action and because the governmental interests of those states would not be impaired were they not applied, a court shall apply the law of the forum state, here Pennsylvania, pursuant to Van Dusen's precepts. See *Austin, 909 F. Supp. at 274.*

[**9] [*186] III.

We conclude that the Court acted within its broad discretion in disallowing the expert testimony of Gray on the topic of causation because his testimony did not satisfy the requirements of *Daubert* and *Rule 702 of the Federal Rules of Evidence*. First, Gray's testimony as to the actions of the Mountains' dog was speculative insofar as this theory was not supported by any scientific analysis or methodology that indicated that the dog in fact brought the draperies into contact with the halogen lamp. In interpreting Daubert, this Court has stated that "that [HN2] the language of *Rule 702* requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994)*. Accordingly, we agree with the District Court that Gray's testimony on the behavior of the Mountains' dog was not supported by any scientific analysis or methodology; it was merely unsupported speculation and was therefore properly excluded.

Second, in the absence of any [**10] evidence that could lead a jury to reasonably conclude that the draperies' contact with the halogen lamp was the probable cause of the fire, the Court did not exceed the permissible bounds of its discretion by precluding the remainder of Gray's testimony on causation. Without a causal link between the fire, the location of the halogen lamp, and the location of the heavy cotton draperies, the remainder of Gray's testimony would not have been helpful to the trier of fact for the purposes of determining causation. Unlike the two cases that State Farm cites addressing similar exclusions of expert testimony, *Breidor v. Sears, Roebuck & Co., 722 F.2d 1134 (3d Cir. 1983)*, and *Gichner v. Antonio Troiano Tile & Marble Co., 133 U.S. App. D.C. 250, 410 F.2d 238 (D.C. Cir 1969)*, the Court here did not err in excluding Gray's testimony because he was only able to state how the fire started in terms of mere possibilities, and this causal supposition was not sufficiently supported by evidence in the record. See *Breidor, 722 F.2d at 1138* ("Where a fire investigator identifies the cause of fire in terms of probabilities (as opposed to mere possibilities) [**11] by eliminating all but one reasonable potential cause, such testimony is highly probative.") (citing *Gichner, 410 F.2d at 247*).

Although Gray eliminated all but the draperies' contact with the halogen lamp as the possible source of the fire, his testimony lacks that logical indicia that would allow the trier of fact to conclude that the remaining *possibility* was in fact the *probable* source of the fire. *Breidor, 722 F.2d at 1138-1139* ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."); *Gichner, 410 F.2d at 247*. In the absence of testimony or evidence explaining how the draperies came into contact with the halogen lamp, a trier of fact could not be allowed to speculate that the Mountains' dog knocked the lamp into the curtains, especially when State Farm's experts were unable to conclusively state whether the lamp fell over before the fire began. See *Flagiello v. Crilly, 409 Pa. 389, 187 A.2d 289, 291 (Pa. 1963)* ("We have said many times that the jury may not be permitted to reach its verdict [**12] merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based.") (citation and quotations omitted). Although it is a close question, we conclude that the exclusion of the entirety of Gray's testimony was not an abuse of discretion because the Court could reasonably have concluded [*187] that his remaining non-speculative testimony did not constitute scientific knowledge helpful for the purposes of determining causation. [2] See *In re Paoli R.R. Yard PCB Litig., 35 F.3d at 742* ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.") (citation and quotations omitted).

> 2  Or, at most, the exclusion of this testimony was only harmless error in light of our conclusion that a trier of fact could only speculate as to how the draperies came into contact with the halogen lamp. See *Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir. 2000)* ("In reviewing evidentiary rulings, if we find nonconstitutional error in a civil suit, such error is harmless only 'if it is highly probable that the error did not affect the outcome of the case.'").

[**13] Having concluded that the District Court did not err in excluding Gray's testimony, we also conclude that it properly granted summary judgment in favor of Defendants. [HN3] Under Pennsylvania law, causation is an essential element of a strict products liability claim, *Wilson v. Vermont Castings, Inc., 170 F.3d 391, 396 (3d Cir. 1999)*, and State Farm, as plaintiff, has the burden of proving this essential element, *Blancha v. Raymark Indus., 972 F.2d 507, 511 (3d Cir. 1992)*. Without evidence sufficient to create a material issue of fact regarding causation, a jury could only speculate as to whether the halogen lamp was indeed the cause of the fire. See *Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 76 (3d Cir. 1996)* (affirming a district court's order granting summary judgment where the plaintiff failed to present sufficient evidence on the element of causation). Accordingly, because State Farm has failed to present facts sufficient to establish the existence of an element essential to its case on which it would bear the burden of proof at trial, the District Court properly entered summary judgment in favor of Defendants. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* [**14] ("Rule 56(c)

165 Fed. Appx. 182, *; 2006 U.S. App. LEXIS 2370, **

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

V.

We have considered all contentions presented by the parties and conclude that no further discussion is necessary. The judgment of the District Court will be affirmed.