

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE

2

Civil Action No. C.A. No. 04-1494 (JJF)

3

MAGTEN ASSET MANAGEMENT CORPORATION and

4    LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5    Plaintiffs,

6    v.

7    NORTHWESTERN CORPORATION,

8    Defendant.

9    -----------------------------------------------

10   Civil Action No. C.A. No. 05-499 (JJF)

11   MAGTEN ASSET MANAGEMENT CORP.,

12   Plaintiff,

13   v.

14   MICHAEL J. HANSON and ERNIE J. KINDT,

15   Defendants.

16   -----------------------------------------------

17                    DEPOSITION OF

18                    ERIC JACOBSEN

19   -----------------------------------------------

20

21

22

23

24

25   TAKEN ON:  6/19/2007        BY:  DANA ANDERSON

Page 2

```
 1   APPEARANCES:
 2
     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
 3   One New York Plaza
     New York, New York 10004-1980
 4   By:  Bonnie Steingart, Esq.
          Sabita Krishnan, Esq.
 5
     For the Plaintiffs
 6
 7
 8
 9
10   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
     101 Park Avenue
11   New York, New York 10178-0061
     By:  Joseph Pizzurro, Esq.
12        Nancy E. Delaney, Esq.
13   For NorthWestern Corporation
14
15
16
17
     WILMER, CUTLER, PICKERING, HALE & DORR
18   1875 Pennsylvania Avenue, NW
     Washington, DC 20006
19   By:  Joseph K. Brenner, Esq.
20   For the Witness
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES (continued):
 2
     BROWNING, KALECZYC, BERRY & HOVEN, PC
 3   139 North Last Chance Gulch
     Helena, MT 59624
 4   By:  Stanley Kaleczyc, Esq.
          Kimberly A. Beatty, Esq.
 5
     For Michael J. Hanson and Ernie J. Kindt
 6
 7
 8
 9
10   NIXON PEABODY, LLP
     437 Madison Avenue
11   New York, NY 10022-7039
     By:  Christopher M. Desiderio, Esq.
12
     For Law Debenture Trust Company of New York
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   INDEX
 2   Examination by Ms. Steingart, page 8
 3
 4   INDEX OF EXHIBITS
 5   Exhibit Number 1, Stipulated Protective Order,
     page 7
 6
     Exhibit Number 2, NorthWestern Corporation Staff
 7   Meeting/Executive Committee Meeting Minutes, January
     28, 2002, page 14
 8
     Exhibit Number 3, February 25, 2002 E-mail from
 9   Barbara Forinash to Karen Smook with NOR Staff/Exec
     Committee Materials attachments, page 15
10
11   Exhibit Number 4, Management Financial and
     Information Report Meeting 2002 Calendar, page 16
12   Exhibit Number 5, January 28, 2002 Memorandum from
     Mike Hanson and Eric Jacobsen to The Board of
13   Directors regarding Update on Montana Power
     Acquisition, page 20
14
     Exhibit Number 6, March 18, 2002 Confidential
15   Memorandum from Eric Jacobsen and Mike Hanson to
     Merle Lewis, Dick Hylland and John Van Camp
16   regarding MPC Compensation Proposal, page 27
17   Exhibit Number 7, May 28, 2002 Memorandum from Kipp
     Onne to Merle Lewis, Dick Hylland and Eric Jacobsen
18   regarding Financing Plans and Considerations,
     page 39
19
     Exhibit Number 8, Form 10-Q, NorthWestern Corp,
20   dated May 15, 2002, page 47
21   Exhibit Number 9, July 3, 2002 E-mail from Karen
     Smook to multiple recipients regarding 05-31-02 For
22   The Month Ended, page 51
23   Exhibit Number 10, NorthWestern Management Financial
     and Information Report For The Month Ended May 31,
24   2002, page 52
25
```

Page 5

```
 1   INDEX OF EXHIBITS (continued)
 2   Exhibit Number 11, NorthWestern Management Financial
     and Information Report For The Month Ended June 30,
 3   2002, page 55
 4   Exhibit Number 12, Form 10-Q, NorthWestern Corp,
     dated August 14, 2002, page 57
 5
     Exhibit Number 13, July 9, 2002 Confidential
 6   Memorandum from Eric Jacobsen and Mike Hanson to
     Merle Lewis, Dick Hylland and John Van Camp
 7   regarding NorthWestern Energy LTIP, page 65
 8   Exhibit Number 14, July 30, 2002 Memorandum from
     Mike Hanson to The Board of Directors regarding
 9   Update on NorthWestern Energy Integration, page 69
10   Exhibit Number 15, July 31, 2002 Memorandum from
     Eric Jacobsen to NorthWestern Board of Directors
11   regarding Going Flat Resolution, page 77
12   Exhibit Number 16, NorthWestern Management Financial
     and Information Report For The Month Ended July 31,
13   2002, page 83
14   Exhibit Number 17, August 16, 2002 Letter from
     William Schwitter to Stephen Hearne and Fred Frank,
15   page 89
16   Exhibit Number 18, September 6, 2002 Letter from
     William Schwitter to Stephen Hearne and Fred Frank,
17   page 94
18   Exhibit Number 19, November 8, 2002 Memorandum from
     Eric Jacobsen, Kipp Onne to The Members of the
19   Disclosure Committee and each Disclosure
     Sub-Committee, page 120
20
     Exhibit Number 20, November 12, 2002 E-mail from Tim
21   Atkinson to Kurt Whitesel, Kipp Onne and Eric
     Jacobsen with attached Memorandum, page 120
22
     Exhibit Number 21, October 30, 2002 Memorandum from
23   Kipp Onne to NorthWestern Board of Directors
     regarding Revised Proposed 2003 Operating Plan,
24   page 130
25
```

2 (Pages 2 to 5)

Page 78

1    A. I don't have specific recollections of that,
2    no.
3    Q. In any case, the board at the meeting in August
4    voted on resolutions concerning the going-flat
5    transaction, correct?
6    A. I believe that's correct.
7    Q. Did you draft the resolutions?
8    A. I believe they were prepared by outside
9    counsel.
10.  Q. Did you review them before they were presented
11   to the boards?
12   A. I would assume that I did. I don't have a
13   specific recollection.
14   Q. Have you had a chance to look at that part of
15   the minutes, and it begins on page 001452
16   A. There's two different numbers, okay.
17   Q. Do I have the wrong number?
18   A. We were using NOR numbers, now --
19   Q. I'm sorry. NOR 9570.
20   A. Okay. Here. (Reviews document.)
21   Q. Do you see the first whereas, it says "Whereas
22   NorthWestern Corporation believes it advisable
23   for rating agency purposes to move the assets."
24       Do you see that?
25   A. Yes, I do.

Page 79

1    Q. Why was it advisable for rating agency purposes
2    to move the assets?
3    A. I don't recall.
4    Q. Was there any discussion of that with the
5    board?
6    A. I don't recall.
7    Q. As you sit here today and review the resolution
8    that was presented to the board, is it your
9    understanding that this is the rationale that
10   the board used in approving the going-flat
11   transaction?
12   A. No. My recollection is that in the very late
13   stages of the acquisition process, Montana
14   Power or Touch America made a change in the
15   structure of their own entity and dropped all
16   of their utility assets into an LLC, a limited
17   liability company. It changed our acquisition
18   from that of assets to the interest in this
19   LLC, so the transaction changed in the last
20   days, month or so, I can't recall the exact
21   timing of that.
22       That resulted in us, after
23   consummating the acquisition, being in a
24   holding company structure which was not the
25   original plan. The original plan was to

Page 80

1    acquire assets. It's my recollection that we
2    then had to seek approval to be in that holding
3    company structure. And as I testified earlier,
4    it was our belief that that structure was not
5    compatible with NorthWestern's business plan.
6    And so we had requested authority to go ahead
7    and close on that basis but then transition to
8    a flat structure so that we would not be forced
9    to become a registered holding company.
10   Q. Now, was there any requirement that this occur
11   at or around November of 2002?
12   A. It's my recollection that we had a year or so.
13   But I don't have a specific recollection.
14   Q. Now, at the time that you received permission
15   to do this from the Montana Public Service
16   Commission, was the Montana Public Service
17   Commission provided with updated financial
18   reporting concerning the advances to Expanets?
19   A. It's my recollection that the approval from the
20   Montana Public Service Commission was given as
21   part of the original approval of the
22   transaction which was in, I believe, January of
23   2002.
24   Q. And after that initial approval was sought and
25   obtained, was updated financial information

Page 81

1    concerning the liquidity of NorthWestern
2    provided to Montana Public Service Commission?
3    A. I don't recall.
4    Q. There were a series of board meetings in
5    September of 2002, correct?
6    A. I believe so.
7    Q. And those series of board meetings concerned
8    the difficulties that NorthWestern was having
9    in raising additional capital, correct?
10   A. I would have to look at the agendas to see all
11   the items that were discussed. Financing would
12   typically be something that the board discussed
13   at every meeting.
14   Q. In September of 2002, did anyone update the
15   Montana Public Service Commission about the
16   issues that NorthWestern was facing concerning
17   liquidity?
18   A. I don't recall.
19   Q. Did anyone update the Montana Public Service
20   Commission about the risks that would be posed
21   to the utility company assets if they were
22   owned directly by NorthWestern?
23       MR. PIZZURRO: Objection.
24       THE WITNESS: I don't recall.
25   BY MS. STEINGART:

21 (Pages 78 to 81)

Page 82

1    Q. Now, when you presented this resolution to the
2    board of directors concerning the going-flat
3    transaction, was there any financial analysis
4    presented with respect to the assets and
5    liabilities being transferred in connection
6    with the going-flat transaction?
7    A. I don't recall.
8    Q. Was the board of directors informed about the
9    value of the assets and the value of the
10   liabilities being transferred in connection
11   with the going-flat transaction?
12   A. I don't recall.
13   Q. Was there any discussion about whether
14   NorthWestern could pay the liabilities being
15   assumed from the Montana Power Company in
16   connection with the going-flat transaction?
17   A. I don't remember any such discussions.
18   Q. So at the time the board approved the
19   going-flat transaction, the board talked about
20   the advisability for rating agency purposes of
21   transferring the assets but did not discuss
22   NorthWestern's ability to make payment on
23   Montana Power Company liabilities, correct?
24           MR. BRENNER: Object to the form.
25           MR. PIZZURRO: Objection.

Page 83

1           THE WITNESS: I don't recall.
2           (Deposition Exhibit Number 16 marked
3    for identification.)
4    BY MS. STEINGART:
5    Q. Sir, do you recognize this to be the
6    NorthWestern MFIR for July 2002?
7    A. (Reviews document.) It appears to be that,
8    yes.
9    Q. And you received this in the course of your
10   employment at NorthWestern?
11   A. I would assume that I did.
12   Q. I'd like to direct your attention to page 9
13   of 14 or NOR 362075.
14   A. (Reviews document.)
15   Q. And I'll ask you to look at the paragraph at
16   the bottom of the page that begins with "Cash
17   collections..."
18   A. All right.
19   Q. And was it your understanding at the end of
20   July 2002 that 100 percent of the customers
21   would not receive accurate bills until October?
22   A. I see that's what's indicated here in the
23   report.
24   Q. Was it your understanding that the incremental
25   borrowings had or were -- had and were

Page 84

1    increasing?
2    A. I don't recall.
3    Q. And was it also your understanding that these
4    predictions of Expanets' ability to repay were
5    also becoming gloomier?
6    A. I see that the forecast as indicated here is
7    changing. It is still prospective.
8    Q. Now, at some point in 2002 you learned that
9    Expanets would not repay any of the monies that
10   were advanced to it during 2002, correct?
11   A. I believe late in the year that become more
12   clear, yes.
13   Q. Did anyone, after receiving the MFIR for July,
14   either during the operational meetings or any
15   other meetings, discuss the connection between
16   Expanets' continued cash flow problems, its
17   borrowings and the Expert system?
18   A. I don't recall.
19   Q. Did anyone discuss at any of these operational
20   meetings that you attended the increasing
21   liquidity pressures that Expanets was creating
22   for NorthWestern?
23   A. I did not attend the -- what I understand to be
24   the operating meetings which were the
25   subsidiary specific meetings. The meetings to

Page 85

1    discuss these MFIRs, I did participate in. And
2    I believe that it's my recollection that
3    somewhere in this report is a liquidity report
4    that's on NOR 362079, I believe.
5           And so that information, I believe,
6    was a standard portion of these reports.
7    Q. Now, is the number there that's listed for
8    Montana First Megawatts a cash availability or
9    a cash need?
10   A. I don't know where you are on this report.
11   Q. I'm looking at the page that you referenced and
12   the line concerning Montana First Megawatts.
13          MR. BRENNER: Under the heading
14   Potential Cash --
15          THE WITNESS: Oh, I see it now. I see
16   it now.
17   BY MS. STEINGART:
18   Q. Yes. So was the company going to have some
19   payment obligation with respect to MFM?
20   A. It appears to be unclear at this point if I
21   read the footnote.
22   Q. Now, during 2002 NorthWestern was not able to
23   sell MFM, was it?
24   A. I don't recall when the actual assets were
25   sold.

22 (Pages 82 to 85)

Page 86

1   Q. There is future cash needs that are noted for
2       Expanets.
3           Do you see that?
4   A. Yes.
5   Q. Expanets working capital, I think it's
6       25 million?
7   A. Yes.
8   Q. Did NorthWestern advance an additional
9       25 million to Expanets?
10  A. I don't recall the -- I do recall that the
11      AVAYA credit agreement was restructured, and it
12      ultimately -- resolution of the relationship
13      with AVAYA was negotiated. I do not recall
14      whether this specific advance was made or not.
15  Q. Now, it says "Funds availability."
16          Do you see that?
17  A. Yes.
18  Q. And facilities?
19  A. Yes.
20  Q. And it says "Expanets." And is that 80
21      million?
22  A. It appears to be, yes.
23  Q. And did NorthWestern ever receive that
24      $80 million?
25  A. I don't know.

Page 87

1   Q. And then do you know what that number is based
2       on?
3   A. No, I don't.
4   Q. Now, the chart that we were looking at before
5       on page 9 talks about there being $160 million
6       in borrowings by Expanets from NorthWestern.
7           Do you see that?
8   A. (Reviews document.) That appears to be a
9       forecasted number.
10  Q. Did that number get even higher than that?
11  A. I don't know.
12  Q. Did anyone discuss in connection with this MFIR
13      and the liquidity section that you've
14      referenced us to, did anyone ask where Expanets
15      was getting the 80 million?
16  A. I don't recall.
17  Q. Do you know of any lender at the end of
18      July 2002 or August 2002 who was willing to
19      lend Expanets any money whatsoever?
20  A. AVAYA.
21  Q. Did AVAYA lend the money?
22  A. AVAYA had an existing credit agreement which
23      stayed outstanding.
24  Q. Other than the AVAYA existing agreement -- and
25      this liquidity analysis shows there is a need

Page 88

1       to pay part of that down, correct?
2   A. It was extended and renegotiated.
3   Q. And how much did that cost? How much did it
4       cost to extend it and renegotiate it?
5   A. In terms of expenses of lawyers to do it?
6   Q. Or to redo the facility, in fees and expenses.
7   A. I don't recall any fee being charged by them to
8       do it at all.
9   Q. And was that part of an overall negotiation
10      with AVAYA?
11  A. There were ongoing negotiations with them over
12      various matters, yes.
13  Q. And was any other new lender other than AVAYA
14      willing to provide any money to Expanets?
15  A. Not that I recall.
16  Q. Was AVAYA willing to provide enough so that
17      Expanets could repay NorthWestern $80 million?
18  A. I don't recall. I don't believe so.
19  Q. And AVAYA wasn't even asked to do that, were
20      they?
21  A. Not that I'm aware.
22  Q. They were just asked to roll over the amount
23      that was outstanding at that time, is that
24      correct?
25  A. I believe that's correct.

Page 89

1   Q. Are you aware of whether additional new money
2       was sought for Expanets during August and
3       September?
4   A. I generally recall that Expanets was looking to
5       obtain financing to replace the AVAYA facility
6       which had a maturity date.
7   Q. Were they looking to obtain any financing to
8       repay NorthWestern?
9   A. I don't remember.
10          (Deposition Exhibit Number 17 marked
11          for identification.)
12  BY MS. STEINGART:
13  Q. We'll do this document then we'll break for
14      lunch.
15          MS. STEINGART: You have a call, don't
16      you?
17          MR. BRENNER: I'm flexible so we can
18      break whenever you want to.
19  BY MS. STEINGART:
20  Q. Have you seen Jacobsen 17 before?
21  A. (Reviews document.) I believe I have.
22  Q. And what do you understand this to be?
23  A. It appears to be NorthWestern's response to SEC
24      comments in connection with the S-4
25      registration statement that was filed.

23 (Pages 86 to 89)

Page 142

1  Q. And D is the sale leaseback of assets, what's
2     that?
3  A. I'm not sure.
4  Q. Did the board specify whether one or two or all
5     of these items were necessary.
6  A. I don't recall that.
7  Q. Were management directed to pursue all of them?
8  A. It appears that the instruction was to continue
9     to explore them.
10 Q. Now, let's look at cost savings. Were steps
11    taken to sell the plane?
12 A. I don't recall.
13 Q. Was there more than one plane?
14 A. I believe there were two.
15 Q. So one was being kept and one was being sold?
16 A. I don't know. One was a jet and one was a prop
17    plane.
18 Q. Were steps taken to reduce corporate events and
19    contributions?
20 A. I don't know.
21 Q. Were steps taken to reduce corporate personnel?
22 A. I don't recall.
23 Q. Were senior management compensation plans
24    reduced?
25 A. I don't recall.

Page 143

1  Q. And do you recall what other items were
2     identified in the board materials on the 5th
3     and the 6th?
4  A. No, I do not.
5  Q. Did you consider nothing as sacred?
6  A. Is that a trick question?
7  Q. Well --
8  A. I see that Mr. Drook has used that term, "I
9     hold many things sacred."
10 Q. That's right. So did you or other members of
11    management add items, cost-saving items to the
12    list pursuing the directive that, quote,
13    Nothing is sacred, close quote?
14 A. I don't recall.
15 Q. Is it fair to say that Mr. Drook had a sense of
16    urgency about these measures?
17 A. That would seem to be indicated by the
18    document.
19 Q. Number 8 talks about Expanets. And
20    prepare -- says "Prepare an evaluation of
21    strategic alternatives involving Expanets no
22    later than the next board meeting."
23    Do you see that?
24 A. Yes, I do.
25 Q. Do you recall what strategic alternatives were

Page 144

1     developed with respect to Expanets?
2  A. I don't have a specific recollection. I
3     believe it was a pretty open-ended assignment
4     to consider all available opportunities from
5     sale to partnership to continued investment.
6  Q. Are you aware -- strike that.
7     During the years that you were at
8     NorthWestern, had any directives such as this
9     (indicating) been imposed by the board on
10    management?
11 A. Not in writing. Many times instructions were
12    given, but not in writing in this type of
13    presentation.
14 Q. Why do you think this was done in writing in
15    this kind of presentation?
16 A. I don't know.
17 Q. Do you think Mr. Drook and the board had
18    concerns about the stability of NorthWestern?
19 A. I don't know.
20 Q. Do you think Mr. Drook and the board had
21    concerns about the options of NorthWestern
22    going forward?
23 A. I don't know.
24 Q. In this period immediately before the closing
25    of the going-flat transaction, were these

Page 145

1     liquidity concerns and the urgency to raise
2     capital disclosed to the Montana Public Service
3     Commission?
4  A. I don't know.
5  Q. Did the Montana Public Service Commission know
6     that the assets of the Montana utility would be
7     used to raise capital to benefit the
8     non-utility assets?
9        MR. KALECZYC: Objection.
10       THE WITNESS: I don't know. They knew
11    that the acquisition debt was maturing
12    because they had seen that debt when it was
13    originally put in place and were familiar
14    with the maturity dates. I don't know -- I
15    don't know if they knew at this particular
16    time.
17 BY MS. STEINGART:
18 Q. And part of the cash flow needs of NorthWestern
19    at this particular time was not only because of
20    the acquisition debt but was because of the
21    hundreds of millions of dollars being spent on
22    the non-utility assets, correct?
23 A. I'm not sure of that statement. The primary
24    focus was the maturity of the debt. At this
25    time of year you are moving into the most

37 (Pages 142 to 145)

Page 146

1    sizable season for an energy company. And
2    actually cash flows are higher during this and
3    the next several months than they are at any
4    other time during the year. So a significant
5    amount of cash was being generated from a cash
6    flow standpoint.
7        So I believe the real target was the
8    fact that there was maturing debt obligations.
9    Q. There was a cash flow issue because there was
10   $190 million advanced to Expanets, correct?
11       MR. PIZZURRO: Objection.
12       THE WITNESS: That cash had already
13   been advanced prior to moving into this
14   seasonal area which would be the highest
15   cash flow period of the company.
16   BY MS. STEINGART:
17   Q. During the highest cash flow period of the
18   company, Mr. Drook told you that nothing was
19   sacred, didn't he?
20   A. He has indicated that in this letter.
21   Q. So he had concerns about liquidity in addition
22   to cash flow, didn't he?
23       MR. PIZZURRO: Objection.
24       THE WITNESS: I'm not sure that
25   follows directly from this so much as it's

Page 147

1    an instruction to be very clinical and
2    objective in the assignment.
3    BY MS. STEINGART:
4    Q. What impact did the advance of $190 million to
5    Expanets have on NorthWestern's financial
6    situation on November 15, 2002?
7    A. That money had already been advanced and so the
8    most telling impact was the interest cost that
9    NorthWestern had to the extent that any funds
10   advanced came from credit arrangements. I
11   believe some of it came from cash flow and that
12   wouldn't have an interest component.
13   Q. And on November 15, 2002 what was the prospect
14   that Expanets was going to repay the
15   $190 million?
16   A. I don't know.
17   Q. As NorthWestern was adding indebtedness at the
18   level of NorthWestern, what assessment was done
19   of the cash flow available to pay for not only
20   the new indebtedness but the liabilities being
21   assumed from the going-flat?
22   A. Well, in every financing, the overall
23   obligations of NorthWestern were considered by
24   the lenders, sometimes there would be covenants
25   addressing those. So it was part of the

Page 148

1    modeling of the NorthWestern enterprise that
2    the creditors would look at.
3    Q. But the lender who was providing this financing
4    was going to be senior to the indebtedness that
5    was being transferred with the assets from
6    Montana Power, correct?
7    A. I believe that's correct.
8    Q. And the assets of Montana Power were going to
9    be used to secure that indebtedness, correct?
10   A. Together with other assets.
11   Q. Together with other assets.
12       So by the time that this lender was
13   paid, there wouldn't be much for other
14   indebtedness, would there be?
15       MR. PIZZURRO: Objection.
16       THE WITNESS: You can't tell that,
17   there could be plenty.
18   BY MS. STEINGART:
19   Q. But there wasn't, was there?
20   A. I believe that's not true. I don't know. I
21   think that most of these -- I don't know what
22   the ultimate payout or return was for
23   creditors, and I believe your client, the issue
24   is still open.
25   Q. Right. And so as far as you know the QUIPS

Page 149

1    weren't repaid, were they?
2    A. I don't know.
3    Q. And if not for the going-flat, those assets
4    would have stayed at Montana Power Company,
5    correct?
6        MR. KALECZYC: Objection.
7        THE WITNESS: There is no guarantee in
8    how those assets would have been treated
9    because had NorthWestern not done it at the
10   going-flat transaction, it might have put
11   additional debt at that subsidiary level
12   and issued secured bonds on the Montana
13   assets. And then did separate secured
14   bonds on Nebraska and South Dakota, didn't
15   have to do it all at one level, you could
16   do it at each of the individual levels,
17   more complex, more work, same result.
18   BY MS. STEINGART:
19   Q. But that's not what happened?
20   A. No, that's not what happened.
21   Q. Now, was there any discussion of getting a
22   fairness opinion with respect to the going-flat
23   transaction?
24   A. Not that I recall.
25   Q. Was there any assessment done of the assets

38 (Pages 146 to 149)

Page 150

```
 1      received and the liabilities assumed?
 2   A. Not that I recall.
 3   Q. Was there a valuation performed in order to
 4      obtain financing by NorthWestern? Was a
 5      valuation done of the assets of the Montana
 6      Power Company that NorthWestern used to obtain
 7      financing?
 8   A. If the question is in connection with the
 9      financing that was done in February of 2003,
10      there was a review by the creditors of the
11      assets, the answer to that would be yes.
12          (Deposition Exhibit Number 23 marked
13          for identification.)
14   BY MS. STEINGART:
15   Q. After the 11/15 directive, there was additional
16      information that Expanets was not going to meet
17      its lowered earnings expectations, correct?
18   A. Yes.
19   Q. So the news that was given to the board in the
20      October 30th memo we just looked at was updated
21      on November 21st, correct?
22   A. Sometime in late November, yes.
23   Q. So we had the October 30th earnings memo. We
24      had the -- then you had meetings with respect
25      to the third quarter 10-Q, correct?
```

Page 151

```
 1   A. Yes.
 2   Q. And also during that period of time you had the
 3      directive from the board that money needed to
 4      be raised and nothing was sacred, correct?
 5   A. Yes.
 6   Q. Then you received the 11/21 memo from Kipp
 7      Orme, right?
 8   A. (Reviews document.) Yes.
 9   Q. At this point did you or anyone else ask
10      Kipp Orme about why these facts should be
11      communicated days after the third quarter 10-Q
12      was filed?
13   A. Yes.
14   Q. Who did you ask about that?
15   A. I asked Kipp about starting a process to
16      immediately advise our audit committee to
17      examine and had the audit committee begin to
18      look into the issues and ask questions as well
19      as it seemed incredibly surprising that we
20      could have an information delta or difference
21      of this sort so soon after we had filed a 10-Q.
22   Q. And how long did you receive this information
23      after the going-flat transaction?
24   A. I don't know when the going-flat transaction
25      closed.
```

Page 152

```
 1   Q. Did it close immediately before this?
 2   A. I don't know.
 3   Q. Did anyone ask why this information was
 4      provided at a point in time that it could not
 5      be taken into account in connection with the
 6      going-flat transaction?
 7   A. I think it was provided by Expanets. They
 8      seemed to have made some determination after
 9      continuing to review their numbers and it was a
10      complete surprise.
11   Q. It was a complete surprise to Expanets?
12   A. To NorthWestern -- to me.
13   Q. What explanation did you receive from those you
14      asked at Expanets about why this came on
15      November 21st?
16   A. Again, we instituted -- I instituted a process
17      to advise the audit committee and the audit
18      committee had, I believe, Rick Fresia and
19      John Charters participate in preparation of
20      materials and answer questions to try to
21      explain what was happening. And I believe some
22      of their explanation is embodied in this
23      (indicating) e-mail, but I believe there was
24      additional information prepared for the audit
25      committee.
```

Page 153

```
 1   Q. Did anyone suggest in words or substance that
 2      the process was being manipulated?
 3   A. I don't recall that.
 4   Q. Did the board or others at NorthWestern
 5      determine that they had been misled?
 6   A. At the time I did not have that understanding.
 7   Q. Given the amount and the consistency of the bad
 8      news that came from Expanets during 2002, could
 9      people say on a basic level that they were
10      really surprised about this?
11          MR. PIZZURRO: Objection.
12   BY MS. STEINGART:
13   Q. Well -- I mean, could --
14   A. I believe that, at least myself, I believe that
15      I was very surprised at this answer and was
16      beginning to have questions about the
17      competence of the people at Expanets. I can't
18      testify as to Kipp Orme, Dick Hylland's, other
19      people's view on whether they were surprised or
20      not.
21   Q. Do people think that it was just a coincidence
22      that the bad news from Expanets emerged after
23      the close of the equity offering, the
24      $720 million bond registration and the
25      going-flat transaction?
```

39 (Pages 150 to 153)

Page 154

1        MR. PIZZURRO: Objection.
2        THE WITNESS: That's a broad question
3    with several aspects to it. The bond
4    registration, that money was already out
5    and it was just merely an exchange. So
6    that financing had been already done and it
7    was merely an exchange of one instrument
8    for another. So that wasn't new money that
9    came as a result of that transaction. This
10   happened well after the equity offering, a
11   couple of months, I guess, and there was
12   never any discussion of manipulation, it
13   was a complete surprise on my part.
14   BY MS. STEINGART:
15   Q. It wasn't a couple of months after the equity
16      offering, it was right on the heels of the
17      equity offering, wasn't it?
18   A. This was late November and the equity offering
19      was the first couple days of October, so that's
20      closer to two months rather than right on the
21      heels.
22   Q. In connection with the equity offering, didn't
23      NorthWestern make the representation in the
24      underwriting agreement that the rating would
25      not be lowered during -- prior to the offering,

Page 155

1      correct?
2    A. (No response.)
3    Q. We looked at that together, do you recall?
4    A. That is not what it said. It said that the
5       rating -- maintenance of the rating was a
6       condition of the financing. NorthWestern did
7       not make a representation that the rating
8       wouldn't be changed. Those are different
9       things.
10   Q. So if the rating changed prior to the equity
11      offering then the underwriter could have walked
12      away, correct?
13   A. They would have that election, they may or may
14      not have walked away.
15   Q. So to the extent NorthWestern wanted to close
16      on the equity offering, it was important for
17      the rating not to change, correct?
18   A. That's one factor, yes.
19   Q. Do you think Mr. Hylland knew that?
20   A. Knew what?
21   Q. That it was important for the rating not to
22      change in order to close the equity offering?
23   A. I don't know.
24   Q. Did the board, to your knowledge, discuss the
25      substance of the timing of the disclosures by

Page 156

1      Expanets in relation to these other capital
2      events that I've just listed?
3    A. It's my recollection that the board -- as I was
4      very surprised by this, and I believe at some
5      point there was a discussion of was there
6      potential liability with respect to the equity
7      offering.
8    Q. But no one considered what the potential
9      exposure would be with respect to going flat,
10     correct?
11   A. I don't recall.
12   Q. How did the 11/21 memo impact the activities
13      that you were undertaking in connection with
14      the 11/15 board directive, if at all?
15   A. I'm not sure -- I mean, we continued to -- I
16      believe that the management team continued to
17      work on those instructions. The receipt of
18      this information initiated another and separate
19      process by the audit committee to try to
20      understand what was behind this new
21      information.
22         (Deposition Exhibit Number 24 marked
23      for identification.)
24   BY MS. STEINGART:
25   Q. I'd like to show you what we've marked as

Page 157

1      Jacobsen 24.
2    A. (Reviews document.) All right.
3    Q. Did you see this memo written by Mr. Lewis and
4      Mr. Hylland to the board of directors on or
5      around December 7, 2002?
6    A. I don't have a specific recollection. I
7      believe that I saw it at that time.
8    Q. And you were participating in trying to obtain
9      financing during that time, weren't you?
10   A. I participated in meetings, yes.
11   Q. Who was taking the lead on getting the facility
12      from Credit Suisse First Boston?
13   A. Economics of those kinds of transactions would
14      generally be discussions amongst Dick Hylland
15      and Kipp Orme from the finance side. And then
16      I would have the lead in executing the
17      transaction from the legal documentation side
18      and all of the many steps that would be
19      required, in particular, for a secured
20      facility.
21   Q. Do you know what Mr. Hylland and Mr. Lewis
22      meant when they say here that "Two additional
23      factors over this timeframe have now also come
24      to light that greatly impact the urgency of
25      executing an FMB or other secured transaction"?

40 (Pages 154 to 157)

Page 158

1      Do you see that?
2  A. Yes, I do.
3  Q. How do these factors impact the urgency?
4  A. Well, I believe we had looked previously at the
5     new information from Expanets and so the board
6     was concerned about what the real situation was
7     at Expanets and was surprised by that
8     revelation of that information. And around
9     this time we're still in the process of
10    investigating that, so it was an unknown.
11       In number 2, it seems to refer to a
12    covenant, but I can't recall the specifics.
13 Q. So to the extent that the existing debt would
14    have had covenant defaults, getting new debt
15    which didn't have those defaults would be
16    important, correct?
17 A. I believe the existing debt had the ability to
18    be rolled over if you were in compliance with
19    certain covenants. And so if you did not
20    comply -- with regard to -- if you were not in compliance with a
21    particular covenant, you would not have the
22    election to roll, you would need the consent of
23    the lender or have to get alternate financing.
24 Q. And typically needing to restate your
25    financials would be a covenant default,

Page 159

1     wouldn't it?
2  A. I don't know.
3  Q. In your experience, isn't there a covenant
4     usually that the financials that you publicly
5     file are not misleading or --
6  A. Yes.
7  Q. -- accurate?
8        Do you recall -- there is a reference
9     further down on the page to -- highlighting
10    to -- an agenda that highlighted NorthWestern's
11    liquidity requirements. "These alternatives
12    will be reviewed with the board."
13       Do you see that?
14 A. Yes, I do.
15 Q. In connection with the agenda -- the attached
16    agenda also highlighting NorthWestern's
17    liquidity requirements, what were the liquidity
18    requirements at that time, if you recall?
19 A. I don't recall. It might just primarily be
20    talking about the maturity date.
21 Q. Well, whether the maturity would, what, be
22    accelerated by covenant default?
23 A. No, I believe the discussions were about
24    rolling that over or refinancing that at its
25    scheduled maturity date.

Page 160

1  Q. Now, if there were covenant defaults, would it
2     cause an acceleration of the debt?
3  A. It could. Typically lenders work with a
4     company, they don't want to default either.
5  Q. Now, at that point, there's knowledge, was
6     there not, that there were serious finance
7     accounting issues at Expanets?
8  A. I believe as I testified that process was
9     undergoing at this point. The audit committee
10    was beginning to look into that and asking
11    questions and demanding answers from the
12    Expanets management team.
13 Q. And there was the expectation at that point
14    that financials would have to be restated,
15    wasn't there?
16 A. I don't believe that that decision had been
17    made yet.
18 Q. Under consideration at that point though,
19    wasn't it?
20 A. I don't recall.
21 Q. Were there disclosure recommendations that were
22    talked about in connection with this memo that
23    you recall?
24 A. I don't have a recollection in connection with
25    this memorandum. I do recall that my advice to

Page 161

1     the audit committee was that once we had this
2     information from Expanets, the audit committee
3     should undertake a process to ask questions,
4     determine for itself what the situation was.
5     And then based on that information, make any
6     corrective disclosures required. And I believe
7     a new press release was issued sometime within
8     a couple of days of this date, is my
9     recollection.
10 Q. Did you participate in obtaining a valuation
11    report for Credit Suisse First Boston to assist
12    in the financing referred to in the
13    December 7th memo?
14 A. I'm not sure what you mean by "evaluation
15    report."
16       MR. BRENNER: Did you say evaluation
17    or valuation?
18       MS. STEINGART: A valuation of...
19       (Deposition Exhibit Number 25 marked
20    for identification.)
21 BY MS. STEINGART:
22 Q. Okay. We brought this, 25, it's a cover memo
23    with a valuation report -- an appraisal.
24       Not evaluation. An appraisal.
25       Did you participate in arranging for

41 (Pages 158 to 161)

Page 162

1 an appraisal for CSFB in connection with the
2 financing that was being discussed with CSFB in
3 December?
4 A. (Reviews document.) No. Kipp Orme would have
5 been the interface with this bearing point firm
6 or Mike Hanson.
7 Q. Do you recall being provided a copy of the
8 final appraisal?
9 A. I don't recall.
10 Q. If you look at the e-mail on the cover, you see
11 that it was provided to you?
12 A. Yes, I do.
13 Q. Did you understand that the appraisal
14 determined -- it is called a valuation report,
15 but the appraisal determined that as of
16 December 31, 2002 that the assets of the
17 Montana Power Company were valued at
18 $1.5 billion?
19 A. I don't have a recollection of that. I see
20 that on page 3 as, one, I believe they use
21 typically several different methods of
22 valuation. So I don't know if that's an
23 average or if that's one of several that they
24 chose. I don't know.
25 Q. Was that the valuation report that was provided

Page 163

1 by the company to CSFB?
2 A. I don't know. I assume it was.
3 Q. If you look at the last page, 56.
4 A. (Reviews document.)
5 Q. Do you see that it says "Conclusion of fair
6 value"?
7 A. Yes, I do.
8 Q. Now, did you understand the amount of
9 liabilities that were assumed by NorthWestern
10 in connection with the going-flat transaction?
11 A. I don't understand the question. Did I
12 understand the amount of the liabilities?
13 Q. Did you have an understanding of the amount of
14 the liabilities assumed by NorthWestern in
15 connection with the going-flat transaction?
16 A. Originally?
17 Q. In November of 2002.
18 A. Oh, no, I don't have a recollection.
19 Q. Now, this valuation as of 12/30/2002 was
20 several weeks after the going-flat transaction,
21 correct?
22    MR. BRENNER: He's already said
23    several times he doesn't remember when it
24    closed.
25 BY MS. STEINGART:

Page 164

1 Q. So it's not your recollection that it closed in
2 or around the middle of November of 2002?
3 A. It's my recollection it closed sometime in
4 October or November, but I don't have a date.
5 Q. So this valuation, as far as your recollection
6 goes, was done shortly after the closing of the
7 going-flat?
8 A. That I do not know. Let me see the date of
9 this.
10 Q. It says "As of 12/31/2002."
11 A. I see that. But the e-mail is January 30th and
12 oftentimes appraisals are as of a date but the
13 work is conducted well after that date but
14 delivered with a reference date. So the fact
15 that it's December 31st doesn't mean it was
16 done as of that date. And in fact, it could
17 have been finished sometime in January and then
18 delivered.
19 Q. But it values the assets at an as-of-date,
20 correct?
21 A. That's correct.
22 Q. So what the report says is as of the end of
23 2002 this was the value of the asset, correct?
24 A. That's correct. That was different than the
25 question then when it was prepared.

Page 165

1 Q. As general counsel of NorthWestern, did you do
2 an assessment of the value of the assets being
3 transferred and the liabilities assumed by
4 NorthWestern in connection with the going-flat
5 transaction?
6 A. I did not.
7 Q. Was any determination made about whether there
8 was a disparity in value with respect to the
9 assets transferred and the liabilities assumed?
10 A. I don't recall.
11 Q. Did anyone ask for such an assessment to be
12 made?
13 A. I don't recall.
14 Q. Did anyone on behalf of Montana Power indicate
15 that in order to protect the creditors of
16 Montana Power, that an assessment of the assets
17 transferred and liabilities assumed should be
18 made?
19    MR. KALECZYC: Objection.
20    THE WITNESS: By Montana Power, do you
21    mean the trust or the QUIP structure,
22    because Montana Power was no longer around?
23 BY MS. STEINGART:
24 Q. NorthWestern, it had a different name at the
25 time of the going-flat transaction, correct?

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 166

1  A. Right.
2  Q. It was called NorthWestern Energy, I think. I
3     don't remember. Can we agree that when we talk
4     about the Montana Power Company we are talking
5     about the company that was acquired in February
6     of 2002?
7  A. All right.
8  Q. And whose assets were transferred in connection
9     with the going-flat transaction?
10 A. Yes.
11 Q. So at the time of that transaction, did anyone
12    who was an officer or director of the Montana
13    Power Company or its successor raise issues
14    with respect to the value of the assets being
15    transferred and the liabilities being assumed?
16        MR. KALECZYC: Objection.
17        MR. PIZZURRO: I'm going to make an
18    objection. I think the record is really
19    getting muddy as to what entities we are
20    talking about. I know they have similar
21    names, but my best recollection is Montana
22    Power Company was one of the entities that
23    was on -- sold the unit interests in
24    Montana Power, LLC which was acquired by
25    NorthWestern in that transaction, closed in

Page 167

1     February of 2002 which then was renamed, if
2     I can recall correctly, NorthWestern
3     Energy, LLC subsequently was renamed Clark
4     Fork and Blackfoot.
5  BY MS. STEINGART:
6  Q. And at the time of the going-flat transaction,
7     the successor to the Montana Power Company was
8     NorthWestern Energy, LLC?
9        MR. KALECZYC: Objection.
10       MR. PIZZURRO: I'm going to object and
11    I'm not going to testify, but that's not my
12    understanding.
13       MR. KALECZYC: It's successor is vague
14    and ambiguous.
15       MS. STEINGART: Montana Power, LLC?
16    Let's see if we can help.
17       (Off the record.)
18       (Deposition Exhibit Number 26 marked
19    for identification.)
20 BY MS. STEINGART:
21 Q. Let's see if we can be clearer.
22 A. (Reviews document.)
23 Q. Now, I guess the question, you know, there are
24    three org charts here that are not NorthWestern
25    documents, okay, that we have put together

Page 168

1     based on what our understanding was of the
2     structure of part of NorthWest before the
3     acquisition of Montana Power, after the
4     acquisition of Montana Power which would be
5     page 2, and page 3 is after the going-flat.
6        Now, I guess my question is: Looking
7     at page 2, is it your understanding that the
8     assets of the Montana Power Company were held
9     by or held in the form of NorthWestern Energy
10    Montana after the acquisition of the Montana
11    Power Company?
12 A. Immediately -- again, I'm not familiar with
13    this chart.
14 Q. Uh-huh.
15 A. I see that it shows South Dakota and Nebraska
16    operations down a couple of tiers and, in fact,
17    those were an unincorporated division of the
18    parent.
19 Q. I see, okay.
20 A. So right away there is a disconnect there.
21       But I can testify that immediately
22    following the acquisition, NorthWestern
23    Corporation acquired all of the outstanding
24    ownership interests of a limited liability
25    company and the assets of the limited liability

Page 169

1     company with the utility operations of the
2     Montana Power Company.
3  Q. Were they placed in a subsidiary of
4     NorthWestern Energy?
5  A. By virtue of acquiring all of the limited
6     liability company interests, you in effect had
7     the subsidiary.
8  Q. At the time of the going-flat transaction or
9     thereafter when this appraisal was prepared,
10    the appraisal was of certain underlying assets
11    acquired from Montana Power, is that correct?
12 A. I believe so.
13 Q. And these were the assets that were transferred
14    to NorthWestern in connection with the
15    going-flat transaction, correct?
16 A. I believe that's correct.
17 Q. Okay. At the time of the going-flat
18    transaction, did any of the officers or
19    directors of the entity that held the Montana
20    Power assets question, to your knowledge, the
21    disparity in value of the assets transferred
22    and the liabilities assumed by NorthWestern in
23    the going-flat?
24       MR. PIZZURRO: Objection.
25       MR. KALECZYC: Objection.

43 (Pages 166 to 169)

Page 170

```
1          THE WITNESS: Several aspects of that
2      question I'm not commenting on any
3      disparity or lack thereof, I don't know.
4  BY MS. STEINGART:
5      Q. Okay.
6      A. The entity was a wholly owned limited liability
7      company, a single member LLC, there is not a
8      board of directors. There is a managing
9      member, I believe that that was NorthWestern
10     corporation although I don't specifically
11     recall. So there was not a body, a board that
12     was part of that entity.
13     Q. Did anyone -- so no one on behalf of either the
14     creditors or shareholders of any entity that
15     had an interest in those assets questioned the
16     legitimacy of the going-flat transaction?
17         MR. PIZZURRO: Objection.
18         MR. KALECZYC: Objection.
19         THE WITNESS: The only shareholder
20     with an equity interest was NorthWestern.
21     I don't know what creditors undertook in
22     terms of the process.
23  BY MS. STEINGART:
24     Q. Now, were there in connection with the
25     going-flat transactions documents signed by the
```

Page 171

```
1      entity that held those assets, the Montana
2      Power Company assets?
3      A. I believe so.
4      Q. And who had the authority to sign those
5      documents?
6      A. I don't recall specifically. There was
7      signature authority guidelines at NorthWestern
8      for signing documents.
9      Q. To the extent that there were creditors of the
10     successor to the Montana Power, LLC, who
11     reviewed the transaction on their behalf?
12         MR. PIZZURRO: Objection.
13         MR. KALECZYC: Objection.
14         THE WITNESS: I don't know.
15     NorthWestern would have reviewed the terms
16     of its credit agreements and to comply with
17     those, I don't know what work was done on
18     behalf of the creditors.
19  BY MS. STEINGART:
20     Q. And certainly there was no fairness opinion
21     done that the going-flat transaction was fair
22     from a financial point of view to the creditors
23     of the successor to the Montana Power, LLC?
24         MR. PIZZURRO: Objection.
25         THE WITNESS: Not that I recall.
```

Page 172

```
1  BY MS. STEINGART:
2      Q. Now, were you involved in the restatement of
3      the NorthWestern financials for Q-1, Q-2 and
4      Q-3 that took place in 2003?
5      A. Yes.
6      Q. And these were restatements of the Q-1, Q-2,
7      Q-3 for 2002?
8      A. Correct.
9      Q. That were done in 2003?
10     A. Yes, in connection with filing the 10-K.
11     Q. And at that time were you still chair of the
12     disclosure committee?
13     A. I believe so.
14     Q. At what point did you leave NorthWestern?
15     A. I believe I left in or around December of 2004.
16     Q. What were the circumstances of your separation
17     from NorthWestern?
18     A. In connection with the filing of the bankruptcy
19     proceedings, I and other executives were
20     retained in connection with that process and
21     provided incentives to assist NorthWestern in
22     exiting that process and stayed on through the
23     exiting of the bankruptcy. And then following
24     that closing of that proceeding then left
25     NorthWestern.
```

Page 173

```
1      Q. What did you do to prepare for today's
2      deposition?
3      A. I met with counsel last night.
4      Q. Okay. Did you meet with or talk with anyone on
5      behalf of -- who was representing NorthWestern?
6      A. I did not.
7      Q. Did you speak with or talk with anyone who
8      represented Mr. Hanson, Mr. Kindt?
9      A. I did not.
10     Q. Did you speak to anyone other than your counsel
11     about this deposition, I mean other than
12     telling people where you were going to be?
13     A. I did not.
14     Q. Were you aware that NorthWestern Corporation
15     entered into a consent decree with respect to a
16     cease and desist proceeding that the SEC had
17     commenced against NorthWestern?
18     A. Yes.
19     Q. How were you aware of that?
20     A. There was a press release to that effect.
21     Q. Did you participate in the -- strike that.
22         Had the SEC commenced its
23     investigation that led up to that cease and
24     desist before your separation from
25     NorthWestern?
```

44 (Pages 170 to 173)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 174

1    A. Yes.
2    Q. In your capacity as general counsel, did you
3       participate in -- on behalf of NorthWestern in
4       that investigation?
5    A. Yes.
6    Q. What was the status of that investigation at
7       the time that you left NorthWestern?
8    A. It had not concluded.
9    Q. Have you had an opportunity to review the
10      actual cease and desist order that was entered?
11   A. I have.
12          (Deposition Exhibit Number 27 marked
13          for identification.)
14   BY MS. STEINGART:
15   Q. I'd like to show you what we've marked as
16      Jacobsen 27 and ask you if you recognize this
17      to be the Order instituting cease and desist
18      proceedings, making findings and imposing a
19      cease and desist order in connection with the
20      SEC's investigation of NorthWestern?
21   A. (Reviews document.) Yes.
22   Q. Now, having participated in the restatement of
23      the 2002 financials and in the preparation of
24      the year-end 2002 10-K, is it your
25      understanding that during the first three

Page 175

1    quarters of 2002 NorthWestern filed quarterly
2    and current reports with the Commission that
3    materially misstated NorthWestern's financial
4    position at that time?
5    A. That's clearly the finding of the Commission.
6    Q. And is that something that you understood as a
7       result of the restatements that you prepared on
8       behalf of NorthWestern?
9    A. The restatements had many different aspects to
10      them, some were quite small in amount, some
11      larger. So some were material, others I did
12      not view as material.
13   Q. Was -- you know, is it your understanding that
14      any of the restatements for Q-1, Q-2 or Q-3, as
15      a whole, were not material?
16   A. I don't know.
17   Q. Do you recall the substance of the matters that
18      were restated in the first quarter of 2002?
19   A. No.
20   Q. Is it your understanding that it included
21      advances from NorthWestern to Expanets?
22   A. The company had more than one restatement. And
23      so as a result of the S-4 registration process
24      and the SEC comment letter process, we -- or
25      NorthWestern, I believe, restated the first and

Page 176

1    second quarter 10-Qs, I believe. And in those
2    restatements headed the disclosure that we
3    looked at in the comment letter.
4    Q. So at the initial time that you restated the
5       10-Qs, there were no additional disclosures
6       about the functionality of Expert, correct?
7    A. Correct.
8    Q. So in the restatement of the 10-Q in 2003 for
9       the first quarter, there was a -- an adjustment
10      with respect to functionality of Expert,
11      correct?
12   A. I don't know -- by "adjustment," do you mean a
13      financial adjustment, or do you mean additional
14      disclosure text?
15   Q. It was additional disclosure text.
16   A. I don't recall.
17   Q. Is it your understanding that the text was
18      changed to indicate that during the first
19      quarter of 2002, that Expert was not fully
20      operational?
21   A. I don't recall.
22   Q. As you sit here today, though, you know that
23      that's the case, don't you? That Expert -- you
24      know aside from the disclosure, you know that
25      it was the case that during the first quarter

Page 177

1    of 2002 Expert was not fully operational?
2    A. As I sit here today, I do know that Expert was
3       not performing to the desired level.
4    Q. As you sit here today, do you have an
5       understanding that there were also adjustments
6       with respect to earnings that were reported in
7       the first quarter 10-Q?
8    A. I don't recall.
9    Q. Why did NorthWestern decide to file an amended
10      first quarter 10-Q in 2003?
11   A. As a result of the information that
12      NorthWestern received at the end of November,
13      which we looked at concerning Expanets, and the
14      review by the audit committee and then later in
15      connection with valuations of the investment in
16      both Blue Dot and Expanets, it became clear
17      that there would be substantial write-offs of
18      the investment in those two entities.
19          And then in connection with filing a
20      10-K, the desire was to absolutely -- and the
21      instruction from the board was to absolutely
22      address any open issue or make any kind of
23      disclosure that it thought to be appropriate to
24      try to address any potential issue out there so
25      that you could set a clean starting point with

45 (Pages 174 to 177)

Page 178

1    . the 10-K that was filed in, I believe, April of
2    2003.
3    Q. So what process did you use internally to
4        decide what material in the first quarter 10-K
5        needed to be restated?
6    A. There was extensive work done by the outside
7        accountants with people on-site at all of the
8        operating companies. There were third-party
9        financial consultants brought in, both
10       financial advisory and operational consultants.
11       And there was additional counsel retained, all
12       of whom participated.
13   Q. And was the conclusion of all of those
14       participants that the first quarter 10-Q for
15       2002 should be restated?
16   A. We filed a restated 10-Q, yes. I don't know
17       what the conclusion of each individual
18       participant was in the process, but it resulted
19       in us filing a 10-Q that was restated.
20   Q. And when you say "it was decided," was it a
21       decision that you participated in or that was
22       communicated to you by somebody else?
23   A. I believe the process was primarily driven by
24       the accountants because in that situation the
25       company will do whatever the accountants tell

Page 179

1    them to do in order to get them to sign off on
2    the 10-K which required audited financial
3    statements.
4    Q. So is it your testimony that you restated the
5        first quarter 10-Q for 2002 because you needed
6        to do that in order for the auditors to sign
7        off on the year-end 10-K for 2002?
8    A. It's my recollection that there was not a
9        complete consensus on whether all of the
10       proposed restatements were necessary. And it
11       was a discussion amongst the financial group
12       and the auditors. And I believe that in the
13       context of NorthWestern at the time which was
14       the public release on this new information from
15       Expanets and the likelihood of a substantial
16       write down of the investment which then
17       ultimately was reflected in the 10-K that the
18       company should follow whatever recommendation
19       was made by the auditors in that respect as
20       opposed to try to argue for a new result.
21       That's my recollection of the financial
22       discussion.
23   Q. Do you have any reason, as you sit here today,
24       to dispute the conclusion of the SEC that the
25       first quarter 10-K filed by NorthWestern in

Page 180

1    2002 was materially misleading?
2    A. No.
3    Q. Do you have any reason, as you sit here today,
4        to dispute the SEC's conclusion that the 10-K
5        filed by NorthWestern for the second quarter of
6        2002 was materially misleading?
7    A. The 10-Q?
8    Q. Do you have any reason, as you sit here today,
9        to dispute the SEC's conclusion that the 10-Q
10       for the second quarter of 2002 was materially
11       misleading?
12   A. I do not.
13   Q. Same question with respect to the third quarter
14       10-Q.
15   A. I do not.
16   Q. The SEC also concluded that in its filings
17       after the effective taxes, NorthWestern
18       overstated its income from continuing
19       operations for the first three quarters of 2002.
20       by approximately 176 percent, 618 percent and
21       109 percent, respectively.
22           MR. BRENNER: Can you tell us where
23       you are reading from?
24           MS. STEINGART: I'm reading from
25       page 2, summary.

Page 181

1    BY MS. STEINGART:
2    Q. Do you have any reason to believe that the SEC
3        is incorrect in that conclusion?
4    A. I have no idea how those numbers were
5        calculated. So, no comment.
6    Q. The SEC also concluded that NorthWestern
7        overstated its income during the first three
8        quarters of 2002 due to the company's improper
9        accounting for accounts receivable, adjustments
10       to customers' bills, allocation of losses
11       to -- and allocation of losses to minority
12       interests.
13           Do you have any reason to dispute that
14       conclusion?
15   A. No.
16   Q. The SEC also concluded that NorthWestern also
17       misrepresented or did not disclose, among other
18       things, the effects of significant problems
19       with Expanets' new information technology
20       system, the material impact of Expanets'
21       reserve reductions and its receipt of
22       non-compete payments on Expanets' income, large
23       company advances to NorthWestern, advances
24       NorthWestern made to support Expanets and
25       Blue Dot and the timing of anticipated payments

46 (Pages 178 to 181)

Page 182

1    from the sale of certain utility assets.
2         Do you have any reason to disagree
3    with that conclusion?
4    A. No.
5    Q. The SEC also concluded that through its
6    financial statements, misrepresentations and
7    omissions, NorthWestern obscured the continuing
8    poor performance of its subsidiaries.
9         Do you have any reason to disagree
10    with that conclusion?
11    A. No.
12    Q. Now, the SEC looked at a number of items that
13    contributed to the conclusions that
14    NorthWestern had materially misstated its
15    quarterly reports during 2002.
16         Are the items in the Consent Decree
17    that the SEC has mentioned items that you dealt
18    with in connection with your restatement of the
19    quarterly reports?
20    A. I don't recall.
21    Q. Should we take a short break so that you can
22    look at this and refresh yourself because I'm
23    going to ask you about it.
24         THE WITNESS: Let's take a quick bio
25    break and keep going.

Page 183

1         (Recess.)
2    BY MS. STEINGART:
3    Q. I'm on page 3 of the Cease and Desist and I'm
4    on paragraph 7.
5    A. (Reviews document.)
6    Q. Now, it's correct, is it not, that the
7    magnitude of NorthWestern's increased debt as a
8    result of the Montana Power acquisition
9    threatened the company's credit ratings?
10    A. I believe it's accurate that incurring that
11    much additional debt would be a negative factor
12    for credit rating agencies.
13    Q. And as a result NorthWestern announced its
14    intention to conduct an equity offering during
15    2002 to raise approximately 200 million to pay
16    down its debt and improve its debt equity
17    ratios.
18         That's true, isn't it?
19    A. NorthWestern did announce that as a plan.
20    Q. And NorthWestern recognized that improvement in
21    the performance of both Expanets and Blue Dot
22    was critical to its planned equity offering,
23    correct?
24    A. It was a relevant factor.
25    Q. And NorthWestern made public statements that

Page 184

1    both Expanets and Blue Dot would achieve 2002
2    targeted earnings and begin providing cash to
3    the NorthWestern consolidated entity in 2002?
4    A. I believe statements to that effect were made
5    at various times during the year.
6    Q. Now, NorthWestern conducted its equity offering
7    during the third quarter of 2002 and raised
8    approximately $87 million, correct?
9    A. That's correct.
10    Q. And also during the third quarter of 2002
11    NorthWestern completed its registration in
12    exchange of new notes for 720 million of debt
13    it incurred to purchase Montana Power, is that
14    true?
15    A. Yes.
16    Q. And it was during the fourth quarter that
17    NorthWestern completed the going-flat
18    transaction, correct?
19    A. I believe that's true.
20    Q. Now, in December 2002 NorthWestern disclosed
21    that significant operational problems at
22    Expanets and Blue Dot would materially impact
23    the company's consolidated year-end financial
24    results, correct?
25    A. Yes.

Page 185

1    Q. And that announcement came after the equity
2    offering, correct?
3    A. Yes.
4    Q. And after the registration and exchange of the
5    new notes, correct?
6    A. Yes.
7    Q. And after the completion of the going-flat
8    transaction?
9    A. Yes.
10    Q. Now, I'm looking further down on page 4, the
11    points relating to the Expert system. "The
12    functionality of the Expert system was critical
13    to Expanets," correct?
14    A. Are you reading from a particular paragraph?
15    Q. I'm just asking for that portion.
16    A. It was one aspect of Expanets' operations. Top
17    line sales were more important, collections are
18    less important. If you are not getting any
19    sales, there is nothing to collect.
20    Q. In fact, ultimately, Expanets had sales without
21    collections, didn't they?
22    A. For a period of time I think subsequently they
23    actually collected many of these receivables.
24    Q. Following its implementation 2001, the Expert
25    system was unable to perform many of the basic

47 (Pages 182 to 185)

Page 186

1    tasks for which it had been designed, that's
2    correct, isn't it?
3    A. I believe that's true as we sit here today,
4    yes.
5    Q. And the problems with Expert materially
6    affected Expanets' results from operations
7    throughout 2002, isn't that true?
8    A. I believe that's correct.
9    Q. NorthWestern's forms 10-Q for the first and
10   second quarters of 2002 and associated press
11   releases attached to Form 8-K mischaracterized
12   Expert's billing system -- I'm sorry, billing
13   activities as fully operational or operational
14   and failed to adequately disclose the magnitude
15   of the system's problems and the material
16   impact of those problems on Experts'
17   operations, that's correct, isn't it?
18   A. That is the SEC's finding.
19   Q. And as you sit here today, do you have any
20   reason to believe that's not correct?
21   A. I don't have a view one way or the other on
22   that. Depending on what you mean by
23   "operational" or "fully operational," the
24   disclosures at the time were consistent with
25   the available information to me.

Page 187

1    Q. Sir, you helped to restate the financials for
2    the first and second quarter of 2002, correct?
3    A. Yes -- excuse me, I helped to restate the 10-Q
4    reports, not the financial statements.
5    Q. You helped to restate the 10-Q reports for the
6    first and second quarter of 2002, correct?
7    A. That's correct.
8    Q. And from your point of view, the restatements
9    that you prepared as general counsel during
10   that period were correct --
11        MR. BRENNER: Object to the form.
12   BY MS. STEINGART:
13   Q. -- strike that.
14        When you prepared the restatements for
15   filing, was it your understanding that the
16   restatements were correct?
17   A. Yes.
18   Q. And as you sit here today, did those
19   restatements impact disclosures that are
20   referenced in the first sentence of
21   paragraph 13?
22   A. There was additional disclosure regarding the
23   Expert matters, yes.
24   Q. So the portions of that first sentence that you
25   disagree with are whether the initial filings

Page 188

1    failed to adequately disclose the magnitude of
2    the problem, do you disagree with that?
3    A. I don't know.
4    Q. Do you disagree that the first two 10-Qs for
5    2002 failed to disclose the material impact of
6    the Expert problems on Expanets' operations?
7    A. As I sit here today, those disclosures were
8    revised in connection with the filing of the
9    amended and restated 10-Qs.
10   Q. And you revised them because you were making
11   them correct?
12        MR. BRENNER: The "you" here is who?
13   BY MS. STEINGART:
14   Q. NorthWestern revised them in order for the
15   amended 10-Qs to be correct?
16   A. Correct.
17   Q. In its Form 10-Q for the third quarter 2002
18   NorthWestern disclosed that Expert had
19   encountered some problems particularly as to
20   billings and collections but did not disclose
21   the extent to which these system problems had
22   impacted Expanets' operations. That's correct,
23   isn't it?
24   A. That is the SEC's finding, yes.
25   Q. Do you have any reason to disagree with that?

Page 189

1    A. I don't recall any reason to disagree.
2    Q. Now, during 2002, I'm looking at paragraph 15,
3    Expanets' bad debt reserve was inadequate,
4    correct?
5    A. I don't know, that's a financial statement
6    determination.
7    Q. And is that a -- an adjustment that was made to
8    the amended 10-Qs that were filed in 2003?
9    A. I believe it was.
10   Q. And is it your understanding that that
11   amendment was made in order to make the 10-Qs
12   accurate?
13        MR. BRENNER: More accurate?
14        THE WITNESS: I think the changes were
15   intended to make them more accurate but a
16   bad debt reserve is prospective in nature,
17   so later events would prove whether or not
18   it was ultimately accurate or not. It is
19   by nature a projection.
20   BY MS. STEINGART:
21   Q. It's your understanding that the thrust of the
22   SEC conclusion is that it was a projection that
23   should have been made during 2002?
24   A. I believe that's correct.
25   Q. And do you have any reason, as you sit here

48 (Pages 186 to 189)



```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
 2

     Civil Action No. C.A. No. 04-1494 (JJF)
 3

     MAGTEN ASSET MANAGEMENT CORPORATION and
 4   LAW DEBENTURE TRUST COMPANY OF NEW YORK,
 5   Plaintiffs,
 6   v.
 7   NORTHWESTERN CORPORATION,
 8   Defendant.

 9   _____

     Civil Action No. C.A. No. 05-499 (JJF)
10

     MAGTEN ASSET MANAGEMENT CORP.,
11

     Plaintiff,
12

     v.
13

     MICHAEL J. HANSON and ERNIE J. KINDT,
14

     Defendants.
15   _____
16   DEPOSITION OF:  RICHARD FRESIA - April 30, 2007
17   _____

18            PURSUANT TO SUBPOENA, the deposition of
     RICHARD FRESIA was taken on behalf of the Plaintiffs at
     1900 Grant Street, Suite 800, Denver, Colorado 80203, on
19   April 30, 2007, at 10 a.m. before Lisa A. Knight,
     Registered Merit Reporter, Certified Realtime Reporter,
20   and Notary Public within Colorado.
21
22
23
24
25
```

Page 2

```
 1              A P P E A R A N C E S
 2  For the Plaintiffs:   GARY L. KAPLAN, ESQ.
    Magten Asset          PHILIP Z. KIMBALL, Esq.
 3  Management Corp.      Fried, Frank, Harris, Shriver
                          & Jacobson LLP
 4                        One New York Plaza
                          New York, New York 10004-1980
 5
    For the Defendant:   JENNIFER A. BAGNATO, ESQ.
 6  NorthWestern         Curtis, Mallet-Prevost, Colt
    Corporation          & Mosle LLP
 7                       101 Park Avenue
                         New York, New York 10178-0061
 8
    For the Defendants:   DANIEL J. AUERBACH, ESQ.
 9  Michael J. Hanson     Browning, Kaleczyc, Berry &
    and Ernie J. Kindt    Hoven, P.C.
10                        Northern Pacific Building
                          100 West Railroad Street
11                        Suite 200
                          Missoula, Montana, 59802
12
    For the Deponent:    DAVID A. ZISSER, ESQ.
13                       Isaacson Rosenbaum P.C.
                         633 17th Street, Suite 2200
14                       Denver, Colorado 80202
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1  11  Order Instituting Cease-and-Desist      76
         Proceedings
 2
    12  Memorandum to Disclosure Committee      96
 3       from Expanets' Disclosure
         Subcommittee, 3/25/03
 4
    13  Timeline to Key Events (ultimately)    103
 5       leading to 12/31/02 reserve
 6  14  Management Financial and Information   114
         Report Meeting, 2002 Calendar
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  EXAMINATION OF RICHARD FRESIA:         PAGE
    April 30, 2007
 3
    By Mr. Kaplan                  5
 4
                        INITIAL
 5  DEPOSITION EXHIBITS:         REFERENCE
 6
    1  Notice of Service of Subpoena      5
 7     (Rick Friesa [sic])
 8  2  NorthWestern Management Financial and   15
       Information Report for Month Ended
 9     June 30, 2002
10  3  E-mail string, top e-mail to Hyland    21
       from Lewis, 4/9/02, Subject:
11     RE: Board
12  4  Form 8-K, NorthWestern Corp. - NWEC,    35
       8/8/02
13
    5  E-mail string, top e-mail to Whitesel   39
14     from Fresia, 8/14/02, Subject: FW:
       DRAFT Language on billing adjustments
15
    6  NorthWestern Corporation, August 8,    45
16     2002, Transcript of Earnings Call
17  7  E-mail to Onus from Fresia, 7/3/02,    49
       Subject: RE: Update - Billings and
18     Collections IT Fix Schedule
19  8  E-mail string, top e-mail to Hyland    50
       from Fresia, 9/1/02, Subject:
20     RE: Expanets cash forecast
21  9  Form 8-K, NorthWestern Corp. - NWEC,    56
       5/1/02
22
    10 E-mail string, top e-mail to Fresia    60
23     and others from Charters, 6/5/02,
       Subject: RE: Comment on Daily Flash
24     Report
25
```

Page 5

```
 1          WHEREUPON, the following proceedings were
 2  taken pursuant to the Federal Rules of Civil Procedure.
 3      *    *    *    *    *
 4          RICHARD FRESIA,
 5  having been first duly sworn to state the whole truth
 6  testified as follows:
 7              EXAMINATION
 8  BY MR. KAPLAN:
 9      Q.  Good morning. I'm Gary Kaplan from Fried,
10  Frank, Harris, Shriver & Jacobson on behalf of Magten
11  Asset Management.
12          I'm going to place before you what we're going
13  to mark as Plaintiff's Exhibit 1.
14          (Deposition Exhibit 1 was marked.)
15      Q.  I'm handing to you the subpoena that was
16  served in this action. Are you here today pursuant to
17  the subpoena?
18      A.  Yes, I am.
19      Q.  Okay.
20      A.  I think as modified.
21          MR. ZISSER: Or maybe not modified.
22      A.  My name is misspelled, and the man came much
23  later than courteous. But other than those two things.
24      Q.  (BY MR. KAPLAN) We apologize for the late
25  arrival and for the misspelling.
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 70

1  of in the ability -- getting asked questions, having to
2  respond were Charters and Fresia.
3      The whole thing had expanded now where
4  everybody felt they had skin in the game. So Marty
5  Snella, who had been the person who I, to this day,
6  still think very highly of, who I was in some ways
7  feeling -- I don't know what the correct emotion was but
8  frustrated that he was never getting any of these
9  questions -- and it was clear to anybody who rationally
10  would think about this is that you should be asking the
11  guy who's trying to fix the system, when is it going to
12  be fixed, not the guy who is trying to collect the
13  money.
14      All of a sudden, he's now energized in being
15  involved in this. So we now have seven people who are
16  very much saying no, we didn't know that at this point.
17  We knew this. No, that's a lie. So on and so forth.
18      Q.  Take it step by step.  The committee met,
19  retained its own lawyer, sent a draft back to
20  NorthWestern.
21      A.  Correct.
22      Q.  And do you recall who it was sent to?
23      A.  It would be sent back to Gary Drook and Kipp
24  Orme and Kurt Whitesel and Kendall Kleever but not to
25  Mike Hanson, for example, because he is not part of the

Page 71

1  corporate group, per se, at the time.
2      Q.  And you mentioned one e-mail back with
3  Mr. Younger, I believe.  But what was the next step?
4  You guys sent a draft back and then what happened?
5      A.  Ultimately, I want to say I'm not sure I
6  was around when the cake came out because I believe they
7  filed an extension.  So I left the first few days in
8  May, and I'm not sure how it came out.  Like I said,
9  five minutes after I left, I just tuned the whole thing
10  out.
11      Q.  But in terms of your role in this, after you
12  got back -- after you sent back your draft to
13  NorthWestern, how did you hear that they were -- didn't
14  like your comments, for lack of a better word, or
15  weren't going to take your comments?
16      A.  I'm not sure that they didn't take them.  It
17  was one of these, they tried to get us to sign off on
18  the original piece.  And the fact that they even
19  attempted without saying, Oh, we won't take these new
20  ones.
21      It was such a blatant issue that they had
22  tried to say, you know, this only happened within the
23  last month or two that I immediately went to the audit
24  committee chair.
25      Q.  And the audit committee chair at the time was?

Page 72

1      A.  Bruce Smith, I think.
2      Q.  And what did Mr. Smith tell you when you
3  raised the concerns to him?
4      A.  He acted surprised about the whole thing and
5  very much wanting to get to the bottom of it.  And he
6  said, I'll get back to you in a couple of days.  And
7  then a couple of days turned into a week and I hadn't
8  heard back, so I called him again.  And I don't know if
9  I got ahold of him or not, but he basically went dark.
10      Q.  And so then what did you do next?
11      A.  By that time, I -- you know, we had gotten to
12  the point where we had our conversation where
13  NorthWestern came in, Bill Austin and the head of HR,
14  and said, You know why we're here.  I said, I don't.
15  And they said, Well, we think you should leave.  And I
16  said, Under what grounds?  And they said, Suppression of
17  information.
18      And I said, What does that mean?  Well, you
19  knew a bunch of stuff and you didn't tell anybody.
20  Well, I said, that's ludicrous.
21      Is this something to do with retaliation under
22  my whistle-blowing of -- on Sarbanes-Oxley?  And they
23  said -- they acted shocked that I had called Bruce
24  Smith.  They didn't seem to know about it.
25      But this whole thing at that point had an air

Page 73

1  of damage control on their part, where Gary Drook and
2  company had -- you know, they were trying to put Humpty
3  Dumpty back together again.  But it was one of these
4  things that was difficult because there was so many
5  e-mails and the like.
6      And I had a fairly robust recordkeeping
7  system.  And I turned much, if not all, of my records
8  over.  And it just seemed so odd that they would feel
9  like they could somehow go back in time and undo this
10  whole thing.
11      Q.  And who did you turn those records over to?
12      A.  Oh, everybody from -- who are the attorneys in
13  California?
14      Q.  Paul Hastings?
15      A.  Paul Hastings and the like and company
16  officials.
17      Q.  And when, approximately, did you turn over
18  those records?
19      A.  Everywhere from probably January until when I
20  left.
21      Q.  Did you ever create -- besides anything that
22  your counsel told you to create, did you ever create any
23  timelines, letters, memos to files, anything else that
24  sort of laid out everything that happened?
25      A.  I think it was basically in talking to David.

19 (Pages 70 to 73)

Page 74

1    Q.  Okay.  But nothing that wasn't done, nothing
2  that wouldn't have been done?
3    A.  Well, some I turned over to -- you know, memos
4  to file and the like to NorthWestern.  And then I have
5  others that I haven't turned over.
6    Q.  Just to be clear, there were memos to file
7  that you did -- there were NorthWestern memos to file
8  that you had done regarding this situation?
9    A.  I'm not sure that there are memos to file as
10  much as just having -- you know, many of these e-mails
11  that you folks have, I don't know if you -- at what
12  point in the discovery you got them, but they came from
13  me originally; not that I had written them originally,
14  that I had saved them originally.
15       So you may have gone and done some forensic
16  work and found them in the system but some of it was
17  easy pickins because I just turned it over to Paul
18  Hastings.
19    Q.  Did you ever create a timeline or any type
20  of -- something, again, besides what David told you to
21  create?
22       MR. ZISSER:  Well, I mean, if you're -- you
23  can answer that.
24    A.  Yeah.  I'm looking at him because I don't
25  recall whether David and I created it together or I did

Page 75

1  it on my own.  Yes, one was created.
2    Q.  (BY MR. KAPLAN)  Did you ever share it with
3  NorthWestern?
4    A.  You know, I'm not sure.  I think I may have,
5  but I'm not sure.  By the time I created it, it was
6  really clear who the bad guys were and who the good guys
7  were.  And there was really no love lost for the new
8  people.
9       As much as Dick could be an asshole, he was,
10  you know, kind of, in some ways, a straight shooter and
11  a, you know, misguided kind of desk-pounding kind of
12  guy.  These new people seemed genuinely dishonest.  And
13  they scared me.
14    Q.  And I know I keep harping on this point but I
15  want to make clear that you never created a timeline at
16  NorthWestern or NorthWestern's counsel's direction.
17    A.  No, I don't believe so.  It was either self-
18  directed or David's direction.
19    Q.  Okay.  And then -- so is there anything else
20  with respect to the 10-K?  After you tried to call
21  Mr. Smith, you're not sure whether you guys actually
22  connected the second time, and then you had the
23  conversation with Mr. Austin and others.  Was there any
24  other discussion or communications regarding the 10-K?
25    A.  No.

Page 76

1    Q.  Have you read the -- have you seen the
2  Complaints that the SEC filed against Mr. Hylland and
3  others?
4    A.  I don't believe I have.
5    Q.  Have you seen the cease and desist -- the
6  findings made by the SEC regarding NorthWestern?
7    A.  I don't believe I have.  I know I heard
8  Hylland had settled recently.  Is that what you're
9  talking about?
10    Q.  There were a couple of settlements.
11  NorthWestern settled first, and that's what I'll show
12  first.  And Mr. Hylland, Merle Lewis, Kipp Orme, Kendall
13  Kleever, Whitesel -- not Kleever, Whitesel, several
14  others settled within the last week.  And we're going to
15  mark this as 11.
16       (Deposition Exhibit 11 was marked.)
17    Q.  Again, you can take the time to read it.  I'm
18  going to ask you in particular first to focus on page 4,
19  the problems relating to Expanets' computer system.
20  But, again, feel free to read as much as you want.
21    A.  As I read this, I don't think I've ever seen
22  this before.
23       (Pause.)
24    A.  So there's a lot here on Expanets.  Is there
25  anything you would like me to focus on?

Page 77

1    Q.  We're going to go through various sections,
2  but first, there are three paragraphs, 11, 12, and 13,
3  if you could read those first.
4       (Pause.)
5    A.  Okay.
6    Q.  And starting with paragraph 12, based upon the
7  information that you had as the CFO of Expanets, is
8  anything in paragraph 12 -- is everything in paragraph
9  12 accurate?
10    A.  Yes.
11    Q.  And then the same question with respect to
12  paragraph 13.
13    A.  Yes.
14    Q.  Now we're going to turn to page 5, the aged
15  accounts receivable.  I apologize, it's a longer
16  section.
17       (Pause.)
18    A.  I don't know about 20, the percentages in
19  there.  17 doesn't seem accurate.
20    Q.  What do you believe is inaccurate about 17?
21    A.  These reports demonstrated Expanets'
22  uncollectible accounts receivable exceeded its existing
23  bad debt reserve.  They didn't prove uncollectible.  We
24  collected that money in the first quarter of '03.  So it
25  seems inaccurate even with 20/20 hindsight.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 78

1  Q. Okay. Other than paragraph -- is the rest of
2  paragraph 17 accurate other than that sentence?
3  A. Yeah, because that's a little bit like, "Other
4  than that, Mrs. Lincoln, how did you like the play?"
5  Q. Understand. But other than the percentages in
6  paragraph 20 and paragraph 17, perhaps the whole
7  paragraphs 14 through 20 are accurate with those
8  caveats?
9  A. Yes.
10  MR. ZISSER: Let me look at 15.
11  Q. (BY MR. KAPLAN) Well, 15 -- I'll say
12  that -- I'm happy to go through them one by one.
13  MR. ZISSER: Yeah.
14  A. 15 does smack a little bit of a 17 problem.
15  Q. (BY MR. KAPLAN) Well, let's start with 14.
16  Why don't we go paragraph by paragraph.
17  A. Okay. 14 looks okay.
18  Q. 15, I was not going to ask you since it talked
19  about aged receivables that predated implementation of
20  EXPERT. So you can answer it if you know, but I'm not
21  going to ask you to guess.
22  A. I don't.
23  Q. Okay. 16?
24  A. 16 is true. That's the 30 million that I
25  suggested we need to supplement into the bad debt

Page 79

1  reserve.
2  Q. Okay. 17, I just have one question. I
3  understand your very big caveat on that one. One
4  question: You said that all of the receivables were
5  collected in '03. Did you really mean all of them were
6  collected?
7  A. I would say all of the ones that -- again, I
8  don't have the documentation, but I know that we had
9  collections plans, and we were at something like 110
10  percent or 120 percent consistently through the first
11  few months of those collections plans. And those
12  collections plans would have included the old
13  receivables.
14  Q. Okay. But when you generated the collection
15  plan, did you, in essence, create your own reserve? I
16  mean, did you have a collection plan that assumed we're
17  going to collect everything or when you had it, you
18  assumed you're going to collect less than all and set a
19  target?
20  A. We all assumed we're going to collect less
21  than all even in a perfect, non-EXPERT world. But it
22  seemed like the plan was fairly aggressive. It wasn't
23  just saying, Hey, we'll collect this suboptimal amount,
24  and we did great against that.
25  Q. Then paragraph 18, is that accurate?

Page 80

1  A. I don't have the numbers in front of me, but I
2  guess I would question as to whether the, in hindsight,
3  uncollectible amount, No. 1, whether it even truly
4  became uncollectible, because we're talking about this
5  as of the time of the K, is when this was known, or was
6  that enough to even swamp the boat.
7  Q. Well, when you're setting a reserve, it
8  doesn't mean that there's zero chance. If you're
9  setting, for example, bad debt reserve, it doesn't mean
10  there's zero chance of collecting, right?
11  A. Right..
12  Q. Is there a rule of thumb, for lack of a better
13  word, that you use when creating a reserve?
14  A. Historical collection ability, which,
15  historically, we were -- I think they were more
16  pessimistic than historical amounts. And so by setting
17  the historical amounts plus some, they would be basing
18  that on, you know, what was history.
19  I think the dilemma we've got is accounting,
20  by its very nature, is full of estimates, and there
21  isn't a whole lot of historical precedent of what if you
22  spent a hundred million dollars on a system and can't
23  collect on anything for a year.
24  Q. But going back into 18, where it says
25  NorthWestern did not disclose information indicating

Page 81

1  that a loss as a result of its uncollectible accounts
2  receivable was probable or reasonably possible.
3  A. Yeah. That's the part I'm taking exception
4  to, which is, even if we discount the fact that
5  collections gained traction in the first quarter of '03,
6  and we just did the sky-is-falling thing, I'm not
7  convinced that the uncollectible accounts receivable was
8  enough to completely eliminate the profitability of the
9  company. I don't know. That's a bold statement.
10  To say that indicating a loss, meaning not --
11  no income, actually negative earnings as a result was
12  probable or reasonably possible.
13  Even with 20/20 hindsight, sitting here today,
14  I wouldn't agree with that statement.
15  Q. And then paragraph 19, is that accurate?
16  A. Those are just statements of fact.
17  Q. And then paragraph 20, understanding that you
18  can't vouch for the percentages.
19  A. I guess the one exception I would take to that
20  is the result of improper accounting. You know, for all
21  the reasons I've given already, which is I will tell you
22  at the time I was banging the drum, I was convinced we
23  should take the extra reserve, but Dick had some very
24  reasonable reasons in retrospect as to why he didn't
25  want to take them, the Avaya covering it. As soon as

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 82

1  it's fixed, we'll collect it kind of thing, so . . .
2     Q.  We'll get back to the document, but is it your
3  view that Mr. Hylland was made a scapegoat by the
4  company?
5     A.  Yeah.  I have very mixed emotions because I
6  disliked every moment I worked for the guy, but I think
7  he was made a scapegoat.
8     Q.  Why do you think he was made the scapegoat?
9     MR. ZISSER:  Why did you come to the
10  conclusion or are you asking him what the motivation
11  was?
12     MR. KAPLAN:  No.
13     Q.  (BY MR. KAPLAN)  Why do you think -- what
14  leads you to the conclusion that he was a scapegoat?
15     A.  Well, I think that he's an easy target because
16  nobody liked him.  So, I mean, he wasn't revered, so it
17  wasn't like there was a lot of defense coming to him.
18     He had been getting counsel from me, you know,
19  sometimes directly, sometimes indirectly, and he
20  seemingly was ignoring it.  And then when the time came
21  to take the earnings charges in December, they kind of
22  threw everything but the kitchen sink in there.  So it
23  was a perfect storm of being able to blame him.
24     On top of that, Merle Lewis, who was the
25  chairman, who ultimately was, like, Why don't we blame

Page 83

1  Merle as well, Merle would fall asleep in board
2  meetings.  I mean, he was definitely asleep at the
3  switch.
4     And so I think Dick -- the combination is Dick
5  was an -- the easiest target possible.
6     Q.  Do you think that Mr. Hylland had information
7  with respect to the issues created by the EXPERT problem
8  that others at NorthWestern -- that others -- let me
9  strike that and try to articulate a decent question.
10     One of the allegations against Mr. Hylland is
11  that he knew about the EXPERT problems but didn't tell
12  the board or other members of senior management.  Based
13  on what you know, is that a fair accusation?
14     A.  Define -- give me the scope of senior
15  management.
16     Q.  Well, how would you define NorthWestern's
17  senior management?
18     A.  Well, I'm not sure exactly who this is about,
19  but it sounds like it's about Mike Hanson.  So if senior
20  management was strictly the corporate units but not
21  necessarily somebody who was senior management of
22  another operating unit, like Blue Dot and these other
23  ones, the energy company, clearly everybody in senior
24  leadership in a corporate administrative role knew about
25  this.  And I know that because I was present and

Page 84

1  verbally told them myself.
2     So the fact that Dick knew and they didn't is
3  ludicrous.
4     I don't know about the board.  I do know that
5  we put all of those exceptions with our Sarbanes-Oxley
6  disclosure committee in writing.  I don't know if the
7  board actually read them or not, but I specifically
8  asked the question, are these available to the board?
9  And I think the answer was something like, it isn't like
10  we're going to purposely give them to them but if they
11  ask, which any reasonable fiduciarily responsible audit
12  committee would, they certainly are available to them.
13     Q.  And just to clarify, this isn't all by
14  Mr. Hanson, so when I ask for senior management, I'm not
15  trying to rope in Mr. Hanson.
16     A.  I just know he's a defendant.
17     Q.  He's only one.
18     A.  Okay.
19     Q.  But I'm just trying to get a sense.  Again,
20  the allegations against Mr. Hylland appeared to be that
21  he was a rogue person that had all this information that
22  was, in essence, suppressed?
23     A.  I wouldn't view it like that at all.
24     Q.  Now turning back to this document, a few more
25  pieces I want you to look at.  Adjustments to customer

Page 85

1  bills on page 6.
2     A.  Okay.
3     Q.  If you could just read paragraphs 21 through
4  26.
5     (Pause.)
6     A.  Can I take a health break and then we'll --
7     (A discussion was had off the record.)
8     (Noon recess taken from 12:14 p.m. to
9  12:54 p.m.)
10     MR. KAPLAN:  Back on the record.
11     Q.  (BY MR. KAPLAN)  I think we were up to
12  paragraph -- we had done through paragraph 20 of the
13  cease and desist order.  We had talked about that.  I
14  think where we had broken was you had just read through
15  paragraphs 21 through 26; is that correct?
16     A.  Correct.
17     Q.  I'm going to go through the same drill with
18  these paragraphs.  First, paragraph 21.
19     A.  That looks accurate.
20     Q.  Okay.  And then paragraph 22?
21     A.  It looks accurate, except I can't vouch for
22  the numbers after so long.
23     Q.  And paragraph 23?
24     A.  It looks accurate.  And I guess I would add
25  the context that if I recall correctly, June was the

22 (Pages 82 to 85)

Page 86

1 first month of the unsuppressed opening balances. And
2 so we had internally forecasted that that would be a
3 kind of moving-the-pig-through-the-python situation; and
4 that we viewed once that was done, that it would
5 subside.
6    Q. And just remind me, I know you used the term
7 earlier in the deposition but I don't remember exactly
8 the unsuppressed billing numbers.
9    A. That is the situation where you'll get a bill
10 for the monthly charges but to the extent you have
11 previous months outstanding, that wasn't listed.
12    Q. Okay.
13    A. And so our view was that customers really
14 never had seen what we thought they owed us in total
15 until that moment. Of course, when they saw that, it
16 would be like getting your cable bill. You'd go, wait a
17 second. I didn't order HBO and On Demand or whatever.
18      So we viewed that there would be one month of
19 that, because once you get your cable bill, you don't
20 call up three months later and say I didn't order HBO or
21 On Demand. You call up fairly timely.
22    Q. Paragraph 24?
23    A. Yeah. I think the numbers obviously are hazy
24 to the point of I have no clue. Order of magnitude
25 looks right. I don't know about this "due to a planned

Page 87

1 correction," blah, blah, blah, would exceed estimates by
2 an additional 3.4 million. That doesn't ring a bell.
3    Q. On paragraph 25?
4    A. I'm assuming that's factually correct. The
5 numbers, again, I don't recall.
6    Q. 26, since it's all numbers and percentages,
7 I'm not going to ask you to try and vouch for that.
8    A. Sure. Thank you.
9    Q. Then if we could go to the next category,
10 which are reserve reductions.
11    A. Okay.
12    Q. If you could read 27 through 31.
13    A. Okay.
14    Q. And let's go through them paragraph by
15 paragraph. 27, is that paragraph accurate?
16    A. Accurate but not -- it's inaccurate by
17 omission, I would guess. What it's not saying is that
18 the external auditors went back and audited all the
19 reserve reductions and deemed that they were taken in
20 the appropriate periods.
21      So I guess if I were writing this as a glass
22 half empty, half full, I think there -- whoever wrote
23 this is very remiss in doing it because it makes it
24 sound like they were inappropriately taken, when I think
25 their point is it should have been disclosed in the

Page 88

1 public filings.
2    Q. We'll get that. I agree. Taken in isolation,
3 it seems that way, but when we get there, that's their
4 allegation?
5    A. Fair enough.
6    Q. Paragraph 28, is that accurate?
7    A. Sounds right, except, again, numbers are hazy
8 at this point. And I don't know that I ever knew what
9 percent they were of NorthWestern's reported income.
10    Q. Okay. Same question for 29, again, I'm not
11 asking for you to vouch for the numbers and percentages.
12    A. Okay. Same answer, then, looks appropriate.
13    Q. Paragraph 30.
14    A. I guess my assumption, then, is about the
15 numbers would have been that that wouldn't have tipped
16 the balance to the point of was able to report 8.7 of
17 operating income rather than substantial operating loss.
18 That sounds pretty dramatic.
19    Q. But would you agree that it would have had to
20 report a loss? Take out "substantial," but would you
21 have -- do you know enough to be able to answer whether
22 it would otherwise have been a loss but for reduction in
23 reserves?
24    A. Well, I mean, this really -- I don't. This
25 gets to the point of I don't see any pages saying why

Page 89

1 did you put those reserves on the books the year before
2 because people bought and sold our stock based on that.
3 So, I mean, it's a classic SEC taking the more juicy
4 part of the argument rather than in balance.
5    Q. Okay. And then paragraph 31?
6    A. That's correct.
7    Q. We're almost done.
8      If you could look at the unusual transactions,
9 paragraph 32 through 36.
10    A. Okay.
11    Q. Is paragraph 32 accurate?
12    A. I would say it's mischaracterized, these
13 noncompete-type payments. As I explained, I thought
14 they were more to make up for the difference -- they
15 weren't about competition, they were more to make up for
16 the difference in what assets Expanets was -- or
17 NorthWestern was buying from Avaya as opposed to a
18 noncompete.
19      So I'm not sure -- that's what threw me when
20 you mentioned noncompete earlier. I just never heard or
21 dealt with it like this because there was certainly no,
22 You can't go solicit these customers, which is what I
23 would call noncompete.
24    Q. Would you agree, though, that even if they
25 were not noncompete payments but they were -- I'm trying

23 (Pages 86 to 89)

Page 90

1  to remember the term you used earlier.
2      A.  Maintenance left behind.
3      Q.  Maintenance left behind -- Would you agree
4  that maintenance left behind payments are not
5  characteristic of Expanets' regular operations and
6  therefore represented unusual transactions?
7      A.  I would not agree with that characterization.
8  My point is that if the deal had gone through the way it
9  would have, those payments would have come through the
10  normal course of business, so it was a complete
11  balancing of what they would have gotten.
12          And I make that point by saying Avaya's not a
13  charitable organization.  They wouldn't have written
14  those checks unless they felt like somehow those
15  payments should have been part of the deal.
16      Q.  Paragraph 33, is that accurate?
17      A.  I don't know about the exact numbers, and I
18  can disagree with the nomenclature.
19      Q.  Paragraph 34, understanding that the numbers
20  you may not recall as well as the terminology of them as
21  noncompete payments, is it otherwise accurate?
22      A.  I won't use my Lincoln quote anymore, but,
23  yeah.  I mean, other than those two things, which is the
24  whole thing, it's accurate.  It's got a period at the
25  end.  It's capitalized properly.  Sorry to be a wise

Page 91

1  ass.  I'm just getting tired.
2      Q.  I understand.  I hate to do this to you, but
3  paragraph 35, is it accurate?  With the same caveats.
4      A.  Ditto.
5          36?
6      Q.  I'm sorry.  I didn't know if you were joking
7  when you answered 35.  Taking, with the caveats about the
8  characterization of noncompete payments, with your
9  disagreement with that characterization and --
10      A.  Yeah.  Yeah.  If we change the -- I'm sorry.
11  Go ahead.
12      Q.  With the caveat that you disagree with the
13  characterization of them as noncompete payments and your
14  inability to verify --
15      A.  There's no numbers in this one.
16      Q.  35?
17      A.  Oh.  I'm sorry.  35.  Yes.
18      Q.  It's accurate with those caveats?
19      A.  Correct.
20      Q.  Okay.  Then 36?
21      A.  36, other than characterizing them as
22  noncompete.  I don't know for a fact that they didn't
23  disclose them, but assuming that that's true, then I
24  would agree with this.
25      Q.  And then this is the last section of this that

Page 92

1  I'm going to go through with you, and that's the
2  intercompany advances to Expanets and Blue Dot.  And
3  we'll only focus for each of these paragraphs on
4  Expanets.  So if you could read 37 through 42.
5      A.  37 is correct.  I'm not sure about the number,
6  but it sounds about right.
7      Q.  Okay.  38?
8      A.  The only thing that's wrong with 38 would be
9  that I started 15 days into the quarter, and we've got
10  that e-mail from me which I'm usually pretty accurate on
11  that said not only did we not borrow anything more, we
12  repaid 5 1/2 million.  So that doesn't jibe with 50
13  million borrowed.
14          And if we're talking about 5 1/2 versus 5.6
15  million, I'd say whatever.  But we're talking about a
16  whole different direction by tenfold.
17      Q.  If you turn back to that MFIR, the management
18  financial --
19      A.  Yeah.  I think the difference between that, if
20  I remember correctly, is NorthWestern was asking
21  Expanets to pay for itself through cash flow.  And so
22  there were $25 million payments that were due for that.
23          I wouldn't characterize that as operating
24  expenses.
25      Q.  Well, so when you look at the -- what have we

Page 93

1  marked this as?  When you look at Exhibit 2, do you
2  think that the incremental borrowings there on page 9,
3  including the operating -- payment for operating
4  expenses?
5      A.  Is this a cumulative chart?
6      Q.  It looks to us --
7      A.  It looks to me, also.
8      Q.  You know this chart.
9      A.  So this basically supports my stance, right?
10  Doesn't look like it went up 50 million to me.  It looks
11  like it went down.
12      Q.  I think you could look from March -- it looks
13  like from March to -- sometime March to April, it may
14  have been the period before you got there, there's a big
15  jump from -- is that 105 to 145 or somewhere in that
16  range?  It's 150.  That's how we've read this chart.  If
17  you disagree --
18      A.  Okay.  I'm sorry.  I was looking at April as
19  the beginning.  Yeah.  And I guess that would jive with
20  the fact that maybe it was all borrowed within the first
21  two weeks before I started.
22      Q.  Okay.
23      A.  I stand corrected then.  I'm not sure about
24  the number, but do you folks have any further detail
25  that would indicate when in April it was borrowed?

24 (Pages 90 to 93)

Page 94

1    Q.  If we have any -- we're not trying to fool you
2  on it.  To the extent we have anything to be more
3  specific --
4    A.  No.  No.  I'm trying to be accurate in my
5  answer because we saw this other thing where I said
6  since the new management team, which would be
7  April 15th, we have only done 5 1/2 million.  So I would
8  suspect there was a large borrowing in the first 15 days
9  of the month.
10    Q.  Okay.  Paragraph 39 is Blue Dot, so I'm not
11  going to ask you about that, as is paragraph 40.
12        Paragraph 41, I'm going to ask you whether
13  that's accurate but only with respect to Expanets and
14  not with respect to Blue Dot.
15    A.  Okay.  Now, this doesn't mention a time period
16  because, as I pointed out, we were accreted on cash from
17  April 15th on, so -- and the word "further" would
18  indicate they're not talking about the initial
19  investments.  So do we know what the time bound of this
20  statement is?
21    Q.  Other than in the context which I can
22  interpret, you can interpret.  So if you can't answer --
23    A.  So I can't -- I'd need to know a time period
24  to know whether it's true or not.
25    Q.  If we were talking in the first quarter of

Page 95

1  2002, do you believe that it was --
2    A.  If we're talking about the first
3  three-and-a-half months of 2002 through April 15th, I
4  would say it's a true statement, but that would be the
5  initial investment because my understanding is they
6  didn't really start borrowing until January.
7        So the word "further" seems to make it sound
8  beyond the initial.  That's what's confusing me.
9    Q.  And then paragraph 42, again, without
10  commenting on the allegations with respect to Blue Dot,
11  is it accurate with respect to Expanets?
12    A.  Okay.  I wasn't there in the first quarter, so
13  I don't know about that.  Disclose in the second quarter
14  that made intercompany advances to Expanets, that sounds
15  like a good thing.  Then the rest of it is about Blue
16  Dot.
17    Q.  Well, I think if you read the sentence, it did
18  not disclose intercompany events to Blue Dot or any
19  information about the significance of the intercompany
20  advances to either subsidiary.
21    MR. ZISSER:  I mean, it might be useful to
22  have some foundation of what "significance" was intended
23  to mean there.
24    A.  It says before that, NorthWestern disclosed in
25  the second quarter.  Then it says did not disclose until

Page 96

1  September '02, so I'm confused.  If they disclosed it in
2  the second quarter of '02, that would be, what,
3  August 15th filing?  And so . . .
4    Q.  (BY MR. KAPLAN)  I believe -- again, you can
5  interpret it, one, they disclosed the existence but they
6  didn't disclose the amounts.  They said, Hey, we lent
7  some money but they didn't disclose the amounts until
8  later.  In essence, you can't answer 42, whether it's
9  accurate?
10    A.  I guess if it was worth it, which it probably
11  isn't, we can pull out the balance sheet for that second
12  quarter and see how they're carrying intercompany
13  advances, which would talk about the amount, I would
14  think.  It might not talk about to what subsidiary.
15        (Deposition Exhibit 12 was marked.)
16    Q.  Do you recognize this document?
17    A.  I think I recognize it.  I'm not sure that
18  I've ever seen it with the hand marking on it.
19    Q.  Aside from the hand marking, do you know --
20    A.  Yes.
21    Q.  What is this document?
22    A.  This looks like the disclosure subcommittee
23  findings.  Now, is that an accurate date on there?
24  Because there's one of these where the date was
25  inaccurate because of the way Word redid the date when

Page 97

1  you pulled it up.  It looks like the right one.  Yeah, I
2  do recognize this.
3    Q.  And, I'm sorry, I don't know if you answered.
4  What is the document?
5    A.  It is the Expanets disclosure subcommittee
6  comments in -- help for preparing the 10-K.
7    Q.  And these are the initial comments that the
8  subcommittee provided that ultimately were -- led you
9  to -- this is the process that ultimately led you to
10  going to the chair of the audit committee?
11    A.  I don't know if it's the initial one, Gary.
12  I'm kind of hard pressed to say where they -- where it
13  is in the place.  Let me look at it a little more
14  carefully, please.
15        (Pause.)
16    A.  I guess -- I recognize it.  I just don't know
17  where, in the pecking order of the things going back and
18  forth, whether it was the first shot, second, third.
19    Q.  Do you recall there being multiple memos to
20  the disclosure committee from the Expanets disclosure
21  subcommittee?
22    A.  Yes, I do.
23    Q.  Do you recall how many?
24    A.  I don't.  I obviously could find out, but I
25  don't know how many.

25 (Pages 94 to 97)

Page 98

1     Q.  You don't recognize the handwriting on there?
2     A.  Kendall, confirm Deloitte and Touche, I would
3   guess.  Okay with current --
4     Q.  No.  I'm not asking you to read it.  I'm
5   asking if you recognize it.
6     A.  No.  I'm trying to get from the context of it
7   whether -- let's put it this way.  I don't think it's
8   us.  I don't think it's Expanets.  I think it's
9   NorthWestern.  It looks like they've taken this and then
10  gone through and said we agree.  We don't agree.  You
11  know, whether Tom Knapp, his name is next to it, he
12  needs to chase it down more.  That kind of thing.
13    Q.  Do you remember seeing this with the -- with
14  sort of the responses from NorthWestern in it?
15    A.  No.  I remember not seeing it.  I've never
16  seen this with the notes on it.  All the information
17  went kind of one way.
18    Q.  I don't see any discussion in here with
19  respect to the timing, you know, by which I'm saying,
20  you know, when NorthWestern knew about the problem with
21  EXPERT.  Would that have been covered in a different one
22  of these memoranda or is it in here and I'm missing it?
23    A.  No, it wouldn't have been in here.  It would
24  be versions -- can I -- what I'm talking about are
25  literally Edgarized -- not Edgarized but things that

Page 99

1   have gone through Donnelly, versions of their queue that
2   were near final that they had the fraudulent statements
3   that had been highlighted and then subsequently
4   corrected.
5     Q.  So your recollection is you wouldn't
6   necessarily have a memorandum like this; instead, you
7   would have just a markup of a 10-K?
8     A.  Right.
9     Q.  Would that have been sent by the Expanets
10  disclosure committee to the disclosure committee?  Was
11  there one person who was responsible for marking it up?
12    A.  As I recall, it was something -- what I can
13  tell you is we did receive them, so we've gotten them
14  and retained them and then probably sent a voicemail
15  back like, What are you guys smoking?  I mean, it was so
16  ludicrous, I'm not sure -- well, some of these things
17  are, well, we'll use this word rather than that word
18  kind of thing.  This is just a, We don't even know where
19  to start --
20    Q.  Okay.
21    A.  -- kind of thing.  So it would almost not lend
22  itself to being marked up and red-lined and sent back
23  because we were so taken back.
24    Q.  Is the first bullet -- and I'm trying to just
25  interpret the document -- is the first bullet trying to

Page 100

1   go to the fact that there was another document and
2   perhaps other drafts floating around but just not laying
3   it out or do you think there's something else?
4     A.  The thing with the piecemeal fashion and --
5     Q.  Piecemeal and informational language
6   requesting permitted.
7     A.  You know, I'd have to read the whole thing for
8   content.  Again, I think the thing that is challenging
9   -- and even reading for content is going to be a
10  challenge in recalling this is, is this before or after
11  the document that we got that we said it didn't happen
12  at all like this?
13       Because we were somewhat uncomfortable in
14  addressing this in a piecemeal fashion was that they
15  would send, How about this?  How about that?  Rather
16  than just getting a complete document that we could
17  react to.  They sent it down one chunk at a time, which,
18  No. 1, didn't give you the context of how it fit into
19  the entire story.
20       So that would lead me to believe right now
21  that this preceded the version where -- that we got
22  where we said we think there is misrepresenting the
23  timeline.
24    Q.  Okay.  And I apologize if I'm being repetitive
25  but I'm trying to see if there is a document, that we

Page 101

1   make sure we have it.
2     A.  Sure.
3     Q.  Do you recall any document, be it memorandum
4   or written markup or any document in which you would
5   have given your -- you or anybody in Expanets'
6   disclosure subcommittee would have given comments to
7   NorthWestern on the draft of the 10-K?
8     A.  I mean, I know I possess it, but I don't know
9   that anybody else kept it.  I was the most rigorous
10  record keeper of my peers.  And the people at
11  NorthWestern sure wouldn't want to keep it.
12    Q.  If you look at the last two pages of the
13  document.
14    A.  Um-hum.
15    Q.  Do you recognize the document?
16    A.  I do.
17    Q.  What is it?
18    A.  I alluded to this document earlier when I said
19  that the reserve reversals were appropriate -- in
20  hindsight were deemed appropriate.  This is the document
21  that I was alluding to.
22    Q.  Okay.
23       MR. AUERBACH:  Just so we're clear for the
24  record, it's NOR 365796 and -797?
25       MR. KAPLAN:  And -797.

26 (Pages 98 to 101)



Magten Asset Management Corporation, et al. vs. NorthWestern Corporation, et al.                                    04/12/07

KIPP ORME

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2
 3   MAGTEN ASSET MANAGEMENT           )
       CORPORATION and LAW DEBENTURE   )
 4   TRUST COMPANY OF NEW YORK,        )
                                       )
 5         Plaintiffs,                 )
                                       )C.A. NO. 04-1494(JJF)
 6        vs.                          )
                                       )
 7   NORTHWESTERN CORPORATION,         )
                                       )
 8        Defendant.                   )
                                       )
 9   - - - - - - - - - - - - - - - - - )
                                       )
10   MAGTEN ASSET MANAGEMENT           )
       CORPORATION,                    )
11                                     )
           Plaintiff,                  )
12                                     )C.A. NO. 05-499(JJF)
          vs.                          )
13                                     )
     MICHAEL J. HANSON and             )
14   ERNIE J. KINDT,                   )
                                       )
15        Defendants.                  )
16   - - - - - - - - - - - - - - - - - )
17                DEPOSITION OF
18                  KIPP ORME
19                April 12, 2007
20
21
22
23           LYON REPORTING, INC.
              Certified Court Reporters
24               P.O. Box 81124
               Atlanta, Georgia  30366
25          770/458-5500   800/767-2030
```

**Page 2**

```
 1        Deposition of KIPP ORME, taken on behalf of
 2   the Plaintiff, Magten Asset Management Corporation, at
 3   Lyon Reporting, Inc., 5873 New Peachtree Road, Suite
 4   50, Atlanta, Georgia, on April 12, 2007, at 1:01 p.m.,
 5   before Donna F. Moliere, Certified Court Reporter and
 6   Notary Public within Georgia.
```

**Page 3**

```
 1                  A P P E A R A N C E S
 2
 3   For the Plaintiff Magten Asset Management Corporation:
 4        BONNIE STEINGART
          Attorney at Law
 5        Fried, Frank, Harris, Shriver &
            Jacobson, LLP
 6        One New York Plaza
          New York, New York 10004
 7        (212) 859-8000
          (212) 859-8585 (fax)
 8        bonnie.steingart@friedfrank.com
 9
10   For the Plaintiff Law Debenture Trust Company
     of New York:
11
12        JOHN V. SNELLINGS
          Attorney at Law
13        Nixon Peabody, LLP
          100 Summer Street
14        Boston, Massachusetts 02110
          (617) 345-1000
15        (866) 947-1732 (fax)
          jsnellings@nixonpeabody.com
16
17
18   For the Defendant NorthWestern Corporation:
19        NANCY DELANEY   (by telephone for a portion)
          JOSEPH D. PIZZURRO        (for a portion)
20        Attorneys at Law
          Curtis, Mallet-Prevost, Colt & Mosle, LLP
21        101 Park Avenue
          New York, New York 10178
22        (212) 696-6000
          (212) 697-1559 (fax)
23        jpizzurro@cm-p.com
24
25
```

**Page 4**

```
 1                  A P P E A R A N C E S
                        (continued)
 2
 3   For the Defendants Michael J. Hanson and
     Ernie J. Kindt:
 4
 5        STANLEY T. KALECZYC          (by telephone)
          KIM BEATTY
 6        Attorneys at Law
          Browning, Kaleczyc, Berry & Hoven, P.C.
 7        139 North Last Chance Gulch
          Helena, Montana  59601
 8        (406) 443-6820
          (406) 443-6883 (fax)
 9        stan@bkbh.com
10
11
12   For the Deponent:
13        MELISSA K. ORME
          Attorney at Law
14        MK Orme & Associates, LLC
          34 Muirfield Court
15        Newnan, Georgia  30265
          (678) 471-2705
16        (770) 254-0308 (fax)
          melissaorme@mkorme.com
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Maglen Asset Management Corporation, et al. vs. NorthWestern Corporation, et al.                                        04/12/07

KiPP ORME

21

1          MS. ORME: Fifth.
2      Q.    (By Ms. Steingart) And the negative
3   overall results during December were, in large part,
4   due to the Expert system problems; right?
5          MS. ORME: Fifth.
6      Q.    (By Ms. Steingart) Indeed, throughout
7   2002 Expanets continued to need infusions of cash from
8   NorthWestern to stay in business; isn't that right?
9          MS. ORME: Fifth.
10     Q.    (By Ms. Steingart) In light of the
11  problems with the Expert transition, NorthWestern
12  began to advance cash to Expanets; isn't that right?
13         MS. ORME: Fifth.
14     Q.    (By Ms. Steingart) And, indeed,
15  Expanets needed a lot of cash, didn't it?
16         MS. ORME: Fifth.
17     Q.    (By Ms. Steingart) Between December
18  2001 and April 2002, NorthWestern advanced $150
19  million to Expanets; right?
20         MS. ORME: Fifth.
21     Q.    (By Ms. Steingart) As CFO of
22  NorthWestern and also because you remained in regular
23  contact with Expanets' senior people, you were aware
24  of the advances NorthWestern was making to Expanets as
25  they were happening; correct?

22

1          MS. ORME: Fifth.
2      Q.    (By Ms. Steingart) To determine how
3   much cash Expanets would get with each of these
4   advances, you and Richard Hilland would discuss
5   Expanets' cash requirements; correct?
6          MS. ORME: Fifth.
7      Q.    (By Ms. Steingart) And NorthWestern
8   was aware even by the end of December of 2001 that the
9   Expert transition issues would require $70 million
10  more in working capital during the first 60 to 90 days
11  of 2002 than previously anticipated; correct?
12         MS. ORME: Fifth.
13     Q.    (By Ms. Steingart) This also was
14  reflected in the MFIR for December 2001, wasn't it?
15         MS. ORME: Fifth.
16     Q.    (By Ms. Steingart) Now, turning back
17  to 10-Q for the first quarter of 2002, NorthWestern
18  did not disclose in this report that it had advanced a
19  substantial amount of money to Expanets during 2002,
20  did it?
21         MS. ORME: Fifth.
22     Q.    (By Ms. Steingart) By the date of the
23  first quarter 2002, you were aware that NorthWestern
24  has advanced over $145 million to Expanets, but this
25  was not included in the 10-Q, was it?

23

1          MS. ORME: Fifth.
2      Q.    (By Ms. Steingart) Now, it's true that
3   after issuance of the second quarter 10-Q for 2002 but
4   before the issuance of the third quarter 10-Q,
5   NorthWestern did a public equity offering?
6          MS. ORME: Fifth.
7      Q.    (By Ms. Steingart) And if we look at
8   the third quarter 10-Q, in the third quarter 10-Q
9   there is a disclosure of intercompany advances
10  totalling $191 million; right?
11         MS. ORME: Fifth.
12     Q.    (By Ms. Steingart) Yet most of that
13  over $150 million of that was advanced prior to the
14  filing of the 10-Q for the second quarter; right?
15         MS. ORME: Fifth.
16     Q.    (By Ms. Steingart) And that wasn't
17  disclosed in the second quarter 10-Q because
18  NorthWestern did not want the market aware that --
19  during the public equity offering; correct?
20         MS. ORME: Fifth.
21     Q.    (By Ms. Steingart) Ultimately,
22  Expanets had massive losses for 2002; correct?
23         MS. ORME: Fifth.
24     Q.    (By Ms. Steingart) And these massive
25  losses for 2002 caused the restatement in an aggregate

24

1   amount to be $900 million, didn't it?
2          MS. ORME: Fifth.
3      Q.    (By Ms. Steingart) And NorthWestern's
4   consolidated figures that were initially misstated
5   included inaccurate results for Expanets for each of
6   the quarters of 2002?
7          MS. ORME: Fifth.
8      Q.    (By Ms. Steingart) In the 2002 10-K,
9   there was a disclosure that NorthWestern's nonenergy
10  businesses had experienced disappointing results for a
11  period of three years; correct?
12         MS. ORME: Fifth.
13     Q.    (By Ms. Steingart) And that is
14  essentially for the duration of those investments;
15  right?
16         MS. ORME: Fifth.
17     Q.    (By Ms. Steingart) Indeed, the 10-Q
18  says that, quote, our experience with our nonenergy
19  businesses has been very disappointing. They have
20  adversely impacted our overall results of operations,
21  financial condition, and liquidity for three years;
22  right?
23         MS. ORME: Fifth.
24     Q.    (By Ms. Steingart) Indeed, all of
25  these operations in each of those three years were a

LYON REPORTING, INC.                           770/458-5500        800/767-2030

Maglen Asset Management Corporation, et al. vs. NorthWestern Corporation, et al.

04/12/07

KIPP ORME

25

1    substantial drain on NorthWestern's liquidity;
2    correct?
3            MS. ORME: Fifth.
4        Q.    (By Ms. Steingart)  And NorthWestern
5    knew during every quarter in 2002 that the nonenergy
6    subsidiaries were complete failures, didn't it?
7        A.    Fifth.
8        Q.    Indeed, it wasn't just suddenly at the
9    end of 2002 that the substantial failure of these
10   businesses was known to NorthWestern; correct?
11           MS. ORME: Fifth.
12       Q.    (By Ms. Steingart)  Expanets' failure
13   was attributed to, among other things, the
14   deterioration of business in telecommunications
15   markets; correct?
16           MS. ORME: Fifth.
17       Q.    (By Ms. Steingart)  But this was
18   something that persisted all during the period of
19   NorthWestern's ownership of that; correct?
20           MS. ORME: Fifth.
21       Q.    (By Ms. Steingart)  Indeed, the amount
22   that NorthWestern carried on its financial statements
23   for good will in Expanets were incorrect all during
24   2002; isn't that right?
25           MS. ORME: Fifth.

26

1        Q.    (By Ms. Steingart)  And the good will
2    associated with Expanets, you know, should have been
3    completely brought to zero prior to the end of 2002;
4    isn't that right?
5            MS. ORME: Fifth.
6        Q.    (By Ms. Steingart)  Blue Dot was
7    another underperforming business at NorthWestern,
8    wasn't it?
9            MS. ORME: Fifth.
10       Q.    (By Ms. Steingart)  Prior to
11   September -- strike that.  In September of 2001, Blue
12   Dot's performance was well below the original plan,
13   wasn't it?
14           MS. ORME: Fifth.
15       Q.    (By Ms. Steingart)  In that month, the
16   revenues were $33 million, and more than $10 million
17   below the planned number; correct?
18           MS. ORME: Fifth.
19       Q.    (By Ms. Steingart)  And the net income
20   was a negative $670,000; correct?
21           MS. ORME: Fifth.
22       Q.    (By Ms. Steingart)  Blue Dot's
23   performance did not improve in 2002; right?
24           MS. ORME: Fifth.
25       Q.    (By Ms. Steingart)  During the first

27

1    quarter of 2002, Blue Dot had a negative operating
2    income of $3.7 million, which was $1.2 million below
3    plan; correct?
4            MS. ORME: Fifth.
5        Q.    (By Ms. Steingart)  And by May 2002,
6    Blue Dot wasn't just underperforming; it was harming
7    the perceived value of NorthWestern in the eyes of
8    financial analysts; isn't that right?
9            MS. ORME: Fifth.
10       Q.    (By Ms. Steingart)  The analysts did
11   not understand how Blue Dot fit into company strategy
12   and saw it as a dead weight; right?
13           MS. ORME: Fifth.
14       Q.    (By Ms. Steingart)  All during 2002,
15   you were aware that Blue Dot actually had zero value;
16   isn't that right?
17           MS. ORME: Fifth.
18       Q.    (By Ms. Steingart)  And you knew that
19   Blue Dot had no value before NorthWestern released the
20   10-Q before the second quarter of 2002; right?
21           MS. ORME: Fifth.
22       Q.    (By Ms. Steingart)  Yet even though
23   Blue Dot had no value for the second quarter of 2002,
24   the company allocated losses of over $8 million to
25   Blue Dot common stock; isn't that right?

28

1            MS. ORME: Fifth.
2        Q.    (By Ms. Steingart)  This resulted in a
3    material misstatement in NorthWestern's public filing,
4    didn't it?
5            MS. ORME: Fifth.
6        Q.    (By Ms. Steingart)  I'd like to turn
7    your attention to the Montana Power acquisition and
8    subsequent going-flat transaction.  On November 15,
9    2002, you were aware that NorthWestern was
10   transferring substantially all of the assets of
11   Montana Power, which had been renamed NorthWestern
12   Energy, LLC, to itself; correct?
13           MS. ORME: Fifth.
14       Q.    (By Ms. Steingart)  And you were also
15   aware that the assets transferred to NorthWestern by
16   Montana Power were worth in excess of $1 billion and
17   between $1 billion and $1.4 billion; correct?
18           MS. ORME: Fifth.
19       Q.    (By Ms. Steingart)  Yet Montana Power,
20   which was renamed, as we said before, NorthWestern
21   Energy, received no cash for that transfer, did it?
22           MS. ORME: Fifth.
23       Q.    (By Ms. Steingart)  The only
24   consideration that NorthWestern Energy, LLC, received
25   from NorthWestern in connection with the transfer was

7 (Pages 25 to 28)

Magten Asset Management Corporation, et al. vs. NorthWestern Corporation, et al.    04/12/07

KIPP ORME

29

1   the assumption by NorthWestern of approximately 700 in
2   liabilities, including liability to the Quips;
3   correct?
4        MS. ORME: Fifth.
5        Q.    (By Ms. Steingart) So the assets
6   transferred far -- the value of the assets transferred
7   far exceeded the value of the liabilities assumed in
8   connection with the going-flat transaction; isn't that
9   right?
10       MS. ORME: Fifth.
11       Q.    (By Ms. Steingart) There was one asset
12  that was left at NorthWestern Energy, LLC, wasn't
13  there?
14       MS. ORME: Fifth.
15       Q.    (By Ms. Steingart) And that asset was
16  the Milltown Dam. Do you recall?
17       MS. ORME: Fifth.
18       Q.    (By Ms. Steingart) The Milltown Dam
19  had various environmental liabilities and operating
20  costs but generated no revenue; isn't that right?
21       MS. ORME: Fifth.
22       Q.    (By Ms. Steingart) As a result of the
23  transfer of assets to NorthWestern and the retention
24  of the Milltown Dam by NorthWestern Energy, LLC,
25  NorthWestern Energy, LLC, was rendered insolvent,

30

1   wasn't it?
2        MS. ORME: Fifth.
3        Q.    (By Ms. Steingart) NorthWestern Energy
4   did not generate sufficient cash to meet the ongoing
5   expenses of the Milltown Dam after the going-flat
6   transaction, did it?
7        MS. ORME: Fifth.
8        Q.    (By Ms. Steingart) And NorthWestern
9   Energy, LLC, did not generate sufficient cash after
10  the going-flat transaction to pay on its joint and
11  several liability on the Quips, did it?
12       A.    Fifth.
13       Q.    Now, at the time that NorthWestern --
14       (Mr. Steingart enters the deposition.)
15       MS. STEINGART: We'll stop for a
16  minute. Joe is entering the room.
17       (A discussion was held off the record.)
18       MS. STEINGART: Nancy, Joe has arrived.
19  Nancy?
20       MR. PIZURRO: Hello?
21       MS. DELANEY: Yes, I'm here.
22       MS. STEINGART: We just wanted you to
23  know that.
24       MS. DELANEY: I'm going to hang up
25  then.

31

1        MS. STEINGART: Well, you can stay on.
2        MS. DELANEY: Thank you all.
3        MS. STEINGART: You're welcome.
4        (Ms. Delaney hangs up, leaving the
5   deposition.)
6        Q.    (By Ms. Steingart) Now, at the time
7   that NorthWestern assumed the liability of the Quips
8   in connection with the going-flat transaction, you
9   knew that NorthWestern did not have the financial
10  ability to pay those liabilities; correct?
11       MS. ORME: Fifth.
12       Q.    (By Ms. Steingart) And had
13  NorthWestern's true financial condition in November of
14  2002 been known, the going-flat transaction would not
15  have been able to go forward; isn't that right?
16       MS. ORME: Fifth.
17       Q.    (By Ms. Steingart) Indeed,
18  NorthWestern fraudulently concealed its true financial
19  condition in order to be able to effectuate the
20  going-flat transaction, didn't it?
21       MS. ORME: Fifth.
22       Q.    (By Ms. Steingart) NorthWestern
23  fraudulently concealed its true financial condition in
24  the first 10-Q for 2002, didn't it?
25       MS. ORME: Fifth.

32

1        Q.    (By Ms. Steingart) NorthWestern
2   fraudulently concealed its true financial condition in
3   its second quarter 10-Q filed with the SEC; correct?
4        MS. ORME: Fifth.
5        Q.    (By Ms. Steingart) If NorthWestern's
6   true financial condition had been known during the
7   first and second quarter of 2002, the credit agencies
8   would have downgraded NorthWestern's stat, wouldn't
9   they?
10       MS. ORME: Fifth.
11       Q.    (By Ms. Steingart) There would have
12  been no equity offering by NorthWestern during that
13  period; isn't that right?
14       MS. ORME: Fifth.
15       Q.    (By Ms. Steingart) If NorthWestern had
16  made the $900 million aggregate adjustment to its
17  first three 10-Qs that were required -- that it was
18  required to make later on, the going-flat transaction
19  would never have occurred; isn't that right?
20       MS. ORME: Fifth.
21       Q.    (By Ms. Steingart) Now, I'd like to
22  ask you a few questions about your compensation as CFO
23  of NorthWestern. In connection with your employment
24  as CFO of NorthWestern, you had an employment
25  agreement, which was filed as part of an 8-K in

8 (Pages 29 to 32)

33

1  December of 2001; correct?
2      MS. ORME: Fifth.
3      Q.    (By Ms. Steingart) And your
4  compensation included a base salary of $230,000 a
5  year; correct?
6      MS. ORME: Fifth.
7      Q.    (By Ms. Steingart) And your
8  compensation included a short-term performance bonus
9  that amounted to 81.3 percent of your annual base
10  salary; correct?
11      MS. ORME: Fifth.
12      Q.    (By Ms. Steingart) And that was
13  payable only if NorthWestern achieved specific target
14  performance; correct?
15      MS. ORME: Fifth.
16      Q.    (By Ms. Steingart) And your
17  compensation also included a long-term equity plan,
18  which would involve a -- Strike that.
19      And your compensation also included a
20  long-term equity plan, which included a grant of
21  29,000 shares worth around $200,000; correct?
22      MS. ORME: Fifth.
23      Q.    (By Ms. Steingart) And it included a
24  long-term incentive performance plan that would have
25  been 28.3 percent of your annual base salary; correct?

34

1      MS. ORME: Fifth.
2      Q.    (By Ms. Steingart) But, again, you
3  would only earn those compensations if NorthWestern
4  achieved a specific target performance; correct?
5      MS. ORME: Fifth.
6      Q.    (By Ms. Steingart) You, therefore,
7  were in a position to receive substantial compensation
8  in addition to your base salary if NorthWestern and
9  its subsidiaries achieved various performance
10  benchmarks; correct?
11      MS. ORME: Fifth.
12      Q.    (By Ms. Steingart) Now, it's true,
13  isn't it, that NorthWestern filed quarterly and
14  current reports with the Securities and Exchange
15  Commission during the first three quarters of 2002
16  that materially misstated NorthWestern's financial
17  position?
18      MS. ORME: Fifth.
19      Q.    (By Ms. Steingart) It's also true that
20  during the first three quarters of 2002 NorthWestern
21  filed quarterly reports with the Securities and
22  Exchange Commission that misrepresented or did not
23  disclose required information about its nonutility
24  businesses, Expanets and Blue Dot; correct?
25      MS. ORME: Fifth.

35

1      Q.    (By Ms. Steingart) NorthWestern
2  overstated its income from continuing operations
3  during the first quarter of 2002 by approximately 176
4  percent; correct?
5      MS. ORME: Fifth.
6      Q.    (By Ms. Steingart) NorthWestern
7  overstated its income from continuing operations
8  during the second quarter of 2002 by 618 percent;
9  correct?
10      MS. ORME: Fifth.
11      Q.    (By Ms. Steingart) And NorthWestern
12  restated its income from operations for the third
13  quarter of 2002 by 109 percent; right?
14      MS. ORME: Fifth.
15      Q.    (By Ms. Steingart) The misstatements
16  during this period were caused by the company's
17  improper accounting for accounts receivable,
18  adjustments to companies' bills, and allocations of
19  losses to minority interests; correct?
20      MS. ORME: Fifth.
21      Q.    (By Ms. Steingart) NorthWestern also
22  misrepresented or did not disclose the effects of
23  significant problems with Expanets' new business
24  technology information system; right?
25      MS. ORME: Fifth.

36

1      Q.    (By Ms. Steingart) During this period,
2  NorthWestern also failed to disclose the material
3  impact of Expanets' reserve reduction and -- reserve
4  reductions and its receipt of noncompete payments on
5  Expanets' income; correct?
6      MS. ORME: Fifth.
7      Q.    (By Ms. Steingart) And during the
8  period that this false reporting occurred, you were
9  the CFO; correct?
10      MS. ORME: Fifth.
11      Q.    (By Ms. Steingart) And you signed each
12  of the 10-Qs and 10-Ks that were filed; correct?
13      MS. ORME: Fifth.
14      Q.    (By Ms. Steingart) Now, during the
15  period that you were CFO in 2002, NorthWestern,
16  through its financial misstatements,
17  misrepresentations, and omissions, obscured the
18  continuing poor performance of its subsidiaries at a
19  time when it was publicly relying on its subsidiaries'
20  operations to strengthen its financial condition;
21  right?
22      MS. ORME: Fifth.
23      Q.    (By Ms. Steingart) Now, the 10-Qs and
24  the 10-K that we've just been discussing were the
25  financial statements that were used in connection with

9 (Pages 33 to 36)

# EXHIBITS  11 - 14

# REDACTED IN THEIR ENTIRETY