

QuickLinks — Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-Q/A
(Amendment No. 2)

(Mark One)

☒    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2002

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934

For the transition period from _____ to _____

Commission File No. 0692

# NORTHWESTERN CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 46–0172280 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 125 S. Dakota Avenue, Sioux Falls, South Dakota | 57104 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: 605–978–2908

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b2 of the Act).    Yes ☒    No ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: As of April 7, 2003, 37,396,762 shares of the registrant's common stock, par value $1.75 per shares were outstanding.

Source: NORTHWESTERN CORP, 10-Q/A, April 15, 2003

This indebtedness could have important consequences to you. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;

- result in vendors requiring additional credit support, such as letters of credit, in order for us to utilize trade credit;

- place us at a competitive disadvantage compared to our competitors that have less debt; and

- limit our ability to borrow additional funds.

In addition, our failure to comply with any of the covenants contained in the instruments governing our indebtedness could result in an event of default which, if not cured or waived, could result in the acceleration of other outstanding indebtedness. We may not have sufficient working capital to satisfy our debt obligations in the event of an acceleration of all or a significant portion of our outstanding indebtedness.

**Our ability to implement our turnaround plan is subject to many impediments and uncertainties. A failure to completely implement our turnaround plan could have a material adverse affect on our results of operations and liquidity.**

Management is implementing a turnaround plan that includes these principal elements:

- focus on our core utility business;

- reduce our indebtedness; and

- sale or disposition of our non-core assets.

Absent proceeds from the sale of noncore assets or significant improvements in the operating results of our nonenergy businesses, we will not have the ability to materially reduce our debt. Therefore, our ability to implement this plan is subject to many impediments and uncertainties including:

- even if we receive offers from buyers, whether we will be able to sell these assets at a price that would enable us to pay down our debt after accounting for related liabilities; and

- whether we will be able to generate sufficient interest among buyers for our non-core assets under current market conditions.

The success of our turnaround plan is dependent upon reducing our debt. Absent the receipt of significant proceeds from the sale of noncore assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our significant maturing debt obligations beginning in 2005. Our senior secured term loan contains restrictions on the sale or disposition of assets, including non-core assets, and on the prepayment of the senior secured term loan and other indebtedness. Therefore, even if we are able to generate funds through the sale of non-core assets or equity, or cash flow from operations, we may not be able to prepay any of the debt in a timely manner.

66

Source: NORTHWESTERN CORP, 10-Q/A, April 15, 2003

We will need significant additional capital to refinance our indebtedness as it matures. If we cannot sell sufficient assets or borrow new indebtedness sufficient to repay our indebtedness as it matures in future periods, our ability to fund our operations and service our substantial indebtedness will be adversely affected, and we will default on such maturing indebtedness as well as all other indebtedness that is cross–defaulted to such indebtedness thereby materially and adversely affecting our financial condition and results of operations.

We will be required to obtain significant additional capital to meet debt obligations maturing in 2005 and beyond. Absent proceeds from the sale of non–core assets or significant improvements in the operating results of our non–energy businesses, which historically have not been cash flow contributors, we will have limited ability to reduce our debt. To the extent we do not sell sufficient assets to pay down debt as it matures, we will need to borrow money. The market for indebtedness is volatile and our ability to raise capital is dependent on a number of factors including our creditworthiness, legal proceedings we are and may be involved in, the ratings of our indebtedness, the cash flow we have available to service the interest expense relating to any new borrowings, and our ability to implement our turnaround. If we are unable to refinance our indebtedness as it matures we will default on such indebtedness and all other indebtedness that is cross–defaulted to such indebtedness. Blue Dot is in default under its credit agreement. If such defaults continue or new defaults by any of our subsidiaries occur under applicable debt instruments, then such entity could seek protection under the bankruptcy law, or its creditors could institute involuntary proceedings against such entities, and we could lose our remaining investment in such entity. Any default by us on our indebtedness will have a material and adverse affect on our financial condition and results of operations.

In addition, we may not be able to generate enough cash flow to fund our operations and meet our debt service obligations. If we can not obtain additional capital to meet such obligations, we will default on such indebtedness and all other indebtedness that is cross–defaulted to such indebtedness.

**Our internal controls and procedures need to be improved.**

We have advised our Audit Committee that, in the course of preparing our financial statements for the year ended December 31, 2002 and in connection with the corresponding audit, we noted deficiencies in internal controls relating to:

- internal accounting controls relating to the EXPERT system, including the evaluation of appropriate reserves for accounts receivable and billing adjustments at Expanets;

- supervision, staffing and training of accounting personnel;

- timely evaluation and substantiation of material account balances;

- inconsistent application of and adherence to our policies and procedures by certain personnel;

- absence of a functioning internal auditing department and integrated information systems limiting our ability to adequately review subsidiary financial information; and

- the inadequacy of systems integration and data reconciliation.

These weaknesses led to the restatement of our financial statements for the first three quarters of 2002. In addition, we have experienced weaknesses in procedures and documentation relating to intercompany transactions, including lapses in documenting loans or advances to our subsidiaries, which could adversely affect our ability to collect such amounts and could force us to subordinate the collection of such amounts in certain circumstances. If we are unable to substantially improve our internal controls our ability to report our financial results on a timely and accurate basis will continue to be adversely affected which could have a substantial adverse affect on our ability to operate our business.

67

Source: NORTHWESTERN CORP, 10–Q/A, April 15, 2003

We are one of several defendants in a class action lawsuit brought in connection with dispositions of energy assets by The Montana Power Company, including the acquisition of our Montana utility. If we do not successfully resolve this lawsuit, or enforce our indemnification claims against The Montana Power Company, our operations and financial condition may be materially harmed.

We are one of several defendants in a class action lawsuit entitled McGreevey, et al. v. The Montana Power Company, et al. The lawsuit, which was filed by shareholders of TouchAmerica Holdings, Inc., the successor to The Montana Power Company, in connection with the disposition of energy assets by The Montana Power Company, contends, among other things, that the shareholders of The Montana Power Company have dissenters' rights under applicable state law and are entitled to damages. We believe our substantive and procedural defenses are meritorious, but we cannot predict the outcome of any such litigation. If we are held liability for any damages in this lawsuit, our operations and financial condition may be severely and materially harmed.

The impact of ongoing class action litigation may be material. We are also subject to the risk of additional litigation and regulatory action in connection with the restatement of our 2002 quarterly financial statements and the potential liability from any such litigation or regulatory action could harm our business.

On April 1, 2003, we announced that we would restate our consolidated financial statements for the fiscal quarters ended March 31, 2002, June 30, 2002, and September 30, 2002. We have recorded significant charges in our full year 2002 results.

We, and certain of our present and former officers and directors, are defendants in a purported class action litigation pending in the United States District Court for the Central District of South Dakota, Southern Division, entitled Dana Ross, et al. v. Merle D. Lewis, et al.; Case No. CIV034049, brought on behalf of shareholders of NorthWestern. The plaintiffs are seeking unspecified compensatory damages, rescission, and attorneys fees and costs as well as accountants and experts fees based on allegations that the defendants misrepresented NorthWestern's business operations and financial performance, overstated NorthWestern's revenue and earnings by, among other things, maintaining insufficient reserves for accounts receivables at Expanets, failing to disclose billing problems and lapses and data conversion problems, and failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system. The lawsuit was recently filed and has not yet been served. We cannot currently predict the impact or resolution of this litigation, which could be material, and the initiation of this lawsuit may harm our business and financial condition.

As a result of the restatement of our quarterly results for the first three quarters of 2002 we could become subject to additional class action or other securities litigation. In addition, regulatory agencies, such as the SEC, the FERC, the MPSC, and/or the New York Stock Exchange could commence a formal investigation relating to the restatement of our quarterly results. As of the date hereof, we are not aware of any additional litigation or investigation having been commenced against us related to these matters, but we cannot predict whether or not any such litigation or regulatory investigation will be commenced or, if it is, the outcome of any such litigation or investigation. If any such investigation were to result in a regulatory proceeding or action against us, our business and financial condition could be harmed. The initiation of any additional securities litigation, together with the lawsuit described above, may also harm our business and financial condition. Until such investigation, proceeding or litigation is resolved, it may be more difficult to raise additional capital or favorably refinance or restructure our debt or other obligations. If an unfavorable result occurred in any such action, our business and financial condition could be further harmed. In addition, we are likely to incur substantial expenses in connection with any such litigation or investigation, including substantial fees for attorneys and other professional advisors. We may also be obligated to indemnify officers and directors

68

Source: NORTHWESTERN CORP, 10-Q/A, April 15, 2003



1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

2

   Civil Action No. C.A. No. 04-1494 (JJF)

3

   MAGTEN ASSET MANAGEMENT CORPORATION and

4  LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5  Plaintiffs,

6  v.

7  NORTHWESTERN CORPORATION,

8  Defendant.

9  -----------------------------------------------------

10 Civil Action No. C.A. No. 05-499 (JJF)

11 MAGTEN ASSET MANAGEMENT CORP.,

12 Plaintiff,

13 v.

14 MICHAEL J. HANSON and ERNIE J. KINDT,

15 Defendants.

16 -----------------------------------------------------

17              DEPOSITION OF

18            MICHAEL J. HANSON

19 -----------------------------------------------------

20

21

22

23

24

25 TAKEN ON:  6/27/2007          BY:  DANA ANDERSON

## Page 2

1  APPEARANCES:
2  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
   One New York Plaza
3  New York, New York 10004-1980
   By: Bonnie Steingart, Esq.
      Sabita L. Krishnan, Esq.
4
   For the Plaintiffs
5
6
7
8
9  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
   101 Park Avenue
10 New York, New York 10178-0061
   By: Nancy E. Delaney, Esq.
11
   For NorthWestern Corporation
12
13
14
15 BROWNING, KALECZYC, BERRY & HOVEN, PC
   139 North Last Chance Gulch
16 Helena, MT 59601
   By: Stanley T. Kaleczyc, Esq.
17    Kimberly A. Beatty, Esq.
18 For Michael J. Hanson and Ernie J. Kindt
19
20
21
22
23
24
25

## Page 3

1  APPEARANCES (continued):
2  NIXON PEABODY, LLP
   100 Summer Street
3  Boston, MA 02110-2131
   By: John V. Snellings, Esq.
4
   For Law Debenture Trust Company of New York
5
6
7
8  NORTHWESTERN ENERGY
   125 S. Dakota Avenue
9  Sioux Falls, SD 57104-6403
   By: Thomas Knapp, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1  INDEX
2  Examination by Ms. Steingart, page 8
3
4  INDEX OF EXHIBITS
5  Exhibit Number 1, The Montana Power Company to The
   Bank of New York Indenture dated November 1, 1996,
6  page 12
7  Exhibit Number 2, Department of Public Service
   Regulation Before the Montana Joint Service
8  Commission of the State of Montana Joint Application
   of the Montana Power Company and NorthWestern
9  Corporation, page 16
10 Exhibit Number 3, Structure of NorthWestern: Post
   Montana Power Acquisition, Prior to Going Flat,
11 page 20
12 Exhibit Number 3-A, Structure of NorthWestern: Post
   Montana Power Acquisition, Prior to Going Flat,
13 page 24
14 Exhibit Number 4, Minutes of Initial Meeting of
   Board of Directors of NorthWestern Energy Held April
15 22, 2002, page 29
16 Exhibit Number 5, Management Financial and
   Information Report Meeting 2002 Calendar, page 42
17
18 Exhibit Number 6, NorthWestern Corporation Staff
   Meeting/Executive Committee Meeting January, 28,
19 2002 Minutes, page 45
20 Exhibit Number 7, February 25, 2002 E-mail from
   Barbara Foritask to Karen Smook regarding Tuesday
21 NOR Staff/Exec Committee Materials, page 47
22 Exhibit Number 8, Department of Public Service
   Regulation Before the Montana Public Service
23 Commission of the State of Montana Joint Application
   of the Montana Power Company and NorthWestern
24 Corporation Supplemental Filing, page 53
25

## Page 5

1  INDEX OF EXHIBITS (continued)
2  Exhibit Number 9, Department of Public Service
   Regulation Before the Public Service Commission of
3  the State of Montana Transcript of Proceedings,
   page 54
4
5  Exhibit Number 10, January 28, 2002 Memorandum from
   Mike Hanson and Eric Jacobsen to the board of
6  directors regarding Update on Montana Power
   Acquisition, page 72
7
8  Exhibit Number 11, Affidavit of Dennis Lopach,
   page 84
9  Exhibit Number 12, March 18, 2002 Memorandum from
   Eric Jacobson and Mike Hanson to Merle Lewis, Dick
10 Hylland and John Van Camp regarding MPC Compensation
   Proposal, page 103
11
12 Exhibit Number 13, NorthWestern Corporation
   Presentation to the Investment Banking Committee
13 dated February 28, 2002, page 142
14 Exhibit Number 14, May 28, 2002 Memorandum from Kipp
   Orme to Merle Lewis, Dick Hylland and Eric Jacobsen
15 regarding Financing Plans and Considerations,
   page 148
16 Exhibit Number 15, June 17, 2002 Memorandum from
   Kipp Orme to NorthWestern Board of Directors
17 regarding Financing and IR Plans, page 160
18 Exhibit Number 16, April 16, 2002 E-mail from Paul
   Wyche to multiple recipients regarding First Quarter
19 Earnings Release, page 166
20 Exhibit Number 17, NorthWestern Energy Monthly
   Operational Update dated June 21, 2002, page 169
21
22 Exhibit Number 18, NorthWestern Energy Monthly
   Operational Update dated July 22, 2002, page 169
23 Exhibit Number 19, NorthWestern Energy Monthly
   Operational Update dated August 19, 2002, page 169
24
25

2 (Pages 2 to 5)

Page 34

1   there were titles or references to me,
2   official or unofficial, that weren't
3   reflected in my employment agreement, that's
4   possible.
5       Q.   And during the course of 2001
6   and 2002 you attended meetings and you
7   reported to various executives at
8   NorthWestern Corp, correct?
9       A.   Of course I went to various
10  meetings, reported to various executives.
11      Q.   You reported to Mr. Hylland?
12      A.   Not individually I didn't
13  report to Dick Hylland. NorthWestern had
14  what it referred to as the office of CEO
15  which was described as the -- Merle Lewis,
16  the CEO and Dick Hylland, the president and
17  chief operating officer I believe his title
18  was, to which we all reported to.
19          But as you just discussed with
20  me they would at times create internal
21  management boards as a technique to
22  overseeing operations, so in that sense I
23  reported to this internal board.
24      Q.   But in essence, the entities
25  that had the internal boards were wholly

Page 35

1   owned by NorthWestern Corp, directly or
2   indirectly, correct?
3       MR. KALECZYC: Objection.
4   BY MS. STEINGART:
5       Q.   The entities that you were
6   involved with in connection with your
7   employment at NorthWestern were wholly
8   owned, directly or indirectly, by
9   NorthWestern Corp, correct?
10      MR. KALECZYC: Objection.
11      THE WITNESS: Wholly owned
12  directly or indirectly by NorthWestern
13  Corporation?
14  BY MS. STEINGART:
15      Q.   Uh-huh.
16      A.   Yes.
17      Q.   And Merle Lewis was the CEO of
18  NorthWestern Corporation, correct?
19      A.   Yes.
20      Q.   And Mr. Lewis and Mr. Hylland
21  were people who set your compensation or at
22  least the bonus aspects of it, correct?
23      MR. KALECZYC: Objection.
24  BY MS. STEINGART:
25      Q.   In conjunction with the board?

Page 36

1       MS. DELANEY: Objection.
2       THE WITNESS: I don't think it's
3   accurate to characterize it that way.
4   BY MS. STEINGART:
5       Q.   How would you characterize
6   Mr. Hylland's and Mr. Lewis' role in
7   connection with your compensation?
8       A.   They would -- as far as base
9   compensation, for all of the officers of the
10  corporation would do compensation studies
11  that would develop a market range of what
12  the pay, the salary should be and the
13  elements of the pay package, if you will,
14  and they would make recommendations to the
15  board of directors of the corporation who
16  would approve those elements. And in terms
17  of incentive compensation or what you call
18  bonuses, those were a pre-established
19  formula based on results or performance that
20  then would be calculated after the period in
21  question to determine what amounts were
22  earned. They didn't just sit down with a
23  blank sheet of paper and decide what they
24  thought people should get.
25      Q.   And is it your view that with

Page 37

1   respect to bonuses or long-term
2   compensation there was no element of
3   discretion?
4       A.   I don't believe I said there is
5   no element of judgment, but for the most
6   part, they were formulaic based on
7   performance results and they didn't just
8   choose a number between a range.
9       Q.   Was it your understanding that
10  to the extent that judgment was involved,
11  that Mr. Hylland and Mr. Lewis would make
12  recommendations to the board with respect
13  to your compensation?
14      MS. DELANEY: Objection.
15      THE WITNESS: Without going back
16  and looking at the formula, I don't recall
17  what, if any, discretionary or judgment-type
18  application, subjective versus objective, to
19  the best of my recollection, they were
20  predominantly objective measures and the
21  results then drove what the compensation would
22  be.
23  BY MS. STEINGART:
24      Q.   So to the extent that you
25  sought discretionary compensation during

10 (Pages 34 to 37)

Page 38

1   2002, were those requests made of
2   Mr. Hylland and Mr. Lewis?
3       A.   I don't want to get tripped up
4   on terminology. I can recall jointly with
5   Mr. Jacobsen asking them to consider a -- an
6   alternative compensation approach or
7   program, if you will. But I don't recall
8   any time what I would consider just
9   discretionary compensation where based upon
10  their position or authority they could just
11  award a sum to someone, that just was not a
12  practice that we had at NorthWestern.
13      Q.   Would it surprise you to learn
14  that it was Mr. Drook's understanding as
15  far as your compensation was concerned the
16  comp committee of the board looked to
17  Mr. Lewis and Mr. Hylland with respect to
18  their views?
19      MS. DELANEY: Objection.
20      THE WITNESS: I can't speak
21  to -- first of all, I don't know if Mr. Drook
22  was on what they call comp committee. I
23  remember him at one time being the chairman of
24  the governance committee, but -- assuming that
25  he was. I can't speak to who or what they

Page 39

1   relied on in their judgment, I wouldn't know.
2   BY MS. STEINGART:
3       Q.   Getting back to the activities
4   that you engaged in with respect to
5   NorthWestern Corporation, during the year
6   you attended meetings with Mr. Lewis and
7   Mr. Hylland?
8       A.   Yes.
9       MS. DELANEY: Do we have a
10  timeframe?
11      MS. STEINGART: During 2001 and
12  2002.
13  BY MS. STEINGART:
14      Q.   In addition to having meetings
15  with Mr. Lewis and Mr. Hylland, from time
16  to time you attended board meetings of the
17  NorthWestern board?
18      A.   Generally speaking, from time
19  to time I would attend parts of board
20  meetings.
21      Q.   In addition to that there were
22  meetings -- there were operations meetings
23  that occurred on a periodic basis with
24  respect to the NorthWestern Energy
25  businesses?

Page 40

1       A.   Yes.
2       Q.   Who attended the monthly
3   operation meetings of the NorthWestern
4   Energy businesses?
5       A.   If I'm following the label that
6   you are giving to those, it would be this
7   (indicating) internal management board
8   referenced in Exhibit Hanson 4 and most of
9   the officers of NorthWestern Energy,
10  although they may not have attended each one
11  if they didn't have some item on the agenda
12  related to their scope of authority.
13      Q.   So those persons that you
14  referenced would be Merle Lewis?
15      A.   Again, generally I don't know
16  that Merle attended every one, but
17  Merle Lewis, Dick Hylland, myself,
18  Dan Newell, Eric Jacobsen, Kipp Orme as the
19  internal board, and then the officers listed
20  here or some combination of them.
21      Q.   And "listed here" refers to
22  Exhibit 4.
23      And in addition to you received
24  periodic reports called management
25  financial information reports, correct,

Page 41

1   during 2002?
2       A.   Yes.
3       Q.   Also the end of 2001, correct?
4       A.   I don't know when those reports
5   began, but subject to verifying that it was
6   in 2001, most likely, yes.
7       MS. STEINGART: For the
8   convenience of counsel we've created another
9   binder. Do they have their binders?
10      MR. KIMBALL: Yes.
11      MS. STEINGART: I'm going to show
12  you another binder called the management
13  financial information report binder so this
14  way you have -- and we've put in there -- and
15  just -- there is one for the witness here
16  so -- just for reference during the
17  deposition, we've put in the MFIRs that are
18  dated December 2001 through November 2002.
19  BY MS. STEINGART:
20      Q.   So would you agree with me,
21  sir, looking at the binder that we've
22  placed before you that at least for the
23  period December 2001 though November 2002
24  there was periodic management financial
25  information reports that were distributed

11 (Pages 38 to 41)

Page 42

1    to the partner entity CEOs among others?
2         MR. KALECZYC: Could you read back
3    the question for me, please?
4         (Whereupon, the court reporter
5    read back the previous question.)
6         THE WITNESS: I'm not sure I know
7    the full distribution list. But if your
8    question is did I receive these reports at
9    least for this period of time, the answer is
10   yes, I did.
11   BY MS. STEINGART:
12        Q.    Thank you. In addition to
13   those reports, there were monthly meetings
14   of a group called the executive/staff of
15   NorthWestern, correct?
16        A.    Yes.
17        (Deposition Exhibit Number 5
18   marked for identification.)
19   BY MS. STEINGART:
20        Q.    Sir, I've placed before you
21   what we've marked as Hanson Exhibit 5. Do
22   you recognize that to be a calendar for
23   2002 with respect to management financial
24   and information report meeting?
25        A.    (Reviews document.) That's

Page 43

1    what it purports to be. I don't recall
2    seeing such a calendar, but that's what it
3    purports to be.
4         Q.    Do you see the first bullet
5    point where it says "11th floor NOR
6    boardroom immediately following the NOR
7    staff/executive meeting"?
8         A.    Yes.
9         Q.    So did -- when these meetings
10   occurred, were there staff/executive
11   meetings then followed by meetings where
12   the, if you'll excuse my reference to
13   MFIRs, were discussed?
14        MS. DELANEY: Objection.
15        THE WITNESS: As best I recall
16   there was a staff meeting or executive meeting
17   that I would attend that was Merle Lewis,
18   Dick Hylland, the corporate officers and we
19   would have periodic staff meetings. Following
20   that, the financial reporting personnel would
21   attend a meeting to discuss the preparation of
22   these financial information reports that you
23   are calling MFIRs.
24        For the most part, subject to
25   going back and looking at that, I don't

Page 44

1    believe I attended those, Kipp Orme would host
2    them, Dick Hylland I think attended many, if
3    not most, but Dave Monaghan who was the
4    controller of the utility. And the purpose of
5    that was to work on the financial information
6    that was eventually included in these reports
7    which were circulated to the partner entity
8    CEOs.
9         Again, as I said, I don't know the
10   full distribution list.
11   BY MS. STEINGART:
12        Q.    And the financial information
13   and other business issues that were current
14   at the businesses were discussed at the NOR
15   staff executive meeting?
16        A.    I think you may be -- there is
17   a third set of meetings -- whether you are
18   confusing or just confusing me with the
19   references that -- the NOR staff meeting,
20   Merle's staff focused on NorthWestern
21   business.
22        And again, for the most part,
23   there was not a lot of discussion about
24   the --in fact, I don't think the other
25   partner entity CEOs routinely attended

Page 45

1    those.
2         So there wasn't a lot of
3    discussion about business issues or
4    developments or whatever that was going on
5    in their businesses. They, like
6    NorthWestern Energy, had their own version
7    of an operations meeting where we would go
8    through those details with our internal
9    board, but I was not on those and didn't
10   attend them. We had a -- some frequency,
11   I'm not certain exactly how much, but I
12   believe quarterly there was what was called
13   a partner entity CEO meeting where Merle,
14   Dick, myself and the other partner entity
15   CEOs, couple of the corporate officers
16   would get together and just discuss
17   generally the businesses.
18        Q.    The quarterly meetings that you
19   referenced, were there minutes kept at
20   those meetings?
21        A.    I don't recall if there was.
22        (Deposition Exhibit Number 6
23   marked for identification.)
24   BY MS. STEINGART:
25        Q.    I'd like to show you what we've

12 (Pages 42 to 45)

Page 46

```
1     marked as Hanson 6.
2        A.    (Reviews document.)
3        Q.    Do you recognize Hanson 6 to be
4     minutes of a NorthWestern staff
5     meeting/executive committee meeting?
6        A.    It appears to be, yes.
7        Q.    Do you see that in addition to
8     yourself and Mr. Hylland and Mr. Lewis that
9     Mr. Walker attended that meeting?
10       A.    Indicates that he was on
11    telephonically.
12       Q.    And he was, at that point, the
13    partner CEO of what entity?
14       A.    Expanets.
15       Q.    And Mr. Newell, what was his
16    role at that time?
17       A.    Without going back and looking
18    it up, I don't know when Mr. Newell went
19    from the president of what was called
20    NorthWestern Growth Corporation, NGC, to
21    become the CEO of Blue Dot.  So I don't know
22    if this is before or after that change.
23       Q.    Was it your recollection that
24    these minutes were prepared in connection
25    with the staff executive meeting and then
```

Page 47

```
1     distributed to the attendees?
2        A.    I believe that's correct.
3        Q.    Okay.
4           (Deposition Exhibit Number 7
5     marked for identification.)
6     BY MS. STEINGART:
7        Q.    I'd like to show you what we've
8     marked as Hanson 7.
9        A.    (Reviews document.)
10       Q.    Hanson 7 is an e-mail dated
11    February 5th from Barbara Forinash to a
12    number of persons including yourself.  Do
13    you see that that attaches the minutes of
14    the January 28th meeting?
15       A.    The document obviously speaks
16    for itself.  To be precise, this is an
17    e-mail being forwarded from Barbara Forinash
18    to Karen Smook that has a previous e-mail
19    attached that is a distribution of materials
20    including the minutes of the January 28th
21    meeting.
22       Q.    And it references the meeting
23    that was to occur in February of the
24    staff/executive, correct?
25       A.    It does.
```

Page 48

```
1        Q.    Now, in addition to these
2     monthly staff/executive meetings and the
3     quarterly meetings that you referenced, the
4     board meetings that you are listed as
5     attending and your monthly operation
6     meetings, were there any other regularized
7     meetings that you had with the executives
8     of NorthWestern Corp?
9        A.    The only other one that I
10    recall -- I'm sorry, when you say "the
11    executives of NorthWestern Corp," can you
12    tell me who you include in that definition?
13       Q.    Mr. Lewis, Mr. Orme and
14    Mr. Hylland.
15       A.    The only other one that I
16    recall would be an annual planning meeting.
17       Q.    Now, physically during 2002
18    where were you located, your offices
19    located in the organization?
20       A.    Go back and verify a move date,
21    but the office I worked here on for a couple
22    of years, so probably by 2000 we had --
23    corporate offices were in the Qwest
24    building, downtown Sioux Falls and
25    NorthWestern Energy was in an office
```

Page 49

```
1     building on the south side of Sioux Falls at
2     57th and Western Avenue.  At some point we
3     vacated that office and consolidated into
4     the Qwest building, but I don't recall when
5     that was.
6        Q.    And once that occurred, did
7     you -- were you on the same floor as the
8     executives of NorthWestern as Mr. -- strike
9     that.
10          When that consolidation
11    occurred, where were you located vis-a-vis
12    Mr. Lewis?
13       A.    We were both on the 11th floor
14    of the Qwest building, on opposite corners
15    but on the same floor.
16       Q.    And Mr. Hylland?
17       A.    Same answer.
18       Q.    Mr. Jacobsen?
19       A.    Eric Jacobsen and I, our
20    offices were next door to each other.
21       Q.    Mr. Orme?
22       A.    He and I were on the same side
23    as Mr. Jacobsen, he was in another corner.
24       Q.    What was the day-to-day contact
25    that you had with the others who occupied
```

13 (Pages 46 to 49)

Page 50

```
1    the 11th floor?
2         MR. KALECZYC: Objection.
3    BY MS. STEINGART:
4         Q.    If any.
5         MR. KALECZYC: Objection.
6    BY MS. STEINGART:
7         Q.    Or if you can characterize it.
8    If you can't characterize it, tell me.
9         A.    The question is fairly vague.
10   There's not substantive contact beyond the
11   meetings or the regularly scheduled or
12   special meetings that obviously if you
13   office with somebody you occasionally run
14   into each other coming in and out and say
15   good morning or good afternoon or whatever.
16        Q.    Other than that they weren't
17   regular lunch companions of yours?
18        A.    No.
19        Q.    Mr. Jacobsen?
20        A.    No.
21        Q.    In terms of carrying out your
22   day-to-day tasks other than the meetings
23   that we've discussed, those tasks would not
24   bring you into contact with them?
25        MR. KALECZYC: Objection.
```

Page 51

```
1         MS. DELANEY: Objection.
2         THE WITNESS: Generally not, I
3    would be interacting with the other officers
4    of NorthWestern Energy.
5    BY MS. STEINGART:
6         Q.    In connection with the
7    Montana Power Company acquisition and the
8    movement toward going flat, did you have
9    more regularized contact with Mr. Jacobsen?
10        A.    Yes.
11        Q.    That was a project that you
12   were working on together, correct?
13        A.    I'm sorry, which was the
14   project that you were referring to?
15        Q.    The acquisition and the
16   movement of that acquisition from the
17   structure that it had on February 2nd to
18   the going-flat in November of 2002?
19        A.    Mr. Jacobsen and I worked
20   closely together on the acquisition of the
21   Montana Power, LLC. With respect to going
22   flat, we were advised by legal counsel,
23   Mr. Jacobsen and outside counsel on that
24   matter.
25        Q.    Now, at the time that the joint
```

Page 52

```
1    application to acquire the
2    Montana Power Company -- I'm sorry, the
3    Montana Power, LLC was filed, there was
4    also prepared testimony that was filed on
5    your behalf, correct?
6         MS. DELANEY: Objection.
7    BY MS. STEINGART:
8         Q.    There was -- strike that.
9         In connection with the
10   application, the joint application
11   concerning the Montana Power Company, LLC,
12   your prepared testimony was filed, correct?
13        MS. DELANEY: Objection.
14        THE WITNESS: Yes, there was
15   pre-filed direct testimony.
16   BY MS. STEINGART:
17        Q.    Then later in January 2002
18   during a hearing that was held in
19   connection with that acquisition, you gave
20   live testimony.
21        Do you recall that?
22        MS. DELANEY: Objection.
23        THE WITNESS: Yes, I do.
24   BY MS. STEINGART:
25        Q.    Do you recall that in
```

Page 53

```
1    connection with that live testimony there
2    was the statement that whatever you had
3    submitted in connection with your prepared
4    testimony was still true?
5         A.    I'm sure there is a transcript
6    of that testimony, so I don't recall the
7    exact thing. But as a general practice when
8    you have pre-filed direct and/or rebuttal
9    testimony, you must affirm from the stand
10   and adopt that as your sworn testimony in
11   that hearing prior to being tendered for
12   cross-examination, so that is likely the
13   case.
14        (Deposition Exhibit Number 8
15   marked for identification.)
16   BY MS. STEINGART:
17        Q.    I'd like to show you what we've
18   marked as Hanson Exhibit 8 and ask you
19   whether you recognize that as a
20   supplemental filing in connection with the
21   joint application by Montana Power Company
22   and NorthWestern Corp to acquire the
23   Montana Power, LLC?
24        A.    (Reviews document.) I don't
25   specifically recall this document or the
```

14 (Pages 50 to 53)

Page 106

1  to substantially increase its cash
2  commitment to Expanets," correct?
3      A.  That is what it says.
4      Q.  And you knew that, right?
5      A.  I knew as all of us, the senior
6  management knew that Expanets, Blue Dot,
7  CornerStone were not meeting their
8  projections and the reports will show that.
9  They also came and said: Here is what we
10  are doing about it and the performance
11  improving. I can't -- having not authored
12  that statement, I don't frankly think I had
13  any information about their -- the cash
14  commitments from NOR to Expanets.
15      Q.  This memo is from you,
16  Mr. Lewis and Mr. Hylland, correct?
17      A.  It is from Mr. Jacobsen and I
18  to them.
19      Q.  Is there any note in here that
20  says: There are things here that I know
21  nothing about but they are in this memo?
22      MS. DELANEY: Objection.
23      MR. KALECZYC: Objection.
24      THE WITNESS: Of course not.
25  BY MS. STEINGART:

Page 107

1      Q.  Let's see what else it says.
2  Let's go on to the next paragraph, "These
3  events placed tremendous pressure on NOR's
4  liquidity during the last half of 2001."
5      Do you see that?
6      A.  I do.
7      Q.  Did you tell that to the
8  Montana Public Service Commission?
9      MR. KALECZYC: Objection.
10      THE WITNESS: I don't
11  understand -- did we say there was pressure on
12  liquidity?
13  BY MS. STEINGART:
14      Q.  Right.
15      A.  I don't recall saying that.
16  But pressure on the liquidity and failure of
17  meeting projections does not indicate that
18  there is a pending disaster, especially when
19  the businesses are reporting that they
20  expect performance to improve based on a
21  series of actions that they represent.
22      Q.  So the answer is: No, you
23  didn't tell them?
24      MR. KALECZYC: Objection.
25      MS. DELANEY: Objection.

Page 108

1      MR. KALECZYC: We've already gone
2  through this line of testimony.
3      MS. STEINGART: NorthWestern --
4      MR. KALECZYC: Bonnie, if I may.
5      We've already gone through the
6  line of testimony related to the PFC and what
7  he testified to and what he did not. If you
8  want to ask him about his PFC testimony again,
9  go ahead.
10      MS. STEINGART: Again, speaking
11  objections are improper.
12  BY MS. STEINGART:
13      Q.  "NorthWestern was overleveraged
14  and running out of liquidity."
15      Do you see that?
16      A.  I do.
17      Q.  Did you tell the Montana Public
18  Service Commission at the end of 2001
19  NorthWestern was overleveraged and running
20  out of liquidity?
21      MR. KALECZYC: Objection.
22      THE WITNESS: We have the
23  transcripts and the discovery.
24  BY MS. STEINGART:
25      Q.  "Beginning in October, NOR

Page 109

1  addressed its liquidity issues through a
2  series of capital market transactions that
3  had a common thread."
4      Do you see that?
5      A.  I do.
6      Q.  Goes on to say "The $78 million
7  common equity offer and two trust preferred
8  offerings that raised $217 million, the
9  recent completed $720 million bond offering
10  and new $280 million revolving credit
11  facility were all positioned on the
12  strength of NOR's stable and recurring cash
13  flows from its combined utility operations
14  giving pro forma effect to the acquisition
15  of Montana Power."
16      Do you see that?
17      A.  Yes, I see the statement.
18      Q.  And did you understand that the
19  $217 million trust preferred offerings were
20  used to support the operations of the
21  non-regulated businesses?
22      MR. KALECZYC: Objection.
23      THE WITNESS: I did not, and I
24  don't believe it's accurate to say they were
25  used solely for that purpose. But there is no

28 (Pages 106 to 109)

Page 110

1   question the transaction was accretive to
2   earnings and cash flow and therefore
3   strengthened the financial profile of the
4   company.
5   BY MS. STEINGART:
6       Q.   Do you understand now as you
7   look at this that that transaction, that
8   the common thread that you referred to in
9   those offerings were giving pro forma
10  effect to the acquisition of Montana Power?
11          MR. KALECZYC: Objection.
12          MS. DELANEY: Objection.
13          THE WITNESS: I think that's a
14  truism.
15  BY MS. STEINGART:
16      Q.   The paragraph goes on to say
17  that NOR's retention of an investment grade
18  rating during this period, dash, absolutely
19  crucial to future liquidity, dash, was
20  entirely dependent on the pro forma utility
21  operations.
22          Do you see that?
23      A.   I see the reference.
24      Q.   Did you tell the Montana Public
25  Service Commission that the credit ratings

Page 111

1   that NorthWestern had at the time it made
2   its application and that you gave its
3   testimony -- strike that.
4           Did you tell the Montana Public
5   Service Commission that NorthWestern's
6   credit ratings that existed at the time you
7   gave your testimony in January was
8   dependent on the pro forma utility
9   operations?
10          MR. KALECZYC: Objection.
11          THE WITNESS: Candidly, this
12  statement is -- this is overstating it. Do
13  the credit ratings depend on the financial
14  strength cash flow interest rate coverage
15  ratios? Of course. Is it important to
16  strengthen the company to have an accretive
17  transaction, earnings and cash flow? Of
18  course. Are they entirely dependent on that?
19  No, I don't believe that to be the case and
20  obviously there is some advocacy going on.
21  The point we are trying to convey was this was
22  very important, took a lot of hard work from
23  people and deserves recognition, very
24  beneficial to our company.
25  BY MS. STEINGART:

Page 112

1       Q.   It goes on to say that without
2   the Montana Power Company transaction, it
3   is doubtful that these capital transactions
4   could have been completed.
5           Do you see that?
6       A.   I see it.
7       Q.   Now, that's what you were
8   telling your superiors in or about March of
9   2002, correct?
10      A.   It's part of what we were
11  telling them in this memo.
12      Q.   Okay. If we could go back to
13  the January 28th executive committee
14  minutes. Sir, could you look at Exhibit 6
15  again?
16          Now, even in January you were
17  aware of the problems that Expanets was
18  having, correct.
19      A.   I was aware that they were
20  having problems, have any knowledge of the
21  details, but they reported a number of times
22  including this that they were having
23  problems and they were working to fix them.
24      Q.   At the meeting that you
25  attended on the 28th, there was an update

Page 113

1   given with respect to the Expert system at
2   Expanets, correct?
3       A.   This would indicate that, yes.
4       Q.   And you gave a presentation at
5   that meeting concerning the
6   Montana Power Company acquisition, correct?
7       A.   I did, yes.
8       Q.   And Mr. Orme gave a
9   presentation with a financial update,
10  right?
11      A.   Yes, it appears that.
12      Q.   Now, if we look at -- and these
13  are the kinds of updates that occurred
14  throughout the year at these meetings,
15  right?
16      A.   There were updates like that,
17  you know, each of the minutes, you know, I
18  describe the specific ones.
19      Q.   In addition to a finance update
20  by Mr. Orme, right?
21      A.   I'm sorry?
22      Q.   In addition to this finance
23  update -- I'm sorry, I'm looking at the
24  page after your presentation.
25      A.   Mr. Orme gave a finance update,

29 (Pages 110 to 113)

Page 114

1  yes.
2      Q.   If we could look at that
3  together. Here Mr. Orme talks about the
4  money that was raised in the offerings,
5  doesn't he?
6          MR. KALECZYC: Objection.
7          THE WITNESS:
8  Indicates that -- he's talking about an
9  offering.
10 BY MS. STEINGART:
11     Q.   He's talking about a 100
12 million retail trust preferred that
13 occurred in January?
14     A.   Yes, that's what it says.
15     Q.   That was just two days after
16 your testimony to the Montana Power
17 Commission, correct?
18     A.   I don't remember the dates, but
19 I think it was January, yes.
20     Q.   And it goes on to say "He noted
21 that these preferred offerings are helpful,
22 however, there are still significant cash
23 flow issues affecting NOR."
24          Do you see that?
25     A.   Yes.

Page 115

1      Q.   At the end, if you look at the
2  last sentence with me, he reminded everyone
3  that NOR has gone through $175 million of
4  cash during the last quarter.
5          Do you see that?
6      A.   Yes.
7      Q.   55 to Blue Dot, right?
8      A.   That's what it says, yes.
9      Q.   70 to Expanets?
10     A.   Yes.
11     Q.   13 to CornerStone?
12     A.   Yes.
13     Q.   20 to NOR, right?
14     A.   Yes.
15     Q.   And then he says "In essence we
16 are no better off regarding working capital
17 than we were before the $200 million
18 offering."
19          Do you see that?
20     A.   I see it, that's what it says.
21 It doesn't -- look, talking about an
22 offering that was made, monies received, it
23 talks about how they were used in working
24 capital. And, you know, clearly they are
25 looking at having to approve it. But it

Page 116

1  doesn't talk about immediacy of the issue or
2  what to do. And you haven't gotten into the
3  rest of 2002, but we, you know, spent a lot
4  of time working to improve the cost
5  structure and therefore cash flow.
6      Q.   He indicates that there are
7  significant cash flow issues affecting NOR.
8          Do you see that?
9      A.   I see the reference, yes.
10     Q.   At or about that time, what did
11 you understand those cash flow issues to
12 be?
13     A.   I understood that these
14 businesses were not meeting their
15 projections. They were using more cash than
16 anticipated. They were providing less than
17 anticipated missing earnings targets and
18 that the management of those businesses said
19 they had the issues in hand, they were
20 working to improve them and this is nothing
21 more than the CFO saying we all need to
22 continue our efforts to improve the cash
23 flow of the company going forward. That was
24 my understanding.
25     Q.   And you understood that they

Page 117

1  were not only missing their projections, but
2  they were not generating enough cash to
3  cover their operating cash flow, correct?
4          MS. DELANEY: Objection.
5          THE WITNESS: I don't recall ever
6  having that understanding. But what you are
7  talking about is, again, a time-specific, not
8  all businesses are positive cash flow every
9  day or every month. The utility is negative
10 cash flow today. Usually two out of four
11 quarters of the year, seasonal businesses. So
12 did I have the understanding? I do not recall
13 that understanding. Would that necessarily
14 alarm me? No.
15 BY MS. STEINGART:
16     Q.   In fact, that Expanets had
17 negative cash flow for an entire year did
18 not alarm you?
19          MS. DELANEY: Objection.
20          THE WITNESS: In and of itself
21 that does not describe what Expanets was
22 saying it's doing about the problem or how
23 it's going to improve the operations.
24 BY MS. STEINGART:
25     Q.   When Expanets continued to have

30 (Pages 114 to 117)

Page 222

1    THE WITNESS: We'd have to check
2  the minutes to see what they say. I do recall
3  a discussion of that with the board where
4  counsel updated the board. But whether that
5  was an executive session that didn't get
6  detail in the minutes, again, I don't know
7  without going through all of these.
8    MS. STEINGART: To the extent such
9  a document exists, such a reference in the
10  board minutes exists, I would ask that it be
11  produced.
12  BY MS. STEINGART:
13    Q.  Let's talk about what you did
14  in furtherance of this directive. I'd like
15  to show you what we've marked as 22 and 23.
16    A.  (Reviews document.)
17    MS. STEINGART: Actually, as part
18  of 23 there are two copies of the officer's
19  certificate. You can take off that last one.
20  It's not signed.
21    MS. DELANEY: Do you want it
22  removed from the exhibit?
23    MS. STEINGART: Yeah, could you
24  remove it.
25    MS. DELANEY: Blue page and all?

Page 223

1    MS. STEINGART: Yes. Thank you.
2    THE WITNESS: (Reviews document.)
3  BY MS. STEINGART:
4    Q.  My only question with respect
5  to 22 is whether you recognize it to be the
6  second supplemental indenture that you
7  executed on behalf of NorthWest Energy on
8  or about August 13, 2002?
9    A.  I believe that it is.
10    Q.  And with respect to 23 --
11    A.  Was I supposed to remove
12  something?
13    Q.  Yeah, just the blue page and
14  beyond.
15    A.  (Complies.)
16    Q.  And with respect to 23, that is
17  the officer's certificate that you executed
18  in August 2002 in connection with that
19  second supplemental indenture.
20    A.  (Reviews document.) Well, it's
21  an officer's certificate and that is my
22  signature. I'm not sure why it says "The
23  undersigned, David A. Monaghan, in his
24  capacity as CEO does hereby certify on
25  behalf of NorthWestern Energy that..."

Page 224

1  but --
2    Q.  Well, evidently you stood in
3  for Mr. Monaghan.
4    A.  Maybe. But yes, officer's
5  certificate signed by me. That is my
6  signature.
7    Q.  Do you understand what an
8  officer's certificate is?
9    A.  Yes.
10    Q.  If you look at paragraph 3 with
11  me.
12    A.  Uh-huh.
13    Q.  And in paragraph 3 you certify
14  that all conditions precedent, provided for
15  in the indenture relating to the execution
16  and delivery of the second supplemental
17  indenture dated as of the date hereof among
18  NorthWestern Energy, LLC and the trustee
19  including any covenants compliance which
20  constitute a condition precedent have been
21  complied with."
22    Do you see that?
23    A.  Yes, I do.
24    Q.  What did you do to satisfy
25  yourself that that was correct?

Page 225

1    A.  I reviewed the documents that
2  are referenced in that case, it's the second
3  supplement and the fourth, it's the
4  indenture, and required of other management,
5  particularly Mr. Monaghan, of counsel,
6  basically whether the conditions stated were
7  in compliance.
8    Q.  Well, doesn't paragraph 6 say
9  that counsel was relying on you?
10    A.  It indicates that Paul Hastings
11  will rely on the accuracy and truth of the
12  foregoing for purposes of rendering its
13  opinion to the trustee. But the
14  conversations I had were with --
15  Euclid Irving was one of the attorneys
16  advising on the -- advising me and
17  NorthWestern Energy, LLC on the transaction.
18    Q.  So you certified paragraph 3
19  based on what Mr. Monaghan told you?
20    MS. DELANEY: Objection.
21    THE WITNESS: I don't think I said
22  that. Based, number 3, on personal inquiry
23  and information provided to me by management
24  including Mr. Monaghan and advice of counsel.
25  BY MS. STEINGART:

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 226

```
 1      Q.    And describe the substance of
 2   the personal inquiry.
 3      A.    Reading the documents to figure
 4   out what conditions precedent existed. And
 5   then inquiring whether or not we were in
 6   compliance with those conditions.
 7      Q.    As you sit here today, do you
 8   recall what conditions precedent that you
 9   inquired into?
10      A.    I don't recall. But I think
11   they are in the document.
12      Q.    And in preparation for this
13   deposition, did you look at any of those
14   things?
15      A.    I did not, no.
16      Q.    Paragraph 4 says that you've
17   read the applicable provisions of the
18   indenture.
19            Do you see that?
20      A.    Yes.
21      Q.    What provisions did you read?
22      A.    I don't recall specifically. I
23   had available the entire indenture document,
24   it was a – I don't remember the date of it,
25   it's an older document, and went though its
```

Page 227

```
 1   provisions.
 2      Q.    It's a document that we marked
 3   just by happenstance as the first exhibit
 4   to this deposition. Is this the document
 5   (indicating)?
 6      A.    (Reviews document.) Yes.
 7      Q.    It says you've also examined
 8   originals or copies certified to his
 9   satisfaction of the various certificates
10   and instruments prepared in connection with
11   the execution and delivery of the second
12   supplemental indenture.
13            What certificates and
14   instruments did you review?
15      A.    I don't remember other than
16   the -- the supplement indenture itself. I
17   don't remember if there are certificates and
18   instruments in connection with it. If there
19   are, I think I was provided with a complete
20   packet.
21      Q.    Do you have a recollection of
22   that?
23      A.    I don't know if there are
24   such -- I don't recall if there are other
25   certificates and instruments related to that
```

Page 228

```
 1   or not.
 2      Q.    And it indicates here "As well
 3   as the indenture and such corporate records
 4   and other instruments and documents."
 5            What corporate records did you
 6   look at?
 7      A.    I don't remember looking at
 8   other corporate records. I recall making
 9   inquiries of some number of people including
10   Mr. Monaghan and counsel, Euclid Irving.
11      Q.    As you sit here today, do you
12   recall either what Mr. Monaghan or what
13   counsel told you in that regard?
14      A.    Generally. Not the specific
15   words.
16      Q.    What did they tell you?
17      A.    That, in general, the substance
18   was that we are -- we meet the requirements
19   of the covenants and the conditions.
20      Q.    And did you ask them what they
21   were they basing -- what information they
22   based those conclusions on?
23      A.    I don't recall asking him that.
24      Q.    Did they prepare memos or
25   summaries for you concerning what they
```

Page 229

```
 1   looked at and what they found in the things
 2   they looked at?
 3      A.    I don't recall if there was
 4   memos or other written material provided.
 5      Q.    Then it goes on to say "And
 6   made such examination and investigation as,
 7   in his opinion, is necessary to unable him
 8   to express an informed opinion as to
 9   whether or not such covenants and
10   conditions have been complied with."
11      A.    Yes.
12      Q.    What examination and
13   investigation did you make?
14      A.    Just what I told you.
15      Q.    So that just refers to what you
16   received from Mr. Monaghan and counsel?
17      A.    As I said, there may have been
18   some number other than just Mr. Monaghan.
19   But my specific recollection today is that I
20   discussed with Mr. Monaghan and with
21   Mr. Irving.
22      Q.    Did you take any steps to
23   assure yourself that there was the capacity
24   to pay principal and interest on the part
25   of NorthWestern Corporation when you
```

58 (Pages 226 to 229)

Page 230

1    executed this indenture?
2            MS. DELANEY: Objection.
3            (Whereupon, the court reporter
4    read back the previous question.)
5            THE WITNESS: I don't recall
6    taking any specific steps relative to that
7    question. But based on my view at the time, I
8    certainly -- I believe that there was such
9    capacity. In fact, I think such payments were
10   made.
11   BY MS. STEINGART:
12       Q.    And was your view at the time
13   based on the company's SEC filings and
14   other public financial statements?
15       A.    In part as well as the other
16   management reports, financial reports we
17   talked about.
18           (Deposition Exhibit Number 26
19   marked for identification.)
20   BY MS. STEINGART:
21       Q.    I'd like to show you what we've
22   marked as Hanson 26. It's a memo dated
23   October 16th to the board from Mr. Lewis
24   and Mr. Hylland.
25       A.    (Reviews document.)

Page 231

1            (Deposition Exhibit Number 27
2    marked for identification.)
3    BY MS. STEINGART:
4        Q.    And also Hanson 27, which is a
5    part of one of the attachments referenced
6    in that October 16th memo.
7        A.    (Reviews document.)
8        Q.    My only question now is whether
9    you recall seeing this cover, this e-mail
10   dated October 16th and the operating plan
11   and board summary that was -- that's noted
12   in the first bullet?
13           MR. KALECZYC: Object to form.
14           THE WITNESS: I don't
15   recall -- you say "this e-mail," are you
16   referring to this memo.
17   BY MS. STEINGART:
18       Q.    Yes.
19       A.    I don't recall seeing that and
20   don't know whether or not this was
21   circulated to people other than to board
22   members. The reference plan summaries, I
23   don't recall seeing them in advance but did
24   attend that portion of the board meeting
25   where myself and each of the other partner

Page 232

1    entity CEOs went through our portion of a
2    presentation as well as the overall
3    discussion by Mr. Hylland.
4        Q.    And do you have an
5    understanding that a packet concerning NOR
6    liquidity and financing opportunities and
7    strategic plan sensitivities was also
8    provided to the board in preparation for
9    the November meeting?
10       A.    I see the reference and their
11   typically were board packets, but I don't
12   know that I knew at that time the contents
13   of the board packet.
14       Q.    We'll get to the meeting and
15   talk about 27 in connection with the
16   meeting.
17           (Deposition Exhibit Number 28
18   marked for identification.)
19   BY MS. STEINGART:
20       Q.    What we've marked as Hanson 28
21   which is a memo dated October 30th from
22   Mr. Orme to the board of directors.
23       A.    (Reviews document.)
24       Q.    And the only thing I'm going to
25   ask you about is the first paragraph under

Page 233

1    2002 Forecast.
2        A.    (Reviews document.) Okay.
3        Q.    Do you recall having seen the
4    October 30th memo?
5        A.    I don't, no.
6        Q.    Did you learn in or around that
7    time, and that is at some point between
8    October 30th and November 5th or 6th board
9    meeting, that the current EPS forecast is
10   now 1.99 as compared with 2.30 reflected in
11   the prior submission?
12       A.    I recall at the meeting that
13   we've not yet discussed that a plan, both
14   operating and financial plan was presented
15   and that segment of sessions, which we
16   talked about, then myself and other partner
17   member CEOs were asked to leave. But
18   following that, Mr. Lewis and Mr. Hylland
19   reported back that the board did not accept
20   and approve a plan and directed the company
21   management to go back and revise the plan
22   because they felt there was too much risk
23   contained in it. And we had a revised plan.
24   I wouldn't recall specifically what that
25   said, but this memo would indicate that the

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 234

1  revised plan and budget had an earnings
2  forecast associated with it of $1.99.
3       Q.  There was the 2002 forecast and
4  the plan that the board was looking at was
5  really the 2003 plan, sir, wasn't it, not
6  the 2002 plan?
7       A.  That's correct.
8       Q.  So the board looked at the
9  plan, but my question for you is: Aside
10 from the plan, did you learn between
11 October 30th and the board meeting that the
12 earnings for the current year, that is
13 2002, that the earnings forecast was being
14 lowered to $1.99 from $2.30?
15      A.  I don't recall if I learned
16 that between that time period or not.
17      Q.  But in any case, that was
18 something that was discussed at the board
19 meeting?
20      A.  The "board meeting" now
21 referring to the November 5th?
22      Q.  Yes, sir.
23      A.  Well, the minutes will cover
24 that, but I believe that would be the case.
25      Q.  Okay.  Why don't we look at the

Page 235

1  minutes for November 6th.
2       A.  (Reviews document.)  Okay.
3       Q.  Now, just so that I can get a
4  timeline sense, before November 6th the
5  company had sold 10 million shares of
6  common stock in a public issuance, correct?
7       A.  There was an equity issuance.
8  I'd have to verify the number of shares.
9       Q.  And that was in October of
10 2002, right?
11      A.  I don't recall exact date, but
12 the fall, September, October.
13      Q.  Right.  We looked at the
14 underwriting agreement a little earlier?
15      A.  We did, yes.  Is that the date?
16      Q.  And that was in October.
17      A.  All right.
18      Q.  And were you aware of the fact
19 there were a series of board meetings in
20 September where the board was considering
21 various means for raising funds?
22      A.  Are you referring to special
23 board meetings?
24      Q.  Yes, sir.
25      A.  I don't have any recollection

Page 236

1  of participating or attending.  So was I
2  aware of those?  I don't recall that I was
3  aware of that specific discussion.
4       Q.  Were you aware that during that
5  period of time the board had retained Bear
6  Stearns to assist the company in looking at
7  various alternatives for raising funds?
8       A.  I recall Bear Stearns coming
9  and participating in some discussion with
10 their representatives.  I guess I either
11 didn't know or don't recall the scope of
12 what their involvement was.
13      Q.  And Bear Stearns was certainly
14 present at this November 6th meeting,
15 correct?
16      A.  Yes, it appears they were, yes.
17      Q.  And before the non-employee
18 members of the board met in an executive
19 session, Bear Stearns made a presentation,
20 right?
21      A.  That's what's indicated by the
22 minutes, yes.
23      Q.  That presentation was made by
24 Mr. Thompson and Mr. Morganbesser of Bear
25 Stearns, correct?

Page 237

1       A.  That's what's indicated here,
2  yes.
3       Q.  And you were present for that,
4  right?
5       A.  I don't know.
6       Q.  Well, it doesn't say that you
7  left, does it?
8       A.  It doesn't.  But I don't think,
9  if you go through these, at that time we had
10 a habit of saying when people joined and
11 left.
12      Q.  Well, it certainly indicates
13 that after that discussion -- that after
14 the discussion that followed, the Bear
15 Stearns presentation, the non-employee
16 members of the board met in executive
17 session, correct?
18      A.  That is what it says, yes.
19      Q.  In the paragraph before that,
20 do you see "At this time Thomas Falatko,
21 Paul Hastings and Cary Thompson and
22 Neil Morganbesser joined the meeting"?
23          Do you see that?
24      A.  I see that, yes.
25      Q.  And it also indicates that

60 (Pages 234 to 237)

Page 258

BY MS. STEINGART:
1
2   Q.   Did you -- after you --
3   A.   We went home.
4   Q.   You know, what's the -- okay.
5        Was there -- were the
6   discussions between the board and
7   management at the November 6th meeting
8   cordial?
9        MR. KALECZYC: Objection.
10       THE WITNESS: The discussions I
11  recall were reasonably cordial and
12  professional. There were a series of action
13  items to be followed up on that we
14  were -- began -- I don't know if we began
15  immediately after that or sometime prior, but
16  reporting to the board on a weekly basis, as I
17  recall.
18  BY MS. STEINGART:
19       Q.   What was your understanding of
20  why there were a series of action items
21  that you were required to report on to the
22  board on a weekly basis?
23       A.   My recollection of that was
24  that at a staff meeting, Merle Lewis shared
25  with us that -- "us" being the members of

Page 259

1   his staff or at attendance, that the board
2   expected execution of these items. And they
3   were then assigned to various people who
4   would be the responsible officer. And then
5   they wanted weekly updates, so we were also
6   instructed to provide those weekly updates
7   to the office of the CEO who then presumably
8   forwarded them on to the board.
9        Q.   Was there an understanding as a
10  result of those directives that the board
11  was disappointed with management?
12       MS. DELANEY: Objection.
13       MR. KALECZYC: Objection.
14       THE WITNESS: I did not get the
15  indication, that I recall, the board being
16  disappointed with the management, disappointed
17  with the performance to date of parts of the
18  business, I think that impression was left.
19  But I don't recall anyone indicating
20  disappointment in the management.
21  BY MS. STEINGART:
22       Q.   Was there disappointment with
23  the continuing failure to be able to
24  predict the performance of those
25  businesses?

Page 260

1        MR. KALECZYC: Objection.
2        THE WITNESS: My only recollection
3   was a disappointment in the results. I don't
4   recall any of the board members indicating a
5   concern or the inability to predict as you
6   phrased in your question. But there is no
7   question that the results were not as
8   anticipated, needed to be improved and with
9   respect to the other partner entities, the
10  management of those business lines were
11  indicating that they could be and would be
12  improved.
13  BY MS. STEINGART:
14       Q.   Was there failure to perform in
15  the manner anticipated a number of times
16  during the course of 2002?
17       MS. DELANEY: Objection.
18  BY MS. STEINGART:
19       Q.   There wasn't just one instance
20  where Expanets had not performed as
21  anticipated, right?
22       A.   I'm not sure why your reference
23  to -- your reference almost sounds like a
24  point in time over the time period, whether
25  you are talking about 2001, 2002, did not

Page 261

1   meet the projected earnings and cash flow.
2        But again, the answer always
3   was that from, I'm talking specifically from
4   the senior leadership of Expanets and
5   Blue Dot, that they had actions they could
6   take to improve that and commitment that it
7   would, in fact, improve.
8        Q.   And how many times had the
9   management of Expanets and Blue Dot said
10  that? And how many times had those
11  predictions not turned out to be the case?
12       MR. KALECZYC: Objection.
13       THE WITNESS: I don't know the
14  answer to that question.
15  BY MS. STEINGART:
16       Q.   More than one?
17       A.   Certainly.
18       Q.   More than twice?
19       A.   I don't have one, because as I
20  just told you, I can't account them, so we
21  can start from one and work our way up. But
22  I don't know the answer to that.
23       There were what had been at
24  that point ongoing discussions that are in
25  the reports about what happened and why and

66 (Pages 258 to 261)

Page 262

1    what they were going to do about it.
2        Q.    But the problem continued month
3    after month, isn't that a fair statement?
4            MS. DELANEY:  Objection.
5            THE WITNESS:  Issues, challenges,
6    problems continued.  You say "the problem,"
7    there is not a problem, a singular problem.
8    But the reports will speak for themselves.
9    BY MS. STEINGART:
10       Q.    And by November the board was
11   providing directives to management,
12   correct?
13       A.    My understanding from
14   Merle Lewis and Dick Hylland was that the
15   board had provided a series of directives to
16   the management of things they wanted to see
17   done with the business.
18       Q.    And the board didn't provide
19   those directives to management because they
20   were pleased with Mr. Lewis, did they?
21           MR. KALECZYC:  Objection.
22           MS. DELANEY:  Objection.
23           THE WITNESS:  I can't testify to
24   their state of mind.  And as I just indicated,
25   the members of the board did not give me

Page 263

1    directly those directives or expectations.  So
2    I can only relay -- can recall what was
3    relayed to me.
4    BY MS. STEINGART:
5        Q.    As a sophisticated executive,
6    you knew that those directives were not a
7    sign that the board was pleased with either
8    Mr. Hylland or Mr. Lewis, isn't that right?
9            MR. KALECZYC:  Objection.
10           THE WITNESS:  I don't think the
11   characterization "pleased" or "disappointed"
12   has any relevance to the information provided
13   back.
14       Q.    How often has the board given
15   you a list of directives and asked you to
16   report back weekly?
17           MR. KALECZYC:  Objection.
18           THE WITNESS:  How often has the
19   board given me?
20   BY MS. STEINGART:
21       Q.    A list of directives and
22   directed you to report --
23       A.    The board did not give me.  It
24   gave, as I understand it, through Mr. Lewis
25   and Mr. Hylland.

Page 264

1        Q.    So during the period that
2    you've been CEO, has it ever happened that
3    the board gave you a list of directives and
4    told you to report back to the board
5    weekly?
6        A.    The board has given me
7    directives.  I have not had them ask for
8    weekly updates on progress.  But they have
9    given directives and made decisions what
10   they want done and required the management
11   to report back not on a weekly basis.
12       Q.    And that's not unusual,
13   correct?
14       A.    I'm sorry, what's not unusual?
15       Q.    A board giving management
16   directives and having management report to
17   the board about progress on those
18   directives, right, that's not unusual?
19       A.    Not within my experience, it's
20   not unusual.
21       Q.    But it is unusual for a board
22   to give management directives and to ask
23   for weekly reports, isn't that right?
24           MS. DELANEY:  Objection.
25   BY MS. STEINGART:

Page 265

1        Q.    It's never happened to you in
2    the time you've been CEO, correct?
3        A.    That is correct.
4            (Deposition Exhibit Number 29
5    marked for identification.)
6    BY MS. STEINGART:
7        Q.    I'll ask you look what we've
8    marked as Hanson 29.  Were these the
9    directives that were issued to Mr. Hylland
10   and Mr. Lewis by the board and shared with
11   you.
12       A.    (Reviews document.)  To the
13   best of my knowledge, I've never seen this
14   particular document.  Note it is not -- this
15   copy is not signed.  And it's not in the
16   format that we used for tracking and
17   reporting those action items.  But it must
18   be in the documents somewhere.  So I
19   can't -- frankly without pulling it out, I
20   can't compare the two.  The ones in my
21   recollection dealt directly with the energy
22   business plus the MFM issue and I don't see
23   those stated here unless I passed it, and I
24   recall updating on those items.
25   BY MS. STEINGART:

67 (Pages 262 to 265)

Page 266

1    Q.  Both Mr. Hylland and Mr. Lewis
2  indicated that they shared that memo with
3  you and other partner entity CEOs.
4         Does that refresh your
5  recollection?
6    A.  It does not.  As I just
7  testified, I recall the discussion.  I don't
8  recall them sharing this memo.  And without
9  pulling the updates that were prepared, I
10  can't make a comparison of what's on this to
11  what we reported.
12    Q.  Do you recall that
13  during -- that in or around the beginning
14  of November 15th, time was of the essence
15  in obtaining a credit facility?
16    A.  I recall Kipp Orme reporting on
17  working to obtain one.
18    Q.  But you don't recall there
19  being time urgency in that effort?
20    A.  I don't recall anyone referring
21  explicitly to time of the essence.
22  Certainly working on it to get it completed
23  in the short timeframe I think, you know --
24  I recall that general sense of that.
25    Q.  Do you recall that the board

Page 267

1  gave a direction from management to
2  proceed -- to get a credit facility using
3  the utility assets as collateral as soon as
4  possible?
5    A.  Do you have a document?  Is
6  that in the board minute or board report?
7    Q.  I'm just asking whether you
8  understood that as part of the efforts that
9  management was to undertake as part of the
10  directives?
11    A.  Understood that the CFO and the
12  financial folks working on getting a credit
13  facility.  I also understood that there was
14  a look at refinancing first mortgage bonds.
15  I don't recall the -- a specific directive
16  by the board to have a secured credit
17  facility as soon as possible, but that could
18  be.  My recollections tend to deal with the
19  ones that were assigned to me.
20    Q.  And were you assigned with the
21  items that were dealt with under Other
22  Liquidity Events on that memo, number 5?
23    A.  (Reviews document.)  Some of
24  them.
25    Q.  During the period following

Page 268

1  this memo and into the first quarter of
2  2003, there was no MFM sale or partnership,
3  correct?
4    A.  During that time period we did
5  not complete a sale of the MFM project.
6    Q.  And nor was Colstrip closed
7  either before the end of 2002 or in the
8  first quarter of 2003?
9    A.  I don't recall the date that we
10  resolved and settled the PPL matter.  But we
11  ultimately didn't sell the assets, we had a
12  monetary settlement.  And to the best of my
13  recollection, that probably wasn't during
14  the first quarter of 2003.
15    Q.  And it wasn't in 2003 at all,
16  was it?
17    A.  No.
18    Q.  C refers to a receivable
19  facility at NorthWestern Energy.
20         Did you attempt to put a
21  receivable facility at NorthWestern Energy
22  in place?
23    A.  I did not.  I believe the
24  finance department specifically -- my
25  recollection was that Kurt Whitesel, the

Page 269

1  controller, was working on this.  But I
2  believe, ultimately, that was not done, if I
3  recall correctly.
4    Q.  Was there a sale and leaseback
5  of utility company assets?
6    A.  There was a sale and leaseback
7  of the airplane.  I don't recall without
8  going back whether or not there was other
9  assets that were sold and leased back.
10    Q.  But certainly not of the energy
11  company, not of the regulated
12  subsidiaries -- strike that -- not of the
13  regulated businesses, correct?
14    A.  Not that I recall.
15    Q.  Okay.  Now, this memo refers to
16  a cost-saving schedule.
17         Do you see that?
18    A.  Yes.
19    Q.  And if you read down, it
20  indicates -- and I guess I say this often,
21  it indicates that nothing is sacred.
22         Do you see that?
23    A.  I do.
24    Q.  Did Mr. Lewis and Mr. Hylland
25  when they met with you about these

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 270

1  directives tell you that nothing was
2  sacred?
3      A.   I don't remember them saying
4  that, but they may have.
5      Q.   Was that the understanding you
6  had in connection with the directives that
7  money was to be raised and nothing was
8  sacred?
9          MR. KALECZYC: Objection.
10         THE WITNESS: My understanding was
11  there were efforts under way to raise cash.
12         (Deposition Exhibit Number 30
13  marked for identification.)
14  BY MS. STEINGART:
15      Q.   I'd like to show you what we've
16  marked as Hanson 30 and ask you if you
17  could describe what that is for the record?
18      A.   (Reviews document.) The
19  document, albeit unsigned, is an asset and
20  stock transfer agreement dated November 15th
21  by and between NorthWestern Energy, LLC and
22  NorthWestern Corporation. This is the
23  agreement by which the utility assets and
24  liabilities were transferred from
25  NorthWestern Energy, LLC to NorthWestern

Page 271

1  Corp and other certain assets and
2  liabilities retained at NorthWestern Energy,
3  LLC, later named Clark Fork and Blackfoot,
4  LLC.
5      Q.   So this is the agreement by
6  which the going-flat transaction was
7  effectuated?
8      A.   I believe so. As I said, it's
9  an unsigned version, but that's what it
10  looks like.
11      Q.   But there is one that's signed
12  and the transaction, in fact, occurred?
13      A.   Yes.
14         MS. STEINGART: Just for the
15  record, if I can find a signed one, I will
16  make it an Exhibit 30-A.
17         (Deposition Exhibit Numbers 31 and
18  32 marked for identification.)
19  BY MS. STEINGART:
20      Q.   I'd like to show you what we've
21  marked as Exhibit 31 and Exhibit 32.
22      A.   (Reviews document.)
23      Q.   Sir, do you recognize Hanson 31
24  to be the third supplemental indenture that
25  was executed in connection with the

Page 272

1  going-flat transaction?
2      A.   Well, it is the third
3  supplemental indenture executed now by
4  NorthWestern Corporation and the Bank of
5  New York.
6      Q.   And it was executed in or
7  around November 15th in connection with the
8  going-flat?
9      A.   I believe it was, yes.
10     Q.   And exhibit 32, do you
11  recognize that to be the officer's
12  certificate that was executed by you in
13  connection with the going-flat transaction?
14     A.   (Reviews document.) It is an
15  officer's certificate executed by me in
16  connection with that transaction.
17     Q.   Now, what did you do to satisfy
18  yourself with respect to paragraph 1 of the
19  officer's certificate that the transaction
20  complies with article 11 of the indenture
21  and all conditions precedent in the
22  indenture including any covenant compliance
23  which constitutes a condition precedent as
24  they relate to the transaction?
25     A.   Well, same answer as the prior

Page 273

1  one, I reviewed the documents referenced,
2  made inquiry of other management, to the
3  best of my recollection, Mr. Monaghan, and
4  conversations with counsel.
5      Q.   And did they prepare any memos
6  for you that summarized or described the
7  assurances that they were providing you
8  with?
9      A.   I don't recall if -- well, to
10  the best of my recollection, I don't think
11  they were internal management ones. I don't
12  recall if there were memos or a memo from
13  counsel or not.
14     Q.   Looking at the earlier
15  paragraph, the sentence that begins "He has
16  read and is familiar with covenants and
17  conditions in the provisions in articles
18  11 and 12 of the indenture."
19         Did you rely on Mr. Monaghan
20  for that?
21     A.   I read those articles at the
22  time, had some discussions with
23  Mr. Monaghan, perhaps others, but I remember
24  Mr. Monaghan and counsel.
25     Q.   Then it says further down "And

69 (Pages 270 to 273)

Page 274

```
 1    has examined the various certificate and
 2    instruments prepared in compliance with the
 3    covenants and conditions."
 4         What certificates and
 5    instruments did you review?
 6      A.   I don't recall if there are any
 7    or what they are.
 8      Q.   What did you do to assure
 9    yourself that NorthWestern was capable of
10    paying principal and interest in connection
11    with the QUIPS?
12         MS. DELANEY: Objection.
13         THE WITNESS: I didn't make a
14    specific analysis of that. And as I said,
15    based upon my involvement in the company and
16    general understanding, I believe we had the --
17    the corporation had the ability to make such
18    payments and did, in fact, do so over at least
19    some period of time.
20    BY MS. STEINGART:
21      Q.   What documents or materials did
22    you base that belief on?
23      A.   I can't point to a specific
24    list of documents. But we've discussed the
25    types of management reports and information
```

Page 275

```
 1    that have been provided to me during that
 2    time period.
 3      Q.   So you referred to the
 4    management financial information reports in
 5    reaching that conclusion?
 6      A.   Not solely, but in part.
 7    Management information reports, 10-Ks and
 8    10-Qs, presentations made to the board.
 9      Q.   Did anyone prepare a fairness
10    opinion on behalf of Montana Power, LLC
11    that the going-flat transaction was fair
12    from a financial point of view to creditors
13    of Montana Power, LLC?
14      A.   To the best of my knowledge,
15    one was not required.
16      Q.   Did anyone prepare an
17    assessment for you of the value of the
18    assets being transferred and the
19    liabilities being assumed in connection
20    with the going-flat transaction?
21      A.   I don't recall any such
22    assessment nor do I think one was necessary.
23      Q.   Did anyone provide an
24    assessment for you about whether the
25    disparity in the value of the assets being
```

Page 276

```
 1    transferred and the liabilities assumed in
 2    connection with the going-flat transaction
 3    made the going-flat transaction a
 4    fraudulent transfer?
 5         MR. KALECZYC: Objection.
 6         MS. DELANEY: Objection.
 7         THE WITNESS: I'm assuming that
 8    you are not asking for the legal conclusion.
 9    To go back, the assets and the liabilities are
10    on the books of the subsidiary, in this case,
11    NorthWestern Energy, LLC. The owner of the
12    assets and the liabilities, the difference
13    being equity, is NorthWestern Corporation. We
14    just looked at a directive from the board of
15    directors of NorthWestern Corporation saying
16    move those up with the exception of Milltown
17    Dam and some incidentals. They owned them
18    both. There was no change. They owned the
19    equity of it before the transaction. They
20    owned it after the transaction. So I just
21    dispute the premise that that type of fairness
22    opinion or assessment of those things was
23    necessary under the circumstances.
24    BY MS. STEINGART:
25      Q.   When you signed the officer's
```

Page 277

```
 1    certificate that's Exhibit 32, were you
 2    aware of the disparity in value of the
 3    assets transferred and liabilities assumed
 4    in connection with the going-flat
 5    transaction?
 6      A.   I don't believe there is any
 7    such disparity.
 8         MS. DELANEY: Objection.
 9    BY MS. STEINGART:
10      Q.   What do you understand the
11    value of the assets transferred in the
12    going-flat transaction to be?
13      A.   It doesn't matter. The assets
14    were worth what they were, the liability was
15    worth what they were and the net result of
16    those was the responsibility of the
17    property of NorthWestern before and after
18    the transaction.
19      Q.   Sir, at the time you executed
20    the officer's certificate, did you have an
21    understanding of the value of the assets
22    transferred and the liabilities assumed in
23    connection with the going-flat transaction?
24      A.   I would have had, in the normal
25    course of things, the balance sheet that you
```

70 (Pages 274 to 277)

Page 278

1 are referring to of NorthWestern Energy,
2 LLC, had a general understanding. I did not
3 inquire at that time about what those
4 specific balances were.
5    Q.    Now, at the time of the
6 going-flat transaction, did counsel for
7 Montana Power, LLC indicate to you that you
8 should be aware of the value of the assets
9 being transferred as well as the
10 liabilities assumed in connection with the
11 going-flat transaction?
12        MS. DELANEY: Objection.
13        MR. KALECZYC: Objection.
14        MS. DELANEY: To the extent this
15 calls for any privileged conversation with
16 counsel, I direct the witness not to answer.
17 BY MS. STEINGART:
18    Q.    Who represented Montana Power,
19 LLC in connection with the going-flat
20 transaction?
21    A.    I relied on advice from
22 Euclid Irving and Paul Hastings.
23    Q.    Who represented NorthWestern in
24 connection with the going-flat transaction?
25    A.    I don't know the answer to that

Page 279

1 question.
2    Q.    It's true -- well, you knew
3 that Paul Hastings was also representing
4 NorthWestern, correct?
5    A.    I knew and recall that
6 Paul Hastings represented NorthWestern in a
7 variety of matters.
8    Q.    Did you consider, as the
9 individual who executed the officer's
10 certificate, that it was not in the best
11 interest of the creditors of Montana Power,
12 LLC for Montana Power, LLC to have the same
13 counsel as NorthWestern in connection with
14 the going-flat?
15        MR. KALECZYC: Objection.
16        MS. DELANEY: Objection.
17        THE WITNESS: I did not.
18 BY MS. STEINGART:
19    Q.    Did anyone talk to you about
20 that?
21    A.    Not that I recall.
22        MR. KALECZYC: Objection.
23 BY MS. STEINGART:
24    Q.    So you said that you had in
25 mind when you executed the officer's

Page 280

1 certificate -- or the materials that you
2 were relying on included the MFIRs and the
3 10-Ks and 10-Qs, was there anything else?
4    A.    Yes.
5    Q.    What else?
6    A.    I cannot tell you. I used
7 those as examples. I had all the variety of
8 information provided to me in the normal
9 course of things available.
10    Q.    And to the extent that those
11 documents that you've been able to identify
12 for me were false and misleading, then you
13 relied on false information in executing
14 the officer's certificate, correct?
15        MS. DELANEY: Objection.
16        MR. KALECZYC: Objection.
17        THE WITNESS: I have no basis for
18 believing that those documents were false or
19 misleading.
20 BY MS. STEINGART:
21    Q.    Are you familiar with the
22 restatements that NorthWestern made of its
23 first three quarter 10-Qs for 2002 in 2003?
24    A.    Generally, yes.
25    Q.    Are you familiar with the cease

Page 281

1 and desist order that was entered against
2 NorthWestern by the SEC?
3    A.    Generally.
4    Q.    Are you familiar with the
5 complaints that have been filed against
6 Merle Lewis, Kipp Orme, Mr. Whitesel and
7 Mr. Hylland?
8        MR. KALECZYC: Object to the form.
9 BY MS. STEINGART:
10    Q.    Are you familiar with the SEC
11 complaint that was filed against Mr. Lewis?
12    A.    I'm aware that one was filed
13 from the news accounts and reports.
14    Q.    And are you aware that he
15 entered into a consent decree?
16    A.    I'm aware that there was a
17 fairly recent -- a news account indicating
18 that.
19    Q.    And the same is true -- is the
20 same true with respect to your awareness of
21 Mr. Hylland having a complaint filed and
22 entering into a consent decree? Are you
23 aware of those two things?
24    A.    I'm aware from the news
25 accounts. What I am saying is I have not

71 (Pages 278 to 281)

Page 282

1    read those complaints or familiar with or
2    knowledge of what resolution was reached
3    other than as relates to those individuals
4    other than what has been reported in the
5    news accounts of the case.
6        Q.    Are you aware that Mr. Orme
7    took the 5th Amendment in response to
8    questions concerning the falsity of the
9    first, second and third quarter 10-Qs for
10   2002?
11       MS. DELANEY: Objection.
12       THE WITNESS: Well, I don't know
13   in what context that may have happened. But
14   no, I'm not aware of that.
15   BY MS. STEINGART:
16       Q.    It happened in the context of
17   this case, sir. Did no one inform you of
18   that?
19       A.    To the best of my recollection,
20   I was informed that in response to a
21   question or line of questioning, that he had
22   taken the 5th Amendment. But the scope of
23   that, I don't know. And your question talks
24   about in relation to certain -- I wouldn't
25   know that, that context.

Page 283

1        Q.    So based on all of the items
2    we've just discussed, is it still your
3    sworn testimony that you have no reason to
4    believe that the first, second and third
5    quarter 10-Qs when they were filed in 2002
6    were not false and misleading?
7        MR. KALECZYC: Objection.
8        MS. DELANEY: Now, or in 2002?
9        I object.
10       THE WITNESS: My testimony is that
11   upon signing these documents, I did not know
12   that nor did I have any basis to know or
13   believe that to be the case.
14   BY MS. STEINGART:
15       Q.    To the extent that -- I'm
16   asking you now, to the extent that those
17   documents were false at the time you signed
18   this officer's certificate, to the extent
19   those documents were false and misleading,
20   in signing this officer's certificate you
21   relied on false and misleading material,
22   correct?
23       MS. DELANEY: Objection.
24       MR. KALECZYC: Objection.
25       THE WITNESS: In part. I had all

Page 284

1    the many reports, all the information, the
2    public disclosures are just one of many. So I
3    cannot say that I relied specifically on those
4    and but for that would not have signed. I'm
5    just saying that was one of a body of
6    information that I had. And the collective
7    body of information, it did not -- I had no
8    reason at that time to believe there was any
9    problem with it or that the company was not
10   able to manage this transaction.
11   BY MS. STEINGART:
12       Q.    But if it was false, if those
13   materials were false, then you relied on
14   false financials in signing the officer's
15   certificate, right?
16       A.    I am aware that allegations
17   have been made, that aspects of those were
18   false, I have no independent understanding
19   or opinion of whether or not that is the
20   case.
21       Q.    If they were false, then you
22   relied on false documents, correct?
23       MS. DELANEY: Objection.
24       MR. KALECZYC: Objection.
25       THE WITNESS: Accepting that your

Page 285

1    question is a hypothetical, "if they were."
2    Well, as I said before, in part, but I relied
3    on the body of information that I had
4    available to me.
5    BY MS. STEINGART:
6        Q.    And in the body of information
7    that you had available to you, did you have
8    any information that evidenced to you in
9    2002 that those SEC files, 10-Ks and 10-Qs,
10   were false?
11       (Whereupon, the court reporter
12   read back the previous question.)
13       THE WITNESS: And you are asking
14   the question as of November 15, 2002 and the
15   answer is no.
16       MR. KALECZYC: Could we take a
17   break at this point?
18       MS. STEINGART: Yes.
19       (Recess.)
20       (Deposition Exhibit Number 33
21   marked for identification.)
22   BY MS. STEINGART:
23       Q.    Sir, I'm handing you what we've
24   had marked as Hanson 33. And it's a memo
25   dated December 7th from Dick Hylland and

72 (Pages 282 to 285)

Page 286

1  Merle Lewis to the board of directors.  And
2  the question is whether you've seen this
3  before in connection with your efforts on
4  the board directives that were referenced
5  earlier?
6       A.    (Reviews document.) I don't
7  recall seeing this memo before.
8       Q.    As you look at it, do you
9  understand these items being items that
10  were contemplated by the board's
11  November 15th directive?
12      A.    Some of them.
13      Q.    By this point had you become
14  aware of the further downward adjustment
15  and expectations with respect to Expanets?
16      A.    Below the one that we looked
17  at that --
18      Q.    On October 30th.
19      A.    -- resulted in a $1.99 --
20      Q.    Yes, sir.
21      A.    I don't recall that.  But the
22  forecast updates are probably in the
23  documents.
24      Q.    And you remember, in general,
25  that over December the forecasts got worse,

Page 287

1  correct?
2       A.    Worse than?
3       Q.    Over December -- during
4  December of 2002, the forecasts with
5  respect to EPS of NorthWestern because of
6  continued bad performance by Expanets got
7  worse, correct?
8           MS. DELANEY: Objection.
9           MR. KALECZYC: Objection.
10          THE WITNESS: I don't recall the
11  year-end results.  But in December there is
12  nothing left to forecast.  So first of the
13  month you had a forecast for the end of the
14  year.  At the end of the month you had the end
15  of the year results.
16  BY MS. STEINGART:
17      Q.    You don't recall there being an
18  announcement during the middle of December
19  about how earnings for NorthWestern were
20  not going to be as predicted?
21      A.    You are referring to an 8-K
22  announcement?
23      Q.    Yes.
24      A.    I generally recall that there
25  was an 8-K.  I don't remember the contents

Page 288

1  of it unless you have it.
2       Q.    Well, if you look at items 1
3  and 2 in this December 7th memo, is
4  that -- were items 1 or 2 something that
5  you learned in or around December 7th?
6       A.    Well, as I said, I don't recall
7  seeing this memo.  To the extent those are
8  reflected in the 8-K, which we may need to
9  pull out, but I would have, you know, gotten
10  that information on or about that time or
11  the date of the filing.
12      Q.    But in connection with your
13  work on the directives, to the extent that
14  you were preparing those weekly updates to
15  the board about progress on the directives,
16  the information contained in Hanson 33 is
17  not something that you learned in connection
18  with that work?
19      A.    No.  Many of the officers were
20  assigned different pieces.  We all updated
21  on our piece and someone associated with the
22  office of CEO compiled those.  So I was
23  reporting on the MFM matter, the minor real
24  estate sale transactions, a couple of other
25  things that were assigned to me.

Page 289

1       Q.    Did you have an understanding
2  that during December of 2002
3  NorthWestern's liquidity position was
4  worsening?
5       A.    I don't recall a discussion
6  about it.  Worsening from November, there
7  was ongoing discussions about the need to
8  improve earnings of cash flow.
9           (Deposition Exhibit Number 34
10  marked for identification.)
11  BY MS. STEINGART:
12      Q.    I'd like to show you what we've
13  marked as Hanson 34.  This is a memo dated
14  January 21, 2003 from Kipp Orme to the
15  board of directors.
16      A.    (Reviews document.)
17          MR. KALECZYC: Can I just note for
18  the record that there are references to
19  schedules A through E in the body of this memo
20  that are not attached to it.
21          THE WITNESS: Okay.
22  BY MS. STEINGART:
23      Q.    Did you see this memo in or
24  around the end of January 2003?
25      A.    I don't recall having seen this

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017



**FILED**

OCT 24 2002

LORI MAHONEY, CLERK

By _____

Deputy Clerk

Replaces fax filed
_10-23-02_

MONTANA SECOND JUDICIAL DISTRICT COURT
BUTTE-SILVER BOW COUNTY

MARGARET A. McGREEVEY, et al )

Plaintiffs, )

vs. )

MONTANA POWER COMPANY, et al )

Defendants. )

Cause No. DV-01-141

*Cll - 03 - 01 - BU - SEH*

**ORDER JOINING NORTHWESTERN ENERGY, L.L.C.
AS PARTY DEFENDANT AND RESTRICTING FURTHER TRANSFER
OF INTEREST WITHOUT COURT APPROVAL**

Plaintiffs and the plaintiff class having moved to join NorthWestern Energy, L.L.C. as a party defendant to this litigation and to restrict further transfers of the interest of this entity, and the Court having considered the positions of all parties, the Court finds and concludes as follows:

1.    NorthWestern Energy, L.L.C. (formerly known as The Montana Power, L.L.C.), a Montana limited liability company, is the surviving entity and successor in interest to the debts, liabilities and other obligations of the Montana Power Company.

2.    The motion to join NorthWestern Energy, L.L.C as a party to this litigation has been properly served upon NorthWestern Energy, L.L.C.

3.    Joinder of NorthWestern Energy, L.L.C. under Rule 25(c), M.R.Civ.P., is appropriate to assure  a) fair and final resolution of NorthWestern Energy, L.L.C.'s liabilities, duties and obligations as a successor entity, and b) efficient administration of justice and discovery procedures.

4.    NorthWestern Energy, L.L.C. has announced an intention to transfer its interests to its sole member and parent, NorthWestern Corporation (a Delaware corporation).

Order Joining Northwestern Energy, L.L.C. as Party Defendant and Restricting Further Transfer of Interest Without Court Approval    1

/21

WHEREFORE, IT IS HEREBY ORDERED as follows:

1.    NorthWestern Energy, L.L.C., a Montana corporation, is added as additional party defendant in this action as a successor entity answerable to the liabilities, duties and obligations of the former Montana Power Company.

2.    NorthWestern Energy, L.L.C. shall not transfer its utility business and other interests acquired from the Montana Power Company until such time as an appropriate entity has appeared to be substituted for NorthWestern Energy, L.L.C. with the approval of this Court.

Dated this 23rd day of October , 2002.

_____
DISTRICT COURT JUDGE

cc: Counsel of Record



1

2

3    **FILED**

4    NOV 1 9 2002

5    LORI MALONEY, CLERK

6    By
     Deputy Clerk

7    Replaces fax filed
     11-15-02

8

9    MONTANA SECOND JUDICIAL DISTRICT COURT,
     BUTTE-SILVER BOW COUNTY

10

11   MARGARET A. MCGREEVEY;          )
     THOMAS G. TAYLOR; JOANNE        )
     BARKELL; PATRICK BURTON;        )
12   ROSALIE BURTON; JAMES           )   CV-03-01-BU-SEH
     DUDLEY; JOSEPH MARTELLI;        )
13   and LAWRENCE A. LOMBARDO,       )   Cause No. DV-01-141
                                     )
14             Plaintiff,            )
                                     )
15        v.                         )
                                     )
16   MONTANA POWER COMPANY, a        )
     Montana Corporation;            )
17   MONTANA POWER, L.L.C.;          )
     TOUCH AMERICA HOLDINGS,         )
18   INC.; R.P. GANNON;              )
     J.P. PEDERSON; M.J.             )
19   MELDAHL; KAY FOSTER; CARL       )   ORDER ADDING NORTHWESTERN
     LEHRKIND, III; DEBORAH D.       )   CORPORATION AS AN
20   McWHINNEY; TUCKER HART          )   ADDITIONAL PARTY DEFENDANT
     ADAMS; ALAN F. CAIN; JOHN       )
21   G. CONNORS; R.D. CORETTE;       )
     JOHN R. JESTER; MICHAEL E.      )
22   ZIMMERMAN; JOHN D. HAFFEY;      )
     NOBLE E. VOSBURG; PPL           )
23   MONTANA, LLC; GOLDMAN,          )
     SACHS & CO., a Limited          )
24   Partnership;                    )
     THE GOLDMAN SACHS GROUP,        )
25   INC.; PANCANADIAN PETROLEUM     )
     LIMITED, a Canadian             )
26   Corporation;                    )
                                     )
27

                                 1

109494

1  WESTMORELAND COAL COMPANY,            )
   a Delaware corporation, and           )
2  its wholly- owned                     )
   subsidiary CES ACQUISITION            )
3  CORP.; MILBANK, TWEED,                )
   HADLEY & McCLOY, LLP; and             )
4  JOHN DOES 3-5

5  Defendant.

6  _____

7      Upon  consideration  of  the  Motion  of  NorthWestern  Energy,

8  L.L.C. and NorthWestern Corporation to add NorthWestern Corporation

9  as  an  additional  party-defendant  consistent  with  and  in  full

10  compliance with this Court's October 23, 2002 Order, reaffirmed by

11  this Court following the November 4, 2002 hearing, and Plaintiffs'

12  not objecting thereto,

13  IT IS HEREBY ORDERED:

14      1.    That  NorthWestern  Corporation  shall  be  and  hereby  is

15            added   as   an   additional   party-defendant   to   these

16            proceedings  and  subject  to  the  personal  jurisdiction  of

17            this Court, without prejudice to any or all defenses or

18            claims  which  NorthWesern  Energy,  LLC  and  NorthWestern

19            Corporation, or either of them, may have with respect to

20            the  matters  which  are  or  may  be  pending  in  these

21            proceedings; and,

22      2.    That  as  stipulated  and  agreed  to  by  NorthWestern

23            Corporation,   NorthWestern   Corporation   shall   be

24            responsible for any judgement which might be entered in

25            these proceedings against NorthWestern Energy, LLC to the

26            extent  that  NorthWestern  Energy,  LLC  might  not  have

27            sufficient   assets   to   satisfy   such   judgment   and

                                        2                              109494

1       NorthWestern Corporation is subject to procedures for all

2       forms of pre- and post-judgment relief and execution

3       procedures under applicable Montana law without waiving

4       any or all defenses or claims which either or both may

5       have with respect to the matters which are or may be

6       pending in these proceedings, and,

7     3.   That NorthWestern Corporation may proceed immediately

8       with its proposed restructuring.

9    DATED this _15th_ day of November, 2002.

10

11

12                 District Court Judge

13  cc:  Counsel of Record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

3

109494



MAGTEN ASSET MANAGEMENT CORP. VS. NORTHWESTERN CORP.

MARY LEWICKI - 5/2/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Co. LLC
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(1/1)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

## Page 1

(1) UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF DELAWARE
(2) ------------------------------------X
    MAGTEN ASSET MANAGEMENT CORPORATION and
(3) LAW DEBENTURE TRUST COMPANY OF NEW YORK,
(4)                         Plaintiffs,
(5)        - against -
(6) NORTHWESTERN CORPORATION,
(7)                         Defendant.
(8) CIVIL ACTION NO.: 04-1494(JJF)
    ------------------------------------X
(9) MAGTEN ASSET MANAGEMENT CORP.,
(10)                        Plaintiffs,
(11)       - against -
(12) MICHAEL J. HANSON and ERNIE J. KINDT,
(13)                        Defendants.
(14) CIVIL ACTION NO.: 04-1494(JJF)
    ------------------------------------X
(15)
                    One New York Plaza
(16)                New York, New York
(17)                May 2, 2007
                    1:15 p.m.
(18)
(19)        Deposition of MARY LEWICKI, pursuant
(20) to Notice, before Melissa Gilmore, a Notary
(21) Public of the State of New York.
(22)
(23)     ELLEN GRAUER COURT REPORTING CO. LLC
(24)     126 East 56th Street, Fifth Floor
            New York, New York 10022
(25)            212-750-6434
                REF: 84143

## Page 2

(1) A P P E A R A N C E S :
(2)
(3) FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
(4) Attorneys for Plaintiff Magten Asset Management
(5)     One New York Plaza
(6)     New York, New York 10004-1980
(7) BY: GARY L. KAPLAN, ESQ.
(8)     JORDANNA L. NADRITCH, ESQ.
(9)     PHONE 212-859-8812
(10)    FAX 212-859-4000
(11)    E-MAIL gary.kaplan@friedfrank.com
(12)
(13)
(14) EMMET, MARVIN & MARTIN, LLP
(15) Attorneys for Bank of New York
(16)    120 Broadway
(17)    New York, New York 10271
(18) BY: KENNETH M. BIALO, ESQ.
(19)    MATTHEW K. McCOY, ESQ.
(20)    PHONE 212-238-3058
(21)    FAX 212-238-3100
(22)    E-MAIL kbialo@emmetmarvin.com
(23)
(24)
(25)

## Page 3

(1) A P P E A R A N C E S :  (Cont'd)
(2)
(3) CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
(4) Attorneys for Defendant Northwestern Corporation
(5)     101 Park Avenue
(6)     New York, New York 10178-0061
(7) BY: NANCY E. DELANEY, ESQ.
(8)     PHONE 212-696-6939
(9)     FAX 212-697-1559
(10)    E-MAIL ndelaney@cm-p.com
(11)
(12)
(13) EDWARDS ANGELL PALMER & DODGE LLP
(14) Attorneys for Defendants Michael J. Hanson and
(15) Ernie J. Kindt
(16)    919 North Market Street, Suite 1500
(17)    Wilmington, Delaware 19801
(18) BY: DENISE SEASTONE KRAFT, ESQ.
(19)    PHONE 302-777-7770
(20)    FAX 302-777-7263
(21)    E-MAIL dkraft@eapdlaw.com
(22)
(23)
(24)
(25)

## Page 4

(1) A P P E A R A N C E S :  (Cont'd)
(2)
(3) NIXON PEABODY LLP
(4) Attorneys for Defendant Law Debenture Trust
(5) Company of New York
(6)     437 Madison Avenue
(7)     New York, New York 10022-7001
(8) BY: CHRISTOPHER M. DESIDERIO, ESQ.
(9)     PHONE 212-940-3077
(10)    FAX 866-741-3993
(11)    E-MAIL cdesiderio@nixonpeabody.com
(12)
(13)
(14) ALSO PRESENT:
(15)    ALEXANDER SHAPIRO, Bank of New York
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

MAGTEN ASSET MANAGEMENT CORP. VS.  
BSA XMAX(14/14)  
MARY LEWICKI - 5/2/07  
NORTHWESTERN CORP.

## Page 53

(1)

(2)     A.   Can I compare this to my

(3) documentation that I've recently reviewed to --

(4) to confirm that?

(5)     Q.   As long as it's documentation that

(6) is produced to us, that's fine.

(7)     MR. BIALO:   Yep.

(8)     A.   (Perusing.)

(9)     MR. BIALO:   Well, the typed text

(10) looks the same as BNY-M-00137 that was

(11) produced by the Bank of New York, except

(12) there is no handwriting on the production

(13) copy, and there is a stamp "Confidential"

(14) on the bottom of page 137 and 138.

(15)     So it doesn't look like this is the

(16) document that was actually produced by the

(17) Bank of New York.

(18)     MR. KAPLAN:   I believe this was

(19) produced by Bank of New York previously.

(20) We have had several productions from the

(21) Bank of New York over the course of the

(22) bankruptcy case. It does have a Bank of

(23) New York Bates Stamp on it.

(24)     MR. BIALO:   Well, I know, but the

(25) Bank of New York Bates Stamp BNY-M00137

## Page 54

(1)

(2) and 138, which is -- appears at the bottom

(3) right of both of these pages of

(4) Plaintiff's Exhibit 7, doesn't have -- the

(5) one that we produced doesn't have any

(6) handwriting on it, and it does have a

(7) "Confidential" stamp on both of the pages

(8) that we produced, which appears on neither

(9) of the pages that you have shown the

(10) witness. And it's funny because both sets

(11) have the same Bates Number.

(12)     So I don't know if the witness can

(13) answer the question that you just asked

(14) because it doesn't appear that was

(15) the document that we produced.

(16) BY MR. KAPLAN:

(17)     Q.   Well, do you recognize the

(18) handwriting on the one that I handed you?

(19)     A.   No.

(20)     Q.   It's not your handwriting?

(21)     A.   No, that's not my handwriting.

(22)     MR. KAPLAN:   How about we -- we're

(23) going to -- how about we take a break and

(24) we will try and see if we can figure this

(25) document out?

## Page 55

(1)

(2)     (Recess taken.)

(3)     MR. KAPLAN:   I just want to go back

(4) to the Third Supplemental Indenture. I

(5) will do this on the record. We had a

(6) discussion before about the document, and

(7) whether it was the one that was produced.

(8)     The -- I have a clean copy without

(9) the handwritten on it, but it is still not

(10) marked "Confidential" as the one that you

(11) were holding was, and we have gone back to

(12) the box of which the production was kept,

(13) and the one that we have is not marked as

(14) "Confidential," so...

(15)     MR. BIALO:   Well, can we deem it

(16) marked? I don't know why that is.

(17)     MR. KAPLAN:   Yeah, we can deem it.

(18) I just wanted to make sure there is no

(19) debate about the document. I'm happy to

(20) substitute -- if you're comfortable, to

(21) substitute Plaintiff's Exhibit 7 for the

(22) one without any handwriting.

(23)     MR. BIALO:   How about if we mark

(24) that 7A?

(25)     (Plaintiff's Exhibit 7A, Third

## Page 56

(1)

(2) Supplemental Indenture without

(3) handwriting, marked for identification.)

(4)     MR. KAPLAN:   For the record, what we

(5) have marked as 7A is also Bates -- has the

(6) same Bates Stamp Number as 7, which is

(7) BNY-M00137 and 138, just without any --

(8) any handwriting on it.

(9) BY MR. KAPLAN:

(10)     Q.   Is this the Third Supplemental

(11) Indenture -- is this the Officer's Certificate

(12) that was issued in connection with the

(13) execution of the Third Supplemental Indenture?

(14)     A.   Yeah, it matches the one I reviewed

(15) previously.

(16)     Q.   Okay. If you look at the end of the

(17) first paragraph on the first page?

(18)     MR. BIALO:   The long paragraph?

(19)     MR. KAPLAN:   The long paragraph.

(20)     Q.   Could you read that?

(21)     A.   (Witness complying.)

(22)     Q.   Do you see there, "The

(23) acknowledgment that the person signing has made

(24) the examination and investigation as is

(25) necessary to enable him to express an informed

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(15/15)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

## Page 57

(1)

(2) opinion as to whether the covenants and
(3) conditions of the Indenture have been complied
(4) with"?
(5)    A.    Right. It starts up on the -- from
(6) the fourth line up?
(7)    Q.    Yes.
(8)    A.    Yes, that he has made a -- yes.
(9)    Q.    Is that language standard in
(10) Officer's Certificates?
(11)    A.    You would have to go back to the
(12) governing document that con -- that usually
(13) tells you what an Officer's Certificate has to
(14) state, and it can be different from indenture
(15) to indenture, but you would track this back
(16) to...
(17)    Q.    And did you -- in executing the
(18) Third Supplemental Indenture, did you rely upon
(19) this Officer's Certificate?
(20)    A.    Yes, we did.
(21)    Q.    Did you rely upon the truth of the
(22) statements in this Officer's Certificate?
(23)    A.    Yes, we did.
(24)    Q.    If you knew at the time that this
(25) Officer's Certificate was false, would you

## Page 58

(1)

(2) nevertheless execute the Third Supplemental
(3) Indenture?
(4)    A.    Again, as a trustee, I am not going
(5) to know if there is a false statement unless I
(6) have received something in writing from someone
(7) notifying me that there is a false statement.
(8) I am relying on this pursuant to the agreement
(9) because it meets the terms of the agreement as
(10) being a truthful Officer's Certificate.
(11)    Q.    And I understand that, but what I'm
(12) asking is in a circumstance where you
(13) actually -- I understand that ordinarily you
(14) wouldn't know, and I'm not suggesting that you
(15) should or shouldn't know. All I'm saying is,
(16) if you actually did know that it was false?
(17)    A.    If I had actual knowledge, somebody
(18) in writing, I -- this would have been escalated
(19) again to management and to counsel to determine
(20) what the next steps would be.
(21)    Q.    At the -- do you recall whether at
(22) the time that you received this Officer's
(23) Certificate, you had any reason to believe that
(24) the statements contained in the certificate
(25) were false?

## Page 59

(1)

(2)    A.    I don't have memory of the time that
(3) this Officer's Certificate came in. I don't
(4) remember the situation around the entire
(5) transaction.
(6)    Q.    Does Bank of New York ever conduct
(7) its own examination or investigation of the
(8) facts that are expressed in the Officer's
(9) Certificate?
(10)    A.    Again, we rely on the terms of the
(11) Officer's Certificate pursuant to the
(12) indenture, which allows us to rely on an
(13) Officer's Certificate and/or an opinion of
(14) counsel.
(15)    Q.    Do you recall why the Third
(16) Supplemental Indenture was executed?
(17)    A.    I mean I recall, if I can go back to
(18) the form of the Third Supplemental Indenture,
(19) it was for the NorthWestern Corporation to
(20) assume the duties and rights under the
(21) indenture from NorthWestern Energy LLC, which
(22) is one of their subsidiaries.
(23)    Q.    Do you recall whether -- under the
(24) indenture if NorthWestern assumed the
(25) obligations, whether Clark Fork would therefore

## Page 60

(1)

(2) be released from its obligations?
(3)    MR. BIALO:    Objection to the form.
(4)    A.    I would have to go back and look at
(5) the actual governing document, the base
(6) indenture, to see what the terms and what the
(7) parties were to that indenture.
(8)    But to my knowledge, Clark Fork was
(9) not -- was not a party to the QUIPS Indenture.
(10)    Q.    And when I say Clark Fork, it was
(11) formerly known as NorthWestern Energy LLC. It
(12) changed its name to Clark Fork at some point.
(13)    A.    Okay.
(14)    Q.    I apologize if I confused you with
(15) Clark Fork.
(16)    MR. BIALO:    Maybe you want to state
(17) the question in a clearer way so that the
(18) witness can give you a clearer answer.
(19)    MR. KAPLAN:    Could you remind me of
(20) my question?
(21)    (Record read.)
(22)    Q.    Do you recall whether the Indenture
(23) provides that upon NorthWestern assuming the
(24) obligations for the QUIPS, that NorthWestern
(25) Energy LLC would be released from its

Page 61

(1)
(2)    obligations under the QUIPS?
(3)        A.   Is it okay if I look at this again?
(4)        Q.   Sure.
(5)        A.   (Perusing.)
(6)        There is not an affirmative
(7)    statement in the Supplemental Indenture that
(8)    states that. What the Supplemental Indenture
(9)    does state is that NorthWestern, and that's
(10)   defined as the corporation here, "hereby
(11)   expressly assumes the due and punctual payment
(12)   of principal or premium, if any, and interest
(13)   on any -- if any, on all outstanding securities
(14)   issued under the Indenture, and the performance
(15)   of every covenant of the Indenture on the part
(16)   of NorthWestern Energy to be performed or
(17)   observed." But there is again, no affirmative
(18)   statement.
(19)       MR. KAPLAN: I'm going to mark this
(20)   as Plaintiff's Exhibit 8.
(21)       (Plaintiff's Exhibit 8, Indenture
(22)   dated November 1, 1996, Bates Numbers
(23)   NOR009214 to NOR009296, marked for
(24)   identification.)
(25)       MR. KAPLAN: And for the record, it

Page 62

(1)
(2)    is an Indenture dated as of November 1,
(3)    1996, and it's Bates Stamped NOR009214
(4)    through NOR009296.
(5)        Q.   I would like you in particular to
(6)    turn to Article 11, which is on page 59.
(7)        MR. BIALO: May I note for the
(8)    record that there is some squiggles and
(9)    underlining on page 59 and 60, I guess.
(10)       MR. KAPLAN: And I'll acknowledge
(11)   that there may be more.
(12)       MR. BIALO: There may be -- there
(13)   may be more elsewhere in the document --
(14)   that were not on the original.
(15)       MR. KAPLAN: There is elsewhere in
(16)   the document.
(17)       MR. BIALO: -- that were not on the
(18)   original.
(19)       THE WITNESS: (Perusing.)
(20)       MR. BIALO: Is there a question
(21)   pending?
(22)       MR. KAPLAN: No. I was waiting for
(23)   her to read.
(24)       Q.   Let me know when you are done
(25)   reading.

Page 63

(1)
(2)        A.   (Perusing.) Okay.
(3)        Q.   I want you to focus in particular on
(4)    Section 1101B in the middle of the page where
(5)    it says, "Immediately after giving effect to
(6)    such transaction, no event of default with
(7)    respect to securities of any series and no
(8)    event which, after notice, or lapse of time, or
(9)    both, with become an event of default with
(10)   respect to securities of any series shall have
(11)   occurred and be continuing."
(12)       Do you see that language?
(13)       A.   Um-hum, yes.
(14)       Q.   So the Indenture provides that the
(15)   company cannot merge -- merge into another
(16)   corporation, or convey, or transfer its
(17)   properties and assets substantially as an
(18)   entirely to any person unless one of the
(19)   conditions is that after giving effect to the
(20)   transaction, there would be no event of
(21)   default, or an event that would give rise to an
(22)   event of default; is that correct?
(23)       MS. KRAFT: Objection to the form of
(24)   the question.
(25)       MS. DELANEY: Objection.

Page 64

(1)
(2)        A.   I mean I can read you what this --
(3)    again, you have read it, and I can confirm what
(4)    you have read back to me. Paragraph B of 1101
(5)    again, it states that one of the conditions
(6)    immediately after giving effect to such
(7)    transaction, no event of default or with
(8)    respect to securities of any series and no
(9)    event which, after notice, or lapse of time, or
(10)   both, would become an event of default with
(11)   respect to the securities of any series and
(12)   shall have occurred and be continuing."
(13)       And there is a third requirement
(14)   that they "provide an Officer's Certificate and
(15)   an opinion of counsel stating that the
(16)   conditions, merger, conveyance, and other
(17)   transfer or lease of such Supplemental
(18)   Indenture comply with this Article, and that
(19)   all conditions precedent herein provide for
(20)   relating to such transaction having been
(21)   complied with." So...
(22)       Q.   So the company has to deliver an
(23)   Officer's Certificate saying that there will --
(24)   that there will be no event of default arising
(25)   from this transaction?

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(17/17)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

Page 65

(1)
(2)     MS. DELANEY: Objection.
(3)     A.  I'm not an attorney. I can't speak
(4)  for the legal requirements. This is saying I
(5)  need to be provided with an Officer's
(6)  Certificate. Again, you would have to go back
(7)  and look at the Officer's Certificate for the
(8)  references to this specific section.
(9)     Q.  Well, why don't we look at the
(10)  Officer's Certificate, which was marked as 7A?
(11)  If you look at paragraph one?
(12)     A.  Yes.
(13)     Q.  You see there, it says that "the
(14)  transaction complies with Article 11 of the
(15)  Indenture"?
(16)     A.  Yes.
(17)     Q.  So the Officer's Certificate was
(18)  certifying that it complied with this section
(19)  of the Indenture?
(20)     MR. BIALO: Well, let's finish the
(21)  sentence, if we may. "The transaction
(22)  complies with Article 11 of the Indenture
(23)  and all conditions precedent in the
(24)  Indenture (including any covenants,
(25)  compliance with which constitutes a

Page 66

(1)
(2)  condition precedent) as they relate to the
(3)  transaction have been complied with."
(4)     Q.  So in the Officer's Certificate, the
(5)  company -- the officer represented that -- that
(6)  the transaction being contemplated by the
(7)  Supplemental Indenture complied with Article 11
(8)  of the Indenture?
(9)     MR. BIALO: And everything else.
(10)     A.  And everything else.
(11)     Q.  And everything else?
(12)     A.  Yes.
(13)     Q.  If you had actual knowledge that the
(14)  transaction would give rise to an event of
(15)  default, would you have signed the Third
(16)  Supplemental Indenture?
(17)     MS. DELANEY: Objection to form.
(18)     A.  Again, this is a "what if" question,
(19)  and as I have stated before, to have actual
(20)  knowledge, I would re-- I would need
(21)  something in writing informing me that there
(22)  was a transaction, an indication of an event,
(23)  or a potential -- event of default.
(24)     I did not have that, and I'm
(25)  speaking in a "what if" situation. If that

Page 67

(1)
(2)  event occurred, it would be discussed with my
(3)  manager, and again, with the attorney working
(4)  on the transaction with me, and the action we
(5)  would take would be based on those discussions
(6)  and what happened.
(7)     Q.  I understand that, and these are
(8)  hypothetical questions. If hypothetically, you
(9)  received a call from somebody at-the company --
(10)  if an officer at the company, who told you, you
(11)  are about to receive an Officer's Certificate
(12)  that's going to certify that there are no
(13)  covenant defaults in essence, and that it
(14)  complies with the Indenture. But the company
(15)  is about to default on the Indenture, would you
(16)  have gone ahead and signed the Supplemental
(17)  Indenture?
(18)     A.  Again, it would have been escalated
(19)  to my manager and to our counsel to review. I
(20)  cannot take something verbally over the phone
(21)  as fact.
(22)     MS. DELANEY: We object to the whole
(23)  line of questioning that leaves out the
(24)  word "immediately" in Article 11 of
(25)  Exhibit 8, Section 1101(b) in parens.

Page 68

(1)
(2)     MS. KRAFT: I join in the objection.
(3)     Q.  If NorthWestern had submitted an
(4)  Officer's Certificate that did not comply with
(5)  the requirements of section 1101(c), would you
(6)  have executed the Third Supplemental Indenture?
(7)     A.  Again, we reviewed the supplemental
(8)  with counsel. Based on counsel's review and
(9)  legal review, we do not sign -- we would not
(10)  sign off until all conditions under the
(11)  agreement are met.
(12)     Q.  Asked another way, if you or your
(13)  counsel concluded that it did not comply with
(14)  the terms of the Indenture, would you still
(15)  sign the Supplemental Indenture?
(16)     A.  It would be, again, brought up with
(17)  management. Based on the discussion with them
(18)  and counsel, we make the determination whether
(19)  or not we would sign the Supplemental
(20)  Indenture.
(21)     Q.  Do you recall any discussions at all
(22)  in connection with the Third Supplemental
(23)  Indenture regarding the Officer's Certificate?
(24)     A.  No.
(25)     Q.  When executing the Third

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(18/18)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

## Page 69

(1)
(2) Supplemental Indenture, you didn't seek the
(3) consent of the holders of the QUIPS did you?
(4)        MS. KRAFT: Objection.
(5)     A.  I need to go -- can I look at the
(6) agreement?
(7)     Q.  Absolutely.
(8)     A.  I'm going to read you from Section
(9) 1201, remember the Third Supplemental Indenture
(10) is the assumption of the corporation of all of
(11) the responsibilities under the QUIPS Indenture
(12) from the LLC. Section 1201 says, "Supplemental
(13) indentures without consent of holder. Without
(14) the consent of any holders, the company and the
(15) trustee, at any time and from time to time, may
(16) enter into one or more indentures supplemental
(17) thereto in a form satisfactory to the trustee
(18) for any of the following purposes..." and I'm
(19) going to read the first purpose in paragraph A,
(20) "To evidence the succession of another person
(21) to the company and the assumption by such
(22) successor of the covenants of the company
(23) herein and in the securities as provided in
(24) Article 11."
(25)     Q.  Did you seek the consent of the

## Page 70

(1)
(2) holders to execute the Third Supplemental
(3) Indenture?
(4)     A.  Pursuant to this base Indenture,
(5) consent was not required from the holders.
(6)     Q.  I'm not asking whether it was
(7) required. I'm asking whether you sought the
(8) consent?
(9)     A.  It was not a requirement, no.
(10)     Q.  So no, you didn't seek the consent?
(11) No, you did not seek the consent?
(12)     A.  No, I did not.
(13)     Q.  Okay.
(14)     A.  Again, it was -- to preface, it was
(15) not a requirement under the governing document.
(16)     Q.  If the modification to the Indenture
(17) had changed or modified the rights of the
(18) holders of the securities, would you have
(19) sought consent from the holders of the QUIPS?
(20)     A.  You would have to define what the
(21) changes to the holders are. We would have to
(22) go back to the base Indenture to determine
(23) whether or not a consent of holders is
(24) required.
(25)     Q.  If you look at 1202 of the

## Page 71

(1)
(2) Indenture, it's on page 62, look at the first
(3) paragraph.
(4)     A.  (Perusing.) Um-hum.
(5)     Q.  Do you see there that the Indenture
(6) provides that, "Without the consent of not less
(7) than a majority in the aggregate principal --
(8) of holders of not less than a majority and
(9) aggregate principal amount of the securities"
(10) that you "can't enter into an Indenture or
(11) indenture supplement to change in any manner or
(12) eliminate any provisions of this Indenture, or
(13) modify in any manner the rights of the holders
(14) of the securities of such series under the
(15) Indenture"?
(16)        MR. BIALO: I need to object to the
(17) form. This is a one and a half page
(18) provision that says -- that provides for
(19) circumstances where consent of holders can
(20) be, or should be obtained, and I'm not
(21) sure in your question that you've captured
(22) all of the provisos and conditions of this
(23) page and a half provision. So I don't
(24) think it's entirely fair to the witness.
(25)        MR. KAPLAN: If the witness needs to

## Page 72

(1)
(2) read it further?
(3)        MR. BIALO: Well, yeah, but the
(4) witness is not a lawyer.
(5)     A.  Again -- and I reconfirm what my
(6) counsel has just said, I am not a lawyer. This
(7) goes into pretty -- pretty -- I'm sorry. It's
(8) pretty long to -- and for me to make a judgment
(9) call as to a legal requirement is not in my
(10) area of expertise.
(11)     Q.  When you get a request for -- to
(12) execute a Supplemental Indenture, would you
(13) review it first to make a determination as to
(14) whether you need holder consent, or would you
(15) send it out to outside counsel and just ask
(16) them?
(17)     A.  We would both review the document.
(18)     Q.  And you would first come to your own
(19) conclusion as to your view as to whether or
(20) not, or you needed holder consent?
(21)        MS. KRAFT: Objection.
(22)     A.  Again, the reviews are done
(23) simultaneously. I'm not making a determination
(24) of what needs to occur until all parties that
(25) need to review the document have reviewed the

Page 73

(1)
(2) document.
(3)   Q.   I understand, but you had sufficient
(4) knowledge to review the document and to at
(5) least form your own conclusion as to whether or
(6) not holder consent was required?
(7)   MS. KRAFT:  Objection.
(8)   MR. BIALO:  I will have to object to
(9)   the form of that, also.
(10)   A.   Again, it's something that's
(11) discussed with counsel and confirmed with
(12) counsel before.
(13)   Q.   I understand it's confirmed with
(14) counsel, but you also come to your own
(15) independent view as to whether or not it needs
(16) holder consent?
(17)   A.   As I will state, it's confirmed with
(18) counsel. I am not an attorney that can say
(19) definitively whether a client consent is
(20) necessary or not. So it is reviewed with
(21) counsel to ensure that we capture all required
(22) actions.
(23)   Q.   Do you recall any discussions with
(24) the issuer or NorthWestern with respect to
(25) whether consent of the holders would be

Page 74

(1)
(2) required to execute the Third Supplemental
(3) Indenture?
(4)   A.   Again, I -- I don't have any memory
(5) of this entire transaction other than what
(6) I've -- the documents I reviewed in the last
(7) couple of days.
(8)   Q.   Would that be something that you
(9) would ordinarily do -- let me rephrase that.
(10)   Ordinarily, if you are asked to
(11) execute a Supplemental Indenture, would you
(12) have discussions with the issuer with respect
(13) to whether consent of the holders is required?
(14)   A.   If, after we reviewed with counsel
(15) and a determination has been made that we -- we
(16) did have to, then we would go back and -- and
(17) notify. We would discuss it with the issuer
(18) that a transaction would require bond holders
(19) consent.
(20)   Q.   Would you seek an opinion from the
(21) issuer's counsel with respect to whether
(22) consent of the holders is required?
(23)   A.   Again, that's a legal requirement.
(24) I can't say specifically if that's a document I
(25) would need.

Page 75

(1)
(2)   Q.   When you were executing the Third
(3) Supplemental Indenture, and therefore, having
(4) NorthWestern be the sole obligor on the QUIPS,
(5) if you knew at the time you were executing the
(6) Third Supplemental Indenture, that
(7) NorthWestern's financial statements were
(8) fraudulent and grossly overstated its revenues,
(9) would you have signed this Supplemental
(10) Indenture?
(11)   MR. BIALO:  Okay. All right, hold
(12)   it. Yeah.
(13)   MS. DELANEY:  Objection.
(14)   MR. BIALO:  Let them make their
(15)   objection. I object to the form of the
(16)   question. I think the witness has already
(17)   said that she addressed in an earlier
(18)   question that you asked, whether there was
(19)   a release of any other obligors in the
(20)   Third Supplemental Indenture. And I'm
(21)   pretty clear that she said she didn't find
(22)   any language doing that, that what she
(23)   found was an assumption by the parent
(24)   corporation, but not a release of the
(25)   subsidiary corporation, and that was

Page 76

(1)
(2)   included as a premise in your question,
(3)   which I don't think is fair to the
(4)   witness.
(5)   Q.   Just for the record -- and other
(6) parties can correct me if I'm wrong -- in
(7) connection with this litigation, there is a
(8) motion to dismiss in which the bankruptcy judge
(9) found that there was a release of the
(10) subsidiary. Now, there may be ways to
(11) challenge that release, but the bankruptcy
(12) court did find there was a release, and that's
(13) the predicate.
(14)   MS. KRAFT:  I'm going to object to
(15)   the characterization of what the court did
(16)   or did not do.
(17) BY MR. KAPLAN:
(18)   Q.   Assuming the Third Supplemental
(19) Indenture effectuated a release of the initial
(20) obligor such that the only obligor was going to
(21) be NorthWestern Corporation, if we use that as
(22) the base assumption, if you knew at the time
(23) that NorthWestern's publicly-issued financial
(24) statements were false and misleading, that
(25) NorthWestern had grossly overstated its

MAGTEN ASSET MANAGEMENT CORP. VS.    BSA XMAX(20/20)    NORTHWESTERN CORP.
MARY LEWICKI - 5/2/07

---

Page 77

(2) revenues, would you nevertheless have executed
(3) the Third Supplemental Indenture.
(4)      MS. KRAFT: Objection.
(5)      MS. DELANEY: Objection.
(6)      A.   Again, we talked about this on the
(7) financials, that the role of the trustee -- we
(8) do not review financials. We just -- we just
(9) confirm receipt of them.
(10)      I would not have any knowledge of --
(11) of misstated financials, of a potential event
(12) of default unless I had actually gotten
(13) something from either the company or a
(14) bondholder stating that fact to me.
(15)      Again, if I had something like that
(16) in writing, addressed to me, it would have gone
(17) up the chain-- up through the bank's process,
(18) talking about it with my manager, with counsel,
(19) and whatever action was determined, based on
(20) those meetings and conversations, is the action
(21) we would have chosen.
(22)      Q.   Again, I am speaking hypothetically
(23) here. Hypothetically, if you are asked to
(24) execute a Supplemental Indenture such as --
(25) similar to the Third Supplemental Indenture,

---

Page 78

(2) and the party that's assuming the obligations
(3) has just announced publicly that parties cannot
(4) rely on its prior financial statements because
(5) they overstated its revenues significantly,
(6) would you take -- in that circumstance, would
(7) you take the request for execution of the
(8) Supplemental Indenture up to management and ask
(9) them?
(10)      A.   And again --
(11)      MS. KRAFT: Objection.
(12)      A.   -- again hypothetically, I do not
(13) have any knowledge, again until I get something
(14) in writing from a bondholder or from the issuer
(15) itself, and again, that's addressed to
(16) management -- that is addressed with
(17) management. That's addressed with counsel, and
(18) I can't say one way or the other how we would
(19) proceed, based on the outcome of those
(20) conversations.
(21)      Q.   Would one of the potential outcomes
(22) be to seek to consent of the holders?
(23)      A.   I -- I can't say that definitively.
(24) Again, it's based on the discussions with
(25) management and counsel and how -- how they --

---

Page 79

(2) how we would want to proceed. I can't -- I'm
(3) making a guess if I say "Yes" or "No" to that,
(4) and that -- I can't do that.
(5)      MR. KAPLAN: Can we take five
(6) minutes now?
(7)      (Discussion off the record.)
(8)      MR. KAPLAN: I'm going to mark as
(9) Plaintiff's Exhibit 9, a lengthy document
(10) that is Bates Stamped NOR009840 through
(11) NOR009935. And it's a letter on Paul
(12) Hasting's stationery dated September 26,
(13) 2002.
(14)      (Plaintiff's Exhibit 9, Letter from
(15) Paul Hastings, dated September 26, 2002,
(16) Bates Numbers NOR009840 to NOR009935,
(17) marked for identification.)
(18)      A.   (Perusing.) You want me to read
(19) the --
(20)      Q.   I just want you to look at the
(21) letter. I'm not going to go through all the
(22) exhibits.
(23)      MR. BIALO: Well, before we do that,
(24) let me make sure I don't have an objection
(25) for the record. Yeah, I do.

---

Page 80

(2)      May I state for the record, please,
(3) that it's not clear that everything that
(4) is under this gigantic staple, and is, as
(5) you say, numbered NOR9840 to NOR9935 is,
(6) in fact, one document.
(7)      It does seem to me that there are a
(8) -- many documents -- many, many documents
(9) that have been collected under this
(10) staple, and are found within this document
(11) range.
(12)      For the record, it appears like the
(13) first couple of pages are a cover letter,
(14) and attached to the cover letter may have
(15) been -- I have no idea -- some things, but
(16) it's clear that other things that are
(17) within this exhibit as currently marked,
(18) and I believe starting at NOR9865 to end
(19) are, in fact, bunches of different
(20) documents, some of which are signed, some
(21) of which are not signed.
(22)      So I think the record needs to be
(23) clear on what it is that you would like
(24) the witness to address because it doesn't
(25) seem to me like Exhibit 9 is, indeed, only

---

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(21/21)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

Page 81

(1)
(2) one document.
(3)     MR. KAPLAN:  Well, a couple of
(4) things. First, it was produced to us as
(5) one document. So I can't -- I can't
(6) verify whether it was or it wasn't.
(7)     MR. BIALO:  "NOR" is NorthWestern?
(8)     MR. KAPLAN:  "NOR" is NorthWestern.
(9)     MR. BIALO:  Clearly not produced by
(10) us.
(11)     MR. KAPLAN:  That is correct.
(12)     MR. BIALO:  Okay.
(13)     MR. KAPLAN:  As well -- and the
(14) first -- the letter, itself, does say that
(15) it is enclosing drafts of a number of
(16) documents, but I can't -- I can't tell the
(17) witness -- I can't represent to the
(18) witness that these are precisely the
(19) drafts that were requested.
(20)     Having said that, all I'm going to
(21) focus on is the letter, itself, and not
(22) the attachments.
(23)     MR. BIALO:  Okay. So as long as we
(24) are willing to agree that this document
(25) comprises many documents, some of which

Page 82

(1)
(2) may or may not have been related to the
(3) cover letter, and others which are
(4) executed things and clearly not relating
(5) to the cover letter, which we are just
(6) talking about drafts.
(7)     MR. KAPLAN:  Well, the only thing
(8) else, I'm not going to agree that they
(9) clearly are unrelated. They may or may
(10) not be. I just -- again, I don't know
(11) whether they are one or not.
(12)     MR. BIALO:  We will agree to
(13) disagree. Go ahead and ask the witness
(14) questions about the cover letter that she
(15) hasn't finished reading it yet. We have
(16) been distracting her, I'm sure.
(17) A.  (Perusing.) Okay.
(18) Q.  Do you recall receiving this
(19) document?
(20) A.  No, I do not.
(21) Q.  Just a couple of questions about the
(22) document.
(23)     First, on the bottom of page 2, you
(24) see there is a section on "Assets and
(25) Liabilities Not Transferred"?

Page 83

(1)
(2) A.  Um-hum.
(3) Q.  And you see there is a discussion
(4) there with respect to the Milltown Dam?
(5) A.  Yes.
(6) Q.  Does it refresh your recollection at
(7) all as to whether the letters that we talked
(8) about earlier regarding the Milltown Dam had
(9) any relation to the QUIPS?
(10) A.  No, it does not.
(11) Q.  You see right above that section,
(12) "Assets and Liabilities Not Transferred" --
(13) A.  Um-hum.
(14) Q.  -- there is a sentence that reads,
(15) "The transaction will also respond to requests
(16) by rating agencies to move the assets and
(17) liabilities of NorthWestern Energy up to
(18) NorthWestern, as well as provide a better
(19) operating structure under the Public Utility
(20) Holding Company Act of 1935, as amended."
(21)     Do you see that sentence?
(22) A.  Um-hum.
(23) Q.  Do you know what Paul Hastings meant
(24) when they said it "would respond to requests by
(25) rating agencies"?

Page 84

(1)
(2) A.  No, I don't.
(3) Q.  Do you recall any discussion at all
(4) with respect to why this transaction was being
(5) done?
(6) A.  No, I don't.
(7) Q.  Do you see on the top of page 4 the
(8) first bullet?
(9) A.  (Perusing.) Yes.
(10) Q.  You see there that it says that
(11) "NorthWestern will deliver an Assumption
(12) Agreement, pursuant to which it will assume all
(13) of NorthWestern Energy's obligations and
(14) liabilities under the guaranty, and
(15) NorthWestern Energy will be released
(16) therefrom"?
(17) A.  Yes.
(18) Q.  Does that refresh your recollection
(19) as to whether there was a release upon
(20) execution of the Supplemental Indenture?
(21) A.  No.
(22) Q.  Do you recall whether you, or anyone
(23) working with you, did any analysis as to
(24) whether the leaving behind of the certain
(25) assets would constitute a transfer of less than

MAGTEN ASSET MANAGEMENT CORP. VS.
BSA XMAX(22/22)
MARY LEWICKI - 5/2/07
NORTHWESTERN CORP.

Page 85

(1)
(2) substantially all of the assets?
(3)     MR. BIALO: I have an objection to
(4) the form.
(5)     MS. DELANEY: I join in the
(6) objection.
(7)     MS. KRAFT: I join in, also.
(8)     MR. BIALO: This is dated September.
(9) The Third Supplemental wasn't executed
(10) until some time in November or December.
(11) I would only offer the proposition that
(12) it's not clear, or at least it can't be
(13) clear so far in this record that what is
(14) covered in this letter was, in fact,
(15) related to the transaction that ultimately
(16) happened.
(17)     MR. KAPLAN: I can point you to page
(18) 4 where it says "Documentation to be
(19) Submitted," and it says, "In connection
(20) with the transaction, we are delivering to
(21) you drafts of the following documents,
(22) execution of which will be delivered to
(23) you at the closing of the transaction."
(24)     The second bullet says, "a Third
(25) Supplemental Indenture, as authorized

Page 86

(1)
(2) under Section 1101(a) of the Indenture,
(3) wherein NorthWestern assumes all of
(4) NorthWestern Energy's obligations under
(5) the Indenture and the Outstanding
(6) Securities."
(7)     MR. BIALO: Yeah. No, I appreciate
(8) that, but you were asking a different
(9) question. You asked about release, and
(10) release is not included in any of those
(11) bullets where they are talking about
(12) documents to be delivered.
(13)     So it's a little -- forgive me, it's
(14) a little confusing to me, and I just want
(15) to make sure that the record is clear, and
(16) you are clear, and the witness is clear
(17) about what's actually being testified to.
(18)     So this is some -- this is a lawyer
(19) who's saying something in September about
(20) something that may or may not happen in
(21) the way that he is describing it.
(22)     MR. KAPLAN: I wasn't asking for the
(23) witness' conclusion as to whether the
(24) lawyer was correct that there was a
(25) release or not.

Page 87

(1)
(2)     MR. BIALO: Fair enough. Sorry.
(3) BY MR. KAPLAN:
(4)     Q. No problem. What I was actually
(5) asking -- this question was actually going to
(6) the section on the assets and liabilities not
(7) transferred.
(8)     And do you recall any discussion or
(9) any analysis as to whether the non transfer of
(10) these assets meant that NorthWestern Energy was
(11) transferring less than substantially all of its
(12) assets to NorthWestern?
(13)     A. Again, I do not remember any
(14) conversations to that issue. And to go back to
(15) what our process is for executing a
(16) Supplemental Indenture, we are relying on an
(17) Officer's Certificate and an opinion of counsel
(18) that are stating that the terms and conditions
(19) under the Indenture have all been met.
(20)     MR. KAPLAN: We are going to mark
(21) two documents. We are going to mark them
(22) as 10. We are going to mark as -- it is a
(23) Complaint. It's not Bates numbered, but
(24) it is a Complaint and Demand for Jury
(25) Trial in the Montana Second Judicial

Page 88

(1)
(2) District Court, Silver Bow County, and it
(3) is pages -- on the bottom of each document
(4) it says, "Complaint and Demand for Jury
(5) Trial," and it's page one through 20.
(6)     (Plaintiff's Exhibit 10, Complaint
(7) and Demand for Jury Trial, marked for
(8) Identification.)
(9)     MR. KAPLAN: And the second document
(10) that we are going to mark is an Answer,
(11) and it says in the caption is, "Magten
(12) Asset Management Corporation, Suing
(13) individually and derivatively on behalf of
(14) Clark Fork and Blackfoot, LLC, versus Paul
(15) Hastings Janofsky & Walker. This will be
(16) Plaintiff's Exhibit 11.
(17)     (Plaintiff's Exhibit 11, Answer of
(18) Magten Asset Management Corporation,
(19) marked for Identification.)
(20) BY MR. KAPLAN:
(21)     Q. I'm not going to ask you to read the
(22) whole Complaint. I'm just going to focus you
(23) on a paragraph in the Complaint and a paragraph
(24) in the Answer, and just see if it refreshes
(25) your recollection. And in particular, if you

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(23/23)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

Page 89

(1)
(2) could turn to page 10 of the Complaint and look
(3) at paragraph 44? If could you read that
(4) paragraph?
(5)    A.   The one that says "In particular"?
(6)    Q.   Yes.
(7)    A.   (Perusing.)
(8)    Q.   And then I would ask you to look at
(9) paragraph 44 of the Answer.
(10)   A.   (Perusing.)
(11)   Q.   You see that the Complaint alleges
(12) that Paul Hastings requested that Bank of New
(13) York execute a supplement purporting to release
(14) Clark Fork from its continuing obligations, but
(15) Bank of New York refused?
(16)        And then the Answer from Paul
(17) Hastings denies the allegation, but admits that
(18) the Bank of New York refused to execute a
(19) supplement to the Indenture, and then refers to
(20) the supplement for its contents.
(21)        Does this refresh your recollection
(22) at all about any discussion with respect to the
(23) execution of the Indenture?
(24)   A.   I have no memory --
(25)        MS. KRAFT: Objection to the

Page 90

(1)
(2) characterization of the documents by
(3) counsel.
(4)        MS. DELANEY: I join in the
(5) objection.
(6)        MR. BIALO: I'm going to object to
(7) the form just because I object to the way
(8) that one would put in front of a witness
(9) the allegations of a Complaint, which is
(10) somebody's story about something they are
(11) complaining about, and then somebody
(12) else's Answer, which is crafted by lawyers
(13) in response to the -- and under the rules
(14) that govern how you plead in response to
(15) complaining allegations, but you are free
(16) to answer -- what was the question? The
(17) question was does this refresh your
(18) recollection?
(19)   Q.   The question was, does this refresh
(20) your recollection with respect to any
(21) discussion or communication with respect to the
(22) execution of the Supplemental Indenture?
(23)        MR. BIALO: The Third Supplemental
(24) Indenture.
(25)   Q.   The Third Supplemental Indenture?

Page 91

(1)
(2)    A.   Again, as I have stated, the only
(3) recollection I have of the Third Supplemental
(4) Indenture has been by looking at the documents
(5) that were provided me to prepare for this
(6) deposition.
(7)    Q.   When you were looking at the
(8) documents to prepare, did you review any prior
(9) drafts of the Third Supplemental Indenture?
(10)   A.   No.
(11)        MR. BIALO: For the record, the
(12) witness reviewed the documents that were
(13) produced to you all on April 25th, and
(14) then the supplemental production that was
(15) made, I believe it was yesterday or the
(16) day before, that's what the witness
(17) reviewed.
(18)   Q.   When I asked you a series of
(19) questions earlier with respect to how you would
(20) react if you had actual notice that the
(21) financial statements or the Officer's
(22) Certificate were fraudulent, do you remember
(23) those questions?
(24)   A.   Yes.
(25)   Q.   If you received notice from one of

Page 92

(1)
(2) the holders of the QUIPS that there was -- that
(3) the financial statements were fraudulent, what
(4) would you have done?
(5)        MS. KRAFT: Objection.
(6)        MR. BIALO: This is in connection
(7) with the consideration of the Third
(8) Supplemental Indenture?
(9)        MR. KAPLAN: Yes.
(10)        MR. BIALO: Okay. Well, obviously
(11) it's hypothetical, but I'm going to allow
(12) the witness to answer.
(13)   A.   Hypothetically again, any notice,
(14) any sort of communication from a holder, that
(15) type of correspondence is reviewed with
(16) senior -- with my management, or with counsel.
(17) Based on those determinations is how we would
(18) proceed as trustee.
(19)   Q.   But you wouldn't have simply -- you
(20) wouldn't simply dismiss it and sign a
(21) Supplemental Indenture. You would take it up
(22) to senior management and discuss it?
(23)        MS. KRAFT: Objection.
(24)        MS. DELANEY: Objection.
(25)        MR. BIALO: I have the same

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(24/24)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

Page 93

(1)
(2) objection on the hypothetical grounds, but
(3) I'm going to let her answer it. She has
(4) already answered it about ten times.
(5)     MS. KRAFT: I have, as to the form
(6) of the question; besides hypothetical.
(7)     A. I'm sorry. Can you say it again? I
(8) apologize.
(9)     MR. KAPLAN: Can you read it back?
(10)     (Record read.)
(11)     A. Again, if it's something I received
(12) in writing, it's an actual notice to me.
(13) Again, it goes to senior management and counsel
(14) for review, and what our next actions would be.
(15)     Q. Are you aware that the SEC -- the
(16) Securities & Exchange Commission, issued a
(17) cease and desist order with respect to
(18) NorthWestern Corporation?
(19)     A. No, I'm not.
(20)     Q. Are you aware that the SEC has
(21) brought complaints against a number of
(22) NorthWestern's former officers with respect to
(23) NorthWestern's financial statements?
(24)     MR. BIALO: I'm going to object to
(25) the form. Go ahead. You can tell him if

Page 94

(1)
(2) you know anything.
(3)     A. Again, the only -- the only
(4) knowledge I have is what I have reviewed in
(5) these documentations that you also have in
(6) preparation for this. I have no knowledge.
(7)     MR. KAPLAN: Just give me one
(8) second.
(9)     (Recess taken.)
(10) BY MR. KAPLAN:
(11)     Q. When did Bank of New York cease to
(12) be the trustee for the QUIPS?
(13)     A. I -- I don't know. I mean in
(14) preparation for this, I just focused on August
(15) to December 2002. I wasn't party to the
(16) resignation.
(17)     Q. Do you know when the last interest
(18) payment was made on the QUIPS?
(19)     A. Not -- I don't remember.
(20)     Q. Could you tell from looking at the
(21) -- I think it's Plaintiff's Exhibit 2, the
(22) tickler report, would that show you?
(23)     A. It's not going to tell me -- it's
(24) either going to tell me that a payment was made
(25) or if there was an alternative -- that that

Page 95

(1)
(2) alternative was effected. So it's not going to
(3) tell me when the last payment was made.
(4)     Q. Could you explain that to me? Will
(5) it tell you if a payment was made or if there
(6) was an alternative? What did you mean by that?
(7)     THE WITNESS: Do I answer that if
(8) it's after the time period?
(9)     MR. BIALO: Yes, you can answer.
(10) You can answer.
(11)     A. That the governing documents in this
(12) particular transaction allowed the issuer to --
(13) what's the word I want to use?
(14)     Q. Suspend?
(15)     MR. BIALO: Defer.
(16)     A. Defer, not suspend -- defer their
(17) payments based on certain criteria.
(18)     Q. So the tickler report would say
(19) either interest was paid, or it would say it
(20) was deferred?
(21)     A. It wouldn't say anything. It would
(22) just indicate it was marked off.
(23)     Q. No, no. Maybe I'm being dense. If
(24) there was no payment because of a deferral,
(25) would you be able to see that on the tickler

Page 96

(1)
(2) report?
(3)     A. No.
(4)     Q. Okay.
(5)     MR. KAPLAN: I have no further
(6) questions.
(7)     MR. BIALO: Any of you have any
(8) questions?
(9)     MS. DELANEY: No questions.
(10)     MS. KRAFT: No questions.
(11)     MR. BIALO: I only have one
(12) question.
(13) EXAMINATION BY
(14) MR. BIALO:
(15)     Q. You were asked earlier today, and I
(16) believe it was in reference to the Officer's
(17) Certificate in connection with the Third
(18) Supplemental Indenture that had been marked as
(19) Exhibit 7A, I believe something about the
(20) accuracy, or truth, or the falsity of the
(21) statements made in that document.
(22)     And I want the record to be clear,
(23) and so I'm going to ask you directly. As you
(24) sit here today, do you have any reason to
(25) believe that any of the statements that were

MAGTEN ASSET MANAGEMENT CORP. VS.

BSA XMAX(25/25)
MARY LEWICKI - 5/2/07

NORTHWESTERN CORP.

## Page 97

(1)
(2) made in that certificate and conveyed to the
(3) bank and its counsel on or about the time of
(4) the Third Supplemental Indenture, were false,
(5) or misleading, or untrue, or incorrect?
(6)     A.  No.
(7)     Q.  Did you have any reason to believe
(8) that at the time you got this in November --
(9)     A.  No, not at all.
(10)    Q.  -- November of 2002?
(11)    A.  No.
(12)        MR. BIALO:  I have no further
(13)    questions.
(14)        MR. KAPLAN:  I have some follow-up
(15)    questions on that.
(16)    FURTHER EXAMINATION
(17) BY MR. KAPLAN:
(18)    Q.  What -- what do you base your
(19) answers on?
(20)    A.  The certificate, the Supplemental
(21) Indenture again, were in the form as required
(22) by the governing documents. There was --
(23) again, if there is an issue, an event of
(24) default, I need to have written notification of
(25) such, which I did not have at that time.

## Page 98

(1)
(2)        We reviewed the document. We
(3) reviewed the Supplemental Indenture. Again,
(4) everything conformed and was in good order
(5) according to the terms of the governing
(6) document and the review by our external
(7) counsel.
(8)    Q.  But you have -- what basis do you
(9) have to testify that the Officer's Certificate
(10) was, in fact, accurate?
(11)        MR. BIALO:  Well, objection to the
(12)    form. That's not what the witness
(13)    testified to.
(14)    Q.  Do you have any basis to conclude
(15) that the Officer's Certificate is or is not
(16) accurate?
(17)        MR. BIALO:  Objection to the form.
(18)    A.  The certificate is accurate in
(19) compliance with the terms of what the Indenture
(20) requires in an Officer's Certificate, and the
(21) statements and representations that are made in
(22) that certificate.
(23)    Q.  I understand that the form is there,
(24) and that it does contain representations.
(25)        Do you have any basis to know

## Page 99

(1)
(2) whether or not the statements contained therein
(3) and the representations contained therein were,
(4) in fact, true?
(5)    A.  I am relying on the statements in
(6) that -- in the Officer's Certificate are
(7) correct, as I am allowed to under the terms of
(8) the Indenture. That is my basis for relying
(9) that those statements are true. --
(10)    Q.  So you are relying on the officer to
(11) be truthful, but you have no basis to know
(12) whether, indeed, the officer was being truthful
(13) or not?
(14)    A.  Again, I'm relying under the terms
(15) of the governing Indenture that these
(16) statements are true, and I am relying on that.
(17)    Q.  I understand that, but you are
(18) relying -- just to be clear -- you have no
(19) basis to know -- at the time, you had no basis
(20) to know that the representations contained
(21) therein were true?
(22)        MR. BIALO:  I'm going to object to
(23)    the form. I'm going to object to
(24)    continuously asking her the same question.
(25)    A.  I'm going to say it again. I have

## Page 100

(1)
(2) relied on the certificate, as I can under the
(3) terms of the Indenture. I mean --
(4)    Q.  Are you aware that the SEC has
(5) alleged that NorthWestern misstated its
(6) financial statements and overstated its
(7) revenues so as to be able to raise equity
(8) financing in September and October of 2002?
(9)        MS. KRAFT:  Objection to the
(10)    characterization.
(11)        MS. DELANEY:  Objection to form.
(12)        MR. BIALO:  I'm going to object to
(13)    the form in that, I don't know that the
(14)    witness could possibly adopt your comments
(15)    as true and correct. But I think you can
(16)    ask her if she is aware of anything having
(17)    anything to do with the SEC investigation,
(18)    and you will get the same answer you got
(19)    before.
(20)    A.  I am not aware of any -- any terms
(21) of the SEC investigation.
(22)    Q.  So you have no basis -- so you have
(23) no basis -- strike that.
(24)        So -- you have not gone back and
(25) looked at the Officer's Certificate based on