

**DEPARTMENT OF PUBLIC SERVICE REGULATION**
**BEFORE THE MONTANA PUBLIC SERVICE COMMISSION**
**OF THE STATE OF MONTANA**

| | |
|---|---|
| IN THE MATTER of the Joint Application )<br>For Approval of the Sale of Montana )<br>Power Company to NorthWestern )<br>Corporation ) | **UTILITY DIVISION**<br><br>**Docket No. D2001.1.5** |

**JOINT APPLICATION OF THE MONTANA POWER COMPANY**
**AND NORTHWESTERN CORPORATION**

**SUPPLEMENTAL FILING**

August 27, 2001

NOR044696

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE MONTANA PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

IN THE MATTER of the Joint Application )        UTILITY DIVISION
For Approval of the Sale of Montana    )
Power Company to NorthWestern          )        Docket No. D2001.1.5
Corporation                            )

JOINT APPLICATION OF THE MONTANA POWER COMPANY
AND NORTHWESTERN CORPORATION

SUPPLEMENTAL FILING

August 27, 2001

NOR044697

NOR044698





August 27, 2001

Mr. David Hoffman
Montana Public Service Commission
1701 Prospect Ave.
P.O. Box 202601
Helena, MT 59620-2601

Re:    The Montana Power Company's and NorthWestern Corporation's
       Response to Commission Order No. 6353, Docket No. D2001.1.5

Dear Mr. Hoffman:

Enclosed please find an original and 14 copies of The Montana Power Company's ("MPC") and NorthWestern Corporation's ("NorthWestern") joint response to Commission Order No. 6353 issued June 27, 2001 (Docket No. D2001.1.5).

In this Order, the Commission provided MPC and NorthWestern the opportunity to supplement their January 12, 2001 joint Application with information that the Commission believed would be helpful in its evaluation of the transaction. The attached materials directly respond to the Commission's requests and provide additional knowledge that will aid the Commission in processing this joint Application and in determining this transaction is in the public interest.

The Applicants note that this transaction involves no transfer of public utility assets and service obligations, as Order No. 6353 appears to suggest (see page 4, lines 1-3). NorthWestern, through a stock purchase, will become the new owner of the regulated utility businesses, which will continue to provide reasonably adequate service and facilities at just and reasonable rates. In effect, NorthWestern is replacing the shareholders who now own MPC.

We are hopeful that, with this supplemental information, the Commission will promptly establish a procedural schedule and begin to process this case. Over seven months have passed since the initial Application was filed, and MPC and NorthWestern would like to close the transaction by October 15, 2001. Toward this end, we pledge our cooperation and help to the Commission and intervenors.

NOR044699

August 27, 2001
Page - 2

    Please let us know if you have any questions or comments.  We look forward to working with the Commission and the intervenors.

                  Sincerely,

                  THE MONTANA POWER COMPANY

By: _Michael P. Manion_

Its: _VP & General Counsel, Utility_

                  NORTHWESTERN CORPORATION

By: _Dennis Lopach Lyman_

Its: _Attorney_

cc:    Service List

J:\sparks\Ltr to Hoffman.doc

NOR044700

MONTANA PUBLIC SERVICE COMMISSION

CERTIFICATE OF SERVICE

* * * * *

I hereby certify that a copy of the **Supplemental Filing of the Joint Application of
The Montana Power Company and NorthWestern Corporation** has today been served
on the following by mailing a copy thereof by first class mail, postage prepaid.

Date:  August 27, 2001.

Dennis Crawford
Montana Public Service Commission
1701 Prospect Ave., Vista Bldg.
P.O. Box 202601
Helena, MT 59620-2601

Robert A. Nelson
Montana Consumer Counsel
616 Helena Ave., Room 300
P.O. Box 201703
Helena, MT 59620-1703

Alan Rosenberg
Brubaker & Assoc, Inc.
1215 Fern Ridge Parkway, Ste 208
P.O. Box 412000
St. Louis, MO 63141-2000

Anne W. Yates
Legal Counsel
Dept. of Natural Resources & Conservation
1625 11th Ave.
Helena, MT 59620-1601

Donald W. Quander
Holland & Hart
P.O. Box 639
Billings, MT 59103-0639

Frank C. Crowley
Doney, Crowley, Bloomquist & Uda
P.O. Box 1185
Helena, MT 59624-1185

Kathryn E. Iverson
Brubaker & Assoc, Inc.
555 DTC Parkway, Ste B-2000
Englewood, CO 80111-3002

Michael J. Uda
Doney, Crowley, Bloomquist & Uda
P.O. Box 1185
Helena, MT 59624-1185

Owen H. Orndorff
Attorney at Law
YELP/CELP
1087 W. River, Suite 200
Boise, ID 83702-7035

Kathleen Sparks

NOR044701

NOR044702

Department of Public Service Regulation
Montana Public Service Commission
Docket No. D2001.1.5
NorthWestern Corporation

## PREFILED TESTIMONY OF MICHAEL J. HANSON
## ON BEHALF OF NORTHWESTERN CORPORATION

Q.  Please state your name and business address.

A.  Michael J. Hanson, 4930 S. Western Ave., Sioux Falls, SD 57108.

Q.  Mr. Hanson, what is your position with NorthWestern Corporation?

A.  I am the President and Chief Executive Officer of both NorthWestern Public
    Service, a division of NorthWestern Corporation, and NorthWestern Services
    Group, Inc., a wholly owned subsidiary of NorthWestern Corporation. I will
    generally refer to the entire family of NorthWestern companies simply as
    NorthWestern in my testimony.

Q.  Please describe your education and business experience.

A.  I have been the President and Chief Executive Officer of NorthWestern's utility
    entities since May 1998. Prior to accepting my current position with
    NorthWestern, I was employed for seventeen years by Northern States Power
    Company ("NSP") in a variety of positions, including General Manager and Chief
    Executive of NSP – South Dakota from 1994-1998. I attended the United States
    Naval Academy from 1977-1979 and graduated from the University of Wisconsin
    in 1982 with a Bachelor of Science degree in accountancy. I received a Juris
    Doctor degree from William Mitchell College of Law in 1989. Exhibit (MH-1),
    attached to this testimony, contains a listing of my education and business
    experience.

Q.  What is the purpose of your testimony?

MJH-1

1  A.  I will describe the structure, business goals and philosophy of NorthWestern. I

2      will also explain why NorthWestern is acquiring The Montana Power Company

3      ("MPC"). Finally, I will provide answers to Questions #2,4,5, and #7-10, set forth

4      in the Commission's Order 6353 entered in this docket.

5                              NORTHWESTERN CORPORATION

6  Q.  Please provide the Commission with a brief history and description of

7      NorthWestern.

8  A.  NorthWestern Public Service Company was incorporated on November 27, 1923,

9      in Wilmington, Delaware, bringing together two utility properties in Nebraska and

10     two in South Dakota. The facilities acquired were the stock and assets of the

11     Aberdeen (SD) Light & Power Company, the North Platte (NE) Light & Power

12     Company, the Columbus (NE) Light, Heat & Power Company, and an electric

13     system in Clark, South Dakota owned by the Union Power & Light Company of

14     Omaha, NE. In 1940 NorthWestern's electric properties in North Platte and

15     Columbus were sold to two newly established public power districts, as Nebraska

16     became totally public power. In January 1941, NorthWestern acquired the natural

17     gas systems in Grand Island and Kearney, NE, which were added to its natural gas

18     system in North Platte, NE. Natural gas systems in South Dakota were added

19     during the years 1957-61. NorthWestern continued to grow, acquiring Central

20     Electric & Gas Company in 1961, and extending natural gas to additional South

21     Dakota communities during the 1990s. NorthWestern now provides not only

22     electric and natural gas service to nearly 150,000 customers in the upper Midwest

23     (South Dakota and Nebraska), but also energy-related services, voice

24     communications, video and data network solutions. NorthWestern currently

25     operates in three additional industries in addition to its traditional electric and gas

26     services: Blue Dot Services Inc., a national provider of installation, maintenance,

MJH-2

NOR044704

1   repair and replacement services for heating, air conditioning, plumbing and

2   related systems for residential and light commercial customers; CornerStone

3   Propane Partners, L.P., a retail propane distributor serving residential,

4   commercial, industrial and agricultural customers from 275 customer service

5   centers in 34 states, and providing wholesale marketing and logistics in propane,

6   natural gas, crude oil and petroleum liquids through its division Coast Energy

7   Group; and Expanets, Inc., a national provider of integrated voice, data, video and

8   related network communication solutions to small- and medium-sized businesses.

9   Q.   Please describe NorthWestern's traditional electric and gas utility operations.

10  A.   NorthWestern is a combination local distribution company engaged in the

11  business of generating, transmitting and distributing electricity and natural gas at

12  retail to residential, commercial and industrial customers in South Dakota, and

13  natural gas only in Nebraska. NorthWestern also owns electric generation and

14  connecting segments of electric transmission lines from its generation in Iowa and

15  North Dakota. NorthWestern is a "public utility" within the meaning of Section

16  201 of the Federal Power Act and as defined in the South Dakota Public Utilities

17  Act (South Dakota Codified Laws Chapter 49-34A) and, as such, is subject to the

18  jurisdiction of the South Dakota Public Utilities Commission for the sale of gas

19  and electric service in South Dakota. The State of Nebraska has no centralized

20  regulatory agency with jurisdiction over the natural gas operations of

21  NorthWestern. Natural gas rates are subject to regulation by the four Nebraska

22  municipalities in which NorthWestern operates (the cities of Grand Island,

23  Kearney and North Platte, and the Village of Alda) which communities have been

24  grouped together in one rate area. NorthWestern is part of the Western Area

25  Power Administration's ("WAPA") Upper Great Plains East control area, a

26  control area certified by the North American Electric Reliability Council, and

MJH-3

1    currently has contracts for transmission service from WAPA for delivery of power

2    and energy from remote generation equivalent to approximately 50% of its

3    bundled retail requirements.  Given the expanse between population centers in its

4    service territory, NorthWestern works with WAPA, the area's rural electric

5    cooperatives, and other investor-owned utilities in order to provide reliable

6    electric service at affordable prices to the citizens in its region.  NorthWestern

7    owns approximately 312 megawatts (MW) of generation capacity, consisting of

8    its interests in three jointly-owned facilities, a three-year power purchase

9    agreement for up to 28 MW from Basin Electric Cooperative, certain peaking

10   units and purchases spinning reserves from WAPA. In addition, NorthWestern

11   provides transmission services and makes limited wholesale sales of electric

12   energy.  NorthWestern provides transmission service for several small South

13   Dakota communities and South Dakota state institutions of their allocation of

14   power from WAPA and makes supplemental wholesale power sales to those

15   entities for electric needs in excess of their allocation.  NorthWestern also

16   provides transmission service for the total electric requirements of the community

17   of Groton, SD, including its WAPA allocation and supplemental energy provided

18   by Heartland Consumers Power District.  NorthWestern has a letter agreement

19   under which WAPA markets NorthWestern's excess energy in intersystem sales.

20   Q.    Please describe, in general terms, NorthWestern's overall business strategy.

21   A.    NorthWestern has focused its business strategy on pursuing success through

22         market leadership in energy and communications.   Our success is achieved

23         through outstanding customer service and efficient operations.  NorthWestern

24         believes that its acquisition of MPC is in complete accord with this overall

25         business strategy.  MPC serves a geographic area with similar characteristics to

26

MJH-4

NOR044706

1          NorthWestern's existing area, and, like NorthWestern, has a record of providing

2          outstanding customer care.

3    Q.    What benefits do you foresee from NorthWestern's acquisition of MPC?

4    A.    We anticipate that the acquisition will allow the continued expansion of our

5          energy distribution capabilities, the integration of the energy-related businesses of

6          NorthWestern and MPC, and the creation of a platform for future growth

7          opportunities in the Northern Tier. NorthWestern will strive to maintain a high

8          degree of reliability and customer satisfaction, stabilize utility rates for Montana

9          consumers, support the communities it serves, provide environmental stewardship

10         and be a good corporate citizen while operating the business to provide stable

11         earnings, cash flow and a fair return to its shareholders.

12   Q.    How does NorthWestern propose that MPC will fit within its corporate structure?

13   A.    NorthWestern plans to make the requisite filings, and take the other steps

14         necessary, to authorize it to obtain exempt status under the Public Utilities

15         Holding Company Act, as amended, with both MPC and NorthWestern Public

16         Service becoming subsidiaries of the parent corporation. If NorthWestern

17         ultimately does not implement a holding company structure, then upon closing of

18         the transaction, it will retain its current divisional structure and MPC will become

19         a division rather than a subsidiary of the company. Under either structure, MPC

20         and NorthWestern will continue to be headquartered in their existing locations in

21         Butte, Montana, and Huron and Sioux Falls, South Dakota, respectively.

22   Q.    Has NorthWestern enjoyed ready access to capital as it has implemented its

23         business plans?

24   A.    Yes. NorthWestern has been able to issue stock and debt under favorable terms as

25         its business needs have required, even under difficult market conditions. It has

26         obtained an acquisition credit facility from Credit Suisse First Boston in an

MJH-5

1    amount sufficient to finance 100% of the proposed equity purchase price for this

2    transaction, and anticipates issuing permanent financing through the public sale or

3    private placement of common stock.

4  Q.  Describe NorthWestern's philosophy regarding its dealings with regulators.

5  A.  NorthWestern maintains excellent open communication with the governmental

6    agencies charged with regulation of its businesses and works to negotiate with all

7    parties to any proceedings in order to bring about a result favorable to all interests:

8    customers, shareholders, the communities it serves, and team members. Through

9    negotiations in rate and other proceedings, NorthWestern has been able to avoid

10    needless and costly litigation.

11  ## NORTHWESTERN'S ACQUISITION OF MPC

12  Q.  What are NorthWestern's plans after it acquires MPC?

13  A.  NorthWestern's objective in operating MPC will be to provide value to all

14    constituencies affected by the transaction. Because NorthWestern and MPC

15    operate in two, non-synchronized power pools and are not contiguous with each

16    other, large operating synergies are not expected in the combination of the two

17    entities. There will, however, be an opportunity to capture efficiencies through

18    the combined procurement of materials, supplies and equipment, and in the

19    provision of joint administrative and general functions. In addition, we expect to

20    minimize cost and maximize performance through the combination of the two

21    entities' information technology resources. NorthWestern will combine senior

22    leadership, but the utility enterprise will operate as two largely self-contained

23    units that are combined at the top and supported by shared administrative

24    resources and consistent operational approaches. This structure will optimize

25    performance while allowing flexibility for each utility unit to meet the unique

26    needs of the markets in which it operates.

MJH-6

NOR044708

1    Q.    Your operating plan after the acquisition seems very straightforward. Are you

2           over- simplifying?

3    A.    No. MPC and NorthWestern operate in entirely different power grids and will be

4           physically separated.  Because we are acquiring the entire company, not just its

5           assets, we are acquiring a self-sufficient, ongoing business.  That will allow us to

6           combine the strengths of the two companies in a manner that will be largely

7           transparent to the current customers of MPC. Our objective is to successfully

8           operate on a going forward, long-term basis, a utility that will be regulated by this

9           Commission. We are submitting this application in the belief that the PSC will

10          become comfortable with NorthWestern as the new owner of MPC.

11    Q.    Is NorthWestern a fit and willing buyer of MPC?

12    A.    Yes. NorthWestern has both the management capability and the financial

13          capability to acquire MPC. Managerial capability is the expertise needed to

14          successfully run a utility. In our case, we take pride in our long history of

15          successfully managing gas and electric operations in South Dakota and gas

16          operations in Nebraska. We're very proud that we were recently acknowledged as

17          the operator of one of the most reliable electric utility systems in the United

18          States. An integral part of our managerial capability is our management

19          systems—the controls and tools that are deployed to ensure that the business

20          operates in a way that is consistent with an established plan. Our systems ensure

21          that decisions are disciplined, expenditures are controlled and investments are

22          sound. .Let me provide some examples regarding our cost control focus and our

23          introduction of new business systems.

24              NorthWestern has worked with its coal-fired generating plant co-owners at

25          the Big Stone Plant and the Coyote I Station to lower its costs of electric

26          generation. In 1993 the owners negotiated coal supply and coal transportation

MJH-7

NOR044709

1    pricing reductions with Knife River Coal Mining Company and the Burlington

2    Northern Railroad for Big Stone. In 1995, we switched from North Dakota lignite

3    coal to Powder River Basin sub-bituminous coal, providing a more efficient and

4    cleaner burning alternative at Big Stone. In 1996 the owners sold their steel rail

5    cars and began leasing aluminum cars, providing additional savings at Big Stone.

6    NorthWestern and two of the other of the four Coyote co-owners brought an

7    arbitration action against Knife River, which culminated (after hearings) in a 1999

8    decision that lowered the cost of lignite coal by approximately $1 per ton (a

9    savings of more than $250,000 per year for NorthWestern's customers), applied

10    stronger price controls for future pricing of lignite under the coal supply

11    agreement and resulted in a cash damage award to the owners (with more than

12    $800,000 as NorthWestern's share) for prior charges.

13        Outside the generation area, we have used technology to achieve higher

14    productivity and cost reductions. For example, we are using a document imaging,

15    or paperless system for numerous types of records. This system contains search

16    capabilities and serves as a central records repository, reduces time for data entry

17    and frees up team members' time for higher priority work.

18        Paperless records now include the documentation of our distribution

19    system (records required by the Department of Transportation -- Office of

20    Pipeline Safety) at a central repository rather than in local offices; and accounts

21    payable (invoicing, etc.) which offers an online payment processing and approval

22    system, and serves as a paperless permanent record of the invoice process.

23        Also, centralized scheduling and dispatch of crews and resources improves

24    work force efficiencies and places team members where they are most needed.

25    This has significantly increased the productivity of our crews. For example, a

26    crew is dispatched to a work site. If a service call is received in the same location,

MJH-8

NOR044710

1        that crew can then move immediately from one task to the next task without

2        having to return to the office to be dispatched. This system also uses automated

3        time sheets and automatically records job costs, eliminating time-consuming data

4        entry.

5             Finally, we have created a "virtual call center" and use technology to tap

6        into customer service talent located in our utility's field locations to handle utility

7        customer service calls without moving those employees to a call center.

8             We are introducing technology where it makes sense to control costs and

9        improve service.

10   Q.   Please address financial capability under two aspects: financial strength and

11        financial flexibility. Can the company finance operations and any expansion that

12        might be needed? Is the capital structure consistent with industry norms, so that

13        different types of financing are available in any reasonably foreseeable economic

14        situation?

15   A.   We are certainly well aware of the industry norms and the Commission's

16        hypothetical capital structure in the last MPC electric transmission and

17        distribution rate order. These factors form the basis of our market evaluation over

18        the two years beyond the close of the transaction.

19             In general, we believe that capital will be no more expensive with

20        NorthWestern as owner of MPC than is the case today. As I indicated,

21        NorthWestern has enjoyed consistent access to capital on reasonable terms.

22        While our corporate structure may seem complex on first examination, it assures

23        separation of the utility related financings from other activities, and it should not

24        create any new or additional concerns for this Commission because MPC has

25        itself historically had significant non-utility operations. Finally, I think it is

26        important to remember that the standard regulatory approach to determining a

MJH-9

1          utility's cost of equity examines financial markets' expectations regarding the cost

2          of capital for comparable companies. That approach will be fully available to the

3          Commission in future proceedings.

4   Q.    In your judgment, does NorthWestern's operating and financial history

5          demonstrate its ability to operate the MPC system in a manner that will result in

6          customers receiving reasonably adequate service at just and reasonable rates?

7   A.    Absolutely. Electric and natural gas systems have a great deal in common,

8          regardless of the state in which they are situated. We know how to run these

9          systems. I do not want to minimize the default supply challenges facing the MPC

10         electric system, but I can confidently say we know what we are doing and will

11         make the best judgments we possibly can on behalf of our customers.

12         NorthWestern prides itself on customer service, and our team members are the

13         foundation of that service. Our compensation is consistent with industry norms,

14         and our team member job satisfaction is high. We have been able to attract and

15         retain top quality personnel, and we maintain excellent relationships with our

16         retired employees (many of whom are shareholders in NorthWestern).

17             With regard to post-close operations, we have been working in a

18         department-by-department collaboration process with MPC for the past eight

19         months. This has allowed departmental counterparts to become familiar with one

20         another, to understand the processes used by each and to begin to understand the

21         business challenges that are before us all. I'm confident that customers will see

22         very little of the transition process.

23               **COMMISSION QUESTION #2**

24   Q.    What are the purchase prices for the electric and natural gas utility rate properties?

25

26

NOR044712

1    A.    We don't know yet how the total purchase price of $602 million in cash and $488

2            million in debt assumption will be allocated among the numerous entities that we

3            are buying. Those entities are listed in Mr. Pederson's testimony.

4                          **COMMISSION QUESTION #4**

5    Q.    What commitment is NorthWestern willing to make with respect to rate levels on

6            the MPC system after its acquisition by NorthWestern?

7    A.    NorthWestern works very hard to maintain stable electric rates in our South

8            Dakota operation. We will do our very best to maintain stable transmission and

9            distribution rates on the MPC system, except for extraordinary charges beyond the

10           Company's control, such as governmentally imposed charges, or the transition

11           charges in the Tier II proceeding. We will need some time to get our arms around

12           the Montana operation, and would hope that other parties would allow us that

13           opportunity by not pursuing near- term transmission and distribution rate

14           reductions.

15    Q.    I note you did not commit NorthWestern to a particular rate for default power

16           supply. Why is that?

17    A.    It simply is not possible to make such a commitment. Neither NorthWestern nor

18           MPC currently has a supply in place to meet default load requirements of the

19           existing MPC customers after June 30, 2002.  Moreover, the cost of that supply

20           will not be determined by NorthWestern, but by the sellers in the bulk power

21           supply market. We will support MPC's efforts to put together a supply portfolio

22           that meets our customers' needs at the lowest possible price.

23                         **COMMISSION QUESTION #5**

24    Q.    What commitment is NorthWestern willing to make that an acquisition

25           adjustment will not be sought for any premium it has paid on the book value of

26           MPC's utility assets?

MJH-11

NOR044713

1    A.    NorthWestern will commit not to seek a rate base addition for the difference

2         between the purchase price (as finally allocated under GAAP and Sec. 338 of the

3         Internal Revenue Code) and the book value of the MPC utility assets in rates,

4         subject to one caveat. Under Sec. 338, the Company will receive certain tax

5         advantages from the stepped-up basis, including depreciation of the increment

6         over the historical book value. If in a future rate proceeding, the Commission

7         were to claim that increased tax advantage for ratepayers, then consistency and

8         fairness would require that the stepped-up basis be used as the rate base, as the tax

9         benefit will arise solely due to the stepped-up basis.

10                              COMMISSION QUESTION #7

11    Q.    Is NorthWestern able and willing to develop and maintain utility-scale generation

12         to serve load in the MPC service territory?

13    A.    If the inquiry is whether NorthWestern plans to build a new series of generating

14         stations to replace the ones sold by MPC to PP&L, the answer is no. Not only

15         would that be expensive and impractical, it would be contrary to the purpose of

16         the 1997 legislation, which was to separate generation ownership from the

17         transmission and distribution system. If the inquiry is whether NorthWestern

18         would act to maintain a default supply in accordance with the House Bill 474

19         from this year's legislative session, the answer is yes. Having said that, we believe

20         it is very important to note that NorthWestern is one of the few companies that

21         have stepped forward to develop new generation in Montana. NorthWestern is

22         finalizing plans to construct a proposed 240-megawatt electricity generating

23         facility near Great Falls, Montana, that will provide reasonably priced, reliable

24         electricity for Montana customers. The proposed generation facility will be

25         located about one mile north of Great Falls, adjacent to and east of Highway 87

26         (Havre Highway) in Cascade County. The project involves the construction of a

MJH-12

NOR044714

| | | |
|---|---|---|
| 1 | | 240-megawatt combined cycle, natural gas-fired generating facility, with the first |
| 2 | | 80-megawatt simple cycle combustion turbine originally hoped to come on line |
| 3 | | early in 2002, the second 80-megawatt simple cycle combustion turbine in the |
| 4 | | summer of 2002 and the conversion to a combined cycle facility (which will add |
| 5 | | another 80 megawatts of electricity output) in late 2002. However, as of the filing |
| 6 | | of this testimony, this timetable has now been delayed by the filing of several |
| 7 | | appeals of the air quality permit issued by the Department of Environmental |
| 8 | | Quality, and we are unable to predict a precise timetable. |

**COMMISSION QUESTION #8**

| | | |
|---|---|---|
| 10 | Q. | What operational efficiencies does NorthWestern expect to achieve after its |
| 11 | | acquisition of MPC? |
| 12 | A. | As I testified earlier, the physical separation of the MPC system from the existing |
| 13 | | NorthWestern system limits, to a degree, the efficiencies one could expect if the |
| 14 | | two systems were physically consolidated. NorthWestern expects to achieve |
| 15 | | efficiencies in the operation of the two systems that would not be achievable in |
| 16 | | the absence of the acquisition. Moreover, NorthWestern is constantly searching |
| 17 | | for ways, such as those involving technology that I outlined above, to improve |
| 18 | | service to both its customers and team members. NorthWestern has implemented |
| 19 | | programs to enhance the work environment of its team members. An enhanced |
| 20 | | work environment will lead to innovations and efficiencies that will improve all |
| 21 | | aspects of customer service. Furthermore, NorthWestern continuously surveys its |
| 22 | | customers to determine what can be done to enhance the value of our services. |
| 23 | | Finally, NorthWestern is constantly reviewing its processes and procedures. The |
| 24 | | collaboration efforts with MPC have given NorthWestern the opportunity to |
| 25 | | review all of its processes and procedures and compare them with MPC's. To the |
| 26 | | extent that better processes and procedures are currently in place at either entity, |

MJH-13

NOR044715

1        or through such discussions are developed, improvements to the operations at

2        both entities will be implemented.

3                   **COMMISSION QUESTION #9**

4    Q.    Did NorthWestern's due diligence reveal any weaknesses in the MPC system?

5    A.    No, it did not. That was one of the reasons the acquisition of MPC was attractive

6        to us.

7                   **COMMISSION QUESTION #10**

8    Q.    Please address how the ability of MPC to provide continued reliable service at just

9        and reasonable rates, as a division or subsidiary of NorthWestern, may be

10       impacted under any reasonable outcome in the Tier II proceedings under Docket

11       D97.7.90.

12   A.    Properly conducted Tier II proceedings, and the result of those proceedings,

13       should not impact the ability of MPC to provide reliable service at just and

14       reasonable rates. As long as the Tier II proceedings are conducted properly, and

15       the result of the proceeding is in accordance with Montana law, the ability of

16       MPC to provide good service at reasonable rates should not be impacted We urge

17       the Commission to expedite theTier II proceedings to provide certainty as the

18       default supply isassembled. In NorthWestern's opinion, the critical consideration

19       is not the outcome of the Tier II proceeding, but how the Commission intends to

20       ensure cost recovery associated with the expense of procuring a default power

21       supply under the provisions of House Bill 474.

22   Q.    Why do you believe the outcome of a properly conducted Tier II proceeding, with

23       a result in conformity with Montana law, should not impact the ability of MPC, as

24       a division or subsidiary of NorthWestern, to provide reliable service at reasonable

25       rates?

26

MJH-14

NOR044716

1    A.    The Tier II proceeding is a calculation of the costs MPC will incur as a result of

2    its transition from a vertically integrated utility with generation to a transmission

3    and distribution company without generation. The original design of the

4    transition has now been altered by the requirement in House Bill 474 that MPC

5    assume the burden of acting as the default supplier for all non-choice customers.

6    There are four broad categories of transition cost which must be addressed: (1)

7    MPC contracts with the qualifying facilities ("QF"); (2) MPC owned generation;

8    (3) energy supply-related deferred charges and regulatory assets; (4) other.

9    MPC's sale of its generating facilities to PPL through a competitive bid process

10    has largely eliminated the second and third categories of cost. In NorthWestern's

11    view, it should be an easy matter to address the category of "other" transition

12    costs, and the real challenge in Tier II will be to accurately estimate the out-of-

13    market cost of the contracts with the QF's.

14    Q.    Why have you characterized the accurate estimate of the out-of-market cost of the

15    contracts with the qualifying facilities as the "real challenge" of Tier II?

16    A.    The power from the contracts with the qualifying facilities will be part of the

17    supply portfolio used by MPC to meet its obligations as the default supplier under

18    House Bill 474. If the out-of-market cost of the qualifying facilities is not

19    accurately estimated, it will affect the timing of the recovery of the costs, and the

20    distribution of the costs between choice and non-choice customers.

21    Q.    Please explain how an inaccurate measure of the out-of-market cost of the

22    qualifying facilities would affect the timing of the recovery of such costs, and the

23    distribution of the costs between choice and non-choice customers.

24    A.    The cost of the default power supply must be recovered on a current period basis.

25    In contrast, the out-of-market cost of the contracts with the qualifying facilities

26    will be recovered over time. If default power supply costs are incorrectly

MJH-15

|    |    |    |
|----|----|----|
| 1  |    | categorized and treated as transition costs, it will unreasonably defer the recovery |
| 2  |    | of current period default supply costs to a later period, and incorrectly distribute |
| 3  |    | such costs between choice and non-choice customers. Assume, for example, that |
| 4  |    | the out-of-market portion of the cost of power from the qualifying facilities was |
| 5  |    | set at too great a value (i.e., the projected market level of power was set at an |
| 6  |    | artificially low level). The resulting transition cost would be artificially high for |
| 7  |    | choice customers, and would effectively require them to subsidize power supply |
| 8  |    | costs for non-choice customers. Additionally, it would deny current period |
| 9  |    | recovery of what are, in reality, default power supply costs. |
| 10 | Q. | How would a Tier II determination that there are no transition costs impact the |
| 11 |    | financial ability of MPC to provide reliable service at just and reasonable rates? |
| 12 | A. | Such a determination would not be a reasonable outcome in the Tier II |
| 13 |    | proceedings. Among other things, it would require a determination that the entire |
| 14 |    | cost of power from the QF's, over the life of the contracts, is within market. We |
| 15 |    | don't believe that is a reasonable position. Although, in the near term, such a |
| 16 |    | determination may result in the full recovery of the cost of power under the QF |
| 17 |    | contracts, it would result in a highly unstable default power supply. A zero |
| 18 |    | transition charge determination would mean that customers with a choice could |
| 19 |    | choose an alternate supplier and avoid any responsibility for the cost of |
| 20 |    | transitioning the MPC system to choice. In effect, non-choice customers would |
| 21 |    | be subsidizing, through their cost of default power supply, the choice of an |
| 22 |    | alternate supplier by choice customers. It would be extraordinarily difficult for |
| 23 |    | MPC to acquire and maintain a reasonably priced default power supply under |
| 24 |    | these circumstances. I should add that this adverse result would not be unique to |
| 25 |    | NorthWestern's ownership of MPC. It would also be the case if current |
| 26 |    | ownership of MPC was maintained. |

MJH-16

1    Q.    Why did you testify that the critical consideration is how the Commission intends

2           to ensure the recovery of the cost of the default power supply?

3    A.    The viability of MPC, whether it is owned by NorthWestern or its current owners,

4           will be critically dependent upon its ability to recover the costs it actually incurs

5           in providing the default power supply. No utility (regardless of the identity of its

6           ownership) can, for any length of time, sell power to its customers at a price less

7           than the cost of that power in the market.

8    Q.    Do you have any final comments for the Commission?

9    A.    Yes. NorthWestern is eager to move ahead on the sale and all other matters that

10          are currently pending at the PSC. We are available to work with the Commission

11          and parties on any reasonable timetable. July 1, 2002 is rapidly approaching, and

12          it is our sincere hope thatdecisions are reached soon concerning important

13          transition issues, our purchase of MPC and the development of the portfolio of

14          default supply contracts. We would prefer to spend the remaining time before

15          default supply service begins educating Montana customers on the impacts on

16          them of the many changes in the Montana electric utility industry, and helping

17          them to understand the methods they can use to help control their electricity bills.

18    Q.    Does that conclude your testimony?

19    A.    Yes.

20

21

22

23

24

25

26

MJH-17

NOR044719

NorthWestern Corporation
Exhibit ___(MJH-1) Page 1 of 2

Biographical Data For

## MICHAEL J. HANSON

47258 272nd Street

Sioux Falls, South Dakota  57108

| | |
|---|---|
| Position: | President & CEO<br>NorthWestern Services Group, Huron, South Dakota<br>NorthWestern Public Service, Huron and Sioux Falls, South Dakota |
| Date Effective: | April 20, 2000 |

Job History:

| | |
|---|---|
| 1981-82 | Northern States Power - Gas Operating Clerk |
| 1981-83 | Northern States Power - Accounting Coordinator |
| 1983-84 | Northern States Power - Accountant |
| 1984-89 | Northern States Power - Internal Auditor |
| 1989-94 | Northern States Power - Attorney |
| 1994-98 | Northern States Power - General Manager & Chief Executive |
| 1998-00 | NorthWestern Public Service - President & CEO |
| 2000-Present | NorthWestern Services Group - President & CEO |

| | |
|---|---|
| Birth: | December 12, 1958<br>Sparta, Wisconsin |
| Military Service: | Navy, 1977-1979<br>Midshipman (W-4) |
| Education: | Sparta Senior High School, 1977<br>United States Naval Academy, 1977-79<br>University of Wisconsin, 1982, BS<br>William Mitchell College of Law, 1989, Juris Doctor |
| Family: | Married Laura K. Eggers, Sparta, Wisconsin, February 16, 1980 |
| | Children -  Justin M. Hanson - born May 25, 1982<br>            Danielle M. Hanson - born March 19, 1985 |
| Directorships: | Huron Regional Medical Center Foundation Board (Vice Chairman)<br>Sioux Council Boy Scouts Board (President), Immediate Past President<br>Marquette Bank - Sioux Falls<br>South Dakota Rural Enterprises, Inc. (1998-1999)<br>Sioux Falls Development Foundation (Chairman) (1997-98)<br>Fargo Cass County Economic Development Corp (1997-98)<br>Sioux Vocational Services (1994-97)<br>Sioux Empire United Way (1994-97) |

1

NOR044720

NorthWestern Corporation
Exhibit ___ (MJH-1) Page 2 of 2

Club and Association Memberships:
        Edison Electric Institute
        South Dakota Electric Utility Companies (Chairman)
        Minnesota State Bar Association
        Hennepin County Bar Association
        American Bar Association
        Institute of Internal Auditors
        North East Council of Governments
        Downtown Rotary Club, Sioux Falls
        Gloria Dei Lutheran Church

Recognitions:    Juris Doctor Magna Cum Laude (1989)
        James R. Kelly Award Certified Internal Auditor (CIA) Exam (1984)
        Certificate of Excellence (CIA Exam) (1984)
        Daughters of the American Revolution Good Citizenship Award (1977)
        Student Council President (1976-77)
        Class President (1974-75)

2

NOR044721

NOR044722

Department of Public Service Regulation
Montana Public Service Commission
Docket No. D2001.1.5
The Montana Power Company

PREFILED TESTIMONY OF JERROLD P. PEDERSON
ON BEHALF OF THE MONTANA POWER COMPANY

Q. Please state your name and business address.

A. Jerrold P. Pederson, 130 N. Main St., Butte, Montana 59701.

Q. What is your position with Montana Power Company (MPC)?

A. I am the Chief Financial Officer, and the Vice-Chairman of MPC's Board of Directors. I am also the Chief Financial Officer of Touch America, Inc.

Q. What is the purpose of your testimony?

A. The purpose of my testimony is to demonstrate that MPC will be as fit, willing and able to continue to provide quality utility service to its customers at the time of the sale to NorthWestern as it is today. I will address the following issues:

    1. the process used in selling MPC's utility business, which is the same process used to sell the other energy businesses (oil and gas, coal and independent power production);

    2. why NorthWestern Corporation was the successful bidder and clear choice to be the buyer of MPC's utility business;

    3. the important distinction that NorthWestern is acquiring an entire business, and not just electric and natural gas utility assets;

    4. the importance of timely resolution of this filing;

    5. the relevance of this PSC decision and its impact on economic development in the state, especially the continued growth of Touch America; and

JPP-1

NOR044723

1              6.    MPC's responses to the pertinent portions of the ten specific items

2                    raised in the Commission's recent Order No. 6353.

3              1.    PROCESS USED IN SELLING UTILITY BUSINESS

4    Q.   Please describe the process used in the sale of the utility business.

5    A.   Our Board of Directors determined that the energy divestiture would be in the form

6         of stock sales and that competitive-bid processes would be followed. An interested

7         party could bid on one or multiple businesses.

8              A stock sale was better than an asset sale for us, because it was simpler and

9         it assured that all assets and liabilities of the business would be assumed by the new

10        owners. There were no tax advantages or disadvantages of one sale method

11        compared to the other. The competitive-bid process encouraged interest from many

12        potential buyers and assured the best terms and conditions to consummate the sale.

13             The process followed was to contact potentially interested parties and upon

14        their signing a confidentiality agreement, to provide them with an Offering

15        Memorandum that described the utility business being offered, including the then

16        current business plan. Based on this information, non-binding indicative bids were

17        submitted, and, upon analyzing bids, potential qualified buyers were invited to visit

18        information data rooms, ask questions of officers and managers and inspect

19        properties. After this opportunity to examine the companies being sold in detail,

20        parties were provided a draft purchase agreement which they were instructed to use

21        in submitting binding bids. Altogether, this process allowed the seller to closely

22        manage the sale, preserving for employees their benefits and values and

23        encouraging a competitive environment. Throughout the process, Goldman Sachs

24        & Co., our business advisor, and Milbank, Tweed, Hadley & McCloy, our legal

25        advisor, helped manage the activities to a successful outcome, and they assisted in

26        selecting and negotiating with the final candidate chosen from those submitting

JPP-2

NOR044724

| | | |
|---|---|---|
| 1 | | binding bids. |
| 2 | Q. | What were the criteria used to select the successful bidder? |
| 3 | A. | There were several criteria, including the proposed purchase price; the buyer's |
| 4 | | ability to finance the transaction and accomplish closing in a timely manner; the |
| 5 | | buyer's willingness to accept the business legacies; the anticipated impact on |
| 6 | | employees and communities; and changes proposed by the buyer to the draft |
| 7 | | purchase agreement, especially the employee protection provisions. |

8       **2.**     **WHY NORTHWESTERN WAS THE SUCCESSFUL BIDDER**

| | | |
|---|---|---|
| 9 | Q. | Why was NorthWestern selected? |
| 10 | A. | NorthWestern was selected based on an evaluation of its overall bid package in |
| 11 | | comparison to the other final bidders.  The primary reasons for the selection were: |

12         1.     NorthWestern's purchase price of $602 million, plus assumption of

13                up to $488 million in debt, was firm and not subject to purchase

14                price adjustment provisions;

15         2.     NorthWestern had firm financing arrangements and did not make

16                financing a closing condition;

17         3.     NorthWestern has an established utility;

18         4.     NorthWestern proposed the fewest substantive changes to the draft

19                purchase agreement.  Most significantly, NorthWestern accepted the

20                employee protection provisions without change and NorthWestern

21                proposed acceptable indemnity provisions, especially regarding

22                environmental liabilities.

23       When all criteria were considered, we and our advisors found NorthWestern's bid

24       proposal the clear choice as the successful final bidder.

25      **3. NORTHWESTERN IS ACQUIRING AN ENTIRE OPERATING BUSINESS**

| | | |
|---|---|---|
| 26 | Q. | Please describe what NorthWestern is purchasing pursuant to the purchase |

NOR044725

1         agreement.

2    A.    NorthWestern is purchasing a business entity comprising the entire current business

3         of MPC, excluding the telecommunications business and Entech, Inc. This is

4         important, because various Commission orders and articles in the press have

5         referred to this transaction as the sale of electric and natural gas utility assets, which

6         is incorrect. There is a fundamental difference between the sale of an entire

7         business, and an asset sale. What NorthWestern is acquiring is the entity which

8         owns the electric and natural gas utility assets. Ownership of those assets will not

9         pass to NorthWestern, but rather will remain in the entity which NorthWestern is

10        acquiring. Accordingly, selling an entire business entity, rather than assets, to

11        NorthWestern results in the following:

12               1.    All existing contractual relationships and arrangements will be

13                     unchanged;

14               2.    The utility assets and net worth will be unchanged;

15               3.    The service to the public will be unchanged;

16               4.    The rate structure and tariffs will be unchanged; and

17               5.    The obligations to operate in accordance with PSC and FERC

18                     regulation will be unchanged.

19        Selling an entire business entity allows the legal existence of the entity to continue

20        without interruption. Only the owner of the entity changes. This would not have

21        been the case if MPC's transaction with NorthWestern was an asset sale. An

22        example of an asset sale is MPC's generation sale transaction with PPL Montana,

23        LLC.

24    Q.    Please describe the restructuring of the business entity to accommodate the sale.

25    A.    To accomplish the separation of the telecommunications business and Entech from

26         MPC and to assure investors avoid adverse tax consequences, MPC needs to

JPP-4

NOR044726

| | | |
|---|---|---|
| 1 | | restructure and convert The Montana Power Company, a Montana corporation, into |
| 2 | | The Montana Power, L.L.C., a Montana limited liability company ("MPC LLC"). |
| 3 | | MPC LLC is the entity NorthWestern will acquire.  This conversion will be done |
| 4 | | through the merger of MPC into MPC LLC, with MPC LLC absorbing MPC and |
| 5 | | emerging as the surviving entity.  By operation of the merger, all the assets and |
| 6 | | liabilities of MPC will automatically vest in MPC LLC.  MPC LLC will be a |
| 7 | | subsidiary of Touch America Holdings, Inc. in this restructuring.  Then, the |
| 8 | | telecommunications business and Entech will be separated from MPC LLC, and |
| 9 | | NorthWestern will purchase all the membership interests in MPC LLC from Touch |
| 10 | | America Holdings.  Entech, Inc. will become Entech, LLC, a subsidiary of Touch |
| 11 | | America Holdings.  Because Entech was the parent of the sold oil and gas, coal and |
| 12 | | independent power production businesses, any remaining legal issues associated |
| 13 | | with those entities or sales will remain with Touch America.  Limited liability |
| 14 | | companies have membership interests, as opposed to capital stock, so this |
| 15 | | transaction is, in effect, a stock sale accomplished through a limited liability |
| 16 | | company.  Attached as Exhibit ___(JPP-1) are diagrams illustrating the merger, |
| 17 | | corporate restructuring and sale of MPC LLC to NorthWestern. |
| 18 | Q. | Because NorthWestern is purchasing an entire business, will NorthWestern be |
| 19 | | acquiring more than the regulated electric and natural gas transmission and |
| 20 | | distribution utility business subject to PSC jurisdiction? |
| 21 | A. | Yes.  As noted above, NorthWestern will acquire everything MPC currently owns |
| 22 | | except its telecommunications business and Entech.  So, in addition to the regulated |
| 23 | | transmission and distribution utility business, the sale will include MPC's interests |
| 24 | | in the following: |
| 25 | | 1.    Colstrip 4 – MPC's 30% leasehold interest in Colstrip Unit 4, and |
| 26 | | corresponding Colstrip 4 related interest in the Colstrip transmission |

JPP-5

NOR044727

| | | | | |
|---|---|---|---|---|
| 1 | | | system; | |
| 2 | | 2. | Milltown Dam; | |
| 3 | | 3. | the following MPC subsidiaries: | |
| 4 | | | a. | One Call Locators, Ltd., |
| 5 | | | b. | Discovery Energy Solutions, Inc., |
| 6 | | | c. | Canadian-Montana Pipe Line Corporation, |
| 7 | | | d. | Montana Power Services Company, and |
| 8 | | | e. | Colstrip Community Services Company; |
| 9 | | 4. | the following MPC business trusts: | |
| 10 | | | a. | Montana Power Capital One, |
| 11 | | | b. | MPC Natural Gas Funding Trust; and |
| 12 | | 5. | MPC's unregulated propane systems that serve the Big Sky Resort | |
| 13 | | | and the Anaconda Job Corps. | |

14 Q. What organizational structure is in place for operation and management of the

15      electric and gas utility business during periods of time before and after the

16      transaction closing?

17 A. The business to be merged into MPC LLC and purchased by NorthWestern is

18      currently a complete, self-contained organization, with approximately 1,100

19      employees.   A complete, experienced management team leads the organization.

20      They are:

| | | |
|---|---|---|
| 21 | John D. Haffey | President, Montana Power Utility Division |
| 22 | | 29 Years of Service |
| 23 | Patrick R. Corcoran | Vice President, Regulatory Affairs |
| | | 22 Years of Service |
| 24 | David A. Johnson | Vice President and Chief Operating Officer, |
| 25 | | Distribution Services |
| | | 20 Years of Service |
| 26 | | |

JPP-6

NOR044728

| | | |
|---|---|---|
| 1 | Ernest J. Kindt | Vice President, Chief Accounting Officer |
| 2 | | 27 Years of Service |
| 3 | Michael P. Manion | Vice President and General Counsel |
| | | 16 Years of Service |
| 4 | Pamela K. Merrell | Vice President, Human Resources and |
| 5 | | Administration |
| | | 20 Years of Service |
| 6 | David N. Ottolino | Vice President and Chief Information Officer |
| 7 | | 21 Years of Service |
| 8 | William A. Pascoe | Vice President, Chief Operating Officer |
| | | Transmission Services |
| 9 | | 23 Years of Service |
| 10 | Ellen M. Senechal | Vice President, Treasurer and Chief Financial |
| | | Officer |
| 11 | | 27 Years of Service |

12   Q.   How does the ownership structure and the stock sale nature of the transaction affect

13        pending PSC proceedings such as the Tier II docket?

14   A.   NorthWestern will be the owner of MPC LLC, the entity that will remain subject to

15        PSC jurisdiction.  MPC LLC is the entity that will continue to be a party to all

16        pending PSC proceedings, and is the entity that will be impacted by any PSC orders.

17        Just as the economic consequences resulting from PSC orders today impact MPC's

18        utility business, after the transaction they will impact the utility business of MPC

19        LLC, independent of the ownership of that entity.  The only exception to this is that

20        Touch America Holdings, the seller, agreed to indemnify MPC LLC, while under

21        NorthWestern ownership, from any adverse consequences resulting from regulatory

22        orders regarding the use of the proceeds from the sale of MPC's oil and gas

23        business.  This is consistent with the seller's indemnity obligation in the purchase

24        agreement with respect to consequences resulting from the divestiture of the oil and

25        gas, coal and independent power businesses.  Montana Power encourages the PSC

26        to move forward quickly to resolve pending proceedings, but they should not be

JPP-7

NOR044729

| 1 | | intertwined with this Application. |
|---|---|---|
| 2 | | 4.    IMPORTANCE OF A TIMELY RESOLUTION |
| 3 | Q. | Why is a timely closing of the transaction important? |
| 4 | A. | All stakeholders have an intense interest in a timely closing of the transaction. |
| 5 | | Until the transaction is closed, there is an obvious uncertainty that negatively |
| 6 | | impacts employees, affected communities, the State of Montana, customers, |
| 7 | | investors, stock price, and the financial community that provides credit to both |
| 8 | | MPC and Touch America. For example, MPC has various lines of credit coming |
| 9 | | up for renewal in the next couple of months. Normally the renewal process is |
| 10 | | fairly routine. However, this year the renewal process is complicated and could |
| 11 | | be more expensive than necessary because the NorthWestern transaction has not |
| 12 | | closed. |
| 13 | Q. | What time frame do you consider timely? |
| 14 | A. | A decision from the PSC by October 15, 2001, would be timely as that is about |
| 15 | | the time the steps necessary to permit closing can be accomplished. The special |
| 16 | | shareholder meeting for approving the restructuring of the company and the sale |
| 17 | | of the utility business will be held September 14, 2001. After that, it will take |
| 18 | | approximately one month to call the two issues of preferred stock also to be |
| 19 | | approved at the meeting and required prior to closing the sale. |
| 20 | Q. | Is a timely closing important to Touch America? |
| 21 | A. | Yes, it is. Touch America's business plan is premised on closing the sale and |
| 22 | | using the after tax proceeds to complete its fiber network construction. Delay in |
| 23 | | closing jeopardizes that plan, placing significant pressure on Touch America's |
| 24 | | liquidity. Access to capital from traditional financial sources is very difficult |
| 25 | | today, especially for telecommunication companies. |
| 26 | Q. | Please describe which governmental approvals have already been obtained. |

JPP-8

NOR044730

A.   The important approvals already obtained are summarized as follows:

Federal Energy Regulatory Commission (FERC)

Since the start of this year, FERC has processed filings and issued four orders of approval as follows:

    1.   Order issued February 20, 2001 authorizing the transaction under Section 203 of the Federal Power Act;

    2.   Order issued February 9, 2001 accepting a filing submitted for purposes of revising MPC's statement of policy and standards of conduct to reflect the NorthWestern transaction;

    3.   Order issued March 30, 2001 approving the transfer of the Milltown FERC license from MPC to MPC LLC;

    4.   Order issued May 18, 2001 approving the transfer to MPC LLC of MPC's Natural Gas Act Section 3 Authorization and Presidential Permits with respect to natural gas border crossing facilities at the border between Montana and Canada.

United States Antitrust Laws

The Hart-Scott-Rodino Antitrust Improvements Act prohibits MPC and NorthWestern from completing their transaction until they submit required information to the antitrust division of the Department of Justice and the Federal Trade Commission and until applicable waiting period requirements have been satisfied. MPC and NorthWestern filed the necessary documents, and the waiting period commenced on December 21, 2000 and expired on January 17, 2001.

Securities and Exchange Commission (SEC) Approval of Proxy

On July 17, 2001 the SEC gave final approval to MPC's proxy statement in connection with the special meeting of MPC's shareholders on September 14, 2001 to approve the transaction with NorthWestern.

JPP-9

NOR044731

1           5. IMPACTS ON MONTANA AND TOUCH AMERICA, INC.

2    Q.    Please describe the potential impact of the Commission's decision on economic

3          development as well as the perception of the risk of doing business in Montana.

4    A.    As Chief Financial Officer I visit with the financial and business community

5          throughout the country on a regular basis. These parties often have views on

6          Montana's economic development climate. I am often placed in the position of

7          explaining and defending the actions of the Commission and the State of Montana

8          from perspectives of others that are critical of the State. Perceptions are reality in

9          investment decisions, and the actions the Commission takes reach far beyond the

10         viewers and listeners in Montana, and are virtually instantaneously communicated

11         throughout the country, especially within the financial community. This is

12         especially true now, as both MPC and Touch America are watched closely. The

13         manner in which the Commission processes this filing, including the timeliness of

14         its actions, is critical in that it will leave long lasting perceptions as to whether

15         Montana is a good place to invest and do business.

16                This is a time of opportunity for our state. NorthWestern is prepared to

17         make a $1.1 billion investment in Montana, as well as build its $175 million

18         Montana First Megawatts generation facility in Great Falls. Correspondingly,

19         Touch America, a Montana-based company managing a nationwide business, will

20         reinvest the proceeds from the sale and grow its business. A decision of this

21         magnitude does not present itself very often, and the Commission has a decisive

22         opportunity to take part in fostering economic development in this state with its

23         actions on this filing, and to communicate it clearly throughout the nation. All of

24         these positive results can flow from a timely approval of the application.

25   Q.    Please describe Touch America's growth plans.

26

JPP-10

NOR044732

1    A.    Touch America has approximately 400 employees in Montana, including

2          approximately 150 in Missoula and 200 at the corporate headquarters in Butte.

3          Customer service activities are performed in Missoula. Butte is the headquarters

4          of Touch America and is also from where the fiber optic network is managed.

5          Touch America also has offices in Billings, Bozeman, Great Falls, Helena and

6          Kalispell. Touch America's nation-wide employment has grown from 170 in

7          1999 to about 950 currently. Touch America's sales and sales support has grown

8          from 50 at the end of 1999 to about 400 today. Around the country, Touch

9          America has 27 staffed offices. Touch America is using the proceeds from the

10         sale of the energy businesses to grow its business. By the end of this year, Touch

11         America will have a 26,000-mile fiber optic network across the country. At the

12         end of this year, after having completed the NorthWestern transaction, Touch

13         America expects to have $1.6 billion in assets, including $350 million in cash, and

14         no debt. This financial structuring makes Touch America unique in the

15         telecommunications industry, as its competitors have relied principally on debt to

16         grow their businesses.   We believe we can take advantage of this basic difference

17         to compete successfully in the telecommunications industry for the benefit of our

18         shareholders, employees and this State.

19         **6.    RESPONSES TO PSC QUESTIONS**

20    Q.    The Commission's "Order Denying Application as Filed and Providing Direction

21         and an Opportunity to Refile" (Order No. 6353) issued June 26, 2001, listed several

22         items that the Commission said the refiled application should address. Please

23         respond to these items.

24    Q.1.  The current book value of all electric and natural gas utility property involved in the

25         transaction.

26    A.    The accounting records of MPC do not separately identify the book value of the

JPP-11

|     |      |                                                                                      |
|-----|------|--------------------------------------------------------------------------------------|
| 1   |      | electric and natural gas businesses. Many of the assets and liabilities included in the |
| 2   |      | sale are common to those two businesses. The Company does maintain detailed           |
| 3   |      | records for electric and gas utility assets that are included in utility rate base. The |
| 4   |      | sale to NorthWestern is a sale of an active business. All of the assets and liabilities |
| 5   |      | of the respective companies comprising the business will be transferred with the      |
| 6   |      | sale.                                                                                 |
| 7   | Q.2. | The proposed purchase prices for the electric and natural gas utility properties.     |
| 8   | A.   | Under the purchase agreement, there is just one purchase price for the business       |
| 9   |      | entity NorthWestern is acquiring. That purchase price is $602 million in cash,         |
| 10  |      | plus the assumption of up to $488 million in debt. NorthWestern may make              |
| 11  |      | allocations of the purchase price for federal income tax purposes under Internal      |
| 12  |      | Revenue Code Section 388(h)(10), consistent with the tax provisions in the            |
| 13  |      | purchase agreement. Any Section 338(h)(10) allocations would be done by               |
| 14  |      | NorthWestern after closing and the seller is obligated under the purchase             |
| 15  |      | agreement to cooperate with NorthWestern in making that allocation.                   |
| 16  | Q.3. | Support for proposed allocation of any above book proceeds associated with the        |
| 17  |      | transaction.                                                                          |
| 18  | A.   | MPC believes that the proceeds from the sale of the businesses should not be an       |
| 19  |      | issue in this proceeding. In our proxy statement/prospectus dated July 13, 2001,      |
| 20  |      | we estimated the after tax gain if the sale occurred on March 31, 2001, to be         |
| 21  |      | approximately $32 million. This estimate is subject to significant change until the   |
| 22  |      | sale closes. Under general business law principles, if a business is sold, the owner  |
| 23  |      | keeps the gain or bears the burden of a loss. No business or legal principle          |
| 24  |      | suggests a privately owned utility sale should be treated any differently.            |
| 25  |      |     This result is not unfair to ratepayers. MPC's investors have supplied the         |
| 26  |      | funds for the utility business to operate and therefore took the financial risk of that |

NOR044734

1    investment. On the other hand, the ratepayers have borne the risk of changing

2    costs and changing rates; they have not assumed general financial risk since they

3    did not contribute the capital for the business.

4        Further, that NorthWestern has agreed to purchase the stock at what may

5    be a premium is, in itself, of no consequence to the regulatory test that applies in

6    this case-that MPC is as fit, willing and able to continue to provide quality utility

7    service to its customers at the time of the sale to NorthWestern as it is today. The

8    Commission has never involved itself in how much someone has paid for MPC or

9    any other utility's stock. Rates do not change based on the fluctuations in a

10   utility's stock price. Where this issue has relevance is if the new owner seeks to

11   recover any premium paid above book value from customers. NorthWestern

12   addresses this issue in its testimony.

13   B.    Q.4.    Any commitments by NorthWestern related to the level of rates, including

14   rates for default electricity supply, and service quality after the transaction.

15   C.    This item is properly addressed by NorthWestern, not MPC.

16   Q.5.   Any commitments by NorthWestern that an acquisition adjustment will not be

17   sought.

18   A.    This item is properly addressed by NorthWestern, not MPC.

19   Q.6.   Support for applicants' claim that, out of a group of potential purchasers,

20   NorthWestern was the clear choice for the transaction.

21   A.    This was addressed previously in my testimony.

22   Q.7.   NorthWestern's ability to develop and maintain utility-scale generation to serve

23   loads in the acquired electric service territory, if, in the future, it is determined to

24   be in the public interest.

25   A.    This item is properly addressed by NorthWestern, not MPC.

26

JPP-13

NOR044735

| | | |
|---|---|---|
| 1 | Q.8. | Any operational efficiencies NorthWestern expects to achieve after the |
| 2 | | transaction. |
| 3 | A. | This item is properly addressed by NorthWestern, not MPC. |
| 4 | Q.9. | Any system weaknesses NorthWestern identified in its due diligence. |
| 5 | A. | This item is properly addressed by NorthWestern, not MPC. |
| 6 | Q.10. | MPC's financial ability, as a division or subsidiary of NorthWestern, to provide |
| 7 | | continued reliable service at just and reasonable rates under any reasonable |
| 8 | | outcome in Docket No. D97.7.90 regarding transition costs and charges. |
| 9 | | Applicants should analyze the effect on the financial strength of the utility, rates |
| 10 | | and service quality of various levels of transition charges, including no transition |
| 11 | | charge. |
| 12 | A. | My response extends to the date of sale. The seller has managed the business in a |
| 13 | | way, and the sales agreement assures, that MPC will be fit and able to continue to |
| 14 | | meet its utility obligations. Here are the reasons why: |

15       1.    All of the assets used to provide electric and gas service to
16            customers remain with Montana Power.

17       2.    There has been no reduction in construction or maintenance
18            spending since the sale was announced in October 2000.

19       3.    The capital structure has been conservatively maintained to support
20            its investment grade credit rating.

21       4.    An experienced and knowledgeable management team was put in
22            place in 2000 and they are running the business. At the time of the
23            sale they will continue to be employees of MPC.

24       5.    The MPC workplace has been appropriately sized to take
25            advantage of the technology improvements through an enhanced
26            severance program.

NOR044736

6.    The cost incurred by MPC to provide utility service will not be adversely impacted by the sale.

Any decision in Docket No. D97.7.90 regarding transition costs must, of course, be made based on the record in that proceeding. The decision also should, and must, be independent of corporate ownership, because it is the Montana Power Company Electric Utility that is the business which must, at the end of the day, be able to continue to provide safe, reliable service, and have financial integrity, with just and reasonable rates, standing on its own. That is, Docket No. D97.7.90 addresses the Electric Utility of the Montana Power Company. In that docket, it is the Electric Utility that must be able to provide continued reliable service at just and reasonable rates. The Electric Utility is the regulated entity in that docket. It is part of the Montana Power Company being acquired by NorthWestern.

Rating agencies have long expressed concern about the potential treatment of the Company's transition costs, especially the qualifying facilities (QF) costs. Their concern centers around the potentially adverse impact on cashflow and debt servicing to the extent that the costs of these contracts are not recoverable through rates. Every dollar of QF costs not recovered in rates negatively impacts the pretax interest coverage, funds from operations interest coverage and funds from operations to total debt ratio. In addition, the revenue shortfall can cause the Company to increase debt in order to pay the amounts owed, which also negatively impacts coverages and ratios. Given the size of the estimates of these costs, a downgrade in the securities ratings is probable if significant costs are disallowed. While the Company's current ratings are in the investment grade range, they are in the lower levels of investment grade ratings and could easily fall below investment grade. This result would hurt current investors and would increase the cost of borrowing on both a long-term and short-term basis. It would

JPP-15

NOR044737

1  become more difficult for the Company to access financial markets, especially

2  during times of market disruptions.  Ultimately, ratepayers would see rates

3  increase as the cost of capital increased.  Because an electric utility is a capital

4  intensive business that must access capital markets from time to time for both

5  working capital and construction capital, the ability to provide reliable service

6  could be compromised if such access becomes difficult.

7  Q.  Does that complete your testimony?

8  A.  Yes.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

JPP-16

NOR044738

NOR044739

The Montana Power Company
Exhibit ___(JPP-1) Page 1 of 5

Step 1

**THE MONTANA POWER COMPANY PRIOR TO RESTRUCTURING**
(Post-Sale of Oil & Gas, Independent Power and Coal Businesses and post-merger of Entech, Inc. into Entech, LLC)



The Montana Power Company
(Includes the Utility Business)

Touch
America
Holdings, Inc.

The Montana
Power, L.L.C.

Utility Subsidiaries and Business Trusts
1. Montana Power Capital 1
2. Discovery Energy Solutions, Inc.
3. Canadian – Montana Pipe Line Corporation
4. Montana Power Services Company
5. One Call Locators, Ltd.
6. MPC Natural Gas Funding Trust
7. Colstrip Community Services Company

Entech, LLC

Touch
America, Inc.

Tetragenics
Company

NOR044740

The Montana Power Company
Exhibit ___ (JPP-1) Page 2 of 5

Step II                                    THE MERGER



Utility Subsidiaries and Business Trusts
1. Montana Power Capital 1
2. Discovery Energy Solutions, Inc.
3. Canadian – Montana Pipe Line Corporation
4. Montana Power Services Company
5. One Call Locators, Ltd.
6. MPC Natural Gas Funding Trust
7. Colstrip Community Services Company

The Montana Power Company
Exhibit ___(JPP-1) Page 3 of 5

NOR044741

**POST-MERGER**

Step III



Touch America Holdings, Inc.

The Montana Power, L.L.C.
(Surviving Entity)

Utility Subsidiaries and Business Trusts
1. Montana Power Capital 1
2. Discovery Energy Solutions, Inc.
3. Canadian – Montana Pipe Line Corporation
4. Montana Power Services Company
5. One Call Locators, Ltd.
6. MPC Natural Gas Funding Trust
7. Colstrip Community Services Company

Entech, LLC

Touch America, Inc.

Tetragenics Company

The Montana Power Company
Exhibit ___ (JPP-1) Page 4 of 5

NOR044742

Step IV

**POST-MERGER**
(Prior to the Sale of the Utility Business But After the Transfer (By Means of Dividend) of Entech, LLC, Tetragenics Company
and Touch America to Touch America Holdings, Inc.)



NOR044743

Step V

The Montana Power Company
Exhibit ___(JPP-1) Page 5 of 5

**TOUCH AMERICA HOLDINGS AFTER COMPLETION OF THE RESTRUCTURING**
(After the Sale of Utility Business)

