

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF DELAWARE

2

Civil Action No. C.A. No. 04-1494 (JJF)

3

MAGTEN ASSET MANAGEMENT CORPORATION and

4    LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5    Plaintiffs,

6    v.

7    NorthWestern Corporation,

8    Defendant.

9    ----------------------------------------------

10   Civil Action No. C.A. No. 05-499 (JJF)

11   MAGTEN ASSET MANAGEMENT CORP.,

12   Plaintiff,

13   v.

14   MICHAEL J. HANSON and ERNIE J. KINDT,

15   Defendants.

16   ----------------------------------------------

17                  DEPOSITION OF

18                   MERLE LEWIS

19   ----------------------------------------------

20

21

22

23

24

25   TAKEN ON:  6/20/2007          BY:  DANA ANDERSON



Page 2

```
 1   APPEARANCES:
 2   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
     One New York Plaza
 3   New York, New York 10004-1980
     By: Bonnie Steingart, Esq.
         Sabita Krishnan, Esq.
 4
     For the Plaintiffs
 5
 6
 7
 8
 9   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
     101 Park Avenue
10   New York, New York 10178-0061
     By: Nancy E. Delaney, Esq.
11
     For NorthWestern Corporation
12
13
14
15   LEONARD, STREET AND DEINARD, P.A.
     150 South Fifth Street, Suite 2300
16   Minneapolis, MN 55402
     By: Michael G. Taylor  Esq.
17
     For the Witness
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES (continued):
 2   BROWNING, KALECZYC, BERRY & HOVEN, PC
     139 North Last Chance Gulch
 3   Helena, MT 59601
     By: Stanley Kaleczyc, Esq.
 4       Kimberly A. Beatty, Esq.
 5   For Michael J. Hanson and Ernie J. Kindt
 6
 7
 8
 9   NIXON PEABODY, LLP
     437 Madison Avenue
10   New York, NY 10022-7039
     By: Christopher M. Desiderio, Esq.
11
     For Law Debenture Trust Company of New York
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   INDEX
 2   Examination by Ms. Steingart, page 7
 3
 4   INDEX OF EXHIBITS
 5   Exhibit Number 1, Confidentiality Agreement, page 8
 6   Exhibit Number 2, Management Financial and
     Information Report Meeting 2002 Calendar, page 19
 7
     Exhibit Number 3, NorthWestern Corporation Staff
 8   Meeting/Executive Committee Meeting Minutes, January
     28, 2002, page 21
 9
     Exhibit Number 4, February 25, 2002 E-mail from
10   Barbara Forinash to Karen Smook regarding NOR
     Staff/Exec Committee Materials, page 22
11
     Exhibit Number 5, January 17, 2002 E-mail from
12   Richard Hylland to Trey Bradley and Merle Lewis
     regarding Scorecard for January, page 29
13
     Exhibit Number 6, March 18, 2002 Confidential
14   Memorandum from Eric Jacobsen and Mike Hanson to
     Merle Lewis, Dick Hylland and John Van Camp
15   regarding MPC Compensation Proposal, page 38
16   Exhibit Number 7, April 9, 2002 E-mail from Merle
     Lewis to Richard Hylland regarding Board, page 43
17
     Exhibit Number 8, April 16, 2002 E-mail from Paul
18   Wyche to Mike Hanson, David Monaghan and Daniel
     Newell regarding First Quarter Earnings Release,
19   page 45
20   Exhibit Number 9, NorthWestern Management Financial
     and Information Report For The Month Ended May 31,
21   2002, page 47
22   Exhibit Number 10, NorthWestern Management Financial
     and Information Report For The Month Ended June 30,
23   2002, page 57
24
25
```

Page 5

```
 1   INDEX OF EXHIBITS (continued)
 2   Exhibit Number 11, NorthWestern Management Financial
     and Information Report For The Month Ended July 31,
 3   2002, page 62
 4   Exhibit Number 12, May 28, 2002 Memorandum from Kipp
     Orme to Merle Lewis, Dick Hylland and Eric Jacobsen
 5   regarding Financing Plans and Considerations, page
     63
 6
     Exhibit Number 13, June 17, 2002 Memorandum from
 7   Kipp Orme to NorthWestern Board of Directors
     regarding Financing and IR Plans, page 72
 8
     Exhibit Number 14, July 9, 2002 Confidential
 9   Memorandum from Eric Jacobsen and Mike Hanson to
     Merle Lewis, Dick Hylland and John Van Camp
10   regarding NorthWestern Energy LTIP, page 75
11   Exhibit Number 15, May 18, 2002 E-mail from Richard
     Hylland to John Charters, Merle Lewis and Richard
12   Hylland regarding PRC Visit, page 80
13   Exhibit Number 16, June 5, 2002 E-mail from John
     Charters to multiple recipients regarding Comment on
14   Daily Flash Report, page 82
15   Exhibit Number 17, June 14, 2002 E-mail from John
     Charters to Merle Lewis regarding Daily Flash Report
16   6-12-02, page 84
17   Exhibit Number 18, June 25, 2002 E-mail from Richard
     Hylland to Trey Bradley and Merle Lewis regarding IT
18   Issues, page 88
19   Exhibit Number 19, July 15, 2002 E-mail from John
     Charters to Richard Hylland, page 89
20
     Exhibit Number 20, September 6, 2002 E-mail from
21   John Charters to Merle Lewis, Daniel Newell and
     Richard Hylland regarding August Update, page 95
22
     Exhibit Number 21, August 16, 2002 E-mail from
23   William Schwitter to Stephen Hearne and Fred Frank,
     page 97
24
25
```

2 (Pages 2 to 5)

Page 26

1  reviewed and approved NorthWestern's filings
2  with the SEC, correct?
3  A. Yes.
4  Q. And was the same true with respect to
5  NorthWestern's press releases?
6  A. No. We had a little bit different process
7  there where certainly those kind of originated
8  in the communications area. Generally I was
9  aware of those, did receive copies. But in
10  large part, I'm not kind of a communications or
11  media-type person and so typically they did not
12  look to me to make comments or changes
13  concerning the press release. That essentially
14  was between the communication area, financial
15  area and the operating areas.
16  Q. Did you review the press releases that were
17  issued to assure yourself that the statements
18  being made about NorthWestern or its earnings
19  were accurate?
20  A. When I was furnished a copy, certainly I would
21  read over that copy to see, you know, is there
22  anything in here that, you know, does not sound
23  to me like exactly the information that I had
24  received or become aware of during our
25  quarterly review process.

Page 27

1  Q. You signed NorthWestern's 10-K for 2001,
2  correct?
3  A. I believe that's correct.
4  Q. Pursuant to Sarbanes-Oxley you certified
5  NorthWestern's 10-Qs for the second and third
6  quarters of 2002, correct?
7  A. I believe that's correct.
8  Q. And the same is true with respect to the
9  amended 10-Qs for the first and second quarters
10  of 2002 that were filed on September 20th?
11  A. I may want to qualify that. I think that's the
12  case, but I maybe have to see that document to
13  be sure. But I believe that to be the case.
14  Q. Okay. Now, during 2002 there were also a
15  number of management representation letters to
16  NorthWestern's outside auditors.
17  Do you recall that during 2002 you
18  signed a management representation letter to
19  NorthWestern's outside auditor for the period
20  ending March 31, 2002?
21  A. I don't recall that specifically. But I do
22  recall that that was our normal process, that I
23  would submit a letter, a representation letter.
24  And I believe the CFO may have also signed on
25  with that with me. I'm not sure. But it seems

Page 28

1  to be my recollection that that was our
2  process.
3  Q. Now, at the beginning of 2002, do you recall
4  that NorthWestern closed on its acquisition of
5  the Montana Power Company?
6  A. I think that's correct.
7  Q. And that was an acquisition that had been in
8  the works for a period of a year or more,
9  correct?
10  A. I think it was closer to two years.
11  Q. And that initial acquisition was in February of
12  2002, do you recall that?
13  A. I believe that is correct, ma'am.
14  Q. And later in the year in November of 2002 there
15  occurred what is -- what we call here the
16  going-flat transaction. Is that something that
17  you recall?
18  A. I don't have a current recollection of that,
19  but subject to check, that perhaps did occur
20  then.
21  Q. If I refer to the going-flat transaction as one
22  where the assets that were being held through a
23  subsidiary of the Montana Power Company, were
24  transferred up to NorthWestern Corporation, is
25  that something that you can understand?

Page 29

1  A. Well, I understand it, ma'am. I really don't
2  have much recollection of it. But I do
3  understand that's what the terminology means.
4  Q. Okay. Great. Let's talk a little bit about
5  Expanets during the end of 2001 and the
6  beginning of 2002.
7  (Deposition Exhibit Number 5 marked
8  for identification.)
9  BY MS. STEINGART:
10  Q. Now, at the end of 2001, Expanets put in place
11  a billing system called Expert.
12  Do you recall that?
13  A. Yes, I do.
14  Q. And after that there was a switchover to that
15  system in November of 2001, correct?
16  A. I believe that's correct.
17  Q. And at the time that the switchover occurred,
18  there were initially significant problems with
19  the functionality of Expert, correct?
20  A. I guess I'm not sure what you mean by
21  "significant problems." But yes, the -- there
22  were some challenges associated with the system
23  as it was cut over.
24  Q. When it was cut over for the first month, there
25  were no bills produced, right?

8 (Pages 26 to 29)

**Page 30**

1  A. We come to understand that I think some five or
2     six weeks later and the cut-over period was not
3     immediately something we became aware of. But
4     we did become aware of that in January of maybe
5     2002 or whatever that timeframe is.
6  Q. I'd like to show you an e-mail we've marked as
7     Lewis 5 and it's dated January 17, 2002 and
8     it's from Mr. Hylland to a Trey Bradley and you
9     are shown as a cc?
10 A. (Reviews document.)
11 Q. Who is Trey Bradley?
12 A. Trey Bradley had the position at NorthWestern
13    Corporation of vice president of – I think
14    something like information services.
15 Q. Uh-huh.
16 A. So essentially we looked to Trey Bradley to be
17    a communication link with more of the technical
18    people at each of the organizations and to
19    understand and then translate the information
20    regarding what was happening with all kinds of
21    information systems in each of the entities
22    back to us in a fashion that we may be able to
23    understand.
24 Q. And as you -- have you seen this e-mail before?
25 A. I don't recall it specifically, but I may have

**Page 31**

1     received it.
2  Q. And you generally recall, you know, learning in
3     January that -- and reading from the first part
4     of the e-mail that starts on the second page,
5     "That as of today..." – that e-mail is
6     January 16th, "...as of today the billing from
7     Expert is a mess and has resulted in
8     extensively billings affecting cash flow."
9     That's something that you learned at that time,
10    correct?
11 A. I'm not sure exactly what time I learned about
12    that. But I think we all need to understand
13    that Mr. Hylland had a little flare for the
14    dramatic when he became concerned and he may
15    have used different ways to kind of impress his
16    current thoughts on others that maybe you or I
17    wouldn't necessarily use. But the point is he
18    was trying to get across that he had a level of
19    concern and so this was kind of maybe just his
20    way of passing on that concern to others.
21 Q. And later on as we get to the top of that
22    e-mail on January 17th Mr. Hylland says "In
23    case you are unaware, this little billing issue
24    has utilized over 50 million in working capital
25    and this last update is expected to add five

**Page 32**

1     to 15 to that."
2        Do you see that?
3  A. I see that.
4  Q. And so did you understand Mr. Hylland at that
5     time to be saying that the problems at Expanets
6     were going to cause a utilization of between 55
7     and $65 million?
8  A. I'm not sure if that's exactly what he's
9     representing here. But yes, I do see those
10    figures and I don't know. I don't know exactly
11    what that means. I don't know what the normal
12    level of working capital was.
13 Q. Uh-huh.
14 A. And perhaps that was included in these numbers.
15    I just couldn't tell you from this (indicating)
16    or from my knowledge exactly what the impact
17    is.
18 Q. Okay. But, in general, there was beginning to
19    be an impact?
20 A. I think that a fair interpretation would be
21    that there was going to be additional working
22    capital required over and above what had been
23    budgeted.
24 Q. If we could look at the January 28th minutes
25    that we have already marked as Lewis 3. These

**Page 33**

1     are the minutes of the staff executive
2     committee meeting from January 28, 2002. On
3     the first page there is an Expert system
4     update.
5        Do you see that?
6  A. Uh-huh.
7        MR. TAYLOR: You have to say yes or
8     no.
9        THE WITNESS: Yes.
10 BY MS. STEINGART:
11 Q. If you could just read that to yourself.
12 A. (Reviews document.) Okay.
13 Q. Do you recall this report being provided during
14    the staff executive meeting in January 2002?
15 A. I don't recall. But I do recall that this was
16    our normal process, so I expect that this was a
17    report that was issued.
18 Q. As the year went on, were there additional
19    reports that were issued at the staff executive
20    committee meeting about Expert and the issues
21    that existed?
22 A. I would expect that we did have additional
23    reports that follow up on this.
24 Q. And if we could look at the next page, there is
25    a section entitled Finance Update. And was a

9 (Pages 30 to 33)

Page 34

```
 1      finance update another typical component of the
 2      meetings staff/executive committee meetings
 3      that were held in 2002?
 4   A. Certainly they would because the CFO was a
 5      member of the committee and the things that he
 6      would report on typically would come under a
 7      category of finance update.
 8   Q. And the people who were attending these
 9      staff/executive committee meetings were the
10      senior executives from NorthWestern, correct?
11   A. And the CEOs from the operating entities.
12   Q. So each of the partner entity CEOs had an idea
13      of what was going on in the company as a whole
14      as well as in their own subsidiary, correct?
15   A. To the extent that there was information about
16      that, that was part of these meetings, yes. I
17      do not know that they received any other
18      independent information about other partner
19      entities other than perhaps what was discussed
20      at these meetings.
21   Q. And also the management information financial
22      reports were provided to all the partner entity
23      CEOs, correct?
24   A. The compiled NorthWestern report was submitted,
25      yes.
```

Page 35

```
 1   Q. And the partner entity CEOs, was part of their
 2      compensation NorthWestern stock?
 3          MR. KALECZYC: Object to form.
 4   BY MS. STEINGART:
 5   Q. Do you recall?
 6          MR. TAYLOR: Do you have a certain
 7      period?
 8          MS. STEINGART: During 2002. Thank
 9      you.
10          THE WITNESS: I don't recall
11      specifically without looking back at the
12      comp packages of the individuals. I don't
13      have a specific recollection. Certainly at
14      the NorthWestern level, which would be all
15      of these people except the partner entity
16      CEOs, there was attempts that were made to tie
17      compensation in some fashion to the
18      company's equity.
19   BY MS. STEINGART:
20   Q. And to the extent that the proxy statements or
21      other filings reported payment of compensation
22      to some of the partner CEOs, payment of stock
23      as compensation, you don't dispute that that
24      occurred?
25   A. I would have to look through that record or
```

Page 36

```
 1      that document speaks for itself. I can't
 2      recall specifically the elements of their comp
 3      packages.
 4   Q. As CEO and chairman of the board of
 5      NorthWestern, was it important to you to have
 6      the CEO of the partner entities have their
 7      compensation tied both to the performance of
 8      their subsidiaries as well as the performance
 9      of NorthWestern as a whole?
10   A. I guess I'm not real sure how to answer that.
11      Certainly if their compensation was tied to
12      their performance within their entities, that
13      performance contributed directly. And so -- to
14      NorthWestern's performance. And so it's kind
15      of a little bit redundant to say that there is
16      an element of both. I just don't recall
17      whether we went that second step with the CEOs
18      or not. That being said, they certainly could
19      not impact the other three entities that were
20      contributing to NorthWestern overall. So I
21      don't know how specific, you know, we tried to
22      draw that connection. But I know we put the
23      heavy emphasis based upon what they were
24      accomplishing within their entity. And that
25      part I do recall.
```

Page 37

```
 1   Q. If we look at the finance update together.
 2   A. Exhibit 3?
 3   Q. Yes, page 2, that section on the finance
 4      update.
 5   A. Okay.
 6   Q. If you see there Mr. Orme is reporting that,
 7      and I'm looking at the last two sentences in
 8      particular, that NOR has gone through
 9      175 million in cash during the last quarter.
10      And then in essence were no better off
11      regarding working capital than we were before
12      the 200 million offering that's referenced in
13      that paragraph.
14          Do you see that?
15   A. Yes.
16   Q. Was there a concern at that time that the need
17      to fund Blue Dot and Expanets and CornerStone
18      was affecting NorthWestern's liquidity?
19   A. I think that this is an expression that there
20      was concern regarding the needs of the entities
21      and that they understood that. I do not
22      interpret from this that there is any concern
23      regarding NorthWestern's liquidity. I
24      certainly did not have that understanding or
25      not read that into this particular report.
```

10 (Pages 34 to 37)

Page 38

1  Q. At that time that the $200 million was being
2     raised that Mr. Orme references there, what
3     were the intended uses of it?
4  A. I don't recall.
5  Q. Was it intended at that time that that
6     200 million was being raised that it should be
7     used for working capital expense?
8         MR. TAYLOR: To the extent you recall.
9  BY MS. STEINGART:
10 Q. To the extent that you recall.
11 A. Yeah, I'm sorry, but I just don't recall those
12    types of things. I was not that closely
13    involved with the financial side.
14        (Deposition Exhibit Number 6 marked
15        for identification.)
16 BY MS. STEINGART:
17 Q. I'd like to show you what we've marked as
18    Lewis 6.
19 A. (Reviews document.)
20 Q. It's a memo dated March 18, 2002 from
21    Eric Jacobsen and Mike Hanson addressed to you
22    and Mr. Hylland and Mr. Van Camp.
23        Do you recall receiving this on or
24        about March 18, 2002?
25 A. I don't recall it specifically, but I see I was

Page 39

1  on it so I'm sure that further review would
2  help me in that recollection.
3  Q. As you look at it now, do you recall this being
4     an unusual request being made for additional
5     compensation?
6         MR. TAYLOR: Take a chance to look at
7     it.
8         THE WITNESS: (Reviews document.)
9  BY MS. STEINGART:
10 Q. Did you regard this as an unusual request for
11    compensation?
12 A. No. I don't recall that I did feel that it was
13    unusual.
14 Q. And was it your understanding, if you look at
15    page 6 with me, that Mr. Jacobsen and
16    Mr. Hanson were requesting compensation that
17    included both cash and NorthWestern stock
18    options?
19 A. Yes, I do see that.
20 Q. Now, in connection with the request for this
21    compensation, Mr. Jacobsen and Mr. Hanson made
22    some statements about the current status of
23    NorthWestern's other subsidiaries. If you
24    could look at me at page 2 to 3 of the memo
25    and on the bottom of page 2 it says "Where

Page 40

1  would NorthWestern be if it had not been for
2  the Montana Power transaction?" There is an
3  indication that Expanets had delivered
4  2,000 – that in 2001 Expanets delivered
5  negative EBITDA.
6         Do you see that?
7  A. Yes.
8  Q. And further the next sentence says "The
9     difficulties encountered in obtaining a
10    third-party credit facility and in implementing
11    the Expert software system required NOR to
12    substantially increase its cash commitment to
13    Expanets."
14        Do you see that?
15 A. Yes.
16 Q. Do you recall what that cash commitment was at
17    the time you received this memo, that is in the
18    middle of March 2002?
19 A. No.
20 Q. Did you regard those events as warranting
21    additional compensation for Mr. Hanson and
22    Mr. Jacobsen?
23 A. What events?
24 Q. The fact that there were difficulties
25    encountered in obtaining a third-party credit

Page 41

1  facility and implementing the Expert software
2  system that required NOR to substantially
3  increase its cash commitment to Expanets.
4         MR. KALECZYC: Objection
5     mischaracterizes the document.
6  BY MS. STEINGART:
7  Q. Well, did you -- strike that.
8         At a time when NorthWestern was being
9     pressured to provide additional cash to its
10    telecommunication subsidiaries, Mr. Hanson and
11    Mr. Jacobsen are asking for additional money,
12    aren't they?
13        MR. KALECZYC: Objection.
14        THE WITNESS: I guess I have a little
15    bit of a concern with your question and
16    giving a simple answer. But at this point
17    in time March 18, 2002, certainly
18    Mr. Jacobsen and Mr. Hanson were seeking
19    compensation based upon their performance
20    in preparing and closing of the Montana
21    Power acquisition.
22        In terms of any other reference to
23    NorthWestern being pressured or anything
24    else, I think this may be their
25    characterization of how they viewed the

11 (Pages 38 to 41)



1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF DELAWARE

2

   Civil Action No. C.A. No. 04-1494 (JJF)

3

   MAGTEN ASSET MANAGEMENT CORPORATION and

4  LAW DEBENTURE TRUST COMPANY OF NEW YORK,

5  Plaintiffs,

6  v.

7  NORTHWESTERN CORPORATION,

8  Defendant.

9  ------------------------------------------------

10 Civil Action No. C.A. No. 05-499 (JJF)

11 MAGTEN ASSET MANAGEMENT CORP.,

12 Plaintiff,

13 v.

14 MICHAEL J. HANSON and ERNIE J. KINDT,

15 Defendants.

16 ------------------------------------------------

17              DEPOSITION OF

18             RICHARD HYLLAND

19 ------------------------------------------------

20

21

22

23

24

25 TAKEN ON:  5/2/2007          BY:  DANA ANDERSON

Page 130

1    have had to transfer to itself the Montana
2    utility assets, correct?
3    A. I don't know that that was an entire
4    requirement. Certainly, there is a lot of ways
5    to do debt transactions. It could have been
6    done at a subsidiary level, could have been
7    done with a purchased money transaction like
8    Montana-Dakota Utilities probably does with
9    collateralizing assets.
10       I don't know that that was a hard
11   requirement.
12   Q. But isn't that what happened here?
13   A. I would have to go back and look and see what
14   the first -- the exact terms of that financing,
15   whether there were, in fact, first mortgage
16   bonds and leveraged on the collateral, those
17   documents should be very clear in stating that.
18   Q. And wasn't that the thrust of the going-flat
19   transaction for NorthWestern, to get these
20   assets and then use them to collateralize
21   further debt?
22   A. I don't know that that was the -- when you say
23   "the thrust," implying that that's the main
24   reason for that transfer. I don't know that I
25   can agree with you on that. I think that you

Page 131

1    could have potentially leveraged those assets,
2    again, as I just stated, at the subsidiary or
3    other structures, but I'm not the person to ask
4    on that question. You'd have to look at the
5    documents, ask Mr. Jacobsen, Mr. Orme,
6    Mr. Hanson as to how the mechanics of that
7    could or could not work. Obviously, they could
8    have done subordinated debt or other potential
9    avenues that wouldn't involve first mortgage
10   bonds, but you'd have to talk to them on that.
11   Q. What they did do is they transferred the
12   Montana utility assets to NorthWestern then
13   they encumbered them, didn't they?
14       MR. KALECZYC: Object to the form of
15   the question.
16   BY MS. STEINGART:
17   Q. If you know.
18   A. I would have to go back and look at the -- I
19   don't recall the dates of when the assets were
20   transferred, and I don't recall whether they
21   were encumbered at that parent company to all
22   your specifics. We can answer that very
23   quickly with documents.
24   Q. Let's look at number 4 on the next page, and
25   here we are talking about other liquidity

Page 132

1    events.
2       Do you see that?
3    A. Yes.
4    Q. Did you continue to evaluate and prepare
5    presentation to the board regarding the status
6    of large liquidity events?
7    A. Which number are you referring to, four or
8    five?
9    Q. Five.
10   A. Let me --
11   Q. Did you continue to evaluate and prepare for
12   the board presentations regarding the status of
13   large liquidity events?
14   A. Again, I'd have to go back and look at the
15   weekly reports. I'm assuming that those
16   reports took each one of the items and reported
17   on who was responsible for those and what
18   progress they were making. There were a
19   variety of reports.
20       I think the answer would be yes, I
21   don't recall the specific actions or activities
22   around number 5 without seeing that document.
23   Q. Now, did you assign responsibility to assist
24   you in these tasks to others who were senior
25   officers at NorthWestern?

Page 133

1    A. My general recollection was yes, those were the
2    people that were specifically responsible for
3    these kinds of areas.
4    Q. And they reported to you their progress in each
5    of the items that were listed?
6    A. That was my general recollection.
7    Q. Did you provide them with a copy of this memo?
8    A. I don't recall specifically if I did. They may
9    have been provided that. I seem to have a
10   vague recollection that Merle might have routed
11   them this and said, you know: Get on the
12   details and we'll assign responsibility and
13   let's move forward.
14   Q. One of the liquidity events here is the MFM
15   sale or partnership. Why was that a liquidity
16   event?
17   A. Well, if there was a potential for that Montana
18   First Megawatt project to be sold or a
19   partnership that would partner with Hanson and
20   Jacobsen in funding the remainder of that
21   project, that would be a positive in terms of
22   cash to the company's plan.
23   Q. That would bring in proceeds of some kind?
24   A. The sale could bring in proceeds, the
25   partnering could have proceeds alongside the

34 (Pages 130 to 133)

Page 134

1  investment to grow and finish the project.
2  Q. The Colstrip sale, how was that a liquidity
3    event?
4  A. As we've talked in early questions, the
5    Colstrip sale, as I understand it, was
6    represented by Hanson and Jacobsen to be an
7    available $97 million sale. It was part of the
8    transaction, it was represented to us that that
9    was going to occur, and so it represented,
10   potentially, $97 million, as you termed it,
11   earlier proceeds to NorthWestern.
12 Q. Did that occur any time during the period that
13   you remained at NorthWestern?
14 A. Not that I recall.
15 Q. A receivable facility at NorthWestern Energy,
16   how is that a liquidity event?
17 A. The utility personnel is not atypical of a
18   utility to what's called factor its receivables
19   or essentially leverage its receivables,
20   because they are very collectible. And so that
21   would provide capital, cash by, for example,
22   putting up the receivables to raise cash.
23 Q. And the same is true with the sale leaseback of
24   assets?
25 A. I don't know if the same is true, they are two

Page 135

1  different items.
2    In terms of sale leaseback of assets,
3    as an example, if you were to take one of the
4    office buildings in the utility and sell it to
5    a REIT and lease it back, that may provide
6    proceeds to be offset by payments that you
7    would have to make over a period of time.
8  Q. Did this have reference to utility assets or
9    non-utility assets or just the whole universe
10   of what was --
11 A. The sale leaseback of assets?
12 Q. Yes.
13 A. I think that was generally any area that could
14   be looked at. For example, there was an
15   airplane that the company had, and I --
16 Q. We are getting to nothing is sacred.
17 A. I don't know. As you know, the sale leaseback
18   of the airplane is one of those things that
19   seemed to be Mr. Drook selling the airplane,
20   same one he used at $17,000 a pop to commute
21   from Naples, Florida. So that is kind of
22   interesting, isn't it?
23    You will have to ask Gary about that
24   one.
25 Q. I will.

Page 136

1    Let's look at the cost-savings
2    schedule. You were directed by Mr. Drook to
3    continue to pursue cost savings that can be
4    accomplished within the next few months --
5  A. Which number are you on?
6  Q. I'm on number 6.
7    Did you consider, as listed here, sale
8    of the plane?
9  A. Number 7?
10 Q. I'm on number 6, it says, "Consider among
11   others, A, sell plane."
12   Is that something that you considered
13   in connection with this direction?
14 A. I'd have to go back and look at the reports and
15   the evaluations of what that transaction would
16   have looked like. I think there was some
17   analysis done of a sale leaseback, but I'd have
18   to go back and see the reports, and all of
19   that.
20 Q. "B, reduction in corporate events and
21   contributions."
22   Do you see that?
23 A. Yes.
24 Q. Do you recall which corporate events or
25   contributions were sacrificed to have a cost

Page 137

1  savings?
2  A. Not specifically the entirety of those.
3    Without documents in front of me, I wouldn't be
4    able to answer that. I know one specific event
5    that I do recall is Drook and Lewis had planned
6    a Naples board meeting for that February, and
7    it was cancelled.
8  Q. There is a note here, "Reduction in corporate
9    personnel."
10   What did you understand this to be an
11   instruction to do?
12 A. I think that's pretty self-explanatory. That
13   if there were opportunities to reduce corporate
14   costs in people, that those would potentially
15   be opportunities to enhance performance. As
16   you probably know from reviewing materials, the
17   operational excellence initiatives had
18   substantial cost savings and reduction of
19   personnel, and there was actually almost a
20   Phase II of that being contemplated that had
21   those kinds of things available in it as well.
22   Essentially, what Mr. Drook is stating
23   here if you look through these items is the
24   agenda for the November board meeting which he
25   was already aware.

35 (Pages 134 to 137)



```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2
       Civil Action No. C.A. No. 04-1494 (JJF)
 3
       MAGTEN ASSET MANAGEMENT CORPORATION and
 4     LAW DEBENTURE TRUST COMPANY OF NEW YORK,
 5     Plaintiffs,
 6     v.
 7     NORTHWESTERN CORPORATION,
 8     Defendant.
 9     -----------------------------------------------
10     Civil Action No. C.A. No. 05-499 (JJF)
11     MAGTEN ASSET MANAGEMENT CORP.,
12     Plaintiff,
13     v.
14     MICHAEL J. HANSON and ERNIE J. KINDT,
15     Defendants.
16     -----------------------------------------------
17                      DEPOSITION OF
18                      BART THIELBAR
19     -----------------------------------------------
20
21
22
23
24
25     TAKEN ON:  6/21/2007          BY:  DANA ANDERSON
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

## Page 2

```
1   APPEARANCES:
2   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
    One New York Plaza
3   New York, New York 10004-1980
    By: Gary Kaplan, Esq.
4
    For the Plaintiffs
5
6
7
8   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
    101 Park Avenue
9   New York, New York 10178-0061
    By: Nancy Delaney, Esq.
10
    For NorthWestern Corporation
11
12
13
14  FAEGRE & BENSON, LLP
    2200 Wells Fargo Center
15  90 South Seventh Street
    Minneapolis, MN 55402
16  By: Wendy Wildung, Esq.
17  For the Witness
18
19
20
21
22
23
24
25
```

## Page 3

```
1   APPEARANCES (continued):
2   BROWNING, KALECZYC, BERRY & HOVEN, PC
    139 North Last Chance Gulch
3   Helena, MT 59601
    By: Stanley Kaleczyc, Esq.
4      Kimberly A. Beatty, Esq.
5   For Michael J. Hanson and Ernie J. Kindt
6
7
8
9   NIXON PEABODY, LLP
    437 Madison Avenue
10  New York, NY 10022-7039
    By: Christopher M. Desiderio, Esq.
11
    For Law Debenture Trust Company of New York
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1   INDEX
2   Examination by Mr. Kaplan  page 6
3
4   INDEX OF EXHIBITS
5   Exhibit Number 1, Amended Notice of Deposition,
    page 6
6
    Exhibit Number 2, Stipulated Protective Order,
7   page 36
8   Exhibit Number 3, April 8, 2003 E-mail from Bart
    Thielbar to David Monaghan and Mike Hanson regarding
9   NCS Audit, page 37
10  Exhibit Number 4, July 31, 2002 E-mail from Mike
    Hanson to Robert Ming regarding NCS Audit Update,
11  page 60
12  Exhibit Number 5, August 12, 2002 E-mail from Bart
    Thielbar to David Monaghan, Jana Quam, Keith
13  Boeschler and Cary Griswold regarding NCS Audit,
    page 66
14
    Exhibit Number 6, September 13, 2002 E-mail from
15  Mike Hanson to Robert Ming regarding Norcom Audit,
    page 90
16
    Exhibit Number 7, September 18, 2002 E-mail from
17  William Janecke to Audit Services regarding
    Resolving Audit Issues, page 93
18
    Exhibit Number 8, October 31, 2002 E-mail from Bruce
19  Smith to William Janecke regarding Audit Report
    Distribution Procedures, page 101
20
    Exhibit Number 9, October 7, 2002 E-mail from Bart
21  Thielbar to Mike Hanson and David Monaghan regarding
    NCS Audit Management Response, page 113
22
    Exhibit Number 10, October 25, 2002 Communique from
23  Audit Services to Mike Hanson and Multiple
    Recipients regarding Audit Report for NorthWestern
24  Communication Solutions, page 119
25
```

## Page 5

```
1   INDEX OF EXHIBITS (continued)
2   Exhibit Number 11, November 5, 2002 Memorandum from
    David Monaghan and Bart Thielbar to Mike Hanson and
3   multiple recipients regarding Management Response to
    Summary Audit Report for NorthWestern Communication
4   Solutions, page 123
    Exhibit Number 12, April 10, 2003 Memorandum from
5   Dave Monaghan and Bart Thielbar to Mike Hanson and
    multiple recipients regarding NCS Audit, page 127
6   Exhibit Number 13, March 20, 2003 E-mail from
    William Janecke to Tom Knapp, John Van Camp and Mike
7   Hanson regarding NCS Audit, page 138
8   Exhibit Number 14, Complaint, page 142
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 34

```
1      the group that handled Expanets, yes, that
2      transfer occurred in 2002. If you meant
3      NorthWestern Communications Solutions, no,
4      because it wouldn't have transferred to itself.
5      But, yes --
6   Q. Right, from NCS to NCG. So it did transfer
7      from NCS to NCG?
8   A. In 2002, correct.
9   Q. In 2002. So in 2002 after the transfer
10     happened, it no longer reported up to NSG but
11     now reported up to NCG?
12  A. In what timeframe?
13  Q. 2002 once the transfer happened.
14  A. That's correct.
15  Q. Why was it transferred from NSG to NCG?
16  A. There was a corporate directive initiative to
17     put all of the telecommunication-type holdings
18     in one bucket basically and all the energy-type
19     stuff in another bucket. Instead of having --
20     NSG had utility and telecom and a little HVAC
21     company and then an energy company, it was
22     basically to provide, I believe, organizational
23     clarity, if you will.
24  Q. What were your responsibilities at NCS
25     following the transfer to NCG?
```

Page 35

```
1   A. I didn't have responsibility for NCS once it
2      was transferred.
3   Q. What were your responsibilities at NorthWestern
4      then after the transfer occurred?
5   A. I was -- that's the senior vice president of IT
6      and CIO for the energy company which included
7      Montana Power and NorthWestern Public Service
8      and so forth.
9   Q. What was your -- what was your role, if any, in
10     the transfer of NCS to NCG?
11  A. To help facilitate it.
12  Q. Since we are in 2002, couple questions about
13     that. At any point in 2002, do you recall
14     being told that NorthWestern's liquidity was
15     tight?
16  A. In any time in 2002, nothing is coming to mind,
17     no.
18  Q. Do you recall ever being told anything about
19     its cash-flow situation in 2002?
20  A. Yes.
21  Q. What do you recall being told?
22  A. I can't recall the specifics. The basic
23     emphasis was the cash flow is important and we
24     need to watch it. I can't tell you when or
25     where.
```

Page 36

```
1   Q. Presumably cash flow is always important. So
2      is there a particular emphasis in 2002 on cash
3      flow?
4   A. How do you mean by "particular," it was more
5      emphasized than it had been in prior years.
6   Q. Was there more emphasis on meeting revenue
7      targets than in prior years?
8   A. No.
9   Q. Was there increased management pressure to
10     achieve financial forecasts?
11  A. Increased? No.
12        MR. KAPLAN: Could we go off the
13     record for a second?
14        MS. DELANEY: Sure.
15     (Off the record.)
16        MR. KAPLAN: Back on the record.
17        MS. DELANEY: Mr. Thielbar and his
18     counsel, I believe, have reviewed the
19     Protective Order, and Mr. Thielbar has
20     agreed to be bound by the terms and
21     conditions and has executed a document
22     dated today 2007 which I'd like to mark as
23     Thielbar Exhibit 2.
24        (Deposition Exhibit Number 2 marked
25     for identification.)
```

Page 37

```
1         MR. KAPLAN: We are going to mark as
2      Thielbar Exhibit 3 a document that's Bates
3      stamped NOR 521869 and while this document
4      is stamped on the bottom "Attorney's Eyes
5      Only," counsel for NorthWestern has
6      acknowledged that we can show this document
7      to Mr. Thielbar.
8         THE WITNESS: (Reviews document.)
9         (Deposition Exhibit Number 3 marked
10     for identification.)
11  BY MR. KAPLAN:
12  Q. Let me know when you are done looking at it,
13     Mr. Thielbar.
14  A. Okay.
15  Q. Do you recall sending this e-mail to Tom Knapp
16     and John Van Camp?
17  A. Vaguely, yeah, it's been four years ago now.
18  Q. I want you to look five lines down there is a
19     sentence that --
20  A. In which paragraph?
21  Q. In the first paragraph.
22  A. Okay.
23  Q. There is a sentence that reads "This is
24     particularly true when an 'aggressive'
25     environment exists in terms of striving to make
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 38

1    financial targets exists."
2         Do you see that sentence?
3    A. I do.
4    Q. What did you mean by that?
5    A. There was demands to meet financial targets.
6    Q. What kind of demands?
7    A. I'm not sure. There is different types of
8       demands. It was -- really had to meet the
9       financial targets.
10   Q. Well, presumably in every company and at every
11      time people always want to meet --
12   A. Right.
13   Q. -- financial targets.
14   A. Exactly.
15   Q. Is it fair to say that -- when you were saying
16      there was an aggressive environment that there
17      was more than just the usual: Hey, we should
18      meet our targets.
19   A. There was a lot of emphasis on meeting targets
20      more so than when I had experienced at my prior
21      company. Does that make sense?
22   Q. Were you ever given a reason why there was more
23      focus on it?
24   A. That's a good question. None that come to
25      mind.

Page 39

1    Q. Did you ever ask and say: Hey, why are you
2       guys harassing us to meet targets?
3    A. If I did, it's not coming to mind, no.
4    Q. Did you put the similar pressure on people who
5       reported to you to make sure they met the
6       financial targets?
7         MS. WILDUNG: Objection, vague. I
8       think it misstates his prior testimony as
9       to -- I don't think you ever asked him
10      about whether there was pressure.
11        You can go ahead and answer.
12        THE WITNESS: By "similar" --
13   BY MR. KAPLAN:
14   Q. Well, you said there was more -- you said there
15      were a lot of demands to meet financial
16      targets, is that a fair statement?
17   A. Correct.
18   Q. Did you put similar demands on the people who
19      reported to you or worked with you?
20   A. No.
21   Q. Why not?
22   A. Stylistically I'm different -- well, this is
23      where we get caught up in a lot of things.
24        You had mentioned earlier that every
25      company has pressure to meet financial targets

Page 40

1    and certainly my view is that that's correct,
2    you should try to meet the financial targets
3    whenever possible.
4         The pressure applied, though, that I
5    put on my staff I think was different than what
6    had been applied to me.
7    Q. And how was it different?
8    A. It was coupled with -- let me back up, it just
9       wasn't as intense I guess you'd say or
10      whatever.
11   Q. Can you describe for me the nature of the
12      intense pressure that you were feeling from
13      management to meet the targets?
14   A. It was a -- we talked earlier about the staff
15      meeting -- or the board meetings, it was just
16      kind of a: Here is your target. Go meet the
17      target. It was kind of a recurring message all
18      the time. And my messaging encompassed that or
19      there was a lot of other stuff, that would be
20      how it would be different. Like being safe,
21      being customer focused.
22   Q. Did -- when you were receiving this pressure,
23      did you always meet the financial targets?
24   A. No.
25        MR. KALECZYC: Objection.

Page 41

1         MS. WILDUNG: Objection.
2         You can answer the question.
3    BY MR. KAPLAN:
4    Q. When you were receiving this pressure, did the
5       groups that you were responsible for meet the
6       financial targets?
7    A. No.
8    Q. And what was the response by senior management
9       when you didn't?
10        MR. KALECZYC: Objection.
11        MS. WILDUNG: Objection, vague as to
12      "senior management."
13        THE WITNESS: By "targets," what time
14      period are you talking about?
15   BY MR. KAPLAN:
16   Q. In 2002. When you didn't meet -- you -- let me
17      clarify the question. You testified that at
18      the board meetings you would constantly be
19      told: Meet your target. Meet your target. If
20      you didn't meet your target, what would they
21      say at the board meetings?
22        MS. WILDUNG: Objection, vague as to
23      which target. Are you intending to
24      encompass the objectives for the IT group
25      as well as for NCS, or are you just talking

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 42

1    about NCS --
2    BY MR. KAPLAN:
3    Q. I'm talking for whatever groups that you were
4    responsible for.
5    A. On the IT side if our expense budget was higher
6    than anticipated for a given month, there was
7    disappointment -- inquiry as to why -- help
8    understand the variance or whatever. Similarly
9    for NCS there was disappointment expressed if
10   you missed, you know, inquiry as to why.
11   Q. Was it ever anything more than disappointment?
12   A. I'm trying to think of -- intense
13   disappointment? I don't know. I don't know I
14   guess how to quantify or -- what you are
15   talking about.
16   Q. Were there ever threats of losing jobs, for
17   example?
18   A. No, my job was never threatened that I recall.
19   Q. How about anybody else's job?
20   A. Not that I recall.
21   Q. Threats of any other actions or tactics to
22   ensure that groups don't miss their targets in
23   the future?
24       MR. KALECZYC: Objection.
25       THE WITNESS: What was the question?

Page 43

1    BY MR. KAPLAN:
2    Q. Were there ever any threats of any other
3    actions aside from job losses to ensure that
4    the groups met their targets in the future?
5    A. Can you give me an example of what you mean?
6    You are talking about like a demotion or
7    something like that?
8    Q. Be a demotion, or: We're going to bring
9    somebody else into the group to look over how
10   you are doing.
11   A. Some of the uninvited help, that kind of thing?
12   Q. Yeah, any type of pressure to --
13   A. I don't recall any specific threats to that
14   end, no.
15   Q. You see in that first sentence, you say
16   that --
17   A. Which paragraph?
18   Q. Same paragraph, first paragraph. It says "Last
19   Friday afternoon, Cary Griswold and I were
20   talking about the NCS audit and it jogged my
21   memory of an event that might be helpful in
22   addressing the 'whatever means necessary'
23   comment."
24       Do you see that sentence?
25   A. Yes.

Page 44

1    Q. What is the "whatever means necessary" comment
2    referring to?
3    A. There was an internal audit and there was an
4    allegation that people had told the auditors
5    that their directive was to make the numbers by
6    whatever means necessary or an allegation to
7    that effect. I disagree with that, continue to
8    disagree with that.
9    Q. Is it fair to say this e-mail was intended to
10   explain where the "whatever means necessary"
11   comment could have come from?
12   A. Let me read the e-mail again. Your question
13   was: If this e-mail was meant to explain where
14   it may have come from?
15   Q. Yes.
16   A. (Reviews document.) No, I don't think that was
17   the purpose of the e-mail.
18   Q. What was the purpose of this e-mail?
19   A. I take your question to mean by wherever it
20   came from, the people who said the comment. Am
21   I interpreting your question correctly?
22   Q. No, I was meaning were you trying to explain
23   why people might have interpreted what was said
24   as whatever means -- as -- in coming up with
25   the phrase of "whatever means necessary"?

Page 45

1    A. No. Well --
2       MR. KALECZYC: Could you repeat --
3       MS. WILDUNG: You answered that.
4       THE WITNESS: Okay.
5       MR. KALECZYC: Could you read it back.
6       (Whereupon, the previous question was
7    read back by the court reporter.)
8       MR. KALECZYC: Objection --
9       THE WITNESS: I can't hear what he's
10   saying.
11   BY MR. KAPLAN:
12   Q. What was the purpose of this e-mail?
13   A. Based on looking at it four years later, my
14   impression is that it was to explain that
15   "whatever means necessary" is not something
16   that I would have said or directed.
17   Q. You see the first sentence of the second
18   paragraph talks about a meeting, an NOR
19   leadership meeting in Denver in early 2002?
20   A. I do.
21   Q. Do you recall that meeting?
22   A. Yes, generally, yep.
23   Q. And what was the purpose of that meeting?
24   A. NorthWestern Corporation at that point in time
25   held an annual corporate leadership meeting

12 (Pages 42 to 45)

# EXHIBITS  56 - 58

# REDACTED  IN  THEIR  ENTIRETY





1  Stanley T. Kaleczyc
   Kimberly A. Beatty
2  BROWNING, KALECZYC, BERRY & HOVEN, P.C.
   139 North Last Chance Gulch
3  P.O. Box 1697
   Helena, MT 59604-1697
4  Phone: (406) 443-6820
   Fax: (406) 443-6883
5
6  Attorneys for Defendants

7
8                    IN THE UNITED STATES DISTRICT COURT
9                       FOR THE DISTRICT OF MONTANA
                              BUTTE DIVISION
10

11  MAGTENASSET MAMAGEMENT                    Case No. CV-04-26-BU-RFC
    CORPORATION,
12
13           Plaintiff,
                                              REPLY IN SUPPORT OF MOTION
14       v.                                   FOR SUMMARY JUDGEMENT

15  MIKE J. HANSON and ERNIE J. KINDT
16           Defendants.

17
18                              **Introduction**
19       Rule 56(e) of the Federal Rules of Civil Procedure clearly states that when a motion for
20  summary judgment is made, "an adverse party may not rest on the mere allegations or denials of
21  the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise
22  provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.
23  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered
24  against the adverse party." Here, Magten has failed to raise any *material* facts in dispute which
25  would properly preclude the issuance of summary judgment in Defendants' favor.
26       In fact, Magten agrees with the facts set forth in Defendants Statement of Uncontroverted
27  Facts, or makes conclusory statements, which are neither material to the legal issues raised by

                                      - 1 -

1  Defendants nor supported by evidence in the form of documents or affidavit testimony, such that

2  "there exists a genuine issue to be tried." See generally, Pl.'s Stmt. of Genuine Issues. Such

3  conclusory statements are insufficient to raise a genuine issue of disputed fact or preclude

4  summary judgment.    Porter v. CA Dept of Corrections, 2004 WL 2029923 *5 (9th Cir. 2004)

5  (noting "once the moving party meets the requirements of Rule 56 by showing there is an

6  absence of evidence to support the non-moving party's case, the burden shifts to the party

7  resisting the motion, who 'must set forth specific facts showing that there is a genuine issue for

8  trial.'"); Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998) (holding "to defeat a summary

9  judgment motion, the non-moving party must demonstrate that the evidence is such that a

10 reasonable jury could return a verdict in his or her favor."). See also, Rattner v. Netburn, 930

11 F.2d 204, 209 (2th Cir. 1991) (holding "the function of the district court in considering the

12 motion for summary judgment is not to resolve disputed issues of fact but only to determine

13 whether there is a genuine issue to be tried.").

14      Further, Plaintiff's "Statement of Genuine Issues" is inadequate; it consists of four

15 statements, two of which are merely recitations of legal conclusions and none of which are

16 relevant to or raise genuine material facts in dispute related to the matters raised in the motion

17 for summary judgment.

18      Magten's Complaint in this Court asserts one cause of action: that Defendants as officers

19 of Clark Fork and Blackfoot, LLC (CFB) breached fiduciary duties owed to creditors of CFB.

20 Nowhere in the Complaint does Magten assert any claim for fraudulent conveyance or any claim

21 to invalidate the transfer of assets by CFB to its parent corporation.  Nor could it raise such

22 complaints without invoking the jurisdiction of the federal bankruptcy court, thus divesting this

23 Court of jurisdiction.

24      Magten further misstates the significance of Judge Case's August 20 opinion in an

25 attempt to lend credence to the allegations raised by Magten in this Court.  Magten erroneously

26 cites Judge Case's opinion for the proposition that Magten has a cause of action against CFB and

27 its officers.  Judge Case's August 20 opinion, however, holds only that Magten has standing to

-2-

1  assert a claim for fraud against NorthWestern Corporation, an allegation Magten does not make
2  here. Judge Case's August 20 and July 23 opinions, however, are dispositive in that they hold
3  (a) that Magten was never a creditor of CFB, an allegation Magten must prove if it is to prove
4  that CFB's officers owed it any fiduciary duty in the first place[1], (b) that CFB owes no duty to
5  any QUIPS holder under either the Trust Indenture or the Guaranty Agreement, and (c) that only
6  *NorthWestern* may be liable for the unwinding of the going flat transaction *if and only if* Magten
7  can prove to the Bankruptcy Court that NorthWestern committed fraud. Moreover, Judge Case's
8  August 20 order has now rendered moot whether the Trustee or the QUIPS holders waived their
9  right to challenge the validity of the going flat transaction since Judge Case determined that
10 CFB's obligations under the Trust Indenture and the Guaranty Agreement were released in the
11 going flat transaction.

12       Finally, the "factual issues" raised by Magten here are irrelevant to whether they have
13 standing to assert claims of their predecessors-in-interest. First, what Magten's predecessors
14 may have known at the time of the transfer is not relevant to what Magten itself knew when it
15 acquired the QUIPS. Secondly, while Magten may have acquired the QUIPS securities without a
16 written conveyance instrument, it cannot acquire the rights to choses in action related to those
17 securities without a written instrument.

18                                         **Argument**

19 **I.    The finding that Magten is not, and never was, a creditor of CFB is dispositive of the
20         issues pending before this Court.**

21      In its response to Defendants' motion to dismiss, Magten conveniently ignores that the
22 Defendants also have pending before this Court a Motion to Dismiss in which Defendants argue
23 that, as a matter of law, as "officers" of CFB they owed no fiduciary duties to the creditors of
24 CFB on November 15, 2002, the date of the going flat transaction. Judge Case, in his first
25 opinion dated July 23, 2004, made a specific finding that Magten was not – and is not today – a
26 creditor of Clark Fork. Exh. E to Defs.' Stmt. Of Uncontroverted Facts, J. Case Memorandum

27

---

[1]  Defendants' have filed a Motion to Dismiss the Complaint on grounds that they owe no fiduciary duties to
Plaintiff. That Motion is currently pending before this Court.

1  Decision dated 7/23/04 at p. 3 ("the Debtor [NorthWestern] asserts and Magten has not disputed,

2  that Magten was never a creditor of Clark Fork ..."); at p. 6 ("Magten was not a creditor of Clark

3  Fork at the time the transaction took place."); at p. 7 ("even if third party creditors were injured

4  by the transaction, Magten was not one of them.")  This adjudicative fact is not disputed.  See,

5  Pl.'s Statement of Genuine Issues, at p 4, ¶ 13; p 5, ¶ 20.  This adjudicative fact is dispositive of

6  both the Defendants' Motion to Dismiss[2] and this Motion for Summary Judgment, not because

7  Judge Case made any specific finding about the standing of Magten to sue the officers of CFB –

8  indeed, the officers are not parties to the NorthWestern Bankruptcy proceeding and Judge Case

9  made no such explicit finding – but because the fact that Magten never was a creditor of CFB

10  may be properly relied upon by this Court in ruling in favor of the Defendants here and

11  dismissing this case with prejudice.

12       Magten further conveniently glosses over the fact that both Judge Case's July 23 ruling

13  and the deposition of Talton Embry, Magten's sole owner, occurred *after* the Defendants filed

14  their Motion to Dismiss.   Magten also ignores the fact that both these events occurred *before*

15  Magten responded to either Defendants' Motion to Dismiss or Motion for Summary Judgment.

16  Thus, Magten had in its possession facts relevant to this case *before* these facts were known to

17  the Defendants.  It is therefore disingenuous at the very least for Magten to suggest that these

18  facts should have been raised when the Defendants filed their Motion to Dismiss.   Any

19  suggestion by Magten that the standing issue should have been raised earlier is simply misplaced

20  and should be summarily disregarded as a desperate attempt by Magten to avoid an issue which

21  proves fatal to their case.

22

23

24

25

26

27

[2]    If the Court decides to rely upon this adjudicative fact, the Court certainly may convert Defendants' Motion to Dismiss into a Motion for Summary Judgment since Magten has had the opportunity to respond to this adjudicative fact and its relevance to these proceedings.  Fed. R. Civ. P. 12(b).

**II.    The import of Judge Case's August 20 Opinion.**

Magten blatantly misconstrues the import of Judge Case's August 20, 2004 order when it says that Magten has standing to pursue fraud claims against CFB. Pl.'s Response to Defs' Mtn. for Summary Judgment, p.1. In his August 20 Opinion, Judge Case makes several findings: First, there was no guarantee that the transferee of the QUIPS obligations had to be solvent. Exh. E to Decl. of J. Devlan Geddes, J. Case Under Advisement Decision re: Motion to Dismiss, dated 8/20/04 at p. 5. As a result, Magten's reliance on solvency as a "genuine issue" is both misplaced and irrelevant. Second, CFB and NorthWestern fully complied with section 1102 of the Trust Indenture and with the terms of the Guaranty Agreement, such that CFB was fully released from all obligations to the QUIPS holders as of the date of the going flat transaction. Id. at pp. 6-9. Third, because Judge Case determined that CFB's obligations under the Trust Indenture and the Guaranty Agreement were released in the going flat transaction, the issue of whether the Trustee or the QUIPS holders waived their right to challenge the validity of the going flat transaction is now moot. See, generally, id. Fourth, Magten may maintain its adversary proceeding *only against NorthWestern* if, and only if, *NorthWestern* committed fraud. Id. at 11. No where in Judge Case's Opinion does he even remotely suggest that Magten has any standing to bring this action against officers of CFB as Magten has asserted. Compare, Pl.'s Response to Motion for Summary Judgment at p. 1 to Judge Case's Opinion generally. Indeed, Magten's own Complaint does not allege a fraudulent conveyance by the Defendants here; the only count of the Complaint is one for alleged breach of fiduciary duty. Moreover, even if Magten could bootstrap Judge Case's August 20, 2004 order to form the legal basis for this suit against officers of CFB, then just as Judge Haddon recently ordered in Magten Asset Management Corporation v. Paul Hastings Janofsky & Walker, LLP, CV-04-40-BU-SEH,[3] this Court should find that these issues are integrally related to the

---

[3]    A copy of Judge Haddon's Memorandum and Order dated September 8, 2004, is attached as Exhibit 1.

1  NorthWestern bankruptcy estate and transfer jurisdiction of this case to the Delaware Bankruptcy

2  Court where it would be properly adjudicated as part of the NorthWestern bankruptcy estate.

3          The lynchpin of Judge Case's August 20 order is that Magten will be permitted to

4  continue its Adversary Proceeding and attempt to prove *NorthWestern, not CFB or its officers,*

5  engaged in fraud – allegations not raised by Magten in these proceedings.  Judge Case has

6  exonerated CFB of all wrongdoing or liability with respect to the going flat transaction and has

7  found that CFB was released of all obligations under the Trust Indenture and Guaranty

8  Agreements.  Exh. E to Decl. of J. Devlan Geddes, J. Case Decision at p. 8 ("Here, the Indenture

9  specifically provides that Clark Fork is released from its underlying liability on the debentures in

10  a Section 1101 transaction.  All of those obligations, including making distributions to the Trust

11  for the purposes of paying the Holders, now lie exclusively with the successor in interest, here

12  Debtor NorthWestern.  Given the quasi *in rem* nature of the guarantee, [footnote omitted] it is

13  nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction)

14  would retain any liability under the Guarantee.  It only makes sense that any such liability has

15  been released as well."); p. 9 ("the Court concludes that Plaintiffs are not creditors of Clark Fork

16  because of the Guarantee.  Rather, Clark Fork's obligations under the Guarantee, to the same

17  extent as its obligations under the Debenture, were released in the Section 1101 transaction with

18  NorthWestern.")

19          These facts and conclusions are consistent with the Defendants' position that

20  NorthWestern, as the sole Member and Manager of CFB, had the authority to direct and

21  implement the going flat transaction, and thus alone retains the liability, if any, with respect to

22  that transaction.  The Defendants here as the officers of CFB were merely performing ministerial

23  acts implementing the mandates of the sole decision maker, a fact documented by that Written

24  Consent of Sole Member and Manager to Action in Lieu of Meeting, dated 8/7/02, attached as

25  Exh. E to Defs.' Stmt. of Uncontroverted Facts, and a fact that Magten neither disputes nor

26  rebuts with its own contrary evidence, documents or affidavit testimony.  See, Pl.'s Statement of

27  Genuine Issues, p. 2-3 ¶ 9.

- 6 -

III.    **Magten lacks standing to assert a breach of fiduciary duty.**

Magten misapprehends the Defendants' argument that Magten lacks standing to assert a claim for breach of any fiduciary duty which these Defendants may have owed to creditors of CFB on the date of the "going flat" transaction (a legal proposition which the Defendants deny and is the basis for their Motion to Dismiss). As the Defendants explained in their brief in support of their Motion for Summary Judgment, a chose in action is a separate and distinct property right as a matter of law. Any chose in action which either the Trustee or the holder of the QUIPS may have had with respect to the Defendants here was personal to them and would have had to have been conveyed separately to Magten when it first acquired its interest in the QUIPS months after the going flat transaction closed and when Magten continued to acquire additional QUIPS even after Magten's owner admitted he was aware that NorthWestern was insolvent. The fact that a sale of securities does not come within Montana's statute of frauds is irrelevant; the issue is not the sale of the securities but rather the sale (or more accurately the lack of any evidence of a sale) of a chose in action for breach of fiduciary duty by former owners of the QUIPS to Magten. If Magten had evidence of such a sale, it should have produced that evidence in its opposition to the Defendants' Motion for Summary Judgment. There obviously is no such evidence.

In this light, it is telling that the QUIPS Property Trustee has not brought any action in this Court on behalf of the present or former holders of QUIPS against either CFB or the individual officers who are Defendants here. Rather, the Trustee has focused upon the acts of NorthWestern which, as the Defendants here have already explained to the Court, was and is the sole owner of CFB and factually and legally had the power to make, and did in fact make, all decisions related to the going flat transaction.

IV.    **Magten is not entitled to invoke the equitable powers of this Court.**

A fundamental maxim of legal jurisprudence is that "no one can take advantage of his own wrong." Mont. Code Ann. § 1-3-208. In litigation involving the fiduciary duties that partners in a joint venture owed to each other and the calculation of damages resulting from a

1  breach of such duties, the Montana Supreme Court held that "equity will refuse to aid a party
2  whose claims had their inception in his own wrongdoing, whether the victim of the wrongdoing
3  is the other party or a third party." Murphy v. Redland, 178 Mont. 296, 309, 583 P.2d 1049,1056
4  (1978); accord, Kauffman-Harmon v. Kauffman, 307 Mont. 45, 52, 36 P.3d 408, 413.

5       Here, Magten knew of the going flat transaction. Exh. B, Defs.' Stmt. of Uncontroverted
6  Facts, Embry Dep. Tr. p. 33, l. 16 – p. 34, l. 2; p. 37, l. 2-6. Mr. Embry is a "veteran" investor of
7  distressed securities. Id. at p. 14, l. 19-22; p. 78, l. 10-12. Magten conducted due diligence
8  before its initial acquisition of the QUIPS. Id. at p. 16-20. Magten knew at the time it purchased
9  the QUIPS that NOR had restated its financial statements. Id. at p. 80, l. 8-16 (*testifying* that he
10 read "what was available in the S.E.C. documents for Montana Power, Montana Capital and
11 NorthWestern." Because NorthWestern's amended 10Qs for the first three quarters of 2002 are
12 public documents on file with the SEC, this Court can take judicial notice, pursuant to Fed. R.
13 Evid. 201 and 1005, that the amended financial statements were filed with the SEC on April 16,
14 2003 and thus, were available for Magten's review prior to its initial acquisition of the QUIPS
15 "at the end of April, 2003." Dep. Tr. p. 20, l. 10.) Having conducted due diligence and having
16 made the informed decision to speculate on distressed securities knowing full well that
17 NorthWestern not only restated its financial statements but also stated in its SEC filings that
18 filing for bankruptcy protection might be a likely event in the near future, Magten cannot seek to
19 profit from its own actions by asserting the officers of CFB breached some alleged fiduciary duty
20 owed to a predecessor in interest of which it does not have standing to represent.

21 **V.    Magten has raised no material issues of disputed fact.**

22       As is evident from both the Complaint and the briefs filed by Magten, Magten relies upon
23 artful pleading and deliberate obfuscation in an effort to keep their case alive before this Court.
24 On the one hand, Magten suggests to the Court that the Defendants' Motion for Summary
25 Judgment is "premature" because no discovery has been completed. Yet, Magten has chosen to
26 respond substantively to the Motion and has *not* seen fit to file a motion pursuant to Fed. R. Civ.
27 P. 56(f), perhaps because Magten recognizes there is no justification to conduct discovery on the

1 | issues raised in Defendants' Motion for Summary Judgment since the *material* facts are not in
2 | dispute and thus no discovery is needed for the Court to resolve the issues before it.

3 |     On the other hand, Magten's Statement of Genuine Issues is no more than a compilation
4 | of legal conclusions and allegations which are not material to the legal issues presented in the
5 | Defendants' Motion for Summary Judgment. As Judge Case found, it matters not whether
6 | NorthWestern was insolvent or placed CFB within a zone of insolvency since NorthWestern and
7 | CFB fully complied with the terms of the Trust Indenture and Guaranty Agreement. Thus, there
8 | is no basis for Magten to allege the individual officers of CFB owed a fiduciary duty to a party
9 | (Magten) which acquired any interest in the QUIPS literally months after the going flat
10 | transaction occurred. Likewise, Magten has no standing to sue the Defendants here for an
11 | alleged breach of fiduciary duty when it is undisputed, even by Magten, that NorthWestern was
12 | the sole decision maker with respect to the going flat transaction. Having conceded these
13 | material facts and in light of Judge Case's orders, the Defendants here are entitled to summary
14 | judgment in their favor and Magten's Complaint should be dismissed with prejudice.

15 | **Conclusion**

16 |     For the foregoing reasons, and the reasons provided both in support of the Defendants'
17 | Motion to Dismiss and in this Motion for Summary Judgment, summary judgment should be
18 | entered in Defendants' favor and this action should be dismissed with prejudice.

19 |     DATED this 27th day of September, 2004.

20 |     BROWNING, KALECZYC, BERRY & HOVEN, P.C.

21 |

22 | By _Kimberly Beatty_

23 | Stanley T. Kaleczyc
24 | Kimberly A. Beatty
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
25 | 139 North Last Chance Gulch
P.O. Box 1697
26 | Helena, MT 59604-1697
Phone: (406) 443-6820
27 | Fax: (406) 443-6883

Attorneys for Defendants.

-9-

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on the _27th_ day of _September_ , 2004, a true copy of the
foregoing was mailed by first-class mail, postage prepaid, addressed as follows:

3

4    James Goetz
J. Devlan Geddes

5    Goetz, Gallik & Baldwin, P.C.
35 North Grand

6    P.O. Box 6580
Bozeman, MT 59771-6580

7    Bonnie Steingert
John W. Brewer

8    Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza

9    New York, NY 10004

10

11

12

13                _Jennifer Michlum_

14        BROWNING, KALECZYC, BERRY & HOVEN, P.C.

15

16

17

18

19

20

21

22

23

24

25

26

27

**RECEIVED**

SEP 1 0 2004

POORE, ROTH & ROBINSON, P.C.
OUR FILE NO. 2670 - 1164

FILED
GREAT FALLS DIV. 24

04 SEP 8 PM 4 20

PATRICK ......... .. CLERK

BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC, | No. CV 04-49-BU-SEH |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| vs. | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | |
| Defendant. | |

## INTRODUCTION

Magten Asset Management Corporation brought this action "individually and derivatively

on behalf of CLARK FORK AND BLACKFOOT, LLC" in Montana state district court alleging

breach of fiduciary duties, aiding and abetting fraudulent transfer, civil conspiracy and

malpractice.[1] Defendant removed to this Court under 28 U.S.C. § 1452(a) as a case "related to"

---

[1] Magten Asset Management Corporation Suing individually and derivatively on behalf
of Clark Fork and Blackfoot, LLC v. Paul Hastings Janofsky & Walker LLP, Cause No. DV 04-
131, Montana Second Judicial District Court, Silver Bow County.

-1-

EXHIBIT
1

bankruptcy of Northwestern Corporation (Northwestern), parent corporation of Clark Fork and
Blackfoot, LLC. Plaintiff has moved to remand. Defendant has moved to have the case
transferred to the District of Delaware, where Northwestern's bankruptcy is pending, or to the
District of New York. As an alternative to transfer, Defendant asks that the case be stayed
pending the outcome of certain adversary proceedings involving Northwestern pending in the
Delaware Bankruptcy Court. All motions are opposed.

### Motion to Remand

A case is "related to" bankruptcy "if the outcome could alter the debtors' rights,
liabilities, options or freedoms of action (either negatively or positively) and which in any way
impacts upon the handling and administration of the bankruptcy estate." In re Fietz, 852 F.2d
455, 457 (9th Cir. 1988)(quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).
Here, the claims asserted by Plaintiff are said to be brought in part on behalf of Clark Fork and
Blackfoot, LLC. Clark Fork and Blackfoot, LLC is a wholly-owned subsidiary of Northwestern.
Successful prosecution of this case could have a positive effect on the size and value of
Northwestern's estate in bankruptcy, thus impacting, at a minimum, options available to the
bankrupt, and administration of its estate. The "relating to" test of Fietz is met. This Court has
jurisdiction. Remand for lack of jurisdiction is not appropriate.

### Motion to Transfer

A motion for transfer under 28 U.S.C. § 1404(a) may be granted if: "(1) . . . venue is
proper in the transferor district; (2) . . . the transferee district is one where the action might have
been brought; and (3) . . . the transfer will serve the convenience of the parties and witnesses and
will promote the interest of justice." Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.,

-2-

820 F. Supp. 503, 506 (C.D. Cal. 1992). Such a motion is addressed to the discretion of the court and is to be decided on an individualized case-by-case consideration of convenience and fairness. Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000). Factors to be taken into account in evaluating convenience and fairness include: "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986)(quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

Upon review of the record and the materials provided by both parties, the Court is persuaded that the interests of justice and of convenience and fairness are best served by transfer of this case to the District of Delaware. As noted, Plaintiff already has filed an adversary proceeding claim in Northwestern's bankruptcy in Delaware, the outcome of which may substantially impact the vitality of the claims asserted in this case. Many of the obligations claimed against Defendant in the Montana case appear to mirror allegations in the adversary proceedings. Plaintiff's choice of forum warrants less consideration since neither party is a citizen of Montana. Plaintiff is a citizen of Delaware. Both Plaintiff and Defendant have offices in New York. Neither has officers or employees in Montana. By all accounts, most of all the significant witnesses reside outside Montana. Substantially all legal activities giving rise to the case occurred outside Montana and in locations on the east coast. Records relating to the transactions in question are in venues located outside Montana and closer to Delaware than to Montana.

-3-

## ORDERED

1.    Plaintiff's Motion to Remand[2] is DENIED.

2.    Defendant's motion to transfer this case to the District of Delaware for the convenience of parties and witnesses and in the interest of justice[3] is GRANTED.

3.    Defendant's motion to stay is DENIED without prejudice to renewal following transfer to the District of Delaware.

The clerk is directed to transfer this case to the United States District Court for the District of Delaware.

DATED this ___ day of September, 2004.

SAM E. HADDON
United States District Judge

---

[2] Docket No. 16.

[3] Docket No. 15.

-4-



QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

**(Mark One)**

☒    **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2002

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File Number: 0-692

# NORTHWESTERN CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-0172280** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **125 S. Dakota Avenue, Sioux Falls, South Dakota** | **57104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:**605-978-2908**

Securities registered pursuant to Section 12(b) of the Act:

| (Title of each class) | (Name of each exchange on which registered) |
|---|---|
| **Common Stock, $1.75 par value, and related Common Stock Purchase Rights** | |
| **Company Obligated Mandatorily Redeemable Security of Trust Holding Solely Parent Debentures, $25.00 liquidation amount** | **All listed on New York Stock Exchange** |
| **Common Stock Purchase Rights** | |

Securities registered under Section 12(g) of the Act:

**Preferred Stock, Par Value $100**
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒   No ☐

As of June 28, 2002, the aggregate market value of the voting common stock held by non-affiliates of the registrant was $464,375,116, computed using the last sales price of $16.95 per share of the registrant's common stock on June 28, 2002, the last business day of the registrant's most recently completed second fiscal quarter, as reported by the New York Stock Exchange.

As of April 7, 2003, 37, 396,762 shares of the registrant's common stock, par value $1.75 per share, were outstanding.

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

Marilyn Seymann, and Bruce Smith, and (b) phantom stock unit plan payouts of $10,418.64 each for 507 units to Jerry Johnson, Larry Ness, and Bruce Smith.

## ITEM 11. EXECUTIVE COMPENSATION

### Compensation of Directors and Executive Officers

We are required by the SEC to disclose compensation earned during the last three fiscal years by (i) our Chief Executive Officer; (ii) our four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002; and (iii) up to two additional individuals for whom such disclosure would have been provided under clause (i) and (ii) above but for the fact that the individual was not serving as an executive officer at the end of fiscal 2002; provided, however, that no disclosure need be provided for any executive officer, other than the Chief Executive Officer, whose total annual salary and bonus does not exceed $100,000.

Accordingly, the following sections disclose information regarding compensation earned during the last three fiscal years by (i) Merle D. Lewis, our former Chief Executive Officer; and (ii) Richard R. Hylland, Michael J. Hanson, Eric R. Jacobsen and Daniel K. Newell, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2002 and whose salary and bonus exceeded $100,000. All of these officers are referred to in this Form 10-K as the "Named Executive Officers."

### Summary Compensation Table

The following table sets forth the compensation earned during the fiscal years indicated for services in all capacities by the Named Executive Officers in 2002:

| Name and Principal Position | Year | Annual Compensation | | Long Term Compensation | | |
| | | Salary $ | Bonus (1)$ | Awards (Securities Underlying Options)(2) | LTIP Payouts (3)($) | All Other Compensation(4) ($) |
| --- | --- | --- | --- | --- | --- | --- |
| Merle D. Lewis | 2002 | 786,000 | 0 | 295,000(5) | 321,712 | 57,918 |
| Former Chairman & | 2001 | 786,000 | 150,000 | 177,511(5) | 1,284,746 | 58,680 |
| Chief Executive | 2000 | 734,208 | 247,000 | 278,442(5) | 80,676 | 57,764 |
| Officer(5) | | | | | | |
| Richard R. Hylland | 2002 | 550,583 | 0 | 154,600 | 130,562 | 32,080 |
| President & Chief | 2001 | 511,000 | 100,000 | 86,469 | 925,537 | 30,044 |
| Operating Officer | 2000 | 483,042 | 158,000 | 119,827 | 30,129 | 28,495 |
| Michael J. Hanson | 2002 | 345,833 | 540,000 | 29,000 | 0 | 14,063 |
| President & CEO of | 2001 | 323,750 | 635,914 | 9,000 | 0 | 19,684 |
| NorthWestern Energy | 2000 | 293,583 | 390,370 | 8,035 | 0 | 19,319 |
| division | | | | | | |
| Eric R. Jacobsen | 2002 | 304,791 | 400,000 | 44,000 | 0 | 16,447 |
| Senior Vice President, | 2001 | 280,416 | 150,000 | 28,000 | 430,757 | 17,491 |
| General Counsel & | 2000 | 257,042 | 44,189 | 32,831 | 0 | 13,465 |
| Chief Legal Officer | | | | | | |
| and Chief Operating | | | | | | |
| Officer of | | | | | | |
| NorthWestern Growth | | | | | | |
| Corp. | | | | | | |
| Daniel K. Newell | 2002 | 354,000 | 0 | 36,000 | 42,979 | 19,541 |
| Sr. Vice President; | 2001 | 347,333 | 80,000 | 44,500 | 861,346 | 21,600 |
| President & CEO of | 2000 | 311,917 | 118,000 | 39,481 | 0 | 19,170 |
| Blue Dot | | | | | | |
| Services, Inc. & | | | | | | |
| Managing Director & | | | | | | |
| CEO of NorthWestern | | | | | | |
| Growth Corp. | | | | | | |

(1)

The amounts in this column are cash awards pursuant to NorthWestern's annual incentive plans, which are described under the "Report on Executive Compensation" which were earned in the year shown and paid in the following year.

*(Footnotes continued on the next page.)*

86

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

*(Footnotes continued from the preceding page.)*

(2)

For 2000 and 2002 for all named executives, and for Mr. Hanson, Mr. Jacobsen, and Mr. Newell, in 2001, these awards are solely incentive stock options. For Mr. Lewis and Mr. Hylland in 2001, the awards included 155,000 and 75,500 incentive stock options, and 22,511 and 10,969 restricted stock awards, respectively, with the restricted stock awards accruing quarterly dividends as declared. As of December 31, 2002, Mr. Hylland's restricted stock award was valued at $64,904. As explained above, the restrictions on Mr. Lewis' restricted stock award shares were removed as part of his retirement agreement.

(3)

For 2000 and 2002, the amounts in this column represent the cash payouts from NorthWestern's former phantom stock long-term incentive compensation plan at the end of the five-year periods following the dates of the awards. The payout in 2002 represents the last phantom stock units held under this former long-term incentive plan. For 2001, the amounts represent such former phantom stock plan payouts for Messrs. Lewis, Hylland, and Newell in the following amounts: Lewis, $146,695; Hylland, $95,161; and Newell, $30,970, with the remainder of the 2001 distributions for those three executives representing vested interests in the NorthWestern Growth Corporation private equity plan.

(4)

The amounts in this column include NorthWestern's contributions on behalf of the named executive officers to the Team Member Savings Plans and to the ESOP as well as the amounts paid by NorthWestern with respect to life insurance for the benefit of the executives. For the executives named in this table, for 2002 such amounts under the Team Member Savings Plans, ESOP, and life insurance under the NorthWestern term life and Family Protector Plan, respectively, were as follows: Mr. Lewis: $25,466, $27,490, and $4,962; Mr. Hylland: $17,954, $9,073, and $5,053; Mr. Hanson: $7,656, $1,746, and $4,661; Mr. Jacobsen: $10,501, $1,558, and $4,388; and Mr. Newell: $12,121, $2,999, and $4,421.

(5)

Mr. Lewis retired, effective December 31, 2002. All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Information on Options**

### Option Grants in Last Fiscal Year

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term(3)($) | |
|---|---|---|---|---|---|---|
| Name | No. of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Team Members in Fiscal Year | Exercise or Base Price ($/Sh)(2) | Expiration Date | At 5% ($35.66 Stock Price) | At 10% ($56.66 Stock Price) |
| Merle D. Lewis | 295,000 | 37.5 | 20.70 | (4) | 0 | 0 |
| Richard R. Hylland | 154,600 | 19.7 | 20.70 | 2/6/2012 | 5,216,204 | 8,288,106 |
| Michael J. Hanson | 29,000 | 3.7 | 20.70 | 2/6/2012 | 978,460 | 1,554,690 |
| Eric R. Jacobsen | 44,000 | 5.6 | 20.70 | 2/6/2012 | 1,484,560 | 2,358,840 |
| Daniel K. Newell | 36,000 | 4.6 | 20.70 | 2/6/2012 | 1,214,640 | 1,929,960 |

(1)

All options granted in 2002 become exercisable in annual cumulative installments of 25%, commencing on the first anniversary of the date of grant, with full vesting occurring on the fourth anniversary date of the grant. Vesting is accelerated in the event of a change in control of NorthWestern.

(2)

All options were granted at market value (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal) on the date of grant.

(3)

The hypothetical potential gains (reported net of exercise price) are based entirely on assumed annual growth rates of 5% and 10% in the value of NorthWestern's stock price over the 10-year

life of the options (which would equal a total increase in stock price of 63% and 159%, respectively). These assumed rates of growth are mandated by rules of the Securities and Exchange Commission for illustration purposes only and are not intended to predict future stock price.

(4)

All ISOs and NQSOs granted to Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

### Fiscal Year-End Option Values

| | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options At Fiscal Year-End ($)(1) | |
|---|---|---|---|---|
| Name | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Merle D. Lewis | 0(2) | 0(2) | 0 | 0 |

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

| | | | | |
|---|---|---|---|---|
| Richard R. Hylland | 47,968 | 407,962 | 0 | 0 |
| Michael J. Hanson | 5,811 | 51,841 | 0 | 0 |
| Eric R. Jacobsen | 833 | 126,872 | 0 | 0 |
| Daniel K. Newell | 19,293 | 146,567 | 0 | 0 |

*(1)*

      Represents the difference between $5.08 (the closing price of the Common Stock on the New York Stock Exchange as reported in the Midwest Edition of The Wall Street Journal for the close on December 31, 2002) and the option exercise price.

*(2)*

      All ISOs and NQSOs previously held by Mr. Lewis were forfeited as part of the terms of his retirement agreement, described elsewhere in this Report.

**Employment Contracts**

    A number of executives, including Messrs. Hylland, Hanson, Jacobsen and Newell, have comprehensive employment agreements. Mr. Hylland's agreement was entered into on March 1, 2001 and terminates on the last day of February 2006. Mr. Hylland is entitled to receive a base salary that is subject to annual increases based on a median of comparable companies and a discretionary bonus. Mr. Hylland is also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. Mr. Hylland is also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreement provides for the payment of accrued salary and termination benefits if Mr. Hylland's employment is terminated by NorthWestern for any reason other than Cause, due to Mr. Hylland's death or by Mr. Hylland due to a "fundamental change." A fundamental change generally occurs if there is a diminution in Mr. Hylland's responsibilities or compensation, NorthWestern relocates its primary offices more than 30 miles or there is a change in control or major transaction involving NorthWestern (each as defined in the agreement). The termination benefits include a lump sum payment equal to (1) the sum of (a) base salary, (b) the higher of either Mr. Hylland's most recent bonuses and short-term incentive awards or the average of such bonuses and awards over the preceding three calendar years and (c) the higher of either the value of Mr. Hylland's most recent options, long-term incentive awards and private equity investment returns or the average value of such options, awards and returns over the preceding three calendar years, multiplied by (2) the remaining term of the agreement plus one year. The termination benefits also include lump sum payments equal to the fair market value of Mr. Hylland's private equity interests and interests under NorthWestern's benefit plans. The payments calculated with respect to Mr. Hylland's private equity investment returns and the fair market value of his private equity interests are grossed up by an

88

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

amount sufficient to put him in the position in which he would be were such payments subject to income tax only at long-term capital gains rates. Mr. Hylland has the right to defer receipt of certain of these termination benefits rather than receiving them as a lump sum. All equity awards granted to Mr. Hylland accelerate in full upon termination of the agreement (other than for Cause) and remain exercisable in accordance with their terms. NorthWestern has agreed to make gross-up payments to Mr. Hylland to the extent that termination benefits would be subject to the excise tax on excess "parachute payments" following a change of control. The termination benefits under these agreements are to be provided regardless of whether Mr. Hylland is able to obtain other employment. The agreement contains provisions requiring Mr. Hylland to maintain the confidentiality of NorthWestern proprietary information and restricts Mr. Hylland from competing with NorthWestern or soliciting NorthWestern employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify Mr. Hylland to the fullest extent permitted by law.

Messrs. Hanson, Jacobsen and Newell entered into employment agreements as of March 1, 2001. Mr. Hanson's agreement terminates on the last day of February 2005. Mr. Jacobsen's agreement terminates on the last day of February 2004. Mr. Newell's agreement terminates on the last day of February 2005. Messrs. Hanson, Jacobsen and Newell are entitled to receive a base salary that is subject to annual increases based on the median of comparable companies and a discretionary bonus. They are also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans include, among other things, options to purchase shares of NorthWestern common stock and the right to participate in private equity incentive plans which hold minority investments in or are otherwise tied to the performance of NorthWestern's non-regulated subsidiaries. They are also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance and country club dues. The agreements provide for the payment of accrued salary and termination benefits if employment is terminated by NorthWestern on substantially the same terms as described above for Mr. Hylland's agreement. The agreements contain provisions requiring them to maintain the confidentiality of NorthWestern proprietary information and restricts them from competing with NorthWestern or soliciting NorthWestern's employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify each of Messrs. Hanson, Jacobsen and Newell to the fullest extent permitted by law.

The total remaining obligation under employment agreements in the ordinary course, excluding a change in control, with Messrs. Hylland, Hanson, Jacobsen and Newell are approximately $3.8 million, $1.8 million, $0.7 million and $1.9 million, respectively.

Merle Lewis retired from his employment with the Company and its subsidiaries and affiliates and resigned as the Company's Chief Executive Officer and Chairman and from all trustee, administrator or similar positions in which he served on behalf of the Company or any of its subsidiaries or affiliates, effective December 31, 2002. Mr. Lewis concurrently resigned as a member of the Board, and as an officer and director of each of the Company's subsidiaries and affiliates (other than as a member of the board of directors of CornerStone Propane G.P., Inc.) for which he served. In connection with his retirement, Mr. Lewis entered into a retirement agreement with the Company and terminated the Comprehensive Employment Agreement and Investment Program, dated June 1, 2000, which was scheduled to expire February 28, 2006. Under the Retirement Agreement, Mr. Lewis received the following, which total an aggregate of approximately $3.5 million: (1) a cash severance payment, the equivalent of one year's base salary and target annual incentive compensation for a total of $1,711,000, (2) a cash payment of $73,000 from the Company, representing his interest in the 1998 NorthWestern Energy Corporation Equity Ownership Incentive Plan, (3) full vesting of the 22,511 shares of restricted stock granted to him on March 1, 2001, originally scheduled to vest on February 4, 2005 (and all additional shares purchased with dividends declared thereon) under the Company's Stock Option and Incentive Plan (as amended on January 16, 2001), (4) payments of $500 per month until age 65 toward

89

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

the cost of retiree health insurance, (5) retention of the company provided leased automobile through the end of the such lease at an estimated cost of $1,000 per month, and (6) age and service credits toward benefit determination in NorthWestern's qualified and nonqualified pension plan as if he were to continue to be employed through June 30, 2006, the value of which is approximately $1.7 million on a present value basis as determined by NorthWestern's actuaries. Based upon Mr. Lewis' years of service, and the benefit elections he made under the provisions of the NorthWestern Pension Plan and Supplemental Executive Retirement Plan, with the enhanced pension benefit, Mr. Lewis began in January 2003 to receive a pension benefit of $29,470 per month. The Company agreed to insure the payment of such subsidy in the event of a change of control of the Company by obtaining a letter of credit or other financial instrument.

Mr. Lewis waived or cancelled all other rights or interests he may have had under the Stock Option and Incentive Plan, including all vested and unvested incentive stock options, non-qualified stock options and phantom stock units (including all dividends accrued thereon) granted to him under the plan. Mr. Lewis waived all of his rights and interests in the Company's short-term and long-term disability insurance coverages, term life insurance coverages and annual incentive plans for 2002. He also waived his rights and interests in the equity ownership incentive plans of NorthWestern Growth Corporation, NorthWestern Services Group, Inc., NorthWestern Public Service, NorthWestern Services Corporation, and NorCom Advanced Technologies, Inc. and assigned his rights in the membership interests of NorthWestern Capital Partners, LLC, a Delaware limited liability company, to the Company. Mr. Lewis retained all benefits vested or earned as of the date of his retirement in the Company's benefit and retirement plans in which he participated (and he waived all post retirement vesting or interests), and the Company agreed to subsidize his pension benefit payments such that his pension benefit will be calculated as if Mr. Lewis' term of service or employment with the Company terminated on June 30, 2006, notwithstanding the actual date of retirement and regardless of the date of payment of such benefits.

Mr. Lewis released the company and its affiliates and subsidiaries and their agents from all know and unknown claims that he may have in connection with his employment with the Company or as a stockholder of the Company, other than (a) his right to enforce the retirement agreement, (b) any rights or claims that arise after the date of his retirement, and (c) any claims for indemnification from the Company or any claims under the Company's Directors and Officers insurance policies, in either case, for actions or omissions in his capacity as an officer or director of the Company.

**Retirement Plan**

NorthWestern has two retirement plans, with one applicable to its Montana NorthWestern Energy team members and one applicable to its South Dakota and Nebraska NorthWestern Energy and all NorthWestern Corporation team members. All of the named executives participate in the latter plan. For that plan, effective January 1, 2000, NorthWestern offered its team members two alternatives with regard to its retirement plan. A team member could convert his or her existing accrued benefit from the existing plan into an opening balance in a hypothetical account under a new cash balance formula, or that team member could continue under the existing defined benefit formula. All team members hired after January 1, 2000 participate in the cash balance formula. The beginning balance in the cash balance account for a converting team member was determined based on the team member's accrued benefit, age and service as of January 1, 2000, 2000 eligible pay, and a conversion interest rate of 6%. Under the cash balance formula a participant's account grows based upon (1) contributions by NorthWestern made once per year, and (2) by annual interest credits based on the average Federal 30-year Treasury bill rate for November of the preceding year (6.15% for 2000). Contribution rates were determined on January 1, 2000, based on the participant's age and years of service on that date. They range from 3%-7.5% (3% for all new team members) for compensation below the taxable wage base and are doubled for compensation above the taxable wage base. Upon termination of employment with NorthWestern, a team member, or if deceased, his or her beneficiary, receives the cash balance in the account paid in a lump sum or in other permitted annuity forms of payment.

90

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

To be eligible for the retirement plan, a team member must be 21 years of age and have worked at least one year for NorthWestern, working at least 1,000 hours in that year. Non-employee Directors are not eligible to participate. Benefits for team members who chose not to convert to the cash balance formula will continue to be part of the defined benefit formula, which provides an annual pension benefit upon normal retirement at age 65 or earlier (subject to benefit reduction). Under this formula, the amount of the annual pension is based upon average annual earnings for the sixty consecutive highest paid months during the 10 years immediately preceding retirement. Upon retirement on the normal retirement date, the annual pension to which an eligible team member becomes entitled under the formula amounts to 1.34% of average annual earnings up to the Covered Compensation base plus 1.75% of such earnings in excess of the Covered Compensation base, multiplied by all years of credited service.

The named executives also participate in a supplemental excess retirement plan related to both of the pension formulas, which provides benefits based on those formulas but with respect to compensation which exceeds the limits under the Code. In addition, NorthWestern has agreed to assure Mr. Hanson a pension benefit equivalent to that which would be provided by the Retirement Plan if he were given credit for his 17 years of prior service with another utility company in addition to his years of service with NorthWestern. As a result, he was credited with those additional years of service under the supplemental excess retirement plan.

Assuming the named executives reach the normal retirement age of 65, the projected annual life annuity benefits for the named executives would be: Mr. Hylland, $246,477; Mr. Hanson, $156,773; Mr. Jacobsen, $54,336; Mr. Newell, $97,279. In 2002 the cash balance accounts for the named executive officers, other than Mr. Lewis, were as follows: Mr. Hylland $376,367, Mr. Hanson $355,290, Mr. Jacobsen $60,693; and Mr. Newell $160,005.

**Other Benefits**

NorthWestern currently maintains a variety of benefit plans and programs, which are generally available to all NorthWestern team members, including executive officers, such as the 401(k) Retirement Plan under which a team member may contribute up to 13% of his or her salary (with NorthWestern matching up to 3¹/₂% of the first 6% contributed by the team member), a Supplemental Variable Investment Plan (a non-qualified Supplemental 401(k) plan available to the extent participation in the 401(k) is limited by the Internal Revenue Code), a Team Member Stock Purchase Plan (Section 423 Plan) approved by shareholders and instituted in 1999, under which a team member may contribute up to $3,000 per year for the purchase of NorthWestern Common Stock (at a discount of up to 15% of market value), term life and supplemental life (Family Protector Plan) insurance coverage, the NorthWestern Employee Stock Ownership Plan (ESOP), long-term disability plan, and other general employee benefits such as emergency personal leave and educational assistance.

**Salary Continuation Plan**

NorthWestern has a non-qualified salary continuation plan for directors and selected management team members (the Supplemental Income Security Plan). In 2002, a total of 35 active team members and non-employee directors participated in this plan. The plan provides for certain amounts of salary continuation in the event of death before or after retirement or, in the alternative, certain supplemental retirement benefits in lieu of any death benefits after age 65. Generally, death benefits will vary from 45% to 75% of salary for up to 15 years, and supplemental retirement benefits from 25% to 40% of current salary. Life insurance is carried on each plan participant in favor of NorthWestern to indirectly fund future benefit payments. Part of the cost of the life insurance carried by NorthWestern is paid by team member participants in the plan. The program was designed so that if assumptions made as to mortality experience, policy dividends or credits, and other actuarial factors are realized, NorthWestern should more than recover its cost of this program. Consequently, the cost of any one individual participant cannot be properly allocated or determined because of the overall actuarial plan assumptions and the cost recovery feature of the plan. Therefore, no amount attributable to this plan has been included in the summary compensation table above.

Source: NORTHWESTERN CORP, 10-K, April 15, 2003

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of not less than three non-employee directors. The members of the Compensation Committee are Chairman Randy G. Darcy, Marilyn R. Seymann, and Larry F. Ness. None of the persons who served as members of the Compensation Committee of the Board during fiscal year 2002 are officers or employees or former employees of NorthWestern or any of its subsidiaries.

**Director Compensation**

Non-employee Directors annually receive 1,200 shares of Common Stock of NorthWestern, are paid $2,500 each quarter for serving on the Board, and receive an attendance fee of $4,000 for attendance at each regular or special meeting of the Board. Directors are also paid $1,700 for each meeting of a committee on which such director serves and $500 for each quarter during which they serve as chairman of a committee of the Board. Directors receive one-half of the meeting fee for telephonic conference board or committee meetings. In addition, non-employee directors received stock options for 4,000 shares of Common Stock in 2002. Directors who are also officers are not separately compensated for services as a director on NorthWestern's Board.

Directors may elect to defer receipt of their cash compensation as directors until they cease to be directors. The deferred compensation may be invested in (1) an account which earns interest at the same rate as accounts in the team member savings plan or (2) a deferred compensation unit account in which the deferred compensation is converted into deferred compensation units on the basis that each unit is at the time of investment equal in value to the fair market value of one share of NorthWestern's Common Stock, sometimes referred to as "phantom stock units." Additional units based on the dividends paid on NorthWestern's Common Stock are added to the director's deferred compensation unit account. Following the director's retirement, the value of the deferred compensation is paid in cash to the former director within a period of five years.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Security Ownership by Certain Beneficial Owners and Management**

The following table sets forth information, as of March 1, 2003, with respect to the beneficial ownership of shares of NorthWestern's Common Stock owned by the directors, nominees for director, the "Named Executive Officers" of NorthWestern, as described below, and by all directors and executive officers of NorthWestern as a group. Except under special circumstances, NorthWestern's Common Stock is the only class of voting securities. There are no persons known to NorthWestern who own more than 5% of the outstanding shares of Common Stock.

The "Named Executive Officers" include NorthWestern's (a) Chief Executive Officer; (b) its four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002; and (c) up to two additional individuals for whom such disclosure would have been provided under clause (a) and (b) above but for the fact that the individual was not serving as an executive officer of NorthWestern at the end of fiscal year 2002; provided, however, that no disclosure need be provided for any executive officer, other than the CEO, whose total annual salary and bonus does not exceed $100,000.

Accordingly, NorthWestern's Named Executive Officers include (a) Gary G. Drook, its Chief Executive Officer; (b) Merle D. Lewis, former Chairman and Chief Executive Officer and (c) Richard R. Hylland, Daniel K. Newell, Michael J. Hanson and Eric R. Jacobsen, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2002 and whose salary and bonus exceeded $100,000.

Source: NORTHWESTERN CORP, 10-K, April 15, 2003