# EXHIBIT A

- PAUL A. MARCUS -

1
2  Northwestern's invested capital and its ability to
3  finance itself.
4      Q.   Did you have an understanding as to how
5  that analysis and any resulting opinion would be
6  relevant to any issue in this lawsuit?
7      A.   Can you repeat the question, please?
8          MR. PIZZURRO:  Can you read it back,
9  please?
10         (The question requested was read back by
11  the reporter.)
12     A.   I'm not sure that I did.
13     Q.   Did you ever reach such an
14  understanding?
15     A.   I think I have a general understanding.
16     Q.   What is your understanding today as to
17  how your analysis and opinions are relevant to the
18  lawsuit?
19     A.   Well, just to the extent that my
20  analysis explains what would have happened had the
21  true information been put into the marketplace, it
22  would determine whether or not Northwestern could
23  have performed a series of financing transactions
24  that it ultimately had done with information that
25  was incorrect in the marketplace.

13

- PAUL A. MARCUS -

1
2      Q.   Mr. Marcus, I think you said you were
3  asked to assess certain misrepresentations and
4  omissions in Northwestern's financial statements
5  for the year 2002; is that correct?
6          MR. KAPLAN:  Objection.
7      A.   I don't believe I set a date. I believe
8  my characterization was that I was asked to assess
9  those misrepresentations and omissions and
10  determine the impact that those would have had on
11  the company's invested capital and its availability
12  of financing.
13     Q.   Who told you there were any omissions or
14  misrepresentations in any of Northwestern's
15  financial statements?
16     A.   Through reviewing documents, there were
17  restated financial statements which would have
18  omissions. There was a Securities and Exchange
19  Dissent Decree Order that I reviewed.
20         There were documents pertaining to an
21  internal investigation that I reviewed, things of
22  that nature.
23     Q.   Do I take it, then, that you are
24  offering no independent opinion of your own in this
25  action as to whether or not there were any

14

- PAUL A. MARCUS -

1
2  misstatements or omissions in any of Northwestern's
3  financial statements?
4          MR. KAPLAN:  Objection to form.
5      A.   I can tell you what my opinions are in
6  the matter, which are that, you know, as it's
7  clearly articulated in my report, that the
8  October 8th equity financing would not have
9  happened, that the transfer of assets -- that would
10  have been impeded by the involved security holders
11  and regulatory commission, that the transfer put
12  the holders of the QUIPS, who were part of the
13  Montana Power Company, at greater risk as being
14  part of the Northwestern company, those would have
15  been two of my opinions. The third being that
16  Clark Fork did not have the wherewithal to pay the
17  QUIPS back. Those are my three opinions.
18     Q.   Let me direct your attention, please, to
19  the penultimate paragraph on the first page of
20  Exhibit 1.
21         Could you read that, please, into the
22  record?
23     A.   Which paragraph are you referring to?
24     Q.   The second to the last paragraph, the
25  last full paragraph, if you will, on Page 1.

15

- PAUL A. MARCUS -

1
2      A.   The one beginning, "We will not be
3  auditing"?
4      Q.   Yes.
5      A.   "We will not be auditing any financial
6  statements or performing test procedures with
7  respect to information in conjunction with this
8  engagement. Our services are not designed nor
9  should they be relied upon to disclose weaknesses
10  in internal controls, financial statement errors,
11  irregularities, illegal acts, or disclosure
12  deficiencies."
13     Q.   Mr. Marcus, let me ask you then, again:
14  Do I take it you are not offering any independent
15  opinion of your own in this action consistent with
16  the representation in the engagement letter as to
17  whether there were any omissions or misstatements
18  in any financial statements of Northwestern?
19         MR. KAPLAN:  Objection.
20     A.   Consistent with this paragraph, I have
21  not performed any attestation procedures that would
22  specifically relate to auditing financial
23  statements, if that answers your question.
24     Q.   Would you agree that nothing in your
25  opinion should be relied upon to disclose any

16

- PAUL A. MARCUS -

1  disclosure deficiencies in any of Northwestern's
2  financial statements?
3  MR. KAPLAN: Objection.
4  A.   I disagree with that.
5  Q.   You disagree.
6  In what way does your opinion disclose
7  such disclosure deficiencies?
8  A.   As I mentioned earlier, my opinion is
9  based on review of significant information which
10  talks about the deficiencies within the financial
11  statements, within the public disclosures that were
12  made. And I gave you a list of sources that I -- I
13  used in my -- developing my understanding of those
14  deficiencies, so --
15  MR. PIZZURRO: Mark this as 2.
16  (Whereupon, Marcus Exhibit 2 was marked
17  at this time.)
18  Q.   Mr. Marcus, you've just been handed a
19  document marked as Exhibit 2.
20  Do you recognize this as the second
21  amend -- strike that.
22  -- First Amended Complaint in this
23  action?
24  A.   It looks familiar.

17

- PAUL A. MARCUS -

1  Q.   Did you review this document in
2  connection with the opinion you gave in this
3  matter?
4  A.   My recollection is, is that I read the
5  document early in the process.
6  Q.   I'd like you to turn to Page 10 of the
7  document. Look at Paragraph 51 if you would, sir.
8  Paragraph 51 reads, "The Debtor was
9  insolvent both immediately before and immediately
10  after the acquisition of MPLLC and the assumption
11  of related liabilities. The Debtor was engaged in
12  a business with unreasonably small capitalization
13  and incurred debts beyond its ability to pay both
14  immediately before and immediately after the
15  acquisition of MPLLC and the assumption of
16  liabilities."
17  Sir, do you understand that the Debtor
18  in this paragraph is Northwestern Corporation?
19  MR. KAPLAN: I think if we look -- if
20  you look on the first page of the Complaint --
21  actually, I'm sorry, Paragraph 1 on Page 2, there
22  it's defined.
23  A.   Yes, I do.
24  Q.   Did you ever discuss the allegations

18

- PAUL A. MARCUS -

1  contained in this paragraph with anyone from Fried,
2  Frank?
3  A.   Not to my recollection, no.
4  Q.   Did you ever discuss the allegations in
5  this paragraph with anybody else at Huron?
6  A.   Not to my recollection, no.
7  Q.   Were you ever asked or did you ever
8  understand that you were being asked to offer any
9  opinions with respect to the allegations contained
10  in Paragraph 51?
11  MR. KAPLAN: Objection to the form.
12  A.   I was never asked to perform any form of
13  insolvency analysis.
14  MR. PIZZURRO: Mark this as Exhibit 3.
15  (Whereupon, Marcus Exhibit 3 was marked
16  at this time.)
17  Q.   Mr. Marcus, you've just been handed a
18  document which is marked as Exhibit 3.
19  Do you recognize this as your report
20  submitted in connection with this matter?
21  A.   Generally I recognize it. And I'll
22  assume all of the pages were appropriately copied,
23  and it is my report, yes.
24  Q.   In connection with issuing this report,

19

- PAUL A. MARCUS -

1  did you ever speak to Mr. Robert Berliner?
2  A.   I did not, no.
3  Q.   Did you ever review any opinions
4  prepared by Mr. Berliner?
5  A.   I did.
6  MR. PIZZURRO: Mark this as Exhibit 4.
7  (Whereupon, Marcus Exhibit 4 was marked
8  at this time.)
9  MR. KAPLAN: Just so the record is
10  clear, there was an errata sheet which was also
11  circulated with respect to the report.
12  MR. PIZZURRO: It should be attached as
13  the last page; if you'd like us to do that.
14  MR. KAPLAN: No, that's all right. I
15  wanted to make sure the record is clear.
16  Q.   Mr. Marcus, do you recognize Exhibit 4?
17  I'm sorry. Let me strike that.
18  You have been handed a document which is
19  marked as Exhibit 4.
20  Does that document contain the opinions
21  of Mr. Berliner to which you referred earlier?
22  A.   I believe it does.
23  Q.   Is there any other document prepared by
24  or on behalf of Mr. Berliner that you reviewed in

20

- PAUL A. MARCUS -

1
2 meeting whether your opinion would be affected if
3 Mr. Berliner's opinion was no longer reliable?
4     MR. KAPLAN: Objection.
5     A.  I don't recall that specific discussion.
6     Q.  Do you recall it generally?
7     MR. KAPLAN: Objection.
8     A.  No.
9     Q.  Do you recall any discussion which in
10 any way related to the impact of Mr. Berliner's
11 deposition on your opinion or your deposition here
12 today?
13     MR. KAPLAN: Objection.
14     A.  Not that I recall, no.
15     Q.  Let me direct your attention, please, to
16 Page 5 of Exhibit 3 of your report.
17     A.  Okay.
18     Q.  Specifically, under "Summary of
19 Opinions," which then goes over to Page 7.
20         Did you write that section, "Summary of
21 Opinions," yourself?
22     A.  I did.
23     Q.  Was any draft of this section of your
24 report edited by anyone other than yourself?
25     A.  I was the only person who edited the

33

- PAUL A. MARCUS -

1
2 document.  There were other people who saw the
3 report.
4     Q.  Were there any people who offered you
5 suggestions as to specific use of language in this
6 section of your report?
7     A.  Not that I recall.  The only suggestions
8 I received, that I recollect were, I'll
9 characterize them as grammatical and sometimes
10 comments were people didn't understand things and I
11 would try to rewrite them to make them more
12 understandable to you, but not word choices, no.
13     Q.  Do you have any opinions in this lawsuit
14 other than what is contained in your report?
15     MR. KAPLAN: I'm going to object to the
16 form.
17     A.  I'm not sure I could answer that sitting
18 here.  I've submitted a report with the opinions
19 that I formed.  If you were to ask me an opinion
20 about something else, I might have an opinion about
21 it.  But I --
22     Q.  My question, sir, is whether as an
23 expert you were offering any opinions which are in
24 addition to or different from the opinions which
25 are set forth in Marcus Exhibit 3 in this lawsuit?

34

- PAUL A. MARCUS -

1
2     A.  I guess I can't answer that because if
3 somebody were to ask me a question and phrase it a
4 certain way and ask me for my opinion, I might
5 offer that opinion.  But I have written a report
6 that summarizes the things that I've analyzed to
7 date and opinions that I'm setting -- proactively
8 setting forth.  But were you to ask me my opinion
9 today on something, if I could give it, I would
10 give it.
11     Q.  Have you changed any of the opinions as
12 they're set forth in Marcus Exhibit 3 as of today?
13     A.  I'm a bit confused by your question.
14     Q.  I want to know if your opinion as
15 expressed in the report or any one of them has
16 changed in any way since September 19th, the date
17 of the report, until you're sitting here today?
18     A.  I understand now.  No, they have not.
19     Q.  Mr. Marcus, you're a CPA, are you not?
20     A.  I'm not, no.
21     Q.  You are not a CPA?
22     A.  I'm not a CPA.
23     Q.  Do you consider yourself an expert on
24 the Montana Public Service Commission?
25     A.  Can you be more specific what you mean

35

- PAUL A. MARCUS -

1
2 by an expert on the Commission?
3     Q.  No.  That's as specific as my question
4 is.  It's pretty specific.
5     A.  Let me try to answer it then.  I can
6 tell you that I have extensive experience working
7 in financing utility companies and reviewing
8 opinions of commissions throughout the country in
9 many jurisdictions.  I have experience in reviewing
10 other people's interpretation and understanding of
11 how those commissions function.  And I would
12 consider myself an expert in interpreting and
13 understanding how commissions work, what positions
14 they put forth, their interests, and the
15 constituencies that they represent.
16     Q.  Do you have any experience in dealing
17 with the Montana Public Service Commission?
18     A.  I don't recall.
19     Q.  Have you ever offered opinion testimony
20 as an expert at any aspect of the Montana Public
21 Service Commission?
22     MR. KAPLAN: Objection to the form.
23     A.  I have not.
24     Q.  Have you ever testified as an expert
25 before the Montana Public Service Commission?

36

- PAUL A. MARCUS -

1
2    MR. KAPLAN: Objection.
3    A.   My opinion is that if the information,
4  which I've articulated in the next 50 pages, was
5  put into the marketplace, that this equity offering
6  in this form would not have happened.
7    Q.   Impossible; is that your opinion?
8    MR. KAPLAN: Objection to the form.
9    A.   It's my belief, as stated in the report,
10  that if all the relevant information was released
11  to the marketplace, the $87 million equity offering
12  in that form would not have happened in October of
13  2002.
14    Q.   And that would be your opinion even
15  if -- strike that.
16        Would that be your opinion even if we
17  assume that there was no breach of any covenant on
18  the $280 million CSFB revolver in 2002?
19    MR. KAPLAN: Objection.
20    A.   Can you repeat the question, please? It
21  was a little confusing.
22        (The question requested was read back by
23  the reporter.)
24    A.   I think, as I've already stated, my
25  opinion is based on the facts I've analyzed. It's

45

- PAUL A. MARCUS -

1
2  also my opinion or my belief at this point that if
3  the covenant breach did not occur, all it would
4  have done is postpone the inevitable anyways. And
5  yes, I believe even without that covenant breach
6  that the equity offering in that form would not
7  have happened.
8    Q.   Would not have happened in October of
9  2002; is that correct?
10    A.   That's my opinion, as of October of
11  2002.
12    Q.   Okay. Your language goes on after you
13  say, "the equity offering would not have occurred,"
14  and you say, "and the asset transfer would have
15  been impeded by the attempts of security holders
16  and regulators to protect their respective
17  investments and constituents because," -- and there
18  are bullet points.
19        I want to stop there and I want to ask
20  you first of all, just so the record is clear, the
21  asset transfer to which you refer here is the
22  transfer of the utility assets from Northwestern
23  Energy LLC to Northwestern and the consequent
24  assumption of liabilities from Northwestern LLC by
25  Northwestern on November 15th, 2002; is that

46

- PAUL A. MARCUS -

1
2  correct?
3    MR. KAPLAN: Objection to the form.
4    A.   The asset transfer is the transfer of
5  the assets and certain liabilities on November 15th
6  to Northwestern Corporation. It didn't include the
7  transfer of a particular asset, a dam that was left
8  out of it, but the majority of the assets and
9  liabilities.
10    Q.   That's the asset transfer that you're
11  referring to in this sentence, correct? That's all
12  I want to establish.
13    A.   That's correct.
14    Q.   You say the asset transfer would have
15  been impeded.
16        What did you mean when you used the word
17  "impeded"?
18    A.   That the significant negative
19  information would have caused both the security
20  holders and regulators to take on certain actions
21  that would have impeded that asset transfer.
22    Q.   I know, sir, that's repeating what you
23  said.
24        I'm asking you: Why did you use the
25  word "impeded"?

47

- PAUL A. MARCUS -

1
2    A.   I'm not sure how I can answer you, why I
3  chose a word.
4    Q.   I would think that would be something
5  you would be most readily able to answer.
6    A.   It specifically describes what my belief
7  is, is that with the information, the security
8  holders and regulators would have attempted to
9  impede the transfer.
10    Q.   Let me put it a different way, sir.
11        In the immediately preceding line in the
12  same sentence you used the words "would not have
13  occurred" when describing the effect of disclosures
14  on the ability of the company to do the equity
15  offering, but you use the word "impeded" when
16  you're talking about the asset transfer.
17        I have to assume that's a very conscious
18  difference in words. And I'm asking you what you
19  meant by "impeded."
20    MR. KAPLAN: Objection to the form.
21    A.   There are a number of things that I
22  think would have happened, which would have
23  included things like lawsuits being instituted,
24  regulatory actions taking place, Trustees being
25  contacted to start lawsuits. So my belief is all

48

- PAUL A. MARCUS -

1    - PAUL A. MARCUS -
2    QUIPS holders had a right to any different
3    treatment than what they ultimately received under
4    the terms of their contract?
5        MR. KAPLAN: Objection to the form.
6        A.   Are you asking me a legal conclusion --
7    to come up with a legal conclusion?
8        Q.   You said their interests were adversely
9    affected. I just want to have an understanding as
10   to whether you're saying that's because their
11   contract was violated or because of some structural
12   reshuffling in the capital structure of
13   Northwestern.
14       MR. KAPLAN: Objection to the form.
15       A.   I'm not drawing any legal conclusions,
16   if that answers your question.
17       Q.   Did you have or do you have any
18   understanding as to whether the QUIPS holders had
19   the ability to take any action that would have
20   impeded the asset transfer, as you've stated in
21   your opinion?
22       A.   Well, I know that they obviously have
23   the right to file a lawsuit, which they've done. I
24   know that they have the right to approach a
25   Trustee, and I know that bondholders frequently do

57

1    - PAUL A. MARCUS -
2    that. So they complained to a Trustee that their
3    -- a Trustee for fiduciary reasons has to protect
4    their interests.
5        I know that they can go to a utility
6    commission and stir up the pot, so to speak. Those
7    are things I know they can do, if that answers your
8    question.
9        Q.   That's as a general matter, correct?
10       MR. KAPLAN: Objection to the form.
11       Q.   I'm asking specifically about the QUIPS
12   holders.
13       A.   I think I answered you what I think the
14   QUIPS holders, off the top of my head, could do if
15   they felt that their position was going to be
16   endangered.
17       Q.   What's the basis for that prediction --
18   that view?
19       MR. KAPLAN: Objection to the form.
20       A.   Facts. Because they've actually filed a
21   lawsuit, so they obviously -- anybody in this
22   country has the right to do that.
23       My experience is that bondholders don't
24   sit idly by and watch their positions deteriorate
25   without doing something. I know that they have the

58

1    - PAUL A. MARCUS -
2    right to contact a Trustee of the bonds, to see if
3    anything could be done as a group. I know that
4    everyone has the right to go talk to the
5    commissions to try to persuade them that the asset
6    transfer would be problematic.
7        You've asked me for things they could
8    do. Those are definitely things that they could
9    do.
10       Q.   Did you review the opinion of Judge
11   Case, which was issued in or about August of 2004,
12   on motion to dismiss that was made in this action
13   by Northwestern? Do you recall, sir?
14       A.   I don't recall seeing that.
15       Q.   Back in that same sentence when you say,
16   "impeded by the attempts of security holders and
17   regulators."
18       Other than the Montana Public Service
19   Commission, were there any other regulators that
20   you were referring to?
21       A.   At one point I was thinking about some
22   of the possible regulators within the state in
23   terms of Attorney Generals, things of that nature,
24   but the majority of my focus was on the Montana
25   Public Utility Commission.

59

1    - PAUL A. MARCUS -
2        Q.   Was that because you had reviewed some
3    of the statements that had been made by the
4    Commissioners in connection with the approval of
5    the $390 million secured financing that was
6    accomplished in January and February of 2003?
7        MR. KAPLAN: Objection to the form.
8        A.   I'm not sure what you're asking me.
9        Q.   You say the majority of your focus was
10   on the Montana Public Utility Commission. I think
11   it's Public Service Commission, not the Public
12   Utility Commission.
13       At any rate, I'm asking if your focus
14   was because you actually reviewed some statements
15   made in proceedings involving the MPSC in
16   connection with Northwestern?
17       A.   No. My focus was on the Commission
18   because I have experience with utility companies
19   and commissions and know what an integral role they
20   play in all of these things. I did ask to look at
21   any rulings they might have made, and I did look at
22   that one as part of my analysis.
23       Q.   Okay. You know that the MPSC had
24   already approved the acquisition of the Montana
25   Power assets by Northwestern in early 2002,

60

- PAUL A. MARCUS -

1  correct?
2  A.   I'd have to go back to the specific
3  order, but my general recollection is that they
4  approved it, yes.
5  Q.   You also knew that that approval covered
6  whether or not Northwestern kept the assets in a
7  wholly owned subsidiary or moved them to the parent
8  company to operate as a division along with
9  Northwestern's other utility assets; is that
10 correct?
11 A.   My recollection is that the approval was
12 for either a separate subsidiary or as a division.
13 Q.   Do you have any basis for understanding
14 whether having given that approval, the MPSC had
15 the authority or the ability to step in and impede,
16 as you've put it, the asset transfer?
17 MR. KAPLAN: Objection to the form.
18 A.   All I can tell you is that the
19 commissions -- from my understanding of commissions
20 in general, is that they have broad authority over
21 the utilities in their states.  And that to the
22 extent that this information, which is material in
23 which they commented on extensively after the fact,
24 if that information had been in the public domain,

61

- PAUL A. MARCUS -

1  that they would have done whatever they could have
2  to protect their constituents.  And to the extent
3  that that meant taking action, I believe that they
4  would have done that.
5  Q.   My question wasn't whether they wanted
6  to do or not wanted to do.
7  My question is: Do you know what they
8  had the authority to do, yes or no?
9  A.   I haven't made a legal determination of
10 what their authority is.
11 Q.   You don't know, do you?
12 MR. KAPLAN: Objection.  Asked and
13 answered.
14 Q.   Withdrawn.
15 Do you know whether the Montana Public
16 Service Commission in its history has ever
17 rescinded approval of a transaction once that
18 approval had already been given?  Ever?
19 A.   That's a bit of a loaded question in
20 that if you're asking me for a good transaction,
21 did they rescind it?  I don't know.
22 I don't know if there have been any
23 transactions where material information was omitted
24 or misrepresented and they were then put in a

62

- PAUL A. MARCUS -

1  position of having to change their opinions.  So I
2  guess it's not really a fair apples to apples
3  comparison.
4  Q.   Fair enough.
5  When did the MPSC approve the
6  transaction, including the assets held at the
7  parent company?
8  MR. KAPLAN: Objection.
9  A.   When you say the "transaction" --
10 Q.   When did the MPSC approve Northwestern's
11 acquisition of Montana Power assets and
12 Northwestern's ability to hold those assets at the
13 parent company level?
14 A.   I don't recall the specific date.
15 Q.   Would it refresh your recollection if I
16 told you that it was in January of 2002?
17 A.   Yes.  That would be my understanding of
18 approximately when that happened.
19 Q.   So you're not suggesting in any way that
20 any of the financial information upon which the
21 MPSC based that decision was false and misleading
22 are you?
23 MR. KAPLAN: Objection to the form.
24 A.   I haven't analyzed what information was

63

- PAUL A. MARCUS -

1  available at the time or what was or was not false
2  and misleading.  Obviously, there were
3  representations made about what the future held,
4  and I haven't assessed whether or not those were
5  misrepresented or not.
6  Q.   I want to understand, Mr. Marcus, other
7  than your experience in dealing with utility
8  commissions, and having read the opinion of the
9  MPSC in connection with the approval of the
10 $390 million secured financing in '03, is there
11 anything else that you base your opinion on that
12 the MPSC would have acted to impede the going flat
13 transaction?
14 MR. KAPLAN: Objection to the form.
15 A.   Based on my belief that the financial
16 information that would have come out would have
17 been so bad and would have endangered the company
18 so much that it's just common sense that they would
19 do whatever they could to protect their
20 constituents.
21 Q.   What could they do to protect their
22 constituents in those circumstances?
23 A.   They could stop the assets from being
24 transferred.  They could restrict salaries.  They

64

- PAUL A. MARCUS -

1
2 could do all kinds of things, which, ultimately,
3 they did. They have fairly broad powers, based on
4 my understanding.
5      Q.   Well, let's back up a second. We've
6 established you don't know whether they had the
7 authority to stop the transaction.
8           MR. KAPLAN: Objection to the form.
9      Q.   We've established the facts --
10 established they never did. So, doing all kinds of
11 things they ultimately did, what did the MPSC
12 ultimately do to protect the interests of its
13 constituents in connection with the $390 million
14 secured financing that Northwestern applied for in
15 early 2003?
16           MR. KAPLAN: Objection to the form.
17      A.   You made two statements which I don't
18 think were questions and then asked me a question,
19 which I'm not sure was related to the statements.
20 If you'd be willing to break that down into some
21 smaller parts, it probably would be easier to
22 answer.
23      Q.   I'm going ask my question, and you're
24 quite correct -- ignoring the statements I made.
25      My question is: What did the MPSC do to
65

- PAUL A. MARCUS -

1
2 protect the interests of its constituencies when it
3 approved the $390 million secured financing that
4 Northwestern applied for in January of 2003?
5      A.   Sure. Well, again, with a gun pointed
6 at their head, because the assets had already been
7 gone, there was limited things at that point that
8 the Commission could do.
9           But they did, in their Order, talk
10 about, I believe, salaries being cut back, limiting
11 the investment to the unregulated subsidiaries.
12           Those are two that come to mind quickly.
13 I'd have to think a little bit more about any
14 others.
15      Q.   Why were there limited things at that
16 point, as you say? Why were there limited things
17 that the Commission could do in January of '03?
18           MR. KAPLAN: Objection. Asked and
19 answered.
20      A.   Because the assets were already gone.
21 They were making a decision to help finance a
22 company that was on its last leg in terms of
23 approaching bankruptcy. And the decision at that
24 point was do what you can to get the 390 out so
25 that maybe they survive.
66

- PAUL A. MARCUS -

1
2      And all it did was postpone their
3 ultimate bankruptcy filing until September of that
4 year from the date in February. So I think they
5 were limited because those assets were already
6 gone.
7      Q.   You say the assets were already gone.
8      Where did the assets go? Had they left
9 the State of Montana?
10           MR. KAPLAN: Objection. Argumentative.
11      Q.   I want to know what -- the assets had
12 already gone. I want to understand.
13      A.   Sure. There was a legal entity that
14 held the assets that had -- there was a legal
15 corporate structure that had security holders in
16 the form of debt, had preferred stock. And those
17 assets became incorporated with another company
18 called Northwestern Corporation.
19      So they were no longer available
20 exclusively for the benefit of those existing
21 security holders at the time. They became
22 incorporated into -- into Northwestern, and
23 therefore, many of the risks of Northwestern were
24 then spread over all of the "assets."
25      Physically, the transmission lines were
67

- PAUL A. MARCUS -

1
2 still in the state. You're correct about that.
3      Q.   Are you -- strike that.
4      The QUIPS holders were not a
5 constituency of the MPSC, correct?
6           MR. KAPLAN: Objection to the form.
7      Are you asking him who the QUIPS
8 holders are or where they live? I'm trying to
9 understand the question.
10      Q.   Do you understand my question?
11      A.   I don't.
12      Q.   We're talking about the constituency of
13 the MPSC, the interests the MPSC has to protect.
14 Let's put it that way.
15      Do those interests include the QUIPS
16 holders?
17           MR. KAPLAN: Objection to the form.
18      A.   The MPSC has to evaluate numerous
19 things, one of which is the financeability of the
20 utilities. And in protecting its constituencies,
21 it has to take into account interests and needs of
22 different financing mechanisms and investors. And
23 I think they would be concerned about what happened
24 to the QUIPS, as well, and other investors of the
25 firm.
68

- PAUL A. MARCUS -

1
2    Q.   Well, why didn't the MPSC just say,
3    "Give the assets back to your subsidiary
4    Northwestern Energy LLC"?
5        MR. KAPLAN: Objection.
6    A.   At that point, I don't know if they had
7    the legal ability to do that. I just don't know
8    the answer to your question.
9    Q.   You also don't know whether they had the
10   legal ability to impede the going flat transaction
11   having given their approval to the transaction in
12   January of '02, correct?
13       MR. KAPLAN: Objection.
14   Q.   I'm just trying to probe the limits of
15   what your inquiry is concerning the scope of
16   authority and ability of the MPSC to act. You
17   offer an opinion they would have impeded.
18   A.   That's correct.
19   Q.   You don't know whether they could have
20   ordered the assets given back.
21       That's your testimony, correct?
22   A.   My testimony is I don't know the legal
23   steps that they can take. I can tell you that my
24   experience has seen a variety of different measures
25   that utility commissions have taken to protect the

69

- PAUL A. MARCUS -

1
2    utilities, whether it was because of a large asset
3    write-off in a nuclear power plant or variety of
4    other situations.
5        And they take a number of different
6    actions. I cannot give you a legal conclusion as
7    to what the Commission would do.
8        MR. PIZZURRO: Let's take a 10-minute
9    break.
10       (Whereupon, there was a brief recess in
11   the proceedings.)
12   Q.   Mr. Marcus, let me just direct your
13   attention for a moment back to the very beginning
14   of Paragraph 13 on Page 5 (I).
15       You say -- you refer to the
16   misstatements and omissions in Northwestern's
17   financial statements.
18       Do you see that, sir?
19       Are you referring there to simply what
20   was corrected in the restatement of the first three
21   quarter Qs in April of '03, or are you including
22   there the impairment analysis which Mr. Berliner
23   performed?
24       MR. KAPLAN: Objection to the form.
25   A.   Included in those statements and

70

- PAUL A. MARCUS -

1
2    omissions I would include the restated financial
3    information. I would include additional
4    information relating to the performance of the
5    unregulated subsidiaries, including their future
6    potential.
7        I would include that an impairment
8    occurred prior to the time in the financial
9    statements but it isn't specifically tied to
10   Mr. Berliner's opinion in any way.
11   Q.   Sir, do you have an opinion as to
12   whether Northwestern should have recognized a
13   goodwill impairment with respect to Blue Dot and
14   Expanets prior to December 31, 2002, independent of
15   Mr. Berliner's analysis?
16   A.   My opinion would include the belief that
17   the company was impaired in -- prior to that time
18   period. I'm not opining on when exactly for GAAP
19   reporting purposes an impairment charge needed to
20   be taken.
21   Q.   Do you understand that Mr. Berliner is
22   offering an opinion for GAAP reporting purposes as
23   to when an impairment charge should have been taken
24   by Northwestern in 2002?
25   A.   That is my understanding.

71

- PAUL A. MARCUS -

1
2    Q.   Is Mr. Berliner's opinion in that
3    respect something upon which you have relied in
4    offering your Opinion Number 1?
5    A.   It is a fact that I used in my analysis
6    of coming up with my opinions.
7    Q.   To be clear, do you have any basis --
8    let's strike that.
9        Let me direct you to the bullet points
10   which appear on Page 6. There's seven bullet
11   points where you enumerate some of the -- what you
12   have offered as the consequences that would have
13   occurred had Northwestern been accurately reporting
14   its financial condition.
15       Do you see that?
16       MR. KAPLAN: Objection.
17   A.   I believe the bullet points reflect some
18   of the reasons that I believe that -- or support my
19   opinion that the equity offering would not have
20   occurred on October 8th and that the asset transfer
21   would have been impeded.
22   Q.   I direct your attention to the fourth
23   bullet point, which reads, "Northwestern would have
24   defaulted on financial covenants related to its
25   $200 million," -- "$280 million facility for which

72

- PAUL A. MARCUS -

1
2  Credit Suisse First Boston, CSFB, was the
3  administrative agent."
4        Do you see that, sir?
5    A.  I do see that, yes.
6    Q.  Do you have an opinion that this would
7  have occurred, which is independent of the analysis
8  and opinions offered by Mr. Berliner?
9    A.  I haven't fully analyzed whether or not
10  there would have been a covenant default, as I
11  mentioned to you earlier.  I did not have
12  sufficient information to complete that analysis.
13  I could if I were asked to.
14    Q.  Sir, is the answer no?  You have no
15  opinion independent of Mr. Berliner as to whether
16  there would have been a default on financial
17  covenants; is that your testimony?
18        MR. KAPLAN:  Objection.
19    A.  My testimony is that I used this piece
20  of information from Mr. Berliner because I did not
21  independently calculate the numbers myself.  Were I
22  to calculate the numbers myself, I might come up
23  with the same opinion.  I just haven't done that.
24    Q.  You testified this morning you didn't do
25  that because you didn't feel you had sufficient

73

- PAUL A. MARCUS -

1  information.
2        Do you recall that testimony?
3    A.  I do.
4    Q.  What additional information would you
5  need that Mr. Berliner had that you did not which
6  would allow you to have done what he did?
7        MR. KAPLAN:  Objection to the form.
8    A.  I don't know what information he had.
9  All of the information he had, I didn't see all of
10  it.  I know there's a list, but I don't know what's
11  included in it.  So you're asking me to determine
12  what he has that I don't know he has that might go
13  into my analysis.
14    Q.  You're right, and I'll ask a better
15  question.
16        What information do you need -- would
17  you need to do the calculation you didn't do to
18  determine whether there was a covenant breach?
19        MR. KAPLAN:  Objection to the form.
20    A.  I'd have to go back and revisit what it
21  was we were missing in the first place.  I just
22  don't recall specifically.
23    Q.  Were you asked to calculate -- strike
24  that.

74

- PAUL A. MARCUS -

1
2        Were you ever asked to offer an opinion
3  independently as to whether or not goodwill
4  impairment should have been recognized earlier in
5  2002 resulting in a covenant breach under the
6  revolver?
7        MR. KAPLAN:  Objection to the form.
8    A.  I'm a little bit confused.  I was
9  asked -- and we went through this at great length
10  this morning.
11        I was asked to assess and analyze
12  misrepresentations and omissions, and I did that.
13  And I was never asked to come up with an opinion.
14  I was never asked to discuss anything in
15  particular.  I came up with my own opinions based
16  on the information I reviewed.
17    Q.  I direct your attention to the fifth
18  bullet point, which is the one directly below the
19  one we just discussed.  It reads, "CSFB would
20  likely not have funded the $280 million facility."
21        Do you see that, sir?  Is that
22  conclusion a consequence of the immediately
23  preceding bullet point?
24        MR. KAPLAN:  Objection to the form.
25    A.  The immediately preceding bullet point

75

- PAUL A. MARCUS -

1  was the impetus for saying this, although there
2  could possibly be other reasons why it would not
3  have funded.  I didn't investigate those.
4    Q.  So in your opinion, the only basis that
5  you have for predicting that CSFB would likely not
6  have funded the $280 million facility is
7  Mr. Berliner's conclusion that there was a covenant
8  breach; is that correct?
9        MR. KAPLAN:  Objection to the form.
10    A.  You're using the word "predicted" again.
11  I guess we don't -- I don't know what that means.
12        But what I've said here is if they were
13  in default, that it's likely that they would not
14  have funded given all of the other things going on
15  regarding the company and the market at that point
16  in time.  The bank group would have likely not
17  funded to protect its cash.
18    Q.  Well, assume with me for a moment that
19  there was no known covenant breach in 2002, but
20  that all the other restated financial information
21  was in the marketplace.
22        Do you have an opinion under those set
23  of assumptions as to whether or not CSFB would have
24  funded the $280 million facility?

76

- PAUL A. MARCUS -

1
2    MR. KAPLAN: Objection to the form.
3    A.   I haven't come to a conclusion one way
4 or another at this point as to whether or not
5 that's true. I'm telling you the statements here
6 are based on the work I've done to date.
7    Q.   Sir, in the paragraph immediately after
8 the last bullet point, the one that starts, "In
9 each case above."
10       Do you see that, sir?
11    A.   I do.
12    Q.   The last sentence of that paragraph
13 says, "In reality, this scheme to withhold
14 information allowed the company to execute the
15 above-mentioned transactions."
16       What is the scheme to which you were
17 referring in that sentence?
18    A.   Generally, it was the withholding of
19 information about the severity of the problems at
20 the unregulated subsidiaries, the lack of ability
21 to ever get a return on those investments, the cash
22 that was being put into those companies, the
23 internal EXPERT system not performing at all -- the
24 billing system not working at all. There might be
25 some others, but generally that's what that's

77

- PAUL A. MARCUS -

1
2 referring to.
3    Q.   Was there any other aspect or objective
4 of the scheme to which you are referring as far as
5 your opinion goes in the last sentence?
6    MR. KAPLAN: Objection to the form.
7    A.   Well, again, all throughout my report --
8 we can go page by page. You're asking me a general
9 recollection as I'm sitting here. You could add in
10 the ability to monetize certain assets. Again,
11 there are others and they're pretty
12 well-articulated in the report.
13       I guess if you want to go page by page
14 through it or ask me the question specifically, I'd
15 be happy to answer it.
16    Q.   If there were any other aspect or
17 objective of the scheme, it would be contained
18 within the four corners of the document which has
19 been marked as Marcus 4?
20    MR. KAPLAN: Objection to the form.
21    A.   That isn't necessarily true.
22    Q.   Where else would one find it?
23    A.   There are hundreds of pages of
24 documentation that I reviewed that I considered
25 that could possibly factor into my interpretation

78

- PAUL A. MARCUS -

1
2 of a particular fact that isn't articulated in the
3 report. If I included the -- everything in the
4 report, the report would have been hundreds and
5 hundreds of pages.
6    Q.   Perhaps you could give us one example of
7 something which you could have opined on but did
8 not in the report that would be relevant to the
9 case.
10    MR. KAPLAN: Objection to the form.
11    A.   I think your characterization of opined
12 is different. And the question I'm answering is:
13 Are there other pieces of information that are not
14 reflected in this report that could have influenced
15 or have an effect on my opinion?
16       And the answer to that is the -- there
17 could possibly be. I don't know for sure.
18    Q.   That's fine. That was not my question,
19 sir.
20    A.   I'm sorry. I misunderstood it.
21    Q.   My question was: Is there any other
22 aspect or objective of the scheme to which you were
23 referring in the sentence we're discussing which,
24 as far as your opinion goes, do you have an opinion
25 as to whether there's anything else that you

79

- PAUL A. MARCUS -

1
2 described that's not here in the report?
3    MR. KAPLAN: Objection to the form.
4    A.   Again, I'm not sure I fully understand
5 so let me try it again.
6       When -- the beginning of your question
7 isn't talking about new opinions. I think the
8 beginning of your question is asking me whether or
9 not I have other pieces of information that are not
10 articulated in this report that could contribute to
11 my opinions.
12       My opinions are stated pretty clearly in
13 this report. I reviewed thousands of pages of
14 documents, and there could be other things in some
15 of those documents that support the scheme or
16 support the materials that were omitted that didn't
17 make it into the text of this report.
18    Q.   I think that's good. Thank you.
19       Focusing again on the seven bullet
20 points that you have on Page 6.
21       Is any one of these bullet points
22 essential to your opinion that the equity offering
23 would not have occurred and the asset transfer
24 would have been impeded?
25    MR. KAPLAN: Objection to the form.

80

- PAUL A. MARCUS -

1
2    A.   As I said, because I knew that he was
3    calculating those things, I didn't continue to
4    pursue an independent calculation.  There are also
5    other reasons that I haven't fully analyzed the
6    $280 million revolving credit facility.
7         But already there are other reasons why
8    a bank group might not fund a loan, and those could
9    be with the legal right to not fund it or without
10   the legal right not to fund it because a bank group
11   that believes a company is on the doorstep of
12   bankruptcy, whether or not it has the legal right,
13   might take the chance that they shouldn't fund and
14   keep the money and turn the -- enter the
15   litigation.  So I haven't analyzed that but that's
16   a possibility that would have caused the credit
17   facility not to fund as well.
18   Q.   There's a lot of things that could
19   happen, right?
20        MR. KAPLAN:  Objection to form.
21   Q.   CSFB could have lost a ton of money in
22   other investments and not had the money to fund,
23   right?
24        MR. KAPLAN:  Objection to the form.
25   Argumentative.

89

- PAUL A. MARCUS -

1
2        MR. PIZZURRO:  Withdrawn.
3    Q.   What is there in any work that you've
4    done, other than speculation in which you just
5    engaged, that would support what is contained
6    Paragraphs 84, 85 and 86 of your report other than
7    Mr. Berliner's work?
8        MR. KAPLAN:  Objection to the form of
9    the question.
10   A.   Again, I know that at the time period in
11   question here the company was way under-performing.
12   I know that the billing system in the subsidiaries
13   wasn't working; that there's identification that
14   the receivables are extended.
15       I know that there are a whole lot of
16   problems going on.  And to the extent that those
17   problems are brought forward to a bank group -- and
18   having been a lender, I can tell you when companies
19   are getting into trouble, there are often
20   conversations that happen.
21       And whether or not you're even in a
22   technical event of default or technical breach of
23   covenant, if you know that covenant is going to be
24   breached shortly and you've got the money and not
25   out the door, it's going to create a conversation.

90

- PAUL A. MARCUS -

1
2    And I haven't articulated that in the report, but I
3    can tell you that is definitely something that
4    happens in practice.
5    Q.   Mr. Berliner -- Marcus, I apologize.
6    Mr. Marcus, are you familiar with the turnaround
7    program that was instituted by Northwestern in
8    announcement dated February 19th, 2003, to address
9    the worsening financial condition of the company at
10   that time?
11   A.   I do recall reading things about the
12   turnaround plan, yes.
13   Q.   Am I correct that your analysis of the
14   effects on Northwestern, based on the assumption
15   that accurate financial information was being
16   reported to the marketplace, does not include any
17   assumption that Northwestern would have reacted any
18   differently than it did in 2002?
19       In other words, you have not assumed the
20   company would have taken any steps to address a
21   continually worsening financial condition as it
22   actually did in February of '03; is that correct?
23        MR. KAPLAN:  Objection to the form.
24   A.   That's not correct, no.
25   Q.   What did you take into account in your

91

- PAUL A. MARCUS -

1
2    analysis that the company might have done that it
3    actually did do in '03 in determining the effect of
4    the accurate reporting of information on the
5    company's position in '02?
6        MR. KAPLAN:  Objection to the form.
7    A.   Can you repeat the question, please?
8        (The question requested was read back by
9    the reporter.)
10       MR. KAPLAN:  Note my objection to the
11   form.
12   A.   First and foremost, the company did
13   start a turnaround process and still did go
14   bankrupt; so we know that's a fact.  Now, if they
15   were to have started some of the major part of that
16   turnaround program earlier -- and really the two
17   major ones that were discussed in addition to a lot
18   of other smaller ones were the suspension of the
19   dividend and suspension of the preferred stock
20   payments, the QUIPS payments.
21       Clearly, I believe that if the dividend
22   would have been cut earlier that would have been an
23   extremely negative signal to the marketplace.  As
24   mentioned to you, their financial advisors were
25   telling them only bankrupt utilities cut the

92

- PAUL A. MARCUS -

1
2  dividend to zero, that the equity analysts were
3  viewing the company on a dividend yield basis which
4  now, at zero, would make the stock fall
5  precipitously and all of those would have happened
6      So even though they would have tried to
7  institute many of those things earlier in time, all
8  it would have done is postpone the bankruptcy
9  filing itself. But all of the things that
10 happened, i.e., the equity offering not happening
11 and the asset transfer not happening, my opinion is
12 the same.
13     Q.  Why is the timing of the bankruptcy
14 filing relevant?
15     A.  The extent of the turnaround plan would
16 have had to save over $80 million, which is 80-plus
17 million dollars which were the proceeds from the
18 equity offering. And all else being equal, they
19 would have had to save that just to still declare
20 bankruptcy.
21     Q.  I ask again, sir: Why is the bankruptcy
22 filing and the timing of the bankruptcy filing
23 relevant? I don't see it in your opinion here, and
24 I'm curious as to why it's relevant.
25     A.  The relevance is that I've looked at the

93

- PAUL A. MARCUS -

1
2  time period up to the bankruptcy. To look at the
3  events that occurred and knowing that the company
4  couldn't make it and needed to declare bankruptcy
5  is something that is an indication also of what
6  would have happened earlier had all of the
7  information been known.
8      Q.  Well, do you have an opinion as you sit
9  here today as to when the company would have had to
10 declare bankruptcy, given the assumptions that
11 you've made?
12     A.  Not specifically, no.
13     Q.  Okay. I take it you don't have an
14 opinion as to when the company would have had to
15 declare bankruptcy, given the assumptions you made,
16 but also given an assumption the company would have
17 employed the same turnaround program in early '02
18 that it actually implemented in early '03, correct?
19     MR. KAPLAN: Objection to form.
20     A.  I have not come up with an opinion as to
21 when the company would have declared bankruptcy.
22     Q.  My question then, sir, is, why is the
23 filing of the bankruptcy and timing of it relevant
24 in any way relevant to your opinion that the asset
25 transfer would have been impeded by the attempts of

94

- PAUL A. MARCUS -

1
2  security holders to protect their investments of
3  constituents.
4      A.  The bankruptcy filing is the penultimate
5  demise of the company and knowing that they did all
6  of these things with all of this false information
7  out there, they issued the equity. They funded the
8  280. They funded the 390 in February. They
9  started the turnaround process a little bit late
10 maybe, but still started it.
11     And with all of those things, they
12 ultimately went bankrupt. So it -- it's part of my
13 thinking in my analysis and seeing what ultimately
14 happened, even though they were able to accomplish
15 all of those things. And that does have an
16 influence on my opinions as to what would have
17 happened.
18     Q.  Sir, you're not offering an opinion as
19 to whether they would have gone bankrupt or not, or
20 when they would have gone bankrupt, you just
21 testified to that.
22     Your opinion is that some confluence of
23 these events, not including the covenant breach and
24 failure of inability to fund the $280 million
25 facility, that the other things taken together,

95

- PAUL A. MARCUS -

1
2  perhaps individually, you haven't done the
3  analysis, would have impeded the going flat
4  transaction.
5      I'm just trying to understand why the
6  bankruptcy filing or the timing of the bankruptcy
7  filing is relevant to anything.
8      MR. KAPLAN: I'm going to object. There
9  were about three speeches worked in there. You're
10 trying to characterize the testimony.
11     You didn't, so I'm going to object to
12 that question. If there's a question in there, ask
13 the question, but I think you can skip the long
14 speeches.
15     Q.  You can answer.
16     A.  Well, you did make a number of
17 statements that I'm not sure I agree with. That
18 was pretty long so I don't remember all of them.
19     Q.  I'll just take the last part of it.
20     Why is the bankruptcy filing or the
21 timing of the bankruptcy filing relevant to
22 anything in your opinion?
23     MR. KAPLAN: Objection. Asked and
24 answered multiple times.
25     A.  And again, in my overall analysis of the

96

Pages 93 to 96

- PAUL A. MARCUS -

1   - PAUL A. MARCUS -
2   company and what actually happened to the company,
3   it is part of the analysis that I did to know what
4   ultimately happened to the company.
5   Q.   Okay.  You're not offering an opinion
6   that the bankruptcy of the company would have
7   impeded the going flat transaction are you?
8   MR. KAPLAN:  Objection to the form.
9   A.   Can you repeat the question?
10  (The question requested was read back by
11  the reporter.)
12  MR. KAPLAN:  Are you asking whether a
13  bankruptcy filing before the going flat
14  transaction --
15  MR. PIZZURRO:  The witness has testified
16  he has no idea under the scenario he assumed when
17  it occurred or the assumed scenarios.  I'm not
18  putting that into my question.  I'll stand on my
19  question.
20  MR. KAPLAN:  If you can understand.
21  A.   First of all, I haven't said I
22  determined when it would have happened as opposed
23  to I don't have any idea.  It actually isn't
24  something that I've done that's in response to your
25  statement.

97

1   - PAUL A. MARCUS -
2   However, the -- knowing that the company
3   with all of the information that ultimately came
4   out about the business caused the company to go
5   bankrupt is relevant in the sense that as you're
6   looking at what the market was doing prior to those
7   two events and how the market was interpreting it
8   to the extent that they could have forecasted or
9   known that the company was in dire straights, it
10  would be additional information that I would have
11  analyzed in coming up with my opinions.
12  Q.   How did you use it in coming up with
13  your opinions?
14  MR. KAPLAN:  Objection to the form.
15  A.   I'm trying to think of a different way
16  to say it than I already have.
17  The way-- in analyzing the company and
18  its prospects, as well as what actually happened to
19  the company, it is a fact that I used in assessing
20  the events that would have occurred had the
21  misrepresented and omitted information been
22  released to the public.
23  I'm not sure there's a better way to
24  explain it to you.
25  Q.   Did you review the bankruptcy filings

98

1   - PAUL A. MARCUS -
2   Northwestern made?
3   MR. KAPLAN:  Objection to the form.  Are
4   you asking any specific filings?
5   Q.   Any.  Did you review the Petition?
6   A.   I don't specifically recall.
7   Q.   Did you review the Disclosure Statement?
8   A.   I don't recall that.
9   Q.   Did you review the Plan?
10  A.   I don't recall.
11  Q.   What caused the company to go bankrupt?
12  MR. KAPLAN:  Objection to the form.
13  A.   As I said, I haven't seen -- I don't
14  recall seeing the documents, so I might have known
15  that at one point.  I just don't know it now.
16  Q.   You don't know?
17  A.   I don't know right now.
18  Q.   Sir, let me direct your attention to
19  Page 43 of the report.
20  Starting with Paragraph 108 and going on
21  to Paragraph 117, do you see that, sir, under the
22  heading -- under "$390 Million CSFB Financing"?
23  A.   I do.
24  MR. KAPLAN:  If you need to read the
25  paragraph, you should.

99

1   - PAUL A. MARCUS -
2   Q.   Please.  If you want to review it,
3   that's fine.  I have no problem.
4   A.   Why don't you ask your question and then
5   I'll review what I need to, if that's necessary.
6   Q.   Is it your view, as expressed in those
7   paragraphs, that Northwestern would have found it
8   difficult -- strike that.
9   If we assume there was no covenant
10  breach and failure to fund the $280 million
11  revolver, does that have any effect on the analysis
12  that you've done in these paragraphs?
13  MR. KAPLAN:  Objection to the form.
14  A.   Can you repeat the question?
15  (The question requested was read back by
16  the reporter.)
17  A.   There might be a small effect.  But as
18  I'm reading through it quickly here, I don't think
19  there would be -- would be much.
20  Q.   What would the small effect be?
21  A.   Probably depend on the timing, but if
22  the loan was fully funded, assuming that happened,
23  hypothetically, and the same group of people were
24  offered an opportunity to switch to first mortgage
25  security bonds versus the unsecured position they

100

- PAUL A. MARCUS -

1
2  doing that kind of analysis. I wanted to
3  characterize it that I was uncomfortable with the
4  information -- or lack thereof information to do
5  that analysis. And I don't remember -- recall any
6  specific conversation with them about not
7  performing it.
8      Q.  Do you recall anything generally
9  discussing with them the fact that you weren't --
10  that you didn't have enough information to perform
11  it?
12      A.  I don't recall that I did, no.
13      Q.  Did you discuss that fact with any of
14  your colleagues at Huron?
15      A.  Yes.
16      Q.  Who did you discuss it with?
17      A.  Most likely Dana Hayes.
18      Q.  Do you know whether Dana Hayes discussed
19  your concern that you didn't have enough
20  information to do that analysis with any of the
21  lawyers at Fried, Frank?
22      A.  Not to my knowledge, no.
23      Q.  Why did you discuss this with Dana
24  Hayes?
25      A.  She was one of the people who was

153

- PAUL A. MARCUS -

1
2  working on the case with me. We were analyzing it.
3  She was in charge of executing my requests for
4  information, and she was involved in crunching some
5  of the numbers, so to speak, and that as we found
6  out there was an accounting expert that was doing
7  that, I diverted our attention to doing the other
8  analyses that we did. And we didn't continue to
9  push for information since it was already being
10  done.
11      Q.  Did you consider that the analysis was
12  crucial to the opinion that you were rendering?
13      A.  As we talked at great lengths this
14  morning, it's not crucial to the opinion that I'm
15  rendering.
16          It all relates to whether or not the 280
17  got funded or not, and it's a component of the
18  analysis where I used Mr. Berliner's numbers that
19  supported a position I already had; so it wasn't
20  critical. I don't agree with your
21  characterization; "crucial," I think you said.
22      Q.  Do you know how much the plaintiffs have
23  paid to have Mr. Berliner's analysis done?
24          MR. KAPLAN: Objection.
25      A.  No idea.

154

- PAUL A. MARCUS -

1
2      Q.  No idea?
3      A.  None.
4          MR. PIZZURRO: Let's take a five-minute
5  break. I might be done.
6          (Whereupon, there was a brief recess in
7  the proceedings.)
8          MR. PIZZURRO: I have no further
9  questions.
10
11  EXAMINATION BY MR. KALECZYC:
12      Q.  Mr. Marcus, my name is Stan Kaleczyc,
13  and I'm one of the attorneys who represents Michael
14  Hanson and Ernie Kindt in the lawsuit Northwestern
15  versus Hanson and Kindt.
16          At the time prior to the filing of your
17  expert report, were you told that the expert report
18  was also to be used in connection with the case
19  Northwestern versus Hanson and Kindt?
20      A.  I was not, no.
21      Q.  Did you have a general understanding
22  that it would be used in that lawsuit?
23      A.  I did not, no.
24      Q.  As we sit here today, do you anticipate
25  being called as an expert witness in connection

155

- PAUL A. MARCUS -

1
2  with the Northwestern versus Hanson lawsuit?
3          MR. KAPLAN: Objection.
4      A.  I don't know what I'm going to be called
5  for past this meeting, so no.
6      Q.  Before you filed the ex -- your expert
7  report in this case, had you reviewed the Complaint
8  in the lawsuit Northwestern versus Hanson and
9  Kindt?
10      A.  I had not.
11      Q.  Do you have any general understanding of
12  the allegations in the lawsuit against
13  Messrs. Hanson and Kindt?
14      A.  I do not.
15      Q.  At any time prior to the completion of
16  your expert report, did you ever discuss the Hanson
17  and Kindt litigation with Miss Steingart or any of
18  the other lawyers from Fried, Frank?
19      A.  I don't recall doing so, no.
20      Q.  Did you ever discuss -- did you ever
21  discuss the Hanson and Kindt matter in any way with
22  any of your associates at Huron?
23      A.  Not that I recall, no.
24      Q.  In preparation of your expert report,
25  did you review the deposition of Ernie Kindt?

156

- PAUL A. MARCUS -

1
2  was with Northwestern Corporation or any of its
3  subsidiaries between the time February 2002 and
4  November 2002?
5      A.  I believe I did know that.  I don't
6  recall that as I'm sitting here today.
7      Q.  Do you remember generally what his job
8  responsibilities were?
9      A.  No, I generally don't remember.
10     Q.  Who would have told you what Mr. Kindt's
11 responsibilities were, if you did not read his
12 deposition?
13         MR. KAPLAN:  Objection to the form.
14     A.  Again, I don't recall where I have that
15 knowledge, so it would have either been the person
16 who reviewed the deposition or to the extent it was
17 in another document that talked about positions
18 within the company.  I just don't remember.
19     Q.  What is your understanding of
20 Mr. Hanson's position with Northwestern Corporation
21 or any of its subsidiaries during that time period,
22 February through November of 2002?
23     A.  My recollection is that he was the CEO
24 of Expanets, but I don't have it in front of me.
25 There are a lot of names, but I think that was his

161

- PAUL A. MARCUS -

1
2  position.
3      Q.  Do you know if he held any other
4  positions?
5      A.  I'm sure I knew what his positions were
6  prior to writing the report.  I just don't recall
7  specifically as I'm sitting here what they were.
8      Q.  To the best of your recollection sitting
9  here today, your recollection is that he was the
10 CEO of Expanets?
11     A.  I think that was his title, though,
12 again, it was confusing because there were
13 overlapping people and overlapping time periods and
14 overlapping titles.  So I knew all of those prior
15 to the deposition.  I didn't refresh my memory on
16 everyone's exact title prior to today.
17     Q.  Do you recall whether Mr. Hanson had any
18 involvement with the management of subsidiary Blue
19 Dot?
20     A.  I don't recall.
21     Q.  Do you know whether Mr. Hanson had any
22 responsibilities with respect to the utility
23 business of Northwestern Corporation?
24     A.  I don't recall that either.
25     Q.  Do you have any opinion as to whether

162

- PAUL A. MARCUS -

1
2  Mr. Kindt had any responsibility for the failure to
3  disclose information during the year 2002 that you
4  discussed in your expert report?
5          MR. KAPLAN:  Objection.
6      A.  The opinions that I stated are set forth
7  in my report.  I would have incorporated a whole
8  host of information in that to the extent he's
9  specifically identified in the report; that would
10 be evidence of a specific connection, but that's
11 not to say that there wouldn't be some others.  But
12 I haven't put forth a separate opinion on
13 Mr. Kindt.
14     Q.  Were you asked to render any opinion
15 with respect to Mr. Kindt and whether he had any
16 responsibility for the disclosures or failure to
17 disclose information in 2002?
18     A.  No, I was not.
19     Q.  Just so that the record is clear,
20 Mr. Marcus, to the extent that you do have an
21 opinion concerning Mr. Kindt's responsibility, it
22 would be contained in the expert report?
23     A.  I would have identified -- if there's a
24 specific identification of him in the report, then
25 that would signify that there was some particular

163

- PAUL A. MARCUS -

1
2  piece of evidence that I was tying to the report in
3  supporting one of the positions in the report.
4  There might be some other things that didn't make
5  it to the report that might or might not support
6  that position.  I don't recall them all.
7      Q.  Well, is it your testimony, Mr. Marcus,
8  that just because an individual's name appears in
9  the report, that that person had responsibility for
10 the failure to disclose information that you
11 believe should have been disclosed in 2002?
12         MR. KAPLAN:  Objection to the form.
13     A.  I don't think that that was what I was
14 trying to say.  What I suggested was that if the
15 person was identified in the report, that it was my
16 belief that that information was supporting the
17 positions and the opinions that I was making in my
18 report.  That's all I said.
19     Q.  I think you've told me just a moment ago
20 that there was other information that may not have
21 been -- may not have made its way into the report;
22 is that correct?
23     A.  I believe I said that in an earlier part
24 of the deposition, as well.  There are lots and
25 lots of pieces of information that I reviewed.

164

- PAUL A. MARCUS -

1
2    Q.   Can you, sitting here today, think of
3  any examples of any information related to
4  Mr. Kindt that did not make its way into the
5  report?
6    A.   None that I can recall, no.
7    Q.   You never specifically analyzed whether
8  Mr. Kindt was responsible in any way for the
9  failure to make disclosures that you criticize in
10 your report?
11   A.   That's correct.
12   Q.   Let's talk for a few minutes, then,
13 about Mr. Hanson.
14       Were you ever requested to render an
15 opinion as to whether Mr. Hanson specifically was
16 responsible for the failure to make any
17 disclosures?
18   A.   I was not, no.
19       Can we go off the record?
20   Q.   Absolutely.
21       (Whereupon, a brief discussion was held
22 off record.)
23   Q.   In your expert report -- in the
24 preparation of your expert report, did you consider
25 whether Mr. Hanson had any responsibility for

165

- PAUL A. MARCUS -

1
2  failure to make the disclosures that you criticize
3  in the report?
4    A.   Again, only to the extent that he would
5  have been identified as participating in something
6  where -- which I felt was indicative of there being
7  misleading information in the marketplace, and that
8  would have been identified in the report.
9    Q.   Could you point out for me any places in
10 your expert report where you identified Mr. Hanson
11 as participating in something which you felt were
12 indicative of there being misleading information?
13   A.   I don't believe there's any specific
14 reference to Mr. Hanson in the report.
15   Q.   Although there is no specific references
16 in the report, Mr. Marcus, did you specifically
17 analyze whether Mr. Hanson was in any way
18 responsible for the failure to disclose certain
19 information during 2002?
20   A.   I did not, no.
21   Q.   You reviewed Mr. Berliner's report prior
22 to the finalization of your expert report, correct?
23   A.   "Review" would be a strong word.  I
24 skimmed through it.
25   Q.   In skimming through Mr. Berliner's

166

- PAUL A. MARCUS -

1
2  report, do you recall anything in Mr. Berliner's
3  report that indicated that Mr. Hanson was in any
4  way responsible for the failure to make disclosures
5  in 2002?
6    A.   Again, based on my very preliminary
7  review of it, I don't recall any, no.
8    Q.   And the same question with respect to
9  Mr. Kindt in your review of the Berliner report?
10   A.   And my answer would be the same.
11   Q.   If you would turn to Pages 5 and 6 of
12 your report, please, Mr. Marcus.
13   A.   Okay.
14   Q.   With respect to your first opinion --
15 and actually, it's on Page 6 in the paragraph that
16 begins, "In each case above."  It's after the
17 bullet points.
18   A.   I see that, yes.
19   Q.   In the first sentence reads, "In each
20 case above, material information, much of which was
21 the focal point of analyses being performed by
22 security analysts, rating agencies and investors,
23 was known and withheld from the marketplace by the
24 management of Northwestern."
25       When you say "management of

167

- PAUL A. MARCUS -

1
2  Northwestern," specifically to which individuals
3  are you referring?
4    A.   In this case, it's a general
5  characterization.  I did not analyze each
6  individual manager's contribution to the
7  information that was not in the marketplace.
8    Q.   Did you analyze the contribution of any
9  of the individual managers of Northwestern?
10   A.   Analyzing individual contributions would
11 be too strong of a statement.  I did review
12 declarations made by different managers.  I
13 reviewed the Cease and Desist Order from the SEC
14 and their accusations regarding management.
15       So I generally reviewed those things and
16 there were different pieces of information I relied
17 on.  But I did not undertake a separate analysis of
18 each individual manager's contribution to those
19 misrepresentations.
20   Q.   Well, would it be fair to say, then,
21 that you have no opinion as to any specific manager
22 at Northwestern as to whether that person has any
23 responsibility for the failure to make disclosures?
24   A.   It's fair to say that I haven't analyzed
25 that.

168

- PAUL A. MARCUS -

1
2  Mr. Marcus, you talk about comments of rating
3  agencies at various periods of time.
4        Do you believe that the comments made by
5  the rating agencies were accurate based upon the
6  information that they then had available to them at
7  any particular time period?
8        MR. KAPLAN:  Objection to the form.
9    A.  I'm not sure I can opine on their
10  accuracy.
11   Q.  Well, let me rephrase the question.
12       Do you have any reason to believe that
13  the rating agencies -- strike that.
14       You rely upon various statements from
15  the rating agencies in your expert report, don't
16  you?
17   A.  Again, I use the rating agency coverage
18  of the company as part of the analysis that I
19  performed in coming up with my conclusions.
20   Q.  Why did you rely upon the rating
21  agencies' statements as part, in coming up with
22  your conclusions?
23       MR. KAPLAN:  Objection to the form.
24   A.  They were one of the areas -- "they"
25  being the rating agencies, that rated the bonds
173

- PAUL A. MARCUS -

1
2  which would have had an effect on how the company
3  would have been able to issue debt and how the
4  company Northwestern was viewed by the debt
5  holders.  So I used that information in coming up
6  with my opinions to help assess those particular
7  characteristics within the debt markets.
8    Q.  The rating agencies would have relied
9  upon publicly available information that -- at the
10  particular time they made their comments?
11       MR. KAPLAN:  Objection to the form.
12   A.  I don't know that to be a fact or not.
13  They could be given information that I don't know
14  about that isn't public, so --
15   Q.  Have you ever been employed by a rating
16  agency?
17   A.  I have not, no.
18   Q.  In your career, you've worked with
19  rating agencies in various capacities and in your
20  work representing lenders, for example?
21   A.  I've had to analyze the reports of
22  credit rating agencies numerous times, yes.
23   Q.  In that context, have you ever known
24  rating agencies to be relying upon information that
25  was not part of the public domain?
174

- PAUL A. MARCUS -

1
2    A.  It's a bit of a chicken and the egg.
3  Once they put out a report, then the information is
4  in the public domain.  I don't know if they had
5  inside conversations with management prior to
6  issuing their report that might have been private;
7  I just can't answer that.
8    Q.  Earlier, Mr. Marcus, I had asked you
9  about the definition of who was management,
10  specifically with respect to your opinion on Page 6
11  of your report.  There are other places in the
12  report where you also refer to company management.
13       Would your answer be the same in each of
14  those cases, that it's a general statement rather
15  than a specific reference to individuals?
16   A.  That's correct; it would.
17   Q.  In the preparation of your expert
18  report, did you ever review the public disclosure
19  documents issued by the Montana Power Company at
20  the time that it sold the QUIPS to the public in
21  1996?
22   A.  I did not, no.
23   Q.  I believe you did testify earlier that
24  you did review the indenture and amendments to the
25  indenture associated with the QUIPS?
175

- PAUL A. MARCUS -

1
2    A.  I believe I testified that I read it
3  quickly.  I reviewed would probably be stronger
4  than I actually -- than I did.
5    Q.  If you would turn to Page 7 of your
6  report, Mr. Marcus, in your opinion that's II.
7        You state, "Had the assets of
8  Northwestern Energy LLC not been transferred to
9  Northwestern, the QUIPS' investors would have been
10  covered by the former's assets and not junior to
11  the debt and other liabilities of Northwestern
12  Corp."
13       What do you mean by "covered by the
14  former's assets"?
15   A.  I refer you to later in my report where
16  I describe it, but generally it's the structural
17  subordination that we were talking about.  So if
18  Northwestern LLC is a separate entity, and looking
19  at the assets and the liabilities of that entity
20  there was positive net worth, as I described later
21  in the report, whereas when they went to -- when
22  those assets were transferred to Northwestern that
23  flipped and by the end of 2002 there was no
24  coverage for the securities that were at the bottom
25  of the pile which, in this case, were the QUIPS.
176

- PAUL A. MARCUS -

1
2  constituents of the Montana Public Service
3  Commission?
4      A.   It would include the rate payers within
5  their jurisdiction, the major one.
6      Q.   Any others?
7      A.   There may be some others.  I can't think
8  of any at this point.
9      Q.   Also this morning you talked about other
10 interested parties who might have a concern, in
11 addition to the Montana Public Service Commission,
12 with the Northwestern Corporation transactions and
13 specifically you mentioned the Montana Attorney
14 General.
15          What is the basis of your opinion that
16 the Montana Attorney General may have had an
17 interest in what was happening at Northwestern
18 during the 2002 time period?
19          MR. KAPLAN: Objection to the form.
20     A.   My general recollection of that question
21 was: Are there any other potential people than
22 Attorney Generals in all states if they feel the
23 consumers in those states are suffering, have the
24 ability to step in.  That was the total extent of
25 what I was trying to say.

181

- PAUL A. MARCUS -

1
2      Q.   Have you specifically reviewed any
3  Montana statutes that might describe the
4  jurisdiction of the Montana Attorney General to
5  step in, in a case like this?
6      A.   I have not, no.
7      Q.   Have you reviewed the provisions of the
8  Montana Constitution that relate to the office of
9  the Attorney General?
10     A.   I have not, no.
11     Q.   So your statement then was really just
12 based upon speculation as to what the Montana
13 statutes might be?
14          MR. KAPLAN: Objection to the form.
15     A.   Well, the statement was based on the
16 fact that Attorney Generals across the country step
17 into situations where they believe people are at
18 risk, or companies are at risk or disclosures
19 aren't made and it was a general question that was
20 asked, and it's a possibility.  That's what it's
21 based on.
22     Q.   Any other state governmental authorities
23 in Montana that you believe may have stepped in?
24          MR. KAPLAN: Objection to the form.
25     A.   None that I can think of sitting here

182

- PAUL A. MARCUS -

1
2  today.
3      Q.   Either in preparation of your expert
4  report or in preparation for your deposition today,
5  did you ever review the joint applications
6  submitted by the sellers and Northwestern
7  Corporation for the acquisition of Montana Power
8  LLC?  That's the joint application to the Montana
9  Public Service Commission.
10     A.   I don't recall that.
11     Q.   I didn't see it listed in the exhibit to
12 your expert report.
13     A.   Then I don't believe I would have.
14     Q.   Did you review the transcript of the
15 proceedings related to the joint application for
16 the acquisition of Montana Power LLC by
17 Northwestern?
18     A.   I don't believe I did.
19     Q.   This afternoon in response to a question
20 from Mr. Pizzurro you stated that the Montana
21 Public Service Commission could have ring fenced
22 the Montana utility assets; is that correct?
23     A.   I think I used the term that someone
24 else had used in the sense that he asked what they
25 could have done, and it was a description of their

183

- PAUL A. MARCUS -

1
2  ability to regulate the flow of money in and out of
3  the company.
4      Q.   In that answer, you did use the phrase
5  "ring fencing"; is that correct?
6      A.   I recall using that term.
7      Q.   What is your understanding of the term
8  "ring fencing"?
9      A.   Again, I think it has broad uses in the
10 context of how I was using it.  It was just as I
11 just described, which is that they could prohibit
12 funds from leaving the entity that was housed in
13 their state to go to other things like unregulated
14 subsidiaries or things of that nature.
15     Q.   Do you know whether the Montana Public
16 Service Commission has the statutory authority to
17 require ring fencing?
18          MR. KAPLAN: Objection.  Calls for a
19 legal conclusion.
20     Q.   I'm asking for your understanding of
21 Montana statutes.
22          MR. KAPLAN: That calls for a legal
23 conclusion.
24     A.   I don't understand the Montana statutes
25 per se.  What I do understand is that regulatory

184

- PAUL A. MARCUS -

1
2  bodies have an ability to protect their
3  constituencies, as I said earlier, and oftentimes
4  they do things like prohibit funds from flowing out
5  of the companies to protect them.
6      Q.  But with respect to the State of
7  Montana, in particular, you don't have any
8  knowledge as to whether ring fencing is a
9  permissible activity of the regulatory bodies,
10  correct?
11      MR. KAPLAN:  Objection to the form.
12  Calls for a legal conclusion.
13      A.  I don't have a legal opinion as to
14  whether or not you could do that or not.
15      Q.  You have no opinion, legal or otherwise,
16  specifically with respect to Montana; is that fair?
17      A.  Respect to what?
18      Q.  Montana authority or the ability of the
19  Montana Public Service Commission to ring fence.
20      MR. KAPLAN:  Objection.  Asked and
21  answered, and calls for a legal conclusion.
22      A.  Can you ask your question again?  I'm
23  sorry.
24      Q.  Let's just move on.
25      A.  Sorry.

185

- PAUL A. MARCUS -

1
2      Q.  I think I know that you don't know.
3      MR. KAPLAN:  Objection to the extra
4  commentary.
5      Q.  Withdrawn.
6      Mr. Marcus, have you ever advised a
7  client on financing matters involving a company
8  regulated by the Montana Public Service Commission?
9      A.  I might have.  I just don't recall.
10      Q.  In what capacity might you have done
11  that?
12      A.  Most specifically, it would have been at
13  the time when I was a lender at Bank of America.
14  We lent money to companies in the utility industry.
15      I was doing that out of their Chicago
16  office so I was covering utilities all throughout
17  the midwest.  Montana was not specifically a state
18  that was covered in our geographical area, although
19  I'm just not sure I remember whether or not some of
20  the utilities that I was working with would have
21  had some holding in Montana that would have caused
22  Montana to regulate them.
23      Q.  But nothing that stands out in your mind
24  sitting here today?
25      A.  That's correct.

186

- PAUL A. MARCUS -

1
2      Q.  Do you know what utilities operate in
3  Montana, regulated utilities?
4      A.  Sitting here today, no.
5      Q.  This morning I think you had testified,
6  if I took my note correctly, that you had reviewed
7  certain procedural pronouncements of the Montana
8  Public Service Commission.
9      Do you recall that testimony?
10      A.  If by the "procedural pronouncements"
11  you're talking about the final order to the
12  dissenting order on the $390 million bond offering
13  I did review that.
14      Q.  That would have been the order that came
15  out in the early part of 2003?
16      A.  I believe that was the time frame.
17      Q.  And that's the same order in which you
18  quote from the dissenting opinion of Commissioner
19  Brainard, B-R-A-I-N-A-R-D; is that correct?
20      A.  That would be correct.
21      Q.  Other than that one particular order,
22  did you review any other orders of the Montana
23  Public Service Commission?
24      A.  I believe there were other things.  I
25  just don't recall what they were specifically.

187

- PAUL A. MARCUS -

1
2      Q.  Would they be reflected in the exhibit
3  that's attached to your expert report?
4      A.  They should be.
5      Q.  If you could turn to the exhibit then,
6  just identify which other Public Service Commission
7  orders you may have relied upon.
8      MR. KAPLAN:  I object to making the
9  witness go through a long list of many documents
10  and testing his memory and ability to find the
11  document on these long lists.
12      A.  I'm not sure I could do that sitting
13  here today.  Some of this stuff is identified by a
14  name and Bates number, but it could have an order
15  within it.  I just -- I'm not trying to not answer
16  the question.  I just can't answer it based on this
17  list.
18      Q.  Other than the order which you have
19  already identified and testified to, do you recall
20  relying upon any other orders of the Public Service
21  Commission in Montana for purposes of opinions you
22  formulate in your expert report?
23      A.  To the extent that I read other
24  opinions, they would have been included.  I think
25  my thinking of how the Commission would react in

188

- PAUL A. MARCUS -

1    - PAUL A. MARCUS -
2    certain situations and my recollection is that I
3    saw some other things from earlier in the time
4    period from the Commission. I just can't identify
5    them sitting here.
6        Q.    Would they have been other things
7    related to the docket whose subject was the
8    acquisition of Montana Power LLC by Northwestern?
9        A.    That would be my general understanding,
10   yes.
11       Q.    Do you have any recollection of looking
12   at any orders of the Montana Public Service
13   Commission dealing with dockets involving regulated
14   utilities other than Northwestern Corporation?
15       A.    I did not, no.
16       Q.    How did you locate those other orders?
17   Did you find them or your staff find them or were
18   they given to you?
19       A.    My staff provided them to me. I don't
20   know if they independently found those or they
21   requested them from counsel. I just don't know the
22   answer to that.
23       Q.    Are there any opinions or orders of the
24   Public Service Commission on which you relied that
25   are not referenced somewhere in your expert report?
                        189

1    - PAUL A. MARCUS -
2        A.    Again, to the extent that I reviewed
3    other documents relating to the Commission's
4    attitude and feelings towards this company, they
5    would have been included in my thinking when I came
6    up with my opinions. I don't think they're
7    referenced in the report, but they would have
8    been -- they would have been something that would
9    have given me a certain impression of what the
10   company relationship with the Commission was and
11   how the Commission might respond in a situation
12   where all of a sudden the financial prospects of
13   the company change dramatically.
14       Q.    Why would you not have referenced those
15   in your report?
16       A.    I'm not saying it's not referenced in
17   the document list. What I'm suggesting is there
18   was one particular quote which I used in my report
19   which you're calling a reference. I'm telling you
20   the collective report describes what my belief is
21   from my review of all this information.
22       Q.    So that it's clear to me, Mr. Marcus,
23   are all the documents you reviewed listed in
24   Exhibit 1 to your report?
25            MR. KAPLAN: Objection to the form.
                        190

1    - PAUL A. MARCUS -
2        A.    It's always my sincere hope that all of
3    them do make it to this list. There could be an
4    exception, and I just don't know.
5        Q.    So other than as a result of perhaps
6    inadvertence, everything you looked at is
7    referenced in Exhibit 1?
8        A.    That's my sincere desire to make that
9    happen.
10       Q.    Just so that the record is clear, you
11   have no understanding as to what the allegations
12   against Messrs. Hanson and Kindt are that are made
13   in the Complaint by Magten against them?
14            MR. KAPLAN: Objection. Asked and
15   answered.
16       A.    That's correct.
17            MR. KALECZYC: Let's take a few minute
18   break.
19            (Whereupon, there was a brief recess in
20   the proceedings.)
21       Q.    Mr. Marcus, would you turn to Page 7 of
22   your report, again, please.
23       A.    Okay.
24       Q.    In III, the third opinion, the
25   assumption is that Clark Fork remained liable for
                        191

1    - PAUL A. MARCUS -
2    the QUIPS obligations.
3            Is that your assumption, or did someone
4    direct you to make that assumption?
5            MR. KAPLAN: Objection to the form.
6        A.    That was an assumption I was asked to
7    make.
8        Q.    Who asked you to make that assumption?
9        A.    That assumption would have been asked by
10   counsel. I was asked to make that assumption by
11   counsel.
12       Q.    Independent of the assumption that
13   counsel asked you to make, do you have any opinion
14   as to whether Clark Fork remained liable for the
15   QUIPS obligations?
16            MR. KAPLAN: Objection.
17       A.    As a matter of a legal conclusion, I
18   don't.
19       Q.    Any opinion?
20            MR. KAPLAN: Objection. Calls for a
21   legal conclusion. Goes to the underlying issue in
22   the litigation.
23       A.    I guess I can only tell you what I have,
24   and I've made this assumption based on what I was
25   asked to do by counsel.
                        192

- PAUL A. MARCUS -

1
2 questions.
3
4 EXAMINATION BY MR. KAPLAN:
5     Q.   Mr. Marcus, if you could pull out your
6 report marked as Exhibit 3. I'd Like you to turn
7 to Page 47 and look at Paragraph 121.
8        Does that paragraph refresh your
9 recollection as to Mr. Hanson's role at
10 Northwestern subsidiaries during 2002?
11    A.   It does; he was president and CEO.
12    Q.   And if you look at Page 49,
13 Paragraph 125.
14    A.   Okay.
15    Q.   I think you testified earlier in
16 response to a question that you didn't think
17 Mr. Hanson was mentioned in the report. I just
18 wanted to know whether you wanted to correct that
19 answer.
20    A.   He is indicated in the report.
21       MR. KAPLAN: I have nothing further.
22       MR. PIZZURRO: I have a couple of
23 questions.
24
25 EXAMINATION BY MR. PIZZURRO:

197

- PAUL A. MARCUS -

1
2     Q.   Direct your attention to Paragraph 121,
3 Page 47 of the report, which your counsel just
4 questioned you on, Mr. Marcus.
5     A.   Yes, sir.
6     Q.   And it refers to the officers'
7 certificates executed in connection with the
8 transfer of the assets.
9        Do you see that?
10    A.   I do see that.
11    Q.   Did you review the officers' certificate
12 referred to in Paragraph 121?
13       MR. KAPLAN: Objection. I object. This
14 is well beyond the scope of my recross. It's just
15 one question to refresh his recollection. It
16 doesn't open up the whole topic.
17       MR. PIZZURRO: Are you directing him not
18 to answer?
19       MR. KAPLAN: I direct --
20       MR. PIZZURRO: We're at deposition, not
21 trial.
22       MR. KAPLAN: I understand. It's still
23 well beyond --
24       MR. PIZZURRO: That's fine. Objection
25 noted.

198

- PAUL A. MARCUS -

1
2     Q.   You can answer the question.
3       MR. KAPLAN: You can.
4     A.   My recollection is it was one of the
5 exhibits of the deposition, and I would have seen
6 it.
7     Q.   As you sit here today, can you recall
8 what it said?
9     A.   Sitting here today, I can't recall
10 exactly what it said.
11    Q.   Do you have any understanding, sitting
12 here today, whether there was any false or
13 misleading statement made in the officers'
14 certificate referenced in Paragraph 121?
15       MR. KAPLAN: I'm going to object. I'll
16 let him answer this question and then not let him
17 answer any more. This is well beyond the scope.
18 I'm not going to let him keep going.
19    A.   Can you repeat the question? I'm sorry
20       (The question requested was read back by
21 the reporter.)
22    A.   Sitting here today, I don't recall that.
23       MR. PIZZURRO: No questions. No further
24 questions.
25       MR. KALECZYC: Mr. Marcus, a few

199

- PAUL A. MARCUS -

1
2 follow-ups.
3
4 EXAMINATION BY MR. KALECZYC:
5     Q.   When Mr. Kaplan directed you to
6 Paragraph 121 with respect to Mr. Hanson's position
7 as president and CEO, Northwestern Energy, was
8 Mr. Hanson, to the best of your recollection during
9 that same time period in 2002, also the -- an
10 officer of Expanets as you previously testified?
11    A.   I'd have to go back. Sitting here now,
12 I'm confused as to which positions he held within
13 the company. I'd have to go back and look at the
14 information I relied on when I put the report
15 together.
16    Q.   Having been referred to Paragraph 121 by
17 Mr. Kaplan, does that in any way change any of your
18 answers to the questions that I put to you during
19 the deposition concerning Mr. Hanson's
20 responsibility, if any, for any false statements or
21 misstatements that may have been made by
22 Northwestern Corporation that you criticized in
23 your report?
24    A.   I don't believe it changes any of my
25 other testimony.

200

- PAUL A. MARCUS -

1
2    Q.   I believe Mr. Kaplan then also referred
3    you to Paragraph 125 on Page 49.  You quote
4    Mr. Hanson's statements there that are indented,
5    correct?
6    A.   That's correct.
7    Q.   In quoting the statements of Mr. Hanson,
8    is it your opinion that the statements that you
9    quote him as having made were not true when made?
10        MR. KAPLAN:  Objection to the form.
11   A.   I don't believe I've testified one way
12   or another whether they were true or not.
13   Q.   I'm asking you whether you have an
14   opinion as to whether you believe the statements
15   made by Mr. Hanson were true at the time he made
16   them.
17   A.   I haven't analyzed what went on in
18   August of 2001.  The statements in the report were
19   meant to set the stage for what the -- one of the
20   stages of what the regulatory commission would be
21   expecting and that was a statement that was made
22   but I haven't analyzed whether or not this was a
23   truthful statement or not.  It's just a statement
24   that was made as part of the public regulation at
25   the time.

201

- PAUL A. MARCUS -

1
2    Q.   There's nothing contained in that
3    statement that would cause you to change any of the
4    opinions that you shared with me earlier in this
5    deposition concerning Mr. Hanson; is that true?
6    A.   I believe that's correct, yes.
7        MR. KALECZYC:  No other questions.
8        MR. KAPLAN:  Nothing further from me.
9        (Whereupon, the deposition concluded at
10   3:30 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

202

- PAUL A. MARCUS -

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK  )
4                       )  ss.
5    COUNTY OF NEW YORK )
6
7    I, HOPE LYNN MENAKER, a Notary Public within
8    and for the State of New York, do hereby certify:
9        That PAUL MARCUS, the witness whose deposition
10   is hereinbefore set forth, was duly sworn by me and
11   that such deposition is a true record of the
12   testimony given by the witness.
13       I further certify that I am not related to any
14   of the parties to this action by blood or marriage,
15   and that I am in no way interested in the outcome
16   of this matter.
17       IN WITNESS WHEREOF, I have hereunto set
18   my hand this _____ day of _____, 2007.
19
20       _____
21           HOPE LYNN MENAKER
22
23
24
25

203

- PAUL A. MARCUS -

1
2        A C K N O W L E D G E M E N T
3
4    STATE OF NEW YORK  )
5                       )  ss.
6    COUNTY OF NEW YORK )
7
8    I, PAUL MARCUS, hereby certify that I have read the
9    transcript of my testimony taken under oath in my
10   deposition of November 13, 2007; that the
11   transcript is a true, complete and correct record
12   of my testimony, and that the answers on the record
13   as given by me are true and correct.
14
15       _____
16           PAUL MARCUS
17
18   Subscribed and sworn
19   to before me on this the
20   _____Day of _____, 2007.
21   Notary Public, State of New York
22
23
24
25

204

```
 1              - PAUL A. MARCUS -
 2                   INDEX
 3  WITNESS:  PAUL A. MARCUS
 4  EXAMINATION                    PAGE   LINE
 5   BY MR. PIZZURRO                 5      9
 6   BY MR. KALECZYC                155    11
 7   BY MR. KAPLAN                  197     4
 8   BY MR. PIZZURRO                197    25
 9   BY MR. KALECZYC                200     4
10
11
12  EXHIBITS FOR IDENTIFICATION
13                             PAGE
    LINE
14  1    Magten (Exp) 000001-4      8     13
15  2    First Amended Complaint   17     17
16  3    Expert Report         19   16
17  4    Expert Report of Robert   20      8
         Berliner
18
     5    CSFB 016298-16341        127    22
19
     6    Expert Report of Christopher  137   17
20       J. Kearns, 10/17/07
21
22
23
24
25
                  205
```