# EXHIBIT  14

**Exhibit No. 14 to Proposed Pre-Trial Order**

**Plaintiffs' Brief Statement of Intended Proof and Damages Claimed
(Local Civil Rule 16.3(c)(8))**

Capitalized terms are used herein with the same meaning given in the Proposed

Pre-Trial Order, Plaintiffs' Statement of Undisputed Facts, Plaintiffs' Statement of Issues

of Fact Which Remain to Be Litigated, and/or Plaintiffs' Statement of Issues of Law

unless otherwise specified.

I.      The NorthWestern Action

Plaintiffs intend to prove the following in support of their claims against

NorthWestern:

The Going Flat Transaction was fraudulent under MUFTA because NorthWestern

took $1.5 billion in assets from Clark Fork, Clark Fork did not receive a reasonably

equivalent value in return, and Clark Fork was rendered both insolvent and

undercapitalized as a result of the Going Flat Transaction. Indeed, the consideration

Clark Fork received (in the form of purported assumption of debt) was less than 50% of

the $1.5 billion fair value of the assets received – a gap of almost $800 million. Clark

Fork's liability on the QUIPS alone was $67 million, whereas Clark Fork's sole

remaining asset (the Milltown Dam) was actually worthless as an economic matter.

Moreover, the circumstantial evidence of multiple "badges of fraud" (for example, that

the Going Flat Transaction was a transfer to an insider, was of substantially all of Clark

Fork's assets, was not for reasonably equivalent value, and insolvency ensued)

establishes that the Going Flat Transaction was carried out with intent to defraud, delay,

1

or hinder Clark Fork's creditors. NorthWestern was unjustly enriched by the Going Flat Transaction for substantially the same reasons.

The purported release of Clark Fork from QUIPS-related liability is void because it was obtained through a fraudulent scheme. No express release was ever signed in connection with the Going Flat Transaction, whether by BONY, any QUIPS holder, or anyone authorized to bind the plaintiffs or their predecessors in interest, and the purported release arising out of the operation of the Indenture is invalid because the Going Flat Transaction was tainted with fraud. NorthWestern carried out a fraudulent scheme beginning no later than May of 2002, pursuant to which it systematically and intentionally issued materially false and misleading financial statements and other public disclosures.

The primary purposes and effects of the fraud were (a) to conceal the catastrophic failure of Expanets and Blue Dot and the extent to which they were draining cash from NorthWestern at a time when it was experiencing an accelerating liquidity crisis and desperately needed to obtain new cash in order to avoid a meltdown; and thus (b) to enable NorthWestern to continue to access the capital markets and obtain that cash. Specifically, the fraud enabled NorthWestern to: (i) avoid ratings downgrades (which would have had a number of cascading adverse consequences), (ii) draw almost $200 million from the CSFB Revolver at a time when it was in breach of its financial covenants, and thereby pay maturing debt on which it would have otherwise defaulted in September 2002; (iii) raise over $80 million by selling additional common stock in October 2002; and then (iv) carry out the Going Flat Transaction in November 2002.

2

The fraudulent scheme facilitated NorthWestern's consummation of the Going Flat Transaction through a number of different, independently sufficient causal paths, including without limitation:

- NorthWestern induced Clark Fork officers to execute necessary documents, including those provided to BONY.

- NorthWestern obtained necessary regulatory approvals.

- NorthWestern secured a court order lifting an injunction that had barred consummation of the Going Flat Transaction.

- NorthWestern misled regulators, QUIPS holders, and BONY (thus avoiding any contemporaneous objections to the Going Flat Transaction).

- As previously noted, NorthWestern avoided credit ratings downgrades and fraudulently obtained sufficient new cash from other sources in the months prior to the Going Flat Transaction to stave off bankruptcy until the Going Flat Transaction could be consummated.

Although Clark Fork remains obligated on the QUIPS, the Going Flat Transaction rendered it absolutely unable to meet those obligations. Accordingly, Plaintiffs (and the QUIPS holders represented by Law Debenture) are entitled under applicable nonbankruptcy law to compensatory damages from NorthWestern in the full face amount of the outstanding QUIPS plus accrued but unpaid prepetition interest, for a total of approximately $50 million, with that sum then to be treated as a Class 9 Allowed Claim to be satisfied as provided for in NorthWestern's confirmed chapter 11 Plan. Law

3

Debenture is also entitled to payment of its trustee fees, attorneys' fees, and related
expenses (all likewise to be treated as a Class 9 Allowed Claim).

II.    The Hanson and Kindt Action

Magten intends to prove the following in support of its claims against defendants
Hanson and Kindt:

Hanson and Kindt, while acting as officers of Clark Fork and fiduciaries to Clark
Fork and its stakeholders, blindly followed the directives of NorthWestern and took steps
that made it possible for NorthWestern to consummate the Going Flat Transaction, thus
breaching their fiduciary duties and harming Clark Fork and its stakeholders, including
the QUIPS holders.

Because NorthWestern had directed Clark Fork and its officers to carry out a
transaction which would divest Clark Fork of substantially all of its assets without
receiving reasonably equivalent value and render Clark Fork insolvent, prior to the Going
Flat Transaction Clark Fork was effectively in the zone of insolvency and its officers
were subject to the distinctive fiduciary duties to all relevant stakeholders associated with
the zone of insolvency. Despite that, defendants failed to conduct any investigation of
the bona fides of the Going Flat Transaction and its likely impact on Clark Fork or
consider the obvious conflict between NorthWestern's interests and Clark Fork's distinct
and independent interests. Nor did defendants seek any independent or objective
professional advice or analysis. Any reasonable investigation would have disclosed the
catastrophic effects on Clark Fork and its stakeholders that the Going Flat Transaction
ultimately had, and would also have disclosed that the Going Flat Transaction would

4

have a negative impact on the regulated Montana utility assets inconsistent with defendant Hanson's prior representations to the MPSC.

Moreover, defendant Hanson had actual knowledge of a significant portion of NorthWestern's concealed financial difficulties – certainly enough to put him on notice that the Original 2002 Quarterly Financials were materially false and misleading.

Defendants' facilitation of the Going Flat Transaction caused damage to Magten (and to its predecessors in interest and the Trust). The purported release of Clark Fork is void because tainted with fraud, for all of the reasons discussed above in connection with the NorthWestern Action.

Defendants acted with actual malice, such that Magten is entitled to punitive damages. Hanson, in particular, derived substantial personal profit in the form of lucrative compensation, bonuses, and, ultimately, promotion to NorthWestern's CEO as a result of his role in enabling the Going Flat Transaction to benefit NorthWestern at the expense of Clark Fork and its stakeholders.

Because Magten is suing, as Judge Cebull held, in a quasi-representative capacity asserting all of the rights of the Trust that could be asserted by its trustee, it is entitled to compensatory damages in the approximately $48 million full face amount of the outstanding QUIPS, plus punitive damages, prejudgment interest, and attorneys' fees. Appropriate relief may be crafted to ensure that the QUIPS holders other than Magten receive their appropriate shares of the award, via a payment to the Trust or otherwise. (Defendants will be entitled to a credit against the judgment to the extent Law Debenture and Magten have able to collect from NorthWestern in respect of the damages caused by

5

the Going Flat Transaction, giving due effect to the provisions of NorthWestern's chapter 11 plan which will effectively limit the collectability of any judgment to approximately 62% of its face amount.)

ffny02\brewejo\562750.1

# EXHIBIT  15

## Exhibit [15] To Proposed Pre-Trial Order

### Brief Statement of NorthWestern's Defenses (Local Civil Rule 16.3(c)(9))

It has been, and continues to be NorthWestern's position that there is no genuine issue of material fact to be tried and that this case should be decided as a matter of law. NorthWestern's position with respect to its defenses are more fully set forth in its motion for summary judgment and the memoranda and other documents submitted in support thereof which are incorporated herein by reference. [D.I. 242-48, Case No. 04-1494].

Upon the execution of the Third Supplemental Indenture, Clark Fork became absolutely released from any liability on the QUIPS and the QUIPS became obligations of NorthWestern alone.

There is no evidence to support Plaintiffs' theory that the Bank of New York, as Indenture Trustee, was induced to execute the Third Supplemental Indenture which released Clark Fork as obligor on the QUIPS by relying on NorthWestern's financial statements for the first three quarters of 2002.

There is no evidence to support Plaintiffs' theory that NorthWestern fraudulently concealed its insolvency in connection with the Going Flat Transaction, no evidence that NorthWestern was insolvent before or immediately after that transaction and no evidence that NorthWestern, in assuming the obligation to pay the QUIPS, knew that it would be unable to perform its obligations to the QUIPS holders.

There is no evidence that the Going Flat Transaction was proximately caused by any fraud or fraudulent scheme on behalf of NorthWestern. There is no evidence that NorthWestern falsified its financials for the first three quarters of 2002 in order to accomplish the Going Flat Transaction or that it used those financials in order to accomplish that transaction.

There is no proximate causal connection between NorthWestern's financials for the first three quarters of 2002 and the Going Flat Transaction.

There is no competent evidence that, had NorthWestern accurately reported its financial condition for the first three quarters of 2002, it would not have been able to accomplish the Going Flat Transaction. NorthWestern would have been able to put in place sufficient measures to allow it to accomplish the Transaction.

The Going Flat Transaction was unrelated to, and had no connection with, any misstatements in NorthWestern's financials for the first three quarters of 2002 and was motivated by both the concerns of rating agencies which wanted to see that the utility assets purchased by NorthWestern would be available to support the obligations of the corporation and by a need to avoid application of the Public Utility Holding Company Act (PUHCA).

The Going Flat Transaction cannot be characterized as a stand alone transaction but must be viewed as the second step in a 2 step transaction pursuant to which NorthWestern purchased the utility assets from Montana Power Corporation for approximately $1.1 billion. It is a fiction to claim that NorthWestern acquired those assets worth $1.1 billion from its wholly owned subsidiary, Clark Fork, simply by assuming liabilities of only $700 million, because this ignores the approximately $500 million in cash NorthWestern paid Montana Power Corporation.

The Going Flat Transaction, viewed in the reality of the entire acquisition, was clearly not a transaction for less than full value, not a transaction which injured the QUIPS holders because they were not left as creditors of an entity stripped of its assets and unable to pay its creditors, and not a transaction which rendered Clark Fork insolvent. The QUIPS holders received all to which they were entitled under their contract QUIPS Indenture. The Going Flat Transaction was not a fraudulent conveyance.

-2-

Neither Law Debenture nor Magten are entitled to recover any legal fees from NorthWestern. To the extent that Law Debenture is entitled to payment of its legal fees, as the Indenture Trustee, those fees are payable out of any recovery that Law Debenture may obtain on behalf of any QUIPS holders. Law Debenture is not entitled to any additional amount out of the Disputed Claims Reserve as a Class 9 Allowed Claim.

4258263v2

# EXHIBIT  16

Exhibit No. [16] to Proposed Pre-Trial Order

**Defendants Hanson and Kindt Brief Statement of Defenses and Intended Proof**
**(Local Civil Rule 16.3(c)(8))**

Capitalized terms are used herein with the same meaning given in the Proposed Pre-Trial Order, Defendants Hanson and Kindt Statement of Undisputed Facts, Defendants Hanson and Kindt Statement of Issues of Fact Which Remain to Be Litigated, and/or Defendants Hanson and Kindt Statement of Issues of Law unless otherwise specified. Defendants Hanson and Kindt reserve the right to amend or supplement this Exhibit in light of any determinations made by this Court on the pending Motion for Summary Judgments, Daubert Motions, or any motions in limine. The statements made herein are applicable only to the Hanson and Kindt Action as neither Hanson nor Kindt are parties to the NorthWestern Action.

1.    Clark Fork was solvent both prior to and immediately following the Transfer.

2.    NorthWestern was solvent both prior to and immediately after the Transfer.

3.    NorthWestern had adequate liquidity throughout 2002 and into 2003 to make the required payments under the QUIPS Indenture.

4.    The QUIPS were junior, unsecured securities subject to all senior debt of the issuer and matured after 40 years in 2036.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER                                   1

5.      Under the QUIPS Indenture there was no limit on the amount of senior debt that could be incurred by the issuer.

6.      The issuer had the right to defer payments of interest on the QUIPS for up to 20 consecutive quarters without incurring a default.

7.      Without the consent of the QUIPS holders, the issuer could enter into supplemental indentures to evidence the assumption of the obligations under the QUIPS Indenture by another entity.

8.      Without the consent of the QUIPS holders, the issuer could "convey or otherwise transfer, or lease, its properties and assets substantially as an entirety to any Person" if it complied with the following three requirements:

(a)      the entity formed by the consolidation is organized and validly existing under United States law and it assumes the payment on the securities described in the QUIPS Indenture and the performance of every covenant of the QUIPS Indenture;

(b)      no event of default shall occur immediately after the consolidation; and

(c)      the issuer delivers to the BoNY an Officer's Certificate and Opinion of Counsel stating that the consolidation and related supplemental indenture comply with Article 11 of the QUIPS Indenture and that all conditions precedent herein relating to consolidating transactions have been complied with.

9.      Under Section 1102, once the issuer complied with Section 1101(a), (b) and (c) (described above), the predecessor entity would be relieved of all obligations and covenants under the QUIPS Indenture.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER                    2

10.     The QUIPS holders had no right to approve a sale or merger by the issuer. *Magten Asset Mgmt. Corp. & Law Debenture Trust Co. of NY v. NorthWestern Corp.*, 313 N.R. 595, 600 (2004).

11.     There was no immediate event of default as of the date of the Going Flat Transaction.

12.     The Going Flat Transaction did not violate the QUIPS Indenture or any other contractual right of the QUIPS Holders.

13.     If NorthWestern held Clark Fork as a subsidiary, NorthWestern could become a public utility holding company and subject to the regulatory requirements of the Public Utility Holding Company Act ("PUHCA").

14.     Because of PUHCA and the concerns of rating agencies related to NorthWestern's debt structure, NorthWestern made the decision in late 2001 to hold the utility assets in Clark Fork at the parent company instead of in a subsidiary.

15.     The decision to hold the utility assets in a division of a subsidiary required that NorthWestern complete the Acquisition in two steps. First, NorthWestern would purchase the equity interest in Clark Fork Second, NorthWestern would transfer the utility assets to the parent to be held in a division of NorthWestern.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER                    3

16.     But for the need to address the unique circumstances associated with the presence of an active Superfund site in one of Clark Fork's assets, the Milltown Dam, and the need to segregate the liability associated with the Milltown Dam, North Western could have acquired Clark Fork and merged Clark Fork with and into Northwestern (with NorthWestern as the surviving entity) in a series of essentially simultaneous transactions and no PUHCA issues would have arisen. The problem with this approach, however, was that a merger of Clark Fork into NorthWestern would have carried to NorthWestern the potential liability associated with the Milltown Dam Superfund site. Accordingly, an interim period was necessary during which NorthWestern addressed the issues associated with the Milltown Dam.

17.     NorthWestern estimated that it needed approximately 18 months after the first step of the Acquisition to dispose of the Milltown Dam.

18.     During the 18 months between the first and second step of the Acquisition, NorthWestern would have been a public utility holding company subject to PUHCA. Therefore, on February 14, 2002, NorthWestern submitted an application to the Securities and Exchange Commission for a temporary exemption to PUHCA under Section 3(a)(3).

19      Under Section 3(c), NorthWestern's application for a Section 3(a)(3) exemption to PUHCA was effective upon its good faith filing with the SEC.

20.     At the time of the Transfer, Mr. Hanson served as Clark Fork's President and Chief Executive Officer.  Mr. Hanson was also the President and Chief Executive Officer of NorthWestern Public Service Division, a division of NorthWestern responsible for overseeing NorthWestern's utility operations in Montana, South Dakota and Nebraska.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER                    4

21.    Mr. Hanson did not manage NorthWestern's non-utility businesses, including Expanets, and did not know the details of those businesses' financial conditions.

22.    Mr. Hanson was aware during 2002 that Expanets was having certain problems, but was repeatedly informed Expanets was working to fix these problems. Each time Expanets management identified a problem, they also discussed the actions Expanets was taking or would take to resolve the problem, constantly assuring those in attendance at NorthWestern Board meetings that Expanets' financial condition was going to improve.

23.    Mr. Hanson was aware during 2002 that Blue Dot was having certain problems, but was repeatedly informed Blue Dot was working to fix these problems.

24.    Between December 2001 and November 2002, Mr. Hanson received periodic Management Financial and Information Reports ("MFIRs") and attended certain meetings at which the various businesses of NorthWestern were discussed. However, these MFIRs provided only selective information about each of the operating companies and did not contain balance sheets, income statements or statements of cash flow for any of NorthWestern's operating companies. Likewise, the management meetings which Hanson attended did not provide any information that would lead him to conclude that NorthWestern was insolvent, in the zone of insolvency or unable to fulfill its obligations under the Indenture. Rather, with respect to the non-regulated subsidiaries, Mr. Hanson was informed that business conditions were improving.

25.    While the MFIRs for May, June and July 2002 contained charts indicating that Expanets experienced some delays in repaying cash advances previously made by NorthWestern, the MFIRs contained only selected financial information and did not contain sufficient information for the reader to conclude that NorthWestern would have been unable to make QUIPS payments after November 2002 or that Expanets would never be able to repay its parent.

EXHIBIT 16 TO FINAL PRE-TRIAL                  5
ORDER

26.     In executing the required Officer's Certificates related to the Transfer, Mr. Hanson relied on Management Financial and Information Reports, SEC filings, other public financial statements, and presentations to NorthWestern's board. Mr. Hanson had no basis for believing that the documents he relied upon were false or misleading when he relied upon them.

27.     Mr. Hanson further relied on the management of NorthWestern and on officers of its subsidiaries regarding any perceived financial problems with NorthWestern or its related companies.

28.     Based on his involvement with NorthWestern and his general understanding, Mr. Hanson had no reason to question either the advisability of the Transfer or the ability of NorthWestern to pay the QUIPS obligations.

29.     Concerning the Transfer, Mr. Hanson followed the directive of NorthWestern to transfer substantially all of the assets and liabilities of Clark Fork to NorthWestern.

30.     By virtue of its ownership of Clark Fork, NorthWestern owned all the assets and liabilities contained within Clark Fork.

31.     By virtue of NorthWestern's acquisition of Clark Fork and the Montana Utility Business from MPC and Touch America in February 2002, NorthWestern already owned the equity (assets minus liabilities) in Clark Fork prior to the Transfer.

32.     After the Transfer, NorthWestern continued to own the equity in Clark Fork.

33.     At the time of the Transfer, Mr. Kindt served as Clark Fork's Vice President and Chief Accounting Officer. As an officer of Clark Fork, Mr. Kindt was responsible for ensuring filing requirements with certain debt holders were completed on time. Mr. Kindt's responsibilities were limited to the Montana utility assets owned by Clark Fork.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER                6

34.   Mr. Kindt was neither involved in the decision to consummate the
Transfer nor did he have access to information which would provide a basis for opining
on the advisability of the Transaction.

35.   Mr. Kindt did not review NorthWestern's financial statements or public
financial disclosures in connection with the Transfer, nor was he obligated to do so.

36.   Mr. Kindt did not discuss with anyone at NorthWestern or with Mr.
Hanson the company's ability to service the QUIPS debt after the Transfer, nor did he
believe in good faith that he had any need to have such discussions.

37.   In 2002, shortly after NorthWestern acquired the unit interest of Clark
Fork, Mr. Kindt attended one NorthWestern meeting attended by all of the Montana vice
presidents and the presidents of NorthWestern's various divisions and subsidiaries. At
that meeting, the division and subsidiary presidents each spent ten to fifteen minutes
updating the attendees on their progress. Mr. Kindt recalls that Expanets noted in their
presentation that it was confident it would meet its annual budgeted target, which it
indicated was an aggressive target.

38.   The only information Mr. Kindt had regarding Expanets and Blue Dot was
from that single meeting he attended in 2002, and from a one-line comparison in the
NorthWestern utility financial statements of the net income of each of these businesses
compared to their respective budgets for each month and for the year-to-date. Mr. Kindt
never reviewed any financial statements for Expanets.

39.   At the time of the Transfer, Mr. Kindt believed NorthWestern had the
financial wherewithal to continue to service the QUIPS debt and that whenever the utility
needed cash, it was available. Mr. Kindt had no concerns with respect to whether
NorthWestern could satisfy the QUIPS obligations since the balance sheet of
NorthWestern was strong and NorthWestern had just recently issued some debt without
difficulty. Further, Mr. Kindt was not aware of any concerns with respect to
NorthWestern's liquidity or cash flows until the late winter or early spring of 2003.

EXHIBIT 16 TO FINAL PRE-TRIAL                7
ORDER

40.     Mr. Kindt believed there was no need for concern regarding Clark Fork's cash flows after the Transfer due to the Support Agreements guaranteeing sufficient cash flows to Clark Fork from NorthWestern. Concerning the Transfer, Mr. Kindt believed NorthWestern was the owner of the assets and that all NorthWestern was doing was changing the form of that ownership from Clark Fork, as a wholly owned subsidiary, to direct ownership of the net assets by NorthWestern.

41.     Mr. Kindt's role in the Transfer was limited: he was responsible for adjusting company codes for the assets and for transmitting certain paperwork relating to the Transaction, including the Notice to the Trustee Bank of New York.

42.     Prior to July 1, 2002, NorthWestern Communications Solutions (NCS) was a business unit for which Mr. Hanson was responsible.

43.     NCS was an immaterial part of NorthWestern's business.

44.     Some time prior to July 1, 2002, the senior management of NorthWestern decided to transfer NCS to Expanets since the business of NCS more logically was related to the business of Expanets.

45.     As part of the process of transferring NCS to Expanets, an audit of NCS was conducted in the normal course of business.

46.     As part of the audit, certain allegations were made related to the accounting methodology employed at NCS.

47.     In response to these allegations, Mr. Hanson ordered that an internal investigation be undertaken.

48.     Following normal and customary business practice, Mr. Hanson gave those management individuals, Messrs. Thielbar and Monaghan, the opportunity to respond to the proposed audit findings.

49.     After the parties had an opportunity to respond, a final audit report was issued and certain adjustments were made to the NCS financial statements.

50.     These audit adjustments were not material to NorthWestern.

EXHIBIT 16 TO FINAL PRE-TRIAL ORDER     8

51.     The internal auditors who made certain allegations about Mr. Monaghan reported directly to Mr. Monaghan.

52.     When the time came for the annual performance review of these individuals, Mr. Kindt was assigned the task of conducting their reviews, since any review by Mr. Monaghan would constitute a conflict of interest. The internal auditors did not report to Mr. Kindt.

53.     Mr. Kindt reviewed the performance of the internal auditors with individuals from the various business units for whom the auditors provided services. Mr. Kindt then issued his performance reviews based upon these interviews.

54.     Because the performance reviews were unfavorable, the auditors in question requested a further review. Ultimately, their reviews were upgraded.

55.     Following the Transfer, NorthWestern timely made two (2) quarterly payments on the QUIPS, in December 2002 and March 2003.

56.     After timely making these two quarterly payments, in May 2003 NorthWestern exercised its contractual right to defer future quarterly payments on the QUIPS. Such a deferral was permitted under the terms of the Indenture and did not constitute an Event of Default.

57.     NorthWestern never defaulted on its obligation to make QUIPS payments until it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 14, 2003.

58.     Magten first acquired a beneficial interest in the Junior Debentures by purchasing the QUIPS issued by the Trust on or about April 30, 2003, approximately five months after the Transfer and two weeks after NorthWestern restated its financials for the first three quarters of 2002 and filed its Form 10-K for 2002.

59.     Prior to purchasing the QUIPS, Magten reviewed all financial information that was available relating to NorthWestern and Montana Power Company, including Form 10-Qs and 10-Ks from 2002 as well as restated financial statements. Magten also

EXHIBIT 16 TO FINAL PRE-TRIAL                9
ORDER

reviewed the Indenture, the Second Supplemental Indenture, the Third Supplemental Indenture and the Assumption Agreement.

60.     Magten purchased additional QUIPS on May 12, 2003, June 3, 2003 and on various other dates throughout the remainder of 2003. These purchases were made both before and after NorthWestern announced publicly that it might not be able to meets its financial obligations with respect to the QUIPS, both before and after NorthWestern publicly announced that it was suspending payments on the QUIPS for up to 60 calendar months as permitted by the Indenture, and both before and after NorthWestern filed its petition for reorganization in bankruptcy, which was an Event of Default under the terms of the Indenture.

61.     Magten knew NorthWestern filed its petition for bankruptcy protection on the date it was actually filed in September 2003.

62.     Magten continued to purchase additional QUIPS after NorthWestern filed for bankruptcy in September 2003. Mr. Embry, Magten's sole director and officer, believed that purchasing QUIPS while NorthWestern was in bankruptcy was a "good investment," "[b]ecause [NorthWestern] had engaged in a fraud which had -- which gave rise to a fraudulent conveyance claim, which the securities represent a claim on." Magten continued to acquire QUIPS until approximately May of 2006. Magten's last purchase of the QUIPS was for $15.00 per security.

63.     Because Magten was not a creditor of Clark Fork and did not own any QUIPS prior to or at the time the Transfer occurred, Magten cannot satisfy the "contemporaneous ownership" requirements of Mont. Code Ann. § 35-8-1104.

64.     Magten's allegations stemming from the Transfer are derivative claims belonging only to members of Clark Fork, not to creditors such as Magten.

65.     At the time of the Transfer, NorthWestern was the sole member and manager of Clark Fork. Magten has never been a member of Clark Fork, and therefore it

EXHIBIT 16 TO FINAL PRE-TRIAL        10
ORDER

lacks standing under Mont. Code Ann. § 35-8-1104 to assert any derivative claims on behalf of Clark Fork.

66.    Neither Mr. Hanson nor Mr. Kindt received any of the assets transferred from Clark Fork to NorthWestern.

67.    Two internal investigations conducted by NorthWestern's Board of Directors in 2003 and a separate investigation conducted by the SEC revealed no improper activity on the part of either Mr. Hanson or Mr. Kindt.

68.    Magten has not submitted any expert testimony that purports to assign any responsibility to Mr. Hanson or Mr. Kindt for any improper activity in connection with the Transfer. Magten's experts do not address whether Mr. Hanson or Mr. Kindt violated any Generally Accepted Accounting Principles ("GAAP"), failed to timely recognize goodwill impairments, were involved in any alleged failure to provide adequate consideration regarding the Transfer, or breached any fiduciary duties to anyone.

69.    Plaintiff's experts express no opinion as to whether Clark Fork remained liable for the QUIPS obligations after the Transfer. They express no opinion concerning the solvency of Clark Fork after the Transfer.

70.    NorthWestern's "Senior Management," as used in the Expert Report of Plaintiff's expert Mr. Berliner, refers to Kipp Orme, Merle Lewis, Richard Hylland, and Kendall Kliewer. According to Mr. Berliner, these four individuals were responsible for NorthWestern's alleged failure to comply with SEC disclosure requirements, the knowing dissemination of materially false and misleading information to the public, failure to timely recognize goodwill impairment losses and NorthWestern's alleged GAAP violations. Neither Mr. Hanson nor Mr. Kindt are included in Mr. Berliner's references to NorthWestern's "Senior Management."

71.    The Berliner Report discusses various deficient disclosures and accounting inaccuracies by NorthWestern and "NorthWestern's Management," but contains no reference to Mr. Hanson or Mr. Kindt and provides no basis for including Mr. Hanson or

EXHIBIT 16 TO FINAL PRE-TRIAL                11
ORDER

Mr. Kindt as part of "NorthWestern's Management." The only reference to either Mr. Hanson or Mr. Kindt in the Berliner Report is a single mention of Hanson in regards to a January 28, 2002 memorandum he co-authored.

72.     Mr. Marcus offers no expert opinions with respect to the Hanson and Kindt Action.

73.     Magten has not submitted any expert testimony relating to whether Clark Fork was insolvent or in the zone of insolvency either before or after the Transfer.

74.     Magten has not submitted any expert testimony relating to whether NorthWestern was insolvent or in the zone of insolvency either before or after the Transfer.

75.     Magten has not submitted any expert testimony as to whether Clark Fork remained liable for the QUIPS obligations after the Transfer. Rather, Magten simply instructed its experts to base their conclusions on the assumption that this was the case.

76.     Stephen J. Scherf, a Certified Public Accountant, Fraud Examiner, and Forensic Accountant, has submitted an expert report in which he concludes that Mr. Hanson and Mr. Kindt had no reason to know that either Clark Fork or NorthWestern would experience any potential financial problems as a result of the Transfer. Mr. Scherf further concludes that Magten has failed to properly account for the risks that it assumed in purchasing the QUIPS, and has failed to properly analyze and calculate its damages.

77.     Bruce B. Bingham, an elected fellow of the American Society of Appraisers, has submitted an expert report in which he affirms the validity of the valuation reports and goodwill impairment analysis that AAA performed for Expanets and Blue Dot as of January 1, 2002 and October 1, 2002. Mr. Bingham explains why the alternative valuation performed by Robert W. Berliner fails to adhere to the Uniform Standards of Professional Appraisal Practice ("USPAP").

78.     Christopher J. Kearns, a Certified Public Accountant, Insolvency and Restructuring Advisor, Turnaround Professional, and Fraud Examiner, has submitted an

EXHIBIT 16 TO FINAL PRE-TRIAL                12
ORDER

expert report in which he refutes, point by point, the methodology and conclusions of Magten's expert witnesses.

79.    Magten is not entitled to compensatory damages, punitive damages, or attorneys fees and costs for all of the reasons set forth in the pending motion for summary judgment.

80.    The evidence will show that Magten failed to mitigate its damages, and in fact intentionally sought to increase its damages to increase the value of this strike suit. Therefore, Magten is not entitled to compensatory damages, or at best, any such damages are limited.

81.    There is no evidence that either Mr. Hanson or Mr. Kindt acted with actual malice, and therefore Magten is not entitled to any award of punitive damages.

82.    Magten has asserted no theory under which it is entitled to the recovery of attorneys fees and costs; its allegations that this is a derivative action that allows Magten to recover its attorneys fees is an intentional misstatement of the cause of action pled. Moreover, Magten lacks standing to assert a derivative action. Therefore, attorneys fees and costs are properly denied. If recovery of attorneys fees is permitted, any award must be limited to only those attorneys fees and costs incurred directly in the Hanson and Kindt Action and must exclude all attorneys fees and costs incurred in the NorthWestern Action.

83.    Magten failed to make any request for pre-judgment interest and therefore cannot for the first time seek such recovery in this proposed pre-trial order. Further, Magten is not entitled to an award of pre-judgment interest in any event.

84.    Defendants Hanson and Kindt are entitled to offset any damages awarded in this case against any damages awarded to Magten in the NorthWestern Action.

EXHIBIT 16 TO FINAL PRE-TRIAL
ORDER                                          13