# UNREPORTED CASES

LEXSEE 2007 U.S. DIST. LEXIS 38515


Analysis
As of: Jan 30, 2008

**AJAX ENTERPRISES, et al., Plaintiffs, v. DECLAN FAY, et al., Defendants.**

**Civil No. 04-4539 (NLH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2007 U.S. Dist. LEXIS 38515*

**May 15, 2007, Decided**
.**May 15, 2007, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by, Motion granted by, Claim dismissed by, Request granted, Request denied by *Ajax Enters. v. Fay, 2007 U.S. Dist. LEXIS 65027 (D.N.J., Aug. 31, 2007)*

**PRIOR HISTORY:** *Ajax Enters. v. Fay, 2007 U.S. Dist. LEXIS 16627 (D.N.J., Mar. 7, 2007)*

**COUNSEL:** [*1]  For AJAX ENTERPRISES, AJAX ENTERPRISES, INC., AJEX ENTERPRISES, INC., UJEX ENTERPRISES, INC., Q TOWN, INC., TJAX INVESTMENT CORP., Plaintiffs: ANDREW L. INDECK, LEAD ATTORNEY, SCARINCI & HOLLENBECK, LLC, LYNDHURST, NJ.

For DECLAN FAY, Defendant: CHRISTOPHER PHILIP LEISE, WHITE & WILLIAMS, LLP, CHERRY HILL, NJ.

For INDUSTRIAL INSURANCE AGENCY, Defendant, ThirdParty Plaintiff, Cross Defendant: EVELYN CADORIN FARKAS, FARKAS & DONOHUE, LLC, FAIRFIELD, NJ.

For INDUSTRIAL INSURANCE AGENCY, Cross Claimant, Cross Defendant, ThirdParty Plaintiff: DAVID C. DONOHUE, LEAD ATTORNEY, EVELYN CADORIN FARKAS, FARKAS & DONOHUE, LLC, FAIRFIELD, NJ.

For DECLAN FAY, Cross Defendant:CHRISTOPHER PHILIP LEISE, LEAD ATTORNEY, WHITE & WILLIAMS, LLP, CHERRY HILL, NJ.

For DECLAN FAY, RISK MANAGEMENT INSURANCE NETWORK AGENCY, Cross Claimants: CHRISTOPHER PHILIP LEISE, LEAD ATTORNEY, WHITE & WILLIAMS, LLP, CHERRY HILL, NJ.

For DECLAN FAY, ThirdParty Plaintiff, Cross Claimant: CHRISTOPHER PHILIP LEISE, LEAD ATTORNEY, CHRISTOPHER PHILIP LEISE, WHITE & WILLIAMS, LLP, CHERRY HILL, NJ.

**JUDGES:** Joel Schneider, United States Magistrate Judge.

**OPINION BY:** Joel Schneider

**OPINION**

*OPINION AND ORDER*

This [*2]  matter is before the Court on plaintiffs' April 2, 2007 informal letter request to amend their answers to interrogatories and Rule 26 disclosures to assert a new damage claim. Defendants object to the amendment. The Court heard oral argument on May 7, 2007. After considering the written and oral arguments of the parties, it is hereby Ordered that plaintiffs' requested amendment is DENIED.

*Background*

The factual background of this matter was summarized in this Court's March 7, 2007 Opinion and Order granting Plaintiff's Motion for Leave to File an Amended Complaint [Doc. No. 43]. *See Ajax Enters. v. Fay, C.A.*

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 3 of 67

Page 2
2007 U.S. Dist. LEXIS 38515, *

No. 04-4539 (NLH), 2007 U.S. Dist. LEXIS 16627, 2007 WL 766335 (D.N.J. 2007). By way of brief summary, Ajax Enterprises ("Ajax") is a Professional Employer Organization ("PEO"). A PEO is a company that provides integrated business services to its clients. A PEO delivers these services by "establishing and maintaining an employment relationship with clients' employees by contractually assuming substantial employer rights, responsibilities, and risks." See Complaint at P4, Doc. No. 1. Ajax brought negligence claims against defendants Declan Fay and Industrial Insurance Agency [*3] alleging that by failing to place Ajax with an existing and viable worker's compensation insurance carrier, defendants breached their duty as insurance brokers. Ajax seeks reimbursement of the finder's fee and all premiums paid in the amount of $ 192,340.94, a declaration that defendants are obligated to assume the defense and indemnification of all claims, including currently unknown claims that would have been covered, and a determination that it is a "successful claimant" entitling it to payment of attorney's fees incurred in bringing this action. Ajax Enters., supra 2007 U.S. Dist. LEXIS 16627, [WL] at *1.

As to the procedural history of this case, the original Complaint was filed on September 20, 2004. [Doc. No. 1]. On February 9, 2006, Ajax filed its first Motion for Summary Judgment. Defendants filed their Cross Motion for Summary Judgment on March 14, 2006. On December 7, 2006, the Honorable Noel L. Hillman, U.S.D.J., entered an Order denying the parties' Motions. After Ajax's Motion was denied it filed a Motion to Amend its Complaint on January 17, 2007 [Doc. No. 38]. The original plaintiff in this matter was Ajax Enterprises. With leave of court, plaintiffs filed their Amended Complaint [*4] on March 14, 2007, adding as named plaintiffs Ajax Enterprises, Inc. ("Ajax"), Ujex Enterprises, Inc. ("Ujex"), Q-Town, Inc. ("Q-Town") and Tjax Invest. Corp. ("Tjax"). When this Court granted Ajax's Motion to Amend on March 7, 2007 its Opinion and Order cautioned, "although the Court grants plaintiffs leave to amend, the new parties are barred from asserting a damage claim different than the claim Ajax Enterprises has been asserting to date." Ajax Enters., supra 2007 U.S. Dist. LEXIS 16627, [WL] at *3. This Court further wrote, "[t]he amendment is not intended to permit the new parties to assert new damage claims." Id. (emphasis in original). On April 9 and 20, 2007, defendants filed new Motions for Summary Judgment. [Doc. Nos. 54, 56]. Plaintiffs' filed a Cross Motion for Summary Judgment as to liability on April 26, 2007. [Doc. No. 56]. These Motions have not been decided. All fact and expert discovery in the case is complete. The Final Pretrial Conference is scheduled on July 13, 2007.

The issue presently before the Court is plaintiffs' request to amend their answers to interrogatories and Rule 26 disclosures to include a new damage claim. On January 22, 2007, Ajax notified defendants [*5] for the first time that it was claiming that T& L Transportation, Inc. "discontinued its business relationship with the Plaintiffs because of the lapse in insurance...." See Plaintiffs' April 2, 2007 Letter Brief at 2, Doc. No. 48. [1] Defendants argue that plaintiffs' amendment is late and prejudicial. [Doc. No. 60].

> 1 During oral argument on May 7, 2007, plaintiffs' counsel informed the parties that the new damage claim is asserted on behalf of Ujex and Q-Town.

Ajax admits that the first time it notified defendants of the T&L damage claim was on January 22, 2007 when it listed the claim in a damage summary letter it sent the Court. Prior to that date the T&L claim was never identified in Ajax's Rule 26 disclosures and answers to interrogatories. [2] Plaintiffs allege the first time they learned T&L did not renew its business with them because of their insurance problems was on January 7, 2007 at the deposition of T&L's Vice President, Leslie R. Bredell, which was taken in a related state court litigation. [*6] In May 2005, T&L filed a state court Complaint against Ajax, Ujex, Q-Town, and others, and alleged it suffered damages because of the plaintiffs' failure to procure proper insurance.

> 2 The Court assumes, but is not certain, that Ujex, Q-Town and Tjax never served separate Rule 26 disclosures.

*Discussion*

Pursuant to Fed. R. Civ. P. 26(e)(1) and (2), a party is under a duty to supplement its Rule 26 disclosures and answers to interrogatories if the answers served in the case are incomplete. Courts have used a four (4) part test to determine whether a party breached its duty to amend under Rule 26(e) : (1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the party knew that the response was incomplete; and (4) whether the correct information was otherwise made known to the other party through the discovery process or in writing. Pfizer, Inc. v. Teva Pharms. USA, Inc., C.A. 04-754 (JCL), 2006 U.S. Dist. LEXIS 74611, 2006 WL 2938723, *3 (D.N.J. 2006). [*7] Pursuant Fed. R. Civ. P. 37(c)(1), a party who without substantial justification fails to amend a prior response to discovery as required by Rule 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at trial any information not disclosed. "Rule 37 is written in mandatory terms, and is designed to provide

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 4 of 67

Page 3
2007 U.S. Dist. LEXIS 38515, *

a strong inducement for disclosure of *Rule 26(a)* material." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995)*(quotations and citations omitted). In *Pfizer, Inc., supra 2006 U.S. Dist. LEXIS 74611, [WL] at *4*, the Court looked at the following factors to determine if withheld evidence should be excluded: (1) the importance of the information withheld; (2) the prejudice or surprise to the party against when the evidence is offered; (3) the likelihood of disruption at trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose, and; (6) the presence of bad faith or willfulness in not disclosing the evidence. The burden of establishing substantial justification and harmlessness is on the party that failed to make the required disclosure. [*8]  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., C.A. 97-1568 (JAG), 2007 U.S. Dist. LEXIS 23636, 2007 WL 979854, *12 (D.N.J. 2007)* (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001)).*

This Court will deny plaintiffs' request to amend their damage claim because it is late and the defendants will be substantially prejudiced by the amendment. Furthermore, the requested amendment is not harmless and there is no substantial justification for plaintiffs' delay in raising the T&L damage claim. Although Mr. Bredell was not deposed until January 7, 2007, plaintiffs knew or should have known long before this date that a plausible reason for why T&L did not renew its contract was because of problems plaintiffs had placing their insurance. This should have put plaintiffs on notice to inquire of T&L why T&L did not renew its contract. In turn this would have alerted Ujex and Q-Town of their damage clam against defendants related to the T&L contract. Nevertheless, plaintiffs admitted at oral argument they did no investigation in this case regarding whether they could assert the non-renewal of the T&L business as an element of their damage [*9]  claim. Plaintiffs also provided no good explanation for why they never took Mr. Bredell's deposition in this case. Another reason why plaintiffs should have been aware of the T&L damage claim long before January 22, 2007 was because T&L sued plaintiffs in a separate state court action in May, 2005 based on actions plaintiffs' claim was the fault of the defendants in this case. Moreover, in October 2005, plaintiffs filed a third-party complaint in T&L's state court action relating to the non-renewal of T&L's business. It is plain, therefore, that plaintiffs knew or should have known at least as early as May 2005, that a possible explanation for why T&L did not renew its contract was because of defendants' actions. Plaintiffs' proposed amendment comes after the end of fact and expert discovery, after the filing of two rounds of summary judgment motions, and on the eve of the Final Pretrial Conference. Plaintiffs' request to assert a new damage claim is unquestionably late.

More importantly, not only is plaintiffs' new damage claim late, but the defendants will be substantially prejudiced if plaintiffs' proposed amendment is granted. At this stage of the case all fact discovery is complete [*10]  and expert reports have been exchanged. As set forth in Declan Fay's May 4, 2007 letter brief [Doc. No. 60], if plaintiffs' amendment is granted it will inevitably open the door to another round of substantial fact and expert discovery and depositions, and will likely necessitate the need for a new round of expert reports. Many of the depositions that must be taken to address plaintiffs' new claim are of witnesses who were already deposed. Defendants should not be compelled to incur substantial unnecessary transaction costs because plaintiffs now want to assert a new damage claim more than 2 1/2 years after their complaint was filed, and virtually on the eve of the Final Pretrial Conference. This is especially true since plaintiffs knew or should have known about the T&L damage claim at least as early as May 2005.

When this Court granted Ajax Enterprises leave to amend their complaint on May 7, 2007, the Court specifically noted that it would not permit plaintiffs to assert new damage claims. The reason was obvious--an amendment at this late stage of the litigation would inevitably delay trial and substantially prejudice defendants. Despite this Court's admonition, plaintiffs are [*11]  now attempting to accomplish what this Court specifically prohibited in its March 7, 2007 Opinion. The Court granted Plaintiffs' Motion to Amend to add new plaintiffs with the clear and unmistakable proviso that it would not permit the new plaintiffs to assert new damage claims that had not previously been raised by Ajax Enterprises.

It is also noteworthy that plaintiffs acknowledge that when they filed their Motion to Amend their Complaint on January 17, 2007 [Doc. No. 38] they were aware of the T&L damage claim. Nevertheless, plaintiffs' Motion did not mention that one of the reasons they wanted to add Ujex and Q-Town as named plaintiffs was so that they could assert the new T&L damage claim. In fact, Plaintiffs' Brief in support of their Motion to Amend represented that if the Motion was granted it would not result in any additional discovery. Plaintiffs' Motion argued that the new plaintiffs should be added to the case to seek reimbursement of the same finder's fee and premiums that Ajax Enterprises had been requesting. Specifically, Plaintiffs' Brief stated:

> As part its claim, the proposed Plaintiffs seek reimbursement of the same finder's fee and all premiums paid. [*12]  The Defendants were long ago provided with copies *all* of the subject checks and wire transfers of the proposed Plaintiffs. *There*

2007 U.S. Dist. LEXIS 38515, *

*are no further documents responsive to any of the discovery requests that would differ for any of the proposed new Plaintiffs.... Accordingly, the proposed amendment will not cause the need to extend discovery in this matter.*

*See* Brief at 5, Doc. No. 38-3 (emphasis supplied). This Court will not permit plaintiffs to amend their damage claim after plaintiffs represented in their Motion to Amend that if new parties were added to the case no new damage claims would be asserted. If plaintiffs had revealed in their Motion that they wanted to assert a new

damage claim on behalf of Ujex and Q-Town, it is likely the Court's ruling on Plaintiffs' Motion to Amend would have been different.

Accordingly, for all the foregoing reasons, it is hereby

ORDERED this 15th day of May, 2007, that plaintiffs' request to amend its answers to interrogatories and Rule 26 disclosures to assert a new damage claim relating to the non-renewal of T&L's business is DENIED.

s/ Joel Schneider

United States Magistrate Judge

LEXSEE 2007 US DIST LEXIS 18626



Analysis
As of: Jan 30, 2008

**MARTIN FREDERICK and BARBARA FREDERICK, his wife, Plaintiffs, -vs-
ELIAS HANNA, JOHN JOHNSON, MANOR BOROUGH, OFFICER STEFFEY
and PENN TOWNSHIP, Defendants.**

**Civil Action No. 05-514**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 18626*

**March 16, 2007, Decided
March 16, 2007, Filed**

**PRIOR HISTORY:** *Frederick v. Hanna, 2006 U.S.
Dist. LEXIS 87037 (W.D. Pa., Nov. 1, 2006)*

**COUNSEL:** [*1] For MARTIN FREDERICK,
BARBARA FREDERICK, his wife, Plaintiffs: Amy S.
Cunningham, LEAD ATTORNEY, Greensburg, PA.

For ELIAS HANNA, JOHN JOHNSON, MANOR
BOROUGH, Defendants: Paul D. Krepps, LEAD
ATTORNEY, Marshall, Dennehey, Warner, Coleman &
Goggin, Pittsburgh, PA.

For OFFICER STEFFEY, PENN TOWNSHIP, Defen-
dants: John F. McCabe, LEAD ATTORNEY, Marks,
O'Neill, O'Brien & Courtney, Pittsburgh, PA.

**JUDGES:** Donetta W. Ambrose, Chief U. S. District
Judge.

**OPINION BY:** Donetta W. Ambrose

**OPINION**

***OPINION and ORDER OF COURT***

*SYNOPSIS*

In this civil matter, in which trial is imminent, the
parties have filed several Motions in Limine. I will ad-
dress each Motion in turn.

**I.** *Applicable Standards*

Relevant evidence is evidence that tends to make the
existence of any fact that is of consequence to the deter-
mination of the action more or less probable than it
would be without the evidence. *Fed. R. Evid. 401.* This
definition of relevance is very broad, and does not raise a
high standard. *Gibson v. Mayor & Council of Wilming-
ton, 355 F. 3d 215, 232 (3d Cir. 2004).* In turn, *Fed. R.
Evid. 403* permits the exclusion of relevant evidence if
its probative value is substantially [*2] outweighed by
the danger of unfair prejudice, confusion of the issues, or
misleading the jury.

The proponent of evidence bears the burden of es-
tablishing its admissibility and relevance. *See, e.g., Yibu-
layin v. yellow Freight Sys., No. 04-3690, 2005 U.S. Dist.
LEXIS 23836, at *5 (E.D. Pa. Oct. 18, 2005).*

**II.** *Motions in Limine*

**A.** *Guilty Plea of Elias Hanna*

Both parties have filed Motions in Limine regarding
Defendant Hanna's January 30, 2007 plea of guilty to
violating *18 U.S.C. § 371,* by conspiring to engage in an
illegal gambling enterprise. Plaintiffs argue that the
guilty plea and related evidence is admissible as im-
peachment evidence under *Fed. R. Evid. 609.* In contrast,
Defendants argue that the evidence is inadmissible, in
part, under *Fed. R. Evid. 403.* Defendants have also sug-
gested, in the alternative, that the Court limit the evi-
dence to a stipulation by the parties, to be read into the
record by the Court, that Defendant Hanna was charged

with one count of participating in a gambling enterprise, to which he plead guilty, and the dates of the charge and the plea.

*Fed. Rule of Evid. 609*, in pertinent part, [*3] provides as follows:

> (a) General rule. For the purpose of attacking the credibility of a witness,
>
>> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted subject to *Rule 403*, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
>
>> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

"Because the district court lacks discretion to engage in balancing, *Rule 609(a)(2)* must be interpreted narrowly to apply only to those crimes that, in the words of the Conference Committee, bear on a witness's propensity to testify truthfully." *Cree v. Hatcher, 969 F.2d 34, 37 (3d Cir. 1992).*

*Section 371* reads, in full, as follows: "If two or more persons conspire to commit any offense against the United States, or to defraud the United States, [*4] or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." *18 U.S.C. § 371.*

Plaintiffs argue that Hanna's conviction involves dishonesty because *Section 371* uses the term "defraud."

The statute, however, uses the term "defraud" in the conjunctive only, and only in reference to a conspiracy to "defraud the United States." There is no suggestion that Defendant Hanna was charged with a conspiracy to defraud, as opposed to a conspiracy to "commit any offense." Moreover, Plaintiffs make no persuasive argument that the underlying gambling offense involves dishonesty or false statement, or bears on Hanna's propensity to testify truthfully. I will not accept their generalized argument based on the commission of a crime while under a police officer's oath to uphold the law, as that would render *Rule 609* a nullity with respect to any law enforcement officer convicted of any crime. Therefore, the evidence is not admissible under *Rule 609(a)(2)*.

The parties do not dispute, however, that the crime at issue [*5] is punishable by imprisonment in excess of one year. As a result, in order to admit the evidence as Plaintiffs urge, I must determine that its probative value outweighs its prejudicial effect under *Rule 609(a)(1)*. Our Court of Appeals has identified four factors that a district court should weigh in making a *Rule 609(a)(1)* determination: (1) the kind of crime involved; (2) when the prior conviction occurred; (3) the importance of the witness's testimony; and (4) the importance of the credibility of the defendant. *Government of the Virgin Islands v. Bedford, 671 F.2d 758, 761 n.4 (3d Cir. 1982).*

Here, Defendant Hanna's testimony and credibility are of central importance, and weigh in favor of permitting the evidence at trial. The dates of conviction and the type of crime, however, weigh against admissibility. The placing of bets described by Plaintiffs bears little, if any, on Defendant Hanna's veracity; and the events underlying the plea are alleged to have occurred in 2005, which is fairly remote in time from both the events underlying this litigation and this trial. I will, therefore, admit the subject evidence with certain limitations. Plaintiffs may introduce [*6] the fact and date of the guilty plea for purposes of impeachment under *Rule 609(a)(1)*. Defendants have indicated that they are willing to stipulate to those facts. The parties will be directed to arrive at a stipulation in that regard, for use at trial.

In connection with this ruling, I find that other evidence associated with Defendant Hanna's plea should be excluded according to *Fed. R. Evid. 403*. Plaintiffs' counsel has indicated that during Defendant Hanna's deposition, she attempted, but was precluded from so doing by Court Order, to ask questions regarding a man named John "Duffy" Connelly. According to Plaintiffs, the criminal information against Defendant Hanna alleged that he placed bets with a person named "JC." Plaintiffs state their intention to explore the identity of "JC," believing it to be Mr. Connelly, at the trial of this matter. I find that any potential probative value represented by this individual's identity, which Plaintiffs utterly fail to

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 8 of 67

Page 3
2007 U.S. Dist. LEXIS 18626, *

explain, is quite heavily outweighed by prejudice to Defendant Hanna and the danger of confusion of the issues. In light of this finding, as well as the Defendants' willingness to stipulate to the fact and date of Defendant [*7] Hanna's plea, Plaintiffs have demonstrated absolutely no need for calling employees of the United States Attorney's office as witnesses. I will preclude Plaintiffs from calling those witnesses, or from offering any evidence beyond the stipulation referred to above. [1]

> 1  This ruling, as well as hearsay rules, also preclude introduction at trial of the December 9, 2006 newspaper article referred to in Docket No. 86, as well as the documents identified in Paragraph 20(a) - (f) of Docket No. 86, as it appears that they relate to the charges against Defendant Hanna. To the extent that I am mistaken, and Plaintiffs tend to proffer the evidence on other grounds or for other reasons, they may raise the issue at the time of trial and outside of the presence of the jury.

### B. Relocation Costs

Both parties have filed Motions in Limine regarding Plaintiffs' costs of moving their business. Plaintiffs argue that they moved their business due to Defendant Hanna's actions, and that they are entitled to introduce [*8] the costs of associated expenses. In particular, Plaintiffs aver that they lacked the time and resources to continue doing business in Manor Borough, the result of various acts committed by Defendant Hanna. Defendants argue, in turn, that no reasonable jury could conclude that the conduct alleged herein caused Plaintiffs to move the business.

Plaintiffs are entitled, in this action, to recover compensatory damages suffered as a result of injury caused by the constitutional violations alleged in this litigation. I agree that the link between Plaintiffs' relocation and Defendant Hanna's conduct is attenuated. A motion in limine, however, "should not be used as a vehicle to weed out weak evidence." Libco Corp. v. Dusek, No. 77 C 4386, 1986 U.S. Dist. LEXIS 26155, at *38 (D. Ill. Apr. 29, 1986). While the fact of causation might be speculative, the numbers that Plaintiffs have posited are not, and do not require expert testimony. [2] Plaintiffs may, therefore, attempt to demonstrate that expenses or losses associated with their relocation were caused by the violations alleged in this litigation. A jury, assisted by appropriate instructions from the Court, will determine [*9] whether the required causal connection exists.

> 2  With respect to lost profits, for example, Plaintiffs proffer a simple comparison of income between 2002, 2003, and 2004, via tax documents, that reflect losses during the tax year

2003. They do not proffer any damages requiring specialized knowledge, such as projections regarding future loss. Lay testimony regarding such losses is acceptable if it is "well founded on personal knowledge and susceptible to specific cross-examination." See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980); Fed.R.Evid. 701, 702.

I must, however, make particular note of Plaintiffs' argument that they had to relocate because Defendant Hanna "would not leave them alone," in that he committed several acts-- i.e., issued zoning and parking citations, conducted surveillance of Plaintiffs, or caused the towing of Plaintiffs' vehicles - that are described in the Pretrial Statement as occurring after April 19, 2003, and are not alleged in this action [*10] to have violated the Constitution or any other laws. [3] Plaintiffs now aver that this "constant harassment" compelled them to relocate.

> 3  Plaintiff's Complaint alleges that Defendant Hanna "targeted Martin Frederick for selective enforcement of certain laws prior to the incident on April 19, 2003." The Complaint, therefore, does not encompass the harassment alleged in the Pretrial Statement; in turn, the Pretrial Statement recites no facts occurring prior to April 19, 2003.

In this lawsuit, however, Plaintiffs may recover compensatory damages suffered as a result of the deprivations of their constitutional rights alleged in this action. They emphatically may not recover damages allegedly resulting from other acts that they have not made the subject of suit. The only claims remaining in this action involve allegations of constitutional violations at Race Street on August 19, 2003, and at the County Jail on April 20, 2003. Plaintiffs are entitled to attempt to prove damages flowing from those alleged violations [*11] only. [4]

> 4  I do not now rule on the admissibility of evidence of Defendant Hanna's other acts, as the parties have not placed that question before me. I merely clarify that Plaintiffs shall not be entitled to recover damages for injuries flowing from conduct upon which they have not brought suit.

### C. Legal Costs

Defendant has moved to exclude evidence of costs associated with the defense of the criminal charges brought against Plaintiffs. Plaintiffs' claims for false imprisonment, false arrest, malicious prosecution, and abuse of process have been dismissed from this action. Therefore, the propriety of the criminal charges is not even tangentially at issue in this action. The costs to Plaintiffs for defending those charges, therefore, are not

relevant to this litigation. To the extent that they could be deemed relevant, the probative value of those costs are substantially outweighed by the danger of misleading the jury and causing confusion of the issues, and are therefore excluded under *Fed. R. Evid. 403* [*12] .

**D. *Various Witnesses and Evidence (Docket No. 86)***

The parties agree that Plaintiffs failed to disclose as witnesses, in their initial disclosures or subsequently in response to discovery requests, the identity of several witnesses and documents that were identified for the first time in Plaintiffs' Pretrial Statement. [5] As a result, Defendants seek the exclusion of those witnesses pursuant to *Fed. R. Civ. P. 37(c)*. Plaintiffs offer no explanation for the late disclosures. [6]

> 5  The Motion regarding U.S. Attorney witnesses is rendered moot by my ruling on Docket Nos 85 and 88.
>
> 6  To the extent that Plaintiffs intend to suggest that they legitimately withheld evidence because Defendants did not produce a registration plate, that is not, at this stage and in this context, a legitimate reason.

*Rule 37(c)(1)* permits the exclusion of evidence that should have been disclosed pursuant to *Rules 26(a)* and *26(e)* unless the non-disclosing party provides substantial justification for its failure [*13] to disclose, or the failure to disclose is harmless. The burden of proving substantial justification or harmlessness lies with the non-producing party. *Tolerico v. Home Depot, 205 F.R.D. 169, 175 (M.D. Pa. 2002)*. In this matter, Plaintiffs have provided no justification, substantial or otherwise, for the failures to disclose. Moreover, in support of admission, Plaintiffs make only the most conclusory assertion of harmlessness. The failure is not harmless, in fact, as trial is imminent and Defendants are without sufficient time to prepare to deal with the proposed evidence.

In considering exclusion pursuant to *Rule 37*, the district court must also consider the following factors: 1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, 2) the ability of that party to cure the prejudice, 3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and 4) bad faith or willfulness in failing to comply with the district court's order. *Meyers v. Pennypack Woods Home Owners Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977).* [*14]

It appears that Plaintiffs never disclosed the "witnesses" listed in § 1(a)-(f) of Defendants' Motion, or the documents generated by those witnesses, prior to the

Pretrial Statement or Motions in Limine. Each of the business entities mentioned, as well as invoices or estimates bearing the names of those entities, relate to Plaintiffs' claim for damages resulting from relocating their business. [7] Defendants are prejudiced, because trial is imminent and they are unable to now prepare to address the late-disclosed documents; Defendants cannot cure that prejudice, because I will not now postpone the trial date to accommodate additional preparation; and waiver of the *Rule 37* sanctions would disrupt the efficient trial of this case, as well as the Court's crowded trial docket. There is no suggestion that Plaintiffs are unable to proffer evidence of these expenses by other means, such as their own testimony, so the excluded evidence is not critical. Particularly in the absence of excuse for the late disclosure, despite the absence of allegations of bad faith or wilfulness, the factors weigh in favor of exclusion. [8]

> 7  Paragraphs 1(g) -(l) (with the exception of Jerome Tierney, who apparently provided legal services associated with the relocation, rather than Plaintiffs' criminal defense) and 11(a) and (b) of Docket No. 86 are addressed elsewhere in this Opinion. The remaining parts of paragraphs 1 and 11 are business entities and corresponding documents relating to damages.

[*15]

> 8  In arguing that they made Defendants aware of the subject information, Plaintiffs draw my attention to their broad and non-specific Interrogatory responses regarding expenses incurred. Several of those expenses listed appear to be reflected in documents now being produced for the first time. I do not make any finding of bad faith or strategic, self-serving behavior, but do note that they have not explained their failure to disclose information that was in their possession.

Therefore, any persons or entities, which were identified for the first time in Plaintiffs' Pretrial Statement, or documents produced for the first time in connection with Plaintiffs' Pretrial Statement or the parties' Motions in Limine, will be excluded from trial. That Plaintiffs may have stated the amount of an item of damages, or listed a non-specific category of damages, without revealing any documentary or testimonial source of which they were aware, does not cure their failures.

In contrast, if the identity of those persons or entities appeared on documents produced during discovery, or were revealed in response [*16] to interrogatories, then Plaintiffs' other failures do not justify the "extreme sanction" of excluding the evidence. *See Lozano v. City of Hazleton, No. 3:06cv1586, 241 F.R.D. 252, 2007 U.S. Dist. LEXIS 13295 (M.D.Pa. Feb. 27, 2007).* [9] This appears to be the case, for example, with the identity of

Nations Rent. I am confident that the parties are able to review Plaintiffs' discovery responses and determine which particular pieces of evidence are not explicitly disclosed therein. This ruling, of course, is subject to the limitations set forth above, in my discussion of evidence of legal and relocation costs.

> 9    I reach a similar conclusion with respect to husband-Plaintiff's shattered watch and torn pants, addressed in Docket No. 86, which do not represent unfair surprise and will be admitted. With respect to the VHS tape of Defendant Hanna talking about the events of April 19, 2003, Defendant's statement on the video is not hearsay pursuant to *Fed. R. Evid. 801(d)(2)*. With respect to the videotape, I also find that a failure to disclose does not justify exclusion.

[*17]    Moreover, Plaintiffs assert that Witold Walczak is offered as a witness regarding attorney's fees. It appears, therefore, that Plaintiffs intend to offer his testimony regarding the appropriateness of counsel fees in the event that the Court is required to consider such an award post-trial. Plaintiffs do not suggest that they intend to offer Mr. Walczak's testimony at trial, and I assume that they will not do so. I will deny this aspect of the Motion, without prejudice, as not ripe for review. In the event that Plaintiffs file a fee petition following trial, and offer Mr. Walczak as a witness, Defendants may object at that time.

Lastly, Defendants argue that several affidavits, including those of Plaintiffs and various other witnesses, are inadmissible as hearsay, as well as because the documents "may" contain irrelevant information. Plaintiffs argue, in turn, that they do not know who might become "unavailable," and therefore qualify the documents for a hearsay exception, or whether the documents will be "properly useable for impeachment or another proper purpose." It is not clear that Plaintiffs intend to offer the challenged evidence; nor does such vague argument by both parties [*18] permit either meaningful evaluation or decision. I will deny this aspect of Defendants' motion without prejudice, and if necessary, they may reassert their arguments at the time of trial. [10]

> 10    This conclusion applies, too, to the telefax cover sheet that accompanies the statement of Bill Beaver, and is also raised in Document No. 86.

### E. *Medical Testimony*

Next, I address Defendant's Motion to exclude the testimony of several physicians who are, apparently, intended to testify regarding husband-Plaintiff's injuries, along with two medical bills and one set of hospital dis-

charge instructions. [11] Defendant's Motion is based on Plaintiffs' failure to make expert disclosures pursuant to *Fed. R. Civ. P. 26(a)(2)(B)* and Local Rule 16.1.4, and that expert opinions are required in this matter. Plaintiffs, in turn, argue that it is "obvious" that the witnesses are experts; that the records provided in discovery explain the witnesses' conclusions; and that husband-Plaintiff's injuries are not beyond the [*19] knowledge of the average layperson, and therefore expert testimony is not required.

> 11    Defendant also objects that the records themselves, standing alone, are hearsay. Because I will not exclude the providers' testimony, Plaintiffs will be afforded the opportunity to lay a foundation for the admission of these records.

All witnesses who are to give expert testimony must be disclosed, accompanied by a written report, under *Rule 26(a)(2)(A)*. Such reports, however, are required only for persons "retained or specially employed to provide expert testimony in the case." *Fed. R. Civ.P. 26(a)(2)(B)*. In contrast, the commentary to *Rule 26* states that "[a] treating physician...can be deposed or called to testify at trial without any requirement for a written report." *Fed.R.Civ.P. 26*, cmt. to 1993 Amendments.

Therefore, treating physicians not so disclosed may testify as to facts within their knowledge, as opposed to offering expert testimony. The physicians may, for example, testify regarding their treatment, examination, [*20] and diagnosis of husband-Plaintiff. *Buss v. Quigg, No. 01-3908, 2002 U.S. Dist. LEXIS 15081, at *2 (E.D. Pa. Aug. 6, 2002)*. Therefore, the witnesses in question, who Plaintiffs depict as treating physicians, will not be precluded from testifying as fact or lay witnesses. They may not, however, proffer any expert opinions. Whether it is "obvious" that the providers are qualified as experts, or the explanatory content of their records, is irrelevant in light of Plaintiffs' failure to designate them as experts as required by applicable rules.

As a final matter, Defendants argue that, absent expert opinion causally connecting the injuries to Defendants' conduct, the physicians' testimony must be excluded. Expert testimony, however, is not required here. This is not a case in which "the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson." *Redland Soccer Club v. Department of the Army, 55 F.3d 827, 852 (3d Cir. 1995)*. Otherwise stated, the causal connection here is not "so esoteric that lay minds cannot form any intelligent judgment about it without expert aid." *See Bushman v. Halm, 798 F.2d 651, 659 (3d Cir. 1986)*. [*21] Plaintiffs claim, for example, that husband-Plaintiff was handcuffed, yanked forward and backward,

2007 U.S. Dist. LEXIS 18626, *

tripped, and driven to the pavement. The causal connection between such conduct and an injured knee or wrist, or treatment sought therefor, is not complex. [12] Expert opinion is not required, and relevance has been demonstrated. I will not, therefore, exclude the evidence on those grounds.

> 12   It seems that Plaintiffs previously identified the itemized statement from Melvin Kukich, D.C. as relating to wife-Plaintiff, rather than husband-Plaintiff. *See* Docket No. 54, ex. 13. Certainly, if the records refer to the treatment of wife-Plaintiff's alleged injuries resulting from the conduct of Defendant Steffey, those records are no longer relevant to or admissible in this action.

**F. *Testimony of John Konecny*** [13]

> 13   I have adopted, for ease, but one of several different spellings of Mr. Konecny's name that has appeared throughout this litigation.

[*22] Finally, Defendants have moved to exclude the testimony of John Konecny, who Plaintiffs identified as a witness, but who both parties have since been unable to locate. Plaintiffs advise that they are continuing to attempt to locate Mr. Konecny. I will, therefore, deny Defendants' Motion without prejudice. In doing so, I operate under the assumption that the witness remains unavailable and will not appear at trial. If Plaintiffs locate Mr. Konecny, and intend to offer his testimony at trial, they are to notify Defendants and the Court as soon as practicable. At that time, Defendants may reassert their objections to his testimony.

## *CONCLUSION*

In sum, in accordance with the all caveats set forth above, I will admit limited evidence of Defendant Hanna's guilty plea; I will admit damages allegedly resulting from the relocation of Plaintiffs' business, and caused by the conduct alleged in this lawsuit; and fact testimony from husband-Plaintiff's treating physicians. I will also exclude evidence of Plaintiffs' legal defense costs, and provisionally deny Defendants' Motion regarding John Konecny. Finally, Plaintiffs will be precluded from proffering evidence that was not disclosed [*23] prior to their Pretrial Statement. An appropriate Order follows.

**ORDER**

AND NOW, this 16<th> day of March, 2007, after careful consideration of the parties' submissions, it is Ordered as follows:

1. Plaintiffs' Motion in Limine and Defendants' Motion in Limine (Docket Nos. 85 and 88) regarding the guilty plea of Defendant Hanna are each GRANTED in part and DENIED in part, as stated in the accompanying Opinion, and the parties are to arrive at a stipulation as stated in the above Opinion, or to apprise the Court of their failure to do so, as soon as practicable;

2. Plaintiffs' Motion in Limine regarding costs incurred by moving their business (Docket No. 90) is GRANTED, and Defendants' Motion in Limine regarding the same (Docket No. 83) is DENIED, as stated in the accompanying Opinion;

3. Defendant's Motion in Limine regarding costs associated with defense of criminal charges (Docket No. 81) is GRANTED;

4. Defendants' Motion in Limine regarding medical experts and records (Docket No. 84) is GRANTED in part and DENIED in part, as stated in the accompanying Opinion;

5. Defendants' Motion in Limine to preclude Witnesses and Evidence (Docket No. 86) is GRANTED in part [*24] and DENIED in part, and DENIED in part without prejudice, as stated in the accompanying Opinion;

6. Defendants' Motion in Limine regarding John Konecny (Docket No. 82) is DENIED, without prejudice; and

7. Defendant Steffey's joinder (Docket No. 87, re-docketed as No. 92) is DENIED as moot.

It is further Ordered that to the extent the parties wish to amend their proposed jury instructions based on today's Order, they shall file such amendments within seven (7) seven days of the date of this Order.

BY THE COURT:

/S/ Donetta W. Ambrose

Chief U. S. District Judge

LEXSEE



Positive
As of: Jan 31, 2008

## GOVERNMENT GUARANTEE FUND OF THE REPUBLIC OF FINLAND, SAASTOPANKKIEN KESKUS-OSAKE-PANKKI (SKOPBANK), 35 ACRES ASSOCIATES, 12 ACRES ASSOCIATES and BENEFORI OY, Plaintiffs, v. HYATT CORPORATION, Defendant.

### CIVIL NO. 1995-49(M)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE VIRGIN ISLANDS, DIVISION OF ST. THOMAS AND ST. JOHN

### 177 F.R.D. 336; 1997 U.S. Dist. LEXIS 20591; 38 V.I. 227

#### December 19, 1997, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The court sought to clarify in this memorandum a portion of its previous order, which required defendant debtor to produce to plaintiff creditors specific documents of an attorney. The creditors originally brought an action regarding a breached agreement.

**OVERVIEW:** The litigation concerned a management and subordination agreement, which the debtor allegedly breached. The court ordered the debtor to provide the creditors with an equitable accounting. When it did not, the creditors brought a motion for contempt and sanctions, and also attempted to strike certain of the debtor's affirmative defenses. In response to this, the debtor submitted a sworn declaration by an attorney who also was involved in the debtor's business. The court ordered the debtor to justify why it did not comply with the first order, which the debtor failed to do. The court then ordered, in connection with the attorney's declaration, that all documents authored or received from the attorney, with the exception of work product, be produced to the creditors. The debtor argued that the information was protected by the attorney-client

privilege. The court clarified that the basis for its order was that the debtor had waived the privilege. The court held that the debtor could not use the attorney's declaration in an attempt to convince the court to deny the creditors' motion, and then use the privilege as a shield to prevent discovery of matters related to that declaration.

**OUTCOME:** The court ordered that the debtor produce to the creditors all documents of the attorney, with the exception of work product related to the litigation.

**CORE TERMS:** discovery, declaration, attorney-client, telephone conference, amend, counterclaim, accounting, waived, hotel, partial, summary judgment, management agreement, affirmative defenses, sanctionable, depositions, unambiguous, advice, sua sponte, confidentiality, interrogatory, stonewalling, non-monetary, law firm, outside counsel, subject matter, breach of contract, mutual mistake, advice of counsel, submitting, equitable

**LexisNexis(R) Headnotes**

177 F.R.D. 336, *; 1997 U.S. Dist. LEXIS 20591, **;
38 V.I. 227

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN1]The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN2]In asserting claims that in fairness requires examination of protected communications, that party thereby waives the attorney-client privilege over the otherwise protected communications.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*

*Legal Ethics > Client Relations > Confidentiality of Information*

[HN3]In terms of the attorney-client privilege, the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication.

**COUNSEL:** [**1] For plaintiff: Warren B. Cole, Richard Hunter, Hunter, Colianni, Cole & Turner.

For plaintiff: Michael M. Baylson, Duane, Morris & Heckscher.

For plaintiff: Samuel H. Hall, Jr., Birch, De Jongh, Hindels & Hall.

For defendant: John Zebedee, Hymes & Zebedee.

For defendant: R. Eric Moore, St. Croix.

For defendant: John A. Sopuch, III, Sopuch, Nouhan & Higgins.

For defendant: Claude D. Montgomery, Philips, Lytle, Hitchcock, Blaine & Huber.

**JUDGES:** Thomas K. Moore, Chief Judge.

**OPINION BY:** Thomas K. Moore

**OPINION**

[*336] **CLARIFYING MEMORANDUM**

Moore, C.J.

**INTRODUCTION**

This Memorandum is submitted pursuant to Third Circuit Local Appellate Rule 3.1 to clarify a portion of this Court's Order dated November 21, 1997 ["November 21st Order"], requiring Hyatt to

> produce to the Skopbank Parties all documents listed on Hyatt's privilege logs authored by or received from Attorneys Shindler and/or Geoga. Specifically included are communications with outside counsel, Phil Kayman, Mr Smith, and the Vorhees law firm, as it relates to Mr. Schindler's Declaration. Excluded from this order is work product relating to this litigation.

(November 21st Order at [**2] 4-5.) The November 21st Order was intended to supplement those orders issued on the formerly privileged documents of Michael Shindler and Douglas Geoga ["Shindler and Geoga Documents"]. to counsel during the telephone conference [*337] with counsel on November 20, 1997 [the "Telephone Conference"].

**Plaintiffs' Motion for Contempt, Preclusion and Other Sanctions**

On May 16, 1997, the Government Guarantee Fund of the Republic of Finland, Saastopankkien Keskus-osake-pankki (Skopbank), 35 Acres Associates, 12 Acres Associates, and Benefori Oy ["Skopbank Parties"] filed their motion for contempt, preclusion and other sanctions, together with a 102-page brief in support and a three-volume appendix. A list of plaintiffs' grievances against Hyatt for obstructing discovery included: failure to comply with orders of this Court and the Magistrate Judge, failure to fully respond to interrogatories, misleading representations to this Court, improper blocking of third-party subpoenas, improper assertion of attorney-client privilege and refusal to log

177 F.R.D. 336, *337; 1997 U.S. Dist. LEXIS 20591, **2;
38 V.I. 227

documents for which the privilege was asserted, impeding access to electronic data, failure to produce a redaction log, and others.

Central to [**3] this Clarifying Memorandum is the claim that Hyatt waived the privilege by submitting an affidavit from Michael Shindler in response to the Skopbank Parties' motion for summary judgment on Hyatt's counterclaims. [1] The Skopbank Parties claim that Hyatt abused and improperly asserted the attorney-client privilege regarding Mr. Shindler's communications by (1) obtaining a ruling from the Magistrate Judge protecting many of those communications and then (2) submitting a sworn Declaration of Mr. Shindler giving testimony on the very same subjects within the scope of the privilege the Magistrate Judge had just upheld.

> 1  As the transcripts of the various hearings on the Skopbank Parties' motion make clear, including the hearing on November 14, 1997, and the Telephone Conference, the November 21st Order had nothing to do with the Magistrate Judge's rulings on the attorney-client privilege issue or any appeal therefrom the Skopbank Parties may have filed.

**The Court's Sua Sponte Motion to Hyatt to Show Cause**

[**4] Useful background to the November 21st Order is also plaintiffs' claim that Hyatt had failed to comply with the Court's order of January 28, 1997, to produce an accounting document in lieu of an equitable accounting.

> While the Skopbank Parties are not entitled to an equitable accounting, they are entitled to have Hyatt prepare and produce such a 'document' accounting for all the benefits it received while wrongfully in possession of the hotel, after March of 1995, including the management fee, chain allocation expenses, etc. . . . The Court recognizes that this requirement exceeds what is encompassed by discovery in civil litigation. The equities of this case justify such an extension.

*Government Guarantee Fund v. Hyatt Corp.*, 35 V.I. 356, 955 F. Supp. 441, 467 (D.V.I. 1997) [erroneously identified by Westlaw as an opinion of the Territorial

Court "(Terr.V.I.)"].

On April 4, 1997, the Court granted partial summary judgment in favor of the Skopbank Parties and dismissed Hyatt's breach of contract counterclaims. *Government Guarantee Fund v. Hyatt Corp.*, 36 V.I. 295, 960 F. Supp. 931 (D.V.I. 1997). Claiming that it was dumbfounded that the Court could find the [**5] relevant provisions of the March 1990 Agreements among the parties to be clear and unambiguous, Hyatt moved to amend its answer and counterclaim based on the "new information" imparted by the Court's rulings. After a hearing at which it expressed from the bench its opinion of Hyatt's motion, this Court entered its written findings:

> Hyatt seeks to amend its counterclaim to assert additional claims of reformation of the Management Agreement and Subordination Agreement, fraud and a claim under the Racketeer Influenced and Corrupt Organizations Act ["RICO"]. Hyatt also seeks to add affirmative defenses of mutual mistake, unilateral mistake with knowledge, fraud, recoupment and offset. In its memorandum in support of its motion to amend, Hyatt alleged that it was not until this Court's opinion dated April 4, 1997 granting the Skopbank Parties' motion for partial summary judgment on Hyatt's counterclaim for breach of contract, that the parties to the Management Agreement "realized that their understanding of the Management Agreement was apparently [*338] mistaken ...." (Mot. Hyatt Corp. Leave of Court to File Amended Answer and Counterclaim ["Motion to Amend"] at 2.) That assertion is absurd.

[**6] *Government Guarantee Fund v. Hyatt Corp.*, 1997 U.S. Dist. LEXIS 9798, No. CIV. 1995-49, 1997 WL 449952 at *1 (D.V.I. June 19, 1997) [erroneously identified by Westlaw as an opinion of the Territorial Court "(Terr.V.I.)"].

The Court summarily rejected Hyatt's mutual mistake theory.

The issue of the meaning and effect of the relevant sections of the Management Agreement and the Subordination Agreement was hotly contested, fully litigated and ultimately resolved by this Court on April 4, 1997. Hyatt's reformation count is nothing more than conjuring up a new theory based upon the same set of facts that have been before the Court and known to Hyatt over the course of two years of litigation. This Court clearly stated in its April 4, 1997 opinion: "The Court finds that the March 1990 Agreements are unambiguous and simply do not support Hyatt's interpretation." 960 F. Supp. at 944. Hyatt simply cannot now allege a mutual mistake theory after having failed to persuade the Court of its interpretation of the agreements which would support that theory.

*Id.* at *1-2.

The Court similarly spurned Hyatt's new

rendition of its fraud allegation. Hyatt asserts that it "did not become aware [**7] of its fraud claim until discovery and investigation revealed that Skopbank had no intention of ever recognizing or honoring the Mangement Agreement or Hyatt's rights to manage the Hotel upon a foreclosure or subsequent sale to a third party." (Motion to Amend, at 2.) However, Hyatt asserted these same allegations in its opposition to Skopbank's motion for partial summary judgment on Hyatt's breach of contract counterclaims under the theory that Skopbank had breached a duty of good faith and fair dealing. Hyatt is simply using these same facts to infer that Skopbank engaged in some sort of fraudulent conduct. The Court has already decided that the conduct does not amount to any breach of a duty of good faith and fair dealing, a fortiori it could not support Hyatt's "new" theory of fraud or any RICO claim.

*Id.* at *2 (internal citation omitted).

In summarily denying Hyatt's motion to amend the pleadings yet again, the Court made its frustration with Hyatt's delaying tactics crystal clear:

> This Court agrees with the characterization by the Skopbank Parties of Hyatt's repeated attempts at amending its pleadings.
>
>> Hyatt arrogantly treats each Hearing before the [**8] Court as if it were nothing more than a dress-rehearsal for the next and each Adjudication by the Court in thorough, detailed and obviously time-consuming Opinions and Orders as if it was nothing more than a preliminary draft proposed by the Court for Hyatt's review and comments, or the brief of another litigant, to be analyzed and somehow distinguished.

*Id.* at *2-3. Since it appeared to the Court that Hyatt's latest motion was filed "simply to unreasonably and vexatiously hinder and delay these proceedings in violation of 28 U.S.C. § 1927," it was

> ORDERED that Hyatt shall include in its July 15, 1997 response to the Skopbank Parties' Motion for Contempt and Sanctions its explanation for why its motion to amend its counterclaim and answer does not warrant sanctions.

*Id.* at *4.

In addition to the Court's April 4th Opinion, its June 19th decision ruling on the Skopbank Parties' motion for partial summary judgement is important background for the ruling in the November 21st Order being clarified here. It was in opposition to this motion of plaintiffs' that Hyatt submitted Mr. Shindler's sworn Declaration, which

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 16 of 67

177 F.R.D. 336, *338; 1997 U.S. Dist. LEXIS 20591, **8;
38 V.I. 227

the Court **considered and rejected** [**9] in *Government Guarantee Fund v. Hyatt Corp.,* 36 V.I. 295, 960 F. Supp. 931.

Hyatt submitted several affidavits from Hyatt and Great Cruz principals involved with the hotel who stated their understanding that no payments would be due to Skopbank [*339] until after the renovation program was completed. (See, e.g. . . . Declaration of Michael Shindler at 5 . . . .) The Court . . . notes that none of these principals have alleged that the provisions of the March 1990 Agreements are ambiguous. The Hyatt affidavits rather put forth a particular interpretation of those provisions. The Court finds the March 1990 Agreements to be unambiguous and that Hyatt's proffered interpretation is not supported by the plain language of the March 1990 Agreements.

960 F. Supp. at 944 n.15. The Court thus held "that the March 1990 Agreements are unambiguous and simply do not support Hyatt's interpretation." *Id.* at 944.

**Plaintiffs' Motion to Strike Defenses and Objections**

The November 21st Order ruled on the Skopbank Parties' motion to strike affirmative defenses and Hyatt's objections to interrogatories relating to the affirmative defenses. Hyatt's very broad and encompassing objections were parroted [**10] by reference into every answer, whether or not it was appropriate. Hyatt interposed blanket objections to every interrogatory despite the fact that only four weeks remained for discovery.

**The Hawaii Litigation**

While Hyatt was failing to comply with this Court's order to produce an accounting document, filing frivolous motions to amend the pleadings, and otherwise engaged in stonewalling legitimate requests of the Skopbank Parties for discovery, Hyatt fought discovery on another front. The Skopbank Parties in June of this year sought discovery of pleadings, documents, depositions and exhibits produced in *Grand Wailea Co. v. Hyatt,* Civil No. 95-00350-HG (D. Haw.), an action pending in the United States District Court for the District of Hawaii. A common issue in *Grand Wailea* and this case related to claims that rebates, commissions, or "kickbacks" (Hearing of November 14, 1997, Transcript ["Tr."] at 16) to Hyatt from vendors who supplied goods and services to hotels under its management, including the St. John

hotel.

Hyatt objected to this discovery based on a stipulated confidentiality agreement it had negotiated with the parties involved in *Grand Wailea.* In August, [**11] the Magistrate Judge largely upheld the objections, allowing only limited access to the highly relevant documents. The Skopbank Parties appeal of the Magistrate Judge's action was also under consideration at the time of the November 14th hearing, the Telephone Conference, and the court's November 21st Order.

**THE FINDINGS**

The Court held several hearing on various aspects of the Skopbank Parties's motion and the Court's sua sponte show cause order and both parties briefed the issues in their usual exhaustive and exhausting manner. At a hearing held October 15, 1997, the attorney-client privilege issue regarding the Shindler and Geoga documents was fully aired. It was at the next hearing on November 14, 1997, that the Court found the conduct of both Hyatt and its then-trial counsel [2] demonstrated an overall, pervasive pattern of stonewalling the legitimate discovery efforts of the Skopbank Parties and otherwise delaying and obstructing the orderly process of this litigation.

> 2 At that time, Hyatt was represented by the firm of Bickel & Brewer. This firm has since moved to withdraw as counsel, having been replaced by the law firm of Philips, Lytle, Hitchcock, Blaine & Huber.

[**12] The Court specifically found that Hyatt's failure to comply with this Court's January 28, 1997, Order requiring it to produce an accounting document (in lieu of an equitable accounting) was sanctionable, if not contumacious (November 14th Tr. at 76-77); its conduct formed an integral part of the overall pattern of delay and obstruction. Hyatt attempted to justify its submission of nothing more than an outline of its cash receipts as complying with an oral modification of the written and published order during a telephone on February 5, 1997, concerning discovery matters conducted jointly with the Magistrate Judge. A review of the transcript of that telephone call gives no support to Hyatt's make-weight argument. There is no way that Hyatt and its then-counsel could have contended in good faith that this document [*340] satisfied this Court's order to produce an accounting for all the benefits Hyatt received while it

177 F.R.D. 336, *340; 1997 U.S. Dist. LEXIS 20591, **12;
38 V.I. 227

wrongfully remained in possession of the St. John Hotel during the eighteen months between March 1995 and September 1996. [3]

> 3    The form and extent of any sanction for the failure to comply with the January 28, 1997, Order requiring an accounting document was deferred for an assessment of the 'document' Hyatt has since produced through its new counsel. (November 14th Tr. at 74-77.)

[**13] Regarding the Court's sua sponte order, Hyatt and its former counsel, as well as its present trial counsel, were given more than ample opportunity to brief, argue and show cause why the Court should not impose sanctions for their conduct in filing the motion to amend the answer and counterclaim after the Court had ruled that the factual basis asserted by Hyatt could not have rendered the March 1990 Agreements ambiguous or the Skopbank Parties' conduct fraudulent. Since Hyatt and it attorneys utterly failed to justify their actions, this Court found that Hyatt's motion to amend required the imposition of monetary [4] and non-monetary sanctions. (November 14th Tr. at 66.) This motion was but part and parcel of Hyatt's bad faith in the conduct of this litigation.

> 4    The Court ruled that the imposition of monetary sanctions would be deferred until after the trial, presently scheduled for March 2, 1998. (November 14th Tr. at 66-67.)

Regarding Hyatt's delay in answering the interrogatories relating to the affirmative [**14] defenses, this Court found that the Skopbank Parties were prejudiced by the numerous objections and spareseness of the answers. As a sanction, Hyatt was limited to answers it had given, unless Hyatt could show that the information was not available (November 14th Tr. at 92-96). Further, several affirmative defenses were struck. This second point is particularly relevant because Hyatt had interposed several affirmative defenses which were directly contrary to and inconsistent with this Court's prior rulings on matters of law. Much as with Hyatt's motion to amend the pleadings, for which sanctions would be imposed, these defenses never should have been filed, and, at the very least, should have been withdrawn. (Telephone Conference Tr. at 42-43.) These tactics were part and parcel of Hyatt's sanctionable conduct in this case.

The Court also dealt with Hyatt's use of a

confidentiality agreement it had negotiated to thwart the Skopbank Parties' discovery of material produced in the Hawaii litigation. At the hearing on November 14, 1997, the Court heard extensive argument on this appeal from the Magistrate Judge. Plaintiffs first sought this information on rebates and commissions by subpoenas [**15] for documents from Hyatt and its affiliates in February of 1996. (Telephone Conference Tr. at 26.) The documents had not been produced, even though some should have been as part of the accounting document the Court ordered Hyatt to produce on January 28, 1997. (Id. at 30-31.) The Magistrate Judge ordered limited production of redacted documents in the *Grand Wailea* case, but concluded that he did not have jurisdiction to modify a confidentiality order entered by the Hawaii District Court, and the Skopbank Partis appealed. Hyatt's present counsel denied that it was Hyatt's unilateral right to waive the Hawaii protective order, even though prior counsel had done so for two Hawaii depositions. (November 14th Tr. at 46, 53.)

Following a series of communications with the Magistrate Judge in Hawaii who had approved the confidentiality agreement, this Court ordered Hyatt to produce that discovery it had control over and not to oppose the Skopbank Parties' intervention in the Hawaiian district court to gain access to material not produced by the other litigants. (November 21st Order at 2-4.) A reading of the *Grand Wailea* protective order discloses that Hyatt reserved the right [**16] in Section 4.1(2) of its attorney to consent to the outside dissemination of the protected material it had produced. (Telephone Conference Tr. at 11.) This was obviously the basis upon which prior counsel had consented to the distribution of the two protected depositions. It was also obvious, giving present Hyatt counsel the benefit of the doubt, that he had not read the protective agreement. (Id. at 26-27.) This episode is but one more example of [*341] Hyatt's stonewalling attitude towards discovery.

As stated by the Court during the Telephone Conference, "I think we've run out of time for anybody, either side, to play games with this kind of discovery." (Telephone Conference at 25.) The Court further stated that

> the parties should be clear that not necessarily the basis for the Court's ruling in these two respects on the appeal, but the scope and the extent of the Court's order is

affected by . . . the Court's finding that there has been . . . less than a forthcoming history on the part of Hyatt in producing discovery, as I think I made clear last week from the bench.

(*Id.* at 28.)

## THE BASIS FOR THE COURT'S ORDER

On November 20, 1997, this Court conducted [**17] a nearly 2-hour telephone conference during which it dealt with numerous topics, including the form that the non-monetary sanctions would take. Other elements of the sanction are outlined in the written November 21st Order. These show that the Court ordered the production of the privileged documents both based upon settled law and as a sanction for Hyatt's bad faith in all the matters discussed above.

First, this Court indicated that the question whether the attorney-client privilege had been waived on the Shindler and Geoga Documents would be considered separately.

> The Court: . . . Let me just again itemize what I think - and correct me if I've missed something - but what was left pending . . . when we last got together were the form of any sanctions for the two violations that I found having to do with discovery and with regard to the Order, the Court's sua sponte [motion], as we call it. And the appeal from the Magistrate Judge's order.
>
> The question of whether or not Hyatt has waived the privilege with regard to Mr. Shindler, I think it was . . . [interruption by appearance of new counsel].

(Telephone Conference Tr. at 5.)

Further, the Court stated during [**18] the Telephone Conference that the Shindler and Geoga documents could properly be ordered produced both as a matter of settled law and as a sanction. "The Court: Well, I have concluded that as a part of the sanction, as well as just based on the law, that the motion [to compel the production of the documents] should be granted." (*Id.* at 45.) The relevant portion of the November 21st Order is

reproduced on the second page of this memorandum.

## Hyatt Waived the Attorney-Client Privilege

On January 27, 1997, the Skopbank Parties filed a motion for partial summary judgment on Hyatt's counterclaims. On February 28, 1997, Hyatt served its reply supported by sworn affidavits. One of these affidavits was that of Michael Shindler, Senior Vice President of Hyatt Development Corporation ["Shindler Declaration"]. Michael Shindler, along with Douglas Geoga, President of Hyatt, had been attorneys before taking management positions with Hyatt. [5] Mr. Shindler originally had been designated as Hyatt's Rule 30(b)(6) witness, but was later withdrawn. Mr. Geoga testified in depositions that Mr. Shindler made key decisions in the Skopbank relationship after consulting with Mr. Geoga. (Deposition [**19] of Douglas Geoga, February 19, 1997, at 43-45.)

> [5] Hyatt's outside counsel so stated in a letter to the Skopbank Parties' counsel.
>
> > While it is true that Mr. Shindler is an attorney, his title and responsibilities within Hyatt Corporation have changed since you and he began having discussions in 1991. Today, Mr. Shindler is a Senior Vice President of Hyatt Development Corporation and he is the business person responsible for this hotel.
>
> Letter dated March 10, 1995, from Thomas B. Smith of Maguire, Voorhis & Wells, P.A., Orlando, Florida.

By using the Declaration of Michael C. Shindler to support its opposition to the Skopbank Parties' motion for partial summary judgment, Hyatt waived the privilege as to Mr. Shindler's communications relating to the subject matter of the declaration. Hyatt cannot use an officer and active player in it's relationship with the Skopbank Parties [*342] to put forth facts supporting its opposition and then deny access to his letters and other communications with him on these [**20] same subjects because he is an attorney. Hyatt cannot use the privilege to shield from discovery those matters related to the subjects dealt with in its affidavit.

[HN1]The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that: (a) the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.

*Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 537 (3d Cir. 1996)(citing Restatement of the Law Governing Lawyers § 130(1)(Final Draft No. 1, 1996)).

The Shindler Declaration ranged far and struck at the heart of the conflict between the parties. Mr. Shindler described himself as one of the representatives of Hyatt in the negotiation, drafting and finalizing of the March 1990 Agreements. Declaration at P4. The declaration described his "(and, therefore, Hyatt's)" (*id.* at P9) understandings about: the meanings and effect of certain provisions of the agreements, the right to declare defaults (*id.* at PP 8-9), and the relationship between Hyatt, Skopbank and Great Cruz (the owner of the Hotel at the time of drafting the [**21] agreements)(*id.* at PP 8-12). The Declaration indicated that its author was "involved in and had responsibility for a number of issues which arose in connection with the relationship among" the parties. (*Id.* at P 7.) These "issues" included retention of funds by the hotel (*id.* at PP 17-23); the provision of services and utilities to the accompanying Villas (*id.* at PP24-28); the original owner's (Great Cruz) failure to approve the renovation program (*id.* at P29), Great Cruz' breach of the management agreement (*id.* at P30), the repudiation of the Guaranty (*Id.* at PP 31-32), and this District Court's orders to release funds in the foreclosure action (*id.* at PP 33-35).

As with the plaintiff's assertion in *Livingstone* that she did not understand her agreement's implications, here, Hyatt asserted its understanding of the implications of its agreements with the Skopbank Parties based on Shindler's interpretations. And just as "it would be unfair to allow [Mrs. Livingstone] to make [her claim of inaccurate legal advice] without permitting the opposing parties to investigate her attorney's version of the facts," *id.* at 537, so it would be unfair to [**22] allow Hyatt to use the testimony of one of its officers to counter the Skopbank Parties' claims and then not allow plaintiffs to investigate that officer's contemporaneous and subsequent communications. As authority, the Court of Appeals cites *United States v. Bilzerian*, 926 F.2d 1285,

1292 (2d Cir.), *cert.* denied, 502 U.S. 813, 116 L. Ed. 2d 39, 112 S. Ct. 63 (1991), which held that [HN2]in asserting claims that "in fairness requires examination of protected communications" that party thereby waives the attorney-client privilege over the otherwise protected communications.

As a related basis for the waiver, the Court of Appeals has held that [HN3]"the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Rhone-Poulenc Rorer Inc. v. Home Indemnity Company*, 32 F.3d 851, 863 (3d Cir. 1994)(citing *North River Insurance Co. v. Philadelphia Reinsurance Corporation*, 797 F. Supp. 363, 370 (D.N.J. 1992).

Whether based on prejudicial unfairness to the opposing party in making a claim that can only be countered through waiver of the privilege, or based [**23] on the disclosure and use of attorney client communications, Hyatt waived the privilege on those matters covered in the Shindler Declaration. Mr. Shindler's Declaration was wide-ranging. Primarily, it offered his and Hyatt's understanding and belief regarding the interpretation of the March 1990 agreements, and Hyatt's compliance therewith, which form the basis of this action. It also offered testimony of his decisions how to use the "excess cash" at the St. John Hotel, the payment of base debt, and the payment of Owner's Remittances.

It is in this Court's power to deem all communications relating to Mr. Shindler's declaration to be discoverable. *See Multiform Dessicants, Inc. v. Stanhope Products* [*343] Co., 930 F. Supp. 45, 48 (W.D.N.Y. 1996)("by submitting the declarations of the . . . attorney . . . the plaintiffs had voluntarily waived the attorney-client privilege with respect to all communications relating to the subject matter of the declarations.")(emphasis added)(citing *Mushroom Assocs. v. Monterey Mushrooms, Inc.*, 1992 U.S. Dist. LEXIS 20640 (N.D. Cal. Aug. 21, 1992).

The Court of Appeals has set similar precedent. In *Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d [**24] Cir. 1995), the Court dealt with the scope of waiver in which petitioners submitted an opinion letter of the law firm acting for the Glenmede Trust.

177 F.R.D. 336, *343; 1997 U.S. Dist. LEXIS 20591, **24;
38 V.I. 227

There is an inherent risk in permitting the party asserting a defense of its reliance on advice of counsel to define the parameters of the waiver of the attorney-client privilege as to that advice. That party should not be permitted to define selectively the subject matter of the advice of counsel on which it relied in order to limit the scope of waiver of the attorney-client privilege and therefore the scope of discovery. To do so would undermine the very purpose behind the exception to the attorney-client privilege at issue here - fairness.

*Id.* at 486.

The Court of Appeals upheld the District Court insomuch as it determined that the petitioner "waived the attorney-client privilege as to **all** communication, both written and oral, to or from counsel as to the **entire** transaction." *Id.* (emphasis added).

## Hyatts' Continued Assertion of the Attorney-Client Privilege Is Part of Its Obstructive and Sanctionable Conduct

The alternative basis for ordering the production of these documents is as part of the [**25] non-monetary sanctions imposed on Hyatt for its pervasive obstruction of discovery in this litigation and of the orderly processes of this Court.

A representative sampling of the many instances of Hyatt's obstructive conduct during the course of this litigation has been highlighted in this Clarifying Memorandum. This sampling shows the pervasiveness of Hyatt's overall strategy to erect a stone wall to block the Skopbank Parties' entitlement to discover the facts of this dispute, conduct which far exceeded Hyatt's right to

confine it opponents' requests to appropriate materials and subjects. The Court finds that Hyatt's attempt to use the attorney-client privilege as both a shield and a sword is part and parcel of its overall scheme to stonewall discovery and obstruct the processes of this Court. Just as the the use of privilege was part of conduct which the Court has found to be sanctionable, just so the release of these documents from that privilege is an appropriate non-monetary sanction.

Hyatt sought and received protection of certain documents based on attorney-client privilege and then used a declaration of the attorney whose bar membership created that privilege in an attempt [**26] to convince this Court to deny plaintiffs' motion for partial summary judgment. This tactic of playing games with discovery was sanctionable. Since Hyatt chose to use Mr. Shindler as a sword in its opposition to partial summary judgment, it cannot also use the privilege of Mr. Shindler as a shield to prevent discovery of matters related to his declaration.

## CONCLUSION

Based upon established precedent confirming that Hyatt waived the attorney-client privilege, and as a sanction for its stonewalling and obstructing the discovery process of this litigation, this Court has ordered that Hyatt produce to the Skopbank parties, *inter alia,* all documents of Mr. Shindler and his boss, Mr. Geoga. Work product relating to the litigation at bar is excluded, but communications with outside counsel are included.

**ENTERED this 19th day of December, 1997.**

**For the Court**

**Thomas K. Moore**

    **Chief Judge**

LEXSEE 2006 US DIST LEXIS 90394

**OTIS MCCREE, Plaintiff, -vs- ALLEGHENY COUNTY, Defendant.**

**Civil Action No. 05-1591**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 90394*

**December 14, 2006, Decided**
**December 14, 2006, Filed**

**COUNSEL:** [*1] For OTIS MCCREE, Plaintiff: Gianni Floro, LEAD ATTORNEY, Pittsburgh, PA.

For ALLEGHENY COUNTY, Defendant: J. Deron Gabriel, LEAD ATTORNEY, Allegheny County Law Department, Pittsburgh, PA.

**JUDGES:** Donetta W. Ambrose, Chief U. S. District Judge.

**OPINION BY:** Donetta W. Ambrose

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff Otis McCree ("McCree") was incarcerated as an unconvicted pretrial detainee in the Allegheny County Jail. He contends that, while in jail, he was attacked without provocation by corrections officers. He claims to have suffered economic, physical, psychological and mental damages as a result of the attack. McCree has asserted claims under *42 U.S.C. § 1983* for violations of his rights under the *4th, 5th, 8th* and *14th Amendments to the United States Constitution* as well as claims for violations of the Pennsylvania Constitution.

The parties attended a Case Management Conference on June 1, 2006. *See* Docket No. 9. J. Deron Gabriel attended on behalf of the Defendant Allegheny County ("the County"). A Case Management Order was distributed to counsel at the conclusion of that conference. The Case Management Order scheduled, along with dates [*2] for the amendment of pleadings and the close of discovery, a Settlement Conference for October 30, 2006 at 9:15 a.m. *See* Docket No. 10. Additionally, the attorneys, including Mr. Gabriel, were electronically notified of the Case Management Order which contained the date for the subsequent Settlement Conference. [1] Nevertheless, Mr. Gabriel did not attend the Settlement Conference. Every effort was made to reach him and have him participate by telephone. Mr. Gabriel contends that he "did not receive any written notice or email concerning the post-discovery conference and was at a doctor's appointment on the morning in question...." *See* Docket No. 21, p. 2. I reject this contention. As stated above, Mr. Gabriel received a hard copy of the Case Management Order on June 1, 2006 which contained notice of the "post-discovery conference" *and* he received email notification of the same.

> 1  This can be verified by clicking on the "silver ball" next to Docket No. 10, then reading the electronic mailing header. A call to the Allegheny County Law department confirmed that Mr. Gabriel's email address was correct.

[*3] The Settlement Conference was conducted in Mr. Gabriel's absence. As McCree's counsel expressed no interest in filing a dispositive motion, this Court issued a Pretrial Order setting forth a trial date of March 5, 2007 and scheduling dates for the filing of pretrial statements, of points for charge, of voir dire, of motions in limine and of responses to motions in limine. *See* Docket No. 12. A few weeks later, the County filed a Motion for Summary Judgment. *See* Docket No. 13.

McCree has filed a Motion for Sanctions and to Strike Defendant's Motion for Summary Judgment. *See* Docket No. 15. McCree offers three bases in support of his Motion. Most easily addressed is McCree's argument that the County's failure to comply with *Local Rule 56.1(B)(1)* mandates that the Motion be stricken. *Local Rule 56.1(B)* provides, in relevant part:

2006 U.S. Dist. LEXIS 90394, *

**(B). Motion Requirements.** The Motion for Summary Judgment must set forth succinctly, but without argument, the specific grounds upon which the judgment is sought and must be accompanied by the following:

> **1. A Concise Statement of Material Facts:** A Separately filed concise statement setting forth the facts essential for the [*4] court to decide the motion for summary judgment, which the moving party contends are **undisputed and material,** including any facts which for purposes of summary judgment only are assumed to be true. The facts set forth in any party's Concise Statement shall be stated in separately numbered paragraphs. A party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact.

*L.R. 56.1(B)(1)* (emphasis in original). The County offers no meaningful defense for its failure to comply with *L.R. 56.1(B)(1)*. Certainly inserting reference to a few facts in the Motion itself hardly constitutes a "separately filed" concise statement of facts. The County's failure to abide by the Local Rule is troubling, especially in light of the County's failure to observe other requirements, such as attending the Settlement Conference and, as set forth below, complying with *Federal Rule 26(a)*. Nevertheless, the failure to file a separate statement of facts does not merit the extreme sanction of striking the Motion for Summary Judgment. Accordingly, the Motion is denied [*5] in this regard.

McCree also argues that the County's failure to produce a log entry from the date of the alleged attack should result in the striking of the Motion. Apparently, the County produced log entries from the days preceding the attack and the days following the attack, but not from the date of the attack itself. There is no explanation

forthcoming from the County as to the missing log entry. I cannot discern whether it was lost, destroyed, never existed, or deliberately withheld. [2] On the other hand, it appears that McCree was invited to inspect the log books himself, but never pursued that option. Nor did McCree ever file a Motion to Compel production of the log entry for the date of the accident. In short, because there is no evidence that the County deliberately withheld the evidence, or indeed even that the evidence exists, the Motion to Strike and Motion for Sanctions is denied in this regard.

> 2  The County states that it "supplemented" its *Rule 26* disclosures on September 19, 2006 and references "Attachment A" - an apparent reference to the log books. *See* Docket No. 21. The County's representation is not helpful, however, as there is no "Attachment A."

[*6] Finally, McCree argues that the County failed to produce its written "Use of Force" Policy ("the Policy") in its initial disclosures under *Rule 26(a)*, or even at any time during discovery. Discovery closed on October 28, 2006. It appears to be undisputed that the County did not produce its Policy until it tendered its Motion on November 17, 2006. Counsel for the County explains that he tendered the Policy as soon as he received it from his client on November 13, 2006 or November 14, 2006. *See* Docket No. 21, p. 2.

This explanation is wholly unsatisfactory. McCree's Complaint clearly put the County on notice that this case is, at its heart, about the alleged use of excessive force. *Rule 26(a)* which governs initial disclosures, requires a party to disclose, *without waiting for a discovery request:*

> (B) a copy of, or a description by category and location of, all documents data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

*Fed. R. Civ. P. 26(a)(1)(B)*. Here, the County's defense [*7] is based at least in part upon the Policy. Indeed, a copy of the Policy is attached to the Motion for Summary Judgment. Thus, *Rule 26(a)* required that the County provide McCree with a copy of the Policy as part of the initial disclosures.

According to the parties' *Rule 26(f)* Report, the *Rule 26(a)* disclosures were to occur no later than July 7, 2006. Obviously, the County did not come close to complying with this requirement, as a copy of the Policy was

2006 U.S. Dist. LEXIS 90394, *

not turned over until late November, well after the close of discovery. Citing to *Rule 37(c)(1)*, McCree asks that the Motion be stricken and that sanctions be imposed. In fact, *Rule 37(c)(1)* provides that:

> A party that without substantial justifi-
> cation fails to disclose information re-
> quired by *Rule 26(a)* or *26(e)(1)* ... is not,
> unless such failure is harmless, permitted
> to use as evidence at trial, at a hearing, or
> on a motion any witness or information
> not so disclosed. In addition to or in lieu
> of this sanction, the court, on motion and
> after affording an opportunity to be heard,
> may impose other appropriate sanctions.
> In addition to requiring payment of rea-
> sonable expenses, including attorney's
> fees, caused by the failure, [*8] these
> sanctions may include any of the actions
> authorized under *Rule 37(b)(2)(A), (B)*
> and *(C)* and may include informing the
> jury of the failure to make the disclosure.

*Rule 37(c)(1)*. I find counsel's explanation that it took approximately nine months from the date of service of a Complaint, which clearly sets forth a claim involving the use of excessive force, to obtain from one's client the Policy, does not constitute "substantial justification" within the meaning of *Rule 37(c)(1)*. As such, I will grant the relief contemplated by *Rule 37(c)* - the County is not permitted to rely upon the Policy in support of its

Motion for Summary Judgment. Again, however, I be-
lieve that the relief McCree seeks is too broad. I have
reviewed the Motion for Summary Judgment. It is not
based exclusively upon the Policy. The County has also
submitted deposition testimony in support of its Motion.
Accordingly, striking the Motion based upon failing to
turn over the Policy would be too harsh a penalty. [3]

> 3    I make no comment at this juncture as to
> whether the evidentiary support which will be
> considered in conjunction with the County's Mo-
> tion will be sufficient to prevail upon its Motion.
> McCree will have to respond to the Motion and
> argue why, based upon the evidence which will
> be considered, the County's argument fails.

[*9]  Consequently, this 14<th> day of December,
2006, after careful consideration and for the reasons set
forth above, it is Ordered that the Motion for Sanctions
and to Strike Defendant's Motion for Summary Judgment
(Docket No. 15) is granted insofar as the Use of Force
Policy is stricken as an Exhibit from the Defendant's
Motion for Summary Judgment and will not be consid-
ered in the disposition of the same. The Motion is denied
in all other respects. Plaintiff is required to respond to the
Motion for Summary Judgment on or before January 3,
2007.

BY THE COURT:

/S/ Donetta W. Ambrose

Chief U. S. District Judge

LEXSEE 2005 US DIST LEXIS 1281



Analysis
As of: Jan 31, 2008

**MEXTEL, INC., et al. Plaintiffs, v. AIR-SHIELDS, INC., et al. Defendants. HILL-ROM MANUFACTURING, INC., et al. Counterclaim Plaintiffs, v. MEXTEL, INC., et al. Counterclaim Defendants.**

**CIVIL ACTION 01-CV-7308**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 1281; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1*

**January 31, 2005, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Mextel, Inc. v. Air-Shields, Inc., 2005 U.S. Dist. LEXIS 8632 (E.D. Pa., Apr. 20, 2005)*

**PRIOR HISTORY:** *Mextel, Inc. v. Air-Shields, Inc., 2004 U.S. Dist. LEXIS 4303 (E.D. Pa., Jan. 29, 2004)*

**DISPOSITION:** Parties' motions for summary judgment granted in part and denied in part.

**COUNSEL:** [*1] For MEXTEL, INC., VEDRAN SKULIC, Plaintiffs: GEORGE PAZUNIAK, OLEH BILYNSKY, V., CONNOLLY BOVE LODGE & HUTZ LLP, WILMINGTON, DE; RODMAN E. HONECKER, TARA JONES HUGHES, WINDELS, MARX, LANE & MITTENDORF, LLP, NEW BRUNSWICK, NJ.

For AIR-SHIELDS, INC., HILLENBRAND INDUSTRIES, INC, HILL-ROM SERVICES, INC., HILL-ROM AIR-SHIELDS, Defendants: A. RICHARD M. BLAIKLOCK, TAMMY J. MEYER, LEWIS & WAGNER, INDIANAPOLIS, IN; ERIK N. VIDELOCK, PEPPER HAMILTON, L.L.P., PHILADELPHIA, PA; KATHLEEN A. JOHNSON, NATHAN W. DEAN, PHILIP H. LEBOWITZ, PEPPER HAMILTON, L.L.P., PHILA., PA.

For HILL-ROM COMPANY, Defendant: HILL-ROM COMPANY, dz; A. RICHARD M. BLAIKLOCK, TAMMY J. MEYER, LEWIS & WAGNER,

INDIANAPOLIS, IN; ERIK N. VIDELOCK, PEPPER HAMILTON, L.L.P., PHILADELPHIA, PA; KATHLEEN A. JOHNSON, NATHAN W. DEAN, PHILIP H. LEBOWITZ, PEPPER HAMILTON, L.L.P., PHILA. PA.

**JUDGES:** Legrome D. Davis, J.

**OPINION BY:** Legrome D. Davis

**OPINION**

**MEMORANDUM AND ORDER**

Presently before the Court are Plaintiffs' Motion for Partial Summary Judgment In Favor of Plaintiffs' Contract Claims and Dismissal of Defendants' Contract Counterclaims (Doc. No. 64), filed on April 14, 2004, and all responses and supplemental briefs [*2] thereto; Plaintiffs' Second Motion for Partial Summary Judgment With Respect to the Dismissal of Patent Defenses and Counterclaims (Doc. No. 66), filed on April 14, 2004, and all responses and supplemental briefs thereto; Defendant's Motion for Summary Judgment on Plaintiffs' Amended Complaint and Count IX of Defendants' Counterclaim (Doc. No. 74), filed on April 14, 2004, and all responses and supplemental briefs thereto; Defendants' Motion to Strike Portions of Plaintiffs' Opening Brief in Support of Their First Motion for Partial Summary Judgment, First Declaration of Vedran Skulic, First Declaration of Novela Skulic, and Plaintiffs' Statement of Undisputed Material Facts in Support of Their First Mo-

tion for Partial Summary Judgment (Doc. No. 82), filed on May 6, 2004, and all responses and supplemental briefs thereto; and Defendants' Motion to Strike Portions of the Affidavit of Oleh V. Bilynsky, Third Declaration of Vedran Skulic, and Declaration of Harry Gugnani (Doc. No. 87), filed on May 19, 2004, and all responses and supplemental briefs thereto.

### I. Factual and Procedural History

The genesis of this litigation stems from an arrangement between the parties for the [*3] development and supply of component medical devices. Defendant Air Shields, Inc., the successor in interest to defendant Hill-Rom Manufacturing Inc. ("Hill-Rom"), [1] a holding company that provides products and services for the health care industry, and plaintiff Mextel, Inc. ("Mextel"), an Illinois-based designer and manufacturer of electronic assemblies, entered into a "Development and Supply Agreement" on December 7, 1996. The Development and Supply Agreement was made retroactive to October 1995. It was supplemented with an "Addendum to the OEM Supply Agreement of October 1, 1995," which the parties executed on February 20, 1997, and by an "Amendment to the Development and Supply Agreement," which the parties executed on December 16, 1997. (See Addendum and Amendment, attached as Ex. 2 and 3 to Pl. App.). Collectively, these three documents shall be referred to as the "Agreement."

> 1 Throughout the opinion, this Court refers to Hill-Rom, and its successors, including Air-Shields, collectively as "Hill-Rom."

### [*4] A. The Agreement

The Agreement required Mextel to design, manufacture, and supply an electronic controller for use in the Hill-Rom's Isoletee, model C2HS infant incubator (the "C2000 incubator"). The C2000 incubator is a neonatal incubator, which, as defined by federal regulation, is a "device consisting of a rigid boxlike enclosure in which in an infant may be kept in a controlled environment for medical care . . . ." See *21 C.F.R. § 880.5400*. The C2000 is used for critically ill newborn premature babies. (See March 28, 1998 Summary of Findings, at FDA00246). The standard model of the C2000 consists of a hood/shell assembly, a heater, a controller, a sensor module, two skin temperature probes, an air temperature probe, and an air flow probe. (Id.). The electronic controller in the C2000 incubator is the "brain" of the device, controlling the incubator's operations and ensuring that the heating, humidity, and oxygen systems operate effectively and according to programmed specifications. (Id.; see Pl. Mot. For SJ., at 2).

Pursuant to the Agreement, Mextel was required to comply with specific design, manufacturing, supply, and [*5] regulatory obligations. First, with respect to design obligations, Mextel was required, *inter alia*, to design the product in accordance with performance specifications prescribed by the Agreement; to provide validation of the product design to enable Hill-Rom to obtain FDA marketing clearance for the infant incubators; and to use its "best efforts" to design and provide validation of the product. (See Agreement, at P 2.1(a); P 2.1(b); P 2.4(a)). Second, with respect to manufacturing obligations, Mextel was required to manufacture the controller in accordance both with manufacturing and quality assurance specifications prescribed by the Agreement and with good manufacturing practices ("GMPs") under the *United States Food, Drug, and Cosmetic Act of 1938* (the "Act") and its attending regulations. (Id., at P 6.1(a)-(b)). Third, with respect to supply obligations, Mextel was required, prior to shipment, to examine all controllers in accordance with the quality assurance procedures prescribed by the Agreement and to provide a written confirmation that the products conformed to product design specifications; to submit to quality assurance audits, as prescribed by the Agreement; [*6] to maintain all manufacturing records, including lot histories and device master records; and to provide copies of these records to Hill-Rom quarterly for all products manufactured in that quarter. (Id., at PP 9.3, 9.4, 8.2). Finally, with respect to regulatory obligations, Mextel agreed to provide Hill-Rom "with any assistance reasonably required" in connection with the generation and development of data necessary to obtain FDA approval to market the incubator. (Id., at P 11.2).

In exchange for Mextel's development and supply of the controllers, Hill-Rom agreed to use Mextel as its exclusive supplier. (See Agreement, at P 6.2). As such, Hill-Rom contracted to purchase a minimum of 8000 controllers throughout the life of the Agreement. (See Addendum to Agreement, at P 2). The Agreement established an arrangement by which Hill-Rom would submit purchase orders to Mextel for the supply of the controllers. (Id., at P 9.7). Purchase orders were required to be placed at least fourteen weeks prior to the requested date of the shipment. (Id., at P 9.9). Hill-Rom was required to pay Mextel within forty days from the date of shipment of the controllers. (Id., at [*7] P 9.6). Hill-Rom also agreed to compensate Mextel for services associated with the development of the controller, including a nonrecurring engineering charge and reasonable out-of-pocket travel expenses in connection with services performed under the Agreement. (Id., at P 2.2).

To ensure the exclusivity of the arrangement, Hill-Rom extended several representations and warranties to

Page 3

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Mextel. (Id., at P 15.1). In P 15.1(c), Hill-Rom represented and warrantied that it:

> is not currently a party to any agreement or undertaking, oral or written, that would, in any manner be inconsistent with the rights herein granted to MEXTEL to design, develop and SUPPLY a PRODUCT and shall not enter into any such agreement or understanding, oral or written, during the term of the Agreement, nor, during the term of this Agreement, directly or indirectly, engage in any activity that would, in any manner, be inconsistent with the right herein granted to MEXTEL to design, develop and SUPPLY a PRODUCT, except as specifically authorized herein.

(Id., at P 15.1(c)).

### 1. Recalls

The Agreement contained a provision expressly allocating liability for costs in the event of a "recall" [*8] of Hill-Rom's products using the controller. This provision stated that:

> In the event of a recall of any Air-Shields products that use PRODUCT [the controller] supplied by MEXTEL hereunder, when it is determined that such an event is caused by PRODUCT malfunction and not by specification or requirement change, MEXTEL shell [sic] repair or replace all such PRODUCTS. Whether it is claimed that PRODUCT is causing such an event or not, AIR-SHIELDS will indemnify, defend, and hold MEXTEL, its current directors, officers, employees, and agents harmless from and against any and all claims, liability, product and warranty liability, loss, damages, costs, or expenses.

(See Agreement, at P 10.2). The Agreement did not define the term "recall."

### 2. Duration and Termination

The duration of the Agreement was for four years, with automatic renewal "for successive one (1) year term [sic] unless sooner terminated . . . ." (See id., at P 16). Although not expressly referenced in the duration clause,

the Agreement provided, in a separate section marked "Termination," several ways for both Hill-Rom and Mextel to end its existence. (Id., at PP 18, 19).

Pursuant [*9] to P 18.1 and P 19.1, both parties enjoyed the right to terminate the Agreement upon the occurrence of certain enumerated events after providing sixty days written notice. (Id., at P 18.1, 19.1). One of these enumerated events included the noticed party's failure to meet "any of its material obligations under the Agreement." (Id., at P 18.1(c), 19.1(c)). Nonetheless, the noticed party retained a right to cure its default within sixty days after receipt of notice; and, if able to do so, the Agreement was to remain in effect. (Id.).

The Agreement also provided an additional mechanism by which Hill-Rom could terminate it:

> AIR-SHIELDS shall have the right to terminate the agreement at any time after giving sixty (60) days' written notice to MEXTEL if AIR-SHIELDS shall, in its sole discretion, determine either that the PRODUCTS are obsolete or that the infant incubators or infant radiant warmers into which such PRODUCTS are incorporated are obsolete.

(Id., at P 18.2). This mechanism was exclusively reserved for Hill-Rom, and, in contrast to P 18.1, did not trigger a right by Mextel to cure.

### 3. Applicable Law

The parties agreed that Pennsylvania law [*10] would apply to all disputes arising from the Agreement. (Id., at P 27). The parties further consented to the exercise of personal jurisdiction by the federal and state courts of Pennsylvania. (Id.).

### B. Design and Supply of the Sensor Module

In addition to designing, manufacturing, and supplying the controller, Mextel also designed and supplied to Hill-Rom a sensor module for use in the C2000 incubator. The sensor module was the subject of *United States Patent 5, 957,830* ('830 patent), which was issued to plaintiff Vedran Skulic ("Skulic"), the founder and president of Mextel (collectively "plaintiffs"), on September 8, 1999. (See *'830* Patent, attached as Ex. B to Second Skulic Declaration). [2] The function of the sensor module was to measure the temperature, humidity, and oxygen inside the incubator, and then to feed the relevant data to the controller. (See Pl. Mot. For SJ., at 2).

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 27 of 67

Page 4

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

2 The *'830* patent is one of two patents at issue in this litigation. The other patent, *US Patent 5,707,006* (the "'006 patent"), was issued to Skulic on January 13, 1998. (See *'006* Patent, attached as Ex. A to Second Skulic Declaration). The *'006* patent covers a removable heater assembly for an infant incubator. (Id.).

[*11] The design and supply of the sensor module was not covered by the Agreement, which, according to its terms, applied only to the "electronic controller." (See Agreement, at P 1.17). Instead, the sensor module was shipped pursuant to an informal arrangement between the parties, whereby Hill-Rom would issue purchase orders for controllers and/or sensor modules and Mextel would fill the purchase orders. (See Pl. Br. In Opp'n. to Def. Mot. For SJ., at 12; see also December 1, 1999 letter placing production hold on controllers and sensor modules, attached as Ex. 16 to Pl. Mot. For SJ.). Mextel supplied the sensor modules during the time when the Agreement was in existence. (See Purchase Orders, attached as Ex. 15 to Pl. Mot. For SJ.).

### C. The Relationship

Between 1996 and December 1999, Mextel designed and shipped controllers and sensor modules to Hill-Rom for use in the C2000 incubator. In order to understand the collapse of this arrangement, and to frame the issues concerning liability and damages in the pending motions, it is necessary to provide: (i) a genealogical discussion of the regulatory requirements applicable to manufacturers of finished medical devices [*12] throughout the course of the parties' relationship; and (ii) a chronological recitation of the major events, correspondence, and regulatory problems associated with the C2000 incubator during the course of the parties' arrangement.

### 1. Regulatory Requirements

The FDA initially issued market clearance for the C2000 incubator in July 1996. (See July 1996 Marketing Clearance letter, attached as Ex. 8 to Pl. Mot. For SJ.). The letter reiterated that, to maintain the right to market the C2000 incubator, Hill-Rom needed to comply with GMPs pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), *21 U.S.C. § 301 et seq.*, and that failure to comply with these practices could result in FDA action. (Id.).

The FDCA authorizes the FDA to promulgate regulations "requiring that the methods used in, and the facilities and controls used for the manufacture, pre-production design validation (including a process to access the performance of a device but not including an evaluation of the safety or effectiveness of a device), packing, storage, and installation of a device conform to

current good manufacturing practice . . . to assure that the device will [*13] be safe and effective and otherwise in compliance with this chapter." *21 U.S.C. § 360j(f)(1)(A) (West 2005)*. In 1976, the FDA promulgated a series of good manufacturing practice regulations, known as GMPs, that preemptively require manufacturers to build quality into their devices, rather than [to] permit a defective device to be distributed and used to treat patients." *United States v. 789 Cases of Latex Surgeons' Gloves, 799 F. Supp. 1275, 1285 (D.P.R. 1992)*. These regulations apply to manufactures of finished medical devices. See *21 C.F.R. § 820.1(a)*. Manufacturers of medical device components, on the other hand, are exempt. Id. ("This regulation is not intended to apply to manufacturers of components or parts of finished devices, but such manufacturers are encouraged to use appropriate provisions of this regulation as guidelines.").

By 1996, the year in which the Agreement was signed, GMPs had been promulgated in the following areas connected with the manufacture of medical devices: organization and personnel; buildings; equipment; control of components; production and process controls; packaging [*14] and labeling control; holding, distribution, and installation; device evaluation; and records. See 21 C.F.R. Part 820. With respect to records, GMPs required (and continue to require) manufacturers to maintain product records during the design and expected life of the device. *21 C.F.R. §§ 820.180-198 (1996)*. Manufacturers were (and continue to be) required to keep the following: (i) a device master record ("DMR"), which includes device specifications, production process specifications, quality assurance procedures, and packing and labeling; (ii) a device history record ("DHR"), which ensures that the device was manufactured in accordance with the device master record by including the dates of manufacture, the quantity manufactured, the quantity released for distribution, and any control number used; and (iii) complaint files. Id.

On October 7, 1996, the FDA published the Quality System ("QS") regulation in the Federal Register. See Medical Devices; Current CGMP (CGMP) Final Rule; Quality System Regulation, 61 Fed. Reg. 52,602, 52,654 (Oct. 7, 1996) (to be codified at 21 C.F.R. pt 820). The QS regulation redefined GMPs, creating stricter standards for manufacturers [*15] of finished medical devices. Id. Although published in October 1996, the QS regulation did not take effect until June 1, 1997. Id. The QS regulation remains in effect today.

As part of the QS regulation, the FDA made verification and validation requirements part of GMPs. The QS regulation defines validation as "establishing by objective evidence that device specifications conform with user needs and intended use(s)." *21 CFR § 820.3(z)*.

Page 5

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Verification is defined as "confirmation by examination and provision of objective evidence that specified requirements have been fulfilled." Id. § 820.3(aa).

The QS regulation implements verification and validation requirements through specific forms of controls, including design, production and process, and document controls. First, with respect to design controls, the QS regulation requires manufacturers of medical devices to maintain procedures for verifying the device design, which must conform to designated output meets design input requirements, and for validating the device design, which must be performed on initial production units and which must ensure that devices confirm to designed user needs and intended uses. Id. § 820.30(a)-(j) [*16] . The results of the design verification and validation must be documented. Id. § 820.30(f)-(g). Furthermore, a design history file ("DHF") must be established and maintained to demonstrate "that the design was developed in accordance with the approved design plan." Id. § 820.30(j).

Second, with respect to production and process controls, the QS regulation requires manufacturers to validate the production process with a high degree of assurance to ensure that a device confirms to its specifications, when such a process cannot be fully verified by subsequent inspections and tests. Id. § 820.75. The validation activities and results must also be documented. Id.

Third, the QS regulation imposes additional document controls and quality system controls, including the maintenance of a quality system record to document executive responsibility for, and commitment to, quality. Id. §§ 820.20, 820.40, 820.186.

## 2. Chronology of Events

Hill-Rom started placing orders for controllers from Mextel in 1996. (See First Declaration of Vedran Skulic, at P 2). For each controller, Mextel kept "Certificates of Conformance" to certify that the product was [*17] manufactured in accordance with the specifications in the purchase order and tested according to the design specifications prescribed by the Agreement. (Id., at P 23; see also Sample Certificates of Conformance, attached as Ex. 22 to Pl. Mot. For SJ.). Nonetheless, regulatory concerns with the controller started to arise almost immediately.

In the summer of 1996, Hill-Rom started to request from Mextel documentation concerning the controller that was necessary for the C2000 incubator to comply with GMPs. On July 10, 1996, September 3, 1996, September 5, 1996, September 24, 1996, and October 11, 1996, Hill-Rom sent facsimile transmissions to Mextel demanding the immediate production of DMR documentation, DHR documentation, and verification and validation information for the controller and sensor module, and identifying the information necessary to satisfy the

DMR and DHR requirements. (See Letters requested documentation, attached as Ex. 4B at Def. Mot. For SJ.). On November 5, 1996, plaintiff Skulic and a representative from Hill-Rom signed a certification statement indicating that complete DMR documentation had been developed for several models of the controllers, and [*18] that, although currently in an untidy and informal form, Mextel would deliver "complete" and "formalized" documentation by December 31, 1996. (See November 5, 1996 Certification, attached as Ex. 3A to Def. Mot. For SJ.).

In February 21, 1997, Hill-Rom again wrote to Mextel concerning the "lack of product device master record documentation" and an "unacceptable level of change controls existing between our respective firms." (See February 21, 1997 letter, attached as Ex. 4B to Def. Mot. For SJ.). The February 21, 1997 correspondence further asserted that "device master record documentation is past due and urgently requested." (Id.). On September 3, 1997, Hill-Rom sent a letter to Mextel concerning outstanding quality problems with the controller, including the lack of complete DMR documentation, and suggested that Hill-Rom was not "in a good position to withstand regulatory audit scrutiny by FDA" due to these problems. (See September 3, 1997 letter, attached as Ex. 4C to Def Mot. For SJ.). Indeed, the letter demanded that a complete DMR was to be provided to Hill-Rom and continuously maintained at both Mextel's and Hill-Rom's facilities. (Id.). Perhaps in response [*19] to these requests, on November 10, 1997, Skulic signed a letter on behalf of Mextel stating that Mextel "will fully cooperate with Air-Shields in an effort to implement QSR [QS] requirements." (See November 10, 1997 Letter, attached as Ex. 12A to Def. Mot. In Opp'n.).

In March 1998, an independent research organization, CriTech Research Inc. ("CriTech"), performed an on-site evaluation of Mextel's software verification and validation methodology, equipment, and records. (See CriTech Research Software Verification and Validation Assessment Report, attached as Ex. 28 to Pl. Mot. For SJ.). The final report indicated that Mextel was able to produce "a software source code." (Id.). However, the report concluded that components of the "Design History File" were missing and that "no documented evidence of Software Verification and Validation, nor of the expected work products of software development, was found during CriTech's on site assessment." (Id.). Indeed, as a result of the lack of documentation, CriTech issued a proposal on April 6, 1998, which was then later reissued on November 10, 1999, to Hill-Rom to "develop a Design History File for the Mextel controller integrated [*20] into the . . . Air Shields Isolette." (See CriTech Proposal, attached as Ex. 30 to Pl. Br. In Opp'n.).

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 29 of 67

Page 6

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

In January and February 1998, the FDA started to actively monitor the regulatory compliance of the C2000 incubator, making unannounced inspections of Hill-Rom's facility in Hatboro, Pennsylvania (the "Hatboro facility"), where the C2000 incubator was manufactured. (See Certified FDA documents, attached as Ex. 14 to Def. Br. In Opp'n.). On March 26, 1998, the FDA issued a "Form FDA 483" to Hill-Rom, listing observations of problems with the C2000 incubator, including a lack of software validation data, an incomplete DMR from the vendor of the controller and sensor module, and incomplete device history records for the C2000 incubator. (See March 26, 1998 Letter, attached as Ex. 14 to Def. Br. In Opp'n., at FDA 00286-291). Hill-Rom met with the FDA to discuss these findings. (See Utterback Aff., attached as Ex. 3 to Def. Mot. For SJ., at P 3).

In response to this letter and meetings with the FDA, Hill-Rom issued an "Urgent Medical Device Notice/Recall" for the incubator on May 18, 1998, citing temperature fluctuations, humidity departures from set points, and air flow [*21] probe failures as the causes of the notice. (See May 18, 1999 Urgent Medical Device Notice/Recall, attached as Ex. 12 to Pl. Mot. For SJ.). This notice was issued in conjunction with and at the recommendation of the FDA. (See October 3, 2001 Memorandum Summarizing Recall, attached as Ex. 14 to Def. Br. In Oppn., at FDA 00293-00294). An FDA memorandum indicated that the reason for the May 18, 1998 notice was the C2000 incubator's "potential for causing serious injuries or deaths," specifying that the "unresolved problems were with regard to the controller and the humidity module." (Id., at 00294). The memorandum further identified overheating problems with the controller and humidity module, which increased the possibility that an infant in the C2000 could "dry out and experience respiratory distress." (Id., at 00295).

On June 18, 1998, Skulic sent Hill-Rom a letter contesting an accusation that Mextel was failing to help Hill-Rom fulfill FDA requirements. (See June 18, 1998 Letter, attached as Ex. 29 to Pl. Br. In Opp'n.). The letter stated that Mextel was available and willing to offer assistance in responding to FDA issues. (Id.).

On June 25, 1998, the FDA [*22] issued a "Warning Letter" to Hill-Rom. (See June 25, 1998 Warning Letter, attached as Ex. 21 to Pl. Mot. For SJ.). The warning letter found that "the C2000 devices are adulterated within the meaning of Section 501(h) of the FD&C Act in that methods used in, or facilities or controls used for, their manufacturing, packing, storage, or installation are not in conformance with the good manufacturing (CGMP) regulations" of the FDCA. (Id., at E22258). The warning letter provided a non-exhaustive list of twenty-four violations, including, inter alia, a failure to include information regarding component specifications in the DMR for the controller, the failure to include the primary history label and labeling for each product unit in the DHR, and the failure to assure that production processes for the controller conform to its specifications. (Id.). The warning letter noted that the controllers were associated with a 15% failure rate at incoming inspection and that the FDA's inspection "revealed significant deviations" from the GMPs. (Id., at E22259).

Immediately after the June 25, 1998 warning letter, Hill-Rom sent a letter to Mextel demanding rectification of several [*23] FDA observations related to the controller. (See June 30, 1998 letter, attached as Ex. 4D to Def. Mot. For SJ.). The June 30, 1998 letter stated that the "recall was largely driven by the lack of verification and validation of the controller software and the unacceptably high fallout rate during incoming inspection and test." (Id.). It also noted that Hill-Rom still had not received DMR materials, and that, if these materials were not provided, Hill-Rom would ask the FDA to directly inspect the DMR materials for the controller at Mextel's facility. (Id.).

In September 1998, Hill-Rom exercised its right under P 9.4 of the Agreement and conducted a quality audit of Mextel's facility to ensure compliance with quality assurance protocols. The Hill-Rom used the regulations promulgated by the FDA as the gauge to determine compliance. (See 1998 Quality Audit Report, attached as Ex. 4E to Def. Mot. For SJ.). The quality audit in September 1998 resulted in an overall survey score of 58.7%, and a conditional certification level grade for Mextel. (Id.).

On October 7 and 8, 1998, representatives from both Hill-Rom and Mextel with the agenda of "problem solving," which included [*24] discussions of the in-coming inspection failures of the controllers and sensor modules. (See Itinerary of October 7 and 8, 1998 Meeting, attached as Ex. 13 to Pl. Mot. For SJ.).

The FDA conducted another unannounced inspection of Hill-Rom's Hatboro facility in February 1999. Following this inspection, the FDA issued a second 483 letter to Hill-Rom on February 19, 1999. (See February 19, 1999 letter, attached as Ex. 14 to Def. Br. In Opp'n., at FDA00230-00285). The February 19, 1999 letter listed fourteen observations of problems with the C2000 incubator, including, inter alia, that "design verification did not confirm that the design output meets the design input requirements through software verification," that "actions needed to correct and prevent recurrence of nonconforming product and quality problems in regards to the control module are incomplete," and that "the DHR does not include or refer to the location of acceptance records which demonstrate the device is manufactured in accordance with the DMR." (See id.).

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 30 of 67

Page 7

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

In April 1999, Hill-Rom conducted a second quality audit of Mextel's manufacturing facility to determine compliance with GMPs. (See April 1999 [*25] Supplier Survey Results, attached as Ex. 4F To Def. Mot. For SJ.). Again, Hill-Rom used the QS regulations as the template to determine quality audit compliance. The audit produced an overall survey score of 34%, with a designated certification level of "unacceptable." (Id.). As a result of the low score, Hill-Rom demanded the submission of improvement plans to Hill-Rom's development team within thirty days of receipt of the survey. (Id.).

After the quality audit, Hill-Rom sent Mextel an April 27, 1999 letter, in which Hill-Rom referenced the poor certification level, listed many alleged deficiencies in Mextel's methodology and performance as a supplier of medical components, and threatened to terminate the Agreement if Mextel did not take "appropriate action." (See April 27, 1999 letter, attached as Ex. 4G to Def. Mot. For SJ.).

In October and November 1999, the FDA again conducted a series of inspections at Hill-Rom's Hatboro facility. On November 30, 1999, the FDA sent Hill-Rom a third 483 letter. (See November 30, 1999 Letter, attached as Ex. 14 to Def. Br. In Opp'n., at FDA00179-00181). The letter emphasized failures with respect to Hill-Rom's procedures for [*26] handling complaints associated with the C2000 incubator. (Id.). Complaints concerning the sensor module and controller were documented and reviewed by the FDA. (See Summary of Findings for November 30, 1999 Report, EIR Addendum, attached as Ex. 14 to Def. Br. In Opp'n., at 00178).

**D. Termination**

In February 1998, Hill-Rom contemplated the possibility of exiting the contractual arrangement with Mextel through a buy-out of Hill-Rom's remaining obligations. (See Estimate of Buyout, attached as Ex. 25 to Pl. Br. In Opp'n.). In July 13, 1998, Hill-Rom accepted a detailed quotation from Comtec Systems, Inc. ("Comtec") "for the development of a replacement controller" for the C2000 incubator. (See July 13, 1998 Letter, attached as Ex. 27 to Pl. Br. In Opp'n). Hill-Rom also accepted a proposal from Battelle to conduct a design and development program for the re-design of the controller. (See Battelle Proposal, attached as Ex. 26 to Pl. Br. In Opp'n.).

Despite accepting quotations and proposals from new suppliers for the development of a replacement controller, Hill-Rom continued to place purchase orders for sensor modules and controllers through November 1999. [*27] (See Purchase Orders, attached as Ex. 14 to Pl. Mot. For SJ.). On December 16, 1999, however, Hill-Rom notified Mextel that it was placing a production

hold on all sensors and controllers, with the exception of spares. (See December 16, 1999 Letter (dated December 1, 1999), attached as Ex. 16 to Pl. Mot. For SJ.; see Skulic's First Declaration, at P 10). Shortly thereafter, Skulic asserts that he notified Hill-Rom that it would not ship any more products until outstanding invoices were paid. (See Skluic's First Declaration, at P 10). Then, on December 28, 1999, Hill-Rom sent Mextel another letter purporting to terminate the Agreement, citing PP 18.1 and 18.2 as the justification for this right to terminate. (See December 28, 1999 Letter, attached as Ex. 17 to Pl. Mot. For SJ.). The December 28, 1999 letter declared that this termination was effective immediately. (Id.).

After purporting to terminate the Agreement, Hill-Rom met with the FDA in January 2000. (See Johnson Aff., attached as Ex. 3 to Def. Mot. In Opp'n., at P 5-6). Hill-Rom issued a revised recall letter for the C2000 incubator on January 5, 2000, based in part on an overheating issue with the [*28] controller. (See October 3, 2001 FDA Memorandum, attached as Ex. 14A to Def. Br. In Opp'n., at FDA00292-FDA00295). Hill-Rom then replaced Mextel's controller with a replacement controller for every C2000 incubator. (See Johnson Aff., at P 8). Hill-Rom also replaced Mextel's sensor module with a new sensor module. After the completion of this process, Hill-Rom started to sell a new version of the C2000 incubator ("new C2000 incubator"), without the Mextel products, on the market.

**E. Litigation**

On December 28, 2001, plaintiffs filed a complaint, which was later amended on April 26, 2002. The amended complaint alleged eleven counts against Hill-Rom: breach of contract (Count I); quantum meruit (Count II); unjust enrichment (Count III); breach of implied covenant of good faith and fear dealing (Count IV); fraud and deceit (Count V); patent infringement (Count VI); misappropriation of trade secrets (Count VII); trade dress infringement (Count VIII); common law unfair competition (Count IX); one count against fictitious individuals incorporating the substance of each prior claim (Count X); and one count against fictitious corporations incorporating the substance of each prior [*29] claim (Count XI). On November 8, 2002, the Court dismissed Counts V, X, and XI for failure to state a claim, and dismissed Counts I-IV on behalf of Skulic. (Doc. No. 20).

The Court issued a scheduling order on October 17, 2002 requiring fact discovery to conclude by March 31, 2003. (Doc. No. 19). On March 10, 2003, the Court amended this order, extending the end date for factual discovery until June 30, 2003 and for expert discovery until September 31, 2003. (Doc. No. 22). On May 9, 2003, the Court amended the scheduling order for a second time, extending the deadline for fact discovery until

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

August 29, 2003 and for expert discovery until November 30, 2003. (Doc. No. 24). On August 4, 2003, after plaintiffs' representation that neither party deposed any witnesses, the Court issued a third amended scheduling order, requiring all fact discovery to end by December 27, 2003 and all expert discovery to conclude by April 14, 2004. (Doc. No. 28), including the submission of expert witness reports.

Subsequent to the issuance of the third amended scheduling order, Hill-Rom filed three motions to compel discovery responses and plaintiffs filed one motion. (Doc. No. 29, 30, 37). On December 19, 2004, the [*30] Court advised the parties to resolve their discovery disputes privately. (Doc. 38). The Court further extended the deadline to file specific motions to compel on particular discovery issues to January 15, 2004 and February 2, 2004, in the event the parties failed to privately resolve their discovery disputes. (Id.). Neither party filed a motion to extend the discovery deadlines or a motion to amend the August 4, 2003 scheduling order during this period.

The parties were unable to work out their discovery disputes, and Hill-Rom filed a motion to compel on January 15, 2004 (Doc. No. 39). Pursuant to its January 29, 2004 Order, the Court granted Hill-Rom's motion to compel and required plaintiffs to produce a copy of the electronic source code for the controller. On February 2, 2004, the Court again extended its deadline, from February 2, 2004 until February 27, 2004, for plaintiffs to file a motion to compel (Doc. No. 49) the production of allegedly privileged documents. On March 30, 2004, the Court resolved the plaintiffs' motion to compel in favor of Hill-Rom. (Doc. No. 59). Because none of the parties requested additional time for fact or expert discovery, the March 30, 2004 order [*31] enforced the existing August 4, 2003 scheduling order, officially closed the discovery period for fact and expert discovery, and demanded the filing of dispositive motions by April 14, 2004. (Id.).

On April 14, 2004, both sides filed summary judgment motions. (Doc. No. 63-74). This was followed by an array of briefs in opposition, reply briefs, statements of disputed and undisputed material facts, and motions to strike.

## II. Discussion

### A. Motions to Strike

It is well-established that "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995)*; see also *Pamintuan v. Nanticoke Mem. Hosp.,192 F.3d 378, 388 (3d Cir. 1999)*; *Fed. R. Civ. P. 56(e)* (requiring affidavits in support of summary judgment motion to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to show affirmatively that the affiant is competent to testify to such matters). Both parties challenge the admissibility of affidavits and documents attached to their opponents' [*32] motions.

### 1. Plaintiffs' Objections

Plaintiffs argue that the affidavits of Susan Reilly ("Reilly Affidavit"), James Utterback ("Utterback Affidavit"), and Otho Boone ("Boone Affidavit"), and the documents attached to the Utterback and Boone Affidavits, constitute inadmissible evidence that may not be relied upon to resolve Hill Rom's motion for summary judgment. (See Pl. Br. In Opp'n., at 5-8).

#### a. The documents attached to the Boone Affidavit and Utterback Affidavit are admissible.

Plaintiffs seek to strike the documents attached to the Boone and Utterback Affidavits because the documents are unauthenticated and because the letters do not constitute business records within the hearsay exception. (Id., at 7). [3] The Court rejects plaintiffs' motion.

> 3    The documents attached to the Utterback Affidavit are attached as Exhibits A-C to the Boone Affidavit.

The documents attached to the Boone Affidavit are admissible. Mr. Boone is the custodian of domestic records of regularly conducted activity [*33] for Hill-Rom and its predecessors, including Air-Shields. (See Boone Aff., attached as Ex. 4 to Def. Mot. For SJ., at P 2). Boone provides testimony to authenticate the documents-that they were made by a person with knowledge at or near the time of the occurrences of the matters set forth in the letters; that they were kept in the course of regularly conducted business activity as part of a regular business practice; and that they were made in the course of a regularly conducted business practice. See *Fed. R. Ev. 902(11)*. Furthermore, to the extent that Hill-Rom seeks to introduce these documents for their truth-value, these authenticated documents meet the business records exception to the hearsay rule. See *Fed. R. Ev. 803(6)* (custodian may establish admissibility of records of regularly conducted business activities). Finally, plaintiffs cite no caselaw to support their position that letters kept in the course of regularly conducted activity fail to constitute a "memorandum, report, record, or data compilation" within the meaning of *Federal Rule of Evidence 803(6)* [*34] .

#### b. The Utterback Affidavit is admissible.

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Plaintiffs seek to strike the Utterback Affidavit on the basis that Mr. Utterback lacks personal knowledge of the testimony in his affidavit and on the basis that his testimony puts in issue communications relating to the FDA that were previously withheld by Hill-Rom on the basis of the attorney-client and work-product privilege. (See Pl. Br. In Opp'n., at 6-7). The Court rejects plaintiffs' motion.

The Utterback Affidavit is admissible. First, the Utterback Affidavit does not put in issue privileged communications between Mr. Utterback and his client to which plaintiffs were previously denied access during discovery, such as communications embodying Mr. Utterback's direction of Hill-Rom's response to FDA investigations. Instead, the Utterback Affidavit refers to, and provides documents concerning, communications between Hill-Rom and the FDA, communications to which the attorney-client privilege does not attach. (See Utterback Aff., attached as Ex. 3 to Pl. Mot. For SJ., at P 2-4); see *42 Pa. Cons. Stat. Ann. § 5928* (attorney-client privilege protects confidential communications between attorney [*35] and client). These documents were turned over in the course of discovery, rather than withheld through Hill-Rom's discovery logs. (See Def. Response to Mot to Compel, at 23-24) ("Hill-Rom has not withheld documents provided to the FDA").

Furthermore, the Court finds that Mr. Utterback, as in-house counsel for Hill-Rom, has knowledge of the factual averments in his affidavit. *Fed. R. Civ. P. 56(e)* (requiring affiant to set forth facts made on personal knowledge). Plaintiffs cite one lone example--Mr. Utterback's reference to the December 31, 1996 certificate statement in which Mextel promised to deliver formal DMR documentation--to support its contention that "Utterback's affidavit is largely not based on personal knowledge." (See Pl. Mot. In Opp'n., at 6). In contrast to plaintiffs' argument, Mr. Utterback does not testify to the circumstances behind the signing of the certificate statement, which occurred prior to his employment at Hill-Rom; but, instead, merely references the existence of the certificate statement in his discussion of Mextel's alleged failure to deliver pertinent DMR information to Hill-Rom both before and after the [*36] commencement of FDA investigations. (See Utterback Affidavit, at P 3c). More importantly, assuming *arguendo* that Mr. Utterback's reference to the December 31, 1996 letter should be stricken, plaintiffs' general contention of lack of personal knowledge, without specific examples, fails as a matter of law to render inadmissible the remaining testimony in the Utterback Affidavit. See Wright, Miller & Kane, 10B Federal Practice & Procedure § 2738, at 377 (3d ed. 1998) ("It follows that a motion to strike should specify the objectionable portions of the affidavit and the grounds for each objections. A motion asserting only a general challenge to an affidavit will be ineffective.").

### c. The Reilly Affidavit is inadmissible.

Plaintiffs seek to exclude the affidavit of Susan C. Reilly, an expert in the field of regulatory compliance for the medical device and diagnostic industry, on the basis of Hill Rom's violation of discovery deadlines. (See Pl. Br. In Opp'n., at 5). The Court agrees.

Ms. Reilly was not designated as an expert witness prior to the close of expert discovery. Nor did Ms. Reilly file an expert report prior to the close of expert discovery. Hill-Rom's [*37] untimely introduction of Ms. Reilly's testimony in affidavit form at the summary judgment stage therefore violates the Court's August 4, 2003 scheduling order. (Doc. No. 28). Accordingly, after weighing the relevant factors, particularly the prejudice to plaintiffs, this Court finds that an appropriate sanction pursuant to *Federal Rule of Civil Procedure 37(b)(2)(B)* is to bar Ms. Reilly's testimony at trial, thereby making her affidavit inadmissible for purposes of Hill Rom's summary judgment motion. See, e.g., *Oliver v. Ingber, 1998 U.S. Dist. LEXIS 2799, 1998 WL 107299, at *2 (E.D. Pa. March 9, 1998)* (excluding expert testimony at trial for failure to meet pre-trial deadline for exchange of expert witness information because defendant would have been prejudiced by allowance of expert testimony); *Perkasie Ind. Corp. v. Advance Transformer, Inc., 143 F.R.D. 73, 77 (E.D. Pa. 1992)* (excluding expert testimony for failure to comply with pre-trial scheduling order).

### d. Conclusion

This Court finds the Utterback Affidavit, the Boone Affidavit, and the documents attached to these affidavits admissible as a matter of law. However, [*38] the Court grants plaintiffs' motion to strike the Reilly Affidavit.

### B. Summary Judgment Motions

Plaintiffs and Hill-Rom have filed motions for summary judgment.

### 1. Standard

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986)*. Only facts that may affect the outcome of a case are "material." *Anderson, 477 U.S.*

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 33 of 67

Page 10

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

*242 at 248, 91 L. Ed. 2d 202.* All reasonable inferences from the record are drawn in favor of the non-movant. See *id. at 256.*

The movant has the initial burden of demonstrating the absence of genuine issues of material fact. This "burden . . . may be discharged by 'showing' that there is an absence of evidence [*39] to support the non-moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Once this burden is discharged, the non-movant must then establish the existence of each element on which it bears the burden of proof. See *J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990).* A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. *Anderson, 477 U.S. at 248; Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989); Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995).*

## 2. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment with respect to certain breach of contract claims in Count I of the amended complaint, Hill-Rom's contract counterclaims, and Hill-Rom's patent defenses and counterclaims. (See Pl. Mots. For SJ.). [4]

> 4    This Court addresses plaintiffs' summary judgment argument with respect to dismissing Hill Rom's patent defenses and counterclaims in the context of Hill Rom's summary judgment motion.

## [*40] A. Breach of Contract

Mextel's summary judgment motion alleges that Hill-Rom breached the Agreement in numerous ways. [5] First, Mextel claims that Hill-Rom refused to pay invoices from March 12, 1998 to January 12, 2000 covering controllers and sensor modules shipped to and accepted by Hill-Rom. (See Pl. Mot. For SJ., at 10-12). Second, Mextel claims that Hill-Rom refused to pay for unshipped products after placing purchase orders pursuant to the Agreement. (Id., at 12-13). Third, Mextel contends that Hill-Rom did not purchase the minimum of 8,000 controllers, as required by the Agreement, but, instead, purchased only 5,621 controllers. (Id., at 13-14). [6]

> 5    Mextel notes that it has not moved for summary judgment on all its breach of contract allegations, including damages stemming from Hill-Rom's breach of its obligations to use plaintiff as

the exclusive supplier for replacement controllers, from plaintiff's exclusive controller design and development rights, and from plaintiff's rights to other damages and attorney's fees. (See Pl. Mot. For SJ., at 10 n.2).

> 6    As a threshold question, this Court must first determine what law to apply to the dispute. The Agreement calls for the application of Pennsylvania law. (See Agreement, at P 27). Neither party has expressly determined whether the Pennsylvania Uniform Commercial Code ("UCC") applies to the Agreement. *Article II of the Pennsylvania UCC* applies to transactions involving the sale of goods. See *13 Pa. Cons. Stat. Ann. § 2-102 (Article II* of UCC applicable to "transactions in goods"). Although the Agreement covers the design, development, and manufacture of controllers, as well as the provision of other types of engineering services, its primary purpose is the supply/sale of these controllers to the Hill-Rom. (See Agreement, at P 9). This Court concludes that *Article II of UCC* applies to the parties' breach of contract dispute. See *Advent Systems Ltd. v. Unisys Corp, 925 F.2d 670 (3d Cir. 1991).* This conclusion is further confirmed by the parties, who, in their respective briefs, both rely upon the Pennsylvania UCC as controlling law.

### [*41] i. The sensor module was not covered by the Agreement.

Mextel seeks summary judgment on its breach of contract claim with respect to the contract price both of delivered and of ordered, but undelivered sensor modules. (See Pl. Mot. For SJ., at 10-12). However, Mextel admits in its brief in opposition to Hill-Rom's summary judgment motion that the production and supply of sensor modules are not covered by the Agreement. (See Pl. Br. In Opp'n. to Def. Mot. For SJ., at 12). [7] Nor does Mextel supply alternative oral or written contracts between Mextel and Hill-Rom for the supply of sensor modules. See, e.g., *Rototherm Corp. v. Penn Linen & Unif. Serv., 1998 U.S. Dist. LEXIS 3943, 1998 WL 134222, at *3 (E.D. Pa. March 19, 1998)* (granting summary judgment to defendant for plaintiff's failure to demonstrate the existence of contract between two parties, "an essential element of its claim for breach of contract"). Moreover, the accounting documentation Mextel submits as proof of its production and supply of sensor modules to Hill-Rom only identifies the date of shipping, rather than the type of products supplied to Hill-Rom. (See Ageing Accounts, attached as Ex. 5 and [*42] 7 to Pl. Mot. For SJ.). Without an express written or oral contract for the supply and purchase of sensor modules, Mextel is not entitled to summary judgment on a breach

Page 11

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

of contract theory as to the cost of the shipped or un-shipped sensor modules. See *13 Pa. Cons. Stat. Ann. § 2107(a)* (contract for the sale of goods for the price of $ 500 or more is not enforceable by way of action or defense unless some writing indicating existence of contract for sale between parties and unless signed by party against whom enforcement is sought).

> 7 Specifically, Mextel concedes that the production and supply of sensor modules to Hill-Rom was not covered by the Agreement, asserting instead that the sensor modules would be supplied to Hill-Rom pursuant to an informal arrangement by which Hill-Rom would place purchase orders both for controllers and sensor modules. (See Pl. Br. In Opp'n., at 12-13; see also December 1, 1999 Letter placing "all sensors and controllers" on hold, attached as Ex. 6 to Pl. Mot. For SJ.).

[*43] **ii. Mextel is entitled to summary judgment on liability for Hill Rom's refusal to pay for controllers that it received and accepted; however, Mextel is not entitled to summary judgment for services received by Hill-Rom.**

Mextel also asserts that it is entitled to summary judgment on Hill-Rom's failure to compensate Mextel for controllers shipped to Hill-Rom between March 12, 1998 and January 12, 2000, and for engineering services rendered to Hill-Rom in connection with the design and production of these products. (See Pl. Mot. For SJ., at 10-12). Mextel asserts that the contract price for the delivered products and services was $ 278,385. (Id.). Hill-Rom admits that outstanding invoices exist for certain shipments. However, Hill-Rom challenges the amount of products received and justifies non-payment on the basis that the products were non-conforming at the time of their receipt. (See Def. Br. In Opp'n., at 2-4).

**a. Engineering Services**

To support its claim for the value of engineering services rendered, Mextel relies upon the affidavit of Novela Skulic, an employee of Mextel who managed product orders, shipping, and invoicing between Mextel and Hill-Rom. [*44] (See First Skulic Declaration, at P 2). However, Skulic's affidavit does not identify the type of "services" rendered. (Id. at P 4). Moreover, Mextel has failed to identify under what provision of the Agreement it is entitled to the reasonable value of engineering services. See, e.g., *Omicron Systems, Inc. v. Weiner, 2004 PA Super 389, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)* (breach of contract requires plaintiff to establish existence of contract, breach of duty imposed by contract, and resultant damages). Nor has Mextel provided an invoice detailing when engineering services were rendered, why these services were rendered, and the amount of

these services. Thus, genuine issues of material fact exist as to whether Mextel provided engineering services to Hill-Rom, whether the Agreement covered these services, and the amount of those services.

**b. Controllers**

The shipment of controllers is governed by the Agreement, and, thus, by the Pennsylvania UCC. Under the Pennsylvania UCC, upon delivery of a commercial unit, a buyer may reject the whole, accept the whole, or accept any commercial units and reject the rest. See *13 Pa. Cons. Stat. Ann. § 2-601* [*45] . An acceptance of goods occurs when the buyer either: (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that she will take or retain them in spite of their nonconformity; or (2) fails to make an effective rejection after a reasonable time for inspection. Id. *§ 2-606*. The buyer must pay at the contract rate for any goods accepted. Id. *§ 2-607(a)*.

To make an "effective rejection," a buyer must notify the seller of the non-conforming nature of the goods "within a reasonable time after the delivery or tender of the goods." Id. *§ 2-602(a)-(b)*. The seller must then hold the goods "with reasonable care at the disposition of the seller for a time sufficient to permit the seller to remove them." Id. *§ 2-602((b)*.

**(i) Liability**

The Agreement required Hill-Rom to pay Mextel forty days from the date of shipment of the controllers, thereby setting the date for rejection of delivered controllers at a maximum of forty days. (See Agreement, at P 9.6). It is indisputable that Hill-Rom immediately rejected a number of incoming controllers for poor quality and then returned these products to Mextel [*46] to cure their defects. (See Wenstrup Aff., attached as Ex. 1 to Def. Br., at P 8); (Ferrante Aff., attached as Ex. 6 to Def. Mot. For SJ., at P 5); (Drinkwater Aff., attached as Ex. 4 to Def. Br., at P 4) ("When Mextel products would arrive, they would be tested to determine if they worked correctly. If they did not, they would be returned to Mextel. As a general rule, when that occurred, Mextel was very uncooperative with Hill-Rom's efforts to get the problems corrected and the controller timely returned"). It is also indisputable that Hill-Rom "accepted" a number of Mextel's controllers by taking steps inconsistent with Mextel's ownership--Hill-Rom incorporated these controllers in the C2000 incubator, sold the C2000 incubator, and then failed to pay Mextel within forty days from the date of shipment (See Novela Skulic Declaration, at PP 3-5). See *Comfort Springs Corp. v. Allancraft Furniture Shop, 165 Pa. Super. 303, 67 A.2d 818, 820 (Pa. Super. Ct. 1949)* (holding that "buyer's rights to reject goods must be exercised promptly and unequivocally and that complaint as to qualify [sic] while exercising domin-

ion over the goods is not rejection"); *Foell Packing Co. v. Harris, 127 Pa. Super. 494, 193 A. 152 (Pa. Super. Ct. 1937)* [*47] (resale of product constitutes act inconsistent with seller's ownership). Nor has Hill-Rom provided documentation to indicate that it effectively rejected those controllers that passed Hill-Rom's initial inspection test; [8] indeed, although Hill-Rom constantly notified Mextel of its general inability to demonstrate and document that the controller was manufactured in accordance with GMPs, Hill-Rom never notified Mextel in writing of particular defects with particular installments, nor offered to return allegedly defective controllers to Mextel. [9] See *13 Pa. Cons. Stat. Ann. § 2-602*; see *Julian C. Cohen Salvage Corp. v. Eastern Elec. Sales Co., 205 Pa. Super. 26, 206 A.2d 331, 334 (Pa. Super. Ct. 1965)* (buyer of 36,440 pounds of defective cable accepted cable when it failed to give written notice of rejection and never offered or attempted to return cable from warehouse). Accordingly, regardless of whether those controllers that passed the initial inspection test were nonconforming at the time of delivery, Hill-Rom "accepted" those controllers within the meaning of *section 2-606 of the Pennsylvania UCC*. Mextel is therefore entitled to summary judgment on its [*48] breach of contract claim for those controllers that Hill-Rom received and accepted, but for which Hill-Rom never paid.

> 8  In fact, as plaintiff points out, Hill-Rom's December 28, 1999 termination letter never suggested that the controllers received by Hill-Rom were non-conforming. (See December 28, 1999 Termination Letter).

> 9  Hill-Rom's arguments to the contrary are not persuasive. Hill-Rom argues that Mextel's controllers were not manufactured in accordance with GMPs, that Hill-Rom returned controllers because they did not pass initial inspections, and that the FDA "suggested" that Hill-Rom terminate its contract with Mextel in 1999 Hill-Rom claims that these acts, some initiated by Hill-Rom and some initiated by third parties, constitute a sufficient "rejection" of non-conforming controllers. (Def. Mot. For SJ., at 2-4). With respect to controllers received by Hill-Rom, this Court disagrees. Hill-Rom continued to place orders for controllers until December 1999, continued to use those controllers that passed the initial screening test in the C2000 incubator, and never indicated nor expressed in writing an intent to reject allegedly defective controllers that it received from Mextel. See *13 Pa. Cons. Stat. Ann. § 2-602*.

[*49] **(ii) Damages**

Under the Pennsylvania UCC, "the buyer must pay at the contract rate for any goods accepted." See *13 Pa. Cons. Stat. Ann. § 2-607(a)*. However, several genuine issues of material fact exist as to the amount of damages.

Mextel has not provided the original purchase orders or supplemental documentation indicating how many controllers Hill-Rom ordered and accepted. Instead, Mextel provides accounting information in the form of "ageing detail reports" of accounts receivable, which identify the date of the invoice and the amount owed for the invoice. (See Ageing Detail Reports, attached as Ex. 5 and 7 To Pl. Mot. For SJ.). This accounting information does not specify what types of goods were delivered, let alone whether the invoices were for the shipment of controllers. (Id.). Nor does the accounting information identify what goods Hill-Rom accepted, what goods Hill-Rom rejected through the initial screening test, and what products were immediately rejected and then cured, if at all, by Mextel. (Id.; see February 17, 1998 letter from Hill-Rom to Mextel discussing the return of a defective controller, attached as Ex. 40 to Pl. Mot. In Opp'n.). Accordingly, [*50] a genuine issue of material fact exists as to the number of controllers that were delivered to Hill-Rom and that were accepted within the meaning of *section 2-615 of the Pennsylvania UCC*.

By implication, a genuine issue of material fact also exists as to the actual amount owed for those controllers shipped to and accepted by Hill-Rom. Mextel provides invoices, along with the affidavit of Mextel's shipping and invoicing personnel, concluding that the total value of the unpaid invoices from March 12, 1998 until January 12, 2000 is $ 278,384.95. (See Novella Skulic Aff., at P 4). Hill-Rom, however, has provided an affidavit from Mextel's manager of finance, Doreen Tierney, who states that the Hill-Rom's accounting department only retains a record of $ 106,664 in outstanding invoices. (See Tierney Aff., attached as Ex. 9 to Def. Br. In Opp'n. to Pl Mot. For SJ.). Accordingly, there is a genuine issue of material fact as to the total value of the unpaid controllers received by Hill-Rom.

**iii. Hill-Rom properly terminated the Agreement pursuant to P 18.2, and, therefore, Hill-Rom is entitled to summary judgment on Mextel's breach of contract claim for obligations that were executory [*51] at the time of Hill-Rom's termination of the Agreement.**

Mextel also claims that it is entitled to summary judgment with respect to two obligations that were outstanding when Hill-Rom first placed a "production hold" on ordered controllers on December 16, 1999 and then purported to terminate the Agreement on December 28, 1999. (See Pl. Mot. For SJ., at 12-13). First, Mextel asserts that Hill-Rom was required to pay for manufac-

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

tured, but undelivered, controllers. (Id.). Second, Mextel asserts that Hill-Rom was required to purchase the minimum aggregate number of 8000 controllers over the course of the Agreement. [10] (See Addendum to Agreement, at P1). According to this logic, because Hill-Rom wrongfully repudiated its Agreement obligations by placing a production hold on all purchase orders and by impermissibly terminating the Agreement, Mextel is entitled to summary judgment on its contract claim for ordered but unshipped controllers and for unordered controllers. (Id.). [11]

> 10   The February 20, 1997 Addendum to the Agreement states that Hill-Rom shall purchase a minimum of two thousand controllers per year during the term of the Agreement. (See Addendum, attached as Ex. 2 to Pl. Mot. For SJ., at P 2). Mextel contends that Hill-Rom only purchased 5,621 controllers and that, even if justified in terminating the contract, Hill-Rom was bound to purchase the remaining 2,379 controllers.(See Novela Skulic Declaration, at P 6).

[*52]

> 11   Under the Pennsylvania UCC, an anticipatory repudiation of a performance not yet due permits the aggrieved party to resort to any remedy for the breach and to either suspend her own performance or to identify goods to the contract. *13 Pa. Cons. Stat. Ann. § 2-610*. The measure of damages for the buyer's repudiation is the difference between the market price at the time of tender and the unpaid contract price and incidental damages, minus expenses saved in consequence of the breach. Id. *§ 2-708(a)*.

Hill-Rom admits that it continued to place orders for controllers throughout the fall of 1999. (See Drinkwater Aff., attached as Ex. 4 to Def. Mot. For SJ., at P 6). Hill-Rom also admits that it did not purchase the minimum number of controllers contemplated by the Agreement. (See Def. Br. In Opp'n. To Pl. Mot. For SJ., at 10; Tierney Aff., attached as Ex. 9 to Def. Br. In Opp'n., at P 3). However, Hill-Rom rejects Mextel's characterization of the December 16, 1999 letter [12] placing a "production hold" on ordered controllers and the December 28, 1999 letter terminating the Agreement [*53] as an anticipatory repudiation of the Agreement. Instead, Hill-Rom asserts that Mextel's breach of contract claim with respect both to the unshipped controllers under the suspended purchase orders and to the unordered controllers must fail for any of three reasons: (i) Hill-Rom properly terminated the Agreement prior to the receipt of these products; (ii) Hill-Rom properly cancelled the Agreement pursuant to *section 2-612 of the Pennsylvania UCC*; and/or (iii) continued performance of the Agreement in December 1999 was impracticable.

> 12   The letter placing a "production hold" on ordered controllers is dated December 1, 1999, but, according to Skulic's First Declaration, was not issued by Hill-Rom until December 16, 1999. (See Skulic First Declaration, at P 10).

The resolution of Mextel's summary judgment motion hinges on the characterization of Hill-Rom's December 1999 correspondence with Mextel either as an anticipatory repudiation of the Agreement or as a proper termination. [13] If no genuine issue of [*54] material fact exists that Hill-Rom improperly repudiated its performance, then Mextel is entitled to the difference between the market price at the time of tender, on one hand, and the unpaid contract price and incidental damages, on the other hand, minus expenses saved in consequence of the breach. See *13 Pa. Cons. Stat. Ann. §§ 2-608(a), 2-610*. However, if Hill-Rom was correct in terminating the Agreement, or if continued performance under the Agreement was impracticable, then Hill-Rom's executory obligations under the Agreement were discharged, and Mextel is not entitled to summary judgment on its contract claims for the unshipped and unordered controllers. See id. *§§ 2105(a)-(b)* (effect of both "termination" and "cancellation" of sale of goods means that all executory obligations on both sides are discharged, but any right based on prior breach or performance survives). Furthermore, Hill-Rom may be entitled to summary judgment if Hill-Rom acted properly in terminating the Agreement due to Mextel's material breaches.

> 13   To the extent that Mextel's briefs raise this issue, the Court finds that the December 16, 1999 letter, standing alone, was not an "anticipatory repudiation" of Hill-Rom's obligations pursuant to *§ 2-610*. Although the statutory text of the Pennsylvania UCC does not define the phrase "anticipatory repudiation," the commentary indicates that an "anticipatory repudiation" depends on the circumstances of the situation. Id., at comment 2. According to this commentary, an anticipatory repudiation may be evidenced by words or actions, and occurs when a party "reasonably indicates a rejection of the continuing obligation." Id. The rejection itself, however, must be "definite and unequivocal." Anderson on the Commercial Code § 2-610:16 (2004).
>
> The December 16, 1999 letter does not meet this standard. This letter tersely states that, pursuant to an earlier telephone conversation between the parties, "all sensors and controllers are on 'Production Hold' with the exception of spares, which will be handled on an as-needed basis." (See December 16, 1999 Letter, attached as Ex. 6

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 37 of 67

Page 14

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

to Pl. Mot. For SJ.). This letter does not indicate that Hill-Rom was no longer willing to perform under the Agreement, that Hill-Rom was refusing to pay for controllers that had been manufactured, that Hill-Rom was refusing shipment of controllers that had already been produced and manufactured, or that Hill-Rom was not going to continue to purchase controllers from Mextel in the future. In fact, through the reference to an earlier conversation, the December 16, 1999 letter does not clearly indicate that the production hold was a unilateral action taken by Hill-Rom. As such, the December 16, 1999 letter did not manifest a definite and unequivocal refusal to perform an obligation not yet due. See *13 Pa. Cons. Stat. Ann. § 2-610*.

Nonetheless, the December 26, 1999 termination letter, when read in conjunction with the December 16, 1999 letter, connotes a clear refusal by Hill-Rom to perform under the Agreement. Consequently, to the extent that the December 26, 1999 letter improperly terminated the Agreement, Hill-Rom repudiated the contract within the meaning of 2-610 of the Pennsylvania UCC.

[*55]    **a. Hill-Rom terminated the Agreement pursuant to P 18.2 in a procedurally and substantively proper manner, but failed to properly terminate the Agreement pursuant to P 18.1(c).** [14]

> 14    The Court uses the term "termination" as employed in the Agreement: as covering all instances when a party properly puts an end to a contractual relationship. Nonetheless, the Court recognizes the distinction between "termination," which refers to when "either party puts an end to the contract otherwise than for its breach," and "cancellation," which refers to when "either party puts an end to the contract for breach by the other." See *13 Pa. Cons. Stat. Ann. § 2106(c)-(d)*. This distinction is important with respect to the remedies that are available the terminating or cancelling party. Id.

#### (I) Moment of Contractual Demise

Before this Court determines whether Hill-Rom properly ended the contractual arrangement between the parties in December 1999, this Court must first address [*56] Mextel's contention that Hill-Rom impermissibly "decided to terminate the Agreement when it began to develop knock-offs of the Mextel controller and sensor module in 1998." (See Pl. Disputed Facts, at P 14). In other words, Mextel argues that Hill-Rom "repudiated" the Agreement prior to December 1999 by surreptitiously

violating its representation and warranty of exclusivity in P 15.1(c), indeed, by "negotiating and contracting with third parties to copy plaintiffs' intellectual property and supply the component parts developed and manufactured by Mextel" (Pl. Undisputed Facts, at P7). As such, Mextel argues that this earlier breach, albeit unknown to Mextel at the time, discharged Mextel's obligations to perform under the Agreement. See *13 Pa. Cons. Stat. Ann. § 2-610(a)* (anticipatory repudiation constitutes breach of contract and entitles seller to suspend performance); see also *Ott v. Buehler Lumber Co., 373 Pa. Super. 515, 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988)* ("the general rule is that a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract"); *Oak Ridge Constr. Co. v. Tolley, 351 Pa. Super. 32, 504 A.2d 1343, 1348 (Pa. Super. Ct. 1986)* [*57] ("If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.").

Hill-Rom admits that it hired a third-party to design and develop a new controller. (Def. Mot. For SJ., at 21-22). However, Hill-Rom asserts that this relationship with a third-party did not violate the Agreement because the third-party never supplied controllers during the life of the contract. (Id.).

In P 15.1(c) of the Agreement, Hill-Rom represented and warrantied that it:

> is not currently a party to any agreement or undertaking, oral or written, that would, in any manner be inconsistent with the rights herein granted to MEXTEL to design, develop, and SUPPLY a PRODUCT and shall not enter into any such agreement or understanding, oral or written, during the term of the Agreement, nor, during the terms of this Agreement, directly or indirectly, engage in any activity that would, in any manner, be inconsistent with the right herein granted to MEXTEL to design, develop, and SUPPLY a PRODUCT, except as specifically authorized herein . . . .

(Id.). The clear language of P 15.1(c) of the Agreement prohibits Hill-Rom [*58] from "designing, developing, and supplying a product" during the life of the contract. Id. The conjunction "and" precludes a breach of this provision if Hill-Rom only hired a third party to design and develop a replacement controller, without using this third party to supply the product. Id.

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 38 of 67

Page 15
2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Mextel has provided evidence, to which Hill-Rom admits, that by June 1998, Hill-Rom was accepting detailed quotations and proposals from third parties to develop a replacement controller for the C2000 incubator. (See Comtec and Battelle Proposals, attached as Ex. 26-27 to Pl. Br. In Opp'n.). It is also true that Mextel could not have waived its right to discharge its obligations under the Agreement based upon Hill-Rom's alleged repudiation by continuing to perform, as Mextel was not aware of Hill-Rom's solicitation of these quotations and proposals. (See Vedran Skulic's Third Declaration, at P 8); see also *Keenan v. Scott Township Auth, 151 Pa. Commw. 225, 151 Pa. Commw. 226, 616 A.2d 751, 755 (Pa. Commw. Ct. 1992)* (waiver requires "intentionally relinquishing or abandoning some known right, claim or privilege"); 13 Williston on Contracts § 39:22 (4th ed. 2004) (party charged with [*59] waiver of contractual breach must possess knowledge or notice of opponent's breach). However, Mextel provides no evidence to indicate that Hill-Rom contracted with a third party to *supply* a replacement controller in June 1998 or, then again, prior to Hill-Rom's attempt to terminate the Agreement in December 1999. As such, no evidence suggests that Hill-Rom breached P 15(c) of the Agreement prior to December 1999. Therefore, Mextel was not discharged of its obligations under the Agreement by virtue of Hill-Rom's solicitation of proposals for the design and manufacture of a replacement controller in 1998.

### (ii) Contractual Termination of the Agreement

Hill-Rom relies upon two different contractual provisions to justify its termination of the Agreement. First, P 18.1(b) gives Hill-Rom the right to terminate the Agreement "at any time after giving sixty (60) days' written notice to Mextel upon the occurrence of" Hill-Rom's failure to meet any of its material obligations under this Agreement. (See Agreement, at P 18.1(b)). Paragraph 18.1(b) also gives Mextel the right to cure any material breach within sixty days after receipt of Hill-Rom's written notice. (Id.).

Second, [*60] P 18.2 grants Hill-Rom the right to terminate the Agreement after providing sixty days written notice, if Hill-Rom "in its sole discretion, determine [sic] that the PRODUCTS are obsolete or that the infant incubators or infant radiant warmers into which such PRODUCTS are incorporated are obsolete." (See Agreement, at P 18.2). Unlike P 18.1, the decision to terminate under P 18.2 resides solely within Hill-Rom's discretion, and does not require Hill-Rom to provide Mextel a right to cure the controller's obsolescence.

Mextel challenges the procedural and substantive propriety of Hill Rom's invocation of P 18.1(b) and P 18.2 to terminate the contract.

### (a) Procedural Propriety

Under Pennsylvania law, "conditions precedent to a contract termination must be strictly fulfilled." *Accu-Weather, Inc. v. Prospect Communications, Inc., 435 Pa. Super. 93, 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994)*; see also 13-68 Corbin on Contracts § 68.9 ("Notice within the designed time period is the condition precedent to the effective exercise of the power reserved. If a party who has a power of termination by notice fails to give the notice in the form and at the time required by the Agreement, [*61] it is ineffective as a termination."). This rule leads to two important corollary rules, both of which are applicable to the resolution of this dispute. First, according to the Pennsylvania Supreme Court, notice to terminate a contract must be "clear and unambiguous," and "where the conduct of one having the right to terminate is ambiguous, he will be deemed not to have terminated the contract." *Maloney v. Madrid Motor Corp., 385 Pa. 224, 122 A.2d 694, 696 (Pa. 1956)*; see also 17B C.J.S. Contracts § 446 ("A clear and unambiguous notice, timely given, and in the form prescribed by the contract, is essential to the exercise of an option to terminate the contract."). Second, notice provided after the contractual deadline for providing termination is ineffective to avoid renewal of a contract among sophisticated commercial entities pursuant to an automatic renewal provision. See, e.g., *Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 909 (3d Cir. 1994)* (holding under Pennsylvania law that failure to comply with ninety-day deadline for providing notice of termination prior to automatic renewal of contract renders termination ineffective, [*62] even without a showing of prejudice by noticed party).

Nonetheless, in contrast to ambiguous and/or untimely notice, Pennsylvania law relaxes in at least one instance the rule of strict compliance with condition precedents to contractual termination. Consistent with the "universally accepted rule," timely notice that purports to terminate the contract in a shorter amount of time than that stipulated in the termination clause effectively terminates the contract, but only after the expiration of the prescribed time within the termination clause. See, e.g., *Shain v. Washington Nat'l Ins. Co., 308 F.2d 611, 614 (8th Cir. 1962)* (J. Blackmun) ("it is the general rule that were a contract, whether it be for one for employment or for insurance or of a different kind, requires written notice of cancellation upon a stated time, a notice failing to meet the time requirement, but otherwise appropriate, is nonetheless effective upon the lapse of the time required by the contract"); *Wetherell v. Sentry Reinsurance, 743 F. Supp. 1157, 1176 (E.D. Pa. 1990)* (applying Pennsylvania law and finding that notice of termination providing less time than required [*63] under reinsurance contract was effective at the conclusion of proper date as between sophisticated insurance companies and brokers); 14 Summ. Pa. Jur. 2d Ins. § 3:58 ("the

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 39 of 67

Page 16

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

fact that the notice contains a time limitation which is void because it is less than that required by the policy does not void the notice or make it inoperative; rather, the notice is effective, but is to be read as though it stated the proper date which would be allowed by the policy"). Of course, notice declaring termination in a shorter amount of time than that stipulated in the contract is effective only to the extent that it does not seek to circumvent or nullify other contractual precedents to termination. Accordingly, such notice is ineffective when the contract affords the noticed party the right, during the stipulated notice period, to cure the conditions that would negate the opposing party's right to terminate the contract. See, e.g., *Luden's Inc. v. Local 6, Bakery, Confectionery & Tobacco Workers Int'l Union, 805 F. Supp. 313, 317 (E.D. Pa. 1992)*, vacated and remanded on other grounds, *28 F.3d 347 (3d Cir. 1994)* (general rule that termination notice [*64] is not rendered ineffective merely because it states shorter period than that required by Agreement carries exception where "the contract affords the noticed party the right during the stipulated period to bring about a condition which will negate the other party's right to terminate"); see also W.C. Crais III, Annotation, Effect of Attempt to Terminate Employment or Agency Contract Upon Shorter Notice Than That Stipulated in Contract, 96 A.L.R.2d 272 (1964) (exception to general rule in context of terminating agency or employment contract is recognized in the "situation where the contract affords the noticed party the right, during the stipulated notice period, to perform certain acts or bring into existence certain conditions which will nullify or negate his adversary's right to give effective notice").

### (i) P 18.1(b)

Hill-Rom asserts that it properly terminated the Agreement pursuant to P 18.1(b). First, Hill-Rom argues that it satisfied its 60-day advance notice of termination when it sent Mextel the April 27, 1999 letter detailing all of the pending problems with the relationship, and advising Mextel that if they were not remedied, the Agreement could [*65] be terminated. (Def. Br. In Opp'n., at 5). Second, even if this did not constitute adequate notice, Hill-Rom contends that the December 26, 1999 termination letter was sufficient under the Agreement. (Id., at 5-8; Statement of Disputed Facts, at P 10). Hill-Rom's arguments fail as a matter of law.

The April 27, 1999 letter failed to establish unequivocal notice of termination. See, e.g., *Pomerantz v. Mutual Fire Ins. Co., 279 Pa. 497, 124 A. 139, 140 (Pa. 1924)* ("If the notice be equivocal or not indicative of a present cancellation, but a mere intention or desire to cancel in the future, a cancellation will not be effected."); 16 Summa. Pa. Jur. 2d Commercial Law § 5:25 ("Notice to terminate a contract must be clear and unambiguous.

Where a notice by Hill-Rom to terminate a contract is unclear and ambiguous it is not effective."). The letter listed various problems with Mextel's design and development of the controllers, including a failure to maintain good design controls and quality work standards, and then threatened that if Mextel "continues to conduct business in this manner, we will have to take appropriate action, which could include termination [*66] of Mextel as a developer/supplier as provided under the contract." (See April 27, 1999 letter, attached as Ex. 4G To Def. Mot. For SJ.). A threat of possible termination in the future does not constitute clear and unambiguous notice. See *Accu-Weather, 644 A.2d at 1255* (notice stating that termination of contract applies in "ninety-days," but that services may be "continued" on some later date, is unclear and ambiguous). Furthermore, Hill-Rom's continued performance under the Agreement, as evidenced by its placing of orders for Mextel's controllers in fall 1999, is inconsistent with a clear intent to terminate the contract. Id. (no legal notice of termination when party allegedly giving notice continues to perform under Agreement because continued performance gives "mixed and ambiguous" message).

It is equally evident that the December 28, 1999 letter, which purported to terminate the Agreement immediately, failed to comply with the contractually imposed conditions precedent to termination. (See December 28, 1999 Termination Letter, attached as Ex. 17 to Pl. Mot. For SJ.). First, the letter failed to provide sixty days notice of termination, as required [*67] by P 18.1(b). (Id.). Second, and most importantly, the letter failed to give Mextel sixty days to cure the alleged breaches of the Agreement and to thereby maintain the parties' contractual relationship, as required by P 18.1. (Id.). Instead, the letter sought to preempt this right to cure by immediately terminating the Agreement, a maneuver that was not permitted by the termination procedures of the Agreement. Accordingly, because Hill-Rom did not follow the conditions precedent to termination, thereby depriving Mextel of its right to nullify Hill-Rom's justifications for termination, the notice based upon P 18.1(b) was ineffective. See, e.g., *Luden's Inc., 805 F. Supp. at 323 n.15*. Therefore, Hill-Rom was not excused from complying with the terms of the Agreement based upon its P 18.1(b) notice of termination.

### (ii) P 18.2

Hill-Rom also claims that the December 28, 1999 letter properly terminated the Agreement under P 18.2 of the Agreement because the controller was "obsolete." (See Def. Br. In Opp'n., at 8). Although P 18.2 required sixty days notice prior to termination, it did not provide Mextel the right to cure the controller's "obsolescence" [*68] within a designated time. (Id.).

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 40 of 67

Page 17
2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Hill-Rom's purported termination under P 18.2 procedurally effective, but only after the expiration of sixty days from the mailing of the termination letter. See, e.g., *Wetherell, 743 F. Supp. at 1176.* Because Mextel did not have the contractual right to cure the reasons for Hill-Rom's determination of the controller's obsolescence, the only condition precedent with which Hill-Rom failed to comply was the provision of the contractually prescribed amount of sixty days notice. Unlike P 18.1, therefore, the procedural appropriateness of Hill-Rom's purported termination under P 18.2 of the Agreement is covered by the general rule that timely notice of termination allowing a period of time shorter than that stipulated in the contract is effective after the lapse of the stipulated time period. See, e.g., *In re Best Film & Video Corp., 46 B.R. 861, 873 (E.D.N.Y. 1985).* Accordingly, so long as Hill-Rom was justified in concluding that the controller was obsolete, the Agreement expired sixty days after mailing the December 28, 1999 notice of termination to Mextel.

**(b) Substantive Propriety**

The [*69] Court has concluded that the notice of termination pursuant to P 18.1 was procedurally ineffective. However, because the notice of termination pursuant to P 18.2 was procedurally appropriate, the Court now considers whether Hill-Rom was substantively justified as a matter of law in terminating the contract pursuant to P 18.2. Importantly, however, the Agreement does not define the term obsolete, and, in fact, leaves the determination of the controller's obsolescence to the "sole discretion" of Hill-Rom. (See Agreement, at P 18.2).

Hill-Rom construes "obsolete" in its colloquial sense, as an outmoded or outdated product. In support of its claim, Hill-Rom provides the testimony of Jan Wenstrup, the engineer responsible for the development of the C2000 incubator. (See Wenstrup Aff., attached as Ex. 1 to Def. Br., at P 19). Wenstrup contends that by December 1999, the product was obsolete for several reasons. First, the controller contained an outdated computer processor that was introduced into the marketplace in the mid-1970's and that had limited expansion capabilities. (Id.). Second, the controller failed to comply with the initial product specifications by accommodating [*70] an interface function, which would have allowed the controller to interface with other devices in addition to the C2000 incubator. (Id.). Third, the controller was unable to accommodate a monitoring feature that would have allowed constant monitoring of a baby's vital signs while in the C2000 incubator. (Id.).

Mextel provides no direct testimony or other evidence to dispute Wenstrup's conclusion regarding the obsolescence of the controller. Instead, Mextel challenges the definition of "obsolete," contending that the

parties' course of dealing establishes that the term "obsolete" means a product that is not marketable. (See Pl. Statement of Undisputed Facts, at P 37). Using this definition, Mextel argues that the product could not have been obsolete because "between November of 1996 and December of 1999, Mextel manufactured and shipped to Air-Shields over 5000 controllers covered by the Agreement." (Id.). Mextel further argues that during this period, Hill-Rom repeatedly manifested a belief that the controllers were not obsolete. (Id.).

This Court must ascertain the mutual intent of the parties by examining the language of the Agreement. See, e.g., *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995)* [*71] (applying Pennsylvania law). In ascertaining the mutual intent of the parties, the Court must construe terms according to their ordinary usage and meaning. *Id.; Raymark Indus., v. Butera, Beausang, Cohen & Brennan, 1997 U.S. Dist. LEXIS 19070, 1997 WL 746125, at *7 (E.D. Pa. Dec. 1, 1997)* (applying Pennsylvania law). The term "obsolete," as defined in Webster's Collegiate Dictionary, means "no longer in use or no longer useful." (See Webster's Collegiate Dictionary, at 816 (1990)). This definition is echoed by Black's Law Dictionary, which defines "obsolete" as "no longer in general use; out-of-date." (See Black's Law Dictionary, at 1105 (7th ed. 1999). Furthermore, Webster's Third International Dictionary notes that the term "obsolete" may apply to any product that is out-of-date, regardless of whether that product is in use or not. (See Webster's New Third International Dictionary, at 1558 (1993)). Accordingly, in this context, the Court adopts both the legal and colloquial definition of "obsolete" as a product that is "out-of-date," even if that product is currently in use in some capacity. To be "obsolete" therefore, the controller need not have been unmarketable, [*72] although the controller's lack of marketability, its inability to be commercially distributed, would certainly establish its obsolescence.

Mextel provides no evidence to rebut Hill-Rom's testimony that the product was, in an objective sense, out-of-date by December 1999. Nor has Mextel provided any evidence to establish that Hill-Rom's decision to terminate the contract pursuant to P18.2 was made in bad faith, as a mere pretext for financial or other motivations unrelated to the product's technological outdatedness. Based upon the testimony of Wenstrup, and upon the Mextel's failure to provide evidence to the contrary, no jury could conclude that Hill-Rom's categorization of the product as obsolete in December 1999 was unreasonable. Indeed, although Hill-Rom continued to place orders for the controllers up to December 1999, the controllers lacked significant technological features required both by the original product specifications, such as the RS-232 interface and the SPO2 monitoring system, and by tech-

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 41 of 67

Page 18
2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

nological advancements in the marketplace, such as a more advanced computer processor, thereby rendering the controller "out-of-date." (See Wenstrup Aff., at P 19).

Furthermore, [*73] assuming *arguendo* that this Court accepts the strict definition of "obsolete" proffered by Mextel, as the state of being unmarketable, Hill-Rom was still justified in terminating the contract pursuant to P 18.2 because no jury could conclude that Hill-Rom's belief in the unmarketability of the controller in December 1999 was unreasonable. Hill-Rom presents evidence that the controller presented numerous quality issues that hindered its marketability. For instance, Mextel's controller suffered from a failure rate of 21.8% for 1997 and 1998, as compared to a 6% failure rate for the replacement controllers for the time period April 30, 2001 through April 23, 2002. (See Ferrante Aff., attached as Ex. 6 to Def. Rsp. To Pl. Mot. For SJ., at P 5). Based upon an analysis of warranty data, Mextel's controller also suffered from a field replacement rate of 15% between the period November 1996 and October 1999, as compared to a field replacement rate of 3% or lower for the replacement controller. (Id., at PP 6-7). Moreover, according to Wenstrup's testimony, "the rejection rate for incoming controllers from Mextel was . . . at an unacceptably high level, as were warranty claims related [*74] to the Mextel controller." (See Wenstrup Aff., attached as Ex. 1 to Def. Br., at P 8). Richard Drinkwater, the buyer responsible for purchasing products and services from Mextel, also provides affidavit testimony that Mextel's "products were returned at an abnormally high, and ultimately, unacceptable level." (See Drinkwater Aff., attached as Ex.4 to Def. Br. In Opp'n., at P 4).

Hill-Rom also provides evidence to justify a reasonable belief that, in addition to lacking the requisite level of quality, the product was *per se* unmarketable in December 1999 because the continued distribution of C2000 incubators with Mextel's controllers would have subject Hill-Rom to FDA enforcement action. James Utterback, an in-house counsel for Hill-Rom who worked directly with the FDA between January 1998 and December 1999, offers affidavit testimony that Mextel's failure to provide verification, validation, and DMR documentation for the controller precluded Hill-Rom from complying with GMPs. See Utterback Aff., at Ex. 3 to Def. Mot. For SJ., at P 3b-e). This, in turn, resulted in a warning letter from the FDA, a finding that the C2000 incubator was "adulterated," and two recalls of [*75] the C2000 incubator. (Id.). Utterback further testifies that the termination of the contract in December 1999 was the direct result of Hill-Rom's inability to comply with submissions required by the FDA in response to the FDA's complaints and warning letters received in 1998 and 1999. (Id.)

James Utterback's testimony is echoed by that of James Wenstrup and Timothy Johnson, Hill-Rom's vice-president of operations until February 2002. According to Wenstrup's testimony, interactions between the FDA and Hill-Rom involved problems with the controller; and specifically, Hill-Rom's inability to provide necessary DMR and verification and validation documentation to satisfy regulatory requirements for medical devices. (Wenstrup Aff., attached as Ex. 1 to Def. Br. In Opp'n., at PP 4-17). Moreover, according to Johnson's affidavit, Mextel's inability to provide information necessary for Hill-Rom to comply with FDA regulations, coupled with the investigations performed by the FDA in 1998 and 1999, led Hill-Rom "to conclude that there was a very real possibility that the FDA was going to take drastic action against Hill-Rom," such as a seizure of the C2000 inventory or an action to shut [*76] down Hill-Rom's Hatboro facility. (See Johnson Aff., at Ex. 3 to Def. Br. In Opp'n., at P 4). Indeed, according to Johnson, "my interactions with the FDA in October and November [1999] led me to conclude that a predominant concern the FDA had was with the C2000 controller." (Id. at P 5).

Mextel cites the affidavit testimony of Vedran Skulic to rebut Hill-Rom's evidence that the product was unmarketable. Skulic's testimony references the fact that Hill-Rom purchased controllers between November 1996 and December 1999, even after the FDA warning letters and the two recalls. (See First Declaration of Vedran Skulic, at P 35). Mextel also cites a December 10, 1996 letter from Hill-Rom to its employees stating that the C2000 "exceeds all other incubators on the market," and a February 1999 comparative review of three nursing incubators by the Medical Devices Agency favorably reviewing the C2000 incubator. (See Reports, attached as Ex. 23 to Pl. Mot. For SJ.). However, neither Skulic's testimony, nor the documents cited by Mextel, disputes the failure and replacement rate of the controller. Nor does this evidence render unreasonable Hill-Rom's belief that by December 1999, [*77] the FDA was preparing to take "drastic action" against Hill-Rom for problems related to the controller. Finally, Mextel fails to dispute the reasonableness of Hill Rom's belief that by December 1999, due to the lack of verification and validation and of DMR documentation, it was no longer safe to sell the controller on the market to consumers.

Based upon the available record, this Court holds as a matter of law that Hill-Rom was justified in providing notice to terminate the contract in December 2000 based upon P 18.2 of the Agreement. No genuine issue of material fact exists to challenge the reasonableness of Hill-Rom's belief that the controller was "obsolete," both in the sense of being unmarketable and in the sense of being technologically outdated. Furthermore, regardless of whether Mextel was required to follow GMPs in the de-

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 42 of 67

Page 19
2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

sign and manufacture of the controller, and regardless of whether Mextel breached these practices, Hill-Rom's inability to provide the FDA with necessary validation, verification, and DMR information rendered the controller unusable and unmarketable.

This Court further concludes that because Hill-Rom did not provide sixty days notice of the obsolescence [*78] of the controller, the termination of the contract did not become effective until Saturday, February 26, 2000, sixty days after the mailing of the December 28, 1999 letter. (See Agreement, at P 24). Hill-Rom was required to perform its obligations under the contract until that date. However, the effective termination of the Agreement on February 26, 2000 discharged Hill-Rom's executory obligations, which included the purchase both of manufactured, but unshipped controllers and of the remaining controllers necessary to reach the minimum amount of 8000 controllers under the Agreement.

### b. Cancellation of the Agreement [15]

> 15    Mextel does not assert that P 18.1(b) of the Agreement modified this statutory remedy by prescribing specific procedures for ending the Agreement upon the occurrence of material breaches, which is the definition of "cancellation" under the Pennsylvania UCC. See *13 Pa. Cons. Stat. Ann. § 2-106(d)* (definition of "cancellation"). Because Mextel failed to raise this argument, and because the Court finds that Mextel was not entitled to cancel the Agreement in December 1999 pursuant to *§ 2-711(a) of the Pennsylvania UCC*, the Court does not address this argument.

[*79] Hill-Rom also contends that it properly cancelled the Agreement in December 1999 pursuant to the statutory authority of the Pennsylvania UCC. In support of its position, Hill-Rom characterizes the Agreement as an "installment contract," which the UCC defines as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted . . ." *13 Pa. Cons. Stat. Ann. § 2-612(a)*. In turn, because the Agreement was an installment contract, the failure of past installments of controllers to substantially conform to commercial expectations and contractual specifications constituted a breach of the contract as a whole. Id. *§ 2-612(c)* ("Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole."). As the buyer, Hill-Rom was therefore entitled to cancel the contract and all unexecuted performances. Id. *§ 2-711(a)* ("Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with

respect to the whole if the breach goes to the whole, the buyer may cancel [*80] . . . ."). [16]

> 16    This argument, if successful, insulates Hill-Rom from liability for damages for any breaches between December 1999 and the date of the termination of the Agreement, on February 26, 2000.

Hill-Rom's argument fails as a matter of law. Regardless of whether the earlier deliveries of controllers were non-conforming and regardless of whether they impaired the value of the Agreement as a whole, thereby giving Hill-Rom the right to treat the earlier nonconforming deliveries as complete breach, Hill-Rom's post-delivery conduct consistently reinstated the terms of the Agreement up to December 1999. See *13 Pa. Cons. Stat. Ann. § 2-612(c)* (aggrieved party reinstates contract by accepting nonconforming installation without seasonably notifying of cancellation or demands performance as to future installments). For instance, there is no dispute that Hill-Rom accepted controllers in previous installments without notifying Mextel of its intent to cancel the Agreement. Furthermore, even after receipt [*81] of the allegedly non-conforming deliveries, Hill-Rom continued to demand shipments of additional controllers up until the point of cancellation in December 1999. See, e.g., *Traynor v. Walters, 342 F. Supp. 455, 461 (M.D. Pa. 1972)* (holding that buyer reinstated contract under Pennsylvania UCC by demanding delivery in future installments of yet undelivered trees, despite allegedly non-conforming aspects of first two deliveries of trees). By placing new purchase orders, Hill-Rom reaffirmed the contract and could only have rejected the yet undelivered installments after delivery, rather than through a premature cancellation. See *13 Pa. Cons. Stat. Ann. § 2-612* comment 6 (although defects in prior installments are cumulative in effect, "if only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future performance but had not an immediate right to cancel the entire contract"). Accordingly, this Court holds that Hill-Rom was not entitled to cancel the Agreement pursuant to *§ 2-711 of the UCC.*

### c. Impracticability/Frustration of Purpose [17]

> 17    Again, this argument, if successful, would insulate Hill-Rom for damages for any breaches between December 1999 and February 26, 2000.

[*82] Hill-Rom also argues that it was not required to purchase unshipped controllers or to purchase the minimum number of controllers because the performance of these obligations was impracticable by December 1999. (See Def. Br. In Opp'n., at 9; Def. Mot. For SJ., at 16-17).

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

The Pennsylvania UCC provides a defense when performance "becomes commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting." See Comment 1 to *13 Pa. Cons. Stat. Ann. § 2-615*. *Section 2-615* excuses a seller from delay in delivery or non-delivery if "performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid." See *13 Pa. Cons. Stat. Ann. § 2-615*. To invoke this defense, the seller "must notify the buyer seasonably that there will be delay or nondelivery." Id. *§ 2-615(3)*.

Although the defense of impracticability within the Pennsylvania UCC does not apply by [*83] its literal terms to buyers, Comment 9 to the provision indicates that the rationale for the exemption may apply to the buyer in certain instances. See Comment 9. One particular instance is "where the buyer's contract is in reasonable commercial understanding conditioned on a definite and specific venture or assumption, as, for instance, a war procurement subcontract known to be based on a prime contract which is subject to termination, or a supply contract for a particular construction venue." Id. Accordingly, this Court concludes that the defense of impracticability is available to buyers under the Pennsylvania UCC in the limited instances articulated in Comment 9.

The defense of impracticability is unavailable to Hill-Rom in this instance. Hill-Rom argues that Mextel's failure to design and manufacture the controller in accordance with FDA regulations made the continued purchase of controllers impracticable, as Hill-Rom would not have been able to resell the controllers in accordance with FDA regulations. (Def. Mot. For SJ., at 15-16). However, the alleged failure to design and manufacture the controller in accordance with FDA regulations was not an "unforeseeable supervening [*84] circumstance." See *Pa. Cons. Stat. Ann. § 2-615*, Comment 1; see also *Restatement (Second) of Contracts § 264* (impracticability applies when supervening government action prohibits performance). Instead, Mextel's alleged failure to meet design specifications was foreseeable, a breach of the provisions the parties negotiated. Indeed, as evidenced by the termination procedures in P 18 and P 19 of the Agreement, the parties contemplated this type of material breach at the time of the formation of the contract, and expressly allocated the risk for such an occurrence by creating procedures to exit the Agreement in the event of such a breach. See Anderson on the *Uniform Commercial Code § 2-615:*42 ("In order to excuse perform-

ance, the contingency must be unforeseen and unusual, and mist be distinct from the risks and hazards of a foreseeable character).

Nor does Hill-Rom provide evidence of a supervening FDA action that prohibited the sale of the C2000 incubators with the Mextel controller. The record indicates that the FDA might have been contemplating action against Hill-Rom, but that no enforcement action was taken with respect to the [*85] C2000 incubators, and, more specifically, with respect to the controller manufactured by Mextel. Furthermore, although Hill-Rom alleges that it was unable to comply with government regulations, both parties were aware of the existence of FDA regulations at the time of contract formation and incorporated these regulations into the Agreement. Accordingly, Hill-Rom may not invoke *section 2-615 of the Pennsylvania UCC* to excuse Hill-Rom's obligations under the Agreement. See, e.g., *Rohm & Hass Co. v. Crompton Corp.*, 2002 WL 1023435, at *7 (Pa. C. P. April 29, 2002) (seller's compliance with pre-existing consent decree that substantially increased costs in requirements contract does not make performance impracticable because compliance was foreseeable and not supervening).

### 3. Hill-Rom's Motion for Summary Judgment

Hill-Rom moves for summary judgment on the remaining counts in plaintiffs' amended complaint, and on Hill-Rom's counterclaims for breach of contract.

#### A. Breach of Contract Counterclaim

This Court has found that Hill-Rom breached the Agreement by failing to pay Mextel for delivered and accepted controllers and that Mextel reaffirmed the [*86] Agreement by continuing to deliver installments of controllers to Hill-Rom, despite lack of payment. This Court has also found that Hill-Rom's failure to follow the appropriate procedures rendered Hill-Rom's attempt to terminate the Agreement based upon P 18.1(b) is ineffective, without deciding whether Hill-Rom was substantively justified in invoking P 18.1(b). Nonetheless, as the Agreement did not terminate until February 26, 2000, Hill-Rom may still recover damages for preceding breaches of the Agreement by Mextel. See *13 Pa. Cons. Stat. Ann. § 2-608(a)* (when buyer accepts goods and gives notification pursuant to *§ 2-607(c)*, buyer may recover damages for any non-conformity of tender from the loss resulting in the ordinary course of events from the seller's breach); see also *Times Mirror Magazines, 103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000)* ("A non-breaching party who elects to continue to perform a contract may still sue later and recover damages solely for the *breach* of the Agreement, provided that it gives notice of the breach to the breaching party."); *Restatement (Second) of Contracts § 246 comment b* (party who tenders [*87] defec-

Page 21

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

tive, but excused performance still liable "for damages for partial breach because of his defective performance").

Although Hill-Rom's counterclaim includes a laundry list of 24 alleged breaches, the Court will only address those breaches discussed in Hill-Rom's various briefs. (See Counterclaim, at P 39(a)-(x)). First, Hill-Rom claims that Mextel breached P 6.1 and P 8.2 of the Agreement by failing to comply with GMPs, such as by failing to provide Hill-Rom with DMR documentation, to perform verification and validation and to provide Hill-Rom with verification and validation documentation, and to maintain for the life of the controller all manufacturing records. (See Def. Undisputed Facts, at PP 2-19). Second, Hill-Rom contends that Mextel breached P 9.4 by failing to correct negative audit findings. (Id., at PP 20-24). Third, Hill-Rom argues that Mextel breached P 2.1(b) by failing to provide Hill-Rom with information needed to obtain FDA marking clearance for the C2000. (Id., at P 3).

**1. Good Manufacturing Practices**

Hill-Rom contends that Mextel breached P 6.1 of the Agreement by failing to manufacture the controller in accordance with GMPs. (See [*88] Def. Mot. For SJ., at 2-7, 15-17).

Mextel, however, contends that it was not subject to GMPs as a matter of contract interpretation. Mextel contends that P 6.1(b) did not require Mextel to comply with GMPs because these regulations expressly exempt "manufacturers of components or parts of finished devices." (Pl. Mot. For SJ., at 18). Instead, P 6.1(b) merely indicates that "Mextel would comply with whatever obligations would be imposed on Mextel by the FDA Act." (Id.). Mextel contends that this interpretation is confirmed by Exhibit E to the Agreement, which states that Mextel "is not a medical device manufacturer and is not subject to FDA regulations." (Id.; see also Ex. E to Agreement, attached as Ex. 1 to Gugnani Declaration). Mextel further argues that P 6.1(b) is prophylactic, "having been apparently copied from some other agreement." (Id., at 18).

This Court finds as a matter of law that Mextel contractually agreed to manufacture the controller in accordance with GMPs. (See Agreement, at P 6.1(b)). The unambiguous language of P 6.1(b) of the Agreement clearly imposes such a contractual obligation:

> The PRODUCTS manufactured by MEXTEL and sold [*89] to AIR-SHIELDS under this AGREEMENT shall be . . . (b) manufactured in accordance with good manufacturing practices under the ACT.

The obligation is presented in clear, mandatory terms, requiring Mextel to comply with all GMPs during the manufacture of controllers for the term of the contract. See, e.g., PBS Coals, Inc. v. Burnham Coal Co., 384 Pa. Super. 323, 558 A.2d 562, 564 (Pa. Super. Ct. 1989) ("In determining the intent of parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly."). It does not contain conditional or suppositional language, nor does it limit Mextel's private obligation to comply with GMPs to a hypothetical future date. Moreover, although Mextel is correct in pointing out that, as a "manufacturer of components or parts of finished devices," it was exempt from compliance with GMPs pursuant to 21 C.F.R. § 820.1(a), this regulatory provision also states that "such manufacturers are encouraged to use appropriate provisions of this regulation as guidance." Id. The Agreement merely transforms [*90] this recommendation into a mandatory obligation in the private setting.

Mextel's reliance on Exhibit E and the statement that Mextel is "not a medical device manufacturer and is not subject to FDA regulations" as nullifying P 6.1(b) is misplaced. Exhibit E only confirms that the contractual arrangement between the parties, and Mextel's agreement to comply with GMPs, would not subject Mextel to FDA action for failure to comply with FDA regulations. Exhibit E's declaration does not absolve Mextel of private liability for the contractual assumption of compliance with particular FDA regulations. Moreover, Exhibit E is only relevant with respect to the obligations imposed by P 6.1(a) of the Agreement and other paragraphs in the contract that expressly reference or rely upon Exhibit E, such as the contractual prescription for confirming product conformance in P 9.3. Indeed, to exempt Mextel from compliance with GMPs based upon the existence of Exhibit E would render the language of P 6.1(b) mere surplusage, and the obligations imposed meaningless. See, e.g., Tenos v. State Farm Ins. Co., 716 A.2d 626, 631 (Pa. Super. Ct. 1998) (Pennsylvania contract law "does not [*91] permit words in a contract to be treated as surplusage."). Such an outcome would violate traditional principles of contract interpretation. See, e.g., Meeting House Lane, Ltd. v. Melso, 427 Pa. Super. 118, 628 A.2d 854, 857-58 (Pa. Super. Ct. 1993) ("One part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms.").

Because the language of the Agreement is clear and unambiguous, the Court need not resort to extrinsic evidence to interpret P 6.1(b). [18] See, e.g., Sabad v. Fessenden, 2003 PA Super 202, 825 A.2d 682, 688 (Pa. Su-

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 45 of 67

Page 22

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

*per. Ct. 2003)* (unambiguous contract interpreted according to language selected by parties, while extrinsic evidence only appropriate to interpret ambiguous contractual terms). Consequently, the Court finds that Exhibit E only modifies P 6.1(a), and not P 6.1(b), and that, pursuant to the Agreement, Mextel was required to comply with GMPs during the manufacture of controllers.

> 18  Nonetheless, the Court notes that the use of extrinsic evidence to interpret P 6.1(b) of the Agreement confirms the Court's interpretation. According to David Ascher, Hill Rom's attorney who negotiated the Agreement with Mextel, the intent of P 6.1 was to ensure that Mextel would manufacture the controller so that Hill-Rom could satisfy its regulatory obligations. (See Ascher Affidavit, attached as Ex. 13 To Def. Mot. For SJ., at P 6). Although this conflicts with Skulic's understanding of the Agreement, any other interpretation would violate principles of common sense. After all, unless Mextel contractually assumed responsibility for complying with the QS regulation, Hill-Rom, as a regulated party, would have been unable to meet its obligations under the FDCA, thereby subjecting itself to perpetual enforcement action by the FDA and dooming the success of the C2000 incubator from the outset.

### [*92]  a. DMR Documentation

Hill-Rom contends that Mextel breached P 6.1(b) and P 8.2 by refusing to generate and maintain DMR documentation, including device specifications, production process specifications, quality assurance procedures, and packing and labeling, and by refusing to provide Hill-Rom with DMR documentation on a quarterly basis. (Def. Br. In Opp'n., at 11-17; Def. Mot. For SJ., at 15-17). This Court agrees.

From 1996 until April 1999, Hill-Rom sent numerous letters to Mextel demanding DMR documentation, including an April 27, 1999 letter revealing Mextel's continued failure to generate and to provide DMR documentation for the controller. James Utterback, Hill-Rom's in-house counsel from September 1997 until September 2002, Jan Wenstrup, the engineer responsible for development of the C2000 incubator, Doug Spencer, the Vice-President and General Manager of Hill-Rom's Maternal and Infant Care Business Unit until June 22, 1999, and Timothy Johnson, the General Manager at the Hatboro manufacturing facility after 1999, all testify that Mextel never produced, made available, or supplied the information necessary to compile an appropriate DMR for the controller. (See [*93] Affidavits, attached as Ex. 1-4 to Def. Br. In Opp'n. and Ex. 3 to Def. Mot. For SJ.). Furthermore, FDA documentation, including the June

1998 Warning Letter, the March 1998 483 Letter, the February 1999 483 Letter, and the various inspection reports, confirmed that DMR documentation was lacking with respect to the controller. Finally, an independent audit conducted in April 1999 documented Mextel's lack of compliance with the QS regulations, including a finding of little or no documentation for design control, inspection and testing, and quality records. (See April 1999 Supplier Survey Results, attached as Exhibit 3C at Def. Mot. For SJ.).

Despite admitting that Skulic had no prior experience in designing or manufacturing components for medical devices regulated by the FDA, Mextel nonetheless contends that it maintained DMR documentation and provided copies of all manufacturing records for the life of the controllers. (See Gugnani Declaration, at P 14; see Pl. Statement of Disputed Facts, at P 9). To support this contention, Mextel relies upon: (i) Skulic's affidavit testimony; (ii) a November 5, 1996 certification statement, signed by representatives from Mextel and [*94] Hill-Rom, indicating that "complete device mast record documentation per *21 CFR § 820.181* has been developed of the models C2C-1 and C2C-1E Air-Shields Infant Incubator Controllers" and that DMR documentation "in its current form is adequate to provide functional and configuration traceability and to control production processes"; and (iii) a selection of certificates of conformance accompanying the shipment of various orders of controllers. (See Pl. Statement of Disputed Facts, at P 9; First Vedran Skulic Declaration, at P 23).

Mextel's proffered evidence fails to raise a genuine issue of material fact. First, Mextel is correct in noting that the November 5, 1996 certification statement averred that DMR documentation in its current form, however "untidy and informal," is "adequate" to "provide functional and configuration traceability and to control production processes." (See November 5, 1996 Certification Statement, attached as Ex. 3A to Def. Mot. For SJ.). However, the November 5, 1996 certification statement does not make clear that Mextel possessed formal DMR documentation in compliance with GMPs. Nor does the certification statement indicate [*95] that Hill-Rom had access to, evaluated, or approved this form of DMR documentation. In fact, the certification statement suggests the opposite, codifying Mextel's obligation to provide formal DMR documentation to Hill-Rom by December 31, 1996. (Id.). Based upon subsequent correspondence, including the February 21, 1997, September 3, 1997, June 30, 1998, and April 27, 1999 letters from Hill-Rom to Mextel demanding DMR documentation, as well as the internal FDA documents and the testimony of Hill-Rom's quality assurance personnel, it is clear that Mextel never provided formal DMR documentation to

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 46 of 67

Page 23
2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Hill-Rom on December 31, 1996 or throughout the relationship.

Second, rather than supporting Mextel's position, Skulic's affidavit suggests ambiguity with respect to Mextel's compliance with GMPs. Skulic indicates that Mextel "comported its facilities and Product records as if it were subject to the FDA *to the extent possible. . . .*" (See First Declaration of Vedran Skulic, at P 23) (emphasis added). Skulic also testifies that although Mextel was not subject to FDA regulations, Mextel "did internally comply with all such *substantive* good manufacturing processes." (Id., at [*96] P 20) (emphasis added). Furthermore, Skulic suggests lacking the resources and expertise to write the DMR, conceding that "my obligation was to assist in that endeavor, not to write the document." (Id., at P 6). Finally, although Skulic suggests that Mextel "maintained all manufacturing records for the life of the controllers by serial number," Hill-Rom only provides two certificates of conformance as evidence of the existence of DMR documentation. (Id., at P 23).

The certificates of conformance are signed by Mextel's representative, and certify that the controllers were produced "in accordance with the specifications" in Hill-Rom's purchase order and with the "Approved Design Specifications." (See Certificates of Conformance, attached as Ex. 22 to Pl. Mot. For SJ.; see also First Declaration of Skulic, at P 23). The Certificates of Conformance also provide lot serial numbers, purchase order numbers, and customer part number and description. (Id.). The Certificates of Conformance were mandated by P 9.3 of the Agreement, and confirm that the products confirm to quality assurance procedures and specifications identified in Exhibits E and F to the Agreement.

The [*97] certificates of conformance do not constitute DMR documentation within the meaning of the FDA regulations. Indeed, they do not contain: (i) device specifications, including appropriate drawings, composition, formulation, and component specifications; (ii) production process specifications, including the appropriate equipment specifications, production methods, production procedures, and production environment specifications; (iii) quality assurance procedures and specifications, including quality assurance checks used and the quality assurance apparatus used; and (iv) packaging and labeling specifications, including methods and processes. See *21 CFR § 820.181 (1995)*. In fact, the certificates of conformance do not even indicate that the products were produced in accordance with GMPs.

Based upon Hill-Rom's overwhelming evidence concerning Mextel's failure to provide DMR documentation, and based upon Mextel's inability to challenge this evidence, this Court concludes that Mextel breached P

6.1(b) and P 8.2 of the Agreement by failing to create, maintain, and provide Hill-Rom with DMR documentation. Hill-Rom is therefore entitled to summary judgment on [*98] counterclaims 39(h) and 39(j) with respect to DMR documentation.

**b. Verification and Validation**

Hill-Rom next argues that Mextel breached P 6.1(b) and P 8.2 by failing to generate and to provide verification and validation information for the controller. (See Def. Mot. For SJ., at 16-17). Mextel's alleged breach with respect to verification and validation takes two forms: (a) failure to provide access to the controller source code, which was necessary to enable Hill-Rom to conduct verification and validation and to establish the root causes for allegedly high warranty and failure rates for the Mextel controller; and (b) failure to conduct verification and validation for device design, to validate the production process, and to provide verification and validation records to Hill-Rom. (See Def. Statement of Disputed Facts, at P 7; Def. Statement of Undisputed Facts, at PP 2-4).

**i. Source Code**

A genuine issue of material fact exists as to whether Mextel provided the controller source code to Hill-Rom. On one hand, Mextel contends that it did provide the source code to a third-party, Cri-Tech, which Hill-Rom hired to develop the verification and validation dossier [*99] for the C2000 controller in March 1998. A March 9, 1998 document identified by Mextel states that, despite numerous other failings, Mextel "presented" two components of the controller: the "software source and engineering notes/memos" (See March 9, 1998 CriTech Report, attached as Ex. 28 to Pl. Br.). Furthermore, Skulic's affidavit states that he personally provided to Cri-Tech "the source code for the electronic controller software." (See Vedran Skulic's Third Declaration, at P 8).

On the other hand, the March 9, 1998 document states that "Mextel still controls the critically needed software source." (See March 9, 1998 CriTech Report, attached as Ex. 28, at E09378). Furthermore, an affidavit from the president of Cri-Tech states that no one associated with CriTech has "received or taken any source code from Mextel, Inc., nor has CriTech given Hill-Rom a computer source code drafted by Mextel, Inc." (See Rajewski Aff., attached as Ex. 23, at PP 4-5). Accordingly, there is a general issue of material fact as to whether Mextel provided the source code to Hill-Rom, and, therefore, whether Mextel breached P 6.1(b) of the Agreement.

**ii. Verification and Validation Records**

[*100] Verification and validation obligations for medical devices were promulgated pursuant to the QS

Regulation on October 7, 1996. See 21 CFR Part 820 (1997). These regulations were made effective on June 1, 1997. Id. These obligations required manufacturers of medical devices to implement "design controls," such as establishing and maintaining procedures for verifying and validating the device design, establishing and maintaining a device history file, and documenting the results of the design verification and validation process. See *21 CFR § 820.30(f)-(j) (1997)*. These obligations also required manufacturers to implement "production and process controls," including validating the production process to establish by "objective evidence that a process consistently produces a result or product meeting its predetermined specifications." Id. *§ 820.3*. Manufacturers were further required to maintain a Quality System Record including or referring to the location of records concerning management responsibility. Id. *§ 820.186*

No genuine issue of material fact exists that Mextel breached P 6.1(b) by failing to comply with the verification and validation [*101] obligations of the QS regulation, particularly with respect to generating and maintaining appropriate documentation. First, Mextel admits that Hill-Rom continued to place orders for, and that Mextel continued to manufacture, controllers after June 1, 1997. (See First Skulic Declaration, at P 10). Second, the contract mandated that Mextel comply with all GMPs, which, after June 1, 1997, included the QS regulations and its verification and validation requirements. (See Agreement, at P 6.1(b)). Third, a body of evidence confirms that Mextel did not comply with these requirements. Hill-Rom sent letters on June 30, 1998 and April 27, 1999 demanding verification and validation documentation for the manufacture of controllers and reiterating Mextel's failure to implement design controls pursuant to *21 CFR § 820.30*. (See June 30, 1998 Letter and April 27, 1999 Letter, attached as Ex. 4D and 4G to Def. Mot. For SJ.). James Utterback, Jan Wenstrup, and Doug Spencer testify that Mextel failed to provide Hill-Rom with verification and validation information for the controller, that Hill-Rom needed to employ, albeit unsuccessfully, a fixture test to validate [*102] incoming controllers against design specifications, and that failure to verify and validate the controller's design led to the 1998 and 1999 recall of the C2000 incubator. (See Utterback Aff., at P 3(a)-(d); Wenstrup Aff., at PP 6-16; Spencer Aff., at P 7). CriTech indicated in its March 9, 1998 Software Verification and Validation Assessment Report and in its November 10, 1999 Proposal that a design history file, as required by *§ 820.30(j)*, was lacking for the controller. (See CriTech Report, attached as Ex. 28 and 30 to Pl. Mot. For SJ.). Finally, documentation from the FDA, including the March 26, 1998 and the February 19, 1999 letters, observed that verification and validation data, including a DHR, was lacking for the controller.

(See March 26, 1998 and February 19, 1999 Letters, attached as Ex. 14 to Def. Br.).

Mextel fails to rebut this evidence, and, by relying on the misapprehension that it was not bound by the verification and validation requirements of the GMPs, concedes its failure to comply. For instance, Skulic admits throughout his Third Declaration that Mextel did not believe that it was contractually or legally responsible for generating or supplying [*103] verification and validation documentation, and that Mextel never generated or supplied such documentation. (See Third Skulic Declaration, at PP 7-9). Specifically, Mextel admits that it did not have "information relating to the design of the electronic controller," but that Hill-Rom continued to demand such information. (Id.). Accordingly, Hill-Rom is entitled to summary judgment on counterclaims 39(b), (h) and (j) with respect to Mextel's failure to comply with the verification and validation requirements of the QS regulation and to provide the appropriate verification and validation documentation to Hill-Rom.

## 2. Quality Audits

Paragraph 9.4 of the Agreement states that Mextel "shall permit an Air-Shields representative to inspect the facility at which Mextel manufactures PRODUCTS to conduct an audit to ensure compliance with quality assurance protocols of Exhibit F . . . ." (See Agreement, at P 9.4). This paragraph further states that "within thirty (30) days of MEXTEL's receipt of AIR-SHIELD's audit report, MEXTEL shall commence and thereafter diligently complete the cure of any deficiencies noted therein." (Id.). Although no quality assurance protocols are [*104] listed in Exhibit F, Mextel submits that the parties meant to refer to Exhibit E as the list of the quality assurance protocols.

A quality audit was conducted in September 1998 based upon Mextel's compliance with the QS regulations. The September 1998 audit resulted in an "overall survey score" of 58.7% and a "conditional" certification level grade by Hill-Rom. (See September 21, 1998 Letter, attached as Ex. 4E to Def. Mot. For SJ.). However, in April 1999, Hill-Rom conducted a second audit to determine compliance with the QS regulations. The second audit demonstrated a decline in a compliance rating from 58.7% to 34%. (See April 1999 Results, attached as Ex. 4F to Def. Mot. For SJ.). The certification level was listed as "unacceptable," with "improvement plans" necessary. (Id.). In turn, Hill-Rom sent Mextel a letter demanding that Mextel cure these deficiencies immediately, particularly with respect to design controls. (See April 27, 1999 Letter, attached as Ex. 4G to Def. Mot. For SJ.). Hill-Rom provides affidavit testimony from James Utterback that Mextel failed to cure any of the

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

deficiencies noted in the reports within 30 days. (See Utterback Aff., at P 3f).

[*105] Mextel characterizes these audits as "unreasonable demands for overly-detailed written procedures." (See Pl. Br., at 10). Mextel contends that, pursuant to the language of P 9.4, the quality audit could only be conducted to ensure compliance with the protocols listed in Exhibit E, rather than with the QS regulations, to which Mextel was not subject as a manufacturer of a component product. (See Pl. Disputed Facts, at P 20). Accordingly, because the quality audit performed by Hill-Rom imposed the requirements of the QS regulations, Mextel contends that it did not constitute a "quality audit" within the meaning of the Agreement, and, hence, that Mextel did not breach the contract by failing to remedy the deficiencies in the April 1999 audit report within 30 days. (Pl. Br. In Opp'n., at 10).

The Court agrees that the parties meant to refer to Exhibit E in P 9.4 of the Agreement. The Court also agrees that P 9.4 of the Agreement defined quality audit according to the specifications listed in Exhibit E, so that compliance with those specifications satisfied Mextel's obligations under P 9.4. Nonetheless, because an overlap may exist between a quality audit conducted pursuant to [*106] Exhibit E and a quality audit conducted pursuant to the QS regulations, the Court concludes that a genuine issue of material fact exists as to whether Mextel met the requirements of Exhibit E during the April 1999 audit. [19] As such, a genuine issue of material fact exists as to whether Mextel failed to cure deficiencies identified in Exhibit E and referenced in the April 1999 audit report, particularly with respect to "in-process procedures" referenced in Exhibit E. Neither Mextel nor Hill-Rom is therefore entitled to summary judgment with respect to counterclaims based on P 9.4 of the Agreement. [20]

> 19    Vedran Skulic testifies that Mextel always met the "assurance specifications and protocols that were identified in Exhibit E to the Agreement." (Skulic's Third Declaration, at P 15).

> 20    Nonetheless, as discussed earlier, the failure to comply with QS regulations in April 1999 demonstrates a failure to comply with GMPs in breach of P 6.1(b) of the Agreement.

### 3. Marketing Clearance

Hill-Rom asserts [*107] that Mextel breached P 2.1(b) of the Agreement by failing to provide validation for the product design sufficient to obtain FDA marketing clearance. (See Answer, at P 39(b)). Paragraph 2.1(b) of the Agreement states that Mextel shall "provide validation of the PRODUCT design sufficient to enable Air-Shields to obtain FDA marketing clearance for the infant incubators and infant radiant warmer incorporating the PRODUCT." Id. The Agreement does not defined the phrase "marketing clearance."

Mextel claims that a July 30, 1996 letter from the FDA provides the required "marketing clearance." The July 30, 1996 letter states:

> You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act [FDCA], include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

(See July 30, 1996 Letter, attached as Ex. 8 to Pl. Mot. For SJ.). Hill-Rom, however, interprets this letter as imposing a condition precedent to marketing clearance, so that marketing clearance could only occur upon compliance with the general [*108] control provisions of the FDCA.

This Court finds as a matter of law that the July 30, 1996 letter satisfies Mextel's obligation in P 2.1(b) to provide validation of the product design sufficient to obtain "marketing clearance." The July 30, 1996 letter further states:

> This letter will allow you to begin marketing your device as described in your 510(k) premarket notification immediately. An FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and permits your device to proceed to the market, but it does not mean that the FDA approves your device.

(Id.). This letter consequently constitutes an initial "marketing clearance," which satisfied Mextel's obligation under P 2.1(b) of the Agreement. Thus, this Court grants summary judgment for Mextel with respect to counterclaims based on P 2.1(b).

### 4. Remaining Counterclaims

Both Hill-Rom and Mextel seek summary judgment on Hill-Rom's remaining counterclaims, including counterclaims 39(a), (d)-(g), (j), (n)-(x). Because neither Mextel nor Hill-Rom has squarely addressed the merits of these remaining counterclaims, this Court denies

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

[*109]    each party's respective motion for summary judgment on these counterclaims.

## 5. Damages

As a result of Mextel's breaches, Hill-Rom seeks the costs associated with recalling Mextels' controller, with developing the replacement controller, with the costs of making FDA submissions, and with a loss of reputation in the marketplace. (See Br. In Opp'n. to Pl. Mot. For SJ., at 19). Hill-Rom claims that these costs flow from Mextel's alleged breaches and from the mitigation doctrine. (Id.). On the other hand, Mextel contends that the terms of the contract limit the remedies available to Hill-Rom and that Mextel is entitled to summary judgment with respect to Hill-Rom's request for each item of damages.

"An unjustified breach of a contract does not subject the breaching party to all remedies under contract law if the contract provides otherwise." *John B. Conomos, Inc. v. Sun Co., Inc., 2003 PA Super 310, 831 A.2d 696, 708 (Pa. Super. Ct. 2003)*; see *13 Pa. Cons. Stat. Ann. § 2-719* (agreement may limit or alter the measure of damages recoverable, with the underlying purpose that parties should be "left free to shape their remedies to their particular requirements").    [*110]    Unless otherwise modified by contractual terms, a buyer who accepts nonconforming goods retains the right to sue for breach of contract, but must notify the seller of the breach within a reasonable time after she discovers or should have discovered the breach. Id. *§ 2-607*. Upon doing so, the buyer may recover damages for any nonconformity of tender, including incidental and consequential damages. Id. *§ 2-714(a)-(b)*. Incidental and consequential damages are those damages that naturally and proximately flow from the breach or that were foreseeable at the time of contract formation. Id.; see, e.g., *Frank B. Bozzo, Inc. v. Electric Weld Div. of Ft. Pitt Bridge Div. etc., 283 Pa. Super. 35, 423 A.2d 702, 709 (Pa. Super. Ct. 1980)* (recoverable loss "must be one which ordinarily follows the breach of the sales contract in the usual course of events or one that reasonable men in the position of the parties would have foreseen as the probable results of that breach.")

### a. Costs of FDA Submissions

In P 11.1 of the Agreement, Hill-Rom agreed to "make, at its sole costs and expense, all necessary submissions to the FDA . . . ." (Id.). However, in the same paragraph, Mextel agreed to provide [*111] Hill-Rom "with any assistance reasonably requested by Hill-Rom in connection with the generation of any such test data [necessary for filings] as well as the preparation of the FDA and comparable foreign submissions." (Id.).

Hill-Rom claims that because Mextel's breaches led to FDA submissions, including submissions in response to agency inquiries, 483 observations, and warning letters, Mextel may not take advantage of Hill Rom's contractual obligation to pay for such submissions. (See Def. Br. In Opp'n., at 18). Mextel, on the other hand, contends that Mextel had no obligation to pay any costs of any regulatory event pursuant to the allocation of expenses within P 11.1. (See Pl. Mot. For SJ., at 19).

The language of P 11.1 clearly states that Hill-Rom was required to pay for all "necessary" submissions to the FDA. Id. Hill-Rom does not argue that the FDA submissions in response to various inquiries were not "necessary" within the meaning of P 11.1. Nor does the language of P 11.1 give Hill-Rom the discretion to limit this financial obligation to certain factual scenarios. Finally, Hill-Rom fails to cite applicable case law to support its view that P 11.1's contractual [*112] allocation of the costs of regulatory submissions is voided by Mextel's breaches of the Agreement, particularly when Hill-Rom continued to reinstate the terms of the Agreement by accepting non-conforming products. Therefore, regardless of whether Mextel's failure to comply with GMPs caused Hill-Rom to make submissions to the FDA, Hill-Rom contractually agreed to assume liability for the costs of all regulatory submissions during the life of the Agreement.

### b. Costs of Recalls

Hill-Rom requests summary judgment on the issue of damages for the cost of recalling Mextel's C2000 incubator. (Def. Mot. For SJ., at 19-21). Hill-Rom provides evidence that it initiated an "Urgent Medical Device Notice/Recall" pertaining to problems with the C2000 incubator in May 1998, and then issued a revised recall letter in January 2000. (See FDA Documentation, attached as Ex. 14 to Def. Br. In Opp'n., at FDA 00292-00295). Mextel, on the other hand, asks the Court to dismiss P 40(b) of Hill-Rom's counterclaim on the basis of the allocation of costs in P 10.2. (Pl. Mot. For SJ., at 19-20).

Although the Agreement does not define the term "recall," the Court finds from the language of the Agreement, [*113] from the context of the contractual arrangement, and from the objective of the arrangement that the parties intended to adopt the FDA's definition of "recall." See, e.g., *Bethlehem Steel Corp. v. MATX, Inc., 703 A.2d 39, 42 (Pa. Super. Ct. 1997)* ("intention of parties paramount and the Court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and nature conduct of the parties, bearing in mind the objects manifestly to be accomplished") (internal quotations omitted). According to the FDA, most "recalls" of medical devices are voluntarily conducted by the manufacturer in accordance with 21 CFR Part 7. See

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 50 of 67

Page 27

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

FDA, *Medical Device Recalls and Corrections and Removals*, available at http://www.fda.gov/cdrh/devadvice/51.html # 3 (as of January 25, 2005). This type of voluntary "recall" is defined as a "firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure." *21 CFR § 7.3 (West)* According to this definition, a "recall does not include [*114] a market withdrawal or a stock recovery." Id.

The Agreement contains a provision that applies to recalls of the controller:

> RECALLS: In the event of a recall of any AIR-SHIELDS products that use PRODUCT supplied by MEXTEL hereunder, when it is determined that such an event is caused by PRODUCT malfunction and not by specification or requirement change, MEXTEL shall repair or replace all such PRODUCTS. Whether it is claimed that PRODUCT is causing such an event or not, AIR-SHIELDS will indemnify, defend, and hold MEXTEL, its current directors, officers, employees, and agents harmless from and against any and all claims, liability, product and warranty liability, loss, damages, costs, or expenses.

(See Agreement, at P 10.2).

Paragraph 10.2 of the Agreement allocates contractual risk and identifies that the appropriate remedy in the event of a recall is replacement or repair of the products. Id. In contrast to Hill-Rom's assertions, the "event" described in the Agreement refers to any form of a recall, rather than to a recall based expressly upon a product malfunction. Id. Thus, regardless of whether the controller caused the recall (ie., regardless of [*115] whether the recall was for a malfunction or not), Hill-Rom agreed to indemnify Mextel for the costs associated with that recall through P 10.2.

Problematically, however, the remedy available to Hill-Rom pursuant to P 10.2 is expanded by P 21.2 of the Agreement. Rather than the replacement or repair of malfunctioning controllers, Mextel in P 21.2 agreed to indemnify Hill-Rom for the costs of recalls that Hill-Rom incurred as a result of any "hardware failure" within the controller. (See Agreement, at P 21.2). Thus, to the extent that P 21.2 requires indemnification for the costs of recalls associated with hardware failures within the controller, it contradicts P 10.2's obligation of Hill-Rom to

indemnify Mextel for any costs incurred in connection with the recall of the controller.

Despite these two seemingly contradictory provisions, one harmonizing principle can be devised: Hill-Rom was required to indemnify, defend, and hold Mextel harmless for all damages or costs associated with the recall of the controller, when the recall was not caused by a hardware failure within the controller. In other words, Mextel is entitled to summary judgment on this issue of damages if the recall [*116] was not caused by a hardware failure; on the other hand, Hill-Rom *may* be entitled to summary judgment on the issue of damages if the recalls were caused by a hardware failure. With this interpretative overlay in mind, the Court finds several genuine issues of material fact that preclude granting summary judgment on this issue.

First, the Court finds that a genuine issue of material fact exists as to whether the May 18, 1998 urgent medical device notice was a "recall" within the meaning of P 10.1 of the Agreement and FDA regulations. [21] It is true that a memorandum from the Philadelphia Branch of the FDA refers to the May 18, 1998 notice as a "recall notification." (See October 3, 2001 Memorandum Concerning Recall Termination Recommendation, at FDA 00292-00295). Nonetheless, the parties have failed to provide the Court with an appropriate factual or legal framework, including citations to the appropriate regulatory authority, to determine whether the May 18, 1998 urgent medical device notice and any accompanying action was a voluntarily "recall," as defined by the FDCA and within the meaning of P 10.1 of the Agreement.

> 21    Mextel implicitly challenges the categorization of the May 18, 1998 notice as a "recall," noting that "this FDA 'recall' did not require Air-Shields [Hill-Rom] to reissue or replace its products as is classically understood by this term." (Pl. Mot. For SJ., at P 20).

[*117] Second, a genuine issue of material fact exists as to whether the process by which Hill-Rom replaced controllers in every C2000 incubator in January 2000 was a "recall." While providing affidavit testimony to indicate that Hill-Rom commenced the process to replace C2000 incubators using the Mextel controller in January 2000, Hill-Rom has failed to provide information relevant to that process, such as the alleged agreement with the FDA to replace such controllers, the procedures by which the event was accomplished, and the results of the process. (See Spencer Aff., at P 8). As such, a genuine issue of material fact exists as to whether the January 2000 event meets the definition of "recall" within the meaning of the FDCA and P 10.1 of the Agreement.

Page 28

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

Finally, assuming *arguendo* that the May 18, 2000 urgent medical device notice and the January 2000 event that led to the replacement of controllers in the C2000 incubator were "recalls," the Court finds that a genuine issue of material fact exists as to whether the two recalls were caused by a hardware failure in the controller. Hill-Rom provides evidence that the controller suffered from a failure rate of 21.8% for 1997 and 1998, [*118] and from a field replacement rate of 15% between November 1996 and October 1999. (See Ferrante Aff., at P 5-7). Furthermore, an October 3, 2001 Memorandum concerning the termination of the recalls, approved by the director of the Philadelphia Investigations Branch for the FDA, stated that the FDA issued to Hill-Rom a recall recommendation for the C2000 incubator in May 1998 and that the reason for the recall recommendation was the product's potential to cause serious injuries and deaths." (See October 3, 2001 Concerning Recall Termination Recommendation, attached as Ex. 14 to Def. Br. In Opp'n., at FDA 00292-00295). The October 3, 2001 Memorandum further states that "the unresolved problems were with regard to the controller and the humidity module," and particularly with regard to their failure to meet QS/GMP requirements. (Id.).

On the other hand, as Mextel points out, FDA inspection reports and 483 letters throughout 1998 and 1999 listed problems with components of the C2000 incubator independent of the controller and with deficiencies in Hill-Rom's manufacturing process. (See id.). For instance, the November 30, 1999 inspection report lists specific problems with [*119] Hill-Rom's complaint handling procedures, and documents complaint occurrence for the humidity system as well as the controller. (See November 30, 1999 483 Letter, attached as Ex. 14 to Def. Br. In Opp'n., at FDA 00179-181). The March 26, 1998 inspection report, which precipitated the May 1998 notice, lists problems with the C2000's simulator, with Hill-Rom's complaint handling procedures and documentation, with a lack of oversight when problems are detected in the manufacturing of the C2000 incubator, and with Hill-Rom's quality system compliance. (See March 26, 1998 483 Letter, attached as Ex. 14 to Def. Br. In Opp'n., at FDA 00286-291). Furthermore, the requisite link between the malfunction of the incubator and the recalls is undermined by Mextel's contradictory position that the recall was not initiated because the controller failed to work properly, or "malfunctioned," but, instead, because Mextel failed to comply with regulatory requirements to verify that the controller would not malfunction. (See Def. Mot. For SJ., at 20).

Accordingly, because genuine issues of material fact exist as to whether Hill-Rom conducted recalls within the meaning of the FDCA, and, if [*120] so, as to whether the recalls were caused by a malfunction or hardware failure with the controller, neither party is entitled to summary judgment on the issue of recall damages.

### c. Cost of Developing a Replacement Controller

Plaintiff contends that no basis exists for the recovery of costs incurred to develop and design a replacement controller. (See Pl. Mot. For SJ. For. SJ., at 20). However, the Agreement does not limit Hill-Rom's right to seek the costs of developing a replacement controller in the event of Mextel's material breach of the Agreement. Furthermore, pursuant to the Pennsylvania UCC, a buyer, such as Hill-Rom, who accepts a non-conforming product, such as a controller that lacks DMR documentation and verification and validation analysis, may seek damages for the non-conformity, as well as incidental damages, which include "any commercially reasonable charges, expenses in connection with effecting cover," and consequential damages, which include damages that were "reasonably foreseeable" at the time of contract formation. See *13 Pa. Cons. Stat. Ann. § 2714*; *AM/PM Franchise Ass'n v. Atlantic Richfield Co., 526 Pa. 110, 584 A.2d 915, 921 (Pa. Super. Ct. 1990)* [*121] (defining consequential damages).

Nonetheless, a genuine issue of material fact exists as to whether the costs associated with the development of a replacement controller flow from Mextel's breaches of the Agreement, particularly because Hill-Rom started soliciting proposals for a replacement controller in 1998 and has not documented the timing of particular expenses for the replacement controller. (See Comtec and Battelle Proposals, attached as Ex. 26-27 to Pl. Br. In Opp'n.). A genuine issue of material fact also exists as to whether Hill-Rom complied with the provisions of the Pennsylvania UCC permitting a recovery of incidental damages in such a situation. See *13 Pa. Cons. Stat. Ann. § 2-607* (requiring buyer who accepts goods and who seeks to recover for breach to notify seller of breach within reasonable time after she discovers or should have discovered breach). Accordingly, neither Hill-Rom nor Mextel is entitled to summary judgment on P 40(d) of Hill-Rom's counterclaim.

### d. Lost Profits From Reputation Damage

The Agreement does not limit Hill-Rom's right to recover consequential damages, including reputation damages. *Section 2-715 of the Pennsylvania UCC* permits [*122] the recovery of loss of good will, including damage to reputation, and the loss of future profits as a result of that loss of good will. See, e.g., *AM/PM Franchise Assoc. v. Atlantic Richfield Co., 526 Pa. 110, 584 A.2d 915, 926 (Pa. 1990)* (holding that good will damages, including loss of business reputation, is available as consequential damages under *sections 2-714* and *2-715 of the Pennsylvania UCC*).

Hill-Rom offers only conclusory and speculative statements, without specific evidentiary support, that Hill-Rom's reputation suffered because of the problems with the Mextel controller and the process of replacing all C2000 incubators that contained a Mextel controller in 2000. (See Johnson Aff., at P 8; Wenstrup Aff., at P 3). Genuine issues of material fact therefore exist as to whether Hill-Rom's reputation suffered loss of reputation due to the alleged "recalls" of the C2000 incubator, and whether this loss of reputation flowed from Mextel's breaches of P 6.1(b) and P 8.2 of the Agreement. A genuine issue of material fact also exists as to the amount of such damages. See, e.g., *Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 305 (3d Cir. 2002)* [*123] (evidence of lost profits must be demonstrated to a fair degree of probability). Accordingly, neither Hill-Rom nor Mextel is entitled to summary judgment on P 40(c) of Hill-Rom's counterclaim.

## B. Counts II and III: Quantum Meruit and Unjust Enrichment

Counts II and III of the Mextel's complaint seek damages on the legal theories of quantum meruit and unjust enrichment. Hill-Rom seeks summary judgment on these claims, asserting that they may not survive because of the existence of the written contract.

Claims for quantum meruit and unjust enrichment presuppose the absence of a valid contract. See, e.g., *Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 1000 (3d Cir. 1987)* (applying Pennsylvania law); *Villoresi v. Femminella, 2004 PA Super 256, 856 A.2d 78, 84 (Pa. Super. Ct. 2004)* ("Where an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist."). Mextel admits that the written agreement covers the electronic controller. However, Mextel contends that the sensor modules [*124] were not covered by the Agreement, and, thus, that Mextel's quantum meruit and unjust enrichment claims should survive with respect to the shipment of sensor modules.

The Agreement permitted Hill-Rom to submit purchase orders for the sale and purchase of "products." (See Agreement, at P 9.1). The Agreement defines "products" as "the electronic controller" for Hill-Rom's infant incubators and infant radiant warmers. (Id., at P 1.17). Thus, Mextel's production and shipment of the sensor modules to Hill-Rom was not expressly covered by the Agreement. Nor has Mextel identified any other contract, written or oral, for the design and supply of sensor modules to Hill-Rom. Hill-Rom is therefore not entitled to summary judgment with respect to Mextel's quantum meruit

and unjust enrichment claims regarding the sensor modules.

## C. Count IV: Breach of Implied Covenant of Good Faith and Fear Dealing

In its opposition brief, Mextel voluntarily withdraws Count IV of its amended complaint. (See Pl. Br. In Opp'n. to Def. Mot, at 1 n.1). Accordingly, this Court grants Hill-Rom's motion for summary judgment with respect to Mextel's claim for breach of the implied covenant of good [*125] faith and fear dealing.

## D. Count VI: Misappropriation of Trade Secrets

Count VII of the amended complaint alleges that Hill-Rom misappropriated plaintiffs' source code that formed the software template for the plaintiffs' controller. (Am. Compl., at PP 48-52). In their opposition brief, plaintiffs further allege that Hill-Rom stole the executable code and trade secrets relating to the sensor module. (Pl. Br. In Opp'n. to Def. Mot. For SJ., at 21-24).

A trade secret can be "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Prudential v. Stella, 994 F. Supp. 318, 323 n. 2 (E.D. Pa. 1998)*. In order to prevail on a claim for misappropriation of trade secrets, plaintiffs must establish: (1) the existence of a trade secret; (2) which was communicated in confidence to Hill-Rom; (3) used by Hill-Rom in breach of that confidence; (4) to the detriment of the plaintiff. See, e.g., *Moore v. Kulicke & Soffa Industries, Inc., 318 F.3d 561, 566 (3d Cir. 2003)*; *Pennfield Precision, Inc. v. EF Precision, Inc., 2000 U.S. Dist. LEXIS 11971, 2000 WL 1201381, at *3 (E.D. Pa. Aug. 15, 2000)* [*126] (outlining elements).

### 1. Source Code

Hill-Rom implicitly agrees that the executable component of the source code for the controller, that hidden portion of the code encoded by the source code, is a "trade secret." (Def. Mot. For SJ., at 22-23; Def. Reply Br., at 6). However, Hill-Rom claims that there is no evidence to support the remaining elements of plaintiffs' cause of action--that plaintiffs communicated the source code to Hill-Rom and that Hill-Rom used that source code without plaintiffs' permission in its new incubator products. (Id.).

This Court agrees. Hill-Rom presents the testimony of Colin Jackson, the software project engineer for Comtec Systems, Inc. ("Comtec"), the company that contracted with Hill-Rom for the design and development of the replacement controller. (See Jackson Aff., attached as Ex. 8 to Def. Mot. For SJ.). According to Jackson, nei-

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 53 of 67

Page 30

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

ther he nor anyone else at Comtec ever used or had access to plaintiff's source code. (Id., at PP 3-5). Jackson further testifies that Comtec did not reverse engineer the replacement controller from plaintiffs' executable code and that Comtec never received a copy of plaintiffs' [*127] executable code from Hill-Rom. (Id.).

Jackson's testimony is reinforced by the testimony of Michael Mountain, Hill-Rom's in-house software engineer who amended the Comtec source code prior to its inclusion in the new C2000 incubator. (See Mountain Aff., attached as Ex. 9 to Def. Mot. For SJ.). Mountain's affidavit avers that work performed on the replacement controller was "done totally independent of any source code generated by Mextel." (Id., at P 4). Specifically, Mountain testifies that neither he nor anyone working on the replacement controller software used any source code language from the original controller, reverse engineered any source code or executable code from the original controller, or used the source code from the original controller in designing the replacement controller. (Id., at PP 2-4).

Plaintiffs have failed to present any evidence to rebut this testimony, let alone to articulate a coherent theory as to how Hill-Rom misappropriated the source code. [22] Instead, plaintiffs attempt to establish the existence of a genuine issue of material fact by arguing: (i) that Hill-Rom has not produced the source code for the replacement controller in discovery, [*128] despite plaintiffs' production of the source code to Hill-Rom; and (ii) that plaintiffs worked directly with Hill Rom's engineers during the production of the plaintiff's electronic controllers. (Pl. Br. In Opp'n., at 21-23).

> 22    Plaintiff seems to have withdrawn from its earlier position that CriTech's representative took plaintiff's source code for the controller on behalf of Hill-Rom. (See Answer to Interrogatory, attached as Ex. 5 to Def. Mot. For SJ., at 4). Nonetheless, Hill-Rom includes an affidavit from Cri-Tech's president, who categorically denies misappropriating the source code. (See Rajewski Aff, attached as Ex. 23 to Def. Mot. For SJ., at PP 2-5).

Plaintiffs' factual disputes are not material to the elements necessary to establish a cause of action for trade secret misappropriation. See *Jersey Central Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985)* (summary judgment motion not defeated by existence of factual dispute, but, instead, by existence of [*129] factual dispute *material* to resolution of claims). First, regardless of the veracity of plaintiffs' allegations concerning the production of the new source code during discovery, plaintiff has failed to put forth any evidence indicating that Hill-Rom used plaintiffs' source code to create the replacement controller. In fact, plaintiffs' admission that it failed to obtain Hill-Rom's source code for the replacement controller despite nearly two years of discovery is fatal to plaintiffs' cause of action; it reveals that plaintiffs will not be able to present evidence at trial, in the form of comparative analysis, that Hill-Rom used plaintiffs' trade secrets, indeed, that the new source code is identical to, or shares similar characteristics with, plaintiffs' source code. See, e.g., *Block v. Blakely, 2004 U.S. Dist. LEXIS 16920, 2004 WL 1902520, at *2 (E.D. Pa. Aug. 24, 2004)* (summary judgment appropriate when plaintiff fails to make sufficient showing as to element of claim for trade secret misappropriation). Second, the fact that Hill-Rom's engineers worked with Skulic and Mextel's engineers to develop the controller does not establish that Hill-Rom's engineers had access to the source [*130] code, nor that they communicated the source code to a third-party to develop the replacement controller. Based upon the record before the Court, no reasonable juror could conclude that Hill-Rom misappropriated plaintiffs' source code.

## 2. Sensor Module

Plaintiffs argue in their opposition brief that Hill-Rom misappropriated trade secrets related to the sensor module. (See Pl. Br. In Opp'n. to Def. Mot. For SJ., at 22-23). Hill-Rom claims that this argument is impermissible at this stage in the litigation because these factual allegations were never articulated in the amended complaint. (See Def. Reply Br., at 6-7). Hill-Rom further asserts that the record is devoid of any support for these allegations. (Id.).

This Court agrees that plaintiffs never asserted that Hill-Rom misappropriated trade secrets related to the sensor module in the amended complaint. See, e.g., *Conley v. Gibson, 355 U.S. 41, 47-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"). Nonetheless, assuming *arguendo* that plaintiffs were entitled to raise this additional misappropriation [*131] claim at this point in the litigation, plaintiffs have failed to identify any evidence in support of their claim. Plaintiffs rely upon 48 documents produced by Hill-Rom to Da-Tech, the third party engaged by Hill-Rom to manufacture the new sensor module, to support their misappropriation claim. (See Da-Tech Documents, attached as Ex. 38 to Pl. Mot. For SJ., at DA 01513-27, DA 01550-75, and DA 02551-57). According to plaintiffs, these documents demonstrate that Hill-Rom provided and used plaintiffs' trade secrets, such as specifications, drawings, and other information, to manufacture the new sensor modules. (Id.).

These documents fail to support plaintiffs' misappropriation claim. Plaintiffs fail to document its owner-

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 54 of 67

Page 31

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

ship of the allegedly confidential information in the Da-Tech documents, such as by providing testimony or documentation that the material within the Da-Tech documents was used in the design, production, or manufacture of the original sensor modules. Indeed, many of the Da-Tech documents themselves indicate that the information is the property of Hill-Rom. (See Da-Tech Documents, at DA01513, DA01550, DA01559, DA02551). Nor do plaintiffs identify what information [*132] contained in the Da-Tech documents is a trade secret and what alleged trade secrets were used by Hill-Rom and Da-Tech to produce the replacement sensor module. Plaintiffs, as the ultimate bearers of proof, have failed to meet their burden at the summary judgment stage of demonstrating a genuine issue for trial. Accordingly, this Court grants Hill-Rom's summary judgment motion as to the misappropriation claim with respect both to the sensor module and the controller.

### E. Count VIII: Trade Dress Infringement

Plaintiffs voluntarily withdraw Count VIII of their amended complaint. (See Pl. Br. In Opp'n. to Def. Mot, at 1 n.1). Accordingly, this Court grants Hill Rom's motion for summary judgment with respect to plaintiffs' trade dress infringement claim.

### F. Count IX: Unfair Competition

Plaintiffs do not identify the basis of their claim for unfair competition. Presumably, plaintiffs proceed on the theory that Hill-Rom was "passing off" plaintiffs' controller, trade secrets, and/or trademarks as that of Hill-Rom in the marketing and sale of the C2000 incubator. See, e.g., *Restatement (Third) of Unfair Competition § 5 (1995)* [*133] (liability for deceiving or misleading prospective purchasers by causing mistaken belief that defendant is manufacturer, producer, or supplier of plaintiff's goods or services); see also *Scott Fetzer Co. v. Gehring, 288 F. Supp. 2d 696, 703 (E.D. Pa. 2003)* (to prove unfair competition concerning trademarks under Pennsylvania common law, plaintiff must show that trademark is valid and legally protectable, that trademark is owned by plaintiff, and that defendant's use of the mark to identify goods and services is likely to create confusion concerning the origin of goods or services); *Haymond v. Lundy, 2001 U.S. Dist. LEXIS 54, 2001 WL 15956, at *2-3 (E.D. Pa. Jan. 5, 2001)* (outlining elements). Under Pennsylvania common law, the "essence" of the claim lies in the "deception practiced in 'passing off' the goods of one for that of another." *Pennsylvania State Univ. v. Univ. of Orthopedics, Ltd., 706 A.2d 863, 870 (Pa. Super. Ct. 1998).* Indeed, the underlying purpose motivating the law of unfair competition is to prevent "substitution by deception." Id.

Hill-Rom offers evidence that there were never visible markings on the C2000 that identified Mextel as the [*134] manufacturer or designer of the controller or its software, therefore making it impossible for consumers to be confused as to the source of the replacement controller. (See Boone Aff., attached as Ex. 6 to Def. Mot. For SJ., at PP 3-5). Plaintiffs lone response to this argument is that the "misappropriation of Mextel's trade secrets also renders Air-Shields liable for unfair competition." (See Pl. Br. In Opp'n., at 24).

This Court has already granted Hill Rom's summary judgment motion on plaintiffs' claim for misappropriation of trade secrets, concluding that plaintiffs failed to establish Hill-Rom's impermissible use of plaintiffs' trade secrets in the design, manufacture, and sale of the new C2000 incubator. With respect to the unfair competition claim, plaintiffs have also failed to create a genuine issue of material fact that Hill-Rom unfairly passed off plaintiffs' products, trade secrets, or trademarks as its own. Nor have plaintiffs put forth any evidence of consumer confusion as to the origin or source of the replacement controller or of any other components of the new C2000 incubator. See, e.g., *Haymond, 2001 U.S. Dist. LEXIS 54, 2001 WL 15956, at *3-4* (summary judgment [*135] appropriate when plaintiff fails to demonstrate likelihood of confusion among consumers); *Polymer Dynamics, Inc. v. Bayer Corp., 2000 U.S. Dist. LEXIS 11493, 2000 WL 1146622, at *8 (E.D. Pa. Aug. 14, 2000)* (consumer confusion essential element of unfair competition claim under Pennsylvania common law). Consequently, the Court grants Hill Rom's motion for summary judgment with respect to the unfair competition claim in Count IX of the amended complaint.

### G. Count VI: Patent Infringement

Defendant moves for summary judgment on plaintiffs' patent infringement claim. (Def. Mot. For SJ., at 18-22). A determination of patent infringement requires a two-step analysis. See *PSC Computer Products, Inc. v. Foxconn Int'l., Inc., 355 F.3d 1353, 1357 (Fed. Cir. 2004).* The court must first interpret the claims to determine their scope and meaning. Id. The court must then compare the properly construed claims to the allegedly infringing device. Id.

The burden is on the plaintiff to prove infringement by a preponderance of the evidence. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys. Inc., 261 F.3d 1329, 1336 (Fed. Cir. 2001).* To establish infringement of [*136] a patent, "every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Johnston v. Ivac Corp., 885 F.2d 1574, 1577 (Fed. Cir. 1989).* An accused infringer is therefore "entitled to summary judgment, on the ground of non-infringement, by pointing out that the

Page 32

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices." *Johnston, 885 F.2d at 1578.* General denials and conclusory statements are insufficient to meet the non-movant's burden. See *Hodosh v. Block Dog Drug Co., 786 F.2d 1136, 1141 (Fed. Cir. 1986).*

Hill-Rom argues that it is entitled to summary judgment on plaintiffs' patent infringement claim for several reasons. First, Hill-Rom argues that the Court need not perform an initial claim construction of the *'006* and *'830* patents because the record lacks a basis for a reasonable juror to find by a preponderance of the evidence that a product possessed by Hill-Rom infringes on plaintiffs' patented devices. (See Def. Mot. For SJ., at 12-14, 18-19). Second, assuming that claim [*137] construction is necessary, Hill-Rom specifically contends that the *'006* patent is not infringed because the heater assembly in the C2000 lacks a mounting bushing. (Id., at 19-20). Third, Hill-Rom contends that even if the *'830* patent is infringed, it is invalid because it was "on sale" more than one year prior to the filing of the patent application. (Id., at 20).

Hill-Rom first argues that the record fails to identify any basis to support plaintiffs' infringement claim--that Hill-Rom's sensor module and heater assembly in the new C2000 incubator infringe upon each and every limitation in various claims of the *'006* and the *'830* patents. Hill-Rom emphasizes that plaintiffs failed to provide answers to interrogatories, which asked plaintiff Skulic to identify the products that he contends infringe upon the *'006* and *'830* patents, to specify the claims of those patents that are infringed, and to explain how, on an element-by-element basis, those claims read on the accused products. (See Hill-Rom's Interrogatory Requests, attached as Ex. 14-15 to Def. Mot. For SJ.). Furthermore, Hill-Rom contends that because plaintiffs failed to inspect the replacement controller and sensor [*138] module during the requisite discovery period, despite numerous opportunities to do so, plaintiffs cannot identify what elements of Hill-Rom's new incubator are infringing. (See Letters to Plaintiffs' Counsel, attached as Ex. 16-19 to Def. Mot. For SJ.).

This Court agrees. Plaintiffs' lone response to Hill-Rom's motion is the testimony of the patentee. According to Skulic's Third Declaration, he inspected an Isolette C2000 incubator with replacement versions of the heater assembly, the controller, and the sensor module in a hospital in Evanston, Illinois. (See Vedran Skulic's Third Declaration, at PP 22-23). Skulic asserts that the inspected incubator "is consistent with all the documents produced in this case indicating that it is the current version of the C2000 being commercialized by Air-Shields." (Id., at 23). Skulic testifies that he was able to take apart

the infringing C2000 incubator, and to review and photograph the internal mechanisms of the sensor module and the heater assembly. Skulic concludes that the Isolette C2000 Incubator included "all the elements of one or more claims of both of my patents." (Id., at PP 25-26).

Skulic's testimony fails as a matter [*139] of law to overcome Hill-Rom's summary judgment motion. See, e.g., *Johnston, 885 F.2d at 1578* (affidavit stating that grip mechanism of accused thermometer infringes upon claims 1, 2, 3, 4, 5, and 6 of the patent constitutes conclusory statement and fails to raise a genuine evidentiary dispute for jury). First, plaintiffs offer no specific evidence that the C2000 incubator inspected by Skulic was in fact the incubator sold by Hill-Rom. Rather than inspecting products that Hill-Rom made available, plaintiff investigated an incubator in a hospital that appeared "consistent" with what the exchanged documents indicated was Hill-Rom's product. (See Letters to Plaintiffs' Counsel For Scheduling of Inspection, attached as Ex. 16-19 to Def. Mot. For SJ.). Second, Skulic's photographs of the accused products are not accompanied by a factual description of the elements in the accused sensor module and heater assembly, of where these elements are located, or of their relationship to claims in the plaintiffs' patents. Third, Skulic's testimony relies upon conclusions without factual support. See, e.g., *TechSearch LLC v. Intel Corp., 286 F.3d 1360, 1372 (Fed. Cir. 2002)* [*140] ("infringement must be shown literally or equivalently for each limitation; general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden"). Specifically, Skulic's Third Declaration fails to provide any fact-based analytical comparison between the accused and patented products, let alone any evidence demonstrating how each limitation in the relevant claims for both the *'006 patent* and *'830* patent is found in the accused products. See, e.g., *McKeown v. Bayshore Concrete Prods. Corp., 34 Fed. Appx. 741, 2002 WL 914339, at *2 (Fed. Cir. 2002)* (granting summary judgment to defendant when plaintiff patentee relies on broad statements in his own affidavit alleging, without factual support, that "he has personally inspected [defendant's] products, compared them to the *'5,846,020* patent, and found that the accused structures contain every element" of the infringed upon claim). In fact, with the exception of Claim 1 of the *006* patent, [23] Skulic fails to identify which claims are being infringed. What Skulic does present is the naked conclusion that the C2000 incubator "includes all the elements of one or more claims of [*141] both of my patents." (See Third Skulic Declaration, at P 24). Such a statement, without more, fails to raise a genuine issue of material fact. *McKeown, 34 Fed. Appx. 741, 2002 WL 914339, at *2* (unsupported, conclusive statements on the issue of infringement "are wholly insufficient to raise a genuine evidentiary dispute for trial"); see *Fed. R. Civ. P. 56(e)*

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 56 of 67

Page 33

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

(nonmoving party must "set forth *specific facts* showing that there is a genuine issue of trial") (emphasis added).

23   Claim 1 of the *'006* patent reads as follows:

> 1. An infant incubator heater assembly comprising:
>
> a mounting plate adapted for attachment to a base of an incubator;
>
> a mounting bushing mounted to said mounting plate;
>
> a heat radiator removably attached to said mounting bushing and having a
>
> plurality or radially extending fins; and
>
> a cartridge heater extending through said heat radiator in heat transfer relationship
>
> with said heat radiator and mounted to said mounting bushing.

(See *'006* Patent, attached as Ex. 2 to Second Skulic Declaration and as Ex. 11 to Def. Mot. For SJ.).

[*142]   It is true that this Court has yet to offer a formal claim construction of the two patents. It is also true that an infringement analysis typically begins with claim construction. See, e.g., *PSC Computer Products, 355 F.3d at 1357*. However, the sequence of this process is not absolute, and, in an effort to avoid advisory opinions, only terms that are disputed, thereby placing such terms actually in controversy in the infringement litigation, are construed. See, e.g., *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1350 (Fed. Cir. 2004)* (district court not obligated to construe undisputed claim terms prior to issuing summary judgment on invalidity); *PSC Computer Products, 355 F.3d at 1357* (affirming district court's decision to not construe claims as first step of infringement analysis because their meaning was not disputed); *Westvaco Corp. v. Viva Magnetics Ltd., 2002 U.S. Dist. LEXIS 17177, 2002 WL 31052870, at *2 (S.D.N.Y. 2002)*. [24] Furthermore, the lack of an express claim construction by the Court does not absolve plaintiffs of their burden at the summary judgment stage to provide factual support for the [*143] conclusion that each and every limitation in the germane claims of the two patents reads on the accused devices. See *Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311,*

*1325-1326 (Fed. Cir. 2004)* (because patent holder bears the burden of establishing infringement at trial, defendant need only establish a deficiency concerning an element of plaintiff's claim). Indeed, without this evidence, the Court's initial claim construction is superfluous, as there is no description of the specific product, let alone its elements, with which to compare the claims of plaintiffs' patents. See, e.g., *Techsearch, 286 F.3d at 1369* ("Summary judgment of non-infringement is also appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial.").

24   The Court notes that in this instance, plaintiffs dispute only one term--the phrase "mounting bushing" in claim 1 of the *'006* patent. (See Third Skulic Declaration, at P 28-29). Resolution of this disputed construction is immaterial because plaintiffs have not met their burden of providing a factual analysis that the limitations in claim 1 of the *'006* patent are infringed by Hill-Rom's heater assembly. Furthermore, Hill-Rom offers evidence, including an affidavit from Ronald Kolarovic, the senior electrical engineer of the new C2000 incubator, along with technical drawings of the new heater assembly unit, that the heater assembly for the new C2000 incubator lacks a mounting bushing, and, in fact, was purposefully designed to eliminate such an element. (See Kolarovic Aff., attached as Ex. 21 to Def. Mot. For SJ.). This analysis is also confirmed by *US Patent 6,646,232* ("'232 patent"), which was issued for Hill-Rom's new heater assembly unit and which does not claim a mounting bushing for the device. (See Claim 1 of *'232* Patent, attached as Ex. 13 to Def. Mot. For SJ.). Once again, plaintiffs fail to present any factual evidence to challenge this showing, with the exception of Skulic's general conclusions that the new heater assembly unit possesses a "mounting bushing" and that, even if it does not, the new heater assembly unit is substantially equivalent to the *'006* patent. (See Third Skulic Declaration, at PP 28-29) ("As described in Mr. Kolarovic's affidavit and the one drawing that he produced, and based on my inspection of the new incubator, the revised heater assembly still does the same thing, the same way, and achieves the same results as the heater assembly that is described in the *006* patent and in my patent claims.").

[*144]   In summary, plaintiffs have failed to make the requisite showing to defeat summary judgment. The discovery period in this litigation lasted more than 15 months, and has been closed for an additional ten

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

months. See, e.g., *Spectra Corp. v. Lutz, 839 F.2d 1579, 1581 (Fed. Cir. 1988)* (thirteen months of discovery to pursue patent infringement claims constitutes reasonable discovery period). Despite this time, plaintiffs never inspected the allegedly infringing products in Hill Rom's possession, and have only identified one specific patent claim that was infringed. Moreover, with respect to this claim, plaintiffs rely upon conclusory allegations, without factual support, that each limitation in claim 1 of the *'006* patent is found in the new heater assembly for the C2000 incubator. Plaintiffs provide no testimony comparing in a comprehensive manner the patented devices and the accused devices, nor does plaintiff identify with clarity the elements of the accused devices that are allegedly infringing. Finally, plaintiffs never filed a *Rule 56(f)* affidavit requesting a delay in the resolution of Hill-Rom's summary judgment motion and additional time to pursue discovery [*145] on its infringement claims so that it could "present by affidavit *facts* essential to justify the party's opposition." *Fed. R. Civ. P. 56(f)* (emphasis added). Accordingly, this Court finds that Hill-Rom is entitled to summary judgment on plaintiffs' infringement claim as a matter of law. [25]

> 25 As a result of this holding, the Court need not address plaintiffs' motion for summary judgment as to the dismissal of Hill-Rom's patent defenses and counterclaims.

**IV. Conclusion**

For the preceding reasons, the Court GRANTS in part and DENIES in part the plaintiffs' first motion for summary judgment. The Court GRANTS the following aspects of plaintiffs' first motion for summary judgment: (i) liability for Hill Rom's failure to pay for shipped but accepted controllers in Count I of the amended complaint; (ii) dismissal of all counterclaims based on Mextel's alleged breach of P 2.1(b) of the Agreement; and (iii) dismissal of damages requested in P 40(a) in Hill Rom's [*146] breach of contract counterclaim. All other aspects of defendants' summary judgment motion are DENIED.

For the preceding reasons, the Court GRANTS in part and DENIES in part Hill Rom's summary judgment motion. The Court GRANTS the following aspects of Hill Rom's summary judgment motion: (i) dismissal of Counts IV-IX of the amended complaint; (ii) dismissal of plaintiffs' breach of contract claims for the recovery of damages both from ordered, but unshipped controllers and from unordered controllers; and (iii) liability for all counterclaims based on plaintiffs' breaches of P 6.1(b) and P 8.2 of the Agreement. All other aspects of Hill Rom's summary judgment motion are DENIED.

For the preceding reasons, the Court DISMISSES plaintiffs' second motion for summary judgment as moot.

An appropriate ORDER follows.

**ORDER**

AND NOW, this     day of January 2005, upon consideration of Plaintiffs' Motion for Partial Summary Judgment In Favor of Plaintiffs' Contract Claims and Dismissal of Defendants' Contract Counterclaims (Doc. No. 64), filed on April 14, 2004, and all responses and supplemental briefs thereto; Plaintiffs' Second Motion for Partial Summary Judgment With Respect [*147] to the Dismissal of Patent Defenses and Counterclaims (Doc. No. 66), filed on April 14, 2004, and all responses and supplemental briefs thereto; and Defendants' Motion for Summary Judgment on Plaintiffs' Amended Complaint and Count IX of Defendants' Counterclaim (Doc. No. 74), filed on April 14, 2004, and all responses and supplemental briefs thereto, it is hereby ORDERED as follows:

> 1. Plaintiffs' First Motion For Summary Judgment (Doc. No. 64) is GRANTED in part and DENIED in part according to the following formula:
>
> a. Plaintiffs are entitled to summary judgment on Count I of the amended complaint with respect to Defendants' liability for failure to pay for shipped and accepted controllers;
>
> b. Plaintiffs are entitled to summary judgment on Defendants' breach of contract counterclaim with respect to Plaintiffs' liability for allegedly breaching P 2.1(b) of the Agreement;
>
> c. Plaintiffs are entitled to summary judgment on damages requested pursuant to P 40(a) in Defendants' breach of contract counterclaim.
>
> d. Plaintiffs' first motion for summary judgment motion is denied in all other respects.
>
> 2. Plaintiffs' Second Motion For Summary Judgment (Doc. No. 66) is DISMISSED [*148] as moot.
>
> 3. Defendants' Motion For Summary Judgment (Doc. No. 74) is GRANTED in part and DENIED in part according to the following formula:
>
> a. Defendants are entitled to summary judgment on Count I of the amended

2005 U.S. Dist. LEXIS 1281, *; 56 U.C.C. Rep. Serv. 2d (Callaghan) 1

complaint with respect to Defendants' liability both for ordered, but unshipped controllers and for unordered controllers;

b. Defendants are entitled to summary judgment as to Counts IV-IX of the amended complaint;

c. Defendants are entitled to summary judgment on their breach of contract counterclaim with respect to Plaintiffs' liability for breaching P 6.1(b) and P 8.2 of the Agreement; and

d. Defendants' summary judgment motion is denied in all other respects.

4. The Affidavit of Susan Reilly is stricken pursuant to *Federal Rule of Civil Procedure 56.*

BY THE COURT:

Legrome D. Davis, J.

LEXSEE 1992 US DIST LEXIS 20640


Caution
As of: Jan 30, 2008

**MUSHROOM ASSOCIATES et al., Plaintiffs, v. MONTEREY MUSHROOMS, INC., et al., Defendant**

**No. C-91-1092 BAC (PJH)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1992 U.S. Dist. LEXIS 20640; 25 U.S.P.Q.2D (BNA) 1304*

**August 21, 1992, Decided**
**August 21, 1992, Filed**

**COUNSEL:** [*1] Richard P. Doyle, Flehr, Hohbach, Test, Albritton & Herbert, Four Embarcadero Center, Suite 3400, San Francisco, California 94111.

Louis Lupin, Cooley, Godward, Castro, Huddleson & Tatum, Five Palo Alto Square, 4th Floor, Palo Alto, California 94306.

**JUDGES:** HAMILTON

**OPINION BY:** PHYLLIS J. HAMILTON

**OPINION**

ORDER RE: DEFENDANTS' MOTIONS TO COMPEL DISCOVERY.

The defendants' motions to compel discovery were heard on July 31, 1992. David J. Brezner and Laura L. Kulhanjian appeared for the plaintiffs. Louis M. Lupin appeared for the defendants. Having heard the parties' arguments and read their briefs, this court orders as follows.

I. INTRODUCTION.

The plaintiffs' allege that the defendants have infringed their patent. The patent at issue, *U.S. Patent No. 4,407,832 ("the '832 patent")* covers technology used in the processing of mushrooms.

On May 13, 1992, the defendants filed their motions to compel. Originally scheduled for June 26, 1992, the

hearing was postponed at the parties' request. At the outset, their motions covered three general areas of discovery. Through meet and confer sessions occurring after the filing of the motions, the parties were able to narrow the scope of the motions. At this point, [*2] three specific disputes are before this court: 1) Whether the plaintiffs should be required to give a more detailed definition of the term, "heat stable,", further requiring the plaintiffs to provide supplemental answers to Interrogatory Nos. 8, 12, 14, and 18; 2) To what extent should the defendants be allowed discovery of documents to which Andrew Ferguson ("Ferguson") had access; and 3) To what extent have the plaintiffs waived the attorney-client privilege with respect to foreign patent prosecutions and the prosecution of the *'832 patent* by their response to the defendants' defense of inequitable conduct.

II. DISCUSSION.

*A. Supplemental answers to interrogatories.*

*1. Interrogatory Nos. 8 and 14.*

Defendants' Interrogatory Nos. 8 and 14 rely on a definition of the term "heat stable." The plaintiffs' initial response to these interrogatories essentially directed the defendants to the *'832 patent.* In the briefing for this motion, the plaintiffs further explained the meaning of "heat stable" as it applies to this litigation. The discussion explains that "heat stable" means that certain particulates do not coagulate during the heat processing of mushrooms. During the [*3] hearing on this motion, the plaintiffs agreed to stipulate to their discussion of "heat

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 60 of 67

Page 2

1992 U.S. Dist. LEXIS 20640, *; 25 U.S.P.Q.2D (BNA) 1304

stable" contained in their opposition as a further definition of that term.

This court is convinced that the discussion in the plaintiffs' opposition provides a sufficient definition of "heat stable," thereby satisfying the inquiries posed by Interrogatory Nos. 8 and 14. Based on the discussion stipulated to by the plaintiffs, no further answer to these interrogatories is required.

### 2. Interrogatory No. 12.

Interrogatory No. 12 asks the plaintiffs to identify the properties of AVICEL CL-611 referred to at column 9, lines 9-14 of the '832 patent. The plaintiffs' initial response referred the defendants to the '832 patent and to other unidentified industry sources. Unsatisfied with this response, the defendants seek a supplementary answer which specifically identifies those properties, particularly in light of the definition of "heat stable." The plaintiffs essentially rest on their contention that such information is available from industry sources, specifically from FMC, the manufacturer of the AVICEL CL-611.

This court finds that the plaintiffs must provide a further answer to this interrogatory. [*4] The answer should list each property of AVICEL CL-611 implicit in the discussion made by the '832 patent, even if that means simply extracting the information directly from the FMC product description. By doing this, the defendants will not be required to guess exactly what the plaintiffs were referring to in the '832 patent. Such certainty is the goal of liberal discovery established by the federal rules.

### 3. Interrogatory No. 18.

Interrogatory No. 18 requests all facts upon which the plaintiffs' counsel told Richard L. Neeley, counsel for the defendants, that rice starch used by the defendants accomplished the same results by the same means as those discussed in the '832 patent. The plaintiffs initially objected to this interrogatory on the grounds that it sought information protected by the attorney-client privilege and the work product doctrine. However, in their opposition to this motion, the plaintiffs provided further explanation of the statement made by their counsel to Mr. Neeley.

This court finds that the discussion in their opposition is a sufficient further answer to this interrogatory. Consequently, the plaintiffs must make a further answer to Interrogatory [*5] No. 18 that incorporates the discussion found in its opposition dated July 17, 1992 at p.9. The plaintiffs must also make a further investigation into the facts of this assertion and supplement their answer accordingly as they agreed to do in their opposition. (Plaintiffs' Opposition, July 17, 1992, p.9:20-22.)

### B. Ferguson discovery.

Ferguson is a co-inventor of the '832 patent. He has also been designated as an expert for purposes of testimony in this litigation.

The defendants move to compel production of all documents to which Ferguson has had access, regardless of whether such documents were used in the formulation of his expert testimony. [1] In essence, the defendants argue that all documents pertaining to the '832 patent to which Ferguson has had access during the life of the patent are part of any testimony he would give, even if such documents were not actually reviewed for the purpose of his testimony. At the hearing, the plaintiffs agreed to produce all documents upon which Ferguson will rely for his testimony as well as all documents that he considered but will not rely upon for his testimony. The defendants object to this production because they are concerned [*6] that the word "considered" is open to abuse.

> 1   Technically, under the provisions of Fed. R. Civ. P. 26(b)(4)(A), the defendants would have to obtain the permission of the court to seek any expert discovery beyond interrogatories. However, the plaintiffs have apparently consented to allowing some document production, leaving the issue of the scope of such discovery.

Bio-Rad Laboratories, Inc. v. Pharmacia, Inc. 130 F.R.D. 116 (N.D.Cal. 1990), cited by the defendants, is not at odds with the plaintiffs' position. In that case, the court held that an expert could be deposed as to facts and opinions developed in preparation for a case without seeking permission from the court pursuant to Fed. R. Civ. P. 26(b)(4)(A)(ii). Id. at 125. That court did not hold that a blanket waiver occurs as to all privileged documents that an employee doubling as an expert witness has had access to during the course of his employment. Intermedics, Inc. v. Ventritex, Inc., 139 F.R.D. 384 (N.D.Cal. 1991) [*7] is also consistent with the plaintiffs' position. In that case, the court held that a party could discover protected communications made by an attorney to an expert witness. The court did not address the issue of an employee receiving a privileged communication before being designated an expert witness. It confined its analysis to communications made in anticipation of litigation.

This court is persuaded by the position taken by the plaintiffs. The defendants shall have access to all documents considered by Ferguson, whether rejected or relied upon. "Considered" applies to all documents Ferguson reviewed in preparation for his expert testimony. However, privileged documents that Ferguson has had access to during the life of the '832 patent, but not considered by him as a basis for his expert testimony, shall remain

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 61 of 67

Page 3

1992 U.S. Dist. LEXIS 20640, *; 25 U.S.P.Q.2D (BNA) 1304

privileged, and not discoverable. In sum this court finds that the naming of an employee as an expert does not result in a blanket waiver of all privilege with respect to every document that the employee has had access to during the course of his employment. The waiver only applies to those documents which the employee considered when formulating his expert testimony.

[*8] C. *Discovery of patent prosecutions.*

As part of their defense to this infringement action, the defendants assert that the *'832 patent* is unenforceable due to the plaintiffs' alleged inequitable conduct. Specifically, the defendants allege that the prosecution of a Spanish patent prior to the *'832 patent* without notification to the U.S. Patent Office constitutes the withholding of material information. In their opposition to the defendants' motion for summary judgment on this issue, the plaintiffs submitted declarations by Ferguson and William A. Wright, the attorney who conducted the prosecution of the '832 and related patents, denying knowledge of the materiality of the Spanish patent or any intent to deceive the U.S. Patent and Trademark Office.

The defendants argue that the submission of these declarations injects the particular person's state of mind into the litigation, effectively waiving all privileges pertaining to prosecution histories of the *'832 patent* and all related foreign patent prosecutions. The plaintiffs acknowledge the waiver of some portion of the attorney-client privilege, but dispute the scope of such a waiver. Their position is that by submitting [*9] the two declarations, they have only waived the attorney-client privilege as to three issues: 1) communications relevant to the issuance of the Spanish patent; 2) the alleged materiality of the Spanish patent to the United States prosecution; and 3) the alleged intent on the part of either the inventors or attorney Wright. (Plaintiffs' Opposition, July 17, 1992, p.4:23-25.) At the hearing on this motion, the plaintiffs agreed to produce their complete Spanish prosecution file. However, they maintained their position that there has not been a complete waiver of the attorney-client privilege with respect to documents pertaining to the prosecution of the *'832 patent* or other foreign patent applications.

The parties cite no direct authority that would guide this court in its determination of the scope of the waiver in this context. Consequently, this court must extract principles from other cases that will lead it to an equitable resolution of this issue.

When a party voluntarily waives the attorney-client privilege, the waiver extends to all communications pertaining to the subject matter of the communication. *In Re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 809 (D.C.Cir. 1982).* [*10] In this case, the subject matter of the waiver is the intent of the inventors and Mr. Wright

with respect to their representations before the U.S. Patent and Trademark Office and whether they knew that the Spanish patent was material to the *'832 patent* application.

This court finds that communications initiated during the prosecution of the *'832 patent* are relevant to these two issues. Rarely will there be direct evidence of a party's intent to deceive or mislead the U.S. Patent and Trademark office. *Halliburton Co. v. Schlumberger Technology Corp., 925 F.2d 1435, 1442 (Fed.Cir. 1991).* Such intent must frequently be determined from the facts and circumstances of the patent prosecution. Furthermore, in determining the materiality of prior art, one must know the scope of the patent being prosecuted. Consequently, all communications pertaining to the *'832 patent* prosecution fall within the subject matter of the inventors' and Mr. Wright's intent as well as their knowledge of the materiality of the Spanish patent to the *'832 patent.*

With respect to other foreign patent prosecutions, this court finds that the plaintiffs have also waived their attorney-client [*11] privilege. Such prosecutions fall within the subject matter of the materiality of the Spanish patent to the *'832 patent* due to the foreign patents' similarity to the Spanish patent. The plaintiffs must produce any documents previously withheld as privileged that pertain to the prosecution of foreign patents similar to the Spanish patent.

III. CONCLUSION.

Based on the foregoing, the defendants' motion to compel further answers to interrogatories is GRANTED. The plaintiffs must stipulate to contents of their opposition brief as being responsive to enumerated interrogatories. The plaintiffs must also supplement those interrogatories affected by the new definition of "heat stable."

The defendants' motion to compel production of documents relating to Ferguson's expert testimony is DENIED. The plaintiffs need only produce those documents that Ferguson considered.

Finally, the defendants' motion to compel production of previously withheld documents is GRANTED. The plaintiffs must produce all attorney-client communications pertaining to the Spanish patent prosecution, the *'832 patent* prosecution, and all other foreign patent prosecutions based on the same technology as the Spanish [*12] patent.

Compliance with this order must occur within 30 days.

IT IS SO ORDERED.

Dated: August 21, 1992

1992 U.S. Dist. LEXIS 20640, *; 25 U.S.P.Q.2D (BNA) 1304

PHYLLIS J. HAMILTON                    UNITED STATES MAGISTRATE JUDGE

Page 1

LEXSEE 1989 US DIST LEXIS 14245



Cited
As of: Jan 30, 2008

**W.L. GORE & ASSOCIATES, INC. and GORE ENTERPRISE HOLDINGS, INC.
v. TETRATEC CORP. and JOSEPH A. DILLON**

Civil Action No. 89-3995

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1989 U.S. Dist. LEXIS 14245; 15 U.S.P.Q.2D (BNA) 1048*

November 27, 1989, Decided; November 28, 1989, Filed

**COUNSEL:** [*1] Murray S. Levin, Esq., PEPPER, HAMILTON & SCHEETZ, Philadelphia, Pennsylvania.

David H. Pfeffer, Esq., MORGAN & FINNEGAN, New York, New York.

William J. Maledon, Esq., MEYER, HENDRICKS, VICTOR, OSBORN & MALEDON, Phoenix, Arizona.

*PRO HAC VICE,* DAVID HPFEFFER, Janet Dore, William J. Maledon, Brett L. Dunkelman, John S. Campbell.

Gerald Denworth, Esq., NORTH & BARRON, Phoenix, Arizona.

*PRO HAC VICE* - GERALD D.W. NORTH, EDWARD R. GLADY, JR.

*ALL DEFTS,* Robert C. Heim, Esq., DECHERT PRICE & RHOADS, Philadelphia, Pennsylvania.

**OPINION BY:** NAYTHONS, Magistrate

**OPINION**

*MEMORANDUM AND ORDER*

EDWIN E. NAYTHONS, UNITED STATES MAGISTRATE

Plaintiffs, W.L. Gore & Associates, Inc. and Gore Enterprise Holdings, Inc. (collectively "Gore"), initiated this action alleging patent infringement by the defendants, Tetratec Corp. and Joseph A. Dillon (collectively "Tetratec").

Presently before this Court is plaintiffs' motion to compel discovery pursuant to *Federal Rule of Civil Procedure 37(a).* For the reasons set forth hereafter, plaintiffs' motion shall be granted in part and denied in part.

*BACKGROUND*

On May 19, 1989, plaintiffs filed their Complaint and served defendants Tetratec [*2] with Plaintiffs' First Request For Documents. On July 5, 1989, Tetratec served its responses with objections to plaintiffs' document requests. On July 14, 1989, after receiving Tetratec's responses, plaintiffs sent a letter to Tetratec challenging the objections to the request for documents. After a series of communications between the parties, Tetratec withdrew some of the objections to the document requests. *See,* Brief In Support of Plaintiffs' Motion to Compel, at "Exhibit 3."

Despite continuing communications, the parties have been unable to agree on many of Tetratec's objections with plaintiffs' document requests. On October 5, 1989, plaintiffs filed their motion to compel discovery alleging that Tetratec had objected to or had delayed producing the documents relating to nineteen of the twenty-one document requests served. [1] On October 31, 1989, after receiving some of the requested documents from Tetratec, plaintiffs withdrew their motion with respect to fourteen of the nineteen document requests in dispute. [2] Plaintiffs now ask this court to compel Tetratec to make full and complete production of all documents responsive

1989 U.S. Dist. LEXIS 14245, *; 15 U.S.P.Q.2D (BNA) 1048

to plaintiffs' Document Request Nos. 5, 11, 14, [*3] 19 and 21.

> 1    Plaintiffs asserted that Document Request Nos. 11, 19, and 21 had been objected to on insufficient grounds. Additionally, plaintiffs contended that Tetratec had been dilatory with respect to complete production of documents responsive to Document Request Nos 1-5, 7-9, 12-18, and 20.

> 2    Having received the documents responsive to plaintiffs' Document Request Nos. 1-4, 7-9, 12, 13, 15-18, and 20, plaintiffs' have withdrawn their motion with respect to these requests. See, Reply Memorandum In Support Of Plaintiffs' Motion To Compel, at 2.

## DISCUSSION

In opposition to plaintiffs' motion to compel discovery, Tetratec argues that plaintiffs violated Local Rule 24(f) which provides that no discovery motion may be filed unless it appears that "the parties, after reasonable effort, are unable to resolve the dispute." Tetratec contends that there has been a lack of cooperation on the part of the plaintiffs in attempting to resolve the present matter. Tetratec argues that given this alleged lack of cooperation, as well as Tetratec's willingness to compromise and to produce [*4] the requested documents as quickly as possible, plaintiffs' motion should be dismissed pursuant to Local Rule 24(f).

This Court finds that the parties have made a reasonable effort to resolve the dispute over plaintiffs' production requests. See, Brief in Support of Plaintiffs' Motion to Compel, "Exhibits 1-6". Therefore, there was no violation of Local Rule 24(f), and I will rule on plaintiffs' motion to compel.

Plaintiffs' Document Request No. 5 asks Tetratec to produce "[a]ll documents referring or relating to sales or offers to sell by Tetratec of porous PTFE film or sheeting, including but not limited to invoices, purchase orders, shipping records, sales journal entries and call and/or service reports." See id. "Exhibit 1", at 4. In responding to this Document Request, Tetratec objected that the request was overbroad and unduly burdensome. However, Tetratec now states that the balance of the documents requested in Request No. 5 has been produced. See, Defendants' Memorandum in Opposition to Plaintiffs' Motion, at 2. Tetratec therefore argues that plaintiffs' motion is moot with respect to Request No. 5.

Plaintiffs at this point are uncertain if Tetratec has produced [*5] the documents responsive to Request No. 5 because Tetratec failed to identify the documents by request number or other recognizable category. See, Reply Memorandum in Support of Plaintiffs' Motion, at 2.

Federal Rule of Civil Procedure 34(b) states in pertinent part: "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Thus, Rule 34(b) does not require that the documents be produced in correspondence with the categories contained in the document requests. Rather, the documents may also be produced as "kept in the usual course of business." Fed.R.Civ.P. 34(b).

In the present matter, if it has not already done so, Tetratec is ordered to produce the documents which are responsive to Request No.5 as they are kept in the usual course of business or organized to correspond with the categories in the plaintiffs' document request, at Tetratec's option.

Document Request No. 14 requests that Tetratec produce "[a]ll documents relating to, referring [*6] to or containing calculations of, the rate of stretch used by defendants and/or anyone else during the stretching of PTFE-containing materials." See, Brief in Support of Plaintiffs' Motion, "Exhibit 1", at 8. Again, Tetratec objected that the request was overbroad and was not reasonably calculated to lead to the discovery of admissible evidence. See id. However, Tetratec now claims that plaintiffs' motion is moot with respect to Document Request No. 14 because "Tetratec has no documents reflecting calculations of the rate of stretch used by defendants in connection with any process used for the manufacture of any porous PTFE product." See, Defendant's Surreply Memorandum in Opposition to Plaintiffs' Motion, at 2.

It has been brought to this Court's attention that the parties have come to an agreement on an acceptable definition of porous PTFE products" for discovery purposes. See, Brief in Support of Plaintiffs' Motion, at 4. This Court presumes that Tetratec has responded to Plaintiffs' Request No. 14 consistantly with the definition of "porous PTFE products" agreed upon by the parties, and, therefore, Plaintiffs' motion is moot with respect to Request No. 14.

Document [*7] Request No. 11 requests Tetratec to produce

[a]ny and all opinions from counsel and any and all documents referring to or embodying opinions from counsel relating to infringement and/or non-infringement and/or validity and/or invalidity of either or both of U.S. Patent No. 3,953,566 and 4,187,390 and/or any claim of one or both of them.

See id., "Exhibit 1", at 6. Defendants objected to Request No. 11 on the grounds that the Request seeks

Case 1:04-cv-01494-JJF    Document 294-2    Filed 01/31/2008    Page 65 of 67

Page 3

1989 U.S. Dist. LEXIS 14245, *; 15 U.S.P.Q.2D (BNA) 1048

documents protected by the attorney-client privilege and work product immunities.

Plaintiffs' motion with respect to Request No. 11 seeks to compel Tetratec to produce documents containing opinions of counsel which are protected by the attorney-client privilege. In the alternative, plaintiffs assert that if Tetratec claims the attorney-client privilege now, then Tetratec waives its right to use such privileged evidence at trial. Thus, plaintiffs' argument is premised on a waiver theory.

Tetratec responds that if it decides to rely upon any privileged documents at trial, the documents will be produced with sufficient time to avoid any surprise to the plaintiffs. Thus, the dispute here is not whether the subject-matter is privileged, [*8]  but rather, whether Tetratec must declare now whether it is claiming or waiving the privilege.

It is well-settled that a client may intentionally or unintentionally waive his privilege by disclosure of some privileged communication, *see Haymes v. Smith, 73 F.R.D. 572, 577 (W.D.N.Y. 1976)*, or by asserting reliance upon advice of counsel as an essential element of his defense. *See, e.g., TWA v. Hughes, 332 F.2d 602, 615 (2d Cir. 1964), cert. denied, 380 U.S. 248 (1965); Donovan v. Fitzsimmons, 90 F.R.D. 583 (N.D. Ill. 1981); Panter v. Marshall Field Co., 80 F.R.D. 718 (N.D. Ill. 1978)*. In such situations the client waives the privilege with respect to the subject-matter of the advice disclosed or asserted as a defense. *Smith, supra*, at 979; *Panter, supra, at 721*.

The 'waiver' principle applies to work product immunity as well as to the attorney-client privilege. Thus, where a party asserts the advice of counsel as an essential element of its defense, work product immunity, like [*9]  attorney-client privilege, is waived with respect to the subject of that advice. *See, e.g., Donovan, supra, at 588; Panter, supra, at 725. See also*, 4 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, para. 26.64(4) (2d Ed. 1984).

This United States Magistrate concludes that Tetratec must elect now or at a date to be fixed in the near future whether to disclose the information or be precluded from introducing the privileged evidence at trial. *See Gaull v. Wyeth Laboratories, 687 F.Supp. 77, 83 (S.D.N.Y. 1988)*. Tetratec is free to choose to stand behind its attorney-client privilege and the work product immunity, and refuse to produce the opinions of its counsel. If privileged material is to be used at trial, however, the plaintiffs must be allowed to examine the privileged documents in order to conduct pre-trial discovery. *Id. at 83. See also American Standard Inc. v. Pfizer Inc., 828 F.2d 734 (Fed. Cir. 1987)*.

Plaintiffs' Document Request No. 19 requests Tetratec to produce all documents relating to waterproof, breathable fabrics. Tetratec objected to this request on the [*10]  grounds that the Request was vague and indefinite with respect to the terms "breathable" and "waterproof." Plaintiffs argue that Tetratec's objection "flies in the face" of Tetratec's own use of those terms in its advertising and in its Complaint in Civil Action No. 89-4014.

*Rule 34(b) of the Federal Rules of Civil Procedure* states in pertinent part: "The Request shall set forth the items to be inspected either by individual item or by category, and describe each item and category with reasonable particularity." Designation by category is sufficient, therefore, and the categories themselves need be defined only with reasonable particularity. The question is whether a reasonable man would know what documents or things are called for. 4A J. Moore, *supra*, at para. 34.07. *See In re IBM Peripheral EDP Devices Antitrust Litigation, 77 F.R.D. 39 (N.D. Cal. 1977); Mallincrodt Chemical Works v. Goldman, Sachs & Co., 58 F.R.D. 348 (S.D.N.Y. 1973)*.

In the present matter, Tetratec is correct in stating that there is no precise meaning of the terms "breathable" [*11]  and "waterproof." All, or at least most fabrics are "breathable" to a certain extent and "waterproof" to a certain degree. *See*, Defendants' Memorandum in Opposition to Plaintiffs' Motion, at 6.

Plaintiffs argue that Tetratec obviously knew the meaning of the disputed terms when it advertised its product. However, although Tetratec's own sales literature used the two disputed terms, that does not mean that the plaintiffs' definitions of those terms as used in Request No. 19 are necessarily the same as Tetratec used them. At this point Tetratec has produced all documents that *refer* to "breathable and waterproof" fabrics. *See* id. at 5. Moreover, despite the fact that Tetratec requested from plaintiffs a definition of the terms as used in Request No. 19, so that Tetratec could respond, plaintiffs chose not to give such a definition.

Though only reasonable particularity is required in the phrasing of Requests for Documents, *see Fed.R.Civ.P. 34(b)*, something more is required than the vague phraseology used here. Tetratec's objection will be sustained. *Cf. Struthers Scientific & Int'l Corp. v. General Foods Corp., 45 F.R.D. 375, 382 (S.D. Tex. 1968);* [*12]  *Webster Motor Car v. Packard Motor Car, 16 F.R.D. 350 (D.D.C. 1954), aff'd, 243 F.2d 481 (D.C.Cir.), cert. denied, 355 U.S. 822 (1957)*.

Document Request No. 21 seeks "all documents evidencing costs, expenses, overhead and profits of defendant Tetratec Corp." *See*, Brief in Support of Plaintiffs' Motion, "Exhibit 1", at 11. Tetratec objected that the

Page 4

1989 U.S. Dist. LEXIS 14245, *; 15 U.S.P.Q.2D (BNA) 1048

request was overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Tetratec further argues that discovery of defendants' profits is unnecessary and impermissible and, it cites *Thomas Industries, Inc. v. Wagner Spray Tech. Corp., 619 F.Supp. 1280, 1287 (E.D. Wis. 1985)* (motion to compel discovery of alleged infringer's profits denied.)

Tetratec's objection to this Document Request is overruled. *Federal Rule of Civil Procedure 26(b)(1)* states that "(p)arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim [*13] or defense of the party seeking discovery or to the claim or defense of any other party. . ." In construing the scope of *Rule 26(b)(1)*, the Court in *Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 124 (M.D.N.C. 1989)*, stated that:

Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978)*. Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. As a result, discovery rules are to be accorded broad and liberal construction. (emphasis added)

*35 U.S.C. § 284*, which governs the award of damages for patent infringement, provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and [*14] costs as fixed by the court." *Section 284* does not mandate how the district court must compute a reasonable royalty, only that the figure compensate for the infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)*; *Dura Corp., supra*, at 898. The methodology of assessing and computing damages under *35 U.S.C. § 284* is within the sound discretion of the district court. *TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 898 (Fed. Cir. 1986)*; *Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268, 275 (Fed. Cir. 1985)*; *King Instrument Corp. v. Otari Corp., 767 F.2d 853, 863 (Fed. Cir. 1985), cert. denied, 475 U.S. 1016 (1986)*.

It has been held that a reasonable royalty is the amount that " a person, desiring to manufacture [,use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make [,use, or] sell the patented article, in the market, at a reasonable profit." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978)* (citing *Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978, 984 (6th Cir. 1938))*; [*15] *Trans-World*

*Manufacturing Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984)*. Among the factors to be considered in determining that amount is the infringer's anticipated profit from use of the patented invention. *Al Nyman & Sons, supra, at 1568*; *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), mod., 446 F.2d 295 (2d Cir.), cert. denied, 404 U.S. 870 (1971)*. See *Deere & Co. v. International Harvester, 710 F.2d 1551 (Fed. Cir. 1983)*. Evidence of the infringer's actual profits generally is admissible as probative of the alleged infringer's anticipated profits. *Al Nyman & Sons, supra, at 1568*; *Locklin v. Switzer Brothers, Inc., 235 F.Supp. 904, 906 (N.D. Cal. 1964)*. See *TWM Mfg Co., supra, at 895 (Fed. Cir. 1986)*.

Therefore, given the broad and liberal construction that the discovery rules are to be accorded, *see Marker, supra, at 124*; *Oppenheimer Fund, supra*, and given the discretion of the district court in assessing and computing [*16] damages under *35 U.S.C. § 284*, see *Dura Corp., supra, at 898*; *Yarway, supra, at 275*; *Otari Corp., supra, at 863*, plaintiffs' motion to compel full and complete production of all documents responsive to Request No. 21 is granted.

Tetratec further argues that even if plaintiffs' Request No. 21 is somehow relevant, it is overbroad because it seeks Tetratec's financial documents from the date that the company began operating until the present day. Tetratec contends that it is only Tetratec's actual profitability before the alleged infringement, and its expected future profitability at that time, that is relevant. *See*, Defendants' Memorandum in Opposition to Plaintiffs' Motion, at 8.

Tetratec is correct in stating that a reasonable royalty is established on the date the alleged infringement begins. *Dura Corp., supra, at 899*; *Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1079 (Fed. Cir. 1983)*; *Paduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978)*. [*17] However, since plaintiffs allege that Tetratec began its infringing activity from the beginning of the company (1981-82), *see*, Reply Memorandum in Support of Plaintiffs' Motion, at 8, Tetratec's objection is overruled.

An appropriate Order follows.

*ORDER*

AND NOW, this 27th day of November, 1989, upon consideration of Plaintiffs' Motion to Compel Discovery, it is hereby ORDERED that:

1. Said motion is Granted with respect to Document Request No. 5 only to the extent that the documents responsive to the Request were not produced as they are

1989 U.S. Dist. LEXIS 14245, *; 15 U.S.P.Q.2D (BNA) 1048

kept in the usual course of business or organized and labeled to correspond with the categories of the Request.

2. Said motion is Denied with respect to Document Request Nos. 14 and 19.

3. Said motion is Granted with respect to Document Request No. 11 to the extent that defendant must elect now or at a date to be fixed in the near future whether to disclose the documents responsive to the Request or be precluded from introducing the privileged evidence at trial.

4. Defendants must make full and complete production of all documents responsive to Document Request No. 21.

5. Plaintiffs' request for oral argument is denied in accordance [*18] with Rule 20(F) Local Rules of the U. S. District Court, Eastern District of Pennsylvania.